## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MARK ANDREWS,

     Plaintiff,

     v.

DINESH D'SOUZA, TRUE THE
VOTE, INC., CATHERINE
ENGELBRECHT, GREGG PHILLIPS,
D'SOUZA MEDIA LLC, SALEM
MEDIA GROUP, INC., REGNERY
PUBLISHING, INC., AND JOHN
DOES,
     Defendants.

Case No. 1:22-cv-04295-SDG

---

### BRIEF IN SUPPORT OF DEFENDANTS TRUE THE VOTE'S, CATHERINE ENGLEBRECHT'S AND GREGG PHILLLIPS' MOTION TO DISMISS

Defendants True the Vote, Inc., Catherine Engelbrecht, and Gregg Phillips (collectively "TTV Defendants") file this Brief in Support of their Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 27) (the "FAC") (Plaintiff being Mark Andrews) on the grounds that the First Amended Complaint fails to state a claim upon which relief can be granted.

### I. Introduction.

Plaintiff asks this Court to do something no court has ever done: to punish speech, about news and reporting of significant public interest, that through attenuated and circuitous means is alleged to have contributed to *third parties'* intimidating a plaintiff. For the Court to create such a precedent on this issue of first impression would

1

create a chilling effect on speech, like installing a defective pacemaker in the heart of our republic.

At its core, Plaintiff's FAC is a complaint of defamation, of speech. Plaintiff does not allege that the TTV Defendants interfered with his voting rights by threatening him with or doing him harm, or threatening his employment, or evicting him from their land. Indeed, as we shall see, Plaintiff does not allege the TTV Defendants even knew of his identity, spoke to him as an individual, or rendered him identifiable to others. Historically actionable intimidation comes in the more clearly identifiable form of defendants committing or threatening violence directly against a known plaintiff[1], economically coercing a known plaintiff[2], or communicating the prospect of adverse

---

[1] In *United States v. Wood,* 295 F.2d 772 (5th Cir. 1961), the plaintiff prevailed where a courthouse official beat a black SNCC volunteer in front of black residents trying to register to vote. In *United States v. Original Knights of the K.K.K.*, 250 F. Supp. 330 (E.D. La. 1965), the court granted an injunction against defendants who directed violence, threats, harassment, and economic coercion against black citizens for the purpose of deterring their registering to vote. In *Paynes v. Lee*, 377 F.2d 61 (5th Cir. 1967), the Court of Appeals held the district court erred in dismissing a claim that white defendants threatened a black man who tried to register. *See also United States v. Clark*, 249 F. Supp. 720 (S.D. Ala. 1965) (granting injunction against local officials who engaged in "baseless arrests" and "unjustified prosecutions" against black citizens seeking to vote and volunteers); *United States by Katzenbach v. Original Knights of the K.K.K.*, 250 F. Supp. 330 (E.D. La. 1965) (granting injunction against defendants who directed violence, threats, harassment, and economic coercion against black citizens for the purpose of deterring their registering to vote).

[2] In *United States v. Beaty,* 288 F.2d 653 (6th Cir. 1961), white landowners' direct-to-plaintiff economic coercion of evictions and boycotts of black tenant farmers merited an injunction where the purpose was to interfere with their voting rights. In *United States v. Deal*, 6 Race Rel. L. Rep. 474 (W.D. La. 1961), the court granted a restraining order against business owners who refused to gin cotton, sell goods or services, or

legal consequences for a known plaintiff.[3] Plaintiff does not even allege the TTV Defendants engaged in another activity subject to anti-intimidation litigation in recent years, that of observing him (or following, photographing, or taking down his license plate number)[4]

Plaintiff here makes an altogether different claim, one of first impression among the voting statutes' anti-intimidation cases. Even among the few anti-intimidation cases

---

engage in ordinary business transactions with black farmers who attempted to register to vote. In *United States v. Bruce*, 353 F.2d 474 (5th Cir. 1965), the government stated a valid claim where white landowners had ordered a black defendant, an insurance collector active in encouraging voter registration, to stay off their property, for reasons clearly having to do with his voter registration activity.

[3] In *United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967), the plaintiff prevailed because local officials conducted "baseless arrests and prosecutions" against both black citizens seeking to register to vote and voter registration volunteers. In *United States v. Wood,* 295 F.2d 772 (5th Cir. 1961), the plaintiff prevailed in part due to defendants conducting baseless arrests and prosecution of a volunteer. In *United States v. Clark*, 249 F. Supp. 720 (S.D. Ala. 1965), the court granted an injunction against local officials who engaged in "baseless arrests" and "unjustified prosecutions" against black citizens seeking to vote and volunteers. In *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 222-23 (2d Cir. 2001), the Second Circuit concluded that an employer's statement to his employee that if the employee continued requesting accommodations for her disability, he would address her behavior "through legal channels" could constitute an unlawful threat or intimidation in violation of the Americans with Disabilities Act.

[4] *See, e.g., Democratic Nat'l Comm. v. Republican Nat'l Comm.* (D.N.J. 1982) (Civ. No. 81-3786) (ordering consent decree favorable to DNC following (1) RNC's compilation of inaccurate voter caging list and announcement through news media that it would be used to challenge voters; and (2) RNC's deployment of individuals dressed as police officers to polls); *Daschle v. Thune,* CIV 04-4177 (D.S.D. Nov. 2, 2004) (granting temporary restraining order prohibiting individuals acting on behalf of defendant candidate from following Native American voters to the polls or copying the license plate numbers of Native American voters driving to or from the polls).

that have survived summary proceedings in the voting context to date, none has featured such an attenuated relationship between defendants' protected speech and a plaintiff's alleged intimidation. In this case, Plaintiff alleges as follows:

- **A Charged Political Context**. The TTV Defendants were engaged in public speech on matters of civic interest, as they have been for more than a decade.
- **Impersonal and Incidental Speech About a Video Image that Turned Out to be of Plaintiff**.
    - There is no allegation the TTV Defendants were speaking to or directing speech at Plaintiff; rather, they are alleged to have simply *narrated* a documentary film concerning a matter of intense public concern and civic interest (as edited by others).
    - The TTV Defendants said things not *to* Plaintiff but *about* activities in a video by unidentified and unidentifiable persons not known to them, of whom Plaintiff was but one.
    - There is no allegation Defendants knew Mark Andrews' identity, and they did not speak *about* – and could not have conspired to violate the rights of – anyone they knew to be Mark Andrews.
- **No Intimidating Speech.** The TTV Defendants are not alleged to have made statements Plaintiff could reasonably regard as serious threats or efforts to intimidate Plaintiff.
- **Third Parties Identified Plaintiff**. Following the TTV Defendants' core public speech about matters of civic interest and scrutiny.
- **Third Parties Intimidated Plaintiff**. Following the TTV Defendants' core public speech about matters of civic interest and scrutiny, *third parties not before the Court* made the only statements plausibly alleged to have intimidated or threatened Plaintiff.

Claiming the TTV Defendants' allegedly defamatory speech is somehow connected to Plaintiff's voting or not voting, Plaintiff improperly asks the Court to carve out an exception to the TTV Defendants' First Amendment protections under two anti-intimidation statutes related to voting. It is a creative argument, but one ultimately far too attenuated for this Court to create a precedent that would chill the speech of combatants in the public square who must fear what *third parties* will do with (1) their

core protected speech, that is (2) not specially targeting a known or identifiable person but is instead (3) made pursuant to legitimate, lawful activities.

## II. <u>The TTV Defendants' Protected Speech Incidentally Touching Upon an Unidentifiable Plaintiff is Subject to Strong First Amendment Protections.</u>

Beginning with the very first paragraph of his FAC, Plaintiff makes clear that the context of the TTV Defendants' speech, alluding at times to his unidentified video image, is high-octane advocacy on a matter of intense public interest. Immediately, Plaintiff invokes the charged context of the disputed 2020 election, claims of voter fraud, and the January 6 attack on the Capitol, s*ee* FAC ¶1, and already we are deep in the territory of core protected speech. The FAC establishes the purely broad and notably impersonal, context of Defendants' speech as it came ever so briefly to touch – through editing and publication largely by others – on video images of an unidentified Plaintiff. Plaintiff states that:

- The TTV Defendants have concerned themselves with election integrity since at least 2012, when "a TTV leader declared at a national summit preparing for the 2012 presidential election: 'I'm not being over the top here: I fear the Obama gang is setting themselves up to steal the elections, if possible,'" *id.* ¶194, and when Defendant Engelbrecht appeared on the news program "Nightline" to discuss the same issues, *id.* 195.
- The TTV Defendants, through their speech, are "architects and amplifiers" of a particular political narrative about the 2020 election. *Id.* ¶3.
- The TTV Defendants, through their speech, have raised questions about ballot-trafficking. *Id.*
- The TTV Defendants, in their speech, were promoting a narrative around the same issues via the "2000 Mules" film. *Id.* ¶4.

- The "Defendants" published[5] "an accompanying book", also titled *2000 Mules*. *Id.*
- Defendants made dramatized statements in the film, such as Defendant D'Souza's saying, "What you are seeing is a crime. These are fraudulent votes." *Id.* ¶7.
- There was "a law enforcement investigation" based on the Defendants' speech about matters of public concern. *Id.* ¶8.
- A former president has involved himself in the same political narrative. *Id.* ¶12.

Plaintiff also makes clear the overtly controversial context of the TTV Defendants' speech as a routine part of a clean-elections mission decidedly not focused on Plaintiff: "Defendant True the Vote, LLC [sic] . . . is a 501(c)(3) nonprofit organization" that "purports to engage individuals to monitor voters to ensure election integrity." *Id.* ¶19 (internal quotations omitted). And Plaintiff makes clear that Defendant Engelbrecht "has made many media appearances promoting *2000 Mules* and the 'mules' theory." *Id.* ¶21. The FAC itself tells us Defendant Phillips "has served on TTV's board of directors" and concedes that Defendant Phillips has been engaged in "develop[ing] the research and methodology used to identify the so-called 'mules'" and that he "has made many media appearances promoting *2000 Mules*" and discussing "claims of mass ballot fraud." *Id.* ¶22 (internal quotations omitted). The rest of the FAC proceeds similarly, detailing what are irrefutably arguments made by the TTV Defendants, in the public square and as part of a decade-old organizational mission,

---

[5] This is one of many examples of Plaintiff's problematic group pleading. Just as the TTV Defendants had no role in editing the "2000 Mules" film (that is not what "executive producers" do), the publicly available video clip of Plaintiff, or the promotional videos, they had no role in publishing the book *2000 Mules.*

about matters of obviously significant public interest.

## A. The TTV Defendants Made Statements About "Mules" in "2000 Mules."

Plaintiff claims all the Defendants here accused him (specifically, his unidentified image on publicly available surveillance footage) and other "mules" of involvement in criminal activity, *id.* ¶¶7, 39, and, drawing from publicly available video surveillance footage used in the film "2000 Mules" and its trailer, that they showed images of an unidentifiable Plaintiff "as an exemplar 'mule.'" *Id.* ¶¶10, 38, 41. However, none of the individuals in the Defendants' publications is named, identified, or readily recognizable. Plaintiff's own pleadings make clear that Defendants Salem Media and Regnery took steps to de-identify all individuals included in the film and to avoid depicting them in any identifiable way, including by blurring their images in publications made by Defendants. ¶¶ 38- 39, 74, 150.

## B. Defendants Discussed Mules Generally While Footage of a Blurred Unidentifiable Plaintiff was Edited by Others to Appear Alongside.

Plaintiff next engages in improper group pleading to say "Defendants" "included the footage of Mr. Andrews voting in their 'official' trailer for *2000 Mules*." *Id.* ¶45. (Plaintiff does not specifically and plausibly allege the *TTV* Defendants had any role in creating or editing the trailer). "In the trailer," the FAC says, "D'Souza asks, 'do you have video evidence?' of the alleged mules engaged in criminal conduct. Phillips replies: 'four million minutes of surveillance video,' as Mr. Andrews' image (with his face blurred) is shown." *Id.* Plaintiff then again improperly pleads that all "Defendants

included in the trailer the following dialogue from the film discussing the purported

mules (including Mr. Andrews)", and Plaintiff then provides that dialogue, paired with

the video content, including statements that the activity is not legal (Engelbrecht) and

is organized crime (Phillips). *Id.* ¶46. Plaintiff alleges that "the Defendants" shared the

(blurred) film trailer in media channels. *Id.* ¶¶ 47-48, 53, 63-64, 69, 151-155.

### C. Several TV Shows Featured Footage of a COVID-masked and Unrecognizable Plaintiff as the TTV Defendants Discussed "Mules" in General.

Plaintiff claims, in error, that the TTV Defendants themselves somehow "twice

showed an excerpt of Mr. Andrews voting without any blurring of his face on *The*

*Charlie Kirk Show*, which Defendant Salem Media produces," *id.* ¶49-52, though

Plaintiff rightly refrains from expressly alleging the TTV Defendants had any role in

providing the clip or deciding not to blur his (still unrecognizable) image. The Court

may take judicial notice that the clip that features Plaintiff shows him (1) at a

considerable distance, (2) masked and (3) possibly wearing dark sunglasses (the area

around his eyes is in any event pixelated and not discernable), so that even without

blurring, he is unrecognizable.[6]  The same is true of Plaintiff's image on *Tucker*

*Carlson,* where Plaintiff is one of about 72 unidentified people featured in the clip

---

[6] *See* https://rumble.com/v10ajh2-how-the-did-it-true-the-votes-catherine-engelbrecht-and-gregg-phillips-on-t.html at 25:08-25:46 and 50:52-50:55.

shown.[7] *Id.*, ¶56.

Plaintiff alleges that on "Truth Matters [sic] with Roman Balmakov*,*" the TTV Defendants implied criminal activity on the part of ballot-traffickers in general, and that show producers showed video clips of alleged ballot-traffickers, again, in general, *id.* ¶¶66-68 (stating *Facts Matter with Roman Balmakov* "showed the TTV clip[8] of Mr. Andrews voting (with his face blurred) as they explained the purported illegal 'mules' scheme"[9]), but it's clear Plaintiff's *blurred* and cropped image, which lasted for under a second, is not only unidentifiable but that he is one of *hundreds* of voters shown on the 51-minute episode's voluminous B-roll. As an example, here is Plaintiff's unblurred and unrecognizable image from the *Charlie Kirk* show:

---

[7] *See* https://www.facebook.com/watch/?v=1381334499041217&ref=sharing at :31-:55 (accessed January 11, 2023).

[8] Plaintiff inexplicably refers to the publicly available surveillance footage of him as "the TTV clip". But the Court may take judicial notice that the footage came from CCTV surveillance footage provided by Gwinnett County. Plaintiff does not claim the TTV Defendants had any role in editing any of the video referred to in the FAC. The clip may no more be said to be "TTV's" than any other entity's.

[9] *See* https://www.truethevote.org/the-epoch-times-interview-about-who-is-funding-the-ballot-mules/ at 38:17 (Plaintiff appears for a fraction of a second, image of head cropped, masked face blurred).



**D. The Rest of the TTV Defendants' Statements**

The TTV Defendants are alleged to have published a Facebook post featuring a third-party's rap song about "mules" featuring two video clips of an *unidentified* Plaintiff's *blurred* image, for about one second in each[10]. *Id.* ¶162. Defendants also posted a video titled "This is not the end: We're about to pull the ripcord,"[11] about releasing their research, in which a flicker of Plaintiff's blurred image is shown so briefly as to be not just unrecognizable but easy to miss entirely. *Id.* ¶64. The TTV Defendants are alleged as well to have posted on social media calls to "watch the [ballot] boxes," *id.* ¶225, which in no way refer to Plaintiff.   None of these actions could have plausibly intimidated a reasonable person, let alone one, like Plaintiff, never alleged to have seen these statements in the first place.

---

[10]  *See* https://www.facebook.com/watch/?v=3304988439758013 at :32 and 1:40 (accessed January 11, 2023).

[11]  See https://www.facebook.com/watch/?v=335770281958423 at :16 (accessed January 11, 2023).

Aside from their sharing social media posts about the same content, we have now reached the extent of Plaintiff's claims alleging intimidation on the part of the TTV Defendants. The TTV Defendants were not by Plaintiff's own admission involved in third parties' identification of Plaintiff in a public hearing or third parties' social media posts.

### E. The State of Georgia, Not the TTV Defendants, Identified Plaintiff.

Notably, though Plaintiff alleges he is one of over a dozen people featured in "a series of twelve clips of voters depositing absentee ballots in drop boxes," *id.* ¶40, and that Defendant Phillips claims he has "four million minutes of surveillance video," *id.* ¶45, and though he is one of 72 people visible in the video used by *Tucker Carlson*, Plaintiff does not allege that any other person in all that footage has ever been identified. The sole difference between Plaintiff and the dozens of parties not alleging intimidation here? The State of Georgia held a public proceeding about Plaintiff.

The FAC itself tells us so. It states that after "a Georgia resident named David A. Cross filed a complaint against Mr. Andrews with the Georgia Bureau of Investigations (GBI) asserting the same false allegations of ballot fraud in *2000 Mules*," ¶84, an investigator used the complaint's "screenshots of Mr. Andrews voting, as well as Mr. Andrews' vehicle and license plate number"[12] (¶85) "to locate and

---

[12] The Court may confirm that the clip of Plaintiff used on the TV shows cited by Plaintiff used a resolution and video inlay size that makes it impossible to read his license plate numbers even with video enhancement. Plaintiff's plate number can only be made out using higher resolution video at 4K from

identify Andrews." FAC at p.34 n.67. On May 17, 2022, the Georgia State Elections Board (SEB) then held "a public meeting", "open to the public and live streamed on the internet," in which they identified Mr. Andrews and "a GBI investigator publicly and unequivocally refuted the allegations." ¶91. The dismissal of the case "received media coverage in local and national publications." ¶95. In short, the TTV Defendants played no part in the key link in Plaintiff's chain of supposedly foreseeable causation.

### F. Third Parties Made Allegedly Intimidating and Threatening Statements to or About "Mules" – and a Still-Unnamed Plaintiff.

For 155 paragraphs over 67 pages, Plaintiff's FAC omits any mention of speech or actions by the TTV Defendants that could plausibly be meant to allege intimidation of or threats against Plaintiff. In Paragraph 156, however, Plaintiff begins his attempt to suggest that the TTV Defendants are liable for what amounts to stochastic intimidation, apparently because they knew or should have known third parties would direct intimidating or threatening speech toward a Plaintiff the Defendants had never identified or made identifiable:

> *As a foreseeable and intended result* of Defendants' coordinated press tour to promote *2000 Mules*, others have repeated their claims and publicized Mr. Andrews' image in concert with these false allegations.

*Id.* ¶156 (emphasis added); *see also* ¶198 (similar). In a clear case of First Amendment

---

the original Gwinnett County source. An example of that higher resolution may be found here: https://www.awesomescreenshot.com/video/8567926?key=afc1054464e337f9291b60ca5d7fd620.

overbreadth, Plaintiff is seeking to hold the TTV Defendants liable for any "foreseeable" consequences of allegedly negligent speech. Accordingly, Plaintiff compiles a list of what may be people (or third parties' bots), *not before the Court*, who posted on social media various statements relating to alleged "mules", and *occasionally* used unidentifiable images of a Plaintiff they do not name. In many cases, Plaintiff complains that *still other* people (or bots) made further attenuated comments on the posts of the original third parties or bots:

- "***Arizona lawmakers***" called on vigilantes to monitor and record voters. In response, ***vigilantes*** held 'mules'-inspired 'tailgate parties' where they monitored, recorded, and questioned voters at drop boxes in Arizona, which led to confrontations during the primary and general elections, during which voters described being intimidated." ¶199 (emphasis added; Plaintiff not featured).
- "At a *2000 Mules* screening at Mar-a-Lago, ***former President Trump*** called on attendees to 'do something' about the purported stealing of the 2020 election." TTV shared the statement on its website. Defendant D'Souza has posted similar calls to action . . ." *Id.* ¶200 (emphasis added; Plaintiff not featured).
- "***Numerous social media users*** have posted or shared threats on social media, including ones threatening to 'arrest,' assault, or kill 'mules' . . ." *Id.* ¶201 (emphasis added). "Many of these posts include Mr. Andrews' image along with white supremacist references, and promote Defendants' narrative that Mr. Andrews is a criminal and a treasonous "mule'." *Id.* ¶202 (emphasis added; Plaintiff not identifiable).
- "***One social media user*** posted that he was 'watching' voters on election day, and that he voted wearing a Defendant Phillips shirt and an 'Arrest the Mules' bracelet." *Id.* ¶203 (emphasis added; Plaintiff not featured).
- "***a Twitter post*** stating, 'Arrest the mules!'" *Id.* ¶205 (emphasis added; Plaintiff not featured).
- "***Some social media posts*** have actually placed images of the alleged 'mules' on mock 'WANTED' posters." *Id.* ¶206 (emphasis added; Plaintiff not featured).
- "***one website*** in particular created digital billboards with the word 'busted' superimposed on a screenshot from the movie of Andrews submitting ballots

for himself and his family and suggests that Andrews was 'hired to illegally dump ballots into ballot boxes.'" *Id.* ¶207 (emphasis added; Plaintiff not identifiable).

- "***numerous social media posts*** repeating the 'mules' narrative have called for physical violence against those falsely depicted in Defendants' film as 'mules,' some of which have used Mr. Andrews' image." *Id.* ¶208 (emphasis added; Plaintiff not identifiable).

- "***one social media user*** posted TTV's clip of Mr. Andrews voting alongside an explanation of the 'mules' theory. . . . ***Comments*** on these posts include threats to have the 'mules' 'forcibly amputated from the country and sent somewhere else en masse,' and proclamations that the 'mules' should be arrested, 'face a firing squad,' or receive 'Bullets to Mules Heads.'" Others "have also assured 'mules' through ***social media comments*** that 'we're coming after you.'" *Id.* ¶209 (emphases added; Plaintiff not featured).

- "***a user*** posted a video on the video-sharing platform Rumble that included the TTV clip of Mr. Andrews. The ***comments*** on the video suggest that Defendants' followers want to track down the 'mules' who they believe should be hanged, 'executed,' 'die,' or face incarceration." *Id.* ¶210 (emphases added; Plaintiff not identifiable).

- ***Other people***, assuming they are not bots, have made similar statements, or comments on statements. *Id.* ¶211 (allegedly with Plaintiff's image, but still unidentifiable).

- "***a Twitter user*** posted photos of flyers posted on the streets of Tucson, Arizona, that stated: 'You cannot stop the revolution! We have just begun! We are watching you, Mules.' Another sign that appeared to be from the same group included an image of a person behind jail bars and threatened: 'Ballot drops get cell blocks. We are watching you.'" *Id.* ¶228 (emphasis added; Plaintiff not featured).

The TTV Defendants strongly condemn the preceding threats of violence and calls for unjustified and even extrajudicial arrests. But the FAC does not allege any of these potentially intimidating or threatening statements – many of which do not even feature Plaintiff or his identifiable characteristics at all – were made by the TTV Defendants. Nor, critically, does Plaintiff allege that he even saw these statements – a crucial omission even for Plaintiff's desired negligence standard.

Perhaps because any of these statements, taken alone, would be difficult to remedy under Plaintiff's stated causes of action, Plaintiff has attempted to hang responsibility for all these statements on all the Defendants, collectively, as if the sheer accumulation of threats by third parties could make Defendants liable. It is no coincidence that only after this deluge of statements by people (or bots) not before the Court does Plaintiff make his extended case, over the course of 12 pages in Paragraphs 212-224 and 229-249, that he was intimidated about voting. (Though Plaintiff did vote in 2022. *See* FAC ¶¶234, 236, 239.)

### III.     TTV Defendants' Speech on Matters of Significant Public Interest, With Only Highly Attenuated Impact on Plaintiff, is Protected by the First Amendment.

A motion to dismiss under Rule 12(b)(6) should be granted unless the complaint contains "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "[f]actual allegations must be enough to raise a right to relief above the speculative level," and "labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

Plaintiff alleges the TTV Defendants' speech may be proscribed because, in addition to being defamatory, it "violates both Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), and Section 2 of the Ku Klux Klan Act, 42 U.S.C. §1985(3), because their actions threatened and intimidated Mr. Andrews for exercising his right to vote and caused injury to him because he exercised his right to vote." FAC, ¶ 15.

But Plaintiff alleges the TTV Defendants threatened and intimidated him, as we have said, in a most unusual manner, one that could again be described with precision only as stochastic intimidation: it was third parties who identified Plaintiff, and it was yet other third parties who made statements to or about him that Plaintiff alleges to have been intimidating. Plaintiff's effort to stretch the definitions of "intimidate" or "threaten" to encompass the TTV Defendants certainly runs afoul of the First Amendment. *See Mills v. Alabama*, 384 U.S. 214, 218-19 (1966) ("there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs ... [including] discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes").

**A. VRA Section 11(b) Arguably Does Not Create a Private Cause of Action.**

Section 11(b) of the VRA does not, as it must, expressly authorize private enforcement, much less relief.   The overwhelming majority of Section 11(b) cases have been filed by the Attorney General.   In those far fewer cases brought by private parties, the courts either did not address the question, or, as in *Wohl* and *LULAC*, failed to apply the Supreme Court's accepted standard for private rights of action outlined in *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001); *see In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021) (deeming *Sandoval* "our lodestar").

A private right of action may not be implied. "[P]rivate rights of action to enforce federal law must be created by Congress," so "[t]he judicial task is to interpret the

statute...to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander*, 532 U.S. at 286. Section 11(b) does not express congressional intent to create a private right or a private remedy. Its language says "[n]o *person* . . . shall", which means it "is directed to the regulated party [the "person"], not the party to be protected". Thus, under Supreme Court precedent, it does not "confer any new right on voters." *Schilling v. Washburne*, 592 F. Supp. 3d 492, 498 (W.D. Va. 2022).

"Statutes that focus on the *person* regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289 (emphasis added). "Nor do the methods that [it] goes on to provide for enforcing its authorized regulations manifest an intent to create a private remedy; if anything, they suggest the opposite." *Id*. Indeed, "the statute expressly delegates enforcement authority to the Attorney General," to the exclusion of a private remedy. *Schilling*, 592 F. Supp. 3d at 498; *Love v. Delta Air Lines*, 310 F.3d 1347, 1353 (11th Cir. 2002) ("If th[e] statutory structure provides a discernible enforcement mechanism, *Sandoval* teaches that we ought not imply a private right of action.").

Controlling precedent "demand[s] clear evidence of congressional intent as a prerequisite to a private right of action," *Wild*, 994 F.3d at 1255, and the text of VRA § 11(b) forecloses any claim Congress intended to provide a private right of action. Such clear evidence is lacking here.

**B. Plaintiff Seeks to Chill Core Speech Concerning Civic Affairs Lacking Either Direct Threat or Intimidation.**

The government may not restrict speech on the basis of its content except in well-recognized areas. *United States v. Alvarez*, 567 U.S. 709, 716 (2012). "Among these categories; speech integral to criminal conduct; so-called 'fighting words'; child pornography; fraud; true threats; and speech presenting some grave and imminent threat the government has the power to prevent ...." *Id.* at 717 (citations omitted). False statements are not categorically excluded from First Amendment protection. *See Alvarez*, 567 U.S. at 718-22 (plurality); *id.* at 732-37 (Breyer, J., concurring). "Although false statements that discourage people from exercising the right to vote could conceivably be exempted from First Amendment protection altogether, the Supreme Court has not crafted such an exemption." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 478 (S.D.N.Y. 2020).

In *Watts v. United States*, 394 U.S. 705 (1969), which articulated the doctrine of "true threats", the Court found the statement "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." qualified as "political hyperbole". "Political hyperbole" is not a true threat, the Supreme Court held, even when "crude," "abusive, and inexact." *Id.* 708.

The facts here do not at all align with the *direct* intimidation and threats contemplated in the anti-intimidation statutes and the caselaw. Both Section 11(b) and the Support and Advocacy Clause of Section 1985(3) require a plaintiff to allege that

a defendant did, or attempted to, intimidate or threaten the plaintiff "for voting or attempting to vote" or "aiding" any person to do the same (11(b)) or that two or more defendants did "conspire to prevent" the plaintiff "from giving his support" to a federal political candidate by "intimidation, or threat" (1985(3)). While there are differences between the statutes – 1985(c) requires greater scienter and a conspiracy – both proscribe "intimidation" and "threats" designed to interfere with a plaintiff's voting rights.[13]

In deciding what is covered by the terms "intimidate" and "threaten," the Court must begin with the plain meaning of the statutory language. The definitions in Webster's Third New International Dictionary, the dictionary most commonly cited by the Supreme Court, are what one would expect. To "intimidate" means "to make timid or fearful; inspire or affect with fear; frighten, especially to compel to action or inaction (as by threats)." A "threat" is "an expression of an intention to inflict evil, injury, or damage on another, usually as punishment for something done or left undone." To "threaten" also means to "utter threats against" or "promise punishment, reprisal, or other distress."

Here, Plaintiff does not plausibly allege the TTV Defendants, by merely narrating the activities of an unidentified and unidentifiable person on video clips,

---

[13] The FAC makes no pretense of claiming Plaintiff was "*coerced* for voting or attempting to vote", under Section 11(b). Indeed, there are no allegations using the term "coerce."

thereby reasonably made him timid or fearful, inspired fear in him, or frightened him to compel any particular action or inaction. Nor does Plaintiff plausibly allege the TTV Defendants expressed an intention to "inflict evil, injury, or damage," including "as punishment." Judge Jones of the Northern District of Georgia recently rejected a similarly attenuated challenge under the Voting Rights Act. Referring to the social media postings by third parties in *Fair Fight et al. v. True the Vote et al*, he noted that those postings did not show that "*Defendants* have intimidated or threatened voters in violation of Section 11(b)." *Fair Fight et al. v. True the Vote et al.*, 2:20-CV-00302-SCJ, Order of Jan. 1, 2021, at 27 (emphasis in original). Judge Jones explained that "without clearer connections borne out by evidence," "[h]ow third-party actors react to Defendants' actions is not directly attributable to Defendants." *Id.*

The closest case to Plaintiff's may be *League of United Latin American Citizens (LULAC) v. Public Interest Legal Foundation (PILF)*, No. 18-cv-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018). In *LULAC*, the defendants *themselves* published reports they titled "Alien Invasion", which claimed that registered Virginia voters were committing voting-related felonies. In the 2017 report, the defendants *themselves* made public the names, home addresses, and telephone numbers of the plaintiffs and other private individuals. That is, unlike in the instant case, *LULAC* involved Defendants who *themselves* doxed identifiable parties, and then directly threatened them too. Similarly, in *United States v. Nguyen*, 673 F.3d 1259, 1265 (9th Cir. 2012), where the Ninth Circuit concluded there was "sufficient" basis for a jury to conclude that a mass

mailing constituted unlawful "intimidation" under California law, the defendants had directed their speech in a targeted way at the plaintiffs, and directly threatened harmful things would happen to them.

### C. No Reasonable Person Would Perceive the TTV Defendants as Making a Real Threat.

Importantly, Plaintiff does not allege that Defendants made threats against Plaintiff. And as noted above, Plaintiff does not even allege that he *saw* the third-parties' social media posts. If he had alleged the former, that might make relevant a discussion about whether the "true threats" exception to the First Amendment applies in this instance, allowing us to go further. But Plaintiff's claim is considerably more circuitous: Plaintiff alleges that the TTV Defendants first said *defamatory* things about an image of him that was not reasonably identifiable, without speaking to him or identifying him, and that *other actors not before the Court* subsequently identified Plaintiff by using the license plate number visible in county-provided surveillance video, and still others made threats against him.    Yet nowhere does Plaintiff plead the existence of a clear causal connection between any particular defendant's statement and those third-party threats. Plaintiff has not made a plausible allegation of threat or intimidation capable of surviving a motion to dismiss. Accepting Plaintiff's interpretation here, per the Supreme Court, "would create an unacceptable risk of the suppression of ideas." *Black*, 538 U.S. at 365 (internal citation omitted). The Supreme Court expressed particular concern in situations where, as here, an interpretation of

"intimidation" may be "relatively weak," while there may be other, permissible purposes – such as the ideological – to the defendants' speech. *Id*. at 366. We address the anti-intimidation caselaw's exemption of speech (or even actions) made pursuant to legitimate activities next.

### D. Because Defendants' Speech Was a Legitimate Part of a Core Civic Purpose Not Focused on Plaintiff, Plaintiff's VRA and KKK Claims Must Be Dismissed.

Even if Plaintiff's claims were not unconstitutionally overbroad, seeking such chilling liability for such attenuated impact, they would fail because Plaintiff himself makes clear the TTV Defendants had a legitimate rationale for their lawful activity. That is, because any alleged intimidation was clearly incidental to the TTV Defendants' legitimate activities, and not directed toward the Plaintiff's voting rights, Plaintiff's efforts to muzzle Defendants are proscribed by the First Amendment.

Where, as here, it is evident even from the pleadings on their face that defendants did what they allegedly did for reasons other than to intimidate a plaintiff, and where there is, as here, no other evidence of an effort to intimidate the plaintiff, courts have denied relief under Section 11(b), as they do in treating textually similar Section 131(b) intimidation claims. For example, in *United States v. Bd. of Educ. of Greene Cnty., Miss.,* 332 F.2d 40 (5th Cir. 1964), addressing § 131(b), the Fifth Circuit found no abuse of discretion in denying a preliminary injunction where the defendant school district had refused to rehire a Black teacher due to her uncooperative behavior and involvement in unrelated litigation, rather than to interfere with her right to vote. In

*United States v. Harvey*, 250 F. Supp. 219 (E.D. La. 1966), the district court denied an injunction under both § 131(b) and § 11(b) against white landowners who had evicted Black tenant farmers, because there was no evidence the evictions were for the purpose of voter intimidation, while the landowners did have legitimate reasons for evicting the tenants.

In *United States v. Leflore Cnty.*, 371 F.2d 368 (5th Cir. 1967), the Fifth Circuit affirmed summary judgment dismissing a § 131(b) claim on grounds that, in prosecuting a group of black citizens for disturbing the peace, the county had been justifiably enforcing its criminal law, not seeking to intimidate voters. In *United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967), the Fifth Circuit held the district court did not err in denying a § 131(b) claim that surveillance of meetings intimidated voters, where there was evidence of defendants' legitimate motive to preserve order. In *AFSCME Council 25 v. Land*, 583 F. Supp. 2d 840, 846 (E.D. Mich. 2008), the district court denied an application for an injunction under both § 131(b) and § 11(b) against state and local officials who had issued a directive prohibiting union members from wearing election-related paraphernalia to polls, because the plaintiff did not offer any evidence the directive was issued for the purpose of interfering with the right to vote.

Here, there can be no reasonable dispute that Plaintiff was incidental to the TTV Defendants' broader protected activities. As the FAC itself makes clear, the TTV Defendants were not actively focusing on Plaintiff and whether he voted in the future. Rather, the FAC is full of recitations of the TTV Defendants' focus on their own

mission of election integrity, including providing information to the media and their co-defendants about their geo-tracking project, some of which their co-defendants edited into the "2000 Mules" film; promoting the "2000 Mules" film; and speaking with the media about the broader election issues that mattered to them, as they have done, without Plaintiff, since 2010. Where a party's engagement in critical civic activity incidentally has an inhibiting or intimidating effect upon the exercise of a protected right, "the unfortunate incidental effect may not be grounds for setting aside or enjoining the otherwise justifiable activity." *Leflore Cnty.*, 371 F.2d at 371. The TTV Defendants here had not only a very different focus, unrelated to Plaintiff, but one that implicates matters of great public interest, as well as their own free speech. And the TTV Defendants' First Amendment rights merit even more protections than those scrutinized in the cases discussed above, where the defendants themselves, not third parties, directly engaged in the allegedly intimidating behavior.

## IV. **Plaintiff Fails to Allege with Specificity Either the KKK Act's Requisite Intent or the Existence of an Agreement to Conspire to Violate His Rights.**

Plaintiff's Section 1985(3) claim is even weaker, because that section requires particularized allegations – entirely missing here – that the defendants intended to intimidate a plaintiff regarding his voting specifically, and that they got together to conspire specifically to do so.

### A. The Support and Advocacy Clause of Section 1985(3) Requires an Intent to Intimidate and Interfere with Voting Rights Not Included Here.

"The operative language in the KKK Act targets those who 'conspire to prevent by force, intimidation, or threat, any citizen' from voting. The description of a conspiracy to prevent voting suggests a deliberate attempt to interfere with voting rights." Ben Cady & Tom Glazer, "Voters Strike Back: Litigating against Modern Voter Intimidation," 39 N.Y.U. Rev. L. & Soc. Change 173 (2015).[14] "Thus, KKK Act claims require a level of intentionality greater than section 11(b)." *See Arizona All. for Retired Americans v. Clean Elections USA,* No. CV-22-01823-PHX-MTL, 2022 WL 15678694, at *6 (D. Ariz. Oct. 28, 2022). It is not enough that a conspiracy "has an effect upon a protected right," as Plaintiff's narrative would have it. Rather, "its impairment must be a conscious objective of the enterprise." *Bray*, 506 U.S. at 275.

In short, plaintiffs "must show proof that the purpose or intent of Defendants' conspiracy was to intimidate or threaten voters" about engaging in voting in federal elections. *Id.* As we have made clear above, Plaintiff alleges no such thing, claiming only that the TTV Defendants engaged in promotional activities and that third parties allegedly intimidated him. Nor does Plaintiff allege the TTV Defendants specifically intended to interfere with his voting. Indeed, Plaintiff does not allege the TTV Defendants even knew who he was or expressed a desire that he either not vote or vote

---

[14]  *See* https://socialchangenyu.com/review/voters-strike-back-litigating-against-modern-voter-intimidation/ (last visited January 6, 2023).

differently. Plaintiff's allegation of conspiracy is textbook conclusory.

**B. Because Plaintiff Failed to Allege Specific Facts That the TTV Defendants Had a Meeting of The Minds About Him at All, Let Alone to Intimidate Him in Voting, His Conspiracy and KKK Act Claims Must Be Dismissed.**

Two of Plaintiff's claims – the KKK Act claim and the Civil Conspiracy claim – fail outright because Plaintiff has not properly pleaded a conspiracy. Plaintiff's conspiracy allegations (1) are impermissibly bare and conclusory, simply pronouncing "there was a conspiracy" without the required detail of who, what, when, where, and how a meeting of the minds occurred; (2) purport to infer a meeting of the minds through mere "parallel actions"; and (3) purport to satisfy both the conspiratorial agreement and overt act elements by listing the same promotional actions that are very much part of the core mission of the TTV Defendants and have an "obvious alternative explanation", that is, one not focused at all on Plaintiff.

In a KKK Act claim, courts apply general principles of conspiracy law, often looking to the elements of civil conspiracy for guidance. *See*, *e.g.*, *Bush v. Butler*, 521 F. Supp. 2d 63, 68 (D.D.C. 2007). Plaintiffs seeking relief under the Support or Advocacy Clause must establish both (1) the existence of a conspiracy and (2) the conspiracy's plan to use "force, intimidation, or threat" toward the plaintiff. The most important elements are an "agreement" or meeting of the minds between the parties to inflict a wrongful injury and an "overt act" in furtherance of that agreement's objective. *See Caldeira v. County of Kauai,* 866 F.2d 1175, 1181 (9th Cir.1989), *cert. denied,* 493 U.S. 817 (1989); *see also Lenard v. Argento,* 699 F.2d 874, 882–83 (7th

Cir.1983), *cert. denied,* 464 U.S. 815 (1983).

Plaintiff may not make "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). But Plaintiff's is exactly the sort of "threadbare claim" that "fails to allege enough facts to make a conspiracy plausible instead of just possible." *Knieper v. Forest Grp. USA, Inc.*, No. 4:15-CV-00222-HLM, 2016 WL 9449794, at *7 (N.D. Ga. Sept. 12, 2016), *order clarified*, No. 4:15-CV-00222-HLM, 2017 WL 3449601 (N.D. Ga. Jan. 23, 2017) (addressing Georgia civil conspiracy claims). "It is not enough to simply aver in the complaint that a conspiracy existed." *Fullman v. Graddick,* 739 F.2d 553, 556–57 (11th Cir.1984); *Shell v. U.S. Dep't Of Hous. And Urban Dev.,* 355 Fed. App'x 300, 307 (11th Cir.2009) (The plaintiff's "bare assertion that a conspiracy occurred [is] insufficient to state a claim."). A complaint "may justifiably be dismissed because of the conclusory, vague and general nature of the allegations of conspiracy." *Fullman,* 739 F.2d at 557 (citation omitted); *see also Bragg v. Bank of Am., N.A.*, No. 1:14-CV-564-WSD, 2014 WL 2154190, at *4 (N.D. Ga. May 21, 2014) (dismissing claim of conspiracy that relied on the "conclusory assertion that Defendants engaged in a 'conspiracy to defraud the Plaintiff'"), *appeal dismissed*, 11th Cir. 14-12670 (11th Cir. Nov. 5, 2014).

Tellingly, up to the point of trying to make out Plaintiff's cause of action for a violation of the KKK Act, over the course of 260 paragraphs, the FAC makes no allegations whatsoever of any agreement by Defendants (1) to form a conspiracy (2)

about Plaintiff (3) to intimidate Plaintiff specifically into not exercising his right to vote, or (4) even to intimidate similarly situated voters in general. Only once he's listed his Count I (1985(3) of the KKK Act) does Plaintiff belatedly lob several impermissibly conclusory claims that Defendants "conspired", or had an "agreement", "to intimidate and threaten Mr. Andrews—and innumerable other eligible voters—in order to deter him from engaging in support or advocacy on behalf of his preferred candidates for federal office by exercising his right to vote." FAC, ¶261. But Plaintiff does not and cannot explain how Defendants got together to form a meeting of the minds – the who, what, when, and where, about an unidentified and nameless person – in which the *what* is a plan to interfere with the voting rights of a known *who*.

In Plaintiff's key Paragraphs 261 and 262, we can see that Plaintiff's allegation of the existence of a conspiracy is simply speculation. "Defendants conspired with each other," Plaintiff begins, with a conclusion, "to intimidate and threaten Mr. Andrews". This, of course, is the very definition of a "bare" or "conclusory" assertion. Does Plaintiff go on to actually identify any agreement among the Defendants? He does not. He simply hopes the Court will infer the existence of a conspiracy from various statements and *parallel actions by Defendants* relating to their efforts to publicize their findings and the film, FAC, ¶¶262, 264 (KKK Act), 318 (state civil conspiracy), with video of Plaintiff, among others, appearing as an incidental part of legal activities in which the TTV Defendants had engaged for decades.

In Paragraph 264, Plaintiff turns to the impermissible speculation that the

conspiratorial "agreement" was "demonstrated by" – or should be inferred by this Court by – Defendants' acts of producing a movie, "launching" a media campaign for the movie, "appearing" on media, and publishing and promoting a book. FAC ¶264. In short, Plaintiff advises the Court to create precedent that a conspiratorial *agreement* may be inferred solely from the conspiracy's alleged *overt acts*, thus conflating two entirely separate requirements for making out a conspiracy. More troublesome still, Plaintiff's claim of "overt acts" encompasses lawful, quintessentially First Amendment activity in which everyone who produces a film or publishes a book engages.

This is not how conspiracies are pleaded. Plaintiff's narrative isn't remotely plausible: consider how spectacularly ineffectual such a conspiracy would have been, had it existed, where the video footage of Plaintiff takes up only seconds (in the film), in some cases milliseconds (in other footage), out of the hours of video in the film and Defendants' media appearances, and where Defendants ensure Plaintiff is unidentifiable, and never mention his name or any other identifying characteristics.

The "2000 Mules" movie is not about Plaintiff. It is a much broader piece of protected speech. Nor were the parties' promotional efforts directed toward Plaintiff; rather, they happened to feature publicly available video of an unidentifiable man along with other voters and a great deal of other content. The mere act of producing a large piece of speech, a film, and doing exactly what people do with films – promote it in the normal course of a PR campaign – cannot be said to "demonstrate", or infer, a meeting of the minds to intimidate Plaintiff, let alone to intimidate him regarding

voting.

### C. Plaintiff Does Not Allege with any Particularity a Plan to Intimidate Him from Voting.

Plaintiff here does not plead a true agreement, by each of the defendants, to intimidate him. *Cf. Wohl*, 498 F. Supp. 3d at 486-87. He also does not plead, with specificity, that the alleged conspirators "knew of the conspiracy" to interfere with his voting and adopted a goal or objective of engaging in this unlawful behavior of intimidating him. "Although an express agreement is not necessary, the participants in the conspiracy *must share the general conspiratorial objective*. It simply must be shown that there was a single plan, the *essential nature and general scope of which [was] known to each person* who is to be held responsible for its consequences." *Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995) (citations omitted); *see also Porter v. Bainbridge,* 405 F.Supp. 83, 91 (D.Ind.1975).

Here, Plaintiff pleads nothing that would indicate a shared "conspiratorial objective" of interfering with Plaintiff's vote. Plaintiff merely pleads an association among the defendants as contributors to a film and its promotion. But in the absence of specific evidence of conspiratorial agreement, the fact that defendants are associated in some manner cannot be used to prove the existence of a conspiracy. *See Moss v. Perkins,* 682 F.Supp. 395, 396 (N.D.Ill.1988); *see also Scott v. Greenville County,* 716 F.2d 1409, 1424 (4th Cir.1983) (rejecting the allegation that private citizens were liable for section 1985(3) conspiracy simply because they wrote letters and spoke at public

meetings in opposition to low-income housing in an effort to influence the County Council's actions, because there was "no joint plan of action"); *Ballinger v. North Carolina Agricultural Extension Service,* 815 F.2d 1001, 1006–07 (4th Cir.1987), *cert. denied,* 484 U.S. 897 (1987) (dismissing a section 1985(3) claim alleging conspiracy on the basis of age, because there was no direct or indirect proof of participation in any conspiracy).

### D. Plaintiff Alleges No More Than Lawful "Parallel Actions" by Defendants That Had "Obvious Alternative Explanations".

Plaintiff doesn't just fail to plead intimidation by someone other than third parties, or a definite meeting of the minds. Indeed, his alleged facts in support of a conspiracy by the Defendants merely recite parallel promotional activities with obvious alternative explanations and no plausible inference of coordinated conduct.

### 1. A Conspiracy Claim May Not be Based on Merely "Parallel Action" by Defendants.

The Supreme Court's standard for pleading a conspiracy in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007), applicable to conspiracies in general, is fatal to Plaintiff's conclusory claims of Defendants' parallel actions, because merely "lawful parallel conduct fails to bespeak unlawful agreement." *See also Am. Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283, 1294 (11th Cir. 2010). The plaintiffs in *Twombly* had alleged a conspiracy among certain regional telecommunications providers. Like Plaintiff's FAC here, their complaint contained only speculation that a meeting of the minds must have happened, somehow. They simply attempted to *infer* a conspiracy

through allegations of the defendants' parallel behavior. The Supreme Court upheld the dismissal of the complaint.

Here, Plaintiff fails to establish a context "that raises a suggestion" that a "preceding agreement" must have happened. *See Twombly*, 550 U.S. at 557. Instead, Plaintiff lists the sorts of promotional activities any party would engage in if it had a public-facing mission or was promoting a book or film. That is, Plaintiff pleads conspiracy via routine PR.

The Court in *Twombly* went on, describing exactly Plaintiff's allegations, saying parallel conduct, even where such conduct is "consciously undertaken" – *i.e.,* the full extent of Plaintiff's claims about Defendants' promotional activities – is not enough without "some setting suggesting the agreement necessary" and that merely parallel conduct is "much like a naked assertion of conspiracy" in that "it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief." *Twombly*, 550 U.S. at 557 (emphasis added).

What sort of parallel conduct might make out a claim for conspiracy? "Parallel conduct infers a conspiracy," for example, "where the plaintiff establishes that each defendant engaged in the parallel action *contrary to its economic self-interest," In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1297 (M.D. Fla. 2016) (emphasis added), or where each defendant adopted the same uniform price, in a way that would be all but statistically impossible absent an agreement, *Quality Auto*

*Painting*, 917 F.3d at 1263 (defendants' adoption of a "uniform" price suggests parallel conduct), or, worse, where the conspirators made "repeated, synchronous pricing decisions" over seven years, *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1304 (11th Cir. 2003).

### 2. The TTV Defendants' "Obvious, Alternative Explanation" for Their Activities Defeats Any Mere Inference of Collective Conduct.

Plaintiff's failure to plead a conspiracy claim goes beyond relying on lawful and uncoordinated parallel action. That's because Plaintiff himself provides an obvious alternative explanation for the TTV Defendants' promotional activities, which is their elections mission in general and their promotional appearances in particular. That alternative explanation renders implausible Plaintiff's bare inferences that Defendants unlawfully coordinated activities were somehow all about him and his voting.

Where, as here, there is an "obvious alternative explanation" for the collective actions alleged, one that suggests lawful, independent conduct, no unlawful conspiracy may be *plausibly* inferred. *See Twombly,* 550 U.S. at 568; *Iqbal,* 129 S.Ct. at 1951–52 (finding that though some of the plaintiff's allegations were "consistent with" purposeful discrimination, the complaint as a whole supported a plausible and legitimate motive by law enforcement officers to protect the nation from "suspected terrorists"); *Gibbs v. United States*, 865 F. Supp. 2d 1127, 1146 (M.D. Fla. 2012), *aff'd,* 517 F. App'x 664 (11th Cir. 2013); *see also Am. Dental Ass'n,* 605 F.3d at 1295 (rejecting conspiracy allegations of parallel conduct where there is an "obvious

33

alternative explanation").

Plaintiff pleads, in essence, a "conspiracy", or agreement, to produce and promote a movie – one that left him unidentifiable. He fails to plead with any particularity beyond the conclusory statement that Defendants had a meeting of the minds about him at all, let alone to intimidate him in order to influence his voting.

The activities of which Plaintiff complains, in short, are what all of the TTV Defendants engage in as part of their ordinary business in elections integrity. They have an obvious alternative explanation, which makes Plaintiff's speculations about such routine PR forming a conspiratorial agreement or the required "overt actions" simply implausible.

### V. Plaintiff Fails to State a Claim Against the True the Vote Defendants for Defamation (Count III).

Plaintiff's claims for defamation and defamation *per se* against the TTV Defendants fail as a matter of law for at least three reasons.

#### A. Defendants' Statements Constitute Protected Opinion Under Georgia Law and the First Amendment.

Defendants' statements are not actionable on the ground that they qualify for protection as expressions of opinion under both the First Amendment and Georgia law.

##### 1. Andrew's Claims of Injury by Opinion Are Not Actionable as A Matter of Georgia Law.

Because the statements charged against respective Defendants in Plaintiff's complaint are clearly expressing their respective opinions of Andrews' conduct in dropping off five ballots, they are not actionable as a matter of Georgia law. Under

Georgia law, a person "'cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperative the expressing of it may be. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.'" *Kendrick v. Jaeger,* 210 Ga. App. 376, 377, 436 S.E.2d 92, 93-94 (1993) (quoting *Bergen v. Martindale-Hubbell,* 176 Ga. App. 745, 747, 337 S.E.2d 770, 772 (1985) (citations and punctuation omitted)). Opinions are not defamatory - and therefore cannot be actionable as defamation - if they are expressed "on matters with respect to which reasonable men might entertain differing opinions." *Kendrick,* 210 Ga. App. at 377, 436 S.E.2d at 93 (citations omitted); *see also* Georgia Const., art. I, sec. I, Para. V ("Every person may speak, write, and publish sentiments on all subjects ...."); *Kirsch v. Jones,* 219 Ga. App. 50, 464 S.E.2d 4 (1995); *Collins v. Cox Enters., Inc.,* 215 Ga. App. 679, 452 S.E.2d 226 (1994); *Hylton v. American Ass'n for Vocational Instructional Materials, Inc.,* 214 Ga. App. 635, 448 S.E.2d 741 (1994); *Elder v. Cardoso,* 205 Ga. App. 144, 421 S.E.2d 753 (1992).

In *Collins,* for example, the Georgia Court of Appeals affirmed judgment on the pleadings for a defendant newspaper that had printed an editorial criticizing a candidate for public office. The editorial at issue stated that plaintiff hoped to "fool" voters by running for public office using a name similar to that of the governor. The court affirmed judgment on the pleadings in favor of the defendant on the ground that the editorial was "merely speculation as to [plaintiff's] motive based on his behavior ... a

matter about which reasonable people might differ." 215 Ga. App. at 680, 452 S.E.2d at 227. Similarly, in *Kirsch,* the court held non-actionable an attorney's assertion that another attorney had "bungled" a case and that if he "had any sense at all, he would not have touched the case with a ten foot pole," on the ground that the statements were "merely expressions of opinion and hyperbole about which reasonable people might differ and which cannot be proved true or false." 219 Ga. App. at 51, 464 S.E.2d at 6.

Following the Supreme Court's decision in *Milkovich v. Lorain Journal Co.,* 497 U.S. 1 (1990), which held that statements of opinion can be actionable only if they "contain a provably false factual connotation," *id.* at 19, the Georgia courts have joined other jurisdictions in recognizing a distinction between statements of opinion made on fully-disclosed facts, which are protected, and those opinions that imply undisclosed defamatory facts and therefore may be actionable. *See Jaillett v. Georgia Television Co.,* 238 Ga. App. 885, 890-91, 520 S.E.2d 721, 726 (1999); *Eidson v. Berry,* 202 Ga. App. 587, 588, 415 S.E.2d 16, 17-18 (1992). As the Georgia Court of Appeals held in *Jaillett:*

> The requirement that, to be actionable, a statement of opinion must imply an assertion of objective facts about the plaintiff "unquestionably excludes from defamation liability not only statements of rhetorical hyperbole ... but also statements clearly recognizable as pure opinion because their factual premises are revealed .... Both types of assertions have an identical impact on readers - neither reasonably appearing factual - and hence are protected equally under the principles espoused in *Milkovich.*" If an opinion is based upon facts already disclosed in the communication, the expression of the opinion implies nothing other than the speaker's subjective interpretation of the facts.

238 Ga. App. at 890, 520 S.E.2d at 726 (quoting *Phantom Touring v. Affiliated Publications,* 953 F.2d 724, 731 n. 13 (1st Cir. 1992)). The *Jaillett* court based its holding not only on the First Amendment but also on Section 566 of the Restatement (Second) of Torts, which provides that "'a statement of [opinion] is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.'" *See* 238 Ga. App. at 890-91, 520 S.E.2d at 726 (quoting Restatement (Second) of Torts, § 566, at 170). As the court further noted, the Restatement clarifies that "'[i]f the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of facts that are not defamatory, he is not subject to liability for the factual statement - nor for the expression of opinion, so long as it does not reasonably indicate an assertion of the existence of other, defamatory, facts that would justify the forming of the opinion.'" *Id.* (quoting Comment c to Restatement § 566).

In *Jaillett,* the Court of Appeals applied these rules to hold non-actionable the defendant's broadcast of a consumer affairs report in which both a news anchor and a consumer interviewee used the term "rip-off" in discussing plaintiffs air-conditioner repair services. The court held that in the context of the entire report, "a reasonable viewer would not have concluded that, by using the term 'rip-off,' [the anchor and consumer] were implying that they were aware of any additional defamatory facts not disclosed in the broadcast." 238 Ga. App. at 891, 520 S.E.2d at 726.

If an allegedly defamatory statement is "not ambiguous and can reasonably have but one interpretation, the question is one of law for the judge." *Thomason v. Times-*

*Journal, Inc.,* 190 Ga. App. 601,601,379 S.E.2d 551, 552 (1989); *Willis v. United Family Life Ins.,* 226 Ga. App. 661, 662, 487 S.E.2d 376, 379 (1997). Any statement "claimed to be defamatory must be read and construed in the sense in which the [viewers] to whom it is addressed would ordinarily understand it." *Southern Comp. v. Hamburg,* 220 Ga. App. 834, 838, 470 S.E.2d 467, 471 (1996). When evaluating the statement, the Court "should read and construe the [interview] as a whole," taking into consideration the context in which the statements were made. *Thomason,* 190 Ga. App. at 601, 379 S.E.2d at 552.

Here, there was no ambiguity at all with respect to the respective Defendants' statements of opinion and the facts on which they were based. Plaintiff alleges that he was libeled by comments that he was committing a crime on the observed basis that he was plainly putting ballots in the box that were not his own, but he seeks to interpret those words entirely out of the context in which they were uttered, which are based on the concurrently played video of Plaintiff doing just that. Not only did Defendants not claim any knowledge of other, non-disclosed facts about Andrews, but his specific identity was obviously unknown to any of the Defendants, and the comments were based solely on the video, which was fully disclosed as the basis for the opinions on the implication of Andrews' actions.

As noted above, under Georgia law "'a statement of [opinion] is actionable only if it implies the allegation of undisclosed *defamatory* facts as the basis for the opinion.'" *Jaillett,* 238 Ga. App. at 890-91, 520 S.E.2d at 726 (quoting Restatement (Second) of

Torts, § 566, at 170) (emphasis added). Thus, even without reaching the First Amendment issues to which we now turn, it is clear as a matter of Georgia tort law that Rivera's statement cannot be the subject of a libel judgment.

### 2. The Challenged Statements Constitute Protected Opinion Under the First Amendment.

The federal courts have sought to encourage free and open debate by providing "full constitutional protection" for "statement[s] of opinion relating to matters of public concern that do[] not contain a provably false factual connotation." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20 (1990); *see also Keller v. Miami Herald Publishing Co.,* 778 F.2d 711, 717 (11th Cir. 1985) ("[o]pinions are protected from defamation actions by the first amendment."). In applying this regime of constitutional protection, courts have distinguished between statements of opinion that merely imply the existence of undisclosed defamatory facts, which are actionable, and those that affirmatively disclose the facts on which the opinion is based. In *Keller,* this Court held that the expression in a political cartoon was protected by the First Amendment on the ground that it fell within the category of "pure opinion; that is, those opinions based on facts set forth in the communication or reasonably assumed to exist." 778 F.2d at 718.

Although *Keller* was a pre-*Milkovich* case, more recent cases in the opinion area make clear that the distinction between statements of opinion on disclosed versus implied facts has continued vitality after *Milkovich. See Standing Committee on Discipline v. Yagman,* 55 F.3d 1430 (9th Cir. 1995); *Phantom Touring v. Affiliated*

*Publications,* 953 F.2d 724, 731 n. 13 (1st Cir. 1992); *Jaillett v. Georgia Television Co.,*

238 Ga. App. 885, 520 S.E.2d 721 (1999). As the Ninth Circuit explained in *Yagman:*

> The rationale behind this rule is straightforward: When the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts. Moreover, "an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea"; readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts.... A statement of opinion of this sort doesn't "imply a false assertion of fact," and is thus entitled to full constitutional protection.

55 F.3d at 1439-40 (quoting *Redco Corp. v. CBS, Inc.,* 758 F.2d 970, 972 (3d Cir. 1985)

and *Milkovich,* 497 U.S. at 19) (other citations omitted).

Plaintiff has amply shown, in his FAC, that the film and its interpretation of the

facts researched and shown therein are matters of fierce debate about which there are

many opinions. Plaintiff wants the Court to stifle this debate and formulate an official

opinion, essentially a prior restraint on discussion generated by the film. However, the

Defendants' opinions on these fully disclosed facts are protected speech and Plaintiff's

defamation claims must be dismissed as a matter of law.

### B. Plaintiff's Allegations Show that the True the Vote Defendants Made No Statement "Of and Concerning" Plaintiff.

To establish the first element of a defamation claim – *i.e.,* a false and

defamatory statement "of and concerning" the plaintiff – "the allegedly defamatory

words or picture must refer to some ascertained or ascertainable person, and that

person must be the plaintiff." *Collins v. Creating Loafing Savannah, Inc.*, 264 Ga.

App. 675, 678 (2003); *Mathis v. Cannon*, 276 Ga. 16, 20-21 (2002). The plaintiff "has the burden of showing, *inter alia*, that the publication was about the plaintiff, that is, whether it was of and concerning [the plaintiff] as a matter of identity." *800 Mktg. Sols., Inc. v. GMAC Ins. Mgmt. Corp.*, 2008 WL 2777140, at *5 (M.D. Ga. July 14, 2008) (quoting *Smith v. Stewart*, 291 Ga. App. 86, 92 (2008)). "If the words or picture used really contain[] no reflection on any particular individual, no averment or innuendo can make them defamatory. An innuendo cannot make the person certain which was uncertain before." *Collins*, 264 Ga. App. at 678.

Plaintiff here does not (and cannot) allege that he is identified by name, that his face is shown, that the license plate of his vehicle is shown, or that he is otherwise identifiable in either the film or the book. To the contrary, Plaintiff affirmatively alleges that every time his image was shown in the film or the book, his face was completely blurred. (*See* Doc. 27 at ¶¶ 38-39, 45, 74.) Thus, any statements in the film or book were made solely in reference to an unidentified, anonymous, and obscured person. Although Plaintiff claims, implausibly, that Defendants Engelbrecht and Phillips were somehow responsible for *The Charlie Kirk Show* featuring an unblurred image of him, it is not clear if Plaintiff contends any of the statements made on that show are actionable in this case and, if so, who is responsible for them. (*Id.* at ¶ 49.) To the extent Plaintiff intended to assert a claim against the TTV Defendants based on any statements made on *The Charlie Kirk Show*, that claim would fail because the FAC does not allege Plaintiff was either identifiable on

the show or identified as a result of any such statements.

In short, there is nothing in the film or the book from which any viewer could identify Plaintiff. *See Fiske v. Stockton*, 171 Ga. App. 601, 602 (1984) (allegedly defamatory statements that did not name or identify plaintiffs and that, on their face, "really contain[ed] no reflection on any particular individual," were not actionable, despite the fact witnesses testified they knew the publication was about plaintiffs).

Like the illustration in *Collins*, the blurred image of Plaintiff in the film and book is not recognizable as Plaintiff without additional evidence. *Collins*, 264 Ga. App. at 678-679; *see also Eakin v. Rosen*, 2017 WL 5709564, at *3 (M.D. Ga. Nov. 27, 2017) (recognizing "the defamed person must be able to be identified through the words contained in the defamatory statement," not through "extrinsic" evidence). And, like the statements in *Fiske*, none of the statements in the film or book names or otherwise identifies Plaintiff. *Fiske*, 171 Ga. App. at 602; *see also Escort*, 2005 WL 8155369, at *6 (dismissing libel claims where plaintiffs did not, and could not, plead allegedly libelous directories "refer[] to them by name or that their names are immediately ascertainable to the average reader perusing these directories").

Because none of the statements or images in the film or book are "of and concerning" Plaintiff, his defamation claim against the TTV Defendants fails as a matter of law.

### C. Plaintiff's Claim for Defamation *Per Quod* Should Be Dismissed Because Plaintiff Failed to Plead Special Damages and Plaintiff is Not Entitled to Presumed Damages.

Under Georgia law, a "written defamatory statement may be actionable either as libel *per se* or libel *per quod*." *Eakin*, 2017 WL 5709564, at *3. The FAC appears to assert both. (*See* Doc. 27 at p. 117.) But even if Plaintiff could show any of the statements in the film or book are "of and concerning" him, the FAC fails to state a claim for defamation *per quod* because Plaintiff did not plead special damages.

"An essential element of an action for libel *per quod* is that the plaintiff be able to show special damages." *Zarach v. Atlanta Claims Ass'n*, 231 Ga. App. 685, 689 (1998). Special damages "must be the loss of money, or of some other material temporal advantage capable of being assessed in monetary value." *Id.* Moreover, a "heightened pleading standards applies to special damages, which must be specifically stated." *Eakin*, 2017 WL 5709564, at *5. Plaintiff does not specifically allege any financial or economic damage he has suffered as a result of any allegedly defamatory statements in the film or the book. Accordingly, Plaintiff's claim for defamation *per quod* fails as a matter of law. *See Zarach*, 231 Ga. App. at 689.

Further, given the unquestioned public interest in the subject matter and the book and film, Georgia law holds that Plaintiff is *only* entitled to special damages. As put by the Georgia Supreme Court in *Mathis v. Cannon*, 573 S.E.2d 376 (Ga. 2002) (emphasis added):

> At common law, libel was a strict liability tort that did not require proof of falsity, fault, or actual damages. Since the United States Supreme Court's decision in *New York Times Co. v. Sullivan*, the law of defamation has undergone substantial changes. The Restatement now

lists four elements in a cause of action for defamation: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the "actionability of the statement irrespective of special harm." When, as here, a libel action involves a speech of public concern, a plaintiff must show that the defendant published a defamatory statement about the plaintiff, the defamatory statement was false, the defendant was at fault in publishing it, and the plaintiff suffered *actual injury from the statements*.

Indeed, remedy for any injury actually incurred does not appear to be the goal of this lawsuit, but rather to attempt to discredit the Defendants, cause them expense in having to answer in litigation, and to serve as a warning to those who would raise such issues as are explored in the film and book. In short, it is a SLAPP suit. Because Plaintiff has not pleaded special damages *per quod* and is not entitled to damages *per se*, his claims of defamation must be dismissed as a matter of law.

### VI.  The FAC Fails to State a Claim Against the True the Vote Defendants for Invasion of Privacy by False Light (Count IV)

The True the Vote Defendants join the arguments of Salem and Regnery as set forth in DKT. 48; 48-1.

### VII.  The FAC Fails to State a Claim Against the True the Vote Defendants for Invasion of Privacy by Appropriation of Likeness (Count V)

The True the Vote Defendants join the arguments of Salem and Regnery as set forth in DKT. 48; 48-1.

### VIII.  Plaintiff's Invasion of Privacy Claims (Counts IV and V) Fail Because the Statements at Issue Involve a Matter of Public Interest

The True the Vote Defendants join the arguments of Salem and Regnery as set

forth in DKT. 48; 48-1.

**IX.    Plaintiff's Claims for Defamation, False Light, and Appropriation of Likeness (Counts III to V) Also Fail Because the Statements at Issue Are Privileged and Plaintiff Has Not Alleged Actual Malice**

The True the Vote Defendants join the arguments of Salem and Regnery as set forth in

DKT. 48; 48-1.

**X.    Plaintiff's Claim for Punitive Damages (Count VII) Fails**

The True the Vote Defendants join the arguments of Salem and Regnery as set

forth in DKT. 48; 48-1.

**XI.    CONCLUSION**

For the foregoing reasons, the True the Vote Defendants respectfully request

that the Court dismiss the FAC against them in its entirety, with prejudice.

Respectfully submitted this 6th day of February 2023.

/s/ *Molly Parmer*_____
MOLLY PARMER (GA Bar No. 942501)
PARMER LAW
1202 W. Peachtree Street, NW, Suite 2300
Atlanta, Georgia 30309
(404) 795-5060
molly@parmer.law

/s/ *Michael J. Wynne*_____
MICHAEL J. WYNNE* (TX Bar No. 785289)
CAMERON POWELL* (DC Bar No 459020)
JOSEPH R. LARSEN* (TX Bar No. 11955425)
GREGOR WYNNE ARNEY PLLC
909 Fannin Street, Suite 3800
Houston, Texas 77010
mwynne@gwafirm.com
cpowell@gwafirm.com

45

jlarsen@gwafirm.com

*Attorneys for Defendants True the Vote, Inc.,*
*Catherine Engelbrecht, and Gregg Phillips*

*\*Admitted Pro Hac Vice*

## RULE 7.1(D) CERTIFICATE

The undersigned counsel certifies that this document has been prepared with Times New Roman 14-point font in accordance with Local Rule 5.1.C.

This 6th day of February 2023.

/s/ *Molly Parmer*
MOLLY PARMER

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the within and foregoing **BRIEF IN SUPPORT OF DEFENDANTS TRUE THE VOTE'S, CATHERINE ENGELBRECHT'S AND GREGG PHILLIPS' MOTION TO DISMISS** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

This 6th day of February 2023.

/s/ *Molly Parmer*
MOLLY PARMER