# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

| | |
|---|---|
| **MARK ANDREWS,**<br><br>Plaintiff,<br><br>v.<br><br>**DINESH D'SOUZA, *et al.*,**<br><br>Defendants. | Case No. 1:22-cv-04259-SDG |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS SALEM MEDIA GROUP, INC. AND REGNERY PUBLISHING'S MOTION TO DISMISS AND DEFENDANTS DINESH D'SOUZA AND D'SOUZA MEDIA LLC'S MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iv

INTRODUCTION .................................................................................... 1

STATEMENT OF FACTS ........................................................................ 2

LEGAL STANDARD ............................................................................... 7

ARGUMENT........................................................................................... 7

I.    Mr. Andrews Has Stated A Claim Under Section 11(b) Of The Voting
      Rights Act (Count II).................................................................... 8

      A.    Section 11(b) Is Enforceable By A Private Right Of Action .............. 8

            1.    The Supreme Court And Lower Courts Have Repeatedly
                  Held That The Voting Rights Act Is Enforceable By
                  Private Rights Of Action........................................................... 9

            2.    Congress Has Repeatedly Ratified The Existence Of A
                  Private Cause Of Action Under Section 11 ............................ 11

            3.    *Sandoval* Militates In Favor Of An Implied Private Right
                  Of Action ................................................................................. 13

      B.    Mr. Andrews Has Pleaded All Elements Of A Section 11(b)
            Claim ........................................................................................... 17

            1.    Section 11(b) Does Not Require Any Showing Of
                  Defendants' Intent................................................................... 18

            2.    Mr. Andrews Has Standing....................................................... 21

            3.    Mr. Andrews Has Alleged That Defendants Engaged In
                  Unlawful Intimidation, Threats, Or Coercion........................ 26

II.   Plaintiff Has Stated A Claim Under The Klan Act's Support-Or-
      Advocacy Clauses, 42 U.S.C. § 1985(3) (Count I) ...................... 30

      A.    Mr. Andrews Has Pleaded All The Required Elements Of A
            Claim Under The Support-Or-Advocacy Clauses Of The Klan
            Act ............................................................................................... 31

            1.    Mr. Andrews Has Alleged A Conspiracy ................................ 31

            2.    Mr. Andrews Has Alleged That Defendants Undertook
                  Overt Acts In Furtherance Of The Conspiracy ....................... 36

i

B.    Defendants' Misstate The Elements Of Plaintiff's Klan Act Claim ................................................................... 37

    1.    Mr. Andrews Need Not Show Any Class-Based Animus ....... 38

    2.    Mr. Andrews Has Plausibly Alleged "Force, Intimidation, Or Threat" ......................................... 40

III.    Mr. Andrews Has Stated Claims For Defamation, False Light, And Appropriation Of Likeness (Counts III, IV, V) ........................................... 41

    A.    Mr. Andrews Has Stated A Claim For Defamation .......................... 41

        1.    Mr. Andrews Has Pleaded That The Statements At Issue Were "Of And Concerning" Him Even If His Face Was At Times Blurred ...................................... 42

        2.    Salem Defendants Are Liable For All Of The Defamatory Statements At Issue ............................. 45

        3.    Mr. Andrews Need Not Plead Special Damages, But Has Pleaded Them .......................................... 47

    B.    Mr. Andrews Has Sufficiently Alleged Actual Malice ..................... 47

        1.    All Defendants Republished And Refused To Retract Their Demonstrably False Statements About Mr. Andrews ................................................. 48

        2.    Defendants Knew Their Statements About Mr. Andrews Were False, Or Consciously Avoided Or Ignored The Truth .......................................... 49

        3.    Additional Circumstantial Evidence Supports An Inference Of Subjective Recklessness To Show Actual Malice .......................................................... 51

        4.    Defendants Had A Financial Motive To Make False Claims ................................................................. 53

        5.    Defendants' Statements Are Not Conditionally Privileged ..... 53

    C.    Mr. Andrews Sufficiently Alleges Invasion Of Privacy By False Light (Count IV) ................................................... 54

    D.    Mr. Andrews Sufficiently Alleges Invasion Of Privacy By Appropriation Of Likeness (Count V) ............................... 56

    E.    Mr. Andrews Sufficiently Alleges Civil Conspiracy (Count VI) ...... 58

IV.    Plaintiff Has Stated A Claim For Punitive Damages (Count VII) ............... 59

CONCLUSION.................................................................................................... 60

RULE 7.1(D) CERTIFICATE................................................................................ 63

CERTIFICATE OF SERVICE .............................................................................. 63

# TABLE OF AUTHORITIES

Page(s)

## CASES

*800 Mktg. Sols., Inc. v GMAC Ins. Mgmt. Corp.*,
    2008 WL 2777140 (M.D. Ga. July 14, 2008) ............................................. 44

*Ala. State Conf. of NAACP v. Ala.*, 949 F.3d 647 (11th Cir. 2020), *judgment*
    *vacated as moot on other grounds*, 141 S. Ct. 2618 (2021) ......................... 11

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ............................................................................... passim

*Allen v. State Board of Elections*, 393 U.S. 544 (1969) ......................... 9, 11, 12, 15

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger*,
    2022 WL 633312 (N.D. Ga. Feb. 28, 2022)................................................. 11

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. City of Miami*,
    637 F.3d 1178 (11th Cir. 2011) ..................................................................... 32

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) .......................................................................... 31

*Ariz. All. for Retired Ams. v. Clean Elections USA*,
    2022 WL 17088041 (D. Ariz. Nov. 1, 2022) ("*Arizona Alliance*") ...... passim

*Ariz. Dem. Party v. Arizona Repub. Party*,
    2016 WL 8669978 (D. Ariz. Nov. 4, 2016) ........................................... 10, 19

*Ark. State Conf. of NAACP v. Ark. Bd. of Apportionment*,
    586 F. Supp. 3d 893 (E.D. Ark. 2022) ......................................................... 11

*Assoc. Servs., Inc. v. Smith*,
    549 S.E.2d 454 (Ga. Ct. App. 2001) ........................................................... 55

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................... 31, 35

iv

*Bell v. Johnson Publ'g Co.,*
  2018 WL 357888 (M.D. Ga. Jan. 10, 2018)........................................... 43, 60

*Bershatsky v. Levin,*
  99 F.3d 555 (2d Cir. 1996) ....................................................................... 10

*Bilal v. Geo Care, LLC,*
  981 F.3d 903 (11th Cir. 2020) ................................................................... 7

*Bonner v. City of Prichard, Ala.,*
  661 F.2d 1206 (11th Cir. 1981) ............................................................... 10

*Branson v. Fawcett Publications, Inc.,*
  124 F. Supp. 429 (E.D. Ill. 1954) ............................................................ 57

*Brauer v. Globe Newspaper Co.,*
  217 N.E.2d 736 (Mass. 1966).................................................................. 42

*Bray v. Alexandria Women's Health Clinic,*
  506 U.S. 263 (1993) ................................................................................ 39

*Bullard v. MRA Holding, LLC,*
  740 S.E.2d 622 (Ga. 2013) ...................................................................... 56

*Cannon v. University of Chi.,*
  441 U.S. 667 (1979) ................................................................................ 13

*Cervini v. Cisneros,*
  593 F. Supp. 3d 530 (W.D. Tex. 2022) .................................................... 39

*CISPES v. FBI,*
  770 F.2d 468 (5th Cir. 1985)................................................................... 27

*City of Greenwood, Miss. v. Peacock,*
  384 U.S. 808 (1966) ................................................................................ 16

*Collins v. Creative Loafing Savannah, Inc,*
  592 S.E.2d 170 (Ga. Ct. App. 2003) ....................................................... 44

*Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity
  Plan,* 2023 WL 1338676 (D. Colo. Jan. 31, 2023) ("*Colorado
  NAACP*") ......................................................................................... 11, 15, 39

*Cook v. Randolph Cnty., Ga.*,
　　573 F.3d 1143 (11th Cir. 2009) ................................................... 39

*Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC*,
　　497 F. Supp. 3d 371 (D. Minn. 2020) ......................................... 10

*Davis v. Macon Tel. Publ'g Co.*,
　　92 S.E.2d 619 (Ga. Ct. App. 1956) .............................................. 43

*Davis v. Nat'l Broad. Co.*,
　　320 F. Supp. 1070 (E.D. La. 1970) ....................................... 46, 56

*Dean v. Warren*,
　　12 F.4th 1248 (11th Cir. 2021) ................................................... 39

*Dekalb Motor Escort v. Verizon Commc'ns, Inc.*,
　　2005 WL 8155369 (N.D. Ga. Sept. 27, 2005) ............................. 44

*DeLong Equip. Co. v. Wash. Mills Abrasive Co.*,
　　887 F.2d 1499 (11th Cir. 1989) ................................................... 32

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
　　733 F. Supp. 2d 1348 (N.D. Ga. 2010) ........................................ 32

*Dep't of Commerce v. New York*,
　　139 S. Ct. 2551 (2019) .......................................................... 21, 25

*Dickerson v. Alachua Cnty. Comm'n*,
　　200 F.3d 761 (11th Cir. 2000) ..................................................... 39

*DNC v. RNC*,
　　671 F. Supp. 2d 575 (D.N.J. 2009),
　　　*aff'd*, 673 F.3d 192 (3d Cir. 2012) ....................................... 10, 28

*Eakin v. Rosen*,
　　2017 WL 5709564 (M.D. Ga. Nov. 27, 2017) ............................. 44

*Echols v. Lawton*,
　　913 F.3d 1313 (11th Cir. 2019) ................................................... 42

*Fair Fight, Inc. v. True The Vote*,
　　No. 2:20-cv-00302, slip op. (N.D. Ga. Mar. 9, 2023), Dkt. 222 .......... passim

*Federer v. Gephardt*,
    363 F.3d 754 (8th Cir. 2004) ........................................................ 40

*Ga. State Conf. of NAACP v. Ga.*,
    2022 WL 18780945 (N.D. Ga. Sept. 26, 2022) ............................... 11, 14, 16

*Gertz v. Robert Welch, Inc.*,
    680 F.2d 527 (7th Cir. 1982) ........................................................ 51

*Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*,
    26 F.4th 1235 (11th Cir. 2022) ..................................................... 7

*Griffin v. Breckenridge*,
    403 U.S. 88 (1971) ....................................................................... 39

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ..................................................... 36

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ..................................................................... 49, 53

*Holmes v. Dominique*,
    2015 WL 11236539 (N.D. Ga. Jan. 20, 2015) ............................. 55

*Hunt v. Liberty Lobby*,
    720 F.2d 631 (11th Cir. 1983) ..................................................... 48, 49, 52

*J.C. v. I Shri Khodiyar, LLC*,
    2022 WL 4482736 (N.D. Ga. Aug. 29, 2022) ............................. 32

*King v. Cook*,
    298 F. Supp. 584 (N.D. Miss. 1969) ........................................... 28

*Krass v. Obstacle Racing Media, LLC*,
    2021 WL 4824110 (N.D. Ga. Feb. 2, 2021) ................................. 55

*Kush v. Rutledge*, 460 U.S. 719 (1983) ........................................... 38, 39

*League of United Latin Am. Citizens v. Pub. Int. Legal Found.*,
    2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ("*LULAC*") ................... passim

*Leocal v. Ashcroft,*
     543 U.S. 1 (2004) ........................................................................... 27

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
     572 U.S. 118 (2014) ...................................................................... 21

*Libertad v. Welch,*
     53 F.3d 428 (1st Cir. 1995) .......................................................... 36

*Lorillard v. Pons,*
     434 U.S. 575 (1978) ...................................................................... 11

*Lujan v. Defenders of Wildlife,*
     504 U.S. 555 (1992) ................................................................. 21, 25

*Maples v. Nat'l Enquirer,*
     763 F. Supp. 1137 (N.D. Ga. 1990)............................................... 57

*Maradiaga v. United States,*
     679 F.3d 1286 (11th Cir. 2012) ...................................................... 7

*Mar-Jac Poultry, Inc. v. Katz,*
     773 F. Supp. 2d 103 (D.D.C. 2011)............................................... 47

*Mayfield v. NASCAR,*
     674 F.3d 369 (4th Cir. 2012) ........................................................ 48

*McCord v. Bailey,*
     636 F.2d 606 (D.C. Cir. 1980)....................................................... 38

*McIntee v. Deramus,*
     722 S.E.2d 377 (Ga. Ct. App. 2012) ............................................. 58

*Melton v. Bow,*
     247 S.E.2d 100 (Ga. 1978) ............................................................ 47

*Miller v. Lomax,*
     596 S.E.2d 232 (Ga. Ct. App. 2004) ............................................. 58

*Moore v. Cecil,*
     2021 WL 1208870 (N.D. Ala. Mar. 31, 2021) ........................ 10, 23

*Morse v. Republican Party of Virginia*,
    517 U.S. 186 (1996) ............................................................................. passim

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    498 F. Supp. 3d 457 (S.D.N.Y. 2020) ("*Wohl I*") ................................. passim

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    512 F. Supp. 3d 500 (S.D.N.Y. 2021) ("*Wohl II*") ................................. 24, 27

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    2023 WL 2403012 (S.D.N.Y. Mar. 8, 2023) ("*Wohl III*") .................... 10, 31

*Neff v. McGee*,
    816 S.E.2d 486 (Ga. Ct. App. 2018) ............................................................ 54

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) .................................................................................... 47

*Ohio Dem. Party v. Ohio Repub. Party*,
    2016 WL 6542486 (N.D. Ohio Nov. 4, 2016) ....................................... 10, 27

*Olagues v. Russoniello*,
    797 F.2d 1511 (9th Cir. 1986) .............................................................. 10, 20

*Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*,
    781 F.3d 1245 (11th Cir. 2015) ..................................................................... 7

*Parson v. Alcorn*,
    157 F. Supp. 3d 479 (E.D. Va. 2016) ................................................... 20, 21

*Pavesich v. New England Life Ins. Co.*,
    50 S.E. 68 (Ga. 1905) ................................................................................. 57

*Pincham v. Ill. Judicial Inquiry Bd.*,
    681 F. Supp. 1309 (N.D. Ill. 1988) .............................................................. 10

*Schilling v. Washburne*,
    592 F. Supp. 3d 492 (W.D. Va. 2022) .................................................. 16, 17

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) .................................................................. 11

*Smith v. City of Jackson,*
    544 U.S. 228 (2005) ...................................................................... 19

*Smith v. Stewart,*
    660 S.E.2d 822 (Ga. Ct. App. 2008) ..................................... 42, 43

*Smith v. Vencare, Inc.,*
    519 S.E.2d 735 (Ga. Ct. App. 1999) ........................................... 54

*Southland Publ'g Co. v. Sewell,*
    143 S.E.2d 428 (Ga. Ct. App. 1965) ........................................... 44

*St. Amant v. Thompson,*
    390 U.S. 727 (1968) ................................................................ 47, 51

*TMX Fin., LLC v. Goldsmith,*
    833 S.E.2d 317 (Ga. Ct. App. 2019) ..................................... 31, 58

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) ........................................................... 21, 23

*Triangle Publ'ns, Inc. v. Chumley,*
    317 S.E.2d 534 (Ga. 1984) ..................................................... 42, 43

*United States v. Clark,*
    249 F. Supp. 720 (S.D. Ala. 1965) .............................................. 24

*United States v. McLeod,*
    385 F.2d 734 (5th Cir. 1967) ....................................................... 20

*United States v. McNair,*
    605 F.3d 1152 (11th Cir. 2010) ............................................. 32, 40

*United States v. McQueen,*
    727 F.3d 1144 (11th Cir. 2013) ................................................... 33

*United States v. Myers,*
    972 F.2d 1566 (11th Cir. 1992) ................................................... 35

*United States v. Nguyen,*
    673 F.3d 1259 (9th Cir. 2002) ..................................................... 29

*US Dominion, Inc. v. Byrne*,
    600 F. Supp. 3d 24 (D.D.C. 2022) ................................................................. 48

*Whatley v. City of Vidalia*,
    399 F.2d 521 (5th Cir. 1968) ................................................................ 10, 16

*Wood v. Raffensperger*,
    981 F.3d 1307 (11th Cir. 2020) ................................................................. 23

*Zedan v. Bailey*,
    522 F. Supp. 3d 1363 (M.D. Ga. 2021) ....................................................... 59

## STATUTES

42 U.S.C. § 1971(b) ................................................................................... 20

42 U.S.C. § 1973(b) ................................................................................... 20

42 U.S.C. § 1973b(f)(2) ............................................................................. 20

42 U.S.C. § 1985(3) ........................................................................... passim

52 U.S.C. § 10101(a)(2)(B) ....................................................................... 11

52 U.S.C. § 10101(b) ................................................................................. 20

52 U.S.C. § 10302(a) ........................................................................... 15, 16

52 U.S.C. § 10302(b) ................................................................................. 16

52 U.S.C. § 10302(c) ................................................................................. 16

52 U.S.C. § 10303(f)(2) ............................................................................. 20

52 U.S.C. § 10306(b) ................................................................................. 17

52 U.S.C. § 10307(a) ................................................................................. 15

52 U.S.C. § 10307(b) ......................................................................... passim

52 U.S.C. § 10308(b) ................................................................................. 17

52 U.S.C. § 10310(e) ........................................................................... 15, 16

O.C.G.A. § 51-5-3 .......................................................................... 59

O.C.G.A. § 51-5-7(4) ..................................................................... 53

O.C.G.A. § 51-5-11(b)(1)(A) ......................................................... 48

O.C.G.A. § 51-12.5.1(b) ................................................................ 59

Civil Rights Act of 1957, Pub. L. No. 85-315, 71 Stat. 634 .................................... 9

Ku Klux Klan Act of 1871, Pub. L. No. 42-22, 17 Stat. 13 ................................... 18

Pub. L. No. 91-285, 84 Stat. 314 (1970) .......................................... 12

Pub. L. No. 94-73, 89 Stat. 404 (1975) ............................................ 12

Pub. L. No. 97-205, 96 Stat. 131 (1982) .......................................... 12

Pub. L. No. 102-344, 106 Stat. 921 (1992) ...................................... 12

Pub. L. No. 109-246, 120 Stat. 577 (2006) ...................................... 12

U.S. Const. Art. I ......................................................................... 16

## OTHER AUTHORITIES

Hearing on the Voting Rights Act of 1965 before the H. Comm. on the
    Judiciary, 89th Cong. 12 (1965) (statement of Nicholas Katzenbach,
    Att'y Gen. of the United States),
    https://www.justice.gov/sites/default/files/ag/legacy/2011/08/23/ 03-
    18-1965.pdf ......................................................................... 19

H.R. Rep. No. 89-439 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437 ......... 16, 19

Restatement (Second) of Torts § 442(b) (1965) ................................... 25

Restatement (Second) of Torts § 576 (1977) ................................ 46, 56

Robert D. Sack, Sack on Defamation § 2:9.1 ...................................... 42

S. Rep. No. 94-295 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 774 .................... 12

Smolla, 1 Law of Defamation § 4:41 (2d ed.) ...................................... 42

Complaint, *Daschle v. Thune*, No. 4:04-cv-4177 (D.S.D. Nov. 1, 2004), Dkt.
1 ................................................................................................. 29

Temporary Restraining Order, *Daschle v. Thune*, No. 4:04-cv-4177
(D.S.D. Nov. 2, 2004), Dkt. 6...................................................... 10, 19, 27, 30

U.S. Comm'n on Civil Rights Rep., *Voting in Mississippi* 39 (1965),
https://perma.cc/YC6L-TRDS .................................................... 28

## INTRODUCTION

As a proud American, Plaintiff Mark Andrews deeply cherishes his right to vote and has worked hard to instill these values in his family. During the 2020 election, he proudly cast his ballot by depositing it at a drop box, along with the ballots of his wife and children, as permitted under Georgia law. When he cast his vote that day, he did not know that it would be the last time he would vote free of fear.

His fear is the direct result of the unlawful actions of Defendants who conspired, coordinated, and took overt acts to produce, promote and profit off a film and book, both called *2000 Mules*, that falsely accuse Mr. Andrews and other voters of being "ballot mules," who supposedly illegally deposited fraudulent ballots in drop boxes to "steal" the 2020 election. Critically, Defendants knew their accusations against Mr. Andrews were false. Indeed, an official law enforcement investigation—itself spawned by Defendants' false accusations—fully exonerated him. But that did not deter Defendants. Instead, they proceeded to publish the film and book to mass audiences, to peddle Mr. Andrews' image as a prime example of a "ballot mule," and to profit handsomely off these false accusations.

Defendants' conduct constitutes a textbook example of well-established illegal conduct: defamation, invasion of privacy by false light and appropriation of

likeness, and voter intimidation. Mr. Andrews has brought this case to seek accountability for these unlawful actions and to clear his good name—which Defendants have intentionally tarnished.

Seeking to evade responsibility for the clear harm they have inflicted, Defendants' Motions to Dismiss disregard well-established law on defamation, invasion of privacy, and voter intimidation; ignore the substance of Mr. Andrews' detailed allegations that specifically identify each Defendant's role; and disregard the standard of review at this stage of proceedings. Their Motions to Dismiss should be denied.

## STATEMENT OF FACTS

On May 22, 2022, Defendants D'Souza, D'Souza Media, True the Vote ("TTV"), Engelbrecht, Phillips, and Salem Media (collectively, the "film Defendants"), jointly released the film *2000 Mules*. First Amended Complaint, Dkt. 27, ("Compl."), ¶ 32. The film falsely claims that a network of "ballot mules" were paid to deliver fraudulent ballots into drop boxes to "steal" the 2020 election. *Id.* ¶ 34. The film features footage of voters depositing ballots in drop boxes as "evidence" to support this theory. *Id*. ¶ 36. Mr. Andrews is one of the voters whose image Defendants use and who Defendants accuse in the film of being a mule. *Id*. ¶ 38.

The film prominently features video of Mr. Andrews legally depositing absentee ballots for himself and his family in a Georgia ballot drop box. *Id*. ¶ 37. But although Mr. Andrews' conduct was entirely legal, Mr. Andrews' image is shown in the film accompanied by a voiceover from Defendant D'Souza stating: "What you are seeing is a crime. These are fraudulent votes." *Id.* ¶ 39. In the film, Defendants also describe him and the other voters as "a cartel" and "like trafficking," and accuse him and the other voters of multiple other felonies, including "burning people" and "pulling people out of cars and beating them up." *Id.* ¶¶ 42-43.

Defendants also created and released an official trailer including the same footage of Mr. Andrews and the same false statements. *Id.*¶ 45. In the trailer, D'Souza asks if there is evidence of the "mules" engaged in criminal conduct; Defendant Phillips replies: "four million minutes of surveillance video," as Mr. Andrews' image is shown. *Id.* The trailer is widely available on 2000mules.com, on TTV's website, and on Salem's streaming website. *Id.* ¶¶ 45, 47, 155, 175 n.166, 196.

The film Defendants also made defamatory statements about Mr. Andrews in promotional interviews. *Id.* ¶¶ 50-52, 56, 63, 90, 126, 147, 157, 244. Defendants D'Souza, Engelbrecht, and Phillips appeared on over eleven programs reaching at least 3.2 million television viewers and 4.4 million web viewers, and again published video of Mr. Andrews along with the same false accusations. *Id.* ¶¶ 52-53, 152, 243.

Several of these appearances were on Salem's shows including D'Souza's own podcast. *Id.* ¶¶ 25, 49, 168. Two interviews, one of which was viewed over 4.4 million times online and one on the *Tucker Carlson Show*, included unblurred video of Mr. Andrews along with the false accusations against him. *Id.* ¶¶ 49, 53, 56.

Before the film was released, the film Defendants had actual knowledge that the film's accusations were false: the state of Georgia had investigated the claims against Mr. Andrews and had publicly and unequivocally declared them to be unfounded. *Id.* ¶¶ 91, 128-31.

On October 25, 2022, Defendants D'Souza, Salem Media, and Regnery[1] further republished Mr. Andrews' image and the same defamatory statements about him in a book, also titled *2000 Mules. Id.* ¶ 70. The book contains screenshots from the film, including the image of Mr. Andrews voting and his car. *Id.* The book repeats the same false claims as the film, including a photo of Mr. Andrews captioned: "What we see here are . . . mules stuffing multiple ballots into mail-in drop boxes. . . . What you are seeing here is organized crime . . . ." *Id.* ¶¶ 74-75. The book was published more than five months after all Defendants learned that the state of

---

[1]  Defendants clarified that the proper name for this entity is "Salem Communications Holding Corporation d/b/a Regnery Publishing." Dkt. 54 at 1 n.1. We refer to them as "Regnery" for brevity.

Georgia had publicly exonerated Mr. Andrews, *id*. ¶¶ 91, 128-31, and after all Defendants had received retraction letters from Mr. Andrews. *Id*. ¶¶ 158-59, 164.

All Defendants worked together to create, release, and promote the film and book as joint business ventures. Defendant D'Souza directed, produced, and narrated the film*,* authored the book, and promotes both; Defendant D'Souza Media distributes the film, and profits from the film and book. *Id*. ¶¶ 18, 135, 139, 166, 167, 172 & n.163-164, 174, 226. Defendant Salem Media produced, *id*. ¶ 25, distributes, and promotes the film and the false accusations against Mr. Andrews on various of its platforms, *id*. ¶¶ 49-53, and profits from it, *id*. ¶¶ 172-173 & nn.163, 166. Defendant Regnery, a subsidiary of Salem Media, published the *2000 Mules* book, *id*. ¶¶ 26, 72-73, and profits from it, *id*. ¶¶ 175, 191. Defendant TTV provided the purported "research" that form the basis for the film and book, *id.* ¶ 19, 22, and Defendant Engelbrecht, its Executive Director, and Defendant Phillips, a TTV board member, also produced the film, star in and promote it, *id.* ¶¶ 20-22, and continue to profit from it. *Id.* ¶¶ 172, 178-179, 187.

Mr. Andrews has been injured and intimidated by Defendants' false and defamatory statements about him. He now lives in fear, feels intimidated to vote, and has changed how he votes and assists his family in voting. *Id.* ¶¶ 13, 208, 222, 239. He has also spent time and money protecting his family from the threats he has received. *Id.* ¶ 217. And his professional reputation has been harmed. *Id.* ¶ 247.

Mr. Andrews filed his Complaint on October 26, 2022, Dkt. 1, and the operative First Amended Complaint on December 1, 2022, Dkt. 27 ("Complaint"). Defendants Salem Media and Regnery ("Salem Defendants") filed a Motion to Dismiss, Dkt. 48, and later Amended Brief in Support of their Motion to Dismiss, Dkt. 54, and a Motion for a More Definite Statement, Dkt. 47. Defendants D'Souza and D'Souza Media ("D'Souza Defendants") filed a "Notice of Joinder" joining the Motion for a More Definite Statement, Dkt. 49, and also filed a Motion to Dismiss, Dkt. 50. Defendants Engelbrecht, Phillips, and TTV ("TTV Defendants") filed a Motion to Dismiss, Dkt. 58. Mr. Andrews, through counsel, now submits this Opposition to the Salem Defendants' and D'Souza Defendants' Motions to Dismiss.[2]

---

[2]   The D'Souza Defendants' Motion to Dismiss, Dkt. 50, fully joins the arguments of the Salem Defendants' Motion to Dismiss, Dkt. 54, with respect to the VRA claim, the Klan Act claim, the alleged failure to plead special damages for the defamation claim, and the invasion of privacy claims, and presents no argument of its own on these points. *See* D'Souza MTD at 7-8. This brief responds to and includes citations to the relevant arguments in the Salem Defendants' brief and the D'Souza Defendants' brief. Plaintiff's response to the arguments of the D'Souza Motion to Dismiss that the Complaint is a "shotgun pleading," D'Souza MTD at 6-7, is included in Plaintiff's Response to the Motion for a More Definite Statement, Dkt. 47, also filed on this date.

## LEGAL STANDARD

Although Defendants only cite Rule 12(b)(6), it appears that they also move to dismiss based on standing, under Rule 12(b)(1). Under Rules 12(b)(1) and 12(b)(6), this Court "accept[s] the factual allegations in the complaint as true and construe[s] them in the light most favorable to the plaintiff." *Bilal v. Geo Care, LLC*, 981 F.3d 903, 911 (11th Cir. 2020) (citation omitted) (regarding 12(b)(6)); *see Maradiaga v. United States*, 679 F.3d 1286, 1291 (11th Cir. 2012) (regarding 12(b)(1)). At the motion to dismiss stage, courts "evaluate standing by determining whether the complaint 'clearly alleges facts demonstrating each element'" of standing. *Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1240 (11th Cir. 2022) (citation omitted). To survive a motion to dismiss for failure to state a claim, "the complaint need only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1260 (11th Cir. 2015) (citation omitted).

## ARGUMENT

The conduct of the Salem Defendants and D'Souza Defendants present textbook examples of voter intimidation, conspiracy to intimidate and injure Mr. Andrews on account of his voting activity, and defamation and invasion of privacy.

The Salem and D'Souza Defendants attempt to confuse the issues by misstating the law, attempting to distance themselves from each other, and arguing that they are not responsible for the unlawful acts or the harm to Mr. Andrews. But they cannot obscure the straightforward nature of the legal issues before this Court: Mr. Andrews has alleged facts more than sufficient to support each of his claims, and he has alleged that *these specific Defendants* are responsible for the unlawful conduct. The Court should deny the Salem Defendants' and D'Souza Defendants' Motions to Dismiss in their entirety.

## I.    Mr. Andrews Has Stated A Claim Under Section 11(b) Of The Voting Rights Act (Count II)

Fifty years of precedent clearly establish that Section 11(b) of the Voting Rights Act ("VRA"), 52 U.S.C. § 10307(b), creates a private cause of action. As detailed below, Section 11(b) requires no demonstration of *mens rea*; the inquiry is whether Defendants caused (or attempted to cause) intimidation, threats, or coercion. Conduct that falls within this definition of voter intimidation includes surveillance of voters, exposure of voters' personal information or threats to do so, allegations of criminal activity—especially voting-related crimes—and threats of consequences for voting. This is exactly what Mr. Andrews has pleaded that all Defendants did.

### A.    Section 11(b) Is Enforceable By A Private Right Of Action

1.   **The Supreme Court And Lower Courts Have Repeatedly Held That The Voting Rights Act Is Enforceable By Private Rights Of Action**

Defendants attempt to upend decades of well-settled Supreme Court precedent solely on the basis of a flimsy argument and a single, incorrect, district court decision from outside of this district. Salem MTD at 12-13; D'Souza MTD at 7; TTV MTD at 16-17. This Court should instead follow settled law—in which the Supreme Court has repeatedly recognized Congress's clear intent to create private rights of action to enforce multiple sections of the Voting Rights Act.

The Supreme Court has repeatedly recognized an implied private right of action to enforce the VRA. In *Allen v. State Board of Elections*, the Supreme Court held that Section 5 created an implied private cause of action. 393 U.S. 544, 557 (1969). Nearly 30 years later, it held the same for Section 10 and acknowledged that Congress intended the same for Section 2. *See Morse v. Republican Party of Virginia*, 517 U.S. 186, 230-34 (1996) (plurality opinion); *accord id.* at 240. The analysis of *Morse* and *Allen* applies equally to Section 11: "The achievement of the Act's laudable goal could be severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General." *Allen*, 393 U.S. at 556; *see also Morse*, 517 U.S. at 232. The same is true here.

Consistent with this reasoning, multiple courts—including the Fifth Circuit— have implicitly held that Section 11(b) creates a private cause of action by

9

considering Section 11(b) claims brought by private litigants. For example, in *Whatley v. City of Vidalia*, the Fifth Circuit permitted a Section 11(b) claim brought by private litigants to move forward. 399 F.2d 521 (5th Cir. 1968)[3] (considering Section 11(b) in permitting removal to federal court). *See also, e.g.*, *Fair Fight, Inc. v. True The Vote*, No. 2:20-cv-00302, slip op. at 1 (N.D. Ga. Mar. 9, 2023), Dkt. 222 ("Fair Fight"); *Nat'l Coal. on Black Civic Participation v. Wohl*, 2023 WL 2403012, at *1 (S.D.N.Y. Mar. 8, 2023) (*Wohl III*); *Ariz. All. for Retired Ams. v. Clean Elections USA*, 2022 WL 17088041, at *1-2 (D. Ariz. Nov. 1, 2022) ("*Arizona Alliance*"); *Moore v. Cecil*, 2021 WL 1208870, at *11 (N.D. Ala. Mar. 31, 2021); *Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 379, 378 (D. Minn. 2020); *League of United Latin Am. Citizens v. Pub. Int. Legal Found.*, 2018 WL 3848404, at *2-3 (E.D. Va. Aug. 13, 2018) ("*LULAC*"); *Ohio Dem. Party v. Ohio Repub. Party*, 2016 WL 6542486, at *1 (N.D. Ohio Nov. 4, 2016); *Ariz. Dem. Party v. Arizona Repub. Party*, 2016 WL 8669978, at *4 (D. Ariz. Nov. 4, 2016); *DNC v. RNC*, 671 F. Supp. 2d 575, 622-23 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012); TRO, *Daschle v. Thune*, No. 4:04-cv-4177 (D.S.D. Nov. 2, 2004), Dkt. 6; *Bershatsky v. Levin*, 99 F.3d 555, 556 (2d Cir. 1996); *Pincham v. Ill. Judicial Inquiry Bd.*, 681 F. Supp. 1309, 1317 (N.D. Ill. 1988); *Olagues v. Russoniello*, 797

---

[3]   Fifth Circuit cases prior to 1981 are binding on the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

F.2d 1511, 1522 (9th Cir. 1986) (en banc), *vacated on other grounds*, 484 U.S. 806

(1987).[4] And one court has recently explicitly held that Section 11(b) creates a

private cause of action. *See Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S.*

*Election Integrity Plan*, 2023 WL 1338676, at *4 (D. Colo. Jan. 31, 2023)

("*Colorado NAACP*").

### 2.   Congress Has Repeatedly Ratified The Existence Of A Private Cause Of Action Under Section 11

The Supreme Court has long held that "Congress is presumed to be aware of

an administrative or judicial interpretation of a statute and to adopt that interpretation

when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580

(1978); *see also Alexander v. Sandoval*, 532 U.S. 275, 288 (2001) ("Congress's

---

[4]   The Eleventh Circuit has also held, either explicitly or impliedly, that other sections of the VRA contain a private cause of action. *See, e.g.*, *Ala. State Conf. of NAACP v. Ala.*, 949 F.3d 647, 649 (11th Cir. 2020) (finding a private cause of action under §§ 2 and 3), *judgment vacated as moot on other grounds*, 141 S. Ct. 2618 (2021); *Schwier v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003) (concluding that Congress did not intend to foreclose a private right of action under 52 U.S.C. § 10101(a)(2)(B) when it amended the VRA, especially in light of *Allen* and *Morse*). Although one district court recently held that Section 2 of the VRA does not create a private cause of action, that decision is currently on appeal to the Eighth Circuit. *See Ark. State Conf. of NAACP v. Ark. Bd. of Apportionment*, 586 F. Supp. 3d 893 (E.D. Ark. 2022), *appeal filed*, No. 22-1395 (8th Cir. Feb. 24, 2022). But that case's reasoning has already been rejected by a three-judge panel in this district, as well as another court in this district. *Ga. State Conf. of NAACP v. Ga.*, 2022 WL 18780945, at *2-7 (N.D. Ga. Sept. 26, 2022) (three judge panel); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 2022 WL 633312, at *11 n.10 (N.D. Ga. Feb. 28, 2022).

enactment (or reenactment) of the verbatim statutory text that courts had previously interpreted to create a private right of action" indicates Congressional intent to create a private cause of action). Congress's repeated reenactment of the VRA after *Allen* and *Morse* definitively shows that Congress intended and ratified the existence of private causes of action to enforce the VRA, including under Section 11.

When Congress reenacted the VRA in 1975, it made two changes to explicitly ratify *Allen* and facilitate private VRA enforcement: it amended Sections 3 and 14 to explicitly acknowledge private enforcement. *See* Pub. L. No. 94-73, § 401-02, 89 Stat. 400, 404 (1975) (acknowledging suits by "aggrieved persons" in Section 3; authorizing fee shifting to private attorneys in Section 14). Moreover, Congress's repeated reenactment of the VRA after multiple courts entertained private suits under Section 11(b) evinces a clear congressional intent to ratify a private cause of action under Section 11. *See* Pub. L. No. 91-285, 84 Stat. 314 (1970); Pub. L. No. 94-73, 89 Stat. 400 (1975); Pub. L. No. 97-205, 96 Stat. 131 (1982); Pub. L. No. 102-344, 106 Stat. 921 (1992); Pub. L. No. 109-246, 120 Stat. 577 (2006). *See also* S. Rep. No. 94-295, at 40, *reprinted in* 1975 U.S.C.C.A.N. 774, 807 ("Congress has regularly established a dual enforcement mechanism. It has . . . provided remedies to private persons acting as a class or on their own behalf."); *Morse*, 517 U.S. at 233 n.45 (describing the preceding quote from S. Rep. No. 94-295 as "explain[ing] more generally" the importance of private remedies to enforce the VRA).

12

Thus both binding Supreme Court precedent and Congress's ratification of the weight of court decisions supporting private causes of action under Section 11 and other sections is fatal to Defendants' argument and confirms that Congress created an implied private right of action in Section 11.

### 3. *Sandoval* Militates In Favor Of An Implied Private Right Of Action

*Alexander v. Sandoval*, 532 U.S. 275 (2001), which Defendants cite as casting doubt on decades of precedent, Salem MTD at 12; TTV MTD at 16-17, actually supports Plaintiff's position. *Sandoval* sets forth the test for determining when an implied private cause of action exists, but it does not overturn decades of Supreme Court precedent recognizing multiple private causes of action under the VRA. Moreover, application of the *Sandoval* test here militates in favor of an implied private cause of action.

First, *Sandoval* itself acknowledges that while its two-step test is to determine whether a statute creates an implied private right of action, such an implied private right of action "must be taken as given" when precedent has "embraced the existence of a private right." *Sandoval*, 532 U.S. at 279-80 (citing *Cannon v. University of Chi.*, 441 U.S. 667, 694 (1979)). Here, as with the statute at issue in *Sandoval*, precedent "embrace[s] the existence of a private right" to enforce the VRA under multiple sections, including Section 11. *See supra* at 8-11.

13

Second, the Court acknowledged that "Congress's enactment (or reenactment) of the verbatim statutory text that courts had previously interpreted to create a private right of action" indicates Congressional intent to create a private cause of action. *Sandoval*, 532 U.S. at 288. Here, Congress has repeatedly reenacted the VRA after the Supreme Court and lower courts have recognized that the VRA contains private causes of action under multiple sections, including Section 11. *See supra* at 11-13.

Thus, Supreme Court precedent and Congressional history outlined above are dispositive under *Sandoval* and this Court need not inquire any further to reject Defendants' argument. *See Sandoval*, 532 U.S. at 279-80. However, even under the two-step *Sandoval* analysis, Section 11 creates a private cause of action.

Under the *Sandoval* test, the first question is whether the text includes "rights-creating language"; the second is whether the text demonstrates Congress's intent to provide a private remedy. *Id.* at 288-89, 291. Section 11 contains "rights-creating language." Section 11(a) identifies the person whose rights are being protected, namely, "any person . . . who is entitled to vote." And Section 11(b) specifically identifies both the voter ("any person for voting or attempting to vote") as well as "any person for exercising any powers or duties" under other specified sections of the VRA as the persons benefited. 52 U.S.C. § 10307(b). As in *Sandoval*, this language identifies "the particular class of persons" that hold the right. 532 U.S. at 289; *see also Georgia State Conf. of NAACP*, 2022 WL 18780945 at *3-4 ("If that

is not rights-creating language, we are not sure what is."). Thus, as another court recently found, Section 11(b) contains "rights-creating language" that pertains to "any individual citizen," and thus creates an individual cause of action. *Colorado NAACP*, 2023 WL 1338676, at *4.

Second, the structure of Section 11 and of the VRA as a whole indicate that Section 11 "displays an intent to create a private remedy" per *Sandoval*'s second step. *See* 532 U.S. at 289 n.7 ("[T]he interpretive inquiry begins with the text and structure of the statute."). Both Section 11(a) and (b) explicitly incorporate other VRA sections that create private remedies or acknowledge the existence of private remedies. Section 11(a) refers to any "any person . . . who is entitled to vote," and references "chapters 103 to 107 of this title"—which includes Sections 2 through 20 of the VRA. 52 U.S.C. § 10307(a). And Section 11(b) refers to "any person exercising any powers or duties under" other sections of the VRA, namely Sections 3, 8, 10, and 12. *Id.* § 10307(b). Sections 2, 5, and 10 (all referenced in Section 11(a) and/or (b)) create implied private rights of action. *See Morse*, 517 U.S. at 230-34; *Allen*, 393 U.S. at 556. And Sections 3 and 14 (referenced in Section 11(a) and (b)) explicitly acknowledge the existence of private suits. *See* 52 U.S.C. §§ 10302(a), 10310(e). This evinces Congress's general recognition that private suits are available

15

to enforce the VRA and ratification of court decisions to that effect.[5] Thus, following *Sandoval*'s directive to consider the text and structure of the statute, it hard to read Section 11 as anything other than evincing Congressional intent to create a private right of action.

The sole case Defendants cite for their contrary argument, *Schilling v. Washburne*, 592 F. Supp. 3d 492 (W.D. Va. 2022), was decided without the benefit of serious briefing, and as a result, does not consider the relevant Supreme Court precedent or the VRA's history. The dispositive motion in *Schilling* was 5 pages and did not cite *Sandoval* at all. The plaintiff's responsive brief was 11 pages and did not cite *Sandoval*, any Supreme Court precedent, or history of the VRA. It is no wonder that the resulting decision does not address Supreme Court precedent or the VRA's history. It therefore, carries little persuasive weight.

---

[5] Sections 3 and 14 both acknowledge private suits to "enforce the voting guarantees of the fourteenth and fifteenth amendment." 52 U.S.C. §§ 10302(a)-(c), 10310(e). Although Section 11 goes beyond enforcing the Fourteenth and Fifteenth Amendments (and indeed relies on Congress's power under the Elections Clause, U.S. Const. Art. I, § 4, *see* H.R. Rep. No. 89-439 (1965)), the Fifth Circuit has held that Section 11(b) creates "a right[] . . . providing for the equal civil rights of citizens." *Whatley*, 399 F.2d at 523-24 (citing *City of Greenwood, Miss. v. Peacock*, 384 U.S. 808, 811 n.3 (1966)). Thus an action to enforce Section 11(b) will often be "at least in part . . . an action that 'enforce[s] the voting guarantees of the fourteenth or fifteenth amendment' as contemplated by Sections 3 and 14" even though Section 11(b) "prohibits a significant swath of activity . . . that the Fourteenth and Fifteenth Amendments do not." *Georgia State Conf. of NAACP*, 2022 WL 18780945, at *6 (alterations original).

Defendants also make much of the fact that Section 12 explicitly authorizes actions by the Attorney General and assert that this implies that the rest of the VRA does not authorize private rights of action. Salem MTD at 13. But while the existence of another enforcement mechanism can indicate private suits are not authorized, *Sandoval*, 532 U.S. at 289, that argument carries no weight here because it was already considered and rejected by the Supreme Court with respect to the VRA in *Morse*. *See* 517 U.S. at 232-33; *accord id.* at 240. The Supreme Court held that the reenactment of the VRA in 1975 implicitly recognized a private right of action under Section 10 despite the fact that Section 10 (like Section 12, discussed in *Schilling*) authorized suits by the Attorney General without mentioning suits by private parties. *Id.* at 232-33; *compare* 52 U.S.C. § 10306(b) (Section 10(b), discussed in *Morse*), *with id.* § 10308(b) (Section 12(d), discussed in *Schilling*). *Morse*'s analysis of Section 10 applies equally to Section 12, and disproves Defendants' arguments that the existence of Section 12 forecloses private relief under other sections of the VRA.

### B.    Mr. Andrews Has Pleaded All Elements Of A Section 11(b) Claim

Section 11(b) states that no person "shall intimidate, threaten, or coerce *or attempt* to intimidate, threaten, or coerce any person for voting or attempting to vote, or . . . for urging or aiding any person to vote or attempt to vote[.]" 52 U.S.C. § 10307(b) (emphasis added). Thus, "to establish a claim under Section 11(b), a

plaintiff must show that the defendant has intimidated, threatened, or coerced someone for voting or attempting to vote, or has attempted such intimidation, threat, or coercion." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020) ("*Wohl I*"). Contrary to Defendants' attempt to add extra-textual requirements to the statute, Section 11(b) does not require any showing of Defendants' intent, nor that Mr. Andrews was fully prevented from voting.

### 1.      Section 11(b) Does Not Require Any Showing Of Defendants' Intent

Defendants wrongly assert that a plaintiff must allege a defendant *intended* to intimidate voters to state a claim under Section 11(b). Salem MTD at 15; D'Souza MTD at 7. Not so.

The text of Section 11(b) makes no mention of a defendant's *mens rea*. This is in contrast to a similar statute that Congress passed just eight years earlier—Section 131(b) of the Civil Rights Act of 1957[6]—which does contain an explicit *mens rea* requirement.

The text itself demonstrates the difference: Section 11(b) is identical to Section 131(b), except for the removed words "for the purpose of"—and therefore does not require a showing of intent, while Section 131(b) does. "The text of § 11(b),

---

[6]   Confusingly, Defendants refer to the Ku Klux Klan Act of 1871, Pub. L. No. 42-22, 17 Stat. 13 (1871), as the Civil Rights Act.

unlike § 131(b), plainly omits 'for the purpose of,' suggesting § 11(b)'s deliberately unqualified reach." *LULAC*, 2018 WL 3848404, at *4. Numerous other courts have recognized the same. *See, e.g.*, *Wohl I*, 498 F. Supp. 3d at 477; *Ariz. Dem. Party*, 2016 WL 8669978, at *4 n.3 ("[T]he plain language of the statute does not require a particular mens rea."); TRO at 2, *Daschle*, No. 4:04-cv-4177, Dkt. 6 ("Whether the intimidation was intended or simply the result of excessive zeal is not the issue").

The legislative history further confirms what the text makes plain: that Congress intentionally excluded a *mens rea* requirement from Section 11(b). As then-Attorney General Katzenbach explained: "Since many types of intimidation, particularly economic intimidation, involve subtle forms of pressure, this treatment of the purpose requirement [in Section 131(b)] has rendered the statute largely ineffective. . . . [Thus] no subjective 'purpose' need be shown . . . in order to prove intimidation under [Section 11(b)]. Rather, defendants would be deemed to intend the natural consequences of their acts."[7]

Courts often look to Section 131(b) when interpreting the terms "intimidate, threaten, or coerce" in Section 11(b). *See Smith v. City of Jackson*, 544 U.S. 228,

---

[7]   Hearing on the Voting Rights Act of 1965 before the H. Comm. on the Judiciary, 89th Cong. 12 (1965) (statement of Nicholas Katzenbach, Att'y Gen. of the United States), https://www.justice.gov/sites/default/files/ag/legacy/2011/08/23/03-18-1965.pdf. The House Report accompanying the VRA states the same: Under Section 11(b), "no subjective purpose or intent need be shown." H.R. Rep. No. 89-439, at 30 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462.

233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes . . . [we] presume that Congress intended that text to have the same meaning in both statutes"). As a result, some courts have erroneously imported the *mens rea* requirement from Section 131(b) into Section 11(b). In a since-vacated opinion, the Ninth Circuit made this error. *See Olagues*, 797 F.2d at 1522. The district court case that Defendants cite, *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016), Salem MTD at 15, makes this error, relying on *Olagues*, seemingly without recognizing that *Olagues* analyzed an entirely different section of the VRA that included an explicit *mens rea* requirement.[8] And the Fifth Circuit case cited by both *Parson* and Defendants, *United States v. McLeod*, 385 F.2d 734, 747 (5th Cir. 1967), *only* considered a Section 131(b) claim and *not* a Section 11(b) claim.[9] *McLeod* thus says nothing about whether Section 11(b) contains a *mens rea* requirement. This Court should not accept Defendants' invitation to extend *Parson*'s error.[10] Indeed, as another court within this district recently held: "there is no intent requirement in

---

[8] *Olagues* considered 52 U.S.C. § 10303(f)(2), then codified 42 U.S.C. § 1973b(f)(2).

[9] Section 131(b) of the Civil Rights Act was then codified at 42 U.S.C. § 1971(b) and is now codified at 52 U.S.C. § 10101(b). Section 11(b) was formerly codified at 42 U.S.C. § 1973(b) and is now codified at 52 U.S.C. § 10307(b).

[10] Should the Court not wish to reach this issue, Mr. Andrews has pleaded Defendants' intent to intimidate him as part of his claim under the Klan Act and those allegations would apply equally to his VRA claim. *See infra* at 31-36.

Section 11(b) cases." *See Fair Fight*, slip op. at 48; *id*. at 14-15 n.8 (finding "*Parson* to be an unpersuasive interpretation of Section 11(b)").

### 2.    Mr. Andrews Has Standing

Defendants incorrectly argue that Mr. Andrews has not adequately pleaded that he was injured or that his injuries are traceable to Defendants for his VRA claim, and therefore he does not have standing. Salem MTD at 11-12. But Defendants fail to grapple with the facts that Mr. Andrews has actually alleged.

To demonstrate standing, a plaintiff must show that he (i) "suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)). Traceability requires showing "a causal connection between the injury and the conduct complained of," *Lujan*, 504 U.S. at 560, but does not require "[p]roximate causation." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). Rather, it requires "no more than *de facto* causality." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).[11]

---

[11]   Defendants do not contest redressability, and thus have waived any argument on that issue.

Mr. Andrews has pleaded sufficient facts to show he was injured by Defendants, and that he continues to be injured by their ongoing defamation and intimidation. He has alleged that he experienced intimidation about voting (and assisting his family to vote) due to his reasonable fear of Defendants' continuing publication of his image along with false allegations that he has committed voter fraud and other crimes. Compl. ¶¶ 218-25, 233-40. Mr. Andrews has alleged that because Defendants broadcast his image (and that of his car and license plate) along with their false and defamatory accusations, he needed to spend time and money to protect his and his family's privacy. *Id.* ¶ 217. He has changed his license plate, removed identifying stickers from his car, paid for home-security upgrades, and paid to remove identifiable information from the internet. *Id.* He has also suffered harm to his privacy and his reputation, including his professional reputation. *Id.* ¶¶ 241-50. He now avoids going outside of his house at night. *Id.* ¶ 216. He also avoids voting by drop box and assisting his family do so. *Id.* ¶¶ 239, 263.

These allegations are more than sufficient for standing. *First*, contrary to Defendants' assertions, Mr. Andrews' injury is not conjectural or hypothetical—he has been and continues to be injured so long as his image and the false accusations against him remain in Defendants' film, book, and promotional appearances. *See* Compl. ¶¶ 9, 11, 37-41, 44-47, 49-50, 52, 54, 56, 59-61, 65, 70, 74-75, 136-37, 139-

40, 142-43, 145-47, 164-65, 191; *TransUnion*, 141 S. Ct. at 2208 (concrete injury arises where an entity has published defamatory information to third parties).

Moreover, the harm that Mr. Andrews alleges is concrete and particularized to him: namely, that *his* image and license plate have been broadcast, along with false accusations *about him* committing crimes, and as a result *he* is intimidated from voting and assisting his family members to vote. The case Salem Defendants cite, *Moore v. Cecil*, 2021 WL 1208870, at *11 (N.D. Ala. Mar. 31, 2021), Salem MTD at 14, actually supports Mr. Andrews' argument. That court dismissed a candidate's claim of voter intimidation where the candidate alleged that ads defaming him would intimidate his supporters. *Id.* at *11. But here, Mr. Andrews is the person who the *Moore* court identified as entitled to bring such a claim: he is "the voter who suffers the intimidation, threat, or coercion." *Id.* This is precisely the opposite of an "undifferentiated, generalized grievance" that the Eleventh Circuit warned of in *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020), MTD at 14.

*Second*, Defendants argue that because Mr. Andrews ultimately voted, he was not injured. Salem MTD at 11; D'Souza MTD at 7. But this is contrary to the text of the statute. The statute forbids any "*attempt* to intimidate, threaten, or coerce any person for voting" or for "aiding any person to vote." 52 U.S.C. § 10307(b) (emphasis added). Thus, the extent to which Defendants succeeded at preventing Mr. Andrews from voting or from assisting his family members to vote is irrelevant.

23

Rather, Mr. Andrews has alleged that Defendants *attempted* to do so, which is enough.[12] *See Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 516 (S.D.N.Y. 2021) ("*Wohl II*") (Sections 11(b) and 1985(3) "do not proscribe only threatening and intimidating language that successfully prevents a person from voting."); *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) ("The success or failure of intimidation, threats or coercion, is immaterial, since 'attempts' are equally proscribed.").

*Third*, Defendants assert that all of the "threats" and "intimidation" came from third parties, and so are not traceable to Defendants. Salem MTD at 14-15; D'Souza MTD at 7. That assertion fails to acknowledge the facts pleaded in the Complaint and misunderstands the standard causation analysis applicable here.

Mr. Andrews has alleged that Defendants' attempts to intimidate, threaten, and coerce him include: publishing an image of him (blurred and unblurred), his vehicle, and license plate number, along with false and defamatory accusations that he committed egregious election crimes, had been involved in violent riots and other crimes, and was paid to commit crimes. Compl. ¶¶ 37-41, 44-47, 49-50, 70, 74-75, 164-165, 191. As a result of these actions by *these Defendants*, he has suffered harm

---

[12] In fact, Mr. Andrews has alleged that Defendants were partially successful: he was intimidated, and he changed his own voting behavior and his efforts to aid his family members to vote in response to that intimidation. Compl. ¶¶ 232-239.

to his reputation and fears further surveillance, harassment, and defamation for lawfully voting and for assisting his family in voting. *Id.* ¶¶ 230, 239, 247, 263. These allegations are more than sufficient for there to be a "causal connection" between the harm he has suffered and Defendants' conduct. *See Lujan*, 504 U.S. at 560. There is an obvious "de facto causality" between Defendants' actions, and the harm that he has experienced. *See Dep't of Commerce*, 139 S. Ct. at 2566. This is more than sufficient to demonstrate "traceability" for the purposes of standing.

Moreover, while the direct threats of physical violence against Mr. Andrews did not come from any of the Defendants, *see* Compl. ¶¶ 208-11, these threats are the natural and foreseeable consequence of Defendants' accusations about Mr. Andrews. As a court in this district explained, "Section 11(b) generally attributes to Defendants the *natural consequences* of their actions." *See Fair Fight*, slip op. at 24.

Indeed, this is a basic tenet of tort law: defendants may be held liable for harms that were neither "different in kind" from the expected harm nor "extraordinary . . . in view of the circumstances." Restatement (Second) of Torts § 442(b) (1965). If a tortfeasor points a loaded gun and fires, he cannot escape liability by claiming the harm was not intended. *See id.* (citing *Morin v. Moore*, 309 F.3d 316, 327 (5th Cir. 2002)). So too here. For this reason, courts have routinely found defendants liable for intimidation when the defendants' conduct leads to the natural and foreseeable consequence of threats by third parties against voters. *See, e.g.*, *LULAC*, 2018 WL

3848404, at *4 (publishing voters' names, personal information, and false accusations of fraudulent registration "in a clear effort to subject the named individuals to public opprobrium" is intimidation, even where threats came from third parties); *Arizona Alliance*, 2022 WL 17088041, at *1-2 (TRO against defendants who posted voters' image online with accusations of voter fraud when subsequent threats came from third parties); *Wohl I*, 498 F. Supp. 3d at 480 ("courts have concluded that conduct *putting others* 'in fear of harassment and interference with their right to vote' constitutes intimidation" under Section 11(b) (emphasis added)). In other words, "Defendants' actions need only be connected to the voters feeling (or potentially feeling) intimidated" to satisfy the standard causation analysis, which "does not . . . need[] to be onerous." *Fair Fight*, slip op. at 24.

### 3.     Mr. Andrews Has Alleged That Defendants Engaged In Unlawful Intimidation, Threats, Or Coercion

Finally, Defendants assert that they have not engaged in any "threats, intimidation, or coercion." Salem MTD at 10, 14; D'Souza MTD at 7. But Defendants' actions exemplify the conduct that multiple courts have found to be unlawful threats, intimidation, or coercion under the statute.

Any conduct that "caused, or could have caused . . . any person to be reasonably intimidated, threatened, or coerced from voting or attempting to vote" violates Section 11(b). *Fair Fight*, slip op. at 16-17. This includes "actions or

communications that inspire fear of economic harm, legal repercussions, privacy violations, and even surveillance." *Wohl II*, 512 F. Supp. 3d at 509. The statute forbids "subtle, nonviolent forms of intimidation" as well as more overt intimidation. *Id.* at 510. In determining whether conduct is intimidating, courts should consider "the totality of the circumstances." *Fair Fight*, slip op. at 16.

This is consistent with the ordinary meaning of Section 11(b)'s broad text. The operative words of the statute—"intimidate," "threaten," and "coerce"—should be given their plain meaning. *Leocal v. Ashcroft*, 543 U.S. 1, 8-9 (2004); *see also CISPES v. FBI*, 770 F.2d 468, 476-77 & n.8 (5th Cir. 1985) (analogizing other statute to Section 11(b) because it contains terms "obviously widely used and commonly understood"). Applying these "commonly understood" words, courts have routinely found that several types of non-violent conduct constitute voter intimidation.

Surveillance of voters, threats of surveillance, and publicizing voters' images and names are classic forms of unlawful intimidation. *See, e.g.*, *Fair Fight*, slip op. at 59 ("non-governmental parties publishing the names of challenged voters to the public can constitute reasonable intimidation"); *Ohio Dem. Party*, 2016 WL 6542486, at *2 (enjoining "[f]ollowing, taking photos of, or otherwise recording voters"); TRO at 2, *Daschle*, No. 04-cv-4177, Dkt. 6 (enjoining following voters outside of the polling place and making note of their license plates); *Arizona Alliance*, 2022 WL 17088041, at *1-2 (enjoining publishing or threatening to publish

27

images of voters along with accusations of being "mules"); *DNC*, 671 F. Supp. 2d at 622-23 (modifying consent decree requiring defendants not to "videotape, photograph, or otherwise make visual records of voters or their vehicles.").

Publishing or threatening to publish voters' images and personal information was also recognized as a common form of intimidation at the time the VRA was passed. In 1969, one court recognized that voters' "[r]eticence to apply for registration might have been intensified . . . by publication in the local newspaper of the names and addresses of all applying for registration[.]" *King v. Cook*, 298 F. Supp. 584, 587 (N.D. Miss. 1969) (analyzing criminal indictment).[13]

Publication of voters' information, and the threat of doing so, is especially likely to constitute intimidation when coupled with threats of "consequences" for voting or with allegations of unlawful voting. For example, one court held that threatening "consequences" for voting, namely, that voters who cast their ballot by mail would have their personal information shared with creditors, law enforcement, and the CDC for mandatory vaccinations, constitutes intimidation under Section 11(b). *See Wohl I*, 498 F. Supp. 3d at 465. Another court held that publishing a report

---

[13] In a 1965 report, the U.S. Commission on Civil Rights noted that Black residents of Mississippi "who attempt to register cannot hope to remain anonymous" because "the legal requirement that their names be published in local newspapers and . . . practices such as the photographing" of them "may be sufficient to deter many potential registrants." U.S. Comm'n on Civil Rights Rep., *Voting in Mississippi* 39 (1965), https://perma.cc/YC6L-TRDS.

with voters' personal information and falsely identifying them as potential felons or people voting illegally constitutes intimidation under Section 11(b). *See LULAC*, 2018 WL 3848404, at *4. Similarly, another court entered a restraining order enjoining the defendants and their agents from photographing and filming voters and publishing false accusations about voters similar to Mr. Andrews, namely, baselessly implying that voters who cast multiple ballots are "mules" who are voting illegally. *See Arizona Alliance*, 2022 WL 17088041, at *1-2; *see also* Compl. at 5-6, *Daschle*, No. 4:04-cv-4177 (D.S.D. Nov. 1, 2004), Dkt. 1 (TRO was issued based on allegations of defendants "[h]aving loud conversations in a polling place" about voters "who were prosecuted for voting illegally," implying a threat of future prosecution); *United States v. Nguyen*, 673 F.3d 1259, 1264-66 (9th Cir. 2002) (warning voters that they could be incarcerated or deported for illegally voting could "constitute[] a tactic of intimidation" under state voter intimidation law).

Defendants' conduct as alleged in the Complaint fits squarely within the parameters of what courts have held to be unlawful voter intimidation. The film Defendants published surveillance video, and images from that video, of Mr. Andrews voting to at least 3.2 million television news viewers, and 5.8 million internet viewers, Compl. ¶ 243, along with false and defamatory accusations that he voted illegally and committed other felonies, with the implied threat of legal and other consequences that necessarily entails. *See id.* ¶¶ 39, 43, 140, 163.

As in *LULAC* and *Arizona Alliance*, each of the Defendants has widely publicized Mr. Andrews images along with false accusations of illegally voting and other serious crimes, "subject[ing him] . . . to public opprobrium." *LULAC*, 2018 WL 3848404, at *4; *Arizona Alliance*, 2022 WL 17088041, at *1-2; Compl. ¶¶ 37-44 (film Defendants falsely accusing Mr. Andrews of crimes); *id.* ¶ 37 (TTV Defendants creating video clip). Like in *Wohl* and *Thune*, by publishing and promoting the film and book, Defendants have necessarily implied legal "consequences" for Mr. Andrews because of his alleged crimes. *See* Compl. ¶¶ 39, 42-46 (all film Defendants); *Wohl I*, 498 F. Supp. 3d at 465; TRO at 2, *Daschle*, No. 4:04-cv-4177, Dkt. 6. Defendants' conduct is a textbook example of the intimidation, threats, and coercion prohibited by federal law.

## II.   Plaintiff Has Stated A Claim Under The Klan Act's Support-Or-Advocacy Clauses, 42 U.S.C. § 1985(3) (Count I)

Plaintiff has stated a claim under the two separate "support-or-advocacy" clauses of 42 U.S.C. § 1985(3)—that is, clauses 3 and 4 of Section 1985(3). The support-or-advocacy clauses make it unlawful for "two or more persons" to "conspire *either* to "prevent by force, intimidation or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy" in a federal election (clause 3), *or* to "injure any citizen in person or property on account of such support or advocacy" (clause 4). To state a claim under clauses 3 and 4, a plaintiff must

allege (i) that defendants entered into one of the two prohibited conspiracies; (ii) a defendant committed an act in furtherance of the conspiracy; and (iii) plaintiff was "injured" in "person or property" by at least one act in furtherance. *See* 42 U.S.C. § 1985(3); *see also Wohl III*, 2023 WL 2403012, at *29.

The Complaint adequately pleads each of these elements, and Defendants' arguments to the contrary mischaracterize the law, ignore Mr. Andrews' detailed allegations, and disregard that at this stage, his allegations must be taken as true.

### A. Mr. Andrews Has Pleaded All The Required Elements Of A Claim Under The Support-Or-Advocacy Clauses Of The Klan Act

### 1. Mr. Andrews Has Alleged A Conspiracy

To prove a conspiracy, a plaintiff must "show that two or more persons combined either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort." *TMX Fin., LLC v. Goldsmith*, 833 S.E.2d 317, 335 (Ga. Ct. App. 2019). At this stage, a plaintiff need only allege "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). "[A]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage." *Id*. at 556; *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) ("Because plausibility is a standard lower than

probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible.").

"Conspiracies are rarely evidenced by explicit agreements, and must almost always be proven by inferences that may be fairly drawn from the behavior of the alleged conspirators." *DeLong Equip. Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989). "[D]irect evidence of an agreement is unnecessary." *United States v. McNair*, 605 F.3d 1152, 1195 (11th Cir. 2010). "Plaintiff[] need not allege the existence of collusive communications in 'smoke-filled rooms' in order to state a [conspiracy] claim." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010). An unlawful agreement may be inferred "from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct." *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1192 (11th Cir. 2011). Evidence that defendants were involved in a common business venture can help demonstrate a conspiracy. *J.C. v. I Shri Khodiyar, LLC*, 2022 WL 4482736, at *10 (N.D. Ga. Aug. 29, 2022).

Here, Mr. Andrews has pleaded more than adequate facts to support a plausible inference that Defendants engaged in *both* conspiracies proscribed clauses 3 and 4 (although at this stage, he only needs to plead facts sufficient for one).

***Clause 4.*** Mr. Andrews has alleged sufficient facts to support a plausible inference that Defendants came to an agreement "to injure" him (and other voters)

under clause 4. The Complaint details how Defendants coordinated with one another to use Mr. Andrews' image to baselessly accuse him of being an "exemplar" "mule" in the film and book—that is, to injure him by accusing him of crimes because he voted and assisted his family in voting. *See* Compl. ¶¶ 18, 20-22, 24-26, 37-41, 70, 72-76. Mr. Andrews further alleges that Defendants and their agents used his image and the false accusations about him to promote their false narrative about the election thereby profiting from their film and book sales. *Id.* ¶¶ 171-179, 188, 191-192.

These Defendants also engaged in a coordinated publicity campaign for their film and book, by appearances by D'Souza and others on shows hosted by Salem, with Salem media personalities, or on the D'Souza Podcast, which is hosted and broadcast by Salem. *Id.* ¶¶ 25, 48-69, 138-140, 142-143, 145-147, 149, 168. It is not plausible that the Salem Defendants, D'Souza Defendants, and TTV Defendants *did not* have an agreement: they had a joint business venture to create and publish the film and book, which necessarily entails an agreement to publish and promote the subject matter of the film and book including the accusations against Mr. Andrews.

Although a conspiracy "often requires that its existence be proven inferentially or circumstantially," *United States v. McQueen*, 727 F.3d 1144, 1153 (11th Cir. 2013), here its existence is in plain view: as the Complaint details, all Defendants engaged in a business enterprise to produce, circulate, promote, and profit from the film and book. Compl. ¶¶ 171-176, 188-192. Salem is the production

company responsible for the film *2000 Mules*; it distributes The Dinesh D'Souza Podcast, which has promoted *2000 Mules* and is hosted by D'Souza, *id.* ¶ 25; it produces *The Charlie Kirk Show*, on which Engelbrecht and Phillips promoted *2000 Mules* with unblurred images of Mr. Andrews and his license plate, *id.* ¶ 49; and it owns Regnery, which published the book based on *2000 Mules*, *id.* ¶ 26. Indeed, while Salem now seeks to distance itself from the other Defendants, one needs to look no further than the *2000 Mules* trailer to see evidence of the conspiracy. The "official trailer" flashes the words: "From DINESH D'SOUZA with SALEM MEDIA." *See id.* ¶¶ 45-47. Moreover, D'Souza is the filmmaker and author behind both the film and book; D'Souza Media is a producer and distributor of the film; and the TTV Defendants are all executive producers—as well as promoters—of the film. *Id.* ¶¶ 18-22, 24-26. Thus, it is not speculation to allege that Defendants had "an agreement" with one another to injure Mr. Andrews. Rather, it is merely a reflection of Defendants' open and acknowledged business enterprise.

*Clause 3.* For largely the same reasons, Mr. Andrews has also plausibly alleged a conspiracy "to prevent by force, intimidation, or threat" him from "giving his support or advocacy in a legal manner" under clause 3. The Complaint plausibly alleges that, by agreeing to falsely accuse Mr. Andrews of being engaged in voter fraud (and other crimes) simply because he voted by drop box—and to widely circulate and promote those false accusations in the film, book and promotional

materials—Defendants intended to intimidate him (and other lawful voters) from casting his vote by drop box and delivering his family members' ballots to the drop box. Such an objective is not conjectural: indeed, the Complaint alleges that as a direct consequence of Defendants' false accusations against him, Mr. Andrews has changed how he votes and how he assists his family in voting. Compl. ¶¶ 230-239. Moreover, as a natural and foreseeable consequence of *2000 Mules*, vigilantes have conducted "mules"-inspired surveillance campaigns to monitor, record and question voters during the 2022 federal election. *Id.* ¶ 199. D'Souza and TTV Defendants have encouraged these activities while promoting the false claims. *Id.* ¶¶ 225-26.

These allegations are far more than enough "to raise a reasonable expectation that discovery will reveal evidence of [Defendants'] illegal agreement" in violation of clauses 3 and 4 of the Klan Act. *Twombly*, 550 U.S. at 556. In addition, because the natural, foreseeable and probable consequence of Defendants' widely distributed defamation of Mr. Andrews was both to injure him and intimidate him (and other voters in the film), a jury could likewise plausibly infer that Defendants' agreement intended those very effects. *See United States v. Myers*, 972 F.2d 1566, 1573 (11th Cir. 1992) ("This circuit has approved similar jury instructions that allow the jury to infer intent from the natural and probable consequences of an act.").

In response, Defendants do not seriously contest that they conspired with one another. Instead, they contend that the purpose of their agreement was merely

"publishing media products," rather than an unlawful conspiracy. Salem MTD at 10. But this argument is not a defense at all. Publishing and promoting the film and the book necessarily consisted of publishing false and defamatory statements about Mr. Andrews, which demonstrates the very purpose of the conspiracy. Defendants' business motive for their actions does not immunize them from conspiracy liability. An agreement to perform a "lawful act in an unlawful manner" is just as illegal as agreeing "to participate in an unlawful act." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). *See also Libertad v. Welch*, 53 F.3d 428, 446 (1st Cir. 1995) (rejecting argument "that a bank robber lacks mens rea and thus cannot be convicted because his ultimate objective was to make money, not to commit robbery.")

### 2.      Mr. Andrews Has Alleged That Defendants Undertook Overt Acts In Furtherance Of The Conspiracy

Mr. Andrews has also plausibly alleged that multiple Defendants undertook overt acts in furtherance of the conspiracy, including but not limited to: D'Souza, Engelbrecht, and Phillips starring in the film, Compl. ¶¶ 18, 21-22; the Salem Defendants producing and publishing the *2000 Mules* film, *id.* ¶¶ 32, 47, 137; the Salem Defendants and D'Souza publishing the *2000 Mules* book, *id*. ¶¶ 33, 70-76, 163; and all Defendants promoting the film and book by creating the trailer, hosting websites, making television and other media appearances, and posting on social media. *See id.* ¶¶ 45-47, 54-55, 59-62, 65, 136, 139-140, 142-147, 167-168,

(regarding D'Souza Defendants); *id.* ¶¶ 45-46, 49-52, 168 (regarding Salem Defendants). *See also id.* ¶¶ 45-47, 49-52, 56-57, 63-64, 66-69, 135, 149, 162 (regarding TTV Defendants). All Defendants have repeatedly published Mr. Andrews' image and the false claims against him. *Id.* ¶¶ 48-68.[14]

### B.      Defendants' Misstate The Elements Of Plaintiff's Klan Act Claim

The thrust of Defendants' counterarguments are premised on a mischaracterization of the elements of Mr. Andrews' Klan Act claim. Specifically, they argue that he has not alleged "invidiously discriminatory animus," Salem MTD at 8-9, or that he was deprived of his civil rights, *id.* at 9. *See also* D'Souza MTD at 7. But these arguments are relevant only to claims brought under the Klan Act's equal protection clauses and thus are not applicable here.

Section 1985(3) has four clauses. Defendants erroneously import the elements of a claim under clauses 1 and 2 (the equal protection clauses) into claims under clauses 3 and 4 (the support-or-advocacy clauses). The text of Section 1985(3) reads:

> If two or more persons . . . conspire or go in disguise on the highway or on the premises of another,
>
> > [1] for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; **or**

---

[14]   The Salem and D'Souza Defendants do not appear to contest that he was injured.

[2] for the purpose of preventing or hindering the constituted authorities . . . from giving or securing to all persons . . . the equal protection of the laws; **or**

if two or more persons conspire

[3] to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; **or**

[4] to injure any citizen in person or property on account of such support or advocacy

in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property . . . . the party so injured or deprived may have an action . . . against any one or more of the conspirators.

42 U.S.C. § 1985(3) (brackets, emphasis, and line breaks added).

### 1.    Mr. Andrews Need Not Show Any Class-Based Animus

There is no class-based animus element of a claim under clauses 3 or 4. As the Supreme Court explained in *Kush v. Rutledge*, courts should not import equal protection elements into the clauses of Section 1985 that do not contain the equal protection language. 460 U.S. 719, 726 (1983) ("[t]here is no suggestion" that the equal protection language should apply to "any other portion of § 1985"); *accord McCord v. Bailey*, 636 F.2d 606, 614 & n.12 (D.C. Cir. 1980) (no showing of class-based animus is required where the text "does not demand a denial of 'equal

protection of the laws'"). While clauses 1 and 2 are aimed at enforcing the equal protection of the laws, clauses 3 and 4 are aimed at different ills: the interference with an important federal function, namely, the right to vote. Clauses 3 and 4 thus rely on a different constitutional authority (the Elections Clause, rather than the Equal Protection Clause) and require pleading different elements.[15]

Thus none of the cases that Defendants cite actually support their argument, because they all involve claims under clause 1, and not clauses 3 or 4. *See Griffin v. Breckenridge*, 403 U.S. 88, 92 (1971) (clause 1); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268-69 (1993) (clause 1); *Dean v. Warren*, 12 F.4th 1248, 1257 (11th Cir. 2021) (clause 1); *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 766 (11th Cir. 2000) (clause 1); *Cook v. Randolph Cnty., Ga.*, 573 F.3d 1143, 1149 (11th Cir. 2009) (clause 1).

Contrary to Defendants' assertions, courts have overwhelmingly followed *Kush* and rejected attempts to graft a class-based animus requirement onto support-or-advocacy claims. *See, e.g.*, *Colorado NAACP*, 2023 WL 1338676, at *9 n.2; *Cervini v. Cisneros*, 593 F. Supp. 3d 530, 536-38 (W.D. Tex. 2022); *Wohl I*, 498 F.

---

[15]  That clauses 1-4 are all codified in 42 U.S.C. § 1985(3) is an artifact of how the Klan Act was recodified into the modern U.S. Code. *See Kush*, 460 U.S. at 726 (the "legislative background" of the equal protection clauses of § 1985 "does not apply to the portions of [it] that prohibit interference with . . . federal elections").

Supp. 3d at 487; *LULAC*, 2018 WL 3848404, at *5-6; *Federer v. Gephardt*, 363 F.3d 754, 760 (8th Cir. 2004).

### 2.   Mr. Andrews Has Plausibly Alleged "Force, Intimidation, Or Threat"

Defendants also argue that Mr. Andrews' Klan Act claim fails because he has not sufficiently alleged "force, intimidation, or threat" or that he was prevented from voting. Salem MTD at 10-11; D'Souza MTD at 7. This is wrong.

*First*, Defendants' conduct squarely falls within well-established bounds of what constitutes "force, intimidation, or threat," related to voting. *See supra* at 26-30. *Second*, Mr. Andrews has, in fact, alleged that Defendants had "direct participation" in these acts of voter intimidation. *See, e.g.*, Compl. ¶¶ 33, 37-41, 45-47, 54-55, 59-60, 65, 70, 72, 74-76, 139-140, 142-147, 163, 168 (regarding D'Souza Defendants); *id.* ¶¶ 33, 37-41, 70, 72, 74-75, 163 (regarding Salem Defendants).

*Third*, to the extent that Defendants argue that each individual defendant must have engaged in a specific act in furtherance of the conspiracy, this is wrong: "an individual conspirator need not participate in the overt act in furtherance of the conspiracy. Once a conspiracy is established, and an individual is linked to that conspiracy, an overt act committed by any conspirator is sufficient." *McNair*, 605 F.3d at 1202 n.67 (citation omitted). Mr. Andrews has indisputably pleaded that

there was both a conspiracy and that at least one conspirator took an overt act in furtherance of that conspiracy. *See supra* at 36-37 (detailing overt acts).

*Finally*, Defendants wrongly contend that Mr. Andrews' claim fails because "he has not been prevented from voting." Salem MTD at 11. But the text requires that he plead that he was "injured" by an act in furtherance of Defendants' conspiracy to intimidate him for voting or to injure him on account of his vote, not that he was prevented from voting. *See* 42 U.S.C. § 1985(3), clauses 3 and 4.

## III.  Mr. Andrews Has Stated Claims For Defamation, False Light, And Appropriation Of Likeness (Counts III, IV, V)

Salem Defendants argue that Mr. Andrews failed to properly plead his common law claims, Salem MTD at 15-29; TTV Defendants "join" these arguments; and D'Souza Defendants "join" these arguments with respect to "Defamation Per Quod" and asserting a public interest privilege to the invasion of privacy claims, D'Souza MTD at 8. As set forth below, however, Mr. Andrews has stated claims for defamation, invasion of privacy by false light, and invasion of privacy by appropriation of likeness.

### A.   Mr. Andrews Has Stated A Claim For Defamation

Under Georgia law, the elements of a defamation claim are: (a) a false and defamatory statement of and concerning the plaintiff; (b) an unprivileged communication of the statement to a third party; (c) fault by the defendant amounting

at least to negligence; and (d) harm to the plaintiff, unless the statement amounts to per se defamation. *Smith v. Stewart*, 660 S.E.2d 822, 828 (Ga. Ct. App. 2008); *see also Echols v. Lawton*, 913 F.3d 1313, 1321 (11th Cir. 2019). Mr. Andrews has pleaded all elements of this claim.

### 1.  Mr. Andrews Has Pleaded That The Statements At Issue Were "Of And Concerning" Him Even If His Face Was At Times Blurred

Salem Defendants (and TTV Defendants) incorrectly assert that their defamatory statements are not "of and concerning" Mr. Andrews. Salem MTD at 16-20; *see also* TTV MTD at 40-42. A statement is "of and concerning" a plaintiff where "the allegedly defamatory words . . . refer to some ascertained or ascertainable person, and that person must be the plaintiff." *Smith* 660 S.E.2d at 828 (citations omitted). The test is met where either the plaintiff was in fact the person meant or where the plaintiff was understood to be the person spoken about in light of extrinsic facts. Robert D. Sack, Sack on Defamation § 2:9.1 (PLI). Thus, "[w]hen the plaintiff's photograph is used in a publication, but not the plaintiff's name, courts will almost always find the communication to be 'of and concerning' the plaintiff." Smolla, 1 Law of Defamation § 4:41 (2d ed.); *see Triangle Publ'ns, Inc. v. Chumley*, 317 S.E.2d 534, 537 (Ga. 1984) (rejecting argument that a photograph of plaintiff published with a substitute name was not "of and concerning" plaintiff); *Brauer v.*

*Globe Newspaper Co.*, 217 N.E.2d 736, 738 (Mass. 1966) (publication was of and concerning plaintiff even though his facial characteristics were not visible and he was not named in the article). "It is not necessary that all the world should understand the libel; it is sufficient if those who knew the plaintiff can make out that [he] is the person meant." *Smith*, 660 S.E.2d at 829. Moreover, "as a general rule," whether statements are "of or concerning the plaintiff[] is a question of fact for determination by a jury." *Davis v. Macon Tel. Publ'g Co.*, 92 S.E.2d 619, 622 (Ga. Ct. App. 1956).

Here, there can be no doubt that the "of and concerning" requirement is met: all Defendants published video *of Mr. Andrews*, and they concede as much. *See* Salem MTD at 16-20; TTV MTD at 40-42; D'Souza MTD at 3. As a result, Mr. Andrews was actually recognized and his identity ascertained. Compl. ¶¶ 89-90.

Salem Defendants disregard the relevant inquiry by emphasizing that Mr. Andrews' face was (sometimes) blurred. But whether his face is blurred does not change whether his identity can be ascertained. And since it can be (and was), all Defendants' publications are "of and concerning" him regardless of whether his face was blurred at times. Courts have permitted defamation claims to proceed on far less. *See, e.g.*, *Bell v. Johnson Publ'g Co.*, 2018 WL 357888, at *4 (M.D. Ga. Jan. 10, 2018) (although article used pseudonyms, it contained sufficient identifying information for persons who knew plaintiffs to identify them); *see also Triangle Publ'ns*, 317 S.E.2d at 537.

The Complaint alleges conclusive proof that Mr. Andrews' identity was ascertainable in Salem Defendants' publications, as his identity was, in fact, ascertained: a reporter for a national newspaper identified and contacted him. Compl. ¶ 89. And when his wife learned of the film and watched the trailer (which contains the same video as the film), she *immediately* recognized him. *Id.* ¶¶ 89-90.

To avoid the straightforward conclusion that their publications containing Mr. Andrews' image (and his car and license plate) were of and concerning him, Salem Defendants rely on cases that are much more ambiguous or even concern works of fiction. *See* Salem MTD at 16-20; *see also* TTV MTD at 40-42. But most of those cases involve no visual representation of the plaintiff, and instead consider whether *words* used in the defamatory statement *could* be said to be about the plaintiff. *See 800 Mktg. Sols., Inc. v GMAC Ins. Mgmt. Corp.*, 2008 WL 2777140 (M.D. Ga. July 14, 2008) (statement not "concerning" plaintiff because on its face the statement related to different entity); *Eakin v. Rosen*, 2017 WL 5709564, at *3 (M.D. Ga. Nov. 27, 2017) (plaintiff did not meet description in article); *Dekalb Motor Escort v. Verizon Commc'ns, Inc.*, 2005 WL 8155369, at *3 (N.D. Ga. Sept. 27, 2005) (statement referred only to a business entity that did not contain plaintiffs' names); *Southland Publ'g Co. v. Sewell*, 143 S.E.2d 428 (Ga. Ct. App. 1965) (question of fact whether statements were "of and concerning plaintiff" where a business name included plaintiff's name). *Collins v. Creative Loafing Savannah, Inc*, 592 S.E.2d

170 (Ga. Ct. App. 2003), which had a cartoon caricature loosely based on a plaintiff along with a story explicitly about someone else, was decided at summary judgment.

Because all Defendants' publications included images that are indisputably of Mr. Andrews, and because others in fact ascertained his identity from the images, all of Defendants' publications (blurred or unblurred) are "of and concerning" him.

### 2.   Salem Defendants Are Liable For All Of The Defamatory Statements At Issue

Salem Defendants also contend that they are accountable only for statements in the *2000 Mules* book and film, and not the trailer or promotional appearances by other Defendants. Salem MTD at 17 n.4. This is wrong.

The Complaint plausibly alleges that Salem Media is responsible for the defamatory content that it produces, publishes, and distributes on shows that it produces and/or publishes, regardless of whether that content is also republished elsewhere. *See* Compl. ¶¶ 50-51. For example, while Salem attempts to disclaim responsibility for publishing Mr. Andrews' unblurred image on *The Charlie Kirk Show*, that show is produced by Salem and Kirk is identified in the book and film as a "Salem host." Compl. ¶¶ 25, 49-50. During an interview by Salem host Charlie Kirk (with Engelbrecht and Phillips), the video of Mr. Andrews was shown twice, unblurred, while the three falsely accused Mr. Andrews of crimes. Compl. ¶¶ 49-50. The second time that Mr. Andrews' image was shown, the location, date, and time

that he voted were included alongside Salem's large bold lettering labeling Mr. Andrews as committing the crime of "ballot harvesting." *Id.* ¶ 52. While Salem might seek to dispute the factual allegations about its relationship with Salem programs, Salem MTD at 17 n.4, at this stage of the proceedings, the Complaint's allegations must be taken as true.

Salem Defendants also assert they were "meticulous" in blurring Mr. Andrews' face. Salem MTD at 20. Not so. *See* Compl. ¶¶ 49-52 (unblurred image on *The Charlie Kirk Show*, which has a "Salem host" and is distributed and produced by Salem). Moreover, Salem is liable for statements on its broadcasts as it did not exercise due care to prevent publication of these defamatory statements.[16]

Further, to the extent this tort supports Mr. Andrews' Klan Act and civil conspiracy claims, all Defendants are liable for the actions of co-conspirators. *See supra* at 40-41. The cases Defendants cite about *unaffiliated* parties republishing defamatory material are therefore inapplicable. *See* Salem MTD at 20.

Finally, Salem Defendants are responsible for republications that are "a natural and probable consequence of" their initial defamatory publications. *Davis v. Nat'l Broad. Co.*, 320 F. Supp. 1070, 1072 (E.D. La. 1970); *see also* Restatement

---

[16] Moreover, the fact that Salem Defendants at times blurred Mr. Andrews' image and at times did not, underscores they knew that they were risking liability for using his image along with the defamatory statements about him.

(Second) of Torts § 576 (1977); *supra* at 25-26. For example, the Complaint alleges sufficient facts to plausibly infer that Salem bears responsibility for the statements in the "trailer" for the film it produced. Compl. ¶ 45.

### 3. Mr. Andrews Need Not Plead Special Damages, But Has Pleaded Them

Because Mr. Andrews has pleaded defamation *per se*, he need not plead special damages. *See Melton v. Bow*, 247 S.E.2d 100, 101 (Ga. 1978); Compl. ¶ 284. Regardless, he alleges special damages. Compl. ¶¶ 217, 294; *see Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 114 (D.D.C. 2011) (plaintiff's request of "special damages" in complaint is sufficient under Georgia law). *Contra* Salem MTD at 21; D'Souza MTD at 8; TTV MTD at 42-44.

### B. Mr. Andrews Has Sufficiently Alleged Actual Malice

Mr. Andrews has alleged that all Defendants acted with actual malice. *Contra* Salem MTD at 26-27; TTV MTD at 45.[17] A defendant acts with actual malice when publishing a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). A defendant acts with reckless disregard if he "entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

---

[17]  D'Souza Defendants appear not to dispute the allegation of actual malice.

"Seldom will a defendant confess his state of mind and thus allow the plaintiff to prove malice with direct evidence," rather, "a plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence." *US Dominion, Inc. v. Byrne*, 600 F. Supp. 3d 24, 33 (D.D.C. 2022) (citations omitted); *see Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir. 1983) (inferences from circumstantial evidence may show actual malice). "[T]here is no heightened pleading standard for malice," rather, the "usual standards . . . apply," namely that only a "plausible claim for relief must be articulated." *Mayfield v. NASCAR*, 674 F.3d 369, 377 (4th Cir. 2012) (cited in Salem MTD at 28).

### 1.   All Defendants Republished And Refused To Retract Their Demonstrably False Statements About Mr. Andrews

Mr. Andrews sent letters to all Defendants alerting them to the false and defamatory nature of their statements in the film, book, trailer, and promotional appearances. Compl. ¶¶ 158-59, 164. Under Georgia law, a retraction *after* receiving such a letter can show a *lack* of actual malice. *See* O.C.G.A. § 51-5-11(b)(1)(A). Here, *none* of the Defendants have retracted or removed their statements from the film, book, trailer, websites, or social media; they continue to promote the book and film. Compl. ¶¶ 53, 64, 69, 135, 162, 181 (TTV Defendants); *id.* ¶¶ 53, 165, 181, 191, 227 (Salem Defendants); *id.* ¶¶ 165, 181, 191, 227 (D'Souza Defendants). The film remains available for streaming on Salem Defendants' website, Salemnow.com.

48

Compl. ¶¶ 32 n.16, 172. Indeed, the Salem Defendants published the book weeks *after* Mr. Andrews sent them his initial letter. *Id.* ¶¶ 70-71, 158, 163, 250.

### 2. Defendants Knew Their Statements About Mr. Andrews Were False, Or Consciously Avoided Or Ignored The Truth

All Defendants knew of but ignored the falsity of their allegations against Mr. Andrews, or at a minimum, consciously avoided the truth. "[A]n inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him." *Hunt*, 720 F.2d at 645. A defendant's choice to ignore reliable, available evidence that conflicts with their narrative is sufficient to find they acted with actual malice. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 683-84 (1989).

The Complaint alleges sufficient facts to plausibly infer that Salem Defendants knew that Georgia law enforcement had publicly cleared Mr. Andrews of any election fraud, because this was public and widely known, and nevertheless they continued to publish statements depicting him as a criminal. Compl. ¶¶ 128-30, 136. For example, *2000Mules.com*, the website for Salem Defendants' film and book, acknowledges various "fact-checkers." Compl. ¶ 114. And, as early as May 18, 2022 (prior to the film and book's release) D'Souza noted on his Salem produced podcast that he knew of the GBI investigation, and therefore of the falsity of his accusations. *Id.* ¶¶ 25, 129-30. In addition to this public acknowledgement of the

49

investigation on a Salem-published podcast, it is plausible to infer that the Salem Defendants were aware of—or consciously avoided—the GBI investigation when their collaborators were extensively aware of it. *See supra* at 31-37 (describing close coordination among Defendants).

Moreover, even if Salem Defendants did not have actual knowledge of information contradicting their statements about Mr. Andrews from the start, the Complaint alleges that they have such actual knowledge now—especially after the October 2022 retraction letters—but have continued to republish the defamatory statements, and have not removed them from the film or book. Compl. ¶¶ 9, 138, 155, 160, 164, 169, 191-192, 196, 227, 250. Further, a vast array of experts publicly debunked the narrative about Mr. Andrews. Compl. ¶¶ 103-104, 107, 109, 121-123.

Similarly, the Complaint alleges sufficient facts to plausibly infer that TTV Defendants knew their statements about Mr. Andrews were false, or consciously chose to ignore reliable, available evidence that was false. Compl. ¶¶ 125, 131 (Phillips and Engelbrecht actual knowledge of falsity); *id.* ¶¶ 103-104, 107, 109-110, 114, 129-131 (all Defendants' knowledge, including TTV Defendants). And TTV Defendants have actual knowledge of the falsity of their statements after the retraction letter sent in October 22, yet they have continued to spread the false and defamatory statements about Mr. Andrews. Compl. ¶¶ 53, 64, 69, 135, 162, 181.

### 3. Additional Circumstantial Evidence Supports An Inference Of Subjective Recklessness To Show Actual Malice

Circumstantial evidence supporting an inference of subjective recklessness includes: that defendants "fabricated" the story; that the defamatory statements are "so inherently improbable that only a reckless man would have put them in circulation"; or that "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732. "[A] publisher cannot feign ignorance or profess good faith when there are clear indications present which bring into question the truth or falsity of defamatory statements." *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 538 (7th Cir. 1982).

The Complaint plausibly alleges that Salem Defendants helped "fabricate" the "mules" narrative, including false accusations about Mr. Andrews, and relied on information "so inherently improbable" and with "obvious reasons to doubt [its] veracity" to support an inference of actual malice. *See St. Amant*, 390 U.S. at 732. As alleged in the Complaint, Salem was not just an investor in the film, but also considered the evidence and then worked with their business partners to fabricate the false statements about Mr. Andrews in the film, book, and trailer. The Complaint alleges that the book contains photos showing D'Souza driving to Salem Media's location, captioned: "This is a movie recreation of our fateful summit with Catherine and Gregg. **We took their evidence to Salem Media to see if Salem would provide**

51

**the equity investment to make the 2000 Mules documentary**.” Compl. ¶ 76 (emphasis added). Given that Salem reviewed the “evidence” before deciding create the film and book, it is reasonable to infer they were aware—or recklessly disregarded—the falsity of their statements. *See* Compl. ¶¶ 111, 118, 121-25, 193-95; *Hunt*, 720 F.2d at 643 (“actual malice may be inferred when the [publisher’s] investigation for a story . . . was grossly inadequate in the circumstances.”).

For example, multiple authorities, including the source of some of the geolocation data upon which the film relies, have publicly explained that the data does not support the *2000 Mules* theory. Compl. ¶¶ 99-107, 110, 117-18. Further, there were extensive reasons for Salem Defendants to doubt the veracity of their partners (the D’Souza and TTV Defendants) in creating the film and book. *Id.* ¶¶ 189-190 (D’Souza Defendants); *id.* ¶¶ 182-186 (TTV Defendants).

The Complaint also alleges sufficient facts to support the same inference that the TTV Defendants “fabricated” the mules story, relied on “inherently improbable,” evidence and had “obvious” reasons to doubt its “accuracy.” *See* Compl. ¶¶ 131, 195 (TTV Defendants’ actual knowledge); *id.* ¶¶ 103-104, 107, 109-110, 129-131 (all Defendants’ knowledge, including TTV Defendants); *id.* ¶ 158 (retraction letter sent to TTV Defendants); *id.* ¶¶ 53, 64, 69, 135, 162, 181 (TTV Defendants’ continued publication of false statements after the retraction letter).

### 4. Defendants Had A Financial Motive To Make False Claims

Financial motive is further circumstantial evidence of actual malice. *See Harte-Hanks Comm'ns*, 491 U.S. at 668. Despite knowledge that Mr. Andrews was not a "mule," Salem Defendants continue to profit from the book and film. Compl. ¶¶ 170-81. Salem Media has a financial interest in the film and has reported more than $10 million in revenue (so far) from it. *Id.* ¶¶ 154, 172-73. And the book, currently in wide distribution, is generating substantial revenue for Regnery and Salem. *Id.* ¶ 175. The same is true for TTV Defendants, who continue to profit from the film, book, and other business that *2000 Mules* drives towards them. Compl. ¶¶ 174, 176, 178-179, 187, 192 n.191. D'Souza Defendants also profit from the film, *id.* ¶¶ 166, 172, 174, 188; the book (with Regnery), *id.* ¶¶ 165-166, 175, 188, 191; and the discussion of both on his podcast (with Salem), *id.* ¶ 188.

### 5. Defendants' Statements Are Not Conditionally Privileged

Whether Defendants' statements are conditionally privileged is irrelevant, because Mr. Andrews' has pleaded actual malice. Regardless, Defendants are wrong that the statements are conditionally privileged under O.C.G.A. § 51-5-7(4). Salem MTD at 26-29; TTV MTD at 44 (adopting this argument only with respect to false light and appropriation of likeness claims); D'Souza MTD at 8-9 (same).

To avail themselves of this privilege, a defendant "must show that his statements were made with 'good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons.'" *Neff v. McGee*, 816 S.E.2d 486, 526 (Ga. Ct. App. 2018). A statement is "deemed not to have been made in good faith" if "a defendant in fact had serious doubts as to the truth of his statements." *Id.* at 527. "Likewise, the failure to exercise ordinary care to reasonably ascertain the truth or accuracy of the statement may show a lack of good faith." *Smith v. Vencare, Inc.*, 519 S.E.2d 735, 741 (Ga. Ct. App. 1999).

Here, for the same reasons *supra* that the Complaint adequately pleads that all Defendants acted with actual malice, it also alleges that all Defendants did not act in "good faith" because they had or should have had "serious doubts" as to the truth of their statements. *See Neff*, 816 S.E.2d at 526. Indeed, the standard for the privilege to apply—"ordinary care to reasonably ascertain the truth" of the statement—is a lower standard than actual malice. *See id.* Thus Mr. Andrews' allegations surely meet the lower bar of alleging that all Defendants failed to act with "ordinary care."

## C.   Mr. Andrews Sufficiently Alleges Invasion Of Privacy By False Light (Count IV)

Mr. Andrews has stated a claim that all Defendants violated Georgia law prohibiting invasion of privacy by false light. "[T]o establish a claim of false light, a plaintiff must establish the existence of false publicity that depicts the plaintiff as

something or someone which [she] is not" and that "the false light in which [she] was placed would be highly offensive to a reasonable person." *Assoc. Servs., Inc. v. Smith*, 549 S.E.2d 454, 459 (Ga. Ct. App. 2001) (alteration in original) (citations omitted). Being falsely accused of crimes is highly offensive to a reasonable person. *See Holmes v. Dominique*, 2015 WL 11236539, at *5 (N.D. Ga. Jan. 20, 2015) ("an average person" would find false accusations of crimes "defamatory on their face.").

Here, the Complaint alleges that the Salem Defendants published, caused to publish, or reasonably could have foreseen the publication of Mr. Andrews' image (and his vehicle and license plate), Compl. ¶¶ 9, 37, 45, 49, 70-76, 163, accompanied by language depicting him as something that he is not, namely, a "mule" who committed voter fraud and other crimes, *id.* ¶¶ 3, 38-39, 43, 50, 55. The Complaint alleges the same with respect to the TTV Defendants. *Id.* ¶¶ 37, 45, 47, 49, 53, 56-58, 63-64, 66-69, 135, 137, 149, 162. So, too, with the D'Souza Defendants. *Id.* ¶¶ 37, 45, 47, 54-55, 59-60, 65, 70-76, 136-137, 139-140, 142-147, 163.

Salem Defendants counter that Mr. Andrews' false light claim is subsumed by his defamation claim. Salem MTD at 22. However, dismissal on that ground is only appropriate if the Court finds the statements constitute defamation; at this stage, alternative pleading is appropriate. *Krass v. Obstacle Racing Media, LLC*, 2021 WL 4824110, at *3 (N.D. Ga. Feb. 2, 2021).

Salem Defendants also assert that Mr. Andrews fails to allege that they publicly depicted him as something which he is not, because he was "never named or identified in the film or book." Salem MTD at 22-23. But as discussed above, Mr. Andrews can be, and in fact *was*, identified from the film, official trailer, and book. *See supra* at 44. And while blurring is irrelevant, the publications of his *unblurred* image were on a show produced and published by Salem. Compl. ¶¶ 49-52. As a "natural and probable consequence," of Salem Defendants' publications, others have published and republished additional false statements about Mr. Andrews. *See Davis*, 320 F. Supp. at 1072; *see also* Restatement (Second) of Torts § 576 (1977).

### D.   Mr. Andrews Sufficiently Alleges Invasion Of Privacy By Appropriation Of Likeness (Count V)

The Complaint alleges a near-textbook violation of Georgia law prohibiting invasion of privacy by appropriation of likeness. This tort is distinct from defamation and false light. Instead, it "consists of the appropriation, for the defendant's benefit, use or advantage, of the plaintiff's name or likeness." *Bullard v. MRA Holding, LLC*, 740 S.E.2d 622, 626-27 (Ga. 2013). "[T]he publication of a picture of a person, without his consent, as a part of an advertisement, for the purpose of exploiting the publisher's business, is a violation of the right of privacy of the person whose picture is reproduced, and entitles him to recover." *Id.* at 627 (citation omitted).

Here, Defendants appear not to dispute that Mr. Andrews' image was used without his consent for profit. Instead, Salem Defendants argue that because they (sometimes) blurred his face, they did not intend to appropriate his likeness. Salem MTD at 23-24. But whether his face was blurred is irrelevant, *see supra* at 42-45, and it was not always blurred, Compl. ¶¶ 50, 52, 56, 63, 147. Moreover, there is no indication that "likeness" requires an image of facial features—rather, the sole case Defendants cite suggests otherwise. In *Branson v. Fawcett Publications, Inc.*, 124 F. Supp. 429 (E.D. Ill. 1954), Salem MTD at 24, the blurred picture was of an automobile that plaintiff contended he was driving. The court dismissed the claim because "[n]o likeness, *face, image, form or silhouette* . . . is shown" and it appeared "there is no one in the car." *Id.* at 432 (emphasis added). Here, even when blurred, Mr. Andrews' "likeness" "form" and "silhouette" are clearly visible. *See id*.

Finally, Salem Defendants assert that the appropriation of likeness claim fails because Georgia has a "newsworthiness" exception to this tort. Salem MTD at 25; *see also* D'Souza MTD at 8 (adopting argument); TTV MTD at 44 (same). However, "to fit within the zone of protection afforded 'news', an account must be factually accurate." *Maples v. Nat'l Enquirer*, 763 F. Supp. 1137, 1143 (N.D. Ga. 1990). And this exception does not apply to expression for commercial gain. *See Pavesich v. New England Life Ins. Co.*, 50 S.E. 68, 80 (Ga. 1905); Compl. ¶¶ 37-40, 45, 137.

**E.      Mr. Andrews Sufficiently Alleges Civil Conspiracy (Count VI)**

For similar reasons that he has adequately alleged a Klan Act conspiracy, Mr.
Andrews has also adequately alleged a civil conspiracy. "To recover damages based
on a civil conspiracy, a plaintiff must show that two or more persons combined either
to do some act which is a tort, or else to do some lawful act by methods which
constitute a tort." *TMX Fin., LLC*, 833 S.E.2d at 335. "Because civil conspiracy is
by its very nature a secret endeavor . . . [it] is best suited for jury resolution." *Miller
v. Lomax*, 596 S.E.2d 232, 242 (Ga. Ct. App. 2004) (citation omitted).

*First*, the Complaint adequately pleads multiple underlying torts. *See supra* at
41-57. *Second*, Mr. Andrews has pleaded sufficient facts to plausibly infer that
Defendants conspired to defame him and subject him to other tortious acts by
agreeing to create, produce, promote, and profit from the *2000 Mules* film and book
and their false accusations therein. *See supra* at 31-36. *Third*, Salem Defendants seek
to shield themselves by contending that they blurred Mr. Andrews' image. This is
both irrelevant and false. *See supra* at 42-45; Compl. ¶¶ 49, 56, 63. Moreover, *all*
Defendants are "jointly and severally liable" for conspirator's actions. *See McIntee
v. Deramus*, 722 S.E.2d 377, 380 (Ga. Ct. App. 2012).

## IV.    Plaintiff Has Stated A Claim For Punitive Damages (Count VII)

A plaintiff may recover punitive damages where defendants "showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12.5.1(b). "Malice" here incorporates the defamation standard for "actual malice," that is, "the speaker's actual or constructive knowledge" of the statements' falsity. *Zedan v. Bailey*, 522 F. Supp. 3d 1363, 1375-76 (M.D. Ga. 2021).

The Complaint more than sufficiently alleges actual malice by the Salem Defendants, D'Souza Defendants, and TTV Defendants, *see supra* at 47-52, thus Mr. Andrews has met the standard for punitive damages.

Defendants' argument that their efforts to blur Mr. Andrews' image indicates a lack of intent, Salem MTD at 24, is wrong. Defendants *did* broadcast Mr. Andrews' unblurred image. Compl. ¶¶ 49-52, 56-57, 63, 90. Mr. Andrews has pleaded actual malice. *See supra* at 47-52. And blurring, if relevant at all, indicates Defendants' knowledge that their statements about Mr. Andrews were false.

Salem Defendants also incorrectly argue that Mr. Andrews failed to send Regnery a retraction letter. Salem MTD at 30. But he sent one on October 24, 2022. Compl. ¶ 164; Salem MTD, Ex. A. Salem is also wrong that the retraction letter preceded "publication" of the book's defamatory statements. "[P]ublication" occurs "as soon as it is communicated to any person other than the party libeled." O.C.G.A.

§ 51-5-3. The book was originally released in August 2022, but was recalled. *See* Compl. ¶¶ 33 n.18, 70 n.62, 166 n.157. Multiple copies, however, were available in August, which is how there was reporting on the book and recall. *Id.* Initial "publication" therefore occurred before the retraction letter, even if re-publication occurred later. Any argument to the contrary is a factual dispute that cannot be resolved here.

Finally, Salem's argument that the retraction letter to Regnery was invalid because it "does not request retraction of any kind" ignores the single case Defendants cite, which held that the retraction statute "does not place any limitations on the contents of the notice," and does not require "any particularized demand" to recover punitive damages. *See Bell*, 2018 WL 357888, at *7.

## CONCLUSION

For these reasons, the Salem Defendants' and D'Souza Defendants' motions to dismiss should be denied in their entirety.

Dated: March 24, 2023                    Respectfully submitted,

*/s/ Rachel F. Homer*
Rachel F. Homer*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Avenue NW, #163
Washington, DC 20006
Tel: (202) 579-4582
rachel.homer@protectdemocracy.org

*/s/ Von A. DuBose*
Von A. DuBose, Esq.
Georgia Bar No. 231451
DuBose Miller, LLC
75 14th Street NE, Suite 2110
Atlanta, GA 30309
Tel: (404) 720-8111
dubose@dubosemiller.com

Sara Chimene-Weiss*
PROTECT DEMOCRACY PROJECT
7000 N. 16th Street, Suite 120, #430
Phoenix, AZ 85020
Tel: (202) 934-4237
sara.chimene-weiss@protectdemocracy.org

Rachel E. Goodman*
John Paredes*
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
rachel.goodman@protectdemocracy.org
john.paredes@protectdemocracy.org

Jared Fletcher Davidson*
PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA 70117
Tel: (202) 579-4582
jared.davidson@protectdemocracy.org

Lea Haber Kuck*
One Manhattan West
New York, NY 10001-8602
Tel: (212) 735-3000
lea.kuck@probonolaw.com

Rajiv Madan*
Paige Braddy*
1440 New York Avenue NW
Washington, DC 20005
Tel: (202) 371-7000
raj.madan@probonolaw.com
paige.braddy@probonolaw.com

Vernon Thomas*
155 N. Wacker Drive
Chicago, IL 60606-1720
Tel: (312) 407-0648
vernon.thomas@probonolaw.com

**_Counsel for Plaintiff_**
*_Admitted Pro Hac Vice_*

## **RULE 7.1(D) CERTIFICATE**

The undersigned counsel certifies that this document has been prepared with Times New Roman 14-point font in accordance with Local Rule 5.1.C.


Dated: March 24, 2023          */s/ Rachel F. Homer*
                               Rachel F. Homer*


## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the within and foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS SALEM MEDIA GROUP, INC. AND REGNERY PUBLISHING'S MOTION TO DISMISS AND DEFENDANTS DINESH D'SOUZA AND D'SOUZA MEDIA LLC'S MOTION TO DISMISS** was electronically filed with the Clerk of Court using CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.


Dated: March 24, 2023          */s/ Rachel F. Homer*
                               Rachel F. Homer*