# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

| | |
|---|---|
| **MARK ANDREWS,** | Case No. 1:22-cv-04259-SDG |
| Plaintiff, | |
| v. | |
| **DINESH D'SOUZA, *et al.*,** | |
| Defendants. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS TRUE
THE VOTE, CATHERINE ENGELBRECHT, AND GREGG PHILLIPS'
MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ................................................................................... 1

STANDARD OF REVIEW ...................................................................... 2

ARGUMENT ......................................................................................... 2

I.    Defendants' Conduct Constitutes Unlawful Voter Intimidation Under The VRA And Klan Act ...................................................................... 3

    A.    Defendants' Conduct Fits Squarely Within The Bounds Of What Many Courts Have Found To Be Intimidation ........................... 3

    B.    Mr. Andrews Alleges That He Was Intimidated By Defendants, Regardless Of Whether Other Voters Were Also Intimidated ............ 5

    C.    Whether Mr. Andrews' Face Is Blurred Is Irrelevant ........................ 6

    D.    Defendants Are Liable For Voter Intimidation Regardless Of Whether They Directly And Personally Communicated With Mr. Andrews ..................................................................................... 9

    E.    Section 11(b) Of The VRA Is Enforceable Through A Private Cause Of Action .................................................................................. 14

II.    Defendants' Unlawful Voter Intimidation Is Not Protected By The First Amendment ............................................................................... 15

    A.    Defendants' Unlawful Voter Intimidation Is Not Shielded By The First Amendment Merely Because It Purportedly Has A Political Or Civic Purpose ................................................................. 16

    B.    Defamation Is Not Protected Under The First Amendment ............... 16

    C.    Non-Defamatory Speech Can Also Give Rise To Liability Under Section 11(b) Without Raising First Amendment Concerns ............................................................................................ 17

    D.    Defendants Do Not Need To Make "True Threats" To Be Liable For Voter Intimidation ............................................................ 19

III.    Mr. Andrews Has Stated A Claim Under The Klan Act, 42 U.S.C. § 1985(3) Clauses 3 And 4 ................................................................... 22

A.   Mr. Andrews Has Alleged Defendants Engaged In A Prohibited Conspiracy.................................................................................. 22

B.   Mr. Andrews Has Alleged The Requisite Intent................................ 25

IV.   Mr. Andrews Has Stated A Claim For Defamation .................................... 26

A.   Defendants' Statements Are Not Protected Opinion ........................ 26

B.   Defendant's Statements Are "Of And Concerning" Mr. Andrews ............................................................................................. 33

C.   Mr. Andrews Need Not Plead Special Damages, But He Has Pleaded Them...................................................................................... 34

D.   Mr. Andrews Sufficiently Alleges His Invasion Of Privacy Claims—False Light And Appropriation Of Likeness—Under Georgia Law ...................................................................................... 34

E.   Mr. Andrews Has Adequately Alleged Actual Malice ..................... 35

F.   Mr. Andrews Has Stated A Claim For Punitive Damages................ 35

CONCLUSION............................................................................................... 35

RULE 7.1(D) CERTIFICATE ........................................................................ 38

CERTIFICATE OF SERVICE ....................................................................... 38

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Arcia v. Fla. Secretary of State*,
    772 F.3d 1335 (11th Cir. 2014) ...................................................... 10

*Arizona Alliance for Retired Ams. v. Clean Elections USA*,
    2022 WL 17088041 (D. Ariz. Nov. 1, 2022)
    ("*Arizona Alliance*") ......................................................... 4, 5, 11, 18

*Bailey v. United States*,
    516 U.S. 137 (1995) ...................................................... 21

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................... 22, 25

*Bergen v. Martindale–Hubbell, Inc.*,
    337 S.E.2d 770 (Ga. Ct. App. 1985) .......................................... 27, 29

*Bilal v. Geo Care, LLC*,
    981 F.3d 903 (11th Cir. 2020) ................................................ 2, 25

*Burson v. Freeman*,
    504 U.S. 191 (1992) ...................................................... 19

*Cervini v. Cisneros*,
    593 F. Supp. 3d 530 (W.D. Tex. 2022) ......................................... 5

*Citizens for Police Accountability Pol. Comm. v. Browning*,
    572 F.3d 1213 (11th Cir. 2009) .............................................. 19

*Collins v. Cox Enterprises, Inc.*,
    452 S.E.2d 226 (Ga. Ct. App. 1994) .......................................... 29

*In re Delta/AirTran Baggage Fee Antitrust Litigation*,
    733 F. Supp. 2d 1348 (N.D. Ga. 2010) ........................................ 22

*DNC v. RNC*,
    673 F.3d 192 (3d Cir. 2012) ................................................ 11

*Eidson v. Berry*,
415 S.E.2d 16 (Ga. Ct. App. 1992) ....................................... 27, 28

*Fair Fight, Inc. v. True The Vote*,
No. 2:20-cv-00302, slip op. (N.D. Ga. Mar. 9, 2023),
Dkt. 222 ........................................................................ 4, 10, 12, 21

*Federal Election Commission v. Akins*,
524 U.S. 11 (1998) ............................................................................ 5

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949) ................................................................. 15, 18

*Harcrow v. Struhar*,
511 S.E.2d 545 (Ga. Ct. App. 1999) ............................................. 28

*Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*,
538 U.S. 600 (2003) ...................................................................... 18

*Jaillet v. Georgia Television Co.*,
520 S.E.2d 721 (Ga. Ct. App. 1999) ................................. 30, 32, 33

*Kendrick v. Jaeger*,
436 S.E.2d 92 (Ga. Ct. App. 1993) ............................................... 29

*Kirsch v. Jones*,
464 S.E.2d 4 (Ga. Ct. App. 1995) ................................................. 29

*League of United Latin Am. Citizens v. Pub. Int. Legal Found.*,
2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ("*LULAC*") ................... passim

*Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990) ...................................................................... passim

*Minn. Voters Alliance v. Mansky*,
138 S. Ct. 1876 (2018) ................................................................. 18

*Nat'l Coal. on Black Civic Participation v. Wohl*,
498 F. Supp. 3d 457 (S.D.N.Y. 2020) ("*Wohl I*") ............................. passim

*Nat'l Coal. on Black Civic Participation v. Wohl*,
512 F. Supp. 3d 500 (S.D.N.Y. 2021) ("*Wohl II*") ........................ 12

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    2023 WL 2403012 (S.D.N.Y. Mar. 8, 2023) ("*Wohl III*") .................. 4, 5, 24

*New York v. Horelick*,
    424 F.2d 697 (2d Cir. 1970) ........................................................... 21

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon General, Fla.*
    *Department of Health*,
    50 F.4th 1126 (11th Cir. 2022) ...................................................... 18

*Palm Beach Golf Cre-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*,
    781 F.3d 1245 (11th Cir. 2015) ....................................................... 2

*Principle Sols. Grp., LLC v. Ironshore Indemnity, Inc.*,
    944 F.3d 886 (11th Cir. 2019) ............................................... 10, 13

*Promoworks, LLC v. Graham*,
    2009 WL 10670413 (N.D. Ga. Dec. 9 ......................................... 28

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ......................................................................... 15

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ....................................................................... 11

*StopLoss Specialists, LLC v. VeriClaim, Inc.*,
    340 F. Supp. 3d 1334 (N.D. Ga. 2018) ....................................... 28

*United States v. Alvarez*,
    567 U.S. 709 (2012) ....................................................... 17, 18, 20

*United States v. Beaty*,
    288 F.2d 653 (6th Cir. 1961) ........................................................ 12

*United States v. Myers*,
    972 F.2d 1566 (11th Cir. 1992) .................................................... 24

*United States v. Quinn*,
    514 F.2d 1250 (5th Cir. 1975) ...................................................... 19

*Wright v. Apartment Inv. & Mgmt. Co.*,
    726 S.E.2d 779 (Ga. Ct. App. 2012) ........................................... 23

# STATUTES

42 U.S.C. § 1985(3) ........................................................................... passim

52 U.S.C. § 10307(b) ........................................................................ passim

# OTHER AUTHORITIES

Complaint, *Daschle v. Thune*, No. 4:04-cv-4177 (D.S.D. Nov. 1, 2004), Dkt. 1 ....................................................................................................... 5, 17

DOJ Brief, *Wohl III*, No. 20-cv-08668 (S.D.N.Y. Aug. 18, 2022), Dkt. 235......... 21

Transcript, *Ariz. Alliance for Retried Ams. v. Clean Elections USA*, No. 22-cv-01823 (D. Ariz. Nov. 1, 2022), Dkt. 69. ................................................ 11

Restatement (Second) of Torts § 442 (1965)......................................................... 11

Richard L. Hasen, *Drawing the Line Between False Election Speech and False Campaign Speech*, Knight First Amend. Instit. (Oct. 12, 2021) ........ 18

## INTRODUCTION

Defendants True the Vote, Catherine Engelbrecht, and Gregg Phillips (collectively, "TTV Defendants") present a hodge podge of arguments casting Mr. Andrews' claims as novel issues of first impression, somehow stretching the bounds of voter intimidation law, the First Amendment, defamation law, and invasion of privacy law. But the Court should ignore these attempts to obfuscate the relatively straightforward legal issues at hand.

Far from being novel, the Complaint alleges that Defendants have engaged in age-old voter intimidation tactics, exactly of a type that courts have long found to be unlawful and that even mirror textbook intimidation tactics from the time the Voting Rights Act was passed. Contrary to Defendants' arguments, the fact that third parties have engaged in even more egregious conduct in making threats to Mr. Andrews and his family does not absolve *these* Defendants from liability for their own actions and for the natural and foreseeable consequences of those actions under standard causation analysis. TTV Defendants' alleged conduct clearly constitutes unlawful voter intimidation, is not protected by the First Amendment, and is a straightforward proximate cause of Mr. Andrews' injuries.

Similarly, Defendants' false and defamatory statements that Mr. Andrews has committed crimes, and their use of his image for financial profit, are paradigmatic

examples of defamation, invasion of privacy by false light and appropriation of likeness. Their conduct exemplifies classic common law torts, and is not protected by the First Amendment. None of the legal issues in this case—and certainly none presented at the Motion to Dismiss stage—require the Court to break any new ground. The TTV Defendants' Motion to Dismiss should be denied in its entirety.

## STANDARD OF REVIEW

For purposes of this motion to dismiss, the Court must "accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Bilal v. Geo Care, LLC*, 981 F.3d 903, 911 (11th Cir. 2020) (citation omitted). To survive a motion to dismiss for failure to state a claim, "the complaint need only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1260 (11th Cir. 2015) (citations omitted).

## ARGUMENT

TTV Defendants conflate the legal issues involved in the elements of each claim, in standard causation analysis, and in the First Amendment. They rely on the outlandish subject matter of their false allegations against Mr. Andrews—involving the 2020 presidential election—to somehow imply that Plaintiff's legal arguments are new or "creative." But contrary to Defendants' attempts at obfuscation, the legal

issues here are relatively straightforward, especially at the motion to dismiss stage. Defendants have engaged in classic voter intimidation that is well-recognized as unlawful under both Section 11(b) of the Voting Rights Act ("VRA"), 52 U.S.C. § 10307(b), and the Ku Klux Klan Act (the "Klan Act"), 42 U.S.C. § 1985(3), clauses 3 and 4. And the First Amendment does not shield Defendants from liability on any of Mr. Andrews' claims, including his common law tort claims.[1]

## I.   Defendants' Conduct Constitutes Unlawful Voter Intimidation Under The VRA And Klan Act

### A.   Defendants' Conduct Fits Squarely Within The Bounds Of What Many Courts Have Found To Be Intimidation

As alleged in the Complaint, Defendants' actions are classic examples of voter intimidation that numerous courts have found to be unlawful. First Amended Complaint, Dkt. 27 ("Compl."). Defendants' attempts to cast the issues as raising novel questions of first impression, TTV MTD at 1-4, are misleading.

The core of Defendants' intimidating conduct is publicizing Mr. Andrews' image and identifying information (including the license plate on his vehicle) along with false and defamatory accusations that he fraudulently voted, and the implicit

---

[1]   For efficiency, to the extent that TTV Defendants' arguments overlap with or adopt the arguments in Salem Defendants' and D'Souza Defendants' Motions to Dismiss, Dkts. 54 and 50, Plaintiff addresses those arguments in his Opposition to the Salem and D'Souza Defendants' Motions to Dismiss, Dkt. 69 ("Salem Opp."), and provides cross-citations in this brief.

threat of consequences and exposure to public opprobrium that such publication necessarily entails. This mirrors classic, well-recognized forms of voter intimidation. Publication of a voters' image and other identifying information coupled with allegations of criminal behavior—especially voting related-crimes—and implicit threats of consequences for the voter's supposed illegal conduct, are quintessential examples of unlawful voter intimidation. *See, e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, 2023 WL 2403012, at *36-37 (S.D.N.Y. Mar. 8, 2023) ("*Wohl III*"); *Arizona All. for Retired Ams. v. Clean Elections USA*, 2022 WL 17088041 (D. Ariz. Nov. 1, 2022) (*"Arizona Alliance"*); *League of United Latin Am. Citizens v. Pub. Int. Legal Found.*, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) ("*LULAC*"); *accord Fair Fight, Inc. v. True the Vote*, No. 2:20-cv-00302, slip op. at 59 (N.D. Ga. Mar. 9, 2023), Dkt. 222 ("non-governmental parties publishing the names of challenged voters to the public can constitute reasonable intimidation"); *see also infra* at 9, 17; Salem Opp. at 26-30, 40-41.

TTV Defendants also appear to imply that because they committed defamation while engaging in voter intimidation, Mr. Andrews may only raise defamation claims. TTV MTD at 2, 4-5. This is nonsense. The same conduct can form the basis for claims of voter intimidation and defamation. *See, e.g.*, *LULAC*, 2018 WL 3848404, at *7. The fact that Defendants both defamed Mr. Andrews *and* engaged in voter intimidation does not somehow shield them from liability; as with

4

any unlawful conduct, it can form the basis of multiple claims. *See generally, e.g.*, *Cervini v. Cisneros*, 593 F. Supp. 3d 530 (W.D. Tex. 2022) (denying Defendants' motion to dismiss plaintiffs' claims under both the Klan Act *and* state-law torts arising from the same conduct).

### B.   Mr. Andrews Alleges That He Was Intimidated By Defendants, Regardless Of Whether Other Voters Were Also Intimidated

Defendants argue that they are not liable for defamation and voter intimidation because they defamed and intimidated many other voters as well. TTV MTD at 9, *see also id.* at 2-3, 7. But there is no exception to Section 11(b) and Section 1985(3) where multiple people are victims. *Cf. Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) ("where a harm is concrete, though widely shared," including "where large numbers of voters suffer interference with voting rights conferred by law," there is "injury in fact." (citation omitted)). Indeed, voter intimidation often affects multiple voters. *See, e.g.*, *Wohl III*, 2023 WL 2403012, at *36 (affecting over 85,000 households that received intimidating robocalls); *LULAC*, 2018 WL 3848404, at *1 (affecting voters included on an "eight-hundred page appendix containing voter registration forms" attached to report falsely alleging fraudulent registration and/or voting (citation omitted)); *Arizona Alliance*, 2022 WL 17088041, at *1-2 (affecting any voter considering voting by drop box in Arizona); Compl. at 5-6, *Daschle v. Thune*, No. 04-cv-4177 (D.S.D. Nov. 1, 2004), Dkt. 1 (affecting all voters at a polling

location). Whether Mr. Andrews alone was harmed, or whether he was harmed along with numerous other voters, is irrelevant.

And while Defendants trivialize the harm they have caused by emphasizing that Mr. Andrews was just one of many people injured and therefore characterizing the harm to him as merely "incidental," TTV MTD at 4-5, 24, the harm he has suffered is significant, and he must live with the consequences every day. As a direct consequence of Defendants' conduct, he is now the literal face of a purported nationwide vast voter fraud scheme, and has suffered personal and professional consequences as a result—including changing his voting behavior, Compl. ¶ 239, changing how he assists his family in voting, *id.* ¶ 236, changing his daily behavior for fear of his safety, *id.* ¶ 216, and harm to his professional reputation, *id.* ¶¶ 247-50. He and his family will forever look over their shoulders as they vote. *Id.* ¶ 238.

## C.    Whether Mr. Andrews' Face Is Blurred Is Irrelevant

TTV Defendants focus extensively on the fact that Mr. Andrews' face was blurred in some of the images they broadcast of him. But their conduct constituted voter intimidation under Sections 11(b) and 1985(3) whether Mr. Andrews' face was blurred or not.

*First*, TTV Defendants did *not* always blur Mr. Andrews' face. Defendants Englebrecht and Phillips appeared on national television and published an *unblurred* image of his face on multiple occasions: at least twice on *The Charlie Kirk Show*

(which is produced and distributed by Defendant Salem) and once on the Fox News show *Tucker Carlson Tonight*, along with his unblurred license plate. Compl. ¶¶ 49, 56, 63. *The Charlie Kirk Show* publishing his unblurred face has been viewed by more than 4.4 million people online, *id.* ¶ 53; the *Tucker Carlson Tonight* show averaged more than 3.2 million viewers per night that month alone, *id.* ¶ 58. Moreover, these national media appearances were not a one-off error: the *Tucker Carlson Tonight* appearance remains available online on Defendant TTV's Facebook page, along with the unblurred image of Mr. Andrews' face. *Id.* ¶ 63. In other words, the TTV Defendants are *still* actively publishing unblurred images of Mr. Andrews and falsely claiming he is a ballot mule.

*Second*, because Mr. Andrews' is easily identifiable even when his face is blurred, the blurring is irrelevant to the question of whether Defendants' conduct was intimidating to him. Indeed, Mr. Andrews was actually identified by a journalist due to his image in the *2000 Mules* film and trailer. *See* Compl. ¶¶ 89-90; Salem Opp. at 26-30, 40-41 (explaining what constitutes intimidation).

*Third*, even if the Court assumes that the blurring of his image fully obscured his identity (which it did not), and therefore made Defendants' initial publications of his blurred image less intimidating, the fact that they *continued* to promote the film, trailer, and website, after his identity was publicly revealed seals their liability. Mr. Andrews was both identified by, and cleared by, the Georgia Bureau of

Investigations (GBI) and State Elections Board on May 17, 2022, Compl. ¶¶ 91-92, as Defendants acknowledge. TTV MTD at 12. Defendants nevertheless proceeded with the nationwide release of the film in theaters after that date. Compl. ¶¶ 36-44. Defendants Engelbrecht and Phillips promoted the film using his *unblurred* image after he was also publicly identified, on *The Charlie Kirk Show*, *id.* ¶¶ 49-52, and *Tucker Carlson Tonight*, *id.* ¶ 56. TTV published the video of those interviews (including Mr. Andrews' image) to its website and social media pages, where they are still available. *Id.* ¶¶ 53, 63. TTV also separately published on its website and social media pages another video that included the trailer and has repeatedly shared the trailer on its website and social media pages. *Id.* ¶ 64.

Even today, TTV Defendants' website continues to promote the film, and its Facebook page still publishes the trailer and other promotional content that features Mr. Andrews unblurred face and accuses him of being a "ballot mule." *Id.* ¶¶ 11, 53, 69, 133, 135, 155, 181. None of the Defendants have retracted their false statements about Mr. Andrews, removed his image from the film, trailer, or their website, or stopped promoting the film that features the false accusations against him. *Id.*

*Fourth*, neither the fact that the footage of Mr. Andrews was obtained from a public source, nor that his identity was also confirmed by the GBI, are relevant to whether Defendants' conduct was intimidation. *Contra* TTV MTD at 7, 9 n.8. It is not the video itself, nor the investigations by the GBI or State Elections Board by

themselves, that create the voter intimidation. Rather, it is Defendants' intentional use of Mr. Andrews' image accompanied by false and defamatory accusations of voter fraud, other felonies, and participation in an "organized crime" network, and holding him out as the nationwide poster boy for the "mules" conspiracy theory that constitutes intimidation. *See, e.g.*, *LULAC*, 2018 WL 3848404, at *4 (publishing reports alleging voter fraud or registration fraud can constitute intimidation, even where the voter registration data itself is publicly available); *Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 467 (S.D.N.Y. 2020) ("*Wohl I*") (threats that citizens who vote by mail will have their information used for warrants, debt collection, and mandatory vaccination, are unlawful intimidation, even if the underlying voter data is often publicly available).

### D. Defendants Are Liable For Voter Intimidation Regardless Of Whether They Directly And Personally Communicated With Mr. Andrews

Defendants present a series of confusing arguments for why they are not liable for the voter intimidation that Mr. Andrews experienced. First, they argue that because they did not communicate with Mr. Andrews directly, or know him or his identity, they cannot be liable. TTV MTD at 3, 18.

But there is no basis in the statute or the case law to support the argument that intimidation is only unlawful if it is communicated directly by a defendant to the voter. "[N]othing about intimidation" under Section 11(b) requires that "it must

be . . . made personally by the intimidator." *Fair Fight*, slip op. at 16. That would be inconsistent with the plain text of both Section 11(b) and Section 1985(3) clauses 3 and 4. Section 11(b) states that "no person . . . shall intimidate, threaten, or coerce . . . any person for voting or attempting to vote." 52 U.S.C. § 10307(b). Similarly, Section 1985(3) clause 3 forbids any two or more persons from conspiring "to prevent by force, intimidation, or threat *any citizen*" from giving his support or advocacy in a federal election, and clause 4 likewise forbids injuring "*any citizen* in person or property on account of such support or advocacy," and authorizes suit by anyone injured "in his person or property" by a prohibited conspiracy. 42 U.S.C. § 1985(3) (emphasis added). None of these provisions contain any language about how direct, or directly communicated, that intimidation must be. To the contrary, "when Congress does not add any language limiting the breadth of that word, 'any' means all." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014). Here, then, "any person" and "any citizen" have an unlimited reach, covering "any person" who is intimidated, threatened, or coerced for any voting activity.

Rather, the standard proximate cause analysis applies: "Section 11(b) generally attributes to Defendants the *natural consequences* of their actions," as is typical in tort liability. *Fair Fight*, slip op. at 24; *see also Principle Sols. Grp., LLC v. Ironshore Indem., Inc.*, 944 F.3d 886, 892 (11th Cir. 2019) (under Georgia law, a proximate cause "encompasses 'all of the natural and probable consequences' of an

action" (quoting *Cowart v. Widener*, 697 S.E.2d 779, 784 (Ga. 2010)). Thus, TTV Defendants can be held liable for the unlawful intimidation that they set in motion, and they "need not be . . . the exclusive proximate cause of the harm." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004); *see also* Restatement (Second) of Torts § 442 (1965) (describing standard proximate cause analysis).

Indeed, numerous cases considering claims under Section 11(b) have held defendants liable for their "conduct putting others 'in fear of harassment and interference with their right to vote,'" even where third parties are responsible for the most egregious threats against a plaintiff. *See Wohl I*, 498 F. Supp. 3d at 480 (quoting *LULAC*, 2018 WL 3848404, at *4). *LULAC*, for example, involved no direct contact between defendants and the intimidated voters. Rather, the defendants published a report containing false and defamatory accusations of voter fraud and registration fraud, "in a clear effort to subject the named individuals to public opprobrium." *LULAC*, 2018 WL 3848404, at *4. The court held the defendants could be liable, even if the "public opprobrium" came from third parties. *Id.* at *4. And in *Arizona Alliance*, some of the defendants' conduct including publicizing, or threatening to publicize, voters' images and license plates along with baseless accusations of fraud, which would subject them to threats and harassment, came from third parties. Tr. 150-52, *Arizona Alliance*, No. 22-cv-01823, Dkt. 69. *See also DNC v. RNC*, 673 F.3d 192, 196 (3d Cir. 2012) (discussing enforcement of consent

decree resolving Section 11(b) claims that proscribed discriminatory voter challenge campaigns by third parties, among other conduct); *cf. Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 505 (S.D.N.Y. 2021) ("*Wohl II*") (finding plaintiffs stated a claim under Section 11(b) for a robocall campaign executed by a third-party communications company); *Fair Fight*, slip op. at 55 (concluding that if TTV set up a "financial incentive" for third parties to challenge others' right to vote, that could violate Section 11(b)).

Indeed, intimidation schemes based on publications about voters—without necessarily involving direct contact with those voters—were both widespread and recognized as effective at intimidating voters at the time the VRA was passed to prohibit such conduct. *See, e.g.*, *United States v. Beaty*, 288 F.2d 653 (6th Cir. 1961) (considering case under Section 131(b) of the Civil Rights Act where white citizens of Haywood County, Tennessee, publicly circulated a list of Black citizens to be threatened with eviction, loss of jobs, and denial of credit after registering to vote).

Thus, TTV Defendants are liable for the harm caused as the natural and foreseeable consequences of their actions—and their conduct closely mirrors what other courts have found to be intimidation. TTV Defendants published Mr. Andrews' image and his vehicle (and its license plate) along with the false and defamatory accusations that he committed notorious election crimes, and other felonies, and that he was paid to do so. Compl. ¶¶ 37-47, 49-50, 56-57, 63-64, 162.

12

As a direct result of Defendants' conduct, he has suffered harm to his reputation, and is afraid of further surveillance and widely publicized defamation if he votes by drop box and assists his family members in voting by drop box. *Id.* ¶¶ 230, 239, 247, 263. Defendants' conduct has also led to the natural and foreseeable consequence of third parties promoting Defendants' accusations online, and expanding the accusations to include offensive references and threats of harm and physical violence, such as entreating others to "arrest," assault, or kill "mules" like Mr. Andrews. *Id.* ¶¶ 201-202; *see also id.* ¶¶ 203-212 (including additional threats of violence).[2]

To the extent TTV Defendants wish to contest that they are a proximate cause of these inflammatory and defamatory statements by third parties, and threats from third parties that have understandably increased Mr. Andrews' fear of voting, that is a matter for a jury. *Principle Sols. Grp.*, 944 F.3d at 893 ("the issue of proximate cause is generally a question of fact for the jury" (citation omitted)).

---

[2]   Similarly, Defendants argue that because their intimidation was not directed *specifically* toward Mr. Andrews, they cannot be liable. TTV MTD at 20-21. But Mr. Andrews does not concede that Defendants' conduct was *not* directed at him, given that Defendants continue to use his image as their clearest example of someone committing voter fraud: he is featured in not only the film, but also the trailer, national news broadcasts, and the book as an exemplar of a mule. Compl. ¶¶ 37-39, 45-46, 49-52, 56-57, 66-68, 149. In other words, the allegations support the plausible inference that Defendants did, in fact, target him specifically—and continue to do so.

Finally, TTV Defendants also argue that because they only narrated the film while others edited it, they are not responsible for its content, but they cite no authority for any "narration-only" exception to voter intimidation laws. *See* TTV MTD at 4, 7-8. In any event, the Complaint alleges that the TTV Defendants were involved in all aspects of the film: they star in it (including narrating it), Compl. ¶¶ 20-22, 37. Critically, they provided the so-called "research" purportedly supporting it, *id*. ¶¶ 20, 22. They serve as its executive producers and Engelbrect and Phillips also served as producers. *Id*. ¶¶ 20-22. They have promoted the film extensively. *Id*. ¶¶ 49-53, 56-58, 63-64, 66-69, 135, 149, 162. And TTV distributes the film through its website. *Id*. ¶¶ 47, 53, 64, 69, 133, 151, 181. To the extent TTV Defendants wish to dispute the facts pleaded concerning their involvement, their motion to dismiss is not the vehicle for that; they may do so after discovery, but for purposes of this motion, the allegations as pleaded must be taken as true.

### E.    Section 11(b) Of The VRA Is Enforceable Through A Private Cause Of Action

TTV Defendants' argument that there is no private right of action under the VRA, TTV MTD at 16-17, is addressed at pages 8-17 of the Opposition to the Salem Defendants' and D'Souza Defendants' Motions to Dismiss ("Salem Opp."), which is incorporated herein by reference.

## II.    Defendants' Unlawful Voter Intimidation Is Not Protected By The First Amendment

Relying on categorical pronouncements about free speech untethered from case law, Defendants incorrectly argue that even if their conduct is unlawful voter intimidation, they are protected by the First Amendment.[3] *See* TTV MTD at 5-24. As a matter of law, however, Defendants may be held liable under both Section 11(b) and Section 1985(3) without violating the First Amendment. In fact, much of Defendants' conduct falls within a categorical exemption from the First Amendment because it is defamatory. And even to the extent that any of Defendants' conduct could be said to be non-defamatory, it falls within well-established bounds of speech that may be regulated consistent with the First Amendment.[4]

---

[3]    TTV Defendants seem to ignore Mr. Andrews' claim under clause 4 of Section 1985(3), which prohibits injury to any citizen in his "person or property" (including his reputation) on account of his voting activity. 42 U.S.C. § 1985(3). Plaintiff agrees that there can be no dispute that Defendants have injured his reputation on account of his lawful voting activities.

[4]    In addition, because Section 1985(3) contains an intent requirement, violations are effectuated in part by non-expressive conduct and therefore the First Amendment is not a shield to liability. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006). Thus not only do TTV Defendants' arguments about the First Amendment only pertain to Mr. Andrews' Section 11(b) claims, the Court need not necessarily reach them, given that Mr. Andrews has also pleaded intent.

15

**A.    Defendants' Unlawful Voter Intimidation Is Not Shielded By The First Amendment Merely Because It Purportedly Has A Political Or Civic Purpose**

Defendants emphasize that their wrongful actions centered on the 2020 election, and claim that these actions should categorically be protected by the First Amendment as political speech and speech regarding a matter of significant public interest and controversy. TTV MTD at 5-7, 21-24. But this argument has no basis in law. Indeed, voter intimidation *necessarily* involves an election, often regards matters of public concern (namely, the election), and often is carried out for "ideological" reasons. There is no free-floating exception to the VRA and the Klan Act for "ideological" conduct. *Contra* TTV MTD at 22. The Court should apply the law as it exists: namely, applying the text of the statutes at issue, the decades of case law recognizing examples of unlawful intimidation, and applying the well-established protections of the First Amendment.

**B.    Defamation Is Not Protected Under The First Amendment**

Mr. Andrews has alleged that Defendants defamed him, which is relevant to his defamation claim (Count III), his claims of invasion of privacy (Counts IV and V), and his voter intimidation claims (Counts I and II). While Defendants correctly assert that false speech is not categorically excluded from First Amendment protection, MTD at 1, 18, they seem to ignore that defamatory speech is. *See United*

16

*States v. Alvarez*, 567 U.S. 709, 716 (2012) (recognizing defamation as categorically excepted).

Here, the defamation forms a core part of the alleged voter intimidation. As detailed above, this type of allegation—threats of "consequences" for voting coupled with false accusations of voter fraud or other crimes—is a common form of voter intimidation. *See, e.g.*, *LULAC*, 2018 WL 3848404, at \*4-6; *Wohl I*, 498 F. Supp. 3d at 465; Compl. at 5-6, *Daschle v. Thune*, No. 4:04-cv-4177 (D.S.D. Nov. 1, 2004), Dkt. 1; Salem Opp. at 28-30. Defendants who engage in voter intimidation through defamation therefore have no First Amendment defense for their actions, regardless of whether the defamation *also* falls into another categorically excluded category. Thus, should Mr. Andrews ultimately prove that Defendants' intimidating conduct was also defamatory, that conduct would result in liability under Section 11(b) without triggering any First Amendment concerns.

### C.   Non-Defamatory Speech Can Also Give Rise To Liability Under Section 11(b) Without Raising First Amendment Concerns

Defamation is just one of several recognized categorical exceptions to the First Amendment that could apply in Section 11(b) cases. *See Alvarez*, 567 U.S. at 716 (listing recognized categorical exceptions). Thus, even if some of Defendants' speech is not ultimately held to be defamatory, it does not necessarily follow that the relevant conduct is protected by the First Amendment. For example, a defendant

who intimidates voters through fraud would not be shielded by the First Amendment. *See, e.g.*, *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud."). Or, for example, a defendant who uses speech incidental to a course of conduct that is independently unlawful would have no First Amendment defense. *See Giboney*, 336 U.S. at 502.

And, for example, the Supreme Court has recognized that the government may regulate—consistent with the First Amendment—"messages intended to mislead voters about voting requirements and procedures." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1889 n.4 (2018); *see also* Richard L. Hasen, *Drawing the Line Between False Election Speech and False Campaign Speech*, Knight First Amend. Instit. (Oct. 12, 2021). Intentional or reckless falsehoods about voter eligibility poses similar risks to the functioning and integrity of government processes as perjury and impersonating government officials, and can therefore be regulated consistent with the First Amendment. *Cf. Alvarez*, 567 U.S. at 721 (explaining why prohibitions on perjury and lying to or impersonating government officials are consistent with the First Amendment); *see also Arizona Alliance*, 2022 WL 17088041 (spreading misinformation about lawful voting practices can constitute voter intimidation).

Moreover, Section 11(b)'s application to Defendants' conduct would also fall into First Amendment exception for speech integral to illegal conduct. *See Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*,

18

50 F.4th 1126, 1135 (11th Cir. 2022) ("The Supreme Court has long acknowledged that making 'a course of conduct illegal' is not 'an abridgment of freedom of speech . . . merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" (citation omitted)); *United States v. Quinn*, 514 F.2d 1250, 1268 (5th Cir. 1975) ("[E]xtortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which is no protection at all.").

Thus, here, Defendants' conduct clearly falls within the bounds of what may be regulated consistent with the First Amendment.[5]

### D.    Defendants Do Not Need To Make "True Threats" To Be Liable For Voter Intimidation

Defendants present a series of confusing arguments about "true threats," TTV MTD at 18-22, and the fact that others have made more threatening statements than they have, *id.* at 4, 12-15. But they have confused the First Amendment question of

---

[5]   In all events, application of Section 11(b) would be permissible here because it advances the government's compelling interest in safeguarding free and fair elections and protecting against voter intimidation. *See Burson v. Freeman*, 504 U.S. 191, 198-99, 206 (1992); *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1219 (11th Cir. 2009). And it is narrowly tailored to advance that interest. *See Wohl I*, 498 F. Supp. 3d at 486 n.29. Thus this Court could impose liability as narrowly tailored to advance the government's compelling interest in preventing voter intimidation.

what constitutes a "true threat" with the statutory interpretation question of what constitutes unlawful intimidation.

Mr. Andrews has not alleged that the TTV Defendants, or any of the named Defendants, have made "true threats" of the type categorically excluded from First Amendment protection. *Cf. Alvarez*, 567 U.S. at 716 (recognizing "true threats" as a categorical exception). Rather, Mr. Andrews has alleged that threats made against him by third parties (whether "true threats" or otherwise) are the natural and foreseeable consequence of Defendants' actions, and Defendants are thus liable for the resultant voter intimidation based on standard causation principles. This is a question of statutory interpretation of the terms "intimidate, threaten, or coerce" in Section 11(b) and "force, intimidation, or threat" in Section 1985(3) clause 3, and of causation as it applies to those standard statutory terms; it is not a question of "true threats" under the First Amendment.

Here, TTV Defendants themselves engaged in conduct that constitutes unlawful intimidation under the statutes, and are liable for the natural and foreseeable consequences of their actions.[6] *See supra* at 12-13; Salem Opp. at 25-26. And as discussed above, they can be held liable for their conduct even if it is not

---

[6] Defendants are wrong that Mr. Andrews did not allege that he saw these posts, TTV MTD at 21, because he specifically includes them in his Complaint. Compl. ¶¶ 206-211, 231.

a "true threat"—because their speech is either defamatory (which is excepted from the First Amendment), or can be regulated consistent with the First Amendment.

To the extent that Defendants argue that their conduct could not be intimidating because it was not a "true threat" of physical violence, they are wrong. The text of Sections 11(b) and 1985(3) clause 3 themselves make that plain: if "threats" were required for intimidation, it would render the words "threaten" (in Section 11(b)) and "threat" (in Section 1985(3)) redundant with the word "intimidate" in each statute. *See Bailey v. United States*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning."). For this reason, multiple courts have explicitly held that Section 11(b) does not require any threat of physical violence. *See, e.g.*, *New York v. Horelick*, 424 F.2d 697, 703 (2d Cir. 1970) (Friendly, J.) (contrasting the VRA to another provision of federal law that the court found applied only to "violent activity"); *Wohl I*, 498 F. Supp. 3d at 477; *LULAC*, 2018 WL 3848404, at *4; *Fair Fight*, slip op. at 75 (non-violent threats may constitute unlawful intimidation under Section 11(b)). The Department of Justice has argued the same. *See* DOJ Br. at 4-12, *Wohl III*, No. 20-cv-08668, Dkt. 235.

### III.   Mr. Andrews Has Stated A Claim Under The Klan Act, 42 U.S.C. § 1985(3) Clauses 3 And 4

Mr. Andrews has set forth detailed and plausible allegations that state a claim against TTV Defendants under the support-or-advocacy clauses of the Klan Act, 42 U.S.C. § 1985(3) clauses 3 and 4. *See* Salem Opp. at 30-41. The TTV Defendants offer only two challenges to this claim. First, they contend that Mr. Andrews has failed to allege a conspiracy. TTV MTD at 26-34. Second, they claim there are inadequate allegations of unlawful intent. TTV MTD at 25-26. These arguments misstate the actual legal elements of a claim under the support-or-advocacy clauses of Section 1985(3) and ignore Mr. Andrews' well-pleaded allegations.

### A.   Mr. Andrews Has Alleged Defendants Engaged In A Prohibited Conspiracy

The TTV Defendants make three arguments as to why they contend Mr. Andrews has failed to allege facts showing a conspiracy or agreement.

*First*, Defendants erroneously contend that Plaintiff must plead specifically the "who, what, when, where, and how a meeting of the minds occurred." TTV MTD at 27. Not so. At this stage, the pleading standard "does not impose a probability requirement . . . it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Defendants do not even attempt to cite a case for the proposition that this is the standard—because there is none. *See, e.g., In re*

*Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010) ("the Eleventh Circuit recognizes that Plaintiffs need not allege the existence of collusive communications in 'smoke-filled rooms'" to show a conspiracy). Rather, a "conspiracy . . . may be inferred from the nature of the acts done, the relation between them, their mutual interests in the matter, and other circumstances." *Wright v. Apartment Inv. & Mgmt. Co.*, 726 S.E.2d 779, 787-88 (Ga. Ct. App. 2012) (citation omitted). Mr. Andrews has more than adequately pleaded a prohibited agreement among Defendants. *See* Salem Opp. at 31-36.

*Second*, the Court should reject the TTV Defendants' attempt to characterize Mr. Andrews' allegations concerning their coordination with one another as mere "parallel action." TTV MTD at 31-32. The TTV Defendants are all executive producers of *2000 Mules*. Compl. ¶¶ 20-22. TTV provided much of the purported "research" featured in the film and book. *Id*. Engelbrecht and Phillips both star in and narrate parts of the film, appear in the book, and have promoted the film extensively. *Id.* ¶¶ 21-22, 49-53, 56-58, 63-64, 66-69, 135, 149, 162. Moreover, the Complaint describes in detail how the TTV Defendants worked together in close coordination with the other Defendants to produce, promote, and profit from the film and book. *Id.* ¶¶ 18, 20-22, 24-26, 41-42, 45-46, 63, 70, 72, 76; *see also* Salem Opp. at 31-36 (describing agreement). This is more than sufficient to plead an agreement among Defendants, rather than parallel action.

23

What makes this an unlawful conspiracy, rather than an agreed-upon business venture, is the *unlawful purpose*—namely, to injure and defame Mr. Andrews (and others) and to intimidate him (and others) with respect to voting. *See* Salem Opp. at 32, 34-36 (describing unlawful intent). And because the natural and foreseeable consequence of falsely accusing Mr. Andrews of voter fraud was to injure and intimidate him, that is sufficient to infer Defendants' intent. *See United States v. Myers*, 972 F.2d 1566, 1573 (11th Cir. 1992) (intent may be inferred "from the natural and probable consequences of an act.").

Indeed, Mr. Andrew's allegations are analogous to cases where courts have found allegations sufficient to plausibly infer a conspiracy to intimidate voters in violation of the Klan Act. *See, e.g.*, *LULAC*, 2018 WL 3848404, at *4 (allegations that Defendants worked together to develop, publish, and disseminate a report that falsely accused citizens of illegal voting were sufficient to infer an unlawful conspiracy); *Wohl III*, 2023 WL 2403012, at *30 (evidence that Defendants coordinated with one another to create, pay for, and publish robocalls with false information about voting was sufficient to infer unlawful conspiracy).

*Finally*, TTV Defendants incorrectly contend that no unlawful conspiracy can be inferred from Mr. Andrews' allegations because their conduct was in the course of their "ordinary business in elections integrity." TTV MTD at 33-34.

24

Here, Mr. Andrews has adequately pleaded that the purpose of the conspiracy was to injure and intimidate him—and other voters—with respect to voting, and these allegations must be accepted as true and all reasonable inferences drawn in his favor. *See Bilal*, 981 F.3d at 911; Salem Opp. at 32-36. Defendants' argument here amounts to a plea to instead draw inferences in *their* favor, which is not appropriate at the motion to dismiss stage. It also ignores the Complaint's specific allegations that the TTV Defendants' purported mission of "ensur[ing] 'election integrity'" is a pretext for engaging in "voter intimidation targeting non-white voters in urban areas," like Mr. Andrews. Compl. ¶¶ 19, 180, 183. In other words, rather than being a shield against liability, Defendants' "mission" and business model—when considered with the Complaint's other allegations—is yet another "fact to raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement." *Twombly*, 550 U.S. at 556.

## B. Mr. Andrews Has Alleged The Requisite Intent

Defendants contend that Mr. Andrews has failed to plead that Defendants had the required intent under Section 1985(3) because he did not plead that they knew Mr. Andrews, targeted him *specifically*, and focused on him in the film. TTV MTD at 20-21, 24-25. This confusing argument invents new elements of a claim out of whole cloth.

The text of the statute explicitly authorizes suit by anyone "injured" by an act in furtherance of a prohibited conspiracy. 42 U.S.C. § 1985(3). It does not specify that the person injured must have been targeted by name, known personally or by name to the conspirators, be the "focus" of the conspiracy,[7] or anything else about the closeness of the relationship between a plaintiff and a defendant. *See also supra* at 9-10 (Defendants need not personally target a voter); Salem Opp. at 37-41 (discussing the elements of Section 1985(3) claim).

## IV.    Mr. Andrews Has Stated A Claim For Defamation

### A.    Defendants' Statements Are Not Protected Opinion

Defendants contend that their statements are not defamatory because they are statements of opinion that are not actionable under either Georgia law or the First Amendment. They are wrong for at least two reasons. First, their accusation that Mr. Andrews was engaging in criminal conduct is not, as a matter of law, an "opinion." Second, the Complaint alleges that underlying "facts," "data," and "research" that Defendants cited to support their purported "opinion" were themselves false.

---

[7]    Although which voter is the "focus" of the film is not legally relevant, the images of voters supposedly committing voter fraud through ballot drop boxes *are* the "focus" of the film and book, and Mr. Andrews is their prime example. The image of Mr. Andrews (along with the false accusations against him) was and continues to be shown as Defendants' clearest example of a so-called "mule": he's featured in not only the film, but also the trailer, the book, and national news broadcasts. Compl. ¶¶ 37-39, 45-46, 49-52, 56-57, 66-68, 149.

### 1. As A Matter Of Georgia Law, Defendants' Statements Do Not Constitute A Protected Opinion

While it is true that "the expression of opinion on 'matters with respect to which reasonable men might entertain differing opinions' is not libelous," *Bergen v. Martindale–Hubbell, Inc.*, 337 S.E.2d 770, 771 (Ga. Ct. App. 1985) (citation omitted), this exception is not "wholesale," because "expressions of 'opinion' may often imply an assertion of objective fact," for which the regular defamation standard applies. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18 (1990). To determine whether a statement is an opinion, Georgia courts ask: (1) "whether [the defendant's] statements can reasonably be interpreted as stating or implying defamatory facts about plaintiff" and (2) "whether the defamatory assertions are capable of being proved false." *Eidson v. Berry*, 415 S.E.2d 16, 17 (Ga. Ct. App. 1992). If, as here, the answer to both questions is yes, the statement is not an opinion.

The Complaint sets forth numerous instances where TTV Defendants have made statements falsely accusing Mr. Andrews of committing a crime. For example, the film (produced, directed by, and starring TTV Defendants), shows a video of Mr. Andrews at a drop box with an accompanying voiceover stating: "What you are seeing is a crime. These are fraudulent votes." Compl. ¶ 39. In the film, Engelbrecht describes the "mules" as "like a cartel . . . like trafficking." *Id.* ¶ 42. The "official" trailer for *2000 Mules* film—which features Engelbrecht and Phillips and is

published on TTV's website and social media pages—describes the purported mules, including Mr. Andrews, as involved in "organized crime." *Id.* ¶¶ 46-47. In media appearances promoting the film, TTV Defendants describe Mr. Andrews as engaging in "illegal" and "criminal" conduct. *Id.* ¶¶ 50, 55, 60, 66.

Statements such as these, that an individual committed a crime, are well-established as facts, rather than opinions, as a matter of Georgia law. *Eidson*, 415 S.E.2d at 17 ("the accusation that plaintiff is guilty of a crime punishable by law is susceptible of being proved false"). Indeed, accusations of criminal conduct are defamation *per se* under Georgia law, regardless of a defendants' attempt to couch them in equivocal language. *See, e.g.*, *StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334 (N.D. Ga. 2018); *Promoworks, LLC v. Graham*, 2009 WL 10670413 (N.D. Ga. Dec. 9, 2009); *Harcrow v. Struhar*, 511 S.E.2d 545, 546 (Ga. Ct. App. 1999) ("Whether stated directly or by implication or innuendo, it is libelous per se to falsely state that a person is guilty of a crime or has a criminal case pending against him.").

Despite TTV Defendants' contentions, their statements are not expressions of "hyperbole . . . which cannot be proved true or false." TTV MTD at 35-36. In fact, not only can these accusations be proven true or false, here, Defendants' accusations that Mr. Andrews committed a crime *have already* been proven false by the Georgia

Bureau of Investigations and State Elections Board. Compl. ¶ 91. This conclusively establishes that the TTV Defendants' statements are not opinions.

None of the cases cited by Defendants are relevant because none contain accusations of criminal behavior. For example, *Collins v. Cox Enters., Inc.*, 452 S.E.2d 226 (Ga. Ct. App. 1994), TTV MTD at 35, involved a newspaper editorial speculating about a political candidate's motive to "fool" voters. And in *Kirsch v. Jones*, 464 S.E.2d 4, 6 (Ga. Ct. App. 1995), TTV MTD at 35, the defendant stated that the plaintiff had "bungled" a case, and that "if [he] had any sense at all, he would not have touched the case with a ten-foot pole." *See also Kendrick v. Jaeger*, 436 S.E.2d 92, 93-94 (Ga. Ct. App. 1993) (statement that one contractor was better suited for a job than another was opinion); *Bergen*, 337 S.E.2d at 771-72 (opinion of plaintiff's legal ability is a matter on which people may differ). Unlike the statements in those cases, here, TTV Defendants explicitly and repeatedly accused Mr. Andrews of committing crimes. Those accusations are assertions of objective facts, not mere speculation about motives or simple hyperbole.

## 2. Defendants' Statements Do Not Constitute A Protected Opinion Because The Underlying "Facts" Defendants Cited In Support Were False

Defendants also argue that their statements are not actionable as defamation under both Georgia law and the First Amendment because they are opinions based on "disclosed facts," rather than implying the existence of undisclosed defamatory

facts. TTV MTD at 38. But Defendants' argument is wrong because the Complaint alleges that they did rely on undisclosed facts (as Defendants themselves claimed), and moreover, that the "disclosed facts" were themselves false.

The Supreme Court in *Milkovich* explained that "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." 497 U.S. at 18-19. Thus, for a statement to qualify for First Amendment protection as an opinion, the defendant must do more than simply disclose the facts on which the opinion is based. *See id.* The disclosed facts must also be correct and complete, and the defendant must correctly assess those facts. *See id.*

Defendants quote *Milkovich* but omit the relevant portion of the opinion, and instead rely on *Jaillet v. Georgia Television Co.*, 520 S.E.2d 721 (Ga. Ct. App. 1999), TTV MTD at 36-37, which states that "[i]f an opinion is based on facts already disclosed in the communication, the expression of the opinion implies nothing other than the speaker's subjective interpretation of the facts." 520 S.E.2d at 726. *Jaillet* is easily distinguishable from the facts alleged here, and under *Milkovich*, Defendants have made statements of fact that are false and defamatory.

Here, Defendants' purported support for their assertions of criminal conduct are "incorrect," "incomplete," and their "assessment of them is erroneous."

*Milkovich*, 497 U.S. at 18-19. As Defendants know, the GBI cleared Mr. Andrews of any wrongdoing before the film and book were released. Compl. ¶¶ 91-94. Thus by May 17, 2022, the Defendants actually *knew* that their statements were "incorrect," "incomplete," and their "assessment of them [was] erroneous," but nevertheless, they continued to accuse Mr. Andrews of criminal conduct (and indeed continue to do so). *Milkovich*, 497 U.S. at 18-19; *see* Compl. ¶¶ 131-133, 135, 149, 162.

Moreover, the Complaint alleges that the entire basis of the "mules" story was manufactured by Defendants. For example, multiple authorities, including the source of some of the geolocation data itself, have explained that the data relied on in the film and book is not precise enough to determine whether an individual deposited a ballot in a particular drop box or to connect video footage of voters to their individualized cell phone geolocation data. Compl. ¶¶ 99-108, 110, 117-18. For another example, the Complaint further alleges that Engelbrecht and Phillips falsely claimed they used "high-powered computers" to compile and analyze their data, when they did not. *Id.* ¶¶ 108-110.

This is not the type of speech that the Supreme Court in *Milkovich* intended to protect. Rather, this is precisely what the *Milkovich* Court was concerned about: a blanket exemption for defamatory statements that would "ignore the fact that

31

expressions of 'opinion' may often imply an assertion of objective fact." *Milkovich*, 497 U.S. at 18.

Unlike in *Jaillet*, Defendants also explicitly stated that they relied on facts and "data" not disclosed to the viewer. For example, TTV Defendants claimed that they had unreleased data evidence of fraudulent voting, including of the so-called mules "harvesting" ballots and then voting at multiple drop boxes. Compl. ¶ 45 (alleging that Phillips claimed to have "four million minutes of surveillance video"); *id.* ¶ 64 (alleging that TTV published a video "about how it planned to release all of its video and data evidence of mass fraud beyond that contained in *2000 Mules*"); *id.* ¶ 112 (alleging Defendant D'Souza claimed in response to a failure to release video of any one "mule" visiting multiple drop boxes, "I am going to do that and True the Vote is going to do that"); *id.* ¶ 120 (TTV Defendants claimed they would provide evidence of "mules" to Arizona Attorney General, but did not). The Complaint further alleges that Defendants have never released this purported "data." *Id.* ¶¶ 64, 112-13, 118-20. Similarly, in a different interview, Phillips introduces the video of Mr. Andrews voting, stating that "some guy's up there putting all these ballots in the video and I can show you the pings, and then we can show you where he did it again and again and again and again." *Id.* ¶ 67. Defendants never showed any such evidence, because it does not exist. *Id.* ¶ 144. This case is therefore completely unlike

*Jaillet*, and instead, like what the Supreme Court warned against in *Milkovich*. Defendants cannot escape liability by masking their assertions of facts as opinions.

### B.    Defendant's Statements Are "Of And Concerning" Mr. Andrews

There can be no serious doubt that Defendants' statements are "of and concerning" Mr. Andrews, as explained in Salem Opp. at 42-44.

In an attempt to distance themselves from the other Defendants, TTV Defendants contend that they can only be held liable for statements and depictions contained in the *2000 Mules* book and film, and not the statements and images shown in the trailer or media appearances. TTV MTD at 41. But TTV Defendants are indeed accountable for the publication and airing of Mr. Andrews' images in the trailer and many media appearances, including the *unblurred* images Mr. Andrews aired by affiliated parties. In fact, the Complaint alleges that TTV Defendants are responsible for procuring and producing the unblurred footage (the "TTV clip") that was shown on both *The Charlie Kirk Show* and *Tucker Carlson Tonight* and then circulated online. Compl. ¶ 39; *see also id.* ¶¶ 49-52, 56-57.

During Salem host Charlie Kirk's interview with Englebrecht and Phillips, the program twice showed the unblurred video of Mr. Andrews voting, while Kirk, Englebrecht and Phillips described his conduct as illegal and falsely described Mr. Andrews as committing a crime. Compl. ¶¶ 49-52. The second time Mr. Andrews' unblurred image was shown, the location, date, and time that he voted were included

alongside Salem's large bold lettering falsely labeling Mr. Andrews as committing the crime of "ballot harvesting." *Id.* ¶ 52. It was during that interview with the TTV Defendants that the unblurred image was broadcast, and it was two of the TTV Defendants' statements during that broadcast that defamed Mr. Andrews by falsely accusing him of crimes. TTV then shared links to that episode of *The Charlie Kirk Show* on its website and social media pages, *id.* ¶ 53, and of the *Tucker Carlson Tonight* episode on its social media pages, *id.* ¶ 63. TTV Defendants surely cannot escape responsibility for *their own statements*.

## C.   Mr. Andrews Need Not Plead Special Damages, But He Has Pleaded Them

TTV Defendants' argument that Mr. Andrews has not pleaded special damages, TTV MTD at 42-44, is addressed in the Salem Opp. at 47.

## D.   Mr. Andrews Sufficiently Alleges His Invasion Of Privacy Claims—False Light And Appropriation Of Likeness—Under Georgia Law

TTV Defendants' adoption of Salem Defendants' argument that Mr. Andrews has not adequately pleaded his invasion of privacy claims, TTV MTD at 44, is addressed in the Salem Opp. at 53-58. TTV Defendants' adoption of Salem Defendants' arguments that their statements are conditionally privileged, TTV MTD at 44, is addressed in the Salem Opp. at 53-54.

### E.     Mr. Andrews Has Adequately Alleged Actual Malice

TTV Defendants' adoption of Salem Defendants' argument that Mr. Andrews' has not alleged actual malice, TTV MTD at 45, is addressed in the Salem Opp. at 47-53.

### F.     Mr. Andrews Has Stated A Claim For Punitive Damages

TTV Defendants' adoption of Salem Defendants' argument that Mr. Andrews' has not alleged actual malice, TTV MTD at 45, is addressed in the Salem Opp. at 59-60.

## CONCLUSION

For these reasons, the TTV Defendants' Motion to Dismiss should be denied in its entirety.


Dated: March 24, 2023                    Respectfully submitted,

                                          */s/ Rachel F. Homer*
                                          Rachel F. Homer*
                                          PROTECT DEMOCRACY PROJECT
                                          2020 Pennsylvania Avenue NW, #163
                                          Washington, DC 20006
                                          Tel: (202) 579-4582
                                          rachel.homer@protectdemocracy.org

                                          */s/ Von A. DuBose*
                                          Von A. DuBose, Esq.
                                          Georgia Bar No. 231451
                                          DuBose Miller, LLC
                                          75 14th Street NE, Suite 2110
                                          Atlanta, GA 30309

Tel: (404) 720-8111
dubose@dubosemiller.com

Sara Chimene-Weiss*
PROTECT DEMOCRACY PROJECT
7000 N. 16th Street, Suite 120, #430
Phoenix, AZ 85020
Tel: (202) 934-4237
sara.chimene-weiss@protectdemocracy.org

Rachel E. Goodman*
John Paredes*
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
rachel.goodman@protectdemocracy.org
john.paredes@protectdemocracy.org

Jared Fletcher Davidson*
PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA 70117
Tel: (202) 579-4582
jared.davidson@protectdemocracy.org

Lea Haber Kuck*
One Manhattan West
New York, NY 10001-8602
Tel: (212) 735-3000
lea.kuck@probonolaw.com

Rajiv Madan*
Paige Braddy*
1440 New York Avenue NW
Washington, DC 20005
Tel: (202) 371-7000
raj.madan@probonolaw.com
paige.braddy@probonolaw.com

36

Vernon Thomas*
155 N. Wacker Drive
Chicago, IL 60606-1720
Tel: (312) 407-0648
vernon.thomas@probonolaw.com

**_Counsel for Plaintiff_**
*_Admitted Pro Hac Vice_*

## **RULE 7.1(D) CERTIFICATE**

The undersigned counsel certifies that this document has been prepared with

Times New Roman 14-point font in accordance with Local Rule 5.1.C.


Dated: March 24, 2023                */s/ Rachel F. Homer*
                                     Rachel F. Homer*


## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the within and

foregoing **RESPONSE IN OPPOSITION TO DEFENDANTS TRUE THE**

**VOTE, CATHERINE ENGELBRECHT, AND GREGG PHILLIPS' MOTION**

**TO DISMISS** was electronically filed with the Clerk of Court using CM/ECF

system, which will automatically send email notification of such filing to all

attorneys of record.


Dated: March 24, 2023                */s/ Rachel F. Homer*
                                     Rachel F. Homer*