# EXHIBIT A

# Appendix of Legislative History Sources

## Index

| | |
|---|---|
| Cong. Globe, 42d Cong., 1st Sess. 236 (Mar. 23, 1871) | 2 |
| Cong. Globe, 42d Cong., 1st Sess. 244 (Mar. 23, 1871) | 3 |
| Cong. Globe, 42d Cong., 1st Sess. 245 (Mar. 23, 1871) | 4 |
| Cong. Globe, 42d Cong., 1st Sess. 246 (Mar. 23, 1871) | 5 |
| Cong. Globe, 42d Cong., 1st Sess. 247 (Mar. 23, 1871) | 6 |
| Cong. Globe, 42d Cong., 1st Sess. 248 (Mar. 23, 1871) | 7 |
| Cong. Globe, 42d Cong., 1st Sess. 320 (Mar. 28, 1871) | 8 |
| Cong. Globe, 42d Cong., 1st Sess. 321 (Mar. 28, 1871) | 9 |
| Cong. Globe, 42d Cong., 1st Sess. 369 (Mar. 31, 1871) | 10 |
| Cong. Globe, 42d Cong., 1st Sess. 374 (Mar. 31, 1871) | 11 |
| Cong. Globe, 42d Cong., 1st Sess. 428 (Apr. 3, 1871) | 12 |
| Cong. Globe, 42d Cong., 1st Sess. 436 (Apr. 4, 1871) | 13 |
| Cong. Globe, 42d Cong., 1st Sess. 820 (Apr. 19, 1871) | 14 |

MESSAGE FROM THE HOUSE.

A message from the House of Representatives, by Mr. McPHERSON, its Clerk, announced that the House had passed a resolution providing for the adjournment of the House, with the consent of the Senate, from Monday next, until the 1st of December next at eleven o'clock a. m., in the following words:

Whereas the Senate has adopted a resolution declaring "that the Senate will consider at the present session no other legislative business than the deficiency appropriation bill, the concurrent resolution for a joint committee of investigation into the condition of the States lately in insurrection, and the resolution now pending instructing the Committee on the Judiciary to report a bill or bills that will enable the President and the courts of the United States to execute the laws in said States, and the report that may be made by the Committee on the Judiciary on that subject," thereby refusing to consider any business which may originate in the House of Representatives, therefore,

*Resolved*, (the Senate permitting,) That this House will adjourn, when it adjourns on Monday next, untill the first Monday of December next, at eleven o'clock a. m.

PROTECTION OF LIFE, ETC., AT THE SOUTH.

The Senate resumed the consideration of the following resolution, submitted by Mr. SHERMAN on the 16th instant:

*Resolved*, That as organized bands of lawless and desperate men, mainly composed of soldiers of the late rebel armies, armed, disciplined, and disguised, and bound by oaths and secret obligations, are proven to exist in the State of North Carolina, and have, by force, terror, and violence, defied civil authority in that State, and by organized perjury have rendered the courts powerless to punish the crimes they have committed, thus overthrowing the safety of person and property, and the rights which are the primary basis of civil government, and which are guarantied by the Constitution of the United States to all its citizens; and as there is good reason to believe that similar organizations exist, and have produced similar results in many parts of the late insurrectionary States; therefore, the Judiciary Committee is instructed to report a bill or bills to enable the President and the courts of the United States to execute the laws, punish and prevent such organized violence, and secure to all citizens the rights so guarantied to them.

Mr. SCOTT resumed, and concluded his speech commenced yesterday. [It will be published in the Appendix.]

During the delivery of Mr. SCOTT's speech the following message was received from the President of the United States:

*To the Senate and House of Representatives:*

A condition of affairs now exists in some of the States of the Union rendering life and property insecure, and the carrying of the mails and the collection of the revenue dangerous. The proof that such a condition of affairs exists in some localities is now before the Senate. That the power to correct these evils is beyond the control of the State authorities I do not doubt; that the power of the Executive of the United States, acting within the limits of existing laws, is sufficient for present emergencies is not clear. Therefore I urgently recommend such legislation as in the judgment of Congress shall effectually secure life, liberty, and property, and the enforcement of law in all parts of the United States. It may be expedient to provide that such law as shall be passed in pursuance of this recommendation shall expire at the end of the next session of Congress. There is no other subject on which I would recommend legislation during the present session.
U. S. GRANT.

WASHINGTON, D, C., *March* 23, 1871.

Mr. CONKLING. I move that the message lie on the table and be printed.

The motion was agreed to.

Mr. MORTON. Mr. President, I desire to detain the Senate for a short time for the purpose of answering the Senator from Kentucky, [Mr. STEVENSON,] who I am sorry is not now in his seat, in reference to the act of the Postmaster General taking the mail off the line from Louisville to Lexington, in that State. And in saying what I shall say in vindication of the Postmaster General it becomes necessary for me, in the first place, very briefly to review the condition of Kentucky as it is presented by the evidence before me.

The Senator from Kentucky, in his remarks last Saturday, used the following language:

"Perhaps during the last three and a half years that I administered the affairs of the government of that State half a dozen instances of violence did occur, not more."

I will remark that the three and a half years of his administration that he speaks of ended on the 13th of February last; and he says that during that period there were half a dozen cases of violence, "not more"—

"And what did they amount to? I know not of any secret political organization in that State. I know there are bad men in both parties; but I say, as I hope to answer at the great bar of God, as I would say at the bar as a witness, that there is no such organization in Kentucky composed of sixty men, throughout the Commonwealth, and that I do not believe it is political in its tendency."

He first says that during the three and a half years ending on the 13th of February last there were not to exceed half a dozen cases of violence, and that there were not concerned in these cases of violence to exceed sixty men throughout the entire Commonwealth.

I desire to remark here that if he is correct in that, the condition of Kentucky is remarkably good; that statement could be made of but very few States in this Union. The Senator says further on:

"Mr. President, these outrages exist everywhere. I admit frankly and freely that half a dozen instances occurred in Kentucky while I was Governor of the State which gave me great pain. Bad men, whose politics were unknown to me, did go secretly, sometimes masked, and attempt to offer indignity to negroes; but I say that such things were confined to a mere neighborhood, were wholly inconsiderable in numbers, and the political complexion of the parties was unknown. I state further, upon my own information, that no outrages received prompter or more indignant reprobation than those did from the distinguished and gallant men who were in the confederate service."

Mere neighborhood affairs, inconsiderable in number, and the reiteration of the statement of but six cases in three and a half years, less than two cases per annum! Now, I submit to the distinguished Senator that if he is correct in his statement in regard to the condition of affairs in Kentucky there was no occasion for him to send to the Legislature of Kentucky the two messages from which I will read. If he is right in his statement now, he was all wrong in his messages. If he was right in his allegations in the messages, he is all wrong now. From this conclusion there is no possible escape. I am not calling in question at all his sincerity, but I shall compare the statement that he has made on this floor with the message that he sent to the Legislature of Kentucky, I believe on the 27th day of January last; and I ask the attention of the Senate to the language of that message:

"During and immediately following the war Kentucky, from its geographical position as a border State, was subjected to a more severe ordeal from this cause than her neighbors, and accordingly, during the first years of my administration"—

Only three years and a half altogether, mind you just now—

"During the first years of my administration lawlessness in some portions of the Commonwealth manifested itself in formidable organization, which defied the local authority, and perpetrated deeds of open violence under the pretext of regulating order and punishing crime."

He here talks about formidable organizations that defied the local authority. That does not sound like six cases in three and a half years and only sixty men or less than sixty men in all the Commonwealth concerned in them, inconsiderable in numbers, as he says, and mere neighborhood affairs! But he goes on in the message to say:

"By the use of the militia at my command, and the exhibition of my firm purpose to suppress such practices at all hazards, tranquillity was restored, and there has not been for some time in the localities which had suffered from such lawlessness any demonstrations having the semblance of organized resistance of the law. Still, in various portions of the State, there have been committed by lawless persons, acting in bodies generally under cover of night and sometimes in disguise, acts of violence upon individuals, either wholly innocent of offense or only subjects of criminal prosecution through the courts, most of which class of violators of the law have escaped detection and punishment."

Now, I submit that taking together the whole extract from his message it sounds more like half a thousand cases than half a dozen cases in three years and a half. He speaks of having called out the militia, of lawless violence that defied the civil authorities, and he goes on further to say that as the law then stood in Kentucky, I believe on the 27th of January last, he had no power to preserve the peace in Kentucky. But I will read his language:

"The other agency at my command, in the suppression of violence or in the execution of the law, is through the militia of the State. In its use I am, however, quite as much restricted as in the matter of proclamations. My authority extends no further than to order out the militia of a county, upon the application of the local authority setting forth the necessity of their use in support of the civil power, or in case of imminent danger of riot. The same authority is vested in the judges of the various courts and the sheriffs and mayors of cities. Upon several occasions, when applied to, I have ordered out the local militia, but without authority, in ordinary cases, to act, except in response to the call of the local officers charged with the execution of the laws. Little good has resulted in these latter cases, save in the moral effect of such demonstrations.

"What is the most efficient remedy for the suppression of these growing evils rests exclusively with you. Whether in the establishment of a well-organized police system, under an efficient head, or in some other way, must be determined by the law-making power. I am quite sure that no measure can be completely successful without conferring upon the Executive additional discretionary power, in any sudden emergency, to act where the public security requires it."

Here, in view of the condition of Kentucky, he asks that extraordinary powers of a military character shall be conferred upon him. I ask how that compares with the declaration on this floor of only half a dozen cases in three and a half years:

"In this connection I desire to repeat my suggestions, as set forth in previous communications, of the absolute necessity of a thorough reorganization of the militia as an important adjunct in the enforcement of law."

The condition of Kentucky is such that there must be a reorganization of the militia to maintain the public peace. The Senator talks in this message of crimes that defy the civil power, that require the military power; and he speaks of these growing evils; ay, that is the language he uses, "these growing evils." What was the character of the crimes that the Governor of Kentucky refers to in this message? He does not mention their character, but I will tell the Senate what I understand the character of these crimes to be. It is the shooting, and the hanging, and the whipping of negroes all over that State, with more indifference than dogs are shot and whipped.

Then, Mr. President, if I judge from the message of the distinguished Senator while acting as Governor of Kentucky, he confirms all that has been said by the Louisville Courier-Journal; he confirms all that has been said in the public prints for the last eighteen months in regard to murder, crime, and outrage of every kind in the State of Kentucky. It comes in aid of that great volume of evidence that pours in upon the country from day to day

in legislation or a ratified treaty, the employment of the Navy in the maintenance of the Government there is without any excuse of national defense, as also, without any excuse of a previous declaration of war by Congress.

*Resolved*, That in any proceedings for the acquisition of part of the island of St. Domingo, whatever may be its temptations of soil, climate, and productions, there must be no exercise of influence by superior force, nor any violation of Public Law, whether international or constitutional; and therefore the present proceedings, which have been conducted at great cost of money, under the constant shadow of superior force, and through the belligerent intervention of our Navy, acting in violation of International Law, and initiating war without an act of Congress, must be abandoned, to the end that justice may be maintained and that proceedings so hostile to correct principles may not become an example for the future.

*Resolved*, That instead of seeking to acquire part of the island of St. Domingo by belligerent intervention, without the authority of an act of Congress, it would have been in better accord with the principles of our Republic, and its mission of peace and beneficence, had our Government, in the spirit of good neighborhood and by friendly action, instead of belligerent intervention, striven for the establishment of tranquillity throughout the whole island, so that the internal dissensions of Dominica and its disturbed relations with Hayti might be brought to a close, thus obtaining that security which is the first condition of prosperity, all of which, being in the nature of good offices, would have been without any violation of International Law, and without any usurpation of War Powers under the Constitution of the United States.

Mr. FINKELNBURG. I object to this bill, unless the amendment which I desire to offer shall be adopted.

Mr. SNYDER. When I called up this bill last Friday objections were made by the gentleman from Michigan [Mr. CONGER] and the gentleman from Missouri, [Mr. FINKELNBURG.] Those objections have been met and reconciled by private consultation, the amendments which they desire to offer being assented to by the friends of the bill. The gentleman from Ohio [Mr. BINGHAM] made the other day an inquiry whether the bill was amendatory of the only act providing for the construction of a bridge across the Arkansas river at Little Rock. I answer that inquiry in the affirmative. This bill is amendatory of the only act providing for the construction of a bridge across Arkansas river at the city of Little Rock. Therefore the connection and relation of the original act and this bill cannot be misunderstood.

Mr. BINGHAM. Does the gentleman mean to say that the act of which this bill is amendatory provides only for a bridge on that river?

Mr. SNYDER. On that river, at the city of Little Rock.

The SPEAKER. The Clerk will read the amendment sent to the desk by the gentleman from Michigan, [Mr. CONGER.]

The Clerk read as follows:

Strike out in the second line of the bill the words "said act," and insert in lieu thereof "an act to authorize the construction of a bridge across the Arkansas river at Little Rock, Arkansas, approved July 1, 1870."

Mr. FINKELNBURG. I move to amend by adding at the end of the first section "The piers of said bridge shall be parallel with the current of said river."

Mr. SNYDER. I will merely state that these amendments are perfectly agreeable to the friends of the bill, and I hope they will be adopted without objection.

Mr. HOLMAN. I ask that the second section of the bill be again read. I desire to hear the proviso.

The Clerk read the second section of the bill.

Mr. HOLMAN. I suggest the insertion of the additional words "by the Secretary of War," in the first part of that proviso. It has been usual to put these bridges under the control of the War Department; otherwise it would not seem that any person was authorized to require this to be done.

Mr. CONGER. These matters are still left under the control of Congress, so far as any action is to be had.

Mr. HOLMAN. It is customary to put these bridges under the control of the Secretary of War, and I hope the words I have suggested will be inserted, in order to remove all ambiguity.

Mr. CONGER. I have no objection to the amendment.

Mr. SNYDER. Nor have I any objection to the amendment.

The amendment was agreed to; and the bill, as amended, was ordered to a third reading; and it was accordingly read the third time, and passed.

Mr. SNYDER moved to reconsider the vote by which the bill was passed; and also moved that the motion to reconsider be laid on the table.

The latter motion was agreed to.

LIFE-SAVING STATIONS.

Mr. HILL, by unanimous consent, presented the following resolutions of the Legislature of the State of New Jersey; which were referred to the Committee on Commerce when appointed, and ordered to be printed:

Whereas N. Broughton Devereux, chief of the revenue marine, in his report of December, 1870, to the honorable the Secretary of the Treasury, recommended additional appropriation to the life-saving stations for the protection of life and property upon the New Jersey coast; and whereas Henry W. Sawyer, superintendent of the stations, and the commissioners of pilotage have recommended additional stations, with crews at each station, and improved surf-boats, for the reason that the present boats are unsafe and worn out: Therefore,

1. Be it resolved by the Senate and General Assembly of the State of New Jersey, That our Senators and Representatives in Congress be urged to secure an appropriation of $200,000 for the year 1871, for the purpose of more effectually securing life and property upon the New Jersey coast.

2. And be it resolved, That the Governor be requested to furnish a copy of the foregoing preamble and resolution immediately to the members of Congress from New Jersey.

ORDER OF BUSINESS.

Mr. HOOPER, of Massachusetts. I hope there will be no objection to going to business on the Speaker's table.

The SPEAKER. The regular order of business would be the morning hour for reports.

Mr. HOOPER, of Massachusetts. I hope the bills on the Speaker's table will be taken up in their order.

Mr. COX. I call for the regular order.

The SPEAKER. The regular order of business being called, for the morning hour now begins at three minutes to two o'clock, and reports are first in order from the Regents of the Smithsonian Institution.

Mr. COX. I do not intend to consent to any bills from the Senate until they consent to an adjournment.

Mr. ELDRIDGE. No bills should be passed from the Senate until we have committees appointed.

PROFESSOR JOSEPH HENRY.

Mr. POLAND. I am directed by the Regents of the Smithsonian Institution to report a joint resolution (H. R. No. 42) giving the consent of Congress to Professor Joseph Henry, secretary of the Smithsonian Institution, to accept the title and regalia of a commander of the Royal Norwegian Order of St. Olaf, conferred upon him by the king of Sweden and Norway, grand master of said order.

The joint resolution was read a first and second time. It provides that the consent of Congress is given to Professor Joseph Henry, secretary of the Smithsonian Institution, to accept the title and regalia of a commander of the Royal Norwegian Order of St. Olaf, conferred upon him for his distinguished scientific services and character by the king of Sweden and Norway, grand master of said order.

Mr. FINKELNBURG. I would like to know if this is a title of nobility.

Mr. POLAND. I propose to make a brief explanation.

Mr. ELDRIDGE. Is there liberty to be given to this gentleman to become a saint?

Mr. POLAND. Professor Henry, who has been for many years at the head of the Smithsonian Institution, and has brought it into a high state of credit, both in this country and abroad, visited Europe during last season; and while there this compliment—the appointment to this order with its decorations and regalia—was granted to him by the king of Sweden, who is the grand master of this Order of St. Olaf. I have endeavored to ascertain what this Order of St. Olaf means, what it is. Nothing is to be found on the subject in any of the encyclopedias in the English language, but the Librarian, having at my suggestion made some examination of the subject, found in a German encyclopedia an article in regard to this order, which I will ask the Clerk to read. It gives all the information which I have on the subject.

Mr. PETERS. Is it in the German language?

Mr. POLAND. It is translated.

The Clerk read as follows:

"Not very long ago, 21st August, 1847, a Norwegian civil order was established by King Oscar I of Sweden and Norway, in honor of St. Olaf, and is composed of three classes: grand cross, commanders, and knights. It has as regalia a white enameled cross, with the arms of the kingdom, a golden lion crowned, holding the halberd of St. Olaf, on a red field, bordered by an enameled red ring with blue and double white borders. In each of the four corners of the cross is a crowned golden O, which commemorates the founder of the order, i. e., Oscar. On the obverse there is an enameled red shield with the device, 'Ret og sandhed,' (right and truth.) The ribbon of the order is watered, bright red, with blue and double white border."—Meyer's News Conversations Lexicon, xii., p. 275, 1865.

Mr. SCOFIELD. I desire to ask the gentleman from Vermont.[Mr. POLAND] a question: whether he will bring in his man here with all his regalia upon him, so that we may see what they are before we pass the bill?

Mr. POLAND. When that shall be the regular order I shall endeavor to see that done.

Mr. CONGER. I would like to inquire what there is in the Constitution of the United States to prevent this gentleman receiving the order and the title without an act of Congress. There is nothing, so far as appears before this House, which shows that he holds any office of profit or trust under this Government.

Mr. POLAND. It may be somewhat doubtful whether the secretary of the Smithsonian Institution is such an officer under the United States, though I am inclined to think he is. But Professor Henry is also a member of the Coast Survey.

Mr. SCOFIELD. I hold that it is his constitutional right to make himself ridiculous, if he has a mind to do so, without a law of Congress.

The previous question was seconded and the main question ordered; and under the operation thereof the joint resolution was ordered to be engrossed and read a third time; and being engrossed, it was accordingly read the third time.

The question recurred on the passage of the joint resolution; and being put, there were— ayes 56, noes 41; no quorum voting.

The SPEAKER, under the rule, ordered tellers; and appointed Mr. POLAND and Mr. HOLMAN.

The House again divided; and the tellers reported—ayes 99, noes 19.

MESSAGE FROM THE PRESIDENT.

A message, in writing, from the President of the United States was communicated to the House by Mr. HORACE PORTER, his Private Secretary.

PROFESSOR JOSEPH HENRY.

Mr. GETZ. I call for the yeas and nays on the passage of the joint resolution.

Mr. HOLMAN. I hope the House will not pass a joint resolution giving effect to these titles of nobility.

Mr. COX. This is not a title of nobility.

Mr. WOOD. Would it be in order to move that the House adjourn?

Mr. BINGHAM. Let us have the message read.

CONDITION OF THE SOUTH.

The SPEAKER. The Chair lays before the House a communication from the President of the United States.

The Clerk read as follows:

To the Senate and House of Representatives:

A condition of affairs now exists in some States of the Union rendering life and property insecure and the carrying of the mails and the collection of the revenue dangerous. The proof that such a condition of affairs exists in some localities is now before the Senate. That the power to correct these evils is beyond the control of State authorities I do not doubt; that the power of the Executive of the United States, acting within the limits of existing laws, is sufficient for present emergencies is not clear. Therefore, I urgently recommend such legislation as in the judgment of Congress shall effectually secure life, liberty, and property, and the enforcement of law in all parts of the United States. It may be expedient to provide that such law as shall be passed in pursuance of this recommendation shall expire at the end of the next session of Congress. There is no other subject upon which I would recommend legislation during the present session.

U. S. GRANT.

WASHINGTON, D. C., March 23, 1871.

Mr. SHELLABARGER. Mr. Speaker, I move that the message just read be referred to a select committee of this House of nine members, to be appointed by the Chair, and upon that motion I ask the previous question.

Mr. COX. I move to lay that motion on the table.

Mr. ELDRIDGE. On that motion I demand the yeas and nays; and now I move that the House adjourn.

Mr. ACKER. I rise to a privileged question. I move that when the House adjourns to-day it adjourn to meet on Monday next at eleven o'clock.

The SPEAKER. That motion cannot be entertained.

Mr. RANDALL. I suggest to my colleague that he modify his motion and say Saturday.

The SPEAKER. That motion is not in order.

Mr. BROOKS, of New York. I call for the yeas and nays on the motion to adjourn, because the previous question is demanded by the gentleman from Ohio.

The SPEAKER. The Chair will state to the gentleman from Ohio [Mr. SHELLABARGER] who makes the motion that the debate on the motion that he has made to refer the communication from the President to a select committee is debatable in the widest sense.

Mr. SHELLABARGER. I rose, having that in my mind, for the purpose of proposing to gentlemen upon the other side of the House to name some reasonable time during which the motion I have made may be discussed, dividing the time equitably between the two sides of the House. If it is agreeable to gentlemen that we shall take a vote upon my motion at some reasonable day they suggest, I shall be earnestly in favor of acceding to such a proposition, and will withdraw the demand for the previous question.

Mr. BROOKS, of New York. If the gentleman from Ohio will permit me—

Mr. ELDRIDGE. Is debate in order?

The SPEAKER. The Chair supposed that this conversation was proceeding for the purpose of accommodation.

Mr. ELDRIDGE. I object to debate unless the previous question is withdrawn.

Mr. SHELLABARGER. I do not withdraw it. I only make a suggestion if it is agreeable to gentlemen on the other side.

Mr. ELDRIDGE. It does not look as if the gentleman desires debate here, when he moves the previous question the first thing.

The SPEAKER. The gentleman from Wisconsin will surely allow the gentleman from Ohio to make his proposition.

Mr. ELDRIDGE. I object to debate unless he withdraws the previous question.

Mr. SHELLABARGER. I will, then, for the purpose of making a statement—

Mr. ELDRIDGE. I object to debate.

The SPEAKER. The Chair will hear the gentleman from Ohio, as it relates to the order of business.

Mr. ELDRIDGE. He should then withdraw the previous question.

The SPEAKER. The Chair will not be dictated to on that point. The gentleman from Ohio is on the floor, not to debate at all, but to do that which it is the universal custom of this House to entertain, to make remarks in relation to fixing the order of business. The Chair does not waive the right of any gentleman in any motion which has been made, or will be made, but within brief limits he will hear the gentleman from Ohio.

Mr. ELDRIDGE. I desire to say that my right to make objection is unquestionable under the rule. The gentleman had the power to debate—

The SPEAKER. He is not debating. He has a right to make an explanation.

Mr. ELDRIDGE. I insist upon my rights under the rule to object unless he withdraws the previous question.

Mr. DAWES. Cannot he withdraw the previous question and hold the floor himself?

The SPEAKER. That, of course, he can do.

Mr. ELDRIDGE. That is the only right he has.

Mr. SHELLABARGER. I was simply attempting to do what for six years it has been the practice of the House to permit, to make a proposition.

Mr. ELDRIDGE. I call the gentleman to order.

Mr. SHELLABARGER. I now withdraw the demand for the previous question and retain the floor for the purpose of making a proposition, which I now do, like the one which I made the other day. As the Speaker suggested, and as we all know, this motion opens up in all its largest and most unlimited sense debate on the subject-matter to which the message refers. I now propose that by unanimous consent we fix a day during which we shall debate the subject-matter of this message, dividing the time between the two sides of the House equitably, and so far as I am concerned I would say equally. If that, then, be agreeable to gentlemen on the other side, I now propose that, by unanimous consent, we fix such reasonable time for debate—

Mr. BROOKS, of New York. Will the gentleman allow me a moment?

Mr. SHELLABARGER. I will yield for a suggestion.

Mr. BROOKS, of New York. I think we cannot agree to the proposition of the honorable gentleman from Ohio, [Mr. SHELLABARGER.] I state so with all frankness, because we do not agree with him that this is so important a matter of legislation as many others that are before the country.

For example, there are some of us who believe that we are now collecting annually from twenty to fifty million dollars of taxes more than are necessary for the support of this Government. There are others among us who believe that among the coal miners and the coal operators and the railroad operators of the State of Pennsylvania there are disturbances involving more peril and damage to the people of the United States, and to the great manufacturing and consuming interests of the country, than are involved in any disturbances which may exist in the southern country. If the President had sent a message here embracing all these troubles in all parts of the United States we should be prepared then to enter upon some discussion.

Mr. SHELLABARGER. I must resume the floor.

Mr. WOOD. Will the gentleman allow me a question?

Mr. SHELLABARGER. A question, yes.

Mr. WOOD. I desire to ask whether the gentleman feels authorized to make any proposition for the other side of the House?

Mr. SHELLABARGER. I feel authorized always, in exercising my rights as a member upon this floor, to make any reasonable suggestion to gentlemen on both sides of the House, and to ask for unanimous consent to any proposition. That authority I have exercised with all due modesty. And now, as it seems not to be agreeable to gentlemen upon the other side to enter upon this debate—

Mr. WOOD. If the gentleman from Ohio will permit me to say one word further.

Mr. SHELLABARGER. Certainly.

Mr. WOOD. I will say this: that I do not think there is any gentleman on this side of the House that possesses the power that he assumes to have in speaking for what we concede to be the majority of that side of the House. I doubt whether any gentleman here is prepared to make any statement, to reach any conclusion, to make or to receive any proposition, which shall be conclusive upon his political friends.

I will say further, for myself personally, that I am sure I have no disposition to shrink from an investigation of this subject, or to avoid any discussion of this subject. But I do think that there are so many other questions pending before Congress of graver importance to the people of the United States, that they should be disposed of by proper legislation in advance of any further effort to agitate and inflame the public mind.

Mr. SHELLABARGER. I ask the gentleman from New York [Mr. WOOD] whether he now declines to name a time during which we may debate this subject?

Mr. WOOD. I have no power to do so.

Mr. SHELLABARGER. For himself he has the power.

Mr. WOOD. For myself individually—

Mr. SHELLABARGER. Will the gentleman state whether he objects to naming the time during which we may debate this subject?

Mr. WOOD. I have no power to speak for anybody but myself.

Mr. SHELLABARGER. What does the gentleman say for himself?

Mr. WOOD. I am ready now to act upon this proposition without any debate at all.

Mr. COX. Allow me to say a word.

Mr. SHELLABARGER. Certainly.

Mr. COX. I desire to say to my former colleague [Mr. SHELLABARGER] that after the remarks which have been made I cannot speak for any one except myself, only so far as I may assume to do so from the action which this side of the House has heretofore taken. This side of the House has supported the honorable gentleman from Massachusetts, [Mr. DAWES,] not only in his reasoning, but in his resolutions of the past ten days, without regard to party affiliation, and with a sole view to the tranquillization of our southern country.

The gentleman from Ohio [Mr. SHELLABARGER] who has submitted the pending motion for the reference of this message made the other day some very earnest and impressive remarks, to the effect that he desired a committee of investigation to be instituted to go down South and inquire into the facts. He now, with the same inconsistency (if he will allow me to say it) in which he indulged the other day, proposes to act in this House upon common clamor, upon newspaper rumor, to crystallize into legislation some form of punishment and afterward to ascertain the facts; to hang the man and then to find the evidence, to give him a new trial after he has been convicted and executed.

Now, Mr. Speaker, I want to come to my conclusion.

Mr. SHELLABARGER. Come quickly. [Laughter.]

Mr. COX. I will as quickly as I can drive it to you. My conclusion is that when we have in the most solemn manner voted committees of investigation as the basis of future legislation, when such resolutions are now pending between the Senate and House, it is irrational, it is unkind toward this side of the House to demand that we should now enter into a discussion with a view to legislation at this session. That is my point.

Mr. BUTLER, of Massachusetts. I desire to ask a single question of the gentleman from New York, [Mr. COX.] What "honorable gentleman from Massachusetts" has the Democracy supported?

Mr. COX. I spoke of the honorable gentleman from Massachusetts, [Mr. DAWES.] [Laughter.]

Mr. SHELLABARGER. Mr. Speaker, I have now submitted to the other side of the House the proposition that we should unanimously consent to fix some not unreasonably distant day on which to vote upon this matter, that we might in the mean time discuss the question which has been alluded to by the gentleman from New York [Mr. COX] as a most grave one. As that proposition is declined, I have nothing further to say at this moment than that the legislation pointed to and invited by the message of the President, is not invited to proceed upon "clamor." If it were not unparliamentary I would say that the remark of the gentleman from New York was unfit to be made. Why, sir, to-day a sworn officer of the United States comes to us

from the South covered with the marks of lashes, gored with the scourge of the murderous clans that infest one half of the Republic. Yet gentlemen come here and venture to say that we invite legislation upon mere "rumor" or "clamor." Mr. Speaker, I go no further with the debate at this time.

Mr. McHENRY. Who is the officer the gentleman has referred to?

Mr. SHELLABARGER. I now yield to the gentleman from Massachusetts, [Mr. DAWES.]

Mr. DAWES. Mr. Speaker, the gentleman from New York [Mr. Cox] has been pleased to say that he has supported me in all the suggestions and all the propositions I have made. The gentleman will bear in mind that while I have been fully convinced of the importance of the earliest possible adjournment of this Congress, and while every proposition I have submitted to the House has tended directly to that end, yet I have at all times pledged myself to coöperate in any legislation which the condition of things in any part of the country may demand. It is my belief that we ought to have—as I have no doubt we shall have under the concurrent resolution pending between the two Houses—a joint committee of such character and composition as will command for its conclusions as to facts and measures the assent of all sides in this House and all parties in the country. At the same time my friend from New York will recollect that I have stood here pledging myself to coöperate in any measure of legislation which would tend to restore peace to the country. Under these circumstances the President of the United States, whose duty under the Constitution requires him "from time to time to give to the Congress information of the state of the Union, and recommend to their consideration such measures as he shall judge necessary and expedient," has, under the obligations of his oath and his sense of duty, submitted to Congress a message, for which he is responsible in the discharge of his duty.

The ordinary proposition is made to refer that message for consideration to a select committee of this House in the absence of all regular standing committees. What less could be done? What ought we to do less than refer that message to such a committee, and to await its candid consideration of its recommendations? I do not understand why any gentleman on either side of this House shrinks from such a reference or from such conclusions as may be arrived at by a committee appointed by the Chair under the grave responsibility of the subject-matter under the attention of this House, to which the President has in his message invited our consideration. Why my friend from New York or any other gentleman shrinks from such a reference I cannot understand.

Mr. ELDRIDGE. Will the gentleman allow me to reply to his inquiry?

Mr. DAWES. I wish only to say, in reply to my friend from New York, that I do not deviate, in urging upon the House the adoption of the motion of the gentleman from Ohio, one particle from the line which he has been pleased to say he has given me his support in following thus far, and in which I have had the coöperation of a majority of my own political associates as well as of gentlemen on the other side.

Mr. ELDRIDGE. Will the gentleman yield to me to reply to his inquiry?

Mr. DAWES. I will yield to the gentleman by the consent of the gentleman from Ohio, by whose courtesy I hold the floor.

Mr. ELDRIDGE. The gentleman charges us with shrinking from the appointment of a committee to consider the message just received from the President. There is no such feeling on this side of the House. That is not the occasion of the motions made which seemed to be dilatory. The gentleman from Ohio, [Mr. SHELLABARGER,] a moment after the message was read, moved to refer it to a committee, and called the previous question. It was supposed he intended to act on that. He had the right to make all the explanation which he has made without calling the previous question, all the explanation he desired in reference to the order of business; but he called the previous question at once, and the steps which were taken here were taken because it was supposed he intended to close the mouths of gentlemen on this subject.

I will say further to the gentleman that the steps taken by us were not because of the proposed reference of the message, but because we think there ought to be committees of this House, and that this matter should be referred to a standing committee. We insist it should not be referred to a special committee or to a select committee, and if we are to legislate here all summer, if we are to continue in session, the committees of the House should be appointed and the regular and appropriate committee should consider this subject, and not any select committee made up for the occasion.

Mr. DAWES. Then I understand the gentleman's first objection is that the gentleman from Ohio called the previous question, and alarmed him lest he was going to call for a vote without discussion. But the gentleman forgets that the gentleman from Ohio withdrew his demand for the previous question, and yielded to the demand for discussion.

The other objection of the gentleman from Wisconsin is that he wants the message referred to a standing rather than to a select committee. There is no standing committee to which it can be referred. And is there anything better in a standing than in a select committee appointed for the purpose of considering this particular subject, which, in the opinion of the President, is of such great importance as to require at his hand a special message?

Mr. RANDALL. I want it distinctly understood that I do not speak for any one but myself; and I say for one member on this side that I do not object to any proper reference of a message of the President of the United States on any subject upon which he may choose to speak. I believe, however, that now is not the time for this discussion at all.

Mr. DAWES. Then let us refer it and wait for the report.

Mr. RANDALL. For myself I would discuss the subject when I know what I am to discuss. When I hear the propositions which may emanate from the gentlemen appointed on the committee, if they be vindictive in their character, then will be the time for us to strike at them. Then will be the time to discuss them. Therefore, for myself, when the question comes, I will vote for the reference. However, relying mainly and in no inconsiderable degree upon the fairness heretofore exhibited by the Speaker in his appointments, I would just remark that we in numerical force are entitled to four members out of the nine. [Laughter.]

Mr. WOOD. I ask the gentleman from Ohio [Mr. SHELLABARGER] to yield to me for a few moments.

Mr. SHELLABARGER. I will by and bye. I have promised to yield now to my colleague, [Mr. GARFIELD.]

Mr. GARFIELD, of Ohio. I desire to say a few words only, the opportunity to do so having been afforded to me by the courtesy of my colleague. The House will probably remember that in a little discussion which was had here a few days since, when we were voting for the appointment of a joint committee, instead of proceeding to direct legislation, I made this point, that I wanted first of all to know whether the Executive of this Government needed any more legislation in order to enable him to keep the peace throughout the country, and that he had given us no sign that any further legislation was needed. And I said then that until such sign was given I did not feel that anything more was needed than for this House to prepare for an inquiry into the whole question.

Now, however, there has come from the President of the United States a very temperate, a very prudent, and, as it seems to me, a very judicious message, in which he says, first of all, that he has undoubted authority for the assertion that there are outrages and combinations which the State authorities are not able to put down; and that he is in doubt, as the Chief Executive of this nation, whether he is empowered by existing laws of the United States to render such aid as the necessities of the case require. And therefore, to help him to resolve his doubts, he asks this Congress to stay here long enough to examine, first, the facts of the case, then the law of the case, and then to help him in its wisdom by such legislation as it may think the case requires. He also, to be very careful and very prudent about it, suggests that it may only be necessary to make a law to last until the next session of Congress ends. I think, therefore, the message is eminently temperate and eminently prudent. I do not, for my part, see how any man belonging to either side of this House can dare, with that paper on our desks, to vote for going away without first giving all the attention, all the consideration, and all the thought that we are capable of giving a request coming from the Chief Executive of the nation.

There is one other thing I desire to say, and only one. There are gentlemen here who represent districts wherein these very difficulties have arisen, and I am informed that many of them are ready now to tell us what they know about the situation; that they are willing to lay before this House facts within their own knowledge of which every member of the House should be possessed.

Mr. MORGAN. Will the gentleman yield to me for a question?

Mr. GARFIELD, of Ohio. In a moment I will. I take it that few statements on this subject can be more reliable than what a gentleman says of his own district, of his own constituents, of his own people, with whom he is well acquainted. Now, I do not believe that our friends on the other side will, I do not think they can stand before the country, did they desire to do so, in a resistance to a full, fair, and candid investigation of the facts and propositions that may be brought forward as has been stated by the President in his message.

I hope the fullest examination will be made of the constitutional question, and that the facts in regard to the condition of affairs in the South may be most amply debated. I do not want to go into that examination and that debate in any party spirit. The question to my mind is full of doubts. I want to resolve my own conscience, and I desire the matter to be dealt with in no factious or party spirit.

Mr. SHELLABARGER. I now yield to the gentleman from New York, [Mr. WOOD.]

Mr. WOOD. I am very much surprised that gentlemen on the other side should assume that there is any objection here to afford every facility and opportunity for a full, free, and thorough investigation as to these alleged outrages in the southern States. Why, sir, within ten days, by the vote of the Democratic party in this House, we have already provided for the appointment of two committees to investigate this very subject referred to by the President.

In the first instance, the committee was not only raised by the vote of the House, but absolutely has been appointed, and is now in existence as a committee of this House to investigate this very subject; and subsequently to that, after the Senate had passed a concurrent resolution providing for a joint committee of investigation, we coöperated with the Senate, and by the united vote of the Democratic side

of the House carried that resolution and sent it back to the Senate, and they have really rejected it by refusing to concur in our amendment.

When, therefore, it is alleged or implied that there is any opposition on this side of the House to a full, fair, and entire investigation, it appears to me that the gentlemen who make that allegation are not generous, certainly are not truthful, if they allege that we stand in the way of investigation.

As to the gentleman from Ohio [Mr. GARFIELD] who has just spoken, and has advocated a committee for the purpose of considering the message of the President, he himself but a few days ago sent up to the Clerk's desk and had read an extract from the existing law, by which he proved conclusively that the President already possesses all the power necessary over the whole subject; and now, forsooth, he comes here and lectures us, and attempts to make the country believe that the Democrats in this House are opposed to an investigation, when he himself is upon record as saying that the President has all the power he need have or which Congress can give him over this whole question. No, sir; the truth is that these gentlemen do not really want an investigation; the truth is that they want to create an artificial condition of the public mind for a wicked purpose; that there is an object beyond the restoring of one section of the Union to its peaceful and harmonious relations to the other sections of the Union or to the Federal Government. They know, as the country knows, that the stimulant that warmed their party into existence is subsiding, and that it is necessary to apply more stimulant, so as to revive their sunken fortunes and to prevent their total political annihilation; and they wish to keep Congress here that we may be excited, that the people may become excited, that the country may be made to believe that some legislation at the hands of Congress is absolutely necessary to preserve life and protect property in the southern States.

Sir, we challenge investigation. We are ready to vote for this committee or for a dozen committees, expressing confidence in the Speaker that he will so constitute them as to give us a really truthful and impartial statement of the facts.

Mr. GARFIELD, of Ohio. Does the gentleman speak for his friends now?

Mr. WOOD. I speak for myself; but I have no doubt what the vote on this side of the House will be when the proper time comes.

Mr. SHELLABARGER. I yield now to the gentleman from Massachusetts, [Mr. BUTLER.]

Mr. BUTLER, of Massachusetts. Some days ago, Mr. Speaker, I was by a number, and I believe a majority of the Republicans on this floor, intrusted with the presentation of a bill, approved by them, which had for its object to remedy the state of disorder and wrong at the South. That bill I have persistently tried, as gentlemen upon both sides of the House know, to get before the House. I ask my friends upon the other side of the House to do me the justice to say that in doing so I offered to them when the bill came up, if it should come up, any time for debate that they desired; that they should fix their own time, so that we might have the subject fully discussed, and when the whole question was before the House and the country we could ascertain whether there was cause for legislation. I also call their attention and the attention of the country to the fact that my attempts have been met by motions of delay, of adjournment, of attempting to adjourn to some possible time, carried steadily by the Democratic majority. They have ever insisted upon not having a hearing upon that bill; and it will not do for them to say that the provisions of the bill were faulty, because it would have been open to amendment. There was no attempt on my part and no desire that the bill should not be amended in the fullest possible manner that the judgment of the House should dictate; so that we could have had the measure discussed for at least two weeks past, if it had not been for the dilatory motions of the gentlemen upon the other side.

Mr. MORGAN. Allow me a moment. I may perhaps have misunderstood the gentleman. I understood the gentleman from Massachusetts [Mr. BUTLER] to say that the bill which he introduced and asked to have referred to a committee met the approval of a majority of the Republicans on this floor. Am I right?

Mr. BUTLER, of Massachusetts. I will restate what I said, so that there shall be no mistake. I understand that the bill which I presented and which is in print does meet the approval of a majority of the Republicans on this floor. That it is perfect nobody dreams of claiming. Everything human is imperfect; everything human needs amendment, and nothing more and nobody more than my friends on the other side, except, perhaps, my bill.

Mr. NIBLACK. One moment. The gentleman will relieve us on this side of the House from some embarrassment if he will cease to call us his friends. [Laughter.]

Mr. BUTLER, of Massachusetts. Ah!

Mr. NIBLACK. We never recognize such relations.

Mr. BUTLER, of Massachusetts. There was a time when the Democratic party recognized me as a friend, ay, and as a leader; and they were very cross when I left them. [Laughter.] And, as a friend near me suggests, they have not got over it yet, but have been mad with me ever since. [Laughter.]

Mr. MORGAN. How many of us followed the gentleman, when at the Charleston convention he voted more than fifty times for Jefferson Davis for President of the United States?

Mr. BUTLER, of Massachusetts. Certainly, I then voted for the representative man of the Democracy. Subsequent events have proved that the difference between the gentleman and myself is that he would not vote for Jeff. Davis then but would now, and I did then but would not now. [Laughter.] There is no trouble about understanding this matter at all.

Mr. MORGAN. If the choice was between the member from Massachusetts and the gentleman from Mississippi the country would certainly justify me in making such a choice.

Mr. BUTLER, of Massachusetts. Will the gentleman repeat his statement? There is so much confusion here that I did not hear him. [After a pause.] I repeated my words for the gentleman when he did not hear me. Is he ashamed to repeat his? I did not hear him. [After another pause.] Then I will grant him the mercy of my silence as to what I did not hear.

I was about to say, when interrupted, that we offered the fullest opportunity for debate, and I trust that we may now, as men, as statesmen, as members of the House of Representatives, with a great evil before us, without heat, without acrimony of debate, and in pure and calm reason, discuss, first, of the question of law, then of the question of fact, and then of the question of remedy; try to find out what is best for the country. I trust that the fullest discussion will be allowed, and when every man has had his say on all those questions, that we shall then come to a direct vote, and show whether or not we care for the safety of the country and for the protection of life, liberty, and property.

Mr. LAMISON. Will my colleague [Mr. SHELLABARGER] yield to me for a few moments?

Mr. SHELLABARGER. How much time have I left?

The SPEAKER. There are twenty-two minutes of the hour remaining.

Mr. SHELLABARGER. I will yield to my colleague [Mr. LAMISON]—how much time?

Mr. LAMISON. But a minute or two.

Mr. SHELLABARGER. Very well.

Mr. LAMISON. I will detain the House but a moment with what I desire to say. We have now been in session for twenty days, including to-day. During that time we have been notified from the other end of the avenue that there was nothing upon which the President desired this Congress to legislate; that there was no such condition of the country as required our longer presence here. To-day we have communicated to us a message from the President in which he says that the condition of the country requires legislation upon the subject named in his message. Sir, if there be any new incidents, if there be any new evidences of tumult and disorder in the South, if there be now anything in the condition of the South that did not exist twenty days ago, that did not exist even ten days ago, I think it would be but fair to members of this Congress that that information should be laid before them. I therefore desire to offer the following resolution.

Mr. SHELLABARGER. I did not yield to have any resolution offered.

Mr. LAMISON. At least let it be read as a portion of my remarks.

Mr. SHELLABARGER. I am willing to have it read.

The Clerk read as follows:

*Resolved*, That, if not incompatible with the public interests, the President of the United States furnish to the Congress of the United States all facts and documents now in the executive department touching the condition of public order in the States lately in rebellion, and to which reference is made in his message to the Senate and House of Representatives of March 23, 1871.

Mr. SHELLABARGER. That is a very good resolution, which we shall have pleasure in voting for when the proper time comes. I yield to the gentleman from Pennsylvania, [Mr. KELLEY.]

Mr. KELLEY. Mr. Speaker, I take the floor for a moment only, to reply especially to the gentleman from Ohio, [Mr. LAMISON,] who tells us that twenty-three days ago the President did not see such a condition of the country as required any recommendation of legislation or demanded to be brought particularly to public attention. During those twenty-three days, sir, the majority of the members of this House have declared to the people of the South their indisposition to strengthen the President's hands or to deal resolutely with the crimes which are now disgracing not only our country but republicanism and the age. This declaration expressed by the conduct of Congress has emboldened organized bands of lawless men in the South, and they to-day do what they did not dare do three weeks ago. Not content with hunting the poor negro, not content with scourging the "carpet-bagger," as they call the immigrant from the North, or the "scalawag," as they call the Union man who happens to have been born in the South, they now enter your mail-cars to assassinate or scourge the officers of the Government.

Mr. BECK. Where was that done?

Mr. KELLEY. It was done in Kentucky.

Mr. BECK. Let me tell the gentleman the facts of the case to which he refers, as I understand them. The mail-car was entered by one man, a Republican and a Union soldier, who was entitled to the place given to a negro. A grand jury at Louisville, I have heard, investigated the case till they found the facts to be as I state, and then, for that reason, they abandoned the investigation. This occurrence was in January last.

Mr. ELDRIDGE. The 26th of last January.

Mr. KELLEY. Let me tell the gentleman that there are two sides to that story; and that he makes a statement resting in part upon the testimony of a man who gave his evidence with a pistol at his head.

Mr. BECK. I have in my hand a resolution which I have desired to offer, calling for all the facts.

Mr. KELLEY. There are facts in reference to that case which will yet come out. But again, sir, the collection of the revenue of the

6

Government is interrupted. Officers charged with their collection, men who served in the Union Army and who bear the commission of the United States Government, come here showing the scars inflicted upon them by masked men at midnight. The inability or indisposition of Congress to make the laws of the United States potent throughout our national limits has invited these outrages, has given a premonition of what will be the condition of affairs between now and December, and has justified the President of the United States in asking us to give him power to protect life on every inch of our soil. I thank the gentleman from Ohio [Mr. SHELLABARGER] for his courtesy.

Mr. SHELLABARGER. How much time have I remaining, Mr. Speaker?

The SPEAKER. Fifteen minutes.

Mr. FARNSWORTH. I hope the gentleman does not intend to call the previous question on his motion.

Mr. SHELLABARGER. I yield to the gentleman from Alabama, [Mr. BUCKLEY.]

Mr. BUCKLEY. Mr. Speaker, I take the floor simply for the purpose of making one statement in reply to the gentleman from Kentucky, [Mr. BECK.] If he wants to know where the mails of the United States are interfered with I can tell him upon very good authority. Last autumn a United States mail agent named Frank Diggs, traveling officially in the mail car upon the Selma and Meridian railroad, was shot dead in broad daylight by a man who, as he took aim with his double-barreled shotgun threw from his face his mask; and this mail agent was engaged at that time in assorting the United States mails.

Mr. BECK. I spoke of the Kentucky case.

Mr. BUCKLEY. And yet this Government has never put forth one particle of power to arrest that murderer, nor can it under existing laws. The local authorities are either unable or unwilling to do it.

Mr. BECK. More shame, then, to the present administration of the Government.

Mr. BUCKLEY. The Government does not protect its own lawfully accredited agents there. But the fault is not with the Administration. The President, in the message just read, has asked of Congress additional legislation to enable him to suppress such lawlessness and murder.

Mr. BECK. Has not the Government of the United States the power to arrest anybody guilty of these outrages; and let me ask the gentleman why these men are not arrested?

Mr. BUCKLEY. Wait a moment. The successor of this man who was shot at that place was a confederate soldier who had served four years in the war of the confederacy and was afterward appointed agent on that same route; and the first trip he made he was warned by a man in disguise, who leaped into the mail car with pistol in hand, to leave that route or change his politics, or he would be shot the next trip he made. But I do not propose at the present time to go into these facts.

A MEMBER. What were his politics?

Mr. BUCKLEY. He was a Republican, of course. But, as I have said, I do not intend to go into the facts. I rose merely to answer the statement of the gentleman from Kentucky. Hereafter a more befitting occasion will be afforded, when this committee shall report their action, to lay before the House the facts in connection with these southern outrages, and to urge upon the attention of the House and country the necessity of promptly doing something to rescue our endangered liberties and to protect the citizens of the southern States in their persons, their property, and their lives.

Mr. SHELLABARGER. I will yield now for five minutes to the gentleman from Illinois.

Mr. FARNSWORTH. Mr. Speaker, I do not see what there is in the present stage of this matter to create such or so much excitement. The President has sent us a letter to-day in which, however, I understand he does not profess to have any information which was not in possession of the House before. He refers the House to facts in the possession of the Senate, alluding, no doubt to a report made some weeks since on investigations made by the Senate committee. That report we have all seen. No new facts are presented to the House. There is now no state of the case different from that which we have had ever since the 4th of March. There is nothing now. There is simply a sort of half and half recommendation on the part of the President that we should do something. He is in some doubt as to the power he has now under the law; and the Congress of the United States is the very last tribunal to appeal to for the purpose of settling doubts in reference to points of law.

Mr. DAWES. I ask the gentleman from Illinois whether under those circumstances this ought not to be referred, for the very purpose of solving those doubts?

Mr. FARNSWORTH. I was about to speak of that. I do not agree, however, to the suggestion. I was about to say that the last tribunal to solve a legal doubt in the mind of the President is a committee of the House of Representatives. The President is furnished with an officer at the head of the Department of Justice to whom should be referred this question, if he has doubt as to whether the law is sufficient now for his purpose.

As to the facts, we have no new facts, and this House has resolved and reresolved five times since we met here on the 4th of March that it is not worth our while to remain here and legislate, but we should adjourn *sine die* at the earliest possible moment.

What is the necessity for all this excitement over the message which has been sent to us by the President? As I have stated, he adds nothing to our information on this subject. Gentlemen have created doubts in his mind, upon which, it seems, he has sent us a letter expressing in some sort his opinion that we should legislate. We have expressed our opinion over and over again that we had better not legislate on this question now. The more we legislate the more harm we will do and the more these evils will continue. Instead of doing good we are doing harm. This House has wisely so resolved repeatedly in the present aspect of this question; and I see nothing to change my resolution in that regard.

Mr. SHELLABARGER. I now yield for one minute to the gentleman from Indiana.

Mr. SHANKS. The gentleman from Illinois has stated to this House that there is nothing new in this message, that there is nothing in it which the House did not know before. I ask his attention to this fact, that the House has been divided on the very question which the President makes plain in his message, and that is, whether he has the power to enforce the law and protect these parties in the South.

Mr. FARNSWORTH. Do I understand the gentleman to ask me a question?

Mr. SHANKS. Wait a moment. I wish to say to the House that whatever an executive officer believes the law to be, that is a law to him; and if the President believes there is no power in his hands to protect these people in the South he will not exercise a power which he believes he does not possess.

Mr. FARNSWORTH. He does not say that.

Mr. SHANKS. He does say that as clearly as language can express it.

Mr. FARNSWORTH. He only expresses a doubt.

Mr. HOAR. It seems to me that that gentleman has studied slightly the principles of constitutional liberty who does not see that in a grave and momentous crisis like this it is proper that every extraordinary exercise of power should, if possible, instead of being left to the discretion of the Executive, be distinctly authorized beforehand by the Representatives of the people. From the time Congress adjourns until its reassembling next winter the remedy for such wrongs, so far as it depends upon executive action, must of course be in accordance with the law, but the Executive himself has doubts as to what is the law and the extent of his power under it. Therefore, when the President informs us that, in his judgment, his powers are not clear, for this Congress to depart hence without making them clear is on the one hand to surrender the people to the executive interpretation of doubtful powers, and on the other hand to abandon the Executive to be denounced by every gentleman on the other side of the House for usurping power in every act he may do.

Mr. Speaker, it is not true that there has been no change since the 4th of March. The evidence comes to us by every mail and by every pulsation of the telegraph from day to day that these outrages are continuing and increasing. The Meridian outrage has been since the 4th of March. The outrage on Palmer the teacher, a man of culture, of education, of character, who, simply for teaching a colored school, was seized, held down by his hair, and scourged with fifty lashes, and has just come to Washington to tell the story of his wrongs, that outrage took place on the 8th of this very month. A few days subsequently the superintendent of schools in the county adjacent to that in which Palmer resided was driven away by these fiends, simply for exercising his duties. Since Congress assembled, some of the high State officers of the State of South Carolina have received notice from these secret bands to lay down their functions and depart. It is idle then for the gentleman from Illinois [Mr. FARNSWORTH] to get up here and say that nothing new has happened since Congress assembled.

Mr. FARNSWORTH. Did we not know all these facts before we voted to adjourn?

Mr. HOAR. No, sir. Any man who knew these facts and voted to adjourn has on his head the blood of those loyal men in the South who may fall victims to these outrages.

Mr. FARNSWORTH. I do not feel that. With a knowledge of the facts mentioned by the gentleman from Massachusetts, a large majority of this House has repeatedly voted to adjourn. The Governor of Mississippi, himself a Republican, has stated that the State authorities have power to deal with these outrages.

Mr. SHELLABARGER. I now yield to the gentleman from Maine, [Mr. PETERS.]

Mr. PETERS. As I have voted for adjournment, and have not given in my adherence to the so-called BUTLER bill, I desire to say a word, and only a word, on the motion before the House. We have received a message from the President. We are bound to give it a respectful consideration of some kind. It is usual to refer executive communications like this to some committee, and the implied assent of the House is usually given for the Speaker to make such references of his own accord. We have no standing committees. The only reference, therefore, which we can make is to a special committee. Courtesy, usage, justice, and every other consideration demand it.

The question before the House is not as to the merits of any particular bill. The committee may report that no action shall be had. We cannot tell in advance what kind of a bill it may recommend. Therefore it seems to me that the discussion in advance of the reference needs to be only of a very limited and unimportant character. With these views, I have no other alternative, and I do not see how other gentlemen can do otherwise than to vote for a reference of this bill to a special committee, as the gentleman from Ohio [Mr. SHELLABARGER] has moved.

Mr. SHELLABARGER. Now I have but a moment or two left.

The SPEAKER. The gentleman has three minutes.

Mr. SHELLABARGER. I wish to say this, that by no action or vote of mine shall the previous question be called upon any measure that

treason should be prohibited from again holding office under the Government; and even this disability has been removed by Congress whenever it has been asked for in good faith. Under these circumstances we have a right to expect and demand at least a quiet submission to just and wholesome laws from our late enemies. Unfortunately, however, our reasonable expectations have not been realized. There exists at this time in the southern States a treasonable conspiracy against the lives, persons, and property of Union citizens, less formidable it may be, but not less dangerous, to American liberty than that which inaugurated the horrors of the rebellion. The existence of this organization and its treasonable character are proved by the sworn testimony of an array of witnesses from all parts of the South, which must carry conviction to the minds of the most skeptical.

The evidence taken before the Senate committee in relation to the outrages, lawlessness, and violence in North Carolina establishes the following propositions:

1. That the Ku Klux organization exists throughout the State, has a political purpose, and is composed of the members of the Democratic or Conservative party.

2. That this organization has sought to carry out its purposes by murders, whippings, intimidation, and violence against its opponents.

3. That it not only binds its members to execute decrees of crime, but protects them against conviction and punishment, first by disguises and secrecy, and second, by perjury, if necessary, upon the witness-stand and in the jury-box.

4. That of all the offenders in this order, which has established a reign of terrorism and bloodshed throughout the State not one has yet been convicted.

James E. Boyd, a witness before this committee, against whom nothing can be alleged except that he was a confederate soldier, a supporter of Seymour and Blair in 1868, and initiated into the Ku Klux Klan as an auxiliary of the Democratic party, testifies, in answer to a question as to the designs and regulations of that order, as follows:

The meetings were to be held in secret places—in the woods, or some other place distant from any habitation, in order to avoid detection. The disguise prescribed was a long white gown, and a mask for the face. No applicant could be admitted as a member of the organization until his name had first been submitted to a regular camp. A county was divided into a certain number of districts, and each district composed a camp, which was under the command of a captain. The whole county constituted a klan, under the command of a chief. No person could be initiated as the member of any camp until his name had been submitted to the camp and his application unanimously agreed to by the members of the camp. The manner of making raids was prescribed by the regulations. No raid was to be made, no person punished, no execution done, unless it had first been unanimously agreed upon at a regular meeting of a camp of the klan and duly approved by the officers and the chief of the klan. The sign of recognition of the White Brotherhood was by sliding the right hand down along the opposite lappel of the coat. If the party to whom the sign was made was a member of the organization he returned it by sliding the left hand in the same manner down along the opposite lappel of the coat. The word of distress was "Shiloh." There was a sign of distress to be made when a brother was in distress and wanted assistance. I do not remember the sign; it was some sign made by the hand. But if the person was so situated that the sign made by the hand could not be seen, then the word "Shiloh" was used to denote distress.

Question. Upon the oath administered, the mode of procedure required, and the government of the organization, so far as you have observed, are the members bound to carry out the decrees of the order, if they involve murder and assassination?
Answer. I think so, sir. If it was decided to take the life of a man a camp is ordered to execute the sentence, and is bound to do it.
Question. What would be the penalty if any member refused?
Answer. I do not know that any penalty was prescribed for him. A member could excuse himself from attendance at meetings or from going upon raids if he had a proper excuse. The penalty prescribed in the regulations for the punishment of any member who should disclose the secrets of the order was death. Each member was informed upon his initiation that if he disclosed the secrets of the organization he should be the first victim.
Question. If any arrests should be made by the civil authorities for murders or other crimes committed in pursuance of the decrees of a camp, to what extent did the obligations of members bind them to assist and protect each other?
Answer. To whatever extent was in their power.
Question. Did it go to the extent of giving testimony in behalf of each other or of acquitting if upon a jury?
Answer. I think that was one of the objects and intentions of the organization, that a person on the witness-stand or in the jury-box should disregard his oath in order to protect a member of the organization.
Question. Do you know of any instances of wrong or outrage perpetrated upon persons in pursuance of the decrees or orders of this organization?
Answer. I do not know of any decrees or decisions they made. I know of punishments that were inflicted by the organization.
Question. State any of them that you now remember.
Answer. The most serious instance in my county, I believe, was the hanging of a negro man by the name of Outlaw, who was taken from his house, in the town where I live, about one o'clock at night, by a band of from eighty to a hundred men, and hung upon an elm tree, not very far from the court-house door.
Question. When was that?
Answer. On the night of the 26th of last February.
Question. What was the offense charged against him?
Answer. I never heard of any. The newspapers have said that he was guilty of having shot at a band of Ku Klux that passed through the town some time previous, but that was not true. * * * *
Question. What is your knowledge of the object and extent of this organization throughout the State?
Answer. I can only state from hearsay—what I have heard from members of the organization. The number of the members of the organization is supposed to be forty thousand. Their object was the overthrow of the reconstruction policy of Congress and the disfranchisement of the negro. There are two other organizations besides that of the White Brotherhood, as I said before. I was a full member of one of them and partly a member in the other. I cannot say that I considered myself really a member of the other. One organization was called the Invisible Empire. There is another organization which rather superseded the White Brotherhood in my county, after it had gone on for some time, and was called the Constitutional Union Guards, whose oaths and manner of operation were about the same. There was very little difference; some change in the signs. The sign of recognition was by crossing the hand on the breast. * * * *
Question. In speaking about the punishing of men, on these raids, in the first part of your testimony, what do you mean?
Answer. Whatever punishment was passed upon in the camp.
Question. For what were they punished?
Answer. I do not know; just whatever they saw proper. If they thought the man ought to be killed for being too prominent in politics, they would have a meeting and pass sentence upon him. I have no doubt in my own mind (though I have no information from others that such was the case) but what Outlaw was killed in order to break up the organization of the colored voters in my own county, or frighten them away from voting.
Question. Were other punishments inflicted in your county besides this?
Answer. Yes, sir. In consequence of Outlaw's murder, a negro by the name of William Puryear, a half simple fellow, who, it was said, saw some of his neighbors returning in disguise from Graham the night that Outlaw was hung, was drowned in the mill-pond.
Question. Were there any whippings in the county?
Answer. Yes, sir. I believe there were one hundred or one hundred and fifty in the last two years in the county, white and black. Some have been whipped two or three times.

I have quoted largely from the testimony of this witness for the purpose of showing the dangerous character of this organization. I also make an extract from the testimony of Hon. Thomas Settle, one of the judges of the supreme court, showing the same state of things and strongly corroborating the material statements of Mr. Boyd:

By the Chairman:
Question. Give us your belief as to the true position of the political organizations with reference to this organization.
Answer. Well, sir, I must think that the present Democratic party there, judging from the circumstances, are encouraging it. I do not think it is accidental. In the course of our investigation last summer it leaked out in the testimony that Hamilton C. Jones, present member of the Legislature, gave the signs of the Invisible Empire to James E. Boyd, who was then a Democratic candidate for the house of commons for Alamance county. Dr. Moore, also, who had been a member of the previous house, gave the signs of the Invisible Empire. Mr. Boyd had belonged to the White Brotherhood, and this was a new organization to make it more compact, it was said. After Dr. Moore had given the signs to Mr. Boyd they walked down to the Yarboro hotel and went into the room of Colonel Jones, who also gave Mr. Boyd the signs. It was not proved that they were members, but Mr. Boyd said in his testimony that Mr. Jarvis was in the room when Hamilton C. Jones gave him the signs. It was further stated by Mr. Boyd that he learned from Dr. Moore that Frederick N. Strudwick, a grandson of a former chief justice, Frederick Nash, was on his way to assassinate Senator Shoffner, who had introduced the stringent militia bill. Well, at the next session of the Legislature, Mr. Jarvis was made speaker. He is speaker of the present house. No person swore positively that Mr. Jarvis was a member of the organization, but Mr. Boyd swore that Dr. Moore informed him that Jarvis was a member, and that Jarvis was in the room when Jones gave the signs. Mr. Jones is a prominent member of the senate, and Judge Warren, who is presiding officer, being in feeble health, Mr. Jones frequently presides in that body. It is notorious that the resolution of impeachment of Governor Holden was passed in caucus. Mr. Strudwick was charged with introducing, and did introduce, the resolution. He was also prominent in bringing forward a bill, which passed and became a law forthwith, to repeal the act which had been passed, introduced by Mr. Shoffner. I draw from these facts the inference that the Legislature must be controlled by those men who were honored by the party, and who were elected last summer as members of the party, and I think that is the general opinion.
Question. Do I understand you, then, to say that the weight of what is known as the Conservative or Democratic party at present gives encouragement to this organization, and that those of that party who denounce it are exceptions?
Answer. Yes, sir; that is the general opinion there.
Question. What has been the effect on the public mind with reference to the security of person and property, of these outrages, and the difficulty in the way of punishment?
Answer. Well, sir, I suppose any candid man in North Carolina would tell you it is impossible for the civil authorities, however vigilant they may be, to punish those who perpetrate these outrages. The defect lies not so much with the courts as with the juries. You cannot get a conviction; you cannot get a bill found by the grand jury, or, if you do, the petit jury acquits the parties. In my official capacity I sit with Judge Pearson and Judge Dick. Judge Pearson issued a bench warrant last summer for some parties, and had them brought before him at Raleigh. He requested Judge Dick and myself to meet him. We did so, and the trial extended over three weeks, and there it came to our knowledge that it was the duty and obligation of members of this secret organization to put themselves in the way to be summoned as jurors, to acquit the accused, or to have themselves summoned as witnesses to prove an alibi. This they swore to; and such is the general impression. Of course it must be so, for there has not been a single instance of conviction in the State.
Question. Upon investigations made before you in your official capacity, have you any doubt that a state of things exists requiring men to shield themselves in the way you have mentioned?
Answer. None whatever. I am satisfied, from their own declarations and from the effect visible in all the courts, that it is so.
Question. Where they are charged with offenses, is there any probability of securing justice against them in counties where the organization exists at all?
Answer. Well, sir, my belief is that the organization extends to every county in the State. I am satisfied that the organization is a very extensive one. I have no doubt it is much more numerous in some counties than others, and I believe the middle or Piedmont region of the State is the chief nucleus, and that there the outrages have been the most numerous.

Judge Logan, of the ninth district, and Judge Henry, of the eleventh district, express substantially the same views. Their opinions are mainly founded upon the effects visible in the courts over which they preside and about which they can neither be mistaken nor deceived. Certain it is that these criminals are able to baffle and set at defiance all the ordinary appliances of the law. The testimony of Thomas W. Willeford, formerly a member of the Ku Klux Klan, throws additional light upon the secret workings of this order and discloses the means by which these results are brought about in the State and local courts. This witness testifies as follows:

Question. Did they tell you what the object was?
Answer. Yes, sir; in the first meeting. I was initiated in Kennedy's barn.
Question. Did you take the oath?
Answer. Yes, sir; and then the next Saturday went to the meeting.
Question. What did they tell you then was the object of the organization?
Answer. They told me it was to damage the Republican party as much as they could—burning, stealing, whipping niggers, and such things as that.
Question. Murder?
Answer. The leading men it was to murder.
* * * * * * *
Question. Have you ever heard of a Ku Klux being convicted of any offense there?
Answer. No, sir.
Question. Was there anything in the obligation you took as to the rules of the order as to your being obliged to defend men by your oaths, or otherwise?

*Answer.* Yes, sir; if he could get you in as a witness you had to swear him out, let you be swearing a lie or not. If you swore against him, why you might just as well be a-traveling at onct.

*Question.* You mean by that you would be in danger of your life from the order?

*Answer.* Yes, sir.

*Question.* Anything about getting on the jury?

*Answer.* Yes, sir; if we could get on the jury we could save him, do what you please.

*Question.* No matter what the proof?

*Answer.* Yes, sir; you could not bring proof enough to convict.

The following testimony of Caswell Holt, a poor and ignorant, but honest and conscientious negro, who was twice visited by the Ku Klux, will show the manner in which these outrages are executed:

By the Chairman:

*Question.* Were these men disguised?

*Answer.* Yes, sir.

*Question.* How?

*Answer.* They all had long white robes on, all of them, loose gowns, and caps on their heads with three horns. I went to my house; my wife said, "What did they do to you?" I said, "Don't talk to me; they pretty nigh killed me." She kept on at me, and asked me what they said and did to me. At last she said, "Must I go down to the house for Mr. Holt?" I told her, "Yes, you may go down there and tell him to come up; I want to see him." I could neither sit, lie down, nor stand; I was up and down all night, trying to get some ease some way.

*Question.* To what extent was your back injured?

*Answer.* It was cut all to pieces; and my wife pulled a splinter out of me here [putting his hand on his right hip] as long as my finger, from one of the sticks they hit me with.

*Question.* Now go on and tell us about the time when you were visited again.

*Answer.* It went on in that way until the crop was gathered again; it was about two weeks before Christmas. I had done gathered the crop and sowed a little wheat on the place. I was going to move the next week. I would have left the week before they shot me, but there was a little road they wanted to cut out from Gun Creek to Company Shops, and I went there on Saturday and worked on that. I had been chopping very hard, and came home that night and laid down on the bed. The boys were all up there that night. The dog broke out after I laid down. There was a hole in the walls of the house; it was a log house; and the boys peeped out and said, "Here, pap, the Ku Klux are all around the house," I said, "They are?" They said, "Yes." By this time they were at the door, and said, "Open the door." They struck against the door with a stick, or something—bang against the door. I said, "No, sir; I don't open my door for no man, unless he tells me who he is and what he wants." He said, "God damn you, open the door." I thought when he come that way he wouldn't got me to open it, sure. I said, "No, sir." He said, "Strike a light before you open it." I said, "I've nothing to make a light of, and if I had I wouldn't do it, and I won't open the door." I then went to the door; it was a little thin poplar door, about three quarter inch plank. I stood at the door. My biggest boy was standing a little piece off from me. There was an ax sitting there, and I picked it up and went to reach it to him, so that if they should break in we would hurt some of them before they did too much mischief. I had a bowie-knife in my hand, standing there at the door. I was standing there as close as I am now to this table. They said, "Open the door." I said I shouldn't do it. Then one said, "Blow his brains out." Just as he said that they all fired through the door, just red-hot, just flaming red when they came through. I didn't think it was but one crack; but they said they shot a half a dozen times or more. I clapped my hand on here [placing his hand on his breast] and said, "There, they've shot me." My boy knew where there were some loose planks in the floor. He jerked up two of them, and they all run through under the house—all the biggest of them; all but the three little girls I had.

*Question.* What occurred afterward?

*Answer.* The next morning I sent for the doctor to come and take out the balls, Dr. Montgomery. He came and took out the balls, and told them they had better move me to Graham, or if I was to be moved, or else they wouldn't move me at all. That evening they carried me to Graham, and got me there just at night.

*Question.* How many balls did they fire into you?

*Answer.* [The witness indicated where he had been shot—in both arms and in his chest.] There were five balls and two shot.

*Question.* What has been the effect of such proceedings upon the colored people of that county; do they feel safe?

*Answer.* They don't feel safe there at all, I can tell you that; and a great many of them have taken the notion to leave; they could hardly stay about there. They wanted to run them all off because the principal part of them voted the Radical ticket.

By Mr. Nye:

*Question.* Wanted to run all off who voted the Radical ticket.

*Answer.* Yes, sir.

*Question.* Did you hear that said?

*Answer.* Yes, sir; I heard it talked, and I saw them try it. They tried to turn me from voting the Republican ticket; but I did'nt turn, and that is what they shot me for I reckon. That is the case every election that has been there. They have been trying to get us to vote the Conservative ticket; some they would get to vote it, and some they wouldn't.

*Question.* Were those that would not vote the Conservative ticket the ones that had these outrages committed on them?

*Answer.* Yes, sir. You never saw one bothered at all that voted the Conservative ticket.

Can any one, Mr. Speaker, contemplate these disclosures without surprise and well-founded alarm? Yet, sir, the Democratic party have from the first denied, and then palliated and excused these outrages. In Tennessee and other southern States the laws which had been passed by Republican Legislatures to suppress and punish the Ku Klux were repealed as soon as the Democratic party came into power. The relation of the Democracy to this order is precisely that of the receiver of stolen property to the thief. The murder of leading Republicans, terrifying the colored population, and putting whole neighborhoods in fear so that the Ku Klux can control an election, is heralded as a Democratic victory.

For the purpose of showing that it is well understood where these outrages are committed that the Democratic party is willing and anxious to receive the benefits of murder and rapine, I cite the testimony of W. P. Bynam, the solicitor of the ninth judicial district of North Carolina, found on page 54 of the Senate report:

*Question.* Do the political parties divide in their sentiments in regard to the outrages committed by this organization, or do those of one political party differ with each other in regard to them? Give us the true state of feeling on that subject.

*Answer.* I think the Republican party, as a party, are universally opposed to these klans; they are regarded by them as confined to the Democratic party, or the Conservative party, as it is called there. * * * The difficulty with me has been that I apprehend they are tacitly countenanced by the Conservative party, who are willing to derive the benefits that may result from their operations.

We may as well concede, Mr. Speaker, that if this system of violence is to continue in the South the Democratic party will secure the ascendency. If political opponents can be marked for slaughter by secret bands of cowardly assassins who ride forth with impunity to execute the decrees upon the unarmed and defenseless, it will be fatal alike to the Republican party and civil liberty. But, sir, we may well ask where this will end. How long will it be before the Tammany Hall Democracy, who are now furnishing arms to the Ku Klux of the South to murder southern Republicans, will introduce this new element of Democratic success into northern politics?

The report, Mr. Speaker, to which I have referred shows over one hundred and fifty authenticated cases where persons have either been murdered, brutally beaten, or driven away at the peril of their lives. And the same deplorable state of things exists in South Carolina, Georgia, Mississippi, Louisiana, Kentucky, Tennessee, and Texas. Jails have been broken open, the officers of the law killed while attempting to discharge their sworn duty, and the criminals turned loose upon the community. Revenue officers and mail agents of the United States have in some instances been murdered, and in others driven away from their posts. But a few days ago, over a hundred Alabama Ku Klux made a raid upon Meridian, Mississippi, and carried off their victims for execution. A meeting of the citizens was called to protest against these outrages. The Ku Klux became alarmed. At their instigation warrants were issued for the arrest of peaceable and well-disposed negroes upon the charge of "using seditious language." When the court convened they again assembled in force, and commenced the work of death. Judge Bramlette, the presiding magistrate, was shot and the scene closed by driving the Republican mayor out of the city. I copy the following statement of the exiled mayor from the New York Tribune:

The Ku Klux will endeavor to make the people of the North believe that Judge Bramlette was killed by a negro. They may make some believe it. But I do not believe that any of the arrested negroes had any weapon other than a pocket-knife, as I was present at the trial for some time and sat close to the accused, and saw none. But in a direct line from the sheriff's office door to the main hall there sat one of those negroes; and I believe, although I saw not the shooting, that one or many of the Ku Klux, in carrying out their design, shot Judge Bramlette. After the negro was shot he jumped out of the two-story window; after which he was killed. George Dennis, colored, was shot in the court-room, after which he was thrown from the two-story window on to the brick pavement below, and as that did not kill him, they then cut his throat. After they had killed J. A. Moore they went and burned his house; and so they continued their hellish barbarities. They surrounded my brother's house. They were all armed with double-barreled shot-guns, and, as I was told, two hundred in number.

Many good citizens of Meridian plead for me, as well as many in the Ku Klux columns, who were in them, not from choice but from necessity. They appointed committee after committee to wait upon me and to inform me that I must leave by ten o'clock next day. Their principal commanders visited me. I wanted to know the whys and wherefores, but they said they came not to argue any question of right; the verdict had been rendered. They treated me respectfully, but said that their ultimatum was that I must take a northern-bound train. I yielded. At about half past twelve o'clock at night perhaps three hundred came and escorted me to the cars. Some difficulties and dangers presented themselves, but I got here in safety.

I am much a sufferer in pain and feeling; but I believe that the State of Mississippi is able to indemnify me. Let me urge the necessity of having martial law proclaimed through every southern State. The soldiery to be sent there should be quartered on the rebels. Lenieney will not do. Gratitude they have none. Reciprocation of favors they never dream of.

WM. STURGES.

New York, *March* 15, 1871.

The Democracy have eagerly seized upon a telegram of Governor Alcorn for the purpose of concealing the enormity of this affair. But, sir, a careful analysis of that remarkable dispatch will furnish conclusive evidence of all the weakness, imbecility, and indifference of the State authorities which has ever been charged. Governor Alcorn says, "A riot occurred recently at Meridian, but was promptly suppressed." What is this statement worth in face of the facts that there were two riots, and neither suppressed until the rioters had accomplished their murderous designs? The Governor continues: "Some minor outrages have been committed on other points of the Alabama border in the night by parties in disguise." The murder of Union people all along the Alabama border is termed "minor outrages." When, a few years ago, Martin Koszta, a Hungarian refugee, who had declared his intention to become a citizen of the United States, was seized upon foreign territory by an Austrian press-gang, our Government exhibited her glory and greatness by demanding his release, even at the risk of war. But at this day, with the lessons of the rebellion before us, the Union people of the South are murdered morning, noon, and night; and when we propose to legislate in their behalf, we are told by gentlemen on the other side of this House that Congress has no power under the Constitution to protect the lives of the citizens of the Republic. Hear this humane Governor of Mississippi a little further: "My only difficulty," he says, "in these cases is to discover the wrong-doers." Here is a confession of the whole case. It presents the singular spectacle of a Governor of a State apologizing for the murder of American citizens and acknowledging his inability to even discover the offenders.

The whole South, Mr. Speaker, is rapidly drifting into a state of anarchy and bloodshed, which renders the worst Government on the face of the earth respectable by way of comparison. There is no security for life, person, or property. The State authorities and local courts are unable or unwilling to check the evil or punish the criminals. It is not a question of power or numbers. If the cowardly miscreants who conceal their crimes by hideous disguises, the dark pall of night and the darker pall of perjury, would give the loyal people of the South an open field and a fair fight they would protect themselves. But, sir, the Ku Klux system is ingeniously devised for the

42D CONG. 1ST SESS.—No. 21.

always more developed in the southern people than in the northern. Slavery induced this propensity, as it led them into a war against the nation. I regard the present manifestations as the receding of the waves which were produced by that storm of blood which prevailed for four years, and spent its main force upon six hundred battle-fields.

There is a struggle in the South on the part of those who ruled before the war to recover their lost domination. It is legitimate for any class of people to seek control or power if the means employed are consistent with the laws of the land. I think the Democratic party of the South do, in many instances, resort to appliances which cannot be justified and are pointedly in conflict with that just and celebrated sentiment of Thomas Jefferson, that "error of opinion may be safely tolerated when reason is left free to combat it." They have not always left reason free to combat their principles. That the condition of those at the close of the war who had joined their fortunes with the confederacy was uncomfortable, I well understand. It is as hard to bear misfortunes which are self-imposed as it is to endure those which are brought upon us by others. Soldiers keenly appreciate the sting of defeat. The southern people had lost their cause, and were broken up in their property. They had been unus·d to labor. The whole social fabric had become a scattered wreck. Although these calamities were the results of their own wrongful acts in warring against the nation, still the prospect was uninviting, and required the exercise of the greatest philosophy to pass out of such a state peacefully and successfully. It will take time and patience and industry and the subduing of prejudices and passions to bring them out; and it is the duty of the nation to lend every aid legitimately in its power to hasten the day when the wrongs and disasters of the past shall be effaced from memory.

The white people of the South are most strongly prejudiced against the colored people. Not so much, however, against them for their color as for their previous condition. The sudden and radical change which has made the slave a coequal citizen does not commend itself so readily to the mind of the whilom slaveholder as to those of us who were reared and educated under other circumstances. While the war was progressing Federals and Confederates learned to regard each other as enemies, and it was a feeling that pervaded the minds of the entire population of both sections. This feeling unhappily did not die away with the sound of the last discharge of fire-arms, and it is hardly a law of mind that it should cease instantaneously. Hence northern soldiers and northern men who set·led in the South were regarded as inimical, and the feeling as a rule was reciprocal. While we believe that the people of the South were criminally wrong in engaging in the rebellion, still we must concede the fact that the great mass of them were sincere. Their opinions resulted from false political teachings of thirty years' duration.

Observation has shown us that conscience is largely the creature of education. Hence, the people of the South look upon laws for the punishment of treason and restrictions upon political privileges and immunities as unkind and oppressive. These are some of the facts which we are to consider and springing from which are some of the causes from which the present condition of the South has resulted.

When the war closed there were two elements of population in the South whose future status was undetermined: the blacks, who had never enjoyed citizenship, and the large mass of the whites, who for their acts might be deprived of citizenship. The solution of the problem, so far as it enfranchised and citizenized both classes, was a wise policy. Whether the nation ought to have gone further and made citizens of all need not now be discussed. Whatever may have been best then, it is clear to my mind

42D CONG. 1ST SESS.—No. 24.

what course should now be pursued. I would grant general amnesty at once. It will not be followed by any dangerous consequences. Good only will flow from such an act.

Why not grant amnesty? Is it withheld from fear of adding strength to a political foe? For such a reason it would be ignoble to withhold it. But it will not add a feather's weight to the one side or the other. All can vote now. Disqualification at best is only a limitation on the number of men who may hold Federal offices. It has been urged that amnesty should be withheld because violence and outrages are perpetrated in the South. Disfranchisement incites to acts of violence. That men feel wronged when their political privileges are restricted is rather natural in America. One such man embitters a whole community if he attempts it, and if he does not make complaint himself, his neighbors and friends do it for him. This is an age and a country of enfranchisement rather than of disfranchisement. It is morally and physically impossible to maintain tranquillity in any State, in any section, when any considerable portion of the people of that State or section are disfranchised. You may send your Army to capture, and your courts to try and punish offenders, but you had better send also the full guard of citizenship to those who are without it. I would use force, if necessary, to quell disorders, but I would remove every exciting cause of discontent.

But it is said that the white people of the South are opposed to the conferring of political privileges upon the blacks. The assertion is true. I do. not believe, however, that they will attempt to annul or abrogate the fifteenth amendment any sooner than the Democrats will everywhere. Whether opposition to it shall cease depends entirely upon the action of the Democratic party. If that party says that the amendment shall not be executed, their partisans in the South will obey the mandate. If, on the contrary, the decision is to submit to it, the advice will be followed. The exercise of political franchises by the blacks will be more tolerable to the hostile whites if they are permitted to enjoy as much themselves. Turn this question over as you will, and look at it from every stand-point, to my mind the arguments for amnesty are unanswerable.

Tennessee disfranchised more than a third of her adult male population. That the State government should speedily fall into the hands of the friends of those who were affected by this proscriptive policy was inevitable. No other result could have been expected. It required more than the legacy of fifteen hundred State troops left by Governor Brownlow to Governor Senter to prevent the popular uprising. The result in that State is to be most deeply deplored, for she gave more of her sons to the Union Army than any or perhaps all of the States which seceded, and she furnished many of the ablest, most unflinching, and self-sacrificing patriots of the South. Missouri had her proscriptive laws and the ties of party were not strong enough to bind men to their support. The Republican party cannot afford to continue disabilities. Wherever a liberal policy has been adopted victory has perched upon the Republican standard; the opposite policy has been followed only by disasters.

Mr. Speaker, my own State has had her carnivals of blood, more bloody than any other State or all other States combined. Her present condition is a source of congratulation to my party for the wise course which has been pursued. The New Orleans Republican of a recent date holds the following language:

"There is no complaint as to Louisiana, thanks to the superior intelligence and greater industry of our people, who have found more profit in accepting the laws and in attending to their material interests than in defending their ancient prejudices and in resisting the manifest will of the nation."

The profoundest peace there prevails. It is as quiet as Vermont. This result is largely due to the liberal policy adopted by the Republican party of the State. I would do injustice not to say that something is also due to the advanced grounds taken by the Democratic party in that State, and I must commend their example to their brethren in other States. The Republicans planted themselves squarely upon the platform of amnesty, and struck from the State constitution and abrogated all disfranchisements for participation in the rebellion by a nearly unanimous vote at the ballot-box. The Democratic party in their State convention passed resolutions accepting the principles of the fifteenth amendment, and invited negro delegates to sit in convention with them on terms of equality. After these occurrences there was no war of races threatened or predicted. Peace has smiled upon the people ever since, and if the two political parties of the nation would follow the examples which have been furnished them in the State of Louisiana we might confidently look for an early dawn of a halcyon period throughout the South and the whole country.

The people of the southern States are anxious to recover from the losses of the war and to resuscitate their broken fortunes. They appreciate fully the advantages of works of internal improvement, and are turning their attention to the subject to the best of their ability. Every act of the Government which encourages the development of resources creates a feeling of satisfaction. Legislate as you will, and enforce order and obedience to law with as strong a hand as you may, still you will accomplish more in the way of removing exciting causes and in softening animosities, by general amnesty acts and by generous and well-adapted legislation to promote the development of the material resources of the South.

But, sir, I do not expect such marked results from the action of the General Government as do gentlemen of more sanguine temperaments. By far the most depends upon the action and efficiency of the local governments. The people themselves must sooner or later rise up in their might and put an end to crimes and disorders. I deplore turbulence everywhere and am willing to grant the requisite force for its suppression whenever it may be practically and safely employed. But I do not despair of the Republic nor of the South, nor do I totally believe in the efficacy of force, and force alone. Time, tolerance, and education are potent remedies for American evils. May I venture to say, in conclusion, that, with all the terrible facts before us, and with all the exaggerations which are so likely to occur, there is not a man of intelligence and thought who did not at the close of the war fear more extensive and obstinate disorders in the South than any which have been experienced?

I yield whatever time I have left to the gentleman from Ohio, [Mr. MONROE.]

Mr. MONROE. Mr. Speaker, I do not propose in the few words which I have to offer to enter upon an examination of the condition of affairs in our southern States. Enough, I suppose, will be admitted in that respect to justify the entertainment and discussion of this bill. I think it must be generally admitted that there exists in that portion of our country an extensive and powerful secret organization, which has become the occasion of very general complaint. Without assuming anything in regard to the character of this organization, as political or otherwise, without assuming anything in regard to the ultimate object which it seeks to accomplish, the plain fact remains that members of this organization, with its approval, by means of murder, burning, and scourging, have established in many neighborhoods a reign of terror.

It is well known that there are large districts in which life, liberty, and property are, to a portion at least of the people, insecure to an extent which is most alarming, and that yet the authors of this criminal disorder are not convicted, and the State whose laws they vio-

lowed by a second, and a third, and so on, until constitutional restraints are soon broken down. "Eternal vigilance is the price of liberty," a maxim as true as trite. On this subject, Junius, in his advice to the English people, expresses himself in language as forcible as it is beautiful, and it will apply to us with even greater force. He says:

"If an honest, and I may truly affirm, a laborious zeal for the public service, has given me any weight in your esteem, let me exhort and conjure you never to suffer an invasion of your political constitution, however minute the instance may appear, to pass without a determined, persevering resistance. One precedent creates another. They soon accumulate and constitute law. What yesterday was fact to-day is doctrine. Examples are supposed to justify the most dangerous measures; and when they do not suit exactly, the defect is supplied by analogy."

This was the advice of a great statesman to his countrymen, and it seems the English people appreciate its value, for at a much later period Macaulay says:

"We have been taught by long experience that we cannot without danger suffer any breach of the constitution to pass unnoticed."

A short experience ought to have been sufficient to have taught us the same thing. We have a written Constitution, prescribed by the sovereign power, the people, containing suitable limitations and restrictions on the known tendency of power to transcend its proper limits; but we do not profit by either the lessons of philosophy or the advice of patriot statesmen.

Our people seem to labor under the delusion that liberty is indestructible. If they will continue, they will soon find a sad end to their delusion. We have seen bad precedents followed by worse. We have seen innovations repeated, and each succeeding one magnified. This bill is the last and greatest of these innovations. We have seen act follow act, until all the original rights of the States have been absorbed and centered in Congress, and Congress now proposes to pass all the power thus absorbed into the hands of one man. Let this bill pass, and then farewell to the Republic.

Although the people have until the late elections been silent and passive, I pray God they may yet reclaim the lost ground; and the hope of every patriot now rests on them. I appeal to them to correct these abuses and to restore the Government to its original beauty.

Men who knowingly err will generally justify themselves on some pretext, and though they have to do so by appealing to some popular prejudices. Revenge is one of the base passions of human nature, and, no doubt, has great weight in shaping public sentiment at the North against the southern people. And there are those who would pander to this vicious passion by justifying the extreme measures of Congress as a proper punishment to the people of the South for their errors.

Such a motive may have influence with some, but it is an aggravation of the wrongs. Congress has no right to inflict punishment on individuals or on whole communities. How blind and misguided is that policy which undertakes to bring back a misguided people by oppressing and punishing them! Was ever a people brought to love or even respect a government which oppressed them? Man can never be brought to love those who oppress him. Religion may teach it, but in vain. And if there be any such thing as a free government which does not command the respect and approbation of the people, statesmen have failed to show us how it can be maintained. Punishment was not the object; it was a shallow pretense, used to deceive the people. The veriest rebel or secessionist at the South becomes at once a loyal citizen, purged of his offense, by joining the party and sustaining its extreme measures. Many of its most prominent men at the South, from Governors down, were the most zealous and active secessionists. They are rewarded and not punished. There is great joy over their conversion to the Republican party.

This proves that punishment was not the object. If the southern people are disloyal, as they are charged with being, oppression has made them so, and the Radical party is responsible therefor. At the close of the war they acknowledged their error, they had suffered grievously for it, and were anxious to be restored to their relations with the Government, and did all in their power to place themselves right. They were repulsed with scorn and consigned to punishment under military despotism.

That old Roman was wise who said in the Roman Senate the way to attach a conquered people to their conquerors is to treat them with kindness. And it was said that Romulus was very wise, with respect to the people he subdued, by making those who were his enemies the same day citizens. The southern people are even yet treated as enemies, and such treatment is very sure to make them so. Kindness is the fountain from which attachment springs as well for Governments as for individuals.

A Roman emperor made a conspirator against his life his warm friend by forgiveness and kindness. Had the Republican party pursued this policy after the war closed it would have given renewed strength and renewed attachment to the Government. Besides, sir, the secessionists had some claims to forgiveness, especially from New England. It was a plant of northern origin, as early as 1796, under the nurture of the Hartford Courant, and upon the acquisition of Louisiana it received a new stimulus and bid fair to bring forth its fruits. Its spread was encouraged by public journals, public meetings, legislative bodies, and from the pulpits. It was fostered by such names as Plummer Pickering, Hillhouse, Hunt, Otis, Griswold, and others, and culminated in that Hartford convention which sent delegates to Washington as its advocates. Its prospects, however, were blighted by the general joy produced by General Jackson's brilliant defense of New Orleans.

To say nothing of the effect of this bill on the South, what of the northern people? By sustaining the Radical party they but forge the chains that ere long will encircle them in the toils of slavery. They have encouraged precedents which this day by this bill threaten to break up their State governments and place them under a one-man, military despotism, which will subject their lives, liberties, and property to military tribunals. And what of the western people, that great community of noble men whose minds should be as free as the air they breathe, will they too crouch before the tyrant's scepter, voluntarily surrender their rights, and willingly take upon themselves the yoke of slavery?

Will they quietly stand by and see a military satrap, with licentious soldiery, take possession of their States and State governments? Will they calmly see the standard of military supremacy erected on the ruins of civil power? The North, the West, and Middle States had better beware. They will but fill the chalice which ere long will be applied to their own lips. When it comes they will have but themselves to blame. In adhering to the Republican party, they have but fostered the monster which is now about to crush them.

I yield for twenty minutes to the gentleman from Pennsylvania, [Mr. STORM.]

Mr. STORM addressed the House in remarks which will appear in the Appendix.

Mr. ARCHER. I yield now to the gentleman from Missouri, [Mr. McCORMICK.]

Mr. McCORMICK, of Missouri, and Mr. MOORE addressed the House in speeches which will appear in the Appendix.

Mr. LOWE. Mr. Speaker, the questions presented for consideration upon the bill before the House are of the very first importance. We are confronted with the two inquiries whether the proposed legislation is needful and whether it is lawful. If these conditions concur, if the exigencies of the public welfare demand it, and if the bill may be constitutionally enacted into a law, then there can be no doubt of the duty of the House and of Congress to provide such redress as this bill proposes. That life and personal rights are insecure and systematically invaded in several of the States may be palliated, but cannot be successfully denied. The evidence is contained in the voluminous report of the Senate committee elicited from a crowd of witnesses; and it is also brought to us by the public press and by the mouths of those who speak of what they know and have seen.

While murder is stalking abroad in disguise, while whippings and lynchings and banishment have been visited upon unoffending American citizens, true local administrations have been found inadequate or unwilling to apply the proper corrective. Combinations, darker than the night that hides them, conspiracies, wicked as the worst of felons could devise, have gone unwhipped of justice. Immunity is given to crime, and the records of the public tribunals are searched in vain for any evidence of effective redress. If there is no remedy for this, if the rights of citizenship may be denied without redress, if the Constitution may not be enforced, if life and liberty may not be effectively protected, then, indeed, is our civil Government a failure, and instead of enjoying liberty regulated by law, its subjects may live only by the sufferance of lawless and exasperated conspirators. The cardinal doctrine of our institutions is that all citizens are equal before the law, and that the law shall equally secure to all, their natural and inalienable rights.

It is well to remember these fundamental doctrines. It is well to remember for what purpose Government is organized, that it may be so administered as to secure its appropriate ends. It is for the purpose of practically enforcing these cardinal principles that this bill is proposed. The President has advised the House that the condition of the country in certain districts is such that life and property are insecure and the carrying of the mails and the collection of the revenue dangerous, and that the power to arrest these evils is, in his judgment, beyond the control of State authority. If this condition does not anywhere exist, if there is nothing, in fact, for this bill to operate upon, if there are no outrages committed, if there are no organized bands of disguised conspirators, why such opposition to this measure? If there is nothing for the bill to apply to, nobody can be inconvenienced by its passage. If there are no Ku Klux organizations conspiring to banish and destroy, then nobody's rights, whether real or fancied, can be injured by a bill to put them down.

It is not impossible that in some instances exaggeration of the violations of law may have been made in reporting them to the public, but it must be a very stubborn incredulity which after perusing the report of the Senate committee, after hearing the credible narrations of eye-witnesses, would deny the substantial fact that in many districts in the South there is a demand for some further safeguards to life, liberty, and property, safeguards that may involve the element of sufficient power and force to carry into execution the guarantees of the Constitution in favor of personal security and personal rights.

It is claimed with great vehemence and pertinacity on the other side of the House that there is no constitutional authority in Congress to pass this law; that, even admitting the facts to be true as alleged, Congress is powerless to grant relief within the scope of the just powers of the Federal Government. If I were of that opinion, I should never give my vote for the bill, for there is no evil so great but that the obligations of the Constitution are paramount to any necessity for the removal of the evil.

But this is not the first time the Constitution

Case 1:22-cv-04259-SDG   Document 78-2   Filed 03/31/23   Page 13 of 15

"'With all the concealment which cunning could invent or perjury secure, or bribery purchase, or the fear of punishment inspire, or the dread of violence from bands of conspirators and Democratic desperadoes could command, or the blandishments of more accomplished knaves could entice, or the hope of office could buy, or fear of the loss of place could bring, all of which would naturally conspire to throw obstacles in the way of or defeat the investigation of the committee, it is by no means possible that the extent of these frauds has been revealed even in any one ward; but this may be approximated from the proof as to election districts in various parts of the city, and by statistical tables showing the voting population at previous periods, with the average increase in those periods, from which the actual voting population of 1868 may be computed with reasonable certainty.'

"'It has already been shown that illegal or fraudulent certificates of naturalization were issued, probably to the extent of 68,343, on most of which votes were cast, and the "repeaters" cast many thousand illegal votes in addition.'

"'Challenging illegal voters was so far prevented by terrorism and violence that it was of rare occurrence either at the registry or on the day of the election, and in many districts no challenges were made. It would be impracticable here to describe fully the means resorted to to prevent challenges, but they are abundantly shown in the evidence.'"

In the light of these facts, and the volume of sworn testimony by which they are verified, how puerile indeed appear the suggestions of the gentleman in reference to the aspirations of the President. My colleague says:

"The power proposed by this bill to be conferred on the President is despotic. It is to place him on a footing with the Czar, the Sultan, and the Mogul."

What sort of footing the Czar, Sultan, and the Mogul are on the honorable gentleman did not stop to explain, but the footing which the Republican members of this House propose to place the President on, if I understand the tenor of their speeches and the scope and bearing of the bill and amendments under discussion, is a footing which will enable him to suppress disorder, violence, and bloodshed, and protect the citizen in the enjoyment of his constitutional rights. Is it for this reason that the legislation proposed strikes terror to the hearts of the Ku Klux Democracy of the South and arouses the indignation of Democratic leaders everywhere?

The object of the Republican members of Congress, so far as I know, is to prevent murder, manslaughter, mayhem, robbery, and criminal obstruction of legal process:

To put down insurrection, domestic violence, unlawful combinations, or conspiracies. To secure to all men, white and black, the "inalienable rights of life, liberty, and the pursuit of happiness."

To give to all the equal protection of the laws. This is the scope and tenor of the bill and amendments under consideration. Do gentlemen cry out because they fear justice will be done to them and their constituents? Is it the fear that the halter will draw which gives them so poor an opinion of the law? Is there anything in the proposed legislation to make my colleague wax hot and exclaim—

"Do you intend to break down all the barriers which protect your constituents; to place the President above the Constitution, and announce to the world that this is a Government of force and not of law?"

Surely not. We propose simply to have a government of both force and law; force guided by law. We propose to raise up barriers to protect our constituents in the enjoyment of their constitutional rights and privileges. We propose to leave the President where he is, under the Constitution, the executor of the laws and the servant of the people. We propose to clothe him with full power to protect the weak, preserve the peace, maintain order, and "put down unlawful combinations to overthrow or set at defiance the constituted authorities of the States." If he abuses the trust, the people through their Representatives in Congress will impeach him, will expel him from the Executive Mansion, and make him as powerless for harm as the poorest beggar on the street. The President is required by the Constitution to "take care that the laws are faithfully executed." We propose simply to enable him to discharge the duty imposed on him by the Constitution; nothing less, nothing more.

My colleague thinks the Constitution does not authorize such legislation. In the opinion of our Democratic friends the Constitution forbade the coercion of rebel States, the suppression of the rebellion, the preservation of the Union, and the emancipation of the slave. It is not strange, therefore, that they should now find constitutional objections to any interference on the part of the General Government for the suppression of treasonable organizations, and the protection of loyal citizens in the enjoyment of their constitutional rights and privileges.

I quote from my colleague's speech in reference to this point:

"Now, sir, I deny that there is in the fourteenth article of amendments to the Constitution of the United States any power conferred which authorizes the President to use the Army, the Navy, and the militia against the people of a State without having been first called upon by the Legislature, or the Governor of that State, there being no time to convene the Legislature. The fourteenth article of amendments, under which it is claimed by the advocates of this bill that this power is given, is as follows:

"'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law.'

"Is there any power conferred there, unless it be to go into the courts for redress against a violation of these rights?"

It will be observed that in his anxiety to make out his case he fails to quote the Constitution fairly, by omitting the concluding paragraph of section one, article fourteen, which reads as follows:

"Nor deny to any person within its jurisdiction the equal protection of the laws."

That is to say, the Constitution declares that—

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

Now, certain States have denied to persons within their jurisdiction the equal protection of the laws. The proof on this point is voluminous and unquestionable. It consists of the sworn testimony of ministers of the Gospel who have been scourged because of their political opinions, of humble citizens who have been whipped and wounded for the same reason, of learned judges within whose circuits men were murdered, houses were burned, women were outraged, men were scourged, and officers of the law shot down; and the State made no successful effort to bring the guilty to punishment or afford protection or redress to the outraged and innocent. The State, from lack of power or inclination, practically denied the equal protection of the law to these persons. It is to remedy this evil and cover these proscribed and outraged citizens with the shield of the Constitution that we propose to authorize the President to send military aid to the local authorities in these lawless sections. As to our constitutional right to do this, I cannot do better than read from a speech of my learned colleague from the seventh district, [Mr. SHELLABARGER:]

"My answer is that the President may, under such circumstances, send military aid; and to make this answer complete, I now again go back to the first section of the fourteenth article. That section provides two things which I wish to notice. The first provision is—

"'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.'

"This provision requires that the laws on their face shall not 'abridge' the privileges or immunities of citizens. It secures equality toward all citizens on the face of the law. It provides that those rights shall not be 'abridged;' in other words, that one man shall not have more rights upon the face of the laws than another man. By that provision equality of legislation, so far as it affects the rights of citizenship, is secured. But the section does not stop there. It contains two other provisions, only one of which I need now notice. It provides:

"'Nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.'

"The laws must be, first, equal, in not abridging rights; and second, the States shall equally protect, under equal laws, all persons in them. Therefore, under the provisions of the fourteenth amendment, when these clauses are put in juxtaposition, in order to bring the idea together, Congress shall have power to make and enforce all proper legislation which shall be necessary to require of the States that they shall not abridge the rights of citizenship, and also that they shall protect all persons equally. Nothing can be plainer. The thing is so absolutely self-evident that it admits of no enforcement by argument. Two things are provided—equal laws and protection for all; and whenever a State denies that protection Congress may by law enforce protection. The amendment does not say that in such case the laws of Congress must be made so that the protection cannot be furnished to the people until it is invited by the Legislature or Executive of the very State which is denying it. To say in such a case as that that Congress cannot protect until it is invited to protect by the State, which is doing the mischief, which is making the denial, is to attribute absurdity to the provision."

It is true, as my colleague from the thirteenth district [Mr. MORGAN] has affirmed, that General Halleck while admitting, "that there may be special organizations of outlaws in particular localities under the name of Ku Klux," denies the necessity for military interference; but this after all is simply the opinion of one man, whose judgment may have been biased very naturally by social intercourse with wealthy and educated rebel sympathizers, who control public opinion and manufacture public sentiment in his military district. His simple statement, therefore, cannot invalidate the fact patent to all eyes, sworn to by hosts of witnesses, corroborated by thousands of well-authenticated outrages, sustained by the indelible scars of those who have been scourged and maimed, that in certain sections of the South freedom of speech and of political action is no longer tolerated.

There may, indeed, be States in the South not cursed by this proscriptive spirit, where oath-bound murderers and scourgers do not meet in conclave to pass sentence upon inoffensive men. It may be true, as Governor Warmoth says, that in Louisiana there is "a growing spirit of harmony and good-will." It is probable that Governor CLAYTON spoke truthfully of Arkansas when he said that "law and order, peace and security reign throughout our borders;" but you cannot prove there was no shedding of innocent blood by armed Ku Klux in Mississippi by showing that Arkansas is peaceful. You cannot wipe out the damning record of Ku Klux outrages in North Carolina by showing that there is a growing spirit of harmony in Louisiana. You cannot prove that men have not been murdered, scourged, and outraged in one section upon the decree of an organization whose sole object is the intimidation or death of their political opponents, by evidence that in certain other sections the Ku Klux Klan is unknown. In the trial of a criminal you do not summon as witnesses those who did not see him commit the offense alleged; you call those who did. It is by the mouth of these last that the fact is established. My colleague [Mr. MORGAN] says, in reference to the South:

"Mr. Speaker, no gentleman upon this floor will deny that one month after the close of the war peace and security existed from Maine to the Rio Grande. I wait for a reply. No gentleman contradicts my statement; but I will produce my authority, a letter written May 25, 1865, by General Sherman to Colonel Bowman. He says:

"'I do want peace and security, and the return to law and justice from Maine to the Rio Grande; and if it does not exist now, substantially, it is for state reasons beyond my comprehension.'

"I hold in my hand another authority, for which my friends on the other side will have respect. It is a report made on the 22d of July, 1865, and signed 'U. S. Grant, Lieutenant General.' General Grant says:

"'General Lee's great influence throughout the whole South caused his example to be followed, and to-day the result is that the armies lately under his leadership, are at their homes, desiring peace and quiet, and their arms are in the hands of our ordnance officers.'

"He says that the armies of the confederacy were at their homes, desiring 'peace and quiet,' and 'their arms are in the hands of our ordnance officers.'

borne in mind that the constitution now limits the debt of the State to $25,000,000. Our present bonded indebtedness must now preclude us from making further appropriations as subsidy or other assistance to works of internal improvement. I do not forget that it is the policy of the State to use all proper means to assist and protect every enterprise calculated to increase facilities for production and transportation. The railroads, canals, and other public works so fostered will, I doubt not, inure to the incalculable benefit of the whole people. Still, I think that we have granted such aid about as far as we safely can. We must now strive to live within our income. If we reduce the taxes to the least amount necessary to conduct the government upon an economical basis, in a short time the problem of the payment of the debt will solve itself. With peace and prosperity, with untold agricultural and mineral wealth, with a system of improvements carefully fostered by the State, our capital will soon double; and, without increasing the tax, the bonds can be rapidly retired."

Now comes a paragraph which is, perhaps, more applicable to the comments made by the Senator from Indiana, [Mr. MORTON,] in his recent remarks upon the efforts of Democrats in the very State Legislatures of the South to promote and carry to a successful issue various schemes of plunder. Here is what the Governor says in reference to that style of gentlemen:

"I warn you, gentlemen, against certain schemes of plunder which are already organized, and will continue to be organized and presented to you for your votes. These are propositions which, under the guise of public improvements or of claims against the State, are simply plans to rob the treasury and fill the pockets of unprincipled speculators. The persons who will probably importune you most pertinaciously for the most barefaced of these speculations are well-dressed gentlemen, claiming to be the representatives of the most respectable of our people. It is these pleasant gentlemen, in broadcloth, with their gigantic swindles, embracing millions, and not the poor and needy applicant for some long-delayed but petty act of justice, who have most depleted the public till in the past and will endeavor to do so again."

The Democratic press of the city of New Orleans daily publish their reliance and confidence in his protection of the public purse. By his statesmanship he has evolved order out of chaos, by his determination he has subdued the spirit of misrule, by his conciliation and magnanimity he has disarmed political enmity of much of its rancor, and by his fidelity to the high duties of his office he has set a noble example to the Chief Magistrates of other States which it would be well for the peace and welfare of our country should be followed. He is himself the impersonation of the success of the reconstruction measures of Congress and Republican principles when faithfully and ably administered.

The Senator from Mississippi [Mr. AMES] truthfully said that over eight hundred political outrages had been perpetrated in Louisiana in the sixty days preceding the election of 1868. He could have doubled that number without exaggeration.

Would that I could blot out from history the record of the deeds of blood of which her people have been guilty within a few years past; but I bear willing testimony that peace now reigns within her borders, and that persecution of political opinion has been in a great degree modified. Her people have aroused to the fact that their welfare is best subserved by devotion to their material interests rather than by lawless defense of old opinions and prejudices. Our chief Executive has, by the exercise of courage and statesmanship, so met the occasion as to evoke peace, good will, and prosperity out of lawlessness, prejudice, and distress, while our people are entitled to every credit for their submission to the laws and for their efforts to subdue the passions of the past.

We have extended the mantle of amnesty over all political offenses, with the result of greater toleration of opinion and an awakened interest in the affairs of the Commonwealth and of the nation. Louisiana needs not such legislation as is now proposed, but I mistake her people if they do not cheerfully give it their assent, and if they shall not court its application within her limits should future events render such application necessary.

My remarks, Mr. President, have had very little reference to the issue that is now before this body; but there having been a direct attack made upon my State with reference to the administration of its public affairs, with reference to the conduct of the party in power, and with particular reference to the character of the man who has done more than any other man there to retrieve it from the rule of misfortune and Democracy, I felt it incumbent on me to make my remarks particularly pertinent in the way of a reply to these charges.

Mr. EDMUNDS. I move that the Senate proceed to the consideration of executive business; but I desire it to be understood that I do not wish to occupy the floor to-morrow in this debate.

The VICE PRESIDENT. The Chair understands that the Senator from New Jersey [Mr. FRELINGHUYSEN] desires to occupy the floor; but he is not at this moment in the Chamber.

Mr. WILSON rose.

The VICE PRESIDENT. Does the Senator from Massachusetts claim the floor?

Mr. WILSON. I understood that the Senator from North Carolina [Mr. POOL] desired specially to take the floor to-morrow.

The VICE PRESIDENT. If the Senator from Vermont yields for that purpose, the Chair will recognize the Senator from North Carolina.

Mr. EDMUNDS. Certainly. I merely made the motion as a matter of business; not to get the floor.

The VICE PRESIDENT. The Chair recognizes the Senator from North Carolina.

Mr. POOL. I do not desire to go on now, but I wish to submit some remarks to-morrow.

Mr. EDMUNDS. The Senator from North Carolina having the floor, I renew my motion.

PAPERS WITHDRAWN.

Mr. PRATT. Before that motion is put, I wish to have an order entered for the withdrawal of papers.

The VICE PRESIDENT. If there be no objection, the Chair will receive the proposition.

On motion of Mr. PRATT, it was

*Ordered*, That J. B. Chipman have leave to withdraw his petition and papers from the files of the Senate.

PETITIONS AND MEMORIALS.

Mr. PATTERSON. I present the petition of Worcester Willey, a missionary among the Cherokee Indians, praying compensation for property taken by United States troops during the late war; if there be no objection, I should like to have the petition referred to the committee.

The VICE PRESIDENT. The Senator from Rhode Island [Mr. ANTHONY] gave notice this morning that he would object this day to receiving any business which was not in order under the restrictive rule adopted by the Senate.

Mr. EDMUNDS. I object at any rate. I promised the Senator from Rhode Island that I would do so.

The VICE PRESIDENT. The petition will lie on the table.

EXECUTIVE BUSINESS.

On motion of Mr. EDMUNDS, the Senate proceeded to the consideration of executive business. After fifty-six minutes spent in executive session, the doors were reopened; and (at four o'clock and thirty-three minutes p. m.) the Senate adjourned.

---

HOUSE OF REPRESENTATIVES.

TUESDAY, *April* 4, 1871.

The House met at eleven o'clock a. m. Prayer by the Chaplain, Rev. J. G. BUTLER, D. D.

The Journal of yesterday was read and approved.

ENFORCEMENT OF FOURTEENTH AMENDMENT.

The SPEAKER. The House resumes the consideration of House bill No. 320, to enforce the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes, upon which the gentleman from North Carolina [Mr. COBB] is entitled to the floor.

Mr. COBB. Mr. Speaker, before I proceed to discuss the question before the House, I desire to express my regret at the absence of my colleague, Mr. SHOBER; for it has been my intention to confine my remarks almost exclusively, by way of reply, to expressions which fell from him in his speech here last Saturday. I am sorry he is not present.

Mr. Speaker, it will be readily perceived that I shall speak under very great disadvantages. Serious and continued ill-health has prevented my attendance upon the sittings of the House during the past week, and nothing less than a sense of duty, "the performance of a sacred filial duty to my mother State," could have induced me to disregard the remonstrance of my physician and bring me from my chamber, at the risk of a relapse, to raise my feeble voice in defense of the State of North Carolina and her people. I have felt a deep interest in these proceedings, and whenever my strength has permitted have read with attention the remarks delivered for and against the bill proposed by the gentleman from Ohio, [Mr. SHELLABARGER.] This deep interest brings me here this morning.

My Republican colleague, [Mr. THOMAS,] who is a member of the select committee reporting the pending bill, is not in the city; no doubt detained at home either by sickness in his family or his own illness, else I should transfer to his able management the conduct of the argument this morning. But, sir, there being no other upon this side of the House from my State to speak for the people of North Carolina, I accept the responsibility, and ask the attention of the House to what I have hurriedly prepared upon the subject. As one of the Representatives of North Carolina upon this floor, I deem it incumbent on me to say a few words in defense of the people of that State and in condemnation of the acts of violence and crime which reckless and lawless men, banded together, have committed, to the common disgrace of us all.

The investigation which has recently taken place was necessary to separate the people from the lawless bands who commit these crimes and to place the reproach and dishonor of them upon the real perpetrators. This was positively necessary to the vindication of the people of the State before the country. The people of North Carolina are law-abiding, indisposed to violence, and disposed to industry and domestic tranquillity; but they have been beset by banded organizations of murderers and assassins who, in the interest of still rebellious leaders, and I believe with their sanction and support, have committed numberless atrocities and crimes at which humanity is shocked. I rise to call attention to the fact that these banded assassins do not number exceeding forty thousand men, while there are two hundred thousand voters in the State. I rise to defend one hundred and sixty thousand freemen against the base imputations thrown out upon this floor, and to fix the guilt upon the forty thousand Ku Klux, who alone, it seems, have found apologists and defenders here from North Carolina Representatives.

Every good man in the land must be horrified at and must condemn the scourging of women and men, the hanging and assassination of citizens, and other untold outrages, which the country now knows have been committed in thirty, and perhaps more, counties of the State, and have gone entirely unpunished in the courts of justice. Sir, I confess my surprise and pain to see those professing to represent that good State in this House attempting to confound its good people with the murderous bands who have perpetrated these crimes, and thus cast reproach and disgrace upon the whole State. Those who have endeavored

could have prevented; and such damages may be recovered in an action on the case in the proper circuit court of the United States; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in such action: *Provided*, That such action shall be commenced within one year after such cause of action shall have accrued. And if the death of any person shall be caused by any such wrongful act and neglect, the legal representatives of such deceased person shall have such action therefor and may recover not exceeding $5,000 damages therein, for the benefit of the widow of such deceased person, if any there be, or if there be no widow, for the benefit of the next of kin of such deceased person.

And that the same stand as section six of the said bill, and that section six stand as section five, and that section five be transferred to the end of the bill as section seven.

GEORGE F. EDMUNDS,
MATT. H. CARPENTER,
*Managers on the part of the Senate.*
S. SHELLABARGER,
LUKE P. POLAND,
*Managers on the part of the House.*

Mr. EDMUNDS. It is right that I should explain the effect of this report. There were four points of disagreement open between the two Houses on the previous conference. Upon the first three points of disagreement, the present conferees have adopted the previous report, leaving the bill in these respects as it was recommended to be left by the former report, precisely word for word. As to the last section, in the way it stood originally, being the amendment offered by the Senator from Ohio, [Mr. SHERMAN,] the conferees of the Senate found it impossible to bring the Representatives of the House to agree to that section in the form in which it stood, on account of difficulties which had occurred to a majority of the House of Representatives respecting our power to deal with the particular organization in a State called a county or a town and for such other reasons as it is not necessary now to state. Thereupon, in order to aid in the repression of these outrages by tumults and conspiracies, the conferees on the part of the House of Representatives and ourselves agreed to substitute for that the provision which the Secretary has read, the substance and effect of which is to make the whole body of the inhabitants of the vicinity who have knowledge that a conspiracy is formed to destroy the property or to injure the person of any peaceable inhabitant, and who refuse or neglect to exert all lawful means to repress it, having the power to assist in preventing it, responsible. It is, in other words, dealing with the citizen under the Constitution.

Every citizen in the vicinity where any such outrages as are mentioned in the second section of this bill, which I need not now describe, are likely to be perpetrated, having knowledge of any such intention or organization, is made a peace officer, and it is made his bounden duty as a citizen of the United States to render positive and affirmative assistance in protecting the life and property of his fellow-citizens in that neighborhood against unlawful aggression; and if, having this knowledge and having power to assist by any reasonable means in preventing it or putting it down or resisting it, he fails to do so, he makes himself an accessory, or rather a principal in the outrage itself, and his fellow-citizen, who is thus wronged on account of his refusal to help him to protect himself, is made responsible for it. I think, Mr. President, that in substance and effect this reaches the same result; and I am not at all sure but that it is quite as effectual as the redress against the county, without liability against the inhabitants of it, would have been. Therefore I hope the Senate will agree to the report which we have made.

Mr. SHERMAN. Mr. President, I do not intend to detain the Senate very long in regard to this matter. We have been debating now for three weeks a bill which is deemed by Congress 'so important as to hold us in session pledged only to transact business in regard to that particular subject. Our committees have been faithfully at work, and have reported us a bill to meet outrages which have scarcely a parallel in history. The startling fact upon which this bill is based is that an organized conspiracy, spreading terror and violence, burning and robbing, murdering and scourging both white and black, both women and men, and pervading large communities of this country, now exist unchecked by punishment, independent of law, uncontrolled by magistrates. We have specific cases, amounting to hundreds, of murder and violence, many of which have occurred since we have been in session here; our officers are driven from their duty; one officer since we have been sitting here has been scourged, his property destroyed, and his wife and children driven from his home. Another case occurred the other day in Tennessee, where two of our deputy marshals were killed in the discharge of their duty. Lawless bands of men, amounting to hundreds, while we have been in session here, have been roaming over the country independent and unchallenged, committing these atrocities, without fear of punishment, cheered by their neighbors, and despising your laws and your authority. We are called upon to legislate in regard to these matters. This condition of affairs, though doubted in the beginning, is now admitted on all hands.

Now, what is the result of this long debate? What remedy do you offer the victims and with what punishment do you threaten the guilty?

First, the party injured may sue in the courts of the United States for money damages. Whom? Disguised outlaws. What is the use of suing them? First, how can you identify them? What remedy have you? You are told by judges of the courts that the grand juries are closed against you; that the petit juries are closed against you; that organized perjury is enlisted against you. You know that of all the multitude of injuries not in a single case has redress ever been meted out to one of the multitude who has been injured. And now these scourged and mutilated victims are told by this bill that they may sue these murderous outlaws for a pecuniary compensation in the courts of the United States instead of the local courts. There they will meet the same grand jury, the same petit jury, the same organized perjury; and the only advantage you give them is a United States judge, one in a State far from the witnesses to be summoned and the place of their sufferings. How hopeless, how feeble, how like a stone to these poor sufferers is this remedy. How these disguised assassins will jeer at your lawsuit. Most likely their plea of abatement will be the assassination of the suitor who appeals to your court.

Mr. President, the second remedy is that the offenders may be indicted as criminals in the courts of the United States. How indicted? How can you indict them when you have the proof positive that at the place of the crime where the facts are notorious no indictment can be found and no indictment has been found? No man can be tried as a criminal, and no man has been tried and punished for these enormities. And yet these suffering people are told, as your alternative remedy, as the limit of your power and disposition to protect them, that they may choose either a civil remedy in the courts of the United States far away from their homes, or they may institute a criminal prosecution in the same courts. What a choice you offer them! Costs to exceed the damages, a judgment not worth the paper on which it is written, or an idle prosecution with death or banishment staring them in the face?

It is true there is one vital feature of this bill; that is, when these atrocities assume the form of civil war and become so great that the State authorities either neglect to or will not put them down, then the President of the United States with the military forces may come in and suspend the writ of *habeas corpus;* in other words, you may wage local civil war in the community. Well, sir, if that is the only alternative, I am willing to make not only local civil war, but in order to put down civil war, and there is no other remedy, I am willing to again appeal to the power of the nation to crush, as we have once before done, this organized civil war. If we must have war it must not be waged solely by the Ku Klux Klan—another name for the same rebel armies who defied the authority of the nation so long, but who now, organized and disguised, seek by assassination to renew the war. This bill will enable the President to again meet force with force, and I do not hide from myself the terrors of this kind of warfare, or the dangerous precedent we set for this kind of legislation. I am willing to vote for it. I am willing to do anything to punish and put down these outrages. That is the third and the chief remedy proposed by this bill.

But, sir, while we give the authority, have we or can we provide the means for its enforcement? The military force of the United States is very limited. It has ample occupation on the western plains. There are not troops enough in the Army of the United States to deal with this class of people now holding in terror vast regions of our territory. Shall you call out the militia? When and where shall this militia be organized, how armed, how equipped, how officered? These are grave and difficult questions. Still, the President of the United States may be compelled to resort to that; and there is, therefore, some virtue in this bill.

What next? There was a remedy provided by the vote of the Senate, twice given, once after a short debate. It was that when these outrages were committed in a community that made no effort to put them down, that took no means to arrest the offenders, and the outrage was a tumultuous and unlawful riot, aimed at the authority of the United States, then, and only then, the persons injured might sue the county or municipal division in which they occurred. And, now, why is not that remedy adopted—a remedy as old as the English law, older than the English law; a remedy derived from the old Saxon law in the country from which we draw all our institutions? There, for centuries, the law has been that when any community fails to protect its citizens, the community itself shall be responsible in damages. What is the objection to it? Is it not just that when a whole community allow a band of outlaws at night or in day, as they have done, to go and kill and slaughter, and murder, whip, and scourge, burn and rob, the community which allows these things to go on unchallenged and unpunished shall be punished? Is it to be said by the Congress of the United States that the property of a community is so sacred that it ought not to be affected because these outlaws do burn and rob and whip and scourge? Why, sir, these crimes could not exist a day if they were not sustained by the public sentiment of the property-holders of the community?

There is no county in North Carolina where twenty of the richest men in that county could not put down these bands of outlaws. If they would only will, they have the way, they have the power; and yet you will not touch the property of these people lest you may do injustice. Sir, we are told, by some mystic process, by some mode of reasoning, which I cannot comprehend, which seems to me so absurd that I cannot even fashion its face, that the Constitution of the United States does not allow a county to be sued in the courts of the United States. Why not? By what authority is any corporation sued? Where is the provision of the Constitution of the United States that allows a railroad company to be sued? A railroad company is the creature of State law, a pure creature of State law, having no powers except what are given it by the State law. Where is the power to sue a railroad company? Only in the general clause which confers upon the courts of the United States the power to entertain suits between persons. Suits may be brought by a citizen of one State against the citizen of another State. There is no express