## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MARK ANDREWS,

          Plaintiff,

v.

DINESH D'SOUZA, TRUE THE VOTE,
INC., CATHERINE ENGELBRECHT,
GREGG PHILLIPS, D'SOUZA MEDIA
LLC, SALEM MEDIA GROUP, INC.,
REGNERY PUBLISHING, INC., and
JOHN DOES,

          Defendants.

Case No. 1:22-CV-04259-SDG

## REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANTS SALEM MEDIA GROUP, INC.'S AND REGNERY PUBLISHING, INC.'S MOTION TO DISMISS

S. DEREK BAUER
Georgia Bar No. 042537
IAN K. BYRNSIDE
Georgia Bar No. 167521
KRISTEN RASMUSSEN
Georgia Bar No. 135018
JACQUELINE T. MENK
Georgia Bar No. 728365
GEORGIA L. BENNETT
Georgia Bar No. 495910

**BAKER & HOSTETLER LLP**
1170 Peachtree Street, NE, Suite 2400
Atlanta, Georgia 30309-7676

*Attorneys for Defendants Salem Media Group, Inc. and Regnery Publishing, Inc.*

Plaintiff's 60-page consolidated opposition ("Opp.") to the motions to dismiss filed by Defendants Salem Media Group, Inc. ("Salem") and Regnery Publishing, Inc. ("Regnery") and Defendants Dinesh D'Souza and D'Souza Media, LLC repeatedly relies on "facts" that are not alleged in the First Amended Complaint (the "FAC") and "authorities" that are plainly inapplicable, and doubles down on his shotgun complaint by continuing to lump all "Defendants" together to try to hold Salem and Regnery liable for statements and images they did not publish. Those tactics fail under even mild scrutiny. Plaintiff's opposition merely confirms that he has not stated – and cannot state – a claim for relief against Salem or Regnery.

## I.   Plaintiff's Voting Rights Act Claim Fails

Plaintiff's VRA claim fails for want of a private right of action and standing. That claim also fails as a matter of law because Plaintiff alleges no act of intimidation or attempt to intimidate by Salem or Regnery, let alone that their conscious objective in publishing a film and book was to intimidate Plaintiff from voting or to punish him for doing so.

### A.   VRA § 11 Confers No Private Right of Action

Under the governing standard of *Alexander v. Sandoval*, 532 U.S. 275 (2001), VRA § 11(b) does not establish a private right of action because its text contains no "clear expression of congressional intent to authorize a would-be plaintiff to sue."

1

*In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021) (en banc). Attempting to avoid that conclusion, Plaintiff digs up practically every argument that *Sandoval* interred.

That begins with Plaintiff's claim that VRA § 11(b) satisfies *Sandoval*'s standard for recognizing implied private rights of action. (Opp. at 14-15.) Plaintiff contends this provision contains "rights-creating" language – a prerequisite to recognition of a private right of action, *Love v. Delta Air Lines*, 310 F.3d 1347, 1352 (11th Cir. 2002) – but *Sandoval* itself makes clear that "[s]tatutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." 532 U.S. at 289 (quotation marks omitted). As Judge Moon explained, VRA § 11(b)'s "[n]o person…shall" language is a prohibition "directed to the regulated party, not the party to be protected" and so "does not, under the Supreme Court's precedents, confer any new right on voters." *Schilling v. Washburne*, 592 F. Supp. 3d 492, 498 (W.D. Va. 2022).

Plaintiff's sole authority on this point, *Georgia State Conf. of NAACP v. Ga.*, only highlights what is missing here. The statute at issue in that case "guarantee[d] a particular individual right to all citizens: i.e., a right not to have one's vote denied or abridged on account of race or color." *Ga. State Conf. of NAACP*, 2022 WL 18780945, at *4 (N.D. Ga. Sept. 26, 2022). Congress did the opposite in VRA § 11(b), authoring a proscription rather than a right. Contrary to Plaintiff's assertion

4855-0037-7695.6

(Opp. at 14), it is not enough that, in so doing, Congress sought to protect some class of persons. *See Gonzaga U. v. Doe*, 536 U.S. 273, 287–88 (2002) (holding as much for Family Educational Rights and Privacy Act). If that were so, every provision of Title 18 could be enforced by private suit. *Contra Love*, 310 F.3d at 1352–53.

Nor does Plaintiff identify anything in the statutory text indicating "an intent to create a private remedy." *Sandoval*, 532 U.S. at 289; *see also Wild*, 994 F.3d at 1255 ("the inquiry both begins and ends with a careful examination of the statute's language"). The only statutory language Plaintiff mentions is VRA § 11(b)'s reference to intimidation of persons "exercising powers or duties" under *other* VRA provisions, some of which courts have held to confer a private right of action. (Opp. at 15.) That has no bearing on whether VRA § 11(b) confers a private right of action. And Plaintiff simply ignores that the VRA expressly provides for enforcement of § 11(b) by the Attorney General, which is the sort of enforcement mechanism that the Supreme Court and Eleventh Circuit have held "'precludes a finding of congressional intent to create a private right of action, even though other aspects of the statute…suggest the contrary.'" *Love*, 310 F.3d at 1358 (quoting *Sandoval*, 532 U.S. at 290). "The bar for showing legislative intent is high" for a plaintiff asserting an implied private right of action, *McDonald v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 723 (11th Cir. 2002), and Plaintiff does not come close to surmounting it.

Recognizing that the statutory text provides him no solace, Plaintiff attempts an end-run around it by claiming his right to sue is settled by precedent. (*See* Opp. at 9-10.) It is not. First, that courts have recognized private rights of action under other VRA provisions does not give Plaintiff a pass on VRA § 11(b). *Sandoval* expressly rejected the argument that the Supreme Court's prior recognition of a private right of action under § 601 of Title VI necessarily carried over to the very next provision, § 602. *Sandoval*, 532 U.S. at 282-86. Instead, "[t]hat right must come, if at all, from the independent force of § 602." *Id*. at 286; *see also id*. at 287 (same, respecting Securities Exchange Act). So too, here, for VRA § 11(b).

Second, the wall of citations Plaintiff claims buttresses his case (Opp. at 10-11) stands for roughly nothing. Only two of those cases decided the private-right-of-action issue. One contains no reasoning and merely asserts "private parties may sue to enforce Section 11(b)." *Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 476 (S.D.N.Y. 2020).[1] The other devotes a whopping two sentences to reaching the same conclusion. *Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, 2023 WL 1338676, at *4 (D. Colo. Jan. 31, 2023). Neither justifies that result under *Sandoval*. That other cases assumed the existence

---

[1] Plaintiff cites two additional iterations of the same case, which simply note that the court already decided the issue.

of a private right of action, where no party raised the issue, is irrelevant. *Sandoval*, 532 U.S. at 284 (dismissing relevance of prior Supreme Court cases on that basis).

Third, Plaintiff's "ratification" argument (Opp. at 12) fails for essentially the same reason: there was nothing for Congress to ratify. *See Sandoval*, 532 U.S. at 291 (rejecting same argument).[2] Finally, Plaintiff's argument (Opp. at 9) that a private right of action should be recognized to further the VRA's "laudable goal" is also foreclosed by *Sandoval*, among many other precedents. *Id*. at 287.

So long as *Sandoval* remains "our lodestar," *Wild*, 994 F.3d at 1255, Plaintiff's VRA claim fails.

### B.    Plaintiff Lacks Standing for His VRA § 11(b) Claim

Plaintiff argues he was injured and has standing to bring a VRA § 11(b) claim because Salem's and Regnery's publication of a film and book "intimidated [him] from voting and assisting his family members to vote." (Opp. at 23.) But this alleged injury is contradicted by the very pleading Plaintiff seeks to save from dismissal: the FAC alleges he has voted in every election, and aided family members in voting in every election, since those publications. (Doc. 27 at ¶¶ 81, 82, 239, 234, 236, 239.)

---

[2] To the extent Plaintiff bases this argument on Supreme Court decisions addressing VRA §§ 5 and 10, (Opp. at 9), § 11(b) does not employ "the verbatim statutory text that courts had previously interpreted to create a private right of action" in those cases, *Sandoval*, 532 U.S. at 288, such that reenactment of the VRA could not "ratify" their holdings as to VRA § 11(b).

No matter, he argues, because the statute forbids any "attempt to intimidate." (Opp. at 23.) But the breadth of a statutory offense is no substitute for Article III standing. "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). Lacking such an injury, Plaintiff asks the Court to render an advisory opinion on whether Salem's and Regnery's publications could hypothetically intimidate someone from voting.

Plaintiff cannot circumvent the requirement of a concrete injury traceable to Salem's or Regnery's conduct by citing his own idiosyncratic actions. For example, Plaintiff claims he "avoids going outside of his house at night." (Opp. at 22.) But plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 416 (2013); *see also Swann v. Sec., Georgia*, 668 F.3d 1285, 1288 (11th Cir. 2012). Self-inflicted expenses and burdens are the crux of Plaintiff's standing argument. For example, there is no allegation – plausible or not – that Salem or Regnery is planning to jump Plaintiff on a darkened street. To the extent Plaintiff premises standing on privacy or reputational injury, that too fails because that "'asserted basis for standing has nothing to do with voting.'" *Ford v. Strange*, 580 Fed. Appx. 701, 709 (11th Cir. 2014) (quoting *Abortion Rights Mobilization Inc. v. Baker*, 885 F.2d 1020, 1028 (2d Cir. 1989)).

6

Finally, Plaintiff is wrong to argue that only a tenuous "causal connection" is necessary to support claims for injuries inflicted by third parties. (Opp. at 24-25.) The only alleged "threats" and "intimidation" here were the independent actions of third parties, Doc. 54 at 10, 14-15, and a plaintiff may not premise standing on asserted injuries that are "the result of the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). While that doctrine recognizes an exception for "injury produced by determinative or coercive effect [by a defendant] upon the actions of someone else," *Bennett v. Spear*, 520 U.S. 154, 169 (1997), Plaintiff does not allege that Salem or Regnery exerted such force on the unknown third parties here. Accordingly, any injury they inflicted provides no standing to assert a claim against Salem or Regnery.

### C.     Plaintiff Fails to State a Claim Under VRA § 11(b)

To justify his VRA § 11(b) claim, Plaintiff is forced to argue that the statute prohibits publication of any speech that leads a voter to feel trepidation in voting, regardless of the publisher's lack of intent to intimidate anyone from voting and the absence of any threat or objectively intimidating message in the publication. (Opp. at 26-27.) That unbounded interpretation of VRA § 11(b) is incorrect and would violate the First Amendment. Under any view of the statute, Plaintiff's claim fails.

Plaintiff identifies no act by Salem or Regnery to "intimidate, threaten, or coerce" him in the exercise of his voting rights, as required to state a claim. 52 U.S.C. § 10307(b). The conduct to which he points (Opp. at 24) consists of ordinary publishing activities by media providers, not a federal offense to impede voting rights: *i.e.*, serving as a producer for a film and trailer, Doc. 27 at ¶¶ 37–41, 44–47; "produc[ing]" a talk show, *id.* at ¶¶ 49–50; and publishing a book, *id.* at ¶¶ 70, 64– 75, 164–65, 191. Even going beyond Salem's and Regnery's specific roles in these publications, Plaintiff alleges nothing more than that these publications depicted him and others, with faces blurred in the book and film, depositing ballots at unidentified public drop boxes and made statements that the individuals are "mules" engaged in voter fraud or criminal activity. (Opp. at 2-5, 29-30.)

None of these things are intimidation: "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Virginia v. Black*, 538 U.S. 343, 360 (2003); *see also United States v. Fleury*, 20 F.4th 1353, 1365 (11th Cir. 2021). Objectively, reporting on potential criminal activity is not a "true threat." Far from being a threat, the publications here are no different than any news report of potentially unlawful activity. Plaintiff essentially recognizes as much. (Opp. at 30 (arguing that publishing accusations of

"alleged crimes" violates VRA § 11(b)).) Interpreting VRA § 11(b) to reach these publications would result in a "prohibition of alarming breadth," rendering it overbroad and, thus, unconstitutional in violation of the First Amendment. *U.S. v. Stevens*, 559 U.S. 460, 473-74 (2010). That interpretation can and must be avoided.

Compounding the constitutional infirmity, Plaintiff would also dispense with the need to prove intent to intimidate, Opp. at 18-21, even though the Supreme Court has held that element to be essential to proscribing intimidating speech consistent with the First Amendment. In *Virginia v. Black*, the Supreme Court struck down a criminal prohibition on cross-burning because it dispensed with the need to prove "intent to intimidate." 538 U.S. at 365. Like that statute, Plaintiff's intent-free interpretation of VRA § 11(b) impermissibly prohibits "lawful political speech at the core of what the First Amendment is designed to protect." *Id*. at 365. Indeed, one of Plaintiff's own authorities, *United States v. Nguyen*, 673 F.3d 1259 (9th Cir. 2012), recognizes that intent to intimidate is required of laws barring voter-intimidation. For that proposition, it relies on, among others, *Olagues v. Russoniello*, 797 F.2d 1511, 1522 (9th Cir. 1986) (en banc), which interpreted VRA § 11(b) to require "inten[t] to intimidate." Plaintiff attempts to wave away *Olagues* and *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016), which endorsed *Olagues*'s interpretation, on the basis that *Olagues* addressed a different VRA provision. That

9

is false. *See* 797 F.2d at 1522 ("appellants contend that the Government also violated 42 U.S.C. §[] 1973i(b)"). Worse, Plaintiff does not devote a word to justifying the unprecedented sweep of his unbounded interpretation.

Finally, there is no merit to Plaintiff's footnote assertion (Opp. at 20 n.10) that he adequately pleaded that Salem or Regnery intended to intimidate him. As discussed below, the FAC alleges no such thing.

## II.    Plaintiff's Civil Rights Conspiracy Claim Fails

Plaintiff's briefing confirms that the FAC fails to state a viable claim for conspiracy under the Civil Rights Act.[3]

### A.    Plaintiff Does Not Allege Force, Intimidation, or Threat

Like his VRA claim, Plaintiff's § 1985 claim rests on the false premise that ordinary publishing activities and reports on suspected criminal activity amount to actionable "force, intimidation, or threat." (*See* Opp. at 40 (equating the two statutes' standards).) Despite throwing around the phrase "voter intimidation" in his brief, *id.*, Plaintiff does not identify a single paragraph of the FAC that alleges Salem or Regnery made any threat, used force against him, lurked menacingly outside a

---

[3] While Plaintiff calls it the "Klan Act" for dramatic effect, the Supreme Court refers to it as the "Civil Rights Act of 1871." *Kush v. Rutledge*, 460 U.S. 719, 724 (1983); *Griffin v. Breckenridge*, 403 U.S. 88, 99 (1971). Regardless, the campaign of terror and violence that motivated its enactment underscores how poor a fit it is for Plaintiff's grievance here.

4855-0037-7695.6

polling place, or did anything of the sort, only that they produced and marketed a film and book depicting him as a "mule." (Opp.at  2-5, 29-30.) As explained above, those things are not "intimidation" as a matter of law, and interpreting the statute to reach so far would transgress constitutional limitation. And Section 1985, in particular, cannot bear that interpretation: "Viewed in the light of its origin as a reaction against the 'murders, whippings, and beatings committed by rogues in white sheets in the postbellum South,'" Section 1985(3) "obviously meant to its framers, when it spoke of 'force, intimidation, or threat' something much more serious and terrifying" than alleged defamation. *Gill v. Farm Bureau Life Ins. Co. of Missouri*, 906 F.2d 1265, 1269 (8th Cir. 1990) (footnote omitted).

### B.       Plaintiff Fails to Allege that Salem or Regnery Agreed to Deprive Him of Voting Rights or to Injure Him for Exercising Voting Rights

Plaintiff is unable to point to any plausible allegation that Salem or Regnery sought to deprive him of, or injure him for exercising, protected rights. To hide that deficiency, Plaintiff's conspiracy argument (Opp. at 33-34) conflates Defendants' agreement and efforts to produce and promote the film and book with the separate element that their "conscious objective" in entering an agreement was to violate ***his*** rights. *Bray*, 506 U.S. at 275. But Plaintiff cannot keep his story straight, later admitting the "conspiracy" was that "Defendants engaged in a business enterprise to produce, circulate, promote, and profit from the film and book." (Opp. at 33.)

11

Despite devoting pages to this point, Plaintiff says nothing about Salem's or Regnery's supposed ill intent. The portions of the FAC he cites allege only that Salem and Regnery are media companies that produced and published the book and film, Doc. 27 at ¶¶ 25-26; Plaintiff is depicted in the film as a "mule," ¶¶ 37-41; he was similarly depicted in the book, ¶¶ 70-76; "Defendants" promoted and distributed the film, ¶¶ 48-69, 138-49, 168, 171-79, 188-89; and they profited from the book and film, ¶¶ 173, 191-92. All this says about Salem's and Regnery's conscious objective is that they engaged in a business to produce a film and book. What is missing from the FAC's hundreds of paragraphs is any indication Salem or Regnery got into this business to deprive Plaintiff of his rights or to injure him for exercising them – the FAC does not even allege Salem or Regnery knew who he was. And Plaintiff simply ignores the fact that Salem and Regnery blurred his face in the film and book, *id.* at ¶¶ 38, 45, 74, which undermines any claim they sought to target him.

Section 1985 provides a remedy for "conspiracy to interfere with civil rights," not conspiracy to publish films and books. As Plaintiff alleges only that Salem and Regnery agreed to enter the latter sort of business, his claim fails as a matter of law.

## C.    Plaintiff Was Deprived of No Rights

Plaintiff freely concedes that he has continued to exercise his voting rights. (Opp. at 23.) His claim therefore fails for want of any claim that he "ha[s] been

deprived of a constitutional right." *Gray v. Town of Darien*, 927 F.2d 69, 73 (2d Cir. 1991); *see also Cook v. Randolph County, Ga.*, 573 F.3d 1143, 1157 (11th Cir. 2009). Plaintiff's thumbnail argument to the contrary (Opp. at 41) overlooks that Section 1985(3) was enacted pursuant to Congress's power to enforce the Thirteenth, Fourteenth, and Fifteenth Amendments, *United Broth. of Carpenters and Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 837 (1983), and so "provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates," *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979). Accordingly, "a claim brought under § 1985(3) must be tied to the violation of a substantive constitutional right." *Cockrum v. Donald J. Trump for President, Inc.*, 365 F. Supp. 3d 652, 662 (2019). There being none, Plaintiff's claim fails.

## III.  <u>The FAC Fails to State a Claim for Defamation Against Salem or Regnery</u>

Because the allegations of the FAC plainly show that Plaintiff cannot state a claim for defamation against Salem or Regnery, Plaintiff seeks to rely on new "facts" that are not in the FAC and now contends that Salem and Regnery are liable for ***all*** statements made by ***all*** Defendants.  None of Plaintiff's arguments has merit.

### A.   Neither Salem nor Regnery Made Any Statement "Of and Concerning" Plaintiff

Plaintiff does not – and cannot – dispute that his face, license plate, name, and other identifying information were never shown in the film or the book.  The FAC

13

does not allege that any such information was included in the film or book and, in fact, Plaintiff affirmatively alleges that his face was completely blurred *every time* his image was shown in the film or the book.  (Doc. 27 at ¶¶ 38-39, 45, 74.) Nevertheless, Plaintiff contends Salem and Regnery made statements "of and concerning" him because his wife and a reporter ultimately identified him as the person in the film and book.  Plaintiff's argument is legally and factually baseless.

Relying solely on a secondary source that is not specific to Georgia, Plaintiff contends the "of and concerning" element of a defamation claim is met "where either the plaintiff was in fact the person meant or where the plaintiff was understood to be the person spoken about in light of extrinsic facts." (Opp. at 42.)  That is not the law in Georgia. To the contrary, to establish the "of and concerning" element of defamation under Georgia law, a plaintiff must show that his identity can be ascertained from the allegedly defamatory statement or photograph "simply by viewing it," and "not through taking the additional step" of reviewing "some extrinsic document" or relying on "innuendo" or external "averment[s]." *See Collins v. Creating Loafing Savannah, Inc.*, 264 Ga. App. 675, 678 (2003); *Eakin v. Rosen*, 2017 WL 5709564, at *3 (M.D. Ga. Nov. 27, 2017).  Thus, to establish that Salem or Regnery made a statement "of and concerning" him, Plaintiff must show he could be identified solely from the blurred images of him in the film and the book.

Plaintiff seeks to sidestep this requirement by arguing that "when the plaintiff's photograph is used in a publication . . . courts will almost always find the communication to be 'of and concerning' the plaintiff." (Opp. at 42.) For this principle, which is in direct conflict with Georgia law, Plaintiff again relies on a secondary source and an ancient Massachusetts case applying Massachusetts law. The only Georgia case Plaintiff cites – *Triangle Publications, Inc. v. Chumley*, 253 Ga. 179 (1984) – actually confirms that the blurred images of Plaintiff cannot support a defamation claim. Unlike here, the publication in that case included an unblurred and unobscured photograph of the plaintiff, making her easily identifiable without reference to any extrinsic facts. *Triangle Publ'ns, Inc.*, 253 Ga. at 180, 182.[4]

Plaintiff does not cite a single case, from Georgia or elsewhere, in which a blurred image of an unidentified person was found to be "of and concerning" the

_____

[4] Plaintiff's reliance on *Bell v. Johnson Publishing Co.*, 2018 WL 357888 (M.D. Ga. Jan. 10, 2018), Opp. at 43, is equally misplaced.  First, the defendants in that case did not dispute the "of and concerning" element was met. *Bell*, 2018 WL 357888, at *4. Second, as Plaintiff acknowledges, the publication in that case "contained sufficient identifying information" – including that one of the plaintiff's was an FBI agent, the name of the school plaintiffs' children attended in Valdosta, Georgia and the grades they were in, a description of one of their children, and a description of incidents involving plaintiffs' children and their relationship to the highly publicized death of another student – "for persons who knew plaintiffs to identify them," without relying on extrinsic facts.  (Opp. at 43); *see Bell*, 2018 WL 35788, at *1-2, *4.  Here, the FAC does not allege that there is ***any*** "identifying information" in the film or the book, much less "sufficient identifying information" from which persons who knew Plaintiff could or did identify him without relying on extrinsic sources.

4855-0037-7695.6

plaintiff.  And we are not aware of any such case.  Indeed, if authorized here, it appears this Court would be the first to permit such a claim.

Apparently recognizing this fact, and without citing any supporting authority, Plaintiff contends the images in the film and book are "of and concerning him regardless of whether his face was blurred" because "Mr. Andrews was actually recognized and his identity ascertained." (Opp. at 43.) Specifically, Plaintiff contends the FAC "alleges conclusive proof that Mr. Andrews' identity was ascertainable *in Salem Defendants' publications*" because "a reporter for a national newspaper identified and contacted him" and because his wife watched the trailer for the film "and *immediately* recognized him." (*Id.* at 44 (first emphasis added).) But neither of those "facts" is alleged in the FAC; in fact, its allegations show the opposite.

The FAC never alleges that a reporter identified Plaintiff from the blurred images in the film or the book.  Instead, it alleges the reporter contacted Plaintiff on May 16, 2022, *before* the film and book were published, *after* his unblurred image and other identifying information were published by parties other than Salem and Regnery, and *after* Plaintiff "provided a voluntary statement" to the GBI.  (*See* Doc. 27 at ¶¶ 49-53, 56, 63, 84-89.)  None of those allegations suggests Plaintiff's identity was ascertainable, much less actually ascertained, from the film or the book.

16

Likewise, and contrary to the argument in the Opposition, the FAC **does not allege** that Plaintiff's wife ever recognized him in the film, the book, or the trailer. The FAC alleges only that Plaintiff's wife "went online and viewed the *2000 Mules* trailer and Defendant Engelbrecht's appearance on Fox News," and that she did so **after** she and Plaintiff were told by the reporter that Plaintiff was portrayed in the film. (*See id.* at ¶¶ 89-90.) Even if the FAC alleged that Plaintiff's wife recognized him in the trailer (and it does not), it is clear Plaintiff's wife already knew the person in the blurred image in the trailer was Plaintiff before she ever watched it. (*Id.*)

In reality, the FAC does not allege that **anyone** identified, or even could identify, Plaintiff from any of the blurred images published by Salem or Regnery. And Plaintiff cannot cure that omission through his opposition brief. *See Brannen v. U.S.*, 2011 WL 8245026, at *5 (N.D. Ga. Aug. 26, 2011) ("Plaintiffs cannot amend their Complaint through their brief in response to the motion to dismiss.") (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 131 (11th Cir. 2004)).

Based on the actual allegations in the FAC, Plaintiff's identity was not and could not be ascertained solely from the statements or images in the film or the book. Accordingly, none of those statements or images is "of and concerning" Plaintiff, and his defamation claim against Salem and Regnery fails. *See Collins*, 264 Ga. App. at 678-679; *Eakin*, 2017 WL 5709564, at *3; *see also Brewer v. Hearst Pub.*

17

*Co.*, 185 F.2d 846, 848 (7th Cir. 1950) (picture of plaintiff's hands, leg, and foot unaccompanied by any other identifying information was not "of and concerning" plaintiff); *Aroonsakul v. Shannon*, 279 Ill. App. 3d 345 (2d Dist. 1996) (holding statement was not "of and concerning" plaintiffs where it was "only through other information disseminated by the broadcast, over which [defendant] did not exercise any control, that the plaintiffs could possibly be connected to the statement").

### B.   Salem and Regnery Cannot Be Liable For Allegedly Defamatory Statements Made by Others

Unable to escape the fact that the film and the book refer only to a nameless, faceless person, Plaintiff treats "all Defendants' publications" as one, contends Plaintiff's face was only "(sometimes) blurred" in those publications, and argues for the first time that Salem and Regnery "are liable for all of the defamatory statements at issue," including those made by other Defendants and non-parties. (Opp. at 43-45.)  Plaintiff's argument has no basis in fact or in law. [5]

Plaintiff does not identify a single statement outside of the book for which he contends Regnery is liable, nor does he identify any paragraph in the FAC alleging that Regnery is responsible for any statements beyond those contained in the book.

---

[5] Plaintiff alleges in a footnote that "Salem Defendants at times blurred Mr. Andrews' image and at times did not," but that allegation is not in the FAC. (Opp. at 46 n.16.) The allegations in the FAC say the exact opposite, and Plaintiff cannot change them in his brief. (*See* Doc. 27 at ¶¶ 38-39, 45, 74); *Brannen*, 2011 WL 8245026, at *5.

Thus, Plaintiff's claim against Regnery is limited to the statements in the book and, as noted above, none of those statements is "of and concerning" Plaintiff.

The only statements outside of the film for which Plaintiff contends Salem is responsible are statements made by Defendants Engelbrecht and Phillips and non-party Charlie Kirk on an episode of "*The Charlie Kirk Show*," during which unblurred video of Plaintiff was allegedly shown. (Opp. at 45-46.) Plaintiff contends Salem is liable for those statements because it "produces, publishes, and distributes" shows, including *The Charlie Kirk Show*; Charlie Kirk is a "Salem host"; that episode of *The Charlie Kirk Show* contains "Salem's large bold lettering labeling" accusing Plaintiff of engaging in ballot harvesting; Salem "distributed and produced" the subject episode of *The Charlie Kirk Show*; and Salem "did not exercise due care to prevent publication" of those statements on *The Charlie Kirk Show*. (Opp. at 45-46.) But ***none*** of those "facts" is found in the FAC. To the contrary, the ***only*** time the FAC mentions any relationship between Salem and *The Charlie Kirk Show* is in one passing reference vaguely alleging that Salem "produces" the show, without any explanation of what that means or what involvement Salem had with this specific episode of the show. (Doc. 27 at ¶ 49.) That lone, substantively empty allegation does not provide a factual basis for holding Salem liable for the statements made on *The Charlie Kirk Show* under Georgia law

and, indeed, Plaintiff does not cite a single case in support because Georgia law requires much, much more to state such a derivative claim for defamation.

Contrary to Plaintiff's assertion, Salem is not "seek[ing] to dispute the factual allegations about its relationship with Salem programs." (Opp. at 46.) There simply are no such allegations in the FAC. Indeed, the FAC alleges nothing about the purported relationship between Salem and Charlie Kirk, Salem's involvement with *The Charlie Kirk Show*, or Salem's control over what is published on *The Charlie Kirk Show*. It does not allege that Salem was the author, editor, or publisher of the statements or unblurred images on *The Charlie Kirk Show*; that Salem directed or authorized Defendants Engelbrecht and Phillips or Charlie Kirk to make any of those statements or to show unblurred images of Plaintiff; that Salem had any ability to prevent publication of those statements, much less that it failed to exercise due care to do so; or that Salem otherwise exercised control over Defendants Engelbrecht and Phillips or Charlie Kirk such that it can be held liable for any of their statements. Georgia law requires much more to state such a claim. *See Woods v. Allsteel, Inc.*, 2017 WL 3597505, at *3 (N.D. Ga. June 5, 2017) ("It is well settled law in Georgia that the doctrine of respondeat superior does not apply in slander cases, and a corporation is not liable for the slanderous utterances of an agent acting within the scope of his employment, unless it affirmatively appears that the agent was expressly

20

directed or authorized to slander the plaintiff."); O.C.G.A. § 51-5-10(a) (owner, licensee, or operator of a broadcasting station "shall not be liable for any damages for any defamatory statement published or uttered in or as part of a visual or sound broadcast by one other than the owner, licensee, or operator or an agent or employee thereof, unless it is alleged and proved by the complaining party that the owner, licensee, operator or the agent or employee has failed to exercise due care to prevent the publication or utterance of the statement in the broadcast").

Finally, Plaintiff relies on one case from Louisiana to argue that "Salem Defendants are responsible for republications that are 'a natural and probable consequence of' their initial defamatory publications," including the statements in the trailer for the film. (Opp. at 46-47.) But "that is not the law, at least in Georgia." *See Peacock v. Retail Credit Co.*, 302 F. Supp. 418, 421 (N.D. Ga. 1969), *aff'd*, 429 F.2d 31 (5th Cir. 1970) (noting the court was "unable to find a single Georgia case" in which a publisher was held liable for a subsequent publication that "was the natural consequence of the original publication," and holding defendant was not liable for its customers' republication of any libelous matter it originally published). Moreover, Plaintiff cites only one paragraph of the FAC to support his contention that Salem is responsible for the statements in the trailer, but it does not even mention Salem, and it admits Plaintiff's image is blurred in the trailer. (*See* Doc. 27 at ¶ 45.)

21

The FAC fails to cite any facts under which Salem or Regnery could possibly be held liable for any statements outside of the film or the book under *Georgia law*, much less *all* of the statements made by *all* of the other Defendants and non-parties.

### C.   Plaintiff's Claim for Defamation Per Quod Fails

Plaintiff contends "he need not plead special damages" because he "pleaded defamation *per se*." (Opp. at 47.) Plaintiff's argument misses the point. Count III of the FAC asserts claims for defamation **and** defamation per se. (Doc. 27 at p. 117.) Those are two separate and distinct claims. *Zarach v. Atlanta Claims Ass'n*, 231 Ga. App. 685, 688 (1998). And, under Georgia law, Plaintiff is required to plead special damages to state a claim for defamation per quod. *Id.* at 689.

Plaintiff next asserts – based solely on a District of Columbia case – that Georgia law only requires him to request "special damages." (Opp. at 47.) Plaintiff is incorrect. Georgia law is clear that the "heightened pleading standard applies to special damages, which must be specifically stated." *Eakin*, 2017 WL 5709564, at *5 (citing Fed. R. Civ. P. 9(g) and *Ballemead, LLC v. Stoker*, 280 Ga. 635 (2006)). The FAC only generally alleges that Plaintiff suffered "special damages" and spent an unspecified amount of money to protect his and his family's safety. (Doc. 27 at ¶¶ 217, 294.) That is not enough under Rule 9(g), and his claim for defamation per quod thus fails as a matter of law. *McGee v. Gast*, 257 Ga. App. 882, 885 (2002).

**IV.**  **The FAC Fails to State a Claim Against Salem or Regnery for Invasion of Privacy by False Light**

Plaintiff contends his false light claim cannot be dismissed because he is allowed to plead claims for defamation and false light in the alternative. (Opp. at 55.) But in order "to survive as a separate cause of action, a false light claim ***must allege*** a nondefamatory statement. If the statements alleged are defamatory, the claim would be for defamation only, not false light invasion of privacy." *Bollea v. World Championship Wrestling, Inc.*, 271 Ga. App. 555, 557 n.1 (2005) (emphasis added). The FAC does not allege that Salem or Regnery made a nondefamatory statement, but instead that *all* of the statements at issue are defamatory *per se*. And while alternative pleading may be permitted, Plaintiff did not plead his false light claim in the alternative; instead he expressly "incorporates and re-alleges" his defamation claim therein. (Doc. 27 at ¶ 295.) Plaintiff's false light claim thus fails.

Plaintiff's remaining arguments simply restate his unsupported assertions that Salem's and Regnery's blurring of his image is "irrelevant" because Plaintiff was "identified from the film, official trailer, and book" and because his unblurred image was shown on *The Charlie Kirk Show*. (Opp. at 56.) As discussed above, those arguments fail because the FAC neither alleges that Plaintiff was identified from any of the blurred images in the film, the trailer, or the book nor contains any factual allegations that would permit the Court to hold Salem or Regnery liable for the

23

content of *The Charlie Kirk Show*. Again, the FAC makes clear that Plaintiff's unblurred image was never published in the film or book and that Plaintiff was not otherwise named or depicted in the film or book. (Doc. 27 at ¶¶ 38-39, 45, 74.)

Finally, for the reasons discussed above, Plaintiff's assertion that Salem and Regnery are liable for the "natural and probable consequences" of their publications, Opp. at 56, is false and contrary to Georgia law. *See Peacock*, 302 F. Supp. at 421.

## V. The FAC Fails to State a Claim Against Salem or Regnery for Invasion Of Privacy By Appropriation Of Likeness

Contrary to Plaintiff's contention, showing a blurred image of an unnamed and unidentified person is nowhere near a "textbook" claim for appropriation of likeness. (Opp. at 57.) If it was, Plaintiff presumably would have cited cases holding that a faceless, nameless image is sufficient to support a claim for appropriation of likeness; he cites none. Indeed, the only case he cites to support his novel theory involved an unblurred picture of the plaintiff, in which she was clearly identified. *Bullard v. MRA Holding, LLC*, 292 Ga. 748, 748-749 (2013).

Not to be deterred, Plaintiff argues that "whether his face was blurred is irrelevant" to whether Salem or Regnery appropriated his likeness and that "it was not always blurred." (Opp. at 57.) Plaintiff cites no authority to support his blanket assertion that "blurring is irrelevant," and his factual contention that his face "was not always blurred" by Salem and Regnery is directly contradicted by the FAC. (*See*

Doc. 27 at ¶¶ 38-39, 45, 74.)  Because Plaintiff's own allegations demonstrate that Salem and Regnery did not identify him and took affirmative steps to ensure they did not use his likeness, his claim for appropriation of likeness fails on its face.

## VI.   <u>Both of Plaintiff's Invasion of Privacy Claims Also Fail Because the Statements at Issue Involve a Matter of Public Interest</u>

Plaintiff does not dispute that the film and book relate to a matter of public interest and concern.  Instead, Plaintiff contends the "newsworthiness exception" does not apply to statements that are not "factually accurate" or that are made for "commercial gain."  (Opp. at 57.)  Plaintiff is mistaken on both counts.

First, Georgia courts do not require media coverage to be 100% accurate to enjoy the newsworthiness privilege. *See Pierson v. News Grp. Publications, Inc.*, 549 F. Supp. 635, 639 (S.D. Ga. 1982) ("Georgia law does not clearly define the degree or type of falsity that will exclude a publication from the common law privilege"). Second, the newsworthiness exception clearly applies to publications made for commercial gain.  In *Waters v. Fleetwood*, 212 Ga. 161 (1956), the Georgia Supreme Court analyzed Plaintiff's cited case (*Pavesich v. New England Life Ins. Co.*, 50 S.E. 68 (Ga. 1905)), recognized that it did not address whether the sale of photographs for commercial gain is entitled to protection under the newsworthiness exception, and held that the exception barred a claim for invasion of privacy against a newspaper that published and ***sold*** gruesome photographs of a teenager's

25

decomposing body *for pecuniary gain* because the publication and reproduction of the photographs related to a matter of public interest. *Waters*, 212 Ga. at 166-167.

Because it is undisputed that the statements in the film and the book relate to a matter of public interest and concern, they "can be a violation of no one's legal right to privacy," even if not wholly accurate. *Id.* at 166. Both of Plaintiff's claims of invasion of privacy (Counts IV and V) therefore fail as a matter of law.

## VII. <u>Plaintiff's Claims for Defamation, False Light, and Appropriation of Likeness Also Fail Because Plaintiff Has Not Alleged Actual Malice</u>

All of the statements in the film and book are conditionally privileged under O.C.G.A. § 51-5-7(4) and are not actionable, unless Salem and Regnery acted with actual malice. None of Plaintiff's conclusory assertions, "[u]nsupported inferences," or "conjecture" regarding Salem's and Regnery's knowledge and motivation "suffice to show malice." *Neff v. McGee*, 346 Ga. App. 522, 529 (2018); *Mayfield v. NASCAR*, 674 F.3d 369, 378 (4th Cir. 2012).

For example, while Plaintiff contends the FAC alleges facts to "plausibly infer" that Salem and Regnery *may* have known "Georgia law enforcement had publicly cleared Mr. Andrews of any election fraud," the FAC never alleges Salem or Regnery actually had such knowledge. (Opp. at 49; *see* Doc. 27 at ¶¶ 128-130 (generally referring to "Defendants").) And Plaintiff's assertion that D'Souza acknowledged the investigation "on a Salem-published podcast" does not connect

26

those dots, especially since the FAC does not even allege that D'Souza's podcast is published by Salem. (Opp. at 49-50.) In fact, the FAC never alleges that Salem or Regnery even knew that Plaintiff was one of the people in the blurred images in the film and the book. Without such knowledge, any allegations about the GBI investigation are irrelevant to whether Salem or Regnery acted with actual malice.[6]

None of the other "circumstantial evidence" cited by Plaintiff fares any better. For example, Plaintiff contends the FAC alleges Salem and Regnery "relied on information" that was "inherently improbable," "worked with their business partners to fabricate the false statements about Mr. Andrews," and "reviewed the 'evidence' before deciding [to] create the film and book." (Opp. at 51-52.) But ***not a single one*** of those "facts" is alleged in the FAC. Indeed, Plaintiff cites only one paragraph of the FAC to support his sweeping allegations, and it alleges only that D'Souza "took [TTV's] evidence to Salem Media ***to see if*** Salem would provide the equity investment to make the *2000 Mules*" film. (Doc. 27 at ¶ 76 (emphasis added).)

---

[6] Even if Plaintiff had alleged that Salem or Regnery "possesse[d] information that indicate[d] the falseness" of any statements in the film or book, that would "not establish the organization acted with knowledge of the falseness. The proper focus is on the state of mind of the persons in the organization having responsibility for the publication." *Waskow v. Assoc. Press*, 462 F.2d 1173, 1175 (D.C. Cir. 1972). The FAC contains no allegations about the state of mind of any person at Salem or Regnery with responsibility for the film or book.

Plaintiff's assertion that Salem and Regnery acted with actual malice because they *now* know or should know that the statements in the film or book are false is equally baseless. (Opp. at 50.)  "The actual malice inquiry is based on what the writer knew when he wrote it, and the [plaintiff] must show that the writer had a 'subjective awareness of probable falsity' when the material was published." *Jones v. Albany Herald Publ'g Co.*, 290 Ga. App. 126, 132 (2008) (citations omitted).  Salem's and Regnery's alleged knowledge *after* they published the film and book is irrelevant.

Finally, while Plaintiff contends "there were extensive reasons for Salem Defendants to doubt the veracity of their partners (the D'Souza and TTV Defendants) in creating the film and book," the FAC does not allege that Salem or Regnery was aware of any of those purported "reasons."  More importantly, the FAC does not allege Salem or Regnery actually doubted the veracity of any statements in the film or book. *See Neff*, 346 Ga. App. at 529 (to show actual malice, plaintiff must show defendant "in fact entertained serious doubts as to the truth of his statements").

Plaintiff failed to allege any facts plausibly show Salem or Regnery acted with actual malice. Thus, Counts III, IV, and IV of the FAC fail as a matter of law.

## VIII.  <u>The FAC Fails to Sufficiently Allege a Claim for Civil Conspiracy</u>

Plaintiff does not identify any of the "facts" he allegedly pleaded to "infer that Defendants conspired to defame him and subject him to other tortious acts," but

instead summarily concludes he did so and that "*all* Defendants are 'jointly and severally liable' for conspirator's actions." (Opp. at 58.) Those "formulaic recitations" and "conclusory assertions" are insufficient to state a claim for conspiracy. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293-94 (11th Cir. 2010); *Lechter v. Aprio, LLP*, 565 F. Supp. 3d 1279, 1339 (N.D. Ga. 2021). Moreover, Plaintiff does not substantively dispute Salem's and Regnery's argument that they could not have conspired to defame him, to portray him in a false light, or to appropriate his likeness since they ensured his image was blurred every time it appeared in the film and the book. Instead, he contends that assertion "is both irrelevant and false." (Opp. at 58.) It is neither. (*See supra* at §§ III.B, IV, V.)

While a conspiracy agreement may be inferred from the circumstances, "the law does not authorize a finding that conspiracy exists merely because of some speculative suspicion." *First Fed. Fin. Sav. Bank v. Hart*, 185 Ga. App. 304 (1987). That is all that Plaintiff has offered here. Thus, his claim for civil conspiracy against Salem and Regnery (Count VI) fails as a matter of law. (*See also supra* at § II.)

## IX.   <u>Plaintiff's Claim For Punitive Damages Fails.</u>

Plaintiff contends the fact that Salem and Regnery blurred his image does not show a lack of malice or intent because "Defendants *did* broadcast" his unblurred image. (Opp. at 59.) While other Defendants may have shown Plaintiff's unblurred

image, the FAC alleges Salem and Regnery did not. (*See* Doc. 27 at ¶¶ 38-39, 45, 74.)  Those allegations, and the absence of any allegation in the FAC that Salem or Regnery knew any of the statements in the film or book were false at the time they were published, are fatal to Plaintiff's claim for punitive damages.

Plaintiff further contends he satisfied the requirements of O.C.G.A. § 51-5-11 because he sent a letter to Regnery and the law does not require "any particularized demand." (Opp. at 60.) Notably, Plaintiff does not point to any statement in the letter that actually demands retraction – because there is none. (*See* Doc. 54 at Ex. A.) And the lone case cited by Plaintiff says only that the statute "does not require that the *defendant* meet any particularized demand," not that plaintiff does not have to demand a retraction. *Bell*, *LLC*, 2018 WL 357888, at *7 (emphasis added).  Plaintiff did not actually request a retraction from Regnery, so he cannot recover punitive damages from it. O.C.G.A. § 51-5-11; *Mathis v. Cannon*, 276 Ga. 16, 29 (2002).

## CONCLUSION

For the reasons set forth above and in their initial brief, the FAC fails to state a claim against Salem or Regnery, and it should be dismissed in its entirety.

Respectfully submitted this 8th day of May, 2023.

<div style="margin-left: 40%">

*/s/ S. Derek Bauer*
S. DEREK BAUER
Georgia Bar No. 042537
dbauer@bakerlaw.com

</div>

4855-0037-7695.6

IAN K. BYRNSIDE
Georgia Bar No. 167521
ibyrnside@bakerlaw.com
KRISTEN RASMUSSEN
Georgia Bar No. 135018
krasmussen@bakerlaw.com
JACQUELINE T. MENK
Georgia Bar No. 728365
jmenk@bakerlaw.com
GEORGIA L. BENNETT
Georgia Bar No. 495910
gbennett@bakerlaw.com

**BAKER & HOSTETLER LLP**
1170 Peachtree Street, NE, Suite 2400
Atlanta, Georgia 30309-7676
Telephone: (404) 459-0050
Facsimile: (404) 459-5734

*Attorneys for Defendants*
*Salem Media Group, Inc.*
*and Regnery Publishing, Inc.*

31

## **RULE 7.1(D) CERTIFICATE**

The undersigned counsel certifies that this document has been prepared with

Times New Roman 14-point font in accordance with Local Rule 5.1.C.

This 8th day of May, 2023.

/s/ S. Derek Bauer
S. DEREK BAUER
Georgia Bar No. 042537

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the within and foregoing **REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANTS SALEM MEDIA GROUP INC.'S AND REGNERY PUBLISHING, INC.'S MOTION TO DISMISS** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record:

> Von A. DuBose
> DuBose Miller, LLC
> 75 14th Street NE, Suite 2110
> Atlanta, GA 30309
> dubose@dubosemiller.com

> Sarah Chimene-Weiss
> Protect Democracy Project
> 7000 N. 16th Street, Suite 120, #430
> Phoenix, AZ 85020
> Sara.chimene-weiss@protectdemocracy.org

> Rachel F. Homer
> Protect Democracy Project
> 2020 Pennsylvania Avenue NW, #163
> Washington, DC 20006
> Rachel.homer@protectdemocracy.org

> Rachel E. Goodman
> John Paredes
> Protect Democracy Project
> 82 Nassau Street, #601
> New York, NY 10038
> Rachel.goodman@protectdemocracy.org

33

John.paredes@protectdemocracy.org

Jared Fletcher Davidson
Protect Democracy Project
3014 Dauphine Street, Suite J
New Orleans, LA 70117
Jared.davidson@protectdemocracy.org

Lea Haber Kuck
One Manhattan West
New York, NY 10001-8602
Lea.kuck@probonolaw.com

Rajiv Madan
Paige Braddy
1440 New York Avenue NW
Washington, DC 20005
Raj.madan@probonolaw.com
Paige.braddy@probonolaw.com

Vernon Thomas
155 N. Wacker Drive
Chicago, IL 60606-1720
Vernon.thomas@probonolaw.com

Amanda Hyland
Taylor English Duma LLP
Suite 200, 1600 Parkwood Circle
Atlanta, GA 30339
ahyland@taylorenglish.com

Joseph R. Larsen
Michael John Wynne
Gregor Wynee Arney, PLLC
909 Fannin Street, Suite 3800
Houston, TX 77010
jlarsen@grfirm.com

mwynne@gwafirm.com

Molly Hiland Parmer
Parmer Law
1201 West Peachtree St. Suite 2300
Atlanta, GA 30309
Molly@Parmer.Law

Cameron Powell
Gregor Wynne Arney, PLLC
301 Massachusetts Ave. NW, Suite 1203
Washington, DC 20002
cpowell@gwafirm.com

This 8th day of May, 2023.

/s/ S. Derek Bauer
S. DEREK BAUER
Georgia Bar No. 042537

35