# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| MARK ANDREWS, | |
| *Plaintiff,* | |
| v. | |
| DINESH D'SOUZA, TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, GREGG PHILLIPS, D'SOUZA MEDIA LLC, SALEM MEDIA GROUP, INC., REGENERY PUBLISHING, INC. and JOHN DOES, | Case No.  1:22-cv-04259-SDG |
| *Defendants.* | |

## BRIEF OF *AMICUS CURIAE* CAMPAIGN LEGAL CENTER IN SUPPORT OF PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................. i

TABLE OF AUTHORITIES ........................................................................... ii

AMICUS CURIAE'S IDENTITY, INTERESTS, & AUTHORITY TO FILE .............. v

INTRODUCTION ......................................................................................... 1

ARGUMENT ............................................................................................... 2

I.   Section 1985(3)'s Broad Text Creates Substantive Rights to Protect Voters from Injury and Intimidation ................................................................. 2

   A.  The Section 1985(3) support-or-advocacy clauses provide their own substantive rights, including freedom from intimidation............................... 6

   B.  The scope and definition of intimidation covers Defendants' alleged conduct comprising the conspiracy .................................................... 11

   C.  The support-and-advocacy clauses do not require proving discriminatory animus or specific intent to prevent voting......................... 17

II.  The First Amendment does not shield Defendants from liability .................... 22

CONCLUSION.......................................................................................... 25

LOCAL RULE 7.1(D) CERTIFICATION ......................................................... 27

CERTIFICATE OF SERVICE ........................................................................ 28

## TABLE OF AUTHORITIES

Case     Page

*Allen v. City of Graham*, No. 1:20-cv-997, 2021 WL 2223772
(M.D.N.C. June 2, 2021) ..................................................................... 5

*Arizona Alliance for Retired Americans v. Clean Elections USA*,
No. 22-cv-01823, 2022 WL 17088041 (D. Ariz. Nov. 1, 2022) ..................... 5, 16

*Blassingame v. Trump*, No. 2:21-cv-858 (D.D.C. 2021) ..................................... v

*Bonner v. City of Prichard, Alabama*, 661 F.2d 1206 (11th Cir. 1981) ................... 9

*Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020) ............................ 6

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) .................. 8, 19, 21

*Carter v. United States*, 530 U.S. 255 (2000) ............................................. 20

*Cervini v. Cisneros*, 593 F. Supp. 3d 530 (W.D. Tex. 2022) ....................... v, 5, 9, 10, 21

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) ...................................... 23

*Cockrum v. Donald J. Trump for President, Inc.*, No. 3:18-cv-00484
(E.D. Va. 2019) ................................................................................ v

*Colorado Montana Wyoming State Area Conf. of NAACP v. United States Election
Integrity Plan*, No. 1:22-cv-00581, 2023 WL 1338676 (D. Colo. Jan. 31, 2023) ...... 5

*Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) ...................... 11

*Daschle v. Thune*, No. 04-cv-4177 (D.S.D. Nov. 2, 2004) ........................... 16, 23

*Delaware v. Pennsylvania*, No. 22-0145, 598 U.S. __ (2023) .......................... 21

*Democratic National Committee v. Republican National Committee*,
673 F.3d 192 (3d Cir. 2012) ................................................................ 16

*Dickerson v. Alachua County Commission*, 200 F.3d 761 (11th Cir. 2000) ............. 9

*Elonis v. United States*, 575 U.S. 723 (2015) ............................................ 25

*Ex Parte Yarbrough (The Ku Klux Cases)*, 110 U.S. 651 (1884) ....................... 19

*Fair Fight, Inc. v. True The Vote*, No. 2:20-cv-00302
(N.D. Ga. Mar. 9, 2023) ............................................................... 14, 17

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ...................................... 26

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) ................................................. v

*Great American Federal Savings & Loan Association v. Novotny*,
442 U.S. 366 (1979) ........................................................................... 7

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) ....................................... 6, 7, 8, 19, 21

*Halprin v. Prairie Single Family Homes of Dearborn Park Association*,
388 F.3d 327 (7th Cir. 2004) .............................................................. 15

*Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833 (2018) ......................... v

*In re Sealed Search Warrant*, No. 22-8332-BER, 2022 WL 3582450
(S.D. Fla. Aug. 22, 2022) ................................................................... 12

*Jones v. DeSantis*, 975 F.3d 1016 (11th Cir. 2020) ............................................................ v

*Kush v. Rutledge*, 460 U.S. 719 (1983) ........................................................ 2, 8, 19, 22

*LULAC v. Public Interest Legal Foundation*, No. 1:18-cv-00423
(E.D. Va. 2018).......................................................................................... v, 5, 17

*McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031 (11th Cir. 2000)........................ 13

*McCord v. Bailey*, 636 F.2d 606 (D.C. Cir. 1980)........................................... 1, 5, 22

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) .................................... 24

*Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018)...................................... 26

*National Coalition on Black Civic Participation v. Wohl*, 2023 WL 2403012
(S.D.N.Y. Mar. 8, 2023) ("*NCBCP III*") ........................ 4, 5, 9, 16, 21, 23, 25, 26, 27

*National Coalition on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500
(S.D.N.Y. 2021) ("*NCBCP II*") ......................................................................... 16, 17

*National Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457
(S.D.N.Y. 2020) ("*NCBCP I*") .......................................................................... 24

*North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204
(4th Cir. 2016)........................................................................................... 11

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon General, Florida Dep't of Health*,
50 F.4th 1126 (11th Cir. 2022) ..................................................................... 26, 27

*Paynes v. Lee*, 377 F.2d 61 (5th Cir. 1967)................................................................ 9, 20

*People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725 (E.D. Va. 1992)............... 15

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979) .................. 16

*Reno v. Bossier Parish School Board*, 520 U.S. 471 (1997) ......................................... 16

*Silverman v. Newspaper & Mail Deliverers' Union of N.Y. and Vicinity*,
No. 97-cv-040, 1999 WL 893398 (S.D.N.Y. Oct. 18, 1999)............................... 13, 14

*Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329 (7th Cir. 1977) ......................................... 5, 22

*Swalwell v. Trump*, No. 2:21-cv-586 (D.D.C. 2021) ....................................................... v

*Thompson v. Trump*, No. 2.21-cv-400 (D.D.C. 2021) ..................................................... v

*United Brotherhood Of Carpenters and Joiners of America, Local 610, AFL-CIO, et al. v.
Scott*, 463 U.S. 825 (1983) ........................................................................... 7

*United States v. Alvarez*, 567 U.S. 709 (2012) ........................................................... 26

*United States v. Beaty*, 288 F.2d 653 (6th Cir. 1961) .................................................. 15

*United States v. Bruce*, 353 F.2d 474 (5th Cir. 1965) .................................................. 15

*United States v. Clark*, 249 F. Supp. 720 (S.D. Ala. 1965) ........................................ 10, 15

*United States v. Deal*, 6 Race Rel. L. Rep. 474 (W.D. La. 1961)................................ 15

*United States v. Fleury*, 20 F.4th 1353 (11th Cir. 2021)............................................. 25

*United States v. Graham*, 931 F.2d 1442 (11th Cir. 1991) .......................................... 13

*United States v. Harrison*, 56 F.4th 1325 (11th Cir. 2023) .......................................... 13

*United States v. Hicks*, 980 F.2d 963 (5th Cir. 1992) ............................... 13, 16
*United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967) ................................ 10
*United States v. Tan Duc Nguyen*, 673 F.3d 1259 (9th Cir. 2012) ..................... 16
*United States v. Wood*, 295 F.2d 772 (5th Cir. 1961) .................................. 15
*U.S. by Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330
    (E.D. La. 1965) ...................................................................... 15
*Vangheluwe v. Got News, LLC*, 365 F. Supp. 3d 850 (E.D. Mich. 2019) ................... 12
*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) ....................................... v
*Virginia v. Black*, 538 U.S. 343 (2003)................................................ 25
*Weaver v. Bonner*, 309 F.3d 1312 (11th Cir. 2002) ..................................... 26

**Statutes**

42 U.S.C. § 1985(1) .................................................................. v, 22
42 U.S.C. § 1985(2) .............................................................. 13, 14, 22
42 U.S.C. § 1985(3) ..................................................... v, 2, 3, 6, 7, 8, 9, 10, 11
42 U.S.C. § 3617 ...................................................................... 15
52 U.S.C. § 10101(b) .................................................................. 19
52 U.S.C. § 10307(b) .................................................................. 14

**Other Authorities**

Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter
    Intimidation*, 39 N.Y.U. Rev. L. & Soc. Change 173 (2015)....................... 6, 12, 14
*Dox*, Merriam-Webster Dictionary (Feb. 21, 2023), www.merriam-
    webster.com/dictionary/dox .......................................................... 11
Eric Foner, Reconstruction: America's Unfinished Revolution 425
    (2d ed. 2014) ...................................................................... 1, 22
J. Gerald Hebert & Armand Derfner, *Voting Is Speech*,
    34 Yale L. & Pol'y Rev. 471 (2016)................................................ 10, 24
Nicholas Stephanopoulos, *The Sweep of the Electoral Power*,
    36 Const. Comment 1 (2021) .......................................................... 19
Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*, 89
    Fordham L. Rev. 145 (2020) ...................................................... 6, 8, 19
*The Support or Advocacy Clause of § 1985(3)*, 133 Harv. L. Rev. 1382 (2020) ............ 6
U.S. Dep't of Just., Federal Prosecution of Election Offenses (8th ed. 2017),
    https://www.justice.gov/criminal/file/1029066/download........................... 13

## AMICUS CURIAE'S IDENTITY, INTERESTS, & AUTHORITY TO FILE

*Amicus curiae* Campaign Legal Center ("CLC") is a nonpartisan, nonprofit organization that has been working for nearly two decades to advance democracy through law. *Amicus* CLC has litigated several prominent voting rights cases, including as lead counsel in *Gill v. Whitford*, 138 S. Ct. 1916 (2018) (redistricting), *Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833 (2018) (NVRA), *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) (VRA), and *Jones v. DeSantis*, 975 F.3d 1016 (11th Cir. 2020) (en banc) (felony disenfranchisement law).

*Amicus* CLC also has expertise in voter intimidation claims. CLC, including through its affiliate CLC Action, has submitted *amicus curiae* briefs in numerous voter intimidation cases involving claims under 42 U.S.C. § 1985(3). *See, e.g.*, *Cervini v. Cisneros*, No. 1:21-cv-565 (W.D. Tex. 2022); *LULAC v. Public Interest Legal Foundation*, No. 1:18-cv-00423 (E.D. Va. 2018); *Cockrum v. Donald J. Trump for President, Inc.*, No. 3:18-cv-00484 (E.D. Va. 2019). And it has filed *amicus curiae* briefs involving analogous 42 U.S.C. § 1985(1) claims. *See Blassingame v. Trump*, No. 2:21-cv-858 (D.D.C. 2021); *Thompson v. Trump*, No. 2.21-cv-400 (D.D.C. 2021); *Swalwell v. Trump*, No. 2:21-cv-586 (D.D.C. 2021). CLC has a demonstrated interest in the interpretation of laws, such as Section 1985(3), that protect voters and the proper functioning of democracy.

## INTRODUCTION

Congress enacted the Ku Klux Klan ("KKK") Act in 1871 to address the "wave of counterrevolutionary terror" that swept over the South during the Reconstruction Era.[1] To suppress newly empowered Black voters, their allies, and the candidates they supported, vigilante groups in the postbellum South banded together to publicly expose their political opponents and subject them to harassment and violence. These attacks were widespread, and Southern state governments either acquiesced to this chaos or were too overwhelmed to counteract it. The federal government lacked the tools to ensure free political advocacy and protect the proper functioning of the democratic process. The KKK Act, codified in part at 42 U.S.C. § 1985, was the answer.

The KKK Act remains the answer for addressing threats of political violence and intimidation today. Plaintiff alleges that Defendants engaged in the type of harassing conduct that Congress designed the KKK Act to prevent. The rise in violence and intimidation that marks today's political environment has taken new forms. Using tactics like doxing, misinformation, and harassing multimedia campaigns, groups today can instill fear and suppress political activity without

---

[1] Eric Foner, Reconstruction: America's Unfinished Revolution 425 (2d ed. 2014); *see also McCord v. Bailey*, 636 F.2d 606, 615 (D.C. Cir. 1980) (summarizing history).

resorting to the direct violence of the past. The KKK Act's protections of voters apply just as forcefully here as they did in their original context 150 years ago.

## ARGUMENT

*Amicus* CLC submits this brief to clarify the proper interpretation of the support-or-advocacy clauses of 42 U.S.C. § 1985(3). *Amicus* CLC lays out the elements of such claims in several respects that Defendants misapprehend, including that support-or-advocacy plaintiffs need not establish a violation of a separate constitutional right, be restricted to a narrow conception of intimidation, or prove discriminatory animus or specific intent to stop the plaintiff from voting.

### I.    Section 1985(3)'s Broad Text Creates Substantive Rights to Protect Voters from Injury and Intimidation.

Congress designed Section 1985(3) to function as a comprehensive federal protection against political violence and intimidation. Although "[t]he length and style" of the statute "make[s] it somewhat difficult to parse[,]" "its meaning becomes clear" if "its several components are carefully identified." *Kush v. Rutledge*, 460 U.S. 719, 724 (1983). Breaking down the text shows the statute creates two categories of prohibitions, each containing a set of two unlawful conspiracies.

First, the KKK Act prevents conspiracies to violate equality under federal law. It prohibits efforts to "conspire" either (1) "for the purpose of depriving, either directly or indirectly, any person or class of persons of the *equal protection of*

2

*the laws*, or of equal privileges and immunities under the laws; *or*" (2) "for the purpose of preventing or hindering" state officials "from giving or securing to all persons … the *equal protection of the laws*." 42 U.S.C. § 1985(3) (emphases added).

Second, and separately, it creates substantive rights proscribing conspiracies to harm voters related to their support or advocacy of a federal candidate. It prohibits any conspiracy to either (1) "prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his *support or advocacy* … in favor of the election of [a federal candidate] *or*" (2) "to injure any citizen in person or property on account of such *support or advocacy*." *Id.* (emphases added). In a final clause, the statute provides that "in any case of conspiracy set forth in this section," if a conspirator acts "whereby another is injured in his person or property, *or* deprived of having and exercising any right or privilege of a citizen of the United States, *the party so injured or deprived may have an action* for the recovery of damages occasioned by such injury." *Id.* (emphases added).

The first set of conspiracies are the KKK Act's equal protection clauses, which prohibit conspiracies to violate equality in separately guaranteed rights. The second set of conspiracies, relevant here, are the KKK Act's support-or-advocacy clauses, which prohibit conspiracies to injure or intimidate those supporting or advocating for candidates in federal elections. They omit any

language concerning "for the purpose of" or "equal protection" because, as described below, they require proof of neither discrimination nor specific intent. The final clause provides the KKK Act's cause of action, empowering any party injured "in person or property" by the prohibited conspiracy to recover damages from any co-conspirator. *Id.* The elements for claims under the support-or-advocacy clauses are (1) defendants entered into a prohibited conspiracy based on either intimidation or injury related to the plaintiff's lawful federal political activity, (2) the defendant acted to further the conspiracy, and (3) the plaintiff was injured in person or property as a result. *See, e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, 2023 WL 2403012 (S.D.N.Y. Mar. 8, 2023) ("*NCBCP III*").

Congress designed the support-or-advocacy clauses to have the broad application necessary to address a dire threat to the proper functioning of the democratic process. In 1871, President Grant urged Congress to pass the law so the federal government could quell the severe "condition of affairs" in the postbellum South that "render[ed] life and property insecure" in the country. Cong. Globe, 42d Cong., 1st Sess. 236, 244 (1871) (legislative history included in Ex. A). Congress compiled an extensive record detailing the rampant terror and intimidation that swept the country during the Reconstruction Era, *see, e.g.*, *id.* 245-48, 320-21, 369, 374, 428, 436, with one leading lawmaker summarizing that

"lawless bands of men … have been roaming over the country independent and unchallenged, committing these atrocities, without fear of punishment, cheered by their neighbors, and despising your laws and your authority." *Id.* at 820 (Sen. Sherman). Congress was "called upon to legislate in regard to these matters," *id.*, and answered by enacting the KKK Act, "creat[ing] a broad remedy to address [its] broad concerns" of attacks on democracy. *McCord*, 636 F.2d at 615.

This broad remedy vindicates violations of the KKK Act in a range of modern contexts that are distinct from, but consistent with, the statute's historical origin. Indeed, that was part of Congress's design—to "use the lesson of a particular historical period as the catalyst for a law of more general application" for the future. *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1335 (7th Cir. 1977). Thus, in response to rising political violence and intimidation, courts have confirmed that KKK Act claims are cognizable to prevent modern electoral harassment.[2]

---

[2] *See, e.g.*, *NCBCP III*, 2023 WL 2403012 (intimidating robocalls); *Colorado Montana Wyoming State Area Conf. of NAACP v. United States Election Integrity Plan*, No. 1:22-CV-00581, 2023 WL 1338676, at *6 (D. Colo. Jan. 31, 2023) (canvasser intimidation programs); *AARA v. Clean Elections USA*, 2022 WL 17088041 (D. Ariz. Nov. 1, 2022) (drop box intimidation); *Cervini v. Cisneros*, 593 F. Supp. 3d 530 (W.D. Tex. 2022) (targeting campaign workers); *LULAC v. Pub. Int. Legal Found.*, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) (doxing, harassment, and fraud accusations); *accord Allen v. City of Graham*, No. 1:20-cv-997, 2021 WL 2223772 (M.D.N.C. June 2, 2021) (excessive force against voter march).

Congress's sweeping statutory design thus applies with equal force to address the kind of injuries that Defendants are alleged to have caused here. The text, structure, and history of Section 1985(3) confirm this application, and as with all "Reconstruction civil rights statutes," the Court should "accord [the statute] a sweep as broad as [its] language." *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971) (citation omitted); *accord Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1747 (2020) (instructing "courts [to] apply the broad rule" when the text so dictates).

### A. The Section 1985(3) support-or-advocacy clauses provide their own substantive rights, including freedom from intimidation.

The Section 1985(3) support-or-advocacy clauses establish their own substantive protections against conspiracies to (1) intimidate any citizens from supporting or advocating for federal candidates, or (2) injure citizens in person or property related to such support or advocacy. Unlike the statute's equal protection clauses, claims under the support-or-advocacy clauses do not require plaintiffs to identify a discriminatory violation of a separately guaranteed civil right.[3] These

---

[3] *See also* Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*, 89 FORDHAM L. REV. 145, 154 (2020) (summarizing differences between clauses); Note, *The Support or Advocacy Clause of § 1985(3)*, 133 HARV. L. REV. 1382, 1387 (2020) (same); Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. REV. L. & SOC. CHANGE 173, 203-04 (2015) (same).

parts of Section 1985(3) *themselves* give plaintiffs substantive rights to be free from conspiracies to hinder their support for a federal candidate.

Defendants misconstrue the statute on this issue. They claim that support-or-advocacy plaintiffs must prove a conspiracy "to deprive him of his civil rights" established elsewhere in law, and even more specifically that the conspiracy "prevented [him] from voting." Salem MTD at 7, 9. But neither is a requirement.

*First*, unlike for a KKK Act claim under the equal protection clauses, support-or-advocacy claims do not require proof that the conspiracy implicate a separate civil right. Based on their text, the equal protection clauses "provide[] no substantive rights [them]sel[ves]." *Great American Fed. S. & L. Ass'n v. Novotny*, 442 U.S. 366, 372 (1979). Claims under those clauses must therefore vindicate the deprivation of rights based in either "equal protection of the laws" or "equal privileges and immunities" that have their substantive basis "found elsewhere." *United Bhd. Of Carpenters Local 610 v. Scott*, 463 U.S. 825, 833 (1983). Accordingly, under the test established in *Griffin*, plaintiffs pursuing an equal protection clauses claim must allege: (1) a violation of an independent right, such as the right to vote protected in, e.g., the First, Fourteenth, and Fifteenth Amendments; (2) a "racial,

or perhaps otherwise class-based" deprivation of that right; and (3) often (but not always) state action. *Griffin*, 403 U.S. at 102; *accord Carpenters*, 463 U.S. at 834-35.[4]

None of these elements apply to support-or-advocacy claims, which have markedly different text and purpose. The Supreme Court has explicitly recognized that Section 1985(3)'s equal protection clauses diverge from other parts of the statute, declining to apply interpretations limiting the coverage of those provisions to the KKK Act generally. *See Kush*, 460 U.S. at 724-26. It has carefully stated that the *Griffin* analysis concerns "the first clause of § 1985(3)," without reaching the third and fourth. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267 (1993); *see also Griffin*, 403 U.S. at 102 n.9. Thus, the separate civil right element of the equal protection clauses does not apply to support-or-advocacy claims, which "relate[] to institutions and processes of" federal government and seek to independently secure "the right to support candidates in federal elections." *Kush*, 460 U.S. at 724.

---

[4] Although the *Novotny* decision imprecisely described this *Griffin* test as the "criteria for measuring whether a complaint states a cause of action under § 1985(3)," *id*. at 372, it did not at all discuss the support-or-advocacy clauses, *see id*. at 370-72. Neither did the dissent, which discussed only the meaning of the "equal privileges and immunities under the laws" portions of Section 1985(3). *See id*. at 388-90 (White, J., dissenting). Indeed, much of the confusion concerning the jurisprudence involving Section 1985(3) stems from courts referencing the general section number as a shorthand for a particular provision because Congress's arcane drafting conventions from 1871 breaks down the statute's distinct provisions into separate clauses rather than citable subsections. *See* Primus & Kistler, *supra* n.3, at 184-89.

Support-or-advocacy clauses caselaw makes this clear. As the Fifth Circuit stated in *Paynes v. Lee*, those claims offer broader protections that are "something more and something different" from the equal protection clauses because they effectuate "the specific attention of Congress which has provided a specific remedy for interference by private individuals" of the rights of voters to engage in political activity. 377 F.2d 61, 64 (5th Cir. 1967).[5] Numerous district courts agree, ruling that the support-or-advocacy clauses create independent, substantive rights enforced through Section 1985(3)'s cause of action. *See LULAC*, 2018 WL 3848404, at *4-6; *NCBCP III*, 2023 WL 2403012, at *30; *Cervini*, 593 F. Supp. 3d at 539.

Defendants' contrary reliance on *Dickerson v. Alachua Cty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000), is misplaced. Salem MTD at 7. *Dickerson* concerned an equal protection clauses claim, and the plaintiff argued the conspiracy involved discrimination that implicated her Fourteenth Amendment rights. 200 F.3d at 766-67. Given the differences between the KKK Act clauses, here "[t]he inquiry … is not whether the defendants have transgressed the Constitution" but rather "whether they have violated the statute" that provides its own substantive rights

---

[5] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (former Fifth Circuit decisions prior to October 1, 1981 are binding in the Eleventh Circuit).

against intimidation and injury. *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) (Wisdom., J.) (analyzing analogous voter intimidation protections).

*Second*, support-or-advocacy claims do not require showing that Defendants actually "prevented [the plaintiff] from voting" or that he would be stopped from "vot[ing] in the future." *Cf.* Salem MTD at 9; TTV MTD at 23. Whether the voter is blocked from actually effectuating their support or advocacy is irrelevant under the text. Rather, the clauses prohibit conspiracies that either (1) use "force, intimidation, or threat" to "prevent … any citizen … from giving his *support or advocacy* … in favor of the election of [a federal candidate] *or*" (2) "injure any citizen in person or property on account of such *support or advocacy*." 42 U.S.C. § 1985(3). These prohibitions extend beyond only casting a ballot, including the numerous ways in which voters support federal candidates by engaging within the electoral process and through political advocacy. *See LULAC*, 2018 WL 3848404, at *1 (registration); *Cervini*, 593 F. Supp. 3d at 539 (campaigning); *see also* J. Gerald Hebert & Armand Derfner, *Voting Is Speech*, 34 Yale L. & Pol'y Rev. 471, 473 (2016).

The statute proscribes even unsuccessful attempts to interfere with support or advocacy so long as the conspiracy makes the voter "injured in his person or property." 42 U.S.C. § 1985(3); *accord United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965). Defendants' assertions that a claim arises only concerning voting

itself, and only if the person is prevented from voting, are baseless. Indeed, not even the direct constitutional and statutory protections of the right to vote "require[] such an onerous showing." *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 232 (4th Cir. 2016) (applying Fourteenth Amendment and VRA section 2 protections); *see also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (ruling that even minimal burdens on voting "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation'").

Thus, claims under the support-or-advocacy clauses create substantive rights that the statute enforces, broadly protecting voters from being intimidating or otherwise injured related to their political activity.

### B.    The scope and definition of intimidation covers Defendants' alleged conduct comprising the conspiracy.

The prohibition of "intimidation" in clause three[6] of Section 1985(3) covers Defendants' alleged conduct targeting and doxing Plaintiff and subjecting him to inevitable harassment, threats, and reputational harm.[7] Defendants invent a

---

[6] Defendants' misreading of the support-or-advocacy provisions also overlooks clause four that prohibits injury apart from intimidation. *See* Salem MTD at 8-9; TTV MTD at 24-26. Accordingly, *Amicus* CLC does not address this separate claim.
[7] "Doxing" is generally understood to mean "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge." *Dox*, Merriam-Webster Dictionary (Feb. 21, 2023), www.merriam-webster.com/dictionary/dox. Courts have applied the term to mean broadcasting

narrow definition of intimidation that is inconsistent with the proper reading of the text, statutory structure, and precedent. *See, e.g.*, Salem MTD at 8-9; TTV MTD at 2-4. Plaintiff's allegations fit the accepted broad understanding of intimidation as used in Section 1985(3). *See* FAC ¶¶ 3-7, 10-11, 13, 37-41, 48, 49-50, 56, 199-213.

*First*, the meaning of "intimidation" in the support-or-advocacy clauses is confirmed in contemporaneous dictionary definitions at the KKK Act's enactment. The 1867 Webster's Dictionary defined "intimidate" as "[t]o make fearful; to inspire with fear." Noah Webster, *An American Dictionary of the English Language* 555 (1867) (Ex. B). Critically, this accepted definition of "intimidate" does not limit the method of intimidation, whether physical violence, psychological coercion, or otherwise. Numerous additional Reconstruction Era dictionaries attributed similar recipient-oriented meaning to the word. Cady & Glazer, *supra* n.3, at 196 (detailing definitions). Thus, the reference to intimidation is instead focused on the reaction that the conduct induces in the person being intimidated. [8]

---

information for a person to "be quickly and broadly identified over social media and other communication channels, which could lead to them being harassed and intimidated." *In re Sealed Search Warrant*, No. 22-8332-BER, 2022 WL 3582450, at *4 (S.D. Fla. Aug. 22, 2022); *see also Vangheluwe v. Got News, LLC*, 365 F. Supp. 3d 850, 859 (E.D. Mich. 2019).

[8] The U.S. Department of Justice similarly defines voter intimidation as efforts to "deter or influence voting activity through threats to deprive voters of something they already have, such as jobs, government benefits, or, in extreme cases, their

This definition also follows "the most commonly understood 'dictionary' definition of 'intimidate'" today, meaning "to place a person in fear." *United States v. Hicks*, 980 F.2d 963, 973 (5th Cir. 1992); *see also United States v. Graham*, 931 F.2d 1442, 1442 (11th Cir. 1991) (defining intimidation as acts that reasonably "put another in fear"). And it adheres to the definition of intimidation employed in Georgia caselaw to mean placing a person in "terror likely to create an apprehension of danger." *United States v. Harrison*, 56 F.4th 1325, 1336 (11th Cir. 2023) (quoting *State v. Epps*, 267 Ga. 175, 476 S.E.2d 579, 580 (1996)). Thus, the meaning of "intimidate" as it has been understood from the Reconstruction Era to the present focuses on the reasonable reaction of the victim(s) being put in fear.

*Second,* the statutory structure and use of "intimidation" elsewhere in the KKK Act supports this meaning. The term is identically used in 42 U.S.C. § 1985(2), a KKK Act provision that bars conspiracies to intimidate parties or witnesses in connection with legal proceedings. In interpreting that section, courts have held that the conspiracy victim's emotional harm, not merely physical injury or distress, gives rise to a claim for witness intimidation. *See McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1034 (11th Cir. 2000); *Silverman v. Newspaper & Mail Deliverers'*

---

personal safety." U.S. Dep't of Just., Federal Prosecution of Election Offenses at 49-50 (8th ed. 2017), https://www.justice.gov/criminal/file/1029066/download.

*Union of N.Y. and Vicinity*, No. 97-cv-040, <u>1999 WL 893398</u>, at *4 (S.D.N.Y. Oct. 18, 1999). The *Silverman* Court, for example, explained that although the KKK Act sought in part "to address physical intimidation," this "was not the only goal of the statute." *Id*. Section 1985(2)'s use of "intimidation" meant the provision was "also designed to address improper interference with the judicial process" apart from physical attacks, and plaintiffs could bring a claim alleging other types of interference "with the witness' ability to give 'free, full and truthful testimony' in federal court." *Id*. This expansive definition of intimidation informs the meaning of its identical usage in the support-or-advocacy clause three.

The interpretation of "intimidation" as used in related civil rights statutes also favors this definition. *See* Cady & Glazer, *supra* n.3, at 193-202. For example, a court in this district recently examined the meaning of "intimidation" in Section 11(b) of the VRA, <u>52 U.S.C. § 10307(b)</u>. *Fair Fight, Inc. v. True The Vote*, No. 2:20-cv-00302, slip op. at 16-18 (N.D. Ga. Ma<u>r. 9</u>, <u>2023)</u>, <u>Dkt. 222</u>. The *Fair Fight* Court noted that the inquiry is context-dependent, "considering the totality of the circumstances." *Id*. at 16. The court ruled that for conduct to amount to intimidation, it must reasonably place the voter in fear, which does not "need[] to be [an] onerous" requirement because "Defendants' actions need only be connected to the voters feeling (or potentially feeling) intimidated." *Id*. at 25.

Likewise, courts have ruled that the prohibited intimidation under Section 131(b) of the Civil Rights Act of 1957 encompasses emotional harassment and other types of coercion beyond intended violent threats.[9] Courts have ruled similarly concerning the fair housing statute barring intimidation. 42 U.S.C. § 3617.[10] These interpretations reveal that the term "intimidation" as used in civil rights law reaches a wide range of conduct and is focused on the reasonable reaction of the receiving person. Section 1985(3)'s support-or-advocacy clauses are no exception, and Defendants' circumscribed view of what counts as intimidation must fail. *See, e.g.*, Salem MTD at 8-9; TTV MTD at 2-4.

*Third*, persuasive authority evaluating "intimidation" in other support-or-advocacy clause cases confirms that the statute focuses on the state of fear reasonably imparted on the targeted person. These actions include falsely publicizing that lawful voters are ineligible or proper voting methods are

---

[9] *See McCleod*, 385 F.2d at 740-41 (baseless arrests and unjustified prosecutions); *United States v. Wood*, 295 F.2d 772, 780 (5th Cir. 1961) (same); *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (same); *U.S. by Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 341, 355 (E.D. La. 1965) (economic coercion and character assassination); *United States v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961) (economic coercion); *United States v. Bruce*, 353 F.2d 474 (5th Cir. 1965) (similar); *United States v. Deal*, 6 Race Rel. L. Rep. 474 (W.D. La. 1961) (similar).

[10] *See, e.g., Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004) (scrawling a racial slur on plaintiffs' property); *People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725, 733 (E.D. Va. 1992) (excessive investigations of a rental property).

unlawful, *LULAC*, 2018 WL 3848404 at *1, 4;  *AARA*, 2022 WL 17088041, at *1-2; making false statements about the consequences of voting or false suggestions that voters could be penalized, *NCBCP III*, 2023 WL 2403012, at *20-24; *accord United States v. Tan Duc Nguyen*, 673 F.3d 1259, 1265 (9th Cir. 2012); and monitoring voting and registration activities in an intimidating fashion, *AARA*, 2022 WL 17088041, at *1-2; *Daschle v. Thune* No. 04-cv-4177, Dkt. 6, at 2 (D.S.D. Nov. 2, 2004) (Ex. C).

Despite Defendants' claim, intimidation can occur indirectly, *Hicks*, 980 F.2d at 973, and where intimidators rely on third parties to effectuate their conduct. *NCBCP v. Wohl*, 512 F. Supp. 3d 500, 505 (S.D.N.Y. 2021); *see also DNC v. RNC*, 673 F.3d 192, 196 (3d Cir. 2012) (discussing consent decree that proscribed third-party intimidation). This is because "the impact of an … action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997); *see also Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 n.25 (1979) (explaining that "the foreseeability of consequences" raises a "strong inference that the adverse effects were desired"). As Plaintiff alleges, Defendants reasonably foresaw third parties threatening and harassing Plaintiff as a result of Defendants' alleged activity. FAC ¶¶ 156, 198, 213, 240-42. Thus, anti-intimidation statutes "generally attribute[] to Defendants the natural consequences of their actions" and Defendants cannot

escape liability merely because third parties further carried out the unlawful acts. *Fair Fight*, *supra*, slip op. at 24.

Two support-or-advocacy cases in particular have recognized that using technology and multimedia to harass voters, as Defendants are alleged to have done here, amounts to unlawful intimidation. In *LULAC v. PILF*, for example, the plaintiffs alleged that the defendants published reports claiming hundreds of Virginians voted unlawfully and doxing them by publishing their names, home addresses, and telephone numbers. *See* 2018 WL 3848404 at *1-2. The plaintiffs "report[ed] the detrimental impact of adverse publicity, intimidation, embarrassment, and fear of harassment associated with their participation in the electoral process" following the publication. *Id.* The court ruled that this amounted to intimidation because it "put [identified voters] in fear of harassment and interference with their" engagement in the political process. *Id.* at *4.

Similarly, in *NCBCP v. Wohl*, the defendants targeted Black voters with disinformation robocalls threatening that if voters participated by mail voting, that would inform police with warrants and debt collectors and would lead to government-mandated vaccines. 512 F. Supp. 3d at 505-07. The court ruled that the disinformation robocalls were intimidation because they imposed "a chilling

effect" that "plausibly 'put [voters] in fear of harassment and interference.'" *Id.* at 511 (quoting *LULAC,* 2018 WL 3848404 at *4).

Defendants' alleged conduct is squarely within the "actionable" intimidation recognized in these cases. *See id.* Plaintiff pleads that, as a result of being publicly broadcasted and targeted under the contrived narrative that he is a "mule" for unlawful ballots, he has been harassed, doxed, investigated for potential prosecution, threatened, and vilified. FAC ¶¶ 13, 38, 50, 56, 85, 147, 156 n.151, 157, 217, 239, 262, 272. Plaintiff plausibly alleges that he has been reasonably put in fear based on this treatment, which has also interfered with his participation in the political process by making him apprehensive about drop box voting. *Id.* ¶¶ 13, 216-18, 230-37, 243, 247. Thus, Plaintiff alleges that Defendants conspired to deter him from political activity by depriving him of his sense of personal safety— a clear case of intimidation under its accepted meaning in the KKK Act.

### C. The support-and-advocacy clauses do not require proving discriminatory animus or specific intent to prevent voting.

Defendants are also wrong that support-or-advocacy claims require any showing of discriminatory animus or the direct, specific intent to prevent a person from voting. *Cf.* Salem MTD 6-7; TTV MTD at 24. Defendants' contrary rule runs headlong into the provision's text, precedent, history, and structure.

*First,* the text establishes that proof of discrimination and specific intent are not elements of support-or-advocacy clauses claims, unlike under the equal protection clauses.[11] While the Section 1985(3) equal protection clauses speak in terms of protecting "equal" civil rights and evaluating the "purpose" driving the conspiracy, 42 U.S.C. § 1985(3), the support-or-advocacy clauses lack this "critical language," *see Kush*, 460 U.S. at 720.[12] Because of these textual differences, "there is no suggestion" that the equal protection clauses' limiting requirements to prove discrimination or specific intent apply to "any other portion of § 1985." *Id.* at 726; *see also Bray*, 506 U.S. at 268 & 281 n.13; *Griffin*, 403 U.S. at 102 & n.9.

Rather than focus on whether the unlawful act was "for the purpose of" blocking voting or discriminating, the analysis concerns whether the defendants made intentional acts to "conspire" in a manner that intimidates or otherwise injures "any citizen" related to their support or advocacy of a federal candidate.

---

[11] The lack of an animus element does not take the support-or-advocacy clauses outside the bounds of Congress's constitutional authority to regulate federal elections—including under the Elections Clause, Necessary and Proper Clause, and the Guarantee Clause, which provide Congress extensive "power to protect the elections on which its existence depends from violence[.]" *Ex Parte Yarbrough (The Ku Klux Cases)*, 110 U.S. 651, 658 (1884); *see also* Nicholas Stephanopoulos, *The Sweep of the Electoral Power*, 36 Const. Comment 1, 7-11, 35 (2021) (explaining constitutional basis); Primus & Kistler, *supra* n.3, at 164-70 (similar).

[12] The support-or-advocacy clauses' text materially differs from Section 131(b) because that statute has the "for the purpose of" language like the KKK Act equal protection clauses. 52 U.S.C. § 10101(b); *accord LULAC*, 2018 WL 3848404, at *4.

42 U.S.C. § 1985(3). It requires neither discriminatory purpose, nor specific intent to target a particular individual, nor a desire to completely block a person from voting. Rather, in the absence of this language, the level of intent required is tied to what the plaintiff must establish in order to prove the applicable conspiracy. Here, like in other statutes lacking specific intent language, the standard is "general intent"—that the defendants "possessed knowledge with respect to the *actus reus* of the" unlawful act. *Carter v. United States*, 530 U.S. 255, 268 (2000).

*Second*, precedent compels the same interpretation. In addition to the above Supreme Court cases repeatedly emphasizing that the limiting requirements of equal protection clauses claims do not apply more broadly, the former Fifth Circuit in *Paynes v. Lee* came to same result. *See* 377 F.2d at 63-65. The *Paynes* Court distinguished the KKK Act support-or-advocacy clauses from the equal protection clauses, holding that plaintiffs must only show that the conspiracy hindered their "right to be free from threatened harm" while engaging in the political process "and the right to be protected from violence for an attempted exercise of a voting right[.]" *Id.* at 64. Although the factual summary in *Paynes* noted that the conspirators were "two unknown white men" and the plaintiffs were Black, *id.* at 63, the Fifth Circuit made no use of those facts in resolving the case and did not discuss discrimination as a component of the analysis, *see id.* at 64-65.

Persuasive authority also supports that support-or-advocacy claims do not require proof of discrimination or specific intent to prevent an individual from voting. Numerous district courts have recently construed the statute and reached this conclusion. *See, e.g.*, *NCBCP III*, 2023 WL 2403012, at *29-31; *LULAC*, 2018 WL 3848404, at *5; *Cervini*, 593 F. Supp. 3d at 537. In *LULAC*, for example, the district court drew on the Supreme Court's reasoning in *Kush*, *Griffin*, and *Bray* to conclude that the support-or-advocacy clauses "do[] not require allegations of a race or class-based, invidiously discriminatory animus." 2018 WL 3848404, at *6. And in *NCBCP*, the Court specified that support-or-advocacy claims are the same as VRA Section 11(b) claims in this respect, and both do not require discriminatory animus or specific intent. *NCBCP III*, 2023 WL 2403012, at *22-24, *29-31.

*Third*, the legislative history and historical context of the statute reinforce that Congress intended the support-or-advocacy clauses to not require race discrimination or a narrow intent element. *See Delaware v. Pennsylvania*, No. 22-0145, 598 U.S. __ (2023) (slip. op., at 21) (considering legislative history that "may illuminate ambiguous text" (citation omitted)). Congress designed the KKK Act's protections to extend to "all the thirty-eight millions of the citizens of this nation" at that time. *Cong. Globe*, at 484 (Rep. Wilson). Race was not the focus of the support-or-advocacy clauses because the KKK's "reign of terror" is "exactly, as

they say, political," and the goal of the statute was to "secure free elections." *Id.* at 460 (Rep. Coburn). White voters who supported Black citizens and their preferred candidates—pejoratively called "scalawags"—did not "escape the violence" of the KKK's intimidation campaigns. Foner, *supra* n.1, at 427-28. As Representative Roberts summarized: "These acts of violence are not directed against colored citizens only … . [T]he victims whose property is destroyed, whose persons are mutilated, whose lives are sacrificed, are always Republicans. They may be black or white … but only Republicans." *Cong. Globe*, at 412-13. Thus, the KKK Act seeks to broadly protect political activity regardless of race because "[b]e they white or black, they must have free speech, a free ballot, and a safe home." *Id.* at 414.

*Fourth*, other KKK Act provisions that are more textually aligned with the support-or-advocacy clauses similarly diverge from the equal protection clauses. For instance, Section 1985(1), barring conspiracies against federal officials, and Section 1985(2), prohibiting conspiracies against witnesses and jurors, do not have equality or purpose-focused text. 42 U.S.C. §§ 1985(1); 1985(2). Courts therefore interpret those provisions to not contain the same discrimination and intent elements as the equal protection clauses claims. *See, e.g.*, *Stern*, 547 F.2d at 1339; *Kush*, 460 U.S. at 724-27; *McCord*, 636 F.2d at 614 & n.12.

Thus, the Section 1985(3) equal protection clauses are largely an outlier in the KKK Act apparatus because those clauses explicitly reference equality and purpose. The support-or-advocacy clauses lack that language, and Plaintiff need not prove discriminatory animus or specific intent to prevent him from voting.

## II. The First Amendment does not shield Defendants from liability.

Defendants cannot compel dismissal of the plaintiff's KKK Act (and other) claims by their categorical First Amendment defense. *Cf.* TTV MTD 22-44. First Amendment protections are not absolute. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942). Speech can be restricted under compelling circumstances, such as to prevent intimidation and protect the electoral process, or in narrow categories.

*First*, the alleged intimidating and harassing actions here leave Defendants no refuge in the First Amendment. That Defendants claim they sought "high-octane advocacy on a matter of intense public interest" is both irrelevant and understates the severity of the alleged conduct. *Cf.* TTV MTD at 5. There is no "political motivation exception" to voter intimidation liability. *See NCBCP III*, 2023 WL 2403012, at *24-29; *Daschle v. Thune*, No. 04-cv-4177, Dkt. 6 at 2 (D.S.D. Nov. 2, 2004) (Ex. C). In fact, voter intimidation will almost always have such motivations.

Accepting Defendants' categorical speech defense rule would negate that Plaintiff and other voters like him also have speech interests that Defendants

cannot trample through intimidation and harassment. By voting using a drop box, Plaintiff takes a stance on a politically contentious issue, which itself deserves utmost constitutional protection. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995); Hebert, *supra*, at 485-91. As alleged, Defendants seek to silence this viewpoint and anyone who acts upon it through doxing, intimidation, and threats of prosecution. Defendants' notion of an absolute constitutional right to engage in such behavior and suppress contrary speech is foreign to the First Amendment. It undermines the basic premise of that right that viewpoints will prevail because they are persuasive in the marketplace of ideas, not because one side can mount an intimidation campaign against another. The KKK Act and other anti-intimidation statutes serve to effectuate this premise by requiring that political discourse remain just that, and not one side promoting its ideas through the suppression and harassment of those who believe in others.

Thus, what Defendants downplay as "political hyperbole" and "a legitimate part of a core civic purpose" is instead an unlawful conspiracy under Section 1985(3). *Cf.* TTV MTD at 18. Their alleged intimidation "inflicts harm upon the broader public's interest in selecting elected officials through a free and fair process." *NCBCP I*, 498 F. Supp. 3d at 488. Participation in the conspiracy is not excused merely because an alleged conspirator had political or financial goals.

*Second*, categorical exceptions to the First Amendment's protections also may apply. Defendants' activity may be beyond free speech protection because it amounts to "true threats." *Virginia v. Black*, <u>538 U.S. 343, 359-60</u> (2003). This exception "protects individuals from the *fear of* violence and the disruption that fear engenders"—not only actual violence itself. *Id.* at 344 (emphasis added). "[W]hether or not the person making a threat intends to cause harm, the damage is the same." *Elonis v. United States*, <u>575 U.S. 723, 746</u> (2015) (Alito, J., concurring). Moreover, "non-physical injury likely falls within the purview of a 'true threat.'" *NCBCP III*, <u>2023 WL 2403012</u>, at *24 (citing *Virginia*, <u>538 U.S. at 359</u>). Such threats are evaluated in "the context of [the] entire course of conduct," and "the sheer number and frequency of the messages" is an important factor. *United States v. Fleury*, <u>20 F.4th 1353, 1365-66</u> (11th Cir. 2021). Because neither the specific intent to carry out the threat nor to make Plaintiff fearful is required, *id.* at 1372, Defendants' purported non-threatening motive is irrelevant. *Cf.* TTV MTD at 22. It is also impermissible to consider at the motion to dismiss stage given Plaintiff's plausible allegations that Defendants acted at least recklessly put Plaintiff in reasonable fear and subjected him to real threats of prosecution and investigation. FAC ¶¶ 39, 42-43, 74-75, 198.

Moreover, the types of "false statements" that Defendants are alleged to have made "are not entitled to the same level of First Amendment protection as truthful statements." *Weaver v. Bonner*, 309 F.3d 1312, 1319 (11th Cir. 2002); *accord United States v. Alvarez*, 567 U.S. 709, 732 (2012) (Breyer J., concurring). For instance, the First Amendment shields neither defamation, *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), nor "messages intended to mislead voters about requirements and procedures" concerning elections, *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1889 n.4 (2018). Both categories are applicable to Defendants' alleged activity.

Finally, the exception for speech integral to illegal conduct means that "making a course of conduct illegal is not an abridgment of freedom of speech … merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1135 (11th Cir. 2022) (quotation omitted). This exception extends to speech that is integral conduct prohibited by antidiscrimination or anti-intimidation statutes. *See id.* at 1136; *NCBCP III*, 2023 WL 2403012, at *26 (applying *Burson v. Freeman*, 504 U.S. 191, 206, 208 (1992)). This is because while such statutes may incidentally regulate speech, "the 'focal point' of their prohibitions is on the *act* of discriminating" or

intimidating, making them consistent with the First Amendment. *Norwegian Cruise*, 50 F.4th at 1136; *accord NCBCP III*, 2023 WL 2403012, at *26.

## **CONCLUSION**

For the above reasons, *Amicus* CLC urges the Court to deny Defendants' motions to dismiss and permit Plaintiff's properly pled KKK Act claim to proceed.


Dated: March 31, 2023                    Respectfully submitted,


/s/ *Katherine L. D'Ambrosio*            /s/ *Danielle Lang*
Katherine L. D'Ambrosio                  Danielle Lang* (DC Bar No. 1500218)
(Ga. Bar No. 780128)                     Hayden Johnson* (DC Bar No. 1671830)
COUNCILL, GUNNEMANN & CHALLY,            Kate Hamilton* (DC Bar No. 90006168)
LLC                                      Ellen Boettcher* (DC Bar No. 90005525)
One Atlantic Center                      CAMPAIGN LEGAL CENTER
1201 W. Peachtree St, NW, Ste 2613       1101 14th Street, NW, St. 400
Atlanta, GA 30309                        Washington, D.C. 20005
Tel: 404-407-5250                        Telephone: (202) 736-2200
Facsimile: 404-600-1624                  Facsimile: (202) 736-2222
kdambrosio@cgc-law.com                   dlang@campaignlegalcenter.org
                                         hjohnson@campaignlegalcenter.org
                                         khamilton@campaignlegalcenter.org
                                         eboettcher@campaignlegalcenter.org

                                         *Counsel for Amicus Curiae*
                                         *Campaign Legal Center*

                                         * Application for admission *pro hac vice*
                                         pending.

# CERTIFICATE OF COMPLIANCE

By signature below, counsel certifies that the foregoing document was prepared in Book Antiqua, 13-point font in compliance with Local Rule 5.1B.

Dated: March 31, 2023                    /s/ *Katherine L. D'Ambrosio*
                                         Katherine L. D'Ambrosio
                                         *Counsel for Amicus Curiae*
                                         *Campaign Legal Center*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: March 31, 2023                         <u>/s/ *Katherine L. D'Ambrosio*</u>
                                              Katherine L. D'Ambrosio
                                              *Counsel for Amicus Curiae*
                                              *Campaign Legal Center*