## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| MARK ANDREWS,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>DINESH D'SOUZA, TRUE THE VOTE, INC., CATHERINE ENGLEBRECHT, GREGG PHILLIPS, D'SOUZA MEDIA LLC, SALEM MEDIA GROUP, INC., REGNERY PUBLISHING, INC., and JOHN DOES,<br><br>　　　　　Defendants. | Case No. 1:22-CV-04259-SDG |

## TRUE THE VOTE DEFENDANT'S SUPPLEMENTAL BRIEF ON FIRST AMENDMENT ISSUES

### Introduction

Plaintiff's Response to the True the Vote Defendants' Motion to Dismiss (Dkt. 70 or "Response") essentially argues that there is no First Amendment restraint at all imposed on either the VRA or KKK Act. However, the Supreme Court recently rejected that position in *Counterman v. Colorado,* ___ S.Ct. ____, 2023 WL 4187751 (2023). Amicus Campaign Legal Center more squarely addresses the issues connected with the "true threat" exception to speech protected by the First Amendment, arguing that, legally, Plaintiff's allegations regarding Defendants' speech do constitute true threats. But Amicus' arguments — also rejected by *Counterman* — are that (1) only an objective examination of the alleged

true threat – that is, what a reasonable plaintiff would think - is constitutionally required, and (2) the purported true threat at issue does not need to consist of a threat of violence. Below we elaborate on how *Counterman* has rejected all these arguments so that (1) in intimidation cases, a plaintiff must plead not only that he or she was reasonable in his or her intimidation but that the defendant possessed the scienter of knowingly or recklessly causing that intimidation, and (2) for speech to lose First Amendment protection on grounds it is a true threat, that threat must involve violence.

## I.   Plaintiff's First Amendment Arguments Must Fail.

Plaintiff's principal argument is that "much of Defendants' conduct falls within a categorical exemption from the First Amendment because it is defamatory." (Dkt. 70 at 22-23) (citing *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (recognizing defamation as categorically excepted). Plaintiff argues that "the defamation forms a core part of the alleged voter intimidation. [T]his type of allegation—threats of 'consequences' for voting coupled with false accusations of voter fraud or other crimes—is a common form of voter intimidation." (Dkt. 70 at 23). That is, Plaintiff is accusing the TTV Defendants of "voter intimidation through defamation" as a result of which, according to Plaintiff, Defendants "have no First Amendment defense for their actions, regardless of whether the defamation *also* falls into another categorically excluded category."

Plaintiff unequivocally (and inaccurately) asserts, in his Response, that "Defendants Do Not Need To Make 'True Threats' To Be Liable For Voter Intimidation." (Dkt. 70 at 25). Of fundamental importance, Plaintiff concedes no Defendant made a true threat here, but, rather, that Defendants were merely negligent in their speech and are liable for the resulting acts of third parties:

> Mr. Andrews has not alleged that the TTV Defendants, or any of the named Defendants, have made "true threats" of the type categorically excluded from First Amendment protection. *Cf. Alvarez*, 567 U.S. at 716 (recognizing "true threats" as a categorical exception). Rather, Mr. Andrews has alleged that ***threats made against him by third parties (whether "true threats" or otherwise) are the natural and foreseeable consequence of Defendants' actions***, and Defendants are thus liable for the resultant voter intimidation based on standard causation principles. This is a question of statutory interpretation of the terms "intimidate, threaten, or coerce" in Section 11(b) and "force, intimidation, or threat" in Section 1985(3) clause 3, and of causation as it applies to those standard statutory terms; it is not a question of "true threats" under the First Amendment.

(Dkt. 70 at 26).

Even assuming this meets the legal requirements for liability under the respective statutes, the "natural and foreseeable consequences" formula used here by Plaintiff essentially articulates a negligence standard — except that (1) the intervention of a third party cuts off a negligence claim and (2) *Counterman* rejects the negligence standard outright.

## II.   Amicus Campaign Legal Center Incorrectly States True Threats Need Not Threaten Violence and Argues a Negligence Standard Rejected by *Counterman.*

Perhaps recognizing the thinness of Plaintiff's arguments, Amicus directly addresses the issue of whether Defendants' actions constitute true threats. However, Amicus' incorrectly states that (1) no threat of physical violence is required in order to support a finding of a true threat and (2) the true threat exception to First Amendment protection of speech may be proved without any need to show the subjective state of mind of the speaker:

> "[W]hether or not the person making a threat intends to cause harm, the damage is the same." *Elonis v. United States*, 575 U.S. 723, 746 (2015) (Alito, J., concurring). Moreover, "non-physical injury likely falls within the purview of a 'true threat.'" *NCBCP III*, 2023 WL 2403012, at *24 (citing *Virginia*, 538 U.S. at 359). Such threats are evaluated in "the context of [the] entire course of conduct," and "the sheer number and frequency of the messages" is an important factor. *United States v. Fleury*, 20 F.4th 1353, 1365-66 (11th Cir. 2021). Because neither the specific intent to carry out the threat nor to make Plaintiff fearful is required, *id.* at 1372, Defendants' purported non-threatening motive is irrelevant.

Dkt. 91 at 30.

Referring to what it calls "Plaintiff's plausible allegations that Defendants acted at least recklessly put Plaintiff in reasonable fear and subjected him to real threats of prosecution and investigation," Amicus gives a nod to an argument Defendants were reckless in their speech, but, stuck with the actual allegations of

Plaintiff's FAC, Amicus is able to cite only to claims of negligence. The allegations Amicus cites from Plaintiff's FAC consist only of the TTV Defendants' speech, in the "2000 Mules" film (and other Defendants' in the book), that the votes cast by Plaintiff were "fraudulent," consisted of "ballot trafficking," and constituted "organized crime." FAC ¶¶ 39, 42, 43, 74. The final paragraph of the FAC cited by Amicus, in support of a pleading of Defendants acting recklessly, ¶ 198, reads in its entirety:

> Defendants' actions have had the *predictable and foreseeable consequence* of leading to threats of physical harm—including death threats — against Mr. Andrews and his family by Defendants' followers . . .

(emphasis added). In short, Plaintiff alleges that third parties' threats of physical harm were merely "foreseeable", and that Defendants were thus merely *negligent* in their speech. Before we turn to *Counterman*'s rejection of these arguments, we first dispose of the notion that Plaintiff has alleged Defendants are liable for any conduct *other* than speech.

### III.   Plaintiff's FAC Complains of No Conduct Separate from Speech.

Both Plaintiff and Amicus argue that Defendants' speech at issue in this case is merely integral to illegal *conduct*, citing *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1135 (11th Cir. 2022) and *National Coalition on Black Civic Participation v. Wohl*, 2023 WL 2403012 at \*26 (S.D.N.Y. Mar. 8, 2023) ("*NCBCP III*"). *Norwegian Cruise Lines*, we would note, regards a

Florida statute requiring customers to present COVID-19 documentation that the court characterized as regulating "*non-expressive* economic conduct." (emphasis added). *NCBCPIII* is a case involving actual conduct: persons who sent robocalls containing false information intended to scare recipients from voting by mail. The *NCBCPIII* court specifically rejected the defendants' request in that case to include an intent requirement to a finding of liability under the voter intimidation statutes.

However, Plaintiff identifies nothing at issue here but Defendants' speech, and Plaintiff's FAC fails to specify any separate conduct Defendants' speech is purportedly facilitating. Indeed, Plaintiff's principal complaint is defamation which, by definition, concerns speech, not conduct. This becomes abundantly clear when one employs the test for expressive conduct.

## IV. Any "Conduct" By Defendants Was Expressive Conduct Subject to First Amendment Protection.

"To determine 'whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play,' the two-part *Johnson* test asks: (1) 'whether [a]n intent to convey a particularized message was present,' and (2) whether 'the likelihood was great that the message would be understood by those who viewed it.'" *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336–37 (11th Cir. 2021) (quoting *Texas v. Johnson*, 491 U.S. 397, 404, (1989)).

"Constitutional protection for freedom of speech 'does not end at the spoken or written word.'" *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,

901 F.3d 1235, 1240 (11th Cir. 2018) (quoting *Johnson*, 491 U.S. at 404). The

Eleventh Circuit articulates the requirements for expressive conduct to be protected

by the First Amendment: (1) the communicator intended "to convey a particularized

message" and (2) a "great" "likelihood" that others would understand a message

was being communicated. *Burns*, 999 F.3d at 1336 (quoting *Johnson*, 491 U.S. at

404).

### A. The TTV Defendants Intended to, and Did, Convey a Particularized Message about the Dangers of Unregulated Ballot Boxes.

The film itself, as well as the interviews in connection with it and petitions

to governmental bodies made consistent with it, is undeniably expressive conduct,

individually and collectively. *See Fort Lauderdale*, 901 F.3d at 1242–43

(discussing multiple "food sharing" events and different communicative conduct

present in the events, such as inviting the public and distributing pamphlets, setting

up tables, and having banners). Indeed, unlike every case cited by Plaintiff on this

issue, Defendants did not target their message to Plaintiff, but to the larger public.

That message was that Americans should be concerned about election procedures

that fail to provide adequate assurances of ballots' chain of custody, and that thus

can leave ballot boxes open to manipulation.

Indeed, as Plaintiff's FAC makes clear, the message of "2,000 Mules", in

which Plaintiff briefly appears, was so particularized, so well understood as a

forceful claim in the public square, that it has been widely debated and commented upon, with opinions ardently supporting and opinions strongly attacking the movie's interpretation of the various factual premises.

### B. The FAC Shows Viewers of "2000 Mules" and its Promotional Videos Clearly Understood the Message the TTV Defendants Sought to Convey.

The second requirement to find expressive conduct is that there is a great likelihood of viewers' perceiving a message was being communicated by Defendants' conduct. The Eleventh Circuit has identified five factors to consider in this analysis: (1) if the conduct at issue is distinguishable from actions in everyday life, such as "set[ting] up tables and [a] banner, and distribut[ing] literature," (2) if the public had access to the conduct, (3) the location of the acts, such as in a public city park or other traditional public forum, (4) if the conduct involved "an issue of concern in the community," and (5) if the conduct historically has been a type that communicates a message. *Fort Lauderdale*, 901 F.3d at 1242–43.

Drawing directly from the FAC, we may apply these factors, to a film whose controversial scenes were taken from footage distributed by Gwinnett County without editing or redactions, as follows: (1) what is at issue here is a film and not everyday life, (2) the film is publicly available — indeed, so available that Plaintiff has gone to great lengths to detail, and complain about, its reach, (3) the film is readily accessible in movie theaters and is available for anyone to download or

watch streaming, (4) the issue treated in the film, the validity of the 2020 election and possible election fraud, is unquestionably an issue of concern in the community, and (5) making a film is historically the type of conduct that communicates a message; it is expressive speech.

This is not an instance where the expressive component of an action is created by the conduct itself. *See, e.g., Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006). The *Rumsfeld* limitation is informed by the fear that "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id*. Rather, here there is simply Defendants' speech to which Plaintiff attempts to impute conduct without offering anything but instances of things Defendants said.

## V.   Before *Counterman*, Whether True Threats Required Intent to Intimidate or Threats of Violence Was Unsettled.

Until 2003, Plaintiff's proposed objective foreseeability test, under which a state prosecutor had to prove that a reasonable person would interpret the defendant's threatening speech as a serious threat before the defendant may be punished for the speech, was universally acknowledged by federal courts as the proper constitutional standard for identifying punishable true threats under the First Amendment. *See Doe v. Pulaski County Special School District*, 306 F.3d 616, 622 (8th Cir. 2002) ("[a]ll the [federal circuit courts of appeals] to have reached the

issue have consistently adopted an objective test that focuses on whether a reasonable person would interpret the purported threat as a serious expression of an intent to cause a present or future harm").

However, this general consensus was shaken by the decision of the United States Supreme Court in *Virginia v. Black*, 538 U.S. 343 (2003) which led to a split in authority among the federal circuit courts of appeals about whether the true threats doctrine requires proof of a defendant's subjective *intent* to intimidate the recipient of the threat or, instead, merely requires proof of objective *foreseeability*. In *Black*, the court considered the constitutionality of a Virginia statute providing in relevant part that "[i]t shall be unlawful for any person or persons, with the intent of intimidating any person or group of persons, to burn, or cause to be burned, a cross on the property of another, a highway or other public place." *Id.* at 348 (internal quotation marks omitted.) A majority of the court observed that "'[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an *intent* to commit an act of unlawful violence to a particular individual or group of individuals." *Id.* at 359 (emphasis added). The majority further observed that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the *intent* of placing the victim in fear of bodily harm or death." *Id.* at 360 (emphasis added). Accordingly, the majority concluded that "[t]he First

Amendment permits Virginia to outlaw cross burnings done with the intent to intimidate ....” *Id*. at 363.

A plurality of the court also held, however, that a provision of the Virginia statute stating that “[a]ny such burning of a cross shall be *prima facie* evidence of an intent to intimidate a person or group of persons” was unconstitutional on its face because it did not differentiate between cross burnings that were intended to intimidate and other cross burnings and, therefore, “would create an unacceptable risk of the suppression of ideas.” *Id*. at 363–66 (internal quotation marks omitted).

Several courts concluded that the statement of the majority in *Virginia v. Black,* 538 U.S. at 360, that “a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death” constitutes a true threat, combined with the statement of the plurality suggesting that the finder of fact must determine whether the defendant “intended to intimidate,” *id*. at 367, showed that the Supreme Court intended to adopt a specific intent standard. *See, e.g., United States v. Martinez*, 736 F.3d 981, 987 (11th Cir. 2013) (under *Black*, “intimidation is but one type of true threat,” and the Court did not intend to require specific intent to intimidate for all true threats), *vacated on other grounds*, —— U.S. ——, 135 S. Ct. 2798 (2015). We would note in this connection that the objective standard – that a reasonable person would regard defendant’s speech – is essentially a negligence standard. *See Elonis v. United States*, 575 U.S. 723, 738 (2015) (concluding with

"reluctan[ce] to infer that a negligence standard was intended in criminal statutes").

There also developed a question of whether threatening to take non-violent action can be a true threat. *Compare Aubin v. Columbia Cas. Co.*, 272 F. Supp. 3d 828, 834 (M.D. La. 2017) ("Threatening to take non-violent action does not constitute a 'true threat.'") *and Seals v. McBee*, No. CV 16-14837, 2017 WL 3252673, at *4 (E.D. La. July 31, 2017), *aff'd*, 898 F.3d 587 (5th Cir. 2018), as revised (Aug. 9, 2018) ("Threats to take lawful, non-violent action are not 'true threats' or any other category of speech that has not historically been protected by the First Amendment.") *with National Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 479 (S.D.N.Y. 2020) ("*NCBCP I*") ("This Court does not interpret the Supreme Court's analysis in *Black* to suggest that the government can ban only threats of physical harm. The threat of severe nonbodily harm can engender as much fear and disruption as the threat of violence.").

## VI.   The Supreme Court Has Now Made Clear Defendants' Speech Cannot Qualify for the True Threats Exception to First Amendment Protection Unless It Involved Threats of Violence.

*Counterman* rejected both the argument that a party may prove the "true threats" exception to the First Amendment solely by the objective test (the Court created a standard requiring the defendant's knowledge or recklessness), and the argument that true threats may include threats of non-violent actions (they may not). The following excerpt encapsulates the Court's analysis:

"True threats" of <u>violence</u> is another historically unprotected category of communications. *Virginia v. Black*, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003); *see United States v. Alvarez*, 567 U.S. 709, 717–718, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012) (plurality opinion). The "true" in that term distinguishes what is at issue from jests, "hyperbole," or other statements that when taken in context do not convey a real possibility that <u>violence</u> will follow (say, "I am going to kill you for showing up late"). *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (*per curiam*). True threats are "serious expression[s]" conveying that a speaker means to "commit an act of <u>unlawful violence</u>." *Black*, 538 U.S. at 359, 123 S.Ct. 1536. Whether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat, as this Court recently explained. *See Elonis v. United States*, 575 U.S. 723, 733, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015). The existence of a threat depends not on "the mental state of the author," but on "what the statement conveys" to the person on the other end. *Ibid*. When the statement is understood as a true threat, all the harms that have long made threats unprotected naturally follow. True threats subject individuals to "<u>fear of violence</u>" and to the many kinds of "disruption that fear engenders." *Black*, 538 U.S. at 360, 123 S.Ct. 1536 (internal quotation marks omitted).

*Counterman*, 2023 WL 4187751, *4 (underscore emphases added).

The majority opinion in *Counterman,* the concurrence, and the dissent are all in accord that the true-threats exception to First Amendment protection applies only to true *threats of violence*. We have already underscored the *Counterman* majority's references to the need for a threat of violent behavior in the above excerpt. The concurrence, quoting *Black*, similarly defines true threats as "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence." *Id*. at *13. The dissent's analysis is even more pointed.

First, only a very narrow class of statements satisfies the definition of a

true threat. To make a true threat, the speaker must express "an intent to commit an act of *unlawful violence*." *Black*, 538 U.S. at 359,123 S.Ct. 1536 (emphasis added). Speech that is merely "offensive," "'poorly chosen,'" or "unpopular" does not qualify. Brief for Petitioner 31, 36, 42. The statement must also threaten violence "to a particular individual or group of individuals" -- not just in general. *Black*, 538 U.S. at 359, 123 S.Ct. 1536. These tight guardrails distinguish true threats from public-figure defamation, the model for the Court's rule. While defamatory statements can cover an infinite number of topics, true threats target one: unlawful violence.

*Id*. at *22 (emphasis added by Justice Barrett).

### VII.   *Counterman* Ruled That Recklessness is Part of the Burden of Proof to Establish the True Threats Exception or Intimidation.

The Supreme Court in *Counterman* clarified why Plaintiff's claims of the TTV Defendants' negligent speech regarding his appearance in a video clip must fail:

. . . the First Amendment may still demand a subjective mental-state requirement shielding some true threats from liability. The reason relates to what is often called a chilling effect. Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not.

*Id*. at *4. *Counterman* holds that the required "subjective mental-state requirement" is recklessness, specifically stating that "recklessness is morally culpable conduct, involving a 'deliberate decision to endanger another.'" *Id*. at *6. "In the threats context, it means that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Id*. (citing *Elonis*, 575 U.S. at

746, 135 S.Ct. 2001 (Alito, J., concurring in part and dissenting in part).

## A. *Counterman* Requires Recklessness of Civil Intimidation Claims.

While *Counterman* analyzes a criminal statute, its standard applies with full force to civil actions. In language as applicable to Section 11(b) as to true threats, the Court explained, "Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. Or he may simply be concerned about the expense of becoming entangled in the legal system. The result is 'self-censorship' of speech that could not be proscribed—a 'cautious and restrictive exercise' of First Amendment freedoms." *Id.* at *6-7 (citations omitted).

The dissent by Justice Barrett also makes clear that "this case is about the scope of the First Amendment, not the interpretation of a criminal statute. Accordingly, the Court's holding affects the civil consequences for true threats just as much as it restricts criminal liability." *Id.* at *25. Moreover, in this case, as in a criminal case, Plaintiff is exercising the power of the state against Defendants. For example, Amicus claims that the Defendants' "alleged intimidation 'inflicts harm upon the broader public's interest in selecting elected officials through a free and fair process.'" Dkt. 91 at 29 (citing *NCBCP I*, 498 F. Supp. 3d at 488). Indeed,

Plaintiff here is asserting[1] little more than a general interest in seeing "that the Nation's laws are faithfully enforced." *See Steel Co. v. Citizens for Better Env't.*, 523 U.S. 83, 107 (1998). Plaintiff is effectively acting as an arm of the executive branch.

### B. Plaintiff Fails to Plausibly and Specifically Allege Recklessness in the TTV Defendants' Statements About His Depositing of Ballots.

As set out above, Plaintiff's FAC pleads, at best, a negligence standard, as we may see in his language that "threats made against him by third parties (whether 'true threats' or otherwise) are the natural and foreseeable consequence of Defendants' actions." Moreover, as discussed in further detail below, the actions of third parties normally cut off an action for negligence. In any event, merely alleging negligent conduct no longer passes muster following *Counterman*.

Nor do Plaintiff's *pro forma* mentions of "recklessness" in his FAC plausibly state a non-conclusory claim that the TTV Defendants behaved recklessly in making the only statements that are the subject of Plaintiff's causes of action: those relating to the video image of a figure (later identified as Plaintiff) depositing multiple ballots in a ballot box. Plaintiff's eleven (11) mentions of "Defendants'" alleged recklessness about that image fail because:

---

[1] Indeed, Plaintiff states in his Response to the TTV Defendants' Motion to Dismiss (Dkt. 70) that "Section 11(b) would be permissible here because it advances the government's compelling interest in safeguarding free and fair elections and protecting against voter intimidation." Plf. Resp. at 19, n.5

1. fully 9 of them **constitute group pleading** that refers only to "Defendants" and thus lack the required specificity regarding the TTV Defendants' alleged recklessness, *see* FAC ¶¶15, 99, 103, 104, 124, 128, 169, 286, 301, while the 2 mentions that *do* properly avoid group pleading explicitly refer to other Defendants, ¶115 (referring to Mr. D'Souza), 116 (same);

2. **they are *also* impermissibly conclusory**, ¶15 ("The reckless and false allegations that Mr. Andrews engaged in voter fraud constitute textbook cases of defamation, false light, and appropriation of likeness under Georgia law"); ¶99 ("Defendants knew of the falsity of their statements about Mr. Andrews, and/or acted with reckless disregard as to the falsity of those statements"), ¶ 169 (conclusory statement), ¶ 286 (same), ¶ 301 (same);

3. they *also* amount to no more than Plaintiff's counsel's **amateur film criticism,** in which counsel irrelevantly deems as reckless claims or conclusions in the film about matters *other* than the specific *image and narration affecting Plaintiff himself*, such as Defendants' statements about geolocation data, use of computers, or general claims of election fraud, *see id*., ¶¶100-110;

4. they *also* purport to deem as "facts", binding on the TTV Defendants' speech, **the opinions of other parties**, ¶¶103-104, 107, 124, including government entities, ¶¶128-129, 131 (referring to irrelevant actions of Georgia Bureau of

Investigations and the State Elections Board).

But none of these group-pleading allegations sets out facts alleging the recklessness of the TTV Defendants' statements about the only speech complained of in Plaintiff's causes of action, which consisted solely of speech about a video of an unidentified figure depositing a handful of ballots into a ballot box. Accordingly, Plaintiff's FAC fails to allege a cause of action under the voter intimidation statutes that the TTV Defendants' alleged negligent speech constitutes "true threats" excepted from the protection of the First Amendment.

## VIII.  There is No Defamation-as-Intimidation Exception to Protected Speech.

What remains after the foregoing analysis is only Plaintiff's claim that Defendants' speech at issue in this lawsuit falls within the defamation exception to First Amendment-protected speech for purposes of the voter intimidation statutes. And, indeed, defamation appears to be the thrust of his intimidation argument. Plaintiff and Amicus both argue and cite to authority holding that subjecting a person to "public opprobrium"— that is, harm from defamation – is sufficient to show intimidation under the voter suppression statutes, citing, for example, *LULAC v. Public Interest Legal Foundation*, No. 1:18-cv-00423, 2018 WL 3848404 *4 (E.D. Va. 2018) ("Defendants have linked Plaintiffs' names and personal information to a report condemning felonious voter registration in a clear effort to subject the named individuals to public opprobrium. Defendants'

suggestion that more is needed to support a finding of intimidation is untenable."").

However, this defamation-as-intimidation analysis is flawed.

For example, in the case of *Brewington v. State*, 7 N.E.3d 946 (Ind. 2014),

the defendant was indicted for intimidating his divorce judge for "communicating

a threat to" the Judge. However, the statute at issue included in its definition of

"threat" the following items:

> (6) expose the person threatened to hatred, contempt, disgrace, or ridicule;
> (7) falsely harm the credit or business reputation of the person threatened;

*Id*. at 958. Confronted with this, the Indiana Supreme Court held:

> [O]ur inquiry cannot end with the statutory definition. As amici point
> out, subpart (c)(6) parallels the classic common-law definition of
> defamation, and (c)(7) reflects a particular type of defamation. *E.g*.,
> *Armentrout v. Moranda*, 8 Black. 426, 427 (Ind.1847) ("A libel is said
> to be a malicious defamation expressed in printing or writing ..., tending
> to injure the reputation of another, and thereby exposing such person to
> public hatred, contempt, or ridicule."); *Johnson v. Stebbins*, 5 Ind. 364,
> 366–67 (1854) ("Any publication that tends to degrade, disgrace, or
> injure the character of a person, or bring him into contempt, hatred, or
> ridicule, is as much a libel as though it contained charges of infamy or
> crime.") Subparts (c)(6) and (7), then, essentially criminalize
> defamation by including it in the definition of a punishable "threat."
> The same constitutional free-speech protections that apply in civil
> defamation cases therefore must also apply to prosecutions under (c)(6)
> and (7).

*Id*. at 958-59. These same free speech protections must therefore also apply to a

civil action brought under federal anti-intimidation statutes where the plaintiff sues

on the basis of defendants' allegedly defamatory speech. Importantly, as

*Brewington* also sets out:

> The United States and Indiana constitutions afford sweeping
> protections to speech about public officials or issues of public or
> general concern, even if the speech is intemperate or caustic. But there
> is no such protection for "true threats"—including veiled or implied
> threats, when the totality of the circumstances shows that they were
> intended to put the victims in fear for their safety. Fear for one's
> *reputation* is often the price of being a public figure, or of involvement
> in public issues. But fear for one's *safety* is not.

*Id*. at 953 (emphases in original). Whether the alleged fear is of safety (as from a

true threat) or the reputational harm of defamation is a fundamental distinction,

made all the more important in this case where Plaintiff has not alleged any actual

reputational damages, but is only (1) generally claiming damages from purportedly

feeling threatened and intimidated and (2) claiming presumed damages based on

the FAC's allegations that Defendants falsely accused Plaintiff of committing a

crime. As one of their defenses to the Plaintiff's defamation claim, the TTV

Defendants argue that he is not entitled to presumed damages in a matter involving

legitimate public interest, and therefore there are therefore no proper allegations of

damages at all.

Of the many First Amendment issues with Plaintiff's defamation cause of

action (and therefore his causes of action under the voter intimidation statutes that

are founded on defamation), perhaps the most troubling is his easy conclusion of

the foreseeability that third parties will act violently against the Plaintiff based upon

Defendants' allegedly defamatory speech. Plaintiff is effectively arguing for a

poorly disguised incitement standard, but incitement must consist of statements

"directed [at] producing imminent lawless action," and likely to do so.

*Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969)

(per curiam). In addition to the requirement of being directed at producing imminent

lawless action, incitement requires specific intent. In so requiring, the Supreme

Court recognized that incitement to disorder is commonly a hair's-breadth away

from constitutionally permissible political "advocacy"—and particularly from

strong protests against the government and prevailing social order. *Brandenburg*,

395 U.S. at 447, 89 S.Ct. 1827. There is no doubt that the First Amendment protects

mere advocacy of force or lawbreaking from legal sanction, *see Counterman* at *7,

which Plaintiff does not even allege. Plaintiff's efforts to prosecute defamation as a

sort of slow-motion incitement will bleed over, directly and indirectly through a

chilling effect, to dissenting political speech at the First Amendment's core.

## Conclusion

Because Plaintiff has alleged only speech by the TTV Defendants (and not

conduct, or actions), and has not alleged any exceptions to the First Amendment's

protections for pure speech, such as threats of violence constituting true threats or

defamation, Plaintiff's claims of intimidation (not to mention defamation) must fail.

Plaintiff has failed to plausibly allege the *TTV Defendants* were *reckless* in making

statements of opinion about the disclosed facts of Plaintiff's appearance on a video

as he deposits multiple ballots in a ballot box.

Respectfully submitted,

*/s/ Molly Parmer*
MOLLY PARMER (GA Bar No. 942501)
Parmer Law
1201 W. Peachtree Street, NW, Suite 2300
Atlanta, Georgia 30309
Telephone: (404) 795-5060
Facsimile: (404) 795-5117
molly@parmer.law

MICHAEL J. WYNNE* (TX Bar No. 00785289)
CAMERON POWELL* (DC Bar No 00459020)
JOSEPH R. LARSEN* (TX Bar No. 11955425)
GREGOR WYNNE ARNEY PLLC
909 Fannin Street, Suite 3800
Houston, Texas 77010
(281) 450-7403
mwynne@gwafirm.com
cpowell@gwafirm.com
jlarsen@gwafirm.com

*Attorneys for Defendants True the Vote, Catherine Englebrecht, and Gregg Phillips.*

*\*Admitted Pro Hac Vice*

## **RULE 7.1(D) CERTIFICATE**

The undersigned counsel certifies that this document has been prepared in

Times New Roman 14-point font in accordance with Local Rule 5.1.C.

This 15th day of August, 2023.

/s/ *Molly Parmer*
MOLLY PARMER
Georgia Bar No. 042537

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the within

and foregoing **SUPPLEMENTAL BRIEF ON FIRST AMENDMENT ISSUES**

was electronically filed with the Clerk of Court using the CM/ECF system, which

will automatically send email notification of such filing to all attorneys of record

via the CM/ECF system.

This 15th day of August, 2023.

/s/ *Molly Parmer*
MOLLY PARMER
Georgia Bar No. 042537