### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

MARK ANDREWS,
     Plaintiff,

          v.

DINESH D'SOUZA, *et al.*,
     Defendants.

Civil Action No.
1:22-cv-04259-SDG

### OPINION AND ORDER

This matter raises the issue of whether Defendants are liable for demonstrably false statements they allegedly made about Plaintiff Mark Andrews, asserting that Andrews engaged in voter fraud in the 2020 election. Andrews contends that he and his family have been subject to violent threats because of Defendants' behavior. The allegations about the individual Defendants' conduct, which was purportedly based solely on conjecture and speculation and continued long after Andrews was officially cleared of any wrongdoing, are disturbing. Be that as it may, not all of Andrews's claims survive Defendants' dismissal motions.

## I.    Introduction

Andrews lives in Gwinnett County, Georgia with his wife and three adult children. He and his family are all registered Georgia voters.[1] A security video of Andrews dropping off ballots for himself and his family during the 2020 election,

---

[1]    ECF 27, ¶¶ 7–8, 17, 77.

at the height of the COVID-19 pandemic, forms the foundation of his claims. Defendants allegedly used clips from the video in a movie and other media to support their contention that people—so-called "ballot mules"—were paid to vote illegally in the 2020 election for the purpose of improperly swinging the vote in Joe Biden's favor. Defendants asserted in multiple published statements that an image of Andrews dropping off the ballots was such an example of a mule and that Andrews had committed various crimes. As a result of Defendants' conduct, Andrews asserts claims against three different sets of Defendants: Salem Media Group, Inc. and Regnery Publishing, Inc. (the Salem Defendants); True the Vote, Inc., Catherine Engelbrecht, and Gregg Phillips (the TTV Defendants); and Dinesh D'Souza and D'Souza Media LLC (collectively, the D'Souza Defendants).

Andrews brings claims under the Ku Klux Klan Act and the Voting Rights Act, as well as for state-law defamation and invasion of privacy. Several motions are before the Court for consideration: for a more definite statement and to dismiss by the Salem Defendants [ECFs 47,[2] 48]; to dismiss by the TTV Defendants [ECF 58]; to dismiss by the D'Souza Defendants [ECF 50]; and by Andrews to file a supplemental complaint [ECF 98]. After due consideration, and with the benefit of oral argument, the Court rules as follows:

---

[2]   The Salem Defendants later amended the brief in support of their motion to dismiss. ECF 54.

- The Salem Defendants' motion to dismiss [ECF 48] is **GRANTED in part** and **DENIED in part**. Counts I, II, and VI are **DISMISSED** as to the Salem Defendants.

- The Salem Defendants' motion for a more definite statement [ECF 47] is **DENIED**.

- The TTV Defendants' motion to dismiss [ECF 58] is **GRANTED in part** and **DENIED in part**. Count II is **DISMISSED** as to the TTV Defendants.

- The D'Souza Defendants' motion to dismiss [ECF 50] is **GRANTED in part** and **DENIED in part**. Count II is **DISMISSED** as to the D'Souza Defendants.

- Andrews's motion for leave to file a supplemental complaint [ECF 98] is **GRANTED**.

## II.   Facts[3]

### A.   General Factual Allegations

The First Amended Complaint (FAC) alleges that, after the 2020 election, Defendants promoted the narrative that the election had involved widespread, coordinated voter fraud.[4] Specifically, according to Andrews, Defendants claimed that this fraud was achieved through "an elaborate network of paid professional

---

[3]   The facts are taken from the well-pleaded allegations in Andrews's First Amended Complaint and are accepted as true for purposes of ruling on Defendants' motions. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) ("At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff.").

[4]   ECF 27, ¶ 32.

operatives called mules delivering fraudulent and illegal votes to mail-in drop boxes in the five key states where the election was decided"—including Georgia.[5] Defendants created, released, and promoted the movie *2000 Mules*, which Andrews alleges "corroborated the false narrative that the election was stolen by 'mules.'"[6] To bolster that narrative, the movie allegedly misrepresents images of Andrews lawfully voting.[7] The FAC pleads that Defendants' conduct led to his doxing[8] and threats of physical harm against him and his family.[9]

The movie asserts that ballot mules were paid to deliver illegal ballots to absentee drop boxes in several swing states, including Georgia, to swing the election in Joe Biden's favor.[10] To support this assertion, the movie claimed that cell phone geolocation data proved that the voters depicted were such mules.[11] Andrews, one of the voters shown in the movie, is depicted dropping several

---

[5]   *Id.* ¶¶ 32, 34.

[6]   *Id.* ¶ 33.

[7]   *Id.* ¶ 35.

[8]   Black's Law Dictionary defines "doxing" as "[t]he nonconsensual online posting of a person's personal information, such as home address, e-mail address, and place of employment, esp. for purposes of harassment." DOXING, BLACK'S LAW DICTIONARY (11th ed. 2019).

[9]   *See, e.g.*, ECF 27, ¶¶ 197–98, 201–02, 209–17.

[10]  *Id.* ¶ 34.

[11]  *Id.* ¶ 36.

ballots into a Georgia ballot drop box.[12] Video surveillance footage containing his image (but with his face blurred) is featured in both the movie and trailer.[13] This video surveillance footage, which also captured Andrews's SUV (and his license plate), was used in the movie without Andrews's knowledge or consent.[14] The voiceover by D'Souza while Andrews's image (with a blurred face) is displayed says: "What you are seeing is a crime. These are fraudulent votes."[15] A clip of Andrews (face blurred) is also shown in the movie immediately after an explanation by D'Souza, Engelbrecht, and Phillips about why Andrews's conduct was allegedly illegal.[16] Engelbrecht described the purported ballot mules scheme as feeling "a lot like a cartel . . . a lot like trafficking."[17]

Andrews's pleading further asserts that, in the movie, D'Souza, Engelbrecht, and Phillips accuse the so-called ballot mules of having committed other crimes—including participating in riots in Atlanta, "burning people," and "pulling people out of cars and beating them up."[18] Phillips refers to the mules as

---

[12] *Id.* ¶¶ 37–38.

[13] *Id.* ¶¶ 37, 38, 45.

[14] *Id.* ¶ 37.

[15] *Id.* ¶¶ 39, 44.

[16] *Id.* ¶ 41, 44.

[17] *Id.* ¶ 42.

[18] *Id.* ¶ 43.

engaging in "organized crime."[19] In the movie's trailer, an image of Andrews with his face blurred is displayed while Phillips asserts that he (Phillips) has 4 million minutes of surveillance video as evidence of the alleged ballot mule scheme.[20] Andrews also accuses Defendants of showing his image (both blurred and unblurred) in nearly a dozen media appearances promoting the movie, while indicating that Andrews was committing a crime.[21]

Contrary to Defendants' public assertions, Andrews pleads that, on October 6, 2020, he legally voted by depositing his ballot in a drop box in Gwinnett County. At the same time, he also legally deposited the ballots of his wife and three children in the drop box.[22] On April 25, 2022, a complaint against Andrews was filed with the Georgia Bureau of Investigations (GBI) alleging that he had engaged in ballot fraud. The complaint included screenshots from the surveillance video with unblurred images of Andrews's face and license plate.[23] On May 2, a GBI investigator interviewed Andrews at his home about the allegations.[24] Based on that interview and further investigation, the GBI quickly cleared Andrews of any

---

19  *Id.* ¶ 46.

20  *Id.* ¶ 45.

21  *Id.* ¶ 48.

22  *Id.* ¶¶ 81–82.

23  *Id.* ¶¶ 84–85.

24  *Id.* ¶ 88.

wrongdoing.[25] The investigator was able to locate Andrews from his license plate number in the video screenshots.[26] A national newspaper was also able to identify Andrews.[27]

On May 17, 2022, the Georgia State Board of Elections (the Elections Board) held a public meeting during which it addressed the complaint against Andrews. During the meeting, the GBI investigator publicly refuted the allegation that Andrews had engaged in illegal ballot harvesting but rather had legally deposited his and his family's ballots.[28] The Elections Board dismissed the case against Andrews that day.[29]

### B.    Specific Allegations Concerning Each Defendant

#### 1.    The D'Souza Defendants

##### i.    Dinesh D'Souza

The FAC alleges that D'Souza engaged in the following actionable conduct. D'Souza provided the voiceover in the movie for the blurred image of Andrews, asserting that Andrews was in the process of committing a crime by fraudulently

---

[25]  *Id.* ¶ 91.

[26]  *Id.* ¶¶ 85 n.67, 217.

[27]  *Id.* ¶ 89.

[28]  *Id.* ¶¶ 91–93.

[29]  *Id.* ¶ 95.

voting.[30] D'Souza also accused the so-called ballot mules of having committed other crimes.[31]

On April 23, 2022, D'Souza published the trailer for *2000 Mules* on a video-sharing website and his social media accounts. The trailer has had millions of views.[32] Andrews's face is blurred in the trailer.[33] On May 4, 2022, D'Souza participated in an interview in which he described *2000 Mules* as "an exposé of a coordinated ring of paid ballot trafficking, illegal votes, fraudulent votes being dumped en masse into mail-in drop boxes."[34] The clip of Andrews with his face blurred was shown onscreen during D'Souza's statement.[35] On May 6, D'Souza appeared on an online news show during which the image of Andrews with his face blurred was shown twice.[36] In connection with one of the displays of Andrews's image, D'Souza referred to "official surveillance video which kind of catches the mules in the act."[37] D'Souza also claimed that everything shown in

---

[30]   ECF 27, ¶¶ 39–42.

[31]   *Id.* ¶ 43.

[32]   *Id.* ¶ 47.

[33]   *Id.* ¶ 45.

[34]   *Id.* ¶¶ 34, 54.

[35]   *Id.* ¶ 54.

[36]   *Id.* ¶ 59.

[37]   *Id.*

*2000 Mules* was "100% illegal in all 50 states."[38] He also accused the mules of other criminal activity, stating, "[w]e happen to know that a number of the mules are Antifa-BLM types."[39] On May 11, D'Souza appeared on a One American News Network (OANN) program during which he showed the clip of Andrews (with his face blurred) voting. He asserted that the video confirmed the "coordinated fraud in all the key states that decided the [2020] election."[40] On May 17, D'Souza appeared on OANN and showed the *2000 Mules* trailer. His voiceover described the clip of Andrews as evidence of an organized crime scheme.[41] D'Souza's comments during the appearance also suggested that Andrews had been to multiple drop boxes to deposit ballots.[42]

On May 21, D'Souza again appeared on OANN. Along with the blurred clip of Andrews voting, D'Souza promoted his ballot mules story and his claims that there was widespread fraud during the 2020 election.[43] On May 23, D'Souza appeared on a news program during which he displayed Andrews's image with

---

[38] *Id.* ¶ 60.

[39] *Id.*

[40] *Id.* ¶ 65.

[41] *Id.* ¶ 142.

[42] *Id.* ¶ 143.

[43] *Id.* ¶ 139.

his face blurred, portraying it as evidence of an election fraud scheme.[44] On June 2, D'Souza made a social media post that embedded a clip of the video of Andrews with his face and license plate *unblurred*.[45] D'Souza continues to promote the movie.[46]

The companion book to the *2000 Mules* movie was released on October 25, 2022. In the book, which D'Souza authored, he republished Andrews's blurred image, that of Andrews's SUV, and false statements about him.[47] This was after Andrews's counsel informed Defendants that their portrayal of Andrews was false.[48] The caption states that the image is of "mules stuffing multiple ballots into mail-in drop boxes. . . . What you are seeing here is organized crime on behalf of the Democratic Party."[49] D'Souza continues to promote the book.[50]

Despite learning no later than May 18, 2022 that the GBI and Elections Board had dismissed the claims against Andrews, D'Souza has continued to promote the movie and book.[51] The public premiere of *2000 Mules* took place after that—on

---

[44] *Id.* ¶ 145.

[45] *Id.* ¶ 147.

[46] *Id.* ¶¶ 166–68.

[47] *Id.* ¶¶ 70, 72, 74.

[48] *Id.* ¶ 71.

[49] *Id.* ¶ 74.

[50] *Id.* ¶¶ 166–67.

[51] *Id.* ¶¶ 136, 147.

May 20, 2022.[52] In fact, D'Souza called the GBI investigation "bogus" because the investigator obtained his information from "the mule himself."[53]

### ii.   D'Souza Media

D'Souza Media is a production company responsible for producing and distributing *2000 Mules*. The move is available on D'Souza Media's website, and the 2000 Mules website itself links to D'Souza Media's webpage.[54]

### 2.   The TTV Defendants

### i.   Engelbrecht & Phillips

Like D'Souza, in *2000 Mules* Engelbrecht described Andrews as having participated in illicit conduct, in addition to serving as a ballot mule. On April 8, 2022, Engelbrecht and Phillips appeared on *The Charlie Kirk Show*, which is produced by Salem Media. Andrews alleges that, during that appearance, Engelbrecht and Phillips showed video that depicted Andrews's unblurred face as well as his license plate. Engelbrecht referred to Andrews as a mule and described his actions of putting his family's ballots in the drop box as "highly illegal."[55] Phillips also described Andrews's conduct as illegal.[56]

---

52   *Id.* ¶ 137.

53   *Id.* ¶ 148.

54   *Id.* ¶¶ 20 n.10, 24, 188.

55   *Id.* ¶¶ 49–50.

56   *Id.* ¶ 50.

On May 5, 2022, Engelbrecht appeared on *Tucker Carlson Tonight*. During her appearance, a clip of the surveillance video showing Andrews's face and license plate was displayed while Engelbrecht discussed the alleged election fraud depicted in *2000 Mules*.[57] On May 14, Engelbrecht and Phillips appeared on an Epoch Times news program (*Truth Matters with Roman Balmakov*) and showed the clip of Andrews with his face blurred while they explained the purported ballot mules scheme. Phillips stated that they had used geolocation tracking because they were looking for "ways to solve a crime." He made additional comments claiming that they had found evidence of illegal ballot trafficking.[58] Referring to the video of Andrews, Phillips also suggested he had evidence of Andrews repeatedly putting multiple ballots in drop boxes.[59] Engelbrecht stated that Andrews's phone "was at a violent riot."[60]

By May 17, 2022, Phillips seemingly acknowledged that Andrews was not a mule in a *Washington Post* article.[61] Despite that acknowledgment, Engelbrecht and Phillips have never retracted their false statements about Andrews, and they have

---

[57]   *Id.* ¶¶ 56–57.

[58]   *Id.* ¶ 66.

[59]   *Id.* ¶ 67.

[60]   *Id.* ¶ 68.

[61]   *Id.* ¶ 131.

continued to promote *2000 Mules*.[62] On June 3, Engelbrecht and Phillips appeared on a program to again promote their mules narrative and displayed the clip of Andrews.[63] Andrews alleges that Engelbrecht and Phillips promoted the false narrative about him in order to drive revenue and raise the profiles of themselves and True the Vote.[64]

### ii.    True the Vote

True the Vote is an executive producer of *2000 Mules*. It allegedly provided the "research" for the movie and related book.[65] On April 23, 2022, True the Vote published the movie trailer on a video-sharing site. At the time Andrews filed the FAC, the trailer had nearly a million views.[66] True the Vote also published the *2000 Mules* trailer, in which Andrews's blurred face is shown, on its website and social media.

On May 8, 2022, True the Vote made the clip of Engelbrecht's appearance on *Tucker Carlson Tonight* available on its Facebook page. That clip contained unblurred images of Andrews's face and license plate.[67] True the Vote also

---

[62]   *Id.* ¶¶ 132, 135.

[63]   *Id.* ¶ 149.

[64]   *Id.* ¶ 178.

[65]   *Id.* ¶ 20.

[66]   *Id.* ¶ 47.

[67]   *Id.* ¶ 63.

published a video about its purported evidence of mass voter fraud that contained a blurred image of Andrews.[68] True the Vote published Engelbrecht and Phillips's May 14 interview on its website and social media accounts.[69] On October 22, 2022, True the Vote posted to social media a trailer for *2000 Mules* that includes an image of Andrews voting as an example of a ballot mule.[70]

### 3.     The Salem Defendants

Andrews alleges that Regnery published the *2000 Mules* book, in which Andrews's image, an image of his SUV, and false statements about him (including that he committed a crime) were republished.[71] Regnery is owned by Eagle Publishing, which is in turn owned by Salem Media.[72] The book indicates that D'Souza, Engelbrecht, and Phillips took their alleged evidence of voter fraud to Salem Media "to see if Salem would provide the equity investment to make the *2000 Mules*" movie.[73]

---

[68]   *Id.* ¶ 64.

[69]   *Id.* ¶ 69.

[70]   *Id.* ¶ 162.

[71]   *Id.* ¶¶ 70, 163.

[72]   *Id.* ¶ 73.

[73]   *Id.* ¶ 76.

### III.  Applicable Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To withstand a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a complaint must now contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint fails to state a claim when it does not "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555–56. A complaint is plausible on its face when a plaintiff pleads sufficient factual content for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. *Am. Dental Ass'n*, 605 F.3d at 1289 (citing *Twombly*, 550 U.S. at 556). "[A]ll well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006)).

## IV.    Discussion[74]

### A.    Count I: Conspiracy in Violation of the Ku Klux Klan Act (42 U.S.C. § 1985(3))[75]

#### 1.    The Statute

The Ku Klux Klan Act of 1871 (also known as the Civil Rights Act of 1871) "was passed in response to a rising tide of Klan terrorism against blacks and Union sympathizers and was designed to proscribe conspiracies having the object or effect of frustrating the constitutional operations of government through assaults on the person, property, and liberties of individuals." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1041 (11th Cir. 2000) (cleaned up). Andrews asserts a claim under Section 2 of the Act, alleging that Defendants conspired with one another to intimidate him for the purpose of deterring him from engaging in support or advocacy on behalf of his preferred candidates.[76]

---

[74] The Salem Defendants and D'Souza Defendants argue that the FAC should be dismissed because it is a shotgun pleading. ECF 54-1, at 8–9 (Salem Defs.); ECF 50-1, at 6–7 (D'Souza Defs.). *See also* ECF 47 (Salem Defs.' Mot. for More Definite Stmt.); ECF 49 (D'Souza Defs.' Joinder). A shotgun pleading is one that fails "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015). Although the FAC frequently lumps all Defendants together, as the Court's Order demonstrates, the pleading provides sufficient detail about each Defendant and their alleged conduct to avoid being construed as an impermissible shotgun pleading.

[75] The Court granted *Amicus Curiae* Campaign Legal Center leave to submit a brief in support of Andrews's Section 1985(3) claim. June 5, 2023 D.E.; ECF 91.

[76] ECF 27, ¶ 261, Count I.

To better understand the parties' arguments, the complete text of Section 2 is reprinted below:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another,
>
>> [i] *for the purpose of* depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or
>>
>> [ii] *for the purpose of preventing* or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws;
>
> *or*
>
> if two or more persons conspire
>
>> [iii] to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or
>>
>> [iv] to injure any citizen in person or property on account of such support or advocacy;
>
> in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages

> occasioned by such injury or deprivation, against any
> one or more of the conspirators.

42 U.S.C. § 1985(3) (emphasis added).[77]

Amicus Curiae Campaign Legal Center (CLC) asserts that the statute creates two categories of claims. First, the CLC contends that clauses [i] and [ii] prevent conspiracies to violate equal protection rights.[78] Second, the CLC argues that clauses [iii] and [iv]—the support-or-advocacy clauses—prohibit conspiracies to prevent any citizen from giving his support or advocacy to a federal candidate.[79] Because subsections [iii] and [iv] do not contain the "for the purpose of" language in subsections [i] and [ii], the CLC asserts that the support-or-advocacy clauses do not require proof of discrimination or specific intent.[80] The Court agrees. *See Kush v. Rutledge*, 460 U.S. 719, 724–25 (1983) ("The statutory provisions dealing with these categories of conspiratorial activity [including "the second part of § 1985(3)"] contain no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws."); *Nat'l Coalition on Black Civil Participation v. Wohl*, 2023 WL 2403012, at *18 (S.D.N.Y. Mar. 8. 2023) (citation

---

[77] In the statute itself, this text appears all in one paragraph. For clarity and because it will aid the Court's discussion of Andrews's claim, the text above is broken down into its constituent parts.

[78] ECF 91, at 8–9.

[79] *See, e.g., id.* at 9.

[80] *See, e.g., id.* at 9–10. *See also* ECF 69, at 44–45.

omitted) ("A violation of the 'Support or Advocacy Clause' of Section 2 of the KKK Act, which is the clause under which Plaintiffs are suing, does not require a showing of racial animus.").

A district court in the Southern District of New York, based on a lengthy and reasoned analysis, concluded that to state a claim under the text of Section 2, a plaintiff must show "(1) a conspiracy; (2) the purpose of which is to force, intimidate, or threaten;[81] (3) an individual legally entitled to vote who is engaging in lawful activity related to voting in federal elections." *Nat'l Coalition on Black Civil Participation v. Wohl*, 498 F. Supp. 3d 457, 486–87 (S.D.N.Y. 2020). In the absence of controlling case law from this Circuit about the elements of a support-or-advocacy claim, and based on the text of Section 2, the Court applies the *Wohl* standard here.

### 2.    The Salem Defendants

The Salem Defendants make several arguments about why Andrews's Section 2 claim fails, some of which apply to the other Defendants as well. The Court addresses the Salem Defendants' arguments in turn.[82]

---

[81]  For efficiency's sake, the Court refers to "force, intimidation, or threat" as used in the statute as simply "intimidation."

[82]  The D'Souza Defendants adopt the Salem Defendants' arguments concerning Section 2. ECF 50-1, at 7.

> ### i.    **For the Purpose of**[83]

The Salem Defendants assert that Section 2 requires "invidiously discriminatory animus" to state a claim and Andrews has alleged none as to them. However, the cases the Salem Defendants cite in support deal with the first two subsections of the statute containing the "for the purpose of" language.[84] *See, e.g., Griffin v. Breckenridge*, 403 U.S. 88, 96–97 (1971); *Dean v. Warren*, 12 F.4th 1248, 1257–64 (11th Cir. 2021). As is clear from the discussion above concerning the constituent parts of Section 2, the support-or-advocacy clauses by their plain language do not require discriminatory animus.[85] *See Kush*, 460 U.S. at 724–26 (rejecting argument that the "equal protection" language in clause [i] of Section 2 applies to, *inter alia*, clauses [iii] and [iv]); *cf. Paynes v. Lee*, 377 F.2d 61, 64 (5th Cir. 1967) (allowing claims under the support-or-advocacy clause to proceed in federal court without requiring allegations of discriminatory animus). Accordingly, Andrews need not allege such animus to state a support-or-advocacy claim.[86]

---

[83] This analysis also applies to all other Defendants.

[84] ECF 54-1, at 9–10.

[85] *See also* ECF 91, at 9–12.

[86] ECF 54-1, at 10–11.

ii.        **Deprivation of Rights**[87]

The Salem Defendants argue that the FAC does not contain allegations that Andrews was actually prevented from voting, so his Section 2 claim fails.[88] It is clear, however, that to state a claim under the support-or-advocacy clauses, a plaintiff need not allege that he was entirely prevented from voting. The plain language of the provisions prevents (among other things) conspiracies to prevent someone from advocating for a federal candidate for office *or* injuring someone for such advocacy. 42 U.S.C. § 1985(3)[iii], [iv]. It does not require successful completion of the object of the conspiracy. "The right to be free from threatened harm and the right to be protected from violence for an attempted exercise of a voting right are no less protected than the right to cast a ballot on the day of election." *Paynes*, 377 F.2d at 64; *Colorado Montana Wyoming State Area Conference of the NAACP v. U.S. Elec. Integrity Plan*, 2023 WL 1338676, at *5 (D. Colo. Jan. 31, 2023) (hereinafter *Colorado NAACP*) ("Section 11(b) does not proscribe only threatening and intimidating language that successfully prevents a person from voting as the attempts to do so are equally proscribed." (internal quotation marks omitted) (citation omitted)). The one in-circuit case on which the Salem Defendants rely to support their assertion that there must be an actual deprivation

---

[87]   This analysis applies to all other Defendants.

[88]   ECF 54-1, at 12; ECF 87, at 13–14.

of constitutional rights, *Cook v. Randolph County*, 573 F.3d 1143, 1157 (11th Cir. 2009),[89] deals with the first two clauses of Section 2—not the support-or-advocacy clauses.

Here, Andrews alleges that, because of Defendants' intimidation, he did not use a drop box to deliver ballots for himself and his family in the subsequent May 2022 primary election; he and his family have changed their voting patterns; and he is fearful of voting in the future and the methods he may use to do so.[90] Whether these allegations are true is for another day, but for pleading purposes it sufficiently alleges a legally cognizable injury under the statute. 42 U.S.C. § 1985(3)[iii], [iv]; *Wohl*, 2023 WL 2403012, at *18 (citation omitted) ("The statutes also prohibit *attempts* to intimidate, threaten, or coerce a person for voting or attempting to vote, and thus a violation of the VRA, the KKK Act, or the Civil Rights Act does not require that the intimidation actually succeed in preventing people from voting. Accordingly, a plaintiff who was the target of such an attempt need not ultimately refrain from participating in the election to have suffered a legally cognizable injury.").

---

[89]   ECF 54-1, at 12; ECF 87, at 13–14.

[90]   ECF 27, ¶ 263.

### *iii.* **Intimidation and Agreement**

The Salem Defendants argue that the FAC does not contain any allegations that they were the ones who intimidated Andrews. Rather, they assert alleged threats were made by third parties with whom Andrews does not contend the Salem Defendants conspired.[91] The Salem Defendants have a point. Although the FAC alleges that Defendants "coordinated with one another to use [his] image to baselessly accuse him of being an 'exemplar' 'mule,'" there are no allegations that make plausible the contention that either Salem Media or Regnery conspired with anyone to make such statements. The Salem Defendants distributed and published some of the alleged intimidating statements by the individual Defendants (including blurred and unblurred images of Andrews's face and license plate, and allegedly unfounded assertions that Andrews had engaged in criminal activity). But the Salem Defendants are not alleged to have made any intimidating statements themselves, nor does the FAC contain any factual support for the contention that they entered into an agreement with anyone to do so.[92]

Andrews argues:

> It is not plausible that the Salem Defendants, D'Souza Defendants, and TTV Defendants *did not* have an agreement: they had a joint business venture to create and publish the film and book, which necessarily entails

---

[91]   ECF 54-1, at 11–12.

[92]   *See, e.g.*, ECF 27, ¶¶ 25–26, 70, 72, 173, 227.

> an agreement to publish and promote the subject matter
> of the film and book including the accusations against
> Mr. Andrews.[93]

But argument is not a substitute for facts. While there does not appear to be any dispute that the Salem Defendants had agreements to publish and promote the movie and book, the language of Section 2 requires a conspiracy to prevent advocacy through intimidation or to injure a person because of such advocacy. There simply are not any allegations in the FAC that suggest the Salem Defendants agreed with anyone to do anything of the sort.[94] While a business agreement might constitute evidence of a conspiracy, Andrews has not alleged facts that plausibly suggest the Salem Defendants' particular business arrangements here are such evidence. Accordingly, the Salem Defendants' motion to dismiss as to Count I is granted.

### 3.    The D'Souza Defendants

The D'Souza Defendants make no independent argument that the FAC fails to allege that they used intimidation against Andrews.[95] In fact, as this Order makes clear, the FAC is replete with statements made by D'Souza himself accusing Andrews of committing crimes and being involved in criminal conspiracies.[96] As

---

93   ECF 69, at 47 (emphasis in original).

94   *See, e.g.*, ECF 87, at 12–13.

95   ECF 50-1, at 7.

96   ECF 27, ¶¶ 39–42, 54–55, 59–60, 65, 70, 74–75, 139–40, 142–43, 168.

discussed below, the FAC also contains sufficient allegations to support the assertion that the D'Souza Defendants conspired with the TTV Defendants in connection with that conduct.[97]

The D'Souza Defendants have not demonstrated that dismissal of Count I is appropriate as to them.

### 4. The TTV Defendants

The TTV Defendants make a smattering of arguments, some of which are not clearly linked to a particular cause of action. Most of those arguments promote some variation of the theme that their alleged conduct was protected by the First Amendment, even when the First Amendment has no apparent connection to the underlying point. Regardless, the Court attempts to address the TTV Defendants' arguments below but concludes that they are not entitled to dismissal of Count I.

### i. Intimidation

The TTV Defendants argue that their statements could not have plausibly intimidated a reasonable person.[98] Their brief attempts to characterize Andrews's allegations as limited to the assertion that they intimidated him only through the conduct of others.[99] This argument is obviously belied by the FAC, which alleges

---

[97] *See infra* Section IV.A.4.ii.

[98] ECF 58-1, at 10, 21–22.

[99] *Id.* at 15–16, 18–22.

that the TTV Defendants *themselves* accused Andrews of being a ballot mule, participating in an illegal voting conspiracy, having engaged in unrelated violent conduct, all while displaying blurred and unblurred images of Andrews's face and license plate.[100] Such actions plausibly intimidate a reasonable person in connection with voting and advocacy for federal candidates. *League of United Latin Am. Citizens–Richmond Region Council 4614 v. Pub. Interest Legal Found.*, Civ. A. No. 1:18-cv-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) (concluding the plaintiffs had stated a claim under a support-or-advocacy clause of Section 2 where "Defendants ha[d] linked Plaintiffs' names and personal information to a report condemning felonious voter registration in a clear effort to subject the named individuals to public opprobrium"). The TTV Defendants' bald assertion that Andrews "does not allege that Defendants made threats against" him is simply false.[101] Far from "incidental,"[102] the FAC alleges that the TTV Defendants'

---

[100] *See, e.g.,* ECF 27, ¶¶ 41–46, 49–53, 56–58, 63–64, 66–68, 135. The TTV Defendants' argument that it was the State of Georgia (not them) that identified Andrews because it held a public proceeding about the allegation that he had voted illegally rings hollow at this pleading stage. ECF 58-1, at 11–12. There is no allegation in the FAC that the State of Georgia falsely accused Andrews of committing multiple crimes in connection with voting and otherwise.

[101] ECF 58-1, at 21.

[102] *Id.* at 23.

accusations against Andrews were the centerpiece of their ballot mules theory, movie, and marketing.[103]

The fact that Andrews was not aware of the TTV Defendants' statements at the time that they were made and only became aware of them later is of no moment for determining whether Andrews has properly pleaded his Section 2 claim. He has. As a result, it is unnecessary at this stage for the Court to address whether the TTV Defendants are potentially liable for the doxing and threats of physical violence against Andrews and his family by non-parties—their so-called "stochastic intimidation" argument—or whether the TTV Defendants would have a First Amendment defense against such liability.[104]

### ii.   Agreement

Andrews asserts that the TTV Defendants worked together and in tandem with the D'Souza Defendants to produce, distribute, and publicize the movie, *2000 Mules*.[105] True the Vote was an executive producer of the movie and allegedly provided "research" on which the movie and D'Souza's related book were based.[106] Further, the FAC alleges that the TTV Defendants worked together to

---

[103]   *See generally* ECF 27, ¶¶ 32–76.

[104]   ECF 58-1, at 12–16, 19–20; ECF 90, at 6–8.

[105]   ECF 27, ¶¶ 18–22.

[106]   *Id.* ¶ 20.

intentionally mischaracterize information to support their ballot mules theory, including the footage depicting Andrews and his SUV.[107] The TTV Defendants and D'Souza Defendants directly targeted Andrews by asserting that he was committing a crime by putting multiple ballots in the drop box. These allegations are sufficient to allege an agreement between and among the TTV Defendants as well as the D'Souza Defendants.

The TTV Defendants further argue that (1) they had a "legitimate rationale" for their conduct that was not targeted to Andrews's exercise of his vote[108] and (2) Andrews has not met the pleading standard because he alleges only "parallel action" by Defendants.[109]  These arguments fail to treat the FAC's allegations in the light most favorable to Andrews. He contends that Defendants developed and promoted a false narrative that ballot mules conspired to rig the 2020 election. As part of that narrative, the FAC alleges that the TTV Defendants and D'Souza Defendants used footage of Andrews's image and license plate (both blurred and unblurred) while he was voting via drop box to *specifically* and *falsely* accuse Andrews of committing a crime. The TTV Defendants and the D'Souza Defendants continued to make the allegedly false statements about Andrews and

---

[107]  *Id.* ¶¶ 18–24, 33, 41–44, 50–51, 76, 102–12, 117–19.

[108]  ECF 58-1, at 22. *See generally id.* at 22–24.

[109]  *Id.* at 31–33; ECF 90, at 8–9.

use the footage of him even after the GBI and Elections Board communicated that Andrews had committed no such crime.[110] Considering Andrews's allegations as true, the argument that there is an "obvious, alternative explanation" for these Defendants' conduct[111] is unpersuasive at this pleading stage. The TTV Defendants are free to raise these arguments again on a summary judgment motion if appropriate, or trial. Andrews has carried his burden to plead a conspiracy between and among the TTV Defendants as well as the D'Souza Defendants.

Finally, the TTV Defendants assert that Andrews has not pleaded with "any [p]articularity" the details of their alleged conspiracy,[112] but that is not the standard. Intent and knowledge may be pleaded generally. Fed. R. Civ. P 9(b). The TTV Defendants cite no authority for this proposition, because there is none. And, the Court finds that the FAC has pleaded Count I with more than sufficient particularity in any event.

The TTV Defendants' motion to dismiss Count I is denied.

---

[110] *Id.* ¶¶ 129–32.

[111] ECF 58-1, at 33–34.

[112] *Id.* at 30–31.

**B.      Count II: Violation of the Voting Rights Act (52 U.S.C. § 10307(b))**

Section 11(b) of the Voting Rights Act (VRA) provides:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote . . . .

52 U.S.C. § 10307(b). Andrews alleges that Defendants' actions of (among other things) publicizing his image and license plate number and making false accusations that he committed crimes intimidated and continue to intimidate him. Specifically, he alleges that Defendants' conduct had the "foreseeable and predictable effect of intimidating" him from exercising his right to vote and from assisting his family in voting going forward.[113]

Both the Salem Defendants and the TTV Defendants argue that there is no private right of action under Section 11(b).[114] It is true that Section 11(b) sets forth no express cause of action for private parties to sue to enforce its protections. Accordingly, the Court applies the *Sandoval* analysis to assess whether a private

---

[113] *See generally* ECF 27, ¶¶ 271–73.

[114] ECF 54-1, at 13–14 (Salem Defs.); ECF 58-1, at 16–17 (TTV Defs.). The D'Souza Defendants adopt the Salem Defendants' arguments in this regard. ECF 50-1, at 7.

right of action may be implied under Section 11(b). *Alexander v. Sandoval*, 532 U.S. 275 (2001).

For an implied right of action to exist, the statute must contain both (1) rights-creating language and (2) language demonstrating congressional intent to provide a private remedy to enforce that right. *Id.* at 286–88. With regard to rights-creating language, Section 11(b) defines a class of persons—any person voting, attempting to vote, or aiding anyone in voting or attempting to vote (among others)—and their right to not be intimidated, threatened, or coerced. *Colorado NAACP*, 2023 WL 1338676, at *4 (concluding under the *Sandoval* analysis that Section 11(b) contains rights-creating language). The Court finds that Section 11(b) contains rights-creating language.

The second prong of the *Sandoval* analysis, however, which requires language demonstrating congressional intent to provide a private cause of action, is a different matter. Section 3 of the VRA provides that "aggrieved person[s]" may initiate statutory proceedings to enforce the voting guarantees of the 14th and 15th Amendments. 52 U.S.C. § 10302(a)–(c). And Section 14 of the VRA sets out various rules and procedures for "enforcement proceedings" under the statute, including a provision allowing for attorney's fees to a "prevailing party, other than the United States" in an "action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10310(e). These passages indicate

that private parties have a right to enforce the provisions of the VRA that enforce the guarantees of the 14th and 15th Amendments. But Andrews points to no persuasive—and certainly no controlling—authority that Section 11(b) is designed to protect the guarantees of those constitutional amendments. Indeed, at least one district court has concluded that Section 11(b) stems from the Elections Clause rather than the 14th or 15th Amendments. *League of United Latin Am. Citizens,* 2018 WL 3848404, at *3.[115] The Court agrees that there is no identifiable link between the rights created under Section 11(b) of the VRA and any statutory language demonstrating congressional intent to provide a private remedy for a violation of those rights. Accordingly, the Court concludes that there exists no private right of action under Section 11(b) of the VRA.  Count II is dismissed as to all Defendants.

## C.    Count III: Defamation/Defamation Per Se

A claim for defamation under Georgia law has four elements: (1) a false and defamatory statement about the plaintiff; (2) publication; (3) fault by the defendant; and (4) special damages or the per se actionability of the statement (*i.e.*, defamation per se). *Am. Civil Liberties Union, Inc. v. Zeh*, 312 Ga. 647, 650 (2021) (citing *Mathis v. Cannon*, 276 Ga. 16, 20–21 (2002)); *see also H&R Block E. Enters., Inc. v. Morris*, 606 F.3d 1285, 1296 (11th Cir. 2010) ("In Georgia, a statement generally

---

[115]  That court concluded there is a private right of action under Section 11(b) without discussing *Sandoval*. This Court declines to adopt such an approach.

may support a claim for defamation only if it is false, published, and unprivileged."). Because Andrews is not alleged to be a public figure[116]—something no Defendant disputes—the level of fault he must show is only ordinary negligence. *Zeh*, 312 Ga. at 650. Special damages must be pleaded with particularity. Fed. R. Civ. P. 9(g).

Defamation per se involves words that are "recognized as injurious on their face" without the need for extrinsic proof. *Cottrell v. Smith*, 299 Ga. 517, 523 (2016) (quoting *Bellemeade, LLC v. Stoker*, 280 Ga. 635, 637–38 (2006)). Asserting that someone has committed a crime punishable by law constitutes defamation per se. *Id.* at 524. "[T]he statement must give the impression that the crime is actually being charged against the individual and couched in language as might reasonably be expected to convey such meaning to a hearer of the statement." *Id.* A plaintiff need not show special damages to make out a claim for defamation per se. *Id.* at 523. Because each group of Defendants is accused of making defamatory statements in different contexts, the Court addresses whether Andrews has stated claims for defamation and defamation per se as to each group in turn.

---

[116]  ECF 27, ¶ 277.

### 1.     The Salem Defendants[117]

### i.     Of and Concerning

The Salem Defendants assert that Andrews fails to allege they made any false or defamatory statements about him because he could not be identified from the images they published.[118] Viewing Andrews's allegations in the light most favorable to him, the FAC (albeit indirectly) indicates that both he and his wife recognized his blurred image.[119] Andrews further alleges that Regnery published the *2000 Mules* book, which reprinted a blurred image of Andrews and the allegedly false statements that he had committed a crime.[120] Salem Media indirectly owns Regnery.[121] Salem Media also produced the *2000 Mules* movie, and distributed other media that was used to promote it.[122] The FAC asserts that Salem Media aired a program that showed an unblurred image of Andrews's face and license plate and contained the false statements about him.[123] "The 'of and concerning' test . . . is whether persons who knew or knew of the plaintiff could

---

[117]   The D'Souza Defendants adopted the Salem Defendants' arguments concerning Andrews's defamation claims.

[118]   ECF 54-1, at 17–21.

[119]   ECF 27, ¶ 90.

[120]   ECF 27, ¶¶ 70, 163.

[121]   *Id.* ¶ 73.

[122]   *Id.* ¶ 25.

[123]   *Id.* ¶¶ 49–50.

reasonably have understood that the [portrayal] was a portrayal of the plaintiff." *Smith v. Stewart*, 291 Ga. App. 86, 92 (2008) (cleaned up); *see also Bell v. Johnson Publ'g Co., LLC*, 2018 WL 357888, at *4 (M.D. Ga. Jan. 10, 2018) (concluding under Georgia law that news articles using pseudonyms contained sufficient detail to be "of and concerning" two of the plaintiffs); *Eakin v. Rosen*, 2017 WL 5709564, at *3 (M.D. Ga. Nov. 27, 2017) (to sustain an action for libel, "there is no requirement that the defamatory statement refer directly to the plaintiff," but "the allegedly defamatory words must refer to some ascertained or ascertainable person, and that person must be plaintiff").

Whether all identifying aspects of Andrews were "redacted" is a factual dispute unfit for resolution at this stage. For this reason, Andrews's failure to allege that Regnery or D'Souza Media ever published an unblurred image of him is not fatal to his defamation claims against them.  *Cf. Triangle Publ'ns, Inc. v. Chumley*, 253 Ga. 179, 182 (1984) (rejecting the argument that the depiction of the plaintiff in a photograph in an advertisement about teen pregnancy was not "of and concerning" the plaintiff because it did not use her name).[124]

---

[124] The TTV Defendants' similar argument that the allegedly defamatory publications were not "of and concerning" Andrews and that they did not identify him is rejected for the same reasons. ECF 58-1, at 5–9, 40–42.

> ii.  **Special Damages**

The Salem Defendants also argue that Andrews's defamation claim must be dismissed because he has not alleged special damages.[125] Andrews need not allege special damages to state a claim for defamation per se. *Cottrell*, 299 Ga. at 522–23. For his basic defamation claim (*i.e.*, defamation per quod), however, Andrews must allege special damages with particularity. *Eakin*, 2017 WL 5709564, at *5; Fed. R. Civ. P. 9(g). "Special damages are those damages that actually flowed from the act. More specifically, special damages are sustained where there is a loss of money, or some other material temporal advantage capable of being assessed in monetary value." *Hood v. Dun & Bradstreet, Inc.*, 486 F.2d 25, 32–33 (5th Cir. 1973) (cleaned up); *see also* O.C.G.A. § 51-12-2(b) ("Special damages are those which actually flow from a tortious act.").

Andrews's cause of action generally alleges special damages, including harm to his reputation and standing in the community, "personal humiliation, mental anguish and suffering, emotional distress, stress, anxiety, and other pecuniary loss."[126] Andrews has allegedly changed his daily life and voting patterns, suffered psychological harm, and had his professional reputation

---

[125]  ECF 54-1, at 22.

[126]  ECF 27, ¶ 294.

damaged.[127] Specifically, he pleads that Defendants' conduct has resulted in him and his family receiving death threats and other threats of physical harm.[128] Andrews has allegedly spent time and money installing a surveillance system at his home and paid to have personal information about him and his family scrubbed from the internet. He also claims to have incurred costs changing his license plate and undertaking other efforts to reduce the likelihood that his SUV would be recognized.[129] *See Hood*, 486 F.2d at 33 (noting that the Georgia Supreme Court has categorized as special damages "the pecuniary expense incurred by the plaintiff in removing from customers' minds the effect of false statements made in a credit report" (citing *Bradstreet Co. v. Oswald*, 96 Ga. 396 (1894)). The Court concludes that Andrews's allegations plausibly support the contention that he suffered special damages. *Twombly*, 550 U.S. at 570; *Am. Dental Ass'n,* 605 F.3d at 1289. That is all that is required at this stage. [130]

### 2.      The D'Souza Defendants

The D'Souza Defendants simply adopt the legal arguments made by the Salem Defendants and present no independent arguments why the defamation

---

[127]   *Id.* ¶¶ 198, 247.

[128]   *Id.* ¶ 198.

[129]   *Id.* ¶ 217.

[130]   The TTV Defendants' similar argument is rejected for the same reasons. ECF 58-1, at 42–44.

claims against them should be dismissed. Indeed, the FAC is replete with allegations of defamatory statements purportedly made by them.[131]

* * * *

Andrews's defamation and defamation per se claims against the Salem Defendants and the D'Souza Defendants are not subject to dismissal at this stage.

### 3.   The TTV Defendants

#### i.   Andrews sufficiently alleges that the TTV Defendants published defamatory statements about him.

The FAC alleges that the TTV Defendants made and published multiple per se defamatory statements about Andrews: While appearing on programs that were broadcast to audiences of various sizes, Engelbrecht and Phillips both accused Andrews of having engaged in illegal voting conduct and other crimes, including that Andrews was engaged in illegal ballot trafficking.[132] Engelbrecht and Phillips did not name Andrews during most of those programs, but made the comments over displays of Andrews's image and car in which Andrews's face and license plate were blurred.[133] They also appeared on at least one program where Andrews's face and license plate were broadcast without blurring while directly

---

[131]   *See supra* Section II.B.1.

[132]   ECF 27, ¶¶ 49–50, 56–57, 66.

[133]   *Id.*

accusing Andrews of being a ballot mule and committing a crime.[134] The FAC alleges that True the Vote made the clip of that appearance available on its Facebook page.[135] True the Vote also published on its website and social media accounts videos of certain of the broadcasts in which Englebrecht and Phillips appeared.[136] It posted to social media a trailer for *2000 Mules* that includes an image of Andrews voting as an example of a ballot mule.[137] Without a shred of evidence to support his statement (according to the FAC), Phillips accused Andrews of having several times put multiple ballots in drop boxes.[138] Further, Engelbrecht stated that Andrews's phone "was at a violent riot."[139]

Assuming for purposes of Defendants' motions to dismiss that the TTV Defendants made these statements and that they are false, they were defamatory. To the extent the statements falsely accused Andrews of committing any crime, they were defamatory per se. *Zeh*, 312 Ga. at 650; *Cottrell*, 299 Ga. at 527 (finding a statement that the plaintiff was participating in a theft of technology was "on its face . . . arguably per se defamatory as imputing a crime"). Even statements that

---

[134] *Id.* ¶¶ 49–50, 56–57.

[135] *Id.* ¶ 63.

[136] *Id.* ¶¶ 64, 69.

[137] *Id.* ¶ 162.

[138] *Id.* ¶ 67.

[139] *Id.* ¶ 68.

may not qualify as defamatory per se are alleged to have been demonstrably false.[140] That is enough.

### ii.    The TTV Defendants' Arguments

The TTV Defendants' scattered arguments that their allegedly false statements about Andrews are subject to First Amendment protection because they did not specifically identify him, that their statements were about a matter of public concern, and that the statements were matters of opinion, are unpersuasive.[141]

To start, the First Amendment does not protect defamatory statements. "From 1791 to the present, the First Amendment has permitted restrictions upon the content of speech in a few limited areas. These historic and traditional categories are long familiar to the bar and perhaps, too, the general public. . . . [One] is defamation—false statements of fact harming another's reputation." *Counterman v. Colorado*, 600 U.S. 66, 143 S. Ct. 2106, 2113–14 (2023) (cleaned up). Nor have the TTV Defendants pointed to any case law suggesting that defamatory statements—particularly of the per se variety—are subject to First Amendment protection just because they involve a matter of public interest.[142] *Eidson v. Berry*,

---

[140]  *Id.* ¶¶ 80–82, 91–95.

[141]  *See generally* ECF 58-1, at 1–9, 15–16, 18–21, 34–40.

[142]  *Id.* at 15–16.

202 Ga. App. 587, 587–88 (1992) ("Any defamatory expression on matters of public concern that is provable as false may carry liability under state defamation law.") (*Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19–20 (1997)).

While the TTV Defendants strenuously argue that their statements were matters of opinion, it is quite plain that, as alleged in the FAC, they were not. As Andrews pleads, those statements included the following:

- Andrews actions as a mule (putting ballots into the drop box) were "highly illegal";[143]

- Andrews's conduct was "organized crime";[144]

- Andrews's phone "was at a violent riot."[145]

These are not statements of opinion. They are assertions of fact.

Even if they could be characterized as opinions, Georgia law provides for "no wholesale defamation exemption for anything that might be labeled 'opinion.'" *Eidson*, 202 Ga. App. at 587 (cleaned up). Moreover, a plaintiff may be liable for an opinion when his "statements can reasonably be interpreted as stating or implying defamatory facts about plaintiff and, if so, whether the defamatory assertions are capable of being proved false." *Id.* at 588. Andrews has alleged both.

---

[143] *Id.* ¶¶ 46, 49–50.

[144] *Id.* ¶ 46.

[145] *Id.* ¶ 68.

As discussed throughout this Order, Andrews alleges that the TTV Defendants made specific statements about his conduct while displaying an identifiable image of him. The statements that Andrews engaged in criminal activity are also capable of being proved false. *Id.* ("[T]he accusation that plaintiff is guilty of a crime punishable by law is susceptible of being proved false."); *see also Harcrow v. Struhar*, 236 Ga. App. 403, 404 (1999) ("Whether stated directly or by implication or innuendo, it is libelous per se to falsely state that a person is guilty of a crime."). In fact, the FAC alleges that they *were* shown to be false and that the TTV Defendants kept making them anyway.[146] As alleged, the TTV Defendants made numerous statements that were defamatory (and defamatory per se) that are not entitled to protection.

The TTV Defendants' motion to dismiss the defamation claims is denied.

### 4. Punitive Damages

The Salem Defendants and TTV Defendants move to dismiss Andrews' demand for punitive damages.[147] To recover punitive damages under O.C.G.A.

---

[146] *See, e.g.*, ECF 27, ¶¶ 149, 162.

[147] Although Andrews pleaded punitive damages as a separate cause of action (Count VII), it is not a stand-alone claim. *Byrne v. Nezhat*, 261 F.3d 1075, 1093 n.34 (11th Cir. 2001) ("[C]ertain causes of action, such as intentional torts, may provide for the recovery of punitive as well as compensatory damages."), *abrogated on other grounds as recognized in Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146 (11th Cir. 2011); *see also Massey v. Kelly, Inc.*, 742 F. Supp. 1156, 1158

§ 51-12-5.1, a plaintiff must prove "by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). "Negligence, even gross negligence, is inadequate to support a punitive damage award." *Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 118 (1988), *superseded by statute on other grounds as stated in Kent v. White*, 249 Ga. App. 893 (2001).

The FAC pleads that Defendants continued to publish and broadcast his image and the false statements about him even after they were aware the GBI and Elections Board had cleared Andrews of any improper conduct with regard to his use of the ballot drop box during the 2020 election.[148] They continued to make the movie and book available, and to promote them, even after receiving notice from Andrews's attorneys that the statements were false and defamatory.[149]

Andrews pleads that Defendants had no evidence to support their false statements,[150] and that the geolocation data on which they relied to claim Andrews went to multiple drop boxes and was at a "violent riot" was not precise enough to

---

(N.D. Ga. 1990) ("[T]he Georgia statute for punitive damages is not grounds for an independent cause of action.").

[148]  ECF 27, ¶¶ 129–31, 136, 147.

[149]  *Id.* ¶ 158.

[150]  *See, e.g.*, *id.* ¶¶ 51, 287.

show any such thing.[151] That is because multiple authorities have demonstrated that the data on which Defendants supposedly relied is not sufficiently precise to show that an individual was at a drop box.[152]

These allegations are sufficient to plead punitive damages. The Salem Defendants and TTV Defendants' motion in this regard is denied.

### D.    Count IV: False Light Invasion of Privacy

All Defendants move to dismiss Andrews's False Light Invasion of Privacy claim. "To establish a claim of false light invasion of privacy, a plaintiff must show the existence of false publicity that depicts the plaintiff as something or someone which he is not. Next, the plaintiff must demonstrate that the false light in which he was placed would be highly offensive to a reasonable person." *Doe v. Roe*, 362 Ga. App. 23, 32 (2021) (quoting *Williams v. Cobb Cnty. Farm Bureau*, 312 Ga. App. 350, 353 (2011)). *See also Zarach v. Atlanta Claims Ass'n*, 231 Ga. App. 685, 689–90 (1998) (indicating the plaintiff must have been depicted as something he is not).

Andrews alleges that Defendants depicted him in a false light by, among other things, portraying him as "engaged in a nationwide criminal conspiracy . . . to accept payments . . . to engage in election fraud" and having

---

[151]  *Id.* ¶¶ 102–04.

[152]  *Id.*

engaged in "multiple violent crimes."[153] *See Cabaniss v. Hipsley*, 114 Ga. App. 367, 375 (1966) (listing false-light cases in which the plaintiffs alleged the defendants had made false statements asserting the plaintiffs engaged in criminal activity). Andrews also alleges that such depictions would be offensive to a reasonable person.[154] Indeed, the Georgia Court of Appeals has made clear that the interest being protected in a false light case is "that of reputation." *Ass'n Servs., Inc. v. Smith*, 249 Ga. App. 629, 633 (2001) (quoting *Cabaniss,* 114 Ga. App. at 375). And false accusations of criminal conduct are so obviously offensive to reasonable people that they do not require proof of special damages. *Zielinski v. Clorox Co.*, 227 Ga. App. 760, 761 (1997), *rev'd in part on other grounds*, 270 Ga. 38 (1998), and *vacated in part*, 235 Ga. App. 886 (1999); *cf. Holmes v. Dominique*, 2015 WL 11236539, at *5 (N.D. Ga. Jan. 20, 2015) (concluding that an average person would find false accusations of criminal activity defamatory on their face).

---

[153] *Id.* ¶ 299. *See also id.* at ¶¶ 39–46, 49–52.

[154] *Id.* ¶ 300.

### 1.    Defendants' Arguments[155]

Defendants argue that Andrews's false-light claim must be dismissed because it is based on the same allegations as his defamation claims.[156] In support, they rely on *Smith v. Stewart*, 291 Ga. App. 86, 100 (2008) and *Bollea v. World Championship Wrestling, Inc.*, 271 Ga. App. 555, 556–57 n.1 (2005). Those cases state that a false-light claim must allege a nondefamatory statement to survive, or it is simply a claim for defamation. But both *Smith* and *Bollea* were decided at summary judgment. While Andrews alleges that Defendants' statements about him were defamatory, the evidence may prove otherwise. A plaintiff may plead inconsistent claims and remedies. Fed. R. Civ. P. 8(d); *see also Allstate Ins. Co. v. James*, 779 F.2d 1536, 1540 (11th Cir. 1986) ("Litigants in federal court may pursue alternative theories of recovery, regardless of their consistency."); *Krass v. Obstacle Racing Media, LLC*, No. 1:19-CV-05785-JPB, 2021 WL 4824110, at *3 (N.D. Ga. Feb. 2, 2021) (holding, at the motion to dismiss stage, that a plaintiff may plead both a defamation claim and a false-light invasion of privacy claim); *Maples v. Nat'l Enquirer*, 763 F. Supp. 1137, 1143 (N.D. Ga. 1990) (similar). Defendants' argument does not provide a basis for dismissing this claim at the pleading stage.

---

[155]    Both the TTV Defendants and the D'Souza Defendants have adopted the arguments made by the Salem Defendants regarding Andrews's false light claim. ECF 50-1, at 8; ECF 58-1, at 44–45.

[156]    ECF 54-1, at 23.

The Salem Defendants also argue that "all possible identifying aspects of Plaintiff in the film and book were redacted."[157] Since they never named or identified him in the *2000 Mules* film or book, these Defendants claim they could not have "depicted" Andrews at all.[158] The FAC, however, specifically alleges that Salem Media produces one of the programs on which Engelbrecht and Phillips published unblurred images of Andrews.[159] Further, whether Andrews was "depicted" is a factual dispute the Court cannot resolve at this pleading stage.[160] For this reason, Andrews's failure to allege that Regnery or D'Souza Media ever published an unblurred image of him is not fatal to his false-light claim against them. If Andrews was identifiable even with his face blurred, then Defendants' arguments on this point will fail. And, viewing Andrews's allegations in the light most favorable to him, the FAC indicates that both he and his wife recognized his blurred image in the trailer for *2000 Mules*.[161] *Compare Collins v. Creative Loafing*

---

[157] *Id.* at 24.

[158] Although the TTV and D'Souza Defendants purport to adopt this argument as well, the FAC alleges that the TTV Defendants and D'Souza published unblurred images of Andrews. ECF 27, ¶¶ 49–50, 56–57, 63, 147.

[159] *Id.* ¶¶ 49–50.

[160] For this reason, Andrews's failure to allege that Regnery or D'Souza Media ever published an unblurred image of him is not fatal to his false-light claim against them. If Andrews was identifiable even with his face blurred, then Defendants' arguments on this point will fail.

[161] ECF 27, ¶ 90.

*Savannah, Inc.*, 264 Ga. App. 675, 678 (2003) (concluding at summary judgment that an illustrated caricature was "unrecognizable as a 'real person'" and did not "really reflect on any particular individual"; stating that there was no record evidence that anyone recognized the image as that of the plaintiff).

Likewise, the TTV Defendants proclamations that they did not specifically identify Andrews and that other people were responsible for airing his image[162] are not proper at this stage since these contentions are inconsistent with Andrews's well-pleaded allegations.

Finally, Defendants argue that there is a newsworthy exception to the right to privacy under Georgia law.[163] They claim that the integrity of the 2020 election is a matter of public interest and that the use of Andrews's image was therefore newsworthy.[164] However, this exception is only applicable when the account is factually accurate. *Maples*, 763 F. Supp. at 1143. Whatever Defendants' personal beliefs, the FAC plainly alleges that none of the depictions of Andrews was true — and that Defendants ***knew*** they were not true.

---

[162]  ECF 58-1, at 7–9, 11–12.

[163]  ECF 54-1, at 26–27. This argument also applies to Andrews's appropriation of likeness claim. *Id.*

[164]  *Id.*

Defendants' motion to dismiss Andrews's False Light Invasion of Privacy claim is denied.

### E.     Count V: Appropriation of Likeness Invasion of Privacy

Defendants likewise move to dismiss Andrews's Appropriation of Likeness Invasion of Privacy claim. "[A]n appropriation of likeness claim in Georgia consists of the following elements: [1] the appropriation of another's name and likeness, whether such likeness be a photograph or other reproduction of the person's likeness, [2] without consent, and [3] for the financial gain of the appropriator." *Bullard v. MRA Holding, LLC*, 292 Ga. 748, 752 (2013) (cleaned up); *see also Cabaniss*, 114 Ga. App. at 377 (stating that an appropriation claim "consists of the appropriation, for the defendant's benefit, use or advantage, of the plaintiff's name or likeness"). The interest being protected is "a proprietary one, in the exclusive use of the plaintiff's name and likeness as an aspect of his identity." *Bullard*, 292 Ga. at 752 (quoting *Martin Luther King, Jr., Ctr. for Soc. Change, Inc. v. Am. Heritage Prods., Inc.*, 250 Ga. 135, 142 (1982)). But there is no requirement that the plaintiff have any preexisting commercial value in his name; that is, the plaintiff can be a private citizen and need not be a celebrity. *Id.*

Andrews alleges that Defendants' publication of his likeness (both with his face blurred and unblurred) was without his consent.[165] He also pleads that

---

[165]  *See, e.g.*, ECF 27, ¶¶ 37, 311.

Defendants engaged in this conduct for financial gain, through (among other things) the sale of tickets to and DVDs of *2000 Mules*, sales of the corresponding book, and to drive subscriptions to Defendants' other platforms.[166]

### 1. Defendants' Arguments[167]

The Salem Defendants argue that the FAC fails to allege either of them ever used or intended to use Andrews's likeness.[168] As to Salem Media, this argument fails for the same reasons as it does with regard to the false-light claim: Salem Media purportedly aired a program in which Andrews's face was shown unblurred.[169] The allegations in the FAC are sufficient to plead that Salem Media improperly used Andrews's likeness.[170]

As to the remaining Defendants, they argue that Andrews's likeness was "not readily recognizable."[171] As discussed above, this is a dispute with the

---

[166] *See, e.g., id.* ¶¶ 170–72, 175, 312.

[167] The TTV Defendants and the D'Souza Defendants adopted the arguments made by the Salem Defendants. ECF 50-1, at 8; ECF 58-1, at 44–45.

[168] ECF 54-1, at 25.

[169] *See supra* Section IV.D.1.

[170] This is also true as to the TTV Defendants and D'Souza, who allegedly publicized unblurred images of Andrews's face.

[171] ECF 54-1, at 25.

pleading that the Court may not resolve at this stage. And in any event Andrews alleges that his blurred likeness *was* recognizable.[172]

### F.   Count VI: Civil Conspiracy

To recover on a claim of civil conspiracy, the plaintiff must show that two or more persons combined "either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort." *McIntee v. Deramus*, 313 Ga. App. 653, 656 (2012). The Court has already concluded that the FAC sufficiently alleges the TTV Defendants and the D'Souza Defendants conspired in violation of 42 U.S.C. § 1985(3). Accordingly, the pleading also satisfies the standard to allege a civil conspiracy under Georgia law. As to the Salem Defendants, the civil conspiracy claim is properly dismissed.[173]

### G.   Andrews's Motion for Leave to File Supplemental Complaint

On August 7, 2023, Andrews filed a motion seeking leave to supplement his pleading under Fed. R. Civ. P. 15(d).[174] The Court may permit a plaintiff to amend his pleading to "set[ ] out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." *Id.* Andrews filed the FAC on

---

[172]   ECF 27, ¶ 90.

[173]   *See supra* Section IV.A.2.

[174]   ECF 98.

December 1, 2022. For the most part, his proposed amendment addresses events that allegedly took place after that date, which support his existing claims.[175]

Under Rule 15, the Court should freely grant leave to amend. *Harris v. Garner*, 216 F.3d 970, 984 (11th Cir. 2000) (indicating that Rule 15 provides for the "liberal allowance of amendments or supplements" to pleadings). And Defendants did not respond to Andrews's motion, leaving it unopposed. LR 7.1(B), NDGa. Because the Court does not find any substantial reason for denying the motion, such as undue delay or futility, the motion is granted.

## V.   Conclusion

The Salem Defendants' motion to dismiss [ECF 48] is **GRANTED in part** and **DENIED in part**. Counts I, II, and VI are **DISMISSED** as to Salem Media and Regnery. The Salem Defendants' motion for a more definite statement [ECF 47] is **DENIED**. The TTV Defendants' motion to dismiss [ECF 58] is **GRANTED in part** and **DENIED in part**. Count II is **DISMISSED** as to the TTV Defendants. The D'Souza Defendants' motion to dismiss [ECF 50] is **GRANTED in part** and **DENIED in part**. Count II is **DISMISSED** as to the D'Souza Defendants. Andrews's motion for leave to file a supplemental complaint [ECF 98] is **GRANTED**. The Clerk is **DIRECTED** to separately file ECF 98-1 on the docket.

---

[175] ECF 98-1. To the extent the supplement describes events before then, the Court reads it as providing context for Defendants' alleged subsequent conduct.

Defendants are **DIRECTED** to answer the First Amended Complaint as supplemented within 21 days of this Order.

**SO ORDERED** this 30th day of September, 2023.

Steven D. Grimberg
United States District Court Judge