<pre>
 1                  UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3

 4   MARK ANDREWS                    )  Docket Number
                                     )  1:22-CV-4259-SDG
 5                                   )
                                     )
 6              v.                   )
                                     )
 7                                   )  Atlanta, Georgia
                                     )  August 24, 2023
 8   DINESH D'SOUZA, et al.          )
                                     )
 9                                   )

10

11                    TRANSCRIPT OF MOTIONS
              BEFORE THE HONORABLE STEVEN D. GRIMBERG
12                UNITED STATES DISTRICT JUDGE

13
     APPEARANCES OF COUNSEL:
14

15   For the Plaintiff:            MR. VON A. DuBOSE
                                   DuBOSE MILLER
16                                 75 14th Street, Northeast
                                   Suite 2110
17                                 Atlanta, Georgia 30309

18                                 MS. LEA HABER KUCK
                                   PRO BONO LAW - NY
19                                 One Manhattan West
                                   New York, New York 10001
20
                                   MS. SARA CHIMENE-WEISS
21                                 PROTECT DEMOCRACY
                                   2020 Pennsylvania Avenue
22                                 Suite 163
                                   Washington, D.C. 20006
23
     For Dinesh D'Souza and        MS. AMANDA HYLAND
24   D'Souza Media, LLC:           TAYLOR ENGLISH DUMA
                                   1600 Parkwood Circle
25                                 Suite 200
                                   Atlanta, Georgia 30339
</pre>

```
 1
 2  For True the Vote, Inc.;       MR. JOSEPH R. LARSEN
    Catherine Engelbrect;          MR. MICHAEL J. WYNNE
    and Gregg Phillips:            MR. CAMERON POWELL
 3                                 GREGOR WYNEE ARNEY, PLLC
                                   909 Fannin Street
 4                                 Suite 3800
                                   Houston, Texas 77010
 5
                                   MS. MOLLY H. PARMER
 6                                 PARMER LAW
                                   1201 West Peachtree Street
 7                                 Suite 2300
                                   Atlanta, Georgia 30309
 8
    Salem Media Group, Inc.        MR. S. DEREK BAUER
 9  and Regnery:                   MR. ANDREW GROSSMAN
                                   MR. IAN K. BYRNSIDE
10                                 BAKER HOSTETLER
                                   1170 Peachtree Street
11                                 Suite 2400
                                   Atlanta, Georgia
12
13  Amicus Campaign Legal          MR. HAYDEN JOHNSON
    Center:                        CAMPAIGN LEGAL CENTER
14                                 1101 14th Street, Northwest
                                   Washington, D.C. 20005
15
16
17
    Official Court Reporter:       ALICIA B. BAGLEY, RMR, CRR
18
19          Proceedings recorded by mechanical stenography, transcript
                        produced by computer
20
21
22
23
24
25
```

<u>P R O C E E D I N G S</u>

(Atlanta, Fulton County, Georgia; August 24, 2023,

in open court)

THE COURT:  All right.  Let me call the case.  This is

Andrews vs. D'Souza, et al.  Case Number 22-CV-4259.  Let's have

appearances of counsel beginning with the plaintiff.

MR. DuBOSE:  Good morning, Judge Grimberg.  Pleasure to

be before you.

THE COURT:  Good morning.

MR. DuBOSE:  My name is Von DuBose of the DuBose Miller

Law Firm here in Atlanta.  I have here with me today my co-counsel Lea

Haber Kuck and Sara Weiss.

THE COURT:  Good morning.

MR. DuBOSE:  So Ms. Kuck will address the state law

claims and Ms. Weiss will address the federal law claims.  I will

follow them with any, to the extent necessary, argument regarding the

motion for a more definite statement.

THE COURT:  All right.

MR. DuBOSE:  So we are privileged to represent the

plaintiff.

THE COURT:  Hold on.  Let me get appearances of counsel

first and we'll go from there.  Thank you.

MR. DuBOSE:  All right.

THE COURT:  All right.  Counsel for Defendant D'Souza

and related parties.

1          MS. HYLAND:  Amanda Hyland for Defendants Dinesh D'Souza

2   and D'Souza Media.

3          THE COURT:  All right.  Good to see you.

4      And let's see.  How about the media groups, Salem Media

5   Group and Regnery Publishing.

6          MR. BAUER:  Yes, Your Honor.  Good morning.  Derek

7   Bauer with Baker Hostetler for Salem and Regnery.  With me are my law

8   partners Andrew Grossman and Ian Byrnside.  Also with us is general

9   counsel of Salem Media Group, Mr. Chris Henderson, from California.

10          THE COURT:  Terrific.  All right.  Good to see you all.

11      I think we have one set of defendants left; correct?

12   Defendants Engelbrecht, Phillips, and True the Vote?

13          MR. LARSEN:  Good morning, Your Honor.

14          THE COURT:  Good morning.

15          MR. LARSEN:  Joe Larsen with Gregor Wynne Arney here

16   for True the Vote, Catherine Engelbrecht, and Gregg Phillips.  I'm

17   with my cocounsel Michael Wynne and Cameron Powell and Molly Parmer.

18   I'll be doing the argument.  I appreciate the Court's indulgence.  I'm

19   on this wheelchair and I'll be giving the argument from the table.

20          THE COURT:  No problem.  No problem at all.  Good to see

21   you.

22          MR. JOHNSON:  Your Honor, if I may.  Hayden Johnson here

23   as well for the *amicus* Campaign Legal Center.

24          THE COURT:  I'm sorry.  Thank you very much.  I didn't

25   mean to bypass you.

1          MR. JOHNSON:  Thank you for inviting us to participate.

2          THE COURT:  Absolutely, absolutely.

3      All right.  Is that everyone?  Okay.  Great.

4      Well, first of all, I have reviewed -- I can't say every

5  page, but the vast majority of the briefing from all sides, including

6  the *amicus*, and it was just terrific, terrific briefing.  It's almost

7  as if you do this every day.  So thank you for that.  It's just a

8  pleasure to read good writing.  One thing that you learn when you take

9  the bench is how the quality of the writing really varies tremendously

10  depending on the litigators and the briefing here is just topnotch all

11  the way around.  So thank you for that.

12          I'm looking forward to the argument.  I believe we've

13  allocated 75 minutes per side and then an additional 15 minutes for

14  the *amicus* briefing with a 15-minute response by the defendants.  So

15  unless you all -- have you all worked out an order?  If not, I can

16  suggest one.

17          MR. BAUER:  For the defendants we have allotted the time

18  amongst ourselves.

19          THE COURT:  All right.

20          MR. BAUER:  Yes, Your Honor.  But, of course, we want to

21  address whatever's on your mind so if you have something in mind,

22  we'll gladly tackle it.

23          THE COURT:  I have questions, don't worry.

24      Mr. DuBose.

25          MR. DuBOSE:  I think you asked whether we've discussed

1    amongst ourselves the sequencing for the arguments.  Is that what

2    you're getting at, Judge?

3                    THE COURT:  Yes, yes.

4                    MR. DuBOSE:  We have not.

5                    THE COURT:  Okay.  All right.

6                    MR. BAUER:  Not among the counterparties.  But

7    certainly the defendants have allocated how they want to spend their

8    time.

9                    THE COURT:  Right.

10                   MR. DuBOSE:  We have that sorted out on our side.

11                   THE COURT:  Okay.  All right.  Why don't we open with

12   the defendants and present your arguments.  You can allow time --

13   leave time for rebuttal, if you'd like, and then I'll give plaintiff

14   an opportunity to respond; all right?

15                   MR. BAUER:  May we proceed, Your Honor?

16                   THE COURT:  Yes.

17                   MR. BAUER:  Good morning again, Your Honor.  May it

18   please the Court.

19            My name is Derek Bauer.  I am privileged to represent

20   Defendants Salem Media and Regnery Publishing.  We only represent

21   those two defendants.

22            As the Court may know, Salem Media's core business is

23   national radio broadcasting and publishing focused on Christian and

24   family values and conservative values content.  Regnery is a

25   subsidiary of Salem that publishes books mostly focused on those same

1   themes.

2          As the Court knows, Mr. Andrews has sued Salem, Regnery, and

3   several others for what he says are false allegations that he was

4   involved in ballot-fraud activities in the 2020 presidential election.

5   All of Mr. Andrews' claims derive from the relatively straightforward

6   factual allegations that all of the defendants, including my clients,

7   Salem and Regnery, falsely identified him as a ballot mule in the 2000

8   Mules' movie and the companion book, also called 2000 Mules, even

9   though he is neither named, nor identifiably depicted in either of

10  those formats.  Then he alleges that some, but not all, of the

11  defendants - and specifically not my clients, Salem or Regnery - also

12  falsely, but clearly, identified him as a ballot mule on various

13  social media, news programs, and other platforms.

14          THE COURT:  Isn't Salem involved with the news programs

15  where the images were shown?

16          MR. BAUER:  There is one allegation in the 257 alleged

17  paragraphs of the complaint that even references a connection between

18  Salem in any of those non-movie and non-book publications that are

19  complained of, that's Paragraph 49, and it says, quite simply, that

20  some of these other defendants appeared on a show called The Charlie

21  Kirk Show.  It doesn't say where that's broadcast or published.  It

22  does have a footnote to a link that that is published on the True the

23  Vote website and a platform called Rumbl, neither of which, in fact,

24  have any connection to Salem, nor are they alleged to.

25          THE COURT:  Right.  But we're here on a motion to

1    dismiss, right, so taking that allegation as true --

2                 MR. BAUER:  Sure.

3                 THE COURT:  -- what's lacking?

4                 MR. BAUER:  The only allegation there is that Salem,

5    quote, "Produces The Charlie Kirk Show."

6                 THE COURT:  Right.

7                 MR. BAUER:  We don't know what that means and there's no

8    exposition in the complaint to explain it and, as I will argue and

9    explain, under Georgia law that is insufficient as a matter of law to

10   deem Salem to be the publisher, the speaker of what was uttered on The

11   Charlie Kirk Show, even if you construe the work produces in the way

12   most favorable to plaintiffs and you infer that that means Salem did

13   things that are not alleged in the complaint like directed the speech,

14   proved the speech, wrote the speech.  You have to have those

15   allegations in the complaint to tie Salem to any of those other

16   publications or broadcasts or speech that's challenged because under

17   Georgia law there is no *respondeat superior* liability for broadcast or

18   slander defamation, right?  So there's a reason for this.  When it's

19   printed and published, it's called libel, and we know who the speaker

20   is because it's written here and they had a chance to vet it before it

21   was published, theoretically.  So there's really no question when

22   you're talking about libel about who is the publisher and speaker of

23   the speech that's being challenged.

24               Our law recognizes that slander is different, that it's a

25   lot harder to control the more spontaneous and contemporaneous speech

1    that makes up broadcast defamation when you're on a talk show or a

2    radio show or just having a conversation in which slanderous

3    utterances might be made.  For that reason, it has been well-settled

4    in Georgia and repeatedly endorsed by this court and the state courts

5    in Georgia that there is no *respondeat superior* liability for slander

6    which is what The Charlie Kirk -- the one Charlie Kirk allegation

7    would be.  So it's important for the court to understand its

8    distinction.

9         Plaintiff has alleged in one paragraph of his complaint that

10   two other defendants uttered slanderous, false, defamatory statements

11   on The Charlie Kirk program.  But they have not alleged that Salem was

12   aware of, knew it, directed it, endorsed it, sponsored it, all of

13   which is required under Georgia law to plead a claim for slander

14   against someone who is not the speaker of the challenged speech.  So

15   that paragraph alone - and this is really the lynchpin of the Georgia

16   law tort claims and why they fail here - that is the only claim that

17   even remotely touches Salem.

18        THE COURT:  Well, and I know this is my fault because we

19   went on to this tangent about The Charlie Kirk Show, but from how I

20   understand plaintiff's allegations to be against your clients is it's

21   broader than that.  It also goes to the 2000 Mules' movie itself, even

22   though the images are blurred, and there's no question that your

23   client is responsible for that movie; correct?

24        MR. BAUER:  Well, what does the word "responsible"

25   mean, Your Honor?  Again, they have to plead it.  And let me explain

1  what I mean here.

2         In the 200 plus factual allegations in the complaint,

3  Salem -- which, you know, Regnery is the book only, that's the

4  publication of the book.

5              THE COURT:  Right.

6              MR. BAUER:  So when we're talking about the movie the

7  only connection we're talking about that's alleged in the complaint -

8  or that could be - is Salem.  There are nine direct mentions of Salem

9  in the entire complaint.  Here they all are:

10        Paragraph 49, the one we just discussed, they produced The

11  Charlie Kirk Show.  We don't really know what that means.

12        Paragraph 70 - Salem republished the image and mule claim in

13  the book.  We know that's Regnery and we know it's deidentified.

14        Paragraph 73 - Salem owns Regnery.

15        Paragraph 76 - The book states that D'Souza sought

16  investment from Salem to make the movie.

17        Paragraph 154 - Salem reported movie viewership and revenue

18  numbers to its investors or its stockholders.

19        Paragraph 158 - Plaintiff sent a demand letter to Salem.

20        Paragraph 173 - Salem again reported movie viewership and

21  revenues.

22        Paragraph 227 - Salem released and promoted the book.

23        And Paragraph 256 - Salem does business in Georgia.

24        So I do think there is a genuine question whether -- even if

25  you give the plaintiff every favorable inference from those limited

1   allegations about Salem's involvement in the movie, I don't know that

2   the Court can fairly discern that Salem is the speaker of the content

3   of the movie.  All I think you can really divine from that is that

4   Salem invested in the production, that's really the only paragraph

5   they allege that ties Salem to the content of the movie and it doesn't

6   really tie to the content.  Again, that's Paragraph 76.

7           In the book, Mr. D'Souza writes that he sought investment

8   from Salem to make a movie.  So all you can really infer, fairly, from

9   that one allegation is that Salem invested in the production of the

10  movie and promoted its investment.  And I want to pause here because I

11  think this neatly illustrates why we have an improper shotgun pleading

12  problem here and it should not be permitted to muddy the waters and

13  keep these defendants in a case on those kinds of thin, nonspecific

14  allegations about speech-based torts where the very first element is

15  who's the speaker?  Who published it?  That's who you sue.

16          And even if we accept all of those nine direct allegations

17  about Salem as true, which I agree we have to, I think it's

18  insufficient as a matter of law to deem Salem the speaker or publisher

19  of the content of the movie.  They don't become the publisher merely

20  because it's alleged to have made an equity investment in it or

21  encouraged people to go see it.  And if that were not the case, Your

22  Honor, then Truist Bank right down the street could be sued for

23  providing a loan to the Real Housewives of Atlanta to make their

24  production or Clear Channel Atlanta could be sued for putting up a

25  billboard to direct people to go see it.  That's not how speech-based

1    torts work, certainly not in Georgia where you have to sue the speaker

2    of the offending speech, not the banker who financed it.  And my point

3    here is you've got to plead more than Salem has an equity piece in the

4    movie.  You've got to plead they had a sufficient level of control

5    over the production of the movie before it could be deemed the speaker

6    itself or sued for somebody else's speech.

7            THE COURT:  Now, this argument you're making is specific

8    to the common law claims, correct, the defamation and other common law

9    claims?

10           MR. BAUER:  Statutory and common law defamation claims.

11           THE COURT:  Defamation, right.

12           MR. BAUER:  Yes, that's correct.

13           THE COURT:  Okay.

14           MR. BAUER:  So I'm only going to talk about the Georgia

15   law claims.  My colleague, Andrew Grossman, is going to speak to the

16   federal voter intimidation and suppression claims.

17           THE COURT:  Got it.  Okay.

18           MR. BAUER:  But I don't want to get us too diverted on

19   this point because I don't even think you need to get to is Salem --

20   based on the allegations in the complaint, can it even be deemed the

21   publisher of the movie because they can't meet the other element that

22   is essential to bring this claim, which is the of-and-concerning

23   element, because even if you are -- even if being the financer or the

24   producer of the movie was enough to satisfy a pleading standard to

25   call Salem the publisher, the speaker, the owner of that content, it's

1    undisputed that he was never named, the plaintiff, and never shown in

2    the 2000 Mules' movie, his face, or in the book.  So he cannot satisfy

3    the element of of and concerning that also runs through all three of

4    his Georgia state law speech-based torts.

5              THE COURT:  Isn't that standard ascertainable?

6              MR. BAUER:  By someone other than the plaintiff and

7    there's not a single allegation in the complaint that anyone other

8    than the plaintiff -- actually, he doesn't even allege that he

9    recognized himself in the movie.

10             THE COURT:  I think he said his wife recognized him

11   immediately.

12             MR. BAUER:  Actually, he said his wife was told by a

13   reporter who is involved in the GBI investigation and after the movie

14   was -- or before the movie was even published, I believe, but there is

15   not a single allegation.  That's in their briefing.  They argue that

16   his wife recognized him, but there's no allegation in the complaint to

17   that effect.  If you actually read the allegations in the complaint,

18   it reveals that's not true.  She was told by a reporter that he was

19   depicted in the movie.  There is no factual allegation --

20             THE COURT:  So how did the reporter ascertain who he

21   was?

22             MR. BAUER:  The complaint suggests that the reporter got

23   that information from the GBI when he was reviewing the reports of the

24   GBI about its investigation into allegations that Mr. Andrews was a

25   ballot mule, that's all separate and distinct from what our client has

1   published; right?  What our client published -- there is no allegation

2   that anyone, including the plaintiff, frankly, was able to ascertain

3   his own identity from what was published.  It's obvious when you look

4   at the images, they're in the book, they're in the movie, no one can

5   recognize -- can identify this man based on what Salem and Regnery are

6   alleged to have participated in the publication of.

7         THE COURT:  But am I right about the standard?  Is it

8   ascertainable?

9         MR. BAUER:  Correct.  But it has to be ascertainable

10  from the content of the book or the movie.  It can't be ascertainable

11  from extrinsic evidence.  It's not ascertainable because somebody has

12  externally told viewers that's who this is; right?  It is confined to

13  the four corners of the publication and if the publication itself

14  de-identifies, you can't sue for reputational harm or invasion of

15  privacy under Georgia law.

16        They may have other complaints about the parties that were

17  involved in the production of this information.  But under plain

18  Georgia law with respect to what Salem and Regnery are alleged to have

19  done where they de-identify the plaintiff - they did not name him,

20  they did not show his face - there is no privacy claim and there is no

21  reputational injury claim under Georgia law.

22        So where that leaves us, if the Court embraces what I think

23  is Hornbook application of the of-and-concerning prong of all three of

24  those torts, the only thing it leaves us with is Paragraph 49 and The

25  Charlie Kirk Show, which is blatantly on its face too thin to support

1    an allegation that Salem has *respondeat superior* liability for

2    somebody else's speech.  There's not even an allegation that the two

3    people who spoke, allegedly spoke, on The Charlie Kirk Show are agents

4    or employees of Salem.  They're not.  But they're not even alleged to

5    be.  So you can't get to Salem and Regnery liability based on any fact

6    actually alleged in the complaint.

7           Where this leaves us is -- you know, we recognize that if

8    you're going to hold somebody else responsible under Georgia law for

9    the speech of another you've got to plead with specificity sufficient

10   information to allow the Court to determine that this person who's

11   being held responsibile for another's speech authorized it, embraced

12   it, endorsed it, sponsored it as their agent or employee and that

13   didn't happen here.  And it's really important that that breathing

14   room protects a media company like Salem and Regnery from liability

15   for others' speech on broadcast defamation or radio broadcast because

16   we've got to give room, under the marketplace of ideas, for people to

17   discuss things, particularly matters of public importance like

18   election fraud.  Whether accurate or not, we recognize that we want

19   the platforms, we want the conversation, and Mr. Andrews can hold the

20   proper parties responsible, if they defame him.  But what they can't

21   do is hold somebody who didn't make the speech accountable if they

22   can't meet the loftier *respondeat superior* elements that Georgia law

23   requires.

24          With that, unless the Court has any further questions on

25   those issues, I'd like to let Mr. Grossman address the federal claims.

1          THE COURT:  Let me just ask you more of a housekeeping

2   question.  There was a discussion about the fact that -- I guess the

3   named party of Regnery was not the correct entity; is that right?

4          MR. BAUER:  I believe that's correct.

5          THE COURT:  So is there a substitution of party that's

6   necessary?

7          MR. BAUER:  We're not contending that there is a

8   necessary substitution.

9          THE COURT:  Okay.  All right.

10          MR. BAUER:  I think we were just trying to make sure

11  that the record was perfected and clear on the issue.  But, no, we're

12  not contending that's anything that requires the Court to act or the

13  plaintiff to change.

14          THE COURT:  You're not going to take the position at

15  some point later in the proceeding that they have the wrong party?

16          MR. BAUER:  Correct, Your Honor.

17          THE COURT:  All right.  Thank you.

18          MR. DuBOSE:  Just a question as to the Court's

19  preference, if I may.

20          THE COURT:  Sure.

21          MR. DuBOSE:  Would you prefer that Ms. Haber Kuck

22  address the state law issues now or just...

23          THE COURT:  Maybe that makes sense to break it up this

24  way since we're breaking it by --

25          MR. BAUER:  Well, I suspect some of the other

1  defendants may have their own arguments on those issues, too.  So I

2  don't know if you want to hear from the defense side first and then

3  the plaintiff.  But we'll defer to the Court's preference.

4          MR. DuBOSE:  We're fine with that.

5          THE COURT:  Okay.  Why don't we do that.  Why don't we

6  finish out defenses' presentation and then we'll go to plaintiff's.

7          MR. GROSSMAN:  Good morning, Your Honor.  Andrew

8  Grossman also for Salem and Regnery.

9          This is not your typical voter rights case.  The

10 support-or-advocacy provision of Section 1985 has been on the books

11 for 150 years.  The Voting Rights Act has been on the books for almost

12 60 years.  This is the first case, which I'm aware, to allege voter

13 intimidation through a publicly released movie and a publicly released

14 book.

15         Now, the Congresses that enacted these statutes were

16 certainly aware that books and other mass media could inspire passion,

17 inflame passion, and could influence the course of elections and

18 voting.  But publishing a book or a movie, even one that contains

19 alleged defamation, is simply not what they were speaking of when they

20 used the word "intimidation."

21         THE COURT:  Well, can't intimidation take various

22 forms, though?

23         MR. GROSSMAN:  We certainly recognize that it can.  But

24 I think that a proper interpretation of the statutes, as I'll discuss,

25 really does confine it to a more limited category of severe and

1  serious compulsion that is simply unlike anything that's been alleged
2  in this case.  If you were to interpret the statutes the way that the
3  plaintiff proposes in this instance, there would be very serious
4  constitutional questions in so doing.  Also, we don't think it fits
5  the text itself.

6       But I think the broader issue is that this sort of
7  voter-intimidation claim just doesn't -- fundamentally does not fit
8  the course of these statutes or their purpose.  I'd like to highlight
9  three reasons why that's so.  The first, with respect to the Voting
10 Rights Act, Section 11(b) claim, is the lack of a private cause of
11 action to enforce that provision.

12      Second is plaintiff's failure to plead legally cognizable
13 intimidation, that's the issue Your Honor raised.

14      And then third is the plaintiff's failure to plead that
15 Salem and Regnery intended or agreed to intimidate the plaintiff for
16 voting, which is a necessary element to both of these claims.

17      So on the private cause of action issue -- as the Supreme
18 Court made clear in *Sandoval*, this is purely a question of Congress's
19 intent and there has to be affirmative *indicia* that Congress intended
20 to authorize a private cause of action.  That standard is subject to a
21 two-step inquiry.  First is whether there's rights-creating language
22 in the statute and second is whether there is this sort of affirmative
23 indication in the statute that Congress intended for the provision to
24 be privately enforceable.  As the Eleventh Circuit has said, this is a
25 high bar for plaintiffs.

1        It's common ground among the parties that Section 11(b) does
2    not contain an express private right of action so, therefore, the
3    *Sandoval* standard applies in this instance.

4        But fortunately for the Court - while this can be an involved
5    inquiry, the Court is not being asked to write on a blank slate.
6    Judge Moon's opinion in *Schilling vs. Washburne,* which we've cited in
7    our briefing and discussed at some length, runs through faithfully the
8    *Sandoval* inquiry and determines that there is no rights-creating
9    language and that there's certainly no *indicia* of any intention in the
10   statute to create a private cause of action.  Indeed, to the contrary.
11   *Schilling* observes the statute is quite clear that this particular
12   provision is solely enforceable by the Attorney General, which is
13   precisely the type of enforcement regime that *Sandoval* and other cases
14   recognize to be an *indicia* that Congress did not intend a private
15   right of action.

16       But let me begin with the rights-creating language prong.
17   In this particular statute, Section 11(b), the operative language is
18   phrased "not as creating rights, but as a prohibition."  In other
19   words, the focus is on the person alleged to have undertaken the
20   wrongful conduct.  *Sandoval*, *Gonzaga University* and the Eleventh
21   Circuit's decision in *Love* all recognize that language of this sort
22   that focuses on persons regulated creates, and I'll quote, "No
23   implication of an intent to confer rights on a class of persons."

24       Now I want to contrast that with Section 2 of the Voting
25   Rights Act because that was the provision that was at issue in the

1   *Georgia NAACP* case where the court did find a private right of action

2   to enforce that provision.  That provision begins "No person in the

3   United States shall be excluded from participation in or subjected to

4   termination under any program or activity."  So, you know, that

5   provision begins by speaking of "No person," in other words, the

6   victim, the person who is allegedly being subjected to wrongful

7   conduct, that is exactly the type of rights-creating language that the

8   court has recognized does potentially authorize a private cause of

9   action.

10          By contrast, Section 11(b) adopts the exact opposite

11  approach.  It doesn't confer any type of right.  It doesn't identify

12  that.  Instead, it focuses on the conduct that is prohibited and the

13  person alleged to have undertaken that conduct.  So the Court could

14  stop at *Sandoval's* first prong.  But if the Court were to go to the

15  second prong --

16          THE COURT:  I guess I'm not following.  What did you

17  say is the difference between the start of Section 2 and the start of

18  Section 11?

19          MR. GROSSMAN:  Oh, sure.

20          THE COURT:  Doesn't both start with "No person"?

21          MR. GROSSMAN:  Yes.  But one talks about no person

22  being denied a right.  The other person talks about no person -- let

23  me pull the text -- no person -- it says that "No person, whether

24  acting under color of law or otherwise, shall intimidate, threaten, or

25  coerce."  In other words, the "person" referred to in these two

1   provisions, it's the opposite.  In Section 2, it's the person whose

2   rights are at issue and that's the type of thing that -- you know,

3   that focus, the Supreme Court has identified, is a rights-creating

4   focus.  By contrast, Section 11(b), the word "person" there refers to

5   the person alleged to have engaged in intimidation, threatening, or

6   coercion.  That focus --

7            THE COURT:  I mean, I understand that it's phrased

8   differently, but then 11(b) then goes on to say "Any person to vote or

9   attempt to vote."  Any person.

10           MR. GROSSMAN:  Yes, Your Honor.

11           THE COURT:  So that's the aggrieved person.

12           MR. GROSSMAN:  Again, I'll refer the Court back to

13  *Sandoval* and I think particularly the Court particularly as well --

14  the decision in *Gonzaga*.  Both of those recognize that this type of

15  statutory prohibition, something that focuses on prohibited conduct as

16  opposed to the rights of the person that are at issue, simply does not

17  create -- it simply does not support the inference of an intent to

18  confer rights via the statute and, indeed, the statute refers to

19  certain types of preexisting rights.  So it's sort of inherent in the

20  statutory language.  And I think you have to understand it that way

21  because if you look at Title 18 of the code, practically every

22  provision begins that "no person" shall do this, that, or the other

23  thing, and those are all things, you know, in many instances, that

24  affect third parties.  Somebody could be subject to fraud.  Somebody

25  could be subject to any number of crimes that are contained in U.S.

1  Code and traditionally none of those provisions have been understood

2  to contain the sort of rights-creating language that's necessary to

3  recognize a private cause of action.  So I think something that is

4  phrased as an ordinary statutory prohibition simply can't be

5  interpreted or understood that way.  And that's not just my view.

6  Again, I think *Sandoval* is perfectly clear on that point.

7          THE COURT:  Now, there's no circuit opinion supporting

8  that position; is there?  Correct?

9          MR. GROSSMAN:  With respect to -- with respect to the

10 general point, there is.

11         THE COURT:  I mean on 11(b).

12         MR. GROSSMAN:  With respect to 11(b), the only -- there

13 is a sum total of one opinion that actually runs through the *Sandoval*

14 analysis with respect to Section 11(b) and that's the decision in

15 *Schilling vs. Washburne*.  The plaintiff in this case has cited --

16         THE COURT:  Well, my question was about whether there

17 was any circuit opinion supporting your opinion.

18         MR. GROSSMAN:  With respect to 11(b)?

19         THE COURT:  Yes.

20         MR. GROSSMAN:  No.

21         THE COURT:  All right.  And there's a Fifth Circuit

22 opinion that goes the other way?

23         MR. GROSSMAN:  I don't think it does, Your Honor.  I

24 think that is more of the genre of a drive-by ruling.  The court

25 didn't consider the issue and simply assumed that there was the

1   availability of a private cause of action under the statute and I'll

2   note that that decision was in the era where courts did commonly

3   recognize or just assume the existence of private causes of action.

4          The Supreme Court in *Sandoval* and again in *Gonzaga*

5   recognizes that that sort of drive-by ruling that doesn't actually

6   consider the private cause of action issue is not sufficient as

7   precedent to support the existence of one and the court held that with

8   respect to its own precedence.  In other words, precedence of the U.S.

9   Supreme Court that simply assumed the existence of a private cause of

10  action.  *Sandoval* was quite clear, and the court has held that as well

11  with respect to the Securities Act as well, that simply -- that a

12  decision that's simply assumed the existence without touching on the

13  issue is not something that can be taken to establish a private cause

14  of action or is evidence of that at all.

15          THE COURT:  All right.

16          MR. GROSSMAN:  Even if the Court were to get to the

17  second step of the *Sandoval* inquiry, there simply is no indication in

18  Section 11(b) of any indication to create a private remedy.  The

19  statute provides in Section 12 for enforcement by the Attorney

20  General.  And, again, let me contrast that with Section 2 of the

21  Voting Rights Act.

22          The court in the *Georgia NAACP* case found an affirmative

23  *indicia* of intent to create a private cause of action through language

24  in Section 3, which is the enforcement clause for Section 2, that

25  referred to aggrieved persons other than the Attorney General.  And so

1    the sense was that that language, that reference to "aggrieved

2    person," suggested that other people, people who are aggrieved, ought

3    to be able to sue and take advantage of the remedies provided by the

4    Act.

5         In this instance, Section 12, the enforcement provision for

6    the statute at issue here, doesn't contain that sort of aggrieved

7    person's language.  It refers solely to the Attorney General.  And the

8    plaintiffs have identified nothing else in the statute that even

9    suggests that anybody other than the Attorney General might have the

10   ability to sue.  There simply is an absence of statutory language and

11   that's fatal because it's not merely a presumption.  Congress has to

12   affirmatively create a private cause of action.  Courts won't assume

13   one just because it might make sense as a matter of public policy or

14   because they believe that it might further the broad purposes of the

15   statute, *Sandoval* rejects all of that.  So if there isn't some

16   affirmative *indicia* of congressional intent for a private cause of

17   action, then it doesn't exist.

18        Against the *Sandoval* inquiry, the plaintiffs make three

19   arguments which I think are largely an attempt just to circumvent

20   *Sandoval*'s standard.  The first -- as I mentioned, the first involves

21   various court orders in cases involving Section 11(b) claims that they

22   say recognize the right for a private cause of action and we'll freely

23   admit that some of them do state that there is a private cause of

24   action.  But I'll also say that most of these are unreasoned temporary

25   restraining orders and preliminary injunction orders and none of them,

1    not one, runs through the analysis that's required by *Sandoval*.  They

2    don't consider the existence of rights-creating language.  They don't

3    consider *indicia* of congressional intent.  They simply take it as a

4    given that there is a private cause of action under this provision.

5    As I said, the only statute to run through -- or the only case to run

6    through the required analysis is *Schilling*.

7         The plaintiff's second argument is that a private cause of

8    action was recognized by the Supreme Court's decisions in *Allen* and

9    *Morse*.  Neither of those cases, however, addresses Section 11(b).

10   *Allen* involved Section 5 and *Morse* Section 10.

11        As the Supreme Court made clear in *Sandoval*, the fact that an

12   adjacent provision or a provision in the same general statute has been

13   found to imply a private cause of action does not carry over to other

14   provisions of that statute.  Each provision has to be considered

15   separately.  That's been true with the Securities and Exchange Act,

16   there's a series of Supreme Court cases on that, and it's true as well

17   with -- it's true as well with Title VI, that was the issue in

18   *Sandoval*.

19        Title VI, of course, is a very important statute and despite

20   that the court had found a cause of action for intentional

21   discrimination under one provision of that statute, it declined, in

22   *Sandoval,* to extend that to the very next provision of the statute

23   that would encompass regulations and things that might reach beyond

24   intentional discrimination.

25        So, finally, the plaintiff argues -- makes an argument

1    regarding ratification.  In other words, that based on cases like

2    *Allen* and *Morse* that the Congresses subsequent reenactment of the

3    Voting Rights Act somehow ratifies anything with respect to 11(b).

4    But, as I said, there was simply nothing for the court to ratify with

5    respect to that provision.

6              THE COURT:  Is that part of the *Sandoval* analysis?

7              MR. GROSSMAN:  *Sandoval* recognizes that if a statute --

8    if Congress enacts a statute that uses the verbatim language - that's

9    the phrase, "verbatim language" - that the court has held to recognize

10   a private right of action, then that might support a ratification

11   argument.  But in this instance I think there's a reason why the

12   plaintiffs don't identify the language Section 5 or Section 10.  It's

13   because neither of them are phrased anything like the prohibition in

14   Section 11(b) and so they simply don't carry over.

15            I'd like to move next to the lack of any actionable threats

16   and I'll address this very briefly.  I think the place to begin, as

17   always, is the statutory text.  Both statutes refer to intimidation

18   and lots of things can be intimidating.  For example, the prospect of

19   negative news coverage or tough questions from the bench, but that's

20   not the sense in which these statutes use the word.  Words are known,

21   of course, by the company -- words have to be understood by the

22   company they keep, *noscitur a sociis*.  In this instance, Section 85

23   refers to conspiring to prevent by force, intimidation, or threat.

24   The VRA, Section 11, refers to intimidation -- acts to intimidate,

25   threaten, or coerce.

1          The words "force" and "coerce" indicate the gravity of the

2     conduct that Congress had in mind, something serious and severe like

3     real or threatened violence, on that level, directed at a person for

4     exercise of their voting rights.  That's how the word "threat" is

5     understood throughout the U.S. Code.  This also makes sense in a

6     historical context.

7          I direct the court to the Eighth Circuit's opinion in Giff --

8     I'm sorry, in *Gill*.  That case addressed a Section 1985 claim and it

9     recognized that Section 1985 was a reaction against the murders,

10    whippings and beatings committed by rogues in white sheets in the

11    postbellum south.  Indeed, the opening words of Subsection 3 of

12    Section 1985 referred to people who, quote, "Go in disguise upon the

13    public highway or upon the premises of another to commit violence."

14    It's no mystery what Congress had in mind in this statute.

15         As the Eighth Circuit concluded --

16              THE COURT:  But then there's an "or."  I mean, the

17    plaintiff is traveling under Subclauses 4 and 5.

18              MR. GROSSMAN:  That's correct, Your Honor.  Well, under

19    subsequent subclauses of that.  We recognize that, Your Honor.

20              THE COURT:  Right.  Well, the part that you were

21    referring to is in --

22              MR. GROSSMAN:  It's in Sub 3, but it's the first clause

23    of Sub 3.

24              THE COURT:  Right.  But there's an "or" in between.

25              MR. GROSSMAN:  Yes, Your Honor.  And I think what it

1   does is it gives an *indicia* of the type of severity of conduct and the

2   nature of the conduct that Congress had in mind.  And I will note that

3   *Gill* did involve the same provision that's at issue -- the same

4   sub-provision that's at issue in this case and it recognized that the

5   type of intimidation at issue has to be something -- the Congress used

6   that word to refer to something more severe, serious, and terrifying

7   than simply the give and take or the burdens and pains of everyday

8   life.  And the words of the statute have to be understood in that

9   fashion because otherwise the statutes would be ludicrously overbroad

10   and facially violate the First Amendment.

11         THE COURT:  Well, how am I supposed to weigh whether

12   there's a sufficient level of intimidation at a motion to dismiss

13   stage?

14         MR. GROSSMAN:  I think what the Court can do -- well, I

15   mean, in this instance, the alleged defamatory speech has been put

16   before the Court.  So, you know, for purposes -- you know, I don't

17   think there's going to be any more evidence of that.

18         If the Court is looking objectively at whether or not these

19   satisfy -- whether or not these fit the bill for the statute, I think

20   the Court can decide as a matter of law that they simply don't rise to

21   that level.  And, again, that's what the court did in *Gill*.  The court

22   recognized that economic repercussions for providing support or

23   advocacy to a political candidate - in that instance it was a breach

24   of contract - simply was not as a matter of law the type of

25   intimidation that would support a claim.

1          THE COURT:  Was that at the motion to dismiss stage?

2          MR. GROSSMAN:  It was decided as a matter of law.  I do

3    not recall whether it was at the motion to dismiss stage, but it was

4    decided as a matter of law.

5          Effectively the plaintiff's view in this case is that these

6    statutes prohibit any kind of speech that causes a voter to feel

7    trepidation about voting.  The plaintiff makes clear that this

8    includes media reports of, quote, "Alleged crimes or criticism of the

9    government for not pursuing those reports."  If that's right, if

10   that's enough to violate these statutes, the statutes are overbroad

11   and unconstitutional.

12         The plaintiff doesn't identify any limiting principle for

13   these statutory prohibitions.  Indeed, instead, his argument is that

14   in this case the speech at issue is defamatory and, therefore, not

15   protected by the First Amendment.  Of course, we disagree with that,

16   as Mr. Bauer explained.  But it also doesn't solve the plaintiff's

17   statutory problem under these provisions.  Neither statute has a

18   carveout for defamatory speech and so if an allegation of illegal

19   voting qualifies as actionable intimidation under these statutes

20   there's nothing in the statutory text that exempts it from liability

21   just because it's true or otherwise non-defamatory.  So that's another

22   reason why intimidation has to be interpreted in context as referring

23   to something more severe that puts a person in fear of physical

24   violence or something of that level and there's no allegation of that

25   sort of intimidation in this case.

1          I do recognize, Your Honor, I had hoped to hit one other

2     issue.  But at the same time my colleagues for the other defendants

3     would like to address issues as well.

4               THE COURT:  All right.  Thank you.

5               MR. GROSSMAN:  Thank you, Your Honor.

6               THE COURT:  Who's next?

7               MR. BAUER:  Your Honor, I think the substantive claims

8     are probably of more interest to you than the motion for more definite

9     statement.  I don't know if you feel like you need argument on that

10    motion.  We're prepared to address it if you have questions about it.

11    We're also perfectly happy to rest on the papers.

12               THE COURT:  I don't have any particular questions about

13    it.

14               MR. LARSEN:  May it please the Court.  Thank you, Your

15    Honor.

16          Our discussion is --

17               THE COURT:  Remind me who you represent.  I'm sorry.

18               MR. LARSEN:  Yes, Judge.  We represent the True the

19    Vote defendants.

20               THE COURT:  Got it.  Okay.  Thank you.

21               MR. LARSEN:  Thank you, Your Honor.

22          Our discussion today is going to focus less on statutory

23    construction and more on the constitutional principles that are at

24    issue in this case because it's true -- I think it could at least be

25    argued that the statutory construction with regard to intimidation and

1    what that entails can be a fairly low level, at least the courts have

2    interpreted it that way.  But what we're dealing with in those cases,

3    virtually every case that plaintiff has cited and that I can find, is

4    conduct of some kind.  Whereas plaintiffs have admitted that this case

5    is about pure speech and we see that particularly in their response to

6    the supplemental brief that we just filed.

7         We are going to argue and we argue that, you know, this case

8    is much -- this was actually a fairly close case until the U.S.

9    Supreme Court issued its opinion in *Counterman v. Colorado* with regard

10   to true threats which pertains to speech.  The plaintiff has basically

11   argued that true threats don't have anything to do with this case, and

12   we think it does.

13        What the plaintiffs have argued vociferously is that

14   defamation is an exception to First Amendment protections and they're

15   arguing defamation, that's the vehicle, that's their pass through the

16   First Amendment protection that inures to speech which is what is at

17   issue in the case.

18        So given that that's the plaintiff's focus, as demonstrated

19   by their papers, I'm going to begin my discussion with the Court with

20   the defamation and particularly beginning it with defamation as

21   intimidation.

22        So plaintiff and *amicus* both argue and cite to authority

23   holding that subjecting a person to, quote, "public opprobrium," that

24   is, harm from defamation, is sufficient to show intimidation under the

25   voter-intimidation statutes and they cite, for example, the *LULAC v.*

*Public Interest Legal Foundation* case which states, quote, "Defendants have linked plaintiffs' names and personal information to a report condemning felonious voter registration in a clear effort to subject the named individuals to public opprobrium.  Defendant's suggestion that more is needed to support a finding of intimidation is untenable," end quote.  We would submit to the Court that this defamation as intimidation argument is flawed.

Plaintiff's argument that his defamation claims gets him past any protected speech issues on voter suppression claims conflates his defamation claims and statutory claims.  However, plaintiff is seeking damages for intimidation in his defamation lawsuit, not damages for reputational harm.  I think the case that best illustrates this analysis is *Brewington v. State,* which is cited in our papers. It's an Indiana Supreme Court case.  Obviously not binding on this court.  But I think the analysis commends itself to this case and I'm aware of no contravening authority in the Eleventh Circuit or anywhere.

The issue in *Brewington* was an Indiana statute that included in the definition of "threat" speech exposing a person to hatred, contempt, or ridicule.  However, as the opinion in *Brewington* sets out - and I'm going to quote the paragraph, Your Honor - "The United States and Indiana Constitutions afford sweeping protections to speech about public officials or issues of public or general concern, even if the speech is intemperate or caustic.  But there is no such protection for true threats, including veiled or implied threats, when the

1    totality of the circumstances shows that they were intended to put the

2    victims in fear for their safety.  Fear for one's reputation is often

3    the price for being a public figure or of involvement in public

4    issues.  But fear of one's safety is not," end quote.  This analysis

5    is also at least consistent with the opinion in *Counterman* which

6    analogizes --

7                    THE COURT:  Did I hear you say that that case involved

8    a public figure?

9                    MR. LARSEN:  *Brewington?*

10                   THE COURT:  Yes.

11                   MR. LARSEN:  Yes.

12                   THE COURT:  Okay.  Mr. Andrews is not.

13                   MR. LARSEN:  Sir?

14                   THE COURT:  Mr. Andrews is not a public figure.

15                   MR. LARSEN:  Well, that's true, but I think the

16   analysis still holds because what we're talking about is a distinction

17   between what's covered by defamation and what's covered by

18   non-defamation intimidation.  To go forward --

19                   THE COURT:  I mean, you'd agree the analysis for

20   defamation is different for public figures versus private parties;

21   correct?

22                   MR. LARSEN:  Yes.  Clearly, Judge.

23                   THE COURT:  And all Mr. Andrews was doing was voting?

24                   MR. LARSEN:  Sir?

25                   THE COURT:  Mr. Andrews was just voting; right?  He was

1  not engaged in any -- he's not a public figure, he's not a candidate,

2  not a celebrity; right?

3       MR. LARSEN:  As a private figure plaintiff, his

4  defamation burden is different than if he were a public figure.  A

5  public figure, obviously, has to show actual malice in order to be

6  able to prevail in a defamation suit.  However, a private figure

7  plaintiff only has to show negligence.  But that different burden of

8  proof is different than the analysis of what's at stake because even a

9  private figure plaintiff still has to show reputational harm as

10 opposed to intimidation.

11      What *Brewington* does, Your Honor, is show the distinction

12 between speech that causes fear and speech that causes a threat to

13 your reputation.  The court talks about a threat to one's safety as

14 opposed to a threat to one's reputation.

15      THE COURT:  Did he not allege reputational harm here?

16      MR. LARSEN:  His only reputational harm claim, Your

17 Honor, is that he was accused of a crime.

18      THE COURT:  So the answer's, yes, he did?

19      MR. LARSEN:  The answer is - the answer is yes.  We

20 address that -- I will address that more specifically because the --

21 in terms of the injury that he claims where it's an issue of public

22 concern, which this case obviously is, the Georgia Supreme Court case

23 in *Mathis* holds that in order to go forward in a case on an issue of

24 public concern the plaintiff -- whether a public figure or a private

25 figure plaintiff, it's a matter of public concern -- that that

1    plaintiff is going to have to show actual injury.  In their response

2    to our motion to dismiss on this point that they don't show any actual

3    injury, they say we don't have to show it.  We're relying on presumed

4    damages, that is, libel *per se*.

5         However, by Georgia Supreme Court's analysis in *Mathis*, they

6    have to show more than just presumed damages.  They have to show

7    actual injury.  There are no allegations of actual injury before this

8    court.  All he is arguing is frankly -- aside from the presumed

9    damages of being accused of a crime, all he's arguing is intimidation

10   and that comes back to the analysis that *Brewington* gives us, which is

11   that intimidation is not - is not damages for reputational harm.

12        It's interesting that in their response to the supplemental

13   motion to dismiss they take issue with *Brewington,* but I don't think

14   they closely read the case, Judge.  They say even in *Brewington* the

15   court found that the plaintiffs had failed to prove actual malice.

16   One of the defendants -- one of the plaintiffs in that case is a

17   doctor and the doctor's a public figure and they failed to show the

18   actual analysis -- excuse me, actual malice.

19        But what the plaintiffs argue that case said is that when the

20   court ruled on the actual malice standard they were holding that that

21   precluded the true threats analysis, that it also applied to the true

22   threats analysis, and that's not what that case does, Judge.  What

23   that case does is it basically divides -- it's actually a criminal

24   statute.  So it divides the criminal statute into criminal negligence

25   and true threats under the constitutional test of what constitutes a

1    true threat because it's about fear speech.  The part of it which is

2    criminal defamation, that's where it holds that the state is going to

3    have to prove actual malice in order to prevail on a criminal

4    defamation claim.

5           As for the rest of the threats at issue in that case, the

6    court finds they have to meet the true threat standard, the true

7    threat exception to constitutional protection.  So the distinction,

8    then, becomes between speech that is defamatory and speech that

9    constitutes true threats which is -- if we're talking about pure

10   speech and not conduct, it has to pass the constitutional test of true

11   threats.

12          Of course, plaintiffs are arguing we don't have to show true

13   threats because our defamation claim is enough to get us through.  The

14   analysis in *Brewington* says that that's not the case.  If it's a

15   defamation case, that's a different horse -- or a horse of a different

16   color or however you'd like to put that.  It's a different analysis.

17   It's fundamentally different.  Therefore, I'm arguing that they've

18   been intimidated by defamatory speech.  Defamation doesn't provide a

19   relief, doesn't provide a remedy for intimidation.  It provides a

20   remedy for damage to reputation, that's the analysis in *Brewington*.

21          Another thing I would note - and I guess we get a bit of a

22   preview of what plaintiff's going to argue today to the Court -

23   plaintiff's defamation claim involves the actions of third parties,

24   that in the natural course following defamation speech, third parties

25   are going to make threats if they're, quote-unquote, followers of

1  defendants and they are the parties who are actually making the

2  threats.  So of the many First Amendment issues with defamation,

3  plaintiff's defamation cause of action, and, therefore, his causes of

4  action under the voter-intimidation statutes that are founded on these

5  claims of defamation, perhaps the most troubling is this easy

6  conclusion the foreseeability that third parties will act violently --

7  excuse me, Judge -- against the plaintiff based on defendants' alleged

8  defamatory speech.  We would submit, Your Honor, that plaintiff is

9  effectively arguing for a poorly disguised incitement standard.  But

10  incitement must consist of statements directed at producing imminent

11  lawless action and likely to do so.  We cite to *Brandenburg v. Ohio*

12  for that.

13        In addition to the requirement of being directed at producing

14  imminent lawless action, incitement requires specific intent.  In so

15  requiring, the Supreme Court recognized that incitement to disorder is

16  commonly a hair's breadth away from constitutionally permissible

17  political advocacy and particularly from strong protests against the

18  government and prevailing social order.

19        THE COURT:  I'm vaguely recalling some of the cases

20  that were cited from the Civil Rights era under these very same claims

21  where even just publishing the names of African Americans who had

22  registered to vote was sufficient.  In other words, the idea being

23  that just by publishing the names of the African Americans who had

24  registered to vote, it was providing an opportunity for third parties

25  to inflict harm or intimidate them.  So if that was sufficient, why

1  wouldn't a video and a book depicting a person that's voting and

2  saying "This is a crime that you're watching," how is that not

3  sufficient?

4          MR. LARSEN:  Well, Your Honor, I've read those cases.

5  I've read the cases that plaintiff has cited.  I'm not aware of any of

6  those cases that relies solely on publishing the names of individuals.

7  You look at those cases, you know, especially like the early Civil

8  Rights Act cases, for example, those cases also include wholesale

9  economic coercion.  They include violence, quite frankly, actual

10  violence.

11          THE COURT:  By third parties.

12          MR. LARSEN:  Sir?

13          THE COURT:  The violence was by the third parties.

14          MR. LARSEN:  No.  It was the defendants, Your Honor,

15  and they were -- many of those are injunction cases.  This is not an

16  injunction case.  The court said don't do that anymore.  I've looked

17  at all -- I can go through the cases that plaintiff cites and they all

18  involve some form of conduct in addition to speech and that provides

19  the ticket for a lower standard for intimidation.

20          If you're talking about speech, pure speech, and we're

21  talking about a threat, it has to rise to the level of a true threat,

22  that's constitutionally mandated and that's set out again in

23  *Counterman*.  If it's true -- in *Counterman*, in fact, *Counterman* says

24  even if it's a true threat, even if everybody would agree that that's

25  a true threat, the standard still requires recklessness because of the

1    chilling factor because the defendant, the speaker, is unsure of the

2    breadth of the statute, how the statute's going to be interpreted,

3    whether or not what he's saying is going to be interpreted the wrong

4    way.

5         The risk of the chilling of his speech, again, is what is at

6    issue in *Counterman* and that's why the court in *Counterman*, the 11

7    majority in *Counterman*, says even if it's a true threat you're still

8    going to have to show recklessness on the part of the speech.  There's

9    no -- the plaintiff's First Amendment complaint uses the word

10   "reckless" over and over again.  What it doesn't have are actual

11   allegations of fact.  Most of the recklessness - and this is similar

12   to some of the argument that's been raised - is a group pleading.  You

13   don't know who's supposedly saying what is or what isn't reckless and

14   the specific allegations of recklessness are conclusory.  There's no

15   facts that say these are facts from which one could gauge defendants'

16   state of mind, or *mens rea*, on a point like this.

17        In addition, Your Honor, while we're on the subject of

18   defamation, we have raised some other defenses to defamation, which I

19   will get into at this point.  Particularly that defendants' speech, to

20   the extent that defendants can be associated with any of the speech in

21   question, the film 2000 Mules is opinion based on disclosed facts.

22   Plaintiff wants to make this case about the film as a whole, which we

23   would argue there's also opinion based on disclosed facts, but the

24   focus here should be on plaintiff's allegation regarding plaintiff

25   himself.

1          THE COURT:  What were the disclosed facts?

2          MR. LARSEN:  Your Honor, I'm sorry?

3          THE COURT:  What were the disclosed facts here?

4          MR. LARSEN:  That's a very good question, Judge, and

5    that's right where I'm headed.

6          So the issue then becomes, you know, what are the underlying

7    facts are defamatory.  The underlying facts here are simply a public

8    record included in the film which is the video --

9          THE COURT:  Right.

10         MR. LARSEN:  -- of the plaintiff.  And the reason

11   there's a video to begin with is because when the drop boxes are set

12   up there are a lot of questions about the process and about -- you're

13   outside of a voting booth, you haven't signed in, it's hard to say

14   who's who, so they set up videos in order to monitor what's going on

15   at the drop box.  The government sets up the videos.

16         THE COURT:  Right.

17         MR. LARSEN:  And these videos -- that's where the video

18   comes from.

19         THE COURT:  Right.

20         MR. LARSEN:  It's a public records request to the

21   Georgia governmental body and those -- that's the underlying facts.

22   The underlying facts is the plaintiff comes up to a drop box with five

23   ballots and deposits five ballots and the allegation is the

24   defendants --

25         THE COURT:  But the narrater is saying "What you are

1   watching is a crime."

2           MR. LARSEN:  Exactly.  And it's a crime to deposit more

3   than your own ballot into a drop box.

4           THE COURT:  Is it?  Is it not lawful to deposit on

5   behalf of your family?

6           MR. LARSEN:  Yes, that's correct, Judge.  That's the

7   exception.

8           THE COURT:  Right.  Was that disclosed?

9           MR. LARSEN:  We would say that that goes outside the

10  whole doctrine of --

11          THE COURT:  I mean, it would be one thing if he was

12  depositing 100 ballots, right, then it's fair to say that that's

13  probably not within this family exception.  But when he's depositing

14  five?

15          MR. LARSEN:  And where do you draw the line on that

16  anyway?

17          But the point -- the whole point of disclosed facts is

18  everybody's free to dispute that.  Based on the fact that we see five

19  ballots, that violates the general prohibition in the state of Georgia

20  against dropping off a ballot that's not yours.  Based on that, based

21  on these five ballots being dropped off, we think that's a crime.

22  Somebody else can look at that and say we don't agree with that.

23          THE COURT:  But the narrator --

24          MR. LARSEN:  Your conclusion based on that premise is

25  false.

1       THE COURT:  But the narrator didn't say "I think this

2   is a crime."

3       MR. LARSEN:  Sir?

4       THE COURT:  The narrator didn't say "I think this is a

5   crime."  The narrator said, "What you're watching is a crime."

6       MR. LARSEN:  Again, you know, it's a conclusion based

7   on the disclosed fact of a person dropping off five ballots.  The

8   viewer -- any viewer of that movie can say, well, I don't think that's

9   a proper conclusion.  That just because a person is dropping off five

10  ballots, I don't think one can conclude that that's a crime.  But the

11  fact is the speaker has fully disclosed the basis of his opinion,

12  which is that there's five ballots being dropped in and that violates

13  the general prohibition on dropping off ballots that don't belong to

14  you.  We conclude from that that that's a crime.

15      THE COURT:  Did the narrator disclose that it was five

16  ballots?

17      MR. LARSEN:  Your Honor?

18      THE COURT:  Did the narrator disclose that it was five

19  ballots?

20      MR. LARSEN:  That was visible in the video.  It's clear

21  that the individual in question, who's the plaintiff, is dropping off

22  five ballots, and that's the whole point.  The whole point of the

23  opinion based on disclosed facts is that the plaintiff can be wrong.

24  The plaintiff doesn't even have to be reasonable.  Anybody can argue

25  with that and this is the reason why I feel this way.  And somebody

1   else looking at it says, well, you know, I don't think that's right.

2   If it's a family member, it's not a crime.  But the whole point is

3   they've disclosed the facts on which they base their opinion and

4   people can talk about it.

5           And the whole point then -- the point of the movie is that

6   there's, at minimum, a dispute -- there's a lot of concern about the

7   process that's involved in voting in this fashion and the likelihood

8   of abuse of the process and raising the consciousness of the public

9   that this is, in fact, a big issue and the public needs to be alert to

10   it and we think, you know, in combination with some of the other facts

11   that we also disclose in the movie.

12           But I think the focus, Your Honor, should be on the plaintiff

13   who's dropping off five ballots.  So, you know, we can talk about

14   whether or not those ballots were, in fact, his family members.  You

15   know, there was a finding.  The State Elections Board held a hearing

16   and cleared the plaintiff.  Then the issue becomes, well, is it the

17   obligation, then, of the defendants to say the State Election Board

18   cleared the plaintiffs?  Our position on that was that Georgia doesn't

19   have libel by omission.

20           THE COURT:  Was that a disclosed fact?

21           MR. LARSEN:  What?

22           THE COURT:  When you published the movie, which I

23   believe was after the Georgia investigation had cleared him, did you

24   disclose the fact that he had been investigated and cleared of any

25   wrongdoing?

1          MR. LARSEN:  The movie had already been at least

2     released on a limited basis.

3          THE COURT:  Right.  But you kept releasing it and

4     that's an undisclosed fact; right?

5          MR. LARSEN:  Again, the argument there, Your Honor, is

6     that that would be libel by omission.  A case that we would cite in

7     that regard --

8          THE COURT:  What about the book that I believe was --

9     was it five months later?  Did the book disclose that he had been

10    cleared?

11         MR. LARSEN:  I'm sure it doesn't.

12         THE COURT:  So that's not a disclosed fact?

13         MR. LARSEN:  Again, Your Honor, I don't think -- I

14    think Georgia law, the libel by omission, you're not obligated to say

15    the defendant was cleared, that's libel by omission.  And part of this

16    comes to the issue of, okay, the State Elections Board clears him --

17    the very premise of the movie and the very premise of defendants'

18    position is you can't trust what the government's saying to begin

19    with.  Does the government saying that somebody's clear make it so?

20    Does a court finding that O.J. Simpson was innocent of murder make it

21    so?

22         THE COURT:  I mean, I understand what you're saying.

23    But, again, right now your argument is about this defense based on all

24    disclosed facts.  You're saying that you're shielded from liability

25    because all the facts were disclosed.

1          MR. LARSEN:  No, Your Honor.  That's not --

2          THE COURT:  It appears to me that once you are operating

3    in that vehicle, you cannot pick and choose which facts you're going

4    to disclose.

5          MR. LARSEN:  No, Your Honor.  That's in fact -- you

6    actually do get to pick and choose the facts, that's the whole point.

7    You're disclosing the facts on which you base your opinion.  You're

8    not saying I'm disclosing every single fact that there possibly could

9    relate to this.  These are the facts.  I am picking these facts,

10   that's exactly what it allows you to do.  I'm picking these facts and

11   based on these facts I am concluding this.

12          There almost always will be other facts.  You can't exhaust

13   all of the possible facts.  You either choose the facts based on these

14   facts and somebody looking in that will say there's other facts,

15   there's other issues, that's not everything and so I disagree with

16   this conclusion, and that's the whole point.  That's what the law

17   permits.  That's why you have an opinion based on disclosed facts as

18   opposed to opinion which is just like rhetorical hyperbole.  You know,

19   I think that, you know, that he's a criminal, you know, or I think

20   that, you know, he's corrupt, you know, and given the circumstances

21   that may just be rhetorical hyperbole.  This is a different --

22          THE COURT:  Let me just get this straight.  So what

23   you're saying is that because you disclosed all the facts when you

24   said -- the facts that you chose to disclose at the time that you

25   said, "What you're watching is a crime," it was okay that you didn't

1   also disclose the fact that the government had concluded that he had

2   not committed a crime?

3            MR. LARSEN:  That's correct.

4            THE COURT:  That's what you're saying?

5            MR. LARSEN:  Yes, that's right, Judge.

6            THE COURT:  Got it.

7            MR. LARSEN:  And also that you don't have to disclose

8   that the government cleared him because that would be a libel by

9   omission also.  And there's a specific Northern District of Texas case

10  of *Hoffmann-Pugh v. Ramsey*, 193 F.Supp.2d at 1295, which I don't think

11  we have in our papers.  In that case the plaintiff was arguing that a

12  book - and this is about the JonBenet Ramsey murder - that the book

13  was defamatory because it neglects to include an express statement

14  that plaintiff was, quote, "cleared," end quote, by authorities and

15  appeared as a grand jury witness.  The holding in that case is that,

16  however, Georgia does not recognize libel by omission -- excuse me,

17  Northern District of Georgia, I stand corrected on that.  And the

18  court on that "Appellant has cited no case and we're unfamiliar with

19  any which provide that the failure to make a written statement has

20  been upheld as the basis for a libel action."  I think that's very

21  close to what we're looking at in this case, Judge.

22           THE COURT:  All right.  Thank you.

23           MR. LARSEN:  Thank you, Your Honor.

24           THE COURT:  All right.  Ms. Hyland, good to see you.

25           MS. HYLAND:  Good to see you, too.  Good morning, Your

1   Honor.  It is still morning.

2           I appreciate that we are nearing the end of our time and I do

3   want to leave my codefendants' counsel some time for rebuttal.  I

4   think that nearly every argument that's been made here today applies

5   with equal force to Mr. D'Souza and D'Souza Media, and I don't need to

6   rehash or repeat what they've said.

7           I do note that some of the allegations in the complaint

8   against him vary slightly from those against Salem and, nonetheless,

9   create the same problem.  Mr. D'Souza needs to be correlated to the

10  claims in this action with identification of the plaintiff and in our

11  opposition -- I'm sorry, in our motion to dismiss we made that

12  argument and in plaintiff's opposition they had every opportunity to

13  explain how they had tied Mr. D'Souza specifically to allegations that

14  directly identify the plaintiff.

15          I'm not going to rehash everything in our reply, but I think

16  this is really the one distinction for my clients versus the others.

17  I encourage the Court to focus on those bullet points in our reply

18  brief which note that we have no correlation between Mr. D'Souza in

19  the complaint -- in the amended complaint, rather, and allegations

20  that actually identify the plaintiff.

21                  THE COURT:  "Identify," you mean an un-blurred

22  depiction?

23                  MS. HYLAND:  Correct, Your Honor.

24                  THE COURT:  Okay.  But you agree that the standard is

25  whether he is ascertainable?

1          MS. HYLAND:  Correct, Your Honor.

2          THE COURT:  All right.

3          MS. HYLAND:  And I think those arguments have already

4    been fully argued.

5          THE COURT:  All right.  Great.

6          MS. HYLAND:  Thank you.

7          THE COURT:  Thank you.

8       All right.  Anything else on behalf of the plaintiffs at this

9    time?

10          MR. BAUER:  The defendants will reserve our time.

11          THE COURT:  All right.  Great.

12       Why don't we take a break.  Let's take a 15-minute break and

13    be back at 11:30 and we'll start with plaintiff's presentation.

14          (recess taken from 11:16 a.m. until 11:30 a.m.)

15          THE COURT:  Mr. DuBose, the floor is yours or one of

16    your colleagues.

17          MR. DuBOSE:  I'm going to have Ms. Haber Kuck.

18          THE COURT:  All right.  Ms. Kuck.

19          MS. KUCK:  Yes.

20          THE COURT:  All right.  Good morning.

21          MS. KUCK:  Good morning.

22       As Mr. DuBose said, I'm going to address the defendants'

23    arguments as they relate to the defamation privacy conspiracy claims

24    as well as the damages issues that have been raised.

25          Could I have permission to hand up a demonstrative that I

1   will refer to during my argument?

2        THE COURT:  Sure.

3        MS. KUCK:  It contains excerpts of the centerfold of

4   the 2000 Mules' book.

5        THE COURT:  Sure.

6        MS. KUCK:  The Court can consider the context of the

7   book, the film, and the trailer on this motion under the incorporation

8   by reference doctrine because plaintiff refers to them in the

9   complaint, the documents are central to plaintiff's claim, and the

10  documents are undisputed.

11       These photographs are from the centerfold of the book with

12  captions and the statement in the captions are repeated in the film

13  trailer and promotional materials, but I'm using the book excerpts

14  just for ease of reference.  But also because this book was published

15  after all the defendants, including Salem and Regnery, were

16  undisputedly on notice of Mr. Andrews' identity, of the Georgia SEB

17  investigation results, and that their statements about him were

18  categorically false.

19       And I say "undisputedly" because this version of the book was

20  published after Mr. Andrews sent retraction letters to all of the

21  defendants and, in fact, one of them is attached as Exhibit A to the

22  Salem/Regnery moving brief.  It put them on notice of all of these

23  facts and they went ahead and published the book anyway.

24       And so I think that in -- they argue, Salem and Regnery, in

25  their reply at 26 and 27 that there's no basis to claim that they knew

1   who he was or the SEB investigation at the time that any of the

2   statements were made and that's just not - that's just not correct.

3   We also argue that they should -- that they were aware of the

4   investigation result and other facts much earlier, that's in the

5   complaint, 128 through 130.  But certainly they cannot argue that at

6   the time of the book they weren't aware.

7           THE COURT:  I mean, when you say "awareness," I mean,

8   you're talking about at least constructive awareness.  You don't know

9   if they actually knew?

10          MS. KUCK:  Well, we do know they actually knew because

11   the letter that's attached as Exhibit A says there was this

12   investigation.

13          THE COURT:  And that was addressed to them?  I don't

14   recall.

15          MS. KUCK:  Yes.

16          THE COURT:  Okay.

17          MS. KUCK:  We had sent -- and what it says in the --

18   that letter's to Regnery.  In the letter, it recites that a few weeks

19   earlier we also sent a letter to the other defendants about the film

20   and the promotional appearances and we asked for a retraction.  So it

21   says in there Mr. Andrews is the voter.  It says in there, you know,

22   there was this investigation.  It says in there he did nothing wrong

23   and, nevertheless, they went ahead and published the book and they

24   continued to publish the film.

25          THE COURT:  What's my authority for being able to rely

1   on that letter at this stage?

2            MS. KUCK:  Actually, they attached it to their brief as

3   Exhibit A because they're arguing that it doesn't specifically say

4   Regnery should retract the claims and they actually ask you to take

5   judicial notice of it on the same incorporation by reference doctrine

6   and that's at Footnote 6 of their brief which cites that and it's also

7   *Baker vs. City of Madison,* 67 F.4th 1268, Eleventh Circuit, 2023.  So

8   I think you can take incorporation by reference includes that.

9   They've attached it and we don't object to it.

10           THE COURT:  All right.

11           MS. KUCK:  So let me start with this issue of the

12  opinion and I'm going to address the defamation claims first.

13           So fundamentally there is no First Amendment right to defame

14  another person.  In *Counterman*, which we've heard a lot about today -

15  and my colleague, Ms. Chimene-Weiss, will address - makes that very

16  clear.  That's a slip opinion at 7.  There is no wholesale defamation

17  exemption for opinions or matters of public concern.  That's the Clear

18  and the *Milkovich* case that the parties discuss in their briefing by

19  the Supreme Court.

20           We're not even really talking about opinions here and what

21  the test is is where a statement that is made is sufficiently factual

22  to be susceptible of being proved true or false, then it may serve as

23  the grounds for a defamation claim and we have cited numerous cases on

24  Pages 27 through 28 of the opposition to the TTV motion holding that

25  statements that a person engaged in criminal conduct are not as a

1   matter of law opinions and, indeed, such statements constitute

2   defamation *per se*.  Defendants have not distinguished these cases in

3   their reply briefs and none of the cases that TTV cites are cases in

4   which the defendant unequivocally stated that plaintiff had committed

5   a crime as they did here.

6          There was just a reference to the *Hoffmann-Pugh* case and that

7   is a case that's cited by TTV for the first time in its reply.  But

8   the court there explicitly noted that the book at issue did not,

9   quote, "Literally state plaintiff is guilty of a crime.  But at most,

10  merely asserts she was acting strangely before the crime occurred."

11         As Your Honor noted, the facts here are that the -- there's

12  a picture of Mr. Andrews voting and it says "This is a crime," so I

13  think that case has nothing to do with it.  And that statement, "This

14  is a crime," is susceptible to being proven true or false and it is

15  false that in depositing his family's ballots Mr. Andrews was

16  committing a crime.  It is false that he participated in organized

17  crime or ballot trafficking.

18         Now, we also heard about the purported facts issue.  I think

19  it is an incorrect characterization of the record to say, well, we

20  show Mr. Andrews putting in five ballots and we opine that that's a

21  crime.  In fact, the film states that the voters portrayed in it

22  constituted mules because geographic location data demonstrated that

23  they had gone to ballot boxes multiple times depositing multiple

24  ballots each time and getting paid to do so.

25         Mr. D'Souza has stated in interviews that the filmmakers only

1   depicted people in the film if the purported mule had been to at least

2   10 drop boxes, that's at the complaint Paragraphs 144 and 146.  In the

3   book he states "True the Vote used a very high bar of requiring the

4   mules to go to 10 or more drop boxes and five or more left-wing

5   nonprofits."

6          Similarly, in an interview, which we cited in the complaint,

7   Paragraph 67, Mr. Phillips introduced the video of Mr. Andrews voting

8   and he stated that "Some guy's up there putting all these ballots in

9   the video and I can show you the pings and then I can show you where

10  he did it again and again and again."  Defendants have never shown any

11  such evidence because it doesn't exist.

12         So it's not just a question of showing Mr. Andrews depositing

13  five ballots and then opining that the act is a crime.  By portraying

14  him as a mule engaged in organized crime defendants have falsely

15  claimed that he not only deposited multiple ballots on this occasion,

16  but that he did it again and again and again.

17              THE COURT:  Can I go back for a second?  With respect

18  to D'Souza, specifically.  That allegation is specific to D'Souza,

19  correct, Paragraphs 144 --

20              MS. KUCK:  It's Mr. D'Souza stating it, but he's saying

21  the filmmakers only depicted people in the film and then in the book

22  he says "True the Vote used a very high bar."  But Mr. Phillips says

23  in the interview - that's at 67 - that here he is -- you know, we can

24  show you he'll do it again and again and again.

25              THE COURT:  Okay.

1          MS. KUCK:  But the complaint alleges that Mr. Andrews

2    did not on any other occasion deposit any ballots in the drop box,

3    that's at 144, Paragraph 144.  He did not pick up ballots for five or

4    more left-wing nonprofits and for purposes of this motion his

5    assertions in the complaint must be taken as true.  So, again, it's

6    not just a question of saying this guy is putting in five ballots and

7    that's a crime.  It's a question of portraying him as a mule and it's

8    also not an opinion that he was committing a crime, that is provable,

9    it's true or false, and it's false.

10         THE COURT:  By that same token, though, isn't calling

11   him a mule an opinion that's not -- I mean, I agree that a crime is

12   either, you know, definitively true or false, but "mule" is a

13   characterization and people would have a different definition of a

14   mule.  Someone could have the opinion that even submitting ballots on

15   behalf of your family is operating as a mule.  You define it however

16   you want; right?

17         MS. KUCK:  But I don't think you can here because we

18   have these accompanying interviews where, as I said, Mr. Phillips says

19   in the interview with the video of Mr. Andrews voting - it's

20   Paragraph 67 of the complaint - he says "I can show you the pings and

21   we can show you where he did it again and again and again."

22         So when they define what they are calling a mule, as

23   Mr. D'Souza says in the interviews that they only depicted people if

24   the purported mule had been to at least 10 drop boxes.  So they are

25   defining "mule" as someone who goes to multiple drop boxes, gets

1   multiple ballots from left-wing organizations and then deposits them.

2   So those facts that he did it again and again and again, that's

3   provable as false and it is false.

4          Also, I want to address Salem defendant's attempt to run

5   away from the book and the film and argue that they're not liable for

6   the occasions on which their codefendants appeared on Salem

7   programming and showed the un-redacted footage of Mr. Andrews and his

8   vehicle and there's several problems with these arguments.

9          First, we didn't hear any reference today about conspiracy

10  and that's something we allege in the complaint.  The Salem defendants

11  are jointly and severally liable for the other segments showing the

12  un-redacted footage because they are alleged to be coconspirators with

13  their codefendants who showed the footage and there's multiple Georgia

14  cases on that that we cite in our briefing.

15         As the Georgia Court of Appeals has explained, a conspiracy

16  may be inferred from the nature of the acts done, the relation between

17  them, their mutual interests in the matter and other circumstances.

18  That's the *Wright* case.  And because civil conspiracy is, by its very

19  nature, a secret endeavor, it is best suited for jury resolution.

20  That's *Miller vs. Lomax*.

21         Here, the defendants had a joint business venture to create

22  the film and publish the book, including false allegations against

23  Mr. Andrews, which constituted defamation.  They engaged in a business

24  entity to produce, circulate, and promote and profit from the film and

25  book.  And I think this is encapsulated in the demonstrative handout

1  which shows that they were all acting together and not in parallel as

2  TTV claims in its papers.

3        So if you look at the first page, PDL1, it says "This

4  captures our" - and this is Mr. D'Souza speaking - "meeting with

5  Catherine Engelbrecht and Gregg Phillips where they presented us with

6  the evidence of geotracking and surveillance videos showing systemic

7  election fraud."

8        Then the next page - and this is important - says "This is a

9  movie recreation of our fateful summit with Catherine and Gregg.  We

10  took their evidence to Salem Media to see if Salem would provide the

11  equity investment to make the 2000 Mules' documentary."  This isn't

12  just a case where Salem gave them a check.

13        THE COURT:  Let me ask you this.  Where does this come

14  from?  I'm happy to look at a demonstrative.  But, again, we're at the

15  pleading stage so I can only rely on what you have alleged.

16        MS. KUCK:  Yeah.  I think you can take judicial notice

17  of the book.  Actually, that statement from the caption that Salem

18  reviewed the evidence, that's quoted in the complaint at Paragraph 76.

19        THE COURT:  Okay.

20        MS. KUCK:  And, again, I think -- I'm using this just

21  because I don't want to have to put up the movie and I think it just

22  encapsulates everything and the idea that Salem was just sort of in

23  the background funding is just not an accurate reflection of what's in

24  the complaint and what's --

25        THE COURT:  Right.  And that's fine.  I'll just point

1    out that obviously Salem's -- the crux of Salem's argument is they are

2    not identified specifically with sufficient particularity in the

3    complaint as having done anything.  So to the extent that you could

4    tether this back to an allegation in the complaint, that would be

5    helpful.

6            MS. KUCK:  Well, I think -- as I said, though, this, I

7    think, just encapsulates this conspiracy and once you have allegations

8    of a conspiracy they are liable for all of the actions of their

9    coconspirators.  So Salem -- and my other point is just that Salem,

10   it's disingenuous because they're all over it.  I mean, if you look at

11   the next page they talk about the Salem hosts.  They talk about

12   including Charlie Kirk, five Salem hosts in the movie, and then on the

13   last page they have the Salem lineup.  We do allege that also in

14   Paragraph 25 of the complaint.

15           But I think the idea that they just showed up and provided

16   funding is not -- doesn't adequately reflect what we've pled and what

17   the underlying documents show.  But I think if we are able to plead a

18   conspiracy - and I think we have and I think, as I said, the

19   demonstrative encapsulates it - then they're jointly and severally

20   liable for all of this.  It's not just a question of a more definite

21   statement.  I mean, they are all liable at that point, defendants as a

22   group.

23           The other thing -- this Charlie Kirk.  We do allege in

24   Paragraph 25 and then 49 through 52 that Salem produces the show.

25   They're saying, you know, what do you mean "produces"?  I think that's

1  probably a factual question.  But he is repeatedly identified in the

2  film and the book as a Salem host, those are their words.  They're

3  identifying with him.  We can find out in discovery exactly what they

4  meant by that.  But they can't say, well, we had nothing to do with

5  him.

6       And then I think -- the next point, though, is also that

7  there is no law - and defendants have not cited any - that says you

8  can take a video of someone, blur their face, and then say whatever

9  you want about them with impunity, that's just not the law.  And that

10  brings us to the of-and-concerning question.  As Your Honor noted, the

11  legal issue there is whether some ascertained or ascertainable person

12  is referred to and that person must be plaintiff.  If so, then the

13  statement is of and concerning the plaintiff.

14       If you look at PD04, there's the statement of -- there's the

15  picture of Mr. Andrews voting and then the caption that says, you

16  know, this is a crime -- "What you are seeing is organized crime on

17  behalf of the Democratic party."  It's clearly - it's clearly about

18  Mr. Andrews.

19       On the ascertainablity issue, though, we know that his

20  identity was ascertainable because it was actually ascertained, and I

21  think they have misrepresented the complaint where we talk about that.

22  It's 89 through 91, Your Honor can obviously review those.  But they

23  also say it was before the film was released.  But as we allege in the

24  complaint, Paragraphs 34, 47, and 48 through 66, defendants were

25  engaged in numerous promotional activities, including The Charlie Kirk

1  and Tucker Carlson episodes, where it was shown un-blown in April and

2  May of that year before the film actually came out.

3          THE COURT:  There's no allegation in the complaint about

4  how the un-blurred version made its way to the Kirk Show; correct?

5          MS. KUCK:  There's not an allegation except that --

6  well, Charlie Kirk is a Salem host, we could infer whatever we want

7  from that.  But it's also -- Mr. Engelbrecht and Ms. Engelbrecht and

8  Mr. Phillips are talking, they're TTV defendants.  I mean, I don't

9  know who else would have it.  Presumably, I think it's a fair

10  inference, that if they're interviewed and the un-blurred film is

11  showing, that's where he got it from.  But, you know, again, that's a

12  discovery question, I think.

13          THE COURT:  I know this is outside of what we're here

14  for, but that is a -- that is a public -- that surveillance film came

15  from public records?

16          MS. KUCK:  They say that they got it from the public

17  records.

18          THE COURT:  Right.

19          MS. KUCK:  However, I don't -- my understanding is you

20  can't just call up the Georgia Bureau and, you know, get this film and

21  then you'd have to go through the film and you'd have to find

22  Mr. Andrews specifically.  But they're talking about how this is a

23  crime, wherever they got it.

24          THE COURT:  Right.

25          MS. KUCK:  It's playing while they're talking so I'm

1    assuming that's where it came from.  But, again, that's a factual

2    question where they got it.

3            THE COURT:  Right.  And I understand your point that it

4    doesn't matter whether it was blurred or un-blurred.  But going to the

5    blurred depictions in the movie and in the book, how do you respond to

6    Mr. Bauer's point that there's no allegation in the complaint that he

7    was ascertainable within the four corners of that display?

8            MS. KUCK:  In the book and in the film?  Well, I think

9    it -- we don't know how the reporter got to him.  I mean, I think that

10   there are -- it's not clear.  But, again, I'm not sure that it matters

11   because the un-blurred was actually shown and as a matter of law

12   they're all responsible for those statements.  So that only -- that

13   argument only works if somehow Salem is sort of contained in the book

14   and the movie.  But I don't think that we can do that because, as I

15   said, it's on a Salem -- a Salem host is showing un-blurred pictures

16   and the coconspirators are talking about them.  So I think Salem is

17   liable for all of that un-blurred footage as well.

18           THE COURT:  What about Regnery?

19           MS. KUCK:  Well, I think Regnery certainly is because

20   we sent them the retraction letter, we sent it beforehand, and we said

21   this is who it is, he's not been found liable.

22           THE COURT:  Right.  But they're only responsible for

23   the book and the book only shows a blurred version of plaintiff.

24           MS. KUCK:  But this issue about the blurred version --

25   as I said, there's no law that says if you blur someone's face, you

can do whatever you want.  I mean, the cases are all cases where you

have like a verbal description of the person and it's not clear

exactly who the person is.

The closest they come to saying that a verbal description

doesn't fall within the of and concerning is a cartoon, and then I

think in their reply they add another case, *Brewer vs. Hearst,* where

it's like someone's arms and legs.  But, again, the Seventh Circuit

decided that on the grounds that it actually related to a group of

people of whom the plaintiff was a member.  It didn't single out the

plaintiff.

So I think this whole like of and concerning and putting it

in the box, you have to look at the doctrine as a whole.  That

doctrine evolved because people would describe things, you know, in

writing and then you'd have to figure out could you really figure out

who the person is, that's really what it's getting at.

And it also doesn't matter whether or not what the blurred

footage is.  It's the *Eakins* case, and it says it doesn't matter if

the world could figure it out.  It doesn't matter whether you or I

could sit here and figure out whether this is Mr. Andrews.  Would

Mr. Andrews and his wife know it was Mr. Andrews?  And they did.  So

if you're Mr. Andrews or his daughter or his next door neighbor, we

contend that you could.

THE COURT:  And is that alleged in the complaint?

MS. KUCK:  We say that he and his wife watched the

movie and were very upset about it and feared for their safety.  So,

1   yes, I mean, we do allege that when they saw it they understood that

2   it was him and it caused them to be nervous about his safety.

3          I also think that the other point worth making is that

4   generally this of-and-concerning issue is not something that you

5   decide on a motion to dismiss.  The case we cited in our brief, *Davis*

6   *vs. Macon Telegraph Publishing Company*, and the Georgia Court of

7   Appeals has stated "As a general rule in Georgia, the question of

8   whether or not a particular publication is libelous, as well as

9   whether the libelous matter was of and concerning the plaintiff, is a

10  question of fact for determination by the jury."  Defendants haven't

11  addressed or distinguished that case and I think we've got more than

12  enough here to proceed on a motion to dismiss.

13         I also just want to now clear up this issue of damages.  The

14  assertion is that Mr. Andrews has not pled -- he doesn't -- he hasn't

15  pled special damages and I think that's an easily disposed of

16  argument.  First, the complaint actually does allege special damages

17  at 217, 293, and 294.  Defendants haven't cited any case law

18  supporting the position that even if he ultimately were found to be

19  required to prove special damages that he's required to plead any more

20  than he has.  The cases that they're relying on -- and it's the TTV

21  reply at 3 through 4.  They're talking about *Latson*, *Mattis,* and

22  *McGee*.  Those are all summary judgment cases or at trial.  They're not

23  pleading cases.  I think Paragraph 217 is more than sufficient for

24  pleading purposes.

25         But secondly, Mr. Andrews has pled defamation *per se*, he's

1    been accused of a crime, so he doesn't need to plead special damages.

2    And, you know, we've now heard, and they say it in their reply, that

3    TTV defendants assert for the first time in the reply that in a case

4    involving public concern defamation *per se* and presumed damages are

5    not available, and I think we heard that again this morning.  That's

6    not a correct statement of the law and I would refer the Court to the

7    Georgia Supreme Court's decision in *ACLU v. Zeh*, Z-E-H, 312 Georgia

8    647, 2021, and it's at 651 in Footnote 5.  In that case the Georgia

9    Supreme Court explained that the U.S. Supreme Court, quote, "Has also

10   held that even a private figure plaintiff is required to prove actual

11   malice in order to recover presumed or punitive damages if the

12   defamatory statement was about a matter of public concern."  It cites

13   the Supreme Court in *Gertz* and the court in *Milkovich* made the same

14   point.  So presumed damages are available here even in cases dealing

15   with a matter of public concern, as long as the plaintiff demonstrates

16   actual malice.

17          And so turning to the actual malice.  To the extent that is

18   required for some aspects of the case -- I think Your Honor noted

19   we're dealing with a private figure here so, in general, it's a

20   negligence standard.  But if we're in the realm of public concern and

21   also for punitive damages, if it is required for any part of the case,

22   we have pled it.  There are many, many factual allegations in the

23   complaint from which a jury could find actual malice and they're set

24   out in Paragraphs -- Pages 48 through 54 of our opposition to the

25   Salem motion and that's -- you know, actual malice is akin to

1  recklessness.  I'll just tick through those quickly.

2        First, that defendants have refused to retract their

3  demonstrably false statements about Mr. Andrews and they continue to

4  produce them even today.  It's sort of a mystery to us why the

5  defendants just didn't cut out the footage of him once they became

6  aware that he didn't engage in unlawful behavior and used footage from

7  one of the other purported 2000 mules.  In the trailer - we allege

8  this in the complaint at Paragraph 45 - Mr. Phillips stated that they

9  had 4 million minutes of surveillance video.  Surely they could have

10 replaced him with a clip of someone else.

11       Second, as alleged in the complaint, they knew at the time

12 of the film was initially released that the SEB had investigated and

13 concluded that Mr. Andrews had committed no crime.  That's the

14 complaint at Paragraphs 128 through 131.

15       Third, the complaint also pleads evidence that defendants

16 fabricated the entire mules' narrative.  As I said, that's why it's

17 important that what they say is that Salem went and looked at the

18 evidence, okay, so this isn't just a movie that was created and Salem

19 put in money.  The evidence underlying the mules' narrative itself is

20 inherently improbable, it's grounded in lies, and it's without

21 scientific foundation and we detail that in the complaint at

22 Paragraphs 99 through 127.

23       Fourth, they had a -- all the defendants had a financial

24 motive.  They have all financially profited and continue to

25 financially profit from the film, the book, and the other businesses

that 2000 Mules drives towards them and the film also got them a lot of public attention, including from the former president even in the past few days.

Fifth, defendants have repeatedly refused to produce their purported evidence to law enforcement, we allege that at the complaint 118 to 120.

And, finally, the complaint also pleads that the false statements were designed to support defendants' predetermined narrative that the 2020 election was stolen, we allege that in the complaint at 193 through 195.

So under the case law these allegations, individually and collectively, if proven at trial, would support a finding of actual malice and defendants are, of course, free to offer evidence to dispute any and all of these facts, but they are most certainly sufficient to survive a motion to dismiss.

I think that unless the Court has any further questions, my colleague, Sara Chimene-Weiss, will address the federal voting claims and we will otherwise stand on our papers on the remaining common law claim issues.

THE COURT:  Great.  Thank you.

MS. KUCK:  Okay.

THE COURT:  Good morning.

MS. CHIMENE-WEISS:  Good morning, Your Honor.

Under the Klan Act support-or-advocacy clauses and the Voting Rights Act, Section 11(b), publishing a voter's image or other

1   identifying information, coupled with false accusations of a

2   voting-related crime, and the implicit threat of legal and other

3   adverse consequences for those supposed crimes is a quintessential

4   type of unlawful voter intimidation that Congress sought to ban with

5   both statutes.

6          The Court should look past defendants' attempts to miscast

7   the claims here as novel and to invent hurdles.  This is voter

8   intimidation not protected by the First Amendment.  Section 11(b) is

9   enforceable with a private cause of action and remedy.

10          I'm going to start today by talking about the Voting Rights

11  Act and the Klan Act and how this is a form of intimidation.  After

12  that, I'll -- sorry, a form of imitation and threats.  After that,

13  I'll turn to the First Amendment and then, finally, I'll turn to the

14  private cause of action issues and I'm happy to answer any other

15  questions that Your Honor may have.

16              THE COURT:  Great.

17              MS. CHIMENE-WEISS:  As Your Honor noted, Defendant

18  D'Souza states in the film "What you're seeing is a crime."  This is

19  about a video of Mark Andrews' voting.  Defendants coordinated with

20  one another to create, produce, release nationwide and promote their

21  film and book to spread their invented mules' narrative and they

22  continue to do so.

23          Andrews' family vacation was interrupted by a reporter

24  calling him to ask how he felt about starring in defendants' concocted

25  mules' theory which they were promoting with his face on national

1    television.  Months after he sent a retraction letter and months after

2    he was publicly cleared by the Georgia Bureau of Investigation the

3    defendants released the accompanying book.

4         At the motion to dismiss stage where the Court takes all

5    facts alleged in the complaint as true and draws all inferences in his

6    favor, Mr. Andrews has easily met his burden of pleading a claim under

7    the Klan Act and the Voting Rights Act, Section 11(b).

8         This is a straightforward application of case law on these

9    statutes, both looking back to the Civil Rights' era and also

10   considering more recent cases such as the *Wohl* case out of New York,

11   the *LULAC* case in Virginia, and the *Arizona Alliance* case out of

12   Arizona.

13        The Court can put a stop to the ongoing voter intimidation

14   and defamation.  The defendants are intimidating my client and making

15   him afraid every single time they refer to him voting as proof that

16   they finally found evidence the 2020 election was stolen and they're

17   still doing that.  Even though the footage they're using may have

18   been -- may have come from publicly available sources, excerpting

19   public information about voters and using it to say that those voters

20   have voted illegally is another quintessential type of illegal voter

21   intimidation.

22        This is a clear conspiracy to commit voter intimidation.

23   The goal of the book, film, and campaign was to injure and defame

24   Mr. Andrews and to intimidate him and others with respect to voting.

25        It's highly foreseeable that third parties would threaten and

1    intimidate someone who they believe voted illegally and more so took

2    part in a massive scheme to subvert an election.  It's also highly

3    reasonable that the voter, facing those threats, would then feel

4    intimidated.

5          Both the Klan Act and the Voting Rights Act are relatively

6    straightforward and their elements have been met here.  The Court

7    should not break new ground here and go against precedent to adopt

8    defendants' arguments here and especially on an argument that's not

9    fully developed.

10         Plaintiff has pled a plausible conspiracy insofar as

11   defendants were engaged in a joint venture that was conducted by means

12   of a defamation and intimidation campaign.

13         THE COURT:  You're addressing the statutory claims,

14   correct, the federal statutory claims?

15         MS. CHIMENE-WEISS:  Yes, Your Honor.

16         THE COURT:  All right.  Let's turn to the Section 1985

17   section, if we can, because I have a question about that.

18         MS. CHIMENE-WEISS:  Yes, Your Honor.

19         THE COURT:  Here the vehicle you're traveling under is

20   on what we've sort of described as Clauses 4 and 5; correct?

21         MS. CHIMENE-WEISS:  Your Honor, it's Clauses 3 and 4,

22   which are called the support-or-advocacy claims.

23         THE COURT:  Okay.  3 and 4.  So the support-or-advocacy

24   clauses which says "If two or more persons conspire to prevent by

25   force, intimidation, or threat any citizen who is lawfully entitled to

1  vote, from giving his support or advocacy in a legal manner, toward or

2  in favor of the election of any lawfully qualified person as an

3  elector for president or vice president, or as a member of Congress of

4  the United States," and then it goes on in Clause 4 to talk about the

5  injury; correct?

6          MS. CHIMENE-WEISS:  Yes, Your Honor.

7          THE COURT:  All right.

8          MR. CHIMENE-WEISS:  So Clause 3 sets out that it's a

9  violation if somebody is, as a result of this conspiracy, prevented by

10 force, intimidation, or threat from giving their support in a federal

11 election.  Here, voting.

12         Clause 4 sets out a separate conspiracy which is -- sets out

13 a separate cause of action, almost, which is to say that if a person -

14 here, Mr. Andrews - is injured as a result of their engagement in

15 support or advocacy.

16         THE COURT:  So going back to Clause 3, then.  My

17 question is this is -- again, as you said, this so-called

18 support-or-advocacy clause.  So what was Mr. Andrews supporting or

19 advocating?

20         MS. CHIMENE-WEISS:  Your Honor, the case law makes

21 clear and congressional intent makes clear that by voting, by engaging

22 in the right to vote, a citizen is engaged in support or advocacy for

23 their candidate of choice in an election.  Casting the ballot is

24 engaging in that support or advocacy.

25         THE COURT:  So voting itself?

1      MR. CHIMENE-WEISS:  Yes, Your Honor.  And that's not

2 what it's limited to.  But in this case that is what it is.

3      THE COURT:  Right.  But Clauses 1 and 2 talk about equal

4 protection under the laws and violations of equal protections of the

5 laws.  But you're saying in sub Clause 3 the support or advocacy also

6 covers just the act of voting?

7      MS. CHIMENE-WEISS:  Your Honor, Clauses 1 and 2 are --

8 the equal protection clauses are separate from Clauses 3 and 4 and we

9 shouldn't import anything from Clauses 1 and 2 into 3 and 4.  The

10 Supreme Court found that in *Kush*.  With respect to Clauses 3 and 4,

11 there's a number of things that can violate that statute.  But one of

12 them is, you know, being prevented from voting.  I'll say --

13      THE COURT:  Even if we don't know who the person is

14 voting for or who the person is supporting because we don't know?

15      MS. CHIMENE-WEISS:  Yes, Your Honor.  I mean, we almost

16 never know who somebody's supporting.  We have a secret ballot.

17 You're right, Your Honor, that we don't know who the person is

18 supporting, but they're engaging in support or advocacy by casting a

19 ballot.

20      And, again, I'll turn to -- there's a Fifth Circuit case

21 from 1967 and, as Your Honor knows, Fifth Circuit prior to 1981 is

22 binding on the Eleventh Circuit.  The court in *Paynes vs. Lee* said,

23 you know, explicitly there that the right to cast a ballot is

24 protected.  But it's also the right to be free from threatened harm

25 and the right to be protected from violence for an attempted exercise

1   of the voting right.

2                   THE COURT:  That's under the support-or-advocacy

3   clause?

4                   MS. CHIMENE-WEISS:  Yes, Your Honor.

5                   THE COURT:  What's the cite for that again?

6                   MS. CHIMENE-WEISS:  It's *Paynes vs. Lee*, 377 F.2d at

7   64, and that's a Fifth Circuit case from 1967.

8                   THE COURT:  Okay.

9                   MS. CHIMENE-WEISS:  Turning to -- I think another thing

10  that's come up repeatedly is whether Mr. Andrews -- whether

11  Mr. Andrews was-- whether these statutes were violated because

12  Mr. Andrews ultimately cast his ballot.  These statutes are absolutely

13  still violated if somebody ultimately votes.  What matters is whether,

14  first, they were -- whether they were injured for engaging in their

15  support or advocacy for voting.  Here, Mr. Andrews was defamed and the

16  complaint details further injuries he experienced.  He was

17  intimidated.  And then, second, whether Mr. Andrews has changed his

18  voting behavior, whether he's been intimidated because of his voting

19  behavior.

20                  Turning back to -- turning to 11(b).  As detailed in our

21  brief, the case law makes clear that defendants violate 11(b) where,

22  as here, they subject voters to reasonable fear that they will face

23  adverse consequences for their voting behavior.  For example, in the

24  *Wohl* case defendant's robo-calls to thousands of voters caused them to

25  fear that if they voted their information might be shared with law

1   enforcement or with creditors.

2        In the *LULAC* case out of Virginia, defendants published a

3   list of voters' names alleging they weren't citizens and voted

4   illegally.

5        In the Arizona drop box case, which was a recent case, Judge

6   Liburdi, in 2020, the court granted a temporary restraining order

7   where defendants were harassing voters online and, as here, accusing

8   them of being ballot mules.

9        In all of those cases the court held that defendant's conduct

10  violated 11(b) because it caused voters to fear that they would face

11  negative consequences for voting and we plead the same in our

12  complaint.

13       In none of these cases did the plaintiff need to show that

14  the defendants targeted those specific voters.  Here, Mr. Andrews is

15  the literal face of their conspiracy, he's the poster child.  At this

16  stage, where the Court must credit plaintiff's allegations and draw

17  all reasonable inferences in its favor, these facts are more than

18  enough to state a claim that defendants' conduct constitutes

19  intimidation within the meaning of 11(b).

20       Turning to the Klan Act.  Again, the complaint alleged that

21  accepting all of the allegations as true and drawing all reasonable

22  inferences in favor, as the Court must do here, Mr. Andrews has stated

23  a claim.  The allegations support a reasonable inference that

24  defendants engaged in a prohibited conspiracy either to injure or

25  intimidate voters.  The crux of the film and the book is that

Mr. Andrews' behavior was illegal and that he should not have been voting that way.

Second, there can be no dispute that Mr. Andrews has adequately alleged that at least one defendant committed an overt act in furtherance of the conspiracy.

Finally, Mr. Andrews has set forth sufficient allegations showing he was injured as a result of defendants' acts.

Again, defendants have said that these statutes require a threat of violence, that's simply not accurate.  These statutes were passed at times when groups were engaged in nonviolent coercive acts meant to intimidate people out of voting and that's exactly what we have here.  Now it's online.  Now it's, you know, video streaming.  It's going on podcasts.  But it's essentially the same thing that Congress meant to address with these statutes.

THE COURT:  Now, the VRA claim, from what I can tell, has a lower burden because it includes an attempt; correct?

MR. CHIMENE-WEISS:  Yes, Your Honor.

THE COURT:  An attempt to intimidate?

MR. CHIMENE-WEISS:  The Voting Rights Act includes both an attempt to intimidate.  It also includes efforts or attempts to intimidate people out of aiding others in exercising their right to vote.

THE COURT:  Okay.

MR. CHIMENE-WEISS:  This was common, you know, when that statute was passed and that's also what Mr. Andrews was doing by

1    dropping off his family members' ballots.

2              THE COURT:  Right.  And I know that your response to the

3    motion to dismiss emphasizes that point that the VRA section, all that

4    it requires is an attempt to intimidate.  We don't have that language

5    in the Section 1985 claim.  It requires that the persons actually

6    prevent by intimidation.

7              MS. CHIMENE-WEISS:  It does not mean that they're

8    prevented from voting.  It means that they're either intimidated as a

9    result.  It means that they're intimidated from voting and it also can

10   mean that they're injured -- Mr. Andrews was injured as a result of

11   his voting by defendants and that's sufficient to satisfy the Klan

12   Act.

13             THE COURT:  And what authority do you have for that

14   because it says "Two or more persons conspire to prevent by force,

15   intimidation, or threat."

16             MS. CHIMENE-WEISS:  Yes, Your Honor.  Ultimately

17   Mr. Andrews -- specifically, Mr. Andrews has changed how he votes.  He

18   no longer comfortably walks in and engages in this support or advocacy

19   and casts his ballot.  He no longer assists his daughters in voting.

20   He no longer assists his wife in voting.  He no longer is able to aid

21   them in voting and encourage them to vote.

22             THE COURT:  I understand that's all his various

23   categories of harm, but this statute requires -- if you read just the

24   text of the statute, it requires a prevention, a prevention.  What

25   allegation have you made that Mr. Andrews has been prevented from

1   voting?

2           MS. CHIMENE-WEISS:  Your Honor, the way that I read the

3   statutes and the way that I read the case law is that what is illegal

4   is when defendants conspire to prevent.  They need not succeed in

5   preventing, but they need to enter into a conspiracy to prevent, and

6   they need to take an overt act and then the voter needs to be injured.

7   In fact, it need not be the voter.  A voter needs to be injured.

8           THE COURT:  So success is not necessary?

9           MS. CHIMENE-WEISS:  Success is not necessary.  What

10  matters is that they enter into the conspiracy and take an overt act

11  as is common in a lot of conspiracy law.

12          THE COURT:  All right.

13          MS. CHIMENE-WEISS:  And I believe the statutes -- I'm

14  sorry.  I believe the case law bears that out.

15          So turning quickly back to 11(b), one thing that Your Honor

16  pointed out and that I wanted to focus on as well and that defendants

17  mentioned, 11(b) specifically does not have any kind of *mens rea*

18  intent requirement.  They need not have intended anything.  As Your

19  Honor said, this is clear from the - this is clear from the text of

20  the statute.  It's also clear from the case law.  The Klan Act,

21  Clauses 3 and 4 -- both 11(b) and the Klan Act, they don't have

22  language that an earlier statute had now codified at 131(b) about the

23  actions being for the purpose of.

24          So turning to -- I think I'll turn to the First Amendment

25  now, because I think that received a lot of attention from defendants.

1    The defendants argued here that because their speech isn't a true

2    threat that -- and because it's related to election that it is

3    entitled to blanket First Amendment protection.  The short answer here

4    is that we've alleged in the complaint that this is defamation.

5    Defendants point to the Supreme Court's recent decision in *Counterman*

6    and *Counterman* explicitly says that defamation is among the categories

7    of speech that are explicitly, categorically entitled to no First

8    Amendment protection.

9         So right off the bat we don't think the First Amendment even

10   factors here because this is defamation and that's a balancing test

11   and that's something that the Supreme Court has set out in *Sullivan*

12   and set out -- you know, and has followed for many years.  Obviously,

13   the First Amendment is important to free and fair elections, but

14   defamation is over the line.

15        Second -- first, we think the Court can end its inquiry

16   there.  But should the Court turn to the true threats inquiry, we

17   don't think that this is necessarily -- we don't think that the true

18   threats inquiry is the necessary inquiry here.  We already know that

19   everything -- their speech is categorically excluded as violating --

20   as being defamatory.

21        Conduct can violate Section 11(b) in Clauses 3 and 4 of the

22   Klan Act without being a true threat of the type categorically

23   excluded.  A true threat, it's a term of art, it doesn't necessarily

24   mean threat.  It's a term of art that -- it's a legal term of art that

25   describes a specific type of speech categorically entitled to no First

1    Amendment protection.  It's completely consistent with the First

2    Amendment that federal voter -- anti voter-intimidation statutes

3    prohibit more than just true threats.

4         Again, while the Court doesn't need to reach the question of

5    whether defendants' actual conduct is categorically excluded from the

6    First Amendment protection as a true threat, however, the defendants'

7    speech can also be regulated here as speech integral to unlawful

8    conduct.

9         In the recent Eleventh Circuit *Norwegian Cruise Lines*' case,

10   the court found that further it can be regulated as speech misleading

11   voters about voting rules and procedures and requirements and Chief

12   Justice Roberts wrote that in the *Manske* case in 2018.  Again, the

13   true threats analysis is not relevant here because defendants' speech

14   is so squarely defamatory.

15        And so finally turning to defendants other First Amendment

16   claims -- First Amendment arguments.  Ultimately just because speech

17   is not categorically accepted doesn't mean the First Amendment

18   entirely shields it, it remains a balancing test.  It's not the end of

19   the inquiry.  Again, we think that we prevail given the defamation at

20   issue here.

21        Finally, because -- ultimately just because that -- just

22   because it's -- defendants make the argument that it's a matter of

23   public concern in connection with an election and draws a lot of

24   attention to the *Brewington* case out of the Indiana Supreme Court.

25   That case concerned defamation of a public figure.  As I believe Your

1   Honor mentioned and as defendants' counsel mentioned, becoming a

2   public figure involves assuming some level of risk of liability that

3   you will face threats, you will face negative -- you know, you will

4   face negative consequences for becoming a public figure and that's

5   fair, we recognize that.

6          All Mr. Andrews was doing was voting and that's almost the

7   opposite of assuming the risk.  That's something that Congress and

8   even our constitution takes special efforts to protect that sacrad

9   fundamental right so that shouldn't be -- the statutes recognize that

10  shouldn't be an area where somebody has to assume a heightened risk

11  for engaging.  We should be extra particular about protecting it.

12         I think -- turning quickly to defendants' arguments about

13  third-party threats.  Our position today is that we could remove all

14  of the third-party threats and we would still state a claim.  The case

15  law makes clear -- the *Paynes*' case that I mentioned, other recent

16  cases, the *Wohl* case, the *Arizona Alliance* case, that just -- it need

17  not be - it need not be a threat of violence to violate the statute at

18  issue here.

19         Second of all, the third-party threats, they go to the issue

20  of foreseeability.  They sort of emphasize just how foreseeable it was

21  that Mr. Andrews would face intense scrutiny, threats, public scorn

22  because of their conduct.  The fact that they kept pushing the film,

23  they kept promoting it, they're still promoting it.  It's still

24  available online.  They're still posting about it on their social

25  media.  The book is still available in Barnes & Noble.  The film's

1   streaming online.  It's not just a DVD, it is a DVD that's out in the

2   world and can't be taken back, but it's also available for purchase

3   and for streaming online.

4        Having said that, foreseeability and reasonableness is

5   really something that is better decided at a later stage.  Ultimately

6   what matters here is that Mr. Andrews was intimidated and felt fear

7   and was injured as a result of defendants' conduct.

8            THE COURT:  Is it your position, though, that these

9   defendants are also responsible for the third parties?

10           MS. CHIMENE-WEISS:  It is, Your Honor.  The third

11  parties' behavior and their violent and other threats against

12  Mr. Andrews were the proximate cause under a standard -- you know,

13  sort of standard tort law.  They were the foreseeable result of

14  defendants' conduct.  Mr. Andrews would never -- they were the direct

15  result of defendants' conduct.

16       Judge Jones, in the *Fair Fight* case in this district,

17  recently held that a defendant can be liable for direct resulting

18  threats as a result of their conduct.  So we do believe that they are

19  liable for those and they go to show foreseeability.  I just wanted to

20  make clear that, you know, the fact that defendants' specific threats

21  may not have been threats and intimidation, they weren't threats of

22  violence, that's not relevant at this stage.

23       I think I will finally turn to the private cause of action

24  issue.  So the Supreme Court has repeatedly affirmed that the Voting

25  Rights Act itself is privately enforceable.  Congress has repeatedly

1    reenacted the Voting Rights Act with knowledge of those Supreme Court

2    decisions interpreting the Voting Rights Act.

3            Defendants focus on *Sandoval* and *Sandoval* itself states that

4    its test is not necessary whereas here Congress has reenacted a

5    statute without a fix after courts have allowed private cases to

6    persist.  That itself ratifies the private cause of action.

7            And, indeed, *Allen* and *Morse* are two Supreme Court cases

8    regarding the Voting Rights Act and *Whatley* is a pre-1981 Fifth

9    Circuit case regarding 11(b) in which a private cause of action was

10   allowed to persist.

11           Very recently, again, Judge Jones in this district found that

12   there's a private cause of action and allowed it to persist.

13               THE COURT:  Was it for 11(b)?

14               MS. CHIMENE-WEISS:  Yes, Your Honor.  That's an 11(b)

15   case, the *Fair Fight* case.

16               THE COURT:  *Fair Fight?*

17               MR. CHIMENE-WEISS:  Yes.

18               THE COURT:  Okay.  *Whatley* is the Fifth Circuit case,

19   but there was no discussion of it; correct?

20               MR. CHIMENE-WEISS:  Yes, Your Honor.  But it allowed

21   the private cause of action to persist and the fact is that Congress

22   ratified the Voting Rights Act again following that.  And, again,

23   though it was implicit --

24               THE COURT:  Is that what Mr. Grossman referred to as a

25   drive-by opinion?  I've never heard of that.

1          MS. CHIMENE-WEISS:  You know, I've also never heard of

2     that.  I also thought that that was interesting in light of the case

3     that they relied on, the *Schilling* case.  The dispositive motion in

4     that case was, I think, five pages long.  All of the briefing in that

5     case made no mention of *Sandoval.*  That's an out-of-circuit,

6     out-of-district case so I would encourage the Court not to follow the

7     logic of that single outlier case.

8          Again, the vast weight -- again, out-of-district cases.  The

9     *Fair Fight* case, first of all, is squarely on point here, but the

10    *Arizona Alliance* case, the *Wohl* case.

11         There also was a recent case out of Colorado, the *Colorado*

12    *NAACP* case, in which the court -- that court, that's a Federal

13    District Court, explicitly found that there was a private cause of

14    action in 11(b).

15         So having said that, under *Sandoval* that court said -- I

16    mean the Supreme Court said don't do the test if - don't do the test

17    if there's already an obvious answer here and I think if it's already

18    been ratified or it's already otherwise been made clear by the courts

19    or by the statute and I think that's true here.

20         Having said that - and I think Your Honor picked up on this-

21    we think that we prevail -- I think we prevail under the *Sandoval* test

22    as well.  The *Sandoval* test asks first does the text contain

23    rights-creating language.  Here, it does.  It talks specifically about

24    voters.  It also talks -- that's similar to the facts in *Sandoval*.

25         Second, the *Sandoval* text asks does text demonstrate

1    Congress's intent to create a private cause of action, and we detailed

2    this in the briefs.  But the section of the Voting Rights Act, it

3    explicitly incorporates a number of different -- of other portions --

4    I'm sorry.  It explicitly incorporates a number of the other portions

5    of the Voting Rights Act which explicitly create a private cause of

6    action.  And, furthermore, there's legislative history that they

7    sought in passing the Voting Rights Act so relatively quickly after

8    the Civil Rights Act of 1957 they wanted to expand the remedy.  They

9    wanted to make sure that peoples' rights were being protected and the

10   purpose of the act is furthered by having a private cause of action.

11        Lastly, defendants' argument that there's no private right

12   of action because Section 12 authorizes Attorney General suits, that

13   was directly rejected by the Supreme Court in *Morse*.  They said that

14   there could be dual causes of action.

15        Again, I don't think that you need to go to the *Sandoval*

16   test.  In *Lorillard vs. Pons*, the Supreme Court held that Congress is

17   presumed to be aware of an administrative or judicial interpretation

18   of a statute and to adopt that interpretation when it reenacts a

19   statute without change and that's guiding here.

20        With that, I will say thank you, Your Honor, and we'll rest

21   on the pleading.

22             THE COURT:  All right.  Thank you.

23             MS. CHIMENE-WEISS:  Thank you.

24             THE COURT:  Anything else on behalf of the plaintiff?

25             MR. DuBOSE:  No, Your Honor.  That's going to conclude

1    our presentation.  We would like to thank you for your time and

2    attention here today.

3         Although we certainly feel that the allegations provide more

4    than enough to deny all of the motions from the defendants, to the

5    extent the Court may determine at some point that there were some

6    deficiencies, we would certainly appreciate the invitation from the

7    Court to amend.

8              THE COURT:  All right.  Thank you.

9         Mr. Bauer.

10             MR. BAUER:  Your Honor, I don't have too much time left

11   so I'm going to rapid fire you, Judge.  I hope that's okay.

12             THE COURT:  Sure.  Lightning round.  Go ahead.

13             MR. BAUER:  All right.  I want to make four quick

14   points.

15         First, in Georgia, statements on matters of public concern

16   are privileged, conditionally privileged, but privileged and require

17   actual malice regardless of the public or private status of the

18   plaintiff, I want to make sure the Court understands that.

19             THE COURT:  Plaintiff alleges that they did allege

20   actual malice.

21             MR. BAUER:  Yeah, they've alleged it.  But as I think

22   we've briefed, I think there are reasons - and I won't argue them all

23   here, but they're in our papers - why they couldn't allege actual

24   malice is sufficiently met here.  The point being it's not a public

25   figure or a private figure case, but it is an actual malice case.

1  That statute is O.C.G.A. 51-5-7.

2       The second point, of and concerning.  Plaintiff says blurring

3  doesn't matter.  That's wrong, Your Honor.

4       THE COURT:  I'm sorry.  What doesn't matter?

5       MR. BAUER:  Blurring.  Blurring of the face.  The

6  deidentification of Mr. Andrews, the failure to identify him by name

7  or image, they say that doesn't matter at least -- and I'm talking for

8  my clients, Salem and Regnery, so we're talking movie and book.  There

9  is no allegation in the complaint - and you questioned them on this -

10  no allegation in the complaint that anyone recognized Mr. Andrews from

11  the movie or the book alone, not even the plaintiff.

12       Paragraphs 89 and 90 of the complaint are clear that a

13  reporter told Mr. Andrews on May 16th, 2022, before the movie or the

14  book were even published, that he was in -- he was the subject of

15  these allegations.  There are zero allegations that anyone anywhere

16  could or did ascertain his identity from blurred images in the movie

17  or the book.  It's not in the complaint.  That is an essential element

18  of their tort claims under Georgia law, they're just not there.

19       THE COURT:  Well, I agree that's as to Regnery.  But as

20  to Salem, they then point back to The Kirk Show.

21       MR. BAUER:  Okay.  So you asked them about that, too,

22  and we talked about that, that there are no allegations other than

23  Salem produces The Charlie Kirk Show.  That's not enough under

24  Georgia's *respondeat superior* law to hold Salem responsible for a

25  third-party's speech and that's what it is.  It's either slander or --

1          THE COURT:  But it's not *respondeat superior* if it's

2    conspiracy; is it?

3          MR. BAUER:  Thank you.  Point Number 3, conspiracy.  We

4    briefed it and they said, well, you didn't hear anything about

5    conspiracy today, Judge, so they must concede it.  We don't.  We fully

6    briefed it.

7          You asked Ms. Kuck where's the beef?  Where's it alleged that

8    Salem ever shared his un-blurred image, and she said conspiracy, we

9    don't have to.  That's absolutely wrong.  As I know the Court has

10   heard over and over again from other lawyers over the years, *Iqbal*,

11   *Twombly*, specifically talks about conspiracy and the Eleventh Circuit

12   fully embraced the requirements those cases imposed on the federal

13   courts in *American Dental Association vs. Cigna*, it's cited in our

14   brief, that's 605 F.3d 1283.

15         Here's what *Iqbal* and *Twombly* compel and the Eleventh Circuit

16   follows.  You do not -- you must eliminate any allegations in

17   plaintiff's complaint that are merely legal conclusions.  Those are

18   specifically conspiracy cases.  So you strip out conclusory

19   statements.  And what are conclusory statements?  Things like - and

20   I'm reading from *American Dental Association* - "Defendants have not

21   undertaken the above practices and activities in isolation but,

22   instead, have done so as a part of a common scheme and conspiracy.

23   Each defendant and member of the conspiracy, with knowledge and

24   intent, agreed to the overall objective of the conspiracy, agreed to

25   commit acts of fraud" to blah, blah, blah, quote, "These are the kinds

1    of formulaic recitations of a conspiracy claim that the court in

2    *Twombly* and *Iqbal* said were insufficient."  We're not required to

3    admit as true these unwarranted deductions of fact.

4         Then we go further and the Eleventh Circuit says in these

5    kinds of conspiracy allegations you actually have to not only strip

6    out the legal conclusions, but then you have to look at the facts that

7    are alleged and say is there any other alternative explanation here

8    that would be neutral or non-conspiratorial like, for example, Salem

9    is just an investor in a movie that may not have a conspiratorial

10   purpose?  And this is particularly important here, Judge, because

11   their conspiracy allegations are not even consistent.  They tell us on

12   the one hand that we all put our minds together and conspired to ruin

13   the man's reputation even though my clients never identified him so

14   there's inconsistency number one.

15        Then they say, well, it's not really about his

16   representation, Judge.  This was actually about voter suppression of

17   Mr. Andrews.  Again, our client never identified him.  Nothing that

18   you can divine from the complaint is consistent with those conspiracy

19   allegations and under *Iqbal* and *Twombly* they can't just pound their

20   chest and say Salem was at the table, we've alleged conspiracy, so we

21   get to state a claim and, most importantly, hold them responsible for

22   the speech of others.

23        Under the First Amendment, the breathing space that the

24   constitution gives, you must do more to hold a party responsible for

25   someone else's speech, particularly on matters of public concern in

1    Georgia where you have to prove actual malice and recklessness above

2    and beyond the *respondeat superior* obligations.   Conspiracy doesn't

3    get them there, Your Honor.

4            The last point -- if I leave you with anything today, it

5    needs to be clarity on this.   Salem and Regnery are different than the

6    other defendants.   There is no allegation that either of my clients

7    ever published the identity or the image of Mr. Andrews.   No image, no

8    name, no liability.   We are different than the other defendants and no

9    allegation can support -- in this complaint, as thick as it is, no

10   allegations can support holding Salem responsible for the speech of

11   others.   Thank you.

12                   THE COURT:   Thank you.

13                   MR. LARSEN:   May it please the Court.

14                   THE COURT:   Yes.

15                   MR. LARSEN:   I also have just a few points I'd like to

16   make.

17                   THE COURT:   Please.   Go ahead.

18                   MR. LARSEN:   First of all, just to follow up on the

19   position -- plaintiffs appear to acknowledge that with regard to

20   damages that they don't have to plead special damages if, only if,

21   there's actual malice and then that ties in with the exposition just

22   made by counsel for codefendant.   This is actually an actual malice

23   case and then we hear from plaintiffs that, well, they pleaded actual

24   malice.

25                   I just want to talk a little bit about actual malice for the

1    Court, because it doesn't look like they actually have pleaded actual

2    malice.  "Actual malice" is a term of art, as I'm sure the Court's

3    aware.  It doesn't mean ill-will or spite or anything like that.

4    "Actual malice" means that it was published and defendants knew it was

5    false or they published it with reckless disregard for the truth.

6    That's what "actual malice" means and it is a heightened pleading

7    standard.  It's a clear and convincing pleading standard.

8            What we have for allegations of actual malice is the refusal

9    to retract, that they knew at the time that the SEB had cleared, that

10   they had a financial motive, and then they just state that defendants

11   fabricated it, they just state that.  That's not a clear and

12   convincing standard, they haven't met it, they don't plead actual

13   malice, and they fall back in the same argument to their real burden

14   that they keep coming to, which is that it was highly foreseeable, and

15   that is a negligence standard, Your Honor.  It's not actual malice.

16   They have not pleaded actual malice.

17           I want to briefly also touch on the argument they made with

18   regard to the Supreme Court case of *Milkovich v. Lorain Publishing*,

19   which -- and following the *New York Times v. Sullivan* and the *Gertz*

20   cases, all the news media were thinking, okay, the Supreme Court's

21   about to issue an opinion privilege of some kind and that's not what

22   the Supreme Court did.

23           With *Milkovich,* they said if the opinion implies a false

24   statement of fact, yes, that is actionable.  In *Milkovich* -- basically

25   it's in *Milkovich* where you get the distinction between just this

1   false statement of fact that's implied by an opinion and the separate

2   standard that I've articulated before the Court which is opinion based

3   on disclosed facts and none of those cases that they cite go to the

4   issue of opinion based on disclosed facts.

5        I want to follow up with regard to -- the Court had a lot of

6   questions about that the "This is a crime" statement and I want to

7   quote from their first amended complaint.

8        THE COURT:  That's okay.  You don't need to quote from

9   it.

10       MR. LARSEN:  It's very -- it's about the statement with

11   regard to "It's a crime," and it's on The Charlie Kirk Show which

12   keeps coming up.

13       THE COURT:  Okay.

14       MR. LARSEN:  Where Ms. Engelbrecht, the defendant,

15   says, well -- Phillips asks -- she says there is a possibility that

16   Andrews could have been an assister, which would have meant he would

17   have had a signed envelope that would have indicated he was an

18   assister in that capacity.  But through our open records request we

19   confirmed that Gwinnett County had no assisters.  So this is on The

20   Charlie Kirk Show.  So this is not just an issue of, well, that's a

21   crime and there aren't the additional facts, which, as we've

22   discussed, you do get to choose your facts on opinion on disclosed

23   facts.  But there's more to that and, in fact, the defendants do

24   acknowledge this possibility.

25       THE COURT:  Okay.

1           MR. LARSEN:  And then finally with regard --

2           THE COURT:  You're out of time so briefly.

3           MR. LARSEN:  Okay.  Well, I just wanted to say that the

4    issue about misleading voters about the voting rules, that there's no

5    voter -- those are cases where, like, they say they're going to use

6    your voter registration and they can use it and turn it over to credit

7    collectors and all that sort of thing, that's false.  This is actually

8    a correct statement of the law that Georgia does have a prohibition on

9    voting ballots that aren't yours and nobody's going to be

10   disenfranchised if they understand that that is, in fact, the general

11   prohibition.

12          Thank you, Your Honor.

13          THE COURT:  All right.  Thank you very much.

14          All right.  Let's take a 10-minute recess now before we turn

15   to Campaign Legal Center's presentation and then defendants will have

16   an opportunity to respond.  Let's be back at 10 to 1:00.  Is that

17   okay?  Does anyone have to eat or can we muscle through here?  Okay.

18   Almost done.  10 to 1:00.  Thank you.

19              (recess taken from 12:40 p.m. to 12:50 p.m.)

20          MR. JOHNSON:  Thank you, Your Honor.  Hayden Johnson

21   for the *amicus* Campaign Legal Center.  Again, I appreciate the

22   opportunity to present our arguments here today.

23          THE COURT:  Sure.

24          MR. JOHNSON:  As you know, our brief just covers two

25   main things.  One is the Klan Act claims and the other is how the

1    First Amendment plays in here.  I'll try to make just a couple of

2    doctrinal points and leave it to the parties to talk about the facts.

3         I think there's sort of -- I wanted to offer a framework for

4    the Court to be thinking about this.  There's sort of four steps of

5    analysis here when we're talking about what intent is required for the

6    Klan Act claim and how the First Amendment plays in there.  The first

7    is just, you know, a basic statutory interpretation question, what

8    intent is required under the statute under Clause 3 and 4 of the Klan

9    Act.

10        Then you get to is there a speech interest on the other side?

11   Is there a speech interest wrapped up in any of the acts furthering

12   the conspiracy?  If you answer "yes" to that question, then you get to

13   Step 3, which is, okay, is there any categorical exceptions at play

14   here on the First Amendment?  We've talked about defamation, which we

15   agree with plaintiffs that this is a better fit under a defamation

16   framework, but defendants bring up true threats so we can address that

17   as well.

18        Under 4, Step 4 in the analysis, you get to a scrutiny

19   analysis.  You decide, okay, there's First Amendment interests on the

20   other side, there's no categorical exception, it doesn't, nonetheless,

21   pass constitutional muster and I think that's -- at each step there

22   it's not as categorical or as easy answer for defendants as they make

23   it seem here.  Again, we're at a motion to dismiss so there's fact

24   questions wrapped up in all these steps.

25        I'll go back to the first one here which is just what intent

1    is required under the Klan Act.  I think it's easy to say -- or easier

2    to say what intent is not required here.  It's not specific intent and

3    we know that for, really, three reasons.  First is the text.  In

4    Clauses 1 and 2 of the Klan Act, the equal protection clauses, it says

5    "for the purpose of," that the conspiracy must be "for the purpose of"

6    the unlawful deprivation.  That text is absent from Clauses 3 and 4.

7    It does not say "for the purpose of," and that difference is

8    meaningful.

9         The U.S. Supreme Court said in the *Bray* case -- Justice

10   Scalia wrote that that language, "for the purpose of," is why there's

11   specific intent in Clauses 1 and 2 and Justice Scalia was sort of

12   sparring back and forth with Justice Stevens' dissent who was claiming

13   there was a lower level of intent and Scalia says in *Bray* at pincites

14   275 to 77, no, the "for the purpose of" language is what requires this

15   element in equal protection clauses claims under the Klan Act.

16        I think another proof point to show that specific intent is

17   not required is looking at the criminal analog to the Klan Act claims

18   which are 18 USC, Section 241 and 18 USC, Section 242.  In those

19   statutes -- 241 says "with intent to prevent," and 242 says "willfully

20   subjects."  Now, again, that language is not at play in Clauses 3 or 4

21   here.  You know, for Clause 3 it's intent, there's no specific intent

22   to intimidate.  For Clause 4, there's no specific intent to injure.

23   Clause 4 isn't really an intimidation clause, it's separate from that.

24   And there's a question here, I think, in this case whether the

25   defendants have even moved on the Clause 4 part of this since they

1    focus so much on intimidation.

2         Another proof point here on that analysis is the history.

3    At this time Congress was trying to legislate in a broad way.  They

4    were trying to fill the gaps left by the reconstruction amendments and

5    the Civil Rights Act of 1866 that didn't adequately prevent access to

6    franchise for voters in the face of the Klan and so they wouldn't have

7    wanted to have a really heightened specific intent element you had to

8    prove in order to bring a cause of action here.  They wanted to

9    provide a broad cloak of protection for voters at this time and that

10   carries through until today.

11        Precedent shows that, too.  We talked a little bit about the

12   *Paynes v. Lee* case in the Fifth Circuit, 1967.  In that case the court

13   doesn't apply any sort of specific intent element.  I think that's

14   informative here.

15        Persuasive authority is the same.  You know, we've talked

16   about *LULAC*, the *Cervini* case in Texas, the *Wohl* case in New York.  In

17   all of those cases the court doesn't require specific intent and that

18   should be persuasive here.

19        We think the better intent element, based on our reading, is

20   just a general intent standard and that's just proof of knowledge with

21   respect to the *actus reus,* proof of knowledge with respect to the acts

22   that are making up the conspiracy.  The Court can look to *Carter v.*

23   *United States* which is a case --

24             THE COURT:  All of the acts?

25             MR. JOHNSON:  Come again.

1          THE COURT:  Does each conspirator need to have knowledge

2     of all of the acts?

3          MR. JOHNSON:  No.  Just their acts forming their

4     involvement in the conspiracy.  So not every other conspirator's act

5     and that's consistent with just general conspiracy law principles.

6          The *Carter* case, for your information, Your Honor, is 530 US

7     255.  It talks about the difference between specific intent and

8     general intent and the court adopts general intent because for the

9     same reasons here, it lacks the language in that statute of "for the

10    purpose of."

11         Once you answer that question, you move on to Step 2, which

12    is is there a speech interest here?  Defendants tend to conflate the

13    First Amendment analysis with the statutory analysis, but they won't

14    always intersect, and I think there's a couple of illustrations of why

15    that's the case.  There's a Klan Act case out of North Carolina called

16    *Allen v. Graham* where the alleged wrongful act was pepper spraying

17    voters.  You know, there's not a speech interest in pepper spraying

18    voters.

19         There's a Klan Act case that -- one I referenced out of

20    Texas, *Cervini*.  You know, that case involves the supporters of one

21    political candidate trying to push the campaign bus of a different

22    political candidate off the highway.  Again, there's no speech

23    interest there.  Defendants, you know, misconstrue the analysis to say

24    that you need to automatically layer on a First Amendment analysis on

25    the Klan Act claim, you don't have to.  I think that's the case here,

1 too.

2       As plaintiff's counsel said, you know, there's good

3 precedent in the Eleventh Circuit in *Norwegian Cruise's* case that says

4 speech (inaudible) the conduct does not necessarily warrant First

5 Amendment protection.  And that makes good sense; right?  Like almost

6 all discrimination cases involve some level of speech; right?  That

7 doesn't mean that that speech excuses the discrimination.  That same

8 analysis applies to an intimidation claim.

9       So if you answer that question "yes," that there is some

10 sort of speech interest wrapped up in a conspiracy, then you're at the

11 exceptions, Step 3, and here we agree with the plaintiff that

12 defamation makes this an easy call to say that this is exempted from

13 the First Amendment's protection and that is aligned under *Gertz v.*

14 *Robert Welch*, the U.S. Supreme Court case.  There they say, you know,

15 that someone like Mr. Andrews, a nonpublic figure, that you don't need

16 to prove actual malice to defeat a First Amendment defense when it

17 comes to defamation, that there you need to prove negligence.

18       Now, there's a separate statutory question of whether you can

19 bring a defamation claim and what you need to prove there.  But to

20 overcome a defamation defense for purposes of the Klan Act, *Gertz*

21 instructs all you need to do is show negligence and that's -- you

22 know, our position is the plaintiffs have done that here.

23       But even if you reach what defendants ask for here, which is

24 to enter into the true threats framework, our view is that the

25 plaintiffs have even met that standard which, again, we don't think is

1   applicable, but it is still met.  *Counterman* instructs that it's just

2   conscious disregard of a substantial risk and *Virginia v. Black* says

3   intimidation can be -- to quote the case, "is a type of true threat,"

4   that's at Pincite 360.  So if we put those two together what we're

5   left with is is there a conscious disregard of a substantial risk that

6   Mr. Andrews would be intimated, and I think the complaint bears that

7   out, at least at the motion to dismiss stage, that that's sufficiently

8   alleged.

9          So if you answer "no" to that question, there's not a

10  categorical exemption, then you're on to Step 4, which is the scrutiny

11  analysis.  And there I think it's important to remember that it's not

12  just a categorical defendants win under this analysis because there

13  are very important competing interests here in two ways.  The first is

14  that you have Mr. Andrews' right to vote and not only right to vote,

15  but to be free from intimidation and to cast his vote freely, and then

16  you have some sort of speech interests on the side if you breach this

17  part of the analysis.

18         *Burson v. Freeman* says that -- and that's a U.S. Supreme

19  Court case involving a restriction on electioneering within polling

20  places.  The cite for that is 504 US 1911, a 1992 case out of

21  Tennessee.  In that case the court said, yes, there's definitely

22  speech interests in electioneering near polling places and trying to

23  convince voters of certain things near polling places.  But there's a

24  countervailing really important interest to having voters be free from

25  intimidation to having voting be sort of a sacrad space and in that

1   case the voting interest won out over the speech interest.  The court

2   said that the ban on electioneering near polling places was

3   permissible under the First Amendment.  Those same types of interests

4   are at play here and we submit that the plaintiff's interest in being

5   free from intimidation would also win out here.

6          Plaintiff's counsel also brings up the *Manske* case.  Again, I

7   think that Footnote 4 in the Roberts' decision where it talks about

8   disinformation about the electoral process, that also puts a thumb on

9   the scale for plaintiffs here.

10          But a second point about the competing interest is -- I

11   think it's -- from our view, it's a mistake to conceptually view this

12   case as First Amendment on one side and Voting Rights on the other and

13   no First Amendment interests on that side.  I think in our political

14   climate right now dropping your ballot off at a drop box is a

15   contentious thing.  It's a political statement to do that.  You're

16   saying "I trust drop boxes."  That comes with some heated pressure in

17   our environment now.  Even though Mr. Andrews doesn't need to have a

18   First Amendment claim in that, the whole concept of the First

19   Amendment is to have an open marketplace of ideas and the persuasive

20   ideas are the ones that win out.

21          If you accept defendants' categorical view of their First

22   Amendment defense, it would mean that defendants can do what they're

23   alleged to have done to trample on other people to say that that view

24   is invalid.

25          THE COURT:  That's an interesting point.  Are you

1    saying that the act of voting through a drop box is the act of

2    supporting or advocating for an issue?

3            MR. JOHNSON:  Your Honor, I think it's both supporting

4    and advocating for the candidate, as the Klan Act contemplates.  But,

5    yes, I think it is supporting or advocating for an issue.  The very

6    act of using a drop box says "I trust drop boxes."  I think the whole

7    framework of the First Amendment that says ideas should win out

8    because they're persuasive, not because one can trample another one,

9    is important to consider here.

10           THE COURT:  I assume you also agree with

11   Ms. Chimene-Weiss' point that Subsections 3 and 4 are also broader and

12   encompass just the act of voting?

13           MR. JOHNSON:  Yes, Your Honor.

14           THE COURT:  So even if it was a traditional voting

15   location, it would still be covered?

16           MR. JOHNSON:  Correct, Your Honor.  I think that it's

17   covered -- any level of support or advocacy that doesn't mean -- if it

18   wanted to say just voting, just casting your ballot, it would have

19   said that.  I think it would include things like *Cervini* where its

20   campaign workers who are advocating for their cause that are

21   obstructed.  I think a lot of the older cases from the former Fifth

22   Circuit also speak to a broader view of what "support or advocacy"

23   means here.  Same for *Paynes* v. -- the *Paynes'* case because that's

24   about voter registration and, again, not casting a ballot.

25           I'd like to make a couple of other doctrinal points about

1    other elements of the Klan Act unless you have questions about the

2    intent part.

3              THE COURT:  Sure.  Go ahead.

4              MR. JOHNSON:  Your Honor, as you said, for what counts

5    as intimidation, that can take a lot of different forms, and I think

6    an illustration of that is looking at the witness intimidation in the

7    sister subsection of this part of the Klan Act 1985, Subsection 2.  If

8    we adopt defendants' view that intimidation is only violence, well,

9    that makes not a whole lot of sense in the witness intimidation

10   context because there's all sorts of other coercion at play in witness

11   intimidation that still would be unlawful under 1985(2) and there's no

12   reason to read what "intimidation" means in 1985(2) a different way

13   than it does in 1985(3).

14             An offshoot of that point is the section Clause 3 uses the

15   dysjunctive "or" when it talks about threat, intimidation, or force.

16   I think defendants' reading of it would conflate the three.  It would

17   say in any case it means violence.  Intimidation must be something

18   else than threat or force if it's using the dysjunctive in that place.

19             So that can include publication, as Your Honor suggested,

20   from the older Civil Rights cases.  More recent cases that represent

21   that as well is Judge Jones' motion for summary judgment order in the

22   *Fair Fight* case, the *Wohl case, the LULAC* case, and the Ninth

23   Circuit's decision in *Nguyen*.

24             Another point I'd like to raise is just how does the

25   historical background play in here for what's required.  I'd like to

1    point the Court to the Seventh Circuit's decision in *Stern v. U.S.*

2    *Gypsum*, <u>547 F.2d 1329</u>.  There the court goes through all the

3    legislative history for the Klan Act and the quote that the court

4    takes from all that is, quote, "To use the lesson of a particular

5    historical period as the catalyst for a law of more general

6    application," quote -- for the future was what Congress was really

7    trying to do, take the lesson of what was going on in the Klan Act

8    period and say that is messing with the proper functioning of

9    democracy and create a broad general statute that will protect the

10   proper functioning of democracy going forward.

11          So with that I'll end my presentation.  Thank you.

12              THE COURT:  Great.  Thank you.  Thank you very much.

13          Mr. Grossman.

14              MR. GROSSMAN:  Good afternoon, Your Honor.

15              THE COURT:  Good afternoon.

16              MR. GROSSMAN:  A few points in response.

17          First I'd like to address the standard -- respond to the

18   standard for actionable intimidation under the Klan Act and I think

19   the way the plaintiff has argued it the plaintiff seems to accept the

20   view that it's the same standard that applies under Section 11(b) as

21   well.

22          Both the *amicus* as well as the plaintiff -- and I'll quote

23   the plaintiff's formulation -- but their view is that an actionable

24   intimidation is, and I quote, "A reasonable fear that a person will

25   face adverse consequences for voting," that is what Ms. Weiss said.

1    If somebody says "I won't go on a date with you because of how you

2    vote," that does put somebody in direct -- that does give them adverse

3    consequences for voting.  So, I mean, taken literally, this is about

4    as broad as you could possibly imagine and it would encompass any type

5    of refusal to do business, breach of a contract, any type of tort

6    liability or any type of interpersonal conflict whatsoever.

7           I'm not saying that point so much as to raise a direct First

8    Amendment defense.  I'm saying it has to be taken into account in

9    interpreting the statute because if that's what the statute means,

10   this is about the most unconstitutional statute on the books because

11   any type of threat that puts somebody in a reasonable fear of adverse

12   consequences, which could be, you know, anything that happens to

13   anybody on any day, would be a violation of the statute, would be

14   actionable under either of these statutes.

15          As I mentioned, neither of these statutes have a carveout

16   for different types of First Amendment protected speech or something

17   like that.  The part that has to do the work of protecting speech as

18   well as -- particularly First Amendment protected speech is the

19   interpretation of words like "intimidation."  If the bar for that is

20   set too low, it's going to encompass simply an enormous amount of

21   protected speech for which there is no recognized First Amendment

22   exception.

23          THE COURT:  What about the point that defamation is not

24   protected?

25          MR. GROSSMAN:  Right, Your Honor.  So what I'm making

1   here is effectively -- it's a constitutional avoidance argument based

2   on overbreadth.  In other words, if you were to interpret the statute

3   the way that they're arguing, this would be invalid under First

4   Amendment overbreadth doctrine because it would encompass too much

5   speech.  So even if one accepts, for the sake of argument, that the

6   speech at issue here was defamatory, that still doesn't alter this

7   interpretative argument; in other words, about the meaning of this

8   particular statute.  The argument isn't that our speech was

9   necessarily constitutionally protected.  Instead, the argument is that

10  you have to interpret the statute so that it isn't unconstitutional on

11  its face.

12          THE COURT:  Right.  But, I mean, I don't understand your

13  argument to be that you're challenging the statute as

14  unconstitutional; correct?

15          MR. GROSSMAN:  You're exactly right, Your Honor.  And

16  the reason we're not is because we think that the statute is perfectly

17  susceptible to an interpretation under which it is perfectly

18  constitutional.  It's the one - it's the one that the court embraced

19  in the *Gill* decision that I mentioned earlier from the Eighth Circuit.

20  And to clarify, that was, in fact, an appeal of an order of dismissal.

21          THE COURT:  Right.  But my only role here is to

22  determine whether the complaint plausibly alleges a violation under

23  the statute.

24          MR. GROSSMAN:  Correct, Your Honor.  I think in this

25  instance that requires you to interpret the statute and that's what

1   I'm saying is that in interpreting the statute you can't adopt the

2   interpretation that the plaintiffs have put forward because if that

3   interpretation was right, the statute is unconstitutional, and I don't

4   think that's --

5            THE COURT:  How so?  Because their interpretation is

6   that the defendants made defamatory statements about the plaintiff

7   that caused him to be intimidated in the act of voting and the manner

8   in which he voted.  So taking that allegation as true, what's

9   unconstitutional about that formulation?

10           MR. GROSSMAN:  Their interpretation of the statute is

11  that it allows punishment and prohibition of any speech that puts

12  somebody in reasonable fear that a person will face adverse

13  consequences for voting.  That's what Ms. Weiss said.  It's what their

14  briefs say as well.  What I'm saying is that that is not an

15  interpretation the Court can accept and that's true regardless of

16  whether or not the defendants' speech here is itself protected by the

17  First Amendment.  I'm talking purely as a statutory matter, that is an

18  unacceptable interpretation of the statute because it would render the

19  statute unconstitutional.

20           THE COURT:  All right.  Well, do you agree that the

21  plaintiff, under his particular allegations, has alleged a

22  constitutional violation?

23           MR. GROSSMAN:  That the plaintiff has alleged a

24  constitutional violation?  I think, yes, because our view is that the

25  speech at issue here is not actionable as defamation, but that's a

1    separate argument.  This is purely a statutory argument regarding the

2    proper interpretation of the threats and intimidation language of

3    these two statutes.  In other words, we think the Court should

4    construe those statutes as other courts have so as to be

5    constitutional under the standard doctrine of constitutional

6    avoidance.  If the Court construes them in that manner, there's simply

7    no allegation of any threat that meets the bar.

8           And the two decisions to which I would point the Court that

9    adopt this, you know, I think, saving construction of the statutes --

10   although I think contextually it's a correct interpretation of them --

11   is the *Gill* case that I mentioned from the Eighth Circuit, as well as

12   the *Arizonian Alliance* for *Retired Americans* case that's cited, I

13   believe, in our briefing, but certainly in the plaintiff's briefing as

14   well.  That decision recognizes that what's actionable under these

15   statutes are true threats.  That's a threat of violence, intimidation

16   that, you know, creates the fear of violence, conduct of that nature.

17   In our view, yes, that's entirely constitutional, that interpretation,

18   and there would be no overbreadth problem whatsoever.  But under that

19   interpretation there's simply no allegation that fits the bill.

20          My friend representing the *amicus* argued that there are, in

21   fact, true threats in this case.  I would merely point out that the

22   plaintiff has disclaimed that any of the defendants in this case made

23   a true threat, the plaintiff has said that several times, but one

24   instance of that to which I will point you is the brief that was filed

25   on Tuesday at Page 3.  The plaintiff has specifically disclaimed that

1    any of the defendants made any true threats.  So if the Court

2    interprets these statutes the way that we're encouraging, then as a

3    statutory matter there is no claim under either of them because the

4    defendants have not made any true threats.

5         I would like to turn to the question of intent and, again, I

6    think this is applicable under both statutory provisions.  As my

7    colleague, Mr. Bauer, noted, there are very few factual allegations

8    regarding any expression of intent by Salem and Regnery.  But I think

9    it's important to start first with the statutory standard and with

10   respect to section -- with respect to Section 1985, the original -- I

11   apologize here.

12        The plaintiff actually concedes - and this is in his

13   response to True the Vote's motion to dismiss at Page 15, Note 4 -

14   that the statute does put on him the burden of proving intent by the

15   defendants and he has to concede that.  First of all, a conspiracy

16   inherently involves an agreement by each of the parties to undertake

17   the unlawful conduct so that's one thing.

18        But, second, there's also a statutory background to all of

19   this that the Court should keep in mind.  The original statutory

20   language from 1871 required, and I will quote, "Intent to prevent any

21   citizen of the United States lawfully entitled to vote from giving his

22   support or advocacy in a lawful manner towards or in favor of the

23   election of any lawfully qualified person."  That language doesn't

24   appear in the current U.S. Code because it was re-codified in the

25   intervening years.

1    But the Supreme Court recognized in *Kush* that that specific

2  re-codification was not meant to alter the understanding and the

3  meaning of the statutory provision.  So I think the intent is clear

4  in -- the need for intent is clear in the codified version.  But if

5  the Court has any doubt about that whatsoever or about the nature of

6  the intent that's required, I think you have to look towards the

7  historical background and understand the codification of the statute

8  and how that affected the text that currently appears in U.S. Code.

9    THE COURT:  I don't think anyone is arguing that

10  there's no intent requirement.  I think the argument is that there's

11  no specific intent requirement as to Clause 3 and 4 because it does

12  not include the "for the purpose of" language that is contained in

13  Clauses 1 and 2.  So what is your argument about that?

14    MR. GROSSMAN:  The "for the purpose of" language was

15  interpreted by the court in *Bray* as requiring specific intent to --

16  has required specifically racial animus and we did argue, I will

17  admit, in our motion to dismiss that that was an element of the claim

18  that's at issue here and we recede from that argument.

19    But that doesn't alter our argument with respect to specific

20  intent.  First I would say that, again, you know, if you look at the

21  original version of the statute.  Which *Kush* says is the meaning --

22  you know, is what controls to this day, that is very clear that

23  specific intent is required to affect somebody in the exercise of

24  their support or advocacy with respect to voting and that entire

25  history is laid out in the *Gill* opinion that I've mentioned several

1  times now.

2        Second, it simply is a matter of the law of conspiracy,

3  there has to be an agreement to engage in unlawful conduct.  That's

4  something a little bit more specific than simply being aware of the

5  different events that may have occurred.  So, again, just as a matter

6  of general conspiracy law, I think that something a little bit more

7  specific is required than what the plaintiff and what the *amicus* are

8  alleging.

9        But even if you were to look at this, you know, just as a

10 matter of general intent or specific intent, the operative fact here

11 is that in the publications with which the defendant -- I'm sorry, the

12 plaintiff has alleged that Salem exercised some degree of control over

13 the speech that went out, that's the movie, that's the book, in all of

14 those the plaintiff was deidentified.  In other words, there was an

15 affirmative step taken to prevent the identification of the plaintiff.

16       The theory of this case is that the entire intimidation was

17 by identifying him and identifying his vote, his voting habits.  It

18 simply doesn't mesh with any plausible account of intent to intimidate

19 somebody in that fashion to obscure their identity and to make it

20 difficult, if not impossible, to identify.

21       So just as a matter of, I think, plausibility in terms of

22 the factual allegations here, that has to count for a lot because it

23 doesn't make a lot of sense to say, well, I'm going to intimidate

24 somebody by making them impossible to identify, that's simply not how

25 it works.

1          I think it also makes sense to look at it a little bit more
2    broadly than that.  I started off my first presentation mentioning
3    this is the first case of this nature to target the publication of a
4    book or mass media like a movie.  I don't think that people typically
5    try to harass and intimidate specific voters by issuing a movie or a
6    book.  The conduct that is alleged here with respect to Salem and
7    Regnery is the ordinary sort of publication and producing activities
8    that are undertaken by any media company that's out there.  So, again,
9    I don't think that that can be stretched into any type of intent with
10   respect to trying to impair somebody's voting rights.

11         I would also mention briefly the need for an injury, which
12   Your Honor raised.  The fact that a deprivation of a right is
13   necessary was stated with respect to Section 1983, Sub 3, generally by
14   the Eleventh Circuit in *Cook*.  *Cook's* analysis was extended to the
15   specific sub-provision that's at issue here in a case called *Cockrum*
16   *vs. The Trump Campaign*.  We cite that case, I believe, in our reply
17   brief and it gives, I think, the historical analysis, as well as the
18   textual analysis, of why an actual deprivation of rights is required--
19   deprivation of constitutional rights.  Plaintiff doesn't allege that.
20   He's voted, he continues to vote, he's voted in every election.  There
21   has been no deprivation.

22         I would simply note that the Eleventh Circuit has embraced
23   similar reasoning with respect to the Voting Rights Act in a case
24   called *Ford v. Strange,* which we cite in our briefing as well.  That
25   is an unpublished opinion, but we think, at the least, it is something

1    the Court should take into account.

2              THE COURT:  Is that this circuit?

3              MR. GROSSMAN:  Yes.  That's the Eleventh Circuit.

4          I mentioned -- the final point that I'll mention is just -- I

5    guess I'll conclude where I started with this overbreadth and

6    statutory interpretation point.  You've heard a lot about defamation

7    and that that provides an exception.  But that still doesn't tell you

8    anything about how to interpret these two statutes that are at issue

9    here.  I haven't heard anything from the *amicus* or from my friends on

10   the other side explaining how you ought to interpret these statutes in

11   light of the enormous constitutional problems that would arise if you

12   were to embrace their interpretations.  Neither of them identifies any

13   limiting principle whatsoever that would prevent these statutes from

14   encompassing an enormous range of otherwise protected speech and so

15   our view is that these two statutes have to be interpreted both

16   consistent with their meaning and historical context, but also

17   consistent with constitutional principle to reach only things in the

18   nature of true threats of violence or things of that level.

19              If the Court has no further questions, I will thank you for

20   your time.

21              THE COURT:  All right.  Thank you very much.

22              MR. LARSEN:  Your Honor, honorable counsel for

23   codefendant has left me with no time at all to make a few comments.

24              THE COURT:  Sure.  Go ahead.

25              MR. LARSEN:  I would ask the Court's indulgence to give

1    me just a few minutes to make a few brief points.

2              THE COURT:  Sure.  Go ahead.

3              MR. LARSEN:  Thank you, Judge.

4         First, with regard to *amicus*' arguments with regard to speech

5    incidental to conduct, he gave two examples.  One was striking voters

6    from the rolls and the other one was pushing a campaign bus off the

7    road.  With all due respect, Your Honor, both of those are conduct and

8    not just speech.  We have yet to hear -- this Court has yet to hear

9    what, other than the speech involved, is the conduct that the speech

10   was supposedly incidental to.  I think that's why we're talking about

11   pure speech here and that's what takes us into the realm of necessary

12   to prove true threats exception to the First Amendment protections.

13             THE COURT:  How do you define "conduct"?  Couldn't

14   "conduct" encompass showing the video of him voting?

15             MR. LARSEN:  No, sir.  I don't see -- no, that's just

16   speech.

17             THE COURT:  It's not their speech.  It's not your

18   client's speech.

19             MR. LARSEN:  Maybe I'm misunderstand the question, Your

20   Honor.  What we're talking about is someone else republishing our

21   speech.  Is that what you're talking about?

22             THE COURT:  Well, the act of showing the video, either

23   blurred or un-blurred, and we can talk about that distinction, but is

24   that conduct?

25             MR. LARSEN:  No.  With all due respect, Your Honor, no,

1   that's not.  That's speech.  That's broadcasting.  That's speech.

2          When we're talking about speech, then, the discussion by

3   *amicus*, again, in *Virginia v. Black*, which is the cross-burning case,

4   which is conduct, and that's revisited in *Counterman*.  When *Counterman*

5   discusses what's at issue here, it refers back to *Black* and cites that

6   with approval.

7          I'm just going to give you three quotes from *Counterman* -

8   True threats of violence is another historically unprotected category

9   of communications, that's true threats of violence.  The "true" in

10  that term distinguishes what's at issue from jest, hyperbole, or other

11  statements that, when taken in conduct, do not convey a real

12  possibility that violence will follow.  And that's quoting *Watts* and

13  that's the case where the draft inductee said if they give me a gun,

14  the first guy I'm going to get in my sights is LBJ.  So they said

15  that's not a true threat because it's not actually a real possibility

16  that violence would follow.

17         And, again, citing back to *Black* - and this is *Counterman* -

18  True threats are serious expressions conveying that a speaker means to

19  commit an act of unlawful violence.  That's what is at issue in a true

20  threats speech.  So, yes, intimidation is a type of true threat and

21  that's explicitly dealt with in *Black*, but it's dealt with through the

22  constitutional prism of -- it still has to fall within that definition

23  of "true threats."

24         Just very briefly with regard to the analysis in the

25  *Brewington* case, the Supreme Court of Indiana case.  The difference

1   that the court is making in that case is between a threat to

2   reputation and a threat to safety.  It doesn't make any difference

3   whether it's a public figure or a private figure, that is a red

4   herring.

5          Finally, just briefly with regard to *amicus*' comment that by

6   using the drop box the plaintiff was making a political statement.

7   That suggests to me that the plaintiff may actually be a vortex public

8   figure here if he's getting himself involved by making a political

9   statement by using a drop box.

10         Thank you, Your Honor.

11         THE COURT:  All right.  Anybody else?  All right.

12         Well, that was a treat for me, at least.  That was terrific.

13  You had a high bar to match the briefing with your oral advocacy, but

14  you managed.  That was really well done and also I can go all day, but

15  I am hungry.  Thank you very much.

16         I'm going to take these motions under advisement.  Our goal

17  is to get an opinion out in the next, let's say, 45 days, if we can.

18  Ms. Jones is giving me the evil eye over there in the corner, but

19  that's our goal, and we'll go from there.  Is there anything else for

20  us to take up today?

21         MR. DuBOSE:  Not for the plaintiff.  Thank you, Your

22  Honor.

23         MR. BAUER:  No.

24         MR. LARSEN:  No, Your Honor.

25         THE COURT:  For those who traveled, thank you very much

1    for coming and I appreciate that very much.  Safe travels back.  All

2    right.  We're in recess.

3                         (Proceedings concluded at 1:25 p.m.)

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF GEORGIA

3   CERTIFICATE OF REPORTER

4

5           I do hereby certify that the foregoing pages are a true and

6   correct transcript of the proceedings taken down by me in the case

7   aforesaid.

8

9

10                          This the 12th day of October, 2023.

11

12

13                                    /S/ Alicia B. Bagley _____
                                      ALICIA B. BAGLEY, RMR, CRR
14                                    OFFICIAL COURT REPORTER
                                      THE HONORABLE STEVEN D. GRIMBERG
15

16

17

18

19

20

21

22

23

24

25