Case 1:22-cv-04259-SDG    Document 248    Filed 12/20/24    Page 1 of 51
Nive Loganathan                                    October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3

MARK ANDREWS,                    )
4                                )
          Plaintiff,             )
5                                ) Case No.
     vs.                         )
6                                ) 1:22-cv-04259-SDG
DINESH D'SOUZA, et al.,          )
7                                )
          Defendants.            )
8    _____ )

9

10

11

                VIDEOTAPED DEPOSITION OF
12

13                  NIVE LOGANATHAN

14

                    October 18, 2024
15

                      1:06 p.m.
16

17

               Via Zoom Videoconference
18

19

20

21

22

23

24

               Marianne R. Wharram, RPR, CRR
25               CCR #6121-5296-5647-5648

Case 1:22-cv-04259-SDG    Document 248    Filed 12/20/24    Page 2 of 51
Nive Loganathan                                    October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 2

1                  APPEARANCES OF COUNSEL

2

3    On behalf of the Plaintiff:

4        JARED DAVIDSON, ESQ.
         PROTECT DEMOCRACY

5        2020 Pennsylvania Avenue, Suite 163
         Washington, DC  20006

6        jared.davidson@protectdemocracy.org

7

     On behalf of the Defendants Dinesh D'Souza and

8    D'Souza Media:

9        AUSTIN VINING, ESQ.
         BUCHALTER

10       Atlanta, GA
         (404) 832-7536

11       avining@buchalter.com

12

     On behalf of the Defendants True the Vote, Gregg

13   Phillips, and Catherine Engelbrecht:

14       JAKE EVANS, ESQ.
         GREENBERG TRAURIG, LLP

15       3333 Piedmont Road NE
         Atlanta, GA  30305

16       (678) 553-2342
         jake.evans@gtlaw.com

17

18   Also Present:

19       KRISHAN PATEL, VIDEOGRAPHER

20

21

22                          -  -  -

23

24

25

Page 3

1                    INDEX TO EXAMINATIONS

2    WITNESS                                        PAGE

3    NIVE LOGANATHAN

4    Examination by Mr. Vining                        5

5    Examination by Mr. Evans                    29, 37

6    Examination by Mr. Davidson                     34

7

                     INDEX TO EXHIBITS

8    Defendant's

     NO.                 DESCRIPTION               PAGE

9

     Exhibit 1    7 pages, Subpoena to Testify at a    7

10               Deposition in a Civil Action

11

12

13

14

15

16

17        (Original Defendant's Exhibit 1 has been

              attached to the original transcript.)

18

19

20

21

22

23

24

25

Case 1:22-cv-04259-SDG    Document 248    Filed 12/20/24    Page 4 of 51
Nive Loganathan                                    October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 4

1                P R O C E E D I N G S

2          VIDEOGRAPHER:  Today's date is

3     October 18th, 2024, and the time is

4     1:06 p.m. Eastern Time.

5          This will be the remote videotaped

6     deposition of Nive Loganathan.  Will

7     counsel please introduce themselves and any

8     objection to the witness being sworn in

9     remotely?

10         MR. VINING:  Hi.  My name is Austin

11    Vining here on behalf of Dinesh D'Souza and

12    D'Souza Media LLC, Defendants.

13         MR. EVANS:  This is Jake Evans on

14    behalf of Defendants True the Vote,

15    Catherine Engelbrecht, and Gregg Phillips.

16         VIDEOGRAPHER:  Okay.  Would the --

17    oh, sorry.  Go ahead.

18         MR. DAVIDSON:  Yes, hi.  This is

19    Jared Davidson, and I'm here in my capacity

20    as plaintiff's counsel, counsel for

21    Mr. Mark Andrews.

22         VIDEOGRAPHER:  Okay.  Would the court

23    reporter please swear in the witness?  Thank you.

24              NIVE LOGANATHAN,

25    having been duly sworn by the court reporter,

Page 5

1          was deposed and testified as follows:

2                          EXAMINATION

3   BY MR. VINING:

4          Q.    Good morning, Ms. Loganathan.  My name is

5   Austin Vining.  Thank you for being with us here

6   today.

7                Do you mind stating your name for the

8   record?

9          A.    Yeah.  It is Nive Loganathan.

10         Q.    Thank you.

11               And have you been deposed before?

12         A.    I'm sorry?

13         Q.    Have you been deposed before?  Have you

14   ever been a witness?

15         A.    No.  This is my first time.

16         Q.    Okay.  I'm just going to give a few

17   housekeeping rules to make sure we're on the same

18   page with everything.  The first one is please --

19   I ask that you let me finish my question before you

20   answer, and I'll let you finish your answer.  If you

21   think I'm interrupting you, please let me know.

22   These are just tips to help the court reporter take a

23   clean record of everything that's being said.  If

24   we're talking over each other, that makes it really

25   hard for her.

Case 1:22-cv-04259-SDG    Document 248    Filed 12/20/24    Page 6 of 51

Nive Loganathan                                    October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 6

1          To that effect, if I'm asking a question,

2    please try to give verbal answers, so either a yes or

3    a no or whatever your response is, instead of shaking

4    your head yes or no and -- or saying uh-huh or

5    huh-uh, because that's hard to interpret from a

6    transcript.

7          If you don't understand any question that

8    I ask, feel free to please let me know, and I'll try

9    to explain and clarify for you.  And the last thing

10   is if you need a break, you can let me know.  The

11   only caveat is if I've asked a question, if there is

12   a question pending, I'll ask that you answer the

13   pending question before taking the break.

14        A.    Understood.

15        Q.    Great.

16              Is there any reason you cannot provide

17   truthful and accurate testimony today?

18        A.    No.

19        Q.    You're not under the influence of any

20   substances or don't have any conditions that would

21   impact your ability to provide truthful answers?

22        A.    No.  I'm not under any drug.

23        Q.    Okay.  Thanks.

24              I'm going to introduce what's been

25   premarked as DDNL Exhibit 1.  So it's been

Case 1:22-cv-04259-SDG    Document 248    Filed 12/20/24    Page 7 of 51
Nive Loganathan                                    October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 7

1   introduced.

2           (Defendant's Exhibit 1 marked for

3       identification.)

4           VIDEOGRAPHER:  And you may have to

5       refresh the page, Ms. Loganathan, to see

6       it.

7       Q.    (By Mr. Vining)  Will you let me know when

8   you can see that?

9       A.    Yes, I can.

10      Q.    Okay.  Have you seen this document before?

11      A.    Yes.

12      Q.    What is this?

13      A.    It's a subpoena.

14      Q.    Okay, so this is the subpoena that you

15  were served that led to you being here today?

16      A.    Right.

17      Q.    Okay.  And then, if you wouldn't mind

18  going to -- let's see.  It's the second to last page,

19  numbered Page Number 3 of the Exhibit A to the

20  subpoena.  Do you see that?

21      A.    Yes.

22      Q.    And did you understand this to be

23  requesting that you provide certain documents?

24      A.    Right.  I do.

25      Q.    Okay.  Did you look for documents

Nive Loganathan
Andrews, Mark vs D'Souza, Dinesh et al.                    October 18, 2024

Page 8

1    responsive to these requests?

2         A.    Yes, I did.

3         Q.    Do you have any documents responsive to

4    these requests?

5         A.    No, I don't.

6         Q.    Okay.  Have you ever exchanged anything in

7    writing with Mr. Andrews, Mark Andrews?

8         A.    Regarding this, no.

9         Q.    Okay.  And we're done with that exhibit.

10             Where do you currently work?

11        A.    I think for NCR Atleos.

12        Q.    And how long have you worked there?

13        A.    NCR Atleos is a new organization that spun

14   out of the parent, NCR Corporation, last year at this

15   time, so it would be a year in this organization.

16        Q.    And prior to that, did you work for the

17   NCR parent organization?

18        A.    That is right.

19        Q.    And how long did you work there?

20        A.    I worked there from August 2015 up until

21   separation, organizational separation, last year.

22        Q.    What was the last position you held at

23   NCR?

24        A.    In the legacy NCR, I was the senior

25   manager of technology audits.

Page 9

1      Q.    Okay.  And did you report to anyone in

2   that position?

3      A.    I reported to Mark Andrews.

4      Q.    Okay.  Which office did you work in?

5      A.    I was in the Atlanta office, like at the

6   global headquarters.

7      Q.    Okay.  And what were your job

8   responsibilities?

9      A.    So as senior manager of internal audits,

10  technology audits in particular, my job

11  responsibilities included annual risk assessment, so

12  talking to key leaders within the organization,

13  understanding what the risks to the organization are,

14  trying to come up with the internal audit plan for

15  the year, and executing on it, executing on the plan.

16     Q.    Okay.  And you said you reported to

17  Mr. Andrews.  Is that the -- is that how you met him

18  is through work?

19     A.    That is right.

20     Q.    And were you a peer of Mr. Andrews?

21     A.    I'm sorry?

22     Q.    A peer of Mr. Andrews?

23     A.    Was I here?  Is that the question?

24     Q.    A peer, P-E-E-R.  Like did you --

25     A.    Was I a peer to Mr. Andrews?

Nive Loganathan
Andrews, Mark vs D'Souza, Dinesh et al.
October 18, 2024

Page 10

1      Q.    Yeah.

2      A.    I was reporting to him, so he was my

3   reporting manager.

4      Q.    Okay.  And did you interact with him on a

5   daily basis?

6      A.    Yes, I did.

7      Q.    Okay.  Do you remember when you first met

8   Mr. Andrews?

9      A.    It was when -- it was during my interview

10  for the role.

11     Q.    Okay, so he was there when you started

12  there?

13     A.    Yes, he was.

14     Q.    Okay.  And how well would you say you knew

15  Mr. Andrews?

16     A.    At work.  I know him as much as a

17  subordinate should know his or her manager.

18     Q.    Okay, but not outside of work?

19     A.    No, not outside of work.

20     Q.    Okay.  And you said you met with him

21  daily, or you -- you interact with him daily?

22     A.    On workdays, yes.

23     Q.    Right.  Right.  And that's been since you

24  started in 2015?

25     A.    Absolutely, yeah.

Nive Loganathan
Andrews, Mark vs D'Souza, Dinesh et al.                    October 18, 2024

Page 11

1        Q.    Okay.  And that continues now to this day?

2    Is that right?

3        A.    So ever since the organization separated,

4    it's a very limited interaction, so unless and until

5    there are some meetings that both organizations will

6    have to agree on, or there are some old work products

7    that are still pending closure, those are the type of

8    interactions that we are engaged in at this point.

9    So it's not as much.  So I don't -- I do not talk to

10   him every day at all.

11       Q.    So you don't speak to him at all since the

12   organization split?

13       A.    Not as much as we used to.  We are in the

14   same building, though.  Everybody is in the same

15   building, so -- although it's two different

16   organizations, it's the same building, so.

17       Q.    Okay.  Have you heard of the film

18   2000 Mules?

19       A.    He did mention about it to me, but I did

20   not like remember the actual name of the movie until

21   I saw it on the subpoena document.

22       Q.    Okay.  And what is 2000 Mules?

23       A.    I'm not too sure about it, because

24   I haven't watched the movie, but all that he had

25   shared with me is that he was -- he was filmed

Case 1:22-cv-04259-SDG    Document 248    Filed 12/20/24    Page 12 of 51
Nive Loganathan                    October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 12

1    without his consent and made part of a movie.

2         Q.    Okay.  And how many times did you discuss

3    that with Mr. Andrews?

4         A.    Just once, when he initially mentioned it.

5         Q.    Do you remember when that was?

6         A.    This was a long time ago.  That much,

7    I remember.  I was trying to wrack my brain to get to

8    the timeline, but no.

9         Q.    Okay.  And that conversation, did it take

10   place in person, or on the phone, or e-mail, or --

11        A.    It was in person.

12        Q.    Okay.  Do you remember the conversation,

13   anything else about the conversation, what he told

14   you?

15        A.    That was all I can recall.  Like he was

16   saying he was made part of a movie without his

17   consent, and I -- I do not recall discussing about it

18   any further.

19        Q.    Did you -- did he mention anything about

20   him voting?

21        A.    Yes, he did.  It was -- it was captured

22   while he was exercising his vote.  He did mention

23   that, yes.

24        Q.    And you don't remember anything else about

25   a conversation?

Nive Loganathan                                    October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 13

1          A.     No, I do not.

2          Q.     Okay.  Did -- do you remember if he

3    mentioned anything about security considerations?

4          A.     No, I do not.

5          Q.     Did he mention that -- if he had discussed

6    the matter with anyone else?

7          A.     No.  He did not mention it to me then, no.

8          Q.     Okay.  When you say then, was there

9    another conversation?

10         A.     No, but now, I understand several people

11   have been called from NCR, so maybe he may have

12   discussed with others, but I'm not sure.

13         Q.     Okay.  And prior to that conversation you

14   had with him, had you heard of 2000 Mules?

15         A.     No.

16         Q.     Okay.  In that conversation, did

17   Mr. Andrews mention Dinesh D'Souza?

18         A.     I do not remember, but --

19         Q.     Do you know who that is?

20         A.     -- I did see that name on the subpoena

21   document, though.

22         Q.     Okay.  Do you know who that is?

23         A.     No, I don't.

24         Q.     In that conversation, did Mr. Andrews

25   mention D'Souza Media LLC?

Case 1:22-cv-04259-SDG    Document 248    Filed 12/20/24    Page 14 of 51
Nive Loganathan                          October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 14

1          A.     I don't recall, no.

2          Q.     Do you know what D'Souza Media LLC is?

3          A.     Must be a media company.

4          Q.     Okay.  In that conversation, did

5     Mr. Andrews mention True the Vote?

6          A.     No, he did not.

7          Q.     Do you know what True the Vote is?

8          A.     I do not.

9          Q.     In that conversation, did Mr. Andrews

10    mention Catherine Engelbrecht?

11         A.     No.

12         Q.     Do you know who that is?

13         A.     No.

14         Q.     In that conversation, did Mr. Andrews

15    mention Gregg Phillips?

16         A.     No.

17         Q.     Do you know who he is?

18         A.     No, I don't.

19         Q.     Okay.  Did you -- after he informed you of

20    this, did you do any of your own discovery or

21    investigation into what he had mentioned to you?

22         A.     I did not.  I would have if I had time,

23    but --

24         Q.     Did you take any further -- I understand.

25                After the conversation, did you take any

Nive Loganathan
Andrews, Mark vs D'Souza, Dinesh et al.
October 18, 2024

Page 15

1    further action or do anything with the information

2    that he gave you?

3        A.    Absolutely not.

4        Q.    Okay.  Is there -- you said he didn't

5    express any security concerns.  Did he express

6    anything that he was doing to -- that could have

7    implicated security concerns, such as like changing

8    daily patterns or anything like that?

9        A.    No, I do not recall such actions.

10       Q.    Okay.  Do you know a Kelly Moyer who

11   worked at NCR in 2022?

12       A.    Yes, I do know her.

13       Q.    Do you know what her role at NCR was?

14       A.    Yes.  She was the chief audit executive.

15       Q.    Do you know if she had any discussions

16   with Mr. Andrews about 2000 Mules?

17       A.    I'm not sure.

18       Q.    Did -- so did you have any conversations

19   with Ms. Moyer about Mr. Andrews and 2000 Mules?

20       A.    So after, when I received the subpoena,

21   I called her and I told her, hey -- because she was

22   audit exec and I worked for Mark, so I didn't know

23   how to go about it, because this was the first time

24   I received such a document.  So I did call, reach out

25   to her.  Then, she did mention that she had been

Nive Loganathan                                     October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 16

1    called in, too.

2        Q.    Is there anything else she mentioned about

3    this?

4        A.    No, she did not --

5        Q.    Okay.

6        A.    -- because at that time, she -- because

7    I was already part of Atleos, so we did not discuss

8    any further.

9        Q.    Do you know William Smith who worked at

10   NCR in 2022?

11       A.    Bill Smith?

12       Q.    Oh.

13       A.    I do know him, yes.

14       Q.    Okay.  And what was his role at NCR?

15       A.    He handled the security division.

16       Q.    Okay.  Do you know if Mr. Andrews spoke

17   with Mr. Smith about 2000 Mules?

18       A.    I -- I'm not sure.  He may have.

19       Q.    Okay.  Did you speak with Mr. Smith about

20   2000 Mules or Mr. Andrews?

21       A.    No, I did not.

22       Q.    Do you know a Ryan Beasley who worked at

23   NCR in 2022?

24       A.    I do know him.

25       Q.    What was his role?

Nive Loganathan
Andrews, Mark vs D'Souza, Dinesh et al.
October 18, 2024

Page 17

1      A.    He was on Mark's team, too.  He was an

2    auditor with Mark's team.

3      Q.    Okay.  Did you have any conversations with

4    Mr. Beasley about Mr. Andrews and 2000 Mules?

5      A.    No, I did not.

6      Q.    Do you know if Mr. Andrews spoke to

7    Mr. Beasley about 2000 Mules?

8      A.    No, I do not.

9      Q.    Do you know -- do you know where

10   Mr. Beasley currently lives?

11     A.    I do not.  Like he did switch his role,

12   and in the interim, he -- he was saying he had to

13   travel like where one of his family members is, but

14   I do not know where he is currently located.  He quit

15   NCR sometime in -- a couple of years ago.

16     Q.    Okay.  Do you know Kelly Black Coveleskie?

17     A.    I do.

18     Q.    And what's her role at NCR?

19     A.    She was the director of internal audit,

20   too.  She was the peer of Mark Andrews.

21     Q.    Okay.  Do you know if she had any

22   conversations with Mr. Andrews about 2000 Mules?

23     A.    Do not.

24     Q.    Did you have any conversations with her

25   about Mr. Andrews related to 2000 Mules?

Nive Loganathan                                    October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 18

1        A.      No, I did not.

2        Q.      Okay.  Do you know Bob Varnadoe, who

3   worked at NCR in 2022?

4        A.      I do.

5        Q.      And what was his role at NCR?

6        A.      He was the chief information security

7   officer.

8        Q.      And did you have any conversations with

9   Mr. Varnadoe about Mr. Andrews relating to

10  2000 Mules?

11       A.      No, I did not.

12       Q.      Do you know if Mr. Andrews spoke with

13  Mr. Varnadoe about 2000 Mules?

14       A.      I do not.

15       Q.      Okay.  Are you aware of Mr. Andrews ever

16  being harassed?

17       A.      No.

18       Q.      Are you aware of anything negative

19  happening to Mr. Andrews at work as a result of what

20  he discussed with you about 2000 Mules?

21       A.      No.

22       Q.      Are you aware of him being demoted?

23       A.      He was not demoted to the extent I know.

24  He was the director of technology audits then, too.

25       Q.      Are you aware of him receiving any lower

Nive Loganathan
Andrews, Mark vs D'Souza, Dinesh et al.                October 18, 2024

Page 19

1    pay?

2         A.    No.   That's -- that's way above my pay

3    grade to know.   He was my manager.

4         Q.    Understood.

5               Are you aware of him not being promoted

6    for any reason?

7         A.    No.

8         Q.    Are you aware of the situation of

9    2000 Mules affecting his work, Mr. Andrews' work?

10        A.    No.

11        Q.    Are you aware of anything related to

12   2000 Mules affecting Mr. Andrews' standing with the

13   company?

14        A.    I would not have known it given my

15   position at that company at that time, right?

16        Q.    Understood.

17        A.    Again, I was reporting to him.   I was not

18   evaluating his performance or -- if nothing was in my

19   scope of work.

20        Q.    Understood.   Thank you.

21              Are you aware of Mr. Andrews' life being

22   affected in any way as a result of the 2000 Mules?

23        A.    Do not.

24        Q.    Did you ever discuss any of these issues

25   with him?

Page 20

1          A.     No, I did not.

2          Q.     Okay.  And then, after he initially told

3     you about 2000 Mules, it never came up again?  You

4     and Mr. Andrews never had any other conversations

5     about it?

6          A.     I don't recall talking about it after

7     that.

8          Q.     Okay.  And so your conversations with him

9     after the initial conversation about 2000 Mules had

10    just been work-related?

11         A.     Absolutely, yes.  Mm-hmm.

12         Q.     Okay.  Other than the people who we've

13    already discussed -- and I don't think you

14    represented that you knew if Mr. Andrews had raised

15    any issues related to 2000 Mules with any of them --

16    are you aware of anyone else at NCR who Mr. Andrews

17    discussed 2000 Mules with?

18         A.     No.

19         Q.     Do you -- I think I know the answer to

20    this, but do you ever exchange e-mails with

21    Mr. Andrews?

22         A.     About this movie?

23         Q.     About anything.

24         A.     Of course.  All work-related e-mails, yes.

25         Q.     Okay.  You've never exchanged e-mails with

Case 1:22-cv-04259-SDG    Document 248    Filed 12/20/24    Page 21 of 51
Nive Loganathan                            October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 21

1   him about the movie?

2       A.    No.

3       Q.    Okay.  And the e-mails that you exchanged

4   with him, are those -- would those be in possession

5   of NCR?  Like is that your work e-mail, not a

6   personal e-mail address, that you use to communicate

7   with him?

8       A.    Absolutely right, yeah.  That would be

9   part of legacy NCR Corporation.  Yes.

10      Q.    Do you ever exchange text messages with

11  Mr. Andrews?

12      A.    Yes.

13      Q.    And would any of those be about

14  2000 Mules?

15      A.    No.  It's mostly work-related, about

16  400 traffic, things like that.  Yes.

17      Q.    I fully understand that.

18            Do you ever exchange instant message or

19  Skype or any kind of Teams messages with Mr. Andrews?

20      A.    Teams, yes --

21      Q.    Microsoft -- okay.

22      A.    -- related to --

23      Q.    I'm sorry.  I didn't mean to talk over

24  you.

25            Okay.  Are there any other forms of

Nive Loganathan
Andrews, Mark vs D'Souza, Dinesh et al.
October 18, 2024

Page 22

1  written communications you have with Mr. Andrews?

2      A.    No.

3      Q.    Have you ever seen Mr. Andrews mentioned

4  in the news?

5      A.    No.

6      Q.    Have you ever seen Mr. Andrews mentioned

7  in any social media?

8      A.    No.

9      Q.    Do you know if any of the issues we've

10  discussed relating to 2000 Mules ever affected

11  Mr. Andrews' reputation at NCR?

12      A.    I don't think so.

13      Q.    Do you know if it affected him

14  professionally?

15      A.    He would be the better person to answer

16  that, but to the extent I know, no.

17      Q.    Thank you.

18            Do you know if Mr. Andrews made any

19  complaints to NCR?

20      A.    No.

21      Q.    No, you don't know?  I'm just clarifying.

22  No, you don't know, or no, he did not make any

23  complaints?

24      A.    No, I do not know.

25      Q.    Thanks.

Nive Loganathan
Andrews, Mark vs D'Souza, Dinesh et al.
October 18, 2024

Page 23

1          Do you know if Mr. Andrews submitted or

2     filed any written statements to NCR?

3          A.    No, I do not know.

4          Q.    Okay.  Do you remember the last time you

5     spoke to Mr. Andrews?

6          A.    Yes.  It was in July, I think.

7          Q.    And that was presumably for something

8     work-related?

9          A.    Yes.

10         Q.    Is that correct?

11         A.    Mm-hmm.

12         Q.    Have you spoken to him about the lawsuit

13     that he's involved with relating to 2000 Mules?

14         A.    Yes.  After, when I received the subpoena

15     and saw his name on it, I did talk to him, asking

16     what this is all about.  Yes.

17         Q.    Can you tell me about that conversation?

18         A.    I'm sorry?

19         Q.    Can you tell me about that conversation?

20         A.    Yeah.  He did say I'll have to talk to his

21     lawyer, so he called Jared on a call, and Jared

22     explained what this is all about.

23         Q.    And what is your understanding of what

24     this is about?

25         A.    He did say that there was a lawsuit and

Page 24

1    they want to have some witnesses with whom he may

2    have discussed about this, so I'm part -- I'm one of

3    those people being called, and there were several

4    others being called.  That's why I know there were

5    several others being called.

6         Q.    Okay.  Is there anything else you remember

7    from that conversation?

8         A.    No, I do not.

9         Q.    Okay.  And what is your understanding of

10   what this lawsuit is about?

11        A.    I would love to know what -- what it's all

12   about, because I do see on the subpoena there are

13   supplementary compliance, compliance pleadings, but

14   there is nothing on it.  All it says is -- so I would

15   like to understand more, if you can explain.

16        Q.    Is that the only conversation you had with

17   Mr. Andrews about this lawsuit?

18        A.    Yes.

19        Q.    Did you tell Mr. Andrews or his attorney

20   on the call anything about your experience with

21   2000 Mules, if you have any experience with

22   2000 Mules?

23        A.    No.

24        Q.    Okay.  Have you -- I think you did mention

25   one person.  Have you spoken with anyone at NCR after

Nive Loganathan                                      October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 25

1   you received the subpoena?

2        A.    No.  Other than Kelly Moyer, no.

3        Q.    Okay.

4        A.    And Mark, of course.

5        Q.    Oh, yeah.

6        A.    Mm-hmm.

7        Q.    Have you talked to anyone else about the

8   subpoena other than Kelly, Mr. Davidson, and

9   Mr. Andrews?

10       A.    At legacy NCR Corporation?  No.

11       Q.    Anyone.

12       A.    Anyone?  Yes, absolutely.  All my friends.

13  I just wanted to know what was going on, so I did

14  let -- I mean, most of my friends know.  My family

15  knows.  Yes.

16       Q.    Okay.

17       A.    And, of course, like I did reach out to

18  the legal team in the current organization that

19  I'm in and -- yes, so I did talk to several to

20  understand what this is about.

21       Q.    Is that how you got connected with

22  Mr. Block?

23       A.    Yes, that's right.

24       Q.    Okay.

25       A.    And he happens to be a friend of a person

Nive Loganathan
Andrews, Mark vs D'Souza, Dinesh et al.
October 18, 2024

Page 26

1    in my current organization, so.

2         Q.    Okay.  And, you know, you've mentioned

3    that you've talked to friends and family about the

4    subpoena, and my understanding is that you were just

5    trying to figure out what this is about and --

6         A.    Yes.

7         Q.    -- letting them know that --

8         A.    Yes, I Googled what a subpoena is and what

9    does it mean.  Yes.  Starting from that through --

10   yes, that's right.

11        Q.    Okay.  Anything else you remember about

12   those conversations?

13        A.    No.

14        Q.    Okay.  Can you tell me, what is your

15   residential address?

16        A.    Yeah, it is REDACTED

17   REDACTED           .

18        Q.    Thank you.

19              And your cell phone number?

20        A.    Yeah, it is REDACTED      .

21        Q.    And how long have you had your current

22   cell phone?

23        A.    I guess two years, I think.  At least a

24   year.  Definitely over a year.

25        Q.    Okay.  And do you have a personal e-mail

Nive Loganathan
Andrews, Mark vs D'Souza, Dinesh et al.                                              October 18, 2024

Page 27

1  address?

2        A.    I do.

3        Q.    What is that e-mail address?

4        A.    May I know why this is required?

5        Q.    In the event that there are documents that

6  we have and there is an e-mail address that we --

7  I mean, it's relevant to the -- to the case.

8        A.    There are no documents that I can produce.

9  I've confirmed that already.

10        Q.    Right, but other people have produced

11  documents, so there -- there could be communications

12  with you that you no longer have or forgot about.

13        A.    I would like to see them, yes --

14        Q.    And so we're trying to figure out --

15        A.    -- if you have any.

16        Q.    -- what your e-mail address is.

17        A.    Okay.  It is REDACTED.

18        Q.    Thank you.

19              And how long have you had that e-mail

20  address?

21        A.    For a while.  Like at least six --

22  definitely more than six months.

23        Q.    Okay.

24        A.    At least a year.  I would think at least a

25  year, yeah.

Nive Loganathan                                      October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 28

1        Q.    Did you have another e-mail before that

2    that you used?

3        A.    The personal e-mail address?

4        Q.    Mm-hmm.

5        A.    Yes, but I have not communicated through

6    that with any of these people that you listed so far.

7              MR. VINING:  Okay.  Why don't we take

8        a quick break, and we'll come back at 1:45,

9        if that works for you.

10             THE WITNESS:  Absolutely.

11             MR. VINING:  Thank you.

12             THE WITNESS:  Thank you.

13             VIDEOGRAPHER:  The time is 1:36 p.m.

14       We're off the record.

15             (Off the record.)

16             (Recess taken from 1:36 to 1:47.)

17             VIDEOGRAPHER:  The time is 1:47 p.m.

18       We're on the record.

19       Q.    (By Mr. Vining)  Ms. Loganathan, did

20   you -- you said you have never watched 2000 Mules.

21   Is that correct?

22       A.    That is right, Austin.

23       Q.    Okay.  And did you ever see any other

24   media related to 2000 Mules?

25       A.    I don't remember watching.

Page 29

1      Q.    The book, or the trailer, or anything like

2   that for the film?

3      A.    I don't remember watching, or reading,

4   or -- I didn't even know there was a book.

5            MR. VINING:  Okay.  Okay.  I have no

6        further questions.

7            MR. EVANS:  I just have a couple

8        questions.

9                     EXAMINATION

10  BY MR. EVANS:

11     Q.    My name is Jake Evans.  I appreciate your

12  time today.  I don't think we'll have -- or need too

13  much more of it.  I represent a couple of other

14  defendants in this case.  And I'm going to ask a

15  couple of questions which really should probably be

16  consistent with your earlier testimony, but if you

17  can't hear me at any moment, let me know.

18            So you've never seen the movie 2000 Mules,

19  right?

20     A.    That's right.

21     Q.    And you've never seen any content from the

22  movie 2000 Mules, have you?

23     A.    I don't remember seeing any content,

24  either.

25     Q.    And you don't know what the movie

Nive Loganathan                                October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 30

1   2000 Mules is about, do you?

2        A.    Now, I know, because of the conversation

3   I had with Jared and Mark.

4        Q.    Uh-huh.  And what was that conversation?

5        A.    Because Mark was filmed like while he was

6   voting, it should be about something to do with

7   voting.

8        Q.    Okay, but other than that conversation,

9   you don't know anything about the movie 2000 Mules,

10  do you?

11       A.    I don't know.  That's right.

12       Q.    And based upon your knowledge, neither the

13  movie 2000 Mules nor anything in it affected Mr. Mark

14  Andrews' employment with NCR, did it?

15       A.    I don't think so.

16       Q.    And is that a yes or a no?  I need a -- is

17  that a no?

18       A.    Can you repeat that question, please?

19       Q.    Yes.  Based upon your personal knowledge,

20  neither the movie, 2000 Mules, nor anything in it

21  affected Mr. Mark Andrews' employment with NCR?

22       A.    No.

23       Q.    What did you do to prepare for your

24  deposition today?

25       A.    Nothing.

Nive Loganathan
Andrews, Mark vs D'Souza, Dinesh et al.
October 18, 2024

Page 31

1      Q.    Earlier, you said you talked with

2   Mr. Jared Davidson.  When did you speak with him?

3      A.    It was sometime in July.

4      Q.    And what was said in that discussion?

5            THE WITNESS:  If you could give me a

6        second, I have to plug my laptop in to

7        charge it.  Give me just a second.

8            MR. EVANS:  Okay.

9            VIDEOGRAPHER:  Would you like to go

10       off the record, counsel?

11           MR. EVANS:  No, no need to go off the

12       record.

13           (Pause.)

14           THE WITNESS:  Thank you for that.

15     A.    Can you repeat that question, please?

16     Q.    (By Mr. Evans)  Yeah, and I just want to

17  note for the record we took a quick break.  During

18  that break, did you communicate with anyone?

19     A.    I'm sorry?

20     Q.    Yeah, I am just noting for the record that

21  we just took a brief break for you to recharge your

22  computer.  And during that break, did you communicate

23  with anyone?

24     A.    No, I did not.

25     Q.    Earlier, you testified that you spoke with

Case 1:22-cv-04259-SDG   Document 248   Filed 12/20/24   Page 32 of 51
Nive Loganathan                                          October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 32

1    Mr. Jared Davidson, and you said that discussion was

2    multiple months ago.  What was discussed in that

3    conversation?

4        A.    I reached out to Mark, like I mentioned,

5    to understand what the subpoena is all about, because

6    his name was on the subpoena.  So he asked me -- like

7    it was -- it is not wise for him to talk directly to

8    me; I'll have to better talk to his attorney.  And

9    that's when I talked to Jared.  And all that Jared

10   mentioned is about like there is a lawsuit going on

11   and that is why you are being called as a witness,

12   and there are a few others who are being called in,

13   too.  That was all we talked about.

14       Q.    And did anyone tell you how to testify

15   today?

16       A.    I did ask Aaron as to how to do it.

17       Q.    You asked Aaron?

18       A.    Mr. Block.  Aaron Block.

19       Q.    Yeah.

20       A.    Yeah.  I did ask like who all would be

21   there, because I -- and he was asking if I would be

22   comfortable going all by myself.  I said yes.

23       Q.    Okay.  And is he -- did you retain him to

24   help you with this deposition?

25       A.    No.  He -- he happens to be a friend of

Nive Loganathan
Andrews, Mark vs D'Souza, Dinesh et al.                    October 18, 2024

Page 33

1    another colleague who works with me.

2        Q.    Mm-hmm.  And what was your discussion with

3    him about the deposition today?

4             MR. DAVIDSON:  Objection.  Privilege.

5        I'm not Ms. Loganathan's attorney, but I'll

6        just state it for the record.

7             MR. EVANS:  Yeah.  Well, she said she

8        didn't retain him, and he's not here, and

9        you're also not representing her.

10            MR. DAVIDSON:  I'm just stating it

11       for the record, Mr. Evans.

12       Q.    (By Mr. Evans)  You can go ahead.  What

13   was your discussion with him, Mr. Block, about the

14   deposition today?

15       A.    He just sent me -- like he is the one who

16   was communicating with you all and getting the date

17   for the deposition.  That was what the conversation

18   was all about, because initially, there were a couple

19   of times where I quoted other dates, and that was not

20   okay on the other side; on your side, I understand.

21   So this is another date that we wanted to agree on

22   for the deposition.  That was all we talked about.

23       Q.    And have you -- in your workplace at NCR,

24   have you ever heard the movie 2000 Mules discussed?

25       A.    No.

Nive Loganathan
Andrews, Mark vs D'Souza, Dinesh et al.                    October 18, 2024

Page 34

1      Q.    In your workplace at NCR, have you ever
2    heard Mark Andrews discussed in relation to
3    2000 Mules?
4      A.    No, not that I remember.
5      Q.    And in your workplace at NCR, you haven't
6    seen Mark Andrews treated in a negative way because
7    of the movie 2000 Mules, right?
8      A.    That is right.
9            MR. EVANS:  Okay.  I have no further
10        questions.
11           MR. DAVIDSON:  I have a brief
12        redirect, but I'm happy to take a break if
13        anyone would like.
14           MR. EVANS:  No, I'm good, unless
15        Austin --
16           MR. VINING:  You're fine to go ahead.
17        Thanks.
18                    EXAMINATION
19   BY MR. DAVIDSON:
20      Q.    Hi, Ms. Loganathan.  My name is Jared
21   Davidson.  We spoke back in July briefly.  How are
22   you?
23      A.    I'm good, Jared.  How are you?
24      Q.    I'm well.  Thank you.
25            So I just have a few follow-up questions

Case 1:22-cv-04259-SDG    Document 248    Filed 12/20/24    Page 35 of 51
Nive Loganathan                                October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 35

1   for you.  So first, you testified earlier that you

2   did not do any of your own investigation after you

3   had the initial conversation with Mr. Andrews

4   informing you about the film.  Do you recall

5   testifying to that with Mr. Vining earlier?

6        A.    As in do I remember that question asked by

7   Vining?

8        Q.    Yes.  Do you -- do you recall testifying

9   that following your conversation with Mr. Andrews,

10  you did not conduct any of your own investigation

11  about 2000 Mules?

12       A.    That is right.  Like I don't remember

13  conducting any investigations of my own.  Yeah.

14       Q.    You don't remember?

15       A.    I don't remember.

16       Q.    So is it possible you may have Googled

17  2000 Mules?

18       A.    I may have, yes, but it isn't -- it is a

19  long time at this point.  I don't recall anything

20  related to it.

21       Q.    And is it possible you may have -- in

22  addition to Googling, that you could have seen media

23  on, for example, Youtube?

24       A.    No, I don't remember doing that.

25       Q.    Is it -- do you recall whether or not you

Page 36

1    saw any images from the movie, including any images

2    that were of Mr. Andrews?

3         A.    I don't remember seeing that, no.

4         Q.    And again, that was a long time ago when

5    you had that conversation with Mr. Andrews?

6         A.    That is right.

7         Q.    Do you have any reason to dispute

8    testimony or representations that Mr. Andrews recalls

9    you seeing images of him from the film and movie?

10   Do you have any reason to dispute that?

11        A.    I don't remember seeing those, but if he

12   has testified so, I don't know as to why he would do

13   that.

14        Q.    So you have no reason to dispute that?

15        A.    Can you repeat that question, please?

16        Q.    Is there any reason that you can --

17   strike that.

18             Do you recall having any conversations

19   with members of your family about your conversation

20   with Mr. Andrews?

21        A.    About the movie?

22        Q.    Yes.

23        A.    I don't.

24        Q.    You don't -- you don't recall, or you did

25   not have any conversations with your family?

Case 1:22-cv-04259-SDG    Document 248    Filed 12/20/24    Page 37 of 51
Nive Loganathan                                    October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 37

1      A.    I don't recall having any conversations
2  with my family.
3      Q.    Do you recall any conversations where
4  anyone in your family may have themselves mentioned
5  that Mr. Andrews was in the film or the book?
6      A.    No.
7            MR. DAVIDSON:  I think that's
8       everything for me.  Thank you,
9       Ms. Loganathan.
10            THE WITNESS:  Thank you, Jared.
11            VIDEOGRAPHER:  Any other questions,
12       counsel?
13            MR. VINING:  None for me.
14            MR. EVANS:  And I just have a couple
15       more.
16                  FURTHER EXAMINATION
17  BY MR. EVANS:
18      Q.    Did you treat Mr. Andrews differently
19  based upon the movie 2000 Mules?
20            MR. DAVIDSON:  Objection.  Outside
21       the scope.
22      Q.    (By Mr. Evans)  You can answer.
23      A.    No, absolutely not.  I still have the same
24  respect I had for him when -- as when he was my
25  manager.

Case 1:22-cv-04259-SDG   Document 248   Filed 12/20/24   Page 38 of 51
Nive Loganathan                          October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 38

```
 1      Q.    Did you treat Mr. Andrews negatively
 2   because of the movie 2000 Mules?
 3      A.    Absolutely not.
 4           MR. EVANS:  Okay, no -- no questions.
 5           THE WITNESS:  Jared, to your previous
 6      question, the discussion with the family
 7      member, is it now or when it happened,
 8      because now, I -- I did discuss with my
 9      family.
10           MR. DAVIDSON:  Thank you.  We're --
11      no need from my end to follow up on this.
12      I appreciate you asking.
13           THE WITNESS:  Understood.  Thank you.
14           VIDEOGRAPHER:  Okay.  This concludes
15      today's deposition.  The time is 2:02 p.m.
16      and we are off the video record.
17           (End of video record.)
18           VIDEOGRAPHER:  I just have a couple
19      of quick questions for counsel before you
20      guys jump off.
21           Mr. Vining, would you like a copy of
22      the video files and/or transcript?
23           MR. VINING:  The transcript, yes.  We
24      don't need the video right now.
25           VIDEOGRAPHER:  Okay.  And for you,
```

Case 1:22-cv-04259-SDG    Document 248    Filed 12/20/24    Page 39 of 51
Nive Loganathan                                    October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 39

1        Mr. Evans?

2              MR. EVANS:  Nothing at this time.

3              VIDEOGRAPHER:  And for you,

4        Mr. Davidson?

5              MR. DAVIDSON:  We'll take the

6        transcript, please.  Thank you.

7              VIDEOGRAPHER:  Great.

8              (Off the record.)

9              (Deposition concluded at 2:03 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:22-cv-04259-SDG    Document 248    Filed 12/20/24    Page 40 of 51
Nive Loganathan
October 18, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 40

1                          DISCLOSURE
2                   DEPONENT: NIVE LOGANATHAN
3    STATE OF GEORGIA
4    COUNTY OF RICHMOND
5         Pursuant to Article 10.B. of the Rules and
     Regulations of the Board of Court Reporting of the
6    Judicial Council of Georgia, I make the following
     disclosure:

7

          I am a Georgia Certified Court Reporter.  I am
8    here as a representative of Veritext Legal Solutions.
9         Veritext Legal Solutions was contacted by the
     offices of Buchalter to provide court reporting
10   services for this deposition.  Veritext Legal
     Solutions will not be taking this deposition under
11   any contract that is prohibited by O.C.G.A. Sec.
     15-14-37(a) and (b).

12

          Veritext Legal Solutions has no
13   contract/agreement to provide reporting services with
     any party to the case, any counsel in the case, or
14   any reporter or reporting agency from whom a referral
     might have been made to cover this deposition.
15   Veritext Legal Solutions will charge its usual and
     customary rates to all parties in the case, and a
16   financial discount will not be given to any party to
     this litigation.

17
18
19
     Dated:  10/18/2024
20   Marianne R. Wharram, RPR, CRR,
     CCR #6121-5296-5647-5648
21
22
23
24
25

Nive Loganathan
Andrews, Mark vs D'Souza, Dinesh et al.                                    October 18, 2024

Page 41

1                       C E R T I F I C A T E

2    STATE OF GEORGIA:

3    COUNTY OF RICHMOND:

4         I hereby certify that the foregoing transcript

5    was taken down, as stated in the caption, and the

6    colloquy, questions, and answers thereto were reduced

7    to typewriting under my direction; that the foregoing

8    pages 1 through 39 represent a true, complete, and

9    correct transcript of the evidence given.

10        The above certification is expressly withdrawn

11   and denied upon the disassembly or photocopying of

12   the foregoing transcript, unless said disassembly or

13   photocopying is done under the auspices of Veritext

14   Legal Solutions, and the signature and original seal

15   is attached thereto.

16        I further certify that I am not related to or

17   are of counsel to the parties in the case; am not in

18   the regular employ of counsel for any of said

19   parties; nor am I in any way interested in the result

20   of said case.

21        This, the 1st day of November, 2024.

22

23

24

25        MARIANNE R. WHARRAM, RPR, CRR,

          CCR #6121-5296-5647-5648

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Northern District of Georgia

| | | |
|---|---|---|
| Mark Andrews, | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.  1:22-CV-04259-SDG |
| Dinesh D'Souza, et al. | ) | |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                      Nive Loganathan
                                      REDACTED
_(Name of person to whom this subpoena is directed)_

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place:   VIA ZOOM | Date and Time: 10/18/2024 1:00 pm |
|---|---|

The deposition will be recorded by this method:   Videographic and stenographic means

❑ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   10/11/2024

| _CLERK OF COURT_ | OR | /s/ Amanda G. Hyland |
|---|---|---|
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_
Dinesh D'Souza and D'Souza Media LLC                                      , who issues or requests this subpoena, are:
Amanda G. Hyland/Buchalter/ahyland@buchalter.com/3350 Riverside Pkwy, Ste. 1900, Atlanta, GA 30339 404-832-7500

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible trial, a notice and a copy of the subpoena must be served on each party in this case before it is served o whom it is directed. Fed. R. Civ. P. 45(a)(4).

**Exhibit
DDNL  01**

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  1:22-CV-04259-SDG

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A TO SUBPOENA DUCES TECUM

## DEFINITIONS

1.     Unless otherwise indicated, these Requests refer to the time, place, and circumstances of the subject matter mentioned or complained of in the pleadings filed in this action.

2.     Any capitalized term not herein defined shall have the same definition as the definition contained in the pleadings in this action.

3.     Any capitalized term not herein defined shall have the same definition as the definition contained in the pleadings in this action.

4.     For purposes of this subpoena, the terms used herein shall have the following meanings unless the context requires otherwise.

5.     "Action" shall mean the above-captioned litigation.

6.     "Complaint" shall refer to the First Amended Complaint filed by Mark Andrews in this Action.

7.     "Plaintiff" or "Mr. Andrews" shall mean Plaintiff, Mark Andrews, and each of his agents, attorneys, accountants, and any other individual or entity associated or affiliated with him or purporting to act on his behalf.

8.     "You" shall mean Nive Loganathan and all agents, attorneys, accountants, and any other individual or entity associated   or affiliated  with Nive Loganathan  or purporting to act on her behalf.

9.     "Supplemental Complaint" shall refer to the Supplemental Complaint filed by Mark Andrews in this Action.

10.    Unless specified otherwise, the time period for these requests is from 2014 to present.

## INSTRUCTIONS

1.     You shall produce to Taylor English Duma LLP all documents that fall within the scope of each and every Request. Please bring the documents with you to your deposition or deliver the documents in an electronic format to Amanda G. Hyland by e-mail at ahyland@buchalter.com before the date of your deposition.

2.     If you object to a Request on the grounds that it seeks information or documents that are beyond the scope of discovery, then, for each and every Request to which you object, please state the ground for objection and specifically explain why the Request exceeds the scope of permissible discovery or is privileged.

3.     If you withhold any responsive document on the grounds that it is privileged, please identify the information or document, describe its subject matter, and specify the basis for the claimed privilege or other grounds of exclusion.

4.      If any responsive document is no longer in existence, cannot be located, or is not in your possession, custody, or control, please identify it, describe its subject matter, describe its disposition, and identify the person having knowledge of the document's disposition. Please specifically state in your response that you are

aware of its existence or former existence but do not have any such responsive document in your possession, custody, or control.

5.    If any responsive document exists but is not in your possession, custody, or control, and you are reasonably certain as to the whereabouts of the document, please provide the name and contact information of the custodian of the document.

6.    These Requests are continuing in nature and therefore require you to reasonably file supplementary responses as you obtain additional responsive information up to, including, and after the time of trial.

7.    Objection will be made at the time of trial to any attempt to introduce evidence which is directly sought by these Requests and to which no disclosure has been made.

## **DOCUMENTS TO BE PRODUCED**

1.    All documents, records, and communications in your possession, custody, or control concerning Mark Andrews.

2.    All communications in your possession, custody, or control with Mark Andrews and any members of his immediate family.

3.    Any documents Mark Andrews has shown you, gave you, sent you, or discussed with you regarding the allegations in this lawsuit.

4.    All documents, records, and communications related to 2000 Mules, the book and/or film involving Mark Andrews.

5.    All documents, records, and communications related to Plaintiff's security or privacy, or concerns Plaintiff raised related to his security or privacy.