## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

### ATLANTA DIVISION

| | |
|---|---|
| **MARK ANDREWS**, <br><br> Plaintiff, <br><br> v. <br><br> **DINESH D'SOUZA, _et al._,** <br><br> Defendants. | Case No. 1:22-cv-04259-SDG |

### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Mark Andrews, by and through the undersigned counsel, hereby moves for partial summary judgment as to liability on Count III of Plaintiff's First Amended Complaint, pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth more fully in the accompanying Memorandum of Law, Statement of Undisputed Material Facts, and Exhibits and Declaration attached thereto, the undisputed material facts establish as a matter of law that partial summary judgment on liability should therefore be granted in Plaintiff's favor.

Wherefore, Plaintiff respectfully requests that the Court grant his Motion for Partial Summary Judgment.

Respectfully submitted, this 20th day of December, 2024.

By: */s/Von A. DuBose*

Von A. DuBose, Esq.
Georgia Bar No. 231451
DuBose Trial Law
128 Richardson St. SE
Atlanta, GA 30312
Tel: (404) 720-8111
von@dubosetrial.com

Sara Chimene-Weiss*
PROTECT DEMOCRACY PROJECT
7000 N. 16th Street, Suite 120, #430
Phoenix, AZ 85020
Tel: (202) 934-4237
sara.chimene-weiss@protectdemocracy.org

Rachel E. Goodman*
John Paredes*
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
rachel.goodman@protectdemocracy.org
john.parades@protectdemocracy.org

Jared Fletcher Davidson*
PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA 70117
Tel: (202) 579-4582
jared.davidson@protectdemocracy.org

Jane Bentrott*
Catherine Chen*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Tel: 202-843-3092
jane.bentrott@protectdemocracy.org

catherine.chen@protectdemocracy.org

Lea Haber Kuck*
Quinn Balliett*
Scott Boisvert*
Sonia Qin*
Danuta Egle*
One Manhattan West
New York, NY 10001-8602
Tel: (212) 735-3000
lea.kuck@probonolaw.com
quinn.balliett@probonolaw.com
scott.boisvert@probonolaw.com
sonia.qin@probonolaw.com
danuta.egle@probonolaw.com

Rajiv Madan*
Paige Braddy*
1440 New York Avenue NW
Washington, DC 20005
Tel: (202) 371-7000
raj.madan@probonolaw.com
paige.braddy@probonolaw.com

Vernon Thomas*
Lindsey Sieling*
155 N. Wacker Drive
Chicago, IL 60606-1720
Tel: (312) 407-0648
vernon.thomas@probonolaw.com
lindsey.sieling@probonolaw.com

*Counsel for Plaintiff*

*Admitted Pro Hac Vice*

## LOCAL RULE 7.1D CERTIFICATION

I hereby certify that the foregoing Plaintiff's Motion for Partial Summary Judgment was prepared double-spaced using Times New Roman font (14 point), in compliance with Local Rule 5.1B.

This 20th day of December, 2024.

By: */s/Von A. DuBose*

Von A. DuBose, Esq.
Georgia Bar No. 231451
DuBose Miller, LLC
75 14th Street NE, Suite 2110
Atlanta, GA 30309
Tel: (404) 720-8111
dubose@dubosemiller.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Plaintiff's Motion for Partial Summary Judgment was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

This 20th day of December, 2024.

By: */s/Von A. DuBose*

Von A. DuBose, Esq.
Georgia Bar No. 231451
DuBose Miller, LLC
75 14th Street NE, Suite 2110
Atlanta, GA 30309
Tel: (404) 720-8111
dubose@dubosemiller.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

### ATLANTA DIVISION

| | |
|---|---|
| **MARK ANDREWS,** | Case No. 1:22-cv-04259-SDG |
| Plaintiff, | |
| v. | |
| **DINESH D'SOUZA, *et al.*,** | |
| Defendants. | |

### PLAINTIFF'S MEMORANDUM OF LAW
### IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 1

UNDISPUTED MATERIAL FACTS ................................................................. 2

    A.    2000 Mules Film Purports to Depict a Criminal Ballot Harvesting Scheme and Portrays Plaintiff as a Participant in that Scheme .......................................................................................... 2

    B.    Defendants Made Knowingly False Statements in the Film to Support Their Preconceived Narrative about Purported Election Fraud ........................................................................................ 4

    C.    Defendants Premiered the Film and Widely Promoted It ..................... 7

    D.    A Government Investigation Prompted by an Associate of True the Vote Exonerated Plaintiff, But Defendants Continued to Accuse Him of Being a Mule ................................................. 8

    E.    The 2000 Mules Book Reasserted Defendants' Defamatory Claims ......................................................................................... 10

    F.    As a Result of Defendants' False Claims about Plaintiff, Plaintiff Was Recognized and Has Suffered Substantial Harm .......... 10

STANDARD OF REVIEW ............................................................................... 12

ARGUMENT ..................................................................................................... 12

I.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON LIABILITY FOR COUNT III .......................................................... 12

    A.    Defendants' Statements Are False, Defamatory, and Of and Concerning Plaintiff .................................................................. 13

        1.    Defendants Have Admitted that Their Statements Are False ................................................................................... 13

i

2.      Defendants' Statements Are Defamatory Per Se ...................... 16

3.      In the Alternative, Defendants' Statements Are
        Defamatory Within the Meaning of O.C.G.A. § 51-5-1(a) ...... 17

4.      Defendants' Statements Are Of and Concerning Plaintiff ....... 18

B.      Defendants' Statements Were Jointly Published ............................... 20

1.      The Defamatory Statements Are Attributable to All
        Defendants ................................................................................ 21

        (a)     The Defamatory Statements in the Film Are
                Attributable to All Defendants ....................................... 21

        (b)     The Defamatory Statements in the Book Are
                Attributable to All Defendants ....................................... 23

        (c)     The Defamatory Promotional Statements Are
                Attributable to All Defendants ....................................... 24

2.      Each Defendant Is Directly Responsible for the
        Defamatory Statements They Made ......................................... 25

        (a)     The Film, Book, Trailer, and Tucker Carlson
                Appearance ..................................................................... 25

        (b)     D'Souza Defendants' Defamatory Promotional
                Statements ...................................................................... 25

        (c)     TTV Defendants' Defamatory Promotional
                Statements ...................................................................... 26

C.      As a Matter of Law and Undisputed Fact, Defendants Were, at
        a Bare Minimum, Negligent in Ascertaining the Truth of the
        Defamatory Statements ...................................................................... 26

D.      The Undisputed Facts Establish that Plaintiff Was Harmed ............... 37

CONCLUSION ........................................................................................................ 38

## TABLE OF AUTHORITIES

### CASES

*American Civil Liberties Union, Inc. v. Zeh*,
    312 Ga. 647 (2021) ........................................................................................26

*Atlanta Journal Co. v. Doyal*,
    60 S.E.2d 802 (Ga. Ct. App. 1950).............................................................21

*Atlanta Journal Co. v. Pearce*,
    89 S.E. 759 (Ga. 1916) ...............................................................................20

*Bell v. Johnson Publishing Co.*,
    2018 WL 357888 (M.D. Ga. Jan. 10, 2018).................................................18

*Carbone v. Cable News Network, Inc.*,
    No. 1:16-CV-1720-ODE, 2017 WL 5244176 (N.D. Ga. Feb. 15, 2017)......35

*Carson v. Allied News Co.*,
    482 F. Supp. 406 (N.D. Ill. 1979).................................................................36

*Eakin v. Rosen*,
    2017 WL 5709564 (M.D. Ga. Nov. 27, 2017) ............................................19

*Echols v. Lawton*,
    913 F.3d 1313 (11th Cir. 2019) ...................................................................12

*Eddleman v. PetVet Care Centers (Georgia), LLC*,
    701 F. Supp. 3d 1299 (N.D. Ga. 2023).........................................................20

*Eidson v. Berry*,
    415 S.E.2d 16 (Ga. Ct. App. 1992)...............................................................36

*FDIC v. Loudermilk*,
    826 S.E.2d 116 (Ga. 2019) ....................................................................21, 25

*Georgia Society of Plastic Surgeons, Inc. v. Anderson*,
    363 S.E.2d 140 (Ga. 1987) ...........................................................................34

*Gettner v. Fitzgerald,*
    677 S.E.2d 149 (Ga. Ct. App. 2009) ........................................................26, 36

*Harcrow v. Struhar,*
    511 S.E.2d 545 (Ga. Ct. App. 1999) ..............................................................29

*Harris v. Pierce County,*
    No. CV 513-82, 2014 WL 3974668 (S.D. Ga. Aug. 14, 2014)......................20

*Hoffman-Pugh v. Ramsey,*
    312 F.3d 1222 (11th Cir. 2002) ......................................................................23

*Holmes v. Clisby,*
    45 S.E. 684 (Ga. 1903) ...................................................................................19

*Howe v. Bradstreet Co.,*
    69 S.E. 1082 (Ga. 1911) ...........................................................................21, 25

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986).........................................................................................12

*Reid v. Viacom International Inc.,*
    No. 1:14-CV-1252-MHC, 2016 WL 11746046 (N.D. Ga. Sept. 14,
    2016) ................................................................................................................22

*Southern Co. v. Hamburg,*
    470 S.E.2d 467 (Ga. Ct. App. 1996) ..............................................................20

*Saye v. Deloitte & Touche, LLP,*
    295 Ga. App. 128, 670 S.E.2d 818 (2008) .....................................................20

*Smith v. Stewart,*
    660 S.E.2d 822 (Ga. Ct. App. 2008) ..............................................................18

*StopLoss Specialists, LLC v. VeriClaim, Inc.,*
    340 F. Supp. 3d 1334 (N.D. Ga. 2018)................................................13, 14, 37

*Triangle Publications, Inc. v. Chumley,*
    317 S.E.2d 534 (Ga. 1984) .........................................................19, 27, 28, 29

iv

*Wolf v. Ramsey*,
    253 F. Supp. 2d 1323 (N.D. Ga. 2003)..........................................................23

*Zimmerman v. Al Jazeera America, LLC*,
    246 F. Supp. 3d 257 (D.D.C. 2017)...............................................................27

## STATUTES

Fed. R. Civ. P. 56(a)............................................................................................12

42 U.S.C. § 1985(3) ...............................................................................................2

52 U.S.C. § 10307(b) .............................................................................................2

O.C.G.A. § 21-2-385..........................................................................................3, 16

O.C.G.A. § 21-2-566..............................................................................................13

O.C.G.A. § 51-5-1(a) .............................................................................................17

O.C.G.A. § 51-5-4(a)(4) ........................................................................................38

## OTHER AUTHORITIES

Restatement (Second) of Torts § 575 (1977)..........................................................37

## INTRODUCTION

During the 2020 election, Plaintiff Mark Andrews lawfully delivered his and his four family members' ballots at an official drop box in Georgia. Defendants Dinesh D'Souza, Catherine Englebrecht, Gregg Phillips, True the Vote, and D'Souza Media knew that Mr. Andrews voted lawfully. Despite this, Defendants produced, promoted, and profited from a film called *2000 Mules* (the "**Film**"), that accuses Mr. Andrews and others of participating in a highly orchestrated plot to steal the 2020 election. In Defendants' telling, cell phone geotracking analysis and surveillance videos featured in the Film and a subsequent book revealed a criminal conspiracy in which leftist non-profit organizations paid a network of thousands of "mules," including Mr. Andrews, to traffic illegal ballots and ensure Joe Biden's victory.

The undisputed record exposes *2000 Mules* to be a work of fiction, both as to Mr. Andrews specifically and to the broader conspiracy that Defendants claimed to have uncovered. Defendants all knew that Mr. Andrews was not a "mule" before the Film premiered—or, at the very least, were negligent as to the truth of that claim. Defendants have since *admitted* that *2000 Mules* shows footage of Mr. Andrews and others, depicting them as criminals, falsely and without proof. Nonetheless, in pursuit of money and political favor, they decided to publish and promote *2000 Mules* anyway.

1

Defendants repeatedly defamed Mark Andrews in service of these lies for profit. This Court should grant him summary judgment as to liability on his defamation claim, Count III of the First Amended Complaint, for the reasons stated below.[1]

## UNDISPUTED MATERIAL FACTS

### A.    2000 Mules Film Purports to Depict a Criminal Ballot Harvesting Scheme and Portrays Plaintiff as a Participant in that Scheme

The Film is a self-described documentary film that claims to "expose[] a massive network of coordinated fraud across all five of the states that decided the [2020 presidential] election." SMF ¶ 1. The Film claims to show actual evidence that so-called "mules," or "paid criminal traffickers," acted as participants in a "cartel" whose members were paid to pick up fraudulent ballots from "leftist" nonprofit centers and then illegally stuff those ballots into drop boxes in key swing states, including Georgia, to change the outcome and ensure President Biden's victory. SMF ¶¶ 2, 47, 243.

---

[1]    Plaintiff has also asserted Count I, Conspiracy In Violation Of 42 U.S.C. § 1985(3); Count IV, Invasion of Privacy by False Light; and Count V, Invasion of Privacy by Appropriation of Likeness. Plaintiff is not moving for summary judgment on those claims. Count II, Violation of the Voting Rights Act 52 U.S.C. § 10307(b), was dismissed.

The Film describes "two types of evidence" as being the foundation for its claim that the illegal conduct of "mules" changed the outcome of the 2020 election: cell phone "geotracking" evidence and surveillance footage of actual voters who were geotracked. SMF ¶¶ 3-4, 47. The Film claims that such geotracking is precise enough to follow a cell phone signal "directly to a drop box" and to exclude phones that just passed by a drop box without stopping. SMF ¶ 5. The Film also claims that the people featured in the surveillance video footage were geotracked and are therefore among the "mules" who were paid to illegally deposit ballots. SMF ¶ 6.

The Film features surveillance video of the Plaintiff, Mark Andrews, dropping off five ballots at a Gwinnett Country drop box in the 2020 general election. SMF ¶¶ 36-37, 51. As video of Plaintiff and his white SUV appear on screen during the film, Defendant Dinesh D'Souza's ("**D'Souza**") voiceover states: "What you are seeing is a crime. These are fraudulent votes." SMF ¶ 45.

Plaintiff has regularly voted in Georgia elections for over 20 years. SMF ¶ 52. Due to the COVID-19 pandemic, Plaintiff voted in the 2020 election by absentee ballot. SMF ¶ 53. Along with his own ballot, he also deposited in the official ballot drop box the absentee ballots of his wife and three adult children, all of whom reside with him. SMF ¶¶ 51, 53. Under Georgia law, family members are permitted to deliver ballots on behalf of their family. O.C.G.A. § 21-2-385.

3

**B.**    **Defendants Made Knowingly False Statements in the Film to Support**
<u>**Their Preconceived Narrative about Purported Election Fraud**</u>

In December 2020, True the Vote, Catherine Engelbrecht, and Gregg Phillips (together, "**TTV Defendants**") developed a theory that there had been extensive election fraud in the 2020 election involving leftist non-profit organizations paying individuals to illegally deliver ballots to ballot drop boxes. SMF ¶¶ 243-46. Their approach to proving this theory was twofold. TTV submitted open records requests to election officials to obtain surveillance video from ballot drop boxes. SMF ¶ 186. Additionally, through Phillips' company OpSec, TTV Defendants hired a third-party vendor, Red Metrics, to purchase and analyze commercially available cell phone geotracking data. SMF ¶¶ 157, 160-62, 172. The locations included in Red Metrics' geotracking analysis were ballot drop box locations pulled from a publicly available website and an enumerated list of nonprofit organizations that Phillips provided. SMF ¶ 165. Red Metrics set up technological "buffer zones" of "a couple hundred feet plus or minus" around those locations. SMF ¶¶ 164, 167-68. Then, Red Metrics conducted a geotracking analysis of mobile devices that had crossed into those "buffer zones." SMF ¶ 166.

Red Metrics was also asked by Phillips to review the surveillance footage received from the open records requests to identify "suspect" footage and to attempt to match the footage to devices identified in the geotracking analysis. SMF ¶ 185.

Red Metrics was unable to match *any* surveillance footage with the geotracking data, because the video surveillance simply "didn't line up" with the geotracking data, and Red Metrics communicated this to Phillips. SMF ¶¶ 190-91. Engelbrecht also knew that the surveillance video of Plaintiff had not been matched with any geotracking analysis. SMF ¶ 193.



SMF ¶¶ 15-17.

SMF ¶¶ 21-24.

SMF ¶ 25.

From the outset, D'Souza and D'Souza Media (together, "**D'Souza Defendants**") were aware that the surveillance video was insufficient to demonstrate wrongdoing. SMF ¶¶ 202-12. After receiving the first batch of surveillance video from TTV in January 2022, Bruce Schooley (co-owner of D'Souza Media and producer of the Film, SMF ¶ 31) emailed Nathan Frankowski (editor of the Film, SMF ¶ 31) and the D'Souzas expressing concern that the videos "just look[] like

people dropping off their votes. It never to me looks like multiple ballots. I asked Gregg [Phillips] in first meeting if he had obvious multi ballot handfuls and I still don't see any." SMF ¶ 206. Later that day, he wrote that the surveillance video footage "doesn't convince me and I want it to be true." SMF ¶ 248. Schooley then emailed TTV Defendants that the footage they had provided showed individuals "just using the drop box to vote. Nothing illegal." SMF ¶ 204.

D'Souza Defendants never sought to verify the geotracking analysis. SMF ¶¶ 216-20. In fact, they never even verified that it existed. When Schooley asked Phillips whether he had the geotracking data, Phillips indicated that it was contained in two large boxes, which Phillips set on a table, but the filmmakers never asked Phillips to open the boxes and did not know what they contained. SMF ¶ 219.

Despite lacking evidence sufficient to verify the existence of an illegal ballot harvesting scheme, the Defendants pressed on with the production of the Film. TTV Defendants participated in interviews that were used in the film, SMF ¶ 33, ████████ ████████████████████████████████████████, SMF ¶ 34, and are listed as executive producers of the Film. SMF ¶¶ 10, 14. ██████████████████████ ████████████████████████████████████████████████ ████████████████████████████, SMF ¶ 30. Nevertheless, they were aware that making false statements about someone could create liability, even if the image was blurred. SMF ¶¶ 226-27.

In addition to advancing their pre-conceived narrative, Defendants also had political motivations that factored into their decisions about the production and editing of the film. SMF ¶¶ 250-54. For example, they coordinated with Donald Trump and his team during the development of the Film, including showing Trump earlier versions of the film and implementing a change suggested by Trump that the film be shortened. *Id.*

### C.    Defendants Premiered the Film and Widely Promoted It

On May 5, 2022, the Film was premiered at Mar-a-Lago in front of 500 people, with on-stage appearances by Donald Trump, the D'Souzas, Engelbrecht, and Phillips. SMF ¶ 86. In the surrounding weeks and months, Defendants made numerous public appearances and social media posts to promote the Film. SMF ¶¶ 88-123. Defendants repeatedly used Plaintiff's image—both blurred and unblurred—in their promotional efforts. SMF ¶ 91.

For example, on April 8, 2022, Defendants Engelbrecht and Phillips appeared on the *Charlie Kirk Show* to promote the *2000 Mules* ballot trafficking narrative. Video of Plaintiff voting was shown without any blurring of his face or license plate. While this footage was playing, Engelbrecht and Phillips identified Plaintiff as a "mule" and stated that his actions were "highly illegal." SMF ¶ 93. Plaintiff's image was shown again later in the segment with a caption that read, "Ballot Harvesting is

illegal in GA!" SMF ¶ 94. TTV Defendants posted the Charlie Kirk Show interview on the TTV Rumble page, and notified D'Souza Defendants about it. SMF ¶¶ 95-96.

On May 5, 2022, Engelbrecht appeared on *Tucker Carlson Tonight* on Fox News to discuss TTV's work relating to alleged ballot trafficking. SMF ¶ 104. A clip of Plaintiff voting, with neither his face nor license plate blurred, was played as Engelbrecht described ballot drop boxes as "a recipe for fraud." *Id.* One minute later, Engelbrecht said: "As I sit here tonight, I can tell you there was rampant abuse of those drop boxes, and the data that we have is immutable and proves it, now buttressed increasingly by video." *Id.* TTV posted the interview on its social media channels, as did Defendant D'Souza. SMF ¶¶ 106-07.

These are just a few of the many instances in which Defendants used Plaintiff's image to promote the Film. SMF ¶ 91.

**D.    A Government Investigation Exonerated Plaintiff, But Defendants Continued to Accuse Him of Being a Mule**

On April 25, 2022, Georgia resident David Cross, whom TTV had recognized for his "work for free and fair elections in Georgia," SMF ¶ 60 (and who later attended the Mar-a-Lago premier of the Film, SMF ¶ 86), filed a complaint with the Georgia State Election Board (the "**SEB**") featuring still photographs of Plaintiff and the white SUV he was driving from the same surveillance footage that had been featured on the *Charlie Kirk Show*. SMF ¶¶ 55-59. The complaint asserted that "[a]

8

private investigative organization, True the Vote, purchased billions of cell phone 'pings' and they identified this individual by tracking his cell phone pings to multiple ballot drop boxes." SMF ¶ 57.

In response, the Georgia Secretary of State conducted an investigation. SMF ¶ 55. Using the license plate number of the white SUV visible in the surveillance video, the investigator identified Plaintiff's name and home address. SMF ¶ 62. The investigator conducted further research into the names and number of registered voters at Plaintiff's home and verified that each of them had voted via absentee ballot. SMF ¶ 63. The investigator also visited Plaintiff's home and interviewed him, finding him to be credible, and concluded that Plaintiff did not violate Georgia law when the deposited his and his family's ballots. SMF ¶¶ 64-65. On May 17, 2022, at a public hearing of the Georgia SEB the investigator testified about his findings, and the SEB dismissed the complaint against Plaintiff. SMF ¶¶ 66-68.

On May 18, 2022, Phillips circulated a news article about Plaintiff's exoneration in a text message to Engelbrecht and the D'Souzas, stating: "In addition, this isn't a mule. Didn't reach the threshold." SMF ¶¶ 70-71. Defendant D'Souza responded, "All good points!" SMF ¶ 72.

Nevertheless, Defendants did not remove Plaintiff's image from the Film, the Film's trailer (the "**Trailer**"), or make any public statement correcting the claim that Plaintiff was a mule. SMF ¶¶ 76-78. In fact, Defendant D'Souza continued to claim

publicly that Plaintiff was a mule, writing on Twitter that "the only 'evidence' the mule was merely dropping off the votes of his family members is that HE SAID SO." SMF ¶¶ 73-74. ████████████████████████████████████████████

████████████. SMF ¶ 87. Defendants continued to promote the Film in the weeks and months that followed. SMF ¶¶ 88-123.

**E.   The *2000 Mules* Book Reasserted Defendants' Defamatory Claims**

In addition to promoting the Film, in the summer of 2022, D'Souza wrote a book based on the Film titled *2,000 Mules: They Thought We'd Never Find Out. They Were Wrong* (the "**Book**"). SMF ¶¶ 124, 132-33.

In the Book, an image of Plaintiff voting appears in a center full color photo spread. SMF ¶ 134. The caption on the page with his image reads: "What we see here are screenshots from the videos of mules stuffing multiple ballots into mail-in drop boxes. While vote harvesting is legal in some states, typically under restricted conditions, paid ballot trafficking is illegal across the country. What you are seeing here is organized crime on behalf of the Democratic Party." *Id.*

**F.   As a Result of Defendants' False Claims about Plaintiff, Plaintiff Was Recognized and Has Suffered Substantial Harm**

Individuals who know Plaintiff are able to identify him in the images used in the Film, Trailer, Book, and promotional content, whether blurred or unblurred. SMF ¶¶ 142-43. All viewers, whether unfamiliar or familiar with Plaintiff, are able to see

him in the unblurred footage, including his unblurred face and his unblurred white SUV, which was used in Defendants' appearances and online posts promoting the film. SMF ¶¶ 93-107. Reporters were able to identify him and reached out to Plaintiff and members of his family. SMF ¶¶ 139-40.

Following the release of the Film, Plaintiff's image appeared in online posts with comments endorsing hostile actions and threats towards individuals depicted as ballot mules in the Film. SMF ¶ 145. Plaintiff's wife has personally viewed online posts threatening her family as a result of Plaintiff's inclusion in the film. SMF ¶ 148. The online threats and posts about the Film have persisted, continuing to circulate long after the Film's release. SMF ¶¶ 147-48.

These threats have caused Plaintiff to experience anxiety and fear for his safety and the safety of his family. SMF ¶ 144. Plaintiff has had to adjust his daily routine and take additional safety precautions for his family, including upgrading the security systems in and around his home, to protect against people who may try to harm them because of his portrayal as a mule by Defendants. SMF ¶¶ 149-51.

In addition, Plaintiff refrained from pursuing potential employment and other opportunities due to Defendants' false allegations against him. SMF ¶ 152. Plaintiff has also changed his voting habits. Prior to 2020, Plaintiff typically voted in person either on election day or during early voting and he infrequently voted by absentee

ballot. SMF ¶ 153. Now, he does not vote in person out of fear that he will be recognized. *Id.*

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## ARGUMENT

The undisputed facts establish that Defendants' repeated statements, accusing Plaintiff of being a ballot "mule" and a criminal, amount to defamation. Plaintiff's motion for partial summary judgment should therefore be granted and judgment on liability should be entered in favor of Plaintiff as to Count III.

## I.  PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON LIABILITY FOR COUNT III

Under Georgia law, the elements of a defamation claim are: (a) a false and defamatory statement of and concerning the plaintiff; (b) an unprivileged communication of the statement to a third party; (c) fault by the defendant amounting at least to negligence; and (d) harm to the plaintiff—unless the statement amounts to per se defamation. *Echols v. Lawton,* 913 F.3d 1313 (11th Cir. 2019);

*see also StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1346 (N.D. Ga. 2018). As detailed below, the undisputed facts establish each of these elements.

**A.    Defendants' Statements Are False, Defamatory, and Of and Concerning Plaintiff**

**1.    Defendants Have Admitted that Their Statements Are False**

Defendants' statements portraying Plaintiff as a ballot "mule" and as committing crimes are patently false, as Defendants have admitted. The Film defines a ballot "mule" as a person that retrieved ballots from leftist non-profits and deposited those ballots at ten or more drop boxes. SMF ¶¶ 39-44. This is a crime in the state of Georgia. O.C.G.A. § 21-2-566.

Defendants, in the Film, Book, and promotional appearances and materials, portrayed Plaintiff as a ballot "mule," and thus, as someone committing a crime, and explicitly referred to him as a criminal. In the Film, while surveillance footage of Plaintiff depositing ballots into a drop box appears on the screen, D'Souza's voiceover states: "What you are seeing is a crime. These are fraudulent votes." SMF ¶ 45. In addition, throughout the Film, Defendants broadly accuse the "mules," which includes Plaintiff, of criminal conduct, associating the "mules" with "organized crime," "a cartel," "trafficking," and "violent riots." SMF ¶¶ 1-2, 6-7, 36-37, 43-48. Likewise, the Trailer, used to promote the Film, depicts Plaintiff as a

"mule" and accuses him and other "mules" of participating in "organized crime." SMF ¶¶ 39, 49-50.

The Book also refers to Mr. Andrews as a "mule" and accuses him of participating in "organized crime." SMF ¶¶ 134-38. There, Plaintiff's image appears in a full-color photo spread, showing him depositing ballots at a drop box. The caption reads: "What we are seeing here are screen shots from the videos of mules stuffing multiple ballots into mail-in drop boxes. . . . What you are seeing is organized crime on behalf of the Democratic Party." *Id.*

Defendants' defamatory statements were not limited to the Film and Book. Instead, Defendants spread falsities about Plaintiff on a multitude of television and podcast appearances, and across social media, over a period of many months. SMF ¶¶ 88-123. This was the case on *The Charlie Kirk Show,* where the unblurred surveillance footage of Plaintiff appeared on screen and Phillips stated: "You're going to see a voter [Andrews] get out—a mule get out." SMF ¶¶ 93-94.

Similarly, D'Souza appeared on NTD News to discuss the *2000 Mules* narrative. He also showed the surveillance video of Plaintiff depositing ballots at the drop box and simultaneously explained that "[*2000 Mules*] is an exposé of a coordinated ring of paid ballot trafficking, illegal votes, fraudulent votes being dumped en masse into mail-in drop boxes." SMF ¶¶ 102-03. And on a billboard in

Times Square, Defendants used Plaintiff's image as an example of a ballot "mule," in order to promote the Film to the public at large. SMF ¶ 92.

It is undisputed that Plaintiff is neither a "mule" nor guilty of any election crimes. Indeed, all Defendants have *admitted* that Plaintiff is not a "mule." On May 18, 2022—two days before the Film's public release—Phillips responded to a news article about Plaintiff, confirming "[Plaintiff] isn't a mule. Didn't reach the threshold." SMF ¶¶ 71-72. Further, TTV Defendants have acknowledged that the geotracking data that allegedly formed the central premise of the *2000 Mules* narrative and the defamatory statements about Plaintiff did not include Gwinnett County, where Plaintiff voted in the 2020 general election, and they have specifically admitted that Plaintiff's devices were not a part of the "geotracking" study they commissioned. SMF ¶¶ 81-85, 192-93. On or about November 27, 2024, D'Souza issued a statement similarly acknowledging that the geotracking data cited as the basis for *2000 Mules* did not include Plaintiff and issued an apology to him. SMF ¶ 85.

Thus, all Defendants admit that the geotracking data, central to Defendants' claims, does *not* show that Plaintiff retrieved ballots from non-profits or went to ten or more drop boxes or was paid to deposit ballots. Their repeated statements portraying Plaintiff as a ballot "mule" are false, and Plaintiff is entitled to summary judgment on this element of the defamation claim.

Moreover, the undisputed evidence affirmatively establishes that Plaintiff did not commit ballot fraud. Under Georgia law, individuals are permitted to deliver ballots on behalf of their family members. O.C.G.A. § 21-2-385. This is exactly what Plaintiff did. SMF ¶¶ 51, 53. The Georgia SEB conducted an investigation into Plaintiff's participation in the 2020 general election and confirmed just that, publicly dismissing the complaint against Plaintiff. SMF ¶¶ 63-68.

### 2.    Defendants' Statements Are Defamatory Per Se

To prevail on a claim for defamation, a false statement must also be defamatory. An assertion that someone has committed a crime constitutes defamation per se. Opinion and Order, ECF 106, at 39.

As established above, Defendants' unequivocal statements explicitly accuse Plaintiff of being a criminal, and also of committing the crime of acting as a ballot "mule." This amounts to defamation per se. In the Film, Defendants show surveillance footage of Plaintiff at a drop box with D'Souza's accompanying voiceover stating: "What you are seeing is a crime. These are fraudulent votes." SMF ¶ 45; *see also* SMF ¶¶ 1-2, 6-7, 36-37, 43-44, 47. Also in the Film, Engelbrecht describes the "mules" as "like a cartel . . . like trafficking." SMF ¶¶ 2, 47; *see also* SMF ¶¶ 1, 6-7, 33, 42-44, 47-48. In the Trailer, Phillips describes the purported mules, including Plaintiff, as involved in "organized crime." SMF ¶¶ 49-50. The Book includes a caption underneath an image of Plaintiff depositing ballots, stating:

16

"What you are seeing here is organized crime on behalf of the Democratic Party." SMF ¶¶ 134-37. Promotional materials for the Book state "the criminals are still at large." SMF ¶ 138. In multiple media appearances and other statements promoting the film, Defendants describe Plaintiff as engaging in "illegal" and "criminal" conduct. SMF ¶¶ 93-94, 98-100, 103-04, 109-10, 112, 114-15, 117-19, 120, 122-23.

In sum, the undisputed evidence establishes many, many instances in which Defendants publicly portrayed Plaintiff as a ballot "mule" and as a criminal. The words uttered by Defendants are unambiguous and defamatory on their face, amounting to defamation per se.

### 3.    In the Alternative, Defendants' Statements Are Defamatory Within the Meaning of O.C.G.A. § 51-5-1(a)

The undisputed evidence also establishes that Defendants' statements are defamatory as a matter of Georgia statutory law. A defamatory statement is one that "tend[s] to injure the reputation of the person and expos[es] [the person] to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1(a).

Defendants' statements portraying Plaintiff as a ballot "mule" and a criminal are sufficient to "injure [his] reputation" and "expos[e] [him] to public hatred, contempt, or ridicule." Numerous threats endorsing and encouraging hostile actions have targeted Plaintiff and his family. SMF ¶¶ 145-46. Supporters of the Film and Book have responded as follows: "These mules need to face a firing squad for

treason or insurrection. I would be glad to pull the trigger"; "Now we know it was Treason, mules need to be flushed out . . ."; and "Who can find me their personal info?!? These traitors need to be DOXXED!! Traitors to the Republic have NO RIGHTS!! FIND THEM!! EXPOSE THEM TO THE BRIGHT LIGHT OF JUSTICE!!!" SMF ¶ 145. The record is replete with many more examples of "public hatred, contempt, or ridicule" that Plaintiff has endured as a result of Defendants' statements. SMF ¶¶ 145-48. There can be no issue of disputed fact that Defendants' statements are defamatory.

### 4.    Defendants' Statements Are Of and Concerning Plaintiff

There also can be no dispute that Defendants' defamatory statements are "of and concerning" Plaintiff. A defamatory statement "must refer to some ascertained or ascertainable person, and that person must be the plaintiff." *Smith v. Stewart*, 660 S.E.2d 822, 828 (Ga. Ct. App. 2008). In other words, the plaintiff has the burden of showing that a publication was "of and concerning her as a matter of identity." *Id.* "The test is whether persons who knew or knew of the plaintiff could reasonably have understood that the [portrayal] was a portrayal of the plaintiff." *Id.* at 829. This burden is met even if the statement is not universally understood to be about the plaintiff, so long as "those who knew the plaintiff can make out that [she] is the person meant." *Id.*; *see also* Opinion and Order, ECF 106 at 35 (citing *Bell v.*

*Johnson Publ'g Co., LLC*, 2018 WL 357888, at *4 (M.D. Ga. Jan. 10, 2018); *Eakin v. Rosen*, 2017 WL 5709564, at *3 (M.D. Ga. Nov. 27, 2017)).

Here, the undisputed record establishes that Plaintiff has satisfied this requirement because multiple persons *did* identify him, including at least two reporters. SMF ¶¶ 139-43.

Further, TTV Defendants repeatedly used unblurred footage and images of Plaintiff as well as his vehicle license plate in promotional appearances for the Film, all while labeling Plaintiff as a "mule" or "ballot traffick[er]," SMF ¶¶ 93-101. *See, e.g.*, *Triangle Publ'ns, Inc. v. Chumley*, 317 S.E.2d 534, 537 (Ga. 1984) (rejecting the argument that a statement containing a photograph of the plaintiff was not "of and concerning" her because it referred to her by a pseudonym as being "clearly without merit"). So, too, did D'Souza, when he reposted the Tucker Carlson promotional appearance on his social media. SMF ¶ 107.

Defendants' statements utilizing Plaintiff's blurred image in the Film, Book, Trailer, and promotional materials are similarly "of and concerning" Plaintiff. SMF ¶¶ 36-37, 39, 45-46, 50-51, 91-92, 102, 108-09, 112-15, 117-19, 123, 134-36. "A publication must be construed in the light of all the attending circumstances . . . and all other extraneous matters which will tend to explain the allusion or point out the person in question," including any "covert meaning" intended to be conveyed to the reader. *Holmes v. Clisby*, 45 S.E. 684, 685-86 (Ga. 1903). Relevant circumstances

19

can include, for example, other statements made by a defendant before and/or after an allegedly defamatory statement that serve to identify the defamatory statement as being about the plaintiff. *See, e.g.*, *Harris v. Pierce Cnty.*, No. CV 513-82, 2014 WL 3974668, at *16 (S.D. Ga. Aug. 14, 2014); *S. Co. v. Hamburg*, 470 S.E.2d 467, 471-72 (Ga. Ct. App. 1996); *Atlanta J. Co. v. Pearce*, 89 S.E. 759 (Ga. 1916).

Here, both TTV Defendants and D'Souza Defendants had already broadcast unblurred images of Plaintiff in promotional appearances before the blurred images were published. SMF ¶¶ 93-101, 104, 106-07. If, "when taken together," a defendant's statements refer to the plaintiff, it is irrelevant if those statements may appear vague in isolation. *See Hamburg*, 470 S.E.2d at 472. Blurring Plaintiff's image after the fact therefore cannot immunize Defendants. In such circumstances, the only possible construction of Defendants' intentional, direct photographic references to Plaintiff is that such publications are of and concerning him.

**B.    Defendants' Statements Were Jointly Published**

There is no dispute that the defamatory statements about Plaintiff were published. O.C.G.A. § 51-5-3; *Eddleman v. PetVet Care Centers (Georgia), LLC*, 701 F. Supp. 3d 1299, 1312 (N.D. Ga. 2023) (quoting *Saye v. Deloitte & Touche, LLP*, 295 Ga. App. 128, 133, 670 S.E.2d 818 (2008)) ("[P]ublication is achieved by communicating a defamatory statement to anyone other than the person being

defamed."). The undisputed evidence establishes that all Defendants are responsible for the publication of these statements.

### 1. The Defamatory Statements Are Attributable to All Defendants

The statements and claims made in the Film, Book, and promotional materials are jointly attributable to all Defendants, such that fault is indivisible and they can be held jointly and severally liable for the statements.

When parties jointly publish a statement, or act in concert, they may be held jointly liable. *Howe v. Bradstreet Co.*, 69 S.E. 1082, 1082 (Ga. 1911) ("All who engage in the publication of the writing are liable as publishers; and where they jointly engage in the publication, their act is joint, and they may be jointly sued."); *FDIC v. Loudermilk*, 826 S.E.2d 116, 125 (Ga. 2019) ("[I]t has always been true that where concert of action appears, a joint tortfeasor relation is presented and all joint tortfeasors are jointly and severally liable for the full amount of plaintiff's damage."). Further, a "republisher of a defamatory statement is equally liable with the original publisher thereof." *Atlanta J. Co. v. Doyal*, 60 S.E.2d 802, 809-10 (Ga. Ct. App. 1950).

### (a) The Defamatory Statements in the Film Are Attributable to All Defendants

The statements in the Film are directly attributable to all Defendants. Each individual Defendant stars in the Film and makes defamatory statements. D'Souza

narrates the entirety of the Film and voices over the video of the Plaintiff, stating "[w]hat you are seeing is a crime. These are fraudulent votes." SMF ¶¶ 1-2, 6-7, 43-45, 47. Engelbrecht and Phillips, together and separately, repeatedly discuss the meaning of "mule" within the Film and Trailer, and Plaintiff is portrayed as falling within this defamatory categorization. SMF ¶¶ 1-2, 6-7, 33, 36-37, 39, 42-44, 47-50. Phillips further claims that so-called "mules" participated in "violent riots." SMF ¶ 48.

Further, D'Souza Defendants and TTV Defendants acted in concert to produce, edit, and market the Film. A producer and screenwriter of a film may be held liable for defamatory statements made in that film. *See generally*, *Reid v. Viacom Int'l Inc.*, No. 1:14-CV-1252-MHC, 2016 WL 11746046 (N.D. Ga. Sept. 14, 2016). Here, all Defendants are producers of the Film. SMF ¶¶ 8-10, 14, 21. D'Souza directed, narrated, and promoted the Film. ███████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████. SMF ¶¶ 15-24, 28-29. Further, TTV Defendants procured the video footage of Plaintiff, licensing and providing it to D'Souza Defendants for use in the Film (as well as the Book and related promotional material). SMF ¶¶ 25-26, 30, 37-38, 134, 204-06, 207-08, 211. Engelbrecht and Phillips participated in filmed interviews to provide content for the Film. SMF ¶¶ 33, 42-44. TTV Defendants were

also directly and actively involved in editing the film. SMF ¶¶ 31, 34-35. Indeed, TTV ███████████████████████████████ SMF ¶ 90, actively promoting the film along with D'Souza Defendants and ████████████████████████████ ███████████████████████████████████, SMF ¶¶ 86, 88-90.

### (b) The Defamatory Statements in the Book Are Attributable to All Defendants

All Defendants are also directly responsible for the contents of the Book. The author and contributors of a book may be held liable for defamatory statements made in the book. *See generally*, *Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002); *Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1326 (N.D. Ga. 2003). D'Souza wrote "every word" of the Book and is listed as its author. SMF ¶ 124. TTV Defendants were also integral to the creation and publication of the book, so much

██████████████████████████████████████████████████

███████████████████████████████, SMF ¶ 126. ██████████████████

████████████████████████████████████████, SMF

¶¶ 17-20, 25-30, 37-38, 134. TTV Defendants are directly quoted throughout the Book, including interviews from TTV Defendants about the mules theory. SMF ¶¶ 136-37. Indeed, without TTV's (flawed) research and recorded interviews, which they licensed to D'Souza for publication, there would be no narrative to publish in a

Book. There can be no dispute that the statements in the book are attributable to all Defendants.

### (c) The Defamatory Promotional Statements Are Attributable to All Defendants

All Defendants made specific defamatory statements while promoting the Film. SMF ¶¶ 36-39, 49-50, 73-74, 93-95, 98-100, 102-123. These statements are attributable to all Defendants because they agreed to promote the Film together and actively worked in concert to do so. SMF ¶¶ 31-32, 34-35, 38-29, 88-90, 96-97, 105.

████████████████████████████████████████████████████

████████████████████████████████. SMF ¶¶ 237.

Further, the undisputed evidence shows Defendants collaborated closely on certain defamatory promotional appearances and reposted each others' defamatory statements on various platforms. For instance, D'Souza appeared in conversation with Englebrecht and Phillips in the Trailer where they define a "mule" and their purported evidence. SMF ¶¶ 39, 49-50. When Engelbrecht appeared on the Tucker Carlson Tonight show, Phillips and D'Souza discussed how to leverage the interview in support of the Film's promotion, and D'Souza posted the interview on his Rumble account. SMF ¶¶ 104-107.

The fault for each statement is not divisible because each Defendant's contribution was integral to each statement in the Film, Book, and promotional

materials. Thus, not only are the statements attributable to all Defendants, but the Defendants jointly participated in the publication of the defamation. Accordingly, the Defendants are jointly liable for that defamation. *See Howe*, 69 S.E. at 1082; *Loudermilk*, 826 S.E.2d at 125.

### 2. Each Defendant Is Directly Responsible for the Defamatory Statements They Made

Even if the Court declines to decide the issue of joint and several liability at the summary judgment stage, the undisputed evidence establishes that each Defendant made defamatory statements and therefore the Court should rule in favor of Plaintiff on liability as to Count III.

### (a) The Film, Book, Trailer, and Tucker Carlson Appearance

As already shown above, both TTV Defendants and D'Souza Defendants are directly responsible for the publication of defamatory statements made in the Film, Book, Trailer, and TTV Defendants' appearance on Tucker Carlson, which D'Souza re-published. *See supra* Section I.B.1.

### (b) D'Souza Defendants' Defamatory Promotional Statements

There can be no dispute that D'Souza Defendants made multiple defamatory statements in promoting the Film, including by placing a billboard in Times Square including Plaintiff's image to promote the Film, SMF ¶ 92, appearing on various

programs in which D'Souza repeated the falsehood that Plaintiff was a "mule," SMF ¶¶ 102-03, 108-110, 113-114, 117-19, and in multiple social media posts and podcast episodes, SMF ¶¶ 73-74, 120-22.

(c)    <strong>TTV Defendants' Defamatory Promotional Statements</strong>

There can be no dispute that TTV Defendants made multiple defamatory statements in promoting the Film, including by making statements in the Trailer about the illegality of the mules' actions and the purported geotracking evidence for the "mules," SMF ¶¶ 36-39, 49-50, and by appearing on various programs in which both Engelbrecht and Phillips repeated the falsehood that Plaintiff was a ballot mule, SMF ¶¶ 93-94, 98-100, 104, 115. TTV Defendants then re-posted these statements on their social media accounts and further published additional defamatory trailers on those same accounts. SMF ¶¶ 95, 106, 111-12, 116, 123.

**C.    As a Matter of Law and Undisputed Fact, Defendants Were, at a Bare Minimum, Negligent in Ascertaining the Truth of the Defamatory Statements**

Plaintiff is not a public figure, and therefore he need only show that Defendants acted with ordinary negligence to prevail on his defamation claim. Opinion and Order, ECF 106 at 32-33 (citing *Am. Civil Liberties Union, Inc. v. Zeh*, 312 Ga. 647, 650 (2021)); *see also Gettner v. Fitzgerald*, 677 S.E.2d 149, 154 (Ga. Ct. App. 2009) ("To recover in a suit for defamation, a plaintiff who is a private person must prove that the defendant acted with ordinary negligence."). The

undisputed facts, as discussed below, establish that Defendants were, at a bare minimum, negligent in making their defamatory statements about Plaintiff.[2]

The standard of care for establishing ordinary negligence by publishers such as D'Souza Defendants and TTV Defendants is "defined by reference to the procedures a reasonable publisher in [their] position would have employed prior to publishing" the statements at issue. *See Triangle Publ'ns*, 317 S.E.2d at 537.

When considering the standard of care in a defamation claim, courts consider the context of the statements at issue, including the genre and medium of a work in which they were made. *See Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 277-28 (D.D.C. 2017) ("It is also significant that . . . the statements at issue in the instant case were published as part of an editorialized *documentary* that features a discernable theme and a story line—circumstances that, together, more readily imply that the reported statements represent the tested positions of the investigators."). Given the importance of context, it is particularly significant that because the Film presents itself as a documentary, SMF ¶¶ 1, 21-22, 225, average viewers will perceive its content and conclusions as factual.

---

[2]  While Plaintiff is not required to demonstrate actual malice to establish liability, Plaintiff reserves the right to prove at trial that Defendants acted with actual malice for the purpose of punitive damages.

In evaluating whether a publisher acted negligently in publishing a false statement, Georgia courts also consider:

> (1) whether the material was topical and required prompt publication, or whether sufficient time was available for a thorough investigation of its contents; (2) the newsworthiness of the material and public interest in promoting its publication; and (3) the extent of damage to the plaintiff's reputation should the publication prove to be false; []and (4) the reliability and truthworthiness of the source.

*Triangle Publ'ns*, 317 S.E.2d at 537. "The thoroughness of the accuracy check a reasonable person would make before publishing a defamatory statement will vary, depending on the relative weight of these factors and the circumstances of the case." *Id.* Here, the undisputed facts establish that all these factors unquestionably weigh in Plaintiff's favor, and no reasonable juror could find that Defendants acted within the standard of care for any of the defamatory statements.

The **first** and **second** factors weigh overwhelmingly in Plaintiff's favor. The undisputed facts establish that "sufficient time was available for a thorough investigation." The defamatory statements in this action do not stem from "breaking news" that was published on traditional news media. *See, e.g.*, SMF ¶¶ 15-31. Rather, when TTV Defendants initially presented the "findings" of their geotracking project to D'Souza Defendants in summer of 2021, ████████████████████ ████████████████████████████████████, but rather to present them in a documentary that ultimately would not be publicly premiered until May 2022.

28

SMF ¶¶ 21-28, 87. Defendants' first-in-time defamatory statement regarding Plaintiff—during the Charlie Kirk Interview on April 8, 2022, SMF ¶ 93—was made approximately *1.5 years* after TTV Defendants first began investigating their ballot mules theory, SMF ¶¶ 15-18, 158, and months after TTV Defendants' analysis was substantially concluded enough to produce the Film, SMF ¶¶ 24-25, 28-29.

The undisputed facts confirm Defendants were not expediting release of the Film due to any "newsworthiness," but rather to prioritize the timing of any release to further their political agenda, including assisting their preferred candidates, David Perdue and Donald Trump. *See* SMF ¶¶ 250-54.

The **third** *Triangle* factor also heavily weighs in Plaintiff's favor. Because falsely accusing a person of committing a crime is defamation per se, it cannot be disputed that the "extent of damage" to Plaintiff's reputation is significant. *See supra* Section I.A.2.; *Harcrow v. Struhar*, 511 S.E.2d 545, 546 (Ga. Ct. App. 1999).

Finally, as detailed below, the **fourth** factor is overwhelmingly met, as all Defendants knew or should have known that the so-called "sources" for their claims lacked "reliability and truthworthiness." *Triangle Publ'ns*, 317 S.E.2d at 537.

As to TTV Defendants, the undisputed facts show they had actual knowledge that the geotracking data and analysis they obtained did not support the conclusions made in the Film, Book, and promotional statements—*not only* about Plaintiff himself *but also* about the existence of "mules" generally.

29

It is undisputed—in fact, TTV admits—that Plaintiff himself was not geotracked. SMF ¶¶ 84-85, 193. TTV Defendants also knew that they had no other evidence that Plaintiff went to any leftist nonprofit to pick up ballots, SMF ¶ 82, or that Plaintiff was paid to deposit any ballot, SMF ¶ 81.

But the lack of support for TTV Defendants' statements about Plaintiff was no mere oversight. TTV Defendants' so-called "geotracking" research did not and could not prove the central premise of the Film, *i.e.*, that paid ballot traffickers engaged in a scheme to pick up ballots from nonprofits and then deposit them in dropboxes. *See* SMF ¶¶ 2-6, 177-79. Red Metrics—the entity that conducted all the geotracking analysis for TTV Defendants—analyzed *only* whether certain mobile devices appeared within a couple hundred feet of dropboxes and the addresses of nonprofit organizations provided by Phillips. SMF ¶¶ 164-76. But this did not prove that a person carrying an identified device visited either a nonprofit or a dropbox, much less that they were paid to go on "routes" from the former to the latter. SMF ¶¶ 166-71.[3] The cell phone signals were too intermittent and imprecise,

---

[3] Red Metrics communicated those limitations to Phillips. SMF ¶¶ 177-179. Neither TTV Defendants nor any contractor working on their behalf conducted any additional geotracking analyses for the Film or Book beyond what Red Metrics did. SMF ¶ 184. And Red Metrics analysis did not include any devices from Gwinnett County in its analysis. SMF ¶ 192.

SMF ¶¶ 171-73, and the buffer zones too large to exclude "false positives," SMF ¶¶ 174-76.

Ignoring these facts, TTV falsely claimed that they worked "to absolutely ensure that we don't have false positives, meaning including people that should not have been included" by creating "smoothed out pattern[s] of life" to follow the "movement" of cell phone signals, identifying only cell phones that were "not going past a drop box but directly to a drop box," and studying "the timing" of drop box visits. SMF ¶ 137. But it is undisputed that Red Metrics' geotracking analysis did **none** of this. SMF ¶¶ 164-78. The so-called steps that TTV Defendants claimed to take to establish the very existence of "mules" are themselves a work of fiction.

In addition—contrary to the claims made in the Film and Book—there was *never* any "matching" of geotracking analysis to any surveillance footage in the Film, and TTV Defendants knew this. SMF ¶¶ 189-93. In fact, TTV Defendants did not possess *any* surveillance videos from Gwinnett County, where Plaintiff voted, when Red Metrics conducted its analysis, and therefore Red Metrics could not have matched that video to geotracking data (even if it had matched other surveillance footage, which it did not). SMF ¶¶ 192-93.[4]

---

[4]    The undisputed evidence also shows that TTV Defendants were aware of the falsity of their claims linking "mules" to violent riots using the Armed Conflict Location & Event Data ("ACLED") database. ███████████████████

*(cont'd)*

Further demonstrating TTV's lack of care, on May 17, 2022 (three days before the Film's public release), the SEB unequivocally cleared Plaintiff of any election crimes in a highly publicized public hearing. SMF ¶¶ 66-68. TTV Defendants were aware of this and shared a news article about Plaintiff's exoneration with D'Souza. SMF ¶ 71. The film premiered publicly in theaters on May 20, 2022, and TTV Defendants made no effort to remove Plaintiff's image or stop it from being used to promote the Film. SMF ¶¶ 76-78, 87.

With respect to D'Souza Defendants, the only conclusion a reasonable juror could reach is that if they had exercised even a modicum of due care, they would have been aware that TTV Defendants—the source of the Film's geotracking and video surveillance evidence—were not reliable.

In his role as the creator and producer of the film, D'Souza was expected to "create the movie and research it," and he was "relied on" by the film's distributor to fact check the data provided by TTV. SMF ¶ 201. But D'Souza Defendants

_____

█████████████████████████████████████████████

████████████████████████████. SMF ¶ 197. Phillips knew, and informed D'Souza, that ACLED did not track cell phone IDs. SMF ¶¶ 198-99. Nevertheless, Phillips claimed in the Film that dozens of mules "show up on the ACLED databases," SMF ¶¶ 48, 196, and D'Souza claimed in the Book that Phillips compared the cellphone IDs of mules with those of "the violent rioters in the ACLED database." SMF ¶ 130. Ultimately, the Book was recalled due in part to these misrepresentations and the Book's publisher entered into a settlement with ACLED. SMF ¶¶ 127-31.

undertook none of the steps to be expected of journalists or documentary filmmakers to discern the reliability of their sources.

Among other things, D'Souza Defendants:

- ████████████████████████████████████████████████████
  ████████████████████████████████████, SMF ¶ 220;

- made *no* efforts to verify TTV Defendants' methodology or conclusions with any actual expert in surveillance or geotracking, SMF ¶¶ 216-20, 222-23;

- never reviewed *any* of the "geotracking" data TTV claimed to rely on which served as the basis for the Film and Book, SMF ¶ 219;

- never saw Phillips' so-called computing center that they recreated in the Film and Book, SMF ¶ 217;

- did not fact check the assertion that "mules" were present at riots, SMF ¶ 48, even after the Book was recalled for misrepresenting ACLED data, SMF ¶¶ 48, 129-32, 195-200;

- did not investigate the nonprofits TTV Defendants had named as "stash houses," even though they emphasized the importance of following the money to those organizations, had a list of "stash houses" they could have investigated, and were aware that geotracking did not and could not

support statements about locating "mules" at the offices of specific nonprofits, SMF ¶¶ 170-78, 213-14; and

- had no evidence that Plaintiff or anyone else was paid to deposit any ballots or went to any leftist nonprofit to pick up ballots, instead basing the assertion that "mules" were paid on nothing more than speculation, SMF ¶¶ 82, 224.

Relying on unverified data from uncredentialed individuals plainly is not enough to be considered ordinary care. *See Georgia Soc'y of Plastic Surgeons, Inc. v. Anderson*, 363 S.E.2d 140, 143 (Ga. 1987) (upholding liability where defendants relied on other articles and "rumors," but did not perform "any independent research or investigation of the facts").

D'Souza Defendants also became aware that TTV's claims were unsubstantiated during the making of—and, importantly, before the release of—the Film. SMF ¶¶ 202-12. D'Souza asked repeatedly for video of the same person going to multiple drop boxes, and knew his team had looked and found nothing. SMF ¶¶ 210-12. D'Souza himself even raised this lack of evidence as a concern during the film-making process. SMF ¶ 210. D'Souza Defendants never found a single person who was approached, but declined, to participate as a mule. SMF ¶ 215.

As if the red flags raised during the film-making process were not enough, D'Souza was on actual notice of the falsity of the statements concerning Plaintiff no

later than May 18, 2022 (two days before the Film's public release), when Phillips texted him that SEB unequivocally cleared Plaintiff of any election crimes and confirmed Plaintiff "isn't a mule." SMF ¶¶ 71-72. Englebrecht also advised D'Souza around this time that "nonmule" video appeared in the Film, which D'Souza ignored. SMF ¶ 75.

Nevertheless, the undisputed evidence establishes that D'Souza Defendants took no action to remove Plaintiff's image from the Film, which they publicly released in theaters on May 20, 2022, two days after Phillips informed D'Souza that Plaintiff "isn't a mule." SMF ¶¶ 71-72, 75-78, 87. The undisputed facts further demonstrate that D'Souza thereafter doubled-down on this falsehood, repeatedly accusing Plaintiff of being a "mule" in subsequent appearances promoting the Film over the following months. *See, e.g.*, SMF ¶¶ 102-03, 108-10, 113-14, 117-19. These undisputed facts alone are sufficient to establish that D'Souza Defendants acted, at the very least, negligently in publishing not only the Film but also any subsequent defamatory statements portraying Plaintiff as a mule or criminal. *Cf. Carbone v. Cable News Network, Inc.*, No. 1:16-CV-1720-ODE, 2017 WL 5244176 at *8 (N.D. Ga. Feb. 15, 2017) (prior notice by government agency and plaintiff that statements are false is sufficient to show news agency's actual malice in making statements), *aff'd in part, dismissed in part on other grounds*, 910 F.3d 1345 (11th Cir. 2018).

Finally, in addition to receiving (and ignoring) Plaintiff's cease-and-desist letter, D'Souza was also forced to recall the Book after learning that the Book had inaccurately portrayed data connecting mules to violent riots and had made baseless claims about nonprofit groups, all of which should have caused him to further question the reliability and veracity of TTV Defendants. SMF ¶¶ 127-32.

***

Courts have routinely found defendants negligent on facts far less egregious than those here. *See Gettner*, 677 S.E.2d at 156 (reversing summary judgment denying defamation claim where evidence showed defendant had "ample opportunity" over months to conduct a more thorough investigation, should have questioned her source's reliability, and failed to verify with those who had first-hand knowledge); *Eidson v. Berry*, 415 S.E.2d 16, 18 (Ga. Ct. App. 1992) (holding that defendant's assumption that plaintiffs' conduct was illegal with no other evidence could be "sufficient to authorize any reasonable jury's finding that [the defendant] acted with reckless disregard for the truth in accusing the [plaintiff] of violating federal law"); *Carson v. Allied News Co.*, 482 F. Supp. 406, 408 (N.D. Ill. 1979) (granting summary judgment for plaintiffs on defamation claim where evidence showed defendants recklessly disregarded the truth by publishing article containing facts they did not investigate or were "sheer fabrication"). The Court should grant summary judgment on Defendants' negligence.

36

## D.    The Undisputed Facts Establish that Plaintiff Was Harmed

The record indisputably shows that Plaintiff suffered special harm as a result of Defendants' defamation, and thus this Court must find that, as a matter of law, Defendants are liable.

A plaintiff is entitled to damages if either the defendant's defamatory communication constitutes defamation *per se* or the plaintiff proves that he suffered monetary loss or "special damages" as a result of the defendant's actions.  GA Code § 51-5-4 (damages inferred where defamatory statement imputes "to another a crime punishable by law); GA Code § 51-5-5 (malice inferred); *StopLoss Specialists*, 340 F. Supp. 3d at 1349-50; *see also* Restatement (Second) of Torts § 575 (1977) ("Special harm . . . is the loss of something having economic or pecuniary value.").

In the aftermath of the 2020 general election and the incendiary political rhetoric and acts of violence that followed it, Defendants' Film and Book accused Plaintiff of being a criminal ballot mule and of participating in election fraud. Foreseeably, consumers of the Film and Book took to social media to threaten and intimidate the "mules" identified in the film, specifically Plaintiff. SMF ¶¶ 145-48.

As a result of these threats, Plaintiff has expended money and resources to take reasonable steps to ensure his family's safety. Plaintiff had to purchase a home security system, a subscription to a home monitoring service, and extra security cameras and floodlights for his home. SMF ¶¶ 150-51. He also had to expend money

to replace his vehicle license plate. SMF ¶ 150. Finally, Plaintiff had to pay for security services to scrub his and his family's personal information from various websites. SMF ¶ 150.

Plaintiff has conclusively established that he has incurred monetary loss that "flows naturally" from Defendants' defamatory statements. O.C.G.A. § 51-5-4(a)(4).

## CONCLUSION

For the reasons set forth above, Plaintiff' Motion for Partial Summary Judgment must be granted, and judgment should be entered for Plaintiff as to liability on Count III of the First Amended Complaint pursuant to Fed. R. Civ. P. 56.

Dated: December 20, 2024                    Respectfully submitted,

By: */s/Von A. DuBose*

Von A. DuBose, Esq.
Georgia Bar No. 231451
DuBose Trial Law
128 Richardson St. SE
Atlanta, GA 30312
Tel: (404) 720-8111
von@dubosetrial.com

Sara Chimene-Weiss*
PROTECT DEMOCRACY PROJECT
7000 N. 16th Street, Suite 120, #430
Phoenix, AZ 85020
Tel: (202) 934-4237
sara.chimene-weiss@protectdemocracy.org

Rachel E. Goodman*
John Paredes*
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
rachel.goodman@protectdemocracy.org
john.parades@protectdemocracy.org

Jared Fletcher Davidson*
PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA 70117
Tel: (202) 579-4582
jared.davidson@protectdemocracy.org

Jane Bentrott*
Catherine Chen*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite 163

Washington, DC 20006
Tel: 202-843-3092
jane.bentrott@protectdemocracy.org
catherine.chen@protectdemocracy.org

Lea Haber Kuck*
Quinn Balliett*
Scott Boisvert*
Sonia Qin*
Danuta Egle*
One Manhattan West
New York, NY 10001-8602
Tel: (212) 735-3000
lea.kuck@probonolaw.com
quinn.balliett@probonolaw.com
scott.boisvert@probonolaw.com
sonia.qin@probonolaw.com
danuta.egle@probonolaw.com

Rajiv Madan*
Paige Braddy*
1440 New York Avenue NW
Washington, DC 20005
Tel: (202) 371-7000
raj.madan@probonolaw.com
paige.braddy@probonolaw.com

Vernon Thomas*
Lindsey Sieling*
155 N. Wacker Drive
Chicago, IL 60606-1720
Tel: (312) 407-0648
vernon.thomas@probonolaw.com
lindsey.sieling@probonolaw.com

*Counsel for Plaintiff*

*\*Admitted Pro Hac Vice*

## RULE 7.1(D) CERTIFICATE

The undersigned counsel certifies that this document has been prepared with Times New Roman 14-point font in accordance with Local Rule 5.1.C.

Dated: December 20, 2024         */s/Von A. DuBose*
                                 Von A. DuBose, Esq.
                                 Georgia Bar No. 231451
                                 DuBose Trial Law
                                 128 Richardson St. SE
                                 Atlanta, GA 30312
                                 Tel: (404) 720-8111
                                 von@dubosetrial.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the within and foregoing **PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT** was electronically filed with the Clerk of Court using CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

Dated: December 20, 2024         */s/Von A. DuBose*
                                 Von A. DuBose, Esq.
                                 Georgia Bar No. 231451
                                 DuBose Trial Law
                                 128 Richardson St. SE
                                 Atlanta, GA 30312
                                 Tel: (404) 720-8111
                                 von@dubosetrial.com