IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **MARK ANDREWS,**<br><br>Plaintiff,<br>v.<br><br>**DINESH D'SOUZA**, *et al.,*<br><br>Defendants. | Case No. 1:22-cv-04259-SDG |

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1.   *2000 Mules* (the **Film**) is a self-described documentary film that claims to "expose[] a massive network of coordinated fraud across all five of the states that decided the [2020 presidential] election."[1]  Ex. 1; Ex. 2; Ex. 3; Ex. 4; Ex. 5.

2.   The Film claims to show actual evidence that so-called "mules," or "paid criminal traffickers," acted as participants in a "cartel" who were paid to pick up fraudulent ballots from "leftist" non-profit organizations and then illegally stuff those ballots into drop boxes in swing states, including Georgia.  Ex. 1; Ex. 2.

---

[1] "Ex. __" refers to the numbered exhibits attached to the Declaration of Von DuBose dated December 20, 2024.

3.    The Film describes "two types of evidence" as being the foundation for its claims: "geotracking" evidence based on geolocation data from cell phones, and surveillance footage of actual voters who were geotracked.  Ex. 1; Ex. 2.

4.    As the DVD back cover summarizes, the Film claims to feature evidence showing that "mules" were identified by a "new technology" called "geotracking" that tracked mules' cell phone physical locations and showed them picking up ballots from non-profits and then "delivering [those] illegal ballots to mail-in dropboxes."  Ex. 1; Ex. 2.

5.    The Film claims that geotracking is precise enough to follow a cell phone signal "directly to a drop box" and to exclude phones that just passed by a drop box without stopping, and that "reliability of geotracking is not substantially different from the reliability of a fingerprint or the reliability of DNA."  Ex. 2 at 23:30, 29:50.

6.    The Film also features surveillance footage of actual voters and claims that the people in the footage were geotracked and are therefore among the "mules."  Ex. 2 at 30:55-37:29; Ex. 1; Ex. 6; Ex. 7; Ex. 8; Ex. 9.

7.    The DVD case of the Film advertises: "The film takes you to the scene of the crime, again and again and again. You can actually watch the criminals at work."  Ex. 1; Ex. 2.

8.      Defendant Dinesh D'Souza (**D'Souza**) directed, produced, and narrated the Film and made numerous media appearances promoting it.  D'Souza is listed as writer and director of the Film.  D'Souza is a writer, filmmaker, podcaster, media personality, and merchandise purveyor.  Ex. 10 ¶ 18; Ex. 11 ¶ 18; Ex. 1.

9.      Defendant D'Souza Media, LLC (**D'Souza Media,** and collectively with D'Souza, **D'Souza Defendants**) is a production company responsible for the Film and was the Film's distributor.  Ex. 10 ¶ 24.

10.     Defendant True the Vote (**TTV**) is a 501(3)(c) non-profit, and is listed as an executive producer of the Film.  Ex. 11 ¶¶ 19-20.

11.     Defendant Catherine Engelbrecht (**Engelbrecht**) is the President and founder of TTV.  Ex. 11 ¶ 21.

12.     Defendant Gregg Phillips (**Phillips**) (together with TTV and Englebrecht, **TTV Defendants**)[2] has served on TTV's board of directors and is a principal in entities that have contracted with TTV to provide consulting services on many occasions.  Ex. 12, Phillips Dep. Tr. at 29:5-12, 16:1-5, 26:12-29:4.

13.     Phillips is also the sole owner of OpSec, a company that contracted with TTV to undertake the geotracking project that led to the Film.  Ex. 12 at 28:7-11, 26:12-17.

---

[2]      TTV Defendants and D'Souza Defendants are referred to collectively herein as "Defendants".

14.    Englebrecht and Phillips appeared in the Film, are listed as Executive Producers in the Film's credits, and have made media appearances promoting the Film.  Ex. 10 ¶ 21-22; Ex. 11 ¶ 21-22; Ex. 1.

15.    

Ex. 13 at Interrogatory Response 6.

16.

. Ex. 14, Dinesh D'Souza Dep. Tr. at 63:4-16; Ex. 13 at Interrogatory Response 6; Ex. 15, Deborah D'Souza Dep. Tr. at 46:18-47:24.

17.    At the meeting at the D'Souzas' house, and in a "Ballot Trafficking Project Overview" document sent in November 2020, TTV Defendants claimed to have evidence of massive vote trafficking, including in Georgia, in the form of cell phone geotracking data and drop box video surveillance footage corroborating the geotracking data.  Ex. 16; Ex. 17; Ex. 18 at 131:7-14; Ex. 15 at 47:9-20.

18.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬ Ex. 17; Ex. 13 at Interrogatory Response 6;

Ex. 14 at 63:12-64:11, 65:1-66:10, 66:23-68:8, 80:11-19.

19.  ▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Ex. 17; Ex. 13 at Interrogatory Response 6.

20.     According to D'Souza, "part of the effectiveness" of TTV's research is that "it took two completely independent lines of inquiry and had the possibility, at least on certain occasions, to match the one with the other." Ex. 14 at 65:16-21. For example, "If your cell phone shows that you were at Mr. Smith's at 2:00 a.m. in the morning and Mr. Smith happens to have a surveillance camera, you go look on the camera at 2 a.m. in the morning and see if you can see the guy. So that's the matching that we're talking about." Ex. 14 at 65:24-66:6.

21.  ▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬ Ex. 13 at

Interrogatory Response 6.

22.  ▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬ Ex. 19; Ex. 14 at 74:24-75:3.

23.  Ex. 13 at Interrogatory

Response 6.

24. Ex. 18, Engelbrecht Dep. Tr. at 139:1-9, 140:14-23, 141:2-6; Ex. 13 at

Interrogatory Responses 3 and 6.

25. Ex. 20.

26.    Although the footage analyzed by TTV was obtained through public

records, D'Souza considered it to be highly confidential because "it's difficult to

get this video.  It's not like it's available online and you simply search it by Google

and it pops up . . . You have to go through a complex process.  You often have to

pay money to get access to this video.  You sometimes need some legal expertise

to be able to obtain it . . . And not only did [TTV] have this video, but more

importantly, they had gone through the video and they had – in an ocean of

essentially nothing had excavated particular meaningful content, clips and so

on . . . They are the clips that they have painfully culled from the large body of video." Ex. 14 at 90:14-91:10. The footage provided by TTV was "not easily obtainable by the public." Ex. 14 at 91:16-18.

27. D'Souza Defendants and their representatives understood during the filmmaking process that the video surveillance footage provided by TTV was "matched" to the geotracking analysis conducted by TTV through OpSec. Ex. 14 at 285:21-287:18, 334:17-21; Ex. 21, Frankowski Dep. Tr. at 44:14-45:15, 62:20-23, 65:12-23, 74:1-75:1; Ex. 22, Schooley Dep. Tr. at 30:15-17, 39:25-40:25, 111:14-18, 112:19-23, 123:5-6; Ex. 9.

28. According to D'Souza, the key elements of the License Agreement included that: (1) TTV's geotracking research would be the "backbone" of the Film; (2) TTV would assist D'Souza Defendants with the Film's promotion; and (3) TTV would protect the confidentiality of their work and surveillance footage. Ex. 14 at 87:6-88:11.



29. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 23 at Interrogatory Response 4; Ex. 15 at 207:24-208:22.

30. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 14 at 51:2-

6, 55:18-56:15, 122:2-4, 123:9-125:17, 127:2-128:16; Ex. 22 at 80:23-81:8, 88:4-89:7, 99:5-9; Ex. 24 at Interrogatory Response 14; Ex. 12 at 41:13-17, 122:23-123:22, 150:2-151:10; Ex. 18 at 83:15-18; Ex. 15 at 87:22-25.

31.     Throughout the making of the Film, TTV Defendants were in regular contact with D'Souza Defendants and their representatives, including Bruce Schooley (co-owner of D'Souza Media and producer of the Film) and Nathan Frankowski (editor of the Film) through phone calls and Zoom meetings, emails, direct messages and texts, including reviewing and commenting on versions of the Film and trailers for the Film, before their respective releases.  Ex. 22 at 13:7-19, 26:24-27:8, 28:1-19; Ex. 21 at 31:16-22, 36:5-1; Ex. 18 at 170:6-171:20, 211:14-212:5; Ex. 25; Ex. 26; Ex. 27; Ex. 28; Ex. 2; Ex. 15 at 28:1-23, 97:9-98:25, 102:23-103:2; Ex. 29.

32.     Defendants created an official 2000 Mules trailer (the **Trailer**), which they released on April 23, 2022, to the public.  Defendants published the Trailer on the 2000 Mules website, the Salem News Channel, the D'Souza Rumble channel, the TTV Rumble channel, TTV Facebook page, and TTV Instagram page.  Ex. 10 ¶ 47; Ex. 11 ¶ 47; Ex. 30; Ex. 31; Ex. 3; Ex. 32; Ex. 33; Ex. 34.

33.     TTV Defendants participated in lengthy filmed interviews with the D'Souzas discussing their illegal ballot harvesting theory and their geotracking and surveillance video project.  Those interviews were edited and featured in the Film.

Ex. 2; Ex. 12 at 138:5-16, 224:9-229:25, 236:25-237:25; Ex. 18 at 183:5-186:4; Ex. 22 at 29:14-21, 47:18-48:8, 52:8-21, 79:18-21.

34.    ████████████████████████████████████████ ████████████████████████. Ex. 28; Ex. 18 at 169:21-171:20, 211:14-212:5; Ex. 25; Ex. 15 at 97:9-98:25; Ex. 29; Ex. 35.

35.    On April 20, 2022, Engelbrecht sent a text message to D'Souza noting, "The call I missed yesterday was to ask that I personally confirm the changes were made to the movie. What is the best way to do this? Can we talk them through or can I view another rough cut?" Ex. 36.

36.    Plaintiff Mark Daryl Andrews (**Plaintiff**) is a Georgia voter, Ex. 37, Mark Andrews Dep. Tr. at 13:17-23, whose image is prominently displayed in the Film and the Trailer, as an example of one of the "mules."  Ex. 2 at 47:55; Ex. 37 at 78:18, 79:1-2, 79:11, 87:21-23, 114:11-12; Ex. 14 at 331:10-13; Ex. 38.

37.    The video images of Plaintiff used in the Film and Trailer, as well as shown by Defendants during appearances promoting the Film, come from surveillance footage, Ex. 14 at 50:20-51:6, showing Plaintiff exiting his white SUV and then depositing his and his family's ballots in a Gwinnett County, Georgia dropbox on October 6, 2020.  Ex. 37 at 113:4-10; Ex. 39.

38.    TTV Defendants provided the video of Plaintiff used in the Film and Trailer to D'Souza Defendants.  Ex. 14 at 50:20-51:6, 137:20-24; Ex. 12 at 150:2-25, 151:1-10; Ex. 18 at 83:15-18; Ex. 15 at 87:22-25.

39.    In the Trailer, which includes footage of Plaintiff voting, D'Souza asks Englebrecht, "What is a mule?"  She replies: "A person picking up ballots and running them to the dropboxes."  Ex. 40 at 1:23.

40.    Defendant D'Souza testified, "A mule is someone who is a conduit for depositing ballots, typically multiple ballots, into a -- into a mail-in drop box. 'Mules' is used in the film in a fairly specific context. So it's not anyone doing those things. It is people doing those things who meet a certain specified or enumerated criteria . . . That criteria is that a mule has to go to ten or more drop boxes within a specified period of time, essentially election season. And the mule also has to go to so-called NGOs or non-profit houses, stash houses it's sometimes called colloquially. And it is the combination of those two things that creates the criterion for the cell phone geotracking."  Ex. 14 at 36:9-37:5.

41.    Debbie D'Souza, a writer and director of the Film, explained the criteria used to identify a "mule" for the Film was that a particular person went to ten drop boxes, went to a non-profit, and, it is assumed, was paid to take these actions.  Ex. 15 at 48:2-17.

42.     In the Film, Engelbrecht states: "A mule is, by our definition, a person that is involved in picking up ballots from locations and running them to the drop boxes. So, you have the collectors on the one hand. You have the stash houses, which are the non-profits. And then you have the mules that are doing the drops." Ex. 2 at 26:50.

43.     In the Film, Defendants further discuss the meaning of the term "mule" as follows:

> **Dinesh D'Souza:** So, the mule is the delivery man or woman.
>
> **Catherine Engelbrecht:** The mule is the delivery man.
>
> **Dinesh D'Souza:** And what you're saying is they have a starting point or multiple starting points, and then they have the end point. And the end point is the drop box. Right?
>
> **Catherine Engelbrecht:** That's right. That's right.
>
> **Dinesh D'Souza:** But you're saying that they get the ballots from somewhere and then they go deposit them in multiple drop boxes.
>
> **Catherine Engelbrecht:** One of the questions that will come up in the work that we've done is, 'Well how do you know that this wasn't just somebody that's got a big family and they just deposited a bunch of ballots once.' Or 'How do you know that this person didn't just work at a location that is near a drop box and so they're constantly going by a drop box?' The elements

that are additive here - the going to the non-profits, the ability to identify the

pattern of approach to a drop box. And that it is going not past a drop box

and on, but directly to a drop box and back to another point - and then to

another drop box. All of these things . . . .

Ex. 2 at 29:00.

44.    In the Film, Defendants further discuss the meaning of the term

"mule" in connection with TTV's research as follows:

D'Souza: And we're also talking about a gross undercount of the actual

number of mules because you set a high bar. They had to go to 10 drop

boxes, so if there's a mule who went to seven drop boxes, you wouldn't

catch that guy.

Engelbrecht: And they had to go to non-profits. So, they had to meet those

two criteria and then go to one of the geo-fenced drop boxes. If they met the

two criteria but went to a Post Office box, we're not going to look at them.

Ex. 2 at 43:41.

45.    In the Film, as video of Plaintiff and his white SUV appear on screen,

D'Souza's voiceover states: "What you are seeing is a crime. These are fraudulent

votes." Ex. 2 at 47:55.

46.    The sequence in the Film featuring the video clip of Plaintiff voting

by drop box is the third surveillance video shown in a series of surveillance videos

of voters. It is the final full-screen surveillance video shown before the screen splits into grids of increasingly smaller videos of drop box voting (with videos repeating numerous times within the grid). Ex. 2 at 47:55.

47.     The Film accuses "mules" of criminal conduct, associating them with "organized crime," "a cartel," and "trafficking." Ex. 2 at 19:05, 26:21, 42:44, 48:06, 49:29, 50:49, 1:19:15. The Film claims mules changed the outcome of the 2020 presidential election: "This was an organized effort to subvert a free and fair election. This is organized crime. You can't look at this data in its aggregate and believe anything otherwise. That's especially true when you consider that in places like Georgia, it was only decided by 10,000/12,000 votes. And you look at 5,000 visits just from our MULES? It's not a leap to say, 'Yes, this would have made a difference.'" Ex. 2 at 42:40; *see also* 48:00-51:30.

48.     The Film also claims "mules" participated in violent riots. Phillips states: "There were several different violent BLM/ANTIFA riots in Atlanta, in one of them, we had three dozen of our mules participate in these violent riots. There's an organization [referring to the Armed Conflict Location & Event Data (**ACLED**)] that tracks the device IDs across all violent protests around the world. We took a look at our 242 mules in Atlanta, and sure enough, dozens and dozens and dozens of our mules show up on the ACLED databases." Ex. 2 at 28:00.

49.    TTV Defendants made similar statements about "mules" in the Trailer: **Phillips**: "This is not grandma walking her dog: bad backgrounds, bad reputations. They are interested in one thing: that's money." **Engelbrecht**: "And in no shape, in no way, in no time is that legal." **Phillips**: "This is organized crime." Ex. 40 at 1:29.

50.    In the Trailer, after Phillips states, "This is organized crime," D'Souza asks, "Do you have video evidence?" and Phillips responds, "Four million minutes of surveillance video around the country." During this exchange, a video clip of Plaintiff voting by drop box with his face blurred is the first surveillance video shown, followed by a second clip of another voter, before the screen splits into grids of increasingly smaller images of drop box voting (with images repeating within the grid). Ex. 40 at 1:42-1:50.

51.    In the footage of Plaintiff shown in the Film and Trailer, Plaintiff is actually legally depositing absentee ballots for himself, his wife, and three adult children with whom he shares a residence. Ex. 37 at 113:4-10, 115:12-23; Ex. 39; Ex. 41; Ex. 42.

52.    Plaintiff has regularly voted in Georgia elections for over 20 years. Ex. 37 at 29:12-30:9.

53.    To vote in the 2020 election, due to COVID-19, Plaintiff deposited his and his family's ballots in a drop box in Gwinnett County, Georgia. Ex. 37 at 113:4-10, 115:12-23, 143:20-23; Ex. 39; Ex. 43.

54.    Thereafter, Georgia election officials contacted Plaintiff's daughter, Courtni Andrews, regarding the need to cure her ballot due to an issue with her signature. Courtni did so. Ex. 44, Brendetta Andrews Dep. Tr. at 80:19-81:6, 81:20-82:4; Ex. 43.

55.    Plaintiff was investigated for election fraud by the Georgia Secretary of State (**SOS**) after a Georgia resident, David Cross, filed a complaint with the State Election Board (**SEB**) on April 25, 2022. Ex. 45, Georgia SOS Dep. Tr. at 27:1-22; Ex. 41; Ex. 42; Ex. 46.

56.    Cross's complaint included multiple still images and a link to a video clip of the same unblurred footage of Plaintiff voting that had been used in the *Charlie Kirk Show* segment on April 8, 2022 (*see infra* ¶¶ 93-95) and was used (in blurred format) in the Film and Trailer. Ex. 45 at 27:1-13, 29:9-18, 33:10-17; Ex. 46.

57.    Cross's complaint about Plaintiff stated: "A private investigative organization, True the Vote, purchased billions of cell phone 'pings' and they identified <u>this individual</u> by tracking his cell phone pings to multiple ballot drop boxes." Ex. 46.

58.    The phrase "this individual" in Cross's complaint refers to Plaintiff as shown in those images and clip. Ex. 46; Ex. 47 at 6:10-16.

59.    Cross's complaint stated similar claims as those made in the Film, asserting that "'Ballot Mules' are typically paid $10 to $15 per ballot delivered" and that "mules," "deliver[] 5 ballots at a time to multiple drop boxes a day." Ex. 46.

60.    On January 30, 2022, four months before Cross filed his complaint, TTV posted a statement on its Facebook page stating: "True the Vote would like to extend a special thank you to David Cross for being a great American. We deeply appreciate his work for free and fair elections in Georgia, it's patriots like him that make this country great. This is just the beginning, get ready, patriots." Ex. 48.

61.    On April 5, 2022, a few weeks before Cross filed his complaint, Engelbrecht asked D'Souza to include David Cross in the credits to the Film with the statement: "Special thanks to Heather Mullins and David Cross for their tireless research." Ex. 49; Ex. 18 at 216:16-217:10.

62.    Using the video and images from Cross's complaint in which Plaintiff's license plate was visible, an SOS investigator identified Plaintiff. Ex. 45 at 37:12-38:12; Ex. 50.

63.     The SOS investigator examined election records and found that

Plaintiff and four family members were registered to vote at his house, that each of

their voting registrations was valid, that they had each requested absentee ballots

for the 2020 election, and that each of their ballots had been received the same day

they were deposited, *i.e.*, the date of the clip capturing Plaintiff depositing them in

the drop box.  Ex. 45 at 40:1-42:8, 44:8-20; Ex. 51.

64.     The investigator interviewed Plaintiff at his home, and found him to

be credible.  Ex. 45 at 17-22, 43:5-8, 44:11-25:1.

65.     The investigator concluded there was no violation of election laws.

Ex. 45 at 45:16-21, 47:6-8.

66.     On May 17, 2022, the SEB held a public hearing in the case filed by

Cross against Plaintiff that was live-streamed on the internet.  Ex. 45 at 49:9-12;

Ex. 52.

67.     The investigator presented his findings, *i.e.*, that he had found no

evidence Plaintiff had engaged in ballot fraud, and recommended the complaint be

dismissed.  Ex. 18 at 107:1-7, 110:11-19; Ex. 53; Ex. 45 at 53:21-56:7, 57:1-18;

Ex. 52.

68.     The SEB dismissed Cross's complaint, ending its investigation of

Plaintiff.  Ex. 45 at 57:20-58:7; Ex. 41; Ex. 54; Ex. 42; Ex. 52.

69.    All Defendants were aware of the SEB's dismissal within days.

Ex. 55; Ex. 56; Ex. 57; Ex. 58; Ex. 59; Ex. 60; Ex. 61; Ex. 62.

70.    On May 17, 2022, the Atlanta Journal-Constitution (**AJC**) published

an article titled, "Georgia investigation dispels allegations highlighted in '2000

Mules.'" Ex. 55 at DD_000071.  The AJC article stated: "An investigation

revealed [Plaintiff] was delivering ballots for his family, which is allowed under

Georgia law." Ex. 58.

71.    Phillips texted a link to the AJC article to D'Souza and Engelbrecht

saying: "Is this what they call a refutation?  This article borders on the comical.  It

features a single case in which the only 'evidence' the mule was merely dropping

off the votes of his family members is that HE SAID SO. True the Vote found

nearly 250 mules in Atlanta going to 10 or more dropboxes."  After the link to the

article, he continued: "In addition, this isn't a mule.  Didn't reach the threshold."

Ex. 55 at DD_000073.

72.    D'Souza responded to Phillips' text, "All good points! I'll take them

up on the podcast." Ex. 55 at DD_000073.

73.    On May 18, 2022, the day following the SEB's hearing exonerating

Plaintiff, D'Souza posted a statement on his Truth Social and X accounts

responding to the AJC article about the hearing, partially echoing Phillips, "This

article borders on the comical. It features a single case in which the only 'evidence'

the mule was merely dropping off the votes of his family members is that HE

SAID SO. True the Vote found nearly 250 mules in Atlanta going to 10 or more

dropboxes." D'Souza is referring to Plaintiff when he says the "mule." D'Souza

did not, however, include Phillips' statement from the text message thread between

the Defendants that "this was not a mule." Ex. 63; Ex. 64; Ex. 10 ¶ 130; Ex. 55 at

DD_000073.

74. D'Souza also did not state on his podcast that Plaintiff was not a mule.

Instead, on May 18, 2022, on his podcast, the *Dinesh D'Souza Podcast*, as posted

on the podcast website, the D'Souza Rumble page, the Dinesh D'Souza X page,

the Salem News website, and the Salem Rumble, D'Souza referred to Plaintiff as

"a mule" and questioned the GBI's investigation and its finding that Plaintiff

lawfully delivered ballots for his family members. D'Souza stated "The Georgia

investigators, instead of going after the mules, are trying to protect the mules, at

least trying in this one case [referring to Plaintiff]. 'Whose votes were they?' 'Oh,

they were the votes of my family members.' 'Oh, wonderful, investigation

concluded.' So, instead of really investigating the mules, they're trying to find the

whistleblower." Ex. 65; Ex. 66; Ex. 67; Ex. 68; Ex. 69; Ex. 10 ¶ 130.

75. On May 16, 2022, Engelbrecht also warned D'Souza that "nonmule"

video appeared in the Film, meaning video of people who were not geotracked.

Ex. 70; Ex. 18 at 289:21-290:4. D'Souza did not ask Engelbrecht what she meant,

did not consider it a "red flag," and "did not give it a second thought." Ex. 14 at 255:8-258:17, 278:9-12.

76.     Even after Phillips confirmed that Plaintiff "isn't a mule," neither Phillips nor Engelbrecht suggested that D'Souza Defendants remove images of Plaintiff from the Film or Trailer. Ex. 55 at DD_000073.

77.     Engelbrecht took no action to ensure no further allegations of voter fraud were made against Plaintiff after the SEB exonerated him. Ex. 18 at 111:17-20.

78.     Nor did D'Souza Defendants take any action to remove Plaintiff from the Film or Trailer in response to Phillips' text message affirming that Plaintiff "isn't a mule." Ex. 2 at 47:50; Ex. 40 at 1:44.

79.     TTV Defendants knew that family members are permitted under Georgia law to deliver ballots, and they had no evidence that Plaintiff deposited ballots from anyone other than his family. Ex. 12 at 141:1-142:5; Ex. 18 at 111:22-112:4, 117:15-120:13; Ex. 71.

80.     D'Souza was aware that in Georgia it is legal for family members to deposit the ballots of other family members. Ex. 14 at 287:21-24.

81.     Defendants have never had any evidence that Plaintiff was paid to deposit any ballots or went to any drop box more than once. Ex. 18 at 100:7,

116:22-25; Ex. 72; Ex. 12 at 122:12-25; Ex. 15 at 179:17-20; Ex. 14 at 37:11-14; Ex. 73.

82.     Defendants have never had any evidence that Plaintiff visited any non-profit to pick up ballots.  Ex. 12 at 123:5-8, 145:2-21, 148:5-10; Ex. 18 at 117:1-4; *see also* Ex. 74 at Interrogatory Response 7.

83.     Defendants have never had any evidence that Plaintiff was ever at a violent riot.  Ex. 15 at 187:18-20; Ex. 74 at Interrogatory Responses 7 and 11.

84.     TTV Defendants never geotracked Plaintiff's cell phone or any device linked to Plaintiff.  Ex. 74 at Interrogatory Response 7; Ex. 18 at 99:21-100:7; Ex. 72; Ex. 12 at 122:12-18, 144:5-25, 145:2-146:5, 147:24-148:9, 149:7-25; Ex. 73; Ex. 75.

85.     In a public statement made on November 27, 2024, D'Souza acknowledged that the footage of Plaintiff in the Film had never been geotracked and claimed that the "videos used in the film were characterized on the basis of inaccurate information."  Ex. 9.

86.     On May 5, 2022, the film's premiere was held at Mar-a-Lago and was attended by 500 people with on-stage appearances by Donald Trump, D'Souza, Engelbrecht, and Phillips.  David Cross was also in attendance.  Ex. 76; Ex. 77.

87.     █████████████████████████████████████████████ ███████.  Ex. 78.

88.  ████████████████████████████████████

████████████████████████████████████████

████████████ Ex. 79; Ex. 80; Ex. 81; Ex. 82; Ex. 83; Ex. 84; Ex. 85;

Ex. 86; Ex. 87; Ex. 88; Ex. 89.

89.    As part of the marketing plan for the Film, Patricia Jackson, a

publicist hired by D'Souza Media would "broker between [Defendants] and set up

interviews with [Engelbrecht], with [Phillips], so that they could help [D'Souza]."

Ex. 15 at 155:8-14; *see also* Ex. 83; Ex. 90.

90.  ████████████████████████████████████████

████████████████████████ Ex. 91; Ex. 92; *see also* Ex. 93,

Ex. 94 ("Here's the poster of our new movie").

91.    Defendants repeatedly used Plaintiff's image in their promotional

efforts for the Film. *E.g.* Ex. 95; Ex. 96; Ex. 97; Ex. 98; Ex. 99; Ex. 47; Ex. 100;

Ex. 101; Ex. 102; Ex. 7; Ex. 8; Ex. 103; Ex. 104; Ex. 105; Ex. 106; Ex. 107;

Ex. 108; Ex. 109; Ex. 110; Ex. 111; Ex. 6; Ex. 112; Ex. 113; Ex. 114; Ex. 115;

Ex. 116; Ex. 117; Ex. 118; Ex. 63; Ex. 64; Ex. 65; Ex. 66; Ex. 67; Ex. 68; Ex. 69;

Ex. 119; Ex. 120; Ex. 121; Ex. 122; Ex. 123; Ex. 124; Ex. 125; Ex. 126; Ex. 127.

92.    D'Souza Defendants worked with Banners4Freedom to put up a

billboard, on or around June 16, 2022, promoting the Film in Times Square in New

York City which included Plaintiff's image.  Ex. 95; Ex. 96.

93.    On April 8, 2022, Engelbrecht and Phillips appeared on the *Charlie Kirk Show* to discuss the Film.  During the interview, video of Plaintiff, which shows his unblurred face, car, and license plate, plays as the first of three videos showing voters inserting ballots into drop boxes that TTV Defendants and Kirk discuss:

**Kirk**: Ok let's watch this video here. This is Gwinnett County, is that right?

**Engelbrecht**: Yes.

**Kirk**: Ok. And we can talk over the video as it's happening because there's no sound. Ok so a white [video of Andrews voting begins] SUV [Andrews' vehicle] pulls up, middle of the day, what are we looking at here guys?

**Phillips**: You're going to see a voter [Andrews] get out—a mule get out.

**Engelbrecht**: A mule [referring to Andrews] get out.

**Kirk**: So this is a mule? [Referring to the unblurred image of Andrews.] This is one of your 2000 that you've profiled.

**Engelbrecht**: Yes.

**Philips**: And they've [referring to Andrews]—and they've got their ballots. And they walk up to the box. You can only fit a couple of ballots in at the same time.

**Kirk**: Is this the state of Georgia?

**Phillips**: Yeah.

**Engelbrecht**: Yes.

**Kirk**: So you're not allowed to turn in more than one?

**Engelbrecht**: Yes.

**Kirk**: Unless it's for a close relative?

**Engelbrecht**: That is correct.

**Phillips**: And [referring to Andrews depositing the ballots] he's trying to figure out how to even get them into the box because he has so many he can't fit them in the little—the little slot. So then he starts having to put them in one by one. Everybody's sitting there waiting on him. One.

**Kirk**: [Referring to Andrews' behavior] Now this is illegal?

**Engelbrecht**: Right.

**Kirk**: Highly illegal to do this.

**Engelbrecht**: Right.

**Phillips**: [Referring to Andrews depositing the ballots] Every one past that first one was illegal.

Ex. 11 ¶ 50; Ex. 97 at 24:50.

94.     Later in the Kirk interview, the clip of Plaintiff voting plays again, with his face unblurred, as the first in a series of three purported "mules" videos. As video of Plaintiff plays, a location and timestamp appears onscreen: "Dropbox - Gwinnett County Election Office - Grayson Hwy" and "10/6/20 9:48AM."  Also

onscreen in large, bold letters is the caption: "Ballot Harvesting is illegal in GA!"
Ex. 18 at 302:16-20, 308:23; Ex. 128; Ex. 129; Ex. 11 ¶ 50; Ex. 97 at 50:53.

95.    In addition to being posted on the Charlie Kirk Rumble, TTV
Defendants posted the Charlie Kirk interview on the TTV Rumble, including the
unblurred footage of Plaintiff voting.  Ex. 98, Ex. 99; Ex. 11 ¶ 53.

96.    Engelbrecht and Phillips alerted D'Souza to the Kirk interview in a
text: "Lastly, we did an interview with Charlie yesterday. He had the same videos
from the ad in GA (the ones we talked about) and asked us to review them. He says
Salem knows, etc., but didn't want to not tell y'all. It's supposed to air tomorrow."
D'Souza responded, "That is no problem! But thanks for letting us know."  The
"videos from the ad in GA (the ones we talked about)" referenced in this text
exchange include an unblurred clip of Plaintiff voting.  Ex. 130 at DD_000103.

97.    On March 22, 2022, days before Engelbrecht and Phillips' appearance
on the Charlie Kirk show, D'Souza exchanged text messages with Kirk explaining
that he would provide "a couple of exclusive short clips from the movie," "videos
of people putting ballots into the drop boxes," and "part of our mule interview."
Ex. 131.

98.    On April 20, 2022, Engelbrecht and Phillips discussed the Film on
The Gateway Pundit.  During the interview, an unblurred video of Plaintiff voting
is the first in a series of three "mules" videos shown.  As video of Plaintiff plays, a

location and timestamp appears onscreen: "Dropbox - Gwinnett County Election Office - Grayson Hwy" and "10/6/20 9:48AM." Also onscreen in large, bold letters is the caption: "Ballot Harvesting is illegal in GA!" The unblurred video image of Plaintiff voting plays four times throughout the interview. Ex. 47 at 6:13, 6:38, 11:05, 34:38.

99.    Around the first time the unblurred clip of Plaintiff voting is shown on The Gateway Pundit interview, Engelbrecht stated: "What we learned through our research was that there was a systematic and coordinated effort to exploit those vulnerabilities around the drop boxes, specifically through what we call ballot trafficking and that is . . . individuals who are moving . . . according to what we can tell moving back and forth between non-profit organizations, key non-profit organizations, and the drop boxes . . . The movie tells that story, it tells it through the data [Unblurred footage of Plaintiff voting is shown with the caption "Ballot Harvesting is illegal in GA!"], it tells it through the video." Ex. 47 at 5:22-6:15.

100.    At another point in The Gateway Pundit interview, when the unblurred clip of Plaintiff voting is shown, Phillips [referring to unblurred video of Plaintiff] stated: "Those people that you just showed . . . that are stuffing those ballot boxes—that's legit, and by the way [unblurred footage of Plaintiff voting is shown with the caption "Ballot Harvesting is illegal in GA!"], two of those most egregious ones are in one ballot box." Ex. 47 at 10:55-11:06.

101.   The April 20, 2022, Gateway Pundit interview was posted on The Gateway Pundit website, The Gateway Pundit Rumble page, and The Gateway Pundit YouTube page.  Ex. 100; Ex. 101; Ex. 102.

102.   On May 4, 2022, D'Souza appeared on NTD News on New York news channel WMBC 63 to discuss 2000 Mules, including a clip of Plaintiff voting.  This interview has been posted on mms.tveyes.com and ntd.com.  Ex. 10 ¶ 54; Ex. 7; Ex. 8.

103.   During the NTD News interview, D'Souza states, "[2000 Mules] is an exposé of a coordinated ring of paid ballot trafficking, illegal votes, fraudulent votes being dumped en masse into mail-in drop boxes."  A clip of Plaintiff voting appeared onscreen as D'Souza says "dumped en masse into mail-in drop boxes." Later in the interview, D'Souza says that by watching the Film, "you will actually be taken to the scene of the crime. You'll be able to see it for yourself. Now where do you see the movie, there's only one way to see it: go to the website."  D' Souza explains that Defendants had identified "more than 2000 mules.  A mule is just kind of the trafficker, it's a term taken out of sex trafficking or drug trafficking, except we're talking now about ballot trafficking."  Ex. 8 at 17:40-18:08, 20:40-20:50.

104.   On May 5, 2022, Engelbrecht appeared on *Tucker Carlson Tonight* on Fox News.  During the segment, while Engelbrecht and Carlson speak, an

unblurred video of Plaintiff voting is shown—the second in a series of ten videos of voters placing ballots into drop boxes.  After about two seconds showing the first voter clip, the second clip shows Plaintiff voting, with neither his face nor license plate blurred, as Engelbrecht describes ballot drop boxes as "a recipe for fraud."  One minute later, Engelbrecht says: "As I sit here tonight, I can tell you there was rampant abuse of those drop boxes, and the data that we have is immutable and proves it, now buttressed increasingly by video."  She also commented: "the subversion was in fact real."  She also commented, "Increasingly now as we're seeing video come out we're able to match the drop box pings with the video and you see it for yourself."  Ex. 11 ¶ 57; Ex. 103, at 0:40-0:55, 1:25-1:38, 6:37-6:40.

105.   Phillips was in contact with D'Souza while Engelbrecht was on *Tucker Carlson* and expressed disappointment that Carlson did not allow Engelbrecht to specifically name the Film.  Phillips and D'Souza discussed ways to leverage the interview to promote the Film.  Ex. 86.

106.   In addition to airing on Fox News and online channels, TTV Defendants posted the *Tucker Carlson Tonight* interview on the TTV Rumble, TTV Facebook, and TTV Instagram.  Ex. 104; Ex. 105; Ex. 106.

107.   On May 6, 2022, D'Souza posted the *Tucker Carlson Tonight* interview on the Dinesh D'Souza Rumble.  Ex. 132.

108.   On May 6, 2022, D'Souza appeared on The Epoch Times' Crossroads with host Joshua Philipp, a news show broadcast online and on television via a streaming service, to discuss the Film and a clip of Plaintiff voting was shown. Ex. 107; Ex. 10 ¶ 59; Ex. 11 ¶ 59.

109.   During the Crossroads interview, Plaintiff's blurred image is shown twice.  The first instance is in the introduction as the host claims that "alleged paid couriers called mules were traveling to various non-profit groups and ballot drop boxes."  This clip of Plaintiff is the first voter surveillance clip shown in the interview.  Later in the interview, D'Souza states, "What seals the deal and what made this movie so powerful . . . is when True the Vote began to show me surveillance video that they had obtained from the states themselves, official surveillance video which kind of catches the mules in the act."  Plaintiff's image appears during D'Souza's first mention of "surveillance video."  Ex. 11 ¶ 59; Ex. 107 at 00:00-00:17, 5:20-5:37.

110.   During the Crossroads interview, D'Souza states that "everything that you see in the movie is 100% illegal in all the 50 states," and "[w]e happen to know that a number of the mules are Antifa-BLM types.  Those are the sort of thugs who are being hired to do this."  Ex. 11 ¶ 59; Ex. 107 at 11:15-11:25, 11:57-12:04.

111.   On May 8, 2022, TTV Defendants published a new video trailer on the TTV Rumble, TTV Facebook, and TTV Instagram pages.  Ex. 11 ¶ 64; Ex. 108, Ex. 109; Ex. 110.

112.   In this new trailer, interspersed among footage and statements about how "all the easy choices are in the past" and that they will "pull the ripcord," Plaintiff's image is the first in a series of examples of video "evidence" of voter fraud.  This new video trailer states that TTV planned to release "the video, the data, all of it," that constitutes evidence of election fraud beyond that contained in the Film.  Ex. 111.  TTV never released all of its data.  Ex. 18 at 87:5-7.

113.   On May 11, 2022, D'Souza appeared on *Tipping Point with Kara McKinney* on One America News Network (**OANN**) to discuss the Film and a clip of Plaintiff voting was played.  Ex. 6; Ex. 10 ¶ 65; Ex. 11 ¶ 65.

114.   During the interview, a video of Plaintiff voting is shown and D'Souza claims the Film "shows that there was fraud, coordinated fraud in all the key states that decided the election."  As evidence, D'Souza says the video "confirm[ed]" the scheme, as it showed the same "mules" that were geotracked "stuffing the ballot box" and constituted "proof of a very high order."  Ex. 6 at 1:21-27, 3:40-53; Ex. 10 ¶ 65; Ex. 11 ¶ 65.

115.   On May 13, 2022, Engelbrecht and Phillips appeared on The Epoch Times' news show *Truth Matters with Roman Balmakov* to discuss the Film,

during which a clip of Plaintiff played as they explained the purported "mules" scheme. Phillips stated that they used geolocation tracking because "we were looking for ways to solve a crime." Phillips claimed that they tracked people going to "stash houses," and "deliver[ing]" ballots to drop boxes, then "backed [that] up with video." He stated, "in no case, either by federal law or any state law, can you get paid to traffic ballots." In discussing a series of clips of voters, including a clip of Mr. Andrews, Engelbrecht stated: "Their phone was at a violent riot." Ex. 11 ¶ 66; Ex. 112 at 5:28-32, 6:48-52, 7:50-8:00, 8:37-43, 40:27-4:30.

116.    In addition to being posted on the *Facts Matter* YouTube channel and Epoch Times website, TTV Defendants posted the interview on the TTV website and TTV Rumble page. Ex. 11 ¶ 69; Ex. 113; Ex. 114; Ex. 115; Ex. 116.

117.    On May 17, 2022, D'Souza appeared on OANN's *Real America with Dan Ball*, which was aired on the OANN channel and was posted on OANN's Rumble page. During the interview, the Trailer played, including the clip of Plaintiff voting, with D'Souza's voiceover describing it as "evidence" of an organized crime scheme. Later in the interview, while discussing the purported fraud scheme, the clip of Plaintiff voting was again played, while the host asked about "ballot stuffers" making five to ten dollars per ballot. D'Souza commented that "fact checkers" were incorrect, referencing the finding that Plaintiff was legally dropping off his family members' ballots: "It's really hard to argue,

because when you look at what the fact checkers are saying, it doesn't really square with what's in the film. So they'll say things like, well, you know, in Georgia, people are allowed to return ballots for their family members. That's true, but if you're returning ballots for your family members, why would you go to more than one drop box? You'd go to one to drop them off, you go home. We're looking at mules that went to a minimum of ten drop boxes. And, as you know, if you've seen that video in the film . . . ." Ex. 117 at 7:50-8:20; Ex. 118; Ex. 10 ¶ 142; Ex. 11 ¶ 142.

118.    On May 20, 2022, D'Souza appeared on OANN's "Weekly Briefing with Chanel Rion," which was posted on mediamatters.org and on Chanel Rion's X page, to discuss the Film. As a clip of Plaintiff voting plays, D'Souza states: "a mule is a paid operative who is delivering these fraudulent and illegal votes" to multiple drop boxes. With Plaintiff's image on the screen, Defendant D'Souza claimed that there was widespread fraud during the 2020 election. Defendant D'Souza later states, "Out of 240 mules, 242 mules in Atlanta, something like 67 of them were in the violent Antifa BLM riots. It doesn't look to me like that's likely to be a population of cops, it's more likely that the Democrats, who by the way dominate these inner cities, basically went to these Antifa BLM guys and said: 'Look you've had enough fun burning cities and pulling people out of their cars and beating them up, why don't we pay you to do a different kind of operation that

might help our guys to get to the White House.'" Ex. 10 ¶ 139; Ex. 119 at 3:09-3:14, 7:58-8:27; Ex. 120.

119.    On May 20, 2022, D'Souza appeared on "KUSI News" on San Diego channel KUSI to discuss the Film.  During the interview, Plaintiff's image is shown as D'Souza describes 2000 Mules as "damning evidence"—portraying the image of Plaintiff as evidence of the election fraud scheme.  The clip of Plaintiff voting is shown a second time as D'Souza states that "mules" wore gloves to avoid leaving fingerprints.  He explains: "These mules are paid operators who deliver illegal and fraudulent votes to mail-in drop boxes and by monitoring the movement of their phones, you can show these guys go from one drop box to another to another to another and track their movements in the crucial weeks leading up to the election."  D'Souza elaborates that "mules" were paid ten dollars per ballot.  He further claims that the filmmakers "set a very high bar, because you don't want to get false positives" for deeming a person a mule: "ten or more drop boxes, because there's no rational or innocent reason to go to more than ten. Even if you're dropping off the votes of your family members, you're going to go to one drop box and put them all in there, why would you go to ten?" Ex. 121 at 1:24-1:41, 2:00-2:33, 3:05; Ex. 122; Ex. 10 ¶ 145.

120.    On June 16, 2022, D'Souza published a post on X replying to another user's post.  The original post states, "GBI found the 3 'mules' they checked to be

act [sic] legally. Including Mr. 5 ballots. 2000 Mules has no evidence of any criminality."  In his response, D'Souza replies, "They didn't check 3 mules, only 1. And here too the 'verification' was largely bogus—basically just interviewing the mule." Ex. 123.

121.   On June 16, 2022, D'Souza published a post on X replying to a post linking to a fact-check of the *2000 Mules* narrative.  In his response, D'Souza states, "Bullshit. The investigator only examined a single case, and even there largely relied on the mule himself saying he was merely dropping off the ballots of family members. There is no way to verify this statement by looking at the ballots themselves." Ex. 124.

122.   On June 18, 2022, D'Souza published a post on X responding to a different user's post.  The original post says, "[A]t 47:47 Dinesh says 'What you are seeing is a crime' as a man puts ballots into a drop box. At 25:58 Gregg says 'We want to absolutely assure that we don't have false positives.' This video was investigated and the case was dismissed. Were you wrong?" In his response, D'Souza states, "No. The investigation was bogus. Since there is no way to retrieve the ballots, the investigator has no way to definitively confirm they were the ballots of family members. He simply got this from the mule himself." Ex. 125.

123.   On October 22, 2022, TTV Defendants published a "music video trailer" for the Film on TTV's Facebook page.  This music video trailer, which repeats Defendants' "mules" narrative, shows the footage of Plaintiff voting as an exemplar mule three times over the course of the video.  Plaintiff's image appears onscreen, including as background to the lyrics "2000 Mules/on a mission/riggin' elections."  The song repeats the lyrics, "Like a thief in the night, they [referring to the mules] stole them votes."  The song continues, "This is organized crime, True the Vote got that evidence." Ex. 126; Ex. 127; Ex. 11 ¶ 162.

124.   In addition to continuing to promote the Film, in the summer of 2022, D'Souza wrote a book based on the Film titled *2,000 Mules: They Thought We'd Never Find Out. They Were Wrong* (the **Book**) which was published by Regnery Publishing, a Salem affiliate at that time.  Ex. 134; Ex. 133; Ex. 135.  D'Souza wrote "every word" of the Book himself.  Ex. 14 at 295:1-5.

125.   The Book quotes extensively from interviews that Phillips and Engelbrecht gave in connection with the making of the Film.  Ex. 134; Ex. 135; Ex. 12 at 202:22-203:10.

126.    Ex. 136; Ex. 18 at 309:11-15.

127.   The Book was originally released around August 2022, but the initial printings of the book were recalled so that factual inaccuracies could be removed from the Book.  Ex. 137; Ex. 138.

128.   The reissued version of the Book removed the names of certain non-profits that the original version claimed were "doing vote trafficking" and were the sources of the fraudulent ballots deposited by mules.  Ex. 139; Ex. 140; Ex. 141; Ex. 142.

129.   Second, the reissued version of the Book removes inaccurate statements about ACLED, including claims that ACLED's data supports allegations that "mules" attended violent riots.  Ex. 143; Ex. 144.

130.   The original version of the Book included multiple incorrect references to ACLED, including "Gregg decided to compare the cellphone IDs of his 242 mules in Atlanta with the cellphone IDs of the violent rioters in the ACLED database."  Ex. 134 at p. 69.

131.   ACLED wrote a letter detailing these inaccuracies in the Book, leading Regnery to agree to remove these inaccurate references to ACLED in the second version of the Book.  Ex. 145; Ex. 144.  Regnery also entered into a settlement agreement with ACLED and issued a retraction of the statements in the Book about ACLED.

132.    D'Souza released the second edition of the Book on October 25, 2022, Ex. 146, after Plaintiff sent Defendants a cease-and-desist letter on October 3, 2022, explaining that the claims of voter fraud against him in the Film and promotional statements were false.  Ex. 147; Ex. 148; Ex. 149.

133.    The Book has been sold at vendors, both brick-and-mortar and online, including Amazon, BulkBookstore, Barnes & Noble, Simon & Schuster, Target, and the Regnery website.  Ex. 150; Ex. 151.

134.    In the Book, Plaintiff's image appears in a centerfold color photo spread.  The caption on the page with his image reads: "What we see here are screenshots from the videos of mules stuffing multiple ballots into mail-in drop boxes.  While vote harvesting is legal in some states, typically under restricted conditions, paid ballot trafficking is illegal across the country.  What you are seeing here is organized crime on behalf of the Democratic Party."  That image of Plaintiff is taken from the surveillance video footage provided and licensed by TTV for use in the Film. Ex. 135 at centerfold insert between pp. 144 and 145; Ex. 2 at 47:55.

135.    In the Book, Plaintiff's image is one of only ten video stills included, and Plaintiff's image appears first in the set.  Ex. 135.

136.    In the Book, Plaintiff's image is used as an example of a ballot mule, defined in the Book as "the paid operative who delivers the illegal ballots to ballot

drop boxes," Ex. 135 at p. 27, and whom TTV had tracked to at least ten ballot drop boxes and five or more visits to at least one non-profit "stash house."  Ex. 135 at pp. 65, 160-61.

137.   Throughout the Book, "mules" are accused of criminal conduct, associating them with "organized crime," "a cartel," and "trafficking."  Ex. 135 at pp. 27, 47, 54, 65, centerfold insert between pp. 144 and 145.  The book contains excerpts of interviews with Engelbrecht and Phillips in which they claimed that they worked "to absolutely ensure that we don't have false positives, meaning including people that should not have been included" by creating "smoothed out pattern[s] of life" to follow the "movement" of cell phone signals, identifying only cell phones that were "not going past a drop box but directly to a drop box," and studying "the timing" of drop box visits.  Ex. 135 at pp. 60-61.

138.   The promotional materials for the book state: "the criminals are still at large."  Ex. 151.

139.   Reporter Amy Gardner identified Plaintiff as appearing in the Film and contacted him via text on May 16, 2022, specifically referencing Plaintiff's appearance in the film.  Ex. 37 at 57:21-25, 65:11-16; Ex. 152.

140.   Reporter Ali Swenson identified Plaintiff as appearing in the Film, and in May 2022 reached out to Plaintiff's daughter, Courtni Andrews, on two

social media platforms, specifically referencing Plaintiff's appearance in the Film. Ex. 153; Ex. 154; Ex. 43.

141.    The Georgia SOS investigator testified that he "woke up at, like, 3:00 in the morning and couldn't go back to sleep, and I put on the TV" and saw and recognized Mr. Andrews' white S.U.V.  Ex. 45 at 73:22-74:1.

142.    Plaintiff viewed the Trailer and recognized himself.  Ex. 37 at 75:25-76:4; Ex. 155.

143.    The following family members and/or family friends of Plaintiff viewed clips from the Film and/or its promotional material and recognized Plaintiff: Brendetta Andrews, Brian Beasley, Kamica Goins; Janet Willams; Paulette Stephens; Sharletta Roberts; Brittani Andrews; Courtni Andrews; and Alec Andrews.  Ex. 155; Ex. 156, Beasley Dep. Tr. at 34:11-20; Ex. 43; Ex. 37 at 75:25-76:4, 91:16-92:10.

144.    Plaintiff has experienced increased anxiety and fear for his and his family's safety because of his portrayal by Defendants as a criminal ballot mule. Ex. 37 at 126:8-18; Ex. 156 at 13:23-14:12, 20:2-5, 20:13-17; Ex. 157, Covleskie Dep. Tr. at 14:7-20; Ex. 158, Moyer Dep. Tr. at 19:7-13, 20:3-9.

145.    Plaintiff's image has appeared in online posts with comments endorsing hostile actions and threats towards mules. Ex. 159; Ex. 160 ("Hang these bastards," "Eat shit & die angry In prison We coming for you," "Now we

know it was Treason, mules need to be flushed out . . ." and "Who can find me their personal info?!? These traitors need to be DOXXED!! Traitors to the Republic have NO RIGHTS!! FIND THEM!! EXPOSE THEM TO THE BRIGHT LIGHT OF JUSTICE!!!"); Ex. 161 ("These mules need to face a firing squad for treason or insurrection. I would be glad to pull the trigger").

146.   On August 1, 2022, D'Souza posted on X: "We need 24/7 surveillance on all mail-in ballot dropboxes. This is already stipulated in the election rules. If states don't do this, citizens might have to take matters into their own hands." Ex. 162.

147.   Online posts and comments use Plaintiff's name.  For example, a comment on a June 2024 news article states, "The data was valid, it was not made up. Maybe Andrews should have been made to show why he deposited ballots for himself and dozens of family members . . . over and over and over again . . . ." Ex. 163. A Truth Social post from May 2024 states, "#electionfraud. NOBODY Trusts the GBI . . . Mr. Andrew's is GUILTY!!!" Ex. 164.

148.   Plaintiff's wife has personally viewed online posts threatening her family as a result of Plaintiff's inclusion in the film, escalating the family's fear of real-world confrontations.  Ex. 165; Ex. 166; Ex. 167; Ex. 168; Ex. 169; Ex. 170; Ex. 44 at 43:1-19, 46:05-47:04, 70:22-71:16.

149.   Due to his portrayal by Defendants as a criminal ballot mule, Plaintiff has adjusted his daily routine and taken additional safety precautions.  Ex. 37 at 90:11-16; Ex. 44 at 75:10-25.

150.   Plaintiff has incurred the following costs: (a) $791.20 to upgrade the security system at his home, Ex. 171; Ex. 172; (b) $414.95 to purchase supplementary security cameras for his home, Ex. 173; (c) $39.99 for an outdoor floodlight to increase visibility and security around his residence, Ex. 174; (d) approximately $20, plus mileage expenses, to replace the license plate on his vehicle to avoid potential tracking or identification by third parties, Ex. 37 at 147:10-11; and (e) $312 in 2022 and $412 in 2023 to remove personal information about himself and his family from various internet sources.  Ex. 175; Ex. 176; Ex. 177 at Interrogatory Responses 8 and 21.

151.   Since May 2022, Plaintiff has incurred monthly costs of $63.17 for home security monitoring; his costs increased by $10 per month in October 2022 and by an additional $4.99 per month in October 2023.  Ex. 178; Ex. 173; Ex. 179; Ex. 180.

152.   Plaintiff has refrained from pursuing potential employment and other opportunities due to his portrayal by Defendants as a criminal ballot mule.  Ex. 37 at 44:1-47:16; Ex. 44 at 83:20-86:15.

153.    Prior to 2020, Plaintiff typically voted in person, but Plaintiff has changed his voting habits due to his portrayal by Defendants as a criminal ballot mule and no longer votes in person to avoid being recognized while voting.  Ex. 37 at 56:14-57:17, 90:15-16, 143:3-5, 143:20-144:18.

154.    Plaintiff is a private person who does not maintain a social media presence.  Ex. 37 at 58:15-59:11.

155.    According to the Film, geotracking involves collecting "signals that are emitted from your [cell] phone," including latitude, longitude, elevation, and time.  This data then allows analysts to "build a pattern of life" for the individual using the device.  Ex. 2 at 20:34-21:30.

156.    Using this data, Phillips claims in the Film that TTV "identified in Atlanta, 242 people that went to an average of 24 drop boxes–and eight organizations–during a two-week period."  Ex. 2 at 26:00.

157.    Through OpSec, Phillips contracted with Red Metrics to conduct the geotracking analysis discussed in the Film.  Ex. 12 at 51:14-25, 67:1-2; Ex. 181 at Interrogatory Response 17.

158.    Phillips first contacted Red Metrics around November or December 2020 to discuss Red Metrics working on the geotracking analysis.  Ex. 182, Matthews Dep. Tr. at 26:15-28:3; Ex. 183, Gerwing Dep. Tr. at 15:20-16:14.

159.    Phillips cannot identify any other contractor retained by OpSec or TTV to provide any geotracking analysis that was provided to TTV and discussed in the Film. Ex. 12 at 67:1-3; Ex. 181 at Interrogatory Response 17.

160.    OpSec hired Red Metrics to perform data analysis to determine if there were potential "leads" that might warrant a law enforcement investigation into election interference. Ex. 183 at 25:13-15, 35:2-5; Ex. 182 at 70:20-25, 74:19-75:13. A "lead" meant "data of interest" and "not conclusive proof." Ex. 182 at 79:12-80:4.

161.    The contract between Red Metrics and OpSec specified that a "lead" for law enforcement is "different from proof to a certainty that there was election fraud," and that Red Metrics' analysis was limited to only "provid[ing] data of interest." Ex. 182 at 76:10-25.

162.    The project name used by Red Metrics for the OpSec engagement was "True the Vote." Ex. 185, Rahlouni Dep. Tr. at 28:8-9.

163.    The Red Metrics employees who worked on the True the Vote project are Chief Technology Officer Tim Gerwing and analyst Azzedine Rahlouni. Ex. 183 at 13:20-24, 39:16-20.

164.    During the True the Vote project, Red Metrics prepared and delivered to Phillips approximately ten slide decks, each of which contained twenty or fewer slides. These slide decks contained Red Metrics' geotracking analyses of certain

cell phones appearing within "buffer zones" around the coordinates of certain "geofenced" locations. Ex. 185 at 15:2-25; Ex. 183 at 64:18-65:6, 132:17-133:21.

165. The geofenced locations included in Red Metrics' analysis were drop box voting locations pulled from a publicly available website, Ex. 185 at 42:10-23, and an enumerated list of non-profit organizations in Georgia that Phillips provided. Ex. 183 at 47:13-18; Ex. 185 at 43:14-24.

166. Red Metrics' analysis assessed only whether a mobile device signal was in proximity to a geofenced location, or within a specified "buffer zone." Red Metrics did not analyze whether someone was passing through a given area without stopping, moving among the floors of a building, or stopping in the area. Ex. 183 at 57:13-18, 65:1-18, 75:9-25, 90:14-25; Ex. 184.

167. For the True the Vote project, Red Metrics applied a "buffer" of "a couple hundred feet plus or minus." Ex. 183 at 65:1-25.

168. Red Metrics could have applied a buffer of as "tight or as broad" as needed for the project, from as small as 1 foot or to larger than 100 feet. Ex. 183 at 82:7-12.

169. The "express intent" of defining the buffer radius this large was to identify "circumstantial leads" that could be used by OpSec to conduct additional analysis. Ex. 183 at 83:1-19.

170.    The analysis for the True the Vote project was limited to providing "circumstantial evidence" at a "macro-level" regarding whether cell phones were in proximity (meaning within a buffer) to both a non-profit address and a ballot drop box. Ex. 183 at 56:15-57:18.

171.    Analyzing cell phone data indicating whether a device appeared within a designated "buffer zone" cannot prove a person actually visited an organization or went to a drop box. Ex. 183 at 57:13-18, 81:7-11, 96:6-22, 119:8-13; Ex. 185 at 54:8-55:7.

172.    Red Metrics used commercially-available cell phone geolocation data for its analysis, which can be inaccurate due to issues with the calibration of each device's GPS, environmental interference, and pooling of "sinks" that cause false signals. Ex. 183 at 55:11-25; Ex. 185 at 34:22-35:11.

173.    Cell phone signals do not continuously emit geolocation signals; they send out signals intermittently. Ex. 2 at 20:34, 30:26; Ex. 185 at 67:12-20.

174.    Using a buffer of a few hundred feet made it "very common" to see a device show up in the buffer zone for a drop box more than once because drop boxes were "typical[ly]" located in public spaces such as libraries, offices, city buildings, malls, and similar locations, where people would be expected to come and go. Ex. 183 at 72:8-15; Ex. 185 at 57:13-23.

175.   Red Metrics' analysis did not account for false positives based on the proximity of a geofenced drop box or non-profit address to unrelated locations. Ex. 183 at 120:10-25.

176.   For example, because some of the non-profit addresses were on a particular floor of a multi-floor building, Red Metrics' analysis of that address could not account for the fact that an individual cell phone may have been located on a different floor of the same building but within the same large buffer zone. Ex. 183 at 75:9-25; Ex. 184.

177.   D'Souza was also told by Phillips and Engelbrecht that geotracking could trace a phone to a particular address, but the data could not "take you to an organization by itself." Ex. 14 at 349:5-350:13.

178.   Due to the inaccuracy of cell phone data and the limitations of using buffer zones to analyze that data, the geotracking analysis conducted by Red Metrics for OpSec could not substantiate the claims made in the Film and Book that mules picked up fraudulent ballots from non-profits and then deposited them into multiple drop boxes. Ex. 183 at 119:5-120:25; Ex. 185 at 34:5-35:1.

179.   Red Metrics communicated to Phillips that its geotracking analysis had limitations, including that it could not distinguish between true and false positives based on a geofenced location's proximity to unrelated locations. Ex. 182 at 62:9-11, 63:21-66:6, 76:18-21, 80:2-4.

180.   Red Metrics used a communications and project management platform called Wire to store documents and communications related to the True the Vote project.  Ex. 183 at 18:18-23:1; Ex. 185 at 20:22-21:3.  Red Metrics exclusively used Wire to communicate in writing with Phillips about the TTV project and to deliver the approximately ten slide deck deliverables.  Ex. 183 at 18:18-23:1, 59:16-60:14; Ex. 184.

181.   Red Metrics' copy of the TTV Wire workspace was "purged" after the TTV engagement concluded, sometime in the "second or third quarter" of 2022. Ex. 183 at 21:7-17, 111:24-112:2.

182.   Since October 3, 2022, TTV Defendants have not had in their possession any documents or communications sent or received on the TTV Wire workspace.  Ex. 186 at Interrogatory Responses 15 and 16; Ex. 187.

183.   The Film and Book describe geotracking analyses that were not prepared by Red Metrics.  *See* Ex. 183 at 85:7-18, 87:3-16, 92:3-93:10, 99:10-100:19, 101:3-102:15.

184.   Other than the analyses prepared by Red Metrics, neither TTV Defendants nor any contractor working on their behalf conducted any additional geotracking analyses that support the Film or Book.  Ex. 12 at 81:17-82:17, 84:24-85:19, 169:10-14; Ex. 186 at Interrogatory Responses 15 and 16.

185.   Phillips also asked Red Metrics to review surveillance footage to identify whether anything was "suspect," and to attempt to match the surveillance footage with the geotracking analysis. Ex. 183 at 37:16-21, 38:7-8, 38:10-12; Ex. 182 at 84:22-85:4, 87:13-15; Ex. 12 at 75:13-76:3.

186.   Phillips sent Red Metrics hard drives containing video files of surveillance footage from drop box locations that he obtained from TTV, which TTV had obtained through open records requests it submitted to election officials in various Georgia counties. Ex. 12 at 75:6-12; Ex. 183 at 23:6-24:8; Ex. 18 at 142:1-13, 350:4-12; Ex. 188.

187.   Red Metrics hired two subcontractors whose only task was reviewing the surveillance video. Ex. 183 at 35:25-36:7, 39:16-20.

188.   These subcontractors had no specialized training since the review of surveillance video only involved "looking at footage to see if there was anything that looked suspect." Ex. 183 at 37:8-21.

189.   Red Metrics never completed the review of the footage because they "hit a wall" on their ability to conduct the work and communicated that to OpSec. Ex. 183 at 35:15-24.

190.   Red Metrics never matched any surveillance footage with the geotracking analysis they conducted because "the ability to match that up was

negligible, was nonexistent." Ex. 183 at 38:10-39:14 ("Running the mobile data against the video, it didn't line up."), 99:24-100:5, 102:5-15.

191.   Red Metrics communicated to OpSec that they never matched their geolocation analysis with any of the surveillance footage of voters provided by OpSec to review.  Ex. 183 at 140:25-142:13.

192.   At the time Red Metrics' analysis was done, TTV did not have any video from Gwinnett County and it was not a part of any review conducted by Red Metrics.  Ex. 18 at 116:12-15.

193.   Engelbrecht knew that surveillance footage from Gwinnett County was never matched to any geotracking analysis by any Defendant or any of their agents.  Ex. 18 at 116:16-21, 190:11-17; Ex. 9.

194.   Phillips also asked Red Metrics to look for correlation between cell phone data and locations of violent riots using data obtained from ACLED. Ex. 183 at 50:23-24, 52:15-18, 153:17-154:2.

195.   ACLED is an organization that tracks "a range of violent and non-violent actions by political agents" around the world and makes such data available to the public through the ACLED website.  Ex. 189; Ex. 12 at 205:4-7.

196.   Phillips claims in the Film, "There's an organization that tracks the device IDs across all violent protests around the world. We took a look at our 242

mules in Atlanta, and sure enough, dozens and dozens and dozens of our mules show up on the ACLED databases." Ex. 2 at 28:10.

197. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ Ex. 190, ACLED Dep. Tr. at 100:8-101:7; Ex. 145.

198. Phillips knew that ACLED did not track device IDs. Ex. 12 at 206:16-22.

199. Phillips made it clear to D'Souza that TTV was not using cell phone data from ACLED. Ex. 12 at 210:9-14.

200. D'Souza researched ACLED by going on the ACLED website and searching and reading the articles he could find about ACLED, including an NPR article after the film's release that quoted an ACLED representative saying that ACLED does not track cell phone IDs. Ex. 14 at 247:1-24; Ex. 191.

201. In his role as the creator and producer of the film, D'Souza was expected to "create the movie and research it," and he was "relied on" to fact check the data provided by TTV. Ex. 192, Salem Dep. Tr. at 36:8-37:9, 133:9-16.

202. During the making of the film, D'Souza Defendants knew they lacked video evidence to support the Film's claims. Ex. 193; Ex. 194; Ex. 195; Ex. 196.

203.    Upon reviewing an initial version of the Film, a Salem representative wrote in an e-mail to D'Souza, Nathan Frankowski (the Film editor), and Bruce Schooley (D'Souza Media business partner, writer and visual effects editor on 2000 Mules) that the Film did not show "enough evidence of wrongdoing" and made suggestions including, "show[ing] the same person visiting multiple drop boxes." Frankowski told D'Souza and Schooley, "There is no video of a mule at multi locations." Ex. 193.

204.    Schooley emailed Engelbrecht and Phillips that the videos provided by TTV show "individuals doing one drop with what appears to be one ballot. At this point they are just using the drop box to vote. Nothing illegal." Schooley then asked, "Do you have video of multiple drops by the same person (and/or) multiple ballots (and/or) evidence they are out of state?" Ex. 194.

205.    D'Souza texted Phillips and Engelbrecht a post on X that says there is no video of the same person going to different drop boxes and then says in the text, "If you have geotracking and the boxes had surveillance, where's the video?" Ex. 197.

206.    Schooley emailed Frankowski and the D'Souzas, "My problem so far . . . This just looks like people dropping off their votes. It never to me looks like multiple ballots. I asked Gregg [Phillips] in first meeting if he had obvious multi ballot handfuls and I still don't see any." He further noted that "if we don't have a

handful then we need the same person multiple times. We track them with geo and show them dump each time. It would be very strong visually and it would be actual EVIDENCE OF ILLEGAL VOTING." Ex. 198.

207.  Ex. 199.

208.   Debbie D'Souza texted Phillips and Engelbrecht that Frankowski picked "innocuous" footage and wrote, "I think the key is to have one person in multiple locations like what you showed us." Ex. 200.

209.   Debbie D'Souza texted D'Souza, "Had Catherine and Gregg provided more footage and the knowledge of the organizations we would have made a solid proof movie with no holes." Ex. 201.

210.   D'Souza testified that he was concerned that he could not find a video of anyone going to more than one drop box and that he "raised that concern" during the film-making process. Ex. 14 at 157:25-158:4; Ex. 202.

211. D'Souza asked TTV for video of the same person visiting multiple drop boxes but never received any. Ex. 14 at 139:12-16, 140:15-24, 155:7-156:5; Ex. 193; Ex. 202.

212. D'Souza admitted on his podcast that neither he nor TTV has released any footage of a "mule" visiting multiple drop boxes. Ex. 203.

213. D'Souza also did not investigate the non-profits that TTV had claimed were involved in the ballot harvesting scheme. Ex. 14 at 177:5-20, 350:20-351:8.

214. D'Souza Defendants wanted to send an investigator to Atlanta to gather information about what non-profits were supplying the ballots, but they never did. Ex. 21 at 58:3-14; Ex. 22 at 31:12-15; Ex. 14 at 128:17-129:12; Ex. 204.

215. D'Souza never located any "reluctant" "mules," i.e. "whistleblowers" or people who were approached, but declined to participate, as mules. Ex. 14 at 118:15-120:2; Ex. 204.

216. According to D'Souza, he could not check the geotracking data or investigate it further because TTV possessed the data and never provided it to him. Ex. 14 at 128:17-130:20; Ex. 204

217. D'Souza never visited OpSec's computer lab or office, and he never met any of the analysts whom Phillips said he had hired to work on the project. Ex. 14 at 48:14-50:8.

218.   The filmmakers did not know how to receive, read, or interpret the data: "[W]e had no capacity to take that amount of data and to analyze it to confirm [TTV's] research." Ex. 22 at 52:23-24.

219.   D'Souza Defendants and their agents never saw the geotracking data that TTV claimed it had; Schooley asked Phillips if he had the data, and Phillips put "two massive boxes" on a table, but the filmmakers never asked Phillips to open them up. Ex. 22 at 17:21-22, 28:22-29:13, 30:23-24.

220.    Ex. 15 at 209:24-210:19; Ex. 14 at 40:21-44:15; Ex. 23 at Interrogatory Response 4.

221.   On June 6, 2022, a Salem employee forwarded to D'Souza an e-mail from the company's executive chairman, who watched the movie and saw "no evidence remotely close to throwing the election into doubt . . . I'm not remotely persuaded that Dinesh proved a thing." Ex. 205.

222.    Ex. 206 at TPNF-0000881-884, Ex. 14 at 38:18-39:8; Ex. 24 at Interrogatory Response 14.

223. D'Souza did not ask anyone to review the technical aspects of what TTV did, and did not conduct any third-party vetting of TTV's findings. Ex. 14 at 40:14-17, 79:2-12.

224. D'Souza had no evidence that any "mules" were paid beyond speculation that some "mules" took photos of drop boxes. Ex. 14 at 37:11-14; 175:10-14; Ex. 15 at 179:17-20.

225. The Film was, as D'Souza testified, "a journalistic operation making a documentary film," and it was "documenting something that happened in the past, in this case, let's say, research that True the Vote did over the past, let's say, year." Ex. 14 at 46:7-13, 123:23-24.

226. TTV Defendants knew that "the posting of Plaintiff's image, much less an unblurred image of Plaintiff," created "liability for deciding to publicly identify an individual accused of any form of election fraud." Ex. 207 at Interrogatory Response 6.

227. D'Souza understood that simply blurring a person's face did not permit him to say false things about the person. Ex. 14 at 125:4-126:10.

228. TTV Defendants had the opportunity to correct the Film's mischaracterizations about Plaintiff and the geotracking research, but failed to do so. Ex. 18 at 170:6-171:20, 211:14-212:5; Ex. 27; Ex. 14 at 47:17-48:13; Ex. 25; Ex. 26; Ex. 22 at 97:21-98:18; Ex. 15 at 98:21-99:17.

229. Red Metrics was never consulted about the Film or its characterization of Red Metrics' geotracking analysis. Ex. 183 at 85:23-86:2, 89:11-17.

230. ████████████████████████████████████████
████████████████████████████████ Ex. 208.

231. ████████████████████████████████████.
Ex. 209; Ex. 210; Ex. 211.

232. ████████████████████████████████████████
████████. Ex. 212; Ex. 213; Ex. 214.

233. D'Souza Media licensed hundreds of private Film screenings, reaping about $25,000 in total revenue through license fees at a cost of $5 per person per screening. Ex. 15 at 169:7-170:12; Ex. 215.

234. ████████████████████████████████████.
Ex. 216.

235. Defendants sought to maximize the Film's audience. Ex. 14 at 88:7-11, 207:13-208:22.

236. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████. Ex. 217.

237. ███████████████████████████████

███████████ Ex. 20.

238. ██████████████████████████████

███████████████████████████████████

███████████ Ex. 218; Ex. 18 at 152:21-154:3; Ex. 90.

239. ███████████████████████████████

Ex. 219; Ex. 220; Ex. 221; Ex. 222; Ex. 223.

240.   TTV paid OpSec, which is solely owned by Defendant Gregg Phillips,

██████ for the "Geospatial Data Analysis Project" that led to the Film.  Ex. 224.

241. ████████████████████████████████

Ex. 16; Ex. 27; Ex. 225.

242.   D'Souza Defendants assisted TTV Defendants in additional

fundraising.  For example, two friends of D'Souza's gave ██████ to TTV, and in

summer 2022, the D'Souzas introduced them to additional donors.  Ex. 15 at

68:22-70:24.

243.   The Film was Defendants' effort to "prove" what they had already

suspected about election fraud resulting in President Biden's victory.  Ex. 14 at

75:12-76:8; Ex. 22 at 59:17-60:15; Ex. 226; Ex. 18 at 40:9-23, 41:15-44:13;

Ex. 182 at 68:13-69:4; Ex. 224; Ex. 15 at 38:9-39:18.

244.    Before any geotracking analysis was undertaken, TTV Defendants believed that the drop boxes used during the 2020 election were not properly monitored. Ex. 18 at 41:15-44:19.

245.    This concern about drop boxes was a basis for TTV's geolocation project, the objective of which was to "[l]everage historic and near real time behavioral mobility data to assist True the Vote in analyzing possible election process subversion in the form of ballot harvesting," that was later conducted by Red Metrics.  Ex. 18 at 40:9-23, 41:15-44:13, 44:11-22; Ex. 224.

246.    Phillips stated to Red Metrics in initial conversations, before Red Metrics or anyone else had done any geotracking analysis, that he believed that there was election fraud and that his "working theory" was that "there was any crossover between folks affiliated with a set of non-profit organizations and any number of drop boxes in and around Georgia."  Ex. 182 at 26:14-27:25, 57:24-58:6, 68:13-69:4; Ex. 183 at 26:4-9.

247.    Debbie D'Souza testified that she had wanted to make a movie about election fraud since before the 2020 election.  Ex. 15 at 38:9-39:18.

248.    Bruce Schooley wrote to the filmmaking team that the surveillance video footage "doesn't convince me and I want it to be true."  He testified that what he "want[ed] [] to be true" was that Trump lost because of voter fraud. Ex. 22 at 59:17-60:15; Ex. 226.

249.   D'Souza testified that he was intrigued by the "widespread ruminations about election fraud in a variety of angles" and was interested in TTV's proposal for a way to "solve this who-done-it." Ex. 14 at 75:12-76:8.

250.   TTV Defendants sought to use the Film to further the campaign of U.S. Senate candidate David Perdue in Georgia, because, as Engelbrecht texted other Defendants, "Perdue needs our evidence out there in order for his campaign to have a chance." Ex. 227.  Englebrecht conferred with D'Souza about what information relating to the Film they could provide to the Perdue campaign before the Film's release.  Ex. 130 at DD_000098.

251.   Engelbrecht was also in touch with Donald Trump's attorneys about how information relating to the Film could assist them.  Ex. 228; Ex. 18 at 259:23-260:18.

252.   The Trailer was released at a Trump rally in coordination with Defendants.  Ex. 229.

253.   Prior to the release of the Film, Defendants provided Donald Trump with a version of the Film to view and comment on.  Schooley emailed that "It will be impossible to have a final edit before 4/17 since Trump sees it on 4/14 and he might have a note or two."  Ex. 230.

254.    Debbie D'Souza emailed Frankowski, Schooley, and Dinesh D'Souza on April 21, 2022, stating, "Trump loves the new cut! He's asking to release trailer at his Ohio rally on Saturday."  Ex. 231.

255.    On May 31, 2024, Salem issued press release stating in part:  "We apologize for the hurt the inclusion of Mr. Andrews' image in the movie, book, and promotional materials have caused Mr. Andrews and his family. We have removed the film from Salem's platforms, and there will be no future distribution of the film or the book by Salem."  Ex. 232.

Dated: December 20, 2024                    Respectfully submitted,


By: */s/Von A. DuBose*

Von A. DuBose, Esq.
Georgia Bar No. 231451
DuBose Trial Law
128 Richardson St. SE
Atlanta, GA 30312
Tel: (404) 720-8111
von@dubosetrial.com

Sara Chimene-Weiss*
PROTECT DEMOCRACY PROJECT
7000 N. 16th Street, Suite 120, #430
Phoenix, AZ 85020
Tel: (202) 934-4237
sara.chimene-weiss@protectdemocracy.org

Rachel E. Goodman*
John Paredes*
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
rachel.goodman@protectdemocracy.org
john.parades@protectdemocracy.org

Jared Fletcher Davidson*
PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA 70117
Tel: (202) 579-4582
jared.davidson@protectdemocracy.org

Jane Bentrott*
Catherine Chen*
PROTECT DEMOCRACY PROJECT

2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Tel: 202-843-3092
jane.bentrott@protectdemocracy.org
catherine.chen@protectdemocracy.org

Lea Haber Kuck*
Quinn Balliett*
Scott Boisvert*
Sonia Qin*
Danuta Egle*
One Manhattan West
New York, NY 10001-8602
Tel: (212) 735-3000
lea.kuck@probonolaw.com
quinn.balliett@probonolaw.com
scott.boisvert@probonolaw.com
sonia.qin@probonolaw.com
danuta.egle@probonolaw.com

Rajiv Madan*
Paige Braddy*
1440 New York Avenue NW
Washington, DC 20005
Tel: (202) 371-7000
raj.madan@probonolaw.com
paige.braddy@probonolaw.com

Vernon Thomas*
Lindsey Sieling*
155 N. Wacker Drive
Chicago, IL 60606-1720
Tel: (312) 407-0648
vernon.thomas@probonolaw.com
lindsey.sieling@probonolaw.com

*Counsel for Plaintiff*

*\*Admitted Pro Hac Vice*

## **RULE 7.1(D) CERTIFICATE**

The undersigned counsel certifies that this document has been prepared with

Times New Roman 14-point font in accordance with Local Rule 5.1.C.


Dated: December 20, 2024          */s/Von A. DuBose*
                                  Von A. DuBose, Esq.
                                  Georgia Bar No. 231451
                                  DuBose Trial Law
                                  128 Richardson St. SE
                                  Atlanta, GA 30312
                                  Tel: (404) 720-8111
                                  von@dubosetrial.com