# EXHIBIT 12

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION
3    MARK ANDREWS,           |
                             |
4     Plaintiff,             |
                             |        Case No.
5    V.                      |        1:22-cv-04259-SDG
                             |
6    DINESH D'SOUZA, et      |
     al.,                    |
7                            |
      Defendants.            |
8
9      *********************************************
     CONFIDENTIAL ORAL AND VIDEOTAPED DEPOSITION
10                        OF
                     GREGG PHILLIPS
11               SEPTEMBER 17, 2024
       *********************************************
12
            ORAL AND VIDEOTAPED DEPOSITION of GREGG
13   PHILLIPS, produced as a witness at the
     instance of the Plaintiff, and duly sworn,
14   was taken in the above-styled and numbered
     cause on September 17, 2024, from 9:37 a.m.
15   to 4:29 p.m., before Mendy A. Schneider, CSR,
     RPR, in and for the State of Texas, recorded
16   by machine shorthand, at the offices of
     Greenberg Traurig LLP, 1000 Louisiana,
17   Houston, Texas, pursuant to the Federal Rules
     of Civil Procedure and the provisions stated
18   on the record or attached hereto; that the
     deposition shall be read and signed.
19
20   NY 6909303
21
22
23
24
25

Page 2

1                    A P P E A R A N C E S
2

     FOR THE PLAINTIFF:
3        LEA HABER KUCK
         QUINN BALLIETT
4        SONIA QIN
         One Manhattan West
5        New York, New York 10001-8602
         lea.kuck@probonolaw.com
6

7    FOR THE DEFENDANTS TRUE THE VOTE, GREGG
     PHILLIPS, AND CATHERINE ENGELBRECHT:
8        JAKE EVANS
         GREENBERG TRAURIG LLP
9        3333 Piedmont Road NE
         Atlanta, Georgia 30305
10       678.553.2342
         Jake.Evans@gtlaw.com
11

12   FOR THE DEFENDANTS DINESH D'SOUZA AND D'SOUZA
     MEDIA:
13       AMANDA G. HYLAND
         AUSTIN C. VINING (Remote)
14       BUCHALTER
         404.832.7534
15       404.304.0039
         ahyland@buchalter.com
16

17   ALSO PRESENT:
      BOBETTE ELLIS, The Videographer
18    CATHERINE ENGELBRECHT
19
20
21
22
23
24
25

Page 3

1                 EXAMINATION INDEX
2      WITNESS:  GREGG PHILLIPS
3    EXAMINATION                              PAGE
       BY MS. KUCK                              9
4      BY MS. HYLAND                          244
5    FURTHER EXAMINATION
        BY MS. KUCK                           263
6
7    SIGNATURE REQUESTED                      273
8    REPORTER'S CERTIFICATION                 274
9                    EXHIBIT INDEX
10                                            PAGE
     PHILLIPS EXHIBIT NO. 3                    31
11    First Amended Complaint
12   PHILLIPS EXHIBIT NO. 4                    31
       Supplemental Complaint
13
     PHILLIPS EXHIBIT NO. 5                    31
14    True the Vote Defendants' Answer
     to Plaintiff's First Amended
15   Complaint and Supplemental
     Complaint
16
     PHILLIPS EXHIBIT NO. 6                    35
17    Gregg Phillips' second amended
     responses to plaintiff's first set
18   of interrogatories
19   PHILLIPS EXHIBIT NO. 7                    39
      TTV defendants' second amended
20   document responses
21   PHILLIPS EXHIBIT NO. 8                    44
       Agreement between OpSec and True
22   the Vote  for the provision of
     geospatial analysis
23
     PHILLIPS EXHIBIT NO. 9                    61
24    E-mail
25

Page 4

```
 1         EXHIBIT INDEX (CONTINUED)              PAGE
 2    PHILLIPS EXHIBIT NO. 10                      88
        Text Messages
 3
      PHILLIPS EXHIBIT NO. 1A                      90
 4      Video Clip
 5    PHILLIPS EXHIBIT NO. 1B                      91
        Video Clip
 6
      PHILLIPS EXHIBIT NO. 11                      96
 7      Text
 8    PHILLIPS EXHIBIT NO. 12                      99
        Text chain
 9
      PHILLIPS EXHIBIT NO. 13                     104
10      Text Messages
11    PHILLIPS EXHIBIT NO. 1E                     106
        Video Clip
12
      PHILLIPS EXHIBIT NO. 1C                     108
13      Video Clip
14    PHILLIPS EXHIBIT NO. 15                     124
        E-mail Chain
15
      PHILLIPS EXHIBIT NO. 16                     129
16      E-mail
17    PHILLIPS EXHIBIT NO. 17                     140
        Screenshot of Post
18
      PHILLIPS EXHIBIT NO. 18                     143
19      True the Vote Post
20    PHILLIPS EXHIBIT NO. 19                     153
        E-mail
21
      PHILLIPS EXHIBIT NO. 20                     166
22      E-mail
23    PHILLIPS EXHIBIT NO. 21                     175
        Text Message
24
      PHILLIPS EXHIBIT NO. 14                     178
25      Chat
```

Page 5

1        EXHIBIT INDEX (CONTINUED)          PAGE
2    PHILLIPS EXHIBIT NO. 22                      184
       Text Messages
3

     PHILLIPS EXHIBIT NO. 23                      191
4      E-mail and Attachment
5    PHILLIPS EXHIBIT NO. 24                      195
       E-mail chain
6

     PHILLIPS EXHIBIT NO. 25                      203
7      Text Messages
8    PHILLIPS EXHIBIT NO. 26                      213
       Form 990
9

     PHILLIPS EXHIBIT NO. 27                      216
10     E-mail
11   PHILLIPS EXHIBIT NO. 2A                      224
       Video Clip
12

     PHILLIPS EXHIBIT NO. 28                      231
13     E-mail Chain
14   PHILLIPS EXHIBIT NO. 2                       263
       Full Video of Interview
15

     PHILLIPS EXHIBIT NO. 29                      265
16     Cross Complaint
17
18        (REPORTER'S NOTE: All quotations from
     exhibits are reflected in the manner in which
19   they were read into the record and do not
     necessarily denote an exact quote from the
20   document.)
21
22
23
24
25

CONFIDENTIAL

Page 6

1           THE VIDEOGRAPHER:  We are now
2      on the record.  My name is Bobette
3      Ellis, videographer representing the
4      firm Veritext.
5           Today's date is Tuesday,
6      September twenty- -- or September 17,
7      2024.  The time is 9:37 a.m.
8           This is the deposition of Gregg
9      Phillips taken in the matter of Mark
10     Andrews versus Dinesh D'Souza, et al.
11          The court reporter today is
12     Mendy Schneider representing the firm
13     Veritext.
14          Will counsel please state their
15     appearances, after which the court
16     reporter will swear in the witness.
17          MS. KUCK:  For the plaintiff,
18     Lea Haber Kuck.
19          MS. BALLIETT:  Also from the
20     plaintiff, Quinn Balliett.
21          MS. QIN:  Also for the
22     plaintiff, Sonia Qin.
23          MR. EVANS:  Jake Evans for
24     defendants True the Vote, Gregg
25     Phillips, and Catherine Engelbrecht.

CONFIDENTIAL

Page 7

1          MS. HYLAND:  Amanda Hyland for
2      defendant Dinesh D'Souza and D'Souza
3      Media.
4          MS. KUCK:  We should also put
5      on the record that Ms. Engelbrecht is
6      also present in the room over -- over
7      plaintiff's objection.
8          So I want it on the record that
9      she is here and she is listening in
10     before her testimony tomorrow.
11         MR. EVANS:  And that's fine.  I
12     also put -- this is Jake Evans -- on
13     the record that no discussion was had
14     for plaintiff's counsel and defense
15     counsel about any objection to Mr. --
16     Ms. Engelbrecht being present.
17         I'm looking at a Bell -- a
18     link, the Co Systems [verbatim] case,
19     which is with the cite 111 -- or
20     112 F.R.D. 154.
21         The rule of sequestration does
22     not authorize exclusion of a party to
23     the case.
24         The rules of evidence apply to
25     depositions, and therefore

Page 8

1          Ms. Engelbrecht has a right to be

2          here.

3                    MS. KUCK:  Understood.

4                    And also we have listening in

5          by telephone Mr. Vining, who is also

6          for defendants.

7                    MS. HYLAND:  Yes.  Austin

8          Vining is on the phone just listening

9          and he represents Dinesh D'Souza and

10         D'Souza Media.

11                   MS. KUCK:  Okay.  Mr. Vining,

12         you're not recording this, are you?

13                   MR. VINING:  I am not recording

14         this.

15                   MS. KUCK:  Okay.  Can I have a

16         representation that you won't?

17                   MR. VINING:  I will not record

18         this.

19                   MS. KUCK:  Okay.  Thank you.

20                   Are you alone?

21                   MR. VINING:  I am alone.

22                   MS. KUCK:  Okay.  And are you

23         on a speakerphone?

24                   MR. VINING:  I have AirPods in.

25                   MS. KUCK:  Okay.  Understood.

CONFIDENTIAL

Page 9

1          Okay.
2                  GREGG PHILLIPS,
3     having been first duly sworn, testified as
4     follows:
5                  E X A M I N A T I O N
6     BY MS. KUCK:
7          Q.     Good morning, Mr. Phillips.
8          A.     Good morning.
9          Q.     My name is Lea Haber Kuck.  I
10    am one of the attorneys for Mark Andrews, who
11    is the plaintiff in this case.
12                 Could you also state your
13    current address.
14         A.     ████████████████████████████
15    ██████████████████
16         Q.     How many times have you been
17    deposed before?
18         A.     Many.  I was a commissioner in
19    Health and Human Services, and part of my job
20    was representing the department.  So...
21         Q.     Okay.  And for what state was
22    that?
23         A.     Texas and Mississippi.
24         Q.     All right.  Would you say more
25    than ten times?

CONFIDENTIAL

Page 10

```
 1            A.     Yes.
 2            Q.     More than 20?
 3            A.     I don't know.
 4            Q.     Okay.  Let's say 10 to 20.
 5                   And when -- when -- when was
 6     that?
 7            A.     Years ago.  A couple decades
 8     ago.
 9            Q.     Okay.  Have you testified in
10     any nondeposition settings?
11            A.     Yes.
12            Q.     Okay.  Can you -- can you
13     describe those for me.
14            A.     I don't have immediate recall
15     of -- of them, but, I mean, same -- same
16     scenario.
17            Q.     Okay.  Have you ever given
18     expert testimony?
19            A.     No.
20            Q.     Okay.  Has any court ever found
21     that you are not a credible witness?
22            A.     No.
23            Q.     Do you understand that you are
24     under oath today?
25            A.     Yes.
```

CONFIDENTIAL

Page 11

1          Q.      And you understand that your

2     testimony today carries the same weight as

3     your testimony before a judge or a jury?

4          A.      Yes.

5          Q.      Okay.  Is there any reason you

6     may not be able to give accurate testimony

7     today?

8          A.      No.

9          Q.      Any reason your memory might be

10     less sharp than usual today?

11          A.      A little bit older than most of

12     you is one thing, but I also have metastatic

13     bone cancer and that causes some challenges

14     occasionally.

15          Q.      Okay.  I'm sorry to hear that.

16                  And is -- does that condition

17     in any way prevent you from giving your best

18     testimony today?

19          A.      I don't know how to answer.

20     Can you rephrase it?

21          Q.      Is -- does that condition

22     prevent you from -- from testifying today to

23     the best of your abilities?

24          A.      I -- I don't know because I --

25     occasionally I get like really, really tired

 1    and kind of lose -- lose, you know, my line

 2    of thought, but I don't know if that's going

 3    to happen or not.  So...

 4          Q.    Okay.  So one of the things

 5    today was that I'll take a break every hour

 6    or so.  But if you need a break sooner than

 7    that or you feel like you're tired, we can

 8    break when you need to.

 9                And -- and if you feel that

10    you're in a condition where you can't give me

11    a complete answer, let me -- let me know and

12    we'll deal with that.

13          A.    Okay.

14          Q.    All right.  Are you under the

15    influence of any drugs or any other

16    substances that would prevent you from giving

17    your testimony today?

18          A.    No.

19          Q.    Any -- any of your cancer

20    treatments that might impair your ability to

21    give testimony?

22                And, again, I don't want to

23    breach any privacy or have you get into it.

24    If there are things, just let me know.

25          A.    Not -- not that -- not that I'm

CONFIDENTIAL

Page 13

```
 1    aware of.
 2          Q.      Okay.
 3          A.      I'll let you know --
 4          Q.      Okay.
 5          A.      -- if it changes.
 6          Q.      I appreciate that.  Thanks.
 7                  So just a few other ground
 8    rules for the rest of the day.
 9                  We -- everything we say today
10    is being recorded and transcribed by a court
11    reporter and a videographer.
12                  And you're aware of that?
13          A.      Yes.
14          Q.      For our court reporter's
15    benefit, please answer my questions verbally.
16                  For example, she can't pick up
17    a nod of your head or a shake, so just make
18    sure we have all the answers verbal.
19          A.      Yes.
20          Q.      And also for the sake of the
21    court reporter, please let's not try and talk
22    over each other.  I don't foresee that we'll
23    have that problem, but just, again, to keep
24    in mind we want to keep her life easy.
25                  And if my question is unclear,
```

Page 14

1    please let me know.  And if you don't ask me

2    to clarify, I'll assume you understood my

3    question.  Okay?

4         A.     Okay.

5         Q.     And throughout the deposition

6    your counsel may object to certain of my

7    questions.  Unless your counsel specifically

8    instructs you not to answer my question, you

9    still must answer it.

10              Do you understand that?

11        A.     Yeah.

12        Q.     And are you aware that there's

13   a protective order in this case,

14   confidentiality order?

15        A.     I am not.

16        Q.     Okay.  Did you speak with

17   anyone today about the testimony -- I'm

18   sorry.

19              Did you speak with anyone about

20   the testimony you expect to give today in

21   preparation?

22        A.     We -- I met with my lawyer and

23   I reviewed documents.

24        Q.     Okay.  And by your lawyer do

25   you mean Mr. Evans?

CONFIDENTIAL

Page 15

```
 1            A.     Yes.
 2            Q.     And how long did you prepare?
 3            A.     We had a -- maybe a four- or
 4    five-hour discussion yesterday and I --
 5                   MR. EVANS:  Don't talk about
 6        anything that we discussed.
 7    (BY MS. KUCK)
 8            Q.     I don't want to know the
 9    substance.
10            A.     I've read -- I've read
11    documents for, you know, a few weeks in
12    advance.
13            Q.     Okay.  And the documents that
14    you read a few weeks in advance, were they --
15    where did those documents come from?
16            A.     From -- from the law firm.
17            Q.     From Mr. -- Mr. Evans provided
18    you with those documents?
19            A.     Yes.
20            Q.     Did any of those documents
21    cause you to remember things that you hadn't
22    remembered before you looked at them?
23            A.     Not particularly.
24            Q.     Mr. Phillips, what do you do
25    for a living?
```

CONFIDENTIAL

Page 16

```
 1          A.      I own several businesses,
 2    mostly in the technology space.
 3          Q.      Could you list those for me.
 4          A.      CoverMe, KLOK, OpSec, and
 5    Ground Fusion.
 6          Q.      What does CoverMe do?
 7          A.      We use advanced analytics to
 8    help patients in hospitals find a pain
 9    source.
10          Q.      And what about KLOK?
11                  What does that business do?
12          A.      It is a private -- we've built
13    a privacy hub that allows people to not -- or
14    it -- it prevents people from being tracked
15    on their phone.
16          Q.      Tracked by whom?
17          A.      Anybody.
18          Q.      And when did you set up that
19    business?
20          A.      Which one are we discussing?
21          Q.      We're talking about KLOK.
22          A.      KLOK.
23                  I'm going to say a couple of
24    years ago.
25          Q.      Before or after the 2000 Mules
```

Page 17

1     film came out?

2          A.     I don't know.

3          Q.     Okay.

4          A.     Maybe slightly after.

5          Q.     And what does Ground Fusion do?

6          A.     Ground Fusion is a -- a

7     combination of a -- a large database, a

8     fusion center, that collects data from

9     various sources and several apps that access

10    that data.

11         Q.     Except for the people who

12    you've prevented from being tracked on their

13    phones in your other business.

14                Fair to say?

15                MR. EVANS:  Objection;

16         misstates testimony.  Assumes facts

17         not in evidence.

18    (BY MS. KUCK)

19         Q.     All right.  I'll strike that.

20         A.     Also not related.

21         Q.     I'll strike the question.

22                Can you describe your

23    educational background.

24         A.     I have a bachelor of science

25    degree from the University of Alabama in

CONFIDENTIAL

Page 18

1    commerce and business administration.

2         Q.     Okay.  Do you have any advanced

3    degrees?

4         A.     No.

5         Q.     The 2000 Mules film says you

6    have a deep background in election

7    intelligence.

8                What is election intelligence?

9         A.     Information relative to

10   elections.

11        Q.     Can you be more specific.

12        A.     Everything from voter roles to

13   voter history to attributes about voters.

14               The analysis of, you know,

15   elections, what happened, how they turned

16   out, how they're going.

17        Q.     Do you have any training in

18   data analytics?

19        A.     Well, I own a -- a company

20   that's -- two companies that are in the data

21   analytics business.

22        Q.     Right.

23        A.     So, yeah.

24        Q.     Right.  So what -- and that's

25   what I'm trying to get at.

CONFIDENTIAL

Page 19

```
 1              You have a B.S. generally and
 2     I'm trying to get at how you got from there
 3     into very specific data analytic business.
 4          A.     I was part of a team that
 5     Deloitte Consulting and their global
 6     outsourcing unit that built a healthcare
 7     analytics program, and that was my first
 8     introduction to it.
 9          Q.     Okay.  And when was that?
10          A.     1996.
11          Q.     Do you have any -- any cyber
12     security training?
13          A.     No.
14          Q.     Any forensics training?
15          A.     Through operations, yes.
16          Q.     What do you mean "through
17     operations"?
18          A.     Having conducted forensic
19     analysis investigations.
20          Q.     And was that also at Deloitte?
21          A.     No.  That's been throughout --
22     throughout my career in healthcare and with
23     law enforcement, with others.
24          Q.     And what -- what experience do
25     you have in law enforcement?
```

CONFIDENTIAL

Page 20

```
 1          A.      Working with federal and local
 2     jurisdictions on specific cases.
 3          Q.      All right.  And in what
 4     capacity?
 5          A.      As a -- as an analyst and
 6     consultant.
 7          Q.      And who -- what -- what law
 8     enforcement agencies have employed you?
 9          A.      Well, let's be clear about
10     employing.
11          Q.      Okay.
12          A.      We work with the FBI, but we're
13     not employed by the FBI.
14          Q.      Okay.  So in what capacity do
15     you work with the FBI?
16          A.      As a -- a -- sharing data
17     and -- and providing analysis as requested.
18          Q.      And they sometimes request your
19     analysis?
20          A.      Yes.
21          Q.      In what area?
22          A.      Mostly forensics, but --
23          Q.      Yeah, I know forensics.  But
24     what -- we've talked about healthcare.  We've
25     talked about elections.  I'm asking what
```

CONFIDENTIAL

Page 21

```
 1     area.
 2            A.      Could be murders, trafficking,
 3     all sorts of possibility.
 4            Q.      And you -- the FBI has come to
 5     you and asked you for assistance in those
 6     cases?
 7            A.      Yes.
 8            Q.      When -- when was that?
 9            A.      I -- across a period of years.
10            Q.      Okay.  When did you first start
11     working with the FBI?
12            A.      I don't recall.
13            Q.      After you left Deloitte?
14            A.      Yes.
15            Q.      What year did you leave
16     Deloitte?
17            A.      2003, I think.
18            Q.      Okay.  And then where did you
19     go after Deloitte?
20            A.      To work for Governor Perry at
21     the Health and Human Services Commission in
22     Texas.
23            Q.      All right.  How long were you
24     there?
25            A.      Couple years.
```

CONFIDENTIAL

Page 22

```
 1          Q.      Say 2003 to 2005, maybe?
 2          A.      That sounds about right.
 3          Q.      Okay.  And where did you go
 4     next?
 5          A.      Rejoined my -- my company,
 6     CoverMe.
 7          Q.      So is that -- that's when you
 8     started the company?
 9          A.      No.  The company was started in
10     1995.
11          Q.      Okay.  Before you were at
12     Deloitte?
13          A.      Right.
14          Q.      What else did you do before you
15     went to Deloitte?
16          A.      Before I went to Deloitte?
17     I've worked in politics, campaigns, parties,
18     PACs.
19                  I -- I was a trader at Merrill
20     Lynch for -- for a number of years.
21          Q.      All right.  And then so you
22     said after you left the -- the first
23     government position you went back to CoverMe.
24                  And then where did you go after
25     that?
```

CONFIDENTIAL

Page 23

1        A.      After I left the first

2    government position in '95, I started the

3    predecessors to CoverMe.

4              And then the employees ran the

5    company while I was in Texas.  And I just

6    rejoined the company after I left my -- my

7    employ with the State.

8        Q.      Okay.  You said when you were

9    in -- before '95 what did you do before you

10   set up CoverMe?

11       A.      I was in the governor's cabinet

12   in Mississippi.

13       Q.      Okay.  And then -- so you went

14   back to CoverMe for how long?

15       A.      Still there.

16       Q.      Okay.  And then did you have

17   any other positions following you rejoining?

18              Did you have any other

19   government positions?

20       A.      No.

21       Q.      When -- when were you at the

22   Health and Human Services?

23       A.      From 2003 to 2005; and in

24   Mississippi from '92 to '95.

25       Q.      Okay.  And at what point in

CONFIDENTIAL

Page 24

```
1      that chronology did you start working with

2      law enforcement?

3           A.      After 2012.

4           Q.      And how -- what happened in

5      2012?

6           A.      Nothing.

7           Q.      Oh.  How do you remember it was

8      after 2012?

9           A.      Because I was working on

10     building the CoverMe operations out.

11          Q.      Okay.

12          A.      Building our system.

13          Q.      Other than the four businesses

14     that we just talked about, CoverMe, KLOK,

15     OpSec, and Ground Fusion, are there any other

16     companies that you -- in which you currently

17     hold any position?

18          A.      No.

19          Q.      Any LLPs where you are a

20     partner?

21          A.      No.

22          Q.      A limited partner?

23          A.      No.

24          Q.      No.

25                  Any PACs that you hold a
```

CONFIDENTIAL

Page 25

1    position at?

2         A.    We've recently started a super

3    PAC.

4         Q.    What's called?

5         A.    PIT PAC, P-I-T P-A-C.

6         Q.    Okay.  And when you say "we,"

7    who are you referring to?

8         A.    Me and my partner, Catherine

9    Engelbrecht.

10        Q.    And what does that PAC do?

11        A.    Supports pro -- pro -- pro

12    freedom and pro faith candidates.

13        Q.    How much of your time is

14    devoted to that PAC work?

15        A.    It just started last week.

16        Q.    Last week?

17        A.    So little -- little to nothing

18    so far.

19        Q.    Okay.  And there -- are there

20    any other businesses that you're working with

21    Ms. Engelbrecht in?

22        A.    No.

23        Q.    Any other entities that you --

24        A.    Let me -- can you rephrase

25    the -- that question.

CONFIDENTIAL

Page 26

1          Q.      Yeah.  Yeah.

2                  Are there any other companies

3     or entities in which you are working with

4     Ms. Engelbrecht?

5          A.      CoverMe.

6          Q.      Okay.

7          A.      And KLOK.

8          Q.      And are there any LLPs, other

9     than the ones we mentioned, that you and

10    Ms. Engelbrecht have together?

11         A.      No.

12         Q.      So let's focus on OpSec.

13                 What does that company do?

14         A.      Consulting.

15         Q.      What kind of consulting?

16         A.      Election information and data

17    consulting.

18         Q.      And -- and without naming

19    specific names, generally who are its

20    clients?

21         A.      For-profits, campaigns,

22    not-for-profits.

23         Q.      And OpSec is a for-profit

24    company?

25         A.      Correct.

CONFIDENTIAL

Page 27

1          Q.      How many people does it employ?

2          A.      We employ no one.  Everything

3    is on contract.

4          Q.      Okay.  And has that always been

5    the case?

6          A.      Yes.

7          Q.      What is your relationship with

8    TTV?  True -- when I say "TTV," I'm going to

9    mean True the Vote.

10         A.      OpSec is a contract.

11         Q.      And is that currently the case?

12         A.      Yes.

13         Q.      When did OpSec first start

14   doing business with TTV?

15         A.      Summer of 2020.

16         Q.      And was that -- that first

17   project, was that the one that led to the

18   2000 Mules film?

19         A.      No.

20         Q.      What was that project?

21         A.      Working on the 2020 elections.

22         Q.      What type of work?

23         A.      Call centers and analytics

24   analysis of a variety of types.

25         Q.      And, again, that would have

CONFIDENTIAL

Page 28

```
 1      been work performed by contractors hired by
 2      OpSec, correct?
 3              A.      Yes.
 4              Q.      Because you don't have any
 5      employees?
 6              A.      Yes.
 7              Q.      And then there was also the --
 8      the geospatial project that led to the
 9      2000 Mules that you worked on with TTV,
10      right?
11              A.      Yes.
12              Q.      Were there -- have you -- have
13      OpSec done any other business with TTV?
14              A.      Any other than what?
15              Q.      Other than those two projects,
16      the 2020 project and the 2000 --
17              A.      We -- we still -- we still work
18      with them on the first one.
19              Q.      On the first one?
20              A.      Right.
21              Q.      Although now we're past the
22      2020.
23                      So now you're doing the same
24      thing for the upcoming elections?
25              A.      Yes.
```

CONFIDENTIAL

Page 29

```
 1         Q.      And did you do similar work for
 2     the midterm elections in 2022?
 3         A.      On a limited basis.  I was -- I
 4     was sick at the time.
 5         Q.      Okay.  Have you -- have you
 6     personally ever held any position at TTV?
 7         A.      No.
 8         Q.      Have you ever been on their
 9     board of directors?
10         A.      Yes.
11         Q.      When was that?
12         A.      2015 to January of 2017.
13         Q.      Have you ever been employed as
14     a researcher for TTV?
15         A.      No.
16         Q.      Other than through OpSec --
17     well, no, strike that.
18                 Do you receive any compensation
19     from TTV?
20         A.      No.
21         Q.      Have you ever?
22         A.      No.
23         Q.      Has OpSec?
24         A.      We receive payment on
25     contracts.
```

CONFIDENTIAL

Page 30

```
 1          Q.      Okay.  Okay.  Do any of your
 2    other businesses do work for TTV?
 3          A.      No.
 4          Q.      What is your relationship with
 5    Dinesh D'Souza?
 6          A.      We worked with them on the 2000
 7    Mules movie.
 8          Q.      How did you meet them -- meet
 9    him?
10          A.      I was introduced to him by
11    Ms. Engelbrecht.
12          Q.      Okay.  And had you -- so before
13    the 2000 Mules project, had you ever worked
14    with him before?
15          A.      No.
16          Q.      Did you know him before at all?
17          A.      No.
18          Q.      Are you in contact with him
19    now?
20          A.      No.
21          Q.      When was the last time you were
22    in contact with him?
23          A.      During the premiere process.  I
24    think the last premiere was in Las Vegas and
25    I saw him there.  And that was it.
```

CONFIDENTIAL

Page 31

1          Q.      So you're talking about the
2    premiere of the film in the -- in the summer
3    of 2021?
4          A.      '22.
5          Q.      '22?
6          A.      Right.
7          Q.      Have you ever -- other than on
8    the 2000 Mules project, have you ever worked
9    with Salem Media Group?
10          A.      No.
11          Q.      Are you in contact with them
12    today?
13          A.      No.
14          Q.      When was the last time you had
15    contact with anyone from there?
16          A.      I don't recall.  I would say at
17    the premiere.  I have no idea.
18          Q.      I'm going to mark as
19    Exhibits 3, 4, and 5, the first amended
20    complaint in this action, a supplemental
21    complaint, and the answer of the TTV
22    defendants.
23              So 3 will be the first amended
24    complaint.
25          (Marked Plaintiff Exhibit Nos. 3-5.)

CONFIDENTIAL

Page 32

1          MS. KUCK:  I'm just going to
2     put this here for a moment.
3          MR. EVANS:  Thank you.
4          MS. KUCK:  And I'm going to be
5     marking these plaintiff's deposition
6     exhibits, and hopefully then we will
7     not be repeating them, Jake, as we go
8     along so that --
9          MR. EVANS:  Yeah.  That's fine.
10          MS. KUCK:  -- we won't re-mark
11     everything for Ms. Engelbrecht's
12     deposition.
13          Supplemental complaint is going
14     to be -- No. 4 is the supplemental
15     complaint.
16          And then No. 5 is going to be
17     the True the Vote defendants' answer
18     to plaintiff's first amended complaint
19     and supplemental complaint.
20          MR. EVANS:  Ms. Kuck may have
21     said this, but you have an opportunity
22     to look at these documents, too,
23     before you testify.
24          THE WITNESS:  Okay.
25          (Discussion off the record.)

CONFIDENTIAL

Page 33

```
1    (BY MS. KUCK)
2         Q.    Have you ever seen these
3    documents before, Mr. Phillips?
4         A.    I can't say that I've ever seen
5    them printed out, but I believe I've seen
6    them --
7              MR. EVANS:  Just for -- yeah --
8         clarity, if we can identify which
9         documents you're referring to.
10             MS. KUCK:  I'm referring to
11        Exhibits 3, 4, and 5, which are the
12        first amended complaint filed in this
13        action, the supplemental complaint
14        filed in this action, and the True the
15        Vote defendants' answer to plaintiff's
16        first amended complaint, and
17        supplemental complaint which was filed
18        in this action.
19             And I understand that these are
20        thick documents and I've just given
21        them to you.
22   (BY MS. KUCK)
23        Q.    But do you recall seeing a
24   complaint filed in this action?
25        A.    Yes.
```

CONFIDENTIAL

Page 34

1          Q.      Okay.  And there was an answer
2     filed on behalf of you, TTV, and
3     Ms. Engelbrecht, correct?
4          A.      Yes.
5          Q.      Did you authorize your lawyers
6     to file that on your behalf?
7          A.      Yes.
8          Q.      Okay.  And did you review it
9     before it was filed?
10         A.      Yes.
11         Q.      And without giving me any
12     substance of the discussions, did you discuss
13     the allegations in the complaint and your
14     responses with your counsel before the answer
15     was filed on your behalf?
16               Again, it's a yes or no.  I
17     don't want to know what the substance was.
18         A.      No.
19         Q.      You didn't have any discussions
20     with them?
21         A.      I don't recall.
22         Q.      I want to mark --
23         A.      Can I re- --
24         Q.      Sure.  Absolutely.
25         A.      I actually think we did have a

CONFIDENTIAL

Page 35

1    conversation about that, but I don't recall

2    when or the substance.

3                    MR. EVANS:  And you can't give

4         any substance to the conversation.

5         A.      Yeah.  I can't --

6    (BY MS. KUCK)

7         Q.      Right.

8         A.      Yeah, I can't remember.

9         Q.      You believe you may have but

10   you can't remember?

11        A.      Right.

12        Q.      Okay.  And I want to mark as

13   Exhibit 6 the -- the interrogatories.

14        (Marked Phillips Exhibit No. 6.)

15   (BY MS. KUCK)

16        Q.      I want to mark as plaintiff's

17   deposition Exhibit 6 the Gregg Phillips'

18   second amended responses to plaintiff's first

19   set of interrogatories.

20                MS. KUCK:  As you promised.

21   (BY MS. KUCK)

22        Q.      Mr. Phillips, have you seen

23   this document before?

24        A.      Yes.

25        Q.      And if you look on the --

CONFIDENTIAL

```
                                                 Page 36

 1             A.      Are you talking about 6?

 2             Q.      6, yes.  Mr. -- it's your

 3       amended responses to the interrogatories.

 4             A.      Yes.

 5             Q.      Okay.  And if you look at the

 6       last page, second-to-last page, is that

 7       your -- your signature?

 8             A.      Yes.

 9             Q.      Okay.  And you understood that

10       you verified these interrogatories and stated

11       they were best -- they were true and correct

12       to the best of your knowledge, information,

13       and belief, right?

14             A.      Yes.

15             Q.      And did you provide the

16       information reflected in these responses to

17       your attorneys?

18             A.      I'm sure, some of it.  It's a

19       big document, so I don't know.

20             Q.      Did you review it before you

21       signed it?

22             A.      Yes.

23             Q.      And you assured yourself that

24       everything in there was accurate?

25             A.      Yes.
```

1        Q.      Were you asked to search for
2    documents in connection with this matter?
3        A.      Yes.
4        Q.      And what steps did you take?
5        A.      I provided access to my -- all
6    my accounts to my counsel.
7        Q.      When you say "all your
8    accounts," what that are you referring to?
9        A.      E-mail.
10       Q.      Anything else?
11       A.      Whatever is -- yeah.
12       Q.      Were OpSec's files searched?
13       A.      As it relates to me, yes.
14       Q.      I don't know what you mean as
15    it relates to you.
16       A.      Well, this is me personally,
17    so...
18       Q.      Right.  So what I'm saying is,
19    though, when you were -- when you were asked
20    to provide documents to your -- I assume you
21    provided the documents to your attorneys to
22    look through them.
23       A.      Yes.
24       Q.      Did you provide any documents
25    you had from OpSec's files or are those kept

```
 1    separately and you didn't access those?
 2          A.     No, they would have had access
 3    to everything.
 4          Q.     Okay.  Do any of your e-mail
 5    accounts autodelete?
 6          A.     I have no idea.
 7          Q.     Okay.  Do you know if you have
 8    any -- your text autodelete?
 9          A.     I don't know.
10          Q.     Did you provide any text
11    messages that you have?
12                 Did you provide access to
13    your -- to your counsel to review those?
14          A.     Yes.
15          Q.     Did you provide them with
16    information from your social media accounts?
17          A.     I think we did, yes.
18          Q.     Okay.  And did you provide them
19    with access to information from Open.Ink,
20    Open.Ink?
21          A.     If -- yes.
22          Q.     And once this lawsuit was
23    filed, did you take any steps to preserve any
24    documents, e-mails, texts, information?
25          A.     I did as instructed by our
```

CONFIDENTIAL

Page 39

1    attorneys.

2            Q.        Did your attorneys instruct

3    you --

4                    MR. EVANS:  Objection.  Any

5            communications between counsel are

6            privileged.

7    (BY MS. KUCK)

8            Q.        Okay.  So let me just ask you

9    what steps.  I know you said it's -- don't

10   tell me what your attorney said.  Just tell

11   me what you did.

12           A.        I don't recall.  It's been a

13   while.

14           Q.        Are you aware of any documents

15   that would have been called for in this case

16   but have since been destroyed?

17           A.        No.

18           Q.        Just so we have everything

19   marked in case we need it, I'm going to mark

20   as Plaintiff's Deposition 7 the TTV

21   defendants' second amended document

22   responses.

23           (Marked Plaintiff Exhibit No. 7.)

24   (BY MS. KUCK)

25           Q.        You can set that aside for a

Page 40

1    moment.  I just want to have it ready to go

2    in case we need it.

3            A.    So we're still on 6?

4            Q.    I'm not -- you can set them all

5    aside for the moment.

6            A.    Oh.

7            Q.    As you know, we are -- we're

8    here today to discuss the film 2000 Mules,

9    which alleges that fraud occurred in the 2020

10   presidential election.

11               Can you tell me where the

12   number 2000 comes from?  The 2000 Mules?

13   Tell --

14           A.    I had nothing to do with the

15   naming of the movie.

16           Q.    Okay.  And you have no idea

17   where -- where the name came from?

18           A.    No.  We had no -- we had no

19   editorial control over the movie.

20           Q.    And you never discussed with

21   Mr. D'Souza where the name 2000 Mules came

22   from?

23           A.    No.

24           Q.    Do you have an understanding of

25   what it meant?

```
                                        Page 41
 1          A.      No.
 2          Q.      You have no understanding?
 3                  MR. EVANS:  Objection; asked
 4          and answered.
 5     (BY MS. KUCK)
 6          Q.      Okay.  The research that you
 7     did to the -- in connection with the -- well,
 8     strike that.
 9                  The research that you did that
10     led to the making of the film, did you
11     identify people that you called -- that you
12     labeled mules?
13                  MR. EVANS:  And one second.
14                  Objection; mischaracterizes
15          evidence.  Assumes facts not in
16          evidence.
17                  Okay.
18                  MS. KUCK:  Well, I'm trying to
19          get the facts and the evidence, so...
20                  MR. EVANS:  Well, then, don't
21          characterize the beginning of the
22          question.  Just ask the question.
23     (BY MS. KUCK)
24          Q.      Let's start over.
25                  You did -- you performed
```

CONFIDENTIAL

Page 42

1    certain geospatial data analysis that led to

2    or that -- strike that.

3              You worked on certain

4    geospatial data analysis that was used in the

5    film 2000 Mules, correct?

6         A.    Yes, but it has nothing to do

7    with this case.

8         Q.    That's not my question.

9              My question is:  Is that

10   correct?

11        A.    Yes.

12        Q.    Okay.  And in the course of

13   that research, did you identify people who

14   you referred to as mules?

15        A.    No.

16        Q.    Did you -- in the context of

17   the film, so that we're on the same page, how

18   do you define mule in that context?

19        A.    Mule broadly in our -- in the

20   context was someone that was improperly

21   making -- placing ballots in drop boxes.

22        Q.    Okay.  And when you say

23   "improperly," what do you mean?

24        A.    Breaking a rule, a process, a

25   law, et cetera.

CONFIDENTIAL

Page 43

1          Q.      Did you have certain criteria
2     that you used to determine whether somebody
3     was a mule?
4          A.      I don't understand the
5     question.
6          Q.      You didn't -- did you classify
7     certain individuals -- I'm not saying by
8     name, but did you classify certain people as
9     mules?
10         A.      What do you mean by "classify"?
11         Q.      Did you call them mules?
12         A.      Well, we didn't.  I mean, that
13    was all related to the movie.  That had
14    nothing to do with our analysis.  Our
15    analysis were very limited.
16              We were to provide some video
17    and some limited analysis to Dinesh.  We had
18    nothing to do with the production or the
19    names or anything.
20         Q.      Have you ever used the term
21    "mule"?
22         A.      Ever?  Sure.
23         Q.      Okay.  And in the context of
24    election intelligence, have you used the term
25    "mule"?

CONFIDENTIAL

Page 44

1          A.      Yes, but not related to the

2    movie.

3          Q.      You never used the term "mule"

4    in connection with the movie?

5          A.      I said not related to the

6    movie.  You said "connected."  I don't even

7    understand your question.

8          Q.      Okay.  So let's -- let's do

9    this.

10          A.      So have I ever said the word

11    "mule"?  Yes.

12                MR. EVANS:  Hold on.  Wait

13          until a question is pending.

14    (BY MS. KUCK)

15          Q.      Let's go with...

16                MS. KUCK:  Can you give me

17          DD 0073.

18          (Discussion off the record.)

19                MS. KUCK:  Let me mark as

20          Plaintiff's Deposition Exhibit No. 8,

21          a multiple-page document bearing

22          control numbers TTV_009901 through

23          9906.

24          (Marked Plaintiff Exhibit No. 8.)

25

CONFIDENTIAL

Page 45

1    (BY MS. KUCK)

2         Q.      Do you recognize this document?

3         A.      Yes.

4         Q.      Okay.  What is it?

5         A.      It's an agreement between OpSec

6    and True the Vote for the provision of

7    geospatial analysis.

8         Q.      And what prompted the -- what

9    prompted this -- this data -- the geospatial

10   data analysis project?

11               Where did the idea come from?

12        A.      I -- it's two questions.

13        Q.      Okay.

14        A.      Can --

15        Q.      Where did the idea for this

16   project come from?

17        A.      True the Vote and -- or

18   Catherine Engelbrecht and I discussed and

19   decided it was an appropriate thing to do

20   given the public's interest in the election

21   results.

22        Q.      When did it begin?

23        A.      It says here it was dated 12/1

24   of 2020.

25        Q.      Okay.  And is that consistent

CONFIDENTIAL

Page 46

1       with your recollection of when it started?

2                A.        I don't have any recollection.

3                Q.        All right.  The -- the proposal

4       provides that OpSec is to be paid ████████

5       for this project up front.

6                          Did -- do you see that?

7                A.        Yes.

8                Q.        Okay.  And -- and did TTV pay

9       OpSec?

10               A.        Yes.

11               Q.        At the time the agreement was

12      executed?

13               A.        I don't recall.

14               Q.        But you know they paid it?

15               A.        Yes.

16               Q.        And it says that the -- in

17      the -- the top, the objective is to analyze

18      historic and near real-time behavioral

19      mobility data to assist True the Vote in

20      analyzing possible election process diversion

21      in the form of ballot harvesting in the

22      following states.

23                          And then it says GA, which I

24      take to mean Georgia; AZ, which I understand

25      to mean Arizona; TX, which I understand to be

```
                                        Page 47
 1      Texas; PA, which I would understand to mean
 2      Pennsylvania; MI, Michigan; and WI,
 3      Wisconsin.
 4                  Do you see that?
 5           A.     Yes.
 6           Q.     Okay.  And did I get the states
 7      right?
 8           A.     Yes.
 9           Q.     And how were those states
10      chosen?
11           A.     I don't recall.
12           Q.     Who chose them?
13           A.     Me and -- and Ms. Engelbrecht.
14           Q.     Okay.  And you don't -- you
15      have no recollection as to why you chose
16      those states?
17                  MR. EVANS:  Objection; asked
18           and answered.
19      (BY MS. KUCK)
20           Q.     You can answer.
21                  You have no recollection as to
22      how the states were chosen?
23           A.     No.  No.  Sorry.
24           Q.     Okay.  And did you
25      ultimately -- did OpSec ultimately complete
```

1    its analysis for all of these states?

2        A.    Yes, with the exception of --

3    if you'll look down, it actually breaks down

4    actual cities.

5        Q.    Right.

6        A.    And the answer to that question

7    is yes as it relates to those.

8              As it relates to the entire

9    states, the answer is no.

10             So I'm not sure what your

11   question is.

12       Q.    Okay.  So you did -- you

13   completed your analysis for the cities that

14   are listed in Paragraph 1?

15       A.    Yes.

16       Q.    And it also talks about

17   suspected ballot harvesting organizations.

18             Do you see that?

19       A.    No.  Where is it?

20       Q.    One -- Paragraph 1.2.  In bold

21   it says:  "Geofence suspected ballot

22   harvesting organizations."

23       A.    Yes, I see that.

24       Q.    Okay.  Who chose those

25   organizations?

CONFIDENTIAL

1          A.     I don't recall.  I know there
2     were a bunch of people reporting a bunch of
3     things to us, so I'm sure it came from
4     citizen reports.
5          Q.     Okay.  Can you identify any of
6     the ballot harvesting organizations that's --
7     that are referred to there?
8          A.     No.  We didn't identify -- we
9     didn't identify -- in our analysis we didn't
10    identify any people or specific
11    organizations.
12         Q.     Then how did you geofence them?
13                It says:  "Geofence suspected
14    ballot harvesting organizations."
15         A.     That's not what you asked.
16                You asked me did -- how did we
17    identify them.
18                They would have been identified
19    by the fact that they showed up in the
20    geospatial analysis.  We didn't identify them
21    first.
22         Q.     I guess I'm having a sort of
23    chicken-and-egg problem.
24                So explain that for me.
25                How did you -- how did you know

1    where to put your geofence?

2         A.      Well, we had been provided,

3    from citizens or whomever, various things to

4    look at.  But that's not what -- that's not a

5    complete view of what one would do in a -- in

6    an analysis like that.

7         Q.      Okay.

8         A.      I mean, you -- you look at the

9    data as the base, not the targets as the

10    base.

11         Q.      You looked at the data as the

12    base.

13              And then how did the data show

14    you which were suspected ballot harvesting

15    organizations?

16         A.      The -- the voters or the -- the

17    IMEI codes, the phones that were identified

18    being near drop boxes were also identified

19    being near certain other locations.

20         Q.      Okay.  And then you researched

21    to see if those locations had organizations

22    there that might participate in ballot

23    harvesting?

24         A.      Eventually we would have gotten

25    to that, but not in the beginning.

CONFIDENTIAL

Page 51

1         Q.      Okay.  And you -- you did not
2    in any way use any of the -- well, strike
3    that.
4              So in coming up with which
5    organizations were suspected of ballot
6    harvesting and you drew a geofence around
7    them, did you incorporate any of the other
8    tips you were getting or was it solely on the
9    data?
10        A.      It likely would have been
11   solely on the data.
12        Q.      And who -- who at OpSec --
13   well, strike that.
14              Both Paragraphs 1 and 2 say
15   that OpSec group -- the first one says:
16   "...will build a mobile device behaviorable
17   database."
18              Who at the OpSec group was
19   involved in building that database?
20        A.      A number of our contractors,
21   including Red Metrics.
22        Q.      Okay.  What other ones?
23        A.      I do not recall.
24        Q.      You have no recollection?
25        A.      I don't.

CONFIDENTIAL

Page 52

```
 1          Q.      Did you pay those contractors?
 2          A.      If -- sometimes we did.
 3     Sometimes we don't.  I mean, some of it is
 4     pro bono work.  You guys know that.
 5          Q.      And I assume at some point you
 6     must have had communications with those
 7     contractors?
 8          A.      Our -- our communications
 9     are -- are internally and generally not
10     written.  Mostly spoken.
11          Q.      So you would call a contractor
12     and say do this and then they would call you
13     back and give you the results.
14               Is that what you're saying?
15          A.      That's a -- that's a terrible
16     oversimplification for our work, but if you
17     want to say it that way, it's fine.
18          Q.      Well, I'm trying to get at
19     how -- so you communicate -- did you
20     communicate with these contractors only
21     orally?
22          A.      Mostly, yes.
23          Q.      Did they -- any -- Red Metrics,
24     for example, did they send you invoices?
25          A.      I don't recall.  Probably not.
```

CONFIDENTIAL

Page 53

1          Q.     Okay.  Did you pay them?

2          A.     Yes.

3          Q.     How did you pay them?

4          A.     Via wire.

5          Q.     Okay.  Do you have records of

6    those payments?

7          A.     Do I have records today of

8    those payments?  No.

9          Q.     What happened to the records?

10         A.     I wouldn't -- I wouldn't have

11   kept the records.  Why would I keep them?

12         Q.     Taxes.  Financial statement?

13              MR. EVANS:  There's no question

14         pending.

15   (BY MS. KUCK)

16         Q.     Your position is you have

17   absolutely no records today of your

18   communications with any of these contractors.

19   Is that correct?

20              MR. EVANS:  Objection;

21         misstates facts and prior testimony.

22              MS. KUCK:  Okay.  So if I'm

23         misstating it, he can tell me.

24   (BY MS. KUCK)

25         Q.     Is it your testimony that today

CONFIDENTIAL

Page 54

```
 1    you have absolutely no records of your
 2    communication with any of the contractors who
 3    worked on this project?
 4         A.     We provided all requested
 5    information to -- to our firm, to the law
 6    firm.
 7         Q.     That wasn't my question.
 8                My question is:  Do you have
 9    any records?
10                Regardless of what you did with
11    them, is it your testimony you have no
12    records today of any communications with the
13    contractors who worked on the project?
14                MR. EVANS:  Objection; asked
15         and answered.
16                And give me one second to
17         object and then that way we -- she can
18         ask and then maybe two seconds, me
19         object, and then you answer.
20                THE WITNESS:  Okay.
21    (BY MS. KUCK)
22         Q.     Okay.  And I'll read the
23    question back.
24                My question is:  Do you have
25    records?
```

CONFIDENTIAL

Page 55

```
 1                  Regardless of what you did to
 2      them, with them, is it your testimony that
 3      you have no records today of any
 4      communications with the contractors who
 5      worked on the project?
 6           A.     I provided --
 7                  MR. EVANS:  Let me renew my
 8           objection also.
 9                  Thank you.
10           A.     I provided all information that
11      we had available to our attorneys.
12      (BY MS. KUCK)
13           Q.     And was there information that
14      you provided?
15           A.     I don't -- I don't recall.
16           Q.     Okay.
17                  MS. KUCK:  Was any of that
18           information produced, Mr. Evans?
19                  MR. EVANS:  I can't recall off
20           the top of my head, but we can look.
21           We will absolutely look.
22                  We're not trying to be
23           obstructionistic here.
24      (BY MS. KUCK)
25           Q.     If there were any
```

CONFIDENTIAL

Page 56

1    communications with any of these contractors

2    who you don't remember, other than Red

3    Metrics, you would have given them to your

4    lawyers and then Mr. Evans and I can work out

5    what happened to those, right?

6         A.    Yes.

7         Q.    Do you remember how many other

8    contractors there were?

9         A.    I don't.

10        Q.    Where did you -- and you

11   purchased certain geospatial data for use in

12   this project; am I right?

13        A.    No, I didn't purchase --

14        Q.    Okay.  Well, did you -- I'm

15   sorry.  Strike that.

16             Was there data purchased

17   from -- from vendors that was then used by

18   these contractors for the analysis that

19   resulted in this project?

20        A.    Look, I don't want to be

21   difficult but I'll say it again and I'll

22   answer the question, but this has nothing to

23   do with this case.

24        Q.    Understood.

25        A.    Okay.

1          Q.      I understand that's your
2     position.
3          A.      Okay.
4          Q.      But you can still answer my
5     question.
6          A.      What was the question?
7          Q.      The question was -- well, tell
8     me how you did this.
9                  You had -- you had these
10     contractors who were analysts; am I right?
11          A.      Among other things, yes.
12          Q.      Okay.  And did OpSec give them
13     data to analyze?
14          A.      No.
15          Q.      Okay.  Where did they get the
16     data?
17          A.      They purchased it.
18          Q.      They purchased it?
19          A.      Yes.
20          Q.      And did you tell them what data
21     to purchase?
22          A.      We -- we worked together to
23     identify the areas of interest and -- and
24     what we could afford.  And so we worked with
25     them to get it done, yeah.

CONFIDENTIAL

Page 58

1          Q.      Okay.  But you did that all

2     orally?

3          A.      Yes.

4          Q.      Was -- this research that you

5     did in this project, did it have any --

6          A.      Which project?

7          Q.      In the project that we are

8     referring to, we've been discussing.

9          A.      The section -- or No. 8 here?

10         Q.      In Exhibit No. 8.

11         A.      Okay.

12         Q.      Did that -- did that research

13    have anything to do with the research that

14    you did in 2016 relating to voter fraud in

15    that election?

16         A.      No.

17         Q.      Did you at one time have an app

18    called VoteStand?

19         A.      Yes.

20         Q.      Do you still -- do you still

21    promote that app?

22         A.      It's -- no.  It's been rebuilt

23    and renamed.  It's now called VoteAlert.

24         Q.      And what is that app?

25         A.      Think of it as Instagram for --

CONFIDENTIAL

Page 59

1    for voting, for elections.  Take a picture,

2    take a video, make a post.

3         Q.     Of what?

4         A.     Whatever people see.

5         Q.     When you say whatever people

6    see --

7         A.     Whatever citizens are upset

8    about or concerned about.

9         Q.     And what do they do with those

10   pictures?

11        A.     They come to us through the

12   app.

13        Q.     And then what do you do with

14   those pictures?

15        A.     Well, we're not doing it right

16   this second so we're not doing anything with

17   it right now.

18        Q.     What did you do with it in

19   connection with the 2020 election?

20        A.     We didn't do it in 2020

21   election.

22        Q.     Okay.  Have you ever done it

23   with any election?

24        A.     Yeah.  2012 and 2016.

25        Q.     Okay.  You plan to do it in

1    2024 as well?

2        A.    Under VoteAlert, yes.

3        Q.    Okay.  And what -- so --

4        A.    It's not related to this topic,

5    though.

6        Q.    Understood.  I understand

7    that's your position.

8        A.    No, it's not related to this

9    topic.

10        Q.    Okay.

11        A.    It's not my position.  It's the

12    truth.

13        Q.    I understand your testimony.

14            When VoteAlert receives these

15    pictures or whatever information people send,

16    what does it do with them?

17        A.    Mrs. Engelbrecht's team handles

18    all of the administrative side as to what

19    happens, whether it's approved, whether it's

20    uploaded, whatever.

21            We built the app is what I'm

22    telling you.

23        Q.    You built the app, but you

24    don't administer it?

25        A.    Right.

CONFIDENTIAL

Page 61

1          Q.     Okay.  Does True the Vote
2     administer it?
3          A.     Yes.
4          Q.     Okay.  Okay.  Let's mark as
5     Exhibit 9 a multiple-page document bearing
6     TTV_006817 through TTV_006853.
7          (Marked Plaintiff Exhibit No. 9.)
8     (BY MS. KUCK)
9          Q.     Okay.  So if you could take a
10     look at this document.
11          A.     Which one?
12          Q.     Number 9.
13          A.     Okay.
14          Q.     If you could look at Exhibit 9,
15     the cover page appears to be an e-mail from
16     Ms. Engelbrecht to Debbie D'Souza.
17          A.     Uh-huh.
18          Q.     Do you recognize the documents
19     attached to this e-mail?
20          A.     Yeah, I do.
21          Q.     Okay.  What are those
22     documents?
23          A.     These documents were working
24     papers from a -- an intervention that True
25     the Vote was considering in a -- in another

Page 62

1    lawsuit.

2          Q.      Okay.  And were they ever filed

3    in the other lawsuit?

4          A.      No.

5          Q.      Why not?

6          A.      I have no idea.

7          Q.      If you go to the page that says

8    at the bottom TTV_006843.

9          A.      43?

10         Q.      Uh-huh.

11         A.      Okay.

12         Q.      That's -- that is titled

13   "Affidavit of Gregg Phillips in Support of

14   True the Vote, Inc.'s Motion to Intervene."

15                 Do you see that?

16         A.      Yes.

17         Q.      Did you review this draft

18   affidavit?

19         A.      I don't think so.  I never even

20   saw it.

21         Q.      You've never seen it before?

22         A.      Doesn't -- doesn't ring a bell.

23         Q.      Okay.  Do you know who prepared

24   it?

25         A.      I do not.

CONFIDENTIAL

Page 63

1          Q.     Okay.  Let's go to -- let's go
2      to the page number TTV_006846.
3          A.     Okay.
4          Q.     Under the Heading 16, it says:
5      "OpSec group was engaged by True the Vote to
6      conduct an analysis of mobile device
7      geospatial and temporal data in the state of
8      Georgia."
9               Do you see that?
10         A.     Yes.
11         Q.     And is that correct?
12         A.     That was -- yeah.  That was the
13     contract we just looked at.
14         Q.     That's the contract we just
15     looked at?
16         A.     Uh-huh.
17         Q.     Okay.  And then if you turn the
18     page and you look at Paragraph 18, it says:
19     "To conduct its analysis, OpSec group
20     utilized commercially available mobile device
21     geospatial and temporal data."
22               Do you see that?  Is that
23     correct?
24         A.     Yes.
25         Q.     Okay.  Where did that data come

1    from?

2          A.    We just answered that.

3          Q.    It came from Red Metrics?

4          A.    Vendors.

5          Q.    Right.

6          A.    Yeah.

7          Q.    And any -- can you identify any

8    vendor other than Red Metrics?

9          A.    Well, they would have bought it

10    from any number of vendors of the data.

11          Q.    Okay.  So Red Metrics bought

12    the data.  OpSec didn't buy the data?

13          A.    Correct.

14          Q.    Did any of your other

15    contractors or vendors buy the data?

16          A.    In this case, no.

17          Q.    Okay.  So all the data was

18    bought by Red Metrics?

19          A.    As far as I remember.

20          Q.    And then what was the role of

21    the other contractors?

22          A.    Analysis.  There's lots of

23    different pieces that go to analysis.  I

24    mean, they would have conducted some

25    analysis.

Page 65

```
 1              They would have worked on
 2      the -- the creation of the -- the creation
 3      and execution of the work plan.
 4              It could have been any number
 5      of things.
 6          Q.      So in the next paragraph, it
 7      says:  "OpSec group analyzed in excess of 25
 8      terabytes" --
 9          A.      Can you tell me where you are?
10      19?
11          Q.      Paragraph 20.
12          A.      Okay.  All right.  I'm with
13      you.
14          Q.      Okay.
15              "OpSec group analyzed in excess
16      of 25 terabytes of data consisting of over
17      1.2 trillion mobile device pings that were
18      collected over a period of 97 days from
19      October 1, 2020, through January 5, 2021,
20      defined as the study period."
21              Is that correct?
22          A.      The number looks a little small
23      to me, the 1.2 trillion.
24          Q.      Okay.
25          A.      And the dates, I think it
```

Page 66

```
 1      actually went back into September.  But,
 2      again, I never signed this document.  I've
 3      never seen it before.
 4           Q.     No, I understand that.  I'm
 5      just sort of using it as -- I'm using it to
 6      get your understanding.  I don't want to rely
 7      on the document if things are inaccurate in
 8      here, so I want to make sure it's
 9      consistent --
10           A.     I've never seen the document,
11      so...
12           Q.     Okay.  Understood.
13                  And when it -- but -- but OpSec
14      group itself didn't do the analysis, you
15      hired other people to do the analysis for
16      you?
17           A.     We were the prime.
18           Q.     The prime.
19                  And when you say "we," it's
20      only you, right?  You don't employ anybody
21      else?
22           A.     No, but we have other
23      contractors that work with us.
24           Q.     Okay.  So you're saying --
25           A.     We were the prime contractor.
```

1          Q.     And other than Red Metrics, you

2     can't identify any of the subcontractors?

3          A.     No.

4          Q.     If you look at Paragraph 23 --

5          A.     Okay.

6          Q.     -- it says:  "By

7     cross-referencing mobile devices" -- well,

8     strike that.

9                 If you can just read

10    Paragraph 23, and then tell me if anything in

11    there is inaccurate.

12         A.     "By cross-referencing mobile

13    device spatial geospatial data against these

14    drop box geofences, OpSec group is able to

15    identify over 500,000 mobile devices that had

16    traveled within 500 feet of a drop box during

17    the study period.  It was from this defined

18    data set that OpSec began to apply analytic

19    methods more tightly defining proximities to

20    identify patterns."

21         Q.     Is that correct?

22         A.     Mostly correct.

23         Q.     Okay.  And then if you would go

24    to Paragraph 26, which is on the next page.

25                It says:  "To further narrow

CONFIDENTIAL

Page 68

1    our investigation, we matched devices that

2    were found within 100 feet of one or more

3    drop box location on at least ten occasions

4    and were within 100 feet of an organization

5    of interest multiple times during the study

6    period."

7                Is that a correct description

8    of -- of your project?

9         A.    No.

10        Q.    Why not?

11        A.    It's -- it's not enough.

12   It's -- it specifically seems to be talking

13   about Atlanta.

14        Q.    Okay.

15        A.    And the 100 feet was -- it

16   makes the implication for whoever wrote this

17   seems to be that they didn't understand what

18   we were doing because what we were doing was

19   excluding.  We started at 500,000 --

20        Q.    Right.

21        A.    -- as you saw previously.

22        Q.    Yeah.

23        A.    And so we were trying to

24   exclude, get the number smaller, not larger.

25                This seems to be implying that

```
                                    Page 69
 1    we were trying to make it be larger.
 2           Q.      Well, if you went to 500 and
 3    then you went to 100, it would be smaller,
 4    right?
 5           A.      Not necessarily.
 6           Q.      Why?
 7           A.      It depends.  There's all sorts
 8    of parameters around that, because you would
 9    want to know what we -- what we were
10    specifically looking at.  This -- this calls
11    for speculation, actually.
12           Q.      Okay.
13           A.      And whoever -- whoever wrote
14    this had no idea what they were saying.
15           Q.      Okay.  Well, where do you think
16    they got the information from?
17           A.      No clue.
18           Q.      Do you know who wrote it?
19           A.      I do not.
20           Q.      Who prepared -- do you have any
21    idea --
22                   MR. EVANS:  Slow down.  Give me
23           an opportunity to object.
24    (BY MS. KUCK)
25           Q.      Do you have any knowledge of
```

 1      who prepared the -- these papers?

 2                  MR. EVANS:   Objection; asked

 3          and answered.

 4      (BY MS. KUCK)

 5          Q.     You can answer.

 6          A.     I don't know.

 7          Q.     Did you ever discuss any of

 8      these papers with Ms. Engelbrecht?

 9          A.     I doubt it.

10          Q.     Okay.

11          A.     These are working papers.

12      These were never filed.

13          Q.     Right.

14                 Were you aware they were

15      provided to Ms. D'Souza?

16          A.     No.

17          Q.     Were you aware they were

18      provided to Fox News?

19          A.     No.

20          Q.     If you would go to page marked

21      TTV 006821, which is right at the beginning.

22          A.     Okay.

23          Q.     This seems to be talking about

24      the analysis that was done in Atlanta.  Is

25      that correct?

1          A.       A limited piece of it, yeah.

2          Q.       What do you mean "a limited

3     piece of it"?

4          A.       This isn't the full analysis.

5          Q.       Of what -- what -- how -- why

6     do you say that?

7          A.       This is just -- this is just

8     locations of where somebody thought drop

9     boxes were.

10         Q.       And you're saying that there

11    were more than these drop boxes, there are

12    309 -- well, strike that.

13                  Is it correct that 309 drop

14    boxes from December 1, 2020, through Election

15    Day January 5, 2021, were geofenced and the

16    analysis was done?

17         A.       I have no idea where 309 came

18    from.

19         Q.       Okay.  What about the period of

20    time?  Is that correct.

21         A.       No.  As I said -- it doesn't

22    look like it.  This looks like just during

23    the -- I don't know what this is.

24         Q.       Okay.  If you would look at the

25    next page, it says "Organizations of

CONFIDENTIAL

Page 72

1     interest."

2               Do you see that?

3          A.     Uh-huh.

4          Q.     Are those the suspected ballot

5     harvesting locations that were referred to in

6     the project proposal we talked about?

7          A.     No.  This is a -- this looks to

8     be like a preliminary document that somebody

9     got their hands on and cited it as fact.

10         Q.     Well, did -- did you -- did

11    your project identify any of these

12    organizations as --

13         A.     I don't recall.  We weren't

14    focused on names.  We were focused on

15    addresses.

16         Q.     Okay.  So you -- you have --

17    you can't testify as to whether these were

18    suspected organizations involved in ballot

19    trafficking as -- as referenced in the

20    project proposal we talked about?

21         A.     No.

22               MR. EVANS:  Objection.  You got

23         to wait.  You gotta give me -- you

24         need to listen to the question.  Let's

25         pause.  And then allow me an

Page 73

1              opportunity to object.

2                        THE WITNESS:  Got it.

3                        MR. EVANS:  Objection; asked

4         and answered.

5    (BY MS. KUCK)

6         Q.    Okay.  If you would turn to the

7    next page, there's a -- there's a map.

8                        Have you ever seen that before?

9         A.    I don't recall.

10        Q.    Do you recognize it?

11        A.    Don't even know what it is.

12        Q.    Huh?

13        A.    Don't know what it is.

14        Q.    You know where it came from?

15                        MR. EVANS:  Objection; asked

16        and answered.

17                        MS. KUCK:  No, he says he

18        doesn't know what it is.  I asked if

19        he knew where it came from.

20        A.    I answered that as well.

21   (BY MS. KUCK)

22        Q.    Is the answer no?

23        A.    Yes.

24        Q.    Let's go to the next page,

25    006824.

1              Have you ever seen that chart
2    before?
3        A.      Doesn't ring a bell.
4        Q.      Okay.  Do you -- do you
5    understand the reference to 242 devices?
6        A.      Yes.
7        Q.      Okay.  What does that refer to?
8        A.      The final number in the Atlanta
9    area that were included in the analysis that
10   we turned over to the FBI.
11       Q.      And for what -- what period of
12   time did that cover?
13       A.      I'm not sure.  I haven't seen
14   this before.
15       Q.      So as you sit here now, you
16   can't tell me the -- whether the 242 were in
17   connection with the runoff or the general
18   election?
19       A.      I don't know.
20       Q.      Okay.  If you wanted to refresh
21   your memory on that, how would you do it?
22       A.      I couldn't.  I mean, you would
23   have to rebuy the data, spin it up.  I have
24   no idea.
25       Q.      Okay.  At -- at some point in

1     time, you also obtained video Dropbox --
2     strike that.
3               At some point in time, OpSec
4     obtained Dropbox video from election
5     officials in Georgia; is that correct?
6          A.     That is incorrect.  We obtained
7     Dropbox video from True the Vote.
8          Q.     From True the Vote.
9               And is your understanding True
10    the Vote obtained it from election officials
11    in Georgia?
12         A.     Yes.
13         Q.     Okay.  And at some point did --
14    did someone working with you attempt to
15    correlate the geospatial data with the
16    Dropbox video?
17         A.     Yes.
18         Q.     And who did that work?
19         A.     There were a variety of people
20    involved in that.
21         Q.     Okay.  Tell me everybody you
22    remember.
23         A.     Red Metrics.
24         Q.     Anybody else?
25         A.     No.

CONFIDENTIAL

Page 76

1          Q.     There was nobody else or you
2     don't remember anybody else?
3          A.     I don't remember.
4          Q.     Okay.  And how much of that --
5     how many of the video came from Gwinnett
6     County?
7          A.     No idea.
8          Q.     Okay.  Do you know how much of
9     it was from the general election and how much
10    was from the runoff?
11         A.     I don't.
12         Q.     Okay.  Lets -- let's look at
13    the -- your interrogatory responses, which we
14    marked as, I believe, Exhibit 5.
15         A.     What number?
16         Q.     Let me make sure I've given you
17    the right number.  Number 6.
18                Okay.  Let's look at your
19    response to Interrogatory No. 4, which is on
20    page --
21         A.     Wait.  Number 4?
22         Q.     Yeah.
23         A.     I thought you said 6.
24         Q.     It's Exhibit 6, Interrogatory
25    No. 4, which is on Page 9 through 11 of that

Page 77

1    document.

2         A.    Okay.

3         Q.    And if you would look at -- why

4    don't you take a minute to review that, your

5    response.

6         A.    Review what?

7         Q.    The response -- your answer to

8    the interrogatory, which is on Page 10

9    through 11.

10              MR. EVANS:  It's long, so take

11         your time.

12              MS. KUCK:  I assumed he's

13         familiar with this, but go ahead.

14         A.    I -- I -- I don't understand

15    what you're asking me to do.

16    (BY MS. KUCK)

17         Q.    Okay.  I'm going to ask you

18    some questions about your answers.  If you

19    need to review it, let me know.

20         A.    Yes, I need to review.

21         Q.    Okay.  So go ahead.

22         A.    So you're talking about Pages

23    10, 11 --

24         Q.    And 12.

25         A.    -- and 12?

Page 78

1          Q.      You know what, I'm going to
2      strike that.  I'm sorry.
3                  Review -- can you go to
4      Page 18, your Interrogatory No. 9.  And then
5      your answer is at 18 and 19.  It's a little
6      bit shorter.
7                  And there's a statement in
8      there that says:  "As the film makes clear,
9      no individual phones were tied to any
10     identifiable individuals as part of the
11     filmmaking process."
12                 Can you explain that sentence
13     to me?
14         A.      Yes.  Geospatial analysis
15     analyzes the unique device IDs that are on
16     our cell phones.
17         Q.      Okay.
18         A.      And those unique device IDs are
19     associated with a number.
20         Q.      Right.
21         A.      A phone number.
22         Q.      Uh-huh.
23         A.      And then the carrier, who owns
24     the phone number, is the owner of the data,
25     who it is.

1          Q.      Okay.  Although, you told me at

2      some point there was an effort to link that

3      data.

4          A.      No.

5          Q.      There was no effort to link the

6      geospatial data to the video of people voting

7      at drop boxes?

8          A.      It -- there was no effort to

9      link anything to any human being.

10          Q.      Okay.  So I had asked you

11      earlier whether at some point someone working

12      with you attempted to correlate the data with

13      the Dropbox video.

14          A.      But that's a different topic.

15          Q.      How is that different?

16          A.      That's not what you just asked

17      me to look at.

18          Q.      Okay.

19          A.      That's not what you were asking

20      me to respond to.

21                  You asked me to respond to this

22      answer.

23          Q.      Right.

24          A.      Number 9.

25          Q.      Okay.

1          A.      How does that relate to this?
2          Q.      Well, did someone -- did
3     someone try and correlate those things?
4                  Look at the geospatial data and
5     the Dropbox video and try and match them up.
6          A.      Where do you see that?
7          Q.      I'm just -- that's a question.
8     We talked about this before.
9                  Somebody tried to correlate the
10    data -- geospatial data with the Dropbox
11    video, correct?
12         A.      Yes.
13         Q.      Okay.  And when I say --
14    what -- correlate, what did they do?  What
15    were they trying to do?
16                 MR. EVANS:  Objection; compound
17         question.
18    (BY MS. KUCK)
19         Q.      Explain to me what they were
20    doing comparing the geospatial data with the
21    Dropbox video.
22         A.      Look, I'll just say again, I'm
23    not trying to be condescending but this has
24    nothing to do with what we're doing here.
25         Q.      I understand your position.

1          A.     And so you're asking me to

2     respond to -- you're asking me to answer a

3     question as to what my contractors were

4     doing.

5          Q.     Yeah.  I am.

6          A.     What -- what -- okay.  Then ask

7     the question.  I don't understand it.

8          Q.     Okay.  The question was:  Was

9     someone working with you attempt to correlate

10    the geospatial data with the Dropbox video?

11         A.     Yes.

12                MR. EVANS:  Objection; asked

13         and answered.

14    (BY MS. KUCK)

15         Q.     Okay.  And what were the

16    contractors doing?

17                What instructions did you give

18    them in connection with that correlation?

19         A.     I didn't give them any

20    instructions.

21         Q.     Okay.  Why were they doing it?

22         A.     Just to add to the file.  I

23    mean, geospatial analysis by itself is -- is

24    interesting.  But activity-based

25    intelligence, which adds more to it, which

CONFIDENTIAL

Page 82

1    would be video and other things, would --

2    would -- would build out the file more

3    completely.

4            Q.      Okay.  So you were trying to

5    build a more complete picture by matching

6    what you were seeing in the data with what

7    you were seeing from the drop boxes?

8            A.      I wasn't, but our contractors

9    would have been, yes.

10           Q.      And you were instructing them

11   to do that?

12           A.      I probably wouldn't have

13   offered that specific of an instruction,

14   but...

15           Q.      Okay.  But you were overseeing

16   the project?

17           A.      Yes.

18           Q.      And some -- at least some of

19   them -- you were paying them to do certain

20   things?

21           A.      I don't understand.

22           Q.      You were paying -- these were

23   people you contracted with so I'm assuming

24   you gave them instructions.

25                   MR. EVANS:  Objection; asked

CONFIDENTIAL

Page 83

1          and answered.

2     (BY MS. KUCK)

3          Q.      You didn't -- did you -- you

4     didn't instruct anybody to try and correlate

5     the geospatial data with the Dropbox video?

6          A.      I really don't think -- I

7     really don't think you understand.

8               What you asked me to review was

9     this --

10         Q.      I am --

11            (Speaking simultaneously.)

12         A.      -- and this is irrelevant to

13    the topic.  It's not related.

14    (BY MS. KUCK)

15         Q.      I understand what you're

16    saying.

17         A.      So which do you want me to

18    answer?  Do you want me to answer this or do

19    you want me to answer that?

20               There's nothing -- there's

21    nothing in here that would --

22               MR. EVANS:  So it would be --

23         are you talking about Interrogatory

24         No. 9 or are you talking about

25         something unrelated?

CONFIDENTIAL

Page 84

1           Because I -- we just want to
2       make sure both of you guys are on the
3       same page.
4   (BY MS. KUCK)
5           Q.      Okay.  So in the film -- you're
6   familiar with the film?
7           A.      Yes.
8           Q.      There is video --
9           A.      Yes.
10          Q.      -- correct?
11              And in the film there is an
12  implication that the video lines up with what
13  is shown in the geospatial data.
14              Am I right about that?
15          A.      No.  We had no editorial
16  control.  Our -- our job was to provide raw
17  footage --
18          Q.      Uh-huh.
19          A.      -- and some limited analysis.
20          Q.      Okay.  What raw -- what
21  criteria did you use to give the raw footage?
22          A.      I don't know that there was any
23  criteria.
24          Q.      You just -- well, how much raw
25  footage did you provide to Mr. D'Souza?

CONFIDENTIAL

Page 85

1          A.     We originally -- I think we
2    originally provided 70 cuts of it.
3          Q.     And how did you choose those
4    70?
5          A.     I don't recall.  I didn't do
6    it.
7          Q.     Who did it?
8          A.     Red Metrics.
9          Q.     Okay.  And did you give them
10   instructions?
11               MR. EVANS:  Objection; asked
12          and answered.
13               MS. KUCK:  No, I don't think
14          so.
15          A.     No.
16   (BY MS. KUCK)
17          Q.     Did you give them instructions
18   as to which -- how to choose the 70?
19          A.     No.
20          Q.     Okay.  So you just said, Give
21   me 70 cuts?
22          A.     Right.  Later in the process,
23   there's an e-mail around that Mrs. D'Souza
24   asked for, I think, another thousand cuts or
25   something like that, to which I said it's out

1    of scope.

2            Q.      What do you mean "it's out of

3    scope"?

4            A.      It was out of scope.  It was

5    more than we had agreed to provide under the

6    terms of the agreement.

7            Q.      Did you have more?

8            A.      Oh, we had a lot more.

9            Q.      Okay.  And when you say "the

10   terms of the agreement," what are you

11   referring to?

12           A.      The agreement to provide

13   video -- raw video to -- to Dinesh and Debbie

14   for the film.

15           Q.      Okay.  And does the agreement

16   specify how much you were going to provide?

17           A.      I wasn't a party to the

18   agreement.  I don't know.

19           Q.      So you don't know what the

20   agreement says?

21           A.      No.

22           Q.      And did you -- did -- did you

23   provide video of more -- of any one person

24   going to more than one drop box?

25           A.      I don't recall.

CONFIDENTIAL

Page 87

```
1            Q.     You have no idea?

2            A.     No idea.

3            Q.     Okay.

4                   MR. EVANS:  We've been going

5            about an hour and a half.

6                   MS. KUCK:  Yeah, we can take a

7            break.

8                   MR. EVANS:  Yeah.  Very brief

9            break.

10                  THE VIDEOGRAPHER:  All parties

11           in agreement with going off the

12           record, we're going off the record at

13           10:59 a.m.

14       (Break from 10:59 a.m. to 11:21 a.m.)

15                  THE VIDEOGRAPHER:  We are going

16           back on the record at 11:21 a.m.

17       (BY MS. KUCK)

18           Q.     Mr. Phillips, you and

19       Ms. Engelbrecht appeared on The Charlie Kirk

20       Show on April 8, 2022, to discuss the 2000

21       Mules project; is that correct?

22           A.     Yes.

23           Q.     And let me show you a document

24       I've marked as Plaintiff's Deposition

25       Exhibit 10.  It bears the Bates
```

1       Nos. DDR 00049450 through 4951.

2                   MR. EVANS:  This is 10?

3                   MS. KUCK:  Yep.

4           (Marked Plaintiff Exhibit No. 10.)

5       (BY MS. KUCK)

6           Q.      Okay.  Looking at the second

7       page, this appears to be a text chain between

8       Mr. D'Souza, Mrs. D'Souza, Ms. Engelbrecht,

9       and yourself.

10                  Do you see that?

11          A.      I do.

12          Q.      Okay.  In about the third entry

13      down, it appears that Ms. Engelbrecht says,

14      quote, Lastly, we did an interview with

15      Charlie yesterday.  He had the same videos

16      from the ad in Georgia, the ones we talked

17      about, and asked us to review them.  He says

18      Salem knows, et cetera, but didn't want to

19      tell y'all.  It's supposed to air tomorrow.

20                  Do you see that?

21          A.      I do.

22          Q.      Is that referring to the

23      Charlie Kirk interview?

24          A.      You know, I really don't know,

25      but I assume so.

CONFIDENTIAL

Page 89

1          Q.     Okay.  Do you know what is

2     referred to there by the videos from the ad

3     in Georgia?

4          A.     I'm not familiar with any ad in

5     Georgia.

6          Q.     Okay.  Do you -- do you recall

7     Mr. -- Mr. Kirk telling you and

8     Ms. Engelbrecht that he didn't want

9     Mr. D'Souza to know about your -- your --

10    your interview on his show?

11               It says:  "He says Salem knows,

12    et cetera, but didn't want to tell y'all."

13               Does that ring any bells?

14         A.     No.

15         Q.     So I premarked -- you can put

16    that down.

17               I premarked as Exhibit 1 the

18    video of the Charlie Kirk interview on

19    April 8, 2022, which has a run time of 1 hour

20    6 minutes and 59 seconds.  And we'll provide

21    that to --

22         A.     I don't have Exhibit 1.

23         Q.     You won't have it.

24         A.     Oh, sorry.

25         Q.     It's a video.  I've marked it

Page 90

1      as a -- I've marked the entire interview as a

2      video [verbatim].  And just to orient

3      ourselves, we're going to start by looking at

4      a video clip --

5                    MS. KUCK:  Yeah, do you want to

6           put...

7      (BY MS. KUCK)

8           Q.    And we'll provide you with the

9      video so you can include it with the

10     transcript and we'll send it to Mr. Evans as

11     well.

12          (Discussion off the record.)

13                    MS. KUCK:  Can you see that,

14          Mr. Evans?

15     (BY MS. KUCK)

16          Q.    So I'm just going to start by

17     showing a video clip, which I've marked

18     Deposition Exhibit 1A, which is the first

19     45 seconds of the program to --

20          (Marked Plaintiff Exhibit No. 1A.)

21          A.    Hang on a second.

22                    MR. EVANS:  Yeah, take your

23          time.

24                    THE WITNESS:  Okay.

25                    (Video playing.)

CONFIDENTIAL

Page 91

1    (BY MS. KUCK)

2         Q.    He talks about sharing the

3    episode on various social media platforms.

4              Did you share it after -- after

5    the program?

6         A.    I have no idea.

7         Q.    Okay.  Do you know if TTV did?

8         A.    I do not.

9         Q.    So we're going to play another

10   clip running from 13:02 to 13:53 of the

11   interview, which I am marking as Deposition

12   Exhibit 1B, and then I'll ask you some

13   questions about it.

14        (Marked Plaintiff Exhibit No. 1B.)

15             (Video playing.)

16   (BY MS. KUCK)

17        Q.    There's -- you made a reference

18   in there to 12 analysts who worked 16 hours a

19   day for 15 months.

20             Who are those 12 people?

21        A.    Mostly was a reference to

22   everybody I could think about.  It was an

23   estimate and us, you know, contractors for

24   OpSec.

25        Q.    Okay.  And you can't name any

CONFIDENTIAL

Page 92

```
 1    of the analysts?
 2           A.     Me.  Red Metrics.  I'm sure
 3    there were others, loads of other people
 4    involved.  I don't know.  It was -- it was an
 5    estimate.
 6           Q.     So the 12 was an estimate.
 7                  How do you know they were
 8    working 16 hours a day?
 9           A.     Because everybody was working
10    like crazy trying to finish this.  It was
11    hard.
12           Q.     But, again, you weren't
13    personally involved in that, right, you were
14    using contractors to do it?
15           A.     What we were trying to do --
16    and I think this is what you were trying to
17    ask me earlier.
18                  But what we were trying to do,
19    once the geospatial analysis was done and we
20    started getting chunks of video in, matching
21    that video back into the -- back into the
22    geospatial analysis was difficult and took a
23    lot of time.
24           Q.     Okay.  So the 12 analysts
25    working 16 hours a day is an estimate based
```

CONFIDENTIAL

Page 93

1    on your involvement in the program?

2         A.      Based on my understanding.

3         Q.      Okay.  And who -- -- who at Red

4    Metrics was your contact person?

5         A.      The two owners, Ben and Tim.

6              MS. HYLAND:  Can you say that

7         again.

8              THE WITNESS:  Ben and Tim.

9    (BY MS. KUCK)

10        Q.      Is that Ben Gerwing?

11        A.      Yeah.

12        Q.      I'm sorry, Tim Gerwing and Ben

13   Matthews.

14        A.      Yep.  Sorry.

15        Q.      And did you have any other

16   contacts with anyone else at Red Metrics?

17        A.      I did not.

18              MS. KUCK:  Can I have

19         TTV_008470?

20   (BY MS. KUCK)

21        Q.      So I'm going to mark as

22   Exhibit 11...

23           (Discussion off the record.)

24   (BY MS. KUCK)

25        Q.      Does the name Rahlouni mean

CONFIDENTIAL

Page 94

```
 1    anything to you?
 2            A.      I'm sorry?
 3            Q.      The last name, Ralooney?
 4            A.      No.
 5            Q.      Was he one of your analysts?
 6            A.      Not for me.
 7            Q.      You don't know of any analysts
 8    named Mr. Rahlouni?
 9            A.      I do not.
10            Q.      You also in there talk about
11    doing the work at the High Performance
12    Computing Center on the campus of Starkville,
13    Mississippi?
14            A.      Yeah.
15            Q.      And that statement was -- was
16    then interpreted by people to mean the
17    Portera High Performance Computing Center,
18    right, and people asked you questions about
19    that?
20            A.      Yeah.
21            Q.      And, in fact, OpSec leased
22    space in a separate building on the same
23    research park.  Is that accurate?
24            A.      Correct.
25            Q.      Yeah.  Let's look at -- well,
```

CONFIDENTIAL

Page 95

```
 1     and at some point your lease there was
 2     canceled, right?
 3          A.     On the day of the premiere of
 4     the release.
 5          Q.     Okay.  And why was that?
 6                 What's your understanding of
 7     why it was canceled?
 8          A.     Because --
 9                 MR. EVANS:  Objection; calls
10          for speculation.
11                 MS. KUCK:  I'm just asking his
12          understanding.
13                 MR. EVANS:  Two seconds.
14                 I'm just making a record.
15                 MS. KUCK:  Okay.
16     (BY MS. KUCK)
17          Q.     What's your understanding of
18     why your lease was canceled?
19          A.     The AP, Associated Press,
20     contacted the Mississippi State University,
21     the president's office, and -- and indicated
22     some things that simply weren't true.
23                 And rather than deal with it,
24     they terminated the lease on the spot.
25          Q.     What -- what do you mean
```

1    they -- they indicated some things that

2    weren't true?

3         A.    I don't know.  I wasn't part of

4    it.  That's just what I was told.

5         Q.    You were told that by whom?

6         A.    I don't recall.  Someone in

7    Mississippi.

8         Q.    Let me mark as Exhibit 11 --

9    it's a many-page document bearing control

10   numbers DD_00087 through DD_000131.  And this

11   is how it was produced to us.

12              But I'm going to refer you to

13   Page 120.  So you can look through this.

14   I've opened it to the page I'm going to ask

15   you about.

16       (Marked Plaintiff Exhibit No. 11.)

17              MR. EVANS:  And is this 11?

18              MS. KUCK:  Yes.

19              MR. EVANS:  I don't know if we

20        got a copy of that.

21              MS. KUCK:  Oh.

22   (BY MS. KUCK)

23         Q.    So when you have Page 120, let

24   me know.

25         A.    Okay.

CONFIDENTIAL

Page 97

1          Q.      Up at the top there appears to

2    be a text from you that says:  "First

3    casualty of the movie is my data center at

4    Mississippi State University.  It was

5    canceled today by MSU."

6          A.      Correct.

7          Q.      You see that?

8                  And that's what we just talked

9    about?

10         A.      Yes.

11         Q.      Okay.

12                 MS. HYLAND:  Can you tell me

13         what page we're on again.

14                 MS. KUCK:   120.

15                 MS. HYLAND:   Thank you.

16    (BY MS. KUCK)

17         Q.      And then further down,

18    Ms. Engelbrecht says:  "We're moving it all

19    offshore anyway."

20                 And you respond:  "Exactly."

21                 Do you see that?

22         A.      Yes.

23         Q.      What -- what -- what were you

24    talking about there?

25         A.      The cold backup.

1          Q.      What do you mean "the cold

2     backup"?

3          A.      I believe for all of the video

4     we have -- we have -- when data is live in a

5     system, hot.

6          Q.      Uh-huh.

7          A.      And when it's not live or it's

8     not in storage in the system, it's a cold

9     store.

10         Q.      Okay.  And did you move all the

11    data offshore?

12         A.      We did.

13         Q.      Where did you put it?

14         A.      Norway and Germany.

15         Q.      Is it still there?

16         A.      Yes.

17         Q.      And who has possession of it in

18    those countries?

19         A.      A contractor.

20         Q.      Do you know the name of the

21    contractor?

22         A.      I don't have it right off the

23    top of my head, but I could get that.

24         Q.      Okay.  And what -- what data is

25    that?

CONFIDENTIAL

Page 99

```
 1              Is it the geospatial data or
 2     what is it that's stored there?
 3          A.     I suspect it's mostly video.
 4          Q.     But you don't know?
 5          A.     I'm not 100 percent sure, but
 6     I'm confident it's video.  By this time this
 7     was the day of the movie release.
 8          Q.     Uh-huh.
 9          A.     Is that right?  Yeah.  Okay.
10     Sorry.  I was trying to reorient myself time
11     wise.
12          Q.     Okay.
13              MS. KUCK:  Thank you.
14     (BY MS. KUCK)
15          Q.     I'm going to mark as
16     exhibits -- well, actually, while we're on
17     this topic...
18              MS. KUCK:  Can you give me
19          49423.
20     (BY MS. KUCK)
21          Q.     I'm going to mark as Exhibit 12
22     a document bearing Bates Nos. DDR-00049422.
23          (Marked Plaintiff Exhibit No. 12.)
24     (BY MS. KUCK)
25          Q.     Which appears to be another --
```

CONFIDENTIAL

Page 100

1    another text chain involving you,

2    Ms. Engelbrecht, and Ms. D'Souza.

3                  Do you see that?

4        A.       Are you talking to her or me?

5        Q.       You.

6        A.       Yeah, but I can only see part

7    of it.

8                  What's the context here?

9    What's above it and what's below it?  Because

10   it cuts off at the bottom and cuts off at the

11   top.

12       Q.       This is what -- this is how it

13   was produced to us.  But I would refer you to

14   the middle is where I'm going to ask a

15   question.

16                 And there's a text from you

17   that says:  "Guys, y'all may get a request

18   from our office on the campus of Mississippi

19   State University.  First, they canceled my

20   lease on the day the movie was released.

21                 "The press is trying to say our

22   office is in an office building next to the

23   data center rather than in it, which is true.

24   Access to data centers is very limited, so

25   this is a common setup."

CONFIDENTIAL

Page 101

1                    Do you see that?
2         A.        Yeah.  But I still don't
3     understand the context.
4                    Is this related to the previous
5     text?
6         Q.        This is how this was produced
7     to us.
8         A.        Okay.  What's the question?
9         Q.        Then you go -- then two below
10    that you say:  "As a private aside, we use
11    this mostly for cold storage of the data and
12    to have a bit of a false flag in case
13    something like this occurred."
14                   What were you talking about
15    there?
16        A.        You might imagine we're
17    attacked pretty regularly.
18        Q.        Physically?  Your offices are
19    physically attacked regularly?
20        A.        We've been physically attacked,
21    sure, but I'm talking about our -- I'm
22    talking about cyber attacks.
23        Q.        Right.
24        A.        That's the answer.
25        Q.        Which -- but -- but that

CONFIDENTIAL

Page 102

```
 1    doesn't matter where an office is.  That's
 2    done virtually?
 3         A.     Sure it does.
 4         Q.     Okay.  So your offices have
 5    physically been attacked?
 6         A.     We've had all manner of
 7    attacks.
 8         Q.     Okay.  When you say it was a
 9    bit of a false flag, what did you mean by
10    that?
11         A.     Well, we didn't store all of
12    the data there.
13         Q.     Okay.  So you were trying to
14    mislead people as to where the data was in
15    case you got attacked?
16         A.     I wasn't trying to mislead
17    anybody.
18         Q.     Well, isn't that --
19         A.     This didn't come up -- this
20    didn't come up until the AP made it come up.
21         Q.     Well, when you say "to have a
22    bit of a false flag," what do you mean by
23    that?
24         A.     Just --
25                MR. EVANS:  Objection; asked
```

CONFIDENTIAL

Page 103

```
 1          and answered.
 2     (BY MS. KUCK)
 3          Q.    By "a false flag," you mean you
 4     misled people?
 5                You wanted to mislead people?
 6          A.    I didn't -- I didn't mislead a
 7     soul.
 8          Q.    Okay.
 9                MR. EVANS:  Objection;
10          mischaracterizes his prior testimony.
11     (BY MS. KUCK)
12          Q.    So when you say "false flag,"
13     what do you mean by that?
14                Just define the term --
15                MR. EVANS:  Objection; asked
16          and answered.
17     (BY MS. KUCK)
18          Q.    Define the term for me, please.
19          A.    If someone is going to do a
20     cyber attack on someone's systems --
21          Q.    Uh-huh.
22          A.    -- you would want to be certain
23     that you don't have all of your data in one
24     place.
25          Q.    Right.
```

CONFIDENTIAL

Page 104

1           A.      And that's this.

2           Q.      Okay.  So the reason -- you're

3    saying the reason that you had data at the

4    University of Mississippi campus was to have

5    the -- a cold storage in a place other than

6    your primary offices?

7           A.      Yes.

8           Q.      Did you use any -- did you do

9    any analysis in that office?

10          A.      No.

11          Q.      You didn't have any computers

12   there or did you?

13          A.      Well --

14          Q.      Did you have any computers at

15   that office?

16          A.      Yes.

17          Q.      Super computers?

18          A.      No.

19          Q.      Let's mark as Exhibit 13

20   TTV 0008486 through TTV 8493.

21       (Marked Plaintiff Exhibit No. 13.)

22               MR. EVANS:  13?

23               MS. KUCK:  13, uh-huh.

24   (BY MS. KUCK)

25          Q.      And this seems to be a text

CONFIDENTIAL

Page 105

1    chain with someone by the name of Brian

2    Glicklich.

3                    Can you tell me who he is?

4        A.      He's a contractor to True the

5    Vote.

6        Q.      Okay.  And what -- what kind of

7    services did he provide?

8        A.      I have no idea.  I'm not a --

9    I'm not part of the contract.

10       Q.      Well, did you have

11   communications with him?

12       A.      Limited.

13       Q.      And what -- what type of

14   communications did you have with him?

15       A.      I don't -- I don't remember.

16   Just friendly conversations.

17       Q.      Okay.  And you don't know what

18   his -- what services he was providing to TTV?

19       A.      I don't know exactly.  You

20   would have to ask Mrs. Engelbrecht.

21       Q.      Okay.  How about generally?

22       A.      I don't -- I don't know what

23   you're talking about.

24       Q.      You -- you have no idea what

25   his --

CONFIDENTIAL

Page 106

```
 1          A.      Calls for speculation and I'm
 2    not going to speculate.
 3          Q.      You can speculate.
 4          A.      I'm not going to speculate.
 5          Q.      Okay.  So you're not willing to
 6    tell me generally what you understood his --
 7    his work for TTV to be?
 8                  MR. EVANS:  Objection;
 9          mischaracterizes testimony.
10          A.      I wasn't part of the contract.
11    (BY MS. KUCK)
12          Q.      Right.  So are you willing to
13    tell me generally what you understood his
14    work to be for TTV?
15          A.      No.
16          Q.      Okay.  Let's -- let's go to
17    another clip of the video, which runs from
18    16:52 to 17:09, which I'm marking as
19    Deposition Exhibit 1E.  And I will then ask
20    you some questions about it.
21        (Marked Plaintiff Exhibit No. 1E.)
22                  (Video playing.)
23    (BY MS. KUCK)
24          Q.      Okay.  What were the -- what
25    ten hubs in Atlanta were you referring to?
```

1          A.     I have no idea.  You're going

2     to have to show the whole video.  I have no

3     idea what the context is.

4          Q.     You don't remember?

5          A.     No.  This was one of many.

6          Q.     Okay.

7          A.     And several years ago.

8          Q.     And you don't remember there

9     being discussion about hubs in Atlanta where

10    ballots were picked up?

11         A.     I don't recall calling them

12    hubs, but it -- that's not -- that's not what

13    you asked.

14         Q.     Okay.  Do you remember

15    identifying locations in Atlanta where

16    ballots were being collected?

17         A.     The geospatial analysis would

18    have -- would have rendered some of that.

19         Q.     So you do remember that?

20         A.     I don't remember them being

21    called "hubs."

22         Q.     Although you just -- you did,

23    but you don't remember that, calling them

24    "hubs"?

25                I mean, you called them "hubs"

CONFIDENTIAL

Page 108

```
1    on the video.
2         A.      I think Charlie called them
3    hubs and then I referenced it, but that's why
4    I said I don't know the context.
5         Q.      Okay.  Did you ever use the
6    term "stash houses"?
7         A.      Maybe.
8         Q.      But you can't say it for
9    certain?
10        A.      That I called something by a
11   stash house?
12        Q.      Did you -- did you ever call
13   the places in Atlanta where ballots were
14   being collected "stash houses"?
15        A.      I don't remember.
16        Q.      Okay.  All right.  Let's go to
17   the next clip, which I've marked as
18   Deposition Exhibit 1C.  It runs from -- oh,
19   here it is.
20              MS. KUCK:  Quinn.
21        (Marked Plaintiff Exhibit No. 1C.)
22   (BY MS. KUCK)
23        Q.      Before we do that, I'm going to
24   mark another document bearing the Bates
25   number of TTV_008427 through TTV_008430.  I'm
```

Page 109

1    going to mark that as Exhibit 14 [verbatim].

2                MS. KUCK:  Can we go off the

3           record for a moment.

4                THE VIDEOGRAPHER:  All parties

5           in agreement with going off the

6           record, we're going off the record at

7           11:46 a.m.

8        (Break from 11:46 a.m. to 11:47 a.m.)

9                THE VIDEOGRAPHER:  We are going

10          back on the record at 11:47 a.m.

11   (BY MS. KUCK)

12       Q.     Oh, okay.  This is another clip

13   running from 24:29 to 26:02, which I am

14   marking as Deposition Exhibit 1C.

15                (Video playing.)

16   (BY MS. KUCK)

17       Q.     Okay.  In that video that is an

18   unblurred video of the plaintiff,

19   Mr. Andrews, correct?

20       A.     I couldn't see whether it was

21   blurred or not.  My eyes aren't good enough.

22   I'm sorry.

23       Q.     Okay.  Well, can you find your

24   answer in there?

25       A.     Can I find my answer in where?

CONFIDENTIAL

Page 110

```
 1          Q.      Yeah.  You admitted in your
 2     answer to the complaint that these statements
 3     were made on the show while there was
 4     unblurred video of Mr. Andrews being shown.
 5                  Do you have any reason to
 6     dispute that?
 7          A.      No.  I just told you I couldn't
 8     see it.
 9          Q.      Okay.
10          A.      It was too far away.
11          Q.      Okay.  Mr. Kirk says he is one
12     of the 2,000 you profiled --
13          A.      Actually it sounded to me like
14     he asked a question.
15          Q.      Okay.  He referred to 2,000 --
16          A.      Uh-huh.
17          Q.      -- people you profiled?
18          A.      Uh-huh.
19          Q.      Okay.  What did you understand
20     him to mean by that --
21                  MR. EVANS:  Objection;
22          misstates the facts.
23                  MS. KUCK:  Okay.  We can play
24          it again if we need to.
25     (BY MS. KUCK)
```

CONFIDENTIAL

Page 111

```
 1          Q.      You referred to Mr. Andrews as
 2     a "mule."
 3                  Am I correct?
 4          A.      I said he was a voter and then
 5     I said a mule.
 6          Q.      Right.
 7          A.      Yes.
 8          Q.      And when you said he was a
 9     mule, what did you mean by that?
10          A.      The law requires -- in Georgia
11     the law requires any -- any -- the law
12     requires signatures on the -- for assisters
13     on ballots as Catherine said in the latter
14     part of the clip.
15                  And we had asked -- True the
16     Vote had asked Gwinnett County for all their
17     assisters and they didn't have any.  And
18     therefore he would meet the category of being
19     a mule.
20          Q.      So to you a mule is anyone
21     who -- who puts in more than one ballot?
22          A.      I didn't say that.
23          Q.      Okay.  So define a mule for me.
24          A.      We already -- we did that
25     earlier.
```

CONFIDENTIAL

Page 112

1          Q.     Okay.  So you -- you are just
2     saying a mule, in your understanding, is just
3     anyone who submits a ballot illegally?
4          A.     Yes.
5          Q.     And Mr. Kirk says in there
6     that -- when you say it's highly illegal, he
7     says:  "...unless for one of your close
8     relatives."
9                 And you seem to acknowledge
10    that, right?
11         A.     That's not at all what
12    happened.  Catherine answered the question
13    about --
14         Q.     Okay.
15         A.     -- about needing -- about
16    needing assister's signatures.
17         Q.     Okay.  Is it your testimony
18    that in Georgia in order to -- in order to
19    deposit ballots of your close relatives you
20    need a signature to do that?
21         A.     The assister's signature is
22    always required --
23         Q.     In order to -- even for
24    relatives?
25         A.     Yes.

CONFIDENTIAL

1          Q.     Okay.  When -- well, let's just

2     redo it again so we're not confused about the

3     2,000 number.

4                    MS. KUCK:  Can we replay it.

5                      (Video playing.)

6                    MS. KUCK:  You can stop this.

7     (BY MS. KUCK)

8          Q.     Okay.  Mr. -- Mr. Kirk says:

9     "This is the one of the 2,000 you profiled?"

10                   And Ms. Engelbrecht says:

11    "Yes."

12                   Did you just hear that?

13         A.     Yeah, but I didn't say it.

14         Q.     Okay.  Do you disagree with

15    that statement?

16         A.     Yes.

17         Q.     Why?

18         A.     The -- the -- going back to the

19    matching of the video --

20         Q.     Uh-huh.

21         A.     -- to the thing, you took that

22    video completely out of context.

23                   What they're talking about

24    before and what they're talking about after

25    were something that we called the "Gwinnett

CONFIDENTIAL

Page 114

1    anomaly."

2         Q.    Okay.

3         A.    And so when the video was

4    brought up in Gwinnett, it was brought up in

5    the context of the Gwinnett anomaly.

6         Q.    Tell me what the Gwinnett

7    anomaly is.

8         A.    I'm going to mix up my dates

9    here, but on October -- excuse me.

10            True the Vote submitted a

11    complaint to the state board of elections on

12    this.  You guys have all this.

13            On or about the 11th of

14    October, there was a pick-up at that drop box

15    in the morning about 7:35 a.m. and there was

16    another pick-up the next day, Monday morning,

17    at about 8:30.  So about 25 hours.

18            During that 25-hour period,

19    approximately 271 people approached the drop

20    box, placed about 400 ballots or so into the

21    drop box.  But on the chain of custody

22    document, it showed 1962 ballots.

23            And, in fact, on the morning --

24    the Monday morning pick-up, the video with

25    that shows them getting thousands of -- of

Page 115

1    documents -- of ballots out and putting them

2    into a -- a black -- a black sort of carrying

3    pouch and then they walked off with it,

4    violating all sorts of terms of the rules of

5    engagement, the -- the chain of custody

6    documents were improperly done.

7              They said they weren't turned

8    in until 11 o'clock that morning.  There were

9    lots of problems with the Gwinnett anomaly.

10             And -- and what was submitted

11   to the state board of elections, which they

12   never still to this moment have not ruled on,

13   is what was -- what was happening.  What was

14   this all about.

15             So what you just showed me from

16   Charlie was sandwiched in between the

17   discussion about the Gwinnett anomaly.  So

18   when Charlie said, This is Gwinnett.

19             It was said in that context.

20   That said, that's Charlie's show.  We had no

21   editorial control whatsoever over what

22   Charlie says, does, or produces.

23   Q.    Well you didn't -- before we go

24   to there, the complaint that you filed with

25   the board of elections, that's been

CONFIDENTIAL

Page 116

```
 1    withdrawn, right?
 2          A.      No.
 3          Q.      Okay.  Did you withdraw any
 4    complaint with the Georgia board of
 5    elections?
 6          A.      I don't think so.  I have no
 7    idea.  I didn't submit them.  True the Vote
 8    did.
 9          Q.      That's a True the Vote
10    question?
11          A.      Uh-huh.
12          Q.      Did -- you're aware that the
13    State of Georgia subpoenaed True the Vote for
14    the information that they used in the
15    complaint?
16          A.      That's false.
17          Q.      It's false that they subpoenaed
18    the information?
19          A.      They had nothing to do -- they
20    subpoenaed nothing about the Gwinnett
21    anomaly.
22          Q.      Okay.  But they subpoenaed
23    certain information?
24          A.      No.  They subpoenaed us.
25          Q.      Right.
```

CONFIDENTIAL

Page 117

1        A.      It had nothing to do with this.

2        Q.      But it was in connection with

3    that complaint?

4        A.      No, it was not.

5        Q.      It was a different complaint?

6        A.      It wasn't in conjunction with

7    any complaint we made.  They wanted the name

8    of someone that was a whistleblower in the

9    case.

10       Q.      Okay.  And you -- a

11   whistleblower in the -- in the case that you

12   submitted to them --

13       A.      No.

14       Q.      -- in the complaint?

15       A.      No.

16       Q.      In what case?

17       A.      In the -- in the -- the ballot

18   harvesting adventure.  All of it.

19              Somebody came to us with some

20   information and they wanted -- they wanted

21   the person subpoenaed.

22              They didn't care about the

23   complaint.  They never ruled on the

24   complaint.  They never did anything.  They

25   never investigated the complaint.

CONFIDENTIAL

Page 118

```
 1                    In fact, when the state board
 2      of elections had to hire some guy who
 3      completely misspelled his -- his name, he
 4      misspelled "secretary," he misspelled
 5      everything, and we didn't even know if it was
 6      real.
 7                    The guy called Mrs. Engelbrecht
 8      and said, I'm now an investigator for the
 9      state board of elections.
10                    And excuse my language, but I
11      believe what he actually said was, We don't
12      give a shit what you submitted.  We just want
13      the name of the whistleblower.
14          Q.      But your testimony is that TTV
15      has never withdrawn any complaint that it
16      filed in Georgia?
17          A.      We tried, one of them.  There
18      were three submitted that day.
19          Q.      Right.  And you tried -- so
20      there was one withdrawn?
21          A.      No.  They wouldn't let us
22      withdraw it.
23          Q.      Okay.  You tried to withdraw
24      one?
25          A.      We tried.
```

CONFIDENTIAL

Page 119

1        Q.      Okay.

2        A.      But they refused to

3    investigate.

4        Q.      So going back to the -- the

5    2000 number that Mr. Kirk uses and

6    Ms. Engelbrecht says, Yes, do you understand

7    what he was referring to?

8        A.      I would be speculating.

9        Q.      You can speculate for purposes

10   of the deposition.

11       A.      I'm not going to speculate.

12       Q.      What was your understanding?

13       A.      I don't have one.

14       Q.      Okay.  So you have no idea what

15   he was talking about and what Ms. Engelbrecht

16   was talking about?

17       A.      You would have known a lot more

18   had you not taken them out of context.  So if

19   you want to watch it all in context, the

20   whole hour-long thing, I'm happy to do it.

21       Q.      Okay.  But you can't tell me --

22   you have no understanding of what the 2000

23   reference is?

24            MR. EVANS:  Objection; asked

25       and answered.

CONFIDENTIAL

Page 120

1          Q.      Okay.  Did you --

2                  THE REPORTER:  I'm sorry, I did

3          not get an answer from him.

4                  MS. KUCK:  Oh, okay.

5      (BY MS. KUCK)

6          Q.      You have no understanding --

7          A.      No.

8          Q.      -- what the 2000 referred to?

9                  Did you object at any time

10     during the taping that Mr. Kirk was using on

11     blurred video?

12         A.      I didn't -- I didn't know.

13         Q.      Even at the time you didn't

14     know it was unblurred?

15         A.      I didn't have my glasses on.

16         Q.      So during the -- your testimony

17     is during this interview you did not

18     realize --

19         A.      Watch it.  I don't have my

20     glasses on.

21         Q.      Strike that.

22                 When -- at the time of the

23     interview --

24         A.      Uh-huh.

25         Q.      -- is it your testimony that at

CONFIDENTIAL

Page 121

1     that time you didn't understand that the
2     video being played on the show was unblurred?
3           A.     Yes.
4           Q.     That is your testimony?
5           A.     Yes.
6                  MR. EVANS:   Objection; asked
7           and answered.
8     (BY MS. KUCK)
9           Q.     Okay.  With respect to the --
10    the individual shown on the videotape that we
11    just watched, do you have any evidence that
12    that person was engaged in any ballot
13    harvesting?
14          A.     What's ballot harvesting to
15    you?
16          Q.     What is ballot harvesting?
17          A.     He put more ballots -- the law
18    compels there to be assister signatures.
19          Q.     Uh-huh.
20          A.     He put five ballots in the drop
21    box.  He violated the law.  There are no
22    assister signatures in Gwinnett County.
23          Q.     But do you -- do you
24    characterize that as ballot harvesting?
25          A.     I didn't characterize that.

1    You did.

2          Q.      I'm ask -- what do you

3    understand "ballot harvesting" to mean?

4          A.      It's a nebulous term.  Anybody

5    uses it.  It just doesn't mean anything.

6          Q.      Not a term you've ever used?

7          A.      Maybe.  No idea.

8          Q.      You don't -- you don't have an

9    understanding of that term?

10          A.      I don't know what your -- I

11    don't know what you're asking me.

12          Q.      Okay.  Do you have any evidence

13    that that particular individual went to more

14    than one drop box?

15          A.      No, but that wasn't the

16    question.

17          Q.      That's my question now.

18          A.      No.

19          Q.      Okay.  Do you have any evidence

20    that that particular individual was paid to

21    deposit those ballots?

22          A.      That's not what was asked.

23          Q.      I'm asking you now.  Do you

24    have any evidence --

25          A.      No.

CONFIDENTIAL

1          Q.      -- that that particular

2     evidence --

3          A.      No.

4          Q.      -- that -- okay.

5               Do you have any evidence that

6     that particular individual picked up ballots

7     from any nonprofit organization?

8          A.      I have no idea.

9          Q.      Okay.  And other than the --

10    the fact that he was putting in more than one

11    ballot, do you have any reason to allege that

12    he was doing anything illegal?

13         A.      Yes.  There are no assister

14    signatures in Gwinnett County.

15         Q.      Right.  So, therefore, you

16    contend that because he was putting in more

17    than one ballot it must have been illegal?

18         A.      That's the law.

19         Q.      Okay.  That's why you called

20    him a mule, you're saying?

21              MR. EVANS:  Objection; asked

22         and answered.

23    (BY MS. KUCK)

24         Q.      Okay.  That's why you're

25    calling him a mule?

Page 124

1          A.     I didn't call him a mule.

2          Q.     You did on the video.

3          A.     Whatever.  It was just a

4     passing thing.

5          Q.     Okay.  But that -- when you

6     used the term "mule," is that what you meant?

7          A.     Likely.

8                 But, again --

9                 MR. EVANS:  There's no pending

10         question.

11                MS. KUCK:  No pending question.

12    (BY MS. KUCK)

13         Q.     Let's -- let's mark as

14    Plaintiff's Deposition 14...

15            (Discussion off the record.)

16    (BY MS. KUCK)

17         Q.     Okay.  Let's mark as

18    Plaintiff's Deposition Exhibit 15 -- right,

19    this is the number -- a document bearing

20    Control No. TTV 008427 through TTV 008430.

21        (Marked Plaintiff Exhibit No. 15.)

22    (BY MS. KUCK)

23         Q.     This seems to be an e-mail

24    chain between you and Mr. Glicklich.

25                Do you see that?

CONFIDENTIAL

Page 125

```
 1          A.     I do.
 2          Q.     Okay.  And we talked about
 3    Mr. Glicklich before and you're not -- you
 4    don't have a general understanding as to what
 5    services he was providing for TTV?
 6          A.     I really don't.
 7          Q.     And why were you providing
 8    information to him?
 9          A.     Likely Catherine asked me.
10          Q.     And you didn't ask her who he
11    was or why you should provide the
12    information?
13          A.     Above my pay grade.
14          Q.     Okay.  If you turn to
15    Page 8429.
16          A.     Okay.
17          Q.     And he seems to be asking you a
18    number of questions in connection with an
19    article that Philip Bump of The Washington
20    Post was doing.
21                 Do you remember that?
22          A.     Philip Bump wrote 27 articles
23    about us.
24          Q.     Okay.
25          A.     Hard to know which one.  Can
```

1    you read it?

2         Q.    I'm not asking you about which

3    one.  I'm just saying you know who Philip

4    Bump is and you know he's a reporter?

5         A.    Yeah.

6         Q.    Okay.  And you were

7    corresponding with Mr. Glicklich about how to

8    respond to Mr. Bump, right?

9         A.    Apparently.

10        Q.    Okay.  If you look at -- on

11    8429 about halfway down, Mr. -- well, let's

12    start at the end, actually.

13              On 8430, Mr. Bump sends you an

14    e-mail that says:  "Good afternoon.  Two

15    questions for a story I'm working on

16    currently."

17              And the first question is:

18    "Can you explain the work of Azzedine

19    Rahlouni did on the data analysis used for

20    2000 Mules?"

21              Do you see that?

22        A.    I do.

23        Q.    Okay.  And then Mr. Glicklich

24    asks you for a little more detail on these

25    answers?

CONFIDENTIAL

Page 127

1          A.     Can you tell me where?

2          Q.     8429.  That's -- you say -- you

3     say:  "Guys, see Bump's questions below.

4     Time's up."

5                 And then he responds.

6          A.     Who responds?

7          Q.     Mr. Glicklich right in the

8     middle of the page where it says on July 18

9     at 1:05 p.m.?

10         A.     Oh, I see.  I'm sorry, I missed

11    it.  Yes, I'm with you.

12         Q.     He -- he -- and the second line

13    down, he asks the question:  "Are we claiming

14    that Rahlouni never did any data analysis on

15    2000 Mules or are we claiming that any

16    analysis he reports to have is flawed?"

17                Do you see that?

18         A.     Yep.

19         Q.     And then -- and then in your

20    response, which is above, you say:  "His name

21    is on the metadata of one of the files that

22    GBI was given access to by the FBI.  He was

23    one of our analysts."

24                Do you see that?

25         A.     I do.

CONFIDENTIAL

Page 128

1          Q.      Okay.  So I asked you earlier

2     if Mr. -- if you knew Mr. Rahlouni and you

3     said no?

4          A.      I didn't recognize his name.

5          Q.      Okay.  So was he one of your

6     analysts?

7          A.      He wasn't one of mine.  He

8     worked for Red Metrics, apparently.

9          Q.      So when you said "our

10    analysts," you meant Red Metrics?

11         A.      I guess.  I don't know.

12         Q.      Okay.  And then why -- why

13    didn't you identify him when I asked you the

14    names of the analysts?

15         A.      Because I didn't know who it

16    was.

17         Q.      You didn't know who it was

18    when?

19         A.      I didn't recognize the name

20    when you asked me for whatever his name is.

21    I can't even pronounce it.

22         Q.      But in this e-mail you're --

23    you're acknowledging that he was one of the

24    analysts?

25         A.      I -- apparently.

CONFIDENTIAL

Page 129

1        Q.    Any other analysts that you can

2    think of now that I've showed you the name of

3    at least one?

4        A.    No.

5                MS. KUCK:  Off the record for a

6        second.

7                THE VIDEOGRAPHER:  All parties

8        in agreement with going off the

9        record, we're going off the record at

10       12:07 p.m.

11       (Break from 12:07 p.m. to 12:09 p.m.)

12               THE VIDEOGRAPHER:  We are going

13       back on the record at 12:09 p.m.

14   (BY MS. KUCK)

15       Q.    I'm going to mark as

16   Plaintiff's Deposition Exhibit 16 a one-page

17   document bearing Bates No. TTV 007399.

18       (Marked Plaintiff Exhibit No. 16.)

19               MR. EVANS:  Are you good,

20       Gregg, for a little bit longer?

21               THE WITNESS:  Yeah.  Yeah.

22               MS. KUCK:  Just 15 minutes

23       maybe.  Maybe, if that.

24   (BY MS. KUCK)

25       Q.    Okay.  So this is an e-mail

CONFIDENTIAL

Page 130

```
 1       from Jim Hoft to you, Ms. Engelbrecht, and a
 2       Patty McMurray, Re podcast invitation.
 3                   Do you -- do you recall him
 4       being with Gateway Pundit?
 5            A.     Yes.
 6            Q.     And do you recall that you and
 7       Ms. Engelbrecht appeared on that podcast?
 8            A.     I don't, but it doesn't
 9       surprise me.
10            Q.     Okay.  He says:  "We have a
11       couple clips of ballot traffickers you ran
12       during your Charlie Kirk interview.  If you
13       have anything else, please send it to us by
14       the 4:00 p.m. ET interview."
15                   Do you see that?
16            A.     I do.
17            Q.     Okay.  And you -- you did
18       appear on that podcast, correct?
19            A.     Which podcast?
20            Q.     The one -- the Gateway one in
21       April.
22            A.     I don't recall.
23            Q.     Okay.  Do you have any reason
24       to believe you didn't?
25            A.     No.
```

CONFIDENTIAL

Page 131

1          Q.       Okay.  Do you -- he says he has
2     a couple clips of ballot traffickers you ran
3     during the Charlie Kirk interview.
4          A.       Uh-huh.
5          Q.       Did you -- did you correct him
6     in any way and say, Oh, wait a minute, those
7     weren't ballot traffickers?
8          A.       I -- I -- I don't know I -- I
9     don't even know if I even saw this.
10         Q.       Okay.  It's sent to you, but
11    you don't remember seeing it?
12         A.       Didn't make any difference.
13         Q.       What do you mean it doesn't
14    make any difference?
15         A.       We were busy.
16         Q.       Okay.  Are you aware that the
17    unblurred footage of the plaintiff was run
18    again on the Gateway podcast?
19         A.       I'll say yet again that we
20    didn't run anything.  We had no editorial
21    control over what Charlie ran.
22         Q.       That's right.  But he says he
23    has the clips from Charlie, although he says
24    you ran but --
25         A.       That makes no sense.

CONFIDENTIAL

Page 132

1          Q.      Okay.  You didn't tell him

2     that, though.

3               All right.  So you didn't

4     object to him using those clips as far as you

5     know, do you -- did you?

6          A.      I didn't give him the clips.

7          Q.      Right.  But he -- you were just

8     on The Charlie Kirk Show.  You knew what

9     clips he had.

10         A.      I had no idea.

11         Q.      Okay.  And he -- are you aware

12    that during that podcast he ran again the

13    clip of the plaintiff unblurred?

14         A.      I am not.

15         Q.      Okay.

16         A.      Didn't get it from me.

17         Q.      I'm not asking if he got it

18    from you.  I'm asking you whether, when you

19    were on his program, he ran it.

20         A.      I don't remember.

21         Q.      Are you aware of any other

22    interviews where the unblurred footage of the

23    plaintiff was used?

24         A.      I'm not even aware of those.  I

25    wasn't aware on Charlie's.  Wasn't -- no

CONFIDENTIAL

Page 133

1    recollection of Hoft's.

2         Q.    And your testimony is you

3    weren't aware on Charlie's because you didn't

4    have your glasses on?

5         A.    We didn't give him the clip.

6    We weren't in charge of Charlie's program.

7         Q.    No, but you were sitting with

8    Mr. Kirk looking at the footage on the

9    computer.  He was running the footage and you

10   were looking at it.

11        A.    Yeah, that's exactly what I'm

12   saying.

13        Q.    Right.

14        A.    But my eyesight is bad.

15        Q.    All right.

16        A.    That's what I'm saying.

17        Q.    All right.  Where did he get

18   that footage?

19        A.    Who knows.

20        Q.    Okay.

21        A.    Not from us.

22        Q.    How did it -- how did it come

23   to you that you and Ms. Engelbrecht were on

24   his program?

25        A.    Don't recall.  We were out

CONFIDENTIAL

Page 134

1    in -- about that time we were out in Phoenix

2    at a -- I think maybe speaking to a

3    legislative group or something.  I don't

4    really recall.

5            Q.    And he asked you to be on?

6            A.    Uh-huh.  We're on a lot of

7    podcasts.  We do probably -- each, probably

8    ten a week.

9            Q.    Right.  And how many of them

10   during this period of time were relating to

11   2000 Mules?

12           A.    No idea.

13           Q.    Okay.  Too many to remember?

14           A.    Maybe.

15           Q.    You don't remember?

16           A.    I don't.

17           Q.    And there were a lot of them?

18                 MR. EVANS:  Objection;

19           misstates testimony.  Asked and

20           answered.

21   (BY MS. KUCK)

22           Q.    During this period of time were

23   you on a lot of podcasts talking about the

24   2000 Mules project?

25           A.    I wasn't on a lot, but I think

CONFIDENTIAL

Page 135

1    Mrs. Engelbrecht was on a good bit more than

2    me.

3         Q.    Right?

4         A.    But I was on a few.

5         Q.    Okay.  Do you remember how many

6    she was on?

7         A.    No idea.  I'm not in charge of

8    her schedule.

9         Q.    The Gateway Pundit -- well,

10   strike that.

11             Do you know who Patricia

12   Jackson is?

13        A.    Name rings a bell but I

14   don't --

15        Q.    The publicist who worked with

16   Mr. D'Souza's company on 2000 Mules.

17        A.    She didn't work with me.

18        Q.    You had no contact with her?

19        A.    I don't ever recall speaking

20   with her.

21        Q.    Do you remember him having a

22   publicist?

23        A.    I'm sure he did.

24        Q.    Your testimony is you never

25   spoke to her?

CONFIDENTIAL

Page 136

1          A.     My testimony is I don't recall

2     ever speaking to her nor was I ever on a show

3     that she set me up on.

4          Q.     Okay.  Do you remember speaking

5     to any publicist hired by Mr. D'Souza?

6          A.     No.  We had a very limited

7     role.

8          Q.     Did you coordinate the

9     publicity for 2000 Mules with Mr. D'Souza?

10          A.     No.  It was out of the scope.

11     I was asked to provide some limited video and

12     some limited research.

13          Q.     And your testimony is that's

14     all you did?

15          A.     My testimony is that's all that

16     we were contracted to do.

17          Q.     Okay.  What did you actually

18     do?

19          A.     You know, we ended up on the

20     movie.  I guess you saw that.

21          Q.     I did see that.

22                 So you gave interviews for the

23     movie?

24          A.     I don't recall -- I gave a few,

25     but none through Dinesh's team.

1          Q.      Right.  Did you coordinate

2    publicity for the movie?

3          A.      I've already answered this.

4    No.

5          Q.      No, you did not?

6          A.      I did not.

7          Q.      Okay.  Did Ms. Engelbrecht?

8          A.      No idea.  I'm not in control of

9    her calendar.

10          Q.      And you were -- as you said,

11    you were in the 2000 Mules film, correct?

12          A.      I was.

13          Q.      Okay.  Did you --

14          A.      I wasn't part of the contract,

15    though.  I was contracted to provide video

16    and some limited research.

17          Q.      And what contract are you

18    referring to?

19          A.      I can't remember what it was

20    called.  The agreement between -- between

21    Dinesh and -- and True the Vote.

22          Q.      But I believe you said earlier

23    you don't -- you've never seen a copy of that

24    contract?

25          A.      I may have seen it but I wasn't

CONFIDENTIAL

Page 138

1    party to it so it wasn't part of my -- my

2    world.

3         Q.    How -- how long were you taped

4    in your interview -- strike that.

5              There is footage of you in the

6    film 2000 Mules.

7         A.    Uh-huh.

8         Q.    How -- how long did you tape

9    interviews for that movie?

10        A.    A few hours.

11        Q.    Less than ten?

12        A.    Yeah.

13        Q.    Did all of the footage make it

14    into the movie?

15        A.    No.  We had no editorial

16    control.

17        Q.    Did you approve the trailer for

18    the movie?

19        A.    Which trailer?

20        Q.    Trailer for the 2000 Mules

21    movie?

22        A.    Which trailer?

23        Q.    Any trailer?

24        A.    No.

25              We had no editorial control.

CONFIDENTIAL

Page 139

1          Q.      That wasn't my question.

2                  My question was:  Did you

3      approve any trailer for the movie?

4                  MR. EVANS:  Asked and answered;

5          objection.

6      (BY MS. KUCK)

7          Q.      I'm not asking about control.

8      I'm just asking if you approved it or not.

9                  MR. EVANS:  He just answered

10         the question.  I'm reading the

11         question and answer right here.

12     (BY MS. KUCK)

13         Q.      And is the answer no?

14         A.      You already know it's no.

15         Q.      Okay.

16                 MS. KUCK:  I think that's

17         probably a good spot to stop for

18         lunch.

19                 THE VIDEOGRAPHER:  All parties

20         in agreement with going off the

21         record, we're going off the record at

22         12:18 p.m.

23         (Break from 12:18 p.m. to 1:32 p.m.)

24                 THE VIDEOGRAPHER:  We are going

25         back on the record at 1:32 p.m.

CONFIDENTIAL

Page 140

1    (BY MS. KUCK)

2         Q.      Okay.  Mr. Phillips, you said

3    you don't have any position currently at True

4    the Vote; is that right?

5         A.      Yes, ma'am.

6         Q.      And the only position you ever

7    held was as a director for a limited period

8    of time?

9         A.      As a board member.

10        Q.      As a board member.  I'm sorry.

11               Did you ever have a True the

12   Vote e-mail?

13        A.      I don't know.  I don't think

14   so.  No idea.

15        Q.      Okay.  Let's mark as

16   Plaintiff's Exhibit 17 a document bearing

17   Bates No. TTV_06 -- I'm sorry -- TTV_09860.

18        (Marked Plaintiff Exhibit No. 17.)

19   (BY MS. KUCK)

20        Q.      Let's see.  We talked this

21   morning a little bit about the meaning of

22   ballot harvesting, and you said it's a

23   nebulous term.

24               Do you remember that?

25        A.      Yeah, I think so.

CONFIDENTIAL

Page 141

1           Q.      Okay.  If -- if we -- this is

2      a -- a post by True the Vote.

3                   And they -- it says:  "To

4      understand this quote" -- and there's a

5      quote -- but it says:  "You must first

6      understand ballot harvesting.  This is when

7      absentee ballots are collected and taken to a

8      ballot box by someone who isn't a member of

9      your immediate family."

10                  Do you see that?

11          A.      Uh-huh.

12          Q.      If we use that definition for

13     ballot harvesting, do you have any evidence

14     that plaintiff, Mr. Andrews, was engaged in

15     ballots -- ballot harvesting?

16          A.      That requires me to speculate.

17          Q.      Do you have any evidence, was

18     my question?

19                  I'm not asking you whether he

20     was or he wasn't.  I'm asking if you have any

21     evidence that he was.

22          A.      There was no evidence that

23     anyone signed as an assister on those

24     ballots.

25          Q.      Right.

CONFIDENTIAL

Page 142

```
 1            A.     That's the evidence.
 2            Q.     But do you have any evidence
 3      that he collected ballots from anyone who was
 4      not a member of his immediate family?
 5            A.     No.
 6            Q.     We also talked about the number
 7      of persons in Atlanta that were included in
 8      the analysis turned over to the FBI, and we
 9      were talking about the 242 number.
10            A.     Yes, ma'am.
11            Q.     Do you remember that?
12            A.     I do.
13            Q.     Okay.  For purposes of that
14      analysis, to be included in the 242, what was
15      the criteria?
16            A.     I think it was ten or more drop
17      boxes during the target period, and I think
18      maybe three NGOs or outside organizations.  I
19      can't remember the final, but it was
20      something close to that.
21            Q.     Okay.  And you would count
22      those 242 people as ballot traffickers,
23      right, the definition we used?
24            A.     You know, again, I mean,
25      it's -- I mean, the -- the phrase --
```

CONFIDENTIAL

Page 143

1    phraseology is in the eye of the beholder.  I

2    don't know what I would call them.

3          Q.    Okay.

4          A.    They're persons of interests,

5    certainly.

6          Q.    Would you call them mules?

7          A.    I might.

8          Q.    Okay.  Let me mark TTV 9858.

9       (Marked Plaintiff Exhibit No. 18.)

10    (BY MS. KUCK)

11          Q.    I'm marking as Plaintiff's

12    Exhibit 18 a document bearing the Bates

13    No. TTV_09858.  And the Bates number is very

14    tiny, but we did verify it.

15                And this is a -- a post from

16    True the Vote from August 30, 2021.  And you

17    see that, 242 Georgia ballot traffickers?

18          A.    I do.

19          Q.    Is that the reference to the

20    same 242 people you were talking about?

21          A.    I don't know.  This isn't my

22    social media account.

23          Q.    Okay.  Can you get -- pull out

24    Exhibit 6.

25          A.    Okay.

CONFIDENTIAL

Page 144

1         Q.    And I'm going to be asking you
2    about your response to Interrogatory No. 7.
3         A.    Okay.  What page is that on?
4         Q.    Page 17.
5              And in the second paragraph,
6    the question I have for you is about the
7    sentence that says:  "Because Gwinnett County
8    didn't provide video until much later, True
9    the Vote did not extend the Atlanta Metro
10   area geolocation pattern study to incorporate
11   when that county video."
12             Can you explain that sentence
13   to me.
14        A.    Sure.  In -- once -- once
15   you've identified -- or once we were able to
16   identify the 242, then we went through the
17   arduous process, then, of trying to figure
18   out was there a corresponding video that --
19   that might match that individual at that box
20   at that time.
21             And that's where we came up
22   with the 70 or so videos and the 242 IMEIs
23   that we presented to the -- to the -- to
24   Dinesh and Debbie.
25        Q.    Okay.

 1          A.      Mr. and Mrs. D'Souza.  Sorry.
 2          Q.      The -- but I guess I'm trying
 3    to understand the link here.  It said:  "We
 4    didn't extend the geolocation pattern study
 5    to incorporate Gwinnett County video."
 6               Are you saying you -- that --
 7    was there a study done of the Atlanta Metro
 8    area?
 9          A.      Yeah.  That's how we matched
10    the 70 that we were able to match.
11          Q.      Okay.  But what does it mean
12    that True the Vote did not extend the pattern
13    study to incorporate Gwinnett County?
14          A.      We didn't go back and then try
15    to figure out was there Gwinnett video that
16    matched any Gwinnett drop box visits.
17          Q.      Okay.  So for purposes of
18    Gwinnett County, there was no matching done
19    between the geospatial location data and the
20    video?
21          A.      Right.
22          Q.      Because you got the video too
23    late?
24          A.      That's right.
25          Q.      So there -- so in the 70 video

CONFIDENTIAL

Page 146

1    cuts that you provided --

2         A.    Uh-huh.

3         Q.    -- those would not have

4    included people in Gwinnett County?

5         A.    Correct.

6         Q.    And the 70 video cuts, were

7    they only people within the 242 that met your

8    criteria about going to ten drop boxes?

9         A.    Yes, as best we could tell.

10              The problem with the video

11   matching is there are -- any kind of

12   surveillance video is -- is subject to one's

13   ability to -- to access the correct viewing

14   software, right.

15              There might be different

16   formats, in other words.

17        Q.    Uh-huh, sure.

18        A.    And -- and many, if not all, of

19   the cameras around -- and there weren't that

20   many, but the few cameras that were around,

21   many of them had different viewing software.

22   So even if we had it --

23        Q.    Yeah.

24        A.    -- it didn't always mean we

25   could see it --

CONFIDENTIAL

Page 147

1          Q.      Right.  Okay.

2          A.      -- number one.

3                  Number two, the -- the -- the

4      positioning of the video was often not -- not

5      very clear.

6          Q.      Okay.

7          A.      So it might be -- you know, if

8      it was at night in the rain --

9          Q.      Right.

10         A.      -- or whatever, I mean, these

11     cameras were not set up to be that way.

12                 That said, the law -- the law

13     compelled any county in Georgia that had drop

14     boxes to have surveillance video on them.

15         Q.      Uh-huh.

16         A.      And that was also false.  They

17     did not.

18         Q.      They didn't com- -- your -- you

19     found that they did not comply with the

20     requirement?

21         A.      That's correct.

22         Q.      Okay.

23         A.      And so it left gaps.

24         Q.      Right.  So any video in the

25     film that is of a Gwinnett County voter would

CONFIDENTIAL

Page 148

1    not have been linked to your geospatial

2    analysis, right, because you didn't match

3    those two up?

4         A.    That's correct.

5         Q.    Okay.  And so for that reason,

6    you know you didn't match the plaintiff video

7    with the geospatial because he's in Gwinnett

8    County?

9         A.    I think that's fair, yes.

10        Q.    Yeah.  Okay.

11              How many -- of the 70 that you

12   gave, how many of them had been linked and

13   how many of them hadn't?

14        A.    All of them had been linked in

15   some way.  I mean, again, the challenge was

16   that -- that, you know, the -- the -- there

17   wasn't a hundred percent certainty, because

18   there were a lot of things going on that

19   can -- that can change, you know, like -- I

20   don't have a great example -- a time zone.

21        Q.    Uh-huh.

22        A.    You know, the time zones

23   weren't changed on the cameras --

24        Q.    Right.  Right.  Sure.

25        A.    -- or some of them didn't even

CONFIDENTIAL

Page 149

1    have the -- the metadata in there --

2         Q.     Yes.

3         A.        -- with the timing.

4         Q.     Uh-huh.

5         A.     So you would be unable to

6    actually review those.

7              But -- but the answer is that

8    most -- all of the ones that we provided, we

9    did match to the best of our ability, but it

10   wasn't a hundred percent certain.

11        Q.     But there are some Gwinnett

12   County videos, including of the plaintiff, in

13   the film?

14        A.     Yes.  We -- we didn't provide

15   that in the initial 70.  What happened was --

16   and you can see in some of the e-mails --

17        Q.     Uh-huh.

18        A.        -- they were trying -- as I

19   recall, Mrs. D'Souza -- Mrs. D'Souza wrote

20   Cath- -- Mrs. Engelbrecht and -- and asked

21   for a -- more videos.

22              I think -- I think she said, We

23   need thousands or something.  And I may be

24   mischaracterizing that.  I don't recall where

25   I saw it, but it's in here somewhere.

CONFIDENTIAL

Page 150

1          Q.      Uh-huh.

2          A.      And -- and I was in the thread

3     and sort of objected and said, I think that's

4     out of scope.

5                  We ended up sending more video,

6     but we had no control over what ended up

7     happening with it.  And it wasn't associated

8     with the 242 mules.

9          Q.      Okay.

10         A.      So -- so the way it was

11    described to us what was going to happen --

12    and I think you see it in -- maybe see it in

13    one of the trailers or something --

14         Q.      Uh-huh.

15         A.      -- that they were -- what they

16    wanted from the -- the videos was the ability

17    to create -- there's like a matrix they

18    create --

19         Q.      Sure.

20         A.      -- that happens somewhere in

21    the video --

22         Q.      Yeah.

23         A.      -- where it shows like a

24    thousand pictures.

25         Q.      Right.

CONFIDENTIAL

Page 151

```
 1          A.     And we were assured that
 2    that -- you know, that those people would all
 3    be blurred and, you know, whatever, because
 4    we -- you know, we made it clear, we haven't
 5    done -- you know, this is -- this is raw
 6    video that's, you know, outside of the scope
 7    of our contract and what we were to provide,
 8    which was, you know, a limited set of video
 9    and a limited set of research on -- on the
10    242 people.
11          Q.     And so Mr. and Mrs. D'Souza
12    were aware that that additional video had not
13    been linked to the geospatial?
14          A.     I -- I've only read that e-mail
15    one time, and so I'm only recalling from
16    memory.  I -- I would have to refer to the
17    e-mail.  And I don't know where it is.  I
18    know it's in here somewhere, but...
19          Q.     Okay.  But do you recall at any
20    point any conversation about there being
21    non-mules in the video -- in the film?
22          A.     Non-mules?
23          Q.     Yeah.
24          A.     I don't know that there were
25    any non-mules in the film.
```

CONFIDENTIAL

Page 152

1              There were mules apparently
2       that didn't meet the standard of the 242, the
3       ten and three or whatever it was.
4              Q.     Uh-huh.
5              A.     But they would have met a
6       different -- you know, in our case and in the
7       case of the video we saw in The Charlie Kirk
8       Show, it would have -- it -- it would have
9       been that -- that video would have been
10      outside of the 242.
11              Does that make sense?
12              Q.     Right.  Because you're defining
13      mules to be something broader than the 242?
14              A.     Best way I could describe it
15      would be mules with a small M, because mule
16      meaning these people were depositing ballots
17      beyond their own ballot not consistent with
18      the law.
19              Q.     Because you're defining mule
20      not to have to meet the criteria of the ten
21      and the five.  You're defining mule much more
22      broadly.
23              You're saying it's anybody that
24      put in a ballot and they shouldn't have?
25              A.     Yes.

CONFIDENTIAL

Page 153

1          Q.     Okay.  And -- and what is your

2     understanding of how it was defined in the

3     film?

4          A.     I don't recall.

5                 Are you done with this one?

6          Q.     For the time being.

7          A.     6.

8          Q.     Keep it handy for the time

9     being.

10         A.     I'm trying to keep organized

11    over here.

12         Q.     I know.  It gets to be a mess.

13    I'm sorry.

14                Could we mark TTV 00145

15    through -- I'm sorry -- TTV 007145 through

16    7148.  And that is going to be --

17                MS. KUCK:  I'm out of stickers.

18                Oh, you're too good.

19    (BY MS. KUCK)

20         Q.     That's going to be No. 19.

21         (Marked Plaintiff Exhibit No. 19.)

22    (BY MS. KUCK)

23         Q.     And let me ask you if you

24    recognize this document.

25         A.     I don't recognize the cover

CONFIDENTIAL

Page 154

1    page.

2         Q.    Okay.  Do you recognize the

3    attachment?

4         A.    I only recognize it in that I

5    assume it -- I mean, I can't assume.

6              I think it's one of the

7    complaints that was made by True the Vote to

8    the state board of elections.

9         Q.    And did you have any role in

10   preparing those complaints?

11        A.    No.  I think I -- I think our

12   attorney did.

13        Q.    And who worked with the

14   attorney to prepare them and give them the

15   information?

16        A.    I don't recall.

17        Q.    Do you recall if you provided

18   any information that the attorneys used in

19   the complaints?

20        A.    I don't recall.

21        Q.    Do you aware -- do you recall

22   being aware at any point of any inaccuracies

23   in any of the complaints that were filed with

24   Georgia?

25        A.    I really don't remember.

Page 155

1          Q.      There may have been
2    inaccuracies in them but you don't remember?
3          A.      I didn't say that I don't
4    remember.  I'm not saying there may -- was or
5    wasn't; I'm just saying I don't remember.
6          Q.      Okay.  If you turn to the
7    second page.
8          A.      146.
9          Q.      14- -- I'm sorry -- 147, the
10   second page of the complaint.
11         A.      I see.  Okay.
12         Q.      And there's a paragraph -- the
13   fourth paragraph down says:  "During the
14   runoff election in six counties in and around
15   Atlanta, 552,987 cell phones came within a
16   narrowly defined distance of ballot drop
17   boxes during our study period.
18                 "However, 242 unique devices
19   made repeat trips to drop boxes, averaging 23
20   trips each.  These same 242 devices also went
21   repeatedly, averaging 8 trips each to
22   specific NGOs."
23         A.      Okay.
24         Q.      You see that?
25                 Is that the 242 we've been

CONFIDENTIAL

Page 156

1    talking about?

2         A.    Apparently, yes.

3         Q.    And does this reflect your --

4    refresh your recollection that this was

5    during the runoff election period?

6         A.    I don't know, because we -- we

7    looked all the way back to -- I think the

8    middle of September.  I know the paperwork

9    said middle or the first of October, but

10   we -- we were looking at both.

11        Q.    Right.  But you don't remember

12   where the 242 came from?

13        A.    I don't.

14        Q.    And it says:  "Averaging eight

15   trips each to specific NGOs."

16              Can you identify those NGOs?

17        A.    No.

18        Q.    Why?

19        A.    Because we were looking at

20   addresses and the NGOs were irrelevant to us.

21        Q.    Well, this is TTV's complaint.

22        A.    They were irrelevant to us.

23              TTV was making a complaint

24   seeking the state board of election's and the

25   attorney general to actually review the

1    complaints and make judgment on them.

2              Us providing information --

3    there's a chasm of difference -- not being

4    condescending, but there's a chasm of

5    difference between information, intelligence,

6    and evidence.

7          Q.    Uh-huh.

8          A.    And so when we turn information

9    over to any law enforcement or -- or anyone

10   in authority like the SPOE, we would expect

11   them to do the -- the law enforcement side of

12   the analysis that would allow them then to be

13   able to present this as evidence in court.

14             It's not our job to present

15   evidence.

16         Q.    Understood.  But -- and when

17   you say "we," who are you speaking?

18         A.    Everybody involved in the

19   project.

20         Q.    Including TTV?

21         A.    Including TTV.  Everybody.

22         Q.    Okay.  But then this says

23   specific NGOs.  You've been saying I wasn't

24   focused on the NGOs, I was just focused on

25   the addresses.

1        A.      Right.  That could well say
2    eight specific addresses.
3        Q.      Right.  But it doesn't.  It
4    says --
5        A.      I didn't write it.
6        Q.      Okay.  You would have said
7    eight specific addresses?
8        A.      Possibly.
9        Q.      Okay.  Can you identify any of
10   the NGOs that are referenced?
11       A.      No.
12       Q.      Was there a point in time in
13   which you could?
14       A.      No, because we never really
15   focused on it.  It wasn't -- it wasn't a
16   point of concern to us.
17       Q.      Again, are you -- when you are
18   using "we" and "us," do you mean --
19       A.      Everyone.
20       Q.      Everyone.  TTV as well?
21       A.      Well, I can't speak for
22   Mrs. Engelbrecht, but -- but everyone
23   involved with this broad analysis.
24       Q.      On the OpSec said?
25       A.      Everyone.

CONFIDENTIAL

Page 159

```
 1              Q.      Everyone.  Even TTV?
 2              A.      I can't speak for them.
 3              Q.      Right.  So when you say "we,"
 4       you're talking about your analysis at OpSec?
 5              A.      I -- I think you -- I think
 6       you've mischaracterized all of it, but, okay,
 7       if you want that to be right that's okay.
 8              Q.      No.  I'm just trying to get
 9       your testimony as to...
10              A.      It feels like you're altering
11       my testimony is what's happening.
12              Q.      All right.  Well, I don't want
13       that to happen, so let's go back.
14                      This says two specific NGOs.
15              A.      I said I don't know.
16              Q.      Right.  You don't know.
17              A.      And you kept pressing.
18              Q.      Understood.  And I asked you
19       whether you ever knew.
20              A.      Don't recall.
21              Q.      Okay.
22                      MR. EVANS:  So what's the
23              pending question?
24         (BY MS. KUCK)
25              Q.      Who made the link between the
```

CONFIDENTIAL

Page 160

```
 1     addresses and the NGOs?
 2          A.      The analysts.
 3          Q.      The analysts who work for you?
 4          A.      I don't know who was doing this
 5     particular piece of it.
 6                  It could well have been us.
 7                  It could have been Red Metrics.
 8                  It could have been our pro bono
 9     analysts.
10                  It could have been anyone.
11          Q.      What about the -- did TTV have
12     analysts working on this?
13          A.      I don't think so.
14          Q.      Okay.  So someone who was
15     working on -- one of the analysts working on
16     this project linked the addresses to certain
17     NGOs?
18          A.      I think that would be True the
19     Vote.
20          Q.      Okay.  And who asked them to do
21     that?
22          A.      I don't know.  It wasn't a
23     point of focus.  We -- we weren't trying to
24     say the NGOs were doing something.
25                  We were simply saying that
```

CONFIDENTIAL

Page 161

1    these people are depositing more ballots than

2    their own in a ballot drop box, and it's a

3    problem.  Somebody needs to look at this.

4         Q.    Let's go back to Exhibit 6

5    again, which is the interrogatory responses.

6              And just have that handy.  I

7    don't -- before I ask you those questions, we

8    talked --

9         A.    But you're done with 19?

10        Q.    I'm done with 19.

11        A.    Okay.

12        Q.    There -- there came a point in

13   time when TTV promised that it was about to

14   pull the rip cord and release the raw data

15   supporting the research behind the

16   2000 Mules.

17             Do you remember that?

18        A.    The video.

19        Q.    Well, I think the term used was

20   "raw data."

21        A.    Okay.  Well, I remember the

22   video, so my mistake.

23        Q.    Okay.  And there was a -- well,

24   was that ever done?

25        A.    No.

Page 162

```
 1            Q.     Why not?
 2            A.     I couldn't afford it.
 3            Q.     And there was -- there was an
 4    event in August of 2022 called The Pit.
 5                   Do you remember that?
 6            A.     I do.
 7            Q.     And -- and there was -- there
 8    was a -- leading up to that there was some
 9    discussion that the data would be --
10            A.     By whom?  By whom?
11            Q.     Well, strike that.
12                   Did you have any -- you
13    appeared at that event?
14            A.     I did.
15            Q.     And what was your understanding
16    as to what was -- what was going to be done
17    at that event?
18            A.     We had a number of speakers
19    come in.  We had people coming in and
20    offering suggestions to -- to citizen
21    researchers, which were the main people
22    attending the event.
23                   And giving them ideas at things
24    they could go look at and think about and
25    research and so on and so forth.
```

Page 163

1          Q.    Do you recall the TTV promise
2    to release the data at that event?
3          A.    I do not.
4          Q.    Do you --
5          A.    Either way, as I said, we
6    couldn't afford it.  Streaming 5 million
7    minutes of video wouldn't -- wouldn't be
8    something affordable by a nonprofit like
9    Catherine -- by Ms. Engelbrecht.  Sorry.
10         Q.    When did you reach that
11   conclusion?
12         A.    I really don't recall.  We had
13   a lot going on, but I assume sometime late
14   summer, early -- early fall.
15         Q.    Of 2022?
16         A.    Right.
17         Q.    Do you recall that at The Pit
18   you announced the launch of the website
19   Open.Ink?
20         A.    I do.
21         Q.    And what -- what was that
22   website supposed to do?
23         A.    Open.Ink was designed to give
24   people the place to -- think of it as sort of
25   a curated special collection library.

CONFIDENTIAL

Page 164

1              If you went to a library and

2    they have special collections where somebody

3    donates all their papers or -- or the like.

4         Q.    Uh-huh.

5         A.    We wanted -- we wanted to give

6    researchers and others the ability to publish

7    information that they knew wouldn't --

8    wouldn't hold on Google and would be, you

9    know, taken off of Twitter and -- and so on

10    and so forth.  So that was that.

11         Q.    Was the -- was the idea that

12    the TTV data would be -- would -- would be

13    posted there?

14         A.    What TTV did.

15         Q.    Well, I said the raw data and

16    you said it was video, but the data we've

17    been talking about, the video.

18         A.    I mean, we -- we've got -- we

19    have lots of data in there.  I'm not -- I'm

20    not sure what you're referring to.  I think

21    we have 6 million documents or something like

22    that.

23         Q.    Was the -- was the purpose of

24    Open.Ink to give you a place to release the

25    data and video?

Page 165

1          A.      This data and video?

2          Q.      That related to the 2000 Mules.

3          A.      No.  This -- the concept for

4     Open.Ink was developed in 2016, well before

5     any concept of any movie was ever thought of.

6          Q.      Okay.  But -- and then you

7     launched it in 2022?

8          A.      We launched it a couple

9     different times over the years, but launched

10    it again in 2022 and then again in January of

11    2023.

12         Q.      Okay.

13         A.      We had lots of problems.

14         Q.      What type of problems?

15         A.      Chinese hackers breaking in,

16    melting down our servers.  Lots of

17    interesting things.  Made -- made reports of

18    that to the FBI.

19                 It was -- it was a challenging

20    project, but I think probably one of the most

21    worthwhile projects we've done.

22         Q.      But you had backup of all the

23    material you had put in?

24         A.      Oh, yeah.

25             (Discussion off the record.)

CONFIDENTIAL

Page 166

1    (BY MS. KUCK)

2           Q.     Let's mark as Plaintiff's

3    Exhibit 20 a document bearing Bates

4    No. TTV 008970 through 8971.

5           (Marked Plaintiff Exhibit No. 20.)

6    (BY MS. KUCK)

7           Q.     This appears to be an e-mail

8    from Ms. Engelbrecht to you.

9                  Do you recall this?

10          A.     I don't recall it.

11          Q.     Okay.  This is October of 2022?

12          A.     Yep.

13          Q.     Do you have any reason to

14   believe you didn't receive it?

15          A.     I have no idea.  We -- we were

16   falsely imprisoned a few days after this and

17   this would have fallen by the wayside.

18          Q.     Okay.  But you did respond to

19   it?

20          A.     I -- apparently I did.  I

21   don't -- I don't know if we ever posted it or

22   not.

23          Q.     Okay.  That was one of my

24   questions.

25                 You don't know if you ever

1    post -- this was ever posted?

2         A.    I don't think so.

3         Q.    If you -- and you responded:

4    "I love this."

5              You see that at the top?

6              And then in the -- in the

7    document she's showing you below in the --

8    one, two, three, four, five -- sixth

9    paragraph, that long paragraph.

10        A.    Yes.

11        Q.    And it talks about the pulling

12   the rip cord?

13        A.    Yes.

14        Q.    And it says:  "We were planning

15   to pull the rip cord by releasing the data

16   and video used in the project"?

17        A.    Uh-huh.

18        Q.    And then further down, it says:

19   "That includes our own analysis of unique

20   devices listed by ID, which would appear to

21   be traveling to ballot drop boxes with

22   alarming frequency."

23              Does that -- does that refresh

24   your recollection that you were also going to

25   post the geospatial data?

CONFIDENTIAL

Page 168

1        A.        No, we couldn't do it.  I told
2    you we couldn't afford it.
3        Q.        You couldn't afford to post the
4    geospatial data?
5        A.        This is an incredible amount of
6    data.  We're talking about close to 10
7    trillion pings.
8        Q.        Right.
9        A.        You can't just open it up on
10   your computer and make it go.  This takes
11   some very heavy-duty horsepower to make it
12   go, not to mention the fact that the
13   bandwidth to run 5 million minutes of video
14   would be completely out of reach for
15   companies like ours.
16       Q.        Right.  But I want to
17   distinguish between the video and the
18   geospatial data.
19       A.        That's not -- you keep talking
20   about the rip cord.
21       Q.        Right.
22       A.        You keep trying to separate
23   them.
24       Q.        The rip cord included both
25   video and the geospatial?

CONFIDENTIAL

Page 169

```
 1          A.      I don't recall.  According to
 2     this, yeah.
 3          Q.      Okay.
 4          A.      But we never posted this, nor
 5     did we ever post the data.
 6          Q.      Right.
 7          A.      Okay.
 8          Q.      Did you -- did you retain the
 9     geospatial data?
10          A.      I never actually have
11     possession of the geospatial data.
12          Q.      Okay.  Who had possession of
13     it?
14          A.      Red Metrics.
15          Q.      And do you know what they did
16     with it?
17          A.      I do not.
18          Q.      Did you give them any
19     instructions?
20          A.      No.  Once the project was done,
21     they did with it what they will.
22          Q.      Okay.
23          A.      Took it offline, I'm sure.  It
24     cost them a lot of money to have it online
25     too.
```

CONFIDENTIAL

Page 170

```
1              Q.      Right.
2              A.      We're talking about -- we're
3    talking about a huge, huge amount of data.
4              Q.      Right.  And your testimony is
5    you never had the data?
6              A.      No.
7              Q.      So when you were also -- when
8    you were talking about it being very
9    expensive, were you -- if we took out the
10   geospatial data and just did the video, are
11   you distinguishing between the -- when you
12   say "video," do you mean the election video
13   or which video are you referring to?
14             A.      The certain --
15             MR. EVANS:  Objection; compound
16        question.
17   (BY MS. KUCK)
18             Q.      Okay.  Which -- well, we've
19   been talking about video.
20             What video were you including
21   in that?
22             A.      Surveillance video from the
23   2020-2021 elections.
24             Q.      The Dropbox video?
25             A.      Yes.
```

CONFIDENTIAL

Page 171

1          Q.     And you concluded that that
2     also was too expensive to post?
3          A.     Especially that.
4          Q.     And you don't recall when you
5     reached that conclusion?
6          A.     I don't.  But it would have
7     been probably later in the year.
8          Q.     How did it come about that you
9     worked with Mr. D'Souza to make the film?
10         A.     Are you -- are you referring to
11    something?
12         Q.     I'm done with that.  No.
13         A.     Okay.
14         Q.     I'm just going to ask you --
15    I'm switching gears.  I'm just asking you a
16    question.
17         A.     I think we covered this later
18    [verbatim].  Catherine introduced us at a
19    meeting at the D'Souzas' house and we
20    discussed it.
21                And there were months' worth of
22    discussions after that, and it ultimately
23    resulted in a -- in a deal to make the movie.
24         Q.     Okay.  What was your objective
25    in participating in the making of the film?

CONFIDENTIAL

Page 172

```
 1          A.      To bring light to the crimes
 2     that were being committed with people
 3     depositing more than one ballot in the drop
 4     box inappropriately.
 5                  We never would have made the
 6     movie if law enforcement would have
 7     investigated it.
 8          Q.      Did you personally enter into
 9     any agreement with respect to the making of
10     the film?
11          A.      No.
12          Q.      You're listed as an executive
13     producer, correct?
14          A.      That was listed without our
15     knowledge.  We didn't know about it until it
16     came out.
17          Q.      You didn't know you were going
18     to be listed as an executive --
19          A.      We had zero editorial control.
20          Q.      When did you first find out you
21     were going to be listed as an executive
22     producer?
23          A.      When the movie was released at
24     Mar-a-Lago, the premiere in front of 500
25     people.
```

CONFIDENTIAL

Page 173

1         Q.      Okay.  So other than in

2    connection with the OpSec work, were you

3    compensated for any work in connection with

4    the making of the film?

5         A.      There was some money that --

6    that came back to us from it, but I don't

7    recall how much.

8         Q.      And what do you mean "came back

9    to us"?

10        A.      The agreement called for them

11   to pay us some -- I don't know how the splits

12   are made.  I'm not a moviemaker and that

13   stuff escapes me.

14        Q.      Okay.  But -- and you said

15   you -- you don't recall seeing the agreement

16   between TTV and the D'Souzas?

17        A.      I may have seen it, but I

18   didn't pay attention to it.  That wasn't what

19   we were trying to do.  We were trying to

20   bring -- you know, shed light on what we

21   considered to be an incredibly important

22   issue.

23        Q.      Okay.  But your understanding

24   was that you were to be compensated under

25   that agreement?

CONFIDENTIAL

Page 174

1          A.     Yes, but -- but, you know, we

2     were compensated to some extent and not --

3     not -- not compensated consistent with the

4     agreement.

5                So, you know, I -- you know,

6     it's not -- it's not worth --

7          (Speaking simultaneously.)

8     (BY MS. KUCK)

9          Q.     What do you mean you weren't

10    compensated?

11               Oh, you mean because you had to

12    do more work you contend --

13         A.     No.

14         Q.     -- then what was provided in

15    the agreement?

16         A.     No.  The agreement made certain

17    representations about closeouts and when

18    things would happen and who would be paid for

19    what, and only -- only a handful of those

20    payments were ever made.

21         Q.     Did you -- were any of your

22    expenses covered in connection with the

23    movie?

24         A.     I think we were given a ████

25    expense check on -- at some point during the

CONFIDENTIAL

Page 175

1    process.  But -- but I'm -- I couldn't tell

2    you when it was.

3                    Sometime during the first half

4    of 2022, I would guess.

5        Q.    All right.  Let's mark

6    TTV_007191.

7                    MS. KUCK:  Do you need a break,

8        Mr. Phillips?

9                    THE WITNESS:  In a little bit.

10        Let's just try to make it through.

11                    MS. KUCK:  All right.

12                    THE WITNESS:  I don't want

13        you-all to have to wait on me.

14                    MS. KUCK:  No, no.  If you need

15        a break we can take --

16                    THE WITNESS:  I may take you up

17        on that here in a bit.

18            (Discussion off the record.)

19        (Marked Plaintiff Exhibit No. 21.)

20    (BY MS. KUCK)

21        Q.    I'm going to mark as Exhibit 21

22    a document that -- no, this is not the right

23    one.  Let's see.

24            (Discussion off the record.)

25                    MS. KUCK:  You know what, let's

CONFIDENTIAL

Page 176

1          take our break now, then.

2                    THE WITNESS:  That would be

3          great.  Thank you.

4                    THE VIDEOGRAPHER:  All parties

5          in agreement with going off the

6          record, we're going off the record at

7          2:12 p.m.

8          (Break from 2:12 p.m. to 2:27 p.m.)

9                    THE VIDEOGRAPHER:  We are going

10          back on the record at 2:27 p.m.

11     (BY MS. KUCK)

12          Q.     You -- am I correct that you

13     saw the first rough cut of the film at

14     Mr. D'Souza's house?

15          A.     Are we looking at a document?

16          Q.     No.

17          A.     Okay.

18          Q.     I'm just asking.

19          A.     Sorry.

20          Q.     Am I correct that you saw a

21     rough cut of the film at Mr. D'Souza's house

22     on April 2, 2021?

23          A.     We saw a rough cut of the film,

24     but I don't recall when.

25          Q.     Okay.  Was it at his house?

CONFIDENTIAL

Page 177

1          A.     Yes.

2          Q.     And then after that, you went

3     to Mar-a-Lago to review another cut a couple

4     weeks later; is that correct?

5          A.     Yes.

6          Q.     Okay.  After watching either of

7     those versions, did you ever tell Mr. D'Souza

8     there was anything in the film that was

9     inaccurate?

10          A.     It was out of the scope of --

11     of our role.  I mean, we had a very limited

12     role.  We were to provide video and we were

13     to provide some limited research.

14               And, you know, how people make

15     movies is -- I -- it -- it's like magic to

16     me.  I mean, I -- I don't know how people do

17     it, but I -- I -- it wasn't -- it wasn't in

18     my scope.  That's not why we were there.

19          Q.     Okay.  But so the answer is no,

20     you didn't tell him anything was in it?

21          A.     I don't think so.

22          Q.     Okay.

23          A.     I mean, Mrs. Engelbrecht may

24     have, but I don't think I did.

25          Q.     Okay.  Did you form a view that

CONFIDENTIAL

Page 178

1     it misrepresented your research in any way?

2          A.     I don't know if misrepresented

3     is the right word, but I think that -- that

4     through the month we had some concerns about

5     some of the decisions that were made about

6     how to, you know, represent certain things.

7               But, again, I'm not a

8     moviemaker.  It was out of my scope.

9          Q.     Okay.  Did you share any of

10    those concerns with Mr. D'Souza?

11         A.     No.

12         Q.     Let me mark the next exhibit --

13    and I'm going to mark this as 14 because

14    there was some confusion before.  So 14 is

15    now DDR-00055904 through DDR-0055905.

16         (Marked Plaintiff Exhibit No. 14.)

17    (BY MS. KUCK)

18         Q.     And this appears to be a chat

19    that was produced by Mrs. D'Souza.  This is

20    4/18/2022.  And partway down it says:  "We

21    fly out later this afternoon and get into

22    Fort Lauderdale late."

23              And then there's a reference to

24    noon at MAL.

25              Do you recognize this as the

CONFIDENTIAL

Page 179

1    day before you went to Mar-a-Lago for the

2    screening?

3            A.    I assume that's what it is but,

4    again, I don't remember the dates.

5            Q.    Okay.  But this would be about

6    the right time?

7            A.    Yes.

8            Q.    And Mr. D'Souza starts out by

9    saying:  "Hey, guys.  You ready to go over

10   marketing plan at noon in a few?"

11                And then you write back:

12   "We're both flying."

13                Did you at some point review

14   with him the marketing plan for the film?

15           A.    I -- I didn't.

16           Q.    Okay.  And then the first --

17   the second chat with your name on it, which

18   is the fifth one down, it says:  "I called

19   the PR lady and left her a message."

20                Does that refresh your memory

21   in any way of ever having spoken to Patricia

22   Jackson?

23           A.    No, I don't think I ever spoke

24   to her.

25           Q.    Okay.  Do you know why you

Page 180

1    called her?

2         A.      No.

3         Q.      What -- what role did you have

4    in the marketing of the film?

5         A.      None.  I was -- I was to

6    provide limited research and video.  That's

7    it.  There was my role.

8         Q.      Let's mark TTV 977 -- I'm

9    sorry -- TTV_009770.  And we're up to 21.

10        A.      I'll catch up in a minute here.

11        Q.      It's okay.

12               You said you didn't participate

13   in the marketing of the film.

14               To your knowledge, did

15   Ms. Engelbrecht?

16        A.      Can you define "marketing"?

17        Q.      Well, Mr. D'Souza -- we were

18   looking at a text where he said the marketing

19   plan.

20        A.      I -- I have -- I have no idea.

21        Q.      Okay.  Do you know whether she

22   was involved in the promotion of the movie?

23        A.      I'd be speculating, but broadly

24   we weren't -- we weren't hired to do that.

25               We were subcontractors that

CONFIDENTIAL

Page 181

1    were providing information -- research and
2    providing video.
3         Q.    Okay.  So looking at the
4    document I just marked 9770, it -- this
5    appears to be a text exchange with Mr. and
6    Mrs. D'Souza and Mr. Schooley.
7              You -- there's the first line
8    there, which is attributed to you, is:
9    "Trump message on 2000 Mules goes out this
10   morning.  Name checks, Dinesh and Catherine."
11             Do you see that?
12        A.    Yep.
13        Q.    How did you know that Mr. Trump
14   was sending out a message?
15        A.    I have no idea.  I have a lot
16   of contacts in my job.
17        Q.    Did you communicate with
18   Mr. Trump at all during the filming of the --
19   the film?
20        A.    During the filming?
21        Q.    Yeah.
22        A.    No.
23        Q.    How about afterwards?
24        A.    We were there for the -- the --
25   the --

CONFIDENTIAL

Page 182

```
 1            Q.      Prescreening?
 2            A.      -- directors screening that was
 3      referenced in the previous e-mail.
 4            Q.      Okay.  And then you were at the
 5      premiere?
 6            A.      Correct.
 7            Q.      Any other context with
 8      Mr. Trump?
 9            A.      I'm not at liberty to say that.
10            I've had -- I've had contacts
11      with lots of people in my career, and I'm not
12      at liberty whether to say the -- whether the
13      President of the United States and I have had
14      a conversation.
15            Q.      Okay.  Let me back up a minute.
16            Have you had any contacts with
17      Mr. Trump, other than you've just testified
18      about, related to 2000 Mules or your research
19      that was used in the film?
20            A.      Yes.
21            Q.      And what -- what context on
22      those subjects have you had?
23            A.      We -- well, this goes back to
24      what I previously said.  What exactly do you
25      want to know?
```

Page 183

1              Have I ever talked to President
2      Trump outside of the Mules movie?
3           Q.     No.  Did you talk to him
4      concerning the mules or your research that
5      was used in the film?
6           A.     Oh, I see what you're saying.
7                  Not outside of those three
8      meetings.
9           Q.     Okay.  And you don't recall
10      what you were referring to in the document we
11      just looked at?
12           A.     No.
13           Q.     You said you did -- you did
14      attend the premiere?
15           A.     Yes, ma'am.
16           Q.     There were about 500 people
17      there?
18           A.     That's my guess.
19           Q.     Okay.  It's your testimony that
20      until that time -- until you saw the movie
21      there you didn't know you were being listed
22      as an executive producer?
23           A.     Not that I recall.
24                  MR. EVANS:  Objection; asked
25           and answered.

Page 184

1                    THE WITNESS:  Oh, sorry.

2         (BY MS. KUCK)

3              Q.    And you actually -- and you

4         spoke at the premiere as well, right?

5              A.    We were offered an opportunity

6         to speak for a few minutes.

7              Q.    Okay.  And you did speak?

8              A.    Yes.

9              Q.    Okay.  Having seen the final

10        version, did you ever tell anyone that you

11        disagreed with anything in the film?

12             A.    It wasn't my place.

13             Q.    So that's no?

14             A.    Yes.

15             Q.    All right.  Let's mark as 22

16        DDR-00049429.

17             A.    You done with 21?

18             Q.    Yep.

19             (Marked Plaintiff Exhibit No. 22.)

20        (BY MS. KUCK)

21             Q.    Okay.  This appears to be

22        another set of texts with Ms. Engelbrecht and

23        Mrs. D'Souza.  And you say:  "Our biggest

24        issue right now is money.  True the Vote is

25        teetering on the edge.  Don't be shocked if

CONFIDENTIAL

Page 185

```
 1    we have to close the door in a few months.
 2    Sad, but true."
 3              Do you see that?
 4         A.    I do.
 5         Q.    What -- what was your basis for
 6    saying that?
 7              How did you know that?
 8         A.    When was this?
 9         Q.    May, looks like May 7 or around
10    May 7.
11         A.    I'm not sure what you -- what's
12    the question?
13         Q.    How did you know that True the
14    Vote was teetering on the edge?
15         A.    Ms. Engelbrecht and I had
16    discussed.
17         Q.    In what context?
18         A.    The lack of money at True the
19    Vote.
20         Q.    Okay.  And then you say:
21    "We're going to keep Catherine in front of
22    the media as long as we can.  I think it's
23    important to consolidate the number of people
24    speaking.  It's getting confusing.  I did a
25    study on this issue in 2012.  Two is the max
```

CONFIDENTIAL

Page 186

1      in political environments.  Also, as I wrote
2      earlier, C and E and Dinesh are killing the
3      message right now.  Secretly kind of happy
4      that fewer hosts tonight."
5                   Does that at all refresh your
6      recollection that Ms. Engelbrecht was
7      involved in promoting the film --
8           A.     No.
9           Q.     -- in the media?
10          A.     That's not what -- that is not
11     what this is about at all.
12          Q.     Okay.  Can you tell me what it
13     is about?
14          A.     Yeah.  It's about the -- the
15     import of the message of -- of 2000 Mules was
16     to heighten America's awareness of election
17     integrity issues about which Catherine is the
18     most knowledgeable person in America.
19                   And to -- there were -- there
20     were press conferences and all sorts of
21     things being -- being done and said that I
22     felt like was diminishing the import of what
23     mules should have been all about.
24                   That's it.
25          Q.     And that's what you were

Page 187

1    referring to when you said, "We're going to

2    get Catherine in front of the media as long

3    as we can"?

4                MR. EVANS:  Objection; asked

5         and answered.

6         A.    Yes.

7    (BY MS. KUCK)

8         Q.    Okay.  The complaint, which

9    you're welcome to look at -- I think it's

10   number -- it's the very first thing we marked

11   this morning.

12        A.    This one.

13        Q.    It's that big fat thing, yeah.

14   Uh-huh.  If you turn to 135, Paragraph 135.

15        A.    I'm not much of a lawyer.  All

16   right.  Go.

17        Q.    It says:  "Between May 24 and

18   July 17, 2022, Defendant Phillips promoted

19   2000 Mules in at least 23 different posts on

20   Truth Social, including posts where you

21   can -- where you continued to claim the film

22   was factually accurate and exposes the

23   cheat."

24                Do you see that?

25        A.    Yes.

1          Q.      And you admitted in your answer

2     that was true?

3          A.      Yes.

4          Q.      That is true?

5          A.      I don't understand the

6     question.  What is the question?

7          Q.      That statement in 135 is

8     accurate.

9          A.      Where are you are reading?

10         Q.      Paragraph 135.  Am I reading it

11    wrong?

12         A.      I seriously doubt if I spoke to

13    The Washington Post, so I would say the whole

14    thing is false.

15         Q.      Let me make sure I'm reading

16    the right paragraph.

17                 MS. HYLAND:  I have 135 as

18         you're reading it.  I'm wondering --

19                 MS. KUCK:  Okay.

20                 MS. HYLAND:  -- what

21         Mr. Phillips is looking at.

22                 MS. KUCK:  It's on page --

23                 MS. HYLAND:  58.

24                 MS. KUCK:  58.

25    (BY MS. KUCK)

Page 189

1          Q.    And it's the second sentence
2     and third sentence.
3          A.    What's the question?
4          Q.    That's correct -- that
5     statement -- those two statements are
6     accurate, right?
7          A.    You said the second sentence
8     and the third sentence, but there's -- on 135
9     there's only one sentence.
10          Q.    Paragraph 135 on the bottom of
11     Page 58?
12          A.    Yes.
13               MR. EVANS:  You might be
14          looking at the wrong thing.
15               MS. KUCK:  Is he looking at
16          footnotes instead of...
17               THE WITNESS:  No.  135, it's
18          only one sentence.
19               MS. KUCK:  Is it the wrong
20          document?
21        (Discussion off the record.)
22               MR. EVANS:  So read it -- read
23          the 135 that you have.
24               MS. KUCK:  I have three
25          sentences.

CONFIDENTIAL

Page 190

```
 1              THE WITNESS:  On that same
 2         page?  There's only one on that page
 3         on 135.
 4              MS. KUCK:  What are -- what are
 5         you looking at?
 6    (BY MS. KUCK)
 7         Q.    Okay.  So I'm referring to the
 8    second sentence here that starts "Between..."
 9         A.    Oh, so it's on two pages.  I
10    got it.
11         Q.    It's one paragraph, two pages.
12              Okay.  "Between May 24 and
13    July 17, 2022, Defendant Phillips promoted
14    2000 Mules in at least 23 different posts on
15    Truth Social.  This included posts where he
16    continued to claim the film was factually
17    accurate and exposes the cheat."
18         A.    Whose -- whose quotes are
19    those?
20         Q.    They're quotes from Truth
21    Social.
22              But you -- and you admitted in
23    your answer that this was true.
24         A.    I guess it is.  I don't know.
25         Q.    Okay.
```

CONFIDENTIAL

Page 191

```
 1          A.      I thought you were -- I
 2    misunderstood the question.
 3          Q.      It's okay.
 4                  Do we have that other --
 5          A.      Can you tell me that page
 6    again, please.
 7          Q.      58.
 8                  MR. EVANS:  Yeah.  58.
 9        (Marked Plaintiff Exhibit No. 23.)
10    (BY MS. KUCK)
11          Q.      Okay.  Let's mark as
12    Plaintiff's Deposition Exhibit 23.  It's
13    going to be TTV_007191 through 7198.
14                  And this is from Bruce
15    Schooley.
16                  Who is he?
17                  Who is Mr. Schooley?
18          A.      I have no idea what his title
19    is.  I mean, I would say director.
20          Q.      Okay.  What -- what does he do?
21          A.      He works with Dinesh.
22          Q.      He works with Dinesh.
23                  And he worked on the film?
24          A.      As far as we know.  We had
25    no -- no interest or control in any of that.
```

CONFIDENTIAL

Page 192

1          Q.      Okay.

2          A.      He was one of the ones creating

3     the magic as far as we were concerned.

4          Q.      All right.  And this --

5          A.      This isn't even about the Mules

6     movie.  This is about One-Party America.

7          Q.      This is not about the mules

8     movie?

9          A.      Read the title.  Read the title

10    of the attachment.

11         Q.      Yeah.

12         A.      Yeah.  It says "One Party

13    America film."

14         Q.      Right.  One-Party America was

15    the entity that Mr. D'Souza created to make

16    the film?

17         A.      No.  I think One Party America

18    was his film -- the name of the film they

19    were going to do.

20         Q.      Okay.  Do you see that you're

21    copied on this?

22         A.      Yes.

23         Q.      Well why would he be copying

24    you?

25         A.      I have no idea.

CONFIDENTIAL

Page 193

1          Q.     Okay.  So let's look at TTV
2     007194.  It says election film beat sheet.
3          A.     I have no idea what any of this
4     is.
5          Q.     Okay so you were copied on it
6     but you don't remember getting it?
7          A.     Nope.
8          Q.     Do you recall any discussions
9     with anybody about it?
10          A.     I don't recall any discussions
11     with anyone about woman doing the lord's work
12     no.
13          Q.     Okay.  So?
14          A.     We were hired on a limited role
15     sorry to keep saying it but it's True the
16     Vote.  We were hired to provide limited
17     research and video.
18          Q.     Okay.  Did you have any
19     understanding -- well, you don't remember
20     this document, right?
21          A.     No.
22          Q.     So you can't tell me why
23     Mr. Schooley might have been sending it to
24     you?
25          A.     No.

CONFIDENTIAL

Page 194

1          Q.      Is it your understanding that
2     the film purports to be a -- a documentary?
3          A.      No.
4          Q.      It does not purport to be a
5     documentary?
6          A.      No.
7          Q.      Okay.  Does it purport to be a
8     work of fiction?
9          A.      I think -- I think the way they
10    described it -- and this is out of my league.
11    I think they have it described as a
12    docudrama, but I may be mistaken.
13         Q.      And your understanding of that
14    term is what?
15         A.      It's none.  I have no
16    understanding of it.  I know nothing about
17    movies.  I've never made a movie.  I know
18    nothing about them.
19         Q.      Okay.  You watched this one,
20    though, right?
21         A.      I can't say I've ever watched
22    all of it.
23         Q.      Even at Mar-a-Lago, the
24    premiere?
25         A.      Even at Mar-a-Lago.

CONFIDENTIAL

Page 195

1          Q.      Did you leave in the middle?

2          A.      No, but I wasn't really paying

3     attention.  I was on the phone.

4          Q.      Okay.  All right.  Let's go to

5     TTV_007720.

6          (Marked Plaintiff Exhibit No. 24.)

7     (BY MS. KUCK)

8          Q.      Okay.  We'll mark as Exhibit 24

9     TTV_007720 through TTV_007726.

10            (Discussion off the record.)

11    (BY MS. KUCK)

12         Q.      Do you see that this is an

13    e-mail chain between you and someone named

14    Mark Davis?

15         A.      Yes.

16         Q.      Who is Mr. Davis?

17         A.      A citizen researcher person in

18    Georgia.

19         Q.      Okay.  And it appears he's

20    reaching out to you about a question

21    concerning a copy of a ballot form provided

22    in the film.

23                 Do you see that?

24         A.      I do, but yeah.  I guess I said

25    what I said.

Page 196

```
 1          Q.      Do you have any recollection of
 2     this?
 3          A.      I don't.
 4          Q.      Do you have any recollection
 5     that there was a -- a form used in the film
 6     which was alleged to have been fabricated?
 7          A.      Out of my -- above my pay
 8     grade.
 9                  We had nothing to do with this.
10                  We didn't provide forms.
11                  We didn't provide anything.
12                  We provided research and
13     limited video.
14          Q.      But my question is were you --
15     do you recall being aware of the allegation
16     that he's giving --
17          A.      I -- no.  Mark Davis is
18     irrelevant to me.  I mean, he wasn't part of
19     the contract.  He wasn't part of the deal.
20     He wasn't part of anything.
21          Q.      But  you responded to him?
22     You went back and forth?
23          A.      Well, I said it's similar to
24     the pixelation of the dog where he's making
25     all these decisions.
```

CONFIDENTIAL

Page 197

```
 1              (Discussion off the record.)
 2                   THE VIDEOGRAPHER:  All parties
 3         in agreement with going off the
 4         record, we're going off the record at
 5         2:51 p.m.
 6            (Break from 2:51 p.m. to 2:58 p.m.)
 7                   THE VIDEOGRAPHER:  We are going
 8         back on the record at 2:58 p.m.
 9      (BY MS. KUCK)
10         Q.     Okay.  So when we broke, we
11      were talking about Exhibit 24, which is the
12      e-mails between you and Mr. Davis.
13         A.     Yep.
14         Q.     And you said he's a citizen
15      researcher, correct?
16         A.     That's all I know about him.
17         Q.     Okay.  But you responded to his
18      inquiry, yes?
19         A.     Yes, I did.
20         Q.     And I think we were starting to
21      discuss your response, in which you said:
22      "It's similar to the pixilation of the dog,
23      lawyers make all these decisions, we provided
24      all the" --
25         A.     Detail.
```

CONFIDENTIAL

Page 198

1        Q.      -- "detail.  What they chose to

2    share is completely out of our hands,

3    interests, or control."

4        A.      That's right.

5        Q.      Okay.

6        A.      We had no editorial control

7    whatsoever.  If you look -- if you look

8    further into it, what he's actually talking

9    about, if you look in here --

10       Q.      Uh-huh.

11       A.      -- on the second page where he

12   says:  Good morning and congrats on the

13   success of the film.  A democrat lawyer named

14   Loren Collins posted this and voted GA

15   10 hours ago.  Can either of you help me with

16   a response?

17                Midway through -- the Mule --

18   Dinesh puts a document on the screen.  As

19   Gregg Phillips says, there's one box in

20   Gwinnett County that is a chain of custody --

21                This is the Gwinnett anomaly

22   that I talked to you about earlier.

23       Q.      Right.

24       A.      And if you look, what he's

25   referring to on Page 3 --

CONFIDENTIAL

Page 199

1          Q.      Uh-huh.

2          A.      -- that looks to me like what

3     they put on the movie.

4          Q.      Yeah.

5          A.      But what we gave them was on

6     the last page.

7          Q.      Right.  So what they put in the

8     movie you're saying is not what you gave

9     them?

10         A.      Correct.

11                 We had no editorial control.

12    Period.

13         Q.      Did you raise this issue with

14    Mr. D'Souza?

15         A.      I -- this is after the movie

16    was out.  There was -- I haven't talked to

17    Dinesh since the movie came out.

18         Q.      Okay.  When you saw the movie

19    did you --

20         A.      I didn't notice it.

21         Q.      You didn't notice it?

22         A.      Huh-uh.

23         Q.      Okay.

24         A.      I think everybody in the

25    theater noticed that they pixilated the dog,

CONFIDENTIAL

Page 200

1    though.

2         Q.    Right?

3         A.    They noticed it because it was

4    a little comical, you know, but...

5         Q.    You said lawyers make all these

6    decisions.

7              What were you referring to?

8         A.    I guess -- I was talking about

9    the pixilation because again --

10        Q.    Oh, about the dog?

11        A.    Yeah.  I know nothing about

12   making movies.  I don't know who makes what

13   decisions about what.  All I know is we made

14   no decisions.

15             We provided limited research

16   and limited video.  And if you look at the --

17   again, if you look at the last page, I guess

18   it wasn't the last page.  I'm sorry.  It's

19   the second to last page in this exhibit.

20        Q.    Uh-huh.

21        A.    That is what we provided.  That

22   is the actual chain of custody document.  If

23   you look on there, you see where it says:

24   "Number of absentee ballots"?

25        Q.    Uh-huh.

CONFIDENTIAL

Page 201

```
1         A.      "352 plus 6 applications, total
2    1692."
3         Q.      Yep.
4         A.      That's what we provided them.
5                 And this is what I was
6    suggesting earlier needed investigation.
7                 This was what one of our three
8    complaints to the state board of elections --
9    this particular document is what we were
10   talking about.
11        Q.      But Mr. D'Souza seems to have
12   altered it when he put it into the film?
13        A.      I don't know.  We had no
14   control.  I don't know who did it.
15        Q.      But it was altered in the film.
16   Is there --
17        A.      According to Davis, yeah.  And
18   I assume -- I mean, I don't know.  I mean,
19   I -- like I said, I haven't -- I haven't
20   talked to Dinesh since the movie.
21        Q.      Okay.
22        A.      Ever since the premiere.
23        Q.      And why not?
24        A.      Just no reason.  Everybody is
25   getting back to work.  Dinesh is making
```

CONFIDENTIAL

Page 202

1    movies and we're doing our thing.

2          Q.    Okay.

3          A.    No point.

4          Q.    Mr. D'Souza also later in the

5    summer came out with a book from the 2000

6    Mules.

7                Do you know anything about

8    that?

9          A.    I don't know anything about the

10   book.

11         Q.    But you know that there was a

12   book?

13         A.    I only know that there was a

14   book.

15         Q.    Okay.

16         A.    I've never seen it.  I've never

17   read it.  I was never asked to comment on it.

18   I never had any communications whatsoever

19   with anybody about that book.

20         Q.    All right.  Do you -- has

21   anybody ever -- well, strike that.

22                Have you and Ms. Engelbrecht

23   discussed the book?

24         A.    Have we ever discussed it?

25         Q.    Yeah.

CONFIDENTIAL

Page 203

```
 1          A.      Maybe.
 2          Q.      Do you recall anything about
 3    those discussions?
 4          A.      Not really.
 5          Q.      Did she tell you that some of
 6    the interview material that you gave for the
 7    film ended up in the book?
 8          A.      She did not.  But as I said, we
 9    had no -- even in the book we had no
10    editorial control.
11          Q.      All right.  So --
12          A.      We were just -- we were just
13    bit players.  We were just a subcontractor.
14          Q.      And executive producer.
15          MR. EVANS:  No pending
16    question.
17    (BY MS. KUCK)
18          Q.      Let's mark DDR-00049441
19    [verbatim] as Exhibit 25.
20          (Marked Plaintiff Exhibit No. 25.)
21          A.      Is this the new one?
22    (BY MS. KUCK)
23          Q.      Uh-huh.  Okay.  This appears to
24    be another text exchange between Ms. D'Souza,
25    Ms. Engelbrecht, and yourself.
```

CONFIDENTIAL

Page 204

1          Do you see that?

2      A.      I do.

3      Q.      How often were you texting with

4  Mrs. D'Souza at this point in time?

5      A.      Me?  Very limited.

6      Q.      Okay.  And did you have

7  conversations with Ms. Engelbrecht about the

8  filming of the movie while it was going on?

9              By which, I mean, you know, you

10  signed the agreement and then we've got

11  this -- you saw the rough cut?

12              What discussions in that period

13  of time did you have with Ms. Engelbrecht

14  about the film?

15      A.      I don't have any recollection

16  of any -- I mean, I'm sure we talked often

17  about it, but I have no idea what.

18      Q.      Okay.  So in the third text

19  here --

20      A.      Uh-huh.

21      Q.      -- it says under your name:

22  "According to my notes, there are between 10

23  and 23 percent of all mules identified in

24  five jurisdictions are also on the ACLED

25  list."

CONFIDENTIAL

Page 205

1          A.      Yes.  Yep.

2          Q.      What were you referring to

3      there?

4          A.      That was part of some of the

5      limited research we provided.  ACLED is an

6      online service that tracks violent protests

7      around the world.

8          Q.      Okay.  When you said -- when

9      you say "10 to 23 percent of all mules" --

10     and when you said "mules" there, is this

11     where you're -- are you referring to the 242

12     people or the broader group of mules?

13         A.      All mules in our -- look, the

14     242 only applied to Atlanta.

15         Q.      Okay.  I guess what I'm getting

16     at is when you're using "mules" here, is that

17     limited to your criteria of having five drop

18     boxes and three NGOs or is it some broader

19     concept of mule?

20         A.      I don't recall.

21         Q.      Okay.  So when you say 10 to

22     20 percent of the mules were identified on

23     the ACLED list, what list are you referring

24     to?

25         A.      ACLED produces a list of all of

CONFIDENTIAL

Page 206

1    the -- and maps of all of the violent

2    protests in the world.

3              The few that we were able to

4    identify specifically going back into 2020,

5    when all of the Antifa protests and BLM

6    protests, et cetera, et cetera, had turned

7    violent, they were creating a sort of a map,

8    if you will, a guide to the geofencing.

9              And so the way to -- the way

10   one would compare those is you geofence

11   around the -- the -- the geography of the

12   violent protest and you compare that to the

13   mules that were approaching the drop boxes.

14   And it's in that marriage that you find what

15   you want.

16        Q.    But ACLED doesn't keep any list

17   of any particular cell phone --

18        A.    No one -- no one ever said that

19   they did.

20        Q.    I'm just asking you:  They

21   didn't?

22        A.    No.

23        Q.    Okay.

24        A.    We would go and buy the cell

25   phones at the violent protests -- buy the --

Page 207

1    buy the list of the cell phones that were at

2    the violent protests and then compare that to

3    our other list.

4         Q.    Okay.  And where did you get

5    the list of cell phones at the violent

6    protests?

7         A.    The same place you get all the

8    other ones, you buy them.

9         Q.    From whom?

10         A.    From the data brokers that --

11    that we bought all the other ones from.

12         Q.    Can you identify who those

13    brokers were?

14         A.    I think there's a pretty

15    comprehensive list in The Wall Street Journal

16    somewhere.  I'll try to find that.

17         Q.    Nobody comes to mind off top of

18    your head?

19         A.    Red Metrics was doing the

20    purchasing and they have a very significant

21    and detailed purchase methodology.  So I have

22    no -- no way of knowing which one they used

23    for this particular.

24         Q.    Okay.  But when you say the

25    ACLED list, you're --

CONFIDENTIAL

Page 208

1          A.      The ACLED list --

2          Q.      The list being?

3          A.      We've been through this.

4          Q.      Right.

5          A.      I know -- I know it's

6    confusing.  I know it's difficult.  But the

7    way one would do this is let's say -- let's

8    say that this paper was the violent

9    protest --

10          Q.      Yep.

11          A.      -- right down the road down

12    here, right.

13          Q.      Yeah.

14          A.      We would geofence around

15    that --

16          Q.      Yeah.

17          A.      -- and get all the cell phone

18    IMEI numbers out of that.

19          Q.      Right.

20          A.      Right?

21          Q.      Yep.

22          A.      Then we would take the list

23    that we were -- or the purchase we were

24    building for the drop box -- they didn't have

25    drop boxes here, but for the sake of this

CONFIDENTIAL

Page 209

1    discussion, let's assume they did.

2                    We would take all the list of

3    all of the cell phone IMEI codes that were

4    emerging from the drop box analysis --

5            Q.      Right.

6            A.      -- and then compare them to the

7    codes that were at the violent protest.

8            Q.      But those -- the -- the list of

9    phones that was at the protest didn't come

10   from ACLED?

11           A.      No.

12           Q.      Okay.

13           A.      No one ever said they did,

14   except Philip Bump.  You can ask Philip what

15   his -- what his confusion was, but it wasn't

16   mine.

17           Q.      Okay.  Are you aware that Salem

18   ultimately entered into a settlement with

19   ACLED about statements made in the book?

20           A.      No.  Knew nothing about the

21   book.

22           Q.      Other than it existed?

23           A.      Only that it existed.

24           Q.      All right.

25               (Discussion off the record.)

Page 210

1    (BY MS. KUCK)

2         Q.    And your testimony is you

3    never -- well, strike that.

4              Did you ever have any

5    discussion with Mr. D'Souza about ACLED?

6         A.    Only in the context of the

7    limited research that we would have provided

8    for the movie.

9         Q.    Okay.  And did you make it

10   clear to him that you weren't using cell

11   phone data from ACLED?

12        A.    Yes.

13        Q.    So he understood that?

14        A.    I believe he did.

15        Q.    Okay.

16        A.    This is a very complex topic.

17   Geospatial analysis is not simple.

18        Q.    All right.  Let's go back to

19   Exhibit 6.

20              In Interrogatory 10 asks that

21   you state the amount of revenue that you

22   received from 2000 Mules.  I'm on Page 20.

23        A.    20?

24        Q.    Uh-huh.

25        A.    Okay.  I see it.

Page 211

1          Q.      And it says -- your answer

2    says:  "Phillips states he will search for

3    and produce nonprivileged documents (e.g.,

4    tax forms) showing revenues he, along with

5    Engelbrecht, received through a limited

6    liability company jointly owned by them in

7    connection with the 2000 Mules film."

8                  Do you see that?

9          A.      Yes.

10         Q.      What limited liability company

11   was that?

12         A.      I don't really recall.

13   Ms. Engelbrecht might -- might know.  I don't

14   know the name of it right off the top of my

15   head.

16         Q.      Does Shadow Beach ring a bell?

17         A.      Could be.

18         Q.      Okay.  What happened to that

19   LLC?

20         A.      What do you mean what happened

21   to it?

22         Q.      I asked you earlier at the

23   beginning whether there were any LLCs that

24   you --

25         A.      I said -- I said I couldn't

CONFIDENTIAL

Page 212

1    recall anymore.  Maybe if that still exists,
2    that is one.
3          Q.     Okay.  You don't know what
4    happened to it, if it went elsewhere?
5          A.     I don't.
6          Q.     And why was that -- why was the
7    payment being made to that entity?
8          A.     That was what was in the
9    contract.  I don't know.  I wasn't party to
10   the contract.
11         Q.     When you say "in the contract,"
12   which contract?
13         A.     We've been over this.
14         Q.     Okay.  This is the contract
15   between TTV and -- and the D'Souzas?
16         A.     Yes.
17         Q.     How much did TTV get in
18   connection with the film?
19         A.     To my knowledge, that ███ is
20   the full amount for everybody.
21         Q.     For everybody.
22                How much of it went to TTV?
23         A.     Half, I guess.  I -- I don't
24   know how -- I don't -- I'm not part of TTV.
25   I don't know where the books are.

CONFIDENTIAL

Page 213

1           Q.      Well, where did it go after it

2     went to Shadow Beach?

3           A.      I don't know the answer to

4     that.

5           Q.      Okay.  Who would know that?

6           A.      Maybe Mrs. Engelbrecht.

7           Q.      We talked this morning about

8     OpSec receiving ██████ from the -- from the

9     TTV arrangement for the geospatial project?

10          A.      For the work.

11          Q.      For the work?

12          A.      Uh-huh.

13          Q.      Did OpSec receive any

14    additional funds in connection with the

15    2000 Mules project?

16          A.      Not that I recall.

17          Q.      Okay.  Let's mark TTV_009760.

18              (Discussion off the record.)

19    (BY MS. KUCK)

20          Q.      Exhibit 26 is TTV 009760.

21          (Marked Plaintiff Exhibit No. 26.)

22    (BY MS. KUCK)

23          Q.      And this appears to be a

24    Form 990 from One Party America.

25                  Do you see that?

CONFIDENTIAL

Page 214

1          A.      I do.

2          Q.      Does that refresh your

3    recollection that One Party America was the

4    corporate vehicle that Mr. D'Souza used for

5    this project?

6          A.      It does, but I had no

7    involvement in any of that, as I've said

8    multiple times.

9          Q.      Right.  But it refreshes your

10   memory that that's where one party --

11         A.      First time I've ever known it.

12         Q.      Okay.

13         A.      All I knew is the original

14   movie was supposed to be One Party America.

15   That's all I knew.

16         Q.      And what do you mean the

17   original movie?

18         A.      We were told that when we --

19   when we went to visit with them about the

20   movie in the beginning, that they were

21   already working on a movie called One Party

22   America.

23         Q.      That had to do with the

24   election?

25         A.      I don't know that we even knew

CONFIDENTIAL

Page 215

1    that.

2         Q.      Okay.  And there's -- the top

3    copy seems to be the ████████ payment to

4    Shadow Beach, LLC.

5         A.      It does.

6         Q.      And then there's a payment to

7    you for ████████

8         A.      That I referenced earlier as an

9    expense payment.

10        Q.      Okay.  And that was -- what

11   were those expenses?

12        A.      I have no idea.  Travel.

13        Q.      Travel?

14        A.      Travel to do the filming.

15   Travel to Mar-a-Lago.  I don't recall what

16   the exact expenses were.

17        Q.      Okay.  And you don't recall

18   individually having any arrangement -- any --

19   strike that -- any contract with Mr. D'Souza

20   to get paid for your expenses?

21        A.      I don't.

22        Q.      Okay.  These are all -- all

23   these entities are listed at the same address

24   in Cat Spring, Texas.

25                Is that your address or is your

CONFIDENTIAL

Page 216

1    address in Alabama?

2          A.      My address is in Alabama.

3          Q.      And do you know why this is

4    made out the way it is?

5          A.      Many of our businesses are

6    listed at that address.

7          Q.      Okay.  And when you say "many

8    of our businesses," are you able to remember

9    any -- any other than the ones you identified

10   for me earlier today?

11         A.      No.

12         Q.      Let's mark as Exhibit 27

13   TTV 8858 through TTV 0082 -- 8923.

14         (Marked Plaintiff Exhibit No. 27.)

15   (BY MS. KUCK)

16         Q.      Do you see this appears to be a

17   document -- well, it seems to be an e-mail

18   from Ms. Engelbrecht to you with an

19   attachment.

20         A.      Yep.

21         Q.      Did you receive this?

22         A.      I don't recall.  This was an

23   incredibly busy time for us.

24         Q.      Okay.  Do you have any reason

25   to believe you didn't receive it?

Page 217

1          A.     No.

2          Q.     Do you recall receiving a

3     letter from Mr. Andrews' attorneys requesting

4     a retraction of certain things about

5     Mr. Andrews?

6          A.     I don't know who Mr. Andrews

7     is.

8          Q.     The plaintiff in this case.

9          A.     I don't know him.

10          Q.     Okay.  Do you remember --

11          A.     I have no connection to him.

12     We've never identified him.  Nothing.

13          Q.     My question is:  Do you

14     remember receiving --

15          A.     No.

16          Q.     Okay.  So you don't know that

17     you got a cease and desist letter in

18     connection, this cease and desist letter?

19          A.     I didn't receive it.

20          Q.     Do you remember anybody telling

21     you about it?

22          A.     We had a lot going on.

23          Q.     So you don't?

24          A.     I don't.

25          Q.     Okay.  So did you take any

Page 218

1    action -- I take it you didn't take any

2    action in response to the letter?

3         A.    I would assume Mrs. Engelbrecht

4    would have handled this with Brock Akers, one

5    of the lawyers.

6         Q.    Okay.  Did you -- if you look

7    at the page that says 8874, it's a litigation

8    hold notice and document preservation

9    request.

10        A.    8874?

11        Q.    Yeah.  The last three pages.

12        A.    Okay.

13        Q.    Do you -- did you put any -- in

14   place at this time any measures to preserve

15   any -- any documents as requested here?

16        A.    I wouldn't have had to have put

17   anything in place.  I mean, anything -- I

18   wouldn't delete anything.  If it was there,

19   it was still there.

20        Q.    So you -- you didn't take

21   special precautions to preserve anything?

22        A.    I -- I don't even recall ever

23   seeing this, so no.

24             MR. EVANS:  Objection;

25        mischaracterizes testimony.

1    (BY MS. KUCK)

2        Q.    All right.  Do you remember

3    anybody asking you to preserve records at

4    about this point in time in connection with

5    allegations that one of the people featured

6    in the film was making?

7        A.    One of the people featured in

8    the film?

9        Q.    2000 Mules?

10       A.    What do you mean one of the

11   people featured?  Me?

12       Q.    One of the people in the video

13   in 2000 Mules.

14       A.    I don't know what you're

15   talking about.

16       Q.    Okay.  Let me back up a minute.

17           At some point in time you

18   became aware of the case that we're talking

19   about right now?

20       A.    Right.

21       Q.    The reason we're here?

22       A.    Right.

23       Q.    And is it your understanding

24   that in that -- in this case, Mr. Andrews,

25   who is the plaintiff, makes an allegation

CONFIDENTIAL

Page 220

1    about video shown of him in the film 2000

2    Mules?

3        A.    We never identified him.  I had

4    nothing to preserve.

5        Q.    My question is:  You

6    understand, though, that at the heart of the

7    case is an allegation by Mr. Andrews about

8    videos shown of him during the 2000 Mules?

9              That's the basis of the

10   lawsuit.

11       A.    How would I even know who that

12   was?

13       Q.    I'm not asking whether you knew

14   who he was or not.  I'm asking you:  Do you

15   understand that the lawsuit is based on an

16   allegation from Mr. Andrews concerning video

17   that he says of him was shown in 2000 Mules?

18       A.    I -- I do now.  I don't know

19   how to answer your question.

20             Did I know then?  I don't know.

21       Q.    No.  When did you -- right.

22             You understand, though, as

23   we're sitting here today, that's what this

24   lawsuit is about?

25             That's why I'm asking you

1    questions.

2         A.    Well, we had no editorial

3    control over what went in that movie.

4    Period.

5         Q.    I understand that's your

6    position.

7              But you understand that why

8    we're -- you understand what the nature of

9    the allegation in the lawsuit that we're

10   talking about today is?

11        A.    Until this exact moment, I

12   believe it's the first time Mark Andrews has

13   been mentioned at all.

14        Q.    I guess I'm a little confused,

15   but let's back up a minute.

16             You -- you knew at some point

17   in time there was a lawsuit brought against

18   you by Mark Andrews?

19        A.    Yes.

20        Q.    And were you -- and how did you

21   learn that?

22        A.    I don't recall.

23        Q.    Okay.  And are you aware that

24   prior to that time --

25        A.    I'm sure the AJC told us.

CONFIDENTIAL

Page 222

1          Q.      You don't remember?

2          A.      I don't know.

3          Q.      Prior to that time, were you

4     aware that there was a cease and desist

5     letter sent by Mr. Andrews' attorneys to you?

6          A.      To -- to me about what?

7          Q.      About video that was featured

8     in 2000 Mules about the -- the letter that

9     we're looking at right now.

10         A.      The video -- you're -- you're

11    confused on your dates.

12                 The video was out in May.

13         Q.      Right.

14         A.      This seems to be dated in

15    October.

16         Q.      That's right.

17         A.      What is it you wanted me to do

18    about a video that I had no editorial control

19    over?

20         Q.      My question is simply:  Were

21    you aware that this letter was sent?

22         A.      I -- I have no --

23                 MR. EVANS:  Objection; asked

24         and answered.

25         A.      I have no -- no recollection of

CONFIDENTIAL

Page 223

1    a letter.

2                    MR. EVANS:  To try to

3            streamline, I think she's asking:  You

4            didn't delete any documents --

5                    THE WITNESS:  No.

6                    MR. EVANS:  -- related to this

7            case?

8                    THE WITNESS:  No.

9                    MR. EVANS:  Okay.

10    (BY MS. KUCK)

11        Q.    I just want to make sure we all

12    understand what this case is.  That's why I

13    was asking those questions.

14                    And we'll show one more video.

15                    MR. EVANS:  You need a break?

16                    THE WITNESS:  No, let's just do

17            it.

18                    MS. KUCK:  Okay.

19    (BY MS. KUCK)

20        Q.    There's -- if you look at

21    Exhibit 6 again, that's the interrogatories.

22        A.    What page?

23        Q.    24.

24        A.    Okay.

25        Q.    There's a reference there under

CONFIDENTIAL

Page 224

1      Interrogatory No. 15 about an interview you

2      gave on CrossPolitic on July 28, 2023.

3                      Do you see that?

4           A.      I do.

5           Q.      And then you gave us an -- we

6      asked a question, which was:  State all facts

7      about a statement you made during that, and

8      then there's your answer.

9                      We're going to just play a clip

10     from that interview, and then I have a couple

11     questions.  And I've marked this as

12     deposition exhibit -- Plaintiff's Deposition

13     Exhibit 2.

14              (Discussion off the record.)

15                   (Video playing.)

16          (Marked Plaintiff Exhibit No. 2A.)

17     (BY MS. KUCK)

18          Q.      So in that interview you say

19     that you were interviewed for about 30 hours.

20     Is that accurate?

21          A.      Probably exaggerated a little

22     bit.

23          Q.      You think it was something less

24     than 30?

25          A.      I really don't know.

Page 225

1          Q.      All right.  And you say there
2    was a lot of left on the cutting room floor
3    that would have explained things.
4               What -- what was left out of
5    the movie that you think would have explained
6    more?
7          A.      It -- it's none of my business.
8               We were -- we were -- we
9    contracted subcontracted to provide a handful
10   of videos, 70 videos, and the analysis on --
11   in the case in Georgia's case 242 videos --
12   or 242 voters and provided that.
13              What happened to it after that
14   is none of our -- it was out of our control.
15   We had no edit control.  We had no nothing.
16              We didn't -- we didn't
17   manufacture documents.  We did not
18   manufacture graphics.  We didn't manufacture
19   any of it.
20              We provided the data and what
21   happened happened.
22         Q.      I understand that's your
23   position.
24              What was it that was left on
25   the cutting room floor that you were

CONFIDENTIAL

Page 226

1    referring to?

2                    MR. EVANS:  Objection; asked

3          and answered.

4    (BY MS. KUCK)

5          Q.    Can you tell me what you were

6    referring to as to what was left behind?

7                    MR. EVANS:  Objection; asked

8          and answered.

9    (BY MS. KUCK)

10         Q.    You can answer.

11         A.    I can't give you a specific.

12    How about that?

13                    We know one thing now, that

14    there was at least one graphic that was made

15    up.  So the original was left on the cutting

16    room floor.

17         Q.    And when you --

18         A.    We know that, right?

19         Q.    And you're talking about the

20    graphic showing the mule transporting ballots

21    around Atlanta?

22         A.    No.  Well, that one, too, but,

23    no, I was referring to the -- the one -- the

24    Mark Davis graphic.

25         Q.    Oh, the ballot.  Yes.

Page 227

```
 1          A.      That wasn't a ballot.
 2          Q.      Well, the -- I'm sorry, the
 3     form.
 4          A.      Right.  The chain of custody
 5     document.
 6          Q.      Right.
 7          A.      That's an example of what was
 8     left on the cutting room floor, the original
 9     document was left on the cutting room floor.
10          Q.      All right.  And there was also
11     a graphic of an alleged ballot mule traveling
12     around Atlanta?
13          A.      Uh-huh.
14          Q.      That was also fabricated in the
15     movie?
16          A.      Yes.
17          Q.      Okay.  And the movie also
18     has --
19          A.      It was a docudrama.
20          Q.      The movie also has a map of
21     Russia in the film purporting to be Atlanta,
22     correct?
23          A.      I understand that that
24     happened.  I have not -- have an independent
25     verification, but I do understand that
```

CONFIDENTIAL

Page 228

1    happened.

2          Q.     Okay.  And did you provide

3    graphics for use in the film?

4          A.     We provided limited graphics.

5                 We provided the chain of

6    custody document in that one case and may

7    have provided a handful of others, but -- but

8    I don't think any of them made the movie.

9          Q.     Okay.  The -- the graphic that

10   I was referring to about the ballot mule

11   traveling around Atlanta, you know what I'm

12   talking about?

13         A.     I do.

14         Q.     In the film you're interviewed

15   while that is shown?

16         A.     That's not what happened.

17         Q.     Okay.

18         A.     We -- we --

19         Q.     Tell me what happened.

20         A.     During the interviews we were

21   in a studio and every screen in that studio

22   was a blue screen.

23         Q.     Okay.

24         A.     Meaning that everything was

25   inserted after the shoot.

Page 229

1              So what I was responding to was

2      nothing.

3          Q.      So when you talk about in the

4      film, though, the graphics showing something,

5      what were you looking at?

6          A.      It was Dinesh -- you're taking

7      it all out of context.

8          Q.      Okay.

9          A.      But Dinesh's description to us

10     in the video -- or excuse me -- in the

11     interview --

12         Q.      Right.

13         A.      -- which may or may not have

14     made it on -- into the movie.

15              I mean, let's just say for the

16     sake of this discussion they interviewed us

17     for 20 hours.  I think we were in there for

18     21 minutes or something.

19              So you want to know what's

20     left, I mean, you're going to have to get

21     with Mr. D'Souza.  I don't know.

22         Q.      Okay.  And your testimony is

23     that even -- that you did not see the

24     graphics as you were speaking in the film?

25         A.      That's correct.

CONFIDENTIAL

Page 230

1          Q.      And am I correct that you told
2    Mr. Bump of The Wall Street Journal -- or of
3    The Washington Post that the movie graphics
4    are not literal interpretations of our data?
5          A.      No.
6          Q.      You didn't tell him that?
7          A.      I've never talked to Bump
8    before.
9          Q.      Did you say that in an e-mail?
10         A.      He's a lying piece of shit.
11   I've never talked to him.
12         Q.      Have you e-mailed with him?
13         A.      I've never talked to him.
14         Q.      Okay.  Have you ever e-mailed
15   with him?
16         A.      I don't know.
17         Q.      And you -- let's look at
18   TTV_008185.
19                 All right.  We'll mark this as
20   Deposition Exhibit 28.  It bears Bates
21   Nos. TTV 008185 through 86.
22                 This appears to be a chain of
23   e-mails between you and Mr. Bump.
24                 Does this refresh your
25   recollection that you --

CONFIDENTIAL

Page 231

1         (Marked Plaintiff Exhibit No. 28.)

2         A.    Don't remember it at all, but

3    it is on my e-mail.  So yeah.

4    (BY MS. KUCK)

5         Q.    Okay.  But you have no

6    recollection of ever e-mailing with him?

7         A.    No.

8         Q.    And you say the second one

9    down, quote, The movie graphics are not

10   literal interpretations of our data.

11        A.    Right.

12        Q.    But you don't remember saying

13   that to him?

14        A.    No.

15        Q.    That statement is accurate,

16   though?

17        A.    Yes.

18        Q.    Okay.  And did you ever discuss

19   that issue with Mr. D'Souza?

20        A.    No.  We were subcontractors

21   hired to provide some limited video and some

22   limited research.  They were the moviemakers.

23   We don't make movies.

24             MS. KUCK:  Why don't we take a

25        break and I'll see --

CONFIDENTIAL

Page 232

1                MR. EVANS:  Yeah.  I've got to
2          do a restroom break myself, so --
3                THE VIDEOGRAPHER:  All parties
4          in agreement with going off the
5          record, we're going off the record at
6          3:37 p.m.
7          (Break from 3:37 p.m. to 3:52 p.m.)
8                THE VIDEOGRAPHER:  We are going
9          back on the record at 3:52 p.m.
10     (BY MS. KUCK)
11          Q.    Let's just -- since you have
12     Exhibit 6 in front of you, let's just finish
13     up the conversation about the CrossPolitic
14     interview.
15          A.    Okay.
16          Q.    And we'll go to Page 25.  24
17     and 25, which is where that question is.
18                And we asked in the
19     interrogatory about the statement you made
20     that, quote, There's a lot more to that story
21     than just what they published here.
22          A.    Right.
23          Q.    And then one of the things you
24     said in response is:  "Phillips further
25     states that he was referring to the fact that

Page 233

1    the complaint mischaracterizes certain key

2    facts regarding the TTV defendants' research

3    findings that were incorporated into the 2000

4    Mules film."

5                    Can you -- can you tell me what

6    facts you were referring to?

7        A.      Well, I mean, I don't know

8    specifically, but I'll try.

9        Q.      Okay.

10       A.      I think I was specifically

11   referring to things like the -- the graphics

12   and things that we had put in there like

13   this -- the Moscow graphic.

14                   And I have to admit there was a

15   time when I first heard it, I thought, well,

16   that's kind of funny, Moscow mule.

17                   But, you know, in retrospect,

18   you know, a film that -- that should have

19   been, you know, a little more buttoned up in

20   terms of, you know, its accuracy and

21   precision, probably -- probably would have

22   done better with our graphics.

23                   But as I said, I mean, we --

24   that wasn't my job.  The -- the -- the people

25   making the movie -- excuse me.

CONFIDENTIAL

Page 234

1              THE WITNESS:  Oh, wonderful.
2       That's perfect.
3       A.      The people making the movie,
4    you know -- and, again, I don't know anything
5    about making movies.
6              And so them taking our -- our
7    research and graphics and turning them into
8    something else seemed, you know -- I had done
9    my job.  Bottom line.
10             And -- and I didn't feel like
11   it was in my place to -- to question them, to
12   question Dinesh and -- and Bruce.
13             And they're a really great team
14   and -- but, you know, it just wasn't my job.
15   (BY MS. KUCK)
16      Q.      Okay.
17      A.      And so I think that's mostly
18   what I was referring to.  I don't really
19   recall why I started talking about the
20   Philadelphia piece of it.
21      Q.      Uh-huh.
22      A.      And I don't really have any
23   opinion about why I said that.
24      Q.      Okay.
25      A.      There may have been something

CONFIDENTIAL

Page 235

1     before that that made me think, Oh, well

2     we're talking about Philadelphia.  But, you

3     know, most of the -- most of the -- the

4     graphics we created -- excuse me -- and

5     shared with them because Atlanta was first.

6          Q.     Yeah.

7          A.     There were more of those kind

8     of things that we could -- plus that -- the

9     one that I keep referring to, that chain of

10    custody document.

11         Q.     Uh-huh.

12         A.     You know, I think that the --

13    the -- the -- you know, kind of -- I didn't

14    read all the way through it, but I think Mark

15    Davis even says in there, you know, it would

16    have been better with the original document.

17               And, again -- but the reason I

18    don't think I objected to any of it was just

19    simply I'm not a moviemaker.

20               I don't know how you do this.

21               You know, I don't know -- you

22    know, I don't know what their thought process

23    was to make this graphic or that graphic or

24    whatever.

25               You know, my job as a -- as

CONFIDENTIAL

Page 236

1    a -- as an analyst is -- is really built

2    around accuracy and precision.

3                 And so, you know, it's one of

4    the reasons I get frustrated with Philip

5    Bump, right, because I'm wanting to be

6    specific and accurate and let's talk about

7    the exact -- you know, nobody -- nobody make

8    anything up.  Let's talk about exactly what

9    happened.

10                And I think probably some of my

11   frustration -- well, certainly a few minutes

12   ago it boiled up, but -- but the frustration

13   that I feel about the whole thing was -- was

14   more just about, you know, my unlearned

15   belief that we would have been better with

16   precision and accuracy.

17                Maybe -- you know, maybe even

18   consulting with us to say, Hey, does this

19   represent kind of what you were thinking,

20   that kind of thing.

21                But -- but, again, it -- it --

22   it wasn't my job.  It wasn't

23   Mrs. Engelbrecht's job.  We were hired to do

24   something specific and we did it.

25           Q.    When you describe the

CONFIDENTIAL

Page 237

1    interviews, you said, you know, you might

2    have been talking about a graphic but it

3    wasn't actually going on behind your head.

4        A.    Uh-huh.

5        Q.    What -- so what happened in

6    those interviews?

7              You were sitting in a room that

8    was totally blank?

9        A.    Yeah.

10       Q.    Okay.

11       A.    It was a studio.

12       Q.    Right.

13       A.    Dinesh's studio up in The

14   Woodlands.  And what happens -- and I didn't

15   know this either.  This is news to me.

16       Q.    Yeah.

17       A.    So like if -- like if -- if

18   they were shooting us in here and this was

19   part of a movie --

20       Q.    Uh-huh.

21       A.    -- and there was ultimately

22   going to be something up on the screen --

23       Q.    Yeah.

24       A.    -- that's added post

25   production.

CONFIDENTIAL

Page 238

1      Q.      Okay.

2      A.      So all that's on the screens

3  are blue screens.

4      Q.      Right.

5      A.      And so you don't really see

6  anything you're talking about.  You're

7  talking to air.  And -- and, you know, little

8  disconcerting because I had never been there

9  before and never done anything like that.

10          But, you know, I mean, all in

11  all, you know, I think that -- that raising

12  the awareness of some of the election

13  challenges that America faces was still the

14  right thing to do.

15      Q.      So you did those interviews in

16  Woodlands and then you went out to -- you

17  went out to California?

18      A.      Yeah.  Yeah.

19      Q.      And had more filming out there?

20      A.      Well, a little bit more.

21  The -- the part of the movie where the --

22  where the Salem hosts --

23      Q.      Uh-huh.

24      A.      -- are -- are sitting around --

25      Q.      Yeah.  Yeah.

CONFIDENTIAL

Page 239

1          A.       -- that was filmed in

2    California.  And we were originally not

3    scheduled to be part of that.  Actually, we

4    were originally not even scheduled to be part

5    of any of it.

6                    And then kind of at the last

7    minute, I think -- I think they realized, you

8    know, they needed maybe a little bit more of

9    our awareness of the topics or something.

10   I'm not -- I'm not sure.  Dinesh could --

11   could share with that.

12                   But -- but then when the --

13   the -- the second day of filming -- that's

14   not quite true.  The next morning -- so there

15   was a day of filming.

16          Q.       Uh-huh.

17          A.       We got there in the morning and

18   left at night.

19          Q.       In California or?

20          A.       Here.

21          Q.       Here.  Okay.

22          A.       And then the next morning there

23   was like a half a day --

24          Q.       Uh-huh.

25          A.       -- where it was just shooting

CONFIDENTIAL

Page 240

1    B-roll, you know, like us walking in and out

2    of the room.

3           Q.    Right.

4           A.    And just, you know, standing in

5    the parking lot.  And I think there was just

6    a lot of -- a lot of shoots going on.

7                 And I -- I don't think -- I

8    think it was after -- and Ms. Engelbrecht

9    maybe can answer this tomorrow.  I just don't

10   recall.

11                But I think we were -- we

12   weren't even invited to come to California

13   until the -- which was like two days after --

14          Q.    Uh-huh.

15          A.    -- that B-roll shoot.

16          Q.    Yep.

17          A.    I don't think we were invited

18   until the B-roll day, and it was just to come

19   and provide information.  It wasn't to be on

20   camera.

21          Q.    Okay.

22          A.    And then when we got there and

23   they kind of set the thing up, I think they

24   realized that -- that the host really needed

25   more -- more detail.

CONFIDENTIAL

1             And so we kind of sat around
2       a -- you know, wasn't quite like this.
3             It was like in a -- in an empty
4       hotel bar that they cleaned out to make a
5       little studio.  And -- and -- and then we
6       talked for a few minutes, some of which got
7       in the movie.
8             Q.    Uh-huh.
9             A.    I don't know if we were -- I
10      don't know if our part was in the movie.  I
11      know the host part was in the movie.
12            Q.    The host part was in there.
13            A.    Yeah, but I don't know if our
14      part was.
15            But we came in and just kind of
16      briefed them a little bit.
17            Q.    Yep.
18            A.    And then -- and then left.  And
19      that was it.
20            Q.    Okay.
21            A.    So we didn't have any more --
22      any more really involvement after that.
23            Q.    Okay.  We talked earlier
24      about --
25            (Discussion off the record.)

Page 242

1      (BY MS. KUCK)

2           Q.      We talked earlier about family

3      members dropping off ballots for other family

4      members.

5           A.      Yes.

6           Q.      And then we talked about the

7      issue of assisters.

8                   Is it your testimony that your

9      understanding is that in Georgia, for a

10     family member to drop off another family

11     member's ballot, they must file an assister

12     certificate?

13                  MR. EVANS:  Objection; asked

14          and answered.

15          A.      Yes.

16     (BY MS. KUCK)

17          Q.      And what is that understanding

18     based on?

19                  MR. EVANS:  Objection; asked

20          and answered.

21          A.      The law.

22     (BY MS. KUCK)

23          Q.      Your understanding of the law,

24     as you read it, or someone gave you an

25     understanding?

CONFIDENTIAL

Page 243

1              MR. EVANS:  Objection; asked

2         and answered.

3    (BY MS. KUCK)

4         Q.    Let me -- let me rephrase that.

5    I don't think this has been asked.

6              Did you get legal advice on

7    that question from a lawyer?

8         A.    No.  This was widely known that

9    assister signatures are needed.  The law is

10   very clear if you don't have them it's not

11   only a felony but $100,000 fine, ten years in

12   prison and $100,000 fine.

13        Q.    Even if you're dropping off a

14   ballot of a family member in your household?

15             MR. EVANS:  Objection; asked

16        and answered.

17             This is at least the third

18        time.

19   (BY MS. KUCK)

20        Q.    You can answer.

21        A.    Yes.

22             It's my belief then and it is

23   my belief today.

24        Q.    I think that that's all I have.

25   I believe Ms. Hyland may have a few

CONFIDENTIAL

Page 244

```
 1     questions.
 2               MS. HYLAND:  Yes.
 3          (Discussion off the record.)
 4               E X A M I N A T I O N
 5     BY MS. HYLAND:
 6          Q.    I just have --
 7               MS. KUCK:  Yeah.  I'm going to
 8          take mine off.
 9               MS. HYLAND:  Yeah.
10               THE WITNESS:  And do I need
11          my -- these documents?
12               MS. HYLAND:  I would keep them
13          there.  I'm not planning on going back
14          to them.
15               THE WITNESS:  Okay.  Good.
16               MS. HYLAND:  Yeah.  Don't need
17          to worry about that.
18     (BY MS. HYLAND)
19          Q.    So I just want to revisit a few
20     of the things that you talked about earlier
21     today.  And I -- I think it's like ten
22     minutes, really quick.
23               I wanted to go back to your
24     initial first meeting with Mr. and Mrs.
25     D'Souza.
```

1          I think you said it was at

2    their home.  Is that right?

3        A.    I think so, yes.

4        Q.    Do you remember roughly when

5    that occurred?  Season and year, kind of...

6        A.    I -- I'm going to say the

7    summer of 2021.  Maybe late summer, like

8    August or something.

9        Q.    And what was your understanding

10    of the purpose of that meeting?

11        A.    To share -- we -- we -- the

12    reason we did the research -- or the reason

13    we did all of this in the first place was we

14    wanted -- we wanted -- we wanted -- you know,

15    every -- I say everybody.

16          Many, many, many millions of

17    Americans believed something was wrong,

18    right.  And -- and we believed we had at

19    least part of a key to maybe what had gone

20    wrong.

21          And -- and our initial

22    desires -- and I took it to the FBI on

23    March 25.  And then I took it to Governor

24    Kemp and all of his team a month or so after.

25          And all through that summer,

1    all that we really wanted was for law

2    enforcement or someone of competent

3    jurisdiction to pick this stuff up and review

4    it and say, Hey, yeah, that -- you know, they

5    may be, right.

6                    But, you know, we kept getting

7    pushed off and shoved aside and told, you

8    know, we -- it didn't meet some, you know,

9    standard or something like that.

10                   But all the while, you know,

11   the -- the -- the FBI was sort of encouraging

12   us.  They were encouraging us to give them

13   the data and to let them share the data with

14   their people.

15   (BY MS. HYLAND)

16        Q.    Who is "them"?

17        A.    I'm sorry?

18        Q.    The FBI was encouraging you to

19   share the data with --

20        A.    With the FBI.

21        Q.    With the FBI.

22        A.    I'm sorry.  I'm sorry.  Yeah,

23   that was confusing.

24                   And -- and all that we really

25   wanted, we never -- truth be told, we never

CONFIDENTIAL

Page 247

1    would have gone to Dinesh.  We never would

2    have gone to anyone.

3                    We didn't know anything about

4    making movies.  But -- when we sort of in

5    exasperation, like, okay.  Well, we'll

6    just -- we'll -- we'll -- Catherine is like,

7    well, I know Debbie.  And, you know, that's

8    the way the thing kind of unfolded.

9                    And there may have been

10   other -- you know, Catherine may have had --

11   or Ms. Engelbrecht may have had, you know,

12   other conversations with other people about

13   it all, you know, or them or further or

14   something.

15                   But I think we jointly -- I'll

16   speak for me.

17                   I believed at that point that

18   it was the best opportunity to get all of

19   this information out so that the people could

20   decide.

21                   It was still our hope even --

22   even as the -- even as the movie came out

23   that you know somebody, some -- some law

24   enforcement officer somewhere would pick this

25   thing up.

CONFIDENTIAL

Page 248

```
 1                  And -- and while we had a lot
 2     of -- you know, a lot of invites to come
 3     speak at this or talk to that or, you know,
 4     talk to sheriffs or this or that or the
 5     other, you know, it just -- it just never
 6     really came to pass.
 7                  And then we had -- you know,
 8     then from there it was just -- just, you
 9     know, total chaos.  I mean, I was sick.
10                  And Catherine -- Catherine got
11     poisoned.
12                  And -- and just everything that
13     happened in those sort of that -- that --
14     that weird six-month period between the
15     movie's release and, you know, say,
16     Thanksgiving was just total chaos.
17                  But the only other thing -- I'm
18     sure Jake is going to not be super happy
19     about me blathering on.
20                  But I believe that the movie
21     for -- for all of the challenges, for all of
22     the -- you know, my frustration about the
23     graphics and not accepting just my videos or,
24     you know, or -- or the work that we had done,
25     I believe in the end -- and -- and it's
```

1    because people come up and talk to me about

2    it.

3                    The reason I believe -- and I

4    know that's a little anecdotal.

5                    But I believe in the end that

6    the movie served its purpose, that it gave

7    those that were willing to listen an

8    opportunity to say, Hey, you know what, I

9    think something was wrong.

10                   And in the end, that -- that I

11   think is -- is all that I wanted.

12                   And y'all can ask Catherine

13   tomorrow, but -- or Ms. Engelbrecht tomorrow,

14   but I think that we -- I think that we

15   accomplished that goal, you know, were

16   there -- were there things -- again, things I

17   didn't care for?  Sure.

18                   You know, this -- this Russia

19   thing and, you know, graphics that weren't

20   right or chain of custody documents that were

21   changed.

22                   But -- but as you see in my --

23   my note with Mark Davis, you know, I think

24   the lawyers make all these decisions.

25                   And the reason I even said

Page 250

1    that, in reference that the pixilation of the

2    dog, none of us had ever seen the movie at

3    that point that, you know, fully -- whatever

4    you call it -- produced.

5                    And so -- and so in this room

6    with -- I don't know how many people were at

7    the premiere.  I'm going to say 500.  I have

8    no idea.  The entire room was full, I know

9    that.

10                    But when that picture of that

11   pixilated -- that video of that pixilated dog

12   came up, I mean, people absolutely burst out

13   laughing about it.

14                    And, you know, not that -- and

15   then when you think about it, it's like oh, I

16   guess they had to do that.  I'm not sure.

17                    But I'm sure there were a

18   zillion of those things that lawyers made

19   decisions on or that Dinesh and Bruce made

20   decisions on that we don't know anything

21   about.

22                    But in the end, the movie

23   served my personal hope and -- and aspiration

24   that -- that it would give Americans willing

25   to listen an opportunity to hear it.

CONFIDENTIAL

Page 251

1                    MS. HYLAND:  Okay.  Well, I may
2           have to retract my ten minutes.  I may
3           go a little bit longer.
4    (BY MS. HYLAND)
5           Q.    And I'm going to go back to
6    the -- the meeting at Mr. D'Souza's home.
7                    Who all was in attendance at
8    that that meeting?
9           A.    Mr. D'Souza, Mrs. D'Souza,
10   Mrs. Engelbrecht, and me.
11          Q.    And nobody else?
12          A.    Right.
13          Q.    And what was your role in that
14   meeting, from your understanding?
15                   Why did you think you were
16   there?
17          A.    Well, just to be able to
18   answer, you know, what I ended up doing,
19   right.
20                   Answer technical questions.
21                   Maybe show them some of the
22   research, you know, and some of the -- I
23   don't know if we had video then or not.
24                   But it was just kind of be a
25   support for Mrs. Engelbrecht.

CONFIDENTIAL

Page 252

1          Q.     And -- and you said show them
2     some of the research.
3                 Did you bring any of your
4     research with you to that meeting?
5          A.     I don't really remember.
6          Q.     Do you remember making any kind
7     of presentation or doing any kind of showing
8     of data at the meeting?
9          A.     I don't, but we may have.  I
10    just don't remember.
11         Q.     When the meeting was over, was
12    there any consensus on what was going to
13    happen next?
14         A.     Not that involved me.  I mean,
15    I think there was a lot of other discussions.
16    They still had to -- you know, I don't
17    know -- whatever the business of making a
18    movie happen happen.
19                 That still had to happen.
20    And -- and so there were several months
21    before we got together with them again.
22         Q.     And the data and analytics that
23    ultimately -- the geotracking and -- and all
24    of that, that data that went into the film,
25    had that already been done by the time you

CONFIDENTIAL

Page 253

1    had this meeting with the Dinesh -- with

2    Dinesh D'Souza or Debbie D'Souza or was the

3    research and analytics process on that data

4    ongoing after you had started talking about

5    doing a film?

6          A.     Much of it was done.  I think

7    Georgia was done for sure.  I think that

8    possibly Arizona was done.

9                But I just -- I don't -- I

10   don't recall, because a lot of it went on and

11   we were starting to get a video in and things

12   like that.

13               So there was -- it was -- the

14   geospatial side, while it may have been

15   happening or -- or been completed, I -- I

16   don't remember.  We still would have had to

17   have looked at all the video from all the

18   states.

19         Q.     But -- and so when you had that

20   meeting in the summer of 2022, you had

21   already started collecting video as well?

22         A.     We would have asked for it.  I

23   don't know if any of it had come in yet.

24         Q.     And when you asked for it, was

25   that open records request?

CONFIDENTIAL

Page 254

1           A.      Yes.

2           Q.      Okay.  And I think you had

3    mentioned about 242 videos where you were

4    able to link the video to the data that

5    you --

6           A.      Seventy videos of 242 people.

7           Q.      242 people, 70 videos.  Okay.

8           A.      Uh-huh.  In Atlanta.

9           Q.      Specifically in Atlanta?

10          A.      Uh-huh.

11          Q.      And -- and I think you also

12   mentioned -- and I've seen an e-mail -- where

13   Ms. D'Souza had wanted a thousand videos.

14          A.      Yeah.  I think that was much

15   later in the thing, and that was related, as

16   we understood it, to a -- their desire to

17   create some kind of a -- like a -- I don't

18   know what you call it.  Like a --

19          Q.      Collage?

20          A.      Collage.  Thank you.

21          Q.      And -- and was your -- you

22   know, was OpSec and its contractors able to

23   find a thousand videos for Ms. D'Souza?

24                  Did that actually happen?

25          A.      No, I don't think so.  I think

CONFIDENTIAL

Page 255

1    what happened was they didn't realize that
2    what we had given them actually had 70 of
3    them in there.
4            And I don't -- I -- I know it
5    was way out of the scope and we encouraged
6    them to make do with what they had.  I don't
7    know if we ever actually gave them anything
8    new or not.  We may have.  I don't -- I don't
9    recall.
10        Q.    And do you know if the video
11   containing the image of Mr. Andrews would
12   have been in the videos they already had?
13        A.    No, because we didn't get -- we
14   didn't get Gwinnett video until way late in
15   the game.
16        Q.    Okay.  And I think you
17   mentioned earlier that you actually objected
18   to using additional videos.  I'm not sure if
19   you meant that literally or more
20   colloquially.
21            Did you actually put something
22   in writing that you objected to the use of
23   any additional videos?
24        A.    I don't think so.  In part,
25   again, because it just wasn't what we were

CONFIDENTIAL

Page 256

1    hired to do.  I was hired to give them some
2    video, give them some research, and that was
3    it.
4              So I -- I wouldn't have been
5    comfortable, nor believed it in my scope of
6    my little subcontract, to -- to question
7    someone like Dinesh.
8         Q.    And do you remember having any
9    specific concerns about the video containing
10   Mr. Andrews' image?
11             Obviously you didn't know it
12   was Mr. Andrews at the time but...
13        A.    I -- I don't because, you know,
14   again, I mean, the -- the -- the definition
15   of the mules for the movie's purpose was
16   different than sort of -- you know, I'll just
17   said those are mules with a big M.
18             And the mules for, you know, a
19   normal purpose, not tied to the geospatial
20   analysis, would have been more related to
21   something else that made it inappropriate or
22   improper to -- to -- for those ballots to
23   be -- to be pushed into the -- into there.
24        Q.    And do you remember any
25   discussion happening with anyone around that

1    particular video footage in terms of why it

2    was chosen or why it went in the film or if

3    somebody thought it shouldn't go in the film?

4            Was there any attention paid to

5    that?

6        A.    No, but I don't think it would

7    have been -- I think in hindsight probably

8    what they were trying to do on that

9    particular camera, that -- that took that

10   identify video at the -- at the -- what I

11   call Gwinnett Central Count -- I don't think

12   that's the official name of the building, but

13   that video at Central Count -- I'm sorry --

14   that camera at Central Count, we knew about

15   it and its resolution was much better than --

16   than a lot of others.

17           And we knew that because we had

18   watched the full 25 hours of video from -- on

19   that Gwinnett anomaly from that same camera

20   the previous Sunday.

21           So from Sunday morning to

22   Monday morning we watched the full 25 hours.

23   But, believe me, that's a mind-numbing

24   process because you can't really speed it up.

25   You really have to sit there and wait for

Page 258

1    somebody new to come.

2                  But we knew that that -- that

3    that setup -- and I don't know -- there at --

4    at Gwinnett was a really good setup.

5                  And in retrospect I think

6    probably what they were looking for in that

7    collage was a -- was a clearer set of video.

8                  And I think -- I don't know if

9    that's a 4G camera or not, but it was pretty

10   darn clear.

11                 And so my -- my suspicion is

12   that, you know, now looking back at it,

13   that -- that, you know, that -- that -- that

14   had -- you know, that video had emerged and,

15   you know -- and it -- and it would have fit

16   well into a collage.

17                 You know, been pretty and nice

18   and you wouldn't be able to see it, you know,

19   because it was too far out.

20                 How it went from there had

21   nothing to do with us.

22                 And how it got into a bigger --

23   you know, bigger one second or three seconds,

24   whatever that was in the movie.

25                 And, you know, I -- just think

CONFIDENTIAL

Page 259

1      that -- I just think that -- that's just my
2      opinion.  I don't know.
3              Q.     I'm still trying to understand,
4      though, how we get from -- I know there's an
5      open records request at some point for the
6      footage from that particular camera.
7              A.     Uh-huh.
8              Q.     And then eventually this clip
9      of Mr. Andrews goes into the film --
10             A.     Yeah.  We're not --
11             Q.     -- how it made it from -- like
12     what -- what was the path?
13             A.     We're not sure either.  We
14     didn't -- we didn't identify the film at all.
15     Mark -- no, there's somebody else.
16                    Some other person made a
17     complaint to the state board of elections.
18     And you --
19             Q.     Is that David Cross?
20             A.     David Cross.  I'm sorry.  Thank
21     you.
22                    David Cross made a complaint to
23     the state board of elections and -- and I
24     believe used that video -- they used that
25     video.

CONFIDENTIAL

Page 260

```
 1                    And, in fact, the first time
 2       that Mark -- as far as I'm aware, the first
 3       time Mark Andrews -- and I wouldn't know who
 4       he is if he walked in here -- that was the --
 5       the State themselves were the people who
 6       outed Mark Andrews.
 7                    It wasn't -- it wasn't us.
 8                    It wasn't Dinesh.
 9                    It wasn't -- it wasn't anyone.
10                    It was the State.  And they
11       said they did it in the name of trying to,
12       you know, prove all this thing up.
13                    And -- you know, and then, you
14       know, what happened from there, you know, I
15       don't know.
16            Q.     And you don't know Mr. Cross?
17            A.     I don't.
18            Q.     Have you ever spoken with him?
19            A.     Probably have once or twice,
20       but back then when we were doing the movie,
21       everybody wanted to talk to us.  And so I --
22       I'm just not really like that kind of people
23       person so I wouldn't remember.
24            Q.     Okay.  And -- but you don't
25       know who, either on your team or on the
```

CONFIDENTIAL

Page 261

1    D'Souza media team, was actually tasked with

2    choosing the video?

3          A.    I don't.

4          Q.    Okay.

5          A.    I'd be shocked if it was

6    someone on our team because we got it so

7    late.

8               My guess is that we -- once it

9    started going around on social media and the

10   whole thing with the Georgia SBOE came about

11   and all of that in that -- the video became a

12   little more -- a little more popular, I think

13   people probably just thought, Well, the State

14   is the one who outed this guy.  I mean, this

15   is not -- this isn't our problem.

16              We wouldn't have done that, but

17   I'm -- I bet you that something like that

18   happened and that's how it emerged.  But I

19   have -- I mean, we wouldn't have done it just

20   because we wouldn't have gone through the

21   video.

22              As far as I'm aware, the only

23   Gwinnett video we went through was the

24   25 hours the Sunday before to the -- Sunday

25   morning to Monday morning.  We watched that

1    entire 25-hour thing.

2                      There is some other stuff on

3    the end of that video of inside Central Count

4    that we became aware of way after the movie.

5    In other words, they gave us a disk with all

6    the video on it.

7                      And then that -- that Central

8    Count thing was on there.  And as far as I'm

9    aware, that's the only time we went back in

10   to look and see, was that really there?

11                     And it was, but we didn't do

12   anything with the -- with it or have never

13   even looked at it again.

14        Q.      Okay.  My last question:  Have

15   you ever reached out to any journalists or

16   any member of the media in order to try to

17   get any kind of coverage or story about Mark

18   Andrews?

19        A.      About Mark Andrews?

20        Q.      Uh-huh.

21        A.      No.

22        Q.      Okay.

23        A.      I don't -- I don't know Mark

24   Andrews.  I wouldn't -- I wouldn't have done

25   that.

CONFIDENTIAL

Page 263

1          Q.      All right.

2                  MS. HYLAND:   That's all I've

3          got.

4                  MS. KUCK:   Okay.   I just have a

5          couple follow-up.

6            (Discussion off the record.)

7                  MS. KUCK:   Okay.   Just a couple

8          questions.   And before I ask those, I

9          just want to clarify one thing on the

10         record.

11                 We showed a clip from

12         CrossPolitic that we have designated

13         as Exhibit 2A.   The full interview

14         will be Exhibit 2.

15                 And I just want to clarify that

16         on the record.   And we'll provide both

17         of those to the court reporter and to

18         the -- to other counsel.

19           (Marked Plaintiff Exhibit No. 2.)

20         F U R T H E R   E X A M I N A T I O N

21    BY MS. KUCK:

22         Q.      Mr. Phillips, can you tell me

23    how many of the videos that actually appeared

24    in the film were of the people in the

25    original 70 who were linked with the

CONFIDENTIAL

Page 264

1    geospatial location data?

2         A.    I couldn't.  I would say a

3    handful, maybe.

4         Q.    And your testimony is that

5    Mr. D'Souza was aware that the second batch

6    of video that you provided were videos that

7    had not been geospatially linked?

8         A.    I don't know if Mr. D'Souza

9    had.

10        Q.    Okay.

11        A.    But Mrs. Engelbrecht's

12   communication with Mrs. D'Souza indicated

13   that pretty clearly.

14        Q.    Okay.

15        A.    And then my intervening

16   response saying, This is way out of context,

17   guys.

18        Q.    And what do you mean it was

19   "way out of context"?

20             MR. EVANS:  Scope.  I think you

21        mean scope.

22        A.    Scope.  Scope.  Not context.

23   Sorry.  Scope.

24   (BY MS. KUCK)

25        Q.    You mean scope meaning your

CONFIDENTIAL

Page 265

```
 1    contract scope?

 2                   What did you mean by "scope"?

 3         A.     Scope of what we were called to

 4    provide for the movie.  We were called to

 5    provide a limited set of video and a set of

 6    our -- some of our analysis.  And that was

 7    it.

 8         Q.     Okay.  Because Mr. Cross's

 9    complaint just came up, I just want to show

10    you -- I'm going to mark it as Plaintiff's

11    Deposition Exhibit 29.  I would just want to

12    have you take a look at the complaint that he

13    filed that you referred to.

14         A.     Yes, ma'am.

15         Q.     So what I'm marking is

16    TTV 008228 through 008284.  And -- and the

17    page I'm going to refer you to is 8233.

18         (Marked Plaintiff Exhibit No. 29.)

19         A.     8233?

20    (BY MS. KUCK)

21         Q.     Yeah.

22         A.     Okay.

23         Q.     Okay.  And do you see that

24    that's Mr. Cross's complaint there?

25         A.     I do.
```

1          Q.      All right.  And the second
2    bullet in the complaint, he says, quote, A
3    private investigative organization, True the
4    Vote, purchased billions of cell phone pings
5    and they identified this individual
6    underlined --
7          A.      That's false.
8          Q.      Let me finish.  And that's
9    going to be my question.
10                 -- by tracking his cell phone
11   pings to multiple ballot drop boxes.
12         A.      That's false.
13         Q.      Okay.  And where would he have
14   gotten that idea?
15         A.      No idea.  Not from me.
16         Q.      And do you know any -- do you
17   know of anyone who -- well, did you have any
18   conversations with Mrs. -- Ms. Engelbrecht
19   about his complaint, Mr. Cross's complaint?
20         A.      We may have had some at some
21   point.  I don't recall.  I mean, this was --
22   these were not our complaints, so --
23         Q.      Right.
24         A.      -- we weren't interested in
25   these.

CONFIDENTIAL

Page 267

1                    We were interested in ours.

2                    They never acted on ours.

3                    They acted on this.

4        Q.      But the -- the statement in

5    there is -- is a statement about your

6    research, and that's why I'm asking whether

7    or not --

8        A.      I'm saying it's categorically

9    false.

10                   MR. EVANS:  Objection;

11        misstates -- hold on.  Hold on.

12                   MS. KUCK:  Okay.

13                   MR. EVANS:  Objection;

14        misstates testimony.  Assumes facts

15        not in evidence.

16    (BY MS. KUCK)

17        Q.      Okay.  Just to clear it up from

18    the objection, are -- Mr. Phillips, we're in

19    agreement that the second bullet point on

20    8233 is false?

21        A.      Yes.

22        Q.      Okay.  And are you aware of

23    anyone reaching out to Mr. Cross to tell him

24    that was false?

25        A.      Well, I -- we would had to have

CONFIDENTIAL

Page 268

1    known about it to -- to do it.  It wasn't us.

2    We had no knowledge.

3         Q.    Right.  But you had his

4    complaint?

5         A.    How?

6         Q.    Well, if you look at the cover

7    page of this exhibit --

8         A.    Uh-huh.

9         Q.    -- and you also reference it in

10   your interrogatories -- there was a request

11   made by TTV for the complaint?

12        A.    That's an open records request.

13        Q.    Right.

14        A.    Right.  But we had no knowledge

15   of it when he submitted it.

16        Q.    You -- right.  But you had

17   knowledge of it at -- as of May 26, 2022.

18        A.    Yeah.  What we were to have

19   done about that?  It's not our complaint.  We

20   had our own complaints we were hoping them to

21   act -- they would act on.

22        Q.    But my question is:  Did anyone

23   straighten Mr. Cross out so that he knew that

24   he was making a false --

25        A.    I didn't -- I didn't --

1        Q.      Wait.  Can I finish?  Let me
2    finish my question.
3        A.      Yeah.  Sorry.
4        Q.      Did anyone straighten out
5    Mr. Cross so that he was aware he had been
6    making a false statement to the SEB in
7    Georgia?
8        A.      I believe Ms. Engelbrecht did,
9    but you would have to ask her.
10       Q.      Okay.  And you believe she told
11    him that he had misrepresented your research?
12       A.      Yes.
13       Q.      Okay.  Do you know where
14    Mr. Cross got the video?
15       A.      I assume open records.  That's
16    the only -- or that's the only way I think he
17    can get it.
18       Q.      It's possible he got it from
19    TTV?
20       A.      No.
21       Q.      Why?
22       A.      Because -- well, two things.
23              First is he apparently had it
24    before we did --
25       Q.      Okay.

Page 270

1           A.      -- number one.

2                   Number two, we had been, I want

3      to say, sequestered.  Mr. Schooley made it

4      abundantly clear that we were to sequester

5      all video and -- and nothing could be given

6      to anyone except for -- except for them until

7      the movie was out and then I think a year

8      afterwards or something like that.

9           Q.      Although we looked at your

10     interview on Charlie Kirk --

11          A.      We didn't --

12          Q.      -- which was April --

13          A.      We didn't give Charlie a video.

14          Q.      Which was on April 8?

15          A.      Yeah.

16          Q.      And you don't know where he got

17     it either?

18          A.      No, I don't.

19          Q.      Okay.  And is it your testimony

20     that you didn't know what video he was going

21     to be showing you until you showed up for the

22     interview?

23          A.      That's correct.  We thought it

24     was going to be a radio interview.  Look at

25     how we're dressed.  We were pretty rough.

CONFIDENTIAL

Page 271

1          Q.      And it's your testimony that

2     after the -- well, strike that.

3                  And did you have any

4     conversations with him, then, about, you

5     know, where did you get this video?

6          A.      No.

7          Q.      Okay.

8                  MS. KUCK:  Okay.  I have

9          nothing further.

10                 MR. EVANS:  All right.

11                 MS. KUCK:  Thank you,

12         Mr. Phillips.

13                 THE WITNESS:  Thank you.

14         Again, I apologize about my outburst

15         earlier to everybody.

16                 THE VIDEOGRAPHER:  All parties

17         in agreement with going off the

18         record, this concludes the deposition

19         of Gregg Phillips on Tuesday,

20         September 17, 2024.

21                 We're going off the record at

22         4:29 p.m.

23         (The deposition concluded at 4:29 p.m.)

24

25

CONFIDENTIAL

Page 272

```
1              WITNESS CORRECTIONS AND SIGNATURE
2           Please indicate changes on this sheet
         of paper, giving the change, page number,
3        line number and reason for the change.
         Please sign each page of changes.
4

         PAGE/LINE        CORRECTION      REASON FOR CHANGE
5
         _____
6
         _____
7
         _____
8
         _____
9
         _____
10
         _____
11
         _____
12
         _____
13
         _____
14
         _____
15
         _____
16
         _____
17
         _____
18
         _____
19
         _____
20
         _____
21
         _____
22
         _____
23
         _____
            _____
24          GREGG PHILLIPS
25
```

CONFIDENTIAL

Page 273

1      S I G N A T U R E   O F   W I T N E S S

2

3          I, GREGG PHILLIPS, solemnly swear or

4      affirm under the pains and penalties of

5      perjury that the foregoing pages contain a

6      true and correct transcript of the testimony

7      given by me at the time and place stated with

8      the corrections, if any, and the reasons

9      therefor noted on the foregoing correction

10     page(s), and that I am signing this before a

11     Notary Public.

12

       _____

13                 GREGG PHILLIPS

14     STATE OF _____   *

       COUNTY OF _____   *

15

16              SUBSCRIBED AND SWORN TO BEFORE

       ME BY GREGG PHILLIPS on this, the _____ day

17     of _____, 2024.

18

                  _____

19                 Notary Public, State of _____

20

       My Commission Expires: _____

21

22

23

       Job NY 6909303

24

25

CONFIDENTIAL

Page 274

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
 2                  ATLANTA DIVISION
 3   MARK ANDREWS,           |
                             |
 4     Plaintiff,            |
                             |   Case No.
 5   V.                      |   1:22-cv-04259-SDG
                             |
 6   DINESH D'SOUZA, et      |
     al.,                    |
 7                           |
       Defendants.           |
 8
     _____
 9   THE STATE OF _____:
     COUNTY  OF  _____:
10
11        I, MENDY A. SCHNEIDER, a Certified
12   Shorthand Reporter in and for the State of
13   Texas, do hereby certify that the facts as
14   stated by me in the caption hereto are true;
15   that the above and foregoing answers of the
16   witness, GREGG PHILLIPS, to the
17   interrogatories as indicated were made before
18   me by the said witness after being first duly
19   sworn to testify the truth, and same were
20   reduced to typewriting under my direction;
21   that the above and foregoing deposition as
22   set forth in typewriting is a full, true, and
23   correct transcript of the proceedings had at
24   the time of taking of said deposition.
25        I further certify that I am not, in any
```

CONFIDENTIAL

Page 275

1    capacity, a regular employee of the party in
2    whose behalf this deposition is taken, nor in
3    the regular employ of this attorney; and I
4    certify that I am not interested in the
5    cause, nor of kin or counsel to either of the
6    parties.
7              That the amount of time used by
8    each party at the deposition is as follows:
9         MS. KUCK - 04:13:20
10        MS. HYLAND - 00:18:42
11
12
              GIVEN UNDER MY HAND AND SEAL OF OFFICE,
13   on this, the 27th of September, 2024.
14
                        _Mendy Schneider_
15        _____
          MENDY A. SCHNEIDER, CSR, RPR
16        Certification No.:  7761
          Expiration Date:  1-31-2025
17
18
19
20
21
22
23
24
25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.