# EXHIBIT 15

CONFIDENTIAL

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION
3    MARK ANDREWS,                    :
                                      :
4          Plaintiff,                 :
                                      : Case No.
5    V.                               : 1:22-cv-04259-SDG
                                      :
6    DINESH D'SOUZA, et al.,          :
           Defendants.                :
7
8
9
         ************************************
10              C O N F I D E N T I A L
11        VIDEOTAPED / REALTIMED DEPOSITION OF
12               DEBORAH C. D'SOUZA
13               OCTOBER 16, 2024
14        ************************************
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 2

1          DEBORAH C. D'SOUZA was called as a

2    witness by the Plaintiff, taken before Pat

3    English-Arredondo, CSR (TX), RMR, CRR, CLR,

4    A Certified Shorthand Reporter in and for the

5    State of Texas, and duly sworn and reported

6    by stenographic machine shorthand in

7    real-time translation to iPads, at the law

8    offices of Greenberg Traurig, LLP, 1000

9    Louisiana Street, Suite 5700, Houston, Texas,

10   on Wednesday, the 16th day of October, 2024,

11   from 10:05 a.m. to 4:25 p.m., pursuant to the

12   Federal Rules of Civil Procedure; that the

13   Witness may read and sign said deposition and

14   sign before any Notary Public; and as

15   outlined in the provisions stated on the

16   record or attached hereto.

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 3

```
 1              A P P E A R A N C E S
 2     COUNSEL FOR PLAINTIFF:
            Ms. Lea Haber Kuck
 3          Ms. Danuta Egle
            SKADDEN, ARPS, SLATE, MEAGHER
 4             & FLOM LLP
            4 Times Sq, New York, NY 10036
 5          One Manhattan West
            New York, NY 10001-8602
 6          Phone:  212-735-3000
            Lea.kuck@probonolaw.com
 7          Danuta.egle@probonolaw.com
 8
       COUNSEL FOR DEFENDANTS TRUE THE VOTE,
 9     CATHERINE ENGELBRECHT AND GREGG PHILLIPS:
            Mr. Jake Evans
10          GREENBERG TRAURIG, LLP
            Terminus 200
11          3333 Piedmont Road NE, Suite 2500
            Atlanta, Georgia 30305
12          Phone: 678.553.2100
            Jake.Evans@gtlaw.com
13
14     COUNSEL FOR DEFENDANTS DINESH D'SOUZA AND
       D'SOUZA MEDIA LLC:
15          Ms. Amanda G. Hyland
            Mr. Austin C. Vining
16          BUCHALTER
            3500 Riverwood Pkwy SE, Suite 1900
17          Atlanta, Georgia 30339
            Phone:  404.832.7536
18          Ahyland@buchalter.com
            avining@buchalter.com
19
       ALSO PRESENT:
20          Ms. Jane Bentrott
21     VIDEOGRAPHER:
            Ms. Alyssa Becerra
22          Veritext
23     CERTIFIED STENOGRAPHIC / REALTIME REPORTER:
            Ms. Pat English-Arredondo
24          CSR(TX), CRR, RMR, CLR
25
```

CONFIDENTIAL

**Page 4**

1                    **EXAMINATION INDEX**

2      **WITNESS:  DEBORAH C. D'SOUZA**

                                          **PAGE**

3      **EXAMINATION BY MS. HABER KUCK**          10

       **EXAMINATION BY MR. EVANS**              197

4      **EXAMINATION BY MS. HYLAND**             199

       **FURTHER EXAMINATION MS. HABER KUCK**    206

5

6      **SIGNATURE REQUESTED**                   212

7      **REPORTER'S CERTIFICATION**              214

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 5

```
 1                      EXHIBITS
 2   NO.            DESCRIPTION                    PAGE
 3   EXHIBIT NO. 9                                  41
     (Previously marked)  Cover email
 4   dated 8-12-21 to Debbie from
     Catherine, w/attachment; Re:  True
 5   the vote info, Bates TTV_006817-6920
 6   EXHIBIT NO. 11                                124
     (Previously marked) Series of chat
 7   messages between Debbie and
     Catherine, Bates DD_000087 - 131
 8
     EXHIBIT NO. 23                                 77
 9   (Previously marked)  Cover email
     dated 12-9-21 to DJD, Debbie,
10   Catherine and others from Schooley;
     Re:  First schedule and beat sheet
11   request, Bates TTV_007191 - 199
12   EXHIBIT NO. 37                                 65
     (Previously marked) Cover email dated
13   11-23-21 to Debbie from Catherine;
     Re:  Trafficking overview, Bates
14   TTV_007087 - 89
15   EXHIBIT NO. 40                                103
     (Previously marked) Cover email dated
16   1-10-22 to Bruce, Debbie, DJD, Gregg
     and Nathan from Catherine; Re:
17   Multiple ballot video needed,
     Bates TTV_007209
18
     EXHIBIT NO. 46                                113
19   (Previously marked) Cover email chain
     dated 2-4-22 to Catherine, Gregg,
20   Dinesh and others from Debbie; Re:
     List of needs for movie, Bates
21   TTV_007271
22   EXHIBIT NO. 49                                117
     (Previously marked) Cover email dated
23   2-10-22 to Debbie and Gregg and
     Dinesh from Catherine; Re:  Zoom call
24   (Wed 7:15 CST) and items to complete,
     Bates TTV_007276 - 77
25
```

CONFIDENTIAL

Page 6

```
 1    EXHIBIT NO. 54                              137
      (Previously marked) Chat messages
 2    between Debbie and Gregg dated
      4-5-22, Bates DDR-00056140 - 142
 3
      EXHIBIT NO. 75                               43
 4    Cover email chain dated 8-12-21 to
      Catherine from Debbie; Re:  True the
 5    Vote info, Bates TTV_006921 - 22
 6    EXHIBIT NO. 76                               85
      Cover email chain dated 1-5-22 among
 7    Bruce, DJD, Debbie and Nathan; Re:
      Does this make sense, Bates
 8    DDR-00020011 - 12
 9    EXHIBIT NO. 77                               88
      Chat messages dated 1-8 to 1-9-22
10    between Debbie and Dinesh and Bruce;
      Bates DDR-00059468 - 472
11
      EXHIBIT NO. 78                              108
12    Chat messages dated 1-10-22 between
      Debbie and Gregg, Bate DDR-00056096 -
13    99
14    EXHIBIT NO. 79                              134
      Chat messages dated 4-19 to 4-20-22
15    between Dinesh and Debbie; Re:
      DDR-00059516 - 518
16
      EXHIBIT NO. 80                              137
17    Cover email chain dated 4-7-22 to
      Nathan and DJD from Bruce; Re:
18    Davids List, Bates TPNF-0001637 - 38
19    EXHIBIT NO. 81                              144
      Cover email dated 4-21-22 to Nathan
20    Frankowski, Bruce and Dinesh from
      Debbie; Re:  Trump Call, Bates
21    TPNF-0001150
22    EXHIBIT NO. 82                              146
      Cover email dated 5-13-22 to Danielle
23    D'Souza from Leah Trilling; Re:
      Schedule for Today, Bates TPDG-000037
24    - 40
25
```

CONFIDENTIAL

Page 7

```
 1    EXHIBIT NO. 83                           147
      Chat messages dated 1-29 to 1-30-22,
 2    Bates DDR-00067677 - 80
 3    EXHIBIT NO. 84                           156
      Chat messages between Debbie D'Souza
 4    and Bruce Schooley dated 4-23-22,
      Bates DDR-00057119 - 121
 5
      EXHIBIT NO. 85                           159
 6    Chat messages between Catherine
      Engelbrecht and Dinesh D'Souza, Bates
 7    DDR-00056860 - 61
 8    EXHIBIT NO. 86                           162
      Cover email chain dated 5-2-22
 9    between Debbie D'Souza and Patricia
      Jackson, 2 pages (non-Bates)
10
      EXHIBIT NO. 87                           171
11    Cover email dated 12-30-23 to Dinesh
      from Dinesh; Re:  C&G 16,
12    w/attachment, Bates DDR-00049514 -
      515
13
      EXHIBIT NO. 88                           172
14    Document showing chats between Dinesh
      D'Souza and Catherine Engelbrecht,
15    Bates (some portions redacted), Bates
      DDR-00055999 - 00056000
16
      EXHIBIT NO. 89                           188
17    Cover email chain dated 3-16-24 among
      Ant W, Debbie D'Souza, Bruce
18    Schooley; Re:  AAR and monthly
      overview, Bates DDR-00018795 - 96
19
      EXHIBIT NO. 90                           191
20    Cover email dated 3-7-23 to Matthew
      DeSilva and Dinesh from Debbie
21    D'Souza; Re:  Show ideas 7 March
      2023, Bates DDR-00031134 - 37
22
23         (REPORTER'S NOTE:  All quotations from
       exhibits are reflected in the manner in which
24     they were read into the record and do not
       necessarily denote an exact quote from the
25     document.)
```

CONFIDENTIAL

Page 8

1              (Following commenced at 10:05 a.m.)

2                   THE VIDEOGRAPHER:  We are going

3         on the record.  The current time is

4         10:05 and the date is 10/16 of 2024.

5                   And the audio and video

6         recording will continue to take place

7         until both parties agree to go off the

8         record.

9                   This is the recorded depo for

10        Deborah D'Souza, taken by counsel for

11        plaintiff in the matter of Mark

12        Andrews versus -- taken by counsel for

13        plaintiff in the matter of Mark

14        Andrews versus Dinesh D'Souza, et al.,

15        filed in the U.S. District Court for

16        the Northern District of Georgia,

17        Atlanta Division.

18                   The location of this deposition

19        is in Greenberg Traurig law office

20        located in Houston, Texas.

21                   My name is Alyssa Beccerra and

22        I will be the video for today.

23                   Will all counsel present

24        themselves, please.

25                   MS. HABER KUCK:  Lea Haber Kuck

CONFIDENTIAL

Page 9

1          for plaintiff.

2                  MS. EGLE:  Danuta Egle for

3          plaintiff.

4                  MS. BENTROTT:  Jean Bentrott

5          for plaintiff.

6                  MS. HYLAND:  Amanda Hyland for

7          Debbie D'Souza, the deponent, and

8          defendants Dinesh D'Souza and D'Souza

9          Media.

10                 MR. VINING:  Austin Vining for

11         Debbie D'Souza, the deponent, and

12         defendants Dinesh D'Souza and D'Souza

13         Media.

14                 MR. EVANS:  Jake Evans for

15         defendants True the Vote, Gregg

16         Phillips, and Catherine Engelbrecht.

17                 MS. HABER KUCK:  And we also

18         have present in the room Mr. D'Souza,

19         who is one of the defendants.

20                 THE REPORTER:  Ma'am, will you

21         go ahead and raise your right hand to

22         be administered the oath?

23             (Oath administered.)

24                 THE WITNESS:  I do.

25                 THE REPORTER:  Thank you.

CONFIDENTIAL

Page 10

1                    DEBORAH C. D'SOUZA,

2       being called as a witness, and having been

3       duly sworn, testified as follows:

4                          EXAMINATION

5       BY MS. HABER KUCK:

6               Q.       Good morning, Mrs. D'Souza.

7               A.       Good morning.

8               Q.       My name is Lea Haber Kuck, and

9       I'm one of the attorneys for Mark Andrews,

10      the plaintiff in this matter, and I'm going

11      to be asking you the questions today.

12              A.       Okay.

13              Q.       Can you please state your full

14      name for record?

15              A.       Deborah Cestero D'Souza.

16              Q.       And please state your address.

17      ███████████████████████████████████████████

18      ███████████████████████████████████████████

19              Q.       Have you been deposed before?

20              A.       Never.

21              Q.       Okay.

22              A.       No.

23              Q.       We'll -- we'll talk about a

24      few -- a few rules about how it's going to go

25      in a minute.

CONFIDENTIAL

Page 11

```
 1                    Have you ever testified in a
 2    nondeposition setting?
 3          A.       Never.
 4          Q.       Okay.  And you understand that
 5    you're under oath?
 6          A.       Yes, I do.
 7          Q.       So do you understand that your
 8    testimony today carries the same weight as
 9    your testimony before a judge or a jury?
10          A.       Yes.
11          Q.       Is there any reason you may not
12    be able to give accurate testimony today?
13          A.       No.
14          Q.       Any reason your memory might be
15    less sharp than usual today?
16          A.       No.
17          Q.       Okay.  Do you have any physical
18    or mental conditions that would prevent you
19    from giving your best testimony today?
20          A.       No.
21          Q.       All right.  And are you under
22    the influence of any drugs or other
23    substances that would prevent you from giving
24    your best testimony today?
25          A.       No.
```

CONFIDENTIAL

Page 12

```
 1        Q.      Okay.  So I will just go
 2   through a few ground rules for the day.
 3                Everything that we say is being
 4   recorded and transcribed by the court
 5   reporter (indicating).  So for the court
 6   reporter's benefit, please answer my
 7   questions verbally.
 8                So, for example, please respond
 9   with a "yes" rather than a nod of your head
10   because the court reporter can't pick that
11   up.  Okay?
12        A.      Okay.
13        Q.      And also for the convenience of
14   the court reporter, let's try not to talk
15   over each other.  So please allow me to
16   finish my questions and then I will try and
17   allow you to finish your answers before we
18   move on.  Okay?
19        A.      Okay.
20        Q.      If my question is unclear, let
21   me know.  If you don't ask me to clarify my
22   question, I will assume that you understand
23   it.  Okay?
24        A.      Okay.
25        Q.      I will plan for us to take a
```

Page 13

```
 1      break every hour or so, but if you need a
 2      break at any other time, please let me know,
 3      and we can take one as long as there is not a
 4      question pending.
 5                   So you can give an answer and
 6      then ask for a break if you need one at any
 7      time.
 8           A.      Okay.
 9           Q.      And throughout the deposition
10      your counsel may object to certain of my
11      questions.  Unless your counsel specifically
12      instructs you not to answer the question, you
13      must still answer it.  Okay?
14           A.      Okay.
15           Q.      All right.  So can you give me
16      your educational background?
17           A.      I have bachelor of Liberal Arts
18      degree in political science with a minor in
19      Spanish.
20           Q.      From what university?
21           A.      It used to be Southwest Texas
22      State University.  It is now called Texas
23      State.
24           Q.      Okay.
25           A.      In San Marcos, Texas.
```

CONFIDENTIAL

Page 14

1      Q.      And any advanced degrees?

2      A.      No.

3      Q.      Okay.  And what is your

4   employment history since college?

5      A.      Oh, a lot.  So I was a -- I

6   managed a group of stores right after

7   college.  It was called Liberty Military

8   Sales.

9      Q.      Okay.

10     A.      And I helped with the customer

11  service department.  I managed the customer

12  service department for that particular

13  company.

14             They filed bankruptcy about a

15  year after I started, so it was short-lived.

16     Q.      And what year did you finish

17  college?

18     A.      '88.  December of '88.

19     Q.      So this would have been like

20  '88, '89?

21     A.      '89.  '89, '90.

22     Q.      Okay.

23     A.      And then I decided to teach,

24  and so I went through the alternative

25  certification program in Houston.  And I

CONFIDENTIAL

Page 15

1    taught kindergarten, second grade, for about
2    seven years, a combination of the two.
3                    I took a little break and then
4    I decided to teach high school, Spanish, so I
5    taught that for a few years.  And I also
6    taught middle school when my son was in
7    middle school.
8                    So on and off, I taught about
9    11 years.
10        Q.      Okay.
11        A.      So teaching is my -- was my
12   profession for 11 years.
13        Q.      And so that was through what,
14   2000 --
15        A.      Oh, 2007, thereabouts.
16        Q.      Okay.  And then since that
17   time, have you been employed?
18        A.      I was not employed until about
19   2014, 2015, when I started working for
20   D'Souza Media.
21        Q.      Okay.  And does the -- what is
22   D'Souza Media?  What does that company do?
23        A.      D'Souza Media is a documentary
24   film company.
25        Q.      And what is your position with

CONFIDENTIAL

Page 16

1    D'Souza Media or has it changed over time?

2         A.     It has changed over time.  At

3    first I was just doing research, and now I'm

4    involved with the projects, you know, the

5    documentary films that we do.

6                So I'm one of -- I think we

7    have a team of about six people and I'm one

8    of the team.

9         Q.     And do you have a title or a

10   formal position?

11        A.     I would just say probably

12   producer would be my title.

13        Q.     Okay.

14        A.     I also produce the Dinesh

15   D'Souza Podcast.

16        Q.     All right.  And what does

17   producing the podcast entail for your work?

18        A.     For my work?  Well, I set it

19   up, like, I'm the one that makes sure that

20   we -- that we stay on time.  I get the ads.

21   I write up the ads for Dinesh to read off the

22   prompter.

23                I take the -- basically run the

24   timer for him.  Collaborate with -- sometimes

25   I collaborate with some of the segments that

CONFIDENTIAL

Page 17

```
1   we do; sometimes I don't.  Just depends.
2               So I prepare that the night
3   before the podcast unless there is breaking
4   news.  In that case, then we change things
5   around.
6               But we go to a studio in
7   The Woodlands where we record it and the
8   technical producer has to have my lineup in
9   order for him to know what comes next, that
10  sort of thing.
11              But Dinesh does not use a
12  script --
13      Q.    Okay.
14      A.    -- so everything that he says
15  in the podcast is unscripted.
16      Q.    And do you do any research or
17  fact-checking for the podcast?
18      A.    It depends on what it is.
19      Q.    Sometimes?
20      A.    Not always.
21      Q.    Yeah, okay.  And who is the
22  person responsible for research and
23  podcast -- I'm sorry -- research and
24  fact-checking for the podcast?  Is there --
25  is there a person?
```

CONFIDENTIAL

Page 18

1          A.       We don't have a person.   We
2     just --
3          Q.       Okay.
4          A.       Between Dinesh and I, we do it
5     ourselves.
6          Q.       Okay.  Anyone else?  Just the
7     two of you?
8          A.       Just the two of us.
9          Q.       And who -- you said there were
10    about -- well, how many people are employed
11    by D'Souza Media?
12         A.       Well, no one is actually
13    employed.  We're all contracted.
14         Q.       Okay.
15         A.       So, let's see, Bruce Schooley,
16    Nathan -- Nathan -- oh, my goodness.
17         Q.       Frankowski?
18         A.       Frankowski, yes.  Yes.
19                  Myself, Dinesh.  So that's four
20    of us.
21                  Sometimes Danielle D'Souza
22    Gill, who is Dinesh's daughter, will have
23    just input here and there, but she's not, you
24    know, on the scene all the time.
25                  And that's pretty much it.

CONFIDENTIAL

Page 19

1           Whenever we do any kind of
2    filming, Bruce will hire an outside team --
3           Q.    Got it.
4           A.    -- to do the day-to-day task of
5    getting people -- getting talent, if we're
6    doing a scene, you know, that sort of thing.
7           Q.    And so as I understand it,
8    D'Souza Media is a limited liability company?
9           A.    Correct.
10          Q.    Okay.  Are you a limited
11   partner or do you have any -- general partner
12   or anything like that?
13          A.    I don't.  Just the wife of a
14   part- -- the partner --
15          Q.    Okay.
16          A.    -- one of the partners, but
17   not -- because this happened before we got
18   married, so I don't have a part in that.
19          Q.    Okay.  And so Mr. D'Souza is
20   the -- is the limited partner?
21          A.    He's one, yes.
22          Q.    Okay.  And who else?  Who else
23   is --
24          A.    And Bruce Schooley.
25          Q.    Okay.  And to your knowledge

CONFIDENTIAL

Page 20

1    they are the two partners in the -- in the
2    D'Souza Media?
3          A.     In the entity, correct.
4          Q.     Okay.  Did you -- did you speak
5    to anyone today -- well, strike that.
6                 Did you speak to anyone about
7    the testimony you expect to give at your
8    deposition today?
9          A.     No.
10         Q.     Are you represented here by
11   counsel?
12         A.     Yes.
13         Q.     And who is that?
14         A.     That is Amanda and Austin.
15         Q.     Okay.  And did you do anything
16   to prepare for your testimony?
17         A.     As in -- can you clarify that?
18         Q.     Did you look at any documents,
19   talk to anyone to, say, refresh your memory
20   about events you expect to talk about today?
21         A.     Briefly with my counsel.
22         Q.     Okay.  And that's Ms. Hyland
23   and Mr. Vining?
24         A.     Yes.
25         Q.     Okay.  And did you look at any

CONFIDENTIAL

Page 21

```
 1    documents?
 2         A.      A couple of documents, yes.
 3         Q.      And who selected those
 4    documents?
 5         A.      My counsel.
 6         Q.      Okay.  Did they cause you to
 7    remember anything that you had forgotten
 8    about prior to looking at them?
 9         A.      Well, probably a couple of
10    emails that I couldn't recall, yes.
11         Q.      And what did it cause you to
12    recall that you had forgotten about?
13         A.      Dates, mainly.
14         Q.      Okay.  And did you do
15    any review of documents on your own, go back
16    through your emails, your files, anything?
17         A.      No.
18         Q.      Okay.
19         A.      I did not.
20         Q.      Okay.  Were you -- were you
21    asked to collect any documents in connection
22    with this litigation?
23         A.      Prior to today or just in
24    general?
25         Q.      In general.  I assume you know
```

Page 22

1    in connection with the litigation, certain

2    documents were -- have been produced to the

3    plaintiff.

4          A.     Right.

5          Q.     Did you have any role in

6    gathering the documents that were produced?

7          A.     Yes.

8          Q.     And what was your role?

9          A.     Well, my role was mainly to

10   give access to those that needed access to

11   emails and text messages.

12         Q.     And did you search for

13   any -- search any files that were in hard

14   copy, not electronic emails or texts?

15         A.     Hard copy, no.

16         Q.     Does D'Souza Media have hard

17   copy files?

18         A.     No.

19         Q.     And whose email were you --

20   were you responsible for providing access to?

21         A.     My husband's and myself.

22         Q.     And what about Mr. Schooley?

23         A.     No.

24         Q.     Is it the same with the text

25   messages?

CONFIDENTIAL

Page 23

1          A.          Yes.  Just Dinesh and I.
2          Q.          And what steps did you -- what
3     steps did you take to give your counsel
4     access?
5          A.          Let's see.  Well, I had to go
6     into our email and there were a couple of
7     things that I'm not familiar with because I'm
8     not an IT person, so I didn't know how to do
9     it.  So I had to get, like, I guess, written
10    instructions as to how to give access to the
11    company that was taking those items.
12                      And so that was basically my
13    role.  Beyond that, I couldn't tell you what
14    else happened because I'm not --
15         Q.          Okay.
16         A.          -- I'm not, you know, good at
17    those types of things.
18         Q.          And you say you got
19    instructions.  Who gave you the instructions?
20         A.          My counsel.
21         Q.          So let's talk a little bit
22    about the "2000 Mules" film.  What was your
23    role in making the film?
24         A.          Well, I was one of the
25    producers for the film.  So I guess I brought

CONFIDENTIAL

Page 24

```
 1    Catherine and Gregg, Catherine Engelbrecht
 2    and Gregg Phillips, into -- into the fold.
 3                I -- we make films about things
 4    that -- you know, that are current, that are
 5    of interest to the -- to the general public.
 6    For me, particularly, election integrity is
 7    very important.
 8                I'm from -- Venezuela is my
 9    home country and I know what happened in
10    Venezuela as far as election -- election
11    fraud, election integrity.  It had none.  So
12    I was determined that that was going to be
13    something that I was going to be very
14    involved in early on, even before this movie.
15                I was trained by Catherine.
16    That is -- I guess let me rephrase that.
17    That is how I met Catherine --
18         Q.     Okay.
19         A.     -- in 2009, I believe.  She was
20    a part of -- or helped found True the Vote,
21    which is an organization that really looks
22    into election integrity.  It's nonpartisan.
23                So we want to make sure that
24    every vote counts regardless of who the
25    person is voting for.  And that was my
```

CONFIDENTIAL

Page 25

1    passion, so I was very involved in that.

2                    Given that Spanish is my first

3    language, I helped with the bilingual portion

4    of being a poll watcher in areas that were

5    mainly Spanish-speaking.  So I learned to do

6    that.

7                    But that was really my --

8    really my role then.

9                    And so Catherine and I have

10   maybe, you know, texted each other throughout

11   the years about different things, but because

12   I know that True the Vote is -- does election

13   integrity and I knew that that was -- that we

14   were having a lot of questions about the 2020

15   election, I mentioned to Dinesh that I knew

16   Catherine and that she did really great work

17   with True the Vote.

18                   And so Catherine told me that

19   they had some things that they had found, and

20   that was primarily why we asked them to come

21   talk to us about what their findings were.

22                   And given the fact that, again,

23   this is something very near and dear to me,

24   Dinesh was like, Okay, well, we have to make

25   sure that this is -- that this is legitimate,

CONFIDENTIAL

Page 26

1    that this is actually something that we

2    can -- we can prove.

3                And so that -- my role was

4    really kind of being the conduit to Catherine

5    and Gregg and our team.

6         Q.    Okay.  And when you said you

7    were trained by Catherine --

8         A.    Uh-huh.

9         Q.    -- what was that training?

10        A.    Well, the training was done by

11   True the Vote.  So --

12        Q.    Okay.

13        A.    So Catherine herself -- I don't

14   even remember, to be honest.  This was 2010,

15   so I don't remember if -- Catherine was

16   probably there, but it wasn't actually

17   Catherine that trained me.  It was her --

18        Q.    Okay.

19        A.    -- team that trained me.

20                They just basically went

21   through the rules, this is what you can do.

22   This is -- if you see this, you can -- you

23   know, you can interject yourself in it.  You

24   can talk to the poll judge about what -- you

25   know, what happened.

Page 27

1                You can -- you can let the
2    judge know that you know the rules in a
3    voting location and that you will be sitting
4    behind the -- you know, the -- I guess, the
5    poll judge and the workers.
6                You're not to, you know, go in
7    there and talk to the people that are coming
8    in, but if you hear something, say something.
9                And so that was really my role.
10        Q.        And that's what -- that's what
11   you meant by being a poll watcher?
12        A.        Yeah.
13        Q.        Okay.
14        A.        Observer.  Really a poll
15   observer, I guess, would be the correct
16   terminology.
17        Q.        And how long did you do that
18   work?
19        A.        I only did it for the election
20   of the -- the 2012 election.
21        Q.        Okay.  And with respect to the
22   film, how much time do you think you spent,
23   say, on a weekly basis during the making of
24   the film?
25        A.        On the film itself?

Page 28

1          Q.        Yeah.   Well, or in
2   communicating with Mr. Phillips and
3   Ms. Engelbrecht and work related to the film,
4   I guess.
5          A.        Okay.   Well, you know, it only
6   took about four months to actually make the
7   movie.
8          Q.        Uh-huh.
9          A.        Our movies, our films, our
10  documentaries are actually -- the process is
11  quite short.   It's anywhere from three to
12  four months.
13               So we began in, I believe,
14  January and we were done by mid-April,
15  something like that.   So on a weekly basis, I
16  would say we would talk to them three or four
17  times.   I don't really -- I don't recall any
18  more than that.
19         Q.        Okay.   And when you said "we"
20  would talk to them, who other than yourself?
21         A.        Dinesh and I.
22         Q.        Okay.
23         A.        And sometimes Bruce Schooley.
24         Q.        And other than those
25  communications with Mr. Phillips and

Page 29

1    Ms. Engelbrecht, did you do any other work on
2    the movie?
3         A.    Can you be more specific?
4         Q.    So did you -- did you do any
5    research?
6         A.    Well, yes.  I'm trying to
7    think of -- I can't really recall exactly
8    what research I did, but I know that it
9    wasn't just their research.
10        Q.    Uh-huh.  Okay.  Maybe we'll be
11   able to refresh your memory as we go.
12        A.    Yeah.
13        Q.    But that -- as you sit here,
14   you can't recall?
15        A.    No, I can't really recall,
16   yeah --
17        Q.    Okay.
18        A.    -- the specifics, yes.
19        Q.    Was there anyone at D'Souza
20   Media other than yourself who was responsible
21   for research for the film?
22        A.    Well, I think everybody
23   involved.
24        Q.    And when you say "everybody" --
25        A.    Bruce, Dinesh, yes.

CONFIDENTIAL

Page 30

```
1         Q.      Mr. Frankowski?
2         A.      He wasn't involved in that.  He
3    was -- he was merely the, I guess, director.
4    So he cut the pieces together, put the -- put
5    the film together.
6         Q.      Uh-huh.
7         A.      But as far as research, he
8    wasn't part of it, no.
9         Q.      So he would have been more on
10   the technical side?
11        A.      He was the technical side, yes.
12        Q.      And then on research, it would
13   have been you and Mr. D'Souza and
14   Mr. Schooley?
15        A.      Correct.
16        Q.      Okay.  And was anyone on your
17   team responsible for fact-checking.
18        A.      We didn't have a specific
19   person, no.
20        Q.      Did any of the three of you do
21   any fact-checking?
22        A.      Well, I guess we all did.
23        Q.      And what did that entail?
24        A.      Well, looking at articles,
25   reading articles about geotracking, because
```

CONFIDENTIAL

Page 31

1    this movie was about that, geotracking.  And
2    so we needed to make sure that we
3    familiarized ourselves with the geotracking
4    data and what that entailed.
5                    You know, murders that were
6    solved via geotracking, things like that.
7         Q.    Okay.  And I noticed one of the
8    credits said that you were a co-writer of the
9    film.  And what did that entail?
10         A.    Well, co-writing really -- we
11    don't really write a script, so it's really
12    just a collaborator.
13         Q.    Okay.  And who else was
14    involved in that collaboration?
15         A.    Bruce and Dinesh, of course.
16         Q.    Okay.  And then how about the
17    editing of the film?  You mentioned
18    Mr. Frankowski.
19                    Anybody else involved in the
20    technical editing and putting the film
21    together?
22         A.    Well, Bruce works with Nathan
23    to edit the film that way.
24         Q.    Okay.  Anyone else you're aware
25    of?

```
 1          A.      No.
 2          Q.      How about the graphics for the
 3    film?  Who prepared those?
 4          A.      I don't know anything about the
 5    graphics.  That was --
 6          Q.      Okay.
 7          A.      That was above my --
 8          Q.      Okay.
 9          A.      Yeah, I don't know about that.
10          Q.      And then in terms of marketing
11    and promoting the film, who was involved in
12    that on the D'Souza Media team?
13          A.      Uh-huh.  Well, we had a
14    publicist that was in charge of getting
15    media.  So she was the one that got all the
16    media together for Dinesh to do interviews
17    and that sort of thing.
18          Q.      And is that Patricia Jackson.
19          A.      Yes, it is.
20          Q.      Anyone else involved in the
21    marketing and promotion that you can recall?
22          A.      No.
23          Q.      Were you compensated for your
24    work on the film?
25          A.      As part of the team, yes.
```

CONFIDENTIAL

Page 33

1          Q.      And who -- what entity
2     compensated you?
3          A.      D'Souza Media.
4          Q.      And do you have a contract or
5     an agreement with them?
6          A.      I do.
7          Q.      And what is the -- what's the
8     nature of that agreement?
9          A.      Well, they compensate me for my
10    time when I work on a project.
11         Q.      Okay.
12         A.      So it's project based.
13         Q.      And is it by the hour or a flat
14    fee?
15         A.      No, it's a flat fee.
16         Q.      And how much did you make for
17    this film?
18         A.      As a contract or you mean
19    monthly or what --
20         Q.      I mean you personally --
21         A.      Uh-huh.
22         Q.      -- how much did you
23    personally -- how much were you compensated
24    for your work on the film by D'Souza Media?
25         A.      Gosh.  About $40,000.

CONFIDENTIAL

Page 34

1      Q.      Okay.

2      A.      Yeah.

3      Q.      All right.  Did you have any

4   role in the "2000 Mules" book?

5      A.      No.

6      Q.      And to your knowledge, did

7   Mr. D'Souza write the book himself or was

8   there a ghostwriter?

9      A.      Dinesh writes all his books.

10      Q.      And do you know anyone else who

11   worked on the book with him?

12      A.      No.

13      Q.      How about merchandising for

14   "2000 Mules"?  Did you have any role in that?

15      A.      I don't believe we had

16   merchandise.

17      Q.      And there is also a children's

18   book that's called "The Plot Against the King

19   2000 Mules."

20              What was your involvement in

21   that?  I understand you were interviewed for

22   that.

23      A.      Yes.  It was very limited.

24   That was Brave Books, and they do children's

25   books about different things.  Usually it's

CONFIDENTIAL

Page 35

1    political.

2              And they asked if they could

3    write a book based on "2000 Mules" and

4    obviously fictionalize our characters or

5    whatever.  And so we agreed to do it.  But we

6    didn't write it.  We didn't have any role in

7    writing the book at all.

8         Q.    Did you get any revenue from

9    the book?

10        A.    Very little, but I don't know

11   how much.

12        Q.    Okay.  And who was -- who is

13   responsible for Mr. D'Souza's social media

14   posts?

15        A.    At the time, I don't recall the

16   name, but Dinesh will have one or two people

17   that do his posts -- that do some of his

18   posts.  Dinesh does some and they do some.

19        Q.    Okay.

20        A.    But I'm not involved, so I

21   don't really -- I don't even know.

22        Q.    Okay.  And that would be

23   another subcontractor?

24        A.    Yes.

25        Q.    Okay.  And does he write most

1    of his posts himself?

2         A.    I think he Tweets.

3         Q.    Okay.

4         A.    But as far as other things, not

5    really.  Dinesh is not technical, so he

6    doesn't, like, do much of that.

7         Q.    Okay.  All right.  So you said

8    a little bit about the events that led to the

9    making of the film.

10        A.    Uh-huh.

11        Q.    Did Ms. Engelbrecht reach out

12   to you or you reach out to her?

13        A.    Oh, goodness.  I'm trying to

14   think.  I don't remember really if I texted

15   her and asked her, Hey, what do you think

16   about the election?  Or -- it was something

17   like that, but I don't really recall who

18   reached out to who first.

19        Q.    Okay.  And do you know Gregg

20   Phillips?

21        A.    Through Catherine.

22        Q.    When did you first meet him?

23        A.    Actually, I believe it was in

24   '21 when we met about the movie.  I knew of

25   Gregg, but I didn't -- I had never net Gregg.

CONFIDENTIAL

Page 37

1          Q.       Okay.  And what did you know of

2     him before you met him?

3          A.       That Catherine worked with him.

4     And I don't even know in what capacity.  But

5     that was -- I think that was the extent of

6     it.

7          Q.       Were you familiar with any of

8     his prior work in Election Intelligence?

9          A.       No.

10         Q.       Okay.  And, again, you

11    mentioned this -- you mentioned this before.

12    I just want to make sure we have everything.

13              So you -- what conversations

14    did you have with Mr. D'Souza about making a

15    determination to make the film?

16         A.       Well, in 2020, we made a film

17    called "Trump Card."

18         Q.       Right.

19         A.       Okay.  And I was in the film,

20    but I typically am not in the films, in the

21    documentaries.  It's usually just Dinesh and

22    other people being interviewed.

23              But this time he thought it

24    would be really -- a really good thing if I

25    talked about parallels from the Venezuelan

CONFIDENTIAL

Page 38

1    left and the American left because I did a

2    lot of research on that, having family in

3    Venezuela and doing research on Hugo Chavez

4    and all of that.

5                    So I came up with some

6    parallels, being gun control, pitting the

7    rich against the poor, going after political

8    opponents, things like that.

9                    But the other one was election

10   fraud.  And Dinesh was, like, No, we can't

11   put election fraud in this film.  What are we

12   going to talk about?  You know, we don't have

13   any evidence of election fraud in America, so

14   that's not going be in the film.

15                   So I was overwritten, so vetoed

16   on that idea because I thought it was

17   important to do that as parallel, given that

18   in 2012 we found some, I guess for lack of a

19   better word, shenanigans from some of the

20   democrats in Harris County that were working

21   with Acorn and that --

22                   So really it was based on that,

23   not so much the 2020 election, because that

24   hadn't happened yet.

25                   But, anyway, so that was my

CONFIDENTIAL

Page 39

1   reason for thinking, you know, this could

2   be -- this could be big.

3                     There were a lot of -- there

4   was a lot of talk about, you know, machines

5   being, you know, messed with or whatever.

6   And Dinesh was, like, you know, There is no

7   evidence of that.  We can't put that in a

8   movie.

9                     So when Catherine and Gregg

10  came to us about their findings, we thought,

11  well, this is different and this is very

12  interesting because if we can get evidence

13  that this occurred, at best, we can talk

14  about the fact that this was not a secure

15  election despite what the media said.

16                    And so that was the reason why

17  we decided to do this, to bring attention to

18  this problem.

19       Q.     So the -- just so the record is

20  clear, when you were talking about the -- you

21  were talking about the "Trump Card" movie.

22  Right?

23       A.     Uh-huh.

24       Q.     And that's the one you decided

25  not to get into election integrity.

1        A.      Correct.

2        Q.      And so now you're talking about

3    "2000 Mules" --

4        A.      Right.  I'm sorry, yes.

5        Q.      No, just so the -- just so the

6    record is clear.  I understood you.

7        A.      Yes.  Yes.

8        Q.      And when you said "shenanigans"

9    in Harris County, what were you talking

10   about?  What did you refer to?

11       A.      There were -- there were a

12   couple of things that happened in the 2012

13   election where voter roles were just in

14   shambles.

15               There were -- you know, Disney

16   characters were voting and -- in fact, one of

17   the -- I don't even remember which polling

18   location that had machines was burned to the

19   ground either -- I think it was prior to the

20   election.

21               And so True the Vote was

22   helping with that.

23               In Fort Bend County there were

24   some, you know, I guess, illegal votes that

25   were counted.

CONFIDENTIAL

Page 41

1              And so -- so they just wanted

2    to make sure that they got to the bottom of

3    it, and that's when I decided to get involved

4    with voter integrity.

5         Q.    And when you say they wanted to

6    get to the bottom of it, do you mean TTV?

7         A.    Yes, True the Vote.  Yes.

8         Q.    Okay.  Let me show you a

9    document that we marked at the last

10   deposition, or couple depositions ago, as

11   Exhibit 9.

12        (Previously marked was Plaintiff's

13   Exhibit No. 9.)

14        Q.    (By Ms. Haber Kuck)  This seems

15   to be a document sent -- it seems to be an

16   email from Ms. Engelbrecht to you in

17   August of 2021 and she's sending you, she

18   says, certain legal documents.

19              Do you see that?

20        A.    Uh-huh.

21        Q.    Do you recall why she was

22   sending this to you?

23        A.    This might have been right

24   after she told me that they had some -- that

25   they had some really good information on the

1    2020 election.

2              But I don't really recall what

3    was in it.

4              MS. HYLAND:  Debbie, you can

5         read the whole thing.  You don't have

6         to --

7         Q.    (By Ms. Haber Kuck)  You --

8    yeah, you're welcome to --

9              THE WITNESS:  Oh, I'm sorry.

10        Q.    (By Ms. Haber Kuck)  You're

11   welcome to take a look at what's -- what's in

12   there.

13        A.    What's in it.

14        Q.    I'm not going to ask you

15   specific questions about it, but go ahead and

16   look through and see if anything rings a

17   bell.

18        A.    (Reviewing.)  Well, like most

19   of the stuff that Catherine would give me, I

20   mean, it didn't make a whole lot of sense,

21   like, looking at this.

22              But it must have been after she

23   told us about irregularities in drop box

24   visits and that kind of thing.

25              Specifically, I can't tell you

1   what -- like, if I -- you know...

2   (reviewing).

3          Q.     Did you review these at the

4   time you got them?

5          A.     I must have.

6                 Yeah, I mean, I don't really

7   remember specifically.

8          Q.     Okay.  Did you provide them to

9   Mr. D'Souza?

10         A.     Yes.

11         Q.     And to your knowledge, did he

12  review them?

13         A.     To my knowledge, I'm sure he

14  did, but we didn't really -- we didn't talk

15  about the findings that I -- that I remember,

16  that I recall.

17         Q.     Okay.  When you say "we" didn't

18  talk about them, you mean --

19         A.     Dinesh and I.

20         Q.     Right.  Right.

21         A.     Yeah.  Uh-huh.

22     (Marked was Plaintiff's Exhibit No. 75.)

23         Q.     (By Ms. Haber Kuck)  Let me

24  mark as Deposition Exhibit 75 a one-page --

25  two-page document bearing control numbers

Page 44

1    TTV_006921 through TTV_006922.

2              And I just have one question

3    about that.  You say in there that I

4    don't -- well, it seems to be an email from

5    you to Ms. Engelbrecht, and you --

6              MS. HYLAND:  There it is

7        (indicating).

8              THE WITNESS:  Oh.

9        Q.    (By Ms. Haber Kuck)  Oh, I'm

10   sorry.

11       A.    That's all right.

12       Q.    Yeah, take a minute to take a

13   look at it.

14       A.    (Reviewing.)  Okay.  So this

15   must have been this (indicating).  Right?

16       Q.    Yeah, and my --

17       A.    Okay.

18       Q.    Right.  And my question is

19   just -- it says to send it to a different

20   email address and my question is just whether

21   you checked that email address for responsive

22   documents when you were collecting.

23       A.    Well, I know that we don't have

24   this email anymore because we used to

25   do -- we did an ad for smart -- for

CONFIDENTIAL

Page 45

1    StartMail, and so that -- they gave us an

2    email address with that ad buy.  And so I

3    know that we had it then, but we don't have

4    it now.

5                 I must have looked at it in

6    that email, but we no longer -- I think we

7    had it for maybe a couple of months.

8         Q.     And then the emails that were

9    in that account, what happened to them when

10   you discontinued that email address?

11        A.     Oh, gosh, they must have gone

12   with it.

13        Q.     Okay.

14        A.     Yeah.  I didn't download

15   anything, so... yeah.

16        Q.     Okay.  And you said it was only

17   a couple months.  So this is August of 2021.

18   So --

19        A.     Probably by the fall it was

20   gone.

21        Q.     Fall of 2021?

22        A.     Yeah.

23        Q.     Okay.

24        A.     Yeah.

25        Q.     So was there a -- well, strike

CONFIDENTIAL

Page 46

 1   that.
 2               Do you recall getting any
 3   additional written information from
 4   Ms. Engelbrecht other than what we just
 5   looked at in connection with the discussions
 6   about whether to make a documentary about the
 7   2000 mules?
 8        A.     Specifically, no, but I'm sure
 9   we did.
10        Q.     And you can't recall the nature
11   of the other information?
12        A.     No.
13        Q.     Was there a point in time at
14   which Ms. Engelbrecht and Mr. Phillips gave a
15   presentation at your home about their
16   research, again, before deciding -- in this
17   time period in the fall of 2021?
18        A.     They came to our home, yes.  I
19   think it was in the summer.  It may have
20   actually been in August.
21        Q.     But do you recall whether it
22   was before or after you got that big email?
23        A.     I'm trying to remember.
24   Probably before because -- because it
25   wouldn't have made sense for them to send us

CONFIDENTIAL

Page 47

```
 1    this if we had no idea what geotracking or
 2    any of that was.
 3                  We didn't -- you know, we
 4    hadn't heard of any of that.  So it must have
 5    been -- our meeting must have been before
 6    this (indicating), and this was a follow-up.
 7         Q.      And what happened at that
 8    meeting?
 9         A.      Well, they came over and they
10    said, This is what we found.
11                  They explained -- Gregg
12    explained what geotracking was.  He told us
13    that he had -- that True the Vote -- or OpSec
14    I believe is -- was his company, or the
15    combination of the two -- that they had
16    information that led to them finding
17    anomalies in the swing states with drop box
18    locations and people that were going to these
19    drop boxes and dropping off more ballots than
20    they were supposed to.
21                  And they had a criteria and I
22    think it was -- I can't recall if that was
23    when they told us the criteria they used, but
24    it may have been.
25                  It has been three years, so
```

CONFIDENTIAL

Page 48

1    it's kind of difficult to recall.

2                  But there was a criteria

3    because Dinesh was very -- you know, very

4    adamant about asking, Okay.  Well, how do you

5    know that these people were -- and I don't

6    even remember if they called them mules at

7    the time -- but how do you know that these

8    people did something illegal?  What -- you

9    know, what criteria did you use?

10                 And I believe it was that time

11   that they said, Well, if they go to ten or

12   more drop boxes and then there's also a

13   nonprofit involved in it, you know.  So the

14   geotracking basically followed their phone

15   from the drop box to the nonprofit location

16   or vice versa, however -- however -- I don't

17   even remember how it was.

18                 But, anyway, so that was the

19   criteria that they used.  So it wasn't just,

20   you know, someone just going to a drop box

21   and never going to another drop box or

22   whatever.  It was very specific.

23                 And when we asked, Okay, do you

24   have -- do you have geotracking with this

25   person in all the drop box locations?  And

1    they said, Only in the drop box locations

2    that there is video.  Because not all of the

3    video was working at the drop box locations.

4                    So, anyway, we did see one

5    video of a gentleman that got out of his car

6    and started stuffing a ballot -- I mean a

7    ballot? -- a drop box and the ballots kept

8    falling out of the box.

9                    And it was like, I don't know,

10   2:00 in the morning or something like that

11   and we thought, Oh, my goodness, you know,

12   first of all, who votes at 2:00 in the

13   morning?  Second of all, he had a big stack

14   of ballots.  So, you know...

15                   And they said they had many

16   more videos, but they didn't show us the

17   videos at the time.

18        Q.      And do you recall what state

19   this video that you saw was from?

20        A.      I do not recall, no.

21        Q.      Do you recall that at this

22   point in time the only state that they had

23   video from was Georgia?  Does that ring a

24   bell?

25        A.      It may have been Georgia,

1    maybe.

2         Q.    Okay.  And you said the

3    criteria, ten drop boxes, had to go to a

4    nonprofit.

5              Did they have any evidence that

6    these people were being paid to do this work?

7         A.    I don't remember if they said

8    they knew for sure that they were being paid.

9    I know that in some instances the mules, for

10   lack of a better word, I want to call them

11   that -- they took photos as they dropped

12   their -- their ballots, or the ballots.

13        Q.    And so the supposition was they

14   were taking the photos --

15        A.    As evidence, as proof --

16        Q.    -- as evidence --

17        A.    -- that they did it.

18        Q.    So that they could get paid?

19        A.    Probably.

20        Q.    And so when you -- I know you

21   said you weren't sure if they were using the

22   term yet, "mules," but when you use the term

23   "mules," you're talking about the people who

24   meet this criteria.  Right?

25        A.    Correct.

CONFIDENTIAL

Page 51

1     Q.     They went to ten drop boxes,
2  they had to have gone to a nonprofit, and
3  there is some speculation or assumption that
4  they got paid to do it.
5     A.     (Moving head up and down.)
6     Q.     Okay.
7     A.     Correct.  Yes.
8          MS. HYLAND:  Yeah.  I was just
9       going to remind to you give verbal
10      answers.
11     A.     Yes, yes.  Absolute- -- yes,
12  correct.
13     Q.     (By Ms. Haber Kuck)  So the
14  presentation that they gave -- well, would
15  you have called it a presentation at your
16  house, or was it just a discussion?
17     A.     Well, I mean, they showed us
18  that video.  So, I mean --
19     Q.     Yeah.
20     A.     -- I guess you can call it a
21  presentation of the video.  But it was mostly
22  just we were sitting in our living room
23  chatting about it.
24     Q.     And did they -- other than the
25  video, did they show you anything else on

 1    their computer?

 2           A.      I think Gregg had some

 3    geotracking graphic that he got from the New

 4    York Times article, but it was not his

 5    geotracking on the mules.  It was an article

 6    and he was showing us how the New York Times

 7    geotracking article was -- so that they were

 8    following the same type of, you know, of -- I

 9    don't even know what you call it -- same type

10    of geotracking, I guess.

11           Q.      Methodology?

12           A.      Methodology, yes.

13           Q.      And he didn't show you -- did

14    he show you any maps from his own research,

15    you know, showing these people who met the

16    criteria in their study, you know, going

17    around to different places?

18           A.      Yeah, they did, but not then.

19           Q.      Okay.  Do you recall when that

20    was that they showed you that?

21           A.      Probably the fall.  Which

22    month, I don't know.

23           Q.      And you had a meeting with

24    Salem at some point.  Right?

25           A.      I believe October.

1          Q.      Okay.  And so what you're
2     remembering when they showed you their own
3     geotracking maps, was that before or after
4     the Salem meeting?
5          A.      It was either -- I'm trying to
6     think.  It was either the Salem meeting or
7     right before the Salem meeting, but it was
8     around that time period, yes.
9          Q.      Okay.  But not at this initial
10    meeting at your house?
11         A.      No.
12         Q.      Other than the video and the
13    just, you know, conversation back and forth,
14    was there anything else that they showed you
15    at this initial meeting in your home in the
16    summer?
17         A.      Not that I recall.
18         Q.      And then there was a meeting
19    with Salem in October of 2021?
20         A.      Yes.
21         Q.      And do you have any
22    relationship with Salem Media?
23         A.      Other than we --
24              MS. HYLAND:  Objection.
25         Q.      (By Ms. Haber Kuck)  Okay.  Let

CONFIDENTIAL

Page 54

1    me --

2            MS. HYLAND:    Ambiguous.

3        Q.        (By Ms. Haber Kuck) -- let me

4    clarify.

5                To your knowledge, does D'Souza

6    Media have any relationship with Salem Media?

7        A.        Well, the movie, the film,

8    "2000 Mules," was funded by Salem.  So that

9    was the relationship.

10       Q.        And other than that, to your

11   knowledge, does D'Souza Media have any other

12   relationship with Salem?

13       A.        No.

14       Q.        And to your knowledge, do you

15   or Mr. D'Souza personally have any

16   relationships with Salem?

17       A.        Well, our podcast is partnered

18   with Salem, but not as D'Souza Media.

19       Q.        Okay.  And when you say

20   "partnered" with Salem, what does that mean?

21       A.        That means we share revenues --

22   revenue with them on the podcast.

23       Q.        Okay.

24       A.        So it's a 50/50 revenue split.

25   Or it was at the time.

1        Q.        I was going to say, is that
2   still true today?
3        A.        I think it's 60/40 today.
4        Q.        Okay.  But you still have the
5   relationship with them?
6        A.        Yes.  They do, yes.
7        Q.        And there was an affiliate of
8   Salem that was involved in the book
9   publishing.  Is that right?
10       A.        Regnery, yes.
11       Q.        And other than the podcast and
12   the book, are you aware of any other
13   relationships that you or Mr. D'Souza have
14   with Salem?
15       A.        No.
16       Q.        So how did it come to pass that
17   there was this meeting with Salem in October
18   about making the movie?
19       A.        Well, we had to get their okay
20   to do this film, given that they were putting
21   up the money to do it, so we wanted to show
22   Salem what Catherine and Gregg had.
23       Q.        And so how did it come to be
24   that they were putting up the money for the
25   film?

1          A.      Well, that was -- that was
2     done, like, way before that, so...
3          Q.      So were you -- before you --
4               Before you decided to make the
5     "Mules" film --
6          A.      Uh-huh.
7          Q.      -- were you in the process of
8     talking to them about making just
9     generally --
10         A.      Yes.
11         Q.      -- a film?
12         A.      Yes.
13         Q.      Okay.  And in connect- -- and
14    they were going to finance, say, the next
15    film you were making?
16         A.      Correct.
17         Q.      And so at some point you
18    decided that that film would be "2000 Mules"?
19         A.      Correct.
20         Q.      Prior to deciding it was going
21    to be "2000 Mules," did you have an idea of
22    what the next film was going to be?
23         A.      We really didn't.  At the time
24    there were just so many, like, different
25    ideas floating and we didn't really have a

Page 57

 1   specific idea in mind.
 2             I think -- I'm trying -- I
 3   can't really remember when we made a deal to
 4   make a movie with Salem.  But prior to that,
 5   all of our documentaries were funded by
 6   different investors.
 7             So it wasn't like a -- Salem is
 8   a corporation.  That was the first time that
 9   we ever partnered with any corporation to
10   make a documentary.  Usually it was private
11   individuals.
12        Q.    And so you had generally
13   reached an agreement with Salem that they
14   would invest in your next film, and then you
15   were in the process of deciding what that
16   film would be?
17        A.    Yes.
18        Q.    And at some point in time you
19   had an idea it might be "2000 Mules."  Right?
20        A.    (Moving head up and down.)
21        Q.    So you then introduced
22   Ms. Engelbrecht and Mr. Phillips to them?
23        A.    Yes.
24        Q.    And before that meeting with
25   them, did you do any preparation with

1    Ms. Engelbrecht and Mr. Phillips?

2         A.        The only preparation we

3    did -- and I'm not even sure we call it

4    preparation -- but it was basically just

5    telling them, Hey, you know, make sure that

6    you give Salem, you know, all of the things

7    that you have told us that you have so that

8    they are on board and so that they decide

9    whether or not they want to go through with

10   it.

11                  But I'm mostly the -- like the

12   managerial person in the family, so I keep

13   the calendar, I set the meetings.  But I had

14   nothing to do with, like, make -- doing this

15   meeting.  I didn't broker it.

16        Q.        Okay.

17        A.        So I just looked at the

18   calendar and, you know, said, Hey, we have a

19   free weekend, we have a -- whatever.  I don't

20   even remember the day of the week it was.

21                  But, you know, trying to juggle

22   the podcast with meetings and things like

23   that.  That's the reason that I was even

24   involved in that process.

25        Q.        And so who did broker the

CONFIDENTIAL

Page 59

1    meeting?  Who set the meeting up?

2         A.      Dinesh.

3         Q.      And did you -- other than --

4    other than scheduling, did you have any

5    conversations with him about the substance of

6    the meeting or what TTV would present or

7    anything like that?

8         A.      Conversation with?

9         Q.      Mr. D'Souza.

10        A.      I'm sure we did, yes.

11        Q.      Do you recall?

12        A.      Well, we talked about making

13   sure that they got a chance to present.

14               Also, I remember Dinesh and I

15   saying that they needed to make sure that

16   they -- or telling Catherine that they need

17   to make sure they have their laptop and that

18   it was charged and all of those things.

19        Q.      And so who do you recall being

20   at this meeting with Salem?

21        A.      I know their attorney, Chris

22   Henderson, was there.

23               THE WITNESS:  Is that his name,

24        Chris Henderson?

25               MR. D'SOUZA:  (Moving head up

CONFIDENTIAL

Page 60

1          and down.)

2          A.      Yeah, so he was there.  The CEO

3    of the company, Dave Santrella, was there.

4    The prior CEO, Ed Atsinger, was there.  A few

5    of the other VPs.

6                  I don't recall exactly who was

7    there.  Probably six or seven of them.

8          Q.      (By Ms. Haber Kuck)  Okay.  And

9    then -- so how did the -- how did the meeting

10   go?  Was there a presentation first?  Did

11   they just ask questions?

12                 How did the -- how did the

13   meeting proceed in terms of Ms. Engelbrecht

14   and Mr. Phillips providing them with

15   information?

16         A.      Well, they presented their

17   information.  And then I believe Mr. Atsinger

18   asked them questions.  Or different --

19   different Salem people asked them questions,

20   yes.

21         Q.      And what did their presentation

22   entail?

23         A.      Very similar to what they

24   showed us except a little bit more detailed.

25   So I think they showed -- they may have

Page 61

```
 1    showed one more video or two more videos.

 2                    They also, I believe, showed

 3    some of the -- there were a couple of crimes

 4    that happened in Atlanta with, you know, one

 5    of them was a very horrific -- I don't know

 6    if it was a drive-by shooting, but it was a

 7    little girl that was killed in Atlanta and

 8    they geotracked the phones.

 9                    And I don't really know if

10    they -- at that point if they had given the

11    GBI that information, but that was one of the

12    murders.

13                    And so I think they were trying

14    to show that geotracking helps solve crimes,

15    helps solve, you know, mystery of, you know,

16    who -- which person was at this location

17    when, that kind of thing.

18                    And so I know that they

19    presented that as part of the big picture.

20          Q.        Did they also refer to

21    tracking, for lack of a better word, the

22    mules going to riots or other -- at some

23    point there was talk of ACLED?

24                    Does that ring a bell?

25          A.        No.
```

Page 62

1         Q.     Did they -- did they talk about
2    these people also being present at violent
3    protests?
4         A.     You mean the mules?
5         Q.     The mules, yeah.
6         A.     I believe so, yes.
7         Q.     What do you recall about that?
8         A.     Just that.
9         Q.     Okay.
10        A.     Uh-huh.
11        Q.     And the presentation that they
12    gave, was there anything in writing?
13        A.     You mean as in handouts or
14    anything?
15        Q.     Yeah.
16        A.     I don't recall that.
17        Q.     Okay.  And you said they
18    present -- so they presented it on their
19    computer?
20        A.     Yes.
21        Q.     And was it projected someplace
22    or they just had a laptop?
23        A.     I believe it was projected on a
24    screen, but I could be wrong.
25        Q.     And you said at some point you

1    saw maps of the mules traveling around.

2    Correct?

3            A.      Yes.

4            Q.      And you think it might have

5    been at this meeting?

6            A.      It could have been at this

7    meeting.  It could have been a little later.

8    I know it was in the fall, but I don't

9    remember exactly when.

10            Q.      And between the meeting at your

11    house and the Salem meeting, did you have any

12    other substantive meetings with

13    Ms. Engelbrecht and Mr. Phillips about their

14    research?

15            A.      No.

16            Q.      And so what was the -- what was

17    the outcome of the meeting with Salem?

18            A.      At the -- I don't -- I'm not

19    sure if Salem decided right away to do this

20    project or if it took them a couple of -- I

21    don't really remember.

22            (Electronic voice interruption.)

23            Q.      (By Ms. Haber Kuck)  Did you

24    have any conversations with Salem directly

25    about their decision as to whether to proceed

1    or not?

2          A.     No.

3          Q.     And who would have had those

4    discussion?

5          A.     Dinesh.

6          Q.     And so eventually they the

7    provide the funding?

8          A.     Yes.

9          Q.     And what was their funding used

10   for?

11         A.     Well, part of it is used to

12   make the movie, the production.  And then the

13   other part is the marketing.

14         Q.     And so did all of their funding

15   stay with D'Souza Media?

16                My question is whether any of

17   it went to TTV to further their research.

18         A.     We did not pay True the Vote to

19   do research, no.

20         Q.     And at some point in time there

21   were agreements that were drawn up between

22   TTV and Salem and TTV and D'Souza Media.

23                Did you have any involvement in

24   any of those written agreements?

25         A.     No.

CONFIDENTIAL

Page 65

```
1        Q.      Who was responsible for that?
2        A.      Dinesh.
3        Q.      Did you have any involvement in
4   getting insurance for the movie?
5        A.      No.
6        Q.      And, again, who would be
7   responsible for that?
8        A.      I believe that was Bruce
9   Schooley.
10       Q.      I have one more thing and then
11  we will take a break.
12       A.      Sure.
13       Q.      So let me show you a document
14  that we marked at a prior deposition as
15  Plaintiff's Deposition Exhibit 37.
16       (Previously marked was Plaintiff's
17  Exhibit No. 37.)
18       A.      (Reviewing.)
19       Q.      (By Ms. Haber Kuck)  Do you
20  recognize this document?
21       A.      Yes.
22       Q.      What is it?
23       A.      It's an overview, a project
24  overview that True the Vote put together.
25       Q.      And so this is now November 23
```

CONFIDENTIAL

Page 66

```
 1    of 2021.
 2          A.      Uh-huh.
 3          Q.      Why was Ms. Engelbrecht sending
 4    this to you?
 5          A.      Well, I mean, this involved the
 6    research that we wanted to use in "2000
 7    Mules."
 8          Q.      And it also says that the -- at
 9    the -- on the last page of the description,
10    it says (as read):  "Remaining funding
11    requirements."
12                  Do you see that?
13          A.      Uh-huh.
14          Q.      Why was she including that
15    information?
16          A.      Because -- because they told us
17    that they needed more funding in order to
18    finish the project.
19          Q.      And did you agree to help them
20    raise that funding?
21          A.      Well, I didn't raise -- I
22    didn't agree to anything.  I said that we had
23    a few people that might be good donors for
24    them and I gave -- I gave her their names.
25    Or either that or I asked them first.
```

CONFIDENTIAL

Page 67

```
 1                   But, anyway, we -- you know, we
 2       didn't have anything to do with them being
 3       able to raise that money at all, so...
 4                   Because they had a -- they had
 5       a pretty big donor list themselves.  So --
 6       and we don't have donors per se.  The people
 7       that were involved in any of our previous
 8       films were investors, they weren't donors.
 9                   So we weren't even sure if
10       these people would be their potential donors
11       or not.
12           Q.    Yeah, we're using the
13       term -- you make a distinction between donors
14       and investors.
15                   TTV is a nonprofit.  Right?
16           A.    Correct.
17           Q.    So they finance their work, to
18       your understanding --
19           A.    Donors.
20           Q.    -- through donors, through
21       donations?
22           A.    Yes, donations.  Uh-huh.
23           Q.    And when she says (as read):
24       "Let me know if this will work," do you know
25       what she's referring to?
```

CONFIDENTIAL

Page 68

```
 1          A.      (As read):   "Let me know if
 2    this will work."
 3                  Well, it may have been that
 4    when Dinesh was talking to some of our
 5    friends that could potentially help being
 6    donors for True the Vote, they needed
 7    something to -- you know, to go by.  They
 8    weren't just going to write a check, or
 9    whatever.
10                  And I'm pretty sure this is
11    what that was about.
12          Q.      Okay.  And did you -- did you
13    provide this document, then, to Mr. D'Souza?
14          A.      Yes.
15          Q.      And do you recall what
16    discussions, if any, you had with him about
17    this document or connecting them with
18    potential donors?
19          A.      I stayed out of that because I
20    don't talk to donors directly, or investors
21    directly.  So that was Dinesh.
22          Q.      Okay.  In the book, Mr. D'Souza
23    references calling up two friends in
24    Jacksonville, Florida, and another in
25    Wichita, Kansas, who eventually agreed to
```

CONFIDENTIAL

Page 69

```
1    give  ██████████  to True the Vote.
2                    Do you know anything about
3    that?
4         A.    Yes, but only because Dinesh
5    told me about it.
6         Q.    Okay.  And what did he tell
7    you?
8         A.    After the fact.
9         Q.    That's okay.
10        A.    He said they might be able to
11   help them.
12        Q.    And who are those people?
13        A.    His name is  ████████████████
14   ██████████████
15               And then the other one, I
16   believe, is  ██████████████
17        Q.    And is  ██████████  in Florida or
18   Kansas?
19        A.    ████████  is in Kansas.  And ██████████
20   is in Florida.
21        Q.    And did Mr. D'Souza ever tell
22   you that they -- that they had agreed to be
23   donors and had given True the Vote money to
24   finish their project?
25        A.    I don't think Dinesh told me.
```

Page 70

```
 1    I think Catherine may have mentioned it.
 2          Q.      And was there -- did there come
 3    another point in time when you assisted TTV
 4    with meeting potential donors?
 5          A.      Was there another time?  Yes,
 6    but it was well after the movie, the film.
 7          Q.      So in the summer of 2022?
 8          A.      Yes.
 9          Q.      And was there concern expressed
10    by Mr. Phillips and Ms. Engelbrecht around
11    the time the movie came out or shortly
12    thereafter that TTV was running out of money?
13    Do you recall that?
14          A.      I believe Catherine mentioned
15    that, yes.
16          Q.      And so was that the reason that
17    you offered to introduce them to donors?
18          A.      Yes.
19          Q.      And why were you -- why were
20    you doing that?  Why were you interested in
21    helping connect them with donors?
22          A.      Because I believe in the work
23    that they do and I wanted to make sure that
24    they finished the work that they do.
25          Q.      When was the last time you
```

CONFIDENTIAL

Page 71

1    spoke to Ms. Engelbrecht?

2         A.      Probably December of '22.  And

3    I don't -- I don't even know if we spoke.  I

4    think it was more of -- I think one of -- one

5    of my old friends from Spirit of Freedom

6    Republican Women wanted to have Catherine

7    speak at their Lincoln Reagan Dinner.

8               So I was asking Catherine if it

9    was okay if I gave them her phone number, and

10   I think that was the last communication.

11        Q.      Did you meet with her after

12   this litigation was filed?

13        A.      No.  Not that I re- -- no, I

14   don't think so.

15        Q.      And so during the film -- you

16   know, as you said, you were probably in

17   contact with them several times a week.  And

18   then in December of 2022, you haven't spoken

19   to her since.

20               What happened -- how did your

21   relationship change?  What happened?

22        A.      Well, Catherine and I, I would

23   say we're more acquaintances than close

24   friends.  So we went years without speaking

25   to each other, you know, from the time that I

CONFIDENTIAL

Page 72

1    knew her back in Fort Bend County to the --

2    you know, after the election, after the 2020

3    election.  And so... You know, we've been

4    busy.

5                 MS. HABER KUCK:  Okay.  Why

6         don't we take a break.

7                 THE WITNESS:  Okay.  Sounds

8         good.

9                 MS. HABER KUCK:  Ten minutes?

10        Fifteen minutes?  What do you want to

11        do?

12                MS. HYLAND:  Want to do like

13        11:20?

14                MS. HABER KUCK:  Sure.

15                THE VIDEOGRAPHER:  We are going

16        off the record.  The time is 11:11.

17                (Recess taken at 11:11 a.m.,

18        resuming at 11:29 a.m.)

19                THE VIDEOGRAPHER:  We are going

20        back on the record.  The current time

21        is 11:29, and this is the start for

22        Media 2.

23        Q.    (By Ms. Haber Kuck)  All right.

24    So we're back on the record.

25                During the break, did you

CONFIDENTIAL

Page 73

1    discuss the substance of your testimony with

2    anyone?

3         A.     My counsel.

4         Q.     Having spoken with your

5    counsel, is there anything you want to change

6    about your testimony?

7         A.     No.

8         Q.     You referred to shenanigans in

9    Harris County.  Remember we talked a little

10   bit about that?

11              And I didn't ask you, what was

12   the source of that information?

13        A.     The source of that information

14   must have come from True the Vote at the

15   time, but also the Fort Bend County GOP is

16   who I was involved with.  So it was probably

17   a combination of the two.

18        Q.     Okay.  And so we talked about

19   the meeting you had with Salem and we talked

20   about then there was some back-and-forth

21   about potential -- getting some new potential

22   donors.

23              What happened -- what happened

24   after that?  You said, I think -- so that

25   was, like, November of 2021.

CONFIDENTIAL

Page 74

```
 1          A.      Uh-huh.
 2          Q.      And then I think you earlier
 3    said that you started making the movie in
 4    January of 2022.
 5                  So what happened in that period
 6    in between, say, after the meeting with Salem
 7    leading up to the starting of the film?
 8          A.      Well, I believe that that is
 9    when we started gathering more information
10    about their findings.
11                  Specifically, I don't remember
12    what it was, but we obviously had to make
13    sure that we had a -- we don't do scripts for
14    the documentaries, but that we had a basic
15    thread that we were going to use for the
16    film.
17          Q.      And were you the person
18    responsible for liaising with Ms. Engelbrecht
19    and Mr. Phillips to get the information?
20          A.      Yes.  I was the conduit, yes.
21          Q.      And when you say you make
22    documentaries, what do you mean by that?
23    What makes a film a documentary?
24          A.      Well, a documentary is
25    documenting things that are of importance to
```

1    society, in general, or to a political
2    discourse or to prove a point or an ideology.
3          Q.      And how are they
4    different -- have you heard the term
5    "docudrama"?
6          A.      Yes.
7          Q.      What is the difference between
8    a documentary and a docudrama?
9          A.      So I believe the difference
10   between the two is with a straight
11   documentary you have just interviews, just --
12   you know, just one interview after another
13   after another.
14                 A docudrama dramatizes the
15   content.  So if, for example, Dinesh is
16   interviewing somebody and he's talking about,
17   say, Lincoln, a recreation of the Lincoln
18   assassination or the Lincoln speech will be
19   playing in the background.  And so that is
20   the scene that goes with what Dinesh is
21   saying or talking about.
22         Q.      And whereas a documentary you
23   would think to be purely factual in nature,
24   not recreation?
25         A.      Well, it's factual in nature.

1    It's just recreating what they are talking

2    about.  We are not making things up.

3                  It's an actual -- it took

4    place.  We're just showing it as -- it's

5    dramatizing the actual verbiage of what --

6    you know, what he's talking about.

7          Q.      In the docudrama?

8          A.      Yes.

9          Q.      And then in the documentary...

10          A.      So ours are docudramas because

11    we do recreations.  So I guess if you want

12    to -- if you want to know what the

13    terminology is, I guess -- and I'm not really

14    sure that it's used all the time that way.

15          Q.      Right.

16          A.      Most people do refer to the

17    movies or the films as documentary film.  I

18    think we just call it a docudrama because we

19    put -- we interject a scene with a, you know,

20    characterization of what they are talking

21    about.

22          Q.      Although up until now you've

23    been using the term "documentary."

24          A.      Documentary, yeah.  So

25    interchangeably, I would say.

1          Q.      All right.  Let me show you a

2    document that we have previously marked as

3    Exhibit 23.

4          (Previously marked was Plaintiff's

5    Exhibit No. 23.)

6          A.      Where would you like for me to

7    put these?

8          Q.      (By Ms. Haber Kuck)  Just if

9    you have a pile in front of you and then --

10          A.      Just like this.

11          Q.      Yeah, the court reporter will

12    need them at the end.

13          A.      Okay.

14          Q.      When you've had a chance to

15    look at it, let me know if you recognize this

16    document.

17          A.      Yes, I do.

18          Q.      And what is it?

19          A.      It's Bruce's beat sheet.

20          Q.      And what is a beat sheet?

21          A.      It's basically a guide for

22    filming.

23          Q.      And is this the one for the

24    "2000 Mules" film?

25          A.      Yes.

CONFIDENTIAL

Page 78

1          Q.      Okay.  And it says (as read):
2     "One Party America Film."
3          A.      Correct.  That is the name of
4     the LLC.  We do not name the LLCs the same
5     name as the movies, or the documentaries.
6          Q.      So that was the LLC that was
7     set up to make the "2000 Mules" film?
8          A.      Well, it was set up to make the
9     film.
10         Q.      The next film?
11         A.      Exactly.
12         Q.      Which turned out to be the
13    "2000 Mules" film.
14         A.      Exactly.  Yes.
15         Q.      Okay.  And I see that
16    Ms. Engelbrecht and Mr. Phillips are copied
17    on this.  Why were they included?
18         A.      Well, let me see.  They were
19    included because they were going to take part
20    in the filming of the documentary.
21         Q.      Okay.  And -- should we -- in
22    his cover email, Mr. Schooley says (as read):
23    "Should we get investigators to help get us
24    every crime investigation feature has, raw
25    footage of actual locations/people, driving

1    down city streets, walking up -- walking up

2    to activist centers?  If we only use

3    reenactments and stock, I think we lose

4    credibility."

5              Do you see that?

6         A.    Uh-huh.

7         Q.    So what ultimately happened?

8    Were there investigators that went to the

9    crime scenes?

10        A.    I don't really know what

11   happened.  Sometimes -- sometimes Bruce will

12   write -- will do a beat sheet and we don't

13   end up using what he -- what he says.

14             So as far as that, I'm not

15   sure.

16        Q.    Were there reenactments,

17   though, in the film?

18        A.    Very brief one.  This was one

19   of the most non-, I guess, -recreation-type

20   films that we've ever done because we didn't

21   use a lot of it.  I believe we used a person

22   that was dressed in a hoodie and he was

23   basically just doing things, reenacting

24   things.  As Dinesh would talk about

25   something, then he would do it.  But I think

```
 1    that was about it, as far as I recall.
 2                I was not in charge of the
 3    scenes, so I have no idea really what took
 4    place as far as that goes.
 5        Q.    Okay.  And there was no -- you
 6    said there was no script for these movies?
 7        A.    No.
 8        Q.    It also talks about walking up
 9    to activist centers.
10                Were any of these -- well, when
11    he says "activist centers," do you understand
12    that to mean these nonprofits that --
13        A.    Nonprofits, yes.
14        Q.    Who were providing the ballots?
15        A.    Right.
16        Q.    Were any of those shown in the
17    film?
18        A.    I don't believe so.
19        Q.    And do you recall why not?
20        A.    I don't recall why not, no.
21        Q.    Okay.  And then what -- so this
22    is December of 2021.
23                What was the next step in
24    making the film?
25        A.    Well, so I believe Bruce had to
```

CONFIDENTIAL

Page 81

1    get the production schedule done and decide

2    when we were going to do the filming.

3              This doesn't look accurate, but

4    I think this was just kind of -- sometimes he

5    will do that where he will tentatively say

6    this is the schedule and then that's not what

7    happens.

8         Q.    Okay.

9         A.    Let's see.   (Reviewing.)

10             So I think the initial thing

11   was going to be that we were going to do

12   everything in Dallas, like film in Dallas,

13   but then we decided to do some of it in

14   The Woodlands, which is where we live, at the

15   studio that we rent out for the podcast.

16             And so I'm not sure if that's

17   even in here.  I don't think it is.

18        Q.    Yeah.  And let's talk about

19   where the movie was filmed.  There's some --

20        A.    Uh-huh.

21        Q.    There is a scene of you and

22   Mr. D'Souza in your kitchen.  Is that really

23   your kitchen?

24        A.    No.

25        Q.    And then there is also a scene

1    that shows Mr. Phillips, you know, with the

2    computers and all of that.  Was that filmed

3    in his office or --

4         A.    That was in The Woodlands

5    studio that we rent out for the podcast.

6         Q.    Okay.  Okay.  So was there

7    anything in the film that was filmed sort of

8    outside of that or in...

9         A.    Let's see.  Well, we were -- we

10   were in The Woodlands to film that part.  The

11   house, the kitchen that you mentioned, was

12   a -- the house of one of our friends.  So we

13   used his kitchen.  We really didn't want to

14   use our kitchen.

15              So -- and then I believe we

16   also filmed in California, which is where the

17   roundtable with the Salem hosts took place.

18        Q.    Okay.

19        A.    And that was in -- I don't

20   recall the city.

21              THE WITNESS:  Do you recall the

22        city?  No?

23        Q.    (By Ms. Haber Kuck)  Well, he

24   can -- I will ask him tomorrow.

25        A.    Yeah, yeah.

Page 83

1          Q.        If you don't recall, that's

2    okay.

3          A.        I don't -- I don't re- -- I'm

4    sorry.  I don't recall.

5          Q.        He will have his chance

6    tomorrow.

7          A.        So -- but anyway, so that --

8    those were the three places that we -- that

9    we filmed, yes.

10          Q.        Okay.  And so didn't --  have

11    you ever been to Mr. Phillips' offices?

12          A.        No.

13          Q.        And there's film in the -- did

14    you ever have any contact with any of the

15    contractors --

16          A.        No.

17          Q.        -- or anyone else that they

18    used for their research?

19          A.        No.

20          Q.        There's -- so for the film

21    there was a trailer, I believe.

22          A.        (Moving head up and down.)

23          Q.        And was there something called

24    a teaser trailer?  Were there two different

25    trailers?

CONFIDENTIAL

Page 84

1          A.      So teaser trailers typically

2    mean they tease the audience.  Right?  So

3    they are short.  30 seconds maybe.

4                  The full-length trailer is

5    typically three minutes long.

6          Q.      Okay.  And did you prepare both

7    for this film?

8          A.      I didn't.

9          Q.      Okay.  Was there both a --

10         A.      Teaser trailer.

11         Q.      -- teaser trailer and a trailer

12   prepared in connection with "2000 Mules"?

13         A.      Yes.

14         Q.      And did you have any role in

15   preparing those?

16         A.      No, I did not.

17         Q.      And I see that there were a

18   number of Zoom conferences that were set up

19   during this, you know, January, February,

20   March period.  Is that correct?  You set up

21   some?

22         A.      That's correct, yes.

23         Q.      And were they by video or were

24   they all audio?

25         A.      I think there were some video

CONFIDENTIAL

Page 85

1    and some audio.   Typically, either

2    Catherine -- Catherine and/or Gregg were

3    traveling, so they were, like, on their

4    phone.

5                 So I'm not even sure that we

6    ever had a Zoom conference where we were all

7    on video at the same time.  So it just

8    depended really.

9          Q.     Okay.  Why don't we look at a

10   document -- this one.

11         (Brief off-the-record discussion.)

12         Q.     (By Ms. Haber Kuck)  So I'm

13   going to mark as Plaintiff's Deposition

14   Exhibit 76 a two-page document bearing

15   Control No. DDR-00020011 through 12.  You can

16   take a look.

17         A.     Okay.

18      (Marked was Plaintiff's Exhibit No. 76.)

19         A.     (Reviewing.)

20                 MR. EVANS:  What was the

21         number?

22                 MS. HABER KUCK:  76.

23         Q.     (By Ms. Haber Kuck)  Do you

24   recognize this document?

25         A.     I was cc'd, but I don't believe

Page 86

1    I participated in any of this.  I don't
2    really remember what all happened here, so...
3                I think they were talking about
4    the teaser trailer from what it appears,
5    but -- but I just -- I wasn't a participant.
6        Q.    And at the top, the last email
7    in the chain or the one at the top of the
8    document says -- from Mr. Schooley (as read):
9    "We need their video and their geotracking
10    graphics which means working with the
11    graphics guy they used or we will need to
12    recreate it with someone like Frank."
13        A.    Uh-huh.
14        Q.    Do you know who "Frank" refers
15    to?
16        A.    I believe Frank is the
17    gentleman that does the graphics for some of
18    the films.
19        Q.    Frank Lamont, maybe?
20        A.    I don't know his last name.
21        Q.    Okay.  And it says (as read):
22    "We need their video and geotrafficking
23    graphics," which is -- the "their" seems to
24    be referring to Ms. Engelbrecht and
25    Mr. Phillips?

CONFIDENTIAL

Page 87

```
 1          A.      Okay.
 2          Q.      Does that make sense, reading
 3    the email?
 4          A.      I think so, yes.
 5          Q.      And do you recall liaising with
 6    them to get that video and graphics?
 7          A.      No.  I don't.  If I did, I
 8    don't recall.
 9          Q.      Okay.  That's fine.
10                  In the -- who selected the
11    videos that were used in the film?
12          A.      Dinesh.
13          Q.      And what was the source of
14    those videos?
15          A.      By "videos" -- what do you mean
16    by "videos"?
17          Q.      I'm sorry.  Let me clarify
18    that.
19                  I mean the videos in the film
20    of people going to drop boxes --
21          A.      Uh-huh.
22          Q.      -- what was the source of
23    that -- those videos, that footage?
24          A.      Okay.  So True the Vote
25    gave -- Catherine Engelbrecht gave us those.
```

1    And I don't know if she gave -- I think she

2    gave them directly to Nathan.

3         Q.    And are you aware of any other

4    source of drop box video other than TTV?

5         A.    No.

6         Q.    I'm going to mark as

7    Plaintiff's Deposition Exhibit 77 a

8    multiple-page document bearing Bates Nos.

9    DDR-00059468 through 59472.

10    (Marked was Plaintiff's Exhibit No. 77.)

11         A.    (Reviewing.)

12         Q.    (By Ms. Haber Kuck)  Let me

13    know when you've had a chance to look at it.

14         A.    Okay.

15         Q.    So this appears to be a series

16    of chats between you, Mr. D'Souza,

17    Mr. Schooley, and Mr. Frankowski.  Correct?

18         A.    Correct.

19         Q.    And the dates are January 8 of

20    2022 through January 9 of 2022.

21              Do you see that?

22         A.    Yes.

23         Q.    At the top, you start the chain

24    by saying, "From:  Catherine."

25         A.    Uh-huh.

Page 89

1      Q.       And then it talks about Nathan
2   having access to 70 plus videos in Dropbox.
3              Do you see that?
4      A.       Yes.
5      Q.       Is that what you were referring
6   to just a few minutes ago when you said they
7   provided the footage to him?
8      A.       Yes.  Correct.
9      Q.       And what did you understand to
10  be included in those videos?
11     A.       Well, it was -- to my
12  recollection, my understanding, it was mules.
13     Q.       So they were -- they were
14  people who met the criteria --
15     A.       Yes, who met the --
16     Q.       -- we discussed?
17     A.       -- criteria, correct.
18              (Reporter clarification.)
19     Q.       (By Ms. Haber Kuck)  And they
20  were people who -- well, strike that.
21              Did you understand they were --
22  that Mr. Phillips and Ms. Engelbrecht were
23  taking their geolocation research and then --
24  and then cross-referencing it with the drop
25  box footage they received?

CONFIDENTIAL

Page 90

```
 1          A.      That was my understanding, that
 2     that's what that was -- that that's what
 3     those were, yes.
 4          Q.      And that's what the 70 videos
 5     were?
 6          A.      Yes.
 7          Q.      They were videos that they had
 8     linked up, the --
 9          A.      Yes.
10          Q.      -- video that they -- the video
11     they got --
12                  Just let me finish because she
13     can't get it all down otherwise.
14                  They had linked up video they
15     got from the states, the drop box video, with
16     their geolocation study?
17          A.      Correct.
18          Q.      About halfway down the page
19     there's a text from Mr. D'Souza that starts
20     out (as read):  "I would like to go over the
21     trailer and set form schedule.  We lose a lot
22     if someone else figures out a way to release
23     a mule video.  We no longer own the story."
24                  Do you see that?
25          A.      Yes.
```

CONFIDENTIAL

Page 91

```
 1        Q.        And do you know what he was
 2   referring to there?
 3        A.        Yes, I do.
 4        Q.        And can you tell me?
 5        A.        Yes.  We were -- in fact,
 6   Catherine and Gregg signed a nondisclosure
 7   agreement so that all of these videos that
 8   included mules would not be leaked to the
 9   media, to the public, because that was the
10   whole point of doing a documentary, to have
11   all of this documented so that it would be in
12   one place.
13               And so we were -- we were very
14   clear to them that we did not want them to go
15   to any media outlet and release any footage
16   of any of these mules going to drop boxes.
17        Q.        Right.  And so, again, this is
18   the 70 videos that they gave you of people
19   they had identified as mules?
20        A.        Correct.
21        Q.        And did they ultimately comply
22   with that nondisclosure agreement?
23        A.        No, but after -- I didn't learn
24   about it until after the fact.
25        Q.        And what did you learn after
```

CONFIDENTIAL

Page 92

1    the fact?

2         A.    That they had gone to some

3    media outlets with some videos.

4         Q.    Which media outlets?

5         A.    If I remember, let's see,

6    Epoch, "Epoch Times," maybe.  What was the

7    other -- "Gateway Pundit" I think was another

8    one.

9              Solomon, "John Solomon" was

10   another one.  But I believe that one may have

11   been even before they came to us with the

12   findings.  So that didn't really count

13   because it was before they signed the

14   agreement.

15              And then there was

16   another -- another instance where they were

17   on "Charlie Kirk" for an interview.  And we

18   found out as it was happening that they had

19   gone to them and were doing an interview

20   about the mules.

21        Q.    And with respect to Charlie,

22   the Charlie Kirk interview, what was your

23   understanding of where the video that he

24   showed came from?

25        A.    I don't know where they --

CONFIDENTIAL

Page 93

1    where the video came from, but it certainly

2    didn't come from us because we didn't want

3    any video out there before the film came out.

4         Q.    Did you ever have any

5    conversations with Ms. Engelbrecht or

6    Mr. Phillips about where that video came

7    from?

8         A.    I didn't personally.  I don't

9    know if Dinesh did.

10        Q.    Did you ever hear that anybody

11   had that conversation?

12        A.    Later, I think.  And I don't

13   know if anybody has found -- found out what

14   actually happened.  I don't know.

15             I just know we were not

16   involved in that because, again, as I stated,

17   we wanted it to not leak out before the film

18   came out.  And I believe this happened maybe

19   a month before.

20        Q.    And when you say you found out

21   after the fact, how far -- when you say after

22   the fact, you mean after the filming or after

23   the release of the movie?

24        A.    I think it was after the

25   release of the film, yes, the documentary.

CONFIDENTIAL

Page 94

```
 1          Q.      And do you recall when after
 2     that?
 3          A.      I don't recall specifically,
 4     no.
 5          Q.      Do you recall the context in
 6     which you found it out?
 7          A.      Unfortunately, no.
 8          Q.      Was it in the context of the
 9     litigation filed by Mr. Andrews?
10          A.      No, because I don't believe
11     that we knew about that until -- I don't even
12     remember when, but it was way after.
13          Q.      Okay.
14          A.      Yeah.  Yeah.  So no, before
15     that.
16          Q.      And so you said when -- so at
17     the time that this came up at -- with Charlie
18     Kirk -- and am I correct that "Gateway
19     Pundit" was around the same time, about a
20     month before the movie was released?
21          A.      I think it was all in April,
22     somewhere around there, yes.
23          Q.      And at that point in time you
24     didn't have any discussion with -- or strike
25     that.
```

CONFIDENTIAL

Page 95

1            Do you recall any discussion

2    with Ms. Engelbrecht and Mr. Phillips about

3    not doing that or why they did it, any of

4    that?

5        A.      I don't recall.

6        Q.      Okay.  And then flipping to the

7    third page of the document.  We were looking

8    at the second page and now on the next page.

9            Actually, at the page after

10   that.

11       A.      The last page?

12       Q.      The second to last page.

13       A.      Okay.

14       Q.      The last full page.

15       A.      Uh-huh.

16       Q.      You had mentioned the hoodies

17   before.  And in here, Mr. Schooley says (as

18   read):  "That works.  Any hoodies, something

19   easy to copy in Houston."

20            Why was there a focus on people

21   wearing hoodies?

22       A.      I think because we had seen

23   several mules with hoodies.  So this is --

24   this is pertaining to the recreation that we

25   did at The Woodlands studio.

1          Q.       Okay.

2          A.       Our actor (indicating quotation

3      marks).

4          Q.       And then you're -- but then

5      you're talking about, it looks like as you go

6      down in the text, about the people in the

7      video who were wearing hoodies.

8                   Do you see where it says, you

9      say, "Did you see the black hoodie guy?  That

10     was a Georgia mule"?

11         A.       Uh-huh.

12         Q.       So did you watch the video that

13     Mr. Frankowski had?

14         A.       I think I saw a couple of

15     those -- of those mule videos and I believe

16     one of them was a guy in the hoodie.  I think

17     it may have even been the one that we used in

18     the teaser trailer.

19         Q.       And just to be clear, it says

20     (as read): "Did you see the black hoodie

21     guy?"

22                  Was the hoodie black or the guy

23     was black?

24         A.       Did you see the black hoodie

25     guy?  Well, I believe the gentleman was black

1      as well, and I think the hoodie may have been

2      gray, actually.

3              Q.      Okay.

4              A.      Of the one I'm recalling.

5              Q.      Do you know whether that was

6      the video of Mr. Andrews, who is the

7      plaintiff in this case?

8              A.      I don't believe so, huh-uh.

9              Q.      And then going to the last two

10     texts in the chain, so the next page, it

11     looks like -- well, it actually starts on the

12     prior page.  It says -- bottom of the prior

13     page, it says, "From:  Catherine" on the

14     trailer.

15              Do you see that?

16             A.      Oh, yes.

17             Q.      And then you -- it appears like

18     you've copied certain texts you got from her.

19     Is that right?

20             A.      Yes.

21             Q.      And she says -- you say (as

22     read):  "And further," and then you quote (as

23     read):  "And forewarning I will almost

24     certainly become a pain about them, language

25     and content.  Example, we can't say that the

CONFIDENTIAL

Page 98

```
 1    ballots are illegal -- were illegal.  We can
 2    say they appear to be illegally cast.  It's
 3    maddening that we've let the left contort our
 4    election processes to the point where there
 5    is very little that's clear about anything.
 6    There's always an exception, always a
 7    lawyer's paradise.  It's such a joke."
 8                    Do you see that?
 9         A.     Yes.
10         Q.     And she -- that was a text she
11    sent to you?
12         A.     Yes.
13         Q.     And did she, in fact, become a
14    pain about the language and content?
15         A.     She was very adamant about
16    making sure that we were very accurate about
17    what that they told us and not to interject
18    our own opinion about anything.
19                    And so I know that's what this
20    pertained to, yes.
21         Q.     And you gave her the
22    opportunity to review the teaser trailer, the
23    trailer, and the film before they were
24    actually released.  Correct?
25         A.     Yes.
```

CONFIDENTIAL

Page 99

1          Q.      At any point in time did she
2     tell you that the final versions did not
3     accurately reflect their research and
4     findings?
5          A.      The only time that she ever
6     said -- mentioned anything about -- and it
7     wasn't even about the research.  It was just
8     about making sure that in her whistleblowers,
9     because we had a couple whistleblowers, that
10    we disguise their voice and she didn't feel
11    like it was enough.
12                 And so she was, like, Debbie,
13    make sure that they do it.  Make sure they
14    disguise the voice.  Make sure that they blur
15    them out.  Things like that.
16                 But as far as content, not that
17    I can recall.
18         Q.      And did they ever at any point
19    disavow the film?
20         A.      Disavow as in?
21         Q.      As in it's Mr. D'Souza's work,
22    it's not our work, it doesn't accurately
23    reflect what we've done?
24         A.      Not to my recollection.
25         Q.      And then in the second to last

CONFIDENTIAL

Page 100

1    text, you say (as read):  "She's going to

2    approach Tucker and tell him we have a

3    trailer on Monday, the 17th.  They will have

4    to run it through legal beforehand."

5               And then you have another text

6    you've copied from her that says (as read):

7    "Tucker is good to go but they will

8    definitely need to see the trailer first.

9    Asked if there is -- was any possible way to

10   get it to them this week.  I said I didn't

11   think so but would try and keep him updated."

12              Do you see that?

13        A.    Yes.

14        Q.    And what is that referring to?

15        A.    So that was the teaser

16   trailer --

17        Q.    Uh-huh.

18        A.    -- and I sent it to one of -- I

19   guess it was one of Tucker's producers.

20        Q.    And when you say "Tucker," you

21   mean Tucker Carlson?

22        A.    Carlson, yes.

23        Q.    And was that a guy named, it's

24   Alex something?  Does that ring a bell?

25        A.    I think it was Alex.  I don't

CONFIDENTIAL

Page 101

1    recall the last name.

2        Q.    Yeah.  And was there a plan at

3    that point to release the teaser trailer on

4    Mr. Carlson's show?

5        A.    As far as we were concerned,

6    yes.

7        Q.    And what do you mean, "As far

8    as we were concerned"?

9        A.    We thought that's what was

10   going to take place.

11       Q.    And did that take place?

12       A.    No.

13       Q.    What happened?

14       A.    I believe that either it was

15   Tucker's team or Tucker's producer, they

16   didn't want to use the trailer.  They wanted

17   to just cut part of the trailer and not talk

18   about the film at all.

19       Q.    So the trailer then

20   was -- well, strike that.

21            Why -- do you have any

22   recollection of why they wanted to do it that

23   way?

24       A.    I can't speculate on why.

25       Q.    Did anybody ever tell you their

CONFIDENTIAL

Page 102

1    understanding of why?

2         A.    Not -- not me, no.  They didn't

3    tell me.

4         Q.    Did they tell anybody who then

5    told you?

6         A.    No.

7         Q.    Do you --

8         A.    I never knew the reason.  Let's

9    put it that way.

10        Q.    Okay.  Fair enough.

11              And so how was the teaser

12   trailer released?

13        A.    I believe it was released on

14   social media.

15        Q.    Do you recall any discussion

16   about Mr. Paxton maybe prematurely releasing

17   it?

18        A.    Oh, yes.  Yes.  I believe it

19   was at a rally, but I'm not even sure if

20   that's accurate.

21        Q.    Okay.

22        A.    That was more hearsay.

23        Q.    Okay.  And so as we talked

24   about, Ms. Engelbrecht was provided with a

25   copy of the teaser trailer before it was

CONFIDENTIAL

Page 103

1    released.  Right?

2         A.      Uh-huh.

3         Q.      And did she give comments on

4    it?

5         A.      Yes.  I believe she mentioned a

6    few things, like we misspelled one of the

7    states, something to that effect?

8         Q.      Arizona?

9         A.      Was that it?  Okay.

10        Q.      Anything else you remember?

11        A.      I don't.  I know that -- she

12   may have told Dinesh, but I don't -- but she

13   didn't tell me.

14        Q.      And were her comments taken

15   into account?

16        A.      I believe they were.

17        Q.      Let me show you a document we

18   marked at a prior deposition as Exhibit 40.

19        (Previously marked was Plaintiff's

20   Exhibit No. 40.)

21        Q.      (By Ms. Haber Kuck)  And

22   Exhibit 40 seems to be an email from

23   Ms. Engelbrecht to Mr. Schooley dated

24   January 10, 2022, and you're copied on it.

25                Do you see that?

CONFIDENTIAL

Page 104

1          A.      Uh-huh.

2          Q.      And in there he seems to

3    be -- in his initial email he seems to be

4    asking for (as read): "...video of multiple

5    drops by the same person (and/or) multiple

6    ballots (and/or) evidence they are out of

7    state."

8                  Do you see that?

9          A.      Uh-huh.

10         Q.      Do you know whether -- whether

11   he was ever able to obtain from

12   Ms. Engelbrecht video of the same person

13   going to multiple drop boxes?

14         A.      I think that the rest of

15   the -- of those video surveillance came later

16   because I think that at this point with the

17   teaser trailer we only had a few mules and we

18   really couldn't call a film "2000 Mules" if

19   we had five mules.

20                 So I believe that that's what

21   this was in reference to.

22         Q.      At this point in time you had

23   the 70, the initial 70 videos.  Right?

24   Because this is now January 10 --

25         A.      Okay.

CONFIDENTIAL

Page 105

1          Q.        -- that we've looked at
2     these -- does that make sense?
3          A.        Okay, yeah.  Uh-huh.
4          Q.        When you say there were --
5          A.        Makes sense.
6          Q.        -- 2,000 mules, do you know
7     where the 2,000 comes from?
8          A.        So actually I asked Catherine
9     if she was to count up all the mules in all
10    the swing states, about how many would there
11    be.
12                   And she said, Roughly around
13    2,000.
14                   So I said, Well, what would you
15    think if we called this film "2000 Mules"?
16                   So it was actually me that came
17    up with the name.  So just for the record.
18                   But -- so that's the reason.
19    That was why.
20         Q.        And do you recall that of the
21    approximately 2,000, about 242 of them were
22    in Georgia?
23         A.        That is what they told us, yes.
24         Q.        Do you recall any discussions
25    with Mr. Schooley about having -- about them

Page 106

```
 1    having difficulty getting video of people

 2    going to multiple drop boxes, the same

 3    person?

 4         A.    I don't know that I discussed

 5    it with Bruce, but it could have been a

 6    discussion with Bruce, with Dinesh and Bruce.

 7         Q.    Did you and Mr. D'Souza discuss

 8    that topic, of the difficulty they were

 9    having getting footage of the same person

10    going to multiple drop boxes?

11         A.    We may have.  I don't recall

12    specifically.

13         Q.    Do you -- do you recall whether

14    the film ultimately showed the same person

15    going to multiple drop boxes?

16         A.    I believe it did, to my

17    recollection.  I don't think it showed all of

18    them because I think there was video footage

19    that was missing because the video wasn't

20    working at some drop boxes.

21         Q.    I forgot to ask you this

22    before, but do you recall in the exhibit we

23    looked at previously, Ms. Engelbrecht had

24    made a reference to not using the word

25    "illegal ballots"?
```

CONFIDENTIAL

1          A.       Uh-huh.

2          Q.       Do you recall a discussion

3     about that, what she was referring to there?

4          A.       I believe -- well, I don't

5     really know exactly the context of that, but

6     I do know that she mentioned it.  She said we

7     couldn't call it that.

8                   Let's see, what did she say

9     exactly?

10         Q.       Yeah, I'm sorry.  I should have

11    asked you when you had it in front of you.

12                  It's on the last page of

13    Exhibit 77.

14         A.       (Reviewing.)  Yeah, so we can't

15    say that the ballots were illegal.  We can

16    say they appear to be illegally cast.  I

17    think based on maybe her counsel, but I --

18    it's speculative.  I don't -- I'm not sure

19    why, but she did say that.

20         Q.       And what do you understand the

21    distinction between an illegal ballot and a

22    ballot illegally cast?

23         A.       I don't know.  I don't know the

24    distinction, the technical or legal

25    distinction between the two, but there must

Page 108

1    be one.

2          Q.      But you don't have an

3    understanding of what the difference might

4    be?

5          A.      I don't.

6          Q.      Okay.  So let's mark as Exhibit

7    78 a document bearing Control Nos.

8    DDR-00056096 through DDR-00056099.

9       (Marked was Plaintiff's Exhibit No. 78.)

10         Q.      (By Ms. Haber Kuck)  Okay.

11   This seems to be another set of chat messages

12   between you, Ms. Engelbrecht, and

13   Mr. Phillips.

14                 Do you see that?

15         A.      Uh-huh.

16         Q.      And the date on it seems to be

17   January 10 of 2022?

18         A.      Uh-huh.

19         Q.      And in the first text in the

20   chain, you say (as read):  "Nathan picked

21   some very innocuous footage.  The people he

22   picked basically looked like they were

23   dropping off one ballot.  I think the key is

24   to show one person in multiple locations like

25   you showed us.  We would like to do a call

1    with Nathan this afternoon and maybe walk him

2    through it."

3                    And then you talk about it

4    being your birthday.

5          A.      Yeah.

6          Q.      Did -- when you said "like you

7    showed us," do you know -- do you recall what

8    you were referring to?

9          A.      Well, it must have been -- I

10   don't actually recall when that happened.  It

11   must have been sometime in the fall, between

12   the fall and January, but I don't know

13   exactly when.

14         Q.      And you -- when --

15         A.      Yeah.

16         Q.      And are you referring to

17   footage of a mule going --

18         A.      A mule.

19         Q.      -- going to multiple ballot

20   boxes?

21         A.      Uh-huh.  Uh-huh.

22         Q.      And you think that they showed

23   you the same person going to multiple places.

24         A.      I thought that was what they

25   showed us, yes.

1          And I believe I'm relaying the
2     message to Catherine from Nathan.  That's
3     what he said.
4          Q.    And then do you -- do you
5     recall the -- did you set up this call with
6     Nathan?
7          A.    I did.
8          Q.    And do you recall -- do you
9     remember the call?
10         A.    Specifically, no.  I don't
11    remember exactly what was said.  But just
12    based on this, I'm assuming that the -- that
13    the call was about getting these mules to go
14    to more than one location and, you know, not
15    just have one mule deliver one ballot or
16    whatever, you know, so that we had to make it
17    accurate.  So...
18         Q.    And convincing.
19         A.    Yes.
20         Q.    So is it fair to say there are
21    conversations that Mr. Frankowski had
22    directly with Ms. Engelbrecht and
23    Mr. Phillips about the -- about the footage?
24         A.    That I don't know.  I don't
25    know if it was -- if it was him directly with

CONFIDENTIAL

Page 111

1     them or him and Bruce and them.  I'm not

2     sure.

3         Q.     Yeah, I'm sorry.  I didn't mean

4     him, only him.

5         A.     Oh, yeah.

6         Q.     But he did -- he was in contact

7     with them?

8         A.     Right.  Because he was the one

9     getting the videos.

10        Q.     Right.

11        A.     Yes.

12        Q.     Right.  And he actually talked

13    to them about what these videos were and what

14    they had.  Is that accurate?

15        A.     I believe so.  Yes.

16               And it seems like Catherine

17    kept asking for a script, which we did not

18    have because we don't do scripts.

19        Q.     And then on the second page, it

20    also looks like she brought up this issue

21    about using the word "illegal"?

22        A.     Where is that?

23        Q.     Second page.  Your text, the

24    fifth one down.

25        A.     I don't see that.  I'm sorry.

CONFIDENTIAL

Page 112

1    Q.    I'm sorry.  It's the third

2    page.  My fault.

3    A.    Oh, okay.  (Reviewing.)

4    Q.    It says (as read):  "I did tell

5    them..."

6    A.    Oh, yes.  Yes.  Uh-huh.

7    Q.    Does that -- does that refresh

8    your recollection in any way about what this

9    issue was about the calling them illegal

10   ballots?

11   A.    Well, it could have been a

12   voiceover that Dinesh did because Dinesh

13   would do voiceovers for the trailers and, of

14   course, the film.

15         And so it could have been that

16   he did a voiceover calling it illegal, maybe,

17   and that's what she was referring to.

18   Q.    Okay.

19   A.    But as far as the other, I

20   don't recall what all of this -- like, I

21   don't recall the attachment or any of that.

22   Q.    Okay.

23   A.    I don't remember what we saw

24   there.

25         Oh, yes, I remember now, my mom

CONFIDENTIAL

Page 113

1    having COVID -- having just found out my mom

2    had COVID on my birthday.  So I -- and I

3    think I was pretty mentally preoccupied.

4           Q.      Okay.  But you believe you had

5    a call -- that the three of you had a call

6    with Mr. Frankowski about the -- about what

7    video they had provided?

8           A.      Uh-huh.

9                   MS. HABER KUCK:  Off the record

10              for just a second.

11                   THE VIDEOGRAPHER:  Going off

12              the record.  The current time is

13              12:19.

14                   (Recess taken at 12:19 p.m.,

15              resuming at 12:20 p.m.)

16                   THE VIDEOGRAPHER:  We are going

17              back on the record.  The current time

18              is 12:20 and this is the start for

19              Video 3.

20           Q.      (By Ms. Haber Kuck)  Let me

21    show you a document we previously marked as

22    Exhibit 46.

23       (Previously marked was Plaintiff's

24    Exhibit No. 46.)

25           Q.      (By Ms. Haber Kuck)  Do you

CONFIDENTIAL

Page 114

1    recognize this document?

2         A.      I do.

3         Q.      What is it?

4         A.      Just letting Catherine and

5    Gregg know that we need -- what we need to

6    finish making the documentary.

7         Q.      So this is an email that you

8    sent on February 4, 2022 to Ms. Engelbrecht

9    and Mr. Phillips?

10        A.      Yes.

11        Q.      And what you're referring to is

12   the first paragraph -- the first full

13   paragraph under 1?  It says 1.

14        A.      Uh-huh.

15        Q.      Yeah, and what -- what was your

16   understanding of what you needed there?

17        A.      Well, this was actually Dinesh

18   wanted me to ask them these questions.  We

19   briefly went over what questions to ask.

20               And I'm -- and I'm not really

21   sure, I don't remember exactly what the 1,000

22   videos is all about, but I'm assuming it's

23   that they had a thousand videos of the mules

24   going to drop boxes.

25               And when I say (as read):

Page 115

1    "Don't worry if they are grainy," I think I'm

2    referring to don't just send the ones that

3    are very clear, but send all of them.

4                I think that's what it was.

5        Q.      And this was a second batch of

6    videos, in addition to the 70 that you

7    already had.  Is that right?

8        A.      I believe so.

9        Q.      And in the second sentence

10   there, you say (as read):  "The reason why we

11   want this is to make a collage for the screen

12   of all the videos compiled to fit the full

13   screen."

14               Do you see that?

15       A.      Yeah, that was more artistic.

16   Yes.

17       Q.      And that's ultimately in the

18   final movie.  Right?

19       A.      Yes.

20       Q.      And you're saying you -- this

21   is something that you were essentially just

22   conveying to them from whom?

23       A.      Dinesh.

24               (Reporter clarification.)

25       Q.      (By Ms. Haber Kuck)  And then

CONFIDENTIAL

Page 116

1    the second -- the second item on here is, it

2    says (as read):  "We need a list of

3    nonprofits that were involved with the

4    trafficking we are trying to follow them on."

5              Do you see that?

6        A.      Uh-huh.

7        Q.      And what were you -- was that

8    also a request from Mr. D'Souza?

9        A.      Yes.

10       Q.      What were you looking for

11   there?

12       A.      The nonprofits where the mules

13   went.

14       Q.      And did you ever get that list?

15       A.      I don't believe we got that

16   list then.  We may have gotten it later.  But

17   I don't remember that list, actually.

18       Q.      And what about the thousand

19   videos?  Do you recall how Ms. Engelbrecht

20   responded to that request?

21       A.      I don't, but it must have -- it

22   must have been sent through Nathan, or to

23   Nathan, not us, not Dinesh and I.

24       Q.      So let's look at what was

25   previously marked as Exhibit 49.

CONFIDENTIAL

Page 117

1          (Previously marked was Plaintiff's

2     Exhibit No. 49.)

3          Q.      (By Ms. Haber Kuck)   Do you

4     recognize this document?

5          A.      (Reviewing.)   I do.

6          Q.      And what do you see it as?

7          A.      I think this was her response

8     to my questions.

9          Q.      Okay.

10         A.      Yeah, to the five that I asked,

11    yes.

12         Q.      And did you have any

13    discussions with her about her answers?

14         A.      I didn't, no.

15         Q.      Do you know if anyone did?

16         A.      Dinesh, I believe, did.

17         Q.      So you -- and is it your

18    recollection that he may have had discussions

19    directly with her about the content of how

20    she responded?

21         A.      Right.

22         Q.      She says in the -- her -- the

23    first sentence of her response on the first

24    question, she said (as read):   "We have

25    around 70 videos currently separated out and

CONFIDENTIAL

Page 118

1    are scaling efforts to review more.  This is
2    incredibly time consuming because it involves
3    reading the geospatial data to try and find a
4    match in really poorly detailed County video
5    so that only the analysts can do this."
6                Do you see that?
7        A.    Yes.
8        Q.    What did you understand her to
9    be talking about there?
10       A.    I think it was in reference to
11   doing the -- showing all of the mules going
12   to ten or more -- showing the same mule going
13   to ten or more drop boxes.  I believe that's
14   what that was.
15       Q.    And do you --
16       A.    With the geotracking data.
17       Q.    So the -- when she says it's
18   incredibly time consuming she's talking about
19   the matching the geotracking data to the
20   videos?
21       A.    Correct.
22       Q.    And when she says "...only the
23   analysts can do this," who are those analysts
24   you understood her to be referring to?
25       A.    I don't know.

CONFIDENTIAL

Page 119

1          Q.        Okay.

2          A.        It must be somebody that they

3     work with, maybe, so probably that.

4          Q.        Other than -- other than

5     Mr. Phillips, did you have any communications

6     with anyone else who worked with him at

7     OpSec?

8          A.        No.

9          Q.        Are you aware of anyone else

10    who worked with him at OpSec?

11         A.        He mentioned a few people, but

12    I don't know them and I never saw them.

13         Q.        Do you recall who they were?

14         A.        No, I do not.

15         Q.        So but then she -- she -- in

16    the last paragraph, under 1, she said (as

17    read):  "We have millions of minutes of

18    general footage, so we can break apart clips.

19    And as long as they're not too blurry -- and

20    as long as they're too blurry to determine

21    identifiable features, they could work for

22    purposes of showing movement to the drop

23    boxes and give a 'fly' effect."

24                   Do you see that?

25         A.        Yes.

CONFIDENTIAL

Page 120

1    Q.    Is she making some distinction
2    between the videos that were matched and just
3    general drop box video they had?
4             What is she -- what do you
5    understand her to be talking about in terms
6    of general video?
7    A.    I do not know.  I cannot
8    speculate.  I really don't know.
9    Q.    Do you recall discussions with
10   anyone where she indicated that the second
11   batch of videos were not videos that had been
12   linked geospatially?
13   A.    No.
14   Q.    Do you -- do you recall any
15   discussion with her specifically about video
16   from Gwinnett County?
17   A.    No.  I believe it was just what
18   was discussed in the film.  That's -- that
19   was the only discussion about Gwinnett County
20   that we had.
21   Q.    Did you have an understanding
22   that the video from Gwinnett County had been
23   obtained by TTV too late for them to do a
24   geolocation -- geospatial linking of the data
25   in the video?

CONFIDENTIAL

Page 121

1          A.      No.  As far as I'm concerned,
2     we had no idea.
3          Q.      And when you say "we," who do
4     you mean?
5          A.      Dinesh and I.
6          Q.      And why -- do you have any
7     basis for thinking that he didn't know that?
8          A.      Who?
9          Q.      Mr. D'Souza.  You can -- I
10     understand what you understood or not.
11          A.      Oh, yes.  Yes.
12          Q.      I'm asking you for your basis
13     of saying he didn't understand that.
14          A.      I don't know that.
15          Q.      Okay.
16          A.      Yeah, I don't know what he
17     understood or didn't.
18          Q.      Right.  So you can only speak
19     for what you understood.
20          A.      Right.  Correct.
21          Q.      And then on the second entry,
22     she says (as read):  "Here's a link to
23     Georgia and Arizona, organizations that have
24     been -- that have published 990s."
25                  Do you see that?

CONFIDENTIAL

Page 122

```
 1          A.      Uh-huh.
 2          Q.      What was she providing there,
 3   to your understanding?
 4          A.      Well, it appears as though she
 5   was providing the list of nonprofits that
 6   were involved in the -- with the mules.
 7          Q.      And she says (as read):
 8   "Here's a link..."
 9          A.      Uh-huh.
10          Q.      What was -- what was the link
11   there?
12          A.      I don't remember actually even
13   clicking on that link, to be honest.  I don't
14   know if Dinesh did, but I certainly did not.
15          Q.      But you understood that the
16   list that she was giving you were
17   people -- well, strike that.
18                  You understood that on that
19   list were nonprofits that their research had
20   shown were supplying ballots?
21          A.      It appears that way.
22          Q.      Is that how you understood it
23   at the time?
24          A.      Yes.  And she was very adamant
25   not to release the names.
```

CONFIDENTIAL

Page 123

1          Q.      And what was your understanding
2    of why that was?
3          A.      I think for legal reasons.
4    According to her counsel.
5          Q.      Did you have -- did that cause
6    you any concern?
7          A.      Me personally, no.  I don't
8    know -- I can't speak for Dinesh.  But I just
9    thought well, you know, if we can't, we
10   can't.
11         Q.      And then she concludes by
12   saying (as read):  "We have NGOs in the other
13   states, too.  We will send a list by close of
14   business, COB, on Friday."
15              Do you know whether you got
16   the -- you ever got the NGO list for the
17   other states?
18         A.      I don't know.  Unless -- I
19   don't -- I don't recall.
20         Q.      Did -- so what did you do with
21   this information when you got it?
22         A.      Probably forwarded it to
23   Dinesh --
24         Q.      But you don't --
25         A.      -- more than likely.

CONFIDENTIAL

Page 124

1          Q.      Okay.  Do you recall any
2     follow-up discussion with Ms. Engelbrecht on
3     the first point?
4          A.      I don't.
5          Q.      How about the second point?
6          A.      I don't.
7          Q.      And you don't recall looking at
8     the list of organizations?
9          A.      No, I do not.
10         (Brief off-the-record discussion.)
11         Q.      (By Ms. Haber Kuck)  And before
12    we go to the next exhibit, this email we were
13    just discussing is dated February 10 of 2022.
14         A.      Uh-huh.
15         Q.      So we place it in time.
16                 And let me show you a document
17    we previously marked as Exhibit 11.
18         (Previously marked was Plaintiff's
19    Exhibit No. 11.)
20         A.      (Reviewing.)
21         Q.      (By Ms. Haber Kuck)  And this
22    is a series of, it looks like, screenshots of
23    texts.  I'm not exactly sure.
24                 But does that look right to
25    you?

CONFIDENTIAL

Page 125

1          A.       Uh-huh.

2          Q.       And if you could go to the page

3    at the bottom that says DDR-000090 and 91.  I

4    can't tell, but it looks -- 90 looks like

5    it's dated March 6 of 2022, at the top.

6          A.       Uh-huh.

7          Q.       And then I -- I'm assuming it

8    continues on to the next page, although it's

9    a little bit unclear; but it looks like this

10   is also March of 2022.

11         A.       Uh-huh.

12         Q.       I just want to make sure we

13   have the right page.

14                  And then if you'd go to the

15   next page, which has 92 at the bottom, again,

16   we're -- we seem to be in March.

17                  And then Mister -- middle of

18   the way through, it looks like Mr. Phillips

19   is asking you to confirm that you have

20   everything that you need for the movie.

21                  Do you see that?

22         A.       Uh-huh.

23         Q.       And then it looks like you say

24   (as read):  "Yes, pretty much done.  The one

25   thing we don't have is a list of nonprofits

1    in Michigan and Pennsylvania, the ones you

2    geotracked for.  Can you send it -- send us

3    if" -- I'm not sure the right word -- "just

4    to complete the geotrafficking picture?"

5                   Do you see that?

6          A.       Uh-huh.

7          Q.       So does this refresh your

8    recollection that even as of -- so this is

9    now March -- you still didn't have

10   this -- the list for these other states,

11   Michigan and Pennsylvania?

12         A.       Uh-huh.  Yes.

13         Q.       And do you know if you ever got

14   them?

15         A.       Not that I know of, no, because

16   we didn't name anything in the movie, in the

17   film.

18         Q.       Do you recall any discussions

19   with Mr. D'Souza about Ms. Engelbrecht not

20   being forthcoming with the information on

21   those NGOs?

22         A.       I don't recall, but probably

23   so, based on these texts, that she just did

24   not want to release the names, or didn't want

25   us to release the names.

CONFIDENTIAL

Page 127

1     Q.     And why -- wasn't the purpose

2  of the film to provide the evidence of the

3  mules?

4     A.     Yes.

5     Q.     So why wouldn't -- wouldn't you

6  have wanted to reveal the names of the NGOs

7  in order to get them to stop what they were

8  doing?

9     A.     We did, yes.  The film did,

10  yes.

11     Q.     And so -- did you have a

12  concern that she wouldn't let you or she

13  didn't want you to release those?  Or she

14  wasn't providing you with the information?

15     A.     It was apparent by her texts

16  that she did not want us to use the names,

17  yes.

18     Q.     And you eventually agreed to

19  that request?

20     A.     Yes.

21     Q.     Are you aware that

22  subsequently -- and she didn't ever tell you

23  the names of those NGOs.  Right?

24     A.     Me personally?

25     Q.     Yeah.

CONFIDENTIAL

Page 128

```
 1          A.      No.
 2          Q.      Are you aware of her telling
 3   Mr. D'Souza personally?
 4          A.      She may have later.
 5          Q.      But you don't recall
 6   specifically?
 7          A.      I don't.
 8          Q.      Do you recall that later on
 9   there was an issue with the book about
10   revealing the names?
11          A.      I recall by Dinesh telling me
12   there was an issue with that, but I
13   don't -- but I wasn't involved in his book,
14   so I don't really know what took place.
15          Q.      Okay.  Do you recall anything
16   about that discussion you had?
17          A.      I don't.
18          Q.      Do you recall any discussions
19   with him about the book being -- the first
20   printing of the book being recalled?
21          A.      That's when I heard about it.
22          Q.      Okay.  What else did you hear
23   about the book being recalled?
24          A.      That was the only reason.
25          Q.      Okay.  You weren't aware of any
```

CONFIDENTIAL

Page 129

1  other reason?

2        A.    No.

3          (Discussion off the record.)

4            MS. HABER KUCK:  Yes, we are

5        going to have lunch.  Would you like

6        to break now?

7            THE WITNESS:  Yes.

8            MS. HABER KUCK:  Okay.

9            THE WITNESS:  If you don't

10        mind.

11            MS. HABER KUCK:  Let's go off

12        the record.

13            THE VIDEOGRAPHER:  Going off

14        the record.  The current time is

15        12:39.

16            (Recess taken for lunch at

17        12:39 p.m., resuming at 1:52 p.m.)

18            THE VIDEOGRAPHER:  We are going

19        back on the record.  The current time

20        is 1:52, and this is the start for        0

21        Media 4.

22        Q.    (By Ms. Haber Kuck)  Good

23  afternoon.

24        A.    Hello.  Good afternoon.

25        Q.    Over the lunch break, did you

CONFIDENTIAL

Page 130

```
 1    discuss the substance of your testimony with
 2    anyone?
 3         A.     Not the substance, no.
 4         Q.     At some point in time there was
 5    a rough cut of the film that Ms. Engelbrecht
 6    and Mr. Phillips reviewed.  Is that right?
 7         A.     Yes.
 8         Q.     And when you use the term
 9    "rough cut," what do you understand that to
10    mean?  What's a rough cut of a film?
11         A.     So a rough cut of any of the
12    documentaries is basically scenes pieced
13    together without final movie -- final
14    music --
15         Q.     Okay.
16         A.     -- final colorization.  If
17    there's -- if it's too long or too short, you
18    know, we add or subtract, that kind of thing.
19    More technical.
20               So it's not the final cut,
21    basically.  It's a rough cut.
22         Q.     And do you have a recollection
23    of them viewing the rough cut?
24         A.     Yes.
25         Q.     And what was the -- where did
```

CONFIDENTIAL

Page 131

1    they review it?

2          A.      They reviewed it at our home.

3          Q.      Was anyone else at your home

4    other than the two of them and you and

5    Mr. D'Souza?

6          A.      Just the four of us.

7          Q.      Okay.  And did they have any

8    reaction to the film?

9          A.      They liked it.

10         Q.      Did they have any other

11   comments on it, other than that?

12         A.      I think I told you a little

13   while ago that one of the things that

14   Catherine noted was that we needed to make

15   sure that the voice of the whistleblower and

16   of the whistleblower mule was more disguised.

17               So I guess I don't know what

18   the technical term is for that, but they felt

19   like it wasn't disguised enough.

20         Q.      Okay.  And did they ever share

21   with you the identity of either of those two

22   whistleblowers?

23         A.      I don't recall them -- they may

24   have given me the name, but I don't remember

25   the name, let's put it that way, yeah.

CONFIDENTIAL

Page 132

```
 1          Q.      Okay.  But you think you may
 2   have known who those people were?
 3          A.      Just by the name, but, you
 4   know, we weren't -- we were definitely not
 5   allowed to out them or tell anyone their name
 6   or anything like that, so it was in
 7   confidence.
 8          Q.      And are you aware of anyone
 9   from D'Souza Media having any direct contact
10   with either of those whistleblowers?
11          A.      I'm not aware, no.
12          Q.      And can you recall anything --
13   any other comments Ms. Engelbrecht or
14   Mr. Phillips had on the phone?
15          A.      It may have been that
16   particular interview that was conducted
17   by -- oh, my goodness, what was her name?
18   McMullins or --
19          Q.      Heather Mullins?
20          A.      Heather Mullins, yes.  So she
21   did the interview with the whistleblower
22   for -- I think he was a -- he was either a
23   detective or something like that.
24                  Anyway, she did the interview
25   and I think that they didn't really like the
```

CONFIDENTIAL

Page 133

1    way it looked kind of screen because it

2    looked very different from the other

3    interviews.  And they may have said something

4    to that effect of it not looking right.

5                    And then, of course, the voice

6    being more hidden, more just camouflaged.

7                    But other than that, I really

8    don't recall anything else that they said.

9         Q.    Did you ever meet Heather

10    Mullins?

11        A.    Yes.  At the premier --

12        Q.    Okay.

13        A.    -- in May.

14        Q.    At Mar-a-Lago?

15        A.    Yes.

16        Q.    Did you ever -- did have

17    contact with her in any other context?

18        A.    No.

19        Q.    Are you aware of anyone else

20    from D'Souza Media having contact with her in

21    any other context?

22        A.    Not that I know of.

23        Q.    Okay.  All right.  Let me mark

24    as Exhibit 79 a multiple-page document

25    bearing Control Nos. DDR-00059516 through

CONFIDENTIAL

Page 134

1    59517.

2       (Marked was Plaintiffs Exhibit No. 79.)

3               MR. EVANS:  What was the

4       number?

5               MS. HABER KUCK:  79.

6       Q.       (By Ms. Haber Kuck)  And this

7    appears to be some messages between you,

8    Mr. Schooley, Mr. D'Souza, and

9    Mr. Frankowski.  Correct?

10      A.      Yes.

11      Q.      Although, now that I'm -- and

12   although it's rather odd because it seems

13   like there is input from -- now I've got the

14   wrong one.

15      A.      Bruce.

16      Q.      From -- oh, I see.  Yes.

17              So and then two -- if you look

18   at the text two down, it says, "From:

19   Catherine"?

20      A.      Yes.

21      Q.      So were you there conveying a

22   message you had gotten from Catherine?

23      A.      Yes.  And I believe this was in

24   reference to what I just told you about the

25   rough cut.

CONFIDENTIAL

Page 135

1        Q.        Yeah.

2        A.        And I wasn't sure exactly on

3    the specifics, but now that I see it.  So she

4    didn't feel like the cop's head/body was

5    pixilated enough, and she did mention his

6    voice needed to be more altered.

7              And then the -- the other, the

8    "RAV" branding and "Heather's clip," I don't

9    know anything about that, but I'm assuming

10   that's maybe an organization that Heather was

11   involved in before and she wanted that

12   removed.

13             But other than that, I don't

14   know really what else.

15       Q.        Okay.

16       A.        Yeah.

17       Q.        And it looks like from this she

18   wanted to personally confirm that the changes

19   were made to the movie?

20       A.        I --

21       Q.        It says from -- (as read):

22   "The call I missed" -- "From:  Catherine.

23   The call I missed yesterday was to ask that I

24   personally confirm the changes were made to

25   the movie."

CONFIDENTIAL

Page 136

1          A.      Yes, I guess she wanted to make
2     sure that what she told us, that she told
3     Dinesh and I, that would be conveyed to
4     Nathan.
5          Q.      Right.
6          A.      Uh-huh.
7          Q.      And then did she see it again
8     and confirm she was happy with the product?
9          A.      You know, I don't remember
10    that.  I don't remember if she saw it or if
11    we sent her -- I really don't remember.
12         Q.      But at some point was her
13    concern about that portion of the movie
14    resolved?
15         A.      Yeah, I -- yes.
16         Q.      She didn't have a problem with
17    it?
18         A.      She never had a -- yeah, she
19    never had that problem again, even after --
20    after watching it at Mar-a-Lago.
21         Q.      Do you recall that at some
22    point in time the Salem folks reviewed the
23    rough cut?
24         A.      Yes, but I don't know when.
25         Q.      Do you recall anything about

CONFIDENTIAL

Page 137

1    their reactions to the film?

2        A.    I do not recall.

3        Q.    So let's mark as Plaintiff's

4    Exhibit 80 document bearing Control No.

5    TPNF-0001637 through 1638.

6      (Marked was Plaintiff's Exhibit No. 80.)

7        Q.    (By Ms. Haber Kuck)  Does this

8    document refresh your recollection in any way

9    about the reactions that Salem had to the

10   film?

11       A.    (Reviewing.)  I don't remember

12   any of this, no.

13             Yeah, he didn't believe that --

14       Q.    You weren't copied on it?

15       A.    I was not copied on this and I

16   don't even remember this at all.

17       Q.    Okay.  And it doesn't refresh

18   your memory in any way of there being further

19   discussion about there not being mule -- a

20   mule at various locations?

21       A.    No.

22       Q.    Okay.  Let me show you a

23   document that we marked previously as Exhibit

24   54.

25     (Previously marked was Plaintiff's Exhibit

CONFIDENTIAL

Page 138

1              No. 54.)

2        A.      (Reviewing.)

3        Q.      (By Ms. Haber Kuck)  Okay.

4   Exhibit 54 seems to be a series of chats

5   between you, Ms. Engelbrecht, and

6   Mr. Phillips.

7              Do you see that?

8        A.      Yes.

9        Q.      On April 5, 2022?

10       A.      Yes.

11       Q.      If you -- and you'll see

12  there's a list of -- there is something

13  redacted and then there is a list of credits.

14             Do you see that?

15       A.      Uh-huh.

16       Q.      What was Ms. Engelbrecht

17  conveying to you there?

18       A.      I think, if I'm not mistaken,

19  this was -- this had to do with a list from

20  Mar-a-Lago.  But we didn't do credits at

21  Mar-a-Lago --

22       Q.      Okay.

23       A.      -- this way.  So I don't think

24  that we actually did this because we just

25  don't do it.

CONFIDENTIAL

Page 139

```
 1                    So -- and I wasn't in charge of
 2      the Mar-a-Lago event, so I really --
 3            Q.      Yeah.
 4            A.      -- don't know what -- you know,
 5      what was sent or wasn't.  Yeah, I think
 6      that's --
 7            Q.      And who was --
 8            A.      -- what it was.
 9            Q.      Who was in charge of that
10      event?
11            A.      So it was -- well, by -- I
12      guess by "in charge," it was Dinesh.  But
13      Danielle, his daughter, is the one that
14      compiled the list and sent the invitations.
15            Q.      And in these credits that
16      Ms. Engelbrecht is including, it says, at the
17      very bottom (as read):  "Special thanks to
18      Heather Mullins and David Cross for their
19      tireless research."
20                    Do you see that?
21            A.      Yes.
22            Q.      And we talked about Heather
23      Mullins.
24                    Do you know who David Cross is?
25            A.      I do not.
```

Page 140

1          Q.        You've never heard that name
2     before?
3          A.        Only -- only after the lawsuit.
4          Q.        And what did you hear after the
5     lawsuit?
6          A.        I specifically didn't -- I just
7     heard that he was involved in something to do
8     with Georgia and that he was one of the
9     people that -- I don't even know exactly what
10    he did, but involved in that aspect of the
11    disclosure of the lawsuit.
12         Q.        Okay.
13         A.        But specifically, I do not
14    know.
15         Q.        You don't remember anything
16    else?
17         A.        I don't remember anything else,
18    no.
19         Q.        And you don't remember any
20    discussion about him at the --
21         A.        No --
22         Q.        -- contemporaneously with the
23    movie coming out?
24         A.        No.  It didn't even -- even
25    when I saw this -- I assumed, I guess, at the

CONFIDENTIAL

Page 141

1    time that it was somebody involved with

2    OpSec, but I had no idea.  I really didn't

3    know.

4         Q.    Right.  Okay.  I think we're

5    done with that document.

6              During the making of the

7    film -- well, no, strike that.

8              Donald Trump had editorial

9    input into the film.  Correct?

10        A.    I mean, not -- not really

11   editorial.  I don't know -- what do you mean

12   by that?

13        Q.    Well, let's go -- what

14   involvement did he have with the film?

15        A.    Well, he saw it.  He saw the

16   film before we put it out and he may have had

17   a few comments, but I was not privy to those

18   comments.  I think he mentioned them to

19   Dinesh.

20        Q.    And did you ever have any

21   direct contact with him about the film?

22        A.    No.

23        Q.    To your knowledge, were either

24   Ms. Engelbrecht or Mr. Phillips directly in

25   communication with him?

CONFIDENTIAL

Page 142

1          A.      I don't know.

2          Q.      Do you recall that he released

3     the longer film trailer at one of his

4     rallies?

5          A.      Is this the one we're talking

6     about that was released with -- by mistake or

7     by...

8          Q.      Well, there was -- when I --

9     right.  So maybe we start with the one -- the

10    one that was released by mistake, we've been

11    calling that, I think, the teaser trailer?

12         A.      Teaser trailer.

13         Q.      And I'm talking about the

14    longer trailer.  The -- we talked about there

15    is, like, a one-minute one --

16         A.      Yes.

17         Q.      -- and a three-minute one.

18         A.      Yes.

19         Q.      The three-minute one, do you

20    recall that he released it at the rally?

21         A.      I think that they were released

22    at rallies, yes.

23         Q.      Okay.  And was he given a

24    preview of it -- of the trailer before it was

25    released?

CONFIDENTIAL

Page 143

1          A.      I don't know.

2          Q.      Do you recall any social media

3     posts where Mr. Trump expressed his support

4     for the movie?

5          A.      Specifically, no, but I know he

6     did.

7          Q.      Okay.  But you just don't --

8     you don't remember anything?

9          A.      I just don't remember it, yeah.

10         Q.      And prior to the whole movie

11    coming out, you went to Mar-a-Lago and

12    screened it with him.  Right?

13         A.      Yes.

14         Q.      And what was his reaction?

15         A.      He thought it was -- he was --

16    he was very pleased with it.  He thought it

17    was really thorough and he liked it.

18         Q.      Anything else?

19         A.      That's all I remember, really.

20         Q.      Okay.  Do you recall that he

21    asked for some changes towards the end of the

22    film?

23         A.      The only thing I remember him

24    saying was that he thought the film was too

25    long.

1          Q.      Okay.  And then let me just

2     show you...

3                  But you had -- did you -- you

4     said you had no direct communication with

5     him.

6                  Did you have direct

7     communication with anybody on his staff?

8          A.      Not me, no.

9          Q.      Not you?

10         A.      No.

11         Q.      Let's mark as Plaintiff's

12    Deposition Exhibit 81 a one-page document

13    bearing Control No. TPNF-0001150.

14       (Marked was Plaintiff's Exhibit No. 81.)

15         Q.      (By Ms. Haber Kuck)  Do you

16    recognize this document?

17         A.      I do.

18         Q.      And what is this?

19         A.      So it was an email sent to

20    Nathan.  And I believe it was actually Dinesh

21    wanted me to tell -- to convey that Trump

22    liked the new cut.  So we cut, I think, about

23    ten minutes off at the end of the movie and

24    he was very pleased with it.

25                 And I guess he asked -- I don't

CONFIDENTIAL

Page 145

1    even -- I don't remember this part of it --

2    releasing the trailer at his Ohio rally.  But

3    he must have said that, and so that's what I

4    conveyed to Nathan.

5         Q.    Okay.

6         A.    But he didn't tell me directly.

7    He told Dinesh, and Dinesh --

8         Q.    Yeah.

9         A.    -- asked me to write the email.

10        Q.    So -- and so you went to

11   Mar-a-Lago, you previewed the movie.

12        A.    Uh-huh.

13        Q.    And then this is a cut that was

14   made after that meeting with him --

15        A.    Right.  Correct.

16        Q.    -- and then he looked at

17   another version --

18        A.    Yes.

19        Q.    -- correct?

20              And then you're conveying his

21   reaction to the revised version?

22        A.    Yes.

23              Yes, and I believe this new cut

24   is the final cut.

25        Q.    Okay.

CONFIDENTIAL

Page 146

1          (Brief off-the-record discussion.)

2          Q.     (By Ms. Haber Kuck)  Let's mark

3    as Exhibit 82 a multiple-paged document

4    bearing Control No. TPDG-0000037 through 40.

5       (Marked was Plaintiff's Exhibit No. 82.)

6          A.     (Reviewing.)

7          Q.     (By Ms. Haber Kuck)  So this is

8    an email to Danielle D'Souza, but it's about

9    a "Real Georgia Speaks Team Trump Bus Tour."

10               Do you see that on the second

11   page?

12         A.     (Moving head up and down.)

13         Q.     Do you know anything about that

14   event?

15         A.     No idea.

16         Q.     Never heard of it before?

17         A.     Never.

18         Q.     Okay.

19         A.     No.  I know Danielle was -- was

20   involved with Women for Trump, so I'm

21   assuming it's that, but it's an assumption.

22   I've never seen this document.

23         Q.     Okay.  And do you recall

24   anything about there being a bus tour to

25   promote the film after it -- after it was

Page 147

1    released at Mar-a-Lago?

2         A.    I believe Danielle mentioned

3    it, but not specifically.

4         Q.    Okay.  So you have no further

5    information about this event?

6         A.    No.  I'm sorry.

7         Q.    Let me mark as Plaintiff's

8    Exhibit 83 a multiple-paged document with

9    Control Nos. DDR-00067677.

10              So we're going to mark that as

11   Exhibit 83.  And then we need to go off the

12   record for a moment because there is an issue

13   with the videographer that we need to fix.

14              THE VIDEOGRAPHER:  Going off

15        the record.  The current time is 2:17.    0

16     (Marked was Plaintiff's Exhibit No. 83.)

17              (Recess taken at 2:17 p.m.,

18        resuming at 2:18 p.m.)

19              THE VIDEOGRAPHER:  We're going

20        back on the record.  The current time

21        is 2:18, and this is the start for

22        Media 5.

23         Q.    (By Ms. Haber Kuck)  So before

24   we broke, we marked Exhibit 83.

25         A.    (Reviewing.)

CONFIDENTIAL

Page 148

1          Q.      So this is a series of text
2     communications.  I can't tell who they are
3     between because it says (as read):  "Redacted
4     and me."
5                   (Reporter clarification.)
6          Q.      (By Ms. Haber Kuck)  Redacted
7     is one person on it, and the other person on
8     it is me, M-E, so I'm not quite sure who this
9     is between.
10                  I was going to ask you if
11    reviewing this document refreshed your memory
12    in any way about the issue about the trailer
13    teaser being leaked.
14         A.      (Reviewing.)  Well, I'm
15    mentioned, so this is not me in this text.
16         Q.      Right.  I --
17         A.      Interesting.  I don't really
18    know.
19         Q.      And does it cause you to
20    remember anything about that incident,
21    though, that you had forgotten about?
22         A.      (Reviewing.)
23                  Well, I'm assuming that
24    their -- that the conversation is about that
25    particular leak of the teaser trailer at one

CONFIDENTIAL

Page 149

1   of the rallies.  So I'm assuming that's what
2   it is.
3               But other than that, I don't
4   really know the conversation.
5       Q.      And you can't...
6       A.      (Reviewing.)  Yeah.  It's
7   probably Danielle and Dinesh, just based on
8   asking us (as read):  "Is Bruce coming to
9   dinner?
10              "No, just the three of us.
11  Deborah tired and not joining us."
12              So I'm assuming that's what it
13  is.  Yeah.
14      Q.      But there is this reference to
15  Mr. Paxton in there.  Does that refresh your
16  memory as to what happened with Mr. Paxton
17  and the trailer?
18      A.      Well, I think the assumption
19  was that he had leaked the trailer, but I
20  don't know that that ever really was
21  discovered to be the fact of the matter.
22      Q.      Okay.
23      A.      And I know Mr. Paxton because
24  of my, you know, being very active in the
25  Fort Bend County GOP and Republican Women's

CONFIDENTIAL

Page 150

1    events and things like that, so I knew him,

2    and that could be why they wanted me to ask

3    if he did it.

4            Q.      Okay.

5            A.      But I never.  So -- and I don't

6    think that -- I don't think much ever came of

7    that, to be honest, that I recall.

8            Q.      And who is Mr. Paxton?

9            A.      Ken Paxton --

10           Q.      Yeah.

11           A.      -- he is the Attorney General

12   of Texas.

13           Q.      Ms. Engelbrecht expressed a

14   desire to use the film to promote the

15   campaign of David Perdue.

16                   Do you recall that?

17           A.      I do, but I don't know why.  I

18   can't really speculate on her reason why.

19           Q.      What do you remember about it?

20           A.      I don't remember a whole lot

21   about it, other than she wanted to -- I guess

22   she wanted it used for his campaign or for

23   something in Georgia.

24           Q.      Well, let me just show you --

25   you should have Exhibit 11.  It's this fat

CONFIDENTIAL

Page 151

1    set of texts (indicating).

2                   And if you go to the page

3    marked 90 at the bottom.

4         A.       Uh-huh.

5         Q.       And then you'll see at the top

6    she's talking about (as read):  "What's the

7    release date of the movie?"

8         A.       Uh-huh.

9         Q.       And then her second text is (as

10   read):  "This is critical for many reasons,

11   not the least of which is Georgia.  David

12   Perdue is running for governor against Kemp.

13   Perdue needs our evidence out there in order

14   for the campaign to have a chance.  Their

15   primary is May 24th, but early voting starts

16   sooner.  They were counting on the April

17   release."

18                   Do you see that?

19        A.       Yes.

20        Q.       What was that -- what were you

21   discussing there?

22        A.       Well, just as you've stated, I

23   guess she wanted the movie released before

24   the -- before the voting began in Georgia,

25   the governor's -- governor race, I guess, in

CONFIDENTIAL

Page 152

1    Georgia.

2              And this is when I guess I told

3    her that it's looking like early May is when

4    the movie will be released, the documentary

5    would be released.  So...

6              But as you can see, I kind of

7    move on from that because I really -- that's

8    not -- we're not involved in Georgia

9    politics, so it didn't really interest me or

10   Dinesh.

11       Q.    Right.  Okay.  So if you'd turn

12   to Page 98 of the same document.  Right in

13   the middle there is a long text.

14             Do you see that?

15       A.    Yes.

16       Q.    And Ms. Engelbrecht says (as

17   read):  "One more request.  I would like to

18   talk about what we can give to Perdue to

19   start using now," and then she goes on.

20             Did you have a conversation

21   with her about what they could give the

22   Perdue campaign?

23       A.    I personally did not.  I may

24   have deferred it to Dinesh, but I can't

25   recall what it was.

CONFIDENTIAL

Page 153

1          Q.      Do you recall whether they did
2    provide evidence to Mr. Perdue's campaign?
3          A.      I don't know what they gave
4    them, to be honest.  I don't recall.
5          Q.      Do you recall any familiarity
6    with a PAC called Get Georgia Right?
7          A.      I am not familiar with that.
8          Q.      Did you ever hear that
9    Mr. Phillips provided video for any campaign
10   ad from the "2000 Mules" film?
11               Let me strike that.  Let me
12   rephrase that.
13               Did you ever hear that
14   Mr. Phillips provided video that was used in
15   "2000 Mules" for any campaign ad?
16         A.      I was not aware of any, no.
17         Q.      You've never heard that?
18         A.      No.
19         Q.      And other than what you've just
20   told me, are you aware of any other
21   coordination with the Perdue campaign by
22   Ms. Engelbrecht or Mr. Phillips?
23         A.      No.
24         Q.      Turning to the marketing and
25   promotion of the film, do you recall -- well,

CONFIDENTIAL

Page 154

1    strike that.

2                    What was Ms. Engelbrecht and

3    Mr. Phillips' involvement in that, in the

4    marketing and promotion of the film?

5         A.    I think they had limited

6    involvement mainly because this was a D'Souza

7    Media film and it wasn't a True the Vote

8    film.  So I don't think that that was --

9                    They didn't have a publicist

10   that did media for them and we had a

11   publicist that did media for us.  So it

12   was -- their involvement was very minimal.

13                   Other than -- other than

14   promoting it on their social media or their

15   website, that was, I think, it.

16        Q.    Do you recall them also

17   coordinating with Patricia Jackson?

18        A.    So Patricia was Dinesh's

19   publicist for the film and she wanted them to

20   also -- because Dinesh's -- well, this is --

21   this is the case with all the films.  We have

22   a publicist that does -- that sets up all the

23   interviews --

24        Q.    Uh-huh.

25        A.    -- for Dinesh.  And typically

CONFIDENTIAL

Page 155

1    they go -- they run from, like, 6:00 in the

2    morning until 10:00 at night, back to back.

3    Dinesh doesn't even have time to go to the

4    bathroom, pretty much.

5              And so he was hoping that

6    Catherine and Gregg would also help with

7    that, with the promotion.

8              So Patricia was supposed to

9    broker between them and set up interviews

10   with Catherine, with Gregg, so that they

11   could help Dinesh.

12             As far as I know, they didn't

13   do a whole lot with Patricia, so it was

14   mostly Dinesh.

15        Q.    Okay.  And you just

16   previously -- you said they had limited

17   involvement mainly because this is a D'Souza

18   Media film and it wasn't a True the Vote

19   film.

20             Do you recall them promoting it

21   as a True the Vote film?

22        A.    Not really, no.  I believe it

23   was the research from True the Vote.  The

24   way -- the way the film was marketed is a

25   D'Souza production with True the Vote as the

CONFIDENTIAL

Page 156

1    source.

2         Q.      And you don't recall them

3    trying to promote it as their film?

4         A.      Not that I recall.

5         Q.      Okay.  So Let's mark as

6    Plaintiff's Exhibit 84 a multiple-paged

7    document bearing Control Nos. DDR-00057119.

8       (Marked was Plaintiff's Exhibit No. 84.)

9         A.      (Reviewing.)  Okay.

10        Q.      (By Ms. Haber Kuck)  Does this

11   refresh your recollection that there was an

12   issue with them --

13        A.      Yes.

14        Q.      -- promoting the film as mine?

15        A.      Yes.

16        Q.      What do you remember now?

17        A.      I think just that post.  And I

18   thought it was very strange because this was

19   really the only time I ever saw this worded

20   like this, and I don't know -- I don't know

21   who did this.  I don't know who does their

22   social media.

23              But I was trying to -- yeah, I

24   was trying to make the point that -- that it

25   was not their movie or their film.

CONFIDENTIAL

Page 157

1          Q.      Did you have any discussions
2     with Ms. Engelbrecht about that?
3          A.      You know, I -- to be honest, I
4     don't think I did.
5          Q.      Do you know why not?
6          A.      I don't remember.  I don't
7     remember why I didn't.  And no, I do not.  I
8     don't know.
9          Q.      Do you -- do you recall there
10    coming a point in time around -- around this
11    period in time when Ms. Engelbrecht was
12    complaining that she and Mr. Phillips were
13    not being appropriately recognized for their
14    film by Mr. D'Souza?
15         A.      Yes, I think she brought it up
16    through a -- someone that was helping them,
17    who I happened to know, Bettina Viviano.
18         Q.      Uh-huh.
19         A.      And so that was kind of the
20    first I had heard of it, through her.
21         Q.      And who is Viviano?
22         A.      She's a producer, and I believe
23    she's friends with Catherine as well.
24         Q.      Okay.  And what do you recall
25    her telling you?

1        A.        It may have been that they

2    were -- that they were upset about the setup,

3    the compensation.

4                When -- I think when the film

5    started taking -- you know, started going

6    viral, I guess you can say, they were, like,

7    you know, the deal that we made initially,

8    they didn't really like.  And so I think

9    Bettina was trying to see if there was

10   something we could do.

11               And I don't really remember the

12   specifics of what it was, but -- but because

13   Catherine and I, I thought, were friends, I

14   wished that Catherine had come to me first

15   and voiced her concerns, but she did not.

16       Q.        So there was a -- so as I

17   understand it, you're referring to around

18   this time.  So Ms. Engelbrecht and

19   Mr. Phillips were essentially trying to

20   renegotiate their original deal?

21       A.        That's what it seemed like,

22   yes.

23       Q.        Were you involved in the

24   discussions with them or with Bettina about

25   it?

CONFIDENTIAL

Page 159

```
 1          A.      I could hear them, but I wasn't
 2     involved.  I mean, I could hear Bettina on
 3     the phone with Dinesh, but I wasn't on the
 4     phone with Bettina.
 5          Q.      Okay.  Okay.  So you think
 6     there was a phone call between Mr. D'Souza --
 7          A.      Yes, there was.
 8          Q.      -- and Bettina?
 9          A.      There was, yes.
10          Q.      Okay.  And what did he tell you
11     about that phone call, if anything?
12          A.      I don't remember specifically
13     what he -- what he said.  I can't recall it.
14          Q.      Okay.  Let's mark as
15     Plaintiff's Exhibit 85 a document bearing
16     Control No. DDR-00056860 through 61.
17        (Marked was Plaintiffs Exhibit No. 85.)
18          Q.      (By Ms. Haber Kuck)  This seems
19     to be a text -- or a chat between
20     Mr. Schooley, Ms. Engelbrecht, you,
21     Mr. D'Souza, and Mr. Phillips.
22                  Do you see that?
23                  If you flip the front page.
24          A.      It looks -- it looks like it's
25     just Dinesh and Catherine.
```

1          Q.     I know, it's -- the way that it
2    was produced to us, it appears that it's all
3    five of you.  It may be that you were just
4    copied.
5                 I can't tell.  This is the way
6    that it -- this is the way that it was
7    produced and I'm looking at the first page.
8          A.     Yeah.
9          Q.     Do you recall ever seeing this
10   before?
11         A.     I don't.  But if I'm -- if I'm
12   on there, it must -- I must have.  But I
13   don't -- I don't recall this exact wording,
14   no.
15         Q.     Because if you look at the top
16   of it, it says (as read):  "Chat, Debbie
17   D'Souza iPhone."
18         A.     Yeah, it does.  It does.  But I
19   don't remember.
20                (Reporter clarification.)
21         Q.     (By Ms. Haber Kuck)  It says,
22   "Debbie D'Souza iPhone."
23         A.     iPhone.  But it's Catherine and
24   Dinesh exchanging a conversation -- having a
25   conversation, just the two of them.

CONFIDENTIAL

Page 161

```
 1          Q.      And in this, Ms. Engelbrecht
 2    seems to be expressing her concern about a
 3    lack of recognition.
 4                  Do you see that?
 5          A.      Yes.
 6          Q.      Do you recall -- and then
 7    Mr. D'Souza says (as read):  "Let's discuss
 8    in detail this weekend"?
 9          A.      Yes.
10          Q.      Do you recall any conversation
11    about this issue?
12          A.      You know, I don't recall if it
13    was before or after Bettina, but it must have
14    been after.
15          Q.      Okay.
16          A.      But I don't really recall the
17    conversation or the -- this was probably the
18    weekend before the premier, 4-27, appears to
19    be.  So it was probably right before the
20    premier.
21          Q.      So it was also in that period
22    of time --
23          A.      Uh-huh.
24          Q.      -- when they were trying to
25    negotiate -- renegotiate their original deal?
```

CONFIDENTIAL

Page 162

```
 1          A.       Right.
 2          Q.       And you don't recall any
 3   conversations you had directly with
 4   Ms. Engelbrecht on this subject?
 5          A.       I do not recall.  If I did, I
 6   really don't remember exactly.
 7                   I think I was -- I was just a
 8   little bit hurt that she didn't come to me
 9   directly, and so I kind of just took myself
10   off of, you know, the conversation.
11          Q.       So let's mark as Exhibit 86 --
12   so I'm going to mark as Exhibit 86, it's a
13   two-page document.  The copy I have doesn't
14   have the Bates numbers on it, but for
15   purposes of locating it, I can represent that
16   the Bates numbers are LTPJ_0000846 and 87
17   [sic].  I'm sorry.  847.
18      (Marked was Plaintiffs Exhibit No. 86.)
19          Q.       (By Ms. Haber Kuck)  Do you
20   recognize this email?
21          A.       Yes.
22          Q.       Okay.  Can you tell me what it
23   is?
24          A.       Yes.  It's an email between
25   myself and Patricia Jackson.  And this is
```

CONFIDENTIAL

Page 163

1    when, as I told you earlier, Patricia was

2    going to be handling the media for Dinesh and

3    wanted -- and Dinesh wanted Catherine and

4    Gregg to be a part of the media.

5                 And Patricia was having a

6    difficult time getting them to agree to do

7    media or even getting ahold of them.  And so

8    that was my response to Patricia was about

9    that.

10        Q.      And do you recall them -- well,

11   is it fair to say they weren't cooperating

12   with Patricia?

13        A.      It's fair to say.

14        Q.      Do you recall them going off on

15   their own and just doing media separately?

16        A.      I don't remember that.  They

17   might have, but I don't remember.

18        Q.      Okay.  And when she says in

19   there, the second email down in the chain,

20   she says (as read):  "It's just so

21   frustrating to me that you and Dinesh have

22   put so much work into it and that they are

23   actively trying to sabotage it."

24                 Do you see that?

25        A.      Yes.

CONFIDENTIAL

Page 164

1        Q.        What did you understand her to
2    mean by that?
3        A.        I don't know.  I can't
4    speculate what she meant.
5        Q.        You didn't have an
6    understanding when you got the email.
7        A.        Just that they weren't being
8    cooperative.  That's what I got from that.
9        Q.        And then you said -- you said
10   (as read):  "I just talked it over with
11   Dinesh and he says it's absolutely necessary
12   for them to be given as much media as
13   possible.  Regardless of their attitude, he
14   thinks that it will still help."
15                 Do you see that?
16       A.        Yes.
17       Q.        What was the discussion you had
18   with Mr. D'Souza?
19       A.        Well, I told him that they were
20   not being cooperative.  And he said, you
21   know, Just try to get them, try to get them
22   to do any media.  Any media is better than no
23   media.
24                 So I think -- believe that was
25   what that was about.

CONFIDENTIAL

Page 165

1    Q.     And we talked about this a
2    little this morning.  At some point you
3    became aware that they had appeared on "The
4    Charlie Kirk Show"?
5    A.     Yes.
6    Q.     How did you become aware of
7    that?
8    A.     I believe I became aware of
9    that after the movie came out.  I don't
10   really recall exactly when.
11   Q.     And you don't recall how you
12   became aware of it?
13   A.     Dinesh must have mentioned it
14   to me.  Or -- either that or -- yeah, he must
15   have mentioned it to me.  I don't recall.
16   Q.     Do you recall any discussion of
17   the footage that Mr. Kirk showed during that
18   appearance?
19   A.     I later recall that that was
20   not our footage.
21   Q.     And how did you know it was not
22   your footage?
23   A.     Well, number one, we didn't
24   give it to him.  Number two, I believe it was
25   just -- as far as I know, it was a mule at a

CONFIDENTIAL

Page 166

1    drop box, but it was not part of

2    the -- either the trailer, the teaser

3    trailer, or the film itself.

4         Q.      And do you recall having any

5    discussion with anyone about how the footage

6    that Mr. Kirk showed was not blurred?

7         A.      That, I do not know.

8         Q.      What do you recall about any

9    discussions about blurring the identity of

10   people who appeared in the film?  And I'm

11   talking now about in the video surveillance,

12   not the whistleblowers.

13        A.      Right.  Right.

14               So I wasn't a part of that

15   conversation.  I don't know how that

16   occurred.

17               I do know that at one point,

18   even in the teaser trailer, the trailer, we

19   had to make sure that they were all blurred,

20   including -- there was someone's dog,

21   including the dog.

22               So we were just trying to be

23   very careful and very diligent about making

24   sure that the identities of these mules was

25   not -- you know, people could not recognize

CONFIDENTIAL

Page 167

1    their face.

2        Q.    Why did you not want them to be

3    recognized?

4        A.    Well, because we felt like any

5    investigation had to go through the correct

6    channels, so the law enforcement.  If they

7    wanted that video surveillance or whatever,

8    then they should -- they would get it and

9    they would, like, unblur the images and see

10   who it was.

11            But it wasn't -- it wasn't our

12   responsibility to show, you know, people, who

13   they were.  We didn't want to invade their

14   privacy that way.  So we made sure that it

15   was blurred.

16       Q.    Even though you thought they

17   were breaking the law?

18       A.    Yes.

19            MS. HABER KUCK:  I think we've

20       been going an hour.  It's probably a

21       good time for a break.

22            THE VIDEOGRAPHER:  Going off

23       the record.  The current time is 2:46.

24            (Recess taken at 2:46 p.m.,

25       resuming at a 3:06 p.m.)

Page 168

```
 1              THE VIDEOGRAPHER:  We are going
 2         back on the record.  The current time
 3         is 3:06.  This is the start for Media
 4         6.
 5         Q.      (By Ms. Haber Kuck)  Before the
 6    break we talked a little bit about the
 7    whistleblowers who were in the film.
 8         A.      Yes.
 9         Q.      To your knowledge, did anyone
10    at D'Souza Media do anything to fact-check
11    those whistleblower claims?
12         A.      Not to my recollection.
13         Q.      And were there also private
14    screenings of the film?
15         A.      When you mean "private
16    screenings," are you talking about, like,
17    before the film came out or after?
18         Q.      No, no, afterwards.  It was
19    shown in the theaters.
20         A.      Yes.
21         Q.      And then there were
22    organizations and there were --
23         A.      Yes.
24         Q.      -- people who wanted to show
25    the film --
```

CONFIDENTIAL

Page 169

1          A.      Yes.

2          Q.      -- in some other setting.

3    That's what --

4          A.      Correct.

5          Q.      -- I'm talking about.

6          A.      Yes.

7          Q.      Did you have any involvement in

8    coordinating those private screenings?

9          A.      Well, by "coordinating," they

10   asked permission to do it and I gave them

11   permission and told them that -- that there

12   would be a minimal license fee to do it, yes.

13         Q.      And were you the person who was

14   responsible for handling those requests?

15         A.      Yes.

16         Q.      And do you recall to -- to your

17   best estimate, about how many of those

18   private screenings were there?

19         A.      Gosh, I do not recall.  I can't

20   even guess.  Maybe 100, 200.  I don't -- I

21   really don't know.  I did not count.

22         Q.      And how much -- do you recall

23   how much revenue those private screenings

24   brought in?

25         A.      Not very much.  We basically

CONFIDENTIAL

Page 170

```
 1    did a -- kind of a handshake deal and said,
 2    you know, $5 a person.  You know, some of
 3    these events had maybe 50 to 100 people.  So
 4    not a lot.
 5              That I recall, there were only
 6    maybe two or three churches that had more
 7    than that, but that's about it.
 8         Q.    So would it have been, say,
 9    more than $10,000 or less?
10         A.    Total?  Probably more, yes.
11         Q.    Less than 25,000 or more?
12         A.    Maybe in that range.
13         Q.    And we also talked about the
14    revised copy of the film being sent to
15    Mr. Trump.  Do you recall that?
16         A.    Uh-huh.
17         Q.    How did that -- how were things
18    transmitted to him?  How would that film have
19    been sent to him?
20         A.    I believe that it would have
21    been Nathan sending him a link.
22         Q.    Okay.
23         A.    One of those links that you
24    send, like, it's called a screener.
25         Q.    Do you know whether it was sent
```

CONFIDENTIAL

Page 171

```
 1    to him directly or someone in his
 2    organization?
 3           A.      More than likely somebody in
 4    his organization because there was no way to
 5    get something to him directly.
 6           Q.      I'm going to mark as Exhibit 87
 7    a two-page document bearing Control No.
 8    DDR-00049514 and 49515.
 9       (Marked was Plaintiff's Exhibit No. 87.)
10           A.      (Reviewing.)
11           Q.      (By Ms. Haber Kuck)  Do you
12    recognize this document?
13           A.      I do not.
14           Q.      And I can't -- again, I can't
15    tell from it whether it's something that you
16    were copied on or not.
17           A.      No, it doesn't appear like I
18    was on this thread at all.
19           Q.      If you look towards the middle,
20    Ms. Engelbrecht says (as read):  "I can't
21    talk now.  Let's connect tomorrow when you're
22    free to talk through a few tiger traps."
23                   Do you see that?
24           A.      Uh-huh.
25           Q.      Did you ever hear her use that
```

CONFIDENTIAL

Page 172

1   term, "tiger traps"?

2        A.      I did not.

3        Q.      Do you have any understanding

4   what she meant by it?

5        A.      I do not.

6        Q.      Okay.  And then she lists three

7   things.  She talks about the murder cases.

8              Do you know what she might be

9   referring to there?

10       A.      Yes.  Earlier I talked about

11  those two murder cases in Georgia.  So those,

12  I'm assuming.

13       Q.      And was there -- was there some

14  issue that she and Mr. Phillips had about the

15  way that these murder cases were portrayed in

16  the film?

17       A.      You know, I don't know.  I

18  really don't know.  Maybe -- maybe because

19  they weren't -- they weren't investigated.

20  That could be why -- what they were talking

21  about.  I don't really know.

22       Q.      Okay.  So let's look at

23  Exhibit 88, which is -- and you can keep --

24  keep Exhibit 87 off to the side there.

25     (Marked was Plaintiff's Exhibit No. 88.)

CONFIDENTIAL

Page 173

1          Q.       (By Ms. Haber Kuck)    Exhibit 88
2     is DDR-00055999 through 56000.
3          A.       (Reviewing.)
4          Q.       This seems to be -- this is
5     another one of those chats that it says (as
6     read):  "Debbie D'Souza iPhone."
7          A.       But I'm not in the -- in the
8     chat.
9          Q.       You're -- well, you're not
10    speaking in the chat.
11         A.       Yeah.   Yeah.
12         Q.       You might have been a member of
13    the chat -- I mean, the page with 55999 seems
14    to indicate you were part of the chat.
15         A.       Yes.
16         Q.       But I recognize that you're not
17    reflected there.
18              Does reading this text from
19    Ms. Engelbrecht refresh your recollection of
20    what the issue was about the way that the
21    murder was portrayed in the film?
22         A.       Well, just from what she says,
23    it says the -- it makes it look like we
24    solved the murder, which we didn't.  So
25    that's probably what she was referring to.

CONFIDENTIAL

Page 174

1          Q.      And do you recall any
2     discussion about that issue, that the film
3     made it appear as they had -- as if they had
4     solved a murder when they hadn't?
5          A.      Well, this wasn't brought up to
6     us prior, you know, when we did the
7     screenings or the rough cut or anything like
8     that, so no.
9          Q.      So she never raised this issue
10    before until after the film came out?
11         A.      Well, yeah, this -- yes, the
12    film had already come out by now, yes.
13         Q.      Right.  And you don't recall
14    her raising this issue prior to this time
15    after the film came out?
16         A.      I do not recall, no.
17         Q.      Okay.  In that text that we
18    were looking at, Exhibit 87, there were three
19    things in that list.  The second one was
20    ACLED.
21              Does that ring any bells?
22         A.      No, actually it doesn't.  I
23    don't know what ACLED is.
24         Q.      And then the third one is (as
25    read):  "Nonmule video in the movie."

CONFIDENTIAL

Page 175

1          Do you know what she's
2    referring to there?
3          A.      I don't.  I don't.
4          Q.      And you don't recall any
5    discussion of people being in the movie who
6    were not actually mules?
7          A.      The videos of people going to
8    drop boxes?
9          Q.      Yes.  Yes.
10         A.      As far as we knew, they were
11   all mules.
12         Q.      Well, you say "we" knew.  As
13   far as...
14         A.      As far as the team, Dinesh,
15   Bruce, me, Nathan, we didn't have any reason
16   to believe they weren't mules.
17         Q.      What's your basis for saying
18   the others -- I mean, I understand you didn't
19   have any basis.
20         A.      Yes.
21         Q.      But what's your basis for
22   saying the others on the team didn't have any
23   basis for knowing that there were nonmules --
24         A.      Well, they didn't raise any --
25   any concerns.

CONFIDENTIAL

Page 176

```
 1              (Reporter clarification.)
 2        Q.       (By Ms. Haber Kuck)   -- for
 3   knowing that there were nonmules in the film?
 4        A.       Just based on I didn't hear any
 5   objection.
 6        Q.       And your understanding was that
 7   everyone portrayed in the film was a mule?
 8        A.       Correct.
 9        Q.       And your understanding of what
10   a mule was is somebody who they had
11   geotracked going to --
12        A.       Ten or more, yes.
13        Q.       -- ten or more drop boxes.
14              And we've been saying, you
15   know, not picking up ballots at nonprofits.
16              Have you ever heard the term
17   stash houses?
18        A.    I have heard the term "stash
19   houses," yes.
20        Q.       And what did you understand
21   that to mean?
22        A.       I thought it was the same
23   thing, yeah.
24        Q.       Do you have any recollection of
25   a discussion at any point about the Georgia
```

CONFIDENTIAL

Page 177

```
1    election bureau ruling on a complaint
2    involving the plaintiff in this case,
3    Mr. Andrews?
4         A.    I did not know about any of
5    that until after we were served papers.
6         Q.    But when you say "after we were
7    served papers," you mean after the lawsuit
8    was --
9         A.    After the lawsuits, correct.
10        Q.    This lawsuit was filed?
11        A.    Correct.
12        Q.    And you -- your testimony is
13   you didn't know anything about that until
14   later down the road?
15        A.    Correct.
16        Q.    And did you have a discussion
17   with anyone about that subject once the
18   lawsuit was filed?
19        A.    Well, after -- yes, after the
20   lawsuit was filed, Dinesh and I spoke about
21   it.
22        Q.    And what did you discuss?
23        A.    We said, you know, What
24   happened?  You know, we were very -- we were
25   very sure that any footage that we had in the
```

CONFIDENTIAL

Page 178

1    film, you know, made sure that none of the

2    mules were ever exposed.

3              And as I told you, we -- we

4    assumed that everything that was given to us

5    was given us -- given to us in the

6    correct -- for the correct criteria.  So we

7    had no reason to believe anybody was not what

8    they portrayed to be -- or what they were

9    portrayed to be by True the Vote.

10              So we were -- I was quite

11   surprised.

12        Q.    Except that this text from

13   Ms. Engelbrecht in May of 2022, right after

14   the film came out, does talk about nonmule

15   video in the movie.

16              Do you see that?

17        A.    Right, but I didn't see that.

18        Q.    Yeah.

19        A.    Yeah.

20        Q.    So I'm saying you don't recall

21   any discussion about that?

22        A.    I -- I do not, no.

23        Q.    Okay.  And you don't recall

24   having any discussion with Mr. D'Souza about

25   that subject until after the litigation was

1    filed?

2         A.      Correct.

3         Q.      Are you aware of any evidence

4    that Mr. Andrews, the plaintiff in this case,

5    went to ten drop boxes?

6         A.      I don't know.

7         Q.      Do you have any evidence that

8    he visited any alleged stash house?

9         A.      Do I have any evidence?

10        Q.      Yeah, you.

11        A.      No.

12        Q.      Okay.

13        A.      No, I --

14        Q.      You can't -- you can't cite

15   anything?

16        A.      No.

17        Q.      Okay.  How about do you have

18   any evidence that you can cite of him being

19   paid to deliver ballots?

20        A.      No.

21        Q.      And did you have any

22   understanding that in Georgia it was legal

23   for family members to deposit ballots?

24        A.      Yes, and Dinesh even says it in

25   the film.

CONFIDENTIAL

Page 180

1        Q.      In the -- we talked a little
2    bit about the graphics that were used in the
3    film earlier.
4                Did you have any role in those
5    graphics being prepared?
6        A.      Not at all.
7        Q.      Did you ever come to hear that
8    the maps that were used in the film were of
9    Moscow, not Atlanta?
10       A.      I heard about that later, but I
11   had no idea.  I had no role in that, so I
12   really didn't know where they came from.
13       Q.      Okay.  And do you have
14   any -- did you ever, when you found this out,
15   develop any understanding that -- why the
16   graphic of a city that was actually in the
17   geospatial research wasn't used?
18       A.      No, I don't know -- I don't
19   know if it was based on just, you know, the
20   aesthetics of the graphics.  I really don't
21   know.
22                I can't speak for Nathan or
23   Frank.  I think Frank is the one that did it.
24   I don't -- I really don't know.
25       Q.      Okay.  So we would have to ask

CONFIDENTIAL

Page 181

1   Nathan or Frank about the graphics?

2        A.      You would have to ask them,

3   yeah.

4        Q.      We had talked earlier about at

5   some point in time, in the fall of 2021 when

6   you were talking about doing this movie, you

7   had seen maps that Mr. Phillips had of the

8   mules moving around the city.

9              Do you recall that?

10       A.      Yes.

11       Q.      Were those maps used in the

12  film?

13       A.      I don't think they were, no.

14       Q.      And so the maps that appear in

15  the film are not the ones that you saw from

16  Mr. Phillips?

17       A.      No.

18       Q.      Would you say that the film was

19  a success?

20       A.      Well, if you -- it depends on

21  what you mean by success.  Do you mean

22  monetary success or do you mean that it

23  raised awareness?

24       Q.      I guess I would ask you what

25  your definition of "success" would be.

CONFIDENTIAL

Page 182

1          A.        Well, for us, any successful

2    documentary is basically raising awareness to

3    an issue that is dire or warrants it.

4                    When we make these

5    documentaries, we typically don't make money

6    on the documentaries.  We -- our aim is to

7    break even.  Dinesh calls it recycled

8    philanthropy because people that -- with the

9    exception of "2000 Mules" because it was

10   funded by Salem.  But when we do other

11   documentaries and we get investors, we just

12   put our money back in and do another one and

13   do another one.

14                   And so if it raised awareness

15   that there is a definite issue with our

16   election system and the way people vote,

17   then, yes, I believe it was a success because

18   it made people aware that there -- that there

19   is such a problem.

20                   And as I told you before, I'm

21   very passionate about elections and I want

22   people to make their vote count, regardless

23   of who they are voting for.

24                   Obviously, I want them to vote

25   for my candidate, but I don't want anybody to

CONFIDENTIAL

Page 183

1    be disenfranchised from voting.  And I feel
2    like anytime there is any election
3    irregularity or shenanigans, as I called it
4    earlier, that it takes away from a real vote.
5              And so I believe that this
6    raised awareness that there was a problem in
7    2020 with drop boxes, with mules, you know,
8    doing this, with people not -- a lot of
9    people didn't even know that this was
10   happening.  And so the awareness that it was
11   happening was a success.
12             Would I have liked for there to
13   have been, like, a follow-up with law
14   enforcement and these people held accountable
15   or responsible for what happened and maybe
16   even confessed, you know, who was -- who
17   hired you, you know, where did -- you know,
18   who is responsible for you doing this?  I
19   would have loved that.  But, unfortunately,
20   that didn't take place.
21             So, in that sense, then I think
22   that, unfortunately, it didn't do what I,
23   myself -- and I'm speaking for just me -- I
24   would have wanted to see.
25        Q.    And you said usually you break

CONFIDENTIAL

Page 184

1    even on these movie.  This one you actually

2    did make a profit.  Right?

3         A.    We did make a profit.  Yes.

4         Q.    Do you recall how much?

5         A.    I think it was about 8 or 9

6    million.

7         Q.    And have you ever read the

8    "2000 Mules" book?

9         A.    I read some of it, yes.

10        Q.    There's some -- there is some

11   discussion in there about how we know that

12   the -- well, strike that.

13             There is some -- there is some

14   discussion there about whether the "2000

15   Mules" resulted in the 2020 election being

16   for Mr. Biden rather than Mr. Trump.

17             Do you recall that?

18        A.    Yes.

19        Q.    What evidence do you have that

20   any cheating in the 2020 election was in

21   favor of the democrats?

22        A.    What evidence do I have?

23        Q.    Yeah.

24        A.    Well, based on the geotracking

25   and the mules and what they did, you know,

Page 185

1    depending on how many -- if they deposited a

2    number of ballots, they were added up.  And I

3    believe there was some talk about there being

4    a kind of an estimate.  There was a

5    conservative estimate and a more liberal

6    estimate.  And the conservative estimate was

7    actually five drop boxes, not ten.

8                And so based on that, I believe

9    that it would have been -- Biden would have

10   won three states out of the five and -- or,

11   no, I'm sorry -- Trump would have won three

12   states out of the five.  He would have lost

13   two.  And I can't recall which two that he

14   would have lost.  I think Michigan and

15   Wisconsin, maybe.

16               But anyway, so based on that

17   math, Dinesh used that math to come up with

18   that answer.

19        Q.    And I have just two follow-ups

20   on that.

21               So you're talking about they

22   would have lost --

23        A.    The electoral.

24        Q.    But was there any study done of

25   the -- of any potential cheating in the

CONFIDENTIAL

Page 186

1    states that Mr. Trump won?

2         A.    Well, no, I don't think -- I

3    don't think that they went after these mules

4    to get that answer.

5         Q.    Okay.

6         A.    So based on the information

7    provided by True the Vote, that is how we did

8    it.

9         Q.    Right.  And True the Vote only

10   looked at states that Mr. Trump lost?

11        A.    The five key states, yes.

12        Q.    Yeah.  Yeah.  So they didn't

13   look at the states where Mr. Trump won to see

14   if there were any irregularities there?

15        A.    Not that I know of.

16        Q.    Okay.  And how do we -- well,

17   strike that.

18              Where does the conclusion that

19   any ballots that were deposited by mules, how

20   do we know that they were for Mr. Biden

21   rather than Mr. Trump?

22        A.    Well, I believe that the way

23   they determined that is that some of the

24   geotracking that they used, some of these

25   people were also involved in some of the

Page 187

1    riots that were clearly not for Trump.

2         Q.      And what do you recall about

3    the geotracking evidence they had about the

4    riots?

5         A.      What do I recall about it?

6         Q.      Yeah.

7         A.      Well, just that some of these

8    people that they geotracked were also in

9    these riots.

10        Q.      And how did they know that?

11        A.      Just cell phone data, I

12   believe.  The cell phone number or however

13   you, you know, scientifically track a cell

14   phone.  So the same cell phone.

15        Q.      And you got that information

16   from Mr. Phillips and Ms. Engelbrecht?

17        A.      Yes.

18        Q.      Was that information ever fact-

19   checked by D'Souza Media?

20        A.      No.

21        Q.      Following the -- following the

22   movie, did you do any other work with respect

23   to ballot mules?

24        A.      No.

25        Q.      Let's mark as Exhibit 89 a

CONFIDENTIAL

Page 188

```
 1    document bearing Control No. DDR-00018795
 2    through 18796.
 3        (Marked was Plaintiff's Exhibit No. 89.)
 4        A.      (Reviewing.)  Okay.
 5        Q.      (By Ms. Haber Kuck)  Do you
 6    recognize this document?
 7        A.      Yes.
 8        Q.      What is it?
 9        A.      So a gentleman came to us, I
10    believe it was last year, and told us that he
11    was an undercover person for Project Veritas
12    and told us that he had information that
13    someone told him that he knew that the "2000
14    Mules" documentary was not -- shouldn't have
15    been debunked because it was real.
16             Now, just so you know, we did
17    not go forward with this information.  We
18    didn't do a documentary about this or want to
19    do one about this because, again, this
20    person, you know, I guess, wanted us to do a
21    follow-up and we did not.
22        Q.      Who was Project Veritas?
23        A.      So it was James O'Keefe's old
24    nonprofit organization.
25        Q.      And did Project Veritas and
```

CONFIDENTIAL

Page 189

1    Mr. O'Keefe have any involvement in the "2000

2    Mules" film?

3            A.      No.

4            Q.      Mr. O'Keefe attended the

5    premier at Mar-a-Lago.  Correct?

6            A.      Yes.

7            Q.      And so -- so what became of

8    this email chain?

9            A.      What became of it?

10           Q.      Yeah.

11           A.      Not a whole lot.  We didn't do

12   anything further.

13           Q.      Did he ever come back to you

14   and say, I found a mule?

15           A.      No.

16           Q.      And who was this -- the email

17   is from Ant W.  Do you know who that person

18   is?

19           A.      Yes.

20           Q.      Who is that?

21           A.      His name is Tony Wray.

22           Q.      And there is also a -- in this

23   chain is someone, Tierra Talks.  Do you know

24   who that is?

25           A.      Yes, she is -- and I don't know

CONFIDENTIAL

Page 190

1    her real name.  That's a, like, fake name, I
2    guess.
3                    She is another person that does
4    undercover work or did undercover work for
5    Project Veritas.
6          Q.    Okay.  And Project Veritas has
7    since gone out of business.  Right?
8          A.    Correct.  They --
9          Q.    Well, Mr. O'Keefe has left
10   Project Veritas?
11         A.    Yes.
12         Q.    And was this before or after he
13   left?  Do you remember?
14         A.    This was after.
15         Q.    Okay.  And so these people were
16   still at Project Veritas?
17         A.    I believe they were gone as
18   well.
19         Q.    Okay.  So since the movie has
20   come out, have you heard from anyone else who
21   gave you credible evidence of the mule
22   conspiracy?
23         A.    No.
24                    MS. HABER KUCK:  Why don't we
25         take a break.  I'm not sure I have

CONFIDENTIAL

Page 191

1          anything else.

2                    THE VIDEOGRAPHER:  Going off

3          the record.  The time is 3:34.

4                    (Recess taken at 3:34 p.m.,

5          resuming at 3:46 p.m.)                      0

6                    THE VIDEOGRAPHER:  We are going

7          back on the record.  The current time

8          is 3:46, and this is the start for

9          Media 7.

10                    MS. HABER KUCK:  And can the

11         videographer tell me how long we've

12         been going?

13                    THE VIDEOGRAPHER:  I can't do

14         that on record.

15                    MS. HABER KUCK:  Okay.  Okay.

16         Q.     (By Ms. Haber Kuck)  Let me

17     show you one more exhibit that's been marked

18     as Exhibit 90.

19        (Marked was Plaintiff's Exhibit No. 90.)

20         Q.     (By Ms. Haber Kuck)  Bears the

21     Control No. DDR-00031134.

22                    Do you recognize this document?

23         A.     (Reviewing.)  Yes.

24         Q.     And what is it?

25         A.     So Matthew DeSilva was our --

CONFIDENTIAL

Page 192

1    kind of like he would watch the podcast and

2    send us podcast ideas and make sure that, you

3    know, if there was any technical issues with

4    a podcast that he would notify us because we

5    don't watch the podcast ourselves after doing

6    it.

7                   And I think he may have asked

8    about what happened with the Tucker interview

9    and why it didn't happen.  And so that's -- I

10   told him, It's a long story with Tucker.

11   Maybe someday over dinner.  You know, I

12   didn't want to go into it.

13         Q.       Right.

14         A.       But that's what that was about.

15         Q.       And so we talked about that

16   earlier, that the teaser trailer was

17   originally going to be shown -- you expected

18   it would be shown on Mr. Carlson's show.  It

19   ultimately was not.

20         A.       Yes.

21         Q.       And then Ms. Engelbrecht,

22   though, later appeared on the program about

23   the time the movie was coming out.  Correct?

24         A.       Yes.

25         Q.       And there was -- well, there

CONFIDENTIAL

Page 193

```
 1    was some -- he showed some footage when she
 2    was on the program.
 3                  Do you know where that footage
 4    came from?
 5         A.     It had to have come from them
 6    because it did not come from us.
 7         Q.     Okay.  And do you recall some
 8    discussion about how she did not mention the
 9    title of the movie during her appearance?
10         A.     Right.  So she -- anytime she
11    went on any show, she didn't talk about "2000
12    Mules" at all.
13         Q.     Do you know what -- was --
14    well, so what was the -- what was the long
15    story about Tucker and the mules you were
16    going to tell him over dinner?
17         A.     It was about that, that they
18    didn't want to talk about the movie, the
19    documentary.  And so if they showed any
20    footage -- and this is back with the teaser
21    trailer -- they wanted to chop it off so that
22    only the videos were shown and not the
23    beginning and the ending of the teaser
24    trailer and no mention of "2000 Mules."
25                  So that was -- that was the
```

1    story.

2         Q.    Not a very long story.

3         A.    It's not -- well, I mean, you

4    know, then there were -- there were other --

5    other, you know, like, arguments maybe that

6    one of the producers had with Dinesh.  But I

7    wasn't involved in that, so...

8                   That was probably what that was

9    about.

10        Q.    What was your understanding

11   about why they weren't allowed to mention the

12   title of the film?

13        A.    I think that they were going

14   through -- I think they were going through

15   some litigation about some lawsuit with

16   Dominion Machines.  And I think that they

17   just -- Fox News -- I can't speak for Fox

18   News, but I'm assuming that that's why they

19   didn't want to talk about anything to do with

20   voter integrity or -- or anything to do with

21   that.

22        Q.    Although Mr. Carlson had

23   Ms. Engelbrecht on to talk about voter

24   integrity, she just didn't mention the movie.

25        A.    Yeah.  And I don't know, I

CONFIDENTIAL

Page 195

```
 1   can't speculate why.
 2         Q.      Okay.
 3         A.      I don't know.
 4         Q.      Do you recall any conversations
 5   with Mr. D'Souza about what was going on with
 6   Fox News and the movie?
 7         A.      I'm sure we had some, but I
 8   can't really recall exactly.
 9         Q.      You don't recall anything more
10   about this issue than what you've already
11   told me?
12         A.      Not that I recall.
13              MS. HABER KUCK:  Okay.  So I
14         have nothing further at this time.  We
15         have some ongoing issues with your
16         counsel about document production and
17         we've been reserving our rights, so
18         we'll continue to do that.  But I'm
19         finished for the time being.
20              THE WITNESS:  Okay.
21              MS. HABER KUCK:  And I don't
22         know if your counsel or --
23              MS. HYLAND:  I think I'm going
24         to have a little bit of redirect, but
25         I would like a quick break before I do
```

1          that.

2                 MS. HABER KUCK:  Okay.  And I

3          don't know if Mr. Evans is going to

4          have anything.

5                 MR. EVANS:  I just have a

6          couple.

7                 MS. HABER KUCK:  All right.  So

8          I guess you would go first --

9                 MR. EVANS:  Yes.

10                 MS. HABER KUCK:  -- and then --

11                 MS. HYLAND:  Yeah, I think

12          he --

13                 MS. HABER KUCK:  -- Ms. Hyland.

14                 MS. HYLAND:  Yeah.

15                 MS. HABER KUCK:  Okay.  So

16          let's go off the record.

17                 THE VIDEOGRAPHER:  Going off

18          the record.  The current time is 3:52.

19                 (Recess taken at 3:52 p.m.,

20          resuming at 4:10 p.m.)                    0

21                 THE VIDEOGRAPHER:  We are going

22          back on the record.  The current time

23          is 4:10.  This is the start for Media

24          8, and we have been on the

25          record -- we have been on the record

Page 197

1          for 3 hours and 41 minutes.

2                    MR. EVANS:  All right.  Good.

3          I just have one little thing to

4          clarify.

5                         EXAMINATION

6     BY MR. EVANS:

7          Q.      My name is Jake Evans.  We met

8     earlier.  I represent True the Vote,

9     Ms. Engelbrecht, and Mr. Phillips.

10                    So earlier you said -- you were

11    talking about Tucker Carlson, the interview.

12    You said the video had to have came from True

13    the Vote.

14                    Could it have came somewhere

15    else other than True the Vote, the clips that

16    were referenced in that interview?

17         A.      Are you talking about the

18    teaser trailer that I sent them or are you

19    talking about the interview that happened way

20    later?

21         Q.      So I'm talking about the

22    interview that happened later, that

23    Ms. Engelbrecht appeared on "The Tucker

24    Carlson Show."

25         A.      Well, I'm assuming it came from

CONFIDENTIAL

Page 198

1    True the Vote because she was the one being
2    interviewed.
3         Q.    And other -- do you have any
4    evidence to support that assumption or is it
5    just an assumption?
6         A.    It's an assumption.
7         Q.    So it could have came from
8    someone other than Ms. Engelbrecht,
9    Mr. Phillips, or True the Vote.  Is that
10   right?
11        A.    I guess it could have.
12        Q.    So sitting here today, your
13   statement that it had to have came from True
14   the Vote was just an assumption.  Right?
15        A.    Because she was the one being
16   interviewed, yes.
17        Q.    And just to make the record
18   clear here, other than your assumption and no
19   evidence, you don't have anything to connect
20   any of the videos shown on "The Tucker
21   Carlson Show" with Ms. Engelbrecht,
22   Mr. Phillips, or True the Vote, do you?
23        A.    No, it was my assumption.
24        Q.    Okay.
25             MR. EVANS:  That's all I have.

CONFIDENTIAL

Page 199

1          Thank you.

2                    THE WITNESS:  Okay.

3          (Following commenced at 4:12 p.m.)

4                    EXAMINATION

5     BY MS. HYLAND:

6          Q.     I'm going to -- I'm actually

7     going to piggy-back right off Mr. Evans.

8                    On "The Tucker Carlson" video

9     footage issue, are you aware of any entity or

10    person other than True the Vote and people

11    associated with True the Vote or D'Souza

12    Media and people associated with D'Souza

13    Media who would have had the mule footage?

14                    Is there any -- is there any

15    other entity that would have had it to give

16    it to Tucker Carlson?

17         A.     Not that I know of.  Not that

18    I'm aware of.

19         Q.     Okay.  So is that why you --

20         A.     That's why I assumed, yes.

21         Q.     Okay.  Earlier today Ms. Kuck

22    asked you about the profit from the film and

23    you mentioned, I think, a profit of 8 to 9

24    million.

25                    Do you remember that?

CONFIDENTIAL

Page 200

1          A.      Yes.

2          Q.      Was that the overall profit for

3     the film or was that the profit made by

4     D'Souza Media?

5          A.      That was the overall profit of

6     the entire film.

7          Q.      And who -- who -- what entities

8     would have split that profit?

9          A.      So it would have been Salem,

10    Bruce Schooley, Dinesh, True the Vote,

11    Catherine and Gregg of True the Vote.

12             I believe it was a small -- a

13    small amount to Nathan, I guess you call it

14    points to Nathan.

15             I think that's it.  Yeah.

16         Q.      Okay.  I also want to go back

17    to the reason that the clip of Mark Andrews

18    made it into the film to begin with.

19         A.      Uh-huh.

20         Q.      You had mentioned earlier that

21    you don't personally have any evidence that

22    Mark Andrews was a mule.

23             In light of that, how is it

24    that Mark Andrews' clip, or any particular

25    clip of any mule, wound up in the film?

Page 201

```
 1        A.      Well, after, you know, various
 2   meetings that we had with True the Vote, we
 3   were very specific about any footage that
 4   came into the film, that it would have to
 5   meet all the criteria that we talked about.
 6               So we had no reason to think
 7   that Mr. Andrews or any other mule was not a
 8   mule, because that was the criteria that we
 9   were very specific about.
10        Q.      When you're talking about
11   criteria, what was the criteria?
12        A.      Ten or more drop boxes and
13   going to these so-called stash houses or
14   NDOs.
15        Q.      And were you present when that
16   criteria was discussed?
17        A.      Yes.  At the various meetings,
18   yes.
19        Q.      And which meetings were those?
20        A.      At our house.  Then later at
21   probably a Zoom.  And then later with Salem.
22        Q.      Okay.  So you remember --
23        A.      So about three, yeah.
24        Q.      Three meetings?
25        A.      Uh-huh.
```

CONFIDENTIAL

Page 202

1        Q.      And would it have been possible

2    for D'Souza Media to independently

3    corroborate or fact-check the use of any

4    particular surveillance footage in the film?

5        A.      No, because we're not experts.

6    We're not geotracking experts or video

7    surveillance experts, so we relied on the

8    expertise of True the Vote to do this

9    fact-checking and to make sure that it was

10   accurate.

11       Q.      And were you ever aware of any

12   reason to doubt that Mr. Andrews was actually

13   a mule during the production process of this

14   film?

15       A.      I do not recall him

16   specifically, but I was not -- I did not

17   think that any of these mules were not mules.

18   I thought that they were all mules, with the

19   specific criteria.

20       Q.      And we were talking about

21   Exhibit -- I believe it was Exhibit 89 was

22   emails involving someone named Ant W.  And I

23   believe you said that Ant W. was actually

24   someone named Tony.  Is that right?

25       A.      Tony Wray, yes.

Page 203

1        Q.      And I know you said that Tony
2    never found a mule or wasn't able to get any
3    undercover footage with a mule.  Right?
4        A.      Correct.
5        Q.      Did Tony ever come to D'Souza
6    Media with anything related to mules?
7        A.      Yes.  He has a video of a
8    person talking about mules, yes.
9        Q.      Can you tell me a little more
10    about that?
11        A.      So that video he sent -- he
12    sent us, which we have possession of, of this
13    person who I think he worked at one of the
14    nonprofits, and he mentioned that he knew --
15    or he thought he knew who these mules were.
16    And he pretty much corroborated the "2000
17    Mules" documentary, undercover.
18        Q.      So Tony was undercover?
19        A.      Tony was undercover, yes.
20        Q.      And who was -- and who was he
21    talking to again?
22        A.      So he was talking to -- I
23    believe he was either the head or one of
24    the -- one of the managers of this nonprofit.
25        Q.      Okay.

CONFIDENTIAL

Page 204

1          A.      But we didn't do anything
2     further with that video.
3          Q.      Okay.   It never made it into
4     any other film?
5          A.      No.
6          Q.      And it never was referenced on
7     the podcast?
8          A.      No.
9          Q.      Okay.   Last question for me.
10               You mentioned that
11     Catherine -- or maybe it wasn't you.   Maybe
12     it was actually Ms. Kuck.
13               But someone mentioned that
14     Catherine never mentioned the title of the
15     film when she went on "The Tucker Carlson
16     Show."
17               To the best of your memory, did
18     either Ms. Engelbrecht or Mr. Phillips
19     mention the title of the film when they went
20     on "The Charlie Kirk Show"?
21          A.      To my recollection, no.
22          Q.      Do you have any specific memory
23     of them promoting "2000 Mules" in any media
24     appearance?
25          A.      No, I don't.   I don't think

CONFIDENTIAL

Page 205

1    they did.

2          Q.      And do you have any opinion on

3    why that would be?

4          A.      Well, it would be just my

5    opinion.  I don't know for a fact, but my

6    opinion is that they did not -- they were

7    upset that the documentary was a D'Souza

8    Media documentary and not a True the Vote

9    documentary; and I think they wanted a little

10   bit -- or felt like they didn't have enough

11   credit and so they wanted to go off kind of

12   rogue and talk about their work and their

13   findings without making reference to the

14   film.

15         Q.      And when you say that they were

16   upset that they didn't get enough credit, was

17   there anything that happened that led you to

18   believe that they felt like they weren't

19   getting enough credit?

20         A.      Well, I had no idea until

21   Bettina came to us and told us.  As I said --

22   as I stated earlier, I was a little hurt that

23   Catherine didn't come to me directly and say,

24   Hey, you know, why is it that everybody is

25   talking about Dinesh's movie and not True the

CONFIDENTIAL

Page 206

1    Vote's movie or whatever.  She never came to

2    me to ask that.

3              So I was kind of caught off

4    guard when that happened.  And so that's why

5    I assumed that she didn't want to promote it

6    was based on that.

7         Q.    Okay.

8              MS. HYLAND:  I don't have

9         anything further.

10    (Following commenced at 4:20 p.m.)         0

11              FURTHER EXAMINATION

12    MS. HABER KUCK:

13         Q.    I just have two things.

14         A.    Yes.

15         Q.    You said you relied on the

16    expertise of True the Vote for the

17    geotracking information?

18         A.    Yes.

19         Q.    What is that expertise?

20         A.    Well, the expertise was the

21    fact that they -- they got these pings,

22    right, and so they had all of this data that

23    they compiled.

24              And so I -- Gregg Phillips, you

25    would have to ask him specifically what his

CONFIDENTIAL

Page 207

1    expertise is, but it's not our expertise.  So

2    that's why I said we used their data that we

3    did not have to do it.

4         Q.    But my question to you is, your

5    understanding, you relied on him?

6         A.    Yes.

7         Q.    Why were you relying on him?

8    What did you understand him to have expertise

9    in that was different from your expertise?

10        A.    Well, I'm not an expert at

11   geotracking.

12        Q.    Okay.  And what makes him an

13   expert at geotracking?

14        A.    Well, it's the way he showed us

15   that, you know, what he did and

16   cross-referencing it to the New York Times

17   article that came out and that data.

18             And I specifically don't

19   remember what that was, but it -- I had no

20   reason to doubt him.  You know, he showed us

21   the pings and where they were and so --

22             Because I -- because I go back

23   with Catherine, I know that all her work was

24   very solid, I would have no reason to believe

25   that this wasn't, you know, fact.

CONFIDENTIAL

Page 208

```
1          Q.     But what reason did you have to
2     believe that it was a legitimate research
3     project?
4          A.     Well, because -- I don't
5     know -- I don't know how to answer that
6     question without, you know, sounding like,
7     you know, kind of a complete dummy at these
8     things.
9               I don't -- I don't understand
10    geotracking and so he made it very -- he made
11    it sound very credible.  And I know that
12    he -- the company that he works for did this
13    type of thing as well.
14              So, you know, I just assumed
15    that that was on track, correct, or
16    whatever -- whatever you want to call it.
17         Q.     So you found -- you found his
18    presentation to be credible?
19         A.     Very cre- -- yes.
20         Q.     And that's what you were
21    relying on?
22         A.     Yes.
23         Q.     And when you say "the company
24    he works for," what company are you referring
25    to?
```

CONFIDENTIAL

1         A.        OpSec.

2         Q.        And are you aware of anyone

3    other than Mr. Phillips, who is employed by

4    OpSec?

5         A.        I'm not aware.  I don't know

6    them, no.

7         Q.        Okay.  And do you even know

8    where their offices are?

9         A.        As far as I remember, he said

10   that they had kind of covert offices here and

11   there, just different places, but not a

12   specific location.  So I don't think they had

13   an actual brick-and-mortar office.

14        Q.        Okay.  But are you able to

15   point me to any credentials of Mr. Phillips

16   that you are aware of that would cause him to

17   be qualified as an expert in this area of

18   geospatial analysis?

19        A.        I am not.  No, I can't point to

20   anything.  I'm pretty sure that we looked at

21   documents and saw -- saw some data and, you

22   know, that kind of thing, but I don't have

23   them with me, so I can't speak for that.

24        Q.        And I'm talking about

25   Mr. Phillips specifically.  You can't point

CONFIDENTIAL

Page 210

1    me to any credentials that he has which would

2    make him an expert in this, other than he

3    gave you a convincing presentation?

4          A.    Well, I think he had

5    documentation with him of things that he had

6    worked on.

7          Q.    Right.

8          A.    Yes.

9          Q.    But my question is, what

10   qualified him to be an expert, other than he

11   showed you things?

12         A.    I don't know.

13         Q.    Okay.  And for all the years

14   that you dealt with Ms. Engelbrecht, do you

15   have any information as to what would make

16   her an expert in this area?

17         A.    In geotracking?

18         Q.    Uh-huh.

19         A.    No.

20         Q.    Okay.  So you're only relying

21   on Mr. Phillips, essentially?

22         A.    Yes.

23         Q.    And, finally, you talked to

24   Ms. Hyland about Tony Wray and how he had

25   something that corroborated the mule story.

CONFIDENTIAL

Page 211

1           When did you receive that

2    information?

3        A.    I want to say maybe a year ago.

4        Q.    So long after the movie --

5        A.    Yes.

6        Q.    -- was completed?

7        A.    Yes.

8              MS. HABER KUCK:  Okay.  I have

9        nothing further.

10             THE WITNESS:  Okay.

11             MR. EVANS:  Nothing for me.

12             THE VIDEOGRAPHER:  Going off

13        the record.  The current time is 4:25.

14        This concludes today's depo, and the

15        number of media used was 8.

16    (Proceedings concluded at 4:25 p.m.)

17                   *   *   *

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 212

1            CHANGES AND SIGNATURE

2      VIDEOTAPED / REALTIMED DEPOSITION OF

            DEBORAH C. D'SOUZA

3            OCTOBER 16, 2024

4    PAGE      LINE        CHANGE              REASON

5    _____    _____    _____    _____

6    _____    _____    _____    _____

7    _____    _____    _____    _____

8    _____    _____    _____    _____

9    _____    _____    _____    _____

10   _____    _____    _____    _____

11   _____    _____    _____    _____

12   _____    _____    _____    _____

13   _____    _____    _____    _____

14   _____    _____    _____    _____

15   _____    _____    _____    _____

16   _____    _____    _____    _____

17   _____    _____    _____    _____

18   _____    _____    _____    _____

19   _____    _____    _____    _____

20   _____    _____    _____    _____

21   _____    _____    _____    _____

22   _____    _____    _____    _____

23   _____    _____    _____    _____

24   _____    _____    _____    _____

25   _____    _____    _____    _____

Page 213

```
               CHANGES AND SIGNATURE
1                DEBORAH C. D'SOUZA
2                      Page 2
3        PAGE        LINE         CHANGE              REASON
4        _____     _____     _____   _____
5        _____     _____     _____   _____
6        _____     _____     _____   _____
7        _____     _____     _____   _____
8        _____     _____     _____   _____
9        _____     _____     _____   _____
              I, DEBORAH C. D'SOUZA, have read
10       the foregoing deposition and hereby affix my
         signature that same is true and correct,
11       except as noted above.
12
              _____
13                    DEBORAH C. D'SOUZA
14       THE STATE OF_____:
         COUNTY OF_____:
15
              BEFORE ME, _____,
16       on this day appeared DEBORAH C. D'SOUZA,
         known to me or proved to me on the oath of
17       _____ or through
         _____ [description of identity
18       card or other document] to be the person
         whose name is subscribed to the foregoing
19       instrument and acknowledged to me that they
         executed the same for purposes and
20       consideration therein expressed.
21              Given under my hand on this
         _____ day of _____, 2024.
22
23
              Notary Public in and for the
24            State of _____
              My commission expires: _____
25       Job No.: 6963189
```

Page 214

1    COUNTY OF HARRIS )
2    STATE  OF  TEXAS )
3           REPORTER'S CERTIFICATION
4        I, Pat English-Arredondo, CSR (TX),
5    RMR, CRR, CLR, Certified Shorthand Reporter
6    in and for the State of Texas, hereby certify
7    that this transcript is a true record of the
8    testimony given and that the witness was duly
9    sworn by the officer.
10       I further certify that I am neither
11   attorney nor counsel for, related to, nor
12   employed by any of the parties to the action
13   in which this testimony was taken.  Further,
14   I am not a relative or employee of any
15   attorney of record in this cause, nor do I
16   have a financial interest in the action.
17       Subscribed and sworn to on this the 30th
     day of October, 2024.
18
19                 *Pat English-Arredondo*
                   Pat English-Arredondo,
20                 CSR (TX), RMR, CRR, CLR
                   Expiration Date:  4/30/2026
21
     Local Affiliate Reporter for:
22   Veritext New York Reporting Co.
     200 Old Country Road, Suite 580
23   Mineola, New York 11501
     Phone:  212.267.6868
24   Toll Free:  800.727.6396
25   Job No. 6963189

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.