# EXHIBIT 18

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
 2                  ATLANTA DIVISION
 3    MARK ANDREWS,          |
                             |
 4     Plaintiff,            |
                             |     Case No.
 5    V.                     |     1:22-cv-04259-SDG
                             |
 6    DINESH D'SOUZA, et     |
      al.,                   |
 7                           |
       Defendants.           |
 8
 9     *********************************************
      CONFIDENTIAL ORAL AND VIDEOTAPED DEPOSITION
10                         OF
                  CATHERINE ENGELBRECHT
11                 SEPTEMBER 18, 2024
       *********************************************
12
          ORAL AND VIDEOTAPED DEPOSITION of
13    CATHERINE ENGELBRECHT, produced as a witness
      at the instance of the Plaintiff, and duly
14    sworn, was taken in the above-styled and
      numbered cause on September 18, 2024, from
15    9:33 a.m. to 6:42 p.m., before Mendy A.
      Schneider, CSR, RPR, in and for the State of
16    Texas, recorded by machine shorthand, at the
      offices of Greenberg Traurig LLP,
17    1000 Louisiana, Houston, Texas, pursuant to
      the Federal Rules of Civil Procedure and the
18    provisions stated on the record or attached
      hereto; that the deposition shall be read and
19    signed.
20
21
22
23
24
25
```

Page 2

1                     A P P E A R A N C E S
2       FOR THE PLAINTIFF:
          LEA HABER KUCK
3         QUINN BALLIETT
          SONIA QIN
4         SKADDEN ARPS SLATE MEAGHER & FLOM LLP
          One Manhattan West
5         New York, New York 10001-8602
          lea.kuck@probonolaw.com
6
7       FOR THE DEFENDANTS TRUE THE VOTE, GREGG
        PHILLIPS, AND CATHERINE ENGELBRECHT:
8         JAKE EVANS
          GREENBERG TRAURIG LLP
9         3333 Piedmont Road NE
          Atlanta, Georgia 30305
10        678.553.2342
          Jake.Evans@gtlaw.com
11
12      FOR THE DEFENDANTS DINESH D'SOUZA AND D'SOUZA
        MEDIA:
13        AMANDA G. HYLAND
          AUSTIN C. VINING (Remote)
14        BUCHALTER
          404.832.7534
15        404.304.0039
          ahyland@buchalter.com
16
17      ALSO PRESENT:
         SAM SWAIN, The Videographer
18
19
20
21
22
23
24
25

Page 3

1                    EXAMINATION INDEX
2     WITNESS:  CATHERINE ENGELBRECHT
3     EXAMINATION                                  PAGE
       BY MS. KUCK                                   8
4      BY MS. HYLAND                               348
5     SIGNATURE REQUESTED                          358
6     REPORTER'S CERTIFICATION                     359
7                      EXHIBIT INDEX
8                                                  PAGE
      PLAINTIFFS DEP EXHIBIT NO. 30                 35
9      True the Vote's Second Amended
      Responses to Plaintiff's First Set
10     of Interrogatories
11    PLAINTIFFS DEP EXHIBIT NO. 31                 35
       Catherine Engelbrecht's second
12    amended responses to plaintiff's
      first set of interrogatories
13
      PLAINTIFFS DEP EXHIBIT NO. 33                 79
14     E-mail
15    PLAINTIFFS DEP EXHIBIT NO. 32                 89
       Screenshot
16
      PLAINTIFFS DEP EXHIBIT NO. 34                 97
17     Agenda from the state board of
      election Georgia Secretary of
18    State
19    PLAINTIFFS DEP EXHIBIT NO. 35                101
       E-mail Chain
20
      PLAINTIFFS DEP EXHIBIT NO. 36                136
21     OpenTable Reservation
22    PLAINTIFFS DEP EXHIBIT NO. 37                142
       E-mail with Attachment
23
      PLAINTIFFS DEP EXHIBIT NO. 38                146
24     E-mail and Exclusive License and
      Nondisclosure Agreement
25

Page 4

1        EXHIBIT INDEX (CONTINUED)              PAGE
2    PLAINTIFFS DEP EXHIBIT NO. 39              160
      Zoom Invitation
3
     PLAINTIFFS DEP EXHIBIT NO. 40              161
4     E-mail Chain
5    PLAINTIFFS DEP EXHIBIT NO. 41              169
      E-mail
6
     PLAINTIFFS DEP EXHIBIT NO. 42              172
7     Zoom invitation
8    PLAINTIFFS DEP EXHIBIT NO. 43              173
      E-mail
9
     PLAINTIFFS DEP EXHIBIT NO. 44              175
10    E-mail
11   PLAINTIFFS DEP EXHIBIT NO. 45              178
      E-mail
12
     PLAINTIFFS DEP EXHIBIT NO. 46              187
13    E-mail
14   PLAINTIFFS DEP EXHIBIT NO. 47              193
      Zoom invitation
15
     PLAINTIFFS DEP EXHIBIT NO. 48              194
16    E-mail
17   PLAINTIFFS DEP EXHIBIT NO. 49              195
      E-mail
18
     PLAINTIFFS DEP EXHIBIT NO. 50              201
19    E-mail
20   PLAINTIFFS DEP EXHIBIT NO. 51              203
      E-mail
21
     PLAINTIFFS DEP EXHIBIT NO. 52              205
22    E-mail
23   PLAINTIFFS DEP EXHIBIT NO. 53              209
      E-mail Chain
24
     PLAINTIFFS DEP EXHIBIT NO. 54              216
25    Chat

Page 5

```
            EXHIBIT INDEX (CONTINUED)              PAGE
 1
 2     PLAINTIFFS DEP EXHIBIT NO. 55               220
         Jacket for the DVD Cover
 3
       PLAINTIFFS DEP EXHIBIT NO. 56               222
 4       Cover of the DVD
 5     PLAINTIFFS DEP EXHIBIT NO. 57               227
         Series of Text Messages
 6
       PLAINTIFFS DEP EXHIBIT NO. 58               233
 7       True the Vote social media post
 8     PLAINTIFFS DEP EXHIBIT NO. 59               239
         Invitation for the Premier
 9
       PLAINTIFFS DEP EXHIBIT NO. 60               241
10       True the Vote Social Media Post
11     PLAINTIFFS DEP EXHIBIT NO. 61               244
         Text Exchange
12
       PLAINTIFFS DEP EXHIBIT NO. 62               248
13       E-mail
14     PLAINTIFFS DEP EXHIBIT NO. 63               250
         Text Messages
15
       PLAINTIFFS DEP EXHIBIT NO. 64               252
16       Chat
17     PLAINTIFFS DEP EXHIBIT NO. 65               254
         Text Messages
18
       PLAINTIFFS DEP EXHIBIT NO. 66               259
19       E-mail
20     PLAINTIFFS DEP EXHIBIT NO. 67               263
         Text Exchange
21
       PLAINTIFFS DEP EXHIBIT NO. 68               269
22       E-mail Chain
23     PLAINTIFFS DEP EXHIBIT NO. 69               273
         True the Vote Social Media Post
24
       PLAINTIFFS DEP EXHIBIT NO. 70               285
25       Text Messages
```

Page 6

1          EXHIBIT INDEX (CONTINUED)              PAGE

2    PLAINTIFFS DEP EXHIBIT NO. 71              315
        Book

3

     PLAINTIFFS DEP EXHIBIT NO. 72              331
4      E-mail Chain

5    PLAINTIFFS DEP EXHIBIT NO. 73              335
        Chat

6

     PLAINTIFFS DEP EXHIBIT NO. 74              336
7      TTV's Tax Filings for 2022

8

9          (REPORTER'S NOTE: All quotations from
      exhibits are reflected in the manner in which
10    they were read into the record and do not
      necessarily denote an exact quote from the
11    document.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 7

1              THE VIDEOGRAPHER:  We're on the

2       record September 18, 2024.  The time

3       is 9:35 a.m.  This begins the

4       video-recorded deposition of Catherine

5       Engelbrecht in the matter of Mark        09:34:02

6       Andrews versus Dinesh D'Souza, et al.

7       in the United States District Court

8       for the Northern District of Georgia,

9       No. 1:22-cv-04259-SDG.

10              Will counsel please state your      09:34:20

11       appearances for the record after which

12       the court reporter will swear in the

13       witness.

14              MS. KUCK:  Lea Haber Kuck for

15       plaintiff Mark Andrews.                   09:34:27

16              MS. BALLIETT:  Quinn Balliett

17       also for the plaintiff.

18              MS. QIN:  Sonia Qin also for

19       the plaintiff.

20              MR. EVANS:  And Jake Evans for      09:34:34

21       defendants Catherine Engelbrecht,

22       Gregg Phillips, and True the Vote.

23              MS. HYLAND:  And Amanda Hyland

24       for defendant for Dinesh D'Souza and

25       D'Souza Media.                            09:34:50

CONFIDENTIAL

Page 8

```
 1              CATHERINE ENGELBRECHT,

 2     having been first duly sworn, testified as

 3     follows:

 4                E X A M I N A T I O N

 5     BY MS. KUCK:                              09:34:57

 6          Q.    Good morning, Ms. Engelbrecht.

 7          A.    Good morning.

 8          Q.    My name is Lea Haber Kuck, and

 9     I'm one of the attorneys for Mark Andrews,

10     the plaintiff in this action.             09:35:10

11                Can you also state your

12     address?

13     ████████████████████████████████████████

14     ████████████████████████████████████████

15          Q.    Have you been deposed before?   09:35:17

16          A.    Yes.

17          Q.    How many times?

18          A.    Once.

19          Q.    Okay.  And when was that?

20          A.    2021, I -- 2021 or 2022.  The   09:35:22

21     year kind of runs together.

22          Q.    Okay.  Have you testified in

23     any nondeposition setting?

24          A.    I was a witness in a case once.

25     And is that --                            09:35:40
```

CONFIDENTIAL

Page 9

```
 1          Q.     Yeah.  That's what I mean.
 2          A.     Yes.
 3          Q.     Have you ever testified in
 4     court?
 5          A.     Yes, once.                    09:35:44
 6          Q.     Okay.  And just once?  All
 7     right.
 8                 When was that?
 9          A.     Late 2023.
10          Q.     Okay.  Have you ever been found  09:35:53
11     by a court to lack credibility as a witness?
12          A.     No.
13          Q.     Do you understand that you are
14     under oath?
15          A.     Yes.                           09:36:01
16          Q.     Okay.  And you understand that
17     your testimony today carries the same weight
18     as the testimony before a judge or a jury?
19          A.     Yes.
20          Q.     Okay.  Is there any reason you  09:36:07
21     might not be able to give accurate testimony
22     today?
23          A.     No.
24          Q.     Any reason your memory might be
25     less sharp than usual?                     09:36:14
```

CONFIDENTIAL

Page 10

```
 1          A.     No.

 2          Q.     Okay.  Do you have any physical

 3     or mental conditions that would prevent you

 4     from giving your best testimony today?

 5          A.     No.                        09:36:21

 6          Q.     Are you under the influence of

 7     any drugs or other substances that would

 8     prevent you from giving your best testimony

 9     today?

10          A.     No.                        09:36:28

11          Q.     All right.  So let's just go --

12     and I know that you were here yesterday so

13     you know how it's going to go, but we'll --

14     just so we're on the same page --

15          A.     Sure.                      09:36:35

16          Q.     -- we'll go through the ground

17     rules again.

18                 Everything we say today is

19     being recorded and transcribed by the court

20     reporter.                              09:36:39

21                 You know that?

22          A.     Yes, ma'am.

23          Q.     And for the court reporter's

24     benefit, please answer my questions verbally.

25     Respond with a "yes" or a "no" rather than a  09:36:48
```

CONFIDENTIAL

Page 11

1    nod of the head.

2          A.    Yes, ma'am.

3          Q.    And also for the court

4    reporter, please let's try not to talk over

5    each other.  I don't think that will happen,    09:36:54

6    but allow me to finish my questions, allow

7    your lawyer to say anything if he needs to,

8    and -- and then you can answer.

9          A.    Yes.

10         Q.    If the question is unclear,         09:37:03

11   though, please let me know because if you

12   don't I'll assume that you understand what

13   I'm asking.

14         A.    Yes.

15         Q.    And I'll plan for us to take a      09:37:09

16   break every hour or so, but if you need a

17   break more frequently than that, let me know.

18         A.    Okay.  Yes.

19         Q.    And then throughout your

20   deposition, your counsel may object to        09:37:18

21   certain of my questions, but unless your

22   counsel specifically instructs you not to

23   answer my question, you must still answer the

24   question.

25               Do you understand that?           09:37:27

CONFIDENTIAL

Page 12

1        A.    Yes.

2        Q.    Okay.  What do you do for a

3    living?

4        A.    Pardon me.  I'm the founder of

5    True the Vote and also an owner and executive    09:37:37

6    in one or two other companies.

7        Q.    Okay.  And what are the two

8    other companies?

9        A.    CoverMe and KLOK.

10        Q.    And you work with Gregg    09:37:55

11    Phillips in those businesses?

12        A.    I do, yes.

13        Q.    Do you -- does Mr. Phillips

14    hold any position at True the Vote?

15        A.    No.    09:38:08

16        Q.    I understand he was on the

17    board of directors at one point in time?

18        A.    That's correct.

19        Q.    Has he ever held any other

20    position at True the Vote?    09:38:17

21        A.    No, ma'am.

22        Q.    And are there any other

23    companies in which you hold a position, just

24    those three?

25        A.    No, no other companies where I    09:38:24

CONFIDENTIAL

Page 13

1    hold a position.

2         Q.    Okay.  Any other companies

3    where you're a limited partner?

4         A.    Yes, there's one, Shadow Beach.

5         Q.    Okay.  And what does that        09:38:34

6    entity do?

7         A.    Yes.  It was just nothing

8    really.  It's an LLC that is -- was set up

9    for just a variety of other purposes and

10   projects.                                    09:38:47

11        Q.    And does it still exist today?

12        A.    I -- I believe so, yes.

13   We're -- we're -- it's likely going to be

14   dissolved.  I just don't remember if it's

15   already been done or not.                    09:39:05

16        Q.    Okay.  And are you involved

17   in -- with any PACs?

18        A.    Yes.

19        Q.    Okay.  And tell me about that.

20        A.    It's a newly started PAC called   09:39:13

21   Pit Pac, and that's -- it's an organized as a

22   super PAC.

23        Q.    And what is its mission?

24        A.    To help support pro-liberty,

25        faith-based candidates and messages and  09:39:32

Page 14

1    the like.

2          Q.    Okay.  But that -- and

3    that's -- you've just set that up in the last

4    few weeks?

5          A.    I'm not sure exactly when it        09:39:42

6    was initially set up.  We've only just like

7    launched it.

8          Q.    Yeah.

9          A.    I don't really know on the

10   paperwork --                                     09:39:48

11         Q.    Okay.

12         A.    -- because I know that had to

13   come first.

14         Q.    Yeah.

15         A.    But -- but it's just been          09:39:51

16   launched like maybe even last week or

17   something.

18         Q.    Okay.  And that's again with

19   Mr. Phillips?

20         A.    Yes, ma'am.                          09:39:57

21         Q.    And Mr. Phillips -- let me get

22   the name of it, but he mentioned an app that

23   you work with him on called -- let me find

24   it.

25                There's a -- a voting integrity     09:40:08

CONFIDENTIAL

Page 15

1      app that you work with him on?

2          A.      He built an app or his team

3      built an app called OpSec called VoteStand.

4          Q.      Yep.

5               And what work are you doing on      09:40:18

6      that?

7          A.      That's on the True the Vote

8      side.

9          Q.      Okay.

10         A.      And True the Vote is -- using    09:40:24

11     that app, it's a web app, to facilitate its

12     second extension of the help line that we

13     always have on our website.  But this allows

14     for voters and election workers to have

15     really, I guess, faster access.  It comes    09:40:40

16     with a -- a toll-free line for -- so people

17     can talk if they need to.  There's lots of

18     questions coming right now so...

19         Q.      And is it also used for -- for

20     them to report suspicious behavior?          09:40:54

21         A.      Well, we call it an incident

22     report.  Just things that don't make sense.

23         Q.      Okay.

24         A.      And there's, you know, a lot of

25     that, so we try to correct as much of it as   09:41:04

1    we can.

2         Q.    And then if you get an incident

3    report through the app, what do you -- what

4    actions do you take?  What do you do?

5         A.    The first thing we do is screen    09:41:13

6    the report.  I've never really run a study on

7    the percentage of -- of reports that come in

8    that are just simple questions that you can

9    just resolve versus significant like we need

10   to get this to the Secretary of State or to    09:41:28

11   the county.

12            But that did happen in -- in

13   2020.  Mr. Phillips was also involved at that

14   point in helping with the hotline and the --

15   the process was if our team couldn't answer    09:41:39

16   the question and if it needed to be advanced

17   or expedited, it would go back to the OpSec

18   team for their management.

19         Q.    And when you say "their

20   management," what do you mean?    09:41:52

21         A.    Just things come in so quickly.

22         Q.    Uh-huh.

23         A.    But you also don't want to drop

24   any balls.

25         Q.    Right.    09:41:59

CONFIDENTIAL

```
                                              Page 17
```

1          A.     And so for an incident that may

2     have -- you would anticipate a lot of

3     back-and-forth, you're trying to figure out

4     who should it go to and then do they actually

5     follow up or is it just going into a black       09:42:07

6     hole.

7          Q.     Yeah.

8          A.     So if you try one place and you

9     don't get a response, try another place.

10    That's the kind of thing that they were         09:42:14

11    focused on.

12              So we would try to separate out

13    and only give them the ones that were going

14    to have what we felt like a -- you know, a --

15    a more -- a more protracted process behind      09:42:24

16    them.

17         Q.     And when you say you sent them

18    to OpSec, I mean, OpSec is -- has no

19    employees other than Mr. Phillips, right?

20         A.     Well, they have a team of           09:42:35

21    contractors, and it just expands and

22    contracts as they need it to.

23         Q.     Okay.  Do you ever work

24    directly with their contractors?

25         A.     No.                                  09:42:44

CONFIDENTIAL

Page 18

```
 1          Q.     Do you know who the contractors
 2     are?
 3          A.     I don't.
 4          Q.     Now, you said you were also a
 5     founder of -- of True the Vote?              09:42:51
 6          A.     Yes.
 7          Q.     Which I'll refer to sometimes
 8     as TTV.  You know what I'm talking about?
 9          A.     Oh, yes.  I do the same, so
10     we're fine.                                  09:42:59
11          Q.     Okay.  Good.
12                 How did you come to found True
13     the Vote?
14          A.     I started True the Vote in
15     2009.  Didn't submit paperwork until 2010.   09:43:07
16     So sometimes you'll see the distinction 2009,
17     2010.  2010 is when paperwork was filed.
18                 After working at the polls and
19     having an experience that I thought didn't
20     make a lot of sense and that we should take a  09:43:21
21     closer look at the process.  The process just
22     seemed to be dysfunctional to me.
23                 And so it -- it started
24     initially here in Harris County just as a --
25     a local effort.  And grew very quickly.  And,  09:43:32
```

CONFIDENTIAL

Page 19

1    you know, I -- I -- if you would have told me

2    15 years ago that I would be sitting here

3    having this kind of a conversation based on

4    what happened in 2009, I couldn't have

5    imagined it, but here we are.                    09:43:50

6          Q.    Got it.

7                And is it a nonprofit

8    organization?

9          A.    Yes, ma'am.

10         Q.    Okay.  And what is its mission?   09:43:55

11   What does it do?

12         A.    We are all about empowering the

13   voters and protecting voters' rights.  So

14   very much about the -- you know, what we

15   refer to as the power of citizen engagement.   09:44:09

16         Q.    And I think - think that I've

17   seen references where you say it's a

18   nonpartisan organization?

19         A.    Yes.  Yes.

20         Q.    And when you say "nonpartisan,"   09:44:21

21   what do you mean by that?

22         A.    I mean that we are straight

23   down the line around election integrity.  And

24   irrespective of party, if there's an issue

25   with process or with a particular election, I   09:44:32

CONFIDENTIAL

Page 20

```
 1     mean, we've -- we've -- we've helped on all

 2     sides.  It doesn't -- you know, it's just

 3     about getting the process right.

 4                 I firmly believe that if we

 5     have a solid election -- we need two parties.   09:44:50

 6     We need debate.  And so if we have a solid

 7     election that people can believe in, then --

 8     then the country is better for that.

 9          Q.    Okay.  But you -- but you do

10     coordinate your work with political              09:45:02

11     candidates, right?

12          A.    No.

13          Q.    How many employees does TTV

14     have?

15          A.    I think right now I'm the only       09:45:08

16     employee.

17          Q.    Okay.  So do you work with

18     contractors?

19          A.    Yes.

20          Q.    And so how many contractors are      09:45:21

21     you working with right now?

22          A.    I think five.

23          Q.    Okay.  Can you identify those?

24          A.    By name?

25          Q.    Yeah.                                 09:45:36
```

CONFIDENTIAL

Page 21

1        A.      Megan Denning.

2        Q.      Okay.

3        A.      Violet Sarria.

4        Q.      Okay.

5        A.      Sarah Skogen.  Heather Mullins.  09:45:57

6   Sam Todd.

7        Q.      I think that's five?

8        A.      Yeah.

9        Q.      And who is Dan Gerletner?

10       A.      Oh, Dan Gerletner.  He worked    09:46:27

11   with us -- oh, gosh -- for a period of time

12   in 2020.  I couldn't tell you how many

13   months, but for a period of time in 2020.

14       Q.      And what was his role?

15       A.      He helped with some IT research   09:46:45

16   analytics.  He -- he's very adept in the

17   technology space.

18       Q.      Okay.  But you're not working

19   with him anymore?

20       A.      No.                              09:47:05

21       Q.      How about Chelsea Magee?

22       A.      Chelsea.  Well, did work

23   with -- first answer the question.

24       Q.      Uh-huh.

25       A.      Did work with her, contractor.   09:47:13

CONFIDENTIAL

Page 22

```
 1                   I'm -- I apologize.  It -- the
 2       dates really do blur together.  I don't
 3       recall.  It was certainly in 2022, whether it
 4       was the whole of 2022 and then into -- some
 5       into 2023, I believe.  I think.              09:47:41
 6            Q.    And what was her role when she
 7       was working as your contractor?
 8            A.    She helped out with social
 9       media, and she helped answer e-mails and --
10       and functioned a little bit as -- as for      09:47:55
11       media and sort of as my just executive
12       assistant sort of just making sure I didn't
13       miss anything.
14            Q.    And during that period of time,
15       say late 2021 through 2022, was there anybody  09:48:06
16       else handling TTV's social media postings?
17            A.    Yes.  We had hired a PR firm.
18       I don't remember the name of the firm.  The
19       principal there that we worked with was
20       Catherine Frazier, but I don't remember the    09:48:32
21       name of the firm.
22            Q.    Okay.  And they -- and -- and
23       what was their role with your social media?
24            A.    They were supposed to manage
25       all of the social media and help develop just  09:48:45
```

CONFIDENTIAL

Page 23

1     a consistent practice of -- of making posts,

2     which heretofore had not been consistent.

3     And help with press releases and media and

4     those types of things.

5          Q.    And then who on your team        09:49:02

6     coordinated with them?  Like, who provided

7     them with the substance?

8          A.    They -- they functioned largely

9     independent -- independently.

10          Q.    Yeah.                            09:49:15

11          A.    We certainly would talk about,

12    you know, when interviews would come up and

13    things that were arising in the news.  But

14    it -- they were -- there was a team of three,

15    as I recall, primary, and they were -- they    09:49:31

16    had deep backgrounds in the space.  And

17    wasn't very election focused, but they did

18    have backgrounds.  And so it -- it -- they

19    just would have did what they thought would

20    be useful.                                    09:49:54

21          Q.    But there must have been

22    coordinating with somebody so they knew what

23    was going on.  Just from a content

24    perspective?

25          A.    Oh, yeah.  Yeah.  Yes, but --    09:50:00

CONFIDENTIAL

Page 24

1    yeah.  Well, yes.  Simple answer is yes.

2         Q.    And that would have been who?

3    Was that you or Ms. Magee or somebody else?

4         A.    It would probably would have

5    been -- first of all, I really don't fully      09:50:10

6    recall, but it likely would have been just on

7    a team call which was how we, you know,

8    function generally.

9         Q.    Okay.  So you would have

10   periodic team calls with them, tell them what   09:50:20

11   was going on, and then they would go figure

12   out how to make it most effective on social

13   media; is that fair?

14        A.    Or the -- or the reverse where

15   they would see something and say --            09:50:30

16        Q.    Okay.

17        A.    -- you know, we think this is

18   developing and you should pay attention or

19   make a comment or something like that.

20        Q.    Okay.  And did you generally       09:50:36

21   monitor your TTV social media postings during

22   this time?

23        A.    I did not.

24        Q.    Did -- are you aware of whether

25   Ms. Magee did that?                            09:50:49

CONFIDENTIAL

Page 25

1          A.      Monitored or posted or?

2          Q.      Just monitoring what they were

3    posting what was going on.

4          A.      Yes, I would think that she

5    did.  She was more just on social media          09:51:01

6    generally.

7          Q.      And who is Cole Hughes?

8          A.      He was an executive director --

9    oh, gosh -- for a period of time in 2022.  I

10   couldn't tell you how many months.               09:51:16

11         Q.      Okay.  And what was his role?

12         A.      He was the executive director.

13         Q.      And then so what did he do?

14         A.      The -- the goal was for him to

15   manage the duties that I've just described.      09:51:29

16                 Plus, we had a big project

17   called IV3 at the time, and it was his

18   responsibility to oversee that, which had

19   a -- a pretty expansive volunteer component.

20   And so that would have been well enough to       09:51:45

21   keep him -- keep him busy.

22         Q.      And how about Kyle Reyes --

23   Reyes?

24         A.      Kyle Reyes was with a marketing

25   company.  I am -- sometime in the period         09:51:58

Page 26

1    after 2020 and, you know, before 2024.  I

2    don't remember exactly when.  It was a

3    six-month contract, I remember that, because

4    we didn't extend it.

5         Q.    Okay.  So -- and the five          09:52:24

6    people you identified at the beginning

7    starting with Megan Denning, those -- were

8    any of those people there in 2022?

9         A.    I think Meg may have come on at

10   the -- at the very tail end of 2022 possibly.  09:52:46

11        Q.    Were any of those -- those

12   people involved in the -- for lack of a

13   better term, the 2000 Mules project?

14        A.    No.

15        Q.    Okay.                              09:53:01

16        A.    Well, of the five that are --

17        Q.    The five that are there now?

18        A.    Yeah.  No.

19        Q.    Okay.  And then of the -- the

20   people we talked about, Mr. Gullutner,        09:53:13

21   Ms. Magee, Mr. Hughes, and Mr. Reyes, they

22   were -- were they all involved in that

23   project of the -- relating to 2000 Mules?

24        A.    I don't -- Dan was not -- well,

25   let me just go person by person.              09:53:33

CONFIDENTIAL

Page 27

```
 1          Q.      Okay.

 2          A.      Dan was not involved in any of

 3     the -- he -- he -- I wish I could recall the

 4     period of time that he was there.  He was not

 5     involved in any of the development of any of     09:53:45

 6     the -- the things that -- the True the Vote

 7     side was working on relative to data.

 8          Q.      Yeah.

 9          A.      And he was not there during the

10     premier and that part of it, so I don't --       09:53:55

11     no, I can't remember anything that Dan did.

12          Q.      Okay.

13          A.      Can you feed me another name?

14          Q.      Chelsea Magee.

15          A.      Chelsea was there during the --      09:54:11

16     she helped with some of the open records

17     request gathering, and she was there during

18     the time that the movie came out for sure

19     because I know she handled a lot of the

20     back-and-forth of, you know, media requests      09:54:35

21     and just things of that nature, social media,

22     I guess.

23          Q.      Did her relationship with TTV

24     end on good terms?

25          A.      Oh, yeah.                            09:54:46
```

CONFIDENTIAL

Page 28

1          Q.      How about Mr. Hughes?

2          A.      Uh-huh.

3          Q.      And he was involved with the --

4    with the project relating to 2000 Mules?

5          A.      I don't recall that he was.        09:54:56

6          Q.      Okay.

7          A.      It -- it's -- I guess it is

8    possible because he would have been there at

9    that time to -- I mean, the latter part in

10   2022.  Most of the -- most of the research      09:55:11

11   was already done, you know, in 2021.  I don't

12   recall him being involved really in any -- I

13   mean, not in the -- not in the development of

14   the research.  I'm really trying to think.

15         Q.      That's okay.                       09:55:32

16         A.      Yeah.

17         Q.      We'll look at some documents --

18         A.      Yeah.  Sure.

19         Q.      -- and maybe they will refresh

20   your memory.                                     09:55:37

21                 But you parted with him on good

22   terms?

23         A.      Yes.

24         Q.      How about Mr. Reyes?

25         A.      He was -- I don't -- again, I      09:55:42

CONFIDENTIAL

Page 29

1    don't remember exactly the period of time,

2    but it was around the -- the movie.  He

3    didn't help with any of the -- of the

4    research project that ultimately led, you

5    know, to -- to having it given to Dinesh, but    09:56:02

6    yeah.  I mean, he helped with the -- some of

7    the promotion or tried to, I guess.

8            Q.    Okay.  And did he -- did you

9    part ways with him on good terms?

10           A.    He would probably say no.    09:56:18

11           Q.    Okay.  Anything -- well, we can

12   get to that later.

13               Who are the current -- who's on

14   the current -- well, strike that.

15               Do you recall who was on the    09:56:31

16   board of directors of TTV in 2022?

17           A.    It would have been myself and

18   Erin Timme and Diane Josephs.

19           Q.    And who is Ms. Josephs?

20           A.    Just a longtime friend.    09:56:44

21           Q.    Okay.  And does she do any work

22   at True the Vote?

23           A.    Other than board meetings and

24   generally keeping up with what's going on.

25   No real work work.    09:56:53

```
                                              Page 30

 1          Q.      Okay.  And how about Ms. Timme
 2     then?
 3          A.      Same is true with respect to
 4     board meetings.  Sometimes she helps write
 5     thank you notes and so forth, and we -- we     09:57:03
 6     all keep in touch with what's happening.
 7          Q.      Did you also -- when you
 8     referenced the five people who are
 9     contractors today, you mentioned Heather
10     Mullins.                                       09:57:14
11               Was she involved -- I know she
12     wasn't -- you said she wasn't a contractor of
13     yours at the time.
14               Was she involved in the film in
15     any way?                                       09:57:20
16          A.      She was.  She did an interview
17     that we found to be particularly interesting
18     and -- or actually she -- she told us of an
19     informant that we then went on to interview
20     and then shared that with Dinesh.              09:57:37
21          Q.      And what was her -- how -- how
22     did she have an informant?  What was she
23     doing at the time?
24          A.      She was very involved in, I
25     would say, like freelance journalism,         09:57:49
```

CONFIDENTIAL

Page 31

1    freelance investigation, and that's how she

2    came to be aware of the situation that she

3    was, you know, represented in the movie.

4          Q.    And she was -- she was paid for

5    her participation in the movie, right?        09:58:05

6          A.    That's a good question.  I

7    don't -- I don't recall.  We certainly would

8    have reimbursed her expenses at minimum.  I

9    don't recall after that.

10         Q.    Okay.  And I take it you've       09:58:22

11   known Debbie D'Souza for a long time?

12         A.    Yes.

13         Q.    And how did you come to know

14   her?

15         A.    Interestingly, I trained her to    09:58:36

16   be a poll watcher, and she's bilingual.  So

17   those are like gold at the elections --

18         Q.    Uh-huh.

19         A.    -- and so that's -- that's how

20   I knew her.                                    09:58:45

21         Q.    And do you --

22         A.    And we were in a Bible study

23   together.

24         Q.    And when -- so when did you

25   meet her?                                      09:58:51

CONFIDENTIAL

Page 32

1          A.    Oof.  Probably -- probably 2010
2    maybe -- or maybe even earlier.
3          Q.    Okay.  And she wasn't married
4    to Dinesh D'Souza at that point?
5          A.    No.                          09:59:02
6          Q.    Okay.  When was the last time
7    you spoke to her?
8          A.    Her mother passed away
9    recently, and I reached out to her.
10         Q.    Okay.  Prior to that time, were  09:59:09
11   you in regular contact -- well, from the
12   period of the time of when the movie was
13   released up until the time you recently
14   reached out to her, were you in regular
15   contact with her?                         09:59:25
16         A.    No.
17         Q.    Why not?
18         A.    Just there wasn't really much
19   to, you know, talk about.
20         Q.    Okay.  Have you ever worked     09:59:35
21   with Salem Media Group before?
22         A.    No.  I mean, I'm sure that I
23   have been on programs that were affiliated
24   with Salem, you know, by their own virtue,
25   but not me directly with Salem other than   09:59:55

CONFIDENTIAL

Page 33

1    that.

2         Q.    Okay.  So you -- you haven't

3    had any relationship with them separate from

4    the 2000 Mules project?

5         A.    No, not separate from that --      10:00:06

6    well, I'm just trying to really think.  No, I

7    don't believe so.

8         Q.    Okay.  Let's look at what's

9    been marked Exhibit 5 in your pile there.

10        A.    Okay.                              10:00:24

11        Q.    And this was an answer filed in

12   this litigation on behalf of you, TTV, and

13   Mr. Phillips, correct?

14        A.    Yes, ma'am.

15        Q.    And did you authorize your        10:00:34

16   lawyers to file it on your behalf?

17        A.    Yes.

18        Q.    And on behalf of TTV?

19        A.    Yes.

20        Q.    I'm not sure if I asked you,      10:00:39

21   but what is your position at TTV?

22        A.    President.  CEO.  That's it.

23        Q.    And there's -- there's no one

24   else employed by TTV, right?

25        A.    Right.                            10:00:52

CONFIDENTIAL

                                                    Page 34

1          Q.     You are --

2          A.     We just made that decision,

3     that determination a few years ago.

4          Q.     Yeah.

5          A.     Just better to have contractors    10:00:58

6     because we're very disparate across the

7     country and -- so...

8          Q.     Okay.  Did you review this

9     document --

10         A.     Yes.                                10:01:04

11         Q.     -- before it was filed?

12                And without telling me the

13    substance of the discussion, did you discuss

14    the allegations in the complaint in your

15    responses before the answer was submitted      10:01:11

16    in -- on your behalf?

17         A.     Yes.

18         Q.     Did you discuss them with your

19    lawyers?

20                I have marked as Exhibit 30 a       10:01:18

21    document entitled "True the Vote

22    defendants" -- oops.

23                Did I answer -- that's the

24    answer, right?  We already marked that?

25                Okay.  So I'll take that back.      10:01:37

Page 35

1    I made a mistake.

2            A.      Okay.

3            Q.      Strike that.

4                    So I'm marking as Exhibit 30 a

5    document entitled "True the Vote's Second        10:01:54

6    Amended Responses to Plaintiff's First Set of

7    Interrogatories."

8        (Marked Engelbrecht Exhibit No. 30.)

9    (BY MS. KUCK)

10           Q.      And I'm going to mark as          10:02:12

11   Exhibit 31, Catherine Engelbrecht's second

12   amended responses to plaintiff's first set of

13   interrogatories.

14                   There's 30.  And there's 31.

15       (Marked Engelbrecht Exhibit No. 31.)        10:02:29

16          (Discussion off the record.)

17   (BY MS. KUCK)

18           Q.      So do you recognize exhibits --

19                   MS. HYLAND:  Excuse me, can I

20          get a copy of the document?              10:02:53

21   (BY MS. KUCK)

22           Q.      Do you recognize -

23                   MR. EVANS:  Me as well.

24   (BY MS. KUCK)

25           Q.      -- Exhibits 30 and 31?           10:02:57

CONFIDENTIAL

Page 36

1          A.     Yes.

2          Q.     And did -- did you prepare

3     those or your attorneys prepared them?

4          A.     My attorneys.

5          Q.     And did you provide your          10:03:11

6     attorneys with the -- the substance to

7     prepare them?

8          A.     Yes.

9          Q.     Okay.  And is that your

10    signature at the end of each of these          10:03:23

11    documents, the second page from the end

12    there?

13         A.     Yes.

14         Q.     Yes?

15         A.     And yes.                           10:03:35

16         Q.     And before you signed them, did

17    you review them to assure yourself that they

18    were accurate?

19         A.     Yes.

20         Q.     You can put them aside for now.    10:03:44

21         A.     Okay.

22         Q.     We may come back to them but --

23         A.     Okay.

24         Q.     -- for now.

25                Were you asked to search for       10:03:52

Page 37

1    documents in connection with this litigation?

2        A.    Yes.

3        Q.    What steps did you take?

4        A.    I consulted with counsel on the

5    most appropriate way to do that.                10:04:02

6        Q.    Uh-huh.

7        A.    And they had a process where

8    you just gave them access to everything which

9    seemed most reasonable.  And then throughout

10   this -- this time, this case, there have been  10:04:15

11   certain instances where they've asked me to

12   go back and look and see things, but it's

13   been -- they did a very thorough job the

14   first time with access to everything.

15       Q.    And when you say "access,"          10:04:31

16   was -- was that hard copy documents, or was

17   everything electronic?

18       A.    Everything was electronic.

19       Q.    Does -- do -- do you keep any

20   hard copy files?                               10:04:42

21       A.    Not -- no.

22       Q.    Does -- does True the Vote?

23       A.    We keep hard copies of, you

24   know, financial documents.  But at this

25   point, we are very -- very much oriented       10:04:59

CONFIDENTIAL

Page 38

1    towards everything being digitized always.

2            Q.    Does True the Vote have a --

3    a -- an -- an office?

4            A.    No.  Not to speak of, no.

5            Q.    Okay.  Do -- in connection with    10:05:17

6    that search, did you have e-mail accounts

7    that you gave your attorneys access to look

8    for documents?

9            A.    Oh, yeah.  Yes.

10           Q.    Do -- do any of those accounts    10:05:32

11   have an autodelete?

12           A.    No -- well, I don't -- not that

13   I know.

14           Q.    Okay.  Are you aware of any

15   documents that -- that would have been called    10:05:40

16   for -- for the litigation that have since

17   been destroyed?

18           A.    No.

19           Q.    Did you -- and did you prepare

20   for your deposition today?                      10:05:51

21           A.    Yes, ma'am.

22           Q.    And how did you -- how did you

23   prepare?

24           A.    I reviewed the documents and

25   spoke with counsel.                             10:05:58

CONFIDENTIAL

Page 39

1          Q.     And when you say "review the

2     documents," who provided those documents?

3          A.     Counsel.

4          Q.     Okay.  You didn't review any

5     files that you selected yourself?          10:06:06

6          A.     No.  I mean, they have them

7     all.

8          Q.     And did you -- did any of those

9     documents cause you to remember things you

10    hadn't remembered previously?          10:06:16

11         A.     I wouldn't -- no.  I mean, it's

12    been a while so just reading things you

13    remember.  Certain timelines maybe, but

14    nothing shocked me.

15         Q.     And other than your counsel,          10:06:31

16    did you discuss your -- the testimony you

17    expect to give with anyone else?

18         A.     No.

19         Q.     Did you discuss Mr. Phillips's

20    testimony with him yesterday after the          10:06:52

21    deposition?

22         A.     No.

23         Q.     And did you have any

24    discussions with him prior to his deposition

25    about the testimony the two of you expected          10:07:00

CONFIDENTIAL

Page 40

1    you'd be asked?

2           A.     No, not about the deposition.

3    Just, you know, how long we're going to be in

4    town and those kinds of things.

5           Q.     So just logistical things?        10:07:11

6           A.     Yeah.   Pretty much.

7           Q.     Okay.   If you could look at

8    what has been previously marked as Exhibit 8.

9                  The title of this is "True the

10   Vote Geospatial Data Analysis Project         10:07:41

11   December 2020."

12                 Do you see that?

13          A.     Yes, ma'am.

14          Q.     And is this the research

15   project that ultimately was used for the      10:07:49

16   2000 Mules project -- or the 2000 Mules film,

17   I should say?

18          A.     Well, it was there -- there

19   were elements of this project that -- that

20   were, you know, presented as part of, you      10:08:02

21   know what, I showed Dinesh.  But, yeah, it

22   wasn't -- they weren't connected until --

23   until well after this was completed.

24          Q.     Right.  And you started this

25   project in December of 2020?                   10:08:16

CONFIDENTIAL

Page 41

```
 1          A.     Correct.

 2          Q.     And you didn't start talking to

 3     Mr. D'Souza until much later, I guess, in

 4     2021?

 5          A.     Yes.  Like -- yes.  I'll just     10:08:23

 6     say yes.

 7          Q.     I mean, we'll get to that, but

 8     yeah.

 9          A.     Yeah.  Yeah.

10          Q.     Okay.  What prompted this         10:08:30

11     project?

12          A.     In the immediate aftermath --

13     well, I had done -- let me take a step back

14     even further than that.

15               I was very concerned about the      10:08:42

16     number of process changes that were happening

17     in 2020 and was very vocal about that.

18     Particularly, the drop boxes.  Because we had

19     done a lot of work via open records trying to

20     understand what the process for securing the  10:09:00

21     drop boxes would be, for just procedures

22     around the chain of custody management,

23     around picking up the ballots, the cameras,

24     the pattern of distribution, all of those

25     things.                                       10:09:18
```

CONFIDENTIAL

Page 42

1           And with -- with troubling

2    consistency, we got back little to nothing

3    that suggested that this -- that this has

4    really been a fully conceptualized idea.

5           And in my opinion, when you          10:09:35

6    take the voter rolls that are not terribly

7    accurate and you categorize that with mass

8    mail out of ballots and then you set up, by

9    the counties' own admissions, insecure

10   receptacles.  It just seemed to me to be a   10:09:54

11   point of weakness.

12           And so in the immediate

13   aftermath of the election, the thought was if

14   there was a problem -- which we didn't know.

15   If there was a problem, that would likely be  10:10:03

16   a point that could be evaluated via data,

17   which is -- is another, I think, important

18   consideration because you -- you have to be

19   very -- there's a lot of things that are

20   broken in process that don't lend themselves   10:10:21

21   to measurement.

22           So you -- you just have a

23   general sense that something is not right,

24   but it doesn't -- you can't -- you can't

25   really get close enough to the issue.  This    10:10:32

CONFIDENTIAL

Page 43

1    was a unique -- what I felt like a unique

2    opportunity.

3         Q.    And is it fair to say that you

4    are anti drop box, you don't think drop boxes

5    are a good idea?                              10:10:44

6         A.    Yeah.  That's very fair.

7               Let me -- actually, may I

8    revise that?

9         Q.    Sure.

10        A.    I think unmonitored and -- and   10:10:53

11   without solid procedural implementation,

12   they're not a good idea.

13        Q.    Okay.  And would you

14   characterize the system that is in place at

15   the current time -- well, or that was in      10:11:07

16   place -- no, the -- at some place at the

17   current time and going back to when they were

18   instituted in 2020, would you characterize

19   those as not being well monitored and not

20   having procedural solid implication --        10:11:22

21   implementation?

22        A.    I would say that in 2020 it was

23   not well monitored, not monitored at all.

24   Well, I shouldn't say at all.  But not to the

25   best of our ability to discern based on        10:11:31

CONFIDENTIAL

Page 44

```
 1      capturing the video.  It was not being

 2      monitored.

 3                 And in -- by contrast today, I

 4      think it's much better, much better.  The

 5      counties have really done, I think, good --     10:11:46

 6      for the most part, really good work in trying

 7      to increase the transparency of the process.

 8           Q.    Okay.  So that was the --

 9      that's the background for the project that's

10      described in Exhibit 8?                          10:12:01

11           A.    Yes.  Whether the drop boxes

12      were being exploited and if we could use data

13      to -- to determine that.

14           Q.    And that was -- and was that

15      your idea?                                       10:12:09

16           A.    I don't really remember who had

17      the idea first.  But Gregg and I talked about

18      it.  It was definitely something that Gregg

19      and I -- or Mr. Phillips and I discussed.

20           Q.    Okay.  And so you came up with     10:12:24

21      this project that you worked with OpSec?

22           A.    Yes.

23           Q.    On -- that's reflected in

24      Exhibit 8?

25           A.    Yes, ma'am.                           10:12:35
```

CONFIDENTIAL

Page 45

```
 1          Q.      And you paid OpSec ███████ for
 2     their work?
 3          A.      Yes, ma'am.
 4          Q.      And the -- it says "The
 5     objective" up at the top on the second page.    10:12:48
 6               "Leverage historic and near
 7     time -- real-time behavioral mobility data to
 8     assist" --
 9          (Discussion off the record.)
10               MS. KUCK:  Let's just take a         10:13:08
11          break off the record.  We don't have
12          to leave.
13          (Discussion off the record.)
14               THE VIDEOGRAPHER:  Off the
15          record at 10:14.                           10:13:22
16       (Break from 10:14 a.m. to 10:15 a.m.)
17               THE VIDEOGRAPHER:  Back on the
18          record at 10:15.
19     (BY MS. KUCK)
20          Q.      So on the second page of the       10:13:57
21     document, which is TTV_009902, the objective
22     under project scope says:  "Leverage historic
23     and near real-time behavioral mobility data
24     to assist True the Vote in analyzing possible
25     election process subversion in the form of     10:14:17
```

CONFIDENTIAL

Page 46

1    ballot harvesting in the following states."

2              There are abbreviations here.

3    I'm going to read the -- the statement, and

4    if you disagree with my interpretation, let

5    me know.                                      10:14:26

6         A.    Yes, ma'am.

7         Q.    Georgia, Arizona, Texas,

8    Pennsylvania, Michigan, and Wisconsin.

9              Do you see that?

10        A.    Yes, ma'am.                        10:14:31

11        Q.    Who selected -- well, strike

12   that.

13             Before I go on, you weren't

14   looking at the entire states, you were

15   looking at specific cities in those states?  10:14:39

16        A.    Yes.

17        Q.    And who came up with those

18   locations?  Where does that come from?

19        A.    I don't -- I don't remember --

20   I mean, I don't remember who came up with     10:14:53

21   them.  These are very familiar areas that we

22   work with so often that it was just a --

23   almost a given, but I don't remember

24   specific.

25        Q.    So you don't know who chose the   10:15:10

CONFIDENTIAL

Page 47

```
 1     cities?
 2          A.    No, I really don't.  It was
 3     a -- I really don't.  It was a function of
 4     where the drop boxes were and, you know,
 5     what -- what made the most sense from -- you    10:15:23
 6     know, through the lens of a project like
 7     this.
 8          Q.    Okay.  You didn't look at
 9     anything in Florida?
10          A.    No.                                  10:15:30
11          Q.    Was there any particular
12     reason?
13          A.    Florida didn't -- as I recall,
14     their drop boxes were actually not drop
15     boxes.  It's a whole different level of        10:15:40
16     insecurity.
17               But we just -- just didn't.  I
18     mean, the -- they did have a drop box issue
19     as I generally recall, but we just didn't
20     look at Florida.                               10:15:57
21          Q.    Okay.  Was the analysis that
22     OpSec provided to you complete before -- in
23     all these states before the filming of
24     2000 Mules?
25          A.    Oh, all the geospatial stuff        10:16:08
```

Page 48

```
 1      was definitely, yes.

 2          Q.    For all the states?

 3          A.    Yes.

 4          Q.    Okay.  And then it says the

 5      next category is deliverables and costs.    10:16:19

 6              Do you see that?

 7          A.    Yes.

 8          Q.    And under 1 it says:  "Build

 9      baseline look-back mobile device database."

10              Did -- is that something that    10:16:31

11      TTV did receive as a deliverable?

12          A.    No, not -- we didn't receive

13      the database.  We received the results from

14      the building of that database.

15          Q.    And how were the results    10:16:43

16      presented to you?

17          A.    They were presented ultimately

18      in some level of pattern of life studies

19      findings that went on to be provided to the

20      FBI.  That was it.    10:17:13

21          Q.    So was there some sort of

22      written report that was provided?

23          A.    There were written reports that

24      were provided on a -- on a

25      location-by-location basis, but it was so --    10:17:38
```

Page 49

```
1     you know, when this was done, I really didn't

2     have an appreciation -- this is way out of

3     True the Vote's area of specialty, so I think

4     it's fair to say that what I thought -- what

5     I thought this data, how it really works and      10:17:57

6     how it really works were very different.

7                   So because by the end of it was

8     clear that it -- you really had to have the

9     benefit of somebody that was trained in

10    reading this data.  It's just not like you      10:18:11

11    print out an Excel spreadsheet necessarily.

12    It's -- it's a huge amount of data.

13          Q.    But there was some sort of

14    summary of the results or some sort of report

15    that was provided to you?                         10:18:24

16          A.    Honestly, I don't recall that

17    there was a report provided to True the Vote

18    per se because it was -- as the results

19    started emerging, it became a function of

20    getting this into the right hands, and so it    10:18:41

21    was presented to Georgia Bureau of

22    Investigations or to the Federal Bureau of

23    Investigations.

24                   I was seeing -- because we were

25    capturing data on our side, so it just -- it    10:18:52
```

CONFIDENTIAL

Page 50

1    sort of married itself, and I didn't feel the

2    need to look at all the geospatial stuff.  I

3    just -- it just seemed to be coming together,

4    and we were in such a compressed period of

5    time that it went straight -- you know,          10:19:05

6    straight to law enforcement or to

7    legislatures -- legislators.

8         Q.    In what form did you present it

9    to those people?

10        A.    Primarily just digitally.             10:19:15

11   It -- it -- once we got into a rhythm, it --

12   the FBI had offered to set up hubs, and so

13   the data was originally transferred through

14   the representatives from South Texas that we

15   were working with.                               10:19:32

16            And then -- and then they were

17   to dispatch the various -- to the various

18   regions.  And our thought in that was that

19   was the very best way because there would be

20   no break in chain of custody or confusion       10:19:44

21   about who had what version.  It was just, you

22   know, put in place and then moved from there.

23        Q.    But at some point in time did

24   True the Vote have any of these, you know,

25   say, reports on particular drop boxes or         10:20:01

CONFIDENTIAL

Page 51

1    anything at all that was written in relation

2    to the study?  When I say "written," that --

3    that was not just a database.

4         A.    Right.

5              There were -- I mean, I -- it    10:20:16

6    wasn't -- it wasn't a report, but there were,

7    you know, some maps.  In Wisconsin, we

8    provided a -- a -- a list of IMEI numbers

9    specifically.

10             So there were things like that.    10:20:42

11        Q.    And -- and what happened to

12   those types of reports?  Do you still have

13   them?

14        A.    If they weren't captured by

15   counsel, then we don't -- I don't have them.    10:20:54

16        Q.    Well, do -- do you -- I mean,

17   do you know as you sit here today if they

18   still exist?

19        A.    I -- I don't know.  I mean, I

20   haven't looked -- looked at -- looked for    10:21:07

21   those specifically outside of the bigger -- I

22   mean, I don't even know.  They may be in what

23   was provided.  I don't know.

24        Q.    Okay.  Do you have any

25   recollection of getting rid of any that    10:21:19

CONFIDENTIAL

Page 52

1      data --

2            A.      Oh, no.

3            Q.      -- or reports or whatever?

4            A.      No.

5            Q.      So you would have still had --      10:21:26

6      any -- anything that you were provided as a

7      deliverable in connection with this project

8      you should have -- you should still have it?

9            A.      Yes.  I mean, I -- I really --

10     I should say I really -- I don't want to      10:21:44

11     speculate because there were also instances

12     where as we were revising things, the last

13     thing I wanted to do was, you know, have data

14     that wasn't accurate.

15           Q.      Uh-huh.                          10:21:57

16           A.      So in that regard there --

17     there could be, you know, versions.  I -- but

18     I don't want to speculate.  What I do know is

19     that when this lawsuit was filed, counsel was

20     given access to everything.                    10:22:14

21           Q.      Okay.  If we look at the

22     Paragraph 1.12, the second paragraph under

23     deliverables, it says:  "Deliverable will

24     include a list of mobile devices that were

25     observed within a predefined geofence for      10:22:33

CONFIDENTIAL

Page 53

1      each ballot box."

2                  Did you get such a list?

3          A.     I don't -- I don't think that

4      True the Vote ever got such a list.  Not

5      that -- not for any other reason than just      10:22:50

6      we -- we didn't, but OpSec did provide it

7      directly to the Georgia Bureau of

8      Investigations.

9          Q.     Okay.  So at some point in time

10     OpSec had a list?                                10:23:03

11         A.     Had -- well, had a database,

12     yes.

13                 And actually, let me revise

14     that.  It was first provided to the Federal

15     Bureau of Investigations, and then it was       10:23:17

16     shared.

17         Q.     Okay.  Does True the Vote have

18     a copy of what was given to the FBI?

19         A.     No.

20         Q.     Do you know if OpSec does?          10:23:27

21         A.     I -- I don't know.

22         Q.     Then 1.2 says:  "Geofence

23     suspected ballot harvesting organization

24     deliverable will include a list of mobile

25     devices that are observed within the            10:23:41

Page 54

1    predefined geofence for each organization

2    location."

3                Can you tell me how those

4    ballot harvesting organizations were

5    identified?                                10:23:54

6        A.    Initially, we had had a couple

7    of informants in -- in Georgia -- one

8    particularly in Georgia, one particularly --

9    or two in Arizona -- actually, more than that

10   in Arizona -- that had suggested that -- that   10:24:07

11   there were some organizations that seemed to

12   be a part of what they were -- had observed.

13   And so we wanted to measure whether or not

14   there was any validity to that.

15       Q.    And so did you provide that       10:24:25

16   information to OpSec and ask them to evaluate

17   it?

18       A.    I -- I would have, yes.

19       Q.    Yeah.  And then they were

20   supposed to use that -- well, strike that.   10:24:32

21                You expected they would use the

22   information you provided from informants to

23   geofence around the organizations?

24       A.    Yes.  I mean, that plus, you

25   know, their own findings and patterns.       10:24:43

CONFIDENTIAL

Page 55

```
 1          Q.      And then under this paragraph
 2    it says:  "The deliverable will include a
 3    list of mobile devices that are observed
 4    within the predefined geofence of each
 5    organization location."              10:24:56
 6               Did you get a list of those
 7    mobile devices?  "You" being TTV?
 8          A.      No.
 9          Q.      Do you know if it exists
10    someplace?                           10:25:05
11          A.      It would exist in the database
12    that the FBI has.
13          Q.      And forgive me if I asked you
14    this.
15          A.      Sure.                  10:25:14
16          Q.      You don't have a -- you don't
17    have a copy of what the FBI was given?
18          A.      No.
19          Q.      And that was given directly
20    from OpSec?                          10:25:20
21          A.      Yes.
22          Q.      And then number -- No. 2
23    talks -- says:  "OpSec will provide big data
24    analytics and consulting services in close
25    coordination with the True the Vote TTV    10:25:36
```

CONFIDENTIAL

Page 56

```
 1    team."
 2                Do you see that?
 3         A.     Yes.
 4         Q.     Who -- who was on -- who was
 5    the coordinating person on the True the Vote    10:25:42
 6    team for this purpose?
 7         A.     That would have been me.
 8         Q.     And this also talks about
 9    deliverables being certain -- lists of
10    certain mobile device, things.                  10:25:58
11                Did you get those lists?
12         A.     They -- I mean, they were
13    presented over to the FBI once -- you know,
14    once we got to that point.  But -- and I -- I
15    saw it at that point, but I don't have a        10:26:10
16    list.
17         Q.     And when you say you saw it, in
18    what form?
19         A.     As I mentioned, there were some
20    maps that showed pattern of life.  There were  10:26:20
21    IMEI -- some IMEI lists.  Actually, there
22    were quite a variety of things in the -- in
23    the database ultimately.
24         Q.     But, again, you -- your
25    testimony is True the Vote doesn't have and    10:26:39
```

CONFIDENTIAL

Page 57

```
 1     has never had --
 2            A.    We didn't keep any of -- any of
 3     that.
 4            Q.    Okay.  And then the last
 5     category of work was strategic consulting and   10:26:50
 6     support.  It says:  "OpSec group will work
 7     with the TTV team to develop materials with
 8     analytics, visualizations, and related deck
 9     content."
10            Do you see that?                         10:27:03
11            A.    Yes.
12            Q.    And, again, were you the TTV
13     team that's referred to?
14            A.    That was -- I would have been
15     lead, yes.                                      10:27:10
16            Q.    Okay.  And -- and what
17     materials were provided by OpSec in
18     connection with this stream of work?
19            A.    Through OpSec, that's where --
20     I mean, that's where the pattern of life maps   10:27:22
21     came from.  And any -- I mean, any lists of
22     IMEI-related stuff.  And -- yeah.  That's it.
23            Q.    Okay.  But, again, you -- TTV
24     doesn't have copies of any of that?
25            A.    No.  Not to the best of my         10:27:40
```

CONFIDENTIAL

Page 58

1    knowledge.

2        Q.    And do you ever remember seeing

3    hard copies of any of that?

4        A.    I -- I really don't -- I don't

5    know that we ever printed a hard copy.        10:27:52

6            In Arizona, we did, but there

7    was a letter that, as I recall -- but you

8    know what, let me -- it may not have had any

9    of this information in it.  But we just

10   didn't -- everything was digital.            10:28:10

11       Q.    Okay.  And, again, TTV didn't

12   get a digital copy?

13       A.    Not that we still have, no.

14       Q.    Well, did you have it at some

15   point?                                        10:28:24

16       A.    We didn't -- we didn't take --

17   ever take -- I mean, we didn't have computers

18   big enough to open the stuff.  But as we

19   talked, you know, sort of in a fragmented way

20   about certain -- certain map or certain --    10:28:35

21   you know, like when we needed to provide the

22   IMEIs in Wisconsin, that was, you know,

23   provided in that way.  But, I mean, we don't

24   have it -- it -- other than the -- the

25   primary way it was provided, again, with the  10:28:49

CONFIDENTIAL

Page 59

```
 1        thought being FBI was the keeper of record.

 2        So...

 3             Q.    But you don't think you have

 4        any of that data anymore?

 5             A.    It may have been provided for    10:28:58

 6        all I know, but it -- if it -- I mean, that's

 7        all I can say.

 8             Q.    Okay.  And when you say "may

 9        have been provided," you mean in the -- in --

10        to your counsel --                          10:29:07

11             A.    Yes.

12             Q.    -- and then to us?

13             A.    Correct.  Well, I mean --

14             Q.    Well, right.  You -- if it

15        existed, you provided it to your counsel?    10:29:11

16             A.    Correct.

17             Q.    Let's look at -- this was

18        previously marked.  I don't know the number.

19             (Discussion off the record.)

20        (BY MS. KUCK)                               10:29:34

21             Q.    Okay.  Let's look at what was

22        previously marked as Exhibit 9.

23             (Discussion off the record.)

24        (BY MS. KUCK)

25             Q.    Do you have it?                   10:29:56
```

CONFIDENTIAL

                                                        Page 60

1          A.      Yes, ma'am.

2          Q.      Do you see that this is an

3    e-mail to you from -- from you to Debbie

4    D'Souza?

5          A.      Yes.                              10:30:04

6          Q.      And this is dated August 12 of

7    2021?

8          A.      Yes.

9          Q.      And so you were sending her

10   some documents at this point in time?        10:30:13

11         A.      Yes.

12         Q.      And why were you sending her

13   those documents?

14         A.      This must have been after we

15   initially talked about the project.  And my   10:30:26

16   thought would be that I provided this to try

17   to explain as quickly as possible and maybe

18   as comprehensively as possible elements of

19   the -- of the project.

20         Q.      Okay.  And -- and the project    10:30:47

21   you're referring to is the one that was

22   prepared under the scope that we just talked

23   about --

24         A.      Uh-huh.

25         Q.      -- in Exhibit 8?               10:30:55

CONFIDENTIAL

Page 61

1          A.      Right.

2          Q.      And then what are these --

3     there's some legal documents attached.

4                  What are these documents?

5          A.      This was a draft of an              10:31:01

6     intervention that was never filed.

7          Q.      And why wasn't it ever filed?

8          A.      Just, you know, as it all came

9     together, it -- we just decided not to file

10    it.                                              10:31:17

11         Q.      Did that have anything to do

12    with -- well, strike that.

13                 And was the reason it wasn't

14    filed, was that a result of some discussion

15    you had with the NRSC?                           10:31:33

16         A.      No.

17         Q.      You don't -- you don't have any

18    specific recollection as to why it wasn't

19    filed?

20                 MR. EVANS:   Objection.   Asked     10:31:42

21         and answered.

22    (BY MS. KUCK)

23         Q.      Go ahead.

24         A.      I -- I think counsel at that

25    time was concerned about --                      10:31:56

CONFIDENTIAL

Page 62

1              MR. EVANS:  Don't --

2              THE WITNESS:  Oh.

3              MR. EVANS:  No attorney-client

4        privilege.

5          (Speaking simultaneously.)          10:32:09

6              MR. EVANS:  Don't discuss

7        anything that counsel told you.

8              THE WITNESS:  Yeah.  Yeah.

9          (Discussion off the record.)

10     (BY MS. KUCK)                            10:32:12

11        Q.    Okay.  So let's break this up.

12              So -- so were these -- I take

13     it these documents were prepared by some

14     counsel?

15        A.    Yes.                            10:32:17

16        Q.    And who was that counsel?

17        A.    Trying to remember the name of

18     the law firm.

19              I'm sorry.  Okay.  Hall Booth

20     Smith.                                   10:32:41

21        Q.    I'm sorry?

22        A.    Hall Booth Smith was the name

23     of the law firm.

24        Q.    Okay.  And TTV -- did TTV

25     retain them?                             10:32:48

Page 63

1          A.     Yes.

2          Q.     And for what purpose?

3          A.     For the purpose of potential

4     intervention in this case.

5          Q.     And why was TTV interested in          10:32:57

6     potentially intervening in this case?

7          A.     This case was about the

8     Department of Justice having sued Georgia

9     over a piece of legislation that either had

10    passed or was in the -- in the process of          10:33:11

11    being considered.  And I felt at the time

12    that the addition of this project that we had

13    undertaken might be useful in -- in their

14    discussions around drop boxes relative to the

15    legislation.                                        10:33:28

16         Q.     And who was the primary contact

17    at TTV with the law firm in connection with

18    preparing these papers?

19         A.     That would have been me.

20         Q.     Okay.  And did you -- were you         10:33:38

21    the person who provided the information that

22    they used to prepare the papers?

23         A.     To some extent, yes.  There

24    was -- there was another person, her name is

25    Courtney Kramer, who also provided               10:33:50

CONFIDENTIAL

Page 64

1    information.

2         Q.    And who was she?

3         A.    She was executive -- she was

4    executive director of True the Vote for a

5    period of time.  I'm not sure if it was        10:34:12

6    during this time or not.  It must have been.

7    I'm not -- I'm actually not certain.

8         Q.    Okay.  Did she leave True the

9    Vote on good terms?

10        A.    Yes.                                 10:34:27

11        Q.    And let's just turn to the page

12   at the bottom that bears the Bates

13   No. TTV_06837.

14        A.    06837.  Okay.

15        Q.    And that -- that appears to be    10:34:53

16   a draft of an affidavit from you.

17              Do you see that?

18        A.    Yes.

19        Q.    Okay.  Did you -- did you have

20   any role in providing the information        10:35:01

21   contained in here?

22        A.    I mean, I had some role in

23   that, you know, I had discussions with them,

24   but this was a -- a draft that was neither

25   signed nor submitted so...                    10:35:20

CONFIDENTIAL

Page 65

1          Q.      Right.

2          A.      Yeah.

3          Q.      I guess what I'm getting is how

4     far along were these papers?  Were they ready

5     to go?  Did you review them to make sure they    10:35:28

6     were accurate?

7                  Where were you in the process?

8          A.      The -- these were -- I would

9     say they would have been -- had we filed,

10    they would have been close to ready --          10:35:42

11         Q.      Uh-huh.

12         A.      -- but there -- there were some

13    big things as I generally recall that needed

14    to be addressed, but it didn't get filed

15    so...                                            10:35:50

16         Q.      Uh-huh.

17                 Do you remember what those

18    things were?

19         A.      Specifically -- you know what,

20    honestly, I don't recall.  I don't recall.      10:35:57

21         Q.      Okay.

22         A.      But I do -- but what I do

23    recall is that there were many.

24         Q.      But you felt that -- that the

25    papers reflected sufficiently a -- a fair       10:36:08

CONFIDENTIAL

Page 66

```
 1       description of the work enough that you gave

 2       them to Ms. D'Souza?

 3              A.      Well, I wouldn't -- I wouldn't

 4       characterize it that way.

 5              Q.      Okay.                          10:36:23

 6              A.      I think I -- I viewed it more

 7       as -- as a starting point.  When you start

 8       cold with understanding a geospatial project

 9       and, you know, it's just how to wrap your

10       brain around it, and so I thought this might   10:36:36

11       be helpful, anticipating that there would be

12       likely some questions that would come of it.

13                     But this was, you know,

14       fundamentally the ideas of -- of it were --

15       you know, and it showed -- it showed I felt    10:36:48

16       like our desire to try to find proper

17       placement for the -- the information that we

18       had.

19              Q.      And there's -- if you flip to

20       TTV_006843, just a few pages back, there's     10:37:03

21       a -- a draft affidavit of Mr. Phillips.

22                     Do you know whether

23       Mr. Phillips -- well, strike that.

24                     Did you ever provide this to

25       Mr. Phillips for his review?                   10:37:16
```

CONFIDENTIAL

Page 67

1         A.    I -- I don't recall.

2         Q.    Do you know if the lawyers did?

3         A.    I -- I don't -- I really don't

4    know --

5         Q.    Okay.                          10:37:27

6         A.    -- specifically.

7         Q.    Do you know if anyone consulted

8    with him in connection with the preparation

9    of his affidavit?

10        A.    Yes, I'm sure that happened.    10:37:36

11        Q.    Okay.  And who would that have

12   been who consulted with him?

13        A.    I mean, I -- I couldn't tell

14   you specifically.  I guess that's my answer.

15   I really couldn't tell you.  I'm sure someone  10:37:51

16   did, but I couldn't tell you specifically.

17        Q.    Okay.  Do you -- did -- did you

18   review his affidavit?

19        A.    I don't recall reviewing his

20   affidavit.                               10:38:11

21        Q.    Do you recall whether you

22   formed a view of -- of whether his affidavit

23   as drafted accurately reflected the work that

24   OpSec was doing for TTV?

25        A.    I don't -- I don't recall      10:38:23

Page 68

1    reviewing it at all.

2        Q.    If you look at Paragraph 26,

3    which is on Page 849, it -- it -- this is in

4    a section talking about the analysis that

5    OpSec was doing.                          10:39:05

6            And then 26 says:  "To further

7    narrow our investigation, we matched devices

8    that were found within a hundred feet of one

9    or more drop box locations on at least ten

10   occasions and were within a hundred feet of   10:39:15

11   an organization of interest multiple times

12   during the study period?"

13           Is that consistent with your

14   understanding of what OpSec did?

15       A.    It is consistent -- it is       10:39:25

16   consistent.  However, it fails to capture the

17   nuance of the 100 feet being for

18   investigatory purposes the starting point

19   with the idea being to -- it was our

20   understanding that -- that that hundred feet   10:39:52

21   would -- would be an appropriate place for

22   investigatory purposes.

23           Less so in -- in the way that

24   this was -- was written.  So it's -- it's an

25   example of -- of a place that I would have    10:40:07

```
 1    not been happy with at that time.
 2         Q.    And what do you mean when you
 3    say "for investigative purposes"?
 4         A.    The way that we looked at it --
 5    and I will also say that prior to this, I    10:40:22
 6    didn't have -- you know, I didn't have
 7    exposure to working with law enforcement so
 8    I'm -- what they said was what we accepted.
 9              That was to get to -- to get to
10    an area that allowed them to make their own    10:40:38
11    decisions because they would have to
12    recreate, they would have to match up the
13    data.  And so that was the -- that was the
14    reasoning that -- yeah, I'll leave it there.
15    That was the reasoning.                        10:40:52
16         Q.    Okay.  So the idea when you say
17    "for investigative purposes," you're
18    referring to investigations that would
19    subsequently be done by law -- by law
20    enforcement personnel?                         10:41:03
21         A.    That's right.  That -- that's
22    where this all started, yes.
23         Q.    Yeah.  Okay.
24              And when it says "within a
25    hundred feet," is that a radius of a hundred    10:41:09
```

CONFIDENTIAL

Page 70

1    feet?

2           A.    I don't know.  You could --

3    yeah.  I guess you could characterize it as a

4    radius.  There were instances, many, where a

5    drop box was up against the side of a          10:41:19

6    building.

7           Q.    Right.  So obviously --

8           A.    Right.  And more --

9           (Speaking simultaneously.)

10          (Discussion off the record.)          10:41:55

11                MS. KUCK:  We'll leave it

12          there.  The transcript is fine.

13                THE WITNESS:  Very impressed.

14    (BY MS. KUCK)

15          Q.    And then in the next paragraph   10:42:00

16    it says -- it talks about we identified 242

17    unique mobile devices of interest.

18                Do you see that?

19          A.    Yes, ma'am.

20          Q.    Those -- that 242 was in         10:42:08

21    Georgia, right?

22          A.    Yes, ma'am.

23          Q.    Okay.  And the 242 were of the

24    ones that you matched using the criteria in

25    the previous Paragraph 26, right?            10:42:24

Page 71

1          A.     Yes.

2          Q.     Okay.  And was that in

3     connection with the general election or the

4     runoff?

5          A.     As I generally recall, our --      10:42:36

6     our initial look started with the runoff and

7     then look back.  I don't want to speculate

8     on -- on how it -- on -- I don't -- I don't

9     want to speculate.  I really don't recall.

10         Q.     Okay.  So you don't know           10:43:07

11    whether the two -- sitting here today, you

12    can't remember whether the 242 was in

13    connection with the runoff -- and when I say

14    "the runoff," you understand I mean the

15    senate runoff --                               10:43:18

16            (Speaking simultaneously.)

17         A.     Sorry.

18    (BY MS. KUCK)

19         Q.     Senate runoff in Georgia as

20    opposed to the general presidential election  10:43:23

21    in November of 2020?

22         A.     Yes.

23         Q.     Okay.

24         A.     We -- we -- the project started

25    looking at the runoff, and that's why I'm a   10:43:31

Page 72

```
 1      little fuzzy on where -- where or how much or

 2      whatever lines were drawn around the various

 3      elections.

 4           Q.    Okay.  Fair enough.

 5                 MS. KUCK:  We've been going      10:43:46

 6           over an hour.  I've got one more

 7           question on this document, and then we

 8           can take a break.

 9                 MR. EVANS:  Sure.

10                 MS. KUCK:  Few more questions.   10:43:51

11      (BY MS. KUCK)

12           Q.    If you look at the page

13      beginning -- it's right at the beginning.  It

14      starts at 821, and it goes through 836.  And

15      those pages are marked as -- as exhibits.    10:44:07

16                 Do you see that?

17           A.    Yes.

18           Q.    What are these documents?

19           A.    Exhibits that were created in

20      supplement to the -- the suit.               10:44:24

21           Q.    And who created them?

22           A.    I -- I would -- I would be

23      speculating.  True the Vote did not create

24      them.

25           Q.    Do you know if OpSec created      10:44:42
```

CONFIDENTIAL

Page 73

```
 1    them?
 2            A.    I -- I don't.  I don't -- I
 3    can't say definitively.
 4            Q.    Okay.  Who else other than TTV
 5    and OpSec would have had sufficient          10:44:55
 6    information to create these?
 7            A.    The law firm may have
 8    attempted.  I -- I really don't know.
 9            Q.    But, for example, Exhibit F --
10            A.    I'm sorry.                      10:45:19
11            Q.    -- which is on 826, does
12    that -- seeing that, do -- do you know where
13    that came from?
14            A.    I believe that these were
15    similar to at minimum the type of map that   10:45:36
16    Red Metrics was providing.
17            Q.    Okay.  Did you have any --
18    and -- well, strike that.
19                  Red Metrics was a contractor
20    that OpSec worked with on this project?       10:45:49
21            A.    Correct.
22            Q.    Did you have any direct
23    communications with Red Metrics?
24            A.    I did not.
25            Q.    And -- but your understanding   10:45:55
```

CONFIDENTIAL

Page 74

```
 1      is this type of -- of map would have -- was

 2      being provided by Red Metrics to OpSec?

 3           A.     Well, I'm speculating only on

 4      the basis of understanding that OpSec doesn't

 5      do graphic -- typically doesn't do graphic      10:46:13

 6      stuff.

 7           Q.     Uh-huh.

 8           A.     So that would be my thought.

 9      But, again, I am -- I am speculating.

10           Q.     Okay.  But other than OpSec or      10:46:19

11      Red Metrics, can you think of anybody else

12      who would have had this information to -- to

13      create these maps?

14           A.     I mean, theoretically the FBI.

15      But, you know, no.  I mean, that would be it.   10:46:32

16           Q.     Okay.  And if the FBI had it,

17      it was provided by OpSec?

18           A.     That -- yes -- well, I mean,

19      the data would have been, and then they would

20      have done graphics or whatever.                 10:46:43

21           Q.     Right.  Have you seen maps like

22      this in any other context?

23           A.     In any other context?

24           Q.     Yeah.  I see them here.

25           A.     Uh-huh.                             10:46:54
```

Page 75

```
 1          Q.     Were these part of the
 2     deliverables, for lack of a better word, that
 3     TTV got in connection with the contract we
 4     talked about?
 5          A.     Well, again, we never took          10:47:05
 6     ownership or possession or -- but I do recall
 7     seeing them, and I do believe that they were
 8     a part of what was provided to the FBI, but
 9     that handoff was not done by True the Vote.
10          Q.     Right.  It was done by OpSec?        10:47:20
11          A.     Yes.
12          Q.     If you look at the page,
13     it's -- it says Exhibit B at the top, but
14     it's TTV_006822.
15          A.     Okay.                                10:47:48
16          Q.     And it says "Organizations of
17     interest"?
18          A.     Yes.
19          Q.     Were those the -- were those
20     organizations listed there among the ones      10:47:56
21     that you referenced when you were talking
22     about -- when we were talking about the
23     contract and you said informants had provided
24     you with some information?  Is that where
25     this -- these names of these organizations     10:48:10
```

CONFIDENTIAL

Page 76

```
 1      came from?
 2           A.    By this point in the analysis,
 3      I would -- I -- I really don't remember if --
 4      I really don't remember if what we were
 5      originally given in Georgia turned out to be      10:48:29
 6      any of these or not.  I don't -- I don't
 7      recall.
 8           Q.    Okay.  In looking at the names
 9      of these organizations, the ones -- I'm
10      talking about the ones in Georgia, were they     10:48:53
11      ultimately organizations that TTV concluded
12      were participating in ballot harvesting?
13           A.    Well, we never concluded
14      anything.  We -- we observed that there were
15      patterns.                                        10:49:13
16           Q.    Okay.  Were these organizations
17      ones in which TTV observed patterns that it
18      believed could be reflective of ballot
19      harvesting?
20           A.    Well, I mean, we -- we observed     10:49:26
21      there was a pattern between devices going
22      back and forth from these addresses or from
23      addresses to drop boxes.
24           Q.    Okay.  And then when you looked
25      at the addresses, these are organizations        10:49:43
```

CONFIDENTIAL

Page 77

1    that were at these -- those addresses?

2         A.    Yeah.  I -- yes.  I -- I -- I'm

3    going to -- I'm going to say I -- it must

4    have been.

5         Q.    Okay.  The set of exhibits we        10:49:59

6    just looked at, do you remember reviewing

7    them in connection with this potential

8    filing?

9         A.    All I can tell you is I --

10   well, I remember seeing them in the draft.    10:50:19

11        Q.    Okay.  And I know we talked

12   about Mr. Phillips's affidavit in particular,

13   but did you share this full draft with

14   Mr. Phillips?

15        A.    I -- I would -- I mean, I would    10:50:30

16   assume, but I don't recall.

17        Q.    Okay.  Do you recall having any

18   discussions with him about the substance of

19   the draft?

20        A.    The substance of the draft?       10:50:40

21        Q.    Yeah.

22        A.    Not any specific conversations,

23   no.

24        Q.    Okay.

25             MS. KUCK:  So we can take a         10:50:49

CONFIDENTIAL

Page 78

1          break then because we've been going an

2          hour and 20 minutes.

3                   MR. EVANS:  Okay.

4                   THE VIDEOGRAPHER:  Off the

5          record at 10:50.                          10:50:55

6          (Break from 10:50 a.m. to 11:05 a.m.)

7                   THE VIDEOGRAPHER:  Back on the

8          record at 11:05.

9                   MS. KUCK:  And since we took

10         the break, Mr. Vining, who is counsel    11:04:46

11         for the D'Souza defendants, has also

12         joined us by telephone.

13                   Is that right?

14                   MR. EVANS:  Who is that?

15                   MS. KUCK:  Austin.              11:04:55

16                   MR. EVANS:  Oh, Austin.

17                   MS. KUCK:  Austin Vining.

18                   MR. EVANS:  Got it.

19                   MS. KUCK:  And then,

20         Mr. Vining, you're not recording this,   11:05:00

21         are you?

22                   MR. VINING:  I am not.

23                   MS. KUCK:  And do you represent

24         that you will not at any time?

25                   MR. VINING:  I will not record  11:05:07

CONFIDENTIAL

Page 79

1           this at any time.

2                   MS. KUCK:  Okay.  And do you

3           have your headphones on so no one else

4           can hear?

5                   MR. VINING:  I do have my          11:05:15

6           headphones on, and I am alone.

7                   MS. KUCK:  Okay.  Great.  Thank

8           you.

9       (BY MS. KUCK)

10          Q.    So let me show you a document      11:05:20

11      that we've marked as Plaintiff's Deposition

12      Exhibit 33, which bears TTV_006957 through

13      TTV_00762.

14          A.    Oh, that's it.  Okay.

15          (Marked Engelbrecht Exhibit No. 33.)     11:05:39

16      (BY MS. KUCK)

17          Q.    And this seems to be an e-mail

18      to Alex --

19                  MS. HYLAND:  Can I have a copy,

20          please?                                  11:05:55

21                  MS. KUCK:  Oh.

22            (Discussion off the record.)

23      (BY MS. KUCK)

24          Q.    This seems to be an e-mail from

25      you to an Alex Pfeiffer with an address at   11:06:14

CONFIDENTIAL

Page 80

```
 1    Fox News.

 2              Do you see that?

 3         A.    Yes.

 4         Q.    And who is Mr. Pfeiffer?

 5         A.    He was a -- I think a producer,    11:06:19

 6    but at Fox, and he represented a number of

 7    shows.

 8         Q.    Was Tucker Carlson's one of

 9    those shows?

10         A.    I -- I really couldn't -- I       11:06:34

11    can't affirm that.  I don't know.

12         Q.    Okay.  And why were you

13    sending -- well, strike that.

14              It appears that -- that you

15    sent him the same set of documents that you   11:06:45

16    had sent to Ms. D'Souza that we just looked

17    at a few minutes ago?

18         A.    Yes.

19         Q.    And this is in September, so

20    this is a -- a month later than the -- the    11:06:53

21    sending of them to -- strike that.

22              This is in September, which is

23    a month after you apparently sent them to

24    Mrs. D'Souza, correct?

25         A.    I -- yeah.  Yes.                    11:07:04
```

CONFIDENTIAL

Page 81

```
 1          Q.     Okay.  And why were you sending
 2     them to Mr. Pfeiffer?
 3          A.     It's been a long time.  And
 4     I -- I -- I -- you know, all -- I don't
 5     really -- specifically recall.  But it would    11:07:20
 6     have clearly been around trying to explain
 7     what we've been working on and -- and try to
 8     determine whether or not there was any
 9     interest in taking a closer look at it.
10          Q.     And there's a -- fair to say a       11:07:35
11     summary of your work in the cover e-mail
12     here?
13          A.     Yes.
14          Q.     And who prepared that?
15          A.     I would have.                        11:07:46
16          Q.     And so where did you get the
17     information that's included here, the
18     specific -- I'm talking about the specifics
19     relating to the project?
20          A.     Yeah.  That would have been          11:07:59
21     from OpSec.  Oh, well, let me make sure.
22                 To -- to the extent that it
23     includes data elements that are -- I would
24     say correlated to open records requests and
25     those kinds of things, those would have been    11:08:19
```

CONFIDENTIAL

Page 82

1    from us.

2         Q.    Okay.  So the first category

3    under geospatial data, would that have come

4    from OpSec?

5         A.    Yes.                              11:08:28

6         Q.    And then under the second

7    category, which is video --

8         A.    Yes.

9         Q.    -- was that information that

10   you had at TTV?                             11:08:34

11        A.    That's a good question.  We did

12   request the video, but we did not have the

13   capacity to open and view it.  It required

14   special -- everything had a different viewer,

15   and it was a ton of data.  And so -- and it   11:08:49

16   was all hard drive and whatever so...

17        Q.    Uh-huh.  So did you then

18   provide that data for OpSec for OpSec to do

19   its work with?

20        A.    Yes, we provided the hard         11:09:04

21   drives to OpSec.

22        Q.    Okay.  And then in parentheses

23   under the first bullet under video, it says:

24   "Video availability in other states is

25   essentially nonexistent despite CISA         11:09:13

CONFIDENTIAL

Page 83

1    guidelines to contrary.  Open records

2    requests submitted consistently since January

3    continue to be met with conflicting

4    communications and stalls."

5              Am I correct in understanding        11:09:27

6    that at this point in time you only had been

7    able to obtain the drop box surveillance

8    video in Georgia?

9        A.    I -- I can't confirm that.  We

10   ultimately got some limited video out of       11:09:48

11   Michigan and one drop box out of Wisconsin.

12   But it -- that may have been what I was

13   referring to when I said "essentially

14   nonexistent."

15       Q.    The -- the video that was used       11:10:03

16   in 2000 Mules film, that was provided by TTV

17   by way of OpSec, correct?

18       A.    Correct.

19       Q.    And was any of that video used

20   in the film from any state other than         11:10:21

21   Georgia?

22       A.    I don't believe so, no.

23       Q.    Okay.  So you think everything

24   in the film came from the Georgia records?

25       A.    Yeah.  There was a sequence          11:10:35

CONFIDENTIAL

Page 84

1    about long-term care that happened in -- I

2    don't remember if that was Michigan or

3    Wisconsin.

4         Q.    But other than that, where

5    there were clips of people voting --           11:10:51

6         A.    Yeah.  I don't believe so.

7         Q.    -- you think it was all from

8    Michigan -- or from Georgia?

9         A.    All from Georgia.

10        Q.    Yeah.                                11:10:57

11        A.    Yes, I think so.

12        Q.    Okay.  And then the next

13   section is a description of the additional

14   exhibits and database correlations.

15             Is that information that you         11:11:09

16   prepared or you got from someone else?

17        A.    Let's see, the first three

18   bullets would have been OpSec related.

19             The database of all available

20   chain of custody would have been True the      11:11:37

21   Vote.

22             And then the extensive open

23   records request would have been True the

24   Vote.

25        Q.    And everything else was OpSec?      11:11:54

CONFIDENTIAL

Page 85

```
1           A.      Yes.
2           Q.      And what were you -- what was
3     your objective here, what were you hoping
4     that Mr. Pfeiffer might do with this
5     information?                                11:12:08
6           A.      Yeah.  I -- I just -- take an
7     interest.  It was a very chaotic time.  And I
8     think then and now that this body of work
9     was -- was -- would have been very important
10    to explore deeply.  And just -- and we hadn't  11:12:26
11    talked about it at all.  Because we were
12    trying to work with law enforcement and not
13    get ahead of them.
14                And so it felt a little like
15    trying to catch up, like let me just show you  11:12:39
16    what we've been working on, you know.  That
17    was it.
18          Q.      And did you have any follow-up
19    conversations with Mr. Pfeiffer after you
20    sent this information?                        11:12:51
21          A.      Not that I can recall.
22          Q.      Did you follow up with him at
23    all?
24          A.      Not that I can recall.
25          Q.      Okay.  The draft intervenor      11:12:58
```

CONFIDENTIAL

Page 86

 1      documents we've been talking about --

 2           A.      Uh-huh.

 3           Q.      -- did you provide those to

 4      anybody else other than Ms. D'Souza and

 5      Mr. Pfeiffer?                                    11:13:11

 6           A.      Not -- not that I can recall.

 7           Q.      Do you recall, though, at some

 8      point later after the lawsuit was filed you

 9      provided them to the Salem general counsel?

10           A.      I don't specifically recall        11:13:20

11      that, but if that's what the documents show,

12      then that's what I did.

13           Q.      Okay.  You can't remember

14      anybody else?

15           A.      No.                                 11:13:31

16           Q.      All right.  In May of 2022

17      there was a lot of postings by TTV about

18      pulling the rip cord and releasing some data.

19              Do you remember that?

20           A.      Yes.                                11:13:52

21           Q.      And was that data that TTV had,

22      or was it all data that OpSec had?

23           A.      It would have been data that

24      OpSec had.  We would have probably put in

25      like the bullets I was just talking about      11:14:02

CONFIDENTIAL

Page 87

1    like the spreadsheet of chain of custody

2    documents, but it was broadly what OpSec had

3    at that point or what the database consisted

4    of at that point, to be more specific.

5        Q.    Okay.  And that data, though,    11:14:15

6    was never released, correct?

7        A.    No.

8        Q.    And why not?

9        A.    2022 turned out to be a very --

10   preceding months turned out to be very    11:14:31

11   difficult on many levels.  And that plus as

12   we -- you know, as we tried to put something

13   into a presentable format, you couldn't

14   just -- you couldn't just post it.  It would

15   just fry anybody's computer.    11:14:50

16              So how would you do that?  How

17   would you chunk it up?  How would you, you

18   know, post it?

19              The costs were extremely

20   significant.  And, you know, we know well    11:15:00

21   enough that if you post something that's not

22   easily digested, you get as much pushback

23   than if you just do it at all and just say

24   this is what's going on so we -- you know,

25   that's what ultimately we began to post.    11:15:19

CONFIDENTIAL

Page 88

1      Like, this is what's happening, and this is

2      why it's not being posted so...

3              Q.      And do you remember when the

4      decision was made finally that you wouldn't

5      be posting it?                                    11:15:30

6              A.      I -- I don't recall.

7              Q.      You know a man in Georgia by

8      the name of David Cross?

9              A.      I -- I certainly -- I do know

10     his name, yes.                                    11:15:51

11             Q.      Okay.

12             A.      And I have met him, yes.

13             Q.      And who -- and what context do

14     you know him?

15                     I'm sorry, in what context have  11:15:59

16     you met him?

17             A.      I -- I became aware of him

18     after he filed a complaint with the Secretary

19     of State that we got brought into without

20     my -- I didn't know who he was at the time.       11:16:18

21                     And that -- I mean, that was --

22     that was how that happened.

23             (Discussion off the record.)

24                     THE WITNESS:  We done with 33?

25                     MS. KUCK:  We're done with 33.    11:16:46

Page 89

```
 1                THE WITNESS:  Okay.  Try to

 2          keep them...

 3      (BY MS. KUCK)

 4          Q.    And that -- the complaint that

 5      you're talking about that he filed in Georgia    11:16:50

 6      was in April of 2022.

 7                Does that sounds right?

 8          A.    Yeah.  I would have to look at

 9      it.  I mean, that's -- I mean, I don't know

10      when he actually filed it.                       11:16:58

11          Q.    Yeah.

12          A.    I think that's when -- whatever

13      the dates are on the documents.

14          Q.    Right.

15          A.    I'm not objecting to those.            11:17:04

16          Q.    Okay.  Let's mark as Exhibit 32

17      a document bearing Bates numbers MA-000460

18      through MA 00462.

19          (Marked Engelbrecht Exhibit No. 32.)

20              (Discussion off the record.)             11:17:55

21      (BY MS. KUCK)

22          Q.    So the -- this document appears

23      to be a screenshot from a post on Facebook by

24      True the Vote.

25                Do you see that?                        11:18:07
```

CONFIDENTIAL

Page 90

1         A.    Yes.

2         Q.    And this is January 30 of --

3    doesn't have the year, but I can represent to

4    you it's 2022.

5         A.    Okay.                              11:18:16

6         Q.    The -- it says:  "True the Vote

7    would like to extend a special thank you to

8    David Cross for being a great American.  We

9    deeply appreciate his work for free and fair

10   elections in Georgia.  It's patriots like him   11:18:26

11   that make this country great.  This is just

12   the beginning.  Get ready, patriots."

13             Do you see that?

14        A.    I do.

15        Q.    And so this is -- this is         11:18:35

16   January before his complaint was filed in

17   April?

18        A.    (Nodding head.)

19        Q.    Does this refresh your

20   recollection in any way that you were aware    11:18:44

21   of him prior to the time he submitted the

22   complaint?

23        A.    This does -- I do recall this.

24        Q.    Yeah.

25        A.    I was not aware of -- of this     11:18:51

Page 91

1    post.  I -- it is my general recollection

2    that someone from the team at that time knew

3    David now that I'm seeing this.

4        Q.    Uh-huh.

5        A.    And I remember being extremely    11:19:07

6    frustrated.  In fact, I'm frustrated now

7    looking at it because as I genuinely recall

8    what this gentleman in this video goes on to

9    hold up appears to be voter registration

10   applications which was not -- I mean, it's    11:19:22

11   not necessarily at cross purposes with the --

12   with the comment, but it wasn't -- it wasn't

13   accurate.  I mean, in my -- I would not have

14   done this, and so I was -- I was frustrated

15   at the time.                                  11:19:37

16       Q.    And do you remember who it was

17   on your team that was responsible for posting

18   this?

19       A.    It most likely had been

20   Chelsea.                                      11:19:48

21       Q.    Did she -- did she know

22   Mr. Cross?

23       A.    I can't -- I mean, they were

24   both from Georgia, but I can't -- somebody

25   knew him or maybe his name had been published  11:20:00

CONFIDENTIAL

Page 92

```
 1      with -- along with this.  I don't -- I don't

 2      know.

 3              Q.      What do you recall about any

 4      conversations you had with her about this

 5      posting?                                    11:20:09

 6              A.      As I vaguely recall --

 7              Q.      Uh-huh.

 8              A.      -- this got a good bit -- not

 9      this necessarily, but his original or

10      whatever -- whatever -- if he posted         11:20:21

11      something or however it originally came out,

12      I don't recall how, but I remembered the

13      conversation with Chelsea saying that when

14      you -- when he -- as I -- again, I'm -- as I

15      generally recall, at some point in this video  11:20:35

16      he fans out what appears to be very long

17      pieces of paper.

18                  I say those are not -- those

19      are not ballots.  Those are not in a security

20      envelope.  Who knows what he's putting in.  I  11:20:46

21      mean, that's not something we would be

22      highlighting or should be highlighting.

23              Q.      Okay.  And the -- the

24      discussion you had with her about this, was

25      it around the time of the post or at some    11:20:59
```

CONFIDENTIAL

Page 93

1    later point in time?

2          A.    I couldn't -- I really couldn't

3    tell you.

4          Q.    Okay.  And you can't recall

5    whether it was after you learned about the          11:21:09

6    complaint that he filed in Georgia?

7          A.    If -- I'm sorry.  If this came

8    after he filed the complaint in Georgia?

9          Q.    You became -- did you become

10   aware of it before or after he filed his           11:21:23

11   complaint?

12         A.    I -- I couldn't -- I couldn't

13   tell you.

14         Q.    Okay.  So let's take a look at

15   his complaint which we marked yesterday as          11:21:37

16   Exhibit 29.

17         A.    Okay.

18            (Discussion off the record.)

19         A.    Okay.

20   (BY MS. KUCK)                                       11:22:06

21         Q.    And is this the -- the

22   complaint filed by Mr. Cross that you were

23   referring to?

24              I should actually refer --

25   because there's a number of documents here.         11:22:21

Page 94

1       I should refer you to 82 -- I think it's

2       Page 8231 --

3                  MS. HYLAND:  8231?

4                  MS. KUCK:  Yeah.

5                  THE WITNESS:  Okay.              11:22:40

6       (BY MS. KUCK)

7            Q.      -- through 8237.

8            A.      Okay.

9            Q.      That's his complaint?

10           A.      I -- I -- just to be clear,    11:22:51

11      this is -- we got -- everything came back as

12      part of his complaint so --

13           Q.      Okay.

14           A.      -- I don't -- I'm not entirely

15      sure what would be considered as -- was what   11:23:06

16      Mr. Cross specifically submitted.

17           Q.      Okay.  And when you say "what

18      came back," you're referring -- you -- you --

19      your testimony is you obtained these

20      documents from an open records request?    11:23:21

21           A.      Open records request.

22           Q.      In Georgia?

23           A.      Yes.

24           Q.      And what caused you to make

25      that request?                              11:23:27

Page 95

1          A.     I had read in the newspaper

2     that True the Vote's complaints had been --

3     what's the right word -- discussed or

4     determined, I guess.  And I -- I had no

5     knowledge of what was being -- what that      11:23:46

6     would be.

7                And there was, I believe -- I

8     believe the reference that in the -- in --

9     that the -- the trigger was the SEB 2022-054

10    that I -- that that was the -- the thing I     11:24:02

11    thought we could -- we could go after.  I had

12    no idea really what was -- what -- what we

13    should be looking for.

14                Yeah.  That's -- I should read

15    this first.  That's correct.  Because that's   11:24:16

16    how we -- how we -- how we laid this out.

17          (Discussion off the record.)

18    (BY MS. KUCK)

19          Q.     And when you say "54," you're

20    referring to the page at the bottom?          11:24:29

21          A.     No, I'm referring to the

22    complaint number, like 20 -- like on

23    Page 8230.

24          Q.     Okay.  Okay.  So Page 8230?

25          A.     That's just an example of how    11:24:48

1      the state election board was numbering cases
2      and --
3           Q.     I see.
4           A.     Yeah.  And that's what I knew
5      had been referred to.  Somewhere I'd read it.   11:24:57
6      I mean, I must have read it.  I wouldn't have
7      heard that.  But that's what I knew to go by
8      because I didn't -- we had submitted
9      complaints, but we hadn't been advised of
10     anything at the SEB and I didn't -- I didn't   11:25:10
11     know that ours had been given any -- whether
12     or not they had been given case numbers, so I
13     was just trying to figure out what was going
14     on.
15          Q.     And so -- so TTV around this      11:25:20
16     time had also submitted its own complaint?
17          A.     No, we submitted complaints
18     back in initially -- oh, gosh -- end of
19     October or November of 2021.
20          Q.     Right.  And it was still         11:25:40
21     pending, though, at this time in April of
22     2022?
23          A.     Oh, yeah.
24          (Discussion off the record.)
25     (BY MS. KUCK)                                11:26:05

Page 97

```
 1           Q.    Okay.  Let's mark as Exhibit 34
 2      a document bearing MA-0000631.
 3           (Marked Engelbrecht Exhibit No. 34.)
 4      (BY MS. KUCK)
 5           Q.    And this is an agenda from the      11:26:29
 6      state board of election Georgia Secretary of
 7      State dated May 17 of 2022.
 8                 Do you see that?
 9           A.    Yes.
10           Q.    And is the -- under Section 7       11:26:41
11      there are three cases referred to.
12                 Are those the cases referred to
13      Mr. -- that were filed by Mr. Cross?
14           A.    I don't know that they were all
15      filed by Mr. Cross.  I just knew that those    11:26:52
16      were the ones we wanted to look at.
17           Q.    Okay.  But if we look at the
18      number on Page 8231 that you were referring
19      to, the first page of -- of the -- if we look
20      at 8231?                                       11:27:15
21           A.    Yes.
22           Q.    And that says "Case title" --
23           A.    Uh-huh.
24           Q.    -- "SEB 2022-054"?
25           A.    Yes.                                11:27:23
```

CONFIDENTIAL

Page 98

1          Q.     And that lines up with one of

2     the ones that's under Section 7?

3          A.     Correct.  Yes, it does.

4          Q.     Okay.  And this case,

5     SEB 2022-054, you under -- do you understand      11:27:34

6     that was a case filed by Mr. Cross making

7     allegations against Mr. Andrews who is the

8     plaintiff in this case?

9          A.     Yeah.  At the time, I didn't

10    know what it was.  But, I mean, having read       11:27:52

11    these documents, yes.

12         Q.     Okay.  And then if you look on

13    that agenda further up under No. 5?

14         A.     Yes.

15         Q.     It says "Update on True the           11:28:01

16    Vote complaint"?

17         A.     Yes.

18         Q.     Do you know what that refers

19    to?

20         A.     We were not aware that -- that        11:28:05

21    there was going to be any discussion about

22    anything related to True the Vote.

23                As I generally recall, a

24    representative from the Secretary of State's

25    office talked with the board about -- I -- I      11:28:23

Page 99

1    really don't recall the -- the back-and-forth

2    specifics, but -- I don't -- I really don't

3    recall the back-and-forth specifics.

4              The end result was, as I -- as

5    I believe out of this meeting, the state        11:28:51

6    election board authorized to advance or -- or

7    shortly after -- thereafter we received a

8    subpoena.  So that -- that was the nature of

9    that, but I didn't know anything about it.  I

10   wasn't prepared for it.                         11:29:07

11        Q.    Did -- did you or anyone else

12   representing True the Vote attend this

13   meeting on May 17, 2022, of the Georgia state

14   election board?

15        A.    Not to the best of my              11:29:20

16   knowledge.

17        Q.    So when -- so you received

18   Mr. Cross's complaint through the open

19   records process in Georgia?

20        A.    Yes.                                11:29:42

21        Q.    And if you look at 8233, which

22   is the second page of the exhibit, Exhibit 9

23   I think it is -- 29, it says, quote, A

24   private investigative organization, True the

25   Vote, purchased billions of cell phone pings,  11:30:00

Page 100

1    and they identified this individual -- which

2    is underlined -- by tracking his cell phone

3    pings to multiple ballot drop boxes.

4                Do you see that?

5         A.    I do.                              11:30:11

6         Q.    Is that statement true?

7         A.    No.  That is not true.

8         Q.    And so where would Mr. Cross

9    have gotten that idea?

10        A.    I really don't know.              11:30:18

11        Q.    Did you ever ask him?

12        A.    Yes, I did.  I e-mailed him

13   and -- because I wanted to have something in

14   writing.  And said what -- you know, it's

15   part -- it's an exhibit somewhere because     11:30:31

16   I've seen it.

17                And asked why he included True

18   the Vote.  And he said he -- he didn't think

19   that he had.  And I just -- oh, you know,

20   Okay.  I mean, yes, you did.  But that was    11:30:45

21   it.

22                And then I went on to say:

23   "Please don't do that."

24        Q.    Did you -- in that e-mail

25   chain, did you tell him that that statement   11:30:54

CONFIDENTIAL

Page 101

1      was false?

2            A.      I -- I don't remember the

3      specifics of the e-mail chain.  It's possible

4      that I did.  I -- I definitely told him this

5      was not -- we have no affiliation with this      11:31:04

6      and don't do it.  Don't include us in these

7      things.  This is not -- we're not a party to

8      this.

9            Q.      Well, let's look at TTV_00016.

10            Okay.  So let me mark as            11:31:26

11      Exhibit 35 a document bearing control Nos.

12      TTV_00016 through 00017.

13          (Marked Engelbrecht Exhibit No. 35.)

14      (BY MS. KUCK)

15            Q.      Is this the e-mail chain that      11:32:06

16      you were referring to your correspondence

17      with Mr. Cross?

18            A.      Yes.

19            Q.      So it looks like the -- from

20      the chain that he actually reached out to you      11:32:14

21      on May 22 about your complaint.

22                  You see that on the second

23      page?

24            A.      I do see it, but it may be a

25      time zone thing because he's responding --      11:32:30

CONFIDENTIAL

Page 102

1    you know, I said:  "To avoid confusion,

2    please don't reference True the Vote."

3                And then he says:  "I don't

4    think I've ever referenced True the Vote."

5        Q.    At the -- in the top one he is,    11:32:40

6    but I'm going to the -- if you look on

7    Page 17.

8        A.    Oh.

9        Q.    It looks like he reached out to

10   you, and then you responded.                  11:32:47

11       A.    Oh, that's possible.  I don't

12   recall it that way, but I guess that's --

13   that's possible.

14       Q.    And in -- in the response that

15   you gave, which is at the bottom of 2 --      11:33:01

16   of -- of TTV_00016, you say to -- "Also, I

17   have a request.  To avoid confusion in your

18   further complaints, please don't reference

19   True the Vote or the movie.  That will avoid

20   future misrepresentations in the press which  11:33:17

21   will definitely help us both."

22                Do you see that?

23       A.    Yes.

24       Q.    But you didn't say to him the

25   information in your complaint is incorrect?   11:33:24

CONFIDENTIAL

Page 103

1          A.     Yeah.  I -- I mean, I -- I said

2     it was a misrepresentation, but I didn't go

3     beyond that.  I felt like if True the Vote

4     didn't have anything to do with it, he can

5     say whatever he wants to say.  I just don't     11:33:37

6     want to have us named in it.

7          Q.     Do you ever remember having any

8     communication with him other than this e-mail

9     chain about the complaint that he filed?

10          A.     About the complaint that he          11:33:50

11     filed?  I really don't recall.

12          Q.     But the -- the back-and-forth

13     you had with him about the complaint that you

14     were remembering in your earlier answer,

15     that's what this document --                     11:34:09

16          A.     Yes.

17          Q.     -- is?

18          A.     Yes.

19          Q.     Do you -- are you aware of

20     anyone at TV -- TTV ever -- ever saying to      11:34:14

21     him that, you know, his -- he had

22     misrepresented TTV's work in his complaint?

23          A.     That they said that to me?

24          Q.     That -- no.

25          Do you -- do you recall anyone          11:34:29

CONFIDENTIAL

Page 104

```
 1        at TTV saying -- saying that to him?
 2              A.    I -- I -- I -- it's possible,
 3        but I -- I don't -- I wasn't -- as I
 4        generally recall, I wasn't in a conversation
 5        where that specifically occurred, but it's     11:34:42
 6        possible.
 7              Q.    But you don't know -- you can't
 8        identify anybody?
 9              A.    I can't.  I mean, you know,
10        there were people that were working with us    11:34:51
11        at that time that lived in Georgia.  It's a
12        very small community.  It's entirely
13        possible, but I -- I can't -- I don't know of
14        a specific example.
15              Q.    Is it possible that one of         11:35:00
16        those -- those people gave him the
17        information that's reflected in his
18        complaint?
19              A.    I wouldn't -- I wouldn't see
20        how.  I mean, they -- they wouldn't have had   11:35:11
21        access to anything at that point so...
22              Q.    This is -- so the complaint is
23        dated April 25, 2022?
24              A.    Uh-huh.
25              Q.    The movie wasn't out at that       11:35:24
```

CONFIDENTIAL

Page 105

1    point, correct?

2         A.    That's right.

3         Q.    Okay.  But the trailer was out?

4         A.    The -- yes, the -- there were

5    two trailers, and the one of them had been        11:35:32

6    out for a while.  I don't recall the second

7    one.

8         Q.    Okay.  And we also -- we spoke

9    yesterday with Mr. Phillips about an

10   appearance you did on Charlie Kirk?            11:35:47

11        A.    Yes.

12        Q.    You remember that?

13              And that was prior to this as

14   well, right?  That was April 8?

15        A.    I -- whatever -- whatever date       11:35:56

16   it was.

17        Q.    Other than those -- those

18   two -- the trailers and the Charlie Kirk

19   interview, are you aware of any other public

20   discussion from which he could have drawn the   11:36:21

21   conclusions that he has in this bullet?

22        A.    No.  But I am recalling he also

23   was very active in -- in filing complaints

24   and was also getting open records requests

25   video.  That, I do -- that, I do recall.  I     11:36:40

CONFIDENTIAL

Page 106

1    couldn't tell you the specific

2    conversation --

3          Q.    Right.

4          A.    -- or who told me that, but I

5    do recall that.                          11:36:48

6          Q.    But none of that would have

7    formed any basis for a statement that True

8    the Vote had purchased cell phone pings and

9    identified this individual by tracking his

10   cell phone?                              11:37:00

11         A.    No, that would not have been --

12   that's not true.

13         Q.    Right.

14               And you never asked him where

15   he got that impression from?             11:37:06

16         A.    No.  And -- and honestly when

17   we looked at this in -- in yesterday's

18   setting, my first recollection was only that

19   he said True the Vote.  I was shocked afresh

20   to see that that was written in there in this  11:37:22

21   way.  That's -- yeah, I -- I have no idea why

22   or...

23         Q.    Where he would have gotten that

24   impression from?

25         A.    I don't know.                11:37:35

CONFIDENTIAL

Page 107

```
 1          Q.      Now, at this -- the hearing
 2    that was held on May 17, you were aware that
 3    at that hearing the Georgia SEB cleared
 4    Mr. Andrews of any wrongdoing as alleged in
 5    Mr. Cross's complaint?                        11:37:56
 6          A.      Yes, ultimately I became aware
 7    of that.
 8          Q.      Do you remember when you became
 9    aware of it?
10          A.      Probably first when I had -- I    11:38:02
11    read it somewhere, and then it was affirmed
12    again, you know, through this.
13          Q.      Right.  So you read about it
14    someplace, and then you got the open records
15    which also indicate that Mr. --              11:38:13
16          A.      I think that's right.  I
17    think --
18          Q.      -- Andrews was a --
19          A.      I think there's a transcript.
20                  I'm sorry.                       11:38:21
21          Q.      Right.  So I'll just read the
22    question in so the record is clear.
23                  So you read about it someplace,
24    and then you think you got the open records
25    requests which also indicate that Mr. Andrews  11:38:28
```

Page 108

1    had been cleared by the SEB?

2         A.    Yes, I believe that that's part

3    of what you -- what I -- what I got back in

4    this, yes.

5         Q.    And we talked about earlier the    11:38:43

6    movie hadn't come out at this point, right?

7               The movie ultimately came out,

8    and it included the footage of Mr. Andrews,

9    correct?

10        A.    Yeah.  I did not know -- I        11:39:05

11   still don't know, you know, who Mark Andrews

12   is, but -- but yes, that video that -- that

13   was included in this complaint was in the

14   movie.

15        Q.    Okay.                             11:39:18

16        A.    Or a portion of it, I guess I

17   should say.

18        Q.    But you were aware by that time

19   that the SEB had concluded that there was no

20   evidence that that individual, whoever they    11:39:27

21   were, had engaged in -- in ballot harvesting?

22        A.    I'm sorry, can you repeat

23   the...

24        Q.    Yeah.  And let me just be

25   clear.                                        11:39:39

CONFIDENTIAL

Page 109

1              By the time the film came out,

2     you were aware that the SEB had concluded

3     that there was no evidence that that

4     individual, whoever they were, had engaged in

5     ballot harvesting?                    11:39:52

6          A.    I was -- I became aware of that

7     after the film came out.  Is that -- is that

8     the way you're -- is that the question?

9              I was not aware of it before.

10    I was aware of it after.              11:40:05

11         Q.    And how did you become aware of

12    it?

13         A.    I read it in the paper -- or I

14    must have read it in the paper or someone

15    told me about it because -- because it was   11:40:13

16    being attached to True the Vote.  And because

17    I had not heard anything from the state

18    election board, I didn't -- I didn't even

19    know that there had been a hearing.

20         Q.    Right.  So you -- yeah, my        11:40:24

21    question is unclear.

22              So you knew there was a

23    hearing, and at that hearing the individual

24    who appears in the -- the footage at 8235 was

25    cleared of any wrongdoing by the SEB,        11:40:40

CONFIDENTIAL

Page 110

1    correct?

2         A.    I -- I didn't -- I did not know

3    that there was a hearing.  I mean, I -- in

4    advance -- you know, whenever the hearing

5    was, I didn't know that was happening.        11:40:50

6         Q.    Okay.

7         A.    I want to make sure I'm

8    answering your question.

9         Q.    Yeah.

10        A.    Okay.                              11:40:54

11        Q.    And then but once you got the

12   open records request, you understood that the

13   SEB investigator had cleared that individual?

14        A.    I did understand that, yes.

15        Q.    Okay.  And the investigator had   11:41:01

16   found no evidence of ballot harvesting by

17   that individual?

18        A.    That's what the investigator

19   had in here, yes.

20        Q.    Okay.  So by the time the film    11:41:15

21   came out, which included the same video, you

22   were aware that the video in the film was of

23   someone who the SEB had cleared of ballot

24   harvesting?

25             MR. EVANS:  Objection;             11:41:34

CONFIDENTIAL

Page 111

1          misstates testimony.

2                    THE WITNESS:  Do I --

3                    MR. EVANS:  Yeah.  You can

4          still answer.

5          A.    No.  I did not know of this          11:41:43

6     before the film came out.

7                    Our open records request was

8     May the 26th.  I think that the movie was

9     much earlier in May.

10    (BY MS. KUCK)                                    11:42:01

11         Q.    When you did your open records

12    request and you learned that the individual

13    had been cleared, did you take any steps to

14    make sure that that individual did not have

15    any further public allegations of ballot       11:42:24

16    harvesting made against them?

17         A.    I -- I -- I really don't

18    recall.  I -- yeah.  I really -- I don't

19    recall a specific conversation.  I -- you

20    know, in my -- in my at that point still       11:43:08

21    understanding of the law, which is pertinent,

22    it -- it was illegal.  If you could not -- if

23    you mailed -- excuse me -- deposited more

24    than your own ballot, which you could do in

25    the case of immediate family or family as      11:43:23

CONFIDENTIAL

Page 112

1    defined by Georgia law or if you were infirm,

2    in the hospital or in prison, you can do

3    that, but you had to sign -- my understanding

4    was you had to sign as an assister.

5              And because we already had the      11:43:36

6    open records request back from Gwinnett, as

7    we talked about the Gwinnett anomaly and the

8    reason that we were looking at Gwinnett, and

9    we knew that there were no assister

10   signatures.  And so, you know, that -- to me,  11:43:48

11   that -- that still held.

12       Q.    So your view was that

13   regardless of whether they were ballots of

14   his family or not, they were being deposited

15   illegally because your view was that there     11:44:09

16   would have had to have been an assister

17   certificate filed for him to deposit even the

18   ballots of his family?

19       A.    That was my absolute

20   understanding, yes.                            11:44:24

21            Additionally, I will say, you

22   know, he went on record as saying he

23   deposited five ballots, but when you actually

24   look at the voter records, there's only an

25   indication of four.                            11:44:33

CONFIDENTIAL

Page 113

1              So there was also that.

2        Q.    There was an indication that

3    four people in his family ballots were

4    received on that date?

5        A.    Correct.  Correct.               11:44:46

6        Q.    There's nothing in the record

7    about how many he actually deposited on that

8    date?

9        A.    No.  There -- there is, I

10   believe.                                   11:44:53

11       Q.    Right.  He deposited five?

12       A.    Uh-huh.

13       Q.    But the voting records you're

14   talking about talk about when certain ballots

15   were received, right?                      11:45:01

16       A.    Correct.

17       Q.    Not when they were deposited?

18       A.    You know, that's a good

19   question.  Let's look and see.

20              Yeah.  They do characterize it   11:45:08

21   as date ballot received.  However --

22       Q.    Received, not deposited?

23       A.    Correct.

24              However, the other -- the other

25   four were all on the same date.            11:45:18

CONFIDENTIAL

Page 114

```
 1          Q.      Right.

 2          A.      Yeah.

 3          Q.      One of them was received later?

 4          A.      Yes, it was received later.

 5          Q.      Okay.  And so -- and your        11:45:26

 6    understanding of the law, where does that

 7    come from?

 8          A.      I cannot quote you the specific

 9    citation, but there is a passage in the

10    Georgia law that describes in two parts how    11:45:45

11    you can -- how you can cast a ballot for

12    someone other than yourself and then the --

13    the requirement that there be an assister

14    signature accompanying that.

15          Q.      And that's based on your own      11:45:59

16    reading of the statute?

17          A.      Initially based on my own

18    reading of the statute, yes.  And then

19    corroborated by just general consensus.

20          Q.      Okay.  So even -- even if your    11:46:11

21    interpretation of the law were correct, you

22    are taking the position that he must have

23    been depositing these five ballots illegally

24    because he didn't file an assister

25    certificate, right?                            11:46:39
```

CONFIDENTIAL

Page 115

1          A.      No, not -- not filing an

2     assister certificate, but just sign the back

3     of the envelope.

4          Q.      Okay.  But that still would not

5     be evidence of ballot harvesting, would it?    11:46:52

6          A.      I'm sorry.  Can you --

7          Q.      Yeah.

8              You don't have -- even if

9     your -- your assumptions about what happened

10    on those five ballots is correct, you don't    11:47:05

11    have any evidence that he went to more than

12    one drop box to deposit ballots?

13         A.      Well, it's two -- I think

14    that's two different questions.

15         Q.      Yeah.  It is.  That's --        11:47:21

16    that's --

17         A.      Yeah, so no, I mean, I don't

18    have any indication that he went to more than

19    one, but I do have indication, depending upon

20    how you want to define ballot harvesting,       11:47:32

21    that, you know, any -- any ballot beyond your

22    own, if -- if not accompanied by a signature,

23    very simple signature on the back of the

24    envelope, would have had that run afoul of

25    Georgia law.                                    11:47:48

CONFIDENTIAL

Page 116

```
 1          Q.     Okay.  But you don't have any
 2     evidence of him going to more than one drop
 3     box?
 4          A.     If we're talking about like in
 5     the 242, the study of the 242.                  11:48:03
 6          Q.     Any evidence of any kind.
 7          A.     No, I mean, the -- that was
 8     not -- that was part of the Gwinnett anomaly
 9     period, and that video footage became -- I
10     mean, that was separate and apart from the      11:48:17
11     study of the 242.
12          Q.     Because at the time that the
13     geospatial data was done you didn't have
14     video from Gwinnett County?
15          A.     Correct.                             11:48:28
16          Q.     And so you couldn't match the
17     video with the geospatial analysis at that --
18     at that point in time where the movie was
19     getting made because you got the Gwinnett --
20          A.     Yeah.  We got the Gwinnett          11:48:41
21     video much later.
22          Q.     Okay.  Do you have any evidence
23     that that individual was paid to -- to
24     deposit those ballots?
25          A.     No.                                  11:48:50
```

CONFIDENTIAL

Page 117

1          Q.     And do you have any evidence
2    that that individual went to any nonprofit
3    organization to get those ballots?
4          A.     No.
5          Q.     Let me just have you look at        11:48:59
6    what we marked yesterday as Exhibit 17.
7          A.     Okay.
8          Q.     Okay.  So we looked at this
9    document yesterday.  It's Exhibit 17.  It's
10   a -- appears to be a social media post from     11:50:16
11   True the Vote.
12               Do you see that?
13         A.     Yeah, I do.
14         Q.     And the first paragraph says:
15   "To understand this quote, you must first       11:50:24
16   understand ballot harvesting.  This is when
17   absentee ballot are collected and taken to a
18   ballot box by someone who isn't a member of
19   your immediate family."
20               Do you see that?                     11:50:34
21         A.     I do.
22         Q.     If we use that definition of --
23   of ballot harvesting, there is no evidence
24   that the individual engaged in ballot
25   harvesting, is there?                            11:50:44

Page 118

1          A.    I mean, this is -- this is not

2      the definition of -- of Georgia law, so it's

3      just a -- I mean, I don't think it's -- I

4      don't think you can really compare it.

5          Q.    No, I'm not asking you about        11:50:54

6      Georgia law, but I'm saying if we use this

7      definition of ballot harvesting, the

8      individual who we've identified -- who the --

9      the plaintiff identifies as Mr. Andrews would

10     not fall within that definition, right, even   11:51:13

11     under the Georgia investigation?

12              MR. EVANS:  Objection; asked

13          and answered.  Improper hypothetical.

14              THE WITNESS:  Do I still

15          answer?                                    11:51:24

16              MR. EVANS:  Yeah.

17         A.    I -- I'm -- if you're asking me

18     if -- I guess this is Instagram.  If this is

19     taken to mean anything in connection to this

20     case or Mark Andrews, I would say no, I'm      11:51:38

21     not -- I'm not really sure this --

22     (BY MS. KUCK)

23         Q.    Yeah.  I just want to make sure

24     when we -- because some of these terms are

25     used differently in different contexts.        11:51:47

1          A.      Oh, yes.  Yes.

2          Q.      But if we used this definition

3     of ballot harvesting, leaving aside Georgia

4     law, if ballot harvesting is when absentee

5     ballots are collected and taken to a ballot      11:52:00

6     box by someone who isn't a member of the --

7     your immediate family, that would not cover

8     Mr. Andrews?

9               MR. EVANS:  Objection; asked

10          and answered.                              11:52:14

11          A.      I -- I mean, I -- I really

12     don't know how to answer that because this

13     isn't a definition of anything.  This is a

14     social media post.  I -- that's -- that's,

15     you know, impartial at best.                    11:52:33

16               Sorry.  Not impartial.

17     Incomplete.

18     (BY MS. KUCK)

19          Q.      Okay.  So let me just break it

20     down.                                           11:52:42

21               You -- you're not aware of any

22     evidence that Mr. Andrews was depositing

23     ballots other than for his immediate family?

24               MR. EVANS:  Objection; asked

25          and answered.                              11:52:57

CONFIDENTIAL

Page 120

1          A.     The voter records indicate that

2     only four ballots were received on the same

3     day where he deposited five.  That -- that I

4     am aware of.

5     (BY MS. KUCK)                                    11:53:15

6          Q.     Other than that, do you have

7     any evidence?

8               MR. EVANS:  Objection; asked

9          and answered.

10         A.     Just, again, I'll refer back to    11:53:18

11    what Georgia law says and what Gwinnett

12    County told us, that there were no assister

13    signatures.

14    (BY MS. KUCK)

15         Q.     Let me have you look at another    11:53:35

16    document that we marked yesterday as

17    Exhibit 19.

18         A.     Okay.  I'm not as good as

19    yesterday's.

20         Q.     That's okay.                        11:53:58

21         A.     Okay.

22         Q.     Let me just get my copy.

23              Is -- is exhibit -- well,

24    strike that.

25              You referred to a complaint        11:54:54

CONFIDENTIAL

Page 121

1    filed by TTV with the Georgia state election

2    board.

3                Is -- is Exhibit 19 a copy of

4    that complaint?

5         A.    I believe it's a -- I believe        11:55:10

6    it's a copy of all three -- of all three

7    complaints.

8         Q.    Okay.  Looking at the -- the

9    first complaint -- well, before I have you

10   look at the specific one, did -- do the same   11:55:27

11   people draft all three complaints?

12        A.    Yes, I drafted all three.

13        Q.    You drafted them yourself?

14        A.    Yes, I drafted them.  I had

15   others, you know, proof them, but I drafted    11:55:39

16   them.

17        Q.    Did you have any counsel

18   involved in drafting them?

19        A.    Yes, I did.

20        Q.    And what was the involvement of     11:55:48

21   counsel, without giving me any specific

22   information about advice they may have given

23   you?

24        A.    Oof.  I don't even know how to

25   answer that without saying what advice they   11:56:01

CONFIDENTIAL

Page 122

```
 1      gave.

 2           Q.    Okay.

 3           A.    I mean, they -- they looked at

 4      it, and Georgia counsel that knew -- you

 5      know, he was very familiar with Georgia law.   11:56:11

 6      And --

 7                 MR. EVANS:  Well, don't --

 8           don't say any of the advice or --

 9                 THE WITNESS:  Okay.

10                 MR. EVANS:  -- counsel that you   11:56:18

11           were provided.

12                 THE WITNESS:  I mean, is that a

13           sufficient -- I don't know how to --

14      (BY MS. KUCK)

15           Q.    So you -- so -- yeah, let me      11:56:22

16      just -- you reviewed -- you drafted these

17      complaints yourself?

18           A.    Yes.

19           Q.    You had Georgia counsel take a

20      look at them before you submitted them?       11:56:32

21                 Or was it later?

22           A.    Oh, no, it was definitely

23      before.  But there was a good bit of, you

24      know, discussion around certain aspects just

25      to make sure it was laid out.  I don't know   11:56:48
```

CONFIDENTIAL

Page 123

1    what I can say and not say so...

2         Q.    Okay.  Okay.  Fair enough.

3               But you were the primary

4    drafter?

5         A.    Yes.                          11:56:55

6         Q.    And where did the information

7    in these complaints come from?

8         A.    From the -- the -- the results

9    of the geospatial project that we had worked

10   on.  And in -- just to be clear, are we just  11:57:13

11   going to talk about the first complaint or

12   all three at the same time?  I mean, they

13   were all from True the Vote's work --

14        Q.    Right.

15        A.    -- broadly.  I mean, you know.    11:57:23

16        Q.    Let's focus on the -- the first

17   complaint in the exhibit, which is TTV_007146

18   through 48.

19        A.    Okay.

20        Q.    And that one is entitled         11:57:35

21   "Complaint: Ballot trafficking General

22   Election November 2020 and Runoff Election

23   January 2021 periods.

24               Counties:  Atlanta Metro."

25               Okay.  So we have the same one?  11:57:51

CONFIDENTIAL

Page 124

1          A.     Yes.

2          Q.     So the information in that

3     complaint, where -- when you drafted it,

4     where did you get that information?

5          A.     This was just a compilation          11:57:59

6     of -- of the events of -- as described that

7     either True the Vote or the OpSec, you know,

8     came to learn.

9          Q.     And did you -- before you filed

10    this, did you believe that everything in it     11:58:29

11    was accurate?

12         A.     Oh, yes.

13         Q.     Okay.  You're not aware of any

14    inaccuracies in it when you filed it?

15         A.     I'm not -- I'm not aware of          11:58:42

16    any.

17         Q.     Okay.  Did you review the

18    complaint with Mr. Phillips before you filed

19    it?

20         A.     I -- I don't remember.  It was       11:58:52

21    a long time ago.  I don't specifically

22    recall.  Some of this was a result of OpSec

23    work but...

24         Q.     Other than the lawyers, did

25    anyone -- well, strike that.                     11:59:09

CONFIDENTIAL

Page 125

```
 1                  Just yes or no, did lawyers
 2       give you comments on your draft?
 3           A.    Yes.
 4           Q.    And other than the lawyers, did
 5       anyone else give you comments on the draft?    11:59:17
 6           A.    Not that I can recall.  I mean,
 7       the first page of this, you know, indicates
 8       that I sent it to Cole --
 9           Q.    Uh-huh.
10           A.    -- Hughes, it's possible that    11:59:33
11       he and I discussed it, but I don't have any
12       specific recall.
13           Q.    Okay.  If you look at the
14       second page which is TTV_007147 --
15           A.    Okay.                             11:59:52
16           Q.    -- the fourth full paragraph
17       down, it says:  "During the runoff election
18       period, in six counties in and around Atlanta
19       552,987 cell phones came within a narrowly
20       defined distance of ballot drop boxes during    12:00:07
21       our study period.  However, 242 unique
22       devices made repeat trips to drop boxes
23       averaging 23 trips each.  These same 242
24       devices went repeatedly averaging eight trips
25       to -- each to specific NGOs."                  12:00:25
```

CONFIDENTIAL

Page 126

1           Do you see that?

2     A.     Yes.

3     Q.     Does that refresh your

4    recollection that the 242 number came from

5    the runoff election, not the general          12:00:32

6    election?

7     A.     Well, yeah.  I mean, that is

8    what this says, yes.

9     Q.     Yes.  You have no reason to

10    believe that's inaccurate?                    12:00:43

11    A.     I -- no.  I -- I -- I really --

12    I really don't recall because I -- I do know

13    that we ultimately received video from 2020

14    so -- but this was before all of that so...

15    Q.     Okay.  So to the -- and when       12:01:06

16    you -- when you actually drafted this

17    document, you recall believing that

18    everything in it was accurate?

19    A.     Yes.

20    Q.     Yeah.  Okay.                        12:01:16

21           It refers to eight trips to

22    specific NGOs.

23           Can you identify those NGOs?

24    A.     Not -- not by name.  There were

25    just, you know, addresses and whatever they   12:01:35

CONFIDENTIAL

Page 127

```
1    were they were.
2          Q.    Okay.  At some point in time,
3    you had a list of those NGOs?
4          A.    I don't know that True the Vote
5    did.  OpSec would have, yes.              12:01:48
6          Q.    Do you recall providing lists
7    of those NGOs to Mrs. D'Souza?
8          A.    No.  Let me -- let me restate
9    that.  Maybe.
10         Q.    Okay.                         12:02:12
11         A.    Well, let me let you ask your
12   question because I think I probably know
13   where that's headed.
14         Q.    Well, did you ever provide
15   Ms. D'Souza with any list of -- of NGOs that   12:02:25
16   you had reason to believe were involved in
17   ballot trafficking in Georgia?
18         A.    Well, I provided her with, as
19   we looked at earlier, the legal brief that
20   had names of -- I forget what we called it or   12:02:42
21   what was called on that document but --
22         Q.    Uh-huh.
23         A.    -- potential organizations or
24   something like that.
25               And then as I just -- I know       12:02:50
```

Page 128

1    because of what's come out in discovery,

2    there had been a folder that I had created of

3    990s tax returns, and it -- it really had

4    no -- it was just, you know, a compilation of

5    returns across many states as I generally      12:03:11

6    recall.

7              And that had, you know,

8    nonprofits in it, and they would have had

9    access to that.

10        Q.    Looking at the paragraph we've      12:03:26

11   been talking about on 7147 that starts

12   "During the runoff election period."

13        A.    Yes.

14        Q.    The -- at the end of the first

15   sentence, it -- it talks about the 552,987    12:03:49

16   cell phones came within a narrowly defined

17   distance of drop box -- ballot drop boxes

18   during our study period.

19              Do you see that?

20        A.    Yes.                               12:04:02

21        Q.    Do you remember conversations

22   with anyone about that language?

23        A.    I mean, there would have

24   necessarily been a conversation with OpSec

25   about it, but I can't tell you a specific     12:04:16

CONFIDENTIAL

Page 129

1        conversation.

2              Q.     And when you say with -- again,

3        when you say "OpSec," you mean Mr. Phillips?

4              A.     I mean OpSec, the -- the

5        corporation, but, you know, Mr. Phillips was      12:04:27

6        clearly a part of OpSec so...

7              Q.     Well, was there -- my

8        understanding from his testimony is that he

9        was the only OpSec employee, correct?

10       Everybody else was a contractor?                  12:04:41

11             A.     I -- I -- listening to him

12       yesterday, I don't know that he was an

13       employee.  I don't know.

14             Q.     Okay.

15             A.     But, I mean, it's likely that I      12:04:46

16       spoke with him.  I mean, it's likely that I

17       spoke with him as the primary person.  It's

18       possible.  I don't have a -- I don't -- I

19       couldn't tell you who else I talked with.

20             Q.     Okay.  And when we spoke            12:04:59

21       earlier, do you remember speaking to any of

22       his contractors who did the geospatial

23       analysis?

24             A.     No.

25             Q.     Okay.                                12:05:06

CONFIDENTIAL

Page 130

1          A.     I did not.

2          Q.     Okay.  So other than -- other

3     than Mr. Phillips, is there any other person

4     you would affiliate with OpSec that you would

5     have spoken to?                          12:05:18

6          A.    No.  I mean, that -- not -- not

7     as a -- no, I can't.

8          Q.    Okay.

9               MR. EVANS:  We should probably

10          break for lunch pretty soon.        12:05:39

11              MS. KUCK:  Yeah.  I've got two

12          quick exhibits that relate to this,

13          and then we'll be ready to break.

14        (Discussion off the record.)

15              MS. KUCK:  You know what, let's   12:06:44

16          break for lunch now.

17              MR. EVANS:  Okay.

18              MS. KUCK:  The exhibits are a

19          little...

20              THE VIDEOGRAPHER:  Off the        12:06:50

21          record at 12:07.

22        (Break from 12:07 p.m. to 1:21 p.m.)

23              THE VIDEOGRAPHER:  Back on the

24          record at 1:21.

25              MS. KUCK:  Okay.  And we have     13:20:07

CONFIDENTIAL

Page 131

1          Mr. Vining is back on?  Ms. Hyland?

2                    MR. VINING:  Yeah.

3                    MS. HYLAND:  Yes.

4                    MS. KUCK:  Okay.  Good.  All

5          right.                              13:20:16

6      (BY MS. KUCK)

7          Q.    Earlier this morning we talked

8      about an e-mail where you were sending

9      Mrs. D'Souza material about the scope of the

10     project, those draft court papers we talked    13:20:27

11     about?

12         A.    Oh, the scope of the geospatial

13     project?

14         Q.    Right.

15         A.    Yes.                           13:20:34

16         Q.    Right.  And that was in August

17     of 2021?

18         A.    I think -- shall I grab it?

19     Would that be helpful?

20         Q.    I'm not going to ask you        13:20:42

21     questions about it.  I just want to sort of

22     orient this.

23         A.    Okay.  Sure.

24         Q.    Okay.  So then after you sent

25     those documents, what was the -- what       13:20:48

Page 132

1      follow-up conversations did you have with

2      Mrs. D'Souza?

3          A.    I really can't -- I -- I can't

4      recall a specific conversation.  I mean,

5      there clearly was something that happened,    13:21:06

6      but I can't recall anything specific.

7          Q.    Do you recall having a dinner

8      in Dallas in the middle of September with the

9      D'Souzas?

10         A.    Yes.  And I'm so sorry.  I was    13:21:21

11     thinking -- yes, I just -- I thought you

12     meant like shortly thereafter whatever.  But

13     yes.  Yes, I do remember the dinner in

14     Dallas.

15         Q.    Okay.  Then do you remember any    13:21:31

16     conversations you had with her other than

17     scheduling the dinner between the time you

18     sent her the materials and the dinner?

19         A.    Okay.  That part of it, I

20     don't --                                    13:21:39

21         Q.    Okay.

22         A.    -- I don't recall any recall

23     of.

24         Q.    And who attended that dinner?

25         A.    Myself, Gregg Phillips, Bruce    13:21:42

CONFIDENTIAL

Page 133

1    Schooley, and then Dinesh and Debbie D'Souza.

2         Q.    And what did you discuss at

3    that dinner?

4         A.    They were discussing --

5    actually, it was more just a general dinner,    13:21:59

6    but they were discussing the movie.  Bruce

7    Schooley was just emphatic about sequestering

8    the videos that we had.  That was a very big

9    point.  And -- which was -- you know, what

10   ultimately what the agreement was.  And then    13:22:15

11   that was really -- that's all I can remember.

12        Q.    So at -- by that point in time,

13   by the time you had this dinner, had you

14   agreed with them that you were going to be

15   doing a movie together?                         13:22:30

16        A.    Huh-uh, no.

17        Q.    And so when you say you mainly

18   talked about the movie, what do you mean by

19   that?

20        A.    Just what -- you know, I mean,      13:22:37

21   we -- that was -- that was the dinner

22   preceding a meeting the next day with -- that

23   they had coordinated with Salem

24   representatives, and so that was what it was

25   about.  But, you know, they were -- they were   13:22:46

Page 134

1    talking about business things that, you know,

2    we had no knowledge or, you know, furtherance

3    in.

4        Q.    Right.  But this -- so at

5    this -- is this generally the first time you    13:23:03

6    discussed with the D'Souzas turning your work

7    into a film?

8        A.    I -- I can't say that it was

9    the very first --

10        Q.    Yeah.                                13:23:17

11        A.    -- but it was -- I mean, it was

12    still uncertain if that would happen because

13    they didn't -- they were going to make a

14    movie regardless, and -- it was my

15    understanding.  And whether or not this was    13:23:25

16    going to be it, they -- they didn't know.

17    And that was it.

18        Q.    Okay.  All right.  So -- so the

19    idea was they were planning to make a movie,

20    it was possible it was going to involve your    13:23:37

21    research, but you hadn't reached an agreement

22    on that yet?

23        A.    Sort of.  They were -- my

24    understanding was they were going to make a

25    movie full stop.  They were going to make a    13:23:47

CONFIDENTIAL

Page 135

1    movie.

2           Q.      Right.

3           A.      And then maybe it would include

4    a portion -- maybe if they made a movie about

5    this -- this sort of broader issue --            13:23:56

6           Q.      Uh-huh.

7           A.      -- it may include some of the

8    work that we had done.  And that was -- that

9    was it.

10          Q.      Okay.  And then your              13:24:05

11   recollection is that dinner was right before

12   meetings with Salem were held?

13          A.      I think it was the next day

14   or -- I'm so sorry.  I really don't -- it

15   must have been because dinner was dinner, so    13:24:18

16   I guess it was the next day.

17          Q.      Let me just show you some

18   documents, and maybe that will help.

19          A.      Sure.

20          (Discussion off the record.)            13:24:34

21   (BY MS. KUCK)

22          Q.      I just want to get us oriented

23   in time --

24          A.      Sure.

25          Q.      -- and get the chronology        13:24:36

CONFIDENTIAL

Page 136

1    right.

2         A.    Okay.

3         Q.    So I'm going to mark as

4    Exhibit 36 a document bearing Control

5    No. TTV_006932.                              13:24:43

6         A.    Thank you.

7         (Marked Engelbrecht Exhibit No. 36.)

8         A.    Oh, okay.

9    (BY MS. KUCK)

10        Q.    And is that the dinner -- is    13:24:54

11   this a -- this appears to be an OpenTable

12   invitation sent to you from Mrs. D'Souza for

13   a reservation on September 15, 2021 at -- is

14   it Uchi in Dallas?

15        A.    Uchi, yes.  Yeah.              13:25:08

16        Q.    And is this the dinner you're

17   referring to?

18        A.    Yes.

19        Q.    So it's -- and then is it your

20   testimony that you believe that you met with  13:25:15

21   Salem the next day?

22        A.    Yes.  Well, at this dinner we

23   had not met with Salem yet, so it must have

24   been the next day.

25        Q.    Okay.  Did you have more than    13:25:24

CONFIDENTIAL

Page 137

1    one meeting with Salem to discuss the

2    possibility of -- of making a film?

3         A.    No, we were in and out.

4         Q.    Okay.  So let me show you --

5    let me go to your Exhibit 31, which is your    13:25:37

6    response to the interrogatories.

7              And there are separate ones for

8    TTV, but am I correct that they're for all

9    intents and purposes the same as your own

10   personal ones?                                13:26:06

11        A.    For all intents and purposes,

12   yes.

13             Okay.

14        Q.    So if you look at Page 8,

15   there's Interrogatory No. 3.  There's a --     13:26:13

16   there's a reference to this -- the Summit

17   that was held with Salem.  And this says

18   October 2021 in Dallas.

19             If you go on the next page,

20   third full paragraph, it says:  "Engelbrecht   13:26:42

21   states that the "summit" referenced in

22   this... it was a meeting that took place at

23   the Salem Media's offices in Dallas, Texas,

24   on or around October 16, 2021?"

25             I'm wondering if that should be      13:26:53

CONFIDENTIAL

Page 138

1    September 16 now that we've looked at --

2         A.    It should be.

3         Q.    Good.   Okay.

4         A.    It should be.   There was a lot

5    of confusion about what's -- what was even    13:27:02

6    meant by Summit.

7         Q.    Yeah.

8         A.    So yeah.

9         Q.    Okay.  So you had dinner on

10   September 15, and then you met with Salem in    13:27:07

11   Dallas on September 16?

12        A.    September 16, that's correct.

13            (Discussion off the record.)

14        A.    Oh, you know, may I -- because

15   I'm just seeing --                             13:27:32

16   (BY MS. KUCK)

17        Q.    Is the -- is invitation for the

18   15th of October?

19        A.    It is.

20        Q.    Okay.  I'm sorry.  So the        13:27:37

21   e-mail is dated the 15th of --

22            (Discussion off the record.)

23   (BY MS. KUCK)

24        Q.    So -- so let me clarify the

25   record because it was my mistake.              13:27:45

CONFIDENTIAL

Page 139

1              So the -- the dinner

2      reservation was sent to you on September 15,

3      2021, but it is a reservation for October 15,

4      2021; is that right?

5          A.    That's correct.                    13:28:00

6          Q.    And that's the day before

7      what's in some instances been called the

8      Summit with Salem?

9          A.    Correct.

10         Q.    So then did you -- during that     13:28:07

11     period from September 15 to October 15, did

12     you prepare for the meeting for -- with

13     Salem?

14              You knew you were going to have

15     the meeting --                               13:28:19

16         A.    Uh-huh.

17         Q.    -- after the dinner, right?

18         A.    Yes.

19         Q.    Okay.

20         A.    And to the best of my              13:28:22

21     recollection, we -- we didn't we weren't even

22     really sure what we were going to be expected

23     to do.

24              So the only thing that we could

25     have prepared was the same, you know, things  13:28:39

Page 140

1      that we had a few videos and the explanation

2      of the project.  And that was it.

3           Q.    And so the -- the interrogatory

4      says that the -- the information discussed at

5      the meeting included but was not necessarily    13:29:00

6      limited to TTV's defendants' data and

7      research findings regarding geolocation and

8      geotracking data and the D'Souza defendants'

9      desire to use that research in a film they

10     were already planning to produce.             13:29:14

11               What -- what specifically did

12     you share with Salem about your data and

13     research findings?

14          A.    I -- it was a long time ago.  I

15     really don't have specific recall.  Just      13:29:26

16     description of the project and probably -- I

17     mean -- and I don't want to speculate.  I --

18     more just the explanation of what we were

19     doing and if we had videos, which I -- I seem

20     to recall we did, which I don't even know      13:29:42

21     that we showed.  It -- it was -- it was -- we

22     did not know what we were really expected to

23     do.

24          Q.    Okay.  So you didn't have a

25     formal presentation that you made to Salem?    13:29:54

CONFIDENTIAL

Page 141

```
 1           A.      Not that I recall.

 2                   There was a time where we were

 3      asked to speak.  I mean, that was a formal

 4      sort of tell us what you're doing but -- and

 5      I feel like we did show something, but I do     13:30:05

 6      not remember what that was specifically.

 7           Q.      Okay.  And would you have any

 8      records in your files as to what you showed

 9      them?

10           A.      Not other than what -- you          13:30:17

11      know, what's been provided.  I...

12           Q.      Okay.  And then what happened

13      next after that meeting?

14           A.      We made the presentation, and

15      then we left.  And they, as I understood it,   13:30:39

16      went on to dinner.  I don't know if they

17      stayed -- I don't know.  I really don't know.

18                   At some point, we were told --

19      and how quickly, I couldn't tell you, but at

20      some point we were told that they were         13:30:54

21      interested in including us or, to be more

22      precise, including the video.

23                   And -- and initially that was

24      going to be it.  So that was -- that was how

25      that was presented.                            13:31:07
```

CONFIDENTIAL

Page 142

1          Q.      And when you're referring to

2      "the video," are you referring to the drop

3      box surveillance video --

4          A.      Yes.

5          Q.      -- that you obtained through      13:31:14

6      open records --

7          A.      Correct.

8          Q.      -- requests?  Yes.

9                  And that, at this point, would

10     have been Michigan -- or I'm sorry, would    13:31:20

11     have been Georgia?

12         A.      Yes.

13         Q.      Okay.

14            (Discussion off the record.)

15                 MS. KUCK:  Let's mark            13:32:02

16            Exhibit 37 bearing control Nos.

17            TTV_007087 through 7089.

18         (Marked Engelbrecht Exhibit No. 37.)

19     (BY MS. KUCK)

20         Q.      This seems to be an e-mail from   13:32:55

21     you to Ms. D'Souza with the "re trafficking

22     overview."

23                 Do you see that?

24         A.      Yes.

25         Q.      And what is this document        13:33:04

CONFIDENTIAL

Page 143

1    that's attached?

2         A.    It looks like a -- an overview

3    of the project that I prepared.

4         Q.    Okay.  And why were you sending

5    it to Mrs. D'Souza at this point?  Now we're    13:33:17

6    up to November 23, 2021.

7         A.    It -- I'm asking will it work.

8    I have no recall for what -- what she needed

9    it for or -- I don't know.

10        Q.    It -- it appears, though, that    13:33:37

11   the -- if you look on...

12            (Discussion off the record.)

13   (BY MS. KUCK)

14        Q.    If you look on the third page,

15   which is TTV_007089, it looks like -- it says    13:34:03

16   "remaining funding requirements."

17            Do you see that?

18        A.    Yes.

19        Q.    Was there some discussion at

20   this point that more money would need to be    13:34:15

21   raised for you to go forward with this

22   project?

23        A.    No.  I believe that this

24   document had been created already -- well,

25   you know what, I -- actually, strike that.    13:34:26

Page 144

```
 1                    I don't -- I don't recall.  And
 2      I don't recall the nature of where this came
 3      into play.  It -- you know, it outlines
 4      things that we never were able to do, so I
 5      don't -- I don't recall -- I don't recall      13:34:44
 6      where or why.
 7            Q.    Okay.  Did you discuss with
 8      Debbie D'Souza around this point in time the
 9      need to raise more money for your project?
10            A.    I don't recall.                     13:35:02
11            Q.    And so you -- you don't -- do
12      you have any recollection as to whether this
13      document was related to the negotiations
14      surrounding the film or something else?
15            A.    I -- I really don't -- it           13:35:24
16      doesn't correspond to anything that happened,
17      so I don't really know.  Maybe she just asked
18      for an overview.  But, again, I'm
19      speculating.  I...
20            Q.    When you say "it doesn't            13:35:38
21      correspond to anything that happened," what
22      do you mean?
23            A.    Well, when you look at these,
24      you know, funding requirements and the things
25      that we were aspiring to do, that -- we        13:35:46
```

Page 145

1    didn't have the funding for that.  So I'm

2    just not sure where -- where it came from or

3    why I was responding in that way.

4         Q.    Okay.  So the -- and the items

5    under remaining funding requirements, you      13:35:58

6    never undertook that part of the project; is

7    that right?

8         A.    There were elements of it that

9    we -- that we, you know, carried on with to a

10   very limited extent, but for the most part,    13:36:11

11   this was just -- no.

12        Q.    Now, at some point in time you

13   entered into a formal agreement with Salem

14   and the D'Souzas, correct?

15        A.    Correct.                            13:36:25

16        Q.    And what -- what were the

17   negotiations that led to that agreement?

18        A.    There were really no

19   negotiations.  It was, you know, as I recall,

20   Dinesh I think called on the phone and said,   13:36:40

21   you know, this -- that they would be willing

22   to -- or not be willing.  That's not really

23   even the right term.  They were interested in

24   using our footage.  Of course, we were elated

25   about that.  We had never, you know, sought    13:36:56

CONFIDENTIAL

Page 146

1    to do any of this, but that was -- that was

2    good news.

3              He was going to try to see if

4    we -- you know, if we could be compensated in

5    some way, and we thought that would be fine.    13:37:13

6    And then they presented what they presented

7    and...

8         Q.    So when you said this wasn't

9    something we -- we didn't seek to do this,

10   what do you mean?                               13:37:22

11        A.    Well, when we started the

12   project, there was no -- no expectation that

13   it would be a movie ever.

14        Q.    But when you started meeting

15   with the D'Souzas, at that point in time you   13:37:32

16   were --

17        A.    Right.

18        Q.    -- you were hoping to do a

19   movie with them?

20        A.    Just hoping to really, you        13:37:38

21   know, find a way to let the work be

22   recognized.

23        Q.    Okay.  So then let's mark as

24   Exhibit 38 TTV_008962 through TTV_008969.

25        (Marked Engelbrecht Exhibit No. 38.)   13:38:22

CONFIDENTIAL

Page 147

1    (BY MS. KUCK)

2        Q.    And did you -- do you recall

3    when Mr. D'Souza called you and said they

4    were interested in using your footage?

5        A.    I do not recall that date, no.    13:38:28

6        Q.    And did you have any

7    conversations directly with Salem after the

8    time you met with them until you got this

9    call from Mr. D'Souza saying, you know, we're

10   interested?                                 13:38:41

11       A.    Not that I recall.

12       Q.    So then this document is an

13   e-mail from you to Brian at

14   DigitalStrategyLimited.com.

15            Do you know who that is?           13:38:56

16       A.    That would be Brian Glicklich.

17       Q.    And who is Mr. Glicklich?

18       A.    Brian Glicklich, I hired his

19   firm for a few months to help with PR and

20   just strategy and media strategy, that kind  13:39:10

21   of thing.

22       Q.    When did you -- about when you

23   hired -- when did you hire them?

24       A.    Oh, gosh.

25            My -- my best estimate would be    13:39:27

CONFIDENTIAL

Page 148

1    maybe July of 2022.

2         Q.    So after the movie came out?

3         A.    Yes.

4         Q.    And when you said "to help with

5    PR," what -- was there any particular PR        13:39:40

6    project?  Was it with -- in connection with

7    the film or something else?

8         A.    We had a lot of other things

9    happening at that time.

10        Q.    Okay.  So they had a broader        13:39:47

11   mandate than just the film?

12        A.    Yes.  Yeah.  The film really by

13   this point had largely, you know, been --

14   sort of had its moment, I guess you could

15   say, for our purposes.                         13:39:57

16        Q.    So you -- you send him this

17   e-mail.  It says:  "Attached is the NDA.

18   Licensing document is the guiding doc for the

19   disaster deal with Dinesh/Salem.  The doc is

20   horrible.  I'd forgotten how bad it really     13:40:14

21   is."

22             What -- what was the context of

23   your e-mail to him?

24        A.    I -- I don't recall.  The --

25   I'd be speculating.  I don't -- I don't know.  13:40:30

CONFIDENTIAL

Page 149

1           Q.     Do you know why you were

2     calling it a disaster deal?

3           A.     Well, the document was designed

4     just to lease the -- lease, I'm so sorry.

5     Strike that.                                 13:40:51

6                  The document was designed to be

7     a licensing agreement for the use of -- of

8     this -- this video that we had.  And it --

9     you know, in my opinion that we'd never been

10    involved in anything like this before.  We    13:41:08

11    had no -- we had no expectations coming in.

12    I had never -- you know, hindsight is 20/20,

13    but I had no expectation of what it would or

14    would not be like to -- to have an agreement

15    like this.                                   13:41:23

16                 It ended up where we -- you

17    know, we were asked to participate in -- at

18    events where we weren't prepared, where we --

19    I mean, we had no editorial control.  We --

20    we had no control over the script.  We had no  13:41:43

21    control over how videos were selected.  We

22    had no control over graphics.  We had no

23    control over documents.

24                 And, you know, we are

25    comfortable speaking for the work that we     13:41:54

CONFIDENTIAL

Page 150

1    did.  But I didn't have -- I didn't

2    understand moviemaking.  And that's just my

3    feeling.

4         Q.    This -- if you'd turn to the --

5    the next page after the e-mail, there's an      13:42:16

6    exclusive license and nondisclosure

7    agreement.

8              Is that the agreement that you

9    entered into with Mr. D'Souza and Salem?

10        A.    I apologize.  I'm -- I'm --        13:42:29

11   what page again are we?

12        Q.    8963.  It's the first page

13   after the e-mail.

14        A.    Okay.  I believe so, yes.

15        Q.    Was -- it says -- it says, the     13:42:41

16   second paragraph:  "Whereas, TTV is the owner

17   of highly confidential film footage."

18              Do you see that?

19        A.    Yes.

20        Q.    I -- wasn't this footage          13:42:53

21   obtained by you through public sources?

22        A.    Yes.

23        Q.    So what was so highly

24   confidential about it?

25        A.    Nothing.  And -- no, nothing.     13:43:06

CONFIDENTIAL

Page 151

1    This was not drafted by -- you know, by me.

2         Q.    Did you give comments on any

3    draft of this agreement before you signed it?

4         A.    As I vaguely recall, there

5    was -- there was a version before this that    13:43:41

6    had language in it that I -- I couldn't -- I

7    just couldn't accept at all.  And then

8    this -- this was the final version.

9         Q.    Okay.  What was the language

10   you couldn't accept?                          13:43:57

11        A.    As I generally recall, it was

12   an agreement that we would never admit that

13   we had anything to do with the movie, that we

14   would never talk about it publicly, which we

15   just couldn't -- I mean, we just couldn't do    13:44:13

16   that.

17        Q.    Okay.  And do you know why

18   Mr. D'Souza would make that request of you?

19        A.    I really don't because it --

20   there's just -- there would have been no way.   13:44:24

21   I don't.

22        Q.    Okay.

23        A.    I don't.

24        Q.    You didn't have any discussion

25   with him about it; you just said that's         13:44:29

CONFIDENTIAL

Page 152

1      unacceptable?

2           A.     Yes.

3           Q.     Do you remember any other

4      comments you gave before the final?

5           A.     I don't.  I could have made          13:44:37

6      some, but I just don't remember them.

7           Q.     Okay.  And then Paragraph 4,

8      which is on Page 8964, talks about revenue

9      share.

10              Do you see that?                         13:44:50

11          A.     Yes.

12          Q.     And it says:  "The parties

13     agree that TTV shall receive an amount equal

14     to 10 percent of the feature film proceeds

15     which shall be paid by Salem and D'Souza as      13:45:00

16     follows."

17              Do you see that?

18          A.     Yes.

19          Q.     And did TTV receive that

20     amount?                                          13:45:08

21          A.     Ultimately, no.  It went to the

22     LLC.

23          Q.     And is that the Shadow Beach

24     LLC?

25          A.     Yes.                                  13:45:24

CONFIDENTIAL

Page 153

```
 1            Q.     Why was it paid to Shadow Beach

 2     LLC rather than TTV?

 3            A.     At the -- at some point Dinesh

 4     offered to do that.  And that seemed to be

 5     a -- you know, acceptable so...              13:45:40

 6            Q.     And why did he offer to pay it

 7     to that entity rather than TTV?

 8            A.     I really don't -- I really

 9     don't know specifically.  It -- it wasn't

10     something that we had sought to change, but  13:45:53

11     when he offered it, we -- okay, that sounds

12     fine.

13            Q.     And what exactly did he offer

14     you?

15            A.     Just a change to -- to pay      13:46:02

16     to -- you know, to another entity besides

17     True the Vote.

18            Q.     And that was his idea?

19            A.     Yes.

20            Q.     And was that so that the funds  13:46:13

21     could go directly to you and Mr. Phillips

22     rather than going through True the Vote?

23            A.     Well, to the -- an entity that

24     we jointly owned, yes.

25            Q.     But you don't have any          13:46:32
```

CONFIDENTIAL

Page 154

```
 1      recollection as to what led him to propose

 2      that to you?

 3              A.     I really don't.

 4              Q.     Okay.  In Paragraph 7, there's

 5      a whole indemnification procedure.  It's on    13:46:49

 6      the following page.

 7              A.     Yes.

 8              Q.     Has anyone ever made any

 9      indemnification requests to TTV pursuant to

10      this provision?                                13:47:02

11              A.     No.

12              Q.     Salem hasn't requested that you

13      indemnify them in connection with any

14      disputes arising out of the film?

15              A.     I'm not even sure what that      13:47:17

16      would look like.

17              Q.     Okay.

18              A.     Did they contact us in -- that

19      would be something in writing?  I don't know

20      how that --                                    13:47:23

21              Q.     Well, you haven't -- they

22      haven't had -- you haven't had any contact

23      with -- you, TTV, haven't had any contact

24      with Salem in which Salem requested that you

25      pay any expenses they've occurred --           13:47:34
```

CONFIDENTIAL

Page 155

1        A.      Oh, no.

2        Q.      -- in connection with any film

3     or anything else?

4        A.      No.

5        Q.      When was the last time you had        13:47:40

6     contact with Salem?  With anyone at Salem?

7        A.      I think -- well, I saw their

8     counsel -- I believe his name is Chris, I

9     don't know if it's Anderson or Henderson --

10    at a hearing some months ago.  And just said    13:48:01

11    hi.  And then, I mean, that's -- that's the

12    most recent.

13       Q.      Okay.  Let's look at a document

14    we marked yesterday as Exhibit 23.  It says

15    22 on there.  22.                                13:48:31

16               MR. EVANS:  23 or 22?

17               MS. KUCK:  22.

18       A.      Okay.

19    (BY MS. KUCK)

20       Q.      This appears to be an e-mail        13:49:07

21    sent to you, Mr. Phillips, and some other

22    people affiliated with the D'Souzas on

23    December 9, 2021, from Bruce Schooley.

24               Do you see that?

25       A.      I think I'm using the wrong         13:49:24

CONFIDENTIAL

Page 156

1    one.

2            Q.      23?

3            A.      Sorry.

4            Q.      There is it.

5            A.      Okay.  Yes.                          13:49:31

6                    MS. KUCK:  It's my handwriting

7            probably.

8    (BY MS. KUCK)

9            Q.      So my question is this appears

10   to be -- this appears to be an e-mail sent to    13:49:46

11   you, to Mr. Phillips, and some other people

12   affiliated with the D'Souzas on December 9,

13   2021, from Bruce Schooley.

14                   Do you see that?

15           A.      Yes.                                13:49:57

16           Q.      And who is Bruce Schooley?

17           A.      He is affiliated in some

18   respect with Dinesh.  I'm not entirely sure

19   how.

20           Q.      And he -- he -- and he was at    13:50:05

21   this dinner --

22           A.      Yes.

23           Q.      -- with you on October 15?

24           A.      Yes.

25           Q.      And do you -- do you recall     13:50:13

CONFIDENTIAL

Page 157

1    receiving this document?

2         A.    Not specifically.

3         Q.    Generally, do -- well, do you

4    have any reason to believe you didn't receive

5    it?                                        13:50:28

6         A.    No, I don't.

7         Q.    Generally, do you recall

8    getting a -- a draft from him of the

9    schedule, and it says:  "The start on a beat

10   sheet"?                                    13:50:38

11        A.    I mean, I -- I'm not disputing

12   that I received it.

13        Q.    Yeah.

14        A.    I really don't have any recall

15   of this but --                             13:50:44

16        Q.    Okay.

17        A.    -- you know, it...

18        Q.    If you look towards the -- if

19   you go to page -- well, strike that.

20             Do you understand this          13:50:57

21   document, though, to relate to the 2000 Mules

22   film?  There was some confusion when I talked

23   to Mr. Phillips about it.

24        A.    It -- I -- I mean, yes, in that

25   I'm -- you know, we were included in this,   13:51:11

1    but when you read what was actually laid out

2    and, you know, all of these -- all of these

3    ideas, this was -- this -- you know, I'm

4    speculating, to be clear, but this may have

5    been at the point where they were -- I don't    13:51:30

6    really know.

7                I mean, we had no -- we had no

8    editorial control over any of this.  I --

9    this was just his ideas, I guess.  I mean,

10   it's very, very outside what anything that we   13:51:39

11   would have known about.

12        Q.    Okay.  And -- and are you

13   referring to the ideas on the -- it says

14   the -- the part of the document says

15   "election film beat sheet input," which is on   13:51:51

16   Page 7194?

17        A.    Yes.

18        Q.    Do you recall any discussions

19   with Mr. Schooley or any of the D'Souzas

20   about this -- these -- these ideas, as you've   13:52:02

21   called them?

22        A.    Not -- not -- no, not

23   specifically.

24        Q.    How about generally?

25        A.    I -- I mean, there -- there are   13:52:14

CONFIDENTIAL

Page 159

1    elements in here that, you know, he would

2    have -- he would have taken from the -- the

3    base of the -- the work that we had done, but

4    that's it.  I mean, there's just a lot here

5    that was never -- I don't even know where it     13:52:35

6    came from.

7         Q.    Okay.  So starting at this

8    point in time, December 9 of 2021, when he

9    circulates this schedule and this beat sheet,

10   how frequently were you in touch with          13:52:48

11   Mrs. D'Souza concerning the making of the

12   film?

13        A.    I -- I couldn't tell you.  I

14   would characterize it as infrequently.

15             In hindsight, I didn't -- at         13:53:00

16   the time, I didn't know what to expect.  I

17   didn't -- I felt -- I felt very detached from

18   it.  I -- so I couldn't tell you with any

19   real clarity how often.

20        Q.    Okay.  Do you recall having         13:53:19

21   regular Zoom meetings between the TTV team

22   and the D'Souza team about the making of the

23   film?

24        A.    I -- I recall seeing in a

25   document that we had one that that -- so I --   13:53:33

CONFIDENTIAL

Page 160

1     that was apparently something.  I don't

2     recall having regular.  I just don't.

3     It's -- maybe it's just been because it's

4     been a long time, but I just don't recall it.

5            Q.    Okay.                          13:53:45

6               (Discussion off the record.)

7     (BY MS. KUCK)

8            Q.    So let's mark as Exhibit 39 a

9     document bearing Control No. TTV_007201

10    through 7202.                               13:54:02

11         (Marked Engelbrecht Exhibit No. 39.)

12    (BY MS. KUCK)

13           Q.    So this is -- this appears to

14    be a -- a Zoom invitation to you and -- I'm

15    sorry, I'm forgetting Cole's last name, Mr.?  13:54:31

16           A.    Hughes.

17           Q.    Mr. Hughes from Ms. D'Souza

18    dated January 4, 2022.

19               Do you see that?

20           A.    Yes.                           13:54:40

21           Q.    And it says "topic E movie?

22           A.    Yes.

23           Q.    And this is about a month after

24    the document we just looked at.

25               Do you recall having an initial  13:54:49

CONFIDENTIAL

Page 161

1     conversation with her at this point in time

2     at the beginning of twenty -- January 4 of

3     2022?

4         A.     No, I don't.  I don't know why

5     Cole would be on -- I don't know.          13:55:03

6         Q.     Okay.  So you -- and do you

7     recall whether -- you have no recollection of

8     this meeting?

9         A.     I really don't, no.

10        Q.     Okay.  Do you have any reason    13:55:10

11    to believe it didn't happen?

12        A.     No, I mean, I just can't recall

13    it at all.

14        Q.     Okay.

15        A.     But I --                         13:55:16

16        Q.     You have no reason to believe

17    that you didn't actually have a meeting?

18        A.     It wouldn't surprise -- I mean,

19    it would seem like that would be something

20    that could happen so...                    13:55:23

21        Q.     Okay.  Let's look at 7209.

22        (Marked Engelbrecht Exhibit No. 40.)

23    (BY MS. KUCK)

24        Q.     Do you recall Mr. Schooley

25    reaching out to you to try and get video of  13:55:47

CONFIDENTIAL

Page 162

1    individuals going to more than one drop box?

2         A.    I -- only because I've seen it

3    in the documents that we were provided.  I

4    wouldn't have otherwise, but, yes, I do.

5         Q.    Okay.  So -- so you know that    13:56:03

6    there's e-mails, but you don't have a

7    recollection of it?

8         A.    I mean, I didn't -- I wouldn't

9    have unless I saw the e-mail, but it

10    doesn't -- I don't dispute the e-mail.    13:56:13

11         Q.    Okay.  So let me show you a

12    document we've marked as Plaintiff's

13    Deposition Exhibit 40.  It bears Control

14    No. TTV_ 007209.

15              So this is about a week after    13:56:45

16    the Zoom invitation that we saw.  And there's

17    an e-mail at the bottom of the chain from

18    Mr. Schooley to -- it says "Hello -- Hi,

19    Catherine and Gregg."

20              And he says:  "Nathan and I are    13:56:56

21    cutting a rough teaser based on Dinesh's

22    outline before we send out today for graphics

23    and sound music.  Now we see individuals

24    going to one drop box with what appears to be

25    one ballot.  At this point, they're just    13:57:09

CONFIDENTIAL

Page 163

1    using the drop box to vote.  Nothing illegal.

2    Do you have video of multiple drops by the

3    same person and/or multiple ballots and/or

4    evidence they were out of state?"

5              And then it goes on a bit --      13:57:22

6        A.    Uh-huh.

7        Q.    -- but do you see what I'm

8    talking about?

9        A.    Yes.

10       Q.    And then it looks like in        13:57:25

11   response to that you sent him some videos?

12       A.    No.  There was a platform that

13   we had given them access to.

14       Q.    Okay.

15       A.    And so that's why I was saying   13:57:37

16   they're -- you know, just look at what you've

17   been given access to.

18       Q.    And how many videos were given

19   to them on this initial platform?

20       A.    I believe initially because it   13:57:52

21   corresponded to the work that we had done,

22   there were approximately 70.

23       Q.    Okay.  And those initial 70

24   videos were videos where -- where OpSec or

25   its contractors had been able to link the    13:58:07

CONFIDENTIAL

Page 164

1    geospatial analysis with the video of drop

2    box voting, correct?

3            A.      That's what I understand, yes.

4            Q.      Okay.  And then it says -- you

5    say -- so you're talking about the platform    13:58:21

6    and you say:  "Look in the repeater and

7    multiple ballots folders."

8            Do you see that?

9            A.      Yes.

10           Q.      What were those folders?           13:58:28

11           A.      Repeater would have been just

12   same person going to different drop boxes.

13           And then multiple ballots would

14   have been, you know, same person of the 242

15   with -- you know, clearly voting in -- with   13:58:50

16   multiple ballots, so just different video

17   cuts.

18           Q.      And so you say the 242.

19           Those are the 242 individuals

20   that the geotracking project identified in    13:59:01

21   Georgia, right?

22           A.      Correct.

23           Q.      And of -- from that group,

24   there was a subset of 70 videos that then was

25   provided to Mr. D'Souza?                        13:59:16

CONFIDENTIAL

Page 165

1          A.      Yeah.  Approximately.

2          Q.      Approximately.  Okay.

3          A.      But that's --

4          Q.      About 70?

5          A.      Yes.                          13:59:21

6          Q.      And those were not people,

7     though, in Gwinnett County, right, because at

8     this point you didn't have the Gwinnett

9     County video?

10         A.      Yeah.  My recollection is no.  13:59:29

11         Q.      Okay.  Who pulled the 70, those

12    70 videos?  Who on your team?

13         A.      On True the Vote's team?

14    Nobody on True the Vote's team.

15         Q.      Okay.  So who pulled them?     13:59:40

16         A.      It would have been OpSec and

17    their -- that team.

18         Q.      And do you know who on that

19    team pulled those together?

20         A.      I mean, I would be speculating. 13:59:47

21    It -- I can tell you it was -- you know, we

22    got the hard drives of the video, and it was

23    very difficult to unpack.  I don't know who

24    all was engaged in that.

25         Q.      And did you get them from       13:59:59

CONFIDENTIAL

Page 166

1    Mr. Phillips or somebody else?

2         A.    They were just put into the --

3    the platform that was being shared at the

4    time.  I don't know who put them.

5         Q.    Okay.  Who created the            14:00:10

6    platform?

7         A.    I don't -- I don't know who,

8    like, had the subscription or I don't -- I

9    don't know.

10        Q.    You don't know who set it up?     14:00:23

11        A.    I don't.

12        Q.    Somebody on the OpSec side?

13        A.    It -- well, definitely on the

14   OpSec side, but I don't -- I don't know who

15   or how.                                      14:00:31

16        Q.    Okay.  You say in your e-mail:

17   "We're glad to talk through the videos with

18   you and what to look for.  It would be

19   helpful to see the script online.  Let me

20   know when you can connect on a call."        14:00:39

21             Did you have a follow-up call

22   with him about this?

23        A.    I couldn't tell you.

24        Q.    Okay.

25        A.    Calls were very limited.          14:00:51

Page 167

1          Q.     But you may have, you just
2     don't remember?
3          A.     It's -- you know, it's
4     possible.  We had no video control or script
5     control or...                              14:01:03
6          Q.     And did he give you access to
7     the script outline?
8          A.     Not that I can recall.
9             (Discussion off the record.)
10         A.     This is -- this is -- before we   14:01:28
11    move from this one, if I may --
12    (BY MS. KUCK)
13         Q.     Sure.
14         A.     -- because I thought about this
15    after we talked earlier.                   14:01:34
16              I recall -- and you're going to
17    have to ask Dinesh about this so I don't want
18    to get too far out over my skis here, but I
19    do recall Dinesh making the observation that
20    it was possible that he felt like maybe     14:01:52
21    Mr. Andrews, after all of this occurred, was
22    seen in a -- in another video.
23              And I'm saying that only by way
24    of I've had this -- I've remembered this, and
25    you may want to ask about it, but I can't --  14:02:10

1    I don't know.

2        Q.    What do you mean he -- that

3    there was more than one video of Mr. Andrews?

4        A.    That's what I generally recall

5    him saying.                          14:02:21

6        Q.    But you didn't go back and look

7    yourself?

8        A.    No, I mean, to me it was what's

9    done is done but...

10        Q.    And in any case, Mr. Andrews      14:02:28

11    was in Gwinnett County?

12        A.    Correct.

13        Q.    So it couldn't have been in

14    these initial 70 because at this point in

15    time in January 2022 you didn't have Gwinnett   14:02:36

16    County yet?

17        A.    Unless he was in another

18    county.  But this is -- you know, I am

19    repeating now what Dinesh said at some point.

20    Yeah.  As I've laid out how we proceeded with   14:02:51

21    our project, that is entirely accurate --

22        Q.    Okay.

23        A.    -- but I'm just sharing that

24    that's something that, you know, you may want

25    to -- I -- ask about.  I don't know.         14:02:59

CONFIDENTIAL

Page 169

1          Q.      Okay.  I know I'm going to see

2     him in a few weeks, and we'll -- we'll ask

3     him about it as well.

4              But nothing -- you don't have

5     any information that you -- you didn't see    14:03:12

6     Mr. Andrews in multiple videos?

7          A.      It was a Gwinnett thing.  I...

8          Q.      Yeah.

9          A.      But I also want to be really

10    clear, we had no -- the videos were used like  14:03:19

11    they were used, and I generally -- my general

12    observation was that they were being selected

13    based on what would look good on screen,

14    which makes sense, so...

15         Q.      So let's mark as Exhibit 41 a    14:03:38

16    document bearing Control No. TTV_007211.

17       (Marked Engelbrecht Exhibit No. 41.)

18    (BY MS. KUCK)

19         Q.      And this is about four days

20    after the last e-mail we looked at.          14:04:06

21              So at the bottom it seems to be

22    an e-mail was originally sent to you from

23    Mrs. D'Souza with the preliminary teaser

24    trailer.

25              Do you see that?                   14:04:26

CONFIDENTIAL

Page 170

```
 1            A.      Yes.
 2            Q.      And you can't tell from this
 3     copy of it, but do you recall whether anybody
 4     else on your team other than you got this?
 5            A.      No.                        14:04:34
 6            Q.      And then the following day it
 7     looks like you wrote back and you said:  "Our
 8     recommended edits"?
 9            A.      Yes.
10            Q.      And so I take it you reviewed    14:04:47
11     it?
12            A.      We looked at the link that they
13     provided, yes.
14            Q.      Yeah.  And when you say "our,"
15     are you referring to you and Mr. Phillips or    14:04:52
16     somebody else?
17            A.      I just -- I tend to use that
18     term a lot, so it's -- I mean, everybody --
19     you know, yes.  But, I mean -- yes, I guess
20     would -- I would say that.                  14:05:02
21            Q.      Do you recall whether you
22     shared the -- the teaser trailer with the --
23     this preliminary teaser trailer with
24     Mr. Phillips?
25            A.      I don't recall at all.        14:05:13
```

CONFIDENTIAL

Page 171

1          Q.      And you gave her some comments

2     on it?

3          A.      I did.

4          Q.      And then at the end you said

5     again:  "Great job.  Super exciting."          14:05:18

6                  Do you see that?

7          A.      Uh-huh.

8          Q.      So you didn't have any

9     objection to any of the content of the -- of

10    the teaser trailer other than these things     14:05:25

11    that you were pointing out?

12         A.      Well, I mean, as you can read,

13    you know, with what Ms. D'Souza went on to

14    say and there was no voice-over.  There was

15    just the -- you know, that -- that was still   14:05:35

16    going to be done, and I was trying to be

17    supportive.

18         Q.      Okay.

19         A.      I don't even know that these --

20    these, you know, suggestions were even taken.  14:05:46

21         Q.      Yeah.  That was going to be my

22    next question.

23                 Do you know whether she took

24    your suggestions?

25         A.      I -- I don't.  It was -- we had  14:05:54

CONFIDENTIAL

Page 172

1    no editorial control.  They -- they needed to

2    do what they needed to do to make a movie and

3    that -- you know, we had licensed the video.

4    That was that.

5        Q.    So this is January 14 and 15.    14:06:07

6            (Discussion off the record.)

7        (Marked Engelbrecht Exhibit No. 42.)

8    (BY MS. KUCK)

9        Q.    I'm going to mark as the next

10   exhibit, 42, a document bearing Control    14:07:05

11   No. 007230.

12            So this appears to be another

13   Zoom invitation that was sent to you by

14   Ms. D'Souza.

15            Do you see that?    14:07:41

16       A.    Yes.

17       Q.    And that's a few days after she

18   gave you the teaser trailer and you gave her

19   some comments.

20            Do you recall having a --    14:07:48

21   another Zoom call with her in approximately

22   that time frame?

23       A.    I -- I don't.  And I -- I have

24   such a void of recollection.  I don't know

25   if -- if this was an update to what the -- I    14:08:00

CONFIDENTIAL

Page 173

1   mean, I don't know if we had the first one.

2   I don't know if this was -- I don't know.  I

3   have no recall of this at all.

4       Q.    Okay.  But do you have any

5   reason to believe you didn't have the call?   14:08:10

6       A.    No.  The only edit I would add

7   there is I don't know if this was -- to the

8   extent that it's important, I don't know

9   that -- if this was a rescheduling of the

10  first one or the -- I -- I just don't know.   14:08:21

11      Q.    Okay.  Because you don't

12  remember whether you had the first one?

13      A.    I really -- I really don't.

14      (Discussion off the record.)

15      (Marked Engelbrecht Exhibit No. 43.)   14:08:55

16  (BY MS. KUCK)

17      Q.    So let's mark as Exhibit 43 a

18  one-page document bearing Control

19  No. TTV_007232.

20             And this -- this appears to be   14:09:25

21  a -- an e-mail from Ms. D'Souza to you and

22  Alex Pfeiffer and -- I'm sorry, strike that.

23             It appears to be an e-mail from

24  Ms. D'Souza to Alex Pfeiffer at fox.com

25  copied to you and Mr. D'Souza with a subject   14:09:46

CONFIDENTIAL

Page 174

1    "here it is."

2              And then she says:  "Hi, Alex,

3    here's the teaser."

4              Do you see that?

5        A.    I do.                              14:09:54

6        Q.    And we spoke earlier about

7    Mr. -- Mr. Pfeiffer.

8              He is -- he is a producer at

9    Fox News?

10       A.    That -- I -- I don't know if      14:10:01

11   that's the right title, but I know he was

12   somehow at Fox News.

13       Q.    Okay.  And why was she sending

14   this?  Do you know?

15       A.    I -- I could only -- I mean, I     14:10:10

16   could speculate that it was to have it shown

17   but I...

18       Q.    Okay.  Did you review the final

19   teaser?

20       A.    I don't recall.                    14:10:24

21       Q.    And do you know why she was

22   copying you on this?

23       A.    I -- maybe just good form.

24   I -- you know, courtesy.  I don't know.

25       Q.    Okay.  So that was January 18.     14:10:39

CONFIDENTIAL

Page 175

1              (Discussion off the record.)

2         (Marked Engelbrecht Exhibit No. 44.)

3     (BY MS. KUCK)

4         Q.    So Exhibit 44 is a

5     multiple-page document bearing Control    14:11:23

6     No. DD_000166 through DD_000176.

7         A.    Okay.

8         Q.    So then this appears to be

9     about a little more than a week later, and it

10    says -- seems to be an e-mail from    14:12:04

11    Mrs. D'Souza to you and Mr. Phillips.  And

12    it's "re shooting schedule."

13              Do you see that?

14        A.    Yes.

15        Q.    Do you recall receiving this    14:12:17

16    e-mail?

17        A.    Not specifically, but I have no

18    reason to think that I didn't.

19        Q.    Okay.  So it seems to be a

20    back-and-forth about the possible shooting    14:12:34

21    schedule for the film, right?

22        A.    Yeah.  Yeah.  Well, for our

23    part.

24        Q.    For your part, yes.

25              And then on Page 171, you have    14:12:42

CONFIDENTIAL

Page 176

1    an e-mail there to Mr. Schooley where you

2    say:  "Got it.  Good deal.  Sidebar re the

3    hackers, we want to be very clear that our

4    team are not hackers, they're programmers,

5    miners, analysts, mathematicians, and          14:13:05

6    investigators.  In our community, the term

7    'hacker' is a pejorative that suggests we

8    stole data or engaged in illegal acts.  We

9    paid for commercially and publicly available

10   data and did all of our work absolutely        14:13:17

11   painstakingly above board."

12              The next paragraph is, "I know

13   these are just internal notes, but did want

14   to mention the baggage of the term and

15   recommend we substitute it with something      14:13:25

16   like researchers or analysts."

17              Do you remember sending that

18   e-mail to Mr. Schooley?

19        A.    I -- I don't remember it, but I

20   don't have any reason to dispute that I did.   14:13:34

21        Q.    Do you have any recollection of

22   giving the comment that the word "hacker"

23   should be avoided?

24        A.    I'm sorry.  Can you restate

25   that?                                          14:13:48

CONFIDENTIAL

Page 177

1        Q.      Yeah.

2                You say:  "Sidebar re hackers."

3    And then you have a number of comments, and

4    you want to -- you say:  "We recommend we

5    substitute it with something else like          14:13:56

6    researchers or analysts."

7                Do you remember having a

8    back-and-forth with him about the word -- the

9    use of the word "hackers" as opposed to

10   researchers or analysts?                        14:14:05

11       A.     I don't recall that.  I mean, I

12   can see that I responded to him when he said

13   "we have five extras acting as hackers," you

14   know, and to work on a hacker vibe, so that's

15   what I was responding to.                        14:14:21

16       Q.     Do you know whether they use

17   the term "hacker" in the movie?

18       A.     I -- I hope not.  I don't -- I

19   don't recall.  I don't know.  We had no -- we

20   had no editorial control.  We lad no control    14:14:30

21   over what happened in their studio or who

22   they hired to do what.

23       Q.     Let's mark as Exhibit 45 a

24   one-page document bearing Control

25   No. TTV_007235.                                  14:15:03

1          (Marked Engelbrecht Exhibit No. 45.)

2             (Discussion off the record.)

3          A.     Thank you.

4     (BY MS. KUCK)

5          Q.     Do you see this appears to be     14:15:30

6     another e-mail during this time frame from

7     Mrs. D'Souza to you and Mr. Phillips

8     scheduling a Zoom call?

9          A.     Yes, I see that.

10         Q.     Okay.  And it says the topic is    14:15:46

11    "catch up"?

12         A.     Yes.

13         Q.     Do you recall a Zoom call

14    around this -- this time given what -- the

15    e-mails we just looked at?                    14:15:56

16         A.     Let me just look back at the

17    dates just to...

18         Q.     Yeah.  This is the -- some --

19    this is the same date as your e-mail about

20    the hackers and the day --                    14:16:07

21         A.     Oh, okay.

22         Q.     -- after -- seems to be the day

23    after she sent you the shooting schedule.

24         A.     I have -- I have no recall of

25    any of the Zoom.  I don't have any reason to  14:16:19

CONFIDENTIAL

Page 179

1    believe that she didn't send this.  I just

2    don't know if it happened or I -- I don't --

3    I just don't have any recall of it.

4           Q.    Okay.  You can't say either

5    way?                                         14:16:31

6           A.    (Shaking head.)

7           Q.    Do you have general

8    recollection of any Zoom calls with the

9    D'Souzas about the film or with Mr. Schooley?

10          A.    I have recollection of calls.    14:16:47

11          Q.    Okay.

12          A.    And I'm not disputing that

13   there could have been Zoom.  You know, when

14   you say "Zoom," you think video.

15          Q.    Right.                           14:17:03

16          A.    I just -- that's the visual

17   that I'm trying to conjure --

18          Q.    Okay.

19          A.    -- is like when we were all on

20   video, and I don't -- I don't recall.         14:17:08

21   Again -- again, I would be -- I just don't --

22   I don't -- I just don't.

23          Q.    So your recollection is more

24   consistent with you having audio calls during

25   this period of time, and it could have been   14:17:23

CONFIDENTIAL

Page 180

1      they were set up through Zoom, but you

2      don't -- when you say you don't recall calls,

3      you mean you don't recall video calls?

4           A.    And that's -- to be clear,

5      that's not even to say that it wasn't a video    14:17:34

6      call.

7           Q.    Right.  Right.

8           A.    I just truly do not remember

9      these calls.

10          Q.    Okay.  And to extent you recall    14:17:39

11     audio calls, was Mr. Phillips on there with

12     you, or was it just you?

13          A.    I -- it -- it could have been,

14     you know, either/or, both.  I don't know.  It

15     was -- it was not -- I mean, if -- based on    14:17:55

16     this last document that was, I guess, as you

17     said, the day before this (indicating), there

18     were a lot of -- there was a lot of confusion

19     that we, you know, likely were trying to

20     understand but...                               14:18:10

21          Q.    And when you say "there was a

22     lot of confusion," what do you mean?

23          A.    Can we...?

24          Q.    Sure.  Of course.

25                Now you want to look back at       14:18:20

CONFIDENTIAL

Page 181

1    Exhibit --

2           A.      44.

3           Q.      -- 44.

4           A.      So my questions are more just

5    about travel and what -- what the expectation    14:18:38

6    was, but I -- all I was looking at earlier, I

7    saw that Gregg had responded here and said:

8    "Can y'all remind me what our

9    responsibilities are in California.  We are

10   struggling with scheduling."                      14:18:55

11              Because we didn't -- initially,

12   we didn't know that this was happening.  And

13   it went from there's going to be something in

14   California and we may want to call you and

15   ask you questions to there's going to be         14:19:09

16   something in California and we may want to

17   have you on a conference call to can you come

18   to California and talk to everybody and kind

19   of brief them on the project to us being

20   there and actually being, you know, on --       14:19:24

21   well, I don't really even know if we were on

22   camera, but we were -- I don't think we

23   were -- if we were -- well, I don't -- we sat

24   with all the hosts and --

25           Q.      Right.                             14:19:37

CONFIDENTIAL

Page 182

```
 1          A.      -- and did that.

 2                  So I think what -- let me

 3      just -- just for clarity --

 4          Q.      Uh-huh.

 5          A.      -- let me just read what Debbie    14:19:45

 6      said here.

 7                  "Basically we are moderating a

 8      Salem host panel discussing these issues and

 9      why the significance.  You and Catherine are

10      two expert witnesses we need on hand to brief    14:19:52

11      them and also to answer questions that will

12      inevitably arise.

13                  "The shooting there is

14      scheduled from 2:00 to 5:00.  However, we

15      would like to meet with you guys beforehand    14:20:02

16      to go over the format."

17                  So it was like, you know, come

18      and, you know, if we have questions we'll ask

19      you, and we want to meet with you, but --

20      that we were not supposed to be in it, which    14:20:12

21      we had no editorial control, and we had no

22      control over what was going to happen, did

23      not know who was going to be there.

24                  And so maybe that -- so maybe

25      this was trying to clear this up.  I -- I    14:20:25
```

CONFIDENTIAL

Page 183

1      don't know.

2           Q.    Okay.  But you did -- you went

3      to California?

4           A.    I did.

5           Q.    And then a day or -- a few days    14:20:32

6      before that, you also did some filming in

7      Woodlands?

8           A.    Yes, correct.

9           Q.    And tell me about the filming

10     in Woodlands.                                14:20:44

11          A.    I believe it is Dinesh's

12     studio.  I'm not sure.

13          Q.    Yep.

14          A.    But it's a studio in The

15     Woodlands.  And Gregg and I were invited to   14:20:57

16     come to the studio.  As I generally recall,

17     we got there -- I don't know -- I mean, in

18     the -- I guess in the morning.  It felt very

19     much like a full day that we were there.

20               We had no -- I mean, we knew we     14:21:11

21     were going to be talking about the movie, but

22     we had no -- we just sat at a table.  And

23     Gregg had his iPad and talked to some of the

24     things that -- that he, you know, showed on

25     his iPad, and -- and we just answered their   14:21:28

Page 184

```
 1    questions.
 2                   And then as was mentioned
 3    yesterday -- yesterday, there was, you know,
 4    the blue screens and no editorial control,
 5    lots left on the cutting room floor.          14:21:47
 6                   And then the next day, there
 7    was just B-roll, which was just us like
 8    getting in and out of cars and standing with
 9    the extras that they had brought in.
10        Q.    So the -- the scenes in the         14:22:02
11    film where you're getting in and out of cars
12    or you're going to the Summit or any of
13    those, that -- that was all staged, right,
14    after the -- it was staged when you filmed at
15    this point in time?                           14:22:17
16                   It wasn't an actual film of you
17    having a meeting?
18        A.    No.  No.  That -- frankly,
19    that's why we didn't like -- you just said
20    the word "summit."  I was just --             14:22:27
21        Q.    Right.
22        A.    It just didn't -- but -- but
23    no, it was -- with the slight exception of
24    the California event because we didn't --
25    hadn't -- you know, that wasn't staged        14:22:38
```

CONFIDENTIAL

Page 185

1    because we didn't even know we --

2         Q.      Right.

3         A.      -- would be a part of it.

4                 But, again, no -- we -- I know

5    I'm redundant, but we just had no editorial    14:22:46

6    control.  This is -- we just -- moviemaking,

7    and that was it.

8         Q.      And you said Mr. --

9    Mr. Phillips had something on his iPad, but

10   then you also talked about blue screens.    14:23:02

11                Can you explain that to me?

12        A.      He had in the movie -- I -- I

13   can't tell you what it was even, but I know

14   he had his iPad with him.

15                And then there were screens set    14:23:13

16   up around the studio, and they were blue

17   because those graphics were going to be added

18   later.  I -- for clarity, I guess.

19        (Discussion off the record.)

20                MS. KUCK:  Yeah.  I'm sorry.    14:23:32

21   (BY MS. KUCK)

22        Q.      So those were set up later.

23                And then in the film, does the

24   film show whatever it was that was on his

25   iPad or it's something that's just put up on    14:23:45

CONFIDENTIAL

Page 186

1    the blue screens?

2            A.      I --

3            Q.      Okay.

4            A.      I really couldn't tell you.

5            Q.      All right.  So then you went to    14:23:52

6    California.

7                    You met with the Salem hosts,

8    correct?

9            A.      Yes.

10           Q.      And that was on film or they    14:24:06

11   were filming when you were meeting with them,

12   or did you do an off camera also?

13           A.      There was no -- to the best of

14   my knowledge, there was no off camera.  We

15   were not -- there was like a hallway    14:24:18

16   situation where we were talking with them, I

17   believe that was all filmed.

18                   And then there was the -- the

19   point where we talked with the hosts when

20   they were seated.  And then we were asked to    14:24:34

21   leave, and then they did the rest of it.

22           Q.      Okay.  Prior to that time, had

23   you had any conversations with any of the

24   hosts about the film?

25           A.      So thinking about who was --    14:24:51

CONFIDENTIAL

Page 187

1    not that I can recall.

2          Q.    But later after at least the

3    teaser came out, you were on some of the

4    shows that were hosted by those people,

5    right?                                    14:25:10

6          A.    Yes.

7          (Discussion off the record.)

8    (BY MS. KUCK)

9          Q.    So let's mark as Plaintiff's

10   Deposition Exhibit 46, TTV 7271.          14:26:21

11       (Marked Engelbrecht Exhibit No. 46.)

12   (BY MS. KUCK)

13         Q.    So this is an e-mail that

14   appears to have been sent to you,

15   Mr. Phillips, and Mr. Hughes by Ms. D'Souza  14:26:53

16   on February 4, 2022, which I guess is two

17   days after the filming in California?

18         A.    I think.

19         Q.    Okay.  And she's asking you for

20   additional information.                   14:27:10

21               Do you see that?

22         A.    Yes.

23         Q.    So for the -- the first item

24   she's asking for is a thousand videos.

25               Do you see that?             14:27:20

CONFIDENTIAL

Page 188

1          A.     I do, yes.

2          Q.     And what -- were there

3     follow-up conversations about that?  Did you

4     give them a thousand videos?

5          A.     No.                          14:27:28

6          Q.     What happened?

7                 Okay.  Tell me what happened

8     with that item.

9          A.     There's another version of this

10    where it goes back and forth with a         14:27:34

11    conversation, but the -- -- there -- I mean,

12    a thousand videos.  The -- my understanding

13    became about that particular request that

14    they were trying to create, and it's

15    mentioned in other documents, a fly effect,  14:27:53

16    like a matrix effect.

17                They had done it in another

18    movie, and that's what they wanted to do

19    here.  And it's not reflected here, but in my

20    response on that document, I just say, you    14:28:04

21    know, it -- the -- these -- these would just

22    be, you know, videos outside of the context

23    of what we've already provided.  I'd make

24    recommendations.  Like, I don't know what

25    to -- what to do.                            14:28:24

CONFIDENTIAL

Page 189

1          And they came back and said,
2     Well, just any kind of video you're not going
3     to be able to see the person or whatever.
4          And I really don't recall.  At
5     that point, we had gotten -- well, no, I        14:28:35
6     guess at this point we still didn't have some
7     of the Gwinnett stuff so --
8          Q.    Right.
9          A.    -- I was -- and maybe this was
10    a lingering request.  I -- I don't -- I         14:28:43
11    couldn't tell you about when and how that
12    actually...
13         Q.    Do you recall how many videos
14    you gave them ultimately in addition to the
15    77 original ones, approximately 77?             14:28:55
16         A.    Yeah, approximately 70.
17              But then there was the Gwinnett
18    anomaly which that was that 25-hour period
19    video.  And then with that, because of the
20    way they provided video, there was just a ton   14:29:08
21    of -- I mean, it was -- it was a longer
22    period than just that 25 hours.  We wanted to
23    look at the 25 hours, but there was more than
24    that.
25              And I -- I really couldn't -- I        14:29:18

CONFIDENTIAL

Page 190

1    don't know more than that except that we --

2    you know, when we -- our deal was with them

3    just to provide this video from the county

4    open records.  And so when we got it, we

5    provided it.  And that was it.            14:29:34

6         Q.    And that was Gwinnett County

7    you're talking about?

8         A.    Yes, I don't recall there being

9    anything else.  There could have been.

10   But...                                     14:29:44

11        Q.    And then so therefore that --

12   that second batch of video from Gwinnett

13   County, again, it wasn't part of the

14   geospatial analysis matching of video and

15   analysis because you didn't have it in time,  14:29:57

16   right?

17        A.    That's -- yes.

18        Q.    Okay.  And did the D'Souzas

19   understand that -- or did you tell Mr. and

20   Mrs. D'Souza that?                          14:30:06

21        A.    I -- I don't recall, but it

22   wouldn't -- I mean, I don't know how that

23   would have been material, but I -- I don't

24   recall telling them or not telling them

25   maybe.                                      14:30:17

CONFIDENTIAL

Page 191

1          Q.      Okay.

2          A.      I mean, we definitely talked

3     about the Gwinnett anomaly because we had

4     exhibits and everything with that.

5          Q.      But you don't recall talking to     14:30:24

6     them about whether the Gwinnett County video

7     had been matched with the geospatial

8     analysis?

9          A.      I can't specifically recall it.

10    I just -- it came so late, it would -- it      14:30:42

11    would -- in my mind almost have been assumed,

12    but I can't recall it.

13              Again, we had no editorial

14    control, no control over what was used or

15    how, which videos were selected.  It was --   14:30:54

16    they were making -- they were trying to do

17    what they could to make it look good on

18    screen.

19         Q.      Okay.  And then No. 2 on this

20    e-mail, it says:  "We need a list of          14:31:06

21    nonprofits that are involved with the

22    trafficking."

23              Do you see that?

24         A.      I do.

25         Q.      And did you ultimately provide     14:31:11

1     that in -- did you ultimately provide

2     information in response to this request?

3          A.    I am -- I am not -- I know that

4     there is another version of this where I do

5     respond.  And I'm hesitant to -- to say what    14:31:21

6     that was.  I -- I -- I -- and maybe you have

7     a copy of it, but I do know I responded.  I

8     don't recall how I responded.

9          Q.    Okay.

10          A.    I know that we were emphatic    14:31:34

11    about not putting the names, and that's

12    repeated throughout the documents that I

13    provided many, many times.

14         Q.    And why not?

15         A.    It -- it was just -- it was    14:31:46

16    not -- we -- we just -- you know, we had

17    always hoped that these -- that these -- that

18    this would go on to be investigated.

19             And while the apparent nexus

20    between potentially these organizations and    14:32:00

21    devices seem significant, and we were

22    comfortable enough to say that they appeared

23    to be frequenting these addresses, we just

24    weren't comfortable going further than that.

25             And, you know, we really    14:32:17

CONFIDENTIAL

Page 193

```
 1    wanted -- we still were hoping that law

 2    enforcement would -- would pick that up, and

 3    we didn't want it to be blown out of

 4    proportion.  And that was it.

 5         Q.    Okay.                           14:32:27

 6               MR. EVANS:  Maybe let's do a

 7         quick break.

 8               MS. KUCK:  Sure.

 9               MR. EVANS:  I know we've been

10         going about an hour and 20.           14:32:33

11               MS. KUCK:  Yeah.  Sorry about

12           that.

13               MR. EVANS:  No, you're good.

14               THE VIDEOGRAPHER:  Off the

15         record at 2:33.                       14:32:36

16        (Break from 2:33 p.m. to 2:51 p.m.)

17               THE VIDEOGRAPHER:  Back on the

18           record at 2:51.

19        (Marked Engelbrecht Exhibit No. 47.)

20       (BY MS. KUCK)                           14:50:07

21         Q.    Ms. Engelbrecht, before the

22    break we were talking about an e-mail that

23    you had received from Debbie D'Souza in which

24    had a list of things including a thousand

25    videos?                                    14:50:21
```

CONFIDENTIAL

Page 194

1           A.     Yes.

2           Q.     And that was on -- the date of

3     that e-mail was February 4.

4                  Do you recall having a call

5     about those items shortly thereafter?        14:50:27

6           A.     I -- I can't -- I don't recall

7     that.  I mean, I -- no, I don't specifically

8     recall that.

9           Q.     Okay.  So let's mark as

10    Exhibit 47 TTV_007272.  And this is another    14:50:43

11    Zoom invitation for February 5.

12                 Do you see that?  That's the

13    day after the e-mail.

14                 You have no recollection of

15    this call?                                     14:51:11

16          A.     I don't.  I really just -- I

17    don't.

18          Q.     Okay.  Do you have any reason

19    to believe it didn't happen?

20          A.     Other than I have no recall of    14:51:19

21    it, I -- I mean, not -- not necessarily.

22          Q.     Okay.  So that's dated

23    February 5.  Let's mark the next document,

24    TTV 7274.

25          (Marked Engelbrecht Exhibit No. 48.)     14:51:48

CONFIDENTIAL

Page 195

```
 1    (BY MS. KUCK)
 2          Q.    So here's a document that
 3    appears to be another e-mail from Ms. D'Souza
 4    to you and Mr. Phillips dated a few days
 5    later, February 9, 2022.                    14:52:20
 6                Re Zoom call, Wednesday, 7:15
 7    Central Standard Time, 8:15 Eastern Standard
 8    Time.  And items to complete.
 9                And then it says:  "Hi,
10    Catherine and Gregg.  Here are the items we   14:52:36
11    need to complete."
12                Do you see that?
13          A.    Yes.
14          Q.    And it's pretty much that same
15    list that we had talked about she had sent    14:52:42
16    you on the 4th?
17          A.    Yes.
18          Q.    And so she's following up again
19    in scheduling a call for the following day on
20    February 10; is that fair?                   14:52:51
21          A.    Yeah.  Yes.
22          Q.    And so let's mark TTV_007276.
23          (Marked Engelbrecht Exhibit No. 49.)
24          A.    Thank you.
25    (BY MS. KUCK)                                14:53:23
```

CONFIDENTIAL

Page 196

```
 1            Q.    And then it -- this exhibit
 2     seems to be an e-mail responding to the
 3     e-mail we just looked at dated February 10,
 4     2022, from you to Ms. D'Souza.
 5                  Is this the e-mail you were        14:53:47
 6     remembering earlier when you spoke about you
 7     responded?
 8            A.    I believe so, yes.
 9            Q.    Okay.  And you respond on the
10     video footage.  It says:  "We have around 70   14:54:04
11     videos currently separated out in our scaling
12     efforts to review more."
13                  Are those the 70 the 70 that
14     we've been talking about that you initially
15     provided?                                       14:54:20
16            A.    Tied to the 242, yes.
17            Q.    Right.  Okay.
18                  And then you gave her a number
19     of ideas.
20                  Did the -- as to possible ways     14:54:27
21     to show some of these issues, including, you
22     know, showing some -- the path of a mule,
23     et cetera.
24                  Did they take you up on any of
25     those ideas?                                    14:54:43
```

CONFIDENTIAL

Page 197

1        A.      No.  No.

2        Q.      Okay.  Did you ultimately give

3    them additional footage?

4        A.      After this -- after the 70 and

5    242 and later --                            14:54:56

6        Q.      Yeah.

7        A.      -- we did give them the

8    Gwinnett footage.

9            Yeah.  I mean, I don't -- I

10   don't recall -- I just don't -- that's --    14:55:06

11   that's what I remember.

12       Q.      Okay.  And then the second item

13   which we talked about earlier, which is:  "We

14   still need a list of nonprofits that are

15   involved with the trafficking."             14:55:15

16           Do you see that?

17       A.      Yes.

18       Q.      And you say:  "Here's a link to

19   the Georgia and Arizona organizations that

20   have published 990s."                       14:55:22

21           Do you see that?

22       A.      Yes.

23       Q.      So you were responding to her

24   response for a list of nonprofits with

25   this -- this link.                          14:55:36

CONFIDENTIAL

Page 198

1          What was in the link?

2     A.     The 990 tax returns.

3     Q.     And those were -- how were

4     those organizations selected?

5     A.     Some of them were -- seemed to     14:55:50

6     be associated with some of the patterns that

7     had shown up.  Some of them were associated

8     with what we had been told by informants.  I

9     was trying to caution here that, you know,

10    this -- these were -- this is just data that     14:56:11

11    we had pulled.

12    Q.     You say:  "There are active

13    investigations going on in both of these

14    states, and we cannot risk bungling the

15    cases."                                         14:56:24

16          What were you referring to

17    there?

18    A.     There were active -- at that

19    point, there were active investigations in

20    Arizona and in Georgia.  And I just -- I     14:56:31

21    didn't want to get ahead.  As I've said, I

22    just didn't want to get ahead of -- our

23    primary purpose was was working with law

24    enforcement so...

25    Q.     Who was doing those     14:56:42

Page 199

1    investigations?

2          A.    The -- the Secretary of State

3    of Georgia had announced that he was going to

4    do an investigation.  To this point, I don't

5    think anything had occurred, but I may be          14:56:52

6    mistaken on that, but he had announced it.

7                And then in Arizona, the Yuma

8    County Sheriff's Office and the -- I don't

9    recall if at this point we were already

10   talking with the -- the criminal team of the     14:57:10

11   attorney general of Arizona, but those were

12   aware that that was happening.

13         Q.    And in Georgia, what -- what

14   organizations were being investigated?

15         A.    I don't know that any             14:57:23

16   organization -- I don't know.  They had just

17   announced that they were -- they had seen,

18   you know, our -- we had had a meeting with --

19   with the Georgia Secretary of State.  We had

20   long since been to the Georgia Bureau of         14:57:40

21   Investigations.  We were just happy that they

22   were considering anything so...

23         Q.    Okay.  Did you ever tell her

24   that -- well, strike that.

25                She's saying:  "We need a list     14:57:53

CONFIDENTIAL

Page 200

```
 1        of nonprofits that are involved with the

 2        trafficking."

 3                    Did you ever explain to her

 4        that the organizations you were providing

 5        were people you suspected of it but didn't       14:58:04

 6        have -- hadn't reached a conclusion about?

 7            A.      Although I don't specifically

 8        state that here, I do -- I do feel fairly

 9        certain that it is a conversation that we had

10        had because I was emphatic about not -- not,     14:58:22

11        you know, releasing names, not jumping to

12        conclusions.  We had not -- I just -- I

13        didn't want that to happen.

14            Q.      But you think that might have

15        been some sort of oral conversation you had      14:58:35

16        with them?

17            A.      Yes.  I got a sense that they

18        were trying to do additional research.  And,

19        you know, again, I wasn't sure what all was

20        going on but was trying to be helpful if I       14:58:51

21        could.

22            Q.      And then you conclude by

23        saying:  "We have NGOs in other states too.

24        We'll send a list by close of business on

25        Friday."                                         14:59:00
```

CONFIDENTIAL

Page 201

```
 1              Did you provide that
 2      information?
 3          A.    I don't -- I don't recall.
 4          Q.    And then am I -- am I correct
 5      that because you -- after you sent this        14:59:17
 6      information there was supposed to be a call
 7      the same day, but the call was canceled
 8      because you gave them the information?
 9          A.    That's -- that would -- that
10      would seem to be the order of events, but I'm  14:59:27
11      not -- I'm not sure.
12          Q.    Okay.
13             (Discussion off the record.)
14          (Marked Engelbrecht Exhibit No. 50.)
15      (BY MS. KUCK)                                  15:00:00
16          Q.    Let's mark as Plaintiff's
17      Deposition Exhibit 50 a one-page document
18      bearing Control No. TTV_007280.
19              And Exhibit 50 seems to be
20      another Zoom invitation for about 12 days      15:00:42
21      later after the e-mail we just looked at to
22      you.  Topic is "Catch up movie meeting."
23              Do you recall that you had
24      another conversation with her -- well, strike
25      that.                                          15:01:02
```

CONFIDENTIAL

Page 202

1              Do you recall having a

2     conversation with her, say, 12 days after

3     your last e-mail exchange?

4          A.    I -- I don't recall.  I recall

5     that we were anxious to complete, you know        15:01:10

6     the provision of whatever they -- whatever we

7     were -- were required to do.  And so they

8     were -- you know, as was indicated in this

9     last -- in the e-mail, 48 -- Exhibit 48 --

10         Q.    Uh-huh.                                 15:01:29

11         A.     -- where she said, you know,

12    here are the items we need to complete, that

13    we -- we very much looked through the lens

14    of, you know, what we needed to complete, you

15    know, our -- our contract to get -- get it     15:01:37

16    done.

17         Q.    You were -- when you say "your

18    contract," you're talking about the licensing

19    agreement?

20         A.    The agreement, yeah.               15:01:46

21         Q.    But does the licensing

22    agreement have any specific as to how many

23    were -- how many pieces of video you're

24    supposed to provide or anything?

25         A.    No.                                15:01:56

CONFIDENTIAL

Page 203

```
 1          Q.     Just -- it's just a license to
 2     use video that you have?
 3          A.     To use open source or open
 4     records video.
 5          Q.     Okay.  And it doesn't spell out    15:02:05
 6     any of your specific obligations in terms of
 7     providing that video?
 8          A.     I don't really recall.  We
 9     would have to go back and -- and look at the
10     agreement.  But generally, I think that's --   15:02:17
11     it was -- it was all about, you know, the
12     video.
13          Q.     Right.  It was just a license
14     to use the video?
15          A.     Yeah.  I -- I -- I'm not a       15:02:25
16     lawyer, so I don't want to get over my skis
17     on it but...
18              (Discussion off the record.)
19          (Marked Engelbrecht Exhibit No. 51.)
20     (BY MS. KUCK)                                  15:04:19
21          Q.     Okay.  Let's mark as Exhibit 51
22     an e-mail from -- well, strike that.
23              Let's mark as Exhibit 51 a
24     document bearing control Nos. TTV_007294
25     through 7295.                                  15:04:34
```

Page 204

```
 1                 (Discussion off the record.)
 2          (BY MS. KUCK)
 3                 Q.     So do you see this appears to
 4          be at the bottom an e-mail dated March 10
 5          from Mr. Schooley to -- well, strike this.    15:05:13
 6                        It's -- it's -- it appears to
 7          be an e-mail from Mrs. D'Souza forwarding an
 8          e-mail to you and Mr. -- you and Mr. Phillips
 9          from Bruce Schooley, correct?
10                 A.     Yes.                            15:05:34
11                 Q.     And he's asking about some
12          questions relating to the film.
13                        Do you see that?
14                 A.     Yes.
15                 Q.     And do you know, did Mr. -- you   15:05:42
16          or Mr. Phillips respond to this?
17                 A.     I -- I don't know.  I mean, if
18          it -- if we had, I imagine it would have been
19          pulled out of -- you know, of this same
20          thread.  I don't know.                       15:06:07
21                 Q.     Okay.  If you look down to the
22          last two lines on this page, he seems to
23          be -- he's asking a question about something
24          that he says Mr. Phillips stated in the film.
25                        Do you see that?                15:06:23
```

CONFIDENTIAL

Page 205

1          A.     Yes.

2          Q.     And then the last two lines on

3     the page quote Mr. Phillips as saying:  "What

4     you are seeing -- what you see here on the

5     screen is a single person on a single day in    15:06:31

6     Atlanta, Georgia.  They went to 28 drop boxes

7     and five organizations in one day."

8                 Do you see that?

9          A.     Yes.

10         Q.     So was -- was that the part        15:06:40

11    when he was looking at his iPad?

12         A.     I -- we'd have to look at the

13    movie.  I -- I don't know.

14         Q.     You don't remember --

15         A.     I don't.                            15:06:50

16         Q.     -- the sequence?  Okay.

17            (Discussion off the record.)

18         (Marked Engelbrecht Exhibit No. 52.)

19      (BY MS. KUCK)

20         Q.     Okay.  Let's mark as Exhibit 52    15:07:20

21    a one-page document bearing Control No.

22    TTV 7278.

23                 And then this appears to be an

24    e-mail from Mr. D'Souza to you, again,

25    following up on this NGO issue.              15:07:49

CONFIDENTIAL

Page 206

```
 1              Do you see that?
 2      A.      Yes.
 3      Q.      Dated February 16?
 4      A.      Yes.
 5      Q.      And he says:  "I seem to have      15:07:56
 6  the list of NGOs you tested for in Georgia,
 7  Wisconsin, and Arizona, but not Michigan or
 8  Pennsylvania."
 9              Do you see that?
10      A.      Yes.                               15:08:07
11      Q.      When he says "NGOs you tested
12  for," do you understand what he's referring
13  to there?
14      A.      No, I do not.
15      Q.      Do you know -- did you give        15:08:12
16  them a list for Georgia, Wisconsin, and
17  Arizona?
18      A.      No.
19              Not to best of my recollection.
20      Q.      And do you recall responding to    15:08:29
21  him that you hadn't given him such a list?
22      A.      I -- I don't -- I don't --
23  I'm -- if I didn't respond, which it doesn't
24  look like I did, I'm nearly certain I would
25  have communicated that verbally.            15:08:45
```

Page 207

1          Q.      Okay.

2          A.      Because they were, you know,

3     trying to -- clearly trying to get this.

4          Q.      Right.  And so you -- your

5     recollection is you may have had verbal          15:08:54

6     conversations with him about it, you just

7     don't remember this?

8          A.      Just to try to explain the

9     situation, yes.

10          (Discussion off the record.)          15:09:29

11     (BY MS. KUCK)

12          Q.      Let's mark as Exhibit 53

13     another Zoom -- well, bearing control

14     Nos. TTV 7280 -- oops.

15          A.      Sorry.                              15:10:10

16          Q.      I've given you the wrong one.

17               MS. KUCK:  7280.

18          (Discussion off the record.)

19     (BY MS. KUCK)

20          Q.      So let's mark as exhibit --          15:10:36

21     it's not.

22          (Discussion off the record.)

23     (BY MS. KUCK)

24          Q.      So let's mark as --

25               MS. KUCK:  Let's just go off          15:11:17

CONFIDENTIAL

Page 208

```
 1           the record a second so we can
 2           straighten up the exhibits.
 3                   THE WITNESS:  Sure.
 4                   THE VIDEOGRAPHER:  Off the
 5           record at 3:11.                        15:11:24
 6        (Break from 3:11 p.m. to 3:21 p.m.)
 7                   THE VIDEOGRAPHER:  We're back
 8           on record at 3:21.
 9    (BY MS. KUCK)
10        Q.     So we were just looking at some   15:20:13
11    e-mails about Mr. D'Souza requesting
12    information for nonprofits in other states?
13        A.     Yes.
14        Q.     Did you ever eventually give
15    him that information that he was looking for?  15:20:23
16        A.     Not to the best of my
17    knowledge.
18        Q.     And why not?
19        A.     I didn't -- I didn't understand
20    the place that it would have gone in the       15:20:41
21    movie.  I was concerned that it would be
22    misconstrued.  I already felt like we were in
23    a position of no control, and I just didn't
24    want to have anything taken out of context.
25        Q.     So then at some point in time     15:21:02
```

1    you reviewed -- you saw a rough cut of the

2    film, correct?

3            A.    Yes.

4            Q.    And was that April 2 at the

5    D'Souza's home?                                15:21:14

6            A.    I -- I couldn't confirm the

7    date, but it was at the D'Souzas' home.

8            Q.    Okay.  Does April 2 sound

9    around the right time?

10           A.    Probably.  I -- I don't really    15:21:24

11   know.

12           Q.    And did you get a -- did you

13   receive a copy of that as well as watching it

14   at their home?

15           A.    No.  Not that I'm aware of.        15:21:33

16           Q.    Okay.  Let's mark as Exhibit 53

17   a document bearing Control No. 7347 through

18   7348.

19       (Marked Engelbrecht Exhibit No. 53.)

20           (Discussion off the record.)            15:22:22

21   (BY MS. KUCK)

22           Q.    And so this appears -- this

23   exhibit appears to be an e-mail chain of

24   back-and-forth between you and Mr. Schooley

25   dated April 7 of 2022.                          15:22:35

CONFIDENTIAL

Page 210

1          Do you see that?

2     A.    Yes.

3     Q.    And it's -- the re line is

4     "last details."

5          Are these comments you were         15:22:45

6     providing to him on the version of the film

7     you had seen?

8     A.    I -- it could have been that or

9     it could have been, you know, they just

10    needed a few outstanding things and I was    15:23:01

11    just responding to that, communicated, you

12    know, directly or something.

13    Q.    It says at the bottom "final

14    screen suggestion."

15         Do you see that?                  15:23:15

16    A.    I do.

17    Q.    And that was a suggestion for

18    the final screen of the film?

19    A.    Yes.

20    Q.    And you're asking him to          15:23:22

21    include the True the Vote logo?

22    A.    Yes.

23    Q.    As well as a QR code?

24    A.    Yes.

25    Q.    And why was that?               15:23:32

CONFIDENTIAL

Page 211

1           A.      We were trying to encourage

2      people to become more familiar with True the

3      Vote and, you know, it was attached to a -- a

4      video.  And it led to our -- on our website,

5      as I recall.                              15:23:50

6           Q.      And -- and you're providing

7      this to him after you had seen the film,

8      correct?

9           A.      The -- the -- this language

10     I -- I mean, assuming the dates that you've    15:24:01

11     given me, which I don't have any reason

12     necessarily to dispute, I guess that's the

13     sequence, yes.

14          Q.      Did you -- after you -- after

15     you saw the rough cut, did you give           15:24:11

16     Mr. D'Souza any feedback on it?

17          A.      As I generally recall, there

18     were two elements that I was, you know,

19     concerned about.  Tried to be supportive

20     overall, but I was concerned about the --     15:24:33

21     this -- this interview that's referred to

22     here in No. 2.

23                  And I was concerned about the

24     representation of -- there was a scene where

25     we described how -- in an effort to encourage  15:24:50

CONFIDENTIAL

Page 212

1    the GBI to take another look at our data that

2    we had done or -- or OpSec had done an

3    analysis of a crime scene, and editing got a

4    little messed up.  And so I mentioned those

5    things.                                    15:25:11

6         Q.    And how did the editing get

7    messed up?

8         A.    There were actually two crime

9    scenes --

10        Q.    Uh-huh.                          15:25:17

11        A.    -- that we -- that we provided

12   analysis on or OpSec specifically provided

13   analysis on.  And we described both of them

14   sitting in Dinesh's studio that day, but only

15   one made it in.  And the way it -- the way it  15:25:32

16   ended up looking, at least in our opinion,

17   was that there was one exchange where -- and

18   I'm going off of recall so --

19        Q.    Uh-huh.

20        A.    -- bear with me.  But there was   15:25:45

21   a question about they showed two individuals

22   who had been arrested or indicted.

23             And then Gregg was asked a

24   question, and he -- it -- bottom line is it

25   made it look like we were saying that our    15:26:00

CONFIDENTIAL

Page 213

1    research had led to their indictment, and

2    that was not accurate.  No doubt it was just

3    a slip in editing, but we knew that that was

4    not going to be good.

5         Q.    And you told him that after you    15:26:13

6    saw the rough cut?

7         A.    As I generally recall, yes.

8         Q.    Okay.  And was any change made

9    to the film after you told him that?

10        A.    No.                                 15:26:21

11        Q.    Okay.  What was the other thing

12   you were concerned about?

13        A.    That an interview that we had

14   provided that -- with Heather Mullins in --

15   and a law enforcement officer that had only    15:26:35

16   spoken under condition of anonymity -- let's

17   see if that's what's actually -- this

18   actually -- because there were a lot of

19   issues with that clip.

20             I would just characterize this      15:27:02

21   as I was -- you know, that was something that

22   I was mentioning there.  The thing I remember

23   is we had asked that his voice be modulated.

24        Q.    Uh-huh.

25        A.    And it, in my opinion, was not      15:27:11

CONFIDENTIAL

Page 214

1    sufficient.  And I don't -- I don't recall if

2    anything more was done with it or not.

3                So this -- this clip -- this

4    recommendation, I don't know how that fully

5    factors in, but I do remember the voice thing    15:27:24

6    because I was -- it was, you know, an

7    auditory.

8        Q.    Okay.  And you also said in

9    here at some point in the movie Dinesh gives

10   an incorrect number about the average number    15:27:35

11   of drop boxes.  The correct number -- the

12   correct number of average box -- drop boxes

13   is 38.

14               Did -- was that change ever

15   made?                                            15:27:46

16       A.    I don't know.

17           (Discussion off the record.)

18   (BY MS. KUCK)

19       Q.    Do you recall earlier we were

20   talking about David Cross?                       15:28:23

21       A.    Yes.

22       Q.    And when is your recollection

23   as to when you first met him?

24       A.    My recollection was the first

25   time that we exchanged e-mails.                  15:28:35

CONFIDENTIAL

Page 215

1          Q.      Uh-huh.

2          A.      That's my recollection.

3          Q.      And that was late in May of

4     2020.  It -- it was -- it was after the --

5     the hearing and -- in Georgia that dealt with    15:28:45

6     Mr. Andrews, and then you went and got the

7     public records.

8                  Well, we can look at -- the

9     e-mail has a date on it.

10         A.      Yeah.                                15:29:03

11         Q.      Let's just go back to that

12    e-mail, which I think it's...

13           (Discussion off the record.)

14    (BY MS. KUCK)

15         Q.      Exhibit 35.                          15:29:18

16         A.      Yes.

17         Q.      And the date on that e-mail is

18    what?

19         A.      May 22.

20         Q.      So that's after the film came       15:29:58

21    out?

22         A.      I believe -- I believe so, yes.

23    The dates are running together.

24         Q.      Okay.  So let's -- let me mark

25    as Plaintiff's Deposition Exhibit 54 a          15:30:10

1    multiple-page document bearing DDR-00056140

2    through DDR-00056142.

3         (Marked Engelbrecht Exhibit No. 54.)

4    (BY MS. KUCK)

5         Q.    And this appears to a chat          15:30:41

6    between you, Ms. D'Souza, and Mr. Phillips.

7              Do you see that?

8         A.    Yes.

9         Q.    And the dates on it seem to be

10   April 5 of 2022 -- 2022?                       15:30:57

11        A.    Yes.

12        Q.    Going to your third entry,

13   three down on Page 56141, and there's some

14   redacted material?

15        A.    Yes.  Uh-huh.                        15:31:14

16        Q.    And then below that do you see

17   that list, it says "credits"?

18        A.    Yes.

19        Q.    And was that information that

20   you provided to Ms. D'Souza for the credits?    15:31:20

21        A.    Yeah.  I don't know that they

22   made the film, but I guess that was correct,

23   yes.

24        Q.    Okay.  But there was

25   information you were giving her and asking      15:31:33

Page 217

1    her to put in?

2         A.    I -- I don't -- I recall

3    specifically, but it says "credits."  I -- I

4    don't really know.

5         Q.    There's a -- if you go to the    15:31:40

6    last line of that, it says:  "Special thanks

7    to Heather Mullins and David Cross for their

8    tireless research."

9              Do you see that?

10        A.    Yes.                             15:31:54

11        Q.    Why were you including

12   Mr. Cross there?

13        A.    You know, I scanned this

14   document as you gave it to me.  I -- I don't

15   recall.                                     15:32:06

16             I do know that he and Heather

17   worked together.  There was a very small

18   group of Georgia citizen investigators, and I

19   was aware that David was among that group and

20   had worked with Heather.  Why I felt the need  15:32:19

21   to say this at that time, I -- I really

22   couldn't tell you.

23        Q.    Okay.  And does this in any way

24   refresh your recollection that you were at

25   least aware of Mr. Cross prior to the -- your  15:32:31

CONFIDENTIAL

Page 218

1    exchange later in May?

2         A.    Oh, yeah.  Only inasmuch as

3    I -- I mean, I wrote it, but I -- I -- it was

4    such -- it was such a -- an intense time, and

5    there were so many people.  And there were --    15:32:45

6    you know, it could have literally been a

7    simple as, you know, I knew that -- I was

8    aware of who was getting surveillance video,

9    and at that point I -- you know, hats off if

10   you survived that gauntlet to get            15:32:57

11   surveillance video.

12           It could have literally just

13   been in a moment -- you know, that he was

14   doing that because it was arduous.

15        Q.    Okay.  You just don't -- you        15:33:06

16   just don't have any recollection of your

17   contacts with him prior to the e-mail we

18   looked at?

19        A.    I -- I really don't.

20        Q.    Okay.                              15:33:15

21        A.    And it's -- there was a

22   tremendous amount happening at this time, and

23   I was trying to be inclusive and...

24           (Discussion off the record.)

25   (BY MS. KUCK)                                 15:33:54

CONFIDENTIAL

Page 219

1        Q.     Let's mark -- well, strike

2    that.

3               You saw the rough cut of the

4    film.

5               And then do you recall that you     15:34:03

6    also attended a premier in Las Vegas?

7        A.     Yes, I do.

8        Q.     And what -- how -- there was

9    also a premier later at Mar-a-Lago?

10       A.     I don't remember the order, but     15:34:19

11   there was a premier at Mar-a-Lago.

12       Q.     Okay.  And the one -- the one

13   in Las Vegas, was that the -- the full

14   viewing of the movie, or is it some portion

15   of the movie?                                  15:34:34

16       A.     Well, the one in Las Vegas was

17   more like a panel.

18       Q.     Okay.

19       A.     And I don't -- either they had

20   some people in the live audience.  I don't     15:34:47

21   recall them showing the movie.  It could have

22   happened.  I just remember the panel.  That

23   was a very last-minute thing that we were

24   included in so...

25       Q.     Okay.  So it was more -- it --      15:35:02

CONFIDENTIAL

Page 220

1    was it a virtual event?

2          A.    There was a -- there was a

3    virtual component.

4          Q.    Right.

5          A.    Absolutely.                    15:35:09

6          Q.    You were there in person?

7          A.    Yes.

8          Q.    Okay.

9             (Discussion off the record.)

10   (BY MS. KUCK)                              15:35:41

11         Q.    Let's mark 7370.  Oh, I have

12   it.

13               So let's mark as Exhibit 55

14   TTV 7370 through 7371.

15         (Marked Engelbrecht Exhibit No. 55.)   15:36:11

16   (BY MS. KUCK)

17         Q.    There you go.

18               And then you -- I know that

19   the -- the print is a little bit of small on

20   this -- is a little small on this.          15:36:37

21               This seems to be the jacket for

22   the DVD cover.

23               Do you see that?

24         A.    Yes.

25         Q.    And Mr. Schooley was asking you   15:36:49

```
 1      for your approval of that.

 2               Do you see that?

 3        A.     Yes.

 4        Q.     And you respond:  "No, we need

 5      to add Gregg."                              15:37:02

 6               You see that?

 7        A.     Yes.

 8        Q.     And what -- what was -- do

 9      you -- do you recall this back-and-forth?

10        A.     I don't recall this particular    15:37:10

11      back-and-forth.  I do recall seeing this and

12      being frustrated.

13        Q.     Why were you frustrated?

14        A.     You know, my name is

15      misspelled.  I have a side profile shot, and 15:37:26

16      Gregg wasn't included.

17               And it just -- it just seemed,

18      you know, every -- every other person that

19      appeared, you know, was -- I'm sorry.

20               MS. HYLAND:  Did you say          15:37:41

21          somewhere on here that she responded

22          that Gregg needed to be included.

23               MS. KUCK:  Yeah.  It's at the

24          very top.  It says:  "No, we need to

25          add Gregg."                            15:37:50
```

1              MS. HYLAND:  I don't think my

2         version --

3              MR. EVANS:  Yeah.  Mine doesn't

4         have that.

5              MS. HYLAND:  I don't have that    15:37:53

6         one.

7              THE WITNESS:  Oh, yeah.  Mine

8         either.

9              MS. KUCK:  Okay.

10             MS. HYLAND:  Is this 7370?        15:38:00

11             MS. KUCK:  No, it's 7374.

12             MS. HYLAND:  Okay.  I have

13        7370.

14             THE WITNESS:  Yeah.  Me too.

15             (Discussion off the record.)     15:38:10

16    (BY MS. KUCK)

17        Q.    So then let's mark -- just to

18    correct my error, let's mark 7374 through

19    TTV 7375.  And that's going to be the

20    exhibit, which is No. 56.                 15:38:34

21             You do -- it seems like you do

22    recall, though, reviewing the cover of the

23    DVD and being frustrated with it independent

24    of the e-mail?

25        (Marked Engelbrecht Exhibit No. 56.)  15:38:51

CONFIDENTIAL

Page 223

```
 1          A.     Yes, I remember that.
 2     (BY MS. KUCK)
 3          Q.     Okay.  And this is the document
 4     I was actually referring to that says:  "No,
 5     we need to add Gregg."                    15:38:55
 6          A.     Uh-huh.
 7               MS. HYLAND:  Got it.  Thank
 8          you.
 9     (BY MS. KUCK)
10          Q.     And Mr. -- you and Mr. Phillips    15:38:59
11     were ultimately named as executive producers
12     in the film?
13          A.     Yes, we were.
14          Q.     How did that come to be?
15          A.     I have no idea.              15:39:10
16          Q.     When did you first know you
17     were being named as executive producers?
18          A.     I believe I saw it for the
19     first time on either -- something -- as I
20     recall, it was some printed material.      15:39:22
21          Q.     Okay.
22          A.     And I don't know if it was
23     maybe this or if it was -- I just -- I don't
24     recall.  I don't even know if it says that in
25     the movie.  I just -- I don't -- it was such   15:39:34
```

Page 224

1    a shock, I -- we -- I don't know.

2            Q.    Did you have any objection to

3    that?

4            A.    At that point because

5    everything was already out and done, it was      15:39:46

6    just like a -- I mean, what -- what -- you

7    know, it's over.  I mean, we didn't have any

8    control or, you know -- I mean, it was --

9    what was I going to say?

10           Q.    Well, you could have objected      15:40:05

11   that you didn't want your name on it as

12   executive producer.

13           A.    Well, I mean, we were trying

14   not to be difficult.  And maybe -- you know,

15   it's possible I did say something.  I'm just    15:40:20

16   not recalling it.  But it was already printed

17   and done, and, you know, we were -- things

18   were very, very busy.

19           Q.    Okay.  And you also had -- you

20   also asked for the TTV website to be put at     15:40:31

21   the end of the film, right?

22           A.    Yes, I did ask for that.

23           Q.    Okay.  Even after you saw the

24   final cut of the film, you never publicly

25   disavowed the film in any way, did you?         15:40:43

CONFIDENTIAL

Page 225

```
 1              A.     I didn't disavow it.  I mean, I
 2      think that's just sort of a choice of words.
 3              We were -- you know, we were
 4      comfortable representing the work that we had
 5      done where it became more moviesque.  That      15:40:56
 6      was -- that was more difficult.
 7              And when -- when there were,
 8      you know, documents that weren't used or
 9      graphics that weren't, in our opinion, maybe
10      appropriate, you know, we were still asked      15:41:08
11      about those things.
12              Q.     Right.
13              A.     So...
14              Q.     Because you were the executive
15      producers of the film?                          15:41:16
16              A.     Well --
17              MR. EVANS:  First, is that a
18          question?  Because if it's a question,
19          objection; ask and answered.
20              MS. KUCK:  Okay.                         15:41:25
21      (BY MS. KUCK)
22              Q.     Am I correct the people would
23      ask you those questions because you are
24      listed as executive producers on the film?
25              MR. EVANS:  Objection;                   15:41:32
```

CONFIDENTIAL

Page 226

```
 1              misstates testimony.
 2                   THE WITNESS:  Do I --
 3                   MR. EVANS:  You can answer.
 4         A.    Yeah.  I don't -- I don't think
 5    that had anything to do with it.  I just      15:41:36
 6    think we were -- you know, True the Vote
 7    is -- it had been at that point known that we
 8    were working on this project and people
 9    expected to hear from us.  And we were going
10    to have to hold the line for everything that  15:41:47
11    was in the movie and some of the things that
12    were in it made it very difficult because it
13    was a movie.
14                   And they had -- I mean, they
15    made a movie, and that's okay.  That's what    15:42:00
16    they do.  And -- you know, and Dinesh was
17    very good about speaking to those things, but
18    that we just -- we had no editorial control.
19    We made suggestions but...
20    (BY MS. KUCK)                                  15:42:11
21         Q.    And the movie was marketed as a
22    documentary, right?
23         A.    I've seen it as a documentary
24    and as a docudrama.
25         Q.    Let's mark as Plaintiff's          15:42:20
```

CONFIDENTIAL

Page 227

1      Deposition Exhibit 57 a document bearing

2      Control No. DDR-00049438.

3          (Marked Engelbrecht Exhibit No. 57.)

4      (BY MS. KUCK)

5          Q.    And this at the second page of      15:42:53

6      this document, 439, appears to be a series of

7      text messages.

8                  Do you see that?

9          A.    Yes.

10         Q.    And up at the top you have --      15:43:04

11     and this -- this is dated April 19, 2022?

12         A.    Yes.

13         Q.    Did you, around this time, go

14     to Mar-a-Lago and see a prescreening with

15     President Trump?                             15:43:20

16         A.    Yes.

17         Q.    And do you -- do you know

18     whether this is before or after the

19     screening?

20         A.    This would have been -- this     15:43:24

21     would have been after.

22         Q.    Okay.  And then when you say

23     "observations," are those your observations

24     having watched the next cut of the movie with

25     Mr. Trump?                                   15:43:38

CONFIDENTIAL

Page 228

```
 1            A.     Yes.
 2            Q.     Do you know whether any of your
 3      suggestions were followed?
 4            A.     I do not know.
 5            Q.     Then if you go down -- well, it     15:43:53
 6      says on Point 6 you've got -- not in the
 7      first one, but the second one down.
 8                   Do you see that the second
 9      paragraph says "on Point 6"?
10            A.     Yes.                                15:44:17
11            Q.     It says:  "On Point 6 the
12      comment is related to the scene where Dinesh
13      is walking up the steps of SCOTUS.  There's
14      some good stuff in that section, but there's
15      also the stuff 45 hates about how nothing can   15:44:28
16      be done.  If we can clip it, it would be
17      great."
18                   Do you see that?
19            A.     Yes.
20            Q.     What were you talking about         15:44:33
21      there?
22            A.     Oof.  I -- I -- it's been, you
23      know, so long.  I mean, there -- as I vaguely
24      recall, there's a scene where Dinesh walks up
25      the steps to the Supreme Court, and at that     15:44:51
```

CONFIDENTIAL

Page 229

1    time, there was just -- it was just so hotly

2    contested because there was hope that the

3    Supreme Court would hear certain legal cases.

4    And I just made the observation I -- you

5    know, just take it for what it's worth kind    15:45:05

6    of thing.

7         Q.    You say:  "There's been some

8    good stuff in that section, but there's also

9    the stuff 45 hates about how nothing can be

10   done."                                          15:45:12

11              Is 45 a reference to Mr. Trump?

12        A.    Yes.

13        Q.    And what were you referring to,

14   "stuff that he hates"?

15        A.    The only thing I can think of      15:45:27

16   is that I know broadly -- I mean, it was --

17   it was inappropriate of me to -- to write

18   something that now makes it seem as though I

19   was speaking on his behalf because that

20   certainly wasn't the case.  But I just knew    15:45:41

21   that -- that -- I mean, everybody that was

22   reading the headlines knew that he was

23   frustrated with the Supreme Court.

24              I -- I mean, I don't even -- I

25   don't even remember.  And I don't know --      15:45:53

CONFIDENTIAL

Page 230

1    when we talk about "stuff," I don't -- I

2    just -- I don't even recall.

3            Q.    Did you -- well, he --

4    Mr. Trump was at the April 19 Mar-a-Lago

5    screening, right?                          15:46:06

6            A.    Yes.

7            Q.    And he obviously was at the

8    premier in May?

9            A.    Yes.

10           Q.    Other than at those two events,  15:46:10

11   did you have any direct contact with him or

12   anyone on his staff about the film?

13           A.    It's possible on his staff

14   about, you know, premier day stuff, but not

15   that I recall.                             15:46:26

16           Q.    You don't recall anything of

17   substance?

18           A.    No.

19           Q.    Do you -- and just going down

20   on this e-mail, then, there's -- on April 21,  15:46:31

21   2022, you have a -- do you see the text or

22   the e-mail -- the text you have to

23   Mr. D'Souza.  It says:  "Please give me a

24   call as soon as possible.  I've just received

25   word that you sent the full movie out to       15:46:46

CONFIDENTIAL

Page 231

1    people as a fundraiser for you.  I'm hoping

2    that is not the case.  Please call me."

3         A.    Yes.

4         Q.    Do you remember that incident?

5         A.    Yes.                              15:46:55

6         Q.    What happened there?

7         A.    I had someone who in the past

8    had been a donor to True the Vote call me and

9    talk about the movie, which I was -- I

10   just -- I had -- it just blind-sided me.  And  15:47:06

11   I shared that with -- with Dinesh.

12        Q.    And how did he respond?

13        A.    Initially -- well, I guess that

14   was Debbie's response.  Well, no, I guess

15   this was Dinesh's response that, you know,    15:47:23

16   that's insane.  I -- I don't -- I don't

17   remember any specifics other than that he

18   confirmed that he had sent it out to -- to

19   people.  And I just -- and how he selected,

20   you know, the people, I -- I don't know, but  15:47:44

21   I do know that a donor of True the Vote

22   called me.  I don't know to whom, how

23   extensive.  I just -- I was shocked.

24        Q.    And so what was your

25   understanding at this point as to when and    15:47:59

1    how the movie was supposed to be released?

2         A.    My understanding was it wasn't

3    going to be released until after the premier,

4    and then it would be shown in theaters or --

5    or sometime in May like, you know, maybe          15:48:11

6    there was a -- maybe there was a theater

7    showing first.  I'm not sure, but it was

8    not -- it was not here.

9         Q.    And did you and -- did you and

10   Mr. Phillips get a link to the film prior to      15:48:30

11   the premier?

12        A.    I don't -- it's possible.  It's

13   totally possible.  I don't recall.  We

14   were -- we were -- there were many other

15   things happening.                                 15:48:42

16        Q.    Do you remember watching a full

17   version of it before the premier, or was the

18   first -- well, was the premier the first time

19   you saw it?

20        A.    I don't recall.                        15:48:50

21          (Discussion off the record.)

22   (BY MS. KUCK)

23        Q.    Let me mark as Plaintiff's

24   Exhibit 58, a one-page document that bears

25   control No. TTV_009850.                           15:50:08

CONFIDENTIAL

Page 233

1          (Marked Engelbrecht Exhibit No. 58.)

2      (BY MS. KUCK)

3          Q.      Is this another -- appears to

4      be another True the Vote social media post

5      dated May 21, 2022?                          15:50:26

6          A.      Yes.

7          Q.      And it says:  "Breaking news:

8      The raids have begun."

9              And then under -- there's a --

10     I assume was a picture or something, but it    15:50:37

11     says underneath:  "Bombshell report.  Law

12     enforcement raids nonprofits in 2000 Mules

13     ballot trafficking investigation"?

14         A.      Yes.

15         Q.      You see that?                       15:50:47

16             What does this refer to?

17         A.      That was in Yuma County,

18     Arizona.

19         Q.      And what -- what nonprofits

20     were raided?                                   15:51:02

21         A.      Oh, gosh.  I think -- I think

22     the name was Comite de Bien Estar.  I could

23     be -- I don't want to -- you know what, I

24     don't want to speculate.  I don't recall.

25         Q.      And it says:  "The raids --       15:51:16

CONFIDENTIAL

Page 234

1     raids nonprofits in 2000 Mules ballot

2     trafficking investigation."

3               Was that NGO a group that you

4     had talked to law enforcement about?

5        A.    Yes, but I'll also point out       15:51:32

6     this was not -- I don't believe this is --

7     just the way this was laid out, I think this

8     was an article that was written and -- and

9     who -- the -- whoever posted this posted it,

10    and that was the headline.                  15:51:44

11       Q.    The 2000 Mules -- the -- the

12    bombshell report headline or the headline

13    under breaking news?  Which --

14       A.    I -- just the way it's laid

15    out, I think the "breaking news, the raids   15:51:58

16    have begun" was -- was from True the Vote.

17               But then this -- this would

18    have likely been whatever this was above it

19    attached.

20       Q.    Okay.  Did you -- shortly          15:52:10

21    before the -- after the viewing at Mar-a-Lago

22    on April 19 and prior to the premier on

23    March -- on May 7, did you -- was there a

24    back-and-forth with Mr. D'Souza about

25    renegotiating the terms of your agreement     15:52:37

CONFIDENTIAL

Page 235

1    with him?

2         A.    Yes.

3         Q.    And that was handled by your --

4    you have -- do you have an agent?

5         A.    I just have a friend that I        15:52:44

6    asked her to look at the agreement.  And I

7    was pretty disheartened by that point and

8    exhausted, and I asked her to look at the

9    agreement.  And she did.  And then she

10   offered to sort of intervene, but there was    15:53:01

11   no contract or pay -- you know, there's

12   nothing like that.

13        Q.    Okay.  So there wasn't a new

14   agreement?

15        A.    No.                                 15:53:11

16        Q.    I'm sorry.

17               Was there a new agreement with

18   Mr. D'Souza?

19        A.    No, there were -- there were

20   comments made back and forth that, you know,   15:53:18

21   my general understanding was that, you know,

22   had we pressed it could have -- those could

23   have been considered binding, I guess, but

24   there was no -- no new document that ever

25   came up.                                       15:53:32

CONFIDENTIAL

Page 236

```
 1          Q.     Okay.  And as part of that new
 2     negotiation, did you -- am I correct that you
 3     were granted a 20 percent profit share in the
 4     2000 Mules book?
 5          A.     That is one of the things that     15:53:48
 6     I -- well, I would like to look at the
 7     document to be sure.
 8          Q.     Yeah.
 9          A.     But that was -- whether or not
10     it was in that exchange, that was mentioned     15:53:55
11     at -- at some point, yes.
12          Q.     Okay.  And at some point was
13     there talk of the expenses of you and
14     Mr. Phillips being paid?
15          A.     I mean, I -- I know that we        15:54:07
16     were paid for expenses, but I don't know if
17     that was in that document or not.
18          Q.     Okay.  So just going --
19          A.     I would like to also --
20          Q.     Sure.                              15:54:24
21          A.     -- to clarify --
22          Q.     Yeah.
23          A.     -- with respect to the book
24     because I know that's been a point of
25     contention.                                    15:54:29
```

CONFIDENTIAL

Page 237

```
 1          Q.      Yeah.
 2          A.      We -- we didn't -- there was no
 3     compensation for the book.  There -- when
 4     we -- I'm sure we'll talk about the book --
 5          Q.      Uh-huh.                          15:54:38
 6          A.      -- or possibly --
 7          Q.      Yep.
 8          A.      -- but that didn't happen.
 9          Q.      Okay.  You never received any
10     funds in connection --                        15:54:44
11          A.      No.
12          Q.      -- with the book?
13                  Was there talk at -- early on
14     about you writing a book about 2000 Mules?
15          A.      No.  There was talk that I       15:54:54
16     could write a book.
17          Q.      Yeah.
18          A.      And I was hopeful about that,
19     but what was ultimately -- it was through
20     Regnery.                                      15:55:03
21          Q.      Uh-huh.
22          A.      And they characterized it as a
23     pamphlet.
24          Q.      Okay.
25          A.      And I wasn't really interested   15:55:07
```

CONFIDENTIAL

Page 238

1    in that.

2        Q.    When you say "it," you mean you

3    had written something and they said it would

4    be a pamphlet?

5        A.    No, it was -- I -- I had this        15:55:13

6    idea for a book, and I -- the -- one of

7    the -- one of the gentlemen -- I don't know

8    his name -- was in one of those early

9    meetings that -- that --

10       Q.    Yeah.                                  15:55:26

11       A.    -- that Dallas meeting.  And I

12   mentioned it, and I was very hopeful that

13   that could come together, but it didn't.

14       Q.    Okay.  And instead, Mr. D'Souza

15   wrote a book?                                    15:55:36

16       A.    I think that was probably

17   always the plan.

18       Q.    Okay.

19       A.    I think that's a -- well, I

20   don't want to speculate.  I think -- I think   15:55:42

21   that that's -- I think that was always the

22   plan.

23       Q.    So just going back to the --

24   the premier of the -- the movie.

25             It was at Mr. Trump's club           15:55:53

CONFIDENTIAL

Page 239

1      Mar-a-Lago, right?

2          A.    Yes.

3          Q.    About how many people would you

4      say attended?

5          A.    Full 500 -- I mean, I don't         15:56:01

6      know how many.  Yesterday it was said 500.  I

7      don't -- I don't know.  It was -- it was a

8      lot of people.

9          Q.    Okay.  And you spoke at the

10     premier along with Mr. Phillips and          15:56:13

11     Mr. D'Souza, correct?

12         A.    It -- we did speak.  We -- it

13     was not planned.  It was just called up on

14     stage to be acknowledged, and so we went.

15         Q.    Okay.  So let's mark as --         15:56:30

16     TTV_007439.

17         (Discussion off the record.)

18     (BY MS. KUCK)

19         Q.    Plaintiff's Exhibit 59,

20     TTV_007439 through 7741.                     15:57:17

21         (Marked Engelbrecht Exhibit No. 59.)

22     (BY MS. KUCK)

23         Q.    And do you see on the second

24     page of this document it appears to be an

25     invitation for the premier?                  15:57:42

CONFIDENTIAL

Page 240

```
 1          A.     Yes.
 2          Q.     And then do you see at the
 3     bottom you were listed -- it's listed as Q&A
 4     with Dinesh D'Souza and Catherine Engelbrecht
 5     and Gregg Phillips?                        15:57:52
 6          A.     Yes.
 7          Q.     Does that refresh your
 8     recollection that you were always planned to
 9     be part of the program?
10          A.     It really doesn't.  I'm not   15:58:00
11     disputing that it was here.  It's not what
12     happened.  But, you know, I guess my -- my
13     recollection is what actually happened.  I
14     didn't recall that this was put on here like
15     this, but...                              15:58:13
16          Q.     Okay.  Well, what actually
17     happened?
18          A.     Dinesh went up and spoke.
19     Debbie went up and sang, and Dinesh went up
20     and spoke.  And as this -- as I generally   15:58:21
21     recall.  And then -- then Dinesh acknowledged
22     us, and we came up on stage and everybody
23     clapped and we said thank you.  And there
24     wasn't a Q&A.
25          Q.     Okay.  And did Mr. Trump also   15:58:36
```

Page 241

1    acknowledge you personally?

2         A.    Likely, yes.

3         Q.    Yeah.

4         A.    But I don't -- I can't say that

5    specifically, but he's very gracious in that    15:58:44

6    way, so...

7         Q.    Do you remember there was some

8    posts after -- some social media posts

9    following the premier reporting that

10   Mr. Trump had encouraged people to do    15:59:00

11   something at the premier?

12        A.    I don't -- I don't recall that.

13            (Discussion off the record.)

14        A.    I'm not saying it didn't

15   happen.  I'm just saying --    15:59:11

16   (BY MS. KUCK)

17        Q.    Yeah.

18        A.    -- I just don't recall it.

19        Q.    Let's mark Defendants' --

20   Plaintiff's Exhibit 60.  It's a one-page    15:59:34

21   document.

22        (Marked Engelbrecht Exhibit No. 60.)

23   (BY MS. KUCK)

24        Q.    And I don't know what -- it

25   should have the Bates No. TTV_009873 -- oh,    15:59:44

CONFIDENTIAL

Page 242

1     which it does, very small letters at the

2     bottom.

3              (Discussion off the record.)

4     (BY MS. KUCK)

5          Q.    Do you -- this appears to be      16:00:06

6     another True the Vote social media post?

7          A.    Yes.

8          Q.    Do you see that?

9               Does this refresh your

10    recollection that there was reports that      16:00:14

11    Trump encourages audience at 2000 Mules

12    premier to do something about voter fraud?

13         A.    I -- I have absolutely no

14    recollection of him saying that.  I'm not

15    disputing that he did.  I just don't remember  16:00:25

16    it or any context around it.

17         Q.    Okay.

18              MR. EVANS:  All right.  I got

19         to do a restroom break.

20              MS. KUCK:  Yep.                16:00:35

21              MR. EVANS:  I only need five

22         minutes.

23              MS. KUCK:  Fine.

24              THE VIDEOGRAPHER:  Off the

25         record at 4:01.                     16:00:40

CONFIDENTIAL

Page 243

1          (Break from 4:01 p.m. to 4:12 p.m.)

2                    THE VIDEOGRAPHER:  Back on the

3               record at 4:12.

4     (BY MS. KUCK)

5          Q.    So we just talked about the --    16:10:55

6     the premier of the movie at Mar-a-Lago,

7     right?

8          A.    Yes.

9          Q.    Mr. Trump was consulted

10    throughout the process of making the film; is   16:11:02

11    that correct?

12         A.    Not to the best of my --

13    possibly.  I -- I don't know.  I had -- I --

14    not by me.

15         Q.    Well, you were aware that he    16:11:13

16    was -- strike that.

17                You were aware that there was

18    coordination with him about when certain

19    things would be released; is that fair?

20         A.    I -- I -- you know, you may be   16:11:26

21    showing something that's going to make me

22    remember, but I -- I don't recall that.

23         Q.    Okay.  So let's mark as

24    Defendants' -- as Plaintiff's Deposition

25    Exhibit 61 a two-page document bearing    16:11:45

CONFIDENTIAL

Page 244

1    control Nos. DDR-0004944 through 45.

2        (Marked Engelbrecht Exhibit No. 61.)

3                MS. HYLAND:  Can we get our

4        copies?

5                MS. KUCK:  Oh, sorry.          16:12:05

6                MS. HYLAND:  Thank you.

7    (BY MS. KUCK)

8        Q.    So this, again, appears to be a

9    text exchange involving you, Mr. Phillips,

10   and Debbie D'Souza.                        16:12:24

11               Do you see that?

12       A.    Yes.

13       Q.    And this is in April of 2022?

14       A.    Yes.

15       Q.    How often were you texting back   16:12:30

16   and forth with Debbie at this point?

17       A.    I mean, as the -- as the

18   situation, you know, arose.  In my -- in my

19   recollection, it was very little but...

20       Q.    Okay.  So if you go on the        16:12:47

21   right -- one, two, three, four -- four

22   entries down, it looks like there's a text

23   from you that says:  "Can we get a copy of

24   the marketing plan?  We're hearing from a

25   variety of outlets/people (GA" J -- "GOP,    16:13:08

Page 245

1    Breitbart, et cetera) wondering why they're
2    not hearing anything.
3              We'd like to understand what
4    the plan is."
5              Do you see that?                    16:13:21
6         A.    Yes.
7         Q.    Do you remember asking about
8    the marketing plan?
9         A.    I don't.  I do remember being
10   contacted by -- you know, not specifically by   16:13:27
11   these individuals, but I do remember
12   generally being contacted by people saying
13   what's -- you know, what's going on and
14   presuming that, you know, I would know which.
15   Of course I didn't, so...                        16:13:39
16        Q.    Okay.  So then Ms. D'Souza
17   responds:  "One, website goes up on Monday.
18   Two, we don't want to send out any screeners
19   until Trump sees it for obvious reasons.
20   Three, trailer is ready to go next week.        16:13:55
21   That's our main marking tool.  Four, Patricia
22   is ready to go with publicity, but she's
23   awaiting the three items above."
24              Do you see that?
25        A.    Yes.                                  16:14:07

CONFIDENTIAL

Page 246

```
 1          Q.      Does that refresh your

 2     recollection that there was coordination with

 3     Mr. Trump before things were released?

 4          A.      I mean, they -- you know,

 5     that's a comment he made.  I -- I don't know.   16:14:15

 6     I don't know -- I would hate to speculate or

 7     I don't want to speculate about what it was

 8     related to.

 9              The -- and I don't even know

10     when he says "for obvious reasons."  The only   16:14:27

11     thing I can -- you know, I guess it hadn't --

12     I don't know the timing of this versus the --

13     the time at Mar-a-Lago, but we had no

14     connection.  I had no connection.

15          Q.      Did you have any understanding   16:14:42

16     that the D'Souzas were coordinating with

17     Mr. Trump?

18          A.      Not specifically.  I know that

19     there was a lot of coordination that went

20     into the D'Souza of Salem hosting of -- of   16:14:52

21     the event.  And so, you know, towards those

22     ends there was a lot of back-and-forth.  I

23     imagine.  I don't know, but I -- I would

24     assume.

25          Q.      And there's -- the reference in   16:15:05
```

CONFIDENTIAL

Page 247

```
 1    the entry I just read has a reference to

 2    Patricia.

 3               Do you understand who that is?

 4       A.    Yes.

 5       Q.    Who's that?                      16:15:16

 6       A.    That was the person that Dinesh

 7    hired to do the PR for the movie.

 8       Q.    Okay.  And did you work with

 9    her at all?

10       A.    Best of my recall, I talked to  16:15:27

11    her on the phone once, and -- and then there

12    were a few things that she -- media

13    opportunities that she set up or suggested, I

14    guess.

15       Q.    When you say "media             16:15:44

16    opportunities," you mean for -- for you

17    and/or Mr. Phillips?

18       A.    Yes.

19       Q.    Okay.  In addition to the

20    premier of the full-length movie, Mr. Trump  16:15:56

21    also released the trailer at a rally.

22               Was that correct?

23       A.    I wouldn't -- yeah.  I mean, a

24    trailer was released at the rally, yes.  A

25    rally.                                   16:16:11
```

Page 248

```
1          Q.     Right.  And that was the --
2     that was the release for the first time of
3     the trailer?
4          A.     Yeah.  To the best of my
5     knowledge, yes.                              16:16:16
6          Q.     Okay.  So let's mark as -- as
7     Plaintiff's Deposition Exhibit 62 TTV_007432
8     through TTV_007434.
9         (Marked Engelbrecht Exhibit No. 62.)
10    (BY MS. KUCK)                                16:16:37
11         Q.     And that seems to be a -- an
12    e-mail from Mr. Hughes on which you were
13    copied.
14              MS. HYLAND:  We still need our
15         copies.                                 16:16:47
16              MS. KUCK:  Oh.
17         (Discussion off the record.)
18    (BY MS. KUCK)
19         Q.     So this is an e-mail dated
20    April 23, 2022, from Mr. Hughes to a number  16:17:05
21    of people and you're copied.
22              Do you see that?
23         A.     Yes.
24         Q.     Some of these people we've --
25    you know who it's addressed to, we've talked 16:17:14
```

CONFIDENTIAL

Page 249

1    about before, but are they all members of the

2    TTV team?

3         A.    No, only Chelsea Magee who was

4    a contractor and worked directly with True

5    the Vote.  The others were marketing types    16:17:26

6    and just -- just with different firms.

7         Q.    Okay.  And it starts with

8    saying:  "All, after Trump speaks on TTV and

9    2000 Mules at tonight's rally, Catherine will

10   be sending this e-mail out with a link to the   16:17:44

11   new trailer."

12             Do you see that?

13        A.    Yes.

14        Q.    Does that refresh your

15   recollection that you were coordinating with    16:17:48

16   the Trump team on the release of items

17   relating to the film?

18        A.    It doesn't.  It's likely a

19   function of time.  I just don't recall any

20   coordination like that or maybe I was told.    16:18:01

21   I don't know.

22        Q.    You don't have any

23   recollection?

24        A.    I do not.

25             MS. KUCK:  Do we have 9763 TTV?    16:18:30

CONFIDENTIAL

Page 250

1    (BY MS. KUCK)

2         Q.    I'm going to mark as Exhibit 63

3    TTV 9763.

4         (Marked Engelbrecht Exhibit No. 63.)

5    (BY MS. KUCK)                           16:19:12

6         Q.    Which appears to be a set of

7    text messages between -- between you and

8    Mrs. D'Souza.

9             Do you see that?

10        A.    Yes.                         16:19:23

11        Q.    And then partway down, it says:

12   "POTUS reached out and wants to send out a

13   statement this morning.  It will include

14   links to Rumble and to the 2000 Mules site.

15   Get ready."                            16:19:42

16             Do you see that?

17        A.    Yes.

18        Q.    And then below, it says:  "Yes

19   to both, and we already know about POTUS.

20   Liz Harrington called Dinesh last night."   16:19:57

21             Do you see that?

22        A.    Yes.

23        Q.    So what's the reference to

24   POTUS reaching out?

25        A.    I -- I don't recall this.        16:20:04

CONFIDENTIAL

Page 251

1       Q.      Okay.

2       A.      It is -- it is possible that

3    Liz Harrington who represents the president

4    in a lot of things, you know, sent me a

5    message or something like that.  Clearly,      16:20:21

6    they had already called Dinesh so...

7       Q.      So it's possible she -- she --

8       A.      I did not speak to the

9    president about this.  I can tell you that.

10      Q.      And I assume even though this       16:20:33

11   is January 31, 2022, the POTUS referred to is

12   Mr. Trump, right?

13      A.      Yes.

14      Q.      And so your recollection, it

15   may be that someone on his staff reached out   16:20:44

16   to you?

17      A.      Yes.  Or I mean it could have

18   been -- it must have been something like

19   that, yes.

20      Q.      Okay.  And Mr. Trump did, in       16:20:54

21   fact, issue several statements relating to

22   the 2000 Mules, correct?

23      A.      I -- I don't -- I mean, I don't

24   have any reason to believe not to -- not --

25   he did not, but I -- I don't know            16:21:19

CONFIDENTIAL

Page 252

1      specifically.

2           Q.     Let's mark as Plaintiff

3      Deposition Exhibit DDR-00054972.

4               (Discussion off the record.)

5           (Marked Engelbrecht Exhibit No. 64.)     16:21:54

6      (BY MS. KUCK)

7           Q.     And this, again, seems to be a

8      chat with you, Ms. -- Mrs. D'Souza, and

9      Mr. D'Souza.

10                 Do you see that?               16:22:10

11          A.     Yes.

12          Q.     And then there's the first line

13     in the chat on the next page is from you.

14                 Do you see that?

15          A.     Yes.                            16:22:19

16          Q.     It says:  "This is going out in

17     ten minutes"?

18          A.     Yes.

19          Q.     And that seems to be a

20     statement from Mr. Trump?                   16:22:23

21          A.     Or just a statement from his --

22     from the Save America group.

23          Q.     Below it, it says "statement of

24     Donald -- by Donald J. Trump"?

25          A.     Oh, okay.  Then yes.            16:22:35

CONFIDENTIAL

Page 253

1        Q.      Okay.   Does this refresh your

2    recollection at all that you were in contact

3    with at least someone from his

4    representatives about statements he was

5    making about the film?                          16:22:45

6        A.      I was trying to look at the

7    date between this and this.  It really

8    doesn't.  It -- it -- I just have no -- I

9    just -- I can't -- I have no personal -- oh,

10   gosh, I have no personal recollection of      16:23:02

11   this.

12       Q.      Okay.

13          (Discussion off the record.)

14   (BY MS. KUCK)

15       Q.      Do you know who Jay Sekulow is?   16:23:24

16       A.      Yes.

17       Q.      Okay.   And who is he?

18       A.      He is an attorney, sort of in

19   the political realm, and has his own firm.  I

20   don't know the name of it.                       16:23:39

21       Q.      And he has represented

22   Mr. Trump?

23       A.      That's -- I -- I don't have

24   personal knowledge of that, but I -- he's in

25   that circle.                                     16:23:47

CONFIDENTIAL

Page 254

1          Q.      Was he somebody that you spoke

2    with from time to time?

3          A.      No.  There was a time -- I'm

4    trying to recall the -- the specifics around

5    it, but it had to do with drop boxes.  I do          16:24:17

6    recall that.  And -- and I don't recall

7    how -- yeah.  I don't -- I don't -- that's --

8    I do recall having an exchange of

9    conversation.  I don't want to speculate any

10   more than that.                                       16:24:36

11         Q.      Do you remember speaking to him

12   about the 2000 Mules filming?

13         A.      That's -- it's -- not

14   specifically, no.  I think -- no, I mean,

15   I -- that's not a -- that's not a common          16:24:46

16   person I speak with by any stretch.

17         Q.      Okay.  So let's mark as

18   Plaintiff's Deposition Exhibit 65 TTV 9761.

19       (Marked Engelbrecht Exhibit No. 65.)

20   (BY MS. KUCK)                                         16:25:20

21         Q.      Again, it seems to be text

22   messages back and forth between you and

23   Mrs. D'Souza.

24              Do you see that?

25         A.      Yes.                                    16:25:26

CONFIDENTIAL

Page 255

1          Q.    And then the first one says:

2     "Good morning.  A couple of things.  Gregg

3     and I are supposed to meet with Mike Vess in

4     Dallas this morning.  Gregg flew to Dallas.

5     I was going to drive up last night, but         16:25:35

6     turned around because my dad was taken to the

7     ER, and so I'm at Memorial Hospital in Katy

8     with him.  Gregg will still meet with him.

9     Just wanted to let you know."

10              And then you say:  "Also,              16:25:49

11     Jay S. called me late yesterday.  He said

12     this shoot was being postponed.  Is that

13     accurate?"

14              Do you see that?

15          A.    Yes.                                 16:25:56

16          Q.    What's that referring to?

17          A.    As I mentioned earlier, I

18     recall that we had a conversation, and I do

19     not remember the genesis of it, but I do

20     recall that it was about the work that we      16:26:10

21     were doing.

22              And in the course of that

23     conversation, it was -- he made some comment

24     about the -- the -- the California -- going

25     to California, that that had been postponed.  16:26:24

CONFIDENTIAL

Page 256

1    And I didn't -- I didn't even know like where

2    that would come from.  I -- what's going on?

3    And that was it.

4        Q.    Were you surprised he would

5    know about those details?                        16:26:38

6        A.    Yeah.  I had no -- yes.

7        Q.    And then Mrs. D'Souza responds

8    to you:  "Wow.  Where in the world did Jay

9    Sekulow get the idea that we weren't filming?

10   That's absolutely false.  In fact, everything   16:26:58

11   is set to go.  They need you and Gregg at the

12   studio tomorrow at 8:30 a.m.  He got the

13   message messed up.  He wasn't even on the

14   call.  We just said we weren't releasing the

15   teaser yet.  That's all we said.  It did come   16:27:10

16   up, though, that they thought you were

17   apprehensive about this, but based on our

18   conversation, we just said the timing."

19            Do you know what she's

20   referring to there?                             16:27:20

21       A.    I -- I have -- I don't know.

22   And I don't -- it doesn't even look like I

23   acknowledged it in my response.  I -- I

24   don't -- I don't -- I mean, there -- there

25   were a lot of calls, you know, I would         16:27:37

Page 257

1    imagine, between Dinesh and -- and -- or

2    the -- Dinesh or D'Souza productions and

3    Salem that we were not a party to, again, as

4    I have said, you know, throughout.

5              We had -- we were not involved    16:27:50

6    in the production of this in all of the

7    moviemaking things that go in.  That's not a

8    negative.  It's just that that's not what we

9    did.  We -- so I don't -- when he says "the

10   call" or the -- you know, "the teaser," I    16:28:05

11   don't even know what those things -- she's

12   referring to.

13        Q.    Okay.

14         (Discussion off the record.)

15   (BY MS. KUCK)                                 16:28:20

16        Q.    Do you -- we talked earlier

17   about there was a law enforcement interview

18   that was included in the film, and you had

19   some reservations about that.

20              Do you remember?                   16:28:30

21        A.    I'm sorry.  Could you repeat?

22        Q.    Yeah.

23        A.    I was caught up in this still,

24   trying to look at it.

25        Q.    The -- we talked earlier,        16:28:35

you -- you mentioned an interview of a Georgia law enforcement officer that was in the film, and you had some concerns about that?

A. Yes. 16:28:45

Q. And you said Heather Mullins was involved in that?

A. Yes.

Q. Did -- how did that --

MS. KUCK: Do you have some -- 16:28:56

(BY MS. KUCK)

Q. How did that come to pass that that -- you -- that you became aware of that interview?

A. Heather was -- as I mentioned 16:29:02 earlier, it's a very small community of people that were, you know, trying to piece together, you know, disjointed pieces of documents and content and whatnot, and Heather was involved in that in Georgia. 16:29:22

And I don't recall if she reached out to myself or Gregg, but one of us, and said that she had had someone come forward to her, actually several people, describing a project that they worked on that 16:29:36

CONFIDENTIAL

Page 259

1    they were, you know, troubled by, and

2    that's -- that's what that was.

3        Q.    Okay.  And did you have

4    conversations with Mr. Trump's attorneys

5    about that interview?                        16:29:50

6        A.    I -- I don't recall.  I mean, I

7    assume you're going to show me something, but

8    I don't recall that.

9        Q.    Okay.  Let me show you what

10   I've marked as Plaintiff Deposition          16:30:03

11   Exhibit 66 TTV_007299.

12       (Marked Engelbrecht Exhibit No. 66.)

13   (BY MS. KUCK)

14       Q.    And this appears to be an

15   e-mail to Mr. D'Souza from you dated         16:30:37

16   March 15, 2022.

17            Do you see that?

18       A.    Yes.

19       Q.    And reviewing this, does

20   this -- does this appear to be about that law  16:30:52

21   enforcement interview?

22       A.    Yes.

23       Q.    Okay.  And you say in the

24   second paragraph:  "Further, I've read in

25   45's attorneys about this.  They have         16:31:00

Page 260

1       additional ways they would like to use this

2       information to draw attention to the swamp."

3                   Do you see that?

4           A.      Yes.

5           Q.      Does that refresh your              16:31:06

6       recollection that you were in contact with

7       Mr. Trump's attorneys in connection with this

8       video?

9           A.      It -- it really doesn't, but

10      there are -- there are people that have         16:31:16

11      represented President Trump that, you know,

12      I -- I do speak to more routinely.  So that

13      would have been that probably.

14          Q.      So you think you may have

15      mentioned it to those attorneys?                16:31:31

16          A.      Likely, yeah.  I mean, if I

17      said I did, I did.

18          Q.      Okay.

19          A.      I would like to also just --

20      just for the record point out --                16:31:47

21          Q.      Sure.

22          A.      -- that this is something we

23      did and had no clue if it was going to go

24      into the movie or not, but, you know, we did

25      this independent and then gave it to -- to      16:31:56

CONFIDENTIAL

Page 261

1    Dinesh.  But just we thought it was an

2    important element.

3           Q.    You were encouraging

4    Mr. D'Souza to use it in the movie?

5           A.    I -- I just said we have this,    16:32:04

6    you know.  It was --  just wanted to let him

7    know.

8           Q.    Okay.  And he ultimately did

9    use it in the movie?

10          A.    He did use it.             16:32:13

11          (Discussion off the record.)

12   (BY MS. KUCK)

13          Q.    And you were also at this point

14   in time coordinating -- well, no, strike

15   that.                                   16:32:41

16                You -- you were also concerned

17   at this point in time about getting the film

18   released to help Mr. Perdue's campaign in

19   Georgia in which he was trying to beat

20   Mr. Kemp; is that accurate?             16:32:55

21          A.    I don't remember that

22   specifically, but, again, let's see what you

23   got.  I just don't remember it.

24          Q.    Okay.

25          A.    These were -- you know,       16:33:10

CONFIDENTIAL

Page 262

1    these -- these conversations were one of, you

2    know, hundreds I would have in any given day,

3    so...

4         Q.    Although when we -- when we

5    spoke earlier this morning, your -- when I        16:33:24

6    asked you whether you ever coordinated your

7    work to influence anyone's political

8    campaign, you told me no.

9         A.    Uh-huh.

10        Q.    Is that true?                           16:33:39

11        A.    Yes.

12        Q.    Okay.  And let's mark as --

13        A.    Well, and let me make a -- let

14   me make a distinguishing characteristic here.

15   I think it's important --                          16:33:53

16        Q.    Okay.

17        A.    -- that True the Vote as a

18   501(c)(3) cannot coordinate.

19        Q.    Right.

20        A.    Myself in my personal capacity         16:34:00

21   as a, you know, free American can talk about

22   politics and -- and can, you know, talk to

23   politicians, so there's that line.

24        Q.    And how do you draw that line

25   when you're thinking about, for example, you     16:34:13

CONFIDENTIAL

Page 263

1      know, True the Vote working on this film?

2              A.      Uh-huh.  I don't -- I mean,

3      I'll be interested to see what we have here.

4      I don't know that I recall -- well, excuse

5      me, let me say it differently.              16:34:25

6                      I don't recall.  But I don't --

7      I don't -- yeah.  I don't remember it being

8      anything that I would have thought would have

9      been a conflict.

10             Q.      Okay.                         16:34:34

11                     Okay.  So let's mark as

12     Exhibit 67 a document bearing control

13     No. DDR-00049474.

14         (Marked Engelbrecht Exhibit No. 67.)

15     (BY MS. KUCK)                                 16:35:21

16             Q.      And this seems to be another

17     text exchange involving you, Mrs. D'Souza,

18     and Mr. Phillips.

19                     Do you see that?

20             A.      Yeah.                         16:35:28

21             Q.      And then the last complete

22     bullet that's there, it's dated March 6.  And

23     it says under your name:  "What is the

24     release date for the movie?  I thought it was

25     April 21, but the last time we spoke you      16:35:39

CONFIDENTIAL

Page 264

1      mentioned that the release is in early May.

2      This is critical for many reasons, not the

3      least of which is Georgia.  David Perdue is

4      running for governor against Kemp.  Perdue

5      needs our evidence out there in order for his    16:35:54

6      campaign to have a chance.  The primary is

7      May 24, but early voting starts sooner.  They

8      were counting on an April release."

9                 Do you see that?

10          A.    Yes.                                   16:36:04

11          Q.    Does that refresh your

12      recollection that you were concerned about

13      the -- the impact that the -- the film could

14      have on certain political races?

15          A.    It -- it -- it really                  16:36:15

16      doesn't -- I mean, specifically, clearly,

17      this is -- you know, I'm not disputing the

18      document.  I don't recall it.

19                 I will say that when the --

20      because the whole geospatial project started    16:36:29

21      in Georgia, one of the first individuals that

22      Gregg Phillips presented -- or the

23      information to was David Perdue.

24                 And, you know, I think it was

25      just a look back at that because we had not     16:36:48

CONFIDENTIAL

Page 265

1       gone public with anything.  And it was, you

2       know, the hope that that would come to light.

3               Q.    Okay.  Let's look at document

4       previously marked as Exhibit 11.

5               A.    I'm sorry, you told me.         16:37:20

6               Q.    11.

7               A.    11.

8               Q.    Yep.

9               A.    I'm sitting here.  Okay.

10              Q.    You have to do your own work on   16:37:24

11      this one.

12              A.    Okay.

13              Q.    So this was a whole series of

14      text messages, and this is the way that it

15      was -- it was produced by Mr. D'Souza.        16:37:41

16              A.    Okay.

17              Q.    So if you go to the page on the

18      bottom partway through that's marked

19      DD_000098.

20                    Do you see that?               16:37:50

21              A.    Yes.

22              Q.    And then midway down there's

23      a -- a long paragraph.

24                    Do you see that under your

25      name?                                        16:38:05

Page 266

```
 1              MS. HYLAND:  What page are you
 2       on?
 3       A.     Yes.
 4              MS. KUCK:  98.
 5              MS. HYLAND:  Oh.                16:38:12
 6   (BY MS. KUCK)
 7       Q.     And you say:  "One more
 8   request.  I would like to talk about what we
 9   can give to Perdue to start using now.  There
10   was a massive coverup against us and the       16:38:25
11   fraud.  We have all manner of dates and info.
12   I don't know how much of this is in the film
13   but, guys, Kemp did everything he could to
14   hurt us."
15              I'm sorry, it's hard to read.   16:38:42
16              It does go on, but -- but what
17   I'm most interested in is the -- the part
18   where you say can we -- "What can we give to
19   Perdue."
20              Do you see that?                16:38:54
21       A.     Uh-huh, yes.
22       Q.     Does that refresh your
23   recollection at all that you were providing
24   information relating to the film to help
25   Mr. Perdue with his campaign?                  16:39:02
```

CONFIDENTIAL

Page 267

1          A.    It really doesn't.  I've

2     never -- I've never -- I mean, I'm not

3     disputing the document.

4          Q.    Right.

5          A.    But my frustration with          16:39:11

6     Governor Kemp, my personal frustration --

7          Q.    Uh-huh.

8          A.    -- in what had happened when we

9     first presented it back in early 2021 would

10    have been enough for me to feel that anything  16:39:24

11    that we can do to get the truth out was going

12    to be good for the whole of the -- for the

13    whole of the state.

14              And it -- you know, I

15    characterized it in that way, but I -- I -- I   16:39:36

16    just don't remember it other than that.  I

17    really don't.

18         Q.    Okay.  Do you -- we can put

19    that away when you're done.

20         A.    Sorry, just --                     16:40:24

21         Q.    It's okay.

22         A.    A lot was going on.

23         Q.    Do you know of someone named

24    Deroy Murdock?

25         A.    Yes, he's a journalist.           16:40:34

CONFIDENTIAL

Page 268

```
 1          Q.      Okay.   And do you recall having
 2     a lot -- well, strike that.
 3                  Do you recall having
 4     back-and-forth with him over the film?
 5          A.      I do.   I don't remember          16:40:43
 6     specifics, but I do remember some
 7     back-and-forth.
 8          Q.      Do you recall that he -- he
 9     produced a number of articles concerning the
10     film?                                          16:40:52
11          A.      It doesn't shock me.   I don't
12     think that I ever saw or, you know, read any
13     of them, but that doesn't surprise me.
14          Q.      Okay.   So you don't remember
15     any discussion about whether any of his       16:41:01
16     articles were accurate or not about the film?
17     Does that ring any bells?
18          A.      No, it really doesn't.
19                  There was a lot going on.   A
20     lot more than just this.                       16:41:16
21          Q.      Okay.
22              (Discussion off the record.)
23     (BY MS. KUCK)
24          Q.      Plaintiff's Deposition Exhibit
25     No. 71...                                      16:41:49
```

CONFIDENTIAL

Page 269

1           (Discussion off the record.)

2      (BY MS. KUCK)

3           Q.     We're going to mark Plaintiff's

4      Deposition Exhibit 68 TTV_0007803 through 08.

5      And this seems to be a series of e-mails          16:42:33

6      between you and Mr. Murdock.

7                Do you see that?

8           A.     Yes.

9        (Marked Engelbrecht Exhibit No. 68.)

10     (BY MS. KUCK)                                      16:42:40

11          Q.     Does this refresh your

12     recollection at all that you were -- had some

13     back-and-forth with him about the film?

14          A.     I knew I had had some, yes.

15          Q.     Okay.  And he on the front page     16:42:45

16     says -- he says:  "I should have added this

17     in green.  Cell phone geotracking data show

18     five pro-Biden ballot harvesting groups

19     (circled) and 28 ballot drop boxes (orange

20     dots) that one mule visited in the Atlanta     16:43:06

21     area on the evening of [insert date]."

22                And then he says:  "How does

23     this look?"

24          A.     Uh-huh.

25          Q.     And you say:  "We are doggedly     16:43:15

CONFIDENTIAL

Page 270

1    steering clear of allegations re all the

2    ballots being pro-Biden, but there's nothing

3    to stop you from saying it."

4            Correct?

5        A.    Yes.                              16:43:26

6        Q.    Do you have any reason to

7    believe you didn't say that to him?

8        A.    No.

9        Q.    So --

10        A.    Just to -- just to clarify for    16:43:34

11    a second here.

12        Q.    Sure.

13        A.    Deroy Murdock I consider to be

14    one of the elders of the journalism world,

15    and I would not -- he has -- he has sent me   16:43:43

16    many e-mails.  I say "many."  That's not

17    true, but he's sent me e-mails occasionally,

18    and he just has a view of things.

19            And so I -- I just -- you know,

20    the things that -- the things I needed to    16:43:57

21    clear up, I cleared up but also didn't -- I

22    was sort of being -- in my opinion I was

23    being deferential to what he had already

24    written.

25        Q.    Okay.  So once the -- once the    16:44:07

CONFIDENTIAL

Page 271

1     film, the complete version of the film was

2     released at Mar-a-Lago --

3              A.     Yes.

4              Q.     -- you did multiple interviews

5     and appearances -- well, strike that.          16:44:17

6                     Even before it came out, you

7     did a number of interviews and appearances in

8     anticipation of it being released, right?

9              A.     I did a few, not -- not many.

10             Q.     Okay.  You were on The Charlie     16:44:27

11    Kirk Show, which we talked about yesterday

12    and we'll talk about in a minute.

13             A.     Okay.

14             Q.     Do you remember doing talk

15    radio in Baltimore?                              16:44:39

16             A.     (Shaking head.)

17             Q.     No.

18                    America Inc. interview?

19             A.     I don't.

20             Q.     You spoke to reporters?  Did     16:44:45

21    you speak to reporters?

22             A.     Prior to the movie?

23             Q.     Yeah.

24             A.     I mean, it -- it's possible

25    that reporters called about it, but I -- I     16:45:01

CONFIDENTIAL

Page 272

1    just -- I don't -- I don't remember.

2         Q.    Okay.  You spoke to -- to

3    reporters at The New York Times.

4               Do you remember that, Danny

5    Hakim?                                          16:45:20

6         A.    I don't remember that.  It's

7    entirely possible that they called or wrote.

8    That's not uncommon.

9         Q.    Okay.  Do you remember talking

10   to the reporters at The Wall Street Journal?    16:45:30

11        A.    Yes, we had talked with The

12   Wall Street Journal back starting in 2021,

13   so -- but this is a -- just to be clear, you

14   know, the press contacts us often.  It was

15   not necessarily about the movie.  It could     16:45:44

16   have been, but that's not an uncommon thing.

17        Q.    And you don't have specific

18   recollection about talking to them about the

19   movie?

20        A.    Not really.                          16:45:53

21        (Discussion off the record.)

22   (BY MS. KUCK)

23        Q.    Let me show you a document that

24   is marked -- I'm going to mark as exhibit --

25   Plaintiff's Deposition Exhibit 69, a document  16:46:33

CONFIDENTIAL

Page 273

1    that bears the control Nos. TTV 0926.

2         (Marked Engelbrecht Exhibit No. 69.)

3    (BY MS. KUCK)

4         Q.    That appear to be another

5    social media post for True the Vote?          16:46:51

6         A.    Yes.

7         Q.    And it says:  "Here's the

8    poster for our new movie 2000 Mules which is

9    out the first week in May."

10              Do you see that?                    16:46:59

11        A.    Yes.

12        Q.    And you referred to it as "our

13   new movie," right?

14        A.    Yes.

15        Q.    You're not saying it's -- it     16:47:03

16   doesn't say it's Mr. D'Souza's movie.

17              It's our movie?

18        A.    Yeah.  That's what was written.

19        Q.    And that's coming from True the

20   Vote?                                          16:47:10

21        A.    Yes.

22        Q.    Do you recall taking any issue

23   with this post?

24        A.    You know, I -- I don't recall

25   taking issue.  I -- as you've heard           16:47:20

CONFIDENTIAL

Page 274

1      throughout my testimony, my personal tendency

2      is to use the word "our" a lot.

3                  You know, I -- I also try to be

4      a team player.  I wanted it to, you know,

5      feel the -- despite having no editorial          16:47:36

6      control and no script control and down the

7      line, I, you know...

8           Q.    You wanted it to be seen as a

9      joint project with Mr. D'Souza?

10          A.    I -- I just -- I wanted our          16:47:50

11     work to be recognized, and I -- that was it.

12     I just -- I just wanted our work that we had

13     put blood, you know, time, talent, treasure

14     into.  And, you know, there were a lot of

15     things that were outside of that scope, but     16:48:05

16     it was the biggest thing we had ever done to

17     that point and...

18          Q.    When you say "it was the

19     biggest thing," what do you --

20          A.    That geospatial project.            16:48:14

21          Q.    Okay.

22          A.    And there was a lot of

23     heartache that went along with it along the

24     way a lot, so...

25                (Discussion off the record.)        16:48:29

CONFIDENTIAL

Page 275

1    (BY MS. KUCK)

2        Q.    Can you just take a quick look

3    at Exhibit 22?

4        (Discussion off the record.)

5        A.    Okay.                              16:48:41

6    (BY MS. KUCK)

7        Q.    This is a document that we

8    marked yesterday as Exhibit 22.  And there's

9    two entries from Mr. Phillips up at the top.

10           It says:  "Our biggest issue      16:48:57

11   right now is money.  True the Vote is

12   teetering on the edge.  Don't be shocked if

13   we have to close our doors in a few months.

14   Sad, but true."

15           Do you see that?                    16:49:07

16       A.    Yes.

17       Q.    And was that the -- was that

18   the case as of May of 2022?

19       A.    Yeah.  I mean, if he wrote it,

20   that was -- that's something that I would     16:49:14

21   have shared with him then.

22       Q.    Okay.  And then he says:

23   "We're going to keep Catherine in front of

24   the media as long as we can.  I think it's

25   important to consolidate the number of people  16:49:29

CONFIDENTIAL

Page 276

```
 1     speaking."
 2               And then he goes on and says
 3     later in the text:  "CE and Dinesh are
 4     killing the message right now.  Secretly
 5     happy that fewer hosts tonight."            16:49:42
 6               And then there's a response
 7     about the Salem house.
 8               And then he says:  "Right.  You
 9     two need to continue this media blitz doing
10     as many shows as you can bringing consistency  16:49:52
11     and power that no others can recreate."
12               Do you see that?
13        A.    Yes.
14        Q.    And was -- that's referring to
15     the -- to the promotional activities that you  16:50:02
16     were doing, right?  In connection with the
17     release of the film?
18        A.    It -- it was -- I mean, that --
19     yes, that was the -- I'm not sure how to even
20     answer.  Maybe that's just enough.         16:50:23
21               Can you ask it again?  I'm
22     sorry.
23        Q.    Yeah.
24               And that -- strike that.
25               Do you understand Mr. Phillips   16:50:30
```

CONFIDENTIAL

Page 277

```
1       there to be referring to the promotional

2       activities that you were doing in connection

3       with the release of the film?

4            A.    He was talking about speaking

5       to the media.  Dinesh had hired the -- the --   16:50:43

6            Q.    Patricia Jackson?

7            A.    Thank you.

8                  To do that.  And there, you

9       know, a handful of things that she sent my

10      way.  And, again, we're just trying to be      16:51:01

11      positive.

12           Q.    About the movie?

13           A.    Yeah.  Or just about -- just

14      about every -- you know --

15           Q.    Okay.                               16:51:13

16           A.    -- everything, just trying

17      to...

18           Q.    And you were -- so you did a

19      number of -- of interviews promoting the

20      film, right?                                   16:51:22

21           A.    I -- yes, I mean, I -- we -- I

22      did interviews.  I -- what we say is a

23      number.  I don't -- not -- you know, not a

24      ton, but some.

25           Q.    Okay.  And at some point, you       16:51:36
```

CONFIDENTIAL

Page 278

1    were on the Tucker Carlson show, right?

2         A.    Yes.

3         Q.    How did that come to be?

4         A.    Somebody would have reached out

5    and asked me to be on or maybe it went -- at    16:51:53

6    that point, maybe it went through one of the

7    PR firms -- not through Patricia, but that's

8    how -- I mean, they were interested in people

9    talking about the election, so...

10        Q.    And do you recall that you --    16:52:15

11   that you actually didn't mention the film

12   itself during that interview?

13        A.    Uh-huh.

14        Q.    Were you told by anyone not to

15   mention the film?    16:52:32

16        A.    I -- I don't -- I don't

17   specifically recall any longer.  I do know

18   that there was -- well, I'll just leave it at

19   that.  I don't specifically recall any longer

20   because I couldn't tell you who said what to    16:52:50

21   whom.

22        Q.    Right.  Okay.

23              Do you recall, though, there

24   was some dispute between Mr. D'Souza and Fox

25   News over the film?    16:52:59

CONFIDENTIAL

Page 279

1          A.      Yes.

2          Q.      What do you remember about

3     that?

4          A.      That -- well, specifically I

5     recall that, you know, I did an interview        16:53:03

6     that was sort of approximate to the time of

7     the movie, but I didn't mention it.  But it

8     wasn't -- I mean, my opinion, it wasn't -- it

9     was about election matters process, and

10    that's what I'm really, I think, best known     16:53:14

11    for is process.  You know, sort of focus on

12    the process of elections.

13               So it didn't seem out of the

14    norm because it wasn't -- you know, it wasn't

15    about the movie.  It was just about the         16:53:26

16    process so...

17         Q.      But I -- but I -- my question

18    was:  Do you recall some dispute about Mr. --

19    between Mr. D'Souza and Fox News about the

20    film?                                           16:53:40

21         A.      Yes.

22         Q.      What do you recall about that

23    dispute?

24         A.      I -- as I generally, very

25    generally recall, he was frustrated that I      16:53:44

CONFIDENTIAL

Page 280

1    didn't bring up the movie or that, you know,

2    or that it was not allowed.  I mean, I -- I

3    just -- that was the -- that was the

4    genesis -- or that was the -- the nucleus of

5    it was that the movie wasn't mentioned, but    16:54:01

6    it wasn't an interview about the movie so...

7         Q.    Okay.  And there was some

8    footage that Mr. Carlson -- or Mr. -- yes,

9    Mr. Carlson played on the -- on the show.

10            Do you recall that?                   16:54:14

11        A.    Yes.

12        Q.    Where did that come from?

13        A.    I do not know.  They -- they

14   often have things, and you just respond.

15   When you're in an interview like that and you   16:54:22

16   likely know but you're literally just looking

17   at a camera and you have no idea what's being

18   shown on the screen.

19            In fact, because I watched this

20   in preparation, my comments don't even          16:54:34

21   correlate to what they're showing on the

22   screen.  In my opinion, my comments don't

23   even correlate to what we they're showing.

24        Q.    After you were on the program,

25   and I'm talking not in connection with the      16:54:45

Page 281

1    litigation, I'm talking about the time, did

2    you watch the interview?  Your own interview?

3         A.    Like, you mean just like watch

4    to see how it went?

5         Q.    How you did, yeah.                16:54:56

6         A.    I generally don't.

7         Q.    Okay.  And are you aware that

8    TTV reposted that -- that interview on

9    Facebook, Instagram, and Rumble?

10        A.    It doesn't shock me.              16:55:13

11        Q.    Okay.  There was unblurred

12   footage that was shown during that interview,

13   correct?

14        A.    You know, I have -- I -- I know

15   that that is true because I have watched it    16:55:24

16   since, but I had no editorial control, no

17   knowledge that that was happening.

18        Q.    And you don't recall watching

19   it -- the interview at the time and seeing

20   that you were being -- there was -- there was  16:55:37

21   unblurred footage being shown?

22        A.    No, I do recall where I did

23   that remote, and it was a -- a place in

24   Florida.  And it was a very tiny room with

25   just -- you just watch the camera, and that's  16:55:49

CONFIDENTIAL

Page 282

1    it.  There's no way to see what's going on on

2    the screen, which is, you know, a

3    disadvantage.

4         Q.    Can you recall anything at all

5    about any correspondence you or anyone else    16:55:59

6    working for TTV had with Mr. Carlson's team

7    relating to that interview?

8         A.    Relating to that interview?

9    No, I don't specifically.  You may -- there

10   may be something, but not that I can recall.    16:56:19

11        Q.    Okay.  And you can't recall who

12   was involved with scheduling it?

13        A.    No.  That just -- it just --

14   you know, a call that comes, and if you can

15   do it, you do it.  And if not, you don't    16:56:30

16   and --

17        Q.    Okay.

18        A.    I'm not -- I'm not a regular.

19        Q.    Okay.  You think he reached out

20   to you, though?    16:56:37

21        A.    Well, he -- he wouldn't have.

22        Q.    Well, I'm sorry.

23        A.    Yeah.

24        Q.    Someone on his -- on his team

25   reached out to you?    16:56:42

CONFIDENTIAL

Page 283

1          A.     It's -- it's -- it is possible,

2     but it's also equally and probably more

3     likely that they reached out to some -- you

4     know, somebody -- a publicist that we were

5     working with.                              16:56:52

6          Q.     Okay.

7          A.     I just don't -- I just don't

8     remember.

9          Q.     Okay.

10         A.     I mean, those come so -- you      16:56:55

11    know, you just try to do what you can, and it

12    just kind of -- just happens.

13         Q.     Although you -- you know, as

14    you say, you're not a regular on Tucker

15    Carlson?                                    16:57:04

16         A.     No.

17         Q.     So that would have been

18    something out of the ordinary?

19         A.      I mean, not out of the

20    ordinary.  I do a lot of interviews, and I'm   16:57:10

21    not -- you know, I mean, just another

22    interview.  It's about election process.

23         Q.     You don't particularly care

24    that it was Tucker Carlson?

25         A.      I mean, I -- I like his show,    16:57:20

CONFIDENTIAL

Page 284

1    but I'm not -- I've been doing this for a

2    long time.  Just talking about the process,

3    hoping that we get things fixed so I can go

4    back to a regular life.

5         Q.    Okay.  And you also -- do you       16:57:31

6    recall you also spoke with -- with NPR around

7    this time?  Reporters at NPR?

8         A.    I recall specifically Tom

9    Dreisbach -- may be mispronouncing his last

10   name -- reaching out, I think, via e-mail.       16:57:51

11   I'm not -- I don't recall a phone call.  It

12   could have happened.  But I do recall that,

13   yes.

14        Q.    Okay.  And do you recall

15   that -- that TTV did -- did podcasts at which    16:57:59

16   you spoke doing a Q&A of the movie?

17        A.    I don't specifically recall.

18   It does -- it wouldn't shock me but...

19        Q.    Okay.  Do you recall doing any

20   podcasts on behalf of TTV in any way            16:58:16

21   connected to the movie?

22        A.    Podcast on behalf of TTV?

23        Q.    Yeah.  On the TTV platform?

24        A.    Oh.

25        Q.    Podcasts sponsored by TTV?          16:58:26

CONFIDENTIAL

Page 285

1        A.      Oh.

2        Q.      Maybe that's a better way to

3    say it.

4        A.      No.  We didn't.  I mean, True

5    the Vote doesn't have a podcast platform.        16:58:38

6        Q.      Okay.  Does it sometimes do

7    virtual events?

8        A.      When we say "virtual" -- when

9    you say "virtual events," they are -- we

10   occasionally do online trainings or -- I'm      16:58:58

11   trying to think.  I mean, that's -- we don't

12   do event events like, you know, you would

13   think of an event.  Well, I don't -- I don't

14   know how we're defining "event."  I maybe

15   should stop there.                               16:59:15

16       Q.      Okay.

17           (Discussion off the record.)

18   (BY MS. KUCK)

19       Q.      Okay.  Let's mark as

20   Plaintiff's Deposition Exhibit 70, a document   16:59:34

21   bearing Control No. DD_00063 through

22   DD_00086.

23        (Marked Engelbrecht Exhibit No. 70.)

24   (BY MS. KUCK)

25       Q.      And the -- this also appears to    17:00:05

CONFIDENTIAL

Page 286

1     be a series of -- of texts that was produced

2     by Mr. D'Souza.

3                Do you see that?

4        A.    Yes.

5        Q.    And the one I'm going to ask        17:00:13

6     you about is on Page 69.

7        A.    Okay.

8        Q.    And this appears to be a text

9     exchange between you, Mr. Phillips, and

10    Mr. D'Souza.                                  17:00:36

11                Do you see that?

12       A.    Yes.

13       Q.    And there's some talk in here

14    about a Q&A that Mr. D'Souza did with Philip

15    Bump of The Washington Post?                  17:00:49

16       A.    Yes.

17       Q.    Do you know who Philip Bump is?

18       A.    Yes.

19       Q.    And what do you know about him?

20       A.    I just know he's a journalist        17:00:54

21    at Washington Post and did a large number and

22    a significant number of articles about this

23    movie.

24       Q.    Okay.  And so the second text

25    from you, it says:  "I can't talk now, but     17:01:08

CONFIDENTIAL

Page 287

1    let's connect tomorrow when you're free to --

2    to talk through a few tiger traps."

3            And you say:  "1, the murder

4    cases; 2, ACLED; 3, non-mule video in the

5    movie.  All manageable.  We just need to be    17:01:22

6    on the same page."

7            Do you see that?

8        A.    Yes.

9        Q.    When you use the term "tiger

10    traps," what do you refer to?                  17:01:31

11        A.    I was just referring to -- it

12    was my way of expressing that some of the

13    things that Dinesh was communicating weren't

14    quite accurate and because they were a -- you

15    know, a sort of tacit reflection of our work,  17:01:45

16    I wanted to try to avoid those issues.

17        Q.    Okay.  The -- No. 1 is the

18    murder cases.

19            Is that the issue that we

20    talked about earlier where your concern was    17:01:59

21    that it was made to appear that you were --

22    that your information had solved a murder

23    when that wasn't the case?

24        A.    Yeah.  That certainly would

25    have been one of the things.  There could      17:02:12

CONFIDENTIAL

Page 288

1    have been more, I don't recall, but -- but

2    that certainly was one.

3        Q.    And No. 2 says "ACLED."

4              What's that a reference to?

5        A.    It's just so long ago I -- I        17:02:20

6    don't want to speculate.  There -- there

7    was...

8              As I generally recall, there

9    were references that I was hearing, you know,

10   being made about ACLED and the data and the     17:02:55

11   way to understand the data that was not

12   accurate.

13       Q.    Okay.  And then 3 says

14   "non-mule video in the movie."

15             What's that referring to?           17:03:05

16       A.    That is referring to the

17   distinction between the 242, 70 videos, and

18   then other footage that was used.  And the

19   other footage that was used was not part of

20   that 242, 70.                                  17:03:23

21             Now, there were still -- you

22   know, I think this was a distinction

23   Mr. Phillips made yesterday, mule, small m,

24   Mule, large M.  In our opinion, the videos

25   that were used were still reflective of       17:03:37

CONFIDENTIAL

Page 289

1    things that ran afoul of the law.

2            But I felt it necessary to

3    clarify that that should be understood more

4    but, I mean, you know, that's...

5        Q.    Yeah.  Because is it accurate    17:03:50

6    to say you understand that "mules" as the

7    term is used in the film refers to the people

8    who were sort of linked between their video

9    and the geospatial harvest -- geospatial

10   project, the people on that original 70?    17:04:05

11       A.    Yeah.  I wouldn't say that.  I

12   would say that "mule" meant anybody.  I mean,

13   mule, ballot harvester, ballot.  I mean, all

14   of those words were fungible, just the

15   same -- you know, anybody that was running    17:04:17

16   afoul of the law was, you know, in our very

17   loose vernacular, a mule.

18            But then there was a set-aside

19   group that was the ones that had had

20   geospatial work attached to them, so...    17:04:28

21       Q.    But when you say "non-mule,"

22   you're referring to the people who didn't

23   have the -- when you're using it here in the

24   context of the film and the videos in the

25   film, you're referring to the people who were    17:04:41

CONFIDENTIAL

Page 290

1    not tracked with the geospatial data, right?

2              A.     It was the -- I was -- I am --

3    was probably the fastest path to explain what

4    I wanted to talk about.

5              Q.     So tell me again what was that.    17:04:56

6                     What's the distinction that you

7    thought you should be drawing?

8              A.     There was, in my opinion, the

9    stories of -- of what was being shown in the

10   film were being convoluted, and the stories    17:05:07

11   about the Gwinnett anomaly and the Gwinnett

12   box and all of that footage was being

13   convoluted.  And that's not to say that they

14   weren't, you know, mules when they were --

15   you know, to be very, very clear, the Georgia   17:05:21

16   law says if you vote more than one ballot

17   more than -- you know, more than your own

18   ballot, you must sign an assister signature

19   on the back of the envelope, and we had done

20   the work to determine that had not happened.    17:05:33

21   So -- so, you know, that -- that is -- that

22   holds.

23                     But it was the -- the -- the --

24   the video that was, you know, added much

25   later that I just -- I just felt like         17:05:49

CONFIDENTIAL

Page 291

```
1      needed -- it was a different -- it was a

2      different story line, I guess you could say,

3      for the movie.

4            Q.     Right, because the story line

5      in the movie is about the people who were        17:05:59

6      geospatially tracked?

7            A.     I wouldn't say -- I wouldn't

8      say it was -- I mean, that was one of them --

9            Q.     Right.

10           A.     -- but there was also the          17:06:08

11     Gwinnett anomaly and there were also, you

12     know, people -- little M mule just running

13     afoul of the law.  And that's, you know,

14     again, ballot harvesting depositing more than

15     one.  And in Georgia, you can't do that        17:06:19

16     without an assister signature.

17           Q.     No, I understand.  I'm just

18     trying to -- to figure out the distinction

19     you're drawing between the two groups of

20     videos.                                         17:06:29

21           A.     Uh-huh.

22           Q.     And when you say "non-mules" in

23     the film --

24           A.     Uh-huh.

25           Q.     -- you are referring to that --    17:06:37
```

CONFIDENTIAL

Page 292

1    not the 70 -- the 70 original videos.

2              You're referring to the later

3    group of videos; is that right?

4         A.    You know, I -- I just -- I

5    don't want to speculate.  It -- it really        17:06:51

6    could have been anything.  It could have been

7    any part of that movie that was -- was being

8    taken out of context.

9              You know, it could have been

10   the -- the 242 mules versus the -- you know,     17:07:07

11   the mules that were just depositing more than

12   one ballot.  I just -- there were just -- I

13   was just trying to -- I mean, Mr. D'Souza

14   was -- was, you know, light years ahead in

15   doing the media, and I just -- it -- I wanted    17:07:26

16   to make sure it was accurate.

17        Q.    When -- when the -- when the

18   term "2000 Mules" is used --

19        A.    Uh-huh.

20        Q.    -- where do you understand the        17:07:38

21   2000 to come from?

22        A.    That was a -- a -- a -- that

23   was Dinesh's idea of just taking the number

24   of identified devices in each of the

25   jurisdictions and then sort of rounding up.      17:08:01

CONFIDENTIAL

Page 293

1      I mean, that was his -- his movie.

2           Q.    Right.  But he --

3           A.    His movie.

4           Q.    The 2000 included the -- it was

5      an amalgam of, say, the 242 in Georgia?     17:08:13

6           A.    Uh-huh.

7           Q.    And then there was, what, over

8      a thousand in Philadelphia?

9           A.    I don't -- I don't know.

10          Q.    But that's what he was doing?     17:08:19

11     That's where those numbers come --

12               (Speaking simultaneously.)

13          A.    That's where -- that's where

14     that -- my understanding is that that's where

15     that came from.                              17:08:24

16               And, again, I -- you know,

17     he -- his movie.  He gets to name it, so...

18     (BY MS. KUCK)

19          Q.    Right.  But your understanding

20     is that's where the 2000 comes from.          17:08:31

21               It's the sum of that number?

22          A.    I mean, that's my general

23     understanding.  Now, he may -- he may look at

24     that differently.

25          Q.    Yeah.  Yeah.  Just all I can     17:08:39

CONFIDENTIAL

Page 294

```
 1      ask for your is your understanding.

 2              A.    Sure.  Sure.

 3              Q.    Okay.

 4                    MS. KUCK:  I have just a little

 5              bit more.                              17:08:45

 6                    Do you want to take one more

 7              break?

 8                    MR. EVANS:  Yeah.  Let's do

 9              that.

10                    THE VIDEOGRAPHER:  Off the       17:08:50

11              record at 5:08.

12          (Break from 5:08 p.m. to 5:21 p.m.)

13                    THE VIDEOGRAPHER:  Back on the

14              record at 5:21.

15      (BY MS. KUCK)                                  17:20:18

16              Q.    Okay.  Do you --

17                    (Discussion off the record.)

18      (BY MS. KUCK)

19              Q.    The -- do you -- we've referred

20          at several junctures to an interview that you  17:20:38

21          and Mr. Phillips did on The Charlie Kirk Show

22          on April 8, 2022?

23              A.    Yes.

24              Q.    And on that you discussed the

25          2000 Mules project; is that correct?       17:20:49
```

CONFIDENTIAL

Page 295

1        A.      Yes.

2        Q.      And I could have you look at

3    what we marked yesterday as -- as Exhibit 10?

4        A.      Oof.

5        Q.      You don't have it?              17:21:17

6        A.       I don't have it in my stack,

7    but let me just keep looking here, but I

8    don't show it.  Maybe it's in here.

9             Oh, yes.  Sorry.  Got it.

10        Q.      I'll be in trouble with the     17:21:26

11    court reporter if you don't have it.

12             Okay.  In Exhibit 10 appears to

13    be a text chain involving you, Mrs. D'Souza,

14    and Mr. Phillips?

15        A.      Yes.                            17:21:45

16        Q.      Do you see that?  Okay.

17             And then partway down -- well,

18    actually, it's the -- the second full text,

19    it says" "Last" -- and your picture is next

20    to it.                                      17:21:58

21             Says:  "Lastly, we did an

22    interview with Charlie yesterday.  He had the

23    same videos from the ad in Georgia, the ones

24    we talked about, and asked us to review them.

25    He says Salem knows but didn't want to tell   17:22:09

CONFIDENTIAL

Page 296

1     y'all.  I -- it's supposed to air tomorrow."

2              Do you see that?

3         A.    Yes.

4         Q.    And that's referring to the

5     Charlie Kirk interview?                        17:22:17

6         A.    Yes.

7         Q.    And when you say "he had the

8     same videos from the ad in Georgia, the ones

9     we previously talked about," what are you

10    referring to?                                  17:22:25

11        A.    I do not remember what the ad

12    in Georgia was.

13              I do recall that I went into

14    this interview thinking it was a radio

15    interview, and then he had -- had videos that  17:22:36

16    we -- we were shown.  And I just -- I don't

17    remember -- zero recollection about what "the

18    ad in Georgia" means.

19        Q.    If I said there was a "Get

20    Georgia right" anti-Kemp ad, would that        17:22:51

21    refresh your recollection at all?

22        A.    I mean, no.  There -- there

23    were people doing all kinds of things.  I --

24    I --

25        Q.    Okay.  And according to the          17:23:02

Page 297

1      text, it was -- it was a taped interview,

2      right?  It wasn't a live interview like -- I

3      assume the Tucker Carlson one was live?

4              A.      I really don't know.  I -- it

5      could be live, could be delayed -- I don't --    17:23:17

6      I don't know.

7              Q.      Well, it says in your text:

8      "It's supposed to air tomorrow"?

9              A.      Oh, well, okay.  Then yes, it

10     would have been.                                  17:23:27

11             Q.      It would have been taped?

12             A.      Yes.

13             Q.      And then there's another long

14     text from you further down.  It says:  "Okay.

15     One more thing, Andrew, Charlie's staffer,       17:23:36

16     also told Heather that in the interview we

17     say he's a police officer.  Note, I explained

18     that the version Andrew saw wasn't finished.

19     Shadow and voice filters were being adjusted.

20     We were working to get his e-mails with his      17:23:48

21     name redacted on screen.  And, also, video

22     that we were still awaiting access to.  And

23     that if it comes together, she -- they will

24     not be on camera as much.  But all that

25     aside, I do want to hell tell her if how we      17:24:02

CONFIDENTIAL

Page 298

1     characterize the informant, would y'all look

2     at the transcript and let me know how he's

3     introduced?  We may need to speak -- tweak

4     slightly.  I just don't remember"?

5          A.    Uh-huh.                          17:24:14

6          Q.    Do you see that?

7          A.    Yes.

8          Q.    What's that referring to?

9          A.    I don't -- as I read this, I

10    don't have a recall of that exchange.        17:24:23

11               However, in reading it, it

12    would seem that Andrew, Charlie's staffer --

13    I don't know the context of "also told

14    Heather," but regardless, it goes on to -- it

15    must have been something that he then told    17:24:40

16    me.

17               And my only expectation was

18    that it wasn't finished and maybe there were

19    still things, you know, being adjusted.

20               And it -- it was -- it was      17:24:52

21    concerning to me that -- that the voice-over,

22    as I generally recall from this, was

23    indicating that he was a police officer,

24    which is -- was not what we had agreed to --

25         Q.    Okay.  And, again, this goes     17:25:10

CONFIDENTIAL

Page 299

1      back with the -- the issue the Georgia law

2      enforcement officer?

3            A.     Yes.

4            Q.     And Heather is Heather Mullins?

5            A.     Yes.                              17:25:18

6            Q.     Okay.  And after your

7      appearance on Charlie Kirk, did you watch it

8      when it was released?

9            A.     No.

10           Q.     Okay.  And when you said in     17:25:38

11     your -- your first text about "he says Salem

12     knows but didn't want to tell y'all," do you

13     know what that's referring to?

14           A.     Well, it says "didn't want to

15     not tell y'all."                             17:25:50

16                  And the issue there was that

17     there was just a very tight hold on what we

18     could and couldn't say.  And, you know, the

19     sequestration of video and so forth.

20                  And so the fact that that came   17:26:06

21     together and it was presented as Salem knows,

22     we were already in the area for speaking to

23     the Arizona legislators, but I just -- I just

24     felt like I needed to close the loop.

25           Q.     Okay.  And how -- do you recall   17:26:20

CONFIDENTIAL

Page 300

```
 1     how it was that you came to be on Mr. Kirk's
 2     show?
 3             A.    I -- it could have been a phone
 4     call to either me or -- or Gregg or a
 5     publicist.  I --                              17:26:34
 6             Q.    Okay.  And you don't know --
 7     you can't recall whether you reached out to
 8     him or he reached out to you?
 9             A.    I -- I -- I can't.  I mean,
10     it -- it -- we were going to be in town       17:26:45
11     anyway so...
12             Q.    Okay.  And he is in the film,
13     right?
14             A.    Yes.
15             Q.    And this is after the film?      17:26:52
16             A.    Yes.
17             Q.    So he's obviously familiar with
18     what's going on in the film?
19             A.    I can't really -- I mean, he's
20     familiar with his part.                       17:27:00
21             Q.    Yeah.
22             A.    I don't know if he's like -- I
23     mean, I guess based on this that he's -- you
24     know, they've had access to the -- to what I
25     was thinking was a rough cut.  Again, you     17:27:06
```

CONFIDENTIAL

Page 301

```
 1      know, going all the way back earlier when I
 2      learned that, you know, somebody called me
 3      and said they had -- so I -- I was making
 4      some assumptions here.
 5              Q.    Okay.  And in the course of        17:27:15
 6      that interview, Mr. Kirk showed the video of
 7      Mr. Andrews, correct?
 8              A.    Yes.
 9              Q.    And it was not blurred?
10              A.    It -- it was not -- I don't --     17:27:29
11      he showed it to us on his laptop.
12              Q.    Right.
13              A.    And I really don't recall
14      whether it was or wasn't then, but now since
15      all of this, I do know that what they posted   17:27:42
16      wasn't.
17              I -- I will state again.  I had
18      no editorial control.  And, frankly, the
19      thought that that was all going through
20      Salem, I just didn't -- it would have never    17:27:52
21      even occurred to me so...
22              Q.    So why don't we -- we're not
23      going to go through all the clips we watched
24      yesterday.
25              A.    Okay.                              17:28:02
```

CONFIDENTIAL

Page 302

```
 1            Q.    Let's just go -- can we do the
 2       one that's Deposition Exhibit 1C.
 3                     (Video playing.)
 4       (BY MS. KUCK)
 5            Q.    Okay.  Did you rehearse that      17:29:54
 6       interchange with Mr. Kirk before you had it
 7       on camera?
 8            A.    No.
 9            Q.    When he says "this is Gwinnett
10       County, right," how does -- how did you --   17:30:04
11       how did you know that?
12            A.    Because that was the most
13       pristine video, and we had spent so much time
14       on that Gwinnett anomaly that I saw that drop
15       box, I mean, I just knew it.                 17:30:14
16            Q.    Okay.  And he says:  "This is
17       one of the 2000 you profiled."
18                  And you said, "Yes."
19                  Right?
20            A.    Yeah.  I -- I heard myself say    17:30:22
21       that.  I can only say that, you know, I was
22       just saying it in -- just sort of in passing.
23       I mean, it was all happening very quickly,
24       and I was shocked by all of it.  I was in,
25       you know, dungarees and expected to be on the 17:30:41
```

CONFIDENTIAL

Page 303

1    radio.

2         Q.    Okay.  And it's your testimony

3    that you didn't notice that the -- the video

4    wasn't blurred?

5         A.    I -- I can't say that I -- I          17:30:51

6    mean, I didn't notice it, but I will say I

7    had no idea what was going to ultimately be

8    done with the video that they had.  I -- I

9    didn't know.  I mean, whatever I saw was on

10   Charlie's screen.  That's on Charlie's -- you   17:31:03

11   know, on Charlie's -- or on a laptop, but I

12   had no -- I had no editorial control over

13   whatever else they were going to do with the

14   video.

15        Q.    And you -- you never said to         17:31:14

16   Mr. Kirk, Hey, if you're going to use that,

17   you've got to blur the identity?

18        A.    I -- I mean, yeah, I don't know

19   that I did or didn't.  I mean, you know,

20   ultimately everything in the movie was          17:31:27

21   blurred.  I -- I don't know.  I mean, it

22   could have been that he -- I just don't know.

23   He could have showed us blurred images and

24   then not used them.  I really don't know.  I

25   had zero editorial control.                     17:31:39

CONFIDENTIAL

Page 304

1          Q.    Yeah, I -- I understand you --

2     you didn't have any control of it.  I'm just

3     trying to get at what you actually saw when

4     you were sitting there --

5          A.    Yeah.                           17:31:46

6          Q.    -- and what you communicated to

7     Mr. Kirk or his staff --

8          A.    Uh-huh.

9          Q.    -- afterwards.

10         A.    Uh-huh.                         17:31:50

11               It's -- it's -- it's entirely

12    possible that I said something.  I don't -- I

13    don't -- I can't tell that, you know, that I

14    have any evidence of it or -- or I -- just an

15    interview that I thought was a radio           17:32:04

16    interview, and he's part of the Salem team,

17    and I -- you know, and I don't know what else

18    they're putting on or doing at -- I have zero

19    involvement in that.

20         Q.    Okay.  And are you aware that    17:32:15

21    TTV reposted on a number of social media

22    channels afterwards?

23         A.    It doesn't surprise me, so...

24         Q.    Okay.  And would it surprise

25    you that they posted it with the unblurred    17:32:27

CONFIDENTIAL

Page 305

1    footage?

2         A.    It doesn't.  They would have

3    just posted the interview.

4         Q.    Okay.  Whoever was doing your

5    social media, would -- would they have been    17:32:40

6    alerted to the fact that it was -- that they

7    shouldn't be posting any video accusing

8    people of voting fraud without -- without

9    redacting their identities?

10        A.    You know, I think that The View    17:32:53

11   was -- it was a show that had, you know,

12   checked all the boxes according to Salem and

13   Charlie and -- or Charlie's show and just

14   posted.  I mean, and I -- you know, that's --

15   that's it.                                     17:33:13

16        Q.    Let's look at what we marked as

17   Exhibit 19 or 16 -- 16 yesterday.

18        A.    Yes.  Got it.

19        Q.    Okay.  And that's an e-mail

20   dated April 19, 2022, from Jim Hoft of         17:33:57

21   Gateway Pundit to you and Mr. Engelbrecht,

22   correct?

23        A.    Yes.

24        Q.    And it looks like you were

25   going to appear on his program shortly after   17:34:10

Page 306

1          the Charlie Kirk program?

2               A.    He -- he is the publisher of

3          a -- of an online news source called Gateway

4          Pundit, and I don't recall doing an interview

5          with him.  It's entirely possible that he          17:34:29

6          wrote an article and -- and took clips.  I...

7               Q.    Okay.  Although he says in the

8          last sentence:  "If you have anything else

9          for us, please send it before the 4:00 p.m.

10         interview."                                         17:34:41

11                   Do you see that?

12              A.    Oh, yeah.  Okay.  And then the

13         interview link.

14              Q.    Yeah.

15              A.    I don't remember doing an              17:34:45

16         interview, but it's possible that I did.  I

17         don't -- I don't recall.

18              Q.    Okay.  And he says:  "We have a

19         couple of clips of ballot traffickers you ran

20         during your Charlie Kirk interview."               17:34:53

21                   Do you see that?

22              A.    Yes.

23              Q.    Did you say to him, Well, those

24         weren't my clips, they were Charlie's clips?

25              A.    I -- I -- I don't -- I don't           17:35:01

CONFIDENTIAL

Page 307

1    it's possible.

2        Q.    But are you just speculating?

3    You don't remember?

4        A.    I don't remember.  I mean, this

5    was, you know, a long time ago.         17:35:10

6        Q.    Two years ago?

7        A.    Yeah.

8        Q.    And did you -- did you indicate

9    to him before he ran them that any clips

10   needed to be blurred?                    17:35:24

11       A.    I -- what was the date of the

12   Charlie Kirk one?

13       Q.    4/8.  April 8.

14       A.    4/8.  I mean, it's -- it's --

15   if I had known that there was an issue, I  17:35:37

16   would have made note of it.  I would have had

17   no idea.  I mean...

18       Q.    You don't remember saying

19   anything to him about it?

20       A.    I -- I just don't remember this  17:35:46

21   at all.

22       Q.    Okay.

23       A.    And I don't know what clips.  I

24   don't know.

25             Again, no editorial control.    17:35:53

CONFIDENTIAL

Page 308

1     You know, I -- this -- I don't -- I mean, I

2     don't even -- frankly, I don't even know that

3     I did this.  I don't know.

4          Q.     Okay.  Yeah.  My only question

5     about that is that he's saying there the         17:36:09

6     clips you ran on the Charlie Kirk interview,

7     so he is characterizing them as your clips.

8          A.     Yeah.  But that's -- that's

9     just a, you know, turn of phrase.  I mean,

10    I -- clearly, I'm not running the Charlie        17:36:22

11    Kirk interview or Charlie Kirk show or, you

12    know, sitting at the editing board or

13    production board or whatever they even call

14    them.

15         Q.     And your testimony is you don't       17:36:32

16    remember providing those clips to Charlie

17    Kirk?

18         A.     No.

19         Q.     Are you aware of the unblurred

20    footage of -- of the video in which -- which     17:36:41

21    we've been talking about, about Mr. Andrews

22    voting?

23         A.     Uh-huh.

24         Q.     Do you have any recollection of

25    anyplace else that it was played in an           17:36:54

CONFIDENTIAL

Page 309

1    unblurred state?

2           A.    I -- no.  I mean, you know, at

3    the time, I was not -- again, I was --

4    I -- our video went to just, you know, Dinesh

5    and what else other shows we're using or        17:37:15

6    doing or how I -- I had no control over any

7    of that, so no, I don't know.

8           Q.    Okay.  So let's -- let's talk

9    about the book for a minute.

10          A.    Okay.                               17:37:35

11          Q.    And it was eventually agreed

12   that you would get 20 percent of any profits

13   on the book, right?

14          A.    It was offered, yes.

15          Q.    And did you agree to that?         17:37:45

16          A.    I really don't -- we would have

17   to look back at that e-mail exchange.

18   Probably not important.

19          Q.    Yeah.  I'm just trying to save

20   a little -- a little time.                      17:37:54

21          A.    Yeah.  No, I mean, the reason I

22   say it that way is not to be difficult.  I

23   just don't know what Bettina [phonetic] would

24   have written back.

25          Q.    Okay.                              17:38:04

CONFIDENTIAL

Page 310

```
 1          A.      I just don't know.

 2          Q.      Okay.  That was something you

 3     asked for?

 4          A.      No.

 5          Q.      It was something Mr. D'Souza    17:38:06

 6     offered?

 7          A.      That's my recollection, yes.

 8          Q.      Okay.  And do you -- do you

 9     recall that you accepted his offer?

10          A.      At that point Bettina           17:38:13

11     [phonetic] was -- was, you know, handling the

12     commentary and I was -- you know, that was

13     it.  It was late in the day and -- or, you

14     know, it was at the very end of all of this

15     so...                                        17:38:29

16          Q.      Okay.  You -- do you recall

17     that there were certain issues that led to

18     the recall of the first printing of the book?

19          A.      Okay.

20          Q.      And what were the issues that    17:38:44

21     led to that recall?

22          A.      I don't know of -- of issues

23     plural.  I do know of one.  Or at least I

24     believe I know of one.

25          Q.      Okay.                            17:38:54
```

CONFIDENTIAL

Page 311

1          A.     And that is the representation

2     of nonprofit organizations in the book.

3          Q.     And did you have conversations

4     with anybody at Salem about that issue?

5          A.     Yes.                              17:39:11

6          Q.     Okay.  Do you remember who?

7          A.     I think it was their attorney.

8          Q.     And did you have any

9     conversations with Mr. D'Souza about the

10    issue?                                        17:39:34

11         A.     Yes.

12         Q.     What were those conversations?

13         A.     He called me and asked me just

14    on the phone if I could corroborate some

15    names.  I don't remember if he said it was in  17:39:48

16    a book or if he just -- I -- I was so

17    shocked -- I was so shocked by the whole

18    thing.  I don't remember if he said it was in

19    a book or -- or how it came out.

20               But in any event, I said, No, I     17:40:01

21    can't do that.  What are we even talking

22    about here?  How -- what is happening?

23               And I -- I generally recall

24    asking him about is this -- has this been

25    published or what is -- you know, what's the   17:40:22

CONFIDENTIAL

Page 312

1    status of this?  And as I generally recall,

2    he said, Oh, no, it's nothing to worry about.

3              And I was troubled enough that

4    I reached out to Salem, and that is when I

5    learned that books had -- had already been          17:40:42

6    released to the media and books were on their

7    way to stores.  And I was -- I was shocked.

8         Q.    And why were you shocked?

9         A.    Because we had never been

10   consulted on the book.  We had never -- I            17:41:02

11   have -- I just had no idea that there was a

12   book being -- actually being written.  I

13   mean, I knew there had been one that had been

14   talked about, but we were not involved in

15   that at all.                                          17:41:17

16        Q.    And when you were talking about

17   getting the 20 percent of the book profits,

18   is it your recollection you didn't even know

19   a book was in process?

20        A.    Huh-uh.  I will say this.  They           17:41:30

21   did talk about a book early in the -- in the

22   discussion like maybe at the time with Salem

23   when -- when we were there in Dallas.

24              So I don't want to represent

25   that I had never heard of a conversation             17:41:43

CONFIDENTIAL

Page 313

1    about, you know, a book.

2           But absolutely we had no

3    involvement, and I was stunned to hear that

4    the copies had gone out and been released and

5    so forth.                                  17:41:57

6    Q.    Okay.  And the person that you

7    were corresponding with, does Tom Spence ring

8    a bell?

9    A.    It rings a bell.  I think he is

10   the gentleman with Regnery that's not the    17:42:13

11   Salem attorney, but yeah, so that does ring a

12   bell.

13   Q.    Okay.

14        (Discussion off the record.)

15   (BY MS. KUCK)                               17:42:40

16   Q.    And do you recall that he

17   consulted with you about what the revised

18   language in the book would be?

19   A.    He -- he said that, as I

20   generally recall, there was a sentence or two  17:42:52

21   and he's like, You can, you know, look at

22   this.  The very few -- because they couldn't

23   change any of the typesetting that was

24   already done.  They didn't want to go to that

25   expense, and I believe that there was a --    17:43:02

CONFIDENTIAL

Page 314

1    like a passage, if I recall.

2         Q.    Okay.  And do you recall

3    providing comments on the passage?

4         A.    I do recall saying something

5    about the passage, but I was -- I was         17:43:13

6    absolutely in shock that this was, you know,

7    happening.

8              (Discussion off the record.)

9    (BY MS. KUCK)

10        Q.    And did you come to some          17:43:38

11   understanding as to where Mr. D'Souza came up

12   with the names?

13        A.    I -- I wouldn't say I came up

14   with an understanding.  I -- I did, you know,

15   speculate that it would have been over the    17:43:51

16   course of, you know, the other exhibits that

17   we've reviewed today and -- and research that

18   we were doing.

19        Q.    Did -- did you have a

20   discussion with him and say, Where did you --  17:44:05

21   you know, where did you get that information?

22        A.    Oh, I am sure I did.

23        Q.    Okay.  Can you tell -- have you

24   told me everything you can remember about the

25   discussion?                                   17:44:16

CONFIDENTIAL

Page 315

1           A.    Yeah.  I think so.  It was -- I

2      was just -- yeah, I was just shocked.

3           Q.    Okay.  All right.

4                 Let me mark...as...

5                 Just make sure I mark the right    17:45:37

6      one.

7           (Discussion off the record.)

8      (BY MS. KUCK)

9           Q.    Let's mark as Plaintiff's

10     Deposition Exhibit 71 --                      17:46:19

11               MS. KUCK:  That's the book,

12          yeah.

13     (BY MS. KUCK)

14          Q.    A document bearing control

15     Nos. TTV_008527 through 28.                   17:46:31

16                Do you see that?

17               MS. KUCK:  And I'll pass those

18     out.

19          (Marked Engelbrecht Exhibit No. 71.)

20     (BY MS. KUCK)                                 17:47:00

21          Q.    Is that the back-and-forth you

22     were remembering about the language?

23          A.    I believe so, yes.

24          Q.    Okay.  And did you approve that

25     language, or was there some -- was there some  17:47:14

CONFIDENTIAL

Page 316

1    tweaking of it?

2         A.    I -- I really don't recall.

3         Q.    Okay.

4         A.    I -- I don't -- I don't recall.

5    And I don't -- I mean, I don't recall.          17:47:29

6         Q.    Okay.  "The -- the proposed

7    language, I have a list of them, as does True

8    the Vote, and True the Vote has agreed to

9    make the names available as needed to the

10   appropriate law enforcement authorities."      17:47:42

11              Do you see that's the language

12   he's proposing?

13        A.    Yes.

14        Q.    What is the list that's being

15   referred to?                                    17:47:50

16        A.    Well, according to this

17   passage, it's the activist and nonprofit

18   groups.

19        Q.    Okay.  And did TTV have such a

20   list?                                           17:48:08

21        A.    We had NGOs, you know, that

22   were -- were locations of interest.

23        Q.    And those were the NGOs that

24   you'd gone back and forth with with the

25   D'Souzas that we talked about earlier today?    17:48:27

Page 317

```
 1            A.      Well, in -- yes.  I mean,

 2      what -- we've talked about about sort of two

 3      different tranches, and one of those being

 4      things that showed up on the -- in the legal

 5      brief and then the other being just a           17:48:42

 6      composite of tax returns for broad, you know,

 7      research and...

 8            Q.     And where did those -- the --

 9      the documents of the tax returns that were

10      pulled, how were those organizations           17:48:53

11      selected?

12            A.     I think a few of them were

13      organizations particularly in Arizona that we

14      had had reports about.

15                   Others were just known           17:49:06

16      organizations in -- in the space and just --

17      just it was really just broad -- very broad

18      research.

19            Q.     Okay.  He says:  "These groups

20      have a known ideological bent and deep          17:49:21

21      affiliations with the cultural left and the

22      Democratic party."

23                   Is that a fair description of

24      the -- the types of groups that were in the

25      research you did?                              17:49:34
```

Page 318

1          A.     Was it -- I'm sorry.  Can

2     you re-ask -- can you repeat the question?

3          Q.     Yeah.  I'm reading the last

4     sentence there after the bolded language.

5          A.     Oh, okay.  Okay.                    17:49:53

6          Q.     And it said:  "These groups

7     have a known ideological bent and deep

8     affiliations with the cultural left and the

9     Democratic party."

10               And what I'm asking you is, is    17:49:58

11    that a fair description of the group of

12    organizations that were contained in your --

13    your -- your file of tax returns?

14         A.     You know, not -- not

15    necessarily.  The groups out in -- in Arizona  17:50:20

16    particularly, I -- I don't know their

17    political bent but...

18         Q.     And do you remember correcting

19    that statement in the -- when you commented

20    on this?                                        17:50:37

21         A.     I -- I remember -- I remember

22    talking on the phone to Tom Spence and just

23    being -- again, just -- you know, there was

24    just a lot of things that were in this that

25    were not correct, and I -- I don't remember    17:50:55

CONFIDENTIAL

Page 319

1     exactly the outcome.  You know, that's all --
2     that's all I can really recall.
3            Q.    And do you remember having some
4     back-and-forth with NPR on this issue, the
5     NPR reporter you referred to earlier,        17:51:11
6     Mr. Dreis --
7            A.    Dreisbach.
8            Q.    Dreisbach.
9            A.    Yeah.
10                  Generally, there were a number   17:51:18
11    of things that he went through that we went
12    back and forth on, yes.
13           Q.    Okay.  Let me have you look at
14    what -- Exhibit 31, it's one of the first
15    things we marked this morning.               17:51:27
16                  And I'll have you look at
17    Response No. 16.
18                  And do you recall amending your
19    response after -- after we discussed this
20    issue with the court?                        17:51:59
21           A.    I mean, I -- I remember needing
22    to respond to this and working with counsel
23    on it.
24           Q.    But just in the last few weeks
25    recently?                                    17:52:31

CONFIDENTIAL

Page 320

1          A.     I mean, sure.  I'm sorry.  I

2     don't recall the -- the -- the timeline, but

3     if it's recent, then it's recent.

4          Q.     Well, it's dated September 6.

5          A.     Okay.                           17:52:41

6          Q.     Which is within the last couple

7     of weeks.

8          A.     Okay.

9          Q.     Do you remember a discussion

10    about of the issue -- don't give me the        17:52:50

11    substance -- but discussion of this issue

12    within the last few weeks?

13         A.     On -- in the midst, you know,

14    lots of other conversations, I'm sure that we

15    discussed this.                               17:53:00

16         Q.     Okay.  Oh, in the last -- so

17    what the -- what the interrogatory asks for

18    is:  "Identify the eight organizations in

19    Atlanta where you allege ballots were

20    collected by mules."                          17:53:16

21              Do you see that?

22         A.     I'm sorry.  What page are we

23    on?

24         Q.     25.  It's this --

25         A.     Oh, 25.                           17:53:20

CONFIDENTIAL

Page 321

```
 1          Q.     Yeah.  It's Interrogatory
 2     No. 16.
 3          A.     I'm sorry.  Okay.
 4          Q.     You see that?
 5          A.     Yes.                            17:53:32
 6          Q.     And -- and there's a long
 7     answer in which you conclude by talking about
 8     the book.  And you say:  "After TTV learned
 9     the names of these organizations were
10     included, it notified Salem of the issue."   17:53:45
11               But you never yourself identify
12     any organizations.
13               Can you do that?
14          A.     I'm sorry.  I don't understand.
15          Q.     This asks you to identify        17:53:57
16     the -- the eight organizations in Atlanta
17     where you allege ballots were collected by
18     mules.
19          A.     Uh-huh.
20          Q.     Can you -- can you identify       17:54:05
21     those organizations?
22          A.     Not -- you know, no, that would
23     be part of what OpSec had done and part of
24     that data set.  I don't have them committed
25     to memory.                                   17:54:19
```

CONFIDENTIAL

Page 322

```
 1         Q.     Can you identify any

 2    organizations in Atlanta where you allege

 3    ballots were collected by mules?

 4         A.     I can say that in the case of

 5    ███████████████████████ and ██████      17:54:39

 6    ████████████████ there was a pattern of

 7    devices going to addresses at minimum shared

 8    by those locations.

 9         Q.     Okay.  Can you recall any other

10    organizations where you saw such a pattern?   17:54:55

11         A.     No, there were -- there were

12    others, but I don't recall the names, no.

13         Q.     Could you find out the names by

14    consulting with any -- I'm sorry.

15                Could you find the other names   17:55:08

16    by looking at any documents?

17         A.     I -- I -- none that True the

18    Vote has.  None that I have in my custody or

19    control.

20         Q.     Okay.  And where would you go   17:55:23

21    to get that information?

22         A.     It would -- it would have to

23    be, you know, pulled back through analysts, I

24    would imagine, at this point.

25         Q.     But your testimony is that this   17:55:43
```

CONFIDENTIAL

Page 323

1    point in time there's no record -- well,

2    strike that.

3              Is it your testimony that this

4    point in time there's no record of what

5    organizations in Atlanta your geospatial        17:56:06

6    location data indicated were sources of

7    ballots?

8        A.    Not that I have, no.  Certainly

9    as we discussed today, other paries that had

10   them, but I no longer have that.              17:56:25

11       Q.    Okay.  And do you know what

12   happened to that information?

13       A.    I -- I don't know that I ever

14   had it.  I mean, it went to the FBI and then

15   followed suit, you know, through the various   17:56:34

16   jurisdictions.

17       Q.    Okay.  Is it possible OpSec

18   still has it?

19       A.    I -- you would have to ask

20   OpSec.                                         17:56:48

21       Q.    Right.  Although you could ask

22   OpSec, right, as your contractor?

23       A.    I mean, sure.  I could, I

24   guess.

25       Q.    Okay.  But you haven't?           17:56:55

CONFIDENTIAL

Page 324

1          A.    I haven't had the need.

2          Q.    Well, nobody has asked you to?

3          A.    I'm sorry?

4          Q.    Nobody has asked you to?

5          A.    Correct.                          17:57:06

6          Q.    Is there any other way you

7     could identify the organizations?

8               MR. EVANS:  Objection; asked

9          and answered.

10         A.    Still answer?  Yes?             17:57:13

11              No, there's no...

12    (BY MS. KUCK)

13         Q.    Okay.  Were you aware that

14    there was also an issue in the first printing

15    of the book concerning information relating   17:57:25

16    to ACLED?

17         A.    No, I did not know that.

18         Q.    Okay.  Did you know that ACLED

19    ultimately settled with Salem and Salem

20    issued a retraction notice?                   17:57:35

21         A.    I did not know that.  I heard

22    that yesterday for the first time.

23         Q.    When you were -- just one more

24    question about the book, and we were going

25    back and forth about the language.            17:58:06

CONFIDENTIAL

Page 325

```
 1          A.     Okay.

 2          Q.     And there was this "I have a

 3     list."  What happened to that list?

 4          A.     Are you saying when -- when

 5     Mr. D'Souza says, "I have a list."          17:58:16

 6          Q.     And then it says "that TTV

 7     shared with me"?

 8          A.     I -- I'm not sure why he wrote

 9     that.

10          Q.     Okay.  And you don't have any     17:58:22

11     list today?

12          A.     Not beyond what we've already

13     discussed.

14          Q.     Okay.  Let's look at...

15          (Discussion off the record.)          17:58:55

16     (BY MS. KUCK)

17          Q.     We're going to look at a

18     document that we marked yesterday.

19               MS. BALLIETT:  Exhibit 27.

20     (BY MS. KUCK)                                17:59:03

21          Q.     It was Exhibit 27.  You should

22     have it in your pile.

23          A.     Okay.

24          (Discussion off the record.)

25     (BY MS. KUCK)                                17:59:44
```

CONFIDENTIAL

Page 326

```
 1          Q.    So Exhibit 27, do you see that
 2     this is a copy of a letter that was forwarded
 3     to you?
 4          A.    Yes.
 5          Q.    Okay.  Do you recall getting      17:59:55
 6     this letter?
 7          A.    I recall it being forwarded.  I
 8     don't recall having received it, but it
 9     doesn't -- yeah.  I'll leave it there.
10          Q.    What do you mean by that?         18:00:03
11          A.    I -- I recall, you know, Brock
12     sending it.
13          Q.    Okay.
14          A.    I don't recall receiving it in
15     the mail but --                              18:00:10
16          Q.    I see.
17          A.    Sorry.
18          Q.    You -- but you did receive it
19     from your lawyers by e-mail?
20          A.    At -- at minimum.  I mean, I      18:00:17
21     may have received --
22          Q.    Yeah.
23          A.    -- these other addresses.  I
24     just don't recall that.
25          Q.    Okay.  Okay.  Understood.         18:00:22
```

CONFIDENTIAL

Page 327

1              And did you take any action in
2      response to this letter?
3          A.    Well, I -- yeah.  I consulted
4      attorneys about what -- what to do at this
5      point.                                  18:00:33
6          Q.    Okay.  Anything else?
7          A.    I -- they mainly just -- I
8      mean, reached out to attorneys like what do
9      we -- what is happening and what should we
10     do.                                     18:00:52
11         Q.    Okay.  Do you -- look -- if you
12     look at the last page, 8874, it says:
13     "Litigation hold notice and document
14     preservation request."
15              Do you see that?                18:01:03
16         A.    Yes.
17         Q.    After you received this, did
18     you put in place any measures to preserve
19     documents?
20         A.    We -- we didn't delete anything  18:01:11
21     so, you know, that was it.  I mean,
22     everything was in place so...
23         Q.    And you're not aware of any
24     autodeletes that you have in your systems?
25         A.    No.                            18:01:27

CONFIDENTIAL

Page 328

```
 1          Q.     No?

 2          A.     No.

 3          Q.     Are you aware that at some

 4   point in time OAN was going to -- was going

 5   to show the film?                          18:01:39

 6          A.     Yes, I am.

 7          Q.     And that was around this point

 8   in time?  Do you recall that, this time

 9   frame?

10          A.     I do recall that when I spoke  18:01:46

11   with OAN, they knew about this.  I do recall

12   that.

13          Q.     Okay.  And what -- tell me

14   about your conversations with OAN.

15          A.     They wanted to show the film --  18:01:56

16          Q.     Right.

17          A.     -- which, again, was news to

18   me.

19          Q.     Okay.

20          A.     It had been licensed to them  18:02:01

21   and I was called, as I understand, because

22   she couldn't reach any of the other parties.

23   And I didn't know anything about it.  I

24   didn't know that -- whatever that agreement

25   had happened, had happened.                  18:02:14
```

1              She asked me about this.  She

2    asked me if I could help identify who this

3    was.  And as I generally recall, I -- I -- I

4    don't -- I don't know exactly, but I tried to

5    do what I could.  And that may have been just   18:02:33

6    referring her to Georgia stuff.  I don't -- I

7    really don't recall, but I tried to do what I

8    could.

9              And then as I -- I believe they

10   went on to -- to edit it and air it --         18:02:44

11        Q.    Yes.

12        A.    -- is my general understanding.

13        Q.    Yes, my understanding is they

14   aired it, but they took out the footage of

15   Mr. Andrews.                                    18:02:55

16        A.    Yeah, that's my -- I didn't

17   watch it, but that's my understanding.

18        Q.    Okay.  And that -- Mr. D'Souza

19   could have done the same thing with the film,

20   right?  The -- that clip could be pulled out?  18:03:14

21        A.    I -- you know, I -- I'd hate

22   to -- I don't want to speculate.  I have --

23        Q.    Okay.

24        A.    I have no idea how extensive

25   that would be or if that would have been       18:03:26

CONFIDENTIAL

Page 330

1    possible.  I just -- I don't know.

2         Q.     Somehow OAN was able to do it?

3         A.     Yeah.

4            (Discussion off the record.)

5    (BY MS. KUCK)                          18:04:04

6         Q.     At some point in -- in time,

7    you became aware that this lawsuit had been

8    filed, right?

9         A.     Yes.  This, yes.

10        Q.     Okay.  And I believe that       18:04:12

11   Mr. --

12            MS. KUCK:  Thanks.

13   (BY MS. KUCK)

14        Q.     I believe that Mr. Phillips

15   alluded to it, but there was an issue in    18:04:22

16   another court case you were doing right

17   around the same time, right?

18        A.     Correct.

19        Q.     And I think he said you were --

20   you were in jail when you found about it or  18:04:29

21   you were jailed around this time?

22        A.     No.  That -- that happened

23   later this month, but there were -- this was

24   a very difficult month.

25        Q.     Okay.  Let me mark as           18:04:39

CONFIDENTIAL

Page 331

```
 1       Plaintiff's Deposition Exhibit 72 a document
 2       bearing control Nos. TTV_008975 through
 3       TTV_009079.
 4           (Marked Engelbrecht Exhibit No. 72.)
 5            (Discussion off the record.)         18:05:11
 6       (BY MS. KUCK)
 7           Q.    Okay.  And then this is --
 8       looks like in e-mails that you went back
 9       and -- that you -- an e-mail exchange you had
10       with Mr. Henderson at Salem Media?          18:05:33
11           A.    Yes.
12           Q.    And it looks to me like you
13       sent him the draft intervenor documents we
14       talked about this morning?
15           A.    Yes.                             18:05:47
16           Q.    Why did you do that?
17           A.    Let me actually take a second
18       to read this.
19           Q.    Yeah.  Go ahead.  Go ahead.
20           A.    That would have been because    18:06:13
21       they were -- he was asking for us to spin
22       things back up and -- and give more
23       information on -- on the geotracking.
24                And so my hope was because it
25       was a very difficult time, my hope was that  18:06:35
```

CONFIDENTIAL

Page 332

1    providing that brief, the lawyer -- you know,

2    a lawyer's brief, a lawyer reading it that he

3    maybe could derive some value from that.

4         Q.    And when you said -- when you

5    say "spin things back up again," what do you      18:06:46

6    mean?

7         A.    We had moved on from that

8    project and, you know, to really -- to do the

9    type of thing at least that I was

10   interpreting he would want would have meant     18:06:55

11   us -- you know, me recommissioning OpSec,

12   OpSec recommissioning their team and starting

13   that process back again.

14        Q.    Okay.  And you say to him in

15   the third paragraph there:  "It's important     18:07:16

16   to note that Mr. Andrews, unnamed and

17   unrecognizable, was shown as one of the many

18   Georgians who voted multiple ballots without

19   properly signing an assister in the section

20   of the movie that discussed drop box issue in   18:07:28

21   one isolated drop box in Gwinnett County,

22   Georgia.  We did not track Mr. Andrews going

23   to ten drop boxes.  He is not among the 242

24   individual devices identified that did go to

25   ten or more drop boxes in Metro Atlanta         18:07:43

CONFIDENTIAL

Page 333

1    Georgia."

2                    Do you see that?

3        A.    Yes.

4        Q.    And why were you -- why were

5    you making that distinction to him?        18:07:50

6        A.    I -- I think it was just an

7    attempt to try to keep everything straight.

8        Q.    Okay.  And he was asking you

9    about -- about tracking specific individuals

10   in the top ten mules.                       18:08:22

11                    Did you ever provide him with a

12   document of that nature?

13       A.    No.  And -- and when you read

14   the first paragraph, it -- he -- he just had

15   a fundamental misunderstanding of the process  18:08:32

16   so...

17       Q.    Okay.  And so his -- his

18   impression seems to be that Mr. Andrews was,

19   in fact, identified through the geospatial

20   tracking, just from reading his e-mail?      18:08:46

21       A.    Yeah.  I mean, let me actually

22   just --

23       Q.    Yeah.  Why don't you read it.

24       A.    Yeah.

25       Q.    That seems -- I want to just    18:08:54

CONFIDENTIAL

Page 334

1    check and see if that was how you interpreted

2    it and that's why you explained the way you

3    did.

4         A.    Okay.  Can you ask your

5    question again?  I apologize.                    18:09:14

6         Q.    Yeah.  My question was:  And so

7    his impression seems to be that Mr. Andrews

8    was, in fact, identified through the

9    geospatial tracking, just from reading his

10   e-mail?                                          18:09:27

11        A.    You know, I -- that would be an

12   inference that I -- I mean, I was just trying

13   to go point by point.  Again, it was a very

14   difficult time.  I just tried to give him,

15   you know, more information so that they would  18:09:44

16   try to better understand what we did.

17        Q.    Okay.  And everything you say

18   in your e-mail is accurate, correct?

19        A.    I would say so, yes.

20        Q.    Okay.  Okay.  I think we're       18:10:48

21   done with that.

22              Let me -- I think that I only

23   have a couple of more exhibits.

24              Let me mark as Plaintiff's

25   Deposition Exhibit 73 a document bearing      18:11:26

CONFIDENTIAL

Page 335

1    Control No. DDR-00064295 through 296.

2        (Marked Engelbrecht Exhibit No. 73.)

3    (BY MS. KUCK)

4        Q.    And this seems to be a --

5    another chat that was produced to us.        18:11:51

6            Do you see that?

7        A.    Yes.

8        Q.    And it says "me."  I'm not -- I

9    can't tell from this whether this was

10   Mr. D'Souza or Ms. D'Souza or who it was.      18:12:02

11           But what he says is:  "BTW, I

12   told Bettina last night I'm happy to modify

13   the license agreement so the 10 percent share

14   goes to you guys.  It can either go 5 to

15   Catherine and 5 to Gregg or 10 to True the     18:12:19

16   Vote.  Completely up to you.  I absolutely

17   think you guys should get some personal

18   benefit out of this, so let me know if you

19   want to make this modification."

20           Is this what you were referring     18:12:30

21   to earlier when Mr. -- you said Mr. D'Souza

22   suggested directing the money somewhere else?

23       A.    I don't recall this.

24       Q.    Uh-huh.

25       A.    And I -- but broadly speaking,      18:12:39

CONFIDENTIAL

Page 336

1       it was his suggestion.

2              Q.     Okay.  And you agreed to it?

3              A.     I -- yes.

4              Q.     And you gave him the name of

5       the Shadow Beach LLC to send it to?          18:13:02

6              A.     Yes.

7              Q.     Okay.  And so TTV didn't

8       receive any -- didn't receive any of the

9       revenue from the film?

10             A.     No.  A portion was given back    18:13:19

11      to -- to True the Vote.

12             Q.     By?

13             A.     Through Shadow Beach.

14             Q.     How much?

15             A.     I'm not exactly sure.  I think    18:13:25

16      that it was a ████████████████████ at

17      minimum, but I just -- I'm not really sure.

18             Q.     Okay.  So let's mark --

19                 (Discussion off the record.)

20      (BY MS. KUCK)                                 18:13:57

21             Q.     -- as Plaintiff's Deposition

22      Exhibit No. 74.

23          (Marked Engelbrecht Exhibit No. 74.)

24      (BY MS. KUCK)

25             Q.     A document that appears to be    18:14:15

CONFIDENTIAL

Page 337

1    TTV's tax filings for 2022.

2          A.    Uh-huh.

3          Q.    And do you prepare these

4    filings?

5          A.    No.                              18:14:28

6          Q.    Who does?

7          A.    We have a CPA.

8          Q.    Okay.  And do you provide the

9    information to the CPA?

10         A.    Our bookkeeper does, but then I    18:14:33

11   follow up on it.

12         Q.    Okay.  And who's your

13   bookkeeper?

14         A.    Her name?

15         Q.    Yeah.                            18:14:41

16         A.    Jean [phonetic].  I'm

17   mortified, but I can't think of her last name

18   right now, but I -- you know, I certainly

19   could get it if that's something you needed.

20         Q.    She's -- she's a contractor      18:14:55

21   also?

22         A.    Yes.

23         Q.    Okay.  So if you -- and do

24   you -- are you the one who signs the tax

25   returns?                                     18:15:04

CONFIDENTIAL

Page 338

```
 1            A.     Well, I give permission for
 2      them to be electronically --
 3            Q.     Of course.
 4            A.     -- signed.
 5            Q.     Correct.                      18:15:08
 6                   But you are the -- you are the
 7      one at TTV who --
 8            A.     Correct.
 9            Q.     -- signs them electronically --
10            A.     Correct.                      18:15:15
11            Q.     -- or in person?
12                   Okay.  Where -- I'm looking on
13      the first page under revenue, and there's a
14      line on contribution and grants, but I don't
15      see any other revenue.                     18:15:25
16                   Where would the ██████
17      ████████████████████ that was sent back to TTV
18      show up?
19            A.     It wouldn't -- it likely
20      wouldn't even have shown up in this year.  It  18:15:37
21      would have probably been in 2023.
22            Q.     And you haven't filed the 2023?
23            A.     Not yet.
24            Q.     And why -- why wouldn't it have
25      been?  The payment was made in 2022, right?  18:15:46
```

CONFIDENTIAL

Page 339

```
 1      To Shadow Beach?
 2           A.    Yes, just 2022 wasn't -- was an
 3      absolute nightmare, and it just didn't
 4      happen.
 5           Q.    Okay.  But your recollection is    18:15:57
 6      that it was -- of the -- of the ███   in
 7      revenue, ██████████████████ was given back to
 8      TTV?
 9           A.    That's my general recollection,
10      yes.                                          18:16:14
11           Q.    And the rest of it stayed in
12      the LLC for you and Mr. Phillips?
13           A.    Well, in the LLC, yes.
14           Q.    Yeah.  But you -- you -- is
15      there anybody who was a partner in the LLC    18:16:22
16      other than you and Mr. Phillips?
17           A.    No.
18           Q.    Okay.  Also, just if you can
19      flip to -- these aren't numbered.  But
20      section -- it's one, two -- fourth page.     18:16:36
21           A.    Of the return?
22           Q.    Of the return.
23           A.    One, two, three.
24           Q.    And it's -- at the top it says
25      "Section B independent contractors."         18:16:46
```

CONFIDENTIAL

                                              Page 340

1           A.    I'm -- I'm sorry.  I -- let's

2      see.

3           Q.    It looks like this.  It's --

4      it's the actual physical page.

5           A.    Oh, okay.  Hang on a second.    18:17:00

6      One, two, three...

7           Q.    Oh, I'm sorry.  Keep going.

8      Mine -- mine is double-sided, so it's

9      probably Page 8.

10           It says "Independent" -- it        18:17:16

11      looks like this.  It says "Independent

12      contractors" at the top?

13                MR. EVANS:  I don't think it's

14           Page 8 either.

15                MS. KUCK:  Okay.              18:17:22

16      (BY MS. KUCK)

17           Q.    Section --

18                MR. EVANS:  It may be 9.  Is it

19           this one?

20                MS. KUCK:  Yeah.              18:17:26

21           A.    Yes.

22      (BY MS. KUCK)

23           Q.    And it -- it says "Independent

24      contractors."

25                Do you see that?              18:17:30

CONFIDENTIAL

Page 341

```
 1           A.      Yes.

 2           Q.      It lists OpSec?

 3           A.      Yes.

 4           Q.      And it says:  "Compensation for

 5      data analysis, ██████████████          18:17:35

 6           A.      Uh-huh.

 7           Q.      Was that all for the geospatial

 8      project, or was it for other things as well?

 9           A.      Oh, no.  There's a ton of stuff

10      that OpSec did for us.                    18:17:47

11           Q.      Okay.  Did it receive anything

12      beyond the ███████ that was in the agreement

13      we looked at this morning?

14           A.      I'm not sure.

15           Q.      For the -- for the -- well,      18:18:02

16      this morning we looked at the --

17           A.      Right.

18           Q.      -- project proposal.  Right.

19                   And that was -- there was a

20      payment that was to be made to OpSec as soon   18:18:11

21      as the agreement was signed?

22           A.      Uh-huh.

23           Q.      In connection with that

24      project --

25           A.      Uh-huh.                         18:18:16
```

CONFIDENTIAL

Page 342

```
 1          Q.     -- did OpSec receive any
 2     additional compensation?
 3          A.     I -- I couldn't -- I don't know
 4     on that particular project.  There were so
 5     many -- again, there were so many things      18:18:25
 6     happening, and there was so much blending
 7     together.  And it was mostly all data related
 8     and analyst related.  I just -- I don't know.
 9          Q.     Okay.  Other than the -- the
10     funds that were deposited into Shadow Beach    18:18:42
11     LLC, did you receive anything else in con- --
12     any other compensation in connection with the
13     film?
14          A.     It got reimbursed for expenses.
15     They gave us ▉▉▉▉▉▉▉                           18:18:55
16          Q.     Okay.  Did that cover all your
17     expenses?
18          A.     No.
19          Q.     Do you recall what your
20     expenses were?                                 18:19:13
21          A.     Like the total?
22          Q.     Yeah.
23          A.     No, I just...
24          Q.     Okay.  This morning when we
25     started, we talked about your work concerning  18:19:25
```

CONFIDENTIAL

Page 343

1        drop boxes and your -- your concern about

2        certain problems in 2020.

3                    Do you remember that?

4            A.     Yes.

5            Q.     There's something recently        18:19:36

6        that -- that I believe TTV undercooked --

7        undertook called the sheriff project or is --

8        is TTV working with -- does it have a project

9        working with local sheriffs?

10           A.     We have -- we have reached out      18:19:49

11       to sheriffs to try to visit with them about

12       getting surveillance on drop boxes, yes.

13           Q.     Surveillance by whom?

14           A.     Ideally by the sheriffs.

15           Q.     Okay.  And what would they be       18:20:08

16       surveilling the drop boxes for?

17           A.     Just monitoring the security of

18       the drop boxes, which should have been a

19       standard but wasn't.  And so this cycle, it

20       was, you know, more preventative than          18:20:26

21       anything else in nature.

22                    And, I mean, frankly, I've been

23       very pleased to talk to sheriffs that have --

24       they've already taken those steps and are

25       live streaming the footage.  And, I mean,      18:20:37

CONFIDENTIAL

Page 344

1    that's fantastic so...

2        Q.    And when you say "live

3    streaming the footage," they're live

4    streaming the footage of people going to drop

5    boxes?                                    18:20:49

6        A.    Yes.

7        Q.    And for what purpose?

8        A.    Just transparency.

9        Q.    And so what -- what would

10   happen if somebody walked up to a drop box    18:20:56

11   and put in more than one ballot?

12       A.    I mean, it depends on the

13   state.

14             In theory, if it's a state, you

15   know, that bans ballot harvesting, they would   18:21:06

16   see that and be able to try to identify

17   who -- you know, who that was.

18             I mean, you take next --

19   necessary precautions in Georgia, you should

20   have been able to match up assister         18:21:16

21   signatures and take those out if they weren't

22   there.  You know, I mean, it's a -- I'm not a

23   big fan of drop boxes because in my belief

24   they're dysfunctional.  This is a gap.

25       Q.    But without looking at the --    18:21:27

CONFIDENTIAL

Page 345

1    following the surveillance video and

2    following up and doing an investigation,

3    there would be no way to know whether

4    somebody who was putting in multiple ballots

5    was doing it legally or not?                18:21:41

6            MR. EVANS:  Objection; calls

7        for speculation.

8    (BY MS. KUCK)

9        Q.    I'm talking -- let's talk about

10   Georgia.                                    18:21:45

11       A.    Uh-huh.

12            Well, like in the case of

13   Gwinnett --

14       Q.    Right.

15       A.    -- for example, we saw many       18:21:49

16   people putting in more than one ballot.

17       Q.    Right.

18       A.    And according to Georgia law,

19   you can deposit your ballot.  And then there

20   are a select group of individuals that you  18:21:58

21   can also submit a ballot for, but you must

22   sign the back of the security envelope, and

23   so that is one way.

24            It -- is it sufficient?  No, I

25   would say not but...                        18:22:09

```
 1              Q.      And so what do you -- what do
 2        you advocate that people should be doing in
 3        terms of the drop boxes?
 4              A.      I don't advocate drop boxes.  I
 5        just -- no drop boxes.                         18:22:19
 6              Q.      Okay.  You'd get rid of them
 7        altogether?
 8              A.      Yes.  Well, let me put a caveat
 9        there.  If there were a proper setup with
10        surveillance and people really paying         18:22:29
11        attention and doing -- having the same -- a
12        drop box is -- is considered under law as a
13        polling place.  And at a polling place you
14        have all manner of checks and balances.  In
15        drop boxes you don't.                          18:22:42
16                      If there was some equivalency
17        that assured that the -- the process, I mean,
18        even just the chain of custody in Georgia,
19        there was just -- it was just lawlessness.  I
20        mean, there just was not -- there were no      18:22:53
21        documents.  There were not sufficient
22        documents.  You couldn't piece it back
23        together.
24                      If that was all in order, and
25        if you had sufficient ID on the ballots and,  18:22:59
```

CONFIDENTIAL

Page 347

1    I mean, it was all, you know, done according

2    to law and in a secure way, then I wouldn't

3    necessarily have a problem.  We're just --

4    we're just not anywhere close to that right

5    now.                                          18:23:14

6         Q.    And so for that reason to the

7    extent we're going to have them, we need to

8    surveil them?

9         A.    Well, I mean, it's what CISA

10   recommends, so it's not like it's, you know,   18:23:22

11   a pie-in-the-sky option.  It's recommended

12   that they be surveilled.

13        Q.    When you say "what CISA

14   recommends," what do you mean?

15        A.    They recommend that you have       18:23:28

16   24-hour surveillance on all drop boxes.

17        Q.    Meaning a camera?

18        A.    Yes, correct.  Yes.  Sorry.

19   Yes.

20        Q.    Not a physical person?            18:23:37

21        A.    No, not a physical person.

22        Q.    And they don't recommend that

23   it be live streamed?

24        A.    They don't make that

25   distinction.                                  18:23:44

CONFIDENTIAL

Page 348

1          Q.    Okay.

2               MS. KUCK:  If you'd give me a

3          minute, I think I'm just about done.

4               THE WITNESS:  Sure.

5               THE VIDEOGRAPHER:  Off the          18:23:53

6          record at 6:25.

7          (Break from 6:25 p.m. to 6:35 p.m.)

8               THE VIDEOGRAPHER:  Back on the

9          record at 6:35.

10               E X A M I N A T I O N          18:33:56

11     BY MS. HYLAND:

12          Q.    Okay.  I think at this point

13     the plaintiff's questions have concluded, and

14     this is Amanda Hyland.  I am counsel for

15     Dinesh D'Souza and D'Souza Media, and I have     18:34:06

16     just a couple of quick questions for you.

17               We've talked about 70 videos

18     that linked geospatial data with the actual

19     drop box videos.  And I want to make sure

20     that I have this right.                  18:34:22

21               Did someone on your team or on

22     Gregg's team send those videos to someone on

23     Mr. D'Souza's team?

24          A.    The 70?

25          Q.    Yes.                          18:34:35

CONFIDENTIAL

Page 349

```
 1          A.     I don't believe they were sent.
 2     I believe they were shared across a platform.
 3          Q.     Okay.  Okay.  So there was some
 4     kind of drop box or some --
 5          A.     It was a -- right, and it was    18:34:42
 6     just open to them.  They could grab what they
 7     wanted.
 8          Q.     Okay.  And do you know who
 9     between OpSec and TTV would have uploaded
10     those videos into the file sharing program?   18:34:52
11          A.     It would have been either OpSec
12     or some -- that side, not True the Vote.
13          Q.     Okay.  And do you know who on
14     Mr. D'Souza's team had access to it or would
15     have received them?                           18:35:11
16          A.     I -- I do not know that.
17          Q.     Okay.  And then we've also
18     talked about additional videos that made it
19     into the film.  And by "videos" I mean drop
20     box videos.                                    18:35:21
21              And I think you've said that
22     there were some that were not part of that
23     70, correct?
24          A.     Correct.
25          Q.     And the footage of Mr. Andrews   18:35:28
```

CONFIDENTIAL

Page 350

1      was one of those additional videos that was

2      not in the original 70, correct?

3          A.      Correct.

4          Q.      And do you know how those

5      videos were obtained?  Like, where did they     18:35:43

6      come from?

7          A.      My understanding is they all

8      came from open records requests.

9          Q.      And do you know who actually

10     initiated the open records request?           18:35:56

11         A.      True the Vote would have.  We

12     always did.  I mean, yeah.

13         Q.      And do you remember actually

14     making that public records request?

15         A.      I mean, not specifically.  But     18:36:05

16     it was an ongoing -- we had heard that the

17     data was available and went back to try to

18     get it.

19         Q.      And do you know roughly the

20     time frame in which that request would have     18:36:17

21     been made?

22         A.      I -- I don't -- later.  I mean,

23     that -- I can tell you that much, just later

24     than, you know, the -- sort of the bigger

25     project.                                        18:36:29

CONFIDENTIAL

Page 351

1          Q.      And do you have any memory of

2     roughly when the videos would have been

3     received?

4          A.      I don't.

5          Q.      Do you have any memory of          18:36:36

6     roughly how many hours of footage was

7     included in those?

8          A.      Roughly there -- there -- we

9     would have -- we would have asked for the

10    entire early election period.  I don't know     18:36:48

11    if we got all of that.  I know we got a

12    substantial bit of it, but I -- I just don't

13    know how much.  You would think you would get

14    all, but that just wasn't the case often.

15         Q.      And do you remember what format    18:37:03

16    the videos were in?

17         A.      Oh, God, no, I don't.

18         Q.      Do you remember --

19         A.      Every -- every -- I mean, I

20    didn't deal with that directly at all.  We      18:37:09

21    just got hard drives.  But as I understand

22    it, every video -- every hard drive required

23    different readers, and it was a -- it was a

24    process.

25         Q.      And those hard drives, were         18:37:18

1    those turned over to Mr. Phillips?

2        A.    Yes.

3        Q.    Okay.  And is it your

4    understanding that he turned them over to his

5    contractors at that point?                    18:37:28

6        A.    I've never really thought about

7    it.  Yes, I guess because he wouldn't have

8    had the capacity, yes.

9        Q.    Okay.  And what is your

10   understanding around how the actual video     18:37:45

11   clips that made it into the 2000 Mules film

12   that were not part of the 70 --

13       A.    Uh-huh.

14       Q.    -- I wish I could come up with

15   a name for it, but those --                    18:37:59

16       A.    Right.

17       Q.    -- non-70.

18       A.    Right.

19       Q.    What is your understanding of

20   how those particular clips were actually       18:38:04

21   identified?

22       A.    My general understanding was at

23   that point there were just a -- a request for

24   any -- any kind of videos because they wanted

25   to do that fly effect, and my presumption      18:38:19

Page 353

1    would be that they would pull people that

2    looked to be also running afoul of the law,

3    small m mule, not, you know, casting more

4    than one ballot in -- in the -- in the county

5    where we knew there were no assister          18:38:39

6    signatures.

7         Q.    And when you say "they would

8    pull the video," who is "they"?

9         A.    OpSec and that group.

10        Q.    Okay.  And do you have any         18:38:48

11   understanding of how those videos were

12   transmitted to Mr. D'Souza's team?

13        A.    I -- I know that there was an

14   instance where it was transferred via FedEx.

15   I don't -- I don't know the specifics.  I     18:39:05

16   just remember it was like very late, they

17   were trying to get the fly effect.  You know,

18   that was it.

19        Q.    And do you have any knowledge

20   of any disclaimers or any kind of concerns    18:39:18

21   that would have been expressed to anyone on

22   Mr. D'Souza's team about these videos not

23   being linked to geospatial data?

24        A.    I mean, I don't -- I don't know

25   how you could have had it confused because    18:39:47

CONFIDENTIAL

Page 354

1    there was such a long period of time where

2    there was one type of discussion.  And then

3    there was an, Oh, we just got more video.

4    Oh, gosh, we need video.

5              And that was a -- a second type    18:39:59

6    of discussion.

7         Q.    Okay.  Is it possible that any

8    of the videos that were provided -- based on

9    your knowledge, right, I'm not asking you to

10   speculate, but are you -- are you aware of     18:40:20

11   any possibility that any video footage was

12   sent to Mr. D'Souza's team by David Cross?

13        A.    It's -- it is -- it's not --

14   excuse me -- not to the best of my knowledge.

15        Q.    Okay.  And you -- you mentioned    18:40:37

16   that Heather Mullins knew David Cross?

17        A.    Yes.

18        Q.    What's your understanding of

19   their relationship?

20        A.    I -- friends and -- and fellow    18:40:51

21   researchers, that's -- that's about all I

22   know.

23        Q.    And does Heather live in

24   Georgia?

25        A.    Heather lives in New Hampshire,    18:41:04

CONFIDENTIAL

Page 355

```
1     but she has family in Georgia.

2          Q.    Okay.  Do you have any reason

3     to believe that Mr. Cross may have been

4     involved with providing the footage of

5     Mr. Andrews to parties or entities other than    18:41:29

6     the Secretary of State?  We know -- you know

7     we've seen --

8          A.    Right.

9          Q.    -- that he provided it to the

10    Secretary of State.                              18:41:40

11              Do you have any reason to

12    believe he may have provided it to other

13    entities such as Charlie Kirk or, you know,

14    any of those?

15         A.    Yeah, I -- I mean, as I          18:41:52

16    generally recall, I knew that it was being

17    posted on -- some things were being posted on

18    social media.  I don't know past that.  I

19    mean, it's possible, but I don't -- I don't

20    know.  I didn't -- I wasn't involved in that.   18:42:03

21         Q.    And you've never asked

22    Mr. Cross if he was the source of any of

23    that?

24         A.    The source of what was posted

25    on -- on social media?                          18:42:11
```

CONFIDENTIAL

Page 356

1        Q.      Right.

2        A.      No.  I mean, I do know that he

3    received video.  I do know that.  And I do

4    know that he and Heather spent a lot of time

5    looking at it.  I do know that but...          18:42:21

6        Q.      Okay.

7              MS. HYLAND:  I don't have

8          anything further.

9              THE WITNESS:  Okay.

10             MS. KUCK:  I have nothing.          18:42:32

11         Jake?

12             MR. EVANS:  Nothing from me.

13             MS. KUCK:  All right.  You're

14         free to go.

15             THE VIDEOGRAPHER:  Off the          18:42:38

16         record at 6:43.

17      (The deposition concluded at 6:43 p.m.)

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 357

```
 1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
 2                   ATLANTA DIVISION
 3     MARK ANDREWS,            |
                                |
 4       Plaintiff,             |
                                |   Case No.
 5     V.                       |   1:22-cv-04259-SDG
                                |
 6     DINESH D'SOUZA, et       |
       al.,                     |
 7                              |
         Defendants.            |
 8
       _____
 9     THE STATE OF _____:
       COUNTY  OF  _____:
10
11          I, MENDY A. SCHNEIDER, a Certified
12     Shorthand Reporter in and for the State of
13     Texas, do hereby certify that the facts as
14     stated by me in the caption hereto are true;
15     that the above and foregoing answers of the
16     witness, CATHERINE ENGELBRECHT, to the
17     interrogatories as indicated were made before
18     me by the said witness after being first duly
19     sworn to testify the truth, and same were
20     reduced to typewriting under my direction;
21     that the above and foregoing deposition as
22     set forth in typewriting is a full, true, and
23     correct transcript of the proceedings had at
24     the time of taking of said deposition.
25          I further certify that I am not, in any
```

CONFIDENTIAL

Page 358

1    capacity, a regular employee of the party in

2    whose behalf this deposition is taken, nor in

3    the regular employ of this attorney; and I

4    certify that I am not interested in the

5    cause, nor of kin or counsel to either of the

6    parties.

7          That the amount of time used by

8    each party at the deposition is as follows:

9        MS. KUCK - 06:33:27

10       MS. HYLAND - 00:08:43

11

12

          GIVEN UNDER MY HAND AND SEAL OF OFFICE,

13    on this, the 26th of September, 2024.

14

15

          MENDY A. SCHNEIDER, CSR, RPR

16          Certification No.: 7761

           Expiration Date: 1-31-2025

17

18

19

20

21

22

23

24

25

Page 359

1    Jake Evans, Esq.

2    Jake.Evans@gtlaw.com

3                    September 26, 2024

4    RE:    Andrews, Mark v. D'souza, Dinesh   Et Al

5         9/18/2024, Catherine Engelbrecht (#6909377)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-ny@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                  Yours,

23                  Veritext Legal Solutions

24

25

```
                                            Page 360

1    Andrews, Mark v. D'souza, Dinesh   Et Al

2    Catherine Engelbrecht (#6909377)

3                   E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Catherine Engelbrecht                       Date

25
```

Page 361

1    Andrews, Mark v. D'souza, Dinesh   Et Al

2    Catherine Engelbrecht (#6909377)

3               ACKNOWLEDGEMENT OF DEPONENT

4       I, Catherine Engelbrecht, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____   _____

12   Catherine Engelbrecht                         Date

13   *If notary is required

14               SUBSCRIBED AND SWORN TO BEFORE ME THIS

15               _____ DAY OF _____, 20___.

16

17

18               _____

19               NOTARY PUBLIC

20

21

22

23

24

25

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.