# EXHIBIT 21

CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION
3
4      MARK ANDREWS,
5           Plaintiff,
                              CIVIL ACTION FILE
6           vs.
                              NO. 1:22-cv-04259-SDG
7      DINESH D'SOUZA, et al.,
8           Defendants.
9
10
11
12
13               **CONFIDENTIAL**
14
15            VIDEO DEPOSITION OF
16            NATHAN FRANKOWSKI
17            November 5, 2024
18               9:35 a.m.
19        TAKEN BY REMOTE VIDEOCONFERENCE
20     Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138
21
22
23
24
25

CONFIDENTIAL

Page 2

1                    INDEX TO EXHIBITS

2    EXHIBIT                DESCRIPTION                  PAGE

3    Exhibit 124    E-mails, 1/9/22, TPNF-0002733        39

4    Exhibit 125    E-mails, 11/4/21, DDR-00010110       52

5    Exhibit 126    E-mails, 4/7/22, DDR-00022531        101

6    Exhibit 127    E-mails, 4/30/22, DDR-00023414       109

7    Exhibit 128    E-mails, 5/25/22, TPNF-0001061       111

8    Exhibit 129    E-mails, 2/4/22, TPNF-0002511        112

9    Exhibit 130    E-mails, 1/16/22, TPNF-0004204       114

10   Exhibit 131    E-mails, 11/28/22,                   119

11                  TPNF-0000994

12   Exhibit 132    E-mails, 5/11/22, TPNF-0002670       122

13   Exhibit 133    E-mail, 12/12/22, TPNF-0001022       133

14   Exhibit 134    E-mails, 4/10/22, TPNF-0002702       135

15   Exhibit 135    E-mails, 4/12/22, DDR-00052690       141

16

17                  INDEX TO EXAMINATION                 PAGE

18   By Mr. Boisvert                               4, 147

19   By Mr. George                                    139

20   By Mr. Vining                                    144

21

22

23

24

25

CONFIDENTIAL

```
                                              Page 3

 1      APPEARANCES OF COUNSEL:

 2      For the Plaintiff:

 3              SCOTT BOISVERT, ESQ.

 4              SONIA QIN, ESQ.

 5              Skadden Arps Slate Meagher & Flom LLP

 6              One Manhattan West

 7              New York, New York 10001-8602

 8

 9      For the Defendants True the Vote, Gregg Phillips,

10      And Catherine Engelbrecht:

11              PHILIP GEORGE, ESQ.

12              Greenberg Traurig LLP

13              3333 Piedmont Road NE

14              Atlanta, Georgia 30305

15

16      For the Defendants Dinesh D'Souza and D'Souza

17      Media:

18              AUSTIN C. VINING, ESQ.

19              Buchalter

20              790 Stratford Drive

21              Alpharetta, Georgia 30004

22

23      Also Present:

24              Jonathan Miller, The Videographer

25              Joshua Bostic, Concierge Tech
```

CONFIDENTIAL

Page 4

1              THE VIDEOGRAPHER:  We are on the record on

2       November 5th, 2024, at approximately 9:35 a.m.

3       Eastern Time.  This will be the videotaped

4       deposition of Nathan Frankowski.

5              Would counsel please identify themselves

6       and who they represent for the record.

7              MR. BOISVERT:  My name is Scott Boisvert,

8       counsel for the plaintiff.

9              MR. VINING:  My name is Austin Vining from

10      the firm Buchalter, and I represent Dinesh D'Souza,

11      D'Souza Media, LLC, and the deponent here today.

12             MR. GEORGE:  My name is Philip George from

13      the law firm Greenberg Traurig, representing True

14      the Vote, Inc., Catherine Engelbrecht, and Gregg

15      Phillips.

16             MS. QIN:  And good morning.  My name is

17      Sonia Qin from the firm Skadden Arps representing

18      plaintiff.

19             THE VIDEOGRAPHER:  Would the court

20      reporter please swear in the witness.

21                    NATHAN FRANKOWSKI,

22      having been first duly sworn, was examined and

23      testified as follows:

24                    EXAMINATION

25      BY MR. BOISVERT:

CONFIDENTIAL

Page 5

1        Q     Thank you very much, Mr. Frankowski, for

2     joining us here today for this deposition.  As I

3     said, my name is Scott Boisvert, and I'm counsel for

4     plaintiff in this matter, and I'm going to be doing

5     the questioning here today.

6              So before we dive in, can you please just

7     state your full name again for the record.

8        A     Nathan Frankowski.

9        Q     And what is your current address?

10     ████████████████████████████████████████████████████

11       Q     And is that where you're located for

12     today's remote deposition?

13       A     Yes.

14       Q     Have you been deposed before?

15       A     No, first time.

16       Q     Have you ever testified in a nondeposition

17     setting?

18       A     No.

19       Q     Do you understand that during this

20     deposition, you are under oath, and that your

21     testimony today carries the same weight as testimony

22     before a judge or a jury?

23       A     I do.

24       Q     Is there any reason why you think you may

25     not be able to give accurate testimony today?

CONFIDENTIAL

Page 6

1          A     No.

2          Q     Is your memory perhaps less sharp than it

3     might be usually?

4          A     No.

5          Q     Do you have any physical or mental

6     conditions that would prevent you from giving your

7     best testimony today?

8          A     No.

9          Q     Are you under the influence of any drugs

10     or other substances that would prevent you from

11     giving your best testimony here today?

12          A     No.

13          Q     Thank you very much.

14               Let's set a few ground rules, then, for

15     how to proceed for the rest of the day.  Everything

16     we say today is being recorded and being transcribed

17     by a court reporter, and you're aware of that, after

18     our intro here, correct?

19          A     Yes.

20          Q     For the court reporter's benefit, please

21     make sure to answer all of my questions verbally.

22     For example, respond with a yes or a no as opposed

23     to a head shake or a nod.  That way, it can all be

24     taken into the record.

25               Is that okay?

CONFIDENTIAL

Page 7

1          A    Yes.

2          Q    And then also, for the court reporter's

3     benefit, as is typically the case on Zoom, let's try

4     not to talk over each other as much as possible.  I

5     will wait for you to finish an answer before having

6     any follow-up questions, and then I would ask for

7     you to wait for me to finish a question before

8     providing your answer.

9               Does that make sense?

10         A    Yes.

11         Q    If at any point in time one of my

12    questions is unclear, please let me know, and I will

13    try to rephrase.  If you don't ask me to clarify my

14    question, I will assume that you understood the

15    question correctly.

16              Is that okay?

17         A    Yes.

18         Q    So we'll plan to take a break every hour

19    or so as we go through today, but if you need a

20    break at any other time, please let me know, and as

21    long as we don't have a question pending at that

22    moment, then we'll be able to take a break at that

23    time.

24              Does that work for you?

25         A    Yes.

CONFIDENTIAL

Page 8

1          Q     Throughout the deposition, your counsel
2     may object to certain of my questions.  Unless they
3     specifically instruct you not to answer the
4     question, after they finish their objection, please
5     still continue to answer the question.
6                Does that make sense?
7          A     Yes.
8          Q     And for the record's benefit, as we did in
9     the prior depositions in this matter for plaintiff,
10    we will be numbering the exhibits sequentially, and
11    we will be picking up where we left off at the last
12    deposition of Mr. Schooley.  So the first exhibit
13    that will be marked as we go through today will
14    begin with Plaintiff's Exhibit 123.
15                So, Mr. Frankowski, did you speak to
16    anyone about the testimony that you expect to give
17    at this deposition?
18         A     I spoke with Austin and Amanda.
19         Q     Did you speak with anyone else?
20         A     About this deposition, no.
21         Q     Have you spoken with anyone else about
22    this court proceeding?
23         A     I've spoken with Dinesh and Bruce about
24    the case in general.
25         Q     Do you remember more specifically what you

 1    discussed about with them?
 2         A    It was all very generic stuff.  Not really
 3    anything specific.
 4         Q    When did you have these discussions with
 5    them?
 6         A    I think when it was first announced, so
 7    maybe October, late October in 2022, and then I
 8    can't really put a date on any other times.  If
 9    someone is getting sued, you know, you know it's
10    going to come up in conversation every now and then,
11    so...
12         Q    Other than what you may have heard from
13    them, have you kept tabs on the progress in this
14    case?
15         A    Not really.
16         Q    Did you do anything else to prepare for
17    today's deposition, other than speak with your
18    attorneys?
19         A    No.
20         Q    Did you look at any documents?
21         A    Outside of my attorneys?
22         Q    Did you review any documents before
23    today's deposition?
24         A    Yes.
25         Q    Who selected those documents?

CONFIDENTIAL

Page 10

1          A    My attorneys, and then I chose to look,
2     kind of refresh my memory, so I went and looked at
3     the video files.
4          Q    Which video files are you referring to?
5          A    The video files I received while I was
6     editing 2000 Mules.  They were sent from Gregg.
7          Q    Okay.  And are there any other documents
8     that you reviewed of your own accord to prepare for
9     today's deposition?
10         A    No.
11         Q    And these video files, did you only review
12    ones that you may have received from Gregg; did
13    you -- or did you view other files, like the final
14    2000 Mules film itself or anything else along those
15    lines?
16         A    Just the mule videos, is what we call
17    them.
18         Q    Do you still have access to all of the
19    mule videos that you received when you were working
20    on this video?
21         A    I believe so.  It's tough to tell.  Files
22    move around and stuff gets deleted, but I think I
23    have -- I know I have all the ones that are in the
24    movie, but I can't tell if I got ones that weren't
25    used that got deleted somehow, but I think I do have

CONFIDENTIAL

Page 11

1    all of them.

2        Q    You say that files move around or get

3    deleted.  In what circumstances would they be

4    deleted from your retention folders that you have

5    them in?

6        A    So I work on numerous projects at a time,

7    and it's kind of an economy of space, and so once

8    I'm finished with a project, if I don't foresee any

9    use of these video files, I get rid of them.  I

10   typically don't get rid of source files, which are

11   the files that are used to make the movie, but if I

12   make renders from the movie itself that can be

13   duplicated, I'll get rid of those, just because they

14   take up a lot of space.

15            Video takes up quite a bit of space, and

16   so I move them around.  Plus, I lost a hard drive

17   last year, so stuff gets deleted that way.  I'm

18   moving -- because of the large space, I'm moving

19   footage from one drive to the next, and then kind of

20   just putting it in storage.  So it never really sits

21   with me the whole time; it's based on what project

22   I'm working on at the time.

23       Q    Have you ever received an instruction to

24   retain documents in relation to this matter?

25       A    Retain -- you mean not delete anything?

CONFIDENTIAL

Page 12

1           Q     Yes.

2           A     No.

3           Q     Has anyone spoken to you about the

4     potential role that your documents may or may not

5     play in this matter or any concerns about you using

6     them for your own personal uses outside of the

7     company?

8           A     When we -- go ahead.

9           Q     I'll rephrase.

10          Did anyone speak to you about the

11    potential relationship of these documents to this

12    ongoing legal matter?

13          A     So you're asking about the documents once

14    the case became public?

15          Q     That's correct.

16          A     Okay.  I think it's kind of known, I

17    guess, that if there's an ongoing case, that you

18    don't delete anything, and that there would be a

19    record if there is, so other than just general

20    knowledge, I don't believe I was instructed, but I

21    think it's just kind of common knowledge that you

22    don't, you know, get rid of anything, and there

23    would be a record if you did, so it kind of, you

24    know, could implicate you in some way.

25          Q     And those files that you received, are

Page 13

1    those files that you own independently, or are they
2    the property of D'Souza Media?
3        A    I don't know how ownership law would work
4    with that, but it's -- it's always been the property
5    of D'Souza Media, and I'm working for them, so
6    it's -- they're not sending me the files.  They're
7    sending, you know, Dinesh's movie company the files,
8    and I'm just the one who's editing, kind of a
9    janitor of these files.
10       Q    Outside of in relation to this matter
11   specifically, does D'Souza Media have a retention
12   policy or other instructions for how these materials
13   should be saved and kept over time?
14       A    No.
15       Q    Have you ever spoken with anyone at
16   D'Souza Media about your -- any obligations that you
17   might have in that regard?
18       A    Recently, when my hard drive went down,
19   which was kind of a big deal, it was due to a
20   hurricane here, and the power blipped and it killed
21   one of my hard drives, and so after that, we decided
22   to come up with a policy to always have a backup on
23   site.  In that particular instance, we did have
24   backups, but they were in California, and so it took
25   a while to get back online, so -- but now we have a

CONFIDENTIAL

Page 14

1    policy where I will have duplicates on site.  But
2    that had nothing to do with this project.
3         Q    On that hard drive that was lost, to the
4    best of your recollection, did that still contain
5    any documents that might relate to the 2000 Mules
6    video or book?
7         A    I don't think so.  And if it did, it was
8    probably on Dropbox, which is backed up for two
9    years anyways, but I'd have the mules drive, and
10   that wasn't destroyed.
11        Q    And do you still have access to the, you
12   said, two years' backlog of retained files on
13   Dropbox?
14        A    Yes, you can -- even if you delete a file
15   on Dropbox, if you type it in on the website, it
16   will show you that file.
17        Q    Do you keep backups of files anywhere
18   other than that California location that you
19   referenced?
20        A    No.
21        Q    And where exactly are those backup files
22   retained in California?
23        A    Are you talking about in this
24   particular -- for 2000 Mules, or just in general?
25        Q    In general, where do you keep backups of

CONFIDENTIAL

Page 15

1    documents that you have through your work with

2    D'Souza Media?

3        A    With D'Souza?  They would be with Bruce,

4    typically, or with a -- a camera assistant would

5    carry a copy for a couple months, until we got back

6    to our location, and there's kind of an e-mail sent

7    out saying everything is good, and then they can

8    remove their files.  Again, these are very large

9    files, so it's kind of a pain to keep them around if

10   you don't need to.

11       Q    So these arrangements, then, would be

12   through Bruce specifically, and by "Bruce," you mean

13   Bruce Schooley, correct?

14       A    Bruce Schooley, yes.

15       Q    And so these retention arrangements for --

16   you're on a project-by-project basis and arranged

17   through him?

18       A    Correct.  I will state, on 2000 Mules, the

19   mules videos specifically, those were never copied

20   and sent to Bruce.  Those were only sent to me.  And

21   the only backups, if Bruce had them, would be of the

22   interviews that we filmed.

23       Q    Do you still have backups of those files?

24       A    Of the mule videos?  Yes.

25       Q    Has anyone asked you to collect documents

1    in connection with this matter?

2        A    Outside of my attorneys?  Other than

3    attorneys?

4        Q    Including -- including your attorneys,

5    have you collected documents?

6        A    Yes.

7        Q    Without telling me what you spoke about

8    with them, but you have collected documents?

9        A    Yes.

10        Q    What steps did you undertake to collect

11    those documents?

12        A    For the video files, I went to the mules

13    hard drive, plugged it in to my computer, and then

14    uploaded those to Dropbox for them to view.  And

15    then for the e-mails, I searched all the e-mails

16    that had to do with 2000 Mules with Bruce, with

17    Dinesh, with Debbie, with everyone in the case, and

18    then sent those to the lawyers, and also with text

19    messages.

20        Q    Did you search your own documents, or did

21    they image your hard drive, for example, or take

22    other steps directly?

23        A    I searched my own.

24        Q    Did they provide you with specific search

25    terms to search, or did you conduct this based on

CONFIDENTIAL

Page 17

1    your own understanding of your documents,

2    independent of anything else?

3              MR. VINING:  Objection; calls for

4    privileged information.

5    BY MR. BOISVERT:

6         Q    So then you referenced two -- three

7    different locations, then -- actually, four

8    locations that you had documents that related to the

9    2000 Mules matter, being the hard drive with the

10   source videos, Dropbox, your e-mails, and your text

11   messages.  Are there any other locations that you

12   might have documents or backups of documents that

13   relate to the 2000 Mules video?

14        A    No.

15        Q    And your devices that you use for your

16   work with D'Souza Media, are those your personal

17   devices?

18        A    I have a personal phone that would be used

19   to communicate, and then I have a work computer that

20   I use to edit the films.

21        Q    So you don't have a separate work phone?

22        A    No.

23        Q    And that work computer, that was provided

24   by D'Souza Media?

25        A    Yes.

CONFIDENTIAL

Page 18

1      Q    Do they have access to that computer, or

2   is that something that you control on a day-to-day

3   basis?

4      A    They don't have access to it.  And I do

5   have -- you know, I do personal e-mails on it, I do

6   other projects on it, so its use isn't just for

7   D'Souza Media; its use is for my business, at the

8   expense of D'Souza Media, I guess.

9      Q    And then other than your personal phone,

10   which you already referenced, do you have any other

11   personal devices, a computer, a tablet, something

12   else that you might have done work relating to the

13   2000 Mules video on?

14      A    No.

15      Q    And other than Dropbox, are there any

16   other cloud locations that you used to work on this

17   project?

18      A    No, we're exclusive to Dropbox.

19      Q    Do you have any paper documents that you

20   retained from the video?

21      A    No, we tend not to use paper documents.

22      Q    And then just a couple more questions

23   about your preparation for today.  Did you review

24   the deposition testimony from anyone else that has

25   been deposed so far in this matter?

CONFIDENTIAL

Page 19

1          A    I did look over Dinesh's and Bruce's.

2          Q    So you live in Florida currently, correct?

3          A    Yes.

4          Q    How long have you been there?

5          A    I moved here at the end of 2021.

6     December.

7          Q    So where were you living prior to that?

8          A    Los Angeles.  Just outside LA.  Place

9     called Thousand Oaks.

10         Q    And how long had you been in LA?

11         A    20 years.

12         Q    So from 2020 and 2021, and up until you

13    moved to Florida, you weren't located in Texas,

14    correct?

15         A    No, I was in Texas for a couple movies,

16    but I don't think I got residency there, if that's

17    what you're asking.  But whenever we film a movie,

18    sometimes it's six months, I have to go to a certain

19    state, and we put up shop, so -- but, yeah, I have

20    been in Texas, but I wouldn't say I lived there.

21         Q    Okay.  Does D'Souza Media have a central

22    office that you would work from, or is everyone

23    spread out around the US?

24         A    Everyone's spread out.  Remote.

25         Q    So most of your, if not all, of your

CONFIDENTIAL

Page 20

```
 1    communications, with the exception of these
 2    instances where you are together for a shoot or
 3    other things like that, your communications at work
 4    would have been done online, via phone, e-mail,
 5    things of that sort, correct?
 6         A    Yes.
 7         Q    So let's just take a step back, then, a
 8    little bit.  And can you just share with me your
 9    educational background?
10         A    I went to film school in Canada.  That's
11    where I'm originally from.
12         Q    What school did you go to?
13         A    University of Regina.
14         Q    And what was your major?
15         A    Film.
16         Q    Did you take any courses outside of film
17    while you were in school?
18         A    You have to take, you know, other, like --
19    you have to take English and science and all those
20    kind of classes.  It's not just film classes, but
21    yeah.
22         Q    Did you take any classes in political
23    science?
24         A    I don't think so.  Not that I recall.
25    Wasn't very good at it if I did.
```

CONFIDENTIAL

Page 21

1          Q     Anything related to data visualization,
2     statistics, anything like that?
3          A     No.
4          Q     Did you take any courses in geography
5     or -- I'll leave it at that.  Did you take any
6     courses in geography?
7          A     No.
8          Q     How about in computer science?
9          A     Yeah, this was in 1999, so computer
10    science class was a little different than it would
11    be now, but, yeah, I guess it was a computer science
12    class.
13         Q     When you say it was different, what -- how
14    was it different, other than the obvious, like, just
15    for a general sense --
16         A     Just technology and how it's changed.
17         Q     Yeah, but was that just like an
18    introduction class, like for --
19         A     Yes.  Yes, it was nothing of big interest
20    for me.
21         Q     And so 1999, is that when you started
22    university, or graduated?
23         A     I started in '98, and then I only did two
24    years of film school, and so 2000 is when I got out.
25         Q     And after those two years, did you earn a

CONFIDENTIAL

Page 22

1    degree?

2         A    No.

3         Q    Have you gone back to school since then?

4         A    No.

5         Q    Why did you leave university?

6         A    I wanted to actually make movies, and I

7    felt like what they were teaching me at film school

8    was more a theory, and I'm very hands on and I need

9    to do things to learn, and so I thought the best way

10   to educate myself would be to get a job editing

11   videos and, you know, doing it rather than learning

12   about it, and so that was a decision I made, and I

13   think it was -- turned out pretty good for me.

14        Q    So then after you left school, what did

15   you go and do next?

16        A    I joined a nonprofit and ran their video

17   department, and this nonprofit, they were focused on

18   world relief stuff, so I traveled around to numerous

19   countries.  I think I've been to 30-some countries.

20   These were not glorious countries.  These are

21   third-world countries, like Nepal, Sierra Leone,

22   places like that, and I would do orphanage videos to

23   try to raise money for orphanages, and that's really

24   where I learned to cut my -- cut film and learned to

25   create a video.

CONFIDENTIAL

Page 23

1          Q     And how long did you work for that

2     nonprofit?

3          A     Four years.

4          Q     And where did you go to after that?

5          A     Then I was independent contractor living

6     in Los Angeles.

7          Q     When did you start working with D'Souza

8     Media?

9          A     I think it was -- the first film I helped

10    them out with was 2014, maybe.  America was the name

11    of it.

12         Q     And how did you come to work with them;

13    did you reach out to them or did they contact you?

14         A     The co-director of that film had worked

15    with me on a previous film, and he wanted me to help

16    him with the recreations, and so he introduced me to

17    Dinesh and Bruce at that time.

18         Q     Were you familiar with Dinesh or Bruce

19    prior to that?

20         A     No.  I had heard about his 2016 Obama's

21    America film, but not really that political at the

22    time, and so just, you know, read it in the trades,

23    basically.

24         Q     And while you were working on that first

25    project, were you a -- an employee of D'Souza Media;

CONFIDENTIAL

Page 24

1    were you an outside contractor; what was your

2    precise relationship?

3         A    Yeah, I've never been an employee; I've

4    always been kind of a consultant or a hired

5    independent contractor.

6         Q    Do you do projects, then, that don't

7    involve D'Souza Media?

8         A    Yes.

9         Q    And you still do outside projects

10   currently?

11        A    Yes.

12        Q    Do you accept these relationships as an

13   individual, or do you have your own company that you

14   establish the contracted relationships under?

15        A    I have an S corp. that he hires -- I hire

16   myself out through.

17        Q    And what's the name of that entity?

18        A    Frankowski Films.

19        Q    And when did -- when was that entity

20   formed?

21        A    When I moved from California, I had a

22   change from Frankie Films to a Florida-based one,

23   which became Frankowski Films, so that was probably

24   in 2022 sometime.  I think maybe in May is when I

25   changed over.

CONFIDENTIAL

Page 25

1          Q     So I'm going -- I'm sorry?

2                On that first project that you worked on,

3     what was your role on that matter?

4          A     Kind of a cinematographer, a visual

5     consultant, I'd say, and then editor.

6          Q     Is that the same role that you have today?

7          A     Yes.

8          Q     Have your job responsibilities changed

9     over time?

10         A     Not really.

11         Q     Do you sign project-based contracts, under

12    your LLC, with D'Souza Media, or do you have a

13    standing relationship with them?

14         A     I think it's based on the project, but --

15    in terms of the deal that we make per project, but

16    I'm not sure.  I'd have to check with my accountant

17    and with Bruce how that all works out.

18         Q     And so on those projects -- on those

19    contracts, do they list your job responsibilities

20    and expectations, generally?

21         A     Maybe when we first signed on.  I think we

22    have a good relationship now that we don't have to

23    really hammer out and get lawyers involved, and save

24    some money, and so I think there was a point where

25    that stuff was hammered out, but that would probably

CONFIDENTIAL

Page 26

1    be after the second film, maybe.  And I don't

2    remember what those things were, but it's basically

3    what I said:  I help them take their ideas and make

4    them cinematic, basically, is how I would explain

5    it.

6        Q    And has your compensation on a per-project

7    level changed over time?

8        A    It's dipped a bit and then kind of leveled

9    off, I'd say.

10       Q    What type of films have you worked on with

11   Dinesh and D'Souza Media?

12       A    What type of films?  All political in

13   nature.

14       Q    Are these films all documentaries?

15       A    Yes.

16       Q    Do you work on any other types of films,

17   other than documentaries?

18       A    Yes, I work on feature films that are

19   narrative in nature.

20       Q    Do you do that in your individual

21   capacity, then, and not in connection with your work

22   with Dinesh?

23       A    Correct.

24       Q    And how do you define the term

25   "documentary"?  What is a documentary to you?

CONFIDENTIAL

Page 27

1        A    A documentary would be based on a true

2    story.

3        Q    So the only requirement for a film to be a

4    documentary is it's based on a true story?

5        A    No, I guess not, because there's obviously

6    films that I've worked on that are films based on a

7    true story.  I would say that it's -- you're

8    documenting real people with maybe reenactments,

9    you're interviewing real people about their

10   experiences, and usually there's a narrator or

11   someone carrying the film with it, which in these

12   instances is Dinesh.

13       Q    Do you have any input on what type of

14   projects or films are made by D'Souza Media and you

15   in collaboration?

16       A    No.

17       Q    At what point in the process of making a

18   film do you typically get involved?

19       A    Depends.  Sometimes they are pretty far

20   along with the idea, and then they come to me, and

21   it's -- in the case with Mules, it was pretty far

22   along.  They had everything kind of laid out, and

23   they had the -- the whole team was already there, of

24   who we were going to talk to, the Salem hosts,

25   Catherine and Gregg, and so that one was kind of

CONFIDENTIAL

Page 28

1    further along than others, I'd say.

2        Q    So let's talk a little bit about, then,

3    that film specifically.  You say it was farther

4    along.  At what point did you first get asked to

5    become involved with the Mules film?

6        A    I think it was in January.  It was after I

7    moved here, and -- yeah, so I would say early

8    January, maybe 3rd or 4th.

9        Q    And when they presented the film to you,

10   how did they describe it?

11       A    Kind of like a thriller, I guess, in the

12   sense that it was a -- they had some kind of --

13   "thriller" is my term.  I'm always trying to look

14   for a cinematic way into films, but I guess how I

15   viewed it -- I can't really say how they sold it,

16   but what got me interested into it was it felt kind

17   of like a crime thriller, and that they had evidence

18   of people doing nefarious acts around voting.

19       Q    And were you familiar with the claims

20   about the 2020 election that were in the public

21   discourse around that time?

22       A    Yeah, I think anyone with an Internet

23   connection was familiar with what people were

24   claiming happened during the 2020 election.

25       Q    And what was your own perception of that?

CONFIDENTIAL

Page 29

1    Do you think there was fraud in the 2020 election?

2         A     I don't think there was enough fraud to

3    overturn the election, but I feel like there was

4    certain things that were stacked against Trump.

5         Q     And is that an opinion that has been

6    consistent since you first heard about this matter,

7    or has it changed over time?

8         A     It's been consistent from before and

9    after.

10        Q     So when you say there were some things

11   that were stacked against Trump, what type of things

12   are you referring to?

13        A     Obviously, the media, I felt like, didn't

14   like Trump and would push their agenda to try and do

15   their best to portray him in a certain light.  There

16   was the Hunter laptop story that was suppressed.  I

17   do feel like the fact that everyone just got mailed

18   ballots is an issue.  I think that -- I lived in

19   California, and you would just get a ballot mailed

20   to you without even requesting one.  I think that

21   that's an issue.  I feel like, with the drop boxes,

22   I never really thought about that, but because of

23   2000 Mules, I felt like if you are going to cheat or

24   if there is a way to cheat, I feel like drop boxes

25   are the best way to do that.

CONFIDENTIAL

Page 30

```
1           Q    So you said when they introduced you to
2      this potential opportunity, that you were excited
3      about it.  Had you ever turned down an offer to work
4      with D'Souza Media previously?
5           A    I don't think so.
6           Q    And were you working on any other films at
7      the time?
8           A    No, this was during COVID, and so the
9      whole industry kind of shut down.
10          Q    And what was your compensation for this
11     film?
12          A    It was, I think, lower than the typical
13     amount, just because -- I think it was because of
14     COVID, but I think I was either 10,000 or 15,000 a
15     month for the duration of the film.
16          Q    Were you compensated in any other ways?
17          A    I had a percentage, like a 3 percent of
18     profit share, I think, but I can't -- I don't -- I
19     have to ask my accountant what that came out to be.
20          Q    And other than the profit sharing and then
21     the regular payments, was there any other form of
22     compensation that you received?
23          A    No.
24          Q    And did you receive a screen credit on the
25     film?
```

CONFIDENTIAL

Page 31

1          A    No.

2          Q    Why not?

3          A    I don't take screen credits unless I am

4     the director of the film, and that's just an early

5     advice I got that if I'm -- that's how I want to

6     perceive myself as a film director.  And so I take

7     other jobs of editing; I'm one of the directors.

8               Actually, now when I edit, I don't have to

9     shoot as well, which is the cinematography side.

10    And so you don't want to kind of cluster your

11    credits, you want to look kind of laser focused, and

12    so it's just kind of a way to sell yourself, I

13    guess.

14         Q    And so who was the director for this film?

15         A    I think it was Bruce, Dinesh, and Debbie.

16         Q    And so you said your role was most

17    accurately described as cinematographer, correct?

18         A    And editor.  Editor most of the time,

19    because with documentaries, a lot of it's made in

20    the edit room because you're only shooting for -- I

21    think maybe four days we shot, and then we edit for

22    four months, so the majority of the time is editing.

23         Q    And so when you say it's made in the

24    editing room, can you describe a little bit more

25    what you mean by that?

CONFIDENTIAL

Page 32

1        A     There's a lot of -- you'd have -- there's
2    a lot more available to you to steer a story,
3    compared to a narrative film.
4             With a narrative film, you have a script,
5    you have shot footage that fits inside that script,
6    and you're kind of put on a path.  With
7    documentaries, you can really open up different
8    avenues, add footage.  You can add stock footage
9    from news clips.  You can easily pivot, I'd say, and
10   go and interview someone else if something interests
11   you during the edit, so there's a lot more -- it's a
12   lot more open, I'd say, than a narrative film.
13       Q     And for the cinematography part of your
14   role, can you describe a little bit more about what
15   specific responsibilities fall under that?
16       A     You're talking about for the 2000 Mules
17   film?
18       Q     Yes.
19       A     So there was some reenactments they wanted
20   to do, which was showing how -- what Gregg's
21   geotracking might look like.  And so while he's
22   talking about that, to kind of give the audience an
23   idea of what he's got going on, they wanted to shoot
24   kind of analysts, I guess, and so I would be helping
25   set that up, visually kind of communicating what

Page 33

1    analysts look like, getting the graphics ready, the

2    lighting, and getting the set.

3         Q    So then for that scene in particular that

4    you're referencing, were there any graphics that

5    existed prior to you joining the film?

6         A    There was graphics that Gregg and

7    Catherine had put together for some kind of

8    promotional video, I think.

9         Q    And why didn't you use those graphics?

10        A    They weren't up to the standard of a

11   feature film that would be potentially in theaters.

12        Q    Did any aspect of the 2000 Mules film have

13   a prewritten script for it?

14        A    There was, like, maybe an outline, but

15   because you're dealing with interviews, you can't

16   really script what someone's going to say, right?

17             But there might have been -- typically in

18   a documentary, you'd have -- you know, we go and

19   interview this guy, and then after that, we go here,

20   we go there.  I don't know if there was one for

21   Mules.

22             I typically don't work off of a script

23   with Dinesh and Bruce, so I can't -- I don't think

24   there was a thing that you'd call a script.

25        Q    And so for the editing portion of your

Page 34

1    job, who did you report to for making decisions

2    about how to edit the film, or were you guiding that

3    process yourself?

4        A    No, it always goes through Bruce and

5    Dinesh, and so it's constantly uploading cuts and

6    scenes to them and see what they think.

7        Q    How frequently did you interact with them

8    during the course of making this movie?

9        A    Bruce, kind of daily, I would say.

10   Dinesh, maybe weekly.

11       Q    How much leeway did you have to propose

12   edits, changes to the film, versus it was more of a

13   top-down approach from them?

14       A    I put my best foot forward, and I try to

15   sell my ideas that way, and if they feel like it's

16   not what they like, then I just got to change to

17   what they want.  They have the final say, basically.

18       Q    And in the course of making the 2000 Mules

19   film, were there any changes that you would have

20   made that they didn't agree with?

21       A    I'm sure if I thought on it for a while, I

22   could come up with certain things, but nothing

23   offhand.

24       Q    And do you work on Dinesh's podcast at

25   all?

CONFIDENTIAL

Page 35

```
1              A    No.
2              Q    And outside of making films, do you do any
3     other work with Dinesh or with Bruce?
4              A    No.
5              Q    And so all of your work with Bruce
6     Schooley as well is in the context of working with
7     D'Souza Media?
8              A    No, we've done other films together, and
9     they're outside of the scope of D'Souza Media --
10    D'Souza Media.
11             Q    Did you make those films before you came
12    to work with Dinesh?
13             A    No.
14             Q    Or was that relationship through your time
15    working with Dinesh and Bruce?
16             A    Correct, it was through the relationship
17    that I established with Bruce.
18             Q    And you mentioned that when you joined the
19    film, that they already had the base narrative
20    already set.  So does that include, then, True the
21    Vote being involved?
22             A    Oh, yeah.
23             Q    Had you heard of True the Vote previously?
24             A    I think so, yes, because there was another
25    film that we interviewed Catherine in, yeah.  So,
```

CONFIDENTIAL

Page 36

1      yeah, I had heard of them.

2          Q    Did you know anyone that worked for TTV,

3      other than Catherine?

4          A    No.

5          Q    And during the course of making the Mules

6      film, did you interact with anyone else at TTV,

7      other than Catherine?

8          A    No.  And I guess -- I don't know if Gregg

9      works for them or not, but it was Catherine and

10     Gregg.

11         Q    So you mentioned that you had met

12     Catherine with a prior movie.  Do you recall which

13     one it was?

14         A    Trump Card maybe.  I think it was called

15     Trump Card.

16         Q    And had you maintained contact with her

17     after that, or was the next time that you interacted

18     with her in the context of the Mules film?

19         A    Yeah, it was -- I never contacted her

20     after the film or before Mules.  I never had private

21     conversations with her.

22         Q    Had you met Mr. Phillips previously?

23         A    No.

24         Q    And are you familiar with OpSec?

25         A    No.

CONFIDENTIAL

Page 37

1        Q    Are you aware that Mr. Phillips had an

2    entity named OpSec that is the entity that did the

3    underlying geotracking research in connection with

4    the film?

5        A    I think that does ring a bell now, so

6    during filming, yeah, I guess I would -- he probably

7    brought it up, so I would know, but I didn't

8    remember it.

9        Q    Is -- other than Mr. Phillips, is there

10    anyone else that you interacted with in connection

11    with the geotracking research?

12        A    No.

13        Q    Have you heard of Red Metrics before?

14        A    No.

15        Q    How about Azzedine Rahlouni?

16        A    No.

17        Q    Ben Matthews?

18        A    No.

19        Q    Or Tim Gerwing?

20        A    No.

21        Q    Was it your understanding that

22    Mr. Phillips himself conducted all the research that

23    underlied the Mules film?

24             MR. GEORGE:  Objection to form.

25    BY MR. BOISVERT:

CONFIDENTIAL

1          Q    You can answer.

2          A    I think it was.  I mean, I knew he used --

3     based on what he said in the interview, in 2000

4     Mules, that he got the information from people that

5     track apps, so I don't -- I knew that he was working

6     with someone, but I did figure the research came

7     from him, yeah.

8          Q    When you first joined the project, how did

9     you learn about the evidence that you referenced

10    them having regarding there being issues with the

11    2020 election?

12         A    Can you rephrase or -- I don't understand

13    what you're asking.

14         Q    When you first joined the project, did

15    they provide you with the -- a summary of the

16    evidence that they claimed showed issues with the

17    2020 election?

18         A    That came through Dinesh and Debbie

19    explained to me what they had.

20         Q    Did TTV or Ms. Engelbrecht or Mr. Phillips

21    discuss with you their work in that matter?

22         A    No.

23         Q    And then you had mentioned that

24    Mr. Phillips had sent you the videos of the mules;

25    is that correct?

CONFIDENTIAL

Page 39

1          A     Yes.

2          Q     Was there anyone else that you interacted

3     with about those videos outside of those at D'Souza

4     Media?

5          A     No.

6                MR. BOISVERT:  So I would like to pull up

7     an exhibit.  This is TPNF-0002733, and this is a new

8     exhibit, so it will be the first one that we're

9     marking today, so it will be Exhibit 123.  Actually,

10    124.  Sorry.

11               (Exhibit Number 124 was marked for

12    identification.)

13    BY MR. BOISVERT:

14         Q     Do you recognize this document?

15         A     I don't recognize it, but I see what it

16    is.

17         Q     And is it a e-mail correspondence that you

18    had with Mr. Phillips and then another person named

19    John David Phillips?

20         A     I guess.

21         Q     Do you recall this e-mail?

22         A     No.  Is that his son?

23         Q     Do you know who John David Phillips is?

24         A     Well, I was trying to refresh my memory

25    how I got the footage, and I still -- I'm not sure.

CONFIDENTIAL

Page 40

1      I know the first batch came through Dropbox, but I

2      know that Gregg was very concerned about the footage

3      and didn't trust mail or -- there was just some kind

4      of -- he was very protective of it, and I thought

5      there was -- that he suggested that his son drive it

6      to me.  I don't know if that happened.  I feel like

7      I would have remembered it, but maybe it did.  But

8      this is the second batch, so I don't know.  Or this

9      is the first batch because it's January 9th.

10          Q    And you mentioned that Mr. Phillips was

11     concerned.  What specifically was he concerned

12     about?

13          A    That this footage would get in the wrong

14     hands maybe; that it felt like what he had was very

15     special.  And also what Dinesh wanted to do, too,

16     was to -- you know, he's basing his film on this

17     footage, so if it got leaked beforehand, it kind of

18     undercuts the movie, so the footage of the mules was

19     very important.

20          Q    So then did you ever interact with JD

21     Phillips directly?

22          A    I don't remember.

23          Q    And you said that Gregg had referenced his

24     son possibly driving down, but that's not, in fact,

25     what happened?

CONFIDENTIAL

Page 41

```
 1        A    Yes, I don't know if it happened.  I think
 2   I would have remembered meeting someone and getting
 3   a hard drive handed to me, but I don't know how I
 4   got the second batch, so that's a possibility.
 5        Q    And are you aware of any role that John
 6   David Phillips might have had with respect to these
 7   videos at TTV, OpSec or otherwise?
 8        A    No.
 9             MR. BOISVERT:  We can take the document
10   down.
11             MR. VINING:  Can we go off the record
12   really quick for a second?
13             MR. BOISVERT:  Yeah.
14             THE VIDEOGRAPHER:  The time is 10:26.  We
15   are off the record.
16             (Recess 10:26-10:27 a.m.)
17             THE VIDEOGRAPHER:  The time is 10:27.  We
18   are back on the record.
19   BY MR. BOISVERT:
20        Q    So after joining the team for the film,
21   did you familiarize yourself with TTV's work?
22        A    No.
23        Q    Did you familiarize yourself with anything
24   that Mr. Phillips or OpSec was doing?
25        A    No.
```

CONFIDENTIAL

Page 42

```
 1        Q     Are you aware of Mr. Phillips's background
 2   or his credentials?
 3        A     Just what he mentioned during the
 4   interview.
 5        Q     And what was it that he mentioned?
 6        A     That he's got a background in voter
 7   integrity.
 8        Q     And what do you understand a background in
 9   voter integrity to be?
10        A     Somehow he studies elections and fraud --
11   potential fraud that happens around it.
12        Q     Did you understand either Mr. Phillips or
13   Ms. Engelbrecht to have a background in geotracking?
14        A     I assumed Gregg did, based on what he
15   communicated to us, and he did seem like he knew
16   quite a bit about it.
17        Q     And how did he seem like he knew quite a
18   bit about it; what specifically did he tell you or
19   did he display?
20        A     This is just what was in the interview,
21   and he's -- he mentioned how you get the geotracking
22   from apps and data, stuff that I wasn't aware of, so
23   he knew more than me.  And if you're able to
24   geotrack 2,000 people, it seems like you're somewhat
25   of an expert in that field.
```

CONFIDENTIAL

Page 43

1        Q    So was it your understanding that

2    Mr. Phillips is the one that geotracked the 2,000

3    mules?

4        A    Yes, but I feel like he -- I mean, he made

5    it obvious that he was using other suppliers, you

6    know, to get him the data.

7        Q    But then he was analyzing the data

8    himself?

9        A    I felt like he was analyzing the data, and

10   that's how we recreated the scenes of him with his

11   analyst.

12       Q    Did you ever see any of the data that

13   Mr. Phillips said he had?

14       A    I don't think so, and I don't even know

15   what it would look like.

16       Q    Do you know if anyone at D'Souza Media

17   ever reviewed the data that Mr. Phillips said he

18   had?

19       A    I was under the understanding that it was

20   kind of like looking at the matrix, and so unless

21   you're Neo, you can't really understand what the

22   data -- it's just going to be a bunch of data

23   points.  So maybe, but how would you know what

24   you're looking at?

25       Q    And so, then, other than Mr. Phillips,

CONFIDENTIAL

Page 44

1     you're not aware of D'Souza Media or anyone at

2     D'Souza Media contacting a third-party geotracking

3     expert to review the data or anyone else to look at

4     the data; it all came from Mr. Phillips?

5          A     I'm not aware if anyone did that.

6          Q     Outside of the geotracking data, was there

7     any other evidence of the supposed 2,000 mules that

8     was provided by Mr. Phillips?

9          A     The video footage, is that what you

10    consider evidence?  Is that what you mean?

11         Q     Did Mr. -- did Mr. Phillips present the

12    video -- video files as being evidence of their

13    geotracking data?

14         A     He presented that these individuals had

15    been geotracked.

16         Q     When you say that he represented that the

17    individuals had been geotracked, the individuals

18    appearing in the videos had been geotracked?

19         A     Correct.

20         Q     Were you -- were you -- was it your

21    understanding that they were able to tie specific

22    videos to specific geotracking data?

23         A     Yes.  In fact, I believe they say that in

24    the film.  Someone asks, So you have this guy at

25    other drop boxes?  And they said yes.

CONFIDENTIAL

Page 45

1        Q    So in relation to this matter, you

2    understand that Mr. Andrews, the plaintiff in this

3    case, was one of the individuals that had a video

4    depicted in the film; is that correct?

5        A    Yes.

6        Q    And so it was your understanding that the

7    evidence provided by Mr. Phillips and/or OpSec and

8    TTV was able to tie Mr. Andrews to geotracking data

9    that showed he went to multiple drop boxes?

10       A    Yes --

11            MR. GEORGE:   Objection to form.

12    BY MR. BOISVERT:

13       Q    You can answer.

14       A    Yes, there's no other reason why we would

15    get the footage.  That's what the whole point was.

16       Q    Did you have footage for all of the

17    individuals that had been geotracked?

18       A    Every individual that Gregg had

19    geotracked, we had footage of them all?  I don't

20    think so.  There was thousands.

21       Q    And how many videos did you receive?

22       A    I think the first batch was 30 to 50, and

23    then the second batch was 20 maybe.

24       Q    And then when you joined the film, was

25    Salem already involved?

CONFIDENTIAL

Page 46

1        A      Yes.

2        Q      And had you worked with them previously?

3        A      No.

4        Q      Have you worked with them since?

5        A      I don't think so, no.

6        Q      Did you interact with anyone at Salem

7    Media directly?

8        A      Not when it had to do with the film.  I

9    mean, when we were shooting, I think I had breakfast

10   with one of the Salem people, but I forget his name.

11       Q      And how would you describe their role in

12   connection with making the film?

13       A      They were financiers and were going to

14   help with distribution.  That's my understanding.

15       Q      For the substantive aspects of the film,

16   did TTV review the film substantively and provide

17   comments?

18       A      I believe so, yeah.

19       Q      So the final film, then, reflects changes

20   that were made at TTV's request?

21       A      I can't be sure that we did what they

22   wanted, but I know they watched the film and gave

23   notes.

24       Q      Do you know who provided those notes?

25       A      No.  If I got the notes, it probably came

CONFIDENTIAL

Page 47

1    through -- Dinesh always filters the notes.
2    Typically.  Not always, but...
3        Q    So typically you weren't directly working
4    or speaking with TTV?
5        A    No, never.  It's always -- you know, I'm
6    the editor, and so for them to be speaking directly
7    to me, it's kind of a -- it wouldn't be protocol, I
8    guess.  You want to go through the producers and the
9    directors.
10       Q    Do you understand -- is it your
11   understanding that Salem provided comments with the
12   movie or no?
13       A    Yeah.
14       Q    Are there any other third parties or
15   individuals that you're aware of providing
16   substantive comments to the movie?
17       A    I think they -- I think they sent Trump a
18   screener, and I don't know if he had -- of
19   substance, but there was feedback from him.  No, I
20   think it would just be Salem and Gregg and
21   Catherine.
22       Q    In regards to comments from Trump's team,
23   had you ever reached out to President Trump in
24   relation to any previous movies that you had worked
25   on with D'Souza?

CONFIDENTIAL

Page 48

1          A     Me personally reach out to Trump?

2          Q     Did you seek comment from him or his team

3     in relation to any of the previous films?

4          A     I don't know if they did.

5          Q     Was it typical that you would reach out to

6     third parties about ongoing films for comment other

7     than those directly involved?

8          A     If Trump got behind the film and liked it,

9     he's a big marketing force, and so I believe that

10    that was their motivation.

11         Q     And in your experience working with

12    D'Souza Media, had they reached out similarly to

13    other political actors or third parties for comments

14    on other projects or was this unusual?

15         A     I think if you're looking for an

16    endorsement, that's quite normal in films to do

17    that.  I can't recall a specific example, but that's

18    not out of the ordinary.

19         Q     Do you know at what point in the process

20    Dinesh or others working on the film first reached

21    out to the Trump team about the movie?

22         A     I don't know, but I can recall that his

23    comment came in April, so late in the game.

24         Q     And do you recall whether or not changes

25    were made based on his comments?

CONFIDENTIAL

Page 49

1          A     I believe the one I know for sure was we

2    just shortened it, which I felt actually made the

3    movie better.

4          Q     So for the production process for the film

5    itself, after you first came on to the team, what

6    was the first step in the process of turning that

7    now-formed team into the final film?

8          A     Well, we had to shoot the Salem hosts and

9    then shoot Gregg and Catherine, and then it was just

10   two main interviews, which is not ordinary.  Like,

11   typically, in a film, you have many, but this one

12   was simple, in that it was kind of two locations.

13   So two days was, like, 60 percent of the film.  So

14   once we got that in the can, it was editing from

15   there.

16         Q     And was that plan already in place before

17   you joined the team?

18         A     The plan to film them was.  Where, what it

19   would look like is what I contributed.

20         Q     So who else was part of the film

21   production team?

22         A     Well, on a film you'd have a lot of

23   people.  You have production designers, who design

24   the set; you have light, people that light the set;

25   you have camera operators.  So you want a number or

CONFIDENTIAL

Page 50

1    specific names?

2        Q    Outside of the day-of filming crew, the

3    people who actively contributed to the development

4    and editing, final product of the film over time.

5        A    Got you.  So there was a researcher named

6    Nick, and I would rely on him to find footage.  I'd

7    send requests of footage, and he would find that for

8    me or try to.  And then there's Frank, who does our

9    graphics.  So the effects, visual effects.

10        Q    And just to be clear, can you give their

11    first and last names?

12        A    Nick Givas, maybe, G-I-V-A-S, and Frank

13    Lamont.

14        Q    And was there anyone else that you can

15    recall?

16        A    No, not that I would interact with, you

17    know, had a significant part in the film.  Nothing

18    comes to mind, but...

19        Q    You mentioned that Nick was a researcher.

20    What was your understanding of the type of research

21    that he did?

22        A    He would -- I don't know what the type of

23    research he did.  All I know is what he produced.

24    So I would say, Get me a news clip that has A and B

25    and C., and he would provide that.

CONFIDENTIAL

Page 51

```
 1          Q    Did he do any other tasks for you during
 2     the course of editing the film?
 3          A    Not for me, no.
 4          Q    Did he review the footage from
 5     Mr. Phillips of the ballot boxes?
 6          A    No, I don't think so.  If he saw them,
 7     that would be because he saw a cut of the movie, but
 8     we didn't reach to Nick for his opinion on the film.
 9          Q    Did Nick provide comments to the film
10     generally, or was his role more limited?
11          A    If he did, they weren't taken seriously.
12          Q    And why do you say that?
13          A    Usually on a film if you -- because it
14     wasn't solicited.  So if he provided a comment -- I
15     don't know if he did.  I'm just saying that if he
16     provided a comment, it wouldn't be something that we
17     would consider to change the movie based on.
18          Q    And that's because his role was that
19     solely as a researcher, correct?
20          A    Correct, yes.
21          Q    Do you know if he conducted any research
22     into the geotracking evidence that Mr. Phillips
23     claimed to have?
24          A    No.  When I'm saying "researcher," I just
25     mean a stock footage researcher.
```

CONFIDENTIAL

Page 52

1            MR. BOISVERT:  So I'd like to pull up a

2    new exhibit.  This one is DDR-00010110.  This will

3    be Plaintiff's Exhibit Number 125.

4            (Exhibit Number 125 was marked for

5    identification.)

6    BY MR. BOISVERT:

7        Q    So this is an e-mail from Debbie D'Souza

8    to Bruce Schooley in which you are copied on the

9    e-mail; is that correct?

10       A    Yeah.

11       Q    And this e-mail was sent in November 2021;

12   is that correct?

13       A    Yeah.

14       Q    So previously I believe you had mentioned

15   that you had started working on this film in 2022.

16   So at the time of November 2021, what was your role

17   in relation to the 2000 Mules film?

18       A    I was moving, so I was very busy.  I think

19   they cc'd me just as a -- kind of like, We have

20   something coming down the pike, but it was not on my

21   radar.  I was very busy at the time.

22       Q    So is it your understanding that even

23   though you hadn't formally joined the team yet, they

24   had an expectation that you would participate in the

25   project once you're moved and more settled; is that

1    fair to say?

2         A    Yes.

3         Q    Do you recall anything that was done in

4    relation to the Mules film prior to January 2022?

5         A    I can't say.  It's -- just because I was

6    moving, my focus was just on moving.  I sold my

7    house in October, and I decided to sell in October,

8    sold it in October, had to find a house in Florida.

9    So from October, November, December, it was as you

10   can imagine.

11             So the whole whirlwind, everything else

12   just kind of sat until I could get my basis here in

13   Florida, and then I started opening e-mails or

14   taking phone calls, but then I probably would have

15   reviewed or they would have resent this.

16        Q    So on the prior e-mail that was sent by

17   Bruce Schooley on November 4th at 12:33 p.m., he

18   includes something called a beat sheet.  Can you

19   describe what that is?

20        A    I'm guessing it's like an outline for a

21   film.

22        Q    And then above that, he includes some

23   points, and I'd like to direct your attention

24   specifically to number 2 that says:  We need

25   evidence other than their data.  It can only help

CONFIDENTIAL

Page 54

1    and will make a much more compelling film.

2           And then if you look back at paragraph

3    number 1, he says:  This is an updated beat input

4    doc following a call with Catherine and Gregg

5    yesterday.  We need to throw a wide net now and then

6    narrow as the beats develop.

7           So based on this e-mail, is it your

8    understanding that he was indicating they need

9    evidence other than the data provided by Catherine

10   and Gregg?

11      A    I can't speak to that.  I have no idea

12   what he meant.

13      Q    So in relation to the final film, are you

14   aware of any other evidence that was included other

15   than that supplied by Catherine and Gregg?

16      A    I don't think so.  Yeah, that's all I

17   know.

18      Q    Do you agree that the film would be more

19   compelling if it included other sources of data?

20      A    I think the film was compelling as it was.

21   As it is.

22      Q    So for paragraph number 1 of that e-mail,

23   it says:  What happens if the story gets out after

24   we are deep into it?  I think we should make a film

25   that holds its own even if this happens so we aren't

1    in panic mode.

2              Was it your understanding, joining the

3    team, that you were attempting to be the first

4    movers on this issue in the public sphere?

5        A    Yes, though I think there was a -- that

6    they had -- there was an article I remember that was

7    out at the time, but no one grabbed on to it.  I

8    think what was exclusive was having the actual

9    footage tied to the geotracking.

10       Q    So that article that you're mentioning, do

11   you recall what it was about?

12       A    Something with Georgia, and they had -- I

13   think they tried to take this evidence to a court.

14   That's all I can recall.

15       Q    And "they," you're referring to Catherine

16   and Gregg?

17       A    Yes.

18       Q    Was this project particularly

19   time-sensitive as compared to previous films that

20   you had done with D'Souza Media?

21       A    Not really, just because all of Dinesh's

22   films are kind of before an election year, or try to

23   be around election year, and so it's always

24   time-sensitive.  It's nothing new with Dinesh films.

25       Q    So then on the top-level e-mail, Debbie

CONFIDENTIAL

Page 56

```
 1   says:  I think it's key that C&G sign an NDA.
 2   Otherwise, nothing really prevents them from
 3   spilling the beans about what they have.
 4            So is it your understanding that "C&G"
 5   refers to Catherine and Gregg?
 6        A    Yes.
 7        Q    And what is your understanding for why an
 8   NDA is required at this time?
 9        A    If we are moving forward on a film,
10   there's a lot of money and resources that's going to
11   go behind it.  If, in the middle of this film,
12   Catherine and Gregg took their videos and their data
13   to someone else, that would be a great hindrance to
14   the movie.
15        Q    Are you aware whether or not Catherine and
16   Gregg signed an NDA with regards to their data?
17        A    I have no idea.
18        Q    Within D'Souza Media, who had access to
19   that data after it was received?
20        A    Which data are you referring to?
21        Q    Any of the data that came from Catherine
22   and Gregg.
23        A    The only data that I know that came from
24   Catherine and Gregg was that was sent to me, which
25   was the surveillance footage of the mules, and I
```

CONFIDENTIAL

Page 57

1    don't believe -- I think it was just me that got it.

2    I don't even think Dinesh or -- and I know Bruce

3    didn't get it, so -- and I think that was the way

4    Gregg wanted it.

5         Q    And then if we could scroll down to the

6    page that's Bates stamped 10113.  So here it says at

7    the very bottom of the page at number 3:  What to

8    sequester.  Seems top of list is the video, which is

9    useful to draw and ties the evidence, but is not

10   essential to any legal proceedings.

11        Do you understand what that paragraph is

12   referring to?

13        A    No.

14        Q    And then if we can go down to the next

15   page.  Number 4 says:  Do we need some investigators

16   to hit the street?  There must be an army in each of

17   these cities that are concerned with what happened.

18   Republicans in each city should know some of them.

19   Isn't there a boatload of affidavits?  Let's find

20   them with help from local Republicans.

21        Do you recall any conversations about

22   having investigators potentially look into the

23   claims underlying the Mules film?

24        A    Yes, I remember an early discussion.  They

25   wanted to, I think, send someone to Atlanta, and I

CONFIDENTIAL

Page 58

1      don't know who, but some investigator, and try to
2      figure out the nonprofits that were supplying the
3      ballots.  I think they wanted to get some footage of
4      that, and I think they felt like just having mule
5      videos, it would be better to have the kind of
6      undercover footage of the nonprofits as well.
7          Q    So when you say "they" wanted that, who is
8      the "they" that you're referring to?
9          A    That would be Dinesh, Bruce, and Debbie.
10         Q    And are you aware of any investigator ever
11     having been sent?
12         A    Sometimes things happen without my
13     knowledge, but I never received any footage of an
14     investigator doing anything in Atlanta.
15         Q    You mentioned that this was a conversation
16     early on.  Do you have a sense of at what points in
17     time this was still being considered?
18         A    I think once we got the footage from Salem
19     and Gregg and Catherine, we felt like we have very
20     compelling footage, and so I feel like we just
21     wanted to focus on that.
22         Q    And the "footage from Salem," is that
23     referring to the interviews with the Salem hosts?
24         A    Correct.
25         Q    In regards to this paragraph, are you

CONFIDENTIAL

Page 59

1    aware of what affidavits that are referred to in the

2    document?

3        A    No.

4        Q    And were those affidavits ever collected?

5        A    I don't know what they were, so I can't

6    speak to it.

7        Q    They weren't included in the movie,

8    though; is that correct?

9        A    Not that I recall.

10            MR. BOISVERT:  We can take this down.

11            We've been going about an hour and a half

12    at this point, so perhaps a short break would be

13    helpful.  So we'll go off the record at this point.

14            THE VIDEOGRAPHER:  The time is 10:55.  We

15    are off the record.

16            (Recess 10:55-11:06 a.m.)

17            THE VIDEOGRAPHER:  The time is 11:06.  We

18    are back on the record.

19    BY MR. BOISVERT:

20        Q    So let's dive a little bit more

21    specifically into the production of the film, and

22    beginning with that, with the evidence that was

23    provided by Mr. Phillips.

24            So earlier you had referenced that you

25    received video footage of the ballot boxes from

1    Mr. Phillips; is that correct?

2         A    Surveillance footage from drop boxes, yes.

3         Q    Do you know how he obtained that footage?

4         A    I believe in the movie, they state how

5    they did.  They petitioned the government, maybe

6    Freedom of Information Act or something like that.

7         Q    And for that -- for those videos, was that

8    something that you received early on in the movie

9    production process?

10        A    I think I received them January 9th, and

11   so that was before filming began, but pretty tight.

12   I think we started filming the week after that.

13        Q    Had you requested or had anyone at D'Souza

14   Media requested those videos prior to then?

15        A    While I was -- I think that that's always

16   been the assumption, that these videos will be a big

17   part of the film, so I guess it was requested, but

18   it's kind of like a given that they would be sent to

19   us.

20        Q    Do you know why, then, the videos were not

21   provided sooner?

22        A    Well, I got them on January 9th, so I

23   don't feel like I -- I couldn't have done anything

24   with them.  Again, I was just setting up my office,

25   so I don't feel like I was late getting the footage

CONFIDENTIAL

Page 61

1    on January 9th.

2        Q    And you said you were the one that

3    received that footage from Mr. Phillips?

4        A    Yes.

5        Q    And are you the one that then reviewed

6    that footage as well?

7        A    Reviewed the footage, yes.

8        Q    What were you reviewing the footage for?

9        A    They wanted to put out -- they wanted to

10   put out a teaser trailer, and so that would

11   incorporate some of this footage, and so I was

12   looking for footage to use for the teaser trailer.

13       Q    And what criteria were you using to select

14   videos for the teaser trailer?

15       A    What looked like obvious cheating.

16       Q    And what would you define obvious cheating

17   to be?

18       A    Someone coming to a drop box after

19   midnight, looking around, dropping in numerous

20   ballots while their car is left running, I guess it

21   looks a little suspicious.

22       Q    Are you aware of any reason why someone

23   may be doing that without, in your words, cheating?

24       A    I think the odds are that they're doing

25   something nefarious, but there's probably a

1    possibility they could be, you know -- I don't know

2    if I can come up with a reason why they would, but

3    that's beside the point.

4           The point was that these people were

5    geotracked, so it doesn't really matter if they look

6    suspicious, but for me to sell to the audience in a

7    teaser trailer, you can't really go into the whole

8    geotracking stuff.  That's a little in the weeds.

9    You need a whole film to do that.  So that's why I

10   was looking for more nefarious actors or what looked

11   nefarious.

12      Q    So your understanding was that

13   Mr. Phillips had geotracked all the individuals in

14   those videos, and so you could choose from any of

15   them and be portraying his research results equally;

16   is that correct?

17           MR. GEORGE:  Object to form.

18   BY MR. BOISVERT:

19      Q    I'll rephrase that.

20           So it was your understanding that all of

21   the videos that you received from Mr. Phillips had

22   been geotracked?

23      A    Yes.

24           MR. GEORGE:  Object to form.

25   BY MR. BOISVERT:

CONFIDENTIAL

Page 63

1          Q    And you selected videos from within that

2    subset that you received to include in the teaser

3    trailer not based on any research-based grounds, but

4    based on how they looked for purposes of creating a

5    compelling visual; is that correct?

6          A    Exactly.

7          Q    And so what are the characteristics that

8    you are looking for?

9          A    Like I said, someone showing up at

10   midnight, looking around, dropping in multiple,

11   multiple ballots, like over five, I think; wearing

12   gloves was, to me, suspicious, especially at night

13   with no one around; taking photos of themselves

14   dropping off ballots looks suspicious, but --

15               (Crosstalk.)

16         Q    Go ahead.

17         A    Yeah, I would say that if it didn't look

18   innocuous in some of the footage, again, I would

19   revert to the fact that it was geotracked.

20         Q    And what does it mean -- strike that.

21               How do you understand the geotracking

22   process to work?

23         A    I'm not an expert, but how I visualized it

24   in my brain is that your cell phone gives off a

25   little ping, and so it basically tracks where you're

Page 64

1    at, and so it's like a little ball on a map that's

2    just following you, and you're basically tied to a

3    phone ID, basically a number, and so if you see this

4    number pop up at many drop boxes in a single day,

5    that's basically how they tracked these people.

6        Q    And what is your understanding of what

7    they were looking for in that tracking?  What was

8    the criteria they used -- other than just tracking

9    everyone, what was the criteria they used to select

10   the final individuals that met the cut to be a mule?

11       A    There was a criteria, and it's listed in

12   the film.  I don't recall exactly what it is, but it

13   had a certain threshold you had to get through, and

14   it was kind of a difficult one.

15            They had to be at numerous drop boxes,

16   because they left room for someone who maybe was,

17   like, a mailman, you know what I mean, but somehow

18   they -- that person wouldn't get through their

19   criteria.  If you refer to the film, though, there's

20   very specific.  I just can't list them offhand.

21       Q    So what is your definition of a mule?

22       A    I don't know if I have a definition of a

23   mule.  I have what the film calls a mule.

24       Q    So how do you understand that term then?

25       A    A mule -- the film represents a mule as

CONFIDENTIAL

Page 65

1    someone who is illegally dumping ballots into a

2    drop box.  Trafficking in ballots, I guess.

3        Q    And that determination for someone to be

4    illegally trafficking in ballots is based on what?

5        A    Based on them doing exactly that, dropping

6    ballots into -- that aren't theirs or their family

7    members', dropping them into drop boxes.

8        Q    But none of the individuals in the photos

9    were convicted of any crimes; is that correct that

10   you're aware of?

11       A    Not that I'm aware of, no.

12       Q    So how did they determine that the

13   activities that they were doing were illegal?

14            MR. GEORGE:  Object to form.

15   BY MR. BOISVERT:

16       Q    So I'll rephrase that.

17            On what -- what is your understanding for

18   the basis of the particular videos being selected as

19   meeting the definition of a mule?

20       A    Well, there's the mule, which is the

21   physical act of dumping them in.  The geotracking is

22   what, you know, put them in numerous locations.

23   That obviously made it illegal.  You know, you're

24   not going -- if you are dumping in your family

25   members' ballots, you're not going to go to numerous

CONFIDENTIAL

Page 66

1    drop boxes to do that.

2        Q    So then your understanding of a mule is

3    the act itself, and a person wouldn't be described

4    as a mule?

5        A    Oh, I see what you're saying, is it the

6    verb or the noun?

7        Q    Yeah, because you said it was the act, and

8    I was asking if it could describe a person or if it

9    was only an illegal act of depositing multiple

10   ballots or some other fraudulent conduct, as you had

11   described earlier.

12       A    No, I think -- well, I think the film

13   assumes that there's 2,000 people in 2000 Mules, not

14   2,000 wrongdoings, so it obviously describes a

15   person, an individual.

16       Q    And it's your understanding that those

17   individuals were identified based on that

18   geotracking data?

19       A    Yes.

20       Q    And is there any other basis, that you're

21   aware of, that was used to identify those

22   individuals or to corroborate the geotracking data?

23       A    I believe it started with the geotracking

24   data and then backed up by the video, but obviously

25   the film goes through reasons why there's not

CONFIDENTIAL

Page 67

1    multiple videos of them, and the reasons that were
2    given was that even though the states were required
3    to video drop boxes, they didn't do that, and if
4    they did have video surveillance, there wasn't a
5    guarantee that the videos were turned on.  And also,
6    the sequestering of the film, the surveillance
7    footage turned difficult.
8         Q    What do you mean by "the sequestering of
9    the film turned difficult"?
10        A    I believe Catherine goes through in the
11   movie about her process to receive the public-owned
12   surveillance footage, and it wasn't just calling
13   them up saying, Hey, can I have this surveillance
14   footage; it was numerous processes and, obviously,
15   red tape that you had to get through and some hoops
16   to jump through that seemed difficult.  And it
17   seemed like they weren't excited about giving it up.
18        Q    So I would like to pull up what was
19   previously marked as Plaintiff's Exhibit Number 115.
20             So this document is an e-mail on which you
21   were copied that was sent by Debbie D'Souza to Bruce
22   Schooley; is that correct?
23        A    Yes.
24        Q    Do you recall this conversation?
25        A    I don't recall this specific e-mail, but I

CONFIDENTIAL

Page 68

1    know this topic was of concern.

2         Q    So you testified earlier that you received

3    the video footage from Mr. Phillips on January 9th;

4    is that correct?

5         A    Yeah.  I can't be sure it was the 9th, but

6    I believe that's what I remember was the 9th.

7         Q    So is it your understanding that this

8    e-mail, then, was after you had received video

9    footage from Mr. Phillips?

10        A    Yes.

11        Q    So in Mr. Schooley's e-mail sent January

12   10th, what is your understanding of his comment that

13   says:  I don't think one person dropping off what

14   looks like one or two ballots -- excuse me.  I don't

15   think one person dropping off what looks like one or

16   two ballots off does it.  It doesn't convince me,

17   and I want it to be true.

18             Does that refer to the results of your

19   analysis of the video footage that Mr. Philips

20   originally sent?

21        A    I felt some of the footage looked

22   innocuous, and that was before it was explained what

23   was happening.  And so when I first got the footage,

24   I thought I was going to see someone -- and maybe

25   Bruce was under the same assumption, that we're

CONFIDENTIAL

Page 69

1    going to see someone with a bag full of ballots

2    dropping in 40, 50 ballots.  That's something that

3    you can easily sell to an audience as an illegal

4    activity.

5              What was explained to us is that's now how

6    these mules operate.  They have five or six ballots,

7    that they're going to go to multiple drop boxes, and

8    that way they don't over-dump into a certain

9    drop box that could be flagged.

10              And so it's -- it's numerous ballots, but

11   it's spread out.  And so once we got that

12   understanding, I think once that was explained to

13   us, it made more sense.

14        Q    And so you changed your opinion of the

15   innocuousness of the videos based on explanation

16   that was provided by who?

17        A    That was during the interview with -- I

18   believe Catherine lays it out.  That was during the

19   filming.  And I think it's in the movie itself.

20        Q    So then your understanding of the

21   illegality or potential illegality of the actions

22   depicted in the videos -- movie was directly the

23   result of TTV's -- TTV and/or OpSec's explanation of

24   their research; is that fair to say?

25              MR. GEORGE:  Object to form.

CONFIDENTIAL

Page 70

1        A    Yes.

2    BY MR. BOISVERT:

3        Q    So here in the second paragraph, it says:

4    We need a phone call with Catherine and Gregg to see

5    what they've got to show multiple drops, multiple

6    ballots, plus out-of-state mules.

7              In that tranche of videos that you

8    received on January 9th, was there videos that

9    showed multiple drops?

10       A    There was a folder called Multiple Drops.

11   The issue with -- and this is another issue with the

12   security footage, is that the camera was, like,

13   40 feet away, and so if it is the same person, you

14   can't visually tell it's the same person.

15             So for me to communicate to an audience

16   that this guy went to this drop box and this

17   drop box, he kind of wants to see the same guy, not

18   a far-away shot.  So it doesn't say that it wasn't

19   the same guy; it just says I can't sell that to an

20   audience in three seconds.

21       Q    Based on your analysis of the videos, did

22   you see any videos that seem to be the same person

23   going to multiple drops?

24       A    In the first January 9th footage?

25       Q    Yes.

CONFIDENTIAL

Page 71

1          A    I have no reason to think that Catherine

2    and Gregg are lying, and so, yes, I believe that the

3    multiple drops that they had video of were people at

4    multiple drop boxes, but the only way I could

5    communicate that is saying that they were

6    geotracked.

7          Q    So outside of just this initial delivery

8    of videos, taking into account all of the videos

9    that you received, is it your understanding that you

10   had videos that depicted a single person going to

11   multiple drops?

12         A    I believe there was people at multiple

13   drops, but visually you cannot prove it with the

14   footage they provided.

15         Q    Did you have videos that depicted people

16   that were out of state or that you could tell were

17   out of state?

18         A    I think it's impossible to tell what state

19   someone's in from their -- the way they walk or

20   look, but there was out-of-state people that we were

21   told were from out of state, and one was -- I think

22   they referred to her as Pittsburgh Girl or something

23   like that, and it -- or Steelers Girl, and she was

24   wearing a Steelers T-shirt, and so they called her

25   Steelers Girl, and they said she was from out of

CONFIDENTIAL

Page 72

1    state.  And that wasn't based on because she was

2    wearing a Steelers shirt; it was based on the

3    geotracking.

4         Q    So you're -- do you understand

5    Mr. Phillips or Ms. Engelbrecht to have been able to

6    identify the specific individuals that were in the

7    videos?

8         A    Yeah, I believe they do in the movie too.

9         Q    And they identified them based on that

10   geotracking data; is that correct?

11        A    Yes.

12        Q    Are you aware of any efforts to contact

13   those individuals or to investigate identified

14   individuals further to confirm the suspicions?

15        A    No, and the film wasn't to out people or

16   get them in trouble.  I think the idea was that if

17   the law was concerned that Gregg and Catherine can

18   show them the data, and then that can lead to

19   further actions.

20             MR. BOISVERT:  We can take down this

21   exhibit now.  So now we can pull up Plaintiff's

22   Exhibit Number 40.

23   BY MR. BOISVERT:

24        Q    So this is an e-mail that was sent from

25   Catherine Engelbrecht to Bruce Schooley in response

CONFIDENTIAL

Page 73

1     to an e-mail that he had previously sent on January

2     10th, 2022; is that correct?

3          A     Yes.

4          Q     And you are copied on this e-mail; is that

5     correct?

6          A     Yeah.

7          Q     So in this e-mail, Mr. Schooley is

8     reaching out, and he says:  Now we see individuals

9     doing one drop with what appears to be one ballot.

10    At this point they are just using a drop box to

11    vote.  Nothing illegal.

12               Is that how you understood the video that

13    you reviewed in the first delivery from TTV?

14         A     Again, it's what's visually being

15    presented and what is actually the case are two

16    different things because we're in a visual medium.

17               So if I have a video of someone dropping

18    one ballot, that's not going to communicate anything

19    to the audience unless they have the knowledge of

20    the geotracking, which, again, in the teaser

21    trailer, we couldn't do, so I think that's what he's

22    referring to there.  Not that this person isn't

23    doing anything illegal, but it doesn't look like

24    he's doing anything illegal without the context of

25    the geotracking.

CONFIDENTIAL

Page 74

1      Q    So previously you had testified that the

2   video of the drop boxes was independent evidence

3   supporting the geotracking data; is that correct?

4      A    Evidence of they had -- they could ID

5   someone based on their geotracking, and they could

6   identify that person in the video.

7           So the video just showed what they did,

8   but the geotracking is what showed how they got

9   there, where they went afterwards.  And it also

10  showed that they made multiple stops at nonprofits,

11  which to me was -- that's a pretty big wow, you

12  know.

13     Q    Is it your testimony, then, that from the

14  videos themselves, you couldn't determine whether or

15  not illegal activity was happening without knowing

16  the underlying geotracking data; is that inaccurate?

17     A    No, some videos in the teaser trailer did

18  show people that looked like they were doing

19  something illegal.  There was a lot of videos that

20  weren't as nefarious-looking as some, but there

21  were -- like I mentioned, the guy pulling up in his

22  vehicle, leaving the car running, getting out at

23  past midnight, dumping in multiple ballots, looking

24  around nervously.  Those do not prove he was doing

25  anything illegal, but it does look like he's doing

1    something illegal.

2        Q    Were those videos that were included in

3    the teaser trailer included in this original tranche

4    of videos, or were those later supplied by

5    Mr. Phillips?

6        A    No, those were in the original.

7        Q    So the videos that you included in the

8    teaser trailer that you say included obvious

9    suspicious activity, are -- strike that.

10            So then is it your understanding that

11    Mr. Schooley was not accurately describing the

12    videos that were included in the teaser trailer, in

13    this e-mail, by saying that:  At this point they are

14    just using the drop box to vote, nothing illegal?

15        A    I think he's maybe exaggerating a bit to

16    try to get a response of the basically -- again, the

17    assumption was that we're going to have these

18    smoking gun videos, and they -- most of the videos

19    needed some form of context to explain what was

20    happening, and so we didn't know the context at that

21    time.  Or if we did, we didn't know how to explain

22    that context to the audience.

23        Q    So at what point in time did you learn

24    that context?

25        A    I believe this is part of the conversation

CONFIDENTIAL

Page 76

1    of them explaining what's happening, but during the

2    filming with them is when they kind of laid out the

3    whole life of a mule and what that means and what

4    they do and how they operate, how they get paid.

5         Q    So your testimony is that it was, like, an

6    ongoing process where your understanding was

7    continually informed by Mr. Phillips and

8    Ms. Engelbrecht over time over the course of making

9    the film and their involvement with it?

10            MR. GEORGE:  Object to form.

11        A    Yeah, and it's kind of difficult.  A

12   documentary, especially with Bruce and I, is we like

13   to challenge things.  And sometime we over-challenge

14   and we overstate things, but that's to get a certain

15   response, and it's kind of a push-and-pull kind of

16   thing.  So we're always testing, you know, things

17   that we're getting.

18            THE REPORTER:  Was that Mr. George who

19   just objected?

20            MR. GEORGE:  Yes.

21            THE REPORTER:  I am having a hard time

22   hearing you, if you've been objecting.  Can you show

23   your video, please.

24            MR. GEORGE:  Sure.

25            THE REPORTER:  Thank you.

CONFIDENTIAL

Page 77

1    BY MR. BOISVERT:

2         Q    So then based on Catherine's explanation

3    here -- did someone say something?

4              Based on Catherine's --

5              CONCIERGE TECH:  Does someone have

6    feedback coming through?  I don't know.  Philip, is

7    that your end?

8              MR. GEORGE:  I don't think I do, but I'll

9    mute myself.

10   BY MR. BOISVERT:

11        Q    So in Catherine's explanation here, where

12   she says look in the Repeater and Multiple Ballots

13   folders, she is referring to the videos already

14   supplied to you; is that correct?

15        A    Yes.

16        Q    And is it your testimony that based on her

17   redirecting you to these folders that you were able

18   to identify the evidence of multiple drops and/or

19   multiple ballots and/or out-of-state people that, on

20   first pass, you couldn't identify?

21        A    I still couldn't tell that someone was a

22   multiple repeater based on the footage, even when I

23   went to the folder.  And I believe that she is

24   looking at the footage through the context of

25   geotracking, which we weren't at this point.

CONFIDENTIAL

Page 78

1          So when she says there's multiple

2     repeaters, it's because she's seeing a number of

3     some phone that's going from here to here.  All I'm

4     seeing is a shadow of a guy here who may be that guy

5     over there, but visually it's not connecting for me.

6               MR. BOISVERT:  Can we now pull up what was

7     previously marked as Plaintiff's Exhibit 76.

8     BY MR. BOISVERT:

9          Q    So you had mentioned that you had used

10    some of the videos that you received in the teaser

11    trailer; is that correct?

12         A    Yes.

13         Q    And do you recall when the teaser trailer

14    was released?

15         A    That would be January.  I would probably

16    put it in mid-January.

17         Q    So this e-mail chain which reflects

18    e-mails on which you were copied, and the top-line

19    e-mail is an e-mail from Bruce to

20    vjd@dineshdsouza.com.  Bruce says:  We need their

21    video and their geotracking graphics, which means

22    working with the graphics guy they used or you will

23    need to recreate it with someone like Frank.

24               Is this in reference to creating the

25    teaser trailer that you referenced?

CONFIDENTIAL

Page 79

```
 1          A     I believe so, yeah.
 2          Q     And so when he says we need their video
 3     graphics, do you know what he's referring to?
 4          A     Yeah, along with the videos on January 9th
 5     that came were some promotional video that they had
 6     created that had rudimentary graphics that looked
 7     like it was pulled from Google Maps with points on
 8     them that kind of communicated their geotracking
 9     data.
10          Q     And do you recall if you used their
11     versions of those graphics you just described, or
12     did you recreate them, as Mr. Schooley references
13     here may be a possibility?
14          A     I would assume we definitely would
15     recreate them, based on the quality of their
16     graphics.
17          Q     Do you recall specifically whether or not
18     you recreated their video and geotracking graphics?
19          A     I can't recall, but I'm pretty sure we
20     wouldn't let what I'm thinking of their graphics in
21     the teaser trailer when it goes public.
22          Q     Were there any graphics or other visual
23     elements that were provided by Mr. Phillips or
24     Ms. Engelbrecht for the film that were actually
25     included in the film?
```

1        A     I think maybe, but we did try to recreate

2     most of them.  Again, it's -- they're low

3     resolution, they look rudimentary, not up to the

4     standards that we're used to, so when we recreate

5     something, we recreate it so that it looks

6     exactly -- most times it looks exactly like the data

7     that we're pulling from with just enhanced, more

8     visually-appealing graphics.

9        Q     In recreating the graphics, were you

10     trying to accomplish anything else, other than just

11     making it a high-quality resolution?

12        A     Yeah, you're always trying to communicate

13     the idea to the audience.  It's not necessarily --

14     like, if you want to show, let's say, 2,000 mules,

15     you would put 2,000 red dots on a blue map.  That

16     communicates to the audience what 2,000 looks like.

17     What did -- did they actually have a graphic of

18     that, no, but we're showing the -- so it's more of a

19     visual and emotional representation, but it's not

20     necessarily exact because sometimes you can't get it

21     exact.

22        Q     And what was the emotional representation

23     that -- or the visual representation or emotional

24     representation that you were aiming for with regards

25     to these particular graphics?

1        A    I can't be -- I can't really say.  I'd
2    have to see one and then kind of talk about that.
3        Q    So if we look down at the very bottom of
4    this page, it says, in the January 5th e-mail from
5    Mr. Schooley, that:  I went over with Nathan.  We
6    both think that we can do this down and dirty.  If
7    we don't do reenactments, and shoot all interviews
8    in real-world settings, I'm going through storyline
9    now based on this.
10            And then on the following page, he goes on
11    to describe a course correction and suggestions for
12    that new direction.
13            Do you recall these changes being made to
14    the direction of the film?
15        A    Not necessarily.  I wasn't into the -- any
16    discussions that happened before January, if they
17    did cc me, I didn't look them over.  Again, I was
18    super busy.
19        Q    This e-mail is dated January 5th.  So were
20    you working directly on the mules matter at that
21    point in time?
22        A    Yes.  But you said if it changed
23    direction, so you're indicating that there was a
24    former direction, and now it's changing to this
25    direction.  I don't know what the former direction

CONFIDENTIAL

Page 82

1    was that you're referring to.

2         Q    I understand.

3              And so do you recall speaking specifically

4    about the need to do reenactments or to shoot all

5    interviews in real-world settings?

6         A    Do I remember that conversation, no, not

7    really.

8         Q    Why would you do all interviews in

9    real-world settings as opposed to doing

10   reenactments?

11        A    Cost, speed.  Depends how quick they want

12   to get this movie out would be one.  And then

13   "real-world settings," I'm not sure what he means by

14   that.

15             Typically, we don't build sets to do

16   interviews.  They're all kind of in real-world

17   settings.  But for the Gregg and Catherine

18   interview, we did go to, like, a -- kind of a

19   garage, I guess you'd call it, that was sort of a

20   set.  So maybe he wanted something easier than that.

21        Q    So for the end result, for the direction

22   actually taken with the movie, did you shoot in

23   real-world settings, or did you do reenactments for

24   those shots that were included in the final film?

25        A    We recreated Gregg's computer lab, so to

Page 83

1    speak, where the geotracking takes place.  I don't

2    know if we ever talked to Gregg about filming in his

3    actual location, but based on other conversations

4    with Gregg, I could see him not wanting that based

5    on secrecy.

6         Q    Were there any other films or -- strike

7    that.

8              Was any of the other shots for the film

9    shot in their real-world locations, or were they all

10   reenactments?

11        A    Are you referring to -- so there's

12   interviews, and then there's reenactments.  All the

13   reenactments were obviously reenacted, but I guess

14   in real world, where we shot our mule dropping in a

15   drop box, we went to -- made it outside of a park

16   and brought our built drop box and placed it there

17   and shot that.

18             The interviews were done I guess you'd say

19   in real-world settings.  It was done at a bar in

20   Thousand Oaks for the Salem hosts, and then in

21   houses for some of the voting experts, and then

22   Gregg and Catherine was at a -- I guess you'd call

23   it a big garage where we did their interview.  So I

24   don't really know what he means by "real world

25   setting."

CONFIDENTIAL

Page 84

1          Q      So those locations, were they just rented
2      spaces for purposes of doing these shoots, or were
3      they somehow tied to the ongoing activities of the
4      individuals that were included in them?
5          A      Oh, I see.  No, they're always -- not
6      always rented, but always someone else's property.
7      There's certain criteria you need when you're
8      filming.  You need space; you need good light.  And
9      so those are things -- interesting-looking place, so
10     we tend to always request that.
11             Sometimes we're stuck in some guy's office
12     because that's the only place he'll be interviewed,
13     but it shows in the final product.  It's not as good
14     as the other places.
15         Q      Then here we see Mr. Schooley say in
16     number 1 of the suggestions that:  We shift from
17     heavy on evidence gathering to following the
18     investigation to keep it honest.  Best guess, they
19     won't be showing much evidence before March or
20     April, so that needs to be our drop-dead date.
21             Do you recall what this suggestion was
22     referring to?
23         A      No idea.
24         Q      Was it your understanding that following
25     this, the film had a heavy-on-evidence-gathering

1    focus or not?

2        A    I can't say either way.  I don't know what

3    that means.

4        Q    At this point in time, do you know what

5    evidence was still to be gathered that he might be

6    referring to?

7        A    I don't know.  You have to ask him.

8            MR. BOISVERT:  We can take down this

9    exhibit.

10   BY MR. BOISVERT:

11       Q    So we've already been discussing that you

12   had received a first set of videos from Mr. Phillips

13   in January of 2022.  When did you receive further

14   videos from anybody referenced previously?

15       A    It was in late March.  I think I had

16   pinpointed the date to around March 27th.

17       Q    Were those the only two dates that you

18   received video evidence from Mr. Phillips?

19       A    Yes, I believe so.  Well, there was an

20   interview that he sent us with a mule from Arizona,

21   like a testimony, and then he sent a video of a

22   police officer from Atlanta.  So he did provide

23   those videos.  I don't remember when those came in,

24   though.

25       Q    In regards to the ballot box videos, was

```
 1    it your understanding that D'Souza Media was still
 2    waiting on additional videos to be able to complete
 3    the Mules film, or was there enough included in the
 4    January set, and anything that was further sent was
 5    just additional evidence?
 6        A    We had hoped that they would send more,
 7    and I think we were under the impression that these
 8    were hard to gather, not only from the soliciting
 9    form of actually getting the videos, but then using
10    the geotracking to pinpoint who's who and where
11    they're going.  And so we hoped that they would have
12    more videos to show us later on.
13            We did move forward without them, but then
14    at the end, we felt more videos would help the case
15    of the film and make it more compelling, and so
16    there was requests to them.  But I think the
17    requests were always kind of in the back of our
18    head, and I think it wasn't a shock that we asked
19    for more videos.
20        Q    What about additional videos do you think
21    would have made them more -- would have made the
22    film more compelling?
23        A    Just having more video of people dropping
24    ballots at drop boxes.  At this point, the film is
25    explaining everything, what is a mule, how it's
```

CONFIDENTIAL

Page 87

1    geotracked, so we didn't really need to sell, you

2    know, huge nefarious-looking activities; we just

3    needed people that were geotracked at this point.

4              And I know I had a graphic where I wanted

5    to show -- I wanted to feel what 2,000 looked like,

6    and so I wanted to basically take videos and shrink

7    them down so you would see -- not 2,000, that would

8    be too many on the screen, it would just be little

9    dots, but at least hundreds.  And so to finish that

10   graphic, we requested quite a bit more of videos

11   from them.

12       Q    And why did you want to include a graphic

13   of this sort specifically?  What were you trying to

14   convey?

15       A    Scale, I believe.  Just the amount of

16   people that are involved in this operation.

17       Q    And your interpretation of the scale is

18   based on what?

19       A    The movie is called 2000 Mules, so I

20   figure, at some point, we have to represent what

21   that kind of looks like.

22       Q    But if they didn't have 2,000 videos that

23   they could send to you, how were you -- what were

24   you using to inform that you needed to increase the

25   scale of the videos that you had actually received?

CONFIDENTIAL

Page 88

1          A    I don't know if I could have done as good
2      a job communicating if I didn't get those videos, so
3      that's why we requested more videos.
4          Q    And that's because you were trying to fit
5      the videos, then, to the title being 2000 Mules, so
6      that way it was consistent?
7          A    Yeah.
8          Q    But that wasn't something that you derived
9      from the first set of videos that they had sent you
10     in any way?
11         A    Derived that there would be 2,000 more
12     coming or -- I don't understand what you're asking.
13         Q    So your request for further videos was
14     just to keep the consistent narrative that there are
15     2,000 mules that were identified, as explained
16     throughout the video?
17         A    Yeah.  2,000 isn't an exact number that I
18     was looking for.  I just was looking for more.
19         Q    And when you did receive additional
20     videos, how many more did you receive?
21     Approximately is fine.
22         A    30 maybe.
23         Q    Does getting 30 more videos, then, achieve
24     the goals of supporting the overall 2,000 mules
25     representation?

CONFIDENTIAL

Page 89

1          A     Not originally what I had hoped with the

2     graphic-wise, but it did help at the end of their

3     interview just to show mule after mule.  It kind of

4     helped get that idea across.

5               I think the issue for me visually from the

6     last batch of videos was that they were around --

7     they all felt like they were from the same location

8     and the same time of day.  So to do a graphic,

9     you're going to see, you know, kind of a

10    consistency, but we were saying this happened in all

11    other states, so I was hoping for more variance, I

12    guess, but the last batch we got were mainly from

13    one drop box.

14              MR. BOISVERT:  Can we pull up what was

15    previously marked as Plaintiff's Exhibit Number 116.

16    BY MR. BOISVERT:

17         Q     So in the bottom here, this is an e-mail

18    from you to Frank Lamont, copying -- to Frank Lamont

19    and Josh L, copying Bruce Schooley, that was sent on

20    March 23rd, 2022; is that correct?

21         A     Yes.

22         Q     Do you recognize this e-mail?

23         A     Yeah.

24         Q     And in this e-mail, you say:  I shared a

25    folder with you guys called MULE.  I still need

CONFIDENTIAL

Page 90

1    videos of mules doing drops.  We would want to show

2    all of them at once on the screen.  Would be good to

3    make it feel like many more since our film is called

4    2000 Mules.

5              So does this reflect the process that you

6    were just describing to create the on-screen visual

7    that was consistent with the 2000 Mules name?

8        A    Yeah, so this is before I got the second

9    batch of videos, though.

10       Q    So the 30 videos that are referenced in

11   here are from the original batch of videos?

12       A    The ones in January 9th, yes.

13       Q    For these videos, you go on and you say:

14   If we want, we can take this -- we can then take

15   this and zoom out more, 30 by 40 [sic].  We would be

16   showing duplicates, but at that size nobody will

17   know.

18             So what exactly were you proposing in that

19   sentence?

20       A    So if you have, like -- let's say you have

21   on screen 16 mule videos because each video would be

22   like a little square.  So it's 4, 4, 4, which is 12.

23   Then you would jump out, and you would times that by

24   4, so you'd have 12 in the top corner, 12 in the top

25   right, top left, and then bottom left, bottom right.

CONFIDENTIAL

Page 91

1    So you would have 12 times 4.  It's just to build a

2    grid, and so you'd zoom out, showing more and more

3    video.

4        Q    To include those, you say, duplicates at

5    that size, nobody will know.  You meant that the

6    videos on screen to a viewer would be too small for

7    them to be able to identify the same video being

8    used more than once?

9        A    Yeah.  As long as you scattered it enough,

10   because the colors could kind of pop if they're

11   close to each other.

12       Q    Why were you contemplating using

13   duplicates?

14       A    If we didn't have enough of the videos

15   from Gregg and Catherine.  The idea is that we know

16   that there's 2,000 mules; that's what was

17   communicated to us.  And so to communicate that to

18   the audience, even if we don't have the footage, we

19   are representing something that is true; we're just

20   doing it in a visual way.

21           And so it would be great to get videos,

22   but we didn't really want to put someone in the

23   video unless they had been geotracked; otherwise, we

24   could have just, you know, linked to a stock footage

25   place and, you know, dumped in anyone that was

CONFIDENTIAL

Page 92

1    voting or shot it.

2              You know, we shot some of our own mules,

3    but we didn't want to -- it was a difference -- we

4    wanted people to know when it's a reenactment and

5    when it's the surveillance footage.

6        Q    Do you recall if the final video, in fact,

7    showed duplicates in this graphic or whether it did

8    not?

9        A    Once we got the second batch, it might

10   have put us at like 50 or 60, so we had enough, but

11   we probably -- once it got down to a real tiny

12   amount, there might have been duplicates.  I can't

13   be for sure, though.  I can't tell you for sure.

14       Q    And you said that the 2000 Mules name was

15   communicated to you.  Who was that communicated by?

16       A    I think from the very start that was the

17   title of the movie.

18       Q    And who came up with that title?

19       A    I want to say it was Dinesh, and I would

20   say it's probably the best title he's ever come up

21   with.

22       Q    So then is it your testimony that you were

23   aiming to reflect the 2,000 mules based on Dinesh

24   having chosen that as the title?

25       A    Dinesh just didn't pick 2000 Mules out of

1       the air.  It was obviously communicated to him that

2       they had geotracked 2,000 mules, so that's where the

3       title came from.  Dinesh was the one who thought

4       about using that as the title for the movie.  So I

5       didn't back into the idea of 2,000 mules.  It was

6       communicated to us that there was 2,000 mules.  I

7       was just trying to represent that visually.

8            Q    And it was communicated by Mr. Phillips

9       and Ms. Engelbrecht, or are you referring to other

10      individuals?

11           MR. GEORGE:  Objection to form.

12      BY MR. BOISVERT:

13           Q    I'll rephrase.

14           Who do you believe communicated that to

15      Mr. D'Souza?

16           A    I believe it was Gregg and Catherine.  I

17      can't be exact, but I know that there was definitely

18      numbers placed on these things, and there's a whole

19      section in the film that goes into the math of it

20      all.

21           Q    And in the top e-mail, Mr. Schooley says:

22      Duplicates are fine.  We know Gregg has the footage.

23           A    Uh-huh.

24           Q    How did you know that Gregg has the

25      footage?

CONFIDENTIAL

Page 94

1          A     He communicated to us that there is
2     footage of numerous mules.  I don't know how many,
3     but that it was just a point of matching of data
4     to -- that's why it took so long to get these
5     videos, was because he had to match these
6     geotracking points to a video.  You know, if you got
7     someone coming to a drop box and you can see a dot,
8     how do you know which individual that is, right?  It
9     could be three or four around.  So I'm guessing he
10    was looking at other drop boxes and then ID'ing that
11    person based on that, or waiting for an individual
12    to come to a drop box when no one was around, which
13    is probably why a lot of people, we saw at midnight,
14    you know, by themselves.
15         Q    Mr. Phillips had communicated to you that
16    he has the footage of mules, and he just hadn't been
17    able to identify the specific mules in it yet; is
18    that correct?
19         A    I can't say exactly why, but I know that
20    there was difficulty in some kind of verification
21    process before we got the videos.  It didn't seem
22    like it was a very flippant thing to send these
23    videos off.  It felt like he -- you know, everything
24    that was sent to us was very carefully -- and that's
25    why he was very secretively communicating not to

CONFIDENTIAL

Page 95

1     share any of these videos, but it was all

2     researched, I guess, extensively before we got it.

3             It wasn't like they would never trust us.

4     I don't feel that they would just give us a bunch

5     and say pick what you like.  They wanted to make

6     sure that each had went through the criteria of

7     being a mule.

8         Q     Do you know how Gregg was able to

9     determine that they had additional footage of mules

10    without having completed this verification process?

11            MR. GEORGE:  Object to form.

12        A     No idea.  I think he just -- well, what he

13    communicated to us was he has, I think, a million

14    hours or some kind of ridiculous number of footage,

15    and so it's kind of like you know they're in there;

16    it's just getting it -- or getting the -- even for

17    someone to -- how many people would it take to watch

18    a million hours of surveillance footage, so that's

19    another part of why we knew it took so long.

20            And we weren't even sure that we would get

21    it in time, just because of the amount of footage

22    they were going through.

23    BY MR. BOISVERT:

24        Q     Isn't it also true that they had

25    difficulty getting video from certain drop boxes or

CONFIDENTIAL

Page 96

1    certain locations, and because of that, there was
2    limitations on what the videos themselves could show
3    with respect to mules being in them?
4         A    I believe that was communicated in the
5    film that some drop boxes were not under
6    surveillance, and those that were didn't -- weren't
7    recording.
8         Q    And then in this e-mail, who is Josh L?
9         A    Josh.  I'm guessing it's Frank's -- yeah,
10   it's probably Frank's kid.  Frank brought him in to
11   help with the graphics.
12        Q    Was there anyone else, that you're aware
13   of, that had been assisting with the graphics?
14        A    No, I think that's just Frank and Josh.
15        Q    Okay.  So by the end, then, of the film,
16   did you end up including a collage that is, as
17   described by Bruce here, 5 by 6, 10 by 12, and then
18   15 by 18?
19        A    We did a collage.  I don't know if it
20   matches those numbers exactly.
21        Q    And did that include all of the footage
22   that you received from Gregg, or only certain
23   footage?
24        A    I can't tell you for sure, but I know we
25   wanted as many as possible, so I don't know why we

1    wouldn't use something.

2        Q    Did you do any verification process of the

3    footage that you received after you received it from

4    Mr. Phillips?

5        A    Verification in which way?

6        Q    Is there any reason why you wouldn't have

7    included a video received from Mr. Phillips in the

8    final product?

9        A    If it was blurry or just wasn't great

10   resolution, or it didn't communicate -- it didn't

11   communicate someone -- didn't look like a typical

12   mule, I guess, maybe.

13       Q    But you didn't do any investigation into

14   the underlying fact that Gregg was claiming that the

15   videos depicted a mule?

16       A    I'm an editor.  I get the footage, and I

17   do what I'm told.  I trusted that -- as Dinesh and

18   Bruce did too -- that we were getting footage that

19   was well-vetted.

20            MR. BOISVERT:  Can we please pull up what

21   was previously marked as Plaintiff's Exhibit

22   Number 100.

23   BY MR. BOISVERT:

24       Q    So this document reflects e-mails between

25   Dinesh, Bruce, Debbie, and yourself a few days after

CONFIDENTIAL

Page 98

1    the previous e-mail, on March 29th; is that correct?

2         A    Yes.

3         Q    And so here, it says:  Here's what I

4    got -- the bottom e-mail says:  Here's what I got

5    after G&C.  It may need some VO to connect to the

6    Salem part coming after it.  I played one full

7    screen because it's the only good left that wasn't

8    shown.

9              So is "G&C" in this referring to Gregg and

10   Catherine?

11        A    Yes.

12        Q    When you say what you got after G&C, do

13   you recall what you're referring to?

14        A    After their latest batch of mule videos, I

15   believe.

16        Q    And "VO" is voiceover; am I understanding

17   that correctly?

18        A    Yes.

19        Q    And what did you mean by "I played it on

20   full screen because it's the only good left that

21   wasn't shown"?

22        A    I think that's probably a full-screen

23   video of a mule rather than the collage.  And I

24   think what I meant was -- when I said there's only

25   one left, is because we used all the other ones

CONFIDENTIAL

Page 99

1    throughout the interview.

2         Q    Then you go on to say that:  Maybe after

3    showing G&C, Gregg will be more motivated to get us

4    more mule videos.

5              Why do you think he would be more

6    motivated to get you more mule videos?

7         A    Maybe that he would feel like we're

8    talking so much about all these mules, and to be

9    able to visually see them -- I don't think the

10   graphic was in here at this point.  So the graphic

11   idea of zooming out, showing many of them.  And so I

12   feel like Gregg would agree that the more the

13   merrier.

14        Q    But with this e-mail being dated March

15   29th, did Gregg ever send you more mule videos

16   after?

17        A    No.

18        Q    And in regards to this point in time

19   having the collage already in there, if you look one

20   e-mail up, where it says -- an e-mail from

21   Mr. Schooley:  I think this works up to the last

22   jump.

23              Do you know what he's referring to there?

24   Was he referring to the increasing size of the

25   collage or something else?

Page 100

1        A    It must have been -- he's talking about a

2    duplication in patterns, but I don't think I gave

3    these videos to Frank yet.  I think there's another

4    e-mail that shows, like, on the 2nd of April that I

5    sent Frank the second batch, so it was probably

6    because this pattern that we're doing, this graphic

7    only incorporated the first batch, so it wouldn't be

8    as plentiful as if we had the second batch.

9        Q    And is it your understanding that the

10   reason why you didn't ultimately receive more videos

11   from Mr. Phillips was because of some motivational

12   concern or something related that you referenced in

13   your e-mail on the bottom of the page?

14            MR. GEORGE:   Form.

15       A    No.  I don't know why.  My assumption is

16   that it was difficult to get the videos, and so with

17   only a few weeks left, he probably didn't have time.

18   BY MR. BOISVERT:

19       Q    Had you tried to ask Mr. Phillips directly

20   for the videos yourself?

21       A    Without -- I don't think I would have

22   without cc'ing Bruce or Dinesh.  Gregg and I did

23   have private conversations.  They were only about

24   the delivery process, but it was never about

25   introducing new -- new ideas of getting more film.

CONFIDENTIAL

Page 101

1    That's something I would refer to the hierarchy of

2    the film.

3        Q    But it was surprising to you that there

4    wasn't more videos at that point in time; is that

5    fair to say?

6        A    I don't know if I'd say surprised.  It's

7    always one's hope as an editor to get the footage

8    you need to sell the movie you want to sell, so what

9    you're looking at is just a film maker hoping for

10   the perfect shot.

11            MR. BOISVERT:  Can you please pull up

12   DDR-00022531, and I will mark this as a new exhibit,

13   and I believe we're up to 126.

14            (Exhibit Number 126 was marked for

15   identification.)

16   BY MR. BOISVERT:

17       Q    So this is an e-mail chain that's dated

18   April 7th, 2022, in which the bottom-most e-mail is

19   sent from you to Mr. Schooley that says More Mules

20   and includes two Dropbox links.

21            Do you recall what was included in those

22   links that you sent to Mr. Schooley?

23       A    It's probably maybe the clips of the

24   montage given the date.  I can't be sure, though.

25       Q    So in the next e-mail up, Mr. Schooley

1    says:  He got the one drop of new videos over the

2    weekend.  Was there another one coming.

3            Is he referring there to you having

4    received over the weekend the second batch of

5    documents from Mr. Phillips?

6        A    Yes, I believe so.

7        Q    Then two e-mails up, Mr. Schooley says:

8    Nathan thought of Mike recreating some of the

9    specifics.  This guy mentions using an iPhone.

10   Nathan is asking Mike.  We will also use our other

11   mule footage and anything we can find from footage,

12   from C $ G -- which I believe to mean Catherine and

13   Gregg.

14       A    Yeah.

15       Q    Who is Mike?

16       A    Mike was the -- kind of a production guy

17   in Houston that -- he works where Dinesh shoots his

18   podcast, and so he has -- that's where we shot the

19   interviews for mules, and so he has access to

20   cameras and crew, and he shot some of the

21   reenactments for us.  So I would send him a request

22   of someone dropping a ballot into a drop box, and he

23   would go and film that for us.

24       Q    What were the specifics that you were

25   looking into recreating?

CONFIDENTIAL

Page 103

```
 1          A     I don't know.

 2                (Sotto voce reading.)

 3                There was an interview we did with a

 4     voting expert, and he documented or talked about

 5     ways in which people cheat.  Some of them was

 6     photocopying ballots; some was stealing ballots out

 7     of mailboxes.  And so I did need these to be

 8     recreated, and so I did ask Mike to recreate those,

 9     and he did.  That could be what I was referring to

10     here, but I can't be sure.

11          Q     So Mike ultimately was engaged to recreate

12     specifics about some of the ways in which people

13     cheat in elections; is that correct?

14          A     Yes.

15          Q     And were those videos included in the

16     final film?

17          A     Yeah.

18          Q     Were there any specifics about the --

19     strike that.

20                When you say in the last sentence:  We

21     will also use our other mule footage and anything we

22     can find from footage from Catherine and Gregg, is

23     the other mule footage you're referring to these

24     recreations?

25          A     This is something I said?
```

CONFIDENTIAL

1    Q    Yes.  So this is your e-mail, the second

2    one down -- apologies.  This is the third e-mail

3    down, the one on April 7th, 2022, from Mr. Schooley.

4    He says:  We will also use our other mule footage

5    and anything we can find from footage from Catherine

6    and Gregg.

7    A    Yeah, I don't know what he's talking about

8    there.

9    Q    So in the next e-mail up, you respond:  I

10   think our footage works pretty good.  Not sure Mike

11   would be needed.

12        And then Mr. Schooley responds:  Agreed.

13   Anything to get away from that interview.

14        What interview was he referring to?

15   A    Probably the voting expert I just

16   mentioned.

17   Q    And why was he trying to get away from

18   that interview?

19   A    Any time you're just sitting down, looking

20   at someone speaking, it can get kind of boring, and

21   so we're always looking for cutaways.

22   Q    So he's referring to visually breaking

23   away from the interview?

24   A    Correct.

25        MR. BOISVERT:  We can take down this

CONFIDENTIAL

Page 105

1    exhibit now.

2    BY MR. BOISVERT:

3        Q    So for the process you were describing for

4    recreating the mule footage with Mike, what was --

5    what did that process look like?  Who determined

6    what type of footage you would need to recreate and

7    go about that?

8        A    It came from the interview itself.  So

9    this individual would speak about how people would

10   steal ballots from mailboxes.  That's in the --

11   that's in the cut of the film.  And so as Bruce was

12   saying, it would be good to cut away from him, just

13   because it gets a little dull looking at this same

14   guy over and over.

15            So I would e-mail Mike or call Mike and

16   say, Mike, I need a shot of someone going into a

17   mailbox and grabbing some ballots out, and then he

18   would send me the raw footage of that, and I would

19   put it in the film.

20       Q    Was this process, then, something that

21   fell under your purview for determining what type of

22   shoots you would recreate, or was there direct

23   oversight from someone else within D'Souza Media or

24   outside?

25       A    Yeah, typically, if it's -- for an

CONFIDENTIAL

Page 106

1    editorial need like that, I would ask Bruce for --

2    because it's going to cost money.  Mike is going to

3    charge money for this.  It's not pro bono -- that

4    would need to go through Bruce.  In terms of if it

5    works in the movie, I put my best foot forward.

6              I put it in, and I show Dinesh, and he

7    says, Oh, that's amazing, or, Oh, that sucks.  And

8    so depending on that is if it makes the cut or not.

9              If it's a big cost and a big shoot, then

10   obviously Dinesh would come in and be involved, but

11   these little cutaway stuff, he trusts us just to

12   kind of get it going and then have him look at it

13   after it's in the cut.

14        Q    And then the ultimate decision after it

15   was included would be Mr. D'Souza; is that correct?

16        A    Yes.

17              MR. BOISVERT:  So I think at this point

18   would be a good point to break for lunch, if that

19   works for everybody.  We can go off the record.

20              THE VIDEOGRAPHER:  The time is 12:19.  We

21   are off the record.

22              (Recess 12:19-1:31 p.m.)

23              THE VIDEOGRAPHER:  The time is 1:31.  We

24   are back on the record.

25              MR. VINING:  Before we get started, I'd

CONFIDENTIAL

Page 107

1    like to put on the record that we'd like to have

2    this transcript marked confidential.

3              MR. BOISVERT:   Thanks, Austin.

4    BY MR. BOISVERT:

5        Q    Okay, Mr. Frankowski.  Before the break,

6    we were discussing up to the production of the

7    movie, when you had received the second batch of

8    documents from Mr. Phillips, and changes that were

9    made after that point in time.

10             So moving forward, I wanted to change

11   gears slightly and start talking about other

12   endeavors that you might have been engaged with

13   during the production and other requests that you

14   were handling outside of the direct movie stream

15   itself.

16             So during this period of time, were there

17   other uses for the video?  Other than its final

18   preparation for release, were clips being used for

19   promotional purposes or any other purposes leading

20   up to its release?

21       A    They were very protective of this footage,

22   and so there was really -- we weren't just very --

23   weren't very flippant with it.  There was one

24   instance in which Dinesh had me send some clips for

25   a private meeting, I think with Charlie Kirk's

CONFIDENTIAL

Page 108

1    people, and that was clips from the movie, not --

2    not raw mule clips, but clips from the actual film.

3         Q    And did you send those clips to Charlie

4    Kirk's team?

5         A    I don't know if I sent them directly or I

6    sent Dinesh a link and he would have forwarded them

7    off, but I created a Dropbox link of the clips that

8    were requested from me.

9         Q    Do you still have access to that Dropbox

10   link that you had used to transfer those documents?

11        A    No, I looked for those, I searched the

12   Dropbox, and typically clips that are created from

13   the source movie, I'll delete pretty quickly because

14   they do take up space, and if I ever needed to

15   recreate them, I have the movie to do that.

16        Q    Do you recall any other instances where

17   you had shared clips of the movie prior to its

18   release?

19        A    No, nothing off of hand, but I'm sure

20   there's requests for clips here and there, but it

21   was all for internal use.

22             MR. BOISVERT:  Can we please pull up

23   DDR-00023414.  And this will be a new exhibit, and I

24   believe we are up to 126.

25             THE REPORTER:  Are you sure it's not 127?

CONFIDENTIAL

Page 109

1             CONCIERGE TECH:  127, we're up to.

2             MR. BOISVERT:  Oh, thank you very much.

3             (Exhibit Number 127 was marked for

4     identification.)

5     BY MR. BOISVERT:

6        Q    So in this document, you can see at the

7     bottom, that is an e-mail from Dinesh to

8     Mr. Schooley and someone named Mr. Caporale that's

9     dated April 30th, 2022, and this e-mail was later

10    sent to you, forwarded by Mr. Schooley, and you

11    responded to that e-mail, then, further up the

12    chain, on April 30th, 2022.  Is that an accurate

13    description?

14       A    Sure.  Yes.

15       Q    Do you know who Mr. Caporale is?

16       A    I don't believe so.  Is his name on the

17    e-mail?

18       Q    On that e-mail at the very bottom there,

19    justin@eventstrategiesinc.com.

20       A    No, I don't know who that is.

21       Q    In this e-mail that is from Mr. D'Souza,

22    it says:  Justin, Bruce Schooley can provide you

23    with the movie link for the Pennsylvania rally.

24             And then Mr. D'Souza says:  I'm planning

25    on introducing the movie before it plays and then

CONFIDENTIAL

                                        Page 110

1    speaking later before President Trump.

2                And then later on, when you're forwarded

3    that, you respond to Bruce that:  Is a vimeo link

4    screener that will stream or do we need to send a

5    Dropbox link, where he'd download it, and have

6    possession of it?

7                And you note further up the chain:  When

8    does he need it?  Just hate having copies out there

9    without the movie released.

10               Do you remember providing the prereleased

11   version of the film for this purpose?

12        A    I don't remember.

13        Q    Are requests like this typical, based on

14   your experience working with D'Souza?

15        A    Requests for the movie, yeah, are typical.

16   Not to play at -- is this at a Trump rally or

17   something?  That's not typical.

18        Q    For the relationship with the Trump rally,

19   do you recall any other instances in which the

20   prereleased film might have been shared with

21   President Trump's team?

22        A    Just I know that he gave feedback once,

23   and so it was obviously shared with his team then,

24   and I know Dinesh and Bruce definitely wanted

25   Trump's support on the film, so I'm sure there was

CONFIDENTIAL

Page 111

1    plenty of communication between them and sharing of

2    clips or the film itself.

3            MR. BOISVERT:  Can we please pull up now

4    TPNF-0001061.  Now we're up to Exhibit Number 128.

5            (Exhibit Number 128 was marked for

6    identification.)

7    BY MR. BOISVERT:

8        Q    In this document, the bottom e-mail,

9    that's an e-mail from you to Mr. Schooley,

10   Mr. D'Souza, and Ms. D'Souza, with the subject line

11   Mule Clips, dated May 5th, 2022.

12           Do you see that?

13       A    Yeah.

14       Q    And it says:  Here are 20 clips I pulled

15   from the film, with bumpers.  Let me know if you

16   want any others.

17           What are clips with bumpers?

18       A    Bumpers are the -- after the clip is

19   played, it tells you where you can watch the film

20   when it's released, so it's like a marketing -- a

21   marketing thing that you put at the beginning or end

22   of a clip, kind of like a trailer.

23       Q    Okay.  So this is -- for the purposes of

24   marketing the film, you pulled clips that could then

25   be distributed to the public.

Page 112

1          Does that sound correct?

2     A     Yes.

3               MR. BOISVERT:  Can we please pull up next

4     TPNF-0002511.

5     BY MR. BOISVERT:

6     Q     And so this is an e-mail chain that the

7     top-line e-mail is from Ms. D'Souza to Mr. Phillips,

8     and copying Mr. Schooley, Dinesh, Catherine, and

9     then yourself, with the subject line Screenshot of

10    Mules.  It's sent February of 2022.  Is that

11    correct?

12              Do you see that?

13    A     Yeah.

14              THE REPORTER:  Is this a new exhibit?

15              MR. BOISVERT:  Yes, it is.  Apologies.  So

16    we are up to 129.

17              (Exhibit Number 129 was marked for

18    identification.)

19    BY MR. BOISVERT:

20    Q     So in the second e-mail down, it says,

21    from Mr. Phillips:  By the way, as soon as you can

22    release a few of those amazing stills from

23    Sunday/Monday, I'd like to get my hands on a couple

24    for a project CE and I are launching.  Happy to pay

25    for them.

CONFIDENTIAL

Page 113

1              Do you know what amazing stills he's

2        referring to?

3              A    We had a production photographer on set

4        with us whose name is Sanjay, and he takes amazing

5        photography, photos of the filming process, and also

6        talent on the screen, and so there was some shots of

7        Gregg and Catherine getting out of a vehicle,

8        looking pretty cool, and so I think they wanted

9        those for their own promotional purposes.

10             Q    I'd like to turn now to discussing the

11       comments that others may have --

12                  MR. BOISVERT:  We can take down the

13       exhibit now.  Thanks.

14       BY MR. BOISVERT:

15             Q    So, previously, you had discussed that

16       there were comments that were provided by external

17       parties throughout the production process; is that

18       correct?

19             A    Yeah.

20             Q    And for those parties, one of them is TTV;

21       is that correct?

22             A    Yes.

23             Q    How often did you receive comments from

24       TTV?

25             A    I think Dinesh was -- he wanted to not

CONFIDENTIAL

Page 114

1    overload them with content of the film, so he picked

2    very specific times to clue them in.  You typically

3    don't want to give a rough cut to someone who hasn't

4    seen a rough cut or know about how the film process

5    goes, because they will comment on things, and

6    things will worry them that will be fixed later on.

7    So there was -- it was later into the cut, I know,

8    when they watched it, and then they provided

9    feedback.  I can't really remember what the feedback

10   was or if we implemented any of their changes.

11           (Crosstalk.)

12       Q    Do you recall only this one instance, or

13   were there other instances of feedback you received

14   from TTV?

15       A    I can't really remember an instance.  I

16   just know that they screened the film, and I'm

17   guessing, knowing them, that they did provide

18   feedback.  I don't recall what the feedback was.

19           MR. BOISVERT:  Can we please pull up

20   TPNF-0004204, and this will be a new exhibit, as

21   130.

22           (Exhibit Number 130 was marked for

23   identification.)

24           MR. BOISVERT:  So if we could please

25   scroll down.  Yeah.

CONFIDENTIAL

Page 115

1            CONCIERGE TECH:  I'm sorry, what are you

2      referring to as "scroll"?

3            MR. BOISVERT:  No, that was my mistake.

4      Lost my line.

5      BY MR. BOISVERT:

6      Q    So in this document, you can see the --

7      bottom line, the original e-mail was sent from

8      Mr. Schooley on January 16th, 2022, and that e-mail

9      is responded to by Debbie to Mr. Schooley, copying

10     Dinesh and yourself, and it reflects that the:  I

11     just changed the 30 to 53 trips, per Catherine.

12           Do you understand the context of what this

13     particular change was?

14     A    No idea.

15     Q    Was receiving feedback like this about

16     particular line items frequent or common when you

17     were working with Catherine?

18     A    I don't recall much.  This was in -- looks

19     like it was before we filmed their scene, so I don't

20     know what they would be commenting on.  Maybe it was

21     on -- might have been on the teaser trailer.  That's

22     probably what it was.  So they watched the teaser --

23     this is all speculation, but, yeah, they probably

24     watched the teaser trailer and are commenting on

25     that.  I think we did have some numbers in the

CONFIDENTIAL

Page 116

1    teaser trailer that referenced how many drop boxes

2    and -- an individual might have taken.

3         Q    To be clear, at this point in time, would

4    that have been before the release of the trailer?

5         A    I'm guessing, yeah, because the comments

6    afterwards weren't really -- if it's already public

7    and out, then it's kind of useless.

8         Q    Did TTV review all of the specific numbers

9    and data that was included in the trailer and/or the

10   film?

11        A    We would want them to.  We're basing the

12   film off of their data, so it would be prudent for

13   us to verify through them, yes.

14        Q    Do you know if they, in fact, verified the

15   claims in the film during the production process?

16        A    I wouldn't be privy to that information.

17        Q    Would you have received comments that TTV

18   had made during the course of the production of the

19   film and then implemented those comments as directed

20   by Mr. Schooley and/or Mr. Dinesh?

21        A    That's in the realm of possibilities that

22   they gave a note or something that we got wrong, and

23   then I would make the change, but I can't remember

24   any specifics.

25        Q    You referenced previously that President

CONFIDENTIAL

Page 117

1    Trump's team had provided comments, correct?

2        A    Yeah.  I don't know if it was his team or

3    him.  I just know that notes came back after his --

4    after he viewed it.

5            MR. BOISVERT:  Can we please pull up what

6    was previously marked as Plaintiff's Exhibit

7    Number 119.

8    BY MR. BOISVERT:

9        Q    So this exhibit is an exchange between

10   Mr. Schooley, yourself, and Mr. Kesler.  Do you

11   recognize this exchange?

12       A    I don't know if I know -- or remember who

13   Kesler is.  Oh, Bryce Kesler.  Yeah, I know who he

14   is.  Okay.

15       Q    And who is Mr. Kesler?

16       A    He did the distribution for us.  So he was

17   communicating with the movie theaters.

18       Q    Then in the top e-mail from Mr. Schooley,

19   he notes that:  It will be impossible to have a

20   final edit before 4/17, since Trump sees it on 4/14

21   and he might have a note or two.

22            So is that reflecting the comments that

23   you received from Trump that you previously

24   indicated?

25       A    If -- what are you asking exactly?

CONFIDENTIAL

Page 118

1    Q    Is this around the time that you recall

2    having sought Trump's opinions and received comments

3    from them back?

4    A    It seems around that time, yeah.  It was

5    late in the game.

6    Q    And do you recall specifically whether or

7    not you made changes based on any comments that you

8    may have received from President Trump?

9    A    Yeah, I think I stated earlier that he

10   wanted it shorter, and I thought it was a good call.

11   Q    Moving on next to Salem, you had mentioned

12   previously that they similarly reviewed the film and

13   provided substantive comments; is that correct?

14   A    Yes.  As financiers, they have a lot at

15   stake.

16   Q    Do you recall the nature of their

17   comments?

18   A    Not -- no, I don't.

19   Q    Were they involved throughout the movie

20   process, or were they only reviewing at the end,

21   like President Trump's team?

22   A    They might have been privy to a couple of

23   earlier drafts than the one that Trump saw, but I

24   don't -- I don't remember.

25   Q    One second.  Apologies.

CONFIDENTIAL

Page 119

1          MR. BOISVERT:  I'd like to turn next to a

2     document Bates-stamped TPNF-0000994, and this is a

3     new exhibit that we'll mark 131.

4          (Exhibit Number 131 was marked for

5     identification.)

6     BY MR. BOISVERT:

7          Q    So this document is reflecting a top-level

8     e-mail, an e-mail from you that was sent on November

9     28th to Dinesh and copying Bruce.

10          Do you see that?

11          A    Uh-huh.

12          Q    And A little further down the chain, there

13     is a forwarded message that came from Marco Numan,

14     with the subject line Distribution Agreement/2000

15     Mules.

16          Are you familiar with who Mr. Numan is?

17          A    No.

18          Q    In that e-mail, it says:  The offer is

19     revised as we want to include exclusive DVD rights

20     in addition to the video-on-demand (VOD) rights

21     (dubbed in German).  Also we'd like to expand the

22     distribution territory with Austria and Switzerland.

23          Do you recall being involved in the

24     discussions surrounding the video rights in these

25     areas?

CONFIDENTIAL

Page 120

1        A    No.  The only reason I'd be involved would

2    be to send them the actual film once they agree to

3    whatever they agree to.

4        Q    So I believe that's reflected, then, in

5    the next e-mail, where D'Souza forwards this e-mail

6    on to you and Mr. Schooley, and he asks:  Can we get

7    all the deliverables ready so that we can get them

8    over to them as soon as the agreement is signed.

9            So is that consistent with your role in

10    this process?

11        A    Yes.

12        Q    So the top line --

13        A    Some of the things.  Deliverables are

14    pretty extensive, and a lot of legal stuff that I

15    don't do, but in terms of the film and the score and

16    the audio, that would -- that would fall under my

17    responsibility.

18        Q    Would you be the only person that would

19    send out clips of this sort or the entire film

20    itself, in this case?

21        A    Yeah.

22        Q    In your top-level e-mail, you note:  I'm

23    not sure how needed that is, but since we made that

24    cut to take out the one mule, all the time codes

25    would be incorrect.  Maybe see if we can remove that

CONFIDENTIAL

Page 121

1       for contract.

2               Do you recall what this "cut to take out

3       the one mule" is referring to?

4           A    Yeah, once the lawsuit came up, we took

5       out Mr. Andrews from the film.

6           Q    And "the lawsuit" being Mr. Andrews's

7       lawsuit, presumably?

8           A    Correct.

9           Q    And did you remove him from the film from

10      all distribution or only in this particular case?

11          A    We couldn't retroactively remove from

12      platforms or DVDs that already had him in it, but

13      wherever we could, we did, and any new deal that was

14      being made would have the new cut.

15          Q    For online platforms and other platforms

16      of that sort that could -- could those be updated to

17      provide a new linked document underneath?

18          A    I believe so.  I don't know if -- this is

19      pretty late.  This is November.  I don't know how

20      many people were actually watching the film,

21      streaming it, at this time.

22          Q    Do you recall if any of those distribution

23      means had been updated to reflect the cut that had

24      been made to remove Mr. Andrews?

25          A    I don't recall, but if there was

CONFIDENTIAL

Page 122

1    significant purchasing of the film on, say, like

2    Rumble, we definitely would have updated it, but I

3    just don't think there was -- it might not have even

4    been available.  You'd have to check when -- if the

5    film was available at this date.

6              MR. BOISVERT:  Can we now please pull up

7    TPNF-0002670, and this will be marked as

8    Exhibit 132.

9              (Exhibit Number 132 was marked for

10   identification.)

11   BY MR. BOISVERT:

12       Q    So the top-level e-mail in this chain is

13   an e-mail from you to Patricia Jackson, subject line

14   Reply: Dinesh D'Souza, that was sent May 11th, 2022.

15             Do you see that?

16       A    Yes.

17       Q    And you are telling Patricia Jackson:

18   They shut us down due to misinformation.

19             Do you recall the context of this

20   occurrence?

21       A    Yeah, I believe it was Vimeo, and we were

22   using Vimeo as a way to screen the film.  Patricia's

23   the -- what do they call it -- like an

24   advertising -- she's the one that's -- she's the

25   publicist, and so she provides screenings of the

CONFIDENTIAL

Page 123

1    films for journalists and all that, and so we were

2    using Vimeo as a platform for them to view it, and

3    they -- Vimeo shut down the film, so would not let

4    us share the film privately and password protected,

5    which I found very odd.

6        Q    And so when she is referring to the

7    screener link -- when she's asking:  Is the screener

8    link still working, or has it been disabled, she's

9    referring to the link that was sent via Vimeo?

10       A    Correct.

11       Q    And do you recall the specific reasons, if

12   any, that Vimeo gave for disabling the link?

13       A    They must have mentioned misinformation,

14   but that's -- that's all I remember.  That's what I

15   said in the e-mail, but it was something along those

16   lines.

17       Q    And what does -- what do you understand

18   misinformation to mean in this context?

19       A    They probably felt like the film was --

20   was delivering some kind of misinformation on

21   voting -- on voting security or something.

22       Q    Did you attempt to contact Vimeo about

23   this decision?

24       A    I don't believe so.  I think I just

25   switched platforms.

CONFIDENTIAL

Page 124

1        Q    Do you know if anyone else at D'Souza
2    Media contacted Vimeo about this?
3        A    No.  They're a big company, and they might
4    have just went public at that time, if I recall, so
5    it would have been just -- they were probably
6    protecting themselves, and it just would have been a
7    useless battle, I think.
8                MR. BOISVERT:  We can take down this
9    exhibit.
10   BY MR. BOISVERT:
11       Q    So I want to talk a little bit about the
12   decision to blur the surveillance videos that were
13   included in the final Mules film.
14       A    Uh-huh.
15       Q    Were you involved in making that decision?
16       A    I don't think so.  I mean, I would have
17   suggested doing it, but it's really not my call.
18       Q    Why would you have suggested doing it?
19       A    I feel it's not the -- not my purpose
20   anyway, but it shouldn't be the film's purpose to
21   dox anybody.  We're not the law, and, you know, I
22   hate the idea of someone being outed based on what
23   they're doing.  And the way that they explained
24   mules to us, it wasn't a lot of ideologues out
25   there; it was people in desperate need of money.  So

CONFIDENTIAL

Page 125

1      it -- it just felt icky if we were going to expose

2      any of them.

3          Q    Had you typically or -- strike that.

4              Had you previously ever blurred images to

5      remove identifiable information of subjects included

6      in prior films that you worked on with D'Souza

7      Media?

8          A    Yeah, it's a regular process when you get

9      a fair-use attorney to look at it and it comes back

10     all the things that they suggest you deal with on a

11     legal stance, and so blurring is a big part of that.

12         Q    Did the team -- the production team always

13     intend to blur the photos, or was that a decision

14     that was made partway through the production

15     process?

16         A    I don't know if we thought about it early

17     on, and then once you were kind of catching up and

18     watching the film, I think it was always assumed

19     that it would happen, and, you know, obviously the

20     lawyers would definitely suggest it.

21         Q    Do you recall what brought about that

22     recognition that it should be considered in this

23     case?

24              MR. VINING:   Objection.

25              Mr. Frankowski, I'm just going to instruct

Page 126

1    you not to divulge any attorney-client privileged
2    information.
3             THE WITNESS:  Got you.
4    BY MR. BOISVERT:
5         Q    So without revealing any privileged
6    information, do you recall when the decision was
7    made to blur the photos?
8         A    I think it was early April.
9         Q    And was there a specific event, to your
10   recollection, that spurred that?
11        A    It was when we got e-mails back from the
12   lawyers.
13            MR. BOISVERT:  Can we please pull up the
14   exhibit that was previously marked as Plaintiff's
15   Exhibit Number 120.
16   BY MR. BOISVERT:
17        Q    So this document reflects an e-mail from
18   Frank Lamont to Mr. Schooley, and copying yourself,
19   and it's in response to a prior e-mail from
20   Mr. Schooley that says:  We are working on E&O
21   insurance.  Clearance lawyer Sarah is requesting a
22   final version blurring for clips they are worried
23   about.  Since we don't want to ship without E&O, can
24   I send her something today?
25            So who is clearance lawyer Sarah?

CONFIDENTIAL

Page 127

1          A    I don't know.  I'm guessing it has to do
2     with clearance.
3          Q    And are you familiar with what E&O
4     insurance is?
5          A    Errors and omission.
6          Q    And is that a typical type of insurance
7     that you would obtain for projects during your
8     experience working with D'Souza Media?
9          A    Every film typically has E&O insurance.
10         Q    Did the Mules film have E&O insurance?
11         A    I know Bruce was working on getting it.  I
12    don't know if he got it or not.  I don't think he
13    did.
14         Q    And do you know what E&O insurance
15    protects against, just generally?
16         A    Errors and omissions that the film makes.
17         Q    And were there any concerns, outside of
18    anything that was discussed with your attorneys,
19    about not having E&O insurance for this particular
20    film?
21         A    I don't recall any conversation about it.
22         Q    And here, where the e-mail says:  They are
23    requesting a final version blurring for clips they
24    are worried about, are those clips the surveillance
25    video clips that you received from Mr. Phillips?

CONFIDENTIAL

Page 128

1        A    They could be those or the interviews that

2    I mentioned.  An actual mule who gave an interview,

3    that person was to be blurred, and so was the cop

4    from Atlanta.  Besides those two, I believe the only

5    other blurring were the actual surveillance footage

6    of drop-box voters and license plates and things

7    like that that could ID everybody.

8        Q    Is it your belief that just blurring the

9    faces and then license plates was sufficient to

10   remove any ability to identify individuals based on

11   any videos that were included in the final film?

12       A    Based on historical films and what they

13   do, yes.

14       Q    Was there any discussion about any other

15   steps, other than blurring, that you might take to

16   obscure identities?

17       A    I know that we took all the steps

18   requested of us.

19            MR. BOISVERT:  Can we please pull up now

20   what was previously marked as Exhibit Number 80.

21   BY MR. BOISVERT:

22       Q    So this is an e-mail chain that is dated

23   April 7th, 2022, and the top-line e-mail is from

24   Mr. Schooley to yourself, and copying Dinesh.

25            Do you see that?

CONFIDENTIAL

Page 129

1          A     Yes.

2          Q     So if we scroll down to the beginning of

3     the e-mail chain, there is an e-mail that is from

4     Bruce that says -- that's passing along from Dinesh:

5     I got some additional feedback from the leadership

6     at Regnery and Townhall.  There was a concern that

7     we are not showing enough evidence of wrongdoing.

8     There were three suggestions:  Show the same person

9     visiting multiple drop boxes; show more people

10    stuffing ballots; show in greater detail the mobile

11    phone data; show the exact route that somebody took

12    at 3:00 in the morning; and state exactly how many

13    bad cell phone trails were found.

14               Do you recall this feedback from the

15    leadership at Regnery and Townhall?

16         A     I don't remember getting this e-mail or

17    seeing it, but...

18         Q     And are you familiar with who Regnery and

19    Townhall are?

20         A     I'm guessing it's a law firm.

21         Q     If we scroll up to the first page, the

22    e-mail where Bruce passes along those comments says:

23    I'll work with Nathan on 1 and 2.  A couple more

24    clips will do it.  Some already in there now.

25               And then in the e-mail response to that,

CONFIDENTIAL

Page 130

1    you reply:  2 and 3 will open the reels again, so

2    this will delay delivery to next week.  Kappa should

3    be able to handle it, but at some point we have to

4    lock the picture.

5              Before that, you say, however:  There is

6    no video of a mule at multi locations, or at least

7    looks like the same person.  Unless Gregg can show

8    me exactly.  But I recall the one he did have.  It's

9    a far-away shot and dark, so it could be anyone.

10             Is that your -- is that opinion that there

11   was no video of a mule at multi locations reflected

12   within the videos that were provided by Mr. Phillips

13   still the opinion that you have today of those

14   videos?

15        A    My opinion is that there's no visual

16   evidence of the same person.  It doesn't mean that

17   they're not the same person; it's just the camera

18   angle doesn't identify their face.

19        Q    So is it true to say, then, that

20   Mr. Phillips did not provide any visual evidence of

21   a mule at multi locations?

22        A    Yes.

23             MR. GEORGE:  Object to the form.

24   BY MR. BOISVERT:

25        Q    Do you recall the specific definition of a

CONFIDENTIAL

Page 131

1    mule that was included in the Mules film?

2         A    Not verbatim, but kind of the idea, I

3    guess.

4         Q    Was an element of that definition a

5    requirement that mules had gone to more than one

6    drop box?

7         A    I believe so, yes.

8         Q    So is it correct to say, then, that there

9    was no video evidence of a mule that meets that

10   definition because there was no video evidence of a

11   mule at multi locations, based on your review of the

12   visual evidence that was provided?

13              MR. GEORGE:   Form.

14        A    Correct, of the 50 or so videos that we

15   had, there was none that was evidence of the same

16   person at a different drop box.

17   BY MR. BOISVERT:

18        Q    Is that particular type of evidence

19   something that you had expressly sought from

20   Mr. Phillips or discussed with him?

21        A    Yes.  I believe there was e-mails early on

22   asking for that.

23        Q    And did he provide any specific reason why

24   that particular type of video evidence was not

25   included in the videos that he sent you?

Page 132

1       A    Yes.  One was the cameras are not there to

2    capture, you know, someone's face, so the wide

3    shots, you're not going to be able to visually ID

4    the same person.  There was plenty of drop boxes

5    that they went to where the camera was turned off.

6    There was also plenty of drop boxes they went to

7    where there was no video surveillance.

8       Q    And given the description that you gave

9    earlier that Mr. Phillips indicated he had over a

10   million minutes, I believe it was, of -- or maybe it

11   was hours -- strike that.

12            When Mr. Phillips described the amount of

13   video evidence that he had accumulated from the

14   surveillance videos, how much evidence did he have,

15   approximately?

16      A    It's in the movie, where he lists the

17   amount of hours.

18      Q    Yeah.

19      A    Yeah, I don't know exactly.  I think the

20   word "a million" was used, but it was a ginormous

21   amount.

22      Q    And do you think -- is it surprising to

23   you that from within such a large dataset, they were

24   unable to provide any videos that showed a mule at

25   multi locations?

CONFIDENTIAL

Page 133

1        A     I think the more video you have makes it

2    harder, because you have to go through all of that,

3    and so unless they have, you know, an army of

4    analysts, I think it would be very difficult to find

5    a needle in a haystack, so to speak, given the time

6    strain.

7        Q     As regards Mr. Andrews specifically, did

8    you have any video evidence that he was at multiple

9    locations within the videos supplied by

10   Mr. Phillips?

11       A     No.

12       Q     Did you ever go back to look at the

13   surveillance videos to determine in which videos

14   Mr. Andrews may or may not appear?

15       A     Once the lawsuit became -- once I found

16   out about the lawsuit, yeah, I definitely want to

17   see which one he was...

18            MR. BOISVERT:  Can we please pull up

19   TPNF-0001022, and we'll mark this as 133.

20            (Exhibit Number 133 was marked for

21   identification.)

22   BY MR. BOISVERT:

23       Q     So in the original e-mail in this chain is

24   an e-mail sent December 12th, 2022, from

25   Mr. Schooley to yourself, and it says:  Nathan,

Page 134

1    There is a photo in Dinesh's book of maybe the same

2    guy that has brought the lawsuit.  I don't think

3    this shot or clip was in the film.  Can you send me

4    the clip that we got, the right side picture from

5    the one where he was wearing a jacket.  Both Dinesh

6    and Debbie think he is wearing the same shoes, but I

7    can't tell.  Need as much res as possible.

8              Do you recall him making this request?

9         A    Yes.

10        Q    And when he says "need as much res as

11   possible," does that mean resolution?

12        A    Correct.

13        Q    And in your reply, you say:  Here is the

14   guy.  It's not the same dude.

15             Do you recall that?

16        A    I don't recall saying that, but obviously

17   I did here.

18        Q    And what is your understanding of your

19   statement here:  It's not the same dude?  What were

20   you telling Mr. Schooley?

21        A    I guess that the guy -- Mark Andrews isn't

22   the guy in Dinesh's book.

23        Q    So if we go to the second page of this

24   document, we can see -- and if we zoom in on the

25   bottom set, we can see three images.  So are these

CONFIDENTIAL

Page 135

1        the three images that you recall being discussed in

2        the above e-mails between you and Mr. Schooley?

3             A    I don't recall it, but I guess it

4        obviously is.

5             Q    So based on these images, is it your

6        understanding that they don't reflect the same dude

7        in each of the images?

8             A    Correct.

9             Q    Thank you.

10            MR. BOISVERT:  We can take down the image.

11       BY MR. BOISVERT:

12            Q    After the lawsuit was filed, other than

13       looking for those images, as just shown in that

14       e-mail correspondence, did you take any other steps

15       or were you aware of anyone else at D'Souza Media

16       taking any other steps to investigate whether you --

17       Mr. Andrews appeared in more than one video?

18            A    No.

19            MR. BOISVERT:  Can we now turn to

20       TPNF-0002702.  And this will be marked Exhibit 133.

21            THE REPORTER:  It should be 134, I

22       believe.

23            MR. BOISVERT:  Thank you.  134.

24            (Exhibit Number 134 was marked for

25       identification.)

CONFIDENTIAL

Page 136

1    BY MR. BOISVERT:

2         Q    So this document reflects e-mails between

3    Mr. Schooley, yourself, and Mr. D'Souza that were

4    dated April 10th, 2022; is that correct?

5         A    Yes.

6         Q    And then on the first-most e-mail on this

7    chain, it was sent by Mr. Schooley, and it says:

8    Nathan, Dinesh likes this placement.  He is sending

9    you this one VO line now.  Disregard the yellow on

10   the second section.

11            And then it provides a transcript that

12   appears to be from the mules video.

13            Is that your understanding of what the

14   transcript is reflecting?

15        A    Yes.

16        Q    Do you recall what Dinesh was trying to

17   add to the film in this instance?

18        A    I'm guessing he wants the Dennis Prager

19   line to come before the -- probably about the

20   trailer, my guess.

21        Q    So in your e-mail directly above this, you

22   say:  I think it's a cheap shot, especially if you

23   don't let on that you know he misspoke.  Maybe call

24   it Freudian slip or something.

25            Do you know what you were speaking about

CONFIDENTIAL

Page 137

1    in that e-mail?

2        A    Yes, it's Biden.  He says, We have put

3    together, I think, the most extensive and inclusive

4    voter fraud organization in the history of American

5    politics.

6            He obviously misspoke, but we used it in

7    the movie anyways.

8        Q    And what did you mean by saying it's a

9    cheap shot?

10        A    If we are trying to convince people that

11    he actually meant that when he said that, it feels a

12    little cheap to me.

13        Q    But you included the clip of Biden in the

14    final video, correct?

15        A    Yeah, it opens the movie.

16        Q    Did you express any other concerns with

17    particular clips that were included in the movie?

18        A    I'm sure I did.  It's kind of my job, and

19    I'm very vocal about it, but I tend to only make it

20    once.

21        Q    Is this interaction typical for how you

22    would raise these concerns?

23        A    Yes.

24        Q    Were your concerns generally taken into

25    account but not necessarily implemented by

1    Mr. Schooley and Mr. Dinesh?

2         A     Yeah, I think they always take what I have

3    to say in account, but they know their market, they

4    know their crowd, they know how to sell the movie,

5    and so they have a better understanding, I guess, of

6    what's going to make a more successful film for the

7    audience.

8         Q    So is it fair to say that their primary

9    concern, then, was determining what would be the

10   most successful with the audiences and what would

11   sell?

12        A    I think anyone who's in the movie

13   business, that's one of their main motives.  I don't

14   think that they would choose that over truth.  I

15   think in this, they know that people will view Biden

16   as misspeaking and will think it's a joke.  I just

17   don't find it very funny.

18        Q    In the top-line e-mail, where Mr. Schooley

19   says:  It is a bit cheap, but let's go ahead and

20   shove it up their ass.  You'll get into heaven

21   before us.

22             Do you understand the sentiment -- or how

23   do you understand the sentiment that he is relaying

24   with this comment?

25        A    He's saying that the Left, if they had --

CONFIDENTIAL

Page 139

1    if they've ever misused anything that Trump's ever

2    said, which is obviously true, they would scream it

3    from the mountains, so let's go ahead and give them

4    a taste of their own medicine.

5        Q    And his comment:  You'll get into heaven

6    before us, why do you think he included that?

7        A    Meaning I'm being virtuous in trying to

8    not include the clip.

9        Q    Do you think that was a common difference

10   that you had with the different perspective of

11   Mr. Schooley and Mr. D'Souza?

12       A    I think what's common about it is that

13   there is different viewpoints.  I don't think that I

14   am always on the side of virtue.  It might switch

15   roles in other instances.

16            MR. BOISVERT:  I think that's all the

17   questions I had for the moment, but I would reserve

18   some time if there's any redirect after any

19   questioning of other counsel.

20                        EXAMINATION

21   BY MR. GEORGE:

22       Q    I have just a couple questions,

23   Mr. Frankowski.  So you discussed that there were

24   two different batches of videos provided; is that

25   right?

CONFIDENTIAL

Page 140

1          A     Correct.

2          Q     Do you know why it came in two different

3    batches?

4          A     Not specifically.  I could -- the

5    assumption was that it just took a long time to

6    analyze the video before we got it, the second

7    batch.

8          Q     Do you know which batch Mr. Andrews

9    appeared in?

10         A     The second batch.

11         Q     When did you first learn who Mr. Andrews

12   was?

13         A     It would be late October when I found out

14   about the lawsuit, 2022.

15         Q     Do you have a standard practice of

16   cleaning out your Dropbox at the conclusion of each

17   movie project that you work on?

18         A     I do.

19         Q     And you discussed earlier that you sent

20   some clips that were ultimately then sent to Charlie

21   Kirk.  Do you remember that?

22         A     Yes.

23         Q     You said you don't have -- you don't have

24   those videos any longer?

25         A     No, I do not.

CONFIDENTIAL

Page 141

1      Q     You don't know exactly what's in those

2    videos, right?

3      A     Dinesh made a specific request, and I

4    don't see why I would send anything other than the

5    request.  Also, the date of when I sent those videos

6    was before I got the Mark Andrews video.  So if the

7    indication that Mark Andrews was in that view, it's

8    not true.

9      Q     Do you recall when you received the Mark

10   Andrews video?

11     A     Yeah, I can kind of pinpoint it off the

12   e-mails, but it was March 27th, is what I think I've

13   boiled it down to.

14     Q     One second.  I want to pull up an exhibit.

15   I'm not that proficient with Exhibit Share.

16           CONCIERGE TECH:  Is it the Exhibit Share

17   giving you trouble or --

18           MR. GEORGE:  I'm pulling it up.  I believe

19   this will be Exhibit 135.

20           (Exhibit Number 135 was marked for

21   identification.)

22   BY MR. GEORGE:

23     Q     Do you see that on your screen?

24           CONCIERGE TECH:  We don't see anything

25   right now.

CONFIDENTIAL

Page 142

1              MR. GEORGE:  It says distributing file.  I
2       assume it's going through.
3              CONCIERGE TECH:  Are you sharing with the
4       Zoom share?
5              MR. GEORGE:  Yeah.  I pressed share, and
6       it says distributing file.  I don't know if it's
7       frozen or something, but...
8              CONCIERGE TECH:  Are you sharing the
9       screen, or are you sharing an application?
10             MR. GEORGE:  No, I'm doing it through
11      Exhibit Share.  All right.  Now it went through.
12      BY MR. GEORGE:
13          Q    Do you see Exhibit 135 on your screen,
14      Mr. Frankowski?
15          A    No.
16             CONCIERGE TECH:  You might have marked it,
17      but you're not showing it.
18             THE WITNESS:  I can look it up here.
19             MR. GEORGE:  It says:  Your exhibit has
20      been introduced.
21             MR. VINING:  I have Exhibit 135.
22             Mr. Frankowski, you may need to refresh.
23             THE WITNESS:  I got it here.
24      BY MR. GEORGE:
25          Q    This is a document Bates-labeled

CONFIDENTIAL

Page 143

1      DDR-00052690, and it's a series of e-mails dated

2      April 11th and April 12th of '22, right?

3           A    Yes.

4           Q    And the top e-mail is from Dinesh D'Souza

5      to Tyler Bowyer, right?

6           A    Yes.

7           Q    You said yes?

8           A    What was the question?  Sorry, I was

9      looking at the -- yeah --

10          Q    Take your time and review it.  That's

11     fine.

12          A    Yeah, I got the dates wrong.  I apologize.

13     So I did send this on 4/12, and I did receive

14     Andrews's videos at 3:27, is what I nailed it down

15     to.  So, yeah, I was incorrect in saying that.  It

16     would be impossible.

17               MR. GEORGE:  Okay.  I think that's all the

18     questions I have.

19               MR. BOISVERT:  No further questions for me

20     either.  Thanks for your time today, Mr. Frankowski.

21               THE WITNESS:  No problem.  Thank you for

22     letting me do this virtually.

23               THE VIDEOGRAPHER:  This concludes the

24     videotaped deposition.  The time -- I'm sorry,

25     Counsel, did you have anything else?

CONFIDENTIAL

Page 144

1           MR. VINING:  I have a few questions.

2           THE VIDEOGRAPHER:  My apologies.

3                     EXAMINATION

4     BY MR. VINING:

5           Q     Reviewing the same exhibit that Mr. George

6     just introduced.  Toward the bottom of the first

7     page, where Mr. D'Souza mentions:  Remember the two

8     clips you prepared for me for Turning Point?  1,

9     mule video and Salem reaction; and, 2, part of the

10    mule interview.

11          Do you remember taking those clips from

12    the film?  Or, I'm sorry, where did you get those

13    clips from?

14          A     I'm confused because I remember looking up

15    where I was requested these videos, and I do

16    thought -- I did think it was, like, March 22nd.

17    I'm confused why it says April 12th now, unless they

18    were -- I resent them to him, but these -- it was a

19    request from Dinesh asking for clips from the movie.

20          Q     Do you remember pulling those clips from

21    the movie?

22          A     I don't remember.  I think it -- yeah, so

23    it describes -- yeah, so this is -- this isn't an

24    indication of when these clips were made.  I think

25    he's referring to an earlier -- because he says:

Page 145

1    Remember the two clips you prepared for me for

2    Turning Point.

3                And so I resent him these videos, so I do

4    believe when I created these mule clips 1, mule

5    clips 4, mule clips 3, that they were sent on, like,

6    March 22nd.

7        Q    Okay.  And then working up the page, it

8    says:  How about the one where Gregg shows only a

9    couple hundred went to a drop box but 1960 ballots

10   were cast?  Shows some VFX -- which I'm assuming

11   stands for visual effects.

12               Is that correct?

13       A    Yes, that's -- that's a part in the movie,

14   in which you would want cut out to be able to show,

15   I guess, on Turning Point.

16       Q    And do you remember clipping that portion

17   from the movie to send to Dinesh?

18       A    I don't remember it.  I do this 50, 60

19   times a film.

20       Q    Okay.  Based on the request, would that

21   have included any surveillance footage of mules?

22       A    No --

23       Q    I'm sorry, strike that.

24               It wasn't a request.  Based on your

25   suggestion to Dinesh, would that have included any

CONFIDENTIAL

Page 146

1    surveillance footage of mules?

2        A    Raw, no.  They would have to be in the

3    context of the movie, and if it was in the context

4    of the movie, they were probably blurred, if we

5    pulled it from the movie.

6        Q    Are there any versions of the film that

7    have raw surveillance footage in them?

8        A    Well, when we were doing the rough cut,

9    there were obviously -- you mean raw, not blurred?

10        Q    I mean raw in the sense that it's the

11    version that was originally received from Gregg

12    Phillips, with no crop or anything else like that;

13    just the totally pure version that you received.

14        A    No, it never goes into the movie like

15    that, because we have to cut it to make time and

16    have to zoom in and do stuff to it, so there was --

17    yeah, they would all have to be changed in some sort

18    to be in the movie, and I don't recall ever sending

19    any raw footage.  One, Gregg would not be very happy

20    if I did, and neither would Dinesh.

21        Q    And do you recall in the raw footage if

22    there's like a -- is there a green bar at the bottom

23    of that -- of the clip --

24        A    There is.

25        Q    -- of material in the footage, in the raw

CONFIDENTIAL

Page 147

1    footage?

2         A    Yeah, it's got a date on it and some kind

3    of weird bar.  I don't know what that is.

4         Q    But were any versions of the raw footage

5    put into the film -- any of the cuts of the film

6    that had that green bar and the date included?

7         A    No, I would have probably zoomed through.

8         Q    Okay.  So, like, cropped in on it, you

9    mean?

10        A    Yeah.

11             MR. VINING:  I have no further questions.

12                  FURTHER EXAMINATION

13   BY MR. GEORGE:

14        Q    Real quick.  But ultimately we don't know

15   exactly what's in these clips, because you don't

16   have them any longer, right?

17        A    Correct.

18             MR. GEORGE:  I don't have any further

19   questions.  Thank you.

20             MR. BOISVERT:  No further questions from

21   me either.

22             I don't know, Austin, if you were planning

23   to instruct Mr. Frankowski about signing the

24   transcript, or if you would like --

25             MR. VINING:  Yeah, he'll read and sign.

CONFIDENTIAL

Page 148

1              THE VIDEOGRAPHER:   This concludes the

2      videotaped deposition.   The time is 2:36 p.m.,

3      Eastern Time.   We are off the record.

4              (Deposition concluded at 2:36 p.m.)

5              (Signature reserved.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 149

1       The following reporter and firm disclosures
were presented by me at this proceeding for review
2   by counsel:
3               REPORTER DISCLOSURES
4           The following representations and
disclosures are made in compliance with Georgia Law,
5   more specifically:
6           Article 10 (B) of the Rules and
Regulations of the Board of Court Reporting
(disclosure forms)
7           OCGA Section 9-11-28 (c) (disqualification
of reporter for financial interest)
8           OCGA Sections 15-14-37 (a) and (b)
(prohibitions against contracts except on a
9   case-by-case basis).
10  - I am a certified court reporter in the State of
Georgia.
11  - I am a subcontractor for Veritext.
- I have been assigned to make a complete and
12  accurate record of these proceedings.
- I have no relationship of interest in the matter
13  on which I am about to report which would disqualify
me from making a verbatim record or maintaining my
14  obligation of impartiality in compliance with the
Code of Professional Ethics.
15  - I have no direct contract with any party in this
action, and my compensation is determined solely by
16  the terms of my subcontractor agreement.
17
18              FIRM DISCLOSURES
19  - Veritext was contacted to provide reporting
services by the noticing or taking attorney in this
20  matter.
- There is no agreement in place that is prohibited
21  by OCGA 15-14-37 (a) and (b).  Any case-specific
discounts are automatically applied to all parties,
22  at such time as any party receives a discount.
- Transcripts:  The transcript of this proceeding as
23  produced will be a true, correct, and complete
record of the colloquies, questions, and answers as
24  submitted by the certified court reporter.
- Exhibits:  No changes will be made to the exhibits
25  as submitted by the reporter, attorneys, or
witnesses.

CONFIDENTIAL

Page 150

1      - Password-Protected Access:  Transcripts and
       exhibits relating to this proceeding will be
2      uploaded to a password-protected repository, to
       which all ordering parties will have access.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

                                                      Page 151

1                        CERTIFICATE
2        STATE OF GEORGIA:
         COUNTY OF FULTON:
3
4              I hereby certify that the foregoing
         transcript was taken down, as stated in the caption,
5        and the colloquies, questions and answers were
         reduced to typewriting under my direction; that the
6        transcript is a true and correct record of the
         evidence given upon said proceeding.
7              I further certify that I am not a relative
         or employee or attorney of any party, nor am I
8        financially interested in the outcome of this
         action.
9              I have no relationship of interest in this
         matter which would disqualify me from maintaining my
10       obligation of impartiality in compliance with the
         Code of Professional Ethics.
11             I have no direct contract with any party
         in this action and my compensation is based solely
12       on the terms of my subcontractor agreement.
               Nothing in the arrangements made for this
13       proceeding impacts my absolute commitment to serve
         all parties as an impartial officer of the court.
14
15             This the 6th day of November, 2024.
16
17       _Robyn Bosworth_
18       _____
19          ROBYN BOSWORTH, RPR, CRR, CRC, CCR-B-2138
20
21
22
23
24
25

CONFIDENTIAL

Page 152

1    Austin C. Vining, Esq.

2    avining@buchalter.com

3                           November 6, 2024

4    RE:    Andrews, Mark v. D'souza, Dinesh   Et Al

5         11/5/2024, Nathan Frankowski (#7006822)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-ny@veritext.com

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

CONFIDENTIAL

Page 153

1    Andrews, Mark v. D'souza, Dinesh   Et Al

2    Nathan Frankowski (#7006822)

3                E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Nathan Frankowski                            Date

25

CONFIDENTIAL

Page 154

1    Andrews, Mark v. D'souza, Dinesh    Et Al

2    Nathan Frankowski (#7006822)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Nathan Frankowski, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Nathan Frankowski                         Date

13    *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.