# EXHIBIT 22

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                FOR THE NORTHERN DISTRICT OF GEORGIA

3                        ATLANTA DIVISION

4

5     MARK ANDREWS,                )  No. 1:22-cv-04259-SDG
                                   )
6                  Plaintiff,      )
                                   )
7     v.                           )
                                   )
8     DINESH D'Souza, et al.,      )
                                   )
9                  Defendants.     )
      _____)

10

11

12

13

14

               VIDEOTAPED DEPOSITION OF BRUCE SCHOOLEY

15

                        October 22, 2024

16                        9:34 a.m.

                3333 Piedmont Road NE, Suite 2500

17                    Atlanta, Georgia

18

19

20

21

22

23

24          Reported by:  Marcella Daughtry, RPR, RMR

                          CA CSR 14315

25                        GA No. 6595-1471-3597-5424

Page 2

```
 1                        I N D E X
 2    WITNESS                                         PAGE
 3    BRUCE SCHOOLEY
 4         Examination by Ms. Balliett                   7
 5
 6
 7
 8                    INDEX TO EXHIBITS
 9    No.                Description              Page
10    Exhibit 112    E-mail from Nick Givas to         35
                     Catherine Engelbrecht
11                   4/29/22
                     TPNG-0001907
12                   (Confidential)
13    Exhibit 113    E-mail from Bruce Schooley to      41
                     Nathan Frankowski 1/5/22
14                   DDR-00020015
                     (Confidential)
15
      Exhibit 114    E-mail chain from Bruce Schooley   54
16                   to Brandon Gill 1/29/22
                     DDR-00021419 to 21420
17                   (Confidential)
18    Exhibit 115    E-mail from Debbie D'Souza         59
                     to Bruce Schooley 1/10/22
19                   TPNF-0004925
                     (Confidential)
20
      Exhibit 116    E-mail from Bruce Schooley to      71
21                   Nathan Frankowski 3/23/22
                     DDR-00020967
22                   (Confidential)
23    Exhibit 117    E-mail from Nathan Frankowski      78
                     to Frank Lamont 4/2/22
24                   DDR-00011348
                     (Confidential)
25
```

Page 3

                        INDEX TO EXHIBITS, CONT'D
1

2   No.          Description                              Page

3   Exhibit 118  E-mail from Nathan Frankowski             81
                 to Bruce Schooley 4/5/22
4                TPNF-0004778 to 4779
                 (Confidential)
5

    Exhibit 119  E-mail chain from Bruce Schooley          86
6                to Bryce Kesler 3/28/22
                 DDR-00020654 to 20655
7                (Confidential)

8   Exhibit 120  E-mail from Frank Lamont                  90
                 to Bruce Schooley 4/19/22
9                TPNF-0004628
                 (Confidential)
10

    Exhibit 121  Letter to Shadow Beach LLC from          104
11               Dinesh and Debbie D'Souza
                 DDR-00059971
12               (Highly confidential - AEO)

13  Exhibit 122  E-mail from Nathan Frankowski            113
                 to Bruce Schooley 10/31/22
14               DDR-00016711
                 (Confidential)
15

    Exhibit 123  E-mail chain from Robert Ellis           117
16               to Bruce Schooley 1/31/24
                 DDR-00018752
17               (Confidential)

18

19

20          PREVIOUSLY MARKED AND REFERENCED EXHIBITS

21                        Exhibit 23
                          Exhibit 40
22                        Exhibit 46
                          Exhibit 76
23                        Exhibit 77
                          Exhibit 80
24                        Exhibit 89
                          Exhibit 100
25                        Exhibit 110

Page 4

```
 1            VIDEOTAPED DEPOSITION OF BRUCE SCHOOLEY
 2    was taken on October 22, 2024 at the offices of Greenberg
 3    Traurig, LLP, 3333 Piedmont Road NE, Atlanta, Georgia,
 4    commencing at the hour of 9:34 a.m. before Marcella
 5    Daughtry, a Registered Professional Reporter and
 6    Registered Merit Reporter, in and for the State of
 7    Georgia and State of California.
 8
 9    APPEARANCES:
10
11        For the Plaintiff:
12            SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
             MS. QUINN BALLIETT
13            MS. DANUTA EGLE
             One Manhattan West
14            New York, New York 10001
             212.735.3556
15            quinn.balliett@skadden.com
             danuta.egle@skadden.com
16
17        For the Defendants True the Vote, Gregg Phillips,
         and Catherine Engelbrecht:
18
             GREENBERG TRAURIG, LLP
19            MR. JAKE EVANS
             3333 Piedmont Road, NE, Suite 2500
20            Atlanta, Georgia 30305
             jake.evans@gtlaw.com
21
22
23
24
25
```

Page 5

1          For the Defendants Dinesh D'Souza and D'Souza Media
           and the Witness:

2

           BUCHALTER
3          MS. AMANDA HYLAND
           MR. AUSTIN VINING
4          3350 Riverwood Parkway, SE, Suite 1900
           Atlanta, Georgia 30339
5          avining@buchalter.com
           ahyland@buchalter.com

6

7      Also Present:
8          Ben Jones, videographer
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1              THE VIDEOGRAPHER:  Today's date is

2     October 22nd, 2024, and the time is 9:34 a.m.  This will

3     be the videotaped deposition of Bruce Schooley.

4              Will counsel please identify themselves for the

5     record.

6              MS. BALLIETT:  Quinn Balliett, counsel for the

7     plaintiff.

8              MS. EGLE:  Danuta Egle, counsel for the

9     plaintiff.

10             MS. HYLAND:  Amanda Hyland, counsel for

11    defendants D'Souza Media, Dinesh D'Souza, and the

12    deponent Bruce Schooley.

13             MR. VINING:  Austin Vining, counsel for

14    defendants Dinesh D'Souza, D'Souza Media, LLC, and the

15    deponent Bruce Schooley.

16             MR. EVANS:  And Jake Evans, counsel for True

17    the Vote, Catherine Engelbrecht, and Gregg Phillips.

18             THE VIDEOGRAPHER:  Will the court reporter

19    please swear in the witness.

20

21                     BRUCE SCHOOLEY,

22    called as a witness herein, having been first duly sworn

23    by the shorthand reporter to speak the truth and nothing

24    but the truth, was examined and testified as follows:

25    >>>

Page 7

1          MS. BALLIETT:  Okay.  Just one quick

2     housekeeping thing I wanted to get on the record, which

3     is that we had some exhibits marked in last week's

4     depositions of Debbie and Dinesh D'Souza, and we do not

5     have the stamped copies of those exhibits, so we're going

6     to be re-marking them with the same exhibit number, and

7     then after those exhibits, we will be starting at Exhibit

8     No. 112.

9

10                         EXAMINATION

11    BY MS. BALLIETT:

12         Q    Okay.  Good morning, Mr. Schooley.

13         A    Good morning.

14         Q    Could you please state your full name for the

15    record.

16         A    Bruce Alan Schooley.

17         Q    And what's your address?

18    ███████████████████████████████████████████

19         Q    Have you been deposed before?

20         A    I have.

21         Q    How many times?

22         A    Once.

23         Q    And what was the context?

24         A    It was a dispute over the payment of royalty

25    fees.  It was 35 to 40 years ago.

1     Q  Okay.

2     A  It was very quick.

3     Q  And do you understand that you are under oath

4  today?

5     A  I do.

6     Q  And your testimony here is the same weight as

7  testimony before a judge or a jury?

8     A  I do.

9     Q  Okay.  Is there any reason you might not be

10  able to give accurate testimony today?

11     A  No.

12     Q  Is there any reason your memory might be less

13  sharp than usual?

14     A  No.

15     Q  Okay.  I'm just going to set a few ground rules

16  for the rest of the day.  Everything we say is being

17  recorded and transcribed by the court reporter.  For her

18  benefit, let's answer every question verbally.  No

19  shaking your head and nodding your head and that sort of

20  thing.  And then let's try not to talk over each other so

21  she can get everything we are saying.

22       If my question is unclear, please let me know.

23  And if you don't ask me to clarify my question, I'm going

24  to assume that you understand it.

25       Is that okay?

Page 9

1          A    Yes.

2          Q    And I will plan for us to take a break every

3     hour or so, and we'll take a break for lunch as well

4     later, but if you need a break at any other time, just

5     let me know.  We can take a break as long as a question

6     is not pending.

7               Throughout the deposition, your counsel may

8     object to certain of my questions.  Unless your counsel

9     specifically instructs you not to answer, you must still

10    answer my question.

11              Okay?

12         A    Okay.

13         Q    Did you speak to anyone about the testimony you

14    expect to give at your deposition today?

15         A    I spoke with Amanda and Austin.

16         Q    Okay.  Yeah, and don't tell me the contents of

17    those --

18         A    I will not.

19         Q    -- communications.  But did you do anything to

20    prepare?

21         A    I did.  I watched the film twice.  I watched

22    the teaser and the two versions of the trailer twice.  I

23    read the depositions of Catherine and Gregg and Dinesh

24    and Debbie.  And I looked at documents yesterday with

25    Amanda and Austin.

1    Q    Okay.  And those documents were selected by

2    your counsel?

3    A    Yes.

4    Q    Okay.  Did you have any conversations with

5    Mr. or Mrs. D'Souza after their depositions, about their

6    depositions?

7    A    I did.  I spoke with Dinesh, and he did not

8    talk about any content, but he did say -- he basically --

9    I listen -- I heard his deposition.  I said, I thought

10   you did a great job, and he said thanks.

11   Q    Okay.  Were you asked to collect any documents

12   in connection with this litigation?

13   A    Yes.

14   Q    And what steps did you undertake to collect

15   those documents?

16   A    That's a big question.

17   Q    Well, let's start with, how many devices, for

18   example, did you use in the course of your work on 2000

19   Mules?

20   A    I -- on my phone and my main computer.

21   Q    Okay.

22   A    So I have one computer that is a hundred

23   percent personal and one computer that is for business,

24   and those would be the homes of my documents.  I really

25   don't have hard copies of things.

Page 11

1          Q    Okay.  And you worked with counsel to collect

2     documents from both of those --

3          A    I did.

4          Q    -- your phone and your work computer?

5          A    Yes, we did.

6          Q    Okay.  And -- and what kind of communication

7     platforms did you usually use to talk about the film?

8     Was it e-mail?  Was it text messages?

9          A    Text and e-mail.

10          Q    Okay.  Any others?

11          A    I mean, phone.

12          Q    Yeah, okay.

13               Could you please share with us your educational

14     background.

15          A    I went to -- I graduated from high school; went

16     to two years of a community college.  I won a Rotary

17     Foundation scholarship, so I spent a year in New Zealand.

18     And then I came back, graduated from Cal State LA in

19     psychology.  I went to Fuller School of Psychology, which

20     is a graduate program, a Ph.D. program.  It's a six-year

21     program.  I only stayed for four years.  I completed all

22     coursework, including experimental and statistics and

23     most of the therapy classes.

24          Q    Okay.  And what do you do for a living?

25          A    I quit graduate -- the graduate program because

Page 12

1    I had started a gift business that I did very well

2    immediately, and so I started -- we did gift products.

3    Then we moved to home products.  So I invented some

4    things, had them produced, sold them mostly through large

5    retailers like Sharper Image, Frontgate, Catalog, and

6    Costco and places like that.

7              And then I eventually sold a patent to Balsam

8    Hill for a -- for one of my inventions and started

9    working with Dinesh in 2014 on with films.

10        Q    Okay.  And how did you start to work with

11   Mr. D'Souza?

12        A    Dinesh and I had been friends for a long time.

13   I met Dinesh -- my wife and I met Dinesh and his wife at

14   the time probably 30 years ago on a National Review

15   cruise.  My wife was very involved with National Review.

16   And Dinesh was a speaker, and we just hit it off.  And he

17   and I like to talk about the same things, which are

18   generally more about things like philosophy and culture

19   than they are about the politics and news.

20              So there's very few people actually are

21   interested in that, and he and I are both very interested

22   in that.

23        Q    Okay.  So you said in 2014, you started to work

24   with him on filmmaking?

25        A    I believe it was 2013/2014, yeah.

Page 13

1        Q    Okay.

2        A    So I was -- I was involved with him, some of

3    his books previously.

4        Q    Okay.

5        A    And I was also -- I was involved with his first

6    film but not officially.

7        Q    When did you become a partner in his company

8    D'Souza Media?

9        A    I -- I believe it was 2014.

10        Q    Okay.  And prior to that, if you did work with

11    him and you were paid, it was on a contract basis or --

12        A    I don't think I was paid.

13        Q    Okay.  And so what type of work do you do with

14    D'Souza Media?

15        A    A producer.  That's my natural skill set.  So I

16    produce products, help to develop them, and then -- and

17    then organize them being made, and then usually passing

18    them off to a retailer or -- or somebody who markets

19    them.

20        Q    Okay.  And so -- so the production work that

21    you do with D'Souza Media, is that just for the films or

22    do you also work on the podcast?

23        A    No, no.

24        Q    Okay.

25        A    I mean, I think I might have done a little bit

Page 14

1      of like artwork or something for at the very beginning of

2      the podcast, but I don't -- I don't have anything to do

3      with the podcast.

4          Q    Okay.

5          A    And I -- I haven't from the beginning.

6          Q    Okay.  And -- and so could you just describe a

7      little more, in more detail what the production process

8      is for the films.  Who -- for example, who selects the

9      topics for the films?

10         A    That's also a big question.  The -- we

11     usually -- when we know we're gonna make a film, we

12     usually develop a sheet of all possible concepts, and

13     then we start narrowing it down with time.  The ultimate

14     decision of what the film will be about is Dinesh's, and

15     the ultimate title decision is his.

16              He makes the final decisions.  He's the

17     majority owner and the managing member of the company,

18     but I have -- but he and I have very honest and frank

19     discussions.  So I would not say that -- I mean, we're

20     both involved in that, but he -- he makes the decisions.

21         Q    Okay.  And how many films have you made with

22     Mr. D'Souza as part of -- as a partner of D'Souza Media?

23     If you know.  If you don't, then you can just estimate.

24         A    No, no, I know.  I'm just trying to figure out

25     when you say "you made," I didn't actually make America.

Page 15

```
 1      So I'd say one -- I'm dyslexic, so it takes me time to
 2      figure things out.  So I would say probably six.
 3           Q    Okay.  But has -- has D'Souza Media made more
 4      films that you were not involved in making --
 5           A    I was not --
 6           Q    -- during that time?
 7           A    I was not involved in -- the answer to that is
 8      yes.
 9           Q    Okay.  And that was just because you were doing
10      other things?
11           A    Yeah.
12           Q    Okay.  And when was the first time you heard of
13      True the Vote?
14           A    Catherine Engelbrecht became somewhat famous in
15      conservative circles after her testimony in front of
16      Congress.  I don't know precisely the date, but I think
17      it was like 2012.
18           Q    That sounds right, yeah.
19           A    So I would have become aware of her immediately
20      after that.
21           Q    Okay.  Did you -- did you meet her at that
22      time?
23           A    No.
24           Q    When was the first time you met her?
25           A    We interviewed her for a film, and that was
```

1      called -- I believe it was Trump Card, and that's when I

2      met her.  It was 2000 -- maybe I met her maybe in 2019,

3      2020.

4          Q    Okay.  And after that interview, did you keep

5      in touch with her?

6          A    No.

7          Q    Okay.

8          A    No.

9          Q    And then after that, when was the next time you

10     spoke with her?

11         A    For -- we met for a dinner in I think Dallas to

12     discuss some findings that they had with regards to voter

13     irregularity in the 2020 election.

14         Q    Okay.  And when was that dinner?

15         A    I think it was like September, October,

16     November of 2021.

17         Q    Okay.  And when was the first time you heard of

18     OpSec?

19         A    I do not know.  I do not recall that.  I do --

20     I met Gregg at that dinner, so he might have used that

21     name then.

22         Q    Okay.  And --

23         A    Names are tough when you're dyslexic.  You

24     don't associate names with...

25         Q    Understandable, yeah.

```
                                                    Page 17

  1            A    Yeah.

  2            Q    Okay.  And then after -- so at that dinner,

  3       could you just tell us a little bit more about what

  4       information you learned or discussed?

  5            A    They had done -- I do -- I'm trying to be

  6       honest in what I recall.  They had done research on

  7       geo-tracking.

  8            Q    By -- by "we," you mean you and Mr. D'Souza?

  9            A    No, they had.

 10            Q    Oh, they had.  They had.  Okay.

 11            A    And I don't know if both of them had, but I do

 12       know that the general conversation was that they had

 13       research on geo-tracking as it relates to the 2020

 14       election.

 15            Q    Okay.  And did they --

 16            A    And they -- they also said that they had

 17       videos.

 18            Q    Okay.  But they didn't show you any videos at

 19       that time?

 20            A    No.

 21            Q    Did they show you any geo-tracking data?

 22            A    No.  No.

 23            Q    Okay.  So it was just more of a discussion?

 24            A    Yes.

 25            Q    Okay.  And after that meeting, did you do
```

Page 18

1    anything to familiarize yourself with either OpSec or

2    TTV?

3         A   I -- I had known who True the Vote -- I mean,

4    True the Vote is a fixture in the -- in the conservative

5    world and highly respected and mentioned often on radio

6    shows and things, and so I didn't really need to

7    familiarize myself that much more with her because I kind

8    of understood what her work was.

9         I did not -- I don't think I did anything more

10   with regards to Gregg, because I didn't -- we hadn't

11   moved it along at that time.

12        Q   Okay.  So at that time, you knew that Dinesh

13   and -- you and Dinesh were considering whether to work

14   with them to make a movie, but you hadn't made the

15   decision yet?

16        A   Right.

17        Q   Okay.  What about Salem Media?  When did you

18   first hear about Salem Media?

19        A   Salem Media also is a fixture in the faith

20   community and conservative community.  I mean, they have

21   very well-known hosts on a lot of radio stations, so I

22   probably have heard about them off and on for more than a

23   decade, two decades.

24        Q   When was the first time you worked with them?

25        A   On this -- on this particular project.

Page 19

```
 1           Q    Okay.  And do you know how that came about?

 2           A    I think Dinesh called them or they -- they

 3      called him.  I really don't recall.

 4           Q    Okay.  Do you know -- do you know why he

 5      reached out to them?

 6           A    No.

 7           Q    Okay.  Was he looking for investors?

 8           A    I mean, I would be speculating, so I'm not

 9      gonna do that.

10           Q    Okay.  And do you know when Salem Media first

11      met Ms. Engelbrecht and Mr. Phillips?

12           A    I believe -- I do not know for sure.

13           Q    Okay.  Did you -- did you ever participate in a

14      meeting with the two of them and Salem Media?

15           A    Yes.

16           Q    And when was that?

17           A    I think it was immediately following that

18      dinner or soon after.

19           Q    Okay.

20           A    And we -- we may -- we all met in Dallas.

21           Q    And what was the substance of that meeting?

22           A    Catherine and Gregg presented their research.

23      That was the first time I believe I -- I saw it.

24           Q    Okay.  And -- and what -- what exactly did they

25      present?  Did they show videos, or what did they show
```

Page 20

1      visually?

2          A    Gregg had some things on his laptop, and he

3      showed that.  I am not -- I think we had that -- I think

4      it was communicated to a larger screen, and he went

5      through that presentation.

6          Q    Okay.  And was that information that he was

7      putting up on the screen related to a surveillance video

8      or geo-tracking or both?

9          A    There was both.

10         Q    Okay.  And did he show any surveillance videos?

11         A    To the best of my recollection, I believe he

12     did.

13         Q    Okay.

14         A    I believe -- I mean, there was clips, I think.

15         Q    Okay.  And then for the geo-tracking, what --

16     was it maps or?

17         A    I remember he had maps with geo-tracking dots

18     on them.  I do not know if they were at that meeting.

19         Q    Okay.  Okay.  And then after that meeting

20     concluded, do you know whether Salem made a decision to

21     make the movie with them or was there a period of time

22     when Salem had this under consideration?

23         A    I do not recall.  Dinesh was the primary

24     contact with Salem.

25         Q    Okay.  And at that point, do you think -- or do

Page 21

1      you know whether Dinesh had made the decision to work

2      with them to make the movie, whether or not Salem would

3      be involved?

4          A   Well, I think we had decided to work with Salem

5      on a film, and I think the issue was whether or not this

6      was the subject matter.

7          Q   Okay.  And so do you remember when the decision

8      was made that you were gonna work with Salem and True the

9      Vote and OpSec to make this movie?

10         A   I do not recall the exact time.

11         Q   Okay.  Once the decision had been made to make

12     the movie that would become 2000 Mules, what was the

13     first step in the production process?

14         A   There's a development phase where you try to

15     limit down the scope of what you could potentially do.

16     So we had this ongoing concept sheet, beat sheet of all

17     the different things we could possibly do, and then you

18     just start limiting it, and -- and you add things to it

19     because of new ideas and new things, and that's the

20     potential overall scope of the project.

21         Q   Okay.

22         A   And I think that what's we -- I mean, that's

23     the kind of thing I would be involved with in working on

24     early on.

25         Q   Okay.  And we're gonna show Plaintiff's Exhibit

Page 22

```
 1      No. 23, which is TTV_007191 through 7199.  This has
 2      already been marked.
 3               Take your time to review the document.
 4      A    Uh-huh.  Should I look at all of it?
 5      Q    I -- I can draw your attention to certain
 6      portions, but if you need to look at more, you can let me
 7      know.  Take any time you need.
 8      A    Because this will take me a while because I
 9      read slow.
10      Q    Okay.  Are you okay with me directing you to a
11      portion --
12      A    Uh-huh.
13      Q    -- to ask you about it?
14               Okay.  Let's look at the page that ends in 195.
15      And at the top of that page, there's a bullet that says
16      4, and it says, "How about people who were approached but
17      declined?"  And it says, "Shouldn't we be able to find
18      someone in a tormented area that kept saying no to these
19      harvesters?  We're talking hundreds of thousands of
20      people" --
21      A    Which point?  I'm sorry.
22      Q    Sorry.  It's point 4 on the page that ends in
23      195.
24      A    Okay.
25      Q    And then you say, "We're talking hundreds of
```

Page 23

1      thousands of people approached.  Can't we find a few who

2      said no?"

3           A    Let me -- I'm just gonna read this.  Okay?

4           Q    Yeah, yeah, of course.  Go ahead.

5           A    Okay.

6           Q    Did -- did you ever research or hire anyone to

7      look into finding someone who was approached to

8      participate in a ballot harvesting scheme or a -- an

9      election fraud scheme and declined to participate and

10     wasn't willing to talk about it?

11          A    We talk -- I know that we talked about it after

12     this, and people anecdotally would tell us that they had

13     known of people, and I do believe that.  We also found

14     people who had been -- I -- I think the bottom line here

15     is, does this happen, right?  And we found people who had

16     been convicted of ballot harvesting, and so it became

17     obviously this is a real event, to me.

18          Q    Okay.  And then let's go to the page that ends

19     in 198.  It's the second to last page.  And about halfway

20     down the page, there's a W.  There's a bullet that starts

21     with W, and then it says "REVEAL."

22               Do you see that?

23          A    Uh-huh.

24          Q    And then it says, "Describe (1) data

25     collection," and "then (2) use the data to track mules

Page 24

1    from activist locations to drop boxes using data

2    graphics."

3        A    Uh-huh.

4        Q    Did -- did you end up doing that in the film?

5        A    We took data from -- the answer is yes, I

6    believe we did.  We took data from Gregg, that he gave us

7    with regards to Atlanta, and we didn't actually use the

8    graphic that he did.  We rebuilt that graphic, but we

9    built -- rebuilt it on the -- on the information he gave

10   us.

11       Q    Okay.  And -- and that route included what you

12   describe here as activist locations, and it used actual

13   data?

14       A    To -- we got the -- we got that graphic from

15   Gregg, and -- and it was based -- to the best of our

16   understanding, it was based on real data.

17       Q    Okay.  And then let's go to the -- just the

18   next page, and there's a -- a bullet, two little ii's.

19   It says, "What to sequestered?"  And then it says, "Top

20   of the list is the video, which is useful to dramatize

21   the evidence but is not essential to any legal

22   proceedings."

23            What did you mean by that?

24       A    I'm gonna have to read it.

25       Q    Okay.

Page 25

```
1          A    I have no idea.  I have to -- let me -- let me

2     see if I -- it will take me a minute.

3          Q    No problem.

4          A    Oh.  I mean, it was -- we -- I very much wanted

5     the video to be sequestered, meaning that we didn't want

6     them to share it to everybody and -- and leak it out

7     because it's very damaging, not only to the film to

8     release, but also you just lose control over the product,

9     I mean.

10              What is useful to dramatize the evidence but is

11    not essential to any legal proceeding, I do not know what

12    I meant by that.

13         Q    Okay.  And --

14         A    So that would be -- I mean, it was drama -- it

15    was dramatizing the evidence of the geo-tracking, but

16    we -- at that point, I don't believe that -- I mean, we

17    never thought the video was the core legal -- the core

18    argument for the fundamental concept, the big picture

19    concept of the film.  The core concept was the

20    geo-tracking data.

21              And then we were committed to use video that

22    was based upon the geo-tracking data, but it wasn't --

23    the video itself was -- was secondary to the geo-tracking

24    data.

25              So at this stage when I wrote this, that's
```

Page 26

1    probably what I was thinking.

2        Q    Okay.  And then just below that, you say, "We

3    need a couple of investigators to hit the street."

4        A    Uh-huh.

5        Q    "They could be on screen."

6            And then you say, "There must be an army in

7    each of these cities that are concerned with what

8    happened.  Republicans in each city should know some of

9    them.  Isn't there a boat load of affidavits?  Let's find

10   them with help from local Republicans."

11           What affidavits were you referring to?

12       A    Well, at the time, this was after the 2020

13   election, and there were, from my reading, thousands of

14   affidavits that had been given up by people who were --

15   who had witnessed what they considered to be election

16   integrity violations.

17       Q    Okay.

18       A    Tens of thousands, and so that was that.

19       Q    Okay.  Did you ever obtain any of those

20   affidavits?

21       A    No.  We -- I mean, I didn't.  I don't know if

22   Gregg did or Dinesh did or anybody else did, but I

23   didn't.

24       Q    Okay.  And so just to take a step back about

25   the film production process, could you list the members

Page 27

```
1        of the team who worked on the film production?
2             A    It was Dinesh and Debbie, me, Nathan, and --
3             Q    That's Mr. Nathan Frankowski?
4             A    Nathan Frankowski, uh-huh.
5                  And then we'd hire camera, locations, cast
6        coordinators.  You know, it's a bunch of people to get a
7        film made.  But the core people are -- are Debbie,
8        Dinesh, Bruce, and Nathan.
9             Q    Okay.
10            A    And then in this situation, we had impact --
11       input from -- some input on a limited basis from Salem
12       and from True the Vote.
13            Q    Okay.
14            A    Very limited.
15            Q    And so what was Mr. Frankowski's role?
16            A    He is a -- primarily a cinematographer.  He
17       works with me on cutting the film and putting it together
18       and getting the -- getting the footage produced and -- I
19       mean, graphics and sound.  He does -- he does a temporary
20       score before we hand it off to the composer.
21            Q    Okay.  And was there anyone else that he worked
22       with on graphics?
23            A    Frank Lamont, who owns a graphics company, and
24       he -- it's a very small team.  I think it's him and his
25       son and somebody else.
```

Page 28

1          Q    Okay.  And what was your understanding of the

2     role that Ms. Engelbrecht and Mr. Phillips would have in

3     the production of the film?

4          A    I mean, they -- they generated the initial

5     primary research.  They were to provide videos based upon

6     the research.  They were -- I mean, I'm looking -- I'm

7     thinking of the contract they signed.  I mean, during the

8     conversations and things, they would give us -- she would

9     give us input or he would give us input on -- on

10    different ideas, but it was limited after they provided

11    the research and the -- and the video.

12         Q    Okay.  And what's your understanding of the

13    relationship --

14         A    Limited on my -- just let me be clear.  It was

15    limited for me.

16         Q    Okay.  Okay.  So who -- was there someone else

17    who was having more interaction with them?

18         A    Dinesh and Debbie would have more interaction

19    with them.

20         Q    Okay.  And when they provided the research,

21    what exactly did they provide?

22         A    He gave us the results of his research, and it

23    was provide -- it was disclosed during the interview.  I

24    asked him if he had the -- I mean, research is a big

25    thing, so I asked him if he had -- I mean, I may be

Page 29

1    trying to be -- I'm a little bit -- I'm trying to be like

2    a tad bit skeptical of this whole thing.  I said, Do you

3    actually have the data?  He said, Yes, I keep it with me

4    all the time.  And so I said, Would you bring it, because

5    we want to show you taking it out of the car, truck.

6             And it's in the film, have him doing it in the

7    film, where he puts it up on the table, and it's in two

8    massive boxes.  So I said, well, he has the data.

9             And then, I think that's it.

10       Q    Okay.  And so in those boxes, was it hard

11   drives or what --

12       A    We didn't ask -- I didn't ask him to open it

13   up.

14       Q    Okay.  And then when they provided their

15   research for use in the film, what format was it in?

16       A    Are you speaking research clips or?

17       Q    And both.  What about the geo-tracking

18   research, how -- how was that provided for use in the

19   film?

20       A    That was -- that was disclosed in the interview

21   that we filmed.

22       Q    Okay.  And what about the data itself that

23   was -- that was used?

24       A    We would have -- we did not receive the data.

25   We would have no ability to deal with that much data.

1      Q    Okay.

2      A    I just wanted to see that it existed.

3      Q    Okay.  And -- and what about the surveillance

4   video, how was that provided to you?

5      A    I believe the first grouping was sent to

6   Nathan.  I'm not exactly sure of the exact dates, but it

7   was a selection of -- I mean, and I saw in the deposition

8   Gregg said 70.  I think it was really more like 15 or 20

9   that were -- would be useable.  And I think that was -- I

10  think that group was a -- you'd have to ask Nathan.

11     Q    Okay.  And when you say only 15 or 20 that were

12  useable, the other ones were not useable for what reason?

13     A    It was just way too fuzzy.

14     Q    Okay.

15     A    Yeah.  So we -- we asked them, of course, to

16  give us video of mules that have been geo-tracked to the

17  criteria, and I was -- I asked several times if they

18  would -- we needed some that had been -- that showed

19  going to various loca -- more than one location.  And

20  they sent us -- I remember this being in a folder called

21  Repeaters, and there were people who had been to more

22  than one location, but extremely fuzzy.

23          So I think we used some of them in the film.

24  I'm quite sure we did, but they were -- they were at

25  night.  Poor quality camera.

1          Q    Okay.  And when -- when you were -- so -- so --
2     sorry.  Other than True the Vote and OpSec, was there any
3     other research that was done for the film?
4          A    During this time, the entire country was
5     talking about this.  So I don't know what your definition
6     of research is, but everybody was -- was obsessed with
7     these issues, and so it was like 20,000 people jointly
8     communicating about this all the time.
9          Q    Okay.  And did you ever consider hiring
10     undercover journalists to obtain material for use in 2000
11     Mules?
12          A    We did consider it, and then we didn't do it.
13     We were going to send them in to some of these activist
14     locations to see what we got, and we decided not to do
15     that.
16          Q    After 2000 Mules, have you ever done that
17     since, hired undercover journalists to look into election
18     fraud?
19          A    You'd have to -- I have not done that.  You
20     would have to speak with Dinesh and Debbie about that or
21     other people.
22          Q    Okay.  Let's show -- we're gonna show you
23     Plaintiff's Exhibit No. 89, which is Bates number
24     DDR-00018795.
25               So just take your time to look over that.

1      A    Uh-huh.

2      Q    Okay.  Do you recognize this document?

3      A    I don't recognize it, but I am -- but I'm

4  on it, and I'm --

5      Q    Okay.

6      A    I recognize Ant W.

7      Q    Okay.  And who is that?

8      A    Tony.  I forget his last name.

9      Q    Okay.  And --

10      A    And Tiara.

11      Q    And -- and who are they?

12      A    Somebody -- you would have to ask Dinesh and

13  Debbie, but they are people that became involved in

14  undercover research to validate concepts behind 2000

15  Mules.

16      Q    Okay.

17      A    And this was after 2000 Mules, and they came --

18  it was presented -- as far as I'm here, it was -- it was

19  something that we did not seek out but that was presented

20  to us.

21      Q    Okay.  So it seems like this -- this first

22  e-mail in the bottom of the chain, which starts on the

23  first page and it goes to the second page, is from this

24  person named Tiara, and it says, "AAR and monthly

25  overview."

1          Do you know what that means?

2     A    You would have to ask her or Dinesh and Debbie.

3     Q    Okay.  And then she says, "Please see attached

4     monthly overview and transcript.  This month we had alot

5     of meetings but there was one in particular that stuck

6     out that we did a transcript for," and then she -- she

7     summarizes this meeting, which we don't need to get into.

8          But what -- do you know when she said "we," who

9     is she talking about?  Is that her and Tony or?

10    A    Uh-huh.

11    Q    Okay.  And -- and then it looks like a couple

12    e-mails up, back on the first page, it says -- you

13    read -- you say, "Thanks Tiara!  I read through the

14    document.  Maybe we can talk through tomorrow afternoon."

15         What -- do you -- do you recall what this

16    document was and why you wanted to talk about it?

17    A    I don't -- I do not recall what the specific

18    document was, but they would send documents.  You would

19    have to talk with Dinesh and Debbie about the specifics

20    of their relationship with -- of the contract -- I mean

21    what they had organized with them.  I -- I still don't

22    know fully what it is, but they set something up where

23    they would send reports.

24    Q    Okay.

25    A    And I received one of these reports.

1        Q    Okay.  And up, the second to the top e-mail,

2    Mrs. D'Souza says, "What are the chances of getting an

3    'actual mule' to come forward?  We would protect their

4    identity."

5            So is she -- is she asking that because that's

6    part of what Tony and Tiara are being asked to do?

7        A    You'd have to ask them.

8        Q    Okay.  And in the top e-mail, Tony says, "Over

9    the coming weeks this will be my sole purpose.  I

10    intend -- I intend to be in the field, across multiple

11    states, nearly every single day this month to make this

12    happen.  I believe it can be done....I believe it must be

13    done."

14            Do you know who was paying Tony to work

15    full-time on finding what Ms. D'Souza describes as an

16    actual mule?

17        A    Yes.

18        Q    And -- and who was paying him?

19        A    Dinesh and Debbie.

20        Q    Okay.  And do you -- do you understand why they

21    were doing that?

22        A    You'd have to ask them why they did that.

23        Q    Okay.  Okay, so I'm gonna go back to the -- the

24    research in the film, and so it looks like -- let's --

25    let's mark -- we're gonna mark a new exhibit.  It's gonna

Page 35

1      be Plaintiff's Exhibit No. 112, and the Bates number is

2      TPNG-0001907.

3              (Deposition Exhibit No. 112 was marked for

4      identification.)

5          Q    BY MS. BALLIETT:  So you can look over this.

6      Take your time.

7          A    Okay.

8          Q    Okay.  So the -- the first e-mail at the bottom

9      of this chain is an e-mail from someone named Nick Givas.

10     Is it Givas?

11         A    Givas.

12         Q    Givas, okay.  And he's e-mailing

13     Ms. Engelbrecht, and he says, "I was hoping I could get

14     your opinion on a movie assignment Bruce has me running

15     down."  And then he says, "Gregg said in this article

16     below, that y'all turned over evidence to the NRSC, but

17     no action was taken," and there's a link to a Gateway

18     Pundit article.

19         A    I don't know what NRSC is.

20         Q    Okay.  And then we don't have the article here,

21     but Catherine, Ms. Engelbrecht, responds to Nick, and she

22     says, "We didn't turn anything over to the NRSC.  The

23     source was the informant in the movie.  Gateway may have

24     misconstrued the comment.  The emails showing the

25     informants activity, payment, etc have been provided to

Page 36

1    Dinesh.  I don't have them on hand but can get if

2    necessary."

3              And then above that, it says -- Mr. Givas loops

4    you and Mr. D'Souza into the e-mail, and he says,

5    "Looping in Dinesh and Bruce here -- Only because I just

6    got off the phone with Bruce, and our team may need that

7    information you cited, to verify a specific part of the

8    film."

9              Do you recall asking Mr. Givas to verify a

10   specific part of the film related to this Gateway Pundit

11   article?

12        A    I do not.

13        Q    Okay.  And this exchange is occurring on

14   April 29th, 2022.

15        A    Uh-huh.

16        Q    When was the movie released?

17        A    About that time.  I mean, we were in -- like

18   two days after this.

19        Q    Okay.

20        A    But this -- the movie had already been

21   transmitted to theaters.

22        Q    Okay.  But you were -- you were asking

23   Mr. Givas to track down a specific part of the film and

24   you're -- do you have any recollection of why?

25        A    No, I'd have to think about -- I'd have to read

Page 37

```
 1      this and actually digest it.
 2          Q   Okay.
 3          A   So I'd have to have more context, like what's
 4      the Gateway article?  I have to have a lot of context to
 5      understand things.
 6          Q   Okay.  So just -- I just have one more
 7      question, and it's okay if you don't recall, but when
 8      Ms. Engelbrecht says -- she refers to e-mails showing an
 9      informant's activity, payment, et cetera, do you ever
10      recall seeing any e-mails that were provided to you in
11      relation to this?
12          A   Can you talk slower?
13          Q   Sorry.
14              So she says the e-mails -- she refers to
15      e-mails showing the informant's activity, payment, et
16      cetera.
17          A   Uh-huh.
18          Q   Do you ever recall seeing e-mails showing an
19      informant's payment, activity, et cetera?
20          A   No.
21          Q   Okay.  And so did Mr. Givas do other research
22      for the film for you?
23          A   We hired him to do general research, but that
24      evolved into him pulling clips and doing other things.
25          Q   Okay.  So was he working full-time on the film?
```

Page 38

1        A    No.

2        Q    Okay.

3        A    He was working some amount of hours.  I think

4    we paid him $7,000 a month or something.

5        Q    Okay.  Okay.

6             I think that's it.  That's it for that

7    document.

8             So Mr. -- Mr. Givas, he -- you said he was

9    pulling clips and doing other things.  So what do you

10   mean by "pulling clips"?

11       A    We use a lot of -- of fair use news clips in

12   the film, and it takes a tremendous amount of effort to

13   find them and put them in someplace where Nathan and I

14   can look at them and get them in the film.  So all the

15   newsy kinds of stuff.

16       Q    Oh, okay.  Okay.  So he was collecting news

17   clips for the film?

18       A    Yeah, nothing -- nothing that had to do with

19   mules.

20       Q    Okay.  Okay.  So he didn't work with the

21   surveillance video at all?

22       A    Huh-uh.

23       Q    Okay.

24       A    No.

25       Q    So let's talk about the surveillance video a

Page 39

```
 1      bit more.  And I recall you said that you received one
 2      batch of surveillance video that Mr. Phillips described
 3      as being about 70 videos, but you said only 15 or 20 of
 4      them were useable, correct?
 5           A    As far as my recollection.
 6           Q    Okay.  And did you ask for any more videos
 7      after that?
 8           A    Constantly.
 9           Q    Okay.  And how many times -- I mean, did they
10      ever provide you with more videos?
11           A    Yes.
12           Q    How many times do you recall that they --
13           A    I believe we got --
14           Q    -- provided you?
15           A    I believe we got one more batch towards the end
16      of March.
17           Q    Okay.  So they only provided you with videos
18      twice?
19           A    Yes.
20           Q    Okay.
21           A    That's my belief.
22           Q    Okay.  And when you received videos from them,
23      what was your understanding of the criteria that were
24      used to choose those videos?
25           A    They were videos of mules, and the criteria was
```

Page 40

```
 1     criteria that explicitly laid out in the film, which is
 2     they had gone to drop boxes, not different drop boxes,
 3     but drop boxes ten times, and they had gone to five
 4     locations that -- specific locations that it appeared to
 5     be they would go to drop boxes, and then they would go to
 6     a particular location, and then back to a drop box, and
 7     then back to a particular location, and those were
 8     considered to be activist centers or places where they
 9     were picking up ballots.
10         Q    Okay.  And so it was your understanding that
11     everyone who had been -- who was in the surveillance
12     videos provided to you had been geo-tracked --
13         A    Absolutely.
14         Q    -- and met this criteria?
15         A    We -- I mean, we had no need -- we had no -- it
16     would have been easy for us to get a video of just
17     anybody doing this.  I mean, we could shoot it.  You
18     could get it off the Internet.  You could -- you could
19     use fair use.  You could license it from Pond5.  You
20     could license it from Getty.
21             I mean, we were holding out for video of mules
22     that satisfied the criteria because that was the core
23     concept of that block of the film that dealt with those
24     mules.  Otherwise, it's the easiest thing in the world to
25     get around that, but we didn't.
```

Page 41

```
 1        Q    Okay.  And was it your understanding that TTV
 2   or OpSec knew who these people were in the videos?
 3        A    No.  We knew that they didn't know who they
 4   were.
 5        Q    Okay.  Were gonna mark a new exhibit,
 6   Plaintiff's Exhibit No. 113.  The Bates number is
 7   DDR-00020015.
 8             MR. EVANS:  What was the number you said?
 9             MS. BALLIETT:  The -- the Exhibit --
10             MS. HYLAND:  113.
11             MS. BALLIETT:  -- 113.
12             MR. EVANS:  113?
13             MS. BALLIETT:  Yeah.
14             THE WITNESS:  It's not that we knew that they
15   didn't know.  We had -- we were never told that they
16   knew.  I do not -- I do not -- that was not the thing
17   that we were doing, was identifying people.  So we never
18   talked about it.  It was just -- it was just not a thing.
19             (Deposition Exhibit No. 113 was marked for
20   identification.)
21        Q    BY MS. BALLIETT:  And then, yeah, if you could
22   take your time --
23        A    We didn't know --
24        Q    -- to look at that.
25        A    Yeah, we did not know who these people were.
```

Page 42

1      Q    Okay.

2      A    I mean, we -- we knew that they were people who

3   had gone to multiple places.  I do not know one name of

4   these people.

5      Q    Okay.  So in your e-mail to Mr. -- Mr.

6   Frankowski, you say -- when you say, "We know who these

7   people are and video shows them dropping handfuls of

8   ballots into boxes" --

9      A    We know --

10      Q    -- what did you mean by --

11      A    We know that these people are mules.

12      Q    Okay.

13      A    Yeah.  I mean, The New York Times article, two

14   reporters got 10,000 -- 100,000 bits of cell phone data,

15   and they were able to, using the Internet, find out who

16   these people were.

17           We never had any interest in doing that, like

18   zero.  I had no interest in knowing who any of these

19   people were, and we didn't do anything to find out who

20   they were.

21      Q    Okay.  Whose job was it to select the

22   surveillance video clips that were gonna be used in the

23   film?

24      A    It was very, very limited, so we used almost

25   all of them that were useable.  But that would -- that

Page 43

```
 1        would have been primarily Nathan, and also me.
 2             Q    Okay.  And so what criteria did you base your
 3        decisions about which clips to use on?
 4             A    Any ones that were -- that you could tell what
 5        the hell they were doing, of what the people were doing.
 6        I mean, some of them were so fuzzy and stuff you couldn't
 7        see anything.
 8                  But so the -- the more you could -- you could
 9        understand what they were doing by watching it,
10        especially ones where they were dumping in multiple
11        ballots, that's why we used them.
12                  THE REPORTER:  That's what?
13                  THE WITNESS:  We used those.  That's why we
14        used those.  We used basically everything that they sent
15        us that was useable.
16             Q    BY MS. BALLIETT:  Okay.  And -- and so when
17        they sent you that first batch, you took everything that
18        was useable from it and put it into a movie?
19             A    You would have to ask Nathan.
20             Q    Okay.  Did you re-create any surveillance video
21        for the film?
22             A    Yes.
23             Q    And why did you do that?
24             A    Because we needed more video, but also it
25        was -- we needed -- we needed like a theme guy, a theme
```

Page 44

1    mule, a theme -- you know, something that we could show

2    on the poster; we could show on the -- going -- in film

3    it's called glue.  You know, it's glue.  If you come back

4    to him every now and then people recognize him, and it

5    just helps people to make sense of what you are saying.

6         Q    Okay.  And then we're gonna show Plaintiff's

7    Exhibit No. 77, which is DDR-00059468.

8              Take your time to look at that.

9         A    Okay.

10         Q    Okay, so I'm going to direct your attention to

11    the second to last page.  The Bates number ends in 471.

12    And the first text on the page is actually --

13         A    I'm sorry, which one?

14         Q    The one that ends in 471.

15         A    Oh, yeah.

16         Q    And the first text, you have to go to the prior

17    page just to see that it's you who is writing it.

18         A    Uh-huh.

19         Q    And you say, "We will release on world with

20    this trailer.  We just need to limit.  Is there one where

21    we see more than one ballot and he returns to take

22    photo?"  And then Mr. Frankowski responds, "I didn't see

23    anyone return to take pic.  But yes, there are multi

24    ballot drops."  And then you say, "Great."  And he says,

25    "They just take a selfie."

Page 45

1          Did you understand taking a selfie to be

2     evidence of an election fraud scheme?

3          A    No, I don't -- I don't think that that's

4     evidence of election fraud.

5          Q    Okay.  And then he says -- you say, "That

6     works.  Any hoodies?  Something easy to copy in Houston?"

7          A    Uh-huh.

8          Q    And then Mr. Frankowski says, "Gregg e-mailed a

9     clip."  And then you say, "Where -- where we see drop

10    box."  And then Ms. -- Mrs. D'Souza says, "I think one of

11    those -- one of the mules in Georgia was wearing a black

12    hoodie."  And Mr. Frankowski says, "It's a gray hoodie

13    and not pulled up."  And then he says, "Nobody looks like

14    they are trying to conceal their ID."  And then

15    Mrs. D'Souza says, "Did you see the black hoodie guy?"

16          So if Mr. Frankowski says that it looks like

17    people are not trying to conceal their identity, so in --

18    and if the hoodie was not pulled up, why -- why were you

19    guys looking for surveillance video people wearing

20    hoodies?

21          A    It was very -- there were -- there were many

22    of -- we have clips of in this batch of people wearing

23    black hoodies over their face concealed.  So just because

24    he says that doesn't mean that's necessarily the case.

25          Q    Okay.

Page 46

```
 1        A    Like if he says they -- they -- he has no
 2   evidence of anybody taking a selfie, it doesn't mean that
 3   we don't have, in this group of people, people taking
 4   pictures of the ballot without -- and it's not a selfie.
 5   We do have -- we did have that.
 6        Q    Okay.  At this point when you guys are having
 7   this conversation, had -- do you think Mr. Frankowski had
 8   had a chance to look at the videos yet?
 9        A    I do not know if he saw all of them.
10        Q    Okay.  Had -- had you looked at the videos --
11        A    No.
12        Q    -- at this point?
13             Okay.  All right.  That's it for this document.
14   And I think we can take a break.  We've been going for
15   about an hour.
16             THE VIDEOGRAPHER:  The time is 10:37 a.m.  We
17   are off the record.
18             (The deposition was at recess from 10:37 a.m.
19   to 10:55 a.m.)
20             THE VIDEOGRAPHER:  The time is 10:55 a.m.  We
21   are back on record.
22        Q    BY MS. BALLIETT:  Okay.  Mr. Schooley, what was
23   the timeline for the production of the movie?  When did
24   you initially plan to release it?
25        A    I need to correct something from my previous
```

Page 47

1    testimony.

2         Q    Okay.

3         A    Can I do that now?

4         Q    Yeah, go ahead.

5         A    I -- I did not -- I said at five drop boxes and

6    five locations.  I meant ten drop boxes and five

7    locations.

8         Q    And that's --

9         A    And I never --

10         Q    -- the criteria that was used?

11         A    And I never ever thought it was five drop

12    boxes.  I always thought it was ten.

13         Q    Okay.  And that's the criteria that --

14         A    I misspoke.

15         Q    -- you were describing to me earlier, correct?

16         A    Yes, yes.  So I apologize for that.

17         Q    Okay.  Thank you.

18              So -- so what was the -- what was the timeline

19    for the production of the movie?

20         A    I mean, we started organizing the shoot in

21    Houston probably around the 10th of January.  It's

22    complicated to do but not unusual.  We shot for two days

23    in Houston, I believe like the 27th, 28th, 29th.  And

24    then we went to Thousand Oaks, a couple days of travel,

25    and then we shot one day in Thousand Oaks with the Salem

Page 48

```
 1      host.
 2              So the primary subject matter in Houston was
 3      the interview of -- of Gregg and Catherine and also
 4      B-roll of Gregg and Catherine.
 5              And then in Houston -- and then with Thousand
 6      Oaks, the primary subject matter was the -- the Salem
 7      ones, and Dinesh interviewing them and Catherine and
 8      Gregg presenting their data to them.
 9          Q   Okay.  And were there any other days of filming
10      other than the days in Houston and the days in Thousand
11      Oaks?
12          A   We shot the footage of the -- what we consider
13      B-roll, a B-roll of the -- of our mule in Houston, I
14      believe on that day, and on one or two other days.  And
15      we also shot Debbie and Dinesh in a locations house, and
16      we did it during that time.  And I do not know if we shot
17      one of the interviews at that time or later with Hans
18      from Heritage.
19              And then there was another shoot that I didn't
20      go to in Washington, D.C. at Capital Research.
21          Q   Okay.  And what -- what is the difference
22      between a regular film trailer and a teaser trailer?
23          A   Teaser you put together at the very, very
24      beginning, and it often -- it shows the flavor of the
25      film, the basic content of the film, if you have it
```

Page 49

```
 1       defined at that point, the premise of the film, and
 2       possibly when you plan on releasing it.  And you do it
 3       for investors, but also to start getting public interest
 4       up if you -- if you actually release it.
 5            Q    Okay.  And sometimes you don't release a teaser
 6       for a film?
 7            A    Right.  Yes.
 8            Q    Okay.  And so at this point in -- when you are
 9       starting to talk about filming, I think you said
10       January 10th around was when you started to plan.  When
11       were you planning to release the film at that point?
12            A    We didn't know at that point.
13            Q    Okay.
14            A    So we were thinking hopefully by summer.
15            Q    Okay.  We are going to look at Plaintiff's
16       Exhibit No. 76, which is DDR-00020011.
17                 And then take your time to look at this.
18            A    Okay.
19            Q    So we're gonna look at the first page, and
20       there's an e-mail from Mr. D'Souza, second from the
21       bottom.  It says, "One important addition is we need to
22       do a trailer ASAP."  And then he says, "We can release
23       two mule videos as the bombshell aspect of the trailer.
24       If these go viral as they will if we release them first
25       it will promote the movie like nothing else can."
```

Page 50

```
 1              And then you respond, "A 60 second teaser
 2    trailer with mule drops and the geotracking graphics
 3    should be pretty straightforward."
 4              Mr. D'Souza responds, "We don't even need
 5    Catherine and Gregg for the trailer.  We can start on it
 6    NOW."
 7              And then you respond here at the top, "We need
 8    their video and their geotracking graphics which means
 9    working with the graphics guy they used or we will need
10    to recreate it with someone like Frank."
11              Is that Frank Lamont?
12         A    Yep.  Yes.
13         Q    And do you recall who the graphics guy they
14    used is?
15         A    No.
16         Q    Did you ever interact with that person?
17         A    I was trying to remember that, and I don't -- I
18    do not believe I ever interacted with him.
19         Q    Okay.  Did you ever ask Mr. Phillips or
20    Ms. Engelbrecht directly to provide you with geo-tracking
21    graphics?
22         A    I might have.
23         Q    Okay.  And do you recall whether they were
24    provided to you?
25         A    I do not recall that.
```

Page 51

```
 1        Q   Okay.
 2        A   I do know that -- I mean, there was some -- he
 3    had some geo-traffic (sic) maps with dots on them, and I
 4    remember they were -- because it's in our film.  He's
 5    looking at his computer, and you can see what he is
 6    looking at.  And he had that, but I just remember them
 7    being extremely fuzzy, low res, and unusable.
 8        Q   Okay.  And -- and when you say geo-tracking
 9    maps, was it your understanding that those maps were --
10    were based on actual data of cell phone pings of people
11    that he had tracked to -- going to five drop boxes?
12        A   I believe that --
13        Q   Or ten drop boxes and ten...
14        A   I believe his were, yes, based upon pings.  I
15    don't know if I thought they were -- I think they were
16    based upon pings.
17        Q   Okay.  And so using those pings over time --
18        A   Right.
19        Q   -- he put the dot in different places at
20    different times --
21        A   Yeah.
22        Q   -- and he created a map?
23        A   I don't think -- I don't think those maps
24    showed that -- a duration of time.  I think they showed
25    pings.
```

Page 52

1        Q    Okay.  So they just showed where the dot was at
2    different times?
3        A    Yeah.
4        Q    But they didn't show what time --
5        A    My understanding --
6        Q    -- the dot took place?
7        A    -- yes.
8        Q    Okay.  And how -- when -- when you were working
9    with True the Vote and OpSec and/or Ms. Engelbrecht and
10   Mr. Phillips in their individual capacities, who was the
11   main point of contact in the film production team to
12   obtain the research from them?
13       A    What do you mean "obtain the research from
14   them"?
15       Q    In other words, who was the person making the
16   request to them, hey, could you please provide us with --
17       A    We asked them on several occasions -- I asked
18   Dinesh to ask them on several occasions, and I think I
19   might have asked maybe once.  I didn't have -- I didn't
20   much contact with them -- that we needed more video.  The
21   research was presented to us in the interview.
22       Q    Okay.
23       A    Again, we had no capacity to take that amount
24   of data and to analyze it to confirm the research.
25       Q    Okay.  And so what material ended up in the

```
                                              Page 53

 1      teaser trailer?

 2          A    It was very brief.  We started with a -- I

 3      think somebody from congress saying this is the most fair

 4      and honest election in the history of American politics,

 5      and we -- we played with that a little bit, from my

 6      recollection.  And then Dinesh presents the fact that we

 7      have new evidence.

 8              I do not know if we did the satellite flyover

 9      for that.  I think we might have.  I think we showed one

10      or two mules that were based on the evidence, and -- and

11      then the logo at the end.

12          Q    And that was True the Vote's logo?

13          A    The title of the film.

14          Q    Of the title of the film, okay.

15              Do you recall whether the teaser or trailer had

16      True the Vote's logo in it?

17          A    I do not recall, but I do think we said, "In

18      association with True the Vote and Salem."

19          Q    Okay.  And how did you plan to release the

20      teaser trailer?

21          A    Dinesh makes those decisions.  I don't know if

22      he put it on social media.  I don't know what he did with

23      it.

24          Q    Okay.  We are going to mark a new exhibit,

25      Plaintiff's Exhibit No. 114.  The Bates number is
```

Page 54

```
1       DDR-00021419.
2               (Deposition Exhibit No. 114 was marked for
3       identification.)
4               THE WITNESS:  Okay.
5          Q   BY MS. BALLIETT:  So the bottom e-mail in the
6       chain on the second page, it's an e-mail from
7       Mr. Frankowski to you and Mr. and Mrs. D'Souza and
8       someone named Bryan Miller.
9               Who is Bryan Miller?
10         A   Bryan, yeah.
11         Q   Sorry?
12         A   Bryan.
13         Q   Bryan Miller?
14         A   Yeah.
15         Q   Who is that?
16         A   He's our composer.
17         Q   Okay.  Okay.
18              So Mr. Frankowski says, "Here is the link you
19      can send to Tucker."
20              Is that Tucker Carlson?
21         A   I believe it would be.
22         Q   Okay.  And -- and so this is -- the subject
23      line is the "Final teaser."  So it -- it appears that the
24      final teaser trailer was going to be sent to Tucker
25      Carlson.
```

Page 55

```
 1            And then at the -- the next e-mail up, it's
 2      kind of difficult to tell who you are sending it to, but
 3      from the e-mail above that, it looks like you are sending
 4      it to Frank Lamont.  And you say, "We have an emergency.
 5      We need to get trailer out tonight but owner of Salem
 6      Media wants us to take their name off.  Can you fix and
 7      resend us a link?"
 8            Do you recall why the owner of Salem Media
 9      wanted their name taken off the teaser trailer?
10      A    Somebody had released the teaser at some event
11      un -- unbeknownst to us at some event, and the leadership
12      of Salem didn't like the fact that it had been released.
13      And they at first wanted the trailer -- their name taken
14      off of it, and then they decided no.
15      Q    Okay.  And do you know at what point they
16      decided that they were okay with their name being on the
17      teaser trailer?
18      A    I really don't.  Dinesh is the one that spoke
19      with them mostly about it.
20      Q    Okay.
21      A    I mean, he was the one that had more
22      interaction with them on that, on things like that.
23      Q    Okay.  And then at the -- the final e-mail at
24      the top, it looks like you are sending this to Brandon
25      Gill.  Who is Brandon Gill?
```

```
                                                    Page 56

 1          A    He is Dinesh's son-in-law.   He married Dinesh's

 2     daughter.

 3          Q    Do you recall why you were sending him this

 4     e-mail chain?

 5          A    Because he -- he's a -- he's a dear friend of

 6     mine, and he's involved with -- I mean, he's -- let me

 7     see if I can remember specifically why I would send him

 8     this thing.

 9               I mean, he might be -- he would be -- he would

10     be quite a -- he's a member of our sequestered, highly

11     confidential team, but he's not an official member, and

12     but he looks at -- he likes to be involved somewhat in

13     looking at things, and I probably sent it to him to see

14     what he thinks of it.

15          Q    Was Mr. Gill involved in the production of the

16     film at all?

17          A    No.   Zero.

18          Q    Okay.  So he was involved in something, I mean,

19     or he wanted to see this --

20          A    Yeah.

21          Q    -- for some reason?

22          A    Yeah.  I mean, he's the -- he and Danielle are

23     Dinesh's family, so he might wanna -- they would be

24     interested in what Dinesh is doing.

25          Q    Okay.  All right.
```

Page 57

```
 1          A    A family member.
 2          Q    And -- and did -- did they have, to your
 3     knowledge, any interaction with TTV or OpSec?
 4          A    I don't believe they had any, other than when
 5     Danielle was involved in organizing the Mar-a-Lago
 6     premier, and they had to find -- they had to come up with
 7     a guest list.
 8          Q    Okay.  So she would have worked with
 9     Ms. Engelbrecht and Mr. Phillips on that?
10          A    Yes.  I -- you have to ask her, but I would
11     think in order for them to get people invited to
12     Mar-a-Lago, she'd have to talk with somebody.
13          Q    Okay.  And what -- what was your understanding
14     of the relationship between True the Vote and OpSec?
15          A    True the Vote was primarily run by Catherine
16     Engelbrecht, and OpSec was primarily run by Gregg
17     Phillips, and they worked together on issues relating to
18     voter integrity.
19          Q    Okay.  And so the -- the geo-tracking research
20     that was conducted, was that done by OpSec or True the
21     Vote?
22          A    I understood that to be part of Gregg's team,
23     so if it was Op -- I may refer to it as team, so that if
24     his team is OpSec or whatever professional people he
25     hires or himself or vendors that he used, it was him.
```

Page 58

```
 1        Q    Okay.  Do you -- do you recall any of the
 2   vendors that he used?
 3        A    No.
 4        Q    Did you ever interact with anyone on his team
 5   other than him?
 6        A    No.
 7        Q    Okay.  Did you feel after receiving and
 8   reviewing the first batch of videos that -- that True the
 9   Vote and OpSec had provided you with enough material for
10   the movie?
11        A    No.
12        Q    And why was that?
13        A    We needed more videos and -- we just needed
14   more videos.  It's a movie.  It's 100 minutes.  You know,
15   we needed more.
16        Q    Okay.
17        A    So we always wanted more videos.
18        Q    And let's -- let's look --
19        A    To support the underlying research.
20        Q    Okay.  Correct.
21             So you -- you felt that the sur -- that you
22   needed more surveillance video to support the underlying
23   research?
24        A    We needed more videos, surveillance videos,
25   mules, that fit the criteria that we could put in the
```

Page 59

```
 1     film.
 2          Q    Okay.
 3          A    The more the better.
 4          Q    Okay.  We're gonna mark a new exhibit,
 5     Plaintiff's Exhibit No. 115, I think we're at.
 6               MS. EGLE:  115, correct.
 7               THE WITNESS:  This is 14.
 8               MS. BALLIETT:  Yeah, okay.  So 115.  This is
 9     Bates number TPNF-0004925.
10               (Deposition Exhibit No. 115 was marked for
11     identification.)
12               THE WITNESS:  Agreed.  Yeah.
13          Q    BY MS. BALLIETT:  Okay.  And this is an e-mail
14     chain between you and Mr. and Mrs. D'Souza and
15     Mr. Frankowski, it looks like?
16          A    Uh-huh.
17          Q    And you e-mailed them and you say, "We need our
18     best evidence of illegal ballot harvesting...then we can
19     go to graphics that makes this evidence explicit.
20               "We need a phone call with Catherine and Gregg
21     to see what they've got to SHOW multiple drops and
22     multiple ballots and out of state mules.
23               "I don't think one person dropping off what
24     looks like one or two ballots off does it.  It doesn't
25     convince me and I want it to be true."
```

Page 60

```
1              What did you mean by that?
2         A    About what part?
3         Q    About the, "It doesn't convince me and I want
4    it to be true."
5         A    I wanted it to be true that there was -- that
6    the reason why -- I wanted it to be true that there was
7    some -- many people thought there was something about the
8    election that was fraudulent, and so, I mean, that's --
9    and they had come up with all these basic theories about
10   these machines and all that stuff, and none of that
11   convinced me.
12             But I wanted it -- I wanted it to be true that
13   the reason why he lost is because of fraud, but I don't
14   want it -- but if it's not fraud, I would not -- I
15   don't -- I wouldn't distort the truth for that.
16             So like if golden plates dropped onto the
17   Supreme Court tomorrow and they said, the accuracy of
18   2020 election was 99.9 percent, I'd say, fine, great.
19   Now we have the responsibility of convincing people the
20   message and we can get off of all this other stuff.
21             But it just seemed really, really messy at the
22   time.  And I'm not the only one.  About 60, 70 percent of
23   Americans still believe that.  So that's -- that's what
24   that meant, and I -- but I wasn't convinced from what I
25   saw.
```

Page 61

1        Q    Okay.  And that what you -- by what you saw,

2    you mean the first batch of videos that they sent you?

3        A    Yes.  And you have to remember this is 1/10.

4        Q    Yeah.

5        A    So this is very early on.

6        Q    Right, right.

7        A    And I had just started thinking about this in a

8    really serious way, and also doing -- you know, Googling

9    it on the Internet, finding out what other people were

10   saying.  At this point I wasn't convinced, and I wasn't

11   convinced visually.  So I believed that their

12   geo-tracking evidence was right.  I just wasn't visually

13   convinced by two or three people popping up.

14           And I had heard from them that it was difficult

15   getting the videos, and then we had three or four

16   conversations about how -- later on in the month about

17   how they had tried to get more and more videos, and these

18   states hadn't done it, which is highly suspicious.  And

19   they couldn't get the videos, not for lack of trying.

20           And so that's all kind of taken into the

21   calculus of why are there not more videos of this and why

22   are there not more people?

23       Q    Okay.  And did you -- did you ever feel like

24   you had enough surveillance at any point when you were

25   making the movie?  Were you ever satisfied with the

Page 62

1    videos that you had?

2        A    I'm a filmmaker, so I always want more and more

3    and more.  So you are never -- you're never happy on any

4    film with anything.  Well, not happy happy.  You do the

5    best you can.  But again, we did not base this on the

6    surveillance videos.  We based it on the -- on the

7    geo-tracking.

8        Q    Okay.  And then at the top of this e-mail,

9    Mrs. D'Souza says, "You have their e-mail, correct?  Why

10   don't you compose an e-mail asking this very question."

11            Do you remember sending that e-mail?

12       A    Huh-uh.  I don't remember that.

13       Q    Okay.  We're gonna look at Plaintiff's Exhibit

14   No. 40, which is Bates number TTV_002 -- sorry, 7209.

15       A    Yeah.

16       Q    So is this the e-mail that you wrote in

17   response to Mrs. D'Souza's suggestion that you e-mailed

18   in the --

19       A    In all likelihood, yes.

20       Q    Okay.  Okay.

21            And then you say, "Do you have video of

22   multiple drops by same person (and/or) multiple ballots

23   (and/or) evidence they are out of state."

24            And Ms. Engelbrecht responds, "Videos are

25   sorted in folders by type.  Look in the repeater and

Page 63

1    multiple ballots folders.

2          "We are glad to talk through the videos with

3    you and what to look for."  And then she says, "It would

4    be helpful to see the script outline.  Let us know when

5    you can connect on a call."

6          Did you have a script outline?

7     A   No, documentaries almost never have scripts.

8     Q   Okay.  Okay.  And -- and so when you produce

9    movies, you don't have a script but you have what -- the

10    beat sheet instead.  Is that sort of?

11     A   Yeah.

12     Q   Okay.  And then Ms. Engelbrecht says, "Let us

13    know when you can connect on a call."

14          Do you remember having a call with her about

15    this?

16     A   We must have, but I don't remember the call.

17     Q   Okay.  Do you remember any calls with her in

18    which you discussed what you needed?

19     A   I remember -- I do remember we talked about

20    this one particular point, that we needed more video, and

21    we talked about it several times.

22     Q   Okay.

23     A   I don't remember specific calls, but I do

24    remember this was a theme.  I'd be not being honest if I

25    didn't say this was -- this was -- this was a theme.

Page 64

1          Q   Okay.  And when you mentioned just now that --
2      that in documentaries, you don't usually do script
3      outlines, what -- what defines a documentary?
4          A   You don't do script outlines -- to answer that
5      part of that, you don't do the script outlines because
6      you don't know what somebody is going to say in an
7      interview.  You don't know where the documentary is
8      going.  You never know the end of a documentary until you
9      get it all together, if -- if you are doing interviews
10     and things like that, which we were.
11             A documentary is a film that's based on the
12     best research you can get, and it is a visual
13     representation, music.  Sometimes you do reenactments
14     which pushes -- pushes things into you must do
15     reenactments.  If you are doing a documentary on Caesar,
16     I mean, statues of Caesar gets a little old, right?  So
17     you have to -- it's very, very seldom that they don't use
18     some form of reenactment in a documentary.
19             I hesitate to say docudrama because it sounds
20     like it's made out of realism.  What you do is you -- you
21     don't drama -- in some ways you dramatize, but you -- you
22     reenact to the best of your ability the events that took
23     place that you are talking about.
24         Q   Okay.  So the difference --
25         A   And -- and we are filmmakers; we are not

Page 65

1     research experts.  So you do rely upon people.  I mean,

2     people are -- documentarians rely upon other people.  We

3     don't pretend not to rely upon other people.  That's the

4     whole point of it.  That's why you have interviews, and

5     that's why you bring in other information and stuff.

6          Q    Okay.  So what would you say the difference is

7     between a docudrama and a documentary?

8          A    People have said -- start using the word

9     docudrama because everyone admits the fact that they have

10    to dramatize some of it -- some of it to become relevant

11    for the reasons I just said.  Some of it to be visually

12    interesting for the reasons I just said.  But to me, it's

13    a distortion.

14         It's very rare to find a documentary that is

15    absolute period piece.  Maybe Ken Burns Civil War.  I

16    mean, it's a rare event, almost doesn't exist.

17         Q    Okay.  Thank you.

18         A    People understand that.  So like if you are

19    looking at -- if you are looking at a documentary, people

20    know that we didn't have a film crew on the International

21    Space Station shooting in real time a satellite flying

22    over the United States collecting pings, and the pings

23    didn't magically create little circles, graphic visual

24    circles with little noises.  People get it.  And they

25    know that that's just a -- that's a visual reenactment of

Page 66

1    satellite -- satellites gathering information.

2        Q    Okay.  Thank you.

3            So you mentioned that you -- you asked OpSec

4    and True the Vote more than once for -- for more video.

5        A    Uh-huh.

6        Q    Do you recall ever asking them for video that

7    was not mule video?

8        A    No.

9        Q    Do you recall --

10       A    We could have --

11       Q    -- anyone else asking them for that?

12       A    We could've -- well, let me -- let me -- let me

13   be clear on that.  I didn't do that.  Maybe somebody else

14   did.  But they did provide video to us that was not mule

15   video.  It was a video -- so there was two of those.

16   Interview between Heather Mullins and an informant, and

17   that wasn't, obviously, a video of drop box mules.  And

18   they did -- they provided another video to us of a

19   mule -- an interview with a mule in someplace in Arizona.

20       Q    And the -- the video, those two videos that

21   they provided of the Heather Mullins' interview and the

22   Arizona informant interview, those were -- those videos

23   were filmed by True the Vote, or did you -- did --

24       A    They filmed them.

25       Q    Okay.  D'Souza Media, okay.

Page 67

1          A    So they provided us non-mule video, but we

2     knew -- it was obvious that those weren't the mule --

3     that wasn't a video based upon the criteria.

4          Q    Okay.  Let's look at --

5          A    And it's not reflected that way in the film

6     either.

7          Q    Okay.  Okay.  Let's look at Plaintiff's Exhibit

8     46, which is TTV_007271.

9          A    Okay.

10         Q    And do you recognize this document?

11         A    I mean, I don't recognize it, no.  That is a

12    long time ago.

13         Q    Okay.  And this is an e-mail from Mrs. D'Souza

14    to Catherine Engelbrecht, Gregg Phillips, and someone

15    named Cole at True the Vote.

16              Do you recall who Cole was?

17         A    No idea.

18         Q    Okay.  And Mrs. D'Souza says, "As you know, we

19    are not done filming so it's important to get the rest of

20    what we need as soon as possible."

21              Number 1, she says, "1,000 videos.  Don't worry

22    if they are grainy - we can work with them.  The reason

23    why we want this is to make a collage for the screen of

24    all these videos compiled to fit the full screen.  It

25    will be incredible to see.  We briefly talked about this

Page 68

1      in California.  Obviously if we want to show in more
2      detail we will only use 20 to 30 of the best ones .. the
3      others are just to fill the screen.  Work with Nathan on
4      this."
5          A    Uh-huh.
6          Q    Do you recall a conversation in California
7      about this collage?
8          A    No.
9          Q    Okay.
10         A    I do not.  I do remember when Dinesh came up
11     with this idea.
12         Q    Okay.  So it was Dinesh's idea?
13         A    Yeah.
14         Q    And -- and what was the purpose of the collage?
15         A    I mean, I told Dinesh we do not need a thousand
16     videos, 1,000 videos.  We need a -- the purpose of the
17     collage is to show -- it is a -- I mean, we've done a
18     collage like this before in a previous film.  It was
19     extremely effective, and it's just -- it's a visually big
20     field to it where you start with 1, 2, and then you go to
21     4 -- 1, 4, 8 or 16, and you fill the screen with this.
22     And the purpose of it was to show that there were lots of
23     video -- of mules.  And that's what we did.  And Dinesh
24     wanted to do that.
25         Q    Okay.  And did TTV or OpSec end up providing

Page 69

1    1,000 videos?

2         A    No, no, no, no.

3         Q    Do you recall how many they provided?

4         A    We got a second group of videos like

5    March 20th, 25th, 30th of, I think like 15 or 17.

6         Q    Okay.

7         A    Yeah.

8         Q    And whose job was it to make the collage?  Was

9    that Nathan?  Mrs. D'Souza says, "Work with Nathan on

10   this."

11        A    Yeah, it was Nathan.  He probably worked with

12   Frank on that, but Nathan -- Nathan and I talked about

13   it.  You don't -- these things are on the screen for a

14   very short period of time, so we just took the footage

15   that we already had from them and this -- and the new

16   footage, and used that as the basis of it, and we just

17   multiplied it out.  We didn't -- we never needed a

18   thousand.

19        Q    Okay.

20        A    We had -- we barely had enough, but we had

21   enough.  I mean, we had enough because that's what we

22   used and it worked.

23        Q    Okay.  And by "it worked," you mean it -- it

24   had the intended effect of showing that there were many

25   videos?

Page 70

1      A    Yeah.

2      Q    Okay.  We're gonna mark Plaintiff's Exhibit No.

3    116, is it?  It's -- the Bates number is DDR-00020967.

4      A    Let me correct that.  It had a -- it had the

5    effect of showing that -- I mean, anybody looking at it

6    would see that there were repeaters in it.  You can see

7    the repeaters, but it just had a visual effect of showing

8    that we had enough video to make that representation.

9      Q    By "repeaters," you mean that the -- the same

10   video had been used more than once in the collage?

11     A    Say it again.

12     Q    By "repeaters," do you mean that the same video

13   had been used more than once in the collage?

14     A    If you look at the collage, it's a group of

15   about 16 videos multiplied.

16     Q    Okay.

17     A    Yeah, and you can easily see it.

18     Q    Okay.

19     A    So we didn't convince anybody we had a thousand

20   videos, and we didn't intend to convince them of that.

21   It's just a -- it's just a way of filling the screen and

22   expressing something visually.  But if you look at it,

23   it's obvious.  I mean, whenever I look at it, I'm --

24   because it's obvious that the -- that there's repeaters

25   all through that thing.

Page 71

1      Q   Okay.  So we're -- we're gonna look at this

2  next exhibit, which is Plaintiff's Exhibit 116.

3          (Deposition Exhibit No. 116 was marked for

4  identification.)

5          THE WITNESS:  Okay.

6      Q   BY MS. BALLIETT:  So the first e-mail in the

7  chain on the bottom --

8      A   Oh, let me read that one.  I'm sorry.

9      Q   Okay.  Go ahead.

10     A   Okay.

11     Q   So this is an e-mail from Mr. Frankowski to

12 Frank Lamont and Josh L.  Who is Josh L?

13     A   Josh Lamont.

14     Q   Oh, Josh Lamont.  Okay.

15         Is that his son that you mentioned?

16     A   Uh-huh.

17     Q   Okay.  And he's copying you, and he says, "I

18 shared a folder with you guys called MULE.  It has 30

19 videos of mules doing drops."  He says, "We will want to

20 show all of them at once on screen.  Would be good to

21 make it feel like many more since our film is called 2000

22 Mules.  But with 5 down and 6 across it feels like alot."

23     A   Yep.

24     Q   "My system gets overloaded so I'll need you

25 guys to do it in after effects."

Page 72

```
 1              And then he says, "If we want, we can then take
 2      this and zoom out more, 30x4.  We'd be showing duplicates
 3      but at that size nobody will know."
 4              And then he says, "What do you think Bruce?  We
 5      need something after Gregg interview to show we have more
 6      than just 4 mules on tape."
 7              At this time in the end of March, did you just
 8      have four mules on tape?
 9         A   No, no, he's just -- he's just -- you have to
10      ask him, but...
11         Q   Okay.
12         A   Yeah, no, I mean, we obviously had more than
13      four mules on tape.  So the -- I don't know why he says
14      that.
15         Q   Did --
16         A   He just says things like that.
17         Q   Do you think that he meant that there were just
18      four that were in the film at that point?
19         A   No, I don't.  I do not believe he thought that,
20      no.
21         Q   Okay.  And then he says, "We'd be showing
22      duplicates but at that size nobody will know."
23              Why -- why would he not want someone to know
24      that there are duplicates?
25         A   I mean, just some -- you'd have to ask him.
```

Page 73

```
 1        Q   Okay.
 2        A   It would be better not to show duplicates, but
 3    we didn't have the video for it.  And maybe he wouldn't
 4    know.  I know because I'm extremely -- Nathan is
 5    visually, too, but I -- I can see it.
 6            THE REPORTER:  I'm sorry?
 7            THE WITNESS:  I can see it, so...  And other
 8    people would know.
 9        Q   BY MS. BALLIETT:  Okay.  And then in your
10    response you say, "Duplicates are fine.  We know Gregg
11    has the footage."
12            So --
13        A   This was before we got it from him.
14        Q   Okay.  Okay.
15            And how did you know he had the footage?
16        A   He said he -- he told us he had it and he was
17    gonna get it to us.
18        Q   Okay.  But he had not given it to you yet?
19        A   Right.
20        Q   And he had not provided you any footage since
21    January at this point; is that correct?
22        A   Right.  I believe so.
23        Q   Okay.  Did you have an understanding of why he
24    hadn't provided it to you if he had it?
25        A   I mean, on several occasions they told us how
```

Page 74

1    hard it was for them to go through that much footage, and

2    first of all they had to get -- they had to -- the

3    criteria had to be met from that mule, and then after

4    that criteria was met, they had to go through and find

5    the footage from the drop shot based upon that criteria

6    and that evidence.  And it was just -- and it was very

7    sporadic what video they had, so the whole thing was

8    represented to us as being extremely difficult and

9    time-consuming.

10        Q    So did you understand that in -- in March of

11   2022, they were still going through and looking for and

12   matching geo-tracking to surveillance video?

13        A    Yeah.

14        Q    Okay.

15        A    That's what was taking so long.  That's what we

16   were waiting for.  As I said previously, we could have --

17   if we didn't -- if we abandoned that, we would have had

18   this done much, much more quickly and with a thousand

19   videos.  I mean, we -- we -- this would not -- none of

20   this would have happened if we had abandoned that

21   concept.  We wouldn't need it.

22        Q    Okay.  So you didn't feel that TTV or OpSec was

23   reluctant to provide surveillance video; they just hadn't

24   gone through it yet?

25        A    Right.  I mean, looking back, that -- that

Page 75

1    seems reasonable to consume -- to say, and I do remember
2    them saying how difficult it was to do it.
3          Q    Okay.
4          A    And it seems reasonable that it would be
5    difficult.
6          Q    Okay.  Let's look at Plaintiff's Exhibit No.
7    100.  This is TPNF-00002579 (sic).
8          A    Okay.
9          Q    Okay.  So the -- the first e-mail at the bottom
10   is -- Mr. Frankowski is e-mailing you and Mr. and
11   Mrs. D'Souza and he says, "Here's what I got after G&C,
12   it may need some VO to connect to the Salem part coming
13   after it.  I played one full screen because it's the only
14   good one left that wasn't shown."
15         Do you understand him to be talking about a
16   portion of the video to go after the interview with
17   Mr. Phillips and Ms. Engelbrecht and -- but before that
18   and -- I mean, sorry, after that and before the Salem
19   part of the --
20         A    Can we do this again?
21         Q    -- film?
22         Yes, sorry.
23         So is -- is he -- is he sending you this drop
24   box link, is this a scene of the movie that he had cut --
25         A    Yeah, uh-huh.

Page 76

1      Q    -- and was sending to you for your review?

2      A    Yes.  Almost certainly.

3      Q    Okay.  And -- and when he says, "Here's what I

4    got" --

5      A    Well, he says here -- he goes, "Here's what I

6    got," so, I mean, he wouldn't -- one second.

7           Well, here's what I got after C&G.  Okay, so

8    that means it's a cut, yep.

9      Q    Okay.  And then he says, "Maybe after showing

10    G&C, Gregg will be more motivated to get us more mule

11    videos."

12      A    We were always obsessed with more mule videos.

13      Q    And -- and Mr. Frankowski seemed to think that

14    Mr. Phillips was not motivated to provide them.  Do you

15    know why he thought that?

16      A    I'm -- you would have to ask Mr. Frankowski,

17    but, I mean -- I mean, you'd have to ask him.

18      Q    Okay.  And then you respond, "I think this

19    works to the last jump.  There we can see the duplication

20    in pattern."

21      A    Uh-huh.

22      Q    "More videos would be super helpful."

23      A    Yep.

24      Q    And so is this the collage?

25      A    Yeah.

Page 77

1          Q   And you are saying that the last zoom out, you

2     can start to see the duplications?

3          A   Yeah.  I think actually -- actually, the second

4     and -- the second to the last and the last, you can see

5     it.

6          Q   Okay.  And then Mr. D'Souza responds,

7     "Realistically I think this is out of the question at

8     least for now."

9              Do you know why he thought it was out of the

10    question for you to get more videos --

11         A   I do not.

12         Q   -- at that point?

13         A   No.

14         Q   Okay.  And then he says, "Maybe when we show

15    Catherine & Gregg the rough cut we can get them to try

16    and provide more."

17             So do you know -- do you know why they would

18    provide more after seeing the rough cut or why

19    Mr. D'Souza --

20         A   Maybe if they would agree with us that we need

21    more visual representation of what the underlying

22    research represent -- said.

23         Q   Okay.  And did TTV or OpSec provide you with

24    more videos after seeing the rough cut?

25         A   No, not to my knowledge.

Page 78

```
 1        Q   Okay.  Let's -- let's mark Plaintiff's Exhibit
 2    No. 117.  The Bates number is DDR-00011348.
 3            (Deposition Exhibit No. 117 was marked for
 4    identification.)
 5            THE WITNESS:  Okay.
 6        Q   BY MS. BALLIETT:  So Mr. Frankowski is sending
 7    an e-mail to you and Frank Lamont, and he says, "Hey
 8    Frank, we got another dump of mule videos, can you mix
 9    these into the grid so it doesn't look like copies and
10    patterns."
11        A   Yeah.
12        Q   So is -- is this the second batch of videos --
13        A   Yeah.
14        Q   -- that was provided?
15        A   So to the best of my knowledge -- you'd have to
16    ask Nathan this, but I'm pretty sure I'm right.  You
17    get -- Nathan can create that montage, and then -- but
18    it's not done to the level it needs to be done for a
19    film, so he sends it off to -- he sends it off to Frank
20    for the final.
21        Q   And -- and that's sort of refining it for use
22    in the movie technical stuff?
23        A   Yeah, it has to be -- it has to -- there's a
24    certain level of threshold you have to get with
25    resolution.  And Frank said -- yes.
```

Page 79

1          Q    Okay.  And do you know whether those -- that
2     second batch of surveillance video was used for anything
3     else other than that collage in the movie?
4          A    We used it in -- we used it in the film, yes.
5          Q    So you didn't --
6          A    There is evidence of -- of visual, a video of
7     mules, yeah.
8          Q    Okay.  So you used those videos for more than
9     just the collage?
10         A    Yeah.
11         Q    Okay.  Let's switch gears a little bit and talk
12    about who had editorial input into the film.
13         A    Dinesh -- I mean, that's a great big open --
14    editorial input is like -- I mean, who made the editorial
15    decisions?  Or input is like everybody inputs.
16         Q    Okay.  And who had the final say?
17         A    The final final is Dinesh.
18         Q    Okay.  And did -- did True the Vote have any
19    say in what went into the film or what was said in the
20    film?
21         A    I mean, we interviewed them.
22         Q    Right, but --
23         A    And they had say as to what the research
24    concluded, and they had -- their other form of input was
25    the video that they gave us.

Page 80

```
1        Q   Okay.  And did they ever provide you with

2    feedback about things they wanted changed in the movie?

3        A   No.  They wanted -- at the end, they wanted to

4    put their logo at the end and a QR code.  And I sent them

5    an e-mail saying that I was gonna list them as executive

6    producers, and they didn't object, so and we did that.

7            And I didn't have a lot to do with them, but my

8    relationship with them was always fairly positive.  I

9    mean, I think they are genuine people, and I have pretty

10   good respect for both of them.  Still do.

11       Q   So was it your decision to list them as

12   executive producers?

13       A   We suggested that.  How that works is, is maybe

14   Dinesh said it or I said it or Debbie said it, do you

15   think they want to be executive producers?  So I sent

16   them an e-mail saying, this is what we are gonna do in

17   credits at the end, and what do you think?  And if they

18   say, no, we don't list them as executive producers.  And

19   if they say something else, we change it.

20           I do that every film with most key people, and

21   everybody changes a little bit all the time, so that's

22   why I do it.

23       Q   Okay.  Did Salem have any input into the

24   content of the film?  Did they ever ask you to change

25   anything in the film?
```

```
                                              Page 81
 1          A    Change anything in the film?  I mean, Salem,
 2     you mean -- I would say generally speaking, no.  We had
 3     one or two Zoom calls with Salem, and I do not remember
 4     them telling us to change anything in the film.
 5          The only thing that was encouraged by the Salem
 6     executives was for us to blur it, which we had already
 7     heard from our legal, and which we were already starting
 8     to do on our own because we believed in it.
 9          Q    Okay.  Okay.  Let's look at a new exhibit,
10     which will be Plaintiff's Exhibit 118.  The Bates number
11     is TPNF-0004778.
12          (Deposition Exhibit No. 118 was marked for
13     identification.)
14          THE WITNESS:  This will take me a while.
15          Q    BY MS. BALLIETT:  That's okay.  Take your time.
16          MS. HYLAND:  Can we go off record for just a
17     moment?
18          MS. BALLIETT:  Yeah.
19          THE VIDEOGRAPHER:  The time is 11:51 a.m.
20     We're off the record.
21          (A discussion was held off the record.)
22          THE VIDEOGRAPHER:  The time is 11:52 a.m.
23     We're back on record.
24          Q    BY MS. BALLIETT:  Okay.  Let me -- let me know
25     when you are finished looking at that document.
```

```
                                                    Page 82
 1          A    Okay.

 2          Q    Okay.  So this appears to be originally an

 3     e-mail from David Santrella?

 4          A    Yes.

 5          Q    Who is the CEO of Salem Media, and you are

 6     forwarding it to Mr. Frankowski, right?

 7          A    Yep.  It looks like that way, yeah.

 8          Q    And there are -- there are two categories of

 9     comments on the first page.  One is Legal comments and

10     one is Other comments.  And under Legal comments, it

11     says, "In several instances the surveillance camera

12     footage shows identifiable faces of both alleged mules

13     and Georgia election workers...we should consider

14     blurring these out as well to avoid right of

15     publicity/privacy issues."

16          A    Uh-huh.

17          Q    And is that what you were just referring to

18     earlier when you said that Salem suggested blurring

19     personally identifiable information?

20          A    Yes.

21          Q    But you were already doing it?

22          A    We were already experimenting with it.  And

23     our -- can I talk to you?  No?  It has to do with my

24     legal counsel.  I don't want to say anything --

25               MS. HYLAND:  I would answer -- I would answer
```

Page 83

1    the question without disclosing --

2            THE WITNESS:  Okay.

3            MS. HYLAND:  -- any advice of counsel.

4            THE WITNESS:  We were encouraged to blur

5    besides this, and through our own conversations.

6        Q   BY MS. BALLIETT:  Okay.  And then let's go over

7    to the Other comments section.  The fourth bullet from

8    the top says, "You talk about the same mules going to

9    several drop boxes, but you never show that.  You always

10   show just one mule and one drop.  Is there any video

11   evidence that you could display that shows the person at

12   multiple drop boxes?  Even if you don't have video of

13   each drop the same person made, the geo tracking would

14   suggest that you could show that the same person/device

15   making several stops in one day or over several days."

16           Did you -- did you ever represent one person

17   making multiple stops in one day or over several days in

18   the film?

19       A   I do not -- I do not -- first of all, I do not

20   think -- I do not agree with this bullet point.  We had

21   in the film three or four people who had made multiple

22   stops that were in that repeater file, and that I know

23   specifically Gregg represented to me that one of them had

24   made maybe five stops that they managed to get on video.

25   That's just on video.  That's not what their geo-tracking

Page 84

1    said.  One of those individuals, so -- and we had that

2    individual in the film making multiple stops.

3           So I disagree with that bullet point.

4           And what was the second one?

5    Q    Oh, that was it.  That was it.  Thank you.

6    A    And -- and in addition to that, if he's looking

7    at this, at 4, 5, I don't know what cut he's looking at.

8    Q    Right.  This was not the final cut of the film?

9    A    No.  I have no idea what cut he's looking at.

10   Q    Do you think between April 5th and when the

11   film was finalized you added in more material pursuant

12   to -- whether or not it was directly in response to this

13   comment, but more things that would fit the description

14   he is asking for here?

15   A    I mean, we were actively cutting this for the

16   next probably 10 days.

17   Q    Okay.

18   A    Maybe 15 days.  So I have -- I have no idea

19   what he was looking at, and if it was -- I do not know if

20   the -- if this cut that he was looking at even had the

21   stuff that we had just gotten four or five days earlier.

22   Q    Okay.  So you mentioned --

23   A    I don't know.

24   Q    Sorry, go ahead.

25   A    No, I just don't know what he was looking at.

Page 85

1          Q    Okay.  So you mentioned that you had someone in

2     the film who you had going to multiple drop boxes.  Did

3     you --

4          A    Uh-huh.

5          Q    -- show that evidence in the film?

6          A    We showed -- we have one sequence in the film

7     of Atlanta that we show the path of a mule during -- I

8     forget the exact wording of it.  But Gregg describes it,

9     and we got that data from him.  We laid it on the -- on

10    the Atlanta map.

11         Q    Okay.

12         A    I can't recall it off the top of my head

13    exactly what was said.

14         Q    Okay.  So, but the -- the map that you just

15    described, is that -- that map is in the film?

16         A    Yeah.

17         Q    Okay.  But the video of that person is not in

18    the film?

19         A    I -- I do not know -- I do not recall off the

20    top of my head.  And since we didn't have the identifying

21    information, I couldn't verify that.  All I know is that

22    I was -- that Gregg told me that he had multiples --

23    multiple mule drops by a single person in the video, and

24    he had this data of one of the mules during the course of

25    a day in Atlanta.  And both went in the film.

Page 86

1          Q   Okay.  Did former President Trump have any --
2      did he ever provide comments on the film that you made a
3      change based on?
4          A   He said that, after he watched it, that it
5      seemed to drag at the end, which is what I thought and
6      Nathan thought, so we were happy about that.
7          Q   How many times did -- did he watch the film?
8          A   He watched it with Dinesh and Debbie, and Gregg
9      and Catherine, and Brandon and Danielle in Mar-a-Lago,
10     and he watched it at the Mar-a-Lago -- Mar-a-Lago
11     premier.
12         Q   Okay.  And do you know when he first watched it
13     with the D'Souzas and Catherine and Gregg?
14         A   At -- when they went to -- you mean the date of
15     that?
16         Q   Yeah, yeah.  Do you know roughly the date?
17         A   I do not know the date.  No, not off the top of
18     my head, no.
19         Q   Okay.  Let's mark a new exhibit, which will be
20     Plaintiff's Exhibit 119, I believe.  The Bates number is
21     DDR 2 -- 00020654.
22             (Deposition Exhibit No. 119 was marked for
23     identification.)
24             THE WITNESS:  Okay.
25         Q   BY MS. BALLIETT:  So the -- the second e-mail

Page 87

1    from the top -- well, I should say, sorry, the whole

2    chain is about when the theaters need the film to be

3    finalized.  Is that correct?

4        A    Right.

5        Q    And you say in the e-mail at the top, "It will

6    be impossible to have a final edit before 4/17 since

7    Trump sees it on 4/14 and he might have a note or two."

8        A    Uh-huh.

9        Q    So you were expecting for President Trump to

10   provide comments that you would incorporate into the

11   film?

12       A    We weren't expecting it, but if he goes, I

13   really do not want, like, something personal that we --

14   we don't know.  There might be something that he thinks

15   is offensive to him personally.  We don't want to offend

16   him, and you never know.  I mean, everybody has got a

17   note.  I mean, literally everybody has a note, and you

18   take them into consideration.

19            And I particularly have a lot of respect for

20   Mr. Trump's ability to brand and market, and he was right

21   when he said, "This thing drags."  I was like, yeah, it

22   drags.  So I was happy.

23       Q    Okay.  Did he provide any other comments

24   besides that he thought the end dragged?

25       A    I do remember -- no, I wasn't at the meeting

1    and I didn't get a lot -- I didn't hear a lot, but I do

2    remember he laughed at the -- when we blurred the dog.

3    Somebody told me he laughed.

4        Q   Okay.  And when you talk about the dog being

5    blurred, is that -- was that something that -- without

6    disclosing the advice of your counsel, why did you blur

7    the face of the dog in the film?

8        A   We were -- there were three of us who were

9    obsessed with not identifying anybody.

10       Q   Okay.  And who -- which three of you was that?

11       A   It was Bruce, it was Debbie, and it was

12   Catherine.

13       Q   Okay.  And -- and so I take that to mean that

14   Mr. D'Souza was not in agreement with you on that?

15       A   No, it wasn't that he wasn't in agreement.  He

16   wasn't obsessed with it.

17       Q   Okay.

18       A   Yeah.  But we were obsessed with it.

19       Q   Okay.  And why were you obsessed with it?

20       A   Because the point was never to come down hard

21   on any individual or to -- it wasn't about this person or

22   that person violating the -- violating some law.  It was

23   about, is there or is there not a systematic, widespread

24   effort to change the outcome of this election with the

25   use of -- that involves -- one piece of it involves these

Page 89

1     mules.  It wasn't about hurting any of these mules or --

2     or exposing them.

3            And -- and that's why at the end of the film, I

4     thought, you know, it's cut time.  We left in the woman

5     that had been a mule that said she did it because she

6     needed Christmas -- Christmas money for her kid.  So we

7     had no interest in hurting anybody.

8        Q    Okay.  Let's switch gears a little bit and just

9     talk about the insurance for the movie.

10           So when you produced films with D'Souza Media,

11    what types of insurance do you normally seek to obtain

12    for each film?

13       A    Production and E&O.  E&O is errors and

14    omission.

15       Q    Okay.  And what does that cover?

16       A    That covers any errors that we make or

17    omissions in the film.  I mean, I'm --

18       Q    And that's --

19       A    I'm the last person to give a legal description

20    of anything, believe me.

21       Q    Okay.  But generally speaking, it's if there is

22    a lawsuit related to an error or omission?

23       A    Yeah.

24       Q    Okay.  And did you seek to obtain both of those

25    types of insurance for 2000 Mules?

Page 90

```
 1        A   We got the production insurance.  We did not
 2   get the E&O insurance.  We did seek E&O insurance.
 3        Q   Okay.  And do you understand why you did not
 4   get it?
 5        A   It was the hottest issue in the country.
 6   Nobody would touch it.  Election integrity, I mean, if
 7   you said anything to challenge election integrity, you
 8   were banged off of Twitter.  You were canceled.  You
 9   were -- I mean, they wouldn't touch it.
10        Q   Okay, so what --
11        A   Obviously.
12        Q   Let's -- let's look at a new exhibit.  We will
13   mark Plaintiff's Exhibit No. 120, and it's TPNF-0004628.
14            (Deposition Exhibit No. 120 was marked for
15   identification.)
16            THE WITNESS:  Okay.
17        Q   BY MS. BALLIETT:  And in this e-mail, at the
18   bottom you are e-mailing, it looks like, Frank Lamont and
19   Mr. Frankowski.  And you say, "We are working on E&O
20   insurance.  Clearance lawyer Sarah is requesting a final
21   version blurring for clips they are worried about.  Since
22   we don't want to ship without E&O can I send her
23   something today?"
24            Do you -- do you understand what clips they
25   were worried about?
```

Page 91

1          A    I mean, I don't know how to -- again, I do not

2    know how to answer this without saying what my lawyer

3    told me.

4          Q    Okay.  Do you -- do you understand what -- do

5    you recall, I should say, what clips Mr. Lamont sent you

6    in response, what these two clips are?

7          A    Well, this is -- this might be more than two

8    clips.  I don't know what's in these folders.

9          Q    Okay.  He says, "Here are two clips."

10         A    I know, but the clips could be --

11         Q    It could be -- it could be the whole movie?

12         A    Yeah.  It could be, yeah.  It could be five

13   minutes.  I don't know what this is without -- I don't

14   know what it is.  I do know that we -- I do know that we

15   did more and more blurring through this thing.

16         Q    Okay.  For how long did you do that process?

17   Was it sort of right up until the end?

18         A    No, I would say around this timing, we would be

19   getting towards the end, because we had to get things

20   organized for the DVD release in the theaters.

21         Q    Okay.  And even though you were blurring more

22   and more, they still wouldn't provide the E&O insurance?

23         A    You know, they wouldn't -- they rejected it

24   without watching the film.

25         Q    Okay.

```
 1          A    They rejected it on the description.

 2          Q    But here it says that you were working on it

 3     and they are asking for clips, so...

 4          A    Yeah.

 5          Q    So you think they didn't --

 6          A    Oh, no.  No, they didn't.

 7          Q    They didn't look at the clips?

 8          A    Hang on one second.  No, Sarah is not the --

 9     Sarah is our lawyer.

10          Q    Okay, so you provided the clips to your

11     attorney, but you don't believe that the -- the insurance

12     company looked at them?

13          A    I -- I'm -- I know the insurance company never

14     watched the film.

15          Q    Okay.

16          A    Unless my broker lied to me.

17          Q    Okay.  I think --

18          A    They rejected it off the -- they rejected it

19     off the description.

20          Q    Okay.  Okay.  I think that's -- might be a good

21     time to break for lunch.

22               MS. HYLAND:  Okay.

23               MS. BALLIETT:  And then do you know how long

24     your?

25               MS. HYLAND:  Does anyone know how long?  I
```

Page 93

```
 1      don't expect it to be long.  I think -- I'm hoping maybe
 2      ten minutes.
 3              THE VIDEOGRAPHER:  Do you want to go off the
 4      record?
 5              MS. HYLAND:  Yeah, we can go off record.
 6              MS. BALLIETT:  Yeah, yeah, we can go off the
 7      record.
 8              THE VIDEOGRAPHER:  The time is 12:10 p.m.  We
 9      are now off the record.
10              (The deposition was at recess from 12:10 p.m.
11      to 1:33 p.m.)
12              THE VIDEOGRAPHER:  The time is 1:33 p.m.  We
13      are back on record.
14         Q   BY MS. BALLIETT:  Okay.  So Mr. Schooley, when
15      the movie was being made, how often did you communicate
16      with True the Vote?  And by that I mean True the Vote,
17      Ms. Engelbrecht, or OpSec, Mr. Phillips, any of them?
18         A   Very seldom.  I would say when the movie is
19      being made, maybe, you know, three, four times, five
20      times.  I mean, we -- I communicated to them on set when
21      we were.  And but after that, maybe two or three Zoom
22      calls.
23         Q   Okay.  And do you know whether Mr. Frankowski
24      communicated with them?
25         A   I think he had limited e-mails.  You have to
```

Page 94

1      ask him, but limited e-mails or -- or communication with

2      Gregg about the delivery of the second batch of videos.

3          Q    Okay.  Okay.  And did you have any

4      correspondence with Gregg around the time that the second

5      batch of videos was sent?

6          A    I don't recall.  I mean, I might have just

7      because we were really hoping to get them, but I -- I

8      don't recall.

9          Q    Do you recall ever asking Mr. Phillips to

10     confirm that the second batch of videos was geo-tracked?

11         A    I do not remember asking him to confirm that.

12         Q    Do you recall having any discussions with him

13     about whether the videos provided after January were

14     geo-tracked?

15         A    No.

16         Q    Okay.  Let's look at Plaintiff's Exhibit No.

17     80, which is Bates numbers TPNF-0001637.

18              And let me know when you are finished.  Take

19     your time.

20         A    Okay.

21         Q    Okay.  So if you look on the second page, the

22     first e-mail in the chain on the bottom, it appears to be

23     another e-mail from someone at Salem who is the COO named

24     David Evans, and he had written Dinesh, which you were

25     forwarding, it looks like, to Mr. Frankowski and copying

Page 95

1    Mr. D'Souza.

2            Does that seem right?

3        A    Yeah.

4        Q    And then what Mr. Evans had written, so he

5    says, "I got some additional feedback from the leadership

6    at Regnery and Townhall.

7            Regnery is the publishing company, right?

8        A    Uh-huh.

9        Q    And what's Townhall?

10       A    I think it's a -- like a platform or an e-mail

11   publishing thing or something that they own.

12       Q    Okay.  And so they were just leadership at

13   Salem who were working at the other non-Salem Media

14   Group, I guess?

15       A    Uh-huh.

16       Q    Or are they part of Salem Media Group; do you

17   know?

18       A    No, I don't -- I don't know that.

19       Q    Okay.  So these -- these people, they say that

20   they -- Mr. Evans says, "There was -- I think he means

21   was -- a concern that we are not showing enough evidence

22   of wrongdoing.  There were 3 suggestions.

23            "Show the same person visiting multiple drop

24   boxes.

25            "Show more people stuffing ballots."

Page 96

1          And "Show in greater detail the mobile phone
2     data.  Show the exact route that someone took at 3 in the
3     morning and state exactly how many bad cell phone trails
4     were found."
5          A    Okay.
6          Q    And then you forward the e-mail and you say,
7     "Regarding David's list:  I'll work with Nathan on one
8     and two.  A couple more clips will do it.  Some are
9     already in there now.
10         "What about 3?  Not a bad idea."
11         A    One second.  "I will work with Nathan on one
12    and two.  A couple more clips will do it.  Some already
13    in there now."
14         So that means to David, I'm saying that he
15    doesn't have the last cut.
16         Q    Okay.
17         A    Yeah.
18         Q    Okay.  So he -- yeah, they had not seen the
19    latest cut.
20         A    Okay.
21         Q    Okay.  "What about 3?"  You say, "Not a bad
22    idea.  Could Gregg give us the route of one mule on one
23    night.  Frank could easily throw it on one of our maps,
24    give the times.  It would take 10 seconds on screen over
25    someone already talking.  All visual with the red pops

Page 97

1      and the time and the coordinates.  We could create it if

2      he can't get us real info but it would be better with

3      real data."

4           A    Uh-huh.

5           Q    Why -- what was your understanding of why

6      Mr. Phillips might not be able to get you real info?

7           A    Well, we had -- I mean, we did have one from

8      him that was real data.  So I don't know when -- of the

9      Atlanta mule, because I think that was in his original

10     presentation or whatever to us, if I'm remembering right.

11               So what was the question?

12          Q    So the question was, you say:  "If he can't get

13     us the real info, we could -- we could create it."

14          A    Yeah.

15          Q    Why wouldn't he be able to get you real info?

16          A    He should be able to get us real info.  He

17     might -- he might not -- he just might not do it.

18          Q    Right.  And -- and why would that be?

19          A    I have no idea.

20          Q    Okay.

21          A    But I think -- I mean, the one we had he looked

22     at and approved.

23          Q    The map that you had?

24          A    Yeah.

25          Q    Okay.  He never said this map is not accurate?

1      A    Right.

2      Q    Okay.  And did -- did Ms. Engelbrecht ever look

3    at the map and say it wasn't accurate?

4      A    And this is April 7th?

5      Q    Yeah.

6      A    Okay.  So did Mrs. -- no, she didn't.  We never

7    got comment from them that anything we did in the film --

8    I mean, I have to be careful.  I have to be -- think.

9           We never got a comment from them that anything

10    in the -- I'm not going to say that because I don't know

11    if that's necessarily true.

12           THE REPORTER:  I didn't hear the last part you

13    said.

14           THE WITNESS:  I'm not going to say that because

15    I -- I have to review the entire film in my head, and I

16    just can't do that right now.

17           So no, they did not tell us at that -- that

18    that particular graphic was wrong.

19      Q    BY MS. BALLIETT:  Okay.  And then in the e-mail

20    above that, Mr. Frankowski says, "There is no video of a

21    mule at multi locations, or at least looks like the same

22    person."

23      A    That's -- so this is how he talks.  You can

24    talk to him about that.  But that's -- those are two

25    different things.  He's not saying there is no mules.  He

Page 99

1    says that you can't -- the visual -- the footage doesn't

2    look like it's the same guy.

3         Q    Okay.

4         A    Yeah.

5         Q    But so at this point, you had already decided

6    to blur people's faces, right?

7         A    We were in the process -- so -- the blurring

8    decision happened sometime in March.  It ramped up, and

9    at this point we were in blur mode.

10        Q    Okay.  So -- so when he says, "There is no

11   video of a mule at multi locations, or at least looks

12   like the same person," but why would it -- why would it

13   matter whether it looked like the same person because the

14   person's face is --

15        A    Well, we --

16        Q    -- blurred anyway?

17        A    We wouldn't represent or put it in the film

18   that it was the same -- that it was the same person just

19   because we could blur it.

20        Q    I understand that.  I'm not implying that --

21   that you would do that.  I'm saying, if you're hiding the

22   person's identity anyway by --

23        A    Yeah.

24        Q    -- blurring their face --

25        A    Yeah.

1          Q    -- and it doesn't look like the same person but

2      you know it is the same person, why wouldn't you include

3      it?

4          A    Well, I think we did put him in.  I think

5      this -- this one was the one of -- Nathan has a very high

6      cinematic orientation towards this stuff, and so it needs

7      to -- I mean, that's as important to him as data.  I

8      mean, he's very, very concerned that it looks -- that it

9      has a particular look.

10              I am -- I'm -- I was concerned about the

11     fundamental data.  When Gregg said that that one guy in

12     the -- with -- in the -- in the black hoodie was in four

13     different places or five different places, he was in the

14     film and I am almost positive at least twice or three

15     times, and we blurred him.

16         Q    Okay.

17         A    When Nathan says the stuff, it doesn't

18     necessary mean that -- that's how he's -- it's how he's

19     approaching it at the time.

20         Q    Okay.  And then -- and then he says, "3 is

21     actually in the movie, here's the transcript.  The

22     problem is it's Gregg's shitty graphic.  We could redo

23     this one with Frank, and make it better."

24         A    One second.  "3 is actually in the movie,

25     here's the" -- so 3 was what?

Page 101

```
1          Q    Three was --

2          A    Yeah, see.

3          Q    -- the mobile phone data.

4          A    Yeah, so that -- so this is probably -- my

5     guess is Salem is a big organization.  They passed these

6     things around.  God only knows what actual video -- what

7     actual cut these people were looking at, right.

8               So by the time that Nathan saw this, he goes,

9     yeah, this is already in the film, and -- and it was like

10    I said earlier, Gregg had these graphics that didn't work

11    for -- they weren't very -- I couldn't understand them

12    really.  I mean, they are just these fuzzy things, and so

13    we redid it.

14         Q    And that's what you are talking about when you

15    say, "I hate that graphic in there now," you re-created

16    his graphic with --

17         A    Yeah, we re-created the graphic now.

18         Q    Okay.

19         A    But it was basically based upon Gregg's work.

20         Q    Right.  And he saw it and he didn't object to

21    it?

22         A    He saw it and he didn't object to it, and it's

23    based upon his work, and yes.  And it's -- yes.

24         Q    Okay.  And did you -- do you remember --

25         A    He didn't object to it to me.
```

Page 102

```
1          Q    Okay.  Okay.  Do you have any reason to think
2      that he objected to it to anyone else?
3          A    I have no reason to think that.
4          Q    Okay.  Who was responsible for payments to True
5      the Vote under the agreement?
6          A    Me, Bruce.
7          Q    Okay.  And --
8          A    I mean, I wrote the checks.
9          Q    Okay.
10         A    Yeah.
11         Q    Okay.  And do you know how many payments were
12     made to -- to True the Vote?
13         A    I don't know how many individual payments.  My
14     guess is four or five.
15         Q    Okay.  And were those payments made to True the
16     Vote itself?
17         A    No.
18         Q    And --
19         A    Well, let me back up.  There were -- there was
20     a -- an expense check that was given -- that was paid,
21     and I don't know if it went to -- who -- who that check
22     was made out to.  I do know we did expense a check.  We
23     did a check for their speaking fees because they went and
24     spoke someplace, and that was either for the expenses of
25     it or their speaking.
```

Page 103

1              So I'm not absolutely clear on this one.  I

2      want to go on record I'm not absolutely clear on this.

3              And then there were checks written to -- for

4      the -- their percentage distribution from the film, and

5      those were written -- did you ask me who they -- what

6      they were?

7          Q    Who -- who those checks were written out to.

8          A    Shadow Beach LLC.

9          Q    Okay.  And do you know what that entity is?

10         A    No.

11         Q    Did you ever ask?

12         A    I asked Dinesh when I got that notification.

13     It's not uncommon for us at all.  I mean, what we do is

14     to contact people who we are going to send the check to

15     that's talent or, you know, some kind of disbursement,

16     what is the entity you want us to use?  And they tell

17     you, and you write a check to that entity.  It's standard

18     business practice.

19             And when I got that notice from Dinesh that

20     they wanted -- wanted it paid to Shadow Beach LLC, I

21     said, I won't do it until you get Salem to sign off on it

22     because I'm just not gonna do that.

23             And -- and he got Salem to agree to it, legal

24     Salem.

25         Q    Okay.  And why were you concerned about Salem

Page 104

1    agreeing to it?

2         A    Because I never heard of Shadow Beach LLC.

3         Q    Is it --

4         A    I had -- and I don't think Salem had ever heard

5    of Shadow Beach LLC.  It was like -- it was --

6         Q    So why do you think that Salem eventually

7    agreed to that?

8         A    I don't know, but they did.

9         Q    Is it common for you to have a profit sharing

10   agreement with one entity and to pay a different entity?

11        A    Like I said, we do -- we often ask -- we don't

12   know what letters of understanding or agreements have

13   been made between True the Vote and Shadow.  We don't

14   know.  We ask them where they want the money to be sent,

15   and we send it.

16        Q    Okay.

17        A    I just wanted everybody in the -- everybody

18   with -- with responsibility for the film to know what was

19   happening --

20        Q    Okay.

21        A    -- and sign off on it.

22        Q    Okay.  Let's look at -- we're gonna mark a new

23   plaintiff's exhibit number.  I think it's 121 we're at,

24   and it's DDR-00059971.

25              (Deposition Exhibit No. 121 was marked for

Page 105

1    identification.)

2          THE WITNESS:  Oh, sorry.

3          Yep.

4    Q    BY MS. BALLIETT:  So this is a letter from you

5    and Mr. and Mrs. D'Souza from OnePartyAmerica LLC to

6    Shadow Beach LLC, and it says, "We have decided to make a

7    third disbursement" -- oh, bless you, if that was a --

8    A    Excuse me.

9    Q    -- sneeze.

10         Are you good?

11   A    Yeah.  Thank you.

12   Q    So it says, "We have decided to make a third

13   disbursement payment to the equity holders of -- from the

14   profits of OnePartyAmerica LLC's film '2000 Mules.'"

15         Now, this is described as a, "We have decided

16   to make a third disbursement payment."  So was this a

17   discretionary payment?

18   A    No, I mean, you -- you decide when you make the

19   disbursement.  I mean, sometimes people hold onto cash

20   forever.

21   Q    Right.

22   A    So we -- we -- we -- we just made a decision to

23   disburse on a regular basis, and...

24   Q    Okay.  So this was part of the percentage that

25   they had contractually agreed?

Page 106

```
 1          A    Yes.
 2          Q    Okay.  That you had contractually agreed to
 3     give them?
 4          A    We had, yeah.
 5          Q    Okay.  And -- and you had just decided when to
 6     make the disbursement?
 7          A    Yeah.
 8          Q    Okay.
 9          A    It was a timing issue.
10          Q    Okay.  Understood.
11               Let's fast-forward a little bit.  How did you
12     come to learn about this litigation?
13          A    I heard -- I got -- I think Dinesh called me
14     and said that he had been deposed or -- I don't know the
15     exact wording.  I mean, I don't know exactly the time in
16     which I came to know it, other than it was in
17     April around -- around him being served.  And I think you
18     got -- were served a -- I think a letter, or I don't know
19     what, something like that.  But I think you got served.
20               And I think I had heard that there was some
21     grumpiness happening, but I didn't know what it was -- I
22     don't believe I knew what it was specifically, and I
23     certainly didn't know the specifics of this until I
24     actually read the -- the -- what's it called?  The
25     document that is used to say that you are being -- is
```

1    there like a -- what's it called?

2            MS. HYLAND:  Complaint.

3        Q    BY MS. BALLIETT:  The complaint.

4        A    Complaint.

5        Q    Yeah.

6        A    I tell you, I'm a very bad lawyer.  I can't

7    remember a word.

8            So that was when.

9        Q    Okay.  And that was in -- you said April of

10   which year?

11       A    No, it was in -- no, it was in October -- I'm

12   sorry, October.

13       Q    Okay.

14       A    It was in October.

15       Q    Okay.  Yeah.  That's -- that's right.  It

16   was -- the complaint was filed in October?

17       A    Right.

18       Q    And what was your reaction to learning about

19   the lawsuit?

20       A    I read it and I said, oh -- I think there was

21   descriptors in it about who was suing us.  And my

22   reaction was, oh, that's the guy that's in the film

23   twice.  He dumps five in one time; he dumps five in

24   another time.  This -- this is simple.

25       Q    Okay.  And did you --

1          A   I didn't -- I didn't -- I treated it seriously,

2     but I had a high confidence that it was somebody who had

3     dumped ballots in twice, and it wasn't on the day of the

4     Gwinnett anomaly, so it wasn't part of that -- that whole

5     thing.  So that means it had been -- you know, I looked

6     at the -- I think I asked Nathan for the video, and --

7     and I looked at it, and I said, yeah, you know, the

8     Gwinnett anomaly was on the -- was on the 12th, so this

9     is stuff that was geo-tracked.

10          And one of his dates was the 6th and the other

11     one was the -- I think 16th.  And I went, and he stuffs

12     five in once and I think like five in the next, and I

13     went -- and I went, oh, that to me started lining up to

14     making the criteria -- I mean, it made the criteria

15     for -- I mean, it would be what you would be looking for

16     for a mule that met our criteria.

17          Q   Okay.  And so could you explain to me your

18     understanding of what the Gwinnett anomaly is?

19          A   There was a day that -- it's in the film.

20     There was a day where they had received like 1620 -- I

21     mean, in the film, 1621 ballots, and Gregg thought that

22     was unusual.  He has wording for it in the film.

23          So he did a -- he said in the film we did a --

24     we geo-tracked it, meaning that they put a -- a border

25     around that drop box, and they counted how many phones

Page 109

1    went to it.  And then he said, you know, it was like

2    200 -- 200 -- I think in the film he says a couple

3    hundred films -- couple hundred phones.

4              And then -- and then he said they asked for the

5    footage.  Catherine asked for the footage.  It's in the

6    film again.  Catherine said that they didn't give -- they

7    told Catherine the footage wasn't there, so they did a

8    Freedom of Information Act or one of those things that

9    compels public documents.  And lo and behold, a couple

10   days later it shows up, and they watched it, and a couple

11   hundred people went to the Gwinnett County on that same

12   day, and that confirmed their geo-tracking.

13        Q   Okay.  So is it your understanding that --

14        A   This is all in the film.

15        Q   -- unlike for drop boxes -- like -- I'm sorry,

16   let me rephrase.

17              Is it your understanding that Mr. Phillips

18   specifically looked at this drop box, and he conducted a

19   different type of research than he conducted for all the

20   other drop boxes?

21        A   I mean, it was -- it was a particular thing he

22   looked at, but that's not why with regards to Mr. --

23   Ms. -- well, that's -- that would have only happened on

24   the 12th.

25        Q   So -- so Mr. Phillips didn't geo-track the rest

Page 110

1      of the -- the days that wasn't --

2          A   I don't know.  In the film, he said he

3      geo-tracked it.  So we -- I mean, we considered that he

4      had geo-tracked it, and they met the criteria.  And I --

5      I thought they expressly met the criteria, because

6      Mr. Andrews -- Chris Andrews?  Andrews?

7          Q   Yes, Andrews.

8          A   -- was in the film twice, and it wasn't on that

9      date, so I had even greater confidence.

10         Q   So I'm -- I'm sorry, I'm just struggling to

11     understand why it not being on October 12th would give

12     you greater confidence?

13         A   Because the Gwinnett anomaly was on

14     October 12th.

15         Q   Right.  So why -- why would it be more likely

16     that he came to the ballot drop box twice if one of the

17     days was not October 12th?

18         A   Both of the days were not.

19         Q   Both of the days were not.  But I'm -- I'm

20     still struggling to understand what the role that

21     October 12th plays in --

22         A   That was --

23         Q   -- that --

24         A   -- a Gwinnett --

25         Q   -- calculus.

Page 111

1      A    -- anomaly date.

2      Q    Okay.

3      A    So even if he did have separate criteria, which

4    we did not know about -- even if he did have separate

5    criteria, it wouldn't have anything to do with him

6    putting those other videos in there.

7      Q    Okay.  So you understood the video to be a

8    tracked -- a geo-tracked video because it was on the

9    dates of October 15th and October 6th; is that correct?

10      A    I -- yes, and because -- and it was not

11    Gwinnett anomaly dates.

12      Q    But the Gwinnett anomaly dates were geo-tracked

13    also?

14      A    They were -- they were -- they were -- he says

15    in the film how they were -- I mean, he missed they were

16    geo-tracked in the film, and then -- and we always

17    assumed they were fully geo-tracked.  I mean, that's what

18    we thought.

19      Q    You assumed what was fully geo-tracked?

20      A    We did not -- we did -- the basis of the film

21    is that there were 2,000 mules that were geo-tracked,

22    right?  But we know that he didn't geo-track the -- a

23    mule in Arizona.  We know he didn't geo-track a mule in

24    Arizona because they are outside of the population of the

25    film.

Page 112

```
1            We are -- we always assumed there was a -- the
2       numbers they gave in -- I still think this.  The numbers
3       they gave, like in -- like in -- in Atlanta, the 242, he
4       geo-tracked 242 people who went to ten drop boxes, ten --
5       made ten visits to drop boxes and five other locations to
6       do whatever they did.  And I had no reason to suspect
7       that those non-October 12th dates were not part of that,
8       and I had no reason to suspect that the non -- that the
9       October 12th date was not part of that.
10           To me, is it absolutely essential that it is?
11      Not for the fundamental concept of the film, but we
12      operated under the concept that it is.  The fundamental
13      concept of the film transcends that.  This is just
14      further evidence of it, but we always operated that all
15      of them were.
16           Q   Okay.  So --
17           A   The film was 2000 Mules, and we show 2,000
18      mules.
19           Q   Right.  And so -- so you understood that
20      every -- I think we've gone over this before, but you
21      understood that every video that was provided to you was
22      geo-tracked?
23           A   Yes.
24           Q   Okay.
25           A   Yeah.  And he says -- he says -- he says in the
```

Page 113

```
 1     film.
 2          Q    He says in the film that every video that you
 3     look at is geo-tracked?
 4          A    Yes.
 5          Q    Okay.  Let's -- let's look at a new exhibit,
 6     Plaintiff's Exhibit No. 122.  The Bates number is
 7     DDR-00016711.
 8               (Deposition Exhibit No. 122 was marked for
 9     identification.)
10               THE WITNESS:  He doesn't struggle that much.
11               (Court reporter clarification.)
12               THE WITNESS:  Sorry, I will wait for a
13     question.
14          Q    BY MS. BALLIETT:  Okay.  This is a -- this
15     looks like an e-mail from Mr. Frankowski to you, and it
16     includes a drop box link, correct?
17          A    Uh-huh.
18          Q    And then it says -- Mr. Frankowski says,
19     "Here's the late dump that had that guy."  And then there
20     are two clip names:  10/15/20 and 10/6/20, and I
21     understand those to be dates.
22               Does that seem right?
23          A    Uh-huh.
24          Q    Okay.  And then Mr. Frankowski says, "The thing
25     that gave me pause was he really struggles with how to
```

Page 114

1       drop the ballets in the 2nd clip."

2               Are you good?

3           A    I'm okay.  Thank you.

4           Q    "He really struggles with how to drop the

5       ballets in the 2nd clip, like he has no idea how to use

6       it.  But if he'd been there before that wouldn't be the

7       case."  And then he says, "If it's the nighttime guy,

8       it's very suspect that he puts on mask before getting out

9       of car, at night with nobody around.  But if he's a big

10      lefty he might just be that scared of covid."

11          A    Yes, yes.

12          Q    So -- so did you -- had you asked

13      Mr. Frankowski to find the clips that you thought were of

14      Mr. Andrews?

15          A    Yeah.  This is probably after the deposition,

16      we heard about this suit.

17          Q    Okay.  Great.

18          A    Yeah.

19          Q    Did you ever share with -- with Mr. or

20      Mrs. D'Souza or anyone else this concerned voice by

21      Mr. Frankowski that there might be a good reason to think

22      that this person was not the same person?

23          A    No.  I mean, maybe I did.  I doubt it.  I --

24      I -- I have my reasons why I believe it is the same

25      person.  And this is very Nathan-esque; you can talk with

Page 115

1    him about that.

2        Q    Did you ever ask Mr. Phillips or

3    Ms. Engelbrecht to provide geo-tracking data to determine

4    whether this was in fact the same person?

5        A    You mean after the lawsuit?

6        Q    Yes.

7        A    No.

8        Q    Okay.  Okay.  So if you are asking

9    Mr. Frankowski to look into this, was there a particular

10   reason why you didn't ask?

11       A    No, I asked him to send me the two clips.

12       Q    Right.  So is there a particular reason why you

13   didn't ask Mr. Phillips or Ms. Engelbrecht to --

14       A    I'm not in communication with them.

15       Q    Okay.

16       A    Yeah.

17       Q    Do you know whether --

18       A    I literally have no communication with them for

19   years.

20       Q    Okay.  So after the lawsuit was filed, you

21   haven't spoken to them?

22       A    No.  And I would be afraid to talk to them

23   after the lawsuit was filed.

24       Q    Why is that?

25       A    I just think you -- people shouldn't -- I don't

Page 116

1    think you talk with each other, right?  I don't know what

2    the deal is, but I just, you know.

3        Q    Okay.

4        A    I mean, that was -- there would be no reason.

5    I -- I believe that he was geo-tracked, and when I looked

6    at the two -- I can make these determinations myself.

7    When I look at this guy, there is many reasons why I

8    think it's the same guy.

9        Q    Okay.  And we talked a little bit about

10   earlier, how Mr. D'Souza had hired some undercover

11   journalist to locate mules who participated in -- in

12   election fraud?

13       A    I'm trying to remember if how you are

14   characterizing it is right.

15       Q    The communications we were talking about with

16   Tony and Trina --

17       A    Right.

18       Q    -- I think it was, or something like that.

19       A    Yeah, they -- I mean, they came to him with a

20   presentation and said they could find this stuff out, and

21   they had stuff already, and I think Dinesh and Debbie

22   gave them some money to continue just to see what they

23   could come up with.

24       Q    Okay.  Do you know whether Mr. or Mrs. D'Souza

25   asked Mr. Phillips or Ms. Engelbrecht to find the

```
 1      geo-tracking data that would support the claim that the
 2      person in these two clips is the same person?
 3          A    I do not know that, no.
 4          Q    Okay.  Okay.  I just have one more document.
 5      We are going to mark --
 6          A    Can I tell you why I think these two people --
 7      this is the same person?  Is that a bad thing for me to
 8      do?
 9              MS. HYLAND:  It's your deposition.
10              THE WITNESS:  I don't want to go rogue.  Can I
11      tell you why?
12          Q   BY MS. BALLIETT:  There is no question pending.
13      There is no question pending.
14          A    It seems relevant, though.
15          Q    Okay.  So I think we're on Plaintiff's Exhibit
16      No. 122.
17              MS. HYLAND:  123 is the next one.
18              MS. BALLIETT:  Yeah, okay.  The Bates number is
19      DDR-00018752.
20              (Deposition Exhibit No. 123 was marked for
21      identification.)
22          Q   BY MS. BALLIETT:  Let me know when you've
23      finished looking at that.
24          A    I've read it.
25          Q    Okay.  So in this e-mail, Robert Ellis from
```

Page 118

```
1      Salem asks you to send him "1,000 Mules DVDs," and that's
2      1,000 -- 2000 Mules DVDs, to be clear.
3                And you say, "Yes!  Are you selling them again
4      or???"
5                And he says, "Quietly selling them..."
6                What did you understand him to mean by that?
7         A   I actually don't know.  I don't know how you
8      quietly sell something.
9         Q   Okay.  And when -- when you say are you selling
10     them again, did you have an understanding that Salem had
11     stopped selling them at some point?
12        A   I understood that they were down to like -- I
13     mean, I don't think they had any, and I understood that
14     they were -- nobody was selling any of these things.  So
15     I think I got something from him -- I don't know.  Oh, he
16     says, "Can you -- can you send" -- I don't know.  One
17     second.
18                He says:  Can you send me 1,000 DVD Mules, so
19     he wanted them for some reason.  And I asked him, "Are
20     you selling them again?"  And he said, "Quietly."
21        Q   Okay.  Sorry, but we're going to have one more
22     document.  We're gonna look at Plaintiff's Exhibit
23     No. 110.
24                Okay.  You have had a chance to review this,
25     right?
```

Page 119

1          A    Uh-huh.

2          Q    And is this related to the -- the explanation

3     you were wanting to provide earlier?

4          A    Yes.

5          Q    Okay.  Go ahead.  What -- what does this tell

6     you?

7          A    So they -- I mean, the -- to me, these two

8     people -- this looks like the same person.  And why I

9     think that's a reasonable thing to conclude is based upon

10    that he -- so once this lawsuit was done, I went back and

11    looked at some of the details.  But when we were making

12    the film, I also looked at details with regards to

13    Gwinnett County and the other places that we had

14    mentioned specifically in the film.

15          So I knew that Gwinnett County -- and we went

16    through all the county registration and how many people

17    voted by drop box versus absentee and in person, and I

18    remember Gregg saying that that was high.  So I checked

19    that before we -- I checked that while we were making the

20    film, and he was right.

21          So in Gwinnett County, you had 420,000 people

22    vote, but 220,000 of those voted by drop box, which is --

23    which is very, very high.  So that's why I was generally

24    suspicious of this.

25          But we know more about this guy, how low of a

Page 120

1    probability this is of this guy.  We know more about how
2    low of a probability that this is two -- this is two
3    people.  He is -- so here's the qualifiers on this.  He
4    is male, so you go from 220 to about a hundred thousand.
5    He's dropping this off at the same drop box, and I
6    remember Gregg saying that there were a couple dozen
7    Gwinnett County drop boxes, and he's close to being
8    right.  There is 23.
9          So if this guy is dropping it off of 1 of 23 at
10   this same location, now you're down to -- I mean, the
11   percentage of 1 on 23 is like five, so now you are down
12   to 5,000 people.
13         And he's completely bald.  He wears these
14   really -- he has these incredibly small John Lennon
15   glasses in the car and in person here as sunglasses.  A
16   very rare thing.  And this is all kind of objective stuff
17   before you get to the fact -- I mean, he -- he appears to
18   be the same race.  All of those are -- all of those
19   dramatically limit the population that he -- the number
20   of people that could possibly perform this.
21         And then you get down after that to the
22   subjective stuff, which is, he looks alike.  He has the
23   same body type.  He moves alike, throws his -- when he
24   walks, he throws his elbows up.  And I was, from the very
25   beginning, very convinced.  Because I looked at all these

Page 121

1    videos quite a bit, I was very convinced this was one

2    single person, and I am convinced of that today.

3          He was awkward the first time he approached the

4    box, which is during -- I believe during the day, and

5    then he was less awkward the second time.  And he put his

6    flashers on.  I mean, he has his left signal flasher on

7    once, and then he puts his night flashers on and leaves

8    them on again.

9          This is all quirky stuff, and I think it's -- I

10   think it's very unlikely that this guy is two people.  I

11   still think that.  Extremely unlikely.

12        Q   Okay.  And so you said that one of the reasons

13   you thought that it was the same person was that it's at

14   the same drop box, but wasn't it true -- isn't it true

15   that in the film, the -- the theory of the election fraud

16   is that people had to go to different drop boxes so

17   people didn't notice that they were going to the same

18   one?

19        A   No, just different -- it's just a drop-off --

20   that was part of it, but somebody could have gone to the

21   same drop box more than once.

22        Q   Did -- is that ever talked about in the movie?

23        A   It was drop box -- it was ten drop box -- ten

24   drop box visits.

25        Q   And that's not ten separate drop box?

Page 122

1       A    No.

2       Q    Just ten visits to any drop box?

3       A    Uh-huh.

4       Q    Was that clarified in the movie?

5       A    I -- I'd have to rerun that movie -- I'd have

6    to rerun the whole thing in my head right now.

7       Q    Okay.

8       A    But it -- I mean, when he -- when they

9    explained the criteria, he says ten drop box -- ten

10   visits to drop box.  And this might have been a

11   limitation on my part, because I thought it was -- it

12   could have been the same drop box.

13      Q    Okay.  I'm just gonna go back in time a little

14   bit now to -- I think earlier before lunch you testified

15   that back in March, you had the understanding that OpSec

16   and TTV were still matching videos to geo-tracking data;

17   is that correct?  You thought that back in March, they

18   were still doing that?

19      A    Yes.

20      Q    Okay.

21      A    I mean, one of them was doing it.

22      Q    Someone who worked for OpSec or TTV was doing

23   that?

24      A    (No oral response.)

25      Q    Okay.  Now, if you were -- if you wanted to

Page 123

1    have more mule videos, right, and you -- you said a

2    couple of times today that you were always hoping for

3    more of them, and you always understood that they were

4    geo-tracked, and that the reason you hadn't received them

5    at some times was because you were waiting for the data

6    to be matched; is that correct?

7        A    That's what we were told, and that it was hard

8    for them to find it.

9        Q    Okay.

10       A    I think in Catherine's deposition, she says

11   that it was a daunting task or something.

12       Q    Okay.  And so they -- someone, either Catherine

13   or Gregg, represented to you at the time that they were

14   still working on it and that they were gonna get you more

15   as they were matching it to the video?

16       A    I mean, it was my understanding.  I don't know

17   if anybody represented that to me.

18       Q    Okay.

19       A    That was my understanding as why we couldn't

20   get it.  I didn't have a lot of back-and-forth with them.

21       Q    Okay.  And so if that was your understanding,

22   did you ever suggest to Mr. D'Souza that you would push

23   back the movie date so that you could wait until you had

24   more video?

25       A    No, because the fundamental -- fundamental

Page 124

1    premise of the film is not -- and this is made incredibly

2    clear in the film.  The fundamental premise of the film

3    is that the geo-tracking of the 2,000 mules is the

4    thing -- is the research that was essential for the

5    findings, just like they -- research for the findings.

6         The supplemental reinforcement or -- or the

7    thing that helped it was that then we could confirm it

8    with video.  But the video was always just a plus.  We

9    just wanted more of it.  We didn't want the video to

10   confirm it; we wanted the video because it helped the

11   film be more -- it helped the film be more cinematic.

12        Q    Okay.

13        A    We could have made this film without any video.

14        Q    Okay.  And that would have just entailed

15   looking at the -- the geo-tracking data?

16        A    Yes.

17             MS. BALLIETT:  Okay.  That's it.  I don't have

18   any more questions for now.  Although, I reserve if

19   anyone else does.

20             THE WITNESS:  That's it?

21             MR. EVANS:  No questions from me.

22             MS. HYLAND:  No questions or follow-up here.

23             THE WITNESS:  I'm almost disappointed.

24             THE VIDEOGRAPHER:  This concludes the

25   videotaped deposition.  We are off the record at

Page 125

1      2:17 p.m.

2              THE REPORTER:  Did you want an expedited copy?

3              MS. BALLIETT:  Yes, by Thursday.

4              THE REPORTER:  And did you need a rough draft?

5              MS. BALLIETT:  Yes.

6              THE REPORTER:  Did you want the transcript

7      expedited as well or regular delivery?

8              MR. VINING:  We will do a rough draft and

9      regular delivery.

10             (The deposition concluded at 2:17 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 126

1         The following reporter and firm disclosures
were presented at this proceeding for review by counsel:

2

         REPORTER DISCLOSURES

3         The following representations and disclosures
are made in compliance with Georgia Law,

4  more specifically:
Article 10(B) of the Rules and Regulations of the Board

5  of Court Reporting (disclosure forms)
OCGA 9-11-28(c) (disqualification of reporter for

6  financial interest)
OCGA 15-14-37(a) and (b) (prohibitions against contracts

7  except on a case-by-case basis).

8  - I am a certified reporter in the State of Georgia.
- I am a subcontractor for Veritext Legal Solutions.

9  - I have been assigned to make a complete and accurate
record of these proceedings.

10  - I have no relationship of interest in the matter on
which I am about to report which would disqualify me from

11  making a verbatim record or maintaining my obligation of
impartiality in compliance with the Code of Professional

12  Ethics.
- I have no direct contract with any party in this action

13  and my compensation is determined solely by the terms of
my subcontractor agreement.

14

         FIRM DISCLOSURES

15  - Veritext Legal Solutions was contacted to provide
reporting services by the noticing or taking attorney in

16  this matter.
- There is no agreement in place that is prohibited by

17  OCG 15-14-37(a) and (b).  Any case-specific discounts are
automatically applied to all parties, at such time as any

18  party receives a discount.
- Transcripts:  The transcript of this proceeding as

19  produced will be a true, correct, and complete record of
the colloquies, questions, and answers as submitted by

20  the certified court reporter.
- Exhibits:  No changes will be made to the exhibits as

21  submitted by the reporter, attorneys, or witnesses.
- Password-Protected Access:  Transcripts and exhibits

22  relating to this proceeding will be uploaded to a
password-protected repository, to which all ordering

23  parties will have access.

24

25

Page 127

```
               C E R T I F I C A T E
```

STATE OF GEORGIA           )
                           )     ss:
COUNTY OF DEKALB           )


            I HEREBY CERTIFY that the foregoing transcript
was taken before me; that I was then and there a
Registered Professional Reporter and Registered Merit
Reporter, License No. 6595-1471-3597-5424 for the State
of Georgia, and License No. 14315 in the State of
California; that the witness before testifying was duly
sworn by me to testify to the whole truth; that the
questions propounded by counsel and the answers of the
witness thereto were taken down by me in shorthand and
thereafter transcribed under my direction; and that the
foregoing pages contain a full, true, and accurate
transcript of all deposition testimony and proceedings
had, all done to the best of my skill and ability.

            I FURTHER CERTIFY that I am in no way related
to, nor employed by any of the parties hereto, nor am I
in any way interested in the outcome.

            I have no direct contract with any party in
this action and my compensation is based solely on the
terms of my subcontractor agreement.

            Nothing in the arrangements made for this
proceeding impacts my absolute commitment to serve all
parties as an impartial officer of the court.

            DATED at Dunwoody, Georgia, this 23rd day of
October, 2024.




            MARCELLA L. DAUGHTRY, RPR, RMR
            GA License No. 6595-1471-3597-5424
            CA CSR 14315

Page 128

1    Amanda Hyland, Esq.

2    ahyland@buchalter.com

3                      October 23 2024__

4    RE:    Andrews, Mark v. D'souza, Dinesh   Et Al

5         10/22/2024, Bruce Schooley (#6967181)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-ny@veritext.com

16    Return completed errata within 30 days from

17    receipt of testimony.

18     If the witness fails to do so within the time

19    allotted, the transcript may be used as if signed.

20

21

22              Yours,

23              Veritext Legal Solutions

24

25

Page 129

1   Andrews, Mark v. D'souza, Dinesh   Et Al

2   Bruce Schooley (#6967181)

3              E R R A T A   S H E E T

4   PAGE_____  LINE_____  CHANGE_____

5   _____

6   REASON_____

7   PAGE_____  LINE_____  CHANGE_____

8   _____

9   REASON_____

10  PAGE_____  LINE_____  CHANGE_____

11  _____

12  REASON_____

13  PAGE_____  LINE_____  CHANGE_____

14  _____

15  REASON_____

16  PAGE_____  LINE_____  CHANGE_____

17  _____

18  REASON_____

19  PAGE_____  LINE_____  CHANGE_____

20  _____

21  REASON_____

22

23  _____    _____

24  Bruce Schooley                                  Date

25

Page 130

1    Andrews, Mark v. D'souza, Dinesh   Et Al

2    Bruce Schooley (#6967181)

3                 ACKNOWLEDGEMENT OF DEPONENT

4        I, Bruce Schooley, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Bruce Schooley                       Date

13    *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.