# EXHIBIT 45

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION
3     MARK ANDREWS,                    )
                                       )
4          Plaintiff,                  )
                                       )
5     vs.                              )    CASE NO.
                                       )
6     DINESH D'SOUZA; TRUE THE         )    1:22-CV-04259-SDG
      VOTE, INC.; CATHERINE            )
7     ENGLEBRECHT; GREGG               )
      PHILLIPS; D'SOUZA MEDIA          )
8     LLC; and JOHN DOES,              )
                                       )
9          Defendants.                 )
10
11
12      THIS DEPOSITION CONTAINS INFORMATION DESIGNATED
        HIGHLY CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
13
14           VIDEOTAPED 30(b)(6) DEPOSITION OF
                 GEORGIA SECRETARY OF STATE
15                  (By DANA DEWEESE)
16               (Taken by Defendants)
17                 November 6, 2024
18               9:50 p.m. Eastern time
19
20
21
22
23
24
25      Reported by:   Debra M. Druzisky, CCR-B-1848

Page 2

1                   APPEARANCES OF COUNSEL

2

3     On behalf of the Plaintiff:

4          PAIGE D. BRADDY, Esq.

5          GAIL LEE, Esq.

6          CHANLER MILLER, Paralegal

7          Skadden, Arps, Slate, Meagher & Flom

8          1440 New York Avenue

9          Washington, D.C.  20005

10         (202) 371-7204

11         paige.braddy@skadden.com

12

13

14    On behalf of the Defendants Dinesh D'Souza and

15    D'Souza Media:

16         AUSTIN VINING, Esq.

17         Buchalter

18         790 Stratforde Drive

19         Alpharetta, Georgia  30004

20         (318) 225-0678

21         avining@buchalter.com

22

23

24

25

1        APPEARANCES OF COUNSEL (Continued.)

2

3     On behalf of the Defendants True the Vote,

4     Catherine Englebrecht and Gregg Phillips:

5         PHILIP GEORGE, Esq.

6         Greenberg Traurig

7         3333 Piedmont Road, Suite 2500

8         Atlanta, Georgia  30305

9         (678) 553-2285

10        philip.george@gtlaw.com

11

12

13    On behalf of the deponent and the Georgia Secretary

14    of State's Office:

15        ELIZABETH T. YOUNG, Esq.

16        Georgia Office of the Attorney General

17        40 Capitol Square

18        Atlanta, Georgia  30334

19        (404) 458-3425

20        eyoung@law.ga.gov

21

22

23    Also Present:

24        Jonathan Miller, videographer

25                      --oOo--

Page 4

1                    INDEX TO EXAMINATION
2     Witness Name:                              Page
3     DANA DEWEESE
4        By Ms. Braddy                              7
5        By Mr. George                             60
6
7
8
9               INDEX TO DEPOSITION EXHIBITS
10      No.              Description              Page
11   Exhibit 136   10-16-24, Notice of Fed. R. Civ.   13
                   P. 30(b)(6) Deposition of
12                 Non-Party The Office of Georgia
                   Secretary of State re: The
13                 above-captioned action.
14   Exhibit 137   4-27-22, E-mail from David Cross   26
                   to Brad Raffensperger re:
15                 Official complaint: Ballot
                   harvester.
16
     Exhibit 138   5-12-22, Georgia Secretary of      34
17                 State Investigations Division
                   Report of Investigation by Dana
18                 DeWeese re: Gwinnett County
                   Ballot Harvesting White SUV.
19
     Exhibit 139   5-2-22, Georgia Secretary of       44
20                 State Investigations Division
                   Memorandum of Interview of Mark
21                 Andrews by Dana DeWeese re:
                   Ballot Harvesting.
22
     Exhibit 140   5-17-22, Transcript of Secretary   47
23                 of State State Election Board
                   Hearing.
24
25

Page 5

1          INDEX TO DEPOSITION EXHIBITS (Continued.)

2       No.                    Description                    Page

3   Exhibit 141    Case file re: Case SEB2022-054      60

                   Gwinnett County Ballot

4                  Harvesting White SUV.

5                            - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

```
1          THE VIDEOGRAPHER:  We are on the
2     record November 6th, 2024, at
3     approximately 9:49 a.m. Eastern time.
4          This will be the videotaped
5     deposition of Dana DeWeese.
6          Would counsel please identify
7     themselves and who they represent for the
8     record?
9          MS. BRADDY:  Hi.  Paige Braddy for
10     plaintiff Mark Andrews.
11          MS. LEE:  Gail Lee also for plaintiff
12     Mark Andrews.
13          MR. GEORGE:  Philip George from the
14     law firm Greenberg Traurig for True the
15     Vote, Inc., Catherine Englebrecht and
16     Gregg Phillips.
17          MR. VINING:  Austin Vining from the
18     law firm Buchalter for defendants Dinesh
19     D'Souza and D'Souza Media, L.L.C.
20          MS. YOUNG:  And Elizabeth Young --
21          THE VIDEOGRAPHER:  My apologies.  Go
22     ahead.
23          MS. YOUNG:  Elizabeth Young from the
24     Attorney General's Office representing
25     Secretary of State and inspect -- and
```

Page 7

1           Investigator DeWeese in this matter.

2                THE VIDEOGRAPHER:  Would the court

3           reporter please swear in the witness?

4                     DANA DEWEESE,

5      having been first duly sworn, was examined and

6      testified as follows:

7                        EXAMINATION

8      BY MS. BRADDY:

9           Q.   Hi, Mr. DeWeese.  Thank you for being

10     here.

11          A.   All right.  Good morning.

12          Q.   My name is Paige Braddy, and I will be

13     taking your deposition and asking you questions

14     today.

15               Can you hear me okay?

16          A.   Very well.

17          Q.   Great.  Have you ever had your deposition

18     taken before?

19          A.   Yes.

20          Q.   How many times?

21          A.   Once.

22          Q.   Okay.  Well, we'd like to first start off

23     by going through some ground rules and some

24     housekeeping items so that we all have the same

25     understanding.

Page 8

```
1              Is that okay with you?
2      A.    Yep.
3      Q.    In this deposition I will be asking you
4   questions.  My questions and your answers will be
5   recorded by the videographer and transcribed by the
6   court reporter.  For that reason we will both need
7   to speak up and to answer out loud so that the
8   reporter can hear -- hear you when you give your
9   answers.
10             Do you understand?
11     A.    I understand.
12     Q.    If you nod or shake your head or give a
13  verbal -- non-verbal answer or even say something
14  like "uh-huh," I'm going to remind you to give a
15  clear verbal answer with words.
16             Do you understand?
17     A.    I understand.
18     Q.    The court reporter also might have trouble
19  if we talk over each other.  So I'm going to let
20  you finish your answer before I ask another
21  question.
22             Equally, it is very important that you
23  wait until I finish my question before you begin
24  answering even when you think you know what the
25  rest of the question will be.
```

1          Will you do that?

2     A.   Yes.

3     Q.   You have just taken an oath that requires

4     you to tell the truth, the whole truth and nothing

5     but the truth, and that is the same oath you would

6     take if you were to testify in court.

7          Do you understand that?

8     A.   Yes, I do.

9     Q.   On occasion I may ask a question that I

10    don't state very well or for some other reason you

11    don't understand.  If you don't understand my

12    question for any reason, don't answer it.  Instead,

13    please ask for clarification.

14         Will you do that?

15    A.   Yes.

16    Q.   We will plan to take a break from time to

17    time.  But if you need to take a break at any time,

18    please let me know.  If I'm in the middle of a

19    question or I've just asked a question, please

20    finish answering the question and then we can plan

21    to take a break.

22         Will you do that?

23    A.   Yes.

24    Q.   If you would like to talk to your

25    attorney, that's completely okay.  I just ask that,

Page 10

```
 1     if there's a question pending or if you're in the
 2     middle of an answer, please finish the answer
 3     before speaking to your lawyer, unless you need to
 4     talk to her about a matter of privilege.
 5              Will you do that?
 6       A.   Yes.
 7       Q.   Relatedly, while we are on the record, you
 8     are not permitted to have a private question with
 9     anyone, including your counsel, by any means,
10     including text message, electronic E-mail or any
11     chat feature.
12              Do you understand that?
13       A.   Yes.
14       Q.   From time to time, your attorney or one of
15     the other attorneys may object.  Unless your
16     attorney tells you not to answer the question
17     specifically, you should go ahead and answer the
18     question.
19              Do you understand that?
20       A.   Yes.
21       Q.   Sometimes it happens that you will give an
22     answer as completely as you can and then later on,
23     maybe five minutes later, maybe two hours later,
24     you remember some additional information or perhaps
25     some clarification in response to that earlier
```

Page 11

```
 1    question.
 2              If that happens to you, please tell us
 3    that you would like to add or clarify something to
 4    the earlier answer, and we will do that right then
 5    while it's on your mind.
 6              Will you do that?
 7      A.    Yes.
 8      Q.    If at any point during this deposition you
 9    are having problems with your Internet connection
10    or trouble hearing or seeing any portion of this
11    deposition, please notify me right away.
12              Do you understand that?
13      A.    Yes.
14      Q.    If at any point you are disconnected from
15    this deposition and unable to rejoin, please let
16    your counsel right next to you know immediately.
17              Is that acceptable?
18      A.    Yes.
19      Q.    Exhibit Share, I will be sharing exhibits
20    today using the Veritext Exhibit Share platform.
21    We will plan to share them on screen as we discuss
22    them.
23              If at any point you are unable to view
24    or -- an exhibit or if you need additional time to
25    review an exhibit, please bring that to my
```

```
                                          Page 12
 1    attention right away.

 2           Do you understand?

 3       A.   Yes.

 4       Q.   Because it is so critical that we get your

 5    full, complete and accurate answers, I have to ask

 6    you whether you are taking any medication or drugs

 7    of any kind or whether you have consumed any cough

 8    syrup or medicine or something containing alcohol

 9    that may make it difficult for you to remember

10    things or to understand and answer my questions

11    today.

12           Are you taking or have you had anything

13    along those lines?

14       A.   No.

15       Q.   Are there any physical or health reasons

16    as to why you may be unable to testify today?

17       A.   Not today.

18       Q.   Is there any reason why you cannot give

19    full, complete and accurate testimony today?

20       A.   No.

21       Q.   Before we get started, do you have any

22    questions?

23       A.   No.

24       Q.   All right.  With that, we will move to the

25    first exhibit.  I'd like to mark Exhibit 136.
```

```
                                              Page 13

 1        A.    Uh-huh.

 2                         (Whereupon, Deposition

 3                          Exhibit 136 was marked for

 4                          identification.)

 5     BY MS. BRADDY:

 6        Q.    Okay, Mr. DeWeese.  Have you seen -- do

 7     you recognize this document?

 8        A.    Yeah.  I was just provided it today.

 9        Q.    Have you had a chance to review it?

10        A.    No.

11        Q.    Okay.  Can you turn to Schedule A?

12              MS. BRADDY:  Go to the next page,

13        please.

14              THE WITNESS:  I'm there.  I'm sorry.

15        Page 6?

16     BY MS. BRADDY:

17        Q.    Correct.

18        A.    Uh-huh.

19        Q.    And actually, if you could turn to Page 7?

20              MS. YOUNG:  And while we're doing

21        that, let me just interject really quickly

22        and just note that, and I -- we discussed

23        this briefly by telephone that, you know,

24        I don't know that there is a single

25        witness that is necessarily the best
```

1           person to testify about each and every one

2           of these topics.

3                 I think Inspector DeWeese probably

4           has, you know, good knowledge to be able

5           to testify on each of these topics to some

6           degree.

7                 If there is something that he is not

8           able to cover from his knowledge and

9           expertise, you know, we may need to follow

10          up with either additional documentary

11          evidence or perhaps an additional witness,

12          depending on how detailed you need to be

13          about any given topic.

14                MS. BRADDY:  Okay.

15    BY MS. BRADDY:

16          Q.   And to the extent, Mr. DeWeese, that you

17    don't know an answer or you're not familiar with

18    one of these topics that we plan to cover today, if

19    you could please let me know?

20          A.   Okay.

21          Q.   All right.  With respect to the topics

22    that you are familiar with, are you the Georgia

23    Secretary of State's designee to testify to these

24    topics?

25          A.   As far as the investigation, I am.  I

Page 15

1     completed the investigation.  So.

2         Q.   Okay.  Do you understand that, when I

3     refer to "you" in this deposition, I will be

4     referring to the Georgia Secretary of State?

5         A.   Okay.

6         Q.   And are you answering on behalf of the

7     Georgia Secretary of State today?

8             MS. YOUNG:  Again, let me just pipe

9         in.  I mean, to the extent that he has the

10        knowledge and familiarity to do so, yes.

11            MS. BRADDY:  Okay.

12            MR. VINING:  And we'll try to

13        delineate for you if, you know, if we're

14        getting into a topic that I feel like he

15        may not be a proper witness to be the

16        Secretary of State's witness on a

17        particular area of inquiry, depending on

18        how deeply y'all go into things.

19            But he does have knowledge on these

20        topics generally.

21            MS. BRADDY:  Okay.  Thank you.

22        Understood, Counsel.

23    BY MS. BRADDY:

24        Q.   Mr. DeWeese, I'd like to start with

25    talking about the prepare -- your preparation for

Page 16

1      this deposition.

2             Did you speak to anyone to prepare for

3      this deposition today?

4        A.    Just the attorney.

5        Q.    And is that attorney Ms. Young?

6        A.    Yes.  Sorry.  Yes.  Ms. Young.

7        Q.    And Mr. DeWeese, did you review any

8      documents to prepare for this deposition today?

9        A.    I got sent some documents this morning

10     when my -- I was told about the deposition on

11     Sunday evening.  Somebody called me at home and let

12     me know that there was going to be a deposition.

13     They didn't have the date.

14            And then Monday I spoke to Ms. Young, and

15     she told me that they wanted to get this done right

16     away.  Yesterday was Election Day, so I was out for

17     15 hours doing election inspections and then came

18     in this morning and got -- she E-mailed me last

19     night the 9:30 time for this morning, so --

20       Q.    Okay.

21       A.    -- I didn't have a lot -- a lot of prep

22     time.

23       Q.    Okay.  So you've received documents, but

24     you've not necessarily had a chance to review those

25     documents; is that correct?

1      A.   No.  Correct.

2      Q.   I'd like to start with your background,

3   Mr. DeWeese.  Can you describe your educational

4   background to us?

5      A.   I'm a high school graduate and a veteran

6   of the United States Air Force.  I did 26 years

7   with the City of Roswell Police.  And I held many

8   positions there, field training officer,

9   investigator, street patrol, and retired there and

10  then started working here three years ago.

11     Q.   And what is your current position at the

12  Georgia Secretary of State's office?

13     A.   Currently I'm an investigator for

14  professional licensing.  So any complaints against

15  anybody that holds a state professional license, I

16  investigate those.  I was just doing elections, but

17  someone left and they moved me over there.

18     Q.   I was just about to ask about that.  It --

19  so it sounds like you had a different position in

20  2022.  Can you tell us --

21     A.   Yes.  Just --

22     Q.   -- about that?

23     A.   I was just doing elections investigations

24  in 2022.

25     Q.   And how long did you hold that position as

Page 18

1    the elections investigator?

2        A.    So I started with the State in December of

3    '21.  And then I got reassigned April 28th of this

4    year.  I believe that was the date.

5        Q.    Okay.  I'd like to focus on your role as

6    the invest -- elections investigator.  Can you

7    please describe the role and your responsibility as

8    the elections investigator?

9        A.    Specific for the case?

10       Q.    More generally, if you could ex --

11       A.    Generally?

12       Q.    (Inaudible due to cross-talk).

13       A.    Okay.

14       Q.    So.

15       A.    So if a complaint comes in regarding any

16   elections or any procedure in the elections, they

17   will look them over, and my supervisors will decide

18   if they're going to assign a case to it.

19            And they'll assign the case, and then I

20   will start my investigation, pretty much it, kind

21   of, you know, just like you would do as a criminal

22   investigator.

23       Q.    And can you estimate about how many

24   elections investigations you've conducted?

25       A.    I think -- I think I had, well, maybe 60

Page 19

1    during that time.  Because we got other stuff that
2    we get that isn't investigations or professional
3    licensing.  There are other complaints that they'll
4    handle.  But maybe about 60.
5        Q.    Okay.  And as part of those 60 or so
6    investigations, did that include ballot harvesting
7    investigations?
8        A.    Yes.
9        Q.    And before joining the Georgia Secretary
10   of State, you said that you worked for the --
11       A.    City of Roswell Police Department.
12       Q.    Okay.  And in that role were you also
13   conducting investigations?  What was your role
14   there?
15       A.    Yeah, I was an invest -- I was a detective
16   from 2011 -- no, 2007 to 2015.
17       Q.    And were those criminal investigations?
18       A.    Criminal investigations, yeah.  Started
19   off at property crimes and then finished in
20   persons, crimes against persons.
21       Q.    So how many years would you say that you
22   have been conducting investigations?
23       A.    Oh.  Well, when you're a patrol officer,
24   that's the beginning of an investigation.  So you
25   know, I started in 1998.  But officially in 2011

Page 20

```
 1      or -- no, was it 2007?  I went to C.I.D., which is
 2      the criminal investigations division.
 3           Q.   Okay.  Thank you, Mr. DeWeese.
 4           A.   Uh-huh.
 5           Q.   I'd like to now switch topics a little bit
 6      and talk about the investigative procedures at the
 7      Georgia Secretary of State's office.
 8                Before doing that, I'm hoping that you can
 9      explain to us the relationship between the
10      Investigation Division of the Secretary of State
11      and the State Election Board.
12                Is that a topic that you're familiar with?
13           A.   I can generalize it, yes.
14                MS. YOUNG:  And let me clarify.
15                You'll need to be specific as to the
16                timing.  Because you know, in 2021, '22,
17                you know, things are -- were different
18                than they are presently.
19                The relationship between the
20                Secretary of State's office has been
21                changed by legislation in the intervening
22                time, so just try to clarify at what point
23                you're seeking to inquire about.
24                MS. BRADDY:  Understood.  Thank you
25                for that, Counsel.
```

Page 21

1    BY MS. BRADDY:

2        Q.    Mr. DeWeese, the time frame that I'm

3    focused on today is 2022.

4        A.    Okay.

5        Q.    So if you could explain to me your

6    understanding of the interaction and the

7    relationship between the Investigative Division of

8    the Secretary of State and the State Elections

9    Board.

10       A.    So after I get a case assigned to me and I

11   investigate it, and once I complete it, just like

12   any investigation file, it's reviewed by the

13   supervisors.  And once it's approved, it's

14   putting -- pending presentation to the board.

15          And once that case goes to the board, they

16   review it and they decide on how they're going to

17   proceed with the, I guess the adjudication would be

18   the word of it.

19          You know, they have the option to, if they

20   find it's a violation, they can issue a letter of

21   instruction to the respondent.  They can refer it

22   to the Attorney General's Office.

23          They can also, if they think it's totally

24   a criminal act, they can refer it to the solicitor

25   of the county where the violation occurred for

Page 22

1    criminal prosecution.

2            And once they do it, it's their case --

3    once I turn it in, it becomes theirs and they send

4    it off and I'm done.

5        Q.    Okay.  So the State Elections Board is the

6    body that makes the decision as to the next step in

7    the case after you produce your findings?

8        A.    Correct.

9        Q.    Does the Investigations Division of the

10   Secretary of State's office have policies and

11   procedures in place for these elections

12   investigations?

13       A.    Procedures?  They're redoing the policy

14   manual but, you know, there's a policy that's

15   there.  It's an older one, but they're -- with the

16   new chiefs and assistant chiefs, they're in the

17   process of redoing it to bring it up to more modern

18   times.

19       Q.    Okay.  And in 2022, can you describe at a

20   high level what policies and procedures were in

21   place at that time?

22       A.    Well, we get assigned the case, and we

23   would have to contact the complainant within a

24   certain amount of time to get more information.

25            Once you get more information, then you

Page 23

1    start looking at, you know, what the alleged

2    violation is, who's involved and, you know, try to

3    contact them to get information, just like, you

4    know, you have both sides of the story.

5            But before I contact people, I, you know,

6    will look into them to see what I know and what,

7    you know -- like in this case, you know, was he a

8    registered voter, you know, and how many registered

9    voters lived at that house and, you know, and were

10   they all valid as far as their status as a voter.

11           And in this -- in this case the -- all the

12   voters were valid voters and all registered out of

13   that home and all living in that home.  I then

14   write the report.  Like I said earlier, it's sent

15   through, and then the board makes the decision.

16       Q.   And Mr. DeWeese, do you have a supervisor

17   that reviews the report?

18       A.   Yes.

19       Q.   What is that --

20       A.   I --

21       Q.   -- supervisor's role?

22       A.   The supervisor will get the reports and,

23   you know, get out his little red pen, check for

24   mistakes.  And if there's a question that he thinks

25   needs to be asked, he'll send it back for

Page 24

1    follow-up, standard stuff like that, and then, you

2    know, they'll send it on.

3           And if they approve it, it gets put in,

4    again, to that pending presentation to the board.

5    And when it goes -- because the board only meets so

6    many times a year.  You know, it could be a long

7    time before it gets presented.

8        Q.   And to the extent there is a typical time

9    frame, what is the typical time frame for the

10   resolution of one of these investigations before it

11   goes to the State Elections Board?

12       A.   In my three years' experience, I don't see

13   a typical timeline.  It just depends, you know.

14   You know, with the elections and politics, certain

15   cases have more importance and, you know, they move

16   them through, you know.

17           You know, I've seen them two years and

18   some heard two years later, some heard three

19   months.  I know COVID has put all the boards really

20   behind, and they've been working hard to catch up

21   with that stuff, but.  So.

22           This has all been through COVID, so it

23   really wasn't typical for me as far as my

24   experience.

25       Q.   Understood.

1            And you have touched on this a little bit,

2     but I'm wondering if you can delve into more

3     detail.  Once a case is assigned to you, what is

4     the first step that you typically take?

5          A.    Is contacting the complainant.  You know,

6     I'll review it, look at what the allegation is.

7     And at the time of this one, you know, I was new to

8     elections, so reviewing the alleged infraction, you

9     know, with the code book and getting familiarized

10    with that, and then start the investigation that

11    way, gather evidence like any investigation.

12         Q.    And what is your next step, typically, in

13    an investigation?

14         A.    Would you like me to go through how I did

15    this case, the steps I did with this case?

16         Q.    We can -- we can go there if that's easier

17    for you to explain.  Let's hold on that line of

18    questioning.  We'll get there.  And maybe we'll

19    jump to another topic, and then we can get to

20    specifically how you handled this case.

21         A.    Yeah.  So like I said, typically, you get

22    the case assigned, you review it, find out who --

23    the people involved, review the allegation of the

24    violation.

25            Then you start gathering your evidence and

Page 26

1    research and just follow the trails, you know, as

2    the evidence leads you, you know, like any

3    investigation, you know.  And you take notes.  If

4    you're interviewing the witness, you write a

5    summary on that.

6           If you're, you know, picking up evidence,

7    make a note of that, you know, logging that stuff

8    or -- very standard investigation procedures is

9    pretty much how we do it.  And you know, they

10    pretty much hire people with investigating

11    experience to fill these positions.  So.

12       Q.   Understood.

13           Let's jump into your investigation of

14    Mr. Mark Andrews.

15           MS. BRADDY:  Chanler, can you put

16    Exhibit 137 up?

17                (Whereupon, Deposition

18                 Exhibit 137 was marked for

19                identification.)

20    BY MS. BRADDY:

21       Q.   Mr. DeWeese, can you see the exhibit?

22       A.   I can see the exhibit.

23       Q.   Have you seen this exhibit before?

24       A.   Yes.

25       Q.   Can you tell me what it is?

Page 27

1       A.   So this is an official complaint made by a
2    citizen in Gwinnett County where this complainant
3    had, through open records, obtained video
4    surveillance of the ballot boxes in Gwinnett
5    County.
6             In his statement, he was reviewing, and
7    his team, reviewing the video, and they observed
8    someone putting multiple ballots in the ballot box.
9    And then he would print out photos of the videos
10   and create this complaint and accusing these people
11   of being ballot mules in the complaint.  And he
12   would quote the law, code section and stuff like
13   that.  So.
14            And from this individual, we got several
15   complaints that were all written pretty much in the
16   same format.  They just added in the new com --
17   alleged respondent that they had observed putting
18   in the multiple ballots.
19       Q.   And who is the complainant here?
20       A.   That was David Cross, Gwinnett County
21   resident.
22       Q.   Are you familiar with Mr. David Cross?
23       A.   This is the first time, this case, that I
24   ever -- you know.  Because I had just started a
25   couple months prior to when I got this case, so

```
                                            Page 28
 1     this is my first contact with Mr. Cross.

 2          Q.   And can you scroll to -- we're going to

 3     turn to Page 2, which is the attachment to the

 4     E-mail from Mr. David Cross.

 5          A.   Okay.

 6               MS. YOUNG:  (Sotto voce discussion).

 7               THE WITNESS:  Okay.

 8     BY MS. BRADDY:

 9          Q.   And Mr. DeWeese, have you seen this

10     document before?

11          A.   Yeah.  This was -- this was part of that.

12     They were sent together when he sent them in.

13          Q.   Correct.  This was the attachment to

14     the --

15          A.   Yeah.

16          Q.   -- E-mail.

17          A.   Yep, I have seen it.

18          Q.   And can you walk us through --

19               MS. BRADDY:  Can you scroll down?

20     BY MS. BRADDY:

21          Q.   Can you walk us through specifically what

22     the complainant, Mr. David Cross, is bringing to

23     the --

24               (Whereupon, there was a telephonic

25          interruption.)
```

Page 29

```
 1    BY MS. BRADDY:
 2        Q.   -- Georgia Secretary of State's
 3    (inaudible) attention?
 4        A.   Okay.  I'm sorry.  It was turned off,
 5    but --
 6        Q.   That's okay.  Do you need me to repeat the
 7    question?
 8        A.   Please.
 9        Q.   Can you just describe at a high level, and
10    you did this a little bit before, but exactly what
11    Mr. Cross is bringing to the attention of the
12    Georgia Secretary of State here?
13        A.   Well, Mr. Cross reviewed the video and he
14    observed Mr. Andrews on the video approach a ballot
15    box with multiple ballots in his hand and then
16    place them in the ballot box and made the
17    accusation that he was harvesting, ballot
18    harvesting.
19        Q.   And were you assigned this investigation?
20        A.   Yes, I was.
21        Q.   Did anyone help you with this
22    investigation?
23        A.   No.  It wasn't that hard of one.  It
24    wasn't difficult, you know.
25        Q.   And I want to call your attention to the
```

1    second bullet here as well, Mr. DeWeese.

2        A.    Okay.

3            (Whereupon, there was a telephonic

4        interruption.)

5            THE WITNESS:  It's gone.  And excuse

6        me.

7            So I'm at the second bullet.

8    BY MS. BRADDY:

9        Q.    Uh-huh.  In addition to, as you mentioned,

10    the complaint against Mr. Andrews, Mr. Cross also

11    raises something about True the Vote.

12        A.    Yes.  Uh-huh.

13        Q.    Was that also something that you

14    investigated?

15        A.    Yeah.  That was one of my first cases.

16    True the Vote had made a com -- that's the -- when

17    I first started, if it was involving the same

18    complainant or the same county, they would add the

19    complaints all in one file.  They now separate each

20    complaint into one case.  So.

21            But in that case, True the Vote had made a

22    complaint against Fulton County reference some

23    production of open records requests.  Also the same

24    with Gwinnett County with open records requests.

25    And then...

Page 31

1           Why is this coming back on?  How is

2      somebody getting in?  I have turned this off so

3      many times.

4           All right.  My apologies.  It's gone.

5           All right.  I'm sorry.  Where did I leave

6      off?

7      Q.    I think you were talking about an open

8      records request.

9      A.    Okay.  Yeah.  So True the Vote was a

10     separate -- another case, and in that case they had

11     three complaints.  One was the open records request

12     from Fulton County.  Another one was open records

13     requests with Gwinnett County.

14          And the third was the -- a letter that

15     they sent to the G.B.I. director and the F.B.I.

16     agent in charge where they explained their ballot

17     harvesting complaint and their collection of

18     evidence through the geospatial data of tracking a

19     cell phone to multiple ballot boxes.

20          And they had an insider, which they named

21     John Doe in the complaint, to -- and this was their

22     statement, that this John Doe was telling them of

23     this organization to pay people to harvest ballots.

24     And they would get paid for each ballot that they

25     had.

Page 32

1           And this letter was sent to those two
2     individuals prior to me working there.  And the --
3     well, my research showed that there was a response
4     letter sent back to them saying that the,
5     basically, that the information they were providing
6     was interesting, but it didn't lead to probable
7     cause to start an investigation.
8           But when True the Vote after that made
9     this new complaint, they added that same complaint
10    with the same information about this John Doe and
11    ballot harvesting and the information they had with
12    John Doe and the geospatial data tracking cell
13    phones to ballot boxes.
14          And I had requested John Doe's identity so
15    I can investigate it, and they -- True the Vote,
16    Catherine Englebrecht, said they were protecting
17    their source and they weren't going to give it to
18    me.  So I mean, without the information, I can't
19    really do an investigation.
20          So I know that would, in the old terms,
21    "no lead" a case.  So I couldn't say it happened or
22    didn't happen without getting the information from
23    the complainant True the Vote.
24          And the other two complaints were handled.
25    One of them, they asked to dismiss that one because

Page 33

1    they didn't -- it didn't matter to them as far as

2    our -- my interview with her about it, but they're

3    past getting the information from Fulton County.

4    And Gwinnett County had produced the information,

5    but.

6              So that case, you know, was finished and

7    sent to the board, and that took off afterwards

8    after my involvement with it, you know, with the

9    court cases and stuff.

10             So not knowing a relationship with David

11   Cross other than what he's mentioning with True the

12   Vote's accusation, looks like Mr. Cross took the

13   information that True the Vote was saying that this

14   was happening, this is just my opinion, you know,

15   I'm not in his head, and started reviewing the

16   video.  And once he saw somebody with more than one

17   vote, he made a complaint.

18        Q.   And that was actually my next question.

19   You are not aware of any relationship between

20   Mr. David Cross and True the Vote?

21        A.   No.  The only thing that -- at that time

22   was his mentioning of True the Vote.

23        Q.   Okay.  I'd like to jump to the next

24   exhibit, Exhibit 138.

25                        (Whereupon, Deposition

```
                                                 Page 34
 1                          Exhibit 138 was marked for
 2                          identification.)
 3       BY MS. BRADDY:
 4            Q.   Mr. DeWeese, have you seen this document
 5       before?
 6            A.   Yes.
 7            Q.   And can you tell me what it is?
 8            A.   That is my Report of Investigation that I
 9       completed and turned in after investigating this
10       case.
11            Q.   Are you the author of this document?
12            A.   I am.
13            Q.   And can you tell me what -- what is the
14       case number?
15            A.   This is SEB, which stands for State
16       Election Board, and then the year that is 2022,
17       that's how all case numbers start, with the year
18       that it involved, and this was 054.
19            Q.   So SEB --
20            A.   2022-054.
21            Q.   That is the case number that was assigned
22       to the Cross complaint that we just reviewed?
23            A.   Yes.
24            MS. BRADDY:  If you could scroll
25       down?
```

Page 35

```
1    BY MS. BRADDY:
2         Q.    Okay.  Mr. DeWeese, starting with the
3    Complaints section.
4         A.    Okay.
5         Q.    Is that a summary of the David Cross
6    complaint that we just reviewed?
7         A.    It is.
8         Q.    And turning to Page 2 of this exhibit,
9    under the section Election Certification, can you
10   tell me who those individuals are listed there?
11        A.    At the time, Ms. Royston was the Gwinnett
12   County elections director for that election.  And
13   then Zachary Manifold replaced her.  I don't know
14   if she left on her own.  I don't know anything
15   about her separating from Gwinnett County.
16             But she was the election director for
17   that.  And she had this date state elector training
18   for -- to -- for election certification.  And then
19   Zachary Manifold came in.  So Zachary Manifold is
20   the one that I dealt with getting information when
21   I needed it.
22        Q.    And so you corresponded with Zachary in
23   connection with the investigation into Mark -- the
24   allegations against Mark Andrews?
25        A.    I'm trying to remember.  Because he was
```

Page 36

```
 1    the one I would call for the True the Vote case to
 2    see about the accusation that -- about the -- their
 3    case.  But on this case I didn't need to contact
 4    him regarding this voter, because I had access to
 5    all that information once I identified him.
 6              And but that's commonplace that, when you
 7    are doing an investigation, you note and report
 8    what county it is and who is the certified employee
 9    at the elections office for those elections.  And
10    that's why we have that Election Certification.
11        Q.   Okay.  So that I understand, so you would
12    have contacted Mr. Manifold to help you identify
13    the elector in the complaint?
14        A.   If I -- if I needed any county
15    information, you know, like his voter registration
16    information.  But the Secretary of State has -- and
17    at the time, the state program was called E-Net,
18    Election Net, and that had everybody -- all the
19    registered voters' information.
20              The counties used it and we used it, and
21    you could look up the voter and get information on
22    them as -- if they're a valid voter and, you know,
23    they're still registered in the county that they
24    are listed as living in.  You know, you can verify
25    all that.
```

```
 1            Since this -- they have changed over to a
 2      program called GARViS, but it pretty much does the
 3      same thing.  It just looks different and it's a
 4      different program, but it's the election app.
 5            And it's -- as U.S. citizens, you can go
 6      on-line and check your voter status to My Voter
 7      Page, that will bring you into our GARViS program.
 8      So you can personally check your own voting status
 9      and precincts and all that, where we can see a
10      little bit more.  You -- yeah.
11            Q.   I see.
12            A.   But I was able to identify Mr. Andrews in
13      this case from the video and his driver's license
14      tag, so I didn't need to ask Mr. Manifold for that
15      information.
16            Q.   Okay.  I'd like to scroll down to the
17      Investigative Summary and talk a little bit more
18      about how you identified Mr. Andrews.
19            A.   Okay.
20            Q.   Let's take this sentence by sentence,
21      Mr. DeWeese.
22            A.   Okay.
23            Q.   It starts with, starting with the first
24      sentence:
25                 "Investigator DeWeese researched
```

Page 38

```
 1          the S.U.V. vehicle registration and
 2          learned that it belonged to Gwinnett
 3          County resident Mark D. Andrews."
 4     A.    Correct.
 5     Q.    Is that an accurate summary of the --
 6     A.    Right.
 7     Q.    -- steps you --
 8     A.    There was clear view of his license plate
 9  in the video.  And the complainant also provided
10  it.  So I just verified the video with the
11  complaint's information, and that's how I came up
12  with Mark Andrews.
13     Q.    And did you use E-Net to connect the
14  license plate to Mr. Andrews, or what software?
15     A.    No.  We used a -- we have two programs
16  that I can run vehicle tags on.  One is the Georgia
17  Criminal Information Center, G.C.I.C., where you
18  can run driver's license, wanted persons, vehicle
19  tags.
20          But in this case, I used -- what was the
21  time we were using? -- TransUnion.  And you could
22  just put a tag in and, if it's registered -- and
23  TransUnion's a research program that private and
24  government agencies use.  And it came up with
25  Mr. Andrews, his vehicle.
```

```
                                            Page 39
 1            And that's how I discovered who belonged
 2     to the vehicle --
 3        Q.    Okay.
 4        A.    -- and got his address and all his other
 5     personal information, phone numbers and all that.
 6        Q.    Okay.
 7        A.    That's how we do it.
 8        Q.    So based on Mr. Cross's complaint, you
 9     were able to identify Mr. Andrews?
10        A.    Correct.
11        Q.    Moving next to the second sentence [sic]
12     in your Investigative Summary.
13        A.    Okay.
14        Q.    "All the names appeared to be
15         family members."
16        A.    Correct.
17        Q.    "DeWeese confirmed the names were
18         family members."
19        A.    Correct.
20        Q.    Excuse me, Mr. DeWeese.  I skipped a
21     sentence.  I apologize.
22        A.    Yes.  Okay.
23        Q.    Can we go back up to the real second
24     sentence?
25        A.    Okay.
```

Page 40

1      Q.    "Investigator DeWeese researched
2          Andrews' address and located five
3          registered voters living at the home."
4      A.    Correct.  So the -- at the time E-Net, you
5    can enter a person, a voter, and get their voter
6    registration status.  And then you also just enter
7    an address, and that address will come up with
8    the -- anybody registered at that address.
9            And I found the five registered voters.
10   All were valid, all listed at the same address.
11   And they were family members, the same names.
12     Q.    And that brings us -- thank you.
13           That brings us to the third and fourth
14   sentences that I previously read:
15           "All the names appeared to be
16         family members."
17     A.    Correct.
18     Q.    "DeWeese confirmed the names were
19         family members."
20           Can you tell us how you confirmed that the
21   individuals were family members of Mark Andrews?
22     A.    The TransUnion search engine will give you
23   information on people at that address, other names
24   at that address, other social security numbers at
25   that address.  And they were all the same names and

Page 41

1    listed under potential family and connections to

2    Mr. Andrews's social security number.

3            You know, when you're born, you're giving

4    that information to the hospitals and stuff like

5    that.  So we get all this information from that

6    search engine.  And before my contact with

7    Mr. Andrews, this is what I did.

8            I researched their voter registration,

9    seeing if they were valid.  I researched when and

10   what type of ballot -- when the ballot -- first I

11   researched what type of ballot that they did.  Was

12   it in person, which you go on Election Day and do

13   it in person.  That's on Election Day.

14           But if you go -- if you do it by mail,

15   it'll be absentee by mail.  And then if you do it

16   early voting, that's still considered absentee, but

17   it's not by mail.  It's just considered absentee.

18   So you look at that.

19           And these were, all five of these were

20   absentee by mail, and they had the date that the

21   absentee ballots are requested, and then they have

22   the date that the county receives them.  They stamp

23   them when they come in.  The County has to stamp

24   them when they come in.

25           And when I researched those ballots, I

Page 42

```
 1     could see that each family member's receipt date to
 2     the County was the exact same date, which I believe
 3     was the -- I -- was the day after, because they
 4     empty them daily.
 5             So that five of them went into the ballot
 6     box, and the next day those five were received by
 7     the County and counted, "and counted" meaning that
 8     they were set -- they were received in.
 9     Q.    And you could see that in the E-Net system
10     that you previously referred to?
11     A.    Yes, ma'am.
12     Q.    Okay.  Does the Investigative Summary, the
13     paragraph that we went through, does that
14     accurately depict the investigation that you
15     conducted here?
16     A.    Yes.  I could have been a better writer,
17     but yeah, it does.
18     Q.    And so far is -- are -- is this
19     investigation consistent with what the policies and
20     procedures of the Georgia Secretary of State's
21     office set forth?
22     A.    Yes.  You -- yeah.  Every investigation's
23     different and you go down different paths, but you
24     follow the path that you're led to to get the
25     answers.
```

```
                                            Page 43
 1            And that's what led me to finding
 2    Mr. Andrews was his tag and finding his family
 3    members, finding the E-Net information with all the
 4    ballots being stamped the same day, you know.
 5        Q.    In addition to those investigative steps
 6    that you conducted on your own, you also met with
 7    Mr. Andrews at his home; is that correct?
 8        A.    Correct.
 9        Q.    Is that standard, to meet with the elector
10    and -- at his home?
11        A.    It depends on the investigation, yeah.  I
12    mean, you -- there's two sides to every story.  And
13    one of my goals was, after I see that these people
14    are registered at a home and that states that
15    they're a -- you know, I'm going to try to confirm
16    it.
17            And when I got there, the number of
18    vehicles at this house, it was pretty confirmed
19    that they all lived there.  I interviewed him.  He
20    says, yes, that's me in the video, that's me
21    carrying my five family members's ballots and
22    placing in there, which the law allows you to do.
23        Q.    And Mr. DeWeese, we'll come back to this
24    exhibit, but I want to jump quickly to Exhibit 139.
25                  (Whereupon, Deposition
```

```
                                        Page 44

 1                    Exhibit 139 was marked for

 2                    identification.)

 3            (Whereupon, the document was

 4         reviewed by the witness.)

 5            THE WITNESS:  Oh, that shows same

 6      day.

 7   BY MS. BRADDY:

 8      Q.   Mr. DeWeese, have you seen this document

 9   before?

10      A.   Yes.  I am the author of this document.

11      Q.   And what is this document?

12      A.   This was just a Memorandum of Interview.

13   So when I went out to speak with him, after I'm

14   done and I write up, you know, what happened, what

15   I -- what I learned and what I confirmed.

16            And to correct my last statement about the

17   ballots, it shows here they were actually processed

18   the same day.  So they were placed in the box, and

19   then Gwinnett collected them the same day and

20   registered it as received the same day.

21      Q.   And did you interview Mr. Andrews on May

22   2nd, 2022?

23      A.   I did.

24      Q.   Did you find Mr. Andrews to be a credible

25   witness?
```

Page 45

```
 1          A.   I did.
 2          Q.   Or interviewee, I should say?
 3          A.   (Whereupon, there was no audible response
 4     by the deponent.)
 5          Q.   Sorry.  I'll restate the question.
 6               Did you find Mr. Andrews to be a credible
 7     interviewee?
 8          A.   I did.
 9          Q.   Was your interview with Mr. Andrews, was
10     it consistent with the voting records that you had
11     previously reviewed?
12          A.   Yes.
13          Q.   And here you only interview Mr. Andrews.
14     Is there a reason that you did not interview
15     Mr. Andrews's wife or his children?
16          A.   I didn't think it was necessary.  You
17     know, there was nothing else leading me to see any
18     criminal activity and no need for me to go further.
19               And you know, that was it.  It was -- you
20     know, they were all legal votes, all legal
21     registered voters.  So.
22          Q.   Okay.  If we could go back to Exhibit
23     137 -- or 138.  Sorry.
24               THE WITNESS:  If I fall asleep, kick
25          me, because it was a long day yesterday.
```

Page 46

```
 1            MS. YOUNG:  I'm right there with you.
 2            MS. BRADDY:  Chanler, can you go to
 3       Page 3 for the Findings?
 4    BY MS. BRADDY:
 5       Q.    Mr. DeWeese, were there any steps taken in
 6    this investigation that are not memorialized in
 7    this investigative report?
 8       A.    None that I can remember.
 9       Q.    Okay.
10       A.    It was pretty cut and dry for me.
11       Q.    Can you tell me what it says under the
12    heading Findings?
13       A.    "There is insufficient evidence to
14         prove a Georgia Election Code
15         violation."
16       Q.    Can you explain how you reached that
17    conclusion based on your investigation?
18       A.    Based on the information I was able to
19    obtain referenced the legal voters, legal
20    registered voters, all registered at that home.
21            Georgia Code allows for family members to
22    transport ballots for legal voters from within your
23    house.  And there's some other exemptions for
24    people to carry more than one ballot.  But in this
25    case, it was family members all living in the same
```

Page 47

1    house.
2              He testified to that fact that he
3    transported them.  He didn't hide the fact that he
4    put all those ballots in there.  He didn't do
5    anything to lead me to feel anything else occurred.
6              You know, in confirming all the legal
7    voters that were registered at the home, that was
8    my conclusion, no violation.
9         Q.    Great.  Thank you.
10              Can we go to Exhibit 140?
11                        (Whereupon, Deposition
12                         Exhibit 140 was marked for
13                         identification.)
14         THE WITNESS:  Do you know what 140
15    is?  I don't know.
16         MS. YOUNG:  I believe it's -- it
17    would be the transcript of the S.E.B.
18    meeting.  And I did not print that out.
19         THE WITNESS:  Oh, okay.
20         MS. YOUNG:  But I can get --
21         THE WITNESS:  That's all right.
22         MS. YOUNG:  Actually --
23    BY MS. BRADDY:
24         Q.    We'll have it on the screen for you.
25         A.    Okay.  Yeah.

Page 48

1          MS. YOUNG:  (Sotto voce discussion).

2    BY MS. BRADDY:

3          Q.   It's a big document, so it's taking a

4    little while as well.

5          A.   Yeah.  No.  I'm all right.

6          Q.   Mr. DeWeese, have you seen this document

7    before?

8          A.   Real quick this morning.  I clicked it --

9    clicked on it.  I didn't get a chance to read it

10   because I started having difficulties trying to

11   sign up to the meeting and...

12         Q.   Understood.

13              Have you -- had you seen it before this

14   meeting?

15         A.   No.

16         Q.   Do you know what this document is?

17         A.   Are these the minutes from the board

18   meeting?

19              MS. BRADDY:  Please scroll to the

20        next page.

21              THE WITNESS:  That's the term I see

22        used for --

23              MS. YOUNG:  Yes.  It's the

24        transcript.

25              THE WITNESS:  The transcript.  Okay.

Page 49

```
 1    BY MS. BRADDY:
 2         Q.    That's right.
 3               MS. BRADDY:  Can you go to Page 2?
 4               Oh.  Sorry.  It's Page 1.  Yeah.
 5         Okay.
 6    BY MS. BRADDY:
 7         Q.    Mr. DeWeese, what is the date of this
 8    document?
 9         A.    May 17th, 2022.
10         Q.    And this is a State Election Board
11    hearing; is that correct?
12         A.    Correct.
13               MS. BRADDY:  And if you could scroll
14         to Page 2?
15    BY MS. BRADDY:
16         Q.    And Mr. DeWeese, it states that you were
17    present at that -- at this hearing.  Is that
18    accurate?
19         A.    Yes, it is.
20         Q.    Do you recall being at this hearing?
21         A.    I do.
22         Q.    And what was the purpose of this hearing?
23         A.    To present the case to the board, to
24    verbally present it.  The investigations department
25    verbally presents it.
```

Page 50

```
 1        Q.    And when you say "case," are you referring
 2    to SEB 2022-054?
 3        A.    Yes.
 4        Q.    And that's the case against Mr. Andrews?
 5        A.    Yes.
 6        Q.    Do you have an estimate of how many of
 7    these State Election Board hearings you've attended
 8    or presented at?
 9        A.    That's the only one I presented at.  Our
10    chief and deputy chief present all the cases now.
11    But at that time, the -- our office had gone
12    through a big change in personnel, so everybody was
13    new.  So I got asked to present it, and so I did.
14        Q.    And when you say "present," what are you
15    presenting to the State Election Board?
16        A.    So we -- they'll call the case, and then I
17    will tell them a summary of the investigation, on
18    this day we conducted this case, this is what was
19    done and this was the findings.  And then the board
20    after will make their decision how they want to
21    handle it.
22        Q.    And does the State Elections Board have a
23    copy of the investigation and its exhibits before
24    the hearing?
25        A.    They get a copy of -- the chair gets a
```

1     copy of the full report of investigation, and

2     then -- and all the other boards.  And at that

3     time, don't quote me about now, but they would

4     get -- because I'm not doing elections anymore --

5     but they would get the summary.

6             And but they get it prior to the meeting

7     so they can review it.  And it -- during -- and

8     after I'm done with the presentation, if they have

9     follow-up questions, they'll ask follow-up

10    questions.

11            If they want follow-up investigations

12    done, they'll voice that at the -- at that time, or

13    they'll go right to voting on how they want to

14    handle it.

15        Q.    Thank you.

16            And to clarify, I'm referring to the

17    process in place in 2022?

18        A.    Yes.

19        Q.    And your answer that you just provided,

20    that was describing the process in 2022; is that

21    correct?

22        A.    Correct.

23        Q.    And who is the acting chair of the State

24    Election Board at this time?

25        A.    That was Matthew Mashburn.

```
                                            Page 52
 1        Q.   Okay.  If we could turn to Page 42 of the
 2     transcript.
 3             MS. YOUNG:  Can you read that or do
 4        we need to make it bigger?
 5             THE WITNESS:  We need to make it
 6        bigger.  Hold on.  Is he at 42 yet?
 7     BY MS. BRADDY:
 8        Q.   We can make it bigger.  It's a big
 9     document, so it's --
10        A.   Yeah.
11        Q.   -- (inaudible due to cross-talk).
12        A.   Yeah.  No problem.  He's only on Page 19,
13     yeah.
14             MS. YOUNG:  (Sotto voce discussion).
15             THE WITNESS:  I can probably pull it
16        up here.
17             MS. YOUNG:  Sure.  (Sotto voce
18        discussion).
19     BY MS. BRADDY:
20        Q.   Apologies.  It's moving very slowly on our
21     end.
22        A.   Okay.
23             MS. YOUNG:  He's got it up on his
24        screen if you -- I don't know if you need
25        to have it up here, but we have a copy
```

Page 53

1          that we're looking at.

2                  MS. BRADDY:  Okay.

3                  Is it moving?

4                  It appears to be moving a little

5          faster now.

6                  MS. YOUNG:  Okay.

7      BY MS. BRADDY:

8          Q.   Okay.  I think we finally got there.  So

9      here at the bottom of Page 42, Mr. Mashburn

10     calls --

11         A.   Line 18?

12         Q.   Line 18, yes.

13         A.   Okay.

14         Q.   Thank you for that.

15                 Mr. Mashburn calls case SEB number

16     2022-054, and that's on Line 21.

17                 MS. BRADDY:  Scroll down a little

18         bit.

19                 THE WITNESS:  Yes, that is.

20     BY MS. BRADDY:

21         Q.   At which time, Mr. DeWeese, you begin to

22     speak at the hearing; is that correct?

23         A.   Correct.

24         Q.   And if you could just review for me the

25     rest of Page 42 starting at Line 24 through Line 17

```
                                                    Page 54
 1     on Page 43.
 2              (Whereupon, the document was
 3          reviewed by the witness.)
 4              THE WITNESS:  Okay.
 5     BY MS. BRADDY:
 6          Q.   Is your summary presented to the State
 7     Election Board consistent with the investigative
 8     description you provided in your report?
 9          A.   Yes.
10          Q.   At Lines 13 through 17 on Page 43, you
11     state:
12              [As read]  "So I then interviewed
13          him and determined -- and validated
14          that he had five -- more than five
15          people living in his home, but the
16          five electors all lived in that
17          residence at the time, making all
18          those ballots legal ballots."
19              Can you explain the significance of the
20     family members living at the residence of
21     Mr. Andrews?
22          A.   Well, the state code, once again, when
23     you're transporting absentee ballots, they list
24     that, you know, only one ballot can be transferred
25     by voter except for family members in the -- in
```

Page 55

 1    the -- living in that residence, caretakers of

 2    handicapped people.

 3           Even people under sentence for

 4    misdemeanors that aren't convicted felons still

 5    have the right to vote.  So the jail can

 6    accommodate them for doing the absentee ballots,

 7    and a jail representative can transport those

 8    ballots for the inmates.

 9           So there's several different exceptions to

10    the "one vote for one elector" rule.

11      Q.   Okay.  And if we turn to Page 44, Line

12    13 -- starting at Line 13, who is Mr. Lindsey?

13      A.   He was a board member at that time.  He's

14    no longer a board member.  Yes, he's no longer a

15    board member.

16      Q.   Okay.  And Mr. Lindsey asked a question to

17    you.  He says:

18           [As read]  "...I think for the

19           listening audience it's important to

20           point out, you know, that the

21           investigator confirmed that you are

22           authorized to deliver ballots for

23           other family members located in your

24           home.

25           "That is something that is clearly

Page 56

1          permissible by law; correct?"

2               At Line 19 --

3     A.    Correct.

4     Q.    -- you respond, "that is correct."

5     A.    Yes, I did.

6     Q.    Do you agree with that statement today?

7     A.    I do.

8     Q.    And was this something that you considered

9     in your findings and conclusions as you reported in

10    your investigation report?

11    A.    Yes.  Well, I didn't consider

12    Mr. Mashburn's statement at the board, because I

13    had already finished it, just to be clear.  But I

14    had my conclusion that they were all legal ballots,

15    which I presented to the board for their review.

16    Q.    Understood.

17               So at the time that you wrote your report,

18    you determined that the ballots were legal ballots;

19    is that accurate?

20    A.    Yes, it is.

21    Q.    Okay.  And turning now to Page 47, Lines

22    16 to 19.

23    A.    Can you repeat the lines?

24    Q.    Lines 16 to 19.

25    A.    Okay.

1      Q.    Mr. Mashburn asks if you have a

2    recommendation for the board, and you respond:

3              "I did not find anything to

4          suggest a violation of Georgia Code."

5      A.    Correct.

6      Q.    Is it standard for the State Election

7    Board to ask for your recommendation?

8      A.    I at that time did not know and was caught

9    off-guard, because I'm expecting them to make the

10   decision based on what I was trained about what the

11   board does.  They would make the decision whether

12   or not they're going to dismiss it or refer it to

13   the Attorney General's Office or to the county for

14   criminal -- for criminal prosecution.

15             So I asked it to be dismissed thinking

16   that's something they would say.  But that was just

17   my lack of the procedure and first time doing it

18   there.

19     Q.    Understood.

20             Moving to Page 48, Line 16, Mr. Mashburn

21   here motions to dismiss the case.  Is that an

22   accurate depiction?  Is that what you recall at

23   the --

24     A.    Yes.

25     Q.    -- hearing?

Page 58

1        A.    Uh-huh.  Yes.

2        Q.    And can you explain, once the case is

3    dismissed, what does -- what does that mean from

4    your end?

5        A.    It's over.  The investigation's over.

6        Q.    And your investigation is final?

7        A.    Correct.

8            MS. BRADDY:  You can turn off the

9        exhibit.

10   BY MS. BRADDY:

11       Q.    For an investigation like the

12   investigation into Mr. Mark Andrews, are all of the

13   documents that you prepare available to the public?

14       A.    Yeah.  I mean, you can go through open

15   records.

16           MS. YOUNG:  Let me just interject to

17       say that there is an exclusion while the

18       investigation is pending.  Once the

19       investigation is closed, those records

20       become public.

21           MS. BRADDY:  Okay.  Thank you,

22       Counsel.

23           Okay.  Mr. DeWeese, my questions are

24       complete.  I will turn it over to

25       defendants' counsel, unless we would like

Page 59

1          to take a quick break.
2              THE WITNESS:  If we could take a
3          quick break, that'd be great.
4              MS. YOUNG:  Well, let -- can y'all
5          give me an estimate how long you might be
6          planning to take?
7              MR. GEORGE:  For my end, possibly
8          just a few minutes, but it'd be -- I'd
9          like to take a break, if that's all right.
10             MS. YOUNG:  Okay.  That's fine.  Want
11         to say five minutes?
12             MR. GEORGE:  Sure.
13             THE VIDEOGRAPHER:  The time is 11:06.
14         We are off the record.
15             (Whereupon, a discussion ensued
16          off the record.)
17             (Whereupon, there was a brief
18          recess.)
19             THE VIDEOGRAPHER:  The time is 11:14.
20         We are back on the record.
21             MR. GEORGE:  Just to confirm,
22         plaintiff's counsel is finished asking
23         questions?
24             MS. BRADDY:  Confirmed.
25             MR. GEORGE:  Okay.  Thanks.

```
                                              Page 60

 1                    EXAMINATION
 2     BY MR. GEORGE:
 3         Q.   Good morning, Mr. DeWeese.  I just have a
 4     few questions for you.
 5         A.   Good morning.
 6         Q.   Morning.  Let me just pull up an exhibit.
 7     Give it a second.  It's loading.
 8              Okay.  Do you see it on your screen?
 9              MS. YOUNG:  There's nothing up on our
10         screen right now.
11              MR. GEORGE:  Okay.
12              MS. YOUNG:  We've got printed copies
13         if you want to tell us which one you're
14         looking at.
15              MR. GEORGE:  Hold on.  I think it's
16         just loading now.  Just refresh.
17              Well, it's stuck on saying
18         distributing file for me, so I don't know
19         if that means it's frozen or it's not
20         going through.  Try it one more time.
21              Okay.  That looks like that worked.
22                        (Whereupon, Deposition
23                         Exhibit 141 was marked for
24                         identification.)
25     BY MR. GEORGE:
```

Page 61

```
 1        Q.   All right.  I think that one might have
 2    gone through.  Do you see anything populating on
 3    your screen?
 4        A.   Not here.
 5        Q.   No?
 6        A.   No.
 7             MR. VINING:  I just refreshed and
 8        I --
 9             MR. GEORGE:  Yeah.  It just popped up
10        on my end in the Marked Exhibits, so I
11        think it might be there now.
12             MR. MILLER:  It showed up on our end
13        as well.
14             MS. YOUNG:  We're still not seeing it
15        here.
16             MR. GEORGE:  Okay.  Maybe I can just
17        share my screen.
18    BY MR. GEORGE:
19        Q.   All right.  Do you see the exhibit on your
20    screen?
21        A.   I do.
22        Q.   Okay.  So this is Exhibit 141.
23             MS. YOUNG:  I don't think we have
24        that one.
25             MR. GEORGE:  Sorry?
```

Page 62

```
 1            MS. YOUNG:  I was just saying, I
 2       don't think we have a printed copy of this
 3       one.
 4            MR. GEORGE:  Oh, okay.  Well, I'll
 5       just start by scrolling through it so you
 6       can take a look at it.
 7            MS. YOUNG:  Okay.
 8            (Whereupon, the document was
 9        reviewed by the witness and counsel.)
10            MS. YOUNG:  Looks like a complete --
11            THE WITNESS:  The complete case --
12            MS. YOUNG:  Yeah.
13            THE WITNESS:  -- file, yeah.
14  BY MR. GEORGE:
15       Q.   Okay.  That was going to be my question.
16  Do you recognize this document?
17       A.   It appears to be the complete case file.
18       Q.   Okay.  Yeah, I can represent to you that
19  this is what was produced to us I think from --
20       A.   Yeah.
21       Q.   -- the Secretary of State's office.  So.
22            And who compiles the complete case file?
23       A.   Well, when the complaints come in, the
24  supervisors in my investigation unit will -- this
25  first page will go into, the program we used was --
```

Page 63

1      is SharePoint.  And then they would upload this

2      information into it to create the case in our

3      SharePoint program.

4              And then they print it out, put it in a

5      folder for me for the physical folder.  And with

6      SharePoint you can add notes by going into the

7      case, clicking on the case and typing in notes as

8      you go.  You can add documents.

9              And that's what we standardly do is, as we

10     go, we put those into SharePoint.  And then whoever

11     handles open records can access them and send them

12     out.

13          Q.   Okay.  So just to kind of break that down

14     a little bit, this first page is what -- the

15     information that's entered on SharePoint?

16          A.   Correct.  That's the --

17          Q.   Okay.

18          A.   -- case creation.

19          Q.   Okay.  And then the other documents here,

20     those would be --

21          A.   That second --

22          Q.   -- attachments, essentially?

23          A.   Yeah.  The second one is when mileage for

24     my investigation, you know, we -- they keep track

25     of mileage and time.  And then that is the

Page 64

1    complaint from Mr. Cross.

2        Q.    Okay.  That's -- just for the record, this

3    is Page 3 we're talking about now in this file,

4    which is the complaint from David Cross.

5        A.    Uh-huh.  Yeah.  And these are the

6    attachments that Mr. Cross sent in --

7        Q.    That's the --

8        A.    -- with his complaint.

9        Q.    Right.  That's Pages 4 through 7, it looks

10   like?

11       A.    Appears to be, yeah.

12       Q.    Okay.  And then following that is an

13   investigation summary; is that right?

14       A.    Summary, correct.

15       Q.    And that's Pages 8 through 10?

16       A.    Yes.

17       Q.    And starting on Page 11, that's your

18   report --

19       A.    Yeah, for --

20       Q.    -- of investigation?

21       A.    Yes.  Uh-huh.  Yes.

22       Q.    And that goes -- and then I guess

23   following the report, there are exhibits to that,

24   which include Witness List on Page 14; right?

25       A.    Correct.

Page 65

```
1         Q.   And then Exhibit 3 that is starting on
2    Page 15 of the file is the Memorandum of Interview?
3         A.   Correct.
4         Q.   I'm showing you Page 16 in the file.  Can
5    you explain what this is, please?
6         A.   That is a voluntary statement filled out
7    by Mr. Andrews on the day of the interview.
8         Q.   Okay.  And that's part of the
9    investigation file?
10        A.   Correct.
11        Q.   And then what's on Pages 17 through 21?
12        A.   Those are the E-Net print-outs.  I can't
13   see for which --
14        Q.   Sorry.  I'll get you to the --
15        A.   Yeah.
16        Q.   -- get you to the top one.
17        A.   Yeah.
18        Q.   Okay.
19        A.   And that's, first one is for Mr. Andrews.
20        Q.   Okay.  Just going through each one of
21   these one by one, so this one on Page 17 is for
22   Mr. Andrews, Mark Andrews?
23        A.   Right.
24        Q.   And then the next page, Page 18, that's
25   for Brendetta Andrews; is that right?
```

```
                                            Page 66

 1        A.   Let me see if I can -- yeah.  That's what
 2     it says, yes.
 3        Q.   See if I can scroll up a little bit.
 4        A.   Ah, there.  Better.
 5        Q.   Okay.  And then the next page, Page 19,
 6     that's for Brittani Andrews; is that --
 7        A.   Correct.
 8        Q.   -- right?
 9        A.   Correct.
10        Q.   Page 20 is for Courtni Andrews?
11        A.   Correct.
12        Q.   Page 21 is for Alec Andrews; right?
13        A.   Correct.
14        Q.   So these are the five ballots that you
15     were investigating?
16        A.   Correct.  These are the voters' E-Net
17     history and voting status, registration status.
18        Q.   Okay.  I just want to direct you to -- so
19     we're back on this Mark Andrews E-Net print-out
20     here.
21        A.   Uh-huh.
22        Q.   And just focused on this 11/3/2020,
23     November 3rd, 2020 general/special election, is
24     that -- is that the election you were primarily
25     investigating?
```

1        A.    Was it the special election?  I'd have to
2    go back to the report of investigation, hold on one
3    sec, to look at the date.
4             (Whereupon, the document was
5         reviewed by the witness.)
6             THE WITNESS:   2020 general election
7         is the election involved.  So you would
8         have early voting and then Election Day.
9    BY MR. GEORGE:
10       Q.    And we're talking about -- and I'm now
11   showing you Page 11, which is the Report of
12   Investigation.
13            So we're talking about the 2020 general
14   election; right?
15       A.    Correct.
16       Q.    Okay.  And going back to Page 17, which is
17   the E-Net print-out for Mark Andrews, so we're
18   looking at this November 3rd, 2020 general/special
19   election, which is the third entry on this page,
20   right, that's the one you were investigating?
21       A.    The general.  If this is -- if there was a
22   special.  But there was a general 2020 election.  I
23   do not recall what the special part was.  You know,
24   the -- they might have had a special election for,
25   you know, a candidate that dropped out or died, but

Page 68

```
 1    I don't remember.
 2            You know, but my focus was the general
 3    election part and his ballots for that.  But the --
 4    yeah, that's the one, to answer your question, yes.
 5        Q.   All right.  So we're focused on the third
 6    entry here on this E-Net print-out; right?
 7        A.   Correct.
 8        Q.   Okay.  So if you look to the right of the
 9    election date, there's the Date Requested.
10            Is that the date the ballot is requested
11    for Mr. Andrews?
12        A.   Right.  That's when the voter will put in
13    a request for the absentee ballot.
14        Q.   And then to the right of that, it says
15    Ballot Request Type, and it says "mailed ballot"?
16        A.   Correct.
17        Q.   So that means the ballot was mailed to
18    him?
19        A.   Correct.
20        Q.   Okay.  And then it has his address that it
21    was mailed to to the right of that?
22        A.   Correct.
23        Q.   And then to the right of that is Date
24    Ballot Received.
25            Is that the date that the County received
```

Page 69

1    his ballot?

2         A.    Right.

3         Q.    Okay.

4         A.    Correct.

5         Q.    And that's what you reflected above in

6    your report; right?

7              Looking at Page 12 here of your

8    investigative report, you say that you "confirmed

9    that a total of five absentee ballot were dropped

10   in the box on 10/6/2020" --

11        A.    Uh-huh.

12        Q.    -- "and marked as ballot received" --

13        A.    Right.

14        Q.    -- "in E-Net on the same day."

15             That's what we're talking about; right?

16        A.    Correct.

17        Q.    All right.  So looking back at

18   Mr. Andrews's E-Net page on Page 17, so the date

19   the ballot received, this is reflected as

20   10/6/2020; right?

21        A.    Correct.

22        Q.    Looking at the next entry for Mrs. Andrews

23   on Page 18, and again looking at the same -- the

24   third entry here, which is the 2020 general

25   election -- sorry, which is the second entry here,

Page 70

1    the November 3rd, 2020 general election, that's the

2    same election we're talking about for Mr. Andrews;

3    right?

4        A.    Correct.

5        Q.    Okay.  And then same thing, Date Ballot

6    Received, 10/6/2020?

7        A.    Is that a six or a five?  It's too small

8    for me to -- okay.  Correct.

9        Q.    Okay.

10       A.    All right.

11       Q.    Looking at the third entry here for

12   Brittani Andrews, is that Mr. Andrews's daughter?

13       A.    Correct.

14       Q.    Okay.  Same thing, November 3rd, 2020

15   general election, Date Ballot Received, 10/6/2020;

16   right?

17       A.    Correct.

18       Q.    Looking at the next entry for Courtni

19   Andrews, is that Mr. Andrews's other daughter?

20       A.    I believe it was his other daughter, yes.

21       Q.    The same thing, we're looking at the

22   November 3rd, 2020 general election, which is the

23   third entry on Page 20 here.

24            But then for this one, if you look at Date

25   Ballot Received, it says 10/26/2020; right?

Page 71

```
 1         A.   It does say that.
 2         Q.   Do you know what the discrepancy is with
 3    this ballot?
 4         A.   I do not.
 5         Q.   So in your report that we talked about
 6    where you say that the -- "a total of five absentee
 7    ballots were dropped in the box on 10/6/2020 and
 8    marked as ballot received in E-Net on the same
 9    day," is that statement not accurate?
10         A.   Well, it was accurate, because I didn't --
11    I don't remember the 26 in there.  I don't remember
12    seeing that.  It's -- but I can't testify to why it
13    says 26.  I don't know.
14         Q.   Okay.  But the E-Net entries that we were
15    just looking at, that's what you were looking at at
16    the time; right?
17         A.   Correct.
18         Q.   Okay.  So one of those ballots was
19    actually marked as received on a different date
20    than 10/6/2020?
21         A.   Correct.
22         Q.   Okay.  And you don't know why that was
23    received on a different date?
24         A.   I do not.
25         Q.   I'll pull that exhibit down.
```

Page 72

1           I know you said you didn't really have a

2     chance to review the files, basically you were busy

3     yesterday; right?

4        A.    15 hours busy, yeah.

5        Q.    Yes.

6              Are you aware of the fact that there were

7     communications between the Georgia Secretary of

8     State's office and Mark Andrews?

9        A.    Other than my communications with him?

10       Q.    Other than --

11       A.    No.

12       Q.    -- your communications?

13       A.    No.

14       Q.    Are you aware that Ryan Germany

15    communicated with Mr. Andrews?

16       A.    Ryan Germany was the staff elections

17    attorney at the time, and he received the

18    complaints from Mr. Cross.  But I don't -- I don't

19    remember any communications with -- between the

20    two.

21       Q.    You don't recall any communications

22    between --

23       A.    Yeah.  If I was --

24       Q.    (Inaudible due to cross-talk)?

25       A.    I wasn't privy to any, no.

Page 73

1          Q.    Okay.  Would that have been typical in
2     your investigations for Mr. Germany to reach out to
3     individuals that are being investigated?
4          A.    I can't answer that.  I was very new.  And
5     the, you know, the everyday procedures of what they
6     did I don't know, you know, what his -- you know, I
7     know he got complaints from all different
8     directions and they had all kinds of issues always
9     going on.
10              But you know, was it typical?  I can't
11     answer to that.  I don't know.
12          Q.    Are you aware that Mr. Andrews was
13     contacted by a reporter right around this time
14     frame in May of 2022?
15          A.    I wasn't aware who, what reporter, but
16     I -- my personal feeling when I started this, I go,
17     the press is going to get this and they're going to
18     jump on it.  That was just my personal -- but I
19     didn't know when.
20              And the first time that I knew that a
21     reporter or any kind of news agency was involved
22     was back -- I woke up at, like, 3:00 in the morning
23     and couldn't go back to sleep, and I put on the TV
24     and I saw Tucker Carlson, and I saw Mr. Andrews's
25     white S.U.V. on Tucker Carlson, and then I knew it

Page 74

```
 1    was out in the public.
 2        Q.    Are you aware of Mr. Andrews being
 3    contacted by any reporters?
 4        A.    No, I don't remember.  No.  It -- you
 5    know.
 6            MR. GEORGE:  I don't think I have any
 7        further questions.  Thank you.
 8            THE WITNESS:  Uh-huh.  You're
 9        welcome.
10            MR. VINING:  I don't have any
11        questions.  Thank you.
12            MS. BRADDY:  Would it be possible to
13        take a five-minute break?
14            MS. YOUNG:  Sure.
15            THE VIDEOGRAPHER:  The time is 11:33.
16        We are off the record.
17            (Whereupon, a discussion ensued
18         off the record.)
19            (Whereupon, there was a brief
20         recess.)
21            THE VIDEOGRAPHER:  The time is 11:39.
22        We are back on the record.
23            MS. BRADDY:  Plaintiff's counsel has
24        no further questions.
25            Thank you very much for your time
```

Page 75

1          today, Mr. DeWeese.

2               THE WITNESS:  Okay.  Thank you.

3               MS. YOUNG:  (Sotto voce discussion).

4               Any --

5               THE VIDEOGRAPHER:  Ready to conclude,

6          Counsel?

7               MS. YOUNG:  Anything else?

8               MR. GEORGE:  No further questions.

9          Thank you.

10               MS. YOUNG:  Okay.

11               THE VIDEOGRAPHER:  This concludes the

12          videotaped deposition.  The time is 11:40

13          a.m.  We are off the record.

14               (Whereupon, a discussion ensued

15           off the record.)

16                         - - -

17               (Witness excused.)

18                         - - -

19               (Whereupon, the deposition

20           concluded at 11:40 a.m. Eastern time.)

21                    --oOo--

22

23

24

25

Page 76

1          VERITEXT LEGAL SOLUTIONS
2        FIRM CERTIFICATE AND DISCLOSURE
3
4          Veritext represents that the foregoing
transcript as produced by our Production
5    Coordinators, Georgia Certified Notaries, is a
true, correct and complete transcript of the
6    colloquies, questions and answers as submitted by
the certified court reporter in this case.
7
8          Veritext further represents that the
attached exhibits, if any, are a true, correct and
complete copy as submitted by the certified
9    reporter, attorneys or witness in this case;
10          And that the exhibits were handled and
produced exclusively through our Production
11    Coordinators, Georgia Certified Notaries.  Copies
of notarized production certificates related to
12    this proceeding are available upon request to
litsup-ga@veritext.com.
13
14          Veritext is not taking this deposition
under any relationship that is prohibited by OCGA
15-14-37(a) and (b).  Case-specific discounts are
15    automatically applied to all parties at such time
as any party receives a discount.  Ancillary
16    services such as calendar and financial reports are
available to all parties upon request.
17
18
19
20
21
22
23
24
25

Page 77

1      R E P O R T E R   C E R T I F I C A T E
2    STATE OF GEORGIA )
     COBB COUNTY      )

3

4           I, Debra M. Druzisky, a Certified Court
     Reporter in and for the State of Georgia, do hereby
5    certify:
            That prior to being examined, the witness
6    named in the foregoing deposition was by me duly
     sworn to testify to the truth, the whole truth, and
7    nothing but the truth;
            That said deposition was taken before me
8    at the time and place set forth and was taken down
     by me in shorthand and thereafter reduced to
9    computerized transcription under my direction and
     supervision.  And I hereby certify the foregoing
10   deposition is a full, true and correct transcript
     of my shorthand notes so taken.
11          Review of the transcript was requested.
     If requested, any changes made by the deponent and
12   provided to the reporter during the period allowed
     are appended hereto.
13          I further certify that I am not of kin or
     counsel to the parties in the case, and I am not in
14   the regular employ of counsel for any of the said
     parties, nor am I in any way financially interested
15   in the result of said case.
            IN WITNESS WHEREOF, I have hereunto
16   subscribed my name this 8th day of November, 2024.
17

18

19

20   _____
                               Debra M. Druzisky
21                             Georgia CCR-B-1848
22

23

24

25

Page 78

1    ELIZABETH T. YOUNG, Esq.

2    eyoung@law.ga.gov

3                        November 8, 2024

4    RE:    Andrews, Mark v. D'Souza, Dinesh    Et Al

5         11/6/2024, Dana DeWeese (#6990964)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-ny@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

1    **ERRATA FOR ASSIGNMENT # 6990964**

2    **I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that**

3

4    **_____ there are no changes noted; or**

5    **_____ the following changes are noted:**

6

7    **Pursuant to Rule 30(7)(e) of the Federal Rules of Civil Procedure and/or OCGA 9-11-30(e), any changes in form or substance which you desire to**

8    **make to your testimony shall be entered upon the deposition with a statement of the reasons given**

9    **for making them.**

10    **To assist you in making any such corrections, please use the form below.  If additional pages are**

11    **necessary, please furnish same and attach hereto.**

12    **Page_____Line_____Change:_  _____**

13    **Reason for change:_____**

14    **Page_____Line_____Change:_  _____**

15    **Reason for change:_____**

16    **Page_____Line_____Change:__  _____**

17    **Reason for change:_____**

18    **Page_____Line_____Change:__  _____**

19    **Reason for change:_____**

20    **Page_____Line_____Change:__  _____**

21    **Reason for change:_____**

22    **Page_____Line_____Change:___  _____**

23    **Reason for change:_____**

24    **Page_____Line_____Change:___  _____**

25    **Reason for change:_____**

Page 80

1     Page_____Line_____Change:_____   _____

2     Reason for change:_____

3     Page_____Line_____Change:_____   _____

4     Reason for change:_____

5     Page_____Line_____Change:_____   _____

6     Reason for change:_____

7     Page_____Line_____Change:_____   _____

8     Reason for change:_____

9     Page_____Line_____Change:_____   _____

10    Reason for change:_____

11    Page_____Line_____Change:_____   _____

12    Reason for change:_____

13    Page_____Line_____Change:_____   _____

14    Reason for change:_____

15    Page_____Line_____Change:_____   _____

16    Reason for change:_____

17    Page_____Line_____Change:_____   _____

18    Reason for change:_____

19                      _____

                        DEPONENT'S SIGNATURE

20

21    Sworn to and subscribed before me this _____ day of

22    _____, 2024.

23    _____

      NOTARY PUBLIC

24    My Commission Expires: _____.

25    _____ Notary Public

1          R E P O R T E R    D I S C L O S U R E
2     DISTRICT COURT    )    DEPOSITION OF
      NORTHERN DISTRICT)    DANA DEWEESE
3     ATLANTA DIVISION )
4              Pursuant to Article 10.B of the Rules and
      Regulations of the Board of Court Reporting of the
5     Judicial Council of Georgia, I make the following
      disclosure:
6              I am a Georgia Certified Court Reporter.
      I am here as a representative of Veritext Legal
7     Solutions.
               Veritext Legal Solutions was contacted by
8     the offices of Skadden, Arps, Slate, Meagher & Flom
      to provide court reporting services for this
9     deposition.  Veritext Legal Solutions will not be
      taking this deposition under any contract that is
10    prohibited by O.C.G.A. 9-11-28 (c).
               Veritext Legal Solutions has no contract
11    or agreement to provide court reporting services
      with any party to the case, or any reporter or
12    reporting agency from whom a referral might have
      been made to cover the deposition.
13             Veritext Legal Solutions will charge its
      usual and customary rates to all parties in the
14    case, and a financial discount will not be given to
      any party in this litigation
15
16
17                      Debra M. Druzisky
                        Georgia CCR-B-1848
18
19
20
21
22
23
24
25

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.