Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 1 of 161

MARK ANDREWS  Conf.                              October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                              1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

MARK ANDREWS,                    )  No. 1:22-cv-04259-SDG
                                 )
              Plaintiff,         )
                                 )
v.                               )
                                 )
DINESH D'SOUZA, et al.,          )
                                 )
              Defendants.        )
_____)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF MARK ANDREWS

October 25, 2024
9:57 a.m.
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia

Reported by:  Marcella Daughtry, RPR, RMR
              CA CSR 14315
              GA No. 6595-1471-3597-5424



```
 1                    I N D E X

 2    WITNESS                                      PAGE

 3    MARK ANDREWS

 4        Examination by Mr. Evans                  8

 5

 6

 7

 8                 INDEX TO EXHIBITS

 9    No.                  Description          Page

10    Exhibit 1       Voting records             29

11    Exhibit 2       Compensation history       36
                      NCRV0061
12                    (Confidential - AEO)

13    Exhibit 3       Mark Andrews Annual Performance    38
                      Review 2023
14                    NCRV0058
                      (Confidential - AEO)
15
      Exhibit 4       NCR Compensation Change    39
16                    NCRV0060
                      (Confidential - AEO)
17
      Exhibit 5       Bankruptcy Voluntary Petition    54
18
      Exhibit 6       Google printout            61
19
      Exhibit 7       Instant message from Ryan    65
20                    Germany dated 5/17/22
                      MA-0000028
21                    (Confidential)

22    Exhibit 8       Instant message from Amy    73
                      Gardner dated 5/16/22
23                    MA-0000027
                      (Confidential)
24

25
```



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 3 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                        3

INDEX TO EXHIBITS, CONT'D

No.                    Description                    Page

Exhibit 9        Plaintiff Mark Andrews' Responses      73
                 and Objections to Defendant
                 Catherine Engelbrecht's First
                 Set of Interrogatories

Exhibit 10       E-mail from Sara Chimene-Weiss         88
                 to Catherine Chen 2/29/24
                 PDSA-0000095 to 96
                 (Confidential)

Exhibit 11       Message from Ali Swenson               96
                 MA-0000038
                 (Confidential)

Exhibit 12       Message from Ali Swenson               97
                 dated 5/23/22
                 MA-0000078
                 (Confidential)

Exhibit 13       Instant message family chats           99
                 MA-0000056 to 59
                 (Confidential)

Exhibit 14       Message from Mark Andrews to          107
                 Von DuBose 6/2/22
                 MA-0000035 to 36
                 (Confidential)

Exhibit 15       Plaintiff Mark Andrews'               131
                 Responses and Objections to
                 Defendant D'Souza Media LLC's
                 Third Set of Interrogatories

Exhibit 16       Plaintiff Mark Andrews'               135
                 Responses and Objections to
                 Defendant True the Vote's
                 First Interrogatories

Exhibit 17       Color photograph                      137
                 DD_000466

Exhibit 18       AJC Politics article                  137

Exhibit 19       Video                                 156



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 4 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                        4

1                    INDEX TO EXHIBITS, CONT'D

2    No.                    Description                    Page

3    Exhibit 20        Video                              157

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 5 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      5

1          CONFIDENTIAL VIDEOTAPED DEPOSITION OF MARK ANDREWS

2     was taken on October 25, 2024 at the offices of Greenberg

3     Traurig, LLP, 3333 Piedmont Road NE, Atlanta, Georgia,

4     commencing at the hour of 9:57 a.m. before Marcella

5     Daughtry, a Registered Professional Reporter and

6     Registered Merit Reporter, in and for the State of

7     Georgia and State of California.

8

9     APPEARANCES:

10

11         For the Plaintiff:

12             PROTECT DEMOCRACY
               MR. JARED FLETCHER DAVIDSON
13             3014 Dauphine Street, Suite J
               New Orleans, LA 70117
14             504.239.3987
               jared.davidson@protectdemocracy.org
15
               And
16
               DUBOSE TRIAL LAW, LLC
17             MR. VON DUBOSE
               128 Richardson Street SW
18             Atlanta, Georgia 30312
               info@dubosetrial.com
19

20         For the Defendants' True the Vote, Gregg Phillips,
           and Catherine Engelbrecht:
21
               GREENBERG TRAURIG, LLP
22             MR. JAKE EVANS
               MR. PHILIP GEORGE
23             3333 Piedmont Road, NE, Suite 2500
               Atlanta, Georgia 30305
24             jake.evans@gtlaw.com
               philip.george@gtlaw.com

25



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 6 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                        6

 1   For the Defendants' Dinesh D'Souza and D'Souza Media
     and the Witness:

 2
          BUCHALTER
 3        MS. AMANDA HYLAND
          MR. AUSTIN VINING
 4        3350 Riverwood Parkway, SE, Suite 1900
          Atlanta, Georgia 30339
 5        avining@buchalter.com
          ahyland@buchalter.com
 6

 7   Also Present:

 8        Todd Parker, videographer
          Cecelia Vieira
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 7 of 161

MARK ANDREWS  Conf.                                  October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      7

1            THE VIDEOGRAPHER:  This is the video deposition

2    of Mark Andrews in the matter of Mark Andrews v. Dinesh

3    D'Souza, et al.  Today is October 25th, 2024.  The time

4    on the record is 9:57 a.m.

5            My name is Todd Parker.  I am the videographer.

6    The court reporter is Marley (sic) Daughtry.

7            Counsel, please introduce yourselves, state

8    whom you represent.  After which, the court reporter will

9    swear in the witness.

10           MR. EVANS:  Jake Evans representing defendants

11   True the Vote, Catherine Engelbrecht, and Gregg Phillips.

12           MR. GEORGE:  Phil George from Greenberg Traurig

13   representing the same parties.

14           MS. HYLAND:  Amanda Hyland representing Dinesh

15   D'Souza and D'Souza Media.

16           MR. VINING:  Austin Vining from Buchalter

17   representing defendants Dinesh D'Souza and D'Souza Media

18   LLC.

19           MR. DuBOSE:  Von DuBose for plaintiff Mark

20   Andrews.

21           MR. DAVIDSON:  Jared Davidson for plaintiff

22   Mark Andrews.

23   >>>

24   >>>

25   >>>



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 8 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      8

1                        MARK ANDREWS,

2     called as a witness herein, having been first duly sworn

3     by the shorthand reporter to speak the truth and nothing

4     but the truth, was examined and testified as follows:

5

6                         EXAMINATION

7     BY MR. EVANS:

8          Q    All right.  Mr. Andrews, my name is Jake Evans,

9     and I will be taking the deposition today for the

10    first -- most part.

11            First, I apologize, we got started -- we

12    thought -- this is all Phil's fault here.  I'm kidding,

13    but we thought it was 10:00.  I think you guys thought it

14    was 9:30.  But that's okay.  We are all here.  So thank

15    you for being here today.

16            If you could, please state your name for the

17    record.

18         A    It's Mark Andrews.

19         Q    And Mr. Andrews, have you ever given a

20    deposition before?

21         A    Yes.

22         Q    Okay.  And when?

23         A    I don't recall a time.

24         Q    Well, I'll get to the questions about that

25    deposition in a moment, but it sounds like you've got



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 9 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                        9

1  some experience with depositions.  And what I tell

2  people, it's kind of like pitch and catch, which is, you

3  can't throw the ball back until you catch it.  And so for

4  the court reporter, try to wait until I finish my

5  question.  When I finish my question, then you answer.

6  And I'll try to wait until you answer to ask my question.

7          Everything you say, you have to make sure it's

8  audible.  It's kind of weird because sometimes, you know,

9  you're like "uh-huh" -- yeah, I do that all the time,

10  too -- but you have to make sure you give a verbal

11  response.  Otherwise, the court reporter is not gonna be

12  able to take it down.

13          We are here to accommodate you, so if you need

14  a break at any point, happy to do that.  We do have seven

15  hours on the record, so even if you take a break, that's

16  not gonna cut into that time, but you do -- you are

17  entitled to a break at any time.

18          If you don't understand any of my questions,

19  let me know.  If you answer the question, I'll assume you

20  understand the question.

21          And also, again, try not to interrupt each

22  other.  It gets for really difficult and incoherent

23  transcripts.  I've read many like that, and I try not to

24  do that.

25          So did you understand all of that?



1      A    Yes.

2      Q    Okay.  Is there any reason why you can't

3  provide true and accurate testimony today?

4      A    No.

5      Q    Are you under any medications?

6      A    No.

7      Q    And earlier you testified that you had been

8  deposed before?

9      A    Yes.

10      Q    Was this in a deposition format like this?  Was

11  this at a hearing?  What type of testimony did you give?

12      A    I believe it was a format like this.

13      Q    And what was the case about?

14      A    It was an employment-related case.

15      Q    And were you a plaintiff in that case?

16      A    No.

17      Q    Were you -- were you a defendant in the case?

18      A    No.

19      Q    How were you related to the case?

20      A    I was a witness.

21      Q    And what was the underlying case about as far

22  as -- I know you said it was employment, but can you give

23  me any more detail on that case?

24      A    I don't recall the specifics, but I'll -- I

25  think it was an employee was suing the employer.



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 11 of 161

MARK ANDREWS  Conf.                                October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                  11

1       Q    Uh-huh.

2       A    And I was a witness.

3       Q    And were any allegations in that case made

4  against you?

5       A    No.

6       Q    What did you do to prepare for your deposition

7  today?

8       A    I met with my attorneys.

9       Q    Did you -- and I don't want to know --

10  attorney-client privilege.  I don't want to know anything

11  you talked about with your attorneys, but how long was

12  the meeting?

13      A    An hour or two.

14      Q    And what attorneys did you meet with?

15      A    My attorney to my right, Jared Davidson.

16      Q    And was Jared the only attorney you met with?

17      A    Yes.

18      Q    Did you review any documents in preparation for

19  your deposition today?

20      A    Yes.

21      Q    And what documents did you review?

22      A    The -- the complaint that was filed.

23      Q    Was that the only document that you reviewed

24  for your deposition today?

25      A    There were other interrogatories that I looked



1  at.

2      Q   So other than the complaint and

3  interrogatories, did you review any other documents in

4  preparation for your deposition today?

5      A   No.

6      Q   Did any of those documents refresh your

7  recollection about your knowledge regarding this case?

8      A   Not really, no.

9      Q   And did you speak to anyone else about your

10 deposition today?

11     A   No.

12     Q   Did you speak to your wife about your

13 deposition today?

14     A   Well, she knew I was having it today, but I

15 didn't speak to her about it.

16     Q   Did you talk to her about the substance?

17     A   No.

18     Q   Okay.  Next I want to just learn about you, you

19 know, who you are, kind of your background, where you are

20 from.  You're obviously a plaintiff in the case and have

21 sued the defendants in this case.

22         So if you could -- but tell me your story,

23 where you were born, when you were born, and then I'll

24 probably go into a little bit more detail, but just tell

25 me who Mark Andrews is.



1      A    Sure.  I was born in Jacksonville, Florida.  I

2  grew up there.  I was raised by a single mom.  I had a

3  dad.  They were divorced.  She raised six kids.  We all

4  went to college.  I graduated from high school, went to

5  college at Florida State University.  I graduated with an

6  accounting degree.  I later sat for my CPA license and

7  passed it.

8          Started my career as a bank examiner, and from

9  there progressed in my career.  Moved to Atlanta.  I -- I

10  got a promotion.  My responsibility was supervising the

11  technology side of a -- one of the largest banks in the

12  southeast from a regulatory perspective.  Got other

13  certifications.

14          My wife and I, we met in high school.  We have

15  three kids.  They are all adults.

16          And anything else you want to know?

17      Q    Uh-huh.  When did you move to Atlanta?

18      A    I believe it was 1980 -- let me back up.  I

19  think it was 1990.

20      Q    1990.  And was it for a job that you moved to

21  Atlanta for?

22      A    Yeah, I was working -- I was a regulator, and I

23  got promoted, so the promotion was me moving to Atlanta.

24      Q    And who was your employer in 1990?

25      A    Comptroller of the Currency, the OCC.



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 14 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      14

```
1        Q   And how long were you there for?

2        A   Gosh, I want to say I was there, 1985.  I want

3   to say ten plus years.

4        Q   So around 1985 to 1995, would you approximate

5   that?

6        A   Yeah.  Actually, it -- it was longer.  So I

7   would say '98 or '99.

8        Q   And where did you go -- so I assume in 1998,

9   you then sought employment somewhere else?

10       A   Yes.

11       Q   And where did you go then?

12       A   I went to work for GE Capital.

13       Q   And what was your role at GE Capital?

14       A   I was an IT audit manager.

15       Q   And what does an IT audit manager do?

16       A   An IT audit manager -- I'm responsible for the

17  technology control environment.  We're auditing it for a

18  corporation.  I look at policies and procedures.  I look

19  at controls.  I evaluate them for adequacy.  I make

20  recommendations.

21           I meet with the board of directors to discuss

22  those findings, and I make recommendations.  I follow up

23  on those recommendations.  I led a team of individuals.

24  I was responsible for developing the audit plan, those

25  activities we would audit for that upcoming year, for
```



 1    that current year.
 2              Yeah, so that's what an IT audit manager does.
 3         Q    And how long were you employed at GE Capital?
 4         A    Oh, gosh.  Ten plus years.
 5         Q    So that puts us about 2008, you think?
 6         A    Yes.
 7         Q    And where did you go in 2008?
 8         A    I went into consulting.
 9         Q    And what -- what company did you do consulting
10    at?
11         A    Actually it was my own company.  It was
12    Preventive Measures LLC.  I did that for a couple of
13    years.
14         Q    And what -- so tell me what -- is it
15    Preventative Measures?  Is that --
16         A    Yes.
17         Q    And what does Preventative Measures or what did
18    it do?
19         A    It was consulting.  I had clients who I went
20    and evaluated their operations, their environment.  I
21    made recommendations.  I developed policies and
22    procedures for them.  I helped them improve their control
23    environment.
24         Q    So it sounds -- was it similar to what you were
25    doing at GE Capital; it's just you kind of started your



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 16 of 161

MARK ANDREWS  Conf.                          October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                            16

1    own company --

2          A    Yes.

3          Q    -- to do it?

4               Okay.  And who were -- do you recall who your

5    clients were?

6          A    No, I don't.

7          Q    And what type of policies and operations were

8    these?

9          A    For example, the policies I developed, you

10    mean?

11          Q    Yeah.

12          A    For example, if you don't have a disaster

13    recovery plan, you know, disaster recovery is, you know,

14    where your operations go down, and you lose business,

15    lose clients/customers because of that.  You know, my

16    recommendations would be, you need to build this plan.

17    This is what it should include, and et cetera.

18               Related to security, we all have passwords that

19    we use to log in to our machines.  The longer the

20    password is, the harder it is for someone to guess what

21    your password is.  When you open up a laptop out of a

22    box, it's not configured.  If you don't configure it, you

23    know, it could be susceptible to someone, you know,

24    compromising it.

25               So I would look at those controls, not on a



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 17 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                              17

1  laptop level, but at a server level or -- or other

2  operating system level to make sure they are configured

3  appropriately.

4          So I would make recommendations for someone to

5  better secure their environment.

6      Q   And how long did you work at Preventative

7  Measures?

8      A   I was there a couple of years.

9      Q   So 2012, 2011?

10     A   2012, I believe.

11     Q   And then where did you go in 2012?

12     A   I went to work for -- it was ING at the time.

13     Q   What did you do at ING?

14     A   Similar work.  I was an IT audit manager

15 responsible for evaluating their control environment, et

16 cetera.

17     Q   And how long were you employed at ING?

18     A   I think that was probably less than a year.

19     Q   And so we're around 2013, and then where did

20 you go?

21     A   I went back to consulting.

22     Q   Is this --

23     A   Not my own business, but I consulted with

24 another firm.

25     Q   And what was that firm?



1        A    RGP.

2        Q    What did RGP do?  Did you do consulting

3   primarily?  Did it focus on an industry?

4        A    There were very, very different industries.

5        Q    And when you say "different industries," you

6   mean --

7        A    It could be --

8        Q    -- everything?

9        A    Well, it could be banking.  It could be

10  manufacturing.  It could be, you know, financial, you

11  know.  It's a large global company, I believe.

12       Q    Were you doing the same role that you had at

13  ING and Preventative Measures and GE Capital or was it

14  distinguishable in some way?

15       A    Similar roles.  I would go into an environment,

16  evaluate and make recommendations.

17       Q    And where did you go next?

18       A    I went to NCR.

19       Q    And when did you join NCR?

20       A    I believe it was 2014.

21       Q    And when you first started in NCR, what was

22  your role?

23       A    IT audit manager.

24       Q    And over the years, have you had promotions?

25  Have you stayed in the same role as IT audit manager?



1       A    I have stayed in the same role, but I have
2   gotten promotions over the years.
3       Q    And what have been your promotions?
4       A    Senior manager, and then my last promotion was
5   executive director, technology audit.
6       Q    Is that your current role?
7       A    Yes.
8       Q    And when was your most recent promotion?
9       A    I want to say 2020 or 2019.
10      Q    So you've been at NCR from 2014 to present day?
11      A    Yes.
12      Q    And I know recently NCR had a company split.
13  Did -- which -- which one did you go into?  Because I
14  think there's two different ones, right?
15      A    Yeah, there are two different ones.
16      Q    Yeah.
17      A    I went to NCR Voyix.
18      Q    And was there an option for you to pick which
19  company that you went to?  How did that play out?
20      A    I chose NCR Voyix and recommended someone who
21  reported to me to go to NCR Atleos in my role.
22      Q    Okay.  So just so I understand this correctly,
23  NCR -- when was the split?
24      A    October of last year, I believe.
25      Q    October 2023?



1      A   Yes.

2      Q   And so NCR is splitting, and then they give you

3   the choice, and they say, Mr. Andrews, which one would

4   you want to go to, and then you picked one; is that

5   right?

6      A   Well, I let my boss know that I preferred NCR

7   Voyix.

8      Q   Okay.  And then your boss honored that

9   preference?

10     A   Yes.

11     Q   And then you recommended that someone that

12  worked under you went to the other?

13     A   Yes.

14     Q   Atleos?

15     A   Yes.  And that person got promoted to my role.

16     Q   So it sounds like you built up some goodwill

17  with NCR over the years; is that right?

18     A   Yes.

19     Q   And we'll talk about this more later, but have

20  you ever gotten a bad performance review at NCR?

21     A   No.

22     Q   And what has been most of your performance

23  reviews over the years?

24     A   We have a grading scale, and when I joined the

25  company ten years ago, I was rated a four.  The next year



1    I was rated a five.  I was rated a five for the next

2    five -- up until 2021, and then I got rated down to a

3    four.  And then in '22, I got rated down to a three.

4        Q   And is this four out of five?  Or I'm sorry,

5    strike that.

6            Is this out of five?  Is that the -- is it one

7    to five?  Zero to five --

8        A   Yes.

9        Q   -- the rating scale?  Okay.

10       A   I think it's one to five.

11       Q   One to five.

12       A   And five being exceed expectations.  I believe

13   that's what it is.

14           So if I can repeat that.  My first year I was a

15   four.  The next year I was a five.  I was a five until

16   2021.  And then 2021 I was a four.  And then 2022 until

17   current, I was -- I've been rated a three, which is meets

18   expectations.

19       Q   What did they tell you was the reason for you

20   to go from a four to five from 2021 to 2022?

21       A   I didn't have that discussion with my manager.

22       Q   You didn't think to ask them why you got --

23   went from a four to five?

24       A   No, I didn't -- didn't have that discussion

25   with her.



1       Q    Why would you not ask her why you went down

2   from a four to five?

3       A    I didn't think it was something that I needed

4   to talk about.

5       Q    Do you take pride in your work at NCR?

6       A    I do.

7       Q    And do you take pride in how they -- NCR views

8   your value to the company?

9       A    Yes.

10      Q    Then why would you not ask them why you went

11  down from a four to five?

12      A    I just decided not to do it.

13      Q    So your most recent one was a three in 2023?

14      A    Yes.

15      Q    And did they give you a reason why you were a

16  three in 2023?

17      A    No.

18      Q    Did you ask?

19      A    No.

20      Q    And why did -- why didn't you ask?

21      A    Because I didn't ask.

22      Q    Are you concerned about your value to them --

23  NCR going down?

24      A    Not really, no.

25      Q    Why is that?



1        A    Because I'm -- meets expectations is -- is --

2    it's a satisfactory rating.

3        Q    Would you describe yourself as a meets

4    expectations type of guy or an exceeds expectations type

5    of guy?

6        A    Exceed expectations type of guy.

7        Q    Then why would meets expectations be

8    satisfactory to you?

9        A    Over that time period I've had three different

10   chief audit executives, and the last audit executive, you

11   know, that was her -- that's how she saw me, which, you

12   know, I accepted that, and there was no need to discuss

13   it.

14       Q    And who was that person?

15       A    Kelly Moyer.

16       Q    And what was her -- her role again or title?

17       A    Chief audit executive.

18       Q    And so it sounds like Kelly may have had some

19   type of problem with you.  Is that what you are saying?

20       A    No, but I don't know.

21       Q    Do you believe that you going down from a four

22   to three was because of Kelly and how she viewed you?

23       A    I don't have an opinion on that.

24       Q    Do you believe that Kelly being in that role

25   affected what your rating was for NCR in any way?





1        A    Possibly, but I don't know for sure.

2        Q    All right.  Let's talk about social media.  Do

3   you have social media accounts?

4        A    No, I don't.

5        Q    Have you ever had a social media account?

6        A    I've got a Facebook account that I closed

7   several years ago, and I have a LinkedIn account, if you

8   consider that social media.

9        Q    It's hard to keep up with.

10       A    Yeah.

11       Q    So when did you have a Facebook account?

12       A    Several years ago.

13       Q    And when would you say you --

14       A    I don't recall.  I don't recall.

15       Q    Did you have it before or after 2020?

16       A    Before 2020.

17       Q    And so you did not have a Facebook account

18   after 2020?

19       A    It may have been there, but it wasn't active on

20   my part.

21       Q    Did you actively delete your Facebook account?

22       A    I think I did.

23       Q    And you believe you deleted it around 2020?

24       A    I don't recall.

25       Q    Why did you delete it?



 1       A   Because I wasn't using it.  My kids, when they

 2   had went on Facebook, it was a way to monitor them, but I

 3   decided I wasn't -- wasn't gonna use it, so why have it

 4   there.

 5       Q   And when you used it, how active were you on

 6   it?

 7       A   I was not active on it.  I opened it up, and

 8   that was it.

 9       Q   Did you open it to see what friends were doing,

10   too, or was it just your kids?

11       A   I just opened it.  I didn't look to see what

12   anyone was doing.

13       Q   Do you have a X or Twitter account?

14       A   No, I do not.

15       Q   Have you ever had an X or Twitter account?

16       A   No.

17       Q   Do you have a Instagram account?

18       A   No.

19       Q   Have you ever had an Instagram account?

20       A   No.

21       Q   What about Snapchat?  I know you're a Snapchat

22   guy.

23       A   I'm not.

24       Q   I guessed right.

25           Ever had a Snapchat account?



1      A   No, I have not.

2      Q   LinkedIn, when did you create a LinkedIn

3  account?

4      A   Several years ago.

5      Q   And when would that be?

6      A   Don't recall.

7      Q   Before 2020 or after?

8      A   I would say before.

9      Q   And how active are you on LinkedIn?

10     A   Infrequent.  I'll check to see what e-mails

11  someone may have reached out to me on.

12     Q   And when you had a Facebook account, did you

13  have it under your name, Mark Andrews?

14     A   I don't recall.

15     Q   Would there be any reasons why you wouldn't

16  have it under your name, Mark Andrews?

17     A   No.

18     Q   So your testimony is today that if you had a

19  Facebook account, it would be under your name?

20     A   Yeah, I don't know why I would not have had it

21  under my name.

22     Q   Is your LinkedIn account under your name?

23     A   Yes.

24     Q   As far as extracurriculars, what do you do in

25  your free time?



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 27 of 161

MARK ANDREWS  Conf.                                October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                  27

1          A    Sleep.

2          Q    Are you a part of any organizations?

3          A    Professional organizations.

4          Q    And what are those organizations?

5          A    The Atlanta Chapter of ISACA, the IAA chapter.

6          Q    IAA?

7          A    Yeah, Institute of Internal Auditors.

8          Q    And what is the Atlanta Chapter of -- is it

9    OSACA?

10         A    ISACA.

11         Q    ISACA.

12         A    Yeah, it's Information Security Auditing

13   Account -- what is it?  Information Systems Auditors

14   Controls Association.  I believe that's what it is.  It's

15   a national chapter.  IAA is also.

16         Q    Have you ever published an article?

17         A    What do you mean?  Local?  You mean --

18         Q    Anywhere.

19         A    Anywhere.  Yeah, I remember writing a story

20   about one of my colleagues when I worked for the

21   Comptroller of the Currency.  We had a newsletter.

22         Q    And what was that article about?

23         A    My colleague.  It was titled:  He's the Nicest

24   Guy You Could Ever Know.

25         Q    Have you ever wrote an op ed?



1      A    No.

2      Q    What would you describe as your political

3  affiliation?

4      A    Democrat.

5      Q    And have you ever voted Republican?

6      A    No.

7      Q    Why not?

8      A    I just have not.

9      Q    You have no reason why you haven't ever voted

10  Republican?

11      A    Well, I usually look at the candidates and what

12  they stand for and make my decision based on that.

13      Q    And what is your thinking in reaching the

14  decision that you've only voted for a Democrat your whole

15  life?

16      A    That I believe whoever the individual who's a

17  Democrat that I voted for stands for more of my values

18  than the Republican.

19      Q    And what are the values that leads you to vote

20  for only Democrats?

21      A    Well, I believe that the Democrats, or the

22  individuals that I voted for, they have policies that

23  help the common man more so.  They are not out for the

24  rich guys.  Cutting taxes and -- and all that for -- you

25  know, and not giving to the guys who need the money, the



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 29 of 161

MARK ANDREWS  Conf.                                          October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                            29

1  middle class or the poor individuals.  And I believe, you

2  know, that the Democrats, or the individuals that I voted

3  for, they are trying to help people.

4      Q   Do you regard the defendants in this case as

5  more in line with Republicans or Democrats?

6      A   I don't have an opinion on that.  I don't know.

7          (Deposition Exhibit No. 1 was marked for

8  identification.)

9      Q   BY MR. EVANS:  So I'll hand you which is

10  Defendants' Exhibit 1.

11      A   Thank you.

12      Q   And I will represent to you that this is a

13  summary of your voting record.  And if you want to look

14  through it, feel free to look through -- through it.

15          And I'll refer you first to 2004.  In 2004, it

16  says that you voted in the presidential preference

17  primary, you pulled a Democrat ballot, and also in the

18  primary, and you pulled a Democratic ballot.

19          Do you have any reason to disagree with that?

20      A   I don't recall that, but if this document shows

21  it, and this is what you say it is.

22      Q   And, also, if you could, just to make it a

23  little quicker, instead of me going one by one, we got

24  2006, 2008, 2010, 2011, 2014, 2016, 2018, 2020, 2022, and

25  all of those show that you have always pulled a



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 30 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      30

1    Democratic ballot.

2          And do you have any reason to disagree with

3    anything represented on this today?

4        A    No.

5        Q    And you also testified in these general

6    elections, 2014, 2006, 2008, so on, so on, all the way

7    down, 2010, you have only voted for Democratic

8    candidates; is that correct?

9        A    Yes.

10        Q    And if you can flip with me to the second page.

11    This is Ms. Andrews, I'm gonna represent to you, your

12    wife.  And she has voted.  2018, pulled a Democratic

13    ballot; 2020, pulled a Democratic ballot.

14          And do you have any evidence or testimony to

15    disagree with her only voting Democrat?

16        A    Could you repeat the question?

17        Q    Yeah.  So this is your wife, the second page.

18    And this reflects her voting record.  And it says 2018,

19    she pulled a Democratic ballot; 2020, she pulled a

20    Democratic ballot.

21          And do you have any evidence or testimony to

22    disagree that this is accurate?

23        A    I do not.

24        Q    And the next page is, I will represent your

25    daughter, Brittani Andrews.  And this represents that in



```
 1   2016, she pulled a Democratic ballot.  In 2018, she
 2   pulled two Democratic ballots, in the primary and the
 3   primary runoff.  In 2020, she pulled Democratic ballots
 4   in the primary -- presidential preference primary and
 5   primary; and then in 2022, pulled a Democratic ballot.
 6           Do you have any reason to disagree with this
 7   being inaccurate?
 8       A   I do not.
 9       Q   And then the next page is your daughter,
10   Courtni Andrews.  And this indicates in 2020, she pulled
11   a Democratic ballot; 2014, Democratic ballot; 2016,
12   Democratic ballot; in 2018, Democratic ballot in the
13   primary and the runoff; 2022, presidential primary,
14   Democrat; primary, Democrat.
15           Do you have any evidence or testimony to
16   indicate that that's inaccurate?
17       A   I do not.
18       Q   And then the last page, this is Mr. Alec
19   Andrews, and this indicates 2018, he pulled a Democratic
20   ballot -- ballot in the primary and the primary runoff;
21   2020, primary -- presidential preference primary and
22   primary, Democrat; in 2022, Democrat.
23           Do you have any testimony or evidence to
24   disagree with that?
25       A   No.
```



1      Q    Would you agree with me that you and your
2   family are a pretty Democratic family?
3      A    Based on this, yes.
4      Q    Have you ever put a yard sign, a political yard
5   sign in your front yard?
6      A    I don't recall.
7      Q    You don't recall if you've ever put a yard sign
8   in your front yard?
9      A    No.
10     Q    Have you ever put a bumper sticker on your car?
11     A    I believe my wife has put a bumper sticker on
12   her car, yes.
13     Q    And what bumper sticker did she put on?
14     A    I don't recall.
15     Q    I assume it was for a Democratic candidate,
16   right?
17     A    I don't recall.
18     Q    Have you ever attended a rally or fundraiser?
19     A    No.
20     Q    Has anyone in your family ever attended a rally
21   or fundraiser?
22     A    Not that I'm aware of.
23     Q    Have you ever donated money to a political
24   campaign?
25     A    I have not, no.



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 33 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                       33

1        Q   Has your wife ever donated money to a political
2   campaign?
3        A   I don't know.
4        Q   So getting -- so a little more background.
5   Let's talk about your wife, and when did you guys meet?
6        A    In high school.
7        Q   And how did your relationship materialize?  You
8   met in high school.  I assume you dated.  You got
9   engaged.  You got married.  Tell me that -- that
10  timeline.
11       A   We met in high school.  We went off to college
12  at Florida State.  We got married.
13       Q   And when -- when was that?
14       A   When did we get married?
15       Q   Yeah.
16       A   In '83.
17       Q   And did you guys go to the same college?
18       A   Yes.
19       Q   And what college is that?
20       A   Florida State University.
21       Q   And how long have you guys been married?
22       A   I think it's -- it's either 39 or 40 plus
23  years.
24       Q   Well, congrats.  That's -- that's easier said
25  than done.  I know.  We all know.



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 34 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      34

1              And does your wife work currently?

2       A    No.

3       Q    And when did she stop working?

4       A    I don't recall.

5       Q    Was it before or after 1995?

6       A    We moved here in '98.  I think it was after

7    '95.

8       Q    Before or after 2000?

9       A    Before 2000.  I don't recall.

10      Q    And would you regard your wife as your best

11   friend?

12      A    Yes.

13      Q    And do you guys share with each other, I would

14   assume, almost everything, right?

15      A    No.

16      Q    What do you not share with your wife?

17           MR. DAVIDSON:  Objection.

18      Q    BY MR. EVANS:  You can answer.

19      A    Well, when I come home talking about work, she

20   don't want to hear it, so I don't share it.

21      Q    And are you proud of your wife?

22      A    Yes.

23      Q    Are you proud of what she stands for?

24      A    Yes.

25      Q    There's a lot of people that say, you know,



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 35 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      35

```
 1   husbands and wives are kind of inseparable, and they
 2   speak for me and I speak for them and vice versa.
 3           Would you say that's you and your wife?
 4           MR. DAVIDSON:  Objection.  Form.
 5           THE WITNESS:  No.  I wouldn't agree with that.
 6       Q   BY MR. EVANS:  And what do you disagree with
 7   about that?
 8       A   Well, my wife has her own opinions, and I have
 9   my own opinions.
10       Q   And so are there opinions your wife has you
11   disagree with?
12       A   Yes.
13       Q   And what are those opinions?
14       A   She might like the color red.  I like the color
15   blue.
16       Q   Are there any other opinions that your wife has
17   you disagree with?
18       A   I'm sure there are several, but I don't recall
19   all of them.
20       Q   Are there any opinions that your wife has that
21   come to mind today that you disagree with?
22       A   I don't recall anything.
23       Q   Is that a no?
24           MR. DAVIDSON:  Objection.
25           THE WITNESS:  Sorry, repeat the question.
```



1        Q    BY MR. EVANS:  Are there any opinions that come

2   to mind today that your wife has that you disagree with?

3        A    Are there any opinions that my wife has today

4   that I may disagree with?

5        Q    As you're testifying today, are there any

6   opinions that your wife has that you disagree with?

7        A    Sure.

8        Q    And what are those opinions?

9        A    I don't -- I don't know those offhand.

10            (Deposition Exhibit No. 2 was marked for

11   identification.)

12        Q    BY MR. EVANS:  All right.  Mr. Andrews, I will

13   hand you what we've marked as Defendants' Exhibit 2.  If

14   you could take a look at that document.

15            And what is that document?

16        A    It looks like a compensation history.

17        Q    Have you seen this document before?

18        A    No.

19        Q    And I'll represent to you that this was

20   produced by NCR in response to a subpoena.

21            I will direct you to the compensation changes.

22   And the font is small, I apologize for that.  I wish we

23   could have gotten it bigger.

24            In this -- does this -- if you look at the top

25   under Compensation Changes, does that accurately reflect



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 37 of 161

MARK ANDREWS  Conf.                                October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                  37

1  your compensation over the years?

2      A   I would say yes.  I have to reason to disagree

3  with this.

4      Q   And would you agree with me that your

5  compensation over the years has went up?

6      A   Yeah, we get merit increases.

7      Q   In each of these years from 2020 to 2023, your

8  compensation has increased, correct?

9      A   Yes.

10      Q   And that is consistent with your testimony

11  earlier that you have gotten promoted over the years,

12  right?

13      A   Well, promotion and compensation are two

14  different things.  Compensation are -- most companies

15  give a merit increase based on cost of living adjustment.

16  If you can see in the same document, you see finance

17  director, and then you see executive director position.

18  You see finance senior manager.

19          So if you go to the first one, you see finance

20  manager.  I was an IT audit manager then.  Then I got

21  promoted to a senior manager.  You see several years

22  there.  Then I was a finance director.  And then I

23  believe they just changed the position name, and I became

24  an executive director.  And you can see that position

25  stayed the same title over the years.



1         But yes, I was compensated, because there are
2    merit increases that are provided to employees.
3         Q   And you received all those merit increases,
4    right?
5         A   Yes.
6         Q   Okay.  I'll hand you Defendants' Exhibit 3.
7         (Deposition Exhibit No. 3 was marked for
8    identification.)
9         Q   BY MR. EVANS:  If you can look at that
10   document.  And have you seen that document before?
11        A   No.
12        Q   I'll represent to you that this was produced in
13   response to a subpoena sent to NCR.  And I'll direct you
14   to the comment, and it says, "Mark has met all of his IA
15   objectives for the year and has been an integral part of
16   the team in supporting his direct reports.  He has been a
17   solid contributor throughout the course of the year and
18   assisted in helping the IA function prepare for spin."
19        Do you believe that that is an accurate
20   evaluation for you?
21        A   Yes.
22        Q   Do you believe that you are an integral member
23   of the team at NCR?
24        A   Yes.
25        Q   And do you believe that you've been a solid



1  contributor throughout the course of the year?

2      A   Yes.

3      Q   Would you regard this, on Defendants' Exhibit

4  3, as a positive review for you?

5      A   It's positive.  But as I mentioned earlier,

6  there are five grades.  This is a grade three, which is

7  meets expectations.  There's a four that -- that you are

8  a superior contributor; and five, which means you exceed

9  expectations.

10          Yeah, I'm a solid performer.

11      Q   And earlier -- earlier you testified that this

12  is a satisfactory review for you, right?

13      A   Yeah, yeah.  Meets expectations means

14  satisfactory, yes.

15      Q   And your manager evaluation says you are a

16  solid team member with deep expertise.  You've done a

17  very good job of supporting your team, and they are very

18  bought in to your leadership and style.

19          Do you agree with all of that?

20      A   Yes.

21      Q   And do you regard that as a positive evaluation

22  for you?

23      A   It's positive, but again, it's not the four or

24  the five.

25          (Deposition Exhibit 4 was marked for



1  identification.)

2      Q    BY MR. EVANS:  I'll now hand you Defendants'

3  Exhibit 4, if you could take a look at that.  And have

4  you seen this document before?

5      A    No.

6      Q    I will represent to you that this document was

7  provided by NCR in response to a subpoena.  And what does

8  this indicate that your salary was in 2023?

9      A    You want me to quote the amount?

10     Q    Yes.

11     A    Yeah, it was -- if I'm reading this correctly,

**REDACTED**

13     Q    And what does "variable incentive target" mean?

14     A    There's a bonus, I believe, that's attached to

15  it, depending upon what our financial performance is.

16     Q    And were you paid that bonus?

17     A    For what year?

18     Q    2023.

19     A    I'm not sure.  I don't know if we got a bonus

20  in 2023.

**REDACTED**

23         Yeah, I got a bonus in 2023.  We didn't get a

24  bonus consistently every year.

**REDACTED**



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 41 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      41

1      A    Yes.

2      Q    And if we look at "Proposed," which is to the

3  right, what was your proposed comp?  Well, strike that.

4          What does "Proposed" mean?

5      A    I'm not a hundred percent sure, but I think

6  proposed is when you put in the percentage change, which

7  is the 2.60.  But if you look at the top line, I haven't

8  gotten a merit increase since a few -- several years,

REDACTED

10         MR. EVANS:  I'll object and strike the

11  nonresponsive portion.

12     Q    BY MR. EVANS:  What I am asking is, what does

13  "Proposed" mean?

14     A    I'm not -- I'm not a hundred percent sure.

15     Q    Does --

16     A    How you are -- what's your -- what do you --

17  what do you want me -- I propose is -- what's your

18  definition of proposed?

19     Q    Does proposed mean your proposed compensation

20  for the next calendar year?

21     A    Yes.

REDACTED

23     A    Yes.

24     Q    So according to Defendants' Exhibit 3, your

REDACTED



MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      42

```
1   right?
2       A   I don't recall that being the case.
3           MR. EVANS:  Will you read back the question.
4           (The requested portion of the record was read
5   by the court reporter.)
6           THE WITNESS:  Yes.  Based on this, yes.
7       Q   BY MR. EVANS:  And it indicated that you got a
```

REDACTED



MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      43

1   doesn't mean that that's what I got.  That's what the --

2        Q   I understand.

3        A   Current is the only thing is -- is what I could

4   say that's correct.

5        Q   And this will go a lot faster if you listen to

6   the question and just answer the question.

**REDACTED**

11       A   If I had my W-2 in front of me, I could tell

12  you, but I don't have it.

13       Q   Do you enjoy working at NCR?

14       A   Yes.

15       Q   Are you looking to leave NCR?

16       A   No.

17       Q   Why not?

18       A   Because I enjoy the people that I work with.

19       Q   So you are not looking for other job

20  opportunities, are you?

21       A   No.

22       Q   Say that again.  Sorry.

23       A   I said no.

24       Q   Do you intend to retire at NCR?

25       A   Yes.



```
 1        Q   So you haven't missed out on any job
 2   opportunities because of the lawsuit that you filed, have
 3   you?
 4        A   I haven't applied for any job opportunities
 5   because a lawsuit has been filed.
 6        Q   You just testified that you are not looking to
 7   leave NCR, right?
 8        A   No, but there -- if opportunities present
 9   themselves, I could -- I would entertain them.
10        Q   Is it your understanding that to get a job, you
11   have to apply for a job?
12        A   Yes.
13        Q   And have you applied for any job in the past
14   four years?
15        A   Yes.
16        Q   What job?
17        A   It was a job in a similar position that I have
18   now.
19        Q   And what company was it?
20        A   What's the name of the company?  I think it was
21   Cox Enterprises.
22        Q   And when did you apply to Cox Enterprises?
23        A   It was within the last four years.
24        Q   Was it within the last two years?
25        A   I don't recall.
```



1       Q    Was it within the last year?

2       A    No.

3       Q    So was it within the last three years?

4       A    I don't recall.

5       Q    Did you fill out an online written application

6    with Cox Enterprises?

7       A    I believe I did, yes.

8       Q    And was -- did you fill out this online

9    application in 2021?

10      A    I don't recall.

11      Q    In 2022?

12      A    I don't recall.

13      Q    The position was for a similar position that

14   you are currently in; is that correct?

15      A    Yes.

16      Q    And what happened with this application?

17      A    I decided not to pursue it.

18      Q    And why did you decide not to pursue it?

19      A    I don't remember.

20      Q    Did you voluntarily withdraw your application

21   with Cox Enterprises?

22      A    Yes.

23      Q    And how did you voluntarily withdraw it?  Did

24   you click -- call them, e-mail them?

25      A    No, I talked to someone at the company and



 1  asked them to -- that I was pulling my application, I

 2  believe.  And I could have sent an e-mail, too.  I don't

 3  recall.

 4      Q    Did you speak to anyone about the opportunity

 5  with Cox Enterprises?

 6      A    What do you mean "anyone"?  I mean, explain

 7  that.

 8      Q    Did you talk to anyone and say, hey, I'm

 9  applying for a job here; will you help me get an

10  interview?  Did you tell friends, hey, I'm potentially

11  pursuing this opportunity?  Did you work with a

12  recruiter?

13      A    No, there was an individual who I worked with

14  before, he was there, and I mentioned it to him.

15      Q    And who is this individual?

16      A    You want his name?

17      Q    Yes.

18      A    It's Rohan Patankar.

19      Q    And who is Rohan?

20      A    He used to work for me at NCR, and today he's

21  in that role.

22      Q    And did you tell him that you decided not to --

23  you were gonna withdraw your application?

24      A    I don't recall.

25      Q    Did you not tell him that you were gonna



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 47 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                       47

1  withdraw your application?

2       A   I -- knowing me, I would have, but I don't

3  recall.

4       Q   If I asked Rohan to tell me everything he knows

5  about you applying to Cox Enterprises, what would he say?

6       A   I don't know.

7       Q   Other than this position at Cox Enterprises,

8  have you applied to any other position in the last four

9  years?

10      A   I don't recall.

11      Q   You don't recall if you --

12      A   I don't believe I have, no.  But there have

13  been opportunities that I'd consider entertaining, but I

14  did not.

15      Q   And what are those opportunities?

16      A   Similar roles around town.

17      Q   So do you or do you not intend to retire at

18  NCR?

19      A   Currently at this moment, I do.  But things

20  change.

21      Q   So we talked to a number of people that you

22  worked with, and you indicated you worked with these

23  individuals, and we asked them about you and about "2000

24  Mules", and they testified that they had never seen the

25  movie or heard of the movie other than you telling them



1   about it.

2          Do you have any reason to dispute that?

3       A   No.

4       Q   And they also testified that they had not

5   treated you any differently because of the movie.

6          Do you have any reason to dispute that?

7       A   No.

8       Q   And they also testified that they are not aware

9   of anyone at NCR treating you any differently because of

10  the movie.

11         Do you have any reason to dispute that?

12      A   No.

13      Q   Is there anyone other than the people that

14  you've identified in your interrogatories that would say

15  that anyone at NCR has treated you any differently

16  because of the movie?

17      A   I don't know.

18      Q   How can you find out?

19      A   I wouldn't be able to find out, I don't

20  believe.

21      Q   I'm asking your personal knowledge.

22      A   I don't know what people think about me, other

23  than the ones -- individuals that I work with.

24      Q   So other than the individuals that you've

25  identified, you can't identify anyone else that would



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 49 of 161

MARK ANDREWS  Conf.                          October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                          49

1   testify that NCR treated you any differently because of

2   the movie, can you?

3       A   I don't want to speculate, so I don't know what

4   people think.

5       Q   I'm asking your personal knowledge.  I'm not

6   asking you to speculate.

7       A   No, I'm not aware.

8       Q   So I'll ask you a couple of questions about

9   your document request.  Do you recall being served with

10  document requests in this case?

11      A   Yes.

12      Q   And what did you do when you received those

13  requests?

14      A   I responded to them with my attorney.

15      Q   What do you mean "responded to them"?

16      A   I guess I don't understand your question.

17      Q   So you -- do you recall receiving document --

18  requests for documents?

19      A   Well, when you wanted access to my cell phone?

20  I mean, what do -- what do you mean when you say

21  document -- what was in the document request?

22      Q   They requested certain documents from you, and

23  you produced those documents, right?

24      A   Yes.

25      Q   And when you -- what did you do to search for



1    documents that were responsive to those requests?

2         A   I didn't -- I provided whatever documents I had

3    to a third party, I believe, who took my cell phone and

4    whatever other information they needed.

5         Q   And who was the third party?

6         A   I don't recall.

7         Q   And did you give them complete access to your

8    cell phone?

9         A   Yes.

10        Q   Did they download all your text messages?

11        A   I believe so, yes.

12        Q   Did they download all of your e-mails?

13        A   Yes, I believe so.

14        Q   Did they search your phone for the e-mails and

15   text messages?

16        A   I believe they did, yes.

17        Q   Did you do any of the searches yourself?

18        A   No.

19        Q   Do you delete text messages at any time?

20        A   Yes.

21        Q   And when do you delete text messages?

22        A   When I have spam text messages from individuals

23   that I have no idea who they are.

24        Q   Do you delete text messages on a consistent

25   basis?



MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                       51

1        A    I'd say no.

2        Q    Do you delete them every month?

3        A    When my messages gets lengthy, yeah.

4        Q    So do you delete text messages you'd say

5    approximately every month?

6        A    Yes.

7        Q    And when you delete text messages, do you

8    delete most of them in order to create more space on your

9    phone?

10       A    That's the objective.

11       Q    And when you delete the text messages, are you

12   deleting text messages with your family?

13       A    Yes and no.

14       Q    Who else do you delete text messages with?

15       A    The spam text messages that I get.

16       Q    Uh-huh.

17       A    I don't know who they are, but I delete them.

18       Q    And then your other text messages with friends

19   you delete to create more data?

20       A    Yeah.

21       Q    Did you delete any text messages that are

22   responsive to the requests that you got in this case?

23       A    No.

24       Q    How do you know?

25       A    Because I haven't deleted any text messages



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 52 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      52

 1  that's related to that.
 2      Q   But you just testified you delete them every
 3  month, so how would you distinguish?
 4      A   Are you talking about text messages related to
 5  this case?
 6      Q   I'm asking about text messages generally.
 7      A   Oh, there's taglines.  You can see who the
 8  messages are for, and you can read the messages.
 9      Q   Did you know what documents that were gonna be
10  requested from you before they were requested?
11      A   No.
12      Q   So how could you know if you deleted text
13  messages that were responsive to requests that you
14  haven't received yet?
15      A   Well, actually, I haven't deleted any text
16  messages until after the document request has been made,
17  and there -- so before that, I didn't delete any
18  messages.
19      Q   Could a document be responsive to a request
20  before you received the document request?
21      A   Could you repeat --
22          MR. DAVIDSON:  Objection.  Form.
23          THE WITNESS:  -- the question.
24          MR. EVANS:  Can you read it back.
25          (The requested portion of the record was read



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 53 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      53

```
 1   by the court reporter.)
 2           THE WITNESS:  Could a document -- I don't
 3   understand the question.
 4       Q   BY MR. EVANS:  So earlier you testified after
 5   you got the request, you didn't delete anything, correct?
 6       A   Correct.  I don't believe I deleted anything,
 7   no.
 8       Q   What if a text message is -- a text message was
 9   responsive to a request before you -- you received a
10   request?
11           MR. DAVIDSON:  Again, objection, form.
12           THE WITNESS:  I guess I don't understand the
13   question.
14       Q   BY MR. EVANS:  Okay.  Strike it.  I'll ask
15   this.
16           You did not start preserving documents until
17   after you received the document request; is that right?
18       A   I would say yes and no, because I don't -- my
19   cell phone text messages, I don't get a lot of messages,
20   and ones I get that are specific to a spam message or
21   someone from China or wherever, I delete those.  But
22   other than that -- but those are sparingly on my phone.
23           So I'm not -- I don't spend a lot of time
24   deleting messages, you know, but the ones I do delete are
25   the ones specific to what I -- I responded to.  I know
```



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 54 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      54

1  they are relevant, and they get deleted -- or they don't

2  get deleted.

3      Q   And did you delete any texts from 2022?

4      A   I don't -- I don't recall.  I don't remember.

5      Q   Do you have any confirmation you did not delete

6  anything from 2022?

7      A   No.

8      Q   So you could have deleted texts from 2022,

9  right?

10     A   Yes.

11     Q   All right.  I will hand you Defendants' Exhibit

12  5.

13         (Deposition Exhibit No. 5 was marked for

14  identification.)

15     Q   BY MR. EVANS:  And do you recognize that

16  document?

17     A   Yes.

18     Q   And what is that?

19     A   It looks like my bankruptcy, Chapter 13.

20     Q   Why did you file for bankruptcy?

21     A   I was behind on a car note two months, and they

22  were threatening to repossess it.  So I filed bankruptcy

23  to -- to prevent that.

24     Q   Did you pay off the car note?

25     A   Yes.



1     Q   And what was the result of this bankruptcy?

2     A   I fulfilled my obligations, and it was

3  discharged, I believe, in 2017 or sometime thereafter.

4     Q   Was the -- were the debts discharged?

5     A   No.  Chapter 13 is where you pay your debts.

6     Q   And have you filed for bankruptcy before?

7     A   No.

8     Q   And did you file for bankruptcy after this?

9     A   Sorry, I didn't understand your question.

10     Q   Have -- have you filed for bankruptcy since --

11     A   No.

12     Q   -- this bankruptcy in 2012?

13     A   No.

14     Q   So very quickly, I want to go how you typically

15  vote and have voted over the years, and I will refer you

16  back to our -- I think it's Defendants' Exhibit 1.

17         Do you have that?

18         And this has your voting going all the way back

19  to 2004.  And it looks like you are a pretty consistent

20  voter, right?

21     A   Yes.

22     Q   And how have you typically voted as far as the

23  manner?

24     A   In person.

25     Q   And on -- do you recall in any of these, voting



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 56 of 161

MARK ANDREWS  Conf.                              October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                              56

 1   early in person?

 2        A   It could have been the day of or it could have

 3   been early in person.

 4        Q   And other than in 2020, have you voted

 5   absentee?

 6        A   Infrequently, but I had.

 7        Q   And in 2022, the primary runoff, I'm gonna

 8   represent to you was May 24th, 2022.  And you voted in

 9   that primary, right?

10        A   Yes.

11        Q   And the general election was in November of

12   2022, and you voted in that general election, right?

13        A   Primary 2022, I don't recall.  But I know 2022,

14   the November one, I did -- did vote.

15        Q   Yeah, I'll represent to you the voting record

16   says you voted then.

17        A   Okay.

18        Q   And I'll represent to you that the premier of

19   "2000 Mules" was on May 20th, 2022, and you would agree

20   with me that May 20th is before May 24th, 2022 and

21   November 2022, right?

22        A   Say that again, please.

23        Q   Would you agree with me that May 20th, 2022 is

24   before May 24th, 2022 and November 2022?

25        A   Yes.



1      Q    So the premier of "2000 Mules" in May of 2022

2  did not affect or stop you from voting in the 2022

3  primary or general election, did it?

4      A    No.

5      Q    Did anyone ever tell you not to vote?

6      A    No.

7      Q    Then why did you not vote in 2023 or 2024?

8      A    I don't recall the reason why.

9      Q    Did you vote in 2023 or 2024?

10     A    I did not vote in 2024.

11     Q    And why not?

12     A    I think that we -- we missed the timing for

13  getting the ballots, the mail-in ballots to be sent to

14  our home, and I was not gonna vote in person.

15     Q    And so you -- you would have voted but for

16  missing the timeline to get the mail-in ballots, right?

17     A    Yes.

18     Q    Do you plan to vote in the 2024 general

19  election?

20     A    Yes, I have already voted.

21     Q    In your interrogatory responses, you indicated

22  that the first time you discovered "2000 Mules" was from

23  a text from a lady named Amy Gardner on May 16th, 2022;

24  is that right?

25     A    Yes.



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 58 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                       58

1      Q   Well, let's do this.  We are about to do --
2  let's do -- are you good for a quick break?
3      A   Yeah.
4      Q   I think it's a good time for a break, and that
5  way we can get all these documents lined up.  So let's do
6  a ten-minute break.
7          THE VIDEOGRAPHER:  Going off the record at
8  11:12.
9          (The deposition was at recess from 11:12 a.m.
10  to 11:31 a.m.)
11          THE VIDEOGRAPHER:  We're back on the record at
12  11:31.
13      Q   BY MR. EVANS:  Mr. Andrews, we're getting back
14  from our first break, and so we'll jump -- jump into it.
15          So would you regard yourself as one of those
16  kind of like loud, let everybody know how you feel type
17  of guys, or are you a little more private guy?  How would
18  you say that you are?
19      A   Depends on the setting, but I'm private.
20      Q   Would you -- so you would say you're more
21  private than you are loud?
22      A   Yes.
23      Q   And do you like to keep your life relatively
24  private?
25      A   Yes.



 1       Q   And what have you done to keep your life
 2   relatively private?
 3       A   As you mentioned earlier, I told you earlier, I
 4   don't have a social media presence.  I don't go out a lot
 5   or -- I'm just a private person.
 6       Q   Uh-huh.  And tell me how you are a private
 7   person.
 8       A   Well, I know one of my former colleagues
 9   mentioned to me that someone said I -- I moved away to
10   Jacksonville, and I laughed and because I was still in
11   Atlanta, you know.  So that's how private I am.
12       Q   Uh-huh.  Do you like to be in the news?
13       A   No.
14       Q   Do you ever get on social media?
15       A   No.
16       Q   Where do you get your news from?
17       A   The television.
18       Q   And what channels do you watch to get your
19   news?
20       A   CNN, MSNBC, and I used to watch Fox.
21       Q   Uh-huh.  Why don't you watch Fox?
22       A   I just don't watch it anymore.
23       Q   And why is that?
24       A   I just don't watch Fox anymore.
25       Q   Is there a reason why you don't watch Fox



1   anymore?

2       A   It was several years ago when I stopped

3   watching it, you know, when Bill O'Reilly was on the

4   show, you know.  But I just don't watch Fox anymore.

5       Q   When did you stop watching Fox?

6       A   When did Bill O'Reilly leave the show, leave

7   Fox?  I think that was several years ago.

8       Q   What was it about him that made you -- or

9   allured you to watch Fox?

10      A   Well, it was a news channel.  I watched CNN,

11  Fox, MSNBC, you know, whatever was available.

12      Q   Do you watch MSNBC or CNN more, would you say?

13      A   I would say probably MSNBC.

14      Q   And what would you regard MSNBC on just the

15  political spectrum of left or right?

16      A   Don't know.

17      Q   Would you disagree with the people that say

18  MSNBC is far left?

19      A   It depends on what the definition of far left

20  is.

21      Q   What news channel would you regard is more left

22  than MSNBC?

23      A   I don't have an opinion on that.

24      Q   Do you think that the filing of this lawsuit

25  has given you less privacy than you would have had if you



 1  hadn't filed the lawsuit?

 2       A   Could you repeat the question?

 3       Q   Do you think that filing this lawsuit has given

 4  you less privacy?

 5       A   No.

 6       Q   And why do you think that?

 7       A   Because when I was notified that I was accused

 8  of voter fraud, and when I signed that affidavit, my

 9  private life was -- was gone.  They had a public hearing.

10  I didn't attend it, and my name was associated with.

11       Q   So I'm going to hand you Defendants' Exhibit 6.

12           (Deposition Exhibit No. 6 was marked for

13  identification.)

14       Q   BY MR. EVANS:  And I'm gonna represent to you

15  that this is a random Google search of you.  You also

16  have the same name as --

17           MR. EVANS:  Go ahead.

18           MR. DAVIDSON:  Can we -- can we have a copy of

19  that?

20           MR. EVANS:  Yeah, yeah.

21           Phil, can you?

22           MR. GEORGE:  All right.

23       Q   BY MR. EVANS:  You also have the same name as

24  an NFL tight end --

25       A   Yeah.



1       Q    -- which is kind of cool.  But we -- we Googled

2   Mark Andrews, Georgia, random Google, and what is the

3   first entry that pops up when we Google your name, if you

4   could read that?

5       A    You mean I'll read the top of the line there

6   (indicating)?

7       Q    Yeah.  Read the topic.

8       A    "Georgia man sues over false ballot fraud claim

9   in film."

10       Q    Is that heading related to your lawsuit?  It's

11   a yes or no question.

12            MR. DAVIDSON:  Objection.  Form.

13            MR. EVANS:  Yeah, no -- no speaking objections.

14       Q    BY MR. EVANS:  It's a yes or no question.

15   Is -- is topic 1 related to your lawsuit?

16       A    If I'm the Georgia man it's talking about, yes.

17       Q    And what is the second entry?

18       A    The second heading, you want me to read?

19       Q    Yes.

20       A    "Andrews versus D'Souza Civil Action

21   1:22-cv-04259-SDG."

22       Q    And is that related to your lawsuit?

23       A    Yes.

24       Q    And the third one, what does that say?

25       A    "Publisher of '2000 Mules' Apologizes to



Case 1:22-cv-04259-SDG  Document 255  Filed 12/20/24  Page 63 of 161

MARK ANDREWS  Conf.                                October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                  63

1   Georgia Man."

2        Q   Is that one related to your lawsuit?

3        A   Yes.

4        Q   And the fourth one, if you could read that

5   topic.

6        A   "Georgia Voter Mark Andrews Sues Dinesh D'Souza

7   Over..."

8        Q   Is that one related to your lawsuit?

9        A   Yes.

10        Q   And the fifth one, what's that topic?

11        A   "Publisher of '2000 Mules' apologizes to

12   Georgia Man..."

13        Q   Is that one related to your lawsuit?

14        A   Yes.

15        Q   And the next one, if you could read that topic.

16        A   "Mark Andrews versus Dinesh D'Souza, et al."

17        Q   Is that one related to your lawsuit?

18        A   Yes.

19        Q   And then the next one, if you could read that

20   topic.

21        A   "Defamation lawsuit against '2000 Mules'

22   considered in..."

23        Q   Is that one related to your lawsuit?

24        A   I don't know for sure, but I -- I don't know.

25        Q   Do you know if anyone else filed a defamation



1    lawsuit against "2000 Mules"?

2         A    I do not.

3         Q    Do you have any reason to say that that one is

4    not also related to your lawsuit?

5         A    Atlanta area man -- well, yes, I'd say that it

6    does.

7         Q    So the first one, two, three, four, five,

8    six -- seven are all topics, when you Google your name,

9    are all related to your lawsuit; is that correct?

10        A    Yes.

11        Q    And is it still your testimony that your

12   lawsuit did not reduce your privacy?

13        A    I guess it depends on what your definition of

14   reduced privacy is.  When my name became public after the

15   Georgia Board of Elections identified me as the

16   individual, my private life was over.

17             When I was put into a movie where they showed

18   me, defaming me, showing this movie all over the world,

19   churches, all over, my privacy was -- was gone.

20        Q    Will you please tell me the name of any other

21   person whose video of a drop box was shown in "2000

22   Mules"?

23        A    Could you repeat the question?

24             MR. EVANS:  Will you read that back.

25             (The requested portion of the record was read



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 65 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      65

 1   by the court reporter.)


 3             Will you please tell me the name of anyone else

 4   who was shown putting ballots in a drop box in the "2000

 5   Mules" movie?

 6        A    I don't know of anyone's name.

 7        Q    So is it still your testimony that your blurred

 8   video being shown in "2000 Mules" is the reason why

 9   people know your name or the fact that you filed this

10   lawsuit?

11        A    My name, again, was known at the Georgia Bureau

12   of Investigation, election investigation.  I filed an

13   affidavit.  I signed it.  That's how Amy Gardner reached

14   out to me via my text phone.  So my name was already out

15   there after that hearing because it's public

16   information.

17        Q    So I'll now hand you -- I think this is 7.

18             (Deposition Exhibit No. 7 was marked for

19   identification.)

20        Q    BY MR. EVANS:  If you could please take a look

21   at that.

22        A    I read it.

23        Q    And what is that document?

24        A    It looks like an instant message.

25        Q    And who is it from?



1      A    Ryan Germany, Georgia state attorney.

2      Q    And who is Ryan Germany?

3      A    Georgia state attorney.

4      Q    Did -- how did Ryan Germany get your number?

5      A    I have no idea.

6      Q    And in this message he says, "We will not

7   identify you by name at the meeting."

8           Do you see that?

9      A    Yes.

10      Q    Do you have any evidence to say that your name

11   was identified at the meeting?

12      A    No, but it also says that, after this is

13   dismissed, your name will become public.

14      Q    I -- if you -- I don't think that's accurate.

15           I believe it says, "Open records laws will

16   allow the media to go get the investigative file after

17   the case is dismissed."  Is that --

18      A    And --

19      Q    -- right?

20      A    -- so then your name will be public.

21      Q    And did Ryan Germany call you at or around the

22   time that you received this text message?

23      A    I don't -- I don't recall.  I don't remember.

24      Q    Have you ever spoken to Ryan Germany on the

25   phone?



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 67 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      67

1       A   I don't recall.

2       Q   You don't recall if you've ever spoken to Ryan

3    Germany on the phone?

4       A   No, it's two years ago.  It was 2022 when this

5    happened.

6       Q   Have you ever spoken at any point in time with

7    Ryan Germany?

8           MR. DAVIDSON:  Objection.  Asked and answered.

9       Q   BY MR. EVANS:  You can answer.

10      A   I don't recall.

11      Q   Is there anything that would refresh your

12   recollection to help you recall if you've ever spoken to

13   Ryan Germany on the phone?

14      A   I don't recall.

15      Q   I'll object nonresponsive, and I'll ask the

16   question again.

17          Is there --

18          MR. DAVIDSON:  Objection.  Asked and answered.

19          MR. EVANS:  Is there --

20          I haven't asked the question yet.  You've got

21   to let me ask the question.  And I'm also asking if

22   there's anything that would refresh his recollection, and

23   he said I don't recall.

24      Q   BY MR. EVANS:  It's a yes or no question, and

25   you have to answer the question; otherwise, it's



1  nonresponsive.

2       Is there anything that would refresh your

3  recollection to allow you to recall if you've ever spoken

4  to Ryan Germany on the phone?

5       MR. DAVIDSON:  Objection.  Asked and answered.

6       THE WITNESS:  You're waiting on me to answer?

7       I told you I don't recall.

8    Q   BY MR. EVANS:  Other -- what -- have you texted

9  Ryan Germany in addition to these texts right here?

10   A   I didn't -- I have never texted Ryan Germany.

11 This is a text from him to me, I believe.

12   Q   So at the bottom, it says, "Mark," and then it

13 says, "Thanks."  Is that a text from you?

14   A   I don't -- I don't understand.  I mean, I --

15 what are you -- what are you -- where do you see that?

16   Q   At the bottom -- strike that.

**REDACTED**

21   A   Yes.

22   Q   Where is it?

23   A   It's in the bottom down here (indicating).

24   Q   And below that number, does it say, "Thanks"?

25   A   Yeah, it says "Thanks."



1       Q   Is that text from you?

2       A   If that's my number, and it is, yes.

3       Q   So your testimony earlier that you've never

4  texted Ryan Germany is false; is that correct?

5       A   No, he texted me.  I responded, "Thanks."

6           I don't know what your definition of "text" is.

7       Q   A text -- what do you regard as a text?

8       A   A communication with someone, and...

9       Q   So you have texted Ryan Germany, right?

10      A   I -- he -- he sent me a text informing me,

11 and -- and at the end of it, I said "Thanks," and that

12 was it.  If you...

13      Q   Did you receive -- strike that.

14          What did you do after you received this text?

15      A   I believe I called my sister, who is an

16 attorney.

17      Q   Uh-huh.  And what was that conversation?  What

18 took place in that conversation?

19      A   I don't remember.

20          MR. DAVIDSON:  Objection.

21      Q   BY MR. EVANS:  Is -- is your sister your

22 attorney?

23      A   No.

24      Q   What took place in that conversation?

25          MR. DAVIDSON:  Objection.  I'm -- I'm just



 1  gonna object and instruct him not to answer as

 2  privileged.

 3      Q   BY MR. EVANS:  Is -- is your sister your

 4  attorney?

 5      A   No.

 6          MR. EVANS:  I -- have you moved for a

 7  protective order on this?  Because it's not his attorney.

 8  There's no attorney-client privilege.

 9          MR. DAVIDSON:  I don't know why we have to move

10  for a protective order.

11          MR. EVANS:  You can only instruct the witness

12  not to answer for privileged material.  This isn't

13  privileged.  There's no protective order precluding him

14  from answering.  He has to answer the question.

15          MR. DAVIDSON:  I'm gonna instruct him not to

16  answer as privileged.  You've not laid the proper

17  foundation in order to push back on the notion that this

18  is not privileged, so I'm gonna instruct my client not to

19  answer the question.

20          You're free to ask about general information,

21  how many times he talked to his sister.

22          MR. EVANS:  You -- you don't have to lay a

23  foundation.

24          MR. DAVIDSON:  We might have --

25          MR. EVANS:  You -- it is -- the question -- we



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 71 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      71

 1  can talk about this offline, but if she's not his

 2  attorney, there's no privilege.  Just talking to someone

 3  who happens to be an attorney doesn't create privilege.

 4          MR. DAVIDSON:  I'm just gonna -- we might have

 5  different views on when things are privileged.  Somebody

 6  doesn't have to enter into a retainer relationship in

 7  order for somebody to be -- and in order for there to be

 8  a privileged communication.  If somebody is seeking any

 9  kind of legal advice absent a formal attorney-client

10  relationship, then that can be privileged.

11          I'm gonna instruct him not to answer the

12  question about the substance of the communication.  You

13  are free to ask him how many times he talked to her, what

14  her name is, things like that, but we're gonna rest on

15  the objection and instruct him not to answer anything

16  about the substance of the communication with his sister,

17  who is an attorney.

18     Q   BY MR. EVANS:  When you were speaking to your

19  sister, who is an attorney, were you seeking the

20  rendition of legal services?

21     A   Yes.

22     Q   And what's your sister's name?

23     A   Sharletta Robertson -- Sharletta Roberts.

24     Q   And what type of law does she practice?

25     A   I don't -- I don't -- I don't know.



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 72 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      72

1      Q    Why did you not retain her to represent you in
2  relation to this case?
3           MR. DAVIDSON:  Objection.
4      Q    BY MR. EVANS:  You can answer.
5      A    She lives in Florida.
6      Q    Have you ever spoken -- strike that.
7           Who all have you spoken to at the Secretary of
8  State's Office?
9      A    The only contact I've had is Ryan Germany.
10     Q    You have never spoken with anyone else at the
11 Secretary of State's Office other than Ryan Germany?
12     A    And an investigator.  I don't know if he was in
13 the Secretary of State's Office, but no, I have not.
14     Q    And did you call Von DuBose?
15     A    Yes.
16     Q    And when did you call him?
17     A    I don't recall.
18     Q    Did you call him soon after receiving this text
19 from Ryan Germany?
20     A    I don't recall.
21     Q    Did you watch the public hearing that was the
22 next day at 8:30?
23     A    No.
24     Q    Why didn't you watch it?
25     A    I was in Orlando, Florida.



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 73 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      73

1      Q    Did you read the transcript of -- about the
2   hearing that was the next day?
3      A    No.
4      Q    Do you know if your name was mentioned at the
5   hearing?
6      A    No.
7      Q    Do you have any reason to believe or evidence
8   that your name was mentioned at the hearing?
9      A    No.
10          (Court reporter clarification.)
11      Q   BY MR. EVANS:  All right.  I'll next hand you,
12   I believe it's 8.
13          (Deposition Exhibit No. 8 was marked for
14   identification.)
15      Q   BY MR. EVANS:  If you could take a look at
16   that.  What is that document, Defendants' Exhibit 8?
17      A    It looks like a text message that I received.
18      Q    And who is it from?
19      A    It says Amy Gardner with The Washington Post.
20      Q    Okay.  I also will now hand you Defendants'
21   Exhibit 9.
22          (Deposition Exhibit No. 9 was marked for
23   identification.)
24      Q   BY MR. EVANS:  And we'll refer -- these are
25   your interrogatories, and if you could look through



```
 1   those.  And do you recall receiving the interrogatories?
 2        A   Yes.
 3        Q   And did you work with your counsel in getting
 4   information responsive to these interrogatories?
 5        A   Yes.
 6        Q   And do you recall verifying or swearing under
 7   oath the truth of these interrogatory responses?
 8        A   Yes.
 9        Q   And I'll refer you to Interrogatory No. 3.  And
10   that says, "Describe how You became aware of the blurred
11   image."
12            And I will refer you to page 5.  And then you
13   say:  Plaintiff received a text message from a reporter
14   at The Washington Post named Amy Gardner.  They were
15   seeking comment.
16            And so Defendants' Exhibit 8, this text message
17   is the first -- strike that.
18            This text message, Defendants' Exhibit 8, is
19   how you became aware about the movie "2000 Mules"; is
20   that right?
21        A   Yes.
22        Q   Where did Amy Gardner get your phone number?
23        A   I have no idea.
24        Q   Did you talk to Amy Gardner at any time?
25        A   No.
```



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 75 of 161

MARK ANDREWS  Conf.                                      October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                        75

```
 1        Q   Have you ever spoken to Amy Gardner?

 2        A   No.

 3        Q   Did you attempt to find out how Amy Gardner got

 4   your phone number?

 5        A   No.

 6        Q   Why not?

 7        A   I just didn't.

 8        Q   And when was this text message from Amy Gardner

 9   received?

10        A   It says on this document 5/16/2022.

11        Q   And is that when you received the text message

12   from her?

13        A   If that's what it says here.

14        Q   So prior to May 16th, 2022, you had never heard

15   of the movie "2000 Mules"?

16        A   Correct.

17        Q   Prior to May 16th, 2022, you had never seen any

18   interviews about the movie "2000 Mules", have you?

19        A   I don't recall, no.

20        Q   Prior to May 16th, 2022, you had never --

21   strike that.

22            Prior to May 16th, 2022, you were unaware of

23   any image of you being used in relation to "2000 Mules",

24   were you?

25        A   I'm just thinking.  I know when I got this text
```



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 76 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                       76

1  message, my wife and I, we Googled "2000 Mules", and then

2  we saw the trailer, and then we saw my image in it.  And

3  my wife was mortified, and I was horrified because of the

4  fact that what the trailer said that I did.

5          So prior to me getting this text, I had no idea

6  what "2000 Mules" was.

7     Q   And just so I make sure that the question is

8  answered.  Prior to -- prior to May 16th, 2022, you had

9  no knowledge of any image --

10    A   I don't recall --

11    Q   -- being used --

12    A   -- any knowledge.

13    Q   You've got -- remember, we are playing catch.

14 You've got to let -- before you can throw it back, you've

15 got to have the ball.  Let me finish.  I'm trying to do

16 the same for you.  It's hard.

17         Prior to May 16th, 2022, you had no knowledge

18 of any image being used that showed you in relation to

19 "2000 Mules", did you?

20    A   Yeah, I -- I don't recall, because I know when

21 this all came about, we went to the Internet, and then

22 that's when we saw the image.  We saw, you know, the

23 trailer and et cetera.  So it could have been thereabout

24 this time.

25         And then when she had got my number and text



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 77 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      77

 1  me, you know, that was alarming to me.  And when Ryan

 2  Germany texts me and tells me there's an Election Board

 3  hearing that's gonna clear my name, and, I mean, it's

 4  gonna be public information afterwards or -- or public

 5  records, you know, that was alarming to me.

 6          I do know I was in -- on vacation in Orlando,

 7  and it was May of 2022.

 8      Q   And did you receive this text from Amy Gardner

 9  before you received a text from Ryan Germany?

10      A   Yes.  If you look at the document, this is

11  5/17.  This is -- the Amy is 5/16.  I believe 16 is

12  before 17.

13      Q   If you look at the early -- where it says

14  earliest item, what's the date on Defendants' Exhibit 7,

15  the date and time?

16      A   It says 5/16, and Amy's says 5/16.

17      Q   And at the top, right above where it says Ryan

18  Germany, does it say Monday, May 16th, 2022?

19      A   I'm not reading a Monday.  I don't know where

20  you are reading it from.

21      Q   It's a gray -- do you see the gray thing here

22  (indicating)?

23      A   Okay.  Yeah, it says May 16th.  Amy's says

24  May 16th, too, Monday.

25      Q   So in the text, Ryan says, "I'm concerned there



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 78 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      78

 1  may be media attention related to this case."
 2          And I'm -- someone from the media texted you
 3  four hours before.  Do you think Ryan Germany gave Amy
 4  Gardner your phone number?
 5      A   I have no idea.
 6      Q   Did you find it concerning that someone from
 7  the media reached out to you before someone from the
 8  Secretary of State's Office reached out to you saying
 9  there may be media attention related to this case?
10      A   I find it alarming that I got the text message,
11  but I don't -- I don't know how she got my message -- got
12  my number.
13      Q   Why do you think Ryan Germany felt the need to
14  text you?
15      A   He was concerned for my family and my safety.
16  He lives in Georgia.  Have you heard of Ruby Freeman and
17  Shaye Moss?
18          You know, I'm pictured in a movie, that all
19  these horrible things about me.  People don't know me.
20  And he was concerned for me and my family's safety.  I
21  appreciate him calling me -- or texting me to tell me
22  that.  I was glad we were in Orlando, and then I get this
23  text message from Amy Gardner.  How did she get my cell
24  number?
25          And then I go look at a movie, and I see



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 79 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                       79

1   horrible things being said about me, and I'm prominent in

2   the movie, in the -- I mean, excuse me, the trailer.

3   I've never looked at the movie.  And so how -- how should

4   I feel?

5          I'm a -- accused of being a criminal.  Horrible

6   things are said about me and my family in a movie -- in a

7   movie depicting me, and all I did was just walk to the

8   ballot box in front of the Georgia tag -- I mean Georgia

9   registration, voters' registration office, with a camera

10  right outside, and dropped in my family's five ballots.

11  And then I -- I'm the star of a movie, saying that I -- I

12  committed all these horrible things.

13         I'm glad Ryan Germany reached out to me, and we

14  were glad we were in Orlando, and we were trying to

15  decide, you know, if we should even go back to our home.

16         MR. EVANS:  I'll move to strike the

17  nonresponsive portion.

18         MR. DAVIDSON:  Objection.

19         MR. EVANS:  What's your objection?  You're

20  objecting to my objection?

21         MR. DAVIDSON:  I have an objection because

22  there's no such thing as moving to strike.  That just

23  might be an experience level thing, but please go on.

24    Q   BY MR. EVANS:  Why do you think Ryan Germany

25  felt the need to give you an attorney name?



Case 1:22-cv-04259-SDG     Document 255     Filed 12/20/24     Page 80 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      80

 1        A   He's a good guy.

 2        Q   How do you know he's a good guy?

 3        A   Because he offered up an attorney.  He didn't

 4   have to do that.

 5        Q   So earlier you testified that you appreciated

 6   Ryan Germany calling you.  Did Ryan Germany call you?

 7        A   No, I said call, and I excused -- striked

 8   myself and I said text me.

 9        Q   So he -- Ryan Germany says an attorney who

10   recently handled some similar cases.  What type of

11   similar cases are those?

12        A   I don't know.  He didn't put that in the -- the

13   text here.

14        Q   To -- to your understanding, what type of

15   similar cases are those?

16        A   You want me to tell you at the time when this

17   was done or after?

18        Q   After.

19        A   Mr. DuBose has handled some voter fraud related

20   cases.

21        Q   And what were the allegations in those cases?

22        A   Defamation.

23        Q   Why did Ryan Germany not send you an election

24   defense attorney?

25        A   I don't know.



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 81 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                       81

1      Q    Why did Ryan Germany feel the need to send you

2   a defamation, attorney based upon your understanding?

3           MR. DAVIDSON:  Objection.

4           MR. EVANS:  What's the objection?

5           MR. DAVIDSON:  Are we doing speaking

6   objections?

7           MR. EVANS:  No, you --

8           MR. DAVIDSON:  You are calling for speculation.

9      Q    BY MR. EVANS:  Okay.  You can answer.

10     A    I don't know.

11     Q    So I'd like to talk about your legal team.  Who

12  are your attorneys representing you in this case?  I -- I

13  want memory.  I don't want you to refer to a document.

14  Who are your --

15     A    Oh.

16     Q    -- attorneys?

17     A    Mr. Von DuBose, Jared Davidson.  There's

18  Catherine.  There is Leah.  There was Sarah once upon a

19  time, and there are others.

20     Q    So you have 17 counsel of record in this case.

21  Can you name those counsel?

22     A    No.

23     Q    How did you pick your counsel?

24     A    I made a few attorney calls and they were not

25  responsive, and then I called Mr. DuBose, and he was



 1  responsive.

 2      Q   And how shortly after May 16th did you retain

 3  Mr. DuBose?

 4      A   I don't recall.

 5      Q   And how did you retain the rest of your legal

 6  team?  How did that come about?

 7      A   I don't understand the question.

 8      Q   How were you introduced to the rest of your

 9  legal team?

10          MR. DAVIDSON:  Objection.  It calls for

11  privileged information.

12          So I'll just, out of an abundance of caution,

13  if you'll indulge me, Mark, please don't divulge any of

14  the substance of any conversations between counsel and

15  you --

16          THE WITNESS:  Okay.

17          MR. DAVIDSON:  -- in answering Mr. Evans'

18  questions.

19      Q   BY MR. EVANS:  Don't tell me what your

20  attorneys told you.  I'm not asking that.  I'm asking you

21  how you picked your legal team?

22      A   I met with Mr. DuBose, and we chatted.  I went

23  to his office; we chatted again.  And then at the time,

24  he mentioned the team.  And I --

25          MR. DAVIDSON:  Objection.



1          So again, Mark, just please make sure you're

2     not divulging any -- the substance of the communications

3     you've had with counsel.

4          THE WITNESS:  Okay.

5          MR. DAVIDSON:  If that makes sense.

6          THE WITNESS:  Yeah, okay.

7     Q    BY MR. EVANS:  And what is it about that -- Von

8     DuBose that made you hire him?

9     A    He took my case.

10    Q    What about Jared Davidson?

11    A    He was a part of the team.

12    Q    What about Sonia Qin?

13    A    The same.

14    Q    What about Allison Brown?

15    A    The same.

16    Q    Allison Brown doesn't represent you.  I just

17    picked her name from the blue.

18         Do you know the attorneys representing you in

19    this case?

20         MR. DAVIDSON:  Objection.  Asked and answered.

21         THE WITNESS:  I don't recall all my attorneys.

22    They're attorneys.  I met them in person.  And I'm not

23    good with names, but...

24    Q    BY MR. EVANS:  What about the Skadden law firm,

25    what made you pick the Skadden law firm?



```
 1        A    Again, they took my case.

 2        Q    And what do you mean by they took your case?

 3        A    They were willing to assist on the case.

 4        Q    Were there no other lawyers willing to assist

 5   other than the 17 that you have?

 6        A    I don't know.

 7        Q    And how much are you paying hourly for your

 8   lawyers?

 9             MR. DAVIDSON:  Objection.

10        Q    BY MR. EVANS:  You can answer.

11        A    I don't know.

12        Q    You don't know how much you are paying hourly?

13        A    No.

14             (Court reporter clarification.)

15             THE WITNESS:  I don't -- do not know.

16        Q    BY MR. EVANS:  Are you paying anything hourly

17   for your attorneys?

18        A    I'm sure they are charging me something, but

19   I -- I'm not aware of what the hourly rate is.

20        Q    Are you -- is money leaving your bank account

21   to your attorneys?

22        A    No.

23        Q    So how can they be charging you something if

24   money is not leaving your bank account to your attorneys?

25        A    You asked me was there a fee being charged.  I
```



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 85 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      85

1   told you I did not know what the fee was, if there was

2   one.

3        Q   Don't tell me the substance of your

4   communications, but how active are you in your case

5   strategy?

6        A   What's your definition of that?  What do you

7   mean by that?

8        Q   What's your definition of active?

9        A   Do I participate?  Do I read the documents?  Do

10  they ask me questions?  Yes.

11       Q   And how many calls a week do you have on your

12  case?

13       A   Maybe one or two.

14       Q   Who all has been deposed in your case?

15       A   I don't understand the question.

16       Q   Do you know what a deposition is?

17       A   Yeah, I do.

18       Q   And so who all has been deposed in this case?

19       A   You mean both sides?

20       Q   Uh-huh.  Yes.

21       A   I know NCR Voyix has been.  Some of the

22  individuals there have been deposed.  I believe D'Souza

23  and his wife were deposed last week.  And I believe

24  Catherine and the other gentleman, David, if I said his

25  name correctly, were already deposed.



1        Q    Have you ever met or talked to Catherine

2    Engelbrecht?

3        A    Never.

4        Q    Have you ever met or talked to Dinesh D'Souza?

5        A    No.

6        Q    Have you ever met or talked to Gregg Phillips?

7        A    No.

8        Q    Have you ever met or talked to a representative

9    at True the Vote, Inc.?

10        A    No.

11        Q    Have you ever met or talked to a representative

12    of D'Souza Media?

13        A    No.

14        Q    And I'll talk to the -- talk about those

15    collectively as defendants.  Have you ever done anything

16    to them to make them have malice towards you?

17        A    Have I ever done anything to them to make them

18    have malice towards me?

19        Q    Yes.

20        A    I don't know them.

21        Q    Is there any reason why they would have any ill

22    feelings towards you?

23             MR. DAVIDSON:  Objection.

24             THE WITNESS:  I don't know.

25        Q    BY MR. EVANS:  Would you agree with me that



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 87 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                       87

1   given you've never talked to them or met them, you

2   haven't given them a reason to have ill feelings toward

3   you, have you?

4          MR. DAVIDSON:  Objection.

5          THE WITNESS:  All I know is they put me in a

6   movie and said awful things about me.  And they must have

7   thought not so highly of me, the fact that they put me in

8   the movie and put my family in harm's way.  So as far as

9   me doing something to them, no.  But they've done

10  something to me and my family.  They put us in harm's way

11  by putting me in a movie and a book and spilling lies out

12  all over the world about me.

13     Q   BY MR. EVANS:  Why do you think you're the only

14  person that was shown in the movie "2000 Mules" that sued

15  the defendants?

16         MR. DAVIDSON:  Objection.

17         THE WITNESS:  Why I believe that I was -- no

18  one else has sued?  I don't know.  I know why I sued,

19  because I was prominently put on television shows,

20  radios, talk show host, a billboard at Times Square,

21  predominantly in the trailer, and the book, and in the

22  movie.  So for some reason I was the star child, or I

23  guess as they say, super mule.  I was over the cartel.  I

24  was the leader.

25             Those are some foul things to say about someone



 1  and their family, and all I did was just drop my ballots

 2  in the box of my family.

 3      Q   BY MR. EVANS:  So the lawsuit that we're here

 4  today for is your lawsuit, right?

 5      A   Yes.

 6          (Deposition Exhibit No. 10 was marked for

 7  identification.)

 8      Q   BY MR. EVANS:  I will hand you Defendants'

 9  Exhibit 10.  And in this it says, "Protect Democracy and

10  partners are suing the makers of the '2000 Mules' film."

11          Is this lawsuit Protect Democracy and partners'

12  lawsuit?

13      A   I would say no, because the document I'm

14  looking at, it says, Mark Andrews, plaintiff, versus

15  D'Souza, TTV, and other individuals.

16      Q   Then why would your attorney Sara refer to it

17  as Protect Democracy and partners' lawsuit?

18      A   I have no idea.

19      Q   Why do you think that all your attorneys have

20  agreed to do this lawsuit and not charge you anything?

21      A   I don't know.

22      Q   Do you think that there's a reason why they

23  have agreed to do it and not charge you anything?

24          MR. DAVIDSON:  Objection.  Asked and answered.

25      Q   BY MR. EVANS:  You can answer.



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 89 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                       89

1        A    I don't know.  I don't know.

2        Q    Do you think that this lawsuit is politically

3   motivated?

4        A    No, because it impacts my life.  After this

5   lawsuit is over with, I still gotta live with this.  I

6   gotta look over my shoulder everywhere I go.  I gotta be

7   aware of my surroundings.

8             It's about me and someone lying on me, defaming

9   me, putting my picture all over the world, saying

10  horrible things about me.  That's what this lawsuit is

11  about to me, and I wouldn't want that to happen to anyone

12  else in these United States of America.  And it makes me

13  wonder why someone would do that to someone, lie on them,

14  get a notice from their attorney to say that it's untrue.

15  The Georgia Election Board says that it's untrue, and

16  still keep my image in the movie and the book and spread

17  lies all over the world.

18             As a matter of fact, I believe D'Souza was in

19  Australia this past summer talking about the movie,

20  still spreading lies.  I mean, that's just unbelievable

21  to me that someone would know that they're lying on

22  someone and continue to do that, and to put their family

23  in harm's way just to make a buck.  It's unreal.

24             So this lawsuit is about me suing these

25  individuals so it won't happen to anyone else and they



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 90 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      90

1    can be held accountable, however that turns out.  And I

2    hope this doesn't happen to anyone else.

3        Q   What claims did you bring in this lawsuit

4    against the defendants?

5        A   Pardon me?

6        Q   What claims did you bring in this lawsuit

7    against the defendants?

8        A   Define claims.

9        Q   What legal claims are you bringing against the

10   defendants?

11       A   They defamed -- the defendants defame -- excuse

12   me, defamed me.  They're causing me and my family undue

13   harm by spreading these lies about me.

14           I have changed my whole perspective on -- on my

15   day-to-day activities.  My voting habit has changed.  I

16   don't vote in person anymore.

17           So whatever is listed in my complaint, and I

18   don't remember, but that's what I am bringing against the

19   defendants in this case.

20           Excuse me, can I take a break?

21       Q   You can.  You absolutely can.

22           THE VIDEOGRAPHER:  Going off the record at

23   12:23.

24           (The deposition was at recess from 12:23 p.m.

25   to 1:30 p.m.)



1           THE VIDEOGRAPHER:  We are back on the record at

2    1:30.

3        Q   BY MR. EVANS:  Okay, Mr. Andrews, I hope -- I

4    hope you had a good lunch to take a break and get a

5    breather for a second.  We'll jump back in.

6           We -- Mr. D'Souza sent you interrogatories

7    asking all individuals that had said that -- or you

8    believe had told your wife that they saw you in the film,

9    and I just want to talk about some of them.

10          But the first is Ms. -- is it Kamica Goins?

11       A   Yes.

12       Q   Did I pronounce that right?

13       A   I believe so.

14       Q   And -- and who is Ms. Goins?

15       A   She's my wife's hairdresser, beautician.

16       Q   And do you have any personal knowledge if

17   Ms. Goins has seen the movie "2000 Mules"?

18       A   No.

19       Q   And the next is Ms. Janet Williams?

20       A   Yes.

21       Q   And who is Ms. Williams?

22       A   She's my mother-in-law.

23       Q   And do you have any personal knowledge if

24   Ms. Williams has seen the movie "2000 Mules"?

25       A   When you say "personal knowledge," you are



1    talking me directly --

2        Q    Uh-huh.

3        A    -- from them?

4        Q    Yeah.

5        A    No.

6        Q    And then the next is Ms. Paulette Stephens.

7    Who is Ms. Stephens?

8        A    She's my sister.

9        Q    And do you have any personal knowledge on if

10   she's seen the movie "2000 Mules"?

11       A    The movie, no.  The trailer, she mentioned that

12   she did see it.

13       Q    And did Ms. Stephens see the trailer after you

14   brought up -- you or your wife brought up the movie to

15   her?

16       A    I would say after.

17       Q    And Ms. -- is it Sharletta?

18       A    Yes.

19       Q    Ms. Sharletta Roberts, who is Ms. Roberts?

20       A    She's my sister.

21       Q    And we talked about her earlier.  I just wanted

22   to make sure there wasn't another one.

23            And do you have any personal knowledge if she

24   saw the movie "2000 Mules"?

25       A    No, but she saw the trailer.



1        Q    And is she like Ms. Stephens and saw the

2   trailer after you did talk to her about it?

3        A    Yes.

4        Q    And then next is Ms. Brittani Andrews, and who

5   is that?

6        A    That's my daughter.

7        Q    That's what I thought.

8             And some of these may be stupid questions.  I

9   just want to make sure.

10            And do you have any personal knowledge of

11  Ms. Brittani Andrews seeing the movie "2000 Mules"?

12       A    Yes.

13       Q    And is she like Ms. Roberts and Ms. Stephens,

14  and saw it after you talked to her about it?

15       A    Yes.  And it was the trailer.

16       Q    The trailer, okay.

17            So you -- just so it's clear, she -- you have

18  personal knowledge of her seeing the trailer but not the

19  movie "2000 Mules"?

20       A    Correct.

21       Q    And then Ms. Courtni Andrews, is that your

22  daughter?

23       A    Yes.

24       Q    And do you have any personal knowledge of her

25  seeing the movie "2000 Mules"?



```
1        A   No, only the trailer.

2        Q   And is she like the rest, which she saw the

3   trailer after you talked to -- talked about "2000 Mules"

4   with her?

5        A   Yes.

6        Q   And Mr. Alec Andrews, is that your son?

7        A   Yes.

8        Q   Do you have any personal knowledge of him

9   seeing the trailer or movie?

10       A   Yes, he saw the trailer.

11       Q   And is he like the rest, saw it after you

12   talked about the movie "2000 Mules" with him?

13       A   Correct.

14       Q   And then Ms. Nive --

15       A   Loganathan.

16       Q   Yeah.  And Nive, do you have any personal

17   knowledge of her seeing the movie "2000 Mules" or the

18   trailer?

19       A   The only recollection I have from Nive is that

20   I mentioned to her that I was in a movie being accused of

21   voter fraud, and then the next day she came into work,

22   she mentioned to me that she saw it, the trailer or

23   the -- I don't think she saw the movie because -- I don't

24   know for sure what she saw, but she came in the next day

25   and said, "You know, Mark, that's a shame what they've
```



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 95 of 161

MARK ANDREWS  Conf.                          October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                           95

 1  done to you."  Also her daughter, she mentioned that she
 2  was vividly upset about it.
 3      Q   And -- and so she said she saw it after you
 4  talked to her --
 5      A   Yeah, it was after.  Yeah, I mentioned it to
 6  her, yes.
 7      Q   And Bryan Beasley, do you have any personal
 8  knowledge about him seeing the trailer or movie?
 9      A   I believe he saw the trailer.  I don't know
10  about the movie.
11      Q   And that was after you talked to -- talked to
12  him about the movie?
13      A   Yes.
14      Q   Is there -- and that's everyone you have for
15  your interrogatories.
16          Is there anyone else that has identified you in
17  the movie "2000 Mules" or -- or anything else?  Any other
18  clips, interviews, anything?
19      A   Not that I'm aware of.
20      Q   And so the only individuals are the ones we
21  just named that have identified you in relation to "2000
22  Mules" or interviews, right?
23      A   Those are the only ones that I'm aware of.
24      Q   And all of these people only identified you
25  after you talked to them about the movies, right?



```
 1        A    Yes.
 2        Q    And so no one has identified you in "2000
 3   Mules" or any related interviews without you first
 4   talking to them about the movie, right?
 5        A    I don't know that.
 6        Q    But to your knowledge, there's no one?
 7        A    To my knowledge.
 8             (Deposition Exhibit No. 11 was marked for
 9   identification.)
10        Q    BY MR. EVANS:  I'll hand you, Mr. Andrews,
11   Defendants' Exhibit 11.  And take your time.
12             Do you recognize that document?
13        A    It looks like a message to my daughter.
14        Q    Do you know who Ali Swenson is?
15        A    No.
16        Q    Did you ever talk to Ms. Swenson?
17        A    No.
18        Q    Did your daughter ever talk to Ms. Swenson?
19        A    No.
20        Q    Did anyone in your family ever talk to
21   Ms. Swenson?
22        A    No.
23        Q    Why did she reach out to your daughter and not
24   you?
25        A    That's a good question.  I don't know.
```



1      Q    Do you think she just couldn't get in touch

2  with you, maybe you didn't have a social media, so she

3  just reached out to your daughter?

4      A    That could be correct.

5      Q    Do you know if Ms. Swenson ever ran a story

6  that mentioned you?

7      A    I'm not aware of that.

8           (Deposition Exhibit No. 12 was marked for

9  identification.)

10     Q    BY MR. EVANS:  And I'll hand you Defendants'

11  Exhibit 12.  Take your time.

12          Do you recognize that document?

13     A    Again, it looks like it's an e-mail to my

14  daughter.

15     Q    And do you know how -- and -- and who is that

16  from?

17     A    It looks like Ali Swenson.

18     Q    And how did she get your daughter's e-mail?

19     A    I don't know.

20     Q    Did your daughter ever respond to this e-mail?

21     A    No.

22     Q    And what did your daughter do after receiving

23  Defendants' Exhibit 11 and 12?

24     A    She mentioned it to me, and that was it.

25     Q    And did you talk about it with her?



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 98 of 161

MARK ANDREWS  Conf.                                October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                    98

1       A    I told her not to respond to it.

2       Q    And why did you tell her not to respond?

3       A    Because she shouldn't respond to it.

4       Q    But -- and why?  Why -- why didn't you want her

5  to respond?

6       A    Well, because it's -- I just told her not to

7  respond to it.

8       Q    Is that because you are a private person and

9  don't want any media about this case?

10      A    I wouldn't say that.  I would say it's because

11  this was an AP reporter trying to get information about a

12  case that I may have been in the process of suing for

13  pending litigation or whatever, so I told her not to

14  respond to it.

15      Q    Had you retained counsel when your daughter

16  received this --

17      A    No.

18      Q    -- e-mail?

19      A    But I remember my sister who is an attorney

20  told me not to respond to anything.

21          MR. DAVIDSON:  Objection.

22          Mark, I'm just gonna again instruct you not to

23  give answers that reveal the substance of communications

24  between you --

25          THE WITNESS:  Okay.



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 99 of 161

MARK ANDREWS  Conf.                                              October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                            99

1            MR. DAVIDSON:  -- and any attorney.

2      Q    BY MR. EVANS:  Was there any other

3    communications with any member of your family other than

4    the ones that you produced in response to the discovery

5    request?

6      A    That's correct.

7            (Deposition Exhibit No. 13 was marked for

8    identification.)

9      Q    BY MR. EVANS:  I'll hand you Defendants'

10   Exhibit 13.  If you could take a look at that.  Is there

11   another one?  I don't have another one.  Hold on.

12   There's one here.  Here you go.  There's one more.

13           Do you recognize that document?

14     A    No.

15     Q    And if you -- and I'll represent to you, and

16   this was produced by your counsel.  It's got the Bates

17   number at the bottom.

18           Do you recognize any of the numbers in the top

19   left, the phone numbers?

20     A    Yeah, these are my kids' and my -- and my

21   wife's number.

22     Q    And is this a group text between you and your

23   family?

24     A    Yes.

25     Q    And how often do you guys communicate on a



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 100 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      100

 1    group text between you and your family?

 2         A    Often.

 3         Q    And how often is "often"?  Would you say that's

 4    daily?

 5         A    Well, they -- yeah, daily.

 6         Q    And what was the date of the earliest message

 7    in this group text?

 8         A    From looking at the page 1, it says 10 -- I

 9    believe that's 10/3.

10         Q    And were there any communications about either

11    your -- the complaint filed against you with the State

12    Election Board or the movie "2000 Mules" and the

13    affiliate interviews?  And I will just say "2000 Mules",

14    so we don't have to include every interview collectively,

15    but about those, between the texts, the group texts with

16    your family prior to October 2023?

17         A    Repeat the question again.

18         Q    Sure.

19              Were there any messages in this group text with

20    your family about the State Election Board complaint

21    filed against you or "2000 Mules" and the affiliate

22    inter -- interviews between you and your family?

23         A    I would say yes, on -- in May 2022, when I got

24    the text from Amy Gardner and from Ryan Germany, we

25    were -- I was out driving around with my son in Orlando,



1  and my wife sent a group text, hey, guys, come home,

2  because she was concerned.

3      Q   Was there any other texts in addition to that

4  one?

5      A   Not that I can recall.

6      Q   How often did you and your family talk about

7  either the complaint or the movie and the interviews

8  around the time of May 2022?

9      A   We as a family, once I became aware of what was

10 happening, we had a conversation about it, and that

11 was -- the conversation was, hey, you know, this is

12 what's going on.  Your dad is being accused of, you know,

13 horrible things.  Let's be careful.

14         We had a daughter in -- back at home.  We told

15 her to be cautious, you know, because she was home by

16 herself, because we were concerned because the other

17 family and I, we were in Orlando.

18     Q   And why did you not produce that "come home

19 text" your wife sent around May 2022?

20     A   It was a part of my phone.  I didn't delete it.

21 Or maybe she didn't text me.  Maybe she called me on the

22 phone.

23     Q   So did you not text it because you didn't have

24 it at the time it was requested?

25     A   I don't understand your question.



1       Q   I'm asking why you didn't produce the May 2022

2   text?

3       A   And I'm telling you now that she could have

4   called me on the phone.  It wasn't a text.

5       Q   But that wouldn't have went to your kids, would

6   it?

7       A   This is -- there's no text in here about that.

8   This is 10/3.  You are talking about May of 2022.

9       Q   And I'm asking, why did you not produce the

10  May 2022 text?

11      A   And I said it was not a text.  It was a phone

12  call.

13      Q   What led you to recall that it was a phone call

14  and not a text between now and four minutes ago when you

15  testified it was a text?

16      A   Because I realized that if it would have been a

17  text, it would have still been in the records, just like

18  this one would have been.

19      Q   Did you delete any texts between your family

20  prior to October 3rd, 2023?

21      A   No.

22      Q   Earlier you testified that you delete texts

23  consistently around once a month, including texts with

24  your family; is that correct?

25          MR. DAVIDSON:  Objection.



1      Q   BY MR. EVANS:  You can answer.

2      A   I don't -- well, I get individual texts from my

3  wife.  I get individual texts from my son.  I get

4  individual texts from my -- my -- my other daughters.

5  And the group chat text, no, I don't delete that.  I

6  don't know how to delete it, because if you delete the

7  group -- one text, you delete the whole text, at least

8  that's my understanding.

9      Q   So we'll look at D 13.  And it looks like at

10  the top, Mom texted a Google link.

11          Do you see that?

12      A   Yes.

13      Q   And it looks like it was a video; is that

14  right?

15      A   You are on page 1?

16      Q   Yes.

17      A   It says Sherwin-Williams in here, iron ore -

18  front door.  It looks like she was texting me a

19  Sherwin-William, which is a paint company.  At the time I

20  was probably heading to the store to buy some paint, and

21  she was sending me a picture of a door she wanted to get

22  my opinion of and all of my kids.

23      Q   So that's not related to this case, right?

24      A   No.

25      Q   And then on page 2, it looks like she sent an



 1    AJC article.  It says, "Judge's ruling clears path for

 2    defamation case."

 3         A    I see that.

 4         Q    And how often were you guys texting about this

 5    case?

 6         A    Not often.

 7         Q    And how often is "not often"?

 8         A    It looks like she texted this based on a ruling

 9    that took place.

10         Q    And the next -- does anyone respond to that,

11    that text?

12         A    Yeah, there are a lot of responses in here:

13    Y'all lock the front door.  Open the door.  Still at the

14    office.  Will head home in 15 minutes.  Had to leave

15    late.

16              Masaki rolling in the kitchen, that was my cat.

17              Did you know they were making a "Five Nights at

18    Freddy's movie"?

19              Some reason I'm thinking about keeping the

20    Camaro, just paint -- paint it black.

21         Q    And does:  Y'all lock the front door, open

22    front door, still at office, will head home, are those

23    related to your wife's texts about "Judge ruling clears

24    path for defamation case"?

25         A    I would say it's a group chat.  My kids text me



1  all sorts of things, and I don't know if they are related

2  to that or not.  I would assume they're not.

3       Q   And then, again, it looks like the link is sent

4  by your wife, and in response, Alec says, "I did not know

5  they were making a Five Nights at Freddy's movie."

6           What did you interpret that text to mean?

7       A   He's talking about a -- a movie.  I believe

8  it's the Winnie-the-Pooh horror flick that Disney didn't

9  want to be made.

10      Q   And why would he reference that movie in

11  relation to that link?

12      A   I have no idea.  It's a group chat.

13          They also talk in here about Masaki rolling on

14  the floor.  That's my cat rolling in the kitchen.  They

15  also talk about -- you know, I'm texting them I'm heading

16  home.  That's how we communicate.

17      Q   Was Alec's text:  I did not know they were

18  making a Friday night movie, I assume that was humorous,

19  right?

20      A   I don't know if it was humorous or not.

21      Q   Did you think it was, what, literal?

22          MR. DAVIDSON:  Objection.  Form.

23          THE WITNESS:  I guess I don't understand your

24  question.  My kid texts on a group chat that, "I did not

25  know they are making a Friday night -- Five Nights at



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 106 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                              106

1  Freddy's movie."  That's an actual movie that they were

2  making.  He made a statement about it.  I don't know if

3  it meant to be funny or not.

4      Q   BY MR. EVANS:  How is your dad -- as his dad,

5  did you interpret it as it being funny?

6      A   I didn't interpret it to being funny.  It was

7  just a statement.  They are making a Five Nights at

8  Freddy's movie.

9      Q   And Alec then says, "So the reason I'm thinking

10  about keeping the Camaro and just paint it black," what

11  did you interpret that to mean?

12      A   He's -- has a white Camaro.  He was thinking

13  about painting it black.

14      Q   And is that related to the link that your wife

15  said about the "2000 Mules" lawsuit?

16      A   No, it's not.

17      Q   Are there any other texts between you and your

18  family about this lawsuit?

19      A   I don't recall any.

20      Q   And so your representation today is this is the

21  only text between you and your family about the lawsuit

22  or the allegations in it; is that right?

23          MR. DAVIDSON:  Objection.  That misstates his

24  testimony.

25      Q   BY MR. EVANS:  Well, he -- he can tell me his



 1  testimony.  That's why I'm asking him.

 2          MR. DAVIDSON:  He just gave you his testimony,

 3  Jake.  He just said I don't recall any.

 4      Q   BY MR. EVANS:  You can answer the question.

 5      A   I'm gonna say I don't recall any.

 6      Q   Is there anything that would refresh your

 7  recollection on if there are any additional texts between

 8  you and your family related to this lawsuit or the

 9  allegations in it?

10      A   Not that I'm aware of.

11          (Deposition Exhibit No. 14 was marked for

12  identification.)

13      Q   BY MR. EVANS:  All right, I will hand you

14  Defendants' Exhibit 14.

15          And do you recognize that document?

16      A   It looks like an e-mail.

17      Q   And who is that e-mail between?

18      A   Like I sent to my attorney.

19      Q   And what did you send to your attorney?

20          MR. DAVIDSON:  Okay.  Can we just take a quick

21  break, I'm sorry, for one moment.

22          THE VIDEOGRAPHER:  Going off the record at

23  1:58.

24          (The deposition was at recess from 1:58 p.m. to

25  2:04 p.m.)



1          THE VIDEOGRAPHER:  We're back on the record at

2    2:04.

3          Q   BY MR. EVANS:  Mr. Andrews, do you typically

4    work in the office or remotely?

5          A   Both.

6          Q   And what's your -- what's your breakdown remote

7    from in the office?

8          A   It depends.  It's not -- there's a policy that

9    was three days a week, and you get to pick your three

10   days a week in the office, and those flexed based on what

11   needs I had.  If I had an appointment at the house or a

12   doctor's appointment or something, I would not

13   necessarily go in the office.

14         Q   So you -- you -- you normally go in about three

15   days a week, is that what you are saying?  I'm just

16   trying to understand what you --

17         A   Yeah, yeah, there's three days a week, but

18   there's no assigned day.

19         Q   And do you typically wear a mask in the office?

20         A   Yes.

21         Q   And so every day, all three days you go in the

22   office, you wear a mask?

23         A   Yes.

24         Q   And do you typically wear a mask when you go

25   out in public anywhere?



1      A    Yes.

2      Q    And why is that?

3      A    Because I choose to wear it.

**REDACTED**

6      Q    And do -- does your family wear a mask as well

7  when they are in public?

8      A    Yes.

9      Q    And this is all -- this is your three kids and

10  wife, they wear a mask every time they go in public?

11     A    Yes.

12     Q    Earlier you testified that the defendants had

13  published this everywhere in the world and everybody

14  knew; do you recall that?

15     A    Yeah.

16     Q    And so you would agree with me that the issues

17  that are outlined to the movie are pretty important to

18  the public, aren't they?

19         MR. DAVIDSON:  Objection.

20         THE WITNESS:  I don't know that.

21     Q    BY MR. EVANS:  Do you have any reason to say

22  that they are not important to the public?

23     A    I don't have an opinion on it.

24     Q    For something, a topic to get the type of

25  interest that you alluded to earlier, wouldn't it have to



MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      110

1  be important to the public?

2      A   Not necessarily.  There's misinformation out

3  there all the time.  You know, they are eating cats and

4  dogs in Springfield, Ohio, that's a lie.

5      Q   Who said that?

6      A   It's been said.

7      Q   By who?

8      A   The media.

9      Q   The media said they are eating cats and dogs?

10     A   No, they repeated that.

11     Q   And who repeated it?

12     A   I don't understand your question.

13     Q   Who repeated that people are eating cats and

14  dogs?

15     A   The media when they report on it.

16     Q   Did anyone else, to your knowledge, say that?

17     A   The presidential debate.  I believe former

18  President Trump mentioned something about Springfield,

19  them eating cats and dogs.

20     Q   Is that significant to you in some way?

21     A   It's misinformation.  The lies about me that

22  have been spread all over the globe and the world about

23  there had been fraud in the election, and that I'm a

24  ballot mule, and that I did something illegal, is

25  misinformation because it's untrue.



1           And for someone to put that out when they knew

2    the Georgia Board cleared me, and then my attorney served

3    them with a notice saying that I was proven innocent, and

4    they still go across the world and spread this news about

5    me that's a lie, yeah, that's misinformation.

6        Q   So it's your belief that "2000 Mules" went

7    across the world?

8        A   It was shown in Belarus.  It was shown in

9    Japan.  It was shown in Russia.  It's been shown all over

10   the United States.  It was shown in Australia, I believe

11   in June or July of this past year, this past summer.

12       Q   And so it's your belief that this movie had

13   widespread interest, right?

14       A   I don't know about interest.  It was just shown

15   all over.

16       Q   Barack Obama said, "Our democracy depends on

17   the integrity of thousands of local officials, Republican

18   and Democrat, who are willing to honestly and fairly

19   administer elections."

20           Do you agree with that?

21       A   I don't have an opinion on it.

22       Q   Nancy Pelosi said, "The integrity of the

23   election system is central to our democracy."

24           Do you agree with that?

25       A   I don't have an opinion on it.



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 112 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      112

1       Q   So you don't have an opinion on the integrity

2   of the election system being important to a democracy?

3       A   No, I do not.

4       Q   Do you -- do you recall in 2020 -- 2020 -- the

5   end of 2020, 2021, and 2022, many people talking about

6   election integrity?

7           MR. DAVIDSON:  Objection.  Form.

8       Q   BY MR. EVANS:  You can answer.

9       A   I don't recall.

10      Q   You do not recall?

11      A   No.

12      Q   Strike that.

13          Did you watch the news at the end of 2020 and

14  2021 and 2022?

15      A   I would say yes, but I don't recall someone

16  specifically talking about that, because it depended on

17  what -- when I saw the news and what type of news I saw.

18      Q   In the end of 2020 and 2021 and 2022, you

19  watched the news, but you never saw anyone talk about

20  election integrity?

21      A   All I remember in 2020 -- 2021, was there was a

22  storming of the capital and because of misinformation

23  about, you know, there being voter fraud.

24      Q   Do you believe that voter -- there is no voter

25  fraud in elections?



1      A   I don't have an opinion.

2      Q   You just referred to voter fraud as

3   misinform -- misinformation, right?

4      A   As it relates to me.  I did not commit voter

5   fraud.  I dropped my family's five ballots, and I've been

6   accused of voter fraud.  I don't know if anyone else has

7   done it.  I know I haven't done it, and I know I was

8   accused of it in my video or my trailer image, whatever,

9   was put in a movie and in a book and shared across the --

10   the world.

11      Q   From end of 2020 to 2021 to 2022, the only

12   thing you recall from the news relating to the election

13   was January 6th; is that right?

14      A   2021, 2022, you want me to recall what was

15   talked about in the news during that time?

16      Q   If you can answer the question.

17      A   No, I don't recall.  You know, I'm not gonna --

18   I can't recall specifically what I saw or what I remember

19   from that time period, but I do remember folks storming

20   the Capitol on January 6th, because every news channel

21   you flipped on, they showed a clip of it.

22      Q   But you don't recall during that same time

23   period anything about election integrity, right?

24      A   I believe I already answered that.

25      Q   You can answer.



1    A   I said, I believe I already answered it.

2    Q   You can answer again.

3    A   I don't recall someone talking about voter

4  integrity.

5        Now, if you are talking about there being fraud

6  in the election from 2020, yes.  In my mind, those are

7  two different things.

8    Q   And how are those different?

9    A   Because one is talking about fraud, and

10 specifically "2000 Mules" was part of that fraud that was

11 alleged, and I was the poster child for that movie, book,

12 so yes.

13   Q   So you do recall a lot of people talking about

14 election fraud, right?

15   A   Yes.

16   Q   And you would say election fraud was an issue

17 that the public was concerned about, right?

18   A   They were talking about it on the news.

19   Q   And you would agree with me that if stuff is

20 being talked about on the news, it's because people have

21 concerns about or interest in that topic, right?

22   A   I mean, they are talking about cats and dogs in

23 Ohio.  Everybody didn't have interest in that and wanted

24 to know about that, so I don't know.

25   Q   Why do you keep using the cats and dogs?  Why



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 115 of 161

MARK ANDREWS  Conf.                                          October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                            115

1   is that so personal in --

2        A    Because --

3        Q    -- personal to you?

4        A    -- it's timely today.  It's misinformation.

5   This movie that had me in -- in my -- from my

6   perspective, was misinformation.  Because I was in the

7   video, the movie, and I didn't do anything wrong.  I just

8   dropped my family ballots off.  But there was -- the

9   public was being misled or led to believe that there was

10  fraud.  I'm not saying if there was fraud there or not

11  was fraud.

12         I just know that I did not vote illegally.  I

13  dropped my family's five ballots, and that was perfectly

14  legal in Georgia.  And I wasn't a ballot mule or

15  harvest -- harvesting ballots or whatever they call it.

16  Because you can't get ballots in Georgia like that.  You

17  gotta have your driver's license, your ID to request

18  them.  In order to submit your ballot back, you have to

19  have your ID and your information there, or they are not

20  gonna send you a ballot, and you have to be a registered

21  voter.  And they match your -- your voting signatures.

22  And again, I just dropped my family's ballots off, and I

23  was accused of voter fraud.

24         They went to -- went to the Georgia Election

25  Board, and they dismissed it.  My attorneys talked to the



1  individuals who were putting out the book.  There was a

2  notice given, but they continued to put my face in the

3  book.  They continued to keep me in the video, and they

4  continued to spill lies about me saying that I committed

5  voter fraud, and I did not.  And from my perspective,

6  that's misinformation, because that was not true about

7  me.

8      Q   What all news channels and publications do you

9  recall talking about voter fraud in 2021 and 2022?

10     A   Okay.  I don't recall.  There were -- there

11 were several news after they stormed the capital in 2021,

12 and -- but I don't -- there were several news channels.

13 I mean, publications, I don't read publications, so...

14     Q   So you -- you recall a -- a lot of people

15 talking about voter fraud, but you don't recall the news

16 channels that were --

17     A   I can recall --

18     Q   -- talking about it?

19     A   -- a few; CNN, MSNBC.

20     Q   So CNN and MSNBC were talking about voter fraud

21 in 2021 and 2022?

22     A   Based on my recollection, yes.

23     Q   Was Fox News talking about voter fraud in 2021

24 and 2022?

25     A   I don't know.



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 117 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                    117

REDACTED



1    individuals out there who believe this misinformation.

2    So every day, every time I get up in the morning, I walk

3    outside the house, I gotta look over my shoulder.  I

4    gotta limit where I go with my family because there's

5    some folks who believe this stuff.

6         This is real.  Y'all -- whoever put this

7    together may think this is unreal; it's a fantasy world.

8    I live in the real world, and I've gotta deal with this

9    every day for the rest of my life, me and my family.  Is

10   someone gonna walk up on me?  Is someone gonna shoot at

11   my house?

12        So I don't know what -- what your question was,

13   but as far as privacy, I don't have no privacy because my

14   voter's registration is public information.  When they

15   accused me of this, and I was cleared, as Ryan said in

16   the -- in the text to me, it's gonna become public

17   record.

18        Amy Gardner reached out to me on my cell phone.

19   I don't know how she got my cell phone.  I don't have

20   privacy anymore.

REDACTED



MARK ANDREWS  Conf.                                      October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                        119

**REDACTED**

7      Q    Why haven't your other attorneys been paid?

8      A    Because they are waiting until all of this is

9   resolved to be paid, I would assume.

10     Q    Are they expecting to be paid?

11          MR. DAVIDSON:  Objection.

12     Q    BY MR. EVANS:  You can answer.

13     A    I would say yes.

**REDACTED**

16          MR. DAVIDSON:  Objection.

17          THE WITNESS:  I'm going to put it to you this

18   way.  No matter how much money I'm given, it's not gonna

19   take away the pain and anguish my family and stress I've

20   lived under for the last two years and that I got to live

21   under for the rest of my life.  So the compensation

22   piece, the whatever, it's not gonna take away what me and

23   my family has to live with.

24          We were perfectly fine prior to this.  As you

25   can see from my salary compensation, I have a nice



1  salary, so I don't need -- I didn't need the ten -- five,

2  ten bucks to run around town dropping ballots off.

3          So again, yes, there was a -- there was that

4  compensation part of it, but it's not gonna repay me for

5  the rest of my life looking over my shoulder, not going

6  outside when it's dark because I don't know who's lurking

7  behind the street or who's following me.  Every time our

8  alarm goes off at home when there's a bug on it or

9  something, we are jumping up late at night not knowing if

10  someone is trying to break in our house.

11          So compensation, it is the compensation.  That

12  was what we settled upon.  But I -- I would not want

13  anyone else to have to go through this, because this is

14  unreal.  A man could drop off his family ballots and

15  become a poster child for a movie.  And it's just not one

16  time that it's shown or talked about; it's peddled all

17  over the world.

18          It's -- when they go on notice that it's not

19  true, when the Georgia Election Boards tell them it's not

20  true, they put it in a book, and they still peddle it

21  knowing it's a lie about me.  I'm only speaking for me.

22      Q   BY MR. EVANS:  So you --

23      A   And to profit off of it.

24      Q   So the talk -- you talked about your children a

25  little bit.  You have three kids; is that right?



MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      121

```
 1        A    Yes.

 2        Q    And that's Alec, Courtni, and Brittani?

 3        A    Yes.

 4        Q    And what -- how old is Alec?  What is he doing?
```

**REDACTED**

```
11        Q    And what did he study?

12        A    Computer science.

13        Q    Did he go to public school for high school?

14        A    Yes.
```

**REDACTED**

```
17        A    He's studying graphic arts and getting a

18   master's.

19        Q    And where does he live?

20        A    At home.

21        Q    And has he lived at home from -- his whole

22   life?

23        A    Yes, until he went off to college and came

24   back.
```

**REDACTED**



1  then came back?

2       A   Yes.

3       Q   And then, did he have a job in between

**REDACTED**

5       A   Yes.

6       Q   And what was his job?

7       A   He was a programmer.  I don't remember what the

8  company name was.

9       Q   And how long -- how many years did he take from

10  college to grad school, how many years off?  Did he go

11  straight through or -- no, he had a job, so he had to

12  take some.

13      A   Yeah, yeah, he -- I think he -- he went to --

**REDACTED**

15  And he graduated from -- he was two years in between, I

16  think.

17      Q   Two years?

18      A   Two years in between, yeah.

19      Q   And next is Courtni, and what does Courtni do?

**REDACTED**

21      Q   And did she go to college?

22      A   Yes.

23      Q   And where did she go to college?

**REDACTED**

25  undergraduate and graduate school, and has a master's in



1  public health.

**REDACTED**

3      A   She's a -- I think she's a scientist.

4      Q   And where does she live?

5      A   At home.

6      Q   And Brittani, where -- tell me about Brittani.

**REDACTED**

8  graduated with a computer science degree.  Worked for a

9  center, a consulting firm for two or three years.

**REDACTED**

11  her master's and -- in the arts, and she published comic

12  books.  She has her story that she published, and she

13  sells it, and she lives at home.

14     Q   So you've got two kids in SCAD currently?

**REDACTED**

17     Q   Oh, she's graduated, okay.

18     A   She graduated, yes.

19     Q   Got it.

20         So all three of your kids live at home?

21     A   Yes.

22     Q   And is there a reason for that?

23     A   Their mother loves it, and they enjoy being

24  around their family, and they live at home.

25     Q   Are they planning to move out anytime soon?



```
 1        A   You have to ask them.  I don't know.

 2        Q   Do you like them living at home?

 3        A   Yeah, I love my kids being home.

 4        Q   How big is your house?

 5        A   I got a four bedroom.  I think it's 3,000

 6   square foot.

 7        Q   So I guess they -- they all have their own

 8   room?

 9        A   Yes, they do.

10        Q   So you've talked a lot about how this has

11   affected your life.  And we asked in your interrogatories

12   how it's affected your life and how it's been bad, and

13   you reference one time somebody had a car outside.

14            Is there any other times that the movie has

15   negatively affected your life?

16        A   I don't understand the question.

17        Q   Is there -- how has the movie negatively

18   affected your life?  And give me --

19        A   My image --

20        Q   Give me specific instances.

21        A   Well, my image is in the movie.  It's not a

22   flattering -- you know, how do I put it?  It's not a

23   flattering depiction of me from the movie or the book,

24   you know.

25            So that's how it's affected my life, because
```



1   whoever has read the book or saw the movie sees me in a

2   different light than what I truly am, and so that's how

3   it's impacted my life.

4        Q   And we -- we asked you all the times that

5   people had called you, and I believe Amy Gardner called

6   you, you said.  But you didn't -- is there anyone else

7   other than Amy Gardner has called you about this case?

8        A   I don't know, because on my phone if I have a

9   foreign number, I don't pick it up.  And if Amy would

10  have called me, I wouldn't have picked it up.  She text

11  messaged me.

12       Q   So do you have any personal knowledge of anyone

13  other than Amy that has texted or called you about "2000

14  Mules" or any interviews about it or related to it?

15       A   No.

16       Q   And has anyone ever sent you an e-mail other

17  than the ones that you produced about your image being

18  used in "2000 Mules" or related interviews?

19       A   Not that I'm aware of.

20       Q   Has anyone ever sent you snail mail about "2000

21  Mules" or the affiliated entities and your image

22  allegedly being used?

23       A   What do you mean by "snail mail"?

24       Q   Like postal mail, you know, your mailbox?

25       A   No.



1        Q    Has anyone communicated with you in any other

2    way because of your image in "2000 Mules" or related

3    videos?

4        A    Not that I'm aware of.

5        Q    So how has this movie negatively impacted you

6    when nobody has called you, nobody sent you an e-mail, or

7    communicated with you in any other way?

8        A    You are talking physical contact.  I'm talking

9    the fact that I have to think about this every time I go

10   out of my house.  My family has been put in harm's way

11   because of this movie.

12           So no, no one has run up on me, and I can't

13   speculate if someone is gonna do that tomorrow or not,

14   but it's still in my head.  I have to think about that

15   every time I go anywhere, that someone may identify me

16   and may, you know, do something harmful to me and my

17   family.  I don't have Secret Service walking around with

18   me.  I don't have security guards walking around with me.

19       Q    Has anyone ever put you in harm's way because

20   of the movie or affiliated interviews?

21       A    No.

22       Q    Has anyone ever recognized you in a grocery

23   store?

24       A    Not that I'm aware of.

25       Q    Have you ever seen a psychiatrist?



```
 1         A    Never.

 2         Q    Have you ever gotten any medical help because

 3    of the movie "2000 Mules" or related interviews?

 4         A    No.

 5         Q    What's your biggest fear?

 6         A    One of my fears is that someone is gonna drive

 7    by my house and shoot -- shoot it up.  Another one of my

 8    fears is that I'm gonna be out walking around, and

 9    someone is gonna run up on me and do some harm to me.

10    Those are just two of my fears.

11         Q    What other fears do you have?

12         A    As it relates to this or to just life?

13         Q    Just -- just life.

14         A    Before this I didn't have a whole lot of fears.

15         Q    Are you worried about catching a disease?

16         A    No.

17         Q    Why do you wear a mask?

18         A    Because I have allergies.  As you hear me

19    sniffing now, pollen kills me.

20         Q    Why does all your kids wear a mask?

21         A    Yeah, well, you'll have to ask them.

22         Q    Did you tell them to wear a mask?

23         A    They are adults.

24         Q    So why do you -- do you think they wear a mask

25    because you wear a mask?
```



1              MR. DAVIDSON:  Objection.  Asked and answered.

2      Q    BY MR. EVANS:  You can answer.

3      A    Again, they are adults.

4      Q    Why does your wife wear a mask?

5      A    She's an adult, too.

6      Q    So there's no other specific instances that

7  have happened aside from what you've named in your

8  interrogatories that have negatively affected your life

9  because of "1000 Mules" (sic) or any affiliated

10  interviews, right?

11      A    Could you repeat your statement again?  What

12  did you just say?

13      Q    Yeah.  There are no specific instances other

14  than what you mentioned in your interrogatory responses

15  where "2000 Mules", the movie, or any affiliated

16  interviews have negatively impacted your life; is that

17  correct?

18      A    Yeah, I signed they were -- I agree, yes.

19              MR. EVANS:  All right.  Well, let's take a

20  break.  We've been going about an hour and ten.  We

21  should have a little bit more.

22              THE VIDEOGRAPHER:  Going off the record at

23  2:36.

24              (The deposition was at recess from 2:36 p.m. to

25  2:59 p.m.)



1              THE VIDEOGRAPHER:  We are back on the record at

2      2:59.

3          Q   BY MR. EVANS:  Okay.  Mr. Andrews, coming back

4      from a break, do you know an individual named David

5      Cross?

6          A   No.

7          Q   Never heard of anybody by the name of David

8      Cross?

9          A   I don't know David Cross.

10         Q   Did you know David Cross is the one who filed

11     the complaint with the Election Board against you?

12         A   No.

13         Q   How did you find the names of Catherine

14     Engelbrecht, Gregg Phillips, Dinesh D'Souza, D'Souza

15     Media and not find the name of David Cross?

16         A   Those names were found in consultation with my

17     attorneys.

18         Q   And why did you not sue David Cross when --

19             MR. DAVIDSON:  Objection.  It calls for

20     privileged information.  I'm going to instruct him not to

21     answer the question.

22             MR. EVANS:  Well, first I gotta ask the

23     question, so if you'd let me ask the question, I would

24     appreciate that.

25         Q   BY MR. EVANS:  Mr. Andrews, why did you -- I'm



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 130 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                     130

 1  not asking for anything about legal guidance, legal --

 2  you filed the lawsuit, right?

 3      A   Yes.

 4      Q   And you helped pick the claims that were

 5  brought in the lawsuit, right?

 6          MR. DAVIDSON:  Objection.

 7      Q   BY MR. EVANS:  You can answer.

 8          MR. DAVIDSON:  No, I -- I'm sorry.  You are

 9  calling for privileged information.  It's also work

10  product.

11          MR. EVANS:  Okay.  No -- no speaking

12  objections.

13      Q   BY MR. EVANS:  Did you approve the complaint

14  that was filed on your behalf in this case?

15      A   Yes.

16      Q   Did you look at the complaint that was filed

17  before it was filed?

18      A   Yes.

19      Q   Okay.  If you instructed your attorneys --

20  well, strike that.

21          Why did you decide -- why did you approve a

22  complaint that did not include David Cross's name?

23          MR. DAVIDSON:  Again, I'm gonna instruct him

24  not to answer the question.

25      Q   BY MR. EVANS:  To the extent it requires



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 131 of 161

MARK ANDREWS  Conf.                                October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                              131

1  privileged information, don't answer, but you can say why
2  you personally didn't sue him.
3        MR. DAVIDSON:  And I'm instructing him not to
4  answer the question, period.
5        MR. EVANS:  Okay.  We'll take that up with the
6  judge.
7        MR. DAVIDSON:  Okeydoke.
8        (Deposition Exhibit No. 15 was marked for
9  identification.)
10     Q   BY MR. EVANS:  So I'll hand you Defendants'
11  Exhibit 15.  And do you recognize this document?
12     A   Yes.
13     Q   And what is Defendants' Exhibit 15?
14     A   It's Plaintiff Mark Andrews' Responses and
15  Objections to Defendant D'Souza Media LLC's Third Set of
16  Interrogatories to Plaintiff.
17     Q   And I'll refer you to Interrogatory No. 19 and
18  your response.  Okay, and I'll focus on the part which is
19  on -- I don't know if this has page numbers, but it's
20  above Interrogatory No. 20.
21        And it says:  Monthly home security monitoring
22  costs (ongoing):  63 per month since May 2022, and
23  additional since -- an additional $10 a month since
24  October, and additional 4.99 per month since
25  October 2023.



MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      132

```
1            And why did you choose to increase the coverage
2    of the security in October of 2023?
3        A    Because of the security concerns.
4        Q    I'm sorry, '2.
5        A    Pardon me?
6        Q    2022.
```

REDACTED

```
14       Q    Did you file this lawsuit in October of 2023?
15       A    If that was the date, yes.  I don't recall what
16   the date was.
17       Q    2022.  Sorry about that.
18            If I represented to you that you filed the
19   lawsuit in October of 2022, would you have any reason to
20   disagree with that?
21       A    No.
22       Q    And so you increased your coverage for security
23   at the same time you filed this lawsuit; is that right?
24       A    Yes.  If the dates coincide, yes.
25       Q    And did you increase the coverage because you
```



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 133 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      133

1    were going to be getting more public attention by virtue

2    of your lawsuit?

3         A    No.    I increased the security for the concern

4    of my family and their well-being.

5         Q    And were you concerned that their well-being

6    would be more endangered by virtue of the public

7    attention that would result from the lawsuit?

8         A    No.    It was because of the fact that I was in a

9    movie being depicted as a horrible human being, and I was

10   concerned that someone would see the movie and take

11   actions, and because some of the horrible things that

12   were said out on the Internet.    So I did this as a

13   precaution to protect my family.

REDACTED



MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      134

**REDACTED**

13      Q    Does you -- you and your family wear masks in
14   your house?
15      A    No.
16      Q    Do you wear masks when you walk out of your
17   front door?
18      A    Yes.
19      Q    Are you concerned about pollen indoors?
20      A    Yes.
21      Q    Why?
22      A    Because it affects me from an allergy
23   perspective.  We have HEPA filters all through the house
24   to -- to suck in the dirty air and clean it out.
25      Q    Is that like an air purification system or



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 135 of 161

MARK ANDREWS  Conf.                                          October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                          135

1    something?

2         A    Yeah, it's a HEPA filter.  That's what they're

3    called.

4              (Deposition Exhibit No. 16 was marked for

5    identification.)

6         Q    BY MR. EVANS:  And I'll refer you -- do you

7    recognize that document?  I believe I -- I don't know if

8    I've handed you these or not, but take your time and look

9    at them.  These are your interrogatories, supplemental

10   interrogatories, and I will refer you to Interrogatory

11   No. 12, which is on 17.

12        A    It's on page 17?

13        Q    That's correct.

14        A    Okay.

15        Q    And Interrogatory No. 12 asks:  Any individual

16   that's attempted to enter your home, cased or surveil

17   your home as you approach or followed without

18   authorization, and you name one instance in the summer of

19   2023.  On one occasion where you drove up, you noticed an

20   individual who appeared to be looking at your home.  It

21   was unusual.  As you drove up, the other individual drove

22   away, departed the -- the cul-de-sac.

23             You didn't talk to this person, right?

24        A    No.

25        Q    You didn't see this person?



1       A    I saw them in the truck.

2       Q    And do you know their name?

3       A    No.

4       Q    They didn't come up to you and talk to you?

5       A    No.

6       Q    You don't have any personal knowledge that this

7    person was watching you or waiting on you, do you?

8       A    No.  It was just odd that they were out in

9    front of my house.

10      Q    And the person could have just been making a

11   delivery or waiting on directions or something else,

12   couldn't they?

13      A    They didn't seem to be -- make a delivery.

14   They could have been waiting on something else, but...  I

15   live in a cul-de-sac, so it was more on my property line

16   versus my neighbor's property line, looking at my house.

17      Q    And this is the only instance where any

18   individual has attempted to enter your home, case or

19   surveil your home, phoned you, approached you or followed

20   you without authorization since May of 2022, right?

21      A    That I'm aware of, yes.

22      Q    And you have no personal knowledge that this

23   person sitting in your cul-de-sac was anywhere related to

24   "2000 Mules" or any of the affiliated interviews, do you?

25      A    No.



1            (Deposition Exhibit No. 17 was marked for

2    identification.)

3        Q    BY MR. EVANS:  And we just handed you

4    Defendants' Exhibit 17, and I'm also going to hand you

5    18.

6            (Deposition Exhibit No. 18 was marked for

7    identification.)

8        Q    BY MR. EVANS:  And I just will -- for 18, I

9    will refer you to the picture.

10           Well, first, do you recognize that picture?

11       A    Yes.

12       Q    And what is that?

13       A    Which one, 18 or 17?

14       Q    18.

15       A    18 is me dropping ballots in the ballot box.

16       Q    And what car is that?  I think it's a white --

17    is that an Expedition?

18       A    Yes.

19       Q    And whose car is that?

20       A    It's registered to me, but it's my wife's.

21       Q    And do you -- when you say "it's my wife's," do

22    you mean she drives it day to day, it's kind of her car,

23    day-to-day car?

24       A    Exactly.

25       Q    What kind of car do you drive?



1      A    I actually don't drive one.

2      Q    So you don't have a car?

3      A    No.

4      Q    And why don't you have a car?

5      A    Because my kids have three vehicles already at

6   the house, and so they work from home, and when I decide

7   to drive to work, I -- I ask them, hey, are you going to

8   work tomorrow?  And they say, no.  Or are you working

9   from home?  And I take a vehicle.

10      Q    And what cars do your kids have?

11      A    There's a Camaro, there's a Mustang, and

12   there's a VW.

13      Q    And are all these -- how are these registered?

14   Are these registered under your name, each of the

15   individual's name?  I know you said that this Expedition

16   is registered to your name.

17      A    The Mustang, I think is registered in my wife's

18   name for my daughter.  The VW is registered in Courtni's

19   name, and the Camaro is registered in my name and my

20   son's name.

21      Q    And what car do you most often drive?

22      A    I switch up every week.  Because my kids drive

23   their cars sparingly, I want to make sure they're driven.

24   So I would say I drive the Camaro and the Mustang.

25      Q    And was this the same situation in 2020,



1  November of 2020?

2      A   Yes.

3      Q   So in 2020, you had -- or your family had, and

4  I will just say that generally, a Camaro, Mustang, VW,

5  and then the Ford Expedition?

6      A   Yes.

7      Q   And why did you drive the Ford Expedition to

8  vote on this day in November of 2020?

9      A   It was probably because of how it was parked in

10  the driveway.  I don't like parking on the street in the

11  cul-de-sac.  So if it was the vehicle that was parked

12  there, I just jumped in it and drove.

13      Q   And do you believe that this car would allow

14  people to identify you given that it's really your wife's

15  car?

16      A   No, it's registered in my name.  So if they

17  look at the tag and look at the VMD or DMV number, or

18  whatever you want to call it, it's registered in my name.

19  It's not registered in my wife's name.

20      Q   But absent the tag, is there anything else that

21  would be identifiable to you?

22      A   I don't know if there's anything identifiable

23  to my wife.

24      Q   So there is nothing identifiable to -- about --

25  other than the tag, about this car to you or your wife,



1  right?

2      A   Yeah, I would say it could have some stickers

3  on the back, you know, but I don't recall.  I don't

4  remember what they were or the identity of them.  But

5  it's a vehicle that my wife drives predominantly.  I

6  don't drive it.  I don't drive it to work because it's a

7  gas guzzler, and, you know, so...

8      Q   Yeah, because you said you mostly drive the

9  Mustang or the VW to work, right?

10     A   No.

11     Q   Oh.

12     A   I mostly drive the Mustang and the Camaro.

13     Q   Camaro.

14         So this Ford Expedition would probably be the

15  least identifiable to you just based upon your voting

16  habits, correct?

17     A   I don't understand.

18     Q   Or not voting habits, driving habits.

19     A   No, I drive it on weekends.  I drive it when I

20  go to -- if I go to Home Depot or I go -- we drive to the

21  mountains, I drive it.  When we go on vacation, I drive

22  it.

23     Q   And I'll refer you to Defendants' Exhibit 18,

24  which looks like it's an AJC article.  Are you mentioned

25  in this article anywhere?  Never mind.  Strike that.



1   This is a different article than I thought.

2        Did Mark Niesse reach out to you about this

3   article?

4     A   Who is Mark Niesse?  I would say no.  I haven't

5   talked to any reporters.

6     Q   And when's the last time that you personally

7   owned a car?

8     A   I don't understand your question.

9     Q   When's the -- so you said that the Camaro is

10  not yours, the Mustang is not yours, the VW is not yours,

11  the Expedition is not yours.  When's the last time that

12  you had your own car?

13    A   Well, technically I own the -- the Expedition,

14  because it's registered in my name.  The Camaro is

15  registered in my name and my son's name.  So when you say

16  the last time I owned a car, you know, I gave the car to

17  my son, and my wife drives this car, but those two

18  vehicles are registered in my name.

19    Q   When's the last time that you regarded a car as

20  yours?  Because it sounds like these are not -- and this

21  is not a trick question.  I'm just -- when's -- you said

22  these are -- and I -- I do the same thing.  It's like,

23  oh, that's my wife's car.  That's my car.  That's

24  so-and-so's car.

25        When's the last time that you had a car that



1  you regard as yours?

2      A   When did I have a car that is mine?  Several

3  years ago.

4      Q   Before 2020?

5      A   Yes.

6      Q   Before 2018?

7      A   I'm trying to remember.  What was that?  I had

8  a Mazda 626.  I don't remember what year I bought it and

9  when I had it.  I don't recall.

10     Q   And how active is your wife in this case?

11     A   She's not a plaintiff, so what do you mean

12  "active"?

13     Q   Strategy, discussions.  Just how active is she?

14     A   Not active with me.  We don't discuss it.

15     Q   You and your wife don't discuss this case?

16     A   No.

17     Q   Is she active with anyone else about this case?

18     A   I don't know.

19     Q   How does your wife feel about this case?

20     A   She feels horrible, concerned, stressed.

21     Q   What is your wife stressed out about this

22  case?

23     A   The potential harm that could come to my family

24  if someone acts on what was said about me.

25     Q   Earlier you testified you've changed your



1   voting habits.  Has anyone ever targeted you at a vote --

2   voting location?

3       A   I haven't been to a voting location since

4   before 2020.  I used to vote in person.  I don't vote in

5   person anymore.  I do mail-in ballot.

6       Q   And why -- why was -- why before 2020 -- why

7   after 2020 did you change the way you voted?

8       A   One, when I became aware of this here, and

9   because of COVID.  No one voted in person barely in 2020

10  because of the virus.

11      Q   And is COVID still a concern to you about --

12  strike that.

13          Is COVID still a concern to you?

14      A   COVID is still out here just like allergies

15  are, just like the flu is.

16      Q   So yes, it is a concern for you?

17      A   No, I wouldn't say it -- I -- I don't -- what's

18  your definition of "concern"?  I don't wake up every

19  morning worrying about COVID, no.

20      Q   And is there any other reasons why you changed

21  your voting habit and stopped voting in person in 2020?

22      A   I -- 2020 it was because of COVID.  After 2020,

23  it's because of this mule movie and me being in it.

24      Q   And what about the mule movie made you change

25  your --





1      A   Well, the fact that I am depicted as a

2   criminal.  I am depicted as -- as an individual who --

3   all sorts of horrible things.  You know, I choose not to

4   go vote in person because I don't want to be confronted

5   or there to be a confrontation with someone with me.

6      Q   Has anyone ever confronted you at a polling

7   location?

8      A   I haven't been to a polling location since

9   before -- since after COVID.

10      Q   Has anyone ever confronted you about voting?

11          MR. DAVIDSON:  Objection.

12      Q   BY MR. EVANS:  You can answer.

13      A   I don't understand the question.

14      Q   Has anyone ever confronted you about voting?

15      A   You mean physically confronted me?

16      Q   In any way.

17      A   Yeah, I don't vote in person, so they wouldn't

18   have the opportunity to do that.

19      Q   Has anyone ever threatened you about voting?

20      A   No.

21      Q   Have they ever intimidated you from voting?

22      A   Individuals, no, but I've changed my voting

23   habit because of this video and this movie.

24      Q   What amount of money do you think makes you

25   whole?



1    A   I think I mentioned it earlier.  I don't think

2  there's no amount of money is gonna make me whole,

3  because I've gotta live with this for the rest of my

4  life.  I've gotta wonder if somebody is gonna take this

5  seriously and come after me and my family.

6    Q   You are seeking damages in this -- damages in

7  this case, right?

8    A   Yes.

9    Q   And what amount of damages are you seeking in

10  this case?

11    A   I'll let a jury decide.

12    Q   And so you are not gonna request a certain

13  amount from the jury?

14    A   I'll let the jury decide.

15    Q   So have you -- who is your expert in this case?

16    A   I don't understand the question.

17    Q   Do you have an expert witness in this case?

18    A   I don't know.

19    Q   You do not know if you have an expert witness

20  in this case?

21    A   No.

22    Q   Did your lawyers -- strike that.

23        Do you know what your expert witness is --

24  well, first, I'll represent to you, you do have an expert

25  witness.



1      A    Okay.

2      Q    What is your expert witness saying that is a

3  proper remedy to make you whole?

4      A    I just told you I didn't knew I had one.  Now

5  you're telling me I do have one.  I have no recollection

6  of what they said that would make me whole.

7      Q    If I told you that the expert witness suggested

8  a marketing campaign putting your name out there with a

9  rehabilitation message, would that surprise you?

10     A    Yes, because I haven't heard that.

11     Q    And do you want your name blasted out there in

12 a marketing campaign given you're a man of privacy?

13     A    On the surface, no, I would not.  But if it's

14 to clear my name, I'll go with it.

15     Q    Have you ever heard of the Streisand effect?

16     A    No.

17     Q    If I told you the Streisand effect means that

18 the more you talk about something, the more people are

19 going to know about it, would you have any reason to

20 disagree with that?

21     A    No.

22          MR. DAVIDSON:  Objection.

23          THE WITNESS:  That's why I --

24     Q    BY MR. EVANS:  You can answer.

25     A    That's what I said about this movie here.  They



1 | talked about it all over the world, and everybody knows

2 | me as an individual in this movie and how they think

3 | unhighly of me.  They think, you know, I'm a criminal.  I

4 | have, you know, done something foul.  I'm a bad person.

5 | So yeah, I believe in the Streisand effect,

6 | because it talks about this, and they're still talking

7 | about this.

8 | Q   To your knowledge, has anyone located you

9 | through the Ford Expedition?

10 | A   I don't know that.  I don't know if they have

11 | or they have not.  I did change my tag.

REDACTED

21 | Q   What is your goal in filing this lawsuit?

22 | A   My goal is that I'm hoping that no one else and

23 | their family have to go through this, go through what me

24 | and my family are going through.

25 | Q   All right.  I will now refer you to Defendants'



1    Exhibit 17, and I'll represent to you both these pictures

2    were taken from drop box video from Gwinnett County.  And

3    I'll refer you to the image on the left side.

4              Do you own any clothing that resembles that

5    clothing in --

6         A    You are talking this image here (indicating)?

7         Q    Yeah, on the left side.

8         A    No, I do not.

9         Q    And I will refer you to the right side.  Do you

10   know who that is?

11        A    Are you talking right, upper right?

12        Q    Upper right and lower right.

13        A    Yes, that's me.

14        Q    And is the image on the left side a picture of

15   you?

16        A    No.

17        Q    And how do you know that?

18        A    Because it doesn't look like me, and it's not

19   me.

20        Q    And what are the distinguishing features

21   amongst the picture on the left side and the picture on

22   the right side?

23        A    The one on the right side, I have glasses on

24   that are shaded; because they are transitional, they

25   shade.  And I don't look like the gentleman on the left





 1  side.

 2       Q    And what are the distinguishing features that

 3  help you determine you don't look like the gentleman on

 4  the right side?

 5       A    I know who I am.  I know the gentleman doesn't

 6  look like me.

 7       Q    Do you have a pair of shoes like those of the

 8  gentleman on the left side of the picture?

 9       A    No, I do not.

10       Q    Do you have a pair of pants like the gentleman

11  on the left side?

12       A    If those are jeans, most individuals have

13  jeans.

14       Q    Do you have a clip -- a clip phone or clip like

15  the gentleman on the left side?

16       A    No, I do not.

17       Q    And did -- did you have a mask like that in

18  2020, like the gentleman on the left side?

19       A    We had several masks.

20       Q    All right.  Give me a couple of minutes to look

21  over my notes.  I may have a couple more questions.

22            So let's do just a five-minute break.

23            THE VIDEOGRAPHER:  Going off the record at

24  3:36.

25            (The deposition was at recess from 3:36 p.m. to



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 150 of 161

MARK ANDREWS  Conf.                          October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                            150

 1   3:50 p.m.)

 2           THE VIDEOGRAPHER:  We're back on the record at

 3   3:50.

 4       Q   BY MR. EVANS:  Okay.  Coming back from a break,

 5   Mr. Andrews, I have a few more questions for you.

 6           What was the rule for depositing multiple

 7   absentee ballots in Georgia in 2020?

 8       A   Could you repeat the question?

 9       Q   Yeah, what -- what was the law or rule that

10   permitted one individual to deposit multiple absentee

11   ballots in a drop box in Georgia in 2020?

12           MR. DAVIDSON:  I'm just gonna object.  It's

13   calling for a legal conclusion.

14       Q   BY MR. EVANS:  I'm asking for your

15   understanding, but go ahead.

16       A   Yeah, actually, before I dropped those ballots

17   off, I read the Georgia law.  I don't remember it

18   specifically, but it said if you have family members who

19   live with you in the residence, you could drop them off.

20       Q   And could you deposit -- did they have to live

21   with you?

22       A   That's what I recall.  And my kids live with

23   me.

24       Q   And if they did not live with you, your

25   understanding was you could not deposit them if they were



1  family members?

2      A   No, I don't recall that.

3      Q   All right.  I'm gonna show you a couple videos,

4  and we'll mark these as -- I think, what are we on,

5  Defendants' 17?  18?

6      A   I think the last one I got was 18.

7      Q   So 19.

8          MR. DAVIDSON:  Do you want to scoot over?

9          THE WITNESS:  Is the video there?  Because I

10  see a blank screen.

11         MR. EVANS:  Can you -- can you -- you may have

12  to turn it, Phil, because it kind of blacks out for some

13  reason.

14         THE WITNESS:  Yeah, it's not.

15         THE REPORTER:  Do you guys want to go off the

16  record?

17         MR. EVANS:  No, we're good.

18         MR. DAVIDSON:  I want to make sure I'm not

19  gonna mess up the filming by looking, but we'd like to be

20  able to see it.

21         MR. EVANS:  Yep.

22         Can you play it, Phil?

23         MR. GEORGE:  Yeah, it's just hard to see from

24  the side.

25         Can everyone see?



 1            THE WITNESS:  I can't see it.

 2            MR. GEORGE:  You can't see it?

 3            THE WITNESS:  You could play it.

 4            MS. HYLAND:  Yeah, you've got that screen that

 5   you can't see.

 6            MR. EVANS:  Do you have a privacy screen on?

 7            MR. GEORGE:  I don't have it on.  It's just...

 8            (Off-the-record discussion.)

 9            MR. DuBOSE:  Here's the problem with the way

10   you guys are doing this, it -- you're not gonna have an

11   accurate record of what's being shown to the witness.

12            MR. EVANS:  Well, we're gonna mark -- we did

13   the same thing with Engelbrecht and Phillips.  So they

14   played it, then we marked it and sent afterwards.

15            MR. GEORGE:  We're gonna e-mail this to the

16   court reporter.

17            MR. EVANS:  That's what we are gonna have to

18   do.

19            MR. DUBOSE:  E-mail a link?

20            MR. EVANS:  No, the videos.  They're short.

21   They're not a big, massive data.

22            MS. HYLAND:  Yeah, this is how Lee did it --

23            MR. EVANS:  Yeah.

24            MS. HYLAND:  -- for -- for your client.

25            MR. DuBOSE:  So the issue is still having an



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 153 of 161

MARK ANDREWS  Conf.                               October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                              153

1    accurate record of what was shown in the deposition

2    versus what's being sent out.

3            MR. EVANS:  Well, it's -- it's Defendants'

4    Exhibit 19.

5            MR. DuBOSE:  Okay.

6            MR. EVANS:  Yeah, so that's what we will mark

7    this as.  You can -- it's gonna be the same one.  It's

8    not --

9            MR. DuBOSE:  So has it been produced in

10   discovery?

11           MR. EVANS:  Yeah.  Yeah.

12           MR. DuBOSE:  All right.

13           MR. EVANS:  This is -- this is from the movie.

14   These are from the movie.

15           MR. GEORGE:  Yeah.

16           MR. DAVIDSON:  So, Jake, are you gonna sort

17   of --

18           MR. DuBose:  So it was produced from the movie,

19   and are you gonna give it time stamps or what?

20           MR. EVANS:  Yeah, we can -- I mean, that's --

21   we can do that.

22           MR. DAVIDSON:  Do you just want to read into

23   the record sort of like, yeah, what it is and what we're

24   seeing?

25           MR. EVANS:  Yeah.  Well, we can ask Mark,



Case 1:22-cv-04259-SDG   Document 255   Filed 12/20/24   Page 154 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      154

 1  Mr. Andrews, that was the plan.  I mean, I've seen them,

 2  so I know what it is.

 3          Can you see them, Mr. Andrews?  Can you see the

 4  film?  It may be -- what we can do, you guys look at it,

 5  and then once -- after you look at it, then we are gonna

 6  play it for him.

 7          MR. DuBOSE:  And then you are gonna put in the

 8  record what the time stamps are for the video clip?

 9          MR. EVANS:  Do we have that?

10          MR. GEORGE:  I don't know that I have that.

11          MR. EVANS:  We -- we can get that.

12          MR. VINING:  I think these may have been

13  individually produced.  I don't know that I know how to

14  really search for a movie clip.  I can try to find that.

15          MR. EVANS:  Yeah.  But for today's purposes,

16  it's -- this is Defendants' Exhibit 19.  We're gonna

17  produce it, label it Defendants' Exhibit 19.  You guys

18  can look at it now if you want to.  And then he'll --

19  he'll play it.

20          MR. DuBOSE:  But the problem is, the record

21  here today has to be clear what the witness is watching.

22          MR. EVANS:  Well, we're gonna get him to

23  describe it.  We did this same thing with our plaintiffs,

24  and we -- and our parties, and we did not create any

25  issues on it.



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 155 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      155

```
 1              MR. DuBOSE:  I understand --

 2              MR. EVANS:  Yeah.

 3              MR. DuBose:  -- but there has to be some

 4     identifiers; otherwise, there's no record here of what

 5     he's watching.

 6              MR. GEORGE:  So this file is called --

 7              MR. EVANS:  Yeah, we'll call the file.  Yeah.

 8              MR. GEORGE:  -- clip underline -- clip_1.MP4 is

 9     what this file is called.  And that's -- that's the file

10     I'm gonna send to the court reporter.

11              MR. EVANS:  So --

12              MR. DuBOSE:  Clip MP4?

13              MR. GEORGE:  I have five clips here.  This is

14     clip_1.MP4.

15              MR. DuBOSE:  I don't know if we're gonna solve

16     this here or not sitting here today.  You can just note

17     your objection for the record to the extent that it

18     doesn't -- I mean, they are gonna have to lay a

19     foundation with it if they need to, so --

20              MR. EVANS:  Yeah.

21              MR. DuBose:  -- I won't tell you guys how to

22     run your depo.

23              MR. DAVIDSON:  Can we just watch it first or --

24              MR. EVANS:  Yeah, go ahead.

25              MR. DAVIDSON:  If I can get behind Mr. Andrews
```



Case 1:22-cv-04259-SDG    Document 255    Filed 12/20/24    Page 156 of 161

MARK ANDREWS  Conf.                                    October 25, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      156

 1  or whatever you want to do.

 2          MR. GEORGE:  Here, I'll just let you do what

 3  you wanna do with it.

 4          (Deposition Exhibit 19 was marked for

 5  identification.)

 6          (Watching video.)

 7          MR. DAVIDSON:  All right.  Okay.  So you-all

 8  want to show that one first or do you want to run through

 9  all of them?

10          MR. EVANS:  No, we'll do one at a time.

11      Q   BY MR. EVANS:  And did you see that,

12  Mr. Andrews?

13      A   Yeah.

14      Q   Okay.  So for the record, we have played what

15  will be Defendants' Exhibit 19.  Mr. George read out the

16  clip number also into the record, which will be provided

17  to counsel.  And there was an individual in that clip,

18  I'm gonna represent to you that is from the movie "2000

19  Mules."

20          Do you know who that individual was?

21      A   No.

22      Q   And why do you not know who the individual was?

23      A   I don't know who he was.

24      Q   So sitting here today, you don't know his name,

25  correct?



```
 1      A    No.

 2      Q    You don't know where he lives, correct?

 3      A    No.

 4      Q    You don't know anything about him, correct?

 5      A    Correct.  I don't know.

 6      Q    And unless you were told who it was, you would

 7   not be able to ascertain that person, would you?

 8      A    I don't know.

 9      Q    Okay.

10           MR. GEORGE:  So this is going to be file

11   clip_2.MP4.

12           Give me one second.  It's not working.

13           Can we go off the record real quick?

14           MR. EVANS:  Yeah, we'll go off the record.

15           THE VIDEOGRAPHER:  Going off the record at

16   3:59.

17           (A discussion was held off the record.)

18           THE VIDEOGRAPHER:  Back on the record at 4:01.

19           MR. DAVIDSON:  If you want to press Play, so I

20   don't mess with the computer.

21           (Deposition Exhibit 20 was marked for

22   identification.)

23           (Watching video.)

24      Q    BY MR. EVANS:  Okay.  Mr. Andrews, we just

25   showed you what we have marked as Defendants' Exhibit 20,
```



 1   which is labeled clip_2-MP4.

 2          Did you see that clip?

 3     A   Yes.

 4     Q   And what was that clip?

 5     A   It looked like individuals standing in line to

 6   cast their ballot.

 7     Q   And I'm gonna represent to you that clip was

 8   pulled from the movie "2000 Mules."

 9          Did you recognize the individual in that clip?

10     A   No.

11     Q   And why could you not recognize the individual

12   in that clip?

13     A   Because I didn't know any -- any individuals in

14   the clip to recognize.

15     Q   And without someone telling you that

16   individual's name, could you ascertain who that

17   individual was?

18     A   No.

19          MR. EVANS:  Okay.  I think that's all the

20   questions that I have.  I appreciate your time today,

21   Mr. Andrews.

22          I don't know if Ms. Hyland has anything on

23   behalf of D'Souza parties?

24          MS. HYLAND:  I do not.

25          MR. EVANS:  Okay.  That's it.  I don't know if



1   your counsel has direct or not.

2            MR. DAVIDSON:  Nothing.

3            MR. EVANS:  If not, we're done.

4            THE WITNESS:  All right.

5            THE VIDEOGRAPHER:  Going off the record at

6   4:02.  This concludes the deposition.

7            MR. DAVIDSON:  We'll mark it confidential.

8            THE REPORTER:  Does anybody need a rough draft?

9            MR. DAVIDSON:  We'll take a rough.

10           MR. GEORGE:  We'll take one.

11           (The deposition concluded at 4:02 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                          CERTIFICATE OF REPORTER

2     STATE OF GEORGIA       )
                             )
3     COUNTY OF DEKALB       )

4

5                  I, Marcella Daughtry, a Certified
      Reporter in the State of Georgia and State of California,
6     do hereby certify that the foregoing deposition was taken
      before me in the County of DeKalb, State of Georgia; that
7     an oath or affirmation was duly administered to the
      witness, MARK ANDREWS; that the questions propounded to
8     the witness and the answers of the witness thereto were
      taken down by me in shorthand and thereafter reduced to
9     typewriting; that the transcript is a full, true and
      accurate record of the proceeding, all done to the best
10    of my skill and ability;

11             The witness herein, MARK ANDREWS, has requested
      signature.
12
               I FURTHER CERTIFY that I'm
13     in no way related to any of the parties nor am I in any
      way interested in the outcome hereof.
14

15             IN WITNESS WHEREOF, I have set my hand in my
      office in the County of DeKalb, State of Georgia, this
16    6th day of November, 2024.

17

18

19                         Marcella Daughtry

20                         _____
                           Marcella Daughtry, RPR, RMR
                           GA License No. 6595-1471-3597-5424
21                         California CSR No. 14315

22

23

24

25



```
1   Mark Andrews v. Dinesh D'Souza, et al.
    J11680690
2

3             DECLARATION UNDER PENALTY OF PERJURY

4

5                   I declare under penalty of perjury that I

6   have read the entire transcript of my deposition taken in

7   the above-captioned matter or the same has been read to

8   me, and the same is true and accurate, save and except

9   for changes and/or corrections, if any, as indicated by

10  me on the DEPOSITION ERRATA SHEET hereof, with the

11  understanding that I offer these changes as if still

12  under oath.

13

14  Signed on the_____day

15  of _____20__.

16

17

18

19  _____

    MARK ANDREWS
20

21

22

23

24

25
```

