In the Matter Of:

ANDREWS V. D'SOUZA

122-CV-04259-SDG

# BOB VARNADOE

*July 26, 2024*



800.211.DEPO (3376)
EsquireSolutions.com

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF GEORGIA.

 3                       ATLANTA DIVISION

 4    MARK ANDREWS,                    Case No.

 5                   Plaintiffs,      122-CV-04259-SDG

 6         vs.

 7    DINESH D'SOUZA, ET AL.

 8                   Defendants.

 9

10

11         Virtual Videotape Zoom Deposition of
                       Bob Varnadoe
12                Friday, July 26, 2024
                    At 9:30 a.m.

13

14

15

16

17

18

19    Reported by LeShaunda Cass-Byrd, CSR, RPR

20

21

22

23

24

25
```



```
1   APPEARANCES OF COUNSEL:

2   On behalf of Plaintiff:

3         SONIA QIN, Esq.
          DANUTA EGLE, Esq.
4         Skadden, Arps, Slate, Meagher & Flom LLP
          One Manhattan West
5         New York, New York 10001
          212.735.3000
6
    On behalf of Defendants True the Vote, Catherine
7   Englebrecht and Gregg Phillips:

8         PHILLIP GEORGE, Esq.
          Greenberg Traurig
9         333 Piedmont Road NE
          Suite 2500
10        Atlanta, Georgia 30305
          678.553.2100
11
    On behalf of the Witness:
12
          CRAIG KUNKES, Esq.
13        Robbins Alloy Belinfante Littlefield LLC
          500 14th St NW
14        Atlanta, Georgia 30318
          404.856.3271
15
    On behalf of Dinesh D'souza:
16
          AUSTIN VINING, Esq.
17        Taylor English Duna LLP
          1600 Parkwood Cir SE
18        Suite 200
          Atlanta, Georgia 30339
19        704.440.1276

20  Also Present:

21        Joe Mendoza, Videographer

22

23

24

25
```



BOB VARNADOE
ANDREWS V. D'SOUZA

July 26, 2024
3

```
 1              EXAMINATION BOB VARNADOE

 2   By Mr. George                          5

 3   By Mr. Vining                         20

 4   By Ms. Qin                            21

 5   By Mr. George                         22

 6              DEPOSITION EXHIBITS

 7   EXHIBIT     DESCRIPTION               PAGE

 8   Exhibit 1  Deposition Subpoena         6

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1          THE VIDEOGRAPHER:  We are now on the

2     record.  The time is 9:32 a.m. eastern time

3     on July 26th, 2024.  This begins the video

4     conference deposition of Bob Varnadoe,

5     taken in the matter of Mark Andrews versus

6     Dinesh D'Souza, et al. filed in the United

7     States District Court, Northern District of

8     Georgia, Atlanta Division, Case Number of

9     which is 122-CV-04259-SDG.

10          My name is Joe Mendosa.  I'm your

11     remote videographer today.  The court

12     reporter is LeShaunda Byrd.  We are

13     representing Esquire Deposition Solutions.

14     Will everybody present please identify

15     themselves and state who you represent,

16     after which the witness will be sworn in.

17          MR. GEORGE:  This is Phillip George

18     from the firm Greenberg Traurig, and I

19     represent the Defendants True The Vote,

20     Catherine Englebrecht and Greg Phillips.

21          MR. VINING:  My name is Austin Vining

22     from Taylor English Duna, and I represent

23     Dinesh D'Souza and D'Souza Media LLC.

24          MS. QIN:  My name is Sonia Qin.  I'm

25     from the firm Skadden Arps, and I represent



1          the plaintiff Mark Andrews.

2               MR. KUNKES:  My name is Craig Kunkes

3          from the firm Robbins Alloy Belinfante

4          Littlefield, and I represent the witness.

5               MS. EGLE:  My name is Daunte Engle.

6          I'm also from Skadden Arps, and I also join

7          Sonia in representing the plaintiff.

8                         BOB VARNADOE,

9     having been first duly sworn, was examined and

10    testified as follows:

11                         EXAMINATION

12    BY MR. GEORGE:

13       Q.    Good morning, Mr. Varnadoe.  As I

14    mentioned, my name is Phillip George, and I represent

15    True The Vote, Inc. Catherine Englebrecht, and Greg

16    Phillips.

17               Have you ever given a deposition before?

18       A.    This is my first deposition.

19       Q.    Just to go over a few ground rules to make

20    sure we are on the same page.  First, just let me

21    finish my question before you respond, and I will let

22    you finish your answer.  If you think I'm cutting you

23    off or anything, just let me know, and I will give you

24    the opportunity to complete your answer.

25               Does that sound okay?



1      A.      Sounds good.

2      Q.      All right.  If you think I'm interrupting

3  you for any reason, just let me know.

4              Please try to give verbal answers, because

5  the court reporter has to write everything down.  She

6  can't take head nods and things like that, so just try

7  to give verbal answers; is that okay?

8      A.      Understood.

9      Q.      If you don't understand a question anyone

10  ask, just let us know; otherwise, we are going to

11  assume that you understand the question you are

12  responding to.

13             Does that sound good?

14     A.      Sounds good.

15     Q.      Okay.  And I don't anticipate this going

16  very long, but if you need a break for any reason,

17  just let me know, and we be will sure to accommodate

18  that.

19     A.      Okay.  Will do.

20     Q.      Is there any reason you cannot provide

21  truthful and accurate testimony today?

22     A.      No.

23     Q.      Okay.  I will share on the screen what has

24  been premarked as TTV Exhibit 1.

25             (TTV Exhibit 1 was marked for



 1  | identification.).
 2  | BY MR. GEORGE:
 3  |     Q.    Let me know if you can see a document on
 4  | your screen.
 5  |     A.    I can.
 6  |     Q.    Okay.  Do you recognize this document?  And
 7  | I can scroll through it, just to give you a clean
 8  | look.
 9  |     A.    Yes.
10  |     Q.    Okay.  And this is the deposition subpoena
11  | that we sent you?
12  |     A.    Yes.
13  |     Q.    Have you reviewed this document?
14  |     A.    I have.
15  |     Q.    I'm showing you portions towards the end
16  | here.  It's called Documents to be Produced.  Did you
17  | review this section in your subpoena?
18  |     A.    I did.
19  |     Q.    Did you look for any documents that were
20  | potentially responsive to these document requests?
21  |     A.    I did, yes.  I looked at my e-mail messages
22  | on LinkedIn and text messages.  I didn't find anything
23  | from -- from our -- related to this matter.
24  |         COURT REPORTER:  I'm sorry, I didn't
25  |      hear the end.  I didn't find anything from



1          our?  Your last three words.

2               THE WITNESS:  I am sorry.  I didn't

3          find anything from Mark Andrews or his

4          family related to this matter.

5     BY MR. GEORGE:

6          Q.    Thank you.

7                Have you ever exchanged anything in writing

8     with Mr. Andrews?

9          A.    I did in the course of my work at NCR where

10    we were both employed.

11         Q.    Where do you currently work?

12         A.    Kaiser Permanente.

13         Q.    How long have you been there?

14         A.    January 8th is when I started there.

15         Q.    January 8th of this year?

16         A.    January 8th of this year.  Yes.

17         Q.    And you mention there was a point in time

18    where you worked for NCR Corporation?

19         A.    Correct, yes.  I left in December of 2023.

20         Q.    When did you start with NCR?

21         A.    2012.  I don't remember exactly when.

22         Q.    What was the last position that you held at

23    NCR?

24         A.    Chief information security officer.

25         Q.    What office did you work in?



1      A.      Well, at -- you know, when I left, I was
2  working out of the Midtown Atlanta office.
3  Originally, I was in the Duluth, Georgia office.
4      Q.      As chief information security officer, what
5  were your general job responsibilities?
6      A.      Information security matters, you know,
7  controlling the information security of our technology
8  systems at NCR, doing investigations, responding to
9  incidents related to technology matters.
10      Q.      As chief information security officer, do
11  you oversee the entire company of NCR, or just a
12  location of it?
13      A.      Yes, the entire company.
14      Q.      When you worked at NCR, when did you first
15  meet Mark Andrews?
16      A.      Gosh, I don't know what year.  It was --
17  let's see, Mark Andrews joined many years, probably
18  six or eight years, you know, into my tenure.
19      Q.      For your time there, did you know him well?
20      A.      I worked with him on a pretty regular
21  basis.  I would say I probably spoke with Mark at
22  least once a month.
23      Q.      What sorts of things did you work with him
24  on?
25      A.      So Mark was a manager in the internal audit



 1  function.  So in the course of his and his team's

 2  audits, we would interact responding to questions that

 3  he or his team might have about information security

 4  settings and configurations and that sort of thing.

 5      Q.     When you say you typically interacted with

 6  him once a month or so, how would that have been?  On

 7  the phone?  On zoom?  E-mail?

 8      A.     It could have been on chat, company chat.

 9  It could have been on e-mail, face-to-face, you know,

10  Teams, virtual meetings.  Yes, all the above.

11      Q.     Okay.  Have you heard of the movie 2000

12  Mules?

13      A.     Not until this matter arose, no.

14      Q.     Okay.  So you don't recall Mr. Andrews ever

15  discussing 2000 Mules with you?

16      A.     Yes, he did.  Yeah, he -- he mentioned that

17  -- I don't know that he mentioned it by name.  But he

18  mentioned that he had been filmed, so I don't recall

19  that he said the name of the film at that time.

20      Q.     What you were just discussing with

21  Mr. Andrews, was that conversation in person that you

22  had with him, or was that virtually, or?

23      A.     It -- it was, yes.  My recollection is that

24  it was in person in the NCR offices.  He pulled me

25  aside and said that, you know, he wanted to make me



1   aware that he had been filmed, putting ballots into a

2   drop box, and that, you know, there was an accusation

3   that there was, you know, it was fraudulent ballots.

4   He asserted that was not the case, that it was not

5   true, and wanted to make me aware in case there was

6   any, you know, implications for NCR, or, you know,

7   anything that arose related to his employment at NCR

8   as a result.

9       Q.    Would that conversation have taken place

10  just in a standalone conversation or multiple

11  conversations?

12      A.    I -- I don't recall anything beyond the one

13  conversation.

14      Q.    Do you recall when that conversation took

15  place?

16      A.    I -- I don't.  I would -- you know, my best

17  guess that it -- it was probably 2021 or after.  My

18  recollection is that it was in person, and for the

19  majority of 2020, we were not in the office.  And I

20  doubt I was in the office very rarely.  I doubt he

21  would have been in the office at the same time.

22      Q.    Was there a point in time that NCR and all

23  employees kind of expected you to come back into the

24  office?

25      A.    Honestly, I don't recall.  You know, NCR



 1  return to office was pretty extended.  You know, I

 2  don't think it wasn't until probably late 2022, 2023

 3  that everybody was in the office.  So I don't -- yeah,

 4  I don't recall.

 5      Q.    Getting back to that conversation that you

 6  had with Mr. Andrews, did you make any recommendations

 7  to him at what he told you?

 8      A.    No.  No.

 9      Q.    Do you recall saying anything in response

10  to him?

11      A.    I said thank you for giving me a heads up.

12  I don't recall that I did anything with it beyond

13  that.

14      Q.    Did you have any other conversations with

15  anyone else at NCR about discussions with you?

16      A.    I don't recall discussing it with anybody

17  else at that time, no.

18      Q.    Did Mr. Andrews ask you to speak with

19  anyone else about it?

20      A.    He did not, no.

21      Q.    Did Mr. Andrews ask you to take any

22  affirmative actions about what he said?

23      A.    I don't recall that he did, no.

24      Q.    In that conversation you had with

25  Mr. Andrews, did he mention True the Vote?



1      A.      I don't recall him mentioning True the

2    Vote.

3      Q.      Did he mention Catherine Englebrecht?

4      A.      I don't recall that, no.

5      Q.      Did he mention Greg Phillips?

6      A.      I don't believe so.

7      Q.      Do you know who any of those three parties

8    are?  Do you know who they are today?

9      A.      I know who they are today.  I did not prior

10   to receiving the subpoena.

11     Q.      Okay.  So after you had that conversation

12   with Mr. Andrews in 2021 or 2022, did you conduct any

13   kind of investigation or anything like that?

14     A.      No.

15     Q.      It was really just the one conversation?

16     A.      (Shaking head in the affirmative)

17     Q.      Other than what we talked about, do you

18   remember anything else about that conversation?

19     A.      Not that I can recall, no.

20     Q.      Do you know Kelly Moyer who worked with NCR

21   in 2022?

22     A.      I do, yes.

23     Q.      Did you have any discussions with her about

24   what Mr. Andrews and what you talked about before?

25     A.      Not that I recall.



1    Q.    Do you know a William Smith who worked at

2  NCR?

3    A.    I do.

4    Q.    Did you have any discussions with him about

5  what Mr. Andrews talked to you about?

6    A.    Not that I recall.

7    Q.    The same questions for Brian Beasley, do

8  you know who he is, who used to work in NCR?

9    A.    I know that name.  I don't know Brian

10  Beasley well.

11    Q.    Assuming you didn't have any conversations

12  with him about Mr. Andrews?

13    A.    I did not, no.

14    Q.    Do you know a Kelly Black who worked at

15  NCR?

16    A.    I do.

17    Q.    Did you have any conversations with her

18  about Mr. Andrews?

19    A.    Not that I recall.

20    Q.    Do you know a Nive Loganathan who worked at

21  NCR?

22         COURT REPORTER:  I'm sorry, what is

23      the name?

24  BY MR. GEORGE:

25    Q.    Nive Loganathan.  I will spell it.



```
 1   N-I-V-E --
 2        A.    Oh, no.
 3             COURT REPORTER:  I'm sorry, I didn't
 4        -- N-I-V-E?
 5             MR. GEORGE:  Last name is
 6        L-O-G-A-N-A- T-H-A-N.
 7             THE WITNESS:  I do know Nive, and no,
 8        I did not have a conversation, that I
 9        recall.
10   BY MR. GEORGE:
11        Q.    Are you aware of anything negative
12   happening to Mr. Andrews at work as a result of what
13   he talked to you about?
14        A.    Not that I'm aware of.
15        Q.    Other than what we discussed about what he
16   discussed with you, are you aware of his life being
17   affected in any way as a result of --
18        A.    Not that I'm aware of.
19        Q.    Are you aware of Mr. Andrews raising any of
20   the issues you discussed with him to anyone else at
21   NCR?
22        A.    Yes.  So I had somebody that reached out to
23   me that -- that said there was a subpoena issued at
24   NCR.  This is a former employer of NCR.  And, you
25   know, told me that there were several people.
```



1               So myself included that were requested to

2    -- to, you know, pull documents and messages related

3    to them.  So I'm aware that there were others.

4               I don't know what that full list is.

5         Q.    Who did you have that discussion with?  You

6    said former NCR employee?

7         A.    Yes.  His name is Paul Farley.

8         Q.    And you said he does not work at NCR any

9    longer?

10        A.    He is not an employee at this point, no.

11        Q.    Do you know how he heard about the

12   subpoenas then?

13        A.    I don't.

14        Q.    Did he mention anything else about this

15   case?

16        A.    He did not, no.

17        Q.    Other than that discussion about the

18   subpoenas, are you aware of Mr. Andrews raising these

19   issues to anyone else at NCR at the time, 2021 and

20   2022?

21        A.    I believe he may have told me that he told

22   Bill Smith, William Smith about it.  I think he did

23   mention that.

24        Q.    Did he say anything else about what he told

25   Mr. Smith?



1      A.      He did not.

2      Q.      Have you ever seen Mr. Andrews mentioned in

3  the news?

4      A.      When I received the subpoena, I did a

5  search and found a New York Times article that -- that

6  talked about the issue.  Other than that, not -- not

7  anything at the time that I recall.

8      Q.      So you don't recall seeing anything in 2021

9  or 2022 about Mr. Andrews?

10     A.      No.

11     Q.      Did he ever discuss with you the fact that

12 he was in the news at the time?

13     A.      He discussed with me that he had been

14 filmed, and that he, you know, again, he was concerned

15 about the potential repercussions as a result of that,

16 but, you know, not that he was listed in articles or

17 anything like that.  Just publicity around the movie.

18     Q.      Do you know if any of the issues we

19 discussed about the conversation he had with you, do

20 you know if any of that affected Mr. Andrews'

21 reputation at NCR at all?

22     A.      None that I'm aware of.

23     Q.      When was the last time you spoke with

24 Mr. Andrews?

25     A.      It would have been prior to my leaving NCR.



1  So probably -- probably December of 2023.

2      Q.    You've never spoken with him at all about

3  the subpoena?

4      A.    I have not.

5      Q.    Have you ever spoken with Mr. Andrews about

6  this case at all?

7      A.    I have not.

8      Q.    Have you ever spoken with Mr. Andrews'

9  attorneys?

10     A.    I have not.

11     Q.    Other than what you discussed before with

12  Paul Farley, have you spoken with anyone else at NCR

13  about this issue after receiving this subpoena?

14     A.    Not that I recall.

15     Q.    After receiving this subpoena, have you

16  talked to anyone else about this case?

17          MR. KUNKES:  Hold on.  Objection to

18      the extent you are asking for privileged

19      communications with me.

20          MR. GEORGE:  Yeah, I'm not asking

21      about privileged communication.

22  BY MR. GEORGE:

23     Q.    Other than with your attorneys, have you

24  had any conversations?

25     A.    My family.



BOB VARNADOE                                          July 26, 2024
ANDREWS V. D'SOUZA                                            19

```
1      Q.     Okay.  What is your residential address?

2      A.     ███████████████████████████

       ██████████

4             COURT REPORTER:  I'm sorry, did you

5       say ████████

       ██████████████████████████

7             COURT REPORTER:  And the street name

8       one more time?  █████

       ████████████████████████████████████

       ███████████████████████

11   BY MR. GEORGE:

12     Q.     What is your cell phone number?

13     A.     ████████████

14     Q.     How long would you say you've had your

15   current cell phone?

16     A.     A long time.  Probably 20 years.

17     Q.     What about the physical phone?  I'm

18   assuming you --

19     A.     Oh, physical phone.  I'm going to say 2019

20   probably.

21     Q.     And do you have a personal e-mail address?

22     A.     I do.

23     Q.     What is that?

24     A.     ████████████████████████

       ████████████████
```



1    Q.    No other personal e-mail addresses?

2    A.    Yeah, I do.  Not ones that I used

3    regularly, but ████████████████████████

    ████████████████████    And then there is a G-mail,

5    and I would have to look it up.  I don't -- I don't

6    recall that.  Let me see.  ████████████████

7    Q.    Thank you.

8          What do you know, generally speaking, about

9    this case?

10   A.    Gosh, not a lot.  I know that Mark is

11   making the assertion that he has had impact to him as

12   a result of the publicity around the movie.  But

13   nothing beyond that.

14   Q.    Other than what we have already discussed,

15   is there anything related to this case that you

16   haven't mentioned that you think we should know?

17          MR. KUNKES:  Object to form.

18          THE WITNESS:  Nothing that -- nothing

19       that I can -- I can think of.

20          MR. GEORGE:  I don't think I have any

21       further questions of the witness.  I don't

22       know if anyone else does.

23                       EXAMINATION

24   BY MR. VINING:

25   Q.    Good morning, Mr. Varnadoe.  I just have a



 1   couple of quick questions.

 2          I believe that Mr. Andrews had only one

 3   conversation with you regarding his depiction in the

 4   2000 Mules film?

 5      A.    That one conversation is all I recall.

 6      Q.    And in that conversation, did you mention

 7   Dinesh D'Souza?

 8      A.    I don't recall him mentioning any names.

 9   Just the movie.

10      Q.    Do you know if he mentioned D'souza Media?

11      A.    I don't recall.

12          MR. KUNKES:  Okay.  I have no further

13      questions.

14          MS. QIN:  I have a few questions.

15                    EXAMINATION

16   BY MS. QIN:

17      Q.    Good morning, Mr. Varnadoe.

18          During your period with NCR, did you report

19   to anyone?

20      A.    I did, yes.  I had two different managers

21   during my tenure.

22      Q.    And Mr. Andrews is one of those two

23   managers?

24      A.    Correct.

25      Q.    During your employment -- period of



1  employment with NCR, how many people reported to you?

2      A.     In total, about 160, 180.

3      Q.     And was Mr. Andrews one of those 160 to 180

4  people?

5      A.     No, he was not.

6      Q.     Outside of the course of your employment

7  with NCR, did you have any interactions with Mark

8  aside from employment context?

9      A.     No.

10             MS. QIN:  I have no further

11     questions.  Thank you.

12                     EXAMINATION

13  BY MR. GEORGE:

14     Q.     Can you name the two managers that you just

15  mentioned.

16     A.     Bill Bancuren -- William Bancuren and Dan

17  Antilley.

18             COURT REPORTER:  Do you mind spelling

19     their last names?  William?

20             THE WITNESS:  Sure.  B-A-N-C-U-R-E-N.

21             COURT REPORTER:  And Dan?

22             THE WITNESS:  Dan is -- I can't

23     remember if it's one L or two.

24     A-N-T-I-L-L-E-Y.

25  BY MR. GEORGE:



1      Q.      Mr. Andrews mentioned 2000 Mules to you,

2    did you watch the movie?

3      A.      I did not.

4      Q.      Did you do any kind of investigation into

5    the movie?

6      A.      Not that I recall.  Okay.

7              MR. GEORGE:  Okay.  I have no further

8        questions.

9              MR. KUNKES:  Finished.

10             THE VIDEOGRAPHER:  The time is 9:59

11       eastern time.  Off the record.

12             MR. GEORGE:  Transcript for me.  No

13       video order at the moment.

14             MR. VINING:  Standard transcript for

15       us.  No video at the moment.

16             MS. QIN:  Standard transcript.  No

17       video.  Thank you.

18             MR. KUNKES:  Nothing from our firm.

19             (Deposition adjourned at 9:59 a.m.)

20

21

22

23

24

25



1                     REPORTER'S CERTIFICATE

2          I, LESHAUNDA CASS-BYRD, CSR No. B-2291, RPR,

3     Registered Professional Reporter, certify that the

4     foregoing proceedings were taken before me at the time

5     and place therein set forth, at which time the witness

6     was put under oath by me;

7          That the testimony of the witness, the questions

8     propounded, and all objections and statements made at

9     the time of the examination were recorded

10    stenographically by me and were thereafter

11    transcribed;

12         That the foregoing is a true and correct

13    transcript of my shorthand notes to taken.

14    I further certify that I am not a relative or employee

15    of any attorney or the parties, nor financially

16    interested in the action.

17         I declare under penalty of perjury under the laws

18    of North Carolina that the foregoing is true and

19    correct.

20         Dated this August 7, 2024.

21
                   
22

23              LESHAUNDA CASS-BYRD, CCR-B-2291, RPR

24

25