**In the Matter Of:**

MARK ANDREWS vs DINESH D'SOUZA

1:22-cv-04259-SDG

---

# WILLIAM SMITH

*July 22, 2024*

---



800.211.DEPO (3376)
EsquireSolutions.com

1          IN THE UNITED STATES DISTRICT COURT FOR THE
                   NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION

3

4   MARK ANDREWS,                    ) CASE NO.
                                     ) 1:22-cv-04259-SDG
5            Plaintiff,              )
    vs.                              )
6                                    )
    DINESH D'SOUZA, et al.           )
7                                    )
                                     )
8            Defendants.             )
                                     )
9   - - - - - - - - - - - - - - - - )

10

11                 VIDEOTAPE DEPOSITION OF

12                      WILLIAM SMITH

13

14          Monday, July 22, 2024, 12:32 p.m.(EST)

15

16

17

18

19

20        HELD VIA ZOOM

21        WITNESS LOCATION:
          ATHENS, GEORGIA
22

23     ---------------------------------------------

24        WANDA L. ROBINSON, CRR, CCR, No. B-1973
       Certified Shorthand Reporter/Notary Public
25



```
 1                    APPEARANCES OF COUNSEL

 2

 3   Appearing on Behalf of the Plaintiff:

 4

         DANUTA EGLE, ESQUIRE
 5       SONIA QIN, ESQUIR
         Skadden, Arps, Slate, Meagher & Flom LLP
 6       One Manhattan West
         New York, New York  10001-8602
 7       T:  212.735.3000  F:  212.735.2000
         E-mail:  danuta.egle@probonolaw.com
 8                  sonia.qin@probonolaw.com

 9

10   Appearing on Behalf of the Defendants Dinesh D'Souza
     and D'Souza Media, LLC:
11
         AUSTIN C. VINING, ESQUIRE
12       Taylor English Duma LLP
         1600 Parkwood Circle, S.E., Suite 200
13       Atlanta, Georgia  30339
         T:  770.434.6868  F:  770.434.7376
14       Email:  avining@taylorenglish.com

15

16   Appearing on Behalf of the Defendants True The Vote,
     Catherine Englebrecht, and Gregg Phillips:
17

18       PHILIP GEORGE, ESQUIRE
         Greenberg Traurig, LLP
19       Terminus 200
         3333 Piedmont Road, N.E., Suite 2500
20       Atlanta, Georgia  30305
         T:  678.553.2100  F:  678.553.2212
21       E-mail:  philip.george@gtlaw.com

22

23   ALSO PRESENT:

24        MARK VON LANKEN, Videographer

25
```



WILLIAM SMITH                                           July 22, 2024
MARK ANDREWS vs DINESH D'SOUZA                                      3

```
 1                  INDEX OF EXAMINATIONS

 2

 3   WILLIAM SMITH (Signature Waived)

 4   By Mr. George                          Page 5, 21

 5   By Mr. Vining                          Page 18

 6   By Ms. Danuta                          Page 20

 7

 8

 9                    INDEX OF EXHIBITS

10   DEFENDANT'S

11   EXHIBIT NO.           DESCRIPTION           PAGE

12   EXHIBIT TTV- 1   Notice of Deposition         7

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1          THE VIDEOGRAPHER:  We are on the record.

2          The time is 12:32 p.m., Eastern Time Zone,

3    on Monday, July 22nd, 2024.

4          This begins the videoconference deposition

5    of Bill Smith, taken in the matter of Mark

6    Andrews versus Dinesh D'Souza, et al., filed in

7    the United States District Court for the

8    Northern District of Georgia, Atlanta Division,

9    Case No. 1:22-cv-04259-SDG.

10         My name is Mark Von Lanken.  I am your

11   remote videographer.  The court reporter is

12   Wanda Robinson.  We are representing Esquire

13   Deposition Solutions.

14         Will everyone please identify themselves

15   and state who you represent, after which the

16   witness will be sworn in.

17         MR. GEORGE:  My name is Philip George,

18   from the firm Greenberg Traurig, and I

19   represent the defendants True to Vote,

20   Catherine Engelbrecht, and Greg Phillips.

21         MR. VINING:  My name is Austin Vining from

22   the law firm Taylor English Duma, and I

23   represent Dinesh D'Souza and D'Souza Media,

24   LLC.

25         MS. DANUTA:  Good Afternoon.  My name is



```
 1        Danuta Egle, on behalf of the Plaintiff, Mark
 2        Andrews, and I'm from the law firm of Skadden.
 3             MS. QIN:  Good afternoon.  My name is
 4        Sonia Qin, also representing the plaintiff, Mr.
 5        Mark Andrews, also from the law firm Skadden
 6        Arps.
 7                   - - - - - - - -
 8                   WILLIAM SMITH,
 9    being duly sworn, was examined and testified as
10    follows:
11                   - - - - - - - -
12    EXAMINATION
13    BY MR. GEORGE:
14        Q    Good afternoon, Mr. Smith.
15             I introduced myself.  My name is Phil
16    George.
17             Have you ever been deposed before?
18        A    Yeah, a few times.
19        Q    Okay.
20        A    Probably close to a thousand.  I'm former
21    law enforcement.  I did 24 years.  I was a senior
22    detective in Maryland.  I was referred to the Secret
23    Service.  So I've testified a lot.
24        Q    I'll just really quickly go over some
25    grounds rules to make sure we're all on the same
```



 1  page.

 2          Please let me finish my question, I'll let

 3  you finish your answer.  If you think I'm

 4  interrupting you at all, just let me know.  I'll let

 5  you finish your answer.

 6          Please give verbal answers so the court

 7  reporter can record everything.  If you don't

 8  understand a question I ask, just let me know and I

 9  can clarify it.  Otherwise, I'm going to assume you

10  understand my question.

11          And if you need a break for any reason,

12  although I don't think this will go very long, just

13  let me know.

14          Does that all sound okay?

15      A    Sounds fine.

16      Q    Is there any reason you cannot provide

17  truthful and accurate testimony today?

18      A    No, sir.

19      Q    I'm just going to click on the screen.

20  Okay.

21          You see a document on your screen, Mr.

22  Smith?

23      A    Yes, I do.

24      Q    And what is this document?

25      A    It's the Northern District Court for the



 1  Northern District of Georgia, Atlanta Division.

 2      Q    Okay.  This is a document that has been --

 3  sorry.  I didn't mean to cut you off.

 4      A    I received this document.

 5      Q    This is a document premarked as TTV

 6  Exhibit 1.

 7           (WHEREUPON, TTV Exhibit 1 was marked for

 8       identification.)

 9  BY MR. GEORGE:

10      Q    This is the subpoena we sent you, right?

11      A    Yes, sir.  It looks to be the same.

12      Q    So you received and reviewed this

13  document?

14      A    Yes, sir.

15      Q    I'll scroll to the end of this document.

16  You see on your screen it says Documents to be

17  Produced?

18      A    Yes, sir.

19      Q    Did you look for documents responsive to

20  these document requests?

21      A    I have no documents.

22      Q    Have you ever exchanged anything in

23  writing with Plaintiff, Mark Andrews?

24      A    No, sir.  Not that I'm aware of.  I don't

25  believe so.  It was all verbal.



WILLIAM SMITH                                          July 22, 2024
MARK ANDREWS vs DINESH D'SOUZA                              8

```
 1        Q     What's your residential address, Mr.
 2   Smith?
 3        A     ███████████████████████████████████.
 4              And for the record, my name is William,
 5   not Bill.
 6        Q     Thank you.
 7              What's your cell phone number?
 8        A     ████████████████.
 9        Q     How long have you had your current cell
10   phone?
11        A     Since I worked in DC, 20 plus years.
12        Q     And do you have a personal email address?
13        A     Yes, sir.
14        Q     What is that?
15        A     It's ████████████████████████████
16        Q     Mr. Smith, where do you currently work?
17        A     I'm self-employed.
18        Q     How long have you been self-employed?
19        A     Since October 2020.
20        Q     Was there a point in time where you worked
21   for NCR Corporation?
22        A     Yes, sir.
23        Q     And for what years did you work for NCR?
24        A     Um, I could look up the exact date.  It
25   ended in 20 -- October of -- yeah, October 1st,
```



1  2020.  It was six years prior, I was chief security

2  officer for the company, 37,000 employees, operating

3  in 180 countries.

4       Q    What office did you work in when you were

5  at NCR?

6       A    The Atlanta office.  I worked out of the

7  Atlanta office.

8       Q    What were your job responsibilities?

9       A    I was chief security officer.  I oversaw

10  global investigations, physical security, executive

11  protection, due diligence.

12            What else?  That's about -- that would

13  probably cover it.  Crisis management.  I oversaw

14  crisis management as well.

15       Q    When you worked at NCR, did you know Mark

16  Andrews?

17       A    No, sir, I did not.

18       Q    When did you first meet or speak with Mark

19  Andrews?

20       A    He called me on the phone.  He wanted some

21  information.

22       Q    Do you remember when that phone call was?

23       A    No, sir, I don't.  And I know it was after

24  the elections.

25       Q    After the 2020 election?



1      A     General elections.  Yes, 2020 elections.

2      Q     How many times did you speak with Mr.

3   Andrews?

4      A     I think two times then, and he called me

5   recently to let me know I'd be getting a subpoena.

6   So three total, I believe.

7      Q     So did you speak with him in between the

8   times you were at NCR and when he recently spoke to

9   you about the subpoena?

10      A     Yeah.  I was still working at NCR.  He

11   called me, I believe, at least twice.

12      Q     Have you heard of the movie 2000 Mules?

13      A     Yes, sir.

14      Q     When did you first hear about that?

15      A     After the elections.  So I came across --

16   I belong to a network of friends and they shared the

17   information and I watched the movie.

18      Q     You said while you were at NCR you had two

19   -- you think you had two phone conversations with

20   Mr. Andrews?  Does that sound right?

21      A     I believe so, yes.

22      Q     Focusing on the first phone conversation,

23   what do you recall about that phone call?

24      A     He was upset.  As I recall.  Again, it's

25   been a number of years.  He was upset that he was



1  being accused of stuffing ballot boxes, voter fraud.

2  He was concerned for his safety and that of his

3  family and wanted information -- he wanted to know

4  if I could provide information on how to better

5  secure --

6          THE COURT REPORTER:  You went out on the

7      end of your answer.

8      A    He wanted information on better how to

9  secure his house to protect himself and his family.

10 He said he felt threatened.

11     Q    Did you provide him with any information

12 on how better to secure his house?

13     A    Yes, sir.  He was an employee and I did,

14 yes.

15     Q    What did you tell him?

16     A    I told him about lighting, exterior

17 lighting for his house.  Camera systems, mainly

18 wireless camera systems.  They're a cheap brand,

19 effective.

20          Contact the local police, let them know so

21 they can mark -- in the 911 system, you can -- the

22 police department's 911, you can mark in the system

23 about threats, if there's an ongoing threat in the

24 house, just to alert responding officers.

25     Q    Did you tell him anything else regarding



```
 1  physical security related to his family?
 2      A    Changing his routes, being aware of being
 3  surveilled, someone following him.  Changing his
 4  routes if he's going to work or shopping.  Just
 5  general security tips that most people don't think
 6  about.
 7      Q    Did you talk to him at all about any
 8  actions he might take online?
 9      A    Well, you can limit your social media
10  footprint, yes.  I told him to make sure you don't
11  have your addresses -- if you're on Facebook, don't
12  post that you're out to dinner, you know, the
13  check-in thing.  Just limit the number -- the amount
14  of information you have on social media.
15      Q    Focusing on the second phone call you
16  believe you had with Mr. Andrews, do you recall
17  anything from that phone call?
18      A    He just had some additional questions, I
19  believe, regarding locks on his doors and lighting.
20  It was just generally a follow-up for clarification
21  of what I told him in the first one, the first
22  conversation.
23      Q    Did you provide him with any information
24  other than related to the locks on doors and
25  lighting in the second phone conversation you had
```



1   with him?

2       A    That's all I believe I needed to tell him

3   about.  He was asking me very specific questions

4   about physical security.

5       Q    Do you know if Mr. Andrews in fact

6   implemented any of the recommendations that you gave

7   him?

8       A    I have no idea.  Like I said, I never met

9   Mr. Andrews.  I have no idea where he lives.

10      Q    On either of the phone conversations that

11  we talked about, did Mr. Andrews mention 2000 Mules?

12      A    Yes.  In the first conversation.

13      Q    Do you remember what he said about it?

14      A    That he was accused of fraud, I guess, in

15  that he had been receiving threats and he was

16  concerned for his safety, and that's where he wanted

17  information, how to protect himself and his family.

18      Q    On either of those two phone

19  conversations, did Mr. Andrews mention True to Vote?

20      A    Not that I can recall.

21      Q    Do you know what True to Vote is?

22      A    Yes, I do.

23      Q    What have you heard about True to Vote?

24      A    I read a lot.  It's just -- I just read

25  about it.  Stuff I read.



1      Q     All right.  Did Mr. Andrews mention Dinesh
2  D'Souza on any of those phone conversations you had
3  with him?
4      A     Not that I can recall.
5      Q     Do you recall him mentioning Catherine
6  Engelbrecht?
7      A     No, sir.
8      Q     Do you remember him mentioning Greg
9  Phillips?
10     A     No, sir.
11     Q     Other than what we've already talked
12  about, do you remember anything else about either of
13  those two phone calls you had with Mr. Andrews?
14     A     No.  They were maybe five or 10 minute
15  phone calls, really.  Again, he was concerned and he
16  asked for help and I gave him help.
17     Q     Did Mr. Andrews mention -- I think you
18  said Mr. Andrews said that he was receiving threats.
19  Did he mention who he was receiving threats from?
20     A     No, sir.
21     Q     Did you ever interact with Mr. Andrews
22  related to a work-related issue?
23     A     No, sir.
24     Q     Are you aware of anything negative
25  happening to Mr. Andrews as a result of the things



```
 1   that he discussed with you on those phone calls?

 2        A    No, sir, I'm not.

 3        Q    Are you aware of him being demoted?

 4        A    Not that I'm aware of.

 5        Q    Are you aware of him receiving any lower

 6   pay?

 7        A    Not that I'm aware of.

 8        Q    Are you aware of him not being promoted?

 9        A    Not that I'm aware of.

10        Q    So after these two phone calls in 2020,

11   you said you had a call with him recently?

12        A    He called me I guess -- I guess the first

13   subpoena you all sent arrived -- just to let me know

14   I should be expecting to be served with a subpoena,

15   and the conversation lasted maybe 45 seconds to a

16   minute.  He just said, do you remember me?  And he

17   reiterated what I talked to him about very shortly

18   and said you should be getting served.

19             About 30 minutes later, a guy showed up at

20   the house and served me.

21        Q    Before he reintroduced himself or

22   reiterated your phone call, did you remember Mr.

23   Andrews?

24        A    I vaguely remember him.  Again, I had

25   37,000 employees across the globe and the amount of
```



1   stuff that happens in a financial business, like

2   ATM's is very astonishing.

3       Q    Are you aware of Mr. Andrews raising any

4   of the security-related issues we talked about to

5   anyone else at NCR?

6       A    Not that I'm aware of, sir.

7       Q    I think you already mentioned this

8   already.  You don't recall ever exchanging any

9   emails with Mr. Andrews?

10      A    No, I don't believe I did.

11      Q    So you didn't exchange any text messages

12  with Mr. Andrews?

13      A    I don't have to do text.  But, no, I don't

14  recall any text messages.  It was phone calls

15  mainly.

16      Q    Do you know if any of the issues we've

17  been talking about with Mr. Andrews affected his

18  reputation at all at NCR?

19      A    I have no idea, sir.

20      Q    Do you know if Mr. Andrews made any formal

21  complaints to NCR?

22      A    Well, if it was an ethics and compliance

23  issue, but this was outside of the company, so, no,

24  I don't know of anything they would have done.  It

25  didn't pertain to work at the company.



 1     Q    Did Mr. Andrews speak about what this
 2   lawsuit is about when he called you recently?
 3     A    Just said he had -- he was involved in
 4   litigation.  He didn't even say lawsuit.  He said he
 5   was involved in litigation.
 6     Q    Have you ever spoken with any of Mr.
 7   Andrews' attorneys?
 8     A    No, sir.  I think a paralegal called me
 9   but I don't know if it was your side or the other
10   side.
11     Q    So we've talked about three conversations
12   you've had with Mr. Andrews.  Do you recall anything
13   else you haven't mentioned about any of those three
14   conversations?
15     A    No, I don't recall anything else about Mr.
16   Andrews.
17     Q    Do you know a Brian Beasley, who used to
18   work at NCR?
19     A    No, sir, I do not.
20          MR. GEORGE:  I believe that's all the
21      questions I have.
22          I pass the witness in case anyone else has
23      any questions.
24          MR. VINING:  I have a few questions.
25



```
 1   ///
 2   EXAMINATION
 3   BY MR. VINING:
 4       Q    Mr. Smith, do you recall a Bob Varnadoe
 5   from NCR?
 6       A    Yes, I do.
 7       Q    Did you have any communications with Mr.
 8   Varnadoe about Mark Andrews?
 9       A    Not that I recall, no, sir.
10       Q    Do you recall a Kelly Moyer from NCR?
11       A    I know Kelly, yes.
12       Q    Did you have any conversations with Kelly
13   Moyer about Mike Andrews?
14       A    Not that I recall, sir.
15       Q    Do you remember Nive, or Nive Loganathan
16   from NCR?
17       A    Nive, yes.  I know Nive, yes.
18       Q    Did you have any conversations with Nive
19   about Mr. Andrews?
20       A    No, sir, I did not.
21       Q    Do recall a Kelly Black from NCR?
22       A    Yes, I do.
23       Q    Did you have any conversations with Ms.
24   Black about Mr. Andrews?
25       A    No, sir, I don't recall anything with
```



1  Kelly.

2      Q    Did you have any conversations with anyone

3  else at NCR about Mr. Andrews?

4      A    Um, Tony Cole was one of my managers.  He

5  was the manager of physical security, and -- like I

6  say, I was just with him this weekend and I brought

7  this up.  And he recall he and I speaking about.

8      Q    Do you remember what the contents of that

9  conversation were?

10     A    Uh, it was just what else, did I miss

11  anything.  I told him about lighting, CCTV, locks.

12  I remember if I missed anything or anything he could

13  add to it at the time.  We had daily meetings with

14  my team and he said -- and I covered it, so.

15     Q    Is there anything else you discussed with

16  him?

17     A    No.

18     Q    What about, you said this past weekend.

19  You met with him and brought this up?

20     A    Yes, sir.

21     Q    What else did you discuss then?

22     A    Nothing.  I was in Alabama for a concert,

23  and he and I met there.

24     Q    And how did this come up in conversation?

25     A    It was, hey, remember me talking about the



1  guy ballot stuffing or whatever, and he goes, yeah,

2  I remember.  And I said, yeah, I got -- I got a

3  thing coming up Monday, I got to talk -- a

4  deposition Monday, I have to talk, and just wish me

5  luck, and lucky you, so.

6      Q    On any of the calls you had with Mr.

7  Andrews did he mention D'Souza Media?

8      A    Not that I can recall, sir.

9          MR. VINING:  I have no further questions.

10         MS. DANUTA:  I have just a few questions.

11 EXAMINATION

12 BY MS. DANUTA:

13      Q    Good afternoon, Mr. Smith.  My name is

14 Danuta Egle.  You may have heard from earlier I

15 represent Mark Andrews in this case.

16          In your employment at NCR Voyix, did you

17 report to anyone?

18      A    Well, when I worked there it was just NCR.

19 NCR has since split, Voyix side and Atelos side.  At

20 the time I was chief security officer for the entire

21 company.

22      Q    Did you report to anyone as chief security

23 officer at NCR?

24      A    Yes.  Deb Bronder, head of HR.

25      Q    In the course of the same employment, how



1  many people reported to you?

2      A    124 in my whole org.

3      Q    Did Mark report to you in the course of

4  that employment?

5      A    No.  No, ma'am.

6      Q    And what was the extent of your

7  professional relationship with Mark during that

8  time?

9      A    He asked me for guidance and I provided

10 guidance.

11     Q    And in terms of a day-to-day basis,

12 strictly for work employment, did you have any other

13 professional relationship with Mark?

14     A    No, ma'am.

15     Q    Did you interact with Mark at all outside

16 the course of your employment?  With the exception

17 of these two phone calls?

18     A    No, ma'am.

19          MS. DANUTA:  I believe that's it.

20          I don't have any further questions.  Thank

21     you.

22          MR. GEORGE:  One more, hopefully.

23 FURTHER EXAMINATION

24 BY MR. GEORGE:

25     Q    Mr. Smith, other than Tony Cole you



 1  mentioned earlier, did you have any other

 2  conversations with anyone at NCR about Mr. Andrews?

 3      A    Not that I can recall, sir.

 4           MR. GEORGE:  Thank you.  That's all I

 5      have.

 6           THE VIDEOGRAPHER:  Does anyone else have

 7      questions?

 8           (No response.)

 9           THE VIDEOGRAPHER:  I'm taking that as a

10      no.

11           Will the witness read and sign or waive

12      his rights?

13           THE WITNESS:  Signing or waiving?

14           THE VIDEOGRAPHER:  I'm sorry.  You cut out

15      at the beginning.

16           THE WITNESS:  You want me to waive

17      signature of this?

18           THE VIDEOGRAPHER:  That's what I'm asking,

19      if your choice is to waive signature, or do you

20      want to receive the transcript and read it

21      first?

22           THE WITNESS:  I really don't think I added

23      a whole lot to either case here, but I can

24      waive it.  It's not a problem.

25           THE VIDEOGRAPHER:  Thank you.



1      Counselors, I just need to collect your

2  transcript and video orders while we're still

3  on the record.

4      Mr. George, what do you need for your

5  transcript?

6      MR. GEORGE:  Just the standard transcript

7  delivery and I think video.

8      THE VIDEOGRAPHER:  Do you need your video

9  synced or standard video?

10      MR. GEORGE:  Get it synced, please.

11      THE VIDEOGRAPHER:  Yes, sir.  Thank you.

12      Ms. Egle, what do you need?

13      MS. DANUTA:  Just a standard transcript is

14  fine.  We don't need video.  Thank you.

15      THE VIDEOGRAPHER:  Thank you.

16      And, Mr. Vining, what do you need?

17      MR. VINING:  The standard transcript is

18  fine.

19      THE VIDEOGRAPHER:  And do you need video?

20      MR. VINING:  No, thank you.

21      THE VIDEOGRAPHER:  Thank you.

22      This concludes the video deposition of

23  William Smith.

24      We are going off the record at 12:58.

25      (The deposition concluded at 12:58 p.m.)



```
 1                   C E R T I F I C A T E

 2

 3   STATE OF GEORGIA:

 4   FULTON COUNTY:

 5

 6            I hereby certify that the foregoing

 7   transcript of WILLIAM SMITH was taken down, as

 8   stated in the caption, and the questions and answers

 9   thereto were reduced by stenographic means under my

10   direction;

11            That the foregoing Pages 1 through

12   23 represent a true and correct transcript of

13   the evidence given upon said hearing;

14            And I further certify that I am not of kin

15   or counsel to the parties in this case; am not in

16   the regular employ of counsel for any of said

17   parties; nor am I in anywise interested in the

18   result of said case.

19

20       IN WITNESS WHEREOF, I have hereunto

21   subscribed my name this 29th day of July, 2024.

22

23   _____

24        Wanda L. Robinson, CRR, CCR No. B-1973
             My Commission Expires 10/11/2027
25
```



```
 1                    D I S C L O S U R E

 2   STATE OF GEORGIA  ) VIDEOTAPE DEPOSITION OF
     FULTON COUNTY         WILLIAM SMITH - 7/22/24
 3                   Pursuant to Article 10.B of the Rules and

 4   Regulations of the Board of Court Reporting

 5   of the Judicial Council of Georgia, I make the

 6   following disclosure:

 7             I am a Georgia certified court reporter.

 8   I am here as a representative of Esquire Deposition

 9   Solutions, LLC, and Esquire Deposition Solutions,

10   LLC was contacted by the offices of Greenberg

11   Traurig, LP to provide court reporter services for

12   this deposition.  Esquire Deposition Solutions, LLC

13   will not be taking this deposition under any

14   contract that is prohibited by O.C.G.A. 9-11-28 (c).

15

16             Esquire Deposition Solutions, LLC has no

17   contract/agreement to provide court reporter

18   services with any party to the case, or any counsel

19   in the case, or any reporter or reporting agency

20   from whom a referral might have been made to cover

21   this deposition.

22             Esquire Deposition Solutions, LLC will

23   charge the usual and customary rates to all parties

24   in the case, and a financial discount will not be

25   given to any party to this litigation.
```

