# EXHIBIT 74

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA**

**ATLANTA DIVISION**

| | |
|---|---|
| **MARK ANDREWS,**<br><br>    Plaintiff,<br><br>v.<br><br>**DINESH D'SOUZA**, *et al.*,<br><br>    Defendants. | Case No. 1:22-cv-04259-SDG |

**TRUE THE VOTE'S AMENDED RESPONSES TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES**

    True the Vote, Inc. ("TTV"), pursuant to Federal Rules of Civil Procedure 26(b) and 33, hereby amends its responses to Plaintiff Mark Andrews' First Set of Interrogatories.

**PRELIMINARY STATEMENT**

    TTV's responses are made without waiving any objections as to relevancy, privilege, or admissibility of any information referenced or provided in response to Plaintiff's Interrogatories in this or any subsequent proceeding or at the trial of this or any other action, on any ground. A partial response to any Interrogatory that has been objected to, in whole or in part, is not intended to be a waiver of the stated objection.  Further, TTV objects to the definition of the term "documents" and "identify" to the extent these definitions seek to invade the attorney-client and

attorney-work product privileges, and/or to obtain disclosure of the substance of materials prepared in anticipation of litigation and/or trial preparation materials, and on the grounds that they are overly broad and not reasonably tailored to lead to the discovery of admissible evidence.

The responses set forth herein are based on information presently available to TTV following a diligent search, reasonable in scope, for information in its possession, custody or control. TTV reserves the right to complete its investigation and discovery of the facts, and to rely at trial or in other proceedings on documents and information in addition to the information provided herein.

TTV reserves the right to revise, amend, correct, supplement, modify, or clarify its objections and responses in accordance with the Federal Rules of Civil Procedure.

All objections as to privilege, immunity, relevance, authenticity or admissibility of any information or documents referred to herein are expressly reserved

## INTERROGATORIES

## INTERROGATORY NO. 1:

Identify all persons or entities who You believe have knowledge of relevant facts and identify the issues upon which You believe they have relevant knowledge.

## ANSWER:

**Plaintiff Mark Andrews and his family members (including, without limitation, those individuals listed in Plaintiff's Initial Disclosures and/or Responses to TTV's First Set of Interrogatories)**
c/o counsel for Plaintiff
Mark Andrews has knowledge regarding his claims in this lawsuit, regarding damages he has purportedly suffered and ways in which his behavior has allegedly changed, if at all, as a consequence of allegedly false and defamatory speech by Defendants. Plaintiff's complaint includes specific scenarios in this connection involving Plaintiff's family members of which they may have knowledge as well. Plaintiff also has knowledge regarding actions if any he took or failed to take to mitigate his damages.

**Plaintiff Mark Andrews' co-workers and supervisors (including, without limitation, those individuals listed in Plaintiff's Initial Disclosures and/or Responses to TTV's First Set of Interrogatories)**
Contact information currently unknown.
Mark Andrews' co-workers and supervisors have knowledge regarding purported damage to Plaintiff's reputation and other claimed damages allegedly suffered as a result of claimed false and defamatory speech by Defendants. Plaintiff's complaint includes specific scenarios in this connection involving his co-workers and employer. Plaintiff's co-workers and supervisors also have knowledge regarding actions Plaintiff took or failed to take to mitigate his damages.

**Defendants Catherine Engelbrecht and Gregg Phillips**
c/o counsel for TTV Defendants
Ms. Engelbrecht and Mr. Phillips have knowledge regarding certain of the content used by Defendant D'Souza in the film; in particular, the geotracking data referenced in the 2000 Mules film and the research findings related to TTV's investigations into election integrity issues across the country,

including in Georgia. In addition, Engelbrecht and Phillips have knowledge regarding certain interviews that occurred prior to and after the premier of the 2000 Mules film that discuss the film and/or the research or data referenced therein. Engelbrecht and Phillips also have knowledge regarding the process and individuals involved in creating and promoting the film, including the roles of the D'Souza Defendants and Salem Defendants (as defined in the Complaint).

**Dinesh and Debbie D'Souza, Bruce Schooley, and the D'Souza's Children**
c/o counsel for Dinesh D'Souza
Mr. D'Souza, Ms. D'Souza and Mr. Schooley, and the D'Souza's children, have knowledge regarding the making of the film and content chosen for the film and book. These individuals also have knowledge regarding revenues earned from the film, promotions and interviews related to the film, and the 2000 Mules book.

**David Evans, Phil Boyce, Tom Spence, Harry Crocker, Chris Henderson and Scott Hunter**
c/o counsel for Salem and Regnery
Messrs. Evans, Boyce, Spence and Crocker have knowledge regarding the making of the film and content chosen for the film and book. Mr. Henderson and Mr. Hunter have knowledge regarding the TTV Defendants consent, knowledge, and control, or lack thereof, over the publication and contents of the 2000 Mules book, including the decision to retract and withdrawn from publication the first version of the book that was published.

**Dana DeWeese**
Criminal Investigator State of Georgia

Investigator DeWeese has knowledge regarding the course and findings of his investigation of the complaint filed by David Cross and regarding the release of information about Plaintiff resulting from or in connection with the investigation.

**David Cross**

Mr. Cross has knowledge regarding the complaint he filed based upon the publicly available video of Mr. Andrews placing five ballots in the drop box and regarding his non-affiliation with True the Vote.

**Election Administration Office for Gwinnett County, Georgia**
The Election Administration Office for Gwinnett County, Georgia, may have knowledge relating to the surveillance videotape provided to the True the Vote defendants in response to an open records request.

**Investigator(s) of the Georgia Bureau of Investigation ("GBI")**
One or more investigators of the GBI may have information about the GBI investigation into Plaintiff's and his family's voting activities, and, in particular, Plaintiff's contention that Defendants alleged he engaged in voter fraud in connection with the 2020 general election.

**Edward Lindsey and Dr. Jan Johnson, Members of the Georgia State Election Board ("SEB").**
Mr. Lindsey will have information about the GBI investigation into Plaintiff's and his family's voting activities. Dr. Johnson will have information regarding same.

**Other Member(s) of the SEB.**
One or more other members of the SEB may have information about the GBI investigation into Plaintiff's and his family's voting activities.

**Charlie Kirk**
Mr. Kirk, who appears in the 2000 Mules film and book, will have information about the creation, contents, and promotion of the book and film.

**Representative of The Charlie Kirk Show**
One or more representatives of The Charlie Kirk Show will have information about the source of, and decision to air, unblurred footage of Mr. Andrews voting on the April 8, 2022, episode.

**Tucker Carlson and/or representative of Tucker Carlson Tonight**
Mr. Carlson or one or more representatives of Tucker Carlson Tonight will have information about the source of, and decision to air, unblurred footage of Mr. Andrews voting on the May 5, 2022, episode.

**Eric Metaxas**

Mr. Metaxas, who appears in the 2000 Mules film, will have information about the creation, contents, and promotion of the book and film, including the D'Souza and Salem Defendants' roles in connection therewith.

**Dennis Prager**

Mr. Prager, who appears in the 2000 Mules film, will have information about the creation, contents, and promotion of the book and film, including the D'Souza and Salem Defendants' roles in connection therewith.

**Sebastian Gorka**

Mr. Gorka, who appears in the 2000 Mules film, will have information about the creation, contents, and promotion of the book and film, including the D'Souza and Salem Defendants' roles in connection therewith.

**Larry Elder**

Mr. Elder, who appears in the 2000 Mules film, will have information about the creation, contents, and promotion of the book and film, including the D'Souza and Salem Defendants' roles in connection therewith.

**Ed Atsinger**

Mr. Atsinger will have information regarding a meeting or "summit" attended by all Defendants at which the TTV Defendants' research was presented to Salem, Salem's decision to produce and promote the 2000 Mules film, and the relationship between Salem and the "Salem hosts" referred to in the book and film.

**Patricia Jackson**

███████████████████████████

Ms. Jackson, a public relations specialist hired by the D'Souza Defendants, will have information regarding media strategy related to the 2000 Mules film. Specifically, Ms. Jackson was responsible for coordinating interviews and other promotional activity in 2022 prior to and after the premiere of the 2000 Mules film.

**Chelsea Magee**

c/o counsel for the TTV Defendants

Ms. Magee has knowledge regarding efforts to coordinate interviews for the promotion of the 2000 Mules film and inquiries from the press, media,

reporters, and other individuals and entities regarding the 2000 Mules film and the data referenced therein.

**Crenguta Free**
c/o counsel for the Salem Defendants
Ms. Free has knowledge regarding efforts to coordinate interviews for the promotion of the 2000 Mules film.

**Individuals listed in the other defendants' interrogatory responses but not named herein.**

**Individuals listed in Plaintiff's Initial Disclosures but not named herein.**

**Additional person(s) to be identified.**
Any person(s) identified through discovery to have relevant information, but not yet known at this time. As of the date listed below.

TTV reserves the right to supplement this response in accordance with the Federal Rules of Civil Procedure.

## INTERROGATORY NO. 2:

Identify all locations, repositories, electronic devices (including, without limitation, computers, mobile phones, tablets, iPads, cameras, or global positioning systems), Social Media or other electronic accounts, or other sources containing or reflecting Documents or Communications potentially relevant to the above-captioned litigation or responsive to Plaintiffs' Requests For Production that You have or have had in Your possession, custody, or control at any time during the Relevant Time Period.

## ANSWER:

TTV objects to this interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. TTV further

objects to this interrogatory as not proportional to the needs of this case to the extent it seeks the locations, devices, and other sources containing "potentially" relevant information, which exceeds the scope of Fed. R. Civ. P. 26(b). It would be extremely burdensome for TTV to identify and list all locations, repositories, devices, or other sources that may have "potentially relevant" information.

Subject to and without waiving the foregoing objections, TTV identifies Open.ink; one computer and one mobile phone for Engelbrecht and Phillips, respectively; Rumble, Facebook, Instagram, Twitter, and Truth Social accounts; two True the Vote email accounts; and an email account owned and controlled by Gregg Phillips, as responsive to this request.

TTV is not withholding information responsive to this Interrogatory on the basis of its objections except to the extent this Interrogatory seeks information covered by the attorney-client privilege.

TTV reserves the right to supplement this response in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 3:**

For the "summit" among Defendants referred to on pages 25-26 of the *2000 Mules* book and in the film, provide the date, location, names of all attendees (whether in-person or remote), and identify the information exchanged at the summit.

**ANSWER:**

TTV objects to this interrogatory on the grounds that its reference to "summit" is vague and ambiguous. TTV will answer this interrogatory based on its assumption that what Plaintiff is referring to is, as described below, a meeting that took place in Dallas, Texas in October 2021. TTV previously understood this interrogatory was referring to a different meeting that took place in February 2022, which is the meeting referenced in the TTV Defendants' and certain other defendants' initial discovery responses. *See* Salem Media's Responses to Plaintiff's First Set of Interrogatories, Response to Interrogatory No. 3.

TTV further objects on the grounds that this interrogatory is overbroad and unduly burdensome because it seeks identification of "all information exchanged" at a meeting not organized by the TTV Defendants and that took place more than two years ago and involved several attendees, some of whom the TTV Defendants had never previously met. TTV further objects to the extent this interrogatory assumes it has a list or other documentation or knowledge showing the complete list of attendees and information exchanged at the October 2021 meeting in Dallas.

TTV further objects to this interrogatory on the grounds that it did not draft or have any control over the drafting or content of the 2000 Mules book and cannot attest to any of the contents therein, including quoted interviews, which may or may not accurately reflect past statements or actions of the TTV Defendants.

Subject to and without waiving the foregoing objections, TTV states that the "summit" referenced in this Interrogatory was a meeting that took place at Salem Media's office in Dallas, Texas, on or around October 16, 2021. To the best of TTV's knowledge, the attendees of this meeting were as follows: Dinesh D'Souza, Debbie D'Souza, Bruce Schooley, Ed Atsinger, Phil Boyce, David Santrella, David Evans, Mike Reed, Tom Spence, Catherine Engelbrecht, and Gregg Phillips. The information discussed at this meeting included, but was not necessarily limited to, the TTV Defendants' data and research findings regarding geolocation and geotracking data and the D'Souza Defendants desire to use that research in a film they were already planning to produce about irregularities and anomalies in the 2020 elections that were suggestive of election fraud. TTV will produce non-privileged documents that were used or exchanged at the meeting, or used to prepare for the meeting, to the extent such documents can be located following a reasonable search. The TTV Defendants will also produce non-privileged documents related to the February 2022 meeting referenced above, to the extent such documents can be located following a reasonable search.

TTV is not withholding information on the basis of the foregoing objections.

TTV reserves the right to supplement this response in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 4:**

Identify and describe in detail all evidence on which You relied to support

Your allegation that Plaintiff engaged in any form of election fraud or illegal conduct

during the 2020 Election, and provide all details regarding the attempts, if any, You

took to examine or independently confirm the veracity of such evidence.

**ANSWER:**

TTV objects to this interrogatory to the extent it mischaracterizes its prior statements and improperly attributes to the TTV Defendants allegations made by co-defendants or third parties who were never under its control or direction. TTV further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege.

Subject to and without waiving the foregoing objections, TTV responds, to the best of its current knowledge and belief, as follows:

In approximately June 2021, in connection with its efforts to promote election integrity, TTV filed a complaint and multiple open records requests with Gwinnett County to determine if there had been any ballot envelopes returned with assistor signatures. TTV received a response that there had not been any such signatures. Subsequently, through additional public records requests, in approximately February 2022, TTV obtained in excess of 4 million minutes of surveillance video, which included, among other things, surveillance video showing repeated instances of individuals voting multiple ballots, which TTV reported by amending their original complaint to the Georgia Secretary of State in approximately March 2022. In addition, the surveillance footage received in response to TTV's public records requests included unaltered and unredacted footage of Plaintiff depositing at least five ballots in a drop-box location. This particular video footage was included in the 2000 Mules film, based on the decisions of the D'Souza and Salem Defendants, to highlight the lack of drop box monitoring and documentation of assistor signatures in Gwinnett County, Georgia. It was TTV's understanding and belief that any and all individuals included in the surveillance video used in the film would have their faces blurred at all times. Indeed, Engelbrecht mentioned this in emails to the other defendants during production of the film.

After the filming and production of the 2000 Mules film was complete, the TTV Defendants appeared in certain interviews discussing the film and/or the research and related issues, including those concerning geospatial data and use of unmonitored drop box locations. During certain of those interviews, Engelbrecht was asked, without her advance knowledge, to opine on portions of the surveillance video, including portions contained blurred and unblurred images of Plaintiff obtained from open records requests. The TTV Defendants did not request or consent to publishing the blurred or unblurred images of Plaintiff, if any, during these interviews. Engelbrecht's responses were based on her knowledge of election laws, as conveyed by attorneys. Specifically, based on her knowledge described above regarding the legal requirements for "assistors" to submit ballots on behalf of others, and knowledge of Gwinnett's responses to prior public records request indicating no assistor signatures had been collected. Further, in at least one of the interviews, Englebrecht expressly noted the possibility that Plaintiff was functioning as an assistor, even though there were no state records provided to TTV to confirm this.

Subsequently, an individual not affiliated with the TTV Defendants and (as documents produced by the TTV Defendants confirm) who acted independently of them, David Cross, submitted a complaint to Georgia election authorities that, based on Engelbrecht's subsequently acquired knowledge, named Plaintiff and requested an investigation into his voting behavior (specifically, submission of multiple ballots). The GBI and Georgia SEB subsequently conducted an investigation and ultimately cleared Plaintiff of wrongdoing. During or after the investigation, Plaintiff's name and personal information were publicly disclosed by the GBI and/or Georgia SEB. To the best of TTV's knowledge, Plaintiff's name was not previously publicly disclosed prior to the Georgia SEB's hearings in connection with Mr. Cross' complaint.

Subsequently, TTV filed an open records request for information regarding any complaints filed against Mr. Andrews and the investigation of same. Documents reflecting this have been produced to Plaintiff. True the Vote received a copy of a complaint submitted by Mr. Cross and the investigation undertaken by Dana DeWeese, including his case notes. True the Vote also requested and received a copy of the state voter files that showed the voting history for all five of the voters living with Mr. Andrews.

TTV further states that, after receiving and reviewing the information from the Georgia State Election Board, TTV Defendants observed that the state had based the

11

conclusion of its investigation on Mark Andrews' assertion that he had deposited five ballots in a Gwinnett County drobox, a fact which was recorded on surveillance video. Mr. Andrews affirmed that he deposited ballots for himself, his wife, and his three children. However, state records that the TTV Defendants received in response to their public records request indicated that, on the date Plaintiff submitted his and his family's ballots, the only ballots he deposited were for himself, his wife, and two of his children, leaving in question how to account for the fifth ballot that, according to those state voting records, was deposited on a different date than the other four ballots. TTV further states that the GBI's investigation does not appear to have been exhaustive and was comprised exclusively of an interview with Mr. Andrews himself and his written confirmation that he deposited his family's ballots on the same date and that all of his family members lived with him in the same house.

TTV further states that, prior to the date on which Plaintiff filed his original Complaint, TTV never publicly uttered or otherwise used Plaintiff's name or published any original work containing his unblurred image, and did not specifically accuse him, by name, of engaging in illegal conduct.  To the best of TTV's knowledge, Mr. Andrews' identity (i.e., name and personally identifiable information) became publicly known only as a result of the independent actions of (i) David Cross, which TTV did not direct or control, based on the surveillance footage from Gwinnett County that various individuals obtained through public records requests and posted online, and (ii) governmental authorities, who publicly disclosed Plaintiff's identity during the course of an investigation into the complaint Mr. Cross filed with the Georgia State Election Board.

TTV further states the geotracking data referenced in the 2000 Mules film did not specifically identify Plaintiff. Indeed, the cellphone data was anonymized, and the only way to de-anonymize that data was through a court-issued subpoena or administrative warranted obtained by law enforcement or other government authorities. Moreover, in connection with providing data used in 2000 Mules, TTV never provided Plaintiff's name to any of the other Defendants in this action. Indeed, at that time, TTV did not know Plaintiff's name.  Further, although the 2000 Mules film did not contain Plaintiff's name or unblurred image, TTV did not have creative control over the way in which the TTV Defendants' data was used in the 2000 Mules film, nor the book.

TTV is not withholding information responsive to this Interrogatory on the basis of its objections except to the extent this Interrogatory seeks information covered by the attorney-client privilege.

TTV reserves the right to supplement this response in accordance with the Federal Rules of Civil Procedure.

## INTERROGATORY NO. 5:

State all facts that You contend are contrary to the findings and conclusions reached by the Georgia Bureau of Investigation and/or the Georgia State Election Board in connection with their investigation of the complaint filed by David A. Cross discussed at ¶¶ 84-95 of the Complaint, and when You became aware of such facts.

## ANSWER:

TTV objects to this interrogatory on the grounds that it is vague, ambiguous, and argumentative with respect to the phrase "findings and conclusions reached by the Georgia Bureau of Investigation and/or the Georgia State Election Board in connection with their investigation of the complaint filed by David A. Cross discussed at ¶¶ 84-95 of the Complaint." The interrogatory does not specify the findings and conclusions about which it seeks information, and the cited paragraphs of the Complaint contain numerous allegations about the "Defendants" collectively, the complaint filed by Mr. Cross, and Plaintiff's awareness of same, and the *2000 Mules* film, none of which are (or cite) findings or conclusions, but are instead Plaintiff's allegations.

Subject to and without waiving the foregoing objections, TTV incorporates by reference its response to Interrogatory No. 4. TTV further states that, with respect to the investigation referenced above that was commenced as a result of Mr. Cross' complaint, which was not filed based on directions or requests by the TTV Defendants but rather as a result of Mr. Cross' independent actions, it did not agree with the efforts of the GBI and GA SEB to investigate Mr. Cross' complaint based on its then-current knowledge of Georgia election laws. Specifically, it was the TTV Defendants' understanding that anyone who cast a mail-in ballot that was not their own had to sign the back of the mail ballot envelope, indicating that they were an assistor. Further, it was TTV's understanding that this was one of the ways that drop box monitoring would be managed, so that if a person was shown depositing more than one ballot, but in the chain of custody it was denoted that ballots were deposited with assistor signatures, then there would be lessened concern as the video could be matched to the number of ballots. This was at issue in a complaint that True the Vote

filed in October 2021 with the Georgia Secretary of State (which has been produced). That complaint was never addressed by any election or law enforcement authorities despite repeated efforts and requests from TTV, which included numerous public records requests, many of which have already been produced to Plaintiff.

Indeed, earlier in 2021, in approximately June 2021, True the Vote filed open records requests with Gwinnett County to determine if there had been any ballot envelopes returned with assistor signatures and received a response that there had not been any such signatures.

TTV further states that True the Vote filed an open records request for all the information regarding any complaint filed against Mr. Andrews and the investigation of the complaint. True the Vote received a copy of a complaint submitted by Mr. Cross and the investigation undertaken by Dana DeWeese, including his case notes. True the Vote also requested and received a copy of the state voter files that showed the voting history for all five of the voters living with Mr. Andrews.

TTV further states that, after receiving and reviewing the information from the Georgia State Election Board, TTV Defendants observed that the state had based the conclusion of its investigation on Mark Andrews' assertion that he had deposited five ballots in a Gwinnett County drobox, a fact which was recorded on surveillance video. Mr. Andrews affirmed that he deposited ballots for himself, his wife, and his three children. However, state records that the TTV Defendants received in response to their public records request indicated that, on the date Plaintiff submitted his and his family's ballots (October 6, 2020), the only ballots he deposited were for himself, his wife, and two of his children, leaving in question how to account for the fifth ballot that, according to those state voting records, was deposited on a different date than the other four ballots. TTV further states that the GBI's investigation does not appear to have been exhaustive and was comprised exclusively of an interview with Mr. Andrews himself and his written confirmation that he deposited his family's ballots on the same date and that all of his family members lived with him in the same house. However, as stated in response to Interrogatory No. 4, when the TTV Defendants were asked about the footage showing Andrews during the April 2022 Charlie Kirk episode, Engelbrecht expressly mentioned the possibility that he could have been functioning as an assistor.

TTV is not withholding information responsive to this Interrogatory on the basis of its objections except to the extent this Interrogatory seeks information covered by the attorney-client privilege.

TTV reserves the right to supplement this response in accordance with the Federal Rules of Civil Procedure.

## INTERROGATORY NO. 6:

Describe Your involvement in the creation, production and promotion of *2000 Mules*.

## ANSWER:

TTV objects to this interrogatory on the grounds that it is vague, overly broad, unduly burdensome, and assumes facts not in evidence. Among other reasons, it would impose an enormous, disproportionate burden if TTV was forced to identify each and every action it or the TTV Defendants took in connection with providing data and participating in interviews in connection with the filming and promotion of the 2000 Mules film. Such actions could include things as mundane as responding to an email confirming a time for an interview.  TTV further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege.

Subject to and without waiving the foregoing objections, TTV states that TTV provided drop box surveillance video, select static maps of geospatial data, explanations of the project, video from two interviews, and participated in on camera interviews as scheduled and coordinated by the D'Souza Defendants and their publicist, Patricia Jackson, as well as an additional interview, which are described below. TTV further states that the TTV Defendants appeared at two movie debut events, including a screening of 2000 Mules at Mar-a-Lago on or around May 5, 2022.

TTV further states that the TTV Defendants participated in the following interviews, shows, and/or podcasts that discussed the data or other research that was or may have been used or referenced in connection with creation, production, or promotion of the 2000 Mules film:

- Interview on April 8, 2022, *The Charlie Kirk* Show.  During this interview, the TTV Defendants discussed their research findings and were shown and asked to comment on, among other things, unblurred images of Plaintiff.  The TTV Defendants had no prior knowledge of, and neither consented to nor

requested, the posting of Plaintiff's image, much less an unblurred image of Plaintiff, at any time, including on the above-referenced episode of the Charlie Kirk Show. The TTV Defendants would not have even considered this because, among other reasons, there could be potential liability for deciding to publicly identify an individual accused of any form of election fraud. Indeed, that is why the TTV Defendants presented their findings as they pertained to specific individuals to law enforcement officials. The TTV Defendants had no control over the host's decision to air certain footage, nor the questions they were asked. Further, to the best of TTV's knowledge and belief, the images (blurred or unblurred) that were shown to her during interviews were already in the public domain at the time Engelbrecht was shown them (to her surprise) during a live broadcast.

- Interview on May 5, 2022, Tucker Carlson Tonight. During this interview, Engelbrecht discussed with the host and answered questions concerning, among other things, the use of unmonitored ballot dropboxes in the 2020 general election. The TTV Defendants had no control over the host's decision to air certain footage, nor the questions they were asked.

- Interview on May 14, 2022, *Facts Matter with Roman Balmakov.* During this interview, the TTV Defendants discussed with the host and answered questions regarding their data and research findings with respect to irregularities and anomalies in connection with voting in the 2020 election. The TTV Defendants were shown blurred images of Plaintiff. The TTV Defendants had no control over the host's decision to air certain footage, nor the questions they were asked.

TTV refers Plaintiff to the Declaration of Patricia Jackson, dated Feb. 29, 2024, and produced by the D'Souza Defendants, for a list of certain additional promotional interviews and related activities that the TTV Defendants participated in at the direction of the D'Souza Defendants. To the extent not described above, documents showing promotional interviews or related activities prior to or after the premier of 2000 Mules will be produced. In addition, TTV will answer questions seeking information responsive to this Interrogatory during its deposition.

TTV is not withholding information responsive to this Interrogatory on the basis of its objections except to the extent this Interrogatory seeks information covered by the attorney-client privilege.

16

TTV reserves the right to supplement this response in accordance with the Federal Rules of Civil Procedure.

## INTERROGATORY NO. 7:

Provide the cellphone number or cellphone ID that was linked to the video of

Plaintiff voting using the geolocation data relied upon in *2000 Mules*.

## ANSWER:

TTV objects to this request on the grounds that it incorrectly assumes it has or had in its possession, custody, or control a cellphone number or cellphone ID "linked to the surveillance video showing Plaintiff voting" during the 2020 general election.

Subject to and without waiving the foregoing objections, TTV does not have information responsive to this Interrogatory in its custody, possession, or control. There was no cellphone ID linked by TTV Defendants to the video of the Plaintiff voting. Further, by the time the Gwinnett County video showing Plaintiff depositing his ballots was released to True the Vote, the TTV Defendants had already submitted initial findings and data to the FBI, which subsequently gave access to the GBI, regarding the complaints described in Interrogatory No 5. Because Gwinnett County didn't provide video until much later, True the Vote did not extend the Atlanta metro area geolocation pattern study to incorporate Gwinnett County video. In other words, Plaintiff's cellphone number or cellphone ID (IMEI) was not part of the geolocation data referenced in *2000 Mules*. TTV further states that the geolocation cellphone data is anonymous and can only be deanonymized at the request of law enforcement officials or via an administrative warrant.

TTV is not withholding information on the basis of the foregoing objections.

TTV reserves the right to supplement this response in accordance with the Federal Rules of Civil Procedure.

17

## INTERROGATORY NO. 8:

Provide the dates and times that the phone number or cellphone ID identified in

Interrogatory 7 was determined to be near ballot drop boxes, and the location of

said drop boxes.

## ANSWER:

TTV incorporates by reference its objections to Interrogatory No. 7. TTV further objects on the grounds that this interrogatory seeks information that is irrelevant to Plaintiff's claims for the reasons stated in its responses to Interrogatories 4 and 5.

Subject to and without waiving the foregoing objections, TTV does not have information directly responsive to this request (specifically, dates and times that Plaintiff's phone number or cellphone ID "was determined to be near ballot drop boxes"). The TTV Defendants will produce documents showing ballot drop box locations that were used as part of the geolocation tracking study, as well as other information related thereto.

TTV is not withholding information responsive to this Interrogatory on the basis of its objections.

TTV reserves the right to supplement this response in accordance with the Federal Rules of Civil Procedure.

## INTERROGATORY NO. 9:

Identify all parties and all locations (including any "stash houses") from which

You allege Plaintiff picked up ballots for depositing at drop box locations specified

in Interrogatory 8.

## ANSWER:

TTV incorporates by reference its objections and responses to Interrogatory No. 7. TTV further objects to this interrogatory on the grounds that it mischaracterizes certain facts and assumes certain facts not in evidence. In particular, this

interrogatory assumes that TTV knew the identity of Mr. Andrews prior to the investigation of Andrews by GBI and public disclosure of his name resulting from GBI's and the Georgia SEB's investigation of Mr. Cross' complaint. As the film makes clear, no individual phones were tied to any specifically identifiable individuals as part of the analysis.   Rather, phone IDs were identified from commercially available data obtained by TTV, and that data was analyzed and filtered to create patterns of life showing the movements or geospatial tracking of cell phone devices and to draw conclusions therefrom.

Subject to and without waiving the foregoing objections, TTV states that it does not have responsive information in its possession, custody, or control.

**INTERROGATORY NO. 10:**

Identify all persons or entities who provided any funding or other contributions for the creation and/or promotion of *2000 Mules* (and/or any underlying data) and the amount of the funding or the type of contribution by each.

**ANSWER:**

TTV objects to this interrogatory on the grounds that it overly broad, unduly burdensome, and seeks information that is not relevant to a claim or defense of any party. The manner in which 2000 Mules film was financed, including individual donors and amounts, is irrelevant to Plaintiff's claims against the TTV Defendants and has no bearing on any purported damages sought in this Action.  Further, the D'Souza Defendants, as the creator and visionary behind 2000 Mules, and the Salem Defendants, who invested in the film and coordinated its production and promotion, are the most appropriate sources to provide information concerning the financing of the film and any promotional activities related thereto.  The TTV Defendants further object on the grounds they had no role in connection with the financing of the film or any related aspects.

Subject to and without waiving the foregoing objections, TTV states that the D'Souza Defendants obtained financing from Salem and possibly others to fund the creation and promotion of 2000 Mules.  TTV refers Plaintiff to the D'Souza Defendants' amended response to Interrogatory 10 and the D'Souza and Salem Defendants' interrogatory responses.  With respect to certain data referenced therein that was provided or discussed by any of the TTV Defendants, the funding TTV

received during the relevant time period was not, to the best of TTV's knowledge, specifically designated or earmarked for obtaining that data or the creation or promotion of 2000 Mules.

TTV is not withholding information on the basis of the foregoing objections.

TTV reserves the right to supplement this response in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 10:**

State the amount of revenue You received from *2000 Mules*.

**ANSWER:**

**THE FOLLOWING RESPONSE IS DESIGNATED AS "CONFIDENTIAL – ATTORNEYS' EYES ONLY" UNDER THE PROTECTIVE ORDER**

TTV objects to this interrogatory on the grounds that it seeks information that is not relevant to a claim or defense of any party.

Subject to and without waiving the foregoing objections, TTV states that it will search for and produce non-privileged documents (e.g., tax forms) showing revenues Engelbrecht and Phillips received through a limited liability company jointly-owned by them, in connection with the 2000 Mules film. Based on TTV's current knowledge and belief, the amount of revenue received was approximately ███████ TTV further states it did not receive any revenue from the 2000 Mules book.

TTV is not withholding information on the basis of the foregoing objections.

TTV reserves the right to supplement this response in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 11:**

Provide the geolocation data, including the relevant cellphone ID(s), supporting the assertion made by Defendant Englebrecht, on May 14, 2022, on *Facts*

*Matter with Roman Balmakov* (referenced at ¶¶ 66-68 of the Complaint), that Plaintiff's phone, or the phones of some other purported mules, were "at a violent riot."

**ANSWER:**

TTV objects to this interrogatory on the grounds that the requested information is not relevant to Plaintiff's claims and seeks to impose an undue burden disproportionate to the needs of this case. TTV further objects to the extent this interrogatory incorrectly assumes that TTV determined that Plaintiff's cell phone was determined to be near violent riots. TTV never asserted that geolocation data showed that Plaintiff was at a violent riot, and data regarding third parties not identified in this action has no bearing on any of Plaintiff's claims. TTV further objects to the extent this interrogatory seeks privileged information. TTV further objects because this interrogatory improperly seeks the production of documents.

Subject to and without waiving the foregoing objections, TTV states that it does not have the information responsive to this interrogatory in its possession, custody, or control. Further, TTV states that, based on its current knowledge and belief, the requested information cannot be obtained without extraordinary cost and burden and, even then, it is unclear whether anyone could recreate or duplicate the geospatial data referenced in 2000 Mules because of the manner in which it was obtained and then generated. Further, the geospatial data, even if could be obtained, would not, in the absence of a court order obtained by law enforcement, allow anyone to identify any specific individuals to whom the data relates. Further, the geospatial tracking project was completed approximately three years ago, and the TTV Defendants had no need to preserve that data after submitting it to the GBI.

TTV is not withholding information responsive to this Interrogatory on the basis of its objections except to the extent this Interrogatory seeks information covered by the attorney-client privilege.

TTV reserves the right to supplement this response in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 12:**

Identify all persons or entities who funded TTV's investigation into the 2020 election that was used in *2000 Mules* and the amount of funding by each.

**ANSWER:**

TTV objects to this interrogatory on the grounds that it seeks information not relevant to the claims or defenses of any party. The identities and amounts of funding that TTV received, regardless of purpose, has no bearing on Plaintiff's claims and is not reasonably calculated to lead to the discovery of admissible evidence. The only purpose that would be accomplished through disclosure of this information is to harass TTV's donors, which is not a legitimate basis for obtaining discovery. TTV further states that, to the best of its current knowledge and belief, the TTV Defendants received no designated donations for the research and analysis that was ultimately used (or not used) in *2000 Mules*. Thus, TTV has no information responsive to this request.

TTV is withholding the names of its donors and the amounts of their donations to TTV, which as noted in response to Interrogatory No. 10 were not designated donations or otherwise earmarked for funding the 2000 Mules film specifically or the acquisition of the data referenced therein.

**INTERROGATORY NO. 13:**

Describe all Communications You have had with David A. Cross concerning the complaint he filed with the Georgia Bureau of Investigation discussed at ¶¶ 84-95 of the Complaint.

**ANSWER:**

TTV objects to this interrogatory to the extent it seeks privileged information protected by the attorney-client privilege and/or work product doctrine.

Subject to and without waiving the foregoing objection, TTV states that Engelbrecht exchanged emails with Mr. Cross after she reviewed the GBI investigative file, which showed Mr. Cross had filed the complaint that launched the investigation. TTV further states that, as shown in emails TTV Defendants have produced, Engelbrecht requested that Mr. Cross not associate or purport to identify himself as

being part of a team with the TTV Defendants. TTV further states Mr. Cross acted independently in filing his complaint against Plaintiff. TTV further states that it will produce any communications with Mr. Cross, to the extent such communications have not already been produced.

TTV is not withholding information on the basis of the foregoing objections.

TTV reserves the right to supplement this response in accordance with the Federal Rules of Civil Procedure.

## INTERROGATORY NO. 14:

With respect to Your repeated statement in Your Answer denying that You are "responsible for the choice of and presentation of the content" of *2000 Mules*, identify the persons and/or entities who You contend are responsible and why.

## ANSWER:

TTV states that Dinesh D'Souza and his team were responsible for the choice and presentation of the content of *2000 Mules* film and book. TTV refers to the other defendants' interrogatory responses for certain information responsive to this interrogatory. TTV further states that it was not consulted and/or did not consent regarding decisions made during production of the 2000 Mules film, and further that the TTV Defendants were told they had no creative control over the film and could only provide suggestions, which the D'Souza Defendants were not bound to – and, in many cases, did not – accept. Indeed, TTV Defendants saw the complete movie for the first time when the TTV Defendants were shown a near-final version referred to as a "Director's Cut," which was fully composed but lacked color balancing and audio adjustments. The D'Souza Defendants created and circulated the trailer for the film. While the TTV Defendants provided suggestions, including expressly stating that any individuals shown in surveillance footage used in the film should be blurred and avoid specifically identifying any individual, the D'Souza Defendants, sometimes in coordination with the Salem Defendants, decided which, if any, of those suggestions to implement.

TTV further states that the TTV Defendants were instructed by the D'Souza Defendants, their publicist (Patricia Jackson) and Bruce Schooley to appear at promotions for the film, including some that were interviews or podcasts with

23

individuals affiliated with the Salem Defendants, but that it had no control over or prior knowledge regarding the materials shown or questions asked by the hosts of those interviews or programs, nor any knowledge it would be asked about Plaintiff or any blurred or unblurred images of Plaintiff, whether from 2000 Mules or otherwise.  Individuals affiliated with the Salem Defendants also provided input and recommendations for the content of the 2000 Mules.

TTV is not withholding information on the basis of the foregoing objections.

TTV reserves the right to supplement this response in accordance with the Federal Rules of Civil Procedure.

**INTERROGATORY NO. 15:**

Identify the twelve people involved in the geotracking project referred to by

Defendant Phillips in the interview quoted on p. 59 of the *2000 Mules* book.

**ANSWER:**

TTV objects to this interrogatory as seeking information that is not relevant to Plaintiff's claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. The names of the individuals involved in the geotracking project have no bearing on Plaintiff's claims. This information, if disclosed, will only lead to harassment of individuals involved in the geotracking project. Moreover, the individual who spearheaded the geotracking project, and who has the relevant knowledge about how the project was completed, is Phillips.

Based on the foregoing objections, the TTV Defendants are not providing information requested by this Interrogatory. However, the identities of TTV contractors who worked on the project will be included in unredacted form in any non-privileged documents that are deemed responsive and produced in response to Plaintiff's discovery requests, though such documents will be designated as Confidential under the Protective Order.

**INTERROGATORY NO. 16:**

Identify the eight organization in Atlanta where You allege ballots were

collected by mules (*see 2000 Mules* book, p. 61).

24

**ANSWER:**

TTV objects to this interrogatory as seeking information that is not relevant to Plaintiff's claims or defenses and not reasonably calculated to lead to the discovery of admissible evidence. TTV further objects on the grounds that this interrogatory mischaracterizes Engelbrecht's allegations and seeks disclosure of information for an improper purpose; namely, to allow third party organization to consider filing legal claims against the TTV Defendants. The identities of the organizations referenced above has no bearing on Plaintiff's claims, as Plaintiff was not alleged to have visited any of these organizations. Further, the TTV Defendants never provided the D'Souza Defendants with the names of any of the organizations referenced above, nor consented to disclosure of any such information in any setting. The TTV Defendants do not know the reasons or basis, if any, for D'Souza naming certain organizations that appeared in the 2000 Mules book before it was recalled. The TTV Defendants refused D'Souza's request to "verify" certain information in the 2000 Mules book after the first version of the book was published, which as noted above was done without the TTV Defendants' knowledge or consent.

TTV is not providing the information requested by this interrogatory on the basis of the foregoing objections. TTV is willing to confer with Plaintiff regarding this request.

Served this 18th day of March, 2024.

*/s/ Jake Evans*
JAKE EVANS
Georgia Bar No. 797018
RICHARD WALKER
Georgia Bar No. 956246
JULIA MARTIN*
GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
P: (678) 553-2100
F: (678) 553-2212
Jake.Evans@gtlaw.com
Richard.f.Walker@gtlaw.com
Julia.Martin@gtlaw.com

*Attorneys for Defendants True the Vote,*
*Catherine Englebrecht and Gregg Phillips.*
*\*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the within and foregoing **True the Vote's Amended Responses to Plaintiff's First Interrogatories** was served on all attorneys of record via email.

This 18th day of March, 2023.

**GREENBERG TRAURIG, LLP**

*/s/ Jake Evans*
JAKE EVANS
Georgia Bar No. 797018

Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
P: (678) 553-2100
F: (678) 553-2212
Jake.Evans@gtlaw.com

*Attorney for Defendants True The Vote, Inc., Catherine Engelbrecht, and Gregg Phillips*

27

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MARK ANDREWS, | |
| Plaintiff, | Civil Action No. 1:22-cv-04259-SDB |
| v. | |
| DINESH D'SOUZA, TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, GREGG PHILLIPS, D'SOUZA MEDIA, LLC, SALEM MEDIA GROUP, INC., REGNERY PUBLISHING, INC., and JOHN DOES, | |
| Defendants. | |

## **VERIFICATION**

I, Catherine Engelbrecht, am over the age of 18 years and am competent to execute this verification.

Based upon information currently available to me, the foregoing responses to the Interrogatories are true and correct to the best of my knowledge, information, and belief. I verify as such under penalty of perjury under 28 U.S.C. § 1746.

Dated: 03/16/2024

True the Vote, Inc.

1

Notary: State of Florida, County of Duval

By: Catherine Engelbrecht, President

Sworn to and subscribed before me this ___16th___ day of ___March___, 2023. ~~2023~~ A.S.
2024

*Abdulrahman Sardani*

Notary Public    Abdulrahman Sardani

ID produced: PASSPORT

My Commission Expires:

___04/03/2027___

ABDULRAHMAN SARDANI
**Notary Public - State of Florida**

**Commission #** HH 382251
**Expires on** April 3, 2027

Notarized remotely online using communication technology via Proof.

2