# EXHIBIT 156

Case 1:22-cv-04259-SDG    Document 264-6    Filed 12/20/24    Page 2 of 43
HIGLY CONF/AEO Brian Beasley          November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION
3      MARK ANDREWS,                )
                                    )
4           Plaintiff,              )
                                    )
5      vs.                          )     CASE NO.
                                    )
6      DINESH D'SOUZA; TRUE THE     )     1:22-CV-04259-SDG
       VOTE, INC.; CATHERINE        )
7      ENGLEBRECHT; GREGG           )
       PHILLIPS; D'SOUZA MEDIA      )
8      LLC; and JOHN DOES,          )
                                    )
9           Defendants.             )
10
11
12        THIS DEPOSITION CONTAINS INFORMATION DESIGNATED
                      HIGHLY CONFIDENTIAL
13                  ATTORNEYS' EYES ONLY
                 SUBJECT TO PROTECTIVE ORDER
14
15          VIDEOTAPED DEPOSITION OF BRIAN BEASLEY
16                 (Taken by Defendants)
17                   November 1, 2024
18                 1:00 p.m. Eastern time
19
20
21
22
23
24
25       Reported by:  Debra M. Druzisky, CCR-B-1848
```

Case 1:22-cv-04259-SDG   Document 264-6   Filed 12/20/24   Page 3 of 43
HIGLY CONF/AEO Brian Beasley          November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 2

```
 1              APPEARANCES OF COUNSEL
 2    On behalf of the Plaintiff:
 3        CATHERINE CHEN, Esq.
          JARED DAVIDSON, Esq.
 4        United to Protect Democracy, Inc.
          2020 Pennsylvania Avenue, Suite 163
 5        Washington, D.C.  20006
          (202) 579-4582
 6        catherine.chen@protectdemocracy.org
 7
      On behalf of the Defendants Dinesh D'Souza and
 8    D'Souza Media:
 9        AUSTIN VINING, Esq.
          Buchalter
10        790 Stratforde Drive
          Alpharetta, Georgia  30004
11        (318) 225-0678
          avining@buchalter.com
12
13    On behalf of the Defendants True the Vote,
      Catherine Englebrecht and Gregg Phillips:
14
          PHILIP GEORGE, Esq.
15        Greenberg Traurig
          3333 Piedmont Road, Suite 2500
16        Atlanta, Georgia  30305
          (678) 553-2285
17        philip.george@gtlaw.com
18
      Also Present:
19
          Jonathan Miller, videographer
20
                      --oOo--
21
22
23
24
25
```

HIGLY CONF/AEO Brian Beasley          November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 3

1                  INDEX TO EXAMINATION

2    Witness Name:                                    Page

3    BRIAN BEASLEY

4         By Mr. Vining                                  5

5         By Ms. Chen                                   34

6         By Mr. George                                 35

7

8

9

10               INDEX TO DEFENDANT'S EXHIBITS

11      No.                Description              Page

12    Exhibit 1     10-28-24, Defendants Dinesh       7

                    D'Souza and D'Souza Media LLC's

13                  Amended Notice of Deposition and

                    Subpoena Duces Tecum to

14                  Non-Party Brian Beasley re: The

                    above-captioned action.

15                              - - -

16

17

18

19

20

21

22

23

24

25

HIGLY CONF/AEO Brian Beasley          November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 4

1          THE VIDEOGRAPHER:  We are on the
2     record November 1st, 2024, approximately
3     1:01 p.m. Eastern time.
4          This will be the videotaped
5     deposition of Brian Beasley.
6          Would counsel please identify
7     themselves and who they represent for the
8     record?
9          MR. VINING:  Austin Vining from the
10     law firm Buchalter.  And I represent
11     defendants Dinesh D'Souza and D'Souza
12     Media, L.L.C.
13          MR. GEORGE:  Philip George from the
14     law firm Greenberg Traurig.  I represent
15     the defendants True the Vote, Inc.,
16     Catherine Englebrecht and Gregg Phillips.
17          MS. CHEN:  Catherine Chen from
18     Protect Democracy.  I represent the
19     plaintiff Mark Andrews.
20          MR. DAVIDSON:  And this is Jared
21     Davidson, also from Protect Democracy,
22     also on behalf of plaintiff Mark Andrews.
23          THE VIDEOGRAPHER:  Will the court
24     reporter please swear in the witness?
25     ///

Page 5

1                     BRIAN BEASLEY,

2    having been first duly sworn, was examined and

3    testified as follows:

4                       EXAMINATION

5    BY MR. VINING:

6        Q.    Good afternoon, Mr. Beasley.  My name is

7    Austin Vining.  Will you please state your name for

8    the record?

9        A.    Good afternoon, Austin.  Brian Beasley.

10        Q.    Have you ever been deposed before?

11        A.    First time.

12        Q.    Okay.  This shouldn't take too long.  And

13    we really appreciate your time this afternoon.

14            To go over a couple of ground rules,

15    whenever I'm asking a question, please let me

16    finish my question, and I'll let you finish your

17    answer.  If we talk over each other, it makes it

18    hard for the court reporter to take down an

19    accurate transcript.

20            And if you think I'm interrupting you,

21    please let me know.  It's not my intent.

22            And when you're answering questions,

23    please give verbal answers, so a "yes" or a "no"

24    instead of shaking your head.  It's fine right now

25    because it's not an important question, but.  And

HIGLY CONF/AEO Brian Beasley                November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 6

1    no -- try not to say "uh-huh" or "huh-uh," because

2    it's really hard for the court reporter to make a

3    clean transcript with those.

4            And if you don't understand a question

5    that I'm asking, please let me know, and I'll try

6    to rephrase it and make sure that we're clear and

7    both on the same page about what's being asked.

8            If you need a break, again, I don't expect

9    this deposition to go on for too long, but if you

10   need a break at any point, please let me know.

11   I'll ask that you answer whatever pending question

12   there is.  But other than that, you know, you're

13   free to take a break.

14           Is there any reason you can't provide

15   truthful and accurate testimony today?

16       A.   No.

17       Q.   You don't have any medical conditions or

18   you're not on any medications or drugs that would

19   impact your ability to testify and -- or affect

20   your memory today?

21       A.   No.  I did want to add, though, my son is

22   in the other room.  So he may, I hope he doesn't,

23   but if he does, I may have to pause and step away

24   briefly.

25       Q.   I understand.  Thank you for letting us

Page 7

1    know.

2          Okay.  Mr. Beasley, I'm going to show you

3    what has been marked as Exhibit DDBB 0001.

4                    (Whereupon, Defendant's

5                     Exhibit 1 was marked for

6                     identification.)

7    BY MR. VINING:

8          Q.   Okay.  It's been introduced in Exhibit

9    Share.  So you may need to refresh your page, but

10   you should be able to see that exhibit.

11         A.   Yes, I can see it.

12         Q.   Do you recognize this document?

13         A.   Yes.

14         Q.   And what is it?

15         A.   I believe it's a subpoena.

16         Q.   Okay.  The subpoena served to you by

17   defendants Dinesh D'Souza and D'Souza Media,

18   L.L.C.; is that correct?

19         A.   Yes.  Via E-mail.

20         Q.   Okay.  And you were served with this

21   document?

22         A.   By E-mail?  Yes.

23         Q.   And is that why you're here today?

24         A.   Yes.

25         Q.   Thank you.

Page 8

1              And do you -- if you'll scroll down with

2      me to Page 8, continuing on to Pages 10 and 11, is

3      this a portion of the subpoena requesting that you

4      provide certain documents?

5          A.    (Whereupon, there was no audible response

6      by the deponent.)

7          Q.    And did you look for documents responsive

8      to these requests?

9          A.    I tried, but I could not produce any

10     because I didn't have any.

11         Q.    Okay.  Have you ever exchanged anything in

12     writing with Mr. Andrews?

13         A.    Do you mind rephrasing?

14         Q.    Yeah.  Do you -- do you know who Mark

15     Andrews is?

16         A.    Yes.

17         Q.    Is it your understanding that he's the

18     plaintiff in this case?

19         A.    Yes.

20         Q.    Okay.  Have you ever exchanged anything in

21     writing with Mr. Andrews relating to --

22         A.    As to --

23         Q.    -- any of these document requests?

24         A.    Okay.  No.

25         Q.    Okay.

Page 9

1       A.    Yeah.

2       Q.    I appreciate it.

3             Mr. Beasley, where do you currently work?

4       A.    The employer is Fannie Mae.

5       Q.    Okay.  And how long have you worked there?

6       A.    Six months.

7       Q.    And what's your position there?

8       A.    SOX lead.

9       Q.    Can you repeat that?  I'm sorry.

10      A.    SOX, S-O-X, Sarbanes-Oxley lead.

11      Q.    Okay.  Thanks.

12            Was there a point in time when you worked

13   for N.C.R. Corporation?

14      A.    Yes.

15      Q.    And what years did you work for N.C.R.

16   Corporation?

17      A.    I do not recall specifically.  I've kind

18   of bounced around, but.  I can't recall the exact

19   year.

20      Q.    Okay.  Do you recall if you worked there

21   in 2022?

22      A.    I don't think so, no.

23      Q.    Okay.

24      A.    Before Fannie Mae, I worked for Lowe's.

25   Before for Lowe's, I worked for Delta.  And then

Page 10

1    before Delta, I worked for N.C.R.  So it's been a

2    few years.

3        Q.   Do you remember any approximate dates that

4    you would have been there, or when you started or

5    when you may have ended?

6        A.   I would have to honestly look at my

7    résumé, which --

8        Q.   Okay.

9        A.   -- I didn't prepare for it.

10       Q.   That's okay.

11       A.   Yeah.

12       Q.   What was the last position that you held

13   at N.C.R.?

14       A.   Senior I.T. auditor.

15       Q.   Okay.  And which office did you work in?

16       A.   Midtown.

17       Q.   Midtown Atlanta?

18       A.   Yes.  Sorry.  Midtown Atlanta.

19       Q.   Okay.  And what were your job

20   responsibilities?

21       A.   As an auditor, just ensuring day-to-day

22   and the enterprise complied with enterprise

23   standards and best policies and procedures.  It was

24   kind of like a --

25       Q.   Okay.

Page 11

1      A.    -- G.R.C., governance, risk and

2   compliance, just ensuring they adhered to it from

3   a -- from a security standpoint.

4      Q.    When you worked at N.C.R., did you know

5   Mr. Andrews?

6      A.    Yes.  He hired me.

7      Q.    Okay.  So was he your supervisor?

8      A.    Yes.

9      Q.    Okay.  Did you interact with him on a

10  daily basis?

11     A.    Yes.

12     Q.    When did you first meet Mr. Andrews?

13     A.    In my interview.

14     Q.    And you don't recall when that was?

15     A.    I worked for N.C.R. for almost five years,

16  so that's -- that's some time away.  So no, I don't

17  recall the exact year.

18     Q.    Okay.  And how well would you say you knew

19  Mr. Andrews?

20     A.    Over the course of time?  Pretty well.

21     Q.    How often did you speak with him?

22     A.    Daily, if not every other day.

23     Q.    And so daily, if not every other day, for

24  the course of approximately five years; is that

25  correct?

HIGLY CONF/AEO Brian Beasley                    November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 12

1        A.    Yeah.  During the workweek, yes.

2        Q.    Okay.  Have you heard of the film 2000

3    Mules?

4        A.    I have, yes.

5        Q.    And what is that film?

6        A.    I honestly don't know.  I've heard of it

7    but don't really know how to explain it.

8        Q.    Is there anything you know about it?

9        A.    Not really.

10        Q.    Have you seen it?

11        A.    Not specifically.  I've only seen YouTube

12    clips.  YouTube clips.

13        Q.    Have you -- are you aware of a book titled

14    2000 Mules?

15        A.    Yes.

16        Q.    Have you read it?

17        A.    No.

18        Q.    Do you know what it's about?

19        A.    I don't, no.

20        Q.    Okay.  Do you recall discussing 2000 Mules

21    with Mr. Andrews?

22        A.    Can you -- I guess I could say -- I could

23    say it this way.  I don't think I discussed it with

24    him, but we have mentioned it, if that makes sense.

25        Q.    When you say "we," do you mean in a

Page 13

1    conversation with you --

2        A.    Yes.

3        Q.    -- and Mr. Andrews?

4        A.    Yes.

5        Q.    I just want to make sure we're clear here

6    what the distinction is between discussing and

7    mentioning.

8        A.    Sure.  Is that a question?

9        Q.    Yeah, can you, I guess --

10       A.    So discussions --

11       Q.    -- in the --

12       A.    Okay.

13       Q.    -- in the conversation that you had with

14   Mr. Andrews where it was mentioned, can you tell me

15   about that conversation?

16       A.    Sure.  I have to add a little context, so

17   forgive me --

18       Q.    Yeah.

19       A.    -- for all the extra details, but.  So I

20   basically had a conversation post-N.C.R. with Mark.

21   And we usually have, like, quarterly check-ins,

22   because he's sort of my mentor.

23           And this one occasion when I worked for

24   Lowe's in New York, he didn't seem like himself, so

25   I asked is everything okay, what's going on.

HIGLY CONF/AEO Brian Beasley          November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 14

1              And he kind of mentioned, you know,

2      he's -- you know, he's not doing his best, he feels

3      like a lot of people are following him, his family

4      is being watched.

5              And I was kind of taken aback.  And I was

6      like, what do you mean?  And then he just asked,

7      have you ever seen the movie or heard of the book

8      2000 Mules?

9              And I said, I've heard of it.  And I --

10     that was all.  And he said, well, yeah, you

11     probably wouldn't understand, and then he left it

12     at that.

13             And so afterwards -- that's how I, I

14     guess, define mention and not discuss, because we

15     didn't go at lengths in, because I didn't really

16     know the meaning or what he meant by it.  I just

17     kind of heard it from maybe social media or friends

18     in passing, but I didn't truly understand what it

19     is.

20        Q.   So you learned about this after you no

21     longer were an employee of N.C.R.; is that correct?

22        A.   Yes.

23        Q.   Do you recall when that conversation

24     occurred?

25        A.   I was in New York for Lowe's, so it had to

HIGLY CONF/AEO Brian Beasley                November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 15

1   be two years.

2        Q.   And do you --

3        A.   Or maybe a year and a half.  Maybe a year

4   and a half.  Sorry.  Because I just moved here,

5   Fannie Mae, six months, so early part of last year.

6   About a year.

7        Q.   So you think this occurred in the early

8   part of 2023?

9        A.   I believe so.  I'm not --

10        Q.   Okay.

11        A.   -- sure.  Yeah, I get confused with dates

12   sometimes.

13        Q.   Do you remember what platform that

14   conversation took place on?

15        A.   I'm not sure I'm following.

16        Q.   Was it a phone call or was it a Teams

17   meeting or a Zoom?

18        A.   Phone call.

19        Q.   And do you recall discussing anything with

20   Mr. Andrews about his voting in 2022?

21        A.   No.

22        Q.   Anything regarding his voting in 2020?

23        A.   No.

24        Q.   Is this the only conversation you had with

25   Mr. Andrews about 2000 Mules?

HIGLY CONF/AEO Brian Beasley          November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 16

1        A.    Yes -- no.  I take that back.  It was not.

2        Q.    How many conversations do you remember

3    having with Mr. Andrews about 2000 Mules?

4        A.    Two.

5        Q.    And can you tell me about the other

6    conversation that we haven't discussed?

7        A.    Sure.  The second one was another

8    check-in.  As again, he's my mentor, so I check in

9    with him quarterly almost.

10             And so the next one I basically told him,

11   like, hey, I checked out the -- a clip of 2000

12   Mules, and I was just taken aback.

13             And he was like, understood, it's just, it

14   is what it is, and we just kept the conversation

15   moving on about work-related items.  But that

16   was --

17       Q.    Do you --

18       A.    -- a second time.

19       Q.    Do you recall when that conversation took

20   place?

21       A.    It was before I accepted the position I'm

22   currently in, so it had to be early part of this

23   year.

24       Q.    Okay.  And was that also a phone call that

25   you had with Mr. Andrews?

Case 1:22-cv-04259-SDG    Document 264-6    Filed 12/20/24    Page 18 of 43
HIGLY CONF/AEO Brian Beasley        November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 17

1      A.    Yes.

2      Q.    Did Mr. Andrews mention in any of these

3    conversations if he had discussed this matter with

4    anyone else?

5      A.    No.

6      Q.    Did you make any recommendations to him

7    about security or anything like that?

8      A.    I want to say no.  I mean, generally

9    speaking, I tend to just say, stay safe.  But other

10   than that, no.

11     Q.    And you mentioned in the first

12   conversation that you had with him that you

13   mentioned that you had heard of 2000 Mules; is that

14   correct?

15     A.    Yes.

16     Q.    Do you remember in what context you heard

17   about 2000 Mules?

18     A.    No.  I have a wide range of friends and

19   family, so I cannot honestly say where I heard it

20   from, no.

21     Q.    Okay.  In the converse -- in either

22   conversation you had with Mr. Andrews, did he

23   mention Dinesh D'Souza?

24     A.    I don't think so.

25     Q.    Do you know --

HIGLY CONF/AEO Brian Beasley          November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 18

1        A.    I can't --

2        Q.    Oh, sorry.

3        A.    I can't really recall, like, accurately,

4    though, like, the conversation.  But I don't think

5    so, no.

6        Q.    Do you know who Dinesh D'Souza is?

7        A.    I do now.  I had to -- I looked him up,

8    yeah.

9        Q.    Okay.  But at the time you didn't?

10       A.    No.  Huh-uh.

11       Q.    In the conversation did Mr. Andrews

12   mention D'Souza Media, L.L.C.?

13       A.    No.

14       Q.    Do you know what D'Souza Media, L.L.C. is?

15       A.    I believe it's the company that created

16   the movie or the book.  I'm not sure which one.

17   But I think it's basically the company behind.

18       Q.    And this is something that you learned

19   after your conversations with Mr. Andrews?

20       A.    Yes.

21       Q.    In your conversations with Mr. Andrews,

22   did he mention True the Vote?

23       A.    No.

24       Q.    Do you know what True the Vote is?

25       A.    I do not.

Page 19

1        Q.    In your conversation with Mr. Andrews, did

2    he mention Catherine Englebrecht?

3        A.    No.

4        Q.    Do you know who she is?

5        A.    I do not.

6        Q.    In your conversation with Mr. Andrews, did

7    he mention Gregg Phillips?

8        A.    No.

9        Q.    Do you know who he is?

10       A.    I do not.

11       Q.    After your conversation with Mr. Andrews,

12   after either conversation, did you conduct any

13   discovery or investigation into 2000 Mules or what

14   he told you?

15       A.    Only what I said, like, it piqued my

16   curiosity, so I went on YouTube just to see what it

17   was about.  So I'm not sure if that's considered

18   discovery, but I definitely did my research just to

19   have a better understanding.

20       Q.    And did you take any other action other

21   than looking at --

22       A.    No.

23       Q.    -- the topic?

24       A.    No.

25       Q.    Anything else you remember about the

Page 20

1    conversations with Mr. Andrews?

2        A.    I mean, outside of how, like, he seemed

3    different and a little distraught, no.  Like, that

4    was the reason I kind of asked him what was going

5    on.

6        Q.    Did you discuss Mr. Andrews or 2000 Mules

7    with anyone else who worked at N.C.R.?

8        A.    No.

9        Q.    Are you aware of Mr. Andrews ever being

10   harassed in relation to 2000 Mules?

11       A.    Yes.

12       Q.    And can you tell me about that?

13       A.    It was a -- the same conversation I had

14   where I asked what was going on, he seemed a little

15   distraught.  He just said his -- him and his family

16   just seemed to be followed and it seemed like he

17   was being harassed.

18            And I was just kind of taken aback, just

19   said, stay safe and, like, kind of left it at that,

20   like, didn't want to get too much and pry too much

21   into his business.

22       Q.    So no specific --

23       A.    No.

24       Q.    I mean --

25       A.    He mentioned he was being followed.  That

HIGLY CONF/AEO Brian Beasley              November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 21

1    was the only mention he did say to me.

2         Q.    Any specificity around that or just

3    generally that he was being followed?

4         A.    Just generally.

5         Q.    Are you aware of anything negative

6    happening to Mr. Andrews at work as a result of

7    what he discussed with you?

8         A.    Not to my knowledge, no.

9         Q.    Are you aware of him being demoted?

10        A.    No.

11        Q.    I'm not -- just to be clear --

12        A.    Oh.

13        Q.    -- I'm not --

14        A.    Oh.

15        Q.    -- making a representation that he was --

16        A.    Okay.

17        Q.    -- demoted.

18        A.    Okay.  Okay.  No.  No, I didn't.  I don't.

19        Q.    Are you aware of him receiving any lower

20    pay?

21        A.    No.

22        Q.    Are you aware of him not being promoted?

23        A.    No.

24        Q.    Are you aware of 2000 Mules affecting his

25    work in any way?

Page 22

1      A.    I'm unsure.

2      Q.    Are you aware of 2000 Mules affecting

3   Mr. Andrews's standing within the company N.C.R.?

4      A.    No, I'm not aware.

5      Q.    Other than what you described with him

6   being followed or his -- him telling you that he

7   was being followed, are you aware of his life being

8   affected in any other way as a result of 2000

9   Mules?

10      A.    Outside of that, no.

11      Q.    Are you aware of Mr. Andrews raising

12   issues related to 2000 Mules with anyone else at

13   N.C.R.?

14      A.    No.

15      Q.    Did you, after your employment at N.C.R.,

16   did you exchange any E-mails with Mr. Andrews?

17      A.    In general or relating to this case?

18      Q.    First generally have you?

19      A.    Yes.  Because he reviewed my résumé, and I

20   had to send him my résumé.

21      Q.    And have you exchanged any E-mails with

22   him related to 2000 Mules?

23      A.    No.

24      Q.    Have you exchanged any text messages with

25   Mr. Andrews related to 2000 Mules?

HIGLY CONF/AEO Brian Beasley          November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 23

1          A.    No.

2          Q.    Did you exchange any Instant Message,

3    Skype or other related messenging platform messages

4    with Mr. Andrews related to 2000 Mules?

5          A.    No.

6          Q.    Did you ever exchange any other forms of

7    written communication with Mr. Andrews relating to

8    2000 Mules?

9          A.    No.

10         Q.    Have you ever seen Mr. Andrews mentioned

11   in the news?

12         A.    I believe so.  I believe there was an

13   article I came across, but I can't remember what it

14   was tied to.

15         Q.    Do you remember anything about the

16   article?

17         A.    No.  I don't, honestly.  It's been so

18   long.  I cannot recall.

19         Q.    Do you recall if you've ever seen

20   Mr. Andrews mentioned in any social media?

21         A.    Do I recall him being mentioned in social

22   media?  No.

23         Q.    Do you know if 2000 Mules or any of the

24   issues we've discussed today affected Mr. Andrews's

25   reputation at N.C.R.?

Page 24

1      A.    I'm unsure.

2      Q.    Do you know if it affected him personally?

3      A.    Yes.

4      Q.    Oh, I'm sorry.  Thank you.

5            Do you know if 2000 Mules affected

6    Mr. Andrews professionally?

7      A.    I'm unsure.

8      Q.    Do you know if Mr. Andrews made any

9    complaints to N.C.R. related to 2000 Mules?

10     A.    Unaware.  I'm unaware.

11     Q.    Do you know if Mr. Andrews submitted or

12   filed any written statements to N.C.R. related to

13   2000 Mules?

14     A.    Not to my knowledge.

15     Q.    When was the last time you spoke to

16   Mr. Andrews?

17     A.    I think the beginning of this year.  We

18   talked about the potential employer where I was

19   trying to decide who I should go with for my job.

20     Q.    Was that the second conversation that you

21   mentioned earlier that you also discussed 2000

22   Mules and you told him that you had seen?

23     A.    No.  That was after, yeah.  So this call

24   was initiated by me because I needed some advice on

25   which direction to go with my career path.  So this

Case 1:22-cv-04259-SDG    Document 264-6    Filed 12/20/24    Page 26 of 43
HIGLY CONF/AEO Brian Beasley    November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 25

1   wouldn't -- didn't even speak about anything other
2   than my résumé and in -- you know, other attributes
3   to consider.
4       Q.   Have you spoken with Mr. Andrews about
5   this lawsuit?
6       A.   No.
7       Q.   Okay.  To be sure, have you spoken to
8   Mr. Andrews after you received the subpoena that
9   was sent to you?
10      A.   No.
11      Q.   Have you spoken with Mr. Andrews's
12  attorneys?
13      A.   Yes.
14      Q.   And what did you speak about Mr. -- with
15  Mr. Andrews's attorneys?
16      A.   Well, one, they said that I was supposed
17  to be subpoenaed and you all couldn't find me.  And
18  then two, just making me aware of the potentiality
19  of being subpoenaed.
20      Q.   Anything else that you recall?
21      A.   Yeah.  And that if I wanted
22  representation, they couldn't.  But I could also do
23  my own research to maybe try to find representation
24  if, you know, I wanted more information on
25  deposition and how it is handled.  But no, nothing

HIGLY CONF/AEO Brian Beasley                November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 26

1    other than that.

2         Q.    Have you spoken with anyone at N.C.R.

3    after receiving the subpoena?

4         A.    No.

5         Q.    After you received the subpoena in this

6    case, have you talked to anyone else about it?

7         A.    Generally.  Because I needed to explain

8    why I was going to be out of pocket for two hours

9    to my mother so she could watch my son.  I didn't

10   give any details.

11        Q.    Anyone else?

12        A.    No.  You mean just in general?  Or

13   specific to 2000 Mules?  No.

14        Q.    About the subpoena or about the case?

15        A.    Generally speaking, yes.

16        Q.    Who else did you speak with?

17        A.    I went to find maybe pro bono work to see

18   if, you know, I could get some more information on

19   a deposition.  And I had to acknowledge that I was

20   being subpoenaed in their, I guess, intake

21   questions.

22        Q.    I'm sorry.  Other than seeking --

23        A.    Oh.

24        Q.    -- legal --

25        A.    No.

Case 1:22-cv-04259-SDG    Document 264-6    Filed 12/20/24    Page 28 of 43
HIGLY CONF/AEO Brian Beasley                November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 27

1      Q.    -- advice?

2      A.    No.

3      Q.    Okay.  What's your current residential

4    address?

5      A.    I'm not comfortable giving the specific

6    address.  Can I give you the city and county I'm

7    in?

8      Q.    We can agree to -- or you can request that

9    this portion of the transcript be marked as

10    confidential so that --

11      A.    Okay.

12      Q.    I mean, this -- it's covered by protective

13    order in this case, confidential -- things marked

14    as confidential can be seen by a limited amount of

15    people.

16      A.    Yeah.  I just don't want my address to be

17    made public.

18      Q.    Right.

19      A.    Yeah.  So you said I have to make mention

20    of it being confidential?

21      Q.    Yeah, you can request it on the record.

22      A.    Okay.  I request on the record to make

23    this confidential.

24            MR. VINING:  And Jared?

25            MR. DAVIDSON:  Austin?

Case 1:22-cv-04259-SDG    Document 264-6    Filed 12/20/24    Page 29 of 43
HIGLY CONF/AEO Brian Beasley          November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 28

1          MR. VINING:  Yeah, and Jared?

2          MR. DAVIDSON:  Just Mr. Beasley,

3     there's two kinds of designations we have

4     in this case.

5          Austin, cut me off if you --

6          MR. VINING:  No, you're -- feel free.

7          MR. DAVIDSON:  But we have a

8     confidential designation, which is very

9     protective.  It just means that, like, the

10     attorneys and the parties are the only

11     ones that can access it.

12          We have a higher level of

13     confidentiality that we can designate

14     called attorneys' eyes only.  And that

15     means that only the attorneys in the

16     matters, as opposed to the parties, could

17     access the information.

18          So if you wanted the most protective

19     form --

20          THE WITNESS:  Yes.

21          MR. DAVIDSON:  -- of confidentiality,

22     we should mark it as attorneys' eyes on --

23     or you should ask for it to be marked

24     attorneys' eyes only.

25          Alternatively, you can mark it as

Page 29

1       confidential.  So.

2             THE WITNESS:  Yes.  I request to mark

3       it attorneys' eyes only.

4             MR. VINING:  Okay.

5             THE WITNESS:  Thank you.

6             MR. VINING:  That's fine.

7             MR. DAVIDSON:  And we have no --

8             MR. VINING:  Thank you.

9             MR. DAVIDSON:  Plaintiff has

10      no objection to that.

11            MR. VINING:  Yeah.

12            THE WITNESS:  Okay.

13            MR. GEORGE:  Yeah, no objection.

14            MR. VINING:  No objections from the

15      D'Souza defendants as well.

16   BY MR. VINING:

17      Q.    Okay.

18      A.    So go ahead and give it?

19      Q.    Yeah.  What is your residential address?

20      A.    REDACTED

21   REDACTED      .

22      Q.    And what is your cell phone number?

23      A.    May I ask why it's needed?

24      Q.    One, in case we need to contact you.  Two,

25   when we're reviewing records, if there's a cell

HIGLY CONF/AEO Brian Beasley          November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 30

1    phone number that doesn't have a name on it, we may

2    use it to verify who -- if that number belongs to

3    you or someone else.  There could be other reasons,

4    but we just like to have it in the record.

5         A.   Okay.  Do I have to, each time I give this

6    information, say I'm -- okay.  So --

7         Q.   We'll --

8         A.   -- all this information --

9         Q.   I'll --

10        A.   -- will be marked ago --

11        Q.   I'll --

12        A.   Okay.

13        Q.   I'll stipulate that this portion of the

14   transcript --

15        A.   Okay.

16        Q.   -- with regards to your contact

17   information, we understand that you would like that

18   to be marked as highly confidential, attorneys'

19   eyes only.

20        A.   Thank you.

21             REDACTED.

22        Q.   Thank you.

23             And how long have you had your current

24   cell phone?

25        A.   A long time.  20 plus years.

HIGLY CONF/AEO Brian Beasley                November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

                                                              Page 31

1      Q.   Okay.  And that's your actual cell phone

2    or your cell phone number?

3      A.   I'm not following.

4      Q.   The device or the phone number?

5      A.   Oh, can you repeat the question?  I'm

6    sorry.

7      Q.   How long have you had your current cell

8    phone?

9      A.   Maybe a year and some change, year and a

10   half maybe.

11     Q.   Okay.  Do you have a personal E-mail

12   address?

13     A.   Yes.

14     Q.   And what is that E-mail address?

15     A.   May I ask why?  I thought you already have

16   an E-mail from me.

17     Q.   Just for the transcript, for the record.

18     A.   Can you use the same one that you

19   subpoenaed me on?

20     Q.   Yeah.  Can you -- can you state it for the

21   record?

22     A.   I don't recall it off the top.  It has my

23   initial and then a lot of numbers.

24     Q.   Okay.

25     A.   I can get it if you need it, though.

Case 1:22-cv-04259-SDG    Document 264-6    Filed 12/20/24    Page 33 of 43
HIGLY CONF/AEO Brian Beasley                November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 32

1      Q.   That's okay.

2           Do you have any other personal E-mail

3      addresses that you use?

4      A.   Yes.

5      Q.   And can you tell me what those are?

6      A.   I don't feel comfortable giving all of my

7      E-mail addresses out.

8      Q.   Even under the protective order for

9      attorneys' eyes only?

10     A.   I don't understand why when you already

11     have an E-mail address.

12     Q.   Okay.

13          MR. VINING:  I'll object as

14     non-responsive.

15          THE WITNESS:  What does that mean?

16     BY MR. VINING:

17     Q.   Just stating on the record that you didn't

18     provide an answer to the question.

19     A.   But I did, I thought.

20     Q.   I mean, you didn't answer the question

21     with a response that gave --

22     A.   (Inaudible due to cross-talk).

23     Q.   -- the answer to the question.

24          MR. VINING:  I think I'm almost done

25     here.  Let's take a quick break.  We'll

Page 33

1      come back at 1:40, if that works for

2      everyone.

3              THE VIDEOGRAPHER:  The time is 1:32.

4      We are off the record.

5              (Whereupon, a discussion ensued

6       off the record.)

7              (Whereupon, there was a brief

8       recess.)

9              THE VIDEOGRAPHER:  The time is 1:39.

10     We are back on the record.

11   BY MR. VINING:

12     Q.   Mr. Beasley, I just have one other point

13   of clarification.  You said you'd heard of the film

14   2000 Mules before Mr. Andrews told you about it; is

15   that correct?

16     A.   I heard of it, yes.

17     Q.   Before Mr. Andrews contacted you, were you

18   aware that he was depicted in the film?

19     A.   I've never seen the film.

20     Q.   I just want to make sure we're clear on

21   the record.  So before he mentioned to you that he

22   was in -- or did he tell you that he was in the

23   film?

24     A.   Yes.

25     Q.   And before he told you that, did you have

Case 1:22-cv-04259-SDG    Document 264-6    Filed 12/20/24    Page 35 of 43
HIGLY CONF/AEO Brian Beasley                    November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 34

1    any awareness that he was in the film?

2        A.    No awareness.

3            MR. VINING:  Okay.  That's all the

4        questions that I have.

5            MR. GEORGE:  I don't have any

6        questions.

7            MS. CHEN:  I have just a couple short

8        questions.

9                    EXAMINATION

10   BY MS. CHEN:

11       Q.    Thank you for your time, Mr. Beasley.

12            You testified that, after you spoke with

13   Mr. Andrews about 2000 Mules, you went on YouTube

14   to see what it was about; is that correct?

15       A.    Yes.

16       Q.    Did you see a clip that included

17   Mr. Andrews?

18       A.    Yes.

19       Q.    Did you recognize Mr. Andrews?

20       A.    Yes.

21            MS. CHEN:  No further questions.

22       Thank you very much for your time.

23            THE VIDEOGRAPHER:  Anyone else or any

24       other statements on the record before we

25       conclude, Counsel?

HIGLY CONF/AEO Brian Beasley                November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 35

1          MR. GEORGE:  I just have one

2      question.

3                    EXAMINATION

4   BY MR. GEORGE:

5      Q.   Mr. Beasley, so you went on YouTube to see

6   the videos after you had discussed it with

7   Mark Andrews and Mark Andrews had told you he was

8   in the film; is that right?

9      A.   Again, I personally wouldn't use the word

10  "discussed."  He made mention of it.  And really my

11  curiosity was piqued, and I went on YouTube on my

12  own discretion to see.

13         Hopefully that answered the question.

14     Q.   Yeah.  I just want to get at the timing.

15  So you saw the YouTube --

16     A.   Oh.

17     Q.   -- video --

18     A.   Oh, okay.

19     Q.   -- after you discussed it with him?

20     A.   Yeah.  I searched after the discussion,

21  yes.

22         MR. GEORGE:  Okay.  Thank you.

23     That's all I have.

24         MR. DAVIDSON:  Should we all go to

25     lunch?

HIGLY CONF/AEO Brian Beasley                November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 36

1          MR. VINING:  I have no further

2     questions.

3          THE VIDEOGRAPHER:  All right.  This

4     concludes the videotaped deposition.  The

5     time is 1:43 p.m. Eastern time.  We are

6     off the record.

7          (Whereupon, a discussion ensued

8      off the record.)

9                         - - -

10          (Witness excused.)

11                         - - -

12          (Whereupon, the deposition

13     concluded at 1:45 p.m. Eastern time.)

14                    --oOo--

15

16

17

18

19

20

21

22

23

24

25

HIGLY CONF/AEO Brian Beasley                    November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 37

1                 VERITEXT LEGAL SOLUTIONS
2              FIRM CERTIFICATE AND DISCLOSURE
3
4              Veritext represents that the foregoing
   transcript as produced by our Production
5    Coordinators, Georgia Certified Notaries, is a
   true, correct and complete transcript of the
6    colloquies, questions and answers as submitted by
   the certified court reporter in this case.
7
              Veritext further represents that the
8    attached exhibits, if any, are a true, correct and
   complete copy as submitted by the certified
9    reporter, attorneys or witness in this case;
10             And that the exhibits were handled and
   produced exclusively through our Production
11   Coordinators, Georgia Certified Notaries.  Copies
   of notarized production certificates related to
12   this proceeding are available upon request to
   litsup-ga@veritext.com.
13
              Veritext is not taking this deposition
14   under any relationship that is prohibited by OCGA
   15-14-37(a) and (b).  Case-specific discounts are
15   automatically applied to all parties at such time
   as any party receives a discount.  Ancillary
16   services such as calendar and financial reports are
   available to all parties upon request.
17
18
19
20
21
22
23
24
25

HIGLY CONF/AEO Brian Beasley                November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 38

1          R E P O R T E R    C E R T I F I C A T E
2     STATE OF GEORGIA )
      COBB COUNTY      )
3
4          I, Debra M. Druzisky, a Certified Court
      Reporter in and for the State of Georgia, do hereby
5     certify:
           That prior to being examined, the witness
6     named in the foregoing deposition was by me duly
      sworn to testify to the truth, the whole truth, and
7     nothing but the truth;
           That said deposition was taken before me
8     at the time and place set forth and was taken down
      by me in shorthand and thereafter reduced to
9     computerized transcription under my direction and
      supervision.  And I hereby certify the foregoing
10    deposition is a full, true and correct transcript
      of my shorthand notes so taken.
11         Review of the transcript was not
      requested.  If requested, any changes made by the
12    deponent and provided to the reporter during the
      period allowed are appended hereto.
13         I further certify that I am not of kin or
      counsel to the parties in the case, and I am not in
14    the regular employ of counsel for any of the said
      parties, nor am I in any way financially interested
15    in the result of said case.
           IN WITNESS WHEREOF, I have hereunto
16    subscribed my name this 15th day of November, 2024.
17
18
19
20    _____
                 Debra M. Druzisky
21               Georgia CCR-B-1848
22
23
24
25

Case 1:22-cv-04259-SDG    Document 264-6    Filed 12/20/24    Page 40 of 43
HIGLY CONF/AEO Brian Beasley          November 1, 2024
Andrews, Mark vs D'Souza, Dinesh et al.

Page 39

1          R E P O R T E R   D I S C L O S U R E

2     DISTRICT COURT  )   DEPOSITION OF

      NORTHERN DISTRICT)   BRIAN BEASLEY

3     ATLANTA DIVISION )

4          Pursuant to Article 10.B of the Rules and
      Regulations of the Board of Court Reporting of the

5     Judicial Council of Georgia, I make the following
      disclosure:

6          I am a Georgia Certified Court Reporter.
      I am here as a representative of Veritext Legal

7     Solutions.
           Veritext Legal Solutions was contacted by

8     the offices of Buchalter to provide court reporting
      services for this deposition.  Veritext Legal

9     Solutions will not be taking this deposition under
      any contract that is prohibited by O.C.G.A. 9-11-28

10    (c).
           Veritext Legal Solutions has no contract

11    or agreement to provide court reporting services
      with any party to the case, or any reporter or

12    reporting agency from whom a referral might have
      been made to cover the deposition.

13         Veritext Legal Solutions will charge its
      usual and customary rates to all parties in the

14    case, and a financial discount will not be given to
      any party in this litigation.

15

16

17                     Debra M. Druzisky
                       Georgia CCR-B-1848

18

19

20

21

22

23

24

25

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.