# EXHIBIT 157

**In the Matter Of:**

ANDREWS V. D'SOUZA

1:22-cv-04259-SDG

---

**KELLY B. COVELESKIE**

*August 14, 2024*

---



800.211.DEPO (3376)
EsquireSolutions.com

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                   NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3

 4   MARK ANDREWS,

 5      Plaintiff,

 6

 7

 8

 9

10   vs.                                 CASE NUMBER
                                   1:22-cv-04259-SDG
11

12

13

14

15
     DINESH D'SOUZA, et al.
16
        Defendant.
17
     --------------------------/
18

19      The videotaped deposition of KELLY BLACK

20   COVELESKIE, a witness in the above-entitled

21   cause, taken pursuant to Notice and Agreement,

22   before Naomi McCracken, stenographic court

23   reporter and Notary Public, via Videoconference

24   on Wednesday August 14, 2024, commencing at or

25   about the hour of 11:34 a.m.
```



1    APPEARANCES OF COUNSEL:

2

     FOR THE PLAINTIFF:
3
                    VIA VIDEOCONFERENCE
4
             SONIA QIN, ESQUIRE
5            Skadden, Arps, Slate, Meagher & Flom LLP
             One Manhattan West
6            New York, New York 10001-8602
             212.735.3571
7            sonia.qin@skadden.com

8
     FOR THE DEFENDANTS, TRUE THE VOTE, INC.,
9    CATHERINE ENGELBRECHT, AND GREGG PHILLIPS:

10                  VIA VIDEOCONFERENCE

11           PHILLIP GEORGE, ESQUIRE
             Greenberg Traurig, LLP
12           3333 Piedmont Road NE
             Suite 2500, Terminus 200
13           Atlanta, Georgia 30305
             678.553.2100
14           philip.george@gtlaw.com

15
     FOR THE DEFENDANTS, DINESH D'SOUZA AND
16   D'SOUZA MEDIA, LLC:

17                  VIA VIDEOCONFERENCE

18           AUSTIN VINING, ESQUIRE
             Buchalter
19           124 Peachtree Memorial Drive NW
             Unit 1
20           Atlanta, Georgia 30309
             404.832.7536
21           avining@buchalter.com

22   ALSO PRESENT (via videoconference):
             Eden Rucker, Videographer
23

24                       -   -   -

25



```
 1                        I N D E X

 2

 3                                                    PAGE

 4
```

```
 5   EXHIBIT INDEX ----------------------------- 4

 6
     OPENING REMARKS AND STIPULATIONS --------- 5-6
 7

 8

 9

10

11

12

13   DIRECT EXAMINATION:
         By Mr. George  ------------------------ 6
14
     CROSS-EXAMINATION:
15       By Mr. Vining  ----------------------- 30
         By Ms. Qin  -------------------------- 31
16
     REDIRECT EXAMINATION:
17       By Mr. George  ----------------------- 33

18

19

20

21

22

23

24
     CERTIFICATE ----------------------------- 35
25
```



KELLY B. COVELESKIE                                August 14, 2024
ANDREWS V. D'SOUZA                                             4

 1          D O C U M E N T A R Y   E V I D E N C E

 2   NUMBER              DESCRIPTION              PAGE
     DEFENDANT'S EXHIBITS
 3
     DX-1      Amended Notice of deposition        8
 4             of Kelly Black Covelskie
               (11 pages)
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1        THE VIDEOGRAPHER:  Good morning,

2   everyone.  We are now on the record.

3   The time is now 11:34 a.m. on

4   Wednesday, August 14th, 2024.  This

5   begins the videotape deposition of

6   Kelly Black Coveleskie taken in the

7   matter of Mark Andrews versus Dinesh

8   D'Souza, et al., filed in the United

9   States District Court for the Northern

10  District of Georgia, Atlanta Division,

11  Case Number of which is

12  1:22-cv-04259-SDG.

13        The videographer today is Eden

14  Rucker.  The court reporter today is

15  Naomi McCracken.  We're both

16  representing Esquire Deposition

17  Solutions.

18        Counsel, will you please announce

19  your name and whom you represent, after

20  which the court reporter will swear in

21  the witness?

22        MR. GEORGE:  My name is Philip

23  George from the law firm Greenberg

24  Traurig, and we represent Defendants

25  True the Vote, Inc., Catherine



```
 1        Engelbrecht, and Gregg Phillips.
 2              MR. VINING:  My name is Austin
 3        Vining from the law firm, Buchalter,
 4        and we represent Dinesh D'Souza and
 5        D'Souza Media, LLC.
 6              MS. QIN:  My name is Sonia Qin
 7        from the law firm Skadden, Arps, Slate,
 8        Meagher & Flom, and we represent
 9        Plaintiff Mark Andrews.
10              MADAM COURT REPORTER:  Will the
11        please raise your right hand?
12              KELLY BLACK COVELESKIE,
13   having been produced and first duly sworn as a
14   witness, testified as follows:
15                DIRECT EXAMINATION
16   BY MR. GEORGE:
17        Q    Good morning, can you please state your
18   name for the record?
19        A    Kelly Black Coveleskie.
20        Q    Thank you.  As I said earlier, my
21   name's Philip George, represent True the Vote,
22   Inc., Catherine Engelbrecht and Gregg Phillips.
23              Have you ever given a deposition
24   before, Ms. Coveleskie?
25        A    Yes.
```



1       Q    I'd just like to go over some ground

2   rules just to make sure we're on the same page.

3            First, please just let me finish my

4   question and I'll let you finish your answer.

5            Does that sound all right?

6       A    Yes.

7       Q    Okay.  If you think I'm interrupting

8   you for any reason, please let me know, I will

9   try to stop doing that.

10           Does that sound good?

11      A    Yes.

12      Q    Please try to give verbal answers

13  seeing there is a court reporter who has to take

14  down everything that's said and that's just

15  difficult to do unless there are verbal answers.

16           Does that sound all right?

17      A    Yes.

18      Q    And if you don't understand a question

19  I'm asking for any reason, just let me know,

20  I'll try to clarify it so we're all on the same

21  page; is that okay?

22      A    Yes.

23      Q    And I don't anticipate this going very

24  long, but if you need a break for any reason,

25  just let me know and I'll be happy to



 1  accommodate.

 2      A    Okay.  Thank you.

 3      Q    Ms. Coveleskie, is there any reason you

 4  cannot provide truthful and accurate testimony

 5  today?

 6      A    No.

 7      Q    Okay.  I'm going to show you a document

 8  on the screen.

 9           Do you see a document that popped up

10  your screen?

11      A    I do.

12           (Whereupon, Defendant's Exhibit

13           Number 1 was marked for

14           identification.)

15  BY MR. GEORGE:

16      Q    And for the record, this is TTV

17  Exhibit 1.

18           Is this the amended notice of

19  deposition that you received in this case?

20      A    Yes.

21      Q    Okay.  So you received this document,

22  right?

23      A    I did.

24      Q    You see this portion I'm showing you

25  now that says documents to be produced?



1      A    Yes.

2      Q    Did you look through your documents to

3   see if you had any documents responsive to these

4   categories?

5      A    I do not have any documents that

6   pertain to this matter.

7      Q    Okay.  Where do you currently work?

8      A    Acquity Brands.

9      Q    What's your position there?

10     A    Vice president of internal audit.

11     Q    And how long have you worked at Acuity

12  Brands?

13     A    About a year and a half, since around

14  February of 2023.

15     Q    Prior to February of 2023, did you work

16  at NCR Corporation?

17     A    Yes.

18     Q    What years did you work at NCR?

19     A    August 2013 through February of 2023.

20     Q    What --

21     A    Almost ten years.

22     Q    Thanks.  What was the last position

23  that you held at NCR?

24     A    Executive director of internal audit.

25     Q    What office did you work in?



 1        A     The midtown office, which is the

 2    headquarters of NCR.

 3        Q     That's midtown Atlanta?

 4        A     Yes.

 5        Q     Who was your last supervisor at NCR?

 6        A     Kelly Moyer.

 7        Q     What were your general job

 8    responsibilities when you were at NCR in your

 9    last position?

10        A     I was responsible for global financial,

11    operational, and compliance audits.

12        Q     When you worked at NCR, did you know

13    Mark Andrews?

14        A     Yes.

15        Q     Would you consider yourself to be a

16    peer of Mark Andrews?

17        A     Yes.

18        Q     Did you know him the entire time that

19    you were at NCR?

20        A     Yes.

21        Q     You knew him for approximately ten

22    years or so?

23        A     Yes.  I can -- I can elaborate more.  I

24    gave -- I got to know Mark.  I had engaged him

25    to be a contractor on an audit in -- let's see,



1   around -- I joined NCR in August of 2013, so I

2   would have engaged him in early spring of 2014

3   to help perform an audit because he had a skill

4   set that my department did not have at the time.

5            And then following that, NCR had

6   acquired a business and we needed to expand the

7   skill set of our team, and so I recommended

8   Mark, just based on his performance as a

9   contractor, I recommended him to apply for a

10  manager role.  And so he interviewed and my

11  manager at the time decided to hire him and

12  bring him on the team.

13       Q    Okay.  Any point in your time at NCR

14  where you supervised Mark Andrews?

15       A    No.  Well, as a contractor, I

16  supervised him, as a contractor performing work.

17  But it was for one -- it was one audit for about

18  six weeks.

19       Q    Would you say that you knew him fairly

20  well?

21       A    Not personally.  I -- over the years, I

22  learned to know about his family, his children,

23  but we never -- beyond greetings, we really

24  didn't spend a lot of time together.  At times,

25  we did travel professionally as a team and --



 1  but I would not characterize us as close peers.

 2      Q    Have you ever heard of the movie 2000

 3  Mules?

 4      A    Yes.

 5      Q    When did you first hear about that?

 6      A    I learned about it through my spouse,

 7  actually, who follows more political, you know,

 8  news.  I learned about it prior to Mark

 9  informing me of -- of the situation, him being

10  featured in the film.

11      Q    Have you seen the film?

12      A    I have.

13      Q    Did you see it in the time frame when

14  your husband mentioned it and you had that

15  conversation with Mr. Andrews?

16      A    Within that time frame, yes.

17      Q    Okay.  How many conversations did you

18  have with Mr. Andrews regarding his appearance

19  in 2000 Mules?

20      A    One conversation.

21      Q    Do you recall when that took place?

22      A    I can't really put a date on it, but it

23  would have been probably in late spring.  I

24  would say maybe -- maybe May 2022.

25      Q    Okay.



1      A    I want to say it was around -- around

2    the time school got out for summer because I

3    have a daughter and I just remember him telling

4    me he would not be at work, and so -- anyway...

5      Q    Now, was this an in-person conversation

6    or --

7      A    Yes, it was in person.

8      Q    So in that conversation, what did

9    Mr. Andrews tell you?

10     A    It was -- I was working at my cube,

11   which is a very big environment.  Our entire

12   team sits around in the area, and he asked me if

13   I had a few minutes.  And so I followed him over

14   to where he was working, which is away from

15   everyone else, and he just asked me how things

16   were going and then he told me he had something

17   he wanted to discuss with me.

18     Q    What did he say after that?

19     A    Excuse me?

20     Q    What did he say after that?

21     A    Oh.  After that, he just asked me how

22   I've been doing and just general catch up,

23   because I hadn't seen Mark a lot.  And then he

24   said, hey, I've got something I need to tell you

25   about.  He said, I just wanted to let you know



1    that in the near future, I'm not going to be

2    here.

3            And then I said, well, you know, what's

4    up?  I thought when we first sat down, he was

5    telling me he was resigning because a lot of

6    people were resigning at NCR.  But it wasn't, it

7    turns out.  He told me, hey, I was -- you know,

8    I'm concerned for my safety, I've been featured

9    in this film or -- I want to say he said it was

10   on the news.  I believe he said Fox News.  Maybe

11   even Tucker Carlson.  My memory is kind of fuzzy

12   here.

13           But he said that he and his vehicle had

14   been featured on the news and he was the

15   subject, he was being featured in a movie and

16   that he was concerned for his safety and that of

17   his family and that he had been advised not be

18   out in public, and that included being at work.

19   And so for the near future, he would not be at

20   NCR, he would be working 100 percent remotely.

21       Q    Okay.  So you said he -- Mr. Andrews

22   said he was advised not to be in public.

23           Did he mention who gave him that

24   advice?

25       A    He did not.  And I did more listening



1   than asking questions because I was caught off

2   guard.  Like, I was not -- I was not

3   expecting -- that's the last thing in the world

4   I expected to be told from Mark, so I did a lot

5   more listening, and I knew it was sensitive to

6   him.  And I just -- I just listened.

7          And he had mentioned the -- he said, I

8   don't know if you've heard of this movie called

9   2000 Mules.  And I really -- I didn't really

10  know it was the film that my husband had told me

11  about at the time.  And I said, well, I'm not

12  really familiar with it.

13         And he said, well, basically they

14  showed me and my car, you know, and they didn't

15  blur it out, and depositing ballots.  I think

16  they were absentee ballots for his family.  I

17  know he has three grown children who are

18  eligible to vote, and I know -- and his wife.

19         And it wasn't -- I didn't really raise

20  any questions.  Mark and I have never really

21  talked political policy, politics, religion.

22  More of a very -- all our discussions typically

23  focused on work.

24     Q    Did you make any recommendations to him

25  in that conversation?



1    A    I told him that I'm happy -- I'm here
2    to support him and offer help with anything I
3    could help with he or his team, but it did not
4    go into any other details.  I said, I'm sorry
5    for your trouble, let me know if there's
6    anything I can do to help.  You know, that was
7    about the extent of it.
8        Q    Do you know if Mr. Andrews took any
9    time off of work as a result of what he
10   discussed with you?
11       A    I don't know, I didn't -- I never
12   really -- although we worked in the same
13   department, he managed his direct reports, I
14   managed mine, and a lot of times we didn't have
15   a lot of overlap.  So I honestly couldn't tell
16   you when he was going to be on vacation or he
17   was out.
18           The nature of our work at the time, NCR
19   had wanted employees to return to office and
20   they had outlined -- their expectation was three
21   days a week, Tuesday, Wednesday, Thursday, and
22   so my team -- myself, my team followed that
23   policy.
24           Because of the size of the campus,
25   3,000 people on a campus, two towers in midtown



1    Atlanta, you couldn't always tell when someone

2    was at work.  You could be off meeting somewhere

3    and not see someone all day.  So I never really

4    knew when Mark was there or when he was on

5    vacation, to tell you the truth.

6            We would have -- we had weekly

7    department meetings that my manager led, and

8    sometimes he would call in and sometimes he

9    would be in person.

10   Q    Do you know if Mr. Andrews' team

11   followed the three days in-office policy?

12   A    They did not.

13   Q    Do you know what their policy was?

14   A    I know -- I don't know what they were

15   instructed to do, I just know that oftentimes

16   they were not in person.  My focus was more on

17   my team and making sure that we were getting our

18   work done.  But when you observed the

19   department, you could see whether people were in

20   seats or not, so...

21   Q    Correct me if I'm getting this wrong,

22   did you -- did you mention that Mr. Andrews said

23   that he would working remotely for some time?

24   A    Yes.

25   Q    Do you know if --



```
 1        A     He would not be physically at NCR.
 2        Q     Okay.  Do you know if he actually did
 3   do that and worked remotely?
 4        A     I don't know.
 5        Q     Do you remember seeing him in the
 6   office at any time after that conversation you
 7   had with him?
 8        A     No.
 9        Q     Not for the rest of the time you were
10   at NCR?
11        A     No.  He returned eventually.  That
12   conversation happened in May.  I don't -- I
13   don't really recall seeing him for several
14   months, and I can't think of an event, even
15   audit committee meetings, the quarterly meetings
16   with the board, I don't recall seeing him there,
17   so...
18        Q     So --
19        A     I know if I needed to -- if I needed to
20   contact him, I could e-mail him or message him
21   in Teams or send him a text.  And I know he was
22   there because I remember we did interview some
23   people for roles because we always -- he always
24   had me interview.  When he brought people in to
25   consider for jobs, I would be part of the
```



1    interview process.  So he was on site some.

2            But it was not -- from the time period

3    he said, you're not going to be seeing me, I'm

4    going out for a period of -- I mean, it could

5    have been summertime, he was not at NCR.  So --

6    and I was interested to see how things -- you

7    know, the result of -- I just -- I didn't know.

8    And then gradually, I believe I saw him.  When

9    he interviewed for roles, I saw him, but that

10   was it.  I --

11   BY MR. GEORGE:

12       Q    Go ahead.

13       A    I was just going to say, my schedule is

14   pretty regimented because I live in North

15   Atlanta and have to commute to Atlanta and I

16   have child in school and my husband works

17   outside the home as well, so it's -- I have a

18   very particular pattern.  And so I was always in

19   the office Tuesday, Wednesday, Thursday, unless

20   I had a doctor's appointment.

21            And that's why I never really knew what

22   his schedule looked like.  So -- but he would --

23   he would -- when we had staff meetings, he would

24   call in virtually to those meetings, so...

25       Q    (Audio distortion) -- some



1    conversations other than the one we've talked

2    about with Mr. Andrews regarding this topic

3    around 2000 Mules?

4        A    I didn't hear you, it cut out.  I'm

5    sorry.

6        Q    I'm sorry.

7             Other than the one conversation we

8    talked about, did you have any other

9    conversations with Mr. Andrews where these

10   topics or 2000 Mules came up?

11       A    No.  No.  To me, I considered that a

12   private matter.  Unless he brought it up, I

13   would never ask, and he did not.

14       Q    I think you said something in one of

15   your responses about blurring him out.

16            Can you just expand on that, what he

17   said?

18       A    Yes.  When he -- when he said he was

19   featured in the video or the news clip or the

20   movie, that his -- his -- he was portrayed on

21   video, but he wasn't blurred out, or maybe his

22   license plate wasn't blurred out.  I don't

23   really recall exactly what he said.  But very

24   clearly, he was shown opening up a ballot box or

25   whatnot and dropping off ballots.



1      Q    Do you know if Mr. Andrews' face was

2   blurred out in the movie 2000 Mules?

3      A    I don't recall.

4      Q    In the conversation you had with

5   Mr. Andrews regarding 2000 Mules, did he ever

6   mention True the Vote?

7      A    No.

8      Q    Did he ever mention Catherine

9   Engelbrecht?

10     A    No.

11     Q    Did he ever mention Gregg Phillips?

12     A    No.

13     Q    After your conversation with

14  Mr. Andrews, did you do anything else to

15  investigate what he was talking about?

16     A    No.  I can tell you that -- I told you

17  earlier that my husband had mentioned this

18  movie, because he follows politics very closely.

19  He told me about this movie, and then maybe a

20  week later, this is when Mark came to me and

21  informed me about this issue.  And then

22  following that, I watched the movie.  So that

23  was the chain.  That was the chain.

24     Q    After you saw the movie, what were your

25  impressions of it?



1       A    No impressions, no conclusions drawn.

2  Interesting.  But no conclusion drawn, really.

3  I consider it to be entertainment.

4       Q    You -- excuse me.

5            Did you have any discussions or

6  conversations with anyone else at NCR regarding

7  what you and Mr. Andrews talked about?

8       A    No.

9       Q    Did you have any discussions or

10  conversations with anyone outside of NCR

11  regarding what you and Mr. Andrews talked about?

12      A    Yes.

13      Q    Who did you speak with about that?

14      A    My spouse.

15      Q    Anyone else?

16      A    No.

17      Q    Did you ever talk to Ms. Moyer about

18  that?

19      A    No.

20      Q    Are you aware of Mr. Andrews ever being

21  harassed?

22      A    No.

23      Q    Are you aware of anything negative

24  happening to Mr. Andrews as a result of 2000

25  Mules or what you discussed with him?



```
 1        A    No.
 2        Q    Are you aware of Mr. Andrews ever being
 3   demoted?
 4        A    No.
 5        Q    Are you aware of Mr. Andrews ever
 6   receiving any lower pay?
 7        A    No.
 8        Q    Are you aware of Mr. Andrews ever not
 9   being promoted?
10        A    No.
11        Q    Are you aware of the results of your
12   conversation with Mr. Andrews ever affecting his
13   standing at NCR?
14        A    No.
15        Q    Are you aware of the results of your
16   conversation with Mr. Andrews ever affecting his
17   work?
18        A    No.
19        Q    Are you aware of Mr. Andrews ever --
20        A    I can't hear you.  Can you hear me?
21        Q    I can hear you.
22        A    Okay.  I cannot hear you.
23        Q    Is this better?
24        A    One moment.
25             THE VIDEOGRAPHER:  Would you like
```



```
 1        to go off the record?
 2              THE WITNESS:  Okay.  I can hear
 3        you now.  I can hear you now.
 4              MS. QIN:  Okay.
 5              THE WITNESS:  Okay.  Sorry.
 6   BY MR. GEORGE:
 7        Q    Not at all.  Let me know if you can't
 8    hear me.
 9        A    Just on a Team's call and I think my
10    audio cut out.  So, anyway.  All right.
11        Q    Are you aware of Mr. Andrews ever
12    raising the issues that he discussed with you
13    about 2000 Mules to anyone else at NCR?
14        A    I recall that he was going to talk to
15    our supervisor, Kelly Moyer, and I recall him
16    talking with me before talking with Kelly.
17        Q    What did he talk to you about before
18    talking to Kelly?
19        A    He -- just informing me, and he said in
20    that conversation that he was going to be
21    talking with Kelly.
22        Q    Oh, okay.
23        A    Yeah.
24        Q    As part of the --
25        A    That's it.
```



1      Q    This conversation?

2      A    I just know I was his first stop

3   probably, so...

4      Q    Do you know if he actually talked to

5   Kelly Moyer?

6      A    I actually don't know.  I assumed that

7   he did since he was out of the office -- or out

8   away from physically in the office after that.

9   Kelly Moyer was newer to our department and so

10  she had just assumed that role recently.  That

11  would have been probably August of 2021, so kind

12  of relative -- still kind of new in her role and

13  very authoritative in her role, and I think

14  Mark -- he talked to me before going to Kelly,

15  so...

16     Q    I assume you don't know what the two of

17  them talked about, if they talked?

18     A    I don't know.  I don't know if they

19  talked and I don't know what they talked about.

20     Q    Other than Ms. Moyer, are you aware of

21  Mr. Andrews speaking with anyone else at NCR

22  about 2000 Mules or your conversation with him?

23     A    No.

24     Q    I'm assuming you didn't exchange any

25  e-mails or text messages or anything like that



1    with Mr. Andrews about this topic?

2         A     No.

3         Q     I believe you said Mr. Andrews

4    mentioned to you that he had been in the news.

5              Did you ever see him in the news?

6         A     I -- so after we had that conversation,

7    the -- whenever -- after that conversation with

8    him, a few days later is when I would have

9    watched the 2000 Mules movie.  But I did go back

10   and I -- I used to record Tucker Carlson, and

11   out of curiosity, I followed his show, and I

12   went back to watch episodes I had not seen.

13             And I don't recall if there was

14   something on there or not.  But that -- the

15   entire topic of election interference was a

16   major news story at that time, and I think it

17   had to do with something with that movie coming

18   out, so -- and I don't -- I don't recall if

19   there was a clip of that run on Tucker Carlson,

20   to tell you the truth.  I just don't remember.

21        Q     Do you know if 2000 Mules affected

22   Mr. Andrews' reputation at NCR at all?

23        A     I don't know.

24        Q     Do you know if 2000 Mules affected

25   Mr. Andrews' reputation at all?



1        A    I don't know.

2        Q    When was the last time you spoke with

3   Mr. Andrews?

4        A    He contacted me two or three months ago

5   and left a voicemail and said, hey, I'd like to

6   catch up with you.  And I called him back on my

7   way to work and just, you know, visited with

8   him.  How are -- How's your summer, how are you

9   doing?

10            And he just said, hey, just reaching

11   out to let you know, if you recall, you know,

12   this matter?  I just want to let you know that

13   the lawsuit is moving forward and you may be

14   contacted by -- by an attorney.  I apologize for

15   dragging you into this.

16            And I said, it's been long time ago.

17   It's been such a long time, I haven't even

18   thought about it.  Anyway, and I said, okay, no

19   problem, I'll cooperate.  And that was it, that

20   was the extent of the conversation.

21        Q    When were you first made aware of the

22   fact that Mr. Andrews had filed a lawsuit?

23        A    I actually didn't know about that.  I

24   knew that at the time that he came to me to

25   notify me of this, he mentioned to me that, you



 1  know, he was very -- my words -- very

 2  aggravated, concerned with his security, and

 3  that -- and that he was going to address it.

 4          And so I would assume that means

 5  involving lawyers.  But we never really spoke to

 6  details about it.

 7      Q    So other than the voicemail and the

 8  phone call you had with him a couple months ago,

 9  have you ever spoken with Mr. Andrews about this

10  lawsuit?

11      A    No.

12      Q    Have you ever spoken with any of

13  Mr. Andrews' attorneys?

14      A    No.

15      Q    Have you spoken with Mr. Andrews after

16  you received the subpoena that we sent to you?

17      A    No.

18      Q    After you received the subpoena that we

19  sent to you, have you spoken to anyone else

20  about the subpoena or this case?

21      A    I mentioned to my spouse that

22  this subpoena, I -- well, he received the

23  subpoena at our house and gave it to me, so he

24  was informed.  And then -- and that's it, just,

25  hey, I've got this scheduled on my calender.



```
 1    That's it.
 2         Q     Okay.
 3         A     No details otherwise.
 4         Q     Will you please provide your
 5    residential address?
 6         A     Yes.  ███████████████████████
 7    ████████████████████████████
 8         Q     Do you have any intentions on moving
 9    anytime soon?
10         A     No.  We just moved.
11         Q     Congratulations.
12               Can you please provide your cell phone
13    number?
14         A     Yes.  It's  ████████████████
15         Q     Can you please provide a personal
16    e-mail address?
17         A     Yes.  It's  █████████████████████
18    ████████████
19               MR. GEORGE:  I don't think I have
20         any further questions.  I think some of
21         the other counsel may ask you some.
22         And I'm just going to look through my
23         notes and see if I have anything else.
24         Thank you.
25               THE WITNESS:  Sure.
```



```
 1                        CROSS-EXAMINATION
 2    BY MR. VINING:
 3        Q     Good morning, Ms. Coveleskie.   My
 4    name's Austin Vining and I represent Dinesh
 5    D'Souza and D'Souza Media, LLC.
 6              How are you doing this morning?
 7        A     Doing well.   Thank you.
 8        Q     I have only a few questions so I hope
 9    not to take too much of your time.
10        A     Sure.
11        Q     You said that you and Mr. Andrews had
12    only one conversation about 2000 Mules; is that
13    correct?
14        A     Yes.
15        Q     And in that conversation, did he
16    mention Dinesh D'Souza?
17        A     No.
18        Q     Did he mention D'Souza Media, LLC?
19        A     No.
20        Q     Okay.   And did you also say that after
21    that conversation, you watched the film 2000
22    Mules?
23        A     Correct.   Yes.
24        Q     Do you remember why you chose to watch
25    the film?
```



```
 1        A    I was curious.  First of all, my
 2   husband said I think this is -- before the
 3   conversation with Mark, my husband was
 4   interested in it because he does follow
 5   political, you know, news very closely just out
 6   of -- it's a hobby, I would say, for him.  And
 7   then Mark brought it to me and told me about
 8   this situation, so I was curious about the
 9   movie.
10        Q    Okay.
11        A    Yeah.
12        Q    So, in part, you wanted to see it
13   because of the conversation you had with
14   Mr. Andrews?
15        A    Part -- partly.  But my husband also
16   really loves politics and so it was probably
17   going to be viewed no matter what.  But it was
18   of more interest as Mark had brought it up to
19   me.
20        Q    Okay.
21        A    Yeah.
22             MR. VINING:  That's all the
23        questions I have.
24             THE WITNESS:  Okay.
25                  CROSS-EXAMINATION
```



 1   BY MS. QIN:

 2       Q    Hello, Ms. Coveleskie, my name is Sonia

 3   Qin and I represent Mark Andrews in this matter.

 4   I just also have some very quick questions for

 5   you.

 6            So after Mark stopped coming into the

 7   office after his conversation with you, did you

 8   have any further interactions with him outside

 9   of a work context?

10       A    No.

11       Q    And prior to the conversation you had

12   with Mark, you mentioned that your relationship

13   was strictly having to work.

14            So did you have any interactions with

15   him outside of work?

16       A    What period of time?

17       Q    Prior to his conversation with you

18   about the movie.

19       A    No, not outside of work.  Everything

20   was always -- was a team event.  You know, it

21   might have been like a holiday event, like

22   wrapping presents for kids or something.  But

23   it's work related, nothing personal at all.

24            MS. QIN:  Okay.  Thank you.  Those

25       are all my questions.



1                THE WITNESS:  Sure.

2                MR. GEORGE:  A few more.

3                     REDIRECT EXAMINATION

4    BY MR. GEORGE:

5         Q    Outside of the context of this lawsuit,

6    were you familiar with True the Vote?

7         A    No, not really.  I honestly couldn't

8    tell you.  I think I've heard of the

9    organization, but I've never researched it.

10        Q    Okay.

11               MR. GEORGE:  That's all I have.

12        Thank you.

13               THE WITNESS:  Okay.  Sure.

14               THE VIDEOGRAPHER:  Okay.  Counsel,

15          if there's no further questions, does

16          anybody want a copy of the video, and,

17          if so, would you like it synced with

18          the transcript?

19               MR. GEORGE:  I think for now we'll

20          just take the transcript.

21               MR. VINING:  We also only need the

22          transcript.

23               THE VIDEOGRAPHER:  Perfect.

24               MS. QIN:  And only transcript for

25          plaintiff as well.



 1          THE VIDEOGRAPHER:  Okay.  If

 2     there's no further questions, then this

 3     concludes today's deposition of Kelly

 4     Black Coveleskie.  We're now going off

 5     the record on Wednesday, August 14th,

 6     2024 at 12:08 p.m.

 7               (WAIVED SIGNATURE.)

 8               (Whereupon, the deposition of

 9               Kelly Black Covelskie was

10               concluded at

11               approximately 12:08 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1   ESQUIRE_ J11497971

 2                C E R T I F I C A T E

 3   STATE OF SOUTH CAROLINA:

 4   BEAUFORT COUNTY:

 5

 6     I, Naomi McCracken, court reporter and Notary

 7   Public in and for the above county and state, do

 8   hereby certify that the foregoing testimony was

 9   taken before me at the time and place

10   herein-before set forth; that the witness was by

11   me first duly sworn to testify to the truth, the

12   whole truth, and nothing but the truth, that

13   thereupon the foregoing testimony was later

14   reduced by computer transcription; and I certify

15   that this is a true and correct transcript of my

16   stenographic notes so taken.

17     I further certify that I am not of counsel to

18   either party, nor interested in the event of

19   this cause.

20

21   _____

22             Naomi McCracken

23             Court Reporter

24             Notary Public

25             Beaufort, South Carolina
```



KELLY B. COVELESKIE
ANDREWS V. D'SOUZA

August 14, 2024
Index: 1..aware

**Exhibits**

11497971 Kelly.
Black Coveleskie.
DEFENDANT.
EXHIBIT1
  8:12,13,
  17

**1**
  8:13,17

**100**
  14:20

**11:34**
  5:3

**12:08**
  34:6,11

**14th**
  5:4 34:5

**1:22-cv-04259-sdg**
  5:12

**2**

**2000**
  12:2,19
  15:9
  20:3,10
  21:2,5
  22:24
  24:13
  25:22
  26:9,21,
  24 30:12,
  21

**2013**
  9:19 11:1

**2014**
  11:2

**2021**
  25:11

**2022**
  12:24

**2023**
  9:14,15,
  19

**2024**
  5:4 34:6

**3**

**3,000**
  16:25

**30004**
  29:7

**7**

**740**
  29:6

**8**

**864 525-0200**
  29:14

**@**

**@gmail.com**
  29:18

**A**

**a.m.**
  5:3

**absentee**
  15:16

**accommodate**
  8:1

**accurate**
  8:4

**acquired**
  11:6

**Acquity**
  9:8

**Acuity**
  9:11

**address**
  28:3
  29:5,16

**advice**
  14:24

**advised**
  14:17,22

**affected**
  26:21,24

**affecting**
  23:12,16

**aggravated**
  28:2

**ahead**
  19:12

**Alpharetta**
  29:7

**amended**
  8:18

**Andrews**
  5:7 6:9
  10:13,16
  11:14
  12:15,18
  13:9
  14:21
  16:8
  17:22
  20:2,9
  21:5,14

**22:7,11,
  20,24
  23:2,5,8,
  12,16,19
  24:11
  25:21
  26:1,3
  27:3,22
  28:9,15
  30:11
  31:14
  32:3

**Andrews'**
  17:10
  21:1
  26:22,25
  28:13

**announce**
  5:18

**answers**
  7:12,15

**anticipate**
  7:23

**anytime**
  29:9

**apologize**
  27:14

**appearance**
  12:18

**apply**
  11:9

**appointment**
  19:20

**approximately**
  10:21
  34:11

**area**
  13:12

**Arps**
  6:7

**assume**
  25:16
  28:4

**assumed**
  25:6,10

**assuming**
  25:24

**Atlanta**
  5:10 10:3
  17:1
  19:15

**attorney**
  27:14

**attorneys**
  28:13

**audio**
  19:25
  24:10

**audit**
  9:10,24
  10:25
  11:3,17
  18:15

**audits**
  10:11

**August**
  5:4 9:19
  11:1
  25:11
  34:5

**Austin**
  6:2 30:4

**authoritative**
  25:13

**aware**
  22:20,23
  23:2,5,8,
  11,15,19
  24:11
  25:20



27:21

**B**

**back**
26:9,12
27:6

**ballot**
20:24

**ballots**
15:15,16
20:25

**based**
11:8

**basically**
15:13

**begins**
5:5

**big**
13:11

**Black**
5:6 6:12,
19 34:4,9

**blur**
15:15

**blurred**
20:21,22
21:2

**blurring**
20:15

**board**
18:16

**box**
20:24

**Brands**
9:8,12

**break**
7:24

**bring**

11:12

**brought**
18:24
20:12
31:7,18

**Buchalter**
6:3

**business**
11:6

**C**

**C-O-V-E-L-**
**E-S-K-I-E**
29:17

**calender**
28:25

**call**
17:8
19:24
24:9 28:8

**called**
15:8 27:6

**campus**
16:24,25

**car**
15:14

**Carlson**
14:11
26:10,19

**case**
5:11 8:19
28:20

**catch**
13:22
27:6

**categories**
9:4

**Catherine**
5:25 6:22

21:8

**caught**
15:1

**cell**
29:12

**chain**
21:23

**characteriz**
**e**
12:1

**child**
19:16

**children**
11:22
15:17

**chose**
30:24

**clarify**
7:20

**clip**
20:19
26:19

**close**
12:1

**closely**
21:18
31:5

**committee**
18:15

**commute**
19:15

**compliance**
10:11

**concerned**
14:8,16
28:2

**concluded**
34:10

**concludes**

34:3

**conclusion**
22:2

**conclusions**
22:1

**Congratulat**
**ions**
29:11

**considered**
20:11

**contact**
18:20

**contacted**
27:4,14

**context**
32:9 33:5

**contractor**
10:25
11:9,15,
16

**conversatio**
**n**
12:15,20
13:5,8
15:25
18:6,12
20:7
21:4,13
23:12,16
24:20
25:1,22
26:6,7
27:20
30:12,15,
21 31:3,
13 32:7,
11,17

**conversatio**
**ns**
12:17
20:1,9
22:6,10

**cooperate**
27:19

**copy**
33:16

**Corporation**
9:16

**correct**
17:21
30:13,23

**counsel**
5:18
29:21
33:14

**couple**
28:8

**court**
5:9,14,20
6:10 7:13
29:6

**Coveleskie**
5:6 6:12,
19,24 8:3
30:3 32:2
34:4

**Covelskie**
34:9

**CROSS-**
**EXAMINATION**
30:1
31:25

**cube**
13:10

**curiosity**
26:11

**curious**
31:1,8

**cut**
20:4
24:10**



---

**D**

---

D'SOUZA
   5:8 6:4,5
   30:5,16,
   18

date
   12:22

daughter
   13:3

day
   17:3

days
   16:21
   17:11
   26:8

decided
   11:11

Defendant's
   8:12

Defendants
   5:24

demoted
   23:3

department
   11:4
   16:13
   17:7,19
   25:9

depositing
   15:15

deposition
   5:5,16
   6:23 8:19
   34:3,8

details
   16:4 28:6
   29:3

difficult

   7:15

Dinesh
   5:7 6:4
   30:4,16

direct
   6:15
   16:13

director
   9:24

discuss
   13:17

discussed
   16:10
   22:25
   24:12

discussions
   15:22
   22:5,9

distortion
   19:25

District
   5:9,10

Division
   5:10

doctor's
   19:20

document
   8:7,9,21

documents
   8:25 9:2,
   3,5

dragging
   27:15

drawn
   22:1,2

dropping
   20:25

duly
   6:13

---

**E**

---

e-mail
   18:20
   29:16

e-mails
   25:25

earlier
   6:20
   21:17

early
   11:2

Eden
   5:13

elaborate
   10:23

election
   26:15

eligible
   15:18

employees
   16:19

engaged
   10:24
   11:2

Engelbrecht
   6:1,22
   21:9

entertainme
   nt
   22:3

entire
   10:18
   13:11
   26:15

environment
   13:11

episodes
   26:12

Esquire
   5:16

et al
   5:8

event
   18:14
   32:20,21

eventually
   18:11

EXAMINATION
   6:15 33:3

exchange
   25:24

excuse
   13:19
   22:4

Executive
   9:24

Exhibit
   8:12,17

expand
   11:6
   20:16

expectation
   16:20

expected
   15:4

expecting
   15:3

extent
   16:7
   27:20

---

**F**

---

face
   21:1

fact
   27:22

fairly
   11:19

familiar
   15:12
   33:6

family
   11:22
   14:17
   15:16

featured
   12:10
   14:8,14,
   15 20:19

February
   9:14,15,
   19

filed
   5:8 27:22

film
   12:10,11
   14:9
   15:10
   30:21,25

financial
   10:10

finish
   7:3,4

firm
   5:23 6:3,
   7

Flom
   6:8

focus
   17:16

focused
   15:23

follow
   31:4

forward
   27:13



KELLY B. COVELESKIE
ANDREWS V. D'SOUZA

August 14, 2024
Index: Fox..late

**Fox**
  14:10

**frame**
  12:13,16

**future**
  14:1,19

**fuzzy**
  14:11

---

**G**

**gave**
  10:24
  14:23
  28:23

**general**
  10:7
  13:22

**George**
  5:22,23
  6:16,21
  8:15
  19:11
  24:6
  29:19
  33:2,4,
  11,19

**Georgia**
  5:10 29:7

**give**
  7:12

**global**
  10:10

**good**
  5:1 6:17
  7:10 30:3

**gradually**
  19:8

**Greenberg**
  5:23

**Gregg**
  6:1,22
  21:11

**ground**
  7:1

**grown**
  15:17

**guard**
  15:2

---

**H**

**half**
  9:13

**Hallbrook**
  29:6

**hand**
  6:11

**happened**
  18:12

**happening**
  22:24

**happy**
  7:25 16:1

**harassed**
  22:21

**headquarters**
  10:2

**hear**
  12:5 20:4
  23:20,21,
  22 24:2,
  3,8

**heard**
  12:2 15:8
  33:8

**held**
  9:23

**hey**
  13:24
  14:7
  27:5,10
  28:25

**hire**
  11:11

**hobby**
  31:6

**holiday**
  32:21

**home**
  19:17

**honestly**
  16:15
  33:7

**hope**
  30:8

**house**
  28:23

**How's**
  27:8

**husband**
  12:14
  15:10
  19:16
  21:17
  31:2,3,15

---

**I**

**identification**
  8:14

**impressions**
  21:25
  22:1

**in-office**
  17:11

**in-person**
        13:5

**included**
  14:18

**informed**
  21:21
  28:24

**informing**
  12:9
  24:19

**instructed**
  17:15

**intentions**
  29:8

**interactions**
  32:8,14

**interest**
  31:18

**interested**
  19:6 31:4

**Interesting**
  22:2

**interference**
  26:15

**internal**
  9:10,24

**interrupting**
  7:7

**interview**
  18:22,24
  19:1

**interviewed**
  11:10
  19:9

**investigate**
  21:15

**involving**
  28:5

**issue**
  21:21

**issues**
  24:12

---

**J**

**job**
  10:7

**jobs**
  18:25

**joined**
  11:1

---

**K**

**KB**
  29:17

**Kelly**
  5:6 6:12,
  19 10:6
  24:15,16,
  18,21
  25:5,9,14
  34:3,9

**kids**
  32:22

**kind**
  14:11
  25:11,12

**knew**
  10:21
  11:19
  15:5 17:4
  19:21
  27:24

---

**L**

**late**
  12:23



KELLY B. COVELESKIE
ANDREWS V. D'SOUZA

August 14, 2024
Index: law..notify

law
  5:23  6:3,
  7

lawsuit
  27:13,22
  28:10
  33:5

lawyers
  28:5

learned
  11:22
  12:6,8

led
  17:7

left
  27:5

license
  20:22

listened
  15:6

listening
  14:25
  15:5

live
  19:14

LLC
  6:5  30:5,
  18

long
  7:24  9:11
  27:16,17

looked
  19:22

lot
  11:24
  13:23
  14:5  15:4
  16:14,15

loves
  31:16

lower
  23:6

_____

**M**
_____

MADAM
  6:10

made
  27:21

major
  26:16

make
  7:2  15:24

making
  17:17

managed
  16:13,14

manager
  11:10,11
  17:7

Mark
  5:7  6:9
  10:13,16,
  24  11:8,
  14  12:8
  13:23
  15:4,20
  17:4
  21:20
  25:14
  31:3,7,18
  32:3,6,12

marked
  8:13

matter
  5:7  9:6
  20:12
  27:12
  31:17
  32:3

Mccracken

  5:15

Meagher
  6:8

means
  28:4

Media
  6:5  30:5,
  18

meeting
  17:2

meetings
  17:7
  18:15
  19:23,24

memory
  14:11

mention
  14:23
  17:22
  21:6,8,11
  30:16,18

mentioned
  12:14
  15:7
  21:17
  26:4
  27:25
  28:21
  32:12

message
  18:20

messages
  25:25

midtown
  10:1,3
  16:25

mine
  16:14

minutes
  13:13

moment
  23:24

months
  18:14
  27:4  28:8

morning
  5:1  6:17
  30:3,6

moved
  29:10

movie
  12:2
  14:15
  15:8
  20:20
  21:2,18,
  19,22,24
  26:9,17
  31:9
  32:18

moving
  27:13
  29:8

Moyer
  10:6
  22:17
  24:15
  25:5,9,20

Mules
  12:3,19
  15:9
  20:3,10
  21:2,5
  22:25
  24:13
  25:22
  26:9,21,
  24  30:12,
  22

_____

**N**
_____

name's

  6:21  30:4

Naomi
  5:15

nature
  16:18

NCR
  9:16,18,
  23  10:2,
  5,8,12,19
  11:1,5,13
  14:6,20
  16:18
  18:1,10
  19:5
  22:6,10
  23:13
  24:13
  25:21
  26:22

needed
  11:6
  18:19

negative
  22:23

newer
  25:9

news
  12:8
  14:10,14
  20:19
  26:4,5,16
  31:5

North
  19:14

Northern
  5:9

notes
  29:23

notice
  8:18

notify



KELLY B. COVELESKIE
ANDREWS V. D'SOUZA

August 14, 2024
Index: number..recommended

27:25

**number**
5:11 8:13
29:13

―――――――――

O

**observed**
17:18

**offer**
16:2

**office**
9:25 10:1
16:19
18:6
19:19
25:7,8
32:7

**oftentimes**
17:15

**opening**
20:24

**operational**
10:11

**organizatio
n**
33:9

**outlined**
16:20

**overlap**
16:15

―――――――――

P

**p.m.**
34:6,11

**part**
18:25
24:24
31:12,15

**partly**
31:15

**pattern**
19:18

**pay**
23:6

**peer**
10:16

**peers**
12:1

**people**
14:6
16:25
17:19
18:23,24

**percent**
14:20

**Perfect**
33:23

**perform**
11:3

**performance**
11:8

**performing**
11:16

**period**
19:2,4
32:16

**person**
13:7
17:9,16

**personal**
29:15
32:23

**personally**
11:21

**pertain**
9:6

**Philip**
5:22 6:21

**Phillips**
6:1,22
21:11

**phone**
28:8
29:12

**physically**
18:1 25:8

**place**
12:21

**plaintiff**
6:9 33:25

**plate**
20:22

**point**
11:13

**policy**
15:21
16:23
17:11,13

**political**
12:7
15:21
31:5

**politics**
15:21
21:18
31:16

**popped**
8:9

**portion**
8:24

**portrayed**
20:20

**position**
9:9,22
10:9

**presents**
32:22

**president**

9:10

**pretty**
19:14

**prior**
9:15 12:8
32:11,17

**private**
20:12

**problem**
27:19

**process**
19:1

**produced**
6:13 8:25

**professiona
lly**
11:25

**promoted**
23:9

**provide**
8:4 29:4,
12,15

**public**
14:18,22

**put**
12:22

―――――――――

Q

**Qin**
6:6 24:4
32:1,3,24
33:24

**quarterly**
18:15

**question**
7:4,18

**questions**
15:1,20
29:20

30:8
31:23
32:4,25
33:15
34:2

**quick**
32:4

―――――――――

R

**raise**
6:11
15:19

**raising**
24:12

**reaching**
27:10

**reason**
7:8,19,24
8:3

**recall**
12:21
18:13,16
20:23
21:3
24:14,15
26:13,18
27:11

**received**
8:19,21
28:16,18,
22

**receiving**
23:6

**recently**
25:10

**recommendat
ions**
15:24

**recommended**
11:7,9



*800.211.DEPO (3376)*
*EsquireSolutions.com*

KELLY B. COVELESKIE
ANDREWS V. D'SOUZA

August 14, 2024
Index: record..talk

record
  5:2  6:18
  8:16  24:1
  26:10
  34:5

REDIRECT
  33:3

regimented
  19:14

related
  32:23

relationshi
p
  32:12

relative
  25:12

religion
  15:21

remember
  13:3
  18:5,22
  26:20
  30:24

remotely
  14:20
  17:23
  18:3

reporter
  5:14,20
  6:10  7:13

reports
  16:13

represent
  5:19,24
  6:4,8,21
  30:4  32:3

representin
g
  5:16

reputation
  26:22,25

researched
  33:9

residential
  29:5

resigning
  14:5,6

responses
  20:15

responsibil
ities
  10:8

responsible
  10:10

responsive
  9:3

rest
  18:9

result
  16:9  19:7
  22:24

results
  23:11,15

return
  16:19

returned
  18:11

role
  11:10
  25:10,12,
  13

roles
  18:23
  19:9

Rucker
  5:14

rules
  7:2

run
  26:19

—————————
        S
—————————

safety
  14:8,16

sat
  14:4

schedule
  19:13,22

scheduled
  28:25

school
  13:2
  19:16

screen
  8:8,10

seats
  17:20

security
  28:2

send
  18:21

sensitive
  15:5

set
  11:4,7

show
  8:7  26:11

showed
  15:14

showing
  8:24

shown
  20:24

SIGNATURE
  34:7

site
  19:1

sits
  13:12

situation
  12:9  31:8

size
  16:24

Skadden
  6:7

skill
  11:3,7

Slate
  6:7

Solutions
  5:17

Sonia
  6:6  32:2

sound
  7:5,10,16

speak
  22:13

speaking
  25:21

spend
  11:24

spoke
  27:2  28:5

spoken
  28:9,12,
  15,19

spouse
  12:6
  22:14
  28:21

spring
  11:2
  12:23

staff
  19:23

standing

23:13

state
  6:17

States
  5:9

stop
  7:9  25:2

stopped
  32:6

story
  26:16

strictly
  32:13

subject
  14:15

subpoena
  28:16,18,
  20,22,23

summer
  13:2  27:8

summertime
  19:5

supervised
  11:14,16

supervisor
  10:5
  24:15

support
  16:2

swear
  5:20

sworn
  6:13

synced
  33:17

—————————
        T
—————————

talk



KELLY B. COVELESKIE
ANDREWS V. D'SOUZA

22:17
24:14,17

**talked**
15:21
20:1,8
22:7,11
25:4,14,
17,19

**talking**
21:15
24:16,18,
21

**team**
11:7,12,
25 13:12
16:3,22
17:10,17
32:20

**Team's**
24:9

**Teams**
18:21

**telling**
13:3 14:5

**ten**
9:21
10:21

**testified**
6:14

**testimony**
8:4

**text**
18:21
25:25

**thing**
15:3

**things**
13:15
19:6

**thought**
14:4

27:18

**Thursday**
16:21
19:19

**time**
5:3 10:18
11:4,11,
13,24
12:13,16
13:2
15:11
16:9,18
17:23
18:6,9
19:2
26:16
27:2,16,
17,24
30:9
32:16

**times**
11:24
16:14

**today**
5:13,14
8:5

**today's**
34:3

**told**
13:16
14:7
15:4,10
16:1
21:16,19
31:7

**topic**
20:2
26:1,15

**topics**
20:10

**towers**
16:25

**transcript**
33:18,20,
22,24

**Traurig**
5:24

**travel**
11:25

**trouble**
16:5

**True**
5:25 6:21
21:6 33:6

**truth**
17:5
26:20

**truthful**
8:4

**TTV**
8:16

**Tucker**
14:11
26:10,19

**Tuesday**
16:21
19:19

**turns**
14:7

**typically**
15:22

---

**U**

**understand**
7:18

**United**
5:8

---

**V**

**vacation**

16:16
17:5

**vehicle**
14:13

**verbal**
7:12,15

**versus**
5:7

**Vice**
9:10

**video**
20:19,21
33:16

**videotape**
5:5

**viewed**
31:17

**Vining**
6:2,3
30:2,4
31:22
33:21

**virtually**
19:24

**visited**
27:7

**voicemail**
27:5 28:7

**vote**
5:25 6:21
15:18
21:6 33:6

---

**W**

**WAIVED**
34:7

**wanted**
13:17,25
16:19

31:12

**watch**
26:12
30:24

**watched**
21:22
26:9
30:21

**Wednesday**
5:4 16:21
19:19
34:5

**week**
16:21
21:20

**weekly**
17:6

**weeks**
11:18

**whatnot**
20:25

**wife**
15:18

**words**
28:1

**work**
9:7,15,
18,25
11:16
13:4
14:18
15:23
16:9,18
17:2,18
23:17
27:7
32:9,13,
15,19,23

**worked**
9:11
10:12
16:12



```
    18:3
working
    13:10,14
    14:20
    17:23
works
    19:16
world
    15:3
wrapping
    32:22
wrong
    17:21
```

———————————

**Y**

———————————

```
year
    9:13
years
    9:18,21
    10:22
    11:21
```

