# EXHIBIT 158

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
                         DISTRICT OF GEORGIA
 2                         ATLANTA DIVISION

 3


 4                                     )
       MARK ANDREWS,                   )
 5            Plaintiff,               )  Case No.:
                                       )
 6     vs.                             )  1:22-cv-04259-SDG
                                       )
 7     DINESH D'SOUZA, et al.          )
              Defendant.               )
 8     _____)

 9

10          Zoom Video-Conference and stenographic deposition of

11     KELLY MOYER taken on behalf of the Defendant, pursuant to the

12     stipulations set forth below, before Ariel Walcott, Certified

13     Court Reporter, commencing at the hour of 9:28 a.m. Friday,

14     August 9, 2024.

15

16

17

18

19

20

21

22                    Ariel Walcott, CVR, CCR

23            Esquire Deposition Solutions
                 2700 Centennial Tower
24                101 Marietta Street
                Atlanta, Georgia 30303
25                  (404)495-0777
```



```
 1                      APPEARANCES PAGE

 2    FOR THE DEFENDANT:

 3              Phillip George
                Greenberg Traurig, LLP
 4              3333 Piedmont Road NE, Suite 2500
                Atlanta, Georgia 30305
 5              Office: (678)553-2100
                Fax: (678)553-2212
 6              E-mail: Philip.George@gtlaw.com

 7              Austin Vining
                Buchalter APC
 8              124 Peachtree Memorial Drive NW, Unit 1
                Atlanta, Georgia 30309
 9              Office: 318-225-0678
                E-mail: avining@buchalter.com

10

11    FOR THE PLAINTIFF:

12              Sonia Qin
                Skadden, Arps, Slate, Meagher & Flom, LLP
13              One Manhatten West
                New York, NY 10001
14              Office: (212)735-3751
                E-mail: sonia.qin@probonolaw.com

15

16              Jane Bentrott, Catherin Chen
                Protect Democracy
17              2020 Pennsylvania Ave NW, Suite 163
                Washington D.C. 20006
18              Office: (202)843-3092
                E-mail: jane.bentrott@protectdemocracy.com;
19                      catherine.chen@protectdemocracy.com

20    FOR THE WITNESS:

21              Christopher Murphy
                NCR VOYIX
22              864 Spring Street NW
                Atlanta, Georgia 30309
23              Office: 1(800)225-5627
                E-mail: christopher.murphy@ncrvoyix.com

24

25
```



1           I N D E X   T O   E X A M I N A T I O N S

2   EXAMINATION                                    PAGE

3   DIRECT EXAMINATION BY: Philip George              5

4   CROSS EXAMINATION BY: Austin Vining             25

5   CROSS EXAMINATION BY: Sonia Qin                 27

6   RE-DIRECT EXAMINATION BY: Philip George         28

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22  (In the following transcript, dashes [--] are used to indicate

23  an intentional or purposeful interruption of a sentence, and

24  ellipsis [...] is used to indicate halting speech or an

25  unfinished sentence in dialogue, written material.)



```
 1              P R O C E E D I N G S

 2       VIDEOGRAPHER:  We are now on the record, the time is

 3   9.28 a.m. eastern time.  Today is August 9th of 2024.

 4   This begins the video conference deposition of Kelly

 5   Moyer.  The case is Mark Andrews v. Dinesh D'Souza et al

 6   filed in the United States District Court for the Northern

 7   District of Georgia, Atlanta Division.  The case number is

 8   122-CV-04259.  My name is Don Savoy; I am your remote

 9   videographer today.  The court order is Ariel Walcott.  We

10   are representing Esquire Deposition Solutions.  Counsel,

11   will you please state your name, who you represent.  After

12   which, the court reporter will swear in the witness.

13       MR. GEORGE:  My name is Philip George from the law

14   firm Greenberg Traurig.  I represent the defendants

15   (unintelligible) and Greg Phillips.

16       MR. VINING:  Good morning, this is Austin Vining from

17   Buchalter, I represent the defendants Dinesh D'Souza and

18   D'Souza Media LLC.

19       MR. VINING:  Good morning, this is Sonia Qin from the

20   firm Skadden, Alps, Slate, Meagher & Flom, representing

21   Plaintiff Mark Andrews.

22       MS. BENTROTT:  Good morning, this is Jane Bentrott,

23   counsel for Plaintiff Mark Andrews from Protect Democracy,

24   and with me is my colleague Catherine Chen.

25       MS. CHEN:  Good morning.  Also, counsel for Plaintiff
```



1        at Protect Democracy.

2            MR. MURPHY:  Good morning, I'm Chris Murphy

3        representing the witness Kelly Moyer.

4                        Kelly Moyer,

5   having been first duly sworn, testified under oath as follows:

6                    DIRECT EXAMINATION

7   BY MR. GEORGE:

8        Q.   Good morning Ms. Moyer, would you please just state

9   your full name for the record?

10       A.   Yes.  It's Lou Ellen Kelly Moyer.

11       Q.   Have you ever given a deposition before?

12       A.   I have not.

13       Q.   I'd just like to go over some quick ground rules just

14  so we're all on the same page.  First, just let me finish my

15  question before you start responding, and I'll let you finish

16  your answer.  If you think I'm interrupting you for any reason,

17  just let me know, and I will let you finish your answer.  Does

18  that sound good?

19       A.   That sounds good.

20       Q.   All right.  Please try to give verbal answers.

21  There's a court reporter that's taking down everything that

22  everyone says, so head nods and shrugs like that are difficult

23  to capture.  So just try to give verbal answers.  If you don't

24  understand a question I'm asking, just let me know.  I'll try

25  to rephrase it.  It's important that we're both on the same



 1 | page.  That sound okay?
 2 |      A.   Yes, that sounds fine.
 3 |      Q.   If you need a break for any reason, just let me know.
 4 | I'm happy to do that as long as it's just not in the middle of
 5 | the question I ask.
 6 |      A.   Okay.
 7 |      Q.   Is there any reason you can not provide a truthful
 8 | and accurate testimony today?
 9 |      A.   No.
10 |      Q.   I just want to share an exhibit with you on the
11 | screen.
12 |          MR. MURPHY:  Can you make it bigger?
13 |          MR. GEORGE:  Sorry?
14 |          MR. MURPHY:  Can you make it bigger?
15 |          MR. GEORGE:  Yes.  Better?
16 |          MR. MURPHY:  Yes.
17 |      Q.   (BY MR. GEORGE):  All right.  Ms. Moyer, do you see
18 | this notice of deposition and event notice of subpoena on the
19 | screen?
20 |      A.   Yes.
21 |      Q.   Okay.  I'll scroll through it quickly just so you can
22 | take a look at it.  This has been marked as TTV Exhibit 10.
23 | First of all, do you recognize this document?
24 |      A.   Sorry, you scrolled really fast.  Is this the
25 | subpoena to me?



1    Q.   Yes.

2    A.   Okay.  Yes.  If it's the subpoena to me, then it

3  looks familiar, yes.  I didn't see my name on the front.

4  That's why when you were scrolling.  Oh, there it was.  That's

5  correct.

6    Q.   Okay.  Do you see this section of subpoena to enable

7  documents to be produced?

8    A.   Yes.

9    Q.   Did you look for documents responsive to these

10  requests?

11    A.   I didn't have to because I don't have any documents

12  in my possession.

13    Q.   Ms. Moyer, where do you currently work?

14    A.   I work at NCR Voyix Corporation.

15    Q.   How long have you worked there?

16    A.   Since 2009.

17    Q.   Was there a point in time where NCR NCEs have split?

18    A.   That's correct.  October 16th last year, NCR

19  Corporation split into two organizations, NCR Voyix and NCR

20  Atleos.

21    Q.   Did you used to be a supervisor for Mark Andrews?

22    A.   I was his supervisor when I led the internal audit

23  team from 2021 to 2023 when the company split.

24    Q.   I take it you're no longer a supervisor?

25    A.   Correct.



1    Q.   And you stopped being a supervisor in 2023; is that

2  accurate?

3    A.   Correct.  Effective as of the split, I took a new

4  position.

5    Q.   What was your previous position before the split?

6    A.   I was the Chief Audit Executive.

7    Q.   What's your position now?

8    A.   I'm in transition, but I'm the Chief Accounting

9  Officer for NCR Voyix.

10    Q.   Do you know who Mr. Andrews' supervisor was prior to

11  you?

12    A.   It was Sarah Higgins.

13    Q.   What was her role at NCR?

14    A.   She was the Chief Audit Executive at the time.

15    Q.   Why did you take over the supervisory role of Mr.

16  Andrews from Ms. Higgins?

17    A.   She left the company, and Tim Oliver was the CFO.

18  And he, in addition to the audit committee, asked me to take on

19  the role.

20    Q.   There are documents that show Tim Oliver was Mr.

21  Andrews' supervisor.  Is that just a temporary designation?

22    A.   No.  He would never have been his supervisor.  He was

23  the CFO of NCR.  So he asked me to be the -- it was before she

24  left.  So I don't think there was ever a time indirectly

25  reported to Tim.



KELLY MOYER                                        August 09, 2024
ANDREWS V. D'SOUZA                                              9

1       Q.    What NCR office did you work in, in 2022?

2       A.    The Spring Street headquarters.

3       Q.    That means Spring Street, Atlanta?

4       A.    That's right, yes.

5       Q.    How closely did you interact with Mr. Andrews in

6   2022?

7       A.    He was my direct report and led all of the internal

8   information systems engagements for the internal audit group.

9   So my interaction with him was in the capacity of setting the

10  plan that got approved and executing on that plan for those

11  engagements.

12      Q.    How many direct reports did you have at the time?

13      A.    I had two.

14      Q.    Who was the other one other than Mark Andrews?

15      A.    Actually, it would have been Kelly Black.  So she led

16  the business process side, and Mark led the information

17  technology.  But she left the company too.  I can't remember

18  when she left.  So if she left in 2022, I would have had her

19  direct reports as well.  But it really is just two areas, Mark

20  being one of them.

21      Q.    Did you interact with Mr. Andrews on a day-to-day

22  basis?

23      A.    Yes.  Pretty frequently.

24      Q.    After the NCR split, have you remained in contact

25  with Mr. Andrews?



KELLY MOYER                                                    August 09, 2024
ANDREWS V. D'SOUZA                                                          10

1    A.    I have not talked to him other than maybe once or

2    twice since the split that I can recall.

3    Q.    I am going to pull up another document on my screen

4    here.  Do you see the document on your screen that says annual

5    performance would be 2021 at the top?

6    A.    Yes.

7    Q.    This I marked as TTV Exhibit 4 for the record.  It's

8    Bates stamped NCRV 43 through 47.  Just for the record, this

9    has been marked confidential (unintelligible).  Ms. Moyer,

10   we'll take quick look, and I'll stop and focus on some of the

11   areas.  Do you recognize this document?

12   A.    I mean it would be a PDF from our workday system.  So

13   I certainly remember, yes.  This is our annual performance

14   review.

15   Q.    Can you describe to me the general overview of how

16   performance reviews were done?  You said through workday?

17   A.    They're done through workday.  That's right.  And you

18   set goals at the beginning of course beginning of the year, and

19   then you measure yourself against those goals.  And then your

20   manager measures you against those goals as well and comes up

21   with an overall rating.  And there's -- yes.

22   Q.    Anything else you'd like to add?

23   A.    No.

24   Q.    So would part of this document be completed by you

25   and part of it completed by Mr. Andrews?



1       A.   Correct.

2       Q.   How would you receive this review?

3       A.   Maybe an email notification when it's complete, but

4  it's all completed within the workday system.

5       Q.   This is Mr. Holder's performance review for 2021.

6  When would you have filled out your portion of the document?

7       A.   In Q1 of 2022 or the very end of 2021.  I can't

8  remember for the cycle that it changes.  But yeah, bonuses are

9  paid out in Q1, so it has to be completed by then.

10      Q.   Are performance reviews like this regularly conducted

11  activities at NCR?

12      A.   Yes.

13      Q.   NCR keeps records like this in the regular course of

14  its business?

15      A.   Yes.

16      Q.   A portion of highlighting this is Executive Director

17  of Finance.  Was that Mr. Andrews' role at the time, 2021?

18      A.   That was his level, yes.

19      Q.   And then it says you were his manager, and you were

20  in part of this evaluation; right?

21      A.   Correct.

22      Q.   Did anyone else assist in this evaluation?

23      A.   No.

24      Q.   At the top right hand, I'm highlighting.  It says

25  Organization Kelly Moyer.  What does that mean?



 1      A.   So I would be responsible for... they keep track of
 2 --  So for internal audit, here's all of the annual performance
 3 reviews within my function.  It's kind of a function view.  So
 4 it's really just for reporting purposes internally.
 5      Q.   You said you fill out your portion before or in one
 6 of the next year.  When would Mr. Andrews have filled out this
 7 portion of it?
 8      A.   It's usually one to two to three months prior to
 9 that.  So the employee does their portion, and then the manager
10 does their assessment.
11      Q.   I'm highlighting something on the first page here.
12 It says rating meets expectations for seats three.  So is that
13 a rating that you gave Mr. Andrews?
14      A.   Yes.  That would be the rating I gave him.
15      Q.   What was the rating scale?
16      A.   It is one to five.  One being the lowest and five
17 being the highest.
18      Q.   Did you just fill out these reports for your direct
19 reports?  Did you just fill out the two direct reports you had?
20      A.   Yes.  But I certainly had conversations with Mark and
21 Kelly on their direct reports to make sure we're aligned on the
22 organization.  I complete it just for my direct reports.
23      Q.   Would Mr. Andrews and Ms. Black perform these for
24 their direct reports then?
25      A.   Correct.



1       Q.    Does NCR provide guidance as to how often to give

2   each rating to different employees?

3       A.    We only give ratings on an annual basis.

4       Q.    That was a bad question.  Would it be typical to give

5   this rating that meets expectations three?

6       A.    Yes.

7       Q.    Would it be rare to give a rating of a four or five?

8       A.    Less people give fours and fives than threes, yes.

9       Q.    Do you have an estimate of the percentage of

10  employees that receive a rating of a four or five?

11      A.    No.

12      Q.    Below that, there's the section that says Discussion

13  Items.  And then below that, there's Manager Evaluation and

14  Employee Evaluation.  Is the employee evaluation, that's what's

15  filled out by Mr. Andrews?

16      A.    That's correct.

17      Q.    Before providing your evaluation and your rating, did

18  you review the employee evaluation report?

19      A.    Yes.

20      Q.    It's running at NCRV 47.  And there's a section

21  called Manager Evaluation with Response.  But neither are

22  comments that you wrote?

23      A.    I would assume so.  I don't recall exactly what I

24  would have written in his evaluation.  But if it's directly

25  from the system, then yes, I would have wrote it.



1    Q.   Am I correct that this would have been the first year
2    that you performed an evaluation from Mr. Andrews?
3    A.   Yes.
4    Q.   Before going out this form, did you have any
5    conversations with Mr. Andrews' prior supervisors about past
6    performance?
7    A.   No.
8    Q.   Before evaluating Mr. Andrews and supervising in
9    2021, did you have any knowledge regarding Mr. Andrews' prior
10   performance?
11   A.   No.
12   Q.   Do you recall Mr. Andrews' performance in 2021?
13   A.   I mean not really.  It's been a while ago.  It's kind
14   of a broad question.
15   Q.   Anything to stick out to you about his performance in
16   2021?
17   A.   No.
18   Q.   I'll pull that document down.  Pull up another one.
19   Do you see on the screen the annual performance review for 2022
20   for Mr. Andrews?
21   A.   Yes.
22   Q.   For the record, this is marked as TTV Exhibit 5,
23   based on NCRV 48 through 50.  Again, this has been marked
24   confidential (unintelligible).  This is the annual performance
25   review for Mr. Andrews for 2022.  So this is the annual



1   performance review for Mr. Andrews for 2022; right?

2       A.   Yes.

3       Q.   Again, you would have filled out part of this and Mr.

4   Andrews' filled out part of this?

5       A.   Correct.

6       Q.   And the portion that you filled out would have been

7   based on your personal knowledge of Mr. Andrews' performance

8   throughout the year?

9       A.   Correct.

10      Q.   And again, NCR keeps records like this so you might

11  get a portion of the business; correct?

12      A.   Correct.

13      Q.   And you gave Mr. Andrews the same ratings here in

14  section of patient review; correct?

15      A.   Yes.

16      Q.   Do you recall any significant differences between Mr.

17  Andrews' performance in 2022 as compared to 2021?

18      A.   I do not.

19      Q.   How would you describe Mr. Andrews as an employee or

20  supervisor?

21      A.   He has a deep knowledge of information technology,

22  controls, and processes.  So he's a subject matter expert.  And

23  everything was done according to my expectations which is why I

24  gave him the rating.

25      Q.   Do you see any changes in Mr. Andrews' demeanor at



 1  work in 2022 as compared to 2021?

 2       A.   I don't recall specifically seeing any changes.

 3       Q.   Does anything in Mr. Andrews' performance in 2022

 4  stand out to you?

 5       A.   No.

 6       Q.   Do you recall any changes with performance in 2022 as

 7  compared to 2021?

 8       A.   No.

 9       Q.   Am I correct that these would have been the only two

10  years you performed these evaluations for Mr. Andrews?

11       A.   Correct.

12       Q.   Do you have any knowledge regarding Mr. Andrews'

13  performance in 2023?

14       A.   I don't know what his rating was, but I did have

15  conversations with the Chief Audit Executive that currently

16  manages him, but I don't know what he rated him at the end.

17  But I certainly provided feedback on his performance in the

18  time he reported to me during 2023.

19       Q.   Who's the current supervisor you were talking about?

20       A.   Puran Sampat.

21       Q.   Spell that for the record.

22       A.   P-u-r-a-n S-a-m-p-a-t.

23       Q.   I'm going to show you what's been marked as TTV

24  Exhibit 7.  And this is the document Bates label, NCRV System

25  1.  Do you remember this document?



1       A.   I do not.

2       Q.   Have you ever seen a document like this related to

3   you?

4       A.   No.

5       Q.   Do you have any knowledge regarding Mr. Andrews' pay

6   when you were the supervisor?

7       A.   Yes.

8       Q.   What did you recall about his pay?

9       A.   So I don't recall exactly what it was.  But certainly

10  after the annual review process, there's a merit bonus decision

11  that you do for all employees.  So we would have input that in.

12  I would have input that in the system.  And I don't know if

13  that's what this is showing, is a progression of his salary.

14  But I would have only seen it in the sense of kind of the

15  annual changes.

16      Q.   So it's the annual merit increase that you were

17  talking about.  Does every employee receive that?

18      A.   Yes.  There's a range.  I don't know what the range

19  is for the periods that we're talking about, but there's a

20  range each year.

21      Q.   Showing the increase of 2022 on this document from

22  ███████████████ is that -- do you remember that at Mr.

23  Andrews' merit increase?

24      A.   I don't remember that specifically, but it would have

25  been in line with the guidance that the company provided for



1  merit increases.

2      Q.   What was the recommendation that the company provided

3  for that range?

4      A.   I don't recall.  So I think it's a better question

5  for HR.

6      Q.   I can clarify that question if you'd like.  So for

7  example, this says effective day 4 to 2022, the merit

8  compensation change, would that be based on the 2021

9  performance?

10     A.   No.  Merit is not based on performance.  Merit is an

11 inflationary change; right?  Yes, merit is not a performance

12 based.  And it's always effective at the beginning of Q2.  So

13 you'll see a similar day.  That's when the effective date is

14 for merit.

15     Q.   Do all employees receive this merit increase, even if

16 they perform poorly?

17     A.   To my knowledge, yes.  Yes.  But again, probably

18 better clarifying with HR.

19     Q.   Are you aware of Mr. Andrews ever being passed over

20 for any promotions?

21     A.   I am not.

22     Q.   Are you aware of Mr. Andrews ever being demoted?

23     A.   I am not.

24     Q.   Are you aware of Mr. Andrews' compensation ever

25 (unintelligible)?



1    A.    No.

2    Q.    Have you ever heard of the movie 2,000 Mules?

3    A.    The only time I heard about it was from one

4  conversation with Mark in 2021, I think, when we were returning

5  to the office.

6    Q.    What do you recall about that conversation?

7    A.    I have regular one-on-ones with my direct reports.

8  It was part of one of those meetings.  And the company had

9  issued a policy change, really requiring us to come back more

10  days in the office.  So he brought up that he appeared in that

11  movie, and he had concern for his security.  And I advised him

12  to talk to Global Security.  And that's the only conversation I

13  had with him about it.

14    Q.    Presumably, you had a conversation with him after the

15  movie came out; right?

16    A.    Yeah, I don't know.  I don't know when it was.  I

17  think in 2021 was when we were coming out.  I don't know.  I

18  may have my dates mixed up.  I don't know.  I did have one

19  conversation with him.  I don't know when the movie came out.

20  I don't know.

21    Q.    I told you the movie came out in 2022.  Do you think

22  you would have had that conversation with him in 2022?

23    A.    Yes.  It was after it came out, so I might have my

24  dates.  My timing misaligned.

25    Q.    Other than saying that he appeared in the movie, did



1   he say anything else about the movie?

2       A.   I don't recall.

3       Q.   And then you mentioned he was concerned about

4   security.  Is that what you said?

5       A.   Yes.  Because we were requiring employees to come

6   into the office more.  We had been working from home.  So he

7   was concerned about coming into the office on a regular basis

8   because of it.  So I just advised him to go talk to our Global

9   Security team.  I don't know if he did that or not.

10      Q.   Did you give him anybody's name to speak to?

11      A.   No.  Because of his role, he would already have

12  relationships with that group.

13      Q.   Other than mentioning that you may want to speak to

14  the Global Security team, did you provide any other advice to

15  Mr. Andrews?

16      A.   I think I probably let him work from home more than

17  the other team members.  That would be the only thing that I

18  would have done.  I just wanted him to be as effective as

19  possible.

20      Q.   Do you know who worked from home or off?

21      A.   No.  I don't know.

22      Q.   Would that have been reflected in any NCR records,

23  how often someone comes into the office versus stay at home?

24      A.   I think it's tracked, but I don't have any visibility

25  into that.



1    Q.   So you don't know if Mr. Andrews spoke to anyone in

2  the Global Security group?

3    A.   I don't, no.

4    Q.   Other than that one conversation with Mr. Andrews,

5  did you have any other communications with him at all regarding

6  2,000 Mules?

7    A.   No.

8    Q.   In that conversation, did Mr. Andrews mention True

9  Devote?

10    A.   He did not.

11    Q.   Did he mention Captain Engelbrecht?

12    A.   I don't recall.  I don't think so.

13    Q.   Do you recall him mentioning Greg Phillips?

14    A.   I do not recall him mentioning Greg Phillips.

15    Q.   Do you know who any of those three parties are?

16    A.   I do not.

17    Q.   After that one conversation with Mr. Andrews, did you

18  take any further action related to what he said?

19    A.   I did not.

20    Q.   Other than what we've discussed, do you recall

21  anything else about that conversation you had with Mr. Andrews?

22    A.   No.

23    Q.   Do you have any communications with any other NCR

24  employees regarding that conversation you had with Mr. Andrews?

25    A.   I did not.



 1      Q.   Do you know if Mr. Andrews had any communications

 2  with any other NCR employees about what he talked about in that

 3  conversation?

 4      A.   I don't know.

 5      Q.   Are you aware of Mr. Andrews ever being harassed?

 6      A.   I'm not.

 7      Q.   Are you aware of anything negative that happened to

 8  Mr. Andrews as a result of the conversation you had with them?

 9      A.   I am not.

10      Q.   Are you aware of anything negative happening to Mr.

11  Andrews as a result of the substance of what he discussed with

12  you?

13      A.   I am not.

14      Q.   Are you aware of Mr. Andrews' life being affected in

15  any way as a result of what he discussed with you?

16      A.   I am not.

17      Q.   After that one conversation we discussed with Mr.

18  Andrews, do you continue to interact with them on a day-to-day

19  basis?

20      A.   Yes.  Solely for the work that we were both engaged

21  in completing.  It was a work relationship.  So yes, I continue

22  to engage with them on work-related matters.

23      Q.   So we discussed the one conversation without Mr.

24  Andrews.  I take it there wasn't anything written?

25      A.   No.  It was a face-to-face meeting.



1    Q.   Have you ever seen or heard about Mr. Andrews being

2  mentioned in the news?

3    A.   I'm not.

4    Q.   Regarding the substance of the conversation you had

5  with Mr. Andrews that we discussed before, do you know if any

6  of those issues affected Mr. Andrews' reputation at NCR?

7    A.   I'm not aware of any.

8    Q.   Do you know if the substance of that one conversation

9  you had with Mr. Andrews affected him professionally?

10   A.   I'm not aware.

11   Q.   Are you aware of Mr. Andrews filing or submitting any

12  written complaints to NCR?

13   A.   I'm not aware.

14   Q.   Have you ever spoken with Mr. Andrews about this

15  lawsuit?

16   A.   I have not, no.

17   Q.   Have you ever spoken with Mr. Andrews' attorneys in

18  this lawsuit?

19   A.   I have not, no.

20   Q.   You said during this time frame that you supervised

21  Mr. Andrews and Kelly Black; is that right?

22   A.   Mm-hm.

23   Q.   How did the two of them compare as employees?

24   A.   They had different responsibilities, but yes, I mean

25  it's kind of different subject matter experts.  So they're both



1  effective in kind of where their expertise kind of lies.  But

2  they don't do the same thing.  They have a different focus

3  area.

4      Q.  We'll pull back up into Exhibit 5 that we talked

5  about briefly before.  And this is the 2022 performance

6  evaluation.  Do you see that on your screen?

7      A.  Yes.

8      Q.  Looking at the bottom of page 49, under the employee

9  evaluation, Mr. Andrews discusses 2022 being a challenging year

10  for a variety of reasons.  And take time to read that if that's

11  helpful.

12      A.  Okay.

13      Q.  Do you recall some of those issues driven into it

14  being a challenging year?

15      A.  Yes, I do.

16      Q.  Mr. Andrews doesn't include anything in here about

17  the 2,000 Mules; right?

18      A.  He does not.

19      Q.  He doesn't include anything about the substance of

20  the conversation he had with you about the 2,000 Mules; right?

21      A.  Correct.

22      Q.  Okay.  Have you spoken to Mr. Andrews after receiving

23  the subpoena that (unintelligible)?

24      A.  I did not, no.

25      Q.  Other than attorneys, have you spoken to anyone else



KELLY MOYER                                    August 09, 2024
ANDREWS V. D'SOUZA                                          25

```
 1  at NCR about the subpoena that you received?
 2      A.   No.
 3      Q.   After receiving the subpoena, other than attorneys,
 4  have you talked to anyone else about it?
 5      A.   I don't know.  I think I probably mentioned it to my
 6  husband because it was... but that's it.  I didn't know what it
 7  was.  No one at NCR.
 8      Q.   I'm assuming you don't have any plans on leaving NCR
 9  in the near future?
10      A.   No.  I am.  August 31st is my last day.
11      Q.   Okay.  What's your residential address?
12      A.   ████████████████████████████████████████
13      Q.   What's your cell phone number?
14      A.   ████████████████
15      Q.   Do you have a personal email address?
16      A.   I do.  ████████████████
17      Q.   What's your email address in NCR?
18      A.   ████████████████████
19           VIDEOGRAPHER:  Okay.  I don't think I have any
20      questions at the moment.  I'm going to let counsel take
21      the floor.
22                     CROSS EXAMINATION
23  BY MR. VINING:
24      Q.   Hi Ms. Moyer, my name is Austin Vining.  How are you
25  this morning?
```



KELLY MOYER                                                    August 09, 2024
ANDREWS V. D'SOUZA                                                          26

1      A.   Hey, doing well.  Thank you.

2      Q.   Great.  In the conversation that you had with Mr.

3   Andrews about 2,000 Mules, can you remember if anything else

4   from that conversation other than he said he told you about the

5   movie and his concerns for his security?

6      A.   Yes.  It was part of a broader kind of meeting, so it

7   wasn't the only reason for the meeting.  And it was in the

8   context of really having to come back into the office on a more

9   regular basis was the reason for bringing it up.  So that's all

10  I remember from the conversation, and it was very short.  And I

11  didn't feel like -- I feel like you need to talk to Global

12  Security if you have those concerns.  So that was really the

13  extent of the conversation.

14     Q.   Was this conversation in office?

15     A.   It was, yes.

16     Q.   Was it after the back-to-office mandate?

17     A.   We were transitioning, I think, back to office.  So

18  yes.  Again, I think I have my timing messed up, but it was --

19  yes, he was coming in, but we were transitioning to more days

20  in the office.

21     Q.   Okay.  Do you remember if in that conversation Mr.

22  Andrews mentioned Dinesh D'Souza?

23     A.   I do not recall.

24     Q.   Okay.  Do you know who Dinesh D'Souza is?

25     A.   I do not know who that is.



1      Q.   Do you recall if Mr. Andrews mentioned D'Souza Media,

2  LLC?

3      A.   I don't recall.

4      Q.   Okay.  Do you know what that organization is?

5      A.   No, I do not.

6           MR. VINING:  I don't believe I have any further

7      questions.  Thank you, Ms. Moyer.

8           THE WITNESS:  Sure.

9                      CROSS EXAMINATION

10  BY MS. QIN:

11     Q.   I have a question.  Good morning, Ms. Moyer.  In the

12  course of your employment as Mark's supervisor, did you ever

13  have any conversations with him aside from this conversation

14  about 2,000 Mules that did not involve your work relationship?

15     A.   I don't understand what you mean.

16     Q.   Did any conversations with Mark aside from this one

17  conversation involve anything outside of work content?

18     A.   I don't know.  The majority of our conversations are

19  about work.

20     Q.   Did you have any interactions with Mark outside of

21  work?

22     A.   No.  Oh, if we do -- no.  The only time we would do

23  is if we did any kind of volunteer activities as a group, we

24  did that, which was not in the office.  But it was still

25  work-related.  So I didn't have any interaction with him



1  non-work related.

2          MS. QIN:  Those are all my questions.  Thank you, Ms.

3      Moyer.

4          THE WITNESS:  All right.  You're welcome.

5                      REDIRECT EXAMINATION

6  BY MR. GEORGE:

7      Q.  I just have a handful more.  I'll be quick.  Did Mr.

8  Andrews say anything else about him appearing in the film 2,000

9  Mules?

10     A.  I think he did mention something, but I don't recall

11 exactly what he said.  I think he mentioned he appeared in the

12 film, but I don't recall the context or any additional, like

13 how he would have said it.

14     Q.  Did he say anything about how he found out about the

15 fact that he was in the film?

16     A.  No.  I don't know that.

17     Q.  Did he say anything about whether his face was

18 blurred or unblurred in the film?

19     A.  He did not mention that, no.

20     Q.  Are you going somewhere else to work after August

21 31st?

22     A.  No.  I'm taking some time off.

23     Q.  Are you aware of the movie, 2,000 Mules, affecting

24 Mr. Andrews' performance in any way?

25     A.  Specific to, no.



1       MR. GEORGE:  All right.  That's all I have.

2       VIDEOGRAPHER:  Before we go off the record, is anyone

3   ordering copy of the transcript or video at this time?

4       MR. VINING:  Yes.  Regular order on the transcript.

5       MS. QIN:  Same for us.

6       MR. GEORGE:  And same for us.

7       VIDEOGRAPHER:  This concludes the deposition of Kelly

8   Moyer.  We're going off the record at 10:17 a.m. eastern

9   time.

10       COURT REPORTER:  Did you all want to read and sign?

11       MR. MURPHY:  No.

12           (Deposition concludes at 10:18 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    D I S C L O S U R E

 2    STATE OF GEORGIA
      COUNTY OF FULTON
 3

 4          Pursuant to Article 10.B of the rules and

 5    regulations of the Board of Court Reporting of the

 6    Judicial Council of Georgia, I make the following

 7    disclosure:

 8          I am a Georgia Certified Court Reporter.  I am here

 9    as an independent contractor for Esquire.  Esquire was

10    contacted by Greenberg Traurig, LLP office to provide court

11    reporting services for this deposition.  Esquire will not be

12    taking this deposition under any contract that is prohibited by

13    O.C.G.A. 15-14-37(a) and (b).  Esquire has no

14    contract/agreement to provide court reporting services with any

15    party to the case, any counsel in the case, or any reporter or

16    reporting agency from whom a referral might have been made to

17    cover this deposition.  Esquire will charge its usual and

18    customary rates to all parties in the case, and a financial

19    discount will not be given to any party to this litigation on

20    this 9th day of August 2024.

21

22

23                              _____

24                              Ariel Walcott

25
```





```
 1                C E R T I F I C A T E

 2    STATE OF GEORGIA
      COUNTY OF FULTON
 3

 4         I hereby certify that the foregoing transcript was

 5    stenographically recorded by me, as stated in the caption;

 6    the colloquies, statements, questions, and answers

 7    thereto were reduced to typewriting under my direction

 8    and supervision; and the transcript is a true and correct

 9    record of the testimony/evidence given to the best of my

10    ability.

11         I further certify that I am not a relative or

12    employee or attorney or counsel of any of the parties,

13    nor am I a relative or employee of such attorney or

14    counsel, nor am I financially interested in the action on this

15    9th day of August 2024.

16

17

18

19

20                        _____

21                              Ariel Walcott

22                        Certified Court Reporter

23                        6652-7927-8035-7632

24

25
```

