# EXHIBIT 182

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF GEORGIA

 3                   ATLANTA DIVISION

 4    MARK ANDREWS,                )

                                   )

 5          Plaintiff,             )

                                   )

 6    vs.                          )  Case No.

                                   )  1:22-cv-04259-SDG

 7    DINESH D'SOUZA, et al.,      )

                                   )

 8          Defendants.            )

 9

10

11

12    ***************************************************

13           VIDEOTAPED ORAL DEPOSITION OF

14                 RED METRICS LLC

15    BY AND THROUGH ITS DESIGNATED REPRESENTATIVE

16                 BEN MATTHEWS

17               OCTOBER 30, 2024

18    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

19    ***************************************************

20

21

22

23

24

25
```

CONFIDENTIAL

Page 2

1

2       On the 30th day of October, 2024, at 8:58 a.m.,

3   the videotaped oral deposition of the above-named

4   witness was taken at the instance of the Plaintiff,

5   Mark Andrews, before Michelle L. Munroe, Certified

6   Shorthand Reporter in and for the State of Texas, at

7   Haynes & Boone LLP, 2801 N. Harwood Street, Suite

8   2300, Dallas, Texas, pursuant to Notice and the

9   agreement hereinafter set forth.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 3

1                    A P P E A R A N C E S
2

    FOR THE PLAINTIFF:
3

        John Langford
4       PROTECT DEMOCRACY PROJECT
        82 Nassau Street
5       Suite 601
        New York, New York  10038
6       john.langford@protectdemocracy.org
7

        Jared Fletcher Davidson
8       PROTECT DEMOCRACY PROJECT
        3014 Dauphine Street, Suite J
9       New Orleans, Louisiana  70117
        jared.davidson@protectdemocracy.org
10

11      Jane Peterson Bentrott  (via Zoom)
        PROTECT DEMOCRACY PROJECT
12      2020 Pennsylvania Avenue, NW
        Suite 163
13      Washington, DC  20006
        jane.bentrott@protectdemocracy.org
14

15

    FOR THE DEFENDANTS DINESH D'SOUZA AND D'SOUZA MEDIA
16  LLC:                                              00:00:02
17      Austin C. Vining  (via Zoom)
        BUCHALTER
18      790 Stratforde Drive
        Alpharetta, Georgia  30004
19      avining@buchalter.com
20

21  FOR THE DEFENDANTS CATHERINE ENGELBRECHT, GREGG    00:48:23
    PHILLIPS, AND TRUE THE VOTE:                       00:42:30
22

        Jake Evans
23      GREENBERG TRAURIG LLP
        3333 Piedmont Road NE, Suite 2500
24      Atlanta, Georgia  30305
        jake.evans@gtlaw.com
25

Page 4

1

     FOR THE WITNESS:

2

          Jace Yarbrough
3         S|L LAW FIRM
          610 Uptown Boulevard
4         Suite 2000
          Cedar Hill, Texas  75104
5         940.299.7243  telephone
          jace.yarbrough@the-sl-lawfirm.com
6

7

     ALSO PRESENT:
8         Marsha Curtis  (via Zoom)
          Richard Foster, Video Technician
9         David Crenshaw, Video Technician
          David Johnson, Concierge Technician
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    I N D E X

WITNESS                                      PAGE

2

BEN MATTHEWS

3

        Examination by Mr. Langford..............  7

4

        Examination by Mr. Davidson.............. 103

5

        Examination by Mr. Vining................ 104

6

        Examination by Mr. Evans................. 106

7

        Further examination by Mr. Langford....... 108

8
9

RED MOUNTAIN EXHIBITS                    IDENTIFIED

10

Exhibit 1        Amended Notice of Deposition

11               of Red Metrics LLC and

                 Subpoena....................... 18

12

Exhibit 3        First Amended Complaint........ 21

13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 6

```
 1              P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  Good morning.  On    08:58:09
 3  the record.  The time is 8:58 a.m., and today is   08:58:09
 4  October 30, 2024.  This is the video-recorded      08:58:14
 5  deposition of Ben Matthews, being taken by counsel 08:58:20
 6  for the plaintiff, in the matter of Mark Andrews   08:58:23
 7  versus Dinesh D'Souza, et al., filed in the United 08:58:28
 8  States District Court for the Northern District of 08:58:30
 9  Georgia, Case Number 1:22-cv-04259.                08:58:32
10              This deposition is taking place at     08:58:39
11  2801 North Harwood Street, Suite 2300, in Dallas,  08:58:42
12  Texas.                                             08:58:47
13              My name is Richard Foster from the     08:58:48
14  firm Veritext Legal Solutions.  I'm the videographer. 08:58:50
15  The court reporter today is Michelle Munroe, also  08:58:52
16  with the firm Veritext Legal Solutions.            08:58:55
17              I am not related to any party in this  08:58:58
18  matter nor do I have any financial interest in its 08:59:00
19  outcome.                                           08:59:03
20              Will counsel present please state your 08:59:03
21  appearances for the record.                        08:59:07
22              MR. LANGFORD:  John Langford for       08:59:07
23  plaintiff, Mark Andrews.                           08:59:09
24              MR. DAVIDSON:  And Jared Davidson for  08:59:10
25  plaintiff, Mark Andrews.                           08:59:12
```

CONFIDENTIAL

Page 7

| | | |
|---|---|---|
| 1 | MR. EVANS:  And Jake Evans for | 08:59:12 |
| 2 | defendant Catherine Engelbrecht, Gregg Phillips, and | 09:05:09 |
| 3 | True the Vote. | 08:59:17 |
| 4 | THE VIDEOGRAPHER:  Thank you. | 08:59:17 |
| 5 | And would the court reporter please -- | 08:59:18 |
| 6 | MR. VINING:  This is Austin Vining for | 08:59:23 |
| 7 | defendants Dinesh D'Souza and D'Souza Media LLC | 08:59:25 |
| 8 | appearing virtually. | 08:59:28 |
| 9 | MR. YARBROUGH:  For the record, this | 08:59:31 |
| 10 | is Jace Yarbrough.  I represent the deponent. | 08:59:33 |
| 11 | MR. CRENSHAW:  Are there any others on | 08:59:37 |
| 12 | Zoom that need to state their appearances? | 08:59:37 |
| 13 | MS. BENTROTT:  Yes.  This is Jane | 08:59:39 |
| 14 | Bentrott on behalf of plaintiff. | 08:59:39 |
| 15 | THE VIDEOGRAPHER:  Will the court | 08:59:47 |
| 16 | reporter please swear in the witness. | 08:59:47 |
| 17 | BEN MATTHEWS, | 08:59:47 |
| 18 | having been first duly sworn, testified as follows: | 08:59:47 |
| 19 | EXAMINATION | 08:59:47 |
| 20 | BY MR. LANGFORD: | 08:59:58 |
| 21 | Q.   Good morning. | 08:59:58 |
| 22 | A.   Good morning. | 09:00:01 |
| 23 | Q.   My name is John Langford, and I will be | 09:00:02 |
| 24 | taking your deposition and asking you questions | 09:00:04 |
| 25 | today. | 09:00:06 |

CONFIDENTIAL

Page 8

| | | |
|---|---|---|
| 1 | Can you also just state your address for | 09:00:07 |
| 2 | the record? | 09:00:09 |
| 3 | ██████████████████████████ | 09:00:09 |
| 4 | Q.   Have you ever had your deposition taken | 09:00:14 |
| 5 | before? | 09:00:16 |
| 6 | A.   No. | 09:00:17 |
| 7 | Q.   And that includes in the capacity as a | 09:00:17 |
| 8 | corporate representative? | 09:00:21 |
| 9 | A.   Correct.  Yeah. | 09:00:22 |
| 10 | Q.   So I'm just going to go over some ground | 09:00:24 |
| 11 | rules and housekeeping items so that we all have the | 09:00:26 |
| 12 | same understanding. | 09:00:29 |
| 13 | In this deposition, I will be asking you | 09:00:30 |
| 14 | questions.  My questions and your answers will be | 09:00:32 |
| 15 | recorded by the videographer and transcribed by the | 09:00:35 |
| 16 | court reporter. | 09:00:38 |
| 17 | For that reason, we both need to speak up | 09:00:39 |
| 18 | and answer out loud so the reporter can hear you | 09:00:41 |
| 19 | when you give your answers. | 09:00:44 |
| 20 | Do you understand that? | 09:00:45 |
| 21 | A.   Yes. | 09:00:45 |
| 22 | Q.   If you nod or shake your head or give a | 09:00:47 |
| 23 | nonverbal answer or even say something like | 09:00:49 |
| 24 | "uh-huh," I'm going to remind you to give a clear | 09:00:51 |
| 25 | verbal answer with words.  Is that fair? | 09:00:55 |

CONFIDENTIAL

Page 9

| | | |
|---|---|---|
| 1 | A.   Yes. | 09:00:57 |
| 2 | Q.   The court reporter also might have trouble | 09:00:57 |
| 3 | if we talk over each other, so I'm going to let you | 09:01:00 |
| 4 | finish your answer before I ask another question. | 09:01:02 |
| 5 | Equally, it is very important that you wait until I | 09:01:05 |
| 6 | finish my question before you begin answering even | 09:01:07 |
| 7 | when you think you know what the rest of the | 09:01:09 |
| 8 | question will be. | 09:01:11 |
| 9 | Will you do that? | 09:01:12 |
| 10 | A.   Yes. | 09:01:13 |
| 11 | Q.   You have just taken an oath that requires | 09:01:14 |
| 12 | you to tell the truth, the whole truth, and nothing | 09:01:15 |
| 13 | but the truth.  And that is the same oath you would | 09:01:19 |
| 14 | take if you were to testify in court. | 09:01:22 |
| 15 | Do you understand that? | 09:01:24 |
| 16 | A.   Yes. | 09:01:24 |
| 17 | Q.   On occasion, I may ask you a question that | 09:01:24 |
| 18 | I don't state very well or for some other reason you | 09:01:26 |
| 19 | don't understand.  If you don't understand my | 09:01:30 |
| 20 | question for any reason, don't answer it; instead, | 09:01:32 |
| 21 | please ask for clarification. | 09:01:34 |
| 22 | Will you do that? | 09:01:36 |
| 23 | A.   Yes. | 09:01:37 |
| 24 | Q.   We will plan to take a break from time to | 09:01:38 |
| 25 | time, but if you need to take a break at any time, | 09:01:40 |

CONFIDENTIAL

Page 10

```
 1   just let me know.  If I am in the middle of a          09:01:42
 2   question or just asked the question, please finish     09:01:46
 3   answering the question, and then we can plan to take   09:01:48
 4   a break.                                               09:01:50
 5        A.   Okay.                                        09:01:50
 6        Q.   And I know you are in a -- no, you are in    09:01:51
 7   the same time zone.                                    09:01:54
 8             If you want to talk to your attorney,        09:01:56
 9   that's completely fine.  I just ask that if there's    09:01:58
10   a question pending or if you are in the middle of an   09:02:02
11   answer, please finish the answer before speaking to    09:02:04
12   your lawyer unless you need to talk to him about a     09:02:07
13   matter of privilege.                                   09:02:10
14             Will you do that?                            09:02:11
15        A.   Yes.                                         09:02:12
16        Q.   Relatedly, while we are on the record, you   09:02:12
17   are not allowed to have private conversations with     09:02:14
18   anyone, including your counsel, by any means,          09:02:17
19   including text message, electronic mail, or any chat   09:02:19
20   feature.                                               09:02:23
21             Do you understand that?                      09:02:23
22        A.   Yes.                                         09:02:23
23        Q.   From time to time your attorney or one of    09:02:25
24   the other attorneys may object.  Unless your           09:02:27
25   attorney tells you not to answer the question          09:02:29
```

CONFIDENTIAL

Page 11

```
 1   specifically, you should go ahead and answer the     09:02:31

 2   question.                                             09:02:32

 3            Do you understand that?                      09:02:33

 4       A.   Okay.  Yes.                                  09:02:33

 5       Q.   Sometimes it happens that you will give an   09:02:34

 6   answer as completely as you can, and then later on,   09:02:37

 7   maybe five minutes later or maybe two hours later,    09:02:39

 8   you remember some additional information or perhaps   09:02:42

 9   some clarification in response to that earlier        09:02:45

10   question.                                             09:02:47

11            If that happens to you, please tell us you   09:02:47

12   would like to add or clarify something to the         09:02:49

13   earlier answer, and we will do that right then while  09:02:52

14   it's on your mind.                                    09:02:54

15            Is that clear?                               09:02:55

16       A.   Yes.                                         09:02:55

17       Q.   If at any point during the deposition        09:02:56

18   you're having problems -- there are problems with     09:02:58

19   the technology or you can't see the exhibits, please  09:03:01

20   notify me right away.                                 09:03:04

21       A.   Okay.                                        09:03:06

22       Q.   Let's see.  We have already explained that   09:03:10

23   in this deposition, the exhibits are going to be      09:03:13

24   introduced through a virtual Exhibit Sharing program  09:03:15

25   and displayed here, but you have a copy of the        09:03:18
```

CONFIDENTIAL

Page 12

1    exhibits that we'll walk through in front of you.    09:03:20

2         A.    Okay.                                      09:03:22

3         Q.    Because it is so critical that we get your    09:03:24

4    full, complete, and accurate answers, I have to ask    09:03:27

5    you whether you are taking any medication or drugs     09:03:28

6    of any kind or whether you have consumed any cough     09:03:30

7    syrup or medicine or something containing alcohol      09:03:33

8    that might make it difficult for you to remember       09:03:37

9    things or to understand and answer my questions        09:03:38

10   today.                                                 09:03:38

11         So are you taking or have you had anything       09:03:40

12   like that?                                             09:03:42

13         A.    Not -- no.                                 09:03:43

14         Q.    Are there any physical or health reasons   09:03:46

15   that would prevent you from being able to testify      09:03:49

16   fully today?                                           09:03:52

17         A.    No.                                        09:03:52

18         Q.    Is there any reason why you cannot give    09:03:53

19   full, complete, and accurate testimony today?          09:03:55

20         A.    No.                                        09:03:57

21         Q.    All right.  Do you have any questions?     09:03:59

22         A.    No.                                        09:04:00

23         Q.    And do you understand these instructions?  09:04:02

24         A.    Yes, sir.                                  09:04:04

25         Q.    All right.  So to start, how did you       09:04:05

CONFIDENTIAL

Page 13

```
 1    prepare for this deposition?  We're not asking for      09:04:10

 2    privileged communications with your counsel.            09:04:13

 3         A.    I talked with my attorney a couple times     09:04:15

 4    and did some research for documents.                    09:04:20

 5         Q.    Did you talk to anyone other than your       09:04:25

 6    attorney about this deposition?                         09:04:27

 7         A.    No.                                          09:04:29

 8         Q.    Did you communicate with any of the          09:04:31

 9    defendants in this action before this deposition --     09:04:34

10    let me -- let me restate that.                          09:04:39

11         First of all, do you understand who the            09:04:40

12    defendants are in this case?                            09:04:44

13         A.    Could you -- could you -- would you mind      09:04:45

14    listing them, please.                                   09:04:48

15         Q.    Yes.  Let me pull up the...                  09:04:49

16         A.    Am I allowed to open this?                   09:04:56

17         Q.    You can.  We're not going to introduce an    09:04:59

18    exhibit here.                                           09:05:01

19         A.    Okay.  I didn't know if the list was in      09:05:02

20    there.                                                  09:05:03

21         Q.    It's okay.  The defendants are Dinesh        09:05:03

22    D'Souza; True the Vote, Incorporated; Catherine         09:05:06

23    Engelbrecht; Gregg Phillips; D'Souza Media.  And        09:05:09

24    prior defendants included Salem Media Group and         09:05:15

25    Regnery Publishing, Inc.                                09:05:20
```

CONFIDENTIAL

Page 14

| | | |
|---|---|---|
| 1 | A.    Okay. | 09:05:22 |
| 2 | Q.    Did you talk to any of those individuals | 09:05:23 |
| 3 | to prepare for this deposition? | 09:05:25 |
| 4 | A.    No. | 09:05:26 |
| 5 | Q.    Have you talked to any of the defendants | 09:05:32 |
| 6 | about this litigation? | 09:05:33 |
| 7 | A.    No. | 09:05:35 |
| 8 | Q.    Do you -- did you have any communications | 09:05:39 |
| 9 | with an entity called OpSec Group about this | 09:05:42 |
| 10 | deposition? | 09:05:46 |
| 11 | A.    No. | 09:05:48 |
| 12 | Q.    And do you understand -- are you familiar | 09:05:50 |
| 13 | with OpSec Group? | 09:05:53 |
| 14 | A.    Yes, I am. | 09:05:54 |
| 15 | Q.    Okay.  Do you know if your attorney had | 09:05:55 |
| 16 | communications with any of the defendants about this | 09:06:00 |
| 17 | deposition? | 09:06:02 |
| 18 | A.    I do not know. | 09:06:03 |
| 19 | Q.    You said you did some documentary review | 09:06:05 |
| 20 | to prepare for the deposition. | 09:06:12 |
| 21 | What documents did you review? | 09:06:14 |
| 22 | A.    I did not review documents.  I did a | 09:06:15 |
| 23 | research trying to find documents. | 09:06:20 |
| 24 | Q.    Can you just -- what did you do exactly? | 09:06:22 |
| 25 | A.    Oh, yes, sir.  We have a communication | 09:06:24 |

Page 15

| | | |
|---|---|---|
| 1 | platform we use for clients.  I looked through that. | 09:06:30 |
| 2 | And we have a document retention platform, and so I | 09:06:36 |
| 3 | looked through that -- did a search through that as | 09:06:43 |
| 4 | well. | 09:06:45 |
| 5 | Q.   And did you find documents there? | 09:06:48 |
| 6 | A.   I did not. | 09:06:50 |
| 7 | Q.   So would that have included any emails | 09:06:53 |
| 8 | that existed?  Like, would the -- let me restate | 09:07:09 |
| 9 | that. | 09:07:12 |
| 10 | Would the system that you reviewed have | 09:07:12 |
| 11 | had any relevant emails? | 09:07:14 |
| 12 | MR. YARBROUGH:  Objection; form. | 09:07:16 |
| 13 | Q.   Did you look for all relevant emails to | 09:07:20 |
| 14 | prepare for this deposition? | 09:07:22 |
| 15 | MR. YARBROUGH:  Objection; form. | 09:07:25 |
| 16 | Q.   I'll restate it one more time. | 09:07:28 |
| 17 | MR. YARBROUGH:  Just specify what | 09:07:30 |
| 18 | "relevant" means maybe. | 09:07:32 |
| 19 | MR. LANGFORD:  Sure. | 09:07:34 |
| 20 | Q.   Did you look for emails that might have | 09:07:34 |
| 21 | some bearing on this case? | 09:07:35 |
| 22 | A.   No. | 09:07:38 |
| 23 | MR. YARBROUGH:  Objection; form. | 09:07:40 |
| 24 | Q.   Did you look for emails with any of the | 09:07:42 |
| 25 | defendants? | 09:07:44 |

CONFIDENTIAL

Page 16

```
 1        A.   No.                                    09:07:49

 2                 MR. YARBROUGH:  Objection; form.    09:07:51

 3                 We're here because of a subpoena.  So   09:07:58

 4        if there are emails that are relevant to and    09:08:01

 5        responsive to the subpoena, maybe that's a way you  09:08:04

 6        could specify the search that we conducted.  09:08:08

 7        Q.   Why don't we -- we'll come back to this in  09:08:12

 8        just a minute.                               09:08:15

 9                 Did you review any deposition transcripts  09:08:16

10        of any of the defendants I listed?          09:08:20

11        A.   Yes, sir.                               09:08:24

12        Q.   Which deposition transcripts did you    09:08:26

13        review?                                      09:08:29

14        A.   Mr. Phillips and Ms. Engelbrecht.       09:08:32

15        Q.   Did you review any other deposition      09:08:40

16        transcripts to prepare for this deposition?  09:08:43

17        A.   No.                                     09:08:45

18        Q.   Did you discuss what was said in the other  09:08:51

19        deposition to prepare for this deposition?   09:08:53

20                 MR. YARBROUGH:  Objection; calls for  09:08:56

21        privileged information.                      09:08:59

22                 I'm going to instruct you not to     09:08:59

23        answer that question.                        09:09:01

24        Q.   All right.  Did you review any other     09:09:06

25        materials related to this case to prepare for this  09:09:08
```

CONFIDENTIAL

Page 17

| | | |
|---|---|---|
| 1 | deposition? | 09:09:11 |
| 2 | MR. YARBROUGH:  Objection; form. | 09:09:14 |
| 3 | Other than what? | 09:09:16 |
| 4 | Q.  Other than the communication system, the | 09:09:17 |
| 5 | document retention program, the Phillips deposition | 09:09:21 |
| 6 | transcript, and the Engelbrecht deposition | 09:09:24 |
| 7 | transcript. | 09:09:27 |
| 8 | A.  No. | 09:09:30 |
| 9 | Q.  Get a little bit of background. | 09:09:35 |
| 10 | Do you work at Red Metrics? | 09:09:40 |
| 11 | A.  Yes. | 09:09:43 |
| 12 | Q.  What is your role at Red Metrics? | 09:09:45 |
| 13 | A.  I am CEO of Red Metrics. | 09:09:48 |
| 14 | Q.  And how long have you served as CEO of Red | 09:09:52 |
| 15 | Metrics? | 09:09:58 |
| 16 | A.  I believe it was 2018. | 09:09:58 |
| 17 | Q.  Did Red Metrics exist before you became | 09:10:02 |
| 18 | CEO? | 09:10:06 |
| 19 | A.  Yes, it did. | 09:10:09 |
| 20 | Q.  And what were you doing right before you | 09:10:10 |
| 21 | became CEO at Red Metrics? | 09:10:12 |
| 22 | A.  I worked for a nonprofit. | 09:10:16 |
| 23 | Q.  If you don't mind, what nonprofit did you | 09:10:20 |
| 24 | work at? | 09:10:25 |
| 25 | A.  It's called Human Coalition. | 09:10:26 |

CONFIDENTIAL

Page 18

| | | |
|---|---|---|
| 1 | Q. Human Coalition. | 09:10:30 |
| 2 | A. Yes, sir. | 09:10:31 |
| 3 | Q. And as CEO, can you just describe what | 09:10:31 |
| 4 | your role is day to day at Red Metrics? | 09:10:34 |
| 5 | A. Vision of the organization, and I tend to | 09:10:36 |
| 6 | stay on the -- spend time on the operations side of | 09:10:42 |
| 7 | the business. | 09:10:46 |
| 8 | Q. Let's go ahead and pull up our first | 09:10:51 |
| 9 | exhibit. This is going to be marked Document B in | 09:10:54 |
| 10 | Exhibit Share. | 09:11:00 |
| 11 | MR. LANGFORD: I'm sorry, this is | 09:11:02 |
| 12 | going to be marked Document A, David, in Exhibit | 09:11:02 |
| 13 | Share. | 09:11:06 |
| 14 | Q. And you can look at document tab A in your | 09:11:06 |
| 15 | binder. | 09:11:10 |
| 16 | (Red Metrics Exhibit 1 marked.) | 09:11:10 |
| 17 | A. Okay. Yes, sir. | 09:11:13 |
| 18 | Q. Do you recognize this? | 09:11:23 |
| 19 | A. (Reviewed document.) Yes, sir. | 09:11:24 |
| 20 | Q. What is it? | 09:11:52 |
| 21 | A. It looks like it's the subpoena that Red | 09:11:53 |
| 22 | Metrics received. | 09:11:59 |
| 23 | Q. Great. | 09:11:59 |
| 24 | And if you can look at Schedule A, which | 09:12:00 |
| 25 | is -- I think you were just on it. It's about four | 09:12:03 |

CONFIDENTIAL

Page 19

```
 1    pages in.                                        09:12:06

 2              MR. YARBROUGH:  David, would you mind   09:12:08

 3    going to Schedule A on the Share?                09:12:10

 4              Thank you.                             09:12:12

 5       A.   I'm here.                                09:12:13

 6       Q.   Okay.  How many --                       09:12:14

 7       A.   Hold on.  Maybe I'm not.                 09:12:19

 8              MR. YARBROUGH:  You're right.          09:12:19

 9       Q.   You're right.                            09:12:22

10       A.   Oh, okay.                                09:12:22

11              MR. LANGFORD:  David, it's page 5, I   09:12:23

12    think, of the pdf.  Couple more pages.  One more. 09:12:25

13    There we go.                                     09:12:45

14       Q.   All right.  This is Schedule A.  If you  09:12:48

15    flip to the topics listed in Schedule A, how many 09:12:50

16    topics are listed there?                         09:12:54

17       A.   The deposition topics?                   09:12:56

18       Q.   Yes.                                     09:13:01

19       A.   There's six.                             09:13:01

20       Q.   Are you Red Metrics' designee to testify 09:13:03

21    to all of these topics?                          09:13:06

22       A.   No.                                      09:13:07

23       Q.   Which topics are you going to testify to 09:13:15

24    today?                                           09:13:18

25       A.   Number 1 and then and -- yeah, number 6, 09:13:19
```

CONFIDENTIAL

Page 20

1    please.                                          09:13:29

2         Q.   Do you understand that when I refer to    09:13:30

3    "you" in this deposition, I'm going to be referring  09:13:32

4    to Red Metrics, the entity?                      09:13:34

5         A.   Okay.  Yes.                            09:13:36

6         Q.   And your answers are on behalf of Red    09:13:37

7    Metrics --                                       09:13:39

8         A.   Okay.                                  09:13:39

9         Q.   -- the company.                        09:13:40

10        A.   Yes, sir.                              09:13:41

11        Q.   All right.  Some of these topics ask about  09:13:41

12   the defendants.  I went through the list of      09:13:46

13   defendants.                                      09:13:50

14        Are you familiar with the lawsuit to which    09:13:51

15   this deposition relates?                         09:13:54

16        A.   When you say "familiar," what do you --   09:13:58

17   what do you mean by that?                        09:14:00

18        Q.   Are you -- do you have an understanding of  09:14:03

19   what the claims are in this litigation?          09:14:05

20             MR. YARBROUGH:  Objection; form.       09:14:08

21        Q.   Did you review -- I think I asked you    09:14:11

22   this.                                            09:14:15

23        Did you -- you did not review the amended    09:14:15

24   complaint to prepare for this deposition?        09:14:17

25        A.   No.                                    09:14:20

CONFIDENTIAL

Page 21

```
 1        Q.   Okay.  Let's go ahead and --          09:14:21

 2        A.   Can I -- maybe -- the amended -- say it   09:14:25

 3   one more time.  The amended complaint, is that what   09:14:29

 4   you said?                                         09:14:31

 5        Q.   Yes.                                    09:14:32

 6        A.   Can you explain what that is?  I'm -- I   09:14:32

 7   apologize.                                        09:14:35

 8             MR. LANGFORD:  Let's go ahead -- why    09:14:37

 9   don't we pull up another exhibit.                 09:14:38

10             David, we're going to pull up           09:14:41

11   Document B.                                        09:14:43

12             (Red Metrics Exhibit 3 marked.)         09:14:43

13        Q.   And it's Document B in your tab.         09:14:44

14        A.   Okay.  Oh, this is the --               09:14:47

15        Q.   Do you recognize this?                  09:14:53

16        A.   Yes.  I believe -- would this have come --   09:14:55

17   would this have come to me?  Would this have been   09:15:02

18   sent to me?  Is that correct?                     09:15:05

19        Q.   I actually don't know.                  09:15:09

20        A.   Or no?                                  09:15:10

21             MR. YARBROUGH:  As part of the          09:15:11

22   subpoena.                                          09:15:12

23        Q.   Then, yes, it was sent to you.          09:15:13

24        A.   Okay.  So, yes, I received -- I received   09:15:14

25   this if that was the question.                    09:15:18
```

CONFIDENTIAL

Page 22

| | | |
|---|---|---|
| 1 | Q.   Did you review it? | 09:15:20 |
| 2 | A.   I would not -- can you explain "review"? | 09:15:22 |
| 3 | Q.   Did you read it? | 09:15:27 |
| 4 | A.   I would say no. | 09:15:29 |
| 5 | Q.   What did you do with it? | 09:15:31 |
| 6 | A.   Thank you. | 09:15:33 |
| 7 |      I did skim -- I did skim it when it came | 09:15:34 |
| 8 | through. | 09:15:38 |
| 9 | Q.   We went through the list of defendants. | 09:15:40 |
| 10 | Do you know any of those defendants? | 09:15:43 |
| 11 | A.   I do. | 09:15:46 |
| 12 | Q.   Which ones? | 09:15:50 |
| 13 | A.   Gregg -- Gregg Phillips is -- when you say | 09:15:51 |
| 14 | know, like -- there are entities listed here as | 09:16:00 |
| 15 | well.  So when you say do I know, what -- can I know | 09:16:04 |
| 16 | an entity? | 09:16:09 |
| 17 |      I'm sorry, are you asking if I know an | 09:16:12 |
| 18 | entity also or... | 09:16:14 |
| 19 | Q.   Let's go through them. | 09:16:14 |
| 20 | A.   Okay. | 09:16:14 |
| 21 | Q.   So you said you know Gregg. | 09:16:16 |
| 22 | A.   Yes. | 09:16:17 |
| 23 | Q.   How do you know Mr. Phillips? | 09:16:17 |
| 24 | A.   I did work with -- with him. | 09:16:21 |
| 25 | Q.   And you said you did not speak with him in | 09:16:24 |

CONFIDENTIAL

Page 23

| | | |
|---|---|---|
| 1 | preparing for this deposition? | 09:16:27 |
| 2 | A.   No. | 09:16:28 |
| 3 | Q.   Have you corresponded with Mr. Phillips? | 09:16:29 |
| 4 | MR. YARBROUGH:  Objection; form. | 09:16:33 |
| 5 | Q.   Have you been in contact with | 09:16:35 |
| 6 | Mr. Phillips? | 09:16:38 |
| 7 | MR. YARBROUGH:  Objection; form. | 09:16:40 |
| 8 | Did you send an email to him?  Did he | 09:16:42 |
| 9 | send you an email to you? | 09:16:44 |
| 10 | Q.   Do you -- did -- have you emailed | 09:16:47 |
| 11 | Mr. Phillips? | 09:16:48 |
| 12 | A.   No. | 09:16:49 |
| 13 | Q.   You have never emailed Mr. Phillips? | 09:16:51 |
| 14 | A.   I want to make sure -- | 09:16:53 |
| 15 | MR. YARBROUGH:  Objection; misstates | 09:16:55 |
| 16 | prior testimony. | 09:16:57 |
| 17 | Q.   Have you ever emailed Mr. Phillips? | 09:16:57 |
| 18 | A.   In my lifetime?  Possibly. | 09:16:59 |
| 19 | Q.   How do you communicate with Mr. Phillips? | 09:17:09 |
| 20 | A.   We used -- I worked with him.  We used a | 09:17:12 |
| 21 | communication platform, an encrypted communication | 09:17:20 |
| 22 | platform. | 09:17:24 |
| 23 | Q.   What platform was that? | 09:17:25 |
| 24 | A.   Wire. | 09:17:27 |
| 25 | Q.   Was that the typical way in which you | 09:17:31 |

CONFIDENTIAL

Page 24

| | | |
|---|---|---|
| 1 | communicated with Mr. Phillips? | 09:17:36 |
| 2 | A.   Yes, sir. | 09:17:38 |
| 3 | Q.   Did you communicate with him in any other | 09:17:39 |
| 4 | way? | 09:17:41 |
| 5 | A.   Not that I recall. | 09:17:41 |
| 6 | Q.   Did you ever speak to Mr. Phillips on the | 09:17:47 |
| 7 | phone? | 09:17:50 |
| 8 | A.   Probably so.  But can I explain that?  But | 09:17:50 |
| 9 | you can use -- you can -- Wire is also voice as | 09:17:59 |
| 10 | well. | 09:18:04 |
| 11 | Q.   Did you text with Mr. Phillips? | 09:18:05 |
| 12 | A.   Can I ask -- are you still referring to as | 09:18:10 |
| 13 | it relates to the work I was doing or... | 09:18:16 |
| 14 | Q.   I'm just asking in general. | 09:18:18 |
| 15 | A.   Okay.  Did I text to him?  No, not that I | 09:18:22 |
| 16 | recall. | 09:18:25 |
| 17 | Q.   Did you use any other messaging platform | 09:18:26 |
| 18 | to communicate with Mr. Phillips? | 09:18:29 |
| 19 | A.   Not that I recall. | 09:18:30 |
| 20 | Q.   What do you -- what -- what is your | 09:18:36 |
| 21 | understanding of who Mr. Phillips is? | 09:18:40 |
| 22 | A.   My understanding of who Mr. Phillips was | 09:18:48 |
| 23 | was he runs an organization called OpSec and works | 09:18:54 |
| 24 | with law enforcement to help on cases. | 09:19:00 |
| 25 | Q.   So we have talked about Mr. Phillips. | 09:19:09 |

Page 25

```
 1        A.   Yes, sir.                           09:19:11

 2        Q.   You asked whether -- I'll strike that.   09:19:13

 3   Let me rephrase that.                          09:19:18

 4            Are there any other defendants,       09:19:19

 5   individuals or entities, with which you have   09:19:22

 6   corresponded on that list?                     09:19:26

 7        A.   No, just -- well, Gregg Phillips and  09:19:30

 8   OpSec, yeah.                                    09:19:36

 9        Q.   But you don't know and haven't spoken with  09:19:38

10   Dinesh D'Souza?                                 09:19:41

11        A.   Never.                               09:19:41

12        Q.   And you don't know and haven't spoken with  09:19:42

13   anyone from True the Vote?                      09:19:44

14        A.   I have not -- I have spoken with Catherine  09:19:50

15   before.                                         09:19:57

16        Q.   How did you communicate with Catherine?   09:19:57

17        A.   Oh, like, just face-to-face conversation.  09:20:00

18        Q.   Have you ever emailed Ms. Engelbrecht?   09:20:10

19        A.   No.                                  09:20:13

20        Q.   Have you ever spoken on the phone with  09:20:14

21   Ms. Engelbrecht?                                09:20:17

22        A.   No, not that I recall.              09:20:18

23        Q.   Did you ever communicate with her on Wire?  09:20:20

24        A.   No, I don't think so.  No, I'm sure -- I'm  09:20:22

25   sure I didn't.                                  09:20:27
```

CONFIDENTIAL

Page 26

| | | |
|---|---|---|
| 1 | Q.   And how did you -- how did you meet | 09:20:30 |
| 2 | Ms. Engelbrecht? | 09:20:33 |
| 3 | A.   Through a conversation that I had with | 09:20:38 |
| 4 | Mr. Phillips. | 09:20:45 |
| 5 | Q.   What was that conversation? | 09:20:48 |
| 6 | A.   At the time, they were looking to launch | 09:20:51 |
| 7 | a -- as I recall, I think they were looking to | 09:21:00 |
| 8 | launch a new -- a new venture. | 09:21:05 |
| 9 | Q.   And what was the time? | 09:21:08 |
| 10 | A.   This was approximately -- approximately -- | 09:21:09 |
| 11 | maybe September/October of '22. | 09:21:23 |
| 12 | Q.   Let's go back for a minute. | 09:21:28 |
| 13 | A.   Okay. | 09:21:30 |
| 14 | Q.   How did you meet Mr. Phillips? | 09:21:30 |
| 15 | A.   Mr. Phillips contacted me.  I can't | 09:21:32 |
| 16 | remember if it was -- I assume it was probably -- I | 09:21:42 |
| 17 | a assume he probably called, but I can't remember, | 09:21:47 |
| 18 | to be honest. | 09:21:50 |
| 19 | Q.   Approximately when would that have been? | 09:21:51 |
| 20 | A.   This would have probably been -- this was | 09:21:54 |
| 21 | probably November of 2020.  Yeah. | 09:21:59 |
| 22 | Q.   And what did he contact you about in | 09:22:06 |
| 23 | November of 2020? | 09:22:08 |
| 24 | A.   It must have been November 2020. | 09:22:08 |
| 25 | He said that -- I'm sorry, can you repeat | 09:22:12 |

CONFIDENTIAL

Page 27

| 1 | that one more time.  I just want to make sure I | 09:22:19 |
| 2 | heard it and answer it right. | 09:22:20 |
| 3 | Q.   What was your conversation with | 09:22:23 |
| 4 | Mr. Phillips in November 2020? | 09:22:24 |
| 5 | A.   He was working with law enforcement to | 09:22:25 |
| 6 | investigate potential voter fraud. | 09:22:33 |
| 7 | Q.   And would that have been before the | 09:22:41 |
| 8 | election or after the election? | 09:22:43 |
| 9 | A.   This was -- this was -- this would have | 09:22:44 |
| 10 | been after the election. | 09:22:46 |
| 11 | Q.   Do you remember approximately when in | 09:22:48 |
| 12 | November? | 09:22:49 |
| 13 | A.   Well, it was -- no, I don't.  And it might | 09:22:50 |
| 14 | have even been early December. | 09:22:56 |
| 15 | Q.   And you said he called you? | 09:23:00 |
| 16 | A.   I apologize, I just -- I can't -- I can't | 09:23:04 |
| 17 | recall if that was a phone call.  I can't recall | 09:23:08 |
| 18 | how -- how he reached out. | 09:23:10 |
| 19 | Q.   And then just tell me exactly what did he | 09:23:14 |
| 20 | say about what he was -- what he wanted to talk to | 09:23:17 |
| 21 | you about. | 09:23:21 |
| 22 | A.   He wanted -- he and -- was actively | 09:23:22 |
| 23 | working with law enforcement, and he wanted to know | 09:23:28 |
| 24 | if we could help give data of interest to them as it | 09:23:33 |
| 25 | related to potential voter fraud. | 09:23:42 |

CONFIDENTIAL

Page 28

| | | |
|---|---|---|
| 1 | Q.   Is that the first time you had been in | 09:23:47 |
| 2 | contact with him? | 09:23:48 |
| 3 | A.   Yes. | 09:23:49 |
| 4 | Q.   Let's come back to that. | 09:23:52 |
| 5 | A.   Okay. | 09:23:59 |
| 6 | Q.   We have talked about Mr. Phillips, | 09:23:59 |
| 7 | Ms. Engelbrecht, True the Vote. | 09:24:02 |
| 8 | Did you speak with anyone at D'Souza | 09:24:07 |
| 9 | Media? | 09:24:11 |
| 10 | A.   I want to make sure I was clear.  On -- | 09:24:11 |
| 11 | step back real quick.  On Catherine I did say the | 09:24:15 |
| 12 | first time I met her was '22; is that... | 09:24:18 |
| 13 | Q.   That's correct. | 09:24:20 |
| 14 | A.   Okay.  Yes. | 09:24:21 |
| 15 | I'm sorry, could you ask that question | 09:24:23 |
| 16 | again. | 09:24:24 |
| 17 | Q.   Have you spoken with anyone from D'Souza | 09:24:25 |
| 18 | Media? | 09:24:28 |
| 19 | A.   No.  No.  I have no familiarity. | 09:24:28 |
| 20 | Q.   And did you speak with anybody at Salem | 09:24:31 |
| 21 | Media or Regnery Publishing? | 09:24:35 |
| 22 | A.   No. | 09:24:37 |
| 23 | Q.   We have talked about OpSec. | 09:24:41 |
| 24 | How do you know OpSec? | 09:24:44 |
| 25 | A.   Just from Gregg, from my conversations | 09:24:46 |

Page 29

| | | |
|---|---|---|
| 1 | with Mr. Phillips. | 09:24:54 |
| 2 | Q.   Just to lay the groundwork, did you work | 09:24:55 |
| 3 | with OpSec at some point? | 09:24:57 |
| 4 | A.   Yes, sir. | 09:24:58 |
| 5 | Q.   In what capacity? | 09:25:01 |
| 6 | A.   I probably already answered this, but it | 09:25:02 |
| 7 | was to help him as he worked with law enforcement on | 09:25:08 |
| 8 | doing investigation for -- for voter -- for | 09:25:14 |
| 9 | potential voter fraud. | 09:25:18 |
| 10 | Q.   What do you know about OpSec? | 09:25:20 |
| 11 | A.   Nothing really, other than what he told me | 09:25:23 |
| 12 | that he worked with law enforcement.  I don't know | 09:25:30 |
| 13 | anything else on him. | 09:25:33 |
| 14 | Q.   Do you know who is in charge? | 09:25:34 |
| 15 | MR. YARBROUGH:  Objection; form. | 09:25:37 |
| 16 | Q.   Do you know who runs OpSec Group? | 09:25:39 |
| 17 | A.   Well, Gregg I think. | 09:25:45 |
| 18 | Q.   And do you have an understanding of | 09:25:48 |
| 19 | whether OpSec Group has employees? | 09:25:50 |
| 20 | A.   I don't know -- I don't know if they have | 09:25:52 |
| 21 | employees or they have contractors.  I don't know | 09:26:00 |
| 22 | how that -- I don't know how they have that set up. | 09:26:02 |
| 23 | Q.   Do you have a sense of how many either | 09:26:06 |
| 24 | employees or contractors OpSec has? | 09:26:10 |
| 25 | MR. YARBROUGH:  Objection; form. | 09:26:11 |

CONFIDENTIAL

Page 30

```
 1        Q.   Do you know how many employees or          09:26:12
 2   contractors work for OpSec?                          09:26:14
 3        A.   Do I -- do I know for sure?  No.            09:26:18
 4        Q.   Do you know approximately?                 09:26:25
 5             MR. YARBROUGH:  Objection; form.           09:26:28
 6        Q.   Do you know approximately how many         09:26:29
 7   employees or contractors work for OpSec Group?       09:26:31
 8             MR. YARBROUGH:  Objection; asked and       09:26:34
 9   answered.                                            09:26:37
10             MR. LANGFORD:  I don't think he's          09:26:38
11   asked and answered.  He's only said he didn't know   09:26:39
12   exactly.                                             09:26:41
13        Q.   I'm asking do you know approximately how   09:26:42
14   many employees OpSec has.                            09:26:45
15             MR. YARBROUGH:  Objection; form.           09:26:46
16             You can answer the question if you         09:26:47
17   know.                                                09:26:48
18        A.   I -- I -- I believe -- again, I don't know 09:26:49
19   for sure.  I think approximately probably 12 or 15.  09:26:56
20   But I don't -- I don't know.                         09:27:02
21        Q.   Have you spoken with anyone who works for  09:27:04
22   OpSec other than Gregg Phillips?                     09:27:07
23        A.   Yes.                                       09:27:12
24        Q.   Who?                                       09:27:13
25        A.   JD.                                        09:27:16
```

CONFIDENTIAL

Page 31

| | | |
|---|---|---|
| 1 | Q.   Do you know JD's last name? | 09:27:22 |
| 2 | A.   I'm not positive. | 09:27:24 |
| 3 | Q.   Who is JD? | 09:27:29 |
| 4 | A.   He was a point of contact analyst for -- | 09:27:30 |
| 5 | with us. | 09:27:41 |
| 6 | Q.   How often would you speak with JD? | 09:27:42 |
| 7 | A.   Personally I wasn't really involved in the | 09:27:44 |
| 8 | production side, so not -- not -- so not very often. | 09:27:51 |
| 9 | Q.   How did you communicate with JD? | 09:27:58 |
| 10 | A.   Same way, which was on the -- that -- the | 09:28:03 |
| 11 | messaging platform. | 09:28:07 |
| 12 | Q.   This is the messaging platform Wire? | 09:28:10 |
| 13 | A.   Yes, sir. | 09:28:12 |
| 14 | Q.   Did you communicate with JD through any | 09:28:12 |
| 15 | other communications platform? | 09:28:15 |
| 16 | A.   Not that I recall. | 09:28:20 |
| 17 | Q.   Did you speak with anyone other than | 09:28:23 |
| 18 | Mr. Phillips or JD from OpSec Group? | 09:28:25 |
| 19 | A.   No.  No. | 09:28:27 |
| 20 | Q.   You mentioned "production side."  What do | 09:28:44 |
| 21 | you mean "production side"? | 09:28:47 |
| 22 | A.   Oh, the way we split up the organization | 09:28:48 |
| 23 | is there's kind of operations, which I explained, | 09:28:56 |
| 24 | kind of the back end, if you will, and there's more | 09:29:00 |
| 25 | the production, which is more in your -- the work | 09:29:03 |

CONFIDENTIAL

Page 32

```
 1    that is being performed and the deliverables.        09:29:08
 2                MR. YARBROUGH:  John, can I ask that      09:29:13
 3    we be given the opportunity to designate certain     09:29:14
 4    portions of the transcript confidential when that    09:29:17
 5    time comes?                                           09:29:19
 6                MR. LANGFORD:  Yeah.  Pursuant to the     09:29:19
 7    protective order, I think the whole thing is         09:29:21
 8    initially designated confidential --                 09:29:22
 9                MR. YARBROUGH:  Is that right?            09:29:24
10                MR. LANGFORD: -- prior to review.         09:29:24
11                MR. YARBROUGH:  Okay.  Great.  Thank      09:29:25
12    you.                                                  09:29:26
13        A.   Did that help?                               09:29:27
14        Q.   I'm sorry?                                   09:29:29
15        A.   Make sense?                                  09:29:29
16                MR. LANGFORD:  Can you just repeat        09:29:31
17    back the answer, production side.                     09:29:32
18                (Record read.)                            09:29:54
19        Q.   So let's walk -- let's start with some       09:29:56
20    background on Red Metrics and we'll come back to      09:30:01
21    that.                                                 09:30:03
22             But before we do that, just to be           09:30:03
23    absolutely clear, the only two people you spoke with  09:30:05
24    at OpSec are Gregg Phillips and someone named JD?     09:30:07
25        A.   As far as I recall, that is -- that is       09:30:13
```

CONFIDENTIAL

Page 33

```
 1   correct.                                          09:30:19

 2        Q.   And do you know what JD stands for?     09:30:19

 3        A.   Not other than his name.                09:30:22

 4        Q.   How long has Red Metrics been in business? 09:30:30

 5        A.   I believe that we were formed in 2015,  09:30:33

 6   April or May of 2015 I believe.  So since then.   09:30:43

 7        Q.   Is Red Metrics incorporated in Texas?   09:30:50

 8        A.   Yes.                                     09:30:54

 9        Q.   Is it based here in Texas?              09:30:56

10        A.   Yes, sir.                                09:30:58

11        Q.   Can you just list all of its office     09:30:59

12   locations?                                        09:31:03

13        A.   Like, the address?  Okay.  Yeah.  It's  09:31:05

14   ████████████████████████████████████████████████  09:31:11

15   ████████████████████████████████████████████████  09:31:17

16        Q.   Are there any other offices?            09:31:21

17        A.   No.                                      09:31:23

18        Q.   Roughly how many employees does Red     09:31:23

19   Metrics have?                                      09:31:26

20        A.   There was -- can I step back?           09:31:26

21        Q.   Yeah.                                    09:31:27

22        A.   There was a -- when that subpoena came  09:31:27

23   through, I think there was a different address on 09:31:30

24   that.  I think that -- I think that was, like, our 09:31:32

25   registered agent from when we formed it, but that's 09:31:36
```

CONFIDENTIAL

Page 34

| | | |
|---|---|---|
| 1 | not -- it's not an office.  Sorry. | 09:31:39 |
| 2 | Q.   That's okay. | 09:31:41 |
| 3 | How many employees does Red Metrics have? | 09:31:42 |
| 4 | A.   Currently?  None. | 09:31:44 |
| 5 | Q.   How many employees did Red Metrics have in | 09:31:49 |
| 6 | 2022? | 09:31:52 |
| 7 | A.   In '22 or when we were -- or when -- is | 09:31:54 |
| 8 | that what you're asking, in 2022? | 09:32:02 |
| 9 | Q.   Let's actually start over. | 09:32:04 |
| 10 | How many employees did Red Metrics have in | 09:32:06 |
| 11 | 2020? | 09:32:08 |
| 12 | A.   I believe -- I believe we had just three | 09:32:09 |
| 13 | or four employees. | 09:32:18 |
| 14 | Q.   And in 2021? | 09:32:20 |
| 15 | A.   That number will probably go -- that three | 09:32:21 |
| 16 | to four will probably be '20, '21, '22 as well. | 09:32:28 |
| 17 | Q.   And when did you go down to zero | 09:32:33 |
| 18 | employees? | 09:32:35 |
| 19 | A.   '23 I believe. | 09:32:37 |
| 20 | Q.   And why did you lose your employees? | 09:32:41 |
| 21 | A.   We -- we kind of changed model.  We -- we | 09:32:44 |
| 22 | were not doing the same work that we had been doing, | 09:32:55 |
| 23 | so we didn't really need the employees anymore. | 09:32:59 |
| 24 | Does that make sense? | 09:33:03 |
| 25 | Q.   Were the employees based here in Texas? | 09:33:04 |

CONFIDENTIAL

Page 35

| | | |
|---|---|---|
| 1 | A.   Yeah.  Yeah.  Yeah.  Sorry.  Yes. | 09:33:08 |
| 2 | Q.   Is Mr. Azeddine Rahlouni, was he one of | 09:33:16 |
| 3 | the employees during that period? | 09:33:22 |
| 4 | A.   Yes, sir. | 09:33:24 |
| 5 | MR. YARBROUGH:  Objection; form. | 09:33:26 |
| 6 | Q.   Was Mr. Rahlouni employed by Red Metrics | 09:33:29 |
| 7 | in the 2020 to 2023 period? | 09:33:33 |
| 8 | A.   Yes. | 09:33:36 |
| 9 | Q.   Was he ever utilized as a contractor and | 09:33:40 |
| 10 | not an employee? | 09:33:44 |
| 11 | MR. YARBROUGH:  Objection; form. | 09:33:46 |
| 12 | Q.   Did Mr.  Rahlouni ever work as a | 09:33:47 |
| 13 | contractor for Red Metrics? | 09:33:50 |
| 14 | A.   I don't think so. | 09:33:54 |
| 15 | Q.   What was Mr. Rahlouni's role? | 09:34:00 |
| 16 | A.   He was a data analyst. | 09:34:04 |
| 17 | Q.   Does Red Metrics utilize contractors? | 09:34:11 |
| 18 | A.   Now or -- can you -- I'm sorry, can you | 09:34:19 |
| 19 | define, like, when? | 09:34:22 |
| 20 | Q.   Sure.  We'll do that first. | 09:34:23 |
| 21 | Did Red Metrics use contractors in the | 09:34:25 |
| 22 | 2020 to 2023 period? | 09:34:27 |
| 23 | A.   Not that I recall. | 09:34:29 |
| 24 | Q.   Does Red Metrics use contractors now? | 09:34:32 |
| 25 | A.   No. | 09:34:33 |

CONFIDENTIAL

Page 36

```
 1        Q.   What is the formal organizational        09:34:35

 2    structure of Red Metrics?                         09:34:43

 3        A.   Legally are you talking?  An LLC.         09:34:48

 4        Q.   Are there any related entities?          09:34:52

 5             MR. YARBROUGH:  Objection; form.          09:34:54

 6        Q.   Are there any corporate entities with whom 09:34:56

 7    Red Metrics has a formal relation?                 09:35:00

 8             MR. YARBROUGH:  Objection; form.          09:35:04

 9        Q.   Are you familiar with Red Fusion?         09:35:08

10        A.   Yes.                                      09:35:10

11        Q.   What is Red Fusion?                       09:35:11

12        A.   Red Fusion is a technology development.   09:35:13

13        Q.   Are you employed at Red Fusion as well?   09:35:24

14        A.   No.                                       09:35:27

15        Q.   Is Red Fusion formally connected to Red   09:35:27

16    Metrics?                                           09:35:32

17        A.   No.                                       09:35:32

18             MR. YARBROUGH:  Objection; form.          09:35:34

19        Q.   Who overseas Red Fusion?                  09:35:36

20        A.   Myself.                                   09:35:41

21        Q.   I'm sorry, you oversee Red Fusion?        09:35:44

22        A.   Yes, sir.                                 09:35:48

23        Q.   What is your role at Red Fusion?          09:35:50

24        A.   I -- I'm CEO.                             09:35:52

25        Q.   Gotcha.                                   09:35:55
```

CONFIDENTIAL

Page 37

| | | |
|---|---|---|
| 1 | Did Red Fusion do any work with OpSec? | 09:35:57 |
| 2 | A.   No. | 09:36:00 |
| 3 | Q.   Did Red Fusion do any work with Gregg | 09:36:01 |
| 4 | Phillips? | 09:36:04 |
| 5 | A.   No. | 09:36:04 |
| 6 | Q.   Did Red Fusion do any work with any of the | 09:36:05 |
| 7 | other defendants that we have discussed? | 09:36:07 |
| 8 | A.   No. | 09:36:09 |
| 9 | Q.   When was Red Fusion founded? | 09:36:09 |
| 10 | MR. YARBROUGH:  So, John, the subpoena | 09:36:16 |
| 11 | was to Red Metrics and the topics were about Red | 09:36:18 |
| 12 | Metrics.  Insofar as there's a relationship between | 09:36:21 |
| 13 | those two things, that's fine, but don't get too far | 09:36:23 |
| 14 | off. | 09:36:28 |
| 15 | MR. LANGFORD:  Yeah, that's fine.  I'm | 09:36:28 |
| 16 | just trying to figure out when Red Fusion took off. | 09:36:29 |
| 17 | Q.   When did Red Fusion incorporate? | 09:36:33 |
| 18 | A.   I think it was -- I think it was '22-ish. | 09:36:35 |
| 19 | Yeah. | 09:36:39 |
| 20 | Q.   And just last question here -- | 09:36:39 |
| 21 | A.   Yeah. | 09:36:39 |
| 22 | Q.   -- did any employees of Red Metrics in the | 09:36:41 |
| 23 | 2020 to 2023 period also work for Red Fusion? | 09:36:43 |
| 24 | A.   No. | 09:36:47 |
| 25 | Q.   Okay.  Can you describe what Red Metrics | 09:36:48 |

CONFIDENTIAL

                                                        Page 38

1    did in the 2020 to 2023 period?                    09:36:53

2              MR. YARBROUGH:  Objection; form.          09:36:56

3         Q.   What business was Red Metrics in in 2020? 09:36:58

4         A.   I'm sorry, ask it one more time.  I was   09:37:05

5    still thinking about the first one.                09:37:08

6         Q.   What business was Red Metrics in in 2020? 09:37:10

7         A.   Data aggregation and some analytics.     09:37:12

8         Q.   What is data aggregation?                09:37:23

9         A.   We looked at geospatial aggregate.  We   09:37:27

10   would bring in large data, like big datasets of    09:37:32

11   geospatial data.                                   09:37:35

12        Q.   Is geospatial data aggregation the same   09:37:38

13   thing as geomarketing?                             09:37:41

14        A.   It's not the same thing.                 09:37:43

15        Q.   Okay.  Can you just describe what         09:37:47

16   geospatial data aggregation is?                    09:37:49

17        A.   Geospatial data is the actual data that   09:37:51

18   you retain.                                        09:37:54

19             Geo -- did you ask me to explain          09:37:57

20   geospatial marketing?                              09:38:00

21             Geospatial marketing then is using that   09:38:01

22   data to -- for messaging purposes.                 09:38:05

23        Q.   And did Red Metrics do both of those      09:38:09

24   things?                                            09:38:11

25        A.   Again, I just want to make sure, are -- is 09:38:14

CONFIDENTIAL

Page 39

```
 1    this related to -- is this related to -- to --      09:38:16
 2         Q.    This is just background.                  09:38:20
 3         A.    -- this or just in -- kind of in general? 09:38:21
 4         Q.    In general.                               09:38:24
 5         A.    Yes.  Yes.  Yes.                          09:38:25
 6         Q.    And you said that geospatial data         09:38:26
 7    aggregation, geomarketing.  Is there -- and you said 09:38:31
 8    analysis.                                            09:38:33
 9         Is there any other kind of analysis work        09:38:35
10    that Red Metrics was engaged in other than           09:38:37
11    geomarketing?                                         09:38:42
12         A.    It's kind of a -- could you define --     09:38:45
13    could you just get a little bit tighter on that      09:38:50
14    definition for me?                                   09:38:53
15         Q.    Yeah.  I'm just trying to ask you what was 09:38:54
16    Red Metrics doing.                                   09:38:56
17         You said you aggregated geospatial data.        09:38:57
18    You did geomarketing.                                09:39:00
19         Did you do anything else?                       09:39:01
20         A.    As it relates to analytics then?          09:39:02
21         Q.    Yeah.                                      09:39:02
22         A.    Okay.  So maybe, like, if you -- the way  09:39:07
23    to maybe understand it, like, simplistically is you  09:39:09
24    have the data aggregation of the geospatial data and 09:39:13
25    you do analytics.  Look at that data.  And then you  09:39:18
```

CONFIDENTIAL

Page 40

```
 1    do the marketing based off of what you -- what those    09:39:22

 2    analytics tell you.                                     09:39:26

 3            Is that -- is that helpful?                     09:39:27

 4        Q.   Is there anything else Red Metrics was         09:39:29

 5    doing at the time?                                      09:39:31

 6        A.   Not that I recall.                             09:39:33

 7        Q.   As part of its work, was Red Metrics           09:39:36

 8    geofencing locations?                                   09:39:39

 9        A.   What do you mean by "geofencing                09:39:44

10    locations"?                                             09:39:46

11        Q.   Why don't you explain to me what is --         09:39:47

12    what exactly did Red Metrics do when it took in         09:39:51

13    geospatial data and it analyzed it?                     09:39:55

14        A.   Can you -- I'm sorry.  Can you -- can you      09:39:59

15    clarify if you are talking about the work that we       09:40:04

16    were doing with OpSec or are you talking in general?    09:40:08

17        Q.   I'm just trying to understand how it works     09:40:12

18    in general.                                             09:40:15

19        A.   Okay.                                          09:40:15

20        Q.   And then we'll talk about how it applies       09:40:15

21    to the work with OpSec.                                 09:40:18

22        A.   Just in general.  Okay.                        09:40:19

23            Sorry, can you say it one more time, the        09:40:20

24    question.                                               09:40:21

25        Q.   Exactly what did Red Metrics do when it        09:40:21
```

CONFIDENTIAL

Page 41

```
 1    took in geospatial data and conducted analysis?        09:40:24

 2         A.    It really would depend on the client.       09:40:31

 3         Q.    And so can you just give us the sort of     09:40:35

 4    range of things Red Metrics was doing?                 09:40:38

 5         A.    Would it help if I gave you kind of an      09:40:43

 6    example?                                               09:40:47

 7         Q.    Sure.                                       09:40:47

 8         A.    The example will not be specific to --      09:40:47

 9         Q.    Sure.                                       09:40:50

10         A.    We do NDAs with all of our clients so       09:40:50

11    nothing in specific.                                   09:40:55

12         Q.    Sure.                                       09:40:56

13         A.    So an example would be we aggregate         09:40:56

14    geospatial data, and a client may -- maybe a client    09:41:00

15    may want -- maybe there's a missing person and there   09:41:08

16    is a -- they know when that person went missing.       09:41:13

17          And so we would be able to look to see --        09:41:18

18    we would possibly be able to identify certain          09:41:25

19    anonymized devices that were in that area, and so we   09:41:27

20    could help identify possible suspects.                 09:41:35

21          Does that -- does that help?  Okay.              09:41:39

22         Q.    Where did you get the geospatial data       09:41:41

23    from?                                                  09:41:44

24               MR. YARBROUGH:  Objection; form.            09:41:44

25         Q.    Did you purchase geospatial data?           09:41:46
```

CONFIDENTIAL

Page 42

| | | |
|---|---|---|
| 1 | A.   Yes. | 09:41:50 |
| 2 | Q.   Is that the primary way that you obtain | 09:41:52 |
| 3 | geospatial data? | 09:41:55 |
| 4 | A.   What do you mean by "primary"? | 09:41:58 |
| 5 | Q.   Is there any other way that you | 09:42:00 |
| 6 | accumulated geospatial data? | 09:42:02 |
| 7 | A.   The geospatial data that we aggregated | 09:42:03 |
| 8 | would be commercially available, if that helps. | 09:42:11 |
| 9 | Q.   And commercially available from whom? | 09:42:15 |
| 10 | A.   I want to be careful.  If I -- if I -- | 09:42:17 |
| 11 | respectfully, I want to be careful because we're | 09:42:23 |
| 12 | starting to get into kind of our IP.  And so the | 09:42:26 |
| 13 | way -- the way that we aggregate is, like -- is | 09:42:30 |
| 14 | our -- it's kind of our secret sauce.  So I want to | 09:42:38 |
| 15 | be careful I don't -- I want to be careful in how | 09:42:41 |
| 16 | much I say there. | 09:42:44 |
| 17 | But it is -- but, again, it is | 09:42:45 |
| 18 | commercially available.  It's readily available for | 09:42:48 |
| 19 | public. | 09:42:51 |
| 20 | Does that answer or not really? | 09:42:53 |
| 21 | Q.   Do you -- do you buy data from vendors? | 09:42:55 |
| 22 | A.   Yes. | 09:42:59 |
| 23 | Q.   And what kind of data are you buying? | 09:42:59 |
| 24 | A.   Geospatial.  So geospatial meaning | 09:43:04 |
| 25 | location based. | 09:43:09 |

CONFIDENTIAL

Page 43

```
 1        Q.   Is this location data based on cell        09:43:13

 2   phones?                                              09:43:20

 3        A.   Primarily.                                 09:43:20

 4        Q.   Is there any other geospatial data that    09:43:22

 5   you're buying?                                       09:43:25

 6        A.   I wouldn't -- I wouldn't word it like      09:43:28

 7   that.                                                09:43:33

 8        Q.   How would you word it?                     09:43:34

 9        A.   We aggregated geospatial data.  The        09:43:35

10   primary data that that -- that comes back from that  09:43:41

11   is mobile -- is -- are anonymized mobile devices.    09:43:44

12        Q.   Is that the kind of data that you used in  09:43:50

13   the work we started to talk about with OpSec?        09:43:53

14        A.   Yes.                                       09:43:58

15        Q.   Was there any other kind of data that you  09:43:58

16   used?                                                09:44:01

17        A.   No, not that I -- we're getting a little   09:44:02

18   bit into more the production side, so I want to      09:44:11

19   be -- I want to be careful because that's not really 09:44:14

20   my expertise.                                        09:44:16

21        Q.   Just to clarify one thing, when -- was Red 09:44:35

22   Metrics mostly doing marketing work in the 2020 to   09:44:39

23   2023 period?                                         09:44:42

24        A.   No.                                        09:44:43

25        Q.   What work was Red Metrics mostly doing?    09:44:47
```

CONFIDENTIAL

Page 44

```
 1        A.   I would -- we were doing marketing work,    09:44:51
 2   but the work that I -- like the example that I gave   09:45:02
 3   you, that's not -- that's not obviously a marketing   09:45:05
 4   side.  And so we were doing a decent amount of        09:45:08
 5   that -- that type of work as well.                    09:45:13
 6        Q.   And was that the primary type of work that  09:45:14
 7   Red Metrics was doing?                                09:45:17
 8        A.   I mean, but when you say "primary," I       09:45:19
 9   don't know that I -- I don't know that I can -- I     09:45:25
10   can't give you a percentage of marketing verse --     09:45:27
11   off the top of my head, I can't give you a            09:45:31
12   percentage of marketing verse more the insights.      09:45:32
13        Q.   Gotcha.                                     09:45:37
14        A.   I want to answer that question but I...     09:45:38
15        Q.   I guess one question for you is how would   09:45:42
16   people find out about Red Metrics, the company?       09:45:46
17        A.   Word of mouth.  So we -- that's it.         09:45:50
18        Q.   And when people called you, what did        09:45:58
19   you -- in the 2020 to 2023 period, what would you     09:46:00
20   tell them Red Metrics was doing as a business?        09:46:04
21        A.   Geospatial data aggregation.               09:46:10
22        Q.   Okay.  So we talked about --                09:46:17
23        A.   And insights probably.                      09:46:21
24        Q.   So the kind of cell data that you used in   09:46:23
25   your work with OpSec, where did you purchase that     09:46:27
```

CONFIDENTIAL

Page 45

| | | |
|---|---|---|
| 1 | from? | 09:46:30 |
| 2 | A.   I -- I don't know that that's worded | 09:46:39 |
| 3 | quite -- I think there's an assumption there that's | 09:46:41 |
| 4 | probably not quite right. | 09:46:44 |
| 5 | Could you -- | 09:46:45 |
| 6 | Q.   How did you get -- | 09:46:45 |
| 7 | A.   -- rephrase that. | 09:46:45 |
| 8 | Q.   -- the cell data that you used in the work | 09:46:46 |
| 9 | for OpSec? | 09:46:49 |
| 10 | A.   Red Metrics has a repository of -- of | 09:46:50 |
| 11 | geolocation -- had a repository of geolocation data. | 09:46:55 |
| 12 | Q.   And how did Red Metrics get that | 09:47:00 |
| 13 | repository? | 09:47:01 |
| 14 | A.   That was -- that was really -- that's | 09:47:04 |
| 15 | really what we were talking about before and how | 09:47:06 |
| 16 | we -- without going into specific vendors, we are | 09:47:08 |
| 17 | purchasing, acquiring commercially available | 09:47:15 |
| 18 | anonymized geolocation data. | 09:47:20 |
| 19 | Q.   Can you tell us who your vendor is? | 09:47:24 |
| 20 | MR. YARBROUGH:  Objection; form. | 09:47:27 |
| 21 | Q.   What vendors did you purchase data from | 09:47:30 |
| 22 | that you put into the Red Metrics repository? | 09:47:33 |
| 23 | MR. YARBROUGH:  Objection; form. | 09:47:41 |
| 24 | So we talked about making sure that no | 09:47:41 |
| 25 | specific trade secret information or commercially | 09:47:43 |

CONFIDENTIAL

Page 46

```
 1    viable information was disclosed.                 09:47:47
 2              If you want to ask him would you give    09:47:48
 3    me a list of typical vendors that people in the space  09:47:50
 4    buy from or list some of the vendors that are    09:47:53
 5    involved in this space, something like that, we're  09:47:55
 6    happy to do that.                                09:47:56
 7              But in terms of the specific plug and    09:47:58
 8    play we bought from this one, this one, and this one,  09:48:01
 9    that's something that the topics explicitly say is  09:48:02
10    out of bounds.                                   09:48:05
11              MR. LANGFORD:  I mean, I think in        09:48:07
12    general that would make sense, but as applied to  09:48:08
13    OpSec, I don't understand why -- yeah, that's     09:48:11
14    obviously relevant to this case.                 09:48:13
15              MR. DAVIDSON:  We're not asking for,     09:48:17
16    like, the generalized --                         09:48:18
17              MR. LANGFORD:  Yeah.                     09:48:18
18              MR. DAVIDSON:  -- information that Red   09:48:20
19    Metrics is, like, purchasing, everything from -- and  09:48:20
20    all of its different contacts.  It's purely, for this  09:48:24
21    project, where did the underlying data come from.  09:48:26
22              MR. YARBROUGH:  Yes.  And we're happy    09:48:31
23    to say these are the types of entities from which  09:48:32
24    that data came from, but we're not going to give you  09:48:35
25    the formula from which we purchased specific pieces  09:48:36
```

CONFIDENTIAL

Page 47

```
 1     of data because that is proprietary.              09:48:38

 2                 One of the things that distinguishes  09:48:40

 3     companies in this space is their ability to select  09:48:41

 4     reliable and good data to begin their process.     09:48:45

 5                 We had talked about this over the      09:48:47

 6     phone.  There's a footnote in the topics themselves  09:48:49

 7     which specifically say we're not disclosing this kind  09:48:51

 8     of proprietary information.                        09:48:54

 9                 MR. LANGFORD:  Let me ask a few        09:48:56

10     questions here, and then we'll come back to this.  09:48:58

11         Q.   Let's ask the first question:  Can you   09:49:00

12     give us a list of the --                           09:49:03

13                 THE WITNESS:  Before you ask that      09:49:03

14     question, can I just have a -- is it possible to do a  09:49:05

15     little side-bar or not?                            09:49:08

16                 MR. LANGFORD:  Yeah, why don't we take  09:49:09

17     a break and we'll come back at the top of the hour.  09:49:10

18     Take a 10-minute break.                            09:49:15

19                 MR. YARBROUGH:  Sounds good.           09:49:16

20                 MR. LANGFORD:  And if you guys want to  09:49:16

21     utilize the breakout room, yeah.                   09:49:16

22                 MR. YARBROUGH:  Thank you.             09:49:18

23                 THE VIDEOGRAPHER:  That concludes      09:49:18

24     Media Number 1.  We're off the record at 9:49 a.m.  09:49:21

25                 (Recess 9:49 a.m. to 9:59 a.m.)        09:49:26
```

CONFIDENTIAL

Page 48

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  This is Media | 09:59:14 |
| 2 | Number 2.  We're back on the record at 9:59 a.m. | 09:59:17 |
| 3 | MR. LANGFORD:  Thank you. | 09:59:19 |
| 4 | Q.   When we left off, we were talking about | 09:59:19 |
| 5 | the kinds of vendors that you might use to acquire | 09:59:21 |
| 6 | geospatial data. | 09:59:26 |
| 7 | Can you just give us a list of the types | 09:59:26 |
| 8 | of vendors that are out there for this data? | 09:59:29 |
| 9 | A.   Those lists are -- are publicly available | 09:59:35 |
| 10 | so you can see even like -- even like the Washington | 09:59:40 |
| 11 | Post and New York Times, like their -- they put | 09:59:45 |
| 12 | lists out there, so most all those lists are very, | 09:59:47 |
| 13 | very prominent in the -- in the public. | 09:59:51 |
| 14 | So you can -- those -- those would easily | 09:59:53 |
| 15 | be obtainable by just doing a quick Google search on | 09:59:57 |
| 16 | here are -- what are location data providers. | 10:00:03 |
| 17 | Q.   Sorry, but can you just give us a list? | 10:00:05 |
| 18 | A.   A list of what? | 10:00:09 |
| 19 | Q.   The kinds of typical vendors -- | 10:00:10 |
| 20 | A.   Kinds? | 10:00:10 |
| 21 | Q.   -- that are used. | 10:00:13 |
| 22 | A.   So if you look at like a -- I want to be | 10:00:14 |
| 23 | careful that I don't give mine -- the way I acquire | 10:00:18 |
| 24 | that data away. | 10:00:24 |
| 25 | Q.   What -- give us -- but let's give -- give | 10:00:27 |

CONFIDENTIAL

Page 49

```
 1    us a list of the kinds of vendors that you acquire      10:00:29

 2    data from.                                               10:00:32

 3         A.   Palantir is a -- is an example.                10:00:32

 4         Q.   And what kinds of data are you acquiring?      10:00:37

 5         A.   Geolocation --                                 10:00:44

 6         Q.   Does that include --                           10:00:44

 7         A.   -- and geospatial.                             10:00:47

 8         Q.   Does that include cell tower data?             10:00:48

 9         A.   It can include cell tower data, yes, sir.      10:00:51

10         Q.   Does that include GPS data?                    10:00:55

11         A.   Yes.                                           10:00:58

12         Q.   Does it include Wi-Fi data?                    10:00:59

13         A.   Yes.                                           10:01:04

14         Q.   Are there any other kinds of data that you     10:01:05

15    acquire?                                                 10:01:08

16         A.   Those are the -- those are the main --         10:01:11

17    those are the main ones that I can -- that I can         10:01:17

18    think of, yes, sir.                                      10:01:18

19         Q.   And is there one of those three kinds of       10:01:19

20    data that predominates in your repository?               10:01:23

21         A.   I wouldn't -- I wouldn't say that.             10:01:29

22         Q.   And exactly what is the cell tower data        10:01:32

23    that you acquire?  What is cell tower data?              10:01:36

24         A.   I'm sorry, when you say what is it, what       10:01:39

25    are you -- I'm not quite sure.                           10:01:41
```

CONFIDENTIAL

Page 50

| | | |
|---|---|---|
| 1 | Q.   Just describe for me what cell tower data | 10:01:42 |
| 2 | is. | 10:01:45 |
| 3 | A.   Cell tower data would just be -- okay. | 10:01:46 |
| 4 | Yeah, it's -- it's geolocation-based data that will | 10:01:50 |
| 5 | typically be tied back to a mobile -- an anonymized | 10:01:54 |
| 6 | mobile device. | 10:02:01 |
| 7 | Is that what you're looking for?  Yeah. | 10:02:02 |
| 8 | Q.   And what is GPS -- the GPS data that you | 10:02:04 |
| 9 | acquire? | 10:02:06 |
| 10 | A.   What is GPS data? | 10:02:09 |
| 11 | Q.   Like, exactly where -- what kind of GPS | 10:02:11 |
| 12 | data are you acquiring? | 10:02:15 |
| 13 | A.   I don't know that -- when you look at, | 10:02:17 |
| 14 | like, geospatial data, I don't know that you would | 10:02:22 |
| 15 | differentiate -- I don't know how you're | 10:02:25 |
| 16 | differentiate -- I differentiate between -- between | 10:02:28 |
| 17 | those two things. | 10:02:29 |
| 18 | Q.   Is the GPS data for cell phones? | 10:02:30 |
| 19 | A.   It can be for cell phones. | 10:02:34 |
| 20 | Q.   What else can it be for? | 10:02:37 |
| 21 | A.   Tablet. | 10:02:38 |
| 22 | Q.   Anything else? | 10:02:42 |
| 23 | A.   GPS -- I'm sorry.  GPS data could be | 10:02:44 |
| 24 | for -- for other things as well, yes. | 10:02:49 |
| 25 | Q.   And do you acquire data from multiple | 10:02:50 |

CONFIDENTIAL

Page 51

| | | |
|---|---|---|
| 1 | kinds of devices? | 10:02:53 |
| 2 | A.   When you say "multiple kinds of devices," | 10:02:56 |
| 3 | would you be saying, like, mobile and tablet? | 10:02:59 |
| 4 | Q.   Yeah. | 10:03:02 |
| 5 | A.   Yes.  You -- you may -- you may not -- | 10:03:03 |
| 6 | sorry.  Go ahead. | 10:03:08 |
| 7 | Q.   No, go for it. | 10:03:09 |
| 8 | A.   I don't know how you differentiate -- you | 10:03:12 |
| 9 | don't typically differentiate. | 10:03:14 |
| 10 | Q.   Differentiate between devices? | 10:03:16 |
| 11 | A.   Yeah. | 10:03:17 |
| 12 | Q.   And then you said you acquire Wi-Fi | 10:03:19 |
| 13 | location data? | 10:03:21 |
| 14 | A.   Yes, sir. | 10:03:26 |
| 15 | Q.   And what does -- what does that data show? | 10:03:27 |
| 16 | A.   This -- this data is all geospatial.  So I | 10:03:30 |
| 17 | feel like maybe you're trying to differentiate -- | 10:03:39 |
| 18 | I'm not -- there's not a lot of -- there's not | 10:03:42 |
| 19 | really differentiation. | 10:03:44 |
| 20 | Q.   So the Wi-Fi data shows where the Wi-Fi | 10:03:45 |
| 21 | user is located? | 10:03:49 |
| 22 | A.   So the geospatial data will have -- is -- | 10:03:50 |
| 23 | will be location based. | 10:03:56 |
| 24 | Q.   What does that mean? | 10:03:59 |
| 25 | A.   It means that it will have a lat/long data | 10:04:00 |

CONFIDENTIAL

Page 52

```
1    attached to that.                                    10:04:06

2        Q.   But it doesn't necessarily mean that the    10:04:07

3    person is located at that lat/long?                  10:04:09

4            MR. YARBROUGH:  Objection; form.             10:04:14

5        Q.   You can answer the question.                10:04:15

6        A.   I would -- I'm going to -- I'm starting to  10:04:17

7    get into an area that's not -- that I'm not an       10:04:20

8    expert at.  That's more on the -- on the production  10:04:23

9    side.  So I want to be careful that I don't -- I     10:04:25

10   don't give bad information.                          10:04:28

11       Q.   Okay.                                       10:04:30

12       A.   Is that fair?                               10:04:31

13       Q.   But your understanding is that Red Metrics  10:04:32

14   buys data that primarily consists of cell tower      10:04:34

15   data, Wi-Fi data, and GPS data?                      10:04:38

16           MR. YARBROUGH:  Objection; form.             10:04:42

17       Q.   You can answer the question.                10:04:43

18       A.   I think that's probably not the best        10:04:45

19   definition, but I think -- I think you could say     10:04:49

20   that that is accurate.                               10:04:53

21       Q.   And do you buy some of this data from data  10:04:54

22   brokers?                                             10:04:59

23           MR. YARBROUGH:  Objection; form.             10:05:01

24       Q.   You can answer the question.                10:05:03

25       A.   Yes.                                        10:05:05
```

CONFIDENTIAL

Page 53

```
 1        Q.   And do you buy some of this data directly    10:05:05

 2   from cell phone companies?                             10:05:07

 3        A.   No.                                          10:05:10

 4        Q.   Other than Palantir, is there any other      10:05:12

 5   typical vendor in this space that you might buy that   10:05:15

 6   kind of data from?                                     10:05:18

 7        A.   I think Palantir is probably a good          10:05:19

 8   example -- best example that I can think of.  And,     10:05:22

 9   again, you know, I'm a little bit in my -- this        10:05:27

10   isn't my expertise on it.                              10:05:30

11        Q.   So let's get into topic 1 of the subpoena,   10:05:32

12   which is:  Your efforts with, for, or on behalf of     10:05:37

13   any defendant (or their agents or employees,           10:05:41

14   including but not limited to OpSec Group) to collect   10:05:43

15   and/or analyze geospatial data and/or to conduct       10:05:46

16   and/or analyze geofencing.                             10:05:49

17        A.   Okay.                                        10:05:52

18        Q.   Before we get to Mr. Phillips and OpSec,     10:05:54

19   to confirm, none of the following requested anything   10:06:01

20   from Red Metrics:  Dinesh D'Souza, D'Souza Media,      10:06:07

21   Salem Media Group, Regnery Publishing; is that         10:06:11

22   correct?                                               10:06:17

23        A.   Correct.  Yes.                               10:06:17

24        Q.   Setting aside Gregg Phillips and OpSec for   10:06:21

25   a minute, did Catherine Engelbrecht request anything   10:06:23
```

CONFIDENTIAL

Page 54

```
 1    from Red Metrics directly?                        10:06:27

 2         A.   No.                                      10:06:29

 3         Q.   Did True the Vote, through some other    10:06:31

 4    person, request anything directly from Red Metrics? 10:06:35

 5         A.   No.                                      10:06:38

 6         Q.   You said you met Ms. Engelbrecht through a 10:06:41

 7    conversation with Mr. Phillips?                    10:06:45

 8         A.   Yes, sir.                                10:06:47

 9         Q.   Roughly how many times did you talk to   10:06:48

10    Ms. Engelbrecht?                                   10:06:51

11         A.   That is the only time I have ever talked 10:06:53

12    to her that I can recall.                          10:06:57

13         Q.   Just one time?                           10:06:59

14         A.   Yes, sir.                                10:07:00

15         Q.   And what did you discuss with her?       10:07:01

16         A.   This was -- this -- I want to be careful 10:07:08

17    because it's two-plus years ago, and so what I     10:07:12

18    recall from the conversation is that they were     10:07:17

19    looking to start a new business venture.           10:07:20

20         Q.   And was that business venture related to 10:07:27

21    the work that Red Metrics did trying to locate     10:07:32

22    individuals who allegedly engaged in election fraud 10:07:39

23    in 2020?                                           10:07:42

24              MR. YARBROUGH:  Objection; form.         10:07:44

25         Q.   You can answer the question.             10:07:44
```

Page 55

```
 1        A.   I'm going to -- I'm going to ask you to --   10:07:47

 2   just to articulate that one more time.  I just want   10:07:49

 3   to make sure I capture it and answer it right.        10:07:51

 4        Q.   Was the new venture that Ms. Engelbrecht    10:07:57

 5   discussed related to the work that Red Metrics did    10:08:00

 6   with Mr. Phillips and OpSec about election --         10:08:05

 7   alleged election fraud in the 2020 election?          10:08:09

 8        A.   Yeah --                                     10:08:12

 9             MR. YARBROUGH:  Same objection.             10:08:12

10        Q.   You can answer.                             10:08:14

11        A.   -- I'm going to -- I'm going to -- I think  10:08:15

12   there's a -- no, it did not have to do with the work  10:08:20

13   that we did.                                          10:08:24

14        Q.   Did it relate to election fraud in the     10:08:27

15   2020 election?                                        10:08:29

16        A.   As I recall, yes -- I'm sorry, on the --    10:08:30

17   say it again, on the twenty...                        10:08:34

18        Q.   '20 election.                               10:08:36

19        A.   Possibly.                                   10:08:40

20        Q.   Did you discuss -- when I say              10:08:42

21   "2000 Mules," do you understand that I'm talking      10:08:47

22   about the alleged election fraud that Mr. Phillips    10:08:49

23   claims happened in the 2020 election?                 10:08:55

24             MR. YARBROUGH:  Objection; form.            10:08:59

25        Q.   You can answer the question.                10:09:00
```

CONFIDENTIAL

Page 56

```
 1        A.   Yeah.                                      10:09:01

 2        Q.   Did you talk --                            10:09:02

 3        A.   Yes.                                        10:09:02

 4        Q.   -- with Ms. Engelbrecht about the          10:09:03

 5   2000 Mules narrative?                                10:09:05

 6        A.   I -- I don't remember that being a topic   10:09:15

 7   with Ms. Engelbrecht.                                10:09:19

 8        Q.   Did you -- you said you only spoke with    10:09:22

 9   Catherine one time.                                  10:09:26

10        A.   Yeah.                                       10:09:27

11        Q.   I believe you testified that was a phone   10:09:27

12   call?                                                10:09:29

13             MR. YARBROUGH:   Objection; form.          10:09:31

14        Q.   You can answer the question.               10:09:32

15        A.   With -- with?                               10:09:34

16        Q.   Ms. Engelbrecht.                            10:09:35

17        A.   No, that was at -- it was at --            10:09:36

18   face-to-face.                                        10:09:38

19        Q.   And where did you meet her face-to-face?  10:09:42

20        A.   I think it was -- I think it was in        10:09:42

21   Austin.  It was in Greater Austin.  Austin.  I can't 10:09:46

22   remember exactly what suburb it was.                 10:09:53

23        Q.   And was there an event that you attended   10:09:57

24   in Austin?                                           10:09:59

25        A.   It seems like I was down there for an      10:09:59
```

CONFIDENTIAL

Page 57

| | | |
|---|---|---|
| 1 | event, but I cannot recall -- I can't recall if it | 10:10:07 |
| 2 | was -- I can't recall if there was an event there. | 10:10:10 |
| 3 | Q.   Okay.  Did you ever speak with | 10:10:12 |
| 4 | Catherine -- let me strike that and ask a different | 10:10:16 |
| 5 | question. | 10:10:19 |
| 6 | A.   Yeah.  Yeah. | 10:10:19 |
| 7 | Q.   Did you attend a premier event for the | 10:10:20 |
| 8 | 2000 Mules movie? | 10:10:23 |
| 9 | A.   Yes. | 10:10:25 |
| 10 | Q.   Was Ms. Engelbrecht there? | 10:10:26 |
| 11 | A.   Yes. | 10:10:28 |
| 12 | Q.   Did you speak with her? | 10:10:29 |
| 13 | A.   No. | 10:10:30 |
| 14 | Q.   Let's go back to Mr. Phillips. | 10:10:36 |
| 15 | A.   Yes. | 10:10:38 |
| 16 | Q.   You said you first met him in 2020? | 10:10:38 |
| 17 | A.   Yeah.  Yes.  Sorry. | 10:10:41 |
| 18 | Q.   Do you know him in a personal capacity at | 10:10:46 |
| 19 | this point? | 10:10:48 |
| 20 | A.   Oh, as of today?  I would say no.  No. | 10:10:50 |
| 21 | Q.   Would you describe your relationship as | 10:10:58 |
| 22 | primarily a business relationship? | 10:10:59 |
| 23 | A.   Yes. | 10:11:01 |
| 24 | Q.   Okay.  So Mr. Phillips called you in 2020. | 10:11:03 |
| 25 | What did he -- what did he call you about? | 10:11:08 |

CONFIDENTIAL

Page 58

| | | |
|---|---|---|
| 1 | A.   This was -- this -- he called about -- he | 10:11:14 |
| 2 | was working with law enforcement, and he was asking | 10:11:18 |
| 3 | if we could help in that capacity on possible voter | 10:11:23 |
| 4 | fraud, identify anonymous devices that would be of | 10:11:29 |
| 5 | interest regarding voter fraud in order to work with | 10:11:33 |
| 6 | law enforcement. | 10:11:36 |
| 7 | Q.   And when you say "law enforcement," what | 10:11:36 |
| 8 | law enforcement exactly? | 10:11:38 |
| 9 | A.   As I recall, it was Georgia Bureau of | 10:11:39 |
| 10 | Investigation. | 10:11:47 |
| 11 | Q.   And when you say "working with," what do | 10:11:47 |
| 12 | you mean he was working with the Georgia Bureau of | 10:11:48 |
| 13 | Investigation? | 10:11:54 |
| 14 | A.   I understood that there was a | 10:11:54 |
| 15 | public-private initiative in order to make sure that | 10:12:00 |
| 16 | there is voter integrity and that there was voter | 10:12:05 |
| 17 | integrity. | 10:12:09 |
| 18 | Q.   What was the public-private initiative? | 10:12:09 |
| 19 | A.   Sorry. | 10:12:13 |
| 20 | Q.   What was the public-private initiative? | 10:12:13 |
| 21 | A.   Again, that's my term.  So I don't know of | 10:12:14 |
| 22 | anything official.  I just knew -- Mr. Phillips | 10:12:17 |
| 23 | said, Hey, we are working with this bureau, and we | 10:12:22 |
| 24 | are looking into possible voter integrity issues, | 10:12:28 |
| 25 | and would you be able to assist -- | 10:12:32 |

CONFIDENTIAL

Page 59

| | | |
|---|---|---|
| 1 | Q.    And when -- | 10:12:32 |
| 2 | A.    -- with that effort.  Sorry.  That was it. | 10:12:35 |
| 3 | Q.    When he said "we," who did you understand | 10:12:39 |
| 4 | him to be referring to? | 10:12:41 |
| 5 | A.    OpSec.  Yeah. | 10:12:42 |
| 6 | Q.    Did he say anything about the nature of | 10:12:48 |
| 7 | the work with Georgia Bureau of Investigations? | 10:12:50 |
| 8 | A.    What do you mean by "the nature"? | 10:12:54 |
| 9 | Q.    Did he describe it as official or | 10:12:56 |
| 10 | unofficial? | 10:12:58 |
| 11 | A.    I -- I don't -- I don't know nor do I even | 10:13:00 |
| 12 | quite know how I would -- how that would be | 10:13:08 |
| 13 | differentiated -- like how you define the unofficial | 10:13:09 |
| 14 | or official. | 10:13:13 |
| 15 | Q.    Did he refer it to as unofficial? | 10:13:13 |
| 16 | A.    No, not that I -- I don't -- I don't | 10:13:16 |
| 17 | recall him referring to it as official or | 10:13:19 |
| 18 | unofficial. | 10:13:22 |
| 19 | Q.    Did you ever speak with anyone at the | 10:13:23 |
| 20 | Georgia Bureau of Investigations? | 10:13:24 |
| 21 | A.    No. | 10:13:26 |
| 22 | Q.    Did anyone at Red Metrics speak with the | 10:13:27 |
| 23 | Georgia Bureau of Investigations? | 10:13:30 |
| 24 | A.    No. | 10:13:32 |
| 25 | Q.    Were you the first person that | 10:13:33 |

CONFIDENTIAL

Page 60

```
 1   Mr. Phillips called at Red Metrics?                 10:13:38

 2        A.   I would -- I would imagine so.  I would   10:13:40

 3   think so.                                           10:13:45

 4        Q.   Are you aware of any other calls before he 10:13:47

 5   called you?                                         10:13:49

 6        A.   No.                                        10:13:50

 7        Q.   So describe the conversation you had with  10:13:54

 8   Mr. Phillips.                                       10:14:00

 9        A.   Is that -- the same one we were just      10:14:00

10   talking about?                                      10:14:03

11             Oh, he called, said that they are working 10:14:06

12   with law enforcement, Georgia Bureau of             10:14:08

13   Investigation, on possible voter fraud in the       10:14:12

14   election and asked if we would have the capability  10:14:17

15   and interest to be able to assist in that.          10:14:20

16        Q.   And what did you tell him?                10:14:23

17        A.   I told him that voter integrity is        10:14:24

18   foundational to our election system and that we     10:14:32

19   would be interested in helping law enforcement give 10:14:37

20   them any information that we could -- that we could. 10:14:42

21        Q.   And how did he respond?                   10:14:47

22        A.   Affirmatively, like, positively.          10:14:50

23        Q.   Did you talk about specific work to be    10:14:54

24   done?                                               10:14:57

25        A.   Like outside of -- of the -- that big --  10:14:57
```

CONFIDENTIAL

Page 61

| | | |
|---|---|---|
| 1 | that scope that I just described are you saying? | 10:15:05 |
| 2 | Like, I just want to make sure I understand what | 10:15:08 |
| 3 | you're asking. | 10:15:10 |
| 4 | Q.   Did you talk -- did you talk about the | 10:15:11 |
| 5 | specifics of the kind of work Red Metrics would do? | 10:15:14 |
| 6 | A.   Just other than, I mean, simply saying | 10:15:20 |
| 7 | this is what our capabilities are. | 10:15:25 |
| 8 | Q.   And how did you describe that to him on | 10:15:27 |
| 9 | that call? | 10:15:30 |
| 10 | A.   That we aggregate geospatial data and we | 10:15:30 |
| 11 | can do analysis on -- on that. | 10:15:35 |
| 12 | Q.   And did you go into detail about the kind | 10:15:38 |
| 13 | of analysis that you could do? | 10:15:41 |
| 14 | A.   Simply that we would be able provide | 10:15:42 |
| 15 | anonymized geospatial data that could be a lead | 10:15:48 |
| 16 | source.  We don't do investigation.  We don't do | 10:15:57 |
| 17 | intelligence.  We don't do that. | 10:16:00 |
| 18 | But if -- if law enforcement would need | 10:16:03 |
| 19 | a -- a high level -- like, if you look at it as like | 10:16:06 |
| 20 | a sales funnel or an investigation funnel, we could | 10:16:12 |
| 21 | provide leads at the top of that that could be -- | 10:16:15 |
| 22 | that they could -- they could then do investigation | 10:16:18 |
| 23 | on or decide if they want to do investigation on. | 10:16:21 |
| 24 | Q.   And did you tell him that you don't do | 10:16:25 |
| 25 | investigations and you don't do that kind of work on | 10:16:29 |

CONFIDENTIAL

Page 62

```
 1   that call?                                    10:16:32

 2              MR. YARBROUGH:  Objection; form.    10:16:34

 3        Q.   You can answer the question.         10:16:35

 4        A.   Yes.  He -- on that call -- I can't  10:16:36

 5   remember the exact words on that call, but I -- 10:16:43

 6   he -- he would know -- he knows that and we have -- 10:16:45

 7   and I did express that for sure.  He -- he     10:16:49

 8   understands that lane very well.               10:16:51

 9        Q.   Did you explain any potential inaccuracies 10:16:55

10   in the kind of analysis that Red Metrics might do? 10:17:02

11        A.   Sure.                                10:17:05

12        Q.   How did you explain those inaccuracies to 10:17:06

13   him?                                           10:17:08

14        A.   I'm starting to get into a little bit of 10:17:11

15   where my expertise is not, and so I can -- I can 10:17:15

16   give you kind of a high level.  But if you --  10:17:20

17        Q.   I'm just asking what you said to     10:17:22

18   Mr. Phillips in terms of the inaccuracies.     10:17:25

19        A.   I would say that Tim is probably the 10:17:27

20   better person -- would be the person that would 10:17:32

21   explain those inaccuracies.  I can give you    10:17:35

22   secondhand.                                    10:17:38

23        Q.   And was the conversation just you and 10:17:39

24   Mr. Phillips or was Tim on that call?          10:17:44

25        A.   Like I was saying earlier, I don't   10:17:46
```

CONFIDENTIAL

Page 63

```
1    remember exactly how that -- how that communication    10:17:50

2    was.  And I can't remember if it was -- if Tim was    10:17:52

3    on that call or not.  It would be common for -- on a    10:17:56

4    call like that, it would be common that we would    10:18:01

5    both handle that, but I just -- I just can't quite    10:18:03

6    remember.                                             10:18:05

7         Q.  Can you remember if anyone else was on the    10:18:06

8    call?                                                 10:18:08

9         A.  No one, no.  No one else would have been    10:18:08

10   on that call.                                         10:18:12

11        Q.  Did Mr. Phillips tell you how he found out    10:18:14

12   about Red Metrics?                                    10:18:17

13        A.  Yes.                                         10:18:21

14        Q.  And how did he find out about Red Metrics?    10:18:23

15        A.  He -- as I recall, he said that some of    10:18:26

16   his law enforcement relationships gave us his --    10:18:32

17   gave him -- gave him our information.                 10:18:39

18        Q.  Did he say which law enforcement    10:18:43

19   relationships?                                        10:18:44

20        A.  No.                                          10:18:45

21        Q.  Going back to the inaccuracies --    10:18:47

22        A.  Yeah.                                        10:18:47

23        Q.  -- you said that you did explain that    10:18:49

24   there could be inaccuracies to Mr. Phillips?          10:18:50

25        A.  I don't recall the exact conversation.    10:18:53
```

CONFIDENTIAL

Page 64

| | | |
|---|---|---|
| 1 | I'm positive that Tim goes -- I'm positive Tim goes | 10:18:55 |
| 2 | into that, and I could explain that at a high level. | 10:19:00 |
| 3 | I just can't quite remember the exact conversation. | 10:19:04 |
| 4 | Q.   Explain at a high level the kinds of | 10:19:06 |
| 5 | inaccuracies. | 10:19:09 |
| 6 | A.   So when you get -- when you aggregate | 10:19:10 |
| 7 | geospatial data, you clean that data.  And so | 10:19:14 |
| 8 | there -- again, this is much better for Tim.  He can | 10:19:18 |
| 9 | explain it much better. | 10:19:21 |
| 10 | But there will be what -- there will be | 10:19:23 |
| 11 | inaccurate data in there, and you can tell that | 10:19:24 |
| 12 | through your analytics.  You can -- you can pull | 10:19:27 |
| 13 | that inaccurate data out of there. | 10:19:29 |
| 14 | The other side of that is -- does that -- | 10:19:31 |
| 15 | does that help? | 10:19:35 |
| 16 | Q.   The other side of that is what? | 10:19:38 |
| 17 | A.   The other side of that is when you look at | 10:19:39 |
| 18 | geospatial data, you can usually tell -- and, again, | 10:19:43 |
| 19 | Tim is -- will be much better explaining this. | 10:19:48 |
| 20 | But you can usually tell -- it will tell | 10:19:51 |
| 21 | you how accurate it is and how far -- how large of a | 10:19:55 |
| 22 | discrepancy there may be in the -- in the reading. | 10:19:59 |
| 23 | Q.   Did you provide any kind of warning to | 10:20:03 |
| 24 | Mr. Phillips that you couldn't prove to a certainty | 10:20:06 |
| 25 | that someone was in a location at a particular time? | 10:20:08 |

Page 65

| | | |
|---|---|---|
| 1 | A.   I think you might be assuming just -- can | 10:20:14 |
| 2 | I clarify an assumption if that's all right? | 10:20:16 |
| 3 | Yes.  But, again, you have got to -- in | 10:20:19 |
| 4 | context, what we were providing to Mr. Phillips was | 10:20:23 |
| 5 | a high-level lead list that needed to be put through | 10:20:28 |
| 6 | a funnel from law enforcement for investigation and | 10:20:34 |
| 7 | intelligence work. | 10:20:38 |
| 8 | Q.   And why would it need to be put through a | 10:20:39 |
| 9 | funnel? | 10:20:42 |
| 10 | A.   Well, because we were not looking at | 10:20:42 |
| 11 | the -- the type of geospatial data that we were | 10:20:44 |
| 12 | looking at, you -- you don't know -- you have to -- | 10:20:47 |
| 13 | you know that that would be there but you don't know | 10:20:53 |
| 14 | the purpose it would be there. | 10:20:55 |
| 15 | Q.   What do you mean by that? | 10:20:57 |
| 16 | A.   So if you look at, as an -- can I give you | 10:20:59 |
| 17 | an example? | 10:21:02 |
| 18 | Q.   Yeah. | 10:21:02 |
| 19 | A.   Does that make sense? | 10:21:03 |
| 20 | So if you look at a -- at a drop box, for | 10:21:05 |
| 21 | example, and you're looking at a location of a drop | 10:21:09 |
| 22 | box, that drop box could be next to a post office. | 10:21:12 |
| 23 | Well, that -- that -- a person may be | 10:21:21 |
| 24 | picking up their mail every week, and so you're | 10:21:25 |
| 25 | looking at a person that visits a drop box many | 10:21:30 |

CONFIDENTIAL

Page 66

```
 1    times.                                               10:21:34

 2             And so the data of interest would be, hey,  10:21:35

 3    here is a -- here is an anonymized mobile device     10:21:38

 4    that visits this drop box frequently.  Well, that    10:21:43

 5    would be a lead for law enforcement, but there's no  10:21:48

 6    intelligence that has been done on that lead.        10:21:54

 7        Q.   And when you say "there's no intelligence   10:21:57

 8    that has been done on that lead," does that mean Red 10:21:59

 9    Metrics doesn't do any intelligence beyond that      10:22:03

10    lead?                                                10:22:05

11        A.   That's correct.                             10:22:06

12        Q.   And did you explain some version of that    10:22:07

13    to Mr. Phillips?                                     10:22:12

14        A.   Yes.  Mr. -- Mr. Phillips understands       10:22:12

15    that, yes, well.                                     10:22:17

16        Q.   So you yourself wouldn't be comfortable     10:22:19

17    saying just because we have this geospatial data, we 10:22:23

18    know for a certainty that someone was dropping off   10:22:26

19    multiple ballots at this drop box at that time?      10:22:30

20             MR. YARBROUGH:  Objection; form.            10:22:34

21        Q.   You can answer the question.                10:22:35

22        A.   I'm going to ask you just to add kind of    10:22:38

23    proper nouns into that.                              10:22:41

24             Can you say it one more time?               10:22:42

25        Q.   You --                                      10:22:45
```

CONFIDENTIAL

Page 67

| | | |
|---|---|---|
| 1 | A.   Red Metrics. | 10:22:45 |
| 2 | Q.   -- Red Metrics, wouldn't be comfortable | 10:22:47 |
| 3 | saying that just because geospatial data shows an | 10:22:50 |
| 4 | anonymized user as being at a particular location at | 10:22:54 |
| 5 | a particular time that they were engaged in election | 10:22:59 |
| 6 | fraud? | 10:23:02 |
| 7 | A.   Correct. | 10:23:03 |
| 8 | Q.   And why not? | 10:23:05 |
| 9 | A.   There's -- what Red Metrics does is | 10:23:08 |
| 10 | provide data of interest.  And it is -- that is -- | 10:23:13 |
| 11 | that data is very high level just saying, hey, there | 10:23:17 |
| 12 | was a anonymized device of some type that was at | 10:23:21 |
| 13 | this location.  That's not intelligence; that's | 10:23:25 |
| 14 | data. | 10:23:29 |
| 15 | Q.   And you said Mr. Phillips understands | 10:23:30 |
| 16 | this? | 10:23:32 |
| 17 | MR. YARBROUGH:  Objection. | 10:23:35 |
| 18 | MR. EVANS:  Object to form. | 10:23:37 |
| 19 | Q.   You can answer the question. | 10:23:41 |
| 20 | A.   I -- I would say that Mr. Phillips | 10:23:43 |
| 21 | understands that there's a funnel there. | 10:23:45 |
| 22 | Q.   And what is the basis for that belief? | 10:23:47 |
| 23 | Let me rephrase that to be very clear. | 10:23:54 |
| 24 | A.   Okay. | 10:23:56 |
| 25 | Q.   What is the basis for your understanding | 10:23:56 |

CONFIDENTIAL

Page 68

```
 1   that Mr. Phillips understands that there is a funnel   10:23:58

 2   there?                                                 10:24:02

 3       A.   Mr. Phillips is very intelligent and          10:24:02

 4   understands this -- understands the data space well.   10:24:14

 5       Q.   So the first conversation was a phone         10:24:21

 6   call?                                                  10:24:26

 7       A.   I believe.                                    10:24:29

 8       Q.   Did you hash out the particulars of the       10:24:35

 9   kind of work Red Metrics would do on that call?        10:24:37

10       A.   I cannot remember where those -- I cannot     10:24:42

11   remember exactly what -- what was hashed out on        10:24:49

12   that.                                                  10:24:53

13       Q.   And then did Mr. Phillips explain to you      10:24:56

14   that -- whether he had a belief that there was         10:25:01

15   election fraud on that phone call?                     10:25:03

16       A.   As I recall -- as I recall, he did have a     10:25:08

17   belief that there was election fraud.                  10:25:15

18       Q.   What did he say, to the best of your          10:25:17

19   recollection?                                          10:25:20

20       A.   I don't -- I don't recall that he went        10:25:21

21   into detail on how any of it happened.  I believe he   10:25:29

22   just expressed that there -- that he believed that     10:25:35

23   there was fraud.                                       10:25:38

24       Q.   And that was before Red Metrics had done      10:25:39

25   any analysis?                                          10:25:42
```

CONFIDENTIAL

Page 69

```
 1              MR. YARBROUGH:  Object to form.        10:25:45

 2       Q.   You can answer the question.             10:25:46

 3       A.   This was my -- yeah, this was early on,  10:25:47

 4  yes.  Yes, sir.                                     10:25:51

 5       Q.   And did Red Metrics agree, ultimately, to 10:25:52

 6  work with Mr. Phillips and OpSec?                    10:25:57

 7       A.   Yes.                                      10:25:59

 8       Q.   And how did -- how did that happen?       10:26:00

 9       A.   How did it happen that we agreed?         10:26:04

10       Q.   Yeah, if you can just describe the        10:26:06

11  communications that led to you --                   10:26:08

12       A.   Oh.                                       10:26:08

13       Q.   -- working with Mr. Phillips.             10:26:11

14       A.   I think -- as I recall, again, it was all 10:26:12

15  based around law enforcement and his work with law   10:26:20

16  enforcement.  And so what I understood is that law   10:26:24

17  enforcement was looking to have a -- lead sources    10:26:31

18  that we needed to -- if there were -- if there was   10:26:34

19  data of interest, that -- and that we could provide  10:26:38

20  that, that they would be interested to -- to         10:26:40

21  leverage that and use that for -- to investigate.    10:26:43

22       Q.   Did Mr. Phillips mention anything about   10:26:51

23  "mules" on that call?                                10:26:54

24       A.   No.                                       10:26:56

25       Q.   Did he mention anything about ballot      10:26:57
```

CONFIDENTIAL

Page 70

```
 1   harvesting?                                      10:27:01

 2       A.   Not that I recall.                      10:27:02

 3       Q.   Did he have a theory about what you might 10:27:08

 4   find if you did the analysis?                    10:27:11

 5             MR. YARBROUGH:  Object to form.         10:27:13

 6       Q.   You can answer the question.            10:27:14

 7       A.   Say it one more time.  Sorry.           10:27:15

 8       Q.   Did he have a theory about what you might 10:27:16

 9   find if you did the analysis?                    10:27:18

10       A.   I don't recall that.  I don't recall that. 10:27:20

11   I'm sorry.  Say it one more time, just make sure I'm 10:27:27

12   hearing it right.                                10:27:30

13       Q.   Did Mr. Phillips offer a theory about what 10:27:32

14   you might find once Red Metrics did its analysis? 10:27:35

15       A.   I can't remember that.  I don't remember 10:27:40

16   that he did.  Sorry.                             10:27:44

17       Q.   So when would you -- when did Red Metrics 10:27:48

18   enter into an agreement with -- let me lay the   10:27:52

19   foundation for that.  I'm sorry.                 10:27:54

20             Did Red Metrics at some point enter into 10:27:55

21   an agreement with Mr. Phillips to do work for    10:27:57

22   Mr. Phillips and OpSec?                          10:27:59

23       A.   Yes.                                    10:27:59

24       Q.   Was that a contract?                    10:28:01

25       A.   Yes.                                    10:28:02
```

CONFIDENTIAL

Page 71

| | | |
|---|---|---|
| 1 | Q.   And when would that have been executed? | 10:28:04 |
| 2 | A.   That would have been December of 2020. | 10:28:08 |
| 3 | Q.   And did Mr. Phillips and OpSec pay Red | 10:28:10 |
| 4 | Metrics for that work? | 10:28:16 |
| 5 | A.   Yes. | 10:28:19 |
| 6 | Q.   And did they pay that all up front? | 10:28:17 |
| 7 | A.   I -- not that I -- I don't think so.  No, | 10:28:20 |
| 8 | I don't think so. | 10:28:26 |
| 9 | Q.   Does -- | 10:28:28 |
| 10 | A.   I'm sure they didn't. | 10:28:29 |
| 11 | Q.   Have you seen the contract that was | 10:28:30 |
| 12 | executed? | 10:28:33 |
| 13 | A.   Well, I executed the contract. | 10:28:33 |
| 14 | Q.   Do you still have a copy of the contract? | 10:28:37 |
| 15 | A.   No.  That's what I was looking for. | 10:28:40 |
| 16 | Q.   Does Red Metrics have a copy of the | 10:28:44 |
| 17 | contract? | 10:28:46 |
| 18 | A.   No. | 10:28:46 |
| 19 | Q.   How would you have shared the contract | 10:28:47 |
| 20 | with Mr. Phillips? | 10:28:49 |
| 21 | A.   I would -- I would guess that we would | 10:28:53 |
| 22 | have -- the way we typically do that is goes through | 10:28:57 |
| 23 | our -- that platform, that Wire platform. | 10:29:01 |
| 24 | Q.   Did you email the contract to | 10:29:05 |
| 25 | Mr. Phillips? | 10:29:07 |

CONFIDENTIAL

Page 72

```
 1        A.   Not that I recall.  We -- not that I      10:29:08

 2   recall.  It could have happened.  I just -- I      10:29:12

 3   don't -- typically we would push communication     10:29:18

 4   through that messaging platform.                    10:29:20

 5        Q.   In general, did Red Metrics keep copies of  10:29:23

 6   its contracts with clients?                         10:29:27

 7        A.   We keep copies of everything until the   10:29:32

 8   client is inactive.                                 10:29:35

 9        Q.   And when --                               10:29:38

10        A.   So -- I'm sorry.                          10:29:39

11        Q.   Go ahead.                                 10:29:41

12        A.   So through -- so, like, through that      10:29:41

13   engagement, we would have -- we would have had     10:29:42

14   everything.                                         10:29:44

15        Q.   And what happens at the end of the       10:29:45

16   engagement?                                         10:29:47

17        A.   We have a data retention policy, and we  10:29:47

18   purge all -- everything related to an inactive     10:29:51

19   client.                                             10:29:56

20        Q.   And that includes the contract?          10:29:56

21        A.   Everything, yes, sir.  Which is -- yeah.  10:29:57

22   I went back to that -- that -- the platform that we  10:30:01

23   store data -- documents on and nothing was there.  10:30:08

24        Q.   Do you know when that would have happened  10:30:14

25   for Mr. Phillips and OpSec for the work we have been  10:30:16
```

CONFIDENTIAL

Page 73

| | | |
|---|---|---|
| 1 | discussing? | 10:30:20 |
| 2 | A.   When what would have happened? | 10:30:20 |
| 3 | Q.   When you would have purged -- | 10:30:22 |
| 4 | A.   Oh. | 10:30:22 |
| 5 | Q.   -- the data. | 10:30:23 |
| 6 | A.   We usually purge -- we usually purge | 10:30:24 |
| 7 | pretty quick, but -- so probably -- probably in '22, | 10:30:29 |
| 8 | I would guess. | 10:30:36 |
| 9 | Do you want me to repeat that? | 10:30:53 |
| 10 | Q.   Does the purge include checks -- copies of | 10:30:56 |
| 11 | checks that clients make out to you? | 10:31:00 |
| 12 | A.   We don't -- we don't get checks. | 10:31:05 |
| 13 | Q.   How did -- how do clients pay Red Metrics? | 10:31:09 |
| 14 | A.   Usually -- usually wire. | 10:31:13 |
| 15 | Q.   Is that how Mr. Phillips would have paid? | 10:31:14 |
| 16 | A.   Yeah, sorry, usually wire transfers, not | 10:31:16 |
| 17 | to get confused with the other Wire. | 10:31:18 |
| 18 | Q.   How did Mr. Phillips pay for the work that | 10:31:21 |
| 19 | Red Metrics did with OpSec? | 10:31:23 |
| 20 | A.   I assume that he paid via wire transfer. | 10:31:24 |
| 21 | Q.   And does Red Metrics keep bank records? | 10:31:32 |
| 22 | A.   We don't keep any hard copies of bank | 10:31:39 |
| 23 | records, no. | 10:31:43 |
| 24 | Q.   Does Red Metrics have access to bank | 10:31:44 |
| 25 | records? | 10:31:46 |

CONFIDENTIAL

Page 74

| | | |
|---|---|---|
| 1 | A.   I'm sure we do.  Yes, I'm sure we do. | 10:31:47 |
| 2 | Yeah. | 10:31:50 |
| 3 | Q.   Red Metrics doesn't purge bank records? | 10:31:51 |
| 4 | A.   No.  Not -- no, if they're -- if they're | 10:31:54 |
| 5 | available, I assume that we have -- I assume that we | 10:31:58 |
| 6 | have bank records that are available online, like | 10:32:02 |
| 7 | digital bank records I would assume. | 10:32:06 |
| 8 | Q.   Would there have been any other records | 10:32:08 |
| 9 | related to that transaction that Red Metrics still | 10:32:11 |
| 10 | has copies of? | 10:32:13 |
| 11 | A.   No, I -- no. | 10:32:17 |
| 12 | Q.   Let's go back to the contract. | 10:32:20 |
| 13 | A.   Okay. | 10:32:22 |
| 14 | Q.   Was the contract solely between Red | 10:32:22 |
| 15 | Metrics and -- let me strike that. | 10:32:24 |
| 16 | The contract that you sent Mr. Phillips, | 10:32:28 |
| 17 | who were the signatories to the contract? | 10:32:34 |
| 18 | A.   Gregg and myself. | 10:32:38 |
| 19 | Q.   And was the contract between Red Metrics | 10:32:41 |
| 20 | and OpSec? | 10:32:43 |
| 21 | A.   As far as I recall, yes. | 10:32:47 |
| 22 | Q.   And were there any other parties to the | 10:32:49 |
| 23 | contract? | 10:32:51 |
| 24 | A.   Not that I recall.  I remember -- not that | 10:32:52 |
| 25 | I recall. | 10:32:59 |

CONFIDENTIAL

Page 75

```
 1          Q.   And would the contract have delineated the   10:32:59
 2     scope of work Red Metrics was going to do for OpSec?   10:33:02
 3          A.   Yes.                                         10:33:05
 4          Q.   And would it have specified in detail what   10:33:06
 5     that work would consist of?                            10:33:09
 6          A.   Detail's a little vague, but yes.            10:33:12
 7          Q.   And what's your best recollection of what    10:33:17
 8     the scope of work was that the contract                10:33:19
 9     contemplated?                                          10:33:23
10          A.   As I recall, it was related to looking at    10:33:26
11     data of interest based around drop boxes and           10:33:34
12     possibly -- possibly NGOs.  I can't quite remember     10:33:46
13     that.                                                  10:33:53
14          Q.   Did the contract contemplate any work        10:33:54
15     around riots?                                          10:33:58
16          A.   Not that I recall, no.                       10:34:03
17          Q.   And what did the contract say about the      10:34:06
18     work that Red Metrics was going to do with respect     10:34:08
19     to drop boxes and/or nonprofits?                       10:34:10
20          A.   As I recall, there was scheduled to be --    10:34:14
21     there was a meeting then that would take place that    10:34:19
22     Gregg would -- and, again, I want to be careful        10:34:24
23     because we're now getting into production, and         10:34:28
24     I'm -- I'm not in the production side.  So I want to   10:34:31
25     be -- I want to be careful.                            10:34:35
```

CONFIDENTIAL

Page 76

| | | |
|---|---|---|
| 1 | Q.    That's okay.  You signed the contract. | 10:34:35 |
| 2 | A.    I did sign the contract.  So -- okay.  So | 10:34:37 |
| 3 | ask the question that related to the contract again. | 10:34:39 |
| 4 | Sorry. | 10:34:41 |
| 5 | Q.    So what did the contract specify about the | 10:34:41 |
| 6 | work Red Metrics would do around drop boxes and | 10:34:44 |
| 7 | nonprofits? | 10:34:47 |
| 8 | A.    We would provide data of interest | 10:34:48 |
| 9 | around -- around those -- those keys. | 10:34:50 |
| 10 | Q.    And what is "data of interest"? | 10:34:52 |
| 11 | A.    That there would be a -- parameters that | 10:34:55 |
| 12 | are set up and say if this data shows up, then that | 10:35:00 |
| 13 | is a possible lead that law enforcement could look | 10:35:06 |
| 14 | into. | 10:35:10 |
| 15 | Q.    And the contract would have specified | 10:35:11 |
| 16 | that? | 10:35:13 |
| 17 | A.    Yes. | 10:35:13 |
| 18 | Q.    Did the contract specify that possible | 10:35:14 |
| 19 | lead is different from proof to a certainty that | 10:35:29 |
| 20 | there was election fraud? | 10:35:24 |
| 21 | A.    Yes. | 10:35:29 |
| 22 | Q.    Can you describe how the contract would | 10:35:29 |
| 23 | have specified that? | 10:35:32 |
| 24 | A.    It would have said that we would provide | 10:35:33 |
| 25 | data of interest. | 10:35:36 |

CONFIDENTIAL

Page 77

```
1         Q.   Did it make any sort of representation        10:35:38

2    about what the data wouldn't show?                      10:35:40

3         A.   Yes.                                           10:35:45

4         Q.   What was -- what was that representation?      10:35:45

5         A.   One, it's anonymized.  Two, there's no PII     10:35:48

6    involved in it, so personally identified                10:35:56

7    information, there's none of that.  And there would      10:35:59

8    be no intelligence incorporated into it.                10:36:03

9         Q.   The contract specified that there would be     10:36:07

10   no intelligence incorporated into the data provided     10:36:09

11   to OpSec?                                                10:36:12

12        A.   The data -- the contract would specify         10:36:16

13   what is -- what is delivered, which -- it's a good       10:36:19

14   point.  Probably didn't say there's no intelligence.    10:36:25

15   But the data that's delivered, anybody in that          10:36:28

16   space, including us and Mr. Phillips, would             10:36:32

17   understand that that's not intelligence.                10:36:35

18        Q.   And did you go through multiple drafts of     10:36:40

19   this contract with Mr. Phillips?                         10:36:42

20        A.   I don't recall going through multiple         10:36:46

21   drafts, drafts.                                          10:36:48

22        Q.   Okay.  So to your recollection, you just       10:36:49

23   sent one copy and he signed?                             10:36:52

24        A.   To my recollection.                            10:36:56

25        Q.   And how much money did OpSec pay Red           10:36:57
```

CONFIDENTIAL

Page 78

| | | |
|---|---|---|
| 1 | Metrics? | 10:37:05 |
| 2 | A.   I don't -- I don't know.  I don't -- I | 10:37:05 |
| 3 | don't remember it. | 10:37:09 |
| 4 | Q.   Do you remember approximately how much | 10:37:09 |
| 5 | money? | 10:37:11 |
| 6 | A.   I don't.  I wish -- if I would have known | 10:37:11 |
| 7 | you wanted that, I could have -- I'm sure I could | 10:37:20 |
| 8 | have looked that up, but I don't have it. | 10:37:23 |
| 9 | Q.   Where would you have looked that up? | 10:37:24 |
| 10 | A.   Well, I assume -- to your point, I assume | 10:37:26 |
| 11 | there are digital bank records. | 10:37:29 |
| 12 | Q.   And do you recall if it was a single | 10:37:33 |
| 13 | payment or multiple payments? | 10:37:35 |
| 14 | A.   As I recall, multiple payments. | 10:37:37 |
| 15 | Q.   And did the contract specify specific | 10:37:40 |
| 16 | deliverables that would be produced to OpSec? | 10:37:47 |
| 17 | A.   I'm sure it -- I'm sure it did. | 10:37:51 |
| 18 | Q.   And what kinds of deliverables would have | 10:37:54 |
| 19 | been specified? | 10:37:57 |
| 20 | A.   It would have been -- again, this is as I | 10:37:57 |
| 21 | recall. | 10:38:02 |
| 22 | It would have been -- it would have been | 10:38:03 |
| 23 | anonymized IMEI numbers, which are your -- your | 10:38:09 |
| 24 | devices of -- anonymized devices of interest. | 10:38:14 |
| 25 | You know what that is?  Yeah. | 10:38:20 |

CONFIDENTIAL

Page 79

| | | |
|---|---|---|
| 1 | Q.   And how would that data have been -- how | 10:38:23 |
| 2 | would those deliverables have been produced?  Would | 10:38:27 |
| 3 | they have been produced in a spreadsheet, for | 10:38:30 |
| 4 | example? | 10:38:33 |
| 5 | A.   Oh, that's a -- that's a better question | 10:38:33 |
| 6 | for production team, if I could, please. | 10:38:35 |
| 7 | Q.   Did the contract specify that Red Metrics | 10:38:38 |
| 8 | would provide any sort of analysis with the IMEIs? | 10:38:42 |
| 9 | A.   Not as I recall. | 10:38:47 |
| 10 | Q.   Is that because Red Metrics didn't do any | 10:38:49 |
| 11 | sort of analysis with the IMEIs? | 10:38:52 |
| 12 | A.   It's because the engagement was for giving | 10:38:56 |
| 13 | leads that would then be investigated.  And we | 10:39:03 |
| 14 | understood law enforcement would handle -- would | 10:39:06 |
| 15 | handle that. | 10:39:08 |
| 16 | Q.   And can you just describe what a lead is? | 10:39:09 |
| 17 | A.   It would be data of interest.  So based on | 10:39:12 |
| 18 | certain parameters, here are anonymized device | 10:39:17 |
| 19 | numbers that would -- that may be of interest. | 10:39:22 |
| 20 | Q.   And who specified the parameters that | 10:39:26 |
| 21 | would be used? | 10:39:29 |
| 22 | A.   This goes into the production team, so as | 10:39:32 |
| 23 | I understand, Gregg would -- as I understood, | 10:39:36 |
| 24 | Gregg -- and I wasn't in these conversations -- | 10:39:40 |
| 25 | Gregg would give that and work that through with our | 10:39:43 |

CONFIDENTIAL

Page 80

```
 1    production team, Tim, Mr. Gerwing.                    10:39:47

 2        Q.   To be clear, a lead means that it's not      10:39:54

 3    conclusive proof?                                     10:39:59

 4        A.   Correct.                                      10:40:02

 5             MR. YARBROUGH:  Object to form.              10:40:02

 6             MR. EVANS:  Object to form.                  10:40:03

 7        A.   Sorry.  Say that one more time.              10:40:05

 8        Q.   To be clear, when you're using the term      10:40:06

 9    "lead," a lead means that it's not conclusive proof   10:40:08

10    of something?                                         10:40:12

11             MR. YARBROUGH:  Object to form.              10:40:14

12             MR. EVANS:  Object to form.                  10:40:15

13        Q.   You can answer the question.                 10:40:16

14        A.   Sorry, let me think that through just a --   10:40:22

15    just a minute so I make sure I have got it right.     10:40:23

16             Lead would not be proof?                     10:40:27

17             Say it one more time, please.  I'm sorry.    10:40:32

18        Q.   Is a lead -- is your understanding of a      10:40:34

19    lead that it is something that is not conclusive      10:40:37

20    proof?                                                10:40:41

21             MR. YARBROUGH:  Same objection.              10:40:42

22             MR. EVANS:  Same objection.                  10:40:44

23        Q.   You can answer the question.                 10:40:45

24        A.   Yes.                                          10:40:46

25        Q.   So with respect to the work that Red         10:40:47
```

CONFIDENTIAL

Page 81

```
 1    Metrics did with OpSec, a lead would not be proof of    10:40:50

 2    election fraud?                                          10:40:56

 3                    MR. YARBROUGH:  Object to form.          10:40:57

 4         Q.   You can answer the question.                   10:40:58

 5                    MR. EVANS:  Objection.                    10:40:59

 6         A.   Correct.                                        10:41:02

 7         Q.   And your understanding is that                 10:41:02

 8    Mr. Phillips understood that?                            10:41:04

 9                    MR. YARBROUGH:  Object to form.          10:41:06

10                    MR. EVANS:  Objection.                    10:41:08

11         Q.   You can answer the question.                   10:41:08

12         A.   Yes.                                            10:41:10

13         Q.   So we were talking about the parameters,      10:41:18

14    and you said production side would talk in more         10:41:22

15    detail about that.  But just as far as you              10:41:25

16    understand it, exactly what was delivered to            10:41:28

17    Mr. Phillips pursuant to this contract?                 10:41:33

18         A.   I think, again, production -- for --          10:41:36

19    asking for specific deliverables, better ask           10:41:42

20    production.  They will know -- they'll know.            10:41:45

21         Q.   And who would send the deliverables to        10:41:48

22    Mr. Phillips?                                            10:41:50

23         A.   That would be Mr. Gerwing.                     10:41:51

24         Q.   Did you continue to speak with                10:41:54

25    Mr. Phillips while Red Metrics was engaged in doing     10:41:56
```

CONFIDENTIAL

Page 82

| | | |
|---|---|---|
| 1 | the work contemplated by the contract? | 10:41:59 |
| 2 | A.  Yes. | 10:42:01 |
| 3 | Q.  How often did you speak with him? | 10:42:02 |
| 4 | A.  Maybe -- maybe every -- maybe every week, | 10:42:05 |
| 5 | maybe every couple weeks, as I recall. | 10:42:14 |
| 6 | Q.  And what did those conversations consist | 10:42:17 |
| 7 | of?  What did you discuss? | 10:42:19 |
| 8 | A.  How -- my conversations are typically | 10:42:23 |
| 9 | how -- how are we doing, are you getting what you | 10:42:29 |
| 10 | need, and how is -- and how are things going with | 10:42:32 |
| 11 | law enforcement. | 10:42:36 |
| 12 | Q.  And what would Mr. Phillips tell you? | 10:42:38 |
| 13 | A.  That they were getting what they needed, | 10:42:45 |
| 14 | that they were -- I wouldn't -- I wouldn't get a lot | 10:42:47 |
| 15 | of detail from the other side but that they were | 10:42:54 |
| 16 | getting what they needed. | 10:42:56 |
| 17 | Q.  Were these calls with Mr. Phillips | 10:43:01 |
| 18 | reflected on your calendar? | 10:43:04 |
| 19 | A.  No. | 10:43:08 |
| 20 | Q.  Did you have a regular meeting scheduled? | 10:43:10 |
| 21 | A.  I didn't. | 10:43:12 |
| 22 | Q.  So we're talking -- is it correct that the | 10:43:14 |
| 23 | time -- | 10:43:17 |
| 24 | A.  Just make sure your -- again, I'm not in | 10:43:17 |
| 25 | the -- | 10:43:19 |

CONFIDENTIAL

Page 83

```
 1        Q.   Yes.                                    10:43:20

 2        A.   -- in the production.  I just want to make   10:43:20

 3   sure you remember that.                           10:43:23

 4        Q.   The work with Mr. Phillips started in   10:43:23

 5   December 2020.                                     10:43:25

 6        A.   Yes.                                     10:43:27

 7        Q.   And you said it lasted until 2022?       10:43:27

 8        A.   Yes.                                     10:43:33

 9        Q.   And you spoke with him roughly every week   10:43:35

10   in that period?                                    10:43:38

11        A.   Your communication will go more frequent   10:43:39

12   when things are going on and very less frequent when   10:43:43

13   there's not a lot going on.                        10:43:46

14             So to take -- to extrapolate that I talked   10:43:47

15   to him every week or every couple weeks and         10:43:51

16   extrapolate that an entire time is not a -- that's   10:43:54

17   not an accurate -- that's not accurate.            10:43:57

18             Does that...                             10:43:57

19        Q.   Were all of the -- sorry.                10:44:03

20             Were all of your communications with     10:44:05

21   Mr. Phillips over Wire?                            10:44:08

22        A.   Everything that I can recall was.        10:44:10

23        Q.   And would anyone else participate in those   10:44:12

24   conversations?                                     10:44:15

25        A.   Most of those conversations would have   10:44:18
```

CONFIDENTIAL

Page 84

```
 1    been in production that I would have just dipped      10:44:21

 2    into.                                                 10:44:23

 3          Q.   And who would have been on those calls?    10:44:25

 4          A.   Mr. Gerwing.                                10:44:30

 5          Q.   Anyone else?                                10:44:32

 6          A.   No.                                         10:44:33

 7          Q.   Does Wire keep a log of calls?             10:44:35

 8                    MR. YARBROUGH:   Object to form.      10:44:38

 9          Q.   You can answer the question.               10:44:42

10          A.   I believe so.  I believe so.  I believe    10:44:44

11    it'll say "call was made."                            10:44:47

12          Q.   And is -- is -- we'll come back to this.   10:44:50

13               You said that the contract contemplated    10:45:00

14    sending IMEIs to Mr. Phillips and OpSec.              10:45:03

15               Did the contract specify that Red Metrics  10:45:08

16    would review security surveillance footage?           10:45:10

17          A.   I believe so.                              10:45:18

18          Q.   Is it your understanding that Red Metrics  10:45:20

19    did analyze surveillance footage?                     10:45:23

20          A.   When you say -- can you just define        10:45:27

21    "analyze"?                                            10:45:29

22          Q.   Did Red Metrics review surveillance        10:45:30

23    footage as part of its work for Mr. Phillips?         10:45:33

24          A.   Yes.                                       10:45:35

25          Q.   Exactly what video was used?               10:45:36
```

CONFIDENTIAL

Page 85

| | | |
|---|---|---|
| 1 | A. Video that -- whatever he supplied to us. | 10:45:47 |
| 2 | Q. When you say "he," you mean Mr. Phillips? | 10:45:51 |
| 3 | A. I'm sorry, yeah, whatever Mr. Phillips | 10:45:53 |
| 4 | gave to us to review. | 10:45:55 |
| 5 | Q. So describe that process. Mr. Phillips | 10:45:56 |
| 6 | would send you video and what would happen? | 10:45:58 |
| 7 | A. I think, again, that's probably better for | 10:46:00 |
| 8 | production to answer. | 10:46:03 |
| 9 | Q. How would Mr. Phillips send the video to | 10:46:04 |
| 10 | Red Metrics? | 10:46:07 |
| 11 | A. Again, I think -- I'm not positive. I | 10:46:09 |
| 12 | think production will be able to answer that very | 10:46:13 |
| 13 | easily for you. | 10:46:16 |
| 14 | Q. Did -- did Mr. Phillips ever send you | 10:46:17 |
| 15 | video? | 10:46:18 |
| 16 | A. Me personally, Ben, no. | 10:46:18 |
| 17 | Q. Did Mr. Phillips send video over Wire? | 10:46:21 |
| 18 | A. I don't know. Again, I'm sorry, I just | 10:46:27 |
| 19 | don't know how that video was delivered to us. | 10:46:30 |
| 20 | Q. Okay. But your testimony is that you, | 10:46:34 |
| 21 | Mr. Matthews, were never on communications with -- | 10:46:38 |
| 22 | let me rephrase that. | 10:46:41 |
| 23 | Were you ever on communications with | 10:46:42 |
| 24 | Mr. Phillips where Mr. Phillips shared video? | 10:46:45 |
| 25 | A. No, not that I -- not that I recall. You | 10:46:48 |

CONFIDENTIAL

Page 86

```
 1    got to keep in mind, those -- those videos were --     10:46:56

 2    were -- those are large files.                         10:46:58

 3        Q.   Would they have been hard to send over        10:47:00

 4    Wire?                                                  10:47:03

 5              MR. YARBROUGH:  Object to form.              10:47:05

 6        Q.   You can answer the question.                  10:47:06

 7        A.   You will have to ask production.  I           10:47:06

 8    would -- my guess is -- my guess is probably.  Well,   10:47:08

 9    my guess is it probably -- well, again, you better     10:47:15

10    ask production.  Sorry.                                10:47:17

11        Q.   Did -- did Mr. Phillips explain where the     10:47:19

12    video came from?                                       10:47:22

13        A.   Yes.  At times, I remember that -- I          10:47:25

14    recall that.                                           10:47:28

15        Q.   What did he say about where the video came    10:47:30

16    from?                                                  10:47:32

17        A.   I believe he did a FOYA request.  And as I    10:47:34

18    understand -- as I understand, all those videos are    10:47:39

19    just public information.                               10:47:43

20        Q.   And we can ask Mr. Gerwing as well, but       10:47:47

21    what is your understanding of who at Red Metrics       10:47:51

22    reviewed surveillance footage?                         10:47:53

23        A.   Again, better question for -- better          10:47:57

24    question for Tim.                                      10:47:57

25        Q.   Do you have any understanding of who at       10:47:58
```

Page 87

| | | |
|---|---|---|
| 1 | Red Metrics reviewed security footage? | 10:48:00 |
| 2 | A.  I'm sure -- I'm sure -- I'm sure Tim did. | 10:48:02 |
| 3 | I don't know if Az would have -- Az would have | 10:48:06 |
| 4 | reviewed or not. | 10:48:09 |
| 5 | Q.  Is the surveillance -- | 10:48:12 |
| 6 | A.  I would guess he did; I don't know. | 10:48:13 |
| 7 | Q.  Do you have an understanding whether | 10:48:14 |
| 8 | surveillance footage is of drop boxes? | 10:48:17 |
| 9 | A.  As I -- as I understand, there was a | 10:48:21 |
| 10 | regulation in place that drop boxes needed to have | 10:48:25 |
| 11 | video on those and that video was public knowledge. | 10:48:29 |
| 12 | That's my understanding. | 10:48:34 |
| 13 | Q.  Did Red Metrics review surveillance | 10:48:36 |
| 14 | footage of drop boxes? | 10:48:39 |
| 15 | A.  Yes. | 10:48:41 |
| 16 | MR. YARBROUGH:  Objection -- | 10:48:41 |
| 17 | THE WITNESS:  Oh. | 10:48:41 |
| 18 | MR. YARBROUGH:  -- form. | 10:48:43 |
| 19 | Q.  You can answer the question. | 10:48:43 |
| 20 | A.  Is -- again, better for production.  I | 10:48:44 |
| 21 | believe so. | 10:48:47 |
| 22 | Q.  Did Red Metrics -- did Mr. Phillips ask | 10:48:47 |
| 23 | Red Metrics to analyze any other video? | 10:48:50 |
| 24 | A.  Not that I know of. | 10:48:54 |
| 25 | Q.  I'll come back to this. | 10:49:02 |

CONFIDENTIAL

Page 88

| | | |
|---|---|---|
| 1 | How long did it take to conduct the full | 10:49:03 |
| 2 | analysis that Red Metrics did for Mr. Phillips and | 10:49:08 |
| 3 | OpSec? | 10:49:12 |
| 4 | MR. YARBROUGH:  Object to form. | 10:49:15 |
| 5 | Q.  You can answer the question. | 10:49:17 |
| 6 | A.  It's better -- I'm sorry, it's better for | 10:49:17 |
| 7 | production.  I don't know.  I don't know. | 10:49:19 |
| 8 | Q.  And you communicated with Mr. Phillips | 10:49:21 |
| 9 | somewhat regularly. | 10:49:25 |
| 10 | Who else at Red Metrics communicated with | 10:49:26 |
| 11 | Mr. Phillips? | 10:49:29 |
| 12 | A.  Mr. Gerwing. | 10:49:30 |
| 13 | Q.  Anyone else? | 10:49:31 |
| 14 | A.  No. | 10:49:32 |
| 15 | Q.  What is your understanding of the work | 10:49:37 |
| 16 | product that was produced to -- ultimately produced | 10:49:39 |
| 17 | to Mr. Phillips? | 10:49:44 |
| 18 | A.  My understanding was that we delivered | 10:49:48 |
| 19 | devices that would be of interest for law | 10:49:53 |
| 20 | enforcement to investigate -- anonymized devices. | 10:49:57 |
| 21 | Q.  Did you look at that work product? | 10:50:02 |
| 22 | A.  I probably did.  I can't recall it but I | 10:50:04 |
| 23 | probably did. | 10:50:10 |
| 24 | Q.  And do you recall what kind of format that | 10:50:11 |
| 25 | work product would be in? | 10:50:19 |

CONFIDENTIAL

Page 89

1    A.   Again, I apologize, production will know        10:50:20

2    exactly on these answers.  I just don't know.        10:50:22

3    Q.   But you don't know if you reviewed a            10:50:25

4    spreadsheet?                                          10:50:28

5    A.   I would assume -- you're probably right.        10:50:28

6    That's probably what it -- what it was.  It was       10:50:30

7    probably a spreadsheet with anonymized IMEI numbers   10:50:32

8    I would -- I would guess.  But, again, I'm just       10:50:35

9    guessing.  I can't -- I can't quite recall it.        10:50:38

10    Q.   And -- but can you recall if you reviewed      10:50:40

11    any other format of deliverable?                     10:50:42

12    A.   Not that I recall.                             10:50:46

13    Q.   The only thing you recall is reviewing one     10:50:48

14    or more spreadsheets?                                10:50:51

15    A.   And, again, on the spreadsheets, I             10:50:53

16    imagine.  But, again, production can give you exact  10:50:55

17    information on that.                                 10:50:59

18    Q.   With -- you testified that the contract        10:51:08

19    contemplated geospatial data for drop boxes and      10:51:10

20    nonprofits --                                        10:51:15

21         MR. EVANS:  Object to form.                    10:51:18

22    Q.   -- is that correct?                            10:51:20

23    A.   Say it -- repeat it one more time, please.     10:51:21

24    Sorry.                                               10:51:24

25    Q.   I believe you testified that the contract      10:51:24

CONFIDENTIAL

Page 90

```
 1    contemplated geospatial data analysis for drop boxes    10:51:26

 2    and -- NGOs is how you said it.                         10:51:30

 3                 MR. EVANS:  Object to form.                10:51:35

 4         A.    Geospatial -- geospatial data of interest    10:51:36

 5    as it related to specific drop boxes and possibly --    10:51:45

 6    possibly NGO.                                           10:51:52

 7         Q.    Anything else?                               10:51:53

 8         A.    Not that I recall.  I don't believe so.      10:51:56

 9         Q.    Do you have an understanding of how Red      10:52:08

10    Metrics would have produced its analysis to             10:52:09

11    Mr. Phillips?                                           10:52:12

12                 MR. YARBROUGH:  Objection; form.           10:52:13

13         Q.    You can answer the question.                 10:52:17

14         A.    That's probably -- again, that's better      10:52:19

15    for production.  They'll give you exactly how they      10:52:22

16    did it.                                                 10:52:24

17         Q.    Did you yourself ever share Red Metrics'     10:52:27

18    analysis with Mr. Phillips?                             10:52:29

19         A.    No.                                          10:52:30

20                 MR. YARBROUGH:  Objection; form.           10:52:31

21         A.    When I say -- when you say "you,             10:52:32

22    yourself," Ben?                                         10:52:34

23         Q.    Yes.                                         10:52:35

24         A.    Yeah, no.                                    10:52:36

25         Q.    And then when did Red Metrics convey its     10:52:37
```

CONFIDENTIAL

Page 91

| | | |
|---|---|---|
| 1 | analysis to Mr. Phillips? | 10:52:40 |
| 2 | MR. YARBROUGH:  Objection; form. | 10:52:44 |
| 3 | A.   When did we convey it? | 10:52:45 |
| 4 | Q.   Let me -- let me start somewhere else -- | 10:52:48 |
| 5 | A.   Okay. | 10:52:48 |
| 6 | Q.   -- since I think you said... | 10:52:51 |
| 7 | Did you regularly -- you regularly updated | 10:52:52 |
| 8 | Mr. Phillips on Red Metrics' analysis? | 10:52:53 |
| 9 | MR. YARBROUGH:  Objection; form. | 10:52:56 |
| 10 | A.   Personally, no. | 10:52:56 |
| 11 | Q.   Did Red Metrics regularly update | 10:52:57 |
| 12 | Mr. Phillips on its analysis? | 10:53:00 |
| 13 | A.   Yes. | 10:53:01 |
| 14 | Q.   And was there one final work product or | 10:53:02 |
| 15 | were there multiple work products through the | 10:53:05 |
| 16 | project? | 10:53:08 |
| 17 | MR. YARBROUGH:  Objection; form. | 10:53:09 |
| 18 | A.   Better for production again.  They'll know | 10:53:13 |
| 19 | exactly -- they'll know exactly if it was ongoing or | 10:53:17 |
| 20 | one final. | 10:53:19 |
| 21 | Q.   Did Red Metrics charge Mr. Phillips for | 10:53:23 |
| 22 | anything beyond what the original contract | 10:53:28 |
| 23 | contemplated? | 10:53:30 |
| 24 | A.   I -- can you -- can you rephrase that or | 10:53:35 |
| 25 | say it again? | 10:53:41 |

CONFIDENTIAL

Page 92

| | | |
|---|---|---|
| 1 | Q.   Yeah, I'll rephrase it. | 10:53:42 |
| 2 | A.   Okay. | 10:53:45 |
| 3 | Q.   You testified that there was some payment | 10:53:47 |
| 4 | pursuant to the contract from Mr. Phillips to Red | 10:53:50 |
| 5 | Metrics. | 10:53:52 |
| 6 | A.   Yes, sir. | 10:53:52 |
| 7 | Q.   You testified that it might have been one | 10:53:54 |
| 8 | payment; it might have been multiple payments. | 10:53:56 |
| 9 | A.   And I -- and I believe it was multiple | 10:53:59 |
| 10 | payments, yes. | 10:54:01 |
| 11 | Q.   Did Red Metrics charge Mr. Phillips and | 10:54:02 |
| 12 | OpSec for any additional work beyond the work | 10:54:10 |
| 13 | contemplated by the original contract? | 10:54:12 |
| 14 | A.   Yes. | 10:54:14 |
| 15 | Q.   What was that work? | 10:54:16 |
| 16 | A.   We did other work with Mr. Phillips. | 10:54:19 |
| 17 | Q.   Did you enter into other contracts with | 10:54:25 |
| 18 | Mr. Phillips? | 10:54:28 |
| 19 | A.   Yes. | 10:54:28 |
| 20 | Q.   And is all of that work related to | 10:54:29 |
| 21 | Mr. Phillips' claims about election fraud and the | 10:54:33 |
| 22 | 2020 election? | 10:54:36 |
| 23 | MR. YARBROUGH:  Objection; form. | 10:54:38 |
| 24 | Q.   You can answer that. | 10:54:39 |
| 25 | A.   No. | 10:54:40 |

CONFIDENTIAL

Page 93

| | | |
|---|---|---|
| 1 | Q.   Gotcha. | 10:54:40 |
| 2 | Did you enter into multiple contracts with | 10:54:43 |
| 3 | Mr. Phillips about the work that relates to election | 10:54:45 |
| 4 | fraud in the 2020 election? | 10:54:50 |
| 5 | A.   Yes.  Yeah.  Yeah. | 10:54:53 |
| 6 | Q.   How many contracts did you enter into? | 10:54:56 |
| 7 | A.   It was -- I believe it was three. | 10:54:59 |
| 8 | Q.   The first was in December of 2020? | 10:55:03 |
| 9 | A.   Yes. | 10:55:05 |
| 10 | Q.   When was the second? | 10:55:06 |
| 11 | A.   The second one was January of '21. | 10:55:07 |
| 12 | Q.   And when was the third? | 10:55:11 |
| 13 | A.   The third one was July of '21. | 10:55:15 |
| 14 | Q.   And were there material differences | 10:55:19 |
| 15 | between the January and July 2021 contracts and the | 10:55:21 |
| 16 | original contract? | 10:55:25 |
| 17 | MR. YARBROUGH:  Objection; form. | 10:55:26 |
| 18 | A.   No. | 10:55:29 |
| 19 | Q.   Why did you enter into a second and third | 10:55:29 |
| 20 | contract? | 10:55:32 |
| 21 | A.   Different markets as I recall. | 10:55:33 |
| 22 | Q.   When you say "different markets," you mean | 10:55:38 |
| 23 | looking at geo data for different areas? | 10:55:39 |
| 24 | A.   Right.  Yes. | 10:55:43 |
| 25 | Q.   So maybe different states? | 10:55:44 |

Page 94

| | | |
|---|---|---|
| 1 | A.    Or cities, yeah. | 10:55:47 |
| 2 | Q.    Was the -- the contract that governed the | 10:55:50 |
| 3 | analysis about Georgia the original contract? | 10:55:52 |
| 4 | A.    Yeah.  Yes. | 10:55:55 |
| 5 | Q.    Did Red Metrics send Mr. Phillips | 10:56:00 |
| 6 | invoices? | 10:56:03 |
| 7 | A.    I doubt it.  We -- we -- I doubt it. | 10:56:05 |
| 8 | Q.    Did Mr. Phillips pay up front for all of | 10:56:14 |
| 9 | Red Metrics' work? | 10:56:17 |
| 10 | A.    I doubt that as well. | 10:56:20 |
| 11 | Q.    So how would Mr. Phillips know when to | 10:56:26 |
| 12 | pay? | 10:56:28 |
| 13 | A.    I would just tell him.  So we would -- | 10:56:29 |
| 14 | yes, I would tell him. | 10:56:33 |
| 15 | Q.    And how would you tell him? | 10:56:34 |
| 16 | A.    I would communicate to him, this is price | 10:56:35 |
| 17 | and this is when payments would be -- would be due. | 10:56:39 |
| 18 | Q.    And how would you communicate that? | 10:56:45 |
| 19 | A.    I don't recall specific conversations, but | 10:56:49 |
| 20 | as a general practice, I would say something -- | 10:56:53 |
| 21 | THE WITNESS:  Sorry, go ahead?  Do you | 10:57:00 |
| 22 | want me to keep going? | 10:57:02 |
| 23 | MR. YARBROUGH:  Yeah. | 10:57:02 |
| 24 | A.    I would say something during one of the | 10:57:05 |
| 25 | production meetings, if I would jump into a | 10:57:08 |

Page 95

| | | |
|---|---|---|
| 1 | production meeting, just say something at the end. | 10:57:10 |
| 2 | Q.   And approximately how much money did | 10:57:13 |
| 3 | Mr. Phillips pay Red Metrics? | 10:57:17 |
| 4 | MR. YARBROUGH:  Objection; form. | 10:57:18 |
| 5 | MR. EVANS:  Objection; asked and | 10:57:20 |
| 6 | answered. | 10:57:24 |
| 7 | A.   I just can't -- I just can't remember.  I | 10:57:24 |
| 8 | can -- I can -- I assume that I can probably look it | 10:57:26 |
| 9 | up. | 10:57:28 |
| 10 | Q.   Yeah, we'll follow up with your counsel | 10:57:28 |
| 11 | about the payments. | 10:57:30 |
| 12 | MR. LANGFORD:  I think -- let's stop | 10:57:34 |
| 13 | there on topic 1 and bring in Mr. Gerwing, and then | 10:57:36 |
| 14 | we will bring you back -- | 10:57:39 |
| 15 | THE WITNESS:  Okay. | 10:57:39 |
| 16 | MR. LANGFORD:  -- Mr. Matthews, at the | 10:57:41 |
| 17 | very end. | 10:57:42 |
| 18 | MR. YARBROUGH:  Do you want to take a | 10:57:43 |
| 19 | 10-minute break, John? | 10:57:44 |
| 20 | MR. LANGFORD:  Yeah, let's do that. | 10:57:45 |
| 21 | THE VIDEOGRAPHER:  That concludes | 10:57:47 |
| 22 | Media Number 2.  We're off the record at 10:58 a.m. | 10:57:48 |
| 23 | (Deposition suspended at 10:58 a.m.) | 10:58:57 |
| 24 | *   *   *   *   * | 10:58:57 |
| 25 | (Deposition resumed at 3:52 p.m.) | 10:58:57 |

CONFIDENTIAL

Page 96

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  This is the | 03:52:49 |
| 2 | continuing deposition of Red Metrics LLC | 03:52:49 |
| 3 | representative Ben Matthews. | 03:52:52 |
| 4 | We're back on the record at 3:52 p.m. | 03:52:53 |
| 5 | FURTHER EXAMINATION | 03:52:53 |
| 6 | BY MR. LANGFORD: | 03:52:56 |
| 7 | Q.  Thank you, Mr. Matthews. | 03:52:56 |
| 8 | Before we jump back in, I will just remind | 03:52:58 |
| 9 | you that you're under oath. | 03:53:01 |
| 10 | Do you understand that? | 03:53:04 |
| 11 | A.  Yes, sir. | 03:53:04 |
| 12 | Q.  So did you have an email account | 03:53:05 |
| 13 | affiliated with Red Metrics? | 03:53:10 |
| 14 | A.  Yes. | 03:53:13 |
| 15 | Q.  What was that email account? | 03:53:14 |
| 16 | A.  The -- my email address? | 03:53:17 |
| 17 | Q.  Uh-huh. | 03:53:19 |
| 18 | A.  It was ██████████████ | 03:53:20 |
| 19 | Q.  And did you communicate with people at Red | 03:53:24 |
| 20 | Metrics or Mr. Phillips with any other email | 03:53:28 |
| 21 | account? | 03:53:30 |
| 22 | MR. YARBROUGH:  Objection; form. | 03:53:33 |
| 23 | Q.  Did you use -- let me ask that. | 03:53:36 |
| 24 | Did you communicate with anyone at Red | 03:53:37 |
| 25 | Metrics using a different email account? | 03:53:40 |

CONFIDENTIAL

Page 97

| | | |
|---|---|---|
| 1 | A.   Not that I recall. | 03:53:43 |
| 2 | Q.   Did you communicate with Mr. Phillips | 03:53:45 |
| 3 | using a different email account? | 03:53:47 |
| 4 | A.   Not that I recall. | 03:53:49 |
| 5 | Q.   Before you testified that you used the | 03:53:52 |
| 6 | application Wire to message with people inside Red | 03:53:54 |
| 7 | Metrics and with Mr. Phillips? | 03:53:59 |
| 8 | A.   Yes. | 03:54:01 |
| 9 | Q.   Do you have a user name on Wire? | 03:54:02 |
| 10 | A.   I'm sure I do. | 03:54:07 |
| 11 | Q.   We can find out. | 03:54:11 |
| 12 | Do you happen to know whether Mr. Phillips | 03:54:12 |
| 13 | has a user name on Wire? | 03:54:16 |
| 14 | A.   I'm sure he does as well.  I shouldn't say | 03:54:18 |
| 15 | that.  If I -- when I communicated with him at that | 03:54:23 |
| 16 | time, you would have had to have had a user name. | 03:54:27 |
| 17 | Q.   Did you have an individual thread on Wire | 03:54:33 |
| 18 | between you and Mr. Phillips? | 03:54:39 |
| 19 | A.   I do not recall an individual thread. | 03:54:44 |
| 20 | Q.   Was there a thread that had both yourself | 03:54:49 |
| 21 | and Mr. Phillips on it? | 03:54:52 |
| 22 | A.   Yes. | 03:54:53 |
| 23 | Q.   And who else would have been on that | 03:54:54 |
| 24 | thread? | 03:54:56 |
| 25 | A.   My recollection would be Tim as well. | 03:54:56 |

CONFIDENTIAL

Page 98

| | | |
|---|---|---|
| 1 | Q.    And were there more -- sorry.  No, go | 03:55:04 |
| 2 | ahead. | 03:55:08 |
| 3 | A.    Tim as well. | 03:55:08 |
| 4 | Q.    Was anyone else on the thread? | 03:55:09 |
| 5 | A.    Not that I recall. | 03:55:11 |
| 6 | Q.    And would there have been multiple threads | 03:55:12 |
| 7 | with Mr. Phillips and one other person? | 03:55:15 |
| 8 | A.    Not that I recall. | 03:55:20 |
| 9 | Q.    In Wire, does the thread have a name of | 03:55:23 |
| 10 | the thread? | 03:55:26 |
| 11 | A.    Yes, it's -- it has a channel name. | 03:55:29 |
| 12 | Q.    Do you recall the channel name for the | 03:55:32 |
| 13 | thread with Mr. Phillips and Mr. Gerwing? | 03:55:34 |
| 14 | A.    I don't. | 03:55:38 |
| 15 | Q.    Did you review -- let me back up. | 03:55:41 |
| 16 | Your former colleague at least, | 03:55:48 |
| 17 | Mr. Gerwing, testified that there were at least two | 03:55:50 |
| 18 | decks of slides that were produced to Mr. Phillips | 03:55:54 |
| 19 | as Red Metrics' work product for Mr. Phillips. | 03:55:57 |
| 20 | A.    Okay. | 03:56:00 |
| 21 | MR. YARBROUGH:  Object to form. | 03:56:01 |
| 22 | Q.    Do you review -- did you review any decks | 03:56:03 |
| 23 | of slides that Red Metrics sent to Mr. Phillips? | 03:56:06 |
| 24 | A.    Can you define review? | 03:56:10 |
| 25 | Q.    Did you look at them? | 03:56:12 |

CONFIDENTIAL

Page 99

| | | |
|---|---|---|
| 1 | A.    I do not recall looking at those. | 03:56:15 |
| 2 | Q.    Are you aware that Red Metrics sent decks | 03:56:22 |
| 3 | to Mr. Phillips? | 03:56:25 |
| 4 | MR. YARBROUGH:  Object to form. | 03:56:28 |
| 5 | MR. EVANS:  Object to form. | 03:56:28 |
| 6 | A.    It would -- I don't recall those decks | 03:56:33 |
| 7 | being sent. | 03:56:38 |
| 8 | Q.    I'll ask it a second time just to be sure. | 03:56:41 |
| 9 | Did Red Metrics send decks to | 03:56:44 |
| 10 | Mr. Phillips? | 03:56:48 |
| 11 | A.    That would be a better question for | 03:56:49 |
| 12 | Mr. Gerwing. | 03:56:51 |
| 13 | Q.    Other than decks of slides, are you aware | 03:56:51 |
| 14 | of any other specific work product that Red Metrics | 03:56:57 |
| 15 | sent Mr. Phillips? | 03:57:01 |
| 16 | A.    I am not aware of other work product. | 03:57:02 |
| 17 | Q.    Are you aware of any Word documents that | 03:57:07 |
| 18 | Red Metrics sent Mr. Phillips? | 03:57:10 |
| 19 | A.    No. | 03:57:11 |
| 20 | Q.    Any spreadsheets? | 03:57:12 |
| 21 | A.    No. | 03:57:14 |
| 22 | Q.    Any maps? | 03:57:15 |
| 23 | A.    No. | 03:57:19 |
| 24 | Q.    Any video content? | 03:57:21 |
| 25 | A.    No. | 03:57:23 |

CONFIDENTIAL

Page 100

```
 1        Q.   Any analysis of video content?          03:57:24

 2        A.   I'm not aware of any analysis of video  03:57:26

 3   content.                                          03:57:31

 4        Q.   Would either your or Mr. Gerwing's Wire 03:57:33

 5   communications to Mr. Phillips constitute Red     03:57:38

 6   Metrics' work product?                            03:57:44

 7             MR. YARBROUGH:  Objection; form.        03:57:47

 8             MR. EVANS:  Object to form.             03:57:49

 9        Q.   Let me ask you a different way.         03:57:49

10             Did you provide Mr. Phillips any of Red 03:57:51

11   Metrics' analysis over Wire?                      03:57:53

12        A.   That would be a better question for     03:57:56

13   Mr. Gerwing.                                      03:57:59

14        Q.   Did you personally?                     03:57:59

15        A.   No.  Thank you.  Sorry.                 03:58:02

16        Q.   Is it your understanding that Mr. Gerwing 03:58:04

17   would have sent analysis to Mr. Phillips over Wire? 03:58:06

18             MR. YARBROUGH:  Objection; form.        03:58:11

19             MR. EVANS:  Object to form.             03:58:12

20        Q.   Let me ask it again.                    03:58:14

21        A.   Thank you.                              03:58:15

22        Q.   To your knowledge, did Mr. Gerwing send 03:58:17

23   Mr. Phillips Red Metrics' work product over Wire? 03:58:20

24             MR. EVANS:  Object to form.             03:58:27

25        A.   I will say I don't recall that work     03:58:27
```

CONFIDENTIAL

Page 101

```
 1   product going over to him.                       03:58:29

 2        Q.   Do you know if Gregg Phillips or OpSec  03:58:35

 3   sent Red Metrics anything that was not sent over 03:58:38

 4   Wire?                                             03:58:47

 5             MR. YARBROUGH:  Objection; form.        03:58:49

 6             MR. EVANS:  Object to form.             03:58:50

 7        Q.   Sorry.                                  03:58:51

 8        A.   I don't recall that.                    03:58:51

 9        Q.   To your knowledge, did Mr. Phillips or  03:58:55

10   OpSec ever email you?                             03:58:59

11        A.   No.                                     03:59:00

12        Q.   Did they ever email Mr. Gerwing?        03:59:01

13             MR. YARBROUGH:  Objection; form.        03:59:06

14             MR. EVANS:  Object to form.             03:59:08

15        A.   I don't know that.                      03:59:08

16        Q.   Let me just check.                      03:59:17

17             For the -- did you use Wire on more than 03:59:19

18   one device?                                       03:59:23

19        A.   At the time of this, I don't recall that. 03:59:28

20        Q.   Did you use Wire on a cell phone between 03:59:36

21   2020 and 2023?                                    03:59:40

22        A.   I believe so.                           03:59:41

23        Q.   And what was the number of the phone that 03:59:43

24   you used?                                         03:59:45

25        A.   Are you asking for my phone or          03:59:48
```

CONFIDENTIAL

Page 102

| | | |
|---|---|---|
| 1 | Mr. Phillips' phone. | 03:59:50 |
| 2 | Q.   Your phone. | 03:59:51 |
| 3 | ███████████████████████████ | 03:59:52 |
| 4 | ███████████████████████████ | 03:59:56 |
| 5 | Q.   Yes. | 03:59:58 |
| 6 | ███████████████ | 03:59:58 |
| 7 | Q.   A couple questions that I didn't think to | 04:00:02 |
| 8 | ask Mr. Gerwing. | 04:00:06 |
| 9 | Did you-all have company cell phones? | 04:00:06 |
| 10 | A.   No. | 04:00:08 |
| 11 | Q.   And -- | 04:00:12 |
| 12 | A.   Let me step back on that.  Can you define | 04:00:12 |
| 13 | what do you mean by company cell phones? | 04:00:16 |
| 14 | Q.   Did you have more than one cell phone | 04:00:18 |
| 15 | between 2020 and 2023? | 04:00:21 |
| 16 | A.   No. | 04:00:22 |
| 17 | Q.   Did Mr. Gerwing have more than one cell | 04:00:24 |
| 18 | phone between 2020 and 2023, to your knowledge? | 04:00:27 |
| 19 | MR. YARBROUGH:  Objection; form. | 04:00:31 |
| 20 | MR. EVANS:  Object to form. | 04:00:31 |
| 21 | A.   Not that I'm aware of. | 04:00:32 |
| 22 | Q.   Did you use any sort of cloud-based server | 04:00:34 |
| 23 | to store Red Metrics' work product? | 04:00:38 |
| 24 | A.   Now you're definitely in Mr. Gerwing's | 04:00:43 |
| 25 | territory. | 04:00:47 |

CONFIDENTIAL

Page 103

1      Q.   To your knowledge, did Red Metrics have a     04:00:48

2   Microsoft account where Excel data might be stored?   04:00:52

3      A.   Not to my knowledge.                           04:00:57

4      Q.   To your knowledge, did Red Metrics have       04:00:59

5   iCloud accounts where information might be backed      04:01:00

6   up?                                                    04:01:03

7      A.   Not to my knowledge.                           04:01:04

8      Q.   Did your phone have an iCloud account that     04:01:06

9   would back up content on Wire?                         04:01:10

10     A.   No.                                            04:01:11

11          MR. LANGFORD:  I think we'll hand it           04:01:19

12   to Mr. Davidson for just a couple final questions.    04:01:21

13                    EXAMINATION                          04:01:21

14   BY MR. DAVIDSON:                                      04:01:21

15     Q.   Just very briefly.  Again, this is             04:01:24

16   Mr. Davidson on behalf of Mr. Andrews.                04:01:27

17          Earlier this morning you testified that        04:01:30

18   Mr. Phillips or OpSec sent payments to Red Metrics    04:01:36

19   for the work that was conducted in connection with    04:01:42

20   the 2020 election.                                    04:01:47

21     A.   Yes, sir.                                      04:01:48

22     Q.   And you conveyed that it is your               04:01:51

23   recollection sitting here today that those were       04:01:56

24   likely effectuated -- those payments were             04:01:57

25   effectuated via wire transfer as opposed to a check?  04:02:03

CONFIDENTIAL

Page 104

| 1 | A.   Most likely, yes. | 04:02:08 |
| 2 | Q.   And it's my understanding that following | 04:02:09 |
| 3 | your testimony this morning, you assessed whether or | 04:02:13 |
| 4 | not you still have access to the bank records that | 04:02:17 |
| 5 | would have reflected those payments? | 04:02:21 |
| 6 | A.   Yes, sir. | 04:02:24 |
| 7 | Q.   And it's your testimony -- and I'm just | 04:02:26 |
| 8 | getting this for the record to be clear. | 04:02:29 |
| 9 | It's your testimony that you have | 04:02:31 |
| 10 | subsequently switched banks? | 04:02:32 |
| 11 | A.   Yes. | 04:02:34 |
| 12 | Q.   And, therefore, you do not presently have | 04:02:35 |
| 13 | access to those -- those financial records? | 04:02:37 |
| 14 | A.   That is -- that is correct. | 04:02:42 |
| 15 | MR. LANGFORD:  No further questions | 04:02:48 |
| 16 | from plaintiff. | 04:02:49 |
| 17 | MR. YARBROUGH:  Austin, do you have | 04:02:50 |
| 18 | anything? | 04:02:52 |
| 19 | MR. VINING:  Yes, I have just a few | 04:02:53 |
| 20 | questions. | 04:02:55 |
| 21 | MR. CRENSHAW:  Give us just a few | 04:02:56 |
| 22 | seconds, Austin. | 04:02:57 |
| 23 | Okay.  You may proceed. | 04:03:06 |
| 24 | EXAMINATION | 04:03:00 |
| 25 | BY MR. VINING: | 04:03:08 |

CONFIDENTIAL

Page 105

| | | |
|---|---|---|
| 1 | Q.    Good afternoon.  My name is Austin Vining. | 04:03:08 |
| 2 | I represent defendants Dinesh D'Souza and D'Souza | 04:03:10 |
| 3 | Media LLC.  I have just a couple of quick questions. | 04:03:14 |
| 4 | Is it your understanding that OpSec sent | 04:03:18 |
| 5 | Red Metrics surveillance footage of voters | 04:03:22 |
| 6 | depositing ballots in ballot boxes -- in drop boxes? | 04:03:26 |
| 7 | I'm sorry. | 04:03:29 |
| 8 | A.    First, nice to meet you as well. | 04:03:29 |
| 9 | That would be better answered by Tim.  I | 04:03:34 |
| 10 | did not receive those. | 04:03:39 |
| 11 | Q.    Is it your understanding that Red Metrics | 04:03:42 |
| 12 | received those? | 04:03:44 |
| 13 | A.    Yes. | 04:03:47 |
| 14 | Q.    Do you recall approximately when those | 04:03:51 |
| 15 | would have been received? | 04:03:52 |
| 16 | A.    I do not. | 04:03:56 |
| 17 | Can you -- maybe you can define | 04:04:00 |
| 18 | approximately. | 04:04:03 |
| 19 | Q.    Yeah.  Do you know if it was in 2021 or | 04:04:03 |
| 20 | 2022? | 04:04:10 |
| 21 | A.    No, I don't recall which one. | 04:04:11 |
| 22 | Q.    Do you know if it was before or after | 04:04:20 |
| 23 | July 1 of 2021? | 04:04:22 |
| 24 | A.    Before -- say that date one more time for | 04:04:25 |
| 25 | me. | 04:04:29 |

CONFIDENTIAL

Page 106

1     Q.  July 1, 2021.                 04:04:29

2     A.  I don't know.  I'm sure Tim -- Tim     04:04:35

3  probably would but I do not.  I'm just not in the   04:04:39

4  production side so I just don't -- I don't know.   04:04:43

5     Q.  Is there anything you remember about the  04:04:47

6  time it was received?                   04:04:49

7     A.  When you say it, what are you referring to 04:04:53

8  again?                                  04:04:59

9     Q.  The video, surveillance video footage from 04:05:00

10  voters depositing ballots into drop boxes.     04:05:04

11     A.  I really -- I really don't remember the   04:05:08

12  time frame.  I apologize.              04:05:11

13     Q.  Okay.  Thank you.             04:05:12

14         MR. VINING:  I have no further      04:05:13

15  questions.                         04:05:14

16              EXAMINATION           04:05:16

17  BY MR. EVANS:                    04:05:17

18     Q.  I just have a couple questions.  My name  04:05:17

19  is Jake Evans.  I represent --           04:05:21

20         MR. CRENSHAW:  Grab you a mic.      04:05:21

21     Q.  I just have a couple questions.  My name  04:05:29

22  is Jake Evans.  I represent the True the Vote    04:05:31

23  defendants, Mr. Phillips and Ms. Engelbrecht.    04:05:34

24     Earlier you testified about a contract     04:05:38

25  between Red Metrics and OpSec.  When is the last  04:05:41

CONFIDENTIAL

Page 107

1    time you saw that contract?                         04:05:45

2         A.    It would have been during the engagement  04:05:46

3    so three -- three to four years ago.               04:05:51

4         Q.    And do you remember how many pages that  04:05:57

5    contract was?                                       04:05:58

6         A.    No.                                       04:05:59

7         Q.    Do you recall how many provisions there  04:06:02

8    were in that contract?                              04:06:04

9         A.    No, sir.                                  04:06:06

10        Q.    Do you recall any specific language in   04:06:07

11   that contract?                                      04:06:11

12        A.    I do not recall specific language in that 04:06:13

13   contract.                                           04:06:19

14        Q.    And earlier you offered testimony about  04:06:19

15   that contract.                                      04:06:23

16            Could your testimony have been off in some 04:06:24

17   way because it has been a number of years since you 04:06:27

18   reviewed it last?                                   04:06:29

19        A.    That's a good point.  What I recall is   04:06:30

20   that in our contracts we have terms and conditions  04:06:34

21   and we have deliverables.  But to your point, I do  04:06:39

22   not recall specific language in that.               04:06:42

23        Q.    And earlier there were some questions that 04:06:47

24   elicited answers where you may have testified about  04:06:49

25   your understanding what Mr. Phillips was thinking.   04:06:52

CONFIDENTIAL

Page 108

```
 1          Do you know what Gregg Phillips is          04:06:56
 2    thinking at any given time?                       04:06:59
 3       A.   No, sir.                                  04:07:01
 4       Q.   Do you know what Gregg Phillips'          04:07:02
 5    understanding is at any given time?               04:07:04
 6       A.   No, sir.                                  04:07:06
 7       Q.   And could Gregg Phillips' understanding   04:07:07
 8    and thinking have been different than to the extent 04:07:10
 9    you said what you thought it was?                 04:07:13
10       A.   Yes, sir.                                 04:07:15
11       Q.   And so your testimony about what Mr. Gregg 04:07:16
12    Phillips was thinking and his understanding was was 04:07:22
13    based upon speculation and not personal knowledge;  04:07:24
14    is that right?                                    04:07:26
15       A.   Yes, sir.                                 04:07:27
16             MR. EVANS:  No further questions.        04:07:28
17             MR. CRENSHAW:  Any other questions?      04:07:32
18             MR. LANGFORD:  We just want to ask one   04:07:35
19    last thing that we are trying to pull up on realtime 04:07:39
20    to see if we had already asked.                   04:07:39
21             FURTHER EXAMINATION                      04:07:39
22    BY MR. LANGFORD:                                  04:07:39
23       Q.   But can you just -- if you have already   04:07:44
24    answered it, I apologize.                         04:07:45
25          Have you spoken with Gregg Phillips or JD   04:07:49
```

CONFIDENTIAL

Page 109

1    about this litigation?                                04:07:55

2        A.   No.                                         04:07:58

3                MR. LANGFORD:  No further questions.     04:08:01

4                THE VIDEOGRAPHER:  That concludes the    04:08:04

5    testimony of the Red Metrics LLC representative Ben  04:08:05

6    Matthews.  We're off the record at 4:07 p.m.         04:08:10

7                (Deposition concluded at 4:07 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 110

1                    DEPOSITION CHANGES

2    WITNESS:  BEN MATTHEWS

3    PAGE NO.  LINE NO.    CHANGE    REASON FOR CHANGE

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

CONFIDENTIAL

Page 111

1

2

3

4                           _____
                            (Signature of the Witness)

5

6

7

8    THE STATE OF _____

9    COUNTY OF _____

10

11        Subscribed and sworn to before me by the said

12   witness, BEN MATTHEWS, on this the _____ day of

13   _____, 2024.

14

15

                            _____
16                          Notary Public in and for the

                            State of _____

17                          County of _____

18   My commission expires: _____

19

20

21

22

23

24

25

CONFIDENTIAL

Page 112

1    STATE OF TEXAS    )

2    COUNTY OF DALLAS )

3        I, Michelle L. Munroe, Certified Shorthand

4    Reporter in and for the State of Texas, certify that

5    the foregoing deposition of BEN MATTHEWS was reported

6    stenographically by me at the time and place

7    indicated, said witness having been placed under oath

8    by me, and that the deposition is a true record of

9    the testimony given by the witness;

10       That the amount of time used by each party at

11   the deposition is as follows:

         Mr. Langford  -    2 hours

12       Mr. Davidson  -    1 minute

         Mr. Vining    -    2 minutes

13       Mr. Evans     -    2 minutes

14       I further certify that I am neither counsel for

15   nor related to any party in this cause and am not

16   financially interested in its outcome.

17       Given under my hand on this the 6th day

18   of November, 2024.

19

20

21

         Michelle L. Munroe, CSR No. 6011

22       Commission expires 1-31-26

         Firm Registration #571

23       VERITEXT LEGAL SOLUTIONS

         300 Throckmorton Street, Suite 1600

24       Fort Worth, Texas  76102

         817.336.3042  telephone

25

CONFIDENTIAL

Page 113

1    Jace Yarbrough, Esquire

2    jace.yarbrough@the-sl-lawfirm.com

3                    November 8, 2024

4    RE:    Andrews, Mark v. D'souza, Dinesh Et Al

5        10/30/2024, Ben Matthews (#6990099)

6        The above-referenced watermarked transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22               Yours,

23               Veritext Legal Solutions

24

25

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
                    VERITEXT LEGAL SOLUTIONS

        COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

   Veritext Legal Solutions represents that the

   foregoing transcript is a true, correct and complete

   transcript of the colloquies, questions and answers

   as submitted by the court reporter. Veritext Legal

   Solutions further represents that the attached

   exhibits, if any, are true, correct and complete

   documents as submitted by the court reporter and/or

   attorneys in relation to this deposition and that

   the documents were processed in accordance with

   our litigation support and production standards.


   Veritext Legal Solutions is committed to maintaining

   the confidentiality of client and witness information,

   in accordance with the regulations promulgated under

   the Health Insurance Portability and Accountability

   Act (HIPAA), as amended with respect to protected

   health information and the Gramm-Leach-Bliley Act, as

   amended, with respect to Personally Identifiable

   Information (PII). Physical transcripts and exhibits

   are managed under strict facility and personnel access

   controls. Electronic files of documents are stored

   in encrypted form and are transmitted in an encrypted
```

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.