# EXHIBIT 183

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF GEORGIA
 3                     ATLANTA DIVISION
 4    MARK ANDREWS,                )
                                   )
 5           Plaintiff,            )
                                   )
 6    vs.                          )  Case No.
                                   )  1:22-cv-04259-SDG
 7    DINESH D'SOUZA, et al.,      )
                                   )
 8           Defendants.           )
 9
10
11
12    **********************************************
13            VIDEOTAPED ORAL DEPOSITION OF
14                   RED METRICS LLC
15      BY AND THROUGH ITS DESIGNATED REPRESENTATIVE
16                   TIM GERWING
17                 OCTOBER 30, 2024
18      CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
19    **********************************************
20
21
22
23
24
25
```

Page 2

1

2          On the 30th day of October, 2024, at 11:16 a.m.,

3    the videotaped oral deposition of the above-named

4    witness was taken at the instance of the Plaintiff,

5    Mark Andrews, before Michelle L. Munroe, Certified

6    Shorthand Reporter in and for the State of Texas, at

7    Haynes & Boone LLP, 2801 N. Harwood Street, Suite

8    2300, Dallas, Texas, pursuant to Notice and the

9    agreement hereinafter set forth.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S
 2

     FOR THE PLAINTIFF:
 3

         John Langford
 4       PROTECT DEMOCRACY PROJECT
         82 Nassau Street
 5       Suite 601
         New York, New York  10038
 6       john.langford@protectdemocracy.org
 7

         Jared Fletcher Davidson
 8       PROTECT DEMOCRACY PROJECT
         3014 Dauphine Street, Suite J
 9       New Orleans, Louisiana  70117
         jared.davidson@protectdemocracy.org
10

11       Jane Peterson Bentrott  (via Zoom)
         PROTECT DEMOCRACY PROJECT
12       2020 Pennsylvania Avenue, NW
         Suite 163
13       Washington, DC  20006
         jane.bentrott@protectdemocracy.org
14

15

     FOR THE DEFENDANTS DINESH D'SOUZA AND D'SOUZA MEDIA
16   LLC:                                           00:00:02
17       Austin C. Vining  (via Zoom)
         BUCHALTER
18       790 Stratforde Drive
         Alpharetta, Georgia  30004
19       avining@buchalter.com
20

21   FOR THE DEFENDANTS CATHERINE ENGELBRECHT, GREGG    00:48:23
     PHILLIPS, AND TRUE THE VOTE:                      00:42:30
22

         Jake Evans
23       GREENBERG TRAURIG LLP
         3333 Piedmont Road NE, Suite 2500
24       Atlanta, Georgia  30305
         jake.evans@gtlaw.com

25
```

1

FOR THE WITNESS:

2

    Jace Yarbrough
3    S|L LAW FIRM
    610 Uptown Boulevard
4    Suite 2000
    Cedar Hill, Texas  75104
5    940.299.7243  telephone
    jace.yarbrough@the-sl-lawfirm.com

6

7

ALSO PRESENT:
8    Marsha Curtis  (via Zoom)
    Richard Foster, Video Technician
9    David Crenshaw, Video Technician
    David Johnson, Concierge Technician

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                        I N D E X

WITNESS                                          PAGE

2

TIM GERWING

3

        Examination by Mr. Langford..............  7

4

        Examination by Mr. Davidson.............. 75

5

        Examination by Mr. Evans................ 137

6

        Examination by Mr. Vining............... 139

7

        Further examination by Mr. Davidson....... 147

8
9

RED MOUNTAIN EXHIBITS                        IDENTIFIED

10

Exhibit 2        2000 Mules DVD..................  44

11

Exhibit 3        First Amended Complaint......... 118

12

Exhibit 4        Book excerpts - 2000 Mules......  92

13

Exhibit 9        Exhibit 9 from Gregg Phillips'
14               deposition.....................  58
15
16
17
18
19
20
21
22
23
24
25

```
 1                    P R O C E E D I N G S
 2            THE VIDEOGRAPHER:  Good morning.          11:16:21
 3    We're on the record.  The time is 11:16 a.m. and   11:16:21
 4    today is October 30, 2024.  And this is the        11:16:25
 5    video-recorded deposition of Tim Gerwing being taken  11:16:30
 6    by counsel for the plaintiff in the matter of      11:16:35
 7    Mark Andrews versus Dinesh D'Souza, et al., filed in  11:16:37
 8    the United States District Court for the Northern  11:16:40
 9    District of Georgia, Case Number 1:22-cv-04259.  This  11:16:43
10    deposition is taking place at 2801 North Harwood,  11:16:54
11    Suite 2300, in Dallas, Texas.                      11:16:58
12            My name is Richard Foster from the          11:17:00
13    firm Veritext Legal Solutions; I'm the videographer.  11:17:03
14    The court reporter today is Michelle Munroe, also   11:17:06
15    with the firm Veritext Legal Solutions.            11:17:08
16            All counsel present please state your      11:17:10
17    appearances for the record.                         11:17:13
18            MR. LANGFORD:  John Langford for            11:17:13
19    plaintiff, Mark Andrews.                            11:17:15
20            MR. DAVIDSON:  Jared Davidson for           11:17:16
21    plaintiff, Mark Andrews.                            11:17:18
22            MR. EVANS:  Jake Evans for defendants       11:17:19
23    True the Vote, Gregg Phillips, and Catherine       11:17:22
24    Engelbrecht.                                        11:17:24
25            MR. YARBROUGH:  Jace Yarbrough             11:17:24
```

Page 7

| | | |
|---|---|---|
| 1 | representing the deponent. | 11:17:25 |
| 2 | MR. VINING:  Austin Vining | 11:17:30 |
| 3 | representing Dinesh D'Souza and D'Souza Media, LLC, | 11:17:30 |
| 4 | defendants. | 11:17:33 |
| 5 | MS. BENTROTT:  Jane Bentrott, also | 11:17:35 |
| 6 | representing plaintiff. | 11:17:36 |
| 7 | TIM GERWING, | 11:17:36 |
| 8 | having been first duly sworn, testified as follows: | 11:17:36 |
| 9 | EXAMINATION | 11:17:36 |
| 10 | BY MR. LANGFORD: | 11:17:50 |
| 11 | Q.   My name is John Langford, and I'll be | 11:17:50 |
| 12 | taking your deposition and asking you questions | 11:17:54 |
| 13 | today. | 11:17:54 |
| 14 | Could you just also state your address for | 11:17:55 |
| 15 | the record? | 11:17:57 |
| 16 | ██████████████████████████████████ | 11:17:57 |
| 17 | ██████████████████████████████████ | 11:18:00 |
| 18 | Q.   Have you ever had your deposition taken | 11:18:02 |
| 19 | before? | 11:18:04 |
| 20 | A.   No. | 11:18:04 |
| 21 | Q.   I would like to go over some ground rules | 11:18:07 |
| 22 | and housekeeping so that we all have the same | 11:18:09 |
| 23 | understanding. | 11:18:11 |
| 24 | In this deposition, I will be asking you | 11:18:12 |
| 25 | questions.  My questions and your answers will be | 11:18:13 |

| | | |
|---|---|---|
| 1 | recorded by the videographer and transcribed by the | 11:18:16 |
| 2 | court reporter. | 11:18:19 |
| 3 | For that reason, we will both need to | 11:18:20 |
| 4 | speak up and to answer out loud so that the reporter | 11:18:22 |
| 5 | can hear you when you give your answers. | 11:18:25 |
| 6 | Do you understand that? | 11:18:27 |
| 7 | A.   Sure. | 11:18:27 |
| 8 | Q.   If you nod or shake your head or give a | 11:18:28 |
| 9 | nonverbal answer or say something like "uh-huh," I'm | 11:18:30 |
| 10 | going to try to remind you to give a clear verbal | 11:18:34 |
| 11 | answer with words. | 11:18:36 |
| 12 | Is that fair? | 11:18:37 |
| 13 | A.   Sure. | 11:18:38 |
| 14 | Q.   The court reporter also might have trouble | 11:18:39 |
| 15 | if we talk over each other, so I'm going to let you | 11:18:43 |
| 16 | finish your answer before I ask you another | 11:18:46 |
| 17 | question.  Equally, it's very important that you | 11:18:48 |
| 18 | wait until I finish my question before you begin | 11:18:50 |
| 19 | answering even when you think you know what the rest | 11:18:53 |
| 20 | of the question will be. | 11:18:55 |
| 21 | Will you do that? | 11:18:56 |
| 22 | A.   Sure.  Yes. | 11:18:57 |
| 23 | Q.   You have just taken an oath that requires | 11:18:58 |
| 24 | you to tell the truth, the whole truth, and nothing | 11:19:00 |
| 25 | but the truth, and that is the same oath you would | 11:19:02 |

Page 9

| | | |
|---|---|---|
| 1 | take if you were to testify in court. | 11:19:06 |
| 2 | Do you understand that? | 11:19:07 |
| 3 | A.   Yes. | 11:19:07 |
| 4 | Q.   On occasion I may ask a question that I | 11:19:08 |
| 5 | don't state very well or for some other reason you | 11:19:10 |
| 6 | don't understand it.  If you don't understand my | 11:19:12 |
| 7 | question for any reason, don't answer it.  Instead, | 11:19:14 |
| 8 | please ask for clarification. | 11:19:17 |
| 9 | Will you do that? | 11:19:18 |
| 10 | A.   Sure.  Yes. | 11:19:19 |
| 11 | Q.   We will plan to take a break from time to | 11:19:23 |
| 12 | time, including at 12:30 for lunch.  But if you need | 11:19:25 |
| 13 | to take a break at any time, let me know.  If I'm in | 11:19:27 |
| 14 | the middle of a question or I've just asked the | 11:19:30 |
| 15 | question, please finish answering the question and | 11:19:31 |
| 16 | then we can plan to take a break. | 11:19:33 |
| 17 | I know you are -- you're in the same time | 11:19:36 |
| 18 | zone. | 11:19:39 |
| 19 | If you want to talk to your attorney, | 11:19:39 |
| 20 | that's completely fine.  I just ask that if there's | 11:19:42 |
| 21 | a question pending or you are in the middle of an | 11:19:45 |
| 22 | answer, please finish the answer before speaking to | 11:19:47 |
| 23 | your attorney unless you need to talk to him about a | 11:19:50 |
| 24 | matter of privilege. | 11:19:54 |
| 25 | Will you do that? | 11:19:54 |

Page 10

| | | |
|---|---|---|
| 1 | A.   Yes. | 11:19:55 |
| 2 | Q.   Relatedly, while we are on the record, you | 11:19:55 |
| 3 | are not allowed to have private conversations with | 11:19:58 |
| 4 | anyone, including your counsel, by any means, | 11:20:00 |
| 5 | including text message, electronic mail, or any chat | 11:20:03 |
| 6 | feature. | 11:20:06 |
| 7 | Do you understand that? | 11:20:06 |
| 8 | A.   Uh-huh. | 11:20:07 |
| 9 | Q.   From time to time, your attorney or one of | 11:20:07 |
| 10 | the other attorneys may object.  Unless your | 11:20:09 |
| 11 | attorney tells you not to answer the question | 11:20:11 |
| 12 | specifically, you should go ahead and answer the | 11:20:13 |
| 13 | question.  That includes objections based on form, | 11:20:15 |
| 14 | after which objection I'll direct you to go ahead | 11:20:19 |
| 15 | and answer the question. | 11:20:22 |
| 16 | A.   Okay. | 11:20:22 |
| 17 | Q.   Do you understand that? | 11:20:23 |
| 18 | A.   Yes.  Uh-huh. | 11:20:24 |
| 19 | Q.   Sometimes it happens that you will give an | 11:20:25 |
| 20 | answer as completely as you can.  And then later on, | 11:20:27 |
| 21 | maybe five minutes later, maybe two hours later, you | 11:20:29 |
| 22 | remember some additional information or perhaps some | 11:20:32 |
| 23 | clarification in response to that earlier question. | 11:20:34 |
| 24 | If that happens to you, please tell us | 11:20:36 |
| 25 | that you would like to add or clarify something to | 11:20:39 |

Page 11

| | | |
|---|---|---|
| 1 | the earlier answer and we will that right then when | 11:20:41 |
| 2 | it's on your mind. | 11:20:46 |
| 3 | A.   Okay. | 11:20:46 |
| 4 | Q.   Will you do that? | 11:20:46 |
| 5 | A.   Yes. | 11:20:47 |
| 6 | Q.   If at any point during this deposition you | 11:20:48 |
| 7 | have problems with the technology, the exhibits that | 11:20:51 |
| 8 | will be displayed in front of you or on the | 11:20:53 |
| 9 | television, please notify me.  You will have a | 11:20:55 |
| 10 | copy -- hard copy of exhibits in front of you. | 11:20:57 |
| 11 | A.   I see. | 11:21:00 |
| 12 | Q.   Do you understand? | 11:21:00 |
| 13 | A.   Great.  Yes. | 11:21:01 |
| 14 | Q.   Because it is so critical we get your | 11:21:05 |
| 15 | full, complete, and accurate testimony, I have to | 11:21:06 |
| 16 | ask you whether you are taking any medication or | 11:21:10 |
| 17 | drugs of any kind or whether you have consumed any | 11:21:12 |
| 18 | cough syrup or medicine or something containing | 11:21:15 |
| 19 | alcohol that might make it difficult for you to | 11:21:18 |
| 20 | remember things or to understand and answer my | 11:21:21 |
| 21 | questions today. | 11:21:23 |
| 22 | So are you taking or have you had anything | 11:21:23 |
| 23 | like that? | 11:21:26 |
| 24 | A.   No. | 11:21:27 |
| 25 | Q.   Are there any physical or health reasons | 11:21:28 |

Page 12

```
 1    that would prevent you from testifying fully today?    11:21:31

 2        A.   No.                                           11:21:33

 3        Q.   Is there any reason why you cannot give       11:21:33

 4    full, complete, and accurate testimony today?          11:21:36

 5        A.   No.                                           11:21:39

 6        Q.   All right.  Just briefly, how did you         11:21:40

 7    prepare for this deposition?                           11:21:44

 8        A.   Jace and I spent some time over the last      11:21:49

 9    few days just one-on-one in preparation, mainly        11:21:52

10    because it's my first deposition.                      11:21:55

11        Q.   Did you talk to anyone other than your        11:22:00

12    attorney about this deposition?                        11:22:01

13        A.   No.                                           11:22:02

14        Q.   Did you communicate with any of the           11:22:03

15    defendants about this deposition?                      11:22:06

16        A.   No.                                           11:22:08

17        Q.   And you're aware of who the defendants are    11:22:10

18    in this litigation?                                    11:22:12

19        A.   I am, yes.                                    11:22:13

20        Q.   Did you speak with anyone from OpSec Group    11:22:16

21    to prepare for this deposition?                        11:22:18

22        A.   No, I did not.                                11:22:20

23        Q.   Did you review any documents to prepare       11:22:21

24    for this deposition?                                   11:22:25

25        A.   Yes, so the original subpoena and then our    11:22:28
```

Page 13

```
 1    response to that subpoena.                        11:22:34

 2         Q.   Any other documents?                    11:22:35

 3         A.   No, that was it.                         11:22:36

 4         Q.   Did you review any internal Red Metrics  11:22:37

 5    work product or documentation?                     11:22:44

 6         A.   No, there wasn't anything to review.     11:22:46

 7         Q.   Did you review any deposition transcripts 11:22:49

 8    in this case?                                      11:22:53

 9         A.   Yes.  Yes.  The most recent depositions  11:22:53

10    from Mr. Phillips and Mrs. Engelbrecht.            11:22:58

11         Q.   Any other deposition transcripts?        11:23:03

12         A.   That was it.                             11:23:04

13         Q.   Were you told what anyone else said in any 11:23:05

14    other deposition?                                  11:23:07

15              MR. YARBROUGH:  Objection.  I'm going    11:23:08

16    to instruct you not to answer that question as it  11:23:10

17    calls for privileged information.                  11:23:11

18         Q.   I will ask you -- we'll come back to that. 11:23:13

19              Do you currently work at Red Metrics?    11:23:28

20         A.   We -- yes, I'm a employee and partial    11:23:40

21    owner of Red Metrics.                              11:23:47

22         Q.   And what is your role as an employee at  11:23:49

23    Red Metrics?                                       11:23:51

24         A.   Yeah, chief technology officer.          11:23:52

25         Q.   How long have you had that role?         11:23:56
```

Page 14

1      A.   We started the company in 2015 so since          11:23:57

2   that -- since that inception.                            11:24:03

3      Q.   And when you say "we," who is "we"?              11:24:05

4      A.   Ben Matthews and myself are the majority         11:24:07

5   owners in Red Metrics and have been since 2015.          11:24:12

6      Q.   And when you started in 2015, were you the       11:24:17

7   only employee of Red Metrics?                            11:24:20

8      A.   No.  We had -- we had four owners at the         11:24:24

9   time that we started the company, and -- but, no, I      11:24:31

10   was one of the first to go from being just a partner     11:24:36

11   to actually working the business as a W-2 employee.      11:24:41

12      Q.   And --                                           11:24:45

13      A.   But we had other employees.                      11:24:46

14      Q.   Who were the other employees?                    11:24:47

15      A.   Ben joined me as an employee shortly             11:24:51

16   thereafter, and so he and I were the primary two         11:24:56

17   employees at the time.                                   11:25:02

18      Q.   And what were you doing right before you         11:25:06

19   started Red Metrics and began working for Red            11:25:07

20   Metrics?                                                 11:25:12

21      A.   Sure.  For the preceding four years              11:25:12

22   since -- yeah, 2011, I was at what was then Online       11:25:20

23   for Life, which is now Human Coalition, a nonprofit      11:25:24

24   501(c)(3).                                               11:25:28

25      Q.   And Mr. Matthews also worked there?              11:25:30

Page 15

| | | |
|---|---|---|
| 1 | A.    He did. | 11:25:32 |
| 2 | Q.    Is that how you guys met? | 11:25:33 |
| 3 | A.    Yes, it is. | 11:25:36 |
| 4 | Q.    Did -- we talked about the deposition | 11:25:37 |
| 5 | transcripts that you reviewed. | 11:25:57 |
| 6 | Did you review any other litigation | 11:25:57 |
| 7 | materials to prepare for this deposition? | 11:25:59 |
| 8 | A.    No, that was the extent of it. | 11:26:01 |
| 9 | Q.    Okay.  All right.  Do you understand that | 11:26:10 |
| 10 | you're testifying on behalf of Red Metrics LLC? | 11:26:18 |
| 11 | A.    Yes, that's my understanding. | 11:26:24 |
| 12 | Q.    So unless we specify otherwise, when I say | 11:26:27 |
| 13 | "you," I'm talking about Red Metrics. | 11:26:29 |
| 14 | Does that make sense? | 11:26:32 |
| 15 | A.    Yeah, that makes sense. | 11:26:33 |
| 16 | Q.    When -- when did Red Metrics -- let me | 11:26:35 |
| 17 | back up here. | 11:26:49 |
| 18 | Are you familiar with Gregg Phillips? | 11:26:50 |
| 19 | A.    Yes.  Yes, I'm familiar. | 11:26:55 |
| 20 | Q.    How do you know Gregg Phillips? | 11:26:57 |
| 21 | A.    We first connected in late 2020. | 11:26:59 |
| 22 | Q.    And how did you connect? | 11:27:05 |
| 23 | A.    Yeah, we -- he called -- he called me in | 11:27:08 |
| 24 | December, I think, of 2020, had heard about some of | 11:27:12 |
| 25 | our work. | 11:27:17 |

Page 16

| | | |
|---|---|---|
| 1 | Q.  And what did he say to you? | 11:27:18 |
| 2 | A.  I don't recall the exact conversation that | 11:27:20 |
| 3 | was had when we first connected. | 11:27:29 |
| 4 | Q.  Do you recall -- was he looking for -- let | 11:27:30 |
| 5 | me strike that. | 11:27:37 |
| 6 | Did he ask Red Metrics to do work for | 11:27:38 |
| 7 | himself? | 11:27:42 |
| 8 | A.  He was -- yes.  Yes.  He was curious to | 11:27:45 |
| 9 | see if there was a fit. | 11:27:51 |
| 10 | Q.  And what was your understanding of the | 11:27:53 |
| 11 | work that he was interested in? | 11:27:55 |
| 12 | A.  Sure.  He was wanting to know specifically | 11:27:57 |
| 13 | if any of the big data analytics might apply to | 11:28:06 |
| 14 | analysis of election interference. | 11:28:12 |
| 15 | Q.  And what did he say about potential | 11:28:16 |
| 16 | election interference on that call? | 11:28:19 |
| 17 | A.  I don't recall the exact agenda or talking | 11:28:22 |
| 18 | points on that call. | 11:28:27 |
| 19 | Q.  Is your -- did he have a belief that there | 11:28:30 |
| 20 | was election fraud? | 11:28:31 |
| 21 | MR. YARBROUGH:  Objection; form. | 11:28:32 |
| 22 | Q.  You can answer that question. | 11:28:34 |
| 23 | A.  I can't speak to whether he thought there | 11:28:36 |
| 24 | was or wasn't. | 11:28:39 |
| 25 | Q.  Did he tell you that he believed there was | 11:28:39 |

Page 17

```
 1    election fraud on that conversation?              11:28:41
 2         A.   I don't recall that.                    11:28:43
 3         Q.   Was he interested in election fraud as it  11:28:47
 4    relates to the 2020 presidential election?       11:28:49
 5              MR. YARBROUGH:  Objection; form.        11:28:53
 6         Q.   You can answer the question.            11:28:54
 7         A.   I think his interest was not specific to  11:28:55
 8    2020.                                             11:29:08
 9         Q.   And what did you tell him about what Red  11:29:11
10    Metrics might do for Mr. Phillips?                11:29:15
11         A.   On that first call?                     11:29:18
12         Q.   Yes.                                     11:29:19
13         A.   It was early -- it was probably early   11:29:20
14    ideation.  We never get to resolving and defining  11:29:25
15    requirements on a first call.  So it was probably  11:29:30
16    early discovery.                                  11:29:32
17         Q.   And do you have an understanding about  11:29:34
18    whether he also spoke with Mr. Matthews in that  11:29:36
19    period?                                           11:29:40
20         A.   I don't recall that.                    11:29:43
21         Q.   Is it your understanding that you were the  11:29:47
22    first call that he made to Red Metrics?          11:29:49
23         A.   I believe I was the first -- the first  11:29:53
24    person from Red Metrics to take that call, yes.  11:29:59
25         Q.   And did you tell anyone at Red Metrics  11:30:01
```

Page 18

| | | |
|---|---|---|
| 1 | about the call after you spoke with Mr. Phillips? | 11:30:05 |
| 2 | A.   At some point later, I would have | 11:30:09 |
| 3 | absolutely. | 11:30:13 |
| 4 | Q.   Who would you have told? | 11:30:15 |
| 5 | A.   Ben and myself would have been the -- | 11:30:18 |
| 6 | probably first two to be involved in terms of what | 11:30:23 |
| 7 | might be a fit, what might not be. | 11:30:27 |
| 8 | Q.   And how would you have talked to Ben? | 11:30:29 |
| 9 | A.   How would I have talked to Ben? | 11:30:33 |
| 10 | Q.   Would it have been a phone call? | 11:30:34 |
| 11 | A.   I don't recall if it was a phone call or a | 11:30:40 |
| 12 | message. | 11:30:43 |
| 13 | Q.   If it was a message, what kind of message | 11:30:44 |
| 14 | would it have been? | 11:30:46 |
| 15 | A.   Sure.  If it wasn't a phone call, it would | 11:30:47 |
| 16 | have been on one of our encrypted platforms that we | 11:30:54 |
| 17 | use for communications. | 11:30:57 |
| 18 | Q.   And what are those encrypted platforms | 11:30:58 |
| 19 | that you use for communications? | 11:31:00 |
| 20 | A.   Sure.  Primary platform is Wire. | 11:31:03 |
| 21 | Q.   And any other platforms that you would | 11:31:07 |
| 22 | have used? | 11:31:09 |
| 23 | A.   That probably would have been the primary | 11:31:09 |
| 24 | platform. | 11:31:16 |
| 25 | Q.   Did you have an email account associated | 11:31:16 |

Page 19

```
 1    with Red Metrics?                                    11:31:19

 2         A.   Yes.                                       11:31:22

 3         Q.   What was your email address?              11:31:23

 4         A.   It would just be ███████████████           11:31:27

 5         Q.   And did you ever use email to communicate 11:31:34

 6    with people inside Red Metrics?                      11:31:37

 7         A.   Sure.  Inside Red Metrics within the team, 11:31:39

 8    yes.                                                 11:31:45

 9         Q.   And did you ever use -- would you have     11:31:46

10    used that email address ██████████████████           11:31:48

11         A.   If I was communicating with someone        11:31:52

12    internally on email, yes.                            11:31:57

13         Q.   Would you have used any other email        11:31:58

14    address to communicate with people at Red Metrics?   11:31:59

15         A.   No.                                        11:32:01

16         Q.   Did you ever use your email account to     11:32:05

17    communicate with Mr. Phillips?                       11:32:08

18         A.   No, that -- those communications were kept 11:32:09

19    to -- kept to Wire.                                  11:32:16

20         Q.   So you never used any email account to     11:32:19

21    communicate with Mr. Phillips?                       11:32:22

22              MR. YARBROUGH:  Objection; form.           11:32:24

23         A.   We kept it on Wire.                         11:32:24

24         Q.   And why did you keep it on Wire?           11:32:28

25         A.   Our industry practice as a company is to   11:32:30
```

Page 20

| | | |
|---|---|---|
| 1 | maintain all client communications on Wire, | 11:32:36 |
| 2 | expressly to keep it off of email.  So this wasn't a | 11:32:40 |
| 3 | unique client or unique conversation. | 11:32:44 |
| 4 | Q.  And why do you keep things off of email? | 11:32:46 |
| 5 | A.  Very simply, for the privacy of our | 11:32:48 |
| 6 | clients. | 11:32:54 |
| 7 | Q.  Is Wire a platform where the | 11:32:55 |
| 8 | communications automatically delete? | 11:32:58 |
| 9 | A.  You can set it so that those messages | 11:33:04 |
| 10 | delete, yes. | 11:33:07 |
| 11 | Q.  And did you set it so that your messages | 11:33:09 |
| 12 | with Mr. Phillips would delete? | 11:33:11 |
| 13 | A.  I don't recall if we set it to auto | 11:33:14 |
| 14 | delete.  It's a custom setting. | 11:33:18 |
| 15 | Q.  And were your internal communications | 11:33:19 |
| 16 | on -- let me back up. | 11:33:21 |
| 17 | Did you use Wire for internal | 11:33:24 |
| 18 | communications at Red Metrics? | 11:33:26 |
| 19 | A.  A hundred percent, yes. | 11:33:28 |
| 20 | Q.  And were those messages set to auto | 11:33:30 |
| 21 | delete? | 11:33:33 |
| 22 | A.  Four years ago, I don't recall what the | 11:33:33 |
| 23 | settings were on those particular Wire threads. | 11:33:38 |
| 24 | They don't automatically set to auto delete. | 11:33:42 |
| 25 | Q.  Do you still have Wire? | 11:33:44 |

Page 21

| | | |
|---|---|---|
| 1 | A.   Yes. | 11:33:46 |
| 2 | Q.   Do you still use Wire? | 11:33:48 |
| 3 | A.   A hundred percent. | 11:33:50 |
| 4 | Q.   Does Wire currently reflect your | 11:33:52 |
| 5 | communications with Mr. Phillips? | 11:33:55 |
| 6 | A.   Can you restate the question? | 11:33:59 |
| 7 | Q.   Does Wire currently reflect the | 11:34:00 |
| 8 | communications you had with Mr. Phillips? | 11:34:02 |
| 9 | A.   No.  Any time we end a client engagement, | 11:34:07 |
| 10 | those rooms -- discussion rooms are purged. | 11:34:10 |
| 11 | Q.   Would internal communications with -- | 11:34:14 |
| 12 | among employees at Red Metrics about Mr. Phillips | 11:34:17 |
| 13 | have also been purged? | 11:34:21 |
| 14 | A.   We purge those over time, whether it's | 11:34:24 |
| 15 | internal or external with a client.  So any and all | 11:34:26 |
| 16 | communications are kept at a minimum on the | 11:34:30 |
| 17 | platform, maybe the last 30 days. | 11:34:34 |
| 18 | Q.   And do you have -- is Wire a platform | 11:34:37 |
| 19 | where you can set up different threads of | 11:34:41 |
| 20 | communication? | 11:34:43 |
| 21 | A.   Yes. | 11:34:46 |
| 22 | Q.   So you can have one thread that's just you | 11:34:47 |
| 23 | and Mr. Matthews and another thread that's you and | 11:34:50 |
| 24 | Mr. Matthews and Mr. Phillips, for example? | 11:34:54 |
| 25 | A.   Yes. | 11:34:57 |

Page 22

| | | |
|---|---|---|
| 1 | Q. And did you keep a thread -- strike that. | 11:34:58 |
| 2 | Do you have a Wire thread with | 11:35:02 |
| 3 | Mr. Matthews? | 11:35:05 |
| 4 | A. Yes. | 11:35:08 |
| 5 | Q. And only Mr. Matthews? | 11:35:09 |
| 6 | A. A hundred percent, yes. | 11:35:10 |
| 7 | Q. And have you purged that thread? | 11:35:15 |
| 8 | A. We have a rolling purge over time, yes, on | 11:35:18 |
| 9 | any communications. | 11:35:21 |
| 10 | Q. And so -- | 11:35:22 |
| 11 | A. Whether it's direct or in a group. | 11:35:23 |
| 12 | Q. And what's the oldest communication you | 11:35:25 |
| 13 | might have with Mr. Matthews? | 11:35:27 |
| 14 | A. I don't know offhand. | 11:35:27 |
| 15 | Q. And do you have a thread with any of the | 11:35:35 |
| 16 | other defendants in this case other than | 11:35:39 |
| 17 | Mr. Phillips? | 11:35:42 |
| 18 | MR. YARBROUGH: Objection; form. | 11:35:42 |
| 19 | Q. You can answer the question. | 11:35:43 |
| 20 | A. No. | 11:35:45 |
| 21 | Q. Did you use Wire to transfer large video | 11:35:49 |
| 22 | files? | 11:35:54 |
| 23 | MR. YARBROUGH: Objection; form. | 11:35:57 |
| 24 | A. I don't recall how we transmitted any -- | 11:36:02 |
| 25 | any video files. Those are probably too large to | 11:36:05 |

Page 23

| | | |
|---|---|---|
| 1 | attach to a Wire thread. | 11:36:09 |
| 2 | Q.   So how -- how would you ordinarily | 11:36:10 |
| 3 | transmit large video files between a client and Red | 11:36:18 |
| 4 | Metrics? | 11:36:21 |
| 5 | A.   For a typical client or for this client? | 11:36:21 |
| 6 | Q.   If you recall for Mr. Phillips, how did | 11:36:25 |
| 7 | Mr. Phillips send you? | 11:36:27 |
| 8 | A.   He had video content he had secured on | 11:36:30 |
| 9 | hard drives, and there was little to no transmission | 11:36:33 |
| 10 | of files electronically. | 11:36:37 |
| 11 | Q.   So he physically sent you hard drives? | 11:36:38 |
| 12 | A.   Yes. | 11:36:42 |
| 13 | Q.   And were the files on the hard drives ever | 11:36:45 |
| 14 | uploaded to Red Metrics' servers or computers? | 11:36:47 |
| 15 | A.   As I recall, the size of those files and | 11:36:53 |
| 16 | the drives that they were on were too large to | 11:36:57 |
| 17 | manage, so they stayed on those drives. | 11:37:02 |
| 18 | Q.   And roughly how long did Red Metrics have | 11:37:05 |
| 19 | possession of those drives? | 11:37:08 |
| 20 | A.   I don't recall. | 11:37:12 |
| 21 | Q.   Did Red Metrics destroy those drives? | 11:37:14 |
| 22 | A.   No.  We returned those.  We returned | 11:37:18 |
| 23 | those. | 11:37:24 |
| 24 | Q.   So you -- returned them means you mailed | 11:37:24 |
| 25 | the drives back to Mr. Phillips? | 11:37:27 |

Page 24

```
 1        A.   I forget how we delivered them but we --    11:37:28

 2    the physical hard drives, we returned to them.        11:37:34

 3        Q.   You said that he provided hard drives with   11:37:50

 4    large video files.                                    11:37:53

 5             Did they have any other data on them?        11:37:54

 6        A.   No.  These -- these drives were directly     11:37:58

 7    from the video that they had received from the        11:38:02

 8    various counties.  There was no data included.        11:38:06

 9        Q.   So you said -- let's go back to the          11:38:09

10    request.                                              11:38:12

11             You said you spoke with Mr. Phillips in      11:38:13

12    December -- roughly December 2020.                    11:38:16

13             Is it your understanding that there was a    11:38:18

14    contract entered into between Red Metrics and         11:38:19

15    Mr. Phillips?                                         11:38:22

16        A.   There was a -- there was a contract.  I      11:38:23

17    forget the timing of it, but the conversation         11:38:31

18    started at least in December of 2020.                 11:38:33

19        Q.   And you're familiar with OpSec Group?        11:38:36

20        A.   Yes.                                         11:38:40

21        Q.   What is OpSec Group?                         11:38:41

22        A.   Gregg was the face of OpSec.  Beyond that,   11:38:42

23    we didn't have any other direct contact with the      11:38:52

24    rest of the team.  It was -- it was Gregg.            11:38:56

25        Q.   And the contract that was entered into,      11:38:58
```

Page 25

| | | |
|---|---|---|
| 1 | was that between Red Metrics and OpSec Group? | 11:39:03 |
| 2 | A.  I don't handle contracts. | 11:39:05 |
| 3 | Q.  Did you review that contract? | 11:39:10 |
| 4 | A.  I would have -- no.  No.  Ben handles | 11:39:12 |
| 5 | finance and contracts and I handle technology and | 11:39:21 |
| 6 | operations. | 11:39:24 |
| 7 | Q.  Who negotiates with a client the scope of | 11:39:25 |
| 8 | the work to be done for the client? | 11:39:27 |
| 9 | A.  Ben and I would have definitely spoken | 11:39:29 |
| 10 | into any scope. | 11:39:39 |
| 11 | Q.  And what was the scope of the work to be | 11:39:40 |
| 12 | done for Mr. Phillips? | 11:39:42 |
| 13 | A.  The original scope would have been | 11:39:44 |
| 14 | analyzing data to understand if there was any | 11:39:56 |
| 15 | potential interference. | 11:40:01 |
| 16 | Q.  And was that the request from Mr. Phillips | 11:40:06 |
| 17 | to Red Metrics? | 11:40:09 |
| 18 | A.  It was. | 11:40:11 |
| 19 | Q.  And did you discuss what kind of data | 11:40:13 |
| 20 | analyst -- data analysis would be possible with | 11:40:17 |
| 21 | Mr. Phillips? | 11:40:22 |
| 22 | A.  Yes.  In the scoping conversation, we | 11:40:25 |
| 23 | would have talked about approach. | 11:40:28 |
| 24 | Q.  And what did you talk about exactly as far | 11:40:29 |
| 25 | as the approach? | 11:40:32 |

Page 26

1       A.    I don't remember specifics, but we would        11:40:36

2   have talked about what his working theory was that       11:40:41

3   he wanted to test -- test against.                       11:40:47

4       Q.    And what was his working theory?               11:40:51

5       A.    The -- as stated, the working theory that      11:40:53

6   he brought to us was in the November election if         11:41:01

7   there was any crossover between folks affiliated         11:41:09

8   with a set of nonprofit organizations and any number     11:41:20

9   of drop boxes in and around Georgia.                     11:41:27

10      Q.    And did he explain how he came up with         11:41:31

11  that theory?                                             11:41:33

12      A.    I don't think he did.                          11:41:35

13      Q.    Did he provide the names of specific           11:41:37

14  nonprofit organizations?                                 11:41:40

15      A.    Yes, he did.                                   11:41:42

16      Q.    Do you remember those nonprofit                11:41:44

17  organizations?                                           11:41:46

18      A.    I do not.                                      11:41:47

19      Q.    And what was his theory exactly about the      11:41:49

20  relationship between the nonprofit organizations and     11:41:57

21  election fraud?                                          11:42:00

22            MR. YARBROUGH:  Objection; form.               11:42:01

23      Q.    You can answer.                                11:42:04

24      A.    As I recall, there -- his working theory       11:42:07

25  was that folks affiliated with those nonprofit          11:42:12

Page 27

```
 1    organizations had -- I'm not in the election space.    11:42:17
 2    He probably used better vernacular, but that they       11:42:28
 3    were in and around drop boxes in that metro area, so    11:42:34
 4    it was the confluence of those two things.              11:42:39
 5         Q.   And did he provide you any evidence at        11:42:41
 6    that time to substantiate the theory?                   11:42:45
 7         A.   I don't recall that he did.                   11:42:48
 8         Q.   Did he reference working with law             11:42:51
 9    enforcement?                                            11:42:53
10         A.   With regards to this use case or in           11:42:53
11    general?                                                11:43:02
12         Q.   This use case.                                11:43:03
13         A.   With regards to this use case, yes, it was    11:43:06
14    positioned such that if that theory held, that there    11:43:14
15    could be information provided to law enforcement to     11:43:20
16    look further into it.  Our role was specific to the     11:43:29
17    data analytics, and then Gregg would, under OpSec,      11:43:35
18    take it from there.                                     11:43:39
19         Q.   Did Mr. Phillips do any data analysis         11:43:42
20    before coming to Red Metrics?                           11:43:50
21              MR. YARBROUGH:  Objection; form.              11:43:51
22         A.   Yeah, I don't know.                           11:43:54
23         Q.   Did he say that he had done any data          11:43:55
24    analysis on that call?                                  11:43:59
25         A.   I -- I don't recall that specifically, no.    11:44:01
```

Page 28

```
 1        Q.   And did Mr. Phillips provide you any data    11:44:04
 2   analysis in December 2020 to substantiate this        11:44:14
 3   theory?                                               11:44:18
 4        A.   I don't believe there was any data          11:44:21
 5   provided, no.  Again, I think it was a working        11:44:25
 6   theory.                                               11:44:28
 7        Q.   And did you discuss with him what Red        11:44:28
 8   Metrics could do with Mr. Phillips on this working    11:44:32
 9   theory?                                               11:44:36
10        A.   So that would have been the scoping and     11:44:38
11   requirement in terms of how to prove or disprove his  11:44:43
12   working theory, yes.                                  11:44:49
13        Q.   What did you tell him?                       11:44:50
14        A.   About that working theory?                   11:44:52
15        Q.   About what Red Metrics' data analysis        11:44:53
16   could show with respect to that working theory.       11:44:56
17        A.   Sure.  It was a use case around looking at   11:45:00
18   mobile data to see if that model -- if there was a    11:45:11
19   model that fit the theory or not.                     11:45:15
20        Q.   And did you tell him whether there were      11:45:17
21   any limitations to what Red Metrics analysis could    11:45:21
22   and couldn't show?                                    11:45:24
23             MR. YARBROUGH:  Objection; form.            11:45:25
24        Q.   You can answer.                              11:45:26
25        A.   Limitations on the mobile analysis?  I      11:45:29
```

Page 29

```
 1    don't recall what we discussed in terms of          11:45:39

 2    capabilities or limitations specifically.           11:45:42

 3         Q.   In general, are there limitations on what 11:45:46

 4    mobile analysis can show?                            11:45:49

 5         A.   Yes.                                        11:45:52

 6         Q.   And in your role at Red Metrics, would you 11:45:54

 7    ordinarily discuss those with clients?               11:45:59

 8         A.   Yes.  We would absolutely discuss pros and 11:46:02

 9    cons.                                                11:46:08

10         Q.   And in general, we'll go through this,     11:46:08

11    what are the kinds of limitations on Red Metrics'    11:46:12

12    analysis?                                            11:46:16

13         A.   Can you clarify the question in terms of   11:46:19

14    limitations?                                         11:46:22

15         Q.   You said you would absolutely discuss the  11:46:22

16    pros and cons in terms of limitations on what mobile 11:46:25

17    analysis can show.                                   11:46:29

18              What are the limitations?                  11:46:30

19         A.   Uh-huh.  So if we take a step back, let's  11:46:34

20    look at the context in which we were having the      11:46:39

21    conversations, which had everything to do with OpSec 11:46:41

22    wanting to work at some level with law enforcement.  11:46:45

23    Our role in that is very niche and only one piece of 11:46:51

24    a much larger puzzle.                                11:46:57

25              And so the limitations are such that big   11:46:59
```

Page 30

| | | |
|---|---|---|
| 1 | data analytics can just give you some circumstantial | 11:47:03 |
| 2 | looks, but in terms of providing that information | 11:47:08 |
| 3 | on, we're not investigators, we're not law | 11:47:15 |
| 4 | enforcement, so it would be incumbent on those | 11:47:19 |
| 5 | downstream entities to do anything more with that | 11:47:22 |
| 6 | than what we can do.  So that -- that's the primary | 11:47:26 |
| 7 | limitation. | 11:47:29 |
| 8 | Q.   Did Mr. Phillips understand that? | 11:47:30 |
| 9 | MR. YARBROUGH:  Objection; form. | 11:47:33 |
| 10 | A.   I -- I don't know if he understood that or | 11:47:34 |
| 11 | not. | 11:47:38 |
| 12 | Q.   Is that -- did you discuss those | 11:47:41 |
| 13 | limitations with Mr. Phillips? | 11:47:43 |
| 14 | A.   I don't know if we specifically talked | 11:47:45 |
| 15 | about that limitation at the time.  I don't recall. | 11:47:51 |
| 16 | Q.   Let's jump down.  I'm going to come back | 11:47:56 |
| 17 | to this, but as Red Metrics did its work for | 11:48:04 |
| 18 | Mr. Phillips, did Mr. Phillips himself do the work? | 11:48:07 |
| 19 | MR. YARBROUGH:  Objection; form. | 11:48:11 |
| 20 | MR. EVANS:  Objection. | 11:48:12 |
| 21 | A.   Did he do what work? | 11:48:15 |
| 22 | Q.   Did he do any of the data analysis | 11:48:17 |
| 23 | himself? | 11:48:21 |
| 24 | MR. YARBROUGH:  Objection; form. | 11:48:21 |
| 25 | A.   I don't know what analysis he did or | 11:48:24 |

Page 31

| | | |
|---|---|---|
| 1 | didn't do.  Beyond the scope of what my team did at | 11:48:29 |
| 2 | OpSec, I don't know. | 11:48:36 |
| 3 | Q.   A different way of asking this is:  Was he | 11:48:37 |
| 4 | embedded in Red Metrics' team or was this a | 11:48:39 |
| 5 | situation where Red Metrics did work for | 11:48:42 |
| 6 | Mr. Phillips? | 11:48:44 |
| 7 | A.   Thanks for reframing.  I understand that | 11:48:46 |
| 8 | question. | 11:48:52 |
| 9 | No, he was not embedded. | 11:48:52 |
| 10 | Q.   To your knowledge, did Mr. Phillips go out | 11:48:54 |
| 11 | and get any cell phone data himself apart from the | 11:48:57 |
| 12 | work he got from Red Metrics? | 11:49:02 |
| 13 | A.   I don't know if he acquired any other data | 11:49:05 |
| 14 | of that type.  It was our understanding that they | 11:49:10 |
| 15 | had other data of other types, but we weren't | 11:49:14 |
| 16 | involved with that. | 11:49:16 |
| 17 | Q.   Did anyone else at OpSec do any of the | 11:49:17 |
| 18 | work that Red Metrics was doing in a kind of | 11:49:24 |
| 19 | embedded role with Red Metrics? | 11:49:28 |
| 20 | MR. EVANS:  Object to form. | 11:49:33 |
| 21 | A.   Our delivery of anything to OpSec through | 11:49:34 |
| 22 | Gregg, I don't know who else on the OpSec team.  We | 11:49:39 |
| 23 | didn't have any direct working relationship with | 11:49:46 |
| 24 | that team really beyond Gregg. | 11:49:48 |
| 25 | Q.   Did you ever talk to anyone other than | 11:49:51 |

1   Gregg about this work?                                    11:50:03

2            MR. YARBROUGH:  Objection; form.                 11:49:54

3       Q.   I'm sorry, let me rephrase that.                 11:49:55

4            Did you ever talk to anyone at OpSec other       11:49:57

5   than Gregg about this work?                               11:50:01

6       A.   Yes.                                             11:50:05

7       Q.   Who did you talk to?                             11:50:07

8       A.   To JD.                                           11:50:09

9       Q.   Who is JD?                                       11:50:12

10      A.   JD Phillips.                                     11:50:14

11      Q.   Is JD related to Gregg?                          11:50:18

12      A.   I believe that's Gregg's son.                    11:50:20

13      Q.   Did you talk to anyone other than JD             11:50:25

14  Phillips?                                                 11:50:27

15      A.   No.                                              11:50:29

16      Q.   How many times did you talk to JD Phillips       11:50:32

17  about this work?                                          11:50:34

18      A.   I don't recall.  He wasn't involved the          11:50:37

19  entire time.                                              11:50:42

20      Q.   When you say he was involved, what was JD         11:50:44

21  Phillips' involvement in this work?                       11:50:47

22            MR. YARBROUGH:  Objection; form.                11:50:51

23      A.   I don't know what his role in terms of           11:50:54

24  scope or responsibility at OpSec was or wasn't, but       11:50:58

25  all the directives and everything that we worked          11:51:02

1    through was directly with Gregg.                    11:51:04

2        Q.   And how often -- let me back up.           11:51:12

3             How long did the work with OpSec about     11:51:15

4    election fraud and the 2020 election last?          11:51:19

5        A.   I don't recall the exact term but it was   11:51:26

6    at least three to six months.                       11:51:31

7        Q.   And did you regularly talk to JD Phillips  11:51:33

8    during that period?                                 11:51:38

9        A.   In that period, I don't recall when Gregg  11:51:39

10   brought him in to play a supporting role at OpSec,  11:51:46

11   but it wasn't the entirety of the project.  It was  11:51:51

12   later on in the project.  So time frame I'm -- I'm  11:51:56

13   not recalling.                                      11:51:58

14       Q.   How often would you talk to Gregg Phillips 11:52:01

15   during that period?                                 11:52:04

16       A.   Yeah, it would have ebbed and flowed, at   11:52:05

17   most, you know, once every other week at the very   11:52:14

18   most.                                               11:52:19

19       Q.   And were those communications on Wire?     11:52:21

20       A.   Yes, they -- they would have almost        11:52:25

21   exclusively been on Wire.                           11:52:32

22       Q.   Was there any other communications         11:52:34

23   platform you used for those conversations?          11:52:36

24       A.   No.  We -- we used Wire for any voice      11:52:38

25   calls and/or messages, sharing of documents, and    11:52:43

Page 34

```
 1    such.                                            11:52:47

 2         Q.   And would you calendar those calls with  11:52:48

 3    Mr. Phillips?                                     11:52:51

 4         A.   Likely not.                             11:52:52

 5         Q.   If you did calendar calls with          11:52:58

 6    Mr. Phillips, what kind of calendar do you use?   11:53:00

 7         A.   Changed platforms over time but either  11:53:05

 8    iCal or -- yeah, it probably would have been iCal, 11:53:12

 9    yeah.                                             11:53:19

10         Q.   We're going to come back to this.       11:53:19

11              At a high level, exactly what work did Red 11:53:27

12    Metrics do for Mr. Phillips with regards to the 2020 11:53:32

13    election?                                         11:53:35

14              MR. YARBROUGH:   Objection; form.       11:53:38

15         A.   Specifically -- yeah, can you reframe the 11:53:39

16    question so I make sure I'm clear?               11:53:45

17         Q.   Just in your own words, what work did Red 11:53:48

18    Metrics do for Mr. Phillips with regards to the 2020 11:53:52

19    election?                                         11:53:56

20         A.   Uh-huh.  The big data analytics on the  11:53:58

21    mobile that I described a minute ago and a small  11:54:01

22    portion of the project in looking at the video and 11:54:07

23    trying to see if there was anything that looked   11:54:12

24    suspect on the videos that they had sourced.      11:54:13

25         Q.   And what is the big data analytics that  11:54:16
```

Page 35

| | | |
|---|---|---|
| 1 | Red Metrics did for Mr. Phillips? | 11:54:22 |
| 2 | A.   In the aggregate, trying to ascertain if | 11:54:23 |
| 3 | there was any, again, confluence of activity in | 11:54:32 |
| 4 | mobile devices at the organizations of interest and | 11:54:40 |
| 5 | the drop boxes in that region. | 11:54:43 |
| 6 | Q.   And you said that part of Red Metrics' | 11:54:48 |
| 7 | work was reviewing surveillance footage? | 11:54:52 |
| 8 | A.   In the later months of the engagement, | 11:54:56 |
| 9 | they had made requests of various counties, and so | 11:54:59 |
| 10 | we were looking at the video to see if there was | 11:55:04 |
| 11 | anything that looked suspect, yes. | 11:55:06 |
| 12 | Q.   And you said that was a small portion of | 11:55:12 |
| 13 | the project? | 11:55:13 |
| 14 | A.   It was. | 11:55:15 |
| 15 | Q.   How much work, roughly, went into | 11:55:15 |
| 16 | reviewing surveillance footage? | 11:55:17 |
| 17 | A.   The scale was really too big for our team, | 11:55:21 |
| 18 | which is why we wound up handing the videos back. | 11:55:24 |
| 19 | They were looking to -- they had, I think, better | 11:55:28 |
| 20 | capabilities and a bigger team to do that.  And so | 11:55:31 |
| 21 | we kind of hit a wall on our ability to analyze the | 11:55:36 |
| 22 | video. | 11:55:39 |
| 23 | Q.   Is "they" OpSec there? | 11:55:39 |
| 24 | A.   Yes, it would have been. | 11:55:41 |
| 25 | Q.   And who at Red Metrics reviewed | 11:55:44 |

Page 36

```
 1    surveillance footage?                          11:55:48
 2         A.   We had a small contract team, I want to    11:55:50
 3    say two subcontractors, to help review -- review    11:56:00
 4    that content.                                  11:56:06
 5         Q.   Who were those subcontractors?       11:56:07
 6         A.   We only used them that once and I don't    11:56:11
 7    recall names.                                  11:56:14
 8         Q.   Did -- were there contracts for that work    11:56:20
 9    that were entered into?                        11:56:23
10         A.   No.  It was just some -- probably someone    11:56:25
11    in our network, local -- you know, local folks.    11:56:31
12    There wasn't a formal, like, entity-to-entity    11:56:35
13    contract, no.                                  11:56:37
14         Q.   Did they get paid?                   11:56:38
15         A.   I think we paid them on an hourly basis if    11:56:43
16    I recall correctly.                            11:56:46
17         Q.   And would there be records of those    11:56:47
18    payments?                                      11:56:49
19         A.   The -- if we paid them hourly, I guess    11:56:51
20    there would have been.  I don't recall.  I'm not    11:56:56
21    head of finance.                               11:56:57
22         Q.   And did those people have any credentials    11:56:59
23    that made them uniquely suited to reviewing    11:57:02
24    surveillance footage?                          11:57:06
25              MR. YARBROUGH:  Objection; form.     11:57:08
```

Page 37

| | | |
|---|---|---|
| 1 | A.   They could open a video file on a hard | 11:57:09 |
| 2 | drive and analyze it.  That was kind of the extent | 11:57:16 |
| 3 | of the expertise needed.  It wasn't anything in | 11:57:19 |
| 4 | particular that was... | 11:57:21 |
| 5 | Q.   Had they done it before? | 11:57:21 |
| 6 | MR. YARBROUGH:  Objection; form. | 11:57:24 |
| 7 | A.   I don't know if they had or not. | 11:57:24 |
| 8 | Q.   Did you train the subcontractors in | 11:57:27 |
| 9 | reviewing surveillance footage? | 11:57:31 |
| 10 | A.   No, there wasn't really any training to be | 11:57:35 |
| 11 | had. | 11:57:38 |
| 12 | Q.   And how would you have communicated with | 11:57:38 |
| 13 | subcontractors? | 11:57:41 |
| 14 | A.   Yeah, that, too, would have been | 11:57:42 |
| 15 | exclusively on Wire. | 11:57:46 |
| 16 | Q.   And what, if any, instructions were given | 11:57:56 |
| 17 | to the subcontractors about reviewing the | 11:57:59 |
| 18 | surveillance footage? | 11:58:01 |
| 19 | A.   Yeah, it was pretty simple.  It was just a | 11:58:04 |
| 20 | matter of looking at footage to see if there was | 11:58:08 |
| 21 | anything that looked suspect -- | 11:58:11 |
| 22 | Q.   And -- | 11:58:11 |
| 23 | A.   -- however you would define that. | 11:58:15 |
| 24 | Q.   How did you define "looked suspect"? | 11:58:17 |
| 25 | A.   Really any -- any comings and goings to a | 11:58:23 |

Page 38

```
 1   drop box, maybe based on time of day, but the whole    11:58:28
 2   intent of our work was to deliver back to client a     11:58:34
 3   series of things for them to further analyze and       11:58:40
 4   make a determination as to whether or not there was    11:58:44
 5   anything of interest there in the video at that        11:58:46
 6   point in time.                                         11:58:49
 7       Q.   Did Red Metrics sync up surveillance          11:58:50
 8   footage with geospatial data?                          11:58:55
 9            MR. YARBROUGH:  Objection; form.               11:59:01
10       A.   With regards to the mobile data that we       11:59:02
11   referenced earlier.  That was the working theory,      11:59:06
12   but there was no matches to be -- to be had.           11:59:16
13       Q.   When you say there were no matches to be      11:59:19
14   had, what do you mean?                                 11:59:21
15       A.   Running the mobile data against the video,    11:59:24
16   it didn't line up.                                     11:59:31
17       Q.   And when you say it didn't line up, do you    11:59:33
18   mean you couldn't find surveillance footage at the     11:59:35
19   right times that would sync up with the cell?          11:59:39
20            MR. EVANS:  Object to form.                   11:59:42
21            MR. YARBROUGH:  Objection; form.               11:59:43
22       Q.   I'm just trying to understand what you're     11:59:44
23   testifying to.                                         11:59:46
24       A.   So can you restate the question then.         11:59:47
25       Q.   You testified it didn't line up.  And also    11:59:50
```

Page 39

| | | |
|---|---|---|
| 1 | that there were no matches to be had. | 11:59:54 |
| 2 | Can you explain exactly what you mean by | 11:59:57 |
| 3 | that? | 12:00:01 |
| 4 | A.   For the express points in time on video | 12:00:01 |
| 5 | where you might see activity, the mobile data is not | 12:00:10 |
| 6 | pervasive, it's not a hundred percent visibility. | 12:00:16 |
| 7 | And so the ability to match that up was -- was | 12:00:22 |
| 8 | negligible, was nonexistent. | 12:00:28 |
| 9 | Q.   So, to your knowledge, Red Metrics never | 12:00:30 |
| 10 | synced up a particular cell user to surveillance | 12:00:32 |
| 11 | footage of that cell user? | 12:00:36 |
| 12 | MR. EVANS:  Object to form. | 12:00:39 |
| 13 | MR. YARBROUGH:  Object to form. | 12:00:40 |
| 14 | A.   That is correct. | 12:00:41 |
| 15 | Q.   So let's jump here for a second. | 12:00:48 |
| 16 | At Red Metrics, who worked on this | 12:00:54 |
| 17 | particular project aside from the two subcontractors | 12:00:58 |
| 18 | and yourself? | 12:01:01 |
| 19 | A.   Our -- at the time, data analyst Azeddine | 12:01:03 |
| 20 | Rahlouni. | 12:01:11 |
| 21 | Q.   Anybody else? | 12:01:11 |
| 22 | A.   No, that was it. | 12:01:15 |
| 23 | Q.   And was Mr. Rahlouni an employee or a | 12:01:18 |
| 24 | contractor? | 12:01:22 |
| 25 | A.   Excuse me.  He was a -- he was an employee | 12:01:24 |

Page 40

1    at the time of Red Metrics.                          12:01:29

2        Q.   And you said he was a data analyst.        12:01:31

3             What is a data analyst?                     12:01:33

4        A.   Yeah, he had training as a -- in the way    12:01:34

5    of statistics and big data analytics and had         12:01:47

6    engineered -- engineered that process for us.         12:01:52

7        Q.   And when you say engineered that process    12:01:55

8    for you, what does that mean?                         12:01:58

9        A.   The methodologies that were used in the    12:02:08

10   data analytics space.                                 12:02:11

11       Q.   What does that mean?  I'm sorry.            12:02:16

12       A.   The series of -- the series of technology   12:02:18

13   that enables you to actually handle and process that  12:02:25

14   kind of data at scale.                                12:02:30

15       Q.   Okay.  We'll come back to that.             12:02:49

16            Approximately when did the work for         12:02:40

17   Mr. Phillips start about the 2020 presidential        12:02:42

18   election?                                             12:02:46

19       A.   December, January, I believe, '20 to '21.  12:02:51

20       Q.   And how long did it last?  I'm not trying   12:02:57

21   to ask and answer.  I believe you testified that it   12:03:00

22   was three to six months, but was there any -- did it  12:03:02

23   last longer than that?                                12:03:05

24       A.   That -- that work lasted three to -- three  12:03:08

25   to six months, and then there were other smaller      12:03:12

Page 41

| | | |
|---|---|---|
| 1 | projects that we then delivered in that same vain | 12:03:17 |
| 2 | with OpSec. | 12:03:21 |
| 3 | Q.   Also related to the 2020 presidential | 12:03:21 |
| 4 | election? | 12:03:26 |
| 5 | A.   No, not all of them. | 12:03:26 |
| 6 | Q.   And when would the data -- let me back up. | 12:03:31 |
| 7 | I believe you testified that at the end of | 12:03:36 |
| 8 | a project, the data is purged. | 12:03:39 |
| 9 | When would the data have been purged for | 12:03:42 |
| 10 | that initial project? | 12:03:44 |
| 11 | A.   Can you define "data"? | 12:03:47 |
| 12 | Q.   The communications with Mr. Phillips or | 12:03:49 |
| 13 | the team about the work. | 12:03:52 |
| 14 | A.   Sure.  Anytime a statement of work is | 12:03:56 |
| 15 | fully delivered, any of the communications regarding | 12:04:04 |
| 16 | that scope would be -- would be purged.  Yeah. | 12:04:07 |
| 17 | Q.   And would the underlying work product have | 12:04:12 |
| 18 | also been purged at that same time? | 12:04:15 |
| 19 | A.   If we had delivered and closed the | 12:04:17 |
| 20 | engagement, yes. | 12:04:20 |
| 21 | Q.   When you were doing the work, | 12:04:21 |
| 22 | approximately how many hours were spent on this | 12:04:32 |
| 23 | particular project? | 12:04:36 |
| 24 | A.   For -- for whom? | 12:04:38 |
| 25 | Q.   Well, let's take each in turn. | 12:04:45 |

Page 42

```
 1                 How many hours did you spend on this          12:04:47

 2   project?                                                    12:04:49

 3        A.   We're not a consulting firm that we track         12:04:51

 4   hours, so I couldn't give you a good estimate.              12:04:55

 5        Q.   Did you have more than one project during         12:04:58

 6   that period?                                                12:05:00

 7        A.   We -- yeah, we absolutely did.                    12:05:01

 8        Q.   And roughly how much of the week was              12:05:06

 9   dedicated to this project versus other projects?            12:05:10

10        A.   It's hard to say.  It would have ebbed and        12:05:15

11   flowed over the course of those months depending on         12:05:19

12   other client engagements.  We're a small team, and         12:05:23

13   so it could vary pretty widely from, you know,              12:05:25

14   5 hours to -- to 15, say, hours.                            12:05:28

15        Q.   And in terms of the projects that Red             12:05:38

16   Metrics takes on, was this a big project or a small         12:05:35

17   project?                                                    12:05:38

18        A.   This was a -- kind of a mid-sized project         12:05:41

19   for us.                                                     12:05:44

20        Q.   And how many hours, roughly, would you            12:05:45

21   expect Mr. Rahlouni to have worked on this project          12:05:48

22   in that time period?                                        12:05:52

23        A.   I don't recall what else we had -- what           12:05:54

24   other projects we had on his plate at the time, to          12:05:58

25   be honest, so it may have been up to half of his            12:06:02
```

Page 43

```
 1    time.                                              12:06:04
 2        Q.    And he would have had other projects on  12:06:05
 3    his plate?                                         12:06:07
 4        A.    Yes.  In this time period, yes.          12:06:08
 5        Q.    Okay.  I want to start to talk a little  12:06:12
 6    bit about the...                                   12:06:18
 7              MR. LANGFORD:  Okay.  Let's do this.     12:06:38
 8    Can we pull up the movie -- we need a 10-minute break 12:06:41
 9    before we do the movie stuff, do you?              12:06:45
10              MR. CRENSHAW:  We may not.               12:06:48
11              MR. LANGFORD:  Let's try pull up the     12:06:50
12    movie.                                             12:06:51
13              We may go to about 12:45 if anyone       12:07:09
14    needs a break.                                     12:07:14
15              MR. EVANS:  Is this marked as an         12:07:15
16    exhibit, the video?                                12:07:17
17              MR. LANGFORD:  It's going to be, yeah.   12:07:19
18    We're just trying to pull it up now.               12:07:22
19              I assume you won't object to the         12:07:22
20    authenticity of the DVD?                           12:07:25
21              MR. EVANS:  No.  We ran into this last   12:07:25
22    week just as far as what are we looking at --      12:07:27
23              MR. LANGFORD:  Yeah.                     12:07:27
24              MR. EVANS:  -- what are we referring     12:07:31
25    to.                                                12:07:34
```

Page 44

```
 1                    MR. LANGFORD:  That's fair.  Can we --   12:07:34
 2                    MR. CRENSHAW:  I think we can proceed    12:07:34
 3    if you want.                                            12:07:34
 4                    MR. LANGFORD:  Perfect.  Yeah, so        12:07:35
 5    let's hold for one second.                              12:07:35
 6         Q.  So I'm going to show you, Mr. Gerwing,         12:07:36
 7    what we will now mark as Gerwing Exhibit -- sorry,      12:07:40
 8    as Red Metrics Exhibit 2, I believe.                    12:07:49
 9                    MR. YARBROUGH:  Plaintiff's Exhibit 2?   12:07:53
10                    MR. LANGFORD:  Yeah.                     12:07:53
11                    MR. YARBROUGH:  I think the first one    12:07:53
12    was A, was it not?                                      12:07:53
13                    MR. LANGFORD:  That's the doc tab for    12:07:58
14    the Exhibit Sharing.                                    12:07:58
15                    MR. YARBROUGH:  Oh, sorry.               12:07:58
16                    MR. LANGFORD:  Sorry.                    12:07:58
17                    MR. YARBROUGH:  I'll let you do your     12:08:01
18    job.  My bad.                                           12:08:02
19         Q.  Have you ever seen the 2000 Mules movie?       12:08:04
20                    (Red Metrics Exhibit 2 marked.)         12:08:09
21         A.  Yes.                                           12:08:09
22         Q.  So I can represent this is a true and          12:08:12
23    accurate copy of the 2000 Mules movie.  And we're       12:08:14
24    going to start at time stamp 30 minutes, 12 seconds     12:08:17
25    and we're going to play through time stamp              12:08:22
```

Page 45

| | | |
|---|---|---|
| 1 | 31 minutes and 20 seconds. | 12:08:25 |
| 2 | (Video played.) | 12:08:32 |
| 3 | MR. LANGFORD:  Let's stop the video | 12:09:35 |
| 4 | here.  I'm sorry. | 12:09:38 |
| 5 | MR. CRENSHAW:  Can we do a do-over? | 12:09:43 |
| 6 | MR. LANGFORD:  Is that the wrong time | 12:09:46 |
| 7 | stamp, by chance?  It doesn't look like it is.  30:12 | 12:09:48 |
| 8 | to 31 -- | 12:09:48 |
| 9 | MR. CRENSHAW:  Yeah, 30:12.  Let me -- | 12:09:48 |
| 10 | you can watch my meter here and I'll go back to it. | 12:09:48 |
| 11 | MR. LANGFORD:  We may have to do this | 12:09:50 |
| 12 | after the break so we can -- | 12:09:51 |
| 13 | MR. YARBROUGH:  Do you want to take a | 12:09:52 |
| 14 | break, John? | 12:09:53 |
| 15 | MR. LANGFORD:  No, let's not take a | 12:09:54 |
| 16 | break. | 12:09:56 |
| 17 | MR. CRENSHAW:  Okay.  See, I'm at | 12:09:57 |
| 18 | 30 -- | 12:09:58 |
| 19 | MR. LANGFORD:  12. | 12:09:58 |
| 20 | MR. CRENSHAW:  -- 11 right there. | 12:09:59 |
| 21 | MR. LANGFORD:  Yeah.  I wonder if the | 12:10:00 |
| 22 | time stamp is off on the DVD copy.  So we'll sync | 12:10:02 |
| 23 | that up on a break. | 12:10:05 |
| 24 | MR. CRENSHAW:  Okay. | 12:10:07 |
| 25 | MR. LANGFORD:  That's okay. | 12:10:07 |

Page 46

```
 1              MR. CRENSHAW:  We can work on that on    12:10:07
 2    a break.                                           12:10:09
 3              MR. LANGFORD:  Yeah.                      12:10:10
 4       Q.   I'm going to skip down then to just sort   12:10:10
 5    of what the kind of analysis was that you did, and 12:10:12
 6    we'll circle back to this.                         12:10:13
 7              Okay.  When Mr. Phillips reached out to  12:10:21
 8    Red Metrics, did you discuss various methodologies 12:10:25
 9    for testing his theory with Mr. Phillips?          12:10:29
10              MR. YARBROUGH:  Objection; form.         12:10:34
11       A.   As I recall, with his working theory, we  12:10:35
12    would have seen if there was a fit in terms of the 12:10:47
13    data that we had and some way to test it.          12:10:51
14       Q.   And did you discuss different ways to test 12:10:54
15    it?                                                12:10:56
16       A.   Yes.  Yeah.  We necessarily would have had 12:10:56
17    to, yeah.                                          12:11:05
18       Q.   And what were all the different ways to    12:11:06
19    test it that you discussed with Mr. Phillips?      12:11:10
20       A.   Pretty simply that the -- if -- if there  12:11:13
21    was to be any connection, again, back to his working 12:11:21
22    theory to provide context, that between the        12:11:24
23    organizations of interest and any set of drop boxes, 12:11:28
24    that as an approximation, again, from a            12:11:34
25    circumstantial standpoint, would the mobile data be 12:11:37
```

Page 47

| | | |
|---|---|---|
| 1 | able to prove or disprove any relationship. | 12:11:41 |
| 2 | Q.   And did you discuss any other | 12:11:46 |
| 3 | methodologies for testing his theory? | 12:11:48 |
| 4 | A.   Again, Red Metrics has a very limited | 12:11:50 |
| 5 | point of visibility.  And so our only contribution, | 12:11:55 |
| 6 | if you will, to that larger equation would have been | 12:12:01 |
| 7 | the mobile data methodology. | 12:12:03 |
| 8 | Q.   And did he provide you this list of | 12:12:08 |
| 9 | organizations? | 12:12:12 |
| 10 | MR. YARBROUGH:  Objection; form. | 12:12:15 |
| 11 | MR. EVANS:  Objection; form. | 12:12:15 |
| 12 | A.   Yes. | 12:12:16 |
| 13 | Q.   Can you -- did he provide addresses for | 12:12:22 |
| 14 | the organizations? | 12:12:27 |
| 15 | A.   I don't recall if he expressly gave us | 12:12:31 |
| 16 | addresses, but he had enumerated the list of | 12:12:34 |
| 17 | organizations in and around the Atlanta Metro or | 12:12:38 |
| 18 | Georgia, whatever region we were looking at. | 12:12:44 |
| 19 | Q.   So I just in that first conversation, | 12:12:51 |
| 20 | exactly what did you tell him about what Red | 12:12:58 |
| 21 | Metrics' methodology could show? | 12:13:03 |
| 22 | MR. YARBROUGH:  Objection; form. | 12:13:05 |
| 23 | A.   Again, I -- this was three and a half | 12:13:07 |
| 24 | years ago, close to four years ago.  So, however, we | 12:13:17 |
| 25 | would have discussed the fact that in the aggregate, | 12:13:23 |

Page 48

```
 1    we could show broad patterns where there might be a    12:13:31
 2    match but that would be the extent of the             12:13:35
 3    visibility.                                            12:13:39
 4         Q.   And when you say "a match," what was a       12:13:40
 5    match?                                                 12:13:42
 6         A.   Yeah, I think we established earlier that    12:13:44
 7    a match, according to the working theory, was          12:13:47
 8    defined as some devices that would have been at or     12:13:50
 9    near location of one of the nonprofit organizations    12:13:56
10    and, in that same time frame, in and around any one    12:13:59
11    of the drop boxes in that region.                      12:14:02
12         Q.   And were there ways to do that analysis      12:14:06
13    that were more expensive and less expensive?           12:14:10
14              MR. YARBROUGH:   Objection; form.            12:14:16
15         A.   I don't think there was any -- I don't       12:14:19
16    think there was any conversation in terms of cost      12:14:24
17    weighing in on the capability set.  It was just that   12:14:27
18    that would -- that one model was -- was what we        12:14:32
19    had -- would have discussed.                           12:14:35
20         Q.   And Red Metrics didn't offer, like, a       12:14:38
21    higher-priced methodology and a lower-priced           12:14:40
22    methodology?                                           12:14:44
23         A.   So that -- that's your question on cost.     12:14:44
24    No, I don't think there would have been a range of     12:14:51
25    pricing per se.  We would have priced it according     12:14:55
```

Page 49

| | | |
|---|---|---|
| 1 | to the scope. | 12:14:57 |
| 2 | Q.   Was -- did Mr. Phillips give Red Metrics a | 12:15:00 |
| 3 | list of locations to look at? | 12:15:04 |
| 4 | A.   He gave us a list of organizations and | 12:15:06 |
| 5 | associated locations. | 12:15:16 |
| 6 | Q.   Did he give you any other locations? | 12:15:18 |
| 7 | A.   I don't know who sourced the location of | 12:15:23 |
| 8 | the drop boxes.  It's obviously public information. | 12:15:28 |
| 9 | So I don't recall if he delivered that to us or not. | 12:15:31 |
| 10 | Q.   And how did he send you the organizations | 12:15:34 |
| 11 | and their addresses? | 12:15:38 |
| 12 | MR. EVANS:  Object to form. | 12:15:42 |
| 13 | A.   I don't recall.  It wasn't a big list, so | 12:15:43 |
| 14 | I don't recall. | 12:15:50 |
| 15 | Q.   Is it possible -- would clients ever send | 12:15:52 |
| 16 | you spreadsheets of locations? | 12:15:56 |
| 17 | MR. YARBROUGH:  Object to form. | 12:15:58 |
| 18 | MR. EVANS:  Object to form. | 12:15:59 |
| 19 | A.   This was a list, if I recall right, less | 12:16:01 |
| 20 | than 20 organizations, so I don't know if it was in | 12:16:04 |
| 21 | a -- even necessitated a spreadsheet.  I don't | 12:16:07 |
| 22 | recall. | 12:16:11 |
| 23 | Q.   And then you mentioned drop box locations. | 12:16:11 |
| 24 | Where did you -- what drop boxes did you | 12:16:15 |
| 25 | look at? | 12:16:18 |

```
 1              MR. YARBROUGH:  Object to form.          12:16:20

 2        A.   We would have looked at -- and I don't    12:16:22

 3   recall the exact region of interest, but we would  12:16:28

 4   have looked at any of the public drop boxes that   12:16:34

 5   were in use then for the general election in 2020 in 12:16:38

 6   that region.                                        12:16:40

 7        Q.   And is that region Georgia?              12:16:41

 8        A.   I don't -- I don't recall.  I don't       12:16:44

 9   believe it was statewide.  I think it was mainly in 12:16:49

10   and around the Atlanta Metro area --               12:16:51

11        Q.   Is that --                                12:16:51

12        A.   -- if I recall right.                     12:16:55

13        Q.   Is that also where the nonprofit          12:16:56

14   organizations were located?                        12:16:58

15        A.   I believe most of them were in that       12:17:01

16   region.  I don't know the Atlanta Metro real well,  12:17:04

17   but I want to say they were in that region, yes.    12:17:10

18        Q.   Did -- was Red Metrics ever provided a    12:17:12

19   list of riot locations?                            12:17:15

20        A.   Are you referring to the ACLED database? 12:17:20

21        Q.   I was genuinely curious, did Red Metrics  12:17:29

22   look for locations of riots?                        12:17:34

23        A.   In a subsequent analysis, OpSec had asked 12:17:37

24   us to look for any correlation to other riots, yes. 12:17:46

25        Q.   And was the location -- you mentioned the 12:17:53
```

Page 51

```
 1    ACLED database.                                    12:17:56

 2            What is the ACLED database?                12:17:57

 3        A.   It's a publicly available database that I 12:17:59

 4    know Gregg was aware of that is public information  12:18:06

 5    as to various events -- some violent, some         12:18:10

 6    nonviolent -- across the country.                  12:18:17

 7        Q.   And is the ACLED database the source Red   12:18:19

 8    Metrics used to obtain the location of what we're   12:18:22

 9    calling riots?                                      12:18:26

10        A.   I don't recall if it was -- it may have    12:18:28

11    been one of the data lists used, yes.               12:18:41

12        Q.   Were there other data lists used?          12:18:43

13        A.   There's a lot of open source information   12:18:45

14    on that same subject matter, so I don't know that it 12:18:48

15    was exclusively or not ACLED.                       12:18:51

16        Q.   What -- what are some of the other open    12:18:53

17    source -- sources for that information?             12:18:55

18        A.   There's some international trackers, and I 12:18:59

19    couldn't cite them by name, but the -- in the open  12:19:04

20    source community, not just specific to -- to the    12:19:06

21    U.S., but there's other databases that perform a    12:19:08

22    kind of similar monitoring or tabulation, if you    12:19:12

23    will.                                               12:19:18

24        Q.   Plaintiffs in this case have deposed       12:19:18

25    ACLED.                                              12:19:21
```

Page 52

1          Did you review that transcript?                    12:19:21

2     A.   No, I did not.                                     12:19:25

3     Q.   So you have testified that there are three         12:19:27

4  categories of locations, roughly, that Red Metrics        12:19:38

5  looked at for Mr. Phillips; nonprofit organizations,      12:19:43

6  drop boxes, and what we're calling riots.                 12:19:46

7          Were there any other locations that Red            12:19:49

8  Metrics looked at for this project?                       12:19:51

9          MR. EVANS:  Object to form.                        12:19:53

10    A.   No, not that I recall.                             12:19:58

11    Q.   You said Mr. Phillips provided the                 12:19:59

12 location of the nonprofits.  You don't recall how         12:20:02

13 you obtained the location of the drop boxes.              12:20:05

14    A.   Correct.                                           12:20:08

15    Q.   And to your knowledge, the data about the          12:20:11

16 riots was from an ACLED database and may have been        12:20:13

17 from other open source -- open sources?                   12:20:17

18    A.   I think that's a fair assessment, yes.             12:20:22

19    Q.   Is there anything that would refresh your          12:20:33

20 recollection about the databases you used to              12:20:36

21 identify the location of violent protests?                12:20:39

22          MR. YARBROUGH:  Objection; form.                  12:20:42

23    A.   Can you restate the question.                      12:20:44

24    Q.   Is there anything that you could review            12:20:46

25 that would refresh your recollection about how you        12:20:48

Page 53

1    identified the location of violent protests?          12:20:52

2            MR. YARBROUGH:  Same objection.             12:20:55

3        A.   Nothing that would refresh my               12:20:57

4    recollection, no.                                     12:20:59

5        Q.   Did Mr. Phillips send you the list of the   12:21:01

6    nonprofit organizations?                              12:21:06

7            And when I say "you," I mean Mr. Gerwing.     12:21:07

8            MR. YARBROUGH:  Object to form.              12:21:11

9            MR. EVANS:  Object to form.                  12:21:12

10       A.   I don't recall if he would have sent it to  12:21:13

11   Azeddine or myself.                                   12:21:25

12       Q.   Are those the two people --                 12:21:25

13       A.   But he would have sent it to Red Metrics.   12:21:26

14       Q.   And if he sent it to Red Metrics, would it  12:21:28

15   have been to you or to Mr. Rahlouni?                  12:21:30

16       A.   Yes.  At the time, yes.                     12:21:35

17       Q.   And if he sent you the drop box locations,  12:21:37

18   he also would have sent that to you and/or            12:21:41

19   Mr. Rahlouni?                                         12:21:45

20       A.   Again, yes, to Red Metrics.                 12:21:48

21       Q.   Okay.  Do you have any understanding of     12:21:52

22   how the list of drop box locations was compiled?     12:21:54

23       A.   I don't specifically recall.  Again, that   12:21:59

24   was more public information, so I don't know if we   12:22:07

25   pulled that list from online or if -- if Gregg       12:22:09

Page 54

```
 1   did -- or the OpSec team, rather.                    12:22:15

 2           So I don't recall who sourced that           12:22:17

 3   originally, but it's public information, so anyone   12:22:19

 4   could have pulled it.                                12:22:22

 5       Q.   Do you understand how many drop box         12:22:23

 6   locations Red Metrics looked at?                     12:22:25

 7       A.   I think it was over 300.                    12:22:31

 8       Q.   Were the locations all in one state?        12:22:36

 9       A.   Yes.  Yeah, they were all in the state of   12:22:39

10   Georgia.                                             12:22:45

11       Q.   Did anyone at Red Metrics check the list    12:22:45

12   to make sure they actually reflected drop box        12:22:50

13   locations?                                           12:22:53

14       A.   It was a publicly available list, and so I  12:22:55

15   don't think we went as far as validating the public  12:23:00

16   veracity of the list.  I think it was -- it was from 12:23:04

17   either counties and/or the state of Georgia, so, no, 12:23:09

18   we wouldn't have crosschecked it.                    12:23:13

19       Q.   Did anyone check the list of nonprofit      12:23:17

20   organizations to make sure those accurately          12:23:20

21   reflected the nonprofit organizations identified?    12:23:23

22           MR. YARBROUGH:  Objection; form.             12:23:29

23       A.   Yeah, it's hard to say.  You know, the      12:23:30

24   list of 20 organizations, it's not real hard to find 12:23:36

25   a location and an address.  So it wasn't validated   12:23:39
```

Page 55

| | | |
|---|---|---|
| 1 | beyond the initial list, I don't recall. | 12:23:44 |
| 2 | Q.   Once you had a list of locations, exactly | 12:23:52 |
| 3 | what did you do with those list of locations in your | 12:23:55 |
| 4 | work for Mr. Phillips? | 12:23:58 |
| 5 | A.   Which locations are you referring to? | 12:24:00 |
| 6 | Q.   Let's start with the drop boxes. | 12:24:02 |
| 7 | A.   For the period that we would have been | 12:24:09 |
| 8 | looking at, we would have been traversing our | 12:24:12 |
| 9 | dataset to see what devices would have been in that | 12:24:16 |
| 10 | radius over -- over that period of time. | 12:24:21 |
| 11 | Q.   And where did the data come from? | 12:24:24 |
| 12 | A.   Which data? | 12:24:29 |
| 13 | Q.   You said you looked at the data of devices | 12:24:32 |
| 14 | in that location. | 12:24:34 |
| 15 | A.   Uh-huh. | 12:24:34 |
| 16 | Q.   Where did the data of devices come from? | 12:24:36 |
| 17 | A.   That's data that we have sourced and used | 12:24:41 |
| 18 | from a proprietary standpoint for multiple use | 12:24:46 |
| 19 | cases. | 12:24:50 |
| 20 | Q.   For the record, are you willing to | 12:24:52 |
| 21 | disclose the exact sources of the data? | 12:25:06 |
| 22 | MR. YARBROUGH:  Objection; form. | 12:25:08 |
| 23 | That's -- we have agreed on this.  I'm going to | 12:25:09 |
| 24 | instruct you not to answer; it's beyond the scope. | 12:25:12 |
| 25 | MR. EVANS:  Objection. | 12:25:14 |

Page 56

```
 1        Q.   Was Red Metrics able to prove that          12:25:19
 2   voters -- I'm sorry, let's go back for a second.      12:25:22
 3             What did you do with the locations of       12:25:26
 4   nonprofits?                                           12:25:28
 5        A.   Same methodology would have been applied.   12:25:32
 6        Q.   And was Red Metrics able to prove that      12:25:35
 7   voters were collecting ballots at those locations     12:25:37
 8   through its methodology?                              12:25:42
 9             MR. YARBROUGH:  Objection; form.            12:25:43
10             MR. EVANS:  Objection; form.                12:25:43
11        A.   Yeah, can we break that question into the   12:25:44
12   two questions so you're -- I think that's two         12:25:47
13   questions.                                            12:25:50
14        Q.   I think it's one question.                  12:25:56
15             Using your methodology for the nonprofit    12:25:57
16   locations, did Red Metrics prove that someone was     12:25:59
17   picking up ballots at the nonprofit locations?        12:26:05
18             MR. YARBROUGH:  Objection; form.            12:26:09
19             MR. EVANS:  Objection.                      12:26:11
20        A.   So going back to the context that I         12:26:12
21   established earlier, the Red Metrics' role in this     12:26:15
22   was to take a look in the aggregate at a macro view   12:26:20
23   to see if there was circumstantial evidence of        12:26:23
24   devices that would fit that model.                    12:26:26
25        Q.   And the model is someone was located in     12:26:29
```

Page 57

| | | |
|---|---|---|
| 1 | proximity to a nonprofit organization and a drop | 12:26:33 |
| 2 | box? | 12:26:39 |
| 3 | MR. EVANS:  Object to form. | 12:26:39 |
| 4 | MR. YARBROUGH:  Objection; form. | 12:26:40 |
| 5 | A.   Yes. | 12:26:40 |
| 6 | Q.   And so, at most, Red Metrics' analysis | 12:26:46 |
| 7 | might show that a device pinged as being near a | 12:26:48 |
| 8 | nonprofit organization and a drop box? | 12:26:53 |
| 9 | MR. EVANS:  Objection; form. | 12:26:55 |
| 10 | MR. YARBROUGH:  Objection; form. | 12:26:58 |
| 11 | A.   Define "near." | 12:26:59 |
| 12 | Q.   Well, it doesn't matter. | 12:27:05 |
| 13 | At most, Red Metrics' analysis would show | 12:27:06 |
| 14 | that someone was located in proximity to a nonprofit | 12:27:09 |
| 15 | organization and then in proximity to a drop box? | 12:27:13 |
| 16 | MR. YARBROUGH:  Object to form. | 12:27:17 |
| 17 | MR. EVANS:  Object to form. | 12:27:18 |
| 18 | A.   Yes. | 12:27:19 |
| 19 | Q.   Okay.  We'll come back to that. | 12:27:26 |
| 20 | I want to show -- let's pull up David | 12:27:29 |
| 21 | Johnson -- let's pull up what has been marked | 12:27:32 |
| 22 | Document D, and please turn to page TTV_6843. | 12:27:36 |
| 23 | MR. YARBROUGH:  So, Tim, D -- the tab | 12:27:55 |
| 24 | D there will be the document that's pulled up here, | 12:27:57 |
| 25 | so you have access to all of it right now all of the | 12:28:00 |

Page 58

```
 1    time.                                             12:28:04

 2              (Red Metrics Exhibit 9 marked.)         12:28:04

 3         Q.   There we go.  If you flip at the bottom, 12:28:06

 4    Mr. Gerwing, to 6843.  It's about 26 pages in.    12:28:09

 5              Have you ever seen this?                 12:28:23

 6         A.   No.                                      12:28:26

 7         Q.   I'm showing you what was marked Exhibit 9 12:28:27

 8    at the deposition of Mr. Phillips.  And if you look 12:28:30

 9    at the first page, you'll see that this is a draft 12:28:34

10    declaration of Mr. Phillips related to a different 12:28:37

11    lawsuit.                                           12:28:39

12              If you turn to TTV_6821, so you're going 12:28:46

13    to go back forwards.                               12:28:49

14              Have you ever seen what's referred to here 12:28:57

15    as Exhibit A?                                      12:29:00

16         A.   Yes.                                     12:29:02

17         Q.   When did you first see this?             12:29:11

18         A.   When did I first see this?  I don't recall 12:29:12

19    the time frame, but, yeah, I recognize it.         12:29:21

20         Q.   Do you know who created this document?   12:29:26

21         A.   This was one of the deliverables from Red 12:29:29

22    Metrics.                                           12:29:34

23         Q.   Red Metrics created this document?       12:29:34

24         A.   Correct.                                 12:29:37

25         Q.   What do you understand this document to  12:29:43
```

Page 59

```
 1    show?                                          12:29:44

 2         A.   On 6821?                             12:29:47

 3         Q.   Uh-huh.                              12:29:50

 4         A.   Yeah, these are the 300-some drop boxes   12:29:54

 5    that would have been part of the analysis.     12:29:59

 6         Q.   Do you see where it says, Geofenced 309   12:30:02

 7    drop boxes?                                     12:30:06

 8         A.   I do see that.                        12:30:07

 9         Q.   What does "geofenced" mean?          12:30:08

10         A.   We established a few minutes ago that it   12:30:16

11    would be something within proximity of that    12:30:20

12    location, geofenced.                            12:30:22

13         Q.   The chart here doesn't show 309 drop   12:30:26

14    boxes; is that correct?                         12:30:33

15         A.   Yeah, it looks like 20.               12:30:34

16         Q.   Is this a portion of a deliverable to   12:30:39

17    Mr. Phillips?                                   12:30:42

18         A.   How do you mean?                      12:30:47

19         Q.   Is there a list that actually has all 309   12:30:49

20    drop boxes on it?                               12:30:54

21         A.   There would have been as part of the   12:30:55

22    analysis, yes.                                  12:30:58

23         Q.   And that's a document that would have been   12:31:00

24    sent to Mr. Phillips?                           12:31:01

25         A.   Not necessarily.                      12:31:02
```

Page 60

| | | |
|---|---|---|
| 1 | Q.   Do you know if this document was sent to | 12:31:05 |
| 2 | Mr. Phillips? | 12:31:08 |
| 3 | A.   I believe this would have been. | 12:31:10 |
| 4 | Q.   Did you send this document to | 12:31:13 |
| 5 | Mr. Phillips? | 12:31:15 |
| 6 | MR. YARBROUGH:  Objection to form. | 12:31:16 |
| 7 | A.   I don't recall who on the team sent it. | 12:31:19 |
| 8 | Q.   How would someone have sent this document | 12:31:25 |
| 9 | to Mr. Phillips? | 12:31:27 |
| 10 | MR. YARBROUGH:  Objection; form. | 12:31:29 |
| 11 | A.   How -- how would we have sent this? | 12:31:30 |
| 12 | Likely via Wire. | 12:31:35 |
| 13 | Q.   You would send documents over Wire? | 12:31:38 |
| 14 | A.   Sure. | 12:31:40 |
| 15 | Q.   This document says that drop boxes were | 12:31:44 |
| 16 | geofenced from December 1 through election day | 12:31:46 |
| 17 | 1/5/2021; is that correct? | 12:31:51 |
| 18 | A.   Yes. | 12:31:56 |
| 19 | Q.   Is that the time period for the analysis | 12:31:57 |
| 20 | that Red Metrics did for Mr. Phillips? | 12:32:01 |
| 21 | MR. YARBROUGH:  Objection; form. | 12:32:03 |
| 22 | A.   Yes. | 12:32:07 |
| 23 | Q.   Did Red Metrics look at data before | 12:32:09 |
| 24 | December 1, 2020? | 12:32:11 |
| 25 | MR. YARBROUGH:  Objection; form. | 12:32:14 |

Page 61

| | | |
|---|---|---|
| 1 | A.   This particular analysis was for that 34, | 12:32:17 |
| 2 | 35 days, which was the period of the runoff | 12:32:23 |
| 3 | election. | 12:32:28 |
| 4 | Q.   Gotcha. | 12:32:28 |
| 5 | Did you create versions of this document | 12:32:32 |
| 6 | for states other than Georgia? | 12:32:34 |
| 7 | MR. YARBROUGH:  Objection; form. | 12:32:39 |
| 8 | A.   This was specific to Georgia.  Yeah, this | 12:32:40 |
| 9 | was specific to Georgia. | 12:32:51 |
| 10 | Q.   Did Red Metrics create documents like this | 12:32:52 |
| 11 | for any other state? | 12:32:56 |
| 12 | MR. YARBROUGH:  Objection; form. | 12:32:57 |
| 13 | A.   There were other jurisdictions later in | 12:32:59 |
| 14 | the project that would have had a similar -- similar | 12:33:04 |
| 15 | look, yeah. | 12:33:07 |
| 16 | Q.   Is this how the locations would have | 12:33:07 |
| 17 | appeared when Red Metrics pulled the drop box | 12:33:12 |
| 18 | locations -- I'm sorry, let me -- let me restate | 12:33:16 |
| 19 | that. | 12:33:21 |
| 20 | A.   Yeah. | 12:33:21 |
| 21 | Q.   Is this what the list of locations that | 12:33:23 |
| 22 | Red Metrics either obtained from Mr. Phillips or | 12:33:26 |
| 23 | from public sources would look like? | 12:33:29 |
| 24 | A.   Yes. | 12:33:33 |
| 25 | Q.   Is this a copy of a spreadsheet? | 12:33:35 |

Page 62

```
 1              MR. YARBROUGH:  Objection; form.        12:33:39
 2      A.   This insert, yeah, was most likely a       12:33:42
 3  snapshot of a spreadsheet.                          12:33:47
 4      Q.   Can you turn to Exhibit B, which is        12:33:51
 5  TTV_6822.  It should just be the next page.         12:33:55
 6      A.   Uh-huh.                                    12:33:55
 7      Q.   Have you ever seen this document?          12:33:59
 8      A.   Same deck, yeah.                           12:34:01
 9      Q.   When you "say the same deck," what do you  12:34:03
10  mean?                                               12:34:07
11      A.   Well, they're consecutive slides.          12:34:07
12      Q.   So is this from a PowerPoint?              12:34:11
13      A.   This would have been either delivered as a 12:34:14
14  PowerPoint or a pdf.                                12:34:22
15      Q.   And would you have delivered a pdf or      12:34:24
16  PowerPoint to Mr. Phillips over Wire?               12:34:33
17      A.   Over Wire, yes.                            12:34:31
18      Q.   Did you ever present this PowerPoint to    12:34:34
19  anyone?                                             12:34:36
20      A.   This would have been a deliverable that we 12:34:39
21  delivered to OpSec as the client.  What they did    12:34:43
22  beyond that, I don't know, with the content.        12:34:46
23      Q.   And when you delivered it, you sent this   12:34:49
24  PowerPoint to OpSec?                                12:34:51
25      A.   That or as a pdf, yes.                     12:34:54
```

Page 63

```
 1        Q.   And did you also talk them through this    12:34:56

 2   PowerPoint or pdf?                                    12:35:01

 3        A.   We would have discussed it for sure.  It's 12:35:05

 4   a deliverable.                                        12:35:07

 5        Q.   So Red Metrics produced Exhibit B?         12:35:09

 6        A.   Yes.                                        12:35:12

 7             MR. YARBROUGH:  Objection; form.            12:35:13

 8        Q.   What do you understand the document to      12:35:14

 9   show?                                                 12:35:16

10        A.   6822?                                       12:35:22

11        Q.   Yes.                                        12:35:24

12        A.   Yeah, this is the list that we have been    12:35:26

13   talking about for the last hour.                      12:35:28

14        Q.   So you recognize that list of              12:35:30

15   organizations?                                        12:35:33

16        A.   Yes, this would have been that list.        12:35:37

17        Q.   And these are the organizations that       12:35:39

18   Mr. Phillips provided to Red Metrics?                 12:35:41

19        A.   That's correct.                             12:35:44

20        Q.   Did he explain anything about why he       12:35:47

21   identified these particular organizations?           12:35:50

22        A.   We didn't discuss any rationale.           12:35:54

23        Q.   Did Red Metrics -- strike that.            12:36:01

24             The document says, Geofenced the primary   12:36:05

25   org office.                                           12:36:10
```

Page 64

```
 1              Did Red Metrics geofence this set of        12:36:10

 2    organizations?                                        12:36:12

 3         A.   Yes.                                        12:36:16

 4         Q.   To your knowledge, was anyone ever told     12:36:19

 5    why Red Metrics was geofencing this particular set    12:36:21

 6    of organizations?                                     12:36:24

 7                   MR. EVANS:  Object to form.            12:36:30

 8         A.   In terms of our role in the data           12:36:31

 9    analytics, we're not in the business of questioning   12:36:33

10    the client's rationale, so, no, rationale wasn't --   12:36:37

11    wasn't discussed.                                     12:36:40

12         Q.   The date on this document says October 1,   12:36:47

13    2020.                                                 12:36:49

14              Why does that not match up with the date    12:36:50

15    from the drop box list we just reviewed?              12:36:53

16                   MR. YARBROUGH:  Object to form.        12:36:56

17         A.   Yeah, I don't recall.                       12:36:58

18         Q.   Okay.  What -- you have said geofence, but  12:37:09

19    walk me exactly through, what did Red Metrics do      12:37:15

20    with this list of organizations?                      12:37:18

21                   MR. EVANS:  Object to form.            12:37:22

22         A.   Geofencing is, from a marketing or any     12:37:26

23    other use case, matter of taking that coordinate,     12:37:32

24    and within a certain radius, pulling a list of        12:37:36

25    devices that were in proximity, very simply.          12:37:44
```

Page 65

```
 1        Q.   And how close of a proximity did Red        12:37:48
 2   Metrics assess for these locations?                   12:37:52
 3        A.   There was a couple hundred feet plus or      12:37:59
 4   minus.  And these signals aren't super precise, and   12:38:02
 5   so you just cast a broad net when you're talking      12:38:08
 6   about a radius.                                        12:38:12
 7        Q.   And what do you mean when you say they're    12:38:13
 8   not super precise?                                     12:38:18
 9        A.   No mobile data is perfect unless you're      12:38:21
10   Google or Apple.  And so in any of the commercially   12:38:26
11   available datasets, they're never a precise -- super  12:38:34
12   precise location.                                      12:38:40
13        Q.   Is the size of the radius referred to as a   12:38:42
14   buffer?                                                12:38:46
15        A.   It can be.                                   12:38:46
16        Q.   So when I'm asking you questions, let's      12:38:50
17   refer to the radius as a buffer?                       12:38:52
18        A.   Okay.                                        12:38:54
19        Q.   What size buffer did Red Metrics use for     12:38:54
20   the organizations?                                     12:38:57
21        A.   I don't recall for this analysis, but it     12:39:02
22   was probably a couple hundred feet.                    12:39:04
23        Q.   And what about for the drop boxes?           12:39:06
24        A.   It would have been likely the -- I don't     12:39:09
25   recall, but I would say likely the same buffer.        12:39:13
```

Page 66

```
 1    Yeah.                                              12:39:17

 2         Q.   And what about for the protests or riots  12:39:18

 3    that we talked about earlier?                       12:39:21

 4         A.   Again, common methodology would have it at 12:39:23

 5    that same buffer.                                   12:39:27

 6         Q.   And how did Red Metrics determine whether 12:39:30

 7    devices were located within the buffer?             12:39:36

 8         A.   The buffer is measured from that          12:39:40

 9    latitude/longitude.  You're just looking at any     12:39:45

10    device that would have been in that buffer in that  12:39:49

11    time period.                                        12:39:53

12         Q.   And what is the data that is being used to 12:39:58

13    identify the location of the cell phone?            12:40:02

14              MR. YARBROUGH:  Objection; form.          12:40:05

15         Q.   I'm sorry, device.                        12:40:06

16         A.   It's just commercially available data.    12:40:08

17         Q.   Is that cell site data?                   12:40:10

18         A.   Not necessarily.                          12:40:15

19         Q.   What other kind of data would it be?      12:40:18

20         A.   I don't know all the data types that      12:40:20

21    exist.  Yeah, I mean, again, if you're -- unless    12:40:26

22    you're Apple or Google, you don't have the degree of 12:40:32

23    precision that the big oligarchs have.              12:40:35

24         Q.   Gotcha.                                   12:40:40

25              Did Red Metrics purchase any data         12:40:42
```

Page 67

1    specifically for this project with Mr. Phillips?        12:40:44

2        A.    We do work in other domains, and so any        12:40:47

3    data that we would have used here could have been        12:40:54

4    used for multiple clients.        12:40:57

5        Q.    But I guess -- let me re-ask the question.        12:41:01

6            Did you obtain any data specifically for        12:41:09

7    Mr. Phillips' project?        12:41:13

8                MR. YARBROUGH:  Objection; form.        12:41:17

9        A.    Again, we would have -- we use these same        12:41:18

10    datasets to serve multiple use cases for multiple        12:41:23

11    clients.        12:41:27

12        Q.    Right.        12:41:27

13            But you could have bought data for        12:41:30

14    Mr. Phillips and then gone on to use it for other        12:41:34

15    clients.        12:41:36

16            Is that --        12:41:37

17                MR. EVANS:  Object to form.        12:41:37

18        Q.    -- the kind of -- is that what happened        12:41:38

19    here or did you go out -- did you already have data        12:41:41

20    that you used for other clients that you then used        12:41:44

21    for Mr. Phillips?        12:41:47

22                MR. YARBROUGH:  Object to form.        12:41:48

23        A.    I don't recall which direction it went,        12:41:49

24    but we typically have data for certain time frames        12:41:51

25    that we can use for any client use case.        12:41:55

Page 68

| | | |
|---|---|---|
| 1 | Q.    Okay.  Do you have any idea how many | 12:41:58 |
| 2 | individual data points the dataset for the analysis | 12:42:04 |
| 3 | you conducted for Mr. Phillips consisted of? | 12:42:07 |
| 4 | MR. YARBROUGH:  Objection to form. | 12:42:11 |
| 5 | A.    For this time period for -- for this | 12:42:13 |
| 6 | analysis?  A data science team would know better.  I | 12:42:17 |
| 7 | don't recall the exact record count, but it was a | 12:42:26 |
| 8 | large dataset. | 12:42:30 |
| 9 | Q.    Are we talking in the millions? | 12:42:32 |
| 10 | A.    Most likely in the billions. | 12:42:33 |
| 11 | Q.    In the billions. | 12:42:36 |
| 12 | A.    Uh-huh. | 12:42:36 |
| 13 | Q.    How did Red Metrics assess whether | 12:42:40 |
| 14 | specific devices were located near a particular | 12:42:43 |
| 15 | location more than once? | 12:42:46 |
| 16 | A.    Back to the buffer methodology that we | 12:42:52 |
| 17 | established, it just would have been a function of | 12:42:55 |
| 18 | looking at, for any period of time, what was in or | 12:42:57 |
| 19 | not in that buffer.  Yeah. | 12:43:01 |
| 20 | Q.    And just mechanically, how would this | 12:43:06 |
| 21 | work?  Is there a spreadsheet with device locations? | 12:43:08 |
| 22 | A.    It would have been -- no, it would have | 12:43:16 |
| 23 | been larger than spreadsheets.  It would have been | 12:43:20 |
| 24 | in -- in database. | 12:43:23 |
| 25 | Q.    So exactly what would Red Metrics' | 12:43:24 |

Page 69

```
1    employees do mechanically to identify whether      12:43:27
2    devices were located in a particular buffer more   12:43:31
3    than once?                                          12:43:34
4         A.   For this specific use case, it would have 12:43:39
5    been a query against the data with these parameters 12:43:44
6    to pull in signals that matched the parameters at   12:43:49
7    time and location.                                  12:43:54
8         Q.   And just break that down for me.          12:43:58
9              What is a query?                          12:44:00
10        A.   Query is just simply something the data   12:44:02
11   science team would use to ask a question of the     12:44:07
12   dataset and get an answer, get a response.          12:44:11
13        Q.   And when you say "analysis," device by    12:44:13
14   device or was it a sort of algorithm that would look 12:44:16
15   for any instance of one device appearing more than  12:44:20
16   once in a buffer zone?                              12:44:23
17        A.   Yeah, again, going back to my comments    12:44:25
18   earlier, this was an analysis done in the aggregate, 12:44:28
19   and so it was a macro view of devices that would    12:44:32
20   just fit that -- fit that set of constraints or --  12:44:36
21   or, you know, what we're matching on.               12:44:39
22        Q.   And is this a piece of software that      12:44:41
23   you're looking at?                                  12:44:43
24        A.   Custom queries that we, as part of our IP, 12:44:47
25   have built to -- to hit these large datasets.       12:44:51
```

Page 70

```
 1        Q.   And is it hosted online or is it, like, at    12:44:55

 2   Red Metrics there's a database that you're running      12:45:00

 3   this across?                                             12:45:04

 4        A.   Yeah, this data would have been run up         12:45:06

 5   against the data that we would have stored in the        12:45:09

 6   cloud.                                                   12:45:13

 7        Q.   Okay.  And when you get a result from the      12:45:13

 8   query, how does it come back to you?                     12:45:16

 9        A.   The result of the query would be a sub         12:45:21

10   dataset that, again, would stay -- would be on the       12:45:26

11   cloud that we could -- that we could then do             12:45:28

12   analytics on.                                            12:45:31

13        Q.   And exactly what analytics did you do on       12:45:32

14   it?                                                      12:45:34

15        A.   We would simply role up again in the          12:45:35

16   aggregate to see how many devices from an account to     12:45:39

17   try to summarize and make sense of that volume of        12:45:45

18   data, so typically counts of how often we would have     12:45:49

19   seen a device in that proximity in that buffer.          12:45:52

20        Q.   Is someone manually counting instances of     12:45:55

21   a device being located in a buffer?                      12:45:58

22        A.   No, that's -- function of the query is to      12:46:01

23   kind of do those roll-ups for us and tabulate those      12:46:04

24   results.                                                 12:46:08

25        Q.   And approximately how many devices came        12:46:08
```

Page 71

| | | |
|---|---|---|
| 1 | back as appearing within a buffer more than once in | 12:46:10 |
| 2 | the work for Mr. Phillips? | 12:46:14 |
| 3 | MR. YARBROUGH:  Objection; form. | 12:46:16 |
| 4 | A.   I don't recall the exact counts, yeah, but | 12:46:18 |
| 5 | it was -- yeah, I don't recall the counts. | 12:46:22 |
| 6 | Q.   Is it more than a thousand? | 12:46:26 |
| 7 | MR. YARBROUGH:  Objection; form. | 12:46:32 |
| 8 | A.   I don't recall.  I -- I don't recall | 12:46:33 |
| 9 | offhand. | 12:46:35 |
| 10 | Q.   Do you -- in general when you run a query | 12:46:43 |
| 11 | like this over a period of months -- | 12:46:46 |
| 12 | A.   Right. | 12:46:48 |
| 13 | Q.   -- is it -- is it common to see devices | 12:46:49 |
| 14 | appear more than once in a buffer zone? | 12:46:52 |
| 15 | A.   It has everything to do with the | 12:46:57 |
| 16 | definition of the buffer, yes. | 12:47:01 |
| 17 | Q.   So for a 100 to 200-foot buffer zone for | 12:47:03 |
| 18 | 300 locations in Atlanta, is it likely to see people | 12:47:08 |
| 19 | within those buffer zones more than once? | 12:47:13 |
| 20 | MR. YARBROUGH:  Objection; form. | 12:47:15 |
| 21 | MR. EVANS:  Objection; form. | 12:47:16 |
| 22 | A.   Can you re-ask that question. | 12:47:17 |
| 23 | Q.   Yeah. | 12:47:22 |
| 24 | A.   Make sure I'm tracking. | 12:47:22 |
| 25 | Q.   When you're looking at a month's long | 12:47:24 |

Page 72

```
1    period of billions of pings and you have a buffer        12:47:27

2    zone of 100 to 200 feet for hundreds of locations in      12:47:31

3    a metropolitan area, how likely is it to find a cell      12:47:35

4    phone device being located in one of those buffers        12:47:40

5    more than once?                                           12:47:44

6               MR. YARBROUGH:  Objection to form.             12:47:45

7               MR. EVANS:  Objection; form.                   12:47:47

8        A.   If you look back at -- you know, by              12:47:47

9    definition, these drop boxes were in public               12:47:52

10   locations, and so it can be very common.                  12:47:54

11       Q.   And when you say "very common," what do          12:47:57

12   you mean?                                                 12:47:59

13       A.   People coming and going in public spaces         12:47:59

14   such as libraries, offices, city buildings, and           12:48:05

15   such.                                                     12:48:09

16       Q.   Did you ever tell Mr. Phillips that it           12:48:13

17   could be very common to see a device in multiple          12:48:18

18   buffer zones in this kind of analysis?                    12:48:21

19       A.   I don't know if we expressly talked about        12:48:26

20   that, but he was very aware of the typical location       12:48:28

21   of these drop boxes, so I don't know what he              12:48:36

22   understood or didn't understand about the results.        12:48:38

23       Q.   Is it obvious to people who work in this         12:48:47

24   space that it's common?                                   12:48:49

25               MR. EVANS:  Object to form.                   12:48:51
```

Page 73

```
 1        A.   Is it obvious, yeah, I don't know.  It    12:48:54

 2    depends on their level of sophistication.         12:48:57

 3        Q.   I'm just going to ask one more question   12:49:01

 4    here then we'll go ahead and break for lunch.      12:49:03

 5            So you testified that it took a            12:49:05

 6    substantial portion of Mr. Rahlouni's time and your 12:49:07

 7    time over a period of three to six months.         12:49:12

 8                MR. YARBROUGH:  Object to form.  I'm    12:49:14

 9    sorry, go ahead.  Sorry, John.                     12:49:15

10        Q.   Was the majority of that time doing the   12:49:17

11    analysis to look for instances of devices appearing 12:49:20

12    multiple times in a buffer zone?                   12:49:24

13                MR. YARBROUGH:  Object to form.        12:49:27

14        A.   How would you define "majority of the     12:49:30

15    engagement"?                                       12:49:33

16        Q.   More than half.                           12:49:34

17        A.   Yeah, I don't know what percentage to --  12:49:37

18    to put on it.  There's a lot of moving parts in any 12:49:42

19    engagement.  So in terms of the ratio of time --   12:49:46

20    again, it would be different if we tracked hours,  12:49:49

21    but that's not how we operate, so I really couldn't 12:49:50

22    answer the question.                               12:49:54

23        Q.   Did it take a substantial amount of time  12:49:54

24    to go through and identify devices that had appeared 12:49:57

25    in a buffer zone more than once?                   12:50:00
```

```
 1              MR. YARBROUGH:  Object to form.        12:50:02

 2        A.   Going back to our intellectual property,  12:50:05

 3   the methodologies that we have built can make that  12:50:08

 4   pretty efficient.                                  12:50:11

 5        Q.   How long -- here is the question I have  12:50:16

 6   for you:  You spent three to six months working on  12:50:20

 7   this.  What were you doing day-to-day?             12:50:24

 8        A.   A lot of other things, not just this     12:50:27

 9   project.                                           12:50:30

10        Q.   On this project, I mean, what were you   12:50:31

11   doing?                                             12:50:33

12        A.   I mean, I -- by saying that we had       12:50:35

13   efficient methodologies also doesn't mean it's, you  12:50:40

14   know, pressing a red button and you have an answer.  12:50:43

15              So I couldn't break out a typical day or  12:50:47

16   week, but it can be an involved process to get to a  12:50:49

17   final result where you're aggregating these kinds of  12:50:53

18   results.                                           12:50:56

19        Q.   And is --                                12:50:56

20        A.   With a small team, I might add, right.  I  12:50:57

21   mean, there's only a few people with access.       12:50:59

22        Q.   And is part of it looking through the    12:51:05

23   responses to the queries that show that the -- a   12:51:07

24   device was in a buffer zone more than once?        12:51:10

25        A.   I wouldn't say -- no.  Again, the        12:51:14
```

Page 75

1    engineering that goes into how to manipulate a date          12:51:19

2    set, this was a specific use case.  And so it would          12:51:22

3    have been the engineering involved to get there, of          12:51:25

4    which that was, you know, one of many steps.                 12:51:28

5         Q.   We'll come back to that after lunch.  I            12:51:31

6    want to ask one more question.                               12:51:35

7                        EXAMINATION                              12:51:35

8    BY MR. DAVIDSON:                                             12:51:35

9         Q.   This is Mr. Davidson.  Referring you back         12:51:44

10   to the exhibit before you -- the list of                     12:51:46

11   organizations, if you look at the addresses for █████        12:51:50

12   ████████, if you look at the address for ████████            12:51:56

13   ████████████████████████████████████████████████████        12:52:01

14   ██████████████ has -- its address is listed as being         12:52:05

15   on the 4th floor (sic), ███████████████████, for             12:52:09

16   example, references ██████████, and let's assume that        12:52:13

17   that's on the fifth floor.                                   12:52:17

18             How would your analysis of buffer zones be         12:52:19

19   able to account for the movement of individuals into         12:52:22

20   or in proximity to ██████████████ on the 4th floor of        12:52:27

21   ████████████████████ as opposed to another business         12:52:33

22   that might be located on the second floor?                   12:52:36

23             MR. EVANS:  Object to form.                        12:52:39

24        Q.   Can you account for that?                          12:52:42

25        A.   The analysis -- the short answer is no.            12:52:44

Page 76

```
 1              MR. LANGFORD:  I think we can take a      12:52:50
 2    break for lunch.                                    12:52:51
 3              Sorry that went 20 minutes over.          12:52:51
 4              We can go off the record.                 12:52:55
 5              THE VIDEOGRAPHER:  That concludes         12:52:56
 6    Media Number 2.  Off the record at 12:53 p.m.       12:52:57
 7              (Recess 12:53 p.m. to 1:39 p.m.)          12:53:03
 8              THE VIDEOGRAPHER:  Back on the record.    13:38:13
 9    Time is 1:39 p.m.                                   13:39:47
10       Q.   (By Mr. Langford)  All right.  Thank you,   13:39:49
11    Mr. Gerwing.                                        13:39:53
12           Before we look at the next exhibit here, I   13:39:55
13    just wanted to ask you, how did Red Metrics assess  13:40:01
14    whether specific devices were located in buffer     13:40:05
15    zones more than once?                               13:40:09
16              MR. YARBROUGH:  Object to form.           13:40:12
17       A.   With the methodology that we had           13:40:15
18    previously discussed in terms of looking at that    13:40:18
19    buffer location and point in time.  That's really   13:40:21
20    just those two variables, location and time, that   13:40:24
21    would give us any kind of indication if there were  13:40:27
22    multiple occurrences over a time period of days or  13:40:30
23    weeks.                                              13:40:33
24       Q.   Earlier you said that Red Metrics reviewed 13:40:37
25    surveillance footage as part of its work.           13:40:40
```

Page 77

```
 1              Was the surveillance footage of drop       13:40:45

 2     boxes?                                              13:40:50

 3         A.   Yeah, it was -- yes.                       13:40:50

 4         Q.   And did you review surveillance footage of 13:40:53

 5     any other kind of location?                         13:40:56

 6         A.   No.  No.                                   13:40:58

 7         Q.   As part of its work did Red Metrics        13:41:02

 8     produce maps for OpSec and Mr. Phillips?            13:41:04

 9         A.   Yes.                                       13:41:07

10         Q.   About how many maps?                       13:41:11

11         A.   I don't recall the number.  It depended on 13:41:15

12     what the requirement was so I couldn't put a number 13:41:19

13     on it.                                              13:41:21

14         Q.   Was it more than 10?                       13:41:22

15         A.   Yes.                                       13:41:23

16         Q.   More than 100?                             13:41:27

17         A.   No.  No.  Somewhere between 10 and 100     13:41:28

18     would be fair.                                      13:41:34

19         Q.   What did those maps represent or purport   13:41:34

20     to show?                                            13:41:38

21         A.   In the macro they would have shown those   13:41:39

22     broad -- broad geos and any devices that again would 13:41:45

23     have fit the criteria as having been in one of those 13:41:54

24     buffers.                                            13:41:57

25         Q.   What do you mean by "broad geos"?          13:41:57
```

```
                                              Page 78
 1        A.   Atlanta Metro as an example, so broad      13:42:01

 2   geographic areas within -- in Georgia.               13:42:05

 3        Q.   So let's pull up -- if you go back to the   13:42:08

 4   same tab, which is tab B in your binder.             13:42:12

 5             MR. LANGFORD:   And this is the same        13:42:16

 6   exhibit that we had up before we took the break,     13:42:20

 7   Mr. Johnson.  It should be Exhibit 2.  Sorry.  Sorry. 13:42:23

 8   This is Exhibit 9 to the Phillips deposition.        13:42:28

 9        Q.   And if you will turn to page 6826, which    13:42:33

10   is Exhibit F.                                         13:42:38

11        A.   So this is David as in David, right?        13:42:39

12        Q.   B as in boy.                                13:42:42

13        A.   And what page are we on?                    13:42:44

14        Q.   6826.                                       13:42:46

15        A.   B doesn't have a 6826.                      13:42:49

16             MR. YARBROUGH:   Do you want me to try      13:43:01

17   and help him, John?                                   13:43:03

18             MR. LANGFORD:   Yes, sir.                   13:43:05

19             I'm sorry.  You're right.  It was D.        13:43:12

20             MR. YARBROUGH:   Delta?                     13:43:17

21             MR. LANGFORD:   Yes.  I don't know why      13:43:19

22   it's different from Exhibit Share.                   13:43:21

23        Q.   And now if you go to 6826.                  13:43:22

24             MR. LANGFORD:   Mr. Johnson, if you can     13:43:42

25   zoom out of observations here.                       13:43:44
```

Page 79

| | | |
|---|---|---|
| 1 | Q. There you go. | 13:43:55 |
| 2 | Have you ever seen this map? | 13:43:55 |
| 3 | A. Yes. | 13:43:58 |
| 4 | Q. Did Red Metrics produce this map? | 13:44:00 |
| 5 | A. Yes. | 13:44:03 |
| 6 | Q. Who made the map? | 13:44:05 |
| 7 | MR. YARBROUGH: Object to form. | 13:44:09 |
| 8 | A. I don't know. | 13:44:11 |
| 9 | Q. Who at Red Metrics made this map? | 13:44:11 |
| 10 | A. I don't recall who on the team, but it was | 13:44:15 |
| 11 | Red Metrics. | 13:44:17 |
| 12 | Q. Did you ever make a map like this | 13:44:18 |
| 13 | yourself, Mr. Gerwing? | 13:44:20 |
| 14 | A. I would have had a role in the analyses, | 13:44:23 |
| 15 | yes. | 13:44:32 |
| 16 | Q. And what would your role have been? | 13:44:34 |
| 17 | A. Rolling out a sufficient level of detail | 13:44:37 |
| 18 | for the client. | 13:44:42 |
| 19 | Q. And what does that mean? | 13:44:44 |
| 20 | A. Making sense of the buffers, and in this | 13:44:47 |
| 21 | case, helping to summarize what the data team had | 13:44:54 |
| 22 | generated. | 13:44:57 |
| 23 | Q. Are these the kinds of maps that we | 13:45:00 |
| 24 | discussed earlier that you said Red Metrics made 10 | 13:45:02 |
| 25 | to 100 of? | 13:45:05 |

Page 80

```
 1          A.   Yes, this would be representative.          13:45:06

 2          Q.   Okay.  Does Red Metrics -- has Red Metrics  13:45:10

 3     ever made a map of an individual device for other    13:45:14

 4     clients?                                              13:45:18

 5               MR. YARBROUGH:  Objection; form.            13:45:19

 6          A.   Not in this use case, no.                   13:45:22

 7          Q.   What do you mean by "not in this use        13:45:29

 8     case"?                                                13:45:30

 9          A.   Not in the election use case.              13:45:32

10          Q.   But Red Metrics has made maps for other    13:45:43

11     clients of individual devices?                        13:45:45

12          A.   Yes.                                        13:45:48

13          Q.   If you look on the right under             13:45:51

14     observations, it says:  Drop box visits equals 24,    13:45:53

15     org visits equals 3, unique locations below.          13:46:00

16               Did Red Metrics compile this list of        13:46:03

17     observations?                                         13:46:06

18          A.   Yes.                                        13:46:08

19          Q.   And when it says, drop box visits equals    13:46:09

20     24, what does that mean?                              13:46:11

21          A.   So given the prior definitions that we      13:46:16

22     established around proximity in and around a buffer,  13:46:19

23     this would have been the roll-up count of those       13:46:23

24     observations.                                         13:46:25

25          Q.   And the roll-up count means there were 24   13:46:26
```

Page 81

| | | |
|---|---|---|
| 1 | observations of a device within the buffer located | 13:46:32 |
| 2 | around a drop box? | 13:46:36 |
| 3 | A.    That's a fair definition. | 13:46:39 |
| 4 | Q.    Does it mean that someone actually visited | 13:46:43 |
| 5 | the drop box 24 times? | 13:46:46 |
| 6 | MR. YARBROUGH:   Objection; form. | 13:46:50 |
| 7 | A.    I think like we established with a radius | 13:46:55 |
| 8 | of several hundred feet, it meant that they were | 13:46:59 |
| 9 | within the buffer.  And we also had established that | 13:47:02 |
| 10 | with the degree of precision, it may or may not have | 13:47:04 |
| 11 | been expressly at the drop box. | 13:47:08 |
| 12 | Q.    And did you explain to Mr. Phillips that | 13:47:12 |
| 13 | it means it may or may not have been a visit to the | 13:47:16 |
| 14 | drop box? | 13:47:19 |
| 15 | MR. YARBROUGH:   Object to form. | 13:47:20 |
| 16 | A.    I don't recall that we had that exact | 13:47:22 |
| 17 | conversation.  We were all in agreement that the | 13:47:27 |
| 18 | model -- the parameters in the model were sufficient | 13:47:29 |
| 19 | for what it is that we were trying to take a look | 13:47:34 |
| 20 | at. | 13:47:37 |
| 21 | Q.    Does Red Metrics ever use smaller radiuses | 13:47:38 |
| 22 | around a location to do geospatial analysis? | 13:47:43 |
| 23 | A.    It depends on the use case. | 13:47:48 |
| 24 | Q.    Has Red Metrics ever used a smaller radius | 13:47:51 |
| 25 | around a location for a client? | 13:47:53 |

Page 82

| | | |
|---|---|---|
| 1 | A.    In what kind of use case? | 13:47:56 |
| 2 | Q.    Any use case. | 13:47:59 |
| 3 | A.    In any use case.  I'm sure we have. | 13:48:00 |
| 4 | Depending on what we're trying to solve for a | 13:48:07 |
| 5 | client, it doesn't have to be in the hundreds of | 13:48:11 |
| 6 | feet, no. | 13:48:13 |
| 7 | Q.    How small is the smallest radius that is | 13:48:14 |
| 8 | feasible for Red Metrics? | 13:48:17 |
| 9 | A.    You can get -- you could get -- you know, | 13:48:21 |
| 10 | you define the radius from, you know, 1, 10, 50, | 13:48:29 |
| 11 | 100 feet.  So you could make it as tight or as broad | 13:48:36 |
| 12 | as you need to.  So it's just a function of -- yeah, | 13:48:42 |
| 13 | I think that's -- that's fair to say. | 13:48:47 |
| 14 | Q.    You could have had a radius of 3 feet | 13:48:48 |
| 15 | around drop box locations? | 13:48:51 |
| 16 | A.    You could, yes. | 13:48:54 |
| 17 | Q.    And would that have meant that when a | 13:48:58 |
| 18 | device appears in that radius, it's more likely that | 13:49:04 |
| 19 | they actually visited the drop box? | 13:49:07 |
| 20 | MR. YARBROUGH:  Objection; form. | 13:49:09 |
| 21 | MR. EVANS:  Objection. | 13:49:11 |
| 22 | A.    Maybe, maybe not.  Three feet could mean | 13:49:11 |
| 23 | that they were either passing through that buffer | 13:49:18 |
| 24 | and still didn't expressly visit the drop box, so it | 13:49:20 |
| 25 | may or may not be, you know, more or less. | 13:49:25 |

1          Q.   So even a radius of 3 feet could have          13:49:27

2    inaccuracies in terms of whether the data actually        13:49:30

3    shows that someone visited a precise location?            13:49:34

4                MR. YARBROUGH:  Objection; form.              13:49:37

5                MR. EVANS:  Object to form.                   13:49:38

6          A.   I think this only goes to re-establish the     13:49:39

7    fact that we made that we discussed earlier which is      13:49:43

8    that these macro analyses were meant to be                13:49:49

9    circumstantial in nature, right, and that there           13:49:57

10   would be other datasets that could be employed that       13:49:59

11   we don't have but that could be employed downstream       13:50:02

12   to say, okay, there's something at least worth            13:50:05

13   looking at here.  That was the express intent of          13:50:08

14   this exercise.                                            13:50:11

15         Q.   And so you defined the radius in a way to      13:50:12

16   just get to circumstantial leads as you describe          13:50:16

17   them?                                                     13:50:20

18                MR. YARBROUGH:  Object to form.              13:50:21

19         A.   Yes, that's a fair characterization.          13:50:22

20         Q.   Did you discuss using different size           13:50:28

21   radiuses with Mr. Phillips?                               13:50:30

22         A.   I don't recall that specific variable          13:50:36

23   being discussed, no.                                      13:50:38

24         Q.   Did -- as part of its work, did Red            13:50:41

25   Metrics -- you know what, strike that.  I'm going to      13:50:57

Page 84

| | | |
|---|---|---|
| 1 | move forward. | 13:50:59 |
| 2 | MR. LANGFORD:  I think what we will do | 13:51:08 |
| 3 | is try this again.  Let's pull up the film. | 13:51:09 |
| 4 | MR. CRENSHAW:  Okay.  Give us | 13:51:17 |
| 5 | 20 seconds here. | 13:51:19 |
| 6 | Q.   Mr. Gerwing, earlier you testified that | 13:51:23 |
| 7 | you have seen 2000 Mules, the movie? | 13:51:25 |
| 8 | A.   Yes. | 13:51:27 |
| 9 | Q.   I can represent that this is a true and | 13:51:31 |
| 10 | correct copy of the 2000 Mules movie DVD.  And we're | 13:51:35 |
| 11 | going to play from minutes 31:56 to 32:57, in other | 13:51:40 |
| 12 | words, minute 31, second 56 through minute 32, | 13:51:53 |
| 13 | second 57. | 13:51:57 |
| 14 | MR. CRENSHAW:  Everybody stand by. | 13:52:02 |
| 15 | (Video played.) | 13:52:05 |
| 16 | Q.   In that passage Mr. Phillips described | 13:53:12 |
| 17 | work being done by "we." | 13:53:15 |
| 18 | Do you understand Mr. Phillips' use of | 13:53:18 |
| 19 | "we" to reference Red Metrics' work? | 13:53:20 |
| 20 | MR. YARBROUGH:  Objection; form. | 13:53:23 |
| 21 | MR. EVANS:  Object to form. | 13:53:24 |
| 22 | A.   I don't. | 13:53:26 |
| 23 | Q.   Is this -- does this reflect work that Red | 13:53:29 |
| 24 | Metrics did? | 13:53:31 |
| 25 | MR. YARBROUGH:  Object to form. | 13:53:32 |

Page 85

```
 1          A.   This was our deliverable.  That was not    13:53:34

 2     our deliverable.                                      13:53:39

 3          Q.   When you say this was our deliverable, you  13:53:42

 4     mean the Exhibit F to Mr. Phillips' declaration that  13:53:44

 5     we just looked at?                                    13:53:47

 6          A.   Yes, that's correct.                        13:53:48

 7          Q.   And you said that the map that was shown    13:53:50

 8     in movie was not the deliverable that Red Metrics     13:53:52

 9     created?                                              13:53:55

10               MR. YARBROUGH:  Object to form.             13:53:56

11               MR. EVANS:  Object to form.                 13:53:57

12          A.   Yeah, that was not produced by Red          13:53:58

13     Metrics.                                              13:54:02

14          Q.   Were you shown that map before the movie    13:54:02

15     was published?                                        13:54:07

16               MR. YARBROUGH:  Object to form.             13:54:08

17          A.   The movie was the first time I saw that     13:54:11

18     map.                                                  13:54:13

19          Q.   Were you asked for any feedback on that     13:54:14

20     map?                                                  13:54:16

21               MR. YARBROUGH:  Object to form.             13:54:17

22          A.   I was not.                                  13:54:19

23          Q.   So once the movie came out, did             13:54:22

24     Mr. Phillips ever approach you to say, did we get it  13:54:26

25     right in the movie?                                   13:54:30
```

Page 86

```
 1              MR. EVANS:  Object to form.        13:54:31

 2       A.   No.                                  13:54:34

 3       Q.   Is there a difference between the map in   13:54:37

 4  the movie and the map we were just looking at?  13:54:38

 5              MR. YARBROUGH:  Object to form.     13:54:42

 6       A.   Yes.                                 13:54:46

 7       Q.   And what would that difference be?   13:54:47

 8       A.   I don't have a sense for the coordinates  13:54:49

 9  of the map in the movie.  The animation was not  13:54:58

10  anything that we ever produced.  These were only  13:55:03

11  static maps in the aggregate.                  13:55:06

12       Q.   Do you know who did make the maps in the   13:55:14

13  movie?                                         13:55:16

14       A.   I have no idea.                      13:55:17

15       Q.   In the movie Mr. Phillips said the orange   13:55:21

16  dots on the map were drop boxes.               13:55:26

17              Does Red Metrics know if the orange dots   13:55:30

18  represent drop box locations?                  13:55:32

19              MR. YARBROUGH:  Object to form.     13:55:34

20       A.   Not having produced that map, I don't   13:55:38

21  know.                                          13:55:40

22       Q.   And with respect to the nonprofit centers   13:55:41

23  that were marked in blue circles, does Red Metrics   13:55:45

24  have any information about whether those represent   13:55:47

25  nonprofit centers?                             13:55:51
```

Page 87

```
 1                    MR. YARBROUGH:  Object to form.        13:55:52

 2          A.   We don't.                                   13:55:53

 3          Q.   Mr. Phillips said the blue line             13:55:56

 4     represented a pattern of life.                        13:55:57

 5               Are you familiar with that phrase?          13:56:00

 6                    MR. YARBROUGH:  Object to form.        13:56:02

 7          A.   I'm familiar with the phrase, yes.          13:56:06

 8          Q.   What does that mean?                        13:56:10

 9          A.   Typically in law enforcement it's a         13:56:14

10     function of where you observed in this case a device 13:56:15

11     over a period of time.                                13:56:21

12          Q.   Did Red Metrics create pattern of life      13:56:25

13     analysis?                                             13:56:29

14          A.   These exhibits -- the static snapshots      13:56:31

15     that we captured to do the roll-up counts are the     13:56:36

16     extent of what we produced, so no.                    13:56:39

17          Q.   Do you know how you would create a pattern  13:56:41

18     of life?                                              13:56:46

19                    MR. YARBROUGH:  Object to form.        13:56:48

20          A.   In general or on this particular use case?  13:56:49

21          Q.   Let's start in general.                     13:56:54

22          A.   Yeah, again, it's just a function of time   13:56:57

23     and location, so over a period of time, what          13:57:01

24     observations that you had and where were they.        13:57:05

25     Yeah.                                                 13:57:08
```

Page 88

```
 1        Q.   And then on this use case, would there be    13:57:10

 2   any difference?                                        13:57:14

 3        A.   No.  Same -- same definition would apply,    13:57:17

 4   yeah.                                                  13:57:20

 5        Q.   For how many devices did Red Metrics         13:57:22

 6   create static snapshot maps as part of the project     13:57:25

 7   with Mr. Phillips?                                     13:57:31

 8        A.   I don't recall an exact count, but I'll      13:57:35

 9   stand by what I said earlier which was that we         13:57:38

10   rolled these things up in the aggregate and so there   13:57:41

11   would have been a summary level.  Not every device     13:57:44

12   was looked at.                                         13:57:47

13        Q.   What would the summary level work product    13:57:48

14   have looked like?                                      13:57:57

15        A.   When I say summary level, I would say        13:58:00

16   these Exhibits F and G 6826 and 27 as an example       13:58:03

17   would be a roll-up type observation.                   13:58:10

18        Q.   In the movie Mr. Phillips said his map       13:58:15

19   represented a smoothed-out pattern of life.            13:58:17

20             What do you understand "smoothed-out" to     13:58:22

21   mean?                                                  13:58:24

22             MR. YARBROUGH:  Objection; form.             13:58:25

23             MR. EVANS:  Objection; form.                 13:58:26

24        A.   Yeah, I don't know what he meant by that.    13:58:27

25        Q.   Is it possible to create a smoothed-out      13:58:31
```

Page 89

```
 1   pattern of life?                                    13:58:33
 2             MR. YARBROUGH:  Object to form.           13:58:35
 3        A.   We at Red Metrics haven't used that       13:58:38
 4   methodology so I'm not sure how they did it or how  13:58:42
 5   they would define it.                               13:58:45
 6        Q.   Do you have any knowledge about whether   13:58:51
 7   Mr. Phillips used Red Metrics' analysis to create   13:58:53
 8   that map?                                           13:58:57
 9             MR. EVANS:  Object to form.               13:58:58
10             MR. YARBROUGH:  Object to form.           13:58:59
11        A.   I don't know because we were never        13:59:00
12   consulted.                                          13:59:03
13        Q.   When you say you were never consulted, you 13:59:06
14   mean you were never consulted about the maps that   13:59:08
15   were created for the movie?                         13:59:11
16        A.   We were never consulted on any point      13:59:13
17   regarding the movie.                                13:59:18
18        Q.   Had you been consulted, what would you    13:59:21
19   have shared with Red Metrics -- with Mr. Phillips   13:59:24
20   about that kind of map?                             13:59:28
21             MR. YARBROUGH:  Object to form.           13:59:29
22             MR. EVANS:  Object to form.               13:59:30
23        A.   I wasn't asked so I couldn't tell you.    13:59:31
24        Q.   Mr. Phillips said that the maps showed    13:59:42
25   someone visiting 28 drop boxes and 5 nonprofit      13:59:45
```

Page 90

```
 1    centers in a single day.                        13:59:48
 2             Is that what -- would Red Metrics'      13:59:50
 3    analysis show -- let me strike that.            13:59:56
 4             Is it possible if the maps in the movie 14:00:00
 5    were based on Red Metrics' data to know for sure 14:00:05
 6    that someone actually visited 28 drop boxes and 5 14:00:08
 7    nonprofit centers based on Red Metrics' data?    14:00:12
 8                   MR. YARBROUGH:  Object to form.   14:00:16
 9                   MR. EVANS:  Object to form.       14:00:17
10        A.   I don't know how that would have been   14:00:20
11    inferred from what we delivered so I'm not sure. 14:00:21
12    Again, we weren't consulted or involved with the 14:00:24
13    content of those visualizations in the movie.    14:00:26
14        Q.   Is it possible using Red Metrics' analysis 14:00:37
15    to tell if someone is just passing through a buffer 14:00:40
16    zone or if they're stopping at a buffer zone?    14:00:44
17                   MR. YARBROUGH:  Object to form.   14:00:47
18                   MR. EVANS:  Object to form.       14:00:47
19        A.   The methodology is only looking at a time 14:00:50
20    and location, and so there's -- that's a not a   14:00:57
21    dimension of the analysis that we run, no.       14:01:04
22        Q.   So you didn't assess the data to determine 14:01:07
23    whether someone was just passing through or stopping 14:01:10
24    within a buffer zone?                            14:01:13
25        A.   Not that I recall.                      14:01:14
```

Page 91

```
 1        Q.   All right.  Let's take that down and I      14:01:19
 2   want to show you what should be doc E in your         14:01:24
 3   binder.  The binder tabs are different than our       14:01:30
 4   Veritext.  You can go to tab C.                       14:01:47
 5             MR. LANGFORD:  And in ours it should         14:01:49
 6   be doc E, Mr. Johnson.                                14:01:55
 7        A.   Did you say C in my binder?                  14:02:00
 8        Q.   C in your binder.                            14:02:02
 9        A.   I got it.                                    14:02:04
10             MR. LANGFORD:  Mr. Johnson, I think it      14:02:16
11   should be doc E in the Veritext Exhibit Share.        14:02:17
12             CONCIERGE TECHNICIAN:  This is doc E,       14:02:32
13   sir.                                                  14:02:36
14             MR. LANGFORD:  I see.  I see what it        14:02:39
15   is.  So it should be doc C.  I was in the wrong one    14:02:41
16   in the Exhibit Share.  It should be doc C.            14:02:47
17             All right.  For the record, let's --        14:02:52
18   we should have done this at the start.  We'll mark    14:02:58
19   the 2000 Mules movie as Exhibit 3 (sic) to the Red    14:03:00
20   Metrics deposition.                                   14:03:05
21        Q.   Mr. Gerwing, have you ever -- are you       14:03:08
22   aware that there's a book version of the 2000 Mules   14:03:14
23   movie?                                                14:03:16
24        A.   I wasn't aware.                             14:03:17
25        Q.   Have you ever seen what you're looking at   14:03:19
```

Page 92

1    in front of you now or read the book?                    14:03:23

2        A.    I have not, no.                                14:03:24

3        Q.    I can represent this is a true and             14:03:28

4    accurate copy of the 2000 Mules book and we're going    14:03:29

5    to turn -- we're going to show you page 60.             14:03:34

6        A.    Okay.                                          14:03:37

7        Q.    This will be marked Exhibit 4 to the Red       14:03:39

8    Metrics deposition.                                      14:03:42

9             At the bottom of page and the top of page      14:03:45

10   61 you'll see the following quote from Gregg.           14:03:48

11   What's interesting about this particular one -- it      14:03:51

12   was the first time we had seen someone go across        14:03:53

13   multiple counties making hard stops at the five         14:03:56

14   organizations.  And then again, it wasn't as though     14:03:59

15   they were just driving by on the highway and            14:04:02

16   stopping.  To get to some of those drop boxes you       14:04:04

17   had to be intentional.  You had to turn in somewhere    14:04:07

18   in order to get to many of these drop boxes.  And       14:04:09

19   this was one of the very first graphics we created      14:04:12

20   in Atlanta.  To our team it was the graphic that        14:04:15

21   made us say, okay, we got this.                         14:04:18

22            In this passage do you understand              14:04:22

23   Mr. Phillips to be including Red Metrics in his         14:04:26

24   reference to "we"?                                      14:04:28

25            (Red Metrics Exhibit 4 marked.)                14:03:43

| | | |
|---|---|---|
| 1 | MR. YARBROUGH:  Objection to form. | 14:04:29 |
| 2 | MR. EVANS:  Objection; form. | 14:04:30 |
| 3 | A.   No.   I would take that to mean OpSec | 14:04:35 |
| 4 | because that wasn't a particular analysis that I | 14:04:38 |
| 5 | recall Red Metrics doing or being a part of. | 14:04:41 |
| 6 | Q.   Does this passage reflect work that Red | 14:04:46 |
| 7 | Metrics did? | 14:04:49 |
| 8 | MR. YARBROUGH:  Object to form. | 14:04:50 |
| 9 | A.   Not -- not this use case that I recall, | 14:04:50 |
| 10 | no. | 14:04:52 |
| 11 | Q.   What is your understanding of the phrase | 14:04:56 |
| 12 | "hard stop"? | 14:04:59 |
| 13 | MR. YARBROUGH:  Object to form. | 14:05:01 |
| 14 | MR. EVANS:  Object to form. | 14:05:02 |
| 15 | A.   Where do you see that? | 14:05:03 |
| 16 | Q.   In that first sentence. | 14:05:05 |
| 17 | A.   That's not a term that at least we use in | 14:05:15 |
| 18 | our analysis, so I'm not sure how Gregg meant to use | 14:05:18 |
| 19 | that or what he meant by it.  I'm not sure.  That's | 14:05:23 |
| 20 | not a common language for analytics at least. | 14:05:27 |
| 21 | Q.   Their phrase use -- does Red Metrics use a | 14:05:34 |
| 22 | phrase to specify when a device stops at a | 14:05:37 |
| 23 | particular buffer? | 14:05:41 |
| 24 | A.   No.  Again, we were looking at the | 14:05:45 |
| 25 | presence of it in or out of the buffer solely. | 14:05:48 |

Page 94

```
 1        Q.   And when you say you were looking at the     14:05:51

 2   presence of it, you were looking at the presence at    14:05:53

 3   a particular snapshot in time?                         14:05:55

 4        A.   Time and location, yes.  Yes.                14:05:58

 5        Q.   If Mr. Phillips had shown you the visual     14:06:03

 6   that we looked at in the movie, what would you have    14:06:21

 7   explained to him about Red Metrics' data analysis      14:06:27

 8   could support the claims he made?                      14:06:31

 9             MR. YARBROUGH:  Object to form.              14:06:37

10        A.   Well, he didn't show it to us so it's hard   14:06:38

11   to say.  I don't -- that map wasn't ours and so I'm    14:06:40

12   not sure what -- what it was supposed to represent     14:06:43

13   so I don't know.                                       14:06:46

14        Q.   All right.  I want to direct in the same     14:06:53

15   exhibit, Exhibit 4 on page 61, starting about a        14:06:56

16   third of the way down the page, you'll see the         14:06:59

17   following passages.                                    14:07:02

18             Dinesh:  Moving to the big picture, what     14:07:03

19   did you find in Georgia?                               14:07:06

20             Gregg:  We're not in any way saying this     14:07:07

21   is all there is.  We're not in any way saying this     14:07:10

22   is all there is.  We're saying that just based on      14:07:17

23   our criteria, we identified in Atlanta 242 people      14:07:21

24   that went to an average of 24 drop boxes and 8         14:07:23

25   organizations during a two-week period.                14:07:26
```

Page 95

| | | |
|---|---|---|
| 1 | What work do you understand Gregg to be | 14:07:29 |
| 2 | referencing there? | 14:07:35 |
| 3 | MR. YARBROUGH: Object to form. | 14:07:35 |
| 4 | MR. EVANS: Object to form. | 14:07:38 |
| 5 | A. Yeah, there's not enough definition here, | 14:07:57 |
| 6 | but I -- so I'm not going to make an assumption. I | 14:07:45 |
| 7 | think by criteria he means the model as we just laid | 14:07:50 |
| 8 | out. As to these counts I can't verify those to be | 14:07:54 |
| 9 | solely our work or a derivative work of OpSec. I'm | 14:08:01 |
| 10 | not sure. | 14:08:05 |
| 11 | Q. So did Red Metrics identify 242 people in | 14:08:07 |
| 12 | Atlanta that went to an average of 24 drop boxes and | 14:08:11 |
| 13 | 8 organizations during a two-week period? | 14:08:14 |
| 14 | MR. YARBROUGH: Object to form. | 14:08:17 |
| 15 | A. In the analysis that we ran -- and I don't | 14:08:20 |
| 16 | recall exact counts in the analysis that we ran. | 14:08:22 |
| 17 | Again, I don't recall exact counts, if this was | 14:08:28 |
| 18 | exactly what he was referring to or something | 14:08:30 |
| 19 | different. | 14:08:33 |
| 20 | Q. Is it possible -- is it possible to -- let | 14:08:40 |
| 21 | me back up here. | 14:08:48 |
| 22 | A. Okay. | 14:08:49 |
| 23 | Q. Just to be clear, from Red Metrics' | 14:08:51 |
| 24 | analysis, the most that could be identified is | 14:08:56 |
| 25 | whether a device was within a buffer of a particular | 14:08:59 |

Page 96

```
 1   location --                                      14:09:03
 2              MR. YARBROUGH:  Object to form.        14:09:05
 3       Q.   -- is that correct?                      14:09:06
 4              MR. EVANS:  Objection.                 14:09:07
 5       A.   That -- that is correct, yes.            14:09:09
 6       Q.   So from that one data point, could you say  14:09:12
 7   that someone had gone to a drop box, meaning the  14:09:16
 8   drop box itself with a buffer of 100 feet with    14:09:22
 9   certainty?                                         14:09:26
10              MR. YARBROUGH:  Objection; form.       14:09:27
11              MR. EVANS:  Object to form.            14:09:29
12       A.   Can you restate the question?  I'm not   14:09:30
13   sure I'm tracking that one.                        14:09:32
14       Q.   I just want to be clear.                 14:09:33
15              Again, Red Metrics' analysis was tied to  14:09:34
16   buffer zones; is that correct?                     14:09:36
17       A.   That is correct, yes.                     14:09:38
18       Q.   So if you showed a device was in a buffer  14:09:39
19   zone, the most it would show was that a device was  14:09:42
20   in a buffer zone?                                  14:09:45
21              MR. YARBROUGH:  Object to form.        14:09:47
22       A.   Yes.  That is a true statement, yes.      14:09:48
23       Q.   I want to go forward.  If you look at page  14:09:51
24   61, Dinesh says, The organizations -- is that where  14:09:59
25   they get the ballots?                              14:10:10
```

1          Catherine:  Yes, and then they go on        14:10:12

2    routes.  Which also significant because one of the   14:10:14

3    questions that comes up in the work we have done is,  14:10:16

4    well, how do you know that this wasn't just somebody  14:10:18

5    that's got a big family and they just deposited a    14:10:20

6    bunch of ballots once?  Or how do you know that this  14:10:23

7    person didn't just work at a location that is near a  14:10:25

8    drop box so they're constantly going by a drop box?  14:10:28

9    And so the elements that are additive here, the      14:10:29

10   going to the nonprofits, the ability to identify the  14:10:31

11   pattern of approach to a drop box, and that's not    14:10:33

12   going past a drop box but directly to a drop box and  14:10:37

13   then back to another point and then to another drop  14:10:40

14   box.                                                 14:10:43

15          Did Red Metrics do any work -- let me         14:10:47

16   rephrase that.                                       14:10:51

17          What work do you understand, if any,          14:10:52

18   Catherine to be referring to?                        14:10:56

19               MR. YARBROUGH:  Objection; form.         14:10:57

20               MR. EVANS:  Object to form.              14:10:59

21      A.   Yeah, we -- Red Metrics didn't perform a     14:11:03

22   granular analysis to that extent, no.                14:11:10

23      Q.   Are you aware of whether OpSec or anyone     14:11:22

24   else did perform that kind of analysis?              14:11:26

25               MR. YARBROUGH:  Object to form.          14:11:29

Page 98

```
 1                    MR. EVANS:  Object to form.          14:11:29

 2        A.   I'm not aware.                              14:11:30

 3        Q.   Did Red Metrics identify individual's       14:11:32

 4   pattern of approach to particular locations?          14:11:35

 5                    MR. YARBROUGH:  Object to form.      14:11:37

 6        A.   I don't know even what they mean by          14:11:40

 7   pattern of approach to be honest, so I can't say.     14:11:42

 8        Q.   Did Red Metrics look at the individual       14:11:48

 9   devices' approach to a particular buffer zone?        14:11:51

10                    MR. YARBROUGH:  Object to form.      14:11:57

11        A.   We did not.                                 14:11:58

12        Q.   I'm sorry.  Could you just restate the       14:12:00

13   answer?                                               14:12:01

14        A.   We did not, no.                             14:12:01

15        Q.   Let's look at the final passage at the       14:12:08

16   bottom of 61.  Dinesh says, Isn't the timing          14:12:12

17   significant?  If some guy's going to a drop box at    14:12:25

18   2:00 a.m., presumably he's not out for a walk.        14:12:29

19   Catherine, Right.                                     14:12:32

20                    Did Red Metrics look at time stamps?  14:12:35

21                    MR. YARBROUGH:  Object to form.      14:12:39

22        A.   No.  We were looking in the aggregate and    14:12:42

23   so we weren't sensitive to time frames, day or        14:12:45

24   night.                                                14:12:49

25        Q.   And are you aware of whether OpSec did any   14:12:56
```

```
 1   other analysis to identify the time stamps?        14:12:59

 2              MR. YARBROUGH:  Object to form.          14:13:03

 3              MR. EVANS:  Object to form.              14:13:04

 4        A.   I'm not aware.                            14:13:05

 5        Q.   Okay.                                     14:13:06

 6              MR. LANGFORD:  Let's pull up the         14:13:11

 7   movie.                                             14:13:12

 8              MR. CRENSHAW:  Just give us              14:13:13

 9   20 seconds.                                        14:13:14

10              MR. LANGFORD:  That's okay.  This is     14:13:15

11   Exhibit 3 (sic) to the Red Metrics deposition.  We're  14:13:15

12   going to play from minutes 40:54 to 41:17.        14:13:18

13              MR. CRENSHAW:  Start at 40:54 and stop   14:14:34

14   at?                                               14:14:37

15              MR. LANGFORD:  41:17.                    14:14:37

16              MR. CRENSHAW:  Everybody stand by.       14:14:56

17              (Video played.)                          14:15:00

18        Q.   Did Red Metrics review the surveillance   14:15:24

19   footage?                                           14:15:27

20              MR. YARBROUGH:  Object to form.          14:15:32

21        A.   I don't remember seeing it in the movie.  14:15:33

22   I don't recall if it was a video segment that we   14:15:35

23   identified.                                        14:15:39

24        Q.   Earlier you testified that Red Metrics    14:15:39

25   identified no instances where the cell phone ping   14:15:46
```

Page 100

```
1    synced up with the surveillance footage; is that      14:15:51

2    correct?                                              14:15:55

3              MR. EVANS:  Object to form.                 14:15:57

4              MR. YARBROUGH:  Object to form.             14:15:59

5        A.   Yeah, that was correct.                      14:15:59

6        Q.   So when Ms. Engelbrecht said in the movie    14:16:00

7    that they identified this user's cell phone device,   14:16:06

8    did Red Metrics do that work?                         14:16:11

9              MR. YARBROUGH:  Object to form.             14:16:14

10       A.   The conclusion, that comment I just heard    14:16:15

11   from the video clip, I don't know what that was       14:16:22

12   based on, if that was something downstream from what  14:16:25

13   we produced.  But it's not consistent with a match    14:16:30

14   that we would have seen.                              14:16:34

15       Q.   And are you aware of whether OpSec or        14:16:35

16   anyone else did that analysis?                        14:16:37

17             MR. YARBROUGH:  Object to form.             14:16:40

18             MR. EVANS:  Object to form.                 14:16:42

19       A.   Yeah, I don't know.                          14:16:42

20       Q.   Okay.  We can fast forward here in the       14:16:43

21   movie to show one more clip.                          14:16:46

22             MR. CRENSHAW:  Tell me my times.            14:16:49

23   Start?                                                14:16:51

24             MR. LANGFORD:  Actually before we skip      14:16:58

25   to the next clip, we're going to play this for about  14:16:59
```

Page 101

```
 1    another minute here.                          14:17:03

 2                MR. CRENSHAW:  Everybody stand by.  14:17:06

 3                MR. LANGFORD:  We're starting at    14:17:08

 4    minute 41:16.                                  14:17:09

 5                (Video played.)                     14:17:30

 6                MR. LANGFORD:  So for the record, we 14:17:33

 7    stopped at 41 minutes and 36 seconds.          14:17:34

 8        Q.  Mr. Phillips just said one of our analysts 14:17:38

 9    identified the gloves as being suspicious.     14:17:40

10            Is he referring to someone at Red Metrics? 14:17:46

11                MR. YARBROUGH:  Object to form.     14:17:50

12                MR. EVANS:  Object to form.         14:17:50

13        A.  That wasn't a level of granularity that 14:17:51

14    our team was involved with in terms of analyzing 14:17:55

15    video, no.                                      14:17:59

16        Q.  Did Red Metrics identify the use of gloves 14:18:00

17    as being suspicious in its work with Mr. Phillips? 14:18:05

18                MR. EVANS:  Object to form.         14:18:11

19        A.  The movie was the first I heard that.   14:18:13

20                MR. LANGFORD:  Now let's fast forward 14:18:18

21    to 56:25.  There (indicating).                  14:18:20

22                MR. CRENSHAW:  Stand by.            14:18:41

23                MR. LANGFORD:  And we're going to play 14:18:43

24    through 57:25.                                  14:18:45

25                (Video played.)                     14:18:48
```

Page 102

```
1        Q.   Did Red Metrics ever review that security   14:20:01

2    surveillance footage?                                14:20:03

3        A.   I don't recall seeing -- seeing that video  14:20:05

4    so I can't say.                                      14:20:09

5        Q.   You heard Mr. Phillips say, quote, and      14:20:11

6    then being able to match that ping where he's        14:20:14

7    standing there to the next place he goes and the     14:20:17

8    next place he goes.                                  14:20:20

9            Did Red Metrics track that individual?       14:20:21

10               MR. YARBROUGH:  Objection; form.          14:20:27

11               MR. EVANS:  Object to form.               14:20:29

12       A.   We had no matches so I'm not sure where     14:20:30

13   that observation came from or if there was another   14:20:33

14   dataset involved that wasn't Red Metrics, so I'm not 14:20:36

15   sure.                                                14:20:39

16       Q.   Okay.  I have got just a few more           14:20:48

17   questions here.                                      14:20:51

18           Apart from the work we have been             14:20:51

19   discussing, did Red Metrics do any additional work   14:20:53

20   with Mr. Phillips or OpSec to identify potential     14:20:55

21   voter fraud?                                         14:20:59

22       A.   Yes.  We ran a similar analysis of a        14:21:03

23   smaller nature in other jurisdictions, yeah.         14:21:09

24       Q.   And when you say "other jurisdictions,"     14:21:16

25   are those jurisdictions outside of Georgia?          14:21:24
```

Page 103

```
 1        A.   Yes.                                      14:21:27

 2        Q.   All right.  I'm going to scroll down here.   14:21:35

 3             MR. LANGFORD:  Can we pull up what has    14:21:47

 4   been marked Phillips Exhibit 9 in the deposition of  14:21:50

 5   Mr. Phillips.                                        14:21:57

 6        Q.   And in your binder, this is back to doc D,  14:21:58

 7   and if you want to scroll to page TTV_6846.         14:22:03

 8   Perfect.  On the bottom of page -- of the affidavit,  14:22:24

 9   page 4, paragraph 16 and 17 provide as follows:     14:22:27

10   OpSec Group was engaged by True the Vote to conduct  14:22:32

11   analysis of mobile device geospatial and temporal    14:22:35

12   data in the State of Georgia.  The purpose of the    14:22:39

13   analysis was to determine whether evidence existed   14:22:40

14   that ballot harvesting had taken place in connection  14:22:44

15   with the November 2020 election and January 6, 2020,  14:22:47

16   runoff vote (the 2020 Election).                    14:22:51

17             Does that analysis describe analysis Red   14:22:54

18   Metrics did?                                        14:23:00

19        A.   I mean, these two clauses are very vague.  14:23:00

20   In concept, a lot of what we have talked about would  14:23:06

21   fit.  But I would say 16 and 17 could additionally   14:23:09

22   have been work that OpSec did outside of the purview  14:23:15

23   of what Red Metrics was engaged to deliver.         14:23:18

24        Q.   If you turn to paragraph 20, which is on   14:23:21

25   TTV6847, Mr. Phillips says, OpSec Group analyzed in  14:23:24
```

Page 104

```
1    excess of 25 terabytes of data consisting of 1.2      14:23:32

2    trillion mobile device pings that were collected      14:23:51

3    over a period of 97 days from October 1, 2020,        14:23:38

4    through January 5, 2021.                              14:23:42

5             Does that describe an analysis that Red      14:23:46

6    Metrics conducted?                                    14:23:50

7         A.   I don't recall the exact size or signal     14:23:55

8    counts.  I know we established before it was at       14:23:58

9    least billions of signals.  So I don't know if        14:24:01

10   1.2 trillion was above and beyond what it is that we  14:24:05

11   delivered or not.                                     14:24:09

12        Q.   Does 1.2 trillion strike you as large?      14:24:10

13             MR. YARBROUGH:  Object to form.             14:24:15

14        A.   That's a big number.  Yeah, it's a big      14:24:21

15   number.                                               14:24:25

16        Q.   Did the data Red Metrics analyze span from  14:24:29

17   October 1, 2020, to January 5, 2021, in its work for  14:24:34

18   Mr. Phillips?                                          14:24:38

19        A.   That study period -- again, I don't recall  14:24:39

20   exact dates, but that study period is in the          14:24:42

21   ballpark.                                             14:24:46

22        Q.   In paragraph 22, which is on 6848, the      14:24:47

23   first sentence of that paragraph reads, In order to   14:24:53

24   determine whether there is evidence that individuals  14:24:55

25   or groups were engaged in ballot harvesting, OpSec    14:24:56
```

Page 105

```
 1    Group defined virtual parameters "geofences" around      14:25:00
 2    309 ballot drop boxes located in the State of            14:25:03
 3    Georgia.                                                 14:25:07
 4              Does that describe analysis conducted by       14:25:08
 5    Red Metrics?                                             14:25:10
 6        A.   I think this references one of the              14:25:15
 7    exhibits we looked at earlier.  So, again, I think       14:25:17
 8    that -- I don't know if that 309 is exact, but it        14:25:20
 9    still feels like that's in the ballpark of what we       14:25:23
10    talked about in Georgia.                                 14:25:26
11        Q.   Paragraph 23 on the same page says, By          14:25:27
12    cross-referencing mobile device geospatial data          14:25:29
13    against these ballot drop box geofences, OpSec Group      14:25:32
14    was able to identify over 500,000 mobile devices         14:25:34
15    that had traveled within 500 feet of a ballot drop       14:25:38
16    box during the study period.  It was from this           14:25:41
17    defined dataset that OpSec began to apply analytic       14:25:44
18    methods and more tightly defined proximities to          14:25:46
19    identify patterns.                                       14:25:48
20              Does this accurately describe work Red         14:25:49
21    Metrics did?                                             14:25:53
22              MR. YARBROUGH:  Objection; form.               14:25:53
23        Q.   Let me restate that question.                   14:25:54
24              Does this describe an analysis that Red        14:25:56
25    Metrics conducted for Mr. Phillips?                      14:26:00
```

Page 106

```
 1        A.   These parameters of a half million      14:26:06
 2   devices, 500 feet, again, directionally would be --  14:26:09
 3   would have been a similar analysis.  What I don't    14:26:14
 4   know cited here in this 23rd clause is if OpSec      14:26:17
 5   Group did something above and beyond what we were    14:26:22
 6   engaged to do or not, so --                          14:26:32
 7        Q.   Did --                                     14:26:27
 8        A.   -- I'm not sure.                           14:26:28
 9        Q.   Did Red Metrics identify devices that     14:26:29
10   traveled within 500 feet of certain locations from  14:26:35
11   Mr. Phillips?                                        14:26:38
12        A.   I don't recall if 500 feet was one of     14:26:43
13   those buffers on the top end of the funnel or not.   14:26:46
14        Q.   Is it possible Red Metrics used the       14:26:50
15   500-foot buffer for drop box locations?             14:26:52
16        A.   It's not -- it's possible.  I don't recall 14:26:57
17   where that model started and where it ended.         14:27:00
18        Q.   So if it was 500 feet for a buffer, that  14:27:05
19   would capture any device that was located within a   14:27:09
20   space a little bit bigger than a football field from 14:27:14
21   a drop box?                                          14:27:18
22             MR. YARBROUGH:  Objection; form.           14:27:19
23        A.   Yeah, that would be correct.               14:27:20
24        Q.   Did Red Metrics apply analytic methods and 14:27:23
25   more tightly defined proximities to identify         14:27:26
```

Page 107

```
1    patterns in its analysis?                          14:27:29

2         A.   Yeah, how do you mean?                    14:27:32

3         Q.   Those are Mr. Phillips' words.            14:27:35

4         A.   Where does he -- where does say that?     14:27:40

5         Q.   It says, It was from this defined dataset 14:27:41

6    that OpSec began to apply analytic methods and more 14:27:47

7    tightly defined proximities to identify patterns.   14:28:13

8         A.   So, again, your question on clause 23 was 14:27:57

9    what again with regards to what Phillips said?      14:28:01

10        Q.   Did Red Metrics apply analytic methods and 14:28:04

11   more tightly defined proximities to define patterns 14:28:07

12   in its analysis?                                    14:28:11

13        A.   Yeah.  I think as we established we would  14:28:13

14   have -- and my point a minute ago in terms of       14:28:20

15   500 feet down to other size buffers would have been 14:28:22

16   consistent with how you would approach this from an 14:28:26

17   analytics standpoint, yes.                          14:28:29

18        Q.   And what analytic methods would Red        14:28:31

19   Metrics use?                                        14:28:36

20        A.   Just size of buffer.                       14:28:37

21        Q.   Size of buffer.                            14:28:40

22             In paragraph 24 on the same page,          14:28:41

23   Mr. Phillips says, OpSec Group utilizes a team of    14:28:43

24   experienced data analysts and proprietary formulas, 14:28:47

25   algorithms, and intellectual property to identify    14:28:48
```

Page 108

```
 1   mobile devices who exhibited irregular patterns of      14:28:50
 2   activity around valid drop boxes.  Such                 14:28:54
 3   irregularities, including making repeated trips to      14:28:56
 4   ballot drop box locations, travelling to multiple       14:28:59
 5   drop box locations on the same day, and visiting        14:29:02
 6   ballot drop box locations in the middle of the          14:29:05
 7   night, among others.                                    14:29:08
 8           MR. EVANS:  I've just got to object to          14:29:10
 9   the characterization because you keep saying,           14:29:11
10   Mr. Phillips says.  So he never signed this             14:29:12
11   affidavit.  It was never filed so it's really just a    14:29:15
12   document.  So I just want to put that on the record.    14:29:19
13           MR. LANGFORD:  Sure.                            14:29:21
14       Q.  Let's pause on the phrase "pattern of           14:29:23
15   life" that's used in that paragraph again.              14:29:27
16           Did Red Metrics ever conduct pattern of         14:29:32
17   life analysis?                                          14:29:36
18           MR. YARBROUGH:  Objection to form.              14:29:39
19       A.  I'm not seeing that in clause 24.  Is that      14:29:40
20   what you're referring to?                               14:29:42
21       Q.  Yes.  Let me pull that up.  Sorry about         14:29:44
22   that.  I'm sorry.  It says, Patterns of activity,       14:29:57
23   irregular patterns of activity.                         14:30:05
24           Do you see that?                                14:30:07
25       A.  I do, yes.  And so your question?               14:30:07
```

1      Q.   Did Red Metrics look at irregular patterns    14:30:11

2   of activity?                                           14:30:14

3                MR. YARBROUGH:   Object to form.          14:30:17

4      A.   I'm not sure what OpSec Group refers to        14:30:18

5   here as irregular patterns of activity.  Again, our    14:30:25

6   analysis was in the aggregate and wasn't this far in   14:30:30

7   the weeds.                                             14:30:33

8      Q.   Did Red Metrics work to exclude devices        14:30:44

9   that appeared in a buffer zone for any reason?         14:30:50

10               MR. YARBROUGH:   Object to form.          14:30:56

11     A.   How do you mean?                               14:30:59

12     Q.   Did Red Metrics try to cull down the total     14:31:03

13  number of devices that showed up in the buffer zones   14:31:06

14  to a smaller number that Mr. Phillips was interested   14:31:11

15  in?                                                    14:31:15

16     A.   I don't recall us applying any kind of         14:31:19

17  filter like that, no.                                  14:31:21

18     Q.   So the final work product that Red Metrics     14:31:23

19  gave to Mr. Phillips was just every device that was    14:31:26

20  ever located within a buffer zone from a location?     14:31:28

21               MR. YARBROUGH:   Object to form.          14:31:33

22     A.   To my recollection, yeah, it was -- it was     14:31:35

23  meant to be that aggregate look, yes.                  14:31:38

24     Q.   I'm going to go one more paragraph.  If        14:31:41

25  you look at paragraph 28, page TTV6849.  The           14:32:03

Page 110

```
1    affidavit says that A significant number of the 242    14:32:09

2    devices were located within the ballot drop box        14:32:16

3    geofences between the hours of 12:00 a.m. and          14:32:20

4    5:00 a.m., and this is the unsigned affidavit.         14:32:23

5            Does that describe an analysis that Red        14:32:27

6    Metrics conducted?                                     14:32:33

7                MR. YARBROUGH:  Object to form.            14:32:38

8        A.   I don't recall doing any kind of             14:32:39

9    segmentation on time so I can't speak to whether       14:32:44

10   that was Red Metrics or OpSec.                         14:32:47

11       Q.   Based on the data and analysis that Red       14:32:51

12   Metrics did do, could you have done this sort of       14:33:13

13   analysis?                                              14:33:16

14               MR. YARBROUGH:  Object to form.            14:33:18

15               MR. EVANS:  Object to form.                14:33:20

16       A.   Only if the time signature was part of       14:33:21

17   that analysis could you do any kind of segmentation    14:33:28

18   on time of day.                                        14:33:31

19       Q.   And did -- and did Red Metrics have the       14:33:32

20   time data?                                             14:33:36

21               MR. YARBROUGH:  Object to form.            14:33:39

22       A.   I don't -- I don't recall.  Just because      14:33:40

23   the time was part of the filter of the query doesn't   14:33:47

24   mean that it was actually included in the resulting    14:33:51

25   dataset downstream to fuel that kind of observation.   14:33:54
```

1    So although it may have been used on the top of the    14:33:57

2    filter, it doesn't mean that it was part of the --    14:34:01

3    what came out at the bottom of the filter.    14:34:03

4              MR. LANGFORD:  Okay.  Why don't we --    14:34:26

5    why don't we take one last break and we'll do --    14:34:29

6    we'll finish up and then we'll switch back to    14:34:32

7    Mr. Matthews for just a few minutes.    14:34:35

8              MR. YARBROUGH:  Okay.    14:34:35

9              MR. LANGFORD:  And why don't we go --    14:34:39

10   how long -- does anyone need a break?  Why don't we    14:34:39

11   just go five minutes if that works.    14:34:40

12             THE VIDEOGRAPHER:  Off the record.    14:34:41

13   The time is 2:34 p.m.    14:34:42

14             (Recess 2:34 p.m. to 2:43 p.m.)    14:34:46

15             THE VIDEOGRAPHER:  This starts media    14:43:09

16   number three.  Back on the record at 2:43 p.m.    14:43:23

17       Q.   (By Mr. Langford)  Thank you, Mr. Gerwing.    14:43:27

18   A few quick questions here.    14:43:30

19             When did the engagement between Red    14:43:33

20   Metrics and Mr. Phillips on this project end?    14:43:35

21       A.   I wasn't as involved with contracting so I    14:43:41

22   can't give you an exact date, but it was mid 2022 I    14:43:48

23   want to say.    14:43:53

24       Q.   Is mid like June or July or was it earlier    14:43:54

25   in 2022?    14:43:58

Page 112

| | | |
|---|---|---|
| 1 | A.   I would say second or third quarter, yeah. | 14:44:00 |
| 2 | Q.   And when was the last time that you | 14:44:05 |
| 3 | communicated with Mr. Phillips? | 14:44:08 |
| 4 | A.   It would have been then in that same '22 | 14:44:11 |
| 5 | time frame, yeah. | 14:44:20 |
| 6 | Q.   What were all of the jurisdictions that | 14:44:23 |
| 7 | Red Metrics looked at for Mr. Phillips besides | 14:44:25 |
| 8 | Georgia? | 14:44:29 |
| 9 | A.   I know Arizona was one.  There were a few | 14:44:33 |
| 10 | cursory looks that I don't think we dug into very | 14:44:41 |
| 11 | deep.  I can't even recall offhand what | 14:44:45 |
| 12 | jurisdictions those were.  But Arizona was, I think, | 14:44:47 |
| 13 | the other look after Georgia. | 14:44:50 |
| 14 | Q.   And what exactly was done in Arizona?  Let | 14:44:54 |
| 15 | me rephrase that. | 14:45:03 |
| 16 | What work did you do in analyzing data | 14:45:04 |
| 17 | from Arizona? | 14:45:09 |
| 18 | MR. YARBROUGH:  John, just insofar as | 14:45:10 |
| 19 | it's relevant to the Georgia 2020 election then ask | 14:45:12 |
| 20 | those questions but we're not going to go down other | 14:45:16 |
| 21 | projects not related to what gave rise to this | 14:45:32 |
| 22 | litigation. | 14:45:23 |
| 23 | A.   In general, the similar methodology that | 14:45:25 |
| 24 | we described here would have been applied to | 14:45:28 |
| 25 | Arizona. | 14:45:32 |

Page 113

| | |
|---|---|
| 1 | Q.   And did Red Metrics produce similar work | 14:45:33 |
| 2 | product for Mr. Phillips for this analysis? | 14:45:37 |
| 3 | A.   If we did, it was a much smaller nature. | 14:45:42 |
| 4 | It wasn't nearly as an involved look. | 14:45:45 |
| 5 | Q.   And do you -- what was the nature of the | 14:45:48 |
| 6 | work product delivered to Mr. Phillips for Arizona? | 14:45:52 |
| 7 | A.   If we had applied that same methodology, | 14:45:58 |
| 8 | then I think the deliverables and outputs would be | 14:46:01 |
| 9 | consistent with what we did here in Georgia so | 14:46:04 |
| 10 | nothing really unique. | 14:46:07 |
| 11 | Q.   When you say it was smaller, does that | 14:46:08 |
| 12 | mean there was less data or -- | 14:46:11 |
| 13 | MR. YARBROUGH:   John, can I ask how | 14:46:13 |
| 14 | many -- is this going to be an extensive analysis of | 14:46:15 |
| 15 | the effort in Arizona? | 14:46:18 |
| 16 | MR. LANGFORD:   No.  We're just trying | 14:46:20 |
| 17 | to understand the scope of the work that relates to | 14:46:22 |
| 18 | this litigation and what work was done by Red Metrics | 14:46:24 |
| 19 | for Mr. Phillips that was then presented in the 2000 | 14:46:27 |
| 20 | Mules movie. | 14:46:31 |
| 21 | MR. YARBROUGH:   So given that -- do | 14:46:32 |
| 22 | you have some reason to believe that anything they | 14:46:33 |
| 23 | did in Arizona is in the movie? | 14:46:35 |
| 24 | MR. LANGFORD:   In the movie which we | 14:46:38 |
| 25 | can pull up.  He references Arizona and Michigan and | 14:46:40 |

Page 114

```
1    other states.                                    14:46:42

2              MR. YARBROUGH:  Okay.  Okay.           14:46:42

3         A.   So what was the question?              14:46:45

4         Q.   The question is:  You said it was a    14:46:46

5    smaller project when it came to Arizona.  And the 14:46:48

6    question I have is:  Is that because you looked at 14:46:53

7    less data or is it because you did less analysis? 14:46:55

8         A.   I would say yes to both.  I don't recall a 14:47:13

9    significant amount of effort going into that look 14:47:03

10   and it's much smaller even in terms of population so 14:47:07

11   I think it was all those factors.                14:47:11

12        Q.   Was the work you did in Atlanta the most 14:47:14

13   significant part of the work -- the analysis that 14:47:16

14   you did for Mr. Phillips?                         14:47:19

15             MR. YARBROUGH:  Object to form.        14:47:24

16        Q.   Let me rephrase that.                   14:47:25

17             Did the work that you did analyzing data 14:47:26

18   from Atlanta predominate the analysis that you   14:47:29

19   conducted for Mr. Phillips?                       14:47:35

20        A.   Yes, I think that's a fair             14:47:38

21   characterization.  I don't know what percentage to 14:47:41

22   put on it, but that was the -- probably the largest 14:47:42

23   of the bodies of work, yes.                       14:47:45

24        Q.   And did you look in Arizona at nonprofits 14:47:47

25   or only at drop boxes?                            14:47:50
```

Page 115

| | | |
|---|---|---|
| 1 | A.   I'm not sure I understand the question. | 14:47:53 |
| 2 | Q.   Let me ask again. | 14:47:55 |
| 3 | What locations in Arizona did you look at | 14:47:56 |
| 4 | for geodata? | 14:47:58 |
| 5 | A.   There were some other -- I don't recall | 14:48:01 |
| 6 | only that there were other -- there was some | 14:48:03 |
| 7 | slight -- elections are handled a little differently | 14:48:06 |
| 8 | there than they were in Atlanta.  I don't recall the | 14:48:09 |
| 9 | nuance but there may have been nonprofits involved | 14:48:11 |
| 10 | there.  It's just been almost four years. | 14:48:15 |
| 11 | I don't recall specifics, but I would just | 14:48:20 |
| 12 | say in general it was a similar methodology.  I | 14:48:22 |
| 13 | don't recall how many entities or of what nature. | 14:48:25 |
| 14 | Q.   Did you look at any jurisdictions other | 14:48:29 |
| 15 | than Arizona and Georgia? | 14:48:31 |
| 16 | A.   The few you just named again were, again, | 14:48:33 |
| 17 | small, small relatively but -- and I can't recall | 14:48:38 |
| 18 | scope on those, but they were well after Georgia, | 14:48:42 |
| 19 | yeah. | 14:48:50 |
| 20 | Q.   To clarify -- I'm sorry.  Before we move | 14:48:52 |
| 21 | on, when you say that the work was done well after | 14:49:00 |
| 22 | Georgia, how long after the Georgia work was that | 14:49:03 |
| 23 | other work done? | 14:49:07 |
| 24 | A.   It probably would have fallen in that | 14:49:08 |
| 25 | second, third quarter again of '22 after most of the | 14:49:12 |

Page 116

1    Georgia work would have been delivered.                    14:49:15

2        Q.   And did all -- I'm sorry.                         14:49:17

3        A.   I think it's ballpark.                           14:49:19

4        Q.   Did all work for Mr. Phillips wrap up in         14:49:21

5    2022 on this project?                                     14:49:24

6        A.   I don't recall anything that went into '23       14:49:27

7    so I think it wrapped up in 2022.                         14:49:29

8        Q.   And even if the work was happening in '22        14:49:33

9    and -- in 2022 for the other jurisdictions, were you     14:49:37

10   still looking at potential fraud in the 2020             14:49:40

11   election?                                                 14:49:44

12       A.   I don't recall if it was specific to the        14:49:52

13   general election or any runoffs in those                 14:50:00

14   jurisdictions, so yeah, I don't recall.                  14:49:58

15       Q.   And I think we covered this, but can you        14:50:01

16   just one more time lay out the size of the Red           14:50:05

17   Metrics team that worked for Mr. Phillips on this        14:50:08

18   project?                                                  14:50:10

19       A.   Sure.  I think we established Ben and my        14:50:13

20   involvement, Azeddine, and then two other                14:50:17

21   contractors just on a very small segment, yeah.          14:50:21

22       Q.   Okay.  So we have established that you          14:50:26

23   have seen the 2000 Mules movie.                           14:50:36

24            In your own words, what do you understand       14:50:41

25   the movie to claim about election fraud in 2020?         14:50:44

Page 117

```
 1              MR. YARBROUGH:  Objection; form.        14:50:50

 2              MR. EVANS:  Object to form.             14:50:50

 3      A.   That's a really broad question for, what,  14:50:53

 4   a two-hour documentary.  So what are -- what's your 14:50:59

 5   question exactly?                                   14:51:03

 6      Q.   Are you familiar with defendants' claims   14:51:05

 7   that geolocation data supposedly proved that there 14:51:09

 8   was election fraud?                                 14:51:12

 9              MR. YARBROUGH:  Object to form.         14:51:14

10              MR. EVANS:  Object to form.             14:51:15

11      A.   I don't know how proved was used or        14:51:16

12   defined in the context of the movie, so I can't say 14:51:22

13   whether that actually holds according to Red Metrics 14:51:28

14   or my definition.                                   14:51:31

15              MR. LANGFORD:  Mr. Johnson, can we      14:51:34

16   pull up Document B?  This has been marked Exhibit 3 14:51:36

17   in Mr. Phillips' deposition and this is tab B in your 14:51:41

18   binder.  This is a copy of the amended complaint in 14:51:45

19   this action.                                        14:51:52

20      Q.   If you can flip to page 14 in paragraph 36 14:51:54

21   you'll see plaintiff's alleges as follows:          14:52:05

22   Defendants' film falsely claims that cell phone     14:52:10

23   geolocation data (combined with the footage in the  14:52:14

24   film) proves that the voters depicted in the film   14:52:17

25   were mules who unlawfully deposited fraudulent       14:52:20
```

Page 118

```
1    ballots because certain cell phones were repeatedly    14:52:23

2    near the location of drop boxes on multiple            14:52:26

3    occasions.  As additional evidence, the film          14:52:28

4    includes surveillance footage of people depositing    14:52:31

5    ballots into drop boxes and claims that these voters  14:52:34

6    are paid operatives involved in picking up            14:52:37

7    fraudulent ballots from locations and running them    14:52:40

8    to the drop boxes.                                     14:52:43

9            Does that comport with your understanding      14:52:44

10   of defendants' claims about election fraud?            14:52:47

11                (Red Metrics Exhibit 3 marked.)           14:52:53

12                MR. YARBROUGH:  Objection; form.           14:52:53

13       A.   That might be their definition which          14:52:56

14   they're -- which they're obviously able to have.  I    14:53:00

15   can't speak to its certainty or clarity.              14:53:05

16       Q.   I'm not asking you to testify to the          14:53:17

17   clarity.  I'm just asking if you understand what      14:53:19

18   defendants' claims are about election fraud in 2020.   14:53:21

19                MR. YARBROUGH:  Objection; form.           14:53:26

20                MR. EVANS:  Object to form.                14:53:29

21       A.   If I understand what aspect of the claim      14:53:29

22   or the definition?                                     14:53:31

23       Q.   Do you understand they claim that            14:53:33

24   geolocation data proves there was election fraud?      14:53:36

25                MR. YARBROUGH:  Object to form.            14:53:40
```

Page 119

1        A.    I think that would depend on how you are        14:53:40

2    defining proves.  I think we have established that        14:53:46

3    there was a working theory and a model applied,          14:53:49

4    so...                                                    14:53:54

5        Q.    Okay.  That's what I want to dive in on.        14:53:54

6    So I want to talk about specifics of what Red            14:53:58

7    Metrics' analysis can show and what it can't show.       14:54:08

8             If a device was accurately located within       14:54:11

9    100 feet of a drop box on multiple occasions, does       14:54:15

10   that prove that the device visited the drop box          14:54:19

11   itself?                                                  14:54:23

12             MR. YARBROUGH:  Object to form.                14:54:24

13       A.    That does not necessarily prove that, no.      14:54:26

14       Q.    Why not?                                       14:54:32

15       A.    By the definition of the buffer previously     14:54:36

16   in this case, 100 feet, all it would show is that        14:54:44

17   that device was in that buffer which may or may not      14:54:50

18   have been at the exact location of the drop box.         14:54:55

19       Q.    Why might a device show up near a drop box     14:55:00

20   multiple times?                                          14:55:05

21             MR. YARBROUGH:  Objection; form.               14:55:09

22             MR. EVANS:  Object to form.                    14:55:09

23       A.    I think the example we gave earlier o f--      14:55:10

24   in the way of it sitting in a public location, on a      14:55:13

25   sidewalk, at a library, there could be any plausible     14:55:17

Page 120

```
 1    reasons why a device may be in or near that         14:55:20

 2    location.                                           14:55:25

 3        Q.   If a drop box was located next to          14:55:27

 4    someone's home, within 100 feet in this case, would 14:55:30

 5    you expect the homeowner's device to appear in the  14:55:34

 6    buffer?                                             14:55:38

 7              MR. YARBROUGH:  Object to form.           14:55:40

 8        A.   It's -- it is possible.  It's possible     14:55:41

 9    according to that definition, yes.                  14:55:47

10        Q.   Did Red Metrics account for potential      14:55:48

11    inaccuracies in the claim that a device visited a   14:55:51

12    drop box caused by proximity to other locations?    14:56:00

13              MR. YARBROUGH:  Object to form.           14:56:05

14        A.   That's not what we were engaged to do.  We 14:56:05

15    were engaged to run the model and then let the      14:56:11

16    observations or the read -- that wasn't what we were 14:56:14

17    engaged.  We were applying definitive proof or lack 14:56:22

18    of proof.                                           14:56:27

19        Q.   Did Red Metrics explain the possibility    14:56:28

20    that an adjacent location could result in what you  14:56:31

21    might call a false positive to Mr. Phillips?        14:56:35

22              MR. EVANS:  Object to form.               14:56:39

23        A.   I don't recall that we specifically talked 14:56:40

24    about every conceivable conception -- exception to  14:56:44

25    that rule, so...                                    14:56:48
```

Page 121

```
 1        Q.   If someone is driving by -- if someone --    14:56:51
 2   strike that.  Rephrase that.  I'm sorry.              14:56:57
 3        If someone is driving through a buffer           14:56:58
 4   zone with a device, is it possible that the device    14:57:01
 5   pings within the buffer?                              14:57:04
 6             MR. YARBROUGH:  Object to form.             14:57:07
 7        A.   It's -- it's possible.  I couldn't say      14:57:08
 8   that that never happens, but it is possible, yes.     14:57:15
 9        Q.   Do cell phones ping while they're in a car  14:57:17
10   that's being driven?                                  14:57:21
11             MR. YARBROUGH:  Object to form.             14:57:24
12        A.   They could, yes.                            14:57:26
13        Q.   How frequently do cell phones ping cell     14:57:27
14   towers?                                               14:57:30
15             MR. YARBROUGH:  Object to form.             14:57:33
16        A.   Yeah, this -- I'm not aware.  That's not    14:57:34
17   the business that we're in.  We're not -- yeah,       14:57:49
18   we're not working with data of that type so I don't   14:57:52
19   know.                                                 14:57:59
20        Q.   Before you described snapshots.             14:58:00
21        A.   Yeah.                                       14:58:02
22        Q.   So how close in time are the snapshots      14:58:03
23   that you have available to you?                       14:58:09
24             MR. YARBROUGH:  Object to form.             14:58:15
25        A.   I think when I used the word snapshot, I    14:58:15
```

Page 122

```
 1    was referring to the exhibits that were static looks    14:58:19
 2    at an aggregate view at a macro level of a device's     14:58:21
 3    behavior.  So that was a snapshot of a several week     14:58:26
 4    period of time.                                         14:58:29
 5         Q.   Can you tell where a cell phone is every      14:58:30
 6    second?                                                 14:58:34
 7              MR. YARBROUGH:  Object to form.               14:58:35
 8         A.   Can we what?                                  14:58:35
 9         Q.   Can you determine where a cell phone is       14:58:37
10    located every second?                                   14:58:39
11              MR. YARBROUGH:  Same objection.               14:58:41
12         A.   No.                                           14:58:42
13         Q.   How -- what's the smallest unit of time       14:58:43
14    that you can get down to to determine a cell phone's    14:58:48
15    location?                                               14:58:51
16              MR. YARBROUGH:  Object to form.               14:58:53
17         A.   There's a lot of variables in that mix.       14:58:55
18    You can get down to the second but that doesn't mean    14:59:02
19    that a cell phone pinging every second either.          14:59:06
20         Q.   What's the sort of longest frequency that     14:59:09
21    a cell phone might go between pings?                     14:59:12
22         A.   It could be hours, days.                      14:59:15
23         Q.   What happens if a cell phone is using         14:59:20
24    Wi-Fi?                                                  14:59:23
25              MR. YARBROUGH:  Object to form.               14:59:26
```

Page 123

| | | |
|---|---|---|
| 1 | A.    How do you mean? | 14:59:26 |
| 2 | Q.    If a cell phone is using Wi-Fi, can you | 14:59:29 |
| 3 | determine its location based on its use of Wi-Fi? | 14:59:32 |
| 4 | A.    Yes.  Yes, it's possible. | 14:59:40 |
| 5 | Q.    And what is the location that is reported | 14:59:42 |
| 6 | back when you're on Wi-Fi, when a cell phone is on | 14:59:45 |
| 7 | Wi-Fi? | 14:59:49 |
| 8 | A.    I'm not sure what you're asking. | 14:59:51 |
| 9 | Q.    Is the location when a cell phone is on | 14:59:56 |
| 10 | Wi-Fi the location of the device or the location of | 14:59:59 |
| 11 | the WiFi router? | 15:00:03 |
| 12 | A.    It would be the -- it could be still the | 15:00:06 |
| 13 | location of the device, yes. | 15:00:10 |
| 14 | Q.    Could it also be the location of the | 15:00:11 |
| 15 | router? | 15:00:14 |
| 16 | A.    That's beyond my engineering expertise. | 15:00:16 |
| 17 | Yeah, I don't know the answer to that. | 15:00:19 |
| 18 | Q.    Can there be inaccuracies in geolocation | 15:00:21 |
| 19 | data caused by the use of Wi-Fi? | 15:00:25 |
| 20 | MR. YARBROUGH:  Object to form. | 15:00:28 |
| 21 | A.    There can be.  That doesn't mean it's | 15:00:32 |
| 22 | pervasive, but yes, there can be like any signal. | 15:00:35 |
| 23 | Q.    And what happens if a cell phone is using | 15:00:38 |
| 24 | a VPN, does that impact the accuracy of the | 15:00:41 |
| 25 | geolocation data? | 15:00:47 |

Page 124

| | | |
|---|---|---|
| 1 | A.    I'm not a network engineer so I can't | 15:00:48 |
| 2 | really answer that question for you.  I don't know. | 15:00:53 |
| 3 | Q.    Did Red Metrics account for the potential | 15:00:57 |
| 4 | uses of VPNs? | 15:00:59 |
| 5 | MR. YARBROUGH:  Object to form. | 15:01:03 |
| 6 | A.    There's no way to identify that level of | 15:01:04 |
| 7 | detail or granularly as to whether a device is on a | 15:01:11 |
| 8 | VPN or not. | 15:01:14 |
| 9 | Q.    So if someone is using the feature on | 15:01:14 |
| 10 | iPhones that mask the phone's location, could that | 15:01:18 |
| 11 | impact the cell phone location data? | 15:01:21 |
| 12 | MR. YARBROUGH:  Object to form. | 15:01:23 |
| 13 | A.    In all fairness, I don't recall what the | 15:01:23 |
| 14 | capability of the OS was on any device back in 2020, | 15:01:27 |
| 15 | 2021, so I can't -- I can't say.  I don't know.  I | 15:01:34 |
| 16 | don't recall. | 15:01:38 |
| 17 | Q.    Do environmental factors like the presence | 15:01:38 |
| 18 | of trees or buildings impact the accuracy of cell | 15:01:41 |
| 19 | geolocation data? | 15:01:46 |
| 20 | A.    Again, I'm not an engineer, but also I | 15:01:50 |
| 21 | don't -- I don't know the answer to that question. | 15:01:53 |
| 22 | Q.    Do you know if weather affects the | 15:01:56 |
| 23 | accuracy of geolocation data? | 15:01:59 |
| 24 | A.    I don't know. | 15:02:03 |
| 25 | Q.    Do you know if Red Metrics accounted for | 15:02:03 |

Page 125

```
 1    potential inaccuracies caused by the environmental    15:02:06

 2    factors in Georgia?                                   15:02:11

 3              MR. YARBROUGH:  Object to form.             15:02:15

 4        A.   Can you give me an example of               15:02:17

 5    environmental factors?                                15:02:18

 6        Q.   A tree.  Is there -- did Red Metrics         15:02:20

 7    account for the possibility that a tree or a          15:02:23

 8    building reflected a cell phone signal to a tower     15:02:24

 9    that's further away?                                  15:02:28

10        A.   No.  No.                                     15:02:29

11        Q.   Does the technology in the cell phone        15:02:33

12    impact the accuracy of geolocation data?              15:02:37

13              MR. YARBROUGH:  Object to form.             15:02:41

14        Q.   Let me rephrase that actually.               15:02:43

15              Are newer cell phones -- do newer cell      15:02:45

16    phones provide more accurate geolocation data than    15:02:47

17    older cell phones?                                    15:02:50

18              MR. YARBROUGH:  Object to form.             15:02:53

19        A.   I'm not a hardware engineer.  I can't -- I   15:02:53

20    can't speak to that.  I don't know.                   15:02:55

21        Q.   Is the accuracy of location data impacted    15:02:57

22    by any other technological aspect of the device?      15:03:00

23              MR. YARBROUGH:  Object to form.             15:03:06

24        A.   No, I think you have hit them all.           15:03:06

25        Q.   I wanted to ask you about a couple of more   15:03:24
```

Page 126

| | | |
|---|---|---|
| 1 | here. | 15:03:29 |
| 2 | Are you familiar with the term | 15:03:29 |
| 3 | "sinkholes"? | 15:03:30 |
| 4 | A.   In what context? | 15:03:34 |
| 5 | Q.   In the context of geolocation data for | 15:03:36 |
| 6 | cell phone devices. | 15:03:40 |
| 7 | A.   I have heard that term, yes. | 15:03:42 |
| 8 | Q.   What are sinkholes? | 15:03:44 |
| 9 | A.   Yeah, in terms of a disproportionate | 15:03:47 |
| 10 | number of devices appearing to be at one location | 15:03:56 |
| 11 | based on errors and data streams and whatnot. | 15:04:00 |
| 12 | Q.   And what kind of errors would cause a | 15:04:02 |
| 13 | sinkhole? | 15:04:08 |
| 14 | A.   I don't know what causes it.  I have seen | 15:04:09 |
| 15 | the effects of it, but I don't know what causes it | 15:04:12 |
| 16 | from a signal standpoint.  I'm not sure. | 15:04:15 |
| 17 | Q.   Do sinkholes impact the accuracy of | 15:04:18 |
| 18 | geolocation data? | 15:04:22 |
| 19 | A.   They can.  And if you see a sinkhole as | 15:04:23 |
| 20 | part of your analysis, then that would be something | 15:04:27 |
| 21 | that you would carve out as an exception as one of | 15:04:29 |
| 22 | those filters on a query, yeah. | 15:04:34 |
| 23 | Q.   And did Red Metrics find sinkholes in the | 15:04:35 |
| 24 | data that it analyzed for Mr. Phillips? | 15:04:38 |
| 25 | A.   I can't speak to whether we did or didn't. | 15:04:41 |

Page 127

1    I mean, it's not uncommon in any dataset to see that    15:04:45

2    on a few occasions, but it's a -- usually a very    15:04:47

3    small percentage of what you're looking at.    15:04:51

4        Q.   Are you familiar with the term "ghost    15:04:53

5    ports"?    15:04:56

6        A.   I am not.    15:04:57

7        Q.   Earlier we said different kinds of devices    15:04:58

8    can provide geolocation data aside from cell phones;    15:05:05

9    is that correct?    15:05:09

10       A.   Tablets, but yeah, that's pretty much it.    15:05:11

11       Q.   If someone showed up at a location with    15:05:18

12   two different devices and they're within a buffer    15:05:22

13   zone, is it possible that both devices would    15:05:26

14   register as within the buffer zone?    15:05:28

15       A.   It's possible that each device could, yes.    15:05:31

16       Q.   Did Red Metrics look for any    15:05:36

17   double-counting in the data for Mr. Phillips?    15:05:37

18            MR. YARBROUGH:  Object to form.    15:05:42

19            MR. EVANS:  Object to form.    15:05:42

20       Q.   Let me look -- let me rephrase that.    15:05:43

21            Did Red Metrics account for the    15:05:45

22   possibility that one user might have two devices    15:05:46

23   that would show up within a single buffer zone?    15:05:51

24       A.   Red Metrics did not.  Yeah, no, we didn't    15:05:55

25   factor that in.    15:05:58

```
                                              Page 128
 1        Q.   How frequently do errors occur in      15:05:59
 2   geofencing data analysis?                        15:06:04
 3             MR. YARBROUGH:  Object to form.         15:06:07
 4        Q.   Let me rephrase that.  I don't want to say  15:06:07
 5   the analysis.                                    15:06:07
 6             How frequently do errors occur in      15:06:09
 7   geofencing datasets?                             15:06:12
 8             MR. YARBROUGH:  Objection; form.        15:06:15
 9        A.   I think we established the sinkhole is one  15:06:16
10   common one.  But like any data source, it's not  15:06:21
11   perfect.  No data source is perfect.  So there's  15:06:26
12   always some, you know, margin for error.  What that  15:06:32
13   percentage is, I couldn't tell you.             15:06:36
14        Q.   Are there ways to account for errors in  15:06:45
15   geofencing analysis?                             15:06:50
16        A.   Can you give me an example of an error  15:06:53
17   that --                                          15:06:56
18        Q.   So you described sinkholes and then    15:06:58
19   testified that Red Metrics didn't -- you're not sure  15:07:02
20   if Red Metrics excluded sinkholes in its analysis  15:07:06
21   for Phillips.                                    15:07:09
22        A.   Uh-huh.                                15:07:10
23        Q.   Are there other ways of making sure the  15:07:11
24   data is more accurate that Red Metrics did not   15:07:14
25   deploy in its work for Mr. Phillips?            15:07:18
```

| | | |
|---|---|---|
| 1 | MR. YARBROUGH:  Objection; form. | 15:07:22 |
| 2 | A.   I think we used the sinkholes as an | 15:07:24 |
| 3 | example.  But again, our analysis being in the macro | 15:07:29 |
| 4 | and in the aggregate, you do that knowing that there | 15:07:32 |
| 5 | is going to be some noise in the results but likely | 15:07:37 |
| 6 | not statistically significant. | 15:07:41 |
| 7 | Q.   And did you describe the possibility of | 15:07:44 |
| 8 | inaccuracies to Mr. Phillips? | 15:07:46 |
| 9 | A.   I don't recall that we had a conversation | 15:07:50 |
| 10 | at that granular level of detail. | 15:07:54 |
| 11 | Q.   Did Mr. Phillips ask you about potential | 15:08:06 |
| 12 | inaccuracies in the data? | 15:08:09 |
| 13 | A.   Did he ask me about potential | 15:08:14 |
| 14 | inaccuracies?  If he did, I don't recall it.  Maybe | 15:08:16 |
| 15 | he did; maybe he didn't.  I don't recall. | 15:08:23 |
| 16 | Q.   Did he have the opportunity to ask you | 15:08:26 |
| 17 | about potential inaccuracies in the data? | 15:08:28 |
| 18 | A.   Through the course of the engagement -- | 15:08:31 |
| 19 | MR. YARBROUGH:  Object to form. | 15:08:33 |
| 20 | A.   Through the course of the engagement, he | 15:08:34 |
| 21 | would have, yes, sure. | 15:08:36 |
| 22 | Q.   And you don't recall if he ever actually | 15:08:38 |
| 23 | did ask about potential inaccuracies? | 15:08:40 |
| 24 | MR. YARBROUGH:  Object to form. | 15:08:43 |
| 25 | MR. EVANS:  Object to form. | 15:08:43 |

Page 130

```
 1        A.   I don't.  I don't recall in the course of   15:08:44
 2   the engagement if we had that specific conversation,  15:08:46
 3   and if we did, at what level of detail.               15:08:48
 4        Q.   You said that you attended a showing of     15:08:58
 5   2000 Mules at a premier event?                         15:09:01
 6        A.   Uh-huh.                                       15:09:03
 7        Q.   Did you talk to Mr. D'Souza at that event?   15:09:05
 8        A.   Well, one, I didn't say that I attended     15:09:09
 9   that.                                                  15:09:12
10        Q.   I'm sorry.                                    15:09:12
11             Can you clarify, did you attend a showing    15:09:13
12   of the movie 2000 Mules?                               15:09:17
13        A.   I did, yes.                                   15:09:19
14        Q.   Was Mr. D'Souza present?                     15:09:20
15        A.   Yes.                                          15:09:22
16        Q.   Okay.  Did he talk to you at the --          15:09:23
17        A.   No.                                           15:09:27
18        Q.   -- event?                                     15:09:28
19        A.   No.                                           15:09:29
20        Q.   Did he ever ask you about potential          15:09:29
21   inaccuracies in Red Metrics' analysis?                 15:09:32
22        A.   Red Metrics has had no conversation or      15:09:36
23   contact with Mr. D'Souza.                              15:09:40
24        Q.   And did -- I'm sorry, I have to ask this     15:09:42
25   again.                                                 15:09:48
```

Page 131

| 1  | Did you speak with Ms. Engelbrecht? | 15:09:48 |
| 2  | MR. EVANS:  Object to form. | 15:09:52 |
| 3  | A.   Have I talked to -- | 15:09:53 |
| 4  | Q.   Have you talked to Ms. Engelbrecht? | 15:09:55 |
| 5  | A.   Yes. | 15:09:57 |
| 6  | Q.   And when did you talk to Ms. Engelbrecht? | 15:09:57 |
| 7  | A.   2022 sometime, yes. | 15:10:01 |
| 8  | Q.   Did she ask you about possible | 15:10:07 |
| 9  | inaccuracies in the analysis? | 15:10:09 |

1       Did you speak with Ms. Engelbrecht?          15:09:48

2              MR. EVANS:  Object to form.          15:09:52

3       A.   Have I talked to --                    15:09:53

4       Q.   Have you talked to Ms. Engelbrecht?    15:09:55

5       A.   Yes.                                   15:09:57

6       Q.   And when did you talk to Ms. Engelbrecht?  15:09:57

7       A.   2022 sometime, yes.                    15:10:01

8       Q.   Did she ask you about possible         15:10:07

9    inaccuracies in the analysis?                  15:10:09

10             MR. EVANS:  Object to form.          15:10:12

11             MR. YARBROUGH:  Object to form.      15:10:13

12      A.   No.  No.                               15:10:13

13      Q.   Did he have the opportunity to ask you 15:10:15

14   about any inaccuracies in Red Metrics' analysis? 15:10:17

15             MR. EVANS:  Object to form.          15:10:22

16      A.   I don't know that she did because we were 15:10:23

17   in -- I think we talked for maybe one time ever. 15:10:27

18      Q.   Okay.  From your conversation with     15:10:32

19   Ms. Engelbrecht, did Ms. Engelbrecht understand that 15:10:52

20   Red Metrics did work for Mr. Phillips?         15:10:55

21             MR. EVANS:  Object to form.          15:11:00

22      A.   I don't know if she knew the -- what we 15:11:00

23   were engaged to do or not.  To do through OpSec, we 15:11:06

24   had such limited contact, I can't really speak to 15:11:10

25   what she knew about our role.                  15:11:14

Page 132

```
1        Q.   Was she aware that Red Metrics was         15:11:16

2   involved in some sort of work for Mr. Phillips?      15:11:18

3             MR. YARBROUGH:  Objection to form.         15:11:21

4             MR. EVANS:  Object to form.                15:11:21

5        A.   I assume she did.  I assume she did.  I    15:11:23

6   don't know that for sure, but it would be a safe     15:11:29

7   assumption.                                          15:11:31

8        Q.   We may come -- was -- did you ever         15:11:36

9   communicate with Ms. Engelbrecht on Wire?            15:11:47

10       A.   No.                                        15:11:55

11       Q.   Were you ever on any communications with   15:11:57

12  Ms. Engelbrecht that would have been reflected in a  15:12:02

13  messaging platform or email?                         15:12:05

14            MR. EVANS:  Object to form.                15:12:09

15       A.   Not that I recall.  That was all through   15:12:10

16  Gregg.                                               15:12:13

17       Q.   And going back to work product that you    15:12:14

18  produced to Gregg.  We have talked about the maps    15:12:19

19  and some of the charts.                              15:12:23

20            Can you just describe any other work       15:12:24

21  product that you sent to Mr. Phillips as part of     15:12:26

22  this analysis, and this analysis being the analysis  15:12:30

23  related to the 2020 election.                        15:12:34

24       A.   That pretty much encompasses the           15:12:37

25  deliverables as they asked for them, as they require 15:12:43
```

Page 133

```
 1   them.                                              15:12:46

 2       Q.   So let's just be very clear.              15:12:47

 3            So the deliverables were a deck?          15:12:50

 4       A.   Decks.                                    15:12:54

 5       Q.   How many decks?                           15:12:55

 6       A.   We probably had a deck for the general    15:12:58

 7   election analysis and then a separate one for the  15:13:05

 8   runoff would be my guess, so a handful of decks.    15:13:09

 9       Q.   And is a handful less than 10 --          15:13:14

10       A.   Yes.                                      15:13:16

11       Q.   -- decks?                                 15:13:17

12       A.   Yeah, well less than 10, sure.            15:13:17

13       Q.   And how large was each deck?              15:13:20

14       A.   How large?  How many slides were in any   15:13:23

15   deck that we delivered four yours ago, I don't      15:13:30

16   recall.  Yeah, I'm not sure.                        15:13:32

17       Q.   Would it have been more than 100 slides in 15:13:33

18   each deck?                                          15:13:35

19       A.   Probably less than 20 slides.             15:13:36

20       Q.   Less than 20 slides.                       15:13:38

21       A.   Yeah.                                      15:13:40

22       Q.   And did you also produce decks to         15:13:41

23   Mr. Phillips for work for the other jurisdictions  15:13:44

24   apart from Georgia?                                 15:13:49

25       A.   Those analyses probably were, yeah, you   15:13:53
```

Page 134

```
 1    know, less than 10 slides if we had delivered those     15:13:57

 2    separately.  Again, much smaller looks, much smaller     15:14:00

 3    analyses.                                                15:14:04

 4         Q.   And was there any work product that Red        15:14:04

 5    Metrics delivered to Mr. Phillips reflecting its         15:14:08

 6    review of surveillance footage?                          15:14:11

 7              MR. EVANS:  Object to form.                     15:14:14

 8         A.   No.                                             15:14:16

 9         Q.   Were the results of the review of               15:14:18

10    surveillance footage communicated to Mr. Phillips        15:14:20

11    orally over the phone?                                   15:14:25

12         A.   By that point, his team had jumped in to        15:14:29

13    run more with that analysis than we were involved.       15:14:33

14         Q.   Did Red Metrics ever deliver any analysis      15:14:37

15    about surveillance footage to Mr. Phillips in any        15:14:41

16    form?                                                    15:14:43

17              MR. YARBROUGH:  Object to form.                 15:14:47

18         A.   Other than delivering the tapes back, I        15:14:48

19    don't recall if we had a -- if we had a deliverable      15:14:53

20    other than what we had tried to scan through.  They      15:14:56

21    took that over.                                          15:14:59

22         Q.   And when you purged the file related to        15:15:01

23    the work for Mr. Phillips, did you give all of the       15:15:06

24    work product and communications to Mr. Phillips?         15:15:09

25              MR. YARBROUGH:  Objection to form.              15:15:14
```

Page 135

1              MR. EVANS:  Object to form.                    15:15:15

2         A.   Yeah, I'm not sure I understand the           15:15:15

3    distinction.                                            15:15:18

4         Q.   When you purged the file, did you give        15:15:18

5    Mr. Phillips materials?                                 15:15:22

6         A.   The only thing that we would have given       15:15:24

7    him would have been through deliverables through the    15:15:26

8    course of the engagement so nothing at the             15:15:29

9    conclusion per se, no.  Just what we had delivered     15:15:32

10   all along, yeah.                                        15:15:35

11        Q.   And do you still have the device that you     15:15:36

12   used to communicate with Mr. Phillips?                 15:15:39

13        A.   No.  Again, you mean where we were using      15:15:41

14   the Wire app?  No, that would have been a different     15:15:49

15   set of devices at the time.  That was two-plus,         15:15:53

16   three years ago.                                        15:15:56

17        Q.   Is the Wire app connected to a particular     15:15:57

18   user name or phone number?                              15:16:00

19        A.   Yes.  Sure.                                   15:16:05

20        Q.   What is your Wire user name?                  15:16:07

21        A.   I would have to look it up.  Some kind of     15:16:09

22   handle, yeah.                                           15:16:13

23        Q.   We can ask about that.                        15:16:14

24             And then what is the phone number for        15:16:15

25   the -- step back.                                       15:16:17

Page 136

```
 1              What is the phone number for the phone      15:16:23

 2    that you used Wire on with Mr. Phillips?             15:16:24

 3    ███████████████████████████████████████████████     15:16:29

 4    ███████████████████████████████████████████████     15:16:32

 5         Q.   And do you know what Mr. Phillips' user    15:16:37

 6    name on Wire is?                                     15:16:45

 7         A.   No.  We haven't been connected there for a 15:16:48

 8    couple years, so...                                  15:16:51

 9         Q.   Do you know Mr. Phillips' phone number for 15:16:52

10    the device he used in contacting you?                15:16:54

11         A.   No, I wouldn't know.  No.                  15:16:57

12         Q.   Okay.  Were there any other messaging      15:16:59

13    applications such as signal that you used with       15:17:02

14    anyone, Mr. Phillips or Red Metrics, to communicate  15:17:06

15    about this work?                                     15:17:10

16         A.   No, it would have been exclusively Wire.   15:17:11

17         Q.   And when you communicate with              15:17:16

18    Mr. Matthews, it would also have been exclusively    15:17:18

19    Wire or did you use any other communication          15:17:20

20    platform?                                            15:17:25

21         A.    It would have predominantly been Wire, but 15:17:26

22    we're in the same office so a lot of it just would   15:17:29

23    have been oral.                                      15:17:33

24         Q.   And when you communicate with              15:17:33

25    Mr. Rahlouni, would that have been over Wire?        15:17:35
```

```
 1        A.   Largely, yes.  Yeah, he's in Houston.      15:17:38

 2   We're in Dallas.                                     15:17:42

 3        Q.   And what -- you said largely.              15:17:43

 4             What other communication platform did you  15:17:44

 5   use to communicate with Mr. Rahlouni?                15:17:47

 6        A.   Well, the voice and I was just making the  15:17:50

 7   distinction between voice document and other         15:17:53

 8   messaging which all -- you can do all that on Wire   15:17:56

 9   desktop and app.                                     15:17:59

10        Q.   Did you ever have video conference         15:18:00

11   meetings with Mr. Rahlouni?                          15:18:03

12        A.   On Wire.  We do that all on Wire, yeah.    15:18:06

13        Q.   Did you ever use Zoom or Google Meet or    15:18:11

14   any other device?                                    15:18:15

15        A.   We don't like those platforms.            15:18:16

16             MR. LANGFORD:  I think that is it.  We     15:18:26

17   can wrap there.  So no further questions for you,    15:18:30

18   Mr. Gerwing.                                         15:18:35

19             We do need to bring Mr. Matthews back      15:18:35

20   in.                                                  15:18:37

21             MR. EVANS:  I just have a couple           15:18:38

22   questions for Mr. Gerwing.                           15:18:39

23                  EXAMINATION                           15:18:41

24   BY MR. EVANS:                                        15:18:41

25        Q.   Okay.  Mr. Gerwing, I just have a couple   15:19:03
```

Page 138

1    question for you.  My name is Jake Evans.  I          15:19:07

2    represent the defendants True the Vote,               15:19:08

3    Ms. Engelbrecht, and Mr. Phillips.                    15:19:12

4           I just want to ask some questions about        15:19:14

5    some answers you gave that maybe suggested you        15:19:15

6    understood what Mr. Phillips was thinking or his      15:19:18

7    understanding at any time.                            15:19:20

8           Do you know what Gregg Phillips is             15:19:22

9    thinking at any given time?                           15:19:24

10      A.   I don't.                                      15:19:27

11      Q.   Do you know what Gregg Phillips'              15:19:29

12   understanding is or was at any given time?            15:19:31

13      A.   No.                                           15:19:36

14      Q.   And could Gregg Phillips' understanding       15:19:37

15   and thinking have been different than what maybe you  15:19:40

16   thought it was at any given time?                     15:19:44

17      A.   Yes.                                          15:19:46

18      Q.   So your testimony about what Gregg            15:19:47

19   Phillips was thinking or his understanding was, to    15:19:50

20   the extent you gave any today, would have been based  15:19:53

21   upon speculation and not personal knowledge; is that  15:19:56

22   right?                                                15:20:00

23      A.   That's fair, yes.                             15:20:00

24           MR. EVANS:  No further questions.             15:20:02

25           MR. VINING:  This is Austin Vining.  I        15:20:06

Page 139

```
 1    have a few questions.                          15:20:08

 2              MR. CRENSHAW:  Give us one second.    15:20:27

 3              MR. EVANS:  Okay.                      15:20:27

 4              MR. CRENSHAW:  You may proceed,        15:20:28

 5    Counsel.                                         15:20:29

 6                     EXAMINATION                     15:20:29

 7    BY MR. VINING:                                   15:20:30

 8        Q.   Good afternoon, Mr. Gerwing.  My name is 15:20:30

 9    Austin Vining and I represent the defendants Dinesh 15:20:33

10    D'Souza and D'Souza Media LLC.  I just have a couple 15:20:35

11    questions to clarify some of things you have      15:20:38

12    testified about today.                            15:20:40

13              I believe you testified that Red Metrics 15:20:41

14    began the work for OpSec on the 2020 presidential 15:20:43

15    election project in December of 2020 or January  15:20:47

16    of 2021; is that correct?                         15:20:50

17        A.   Yes.                                     15:20:51

18        Q.   And the bulk of the work, I think you   15:20:54

19    testified, took approximately three to six months; 15:20:57

20    is that correct?                                  15:21:00

21        A.   Yeah.  That's a good approximate time   15:21:02

22    frame, yes.                                       15:21:05

23        Q.   And that you continued doing some projects 15:21:06

24    into 2022?                                         15:21:11

25        A.   Yes.  Uh-huh.                            15:21:12
```

Page 140

```
 1        Q.   And at some point, Red Metrics was          15:21:15

 2   provided with video surveillance footage of people    15:21:21

 3   dropping ballots in drop boxes; is that correct?      15:21:23

 4        A.   Yes.  From OpSec, yes.                       15:21:25

 5        Q.   And who at OpSec provided that footage?      15:21:28

 6        A.   It came through Gregg Phillips.             15:21:30

 7        Q.   And do you remember when that footage was    15:21:37

 8   provided?                                             15:21:40

 9        A.   I couldn't give you an exact time frame.    15:21:42

10   Yeah, I don't recall that.                            15:21:45

11        Q.   Any sort of approximate time frame?         15:21:48

12        A.   I would be making it up.  Yeah, I really    15:21:52

13   couldn't -- I couldn't nail that down.                15:21:58

14        Q.   Do you know if it was in the initial three  15:21:59

15   to six months when you did the bulk of the work?      15:22:02

16        A.   Yeah, within that time frame.  Yes.  Yes.   15:22:04

17        Q.   So that would have been by June or July     15:22:10

18   of 2021; is that correct?                             15:22:15

19        A.   Yeah.  Like I said, I don't recall the      15:22:17

20   exact time frame.  I don't have anything to kind of   15:22:22

21   anchor that to so -- I think I had said before some   15:22:26

22   of that work had extended into second, third          15:22:31

23   quarter, so it may have even been late summer, early  15:22:34

24   fall.                                                 15:22:37

25        Q.   And what were you asked to do with the      15:22:40
```

Page 141

```
1    video footage?                                    15:22:42
2         A.    Initially it was to review it for what  15:22:45
3    might look like suspect activity and see if it    15:22:50
4    married up to any of the mobile analytics that we 15:22:53
5    had done previously.                              15:22:57
6         Q.    And do you know -- I'm sorry.           15:23:00
7               Were you able to complete that objective? 15:23:03
8         A.    Which objective?                        15:23:09
9         Q.    Looking for suspect activity and seeing if 15:23:10
10   it matched up to any of the geotracking data.     15:23:14
11        A.    No, we were not.                        15:23:21
12        Q.    And how long did it take you to determine 15:23:23
13   that?                                             15:23:26
14        A.    It was probably several weeks at least of 15:23:26
15   effort, yeah.                                     15:23:32
16        Q.    And did you communicate that to anyone at 15:23:35
17   OpSec?                                            15:23:41
18        A.    Yeah, I think we -- I don't recall exact 15:23:44
19   conversations, but it was thousands of hours of   15:23:50
20   video began to look at.  And I think that's when  15:23:56
21   their team had more scalability and more fire power 15:23:59
22   to put behind the video analytics.  So that's when 15:24:03
23   we delivered those drives back for them to kind of 15:24:08
24   take the ball and run with it from there.         15:24:10
25        Q.    Do you remember approximately when you  15:24:12
```

Page 142

```
 1    told them that your team couldn't do it?          15:24:18
 2         A.   I don't.  I don't.                       15:24:23
 3         Q.   Do you remember who you communicated with 15:24:28
 4    to tell them that you team couldn't do it?         15:24:30
 5         A.   All our communications at that point would 15:24:35
 6    have still been going through -- through Gregg and 15:24:38
 7    JD.                                                 15:24:43
 8         Q.   Do you remember which, if it was Gregg or 15:24:44
 9    JD, that you told that you couldn't do this?       15:24:47
10         A.   I don't.  They were both party to some   15:24:51
11    conversations and maybe one-off conversations, you 15:24:58
12    know, one on one separately, so I don't recall who 15:25:00
13    or when.                                           15:25:03
14         Q.   Did Red Metrics provide any sort of      15:25:11
15    segmented footage to OpSec?                        15:25:14
16         A.   What do you mean by segmented footage?   15:25:17
17         Q.   Like whenever you say that you spent weeks 15:25:21
18    looking for suspect activity in the video footage  15:25:24
19    and trying to match it to geotracking data, the    15:25:28
20    suspect activity that -- or did you find any suspect 15:25:33
21    activity in the footage?                           15:25:36
22         A.   We didn't know what may or may not be    15:25:41
23    legitimate activity.  All we were looking for in   15:25:45
24    that initial pass of the video was did something   15:25:49
25    just, you know, look off.  But, you know, that's -- 15:25:53
```

```
 1      that's more interpretation than anything else.        15:25:57

 2              So it was overly just burdensome, kind of      15:26:00

 3      laborious process so that's when -- that was kind of   15:26:05

 4      reaching beyond the scope of what he had been          15:26:10

 5      engaged to do, which is why we all agreed it would     15:26:12

 6      be more efficient to have them conclude and do more    15:26:16

 7      of that work than what we -- than what we could        15:26:20

 8      handle.                                                15:26:23

 9          Q.   Did Red Metrics identify anything that        15:26:24

10      looked off like you described?                         15:26:27

11          A.   The only other -- not necessarily in the      15:26:30

12      video.  The other data that OpSec had surfaced were    15:26:41

13      some of the ballot transfer forms that had nothing     15:26:47

14      do with the video per se or the mobile but had more    15:26:52

15      to do with the chain of custody, if I recall.  And     15:26:57

16      so that was actually of more interest at that point    15:27:01

17      in time than was even marrying up the mobile and the   15:27:05

18      video.                                                 15:27:10

19          Q.   I just want to be sure we're clear.  You      15:27:13

20      said not necessarily in the videos.                    15:27:16

21              Did Red Metrics identify anything that         15:27:17

22      looked off in the video footage it was asked to        15:27:19

23      review?                                                15:27:22

24          A.   We -- we just flagged activity as to          15:27:23

25      whether or not it met kind of a criteria that they     15:27:29
```

Page 144

```
1    wanted to use to define, you know, suspect or        15:27:32
2    wrongful potential activity.  Again, that was kind    15:27:36
3    of beyond the scope of what we were engaged to do.    15:27:41
4    So in terms of the interpretation and/or we were led  15:27:43
5    to believe again that the law enforcement at some     15:27:49
6    point would be involved but that was well beyond the  15:27:51
7    purview.  That's not who we are, so that was well     15:27:55
8    beyond the purview of what Red Metrics was equipped   15:27:59
9    to deliver and engaged to do.                         15:28:02
10        Q.    When you said it met criteria that they    15:28:03
11   wanted to use to define, what was that criteria?      15:28:08
12        A.    I think similar to what we were trying to  15:28:13
13   demonstrate in the movie, which was, you know, video  15:28:15
14   evidence of a batch or some number of ballots being   15:28:18
15   inserted into a drop box at any one time by an        15:28:22
16   individual.                                           15:28:26
17        Q.    You said Red Metrics flagged certain       15:28:27
18   footage.  How was that flagged to OpSec?              15:28:30
19        A.    In our analysis, we didn't -- I don't      15:28:37
20   recall that we visually -- again, we didn't scrub     15:28:41
21   the thousands of hours of video that existed.  What   15:28:44
22   they did downstream to analyze more the video than    15:28:48
23   what we looked at, I really can't speak to.           15:28:52
24           But in terms of what -- what I recall that    15:28:55
25   we had looked at, we hadn't found any instances       15:28:58
```

Page 145

```
 1    where there were a large batch of ballots involved.    15:29:05
 2         Q.   How was that flagged -- or you said that      15:29:09
 3    some suspect video was flagged --                       15:29:13
 4         A.   I just meant --                               15:29:17
 5         Q.   Is that correct?                              15:29:17
 6         A.   -- operationally, yeah, flagged.  We were     15:29:19
 7    in, you know, communication with the OpSec team.  I     15:29:23
 8    don't recall how it was flagged, but I'm -- when I      15:29:28
 9    use that term, I'm just referring to the fact that      15:29:32
10    we would have highlighted something that they needed    15:29:34
11    to take a closer look at, just not the space that we    15:29:38
12    live in as data analytics as opposed to more            15:29:41
13    operators or operationalized kind of work.              15:29:51
14         Q.   Did you send them certain clips from the      15:29:56
15    footage?                                                15:29:58
16         A.   I think we probably reviewed some clips       15:30:02
17    together.  We never -- I don't recall sent videos       15:30:05
18    but we probably reviewed things together with their     15:30:08
19    team.                                                   15:30:13
20         Q.   Do you recall approximately how many          15:30:15
21    flagged clips there might have been?                    15:30:18
22         A.   That we had flagged?                          15:30:23
23         Q.   Yes.                                          15:30:25
24         A.   Probably less than 15.  Yeah, I don't         15:30:26
25    recall the number, but it was not a -- it wasn't in     15:30:33
```

Page 146

| | | |
|---|---|---|
| 1 | the tens of numbers, tens of videos, yeah. | 15:30:36 |
| 2 | Q.  You believe less than 20? | 15:30:41 |
| 3 | A.  Yeah.  It was a relatively small subset, | 15:30:45 |
| 4 | yes. | 15:30:47 |
| 5 | Q.  Okay.  The footage that was provided to | 15:30:49 |
| 6 | Red Metrics by OpSec, did that come in one batch? | 15:30:53 |
| 7 | A.  I think it did.  They had been making | 15:30:58 |
| 8 | requests of the various counties for a period of | 15:31:06 |
| 9 | time.  I want to say what they delivered was all | 15:31:09 |
| 10 | those drives.  I don't recall if we got more than | 15:31:13 |
| 11 | one batch but it likely was one handoff. | 15:31:15 |
| 12 | Q.  And -- okay.  And if there were more than | 15:31:20 |
| 13 | one handoff, you believe -- is it your belief that | 15:31:27 |
| 14 | they would have been close in time? | 15:31:29 |
| 15 | A.  Yes.  Yeah, for sure. | 15:31:31 |
| 16 | Q.  Okay.  Do you remember if any of the | 15:31:35 |
| 17 | videos you received were from Gwinnett County? | 15:31:41 |
| 18 | A.  I know Gwinnett County was one of the | 15:31:46 |
| 19 | counties in the analysis.  I don't expressly recall | 15:31:50 |
| 20 | if there were videos that we received from Gwinnett | 15:31:52 |
| 21 | County.  So counties I don't think ever wound up | 15:31:59 |
| 22 | honoring OpSec requests and I don't know if Gwinnett | 15:32:02 |
| 23 | County was in our mix or not. | 15:32:06 |
| 24 | Q.  Did you -- did Red Metrics have an | 15:32:11 |
| 25 | understanding that the video clips were to | 15:32:14 |

Page 147

```
 1    potentially be used in the film that would         15:32:18

 2    eventually become 2000 Mules?                      15:32:22

 3         A.   We weren't aware of the movie until a    15:32:27

 4    month of it coming out, so we were really never part  15:32:32

 5    of that conversation.                              15:32:35

 6              MR. VINING:  I have no further           15:32:42

 7    questions.                                         15:32:43

 8              MR. DAVIDSON:  Very brief redirect       15:32:43

 9    which I'll take care of.                           15:32:43

10                   FURTHER EXAMINATION                 15:32:43

11    BY MR. DAVIDSON:                                   15:32:43

12         Q.   So this is -- hi, Mr. Gerwing -- Jared   15:32:51

13    Davidson.  Just a few questions.                   15:32:52

14              So you just testified to Mr. Vining that 15:32:54

15    you became aware of the film just a month or so    15:32:57

16    before it came out; is that correct?               15:33:00

17         A.   That's correct.                          15:33:03

18         Q.   So just to be clear, you became aware of 15:33:04

19    the film before it was released?                   15:33:06

20         A.   We became aware of the film when we were 15:33:12

21    invited to the preview event, but we had no prior  15:33:17

22    knowledge of the movie or its contents.            15:33:21

23         Q.   And during that period, just to be very  15:33:25

24    clear, before the movie's release, did any of the  15:33:28

25    defendants in this case ask you, any other         15:33:33
```

1    representative, for any feedback or other                15:33:39

2    confirmations about particular representations made       15:33:47

3    in the movie before the premier?                          15:33:50

4              MR. YARBROUGH:  Object to form.                 15:33:54

5         Q.   You can answer.                                 15:33:54

6         A.   None.                                           15:33:55

7         Q.   And to be clear, do you recall the exact        15:33:56

8    date that you became aware of the film vis-a-vis the      15:34:02

9    premier date?  Was it exactly a month before?            15:34:07

10        A.   It was actually no more than a month.           15:34:12

11   Maybe more like three weeks.  It was -- it was            15:34:16

12   pretty close to that -- to that time frame.               15:34:24

13        Q.   Did you have any ongoing work for OpSec         15:34:27

14   that continued after the movie was released?             15:34:33

15        A.   When was the movie released?  I don't           15:34:39

16   recall the date or time frame.                            15:34:44

17        Q.   May of 2022.                                    15:34:45

18        A.   If -- the only other -- we had been doing       15:34:48

19   some law enforcement-related work for OpSec that had      15:34:56

20   nothing to do with this particular case.                  15:35:01

21        Q.   Was there any work that y'all were doing        15:35:04

22   in 2022 related to analyzing geolocation information      15:35:08

23   to assess whether or not there might be evidence          15:35:21

24   consistent with or correlative with voter fraud?          15:35:26

25             MR. YARBROUGH:  Object to form.                 15:35:32

Page 149

```
 1        A.   These time frame questions -- the Georgia    15:35:35

 2   work had been completed.  And so if there was any     15:35:43

 3   follow-on work that spanned into early 2022, it was   15:35:45

 4   in any of these smaller jurisdictions that we --      15:35:51

 5   that we discussed.                                    15:35:53

 6        Q.   That makes sense.                           15:35:53

 7             So just to be clear, it's possible that in  15:35:53

 8   2022 you were doing some of the work for Arizona?     15:35:55

 9             MR. EVANS:  Object to form.                 15:35:59

10        A.   I can't confirm that time frame, but        15:36:01

11   it's -- I just don't recall the time frame to be      15:36:03

12   perfectly honest, so I don't know how to answer       15:36:09

13   that.                                                 15:36:11

14        Q.   We're almost done.                          15:36:12

15             We have discussed a bit about the work      15:36:13

16   that you-all at Red Metrics did as distinct from      15:36:15

17   work that OpSec may have done after the fact.  You    15:36:20

18   made a number of difference references to work that   15:36:23

19   Mr. Phillips or OpSec may have done.                  15:36:29

20             Is that a fair characterization of your     15:36:30

21   testimony today?                                      15:36:32

22        A.   I think it is.                              15:36:32

23             MR. YARBROUGH:  Object to form.             15:36:34

24             MR. EVANS:  Object to form.                 15:36:34

25        Q.   Is that a fair characterization of your     15:36:34
```

Page 150

```
 1    testimony today?                                    15:36:36

 2               MR. YARBROUGH:  Same Objections.         15:36:37

 3               MR. EVANS:  Object to form.              15:36:38

 4       A.   I think it is.                              15:36:38

 5       Q.   Okay.  Are you personally aware of any      15:36:39

 6    analysis that OpSec or Mr. Phillips did utilizing   15:36:42

 7    any of the work that -- or analysis that Red Metrics 15:36:50

 8    had done subsequent to providing the analysis to    15:36:54

 9    OpSec?                                              15:36:58

10               MR. YARBROUGH:  Objection; form.         15:36:59

11               MR. EVANS:  Object to form.              15:36:59

12       A.   We weren't involved and so I can't speak    15:37:00

13    to what they did or didn't do with what we          15:37:05

14    delivered.                                          15:37:07

15       Q.   I want to be really clear.                  15:37:08

16           What are you personally aware, personally    15:37:11

17    aware of any follow-up analysis or research that    15:37:14

18    OpSec or Mr. Phillips, in fact, did, whether or not 15:37:19

19    Red Metrics was involved?  Does that make sense?    15:37:23

20       A.   That makes sense.                           15:37:26

21               MR. YARBROUGH:  Object to form.          15:37:28

22               MR. EVANS:  Object to form.              15:37:28

23       A.   I don't know.                               15:37:29

24       Q.   You're not aware of any?                    15:37:29

25       A.   I'm not aware of any.                       15:37:30
```

Page 151

```
 1         Q.   And had OpSec conducted any analysis        15:37:32
 2    leveraging analysis or findings that Red Metrics had   15:37:44
 3    done, you would have been available to speak with      15:37:48
 4    Mr. Phillips about whether he was accurately           15:37:54
 5    utilizing your analysis, correct?                      15:37:59
 6              MR. EVANS:  Object to form.                  15:38:02
 7              MR. YARBROUGH:  Object to form.              15:38:03
 8         A.   Had they asked, we would have had that       15:38:03
 9    conversation.                                          15:38:08
10         Q.   And they didn't ask?                         15:38:09
11              MR. EVANS:  Object to form.                  15:38:11
12         A.   They did not ask.                            15:38:12
13         Q.   Very good.                                   15:38:14
14              Lastly, we discussed earlier -- and my       15:38:15
15    apologies, I can't remember if we were talking about   15:38:20
16    this with your colleague or you.                       15:38:23
17              You testified earlier about data from the    15:38:24
18    armed conflict location of EMSData that may or may     15:38:27
19    want have been utilized in your analysis.              15:38:31
20              Do you recall that testimony?                15:38:33
21         A.   Yes.                                         15:38:34
22         Q.   Are you personally familiar of how ACLED     15:38:35
23    identifies the location of violent riots that it       15:38:40
24    tracks?                                                15:38:45
25              MR. YARBROUGH:  Object to form.              15:38:47
```

Page 152

```
 1        A.   I'm not personally aware, no.          15:38:48

 2        Q.   If I represented to you that ACLED      15:38:50

 3   identifies the location of a violent riot as being  15:38:53

 4   just broadly within the center of a particular area,  15:38:59

 5   so for example, the center of Atlanta as opposed to  15:39:03

 6   an exact coordinate within Atlanta, do you have any  15:39:06

 7   reason to disagree with that representation?        15:39:10

 8             MR. YARBROUGH:  Object to form.         15:39:13

 9        Q.   You can answer the question.            15:39:14

10        A.   I would take that representation at face  15:39:16

11   value.  I wouldn't have any way to debate it, so    15:39:21

12   yeah, that sounds reasonable.                       15:39:24

13        Q.   Are you personally aware -- we have      15:39:25

14   referenced other data sources, other publicly       15:39:29

15   available datasets that capture certain information  15:39:31

16   about violent riots, correct?                       15:39:36

17        A.   That's correct.                          15:39:38

18        Q.   So there's ACLED, correct?               15:39:39

19        A.   Correct.                                 15:39:42

20        Q.   And then you've referenced other data    15:39:42

21   sources?                                            15:39:45

22        A.   Yes.                                     15:39:45

23        Q.   Okay.  Has your recollection been        15:39:46

24   refreshed as to the identity of those other data    15:39:51

25   sources as distinct from ACLED that would capture   15:39:54
```

Page 153

```
 1    the location of violent riots?                    15:39:59

 2              MR. YARBROUGH:  Object to form.           15:40:02

 3              MR. EVANS:  Object to form.               15:40:03

 4         Q.   You can answer.                           15:40:03

 5         A.   If our team pulled those, I don't recall  15:40:05

 6    the names of those particular datasets.            15:40:07

 7         Q.   Are you aware of any dataset that your    15:40:11

 8    team leveraged regarding the location of riots or  15:40:15

 9    other violence in a jurisdiction that definitively 15:40:23

10    locates the exact coordinates of that violent riot 15:40:32

11    as opposed -- as distinct from the ACLED data that 15:40:38

12    we were just referencing that does not provide an  15:40:41

13    exact coordinate?  Are you aware of any other data 15:40:43

14    source that provides that level of granularity?    15:40:47

15              MR. YARBROUGH:  Object to form.           15:40:49

16         Q.   You can answer.                           15:40:49

17         A.   ACLED was the primary.                    15:40:51

18         Q.   And so you're not personally aware of any 15:40:53

19    data sources that either your team utilized or     15:40:58

20    Mr. Phillips may have utilized subsequently that   15:41:03

21    would have provided more precise location about    15:41:05

22    violent riots than just the generalized information 15:41:10

23    that ACLED provides, correct?                      15:41:14

24              MR. YARBROUGH:  Object to form.           15:41:17

25              MR. EVANS:  Object to form.               15:41:18
```

Page 154

1        Q.    You can answer.                          15:41:18

2        A.    Yeah, that's correct.                    15:41:20

3               MR. DAVIDSON:  I think we're all done    15:41:22

4     now.                                              15:41:23

5               MR. LANGFORD:  So we just need to        15:41:23

6     bring -- go off the record here.                  15:41:24

7               THE VIDEOGRAPHER:  That concludes        15:41:27

8     media three.  We're off the record at 3:41 p.m.   15:41:28

9               (Deposition concluded at 3:41 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 155

1                    DEPOSITION CHANGES

2    WITNESS:   TIM GERWING

3    PAGE NO.   LINE NO.    CHANGE    REASON FOR CHANGE

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

1

2

3

4
　　　　　　　　　_____
　　　　　　　　　(Signature of the Witness)

5

6

7

8　THE STATE OF _____

9　COUNTY OF _____

10

11　　　　Subscribed and sworn to before me by the said

12　witness, TIM GERWING, on this the _____ day of

13　_____, 2024.

14

15

16　　　　　　　　　_____
　　　　　　　　　Notary Public in and for the
　　　　　　　　　State of _____

17　　　　　　　　　County of _____

18　My commission expires:  _____

19

20

21

22

23

24

25

Page 157

1    STATE OF TEXAS    )

2    COUNTY OF DALLAS )

3         I, Michelle L. Munroe, Certified Shorthand

4    Reporter in and for the State of Texas, certify that

5    the foregoing deposition of TIM GERWING was reported

6    stenographically by me at the time and place

7    indicated, said witness having been placed under oath

8    by me, and that the deposition is a true record of

9    the testimony given by the witness;

10        That the amount of time used by each party at

11   the deposition is as follows:

     Mr. Langford       -    3 hours, 5 minutes

12   Mr. Davidson       -    11 minutes

     Mr. Evans          -    12 minutes

13   Mr. Vining         -    2 minutes

14        I further certify that I am neither counsel for

15   nor related to any party in this cause and am not

16   financially interested in its outcome.

17        Given under my hand on this the 6th day

18   of November, 2024.

19

20

21

     Michelle L. Munroe, CSR No. 6011

22   Commission expires 1-31-26

     Firm Registration #571

23   VERITEXT LEGAL SOLUTIONS

     300 Throckmorton Street, Suite 1600

24   Fort Worth, Texas   76102

     817.336.3042  telephone

25

Page 158

1    Jace Yarbrough, Esquire

2    jace.yarbrough@the-sl-lawfirm.com

3                        November 8, 2024

4    RE:    Andrews, Mark v. D'souza, Dinesh Et Al

5         10/30/2024, Tim Gerwing (#6990099)

6         The above-referenced watermarked transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.