# EXHIBIT 185

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF GEORGIA

 3                    ATLANTA DIVISION

 4    MARK ANDREWS,                 )
                                    )
 5            Plaintiff,            )
                                    )
 6    vs.                           )   Case No.
                                    )   1:22-cv-04259-SDG
 7    DINESH D'SOUZA, et al.,       )
                                    )
 8            Defendants.           )

 9

10

11

12    ************************************************

13          VIDEOTAPED ORAL DEPOSITION OF

14                 AZEDDINE RAHLOUNI

15                 OCTOBER 30, 2024

16     CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

17                 (Reported Remotely)

18    ************************************************

19

20

21

22

23

24

25
```

Page 2

1

2      On the 30th day of October, 2024, at 4:33 p.m.,

3  the videotaped oral deposition of the above-named

4  witness was taken at the instance of the Plaintiff,

5  Mark Andrews, before Michelle L. Munroe, Certified

6  Shorthand Reporter in and for the State of Texas, the

7  Witness located in League City, Texas, pursuant to

8  Notice and the agreement hereinafter set forth.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                      Page 3
 1            R E M O T E   A P P E A R A N C E S
 2
      FOR THE PLAINTIFF:
 3
          John Langford
 4        PROTECT DEMOCRACY PROJECT
          82 Nassau Street
 5        Suite 601
          New York, New York  10038
 6        john.langford@protectdemocracy.org
 7
          Jared Fletcher Davidson
 8        PROTECT DEMOCRACY PROJECT
          3014 Dauphine Street, Suite J
 9        New Orleans, Louisiana  70117
          jared.davidson@protectdemocracy.org
10
11        Jane Peterson Bentrott  (via Zoom)
          PROTECT DEMOCRACY PROJECT
12        2020 Pennsylvania Avenue, NW
          Suite 163
13        Washington, DC  20006
          jane.bentrott@protectdemocracy.org
14
15
      FOR THE DEFENDANTS DINESH D'SOUZA AND D'SOUZA MEDIA
16    LLC:                                           00:00:02
17        Austin C. Vining  (via Zoom)
          BUCHALTER
18        790 Stratforde Drive
          Alpharetta, Georgia  30004
19        avining@buchalter.com
20
21    FOR THE DEFENDANTS CATHERINE ENGELBRECHT, GREGG    00:48:23
      PHILLIPS, AND TRUE THE VOTE:                       00:42:30
22
          Jake Evans
23        GREENBERG TRAURIG LLP
          3333 Piedmont Road NE, Suite 2500
24        Atlanta, Georgia  30305
          jake.evans@gtlaw.com
25
```

Page 4

1

   FOR THE WITNESS:

2

       Jace Yarbrough

3       S|L LAW FIRM

       610 Uptown Boulevard

4       Suite 2000

       Cedar Hill, Texas  75104

5       940.299.7243  telephone

       jace.yarbrough@the-sl-lawfirm.com

6

7

   ALSO PRESENT:

8       Marsha Curtis  (via Zoom)

       Richard Foster, Video Technician

9       David Crenshaw, Video Technician

       David Johnson, Concierge Technician

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    I N D E X

    WITNESS                                      PAGE

2

    AZEDDINE RAHLOUNI

3

         Examination by Mr. Langford.............  7

4

         Examination by Mr. Davidson............. 67

5

         Examination by Mr. Vining............... 72

6

         Examination by Mr. Evans................ 77

7

8   RAHLOUNI EXHIBITS                       IDENTIFIED

9   Exhibit 1      September 30, 2021 letter from
                   Director Victor Reynolds........ 62

10

    Exhibit 9      Exhibit 9 from Gregg Phillips'
11                 deposition...................... 48

12

13               PREVIOUSLY MARKED EXHIBITS

14     Red Metrics Exhibit 2.................... 53

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  Good afternoon.    04:33:26
 3  We're on the record.  The time is 4:33 p.m.  Today is  04:33:26
 4  October 30th, 2024.  This is the video recorded      04:33:29
 5  deposition of Azeddine Rahlouni being taken by       04:33:34
 6  counsel for the plaintiff in the matter of Mark      04:33:37
 7  Andrews versus Dinesh D'Souza, et al., filed in the  04:33:40
 8  United States District Court for the Northern        04:33:44
 9  District of Georgia, Case Number 1:22-cv-04259.  The 04:33:46
10  deposition is taking place at 2801 North Harwood in  04:33:55
11  Dallas, Texas.                                       04:33:59
12              My name is Richard Foster from           04:34:00
13  Veritext Legal Solutions.  I'm the videographer.  The 04:34:02
14  court reporter today is Michelle Munroe, also with   04:34:04
15  the firm Veritext Legal Solutions.                   04:34:08
16              Will all counsel please make your        04:34:10
17  appearances for the record.                          04:34:12
18              MR. LANGFORD:  John Langford for         04:34:13
19  plaintiff Mark Andrews.                              04:34:15
20              MR. DAVIDSON:  Jared Davidson for        04:34:18
21  plaintiff Mark Andrews.                              04:34:18
22              MR. EVANS:  Jake Evans for defendants    04:34:20
23  True the Vote, Gregg Phillips, and Catherine         04:34:23
24  Engelbrecht.                                         04:34:23
25              MR. VINING:  Austin Vining from          04:34:28
```

Page 7

1    Buchalter for the defendants Dinesh D'Souza and        04:34:29

2    D'Souza Media LLC.                                     04:34:32

3               MS. BENTROTT:  Jane Bentrott, also for      04:34:36

4    plaintiff.                                             04:34:37

5               MR. YARBROUGH:  This is Jace                04:34:39

6    Yarbrough; I represent the deponent.                   04:34:41

7               THE VIDEOGRAPHER:  Thank you.  And          04:34:45

8    would the court reporter please swear in the witness.  04:34:50

9               AZEDDINE RAHLOUNI,

10   having been first duly sworn, testified as follows:

11                    EXAMINATION

12   BY MR. LANGFORD:

13        Q.   Thank you, Mr. Rahlouni.                     04:35:03

14             My name is John Langford and I will be       04:35:05

15   taking your deposition and asking you questions this   04:35:07

16   afternoon.                                             04:35:09

17             Have you ever had your deposition taken      04:35:10

18   before?                                                04:35:12

19        A.   This is the first time.                      04:35:14

20        Q.   And let me go back one step.                 04:35:17

21             Would you just state your address for the    04:35:18

22   record?                                                04:35:21

23   ██████████████████████████████████████████████        04:35:21

24   ██████████████████████████████████████████████        04:35:33

25        Q.   I would like to go over some ground rules    04:35:33

Page 8

```
 1    and housekeeping items so that we all have the same      04:35:36

 2    understanding.                                           04:35:36

 3              Does that sound good to you?                   04:35:38

 4        A.   Sounds good.                                    04:35:39

 5        Q.   In this deposition I will be asking you         04:35:40

 6    questions, and my questions and your answer will         04:35:42

 7    recorded by the videographer and transcribed by the      04:35:44

 8    court reporter.  For that reason, we both need to        04:35:46

 9    speak up and to answer out loud so that the reporter     04:35:49

10    can hear you when you give your answers.                 04:35:52

11              Do you understand that?                        04:35:54

12        A.   I do.                                           04:35:55

13        Q.   If you nod or shake your head or given a        04:35:55

14    nonverbal answer or even say something like uh-huh,      04:35:58

15    I am going to remind to you give a clear verbal          04:35:59

16    answer with words; is that fair?                         04:36:03

17        A.   Yes.                                            04:36:04

18        Q.   The court reporter also might have trouble      04:36:06

19    if we talk over each other, so I'm going to let you      04:36:09

20    finish your answer before I ask another question.        04:36:11

21    Equally it is very important that you wait until I       04:36:14

22    finish my question before you begin answering even       04:36:16

23    when you think you know what the rest of the             04:36:19

24    question will be.                                        04:36:21

25              Will you do that?                              04:36:22
```

Page 9

```
 1        A.   Will do.                                  04:36:23

 2        Q.   You have just taken an oath that requires 04:36:25

 3   you to tell the truth, the whole truth, and nothing 04:36:27

 4   but the truth, and that is the same oath you would  04:36:30

 5   take if you were to testify in court.               04:36:32

 6             Do you understand that?                   04:36:34

 7        A.   I understand.                             04:36:35

 8        Q.   On occasion I may ask a question that I   04:36:37

 9   don't state very well or for some other reason you  04:36:39

10   don't understand.  If you don't understand my       04:36:43

11   question for any reason, don't answer it.  Instead, 04:36:45

12   please ask for clarification.                       04:36:46

13             Will you do that?                         04:36:48

14        A.   I will do.                                04:36:49

15        Q.   We may take a break.  But if you need to  04:36:52

16   take a break at any time, just let me know.  If I'm 04:36:55

17   in the middle of a question or I have just asked the 04:36:58

18   question, please finish answering the question and  04:37:00

19   then we can plan to take a break.                   04:37:02

20             And I actually don't know if you're in a  04:37:05

21   different time zone as well.                        04:37:08

22        A.   Same time zone.                           04:37:09

23        Q.   Okay.  If you want to talk to your        04:37:11

24   attorney, that's fine.  I just ask that if there is 04:37:13

25   a question pending or you're in the middle of an    04:37:16
```

1   answer, please finish the answer before speaking to        04:37:19

2   your lawyer unless you talk need to talk to him            04:37:21

3   about a matter of privilege.                               04:37:24

4           Will you do that?                                  04:37:25

5       A.   Yes, I will.                                      04:37:25

6       Q.   Relatedly, while we were on the record,           04:37:26

7   you're not allowed to have private conversations           04:37:29

8   with anyone, including your counsel, by any means,         04:37:31

9   including test message, electronic email or any chat       04:37:35

10  feature.                                                   04:37:37

11          Do you understand that?                            04:37:37

12      A.   I do.                                             04:37:40

13      Q.   From time to time your attorney or one of         04:37:41

14  the other attorneys may object.  Unless your               04:37:45

15  attorney tells you not to answer the question              04:37:46

16  specifically, you should go ahead and answer the           04:37:47

17  question.  And that pertains, in part, to when your        04:37:50

18  attorneys object on the basis of form.                     04:37:55

19          Do you understand that?                            04:37:57

20      A.   I understand.                                     04:37:58

21      Q.   Sometimes it happens that you will give an        04:38:01

22  answer as completely as you can and then later on,         04:38:02

23  maybe five minutes later or maybe two hours later          04:38:05

24  you remember some additional information or perhaps        04:38:06

25  some clarification in response to that earlier             04:38:08

Page 11

| | | |
|---|---|---|
| 1 | question. | 04:38:12 |
| 2 | If that happens to you, please tell us | 04:38:12 |
| 3 | that you would like to add or clarify something to | 04:38:14 |
| 4 | the earlier answer and we will do that right then | 04:38:16 |
| 5 | while it's on your mind. | 04:38:18 |
| 6 | Will you do that? | 04:38:19 |
| 7 | A.   Yes. | 04:38:20 |
| 8 | Q.   If at any point during deposition you're | 04:38:21 |
| 9 | having problems with your internet connection or | 04:38:24 |
| 10 | trouble hearing or seeing a portion of this | 04:38:27 |
| 11 | deposition, please notify me right away. | 04:38:27 |
| 12 | Do you understand? | 04:38:29 |
| 13 | A.   Yes. | 04:38:30 |
| 14 | Q.   If at any point you are disconnected from | 04:38:32 |
| 15 | this deposition, unable to rejoin, please contact | 04:38:34 |
| 16 | your counsel immediately. | 04:38:37 |
| 17 | Do you understand? | 04:38:38 |
| 18 | A.   I understand. | 04:38:39 |
| 19 | Q.   Do you have any reason to expect that you | 04:38:41 |
| 20 | may have technological issues today? | 04:38:42 |
| 21 | A.   I hope not.  It's not unusual in League | 04:38:45 |
| 22 | City, so... | 04:38:49 |
| 23 | Q.   We will be sharing exhibits with you today | 04:38:50 |
| 24 | using Veritext Exhibit Share platform and the screen | 04:38:53 |
| 25 | will be shared so that you can view the exhibits on | 04:38:58 |

Page 12

```
 1    your computer.                                  04:39:00

 2            Because it is so critical that we get your   04:39:08

 3    full, complete, and accurate answers, I have to ask  04:39:11

 4    you whether you're taking any medication or drugs of  04:39:14

 5    any kind or that you have consumed any cough syrup   04:39:17

 6    or medicine or something containing alcohol that    04:39:17

 7    might make it difficult for you to remember things   04:39:19

 8    and understand and answer my questions today.       04:39:22

 9            So are you taking or have you had anything   04:39:24

10    like that?                                          04:39:26

11        A.   I have not.                                04:39:26

12        Q.   Are there any physical or health reasons   04:39:27

13    you may be unable to testify today?                 04:39:30

14        A.   No, there are not.                         04:39:33

15        Q.   Is there any reason why you cannot give    04:39:34

16    full, complete, and accurate testimony today?       04:39:36

17        A.   No.                                        04:39:38

18        Q.   Are you alone right now where you are      04:39:39

19    located?                                            04:39:41

20        A.   Yes.                                       04:39:43

21        Q.   You understand you should not be          04:39:45

22    communicating with anyone during the deposition    04:39:47

23    itself other than your lawyer?                      04:39:51

24        A.   I understand.                              04:39:52

25        Q.   And you understand that you should not     04:39:53
```

Page 13

| | | |
|---|---|---|
| 1 | record this deposition? | 04:39:54 |
| 2 | A.   Yes, sir. | 04:39:57 |
| 3 | Q.   Let's see, do you have any questions? | 04:39:59 |
| 4 | A.   No. | 04:40:04 |
| 5 | Q.   Okay.  We can get started. | 04:40:04 |
| 6 | How did you prepare for this deposition, | 04:40:09 |
| 7 | apart from any privileged conversation you had with | 04:40:11 |
| 8 | your attorney? | 04:40:13 |
| 9 | A.   Just met a couple times with the attorney. | 04:40:17 |
| 10 | Q.   Did you talk to anyone other than your | 04:40:21 |
| 11 | attorney about this deposition? | 04:40:23 |
| 12 | A.   No. | 04:40:24 |
| 13 | Q.   Have you communicated with the defendants | 04:40:28 |
| 14 | in this action about this deposition? | 04:40:31 |
| 15 | MR. YARBROUGH:  Objection; form. | 04:40:34 |
| 16 | Q.   I'll rephrase this. | 04:40:36 |
| 17 | Are you aware of who the defendants are in | 04:40:38 |
| 18 | this litigation? | 04:40:40 |
| 19 | A.   There's a list of them, but I don't -- I | 04:40:43 |
| 20 | haven't communicated with them. | 04:40:46 |
| 21 | Q.   Okay.  Did you review any documents to | 04:40:48 |
| 22 | prepare for this deposition? | 04:40:54 |
| 23 | A.   I reviewed the -- briefly the subpoena. | 04:40:58 |
| 24 | Q.   And when you reviewed the subpoena, did | 04:41:03 |
| 25 | you look for any documents related to the subpoena? | 04:41:05 |

Page 14

| | | |
|---|---|---|
| 1 | A.   No, I have not. | 04:41:09 |
| 2 | Q.   And did you review any of the deposition | 04:41:12 |
| 3 | transcripts in this litigation to prepare for this | 04:41:19 |
| 4 | deposition? | 04:41:22 |
| 5 | A.   So just to clarify, so I did read the | 04:41:24 |
| 6 | subpoena when I received it back in June.  But | 04:41:29 |
| 7 | when -- can you -- can you ask the question one more | 04:41:33 |
| 8 | time?  You said like reviewing -- what is the | 04:41:36 |
| 9 | question you asking?  I'm sorry. | 04:41:39 |
| 10 | Q.   The question about the subpoena was, when | 04:41:40 |
| 11 | you read the subpoena, did you go look for documents | 04:41:42 |
| 12 | relevant to the subpoena? | 04:41:44 |
| 13 | A.   Documents pertaining to the case? | 04:41:47 |
| 14 | Q.   Yes. | 04:41:53 |
| 15 | A.   Not right away, no. | 04:41:57 |
| 16 | Q.   Did you do that at some point between when | 04:42:00 |
| 17 | you received the subpoena and today? | 04:42:02 |
| 18 | A.   When the counsel instructed me to look for | 04:42:04 |
| 19 | anything related to the case, I did, yes. | 04:42:07 |
| 20 | Q.   And did you find documents that you | 04:42:10 |
| 21 | reviewed? | 04:42:12 |
| 22 | A.   I did find documents, yes. | 04:42:14 |
| 23 | Q.   Can you just describe those documents? | 04:42:16 |
| 24 | A.   They were essentially pdfs, Excel sheets, | 04:42:20 |
| 25 | I think tableau workbooks, some log texts.  That's | 04:42:29 |

Page 15

| | | |
|---|---|---|
| 1 | the bulk of it pretty much. | 04:42:34 |
| 2 | Q.   And can we just go through each of those. | 04:42:36 |
| 3 | What kind of pdfs did you find? | 04:42:37 |
| 4 | A.   Appears to be presentations or copies of | 04:42:44 |
| 5 | presentations, like a pdf presentation. | 04:42:47 |
| 6 | Q.   What kind of presentation? | 04:42:50 |
| 7 | A.   Like a PowerPoint presentation. | 04:42:54 |
| 8 | Q.   And what did the PowerPoint presentation | 04:42:56 |
| 9 | concern? | 04:42:58 |
| 10 | A.   So my recollection it was basically likes | 04:43:02 |
| 11 | maps, devices, stuff like that. | 04:43:08 |
| 12 | Q.   And how many of those did you find? | 04:43:10 |
| 13 | A.   I can't recall off the top of my head, but | 04:43:17 |
| 14 | there were -- talking about pdfs, probably like, I | 04:43:19 |
| 15 | don't know, maybe like between 10 or 20 or something | 04:43:26 |
| 16 | like that.  Maybe less.  Maybe more.  I can't | 04:43:27 |
| 17 | recall. | 04:43:29 |
| 18 | Q.   Around 10 or 20 different documents? | 04:43:29 |
| 19 | A.   Yeah.  And some of them might be | 04:43:32 |
| 20 | duplicates, just to be clear.  I haven't -- I did | 04:43:34 |
| 21 | not want to see those documents to be honest. | 04:43:36 |
| 22 | Q.   And how long were the PowerPoint pdfs? | 04:43:40 |
| 23 | A.   They were multiple pages. | 04:43:49 |
| 24 | Q.   More than 10 pages? | 04:43:51 |
| 25 | A.   I'm not sure. | 04:43:54 |

Page 16

1      Q.    Okay.  You mentioned Excel spreadsheets.    04:43:55

2            What Excel spreadsheets did you find?       04:43:58

3      A.    So Excel spreadsheets with columns,          04:44:02

4    results of analysis.                                 04:44:07

5      Q.    And when you say "results of analysis," do   04:44:11

6    you mean results of analysis that was done for work  04:44:14

7    relating to this case?                               04:44:19

8      A.    Yes.                                          04:44:22

9      Q.    And how many Excel spreadsheets did you      04:44:24

10   find?                                                04:44:26

11     A.    I'll have -- I don't recall off the top of   04:44:27

12   my head.  But yeah, it must be around that ballpark, 04:44:33

13   so maybe -- don't call me on this -- maybe also like 04:44:37

14   between -- I would say, like, between 5 and 20 for   04:44:43

15   sure, something like that.                           04:44:46

16     Q.    And were these Excel spreadsheets, did       04:44:48

17   they have more than 100 rows of entries?             04:44:50

18     A.    I can remember one that had multiple,        04:44:55

19   like, yeah, more than 100 rows, yes.                 04:44:59

20     Q.    Approximately how many rows did that         04:45:01

21   spreadsheet from?                                    04:45:04

22     A.    It's not uncommon for it to have more than   04:45:05

23   100, you know, so -- but exactly the number of rows, 04:45:08

24   I think probably, you know, a size of the file is    04:45:15

25   more indicative.  Some of them were small; some of   04:45:18

Page 17

1    them were big.                                          04:45:21

2        Q.   And can you just describe what you recall      04:45:22

3    these spreadsheets reflecting?                          04:45:27

4        A.   So for the most part, it is -- so you have     04:45:31

5    a device longitude/latitude, and then it depends        04:45:39

6    on -- so let me kind of like, you know, backtrack       04:45:46

7    here a little bit.                                       04:45:49

8            So the request comes in, you know, and          04:45:50

9    that request is translated into, you know, an           04:45:52

10   analysis and then including like what devices are       04:45:56

11   needed -- what columns are needed, so you kind of       04:46:01

12   provide those devices -- those columns.                 04:46:05

13           Usually it is device longitude/latitude, a      04:46:07

14   result of accuracy, some sort of time stamp and some    04:46:12

15   sort of reference to either a shape file or some        04:46:15

16   sort of geospatial location for which -- so, for        04:46:21

17   example, if you wanted to know -- to see, like,         04:46:27

18   location devices within a location, you just list       04:46:31

19   those locations.  That location might be listed         04:46:34

20   afterwards in the results; it may not be listed in      04:46:37

21   the results, but yeah.                                  04:46:39

22       Q.   And were all of the spreadsheets related       04:46:41

23   to work that you did while you -- work that you did      04:46:43

24   at Red Metrics?                                         04:46:48

25       A.   Yes.                                           04:46:52

Page 18

```
 1        Q.   And did all of the documents relate to      04:46:53

 2   work that you did for Mr. Phillips or an              04:46:59

 3   organization called OpSec?                            04:47:02

 4             MR. YARBROUGH:   Objection; form.           04:47:04

 5        A.   So just to be clear, like, I know Gregg     04:47:09

 6   because basically like I heard Tim mention him, but   04:47:11

 7   the rest I don't know these guys.  So it was          04:47:15

 8   basically my rapport was just, you know, TTV and      04:47:18

 9   work and then producing results.  But me personally,  04:47:23

10   I've never interacted with any of them.               04:47:27

11        Q.   And are these spreadsheets that you helped  04:47:29

12   create?                                               04:47:32

13        A.   The spreadsheets I did create, yes.         04:47:33

14        Q.   And are these spreadsheets that you sent    04:47:35

15   to -- did you ever send these spreadsheets to Gregg   04:47:37

16   Phillips?                                             04:47:43

17        A.   Not directly, no.                           04:47:43

18        Q.   Did you send these spreadsheets to Tim      04:47:44

19   Gerwing?                                              04:47:47

20        A.   I did.                                      04:47:48

21        Q.   Did you send them to anyone else?          04:47:48

22        A.   No.                                         04:47:53

23        Q.   And stepping back for a second, the pdf -- 04:47:54

24        A.   Well, so we have essentially -- it could    04:48:02

25   have been Ben, but I'm not sure because 99 percent    04:48:08
```

Page 19

| | | |
|---|---|---|
| 1 | of my communication is with Tim. | 04:48:11 |
| 2 | Q.   And stepping back to the pdf PowerPoints, | 04:48:14 |
| 3 | did you help create those PowerPoints? | 04:48:17 |
| 4 | A.   Me personally, no. | 04:48:21 |
| 5 | Q.   Do you know if the spreadsheets were sent | 04:48:25 |
| 6 | to Mr. Phillips? | 04:48:27 |
| 7 | MR. EVANS:  Objection.  Objection to | 04:48:30 |
| 8 | form. | 04:48:32 |
| 9 | A.   You know, honestly, it's possible but I'm | 04:48:33 |
| 10 | not sure. | 04:48:36 |
| 11 | Q.   Do you know if the pdf PowerPoints were | 04:48:36 |
| 12 | sent to Mr. Phillips? | 04:48:39 |
| 13 | MR. EVANS:  Objection. | 04:48:41 |
| 14 | A.   I'm not -- it's possible, but I'm not sure | 04:48:42 |
| 15 | either. | 04:48:45 |
| 16 | Q.   And the last category you mentioned was | 04:48:45 |
| 17 | tableau files.  What are those? | 04:48:49 |
| 18 | A.   So tableau is a tool by which you do a | 04:48:51 |
| 19 | data analysis.  In our case, we use it to visualize | 04:48:55 |
| 20 | there.  So in this case, we visualize devices on a | 04:49:01 |
| 21 | map and whatnot. | 04:49:05 |
| 22 | Q.   And roughly how many tableau files did you | 04:49:06 |
| 23 | locate? | 04:49:10 |
| 24 | A.   I can't recall off the top of my head | 04:49:12 |
| 25 | but -- you know, I can't recall. | 04:49:16 |

Page 20

| | | |
|---|---|---|
| 1 | Q.   Are these tableau files, are they pdfs or | 04:49:24 |
| 2 | is it some other type of document? | 04:49:29 |
| 3 | A.   No, they are either a workbook or a | 04:49:32 |
| 4 | package workbook, so one of those, but they are | 04:49:37 |
| 5 | tableau files.  They're proprietary. | 04:49:42 |
| 6 | Q.   And did you help create those tableau | 04:49:44 |
| 7 | files? | 04:49:47 |
| 8 | A.   Yes. | 04:49:47 |
| 9 | Q.   What did you do with the documents you | 04:49:47 |
| 10 | located when you located them in response to the | 04:49:52 |
| 11 | subpoena? | 04:49:55 |
| 12 | A.   I kept them. | 04:49:57 |
| 13 | Q.   And did you share them with anybody? | 04:49:59 |
| 14 | A.   They were ultimately shared with, you | 04:50:04 |
| 15 | know, the attorney and with Ben and Tim. | 04:50:06 |
| 16 | Q.   And do you still have these files? | 04:50:10 |
| 17 | A.   I do. | 04:50:13 |
| 18 | Q.   And did you locate any other files in | 04:50:14 |
| 19 | response to the subpoena? | 04:50:16 |
| 20 | A.   I did my thorough best to look at | 04:50:20 |
| 21 | everything that I could. | 04:50:23 |
| 22 | Q.   Did you look for communications with | 04:50:23 |
| 23 | individuals at Red Metrics? | 04:50:26 |
| 24 | A.   Communication, no, no.  Just because the | 04:50:31 |
| 25 | tool that we use to communicate does not have an | 04:50:38 |

Page 21

| | | |
|---|---|---|
| 1 | archive. | 04:50:41 |
| 2 | Q.   What tool was that? | 04:50:42 |
| 3 | A.   Wire. | 04:50:43 |
| 4 | Q.   Did you have an email account at -- | 04:50:48 |
| 5 | scratch that. | 04:50:51 |
| 6 | Did you have a user name on Wire? | 04:50:52 |
| 7 | A.   I do. | 04:50:55 |
| 8 | Q.   What was your user name on Wire? | 04:50:57 |
| 9 | A.   For the longest it was Az, A-z. | 04:51:00 |
| 10 | Q.   And is that the user name you used to | 04:51:05 |
| 11 | communicate with people at Red Metrics? | 04:51:08 |
| 12 | A.   Yes. | 04:51:09 |
| 13 | Q.   And did you use Wire to communicate with | 04:51:12 |
| 14 | anyone outside of Red Metrics? | 04:51:14 |
| 15 | A.   Occasionally we communicate with clients, | 04:51:16 |
| 16 | but I don't recall it for this particular case. | 04:51:21 |
| 17 | Q.   So to be clear, you don't recall | 04:51:22 |
| 18 | communicating Mr. Phillips directly? | 04:51:25 |
| 19 | A.   No. | 04:51:27 |
| 20 | Q.   Do you recall communicating with one JD | 04:51:29 |
| 21 | Phillips? | 04:51:33 |
| 22 | A.   JD?  No. | 04:51:34 |
| 23 | Q.   Do you recall communicating with anyone | 04:51:37 |
| 24 | else at OpSec Group? | 04:51:40 |
| 25 | A.   No. | 04:51:43 |

Page 22

1          Q.   Do you still have communications with          04:51:47

2     individuals at Red Metrics about work you did for        04:51:52

3     Mr. Phillips?                                            04:51:56

4          A.   No, I try not to, to be honest.               04:51:58

5          Q.   When you say you try not to, what do you      04:52:02

6     mean?                                                   04:52:06

7          A.   Well, let me clarify.  So when we wrap up     04:52:06

8     a project, you know, we just go ahead and move on,      04:52:11

9     you know, so -- I tend to just do what the request      04:52:14

10    says and then move on and I don't -- I really don't     04:52:19

11    ask much questions -- any questions.                    04:52:22

12         Q.   Did your Wire account have an auto delete     04:52:32

13    turned on for those messages?                           04:52:36

14         A.   So it's possible.  I know that it doesn't     04:52:41

15    keep old messages.  So if that's the setting that is    04:52:45

16    set, then yeah.                                         04:52:50

17         Q.   And when did that work finish up, the work    04:52:50

18    that was done for Mr. Phillips?                         04:52:54

19         A.   Probably like twenty -- 2020 -- 2022          04:52:57

20    maybe.  I don't know.  Around that time.  I know we     04:53:14

21    worked on it, but I don't recall the exact time that    04:53:17

22    we finished at the time.                                04:53:19

23         Q.   Gotcha.  All right.  I'm going to walk        04:53:22

24    through a little bit of background.  I'm sorry.         04:53:29

25    Actually I want to get a couple more things here.       04:53:29

Page 23

| | | |
|---|---|---|
| 1 | A.    Sure. | 04:53:29 |
| 2 | Q.    Did you have an email account at Red | 04:53:32 |
| 3 | Metrics? | 04:53:35 |
| 4 | A.    I do have an email account, yes, at Red | 04:53:35 |
| 5 | Metrics group. | 04:53:40 |
| 6 | Q.    What was your email address?  What is your | 04:53:40 |
| 7 | email address? | 04:53:43 |
| 8 | ███████████████████████████████ | 04:53:46 |
| 9 | ███████████████████████████  I can provide | 04:53:53 |
| 10 | that later I guess.  I don't know. | 04:53:55 |
| 11 | Q.    Did you ever use that email account to | 04:53:56 |
| 12 | communicate with individuals at Red Metrics about | 04:53:59 |
| 13 | work done for Mr. Phillips? | 04:54:02 |
| 14 | A.    It's possible, yes. | 04:54:05 |
| 15 | Q.    Did you sometimes communicate over email? | 04:54:06 |
| 16 | A.    Sometimes but there wasn't usual.  It | 04:54:11 |
| 17 | was -- it was our -- basically our communication | 04:54:14 |
| 18 | tool that we used.  If it was like a receipt or | 04:54:17 |
| 19 | something, maybe I'll send it over email or what | 04:54:21 |
| 20 | have you. | 04:54:23 |
| 21 | Q.    Can you say that again?  If it was a | 04:54:24 |
| 22 | receipt? | 04:54:27 |
| 23 | A.    Like a receipt, like an expense or | 04:54:27 |
| 24 | something more formal, I suppose, you know. | 04:54:29 |
| 25 | Q.    Gotcha. | 04:54:32 |

Page 24

| | | |
|---|---|---|
| 1 | And when you shared Excel files, did you | 04:54:34 |
| 2 | share those over email or over Wire or some other | 04:54:38 |
| 3 | platform? | 04:54:43 |
| 4 | A.    Wire. | 04:54:44 |
| 5 | Q.    Okay.  And just so I know, where did you | 04:55:08 |
| 6 | find copies of the Excel spreadsheets, pdfs, and | 04:54:54 |
| 7 | tableau files? | 04:54:59 |
| 8 | A.    On my local machine. | 04:55:00 |
| 9 | Q.    So those are saved on your local device? | 04:55:02 |
| 10 | A.    Correct. | 04:55:04 |
| 11 | Q.    And do you remember, are there any other | 04:55:09 |
| 12 | documents relating to work done for Mr. Phillips | 04:55:12 |
| 13 | other than the pdfs, Excel files, or tableau files? | 04:55:14 |
| 14 | MR. EVANS:  Object to form. | 04:55:22 |
| 15 | A.    Can you restate the question? | 04:55:22 |
| 16 | Q.    Are there any other documents that you | 04:55:23 |
| 17 | located other than the pdfs, PowerPoints, Excel | 04:55:25 |
| 18 | files, or tableau files? | 04:55:33 |
| 19 | A.    Everything that I located is on -- you | 04:55:35 |
| 20 | know, is what I shared with the lawyer. | 04:55:38 |
| 21 | Q.    Do you remember creating any kind of work | 04:55:40 |
| 22 | product other than pdfs, Excel files, or tableau | 04:55:43 |
| 23 | files for Mr. Phillips? | 04:55:47 |
| 24 | MR. EVANS:  Object to form. | 04:55:52 |
| 25 | MR. YARBROUGH:  Objection; form. | 04:55:53 |

Page 25

```
 1        A.   So as in creating files, yeah.  I mean, we    04:55:53
 2   create files a lot of files all the time, Excel,       04:55:57
 3   tableau workbook, yeah.  So possible, yes.             04:55:59
 4        Q.   Did you ever create Word documents?          04:56:08
 5        A.   Word, no, I don't recall doing that.         04:56:12
 6        Q.   I want to go back and do a little bit of      04:56:16
 7   background just on you.                                04:56:20
 8             Can you share how old you are?               04:56:21
 9        A.   Forty-three.                                 04:56:25
10        Q.   Have you ever been known by any other        04:56:27
11   names?                                                 04:56:29
12        A.   Az, Azeddine, yeah.                          04:56:30
13        Q.   And how long have you lived in your          04:56:32
14   current location?                                      04:56:36
15        A.   Here, about a little bit over two years.     04:56:37
16        Q.   Can you briefly describe your educational    04:56:43
17   background?                                            04:56:47
18        A.   I have a bachelor's in international         04:56:47
19   business, MBA in marketing, MS in marketing and       04:56:51
20   research.                                             04:56:54
21        Q.   Where are you currently employed?           04:56:59
22        A.   Right now I do consulting so -- and I also   04:57:02
23   work for Red Fusion -- Red Fusion.  I'm retained by    04:57:07
24   Red Fusion as -- you can say like a part-time basis.   04:57:17
25        Q.   And when you say you do consulting, is       04:57:18
```

Page 26

| | | |
|---|---|---|
| 1 | that freelance work? | 04:57:20 |
| 2 | A.    Yeah, I work as a contractor. | 04:57:21 |
| 3 | Q.    Do you have any -- scrap that. | 04:57:27 |
| 4 | Immediately prior to your employment with | 04:57:30 |
| 5 | Red Fusion, where did you work? | 04:57:33 |
| 6 | A.    Red Metrics. | 04:57:36 |
| 7 | Q.    Is Red Metrics affiliated with Red Fusion? | 04:57:37 |
| 8 | MR. YARBROUGH:   Objection; form. | 04:57:41 |
| 9 | A.    I'm not privy to that information.   I | 04:57:43 |
| 10 | don't know how they're related but -- yeah. | 04:57:45 |
| 11 | Q.    And what was your role at Red Metrics? | 04:57:50 |
| 12 | A.    I was a data analyst. | 04:57:54 |
| 13 | Q.    And before you worked as a data analyst at | 04:57:57 |
| 14 | Red Metrics, what were you doing? | 04:58:00 |
| 15 | A.    I was a manager of insights and analytics | 04:58:02 |
| 16 | at Human Coalition. | 04:58:06 |
| 17 | Q.    And is that where you met Mr. Matthews and | 04:58:08 |
| 18 | Mr. Gerwing? | 04:58:14 |
| 19 | A.    Correct. | 04:58:14 |
| 20 | Q.    And were you doing data analyst work at | 04:58:16 |
| 21 | that organization? | 04:58:19 |
| 22 | A.    Pretty much, same line of work. | 04:58:20 |
| 23 | Q.    Was that also geofencing work? | 04:58:23 |
| 24 | A.    We did some mapping but not extensively, | 04:58:25 |
| 25 | no. | 04:58:29 |

1     Q.   Okay.  How long were you employed at Red          04:58:30

2     Metrics?                                                04:58:38

3     A.   So in my mind, I can't really exactly             04:58:38

4     recall.  But I know at some point we moved from        04:58:45

5     paychecks getting cut by Red Metrics to -- in my       04:58:49

6     case half of my income was coming from Red Pegasus     04:58:52

7     and the other half was coming from Red Fusion, I       04:58:57

8     believe.                                                04:59:00

9     Q.   Do you remember what year you started             04:59:02

10    working for Red Metrics?                                04:59:04

11    A.   Yes.  September 2019, I think, around that        04:59:07

12    time.                                                   04:59:13

13    Q.   During your time at Red Metrics, did Red          04:59:16

14    Metrics do any work for Gregg Phillips?                 04:59:18

15         MR. YARBROUGH:  Objection; form.                  04:59:20

16    Q.   You can answer the question.                      04:59:27

17    A.   Yes, but can you like -- what are you --          04:59:28

18    with Gregg, yes, I think that's -- yes.                 04:59:32

19    Q.   And are you familiar with OpSec?                  04:59:36

20    A.   I have heard the word, yes.                       04:59:40

21    Q.   Do you know what OpSec is?                        04:59:42

22    A.   Not really.                                        04:59:44

23    Q.   Do you have any understanding about the           04:59:46

24    relationship, if there is one, between Mr. Phillips    04:59:49

25    and OpSec?                                              04:59:51

```
 1        A.   Not really.  Just to be clear, like      04:59:54

 2   acronyms are thrown all the time and I really don't  04:59:58

 3   care.  I'm sorry.                                   05:00:01

 4        Q.   Did Red Metrics do any work for True the  05:00:08

 5   Vote?                                               05:00:16

 6                  MR. YARBROUGH:  Objection; form.     05:00:16

 7                  MR. EVANS:  Object to form.          05:00:16

 8        A.   So True the Vote was the project name.    05:00:18

 9   TTV, yes.                                           05:00:24

10        Q.   And who did you communicate with about    05:00:25

11   that work?                                          05:00:29

12                  MR. EVANS:  Object to form.          05:00:32

13        A.   Like I mentioned, my main communication   05:00:33

14   was with Tim Gerwing.  That's my -- that's my       05:00:38

15   manager.                                            05:00:41

16        Q.   Other than -- I'll just ask it.           05:00:42

17             Did you ever have communications with     05:00:45

18   Catherine Engelbrecht?                              05:00:47

19                  MR. EVANS:  Object to form.          05:00:49

20        A.   Who is Catherine?                         05:00:49

21        Q.   Okay.  Did you talk to anyone affiliated  05:00:51

22   with True the Vote?                                 05:00:55

23        A.   No.                                       05:00:59

24                  MR. EVANS:  Object to form.          05:01:01

25        Q.   Did you speak to Mr. Phillips directly?   05:01:01
```

Page 29

```
 1              MR. EVANS:  Object to form.          05:01:04

 2       A.   No.                                    05:01:04

 3       Q.   Why was the project called True the Vote?   05:01:06

 4              MR. YARBROUGH:  Object to form.       05:01:15

 5       A.   Honestly, I don't know.               05:01:17

 6       Q.   Was that the name --                   05:01:24

 7       A.   Just to be clear, I think -- you know, in   05:01:25

 8   my personal perspective, my role as I see it is to   05:01:28

 9   translate requests into data analysis.  What they   05:01:35

10   choose to call it...                            05:01:39

11       Q.   All right.  All right.                 05:01:45

12              If you had to describe the kind of work   05:02:06

13   that Red Metrics did for clients in the period of   05:02:08

14   2020 to 2023, how would you describe the work that   05:02:12

15   Red Metrics did?                                05:02:15

16              MR. YARBROUGH:  Objection; form.      05:02:17

17       Q.   You can answer the question.           05:02:18

18       A.   Yeah.  So that could be, like, privileged   05:02:20

19   information or confidential.  But essentially our   05:02:22

20   business is to use geospatial there and to create an   05:02:27

21   audience.  If you -- let's say you are Home Depot,   05:02:33

22   right, and you're trying to see essentially, like,   05:02:36

23   who is at your locations and afterwards you want to   05:02:38

24   serve them ads.                                 05:02:42

25              So what we do, we create like a pool of   05:02:43
```

Page 30

| | | |
|---|---|---|
| 1 | devices that consider your audience, right.  Also | 05:02:45 |
| 2 | help you understand like, you know, their | 05:02:49 |
| 3 | geodistribution, their -- you know, the distance | 05:02:52 |
| 4 | from the different locations that you might have and | 05:02:55 |
| 5 | whatnot.  So that's for commercial. | 05:02:57 |
| 6 | For nonprofits, the same thing.  By same, | 05:03:01 |
| 7 | like creating audiences and talking to audiences is | 05:03:04 |
| 8 | the main focus I would say. | 05:03:08 |
| 9 | Q.  Was Red Metrics primarily involved in | 05:03:11 |
| 10 | marketing work or was it a different kind of work | 05:03:15 |
| 11 | the main type of work at Red Metrics? | 05:03:18 |
| 12 | MR. YARBROUGH:  Objection; form. | 05:03:21 |
| 13 | A.  So I remember working on marketing, | 05:03:24 |
| 14 | nonprofit, you know, political, law, you know, some | 05:03:28 |
| 15 | cases, you know. | 05:03:36 |
| 16 | Q.  Gotcha. | 05:03:38 |
| 17 | A.  Some sort of like, yeah, small project. | 05:03:39 |
| 18 | The way I see it, like, we were trying to get | 05:03:43 |
| 19 | business and if the business comes, you fulfill the | 05:03:45 |
| 20 | request. | 05:03:49 |
| 21 | Q.  Are you familiar with the lawsuit to which | 05:03:50 |
| 22 | this deposition relates? | 05:03:53 |
| 23 | A.  Yes. | 05:03:56 |
| 24 | Q.  When did you become aware of it? | 05:03:57 |
| 25 | A.  So the whole lawsuit or -- aware of what? | 05:04:00 |

Page 31

| | | |
|---|---|---|
| 1 | I'm sorry. | 05:04:10 |
| 2 | Q.   When did you become aware of this | 05:04:10 |
| 3 | litigation? | 05:04:12 |
| 4 | A.   I was aware or I became aware of a | 05:04:15 |
| 5 | litigation with Gregg, yeah. | 05:04:18 |
| 6 | Q.   And when did you learn about it? | 05:04:22 |
| 7 | A.   So I learned about it right after | 05:04:27 |
| 8 | basically a reporter called me, the Washington Post, | 05:04:31 |
| 9 | and asked about, you know, if I was Azeddine | 05:04:36 |
| 10 | Rahlouni and I said, yes.  He said, I'm so and so | 05:04:42 |
| 11 | from the Washington Post. | 05:04:44 |
| 12 | And then afterwards -- you know, so let | 05:04:51 |
| 13 | me -- so yeah, so this is where I learned, like, you | 05:04:54 |
| 14 | know, this is some sort of reporting on something | 05:04:55 |
| 15 | related to the project.  But the actual knowing that | 05:04:57 |
| 16 | there's a lawsuit, that in itself I think came maybe | 05:05:04 |
| 17 | a little bit later than that, you know. | 05:05:08 |
| 18 | Q.   Do you recall when you had the phone call | 05:05:10 |
| 19 | with the Washington Post reporter? | 05:05:12 |
| 20 | A.   I think it was 2022, but I'm not | 05:05:15 |
| 21 | exactly -- around the time.  I looked it up just to | 05:05:22 |
| 22 | let you know I thought it was July 2022 so I have to | 05:05:25 |
| 23 | go with that. | 05:05:29 |
| 24 | Q.   And what did the reporter say to you? | 05:05:30 |
| 25 | A.   He asked if I was Azeddine Rahlouni and | 05:05:32 |

Page 32

```
 1    then I said yes and then he asked me -- basically he      05:05:33
 2    presented himself as -- I don't even remember his         05:05:37
 3    name.  He said somebody from the Washington Post and      05:05:39
 4    I just hang up the phone.                                 05:05:42
 5        Q.   Did you ever talk with the reporter again?       05:05:44
 6        A.   No.                                              05:05:46
 7        Q.   Did any other reporter contact you?             05:05:48
 8        A.   No.                                              05:05:51
 9        Q.   Have you read any articles about this           05:05:55
10    litigation?                                               05:05:58
11        A.   So post the -- when I was served the            05:06:00
12    subpoena, this is when I started reading like news        05:06:10
13    about it basically, like, what it's about and            05:06:13
14    whatnot.                                                  05:06:19
15        Q.   And what is your understanding of what          05:06:19
16    this litigation is about?                                 05:06:29
17        A.   So just from the subpoena, there's a            05:06:30
18    person that put in multiple ballots, the defendant I     05:06:36
19    suppose, and he was labeled as a fraud when it comes     05:06:40
20    to voting and his reputation got damaged as a result     05:06:46
21    of that.  And this is how this whole lawsuit came up     05:06:50
22    but...                                                    05:06:54
23        Q.   And are you familiar with claims by the        05:06:58
24    defendants in this case about election fraud in the      05:07:02
25    2020 election?                                            05:07:04
```

Page 33

```
 1              MR. EVANS:  Object to form.              05:07:06

 2      A.   Yes.                                        05:07:07

 3      Q.   And what is your understanding of what      05:07:08

 4  those claims are?                                    05:07:10

 5              MR. EVANS:  Object to form.              05:07:14

 6              MR. YARBROUGH:  Object to form.          05:07:15

 7      A.   Claiming that essentially that there was    05:07:16

 8  fraud in voting by mail-in ballots.                  05:07:19

 9      Q.   And what is the basis of defendants'        05:07:22

10  claims?                                              05:07:26

11              MR. YARBROUGH:  Objection; form.         05:07:28

12              MR. EVANS:  Object to form.              05:07:28

13      A.   Can you explain what basis is?              05:07:31

14      Q.   Do you understand on what basis defendants  05:07:33

15  make those claim?                                    05:07:39

16              MR. YARBROUGH:  Objection; form.         05:07:40

17      A.   Other than his own theory you mean?         05:07:40

18  That -- on what basis he made those claims?  I think 05:07:46

19  from what I understand is that PowerPoint -- well,   05:07:50

20  you know, not the PowerPoint but that -- you know,   05:07:57

21  the mapping of multiple devices led them to believe  05:08:00

22  that those devices were also, you know, doing fraud  05:08:04

23  and whatnot.                                         05:08:08

24      Q.   What is your understanding, if any, of the  05:08:09

25  role of geolocation in defendants' claims?           05:08:11
```

1          MR. YARBROUGH:  Objection; form.          05:08:16

2     A.   That played a role in his understanding of   05:08:19

3  it.                                                   05:08:22

4     Q.   Okay.  Earlier --                             05:08:25

5     A.   I'm just going to clarify here.  Part of      05:08:30

6  the work that was produced, you have devices and you  05:08:36

7  have locations.  Right.  But the association of       05:08:39

8  those locations could be 500 feet, 1,000 feet,        05:08:43

9  200 feet, 100 feet, adding to that the accuracy of    05:08:47

10 that particular signal.  So based on that, they       05:08:53

11 could have made all kind of claims if they wanted --  05:08:57

12 if they wanted to.                                    05:08:59

13    Q.   And what is your assessment of whether         05:09:01

14 those claims would be --                              05:09:06

15    A.   True?                                         05:09:10

16    Q.   -- true?                                      05:09:10

17         MR. YARBROUGH:  Object to form.               05:09:11

18    A.   So that's -- whether it's true, I             05:09:15

19 personally -- because of the nature of the data, you  05:09:19

20 know, the data is not a tool to make those claims.    05:09:24

21    Q.   And why not?                                  05:09:28

22    A.   You have the GPS signal accuracy.  You        05:09:30

23 know, so let's say you have a cheap phone,            05:09:35

24 essentially it will drift and not get the right       05:09:39

25 locations of where you're at, especially if you are   05:09:43

Page 35

| | | |
|---|---|---|
| 1 | moving.  So that is hardware. | 05:09:45 |
| 2 | And then you also have noise and signals, | 05:09:48 |
| 3 | so there's something called sinks where it's a | 05:09:55 |
| 4 | pooling of signals in known areas in the U.S. that | 05:09:59 |
| 5 | those are just called data sinks where they are | 05:10:04 |
| 6 | false, you know. | 05:10:07 |
| 7 | And you do get like a false signal here | 05:10:08 |
| 8 | and there so -- the algorithms kind of try to | 05:10:11 |
| 9 | correct for that.  So based on that, you know, you | 05:10:14 |
| 10 | can't -- you know, let's put it -- you're not going | 05:10:16 |
| 11 | to drop a bomb based on a signal this way. | 05:10:19 |
| 12 | Q.   Do you have any understanding of whether | 05:10:24 |
| 13 | Red Metrics conveyed those limitations to | 05:10:25 |
| 14 | Mr. Phillips? | 05:10:29 |
| 15 | MR. YARBROUGH:  Objection; form. | 05:10:31 |
| 16 | MR. EVANS:  Object to form. | 05:10:32 |
| 17 | A.   Because of the nature -- the limited | 05:10:33 |
| 18 | nature of my interaction, it was essentially with | 05:10:35 |
| 19 | Tim.  Sp it was basically like a request, analysis, | 05:10:38 |
| 20 | pushback results and, you know, that's the | 05:10:40 |
| 21 | production loop. | 05:10:43 |
| 22 | Q.   Are the potential errors that you | 05:10:44 |
| 23 | discussed obvious to people who work in geolocation? | 05:10:48 |
| 24 | MR. YARBROUGH:  Objection; form. | 05:10:53 |
| 25 | MR. EVANS:  Object to form. | 05:10:54 |

```
 1        A.   So if there are in the field of          05:10:55
 2    geolocation there would -- well, geotag and       05:10:58
 3    geotargeting, they would know there's an accuracy 05:11:03
 4    for signal at some point.  They would note the    05:11:06
 5    problems, yes.                                    05:11:09
 6        Q.   So let's talk about exactly what work Red 05:11:10
 7    Metrics did for Mr. Phillips.                     05:11:15
 8             Did the work involve geofencing particular 05:11:18
 9    locations?                                        05:11:23
10        A.   Yes.                                      05:11:24
11        Q.   What locations were geofenced?           05:11:25
12        A.   My recollection -- again, it has been a  05:11:28
13    long time now.  But we get, like, locations.  In  05:11:34
14    this case, I think it was voting booths, right,   05:11:38
15    like, you know, where you drop off your voting -- 05:11:42
16    you vote, right.  And then we geofenced those     05:11:46
17    locations.  Sometimes I think it was buffers.     05:11:50
18    Sometimes it was the exact location.              05:11:53
19        Q.   Did you geofence any other kind of       05:11:56
20    location?                                         05:11:59
21        A.   Possible, but I can't recollect.  It's   05:12:01
22    possible, yes.                                    05:12:05
23        Q.   Do you recall whether Red Metrics        05:12:06
24    geofenced nonprofit organizations?                05:12:08
25        A.   Part of this work?  It's possible, but I 05:12:11
```

Page 37

| | | |
|---|---|---|
| 1 | can't recall. | 05:12:20 |
| 2 | Q.   Do you recall whether Red Metrics | 05:12:21 |
| 3 | geofenced violent riots? | 05:12:23 |
| 4 | A.   Yes. | 05:12:27 |
| 5 | Q.   And you did that as part of the work for | 05:12:28 |
| 6 | Mr. Phillips? | 05:12:30 |
| 7 | A.   I could not make the connection that it's | 05:12:33 |
| 8 | directly to TTV, you know.  So the request would | 05:12:36 |
| 9 | come in that, hey, we have these riots and we're | 05:12:39 |
| 10 | trying to geofence them so I'll do that.  But | 05:12:42 |
| 11 | directly linked to TTV, I can't make that | 05:12:47 |
| 12 | connection. | 05:12:50 |
| 13 | Q.   Did Red Metrics review surveillance video | 05:12:51 |
| 14 | along with its geolocation analysis? | 05:12:55 |
| 15 | MR. YARBROUGH:  Objection; form. | 05:12:59 |
| 16 | Just to be clear, John, he's | 05:12:59 |
| 17 | testifying to what he knows. | 05:13:01 |
| 18 | MR. LANGFORD:  Yeah.  Yeah. | 05:13:03 |
| 19 | Q.   In your personal knowledge, did Red | 05:13:03 |
| 20 | Metrics review surveillance footage as part of its | 05:13:05 |
| 21 | work for Mr. Phillips? | 05:13:07 |
| 22 | A.   In my personal knowledge, I know that it | 05:13:09 |
| 23 | was reviewed, yes. | 05:13:12 |
| 24 | Q.   Did you review surveillance footage? | 05:13:15 |
| 25 | A.   My -- I was tasked with finding a way to | 05:13:19 |

Page 38

```
 1    automate image recognition of -- because the footage    05:13:23
 2    is, you know, hours and hours and whatnot.  But that     05:13:29
 3    wasn't my expertise, so I -- you know, I kind of --      05:13:32
 4    I tried but I didn't go anywhere and somebody else       05:13:36
 5    took on that effort.                                     05:13:39
 6         Q.   So if you can just describe step by step       05:13:41
 7    the work that you're aware of that Red Metrics did       05:13:44
 8    for Mr. Phillips.                                        05:13:48
 9         A.   So for TTV -- so geofence -- so the work       05:13:49
10    that we do is either geofencing or tracing or           05:13:57
11    copresence.  So geofencing you have a location of       05:14:02
12    interest and you geofence it for a period of time,      05:14:06
13    right.  So that geofencing result would give you the    05:14:09
14    devices that were there and the times they were         05:14:17
15    there.  And then a byproduct of that would be to see    05:14:19
16    if any device is seen in multiple locations, a          05:14:22
17    copresence.                                             05:14:30
18         And then frequencies is another byproduct         05:14:31
19    that is asked, like how many times did you see a        05:14:35
20    particular device in a particular location.  So that   05:14:39
21    was -- that was the initial work.                       05:14:45
22         There was also something called tracing           05:14:47
23    where you kind of review for a particular device       05:14:51
24    their signal in a period of time.  And you have the    05:14:55
25    full history of that particular device, right, you     05:14:59
```

Page 39

```
 1    know.  And based on that you can also see if they      05:15:02

 2    can within the data buffer zone or whatnot.            05:15:08

 3            So there's geofencing.  There's also           05:15:11

 4    buffers that go from like 200 feet, 500 feet,          05:15:13

 5    1,000 feet, mile.  And then you can think of all the   05:15:16

 6    byproducts of that.  You know, who is seen here but    05:15:20

 7    not there.  It's possibly, you know, different         05:15:23

 8    places.                                                05:15:25

 9            And all that either is getting consumed in     05:15:26

10    Excel sheet, sometimes you have to abbreviate it       05:15:29

11    because the files can get large.  And a client sends   05:15:33

12    you, like, a tableau because it's a visualization      05:15:39

13    that they can see, you know, the map and colors and    05:15:43

14    whatnot.                                               05:15:46

15       Q.   And how long did you do work at Red            05:15:46

16    Metrics for Mr. Phillips?                              05:15:49

17       A.   I don't have an exact recollection.  Like      05:15:53

18    I said, not to sound like a bad worker here or         05:15:56

19    anything like that, but I just get the request and I   05:16:01

20    do the job and I can really care less where the        05:16:04

21    request comes from.                                    05:16:07

22       Q.   Any estimation of how many hours you spent     05:16:08

23    on the project for Mr. Phillips?                       05:16:11

24            MR. EVANS:  Object to form.                    05:16:13

25       A.   I know, like, you know, he was -- it was       05:16:14
```

Page 40

1  the sole thing that I have done for quite a bit and    05:16:17

2  then kind of stopped, you know.  So it was kind of    05:16:22

3  like, all right.    05:16:27

4       Q.   And to your knowledge, who else at Red    05:16:27

5  Metrics worked on that project, if anyone?    05:16:30

6       A.    Like worked on it?  So I suppose by    05:16:33

7  working you mean like -- well, you know, what is --    05:16:42

8  not to be picky, but what is work?  Like, producing    05:16:49

9  stuff?  What do you mean by work?    05:16:52

10      Q.   I guess what was the full team that was    05:16:55

11 assigned to the True the Vote project?    05:16:58

12      A.    So it was myself, Tim, and then Ben.  We    05:17:01

13 are a very small company.  And then maybe there were    05:17:06

14 a couple contractors, somebody to review videos or    05:17:09

15 something like that, yeah.  But the core was us.    05:17:15

16      Q.   Did Mr. Phillips do any work himself sort    05:17:21

17 of embedded with Red Metrics?    05:17:24

18           MR. EVANS:  Object to form.    05:17:28

19      A.   I can only speak to what I have done, but    05:17:29

20 I don't know what Mr. Phillips did, did not.  Sorry.    05:17:31

21      Q.   Do you have any knowledge of whether    05:17:34

22 anyone at OpSec or Mr. Phillips did any analysis in    05:17:36

23 the geolocation arena themselves?    05:17:42

24           MR. EVANS:  Object to form.    05:17:45

25      A.   As I mentioned, I don't know what OpSec    05:17:47

```
 1    is.  Like, what -- what is OpSec?                    05:17:50

 2         Q.  It's okay.                                   05:17:52

 3              To your knowledge, are you aware of any     05:17:55

 4    geolocation work performed by Mr. Phillips himself?  05:17:57

 5              MR. EVANS:  Object to form.                 05:18:01

 6         A.  Not that I -- it's possible but -- because  05:18:02

 7    the files -- he has the files, so technically he     05:18:05

 8    could, you know, do more or whatnot.  The files were 05:18:09

 9    delivered to him so it's possible.  And by the way,  05:18:13

10    I don't know which files I delivered.  It's just     05:18:16

11    like a production line so it's possible that he has  05:18:20

12    gotten some files and worked on them himself.        05:18:22

13         Q.  Did you have an understanding about why     05:18:24

14    you were doing the work for Mr. Phillips?            05:18:26

15         A.  Yeah.  There's -- like I mentioned, like,   05:18:30

16    their theory was that there were, you know, some     05:18:32

17    sort of, like, fraud in the ballots and whatnot.     05:18:34

18         Q.  And did you know that at the start of Red   05:18:36

19    Metrics' work for Mr. Phillips?                      05:18:38

20         A.  Yeah, I got a hunch of it but not -- you    05:18:46

21    know, it's like...                                   05:18:49

22         Q.  Are you aware of any evidence that          05:18:54

23    Mr. Phillips had to support that theory?             05:18:59

24              MR. YARBROUGH:  Objection; form.           05:19:03

25         A.  Honestly, I don't know.  It's for him to    05:19:05
```

Page 42

```
 1   say, right, you know.                           05:19:08

 2       Q.   Did he present any evidence -- or let me  05:19:10

 3   strike that.                                     05:19:13

 4            Did you see any evidence provided by the  05:19:14

 5   client at the start of Red Metrics' work to support  05:19:16

 6   that theory?                                     05:19:19

 7                MR. YARBROUGH:  Objection; form.    05:19:21

 8       A.   I don't -- I did not.  I don't know.  I  05:19:36

 9   don't interact with him, so I don't know.        05:19:26

10       Q.   Where did the list of locations that you  05:19:37

11   used for the work for Mr. Phillips come from?     05:19:39

12       A.   So there was a website that listed the   05:19:41

13   voting locations, right.  And then from that      05:19:53

14   website, you know, I had to go and get the address  05:19:57

15   and then geocode that address and then turn it to  05:20:00

16   actionable data that I can -- by which, you know,  05:20:05

17   process against and whatnot.                      05:20:09

18       Q.   So you pulled the list of locations for   05:20:10

19   that work?                                        05:20:12

20       A.   If -- pertaining to the voting locations,  05:20:14

21   yes.  You know, possible that they provided some   05:20:18

22   other locations, you know, saying like maybe at this  05:20:21

23   analysis, but that's my recollection of the work.  05:20:24

24       Q.   And did you ever check the list that you  05:20:27

25   used to make sure that it actually reflected drop  05:20:30
```

Page 43

```
 1    box locations?                                       05:20:34

 2              MR. YARBROUGH:  Objection; form.           05:20:35

 3              MR. EVANS:  Objection to form.             05:20:36

 4         A.   Yeah, we had like some QC baked in         05:20:38

 5    because, again -- in this case, you're pulling the   05:20:43

 6    address, right, you know.  So when you pull the      05:20:44

 7    address, you tend to want to see it, you know.  And  05:20:47

 8    then when you're provided with longitude/latitude    05:20:51

 9    location, a lot of clients will just give you, like, 05:20:53

10    what they think it is.  Sometimes they'll swap it.   05:20:58

11    So it's common for me to kind of check the locations 05:21:00

12    and even, you know, just make sure that it's not too 05:21:06

13    decimals versus six or something, you know.          05:21:10

14         Q.   Earlier you said that it's possible that   05:21:12

15    part of the work involved geofencing nonprofit       05:21:15

16    organizations.                                       05:21:19

17         A.   Yes, possible.                             05:21:21

18         Q.   Did you pull a list of addresses for those 05:21:22

19    organizations?                                       05:21:25

20         A.   If --                                      05:21:27

21              MR. YARBROUGH:  Objection; form.           05:21:28

22         A.   -- coordinates were not, you know,         05:21:30

23    presented or given, yes, I'll have to go and look    05:21:32

24    them up myself.                                       05:21:35

25         Q.   And what about for violent riots?          05:21:38
```

Page 44

1      A.    Violent riots, there was, I think, a         05:21:45

2    website that listed.  I think there was a          05:21:48

3    spreadsheet but also there was a website that listed   05:21:50

4    the different riots that happened.  I don't remember   05:21:55

5    the name of the website but that was given as a      05:21:57

6    resource to locate those events.                 05:22:00

7      Q.    Are you familiar with the acronym ACLED?     05:22:02

8      A.    ACLED, I have heard the word before.  I'm    05:22:06

9    not familiar with what it means.                 05:22:09

10     Q.    I want to drill down a little bit on         05:22:11

11   geofencing.                                 05:22:15

12           What is geofencing?                      05:22:17

13     A.    For purposes of this exercise, you get a     05:22:20

14   location, right.  Let's say where you guys are      05:22:25

15   sitting right now.  And geofencing comes in         05:22:28

16   different flavors.  It could be to where I get the    05:22:31

17   exact footprint of the building, right, or I get the   05:22:35

18   exact footprint of the property or I get just the    05:22:38

19   centroid of the building or the buffer or -- and     05:22:42

20   that buffer can be, you know, rectangle or circular,   05:22:45

21   different distances.  And sometimes, you know, it is   05:22:49

22   custom.  So you said, I want this general area and    05:22:54

23   we customize that, a custom shape file.           05:22:57

24     Q.    Did you use a buffer for the locations       05:23:00

25   used in the work done for Mr. Phillips?           05:23:03

Page 45

| | | |
|---|---|---|
| 1 | A.   I remember doing all kind of ways of | 05:23:07 |
| 2 | looking at it.  Buffer is one of them, yes. | 05:23:10 |
| 3 | Q.   And do you remember what size buffer you | 05:23:13 |
| 4 | used? | 05:23:15 |
| 5 | A.   Maybe like 500, 1,000 feet, even more than | 05:23:16 |
| 6 | that, like a mile or something like that, you know. | 05:23:21 |
| 7 | Q.   And what's the smallest buffer you could | 05:23:24 |
| 8 | use? | 05:23:27 |
| 9 | MR. YARBROUGH:  Objection; form. | 05:23:28 |
| 10 | A.   From a data perspective, you can make any | 05:23:30 |
| 11 | number because it's a buffer so it's just saying a | 05:23:36 |
| 12 | buffer.  Whether or not you're going to find | 05:23:38 |
| 13 | signals, that's another -- that's another thing. | 05:23:39 |
| 14 | It's like a search.  You can search within a buffer | 05:23:42 |
| 15 | of 1 foot within -- you know, from a particular | 05:23:45 |
| 16 | location. | 05:23:48 |
| 17 | Q.   But for Mr. Phillips' work, you used the | 05:23:48 |
| 18 | buffer of -- you said 500 feet or 1,000 feet? | 05:23:52 |
| 19 | MR. YARBROUGH:  Objection; form. | 05:23:55 |
| 20 | A.   So, again, my recollection it could be | 05:23:55 |
| 21 | that we started with like the exact location and | 05:23:58 |
| 22 | then buffer it out and then you do all kind of | 05:24:00 |
| 23 | looks.  So just, you know, all produce results that | 05:24:03 |
| 24 | say, like, you know, increase, decrease, stuff like | 05:24:08 |
| 25 | that. | 05:24:10 |

Page 46

```
 1        Q.    Who says increase or decrease the buffer      05:24:10
 2   size?                                                    05:24:13
 3        A.    So sometimes the client.  Sometimes it's      05:24:14
 4   Tim, you know.  But Tim will say like, hey, increase     05:24:16
 5   the buffer zone on these out here.                       05:24:19
 6        Q.    Do you remember who determined the buffer     05:24:21
 7   distance for Mr. Phillips?                               05:24:24
 8        A.    That I don't know, but usually we increase    05:24:28
 9   buffers as we get more devices.                          05:24:32
10        Q.    And would a larger buffer mean that           05:24:39
11   there's less precision on exactly where a device was     05:24:41
12   located?                                                 05:24:45
13              MR. YARBROUGH:  Objection; form.              05:24:46
14        A.    So the buffer simply states that you're       05:24:47
15   going to look for anything that is within a              05:24:52
16   particular radius.  The results, however, will give      05:24:54
17   you the devices with the longitude and latitude and      05:24:58
18   the horizontal accuracy.                                 05:25:02
19              So to your question, is it going to           05:25:04
20   increase the accuracy.  The accuracy is within the       05:25:07
21   signal itself.  Things that we have discussed, you       05:25:12
22   know, so hardware, also like signal, signal quality,     05:25:14
23   sometimes noise, fraud, whatever.                        05:25:19
24        Q.    Let's see, how did Red Metrics -- let me      05:25:25
25   back up.                                                 05:25:30
```

Page 47

| | | |
|---|---|---|
| 1 | As part of your work for Mr. Phillips, did | 05:25:31 |
| 2 | you look to see if devices appeared in a buffer more | 05:25:33 |
| 3 | than once? | 05:25:37 |
| 4 | A.   Co occurrence, yes, like frequency as I | 05:25:38 |
| 5 | mentioned, yes, it's a frequently event. | 05:25:43 |
| 6 | Q.   And how did you? | 05:25:44 |
| 7 | A.   You can -- | 05:25:44 |
| 8 | Q.   I'm sorry. | 05:25:46 |
| 9 | A.   Go ahead. | 05:25:46 |
| 10 | Q.   How did you determine that a device was in | 05:25:48 |
| 11 | a buffer more than once? | 05:25:51 |
| 12 | A.   So the singular level, you have longitude, | 05:25:52 |
| 13 | latitude and a time stamp.  So a device technically | 05:25:57 |
| 14 | is in a buffer more than once if it's seen more than | 05:26:00 |
| 15 | one record.  And a record can be for -- you know, | 05:26:04 |
| 16 | let's say, January 1st, 9:00 o'clock.  But also some | 05:26:09 |
| 17 | of these apps will shoot out multiple signals that | 05:26:15 |
| 18 | are -- because, you know, that -- you know, within | 05:26:20 |
| 19 | milliseconds. | 05:26:22 |
| 20 | So yeah, you're collecting all the | 05:26:25 |
| 21 | occurrences of that signal, whatever you see out | 05:26:28 |
| 22 | there.  And this is how we determine the frequency, | 05:26:29 |
| 23 | right, and also the dates, so... | 05:26:32 |
| 24 | Q.   And did Red Metrics look at time stamps in | 05:26:34 |
| 25 | its analysis for Mr. Phillips? | 05:26:38 |

Page 48

```
 1              MR. EVANS:  Object to form.         05:26:43

 2      A.   Yes.                                   05:26:44

 3      Q.   I want to -- let me ask you, did Red   05:26:44

 4  Metrics create maps in its work for Mr. Phillips?  05:26:48

 5      A.   Yes.                                   05:26:51

 6              MR. LANGFORD:  Can we pull up what has  05:26:55

 7  been marked as Phillips Deposition Exhibit 9 and go  05:26:59

 8  to page TTV_6826.                               05:27:05

 9              CONCIERGE TECHNICIAN:  Can you tell me  05:27:14

10  what doc that is?                               05:27:16

11              MR. LANGFORD:  Yes.  One second.  That  05:27:17

12  is -- it's going to be doc B (sic).             05:27:19

13              CONCIERGE TECHNICIAN:  Once again with  05:27:30

14  the page number?                               05:27:33

15              MR. LANGFORD:  TTV_6826.            05:27:34

16              (Rahlouni Exhibit 9 marked.)        05:27:34

17      Q.   Mr. Rahlouni, have you ever seen this  05:27:57

18  document before?                               05:27:58

19      A.   Can you -- can you zoom it out a little  05:28:00

20  bit more?  I'm sorry.                          05:28:03

21              MR. YARBROUGH:  Can we get a display  05:28:10

22  for us so that I can see it?                   05:28:12

23              MR. LANGFORD:  It should be on --   05:28:12

24      A.   I can see --                          05:28:12

25              MR. YARBROUGH:  Is it in this thing?  05:28:21
```

Page 49

1   If possible, I would like to see what he sees.          05:28:21
2              MR. LANGFORD:  Of course.  I thought          05:28:25
3   you had the screen.                                     05:28:25
4        A.   On the observations, the font is too          05:28:29
5   small.                                                  05:28:33
6        Q.   Have you seen this document before?           05:28:34
7        A.   The document itself, maybe, yes.  That's      05:28:39
8   possible, yes.                                          05:28:44
9        Q.   Did you ever create maps like this?           05:28:45
10       A.   The map, I probably created that map.         05:28:47
11       Q.   Okay.  And just briefly, what does that       05:28:50
12   map show?                                              05:28:53
13       A.   That's -- so this is probably like a trace    05:28:55
14   of a particular location -- I'm sorry, particular      05:28:58
15   device.  So you're looking for a device and you can    05:29:02
16   see all their activity or their -- basically their     05:29:05
17   pings.                                                 05:29:09
18              And from that particular ping, you          05:29:14
19   probably can determine if they were close within       05:29:17
20   locations of interest.  In this case, drop boxes to    05:29:18
21   your right and organizations to your right.            05:29:21
22       Q.   And up at the top do you see where it         05:29:24
23   says, Drop box visits equals 24?                       05:29:26
24       A.   Uh-huh.                                       05:29:28
25       Q.   If Red Metrics were using a buffer zone,      05:29:30

Page 50

```
 1    what does it mean to say that a device had a drop      05:29:32

 2    box visit?                                             05:29:36

 3        A.    That it was seen within the buffer simply.   05:29:37

 4        Q.    So if the buffer was 1,000 feet, it means    05:29:40

 5    a device was located within 1,000 feet of a drop       05:29:43

 6    box?                                                   05:29:47

 7        A.    That was the buffer used.  That's the        05:29:47

 8    definition.                                            05:29:49

 9        Q.    Okay.  I'm going to fast forward here.       05:29:52

10              MR. LANGFORD:  All right.  We can take       05:30:06

11    that exhibit down.                                     05:30:07

12        Q.    Are you familiar with the 2000 Mules         05:30:15

13    movie?                                                 05:30:17

14        A.    So I was made aware of 2000 Mules because    05:30:19

15    I think, like, it was shared internally.  Not the      05:30:27

16    movie though, of like some sort of like a -- maybe     05:30:30

17    like a clip or something or, you know, like a          05:30:34

18    trailer, what have you, something like that.           05:30:37

19        Q.    So you have never seen the movie?            05:30:39

20        A.    No.                                          05:30:41

21        Q.    You said the movie was shared internally     05:30:48

22    at Red Metrics?                                        05:30:51

23        A.    I don't -- it's not the movie.  I think it   05:30:52

24    was a clip or something, like a trailer maybe.         05:30:55

25        Q.    And who shared --                            05:30:55
```

Page 51

1     A.   That's my recollection, you know.  So who      05:30:57

2   that -- I don't remember exactly, but I remember      05:31:01

3   personally watching a trailer so it has to come      05:31:04

4   from, you know, our communication or something like      05:31:07

5   that.      05:31:11

6     Q.   And did people talk about the trailer at      05:31:11

7   Red Metrics?      05:31:15

8     A.   Well, I work remote so talking about it      05:31:18

9   meaning like chatting and whatnot, probably not.      05:31:24

10   Maybe somebody else but I don't remember talking      05:31:26

11   about it.      05:31:29

12         MR. YARBROUGH:  Sorry, can we get his      05:31:30

13   feed up on this so I can see him?      05:31:31

14     Q.   What is your understanding of why the      05:31:33

15   trailer was shared between people at Red Metrics --      05:31:48

16         MR. YARBROUGH:  Objection; form.      05:31:52

17     Q.   -- if you have an understanding?      05:31:56

18     A.   I don't have an understanding.  You know,      05:31:57

19   maybe -- I don't know.  Like, it's probably like      05:31:58

20   a -- something that TTV did or didn't, something      05:32:01

21   like that.      05:32:05

22     Q.   To your knowledge, was the movie related      05:32:06

23   at all to work that Red Metrics did for      05:32:10

24   Mr. Phillips?      05:32:13

25     A.   It is, you know, possible, like, from what      05:32:16

Page 52

| | | |
|---|---|---|
| 1 | I saw from the trailer.  I guess, like a map or | 05:32:19 |
| 2 | something, that's possible, yeah. | 05:32:23 |
| 3 | Q.   Have you ever -- are you familiar with the | 05:32:26 |
| 4 | book version of the 2000 Mules movie? | 05:32:29 |
| 5 | A.   No. | 05:32:32 |
| 6 | Q.   So you have never read the book 2000 | 05:32:33 |
| 7 | Mules? | 05:32:36 |
| 8 | A.   (Shakes head negatively.) | 05:32:36 |
| 9 | MR. LANGFORD:  I think what I want to | 05:32:42 |
| 10 | do here is -- let's try pull up the movie. | 05:32:44 |
| 11 | MR. CRENSHAW:  We're going to need to | 05:32:48 |
| 12 | go off the record real quick. | 05:32:50 |
| 13 | MR. LANGFORD:  Okay.  How long do you | 05:32:52 |
| 14 | need? | 05:32:54 |
| 15 | MR. CRENSHAW:  Five, 10 minutes tops. | 05:32:54 |
| 16 | MR. LANGFORD:  Okay.  Mr. Rahlouni, | 05:32:57 |
| 17 | we're going to take a 5- to 10-minute break so we can | 05:32:58 |
| 18 | pull up the movie. | 05:33:01 |
| 19 | THE VIDEOGRAPHER:  We're off the | 05:33:07 |
| 20 | record.  The time is 5:33 p.m. | 05:33:09 |
| 21 | (Recess 5:33 p.m. to 5:47 p.m.) | 05:33:12 |
| 22 | THE VIDEOGRAPHER:  This is media two. | 05:47:16 |
| 23 | Back on the record at 5:47 p.m. | 05:47:31 |
| 24 | MR. LANGFORD:  Thank you. | 05:47:36 |
| 25 | Q.   Mr. Rahlouni, you testified that you had | 05:47:40 |

Page 53

| | | |
|---|---|---|
| 1 | never seen the movie 2000 Mules.  I can represent | 05:47:41 |
| 2 | that we're going to pull up a clip from the movie. | 05:47:44 |
| 3 | The movie itself was marked as Exhibit 3 (sic) to | 05:47:48 |
| 4 | the Red Metrics LLC deposition earlier this | 05:47:51 |
| 5 | afternoon. | 05:47:54 |
| 6 | (Red Metrics Exhibit 2 previously | 05:47:54 |
| 7 | marked.) | 05:47:54 |
| 8 | MR. LANGFORD:  And we're going to | 05:47:56 |
| 9 | watch from minute 31:56 to minute 32:57. | 05:47:57 |
| 10 | (Video played.) | 05:48:06 |
| 11 | THE WITNESS:  I don't have sound FYI. | 05:48:20 |
| 12 | CONCIERGE TECHNICIAN:  This is David, | 05:48:24 |
| 13 | the concierge.  Don't forget to share the sound on | 05:48:25 |
| 14 | the bottom left-hand corner where you share our | 05:48:28 |
| 15 | screen. | 05:48:31 |
| 16 | MR. CRENSHAW:  Let me re-queue that | 05:48:31 |
| 17 | up.  I knew there was a stone I didn't unturn. | 05:48:34 |
| 18 | Sharing sound but nothing is coming through.  Hang on | 05:49:01 |
| 19 | one second. | 05:49:07 |
| 20 | (Off-the-record conversation.) | 05:49:57 |
| 21 | MR. CRENSHAW:  I think I got it, Dave. | 05:50:35 |
| 22 | Hang on.  I'm close. | 05:50:40 |
| 23 | (Video played.) | 05:51:44 |
| 24 | THE WITNESS:  I can't see the video. | 05:51:44 |
| 25 | (Off-the-record conversation.) | 05:51:44 |

Page 54

| | | |
|---|---|---|
| 1 | (Video played.) | 05:51:44 |
| 2 | Q.  All right.  Thank you, Mr. Rahlouni. | 05:53:01 |
| 3 | To your knowledge, is the visual that we | 05:53:08 |
| 4 | just watched based on Red Metrics' analysis? | 05:53:09 |
| 5 | MR. YARBROUGH:  Objection; form. | 05:53:13 |
| 6 | A.  I'm not aware.  That doesn't look like | 05:53:16 |
| 7 | anything that I made or -- yeah. | 05:53:19 |
| 8 | Q.  And would -- if it were based on Red | 05:53:24 |
| 9 | Metrics' analysis, could you prove what was claimed | 05:53:29 |
| 10 | about the visual showing that a particular | 05:53:34 |
| 11 | individual went to 28 drop boxes and 5 organizations | 05:53:36 |
| 12 | in one day? | 05:53:43 |
| 13 | MR. YARBROUGH:  Objection; form. | 05:53:43 |
| 14 | MR. EVANS:  Form. | 05:53:47 |
| 15 | A.  Again, I think -- the way, like, I think | 05:53:48 |
| 16 | you saw our presentation, the one document that you | 05:53:51 |
| 17 | showed before, depending on how you define the | 05:53:55 |
| 18 | visit, what is a visit and what is an organization, | 05:53:59 |
| 19 | you could state that a signal was seen close by a | 05:54:02 |
| 20 | particular, you know, location or visit.  But to | 05:54:08 |
| 21 | visit the actual location, I don't have the data so | 05:54:11 |
| 22 | I can't know for certain. | 05:54:14 |
| 23 | Q.  If a device was accurately located within | 05:54:18 |
| 24 | 100 feet of a location like a drop box on multiple | 05:54:24 |
| 25 | occasions, does that prove that the device visited | 05:54:29 |

Page 55

```
 1    the drop box itself on multiple occasions?      05:54:34
 2         A.   I think the statement in this case would   05:54:38
 3    be that drop box were seen in close to the -- a   05:54:40
 4    device was seen close to the drop box.  That's the  05:54:44
 5    statement that I would make.                    05:54:47
 6         Q.   And --                                05:54:49
 7         A.   That is it.                           05:54:50
 8         Q.   And why is that it?                   05:54:52
 9         A.   Simply because you don't have continuity  05:54:54
10    of the signal.                                  05:54:59
11         Q.   And what do you mean by continuity of  05:55:01
12    signal?                                         05:55:04
13         A.   I think for the statement that you just  05:55:05
14    made, it's almost like you have to have a beacon on  05:55:07
15    someone broadcasting their signal all the way   05:55:11
16    through.  The technology that we use is for      05:55:14
17    geofencing, not tracking, you know.             05:55:19
18         Q.   So why might a device show up in close  05:55:22
19    proximity to a location like a drop box multiple  05:55:25
20    times?                                          05:55:28
21              MR. YARBROUGH:  Objection; form.      05:55:29
22         A.   It could be multiple reasons.  It could be  05:55:31
23    like -- I mentioned, like, it could be annoyances  05:55:35
24    like a street by or, you know, boulevard or a   05:55:39
25    highway and the buffer goes over the highway.  Yeah,  05:55:40
```

Page 56

```
1    you're going to pick up traffic out there.  Yeah.     05:55:43

2          It could be -- that person could be, you        05:55:49

3    know, somebody with like high footprint.  I have      05:55:51

4    seen that before, like a UPS delivery or some sort    05:55:57

5    like that.  That's a possibility.  You can have       05:56:01

6    something like that.                                  05:56:03

7          Q.   So if the buffer zone around a drop box    05:56:04

8    were defined large enough to encompass like a         05:56:07

9    library beside the drop box, could you find devices   05:56:11

10   at the library pinging as within the buffer zone?     05:56:16

11          MR. YARBROUGH:  Objection; form.               05:56:20

12          A.   If the device is in that library and the  05:56:23

13   library is in the buffer, then yes, it will count     05:56:28

14   that device as within that buffer of that location,   05:56:31

15   that location buffer.                                 05:56:34

16          Q.   And you just said I think if someone      05:56:35

17   drives through a buffer zone, is it possible that     05:56:38

18   the device pings within the buffer?                   05:56:40

19          A.   Yeah.  So if you are -- let's say, you    05:56:43

20   know, your phone kind of like sends in a signal of    05:56:47

21   your location, you see that sometimes on your phone,  05:56:51

22   right, and you are driving, then if that is part of   05:56:53

23   the feed, then yeah, it's going to pick you up.       05:56:57

24          Q.   Let's just do a few more examples.  If    05:57:03

25   there is a drop box with a buffer zone that overlaps  05:57:07
```

Page 57

1    with a store, if someone has a device in the store,     05:57:11

2    could it ping within the buffer zone?     05:57:19

3              MR. EVANS:  Object to form.     05:57:19

4              MR. YARBROUGH:  Objection; form.     05:57:19

5         A.   Is someone is within the buffer zone,     05:57:24

6    could the device ping?  If the signal is within our     05:57:27

7    feed, meaning -- I think people think that this     05:57:29

8    thing is 24/7.  It's not.     05:57:32

9              You know, if it's within the feed, then     05:57:35

10   the signal would have to exist and you would have to     05:57:38

11   be in the buffer.  There are two things that need to     05:57:42

12   happen before you can even be comfortable.     05:57:44

13        Q.   And if a location with a sizable buffer is     05:57:48

14   located in a populated space like a mall, school,     05:57:52

15   you might -- would you see a lot of device pings in     05:57:58

16   that buffer that didn't visit the location you're     05:58:02

17   trying to analyze?     05:58:05

18             MR. YARBROUGH:  Objection; form.     05:58:06

19        A.   So, again, here the definition is there a     05:58:07

20   location, there is the buffer and there is the     05:58:13

21   buffer.  What are the devices that we're seeing     05:58:15

22   around the buffer?  So if the buffer is large     05:58:18

23   enough, you would encompass that for sure.     05:58:20

24        Q.   And in your work for Red Metrics, did you     05:58:23

25   go into the dataset that you used for Mr. Phillips     05:58:25

Page 58

```
1     and try to figure out whether a school was in the        05:58:32

2     buffer or a store was in the buffer?                      05:58:34

3          A.   No.  That never -- no.                          05:58:36

4          Q.   And did you do any work to assess whether       05:58:39

5     someone was just driving through a buffer versus          05:58:41

6     someone going and stopping in a buffer zone?              05:58:45

7               MR. YARBROUGH:  Objection; form.                05:58:46

8          A.   So I recall we done something like this,        05:58:49

9     but I can't tell if this is for this client or some       05:58:54

10    other client, controlling for speed.  But for that        05:58:57

11    you'll have to have two subsequent signals and then       05:58:59

12    you kind of -- you calculate your speed, right.  You      05:59:03

13    see someone, let's say in the buffer example,             05:59:06

14    entering the buffer at 5:59 p.m. right now and            05:59:10

15    exiting the buffer at 6:00 p.m., for instance, or         05:59:14

16    less than 6:00 p.m.  Then you have the location.          05:59:17

17    You have time.  You have distance because of time         05:59:20

18    stamp.  You can see their speed.  And if they are         05:59:23

19    moving, obviously, they're not in -- they're not in       05:59:25

20    the buffer.  They're traveling through the buffer.        05:59:29

21          So you can control for speed and adjust             05:59:32

22    speed.  That's one of the algorithms to say, like,        05:59:36

23    passing through, exclude them, or -- it just depends      05:59:39

24    on whether we -- you know, you want to keep that          05:59:42

25    noise or you don't want to keep the noise.  Does          05:59:45
```

1    that -- does that answer your question?                    05:59:52

2         Q.   Would there be documentation of any kind         05:59:54

3    of analysis like that?                                     05:59:57

4         A.   In the sense of -- no, it's just a -- it's       05:59:59

5    a SQL query.  So you -- it's a SQL query kind of           06:00:06

6    like an over -- get a row, a subsequent row, you           06:00:11

7    offset it.  You calculate the distance and time.           06:00:15

8    You exclude those.                                         06:00:18

9         Q.   And to be clear, you can't recall whether        06:00:19

10   you did that for Mr. Phillips?                             06:00:21

11        A.   Not specifically, no, I can't.  But I            06:00:23

12   recall we have done it before based on clients'            06:00:26

13   requests.                                                  06:00:29

14        Q.   Is there other accuracy data like that           06:00:29

15   that you would only provide if a client asked for          06:00:32

16   it?                                                        06:00:35

17        A.   Horizontal --                                    06:00:35

18             MR. YARBROUGH:  Objection; form.                 06:00:35

19        Q.   I'm sorry.  You can answer the question.         06:00:40

20        A.   Horizontal accuracy.                             06:00:42

21        Q.   And what is horizontal accuracy?                 06:00:44

22        A.   It's one of the columns that's provided          06:00:48

23   and basically tells you if a signal is -- if that --      06:00:50

24   what is the accuracy of that signal, right, so...          06:00:53

25        Q.   To your knowledge, did you provide the          06:00:59

Page 60

```
 1   horizontal accuracy data to Mr. Phillips?         06:01:17
 2       A.   I can't recall.  But if he did ask for it,  06:01:04
 3   it would have been provided.                      06:01:07
 4       Q.   But you don't have any recollection of    06:01:09
 5   whether he asked for it?                          06:01:10
 6       A.   No.                                       06:01:11
 7            MR. EVANS:  Object to form.               06:01:12
 8       Q.   We talked a little bit about this but just  06:01:22
 9   to go back to it briefly.                         06:01:24
10       A.   Sure.                                     06:01:26
11       Q.   Can you just explain the relationship     06:01:27
12   between the precision of the analysis and the size  06:01:30
13   of buffer used around any particular location.    06:01:33
14       A.   So when you say the precision, in your    06:01:39
15   mind, what does that mean?                        06:01:42
16       Q.   If you have a larger buffer --            06:01:44
17       A.   Precision.                                06:01:46
18       Q.   -- you -- if you have a larger buffer, is  06:01:47
19   it true that you're likely to get more devices    06:01:50
20   captured within that buffer?                      06:01:53
21       A.   That is correct, yes.                     06:01:55
22       Q.   And you're less likely to be able to know  06:01:55
23   that any device in that buffer actually visited the  06:01:58
24   center of the buffer?                             06:02:01
25            MR. EVANS:  Object to form.               06:02:04
```

Page 61

1          A.    So in this case, you have -- so imagine          06:02:04

2     this is your center point.  This is the buffer, like          06:02:08

3     all circle and then there is your signal here.  You          06:02:12

4     can technically calculate the distance within.  It's          06:02:17

5     possible, yeah.          06:02:20

6          Q.    Earlier you also mentioned older devices          06:02:21

7     with older technology might be less reliable.          06:02:32

8          A.    Yeah.  If you have like a cheap device,          06:02:37

9     you know, hardware is a big element of it, so...          06:02:39

10          Q.    Can you just list all of the things that          06:02:45

11     could lead to inaccuracies in locating a device?          06:02:47

12               MR. EVANS:  Object to form.          06:02:51

13               MR. YARBROUGH:  Objection; form.          06:02:52

14          A.    I don't have that expertise on top of my          06:02:52

15     head, you know.  I can only speak to, you know,          06:02:55

16     hardware and also the feed that we got provides the          06:02:57

17     horizontal accuracy and the sinks that I'm aware of.          06:03:02

18     There are data sinks and then there are ghost          06:03:05

19     points.  So this is just our feed.          06:03:08

20               MR. LANGFORD:  Okay.  Mr. Johnson, we          06:03:14

21     would like to pull up one last exhibit here.  It is          06:03:37

22     in your binder at Document C and it's Document C in          06:03:41

23     the Veritext exhibit.  This can be marked Exhibit 1          06:03:47

24     to the Mr. Rahlouni deposition for identification.          06:03:54

25               MR. CRENSHAW:  One second.          06:04:07

Page 62

```
 1              MR. LANGFORD:  And, Mr. Johnson, if we    06:04:09

 2    can zoom in a little bit for Mr. Rahlouni.  Sorry.    06:04:13

 3    Thank you.                                            06:04:18

 4       Q.   Mr. Rahlouni, have you ever seen this         06:04:20

 5    before?                                               06:04:23

 6              (Rahlouni Exhibit 1 marked.)                06:03:59

 7       A.   No, this is the first time.                   06:04:24

 8       Q.   Okay.  I can represent that I'm showing       06:04:26

 9    you a document produced by a third party in           06:04:28

10    discovery in this case.  It's a September 30, 2021,   06:04:30

11    letter from the Georgia Bureau of Investigations to   06:04:33

12    Mr. Phillips and one other individual.                06:04:37

13              If you will scroll the Zoom down to the     06:04:39

14    bullet points.  You will see that the letter says     06:04:42

15    that a hard drive that the Georgia Bureau of          06:04:54

16    Investigations received contains certain information  06:04:57

17    including this bullet pointed list.  And the list is   06:05:01

18    right there, ACLED USA 2020 December 12.              06:05:05

19              Can you walk through that list of bullet    06:05:12

20    points and identify any of those documents you        06:05:15

21    recognize and then tell us whether they were          06:05:18

22    produced by Red Metrics?                              06:05:22

23              MR. YARBROUGH:  Sorry, before you           06:05:23

24    answer that, will you move your camera down so we can 06:05:24

25    see your face.  Thanks.                               06:05:27
```

| | | |
|---|---|---|
| 1 | THE WITNESS:  I was trying to get | 06:05:30 |
| 2 | the -- | 06:05:32 |
| 3 | A.   Yes.  So -- so ACLED is an org.  It's | 06:05:33 |
| 4 | possible.  ATL drop boxes and days of interest, yes. | 06:05:40 |
| 5 | I recall that.  Devices within 100 feet of org or | 06:05:46 |
| 6 | drop boxes by day.  Yes, you know, that's possible | 06:05:50 |
| 7 | format for output. | 06:05:55 |
| 8 | Georgia 279 devices nationwide 10.1.2020 | 06:05:56 |
| 9 | to 1.5.2021, it's possible.  Output devices of | 06:06:02 |
| 10 | interest, yeah.  Drop box locations output.  GA | 06:06:08 |
| 11 | Devices of interest, yeah.  GA drop box locations | 06:06:08 |
| 12 | output copy, not sure what that is but it's | 06:06:16 |
| 13 | possible.  TTV GA 207 of -- that TTV address may be | 06:06:18 |
| 14 | a reverse geolocation of addresses.  And then UPS | 06:06:26 |
| 15 | locations, yeah, it's possible.  UPS -- I remember | 06:06:30 |
| 16 | UPS locations.  I can recall UPS locations. | 06:06:33 |
| 17 | I'm sorry, what was the question again? | 06:06:38 |
| 18 | Do I recall this stuff or -- | 06:06:39 |
| 19 | Q.   The first question was just whether you | 06:06:40 |
| 20 | recognize these documents.  And it sounds like your | 06:06:42 |
| 21 | testimony is that you recognize them -- | 06:06:45 |
| 22 | A.   Yeah, they look familiar, at least the -- | 06:06:46 |
| 23 | Q.   And when you say these are outputs, are | 06:06:49 |
| 24 | these things Red Metrics would have created? | 06:06:51 |
| 25 | A.   So I can say that bullet point number 2, | 06:06:56 |

Page 64

```
 1    that sounds like something that I would -- that      06:07:05
 2    sounds like the way I phrase my output, ATL drop     06:07:09
 3    boxes and days of interest, yeah.  So that is an     06:07:13
 4    analysis that could be done, yes.                    06:07:17
 5            Devices within 100 feet or org or drop box   06:07:18
 6    by day, yes, that's something that I probably        06:07:24
 7    included in the sentence in our -- the phraseology   06:07:26
 8    here.  100 feet of org or drop boxes by day.  Yeah,  06:07:30
 9    that's something that would have labeled that way.   06:07:36
10    GA 279 devices nationwide 10.1 to -- that's like a   06:07:39
11    lookback or a trace so that's -- GA devices of       06:07:43
12    interest 1.14.2021.csv.  Yeah, if that's a trace     06:07:49
13    signal, that's possible too.  The copy one, I don't  06:07:55
14    know about that one.  Pass 1 address, that TTV       06:07:57
15    address, I don't know about that one, but it's       06:08:02
16    possible that I produced it maybe for, like, getting 06:08:04
17    signals and getting their reverse geolocation,       06:08:07
18    meaning if it's like an address, a home or what have 06:08:12
19    you, right.                                          06:08:15
20        Q.   Yeah.                                       06:08:15
21        A.   And then UPS locations, if -- I remember,   06:08:16
22    like, doing work on UPS location now that I see it   06:08:20
23    basically, like, what are out there, like what are   06:08:25
24    the UPS locations.  Because like I mentioned, like,  06:08:26
25    possible, like, you know, you have like a UPS        06:08:29
```

Page 65

1    delivery or something like that that is creating a        06:08:31

2    lot of signals within a bigger footprint.                 06:08:35

3         Q.   With the TTV bullet point, is that             06:08:47

4    consistent with the Red Metrics project being named      06:08:50

5    True the Vote?                                            06:08:56

6         A.   That is the way I name it, TTV.  That's        06:08:56

7    the way I recognize it, TTV.                              06:08:58

8         Q.   And is that how -- did you name any other      06:09:00

9    files TTV something?                                      06:09:04

10        A.   I'll have to see the file, but I don't --      06:09:09

11   you know, TTV is how the project came in so               06:09:11

12   everything is TTV.  So whether I named another file,      06:09:15

13   I don't know.  It could be something that they have       06:09:19

14   used.  I don't know.                                      06:09:22

15        Q.   Can you just flip to page 2 of this.           06:09:27

16   You'll see at the top of the page, we can Zoom in on      06:09:36

17   those first two paragraphs.  The letter says, Of          06:09:41

18   those data points, the spreadsheets identify 279          06:09:45

19   cell phones which made multiple trips to within           06:09:48

20   100 feet of a voter drop box.  Other spreadsheets         06:09:51

21   and documents provided tie these cell phones through      06:09:55

22   geolocation to various organizations.  What has not       06:09:55

23   been provided is any other kind of evidence that          06:09:57

24   ties these cell phones to ballot harvesting.              06:09:59

25             Is that consistent with your understanding      06:10:03

Page 66

```
1    what those documents might show?                    06:10:05

2             MR. YARBROUGH:  Objection; form.            06:10:08

3        A.   So, again, the way I produced my output     06:10:09

4    relates to the output, which means in this case the  06:10:14

5    second paragraph is totally unrelated to me.  So I   06:10:18

6    don't know what that even details, right.  (Reviewed 06:10:21

7    document.)                                           06:10:21

8             Yeah, so we -- we didn't have any names or  06:10:33

9    anything like that so that's for -- I don't know     06:10:35

10   but -- (reviewed document.)  So, again, we're        06:10:39

11   talking about the visits and here we're talking      06:10:43

12   about how the visit is defined within 100 feet --    06:10:46

13       Q.   And if we scroll down to the next           06:10:51

14   paragraph -- I'm sorry?                              06:10:54

15       A.   So the tie here, you know, what is the      06:10:56

16   definition of a tie, so...                           06:10:58

17       Q.   If we scroll down, that next paragraph, it  06:11:01

18   says, As it exists, the data, while curious, does    06:11:04

19   not rise to the level of probable cause that a crime 06:11:06

20   has been committed.                                  06:11:09

21            Earlier you testified I would not drop      06:11:11

22   a -- I think you said you would not drop a bomb      06:11:14

23   based on Red Metrics' analysis?                      06:11:17

24            MR. EVANS:  Object to form.                 06:11:20

25       A.   I did not say based on Red Metrics.  I      06:11:20
```

Page 67

```
 1    said based on the nature of data that we use.        06:11:23

 2        Q.    Based on the nature of data that you use    06:11:27

 3    when you accuse someone of committing a crime?        06:11:29

 4              MR. YARBROUGH:  Objection; form.            06:11:33

 5        A.    So in this -- can you define the crime in   06:11:36

 6    this case?                                            06:11:40

 7        Q.    Let's say, for example --                   06:11:40

 8        A.    Give me an example.                         06:11:41

 9        Q.    -- election fraud.                          06:11:43

10              MR. YARBROUGH:  Objection; form.            06:11:45

11              MR. EVANS:  Object to form.                 06:11:49

12        A.    You know, I can only speak to whether,      06:11:49

13    like I said, like, the signals are not -- they're    06:11:53

14    not a beacon.  They're not beaming one after the     06:11:56

15    other, one after the other.  Your phone does not     06:12:00

16    work that way.                                        06:12:02

17              Your phone sends a signal, maybe multiple   06:12:03

18    signals within a milliseconds.  Maybe sometimes we   06:12:06

19    get our phone that sends a signal within a month.    06:12:08

20    So how can you tie that to a crime.  I'm not sure.   06:12:12

21                         EXAMINATION                      06:12:12

22    BY MR. DAVIDSON:                                      06:12:12

23        Q.    Hi, Mr. Rahlouni.  My name is Jared         06:12:21

24    Davidson.  I just have a couple of questions.  With  06:12:22

25    my colleague John Langford, I also work for the same 06:12:25
```

Page 68

```
 1    organization representing Mr. Mark Andrews in this      06:12:28

 2    case.                                                   06:12:33

 3              I wanted to put a couple things on the        06:12:33

 4    record.  To be very clear, this is just for purposes    06:12:36

 5    of ensuring that it's on the record.                    06:12:39

 6              So you testified earlier that you had         06:12:41

 7    identified a number of documents in this case           06:12:44

 8    related to the project that you conducted which we      06:12:46

 9    have been talking about.                                06:12:52

10              Do you recall that testimony?                 06:12:53

11         A.   Yes.                                          06:12:56

12         Q.   Okay.  And you mentioned, I think,            06:12:57

13    spreadsheets and pdfs, the tableau.  Is there any --    06:13:00

14    and some spreadsheets.                                  06:13:05

15              Is there any -- anything else that you        06:13:06

16    identified that you did not discuss earlier?            06:13:10

17         A.   So --                                         06:13:16

18              MR. YARBROUGH:  Object to form.               06:13:17

19         A.   -- spreadsheets, Excel spreadsheets,          06:13:17

20    tableau workbooks, pdfs, and then I mentioned maybe     06:13:19

21    like logs or something.                                 06:13:25

22         Q.   And I want to state on the record, it's my    06:13:26

23    understanding you have -- you continue to maintain      06:13:30

24    those documents.                                        06:13:35

25              Are they currently in your physical           06:13:36
```

Page 69

| | | |
|---|---|---|
| 1 | possession? | 06:13:38 |
| 2 | A.  They are on my local machine, yes. | 06:13:39 |
| 3 | Q.  And have you shared those documents with | 06:13:42 |
| 4 | anyone else, for example, with Mr. Matthews or | 06:13:44 |
| 5 | Mr. Gerwing? | 06:13:51 |
| 6 | A.  I shared the documents with my counsel, | 06:13:53 |
| 7 | Tim Gerwing, Ben Matthews. | 06:13:58 |
| 8 | Q.  Okay.  Have you shared those with any | 06:14:00 |
| 9 | other individuals? | 06:14:01 |
| 10 | A.  No. | 06:14:03 |
| 11 | Q.  I'm only asking you what you know.  I'm | 06:14:04 |
| 12 | not asking you to tell me what you -- what, in fact, | 06:14:08 |
| 13 | exists. | 06:14:10 |
| 14 | So as you know, do Mr. Matthews and | 06:14:11 |
| 15 | Mr. Gerwing currently have possession of those | 06:14:17 |
| 16 | documents since you conveyed them to them? | 06:14:19 |
| 17 | MR. EVANS:  Object to form. | 06:14:22 |
| 18 | MR. YARBROUGH:  Object to form. | 06:14:23 |
| 19 | Q.  Are you aware of whether they have those | 06:14:26 |
| 20 | documents you sent to them? | 06:14:28 |
| 21 | MR. YARBROUGH:  Objection; form. | 06:14:30 |
| 22 | MR. EVANS:  Object to form. | 06:14:31 |
| 23 | A.  I sent the documents so it's possible they | 06:14:31 |
| 24 | have them, yes. | 06:14:36 |
| 25 | Q.  And is it your understanding that those | 06:14:36 |

Page 70

```
 1   documents relate to this lawsuit?                    06:14:38
 2              MR. EVANS:  Object to form.               06:14:44
 3       A.   Yes, they relate to this lawsuit.           06:14:44
 4              MR. DAVIDSON:  I'm just putting on the     06:14:47
 5   record here -- Jace, feel free to add anything else  06:14:48
 6   you want to add.  But based on my understanding,     06:14:54
 7   you-all are withholding those documents for now      06:14:55
 8   pursuant to your amended responses and objections to 06:14:59
 9   our Rule 45 subpoena.                                06:15:02
10              And I just want to make clear for the     06:15:05
11   record that it's plaintiff's position those documents 06:15:06
12   should stay preserved.  It's also our position that  06:15:09
13   they should be produced to us eventually.            06:15:12
14              And, you know, I look forward to us        06:15:16
15   conferring about that at a later time.  But just out 06:15:19
16   of an abundance of caution, I wanted to make very    06:15:22
17   clear that those documents remain preserved and we   06:15:25
18   can sort of confer about next steps.                 06:15:28
19              MR. YARBROUGH:  Sure.  I'll add that       06:15:31
20   Mr. Rahlouni's responses and objections list the     06:15:33
21   reasons that we are respectfully declining to produce 06:15:36
22   those and that those -- that response has not been   06:15:40
23   amended.  So, whereas, we had a fairly lengthy back  06:15:42
24   and forth about amending the other ones which we were 06:15:45
25   happy to do in good faith, his were not.  And yes,   06:15:48
```

Page 71

```
 1    everything else good.                            06:15:52
 2            MR. DAVIDSON:  Thank you.                06:15:52
 3            MR. YARBROUGH:  And also I have          06:15:54
 4    instructed Mr. Rahlouni to maintain those documents.  06:15:56
 5    He needs to keep them, so...                     06:15:59
 6            MR. DAVIDSON:  Thank you,                06:16:02
 7    Mr. Rahlouni.                                    06:16:03
 8            MR. LANGFORD:  No further questions      06:16:03
 9    from plaintiff Mark Andrews.                     06:16:04
10            MR. EVANS:  Austin, do you have          06:16:06
11    anything?                                        06:16:08
12            MR. VINING:  I have just a few           06:16:09
13    questions.  Thank you.                           06:16:12
14            MR. CRENSHAW:  Give us just a second,    06:16:13
15    Austin.  We'll lose our witness if we switch.    06:16:15
16            Do y'all need to see the attorney        06:16:22
17    asking questions?                                06:16:24
18            MR. YARBROUGH:  No, it's okay.           06:16:25
19            One thing I should add, sorry, as to     06:16:27
20    the -- my understanding was that in negotiating our  06:16:29
21    not resisting through motion practice, these    06:16:32
22    depositions was an agreement that y'all weren't going  06:16:35
23    to move to compel documents, so that was my      06:16:37
24    understanding of our back and forth.            06:16:40
25            MR. CRENSHAW:  Counsel, you may          06:16:46
```

Page 72

| | | |
|---|---|---|
| 1 | proceed. | 06:16:48 |
| 2 | MR. VINING:  Thank you. | 06:16:50 |
| 3 | EXAMINATION | 06:16:50 |
| 4 | BY MR. VINING: | 06:16:50 |
| 5 | Q.   Good evening, Mr. Rahlouni.  My name is | 06:16:50 |
| 6 | Austin Vining and I represent defendants Dinesh | 06:16:53 |
| 7 | D'Souza and D'Souza Media LLC.  I have just a couple | 06:16:55 |
| 8 | of quick questions to clarify. | 06:17:00 |
| 9 | Is it your understanding that Red Metrics | 06:17:02 |
| 10 | reviewed surveillance footage of voters depositing | 06:17:06 |
| 11 | ballots in drop boxes in connection with their work | 06:17:11 |
| 12 | on the project for OpSec and Mr. Phillips? | 06:17:13 |
| 13 | A.   So yes, video was reviewed.  Yes. | 06:17:17 |
| 14 | Q.   And what was your involvement with that | 06:17:21 |
| 15 | project? | 06:17:24 |
| 16 | A.   So initially, as I mentioned, I was tasked | 06:17:24 |
| 17 | to find a way to automate the video review.  But | 06:17:29 |
| 18 | then I was not successful and then somebody else | 06:17:33 |
| 19 | took on the review of the video, most likely manual. | 06:17:36 |
| 20 | Q.   Do you remember when you were tasked with | 06:17:40 |
| 21 | that project? | 06:17:42 |
| 22 | A.   I can't recall.  Sorry. | 06:17:43 |
| 23 | Q.   Any sort of approximation? | 06:17:45 |
| 24 | A.   Whatever that project was on. | 06:17:47 |
| 25 | Q.   So no approximation, is that -- | 06:17:51 |

Page 73

```
 1        A.    No, I can't.  Sorry.                    06:17:54

 2        Q.    Okay.  And do you know the results of the  06:17:55

 3   manual review?                                     06:17:59

 4        A.    No.                                     06:18:01

 5        Q.    Okay.  After you determined that you    06:18:04

 6   couldn't find a way to automate your involvement,  06:18:06

 7   would that end it at that point?                   06:18:10

 8        A.    Yeah.  So at that point, you know,      06:18:12

 9   basically, like I said, I can't find a way to      06:18:14

10   automate it.  And essentially, you know, they had a  06:18:17

11   contractor, like, review the video.  But I just    06:18:22

12   stayed on my line and did the geofencing and       06:18:25

13   whatnot.                                           06:18:28

14        Q.    Okay.  Do you remember even at what kind  06:18:28

15   of point in the project -- I know you were working  06:18:36

16   on the geofencing -- if this was toward the        06:18:38

17   beginning of that, middle of that, or end of that  06:18:41

18   project?                                           06:18:43

19        A.    Probably not the end.  And kind of just to  06:18:45

20   confirm, so the way that I would, you know -- not  06:18:48

21   that I recall, maybe, like, you know, they had,    06:18:55

22   like, snippets of video and they want to try to see  06:18:57

23   where the devices within that particular buffer or  06:18:59

24   video, just to be clear.                           06:19:02

25        Q.    That's what you were doing?  I'm sorry?  06:19:05
```

Page 74

```
 1        A.   Yeah, I remember doing -- I remember doing    06:19:09
 2   that, yeah.                                             06:19:11
 3        Q.   That's the automation process you were        06:19:16
 4   describing?                                             06:19:18
 5        A.   No, that's not automation.  That's            06:19:18
 6   basically after manual review and he would say can     06:19:20
 7   you see any signals within this particular time,       06:19:24
 8   right.  So that would be then a data analysis, be      06:19:29
 9   like a SQL query querying the data trying to see any   06:19:34
10   signals within a particular time on a particular       06:19:38
11   buffer.                                                06:19:41
12        Q.   And were you able to get any results from    06:19:41
13   that?                                                  06:19:43
14        A.   Yeah, I mean, sure, yeah.  Results as in     06:19:43
15   like the results of the query and then you push the   06:19:47
16   results.                                               06:19:49
17        Q.   And were you able to link video footage to   06:19:52
18   certain devices?                                       06:19:56
19        A.   That I don't recall, no.                     06:19:57
20        Q.   Okay.  Do you remember when you wrapped up   06:20:00
21   this project or you finished your work on this         06:20:05
22   project?                                               06:20:09
23        A.   Not exactly, no.  And it's not uncommon      06:20:11
24   because we have clients that go and then come back     06:20:13
25   with a request.  You know, so it's like a ebb and      06:20:16
```

Page 75

```
 1    flow at least the way I see it.                    06:20:21

 2        Q.   And the clips that you were asked to try  06:20:23

 3    to -- excuse me if I'm saying this wrong.          06:20:26

 4             Is it accurate to say you were trying to  06:20:33

 5    align them with the geotracking data?              06:20:34

 6        A.   Trying to align?                           06:20:38

 7        Q.   The video clips with the data that you    06:20:39

 8    had.                                                06:20:43

 9        A.   Yeah, like over -- like, trying to see    06:20:44

10    whether there is a signal that exists within a     06:20:47

11    particular buffer.  So it is like a space in time  06:20:50

12    queue at least, geolocation.  So you have a -- you 06:20:54

13    define your space time and you define how big is the 06:20:56

14    queue and you see if there is anything in it.      06:21:01

15        Q.   How many -- sorry.                         06:21:03

16             How many clips were there that you were   06:21:03

17    asked to review?                                    06:21:05

18        A.   That I don't remember.  But I -- you know, 06:21:07

19    it would have come in the spreadsheet, you know,   06:21:14

20    these are the events.  And then I would have created 06:21:17

21    a table for those events and then try to see, you  06:21:20

22    know, co occurrences or overlap of devices.  You   06:21:23

23    treat them as an event essentially.                06:21:28

24             Like you say, hey, here's a video of a    06:21:30

25    clip at this time at this location.  So now all you 06:21:33
```

Page 76

1    have is, like, a time and a location and you try to          06:21:35

2    see what devices are there.  Just kind of -- I guess         06:21:37

3    that's as simple as that.                                    06:21:40

4         Q.   Do you have any sort of estimate of how            06:21:41

5    many clips there were?                                       06:21:45

6         A.   No.  Because it was footage.  So clips, I          06:21:47

7    don't know how many there were cut.  But I remember          06:21:49

8    there were spreadsheet that were probably worked on          06:21:50

9    trying to overlay those clips.                               06:21:53

10        Q.   Okay.  And do you know who -- you said             06:21:55

11   there weren't clips, is that right, or there were            06:21:58

12   clips?                                                       06:22:02

13        A.   It's footage the way I -- I remember it,           06:22:02

14   right.  And the challenge is that the footage is             06:22:06

15   long so you have to essentially, like, review                06:22:10

16   manually the footage and -- yeah.                            06:22:14

17        Q.   Okay.  I'm sorry.  I think I                       06:22:19

18   misunderstanding.                                            06:22:20

19             Were you given individual time segments in         06:22:22

20   the footage or shorter clips of the footage or you           06:22:28

21   just had the long manual --                                  06:22:33

22        A.   The metadata.  Can you see anything.  So           06:22:35

23   they're interested in -- so the way I understand it,         06:22:37

24   they're interested into, like, let's say, a ballot           06:22:42

25   box within a particular time because they found              06:22:44

Page 77

```
 1    footage that they were interested in footage.  So      06:22:46

 2    what are the interested devices that were around       06:22:50

 3    that time.                                             06:22:52

 4            So you have your time, location, and then      06:22:52

 5    you create a buffer and you get the devices within     06:22:58

 6    that particular time.                                  06:23:02

 7       Q.   So for the times that they identified, do      06:23:03

 8    you remember how many particular times they gave you   06:23:08

 9    to try to --                                           06:23:09

10       A.   Oh, no.                                        06:23:10

11       Q.   -- investigate?                                06:23:10

12            Any approximation?                             06:23:11

13       A.   Not really.  Because you just upload the       06:23:13

14    spreadsheet and then you kind of like get into an      06:23:16

15    analysis and then you get the results if there's       06:23:18

16    anything that shows up.                                06:23:21

17                  MR. VINING:  Okay.  Thank you.  I have   06:23:23

18    further questions.                                     06:23:24

19                  MR. EVANS:  I just have a couple         06:23:26

20    questions.                                             06:23:28

21                     EXAMINATION                           06:23:28

22    BY MR. EVANS:                                          06:23:28

23       Q.   My name is -- can you hear me?                 06:23:29

24       A.   I can hear you.                                06:23:39

25       Q.   My name is Jake --                             06:23:39
```

Page 78

```
 1        A.    Hello.                                  06:23:39

 2        Q.    Can you hear me okay?                   06:23:41

 3        A.    Yes.                                    06:23:42

 4        Q.    So my name is Jake Evans.  I represent the  06:23:43

 5   defendants True the Vote, Ms. Engelbrecht, and   06:23:46

 6   Mr. Phillips.                                     06:23:49

 7              Was Mr. Gerwing and Mr. Matthews lead on  06:23:51

 8   this project that you called True the Vote?      06:23:56

 9        A.    I know Mr. Gerwing interacted with      06:24:00

10   Phillips so it was probably -- if you want to call  06:24:05

11   that lead.  We're a small company so...          06:24:06

12        Q.    And would Mr. Gerwing have more knowledge  06:24:10

13   about this specific project than you?            06:24:12

14        A.    More knowledge in terms -- I'm sorry?  06:24:18

15        Q.    Would he have more knowledge about the  06:24:21

16   client relationship about -- with True the Vote?  06:24:24

17        A.    Yes.                                    06:24:27

18        Q.    And would you defer to him and his      06:24:28

19   interactions with Mr. Phillips because he had more  06:24:31

20   affiliation or knowledge?                         06:24:38

21        A.    In terms of asking clarifications about  06:24:44

22   the requests, yes.                                06:24:46

23              MR. EVANS:  Okay.  No further           06:24:48

24   questions.                                        06:24:49

25              MR. LANGFORD:  That's it.  No further   06:24:53
```

Page 79

1    questions from plaintiffs.                          06:24:54

2              MR. CRENSHAW:  Anybody on Zoom           06:24:56

3    questions?                                          06:24:57

4              (No response.)                            06:24:59

5              THE VIDEOGRAPHER:  That concludes        06:24:59

6    today's testimony.  We're off the record at 6:24 p.m.  06:25:01

7              (Deposition concluded at 6:24 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 80

1                          DEPOSITION CHANGES

2    WITNESS:   AZEDDINE RAHLOUNI

3    PAGE NO.  LINE NO.     CHANGE      REASON FOR CHANGE

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Page 81

1

2

3

4                          _____
                           (Signature of the Witness)

5

6

7

8    THE STATE OF _____

9    COUNTY OF _____

10

11        Subscribed and sworn to before me by the said

12   witness, AZEDDINE RAHLOUNI, on this the _____

13   day of _____, 2024.

14

15

                           _____
16                         Notary Public in and for the

                           State of _____

17                         County of _____

18   My commission expires: _____

19

20

21

22

23

24

25

Page 82

```
 1   STATE OF TEXAS    )
 2   COUNTY OF DALLAS  )
 3        I, Michelle L. Munroe, Certified Shorthand
 4   Reporter in and for the State of Texas, certify that
 5   the foregoing deposition of AZEDDINE RAHLOUNI was
 6   reported stenographically by me at the time and place
 7   indicated, said witness having been placed under oath
 8   by me, and that the deposition is a true record of
 9   the testimony given by the witness;
10        That the amount of time used by each party at
11   the deposition is as follows:
          Mr. Langford  -   1 hour, 25 minutes
12        Mr. Davidson  -   3 minutes
          Mr. Vining    -   7 minutes
13        Mr. Evans     -   1 minute
14        I further certify that I am neither counsel for
15   nor related to any party in this cause and am not
16   financially interested in its outcome.
17        Given under my hand on this the 6th day
18   of November, 2024.
19
20
21
          Michelle L. Munroe, CSR No. 6011
22        Commission expires 1-31-26
          Firm Registration #571
23        VERITEXT LEGAL SOLUTIONS
          300 Throckmorton Street, Suite 1600
24        Fort Worth, Texas  76102
          817.336.3042  telephone
25
```

```
                                                      Page 83

 1     Jace Yarbrough, Esquire

 2     jace.yarbrough@the-sl-lawfirm.com

 3                       November 8, 2024

 4     RE:    Andrews, Mark v. D'souza, Dinesh Et Al

 5         10/30/2024, Azeddine Rahlouni (#6990099)

 6         The above-referenced watermarked transcript is available for

 7     review.

 8         Within the applicable timeframe, the witness should

 9     read the testimony to verify its accuracy. If there are

10     any changes, the witness should note those with the

11     reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13     Deponent and Errata and return to the deposing attorney.

14     Copies should be sent to all counsel, and to Veritext at

15     cs-midatlantic@veritext.com

16      Return completed errata within 30 days from

17    receipt of testimony.

18      If the witness fails to do so within the time

19    allotted, the transcript may be used as if signed.

20

21

22                  Yours,

23                  Veritext Legal Solutions

24

25
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.