# EXHIBIT 192

CONFIDENTIAL

Page 1

1        IN THE UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF GEORGIA

2             ATLANTA DIVISION

3

4   MARK ANDREWS,

5      Plaintiff,

                     CIVIL ACTION FILE

6      vs.

                     NO. 1:22-cv-04259-SDG

7   DINESH D'SOUZA, et al.,

8      Defendants.

9

10

11

12

13           **CONFIDENTIAL**

14

15       30(b)(6) VIDEO DEPOSITION OF

16   SALEM MEDIA GROUP, INC. through PHILIP BOYCE

17         November 26, 2024

18           9:37 a.m.

19     TAKEN BY REMOTE VIDEOCONFERENCE

20   Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

21

22

23

24

25

CONFIDENTIAL

Page 2

1                    INDEX TO EXHIBITS

2      EXHIBIT              DESCRIPTION                    PAGE

3      Exhibit 153    Notice of deposition and        12

4                     subpoena

5      Exhibit 154    E-mails, 9/10/21, SMG0000164     29

6      Exhibit 155    E-mails, 3/8/24, SMG0000146      47

7      Exhibit 156    E-mails, 4/6/22, SMG0000528      53

8      Exhibit 157    E-mails, 4/20/22, SMG0000882     62

9      Exhibit 158    E-mails, 4/7/22, SMG0000912      67

10     Exhibit 159    E-mails, 4/25/22, SMG0001255     70

11     Exhibit 160    E-mails, 8/12/22, SMG0002233     78

12     Exhibit 161    E-mails, 8/18/22, SMG0000109     83

13     Exhibit 162    E-mail, 9/8/22, SMG0000517       86

14     Exhibit 163    E-mails, 9/8/22, SMG0000054      90

15     Exhibit 164    E-mails, 10/25/22, SMG0000933    92

16     Exhibit 165    E-mails, 10/26/22, SMG0001261    95

17     Exhibit 166    E-mails, 9/8/22, SMG0001278      98

18     Exhibit 167    E-mails, 6/10/22, DDR-00051352   103

19     Exhibit 168    E-mails, 10/1/22, SMG0000003     108

20     Exhibit 169    E-mails, 9/7/22, SMG0000078      112

21     Exhibit 170    E-mails, 8/30/22, SMG0000092     117

22     Exhibit 171    E-mails, 9/16/22, SMG0000510     121

23     Exhibit 172    E-mails, 4/4/22, SMG0000530      124

24     Exhibit 173    E-mail, 4/19/22, SMG0001158      127

25     Exhibit 174    Press release, SMG0001159        128

CONFIDENTIAL

Page 3

1                    INDEX TO EXAMINATION                    PAGE

2      By Ms. Qin                                               7

3      By Mr. Vining                                          132

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

```
                                          Page 4
 1      APPEARANCES OF COUNSEL:
 2      For the Plaintiff:
 3                 SONIA QIN, ESQ.
 4                 SCOTT BOISVERT, ESQ.
 5                 Skadden Arps Slate Meagher & Flom LLP
 6                 One Manhattan West
 7                 New York, New York 10001-8602
 8
 9      For the Defendants True the Vote, Gregg Phillips,
10      and Catherine Engelbrecht:
11                 PHILIP GEORGE, ESQ.
12                 Greenberg Traurig LLP
13                 3333 Piedmont Road NE
14                 Atlanta, Georgia 30305
15
16      For the Defendants Dinesh D'Souza and D'Souza
17      Media:
18                 AUSTIN C. VINING, ESQ.
19                 Buchalter
20                 790 Stratforde Drive
21                 Alpharetta, Georgia 30004
22
23
24
25
```

CONFIDENTIAL

Page 5

1    APPEARANCES (Cont'd):

2    On behalf of Salem Media Group, Inc. and the

3    Witness:

4                IAN BYRNSIDE, ESQ.

5                S. DEREK BAUER, ESQ.

6                GEORGIA BENNETT, ESQ.

7                Baker & Hostetler LLP

8                1170 Peachtree Street

9                Suite 2400

10                Atlanta, Georgia 30309

11

12    Also Present:

13                John Badgley, Videographer

14                JB Duff, Concierge Tech

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 6

1              THE VIDEOGRAPHER:  Good morning.  We're on

2       the record at 9:37 on Tuesday, November 26th, 2024.

3       This begins Media Unit 1 of the video-recorded

4       deposition of Philip Boyce in the matter of Mark

5       Andrews versus Dinesh D'Souza, et al.

6              Will counsel identify yourself and state

7       whom you represent.

8              MS. QIN:  Sonia Qin, counsel for

9       plaintiff, Mark Andrews.

10             MR. BOISVERT:  Scott Boisvert also pro

11      bono counsel for plaintiff, Mark Andrews.

12             THE VIDEOGRAPHER:  Will the court reporter

13      please swear in the witness.

14             MR. GEORGE:  Hold on.  Sorry.  Philip

15      George for defendants True the Vote, Inc., Catherine

16      Engelbrecht, and Gregg Phillips.

17             MR. VINING:  Austin Vining from the law

18      firm Buchalter on behalf of defendants Dinesh

19      D'Souza and D'Souza Media, LLC.

20             MR. BYRNSIDE:  This is Ian Byrnside with

21      Baker & Hostetler here on behalf of Salem Media and

22      the witness.

23                     PHILIP BOYCE,

24      having been first duly sworn, was examined and

25      testified as follows:

CONFIDENTIAL

Page 7

1                    EXAMINATION

2    BY MS. QIN:

3        Q    Good morning, Mr. Boyce.  My name is Sonia

4    Qin, as I mentioned earlier, and I will be one of --

5    I will be the attorney taking the deposition today.

6    I'm one of the attorneys for Mark Andrews, the

7    plaintiff in this action.

8              To start off, could you please state your

9    full name for the record?

10       A    Full name is Phil or Philip, with one L,

11   Boyce, B-O-Y-C-E.

12       Q    Thank you.

13             And could you please state your current

14   address?

15       A    My home address?

16       Q    Yes.

17       A    827 Assembly Court, Reunion, Florida

18   34747.

19       Q    Great.  Thank you very much.

20             Have you been deposed before, Mr. Boyce?

21       A    Yes.

22       Q    In what setting have you been deposed

23   before?

24       A    As a manager of a radio station.  It was

25   years ago.

CONFIDENTIAL

Page 8

```
1          Q     And that was the only time you have been
2     deposed?
3          A     Yeah, the only time I recall.
4          Q     Great.  Thank you.
5                Have you ever testified in a nondeposition
6     setting?
7          A     I don't recall that I have.
8          Q     Are you familiar with a 30(b)(6)
9     deposition, what that means?
10         A     Other than that's what I'm in now, I'm not
11    all that familiar.
12         Q     So this means that we are seeking
13    information from an organization or a corporation,
14    and you are here today as a representative of that
15    corporation to provide testimony on its behalf.
16         A     I understand that.
17         Q     And am I correct that you have never been
18    deposed before for a 30(b)(6) deposition?
19         A     Not to my knowledge, no.
20         Q     Great.  Thank you.
21               Do you understand that you're under oath
22    today?
23         A     Yes.
24         Q     And you understand that your testimony
25    today carries the same weight as testimony before a
```

CONFIDENTIAL

Page 9

1    judge or a jury?

2         A    I do understand.

3         Q    Thank you.

4              Is there any reason you think you might

5    not be able to give accurate testimony today?

6         A    No.

7         Q    Is there any reason your memory might be

8    less sharp than usual today?

9         A    No.

10        Q    Do you have any physical or mental

11   conditions that would prevent you from giving your

12   best testimony today?

13        A    No.

14        Q    And are you under the influence of any

15   drugs or other substances that would prevent you

16   from giving your best testimony today?

17        A    No.

18        Q    Thank you.

19             So before we get started, let's just set

20   down a few ground rules for the rest of the day to

21   make things a little easier.

22             As stated before, everything we say today

23   is being recorded and transcribed by a court

24   reporter and a videographer, and I presume you're

25   aware of that?

CONFIDENTIAL

Page 10

1          A     Yes.

2          Q     Great.

3                And throughout the deposition, we will be

4     introducing certain documents as exhibits and

5     putting them on the screen for you to view, as you

6     had seen earlier.  I will assume that you're able to

7     see and review that document on the screen unless

8     you say otherwise.  So if you have trouble seeing

9     anything, just please let me know.

10         A     Okay.

11         Q     Great.

12               And, of course, if you need any additional

13    time to review a document, please also let me know.

14         A     Okay.

15               MS. QIN:  So the majority of the documents

16    that we will be seeing today on the screen are

17    documents that Salem Media has produced in response

18    to the plaintiff's subpoena in this matter, so I

19    wanted to check with counsel if we can agree to

20    stipulate that any documents produced by Salem Media

21    in response to plaintiff's subpoena are true and

22    accurate copies of documents that were produced in

23    the ordinary course of business.

24               MR. BYRNSIDE:  We can agree they are

25    authentic copies of our documents, but whether the

CONFIDENTIAL

Page 11

```
 1    witness is able to answer questions about them or
 2    not will depend on what documents you show him.
 3              MS. QIN:  Thank you.
 4    BY MS. QIN:
 5         Q    So, Mr. Boyce, for the court reporter's
 6    benefit, it would be helpful if you answered my
 7    questions verbally.  Sometimes it's easy to just
 8    answer with a shake of the head or a nod, but please
 9    respond with a "yes" or "no" so that we can get the
10    transcription correct.
11         A    Okay.  Sure.
12         Q    For -- also for the court reporter, let's
13    try to not talk over each other.  So please allow me
14    to finish my questions, and I will also allow you to
15    finish your answers.  Does that sound okay?
16         A    Okay.  That sounds good.
17         Q    And if any question that I ask you is
18    unclear or you don't understand it, please let me
19    know, and if you don't ask me to clarify, I will
20    assume that you understand my question.
21         A    Understood.
22         Q    Great.
23              You had asked about breaks earlier, so I
24    will plan for us to take a break every hour or so at
25    reasonable times, but if you need a break -- if you
```

CONFIDENTIAL

Page 12

1    need a break at any other time, please let me know.

2        A    Thank you.

3        Q    We can take a little break as long as no

4    question is pending.

5        A    Okay.

6        Q    Throughout the deposition, your counsel

7    may object to certain questions that I ask, but

8    unless your counsel specifically instructs you not

9    to answer my question, you still must answer my

10   question.

11       A    Okay.

12       Q    Great.

13           MS. QIN:  So I'd like to get started with

14   what we're marking as Exhibit 153, which is the

15   notice of deposition, the subpoena to the witness.

16   If we could pull that up on screen.

17           CONCIERGE TECH:  One moment.  That

18   document is up and marked as Exhibit Number 153.

19   Stand by while I bring that up on the screen.

20           (Exhibit Number 153 was marked for

21   identification.)

22           MS. QIN:  Thank you.

23   BY MS. QIN:

24       Q    So, Mr. Boyce, this is the deposition

25   subpoena that we had sent to Salem Media.  Do you

CONFIDENTIAL

Page 13

1    recognize this document?

2         A    I do.

3         Q    So in what context did you see this

4    document -- have you seen this document?

5         A    It was e-mailed to me in prep for this

6    deposition.

7         Q    And do you understand that you are here

8    today as the corporate representative of Salem

9    Media?

10        A    I understand.

11        Q    And you understand that your answers will

12   be made on behalf of Salem Media?

13        A    Yes, I understand.

14        Q    Great.

15             MS. QIN:  If we could please scroll down

16   to -- I believe it should be page -- PDF page 10.

17   BY MS. QIN:

18        Q    So this is the list of deposition topics

19   that we expect to cover today.  And, Mr. Boyce, did

20   you review this list of topics?

21        A    I have seen this list.

22        Q    Great.

23             And you understand that you have been

24   designated as the representative of Salem Media for

25   these topics?

CONFIDENTIAL

Page 14

1              MS. QIN:  If we could scroll down just a

2      little bit.  Yeah.

3          A    Yes, I understand.

4              MR. BYRNSIDE:  I would just note for the

5      record that he's been designated on these topics

6      subject to the objections that Salem served to these

7      topics and the limitations stated in those

8      objections.

9              MS. QIN:  Could we maybe zoom in on the

10     document a little bit.  I think maybe it is a little

11     hard to read.  Thank you.

12     BY MS. QIN:

13         Q    And, Mr. Boyce, you are prepared to

14     testify on these topics today on behalf of Salem

15     Media Group?

16         A    Yes.

17         Q    Great.  Thank you.

18              Did you speak to anyone about the

19     testimony that you expect to give at your deposition

20     today?

21         A    Yes, I spoke to our counsel.

22         Q    So without telling me the substance of any

23     privileged conversation that you had with your

24     counsel, could you tell me what you did to prepare

25     for this deposition?

CONFIDENTIAL

Page 15

```
 1        A     Other than that meeting and a little bit
 2   of research on my part, that's all I did.
 3        Q     What type of research are you referring
 4   to?
 5        A     I looked over some -- I looked over my
 6   e-mails to see if I had anything, and unfortunately,
 7   I couldn't find anything that related to this case.
 8        Q     Did you look at any other documents?
 9        A     No.  Other than what counsel provided me,
10   no, I did not.
11        Q     Okay.  So counsel provided you with
12   certain documents to review?
13        A     Like this one.
14        Q     Great.  Thank you.
15              So I'd like to talk to you a little bit
16   about your background.  So if we could start off
17   with could you tell me what is the position you hold
18   at Salem Media Group; what is your title?
19        A     I'm senior vice president of spoken word
20   for the company.  That's my title.
21        Q     And what is -- is spoken word a division
22   of Salem Media?
23        A     No, it just delineates the area of
24   responsibility that I have.  So I supervise the
25   Salem Radio Network, the Salem News Channel, and the
```

CONFIDENTIAL

Page 16

```
 1      Salem Podcast Network.
 2           Q     Great.   Thank you.
 3                 How involved are you with any films that
 4      Salem chooses to invest in?
 5                 MR. BYRNSIDE:  Object to the form.  You
 6      can answer, Phil.
 7           A     Yeah, I'm involved in either a little bit
 8      or a lot depending on which product that we are
 9      investing in.  If we're investing in it, then, yeah,
10      I'm very involved in it.  If it's just a documentary
11      that we're picking up and we want to promote, I may
12      have a little bit of involvement in it, but not
13      necessarily a lot.
14      BY MS. QIN:
15           Q     So if this is a film that Salem Media is
16      investing in, what types of responsibilities do you
17      typically have with respect to that film?
18           A     Mainly just reviewing the content and the
19      appropriateness of whether or not this fits the
20      Salem platform, and if it's something that we think
21      that our hosts would get involved in supporting,
22      then it's up to me to sort of coordinate the
23      marketing and the promotion of the movie.
24           Q     And do you have certain criteria that you
25      adhere to when you review that content and check for
```

CONFIDENTIAL

Page 17

1    appropriateness?

2        A    Not particularly.  I don't have anything

3    written.  I have a mental understanding of what we

4    think would work on the Salem platform, what we're

5    interested in.  Mainly it's what we think our

6    audience is interested in, what we think our

7    listeners and viewers are interested in.

8        Q    And could you tell me a little bit about

9    that mental understanding that you have; what --

10   what exactly are you looking at?

11       A    Well, it's similar to what I do on a daily

12   basis with other projects.  I try to make sure that

13   whatever we're talking about on all of these Salem

14   platforms is consistent with both the Salem view and

15   what we think that our audience will respond to.

16       Q    So are you involved in the decision-making

17   process when Salem is deciding to invest in a film

18   or not?

19       A    I would be involved.  Not the only

20   decision-maker, but I would be -- certainly be

21   involved in the discussion, absolutely.

22       Q    And are you subsequently also involved

23   with the production process of --

24       A    Not so much.

25            MR. BYRNSIDE:  Phil, you got to let her

CONFIDENTIAL

Page 18

1      finish --

2              THE WITNESS:  Sorry.

3              MR. BYRNSIDE:  -- and give me a second to

4      object.  Let her finish her question.

5              THE WITNESS:  Sorry.

6              MR. BYRNSIDE:  You're fine.

7      BY MS. QIN:

8          Q    Thank you.

9              Yeah, so are you similarly -- do you

10     similarly have a role to play during the production

11     process when Salem has decided to invest in a

12     certain film?

13             MR. BYRNSIDE:  Object to the form.

14     BY MS. QIN:

15         Q    You can still answer, Mr. Boyce.

16         A    Not so much in the production.

17         Q    Is there any other aspect of the process

18     of getting the film to the market that you are

19     involved in?

20         A    Once the movie is created, I get involved

21     in the promotion of the movie, making sure that it

22     is on the right platform, and that we're -- that our

23     hosts are able to promote it and talk about it.

24         Q    So we were talking about movies earlier.

25     What about books that Salem invests in?  And the

CONFIDENTIAL

Page 19

 1    question here is, are you similarly involved with
 2    vetting content that goes into the books that Salem
 3    invests in?
 4              MR. BYRNSIDE:  Object to the form, assumes
 5    facts.  You can answer.
 6         A    Not so much involved in books, more
 7    involved in movies.  So, yeah, that's my answer.
 8    BY MS. QIN:
 9         Q    When Salem decides whether or not to
10    invest in a book, do you have a say in that
11    decision-making process?
12              MR. BYRNSIDE:  Object to the form,
13    foundation.  Go ahead.
14         A    Not so much in the books.  More in the
15    movies.
16    BY MS. QIN:
17         Q    Thank you.
18              What is -- Mr. Boyce, what is the
19    relationship between Salem Media and Regnery
20    Publishing?
21         A    Well, now --
22              MR. BYRNSIDE:  Hang on a second, Phil.
23    I'm going to object to form and scope.  You can
24    answer.
25         A    Now it's not much at all because we sold

CONFIDENTIAL

Page 20

1     that division, but back when this movie was being

2     made, Regnery was co-owned with Salem.  By Salem.

3     BY MS. QIN:

4          Q     Thank you.

5                Mr. Boyce, do you know the organization

6     True the Vote?

7          A     I do know of them.

8          Q     Could you tell me how Salem Media first

9     heard of True the Vote?

10               MR. BYRNSIDE:  Objection, scope.  You can

11    answer.

12         A     I know how I heard of them, and that was

13    when Dinesh brought it to my attention that there

14    was this organization that might be able to help us

15    in this movie.

16    BY MS. QIN:

17         Q     And when was that?

18         A     You know, I don't remember exactly when.

19    It would have been probably late '21 or early '22.

20         Q     Great.  Thank you.

21               And just going forward, is it okay if we

22    refer to that organization, True the Vote, as TTV?

23         A     You can.

24         Q     Great.

25               You said just now something about helping

CONFIDENTIAL

Page 21

1    us in this movie.  Do you mean to say that the movie
2    2000 Mules existed before you heard of TT- -- before
3    Salem Media heard of TTV?
4            MR. BYRNSIDE:  Object to the form.
5        A    Yeah, the concept of doing a movie with
6    Dinesh existed, but we didn't know exactly what form
7    that would take.  So when we learned of some
8    information that might help us with this concept,
9    yeah, that's when the -- True the Vote became
10   apparent to us.
11   BY MS. QIN:
12       Q    Great.
13            Do you know of specific individuals
14   associated with TTV?
15       A    I know the names.  I don't really know
16   them personally.
17       Q    Could you tell me the names of the people
18   that you know?
19       A    Catherine and Gregg.  Catherine -- I
20   believe it's Engelbrecht, and Gregg -- I can't
21   remember his last name.
22       Q    So for Catherine Engelbrecht, do you
23   recall when Salem first met Catherine or made
24   contact with her?
25            MR. BYRNSIDE:  Objection, outside the

CONFIDENTIAL

Page 22

1    scope.  You can answer.

2         A    Yeah, we met Gregg and Catherine in Dallas

3    when we were doing prep for the movie.

4    BY MS. QIN:

5         Q    Okay.  Is there anyone else from TTV that

6    Salem knew?

7         A    No, not to my knowledge.

8         Q    So Salem Media worked with TTV on the

9    movie 2000 Mules; is that correct?

10        A    Well, we didn't really work with them.  We

11   worked with Dinesh, and Dinesh worked with them.

12        Q    So did Salem have regular contact with TTV

13   throughout the process of producing the film?

14             MR. BYRNSIDE:  Object to the form.  You

15   can answer.

16        A    I wouldn't say we had regular contact with

17   them.  We had some contact -- occasional contact.

18   We had questions that came up, but nothing on a

19   regular basis.

20   BY MS. QIN:

21        Q    Did you also -- were you also in

22   communication with TTV for the 2000 Mules book?

23        A    No.

24        Q    So in the instances in which Salem did

25   interact with members of TTV for the movie, who were

CONFIDENTIAL

Page 23

1    those individuals?
2            MR. BYRNSIDE:  Objection.
3            THE WITNESS:  Go ahead.
4            MR. BYRNSIDE:  You go ahead.  I just
5    object to the form.  You can answer.
6        A    Catherine and Gregg were the only ones
7    that I had any dealing with.
8    BY MS. QIN:
9        Q    Thank you.
10            Other than the 2000 Mules movie, has Salem
11    Media worked on any other projects involving TTV,
12    Catherine Engelbrecht or Gregg Phillips?
13            MR. BYRNSIDE:  Objection, outside the
14    scope.  You can answer.
15        A    No.  No, we have not.
16    BY MS. QIN:
17        Q    Great.  Thank you.
18            So earlier you had talked about being in
19    discussions with Dinesh D'Souza about producing a
20    film, so could you tell me about how Salem first met
21    Dinesh D'Souza?
22        A    Well, Dinesh became one of our podcasters
23    I believe it was in early 2020.  We were creating
24    the Salem Podcast Network, and Dinesh was a
25    potential podcaster for us.  I talked to Dinesh at

CONFIDENTIAL

Page 24

1    that time we worked out the podcast agreement, and

2    he began as a podcaster for us at that time.

3         Q    Had you ever worked on any -- had Salem

4    ever worked on any other film projects with Dinesh

5    D'Souza prior to 2000 Mules?

6              MR. BYRNSIDE:  Objection, outside the

7    scope.

8         A    Yeah, I mean, we did work with some of his

9    other movies.  I think he's made maybe six other

10   movies, and some of them we promoted on the Salem

11   Now platform.

12   BY MS. QIN:

13        Q    And after the movie 2000 Mules, has Salem

14   continued to work with Dinesh D'Souza on any film

15   project?

16        A    Yes.

17             MR. BYRNSIDE:  Outside the scope.

18        A    Yes.

19   BY MS. QIN:

20        Q    Thank you.

21             How did Salem Media first meet Debbie

22   D'Souza -- Debra D'Souza?

23        A    Can you guys still hear me?

24        Q    Yes.

25        A    We met Debbie, or I did, at the time that

CONFIDENTIAL

Page 25

1    we did the podcast agreement with Dinesh.

2        Q    And so today is Salem Media still in

3    contact with Dinesh D'Souza?

4            MR. BYRNSIDE:  Objection.

5        A    Yes, he --

6            MR. BYRNSIDE:  Hang on, Phil, I'm just

7    going to object outside the scope.  You can answer.

8        A    Yes, he's a podcaster with the Salem

9    Podcast Network.

10   BY MS. QIN:

11       Q    Thank you.

12            Does Salem work with anyone else who is

13   working at D'Souza Media?

14            MR. BYRNSIDE:  Objection, scope.  Go

15   ahead.

16       A    Yeah, we had a few meetings with Bruce

17   Schooley I believe was his name, who is -- works

18   with Dinesh on the movie projects.

19   BY MS. QIN:

20       Q    Other than Bruce Schooley, was there

21   anybody else that Salem worked with?

22       A    Not that I recall.

23       Q    Is Salem aware of anybody else from

24   D'Souza Media that worked on 2000 Mules?

25       A    I don't have any names.

CONFIDENTIAL

Page 26

1      Q    Great.  Thank you.

2           So, Mr. Boyce, as you know, we are here

3      today to discuss the film 2000 Mules, and also the

4      book by that same name, but let's focus first on the

5      film, which alleges that fraud occurred in the 2020

6      Presidential election.

7           So could you tell me when Salem Media

8      Group first heard about the concept for this film?

9      A    Yeah, it would have been late '21, early

10     '22, Dinesh called me and said, I got a concept here

11     for the movie, and gave me a brief synopsis of what

12     the concept was.

13     Q    And how did you react when you heard about

14     this concept?

15     A    I said it was interesting.

16     Q    And was it at this moment that he brought

17     up TTV as an organization?

18     A    I don't remember specifically if he

19     brought them up by name, but he did mention that he

20     had become aware of some information that would be

21     helpful in the creation of this movie.

22     Q    So prior to this moment, you had not heard

23     about the organization TTV?

24     A    I had --

25           MR. BYRNSIDE:  Object to form.  Go ahead.

CONFIDENTIAL

Page 27

```
 1        A    I had heard of them but didn't have
 2    knowledge of them.
 3    BY MS. QIN:
 4        Q    Great.
 5             And -- but when you had heard of them
 6    prior to this conversation --
 7             THE VIDEOGRAPHER:  Can we go off the
 8    record for a moment?
 9             MS. QIN:  Yes.
10             THE VIDEOGRAPHER:  We're having some
11    technical issues here.
12             Going off the record at 10:04.
13             (Recess 10:04-10:07 a.m.)
14             THE VIDEOGRAPHER:  Going back on the
15    record at 10:07.
16    BY MS. QIN:
17        Q    So, Mr. Boyce, going back to the
18    discussion that you had with Dinesh D'Souza about
19    the concept for the film 2000 Mules, what exactly
20    was the concept that was described to you?
21        A    Dinesh told me that he had a concept for
22    the movie in which we would focus on the drop boxes
23    that were utilized in some of the battleground
24    states like Georgia in which people were allowed to
25    drop ballots into the box in the middle of the night
```

CONFIDENTIAL

Page 28

1    with no supervision.  He had video of these drop

2    boxes, many of them had cameras on them, and he had

3    access to this video, and he also had access to cell

4    phone records showing that there were multiple

5    people that went from ballot box to ballot box

6    according to the ping of the cell phone, and he

7    thought this could be all tied together to show that

8    something wrong was going on.

9         Q    Did Dinesh D'Souza explain where he got

10   that data?

11        A    You know, I don't recall how -- how much

12   in depth he got as far as telling me where the

13   source of that information came from.

14        Q    So sometime after this conversation with

15   Dinesh D'Souza -- sorry, strike that.

16             Was TTV brought on as a collaborating

17   organization after this conversation?

18        A    I didn't bring them on.  If Dinesh did,

19   that would have been his decision.

20        Q    You only learned of TTV's participation in

21   this film project after this initial conversation

22   with Dinesh; is that correct?

23        A    I learned -- I learned of it in the

24   conversation with Dinesh.

25        Q    But earlier you had said that he did not

CONFIDENTIAL

Page 29

1    mention the names of any organizations?

2         A    Well --

3              MR. BYRNSIDE:  Hang on, Phil.

4              Is there a question, Sonia?

5    BY MS. QIN:

6         Q    Sorry.  Earlier you had said that there

7    was no name mentioned for any organization in the

8    conversation with Dinesh, so did he talk about TTV

9    by name when he had that conversation with you?

10             MR. BYRNSIDE:  Object to the form.  You

11   can answer, Phil.

12        A    You know, I don't recall specifically, but

13   I think it's -- they probably -- he probably did

14   mention True the Vote.

15   BY MS. QIN:

16        Q    Thank you.

17             MS. QIN:  Could we please pull up document

18   with Bates number SMG0000164, please?

19             CONCIERGE TECH:  One moment.  164?

20             MS. QIN:  Yes, that's correct.

21             CONCIERGE TECH:  The document ending in

22   164 is up and marked as Exhibit Number 154.  Stand

23   by while I bring that on screen.

24             (Exhibit Number 154 was marked for

25   identification.)

CONFIDENTIAL

Page 30

1            MS. QIN:  Thank you.  If we could scroll
2     down a little bit.  Great.  Perfect.
3     BY MS. QIN:
4         Q    Mr. Boyce, do you recognize your e-mail?
5            MS. QIN:  Thank you.
6         A    Looks like one of my e-mails.
7     BY MS. QIN:
8         Q    Great.
9            MS. QIN:  If we could scroll down to PDF
10    page 4.
11    BY MS. QIN:
12        Q    So it looks like on August 18th, 2021, you
13    wrote in this chain:  I will put it in my calendar,
14    if the other important people can be there.
15            Is that correct?
16        A    Looks like what I said.
17            MS. QIN:  If we could scroll down to --
18    just a little bit to the bottom of this page.
19    Great.  Thank you.
20    BY MS. QIN:
21        Q    The formatting is a little narrow here,
22    but on August 18th, 2021, Debbie D'Souza sent a
23    message.  Is that -- does that look correct to you?
24        A    It does.
25            MS. QIN:  If we could scroll down to PDF

CONFIDENTIAL

Page 31

1    page 5.  Thank you.

2    BY MS. QIN:

3        Q    So this is the part that -- where the

4    formatting gets a little strange, but I think it's

5    still legible.  If you want to take a moment to

6    review that, Mr. Boyce.

7        A    Okay.  I understand.

8        Q    Thank you.

9            So it looks like -- and I can read this

10   part.  Debbie D'Souza says:  Please let me know if

11   Saturday, October 16 will work.  As I said, it's

12   very difficult for us to do anything during the week

13   because of the podcast.

14           Mr. Boyce, do you recall what happened on

15   October 16th, 2021?

16           MR. BYRNSIDE:  Object to the form.

17       A    Yes, I believe that was when we scheduled

18   that Dallas meeting.

19   BY MS. QIN:

20       Q    And what was the Dallas meeting?

21       A    That would have been our opportunity to

22   meet with Catherine and Gregg and see the documents

23   that they wanted to show us.  They had some video,

24   and they also had some cell phone data.

25       Q    Other than Catherine Engelbrecht and Gregg

CONFIDENTIAL

Page 32

1       Phillips, who else was present at this meeting?

2            A     As I recall, there was Dave Santrella, our

3       CEO, and Ed Atsinger, and I believe David Evans was

4       probably there, and I believe Mike Reed, our head of

5       sales in Dallas was there.

6            Q     Was Dinesh D'Souza present as well?

7            A     Yes, Dinesh and Debbie were there.

8            Q     Was this the first time that Salem met

9       with TTV in person?

10           A     Yes, that I recall.  I'm not aware of any

11      other meetings before that.

12           Q     And was this the first time that you

13      ever -- that Salem ever received a presentation from

14      TTV?

15           A     Yes.

16           Q     Prior to this meeting, were you aware of

17      the purpose of this meeting?

18           A     Yes, I knew why we were having the

19      meeting.

20           Q     Were there any outcomes from this meeting;

21      were any -- sorry, strike that.

22                 Were any investment decisions made

23      following this meeting?

24                 MR. BYRNSIDE:  Object to the form, scope.

25           A     Yes.

CONFIDENTIAL

Page 33

1           THE VIDEOGRAPHER:  I don't have the
2      witness at all.  Can we go off the record again?
3           MS. QIN:  Yeah.
4           THE VIDEOGRAPHER:  Going off the record at
5      10:15.
6           (Recess 10:15-10:18 a.m.)
7           THE VIDEOGRAPHER:  Going back on record at
8      10:18.
9      BY MS. QIN:
10          Q    So, Mr. Boyce, going back to the topic of
11     this meeting in Dallas, you said that this was
12     Salem's opportunity to meet with Catherine and Gregg
13     and see the documents that they wanted to show you.
14     Could you tell me what documents you were referring
15     to?
16          A    They had a PowerPoint, and they put the
17     evidence that they had uncovered up on the
18     PowerPoint, and that's what we saw.  I don't
19     remember having any take-home material.  I think it
20     was all on the PowerPoint.
21          Q    And what -- when you say "evidence," what
22     evidence are you referring to?
23          A    The videos that they wanted to show us,
24     and the cell phone data that they wanted to show us.
25          Q    What videos are you referring to?

CONFIDENTIAL

Page 34

1          A     They had videos of the drop boxes in the

2     battleground states where people had dropped off

3     multiple ballots in the middle of the night.  So

4     they showed us a few of those, and that's what I'm

5     referring to.

6          Q     And when you mentioned cell phone data,

7     what cell phone data are you referring to?

8          A     They had maps of cell phones pinging

9     various locations in the battleground states, and it

10    showed some of the cell phones were actually going

11    from one drop box to another.

12         Q     Did Salem ask any questions during this

13    meeting?

14         A     Yes.

15         Q     What questions did Salem ask to TTV?

16         A     Yeah, I don't recall specifically what

17    questions.

18         Q     Did Dinesh D'Souza speak during this

19    meeting?

20         A     Yes.

21         Q     Do you recall what he said?

22         A     No, I don't recall.

23         Q     Did Debbie D'Souza speak during this

24    meeting?

25         A     I don't recall.

CONFIDENTIAL

Page 35

```
 1        Q    So you mentioned that the videos Salem was
 2   shown during this meeting consisted of videos
 3   showing people dropping off ballots in the middle of
 4   the night.  Were there any other videos that were
 5   shown?
 6        A    Not that I recall.
 7        Q    So prior to this meeting occurring, had
 8   Salem already agreed to invest in the film 2000
 9   Mules?
10             MR. BYRNSIDE:  Object to the form.
11        A    No, I don't think --
12             MR. BYRNSIDE:  Go ahead.
13        A    I don't think we had.
14   BY MS. QIN:
15        Q    So when -- when exactly did Salem decide
16   to invest in this film?
17             MR. BYRNSIDE:  Object to the form and
18   scope.  You can answer, Phil.
19        A    Sometime after that meeting.  I don't
20   recall exactly when.
21   BY MS. QIN:
22        Q    So what did Salem Media understand the
23   film 2000 Mules to be about?
24        A    Well, the movie that Dinesh presented to
25   us that he wanted to create told the story of how
```

CONFIDENTIAL

Page 36

1      the unmanned ballot boxes were used by multiple
2      people to drop ballots in the middle of the night
3      not knowing who they were, and then their cell
4      phones were pinging various locations, and that's
5      where the basic story of the movie occurred.  We
6      wanted to present something funny going on in the
7      2020 Presidential election.
8            Q    And given the presentation by TTV, you
9      understood that -- Salem understood that TTV was
10     providing the data to be used in this film?
11           A    Correct.
12           Q    So following this presentation in the fall
13     of 2021, did you, in your capacity as somebody who
14     checks content -- the content of films that Salem
15     chooses to invest in, did you verify any of the
16     facts that were presented during the presentation?
17                MR. BYRNSIDE:  Object to the form and the
18     scope.
19           A    No, I -- it wasn't my job to fact check.
20     BY MS. QIN:
21           Q    Did anybody else fact check the
22     presentation?
23                MR. BYRNSIDE:  Object to the form and the
24     scope and advise you, Phil, that you can answer that
25     question -- to the extent you can answer that

CONFIDENTIAL

Page 37

1    question without disclosing privileged information,
2    please go ahead; otherwise, do not disclose any
3    privileged information.
4         A    Yeah, we relied on Dinesh in that regard.
5    BY MS. QIN:
6         Q    And when you say "relied on Dinesh," what
7    do you mean by that?
8         A    Well, we left it up to Dinesh to create
9    the movie.
10        Q    So what was Salem's understanding of the
11   genre of film that 2000 Mules was to be?
12        A    Yeah, it was a political news oriented
13   documentary.
14        Q    What are the defining characteristics of a
15   documentary?
16             MR. BYRNSIDE:   Object to the form and
17   scope.
18        A    Well, documentaries take many different
19   forms, so I'm assuming you're talking about Salem's
20   interest in documentaries; is that correct?
21   BY MS. QIN:
22        Q    That's correct.
23        A    Yeah, usually our documentaries are news
24   and politically oriented.  Not all of them, but
25   those are the ones that seem to do the best on our

CONFIDENTIAL

Page 38

1    platform.

2        Q    So what differentiates a documentary from

3    another type of film, what -- sorry, strike that.

4             What is Salem's understanding of what

5    exactly a documentary is?

6             MR. BYRNSIDE:  Objection, outside the

7    scope.  You can answer.

8        A    Well, a documentary tells a story.  It

9    should be fact based and truth based, and it tells a

10   compelling story that our listeners find fascinating

11   and want to view, want to buy a DVD or want to buy a

12   download and learn more about it.

13   BY MS. QIN:

14       Q    Thank you.

15            Earlier you said that Salem relied on

16   Dinesh D'Souza for the creation of the film.  Did

17   Salem provide any input on the concept for the film

18   2000 Mules?

19       A    Well, as we discussed, they brought it to

20   us.  We had the information presented to us, and we

21   had questions at that meeting, and legal would have

22   had questions for them of their own, so that's about

23   the extent of it.

24       Q    But the concept originated fully from

25   Dinesh D'Souza?

CONFIDENTIAL

Page 39

1         A    Yes.

2         Q    When did development of the film begin?

3         A    It's hard to say when because some work

4    had been done before that October meeting, so it

5    would have been probably around the summer of '21

6    that some work began on creating the movie.

7         Q    And what work would that be?

8         A    Well, specifically that would be Dinesh

9    doing his pre-production work to get everything

10   ready to shoot the movie.

11        Q    And what does getting everything ready

12   mean?

13        A    Well, I don't know.  You might want to ask

14   Dinesh.  I'm not an expert in creating these movies.

15   He is.

16        Q    So after the presentation was made, what

17   did Salem do next with respect to this film?

18             MR. BYRNSIDE:  Object to the form.

19        A    We would have met, and we had several

20   discussions about whether or not this is something

21   that we wanted to invest in.

22   BY MS. QIN:

23        Q    And once the decision was made to invest

24   in this film, what did Salem do then?

25        A    Well, we gave them the green light to make

CONFIDENTIAL

Page 40

1    the movie, and legal primarily got involved at that

2    point in making sure that everything was buttoned up

3    in the creation of the movie.

4         Q    Is this -- is this timeline of events

5    typical for Salem in films that it invests in?

6              MR. BYRNSIDE:  Object to the form, scope.

7         A    There aren't that many movies that we have

8    invested in, but this is a fairly typical procedure.

9    BY MS. QIN:

10        Q    Great.

11             So once the green light was given by

12   Salem, what did Salem do to involve itself in the

13   film after?

14             MR. BYRNSIDE:  Object to the form.

15        A    We began to talk to Dinesh about how we

16   should proceed with this movie, and how we wanted it

17   to look, and what -- what impact our hosts might be

18   able to bring to the movie in terms of providing

19   commentary and additional information.

20   BY MS. QIN:

21        Q    And how frequently did Salem speak to

22   Dinesh during this film development process?

23        A    Probably every couple of weeks.

24        Q    And what did those discussions look like?

25             MR. BYRNSIDE:  And, Phil, again, I'll

CONFIDENTIAL

Page 41

1    instruct you not to disclose any privileged

2    information to the extent those communications were

3    occurring with counsel, but, otherwise, you can

4    answer.

5         A     From time to time, we would talk to Dinesh

6    about how we wanted this movie to look and how we

7    wanted to involve the hosts, and we set up a time to

8    have that meeting at the hotel there in California.

9    BY MS. QIN:

10        Q     And how exactly did Salem want the movie

11   to look?

12        A     Well, I thought it would make sense to

13   involve our hosts because they have opinions about

14   the election, and so what we thought we would do is

15   bring them in, show them the information, and then

16   film them with an honest reaction.

17        Q     Did Dinesh D'Souza agree with that view?

18        A     Yes, he did, and he actually came up with

19   the concept of how that would look.

20        Q     Did Salem and Dinesh D'Souza disagree on

21   any points regarding how the movie would look?

22             MR. BYRNSIDE:   Object to the form.

23        A     Not to my knowledge.

24   BY MS. QIN:

25        Q     So you mentioned that Salem met quite

CONFIDENTIAL

Page 42

1    frequently with Dinesh over this time period.  How

2    long -- strike that.

3              Until when did Salem continue to meet with

4    Dinesh D'Souza for this -- the purposes of

5    developing 2000 Mules?

6              MR. BYRNSIDE:  Object to the form.  You

7    can answer.

8       A    Yeah, in terms of developing it, you know,

9    again, it wasn't really a meeting, but I would talk

10   to Dinesh maybe every two to four weeks.  As he was

11   creating the movie and he was planning the shoot,

12   all of that I had some communication with Dinesh.

13   Not a lot, but some.

14   BY MS. QIN:

15      Q    When did the movie start shooting?

16      A    I don't know when Dinesh actually started

17   filming some of this.  I know that there was some

18   shoots that he made in Washington, DC where he was

19   walking around that was featured in the movie.  So

20   at some point he shot those.  He went there; shot

21   those.  You know, the -- the filming of the hosts in

22   the Four Seasons was early February, as I recall.

23      Q    Did Salem have any input into the shooting

24   process?

25              MR. BYRNSIDE:  Object to the form.

CONFIDENTIAL

Page 43

```
1          A     We were involved mostly as observers in
2      the shooting of that scene, which took up quite a
3      bit of time in the movie, so there were a few of us
4      that were there, and mainly it was a learning
5      experience for us to see how a movie was made.
6      BY MS. QIN:
7          Q     Did Salem have any questions for Dinesh
8      D'Souza during this process?
9                MR. BYRNSIDE:  Object to the form, and
10     I'll give you the same instruction on privilege,
11     Phil.  Otherwise, you can answer.
12         A     Well, we had a few questions for him, but
13     I can't respond to that because I don't remember
14     them, or maybe I wasn't privy to them.
15     BY MS. QIN:
16         Q     Did Salem ask any questions to TTV during
17     this process?
18               MR. BYRNSIDE:  Same objection and
19     instruction.  Go ahead, Phil.
20         A     Well, we met with them October 16th in
21     Dallas.  We had some questions for them then, but
22     beyond that, I don't think we had a whole lot to do
23     with it.
24     BY MS. QIN:
25         Q     Did you meet regularly with TTV during the
```

CONFIDENTIAL

Page 44

1    film production process?

2         A    No.

3         Q    Did you meet regularly with TTV during the

4    film development process prior to the commencement

5    of shooting?

6         A    No.

7         Q    When did the shooting of the film

8    conclude?

9         A    That I don't recall.

10        Q    Are you aware of the -- sorry, strike

11   that.

12             Did Salem have any input on how 2000 Mules

13   would be promoted?

14        A    Yes.

15        Q    And what type of input did Salem give on

16   that -- on the marketing of the movie?

17        A    Well, there was a fund created where we

18   would purchase advertising for the movie, but then

19   there was also the opportunity to use some of the

20   Salem assets to help promote the movie based on its

21   relevancy to what was going on in the country, and

22   we felt like listeners would want to know about it,

23   so we promoted it through our shows.

24        Q    And when exactly did Salem begin promoting

25   the movie?

CONFIDENTIAL

Page 45

1          A    That I don't recall.

2          Q    When -- you mentioned that a fund was

3     created.  Do you recall when that fund was created?

4          A    Well, it was about the time that we agreed

5     to finance the movie.  We knew that there were

6     production costs involved that we would help with,

7     and we wanted to have enough left over that we could

8     promote the movie.

9          Q    And has Salem ever promoted other movies

10    that it has invested in in a similar manner?

11               MR. BYRNSIDE:  Objection, outside the

12    scope.

13         A    Yeah, we don't normally spend money to

14    promote the movie.  That would be on the movie

15    producer to do, but we have promoted other movies

16    through the same process where we use our shows, our

17    assets, our hosts to promote a movie that we think

18    our listeners would want to see.

19    BY MS. QIN:

20         Q    So why did Salem choose to promote this

21    movie?

22         A    We thought it was a movie that our viewers

23    would want to see.

24         Q    Did Dinesh D'Souza provide input on the

25    marketing of the film?

CONFIDENTIAL

Page 46

1           A    Yes.
2           Q    Did Debbie D'Souza provide input on the
3     marketing of the film?
4           A    Not that I recall.
5           Q    Did Catherine Engelbrecht provide input on
6     the marketing of the film?
7           A    Not that I recall.
8           Q    Did Gregg Phillips provide input on the
9     marketing of the film?
10          A    Not that I recall.
11          Q    Did Salem ever discuss marketing with
12    Dinesh D'Souza?
13          A    Yes.
14          Q    Were those discussions in meetings that
15    you had with Dinesh D'Souza?
16          A     I don't recall specific meetings.  I do
17    recall that we had discussions with him about how
18    best to market the movie being that he was
19    experienced in making these kinds of movies.
20          Q    And did Salem ever discuss the marketing
21    of the film with Catherine Engelbrecht?
22          A    No.
23          Q    Did Salem ever discuss the marketing of
24    the movie with Gregg Phillips?
25          A    No.

CONFIDENTIAL

Page 47

```
 1          Q     Thank you.
 2                MS. QIN:  Could we pull up the document
 3      with the Bates number SMG0000146, please.
 4                CONCIERGE TECH:  One moment.  Okay.  146
 5      is up.  That is marked as Exhibit Number 155.  Stand
 6      by while I bring that on screen.
 7                (Exhibit Number 155 was marked for
 8      identification.)
 9                MS. QIN:  Thank you.
10      BY MS. QIN:
11          Q     Mr. Boyce, are you able to see that
12      document?
13          A     I am.
14          Q     Thank you.
15                MS. QIN:  Could we please scroll to PDF
16      page 4?  That's perfect.
17      BY MS. QIN:
18          Q     So, Mr. Boyce, do you see that somebody
19      named David A.R. Evans has sent an e-mail here; do
20      you see that e-mail?
21          A     I do.
22          Q     And in that e-mail sent February 10th,
23      2022, David Evans wrote:  We should also discuss
24      premieres and theatrical release strategy.
25                Do you see that?
```

CONFIDENTIAL

Page 48

1        A     Yes, I do.

2        Q     And in his e-mail signature, David Evans

3    signs as the chief operating officer of Salem Media

4    Group.  Do you see that?

5        A     I do.

6             MS. QIN:  Could we please scroll up to PDF

7    page 3.  Great.  That's perfect.

8    BY MS. QIN:

9        Q     So, Mr. Boyce, here at the bottom of the

10   page, February 10th, 2022, Dinesh D'Souza sent an

11   e-mail.  Do you see that e-mail?

12       A     I do.

13

14

15

16

17

18

19

20             Do you see that?

21       A     I do.

22       Q     Earlier you said that you -- that Salem

23   had discussed the marketing of the 2000 Mules film

24   with Dinesh D'Souza; is that correct?

25       A     Yes, that's correct.

CONFIDENTIAL

Page 49

1      Q    Did Dinesh D'Souza ever share his

2   marketing plans with Salem?

3           MR. BYRNSIDE:   Object to the form.

4   BY MS. QIN:

5      Q    You can still answer.

6      A    I don't recall specifically what he shared

7   other than these kinds of discussions that you're

8   pointing out here.

9

10

11

12

13

14

15

16

17

18      A    That refers to various ways that we were

19   to market the movie, buying Facebook ads or other

20   forms of social media, and it's kind of in general.

21   I don't know specifically what we all did, but that

22   was part of the plan.

23

24

25      A    Yes.

CONFIDENTIAL

Page 50

```
 1        Q     And is that money that Salem was spending
 2    on the marketing plan?
 3        A     Yes.
 4    ████████████████████████████████████████████████
 5    ████████████████████████████████████████████████
 6    ████████████████████████████████████████████████
 7    ████████████████████████████████████████████████
 8    BY MS. QIN:
 9        Q     Great.
10              MS. QIN:  If we could scroll up just a
11    little bit, staying on this page.
12    BY MS. QIN:
13        Q     So on February 25th, 2022, David Evans
14    says:  We have been discussing publicity efforts for
15    the movie, and something that has been very helpful
16    for some recent book launches has been the
17    recruitment and use of a social media launch team.
18    We'd like to explore this with you to see if it
19    would benefit the movie launch.
20              Do you see that, Mr. Boyce?
21        A     I do.
22        Q     What is a social media launch team?
23        A     That refers to our ability to promote a
24    movie to social media through -- whether it be
25    Twitter or Facebook or Instagram or any of the
```

CONFIDENTIAL

Page 51

1    social media outlets there.  There are ways that you

2    can maximize your marketing through social media,

3    and that's what he's referring to.

4         Q    And is social media launch team something

5    that Salem put together?

6              MR. BYRNSIDE:  Object to the form, scope.

7         A    Yeah, I think it's something that we and

8    Dinesh worked on together.

9              MS. QIN:  So if we scroll up to page 1 of

10   this PDF.  Just scroll down a little bit to the

11   middle of the page.

12   BY MS. QIN:

13        Q    So here on February 25th, Debbie D'Souza

14   asks:  Is there any way we can do 1pm CST on the

15   14th or later in the day?

16              One e-mail up from that, somebody named

17   Crenguta Free from Salem Media responds:  On the

18   14th we can do 2:00 p.m. Pacific/4:00 Central.  Does

19   that work?

20              And then the top e-mail in this chain, if

21   we can just scroll up, is a confirmation from Debbie

22   and a request that:  Can you please add Bruce

23   Schooley to the invite for the March 14th call?

24              Do you see that chain?

25        A    I do.

CONFIDENTIAL

Page 52

1          Q     Was there a March 14th call that occurred
2     with Salem Media and Dinesh and Debbie D'Souza?
3          A     I'm assuming so, but I don't recall.
4     Based on this e-mail, looks like it probably did.
5          Q     So do you recall ever discussing this
6     social media launch team idea with Dinesh D'Souza?
7          A     No, I don't recall.
8          Q     Do you recall discussing any other
9     specific marketing ideas with Dinesh D'Souza?
10         A     I don't recall anything specific.
11         Q     Thank you.
12               I think now would be a good time for us to
13     take a break, if that sounds good to you, Mr. Boyce.
14         A     Sounds good to me.  What do you think,
15     five minutes?
16         Q     How about we come back at 10:55 Eastern,
17     so seven minutes?
18         A     Perfect.
19               THE VIDEOGRAPHER:  This concludes -- this
20     ends disc 1.  Going off the record at 10:48.
21               (Recess 10:48-10:55 a.m.)
22               THE VIDEOGRAPHER:  This begins disc 2.
23     Going back on record at 10:55.
24               MS. QIN:  Could we please pull up the
25     document with Bates number SMG0000528, please.

CONFIDENTIAL

Page 53

1            CONCIERGE TECH:  Stand by.  One moment
2    here.  Okay.  Document 528 is up and marked as
3    Exhibit Number 156.  Stand by while I bring that on
4    screen.
5            (Exhibit Number 156 was marked for
6    identification.)
7            MS. QIN:  Thank you for enlarging it.
8    BY MS. QIN:
9        Q    So, Mr. Boyce, are you able to see that
10    document?
11        A    Yes, I am.
12        Q    And you see that this is an e-mail that
13    was sent by Dan Nelson from Salem Media on April 6,
14    2022; is that correct?
15        A    Yes, that is correct.
16        Q    And who is Dan Nelson?
17        A    Dan Nelson is our VP of events, so he
18    would have been involved in this in some way.
19        Q    Do you know how he was involved?
20        A    I think mainly in coordinating the
21    promotion of the movie on the Salem radio stations
22    and the Salem talk shows.
23        Q    Did Dan Nelson ever speak with Dinesh
24    D'Souza?
25            MR. BYRNSIDE:  Object to the form,

CONFIDENTIAL

Page 54

1    foundation.

2         A     Yeah, I'm not aware of that, whether he

3    did or didn't.

4    BY MS. QIN:

5         Q     Do you know why this e-mail was sent?

6         A     It looks like it was sent to the general

7    managers and the sales managers and the regional VPs

8    to coordinate the promotion of the movie before the

9    movie was released so they would know what the plan

10   was in terms of getting adequate promotion.

11        Q     And had Salem discussed the contents of

12   this e-mail with Dinesh D'Souza?

13        A     I'm not aware.

14        Q     So in this e-mail, if you look at the

15   first line that starts with "Salem," the second

16   sentence in that line says:  The movie is a

17   documentary that examines widespread coordinated

18   voter fraud in the 2020 election.

19              Was this Salem's understanding of the

20   movie 2000 Mules?

21        A     In general, yes.

22        Q     And if you look at the last sentence in

23   that first paragraph, it says:  2000 Mules provides

24   evidence that proves the opposite is true and

25   explores numerous ways to prevent fraud from

CONFIDENTIAL

Page 55

1    happening again in future elections.

2            Do you see that?

3       A    I do.

4       Q    And does that correspond to Salem's

5    understanding of the evidence presented in the 2000

6    Mules film?

7       A    It does.

8       Q    So in the second paragraph that starts

9    with "Our news talk stations," Dan Nelson wrote:

10   Our news talk stations are vital to the success of

11   this movie, and we need every market to support this

12   film in two ways.  First, by promoting ticket sales

13   for the screenings that will take place in your

14   market, and second by promoting the streaming

15   release and DVD sales that will happen on Salem Now

16   following the release in theaters.

17           Do you see that paragraph?

18      A    I do.

19      Q    What does Dan Nelson mean by "promoting

20   ticket sales for the screenings that will take place

21   in your market"?

22           MR. BYRNSIDE:  Object to the form,

23   foundation.  You can answer.

24      A    Yeah, in many markets we had theaters that

25   were willing to show the movie, and so what we

CONFIDENTIAL

Page 56

1    wanted to do was make sure listeners knew where

2    those screenings were and to go see the movie.

3    BY MS. QIN:

4        Q    And how would you do that?

5        A    In this case we would do that by promoting

6    it on the news talk stations.  So they might put a

7    30-second promo on the air saying, "The new movie

8    2000 Mules is coming out in a theater near you;

9    here's where you can go see it."

10       Q    So the second part of this strategy says:

11   Second, by promoting the streaming release and DVD

12   sales that will happen on Salem Now following the

13   release in theaters.

14            What is Salem Now?

15       A    Salem Now is our video-on-demand platform.

16       Q    And so how -- how does -- how does one

17   promote the streaming release and DVD sales that

18   will happen on Salem Now?

19       A    The same way.  We use the radio stations

20   to run a promo.  It was released first in theaters,

21   and then shortly thereafter, we put it up on Salem

22   Now.

23       Q    Did Dinesh D'Souza know that this was the

24   plan for promotion at Salem?

25       A    Yes.

CONFIDENTIAL

Page 57

```
 1              MR. BYRNSIDE:  Object to the form.
 2        A    Yes.
 3   BY MS. QIN:
 4        Q    Whose idea was it to promote the ticket
 5   sales and the streaming release in this manner?
 6        A    Well, that would have been a combination
 7   of Dan and me and Dinesh and all the way up to Dave
 8   Santrella.
 9        Q    And was TTV involved in any way in these
10   discussions regarding how to promote the film?
11        A    Not that I'm aware of.
12        Q    So if we look at the third paragraph, it
13   starts off with:  Dinesh and his team are finalizing
14   rental agreements with 400-plus theaters across the
15   country to show the film on two days only.
16              Do you see that?
17        A    Yes.
18        Q    Whose idea was that to rent -- to rent
19   400-plus theaters across the country?
20        A    Well, I think that was Dinesh.
21        Q    And how -- how was it decided which
22   theaters would show this movie?
23        A    Well, that was something Dinesh worked out
24   with a movie chain.  I'm not sure.  I can't recall
25   what movie chain agreed to take the movie.
```

CONFIDENTIAL

Page 58

1          Q     Did Salem discuss this strategy of renting
2     out theaters with Dinesh D'Souza?
3          A     Yes.
4          Q     What was the content of those discussions?
5          A     Well, that we would promote it on our
6     radio stations so that people would go see the movie
7     in the theaters.
8          Q     Do you know what criteria was used to
9     select those 400-plus theaters?
10          A     No, I don't.  As I recall, there was a
11     theater chain that agreed to show the movie in their
12     chains all across the country, but I don't recall
13     who that was.
14          Q     So in the yellow highlighted paragraph
15     here, you'll see that it -- that Dan Nelson wrote:
16     This e-mail is simply a heads-up, to make you aware
17     that our promotion of these theatrical showings will
18     begin over the next couple of weeks, and that Jasper
19     and I will be reaching out to each market
20     individually with further information once we have
21     everything.
22               Who is Jasper?
23          A     Jasper Lukose is Dan Nelson's assistant.
24          Q     And when Dan refers to each market, what
25     markets is he referring to?

CONFIDENTIAL

Page 59

1          A    The Salem news talk markets.  Salem owns
2     31, I think it is, news talk stations across the
3     country, so those markets were what we were
4     referring to.
5          Q    And he says he would reach out to each
6     market individually with further information once we
7     have everything.  What does he mean by "everything"?
8               MR. BYRNSIDE:  Object to the form,
9     foundation.  You can answer.
10         A    Yeah, it means once they have the theater
11    locations.  It doesn't appear in this e-mail that we
12    had the theater locations, so it must have been
13    referring to that.
14    BY MS. QIN:
15         Q    I see.  Thank you.
16              In the next paragraph starting with
17    "Finally it is important for you to know," do you
18    see that paragraph?
19         A    Yeah, I do.
20         Q    In the last sentence of this paragraph, it
21    says:  We need you to pull out all of the stops and
22    do everything you can to make our audience aware of
23    this limited time opportunity to see 2000 Mules in
24    theaters.
25              Do you see that?

CONFIDENTIAL

Page 60

1        A    Yes.

2        Q    What does "all of the stops" refer to?

3        A    Well, when he says "pull out all of the

4    stops," I assume that he means do everything that

5    you can to promote this movie because it's a big

6    deal to Salem, and we want everyone to have an

7    opportunity to go see it.

8        Q    And why was it a big deal to Salem?

9        A    Because we were financial participants in

10    the creation of the movie, so there was a -- there

11    was reason for us beyond just wanting people to see

12    the movie.  It was a financial reason.

13        Q    Is it -- is it common for Salem to speak

14    with its movie partners -- find themselves in

15    positions like Dinesh D'Souza, is it common for

16    Salem to coordinate with these parties on the

17    marketing of films that Salem invests in?

18            MR. BYRNSIDE:  Object to the form and

19    scope.  You can answer.

20        A    The answer is yes.

21    BY MS. QIN:

22        Q    Thank you.

23            So going back to this last sentence in

24    this last full paragraph:  We need you to pull out

25    all of the stops and do everything you can to make

CONFIDENTIAL

Page 61

1    our audience aware of this limited time opportunity

2    to see 2000 Mules in theaters.

3              Why was -- what does "limited time

4    opportunity" refer to?

5        A    The amount of time that the movie is going

6    to be in theaters.

7        Q    And how long was the movie in theaters?

8        A    I think only a few days.

9        Q    And who decided on that length of time?

10       A    Well, that was Dinesh working with the

11   movie theater, and I think earlier in this e-mail,

12   it mentions the two dates.

13       Q    Why was -- why was the movie only going to

14   be showing for a limited time?

15       A    It's typical in documentaries that you

16   don't get a full theatrical release like you would

17   if it was Paramount creating the next Tom Cruise

18   movie, so you work a deal with the movie theaters.

19   Usually it's a very limited time that people can see

20   it.  That's all.

21       Q    Great.

22            MS. QIN:  So we can take this exhibit

23   down.  If we could show Mr. Boyce the document with

24   Bates number SMG0000882.

25            CONCIERGE TECH:  One moment.  882 is up

CONFIDENTIAL

Page 62

1        and marked as Exhibit Number 157.  Stand by while I
2        bring that on screen.
3                    (Exhibit Number 157 was marked for
4        identification.)
5                    MS. QIN:  Great.  Thank you.
6        BY MS. QIN:
7            Q    Mr. Boyce, are you able to see this
8        document?
9            A    Yes.
10           Q    So you see that this is another e-mail
11       sent by Dan Nelson from Salem Media sent on April
12       20th, 2022; is that correct?
13           A    Yes.
14           Q    And this e-mail, he has three main bullet
15       points.  If we could scroll down a little bit.  And
16       do you see those three main bullet points?
17           A    I do.
18           Q    So one bullet point says, Local Ad
19       Schedule, the second one says, Booking Interviews,
20       and the third one says, Digital/Social Media; is
21       that correct?
22           A    Yes.
23           Q    And what is Dan Nelson talking about in
24       this e-mail?
25           A    He's talking about the marketing plan, the

CONFIDENTIAL

Page 63

1    promotional plan, the internal Salem promotional

2    plan, the ad schedule, the booking of the interviews

3    on various shows, and the digital/social media that

4    is also being employed as part of the strategy.

5        Q    Did you discuss -- did Salem discuss the

6    contents of this e-mail with Dinesh D'Souza?

7            MR. BYRNSIDE:  Object to the form.

8        A    That I don't know.

9    BY MS. QIN:

10       Q    Did Salem share this e-mail or its

11   contents with Catherine Engelbrecht or Gregg

12   Phillips?

13       A    Not to my knowledge.  You'd have to look

14   on the "to" line or the cc line to see if they were

15   on it, but I don't think so.

16       Q    Did Salem discuss bullet point 1, local ad

17   schedule, with Dinesh D'Souza?

18       A    I don't know.  I'm assuming we did, but I

19   don't know.

20       Q    Did Salem discuss the local ad schedule

21   with Catherine Engelbrecht or Gregg Phillips?

22       A    Not to my knowledge.

23       Q    So focusing on the first bullet point

24   first, who created the national ads for this film?

25       A    You know, I don't know, but I'm assuming

CONFIDENTIAL

Page 64

1          it would be Dan Nelson.

2               Q     So Salem created the ads for the film?

3               A     I think so.

4               Q     Did Salem discuss those -- the creation of

5          these ads with Dinesh D'Souza?

6               A     I don't know.

7               Q     Did Dinesh D'Souza provide any input on

8          advertisements for the film?

9               A     You mean specifically the content of the

10         advertisement?

11              Q     Correct.

12              A     Yeah, I don't know whether he did or

13         didn't.

14              Q     Did Salem discuss the creation of these

15         ads with TTV?

16              A     Not to my knowledge.

17              Q     So moving on to the second bullet point,

18         booking interviews, did Salem discuss interviews

19         with Dinesh D'Souza?

20              A     Yes.

21                    MR. BYRNSIDE:   Object to the form.

22         BY MS. QIN:

23              Q     And what was the content of those

24         discussions?

25              A     Well, I don't know specifically other than

CONFIDENTIAL

Page 65

1    to make sure that Dinesh would be available if we

2    wanted to book him on one of the local shows.

3        Q    Did Salem discuss booking interviews with

4    TTV?

5        A    There was a discussion about booking

6    Catherine Engelbrecht, and I think she was willing

7    to be interviewed, so I think that we made that

8    opportunity available.

9        Q    And whose idea was it to have Dinesh

10   D'Souza and Catherine Engelbrecht appear on

11   interviews?

12       A    You know, I don't know specifically any

13   individual.  I think that was a group discussion.

14   This is the typical way that we would market and

15   promote a big deal, and that's what we did.

16       Q    And when you say "group discussion," who

17   were the members of that group discussion?

18       A    It would probably have been me and Dan,

19   and we may have involved Dinesh; we may have

20   involved Dave Santrella.  The management structure

21   at Salem.

22       Q    Thank you.

23            Moving on to the third bullet point,

24   digital/social media, did Salem have any discussions

25   about the ways the film would be promoted on digital

CONFIDENTIAL

Page 66

```
 1      and social media with Dinesh D'Souza?
 2          A    I believe we did probably have some
 3      discussion.  I was not a participant in that
 4      discussion.
 5          Q    Are you aware of what was discussed
 6      between Salem Media and Dinesh D'Souza?
 7          A    It's kind of a broad question.  I would
 8      need more specifics.
 9          Q    In terms of -- you said that Salem Media
10      had discussed the ways that the film 2000 Mules
11      would be promoted on digital and social media with
12      Dinesh D'Souza; is that correct?
13          A    Yes.
14          Q    What did Salem and Dinesh D'Souza discuss
15      with respect to the film's digital and social media
16      promotion?
17          A    Well, I don't know specifically how to
18      answer that question, but in general, Dinesh was our
19      partner in making this movie.  We wanted to make
20      sure it was promoted properly.
21          Q    Did Dinesh D'Souza provide input on how
22      the film would be promoted on digital and social
23      media?
24          A    Yes, in general he did, but I don't know
25      of anything specific.
```

CONFIDENTIAL

Page 67

1          Q     In general, what was the input that he

2     provided?

3          A     Well, he was very encouraging in wanting

4     us to promote the movie, and he felt like this was a

5     great opportunity to build an audience for it, so he

6     wanted Salem to help.

7          Q     Is it typical for Salem to provide

8     advertisements, interviews, digital/social media

9     promotion for films that it invests in?

10              MR. BYRNSIDE:  Object to the form and

11     scope.  You can answer.

12          A     Yeah, I would say it would be typical of

13     the really big movies that we get behind.

14     BY MS. QIN:

15          Q     Great.  Thank you.

16              MS. QIN:  We can take down this exhibit.

17     Can we please pull up SMG0000912, please.

18              CONCIERGE TECH:  Document ending in 912 is

19     up and marked as Exhibit Number 158.  Stand by while

20     I bring that on screen.

21              (Exhibit Number 158 was marked for

22     identification.)

23              MS. QIN:  Great.  Thank you.  Let's scroll

24     to the bottom of PDF page 1.  Thank you.

25     BY MS. QIN:

CONFIDENTIAL

Page 68

1          Q     Do you see this document, Mr. Boyce?

2          A     Yes.

3          Q     So right now we're looking at an e-mail

4     from David Evans sent on April 7th, 2022.  Do you

5     see that?

6          A     Yes.

7          Q     And here he says:  I've had a couple of

8     requests for timeline for the 2000 Mules marketing,

9     publicity, and launch.  This is the closest I have

10    seen, but there are some things missing.

11               Do you see that?

12         A     Yes.

13               MS. QIN:  If we could please scroll down

14    to PDF page 2.

15    BY MS. QIN:

16         Q     You see that on April 4th, 2022, someone

17    named Robert Ellis at Salem National sent an e-mail.

18    Do you see that?

19         A     Yes.

20         Q     So who is Robert Ellis?

21         A     Rob is our VP of Salem Now.

22         Q     And what is his role at Salem Now?

23         A     He's basically the general manager of the

24    video-on-demand platform.

25         Q     So in this e-mail, he says -- starts off

CONFIDENTIAL

Page 69

1    with:  Telephone call with Bruce Schooley.  Here's

2    how the timeline was explained to me.

3              Do you see that?

4         A    Yes.

5         Q    So did Salem discuss the timeline of the

6    marketing of the movie with Dinesh D'Souza?

7         A    Well, we did discuss it with Dinesh.  It

8    looks like this was more with Bruce, who was

9    Dinesh's helper on this movie, and as I recall,

10   Bruce was handling a lot of the promotional gory

11   details.

12        Q    And Salem had input on the timeline of the

13   marketing?

14        A    Yeah, we had input here between Rob Ellis

15   and Bruce, and, of course, Dinesh was involved as

16   well.

17        Q    Are you aware of this conversation that

18   Robert Ellis is referring with Bruce Schooley?

19        A    No, not specifically.

20        Q    But it -- but Robert Ellis did have

21   conversations with Bruce Schooley, Dinesh -- and

22   Dinesh D'Souza about marketing and the timeline?

23              MR. BYRNSIDE:  Object to the form,

24   foundation.  You can answer.

25   BY MS. QIN:

CONFIDENTIAL

Page 70

1        Q    Is that correct?

2        A    Yes.

3             MS. QIN:  I think we can take down this

4    document.  I'd like to exhibit another document with

5    Bates number SMG0001255.

6             CONCIERGE TECH:  One moment.  1255?

7             MS. QIN:  That's correct.

8             CONCIERGE TECH:  The document ending in

9    255 is up and marked as Exhibit 159.  Stand by while

10   I put that on screen.

11            (Exhibit Number 159 was marked for

12   identification.)

13            MS. QIN:  Maybe zoom in just a little bit.

14   That's perfect.

15   BY MS. QIN:

16       Q    Do you see that document, Mr. Boyce?

17       A    Yes.

18       Q    So do you see that this is an e-mail from

19   Danielle D'Souza Gill sent on April 25th, 2022?

20       A    Yes.

21       Q    And you see that this is an e-mail sent to

22   harrycrocker@regnery.com?

23       A    Yes.

24       Q    Who is Danielle D'Souza Gill?

25       A    She is the daughter of Dinesh.

CONFIDENTIAL

Page 71

```
 1          Q     And how did Salem first meet her?
 2                MR. BYRNSIDE:  Object to form.
 3          A     You know, I don't know the answer to that
 4     question.  Being that she was the daughter of Dinesh
 5     and was helping out with the promotion of this
 6     movie, that's the context of how we met her.
 7     BY MS. QIN:
 8          Q     And who is Harry Crocker?
 9          A     Harry had a position at Regnery, and I'm
10     not sure what his title was there.
11          Q     So why is Danielle sending this e-mail to
12     Harry?
13                MR. BYRNSIDE:  Object to the form,
14     foundation.
15     BY MS. QIN:
16          Q     I'll rephrase that question.
17                Mr. Boyce, what is this e-mail about?
18          A     Well, this is about the red carpet movie
19     premiere at Mar-a-Lago in which the movie was shown
20     and Donald Trump did appear.
21          Q     Did Salem attend -- did representatives of
22     Salem attend this Mar-a-Lago screening?
23          A     Yes.
24          Q     Do you recall who attended?
25          A     I don't recall the exact number.  Probably
```

CONFIDENTIAL

Page 72

1    12 Salem people.

2        Q    And whose idea was it to have a Mar-a-Lago

3    screening of this film?

4        A    Well, I think it was Dinesh.

5        Q    Did Dinesh discuss his idea for the

6    screening with Salem?

7        A    Yes.

8        Q    And what did he say about his idea for the

9    screening?

10       A    Just what a great opportunity it was for

11   us to launch the movie at Mar-a-Lago.

12       Q    Did Salem assist with the logistics for

13   the screening?

14       A    Not really.  They were pretty simple, so

15   there wasn't a lot for us to do other than get

16   there.

17       Q    And what happened during this screening

18   event?

19       A    Well, it was a typical movie screening

20   with hors d'oeuvres and food before, an opportunity

21   to have pictures with -- some of us had pictures

22   taken, and then we saw the movie, and then there was

23   a dinner, I think, afterwards.

24       Q    And was Former President Donald Trump

25   present at this screening?

CONFIDENTIAL

Page 73

```
 1          A     Yes.
 2          Q     Did Dinesh D'Souza speak to Salem about
 3     his coordination with Former President Donald Trump
 4     for this screening?
 5          A     Well, just in general.  I don't remember
 6     anything specific.
 7          Q     Was there any other screening of the movie
 8     where Former President Donald Trump was present?
 9                MR. BYRNSIDE:  Object to the form.
10          A     Not to my knowledge.
11     BY MS. QIN:
12          Q     Are you aware of any other coordination
13     with Former President Donald Trump and his team for
14     the purposes of promoting the 2000 Mules movie?
15                MR. BYRNSIDE:  Object to the form.
16          A     I'm not aware.
17     BY MS. QIN:
18          Q     Great.
19                MS. QIN:  We can take this document down
20     now.  Thank you very much.
21     BY MS. QIN:
22          Q     So I'd like to move on to talk about the
23     book that also went by the name 2000 Mules.
24                So as you know, there was also a book that
25     was due to be published soon after the release of
```

CONFIDENTIAL

Page 74

1    the 2000 Mules film.  Do you know about this book

2    also called 2000 Mules?

3            MR. BYRNSIDE:  Object to the form.

4        A    I know about it.

5    BY MS. QIN:

6        Q    Can you tell me when Salem first learned

7    about this book?

8        A    No, I can't tell you that.  I don't know.

9        Q    Who told Salem Media about the planned

10   publication of this book?

11           MR. BYRNSIDE:  Object to the form and the

12   scope.  You can answer.

13       A    Yeah, as I recall, Dinesh suggested to us

14   that he wanted to write the book and publish it

15   through Regnery as a supporting piece to the movie,

16   but I don't recall much about it.  Regnery was not

17   under my area of responsibility, so I can answer as

18   best I can, but I don't have a lot of details.

19   BY MS. QIN:

20       Q    And when did Dinesh have that conversation

21   with Salem?

22       A    That I don't know.

23       Q    Would it have been before the release of

24   the 2000 Mules film?

25       A    Probably.

CONFIDENTIAL

Page 75

```
 1              MR. BYRNSIDE:  Object to form.
 2              THE REPORTER:  I'm sorry, was there an
 3     objection?
 4              MR. BYRNSIDE:  I objected to the form,
 5     Robyn.  Thank you.
 6     BY MS. QIN:
 7         Q    Did Salem have any conversations with TTV
 8     regarding the 2000 Mules book?
 9         A    If we did, it would have been with our
10     legal.  It wasn't anything I had -- I'm not aware of
11     it.
12         Q    What was Salem's role regarding the
13     publication of this book?
14              MR. BYRNSIDE:  Object to the form, scope.
15     You can answer.
16         A    We didn't have a big role, not Salem.
17     Regnery was a different division, and so no, we
18     didn't have a lot to do with it.  It was mainly a
19     Regnery thing.
20     BY MS. QIN:
21         Q    So did Dinesh D'Souza ask Regnery to play
22     a role in publishing this book?
23              MR. BYRNSIDE:  Object to the form,
24     foundation, scope.
25         A    Yeah, I mean, David Evans, who was our
```

CONFIDENTIAL

Page 76

1    COO, still is our COO, was the supervisor over

2    Regnery, so he would have had some conversation,

3    and, of course, legal would have had conversation.

4    BY MS. QIN:

5        Q    So did Salem Media supervise the

6    publication of this book?

7        A    No, it was Regnery that did, not Salem

8    Media specifically.

9        Q    So Regnery supervised the publication of

10   this book?

11       A    Correct.

12            MR. BYRNSIDE:  Object to form, foundation,

13   scope.  Give me a second to object, Phil, if you

14   don't mind.

15       A    My answer is correct.

16   BY MS. QIN:

17       Q    Thank you.

18            And what exactly did Regnery have to do

19   with respect to the publication of this book?

20            MR. BYRNSIDE:  Object to the form,

21   foundation, and scope.  You can answer.

22       A    Regnery did what it always does, it

23   publishes the book and distributes the book.

24   BY MS. QIN:

25       Q    Does Regnery review the accuracy of

CONFIDENTIAL

Page 77

```
 1    content in books that it publishes?
 2              MR. BYRNSIDE:  Objection, lack of
 3    foundation, outside the scope.
 4         A    As far as I know, they do.
 5    BY MS. QIN:
 6         Q    Going back to something you said earlier,
 7    you mentioned that the COO of Salem was involved
 8    with this book publication process; is that correct?
 9              MR. BYRNSIDE:  Object to the form,
10    misstates testimony.
11    BY MS. QIN:
12         Q    You can still answer.
13              MR. BYRNSIDE:  You can answer.
14         A    Yes.  That is a yes answer.
15    BY MS. QIN:
16         Q    So what was his role with respect to this
17    book?
18         A    Well, I don't know specifically with this
19    book, but he was the corporate executive in charge
20    of Regnery in addition to a whole lot of other
21    things.
22         Q    What did Salem Media and Regnery
23    understand the book 2000 Mules to be about?
24              MR. BYRNSIDE:  Objection, foundation,
25    scope.  You can answer.
```

CONFIDENTIAL

Page 78

1          A     It was an extension of the movie.

2     BY MS. QIN:

3          Q     What do you mean by "extension of the

4     movie"?

5          A     I mean that whatever the movie was about

6     the book should be about.

7               MS. QIN:  Could we please show the

8     document with the Bates number SMG0002233, please.

9               CONCIERGE TECH:  One moment.  The document

10    ending in 2233 is up and marked as Exhibit 160.

11    Stand by while I bring that on screen.

12               (Exhibit Number 160 was marked for

13    identification.)

14               MS. QIN:  Great.  Thank you.

15    BY MS. QIN:

16         Q     Are you able to see that document,

17    Mr. Boyce?

18         A     Yes, I see it.

19               MS. QIN:  If we could just scroll down a

20    little bit.  That's good.  Maybe just up a little

21    bit.  Yeah, that's perfect.

22    BY MS. QIN:

23         Q     So this appears to be an e-mail from you

24    sent on August 12th, 2022.  Does that look correct?

25         A     That does.

CONFIDENTIAL

Page 79

1          Q    And so this e-mail starts off saying:  As
2     you all know, 2000 Mules, the movie, was a huge
3     success for Salem.
4               Do you see that?
5          A    Yes.
6          Q    And the start of the second paragraph of
7     this e-mail says:  Now comes the second phase of
8     this effort, a Regnery book with the same title.
9     The book is awesome, and provides greater detail
10    than the movie could in 90 minutes.  It is a
11    fascinating detective story, as we learn how the
12    unthinkable was covered [sic], and we all helped
13    uncover it.  Salem is a financial partner.  This is
14    how we change the world.
15              Do you see that?
16         A    I do.
17         Q    So Salem was aware of the -- of this book
18    prior to August 12th, 2022; is that correct?
19         A    That is correct.
20         Q    Here you say:  The book is awesome and
21    provides greater detail than the movie could in 90
22    minutes.  It is a fascinating detective story as we
23    learn how the unthinkable was uncovered, and we all
24    helped uncover it.
25              Where did you get this information from

CONFIDENTIAL

Page 80

1    about the book?

2        A    I don't know where I got the information.

3    I'm basically stating an opinion here, the quality

4    of the story, and how we'd like people to see it and

5    read it.

6        Q    And how did you know about the quality of

7    the story?

8        A    Well, we were very involved in the making

9    of the movie, and the book was an extension of the

10   movie, so if the book is as good as the movie, it's

11   going to be very good.

12       Q    Had you read the book at the time you sent

13   this e-mail?

14       A    No.

15       Q    Had Dinesh had conversations with Salem

16   about the contents of the book prior to you sending

17   this e-mail?

18       A    Not that I know of.  I mean, he had

19   conversations with the folks at Regnery, but not

20   with me.

21       Q    Do you know about the contents of those

22   conversations with the Regnery folks?

23       A    I don't.

24       Q    So if we look at the last paragraph, if we

25   can scroll down a little bit, last paragraph on this

CONFIDENTIAL

Page 81

1    page, if we look the middle there, you have a

2    sentence that says:   Please help promote it.

3            Do you see that sentence, the middle of

4    the last paragraph?

5       A    Yeah, let me look it up.   "Please help

6    promote it," yeah, I see that.

7       Q    You say:   Please help promote it, talk it

8    up on your shows and interview Dinesh when you have

9    the time.

10           Did you -- did Salem have any

11    conversations with Dinesh D'Souza about the

12    marketing for the book?

13      A    Other than telling Dinesh that we would

14    promote it, that's pretty much all.

15      Q    Was the promotion and marketing scheme

16    similar to the scheme followed for the movie?

17           MR. BYRNSIDE:   Object to the form.

18      A    Yes.

19   BY MS. QIN:

20      Q    So if we look again at this last

21    paragraph, the next sentence after the one we just

22    read, you say:   If you want a digital copy of the

23    book, I can send you one.   If you want a hard copy,

24    Patricia can send one.

25           Who is Patricia?

CONFIDENTIAL

Page 82

1      A    Patricia Jackson was a publicist that was

2    working for us on promotion of both the movie and

3    the book.

4      Q    So at the time you sent this e-mail in

5    August 2022, the book had already been written; is

6    that correct?

7      A    Yes.

8      Q    And Salem had access to copies of the

9    book; is that correct?

10     A    Yes.

11     Q    But you had not yet read the book at this

12   point; is that correct?

13     A    Yes, that's correct.

14     Q    Did other people at Salem read the book --

15   had other -- had other people at Salem read the book

16   by August 12th?

17          MR. BYRNSIDE:  Objection, foundation and

18   scope.  You can answer.

19     A    I don't know.

20          MS. QIN:  We can take down this exhibit.

21   I'd like to exhibit another document, the document

22   with Bates number SMG0000109.

23          CONCIERGE TECH:  One moment.  The document

24   ending in 109 is up and marked as Exhibit Number

25   161.  Stand by while I bring that on screen.

CONFIDENTIAL

Page 83

1              (Exhibit Number 161 was marked for

2      identification.)

3      BY MS. QIN:

4           Q    Do you see this document, Mr. Boyce?

5           A    Yes.

6           Q    So here we have an e-mail from someone

7      named Danielle Rankin at Regnery sent on August 18,

8      2022.  Do you see that?

9           A    I do.

10          Q    And who is Danielle Rankin?

11          A    As I recall, she was a publicist there at

12     Regnery.

13          Q    So this e-mail starts off with:  Good

14     morning, all.  I wanted to share an update of what

15     has been scheduled so far for 2000 Mules publishing

16     August 30th.

17              Do you see that?

18          A    Yes.

19              MS. QIN:  If we scroll down to PDF page 2,

20     the bottom of the second page.

21     BY MS. QIN:

22          Q    So here you see "publicity" in bold.  Do

23     you see that?

24          A    Yes.

25          Q    And if we keep scrolling to page 3, you

CONFIDENTIAL

Page 84

1    see that this list continues; is that correct?

2         A    I see that.  I see the list.

3         Q    Could you explain to me what this list is?

4              MR. BYRNSIDE:  Object to the form,

5    foundation, outside the scope.

6         A    It appears to be an interview schedule

7    with someone to promote the book.  It looks like

8    these are all hosts that were asked to interview

9    someone.

10   BY MS. QIN:

11        Q    This list appears to show certain Salem

12   hosts; is that correct?

13        A    Some of these hosts on the list are Salem

14   hosts.

15        Q    So were the Salem networks promoting the

16   2000 Mules book?

17        A    Well, you saw the earlier e-mail from me

18   in which I asked the hosts to promote the book.

19        Q    So how were they promoting the book?

20        A    In some cases by interviewing Dinesh, and

21   in other cases just by mentioning that the book was

22   coming out and asking people if they wanted to buy

23   it.

24        Q    Did all the Salem hosts receive copies of

25   the book?

CONFIDENTIAL

Page 85

1          A     Well, you saw the people that were on the

2     e-mail that I had sent previously, so those people

3     were offered copies of the book.  I don't know how

4     many actually received a copy.  We also offered it

5     digitally, but I don't recall how many people

6     actually asked for it to be seen digitally.

7          Q     Did the Salem hosts who promoted the book

8     on their networks read the book?

9                MR. BYRNSIDE:  Object, lack of foundation,

10    outside the scope.  You can answer.

11         A     I don't know.  Some of them did; some of

12    them didn't.

13               MS. QIN:  Great.  I think we can take this

14    exhibit down.  Thank you.

15    BY MS. QIN:

16         Q     So, Mr. Boyce, in the publishing industry,

17    what does a recall mean?

18               MR. BYRNSIDE:  Object to the form,

19    foundation, and scope.

20         A     I'm not an expert on publishing, so I

21    can't really answer that for sure.

22    BY MS. QIN:

23         Q     When Salem Media publishes a book, is it

24    possible for Salem to later recall that book?

25               MR. BYRNSIDE:  Object to the form, assumes

CONFIDENTIAL

Page 86

1    facts, and outside the scope.

2        A    Salem doesn't recall books.  It would be

3    Regnery that would recall a book.

4    BY MS. QIN:

5        Q    So is it possible for Regnery to recall

6    books that it publishes?

7            MR. BYRNSIDE:  Objection, foundation,

8    outside the scope.

9        A    I don't really know the answer to that.

10   It's not my area of expertise.

11           MS. QIN:  Could we please pull up the

12   document with the Bates number SMG0000517, please.

13           CONCIERGE TECH:  One moment.  The document

14   ending in 517 is up and marked as Exhibit Number

15   162.  Stand by while I bring that on screen.

16           (Exhibit Number 162 was marked for

17   identification.)

18   BY MS. QIN:

19       Q    Do you see this document, Mr. Boyce?

20       A    Yes, I do.

21       Q    Do you see that this is an e-mail sent

22   from Danielle Rankin to Tom Spence on September 8th,

23   2022?

24       A    Yes.

25       Q    And who is Tom Spence?

CONFIDENTIAL

Page 87

1        A    Tom Spence was the president of Regnery at
2    that time.
3        Q    So in the e-mail, Danielle says:
4    Apologies for the delay from our call yesterday.
5    Here is the Excel spreadsheet of everyone who
6    received a copy of the original 2000 Mules.
7            Do you see that?
8        A    Yes.
9        Q    When she refers to the "original 2000
10    Mules," what is she referring to?
11            MR. BYRNSIDE:  Objection to the form,
12    foundation, and scope.
13        A    And I don't know for sure what she's
14    referring to.
15    BY MS. QIN:
16        Q    So then the next sentence, she says:  This
17    includes everyone who requested a copy plus our must
18    get list that we send a copy to for every book.
19    Everyone received a recall e-mail.
20            Do you see that?
21        A    Yes.
22        Q    What is this must get list that Danielle
23    is referring to?
24            MR. BYRNSIDE:  Objection, lack of
25    foundation, outside the scope.

CONFIDENTIAL

Page 88

1          A     Yeah, I don't really know.

2     BY MS. QIN:

3          Q     Was Salem aware that the 2000 Mules book

4     was recalled?

5          A     Yes, we did discover that it was recalled.

6          Q     When did Salem make that discovery?

7          A     I don't know.

8          Q     Who informed Salem about the recall?

9          A     That I don't know either.

10         Q     How did Salem find out about the recall?

11         A     I don't know for sure how we found out.  I

12    just don't recall.

13         Q     Who made the decision to recall the 2000

14    Mules book?

15              MR. BYRNSIDE:  Object to the form,

16    foundation, scope.

17         A     Yeah, I don't know, but you would assume

18    that our legal would have been involved in that.

19    BY MS. QIN:

20         Q     Do you know when this decision to recall

21    was made?

22         A     No.

23         Q     Are you aware of why -- was Salem aware of

24    why the book was recalled?

25         A     No.

CONFIDENTIAL

Page 89

1        Q    Did Salem ask Regnery any questions about

2    why the book was recalled?

3            MR. BYRNSIDE:  I'm going to just instruct

4    you here, Phil, to the extent that would require you

5    to disclose privileged information that came from

6    Salem's in-house legal counsel, I will instruct you

7    not to answer.  If you can answer without disclosing

8    privileged information, please go ahead.

9        A    Yeah, I can't really answer that.

10   BY MS. QIN:

11       Q    Did Salem talk to Dinesh D'Souza about the

12   book being recalled?

13       A    Someone did, but it wasn't me.

14       Q    Do you know what was discussed with Dinesh

15   D'Souza and the Salem individual?

16            MR. BYRNSIDE:  I'll give you the same

17   instruction, Phil, in terms of not disclosing

18   privileged information.

19       A    Yeah, and I can't really answer that.

20   BY MS. QIN:

21       Q    Did Salem discuss the recall of the book

22   with TTV?

23       A    Not to my knowledge.

24            MS. QIN:  Can we please take down this

25   document and pull up the document with the Bates

CONFIDENTIAL

Page 90

1      number SMG0000054, please.

2              CONCIERGE TECH:  One moment.  The document

3      ending in 54 is up and marked as Exhibit Number 163.

4      Stand by while I bring it on screen.

5              (Exhibit Number 163 was marked for

6      identification.)

7      BY MS. QIN:

8          Q    You see this document, Mr. Boyce?

9          A    Yes.

10         Q    So if we scroll down to the last page --

11             MS. QIN:  Maybe scroll up a little bit so

12     we can see the -- yes.

13     BY MS. QIN:

14         Q    So if you see here, this is the same

15     e-mail we had seen earlier from Danielle Rankin to

16     Tom Spence sent on September 8th, 2022.  Do you see

17     that?

18         A    Yes.

19             MS. QIN:  So if we scroll up a little -- a

20     little bit more up -- great.  Thank you.

21     BY MS. QIN:

22         Q    Here you see that, again, on

23     September 8th, 2022, at 2:44 p.m., Danielle Rankin

24     writes to Tom Spence in response to Tom Spence's

25     e-mail on the same day at 2:38 p.m. asking:  Thanks,

CONFIDENTIAL

Page 91

1       Danielle.  Can you tell me more about the recall

2       e-mail?  What did it say?  Has anyone returned his

3       copy (I assume not)?

4               Do you see that?

5           A    Yes.

6           Q    So if we look at Danielle Rankin's e-mail,

7       she says -- she copies:  Due to a publishing error,

8       the publication date of the 2000 Mules book has been

9       postponed to a date later this year.

10              What is the publishing error that she's

11      referring to?

12              MR. BYRNSIDE:  Object to the form, lacks

13      foundation, outside the scope.

14          A    I don't know.

15      BY MS. QIN:

16          Q    Did Salem discuss any publishing errors in

17      the 2000 Mules book with Regnery?

18              MR. BYRNSIDE:  Here again, Phil, just give

19      you the same instruction.  If you can answer the

20      question without disclosing privileged information,

21      go ahead, but please do not disclose any privileged

22      communications involving Salem's legal counsel.

23          A    Yeah, I can't really answer that.

24      BY MS. QIN:

25          Q    Did Salem have any discussions with Dinesh

CONFIDENTIAL

Page 92

1    D'Souza regarding publishing errors in the 2000

2    Mules book?

3              MR. BYRNSIDE:  Give you the same

4    instruction.

5        A    Any discussion would have been with legal.

6    BY MS. QIN:

7        Q    Are you aware of when Salem became aware

8    of this publishing error?

9        A    No.

10       Q    Do you know who told Salem about this

11   publishing error?

12             MR. BYRNSIDE:  Object to the form.

13       A    No.

14             MS. QIN:  Let's take down this exhibit and

15   show the document with Bates number SMG0000933.

16             CONCIERGE TECH:  One moment.  933; is that

17   correct?

18             MS. QIN:  That's correct.

19             CONCIERGE TECH:  Okay, 933 is up and

20   marked as Exhibit Number 164.  Stand by while I

21   bring that on screen.

22             (Exhibit Number 164 was marked for

23   identification.)

24   BY MS. QIN:

25       Q    You see this document, Mr. Boyce?

CONFIDENTIAL

Page 93

1          A    Yes.

2          Q    So this is an e-mail from Matthew Maschino

3     sent on October 25th, 2022; is that correct?

4          A    Yes.

5          Q    And who is Matthew?

6          A    I don't know.

7               MS. QIN:  So if we scroll all the way to

8     the end to page 3, but a little bit further up so we

9     could see -- perfect.

10    BY MS. QIN:

11         Q    You see here an e-mail that was sent by

12    Matthew on October 25th; is that correct?

13         A    I see that.

14         Q    In this e-mail to a Mr. Sukites, Matthew

15    Maschino says:  Dear Mr. Sukites, we will be

16    delivering a copy today of 2000 Mules, and then he

17    proceeds to provide the ISBN number.  Do you see

18    that?

19         A    Yes.

20         Q    So if we scroll up a little bit to PDF

21    page 2, here you see Matthew Maschino sends an

22    e-mail to someone named Sandra Savage on October

23    25th saying:  Hello, Sandra.  We deposited a copy

24    with the LOC/House delivery drop site this morning.

25               Do you see that?

CONFIDENTIAL

Page 94

1          A    I do.

2          Q    Then if you continue to scroll up and go

3     back to the top e-mail, Matthew Maschino now says:

4     Hello, Schamell, the first printing of this title

5     was recalled after a legal review, and has been

6     reissued with revised content and published today.

7               Do you see that?

8          A    Yes.

9          Q    What content was revised in the 2000 Mules

10    book?

11               MR. BYRNSIDE:  Objection, lacks

12    foundation, outside the scope.

13          A    I don't know.

14    BY MS. QIN:

15          Q    Was Salem aware that the book was being

16    reissued with revised content?

17          A    I wasn't, but some were.

18          Q    Did Salem discuss the reissuing of the

19    book with revised content with Regnery?

20               MR. BYRNSIDE:  Phil, I'll give you the

21    same direction I've given you up to this point on

22    this topic, which is if you can answer the question

23    without disclosing privileged communications or

24    information involving Salem's legal counsel, please

25    go ahead, but I will otherwise instruct you not to

CONFIDENTIAL

Page 95

1    disclose privileged information in answering

2    questions.

3        A    Yeah, I can't answer that question.

4    BY MS. QIN:

5        Q    Did Salem discuss reissuing the book with

6    revised content with Dinesh D'Souza?

7            MR. BYRNSIDE:  Same instruction.

8        A    That I don't know.  If they did, that

9    would have been with legal.

10   BY MS. QIN:

11       Q    Did Salem discuss reissuing the book with

12   revised content with TTV?

13       A    Not that I'm aware of.

14           MS. QIN:  Okay.  We can take down this

15   document.  I'd like to show the document with Bates

16   number SMG0001261.

17           CONCIERGE TECH:  1261 is up and marked as

18   Exhibit Number 165.  Stand by while I bring that on

19   screen.

20           (Exhibit Number 165 was marked for

21   identification.)

22   BY MS. QIN:

23       Q    You see this document, Mr. Boyce?

24       A    Yes.

25       Q    So here it looks like on October 26, 2022,

CONFIDENTIAL

Page 96

1    someone named Thomas Howell from the Washington

2    Times reached out to Regnery, and in his e-mail, he

3    says:  I wanted to know if Regnery could comment on

4    this report about revisions in 2000 Mules.

5            He proceeds to paste a link from NPR.

6    Then Thomas Howell asks:  Why was the recall issued

7    initially, and what was the purpose of the

8    revisions?  Was it to satisfy potential legal

9    issues?

10           Do you see that question?

11       A    Yes.

12       Q    The top e-mail in this chain is a message

13   from Lauren Snyder at Regnery.  Do you see that?

14       A    Yes.

15       Q    And who is Lauren Snyder?

16       A    She's one of the PR people or was at

17   Regnery.

18       Q    So how did Salem respond to Mr. Howell's

19   questions?

20           MR. BYRNSIDE:  I'm going to object to the

21   form.  There's nothing in here to suggest that Salem

22   responded to any questions.

23       A    Yeah, I don't have an answer for that.

24   BY MS. QIN:

25       Q    I'll rephrase.

CONFIDENTIAL

Page 97

```
 1              Are you aware of any responses by Regnery
 2      to Mr. Howell's questions?
 3          A    Yeah, if there was a response, it would
 4      have been with legal, and I don't know what that
 5      response would have been.
 6          Q    Did Salem receive any media inquiries
 7      regarding the recall of the 2000 Mules book?
 8          A    Not that I know of.
 9          Q    Did Salem discuss with Regnery any media
10      inquiries regarding the recall of the 2000 Mules
11      book?
12              MR. BYRNSIDE:  I will give you the same
13      instruction, Phil, I've given you on all these
14      questions to not disclose privileged information in
15      answering the question.
16          A    I can't really answer that.
17      BY MS. QIN:
18          Q    Did Salem discuss with Dinesh D'Souza
19      regarding media inquiries about the recall of the --
20      of the 2000 Mules book?
21              MR. BYRNSIDE:  Same instruction.
22          A    Yeah, I can't really answer that.
23      BY MS. QIN:
24          Q    Did Salem have any conversations with TTV
25      regarding the recall of -- regarding media inquiries
```

CONFIDENTIAL

Page 98

1      of the book's recall?

2              A     Not that I'm aware of.

3              MS. QIN:  We can exit this document.  I'd

4      like to exhibit the document with Bates number

5      SMG0001278, please.

6              CONCIERGE TECH:  One moment.  Okay.  The

7      document ending in 1278 is up and marked as Exhibit

8      Number 166, I believe.  Stand by while I bring it on

9      screen.

10             (Exhibit Number 166 was marked for

11     identification.)

12             MS. QIN:  Great.  Thank you.

13     BY MS. QIN:

14             Q     Mr. Boyce, do you see this document?

15             A     Yes, I do.

16             Q     You'll see that on August 29th, 2022,

17     someone named Dean Miller from leadstories.com sent

18     an e-mail saying:  Much is being made of a

19     publishing observer's claim that book sellers have

20     been told that Regnery has recalled or will recall

21     2000 Mules.  If true, will there be a Regnery

22     statement?

23             Do you see that e-mail?

24             A     Yes.

25             Q     In response, Lauren Snyder from Regnery

CONFIDENTIAL

Page 99

1    wrote:  Due to a publishing error, the publication
2    date of 2000 Mules has been postponed to October
3    25th, 2022.  We look forward to publishing the 2000
4    Mules this fall.
5            Do you see that e-mail?
6        A    I do.
7        Q    And in response to Lauren's reply, Dean
8    Miller sends another e-mail on September 8th, 2022,
9    saying:  Lauren, you were not straight with me it
10    appears.  This is not a postponement, it is a
11    recall.  NPR now has a copy of the book and is
12    reporting that it includes multiple debunked claims,
13    some of which are about people/organizations who
14    intend to sue.  Do you have anything to say?
15            Do you see that e-mail?
16        A    I do.
17        Q    Did Salem know about the multiple debunked
18    claims in the book?
19            MR. BYRNSIDE:  Object to the form.
20        A    That's a question for legal.
21    BY MS. QIN:
22        Q    Did Salem discuss these multiple debunked
23    claims with Regnery?
24            MR. BYRNSIDE:  Object to the form.  Phil,
25    I'll give you the same instruction.

CONFIDENTIAL

Page 100

1          I will say for the benefit of the record,

2     Ms. Qin, you can keep showing him these e-mails that

3     involve Regnery but not Salem, but we've stated in

4     our responses to your subpoena that Salem does not

5     have nonprivileged information related to the recall

6     and reissue of the book, so the answers are all

7     going to be the same, but I will allow you to

8     conduct your deposition.

9          Phil, I'll just instruct you not to

10    disclose any privileged information.

11    BY MS. QIN:

12         Q    You can answer, Mr. Boyce.

13         A    I can't answer that question.

14         Q    Did Salem have any conversations about

15    multiple debunked -- the multiple debunked claims in

16    the 2000 Mules book with Dinesh D'Souza or TTV?

17              MR. BYRNSIDE:  Object to the form.  Give

18    you the same instruction.

19         A    I can't answer that.

20              MS. QIN:  We can exit this exhibit now,

21    and I think since it's a little after noon, it might

22    be a good time to break for lunch.

23              MR. BYRNSIDE:  We can go off the record,

24    and I'd like to talk about how long we are going to

25    take for a break and how much time we have left.

CONFIDENTIAL

Page 101

1           THE VIDEOGRAPHER:  This disc 2.  Going off
2     the record at 12:11.
3              (Recess 12:11-12:47 p.m.)
4           THE VIDEOGRAPHER:  This begins disc 3.
5     Going back on the record at 12:47.
6     BY MS. QIN:
7        Q    Mr. Boyce, did Salem ever ask Dinesh
8     D'Souza questions about the specific claims that
9     were made in the 2000 Mules film?
10       A    You know, there was discussion with Dinesh
11    throughout the creation of the movie, and, yeah, we
12    wanted to make sure that the information we were
13    getting and relying upon was correct.  So, yeah, we
14    did have those discussions from time to time.
15       Q    Did those discussions include members of
16    TTV?
17       A    No.  No, they did not.
18       Q    Could you tell me what was discussed in
19    those meetings with Dinesh D'Souza?
20           MR. BYRNSIDE:  I'll give you the same
21    instruction I've given you previously today.  If
22    those discussions involved Salem's legal counsel and
23    were privileged, please do not disclose any
24    privileged information.
25       A    Yeah, it was just a very vague, you know,

CONFIDENTIAL

Page 102

1    wanting to make sure that this information is

2    correct.  Beyond that, it would have been a

3    discussion with legal, and I wouldn't be able to

4    respond to that.

5    BY MS. QIN:

6         Q    When Salem asked Dinesh if the claims were

7    correct, how did Dinesh D'Souza respond?

8              MR. BYRNSIDE:  Give you the same

9    instruction.

10        A    Absolutely.  If he was talking to me, he

11   said absolutely they were correct, but beyond that,

12   that would have been a discussion with legal.

13   BY MS. QIN:

14        Q    So did Salem have any reservations about

15   the claims made in the 2000 Mules movie at any point

16   prior to the release of the movie?

17             MR. BYRNSIDE:  Object to the form, and

18   also instruct you not to disclose any privileged

19   communications or information from Salem's legal

20   counsel.  Otherwise, you can answer.

21        A    Yeah, we did not have serious concerns

22   that there was anything incorrect.

23   BY MS. QIN:

24        Q    Why did Salem not have any serious

25   concerns?

CONFIDENTIAL

Page 103

```
 1        A     We believed that this was accurate.
 2              THE WITNESS:  Yeah, go ahead.
 3              MR. BYRNSIDE:  I was giving you the same
 4     instruction on privilege, but you can go ahead and
 5     answer.
 6        A     Yeah, we believed that the information was
 7     accurate.  If we didn't, we would have not
 8     participated in the movies.
 9     BY MS. QIN:
10        Q     And when you say that you believed the
11     information was accurate, you referred to
12     information provided by Dinesh D'Souza; is that
13     correct?
14        A     Yes.
15        Q     I'd like to show the document with the
16     Bates number DDR00051352.
17              CONCIERGE TECH:  One moment.  That
18     document is up and marked as Exhibit Number 167.
19     Stand by while I bring that on screen.
20              (Exhibit Number 167 was marked for
21     identification.)
22     BY MS. QIN:
23        Q     Mr. Boyce, are you able to see this
24     document?
25        A     Yes, I do see it.
```

CONFIDENTIAL

Page 104

1          Q    So this is an e-mail sent on June 10th,
2     2022, from Edward G. Atsinger III.  Do you see that?
3          A    Yes.
4          Q    And it was sent to Dinesh D'Souza.
5               Can you tell me who Edward G. Atsinger III
6     is?
7          A    Yes, he's the executive chairman of the
8     board of Salem Media Group.
9          Q    So if we take a closer look at his
10    e-mail --
11              MS. QIN:  Maybe we can zoom in a little
12    bit to make the text a little larger.
13    BY MS. QIN:
14         Q    So if we look at the first line in the
15    first paragraph after "Hi Edward,"  It says:  I
16    watched 2000 Mules this afternoon as you requested.
17    My opinion that there's no evidence remotely close
18    to throwing the election into doubt in one much less
19    three/four states to change to results in 2020
20    Presidential; do you see that line?
21         A    Yes.
22         Q    Sorry, backing up here a little.  Looking
23    at the first line of this e-mail after "Dinesh," if
24    we could scroll up a little bit just to establish
25    who this is from, it looks like Edward says:  See

CONFIDENTIAL

Page 105

1    below the first two paragraphs of the e-mail Hugh

2    sent me after watching 2000 Mules.

3            Do you see that line?

4    A    Yes, this is the comment from Ed to Hugh.

5    Q    No, so --

6    A    Or is it to Dinesh?

7    Q    So this is --

8            MS. QIN:  If you scroll up a little bit.

9    BY MS. QIN:

10   Q    So this is the e-mail that Edward sent to

11   Dinesh, but copying the e-mail that Hugh sent to

12   Edward.

13   A    Yes.

14   Q    So could you tell me who Hugh is?

15   A    Hugh Hewitt is one of our talk show hosts.

16   He does the morning show on SRN and SMC.  So, yeah,

17   he's one of our hosts.

18   Q    So after this e-mail was sent from Hugh to

19   the executive chairman, what discussions did Salem

20   have internally about Hugh's concerns?

21           MR. BYRNSIDE:  Object to the form,

22   foundation and scope.  You can answer.

23   A    Yeah, I mean, we did talk about whether or

24   not we felt this information was accurate, and we

25   came to the conclusion that we thought it was.  Hugh

CONFIDENTIAL

Page 106

1    may have had a different opinion, but everybody has

2    the right to an opinion, and Hugh maybe didn't quite

3    see it that way.

4    BY MS. QIN:

5        Q    So this e-mail was discussed among Salem?

6        A    I don't know if this specific e-mail was

7    discussed among Salem.  It looks like this was an

8    e-mail between Ed and Hugh, and Hugh was responding

9    to it with Dinesh.

10       Q    Did Salem ever -- aside from this e-mail,

11   did Salem ever discuss these concerns about the

12   movie with Dinesh D'Souza?

13           MR. BYRNSIDE:  Object to the form,

14   foundation, scope, and will also instruct you not to

15   disclose any privileged information in answering the

16   question.

17       A    I can't really answer that question.

18   BY MS. QIN:

19       Q    Did Salem have any discussions with TTV

20   regarding concerns about the claims made in the

21   film?

22           MR. BYRNSIDE:  Same objection.

23       A    Not to my knowledge.

24   BY MS. QIN:

25       Q    So did Salem take any actions to check the

CONFIDENTIAL

Page 107

1    accuracy of the claims in the movie after receiving

2    this e-mail?

3              MR. BYRNSIDE:  Object to lack of

4    foundation, scope, and instruct you not to disclose

5    any privileged information, but, otherwise, you can

6    answer.

7         A    I can't really answer that.

8    BY MS. QIN:

9         Q    So after receiving this e-mail, did this

10   e-mail change the way that Salem viewed the movie?

11             MR. BYRNSIDE:  Same objections and

12   instruction.

13        A    Yeah, I can't really answer that.

14   BY MS. QIN:

15        Q    You mentioned earlier that Salem believed

16   all the information in the movie was accurate; is

17   that correct?

18        A    It is.

19        Q    And did that belief change after receiving

20   this e-mail?

21        A    No.

22             MS. QIN:  We can take down this exhibit.

23   BY MS. QIN:

24        Q    I'd like to pull up the document with the

25   Bates number SMG0000003.

CONFIDENTIAL

Page 108

1              CONCIERGE TECH:  One moment.  The document
2    ending in 3 is up and marked as Exhibit Number 168.
3    Stand by while I bring that on the screen.
4              (Exhibit Number 168 was marked for
5    identification.)
6    BY MS. QIN:
7         Q     You see that document, Mr. Boyce?
8         A     I do.
9         Q     So if we scroll a little bit down to the
10   bottom of this first page -- that's perfect -- you
11   see an e-mail sent by Tom Spence on September 30th,
12   2022, and he says:  Harry, would you take a look at
13   the e-mail that Bettina has composed to Salem to
14   blast out for Mules.
15              Do you see that?
16        A     I do.
17        Q     He then says:  I noted in my e-mail to
18   Mark (below) a couple of things that give me pause.
19              You see that?
20        A     Yes.
21              MS. QIN:  So why don't we scroll down to
22   the second page of this PDF.  A little further down.
23   That's perfect.
24   BY MS. QIN:
25        Q     So they appear to be referring to this

CONFIDENTIAL

Page 109

1    e-mail from Bettina Allison.  And who is Bettina

2    Allison?

3          A    I don't know.

4          Q    So in this e-mail that she sends on

5    September 30th to Tom Spence, she says:  Hi, Tom.

6    Here is a test of the pre-order e-mail for 2000

7    Mules.

8                So if we scroll down further, this appears

9    to be the e-mail that was referenced in Tom Spence's

10   e-mail to Harry saying:  Bettina composed this for

11   Salem to blast out for Mules.

12               See that -- is that --

13               MR. BYRNSIDE:  Object to the form,

14   foundation, scope.

15   BY MS. QIN:

16         Q    You can still answer.

17         A    Yeah, I don't know your question.

18         Q    Was this the e-mail that was composed for

19   Salem to send out on behalf of the 2000 Mules book?

20               MR. BYRNSIDE:  Objection, lacks

21   foundation, outside the scope.

22         A    I don't know.

23   BY MS. QIN:

24         Q    Did Salem send out an e-mail -- an e-mail

25   blast regarding the 2000 Mules book?

CONFIDENTIAL

Page 110

1          MR. BYRNSIDE:  Object to the form.

2      A    Yeah, I don't know specifically, but I'm

3    assuming we probably did.

4          MS. QIN:  So if we scroll down a little

5    bit here.  Thank you.

6    BY MS. QIN:

7      Q    If you look at that last sentence in the

8    last paragraph, it says:  In his new book 2000

9    Mules:  They thought we'd never find out.  They were

10   wrong, D'Souza exposes through eyewitness testimony

11   and pinpoint precision of the forensic technique of

12   geotracking how a corrupt system put in place by

13   community organizers produced massive electoral

14   fraud.

15          Do you see that sentence?

16     A    I do.

17     Q    So if we scroll back up to page 2 -- a

18   little bit further up, please -- we see an e-mail

19   from Tom Spence to Mark Bloomfield.  And who is Mark

20   Bloomfield?

21     A    Yeah, that I don't know.

22     Q    Okay.  So in this e-mail that Tom sent to

23   Mark on September 30th, 2022, Tom says:  I don't

24   know that legal needs to see it, but I'm

25   uncomfortable with a couple of phrases.  I'd rather

CONFIDENTIAL

Page 111

1    not say directly that there was, quote, massive

2    electoral fraud, end quote.  The point is more that

3    the integrity of the election system was deeply

4    compromised.

5           Do you know why Tom Spence had

6    reservations about the use of the term "massive

7    electoral fraud"?

8           MR. BYRNSIDE:  Objection to the form, lack

9    of foundation, outside the scope.  You can answer.

10       A    No, I don't know why.

11   BY MS. QIN:

12       Q    Did Tom ever speak to Salem about his

13   reservations of -- reservations regarding language

14   used to describe the 2000 Mules book?

15           MR. BYRNSIDE:  Object to the form and the

16   scope.

17       A    I don't know.

18           MS. QIN:  If we scroll up in this document

19   and look at the second e-mail in the chain on page 1

20   of the PDF.  Great.

21   BY MS. QIN:

22       Q    So on October 1st, it looks like Tom

23   Spence wrote in the first line of the second

24   paragraph:  Next week I'll have to tell you about

25   the phone call I got from Dinesh on Friday.  It was

CONFIDENTIAL

Page 112

1    so outrageous that I've been dying to tell everyone

2    about it.

3            Do you know what phone call he's referring

4    to?

5        A    No, I don't.

6        Q    Are you aware of any conversations between

7    Dinesh D'Souza and Salem regarding language used to

8    describe the 2000 Mules book?

9            MR. BYRNSIDE:  Object to the form and the

10   scope.

11       A    And the answer is no, I'm not aware.

12           MS. QIN:  We can take down this exhibit.

13           I'd like to show the document with Bates

14   number SMG0000078.

15           CONCIERGE TECH:  78 is up and marked as

16   Exhibit Number 169.  Stand by while I bring that on

17   screen.

18           (Exhibit Number 169 was marked for

19   identification.)

20   BY MS. QIN:

21       Q    And do you see this document, Mr. Boyce?

22       A    Yes, I do.

23       Q    Great.  So if we just look at this top

24   e-mail, it looks like Dinesh D'Souza has forwarded

25   an e-mail chain on September 7th, 2022, to several

CONFIDENTIAL

Page 113

1    people from Salem and Regnery.

2            Does that look correct to you?

3       A    Yes.

4       Q    So if we scroll further down, the core

5    e-mail that he's forwarding is an e-mail sent on

6    September 6, 2022, from Tom Dreisbach from NPR

7    addressed to Catherine Engelbrecht and Gregg

8    Phillips from TTV.

9            Does that look correct?

10      A    Looks correct to me.

11           MS. QIN:  So if we scroll down maybe a

12   little bit so that Mr. Boyce can see the -- as much

13   of the e-mail as possible.  That's good.

14   BY MS. QIN:

15      Q    So if you look at the very top here, the

16   first paragraph, Tom Dreisbach says:  In the book --

17   the 2000 Mules book -- D'Souza identifies the

18   following groups, and then he proceeds to name

19   several groups.

20           Do you see that paragraph?

21      A    Yes, I see it.

22      Q    And then he says that:  We've contacted

23   those groups for comment.  Among their responses so

24   far, and then he provides comments from the New

25   Georgia Project and the National Education

CONFIDENTIAL

Page 114

1    Association, and I'll give you a moment to just read

2    that.

3         A    Okay.

4         Q    And then if you look at the second

5    paragraph appearing on the second page here, Tom

6    Dreisbach asks:  Does True the Vote stand by the

7    claim that those seven groups functioned as, quote,

8    stash houses, end quote, for ballot mules which

9    Gregg said amounts to organized crime in the film?

10   Did TTV take any steps to verify the allegations by

11   contacting these groups?

12             So this message was forwarded to Salem.

13   Did Salem discuss the contents of this e-mail from

14   NPR with Catherine Engelbrecht or Gregg Phillips?

15             MR. BYRNSIDE:  I'll just instruct you,

16   Phil, not to disclose any privileged information or

17   communications from Salem's legal counsel;

18   otherwise, you can answer.

19        A    Yeah, I can't answer that one.

20   BY MS. QIN:

21        Q    Similarly, did Salem have any

22   conversations with Dinesh or Debbie D'Souza about

23   the contents of this e-mail?

24             MR. BYRNSIDE:  Give you the same

25   instruction.

CONFIDENTIAL

Page 115

1          A    Have the same answer.  I can't really
2     answer that.
3     BY MS. QIN:
4          Q    Did Salem take any actions to check the
5     accuracy of the claims made in this e-mail following
6     the receipt of this e-mail?
7               MR. BYRNSIDE:  I will object to the scope
8     and give you the same instruction, Phil, in terms of
9     not disclosing any privileged information or
10    communications with Salem's legal counsel.
11    Otherwise, you can answer.
12         A    Yeah, I can't answer that.
13    BY MS. QIN:
14         Q    Mr. Boyce, are you not able to answer
15    because you don't know the answer or because these
16    are privileged communications?
17         A    These are privileged conversations between
18    legal and the parties you're asking about.
19         Q    Thank you.
20              Prior to receiving this e-mail, was Salem
21    aware of these organizations' denial of the
22    allegations made against them?
23         A    Not to my knowledge.
24         Q    After receiving this e-mail, did Salem
25    continue to believe that the information provided --

CONFIDENTIAL

Page 116

 1     sorry, strike that.

 2             After receiving this e-mail, did Salem

 3     continue to believe that the information and claims

 4     presented in the 2000 Mules movie and book were

 5     accurate?

 6             MR. BYRNSIDE:  Object to form and scope.

 7     You can answer.

 8        A    As far as 2000 Mules movie, yes, we

 9     believed they were accurate.

10     BY MS. QIN:

11        Q    Did you no longer believe that the claims

12     made in the book were accurate?

13             MR. BYRNSIDE:  Object to the form.

14        A    I can't answer that.

15     BY MS. QIN:

16        Q    And, again, the reason you can't answer is

17     due to privilege or because you are not aware of

18     Salem's view on that issue?

19        A    You want to repeat the question so I know

20     for sure?

21        Q    Sure.  So after receiving this e-mail, did

22     Salem continue to believe that the information and

23     claims presented in the 2000 Mules book were

24     accurate?

25             MR. BYRNSIDE:  Object to the form, outside

CONFIDENTIAL

Page 117

1    the scope.

2          A    I can't answer that.  That's privileged

3    with the attorneys and my company.

4               MS. QIN:  Okay.  We can take down this

5    exhibit.  I'd like to now show the document with the

6    Bates number SMG0000092, please.

7               CONCIERGE TECH:  One moment.  The document

8    ending in 92 is now up and marked as Exhibit 170,

9    1-7-0.  Stand by while I bring it on screen.

10              (Exhibit Number 170 was marked for

11   identification.)

12   BY MS. QIN:

13         Q    Do you see this document, Mr. Boyce?

14         A    Yes.

15         Q    So if you scroll down to the bottom of

16   this first page, you'll see an e-mail sent on August

17   29th by Tom Spence to Catherine Engelbrecht.  In

18   this e-mail, Tom says in the first paragraph:  We

19   are going to reprint the book version of 2000 Mules,

20   and I have a question for you about the changes

21   we're making.

22              He then says:  We plan to delete the

23   sentence on page 28 [sic] in which Dinesh names

24   seven organizations that were supposedly involved in

25   the ballot harvesting.

CONFIDENTIAL

Page 118

1            Do you see that sentence?

2      A    I do.

3            MR. BYRNSIDE:  Object to the form.

4    BY MS. QIN:

5      Q    Sorry, could you repeat your answer?

6      A    Yes, I do see that.

7            THE REPORTER:  Mr. Boyce, we're getting a

8    little crosstalk here.  If you could just please

9    wait until she finishes her objection [sic] and then

10   maybe give a little pause to let Mr. Byrnside

11   object.  Thank you.

12           THE WITNESS:  Okay.

13   BY MS. QIN:

14     Q    Does Salem -- strike that.

15           Why did Salem and Regnery -- strike that.

16           Does -- do you recall why there was an

17   objection to the sentence on page 68 of the book

18   regarding Dinesh D'Souza's naming of the seven

19   organizations that were supposedly involved in

20   ballot harvesting?

21           MR. BYRNSIDE:  Object to the form, lack of

22   foundation, outside the scope, and we'll instruct

23   you, Phil, not to disclose any privileged

24   information or communications with Salem's legal

25   counsel; otherwise, you can answer.

CONFIDENTIAL

Page 119

1          A    Yeah, I can't answer that.  That would be

2     privileged.

3     BY MS. QIN:

4          Q    Did Salem speak to Dinesh D'Souza about

5     his use of -- about his naming of these

6     organizations in the book?

7               MR. BYRNSIDE:  Make the same objections

8     and instruction.

9          A    Yeah, that's privileged information.

10    BY MS. QIN:

11         Q    Did Salem have conversations with

12    Catherine Engelbrecht or Gregg Phillips about these

13    organizations and their naming in the book?

14              MR. BYRNSIDE:  Same objections and

15    instruction.

16         A    Yeah, that would be privileged also.

17    BY MS. QIN:

18         Q    Do you know where Dinesh D'Souza got the

19    names of these organizations from?

20         A    No, I don't.

21         Q    Did Salem ever ask Dinesh D'Souza where

22    these names came from?

23              MR. BYRNSIDE:  Object to the form,

24    foundation, and scope.  I'll give you the same

25    instruction on privilege.

CONFIDENTIAL

Page 120

1           A    I can't answer that due to privilege.

2     BY MS. QIN:

3           Q    What was Salem's understanding of the need

4     to include these organizations in the book?

5                MR. BYRNSIDE:  Object to the form, assumes

6     facts, and outside the scope.

7           A    I can't answer that.

8     BY MS. QIN:

9           Q    I'll rephrase the question.

10               Did Salem believe that including these

11    organizations in the narrative presented in the book

12    was necessary?

13               MR. BYRNSIDE:  Object to the form and

14    foundation and scope.

15          A    I can't answer that one.

16    BY MS. QIN:

17          Q    You can't answer because of privilege or

18    because --

19          A    Correct.

20          Q    Okay.

21               MS. QIN:  We can take down this document.

22               Can we pull up the document with Bates

23    number SMG0000510.

24               CONCIERGE TECH:  One moment.  510 is up

25    and marked as Exhibit 171.  Stand by while I bring

CONFIDENTIAL

Page 121

1    it on screen.

2            (Exhibit Number 171 was marked for

3    identification.)

4            MS. QIN:  So if we scroll down to page --

5    kind of straddling the two pages to show the e-mail.

6    That's good.  Maybe just scrolling up a little bit.

7    Yeah, that's perfect.

8    BY MS. QIN:

9        Q    So this is an e-mail from ACLED

10   Communications sent on September 13th, 2022.  Do you

11   see that, Mr. Boyce?

12       A    I do.

13           MS. QIN:  And if we just scroll down a

14   little bit to see the signature line.

15   BY MS. QIN:

16       Q    So this is their head of communications,

17   Sam Jones, and he says -- that's perfect -- he says

18   in his first line:  I'm writing from the Armed

19   Conflict Location & Event Data Project (ACLED), a

20   nonprofit research organization that collects data

21   on political violence and protest events around the

22   world.

23           If we go to the second paragraph, he says:

24   It has come to our attention that Regnery Publishing

25   is preparing to release a book authored by Dinesh

CONFIDENTIAL

Page 122

1    D'Souza entitled, 2000 Mules:  They thought we'd

2    never find out.  They were wrong.

3            In the third paragraph, he says:  An early

4    recalled version of the book indicates that it

5    contains multiple incorrect and misleading

6    references to ACLED and ACLED data.  As such, we

7    request that these references either be corrected or

8    removed from the book.

9            Did Salem take any action after receiving

10   this e-mail from ACLED?

11           MR. BYRNSIDE:  Objection, outside the

12   scope, and will ask you not to disclose any

13   privileged communications with legal counsel.  Other

14   than that, you can answer.

15       A    I can't answer that.  That's privileged.

16   BY MS. QIN:

17       Q    Did Salem have any discussions with Dinesh

18   D'Souza regarding this e-mail from ACLED?

19           MR. BYRNSIDE:  Object to the form and

20   scope.  Same instruction.

21       A    And same answer.

22   BY MS. QIN:

23       Q    Did Salem have any conversations with

24   Catherine Engelbrecht or Gregg Phillips regarding

25   the contents of this e-mail from ACLED?

CONFIDENTIAL

Page 123

1          MR. BYRNSIDE:  Objection, outside the
2     scope, and I'll give you the same instruction on
3     privilege.
4          A    And that's the same answer.
5     BY MS. QIN:
6          Q    Do you know what -- strike that.
7               Did Salem end up making any corrections to
8     the 2000 Mules book as a result of ACLED's e-mail?
9          MR. BYRNSIDE:  Object to the form and
10    scope.  You can answer.
11         A    Yeah, I can't answer that.  That's
12    privileged.
13    BY MS. QIN:
14         Q    I understand that Salem Media had a
15    settlement with ACLED as a result of statements made
16    in the 2000 Mules book; is that correct?
17              MR. BYRNSIDE:  Object to the form,
18    foundation, and scope.  It's not something he's here
19    to testify about, but you can answer if you're aware
20    of it.
21         A    Yeah, I can't answer that because, A, I'm
22    not aware, and, B, it's privileged if I was.
23              MS. QIN:  Okay.  We can take this document
24    down.
25              I'd like to go back to the 2000 Mules

CONFIDENTIAL

Page 124

1    movie, so could we please show the document with
2    Bates number SMG0000530.
3              CONCIERGE TECH:  One moment.  You said
4    that was 530?
5              MS. QIN:  That's right.
6              CONCIERGE TECH:  Stand by.  Okay.  That
7    document is up and marked as Exhibit Number 172.
8    Stand by while I bring that on screen.
9              (Exhibit Number 172 was marked for
10   identification.)
11             MS. QIN:  Thank you.  So if you could
12   scroll down to PDF page 2 and 3, kind of straddling
13   those two pages.  That's good.  So we can scroll up
14   just a little bit.  Maybe make the font just a
15   little larger and scroll up a little bit more.
16   Great.
17   BY MS. QIN:
18        Q    Mr. Boyce, do you see that this is an
19   e-mail sent from Bruce Schooley to members of Salem
20   Media on April 3rd, 2022?
21        A    I do.
22        Q    And in this e-mail, he says:  We are
23   gaining confidence in this film as it comes
24   together.  As promised, here is the Salem April 4
25   rough cut.  I suggest you test the link before the

CONFIDENTIAL

Page 125

1    screening.

2              Do you see that?

3         A    I do.

4         Q    And so what does he mean when he says

5    "Salem April 4 rough cut"?

6              MR. BYRNSIDE:  Object to the form,

7    foundation.  You can answer.

8         A    Yeah, I mean, it appears that he's

9    referring to the rough cut, and he's sending the

10   rough cut out to various members of Salem management

11   so that we can review the rough cut and see what

12   they have been working on.

13   BY MS. QIN:

14        Q    And did Salem review the rough cut?

15        A    Yeah, I think everybody who received the

16   rough cut was able to take a look at it.

17        Q    What were Salem's thoughts on the film

18   after reviewing the rough cut?

19             MR. BYRNSIDE:  Objection to the form,

20   outside the scope.

21        A    Yeah, I really don't know specifically.  I

22   can't recall talking to all of these people about

23   what they thought of the movie, so I can't really

24   answer that.

25   BY MS. QIN:

CONFIDENTIAL

Page 126

1        Q    Did anybody at Salem raise any concerns

2   about the accuracy of the claims made in the film

3   after reviewing the rough cut?

4             MR. BYRNSIDE:  Objection, outside the

5   scope, and I'll instruct you not to disclose any

6   privileged information, but, otherwise, you can

7   answer the question.

8        A    Yeah, I can't really answer that.  That

9   would be privileged.

10  BY MS. QIN:

11       Q    After reviewing this rough cut, did Salem

12  provide any feedback to Dinesh D'Souza on this film?

13            MR. BYRNSIDE:  Same objection and

14  instruction.

15       A    Yeah, not that I know of.

16  BY MS. QIN:

17       Q    Okay.  So no -- no comments were given to

18  Dinesh D'Souza?

19       A    Well, not that I'm aware of.  I can't

20  recall if there were.  There may have been -- one of

21  these individuals might have talked to him, but we

22  didn't have a group meeting with him.

23       Q    Was any feedback provided to TTV after

24  reviewing the rough cut of this film?

25       A    No, not that I'm aware of.

CONFIDENTIAL

Page 127

1           MS. QIN:  We can take this document down.

2    BY MS. QIN:

3       Q    Was there a press release issued for this

4    film -- for the film 2000 Mules?

5           MR. BYRNSIDE:  Object to the form.  You

6    can answer.

7       A    I'm assuming there was.

8    BY MS. QIN:

9       Q    Okay.  I'm going to show you the document

10   Bates stamped SMG0001158.

11          CONCIERGE TECH:  One moment.  Okay.  1158

12   is up and marked as Exhibit Number 173.  Stand by

13   while I pull that on screen.

14          (Exhibit Number 173 was marked for

15   identification.)

16   BY MS. QIN:

17      Q    So here, Mr. Boyce, there's -- this is an

18   e-mail from Lauren Snyder to Tom Spence and others

19   sent on April 19th, 2022.  Do you see that?

20      A    I do.

21      Q    And here she says:  Attached is the film

22   press release.  Patricia Jackson tells me she went

23   back and forth a lot with Dinesh and Debbie on the

24   language for this.

25          And you had mentioned earlier that

CONFIDENTIAL

                                        Page 128

1        Patricia Jackson worked for Salem; is that correct?

2              A      Yes, she was an IC.

3              Q      Sorry, what is an IC?

4              A      An independent contractor.

5              Q      Thank you.

6                     So was Salem in touch with Dinesh D'Souza

7        and Debbie D'Souza for the film press release?

8                     MR. BYRNSIDE:  Object to the form.  You

9        can answer.

10             A      I don't recall.

11                    MS. QIN:  So I'd like to show the document

12       SMG0001159 as the next exhibit.

13                    CONCIERGE TECH:  Stand by.  1159 is up and

14       marked as Exhibit Number 174.

15                    (Exhibit Number 174 was marked for

16       identification.)

17                    MS. QIN:  Great.  Thank you.

18       BY MS. QIN:

19             Q      So, Mr. Boyce, this is the attachment to

20       the e-mail that we saw earlier, which is the -- this

21       is the press release for the film.

22                    Do you know who drafted the language for

23       this press release?

24                    MS. QIN:  If we could maybe zoom in a

25       little bit so we could see better.

CONFIDENTIAL

Page 129

1    BY MS. QIN:

2        Q    I'll repeat my question:  Do you know who

3    drafted the language for this press release?

4        A    No, I don't.

5        Q    Did Salem review the language of this

6    press release?

7            MR. BYRNSIDE:  Object to the form.

8        A    I don't know.

9            MS. QIN:  We can take this exhibit off as

10   well.

11   BY MS. QIN:

12       Q    I have a few questions about insurance for

13   the 2000 Mules film.  So does Salem typically

14   request that films it invests in obtain any types of

15   insurance?

16           MR. BYRNSIDE:  Object to the form,

17   foundation, scope.  You can answer.

18       A    Yes, we normally do.

19   BY MS. QIN:

20       Q    And what types of insurance does Salem

21   require?

22           MR. BYRNSIDE:  Objection, outside the

23   scope.  You can answer.

24       A    Yeah, it would be indemnity insurance to

25   protect us if there was a lawsuit.

CONFIDENTIAL

Page 130

1      BY MS. QIN:
2          Q    Did Salem ever request that One Party
3      America, LLC obtain any type of insurance?
4          A    We did.
5          Q    What type of insurance did Salem request?
6          A    I don't know specifically.
7          Q    And you said earlier that Salem requests
8      insurance to protect itself; is that correct?
9          A    Yeah, that's usually why you get
10     insurance.
11         Q    And is that the same reason that Salem
12     requested that One Party America obtain insurance?
13         A    No, it would be -- the reason would be to
14     protect ourselves.  Yeah, I guess you'd say yes, the
15     answer to that.
16         Q    Do you know if One Party America, LLC ever
17     obtained the insurance that Salem requested?
18         A    Yeah, I don't believe we did.
19         Q    Sorry, when you say "I don't believe we
20     did," do you mean that Salem was not aware if One
21     Party America, LLC ever obtained the insurance?
22         A    No, we were aware.  We -- I don't believe
23     we did obtain the insurance that we wanted.
24         Q    I see.
25              Do you know why that is?

CONFIDENTIAL

Page 131

1        A    Yeah, I think we tried, and there was

2    no -- no one willing to write the policy for us.

3        Q    Why was no one willing to write the

4    policy?

5        A    That I don't know.

6        Q    Did Salem ever discuss with Dinesh D'Souza

7    why One Party America, LLC was not able to obtain

8    insurance?

9        A    Yeah, that would be privileged.  I don't

10   know that we had that discussion, but legal may

11   have.

12       Q    So after One Party America, LLC was not

13   able to obtain insurance, did Salem take any actions

14   with respect to this fact?

15           MR. BYRNSIDE:  Object to the form, scope.

16       A    Not that I know of.

17   BY MS. QIN:

18       Q    And is it unusual for insurance companies

19   to refuse to write policies for films?

20           MR. BYRNSIDE:  Object to the form,

21   foundation, and scope.  You can answer.

22       A    Yeah, I'm not an expert on insurance, so I

23   can't really answer that truthfully.

24   BY MS. QIN:

25       Q    I don't have any more questions for you,

CONFIDENTIAL

Page 132

1      Mr. Boyce.  Thank you very much for your time today.

2           A      Thank you, Sonia.

3                  MS. QIN:  I'm not sure if other counsel

4      may have questions.

5                  MR. GEORGE:  This is Philip George.  I

6      don't have any further questions.  Thank you.

7                  THE WITNESS:  Thank you, Philip.

8                  MR. VINING:  This is Austin Vining.  I

9      have just a few questions.

10                 THE WITNESS:  Okay.

11                         EXAMINATION

12     BY MR. VINING:

13          Q      Good afternoon.  Thanks for being with us

14     today.

15          A      Thank you.

16          Q      A couple of the different parties, I just

17     want to get an understanding of what Salem's

18     understanding of the different parties and what they

19     were bringing to the table for this project was.

20                 Do you know what Salem's understanding of

21     what Gregg Phillips was contributing to this 2000

22     Mules project?

23          A      Yeah, he was a researcher that was

24     providing information that would bolster the claims

25     of the movie.

CONFIDENTIAL

Page 133

```
 1         Q     Thank you.
 2               And Catherine Engelbrecht, what was
 3     Salem's understanding of what she was bringing to
 4     the project?
 5         A     Yeah, the same thing.
 6         Q     And would your answer be the same for True
 7     the Vote?
 8         A     Yeah, same thing.
 9         Q     And then for Dinesh D'Souza, what was
10     Salem's understanding of what he was bringing to the
11     project?
12         A     Well, he's the movie producer.  He's the
13     creator of the project and sort of the CEO of the
14     project, so his job was to create the movie and
15     research it and write it and put it in the proper
16     form and make it look good.
17         Q     And D'Souza Media, LLC, would your answer
18     be similar to Dinesh D'Souza, or is there anything
19     else you would add?
20         A     Say that again.  I didn't understand the
21     first part.
22         Q     D'Souza Media, LLC, what was your
23     understanding of their involvement and contribution
24     to the project?
25         A     Yeah, well, they would be the executive
```

CONFIDENTIAL

Page 134

1    producer of the film.

2         Q    Then I wanted to ask you about the October

3    16th meeting in Dallas.  I believe you testified

4    previously that Catherine Engelbrecht and Gregg

5    Phillips came and made a presentation to Salem; is

6    that correct?

7         A    Yes.

8         Q    Is there anything else you remember about

9    that presentation or any color you can add how that

10   presentation went?

11              MR. BYRNSIDE:  Object to form.  You can

12   answer.

13         A    I don't remember anything more.

14   BY MR. VINING:

15         Q    Do you remember if Salem had the

16   opportunity to ask questions?

17         A    Yes, we did.

18         Q    And are you saying that -- I'm sorry,

19   scratch that.

20              Did Salem ask questions?

21         A    We did.

22         Q    Do you remember any of the questions

23   specifically?

24         A    No, I don't.

25         Q    Do you remember the topics of

CONFIDENTIAL

Page 135

1    conversations that were asked?

2         A    Right.  Where did you get the information,

3    how did you obtain it, and how do you verify it.

4         Q    Do you remember if there were any concerns

5    about the responses you got to those questions?

6         A    I don't remember there being concerns

7    about the responses.

8         Q    Who was primarily answering those

9    questions?  Was that Mr. Phillips or Ms. Engelbrecht

10   or both?

11        A    That would be both.  Both of them probably

12   equally.

13        Q    What was your overall impression of

14   Mr. Phillips's competence and capability after that

15   meeting?

16             MR. BYRNSIDE:  Object to form and scope.

17   BY MR. VINING:

18        Q    I'm sorry.  Let me reask that.

19             What was Salem's impression of

20   Mr. Phillips's competency and overall impression of

21   Mr. Phillips as it relates to the 2000 Mules project

22   after that meeting?

23             MR. BYRNSIDE:  Same objection.

24        A    I think we thought he was competent.

25   BY MR. VINING:

CONFIDENTIAL

Page 136

1          Q     And same question for Ms. Engelbrecht,
2     what was Salem's impression of Ms. Engelbrecht's
3     competency as it related to the 2000 Mules project
4     after that meeting?
5                MR. BYRNSIDE:  Object to the form and
6     scope.
7          A     We thought she was competent.
8     BY MR. VINING:
9          Q     Is there anything you remember about that
10    meeting or anything that followed about what would
11    contribute to Salem's understanding of
12    Ms. Phillips's competency -- I'm sorry,
13    Ms. Engelbrecht's competency?
14                MR. BYRNSIDE:  Object to form.
15         A     No, there's nothing more.
16    BY MR. VINING:
17         Q     Same answer for Mr. Phillips?
18         A     Same answer.
19         Q     Last question.  Is Salem Media Group a
20    publicly traded company?
21         A     It was at that time.
22                MR. BYRNSIDE:  Yeah, let me just object,
23    Phil.
24                THE WITNESS:  Yeah.
25                MR. BYRNSIDE:  I'm just going to object

CONFIDENTIAL

Page 137

1    outside the scope, but you can answer the question.

2         A    Yeah.   It was on the NASDAQ at that time.

3    It's now an OTC.

4    BY MR. VINING:

5         Q    Okay.

6              MR. VINING:   I have no further questions.

7              MR. BYRNSIDE:   Well, if nobody else has

8    any questions, I do not have any questions for the

9    witness, but we would like to designate the

10   transcript of this deposition as confidential, and

11   the witness will read and sign.

12             THE VIDEOGRAPHER:   This concludes the

13   deposition.   Going off the record at 1:38.

14             (Deposition concluded at 1:38 p.m.)

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

1        The following reporter and firm disclosures
were presented by me at this proceeding for review
2   by counsel:
3               REPORTER DISCLOSURES
4        The following representations and
disclosures are made in compliance with Georgia Law,
5   more specifically:
           Article 10 (B) of the Rules and
6   Regulations of the Board of Court Reporting
   (disclosure forms)
7        OCGA Section 9-11-28 (c) (disqualification
of reporter for financial interest)
8        OCGA Sections 15-14-37 (a) and (b)
(prohibitions against contracts except on a
9   case-by-case basis).
10  - I am a certified court reporter in the State of
   Georgia.
11  - I am a subcontractor for Veritext.
   - I have been assigned to make a complete and
12  accurate record of these proceedings.
   - I have no relationship of interest in the matter
13  on which I am about to report which would disqualify
   me from making a verbatim record or maintaining my
14  obligation of impartiality in compliance with the
   Code of Professional Ethics.
15  - I have no direct contract with any party in this
   action, and my compensation is determined solely by
16  the terms of my subcontractor agreement.
17
18               FIRM DISCLOSURES
19  - Veritext was contacted to provide reporting
   services by the noticing or taking attorney in this
20  matter.
   - There is no agreement in place that is prohibited
21  by OCGA 15-14-37 (a) and (b).  Any case-specific
   discounts are automatically applied to all parties,
22  at such time as any party receives a discount.
   - Transcripts:  The transcript of this proceeding as
23  produced will be a true, correct, and complete
   record of the colloquies, questions, and answers as
24  submitted by the certified court reporter.
   - Exhibits:  No changes will be made to the exhibits
25  as submitted by the reporter, attorneys, or
   witnesses.

CONFIDENTIAL

Page 139

1    - Password-Protected Access:  Transcripts and
     exhibits relating to this proceeding will be
2    uploaded to a password-protected repository, to
     which all ordering parties will have access.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 140

```
 1                      CERTIFICATE
 2     STATE OF GEORGIA:
       COUNTY OF FULTON:
 3
 4          I hereby certify that the foregoing
       transcript was taken down, as stated in the caption,
 5     and the colloquies, questions and answers were
       reduced to typewriting under my direction; that the
 6     transcript is a true and correct record of the
       evidence given upon said proceeding.
 7          I further certify that I am not a relative
       or employee or attorney of any party, nor am I
 8     financially interested in the outcome of this
       action.
 9          I have no relationship of interest in this
       matter which would disqualify me from maintaining my
10     obligation of impartiality in compliance with the
       Code of Professional Ethics.
11          I have no direct contract with any party
       in this action and my compensation is based solely
12     on the terms of my subcontractor agreement.
            Nothing in the arrangements made for this
13     proceeding impacts my absolute commitment to serve
       all parties as an impartial officer of the court.
14
15          This the 2nd day of December, 2024.
16
17
18
19          ROBYN BOSWORTH, RPR, CRR, CRC, CCR-B-2138
20
21
22
23
24
25
```

CONFIDENTIAL

Page 141

1    IAN BYRNSIDE, ESQ.

2    ibyrnside@bakerlaw.com

3                       December 2, 2024

4    RE:  Mark Andrews v. Dinesh D'souza, Et Al

5        11/26/2024, Philip Boyce (#7006841)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   CS-NY@veritext.com

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                  Yours,

23                  Veritext Legal Solutions

24

25

CONFIDENTIAL

```
                                                    Page 142

 1     Mark Andrews v. Dinesh D'souza, Et Al

 2     Philip Boyce (#7006841)

 3                  E R R A T A   S H E E T

 4     PAGE_____ LINE_____ CHANGE_____

 5     _____

 6     REASON_____

 7     PAGE_____ LINE_____ CHANGE_____

 8     _____

 9     REASON_____

10     PAGE_____ LINE_____ CHANGE_____

11     _____

12     REASON_____

13     PAGE_____ LINE_____ CHANGE_____

14     _____

15     REASON_____

16     PAGE_____ LINE_____ CHANGE_____

17     _____

18     REASON_____

19     PAGE_____ LINE_____ CHANGE_____

20     _____

21     REASON_____

22

23     _____    _____

24     Philip Boyce                        Date

25
```

CONFIDENTIAL

Page 143

1    Mark Andrews v. Dinesh D'souza, Et Al

2    Philip Boyce (#7006841)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Philip Boyce, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Philip Boyce                        Date

13    *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

CONFIDENTIAL

**[& - 2000]**                                          Page 1

**&**

**&**   4:5 5:7 6:21
121:19

**0**

**00051352**   2:18
**04259**   1:6

**1**

**1**   6:3 51:9
52:20 63:16
67:24 111:19
**1-7-0**   117:9
**1.5**   48:18 49:14
49:17,23 50:7
**10**   13:16 138:5
**10/1/22**   2:19
**10/25/22**   2:15
**10/26/22**   2:16
**10001-8602**   4:7
**103**   2:18
**108**   2:19
**109**   82:24
**10:04**   27:12
**10:04-10:07**
27:13
**10:07**   27:15
**10:15**   33:5
**10:15-10:18**
33:6
**10:18**   33:8
**10:48**   52:20
**10:48-10:55**
52:21

**10:55**   52:16,23
**10th**   47:22
48:10 104:1
**11/26/2024**
141:5
**112**   2:20
**1158**   127:11
**1159**   128:13
**117**   2:21
**1170**   5:8
**12**   2:3 72:1
**121**   2:22
**124**   2:23
**1255**   70:6
**1261**   95:17
**127**   2:24
**1278**   98:7
**128**   2:25
**12:11**   101:2
**12:11-12:47**
101:3
**12:47**   101:5
**12th**   78:24
79:18 82:16
**132**   3:3
**13609**   140:18
**13th**   121:10
**146**   47:4
**14th**   51:15,18
51:23 52:1
**15-14-37**   138:8
138:21
**153**   2:3 12:14
12:18,20

**154**   2:5 29:22
29:24
**155**   2:6 47:5,7
**156**   2:7 53:3,5
**157**   2:8 62:1,3
**158**   2:9 67:19
67:21
**159**   2:10 70:9
70:11
**16**   31:11
**160**   2:11 78:10
78:12
**161**   2:12 82:25
83:1
**162**   2:13 86:15
86:16
**163**   2:14 90:3,5
**164**   2:15 29:19
29:22 92:20,22
**165**   2:16 95:18
95:20
**166**   2:17 98:8
98:10
**167**   2:18
103:18,20
**168**   2:19 108:2
108:4
**169**   2:20
112:16,18
**16th**   31:15
43:20 134:3
**170**   2:21 117:8
117:10

**171**   2:22
120:25 121:2
**172**   2:23 124:7
124:9
**173**   2:24
127:12,14
**174**   2:25
128:14,15
**18**   83:7
**18th**   30:12,22
**19th**   127:19
**1:22**   1:6
**1:38**   137:13,14
**1pm**   51:14
**1st**   111:22

**2**

**2**   52:22 68:14
83:19 93:21
101:1 110:17
124:12 141:3
**20**   143:15
**2000**   21:2 22:9
22:22 23:10
24:5,13 25:24
26:3 27:19
35:8,23 37:11
38:18 42:5
44:12 48:23
54:20,23 55:5
56:8 59:23
61:2 66:10
68:8 73:14,23
74:1,2,24 75:8

CONFIDENTIAL

**[2000 - 9/10/21]**                                        Page 2

77:23 79:2
83:15 84:16
87:6,9 88:3,13
91:8,17 92:1
93:16 94:9
96:4 97:7,10
97:20 98:21
99:2,3 100:16
101:9 102:15
104:16 105:2
109:6,19,25
110:8 111:14
112:8 113:17
116:4,8,23
117:19 122:1
123:8,16,25
127:4 129:13
132:21 135:21
136:3
**2020**  23:23
26:5 36:7
54:18 104:19
**2021**  30:12,22
31:15 36:13
**2022**  47:23
48:10 50:13
53:14 62:12
68:4,16 70:19
78:24 79:18
82:5 83:8
86:23 90:16,23
93:3 95:25
98:16 99:3,8
104:2 108:12

110:23 112:25
113:6 121:10
124:20 127:19
**2024**  1:17 6:2
140:15 141:3
**20th**  62:12
**21**  20:19 26:9
39:5
**2138**  1:20
140:19
**22**  20:19 26:10
**2233**  78:10
**2400**  5:9
**255**  70:9
**25th**  50:13
51:13 70:19
93:3,12,23
99:3
**26**  1:17 95:25
**26th**  6:2
**28**  117:23
**29**  2:5
**29th**  98:16
117:17
**2:00**  51:18
**2:38**  90:25
**2:44**  90:23
**2nd**  140:15

**3**

**3**  48:7 83:25
93:8 101:4
108:2 124:12

**3/8/24**  2:6
**30**  1:15 8:8,18
56:7 141:16
**30004**  4:21
**30305**  4:14
**30309**  5:10
**30th**  83:16
108:11 109:5
110:23
**31**  59:2
**3333**  4:13
**34747**  7:18
**3rd**  124:20

**4**

**4**  30:10 47:16
124:24 125:5
**4/19/22**  2:24
**4/20/22**  2:8
**4/25/22**  2:10
**4/4/22**  2:23
**4/6/22**  2:7
**4/7/22**  2:9
**400**  57:14,19
58:9
**47**  2:6
**4:00**  51:18
**4th**  68:16

**5**

**5**  31:1 48:19
**510**  120:24
**517**  86:14
**528**  53:2

**53**  2:7
**530**  124:4
**54**  90:3

**6**

**6**  1:15 8:8,18
53:13 113:6
**6/10/22**  2:18
**62**  2:8
**67**  2:9
**68**  118:17

**7**

**7**  3:2
**70**  2:10
**7006841**  141:5
142:2 143:2
**78**  2:11 112:15
**790**  4:20
**7th**  68:4 112:25

**8**

**8/12/22**  2:11
**8/18/22**  2:12
**8/30/22**  2:21
**827**  7:17
**83**  2:12
**86**  2:13
**882**  61:25
**8th**  86:22 90:16
90:23 99:8

**9**

**9-11-28**  138:7
**9/10/21**  2:5

CONFIDENTIAL

**[9/16/22 - answer]**                                                              Page 3

| | | | |
|---|---|---|---|
| **9/16/22**   2:22 | **access**   28:3,3 | **additions**   143:6 | **air**   56:7 |
| **9/7/22**   2:20 | 82:8 139:1,2 | **address**   7:14,15 | **al**   1:7 6:5 141:4 |
| **9/8/22**   2:13,14 | **accuracy**   76:25 | **addressed** | 142:1 143:1 |
| 2:17 | 107:1 115:5 | 113:7 | **allegations** |
| **90**   2:14 79:10 | 126:2 141:9 | **adequate**   54:10 | 114:10 115:22 |
| 79:21 | **accurate**   9:5 | **adhere**   16:25 | **alleges**   26:5 |
| **912**   67:18 | 10:22 103:1,7 | **ads**   49:19 63:24 | **allison**   109:1,2 |
| **92**   2:15 117:8 | 103:11 105:24 | 64:2,5,15 | **allotted**   141:19 |
| **933**   92:16,19 | 107:16 116:5,9 | **advertisement** | **allow**   11:13,14 |
| **95**   2:16 | 116:12,24 | 64:10 | 100:7 |
| **98**   2:17 | 138:12 | **advertisements** | **allowed**   27:24 |
| **9:37**   1:18 6:2 | **acknowledge...** | 64:8 67:8 | **alpharetta**   4:21 |
| | 143:3 | **advertising** | **america**   130:3 |
| **a** | **acknowledg...** | 44:18 | 130:12,16,21 |
| | 141:12 | **advise**   36:24 | 131:7,12 |
| **a.m.**   1:18 27:13 | **acled**   121:9,19 | **afternoon** | **amount**   61:5 |
| 33:6 52:21 | 122:6,6,10,18 | 104:16 132:13 | **amounts**   114:9 |
| **a.r.**   47:19 | 122:25 123:15 | **ago**   7:25 | **andrews**   1:4 |
| **ability**   50:23 | **acled's**   123:8 | **agree**   10:19,24 | 6:5,9,11 7:6 |
| **able**   9:5 10:6 | **action**   1:5 7:7 | 41:17 | 141:4 142:1 |
| 11:1 18:23 | 122:9 138:15 | **agreed**   35:8 | 143:1 |
| 20:14 40:18 | 140:8,11 | 45:4 50:5,7 | **answer**   11:1,8 |
| 47:11 53:9 | **actions**   106:25 | 57:25 58:11 | 12:9,9 16:6 |
| 62:7 78:16 | 115:4 131:13 | **agreement**   24:1 | 18:15 19:5,7 |
| 102:3 103:23 | **actually**   34:10 | 25:1 138:16,20 | 19:24 20:11 |
| 115:14 125:16 | 41:18 42:16 | 140:12 | 22:1,15 23:5 |
| 131:7,13 | 85:4,6 | **agreements** | 23:14 25:7 |
| **above**   141:6 | **ad**   62:18 63:2 | 57:14 | 29:11 35:18 |
| 143:7 | 63:16,20 | **ahead**   19:13 | 36:24,25 38:7 |
| **absolute** | **add**   51:22 | 23:3,4 25:15 | 41:4 42:7 |
| 140:13 | 133:19 134:9 | 26:25 35:12 | 43:11 49:5 |
| **absolutely** | **addition**   77:20 | 37:2 43:19 | 55:23 59:9 |
| 17:21 48:14 | **additional** | 89:8 91:21 | 60:19,20 66:18 |
| 102:10,11 | 10:12 40:19 | 94:25 103:2,4 | 67:11 69:24 |

CONFIDENTIAL

**[answer - automatically]**                                    Page 4

71:3 74:12,17
75:15 76:15,21
77:12,13,14,25
82:18 85:10,21
86:9 89:7,7,9
89:19 91:19,23
94:22 95:3
96:23 97:16,22
100:12,13,19
102:20 103:5
105:22 106:17
107:6,7,13
109:16 111:9
112:11 114:18
114:19 115:1,2
115:11,12,14
115:15 116:7
116:14,16
117:2 118:5,25
119:1 120:1,7
120:15,17
122:14,15,21
123:4,10,11,19
123:21 125:7
125:24 126:7,8
127:6 128:9
129:17,23
130:15 131:21
131:23 133:6
133:17 134:12
136:17,18
137:1
**answered**  11:6

**answering**  95:1
97:15 106:15
135:8
**answers**  11:15
13:11 100:6
138:23 140:5
**anybody**  25:21
25:23 36:21
126:1
**apologies**  87:4
**apparent**  21:10
**appear**  59:11
65:10 71:20
108:25
**appearances**
4:1 5:1
**appearing**
114:5
**appears**  78:23
84:6,11 99:10
109:8 125:8
**appended**
143:7
**applicable**
141:8
**applied**  138:21
**appropriaten...**
16:19 17:1
**april**  53:13
62:11 68:4,16
70:19 124:20
124:24 125:5
127:19

**area**  15:23
74:17 86:10
**armed**  121:18
**arps**  4:5
**arrangements**
140:12
**article**  138:5
**aside**  106:10
**asked**  11:23
84:8,18 85:6
102:6 135:1
**asking**  84:22
90:25 115:18
**asks**  51:14 96:6
114:6
**aspect**  18:17
**assembly**  7:17
**assets**  44:20
45:17
**assigned**
138:11
**assist**  72:12
**assistant**  58:23
**associated**
21:14
**association**
114:1
**assume**  10:6
11:20 60:4
88:17 91:3
**assumes**  19:4
85:25 120:5
**assuming**  37:19
52:3 63:18,25

110:3 127:7
**atlanta**  1:2
4:14 5:10
**atsinger**  32:3
104:2,5
**attached**
127:21 141:11
**attachment**
128:19
**attend**  71:21,22
**attended**  71:24
**attention**  20:13
121:24
**attorney**  7:5
138:19 140:7
141:13
**attorneys**  7:6
117:3 138:25
**audience**  17:6
17:15 59:22
61:1 67:5
**august**  30:12
30:22 78:24
79:18 82:5,16
83:7,16 98:16
117:16
**austin**  4:18
6:17 132:8
**authentic**  10:25
**authored**
121:25
**automatically**
138:21

CONFIDENTIAL

**[available - book]**                                                    Page 5

| | | | |
|---|---|---|---|
| **available** 65:1 | **background** | **began** 24:2 | **big** 48:16,19 |
| 65:8 141:6 | 15:16 | 39:6 40:15 | 60:5,8 65:15 |
| **aware** 9:25 | **backing** 104:22 | **begins** 6:3 | 67:13 75:16 |
| 25:23 26:20 | **badgley** 5:13 | 52:22 101:4 | **bit** 14:2,10 15:1 |
| 32:10,16 44:10 | **baker** 5:7 6:21 | **behalf** 5:2 6:18 | 15:15 16:7,12 |
| 54:2,13 57:11 | **bakerlaw.com** | 6:21 8:15 | 17:8 30:2,18 |
| 58:16 59:22 | 141:2 | 13:12 14:14 | 43:3 50:11 |
| 61:1 66:5 | **ballot** 28:5,5 | 109:19 | 51:10 62:15 |
| 69:17 73:12,16 | 36:1 114:8 | **belief** 107:19 | 70:13 78:20,21 |
| 75:10 79:17 | 117:25 118:20 | **believe** 13:16 | 80:25 90:11,20 |
| 88:3,23,23 | **ballots** 27:25 | 21:20 23:23 | 93:8,20 104:12 |
| 92:7,7 94:15 | 34:3 35:3 36:2 | 25:17 31:17 | 104:24 105:8 |
| 95:13 97:1 | **based** 38:9,9 | 32:3,4 50:7 | 108:9 110:5,18 |
| 98:2 112:6,11 | 44:20 52:4 | 66:2 98:8 | 113:12 121:6 |
| 115:21 116:17 | 140:11 | 115:25 116:3 | 121:14 124:14 |
| 123:19,22 | **basic** 36:5 | 116:11,22 | 124:15 128:25 |
| 126:19,25 | **basically** 68:23 | 120:10 130:18 | **blast** 108:14 |
| 130:20,22 | 80:3 | 130:19,22 | 109:11,25 |
| **awesome** 79:9 | **basis** 17:12 | 134:3 | **bloomfield** |
| 79:20 | 22:19 138:9 | **believed** 103:1 | 110:19,20 |
| | **bates** 29:18 | 103:6,10 | **board** 104:8 |
| **b** | 47:3 52:25 | 107:15 116:9 | 138:6 |
| **b** 1:15,20 7:11 | 61:24 70:5 | **benefit** 11:6 | **boisvert** 4:4 |
| 8:8,18 123:22 | 78:8 82:22 | 50:19 100:1 | 6:10,10 |
| 138:5,8,21 | 86:12 89:25 | **bennett** 5:6 | **bold** 83:22 |
| 140:19 | 92:15 95:15 | **best** 9:12,16 | **bolster** 132:24 |
| **back** 20:1 | 98:4 103:16 | 37:25 46:18 | **bono** 6:11 |
| 27:14,17 33:7 | 107:25 112:13 | 74:18 | **book** 19:10 |
| 33:10 52:16,23 | 117:6 120:22 | **better** 128:25 | 22:22 26:4 |
| 60:23 77:6 | 124:2 127:10 | **bettina** 108:13 | 50:16 65:2 |
| 94:3 101:5 | **battleground** | 109:1,1,10 | 73:23,24 74:1 |
| 110:17 123:25 | 27:23 34:2,9 | **beyond** 43:22 | 74:7,10,14 |
| 127:23 | **bauer** 5:5 | 60:11 102:2,11 | 75:8,13,22 |
| | | | 76:6,10,19,23 |

CONFIDENTIAL

**[book - byrnside]** Page 6

| | | | |
|---|---|---|---|
| 76:23 77:8,17 | **bosworth** 1:20 | 141:5 142:2,24 | 64:17 65:23 |
| 77:19,23 78:6 | 140:19 | 143:2,4,12 | **business** 10:23 |
| 79:8,9,17,20 | **bottom** 30:18 | **break** 11:24,25 | **buttoned** 40:2 |
| 80:1,9,10,12,16 | 48:9 67:24 | 12:1,3 52:13 | **buy** 38:11,11 |
| 81:12,23 82:3 | 83:20 108:10 | 100:22,25 | 84:22 |
| 82:5,9,11,14,15 | 117:15 | **breaks** 11:23 | **buying** 49:19 |
| 84:7,16,18,19 | **box** 27:25 28:5 | **brief** 26:11 | **byrnside** 5:4 |
| 84:21,25 85:3 | 28:5 34:11 | **bring** 12:19 | 6:20,20 10:24 |
| 85:7,8,23,24 | **boxes** 27:22 | 28:18 29:23 | 14:4 16:5 |
| 86:3 87:18 | 28:2 34:1 36:1 | 40:18 41:15 | 17:25 18:3,6 |
| 88:3,14,24 | **boyce** 1:16 6:4 | 47:6 53:3 62:2 | 18:13 19:4,12 |
| 89:2,12,21 | 6:23 7:3,11,20 | 67:20 78:11 | 19:22 20:10 |
| 91:8,17 92:2 | 11:5 12:24 | 82:25 86:15 | 21:4,25 22:14 |
| 94:10,15,19 | 13:19 14:13 | 90:4 92:21 | 23:2,4,13 24:6 |
| 95:5,11 97:7 | 18:15 19:18 | 95:18 98:8 | 24:17 25:4,6 |
| 97:11,20 98:19 | 20:5 26:2 | 103:19 108:3 | 25:14 26:25 |
| 99:11,18 100:6 | 27:17 30:4 | 112:16 117:9 | 29:3,10 31:16 |
| 100:16 109:19 | 31:6,14 33:10 | 120:25 124:8 | 32:24 35:10,12 |
| 109:25 110:8 | 47:11,18 48:9 | **bringing** | 35:17 36:17,23 |
| 111:14 112:8 | 50:20 52:13 | 132:19 133:3 | 37:16 38:6 |
| 113:16,17 | 53:9 61:23 | 133:10 | 39:18 40:6,14 |
| 116:4,12,23 | 62:7 68:1 | **broad** 66:7 | 40:25 41:22 |
| 117:19 118:17 | 70:16 71:17 | **brought** 20:13 | 42:6,25 43:9 |
| 119:6,13 120:4 | 78:17 83:4 | 26:16,19 28:16 | 43:18 45:11 |
| 120:11 121:25 | 85:16 86:19 | 38:19 | 49:3 50:6 51:6 |
| 122:4,8 123:8 | 90:8 92:25 | **bruce** 25:16,20 | 53:25 55:22 |
| 123:16 | 95:23 98:14 | 51:22 69:1,8 | 57:1 59:8 |
| **book's** 98:1 | 100:12 101:7 | 69:10,15,18,21 | 60:18 63:7 |
| **booking** 62:19 | 103:23 108:7 | 124:19 | 64:21 67:10 |
| 63:2 64:18 | 112:21 113:12 | **buchalter** 4:19 | 69:23 71:2,13 |
| 65:3,5 | 115:14 117:13 | 6:18 | 73:9,15 74:3 |
| **books** 18:25 | 118:7 121:11 | **build** 67:5 | 74:11 75:1,4 |
| 19:2,6,14 77:1 | 124:18 127:17 | **bullet** 62:14,16 | 75:14,23 76:12 |
| 86:2,6 | 128:19 132:1 | 62:18 63:16,23 | 76:20 77:2,9 |

CONFIDENTIAL

77:13,24 81:17
82:17 84:4
85:9,18,25
86:7 87:11,24
88:15 89:3,16
91:12,18 92:3
92:12 94:11,20
95:7 96:20
97:12,21 99:19
99:24 100:17
100:23 101:20
102:8,17 103:3
105:21 106:13
106:22 107:3
107:11 109:13
109:20 110:1
111:8,15 112:9
114:15,24
115:7 116:6,13
116:25 118:3
118:10,21
119:7,14,23
120:5,13
122:11,19
123:1,9,17
125:6,19 126:4
126:13 127:5
128:8 129:7,16
129:22 131:15
131:20 134:11
135:16,23
136:5,14,22,25
137:7 141:1

**c**

c  4:18 7:11
  138:7
calendar  30:13
california  41:8
call  51:23 52:1
  69:1 87:4
  111:25 112:3
called  26:10
  74:2
calling  48:15
cameras  28:2
capability
  135:14
capacity  36:13
caption  140:4
carpet  71:18
carries  8:25
case  15:7 56:5
  138:9,9,21
cases  84:20,21
catherine  4:10
  6:15 21:19,19
  21:22,23 22:2
  23:6,12 31:22
  31:25 33:12
  46:5,21 63:11
  63:21 65:6,10
  113:7 114:14
  117:17 119:12
  122:24 133:2
  134:4

cc  63:14
ccr  1:20 140:19
cell  28:3,6
  31:24 33:24
  34:6,7,8,10
  36:3
central  51:18
ceo  32:3 133:13
certain  10:4
  12:7 15:12
  16:24 18:12
  84:11
certainly  17:20
certificate
  140:1
certified
  138:10,24
certify  140:4,7
chain  30:13
  51:20,24 57:24
  57:25 58:11
  96:12 111:19
  112:25
chains  58:12
chairman
  104:7 105:19
change  79:14
  104:19 107:10
  107:19 142:4,7
  142:10,13,16
  142:19
changes  117:20
  138:24 141:10
  143:6

channel  15:25
characteristics
  37:14
charge  77:19
check  10:19
  16:25 36:19,21
  106:25 115:4
checks  36:14
chief  48:3
choose  45:20
chooses  16:4
  36:15
civil  1:5
claim  98:19
  114:7
claims  99:12,18
  99:23 100:15
  101:8 102:6,15
  106:20 107:1
  115:5 116:3,11
  116:23 126:2
  132:24
clarify  11:19
close  104:17
closer  104:9
closest  68:9
code  138:14
  140:10
collaborating
  28:16
collects  121:20
colloquies
  138:23 140:5

**[color - contribute]**　　　　　　　　　　　　　　　　Page 8

| | | | |
|---|---|---|---|
| **color** 134:9 | **company** 15:20 | 135:4,6 | **contact** 21:24 |
| **combination** | 117:3 136:20 | **concierge** 5:14 | 22:12,16,17,17 |
| 57:6 | **compelling** | 12:17 29:19,21 | 25:3 |
| **come** 52:16 | 38:10 | 47:4 53:1 | **contacted** |
| 121:24 | **compensation** | 61:25 67:18 | 113:22 138:19 |
| **comes** 79:7 | 138:15 140:11 | 70:6,8 78:9 | **contacting** |
| 124:23 | **competence** | 82:23 86:13 | 114:11 |
| **coming** 56:8 | 135:14 | 90:2 92:16,19 | **contains** 122:5 |
| 84:22 | **competency** | 95:17 98:6 | **content** 16:18 |
| **commencem...** | 135:20 136:3 | 103:17 108:1 | 16:25 19:2 |
| 44:4 | 136:12,13 | 112:15 117:7 | 36:14,14 58:4 |
| **comment** 96:3 | **competent** | 120:24 124:3,6 | 64:9,23 77:1 |
| 105:4 113:23 | 135:24 136:7 | 127:11 128:13 | 94:6,9,16,19 |
| **commentary** | **complete** | **conclude** 44:8 | 95:6,12 |
| 40:19 | 138:11,23 | **concluded** | **contents** 54:11 |
| **comments** | 143:8 | 137:14 | 63:6,11 80:16 |
| 113:24 126:17 | **completed** | **concludes** | 80:21 114:13 |
| **commitment** | 141:16 | 52:19 137:12 | 114:23 122:25 |
| 140:13 | **compliance** | **conclusion** | **context** 13:3 |
| **common** 60:13 | 138:4,14 | 105:25 | 71:6 |
| 60:15 | 140:10 | **conditions** 9:11 | **continue** 42:3 |
| **communication** | **composed** | **conduct** 100:8 | 94:2 115:25 |
| 22:22 42:12 | 108:13 109:10 | **confidence** | 116:3,22 |
| **communicati...** | 109:18 | 124:23 | **continued** |
| 41:2 91:22 | **compromised** | **confidential** | 24:14 |
| 94:23 102:19 | 111:4 | 1:13 137:10 | **continues** 84:1 |
| 114:17 115:10 | **concept** 21:5,8 | **confirmation** | **contract** |
| 115:16 118:24 | 26:8,10,12,14 | 51:21 | 138:15 140:11 |
| 121:10,16 | 27:19,20,21 | **conflict** 121:19 | **contractor** |
| 122:13 | 38:17,24 41:19 | **consisted** 35:2 | 128:4 |
| **community** | **concerns** | **consistent** | **contracts** 138:8 |
| 110:13 | 102:21,25 | 17:14 | **contribute** |
| **companies** | 105:20 106:11 | **cont'd** 5:1 | 136:11 |
| 131:18 | 106:20 126:1 | | |

CONFIDENTIAL

contributing
132:21
contribution
133:23
conversation
14:23 27:6
28:14,17,21,24
29:8,9 69:17
74:20 76:2,3
conversations
69:21 75:7
80:15,19,22
81:11 97:24
100:14 112:6
114:22 115:17
119:11 122:23
135:1
coo  76:1,1 77:7
coordinate
16:22 54:8
60:16
coordinated
54:17
coordinating
53:20
coordination
73:3,12
copies  10:22,25
82:8 84:24
85:3 91:7
141:14
copy  81:22,23
85:4 87:6,17
87:18 91:3

93:16,23 99:11
copying  105:11
core  113:4
corporate  13:8
77:19
corporation
8:13,15
correct  8:17
11:10 22:9
28:22 29:20
30:15,23 36:11
37:20,22 48:24
48:25 53:14,15
62:12,21 64:11
66:12 70:1,7
76:11,15 77:8
78:24 79:18,19
82:6,9,12,13
84:1,12 92:17
92:18 93:3,12
101:13 102:2,7
102:11 103:13
107:17 113:2,9
113:10 120:19
123:16 128:1
130:8 134:6
138:23 140:6
143:8
corrected  122:7
corrections
123:7 143:6
correspond
55:4

corrupt  110:12
costs  45:6
counsel  4:1 6:6
6:8,11 10:19
12:6,8 14:21
14:24 15:9,11
41:3 89:6
91:22 94:24
101:22 102:20
114:17 115:10
118:25 122:13
132:3 138:2
141:14
country  44:21
57:15,19 58:12
59:3
county  140:2
couple  40:23
58:18 68:7
108:18 110:25
132:16
course  10:12,23
69:15 76:3
court  1:1 6:12
7:17 9:23 11:5
11:12 138:6,10
138:24 140:13
cover  13:19
covered  79:12
crc  1:20 140:19
create  35:25
37:8 133:14
created  18:20
44:17 45:3,3

63:24 64:2
creating  23:23
39:6,14 42:11
61:17
creation  26:21
38:16 40:3
60:10 64:4,14
101:11
creator  133:13
crenguta  51:17
crime  114:9
criteria  16:24
58:8
crocker  71:8
crosstalk  118:8
crr  1:20 140:19
cruise  61:17
cs  141:15
cst  51:14
current  7:13
cut  124:25
125:5,9,10,11
125:14,16,18
126:3,11,24
cv  1:6

**d**

d'oeuvres
72:20
d'souza  1:7
4:16,16 6:5,19
6:19 23:19,21
24:5,14,22,22
25:3,13,24

CONFIDENTIAL

[d'souza - deposition]                                    Page 10

27:18 28:9,15
30:22 31:10
32:6 34:18,23
38:16,25 41:17
41:20 42:4
43:8 45:24
46:2,12,15
48:10,13,24
49:1,10 51:13
52:2,6,9 53:24
54:12 56:23
58:2 60:15
63:6,17 64:5,7
64:19 65:10
66:1,6,12,14,21
69:6,22 70:19
70:24 73:2
75:21 81:11
89:11,15 92:1
95:6 97:18
100:16 101:8
101:19 102:7
103:12 104:4
106:12 110:10
112:7,24
113:17 114:22
119:4,18,21
122:1,18
126:12,18
128:6,7 131:6
133:9,17,18,22
141:4 142:1
143:1

d'souza's
  118:18
daily  17:11
dallas  22:2
  31:18,20 32:5
  33:11 43:21
  134:3
dan  53:13,16
  53:17,23 55:9
  55:19 57:7
  58:15,23,24
  62:11,23 64:1
  65:18
danielle  70:19
  70:24 71:11
  83:7,10 86:22
  87:3,22 90:15
  90:23 91:1,6
data  28:10
  31:24 33:24
  34:6,7 36:10
  121:19,20
  122:6
date  91:8,9
  99:2 142:24
  143:12
dates  61:12
daughter  70:25
  71:4
dave  32:2 57:7
  65:20
david  32:3
  47:19,23 48:2
  50:13 68:4

75:25
day  9:20 51:15
  90:25 140:15
  143:15
days  57:15 61:8
  141:16
dc  42:18
ddr  2:18
ddr00051352
  103:16
deal  60:6,8
  61:18 65:15
dealing  23:7
dean  98:17
  99:7
dear  93:15
debbie  24:21
  24:25 30:22
  31:10 32:7
  34:23 46:2
  51:13,21 52:2
  114:22 127:23
  128:7
debra  24:22
debunked
  99:12,17,22
  100:15,15
december
  140:15 141:3
decide  35:15
decided  18:11
  57:21 61:9
decides  19:9

deciding  17:17
decision  17:16
  17:20 19:11
  28:19 39:23
  88:13,20
decisions  32:22
declare  143:4
deemed  143:6
deeply  111:3
defendants  1:8
  4:9,16 6:15,18
defining  37:14
delay  87:4
delete  117:22
delineates
  15:23
delivering
  93:16
delivery  93:24
demand  56:15
  68:24
denial  115:21
depend  11:2
depending  16:8
deponent
  141:13 143:3
deposed  7:20
  7:22 8:2,18
deposing
  141:13
deposited
  93:23
deposition  1:15
  2:3 6:4 7:5 8:9

CONFIDENTIAL

8:18 10:3 12:6
12:15,24 13:6
13:18 14:19,25
100:8 137:10
137:13,14
**depth** 28:12
**derek** 5:5
**describe**
111:14 112:8
**described**
27:20
**description** 2:2
**designate** 137:9
**designated**
13:24 14:5
**detail** 79:9,21
**details** 69:11
74:18
**detective** 79:11
79:22
**determined**
138:15
**developing**
42:5,8
**development**
39:2 40:22
44:4
**different** 37:18
75:17 106:1
132:16,18
**differentiates**
38:2
**difficult** 31:12

**digital** 62:20
63:3 65:24,25
66:11,15,22
67:8 81:22
**digitally** 85:5,6
**dinesh** 1:7 4:16
6:5,18 20:13
21:6 22:11,11
23:19,21,22,24
23:25 24:4,14
25:1,3,18
26:10 27:18,21
28:9,15,18,22
28:24 29:8
32:6,7 34:18
35:24 37:4,6,8
38:16,25 39:8
39:14 40:15,22
41:5,17,20
42:1,4,10,12,16
43:7 45:24
46:12,15 48:10
48:13,24 49:1
49:10 51:8
52:2,6,9 53:23
54:12 56:23
57:7,13,20,23
58:2 60:15
61:10 63:6,17
64:5,7,19 65:1
65:9,19 66:1,6
66:12,14,18,21
69:6,7,15,21,22
70:25 71:4

72:4,5 73:2
74:13,20 75:21
80:15 81:8,11
81:13 84:20
89:11,14 91:25
95:6 97:18
100:16 101:7
101:10,19
102:6,7 103:12
104:4,23 105:6
105:11 106:9
106:12 111:25
112:7,24
114:22 117:23
118:18 119:4
119:18,21
121:25 122:17
126:12,18
127:23 128:6
131:6 133:9,18
141:4 142:1
143:1
**dinesh's** 69:9
**dinner** 72:23
**direct** 138:15
140:11
**direction** 94:21
140:5
**directly** 111:1
**disagree** 41:20
**disc** 52:20,22
101:1,4
**disclose** 37:2
41:1 89:5

91:21 95:1
97:14 100:10
101:23 102:18
106:15 107:4
114:16 118:23
122:12 126:5
**disclosing** 37:1
89:7,17 91:20
94:23 115:9
**disclosure**
138:6
**disclosures**
138:1,3,4,18
**discount**
138:22
**discounts**
138:21
**discover** 88:5
**discovery** 88:6
**discuss** 26:3
46:11,20,23
47:23 49:12
58:1 63:5,5,16
63:20 64:4,14
64:18 65:3
66:14 69:5,7
72:5 89:21
91:16 94:18
95:5,11 97:9
97:18 99:22
106:11 114:13
131:6
**discussed** 38:19
48:23 54:11

CONFIDENTIAL

**[discussed - e]**                                                    Page 12

66:5,10 89:14
101:18 106:5,7
**discussing**
49:11 50:14
52:5,8
**discussion**
17:21 27:18
65:5,13,16,17
66:3,4 92:5
101:10 102:3
102:12 131:10
**discussions**
23:19 39:20
40:24 46:14,17
49:7 57:10
58:4 64:24
65:24 91:25
101:14,15,22
105:19 106:19
122:17
**disqualificati...**
138:7
**disqualify**
138:13 140:9
**distributes**
76:23
**district**    1:1,1
**division**    1:2
15:21 20:1
75:17
**document**    10:7
10:13 12:18
13:1,4,4 14:10
29:17,21 47:2

47:12 52:25
53:2,10 61:23
62:8 67:18
68:1 70:4,4,8
70:16 73:19
78:8,9,16
82:21,21,23
83:4 86:12,13
86:19 89:25,25
90:2,8 92:15
92:25 95:15,15
95:23 98:3,4,7
98:14 103:15
103:18,24
107:24 108:1,7
111:18 112:13
112:21 117:5,7
117:13 120:21
120:22 123:23
124:1,7 127:1
127:9 128:11
**documentaries**
37:18,20,23
61:15
**documentary**
16:10 37:13,15
38:2,5,8 54:17
**documents**
10:4,15,17,20
10:22,25 11:2
15:8,12 31:22
33:13,14
**doing**    21:5 22:3
39:9

**donald**    71:20
72:24 73:3,8
73:13
**doubt**    104:18
**download**
38:12
**drafted**    128:22
129:3
**dreisbach**
113:6,16 114:6
**drive**    4:20
**drop**    27:22,25
28:1 34:1,11
36:2 93:24
**dropped**    34:2
**dropping**    35:3
**drugs**    9:15
**due**    73:25 91:7
99:1 116:17
120:1
**duff**    5:14
**duly**    6:24
**dvd**    38:11
55:15 56:11,17
**dying**    112:1

e

**e**    2:5,6,7,8,9,10
2:11,12,13,14
2:15,16,17,18
2:19,20,21,22
2:23,24 7:11
13:5 15:6 30:4
30:6 47:19,20

47:22 48:2,11
48:11,13 49:9
51:16,20 52:4
53:12 54:5,12
54:14 58:16
59:11 61:11
62:10,14,24
63:6,10 68:3
68:17,25 70:18
70:21 71:11,17
78:23 79:1,7
80:13,17 82:4
83:6,13 84:17
85:2 86:21
87:3,19 90:15
90:25 91:2,6
93:2,11,14,22
94:3 96:2,12
98:18,23 99:5
99:8,15 100:2
104:1,10,23
105:1,10,11,18
106:5,6,8,10
107:2,9,10,20
108:11,13,17
109:1,4,6,9,10
109:18,24,24
110:18,22
111:19 112:24
112:25 113:5,5
113:13 114:13
114:23 115:5,6
115:20,24
116:2,21

CONFIDENTIAL

[e - exhibit]

Page 13

117:16,18
121:5,9 122:10
122:18,25
123:8 124:19
124:22 127:18
128:20 142:3,3
142:3
earlier  7:4 10:6
11:23 18:24
23:18 28:25
29:6 38:15
48:22 61:11
77:6 84:17
90:15 107:15
127:25 128:20
130:7
early  20:19
23:23 26:9
42:22 122:3
earmarked
49:15
easier  9:21
eastern  52:16
easy  11:7
ed  32:3 105:4
106:8
education
113:25
edward  104:2,5
104:15,25
105:10,12
effort  79:8
efforts  50:14

either  16:7 88:9
122:7
election  26:6
36:7 41:14
54:18 104:18
111:3
elections  55:1
electoral
110:13 111:2,7
ellis  68:17,20
69:14,18,20
employed  63:4
employee  140:7
encouraging
67:3
ends  52:20
engelbrecht
4:10 6:16
21:20,22 23:12
31:25 46:5,21
63:11,21 65:6
65:10 113:7
114:14 117:17
119:12 122:24
133:2 134:4
135:9 136:1
engelbrecht's
136:2,13
enlarging  53:7
entitled  122:1
equally  135:12
errata  141:11
141:13,16

error  91:7,10
92:8,11 99:1
errors  91:16
92:1
esq  4:3,4,11,18
5:4,5,6 141:1
establish
104:24
et  1:7 6:5 141:4
142:1 143:1
ethics  138:14
140:10
evans  32:3
47:19,23 48:2
50:13 68:4
75:25
event  72:18
121:19
events  40:4
53:17 121:21
everybody
106:1 125:15
evidence  33:17
33:21,22 54:24
55:5 104:17
140:6
exact  71:25
exactly  17:10
20:18 21:6
27:19 35:15,20
38:5 41:10
44:24 76:18
examination
3:1 7:1 132:11

examined  6:24
examines  54:17
excel  87:5
except  138:8
executive  77:19
104:7 105:19
133:25
exhibit  2:2,3,5
2:6,7,8,9,10,11
2:12,13,14,15
2:16,17,18,19
2:20,21,22,23
2:24,25 12:14
12:18,20 29:22
29:24 47:5,7
53:3,5 61:22
62:1,3 67:16
67:19,21 70:4
70:9,11 78:10
78:12 82:20,21
82:24 83:1
85:14 86:14,16
90:3,5 92:14
92:20,22 95:18
95:20 98:4,7
98:10 100:20
103:18,20
107:22 108:2,4
112:12,16,18
117:5,8,10
120:25 121:2
124:7,9 127:12
127:14 128:12
128:14,15

CONFIDENTIAL

**[exhibit - foregoing]**                                    Page 14

| | | | |
|---|---|---|---|
| 129:9 | **facts** 19:5 | 55:6,12 57:10 | **firm** 6:18 138:1 |
| **exhibits** 2:1 | 36:16 86:1 | 57:15 63:24 | 138:18 |
| 10:4 138:24,24 | 120:6 | 64:2,8 65:25 | **first** 6:24 20:8 |
| 139:1 | **fails** 141:18 | 66:10,22 72:3 | 21:23 23:20 |
| **existed** 21:2,6 | **fairly** 40:8 | 74:1,24 101:9 | 24:21 26:4,8 |
| **exit** 98:3 | **fall** 36:12 99:4 | 106:21 114:9 | 32:8,12 54:15 |
| 100:20 | **familiar** 8:8,11 | 124:23 125:17 | 54:23 55:12 |
| **expect** 13:19 | **far** 28:12 77:4 | 126:2,12,24 | 56:20 63:23,24 |
| 14:19 | 83:15 113:24 | 127:4,4,21 | 71:1 74:6 94:4 |
| **experience** 43:5 | 116:8 | 128:7,21 | 104:14,15,23 |
| **experienced** | **fascinating** | 129:13 134:1 | 105:1 108:10 |
| 46:19 | 38:10 79:11,22 | **film's** 66:15 | 111:23 113:16 |
| **expert** 39:14 | **featured** 42:19 | **filming** 42:17 | 117:16,18 |
| 85:20 131:22 | **february** 42:22 | 42:21 | 121:18 133:21 |
| **expertise** 86:10 | 47:22 48:10 | **films** 16:3 | **fits** 16:19 |
| **explain** 28:9 | 50:13 51:13 | 36:14 40:5 | **five** 52:15 |
| 84:3 | **feedback** | 60:17 67:9 | **flom** 4:5 |
| **explained** 69:2 | 126:12,23 | 129:14 131:19 | **florida** 7:17 |
| **explore** 50:18 | **felt** 44:22 67:4 | **finalizing** 57:13 | **focus** 26:4 |
| **explores** 54:25 | 105:24 | **finally** 59:17 | 27:22 |
| **exposes** 110:10 | **file** 1:5 | **finance** 45:5 | **focusing** 63:23 |
| **extension** 78:1 | **film** 16:15,17 | **financial** 60:9 | **folks** 80:19,22 |
| 78:3 80:9 | 17:17 18:12,18 | 60:12 79:13 | **followed** 81:16 |
| **extent** 36:25 | 22:13 23:20 | 138:7 | 136:10 |
| 38:23 41:2 | 24:4,14 26:3,5 | **financially** | **following** 32:23 |
| 89:4 | 26:8 27:19 | 140:8 | 36:12 55:16 |
| **eyewitness** | 28:21 35:8,16 | **find** 15:7 38:10 | 56:12 113:18 |
| 110:10 | 35:23 36:10 | 60:14 88:10 | 115:5 138:1,4 |
| | 37:11 38:3,16 | 110:9 122:2 | **follows** 6:25 |
| **f** | 38:17 39:2,17 | **fine** 18:6 | **font** 124:14 |
| | 39:24 40:13,22 | **finish** 11:14,15 | **food** 72:20 |
| **facebook** 49:19 | 41:16 44:1,4,7 | 18:1,4 | **foregoing** |
| 50:25 | 45:25 46:3,6,9 | **finishes** 118:9 | 140:4 143:5 |
| **fact** 36:19,21 | 46:21 48:23 | | |
| 38:9 131:14 | | | |

CONFIDENTIAL

**[forensic - giving]**                                    Page 15

**forensic**  110:11
**form**  16:5
   18:13 19:4,12
   19:23 21:4,6
   22:14 23:5
   26:25 29:10
   31:16 32:24
   35:10,17 36:17
   36:23 37:16
   39:18 40:6,14
   41:22 42:6,25
   43:9 49:3 50:6
   51:6 53:25
   55:22 57:1
   59:8 60:18
   63:7 64:21
   67:10 69:23
   71:2,13 73:9
   73:15 74:3,11
   75:1,4,14,23
   76:12,20 77:9
   81:17 84:4
   85:18,25 87:11
   88:15 91:12
   92:12 96:21
   99:19,24
   100:17 102:17
   105:21 106:13
   109:13 110:1
   111:8,15 112:9
   116:6,13,25
   118:3,21
   119:23 120:5
   120:13 122:19

123:9,17 125:6
125:19 127:5
128:8 129:7,16
131:15,20
133:16 134:11
135:16 136:5
136:14
**formatting**
   30:21 31:4
**former**  72:24
   73:3,8,13
**forms**  37:19
   49:20 138:6
**forth**  127:23
**forward**  20:21
   99:3
**forwarded**
   112:24 114:12
**forwarding**
   113:5
**found**  88:11
**foundation**
   19:13 54:1
   55:23 59:9
   69:24 71:14
   75:24 76:12,21
   77:3,24 82:17
   84:5 85:9,19
   86:7 87:12,25
   88:16 91:13
   94:12 105:22
   106:14 107:4
   109:14,21
   111:9 118:22

119:24 120:14
123:18 125:7
129:17 131:21
**four**  42:10,22
   104:19
**fraud**  26:5
   54:18,25
   110:14 111:2,7
**free**  51:17
**frequently**
   40:21 42:1
**friday**  111:25
**full**  7:9,10
   60:24 61:16
**fully**  38:24
**fulton**  140:2
**functioned**
   114:7
**fund**  44:17
   45:2,3
**funny**  36:6
**further**  58:20
   59:6 93:8
   108:22 109:8
   110:18 113:4
   132:6 137:6
   140:7
**future**  55:1

---
**g**
---

**g**  104:2,5
**gaining**  124:23
**general**  49:20
   54:6,21 66:18

66:24 67:1
68:23 73:5
**genre**  37:11
**george**  4:11
   6:14,15 132:5
   132:5
**georgia**  1:1
   4:14,21 5:6,10
   27:24 113:25
   138:4,10 140:2
**geotracking**
   110:12
**getting**  18:18
   39:11 54:10
   101:13 118:7
**gill**  70:19,24
**give**  9:5 14:19
   18:3 43:10
   44:15 76:13
   89:16 91:18
   92:3 94:20
   97:12 99:25
   100:17 101:20
   102:8 108:18
   114:1,24 115:8
   118:10 119:24
   123:2
**given**  36:8
   40:11 94:21
   97:13 101:21
   126:17 140:6
   143:9
**giving**  9:11,16
   103:3

CONFIDENTIAL

[go - houses]

Page 16

| go | 19:13 23:3,4 | 13:14,22 14:17 | groups | 113:18 | help | 20:14 21:8 |

go   19:13 23:3,4
25:14 26:25
27:7 33:2
35:12 37:2
43:19 56:2,9
58:6 60:7 89:8
91:21 94:2,25
100:23 103:2,4
121:23 123:25
goes   19:2
going   19:23
20:21 25:7
27:12,14,17
28:8 33:4,7,10
34:10 36:6
44:21 52:20,23
60:23 61:5,13
77:6 80:11
89:3 96:20
100:7,24 101:1
101:5 117:19
127:9 136:25
137:13
good   6:1 7:3
11:16 52:12,13
52:14 78:20
80:10,11 83:13
100:22 113:13
121:6 124:13
132:13 133:16
gory   69:10
great   7:19 8:4
8:20 10:2,11
11:22 12:12

13:14,22 14:17
15:14 16:2
20:20,24 21:12
23:17 26:1
27:4 30:2,8,19
40:10 48:7
50:9 61:21
62:5 67:5,15
67:23 72:10
73:18 78:14
85:13 90:20
98:12 111:20
112:23 124:16
128:17
greater   79:9,21
green   39:25
40:11
greenberg   4:12
gregg   4:9 6:16
21:19,20 22:2
23:6,12 31:22
31:25 33:12
46:8,24 63:11
63:21 113:7
114:9,14
119:12 122:24
132:21 134:4
ground   9:20
group   1:16 5:2
14:15 15:18
26:8 48:4
65:13,16,17
104:8 126:22
136:19

groups   113:18
113:19,23
114:7,11
guess   130:14
guys   24:23

**h**

h   142:3
handling   69:10
hang   19:22
25:6 29:3
happen   55:15
56:12,18
happened
31:14 72:17
happening   55:1
hard   14:11
39:3 81:23
harry   71:8,9,12
108:12 109:10
harrycrocker
70:22
harvesting
117:25 118:20
head   11:8 32:4
121:16
heads   58:16
hear   24:23
heard   20:9,12
21:2,3 26:8,13
26:22 27:1,5
hello   93:23
94:4

help   20:14 21:8
44:20 45:6
67:6 81:2,5,7
helped   79:12
79:24
helper   69:9
helpful   11:6
26:21 50:15
helping   20:25
71:5
hereto   143:7
hewitt   105:15
hi   104:15 109:5
highlighted
58:14
hold   6:14 15:17
home   7:15
33:19
honest   41:16
hors   72:20
hostetler   5:7
6:21
hosts   16:21
18:23 40:17
41:7,13 42:21
45:17 84:8,12
84:13,14,18,24
85:7 105:15,17
hotel   41:8
hour   11:24
house   89:6
93:24
houses   114:8

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **howell** 96:1,6 | **identify** 6:6 | **industry** 85:16 | **instagram** |
| **howell's** 96:18 | **iii** 104:2,5 | **influence** 9:14 | 50:25 |
| 97:2 | **impact** 40:17 | **information** | **instances** 22:24 |
| **huge** 79:2 | **impacts** 140:13 | 8:13 21:8 | **instruct** 41:1 |
| **hugh** 105:1,4 | **impartial** | 26:20 28:13 | 89:3,6 94:25 |
| 105:11,14,15 | 140:13 | 37:1,3 38:20 | 100:9 102:18 |
| 105:18,25 | **impartiality** | 40:19 41:2,15 | 106:14 107:4 |
| 106:2,8,8 | 138:14 140:10 | 58:20 59:6 | 114:15 118:22 |
| **hugh's** 105:20 | **important** | 79:25 80:2 | 126:5 |

| | | | |
|---|---|---|---|
| **i** | 30:14 59:17 | 89:5,8,18 | **instruction** |
| **ian** 5:4 6:20 | **impression** | 91:20 94:24 | 43:10,19 89:17 |
| 141:1 | 135:13,19,20 | 95:1 97:14 | 91:19 92:4 |
| **ibyrnside** 141:2 | 136:2 | 100:5,10 | 95:7 97:13,21 |
| **ic** 128:2,3 | **include** 101:15 | 101:12,24 | 99:25 100:18 |
| **idea** 52:6 57:4 | 120:4 | 102:1,19 103:6 | 101:21 102:9 |
| 57:18 65:9 | **includes** 87:17 | 103:11,12 | 103:4 107:12 |
| 72:2,5,8 | 99:12 | 105:24 106:15 | 114:25 115:8 |
| **ideas** 52:9 | **including** | 107:5,16 | 119:8,15,25 |
| **identification** | 120:10 | 114:16 115:9 | 122:20 123:2 |
| 12:21 29:25 | **incorrect** | 115:25 116:3 | 126:14 |
| 47:8 53:6 62:4 | 102:22 122:5 | 116:22 118:24 | **instructs** 12:8 |
| 67:22 70:12 | **indemnity** | 119:9 126:6 | **insurance** |
| 78:13 83:2 | 129:24 | 132:24 135:2 | 129:12,15,20 |
| 86:17 90:6 | **independent** | **informed** 88:8 | 129:24 130:3,5 |
| 92:23 95:21 | 128:4 | **initial** 28:21 | 130:8,10,12,17 |
| 98:11 103:21 | **index** 2:1 3:1 | **initially** 96:7 | 130:21,23 |
| 108:5 112:19 | **indicates** 122:4 | **input** 38:17 | 131:8,13,18,22 |
| 117:11 121:3 | **individual** | 42:23 44:12,15 | **integrity** 111:3 |
| 124:10 127:15 | 65:13 89:15 | 45:24 46:2,5,8 | **intend** 99:14 |
| 128:16 | **individually** | 64:7 66:21 | **interact** 22:25 |
| **identifies** | 58:20 59:6 | 67:1 69:12,14 | **interest** 37:20 |
| 113:17 | **individuals** | **inquiries** 97:6 | 138:7,12 140:9 |
| | 21:13 23:1 | 97:10,19,25 | **interested** 17:5 |
| | 126:21 | | 17:6,7 140:8 |

CONFIDENTIAL

**[interesting - lack]**                                    Page 18

| | | | |
|---|---|---|---|
| **interesting** 26:15 | **involved** 16:3,7 16:10,21 17:16 17:19,21,22 18:19,20 19:1 19:6,7 40:1 43:1 45:6 53:18,19 57:9 65:19,20 69:15 77:7 80:8 88:18 101:22 117:24 118:19 | **june** 104:1 | 86:9 87:13 |
| **internal** 63:1 | | **jury** 9:1 | 88:1,7,9,11,17 |
| **internally** 105:20 | | **k** | 88:20 89:14 |
| **interview** 81:8 84:6,8 | | **keep** 83:25 100:2 | 91:14 92:10 93:6 94:13 |

interesting
26:15
internal 63:1
internally
105:20
interview 81:8
84:6,8
interviewed
65:7
interviewing
84:20
interviews
62:19 63:2
64:18,18 65:3
65:11 67:8
introducing
10:4
invest 16:4
17:17 18:11
19:10 35:8,16
36:15 39:21,23
invested 40:8
45:10
investing 16:9
16:9,16
investment
32:22
invests 18:25
19:3 40:5
60:17 67:9
129:14
invite 51:23
involve 40:12
41:7,13 100:3

involved 16:3,7
16:10,21 17:16
17:19,21,22
18:19,20 19:1
19:6,7 40:1
43:1 45:6
53:18,19 57:9
65:19,20 69:15
77:7 80:8
88:18 101:22
117:24 118:19
involvement
16:12 133:23
involving 23:11
91:22 94:24
isbn 93:17
issue 116:18
issued 96:6
127:3
issues 27:11
96:9

**j**

jackson 82:1
127:22 128:1
jasper 58:18,22
58:23
jb 5:14
job 36:19
133:14
john 5:13
jones 121:17
judge 9:1

june 104:1
jury 9:1

**k**

keep 83:25
100:2
kind 49:20 66:7
121:5 124:12
kinds 46:19
49:7
knew 22:6
32:18 45:5
56:1
know 10:9,13
11:19 12:1
20:5,7,12,18
21:6,13,15,15
21:18 26:2
28:11 29:12
31:10 39:13
42:8,16,17,21
44:22 49:12,14
49:21 53:19
54:5,9 56:23
58:8 59:17
63:8,18,19,25
63:25 64:6,12
64:25 65:12,12
66:17,24 71:3
71:3 73:24
74:1,4,8,22
77:4,18 79:2
80:2,6,18,21
82:19 85:3,11

86:9 87:13
88:1,7,9,11,17
88:20 89:14
91:14 92:10
93:6 94:13
95:8 96:3 97:4
97:8 99:17
101:10,25
106:6 109:3,17
109:22 110:2
110:21,24
111:5,10,17
112:3 115:15
116:19 119:18
123:6 125:21
126:15 128:22
129:2,8 130:6
130:16,25
131:5,10,16
132:20
knowing 36:3
knowledge
8:19 22:7 27:2
41:23 63:13,22
64:16 73:10
89:23 106:23
115:23

**l**

l 7:10
lack 77:2 85:9
87:24 107:3
111:8 118:21

CONFIDENTIAL

**[lacks - lunch]**                                                    Page 19

**lacks** 91:12
  94:11 109:20
**lago** 71:19,22
  72:2,11
**language**
  111:13 112:7
  127:24 128:22
  129:3,5
**larger** 104:12
  124:15
**late** 20:19 26:9
**launch** 50:17
  50:19,22 51:4
  52:6 68:9
  72:11
**launches** 50:16
**lauren** 96:13,15
  98:25 99:9
  127:18
**lauren's** 99:7
**law** 6:17 138:4
**lawsuit** 129:25
**leadstories.co...**
  98:17
**learn** 38:12
  79:11,23
**learned** 21:7
  28:20,23,23
  74:6
**learning** 43:4
**left** 37:8 45:7
  100:25
**legal** 38:21
  40:1 75:10

76:3 88:18
89:6 91:22
92:5 94:5,24
95:9 96:8 97:4
99:20 101:22
102:3,12,19
110:24 114:17
115:10,18
118:24 122:13
131:10 141:23
**legible** 31:5
**length** 61:9
**light** 39:25
  40:11
**limitations**
  14:7
**limited** 59:23
  61:1,3,14,19
**line** 48:17
  54:15,16 63:14
  63:14 104:14
  104:20,23
  105:3 111:23
  121:14,18
  142:4,7,10,13
  142:16,19
**link** 96:5
  124:25
**list** 13:18,20,21
  84:1,2,3,11,13
  87:18,22
**listeners** 17:7
  38:10 44:22
  45:18 56:1

**little** 9:21 12:3
  14:2,10,10
  15:1,15 16:7
  16:12 17:8
  30:2,18,21
  31:4 50:11
  51:10 62:15
  70:13 78:20,20
  80:25 90:11,19
  90:20 93:8,20
  100:21 104:11
  104:12,22,24
  105:8 108:9,22
  110:4,18
  113:12 118:8
  118:10 121:6
  121:14 124:14
  124:15,15
  128:25
**llc** 6:19 130:3
  130:16,21
  131:7,12
  133:17,22
**llp** 4:5,12 5:7
**loc** 93:24
**local** 62:18
  63:16,20 65:2
**location** 121:19
**locations** 34:9
  36:4 59:11,12
**logistics** 72:12
**long** 12:3 42:2
  61:7 100:24

**longer** 116:11
**look** 15:8 30:23
  40:17,24 41:6
  41:11,19,21
  54:14,22 57:12
  63:13 78:24
  80:24 81:1,5
  81:20 91:6
  99:3 104:9,14
  108:12 110:7
  111:19 112:23
  113:2,9,15
  114:4 125:16
  133:16
**looked** 15:5,5
**looking** 17:10
  68:3 104:22
**looks** 30:6,12
  30:16 31:9
  52:4 54:6 69:8
  84:7 95:25
  104:25 106:7
  111:22 112:24
  113:10
**lot** 16:8,13
  42:13 43:22
  69:10 72:15
  74:18 75:18
  77:20 127:23
**lukose** 58:23
**lunch** 100:22

CONFIDENTIAL

| m | | | |
| --- | --- | --- | --- |
| **made** 13:12 | 98:18,23 99:5 | **make** 9:21 | 110:19,23 |
| 20:2 21:23 | 99:8,15 104:1 | 17:12 39:25 | 141:4 142:1 |
| 24:9 32:22 | 104:10,23 | 41:12 56:1 | 143:1 |
| 39:16,23 42:18 | 105:1,10,11,18 | 58:16 59:22 | **marked** 12:18 |
| 43:5 65:7 | 106:5,6,8,10 | 60:25 65:1 | 12:20 29:22,24 |
| 88:13,21 98:18 | 107:2,9,10,20 | 66:19 88:6 | 47:5,7 53:2,5 |
| 101:9 102:15 | 108:11,13,17 | 101:12 102:1 | 62:1,3 67:19 |
| 106:20 115:5 | 109:1,4,6,9,10 | 104:12 119:7 | 67:21 70:9,11 |
| 115:22 116:12 | 109:18,24,24 | 124:14 133:16 | 78:10,12 82:24 |
| 123:15 126:2 | 110:18,22 | 138:11 | 83:1 86:14,16 |
| 134:5 138:4,24 | 111:19 112:24 | **maker** 17:20 | 90:3,5 92:20 |
| 140:12 143:5 | 112:25 113:5,5 | **making** 17:16 | 92:22 95:17,20 |
| **mail** 2:13,24 | 113:13 114:13 | 18:21 19:11 | 98:7,10 103:18 |
| 30:4 47:19,20 | 114:23 115:5,6 | 40:2 46:19 | 103:20 108:2,4 |
| 47:22 48:2,11 | 115:20,24 | 66:19 80:8 | 112:15,18 |
| 48:11,13 49:9 | 116:2,21 | 117:21 123:7 | 117:8,10 |
| 51:16,20 52:4 | 117:16,18 | 138:13 | 120:25 121:2 |
| 53:12 54:5,12 | 121:5,9 122:10 | **management** | 124:7,9 127:12 |
| 54:14 58:16 | 122:18,25 | 65:20 125:10 | 127:14 128:14 |
| 59:11 61:11 | 123:8 124:19 | **manager** 7:24 | 128:15 |
| 62:10,14,24 | 124:22 127:18 | 68:23 | **market** 18:18 |
| 63:6,10 68:3 | 128:20 | **managers** 54:7 | 46:18 49:19 |
| 68:17,25 70:18 | **mailed** 13:5 | 54:7 | 55:11,14,21 |
| 70:21 71:11,17 | **mails** 2:5,6,7,8 | **manhattan** 4:6 | 58:19,24 59:6 |
| 78:23 79:1,7 | 2:9,10,11,12,14 | **manner** 45:10 | 65:14 |
| 80:13,17 82:4 | 2:15,16,17,18 | 57:5 | **marketing** |
| 83:6,13 84:17 | 2:19,20,21,22 | **maps** 34:8 | 16:23 44:16 |
| 85:2 86:21 | 2:23 15:6 30:6 | **mar** 71:19,22 | 45:25 46:3,6,9 |
| 87:3,19 90:15 | 100:2 | 72:2,11 | 46:11,20,23 |
| 90:25 91:2,6 | **main** 62:14,16 | **march** 51:23 | 48:15,23 49:2 |
| 93:2,11,14,22 | **maintaining** | 52:1 | 49:10,15,24 |
| 94:3 96:2,12 | 138:13 140:9 | **mark** 1:4 6:4,9 | 50:2 51:2 52:9 |
| | **majority** 10:15 | 6:11 7:6 | 60:17 62:25 |
| | | 108:18 110:19 | 68:8 69:6,13 |

| | | | |
|---|---|---|---|
| 69:22 81:12,15 | 23:11 24:21 | 101:19 | **mind** 76:14 |
| **markets** 55:24 | 25:2,13,24 | **members** 22:25 | **minutes** 52:15 |
| 58:25 59:1,3 | 26:7 35:22 | 65:17 101:15 | 52:17 79:10,22 |
| **marking** 12:14 | 48:3 49:20 | 124:19 125:10 | **misleading** |
| **maschino** 93:2 | 50:17,22,24 | **memory** 9:7 | 122:5 |
| 93:15,21 94:3 | 51:1,2,4,17 | **mental** 9:10 | **missing** 68:10 |
| **massive** 110:13 | 52:2,6 53:13 | 17:3,9 | **misstates** 77:10 |
| 111:1,6 | 62:11,20 63:3 | **mention** 26:19 | **moment** 12:17 |
| **material** 33:19 | 65:24 66:1,6,9 | 29:1,14 | 26:16,22 27:8 |
| **matter** 6:4 | 66:11,15,23 | **mentioned** 7:4 | 29:19 31:5 |
| 10:18 138:12 | 67:8 74:9 76:5 | 29:7 34:6 35:1 | 47:4 53:1 |
| 138:20 140:9 | 76:8 77:22 | 41:25 45:2 | 61:25 70:6 |
| **matthew** 93:2,5 | 85:23 97:6,9 | 77:7 107:15 | 78:9 82:23 |
| 93:12,14,21 | 97:19,25 104:8 | 127:25 | 86:13 90:2 |
| 94:3 | 123:14 124:20 | **mentioning** | 92:16 98:6 |
| **maximize** 51:2 | 133:17,22 | 84:21 | 103:17 108:1 |
| **meagher** 4:5 | 136:19 | **mentions** 61:12 | 114:1 117:7 |
| **mean** 21:1 24:8 | **meet** 24:21 | **message** 30:23 | 120:24 124:3 |
| 37:7 39:12 | 31:22 33:12 | 96:12 114:12 | 127:11 |
| 55:19 59:7 | 42:3 43:25 | **met** 21:23 22:2 | **money** 45:13 |
| 64:9 75:25 | 44:3 71:1 | 23:20 24:25 | 49:23 50:1 |
| 78:3,5 80:18 | **meeting** 15:1 | 32:8 39:19 | **morning** 6:1 |
| 85:17 105:23 | 31:18,20 32:1 | 41:25 43:20 | 7:3 83:14 |
| 125:4,8 130:20 | 32:16,17,19,20 | 71:6 | 93:24 105:16 |
| **means** 8:9,12 | 32:23 33:11 | **middle** 27:25 | **move** 73:22 |
| 59:10 60:4 | 34:13,19,24 | 34:3 35:3 36:2 | **movie** 16:23 |
| **media** 1:16 | 35:2,7,19 | 51:11 81:1,3 | 18:20,21 20:1 |
| 4:17 5:2 6:3,19 | 38:21 39:4 | **mike** 32:4 | 20:15 21:1,1,5 |
| 6:21 10:17,20 | 41:8 42:9 | **miller** 98:17 | 22:3,9,25 |
| 12:25 13:9,12 | 126:22 134:3 | 99:8 | 23:10 24:13 |
| 13:24 14:15 | 135:15,22 | **million** 48:18 | 25:18 26:11,21 |
| 15:18,22 16:15 | 136:4,10 | 48:19 49:14,17 | 27:22 35:24 |
| 19:19 20:8 | **meetings** 25:16 | 49:23 | 36:5 37:9 39:6 |
| 21:3 22:8 | 32:11 46:14,16 | | 39:10 40:1,3 |

CONFIDENTIAL

**[movie - nonprivileged]**                                                         Page 22

40:16,18 41:6
41:10,21 42:11
42:15,19 43:3
43:5 44:16,18
44:20,25 45:5
45:8,14,14,17
45:21,22 46:18
46:24 49:16,19
50:15,19,24
53:21 54:8,9
54:16,20 55:11
55:25 56:2,7
57:22,24,25,25
58:6,11 60:5
60:10,12,14
61:5,7,11,13,18
61:18 66:19
67:4 69:6,9
71:6,18,19
72:11,19,22
73:7,14 74:15
78:1,4,5 79:2
79:10,21 80:9
80:10,10 81:16
82:2 101:11
102:15,16
106:12 107:1
107:10,16
116:4,8 124:1
125:23 132:25
133:12,14
**movies**   18:24
19:7,15 24:9
24:10 39:14

40:7 45:9,15
46:19 67:13
103:8
**moving**   64:17
65:23
**mules**   21:2 22:9
22:22 23:10
24:5,13 25:24
26:3 27:19
35:9,23 37:11
38:18 42:5
44:12 48:23
54:20,23 55:6
56:8 59:23
61:2 66:10
68:8 73:14,23
74:1,2,24 75:8
77:23 79:2
83:15 84:16
87:6,10 88:3
88:14 91:8,17
92:2 93:16
94:9 96:4 97:7
97:10,20 98:21
99:2,4 100:16
101:9 102:15
104:16 105:2
108:14 109:7
109:11,19,25
110:9 111:14
112:8 113:17
114:8 116:4,8
116:23 117:19
122:1 123:8,16

123:25 127:4
129:13 132:22
135:21 136:3
**multiple**   28:4
34:3 36:1
99:12,17,22
100:15,15
122:5

### n

**name**   7:3,9,10
21:21 25:17
26:4,19 29:7,9
73:23 113:18
**named**   47:19
51:16 68:17
83:7 93:22
96:1 98:17
**names**   21:15,17
25:25 29:1
117:23 119:19
119:22
**naming**   118:18
119:5,13
**narrative**
120:11
**narrow**   30:21
**nasdaq**   137:2
**national**   63:24
68:17 113:25
**ne**   4:13
**near**   56:8
**necessarily**
16:13

**necessary**
120:12 143:6
**need**   10:12
11:25 12:1
55:11 59:21
60:24 66:8
120:3
**needs**   110:24
**nelson**   53:13,16
53:17,23 55:9
55:19 58:15
62:11,23 64:1
**nelson's**   58:23
**network**   15:25
16:1 23:24
25:9
**networks**   84:15
85:8
**never**   8:17
110:9 122:2
**new**   4:7,7 48:17
56:7 110:8
113:24
**news**   15:25
37:12,23 55:9
55:10 56:6
59:1,2
**night**   27:25
34:3 35:4 36:2
**nod**   11:8
**nondeposition**
8:5
**nonprivileged**
100:5

CONFIDENTIAL

**[nonprofit - okay]**                                                                    Page 23

**nonprofit**
  121:20
**noon**  100:21
**normally**  45:13
  129:18
**northern**  1:1
**notary**  143:13
  143:19
**note**  14:4
  141:10
**noted**  108:17
  143:7
**notice**  2:3
  12:15
**noticing**  138:19
**november**  1:17
  6:2
**npr**  96:5 99:11
  113:6 114:14
**number**  12:18
  12:20 29:18,22
  29:24 47:3,5,7
  52:25 53:3,5
  61:24 62:1,3
  67:19,21 70:5
  70:11 71:25
  78:8,12 82:22
  82:24 83:1
  86:12,14,16
  90:1,3,5 92:15
  92:20,22 93:17
  95:16,18,20
  98:4,8,10
  103:16,18,20

107:25 108:2,4
112:14,16,18
117:6,10
120:23 121:2
124:2,7,9
127:12,14
128:14,15
**numerous**
  54:25
**ny**  141:15

**o**

**o**  7:11
**oath**  8:21
**object**  12:7
  16:5 18:4,13
  19:4,12,23
  21:4 22:14
  23:5 25:7
  26:25 29:10
  31:16 32:24
  35:10,17 36:17
  36:23 37:16
  39:18 40:6,14
  41:22 42:6,25
  43:9 49:3 50:6
  51:6 53:25
  55:22 57:1
  59:8 60:18
  63:7 64:21
  67:10 69:23
  71:2,13 73:9
  73:15 74:3,11
  75:1,14,23

76:12,13,20
77:9 81:17
84:4 85:9,18
85:25 88:15
91:12 92:12
96:20 99:19,24
100:17 102:17
105:21 106:13
107:3 109:13
110:1 111:15
112:9 115:7
116:6,13,25
118:3,11,21
119:23 120:5
120:13 122:19
123:9,17 125:6
127:5 128:8
129:7,16
131:15,20
134:11 135:16
136:5,14,22,25
**objected**  75:4
**objection**  20:10
  21:25 23:2,13
  24:6 25:4,14
  38:6 43:18
  45:11 75:3
  77:2,24 82:17
  86:7 87:11,24
  94:11 106:22
  109:20 111:8
  118:9,17
  122:11 123:1
  125:19 126:4

126:13 129:22
135:23
**objections**  14:6
  14:8 107:11
  119:7,14
**obligation**
  138:14 140:10
**observer's**
  98:19
**observers**  43:1
**obtain**  129:14
  130:3,12,23
  131:7,13 135:3
**obtained**
  130:17,21
**occasional**
  22:17
**occurred**  26:5
  36:5 52:1
**occurring**  35:7
  41:3
**ocga**  138:7,8,21
**october**  31:11
  31:15 39:4
  43:20 93:3,12
  93:22 95:25
  99:2 111:22
  134:2
**offered**  85:3,4
**officer**  48:3
  140:13
**okay**  10:10,14
  11:11,15,16
  12:5,11 15:11

CONFIDENTIAL

20:21 22:5
31:7 47:4 53:2
92:19 95:14
98:6 110:22
114:3 117:4
118:12 120:20
123:23 124:6
126:17 127:9
127:11 132:10
137:5
**once** 18:20
39:23 40:11
58:20 59:6,10
**ones** 23:6 37:25
**operating** 48:3
**opinion** 80:3
104:17 106:1,2
**opinions** 41:13
**opportunity**
31:21 33:12
44:19 59:23
60:7 61:1,4
65:8 67:5
72:10,20
134:16
**opposite** 54:24
**order** 109:6
**ordering** 139:2
**ordinary** 10:23
**organization**
8:13 20:5,14
20:22 26:17,23
28:17 29:7
121:20

**organizations**
29:1 99:13
115:21 117:24
118:19 119:6
119:13,19
120:4,11
**organized**
114:9
**organizers**
110:13
**oriented** 37:12
37:24
**original** 87:6,9
**originated**
38:24
**otc** 137:3
**outcome** 140:8
**outcomes** 32:20
**outlets** 51:1
**outrageous**
112:1
**outside** 21:25
23:13 24:6,17
25:7 38:6
45:11 77:3
84:5 85:10
86:1,8 87:25
91:13 94:12
109:21 111:9
116:25 118:22
120:6 122:11
123:1 125:20
126:4 129:22
137:1

**overall** 135:13
135:20
**own** 38:22
**owned** 20:2
**owns** 59:1

**p**

**p.m.** 51:18
90:23,25 101:3
137:14
**pacific** 51:18
**page** 2:2 3:1
13:16,16 30:10
30:18 31:1
47:16 48:7,10
50:11 51:9,11
67:24 68:14
81:1 83:19,20
83:25 90:10
93:8,21 108:10
108:22 110:17
111:19 114:5
117:16,23
118:17 121:4
124:12 142:4,7
142:10,13,16
142:19
**pages** 121:5
124:13
**paragraph**
54:23 55:8,17
57:12 58:14
59:16,18,20
60:24 79:6

80:24,25 81:4
81:21 104:15
110:8 111:24
113:16,20
114:5 117:18
121:23 122:3
**paragraphs**
105:1
**paramount**
61:17
**part** 15:2 31:3
31:10 49:22
56:10 63:4
133:21
**participant**
66:3
**participants**
60:9
**participated**
103:8
**participation**
28:20
**particularly**
17:2
**parties** 60:16
115:18 132:16
132:18 138:21
139:2 140:13
**partner** 66:19
79:13
**partners** 60:14
**party** 130:2,12
130:16,21
131:7,12

CONFIDENTIAL

**[party - podcasters]**                                    Page 25

138:15,22
140:7,11
**password**
139:1,2
**paste**  96:5
**patricia**  81:24
81:25 82:1
127:22 128:1
**pause**  108:18
118:10
**pdf**  13:16 30:9
30:25 47:15
48:6 51:10
67:24 68:14
83:19 93:20
108:22 111:20
124:12
**peachtree**  5:8
**pending**  12:4
**people**  21:17
27:24 28:5
30:14 34:2
35:3 36:2 58:6
60:11 61:19
72:1 80:4
82:14,15 84:22
85:1,2,5 96:16
99:13 113:1
125:22
**perfect**  30:2
47:16 48:7
52:18 70:14
78:21 93:9
108:10,23

121:7,17
**period**  42:1
**person**  32:9
**personally**
21:16
**phase**  79:7
**phil**  7:10 16:6
17:25 19:22
25:6 29:3,11
35:18 36:24
40:25 43:11,19
76:13 89:4,17
91:18 94:20
97:13 99:24
100:9 114:16
115:8 118:23
136:23
**philip**  1:16
4:11 6:4,14,23
7:10 132:5,7
141:5 142:2,24
143:2,4,12
**phillips**  4:9
6:16 23:12
32:1 46:8,24
63:12,21 113:8
114:14 119:12
122:24 132:21
134:5 135:9,21
136:17
**phillips's**
135:14,20
136:12

**phone**  28:4,6
31:24 33:24
34:6,7 111:25
112:3
**phones**  34:8,10
36:4
**phrases**  110:25
**physical**  9:10
**picking**  16:11
**pictures**  72:21
72:21
**piece**  74:15
**piedmont**  4:13
**ping**  28:6
**pinging**  34:8
36:4
**pinpoint**
110:11
**place**  55:13,20
110:12 138:20
**plaintiff**  1:5 4:2
6:9,11 7:7
**plaintiff's**
10:18,21
**plan**  11:24
48:16,16,18,19
49:22,24 50:2
50:4 54:9
56:24 62:25
63:1,2 117:22
**planned**  74:9
**planning**  42:11
**plans**  48:15
49:2,10,11,13

**platform**  16:20
17:4 18:22
24:11 38:1
56:15 68:24
**platforms**
17:14
**play**  18:10
75:21
**please**  6:13 7:8
7:13 10:9,13
11:8,13,18
12:1 13:15
29:17,18 31:10
37:2 47:3,15
48:6 51:22
52:24,25 67:17
67:17 68:13
78:7,8 81:2,5,7
86:11,12 89:8
89:24 90:1
91:21 94:24
98:5 101:23
110:18 117:6
118:8 124:1
**plus**  57:14,19
58:9 87:17
**podcast**  16:1
23:24 24:1
25:1,9 31:13
**podcaster**
23:25 24:2
25:8
**podcasters**
23:22

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **point** 40:2 | **premieres** | **previously** 85:2 | 39:5 40:23 |
| 42:20 62:18 | 47:24 | 101:21 134:4 | 52:4 65:18 |
| 63:16,23 64:17 | **prep** 13:5 22:3 | **primarily** 40:1 | 66:2 71:25 |
| 65:23 82:12 | **prepare** 14:24 | 135:8 | 74:25 110:3 |
| 94:21 102:15 | **prepared** 14:13 | **printing** 94:4 | 135:11 |
| 111:2 | **preparing** | **prior** 24:5 | **procedure** 40:8 |
| **pointing** 49:8 | 121:25 | 26:22 27:6 | **proceed** 40:16 |
| **points** 41:21 | **present** 5:12 | 32:16 35:7 | **proceeding** |
| 62:15,16 | 32:1,6 36:6 | 44:4 79:18 | 138:1,22 139:1 |
| **policies** 131:19 | 72:25 73:8 | 80:16 102:16 | 140:6,13 |
| **policy** 131:2,4 | **presentation** | 115:20 | **proceedings** |
| **political** 37:12 | 32:13 36:8,12 | **privilege** 43:10 | 138:12 |
| 121:21 | 36:16,22 39:16 | 103:4 116:17 | **proceeds** 93:17 |
| **politically** | 134:5,9,10 | 119:25 120:1 | 96:5 113:18 |
| 37:24 | **presented** | 120:17 123:3 | **process** 17:17 |
| **position** 15:17 | 35:24 36:16 | **privileged** | 17:23 18:11,17 |
| 71:9 | 38:20 55:5 | 14:23 37:1,3 | 19:11 22:13 |
| **positions** 60:15 | 116:4,23 | 41:1 89:5,8,18 | 40:22 42:24 |
| **possible** 85:24 | 120:11 138:1 | 91:20,21 94:23 | 43:8,17 44:1,4 |
| 86:5 113:13 | **president** 15:19 | 95:1 97:14 | 45:16 77:8 |
| **postponed** 91:9 | 72:24 73:3,8 | 100:10 101:23 | **produced** |
| 99:2 | 73:13 87:1 | 101:24 102:18 | 10:17,20,22 |
| **postponement** | **presidential** | 106:15 107:5 | 110:13 138:23 |
| 99:10 | 26:6 36:7 | 114:16 115:9 | **producer** 45:15 |
| **potential** 23:25 | 104:20 | 115:16,17 | 133:12 134:1 |
| 96:8 | **press** 2:25 | 117:2 118:23 | **producing** |
| **powerpoint** | 127:3,22 128:7 | 119:2,9,16 | 22:13 23:19 |
| 33:16,18,20 | 128:21,23 | 122:13,15 | **product** 16:8 |
| **pr** 96:16 | 129:3,6 | 123:12,22 | **production** |
| **pre** 39:9 109:6 | **presume** 9:24 | 126:6,9 131:9 | 17:23 18:10,16 |
| **precision** | **pretty** 72:14 | **privy** 43:14 | 39:9 44:1 45:6 |
| 110:11 | 81:14 | **pro** 6:10 | **professional** |
| **premiere** 71:19 | **prevent** 9:11,15 | **probably** 20:19 | 138:14 140:10 |
| | 54:25 | 29:13,13 32:4 | |

CONFIDENTIAL

**[prohibited - qin]**                                          Page 27

| | | | |
|---|---|---|---|
| **prohibited** 138:20 | **promotion** 16:23 18:21 53:21 54:8,10 56:24 58:17 66:16 67:9 71:5 81:15 82:2 | **publication** 74:10 75:13 76:6,9,19 77:8 91:8 99:1 | **put** 30:13 33:16 51:5 56:6,21 70:10 110:12 133:15 |
| **prohibitions** 138:8 | | **publicist** 82:1 83:11 | **putting** 10:5 |
| **project** 24:15 28:21 113:25 121:19 132:19 132:22 133:4 133:11,13,14 133:24 135:21 136:3 | **promotional** 63:1,1 69:10 | **publicity** 50:14 68:9 83:22 | **q** |
| | **proper** 133:15 | **publicly** 136:20 | **qin** 3:2 4:3 6:8 6:8 7:2,4 10:15 11:3,4 12:13 12:22,23 13:15 13:17 14:1,9 14:12 16:14 18:7,14 19:8 19:16 20:3,16 21:11 22:4,20 23:8,16 24:12 24:19 25:10,19 27:3,9,16 29:5 29:15,17,20 30:1,3,5,7,9,11 30:17,20,25 31:2,19 33:3,9 35:14,21 36:20 37:5,21 38:13 39:22 40:9,20 41:9,24 42:14 43:6,15,24 45:19 47:2,9 47:10,15,17 48:6,8 49:4 50:8,10,12 51:9,12 52:24 53:7,8 54:4 |
| | **properly** 66:20 | **publish** 74:14 | |
| **projects** 17:12 23:11 24:4 25:18 | **protect** 129:25 130:8,14 | **published** 73:25 94:6 | |
| | **protected** 139:1,2 | **publishes** 76:23 77:1 85:23 86:6 | |
| **promised** 124:24 | **protest** 121:21 | **publishing** 19:20 75:22 83:15 85:16,20 91:7,10,16 92:1,8,11 98:19 99:1,3 121:24 | |
| **promo** 56:7,20 | **proves** 54:24 | | |
| **promote** 16:11 18:23 44:20 45:8,14,17,20 50:23 56:17 57:4,10 58:5 60:5 65:15 67:4 81:2,6,7 81:14 84:7,18 | **provide** 8:15 38:17 45:24 46:2,5,8 64:7 66:21 67:7 93:17 126:12 138:19 | | |
| | **provided** 15:9 15:11 67:2 103:12 115:25 126:23 | **pull** 12:16 29:17 47:2 52:24 59:21 60:3,24 67:17 86:11 89:25 107:24 120:22 127:13 | |
| **promoted** 24:10 44:13,23 45:9,15 65:25 66:11,20,22 85:7 | **provides** 54:23 79:9,21 113:24 | | |
| | **providing** 36:10 40:18 132:24 | **purchase** 44:18 | |
| **promoting** 44:24 55:12,14 55:19 56:5,11 73:14 84:15,19 | | **purpose** 32:17 96:7 | |
| | **public** 143:19 | **purposes** 42:4 73:14 | |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 56:3 57:3 | 106:18,24 | 71:16 91:20 | **raise** 126:1 |
| 59:14 60:21 | 107:8,14,22,23 | 94:22 95:3 | **rankin** 83:7,10 |
| 61:22 62:5,6 | 108:6,21,24 | 96:10 97:15 | 86:22 90:15,23 |
| 63:9 64:22 | 109:15,23 | 99:20 100:13 | **rankin's** 91:6 |
| 67:14,16,23,25 | 110:4,6 111:11 | 106:16,17 | **rather** 110:25 |
| 68:13,15 69:25 | 111:18,21 | 109:17 116:19 | **reach** 59:5 |
| 70:3,7,13,15 | 112:12,20 | 117:20 120:9 | **reached** 96:2 |
| 71:7,15 73:11 | 113:11,14 | 126:7 129:2 | **reaching** 58:19 |
| 73:17,19,21 | 114:20 115:3 | 136:1,19 137:1 | **react** 26:13 |
| 74:5,19 75:6 | 115:13 116:10 | **questions** 11:1 | **reaction** 41:16 |
| 75:20 76:4,16 | 116:15 117:4 | 11:7,14 12:7 | **read** 14:11 31:9 |
| 76:24 77:5,11 | 117:12 118:4 | 22:18 34:12,15 | 80:5,12 81:22 |
| 77:15 78:2,7 | 118:13 119:3 | 34:17 38:21,22 | 82:11,14,15 |
| 78:14,15,19,22 | 119:10,17 | 43:7,12,16,21 | 85:8 114:1 |
| 81:19 82:20 | 120:2,8,16,21 | 89:1 95:2 | 137:11 141:9 |
| 83:3,19,21 | 121:4,8,13,15 | 96:19,22 97:2 | 143:5 |
| 84:10 85:13,15 | 122:16,22 | 97:14 101:8 | **ready** 39:10,11 |
| 85:22 86:4,11 | 123:5,13,23 | 129:12 131:25 | **really** 21:15 |
| 86:18 87:15 | 124:5,11,17 | 132:4,6,9 | 22:10 42:9 |
| 88:2,19 89:10 | 125:13,25 | 134:16,20,22 | 67:13 72:14 |
| 89:20,24 90:7 | 126:10,16 | 135:5,9 137:6 | 85:21 86:9 |
| 90:11,13,19,21 | 127:1,2,8,16 | 137:8,8 138:23 | 88:1 89:9,19 |
| 91:15,24 92:6 | 128:11,17,18 | 140:5 | 91:23 97:16,22 |
| 92:14,18,24 | 128:24 129:1,9 | **quite** 41:25 | 106:17 107:7 |
| 93:7,10 94:14 | 129:11,19 | 43:2 106:2 | 107:13 115:1 |
| 95:4,10,14,22 | 130:1 131:17 | **quote** 111:1,2 | 125:21,23 |
| 96:24 97:17,23 | 131:24 132:3 | 114:7,8 | 126:8 131:23 |
| 98:3,12,13 | **quality** 80:3,6 | **r** | **reask** 135:18 |
| 99:21 100:2,11 | **question** 11:17 | **r** 142:3,3 | **reason** 9:4,7 |
| 100:20 101:6 | 11:20 12:4,9 | **radio** 7:24 | 60:11,12 |
| 102:5,13,23 | 12:10 18:4 | 15:25 53:21 | 116:16 130:11 |
| 103:9,22 | 19:1 29:4 | 56:19 58:6 | 130:13 141:11 |
| 104:11,13 | 36:25 37:1 | | 142:6,9,12,15 |
| 105:8,9 106:4 | 66:7,18 71:4 | | 142:18,21 |

CONFIDENTIAL

**reasonable**
    11:25
**recall**  8:3,7
    21:23 25:22
    28:11 29:12
    31:14 32:2,10
    34:16,21,22,25
    35:6,20 42:22
    44:9 45:1,3
    46:4,7,10,16,17
    49:6,11,13
    50:4 52:3,5,7,8
    52:10 57:24
    58:10,12 69:9
    71:24,25 74:13
    74:16 83:11
    85:5,17,24
    86:2,3,5 87:19
    88:8,10,12,13
    88:20 89:21
    91:1 96:6 97:7
    97:10,19,25
    98:1,20 99:11
    100:5 118:16
    125:22 126:20
    128:10
**recalled**  88:4,5
    88:24 89:2,12
    94:5 98:20
    122:4
**receipt**  115:6
    141:17
**receive**  84:24
    97:6

**received**  32:13
    85:4 87:6,19
    125:15
**receives**  138:22
**receiving**  107:1
    107:9,19
    115:20,24
    116:2,21 122:9
**recent**  50:16
**recess**  27:13
    33:6 52:21
    101:3
**recognize**  13:1
    30:4
**record**  6:2 7:9
    14:5 27:8,12
    27:15 33:2,4,7
    52:20,23 100:1
    100:23 101:2,5
    137:13 138:12
    138:13,23
    140:6
**recorded**  6:3
    9:23
**records**  28:4
**recruitment**
    50:17
**red**  71:18
**reduced**  140:5
**reed**  32:4
**refer**  20:22
    49:17,23 60:2
    61:4

**referenced**
    109:9 141:6
**references**
    122:6,7
**referred**  103:11
**referring**  15:3
    33:14,22,25
    34:5,7 51:3
    58:25 59:4,13
    69:18 87:10,14
    87:23 91:11
    108:25 112:3
    125:9
**refers**  49:18
    50:23 58:24
    87:9
**refuse**  131:19
**regard**  37:4
**regarding**
    41:21 57:10
    75:8,12 92:1
    97:7,10,19,25
    97:25 106:20
    109:25 111:13
    112:7 118:18
    122:18,24
**regional**  54:7
**regnery**  19:19
    20:2 71:9
    74:15,16 75:17
    75:19,21 76:2
    76:7,9,18,22,25
    77:20,22 79:8
    80:19,22 83:7

    83:12 86:3,5
    87:1 89:1
    91:17 94:19
    96:2,3,13,17
    97:1,9 98:20
    98:21,25 99:23
    100:3 113:1
    118:15 121:24
**regnery.com**
    70:22
**regular**  22:12
    22:16,19
**regularly**  43:25
    44:3
**regulations**
    138:6
**reissue**  100:6
**reissued**  94:6
    94:16
**reissuing**  94:18
    95:5,11
**related**  15:7
    100:5 136:3
**relates**  135:21
**relating**  139:1
**relationship**
    19:19 138:12
    140:9
**relative**  140:7
**release**  2:25
    47:24 55:15,16
    56:11,13,17
    57:5 61:16
    73:25 74:23

CONFIDENTIAL

**[release - run]**                                                                 Page 30

102:16 121:25
127:3,22 128:7
128:21,23
129:3,6
**released** 54:9
56:20
**relevancy**
44:21
**relied** 37:4,6
38:15
**relying** 101:13
**remember**
20:18 21:21
26:18 33:19
43:13 73:5
134:8,13,15,22
134:25 135:4,6
136:9
**remote** 1:19
**remotely**
104:17
**removed** 122:8
**rent** 57:18,18
**rental** 57:14
**renting** 58:1
**repeat** 116:19
118:5 129:2
**rephrase** 71:16
96:25 120:9
**reply** 99:7
**report** 96:4
138:13
**reporter** 6:12
9:24 11:12

75:2 118:7
138:1,3,7,10,24
138:25
**reporter's** 11:5
**reporting**
99:12 138:6,19
**repository**
139:2
**represent** 6:7
**representations**
138:4
**representative**
8:14 13:8,24
**representatives**
71:21
**reprint** 117:19
**request** 51:22
122:7 129:14
130:2,5
**requested**
87:17 104:16
130:12,17
**requests** 68:8
130:7
**require** 89:4
129:21
**required**
143:13
**research** 15:2,3
121:20 133:15
**researcher**
132:23
**reservations**
102:14 111:6

111:13,13
**respect** 16:17
39:17 66:15
76:19 77:16
131:14
**respond** 11:9
17:15 43:13
96:18 102:4,7
**responded**
96:22
**responding**
106:8
**responds** 51:17
**response** 10:17
10:21 90:24
97:3,5 98:25
99:7
**responses** 97:1
100:4 113:23
135:5,7
**responsibilities**
16:16
**responsibility**
15:24 74:17
**rest** 9:20
**result** 123:8,15
**results** 104:19
**return** 141:13
141:16
**returned** 91:2
**reunion** 7:17
**review** 10:7,13
13:20 15:12
16:25 31:6

76:25 94:5
125:11,14
129:5 138:1
141:7
**reviewing**
16:18 125:18
126:3,11,24
**revised** 94:6,9
94:16,19 95:6
95:12
**revisions** 96:4,8
**right** 18:22
68:3 106:2
124:5 135:2
**road** 4:13
**rob** 68:21
69:14
**robert** 68:17,20
69:18,20
**robyn** 1:20
75:5 140:19
**role** 18:10
68:22 75:12,16
75:22 77:16
**rough** 124:25
125:5,9,10,11
125:14,16,18
126:3,11,24
**rpr** 1:20 140:19
**rules** 9:20
138:5
**run** 56:20

CONFIDENTIAL

**[s - says]**

Page 31

| **s** | | | |
|---|---|---|---|
| **s**  5:5 142:3 | 56:21,24 58:1 | 108:13 109:11 | **sales**  32:5 54:7 |
| **salem**  1:16 5:2 | 59:1,1 60:6,8 | 109:19,24 | 55:12,15,20 |
| 6:21 10:17,20 | 60:13,16,17 | 111:12 112:7 | 56:12,17 57:5 |
| 12:25 13:8,12 | 62:11 63:1,5 | 113:1 114:12 | **sam**  121:17 |
| 13:24 14:6,14 | 63:10,16,20 | 114:13,21 | **sandra**  93:22 |
| 15:18,22,25,25 | 64:2,4,14,18 | 115:4,20,24 | 93:23 |
| 16:1,4,15,20 | 65:3,21,24 | 116:2,22 | **santrella**  32:2 |
| 17:4,13,14,17 | 66:6,9,14 67:6 | 118:14,15 | 57:8 65:20 |
| 18:11,25 19:2 | 67:7 68:17,21 | 119:4,11,21 | **satisfy**  96:8 |
| 19:9,19 20:2,2 | 68:22 69:5,12 | 120:10 122:9 | **saturday**  31:11 |
| 20:8 21:3,23 | 71:1,21,22 | 122:17,23 | **savage**  93:22 |
| 22:6,8,12,24 | 72:1,6,12 73:2 | 123:7,14 | **saw**  33:18 |
| 23:10,20,24 | 74:6,9,21 75:7 | 124:19,24 | 72:22 84:17 |
| 24:3,10,13,21 | 75:16 76:5,7 | 125:5,10,14 | 85:1 128:20 |
| 25:2,8,12,21,23 | 77:7,22 79:3 | 126:1,11 128:1 | **saying**  56:7 |
| 26:7 32:8,13 | 79:13,17 80:15 | 128:6 129:5,13 | 79:1 93:23 |
| 34:12,15 35:1 | 81:10 82:8,14 | 129:20 130:2,5 | 98:18 99:9 |
| 35:8,15,22 | 82:15 84:11,13 | 130:7,11,17,20 | 109:10 134:18 |
| 36:9,14 38:15 | 84:15,24 85:7 | 131:6,13 134:5 | **says**  31:10 |
| 38:17 39:17,24 | 85:23,24 86:2 | 134:15,20 | 48:13,14 50:14 |
| 40:5,12,12,21 | 88:3,6,8,10,23 | 136:19 | 54:16,23 56:10 |
| 41:10,20,25 | 89:1,11,15,21 | **salem's**  33:12 | 59:5,21 60:3 |
| 42:3,23 43:7 | 91:16,25 92:7 | 37:10,19 38:4 | 62:18,19,20 |
| 43:16 44:12,15 | 92:10 94:15,18 | 54:19 55:4 | 68:7,25 79:7 |
| 44:20,24 45:9 | 95:5,11 96:18 | 75:12 89:6 | 81:2 87:3,16 |
| 45:20 46:11,20 | 96:21 97:6,9 | 91:22 94:24 | 91:7 93:15 |
| 46:23 48:3,22 | 97:18,24 99:17 | 101:22 102:19 | 94:3 96:3 |
| 49:2 50:1 51:5 | 99:22 100:3,4 | 114:17 115:10 | 104:15,25 |
| 51:17 52:2 | 100:14 101:7 | 116:18 118:24 | 108:12,17 |
| 53:13,21,22 | 102:6,14,24 | 120:3 125:17 | 109:5 110:8,23 |
| 54:11,15 55:15 | 104:8 105:19 | 132:17,20 | 113:16,22 |
| 56:12,14,15,18 | 106:5,7,10,11 | 133:3,10 | 117:18,22 |
| | 106:19,25 | 135:19 136:2 | 121:17,17,23 |
| | 107:10,15 | 136:11 | 122:3 124:22 |

CONFIDENTIAL

**[says - see]**                                                    Page 32

|  |  |  |  |
|---|---|---|---|
| 125:4 127:21 | 116:6 117:1 | 51:9,10,21 | 50:18,20 51:24 |
| **scene** 43:2 | 118:22 119:24 | 62:15 67:23 | 53:9,12 55:2 |
| **schamell** 94:4 | 120:6,14 | 68:13 78:19 | 55:17 56:2,9 |
| **schedule** 62:19 | 122:12,20 | 80:25 83:19 | 57:16 58:6,15 |
| 63:2,17,20 | 123:2,10,18 | 90:10,11,19 | 59:15,18,23,25 |
| 84:6 | 125:20 126:5 | 93:7,20 94:2 | 60:7,11 61:2 |
| **scheduled** | 129:17,23 | 104:24 105:8 | 61:19 62:7,10 |
| 31:17 83:15 | 131:15,21 | 108:9,21 109:8 | 62:16 63:14 |
| **scheme** 81:15 | 135:16 136:6 | 110:4,17 | 68:1,5,11,16,18 |
| 81:16 | 137:1 | 111:18 113:4 | 69:3 70:16,18 |
| **schooley** 25:17 | **scott** 4:4 6:10 | 113:11 117:15 | 70:21 78:16,18 |
| 25:20 51:23 | **scratch** 134:19 | 121:4,13 | 79:4,15 80:4 |
| 69:1,18,21 | **screen** 10:5,7 | 124:12,13,15 | 81:3,6 83:4,8 |
| 124:19 | 10:16 12:16,19 | **scrolling** 83:25 | 83:17,22,23 |
| **scope** 19:23 | 29:23 47:6 | 121:6 | 84:1,2,2 86:19 |
| 20:10 22:1 | 53:4 62:2 | **sdg** 1:6 | 86:21 87:7,20 |
| 23:14 24:7,17 | 67:20 70:10 | **seasons** 42:22 | 90:8,12,14,16 |
| 25:7,14 32:24 | 78:11 82:25 | **second** 18:3 | 90:22 91:4 |
| 35:18 36:18,24 | 86:15 90:4 | 19:22 54:15 | 92:25 93:9,11 |
| 37:17 38:7 | 92:21 95:19 | 55:8,14 56:7 | 93:13,17,21,25 |
| 40:6 45:12 | 98:9 103:19 | 56:10,11 62:19 | 94:7 95:23 |
| 51:6 60:19 | 108:3 112:17 | 64:17 76:13 | 96:10,13 98:14 |
| 67:11 74:12 | 117:9 121:1 | 79:6,7 83:20 | 98:16,23 99:5 |
| 75:14,24 76:13 | 124:8 127:13 | 108:22 111:19 | 99:15 103:23 |
| 76:21 77:3,25 | **screening** | 111:23 114:4,5 | 103:25 104:2 |
| 82:18 84:5 | 71:22 72:3,6,9 | 121:23 | 104:20,25 |
| 85:10,19 86:1 | 72:13,17,19,25 | **section** 138:7 | 105:3 106:3 |
| 86:8 87:12,25 | 73:4,7 125:1 | **sections** 138:8 | 108:7,11,15,19 |
| 88:16 91:13 | **screenings** | **see** 10:7 13:3 | 109:12 110:15 |
| 94:12 105:22 | 55:13,20 56:2 | 15:6 31:22 | 110:18,24 |
| 106:14 107:4 | **scroll** 13:15 | 33:13 43:5 | 112:21 113:12 |
| 109:14,21 | 14:1 30:1,9,17 | 45:18,23 47:11 | 113:20,21 |
| 111:9,16 | 30:25 47:15 | 47:18,20,25 | 117:13,16 |
| 112:10 115:7 | 48:6 50:10 | 48:4,11,20 | 118:1,6 121:11 |

CONFIDENTIAL

**[see - smg0000146]**

121:14 124:18
125:2,11
127:19 128:25
130:24
**seeing** 10:8,16
49:9
**seeking** 8:12
**seem** 37:25
**seen** 10:6 13:4
13:21 68:10
85:6 90:15
**select** 58:9
**sellers** 98:19
**send** 81:23,24
87:18 109:19
109:24
**sending** 71:11
80:16 125:9
**sends** 93:21
99:8 109:4
**senior** 15:19
**sense** 41:12
**sent** 12:25
30:22 47:19,22
48:10 53:13
54:5,6 62:11
62:11 68:4,17
70:19,21 78:24
80:12 82:4
83:7 85:2
86:21 90:16
93:3,11 98:17
104:1,4 105:2
105:10,11,18

108:11 110:22
113:5 117:16
121:10 124:19
127:19 141:14
**sentence** 54:16
54:22 59:20
60:23 81:2,3
81:21 87:16
110:7,15
117:23 118:1
118:17
**september**
86:22 90:16,23
99:8 108:11
109:5 110:23
112:25 113:6
121:10
**serious** 102:21
102:24
**serve** 140:13
**served** 14:6
**services** 138:19
**set** 9:19 41:7
**setting** 7:22 8:6
**settlement**
123:15
**seven** 52:17
114:7 117:24
118:18
**several** 39:19
112:25 113:19
**shake** 11:8
**share** 49:1
63:10 83:14

**shared** 49:6
**sharp** 9:8
**sheet** 141:11
**shoot** 39:10
42:11
**shooting** 42:15
42:23 43:2
44:5,7
**shoots** 42:18
**shortly** 56:21
**shot** 42:20,20
**show** 11:2 28:7
31:23 33:13,23
33:24 41:15
55:25 57:15,22
58:11 61:23
78:7 84:11
92:15 95:15
103:15 105:15
105:16 112:13
117:5 121:5
124:1 127:9
128:11
**showed** 34:4,10
**showing** 28:4
35:3 61:14
100:2
**showings** 58:17
**shown** 35:2,5
71:19
**shows** 44:23
45:16 53:22
63:3 65:2 81:8

**sic** 79:12
117:23 118:9
**sign** 137:11
141:12
**signature** 48:2
121:14 140:18
**signed** 141:19
**signs** 48:3
**similar** 17:11
45:10 81:16
133:18
**similarly** 18:9
18:10 19:1
114:21
**simple** 72:14
**simply** 58:16
**site** 93:24
**six** 24:9
**skadden** 4:5
**slate** 4:5
**small** 48:16,18
**smc** 105:16
**smg0000003**
2:19 107:25
**smg0000054**
2:14 90:1
**smg0000078**
2:20 112:14
**smg0000092**
2:21 117:6
**smg0000109**
2:12 82:22
**smg0000146**
2:6 47:3

CONFIDENTIAL

**[smg0000164 - statement]**                                        Page 34

| | | | |
|---|---|---|---|
| **smg0000164** | 62:20 63:3 | **specific** 21:13 | **srn** 105:16 |
| 2:5 29:18 | 65:24 66:1,11 | 46:16 52:9,10 | **stamped** |
| **smg0000510** | 66:15,22 67:8 | 66:25 73:6 | 127:10 |
| 2:22 120:23 | **sold** 19:25 | 101:8 106:6 | **stand** 12:19 |
| **smg0000517** | **solely** 138:15 | 138:21 | 29:22 47:5 |
| 2:13 86:12 | 140:11 | **specifically** | 53:1,3 62:1 |
| **smg0000528** | **solutions** | 12:8 26:18 | 67:19 70:9 |
| 2:7 52:25 | 141:23 | 29:12 34:16 | 78:11 82:25 |
| **smg0000530** | **somebody** | 39:8 49:6,13 | 86:15 90:4 |
| 2:23 124:2 | 36:13 47:18 | 49:21 64:9,25 | 92:20 95:18 |
| **smg0000882** | 51:16 | 65:12 66:17 | 98:8 103:19 |
| 2:8 61:24 | **sonia** 4:3 6:8 | 69:19 76:8 | 108:3 112:16 |
| **smg0000912** | 7:3 29:4 132:2 | 77:18 110:2 | 114:6 117:9 |
| 2:9 67:17 | **soon** 73:25 | 125:21 130:6 | 120:25 124:6,8 |
| **smg0000933** | **sorry** 6:14 18:2 | 134:23 138:5 | 127:12 128:13 |
| 2:15 92:15 | 18:5 28:15 | **specifics** 66:8 | **stands** 49:14 |
| **smg0001158** | 29:6 32:21 | **spence** 86:22 | **start** 7:8 15:16 |
| 2:24 127:10 | 38:3 44:10 | 86:25 87:1 | 42:15 79:6 |
| **smg0001159** | 75:2 104:22 | 90:16,24 | **started** 9:19 |
| 2:25 128:12 | 116:1 118:5 | 108:11 109:5 | 12:13 42:16 |
| **smg0001255** | 128:3 130:19 | 110:19 111:5 | **starting** 59:16 |
| 2:10 70:5 | 134:18 135:18 | 111:23 117:17 | **starts** 54:15 |
| **smg0001261** | 136:12 | 127:18 | 55:8 57:13 |
| 2:16 95:16 | **sort** 16:22 | **spence's** 90:24 | 68:25 79:1 |
| **smg0001278** | 133:13 | 109:9 | 83:13 |
| 2:17 98:5 | **sound** 11:15 | **spend** 45:13 | **stash** 114:8 |
| **smg0002233** | **sounds** 11:16 | **spending** 50:1 | **state** 6:6 7:8,13 |
| 2:11 78:8 | 52:13,14 | **spent** 49:24 | 138:10 140:2 |
| **snyder** 96:13 | **source** 28:13 | **spoke** 14:21 | **stated** 9:22 |
| 96:15 98:25 | **speak** 14:18 | **spoken** 15:19 | 14:7 100:3 |
| 127:18 | 34:18,23 40:21 | 15:21 | 140:4 |
| **social** 49:20 | 53:23 60:13 | **spreadsheet** | **statement** |
| 50:17,22,24 | 73:2 111:12 | 87:5 | 98:22 |
| 51:1,2,4 52:6 | 119:4 | | |

CONFIDENTIAL

**[statements - team]**                                          Page 35

| | | | |
|---|---|---|---|
| **statements** 123:15 | 116:1 118:14 118:15 123:6 | **supervised** 76:9 | 67:16 70:3 73:19 82:20 |
| **states** 1:1 27:24 34:2,9 104:19 | **structure** 65:20 **subcontractor** 138:11,16 | **supervision** 28:1 **supervisor** 76:1 | 85:13 89:24 92:14 95:14 100:25 104:9 |
| **stating** 80:3 | 140:12 | **support** 55:11 | 106:25 107:22 |
| **station** 7:24 | **subject** 14:6 | **supporting** | 108:12 112:12 |
| **stations** 53:21 55:9,10 56:6 56:19 58:6 59:2 | **submitted** 138:24,25 **subpoena** 2:4 10:18,21 12:15 | 16:21 74:15 **supposedly** 117:24 118:19 **sure** 11:11 | 114:10 115:4 117:4 120:21 122:9 123:23 125:16 127:1 |
| **staying** 50:11 | 12:25 100:4 | 17:12 18:21 | 129:9 131:13 |
| **steps** 114:10 | **subscribed** | 40:2 56:1 | **taken** 1:19 |
| **stipulate** 10:20 | 143:14 | 57:24 65:1 | 72:22 140:4 |
| **stops** 59:21 60:2,4,25 | **subsequently** 17:22 | 66:20 71:10 85:21 87:13 | **talk** 11:13 15:15 18:23 |
| **story** 35:25 36:5 38:8,10 79:11,22 80:4 80:7 | **substance** 14:22 **substances** 9:15 | 88:11 101:12 102:1 116:20 116:21 132:3 **swear** 6:13 | 29:8 40:15 41:5 42:9 48:14 53:22 55:9,10 56:6 |
| **straddling** 121:5 124:12 | **success** 55:10 79:3 | **sworn** 6:24 143:14 | 59:1,2 73:22 81:7 89:11 |
| **straight** 99:9 | **sue** 99:14 | **synopsis** 26:11 | 100:24 105:15 |
| **strange** 31:4 | **suggest** 96:21 | **system** 110:12 | 105:23 |
| **strategy** 47:24 56:10 58:1 | 124:25 **suggested** | 111:3 | **talked** 23:18,25 126:21 |
| 63:4 | 74:13 | **t** | **talking** 17:13 |
| **stratforde** 4:20 | **suite** 5:9 | **t** 142:3,3 | 18:24 37:19 |
| **streaming** 55:14 56:11,17 | **sukites** 93:14 93:15 | **table** 132:19 **take** 11:24 12:3 | 62:23,25 102:10 125:22 |
| 57:5 | **summer** 39:5 | 21:7 31:5 | **talks** 49:10 |
| **street** 5:8 | **supervise** 15:24 | 33:19 37:18 | **team** 50:17,22 |
| **strike** 28:15 32:21 38:3 42:2 44:10 | 76:5 | 52:13 55:13,20 57:25 61:22 | 51:4 52:6 57:13 73:13 |

CONFIDENTIAL

**[tech - timeframe]**                                            Page 36

**tech** 5:14 12:17
  29:19,21 47:4
  53:1 61:25
  67:18 70:6,8
  78:9 82:23
  86:13 90:2
  92:16,19 95:17
  98:6 103:17
  108:1 112:15
  117:7 120:24
  124:3,6 127:11
  128:13
**technical** 27:11
**technique**
  110:11
**telephone** 69:1
**tell** 14:24 15:17
  17:8 20:8
  21:17 23:20
  26:7 33:14
  74:6,8 91:1
  101:18 104:5
  105:14 111:24
  112:1
**telling** 14:22
  28:12 81:13
**tells** 38:8,9
  127:22
**term** 111:6
**terms** 40:18
  42:8 54:10
  66:9 89:17
  115:8 138:16
  140:12

**test** 109:6
  124:25
**testified** 6:25
  8:5 134:3
**testify** 14:14
  123:19
**testimony** 8:15
  8:24,25 9:5,12
  9:16 14:19
  77:10 110:10
  141:9,17 143:8
**text** 104:12
**thank** 7:12,19
  8:4,20 9:3,18
  11:3 12:2,22
  14:11,17 15:14
  16:2 18:8
  19:17 20:4,20
  23:9,17 24:20
  25:11 26:1
  29:16 30:1,5
  30:19 31:1,8
  38:14 47:1,9
  47:14 52:11
  53:7 59:15
  60:22 62:5
  65:22 67:15,23
  67:24 73:20
  75:5 76:17
  78:14 85:14
  90:20 98:12
  110:5 115:19
  118:11 124:11
  128:5,17 132:1

132:2,6,7,15
  133:1
**thanks** 90:25
  132:13
**theater** 56:8
  58:11 59:10,12
  61:11
**theaters** 55:16
  55:24 56:13,20
  57:14,19,22
  58:2,7,9 59:24
  61:2,6,7,18
**theatrical**
  47:24 58:17
  61:16
**thing** 75:19
  133:5,8
**things** 9:21
  68:10 77:21
  108:18
**think** 9:4 14:10
  16:20 17:4,5,6
  17:15 24:9
  29:13 31:4
  33:19 35:11,13
  43:22 45:17
  51:7 52:12,14
  53:20 57:20
  59:2 61:8,11
  63:15 64:3
  65:6,7,13 70:3
  72:4,23 85:13
  100:21 125:15
  131:1 135:24

**third** 57:12
  62:20 65:23
  122:3
**thomas** 96:1,6
**thought** 28:7
  41:12,14 45:22
  105:25 110:9
  122:1 125:23
  135:24 136:7
**thoughts**
  125:17
**three** 62:14,16
  104:19
**throwing**
  104:18
**ticket** 55:12,20
  57:4
**tied** 28:7
**time** 8:1,3
  10:13 12:1
  24:1,2,25 32:8
  32:12 41:5,5,7
  42:1 43:3 45:4
  52:12 59:23
  61:1,3,5,9,14
  61:19 80:12
  81:9 82:4 87:2
  100:22,25
  101:14,14
  132:1 136:21
  137:2 138:22
  141:18
**timeframe**
  141:8

CONFIDENTIAL

**[timeline - unfortunately]**                                    Page 37

| | | | |
|---|---|---|---|
| **timeline** 40:4 | 113:15 | **try** 11:13 17:12 | **typically** 16:17 |
| 68:8 69:2,5,12 | **topic** 33:10 | **tt** 21:2 | 129:13 |
| 69:22 | 94:22 | **ttv** 20:22 21:3 | |

| **u** |
|---|

**times** 11:25
96:2
**title** 15:18,20
71:10 79:8
94:4
**today** 7:5 8:14
8:22,25 9:5,8
9:12,16,22
10:16 13:8,19
14:14,20 25:2
26:3 93:16
94:6 101:21
132:1,14
**together** 28:7
51:5,8 124:24
**told** 27:21
35:25 74:9
92:10 98:20
**tom** 61:17
86:22,25 87:1
90:16,24,24
108:11 109:5,5
109:9 110:19
110:22,23
111:5,12,22
113:6,16 114:5
117:17,18
127:18
**took** 43:2
**top** 51:20 94:3
96:12 112:23

**topics** 13:18,20
13:25 14:5,7
14:14 134:25
**touch** 128:6
**traded** 136:20
**transcribed**
9:23
**transcript**
137:10 138:22
140:4,6 141:6
141:19 143:5,8
**transcription**
11:10
**transcripts**
138:22 139:1
**traurig** 4:12
**tried** 131:1
**trouble** 10:8
**true** 4:9 6:15
10:21 20:6,9
20:22 21:9
29:14 54:24
98:21 114:6
133:6 138:23
140:6 143:8
**trump** 71:20
72:24 73:3,8
73:13
**truth** 38:9
**truthfully**
131:23

21:14 22:5,8
22:12,22,25
23:11 26:17,23
28:16 29:8
32:9,14 34:15
36:8,9 43:16
43:25 44:3
57:9 64:15
65:4 75:7
89:22 95:12
97:24 100:16
101:16 106:19
113:8 114:10
126:23
**ttv's** 28:20
**tuesday** 6:2
**twitter** 50:25
**two** 42:10
48:15 49:10
55:12 57:15
61:12 105:1
121:5 124:13
**type** 15:3 38:3
44:15 130:3,5
**types** 16:16
129:14,20
**typewriting**
140:5
**typical** 40:5,8
61:15 65:14
67:7,12 72:19

**ultimately** 50:4
**unclear** 11:18
**uncomfortable**
110:25
**uncover** 79:13
79:24
**uncovered**
33:17 79:23
**under** 8:21
9:14 74:17
140:5
**understand**
8:16,21,24 9:2
11:18,20 13:7
13:10,11,13,23
14:3 31:7
35:22 77:23
123:14 133:20
**understanding**
17:3,9 37:10
38:4 54:19
55:5 120:3
132:17,18,20
133:3,10,23
136:11
**understood**
11:21 36:9,9
**unfortunately**
15:6

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **unit**  6:3 | **veritext**  138:11 | 136:16 137:4,6 | **wanting**  60:11 |
| **united**  1:1 | 138:19 141:14 | **violence**  121:21 | 67:3 102:1 |
| **unmanned** | 141:23 | **vital**  55:10 | **washington** |
| 36:1 | **veritext.com** | **vote**  4:9 6:15 | 42:18 96:1 |
| **unthinkable** | 141:15 | 20:6,9,22 21:9 | **watched** |
| 79:12,23 | **version**  117:19 | 29:14 114:6 | 104:16 |
| **unusual**  131:18 | 122:4 | 133:7 | **watching**  105:2 |
| **update**  83:14 | **versus**  6:5 | **voter**  54:18 | **way**  51:14 |
| **uploaded**  139:2 | **vetting**  19:2 | **vp**  53:17 68:21 | 53:18 56:19 |
| **use**  44:19 45:16 | **vice**  15:19 | **vps**  54:7 | 57:7,9 65:14 |
| 50:17 56:19 | **video**  1:15 6:3 | **vs**  1:6 | 93:7 106:3 |
| 111:6 119:5 | 28:1,3 31:23 | | 107:10 |
| **used**  36:1,10 | 56:15 68:24 | **w** | **ways**  49:18 |
| 58:8 111:14 | **videoconfere...** | | 51:1 54:25 |
| 112:7 141:19 | 1:19 | **wait**  118:9 | 55:12 65:25 |
| **usual**  9:8 | **videographer** | **walking**  42:19 | 66:10 |
| **usually**  37:23 | 5:13 6:1,12 | **want**  16:11 | **we've**  100:3 |
| 61:19 130:9 | 9:24 27:7,10 | 31:5 38:11,11 | 113:22 |
| **utilized**  27:23 | 27:14 33:1,4,7 | 38:11 39:13 | **week**  31:12 |
| | 52:19,22 101:1 | 41:10 44:22 | 111:24 |
| **v** | 101:4 137:12 | 45:18,23 60:6 | **weeks**  40:23 |
| | **videos**  33:23,25 | 81:22,23 | 42:10 58:18 |
| **v**  141:4 142:1 | 34:1 35:1,2,4 | 116:19 132:17 | **weight**  8:25 |
| 143:1 | **view**  10:5 17:14 | **wanted**  10:19 | **went**  28:5 |
| **vague**  101:25 | 38:11 41:17 | 31:23 33:13,23 | 42:20 73:23 |
| **vaguely**  49:12 | 116:18 | 33:24 35:25 | 127:22 134:10 |
| **various**  34:9 | **viewed**  107:10 | 36:6 39:21 | **west**  4:6 |
| 36:4 49:18 | **viewers**  17:7 | 40:16 41:6,7 | **widespread** |
| 63:3 125:10 | 45:22 | 45:7 56:1 65:2 | 54:17 |
| **verbally**  11:7 | **vining**  3:3 4:18 | 66:19 67:6 | **willing**  55:25 |
| **verbatim** | 6:17,17 132:8 | 74:14 83:14 | 65:6 131:2,3 |
| 138:13 | 132:8,12 | 84:22 96:3 | **witness**  5:3 |
| **verify**  36:15 | 134:14 135:17 | 101:12 130:23 | 6:13,22 11:1 |
| 114:10 135:3 | 135:25 136:8 | 134:2 | 12:15 18:2,5 |
| 141:9 | | | |

CONFIDENTIAL

**[witness - zoom]**                                         Page 39

23:3 33:2
103:2 118:12
132:7,10
136:24 137:9
137:11 141:8
141:10,12,18
**witnesses**
138:25
**word**   15:19,21
**work**   17:4
22:10 24:8,14
25:12 31:11
39:3,6,7,9
51:19 61:18
**worked**   22:8,11
22:11 23:11
24:1,3,4 25:21
25:24 51:8
57:23 128:1
**working**   25:13
61:10 82:2
125:12
**works**   25:17
**world**   79:14
121:22
**write**   74:14
131:2,3,19
133:15
**writes**   90:24
**writing**   121:18
**written**   17:3
82:5
**wrong**   28:8
110:10 122:2

**wrote**   30:13
47:23 55:9
58:15 99:1
111:23

**y**

**y**   7:11
**yeah**   8:3 14:2
16:7,9 18:9
19:7 21:5,9
22:2 24:8
25:16 26:9
33:3 34:16
37:4,12,23
42:8 45:13
50:7 51:7 54:2
55:24 59:10,19
64:12 67:12
69:14 74:13
75:25 78:21
81:5,6 88:1,17
89:9,19 91:23
95:3 96:23
97:3,22 101:11
101:13,25
102:21 103:2,6
105:16,23
107:13 109:17
110:2,21
114:19 115:12
119:1,9,16
121:7 123:11
123:21 125:8
125:15,21

126:8,15
129:24 130:9
130:14,18
131:1,9,22
132:23 133:5,8
133:25 136:22
136:24 137:2
**year**   91:9
**years**   7:25
**yellow**   58:14
**yesterday**   87:4
**york**   4:7,7

**z**

**zoom**   14:9
70:13 104:11
128:24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.