## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MARK ANDREWS,

       Plaintiff,

v.

DINESH D'SOUZA, TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, GREGG PHILLIPS, D'SOUZA MEDIA LLC, SALEM MEDIA GROUP, INC., REGNERY PUBLISHING, INC., and JOHN DOES,

       Defendants.

Case No. 1:22-CV-04259-SDG

## MOTION AND MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56, Defendants Dinesh D'Souza and D'Souza Media LLC ("D'Souza Media," and collectively "D'Souza Parties") hereby move the Court for summary judgment on all remaining claims in this action.

## I.   INTRODUCTION

Filmmakers and journalists cannot do their jobs without relying on the statements of others and relying on data they did not collect or analyze themselves. Sometimes it turns out that the source was wrong.

This is one of those cases. In 2022, Dinesh D'Souza and his team made a film called *2000 Mules* about the integrity of drop box voting in the 2020 presidential election. The film relied on a massive data collection and analysis project undertaken

by experts. That project included the use of geolocation data, which was analyzed to identify suspicious patterns of cell phone locations that had pinged at visits to at least 10 ballot drop boxes, indicating likely ballot trafficking. The analysis revealed extensive suspicious voting patterns, and was the heart of the *2000 Mules* film. That part of the project is not at issue here, and has not been discredited.

The project also involved the use of ballot drop box surveillance footage, obtained through open records, and linked to the geolocation data by a team of analysts hired by a vendor. It now appears evident that the drop box surveillance videos provided to Mr. D'Souza's team, and used in the film, were never linked to any geolocation data.

Unfortunately, this revelation did not occur during the production of the film, or even in the two years after. During that time, Mr. D'Souza's source for the video claimed that the surveillance videos had been painstakingly matched with the geolocation data — claims made (1) directly to Mr. D'Souza and his team, (2) in an interview in the film itself, and (3) in interviews given on national platforms, including Tucker Carlson Tonight. It was only a few months ago, during discovery in this case, that it was revealed that Mr. D'Souza had been misled. Mr. D'Souza promptly issued a public apology to Mr. Andrews and retracted the use of the video.

The inclusion of Mr. Andrews in *2000 Mules* was a mistake. But it was an honest one, made by a team that legitimately believed the film was accurate. And while Mr. Andrews is a sympathetic plaintiff, our Constitution recognizes that publishers need breathing space to survive, which requires some latitude for error. Accordingly, **the law does not allow for recovery in defamation cases when there**

**has been no fault and no ill intent. Such is the case here.** Because Mr. D'Souza and his team acted responsibly, based on what they knew at the time, there can be no recovery for defamation, false light, civil rights violations, or conspiracy.

The law also prohibits recovery for libel, false light, or misappropriation of likeness when there has been no showing that the plaintiff was recognizable. Here, because Mr. Andrews was not recognizable, his claims fail on that basis as well.

## II.    FACTS

### A. True the Vote

Ms. Engelbrecht started True the Vote ("TTV"), a nonprofit, nonpartisan voter integrity organization. Statement of Facts ("SMF") ¶1. In the aftermath of the 2020 election, she believed data could be used to assess whether drop boxes had been used to perpetuate voter fraud. *Id*. ¶2. She teamed up with Gregg Phillips because she had worked with him on other projects,[1] and she knew his data analytics company, OpSec Group, had experience with large data analytics projects.[2] *Id*. ¶3. On December 1, 2020, TTV contracted with OpSec to do a Geospatial Data Analysis Project in order to "[l]everage historic and near real time behavioral mobility data to assist . . . in analyzing possible election process subversion."[3] *Id*. ¶6.

As part of this project, Ms. Engelbrecht submitted open records requests to the Georgia Secretary of State ("SOS") seeking the surveillance video from Georgia

---

[1] For example, they had worked together on the development of voter-integrity software to facilitate incident reporting of suspicious behavior at polls. SMF ¶4.

[2] Such projects included the development of Deloitte Consulting's healthcare analytics program. *Id*. ¶5.

[3] Under the terms of the agreement, OpSec agreed to identify possible patterns of ballot harvesting through the analysis of cell phone geolocation data. SMF ¶7.

ballot drop box cameras. *Id.* ¶8. Mr. Phillips, through Opsec, contracted with Red Metrics to analyze cell phone geospatial data, including over 25 terabytes of data consisting of over 1.2 trillion device pings collected from September 2020 through January 2021. *Id.* ¶9. By early 2021, they had evidence demonstrating that illegal ballot harvesting had occurred, but when they tried to get the attention of authorities, they were "pushed off and shoved aside."[4] *Id.* at ¶10.

**B. Origins of Film**

In light of law enforcement's disinterest, the pair decided to take their story directly to the public. *Id.* ¶12. To that end, Ms. Engelbrecht approached Debbie D'Souza, and asked if her husband, Dinesh D'Souza would take a meeting to discuss a possible film based on TTV's research.[5] *Id.* ¶¶ 13–14.

Mr. D'Souza had little knowledge about Mr. Phillips other than that he generally had a good reputation; however, he knew of Ms. Engelbrecht because she testified before Congress in 2014, and he understood her to be an expert on election issues. *Id.* ¶16. The D'Souzas agreed to the meeting, with Mr. D'Souza emphasizing the need for them to be able to prove their theories. *Id.* ¶17.

Ms. Engelbrecht and Mr. Phillips went to the D'Souza's home to discuss their findings in August 2021. *Id.* ¶18. Mr. Phillips showed the D'Souzas a presentation and supporting materials on his laptop, including background information and

---

[4] Mr. Phillips first took the information to the FBI on March 25, 2021, and then to Governor Kemp, the GBI, and legislators. SMF ¶11.
[5] Ms. Engelbrecht knew that Mr. D'Souza, was an award-winning documentary filmmaker, and she also knew that Ms. D'Souza was passionate about election integrity after witnessing election fraud in Venezuela, her home country. SMF ¶15.

graphics explaining cell phone geotracking methodology, his data and maps depicting the geospatial data and pattern-of-life schematics, and drop box surveillance video clips, which all supported the theory that numerous individual cellphone ids, or IMEIs, could be correlated with multiple drop box visits. *Id*. ¶19.

Mr. Phillips explained how the geotracking data could be matched to the time-stamped surveillance video to cross-check the two separate lines of inquiry. *Id*. ¶20. The idea of matching the surveillance videos to the geotracking data also appealed to Mr. D'Souza because the surveillance video would provide visuals for effectively conveying these complex ideas to a film audience. *Id*. ¶21. During the meeting, Mr. D'Souza also probed Mr. Phillips's background and learned that he had held various positions in the corporate world as well as high-level positions within government,[6] leading Mr. D'Souza to determine that Mr. Phillips was a "visible, competent managerial person." *Id*. ¶22. Additionally, he "represented to [Mr. D'Souza] that he had been, for not years, but decades, involved in election integrity and election intelligence," including "involvement in studying, monitoring, [and] investigating elections not just in the United States, but around the world." *Id*. ¶24. Mr. Phillips further insinuated that he had performed this work in conjunction with both intelligence agencies and law enforcement agencies. *Id*. ¶25. Mr. Phillips also conveyed that he knew a great deal about geotracking, which he corroborated by answering detailed questions on the topic. *Id*. ¶26. The D'Souzas ultimately found the presentation convincing. *Id*. ¶27.

---

[6] Mr. Phillips was the head of Human Services in Mississippi and the head of the Health & Human Services Commission in Texas. SMF ¶23.

Following the meeting, Ms. Engelbrecht sent the D'Souzas an email that included draft affidavits from both Ms. Engelbrecht and Mr. Phillips for the purpose of comprehensively explaining the project. *Id.* ¶28. Mr. Phillips's affidavit indicated that he had more than three decades of data analysis experience.[7] *Id.* ¶29. It also indicated that OpSec utilized commercially available mobile device geospatial and temporal data to identify cell phones that had been located in close proximity to the 309 ballot drop boxes in Georgia by establishing geofences around those drop boxes and identifying cell phone pings within those boundaries. *Id.* ¶31. Through its analysis, OpSec identified 242 "devices of interest" that had each been located within 100 feet of one or more drop boxes on at least 10 occasions and within 100 feet of one or more organizations suspected of ballot harvesting. *Id.* ¶32. The documents also included maps individually tracking 10 different devices on as many as 53 visits to 14 different drop boxes and 35 visits to four suspected ballot harvesting organizations. *Id.* ¶33. Ms. Engelbrecht's affidavit indicated that TTV had already spent $1.5 million on the investigation. *Id.* ¶34.

Mr. D'Souza also did his own research that ultimately substantiated the reliability of geotracking. *Id.* ¶35. He read articles stating that geotracking is used by law enforcement to investigate crimes, and was used by the Centers for Disease Control ("CDC") to track people's movement during the pandemic. *Id.* ¶36.

---

[7] This experience included "us[e] of large data sets in fraud control, quality control, and identify resolution in voting-related cases and analysis," and previous "expert testimony on matters pertaining to mobile device geospatial and temporal data analysis, mobile device tracking, and law enforcement matters . . . includ[ing] testimony in front of the Foreign Intelligence Surveillance Court." *Id.* ¶30.

Mr. D'Souza set up a meeting for Mr. Phillips and Ms. Engelbrecht with Salem Media Group ("Salem") in October 2021, largely to see how their theories would hold up to probing questions from the attorney, past and present CEOs, and other executives of this publicly traded company *Id.* ¶37. The presentation included maps of the mules traveling to numerous drop boxes, discussion of geotracking mules to violent protests, the use of geotracking to aid in Atlanta murder investigations, and surveillance video footage. *Id.* ¶38. The meeting went well, and Salem found Mr. Phillips and Ms. Engelbrecht to be competent professionals. *Id.* ¶39. Following the meeting, Mr. D'Souza and Salem decided to make a film based on TTV's investigation. Additionally, Mr. D'Souza had a previous agreement to write two books for Salem Media, and Salem agreed that his second book would be published by Salem's subsidiary, Regnery, as a companion piece to the film. *Id.* ¶40.

## C. Red Metrics' Analysis

Red Metrics was hired by OpSec to perform the geospatial analysis and the linking of that data to drop box surveillance video. Mr. Phillips testified that Red Metrics engaged in the "arduous process . . . of trying to figure out was there a corresponding video that — that might match that individual at that box at that time" as a means to provide a clearer picture of the patterns in the data. *Id.* ¶41. He said the process was labor intensive with an about 12 analysts working 16-hour days for 15 months, and progress was hampered by numerous technical challenges. *Id.* ¶42.

For example, TTV had more than 5 million minutes of raw video, which could not be analyzed without powerful computing resources. *Id.* ¶43. Additionally, much of the footage was of poor quality, the cameras were poorly positioned, the files

could not be opened without special software, or footage was missing because certain drop boxes lacked surveillance cameras. *Id.* ¶44. Mr. Phillips testified that Red Metrics was able to find 70 video clips corresponding to the 242 devices identified through the geotracking analysis. *Id.* ¶45.

### D. Concerns over TTV public disclosures

On December 5, 2021, Ms. Engelbrecht revealed to Ms. D'Souza that TTV had sent a series of complaints to the Georgia SOS in which TTV disclosed its investigation and findings. *Id.* ¶46. Mr. D'Souza and his business partner Bruce Schooley were concerned that such disclosures might "spill the beans" and spoil the movie. *Id.* ¶47. Accordingly, on January 7, 2022, D'Souza Media and Salem executed a licensing and nondisclosure agreement with TTV, with an effective date of December 3, 2021, relating to the footage in TTV's possession that purportedly contained evidence of voting irregularities occurring in the 2020 election. *Id.* ¶48. The agreement expressly prohibited TTV and its representatives from disclosing the surveillance film or its contents to anyone prior to the public release of the film. *Id.* ¶49. Mr. D'Souza inserted this provision because he wanted to ensure that his film would be the only source for this valuable footage. *Id.* ¶50. Interest in the film would diminish if the public could see the footage simply by going online. *Id.* at ¶51.

### E. The Production of *2000 Mules*

On January 9, 2022, two days after the agreement was executed, Mr. Phillips provided the initial batch of 70 videos (that he asserted had been previously matched to the 242 geotracked devices) to D'Souza's video editor, Nathan Frankowski. *Id.* ¶52. Meanwhile, the film continued to develop. While TTV's research was meant to

be the backbone of the film, Mr. D'Souza had envisioned that the film would have a wider scope that would include experts who could corroborate TTV's investigation and enhance the film's themes. *Id.* ¶53. For example, Mr. D'Souza interviewed numerous experts for inclusion in the film and to corroborate TTV's theories. *Id.* ¶54. Mr. D'Souza was repeatedly "reassured, even by some people who did not like Catherine and Gregg personally, that their work was excellent." *Id.* ¶55.

Mr. D'Souza filmed unscripted interviews with Ms. Engelbrecht and Mr. Phillips for inclusion in the film, both in his studio in Texas, and in Los Angeles with several media figures. *Id.* ¶56. During the interviews, which were included in the film, Ms. Engelbrecht was clear that the footage that they had provided had been linked to geotracked cell phones: "What kicks it up a notch is that we have the geospatial data to support the video." *Id.* ¶57. Mr. Phillips, looking at a surveillance video, then states, "this particular individual, we have in a number of different locations . . . he's actually a mule." *Id.* In the interview, they also discussed the criteria for a "mule": only phones that had been to ten separate drop boxes and to a liberal non-profit organization would qualify for purposes of the film. *Id.* ¶58.

During production, Ms. D'Souza requested additional mule videos from Ms. Engelbrecht. *Id.* ¶59. She balked at this request because it was so "time consuming" to link the videos to the data:

> **1) Video footage and how many can we realistically have. We want to show the mules…**
> **all of what you have that works.**
>
> *We have around 70 videos currently separated out and are scaling efforts to review more.*
> *This is **incredibly** time consuming because it involves reading the geospatial data to try and*
> *find a match in really poorly detailed county video, so only analysts can do this. It is difficult*
> *to know how many more we will have. We have lots of footage, but finding the pieces that*
> *work is difficult. We need to understand what you need, how you want to use it, and the*
> ***deadline** by which you need it. Here are some ideas:*

*Id*. ¶60. As a shortcut, Ms. Engelbrecht offered clips from their "general footage" that had not been linked to geotracking data. *Id*. ¶61. Mr. D'Souza had no interest in such footage and only wanted videos of persons that met the "mule" criteria. *Id*. ¶62.

Eventually, on March 27, Mr. Frankowski received a hard drive from TTV containing the second batch of surveillance clips. *Id*. ¶63. This drive contained the footage from the Gwinnett County drop box, including the footage of Mr. Andrews. *Id*. ¶64. No communication was provided by TTV or anyone associated with TTV indicating that these videos had not been linked to the geolocation data. *Id*. ¶65.

### F. The Decision to Blur

Mr. D'Souza and his team began working on the rough cut, but first the team had to resolve the question of whether the faces of the mules should be blurred to conceal their identities. *Id*. ¶66. While Mr. D'Souza initially did not want to blur (fearing it would affect the credibility of the film), he was ultimately persuaded because the film was not about unveiling individual mules, but instead on the larger, publicly significant question of whether organized fraud had occurred. *Id*. ¶67. Once the decision was made, the team was "very careful and very diligent" about blurring identifiable details because the team was "obsessed with not identifying anybody" and wanted to ensure that they did not "invade their privacy that way."[8] *Id*. ¶68.

### G. The Rough Cut

By early April, the rough cut of the film had been completed, followed by the final cut in late April. *Id*. ¶70. Mr. Phillips and Ms. Engelbrecht viewed the rough

---

[8] The team blurred potentially identifiable details, including a dog, a woman's t-shirt, license plates on cars, and other markings on cars. SMF ¶68.

cut in the D'Souza's home and a private pre-screening of the movie in Mar-a-Lago, were given an opportunity to provide their feedback after both. *Id.* ¶¶71–72. Ms. Engelbrecht provided small suggestions, while Mr. Phillips did not share any concerns with the team. *Id.* ¶73. In short, neither Ms. Engelbrecht nor Mr. Phillips raised any concerns about the use or characterization of the surveillance footage used in the film, despite having opportunities to do so.

## H. The Charlie Kirk Show and Gateway Pundit

On April 8, 2022, before the release of the film, talk show host Charlie Kirk aired an interview with Mr. Phillips and Ms. Engelbrecht. *Id.* ¶74. During the interview, they made no reference to *2000 Mules,* and it appeared as though they appeared on the show only to promote TTV's research. *Id.* ¶¶75–76. Mr. D'Souza did not consent to the interview, and only became aware of it afterwards. *Id.* ¶77.

During the interview, Mr. Kirk displayed an unblurred video of Mr. Andrews dropping ballots into a ballot box. *Id.* ¶78. Mr. Kirk asked, "So this is a mule . . . one of the 2000 that you profiled?" to which Ms. Engelbrecht replied, "Yes." *Id.* That video was not provided by the D'Souza Parties or anyone associated with them, and indeed they could not have provided a video for an interview they knew nothing about. *Id.* ¶79–80. Mr. Phillips and Ms. Engelbrecht also deny that they provided the video, but they would be motivated to deny it, as disclosing the footage would have been a violation of their contract with D'Souza Media. Ms. Engelbrecht insinuated that Mr. Kirk had the video from "the ad in GA," referring to an ad for Get Georgia Right (a political action committee) featured in the same Charlie Kirk episode, and which included the same unblurred footage of Mr. Andrews. *Id.* ¶¶81–83.

Days after the Charlie Kirk show, Ms. Engelbrecht and Mr. Phillips appeared in another interview, this time with Gateway Pundit, that again was coordinated without consulting Mr. D'Souza, and again, showed the Get Georgia Right ad with unblurred footage of Mr. Andrews. *Id.* ¶84. Get Georgia Right received the surveillance footage of Mr. Andrews directly from Mr. Phillips. *Id.* ¶85.

## I. Release of the *2000 Mules* Trailer

Ms. Engelbrecht coordinated the trailer's initial release to occur on April 23, to coincide with a Trump rally during which he spoke about True the Vote. *Id.* ¶86. The trailer included a 2-second clip of Mr. Andrews with his face blurred. *Id.* ¶87.

## J. The *2000 Mules* Film

On May 4, 2022, *2000 Mules* premiered at Mar-a-Lago, followed by a virtual premier on May 7. *Id.* ¶88. In the film, Mr. Andrews's face and the license plate on the vehicle (which could have belonged to anyone in line) were blurred. *Id.* at ¶89:



.

## K. Tucker Carlson Interview

Two days after the *2000 Mules* film premiered, Ms. Engelbrecht appeared on Tucker Carlson's show. *Id.* ¶90. And, again, this interview was coordinated without

involving the D'Souzas or their publicist. *Id.* ¶91. The D'Souzas thought that the purpose of the interview was to promote the film; however, Ms. Engelbrecht never mentioned the film. *Id.* ¶92. Nonetheless, someone on Mr. D'Souza's media team uploaded the interview to Mr. D'Souza's Rumble account without even watching it, mistakenly assuming that the interview promoted *2000 Mules,* and without any awareness that the interview featured unblurred footage of Mr. Andrews. *Id.*

It turned out, unfortunately, that the interview featured unblurred footage of Mr. Andrews (which obviously did not originate from D'Souza Media), but the footage was low quality and in a small box, such that the actual image of Mr. Andrews is extraordinarily small and low-resolution, rendering Mr. Andrews no more recognizable than he would have been if he had been blurred (*Id.* ¶¶93–94):



Ms. Engelbrecht was unequivocal during the interview that "we are able to match the drop box pings with the video, and you see it for yourself." *Id.* ¶90. To be clear, this was the *third* interview involving Ms. Engelbrecht and/or Mr. Phillips that

was unauthorized, in breach of the agreement between TTV and D'Souza Media, and using the same unblurred video of Mr. Andrews.

**L. David Cross's Complaint and SEB Investigation**

Unbeknownst to the D'Souzas, David Cross, a Gwinnett County citizen activist, had conducted his own election integrity research, including open records requests for drop box surveillance video. *Id.* ¶95. Seeing TTV's appearance on the Charlie Kirk show, Mr. Cross was concerned because he recognized the drop box shown during the interview as the same drop box he had seen in footage that he had previously acquired through open records requests. *Id.* at ¶96. He located in his own possession the same footage of Mr. Andrews that was depicted in the interview and filed a complaint with the State Elections Board ("SEB") on April 25, 2022. *Id.* ¶97.

Mr. Cross's complaint, relying on his own, independently obtained Gwinnett County surveillance footage, included the license plate number of Mr. Andrews' SUV, through which the SOS identified Mr. Andrews as the vehicle owner. *Id.* ¶98. The SOS investigated Mr. Andrews by interviewing him once, during which he asserted that he had only dropped off ballots of his household.[9] *Id.* ¶99. The investigator found no wrongdoing. *Id.* ¶101. The SEB then held a hearing on May 17, at which time the complaint against Mr. Andrews was dismissed, but only after the *2000 Mules* film had premiered on May 4, and virtually on May 7. *Id.* ¶102. No one at the hearing mentioned Mr. Andrews by name. *Id.* ¶103. On the same day, Ryan Germany, the General Counsel at the SOS Office, texted Mr. Andrews to warn

---

[9] Even though the complaint against Mr. Andrews referenced TTV's geotracking research, the investigator did not collect or analyze geospatial evidence. *Id.* ¶100.

him that he would receive press inquiries. *Id*. ¶104. Mr. Jeremy also offered the name of an attorney, Von DuBose, and suggested Mr. Andrews should call him. *Id*. ¶105.

Between May 16 and 23, 2022, two reporters tried to talk to Mr. Andrews. *Id*. ¶106. Mr. Andrews did not return their calls, and neither reporter ever authored a news article mentioning Mr. Andrews by name, and in fact, prior to this lawsuit, **no news story on any platform ever referenced Mr. Andrews by name**. *Id*. ¶107.

Mr. D'Souza became aware of the SEB investigation because he saw a Twitter post with a video of the proceeding. *Id*. ¶108. His thought was, "This is not what I would call an investigation," because the state had done only the "irresponsible bare minimum." *Id*. ¶109. He thought the state's effort was perfunctory, an investigation of one incident, not "an investigation of the phenomenon that is very seriously presented in the movie." *Id*. ¶110. Even prior to this investigation, Mr. D'Souza was wary of Secretary Brad Raffensperger because Mr. D'Souza believed that he enabled the ballot trafficking in the first place by entering into a consent decree that weakened ballot signature-matching rules. *Id*. ¶111. Moreover, the Secretary was under pressure in court and from within his own party for the perceived failure to root out fraud.[10] *Id*. ¶112. While Mr. D'Souza appreciated that the investigation might be connected to the film, it never occurred to him that the investigation could

---

[10] Senate candidates Kelly Loeffler and David Perdue both called for Raffensperger's resignation for "fail[ing] to deliver honest and transparent elections," and Donald Trump declared Secretary Raffensperger "an enemy of the people." SMF ¶113. Numerous high profile lawsuits were also filed in Fulton County against the Secretary relating to claims of election fraud. *See, e.g., Trump v. Raffensperger,* 2020-cv-343255; *American Oversight v. Raffensperger,* 2020-CV-341511; *Wood v. Raffensperger,* 2020-cv-342949.

possibly relate to the same surveillance footage that was included in the film because the film had only been released a few days prior, and all of the footage included in the film had been blurred to render the mules completely unrecognizable.[11] *Id.* ¶114.

## M. Post-publication Communications

In response to a May 17, 2022, Atlanta Journal-Constitution article about the SEB investigation, Mr. Phillips sent a text message to Mr. D'Souza expressing his frustration with the minimal level of fact finding and casually mentioning that the individual didn't "reach the threshold" to be a "mule" — a buried comment that went unnoticed by Mr. D'Souza and which, given the context, was not any sort of grand admission from Mr. Phillips about the accuracy of the film:



*Id.* ¶116. Around the same time, reporters reached out to Mr. D'Souza, and Ms. Engelbrecht sent several text messages indicating that she'd like to talk to straighten out a few details before Mr. D'Souza engaged with the media. *Id.* ¶117. Ms. Englebrecht provided a brief list of what she called "tiger traps," the last of which was "Non-mule video in the movie." *Id.* ¶118. Because the film is predominantly "non-mule" videos (i.e., interviews with informants, interviews with the panel, interviews with a police officer, etc.), Mr. D'Souza did not interpret this text as any

---

[11] Also, Mr. D'Souza had never filed any complaints with the SEB. *Id.* at ¶115.

sort of news. *Id*. ¶119. Ms. Engelbrecht and Mr. D'Souza agreed to connect the next day to go over Ms. Engelbrecht's concerns, but they never did because they were in the midst of an "absolute media frenzy" surrounding the movie. *Id*. ¶120.

Notably, these messages had no concerning meaning to Mr. D'Souza because he did not know how the video could exist if it had not been geotracked:

> How can you find surveillance video if you don't geotrack? The only way, presumably, would be to scroll all the video . . . it struck me that that would be an impossible, at the very least absurdly cumbersome way to do it. And Catherine had specifically said that's not how they do it. They do the geotracking. The geotracking points to a call phone ID at a location. Then they look at the video. So at no point did it cross my mind that somehow we have video that is somehow divorced from the cell phone geotracking. We certainly had no evidence of this at all.

*Id*. ¶119.

### N. The *2000 Mules* Book

Following the premier of the film, numerous media outlets attacked the credibility of the film and attempted to "debunk" the film's geospatial analysis. *Id*. ¶121. Mr. D'Souza was so confident that these attacks were wrong that he included an entire chapter in his book countering the common criticisms. *Id*. ¶122. For example, in response to claims that the use of geotracking data was unreliable, he noted that geotacking has been used by Uber (to locate customers and drivers), the CDC (to verify social distancing), and even the Supreme Court, which stated that, "[w]hen the Government tracks the location of a cell phone, it achieves near perfect surveillance as if it had attached an ankle monitor to the phone's user." *Id*. ¶123. The book included a single image from the film showing Mr. Andrews in which he is 1.5 inches tall, with his blurred face measuring 3/16 of an inch. *Id.*

The book initially published on August 30, 2022, but Regnery independently decided to recall the book to remove the names of nonprofit organizations. *Id.* ¶124. The book re-published on October 25, 2022, not long after Mr. Andrews' counsel (the same attorney recommended by Mr. Germany), sent a cease-and-desist letter dated October 3, 2022, to Mr. D'Souza. *Id.* ¶125. However, by that time, the book was completely out of Mr. D'Souza's hands, and moreover, he remained convinced that the individuals in the video footage were geotracked mules. *Id.* ¶126.

### O. The Lawsuit and Revelations from Discovery

On October 26, 2022, Mr. Andrews filed this lawsuit. *Id.* ¶127. Mr. Phillips and Ms. Engelbrecht were deposed on September 17 and 18, 2024, and each testified that only the first batch of videos had been matched to geospatial data, and that the second batch containing videos of the Gwinnett County drop boxes (and, *ergo*, Mr. Andrews) had never been matched to the data. *Id.* ¶128. Mr. Phillips was clear, however, that Red Metrics *had* done the video/ data linking for the first batch of videos. *Id.* ¶129. Mr. D'Souza and his team were stunned. They had previously been given no reason to believe that any of the surveillance footage provided by TTV had not been geotracked. *Id.* ¶130. Indeed, in their depositions, Ms. Engelbrecht and Mr. Phillips were each unable to identify any time they had told Mr. D'Souza or anyone on his team that any of the videos had not been linked to geotracking data. *Id.*

A little over a month later, during the depositions of a Red Metrics' executive and analyst, each testified that Red Metrics was never able to successfully match *any* drop box surveillance video to the geotracking data. *Id.* ¶131. Instead, Red Metrics manually identified drop box video clips that looked suspicious to them and provided

those clips back to OpSec for them to perform further analysis.[12] *Id.* ¶132.

In response to these revelations, and for the first time appreciating that the video footage was not what he had always believed it to be (and what TTV claimed it to be to Mr. D'Souza, in the film, on Charlie Kirk, and on Tucker Carlson), Mr. D'Souza issued a public apology to Mr. Andrews, explaining that the inclusion of his image was based on inaccurate information, and correcting the claim that the video had been correlated to geolocation data. *Id.* ¶¶134–35.

## P. Identification of Mr. Andrews

Throughout discovery, Mr. Andrews has been unable to identify a single person that identified him from *2000 Mules* or any related media without first being told of Mr. Andrews' appearance in the film, such that they already knew he appeared in the film and were actively looking for him. *Id.* ¶136. This is unsurprising, as Mr. Andrews is only shown in a single clip for 8 seconds of the film's 1.5 hour run time, and during that time, both his face and the license plate of his car are blurred and visually small. *Id.* ¶137. Mr. Andrews was also unable to identify anyone who had called, texted, e-mailed, or mailed him about *2000 Mules* or any related interviews other than the reporters referenced *supra*. *Id.* ¶138.

Neither Mr. Andrews nor his coworkers were able to identify a single person who thought less of him due to *2000 Mules* or the associated interviews. *Id.* ¶139. Mr. Andrews did not stop voting after discovering *2000 Mules*, nor had anyone ever intimidated or threatened him for voting. *Id.* ¶140. To the extent he stopped voting

---

[12] Red Metrics communicated solely with Mr. Phillips and his son about the project, so Mr. D'Souza's team had no way to know this occurred. SMF ¶133.

in person, his change in voting habits started in 2020, well before *2000 Mules*, and was due to concerns over Covid. *Id*. ¶141. Mr. Andrews admitted that no one had ever put him in harm's way due to the movie or promotion of it. *Id*. ¶142.

## III.    ARGUMENT

### A. Summary Judgment Standard

"[S]ummary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56. The existence of some factual disputes between litigants will not defeat an otherwise properly ground motion for summary judgment; "the requirement is that there be no *genuine* issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis added).

### B. No question of fact exists as to the Claim for Defamation

Mr. Andrews' claim for defamation must be dismissed for two reasons. First, Mr. Andrews cannot show that a jury could find with convincing clarity that Defendants acted with the requisite level of fault in distributing the allegedly defamatory statements. Second, Mr. Andrews cannot satisfy the constitutional requirement that the alleged defamatory statement is "of and concerning" him.

#### 1.  The Elements of Defamation

To succeed in a libel action, a plaintiff must prove that the defendant published a defamatory statement about the plaintiff, the defamatory statement was false, the defendant was at fault in publishing it, and the plaintiff suffered actual injury from the statement. *Mathis v. Cannon*, 276 Ga. 16, 21 (2002).

#### 2.  Standard of Fault

At the heart of this case is the issue of fault. While the law protects those who have been defamed, it does not do so without balancing the need for our press and citizens to speak freely on matters of public concern because "First Amendment freedoms need breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 433, (1963); s*ee also Gertz v. Robert Welch, Inc*., 418 U.S. 323, 341 (1974) ("The First Amendment requires that we protect some falsehood in order to protect speech that matters."). It erects a high bar to recovery so the press and public may comment on important issues without "the pall of fear and timidity" that freewheeling defamation liability would cast. *New York Times Co. v. Sullivan*, 376 U.S. 254, 278 (1964).

In *Sullivan*, the Court stated that restrictions on libel did not enjoy "talismanic immunity" from constitutional scrutiny. *Id.* at 269. The Court held that public officials could recover damages only upon demonstrating "actual malice"—that is, that the defendant either had knowledge that the defamatory statement concerning the plaintiff's was false or recklessly disregarded whether it was false. *Id*. at 279–80. To further enhance this requirement, the *Sullivan* court compelled that actual malice be established with a "convincing clarity." *Id.* at 285–86.

A decade after *Sullivan*, in *Gertz*, the Court held that the states could define for themselves the standard of liability for a publisher of defamatory injuries to a private individual, so long as they did not establish liability without fault. 418 U.S. at 342. Pursuant to *Gertz*, in cases such as this one, where the plaintiff is a private figure, the appropriate standard of fault is determined by the state.

In this case, Georgia requires proof of actual malice under the state's conditional privileges statute, set forth in O.C.G.A. § 51-5-7. This statute identifies

privileged communications, including the "public interest privilege," which protects

> "[s]tatements made in good faith as part of an act in furtherance of the . . . entity's right of . . . free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern as defined in [O.C.G.A. § 9-11-11.1(c)]."

O.C.G.A. § 9-11-11.1(c)(2)-(4) defines an act in furtherance of free speech as:

> "[a]ny written or oral statement . . . made in . . . a public forum in connection with an issue of public concern"; or "[a]ny other conduct in furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public concern."

Public concern "is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004). Here, the statements at issue fall squarely within the statute. Indeed, few things could be of greater public concern than public confidence in elections, a fact underscored by the reporting on the issue after the 2020 election (SMF ¶143). *See, e.g., Thompson v. Trump*, 590 F. Supp. 3d 46, 79 (D.D.C. 2022) (Noting that "the outcome of the 2020 Presidential Election and election integrity" are "matters of public concern.").

### a. Actual malice must be proven here

Because the D'Souza Parties' statements were made in public forums (movie, book, and social media) and concerned a matter of public concern (election integrity), the statements are conditionally privileged under O.C.G.A. § 51-5-7(4). Accordingly, the privilege applies and may only be overcome by "clear and convincing" evidence that the statements were made with actual malice. *Neff v. McGee,* 346 Ga. App. 522, 527 (Ga. Ct. App. 2018). The burden is on the plaintiff

to prove actual malice. *Rabun v. McCoy*, 273 Ga. App. 311, 317–18 (2005).

### b. Actual Malice, explained

The standard of proof for actual malice is "extremely high." *Cottrell v. Smith*, 299 Ga. 517, 525–26 (Ga. 2016). As described by the Georgia Supreme Court:

> Actual malice in a constitutional sense is not merely spite or ill will, or even outright hatred; it must constitute actual knowledge that a statement is false or a reckless disregard as to its truth or falsity. . . Reckless disregard requires clear and convincing proof that a defendant was aware of the likelihood he was circulating false information. Thus, it is not sufficient to measure reckless disregard by what a reasonably prudent man would have done under similar circumstances nor whether a reasonably prudent man would have conducted further investigation. The evidence must show in a clear and convincing manner that a defendant in fact entertained serious doubts as to the truth of his statements.

*Id.* "Actual malice requires more than a departure from reasonable journalistic standards" or "a failure to investigate." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016). "Rather there must be some showing that the defendant purposefully avoided further investigation with the intent to avoid the truth." *Id.*

Where, on summary judgment, "the defendant[] denies any libel and … offer[s] proof that [it] had no reckless disregard of the truth or that there were any serious doubts as to the truth of the publication[,] the burden of proof shift[s] to the plaintiff to show that there was actual malice." *Murray v. Williams*, *supra*, at 867, citing *Rosenbloom v. Metromedia,* 403 U.S. 29, 30–31 (1971).

Actual malice is a "constitutional issue to be decided initially by the trial judge vis-à-vis motions for summary judgment and directed verdict." *Sigman v. Gove*, 169 Ga. App. 580, 583 (1964); *see also Rosanova v. Playboy Enters.*, 411 F. Supp. 440, 449 (S.D. Ga. 1976) ("because of the importance of free speech, summary judgment

23

is the **rule, not the exception**.") (emphasis original). Before the Court can deny a defendant's motion, it "must conclude that, based on the evidence asserted in the plaintiff's affidavits, 'a reasonable jury **could find** malice with convincing clarity." *Yiamouyiannis v. Consumers U. of United States*, 619 F.2d 932, 940 (2nd Cir. 1980), *cert. denied,* 449 U.S. 839 (1980) (emphasis original). This involves a higher standard than in normal summary judgment cases. *See Rebozo v. Washington Post Co.*, 637 F.2d 375, 381 (5th Cir. 1981) (holding that since "a jury verdict in a defamation case can only be supported when the actual malice is shown by clear and convincing evidence, rather than by a preponderance of evidence as in most other civil cases . . . the evidence and all the inferences drawn from the record when considering summary judgment motions must meet that higher standard").

### d. Actual malice did not exist during the production of *2000 Mules*

While much doubt exists today about the accuracy of including the surveillance footage of Mr. Andrews in *2000 Mules*, the relevant inquiry requires us to place ourselves in the shoes of what the D'Souza Parties knew **when the film was being made**, and to ask if the record shows facts whereby a jury could determine with *convincing clarity* that they had a "high degree of awareness of probable falsity." The record shows no such evidence and in fact, shows a filmmaker who, like all journalists and filmmakers, had to rely on his sources and authorities to do his job and did so with diligence and an interest in the truth:

- Mr. D'Souza relied on the voluminous evidence provided to him by TTV during the meeting in his home, which included a detailed presentation on methodology, data, maps, and videos, and claims that the video surveillance footage had been linked to geolocation data. SMF ¶¶18–19.

- He relied on the fact that TTV had previously presented the same research to law enforcement in pleas for investigations. *Id.* ¶¶10–11.

- He relied on the professional reputations and resumes of Ms. Engelbrecht and Mr. Phillips, which were outstanding. *Id.* ¶¶16, 22–25.

- He relied on Mr. Phillips' credible knowledge on the subject of geotracking, including his ability to respond clearly to questions on the topic. *Id.* ¶26.

- He relied on the affidavits provided by TTV that detailed the project, the $1.5 million spent on the project, and the experience and capabilities of Mr. Phillips and OpSec, including notable credentials relating to geotracking. *Id.* ¶¶28–34

- He relied on his own research into geotracking, used by law enforcement, the CDC, and Uber, and credited by the Supreme Court. *Id.* ¶¶35–36, 121–23.

- He relied on the credibility of TTV's presentation to Salem. *Id.* ¶¶37–38.

- He relied on TTV's statements in interviews filmed for *2000 Mules* and in media interviews, which included statements that Mr. Andrews was "profiled" and that the videos had been linked to geolocation data. *Id.* ¶¶56–57; 78, 90.

- He relied on communications with TTV, which included express references to the laborious process of linking the videos to the data. *Id.* ¶¶59–60.

- He relied on TTV's failure to, ever, notify him that any of the surveillance footage had not been geotracked, or to express any concerns over the use or characterization of the videos when previewing the film. *Id.* ¶¶63–65; 70–73.

These facts show that Mr. D'Souza had zero reason to doubt that the drop box surveillance videos provided by TTV were legitimate. Yet, Mr. Andrews has contended that actual malice exists because Mr. D'Souza did not himself undertake the data analysis, that he failed to consult with geolocation experts, that he relied on Mr. Phillips despite not knowing him well, and similar nitpicking. These complaints all amount to a judgment that a more perfect, meticulous job could have been done. But perfection is not required, and if it were, we would cease to have a functioning

press. Indeed, if Mr. D'Souza, or any journalist or filmmaker were required to personally analyze all data they relied on, consult with numerous experts, or find every possible fact that might be relevant, our news sources would be restrained out of existence.

As a matter of law, the failure to perform extensive, exhaustive research on sources and information is not required. Even a wholesale "failure to investigate" or an extreme departure from journalistic standards does not constitute actual malice. *Michel*, 816 F.3d at 703. Mr. Andrews simply has no basis to assert that 2000 Mules or the related books or media were produced with actual malice.

### e. Actual malice did not exist following publication of *2000 Mules*

The facts show that *nothing* had occurred at the time of publication indicating that Mr. D'Souza "in fact entertained serious doubts as to the truth of his statements." And because "[t]he actual malice inquiry is based on what the writer knew *when he wrote it*, and the claimant must show that the writer had a subjective awareness of probable falsity *when the material was published,*" the inquiry should end here. *Weaver v. Millsaps*, 370 Ga. App. 513, 516 (2024) (emphases added).

Nonetheless, Mr. Andrews has indicated during discovery that he intends to argue that the D'Souza Parties' post-publication conduct demonstrates actual malice. Such an argument is both legally irrelevant and factually misguided as the D'Souza Parties maintained their confidence in the accuracy of *2000 Mules* throughout the many months following publication.

During the spring of 2022, the SOS Office and Secretary Raffensperger were under intense scrutiny in court, by the public, and by Donald Trump for numerous

26

accusations of election mishandling. It goes without saying that the SOS Office was *highly* incentivized to disprove any assertion of widespread voting fraud. It was under this backdrop that on May 17, 2022, the Georgia SEB cleared Mr. Andrews. The SEB's exoneration of Mr. Andrews could only cause Mr. D'Souza to doubt the film or the book (or the related promotion of them) if Mr. D'Souza had a reason to credit the investigation. Here, he had no faith in the investigation, for good reason.

Not only was the SEB self-interested in clearing Mr. Andrews, the investigation itself was demonstrably inadequate. Indeed, it was clear that the investigator failed to obtain or consider the geotracking data that Mr. D'Souza believed to be the basis under which Mr. Andrews was included in the film. While today we know that Mr. Andrews was not geotracked, Mr. D'Souza had every reason at that point in time to believe that TTV had undertaken a painstaking geolocation analysis that correlated Mr. Andrews' cell phone ID to at least ten drop box visits, and also to the exact time and location of the surveillance video showing a masked, gloved person putting numerous ballots in a drop box. The SEB investigator did not consider any of these facts and cleared Mr. Andrews in a perfunctory house visit in which Mr. Andrews denied wrongdoing. Mr. D'Souza responded to the investigation with frustration at the Georgia SEB, not with concern that his film or his book were inaccurate. In short, Mr. D'Souza had every reason at that point in time to assume that if the SEB didn't want to find ballot fraud, it wouldn't.

Mr. Andrews is also likely to point to a text message from Mr. Phillips that

was brought to the attention of Mr. D'Souza in his deposition:



SMF ¶ 116. Mr. Andrews likely will contend that this text put Mr. D'Souza on notice that the Mr. Andrews had not been geotracked, and was not a ballot trafficker. Such a contention would be inaccurate. First, Mr. Phillips did *not* assert that the individual cleared by the SEB in the AJC article had not been geotracked. He said that he "didn't meet the threshold." This was, most reasonably, a concession that TTV may have provided D'Souza's team with some surveillance videos including individuals who had not been tracked to *ten* drop boxes and a non-profit, the criteria they had all previously agreed, including in the film itself, to be defined as a "mule."

Indeed, if Mr. Phillips intended to casually confess at that moment the bombshell revelation that the videos used in the film had not been linked to geotracking data, the rest of the same text message makes no sense. In the same text, he flat-out rejects the results of the investigation, asserting it "borders on the comical," notes that the individual was cleared based on nothing but is own denial, and reaffirms that TTV found nearly 250 mules going to ten or more dropboxes. The text itself did nothing to raise alarm bells that Mr. Andrews, or any other "mule" depicted in the film, had been improperly included or characterized. Moreover, Mr.

D'Souza had lived through months of events and discussions that made such a revelation an impossibility in his mind. *See* SMF ¶119.

Finally, Mr. Andrews is likely to contend that his demand letter should have put Mr. D'Souza on notice that his film was false. The letter, however, was perceived no differently than the SEB investigation. At that time, Mr. D'Souza had not been provided with *any* information indicating that Mr. Andrews had not been geotracked, and the SEB had cleared him based on nothing more than Mr. Andrews' own denial. Mr. D'Souza did not take the letter seriously because he was, at that time, highly confident that the film got it right, and that Mr. Andrews was a mule.[13] *See Id.* ¶126.

### f. Recent revelations

Ms. Engelbrecht and Mr. Phillips had, unequivocally, asserted to the D'Souza Parties that the videos they provided had been linked to geotracking data. *Id.* ¶18–19, 59–60. They raised no objection as to the video footage when they were shown a rough edit and asked to provide feedback, and they characterized the video of Mr. Andrews as that of a geotracked mule on the Charlie Kirk Show, the Tucker Carlson Tonight, and in *2000 Mules* itself. SMF ¶¶56–57, 63–65, 70–73, 78, 90.

Yet, in his deposition, Mr. Phillips and Ms. Engelbrecht claimed that the Gwinnett County videos had never been geotracked, a claim that had *never* been

---

[13] Actual malice cannot be inferred from a failure to retract. *See Pippen v. NBC Universal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013) ("[A]ctual malice cannot be inferred from a publisher's failure to retract a statement once it learns it to be false."); *Fairfax v. CBS Corp.*, 2 F.4th 286, 295 (4th Cir. 2021) (a publisher's failure to retract a statement upon request generally "is not probative of [the speaker's] state of mind at the time of publication.").

made prior to this deposition and which was wholly inconsistent with *everything* they had said and done in the years prior. *Id.* ¶128. A few weeks later, Red Metrics, the vendor that had done the video linking, testified that the company had been tasked with the project of linking the surveillance videos to the geolocation data, but they were unable to do it for *any* of the videos — not just Gwinnett County, but *any*.

It is difficult to conjure any interpretation of these events other than that TTV misrepresented particularly important facts to the D'Souza Parties — perhaps out of fear that the film would be cancelled without the surveillance video. Regardless, it does now seem that Mr. Andrews was never geotracked, and in fact, that *none* of the individuals depicted in the surveillance footage had been geotracked. This revelation has been shocking to the D'Souza Parties. Upon learning this information, Mr. D'Souza issued a public apology to Mr. Andrews, despite the inevitable media blowback that, predictably, has been intense and unfavorable to him personally. But, in Mr. D'Souza's words, it was the right thing to do. SMF ¶¶134–35.

And while cause exists *today* to doubt the accuracy of the use of the video surveillance footage used in *2000 Mules*, that is not the question. The inquiry is whether the D'Souza Parties entertained serious doubt as to the truth of their statements *at the time of publication. See, e.g., Hunt v. Liberty Lobby*, 720 F.2d 631, 647 (11th Cir. 1983) ("the inquiry focuses on the defendant's state of mind at the time of publication"); *Jones*, 290 Ga. App. at 132 ("The actual malice inquiry is based on what the writer knew when he wrote it"); *Neff*, 346 Ga. App. at 527 (holding that the trial court erred by considering post-publication facts). Here, there can be no jury question that, *at the time of publication,* the D'Souza Parties did not publish

with knowledge of falsity or with an awareness of probable falsity. Because they did not publish with actual malice, the defamation claim fails as a matter of law.

### 3. *2000 Mules* was not "Of and Concerning" Mr. Andrews

Mr. Andrews' defamation claim also fails because he cannot provide any facts showing that any statement attributable to the D'Souza Parties was "of and concerning" Mr. Andrews. This element fails for two reasons: (1) Mr. Andrews was not identifiable from the blurred image in the film or the book; and (2) the D'Souza Parties cannot be liable for any identification of Mr. Andrews that occurred as a result of extrinsic actions outside their control.

Defamatory words are not actionable unless they refer to someone, and do so clearly enough that those who hear or read the statement will understand the reference, a requirement referred to as the "of and concerning" element. The plaintiff bears the burden of showing that "the publication was about the plaintiff, that is, whether it was *of and concerning* her as a matter of identity." *Smith v. Stewart*, 291 Ga. App. 86, 92 (2008) (quotation marks and citation omitted).

Here, the record is clear that Mr. Andrews was blurred in the film, the book, and the trailer. The Tucker Carlson interview features unblurred footage (and, *ergo,* not from the film or trailer), but displayed in such a small, pixelated box that Mr. Andrews cannot be identified. In short, any image of Mr. Andrews that could arguably be attributable to the D'Souza Parties did not identify Mr. Andrews.

When asked in discovery to identify all individuals who recognized him from *2000 Mules*, Mr. Andrews identified several coworkers and family members. Discovery, however, revealed that not one person saw the film and identified Mr.

Andrews unless they did so *after* he told them he was in the film and they were *already aware* that he was the blurred individual. SMF ¶¶ 136–39. Moreover, Mr. Andrews' name was *not once* identified publicly in association with *2000 Mules* or its assertions until Mr. Andrews himself filed this lawsuit. There is absolutely no evidence that Mr. Andrews was actually identified by anyone, ever. *Id.* ¶ 107.

Mr. Andrews has alleged that he was identifiable in *2000 Mules* because two reporters attempted to communicate with him right after he was cleared by the SEB. It is clear, however, that the SEB investigation was initiated based on a complaint from Mr. Cross, who made the complaint based on his viewing of the April 8 Charlie Kirk Show, not his viewing of *2000 Mules*, which had not been released at the time of his April 25 complaint. *Id.* ¶¶ 95–98. It is also clear that Mr. Andrews' name was not released in connection with the SEB investigation, meaning that the reporters obtained his name in some other manner — perhaps from someone at the SOS office. *Id.* ¶103. In short, to the extent these two reporters were aware that Mr. Andrews was one of the individuals featured in *2000 Mules*, such awareness was based on events outside the control of the D'Souza Parties and unrelated to *2000 Mules*.

A defendant cannot be liable for libel if the plaintiff can only be identified through extrinsic investigation or facts. *Eakin v. Rosen,* 2017 U.S. Dist. LEXIS 194125, *7 (M.D. Ga. 2017) ("the defamed person must be able to be identified through the words contained in the defamatory statement — not through taking the additional step of submitting an open records request to obtain some extrinsic document"); *see also Aroonsakul v. Shannon,* 279 Ill.App. 3d 345, 351 (1996) (holding that statements were not "of and concerning" the plaintiffs because "[t]here

is no way to connect the statement, standing alone, to the plaintiffs" because it was "only through other information . . . over which [defendant] did not exercise any control, the plaintiffs could possibly be connected to the statement.").

The prohibition on the use of extrinsic evidence to identify a plaintiff is rooted in the constitution and *Gertz's* prohibition on imposing liability without fault. It is not enough for a libel plaintiff to prove that the defendant acted with the requisite degree of fault as to falsity, but also as to the "of and concerning" requirement. In other words, the plaintiff must prove that the defendant either knew that a reasonable observer would identify him or that the defendant was subjectively aware or negligent that the plaintiff would be identifiable. *See* ROBERT D. SACK, SACK ON DEFAMATION § 2:9.1 (5th ed. 2017) ("This rule permitting liability without fault for unintentional defamation has doubtless been attenuated by the rule in *Gertz* abolishing liability without fault.")[14]; *see also Greene v. Paramount Pictures Corp.*, 813 Fed. Appx. 728, 731–32 (EDNY 2018) (finding a lack of actual malice because "a reasonable jury could only find [that] defendants took appropriate steps to ensure that no one would be defamed by the Film"); *New England Tractor-Trailer Training, Inc. v. Globe Newspaper Co.*, 395 Mass. 471, 478 (Mass. 1985) ("While the plaintiff

---

[14] In upholding *Gertz*, courts applied the fault requirement to each element of libel claims. *See, e.g., Dworkin v. Hustler*, 867 F.2d 1188, 1194–95 (9th Cir. 1989) ("[I]f a speaker knowingly publishes a literally untrue statement without holding the statement out as true, he may still lack subjective knowledge or recklessness as to the falsification of a statement of fact required by *New York Times*"); *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 163 (Tex. 2004) (actual malice standard requires court to ask "did the publisher either know or have reckless disregard for whether the article could reasonably be interpreted as stating actual facts?").

need not prove that the defendant 'aimed' at the plaintiff, he or she must prove that the defendant was negligent in writing or saying words which reasonably could be understood to 'hit' the plaintiff.").

Here, to the extent anyone is presently aware that Mr. Andrews' image was used in *2000 Mules*, it is because either (1) he told the person himself, or (2) he filed this lawsuit. And the D'Souza Parties cannot be liable for the combined extrinsic actions of TTV, the Charlie Kirk Show, David Cross, and the SEB, whose collective activities may have resulted in two reporters identifying Mr. Andrews.

## C. Mr. Andrews cannot show that he was placed in a false light

In order to sustain a false light claim under Georgia law, a plaintiff must show that the defendant knowingly or recklessly published falsehoods about him and placed him in a false light that would be highly offensive to a reasonable person. *Smith v. Stewart*, 291 Ga. App. 86 (Ga. Ct. App. 2008); *see also Simpson v. Certegy Check Servs.*, 513 Fed. Appx. 843, 845 (11th Cir. 2013). In false light cases, "the interest protected is clearly that of reputation, with the same overtones of mental distress as in defamation." *Cabaniss v. Hipsley*, 114 Ga. App. 367, 370 (1966). "In order to survive as a separate cause of action, a false light claim must allege a nondefamatory statement. If the statements alleged are defamatory, the claim would be for defamation only, not false light invasion of privacy." *Bollea v. World Championship Wrestling*, 271 Ga. App. 555, 557 (1) (2005).

Mr. Andrews therefore cannot pursue both a libel claim and a false light claim based on the same statements, and, to the extent his false light claim is based on the same facts as his defamation claim, the false light claim must fail when the

defamation claim fails. *See Bollea v. World Championship Wrestling*, 271 Ga. App. at 557, n.1; *Smith v. Stewart*, 291 Ga. App. 86, 100 (2008).

Even if Mr. Andrews had an independent claim for false light, it could not survive because he cannot show actual malice. In *Time, Inc. v. Hill*, the Supreme Court held that in "false light" cases concerning communications about matters of legitimate public interest, the plaintiff must prove *New York Times* actual malice to prevail. 385 U.S. 374 (1967). *Time* is clear that no matter how any particular claim is characterized, if an invasion of privacy claim is brought in regards to a publication on a matter of public concern, the plaintiff must prove actual malice. As stated by the leading treatise on defamation, "Concerned that constitutional principles not be evaded simply by the relabeling of claims, courts have repeatedly held that constitutional standards applicable to defamation apply where the gravamen of a claim is false, harmful speech, even if the plaintiff calls it "invasion of privacy." SACK ON DEFAMATION § 12:1.2. As fully set forth above, no actual malice can be shown in this case.

**D. Mr. Andrews cannot show that his likeness was misappropriated**

Mr. Andrews' claim for misappropriation of likeness fails because (1) he was not identifiable, and (2) his image was taken in a public place and obtained from public records. "[A]n appropriation of likeness claim in Georgia consists of the following elements: [1] the appropriation of another's name and likeness, whether such likeness be a photograph or other reproduction of the person's likeness, [2] without consent, and [3] for the financial gain of the appropriator." *Bullard v. MRA Holding, LLC*, 292 Ga. 748, 752 (2013). Infringement relates to whether the defendants,

without consent "used some aspect of identity or persona in such a way that [plaintiff] *is identifiable* from defendant[s'] use." *Id.* (emphasis added).

### 1. Mr. Andrews was not identifiable

Here, Mr. Andrews was not recognizable, rendering judgment appropriate on his claim for misappropriation. Indeed, where a depiction is not recognizable, dismissal at the summary judgment stage is proper. *Collins v. Creative Loafing Savannah, Inc.*, 264 Ga. App. 675, 678 (2003). (concluding at summary judgment that an illustrated caricature was "unrecognizable as a 'real person'" and did not "really reflect on any particular individual"); *Branson v. Fawcett Publications*, 124 F. Supp. 429, 431–33 (E.D. Ill. 1954) (dismissing claim for misappropriation where picture at issue was "blurred" because, standing alone, the picture did not "identify the plaintiff" or any particular person); *Brauer v Globe Newspaper Co*. 351 Mass 53, 55, 58 (1966) (dismissing claim because plaintiff's image was taken with his face turned, such that "none of his features or facial characteristics is visible" and was only identified by "neighbors, friends, and family" who were "familiar with the circumstances under which the photograph was taken").

Here, no question of fact exists that Mr. Andrews' image was either blurred, or so small and of such poor quality, that he could not be recognized, and moreover, that he was not actually recognized by anyone independently. His image and likeness, therefore, were not misappropriated as a matter of law.

## 2.  The video was not private and was taken from public records

Mr. Andrews' "likeness" here is limited to the eight seconds of surveillance footage of him dropping off ballots. Because Mr. Andrews' voting was a non-private act done in public, and because the video was a public record, his claim must fail.

That which is "open to public observation," cannot be appropriated. *Toffoloni v. LFP Publishing Group, LLC*, 572 F.3d 1201, 1207 (11th Cir. 2009); *Pierce v. Warner Bros Entm't, Inc*., 237 F. Supp. 3d 1375, 1381 (MD Ga 2017) (dismissing misappropriation claim where television show displayed plaintiff's image from real estate billboard because the billboard was public). Relatedly, publication of a plaintiff's likeness, if obtained from public records, is not misappropriation. *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 494 (1975) ("We are reluctant to embark on a course that would make public records generally available to the media but forbid their publication if offensive to the sensibilities of the supposed reasonable man."); *Busener v. Leagle.com*, 2020 U.S. Dist. LEXIS 251635, *4 (N.D. Ga. 2020) ("[T]he publication of information or incidents that are matters of public record will not constitute a violation of any one's legal right to publicity.") (citations omitted).

Here, Mr. Andrews' video — which involved no inherently private action or facts — was taken in a public place, open to public observation, and obtained through a public records request. Accordingly, his claim fails.

## E.  No question of fact exists as to Civil Conspiracy

Mr. Andrews brought claims for conspiracy under 42 U.S.C. § 1985(3) ("Civil Rights Act") and civil conspiracy. Because conspiracy is a required element of the

Civil Rights Act, and because Mr. Andrews cannot show any evidence that a conspiracy existed, both claims fail.

To establish liability for a violation of the Civil Rights Act, "a plaintiff must show '(1) a conspiracy; (2) the purpose of which is to force, intimidate, or threaten; (3) an individual legally entitled to vote who is engaging in lawful activity related to voting in federal elections.' *Andrews v. D'Souza,* 696 F.Supp. 1332, 1346 (N.D. Ga. 2023) (quoting *Nat'l Coalition on Black Civil Participation v. Wohl*, 498 F. Supp. 3d 457, 486–87 (S.D.N.Y. 2020)). The Eleventh Circuit defines civil conspiracy as "an agreement between two or more people to achieve an illegal objective, an overt act in furtherance of that illegal objective, and a resulting injury to the plaintiff." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc). The Eleventh Circuit has applied this definition to the Civil Rights Act. *Wainberg v. Mellichamp*, 93 F.4th 1221, 1225 (11th Cir. 2024). Therefore, without a conspiracy, Plaintiff cannot recover under either claim.

To prove conspiracy, Plaintiff must first establish that there was an agreement. "It is by now axiomatic that a conspiracy requires a meeting of the minds between two or more persons to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.,* 206 F.3d 1031, 1036 (11th Cir. 2000). Moreover, "[t]here can be no conspiracy without a purpose, express or implied, to do something unlawful, oppressive, or immoral . . . ." *Zeal Glob. Servs. Priv. Ltd. v. SunTrust Bank*, 508 F. Supp. 3d 1303, 1314 (N.D. Ga. 2020) (internal quotations omitted). In other words, *intent* is required, and "[a]n allegation of a conspiracy to commit negligence is a non sequitur." *Nayani v. Bhatia*, 371 Ga. App. 44, 52 (2024).

Here, no fact exists that the D'Souza Parties engaged in an agreement with anyone to defame or to intimidate lawful voting. Instead, the D'Souza Parties reasonably relied upon TTV's evidence that Mr. Andrews illegally cast ballots in the 2020 election. For all of the reasons the D'Souza Parties did not act with actual malice, they did not engage in a conspiracy. In this case, both would require that the D'Souza Parties had an awareness that Mr. Andrews was a legal voter, such that their agreement to produce the film was done with an intent to deprive him of his rights or intimidate him. Nothing in the record shows that such awareness or intent existed.

Here, there was an agreement among all defendants to create, publish, and promote a film—a perfectly legal plan. Mr. D'Souza, in fact, believed that the purpose of the film was to uncover *illegal* voting and to prompt government action. This Court has already held that such an agreement is not enough to establish liability. *Andrews,* 696 F.Supp.3d at 1347–48 (dismissing claim against Salem because, "[w]hile there does not appear to be any dispute that the Salem Defendants had agreements to publish and promote the movie and book," the claim fails because no allegations assert "a conspiracy to prevent advocacy through intimidation . . ."). Moreover, the D'Souza Parties had an agreement with TTV that it could *not* share its surveillance footage with the media. To the extent the claims in this case are based on a theory under which the D'Souza Parties are liable for TTV's use of unblurred images, such uses were *directly contrary* to their agreement.

It's true that "[c]onspiracies are rarely evidenced by explicit agreements, and must almost always be proven by inferences that may be fairly drawn from the

behavior of the alleged conspirators." *DeLong Equip. Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989). However, after almost a year of discovery, evidence has borne out nothing to suggest even a tacit agreement to engage in unlawful activity. The record is also devoid of any facts showing that Mr. Andrews was actually injured as a result of this alleged conspiracy; indeed, he testified that no one has harmed him, no one has threatened him, and his voting activity is unchanged. SOF ¶¶140–43. For these reasons, the claim for conspiracy and the Civil Rights claim fail, and Mr. Andrews cannot hold the D'Souza Parties responsible for the statements or actions of TTV, Ms. Engelbrecht, or Mr. Phillips.

## IV.  CONCLUSION

In order to prevail on his claim for defamation and false light, Mr. Andrews must show that jury could find, with convincing clarity, that the D'Souza Parties published *2000 Mules*, and the related book, trailer, and media appearances, with a high degree of awareness of probable falsity. No evidence exists that could allow a reasonable jury to arrive at this conclusion. The evidence shows the opposite — that they produced a film with integrity and diligence, in hopes of making elections more secure and with no intent to cause any harm. To the extent the film got it wrong, the error was a result their reliance on parties they reasonably thought they could trust.

The case present no evidence of fault, no evidence of conspiracy, no evidence that Mr. Andrews was identifiable or actually identified by anyone, and no evidence that any actual harm was suffered by Mr. Andrews. Nothing here belongs in front of a jury, and the claims in this case must fail.

*[Signatures on following page]*

40

Respectfully submitted this 20th day of December, 2024,

/s/ *Amanda G. Hyland*

Amanda G. Hyland
Georgia Bar No. 325115
Austin C. Vining
Georgia Bar No. 362473
Cory Mull
Georgia Bar No. 595376
**BUCHALTER APC**
3350 Riverwood Pkwy SE, Ste. 1900
Atlanta, GA 30339
(404) 832-7350 Telephone
ahyland@buchalter.com
avining@buchalter.com
cmull@buchalter.com

*Attorneys for Defendants Dinesh D'Souza and D'Souza Media LLC*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D, counsel certifies that the foregoing was prepared in Times New Roman, 14-point font, in compliance with Local Rule 5.1C.

*/s/ Amanda G. Hyland*

Amanda G. Hyland
Georgia Bar No. 325115

*Attorney for Defendants Dinesh D'Souza and D'Souza Media LLC*