## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MARK ANDREWS,

            Plaintiff,

v.

DINESH D'SOUZA, TRUE THE VOTE, INC., CATHERINE ENGLEBRECHT, GREGG PHILLIPS, D'SOUZA MEDIA LLC, SALEM MEDIA GROUP, INC., REGNERY PUBLISHING, INC., and JOHN DOES,

            Defendants.

Case No. 1:22-CV-04259-SDG

## DEFENDANTS DINESH D'SOUZA AND D'SOUZA MEDIA LLC'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  Catherine Engelbrecht started a nonprofit, nonpartisan voter integrity organization called True the Vote ("TTV") in 2009. Ex. 1 (Deposition of Catherine Engelbrecht ("Engelbrecht Dep.")) at 18:14–17, 19:7–19.

2.  In the aftermath of the 2020 election, Ms. Engelbrecht believed data could be used to assess whether the use of drop boxes had been used to perpetuate voter fraud. Ex. 1 (Engelbrecht Dep.) at 42:5–43:2.

3.  Ms. Engelbrecht teamed up with Gregg Phillips because she had worked with him on other tech-intensive projects, and because Mr. Phillips owned a data analytics company, OpSec Group, and had previous experience on large-scale data analytics projects. Ex. 2 (Deposition of Gregg Phillips ("Phillips Dep.")) at 18:17–21, 26:12–22.

4.  For example, the development of voter-integrity-oriented software to facilitate incident reporting of suspicious behavior at polls. Ex. 1 (Engelbrecht Dep.) at 14:21–16:18; Ex. 2 (Phillips Dep.) at 27:13–24.

5.  Such projects included the development of Deloitte Consulting's healthcare analytics program. Ex. 2 (Phillips Dep.) at 19:4–8.

6.  On December 1, 2020, TTV entered into an agreement with OpSec to complete a Geospatial Data Analysis Project with the objective of "[l]everag[ing] historic and near real time behavioral mobility data to assist . . . in analyzing possible election process subversion." Ex. 2 (Phillips Dep.) at 45:5–7; Ex. 3 (TTV_009901–06 (Phillips Dep. Ex. 8)).

7.  Under the terms of the agreement, OpSec agreed to identify possible patterns of ballot harvesting through the analysis of cell phone geolocation data. Ex. 2 (Phillips Dep.) at 46:16–47:5; Ex. 3 (TTV_009901–06 (Phillips Dep. Ex. 8)) at TTV_009902.

8.  As part of this project, Ms. Engelbrecht submitted open records requests to the Georgia Secretary of State ("SOS") seeking the surveillance video tape from cameras recording Georgia ballot drop boxes. Ex. 4 (TTV_001018).

9.  Mr. Phillips, through OpSec, contracted with Red Metrics to procure and analyze mobile device geospatial data, including over 25 terabytes of data consisting of over 1.2 trillion mobile device pings collected from September 2020 through January 2021. Ex. 2 (Phillips Dep.) at 63:19–64:19, 65:15–66:1.

10. They tried to get the attention of authorities, but received a lackluster response, and each time, they were "pushed off and shoved aside." Ex. 1

(Engelbrecht Dep.) at 48:15–20, 49:13–50:7; Ex. 2 (Phillips Dep.) at 156:23–157:13, 171:24–172:7, 245:9–246:14, 246:18–247:25.

11.  Mr. Phillips first took the information to the FBI on March 25, 2021 and then to Governor Kemp, the GBI, and legislators, each time hoping that law enforcement would dig deeper into their findings. Ex. 1 (Engelbrecht Dep.) at 49:18–23, 50:3–7; Ex. 2 (Phillips Dep.) at 245:21–246:5.

12.  In light of law enforcement's disinterest, the pair decided to take their story directly to the public. Ex. 2 (Phillips Dep.) at 172:1–4, 246:24–247:5.

13.  To that end, Ms. Engelbrecht approached her friend, Debbie D'Souza, and asked if Mr. D'Souza would meet with her and Mr. Phillips to discuss a possible film based on TTV's research. Ex. 5 (DDR-00055287–88).

14.  Ms. Engelbrecht knew that Ms. D'Souza's husband, Dinesh D'Souza, was an award-winning documentary filmmaker. Ex. 6 (Deposition of Dinesh D'Souza ("Dinesh D'Souza Dep.")) at 19:5–6.

15.  Ms. Engelbrecht knew of Ms. D'Souza's passion for election integrity resulting from the election fraud that she had known in her home country of Venezuela. Ex. 7 (Deposition of Debbie D'Souza ("Debbie D'Souza Dep.")) at 24:6–17, 25:18–26:2.

16.  Mr. D'Souza had little knowledge about Mr. Phillips other than that he generally had a good reputation; however, he knew of Ms. Engelbrecht since she testified before Congress in 2014, and he understood her to be a competent expert on election issues. Ex. 6 (Dinesh D'Souza Dep.) at 23:14–20, 41:3–13.

17.    Consequently, the D'Souzas agreed to take the meeting, with Mr. D'Souza emphasizing the need for them to be able to prove their theories. Ex. 5 (DDR-00055287–88); Ex. 7 (Debbie D'Souza Dep.) at 25:24–26:2.

18.    In August of 2021, Ms. Engelbrecht and Mr. Phillips went to the D'Souza's home to discuss their investigation. Ex. 2(Phillips Dep.) at 244:23–245:8; Ex. 7 (Debbie D'Souza Dep.) at 46:18–20).

19.    Mr. Phillips showed the D'Souzas a presentation and supporting materials on his laptop, including background information and graphics explaining cell phone geotracking methodology, his data and maps depicting the geospatial data and pattern-of-life schematics, and drop box surveillance video clips, which all supported the theory that numerous individual cellphone ids, or IMEIs, could be correlated with multiple drop box visits. Ex. 6 (Dinesh D'Souza Dep.) at 63:9–64:8, 67:9–68:8, 72:1–12; Ex. 7 (Debbie D'Souza Dep.) at 46:13–20, 51:13–21, 52:2–12.

20.    Mr. D'Souza had not heard of geotracking and was initially skeptical; however, Mr. Phillips explained how the geotracking data could be matched to the time-stamped surveillance video to cross-check the two separate lines of inquiry. Ex. 6 (Dinesh D'Souza Dep.) at 64:9–16, 65:1–8, 65:16–21.

21.    The idea of matching the surveillance videos to the geotracking data particularly appealed to Mr. D'Souza because the surveillance video would provide visuals for effectively conveying these complex ideas to a film audience. Ex. 6 (Dinesh D'Souza Dep.) at 46:14–18, 48:1–9, 67:2–67:8, 87:24-88:6.

22.  During the meeting, Mr. D'Souza also probed Mr. Phillips's background and learned that he had held various positions in the corporate world as well as high-level positions within government, leading Mr. D'Souza to determine that Mr. Phillips was a "visible, competent managerial person Ex. 6 (Dinesh D'Souza Dep.) at 42:6–18.

23.  Mr. Phillips was the head of Human Services in Mississippi and the head of the Health & Human Services Commission in Texas. Ex. 6 (Dinesh D'Souza Dep.) at 42:11–16.

24.  Additionally, "Gregg represented to [Mr. D'Souza] that he had been, for not years, but decades, involved in election integrity and election intelligence," including "involvement in studying, monitoring, [and] investigating elections not just in the United States, but around the world." Ex. 6 (Dinesh D'Souza Dep.) at 42:19–43:3. *See also* Ex. 8 (DDR-00060740–876) at DDR-00060744; Ex. 9 (*2000 Mules* film) at 00:15:19–00:15:35, 00:15:51–00:16:21);[1] Ex. 9A (00:15:17–00:16:25 of DDR-00059987).[2]

25.  Mr. Phillips further insinuated that he had performed this work in conjunction with both intelligence agencies and law enforcement agencies. Ex. 6 (Dinesh D'Souza Dep.) at 43:4–9.

---

[1] The *2000 Mules* film has been produced both as a DVD (DD_000536) and as a digital copy (DDR-00059987) for the Court's convenience. The cited run times correspond to the digital copy.

[2] For the Court's convenience, separate clips have been created that encompass the cited portions of the larger work. For instance, Ex. 9A includes 00:15:17–00:16:25 of DDR-00059987, which encompasses both excerpts cited in Ex. 9 for Paragraph 24.

26.     Mr. Phillips also conveyed that he knew a great deal about geotracking, which he was able to corroborate by answering detailed questions on the topic. Ex. 6 (Dinesh D'Souza Dep.) at 43:18–44:2.

27.     The D'Souzas ultimately found the presentation to be convincing. Ex. 6 (Dinesh D'Souza Dep.) at 65:16–21, 66:10–67:8; Ex. 7 (Debbie D'Souza Dep.) at 208:9–13.

28.     Following the meeting, Ms. Engelbrecht sent the D'Souzas an email that included affidavits from both Ms. Engelbrecht and Mr. Phillips, for the purpose of explaining the project to the D'Souzas as comprehensively as possible. Ex. 1 (Engelbrecht Dep.) at 59:21–60:19; Ex. 10 (TTV_006817-920 (Phillips Dep. Ex. 9)).

29.     Mr. Phillips's draft affidavit (Ex. 10 (TTV_006817–920 (Phillips Dep. Ex. 9)) at TTV_006843–53) indicated that he had more than three decades of data analysis experience. Ex. 10 (TTV_006817–920 (Phillips Dep. Ex. 9)) at TTV_006844.

30.     This experience included the "us[e] of large data sets in fraud control, quality control, and identify resolution in voting-related cases and analysis," and previous "expert testimony on matters pertaining to mobile device geospatial and temporal data analysis, mobile device tracking, and law enforcement matters . . . includ[ing] testimony in front of the Foreign Intelligence Surveillance Court." Ex. 10 (TTV_006817–920 (Phillips Dep. Ex. 9)) at TTV_006844.

31.   It also indicated that OpSec Group utilized commercially available mobile device geospatial and temporal data to identify devices, such as cell phones, that had been located in close proximity to the 309 ballot drop boxes in Georgia by establishing geofences around those drop box and identifying cell phone pings within those boundaries. Ex. 10 (TTV_006817–920 (Phillips Dep. Ex. 9)) at TTV_006846–48.

32.   Through its analysis, OpSec Group identified 242 "devices of interest" that had each been located within 100 feet of one or more drop boxes on at least 10 occasions and within 100 feet of one or more organization suspected of ballot harvesting on multiple occasions. Ex. 10 (TTV_006817–920 (Phillips Dep. Ex. 9)) at TTV_006849.

33.   The documents also included maps individually tracking 10 different devices on as many as 53 visits to 14 different drop boxes and 35 visits to four suspected ballot harvesting organizations. Ex. 10 (TTV_006817–920 (Phillips Dep. Ex. 9)) at TTV_006851, TTV_006826–835.

34.   Ms. Engelbrecht's draft affidavit indicated that TTV had already spent $1.5 million on the investigation. Ex. 10 (TTV_006817–920 (Phillips Dep. Ex. 9)) at TTV_006840.

35.   In addition to reviewing the materials sent by Ms. Engelbrecht, Mr. D'Souza began researching geotracking on his own to vet the geotracking methodology. Ex. 6 (Dinesh D'Souza Dep.) at 73:2–11.

36.   Mr. D'Souza read articles that confirmed that geotracking is a valid technique that is employed by governments for law enforcement purposes and which

was used to track the movement of individuals during the pandemic. Ex. 6 (Dinesh D'Souza Dep.) at 39:11–20; Ex. 11 (DDR-00069542–67).

37.  As the final step in the vetting process, Mr. D'Souza set up a meeting for Mr. Phillips and Ms. Engelbrecht with Salem Media in October 2021, largely to see how their theories would hold up to probing questions from a diverse group of intelligent people, including Salem's attorney, Salem's past and present CEOs, and other media executives. Ex. 6 (Dinesh D'Souza Dep.) at 76:18–77:20, 78:1–3, 78:14–79:1; Ex. 7 (Debbie D'Souza Dep.) at 59:19–60:5.

38.  The presentation included maps of the mules traveling to numerous drop boxes, discussion of geotracking mules to violent protests, the use of geotracking to aid in Atlanta murder investigations, and surveillance video footage. Ex. 7 (Debbie D'Souza Dep.) at 60:21–61:19, 62:1–6, 62:25–63:3).

39.  The meeting went well, and Salem Media found both Mr. Phillips and Ms. Engelbrecht to be competent professionals. Ex. 12 (Philip Boyce Dep.) at 135:19–136:7).

40.  Additionally, Mr. D'Souza had a previous agreement to write two books for Salem Media, and Salem Media and Mr. D'Souza agreed that his second book under this agreement would be published by Salem's subsidiary, Regnery, as a companion piece to the film as he had done before with his previous film, *Hillary's America*. Ex. 6 (Dinesh D'Souza Dep.) at 293:1–16.

41.  Red Metrics was hired by OpSec to perform the geospatial analysis and the linking of that data to drop box surveillance video. Mr. Phillips testified that

Red Metrics engaged in the "arduous process . . . of trying to figure out was there a corresponding video that — that might match that individual at that box at that time" as a means to provide a clearer picture of the patterns they were seeing in the data. Ex. 2 (Phillips Dep.) at 81:21–82:9, 144:14–20.

42. The process was labor intensive with an estimated 12 analysts working 16-hour days for 15 months, and progress was hampered by numerous technical challenges. Ex. 2 (Phillips Dep.) at 91:17–93:2.

43. For example, TTV had more than 5 million minutes of raw video, which could not be analyzed without extremely powerful computing resources. Ex. 2 (Phillips Dep.) at 168:9–15.

44. Additionally, much of the footage was of poor quality, the cameras were poorly positioned, the files could not be opened without special software, or footage was simply missing because certain drop boxes lacked surveillance cameras even though they were required by law. Ex. 2 (Phillips Dep.) at 146:9–147:21.

45. Mr. Phillips testified that Red Metrics was able to find 70 video clips corresponding to the 242 devices identified through the geotracking analysis. Ex. 2 (Phillips Dep.) at 85:1–8; 144:21–24, 146:6–9.

46. On December 5, 2021, Ms. Engelbrecht revealed to Ms. D'Souza that TTV had sent a series of complaints to the Georgia SOS in which TTV disclosed its investigation and findings. Ex. 13 (TTV_007145–48).

47. Mr. D'Souza and Mr. Schooley were concerned that such disclosures might "spill the beans" and spoil the movie. Ex. 1 (Engelbrecht Dep.) at 133:6–9;

Ex. 14 (DDR-00045315–18); Ex. 15 (TTV_007191–99 (Phillips Dep. Ex. 23)) at TTV_007199.

48.  Accordingly, on January 7, 2022, D'Souza Media and Salem Media Group, Inc. executed a licensing and nondisclosure agreement with TTV, with an effective date of December 3, 2021, relating to the footage in TTV's possession that purportedly contained evidence of voting irregularities occurring in the 2020 election. Ex. 16 (DDR-00046930–37).

49.  Notably, the agreement expressly prohibited TTV and its representatives from disclosing the surveillance film or its contents to anyone prior to the public release of the film. Ex. 16 (DDR-00046930–937) at DDR-00046932–33.

50.  Mr. D'Souza inserted this provision into the contract because he wanted to ensure that his film would be the only source for this valuable geotracked footage. Ex. 6 (Dinesh D'Souza Dep.) at 87:20–88:11, 153:7–9; 205:21–24, 207:18–208:16.

51.  Interest in the film would evaporate if the public could see the footage simply by going online. Ex. 6 (Dinesh D'Souza Dep.) at 87:20–23, 88:7–11, 207:18–208:16; Ex. 17 (Deposition of Bruce Schooley ("Schooley Dep.")) at 25:4–9; Ex. 14 (DDR-00045315–18) at DDR-00045315.

52.  On January 9, 2022, the day after the agreement was executed, Mr. Phillips provided the initial batch of 70 videos that he asserted had been previously matched to the 242 geotracked devices to D'Souza Media's video editor, Nathan Frankowski, via Dropbox. Ex. 18 (TPNF-0002744); Ex. 19

(Deposition of Nathan Frankowski ("Frankowski Dep.")) at 60:20–61:4; Ex. 2 (Phillips Dep.) at 144:21–24.

53. While TTV's research was meant to be the backbone of the film, Mr. D'Souza had envisioned from the beginning that the film would have a wider scope which would include experts who could corroborate TTV's investigation and enhance the film's themes. Ex. 6 (Dinesh D'Souza Dep.) at 79:7–12.

54. For example, Mr. D'Souza interviewed numerous experts for possible inclusion in the film and to corroborate TTV's theories. Ex. 6 (Dinesh D'Souza Dep.) at 38:1–17, 82:6–18, 133:1–8, 174:9–15.

55. Mr. D'Souza was repeatedly "reassured, even by some people who did not like Catherine and Gregg personally, that their work was excellent." Ex. 6 (Dinesh D'Souza Dep.) at 134:3–6.

56. Mr. D'Souza filmed unscripted interviews with Ms. Engelbrecht and Mr. Phillips for inclusion in the movie, both one-on-one in his studio in Texas, and in a session in Los Angeles with several prominent media figures. Ex. 1 (Engelbrecht Dep.) at 182:7–184:1; Ex. 2 (Phillips Dep.) at 238:15–239:2; Ex. 8 (DDR-00060740–876); Ex. 9 (*2000 Mules* film) at 00:08:04–00:08:20 (introducing Salem Media hosts Larry Elder, Dennis Prager, Eric Metaxas, Sebastian Gorka, and Charlie Kirk, who each participated in the Los Angeles interview), 00:15:51–00:47:25 (Texas interview between Mr. Phillips, Ms. Engelbrecht, Mr. D'Souza, and Ms. D'Souza), 00:52:27–00:58:31 (Los Angeles interview with Mr. Phillips, Ms. Engelbrecht, Mr. D'Souza, Larry Elder, Dennis Prager, Eric Metaxas, Sebastian Gorka, and Charlie Kirk); Ex.

9B (00:08:02–00:08:22 of DDR-00059987); Ex. 9C (00:15:44–00:47:27 of DDR-00059987); Ex. 9D (00:52:22–00:58:35 of DDR-00059987);  Ex. 20 (DDR-00054319–32).

57.  During the interviews, Ms. Engelbrecht was clear that the video surveillance footage that they had provided had been linked to geotracked cell phones: "What kicks it up a notch is that we have the geospatial data to support the video." Ex. 8 (DDR-00060740–876) at DDR-00060772–73; Ex. 9 (*2000 Mules* film) at 00:36:31–00:36:40; Ex. 9E (00:36:31–00:36:55 of DDR-00059987). Mr. Phillips, looking at a surveillance video, then states, "this particular individual, we have in a number of different locations . . . he's actually a mule." Ex. 9 (DDR-00059987) at 00:36:41–00:36:50); Ex. 9E (00:36:31–00:36:55 of DDR-00059987).

58.  In their interview, they also discussed the criteria for a "mule": only phones that had been to ten separate drop boxes and to at least one liberal non-profit organization would qualify for purposes of the film. Ex. 8 (DDR-00060740–876) at DDR-00060760; Ex. 9 (*2000 Mules* film) at 00:25:24–00:25:38, 00:43:50–00:44:11); Ex. 9F (00:25:16–00:25:40 of DDR-00059987); Ex. 9G (00:43:44–00:44:20 of DDR-00059987).

59.  As progress continued, Ms. D'Souza requested additional surveillance videos for the film. Ex. 21 (TTV_007271); Ex. 22 (TTV_007276–77 (Engelbrecht Dep. Ex. 49)).

60.  Ms. Engelbrecht balked at this request because it was so "time consuming" to link the videos to the date:

**1) Video footage and how many can we realistically have. We want to show the mules…
all of what you have that works.**

*We have around 70 videos currently separated out and are scaling efforts to review more.
This is **incredibly** time consuming because it involves reading the geospatial data to try and
find a match in really poorly detailed county video, so only analysts can do this. It is difficult
to know how many more we will have. We have lots of footage, but finding the pieces that
work is difficult. We need to understand what you need, how you want to use it, and the
**deadline** by which you need it. Here are some ideas:*

Ex. 22 (TTV_007276–77 (Engelbrecht Dep. Ex. 49)) at TTV_007276.

61.    As a potential shortcut, Ms. Engelbrecht offered instead clips from their
"general footage" that had not been matched to geotracking results. Ex. 6
(Dinesh D'Souza Dep.) at 163:2–6; Ex. 22 (TTV_007276–77 (Engelbrecht
Dep. Ex. 49)) at TTV_007276.

62.    Mr. D'Souza had no interest in general footage and only wanted footage of
persons that met the mule selection criteria. Ex. 6 (Dinesh D'Souza Dep.) at
164:17–165:12.

63.    Eventually, on March 27, 2022, Mr. Frankowski received a hard drive
containing the second and final batch of surveillance video clips from TTV.
Ex. 1 (Engelbrecht Dep.) at 353:10–18; Ex. 6 (Dinesh D'Souza Dep.) at
165:13–16; Ex. 19 (Frankowski Dep.) at 85:11–19.

64.    This hard drive contained the footage obtained from the Gwinnett County
drop box, including the footage of Mr. Andrews. Ex. 1 (Engelbrecht Dep.) at
168:10–12, 187:23–190:17, 197:2–8.

65.    There was no note that these videos had not been geotracked, no discussion
that they had not been geotracked, and no reason for anyone on the D'Souza
team to believe they were not geotracked. Ex. 1 (Engelbrecht Dep.) at 190:11–

25, 191:5–12; Ex. 2 (Phillips Dep.) at 255:10–256:7 Ex. 6 (Dinesh D'Souza
Dep.) at 161:22–162:16, 163:23–165:12; Ex. 7 (Debbie D'Souza Dep.) at
120:9–13, 120:21–121:2, Ex. 19 (Frankowski Dep.) at 62:20–23, 71:1–6.

66.  With the second batch of footage in their possession, Mr. D'Souza and his
team began working on the rough cut, but first the team had to resolve the
question of whether the faces of the mules should be blurred to conceal their
identities. Ex. 6 (Dinesh D'Souza Dep.) at 128:3–16.

67.  While Mr. D'Souza initially did not want to blur (fearing it would affect the
credibility of the film), Mr. D'Souza was ultimately persuaded because the
film was not about unveiling individual mules, but instead on the larger,
publicly significant question of whether organized fraud had occurred. Ex. 6
(Dinesh D'Souza Dep.) at 123:9–125:3, 127:8–15; 128:3–16; Ex. 17
(Schooley Dep). 88:8–89:2.

68.  Once the decision was made, the team was "very careful and very diligent"
about blurring potentially identifiable details because the team was "obsessed
with not identifying anybody" and wanted to ensure that they did not "invade
their privacy that way." Ex. 7 (Debbie D'Souza Dep.) at 166:22–167:1,
167:13–15, Ex. 17 (Schooley Dep.) at 88:8–9, 88:18.

69.  Not only did the team blur the mules' faces, but they also blurred other
potentially identifiable details, including a dog, a woman's t-shirt, license
plates on cars, and other markings on cars. Ex. 7 (Debbie D'Souza Dep.) at
166:17–21, Ex. 17 (Schooley Dep.) at 88:1–9; Ex. 9 (*2000 Mules* film) at
00:37:01–00:37:28 (blurred man's face), 00:39:00–00:39:11 (blurring several

faces, license plates of cars, rear bumper area of tan sedan, headlight and driver side of grey SUV), 00:39:13–00:40:35 (blurring woman's face and t-shirt graphic), 00:40:48–00:41:50 (blurring man's face), 00:41:55–00:42:45 (blurring man's face and dog) 00:42:51–00:43:11 (blurring man's face), 00:43:17–00:43:35 (blurring numerous faces), 00:44:11–00:44:26 (blurring man's face and sweatshirt graphic), 00:44:27–00:44:36 (blurring woman's face), 00:44:37–00:44:47 (blurring man's face), 00:47:25–00:47:48 (blurring man's face), 00:47:58–00:48:05 (blurring several faces, including Mr. Andrew's face, and the license plate of Mr. Andrew's car), 00:48:06–00:48:21 (blurring numerous faces and license plates); Ex. 9H (00:36:55–00:48:33 of DDR-00059987).

70. By early April, the rough cut of the film had been completed, followed by the final cut in late April. Ex. 6 (Dinesh D'Souza Dep.) at 153:23–25.

71. Mr. Phillips and Ms. Engelbrecht viewed the rough cut in the D'Souzas' home and were given an opportunity to provide their feedback. Ex. 1 (Engelbrecht Dep.) at 208:25–209:7; Ex. 2 (Phillips Dep.) at 176:20–177:1.

72. The pair also attended a pre-screening of the movie in Mar-a-Lago with Mr. Trump. Ex. 1 (Engelbrecht Dep.) at 227:13–16; Ex. 2 (Phillips Dep.) at 177:2–5.

73. Ms. Engelbrecht provided some small suggestions, but Mr. Phillips did not share any concerns or perceived inaccuracies with the team. Ex. 1 (Engelbrecht Dep.) at 211:14–213:23; Ex. 2 (Phillips Dep.) at 177:6–21, 177:25–178:11; Ex. 23 (TTV_007347–48 (Engelbrecht Dep. Ex. 53)) at

TTV_007347; Ex. 24 (DDR-00049438–39 (Engelbrecht Dep. Ex. 57)) at DDR-00049439.

74. On April 8, 2022, before the release of the film, talk show host Charlie Kirk aired an interview with Mr. Phillips and Ms. Engelbrecht. Ex. 2 (Phillips Dep.) at 87:18–22, 270:9–15; Ex. 25 (MA-0000479–82) at MA-0000479; Ex. 26 (MA-0000550–53) at MA-0000550.

75. During the interview, no reference was made to *2000 Mules*. Ex. 7 (Debbie D'Souza Dep.) at 204:17–25; Ex. 28 (Charlie Kirk interview (Phillips Dep. Ex. 1)).

76. Indeed, Mr. Phillips and Ms. Engelbrecht appeared on the show to promote TTV's research. Ex. 1 (Engelbrecht Dep.) at 294:19–295:1; Ex. 2 (Phillips Dep.) at 87:18–22; Ex. 28 (Charlie Kirk interview (Phillips Dep. Ex. 1)).

77. Mr. and Ms. D'Souza did not consent to the interview, and only became aware of the interview after it had occurred. Ex. 6 (Dinesh D'Souza Dep.) at 205:21–206:23, 217:11–218:6; Ex. 16 (DDR-00046930–37) at DDR-00046932–33; Ex. 27 (DD-000469–512 (February 29, 2024 Declaration of Patricia Jackson)) at DD-000473, ¶18; Ex. 29 (DDR-00055834–37) at DDR-00055836.

78. During the interview, Mr. Kirk displayed an unblurred video of Mr. Andrews dropping ballots into a ballot box. Ex. 1 (Engelbrecht Dep.) at 301:5–10, 308:19–23; Ex. 2 (Phillips Dep.) at 110:1–7; Ex. 28 (Charlie Kirk interview (Phillips Dep. Ex. 1)) at 00:25:00–00:25:48; Ex. 28A (00:24:51–00:25:54 from Ex. 28). Mr. Kirk asks, "So this is a mule . . . one of the 2000 that you profiled?" to which Ms. Engelbrecht replied, "Yes." Ex. 28 (Charlie Kirk

interview (Phillips Dep. Ex. 1)) at 25:09–25:13; Ex. 28A (00:24:51–00:25:54 from Ex. 28).

79. That video of Mr. Andrews was not provided by the D'Souza Defendants or anyone associated with them. Ex. 6 (Dinesh D'Souza Dep.) at 209:24–210:14, 214:17–215:20, 216:10–217:3, 217:11–218:6; Ex. 29 (DDR-00055834–37) at DDR-00055836; Ex. 30 (DDR-00052769); Ex. 31 (DDR-00049450–51(Phillips Dep. Ex. 10)) at DDR-00049451.

80. They could not have provided the footage because the D'Souzas only found out about the interview after the fact and could not have provided footage for use on an episode they knew nothing about. Ex. 6 (Dinesh D'Souza Dep.) at 217:11–19.

81. Mr. Phillips and Ms. Engelbrecht deny that they provided the film to the Charlie Kirk show. Ex. 1 (Engelbrecht Dep.) at 308:15–18; Ex. 2 (Phillips Dep.) at 133:2–6, 133:17–21.

82. Ms. Engelbrecht insinuated that Mr. Kirk had the videos from "the ad in GA." Ex. 31 (DDR-00049450–51(Phillips Dep. Ex. 10)) at DDR-00049451.

83. The same video depicting Mr. Andrews's image was also shown as part of an ad for Get Georgia Right featured in the same Charlie Kirk episode Ex. 28 (Charlie Kirk interview (Phillips Dep. Ex. 1)) at 00:50:52–00:51:15; Ex. 28B (00:50:45–00:51:22 of Ex. 28).

84. Days after the Charlie Kirk interview, on April 20, Ms. Engelbrecht and Mr. Phillips appeared in another interview with Gateway Pundit that, again, had been coordinated without consulting the D'Souzas and, again, showed the

same Get Georgia Right ad, including unblurred footage of Mr. Andrews. Ex. 7 (Debbie D'Souza Dep.) at 91:21–92:8; Ex. 27 (DD-000469–512 (February 29, 2024 Declaration of Patricia Jackson)) at DD_000471, ¶11 (indicating that the D'Souzas' publicist, Patricia Jackson, only began to setup interviews beginning on April 24, 2022 — after the Gateway Pundit appearance); Ex. 32 (Gateway Pundit interview) at 00:06:13–00:06:49; Ex. 32A (00:06:06–00:06:56 of Ex. 32).

85. In that interview, after showing the ad, Mr. Phillips stated that when Get Georgia Right offered him an opportunity to advise them, "maybe share a little bit of information, a little bit of video, . . . I was happy to do it," identifying himself as the source of the unblurred drop box footage in the advertisement. Ex. 32 (Gateway Pundit interview) at 00:10:30–00:10:42; Ex. 32B (00:10:19–00:10:44 of Ex. 32). *See also* Ex. 32.1 (Defendant Gregg Phillips's Responses and Objections to Defendant Dinesh D'Souza's First Set of Interrogatories), p. 8 ("Phillips also provided Robert Cahaly certain publicly available videos in approximately that same timeframe which may or may not have contained the video of Plaintiff . . ."); Ex. 32.2 (GGR-000001–03) at GGR-000002, (Get Georgia Right PAC's Supplemental Responses to Requests for Production of Documents indicating that Robert Cahaly is affiliated with Invictus Strategies and Paperless Campaigns and was involved with compliance review of the above referenced Get Georgia Right PAC advertisement.); Ex. 32.3 (GGR-000004–06) at GGR-000005 (Text messages from Robert Cahaly to Tim Beall seeking compliance advice for the Get Georgia Right PAC ad).

86.  Ms. Engelbrecht coordinated the trailer's initial release on April 23, 2022 to coincide with a political rally, at which Mr. Trump spoke about True the Vote and 2000 Mules. Ex. 1 (Engelbrecht Dep.) at 247:19–248:5; Ex. 33 (TTV_007432–34 (Engelbrecht Dep. Ex. 62)) at TTV_007432.

87.  The trailer included a two-second clip showing Mr. Andrews with his face blurred. Ex. 34 (DDR-00000068 (*2000 Mules* trailer)) at 00:01:43–00:01:45; Ex. 34A (00:01:42–00:01:46 of Ex. 34).

88.  On May 4, 2022, the *2000 Mules* film premiered at Mar-a-Lago, which was followed by the virtual premier on May 7. Ex. 35 (TTV_007439–41 (Engelbrecht Dep. Ex. 59)) at TTV_007440; Ex. 36 (DDR-00014532); Ex. 37 (DDR-00005285-356) at DDR-00005285.

89.  In the film, Mr. Andrews's face and the license plate on the vehicle (which could have belonged to any of the people in line) were blurred:



Ex. 9 (*2000 Mules* film) at 00:48:04.

90.     Two days after the *2000 Mules* film premiered at Mar-a-Lago, Ms.
        Engelbrecht appeared on Tucker Carlson's show. Ex. 38 (Tucker Carlson
        interview). Ms. Engelbrecht was unequivocal during the interview that "we
        are able to match the drop box pings with the video, and you see it for
        yourself." Ex. 38 (Tucker Carlson interview) at 00:03:17–00:03:23; Ex. 38A
        (00:03:16–00:03:24 of Ex. 38).

91.     And, again, this interview was coordinated without involving the D'Souzas or
        their publicist, Patricia Jackson. Ex. 1 (Engelbrecht Dep.) at 277:25–278:9;
        Ex. 27 (DD-000469–512 (February 29, 2024 Declaration of Patricia Jackson))
        at DD_000472, ¶14.

92.  The D'Souzas thought that the purpose of the interview was to promote the film; however, they were stunned to find out that Ms. Engelbrecht never mentioned the film — nonetheless, someone on Mr. D'Souza's media team uploaded the interview to Mr. D'Souza's Rumble account without even watching it, mistakenly assuming that the interview promoted *2000 Mules*. Ex. 1 (Engelbrecht Dep.) at 278:10–21; Ex. 6 (Dinesh D'Souza Dep.) at 222:16–223:3, 223:8–12, 224:6–11, 225:23–227:9; Ex. 35 (TTV_007439–41 (Engelbrecht Dep. Ex. 59)) at TTV_007440; Ex. 36 (DDR-00014532).

93.  During the interview, unblurred footage of Mr. Andrews was once again shown, and, again this footage did not originate from the D'Souzas or D'Souza Media. Ex. 38 (Tucker Carlson interview) at 00:00:45–00:01:11; Ex. 38B (00:00:43–00:01:12 of Ex. 38).

94.  The footage used by Tucker Carlson was in a small box, such that the actual image of Mr. Andrews is extraordinarily small, rendering Mr. Andrews no more recognizable than he would have been if he had been blurred:



Ex. 38 (Tucker Carlson interview) at 00:01:10.

95.    Unbeknownst to the D'Souzas, David Cross, a Gwinnett County citizen activist, conducted his own independent election integrity research, including open records requests for drop box surveillance video. Ex. 6 (Dinesh D'Souza Dep.) at 33:3–8; Ex. 7 (Debbie D'Souza Dep.) at 139:24–140:3; Ex. 39 (November 11, 2024 Declaration of David Cross) at ¶¶ 3–10.

96.    Seeing TTV's appearance on the Charlie Kirk show, Mr. Cross became concerned by the allegations because he recognized the drop box shown during the interview as the same drop box he had seen in footage that he had previously acquired through open records requests. Ex. 39 (November 11, 2024 Declaration of David Cross) at ¶¶ 8–10, 17, 19.

97.    Mr. Cross was able to locate in his own possession the same footage of Mr. Andrews that was depicted in the interview, and he filed a complaint with the Georgia State Elections Board ("SEB") on April 25, 2022, to seek an

investigation. Ex. 39 (November 11, 2024 Declaration of David Cross) at ¶¶ 20–22, 24; Ex. 40 (TTV_008231–84) at TTV_008233–37, TTV_008254–57, TTV_008272–75; Ex. 41 (TTV_010051–91) at TTV_010059.

98. Mr. Cross's complaint, relying on his own, *independently-obtained* Gwinnett County surveillance footage*,* included the license plate number of Mr. Andrews' SUV, through which the SOS was able to identify Mr. Andrews as the vehicle's owner. Ex. 40 (TTV_008231–84) at TTV_008233, TTV_008239.

99. The SOS investigated Mr. Andrews by interviewing him once, during which he asserted that he had only dropped off ballots of his household. Ex. 40 (TTV_008231–84) at TTV_008239, TTV_008246–51.

100. Even though the complaint against Mr. Andrews specifically referenced True the Vote's research and the use of geotracking to identify voter fraud based on cell phone pings, the investigator made no attempt to collect geospatial evidence, let alone perform geospatial analysis, nor did he seek assistance or resources necessary to do so. Ex. 40 (TTV_008231–84) at TTV_008233, TTV_008239.

101. The investigator found no sign of any wrongdoing. Ex. 40 (TTV_008231–84) at TTV_008240, TTV_008243; Ex. 41 (TTV_010051–91) at TTV_010078–82; Ex. 42 (MA-0001291–92) at MA-0001292; Ex. 43 (PDSA-0000345–69) at PDSA-0000361–64.

102. The SEB subsequently held a hearing on May 17, 2022 at which time the complaint against Mr. Andrews was dismissed, but only after the *2000 Mules*

film had premiered at Mar-a-Lago on May 4, 2022 and virtually on May 7, 2022. Ex. 35 (TTV_007439–41 (Engelbrecht Dep. Ex. 59)) at TTV_007440; Ex. 36 (DDR-00014532); Ex. 41 (TTV_010051-091) at TTV_010078–82; Ex. 42 (MA-0001291–92) at MA-0001292; Ex. 43 (PDSA-0000345–69) at PDSA-0000361–64.

103. No one at the hearing mentioned or identified Mr. Andrews by name. Ex. 41 (TTV_010051–91); Ex. 43 (PDSA-0000345–69).

104. On the same day, Ryan Germany, the General Counsel at the SOS Office, texted Mr. Andrews and warned him that he would receive press inquiries. Ex. 44 (MA-0000028).

105. Mr. Jeremy also offered the name of an attorney, Von DuBose, and suggested Mr. Andrews should call him. Ex. 44 (MA-0000028).

106. Between May 16 and 23, 2022, two reporters, Amy Gardner and Ali Swenson, attempted to talk to Mr. Andrews. Ex. 45 (MA-0000027, MA-0000038, MA-0000078, MA-0000089).

107. Mr. Andrews did not return their calls, and neither reporter ever authored a news article mentioning Mr. Andrews by name, and in fact no news article written by anyone referenced Mr. Andrews by name prior to the filing of this lawsuit. Ex. 45 (MA-0000027, MA-0000038, MA-0000078, MA-0000089); Ex. 46 (MA-0001562–69); Ex. 47 (Plaintiff Mark Andrews' First Supplemental Response and Objections to Defendant Dinesh D'Souza's First Requests for Admission to Plaintiff), pp. 4-5 (Plaintiff admitting that he is not aware of any news report published prior to the filing of this lawsuit that

identified him by name in response to Plaintiff's Request for Admission No. 4).

108. At some point, Mr. D'Souza became aware of the SEB's investigation because he saw a Twitter post with a video of the proceeding. Ex. 6 (Dinesh D'Souza Dep.) at 259:9–25.

109. His immediate thought was, "This is not what I would call an investigation," because the state had done no more than the "irresponsible bare minimum." Ex. 6 (Dinesh D'Souza Dep.) at 260:5–7, 262:17–24.

110. He found the state's effort to be wholly perfunctory, an investigation of a single incident, not "an investigation of the phenomenon that is very seriously presented in the movie." Ex. 6 (Dinesh D'Souza Dep.) at 260:22–261:13, 262:19–21.

111. Even prior to this investigation, Mr. D'Souza had already been suspicious of Secretary Raffensperger's motives because Mr. D'Souza believed that Mr. Raffensperger enabled the ballot trafficking in the first place by entering into a consent decree that weakened ballot signature-matching requirements. Ex. 8 (DDR-00060740–876) at DDR-00060790–91; Ex. 48 (DDR-00052128–35) at DDR-00052129.

112. Additionally, Secretary Raffensperger was under pressure from within his own party for the perceived failure to root out fraud. Ex. 49 (MA-0001646–49) at MA-0001647.

113. Republican senatorial candidates Kelly Loeffler and David Perdue both called for Secretary Raffensperger's resignation for "fail[ing] to deliver honest and

transparent elections," and Donald Trump declared Secretary Raffensperger "an enemy of the people." Ex. 49 (MA-0001646–49) at MA-0001647; Ex. 50 (PDSA-0002388).

114. While Mr. D'Souza appreciated that the investigation might be connected to the film, it never occurred to him that the investigation could possibly relate to the same surveillance footage that was included in the film because the film had only been released a few days prior, and all of the footage included in the film had been blurred to render the mules completely unrecognizable. Ex. 6 (Dinesh D'Souza Dep.) at 261:18–25, 263:11–25, 268:4–9, 268:24–269:8).

115. And of course, Mr. D'Souza and his team had never filed any complaints with the SEB. Ex. 6 (Dinesh D'Souza Dep.) at 262:9–12.

116. In response to a May 17, 2022, Atlanta Journal-Constitution article about the SEB investigation, Mr. Phillips sent a text message to Mr. D'Souza expressing his frustration with the minimal level of fact finding and casually mentioning that the individual didn't "reach the threshold" to be a "mule" — a buried comment that went unnoticed by Mr. D'Souza and which, given the context, was not any sort of grand admission from Mr. Phillips about the accuracy of the film:



Ex. 6 (Dinesh D'Souza Dep.) at 272:10–277:7; Ex. 51 (DDR-00049510–11 (Dinesh D'Souza Dep. Ex. 104)) at DDR-00049511.

117.   Around the same time, several news outlets reached out to Mr. D'Souza, and Ms. Engelbrecht sent several text messages indicating that she'd like to talk to straighten out a few details before Mr. D'Souza engaged with the media. Ex. 52 (DDR-00049514–15 (Debbie D'Souza Dep. Ex. 87)) at DDR-00049515.

118.   Ms. Engelbrecht provided a brief list of what she called "tiger traps," the last of which was "Non-mule video in the movie." Ex. 52 (DDR-00049514–15 (Debbie D'Souza Dep. Ex. 87)) at DDR-00049515.

119.   Because the film is *predominantly* "non-mule" videos (i.e., interviews with informants, interviews with the panel, interviews with a police officer, etc.), Mr. D'Souza did not interpret this text as any sort of major news. Ex. 6 (Dinesh D'Souza Dep.) at 255:13–18, 255:21–256:3, 256:8–15.

120.   Ms. Engelbrecht and Mr. D'Souza agreed to connect the next day to go over Ms. Engelbrecht's concerns, but they never did because they were in the midst of an "absolute media frenzy" surrounding the movie. Ex. 52 (DDR-00049514-515 (Debbie D'Souza Dep. Ex. 87)) at DDR-00049515; Ex. 6 (Dinesh D'Souza Dep. 256:16–25).

121.   Following the premier of the film, numerous media outlets attacked the credibility of the film and attempted to "debunk" the film's premise,

geospatial analysis. Ex. 6 (Dinesh D'Souza Dep.) at 251:24–252:2; Ex. 53 (DD-000535 (*2000 Mules* Book)), pp. 149–57.

122. Mr. D'Souza was so confident that these attacks were wrong that he included an entire section in his book countering some of the common criticisms and specific articles. Ex. 53 (DD-000535 (*2000 Mules* Book)), pp. 149–73.

123. For example, where many had criticized the use of cellphone geotracking data as unreliable, Mr. D'Souza noted that geotracking has been used by Uber (to locate customers and drivers), the CDC (to verify social distancing), and even the Supreme Court, which found in *Carpenter v. United States* that, "[w]hen the Government tracks the location of a cell phone, it achieves near perfect surveillance as if it had attached an ankle monitor to the phone's user." Ex. 53 (DD-000535 (*2000 Mules* Book)), pp. 157–63; *Carpenter v. United States*, 585 U.S. 296, 311–12 (2018). The book included a single image from the film showing Mr. Andrews in which he is 1.5 inches tall, with his blurred face measuring 3/16 of an inch:



What we see here are screenshots from the videos of mules stuffing multiple ballots into mail-in drop boxes. While vote harvesting is legal in some states, typically under restricted conditions, paid ballot trafficking is illegal across the country. What you are seeing here is organized crime on behalf of the Democratic Party.

Ex. 53 (DD-000535 (*2000 Mules* Book)), un-paginated photograph insert between p. 144 and p. 145.

124. The book initially published on August 30, 2022, but Regnery independently decided to recall the book to remove the names of nonprofit organizations that had been identified in the book. Ex. 6 (Dinesh D'Souza Dep.) at 306:9–307:3; Ex. 54 (SMG0003619–23) at SMG0003621.

125. The book subsequently re-published on October 25, 2022, not long after the law firm Dubose Miller sent a cease-and-desist letter dated October 3, 2022, to Mr. D'Souza and others regarding the alleged defamation of Mr. Andrews. Ex. 55 (SMG0003550–52 (Plaintiff Dep. Ex. 27)) at SMG0003551.

126. However, by that time, the book was completely out of Mr. D'Souza's hands, and moreover, he remained convinced that Mr. Andrews was a geotracked mule. Ex. 6 (Dinesh D'Souza Dep.) at 317:13–18.

127. On October 26, 2022, Mr. Andrews filed this lawsuit. (Doc. 1).

128. Mr. Phillips and Ms. Engelbrecht were deposed on September 17 and 18, 2024, and each testified that only the first batch of videos had been matched to geospatial data, and that the second batch of video containing footage of the Gwinnett County drop boxes (and, *ergo*, Mr. Andrews) had never been matched to geolocation data. Ex. 1 (Engelbrecht Dep.) at 116:12–21); Ex. 2 (Phillips Dep.) at 145:3–146:9.

129. Mr. Phillips was clear, however, that Red Metrics *had* done the video/geolocation data linking for the first batch of videos. Ex. 2 (Phillips Dep.) at 75:13–25, 81:8–11, 82:4–9, 85:1–8, 144:14–24, 145:2–10, 146:6–9, 148:11–15.

130.   They had previously been given no reason to believe that any of the surveillance footage provided by Mr. Phillips and Ms. Engelbrecht had not been geotracked. Ex. 6 (Dinesh D'Souza Dep.) at 164:1–165:12; Ex. 7 (Debbie D'Souza Dep.) at 175:4–16; Ex. 17 (Schooley Dep.) at 74:10–19; Ex. 19 (Frankowski Dep.) at 44:11–45:10. Indeed, in their depositions, Ms. Engelbrecht and Mr. Phillips were each unable to identify any time they had told Mr. D'Souza or anyone on his team that any of the videos had not been linked to geotracking data:

> Q. Okay. And did the D'Souzas understand that -- or did you tell Mr. and Mrs. D'Souza that?
>
> A. I -- I don't recall, but it wouldn't -- I mean, I don't know how that would have been material, but I -- I don't recall telling them or not telling them maybe.
>
> . . .
>
> Q. But you don't recall talking to them about whether the Gwinnett County video had been matched with the geospatial analysis?
>
> A. I can't specifically recall it. I just -- it came so late, it would -- it would -- in my mind almost have been assumed, but I can't recall it.

Ex. 1 (Engelbrecht Dep.) at 190:18-191:12; Ex. 2 (Phillips Dep.) at 255:16-24 ("Q. Okay. And I think you mentioned earlier that you actually objected to

using additional videos. I'm not sure if you meant that literally or more colloquially. Did you actually put something in writing that you objected to the use of any additional videos? A. I don't think so."), 264:4-9 ("Q. And your testimony is that Mr. D'Souza was aware that the second batch of video that you provided were videos that had not been geospatially linked? A. I don't know if Mr. D'Souza had.").

131.  A little over a month later, during the depositions of a Red Metrics' executive and analyst, each testified that Red Metrics was never able to successfully match *any* drop box surveillance video to the geotracking data. Ex. 56 (Deposition of Tim Gerwing ("Gerwing Dep.")) at 38:7–16, 39:9–14, 99:24–100:5, 141:7–11; Ex. 57 (Azeddine Rahlouni Dep.) at 74:17–19.

132.  Instead, Red Metrics manually identified drop box video clips that looked suspicious to them and provided those clips back to OpSec for them to perform further analysis. Ex. 56 (Gerwing Dep.) at 35:6–11, 37:16–38:6, 142:17–143:8).

133.  Red Metrics communicated solely with Mr. Phillips and his son, JD, about the project, so Mr. D'Souza and his team had no way of knowing the truth or that they were being deceived until now. Ex. 56 (Gerwing Dep.) at 32:4–15, 130:20–23, 132:8–16); Ex. 58 (Deposition of Ben Matthews) at 25:4–26:11, 28:17–22, 30:21–31:5, 32:22–33:1, 53:18–54:19, 56:2–7.

134.  In response to these revelations, and for the first time appreciating that the video footage was not what he had always believed it to be, Mr. D'Souza issued a public apology to Mr. Andrews and explained that the inclusion of

his image was based on inaccurate information that had been provided to Mr. D'Souza and his team. Ex. 59 (DDR-00069604–05).

135. Mr. D'Souza clarified that the video surveillance footage shown in *2000 Mules* had not been correlated to any geolocation data. Ex. 59 (DDR-00069604–05) at DDR-00069604.

136. Throughout discovery, Mr. Andrews has been unable to identify a single person that identified him from *2000 Mules* or any related media without first being told of Mr. Andrews' appearance in the film, such that they already knew he appeared in the film and were actively looking for him. Ex. 60 (Deposition of Mark Andrews ("Mark Andrews Dep.")) at 96:2–7; Ex. 60.1 (Plaintiff Mark Andrews' Second Supplemental Responses and Objections to Defendant Catherine Engelbrecht's First Set of Interrogatories to Plaintiff), p. 3 ("Plaintiff is not presently aware of the individuals who identified him based **solely** on what he or she saw in the film 2000 Mules **without** being told or being otherwise aware that Plaintiff's image appears in the film."(emphasis reproduced from original)).

137. This is unsurprising, as Mr. Andrews is only shown in a single clip for 8 seconds of the film's 1.5 hour run time, and during that time, both his face and the license plate of his car are blurred. Ex. 9 (*2000 Mules* film) at 00:47:58–00:48:06; Ex. 9I (00:47:47–00:48:15 of DDR-00059987).

138. Mr. Andrews was also unable to identify anyone who had called, texted, e-mailed, or mailed him about *2000 Mules* or any related interviews other than

the reporters referenced *supra*. Ex. 60 (Mark Andrews Dep.) at 65:11–14, 125:12–25.

139. Neither Mr. Andrews nor his coworkers were able to identify a single person who thought less of him due to *2000 Mules* or the associated interviews. Ex. 60 (Mark Andrews Dep.) at 47:21–49:7; Ex. 61 (Deposition of Bob Varngadoe) at 15:11–18, 17:18–22; Ex. 62 (Deposition of Kelly Moyer) at 18:19–19:1, 20:13–19, 22:14–16, 23:4–10, 28:23–25; Ex. 63 (Deposition of Nive Loganathan) at 18:22–19:15, 30:12–22, 37:18–35; Ex. 64 (Deposition of Brian Beasley) at 21:5–22:4, 24:5–7; Ex. 65 (Deposition of William Smith) at 14:24–15:9; Ex. 66 (Deposition of Kelly B. Coveleskie) at 22:20–23:18.

140. Mr. Andrews did not stop voting after discovering *2000 Mules*, nor had anyone ever intimidated or threatened him for voting. Ex. 60 (Mark Andrews Dep.) at 56:7–10, 57:18–25, 144:19–23.

141. To the extent he stopped voting in person, the change in voting habits started in 2020, well before the premier of *2000 Mules*, and was due to COVID which he still viewed as a threat. Ex. 60 (Mark Andrews Dep.) at 143:11–15, 143:20–22.

142. Mr. Andrews admitted that no one had ever put him in harm's way due to the movie or promotion of it. Ex. 60 (Mark Andrews Dep.) at 126:19–21.

143. Intensive reporting on the issue of voter fraud after the 2020 election demonstrated a high level of public concern regarding public confidence in elections. Ex. 67 (DDR-00069344–47, DDR-00069360–62, DDR-00069365–422, DDR-00069423–25, DDR-00069429–31, DDR-00069432–33, DDR-

00069434, DDR-00069450–51, DDR-00069452–60, DDR-00069461–68, DDR-00069469–78, DDR-00069479–507, DDR-00069508–21).

Respectfully submitted this 20th day of December, 2024.

**BUCHALTER APC**

/s/ *Amanda G. Hyland*
Amanda G. Hyland
Georgia Bar No. 325115
Austin C. Vining
Georgia Bar No. 362473
Cory Mull
Georgia Bar No. 595376
3350 Riverwood Pkwy SE, Ste. 1900
Atlanta, GA 30339
(404) 832-7350 Telephone
ahyland@buchalter.com
avining@buchalter.com
cmull@buchalter.com

*Attorneys for Defendants Dinesh D'Souza and D'Souza Media LLC*

## CERTIFICATE OF COMPLIANCE WITH L.R. 5.1

I HEREBY CERTIFY that the foregoing document was prepared in Times New Roman, 14-point font, as approved by Local Rule 5.1.

/s/ *Amanda G. Hyland*
Amanda G. Hyland
Georgia Bar No. 325115

35

*Attorney for Defendants Dinesh D'Souza*
*and D'Souza Media LLC*