# EXHIBIT 1

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA DIVISION
 3    MARK ANDREWS,            |
                               |
 4     Plaintiff,              |
                               |   Case No.
 5    V.                       |   1:22-cv-04259-SDG
                               |
 6    DINESH D'SOUZA, et       |
      al.,                     |
 7                             |
       Defendants.             |
 8
 9      *********************************************
       CONFIDENTIAL ORAL AND VIDEOTAPED DEPOSITION
10                          OF
                   CATHERINE ENGELBRECHT
11                 SEPTEMBER 18, 2024
        *********************************************
12
             ORAL AND VIDEOTAPED DEPOSITION of
13     CATHERINE ENGELBRECHT, produced as a witness
       at the instance of the Plaintiff, and duly
14     sworn, was taken in the above-styled and
       numbered cause on September 18, 2024, from
15     9:33 a.m. to 6:42 p.m., before Mendy A.
       Schneider, CSR, RPR, in and for the State of
16     Texas, recorded by machine shorthand, at the
       offices of Greenberg Traurig LLP,
17     1000 Louisiana, Houston, Texas, pursuant to
       the Federal Rules of Civil Procedure and the
18     provisions stated on the record or attached
       hereto; that the deposition shall be read and
19     signed.
20
21
22
23
24
25
```

CONFIDENTIAL

Page 14

1    the like.

2         Q.    Okay.  But that -- and

3    that's -- you've just set that up in the last

4    few weeks?

5         A.    I'm not sure exactly when it      09:39:42

6    was initially set up.  We've only just like

7    launched it.

8         Q.    Yeah.

9         A.    I don't really know on the

10   paperwork --                                09:39:48

11        Q.    Okay.

12        A.    -- because I know that had to

13   come first.

14        Q.    Yeah.

15        A.    But -- but it's just been        09:39:51

16   launched like maybe even last week or

17   something.

18        Q.    Okay.  And that's again with

19   Mr. Phillips?

20        A.    Yes, ma'am.                      09:39:57

21        Q.    And Mr. Phillips -- let me get

22   the name of it, but he mentioned an app that

23   you work with him on called -- let me find

24   it.

25             There's a -- a voting integrity   09:40:08

CONFIDENTIAL

Page 15

1    app that you work with him on?

2         A.    He built an app or his team

3    built an app called OpSec called VoteStand.

4         Q.    Yep.

5              And what work are you doing on    09:40:18

6    that?

7         A.    That's on the True the Vote

8    side.

9         Q.    Okay.

10        A.    And True the Vote is -- using    09:40:24

11   that app, it's a web app, to facilitate its

12   second extension of the help line that we

13   always have on our website.  But this allows

14   for voters and election workers to have

15   really, I guess, faster access.  It comes    09:40:40

16   with a -- a toll-free line for -- so people

17   can talk if they need to.  There's lots of

18   questions coming right now so...

19        Q.    And is it also used for -- for

20   them to report suspicious behavior?    09:40:54

21        A.    Well, we call it an incident

22   report.  Just things that don't make sense.

23        Q.    Okay.

24        A.    And there's, you know, a lot of

25   that, so we try to correct as much of it as    09:41:04

CONFIDENTIAL

Page 16

1    we can.

2         Q.    And then if you get an incident

3    report through the app, what do you -- what

4    actions do you take?  What do you do?

5         A.    The first thing we do is screen    09:41:13

6    the report.  I've never really run a study on

7    the percentage of -- of reports that come in

8    that are just simple questions that you can

9    just resolve versus significant like we need

10   to get this to the Secretary of State or to    09:41:28

11   the county.

12              But that did happen in -- in

13   2020.  Mr. Phillips was also involved at that

14   point in helping with the hotline and the --

15   the process was if our team couldn't answer    09:41:39

16   the question and if it needed to be advanced

17   or expedited, it would go back to the OpSec

18   team for their management.

19        Q.    And when you say "their

20   management," what do you mean?    09:41:52

21        A.    Just things come in so quickly.

22        Q.    Uh-huh.

23        A.    But you also don't want to drop

24   any balls.

25        Q.    Right.    09:41:59

CONFIDENTIAL

                                                    Page 18

1          Q.     Do you know who the contractors

2     are?

3          A.     I don't.

4          Q.     Now, you said you were also a

5     founder of -- of True the Vote?              09:42:51

6          A.     Yes.

7          Q.     Which I'll refer to sometimes

8     as TTV.  You know what I'm talking about?

9          A.     Oh, yes.  I do the same, so

10    we're fine.                                  09:42:59

11         Q.     Okay.  Good.

12                How did you come to found True

13    the Vote?

14         A.     I started True the Vote in

15    2009.  Didn't submit paperwork until 2010.   09:43:07

16    So sometimes you'll see the distinction 2009,

17    2010.  2010 is when paperwork was filed.

18                After working at the polls and

19    having an experience that I thought didn't

20    make a lot of sense and that we should take a  09:43:21

21    closer look at the process.  The process just

22    seemed to be dysfunctional to me.

23                And so it -- it started

24    initially here in Harris County just as a --

25    a local effort.  And grew very quickly.  And,  09:43:32

CONFIDENTIAL

Page 19

1    you know, I -- I -- if you would have told me

2    15 years ago that I would be sitting here

3    having this kind of a conversation based on

4    what happened in 2009, I couldn't have

5    imagined it, but here we are.                09:43:50

6         Q.    Got it.

7               And is it a nonprofit

8    organization?

9         A.    Yes, ma'am.

10        Q.    Okay.  And what is its mission?   09:43:55

11   What does it do?

12        A.    We are all about empowering the

13   voters and protecting voters' rights.  So

14   very much about the -- you know, what we

15   refer to as the power of citizen engagement.  09:44:09

16        Q.    And I think - think that I've

17   seen references where you say it's a

18   nonpartisan organization?

19        A.    Yes.  Yes.

20        Q.    And when you say "nonpartisan,"   09:44:21

21   what do you mean by that?

22        A.    I mean that we are straight

23   down the line around election integrity.  And

24   irrespective of party, if there's an issue

25   with process or with a particular election, I  09:44:32

CONFIDENTIAL

Page 42

```
 1                    And with -- with troubling
 2        consistency, we got back little to nothing
 3        that suggested that this -- that this has
 4        really been a fully conceptualized idea.
 5                    And in my opinion, when you        10:09:35
 6        take the voter rolls that are not terribly
 7        accurate and you categorize that with mass
 8        mail out of ballots and then you set up, by
 9        the counties' own admissions, insecure
10        receptacles.  It just seemed to me to be a    10:09:54
11        point of weakness.
12                    And so in the immediate
13        aftermath of the election, the thought was if
14        there was a problem -- which we didn't know.
15        If there was a problem, that would likely be   10:10:03
16        a point that could be evaluated via data,
17        which is -- is another, I think, important
18        consideration because you -- you have to be
19        very -- there's a lot of things that are
20        broken in process that don't lend themselves   10:10:21
21        to measurement.
22                    So you -- you just have a
23        general sense that something is not right,
24        but it doesn't -- you can't -- you can't
25        really get close enough to the issue.  This    10:10:32
```

CONFIDENTIAL

Page 43

```
 1      was a unique -- what I felt like a unique
 2      opportunity.
 3           Q.     And is it fair to say that you
 4      are anti drop box, you don't think drop boxes
 5      are a good idea?                          10:10:44
 6           A.     Yeah.  That's very fair.
 7                  Let me -- actually, may I
 8      revise that?
 9           Q.     Sure.
10           A.     I think unmonitored and -- and   10:10:53
11      without solid procedural implementation,
12      they're not a good idea.
13           Q.     Okay.  And would you
14      characterize the system that is in place at
15      the current time -- well, or that was in      10:11:07
16      place -- no, the -- at some place at the
17      current time and going back to when they were
18      instituted in 2020, would you characterize
19      those as not being well monitored and not
20      having procedural solid implication --        10:11:22
21      implementation?
22           A.     I would say that in 2020 it was
23      not well monitored, not monitored at all.
24      Well, I shouldn't say at all.  But not to the
25      best of our ability to discern based on        10:11:31
```

CONFIDENTIAL

Page 48

```
1      was definitely, yes.
2              Q.      For all the states?
3              A.      Yes.
4              Q.      Okay.  And then it says the
5      next category is deliverables and costs.       10:16:19
6                      Do you see that?
7              A.      Yes.
8              Q.      And under 1 it says:  "Build
9      baseline look-back mobile device database."
10                     Did -- is that something that    10:16:31
11     TTV did receive as a deliverable?
12             A.      No, not -- we didn't receive
13     the database.  We received the results from
14     the building of that database.
15             Q.      And how were the results         10:16:43
16     presented to you?
17             A.      They were presented ultimately
18     in some level of pattern of life studies
19     findings that went on to be provided to the
20     FBI.  That was it.                               10:17:13
21             Q.      So was there some sort of
22     written report that was provided?
23             A.      There were written reports that
24     were provided on a -- on a
25     location-by-location basis, but it was so --    10:17:38
```

Page 49

1      you know, when this was done, I really didn't

2      have an appreciation -- this is way out of

3      True the Vote's area of specialty, so I think

4      it's fair to say that what I thought -- what

5      I thought this data, how it really works and      10:17:57

6      how it really works were very different.

7                   So because by the end of it was

8      clear that it -- you really had to have the

9      benefit of somebody that was trained in

10     reading this data.  It's just not like you        10:18:11

11     print out an Excel spreadsheet necessarily.

12     It's -- it's a huge amount of data.

13          Q.    But there was some sort of

14     summary of the results or some sort of report

15     that was provided to you?                          10:18:24

16          A.    Honestly, I don't recall that

17     there was a report provided to True the Vote

18     per se because it was -- as the results

19     started emerging, it became a function of

20     getting this into the right hands, and so it       10:18:41

21     was presented to Georgia Bureau of

22     Investigations or to the Federal Bureau of

23     Investigations.

24                   I was seeing -- because we were

25     capturing data on our side, so it just -- it       10:18:52

CONFIDENTIAL

```
                                                    Page 50
```

1    sort of married itself, and I didn't feel the

2    need to look at all the geospatial stuff.  I

3    just -- it just seemed to be coming together,

4    and we were in such a compressed period of

5    time that it went straight -- you know,          10:19:05

6    straight to law enforcement or to

7    legislatures -- legislators.

8           Q.    In what form did you present it

9    to those people?

10          A.    Primarily just digitally.           10:19:15

11   It -- it -- once we got into a rhythm, it --

12   the FBI had offered to set up hubs, and so

13   the data was originally transferred through

14   the representatives from South Texas that we

15   were working with.                               10:19:32

16               And then -- and then they were

17   to dispatch the various -- to the various

18   regions.  And our thought in that was that

19   was the very best way because there would be

20   no break in chain of custody or confusion        10:19:44

21   about who had what version.  It was just, you

22   know, put in place and then moved from there.

23          Q.    But at some point in time did

24   True the Vote have any of these, you know,

25   say, reports on particular drop boxes or         10:20:01

Page 59

1        thought being FBI was the keeper of record.

2        So...

3                Q.      But you don't think you have

4        any of that data anymore?

5                A.      It may have been provided for      10:28:58

6        all I know, but it -- if it -- I mean, that's

7        all I can say.

8                Q.      Okay.  And when you say "may

9        have been provided," you mean in the -- in --

10       to your counsel --                                10:29:07

11               A.      Yes.

12               Q.      -- and then to us?

13               A.      Correct.  Well, I mean --

14               Q.      Well, right.  You -- if it

15       existed, you provided it to your counsel?         10:29:11

16               A.      Correct.

17               Q.      Let's look at -- this was

18       previously marked.  I don't know the number.

19               (Discussion off the record.)

20       (BY MS. KUCK)                                     10:29:34

21               Q.      Okay.  Let's look at what was

22       previously marked as Exhibit 9.

23               (Discussion off the record.)

24       (BY MS. KUCK)

25               Q.      Do you have it?                    10:29:56

CONFIDENTIAL

```
                                            Page 60
 1          A.    Yes, ma'am.
 2          Q.    Do you see that this is an
 3    e-mail to you from -- from you to Debbie
 4    D'Souza?
 5          A.    Yes.                        10:30:04
 6          Q.    And this is dated August 12 of
 7    2021?
 8          A.    Yes.
 9          Q.    And so you were sending her
10    some documents at this point in time?     10:30:13
11          A.    Yes.
12          Q.    And why were you sending her
13    those documents?
14          A.    This must have been after we
15    initially talked about the project.  And my  10:30:26
16    thought would be that I provided this to try
17    to explain as quickly as possible and maybe
18    as comprehensively as possible elements of
19    the -- of the project.
20          Q.    Okay.  And -- and the project    10:30:47
21    you're referring to is the one that was
22    prepared under the scope that we just talked
23    about --
24          A.    Uh-huh.
25          Q.    -- in Exhibit 8?               10:30:55
```

CONFIDENTIAL

Page 116

```
 1          Q.     Okay.  But you don't have any
 2     evidence of him going to more than one drop
 3     box?
 4          A.     If we're talking about like in
 5     the 242, the study of the 242.              11:48:03
 6          Q.     Any evidence of any kind.
 7          A.     No, I mean, the -- that was
 8     not -- that was part of the Gwinnett anomaly
 9     period, and that video footage became -- I
10     mean, that was separate and apart from the   11:48:17
11     study of the 242.
12          Q.     Because at the time that the
13     geospatial data was done you didn't have
14     video from Gwinnett County?
15          A.     Correct.                         11:48:28
16          Q.     And so you couldn't match the
17     video with the geospatial analysis at that --
18     at that point in time where the movie was
19     getting made because you got the Gwinnett --
20          A.     Yeah.  We got the Gwinnett       11:48:41
21     video much later.
22          Q.     Okay.  Do you have any evidence
23     that that individual was paid to -- to
24     deposit those ballots?
25          A.     No.                              11:48:50
```

CONFIDENTIAL

Page 133

1    Schooley, and then Dinesh and Debbie D'Souza.

2         Q.    And what did you discuss at

3    that dinner?

4         A.    They were discussing --

5    actually, it was more just a general dinner,    13:21:59

6    but they were discussing the movie.  Bruce

7    Schooley was just emphatic about sequestering

8    the videos that we had.  That was a very big

9    point.  And -- which was -- you know, what

10   ultimately what the agreement was.  And then    13:22:15

11   that was really -- that's all I can remember.

12        Q.    So at -- by that point in time,

13   by the time you had this dinner, had you

14   agreed with them that you were going to be

15   doing a movie together?                          13:22:30

16        A.    Huh-uh, no.

17        Q.    And so when you say you mainly

18   talked about the movie, what do you mean by

19   that?

20        A.    Just what -- you know, I mean,       13:22:37

21   we -- that was -- that was the dinner

22   preceding a meeting the next day with -- that

23   they had coordinated with Salem

24   representatives, and so that was what it was

25   about.  But, you know, they were -- they were   13:22:46

CONFIDENTIAL

1     I don't know.

2          Q.     What do you mean he -- that

3     there was more than one video of Mr. Andrews?

4          A.     That's what I generally recall

5     him saying.                                    14:02:21

6          Q.     But you didn't go back and look

7     yourself?

8          A.     No, I mean, to me it was what's

9     done is done but...

10          Q.     And in any case, Mr. Andrews     14:02:28

11     was in Gwinnett County?

12          A.     Correct.

13          Q.     So it couldn't have been in

14     these initial 70 because at this point in

15     time in January 2022 you didn't have Gwinnett  14:02:36

16     County yet?

17          A.     Unless he was in another

18     county.  But this is -- you know, I am

19     repeating now what Dinesh said at some point.

20     Yeah.  As I've laid out how we proceeded with  14:02:51

21     our project, that is entirely accurate --

22          Q.     Okay.

23          A.     -- but I'm just sharing that

24     that's something that, you know, you may want

25     to -- I -- ask about.  I don't know.          14:02:59

CONFIDENTIAL

Page 182

1           A.      -- and did that.

2                   So I think what -- let me

3       just -- just for clarity --

4           Q.      Uh-huh.

5           A.      -- let me just read what Debbie    14:19:45

6       said here.

7                   "Basically we are moderating a

8       Salem host panel discussing these issues and

9       why the significance.  You and Catherine are

10      two expert witnesses we need on hand to brief   14:19:52

11      them and also to answer questions that will

12      inevitably arise.

13                  "The shooting there is

14      scheduled from 2:00 to 5:00.  However, we

15      would like to meet with you guys beforehand   14:20:02

16      to go over the format."

17                  So it was like, you know, come

18      and, you know, if we have questions we'll ask

19      you, and we want to meet with you, but --

20      that we were not supposed to be in it, which   14:20:12

21      we had no editorial control, and we had no

22      control over what was going to happen, did

23      not know who was going to be there.

24                  And so maybe that -- so maybe

25      this was trying to clear this up.  I -- I    14:20:25

CONFIDENTIAL

Page 183

1    don't know.

2         Q.    Okay.  But you did -- you went

3    to California?

4         A.    I did.

5         Q.    And then a day or -- a few days    14:20:32

6    before that, you also did some filming in

7    Woodlands?

8         A.    Yes, correct.

9         Q.    And tell me about the filming

10   in Woodlands.                                  14:20:44

11        A.    I believe it is Dinesh's

12   studio.  I'm not sure.

13        Q.    Yep.

14        A.    But it's a studio in The

15   Woodlands.  And Gregg and I were invited to    14:20:57

16   come to the studio.  As I generally recall,

17   we got there -- I don't know -- I mean, in

18   the -- I guess in the morning.  It felt very

19   much like a full day that we were there.

20            We had no -- I mean, we knew we      14:21:11

21   were going to be talking about the movie, but

22   we had no -- we just sat at a table.  And

23   Gregg had his iPad and talked to some of the

24   things that -- that he, you know, showed on

25   his iPad, and -- and we just answered their    14:21:28

Page 184

1    questions.

2              And then as was mentioned

3    yesterday -- yesterday, there was, you know,

4    the blue screens and no editorial control,

5    lots left on the cutting room floor.          14:21:47

6              And then the next day, there

7    was just B-roll, which was just us like

8    getting in and out of cars and standing with

9    the extras that they had brought in.

10        Q.    So the -- the scenes in the      14:22:02

11   film where you're getting in and out of cars

12   or you're going to the Summit or any of

13   those, that -- that was all staged, right,

14   after the -- it was staged when you filmed at

15   this point in time?                           14:22:17

16             It wasn't an actual film of you

17   having a meeting?

18        A.    No.  No.  That -- frankly,

19   that's why we didn't like -- you just said

20   the word "summit."  I was just --            14:22:27

21        Q.    Right.

22        A.    It just didn't -- but -- but

23   no, it was -- with the slight exception of

24   the California event because we didn't --

25   hadn't -- you know, that wasn't staged       14:22:38

CONFIDENTIAL

Page 187

1     not that I can recall.

2          Q.    But later after at least the

3     teaser came out, you were on some of the

4     shows that were hosted by those people,

5     right?                                           14:25:10

6          A.    Yes.

7              (Discussion off the record.)

8     (BY MS. KUCK)

9          Q.    So let's mark as Plaintiff's

10    Deposition Exhibit 46, TTV 7271.                 14:26:21

11        (Marked Engelbrecht Exhibit No. 46.)

12    (BY MS. KUCK)

13         Q.    So this is an e-mail that

14    appears to have been sent to you,

15    Mr. Phillips, and Mr. Hughes by Ms. D'Souza      14:26:53

16    on February 4, 2022, which I guess is two

17    days after the filming in California?

18         A.    I think.

19         Q.    Okay.  And she's asking you for

20    additional information.                          14:27:10

21              Do you see that?

22         A.    Yes.

23         Q.    So for the -- the first item

24    she's asking for is a thousand videos.

25              Do you see that?                       14:27:20

CONFIDENTIAL

Page 188

1          A.      I do, yes.

2          Q.      And what -- were there

3    follow-up conversations about that?  Did you

4    give them a thousand videos?

5          A.      No.                              14:27:28

6          Q.      What happened?

7                  Okay.  Tell me what happened

8    with that item.

9          A.      There's another version of this

10   where it goes back and forth with a            14:27:34

11   conversation, but the -- -- there -- I mean,

12   a thousand videos.  The -- my understanding

13   became about that particular request that

14   they were trying to create, and it's

15   mentioned in other documents, a fly effect,   14:27:53

16   like a matrix effect.

17                 They had done it in another

18   movie, and that's what they wanted to do

19   here.  And it's not reflected here, but in my

20   response on that document, I just say, you     14:28:04

21   know, it -- the -- these -- these would just

22   be, you know, videos outside of the context

23   of what we've already provided.  I'd make

24   recommendations.  Like, I don't know what

25   to -- what to do.                              14:28:24

```
 1                      And they came back and said,

 2       Well, just any kind of video you're not going

 3       to be able to see the person or whatever.

 4                      And I really don't recall.  At

 5       that point, we had gotten -- well, no, I        14:28:35

 6       guess at this point we still didn't have some

 7       of the Gwinnett stuff so --

 8            Q.     Right.

 9            A.     -- I was -- and maybe this was

10       a lingering request.  I -- I don't -- I        14:28:43

11       couldn't tell you about when and how that

12       actually...

13            Q.     Do you recall how many videos

14       you gave them ultimately in addition to the

15       77 original ones, approximately 77?            14:28:55

16            A.     Yeah, approximately 70.

17                      But then there was the Gwinnett

18       anomaly which that was that 25-hour period

19       video.  And then with that, because of the

20       way they provided video, there was just a ton  14:29:08

21       of -- I mean, it was -- it was a longer

22       period than just that 25 hours.  We wanted to

23       look at the 25 hours, but there was more than

24       that.

25                      And I -- I really couldn't -- I  14:29:18
```

CONFIDENTIAL

Page 190

1     don't know more than that except that we --
2     you know, when we -- our deal was with them
3     just to provide this video from the county
4     open records.  And so when we got it, we
5     provided it.  And that was it.                14:29:34
6           Q.    And that was Gwinnett County
7     you're talking about?
8           A.    Yes, I don't recall there being
9     anything else.  There could have been.
10    But...                                        14:29:44
11          Q.    And then so therefore that --
12    that second batch of video from Gwinnett
13    County, again, it wasn't part of the
14    geospatial analysis matching of video and
15    analysis because you didn't have it in time,  14:29:57
16    right?
17          A.    That's -- yes.
18          Q.    Okay.  And did the D'Souzas
19    understand that -- or did you tell Mr. and
20    Mrs. D'Souza that?                            14:30:06
21          A.    I -- I don't recall, but it
22    wouldn't -- I mean, I don't know how that
23    would have been material, but I -- I don't
24    recall telling them or not telling them
25    maybe.                                        14:30:17

CONFIDENTIAL

Page 191

1          Q.      Okay.

2          A.      I mean, we definitely talked

3     about the Gwinnett anomaly because we had

4     exhibits and everything with that.

5          Q.      But you don't recall talking to      14:30:24

6     them about whether the Gwinnett County video

7     had been matched with the geospatial

8     analysis?

9          A.      I can't specifically recall it.

10    I just -- it came so late, it would -- it        14:30:42

11    would -- in my mind almost have been assumed,

12    but I can't recall it.

13                 Again, we had no editorial

14    control, no control over what was used or

15    how, which videos were selected.  It was --     14:30:54

16    they were making -- they were trying to do

17    what they could to make it look good on

18    screen.

19         Q.      Okay.  And then No. 2 on this

20    e-mail, it says:  "We need a list of            14:31:06

21    nonprofits that are involved with the

22    trafficking."

23                 Do you see that?

24         A.      I do.

25         Q.      And did you ultimately provide      14:31:11

CONFIDENTIAL

Page 197

1          A.     No.  No.

2          Q.     Okay.  Did you ultimately give

3     them additional footage?

4          A.     After this -- after the 70 and

5     242 and later --                          14:54:56

6          Q.     Yeah.

7          A.     -- we did give them the

8     Gwinnett footage.

9               Yeah.  I mean, I don't -- I

10    don't recall -- I just don't -- that's --   14:55:06

11    that's what I remember.

12         Q.     Okay.  And then the second item

13    which we talked about earlier, which is:  "We

14    still need a list of nonprofits that are

15    involved with the trafficking."            14:55:15

16              Do you see that?

17         A.     Yes.

18         Q.     And you say:  "Here's a link to

19    the Georgia and Arizona organizations that

20    have published 990s."                      14:55:22

21              Do you see that?

22         A.     Yes.

23         Q.     So you were responding to her

24    response for a list of nonprofits with

25    this -- this link.                         14:55:36

CONFIDENTIAL

Page 208

1              the record a second so we can

2              straighten up the exhibits.

3                     THE WITNESS:  Sure.

4                     THE VIDEOGRAPHER:  Off the

5              record at 3:11.                         15:11:24

6          (Break from 3:11 p.m. to 3:21 p.m.)

7                     THE VIDEOGRAPHER:  We're back

8              on record at 3:21.

9      (BY MS. KUCK)

10            Q.    So we were just looking at some   15:20:13

11     e-mails about Mr. D'Souza requesting

12     information for nonprofits in other states?

13            A.    Yes.

14            Q.    Did you ever eventually give

15     him that information that he was looking for?  15:20:23

16            A.    Not to the best of my

17     knowledge.

18            Q.    And why not?

19            A.    I didn't -- I didn't understand

20     the place that it would have gone in the        15:20:41

21     movie.  I was concerned that it would be

22     misconstrued.  I already felt like we were in

23     a position of no control, and I just didn't

24     want to have anything taken out of context.

25            Q.    So then at some point in time     15:21:02

Page 209

1    you reviewed -- you saw a rough cut of the

2    film, correct?

3          A.     Yes.

4          Q.     And was that April 2 at the

5    D'Souza's home?                              15:21:14

6          A.     I -- I couldn't confirm the

7    date, but it was at the D'Souzas' home.

8          Q.     Okay.  Does April 2 sound

9    around the right time?

10         A.     Probably.  I -- I don't really    15:21:24

11    know.

12         Q.     And did you get a -- did you

13    receive a copy of that as well as watching it

14    at their home?

15         A.     No.  Not that I'm aware of.       15:21:33

16         Q.     Okay.  Let's mark as Exhibit 53

17    a document bearing Control No. 7347 through

18    7348.

19        (Marked Engelbrecht Exhibit No. 53.)

20          (Discussion off the record.)           15:22:22

21    (BY MS. KUCK)

22         Q.     And so this appears -- this

23    exhibit appears to be an e-mail chain of

24    back-and-forth between you and Mr. Schooley

25    dated April 7 of 2022.                        15:22:35

CONFIDENTIAL

Page 211

1          A.     We were trying to encourage

2     people to become more familiar with True the

3     Vote and, you know, it was attached to a -- a

4     video.  And it led to our -- on our website,

5     as I recall.                              15:23:50

6          Q.     And -- and you're providing

7     this to him after you had seen the film,

8     correct?

9          A.     The -- the -- this language

10    I -- I mean, assuming the dates that you've    15:24:01

11    given me, which I don't have any reason

12    necessarily to dispute, I guess that's the

13    sequence, yes.

14          Q.     Did you -- after you -- after

15    you saw the rough cut, did you give          15:24:11

16    Mr. D'Souza any feedback on it?

17          A.     As I generally recall, there

18    were two elements that I was, you know,

19    concerned about.  Tried to be supportive

20    overall, but I was concerned about the --    15:24:33

21    this -- this interview that's referred to

22    here in No. 2.

23               And I was concerned about the

24    representation of -- there was a scene where

25    we described how -- in an effort to encourage  15:24:50

Page 212

```
 1      the GBI to take another look at our data that
 2      we had done or -- or OpSec had done an
 3      analysis of a crime scene, and editing got a
 4      little messed up.  And so I mentioned those
 5      things.                                         15:25:11
 6           Q.    And how did the editing get
 7      messed up?
 8           A.    There were actually two crime
 9      scenes --
10           Q.    Uh-huh.                              15:25:17
11           A.    -- that we -- that we provided
12      analysis on or OpSec specifically provided
13      analysis on.  And we described both of them
14      sitting in Dinesh's studio that day, but only
15      one made it in.  And the way it -- the way it  15:25:32
16      ended up looking, at least in our opinion,
17      was that there was one exchange where -- and
18      I'm going off of recall so --
19           Q.    Uh-huh.
20           A.    -- bear with me.  But there was     15:25:45
21      a question about they showed two individuals
22      who had been arrested or indicted.
23                 And then Gregg was asked a
24      question, and he -- it -- bottom line is it
25      made it look like we were saying that our      15:26:00
```

CONFIDENTIAL

Page 213

1    research had led to their indictment, and

2    that was not accurate.  No doubt it was just

3    a slip in editing, but we knew that that was

4    not going to be good.

5           Q.    And you told him that after you    15:26:13

6    saw the rough cut?

7           A.    As I generally recall, yes.

8           Q.    Okay.  And was any change made

9    to the film after you told him that?

10          A.    No.                                 15:26:21

11          Q.    Okay.  What was the other thing

12   you were concerned about?

13          A.    That an interview that we had

14   provided that -- with Heather Mullins in --

15   and a law enforcement officer that had only    15:26:35

16   spoken under condition of anonymity -- let's

17   see if that's what's actually -- this

18   actually -- because there were a lot of

19   issues with that clip.

20               I would just characterize this     15:27:02

21   as I was -- you know, that was something that

22   I was mentioning there.  The thing I remember

23   is we had asked that his voice be modulated.

24          Q.    Uh-huh.

25          A.    And it, in my opinion, was not     15:27:11

CONFIDENTIAL

Page 227

1     Deposition Exhibit 57 a document bearing

2     Control No. DDR-00049438.

3          (Marked Engelbrecht Exhibit No. 57.)

4     (BY MS. KUCK)

5          Q.     And this at the second page of     15:42:53

6     this document, 439, appears to be a series of

7     text messages.

8               Do you see that?

9          A.     Yes.

10         Q.     And up at the top you have --     15:43:04

11    and this -- this is dated April 19, 2022?

12         A.     Yes.

13         Q.     Did you, around this time, go

14    to Mar-a-Lago and see a prescreening with

15    President Trump?                             15:43:20

16         A.     Yes.

17         Q.     And do you -- do you know

18    whether this is before or after the

19    screening?

20         A.     This would have been -- this     15:43:24

21    would have been after.

22         Q.     Okay.  And then when you say

23    "observations," are those your observations

24    having watched the next cut of the movie with

25    Mr. Trump?                                   15:43:38

CONFIDENTIAL

Page 247

1      the entry I just read has a reference to

2      Patricia.

3                    Do you understand who that is?

4           A.      Yes.

5           Q.      Who's that?                         16:15:16

6           A.      That was the person that Dinesh

7      hired to do the PR for the movie.

8           Q.      Okay.  And did you work with

9      her at all?

10          A.      Best of my recall, I talked to    16:15:27

11     her on the phone once, and -- and then there

12     were a few things that she -- media

13     opportunities that she set up or suggested, I

14     guess.

15          Q.      When you say "media              16:15:44

16     opportunities," you mean for -- for you

17     and/or Mr. Phillips?

18          A.      Yes.

19          Q.      Okay.  In addition to the

20     premier of the full-length movie, Mr. Trump   16:15:56

21     also released the trailer at a rally.

22                    Was that correct?

23          A.      I wouldn't -- yeah.  I mean, a

24     trailer was released at the rally, yes.  A

25     rally.                                        16:16:11

CONFIDENTIAL

Page 248

1          Q.     Right.  And that was the --
2     that was the release for the first time of
3     the trailer?
4          A.     Yeah.  To the best of my
5     knowledge, yes.                            16:16:16
6          Q.     Okay.  So let's mark as -- as
7     Plaintiff's Deposition Exhibit 62 TTV_007432
8     through TTV_007434.
9          (Marked Engelbrecht Exhibit No. 62.)
10    (BY MS. KUCK)                              16:16:37
11         Q.     And that seems to be a -- an
12    e-mail from Mr. Hughes on which you were
13    copied.
14              MS. HYLAND:  We still need our
15         copies.                               16:16:47
16              MS. KUCK:  Oh.
17         (Discussion off the record.)
18    (BY MS. KUCK)
19         Q.     So this is an e-mail dated
20    April 23, 2022, from Mr. Hughes to a number  16:17:05
21    of people and you're copied.
22              Do you see that?
23         A.     Yes.
24         Q.     Some of these people we've --
25    you know who it's addressed to, we've talked  16:17:14

CONFIDENTIAL

Page 277

1    there to be referring to the promotional

2    activities that you were doing in connection

3    with the release of the film?

4         A.    He was talking about speaking

5    to the media.  Dinesh had hired the -- the --    16:50:43

6         Q.    Patricia Jackson?

7         A.    Thank you.

8               To do that.  And there, you

9    know, a handful of things that she sent my

10   way.  And, again, we're just trying to be      16:51:01

11   positive.

12        Q.    About the movie?

13        A.    Yeah.  Or just about -- just

14   about every -- you know --

15        Q.    Okay.                               16:51:13

16        A.    -- everything, just trying

17   to...

18        Q.    And you were -- so you did a

19   number of -- of interviews promoting the

20   film, right?                                   16:51:22

21        A.    I -- yes, I mean, I -- we -- I

22   did interviews.  I -- what we say is a

23   number.  I don't -- not -- you know, not a

24   ton, but some.

25        Q.    Okay.  And at some point, you       16:51:36

Page 278

1    were on the Tucker Carlson show, right?

2           A.     Yes.

3           Q.     How did that come to be?

4           A.     Somebody would have reached out

5    and asked me to be on or maybe it went -- at    16:51:53

6    that point, maybe it went through one of the

7    PR firms -- not through Patricia, but that's

8    how -- I mean, they were interested in people

9    talking about the election, so...

10          Q.     And do you recall that you --     16:52:15

11   that you actually didn't mention the film

12   itself during that interview?

13          A.     Uh-huh.

14          Q.     Were you told by anyone not to

15   mention the film?                               16:52:32

16          A.     I -- I don't -- I don't

17   specifically recall any longer.  I do know

18   that there was -- well, I'll just leave it at

19   that.  I don't specifically recall any longer

20   because I couldn't tell you who said what to    16:52:50

21   whom.

22          Q.     Right.  Okay.

23                 Do you recall, though, there

24   was some dispute between Mr. D'Souza and Fox

25   News over the film?                             16:52:59

CONFIDENTIAL

Page 294

```
 1      ask for your is your understanding.
 2              A.      Sure.  Sure.
 3              Q.      Okay.
 4              MS. KUCK:  I have just a little
 5          bit more.                               17:08:45
 6              Do you want to take one more
 7          break?
 8              MR. EVANS:  Yeah.  Let's do
 9          that.
10              THE VIDEOGRAPHER:  Off the         17:08:50
11          record at 5:08.
12          (Break from 5:08 p.m. to 5:21 p.m.)
13              THE VIDEOGRAPHER:  Back on the
14          record at 5:21.
15      (BY MS. KUCK)                               17:20:18
16              Q.      Okay.  Do you --
17                  (Discussion off the record.)
18      (BY MS. KUCK)
19              Q.      The -- do you -- we've referred
20      at several junctures to an interview that you   17:20:38
21      and Mr. Phillips did on The Charlie Kirk Show
22      on April 8, 2022?
23              A.      Yes.
24              Q.      And on that you discussed the
25      2000 Mules project; is that correct?         17:20:49
```

CONFIDENTIAL

Page 295

1          A.     Yes.

2          Q.     And I could have you look at

3     what we marked yesterday as -- as Exhibit 10?

4          A.     Oof.

5          Q.     You don't have it?              17:21:17

6          A.     I don't have it in my stack,

7     but let me just keep looking here, but I

8     don't show it.  Maybe it's in here.

9               Oh, yes.  Sorry.  Got it.

10         Q.     I'll be in trouble with the      17:21:26

11    court reporter if you don't have it.

12              Okay.  In Exhibit 10 appears to

13    be a text chain involving you, Mrs. D'Souza,

14    and Mr. Phillips?

15         A.     Yes.                            17:21:45

16         Q.     Do you see that?  Okay.

17              And then partway down -- well,

18    actually, it's the -- the second full text,

19    it says" "Last" -- and your picture is next

20    to it.                                      17:21:58

21              Says:  "Lastly, we did an

22    interview with Charlie yesterday.  He had the

23    same videos from the ad in Georgia, the ones

24    we talked about, and asked us to review them.

25    He says Salem knows but didn't want to tell  17:22:09

CONFIDENTIAL

Page 301

1    know, going all the way back earlier when I

2    learned that, you know, somebody called me

3    and said they had -- so I -- I was making

4    some assumptions here.

5         Q.    Okay.  And in the course of         17:27:15

6    that interview, Mr. Kirk showed the video of

7    Mr. Andrews, correct?

8         A.    Yes.

9         Q.    And it was not blurred?

10        A.    It -- it was not -- I don't --     17:27:29

11   he showed it to us on his laptop.

12        Q.    Right.

13        A.    And I really don't recall

14   whether it was or wasn't then, but now since

15   all of this, I do know that what they posted   17:27:42

16   wasn't.

17             I -- I will state again.  I had

18   no editorial control.  And, frankly, the

19   thought that that was all going through

20   Salem, I just didn't -- it would have never    17:27:52

21   even occurred to me so...

22        Q.    So why don't we -- we're not

23   going to go through all the clips we watched

24   yesterday.

25        A.    Okay.                              17:28:02

CONFIDENTIAL

Page 308

1    You know, I -- this -- I don't -- I mean, I

2    don't even -- frankly, I don't even know that

3    I did this.  I don't know.

4         Q.    Okay.  Yeah.  My only question

5    about that is that he's saying there the        17:36:09

6    clips you ran on the Charlie Kirk interview,

7    so he is characterizing them as your clips.

8         A.    Yeah.  But that's -- that's

9    just a, you know, turn of phrase.  I mean,

10   I -- clearly, I'm not running the Charlie       17:36:22

11   Kirk interview or Charlie Kirk show or, you

12   know, sitting at the editing board or

13   production board or whatever they even call

14   them.

15        Q.    And your testimony is you don't      17:36:32

16   remember providing those clips to Charlie

17   Kirk?

18        A.    No.

19        Q.    Are you aware of the unblurred

20   footage of -- of the video in which -- which    17:36:41

21   we've been talking about, about Mr. Andrews

22   voting?

23        A.    Uh-huh.

24        Q.    Do you have any recollection of

25   anyplace else that it was played in an          17:36:54

CONFIDENTIAL

Page 353

1    would be that they would pull people that

2    looked to be also running afoul of the law,

3    small m mule, not, you know, casting more

4    than one ballot in -- in the -- in the county

5    where we knew there were no assister          18:38:39

6    signatures.

7         Q.    And when you say "they would

8    pull the video," who is "they"?

9         A.    OpSec and that group.

10        Q.    Okay.  And do you have any          18:38:48

11   understanding of how those videos were

12   transmitted to Mr. D'Souza's team?

13        A.    I -- I know that there was an

14   instance where it was transferred via FedEx.

15   I don't -- I don't know the specifics.  I      18:39:05

16   just remember it was like very late, they

17   were trying to get the fly effect.  You know,

18   that was it.

19        Q.    And do you have any knowledge

20   of any disclaimers or any kind of concerns     18:39:18

21   that would have been expressed to anyone on

22   Mr. D'Souza's team about these videos not

23   being linked to geospatial data?

24        A.    I mean, I don't -- I don't know

25   how you could have had it confused because     18:39:47