# EXHIBIT 2

Page 1

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION
3    MARK ANDREWS,            |
                              |
4     Plaintiff,             |
                              |    Case No.
5    V.                       |    1:22-cv-04259-SDG
                              |
6    DINESH D'SOUZA, et       |
     al.,                     |
7                             |
      Defendants.             |
8
9      *******************************************
       CONFIDENTIAL ORAL AND VIDEOTAPED DEPOSITION
10                         OF
                     GREGG PHILLIPS
11                 SEPTEMBER 17, 2024
       *******************************************
12
13          ORAL AND VIDEOTAPED DEPOSITION of GREGG
     PHILLIPS, produced as a witness at the
     instance of the Plaintiff, and duly sworn,
14   was taken in the above-styled and numbered
     cause on September 17, 2024, from 9:37 a.m.
15   to 4:29 p.m., before Mendy A. Schneider, CSR,
     RPR, in and for the State of Texas, recorded
16   by machine shorthand, at the offices of
     Greenberg Traurig LLP, 1000 Louisiana,
17   Houston, Texas, pursuant to the Federal Rules
     of Civil Procedure and the provisions stated
18   on the record or attached hereto; that the
     deposition shall be read and signed.
19
20   NY 6909303
21
22
23
24
25

CONFIDENTIAL

Page 18

1    commerce and business administration.

2         Q.    Okay.  Do you have any advanced

3    degrees?

4         A.    No.

5         Q.    The 2000 Mules film says you

6    have a deep background in election

7    intelligence.

8              What is election intelligence?

9         A.    Information relative to

10   elections.

11        Q.    Can you be more specific.

12        A.    Everything from voter roles to

13   voter history to attributes about voters.

14             The analysis of, you know,

15   elections, what happened, how they turned

16   out, how they're going.

17        Q.    Do you have any training in

18   data analytics?

19        A.    Well, I own a -- a company

20   that's -- two companies that are in the data

21   analytics business.

22        Q.    Right.

23        A.    So, yeah.

24        Q.    Right.  So what -- and that's

25   what I'm trying to get at.

CONFIDENTIAL

Page 19

```
 1                  You have a B.S. generally and
 2       I'm trying to get at how you got from there
 3       into very specific data analytic business.
 4            A.     I was part of a team that
 5       Deloitte Consulting and their global
 6       outsourcing unit that built a healthcare
 7       analytics program, and that was my first
 8       introduction to it.
 9            Q.     Okay.  And when was that?
10            A.     1996.
11            Q.     Do you have any -- any cyber
12       security training?
13            A.     No.
14            Q.     Any forensics training?
15            A.     Through operations, yes.
16            Q.     What do you mean "through
17       operations"?
18            A.     Having conducted forensic
19       analysis investigations.
20            Q.     And was that also at Deloitte?
21            A.     No.  That's been throughout --
22       throughout my career in healthcare and with
23       law enforcement, with others.
24            Q.     And what -- what experience do
25       you have in law enforcement?
```

CONFIDENTIAL

Page 26

```
 1          Q.      Yeah.  Yeah.
 2                  Are there any other companies
 3      or entities in which you are working with
 4      Ms. Engelbrecht?
 5          A.      CoverMe.
 6          Q.      Okay.
 7          A.      And KLOK.
 8          Q.      And are there any LLPs, other
 9      than the ones we mentioned, that you and
10      Ms. Engelbrecht have together?
11          A.      No.
12          Q.      So let's focus on OpSec.
13                  What does that company do?
14          A.      Consulting.
15          Q.      What kind of consulting?
16          A.      Election information and data
17      consulting.
18          Q.      And -- and without naming
19      specific names, generally who are its
20      clients?
21          A.      For-profits, campaigns,
22      not-for-profits.
23          Q.      And OpSec is a for-profit
24      company?
25          A.      Correct.
```

CONFIDENTIAL

Page 27

1          Q.      How many people does it employ?

2          A.      We employ no one.  Everything

3     is on contract.

4          Q.      Okay.  And has that always been

5     the case?

6          A.      Yes.

7          Q.      What is your relationship with

8     TTV?  True -- when I say "TTV," I'm going to

9     mean True the Vote.

10         A.      OpSec is a contract.

11         Q.      And is that currently the case?

12         A.      Yes.

13         Q.      When did OpSec first start

14    doing business with TTV?

15         A.      Summer of 2020.

16         Q.      And was that -- that first

17    project, was that the one that led to the

18    2000 Mules film?

19         A.      No.

20         Q.      What was that project?

21         A.      Working on the 2020 elections.

22         Q.      What type of work?

23         A.      Call centers and analytics

24    analysis of a variety of types.

25         Q.      And, again, that would have

Page 45

```
 1      (BY MS. KUCK)

 2            Q.      Do you recognize this document?

 3            A.      Yes.

 4            Q.      Okay.  What is it?

 5            A.      It's an agreement between OpSec

 6      and True the Vote for the provision of

 7      geospatial analysis.

 8            Q.      And what prompted the -- what

 9      prompted this -- this data -- the geospatial

10      data analysis project?

11                    Where did the idea come from?

12            A.      I -- it's two questions.

13            Q.      Okay.

14            A.      Can --

15            Q.      Where did the idea for this

16      project come from?

17            A.      True the Vote and -- or

18      Catherine Engelbrecht and I discussed and

19      decided it was an appropriate thing to do

20      given the public's interest in the election

21      results.

22            Q.      When did it begin?

23            A.      It says here it was dated 12/1

24      of 2020.

25            Q.      Okay.  And is that consistent
```

CONFIDENTIAL

Page 46

1    with your recollection of when it started?

2            A.      I don't have any recollection.

3            Q.      All right.  The -- the proposal

4    provides that OpSec is to be paid REDACTED

5    for this project up front.

6                    Did -- do you see that?

7            A.      Yes.

8            Q.      Okay.  And -- and did TTV pay

9    OpSec?

10           A.      Yes.

11           Q.      At the time the agreement was

12   executed?

13           A.      I don't recall.

14           Q.      But you know they paid it?

15           A.      Yes.

16           Q.      And it says that the -- in

17   the -- the top, the objective is to analyze

18   historic and near real-time behavioral

19   mobility data to assist True the Vote in

20   analyzing possible election process diversion

21   in the form of ballot harvesting in the

22   following states.

23                    And then it says GA, which I

24   take to mean Georgia; AZ, which I understand

25   to mean Arizona; TX, which I understand to be

CONFIDENTIAL

Page 47

1    Texas; PA, which I would understand to mean

2    Pennsylvania; MI, Michigan; and WI,

3    Wisconsin.

4              Do you see that?

5         A.    Yes.

6         Q.    Okay.  And did I get the states

7    right?

8         A.    Yes.

9         Q.    And how were those states

10   chosen?

11        A.    I don't recall.

12        Q.    Who chose them?

13        A.    Me and -- and Ms. Engelbrecht.

14        Q.    Okay.  And you don't -- you

15   have no recollection as to why you chose

16   those states?

17              MR. EVANS:  Objection; asked

18        and answered.

19   (BY MS. KUCK)

20        Q.    You can answer.

21              You have no recollection as to

22   how the states were chosen?

23        A.    No.  No.  Sorry.

24        Q.    Okay.  And did you

25   ultimately -- did OpSec ultimately complete

CONFIDENTIAL

Page 63

1          Q.     Okay.  Let's go to -- let's go

2     to the page number TTV_006846.

3          A.     Okay.

4          Q.     Under the Heading 16, it says:

5     "OpSec group was engaged by True the Vote to

6     conduct an analysis of mobile device

7     geospatial and temporal data in the state of

8     Georgia."

9               Do you see that?

10         A.     Yes.

11         Q.     And is that correct?

12         A.     That was -- yeah.  That was the

13    contract we just looked at.

14         Q.     That's the contract we just

15    looked at?

16         A.     Uh-huh.

17         Q.     Okay.  And then if you turn the

18    page and you look at Paragraph 18, it says:

19    "To conduct its analysis, OpSec group

20    utilized commercially available mobile device

21    geospatial and temporal data."

22               Do you see that?  Is that

23    correct?

24         A.     Yes.

25         Q.     Okay.  Where did that data come

1    from?

2         A.      We just answered that.

3         Q.      It came from Red Metrics?

4         A.      Vendors.

5         Q.      Right.

6         A.      Yeah.

7         Q.      And any -- can you identify any

8    vendor other than Red Metrics?

9         A.      Well, they would have bought it

10   from any number of vendors of the data.

11        Q.      Okay.  So Red Metrics bought

12   the data.  OpSec didn't buy the data?

13        A.      Correct.

14        Q.      Did any of your other

15   contractors or vendors buy the data?

16        A.      In this case, no.

17        Q.      Okay.  So all the data was

18   bought by Red Metrics?

19        A.      As far as I remember.

20        Q.      And then what was the role of

21   the other contractors?

22        A.      Analysis.  There's lots of

23   different pieces that go to analysis.  I

24   mean, they would have conducted some

25   analysis.

1                  They would have worked on

2       the -- the creation of the -- the creation

3       and execution of the work plan.

4                  It could have been any number

5       of things.

6            Q.      So in the next paragraph, it

7       says:  "OpSec group analyzed in excess of 25

8       terabytes" --

9            A.      Can you tell me where you are?

10      19?

11           Q.      Paragraph 20.

12           A.      Okay.  All right.  I'm with

13      you.

14           Q.      Okay.

15                  "OpSec group analyzed in excess

16      of 25 terabytes of data consisting of over

17      1.2 trillion mobile device pings that were

18      collected over a period of 97 days from

19      October 1, 2020, through January 5, 2021,

20      defined as the study period."

21                  Is that correct?

22           A.      The number looks a little small

23      to me, the 1.2 trillion.

24           Q.      Okay.

25           A.      And the dates, I think it

1    actually went back into September.  But,

2    again, I never signed this document.  I've

3    never seen it before.

4         Q.    No, I understand that.  I'm

5    just sort of using it as -- I'm using it to

6    get your understanding.  I don't want to rely

7    on the document if things are inaccurate in

8    here, so I want to make sure it's

9    consistent --

10         A.    I've never seen the document,

11    so...

12         Q.    Okay.  Understood.

13              And when it -- but -- but OpSec

14    group itself didn't do the analysis, you

15    hired other people to do the analysis for

16    you?

17         A.    We were the prime.

18         Q.    The prime.

19              And when you say "we," it's

20    only you, right?  You don't employ anybody

21    else?

22         A.    No, but we have other

23    contractors that work with us.

24         Q.    Okay.  So you're saying --

25         A.    We were the prime contractor.

CONFIDENTIAL

Page 75

```
 1    time, you also obtained video Dropbox --
 2    strike that.
 3              At some point in time, OpSec
 4    obtained Dropbox video from election
 5    officials in Georgia; is that correct?
 6    A.       That is incorrect.  We obtained
 7    Dropbox video from True the Vote.
 8    Q.       From True the Vote.
 9              And is your understanding True
10    the Vote obtained it from election officials
11    in Georgia?
12    A.       Yes.
13    Q.       Okay.  And at some point did --
14    did someone working with you attempt to
15    correlate the geospatial data with the
16    Dropbox video?
17    A.       Yes.
18    Q.       And who did that work?
19    A.       There were a variety of people
20    involved in that.
21    Q.       Okay.  Tell me everybody you
22    remember.
23    A.       Red Metrics.
24    Q.       Anybody else?
25    A.       No.
```

1          A.     And so you're asking me to

2     respond to -- you're asking me to answer a

3     question as to what my contractors were

4     doing.

5          Q.     Yeah.  I am.

6          A.     What -- what -- okay.  Then ask

7     the question.  I don't understand it.

8          Q.     Okay.  The question was:  Was

9     someone working with you attempt to correlate

10    the geospatial data with the Dropbox video?

11         A.     Yes.

12                MR. EVANS:  Objection; asked

13          and answered.

14    (BY MS. KUCK)

15         Q.     Okay.  And what were the

16    contractors doing?

17                What instructions did you give

18    them in connection with that correlation?

19         A.     I didn't give them any

20    instructions.

21         Q.     Okay.  Why were they doing it?

22         A.     Just to add to the file.  I

23    mean, geospatial analysis by itself is -- is

24    interesting.  But activity-based

25    intelligence, which adds more to it, which

Page 82

1    would be video and other things, would --
2    would -- would build out the file more
3    completely.
4            Q.    Okay.  So you were trying to
5    build a more complete picture by matching
6    what you were seeing in the data with what
7    you were seeing from the drop boxes?
8            A.    I wasn't, but our contractors
9    would have been, yes.
10           Q.    And you were instructing them
11   to do that?
12           A.    I probably wouldn't have
13   offered that specific of an instruction,
14   but...
15           Q.    Okay.  But you were overseeing
16   the project?
17           A.    Yes.
18           Q.    And some -- at least some of
19   them -- you were paying them to do certain
20   things?
21           A.    I don't understand.
22           Q.    You were paying -- these were
23   people you contracted with so I'm assuming
24   you gave them instructions.
25                 MR. EVANS:  Objection; asked

CONFIDENTIAL

```
 1          A.      We originally -- I think we
 2    originally provided 70 cuts of it.
 3          Q.      And how did you choose those
 4    70?
 5          A.      I don't recall.  I didn't do
 6    it.
 7          Q.      Who did it?
 8          A.      Red Metrics.
 9          Q.      Okay.  And did you give them
10    instructions?
11              MR. EVANS:  Objection; asked
12          and answered.
13              MS. KUCK:  No, I don't think
14          so.
15          A.      No.
16    (BY MS. KUCK)
17          Q.      Did you give them instructions
18    as to which -- how to choose the 70?
19          A.      No.
20          Q.      Okay.  So you just said, Give
21    me 70 cuts?
22          A.      Right.  Later in the process,
23    there's an e-mail around that Mrs. D'Souza
24    asked for, I think, another thousand cuts or
25    something like that, to which I said it's out
```

1          Q.      You have no idea?

2          A.      No idea.

3          Q.      Okay.

4                  MR. EVANS:  We've been going

5          about an hour and a half.

6                  MS. KUCK:  Yeah, we can take a

7          break.

8                  MR. EVANS:  Yeah.  Very brief

9          break.

10                 THE VIDEOGRAPHER:  All parties

11         in agreement with going off the

12         record, we're going off the record at

13         10:59 a.m.

14      (Break from 10:59 a.m. to 11:21 a.m.)

15                 THE VIDEOGRAPHER:  We are going

16         back on the record at 11:21 a.m.

17      (BY MS. KUCK)

18         Q.      Mr. Phillips, you and

19      Ms. Engelbrecht appeared on The Charlie Kirk

20      Show on April 8, 2022, to discuss the 2000

21      Mules project; is that correct?

22         A.      Yes.

23         Q.      And let me show you a document

24      I've marked as Plaintiff's Deposition

25      Exhibit 10.  It bears the Bates

CONFIDENTIAL

Page 91

```
 1      (BY MS. KUCK)
 2           Q.     He talks about sharing the
 3      episode on various social media platforms.
 4                  Did you share it after -- after
 5      the program?
 6           A.     I have no idea.
 7           Q.     Okay.  Do you know if TTV did?
 8           A.     I do not.
 9           Q.     So we're going to play another
10      clip running from 13:02 to 13:53 of the
11      interview, which I am marking as Deposition
12      Exhibit 1B, and then I'll ask you some
13      questions about it.
14           (Marked Plaintiff Exhibit No. 1B.)
15                  (Video playing.)
16      (BY MS. KUCK)
17           Q.     There's -- you made a reference
18      in there to 12 analysts who worked 16 hours a
19      day for 15 months.
20                  Who are those 12 people?
21           A.     Mostly was a reference to
22      everybody I could think about.  It was an
23      estimate and us, you know, contractors for
24      OpSec.
25           Q.     Okay.  And you can't name any
```

CONFIDENTIAL

Page 92

1     of the analysts?

2          A.     Me.  Red Metrics.  I'm sure

3     there were others, loads of other people

4     involved.  I don't know.  It was -- it was an

5     estimate.

6          Q.     So the 12 was an estimate.

7                 How do you know they were

8     working 16 hours a day?

9          A.     Because everybody was working

10    like crazy trying to finish this.  It was

11    hard.

12         Q.     But, again, you weren't

13    personally involved in that, right, you were

14    using contractors to do it?

15         A.     What we were trying to do --

16    and I think this is what you were trying to

17    ask me earlier.

18                But what we were trying to do,

19    once the geospatial analysis was done and we

20    started getting chunks of video in, matching

21    that video back into the -- back into the

22    geospatial analysis was difficult and took a

23    lot of time.

24         Q.     Okay.  So the 12 analysts

25    working 16 hours a day is an estimate based

1    on your involvement in the program?

2          A.      Based on my understanding.

3          Q.      Okay.  And who -- -- who at Red

4    Metrics was your contact person?

5          A.      The two owners, Ben and Tim.

6                  MS. HYLAND:  Can you say that

7          again.

8                  THE WITNESS:  Ben and Tim.

9    (BY MS. KUCK)

10         Q.      Is that Ben Gerwing?

11         A.      Yeah.

12         Q.      I'm sorry, Tim Gerwing and Ben

13   Matthews.

14         A.      Yep.  Sorry.

15         Q.      And did you have any other

16   contacts with anyone else at Red Metrics?

17         A.      I did not.

18                 MS. KUCK:  Can I have

19         TTV_008470?

20   (BY MS. KUCK)

21         Q.      So I'm going to mark as

22   Exhibit 11...

23             (Discussion off the record.)

24   (BY MS. KUCK)

25         Q.      Does the name Rahlouni mean

Page 110

```
 1          Q.     Yeah.  You admitted in your
 2    answer to the complaint that these statements
 3    were made on the show while there was
 4    unblurred video of Mr. Andrews being shown.
 5               Do you have any reason to
 6    dispute that?
 7          A.     No.  I just told you I couldn't
 8    see it.
 9          Q.     Okay.
10          A.     It was too far away.
11          Q.     Okay.  Mr. Kirk says he is one
12    of the 2,000 you profiled --
13          A.     Actually it sounded to me like
14    he asked a question.
15          Q.     Okay.  He referred to 2,000 --
16          A.     Uh-huh.
17          Q.     -- people you profiled?
18          A.     Uh-huh.
19          Q.     Okay.  What did you understand
20    him to mean by that --
21               MR. EVANS:  Objection;
22          misstates the facts.
23               MS. KUCK:  Okay.  We can play
24          it again if we need to.
25    (BY MS. KUCK)
```

1    recollection of Hoft's.

2          Q.      And your testimony is you

3    weren't aware on Charlie's because you didn't

4    have your glasses on?

5          A.      We didn't give him the clip.

6    We weren't in charge of Charlie's program.

7          Q.      No, but you were sitting with

8    Mr. Kirk looking at the footage on the

9    computer.  He was running the footage and you

10   were looking at it.

11         A.      Yeah, that's exactly what I'm

12   saying.

13         Q.      Right.

14         A.      But my eyesight is bad.

15         Q.      All right.

16         A.      That's what I'm saying.

17         Q.      All right.  Where did he get

18   that footage?

19         A.      Who knows.

20         Q.      Okay.

21         A.      Not from us.

22         Q.      How did it -- how did it come

23   to you that you and Ms. Engelbrecht were on

24   his program?

25         A.      Don't recall.  We were out

Page 144

1          Q.     And I'm going to be asking you

2     about your response to Interrogatory No. 7.

3          A.     Okay.  What page is that on?

4          Q.     Page 17.

5                 And in the second paragraph,

6     the question I have for you is about the

7     sentence that says:  "Because Gwinnett County

8     didn't provide video until much later, True

9     the Vote did not extend the Atlanta Metro

10    area geolocation pattern study to incorporate

11    when that county video."

12                Can you explain that sentence

13    to me.

14         A.     Sure.  In -- once -- once

15    you've identified -- or once we were able to

16    identify the 242, then we went through the

17    arduous process, then, of trying to figure

18    out was there a corresponding video that --

19    that might match that individual at that box

20    at that time.

21                And that's where we came up

22    with the 70 or so videos and the 242 IMEIs

23    that we presented to the -- to the -- to

24    Dinesh and Debbie.

25         Q.     Okay.

Page 145

1          A.      Mr. and Mrs. D'Souza.  Sorry.

2          Q.      The -- but I guess I'm trying

3     to understand the link here.  It said:  "We

4     didn't extend the geolocation pattern study

5     to incorporate Gwinnett County video."

6                  Are you saying you -- that --

7     was there a study done of the Atlanta Metro

8     area?

9          A.      Yeah.  That's how we matched

10    the 70 that we were able to match.

11         Q.      Okay.  But what does it mean

12    that True the Vote did not extend the pattern

13    study to incorporate Gwinnett County?

14         A.      We didn't go back and then try

15    to figure out was there Gwinnett video that

16    matched any Gwinnett drop box visits.

17         Q.      Okay.  So for purposes of

18    Gwinnett County, there was no matching done

19    between the geospatial location data and the

20    video?

21         A.      Right.

22         Q.      Because you got the video too

23    late?

24         A.      That's right.

25         Q.      So there -- so in the 70 video

CONFIDENTIAL

Page 146

1    cuts that you provided --

2            A.       Uh-huh.

3            Q.       -- those would not have

4    included people in Gwinnett County?

5            A.       Correct.

6            Q.       And the 70 video cuts, were

7    they only people within the 242 that met your

8    criteria about going to ten drop boxes?

9            A.       Yes, as best we could tell.

10                   The problem with the video

11   matching is there are -- any kind of

12   surveillance video is -- is subject to one's

13   ability to -- to access the correct viewing

14   software, right.

15                   There might be different

16   formats, in other words.

17           Q.       Uh-huh, sure.

18           A.       And -- and many, if not all, of

19   the cameras around -- and there weren't that

20   many, but the few cameras that were around,

21   many of them had different viewing software.

22   So even if we had it --

23           Q.       Yeah.

24           A.       -- it didn't always mean we

25   could see it --

CONFIDENTIAL

Page 147

```
 1          Q.      Right.  Okay.
 2          A.      -- number one.
 3                  Number two, the -- the -- the
 4      positioning of the video was often not -- not
 5      very clear.
 6          Q.      Okay.
 7          A.      So it might be -- you know, if
 8      it was at night in the rain --
 9          Q.      Right.
10          A.      -- or whatever, I mean, these
11      cameras were not set up to be that way.
12                  That said, the law -- the law
13      compelled any county in Georgia that had drop
14      boxes to have surveillance video on them.
15          Q.      Uh-huh.
16          A.      And that was also false.  They
17      did not.
18          Q.      They didn't com- -- your -- you
19      found that they did not comply with the
20      requirement?
21          A.      That's correct.
22          Q.      Okay.
23          A.      And so it left gaps.
24          Q.      Right.  So any video in the
25      film that is of a Gwinnett County voter would
```

Page 148

1    not have been linked to your geospatial

2    analysis, right, because you didn't match

3    those two up?

4          A.      That's correct.

5          Q.      Okay.  And so for that reason,

6    you know you didn't match the plaintiff video

7    with the geospatial because he's in Gwinnett

8    County?

9          A.      I think that's fair, yes.

10         Q.      Yeah.  Okay.

11                 How many -- of the 70 that you

12   gave, how many of them had been linked and

13   how many of them hadn't?

14         A.      All of them had been linked in

15   some way.  I mean, again, the challenge was

16   that -- that, you know, the -- the -- there

17   wasn't a hundred percent certainty, because

18   there were a lot of things going on that

19   can -- that can change, you know, like -- I

20   don't have a great example -- a time zone.

21         Q.      Uh-huh.

22         A.      You know, the time zones

23   weren't changed on the cameras --

24         Q.      Right.  Right.  Sure.

25         A.      -- or some of them didn't even

1    talking about?

2         A.       Apparently, yes.

3         Q.       And does this reflect your --

4    refresh your recollection that this was

5    during the runoff election period?

6         A.       I don't know, because we -- we

7    looked all the way back to -- I think the

8    middle of September.  I know the paperwork

9    said middle or the first of October, but

10   we -- we were looking at both.

11        Q.       Right.  But you don't remember

12   where the 242 came from?

13        A.       I don't.

14        Q.       And it says:  "Averaging eight

15   trips each to specific NGOs."

16                 Can you identify those NGOs?

17        A.       No.

18        Q.       Why?

19        A.       Because we were looking at

20   addresses and the NGOs were irrelevant to us.

21        Q.       Well, this is TTV's complaint.

22        A.       They were irrelevant to us.

23                 TTV was making a complaint

24   seeking the state board of election's and the

25   attorney general to actually review the

1      complaints and make judgment on them.

2                  Us providing information --

3      there's a chasm of difference -- not being

4      condescending, but there's a chasm of

5      difference between information, intelligence,

6      and evidence.

7          Q.      Uh-huh.

8          A.      And so when we turn information

9      over to any law enforcement or -- or anyone

10     in authority like the SPOE, we would expect

11     them to do the -- the law enforcement side of

12     the analysis that would allow them then to be

13     able to present this as evidence in court.

14                 It's not our job to present

15     evidence.

16         Q.      Understood.  But -- and when

17     you say "we," who are you speaking?

18         A.      Everybody involved in the

19     project.

20         Q.      Including TTV?

21         A.      Including TTV.  Everybody.

22         Q.      Okay.  But then this says

23     specific NGOs.  You've been saying I wasn't

24     focused on the NGOs, I was just focused on

25     the addresses.

1      A.      No, we couldn't do it.  I told

2  you we couldn't afford it.

3      Q.      You couldn't afford to post the

4  geospatial data?

5      A.      This is an incredible amount of

6  data.  We're talking about close to 10

7  trillion pings.

8      Q.      Right.

9      A.      You can't just open it up on

10  your computer and make it go.  This takes

11  some very heavy-duty horsepower to make it

12  go, not to mention the fact that the

13  bandwidth to run 5 million minutes of video

14  would be completely out of reach for

15  companies like ours.

16      Q.      Right.  But I want to

17  distinguish between the video and the

18  geospatial data.

19      A.      That's not -- you keep talking

20  about the rip cord.

21      Q.      Right.

22      A.      You keep trying to separate

23  them.

24      Q.      The rip cord included both

25  video and the geospatial?

Page 171

1          Q.     And you concluded that that
2     also was too expensive to post?
3          A.     Especially that.
4          Q.     And you don't recall when you
5     reached that conclusion?
6          A.     I don't.  But it would have
7     been probably later in the year.
8          Q.     How did it come about that you
9     worked with Mr. D'Souza to make the film?
10         A.     Are you -- are you referring to
11    something?
12         Q.     I'm done with that.  No.
13         A.     Okay.
14         Q.     I'm just going to ask you --
15    I'm switching gears.  I'm just asking you a
16    question.
17         A.     I think we covered this later
18    [verbatim].  Catherine introduced us at a
19    meeting at the D'Souzas' house and we
20    discussed it.
21                And there were months' worth of
22    discussions after that, and it ultimately
23    resulted in a -- in a deal to make the movie.
24         Q.     Okay.  What was your objective
25    in participating in the making of the film?

Page 172

1          A.     To bring light to the crimes

2     that were being committed with people

3     depositing more than one ballot in the drop

4     box inappropriately.

5                    We never would have made the

6     movie if law enforcement would have

7     investigated it.

8          Q.     Did you personally enter into

9     any agreement with respect to the making of

10    the film?

11         A.     No.

12         Q.     You're listed as an executive

13    producer, correct?

14         A.     That was listed without our

15    knowledge.  We didn't know about it until it

16    came out.

17         Q.     You didn't know you were going

18    to be listed as an executive --

19         A.     We had zero editorial control.

20         Q.     When did you first find out you

21    were going to be listed as an executive

22    producer?

23         A.     When the movie was released at

24    Mar-a-Lago, the premiere in front of 500

25    people.

1           take our break now, then.

2                   THE WITNESS:  That would be

3           great.  Thank you.

4                   THE VIDEOGRAPHER:  All parties

5           in agreement with going off the

6           record, we're going off the record at

7           2:12 p.m.

8       (Break from 2:12 p.m. to 2:27 p.m.)

9                   THE VIDEOGRAPHER:  We are going

10          back on the record at 2:27 p.m.

11      (BY MS. KUCK)

12          Q.      You -- am I correct that you

13      saw the first rough cut of the film at

14      Mr. D'Souza's house?

15          A.      Are we looking at a document?

16          Q.      No.

17          A.      Okay.

18          Q.      I'm just asking.

19          A.      Sorry.

20          Q.      Am I correct that you saw a

21      rough cut of the film at Mr. D'Souza's house

22      on April 2, 2021?

23          A.      We saw a rough cut of the film,

24      but I don't recall when.

25          Q.      Okay.  Was it at his house?

CONFIDENTIAL

Page 177

```
1              A.      Yes.
2              Q.      And then after that, you went
3      to Mar-a-Lago to review another cut a couple
4      weeks later; is that correct?
5              A.      Yes.
6              Q.      Okay.  After watching either of
7      those versions, did you ever tell Mr. D'Souza
8      there was anything in the film that was
9      inaccurate?
10             A.      It was out of the scope of --
11     of our role.  I mean, we had a very limited
12     role.  We were to provide video and we were
13     to provide some limited research.
14                     And, you know, how people make
15     movies is -- I -- it -- it's like magic to
16     me.  I mean, I -- I don't know how people do
17     it, but I -- I -- it wasn't -- it wasn't in
18     my scope.  That's not why we were there.
19             Q.      Okay.  But so the answer is no,
20     you didn't tell him anything was in it?
21             A.      I don't think so.
22             Q.      Okay.
23             A.      I mean, Mrs. Engelbrecht may
24     have, but I don't think I did.
25             Q.      Okay.  Did you form a view that
```

Page 178

1    it misrepresented your research in any way?

2         A.    I don't know if misrepresented

3    is the right word, but I think that -- that

4    through the month we had some concerns about

5    some of the decisions that were made about

6    how to, you know, represent certain things.

7              But, again, I'm not a

8    moviemaker.  It was out of my scope.

9         Q.    Okay.  Did you share any of

10   those concerns with Mr. D'Souza?

11        A.    No.

12        Q.    Let me mark the next exhibit --

13   and I'm going to mark this as 14 because

14   there was some confusion before.  So 14 is

15   now DDR-00055904 through DDR-0055905.

16        (Marked Plaintiff Exhibit No. 14.)

17   (BY MS. KUCK)

18        Q.    And this appears to be a chat

19   that was produced by Mrs. D'Souza.  This is

20   4/18/2022.  And partway down it says:  "We

21   fly out later this afternoon and get into

22   Fort Lauderdale late."

23              And then there's a reference to

24   noon at MAL.

25              Do you recognize this as the

CONFIDENTIAL

Page 238

1          Q.     Okay.

2          A.     So all that's on the screens

3     are blue screens.

4          Q.     Right.

5          A.     And so you don't really see

6     anything you're talking about.  You're

7     talking to air.  And -- and, you know, little

8     disconcerting because I had never been there

9     before and never done anything like that.

10               But, you know, I mean, all in

11    all, you know, I think that -- that raising

12    the awareness of some of the election

13    challenges that America faces was still the

14    right thing to do.

15         Q.     So you did those interviews in

16    Woodlands and then you went out to -- you

17    went out to California?

18         A.     Yeah.  Yeah.

19         Q.     And had more filming out there?

20         A.     Well, a little bit more.

21    The -- the part of the movie where the --

22    where the Salem hosts --

23         Q.     Uh-huh.

24         A.     -- are -- are sitting around --

25         Q.     Yeah.  Yeah.

1          A.      -- that was filmed in

2     California.  And we were originally not

3     scheduled to be part of that.  Actually, we

4     were originally not even scheduled to be part

5     of any of it.

6               And then kind of at the last

7     minute, I think -- I think they realized, you

8     know, they needed maybe a little bit more of

9     our awareness of the topics or something.

10    I'm not -- I'm not sure.  Dinesh could --

11    could share with that.

12              But -- but then when the --

13    the -- the second day of filming -- that's

14    not quite true.  The next morning -- so there

15    was a day of filming.

16         Q.      Uh-huh.

17         A.      We got there in the morning and

18    left at night.

19         Q.      In California or?

20         A.      Here.

21         Q.      Here.  Okay.

22         A.      And then the next morning there

23    was like a half a day --

24         Q.      Uh-huh.

25         A.      -- where it was just shooting

Page 244

```
 1    questions.
 2              MS. HYLAND:  Yes.
 3         (Discussion off the record.)
 4              E X A M I N A T I O N
 5    BY MS. HYLAND:
 6         Q.    I just have --
 7              MS. KUCK:  Yeah.  I'm going to
 8         take mine off.
 9              MS. HYLAND:  Yeah.
10              THE WITNESS:  And do I need
11         my -- these documents?
12              MS. HYLAND:  I would keep them
13         there.  I'm not planning on going back
14         to them.
15              THE WITNESS:  Okay.  Good.
16              MS. HYLAND:  Yeah.  Don't need
17         to worry about that.
18    (BY MS. HYLAND)
19         Q.    So I just want to revisit a few
20    of the things that you talked about earlier
21    today.  And I -- I think it's like ten
22    minutes, really quick.
23              I wanted to go back to your
24    initial first meeting with Mr. and Mrs.
25    D'Souza.
```

Page 245

1           I think you said it was at

2    their home.  Is that right?

3         A.    I think so, yes.

4         Q.    Do you remember roughly when

5    that occurred?  Season and year, kind of...

6         A.    I -- I'm going to say the

7    summer of 2021.  Maybe late summer, like

8    August or something.

9         Q.    And what was your understanding

10   of the purpose of that meeting?

11        A.    To share -- we -- we -- the

12   reason we did the research -- or the reason

13   we did all of this in the first place was we

14   wanted -- we wanted -- we wanted -- you know,

15   every -- I say everybody.

16           Many, many, many millions of

17   Americans believed something was wrong,

18   right.  And -- and we believed we had at

19   least part of a key to maybe what had gone

20   wrong.

21           And -- and our initial

22   desires -- and I took it to the FBI on

23   March 25.  And then I took it to Governor

24   Kemp and all of his team a month or so after.

25           And all through that summer,

Page 246

1    all that we really wanted was for law

2    enforcement or someone of competent

3    jurisdiction to pick this stuff up and review

4    it and say, Hey, yeah, that -- you know, they

5    may be, right.

6              But, you know, we kept getting

7    pushed off and shoved aside and told, you

8    know, we -- it didn't meet some, you know,

9    standard or something like that.

10             But all the while, you know,

11   the -- the -- the FBI was sort of encouraging

12   us.  They were encouraging us to give them

13   the data and to let them share the data with

14   their people.

15   (BY MS. HYLAND)

16        Q.    Who is "them"?

17        A.    I'm sorry?

18        Q.    The FBI was encouraging you to

19   share the data with --

20        A.    With the FBI.

21        Q.    With the FBI.

22        A.    I'm sorry.  I'm sorry.  Yeah,

23   that was confusing.

24             And -- and all that we really

25   wanted, we never -- truth be told, we never

1     would have gone to Dinesh.  We never would

2     have gone to anyone.

3               We didn't know anything about

4     making movies.  But -- when we sort of in

5     exasperation, like, okay.  Well, we'll

6     just -- we'll -- we'll -- Catherine is like,

7     well, I know Debbie.  And, you know, that's

8     the way the thing kind of unfolded.

9               And there may have been

10    other -- you know, Catherine may have had --

11    or Ms. Engelbrecht may have had, you know,

12    other conversations with other people about

13    it all, you know, or them or further or

14    something.

15              But I think we jointly -- I'll

16    speak for me.

17              I believed at that point that

18    it was the best opportunity to get all of

19    this information out so that the people could

20    decide.

21              It was still our hope even --

22    even as the -- even as the movie came out

23    that you know somebody, some -- some law

24    enforcement officer somewhere would pick this

25    thing up.

1    what happened was they didn't realize that
2    what we had given them actually had 70 of
3    them in there.
4              And I don't -- I -- I know it
5    was way out of the scope and we encouraged
6    them to make do with what they had.  I don't
7    know if we ever actually gave them anything
8    new or not.  We may have.  I don't -- I don't
9    recall.
10        Q.    And do you know if the video
11   containing the image of Mr. Andrews would
12   have been in the videos they already had?
13        A.    No, because we didn't get -- we
14   didn't get Gwinnett video until way late in
15   the game.
16        Q.    Okay.  And I think you
17   mentioned earlier that you actually objected
18   to using additional videos.  I'm not sure if
19   you meant that literally or more
20   colloquially.
21              Did you actually put something
22   in writing that you objected to the use of
23   any additional videos?
24        A.    I don't think so.  In part,
25   again, because it just wasn't what we were

1       hired to do.  I was hired to give them some

2       video, give them some research, and that was

3       it.

4                 So I -- I wouldn't have been

5       comfortable, nor believed it in my scope of

6       my little subcontract, to -- to question

7       someone like Dinesh.

8       Q.       And do you remember having any

9       specific concerns about the video containing

10      Mr. Andrews' image?

11                Obviously you didn't know it

12      was Mr. Andrews at the time but...

13      A.       I -- I don't because, you know,

14      again, I mean, the -- the -- the definition

15      of the mules for the movie's purpose was

16      different than sort of -- you know, I'll just

17      said those are mules with a big M.

18                And the mules for, you know, a

19      normal purpose, not tied to the geospatial

20      analysis, would have been more related to

21      something else that made it inappropriate or

22      improper to -- to -- for those ballots to

23      be -- to be pushed into the -- into there.

24      Q.       And do you remember any

25      discussion happening with anyone around that

CONFIDENTIAL

Page 264

1    geospatial location data?

2            A.      I couldn't.  I would say a

3    handful, maybe.

4            Q.      And your testimony is that

5    Mr. D'Souza was aware that the second batch

6    of video that you provided were videos that

7    had not been geospatially linked?

8            A.      I don't know if Mr. D'Souza

9    had.

10           Q.      Okay.

11           A.      But Mrs. Engelbrecht's

12   communication with Mrs. D'Souza indicated

13   that pretty clearly.

14           Q.      Okay.

15           A.      And then my intervening

16   response saying, This is way out of context,

17   guys.

18           Q.      And what do you mean it was

19   "way out of context"?

20                   MR. EVANS:  Scope.  I think you

21       mean scope.

22           A.      Scope.  Scope.  Not context.

23   Sorry.  Scope.

24   (BY MS. KUCK)

25           Q.      You mean scope meaning your

CONFIDENTIAL

Page 270

1              A.      -- number one.

2                      Number two, we had been, I want

3      to say, sequestered.  Mr. Schooley made it

4      abundantly clear that we were to sequester

5      all video and -- and nothing could be given

6      to anyone except for -- except for them until

7      the movie was out and then I think a year

8      afterwards or something like that.

9              Q.      Although we looked at your

10     interview on Charlie Kirk --

11             A.      We didn't --

12             Q.      -- which was April --

13             A.      We didn't give Charlie a video.

14             Q.      Which was on April 8?

15             A.      Yeah.

16             Q.      And you don't know where he got

17     it either?

18             A.      No, I don't.

19             Q.      Okay.  And is it your testimony

20     that you didn't know what video he was going

21     to be showing you until you showed up for the

22     interview?

23             A.      That's correct.  We thought it

24     was going to be a radio interview.  Look at

25     how we're dressed.  We were pretty rough.