# EXHIBIT 6

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION
3    MARK ANDREWS,                    :
                                      :
4          Plaintiff,                 :
                                      : Case No.
5    V.                               : 1:22-cv-04259-SDG
                                      :
6    DINESH D'SOUZA, et al.,          :
          Defendants.                 :
7
8
9
       ************************************
10             C O N F I D E N T I A L
11     VIDEOTAPED / REALTIMED DEPOSITION OF
12             DINESH J. D'SOUZA
13             OCTOBER 17, 2024
14     ************************************
15
16
17
18
19
20
21
22
23
24
25

```
 1    was -- it was our relationship with Catherine
 2    and Gregg.
 3          Q.    Okay.  And what do you do for a
 4    living?
 5          A.    I am a writer, an author, a
 6    podcaster, a documentary film maker.
 7          Q.    And how long have you been
 8    doing that?
 9                MS. HYLAND:  Objection.
10          Ambiguous.
11          Q.    (By Ms. Haber Kuck)  Okay.  How
12    long have you been making documentaries?
13          A.    My first one was in 2012, so
14    I've been doing it about a decade.
15                I've been author -- my first
16    kind of trade book was in 1991, so I've been
17    doing that for a long time.
18                Speaking, about the same amount
19    of time as the book writing.
20                The podcast we began more
21    recently, during the COVID period.
22          Q.    And what is your relationship
23    to D'Souza Media, LLC?
24          A.    I am the manager and one of the
25    two partners in D'Souza Media.
```

Page 23

```
 1    meeting that we had to talk about the film.
 2          Q.     Okay.  And that was a meeting
 3    at your home?
 4          A.     Yes.
 5          Q.     And you had never met
 6    Ms. Engelbrecht before that?
 7          A.     As far as I can remember, I
 8    hadn't.
 9          Q.     Okay.  And was Mr. Phillips at
10    that meeting?
11          A.     Yes.
12          Q.     And had you met him previously?
13          A.     No.
14          Q.     Were you aware of his work
15    prior to the time that you first met him?
16          A.     I had heard of him and I had
17    heard about his -- I had heard about some of
18    the things he had done.
19          Q.     Did he have a good reputation?
20          A.     Yes.
21          Q.     When did you last speak to
22    Ms. Engelbrecht?
23          A.     It's been a while.  It would be
24    in the -- in the aftermath of "2000 Mules,"
25    but not since.
```

1    with the Georgia Bureau of Investigation.

2         A.    Yes.

3         Q.    Do you know who David Cross is?

4         A.    I know who he is now.

5         Q.    Okay.  When did you first learn

6    who he was?

7         A.    In the process of this

8    litigation, I learned that a man named David

9    Cross had filed a complaint or a demand or

10   request to the Georgia authorities to

11   investigate alleged mules, and that's when I

12   heard about David Cross.

13        Q.    Okay.  And so have you ever had

14   any communications with Mr. Cross?

15        A.    Not that I know of.

16        Q.    Are you aware of any

17   communications between Mr. Cross and anyone

18   else at D'Souza Media?

19        A.    I'm not aware of any.

20        Q.    Are you aware of any

21   communications with anyone who worked on the

22   "2000 Mules" film have had with Mr. Cross?

23        A.    Anyone who worked on the "2000

24   Mules" film.  I'm now aware that -- that

25   Catherine Engelbrecht and -- well, I will

```
                                         Page 38
1          A.      The people that we interviewed
2    are, number one, a fellow named Hans von
3    Spakovsky, who is a former member of the
4    Federal Election Commission.
5                  A second person was an election
6    lawyer named Harmeet Dhillon.
7                  A third person is a person -- a
8    long-time public policy intellectual who does
9    research into the nature of nonprofit
10   organizations and their sources of funding.
11   His name is Scott Walter.  He's head of the
12   Capital Research Center based in Washington,
13   D.C.
14                 And those -- two of those three
15   interviews are in the film, and the third
16   one, Harmeet Dhillon, is
17   represented -- reflected in the book.
18        Q.      And are any of them experts on
19   geotracking?
20        A.      I don't know what you mean by
21   "experts on geotracking."  Do you mean the
22   technical aspects of geotracking?
23        Q.      Yes.
24        A.      Not to my knowledge, no.  Their
25   expertise is in election-related areas.
```

Page 39

```
1         Q.     And so did you talk to any
2    expert about the methodology that TTV used in
3    its study of the mules?
4         A.     Do you mean any outside expert?
5         Q.     Any outside expert on
6    geotracking, on the methodology they used?
7         A.     I didn't speak to anyone, but I
8    did a considerable amount of reading.
9         Q.     Okay.  And what reading did you
10   do?
11        A.     I read articles both in the
12   general media, as well as in law enforcement
13   media, to -- articles that I pulled up on
14   geotracking and to develop a good, I would
15   call it, layman's understanding of what it
16   is, how it worked, what it showed and didn't
17   show, its relative accuracy, and its -- the
18   frequency of its use in law enforcement, as
19   well as potential objections or problems with
20   geotracking.
21        Q.     And -- but you didn't have
22   anyone review specifically what Mister -- or
23   what TTV did with its methodology.  You were
24   looking at geotracking in general and what
25   its capacity was.
```

1    bringing to the subject different levels of

2    expertise and areas of knowledge.

3                    Catherine Engelbrecht I had

4    first encountered I think in 2013 or '14 when

5    she gave a public testimony in front of the

6    U.S. Congress.  And so I knew her to be both

7    a public figure as well as a -- as well as a

8    competent expert on election issues; and also

9    was familiar, in general, with the work of

10   True the Vote based on things it had done

11   over the years.

12                    I had heard of Gregg Phillips

13   and I knew a little bit about him, and -- and

14   then I learned a lot more about him starting

15   at our first meeting.

16                    And based upon that, I had to

17   make an assessment about the credibility of

18   these two as a team in being able to do what

19   they said that they were going to do.

20        Q.    Okay.  And what did you learn

21   about Mr. Phillips' expertise in this area at

22   the meeting you had?  And just -- and just so

23   we're clear, is this the first meeting that

24   you had at your house about whether to do

25   the -- possibility of doing the film?

```
                                        Page 42
 1          A.      Exactly.  We spent several
 2     hours with the two of them and it was a lot
 3     of conversation around these topics.
 4                  Since I had -- actually knew
 5     less about Gregg than I did about Catherine,
 6     I asked more questions about Gregg.  And what
 7     I learned from him is that he had had various
 8     positions in corporate America.  I believe he
 9     may have worked at one point for an
10     accounting firm.
11                  He had had high-level positions
12     in government.  He had been the Mississippi
13     head of Human Services, overseeing a rather
14     large army of employees.  He was also the
15     Texas head of the Health & Human Services
16     Commission.
17                  In other words, you're dealing
18     with a visible, competent managerial person.
19                  In addition, Gregg represented
20     to me that he had been, for not years, but
21     decades, involved in election integrity and
22     election intelligence.  That's the phrase
23     that he used.
24                  And when I asked him what that
25     was, he said it was basically involvement in
```

Page 43

```
 1     studying, monitoring, investigating elections
 2     not just in the United States, but around the
 3     world.
 4                    And he had done this in
 5     conjunction with intelligence agencies as
 6     well as law enforcement agencies; and that
 7     some of that was sort of on the down-low, if
 8     you can put it that way, but, nevertheless,
 9     that this was something that he actively did.
10                    And he gave me to understand
11     that the kind of things that they were
12     doing -- or that they were doing now, meaning
13     at that time, were things that he had been
14     involved in either in an active capacity or a
15     supervisory capacity, or that he was capable
16     of putting together a team that could carry
17     out that kind of research.
18          Q.     And did he -- did he tell you
19     about any specific training or education that
20     he had in the technical area of the
21     geotracking?
22          A.     He didn't, but he conveyed that
23     this is something that he knew a lot about.
24     He was able to corroborate that by answering
25     some quite detailed questions that we had
```

                                                        Page 44

 1      because this was something that I had the
 2      most cursory knowledge of.
 3                   And I also understand from not
 4      just the world of politics, but American
 5      life, that there are all kinds of people who
 6      manage projects that don't have a technical
 7      understanding of those projects.
 8                   You know, you may have the head
 9      of an accounting firm become the head of
10      Delta Airlines.  He's not a pilot.  He
11      doesn't fly planes.
12                   So, in that sense, I not only
13      didn't probe him on the technicalities of
14      geotracking, but I wouldn't have felt myself
15      competent to do that.
16           Q.      And just following up on that
17      answer in terms of managing people, did you
18      under- -- did he tell you that he had people
19      working for him who were doing the actual
20      technical work?
21           A.      He just said, Me and my team.
22      That was kind of the phraseology that we --
23      he applied consistently through the months
24      leading up to the movie.
25           Q.      Did you ever learn who was on

Page 46

```
 1                   And who were -- so who are the
 2      people in the film?
 3           A.     So that is -- maybe I should
 4      back up and talk a little bit about how
 5      documentary films are done.
 6           Q.     Uh-huh.
 7           A.     Documentary films are typically
 8      documenting something that is happening now,
 9      but they are also documenting something that
10      happened in the past, whether historically
11      or, in this case, let's say, research that
12      True the Vote did over the past, let's say,
13      year.
14                   And what the documentary film
15      wants to do is, because film is a visual
16      medium, show you things even though it may be
17      actually impossible to show you things that
18      happened before.
19                   Just by way of illustration,
20      you know, if you watch "Forensic Files,"
21      there is a murder that appeared three years
22      ago.  You see a recreation of the murder.
23                   Obviously, it's not the same
24      guy.  Obviously, it's not the same house.  It
25      may not be the same town.  But you're
```

1      of -- you know, there is a kind of -- this is

2      the nature of documentary films.

3                    They combine interviews with,

4      in some cases, actual footage.  That would be

5      surveillance video, for example.  And in some

6      cases, a representation of things that are --

7      are sometimes better shown in order to make

8      them visually more understandable to the

9      audience.

10          Q.      Right.  And he -- but he didn't

11     indicate to you in any way that the way that

12     you were depicting his work was inaccurate?

13          A.      Never.

14          Q.      Okay.  And what was your

15     understanding of where his actual computer

16     lab was?  Where was this work being done?

17          A.      He gave me to understand that

18     they were -- that the work was being done in

19     multiple places, but that they had a kind of

20     outpost at one of the either university or

21     university-related facilities.

22                    I believe at the University of

23     Mississippi, but I might have the wrong

24     university because it's off the top of my

25     head.  And that they had leased some

Page 63

```
1    you?
2           A.      Yes.
3           Q.      How long was the meeting?
4           A.      We went to lunch first just on
5    a social basis, didn't discuss any of the
6    work per se.  And then we sat down to a
7    meeting at our house for somewhere between
8    three to five hours.
9           Q.      And what did they -- so did
10   they make a presentation to you?  Was it a
11   conversation?  How did the meeting go?
12          A.      Both.  They made a -- they made
13   a presentation, which was illustrated by
14   Gregg opening up his computer and showing us
15   things.  And most of those things pertained
16   to cell phone geotracking.
17                  It was a little bit of a primer
18   in -- a course, mini course, if you will, in
19   cell phone geotracking.
20                  It was a discussion of election
21   laws and election rules.
22                  It was a discu- -- we had a
23   discussion, as I recall, about the criteria
24   for elections to be called into question,
25   overturned.
```

```
 1                    And then there was a discussion
 2        of surveillance video.
 3                    And we didn't see a lot of
 4        video, but they made it clear to us that they
 5        were in the process of obtaining video.  And,
 6        obviously, for someone like me, thinking in a
 7        sort of a film mode, that becomes quite
 8        important because films show things.
 9                    And as -- in the early part of
10        our conversation, I was a little bit
11        skeptical.
12                    Well, first of all, the topic
13        was kind of new to me.  And while I've been
14        quite involved in political stuff, I was
15        learning new things.  So that was -- that
16        raised a whole host of questions.
17                    And -- but also in the back of
18        mind there were also, I would call it, you
19        know, the filmmaker questions, which is, What
20        do you show?  What will the audience see?
21        What can you -- if you make a movie about,
22        let's just say, the, you know, robbing of
23        Fort Knox, you kind of need to show burglars
24        breaking into Fort Knox.  There's no other
25        way to make the movie.
```

Page 65

```
 1        Q.      And at that -- at that point in
 2   time, had they done any matching of video to
 3   their geolocation research?
 4        A.      I don't know if they had or not
 5   because we've had so many subsequent
 6   conversations and it's a little difficult for
 7   me to place them into a timeline; however,
 8   the topic was discussed.
 9             And they discussed the fact
10   that while the amount of video was scarce,
11   relatively scarce, they had a lot of it, but
12   they had not a lot of it relative to how much
13   they should have had or, in other words, how
14   much would -- you would get if you had --
15   were able to track all the drop boxes.
16             Nevertheless, they said that
17   part of the effectiveness of this mode of
18   research was that it took two completely
19   independent lines of inquiry and had the
20   possibility, at least on certain occasions,
21   to match the one with the other.
22             To illustrate very briefly, you
23   know, if your cell phone shows that let's --
24   I'm just giving a general example here.  If
25   your cell phone shows that you were at
```

```
 1      Mr. Smith's at 2:00 a.m. in the morning and
 2      Mr. Smith happens to have a surveillance
 3      camera, you go look on the camera at
 4      a.m. in the morning and see if you can see
 5      the guy.  So that's the matching that we're
 6      talking about.
 7                  I don't remember if they --
 8      what they said in terms of how much they had
 9      progressed on that to that point, but they
10      did discuss the topic.  And it was very
11      appealing to me because obviously I thought
12      cell phone geotracking alone was a
13      fascinating and original line of inquiry.  It
14      was a very rare opportunity to take us right
15      back to what happened exactly in the days
16      leading up to the 2020 election.
17                  In theory, prior to that
18      meeting, if you had asked me, you know, How
19      can you go back and find out what happened?
20      I would have said, There is no way.  The best
21      you can do is affidavits, complaints by
22      people who are -- said, I was there.
23                  But the cell phone geotracking
24      was a way of putting people there at that
25      time.  So I thought, Wow, this is really
```

Page 67

```
 1    great, very interesting, at the very least.
 2                 And then, second, the idea of
 3    having the surveillance video appealed to me
 4    both as a filmmaking -- as a filmmaker, but,
 5    moreover, as a way of either supporting or
 6    reinforcing, corroborating things that were
 7    established through the cell phone
 8    geotracking.
 9         Q.    And did Mr. Phillips show you
10    any maps?
11         A.    Yes.
12         Q.    And what were those maps
13    depicting?
14         A.    The maps were -- were -- he
15    described them as a streamlined version of
16    the data.
17                 So the data is the data.  I
18    envisioned in my mind like an Excel
19    spreadsheet.  And then the map was a
20    depiction of a particular -- not a person,
21    but a cell phone, a device, moving through
22    space and through time.
23                 And he had depictions of that
24    on his computer.  I don't remember the
25    specific maps, but he was like, This is how
```

1    we do it.  Let me show you what this looks

2    like.

3                   And he went on to describe a

4    concept that I had not heard of before, but

5    called pattern-of-life, which is a way of

6    sort of schematizing a map and developing a

7    pattern out of it, or maps, that could give

8    you a picture of real-life events.

9         Q.    And did you use any of those

10   maps in the film?

11        A.    I'm not sure if we did.  I

12   think that we -- we might have.  But I also

13   know that we didn't like the -- the maps were

14   very crude and they were -- you know, they

15   were the kind of maps I would make.

16                   And so I think we were

17   uncomfortable with the crudity of the maps.

18   And besides, in the film you have to think

19   about what something means to the audience.

20                   So, for example, putting up,

21   you know, an Excel spreadsheet is absolutely

22   pointless in a documentary film.  No one

23   could make head or tail of it.

24                   And so the maps that were shown

25   largely in the background of the film were

Page 72

1           A.      That is right.  Although --
2      although, as I recall, during that discussion
3      there were times when Gregg did open up his
4      computer and show us things in the
5      conversation.  And I'm not quite sure how
6      much of that in the edited version made it
7      into the movie.
8                   So did Gregg have maps and
9      computer presentations?  Yes, he did, during
10     both presentations, meaning the presentation
11     in The Woodlands as well as the LA
12     presentation.
13                  And then ultimately we make
14     movie decisions, editorial decisions about
15     how best to depict the information that is
16     collected and how best to present it.  How do
17     we make it more understandable.
18                  This is an inherently complex
19     topic and so I have a task that I normally am
20     considered good at, but it's very difficult
21     here, the supreme task of taking an
22     inherently technical topic, you know, similar
23     to ballistics or something like that, and
24     trying to convey this in an understandable
25     manner that makes sense to an audience that

Page 73

```
 1      is obviously not technical at all.
 2           Q.      And when you said you did a lot
 3      of research on geotracking, was that before
 4      or after this meeting?
 5           A.      That was after the meeting.
 6           Q.      Okay.
 7           A.      You're talking about the
 8      initial meeting?
 9           Q.      Yeah, after the initial meeting
10      at Woodlands.
11           A.      Yes.
12           Q.      And at the -- what was -- well,
13      you referred to -- a couple of times you
14      talked about Excel spreadsheets.
15                   You didn't see any Excel
16      spreadsheets, did you, from Mr. Phillips?
17           A.      No.  I mean, he always had a
18      massive briefcase full of drives, documents,
19      computers, other devices.  But, no, I didn't
20      go through it.
21           Q.      Okay.  Did he show you any
22      hard-copy documents?
23           A.      What do you mean?
24           Q.      Paper documents.
25           A.      I'm trying to remember.
```

1    just a strange thing that needs to be

2    explained and possibly there is a rational

3    explanation.

4              Also, as I mentioned a moment

5    ago, I was very doubtful that one could sort

6    of go back and solve this who-done-it, if you

7    will.  But True the Vote was proposing a way

8    to do that.

9              Not to do that in the

10   definitive sense that no more work would need

11   to be done, but to do that in a way that

12   would give is really important new

13   information on a really critical topic that I

14   thought audiences across the board would find

15   fascinating and would generate a constructive

16   debate, although I was also aware the topic

17   was controversial.

18              And so essentially over the

19   next relatively short period, I made the

20   decision to approach Salem Media about the

21   topic.

22              This was also part of what I

23   would call my vetting process, which is to

24   say that I have had a long career myself in

25   public life, you know, as a university

1    president, I've been at two prestigious think

2    tanks, I've taught courses and classes at

3    universities.  And so I trust my judgment.

4    But on the other hand, I also think there are

5    other intelligent people in the world.

6              And so what I wanted to do was,

7    all right, here we've got Gregg Phillips and

8    Catherine Engelbrecht and they are giving me

9    a very interesting, to say the least,

10   presentation.  Why don't I haul them before a

11   group of corporate people at Salem?

12             It's quite a diverse group.

13   It's got lawyers.  It's got CEOs.  It's got

14   media people.  It's got people who deal with

15   social media.

16             In other words, a relatively

17   wide range of backgrounds.

18             And let me put these two in

19   front of them in a free-for-all and have them

20   do a presentation and then have at it.

21             And part of my goal there is

22   partly to persuade Salem, Hey, guys, this is

23   something that you would like to pursue.

24   Because while it's my choice as to the topic

25   of the film, I like to get Salem on board as

Page 78

1     the funder of the film.  But I also saw it as
2     an opportunity to learn more from probing
3     questions from intelligent people.
4              And so that was the next step.
5        Q.     Did you consider taking them
6     before a panel of experts in geotracking to
7     see how their methodology held up?
8        A.     I didn't do that and the reason
9     I didn't do that is because this would be
10    akin to me taking an expert on ballistics to
11    a panel of ballistics experts and having --
12    and listening to that discussion, which I
13    would never be able to make head nor tail of.
14             So it was really more about
15    making a judgment about the credibility and
16    ability of these two people to execute the
17    task at hand which was ongoing, raise
18    questions, whether they were technical
19    questions or whether they were more questions
20    about the implications of these findings, and
21    to do that in more than one setting with a
22    diverse group of people so that we could
23    assess their -- assess the value of their
24    work both -- initially, of course, outside
25    the film, but then critically inside the

1    film.

2          Q.      And so did you do any other

3    vetting other than with the Salem Media

4    folks?  Any third party -- any vetting with

5    anyone -- any other groups of people other

6    than Salem Media?

7          A.      I didn't do any additional

8    vetting, but I did hatch in my mind the idea

9    of not doing a film exclusively on True the

10   Vote, but widening the scope of the film to

11   draw in other experts who would corroborate

12   and enhance the themes in the film.

13              So, for example, if you're

14   talking about nonprofits, which obviously had

15   been mentioned, my question is, I thought

16   nonprofits are not supposed to be involved in

17   elections.  Are we making the claim that

18   these nonprofits are involved in elections?

19   How do we know that?

20              Moreover, any kind of organized

21   operation, any kind of election fraud,

22   election fraud as distinguished from, say,

23   voter fraud.  Voter fraud is if you vote

24   twice.  Election fraud is when someone is

25   organizing something.

```
 1      don't know who really won this election;
 2      therefore, I'm going to, as a judge, kind of
 3      cancel the election and either have it again
 4      or remove the alleged -- you know, remove the
 5      winner from office.
 6                   And I remember Gregg telling me
 7      that and so not only did I go and research
 8      the case in North Carolina in some depth
 9      where an election was, in fact, overturned,
10      but I talked to people I know who are in the
11      election field, including Harmeet, about what
12      happened in this case.  Is this, in fact,
13      accurate?
14                   So these were ways of me
15      testing the credibility of Gregg and
16      Catherine in areas that I was competent to
17      find out if what they were saying is -- was
18      valid, and it was.
19           Q.     At what point did Mr. Schooley
20      become involved?
21           A.     Bruce has been involved with my
22      films from --
23           Q.     I meant this particular film.
24           A.     Oh, yeah, with this particular
25      film, after the meeting with Gregg and
```

Page 87

1          Q.     And do you recall the terms of

2     that agreement?

3          A.     In general terms, yes.

4          Q.     Tell me in general terms and

5     then we'll look at the document.

6          A.     Well, in general terms, there

7     were a few key elements outside of the legal

8     boilerplate.

9               One, that True the Vote would

10    cooperate actively with the research that was

11    needed, that would be the backbone, if you

12    will, of the film.  They would be

13    acknowledged and credited for that

14    involvement.

15              They would also participate in

16    helping to promote the film and help us get

17    the word out, so to speak.  We would be the

18    primary promoters, but we were counting on

19    them to kind of do their part.

20              Number three, we wanted

21    to -- we were insistent that they protect the

22    confidentiality of the surveillance video,

23    but also more generally of their work,

24    because part of my persuasion to them about

25    whether to do a film was based upon the idea

Page 88

1    that complex ideas cannot be released in
2    dribs and drabs and they need -- it needs to
3    be presented as part of a narrative
4    storyline; and, therefore, the film is an
5    effective medium to present these ideas and
6    have them intelligently discussed.
7                    And so we didn't want the key
8    visual features of the film to be getting out
9    or people to sort of know all about it
10   beforehand because why go see the film if
11   that's the case?
12                   We offered True the Vote
13   10 percent of the profit share of the film,
14   which is basically once you recover all the
15   costs of the film, pay back the equity
16   investor, which is Salem, the so-called P and
17   A lender, prints and advertising lender, also
18   Salem, once Salem had recouped its investment
19   and loan, then the balance left over would be
20   the profit bucket.  And we offered True the
21   Vote 10 percent of that, which I thought was
22   a reasonable amount, the reason being that,
23   of course, Salem inherently had 50 percent of
24   the bucket just by virtue of putting the
25   money in.  So everybody else had to share the

Page 123

```
 1      is of a rather elaborate and dramatic sort.
 2      There might be incidents.
 3                  And so all of this was highly
 4      toxic, in their view, and ultimately I was
 5      persuaded that we were not going to do that.
 6           Q.     Okay.  And that was based on
 7      your conversations with Catherine and Gregg?
 8           A.     And the reasoning just given.
 9           Q.     Yes.  And you said you also
10      originally wanted to show the faces of the
11      mules?
12           A.     Yes.
13           Q.     But you didn't do that either.
14      Right?
15           A.     Right.
16           Q.     And why not?
17           A.     I was persuaded in the end
18      that -- that that was not necessary and not
19      the thing that we had set out to do or to
20      show.
21                  In other words, we are not the
22      FBI.  We are not a law enforcement agency.
23      We are a -- we are a journalistic operation
24      making a documentary film attempting to throw
25      light on a matter of grave importance.
```

Page 124

1              As I mentioned, there is a

2       difference between voter fraud and election

3       fraud.  And if our goal was to try to somehow

4       bust individuals, then we would go and try to

5       find the guy who voted in Georgia, then moved

6       to Arizona and voted there also.  This was

7       never our intention.

8              Our intention was to try to

9       examine whether there is an organized

10      operation to deliver -- to traffic votes,

11      generally in bulk.  And, of course, one of

12      the overriding questions is, of a magnitude

13      sufficient to make a difference.

14             We were not interested in doing

15      investigation that showed that there was a

16      modicum of fraud that made no difference

17      because that would be, then, so what?

18             So in the end, I was

19      persuade -- we had internal discussions about

20      this and I was persuaded that it's not about

21      the individual mules.  It's not about, you

22      know, Fred who decided to do this.  Who even

23      knows wether he knew or she knew what they

24      were doing?

25             This is really about a matter

Page 125

1    of public policy significance.  And so

2    showing the face of the mules is not

3    essential and it's probably not even prudent.

4           Q.     And I've seen -- I've seen

5    public statements by you where you say there

6    were legal reasons you had to blur them.

7           A.     Those might have been also in

8    the back of my mind in the sense that

9    the -- I have an understanding, in general,

10   that things go through legal review.  Books

11   go through legal review.

12                 It's quite customary.  And I've

13   had that happen to me 25 times with pretty

14   much every book I've written.  And it is --

15   it's not unusual for us to discuss legal

16   aspects of something and try to take those

17   into account.

18          Q.     Did anyone ever tell you that

19   as long as you blurred someone's face, you

20   could say false things about them with

21   impunity?

22                 MS. HYLAND:  And I'm going to

23          instruct you not to answer that if it

24          discloses attorney-client

25          communications.

Page 127

```
 1      that even entered into my mind.
 2            Q.      And this didn't -- and the
 3      blurring didn't have anything to do with the
 4      insurance, the liability insurance, because
 5      you didn't get that for this film.
 6            A.      Well, I wasn't involved in the
 7      insurance part of the discussion, Bruce was.
 8                    But Bruce and I, you know,
 9      talked about blurring, and basically Bruce
10      and then Debbie were advocates of blurring
11      and I was an advocate for not blurring.
12                    But ultimately I acceded to
13      their concerns and agreed with them, and we
14      made the decision -- I mean, I did -- to
15      blur.
16            Q.      Okay.  So your testimony now is
17      it was just a -- it was really just a
18      stylistic issue?
19            A.      I didn't say that.
20                    MS. HYLAND:  Objection.  I
21            don't -- I don't --
22                    MS. HABER KUCK:  Okay.
23                    MS. HYLAND:  -- think that's
24            what he said.
25            A.      Yeah, I didn't say it was a
```

1    stylistic issue.  I thought it was

2    substantive on a number of levels.

3          Q.      (By Ms. Haber Kuck)  Okay.  But

4    you also were in favor of not blurring the

5    faces.

6          A.      Initially.

7          Q.      And you were convinced by

8    Mrs. D'Souza and Mr. Schooley that you

9    should.

10         A.      Yes.  And I'm trying to

11   remember if Catherine -- Catherine and Gregg

12   also weighed in on that.  I'm pretty sure

13   that they were on, loosely speaking, the

14   Bruce and Debbie side of this -- of this

15   discussion, but I don't remember anything

16   specific that they said.

17         Q.      Okay.  The last question I have

18   about Exhibit 23 is on the last page.  It

19   says (as read):  "Other."  And it says (as

20   read):  "The third thing is we need a couple

21   of investigators to hit the street.  They

22   could be on screen."

23              Do you see that?

24         A.      Where is that?

25         Q.      The last page.

1          A.     Well, I -- I discussed the
2     general findings of Catherine and Gregg with
3     people that I considered highly credible on
4     the topic of how election fraud is organized,
5     notably Hans von Spakovsky of the -- formerly
6     of the Federal Election Commission.  This is
7     a man who is an encyclopedia on election
8     fraud.
9          Q.     Well, let me just stop you
10     because we talked about him earlier.
11          A.     Yes.
12          Q.     Other than those people...
13          A.     Other than those people.  Well,
14     I guess what I was saying was initially I was
15     talking about something different.  I was
16     talking about the fact that I would draw the
17     implications of Catherine and Gregg's work
18     and test those against these other.
19               But now I'm talking about the
20     fact that I specifically discussed with Hans
21     and with Harmeet, and there was also another
22     election lawyer named Cleta Mitchell, whom I
23     met in another context, but I knew that she
24     had done some work with Catherine and Gregg.
25               And so I specifically asked

1    them about Catherine and Gregg's work and
2    asked them what their assessment was of the
3    credibility and value of this work.  And I
4    was reassured, even by some people who did
5    not like Catherine and Gregg personally, that
6    their work was excellent and that -- and that
7    this was a very alarming development that
8    they were describing and that, according to
9    Hans von Spakovsky, it fit in with other
10   things that he was quite familiar with.
11              And so he considered this to be
12   believable, I suppose plausible is another
13   way to put it, and he was very interested to
14   comment on it, and he did so in the film.
15        Q.    But, again, none of those
16   people are experts in the geotracking aspect
17   of it?
18        A.    Yeah, but we're talking about
19   two different things.  We're talking about an
20   election fraud operation and how it's carried
21   out.
22              That is quite separate from the
23   retroactive technical mechanics of
24   discovering and excavating that operation.
25              I'm talking about the former.

Page 153

1    that it was difficult to get video from them,
2    that maybe this -- that maybe they didn't
3    have the video, maybe it didn't exist?
4            A.     At times I thought that -- that
5    there may be video that we're not getting.
6    At other times they -- they never said that
7    to us.  They always emphasized, It is really
8    hard to process this video.  It's extremely
9    time-consuming.  It's extremely expensive.
10                  And so we understood that we
11    were operating with limited, sort of,
12    availability here.  And we were trying to
13    make the best of what we had.
14            Q.     Did there come a time shortly
15    after this when the Salem folks viewed the
16    film?
17            A.     The Salem folks viewed the film
18    shortly after "this," meaning after the --
19            Q.     At the --
20            A.     -- 29th of March?
21            Q.     Yeah.  Yeah.
22            A.     Yeah.  The film was released in
23    early May, and so there would have been a
24    rough cut of the film sometime in April and
25    then more of a final cut in late April, and

```
                                                Page 161
 1    works."
 2                    That was the first request?
 3         A.     Yes.
 4         Q.     She says (as read):  "We have
 5    around 70 videos currently separated out and
 6    are scaling our efforts to review more.  This
 7    is an incredibly time-consuming because it
 8    involves reading the geospatial data to try
 9    and find a match in really poorly detailed
10    county video, so only the analysts can do
11    that."
12                    Do you see that?
13         A.     Yes.
14         Q.     And are those -- she refers to
15    around 70 videos.  Are those the ones that
16    you had already received?
17         A.     I think in context it seems
18    clear; that is, it's dated February 10.  So
19    to me it makes sense in my timeline that we
20    would have gotten the first batch of videos,
21    and that's what she's referring to.
22         Q.     And do you understand, from the
23    way she describes it, she's talking about
24    videos that they had done the geospatial
25    matching on?
```

1          A.      Yeah.   My understanding was

2      that that was a consistent pattern.   And, in

3      fact, it has to be because there is no -- I

4      cannot think of a reasonable way to excavate

5      videos of mules without doing that.

6                  You've got 4 million minutes of

7      video and unless you have somebody watching

8      24 hours a day to, Hey, I found somebody at

9      this drop box, you really have to coordinate

10     the two.   That is the essence of the task

11     here.

12                 In other words, you can have

13     the geotracking without the video, but you

14     really can't have the video without the

15     geotracking, as I understand it.   And I think

16     that's what she's confirming here.

17          Q.      And then she goes -- she goes

18     down -- at the bottom she says (as read):

19     "We have millions of minutes of general

20     footage so we can break apart clips and as

21     long as they are too blurry to determine

22     identifiable features, they could work for

23     purposes of showing movement to the drop

24     boxes and giving a 'fly' effect."

25                 Do you see that?

Page 163

1        A.    Yeah.

2        Q.    So when she's using the term

3   "general footage," did you understand her to

4   mean the footage that hadn't yet been linked

5   to the geospatial tracking?

6        A.    Exactly.  She seems to be

7   saying that if you don't have enough usable

8   video, we can just scroll the video and we

9   will find some people moving around; and as

10  long as you have no idea who they are, quote,

11  sort of what we would loosely in films call

12  something like crowd footage or B role or

13  background footage or showing someone walking

14  through a subway.  There are obviously other

15  people milling about.

16             She appears to be suggesting

17  this.  It's not an advice that we took in any

18  way, but she's throwing out an idea to

19  seemingly satisfy our question.

20       Q.    And did you get a second batch

21  of footage from them?

22       A.    Yes.

23       Q.    And was that the general

24  footage as opposed to the footage that had

25  been tracked?

1         A.      No, we never got -- we never
2    got general footage.  We got a second batch
3    of mule videos.  I don't know on what date,
4    but that was Batch No. 2.
5         Q.      And your understanding that --
6    was that that was a batch of videos that
7    actually had been matched?
8         A.      Yes.
9         Q.      Did she tell you that?
10        A.      That was the agreed-upon
11   understanding of the videos, the mule videos
12   we were using in the movie, given that we
13   had -- by this time we had already done the
14   interview with Catherine and Gregg.  So this
15   is subsequent to all that.
16        Q.      Right.
17        A.      And in the -- in the interview,
18   which is to say in the movie, we couldn't
19   have been more clear up front about what a
20   mule is.
21               That was the point of the very
22   basic:  What is a mule?  What is geotracking?
23   How do you define a mule?
24               So our criteria had been put on
25   the table by then and we were operating

1      within that criteria.

2                  I -- when I read this, I paid

3      no attention to the bottom of it because I

4      took it as really one of those, We're trying

5      to be helpful and here is a wild idea.

6                  I was, like, Pass.

7                  So, no.  We were -- we asked

8      them, and I believe there is plenty of

9      documentation where we specifically asked

10     them, We need more mule videos.

11                 Not, We need general footage.

12     We need mule videos.

13         Q.     And who did -- who did they

14     give that second batch to?

15         A.     The second batch went to

16     Nathan.  I'm not sure of the mode of the

17     delivery, whether in person or somehow

18     digitally or -- I have no idea.  But I know

19     that it was delivered and Nathan received it.

20         Q.     And do you know if -- well,

21     strike that.

22                 Did you have any direct

23     conversations with Ms. Engelbrecht or

24     Mr. Phillips about what was in that second

25     batch?

Page 174

1    because this is an illicit operation.  It is

2    an under- -- is an underground operation.

3                   So it cannot be that the Ford

4    Foundation gave you this money because

5    typically that will appear in the Ford

6    Foundation's report as the money has been

7    given to you for this reason.

8                   So you are looking for really a

9    river of cash.  And that was the point

10   of consulting Scott Walter, Are there big

11   rivers of cash that flow into nonprofits

12   right around election time?

13                  And his answer was, You won't

14   be surprised, Dinesh, that the answer to that

15   is yes.

16                  And so I was like, all right,

17   without being able to connect those to the

18   mules, since we're not naming the nonprofits,

19   let's discuss that because that is -- that is

20   a very interesting question to someone who

21   would follow the trail to where the trail

22   ends, but then still have questions.  And I'm

23   going to do my best effort to answer those

24   questions.

25                  So I was not able to go beyond

1    date below.  It's given on the -- on the
2    script itself.
3          Q.      Uh-huh.  Yep.
4          A.      So this is obviously right
5    around then, maybe the 4th, maybe the 5th.
6                  And this is, like, a bit of a
7    red flag.  And she knows it because you can
8    see that she's cautiously wording this text
9    to kind of disclose something to us that she
10   knows will annoy us; namely, that:
11                  (As read):  "We are releasing
12   videos or Charlie Kirk is releasing videos,
13   surveillance videos it seems.  They are not
14   from the film, but they are from the ad in
15   Georgia."
16                  Now, I don't think I knew what
17   the so-called ad in Georgia was.  That was
18   complete, you know, mystery to me.  But
19   apparently those videos, Charlie Kirk had
20   them.
21                  So, you know, remember, this
22   is -- these are videos we were -- we were
23   hoping to release exclusively in the film,
24   which is still a month away.
25                  "...and asked us to review

Page 206

1    them."  I think she means on the show.

2                Then I think to sort of soften

3    the blow (as read):  "He says Salem knows,"

4    is to me a way of saying, Don't be too upset

5    about it.  Salem Media is the one that is

6    funding this film.  They know about it

7    because Charlie Kirk is, after all, on the

8    Salem Network.  And so since they know about

9    it, you shouldn't be too freaked out about it

10   because Salem has seemingly given tacit

11   approval.

12                So I think all of this is aimed

13   at telling us not to react, not to freak out.

14                "...but didn't want to not tell

15   you-all" is a -- is a kind of after-the-fact

16   disclosure; by the way, I'm letting you know

17   that it's coming tomorrow, heads-up.

18                So that's how I read this text

19   line by line.  And I infer from it that

20   Charlie Kirk got the videos, he seems to have

21   gotten them from the, quote, ad in Georgia,

22   whatever that is, and we had no prior

23   knowledge of any of this.

24        Q.    And what did you understand her

25   to be referring to?  She says, "... the ones

Page 207

1    we talked about."
2         A.     It seems that she's referring
3    to some conversation she had, but not with
4    me, about this ad in Georgia.  She might have
5    said something either to Debbie or somebody
6    like, Oh, there's this ad in Georgia.  It's
7    part of our -- I don't know anything about
8    it.
9         Q.     Okay.  So you -- this seems to
10   be just -- okay.  So you don't recall any
11   discussion about this ad in Georgia?
12        A.     Exactly.
13        Q.     After this -- after you got
14   this, and you said it was a bit of a red
15   flag, did you try and figure out what she was
16   talking about about the ad in Georgia?
17        A.     No.  That wasn't the part that
18   worried me.  It was rather the fact that --
19   that True the Vote was -- well, it was -- it
20   was really the fact that these videos were
21   getting out a full 30 days before the film.
22               And, you know, the way films
23   work is people make plans to go see a film
24   generally in the ten days leading up to the
25   film.  I don't even know anyone who plans 30

1    days ahead, I'm going to go see a movie.

2             So this is a serious kind of

3    problem for us when this kind of thing

4    happens.  We -- we had thought it might

5    happen.  We were worried it might happen.

6    And I think this was an indication that it

7    was happening.

8             So I -- that's really what

9    caught my attention.  It wasn't like I cared

10   about the, quote, ad in Georgia.  I didn't

11   even know what that was.

12            But what I did know was why on

13   earth would Salem allow Charlie Kirk to do

14   this?  Doesn't Salem realize that we're

15   trying to hold back on the film?  Of course

16   they do.

17            Is this even really true that

18   Salem does know?  And why are you telling us

19   this like as a fait accompli, as a done deal?

20            And so all of this was, you

21   know, I would say deeply concerning is a good

22   way to put it.

23       Q.    Well, did -- and did you have

24   any follow-up conversations with them about

25   it?

Page 209

```
 1            A.      We -- okay.  We are now in
 2      April.  So we are right about the time that
 3      the film, I think, is being edited and sort
 4      of hammered down.  This is about a -- it
 5      would be a normal schedule.
 6                    I see we talk here about (as
 7      read):  "Interesting they came with 7 percent
 8      just as we did."
 9                    So this is referring to the
10      content of a later cut of the film.  So I
11      kind of know where we are in this stage of
12      the film here.
13                    I think by this stage we were
14      very concerned about things getting out and
15      we would have conveyed that to them, yes.
16            Q.      Did you have any conversation
17      with them about -- well, strike that.
18                    Where did you think Mr. Kirk
19      got the film that he was showing on the show?
20            A.      I don't -- got the film?  You
21      mean got the video?
22            Q.      Where -- where'd he get the
23      video?
24            A.      Where he got the video?  Well,
25      the text says he had the same videos from the
```

1    ad in Georgia.  So we know what the videos

2    are.

3                    And we seem to know where they

4    came from; namely, the people who are making

5    the ad in Georgia, because they are the same

6    videos.

7                    And they are not our videos.

8    We -- and what I mean by that is they are not

9    videos from the film.  And it's quite easy to

10   tell that because you can tell the difference

11   between something that's in the film.  It has

12   a certain type of cut, color, texture,

13   et cetera.  This is -- this is seemingly the

14   raw video.

15                    So I don't know for a fact -- I

16   think I was less concerned about kind of

17   where he got it and more concerned about why

18   is this getting out?

19        Q.    Okay.  And you subsequently

20   learned that this video was being used in an

21   ad.

22        A.    Yes.

23        Q.    And did you ever hear that

24   Mr. Phillips provided the video for that

25   campaign ad?

Page 214

1          So I'm quite sure I didn't see

2     the original video.  I was simply reacting to

3     the information in the text.

4          Q.    Okay.  Around this time you

5     also provided some of the -- well, strike

6     that.

7               Around this time you also

8     showed some of the mule footage at a private

9     event for Mr. Kirk.

10              Do you recall that?

11         A.    Yes, but I think -- I recall it

12    with some specificity.  And when you say

13    "mule footage," I believe we're talking about

14    two or three specific items, which we can go

15    into.  But I -- so I am aware of the event,

16    yes.

17         Q.    And you provided -- this is

18    also around the same period of time, but you

19    provided footage to him in connection with

20    that event?

21         A.    I provided clips from the

22    movie.

23         Q.    Okay.  And which clips did you

24    provide?

25         A.    Going based on memory, I

Page 215

1    provided a clip of the interview with the

2    mule in Arizona talking in a disguised voice

3    about her participation.

4                We also provided a clip from

5    the movie of Catherine and Gregg discussing a

6    mule.

7                Now, here, by memory, I cannot

8    tell you which discussion there is.  There

9    are three or four candidates that are quite

10   obviously the ones we chose, and I could tell

11   you what those are, but I don't recall the

12   clip from memory now.

13               I just remember -- I just know

14   what I asked for, I know what we got, and I

15   know what we -- you know, well -- I know the

16   designation of the videos that we sent.

17        Q.    And was one of -- is it

18   possible that one of those clips was the clip

19   of Mr. Andrews?

20        A.    No.

21        Q.    Okay.  Did you have a concern

22   in providing those clips for this private

23   donor event that the -- that they could get

24   leaked out?

25        A.    The -- I don't remember the

Page 216

1    date of the private donor event, but I was

2    not concerned about that because the -- we

3    keep a fairly tight control over our own

4    material, and not to mention the fact that if

5    those exact videos got leaked out, we would

6    know exactly who leaked it; namely, Charlie

7    Kirk and "Turning Point."

8                And I'm sure we were quite

9    emphatic with them that that cannot and

10   should not happen.  And those were not, in

11   fact, the videos that appeared on "The

12   Charlie Kirk Show."

13        Q.    And how are you -- how can you

14   be sure of that?

15        A.    Because of the description of

16   them.  The description of the videos is

17   entirely different.  Clearly the videos we

18   sent are from our film.

19                And Charlie Kirk never showed

20   the interview with the mule.  He never showed

21   Catherine and Gregg discussing a mule.

22                So we had sent very short and

23   particular clips that are described in the --

24   in the request and -- in what we sent, and,

25   quite obviously, they are not these videos.

```
 1    And now that I've seen these videos, I
 2    actually know that these are different
 3    videos.
 4         Q.    And also you can tell by the
 5    quality of the video?
 6         A.    By the nature of the cut.
 7    Somebody like Nathan would give you five
 8    immediate, like, technical reasons, but they
 9    looked different.
10         Q.    Yeah.  Okay.
11         A.    I also want to emphasize, you
12    know, that with regard to Charlie Kirk, not
13    only did we not send him those videos, we
14    couldn't have and we had no good reason to.
15              We couldn't have because we
16    didn't even know the show was going to
17    happen.  So there's no way we could have sent
18    videos for a show that we had no idea was
19    occurring at all.
20              I'm now talking about the
21    interview with Gregg and Catherine.
22         Q.    Right.
23         A.    And moreover, it would be very
24    destructive to our own interests to do that
25    when we're trying to hold the videos close to
```

                                                    Page 218

1    our chest and not release them prior to the

2    film.

3              So for all of these reasons,

4    not only did we not send the videos, but we

5    couldn't have, and it runs completely against

6    our interest to do it.

7         Q.    But he could have used the

8    videos that you sent him, but he just didn't.

9         A.    He just -- he could have used

10   the videos that I sent him, which would have

11   been a breach of trust if he had done that.

12   I think he would probably have gotten a phone

13   call from me immediately had that happened.

14             He -- Charlie Kirk is a very

15   smart guy and I'm sure he knew that.  I also

16   think that he did not want to -- he knew that

17   he --

18             He knows enough to know that

19   the film is quite a-ways away, and so it's

20   very important for him to play nonfilm videos

21   because that way he can say, Well, I got the

22   videos myself and so I'm not -- I'm not

23   trespassing on the film, Dinesh.

24             So there's a -- I mean, I sort

25   of can see this -- how this happened from

1    to do, don't use it.  If you're telling me

2    that you want to use 42 seconds and you want

3    us to make a shorter cut, we would be willing

4    to do that.  But you cannot appropriate our

5    teaser in the way that you've described.

6              And then I got an extremely

7    brash and abusive text from the executive

8    vice president, a guy named Justin B. Wells,

9    where he says things like, Dinesh, that's it.

10   We were trying to do you a favor.  You will

11   never appear on "Tucker" again, blah, blah,

12   blah.

13             And -- but I didn't budge.  And

14   they realized that they couldn't use the

15   trailer and so they pulled the show.

16        Q.    And then -- but then sometime

17   later in May, Ms. Engelbrecht did go on

18   "Tucker Carlson" and there was some footage

19   shown.  Correct?

20        A.    Later, right around the time

21   the movie came out, Catherine, yes, she did

22   go on "Tucker Carlson" and in an appearance

23   that we had sort of expected would be a

24   promotion of the movie, because the movie at

25   this point was either -- had been released or

Page 223

1    on the verge of being released, and so

2    publicity at this point would do us a lot of

3    good.

4                    And Tucker, of course, is the

5    No. 1 show on Fox.  So that was an added

6    reason to want this to -- to be helpful to

7    the movie.

8                    As a matter of fact, I would

9    say -- I would not say it was unhelpful to

10   the movie, but it was -- it was much below

11   our expectations because the movie was never

12   mentioned either by Tucker or by Catherine.

13                   And to be honest, that's really

14   what, at the time, caught my attention.  It

15   wasn't the videos.  Quite honestly, I wasn't

16   paying attention to what videos were shown.

17                   The movie either being out or

18   being on the verge of being out -- this was

19   not the same as "The Charlie Kirk Show"

20   because at that point, the videos were one

21   month away from being released.  But the

22   movie has evidently either been out -- is

23   already out.

24                   So my attention was, what's

25   going on here?  You have Tucker, who doesn't

Page 224

```
 1     want to say a word about the movie.
 2     Catherine is evidently on board with this.
 3               I sort of felt that it was bad
 4     blood from Tucker, going back to my earlier
 5     skirmish with his -- you know, his sidekick.
 6               But I was more bewildered by
 7     Catherine because I thought it's Catherine's
 8     job to help us promote this film.  The film
 9     is, like, red hot.  This is the time to be
10     doing that kind of promotion.  You're clearly
11     okay with not doing it.
12               I understand you like to be on
13     "Tucker."  I don't know if this is a
14     condition that Tucker and his people imposed
15     on you.  I have no idea.  But this is not
16     what we had hoped for.
17          Q.     And did you know in advance she
18     was going to be on the show?
19          A.     I think she told us that she
20     was going to be on the show, but I don't
21     remember if she told Debbie or if she told
22     me.  I think she said, I'm going on "Tucker."
23          Q.     And where did the footage that
24     was shown on "The Tucker Carlson Show" come
25     from?
```

```
 1           A.      It certainly didn't come from
 2      us.  And it couldn't have come from us.
 3      We -- our communications with Tucker were cut
 4      off at that point.
 5                   Obviously, the teaser trailer
 6      was a completely different thing at that
 7      point.  The teaser, in fact, had very little
 8      video.  And all the video that we had was
 9      extremely early.
10                   The -- now that I know a little
11      bit more about what was on "Tucker" in terms
12      of the video, as I say, at the time I paid
13      very little attention to what -- you know,
14      are these blurred or unblurred?  I don't even
15      think I could even tell looking at the video.
16                   But the truth of it is that
17      wasn't my focus.  My focus was somebody
18      was -- primary concern and the main, like,
19      marketing guy for the movie, like this is a
20      foregone opportunity and it probably blows
21      our chance to have the movie talked about on
22      "Tucker" at all.
23           Q.      And did you -- you reposted
24      that interview, though.  Right?
25           A.      Yeah, one my social media guys
```

Page 226

1    did.

2          Q.      And you didn't blur any of the

3    video when you reposted it.

4          A.      Well, we didn't know what was

5    in the interview at that point.  The -- my

6    schedule is such that when a movie comes out,

7    I'm doing back-to-back interviews, morning to

8    night.

9                  And so what -- the reason we

10   share content is it's content relevant to the

11   movie.  I think we expected that it would

12   promote the movie.

13                 Obviously, it's a big show,

14   "Tucker."  And we had been trying to also do

15   things with Hannity and on Laura's show as

16   well, Laura Ingraham.

17                 And so I think from the point

18   of view of my social media guys, they're

19   like, Catherine Engelbrecht is talking about

20   mules on "Tucker Carlson."  You know, share.

21                 And so I'm sure I approved of

22   the decision, but it was not based upon me

23   reviewing videos that Tucker showed or

24   anything like that.  I had no idea what that

25   was.

```
 1              As I say, what I -- when I
 2     learned about was she -- and I think people
 3     told me.  It's not that I even watched the
 4     show -- not a word about "2000 Mules."
 5              And I'm like, yeah, Tucker, I
 6     had this bad blood.  But Catherine never said
 7     a word about it?  No?  It's like the movie
 8     doesn't exist.  That was like, This is
 9     horrible.
10         Q.    So at some point in time did
11     you come to understand that Ms. Engelbrecht
12     was instructed not to mention the movie by
13     name?
14         A.    No, I was never -- I never got
15     the inside story of that.  I'm merely
16     offering the two possibilities.
17         Q.    And you don't recall Tweeting
18     about Fox instructing her not to mention the
19     film?
20         A.    I don't remember that.  I do
21     remember a little bit later doing some
22     postmortems on the film and Fox.  I've
23     actually not been on Fox since "2000 Mules,"
24     and it has to do with their extreme
25     skittishness around this issue, even though
```

Page 251

1    what data ACLED does and doesn't have.

2                  In other words, it wasn't until

3    I read after the movie, in Dreisbach's

4    article or other articles, simply a spokesman

5    for ACLED disavowing the connection that True

6    the Vote had made and saying, We don't do it

7    this way.

8                  But that was news to me when I

9    heard that in the article.  In other words, I

10   was like, Oh, you don't do it that way?

11                 And then I was thinking

12   through, What could Gregg have meant then

13   when he said what he said about ACLED?

14                 And I'm just telling you

15   what -- what I think now.

16        Q.     Did you ask him?

17        A.     I think ACLED came up at one

18   point and Gregg was not very clear about what

19   it is that they did or didn't do.

20                 Part of the -- part of the

21   problem here, I think, is that we were

22   getting information not firsthand, but

23   refracted through the lens of critical media.

24                 In other words, it's quite

25   clear that Tom Dreisbach had his agenda.  He

Page 252

```
 1    was trying to debunk the movie, using ACLED
 2    for that purpose.
 3                  And so we had to sort out what
 4    is ACLED saying?  What is it that ACLED does?
 5    Is ACLED trying to kind of cover its tracks
 6    in some way?
 7                  Are they being deliberately
 8    ambiguous?  What is Dreisbach -- what words
 9    is Dreisbach putting in their mouth?  What
10    words are in quotes and what are not?
11                  I guess what I'm saying is I
12    think you -- I think you know what I'm
13    getting at.  I'm saying we're getting
14    information at least one step removed.  And
15    so we ourselves have to be a little
16    skeptical -- all of us I think are these
17    dates -- of things you just read.
18         Q.    Did you check up on it after
19    you read Mr. Dreisbach's article?
20         A.    I spoke to Tom about it, about
21    this stuff.  So we discussed it, the two of
22    us.  I didn't contact ACLED directly, no.
23    But I got Tom's best understanding of what
24    was going on.
25                  And I assumed -- I mean, I
```

Page 255

1    pulled.

2         Q.    Okay.  And you're not aware of

3    a settlement that Salem reached with ACLED

4    relating to statements made in the book, part

5    of which included the little blurb you're

6    talking about?

7         A.    Not until right now.

8         Q.    So the third category in -- on

9    Ms. Engelbrecht's list is (as read):

10   "Nonmule video in the movie."

11              What did you understand her to

12   be referring to there?

13        A.    She appears to be referring to

14   some video in the movie that does not pertain

15   to a mule.

16        Q.    Right.

17        A.    And it's not clear whether it's

18   even her video or if she's objecting or has a

19   point to make about -- or has a tiger trap

20   about some nonmule video in the movie.

21              I think in my mind at the time,

22   we have -- we have some video in the movie --

23   early in the movie, for example, we show a

24   video which came from Project Veritas.  And

25   it's about a guy, a sort of a Somalian guy

Page 256

1  who appears to be, like, buying votes or
2  something like that.  And he's -- he appears
3  to either be paying someone for a vote --
4          Anyway, James O'Keefe had
5  released this video publicly.  It's not --
6  it's not our video, but we did have it in the
7  movie.
8          And so there were these sort of
9  rare, but, nevertheless, other videos in the
10 movie.  And I guess I thought -- you know, I
11 don't know, I want to hear what Catherine is
12 talking about, but it made -- I didn't know
13 at all --
14      Q.    Okay.  So --
15      A.    -- beyond what I just said.
16      Q.    Did you ask her what she was
17 talking about?
18      A.    This is -- let me -- let me
19 look at this.
20      Q.    May 16.
21      A.    May 16, yeah.
22          This is in the -- in the
23 absolute media frenzy of the movie.  I don't
24 remember the, quote, connect tomorrow
25 conversation occurring at all.

Page 259

```
1            Q.      And that was in May of 2022.
2       Does that sound right?
3            A.      It sounds right.
4            Q.      Okay.  And you -- you became
5       aware of that complaint at some point in
6       time?
7            A.      I became aware of it at some
8       point in time.  I don't know exactly when.
9       And I think I saw something about it posted
10      on the platform now X, but then Twitter.  I
11      think I saw something about it.
12           Q.      And what do you recall?  Do you
13      recall that the SEB cleared Mr. Andrews?
14           A.      I remember seeing a video in
15      which an investigator was talking.  It was a
16      video, so I saw him.  It was evidently from
17      some sort of a proceeding.  And he was saying
18      what he did.
19                   And he was saying that based
20      upon what he did, he had no reason to suspect
21      any wrongdoing, something to that effect.
22                   And then I think I might
23      have -- I don't know if I learned from that
24      video or from something else that
25      subsequently that case was dismissed.
```

1          Q.      And do you recall posting

2     around that time something to the effect

3     that, you know, the investigation was a joke

4     because all they did was talk to the mule?

5          A.      I thought -- I remember when I

6     saw it, I thought, This is not what I would

7     call an investigation.

8               Because you have to remember

9     the context of the movie.  The movie is

10    describing a rather widespread phenomenon.

11    The expectation of the movie, which is

12    discussed in the movie, is to have sort of

13    systematic follow-up to the movie that goes,

14    again, beyond the water's edge, by which I

15    mean takes up questions the movie cannot go

16    further in.

17               So we're showing patterns of

18    geotracking in five different states.  We're

19    showing surveillance video that is -- that is

20    very striking on its face involving lots of

21    different people.

22               And kind of my expectation was,

23    all right, what we need is some sort of

24    investigation where you go talk to all of

25    these people and ask them:

Page 261

1              Well, what were you doing at
2      1:30 in the morning with a backpack full of
3      ballots?  Do you have some alternative
4      explanation for your behavior that would make
5      sense, other than you're somehow doing
6      something wrong?
7                   So that's the context.  That,
8      in fact, in a systematic way never happens.
9                   So this was the -- in some ways
10     the closest that I saw to a -- to an
11     investigation.  And I think it struck me at
12     the time, given these expectations, as being
13     inadequate.
14                   If I said it was a joke, I was
15     probably reacting a little emotionally.  But
16     on the other hand, "inadequate" is probably a
17     better term that I would use now.
18          Q.     And the -- and you understood
19     at the time that the complaint was based on
20     surveillance footage that you also used in
21     the film.  Right?
22          A.     I'm not sure if I understood
23     that at the time.  I think I gleaned from the
24     context that there had been some sort of
25     complaint.

1          I honestly don't remember,
2     because I haven't seen that video since,
3     whether the investigator referenced the movie
4     or referenced -- but I was obviously familiar
5     with the fact that they were talking about
6     trafficking and they were talking about, you
7     know, Mules.  So in that sense, it clearly
8     pertained to the movie.
9          And obviously we had nothing to
10    do with the circumstances of that complaint.
11    We didn't make the complaint.  So -- and I
12    had no knowledge of any of that.
13          But I was like, whoa, this is
14    something -- he's talking about something
15    that is relevant to our movie.  I saw it that
16    way.
17          And then I was like -- and I
18    remember my reaction was that if this is what
19    you call an investigation, this is not really
20    an investigation of a phenomenon that is very
21    seriously presented in this movie.
22          And what you seem to have been
23    done to clear this guy is what I would call
24    sort of the irresponsible bare minimum.
25         Q.    But you were on notice the

Page 263

1    mule, or the person that they were discussing
2    in this complaint was one of the mules you
3    were portraying in the movie.  You knew that
4    at the time.
5        A.    I'm not sure if I did.  I might
6    have honestly because I -- because I think it
7    would have piqued my interest.  Obviously, if
8    they said, This was the guy portrayed in
9    "2000 Mules," I, of course, knew that we had
10   blurred the faces of the mules.
11             And so -- and so maybe I was
12   aware that there was some connection to the
13   movie, but I also knew for a fact that this
14   was not a case that was in any way brought by
15   us.
16             Let's remember the movie is a
17   few days old.
18        Q.    Right.
19        A.    So the idea that there is a
20   movie that just came out, like, last Tuesday
21   and somehow there is some sort of case before
22   the election commission, quote, coming out of
23   the movie based upon images that are
24   unrecognizable and completely blurred struck
25   me as sort of preposterous.

Page 268

1    And did you see the way they carried that

2    out?

3                    That was what I got out of that

4    video.  Because the mules were blurred in the

5    movie, it didn't even cross my mind that we

6    had some problem with mules in the movie

7    because we hadn't shown any Mules in the

8    movie.  That was my point.  We hadn't shown a

9    single mule in the movie.

10         Q.    Well, you showed mules in

11    the -- you showed people that you

12    characterized as mules in the movie.  You

13    just blurred their faces.  Is that fair?

14         A.    Right.  But -- but what I'm

15    saying is if somebody says, you know, that I

16    saw Dinesh on Park Avenue and 35th and, in

17    fact, I was wearing a Halloween mask, there

18    is simply no way you could have said, I saw

19    Dinesh.

20                    It makes no sense, because

21    Dinesh was wearing -- was not -- Dinesh was

22    wearing a Halloween mask.  There was no way

23    to identify Dinesh.

24                    So my point being that -- was

25    simply this:  Yes, we did show mules in the

movie, people that -- that we believed were 100 percent mules. We blurred their faces so that they were unrecognizable.

And so the fact that there was a case of an alleged mule supposedly in the movie was something that was obviously interesting, but I was like, this didn't come from the movie.

In the movie you see bodies moving, but you cannot tell who they are. And -- and also, as I said, when I looked at the case, I'm like, This investigation actually tells me very little about the circumstances involving this person because it omits some obvious things that one would normally do. And then it's like, you know, clap your hands because the thing is closed.

I was like, okay, I understand. Okay, I'm -- you know, this is not my hearing, obviously; but to me it's a little bit -- it's a little bit shoddy.

Q. All right. Let's look at a document that I'm marking as Exhibit 104. It bears Control Nos. DDR-00049510 through DDR-00049511.

Page 293

```
 1        A.      How did it come to pass?  I had
 2   a two-book deal with Salem Media.  It is
 3   customary for me to write books that go along
 4   with my films.  I've done that on multiple
 5   occasions.
 6              The Obama book, the book called
 7   "America" that matched a film of the same
 8   title.  "Hillary's America," which matched a
 9   film of the same title.
10              So this was my practice to do
11   something like this.  And I undertook the
12   project very much in the understanding that
13   this would be my book.  As with the film, it
14   would give a lot of credit to True the Vote
15   and it would cite them and refer to their
16   work.
17              But a book is not a -- a film
18   is different than a book.  A book is
19   typically an individual's enterprise, and so
20   I undertook to do this as an individual.
21   And, of course, I told Catherine and Gregg
22   about it.
23        Q.    Was Ms. Engelbrecht at some
24   time thinking about also writing a book?
25        A.      After I told her that I was
```

Page 306

```
 1          A.     Oh, that is true.
 2          Q.     And we've talked a couple of
 3     times about the first printing being
 4     recalled.
 5                 How did you come to learn it
 6     was being recalled?
 7          A.     I learned about it from
 8     Regnery.
 9          Q.     And was it's Regnery's decision
10     to recall the book?
11          A.     100 percent.
12          Q.     And what did they tell you
13     about why they were recalling the book?
14          A.     They told me that they were
15     recalling the book because they had concerns
16     about me having listed some of the nonprofit
17     organizations or NGOs in the book.
18                 They took full responsibility
19     for it and they said that all books
20     customarily -- always go through a legal
21     review and they had neglected to do that.
22     And the legal review should have picked that
23     up and the issue resolved, but they
24     didn't -- it was their fault that they didn't
25     do that and, therefore, they were -- it was
```

Page 307

1      their mistake, their responsibility, and,

2      however, they were -- they had decided to

3      pull the book.

4            Q.     And your -- your understanding,

5      as we talked about earlier, is it didn't have

6      anything to do with ACLED?

7            A.     Yes.  It didn't have anything

8      to do with ACLED.  That was never mentioned.

9            Q.     And you said you originally

10     named the NGOs in the book.  Correct?

11           A.     Some of them, yes.

12           Q.     And where did you get the

13     information that you used?

14           A.     I got it from some of the

15     documentation that Catherine and Gregg

16     provided.  In other words, I had, by that

17     time, done a pretty careful study of the

18     information.

19                  And as you saw from earlier

20     things that you showed me, there

21     were -- there was information that Catherine

22     and Gregg had provided relative to at least

23     some of the NGOs, if not all.

24                  And I had a relatively

25     innocuous statement in the book that didn't

Page 317

1          Q.      And did you review it when you
2    received it?
3          A.      I read it, yes.
4          Q.      Did you take any actions as a
5    result of the letter?
6          A.      What do you mean by "actions"?
7          Q.      Did you -- well anything.  Did
8    you do anything in response to the letter?
9          A.      I took the letter as a -- a
10   sort of a legal warning and a legal threat,
11   and I began the process of finding a lawyer
12   to represent me in dealing with this matter.
13         Q.      Did you take any action with
14   respect to your forthcoming book?
15         A.      The book was, by this time,
16   completely out of my hands and there is no
17   action to be taken, or that I could have
18   taken.
19         Q.      Did you have any discussions
20   with anyone at Regnery or Salem Media about
21   the implications of this for you book, which
22   was the second printing which was coming out
23   about this time?
24         A.      I don't remember if the topic
25   came up with Salem at this point.