# EXHIBIT 7

CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION
3   MARK ANDREWS,                    :
                                     :
4         Plaintiff,                 :
                                     : Case No.
5   V.                               : 1:22-cv-04259-SDG
                                     :
6   DINESH D'SOUZA, et al.,          :
          Defendants.                :
7
8
9

      *************************************
10             C O N F I D E N T I A L
11       VIDEOTAPED / REALTIMED DEPOSITION OF
12              DEBORAH C. D'SOUZA
13              OCTOBER 16, 2024
14       *************************************
15
16
17
18
19
20
21
22
23
24
25

Page 24

1    Catherine and Gregg, Catherine Engelbrecht

2    and Gregg Phillips, into -- into the fold.

3              I -- we make films about things

4    that -- you know, that are current, that are

5    of interest to the -- to the general public.

6    For me, particularly, election integrity is

7    very important.

8              I'm from -- Venezuela is my

9    home country and I know what happened in

10   Venezuela as far as election -- election

11   fraud, election integrity.  It had none.  So

12   I was determined that that was going to be

13   something that I was going to be very

14   involved in early on, even before this movie.

15             I was trained by Catherine.

16   That is -- I guess let me rephrase that.

17   That is how I met Catherine --

18        Q.    Okay.

19        A.    -- in 2009, I believe.  She was

20   a part of -- or helped found True the Vote,

21   which is an organization that really looks

22   into election integrity.  It's nonpartisan.

23             So we want to make sure that

24   every vote counts regardless of who the

25   person is voting for.  And that was my

Page 25

1    passion, so I was very involved in that.

2                    Given that Spanish is my first

3    language, I helped with the bilingual portion

4    of being a poll watcher in areas that were

5    mainly Spanish-speaking.  So I learned to do

6    that.

7                    But that was really my --

8    really my role then.

9                    And so Catherine and I have

10   maybe, you know, texted each other throughout

11   the years about different things, but because

12   I know that True the Vote is -- does election

13   integrity and I knew that that was -- that we

14   were having a lot of questions about the 2020

15   election, I mentioned to Dinesh that I knew

16   Catherine and that she did really great work

17   with True the Vote.

18                    And so Catherine told me that

19   they had some things that they had found, and

20   that was primarily why we asked them to come

21   talk to us about what their findings were.

22                    And given the fact that, again,

23   this is something very near and dear to me,

24   Dinesh was like, Okay, well, we have to make

25   sure that this is -- that this is legitimate,

CONFIDENTIAL

Page 26

1    that this is actually something that we

2    can -- we can prove.

3                    And so that -- my role was

4    really kind of being the conduit to Catherine

5    and Gregg and our team.

6         Q.     Okay.  And when you said you

7    were trained by Catherine --

8         A.     Uh-huh.

9         Q.     -- what was that training?

10        A.     Well, the training was done by

11   True the Vote.  So --

12        Q.     Okay.

13        A.     So Catherine herself -- I don't

14   even remember, to be honest.  This was 2010,

15   so I don't remember if -- Catherine was

16   probably there, but it wasn't actually

17   Catherine that trained me.  It was her --

18        Q.     Okay.

19        A.     -- team that trained me.

20                    They just basically went

21   through the rules, this is what you can do.

22   This is -- if you see this, you can -- you

23   know, you can interject yourself in it.  You

24   can talk to the poll judge about what -- you

25   know, what happened.

CONFIDENTIAL

Page 27

```
 1                    You can -- you can let the
 2      judge know that you know the rules in a
 3      voting location and that you will be sitting
 4      behind the -- you know, the -- I guess, the
 5      poll judge and the workers.
 6                    You're not to, you know, go in
 7      there and talk to the people that are coming
 8      in, but if you hear something, say something.
 9                    And so that was really my role.
10           Q.       And that's what -- that's what
11      you meant by being a poll watcher?
12           A.       Yeah.
13           Q.       Okay.
14           A.       Observer.  Really a poll
15      observer, I guess, would be the correct
16      terminology.
17           Q.       And how long did you do that
18      work?
19           A.       I only did it for the election
20      of the -- the 2012 election.
21           Q.       Okay.  And with respect to the
22      film, how much time do you think you spent,
23      say, on a weekly basis during the making of
24      the film?
25           A.       On the film itself?
```

1    that.

2                Do you recall getting any

3    additional written information from

4    Ms. Engelbrecht other than what we just

5    looked at in connection with the discussions

6    about whether to make a documentary about the

7    2000 mules?

8         A.    Specifically, no, but I'm sure

9    we did.

10        Q.    And you can't recall the nature

11   of the other information?

12        A.    No.

13        Q.    Was there a point in time at

14   which Ms. Engelbrecht and Mr. Phillips gave a

15   presentation at your home about their

16   research, again, before deciding -- in this

17   time period in the fall of 2021?

18        A.    They came to our home, yes.  I

19   think it was in the summer.  It may have

20   actually been in August.

21        Q.    But do you recall whether it

22   was before or after you got that big email?

23        A.    I'm trying to remember.

24   Probably before because -- because it

25   wouldn't have made sense for them to send us

1          Q.        They went to ten drop boxes,
2    they had to have gone to a nonprofit, and
3    there is some speculation or assumption that
4    they got paid to do it.
5          A.        (Moving head up and down.)
6          Q.        Okay.
7          A.        Correct.  Yes.
8                    MS. HYLAND:  Yeah.  I was just
9            going to remind to you give verbal
10           answers.
11         A.        Yes, yes.  Absolute- -- yes,
12   correct.
13         Q.        (By Ms. Haber Kuck)  So the
14   presentation that they gave -- well, would
15   you have called it a presentation at your
16   house, or was it just a discussion?
17         A.        Well, I mean, they showed us
18   that video.  So, I mean --
19         Q.        Yeah.
20         A.        -- I guess you can call it a
21   presentation of the video.  But it was mostly
22   just we were sitting in our living room
23   chatting about it.
24         Q.        And did they -- other than the
25   video, did they show you anything else on

CONFIDENTIAL

Page 52

```
 1    their computer?
 2          A.      I think Gregg had some
 3    geotracking graphic that he got from the New
 4    York Times article, but it was not his
 5    geotracking on the mules.  It was an article
 6    and he was showing us how the New York Times
 7    geotracking article was -- so that they were
 8    following the same type of, you know, of -- I
 9    don't even know what you call it -- same type
10    of geotracking, I guess.
11          Q.      Methodology?
12          A.      Methodology, yes.
13          Q.      And he didn't show you -- did
14    he show you any maps from his own research,
15    you know, showing these people who met the
16    criteria in their study, you know, going
17    around to different places?
18          A.      Yeah, they did, but not then.
19          Q.      Okay.  Do you recall when that
20    was that they showed you that?
21          A.      Probably the fall.  Which
22    month, I don't know.
23          Q.      And you had a meeting with
24    Salem at some point.  Right?
25          A.      I believe October.
```

1    meeting?  Who set the meeting up?

2          A.      Dinesh.

3          Q.      And did you -- other than --

4    other than scheduling, did you have any

5    conversations with him about the substance of

6    the meeting or what TTV would present or

7    anything like that?

8          A.      Conversation with?

9          Q.      Mr. D'Souza.

10         A.      I'm sure we did, yes.

11         Q.      Do you recall?

12         A.      Well, we talked about making

13   sure that they got a chance to present.

14                 Also, I remember Dinesh and I

15   saying that they needed to make sure that

16   they -- or telling Catherine that they need

17   to make sure they have their laptop and that

18   it was charged and all of those things.

19         Q.      And so who do you recall being

20   at this meeting with Salem?

21         A.      I know their attorney, Chris

22   Henderson, was there.

23                 THE WITNESS:  Is that his name,

24   Chris Henderson?

25                 MR. D'SOUZA:  (Moving head up

CONFIDENTIAL

Page 60

1          and down.)

2          A.      Yeah, so he was there.  The CEO

3     of the company, Dave Santrella, was there.

4     The prior CEO, Ed Atsinger, was there.  A few

5     of the other VPs.

6                  I don't recall exactly who was

7     there.  Probably six or seven of them.

8          Q.      (By Ms. Haber Kuck)  Okay.  And

9     then -- so how did the -- how did the meeting

10    go?  Was there a presentation first?  Did

11    they just ask questions?

12                 How did the -- how did the

13    meeting proceed in terms of Ms. Engelbrecht

14    and Mr. Phillips providing them with

15    information?

16         A.      Well, they presented their

17    information.  And then I believe Mr. Atsinger

18    asked them questions.  Or different --

19    different Salem people asked them questions,

20    yes.

21         Q.      And what did their presentation

22    entail?

23         A.      Very similar to what they

24    showed us except a little bit more detailed.

25    So I think they showed -- they may have

Page 61

1    showed one more video or two more videos.

2                    They also, I believe, showed

3    some of the -- there were a couple of crimes

4    that happened in Atlanta with, you know, one

5    of them was a very horrific -- I don't know

6    if it was a drive-by shooting, but it was a

7    little girl that was killed in Atlanta and

8    they geotracked the phones.

9                    And I don't really know if

10   they -- at that point if they had given the

11   GBI that information, but that was one of the

12   murders.

13                   And so I think they were trying

14   to show that geotracking helps solve crimes,

15   helps solve, you know, mystery of, you know,

16   who -- which person was at this location

17   when, that kind of thing.

18                   And so I know that they

19   presented that as part of the big picture.

20        Q.      Did they also refer to

21   tracking, for lack of a better word, the

22   mules going to riots or other -- at some

23   point there was talk of ACLED?

24                   Does that ring a bell?

25        A.      No.

CONFIDENTIAL

1      Q.      Did they -- did they talk about

2   these people also being present at violent

3   protests?

4      A.      You mean the mules?

5      Q.      The mules, yeah.

6      A.      I believe so, yes.

7      Q.      What do you recall about that?

8      A.      Just that.

9      Q.      Okay.

10     A.      Uh-huh.

11     Q.      And the presentation that they

12   gave, was there anything in writing?

13     A.      You mean as in handouts or

14   anything?

15     Q.      Yeah.

16     A.      I don't recall that.

17     Q.      Okay.  And you said they

18   present -- so they presented it on their

19   computer?

20     A.      Yes.

21     Q.      And was it projected someplace

22   or they just had a laptop?

23     A.      I believe it was projected on a

24   screen, but I could be wrong.

25     Q.      And you said at some point you

Page 63

1    saw maps of the mules traveling around.
2    Correct?
3           A.      Yes.
4           Q.      And you think it might have
5    been at this meeting?
6           A.      It could have been at this
7    meeting.  It could have been a little later.
8    I know it was in the fall, but I don't
9    remember exactly when.
10          Q.      And between the meeting at your
11   house and the Salem meeting, did you have any
12   other substantive meetings with
13   Ms. Engelbrecht and Mr. Phillips about their
14   research?
15          A.      No.
16          Q.      And so what was the -- what was
17   the outcome of the meeting with Salem?
18          A.      At the -- I don't -- I'm not
19   sure if Salem decided right away to do this
20   project or if it took them a couple of -- I
21   don't really remember.
22          (Electronic voice interruption.)
23          Q.      (By Ms. Haber Kuck)  Did you
24   have any conversations with Salem directly
25   about their decision as to whether to proceed

1          Q.      And do you know what he was
2     referring to there?
3          A.      Yes, I do.
4          Q.      And can you tell me?
5          A.      Yes.  We were -- in fact,
6     Catherine and Gregg signed a nondisclosure
7     agreement so that all of these videos that
8     included mules would not be leaked to the
9     media, to the public, because that was the
10    whole point of doing a documentary, to have
11    all of this documented so that it would be in
12    one place.
13              And so we were -- we were very
14    clear to them that we did not want them to go
15    to any media outlet and release any footage
16    of any of these mules going to drop boxes.
17         Q.      Right.  And so, again, this is
18    the 70 videos that they gave you of people
19    they had identified as mules?
20         A.      Correct.
21         Q.      And did they ultimately comply
22    with that nondisclosure agreement?
23         A.      No, but after -- I didn't learn
24    about it until after the fact.
25         Q.      And what did you learn after

CONFIDENTIAL

Page 92

1    the fact?

2          A.      That they had gone to some

3    media outlets with some videos.

4          Q.      Which media outlets?

5          A.      If I remember, let's see,

6    Epoch, "Epoch Times," maybe.  What was the

7    other -- "Gateway Pundit" I think was another

8    one.

9                  Solomon, "John Solomon" was

10   another one.  But I believe that one may have

11   been even before they came to us with the

12   findings.  So that didn't really count

13   because it was before they signed the

14   agreement.

15                 And then there was

16   another -- another instance where they were

17   on "Charlie Kirk" for an interview.  And we

18   found out as it was happening that they had

19   gone to them and were doing an interview

20   about the mules.

21         Q.      And with respect to Charlie,

22   the Charlie Kirk interview, what was your

23   understanding of where the video that he

24   showed came from?

25         A.      I don't know where they --

1     Q.    Is she making some distinction

2     between the videos that were matched and just

3     general drop box video they had?

4                What is she -- what do you

5     understand her to be talking about in terms

6     of general video?

7     A.    I do not know.  I cannot

8     speculate.  I really don't know.

9     Q.    Do you recall discussions with

10    anyone where she indicated that the second

11    batch of videos were not videos that had been

12    linked geospatially?

13    A.    No.

14    Q.    Do you -- do you recall any

15    discussion with her specifically about video

16    from Gwinnett County?

17    A.    No.  I believe it was just what

18    was discussed in the film.  That's -- that

19    was the only discussion about Gwinnett County

20    that we had.

21    Q.    Did you have an understanding

22    that the video from Gwinnett County had been

23    obtained by TTV too late for them to do a

24    geolocation -- geospatial linking of the data

25    in the video?

CONFIDENTIAL

Page 121

1        A.      No.  As far as I'm concerned,
2    we had no idea.
3        Q.      And when you say "we," who do
4    you mean?
5        A.      Dinesh and I.
6        Q.      And why -- do you have any
7    basis for thinking that he didn't know that?
8        A.      Who?
9        Q.      Mr. D'Souza.  You can -- I
10   understand what you understood or not.
11       A.      Oh, yes.  Yes.
12       Q.      I'm asking you for your basis
13   of saying he didn't understand that.
14       A.      I don't know that.
15       Q.      Okay.
16       A.      Yeah, I don't know what he
17   understood or didn't.
18       Q.      Right.  So you can only speak
19   for what you understood.
20       A.      Right.  Correct.
21       Q.      And then on the second entry,
22   she says (as read):  "Here's a link to
23   Georgia and Arizona, organizations that have
24   been -- that have published 990s."
25               Do you see that?

CONFIDENTIAL

Page 139

```
 1              So -- and I wasn't in charge of
 2     the Mar-a-Lago event, so I really --
 3         Q.       Yeah.
 4         A.       -- don't know what -- you know,
 5     what was sent or wasn't.  Yeah, I think
 6     that's --
 7         Q.       And who was --
 8         A.       -- what it was.
 9         Q.       Who was in charge of that
10     event?
11         A.       So it was -- well, by -- I
12     guess by "in charge," it was Dinesh.  But
13     Danielle, his daughter, is the one that
14     compiled the list and sent the invitations.
15         Q.       And in these credits that
16     Ms. Engelbrecht is including, it says, at the
17     very bottom (as read):  "Special thanks to
18     Heather Mullins and David Cross for their
19     tireless research."
20              Do you see that?
21         A.       Yes.
22         Q.       And we talked about Heather
23     Mullins.
24              Do you know who David Cross is?
25         A.       I do not.
```

CONFIDENTIAL

Page 140

```
 1          Q.      You've never heard that name
 2   before?
 3          A.      Only -- only after the lawsuit.
 4          Q.      And what did you hear after the
 5   lawsuit?
 6          A.      I specifically didn't -- I just
 7   heard that he was involved in something to do
 8   with Georgia and that he was one of the
 9   people that -- I don't even know exactly what
10   he did, but involved in that aspect of the
11   disclosure of the lawsuit.
12          Q.      Okay.
13          A.      But specifically, I do not
14   know.
15          Q.      You don't remember anything
16   else?
17          A.      I don't remember anything else,
18   no.
19          Q.      And you don't remember any
20   discussion about him at the --
21          A.      No --
22          Q.      -- contemporaneously with the
23   movie coming out?
24          A.      No.  It didn't even -- even
25   when I saw this -- I assumed, I guess, at the
```

CONFIDENTIAL

Page 166

1    drop box, but it was not part of

2    the -- either the trailer, the teaser

3    trailer, or the film itself.

4         Q.    And do you recall having any

5    discussion with anyone about how the footage

6    that Mr. Kirk showed was not blurred?

7         A.    That, I do not know.

8         Q.    What do you recall about any

9    discussions about blurring the identity of

10   people who appeared in the film?  And I'm

11   talking now about in the video surveillance,

12   not the whistleblowers.

13        A.    Right.  Right.

14              So I wasn't a part of that

15   conversation.  I don't know how that

16   occurred.

17              I do know that at one point,

18   even in the teaser trailer, the trailer, we

19   had to make sure that they were all blurred,

20   including -- there was someone's dog,

21   including the dog.

22              So we were just trying to be

23   very careful and very diligent about making

24   sure that the identities of these mules was

25   not -- you know, people could not recognize

Page 167

1    their face.

2        Q.     Why did you not want them to be

3    recognized?

4        A.     Well, because we felt like any

5    investigation had to go through the correct

6    channels, so the law enforcement.  If they

7    wanted that video surveillance or whatever,

8    then they should -- they would get it and

9    they would, like, unblur the images and see

10   who it was.

11            But it wasn't -- it wasn't our

12   responsibility to show, you know, people, who

13   they were.  We didn't want to invade their

14   privacy that way.  So we made sure that it

15   was blurred.

16       Q.     Even though you thought they

17   were breaking the law?

18       A.     Yes.

19            MS. HABER KUCK:  I think we've

20       been going an hour.  It's probably a

21       good time for a break.

22            THE VIDEOGRAPHER:  Going off

23       the record.  The current time is 2:46.

24            (Recess taken at 2:46 p.m.,

25       resuming at a 3:06 p.m.)

1          Do you know what she's
2    referring to there?
3          A.    I don't.  I don't.
4          Q.    And you don't recall any
5    discussion of people being in the movie who
6    were not actually mules?
7          A.    The videos of people going to
8    drop boxes?
9          Q.    Yes.  Yes.
10          A.    As far as we knew, they were
11    all mules.
12          Q.    Well, you say "we" knew.  As
13    far as...
14          A.    As far as the team, Dinesh,
15    Bruce, me, Nathan, we didn't have any reason
16    to believe they weren't mules.
17          Q.    What's your basis for saying
18    the others -- I mean, I understand you didn't
19    have any basis.
20          A.    Yes.
21          Q.    But what's your basis for
22    saying the others on the team didn't have any
23    basis for knowing that there were nonmules --
24          A.    Well, they didn't raise any --
25    any concerns.

1          A.     But we didn't do anything

2    further with that video.

3          Q.     Okay.  It never made it into

4    any other film?

5          A.     No.

6          Q.     And it never was referenced on

7    the podcast?

8          A.     No.

9          Q.     Okay.  Last question for me.

10                You mentioned that

11   Catherine -- or maybe it wasn't you.  Maybe

12   it was actually Ms. Kuck.

13                But someone mentioned that

14   Catherine never mentioned the title of the

15   film when she went on "The Tucker Carlson

16   Show."

17                To the best of your memory, did

18   either Ms. Engelbrecht or Mr. Phillips

19   mention the title of the film when they went

20   on "The Charlie Kirk Show"?

21         A.     To my recollection, no.

22         Q.     Do you have any specific memory

23   of them promoting "2000 Mules" in any media

24   appearance?

25         A.     No, I don't.  I don't think

1          Q.      But what reason did you have to

2     believe that it was a legitimate research

3     project?

4          A.      Well, because -- I don't

5     know -- I don't know how to answer that

6     question without, you know, sounding like,

7     you know, kind of a complete dummy at these

8     things.

9               I don't -- I don't understand

10    geotracking and so he made it very -- he made

11    it sound very credible.  And I know that

12    he -- the company that he works for did this

13    type of thing as well.

14               So, you know, I just assumed

15    that that was on track, correct, or

16    whatever -- whatever you want to call it.

17         Q.      So you found -- you found his

18    presentation to be credible?

19         A.      Very cre- -- yes.

20         Q.      And that's what you were

21    relying on?

22         A.      Yes.

23         Q.      And when you say "the company

24    he works for," what company are you referring

25    to?