# EXHIBIT 10
# (2 of 3)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff,*<br><br>v.<br><br>THE STATE OF GEORGIA<br>and THE GEORGIA STATE<br>ELECTION BOARD,<br>*Defendants,*<br><br>TRUE THE VOTE, INC.<br>*Proposed Intervenor-Defendant.* | No. 1:21-cv-02575-JPB |

---

**PROPOSED INTERVENOR-DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO INTERVENE**

COMES NOW, Proposed Intervenor-Defendant True the Vote, Inc. (hereinafter, "True the Vote" or "Movant") and presents its Memorandum of Law in Support of its Motion to Intervene, showing this Honorable Court that its Motion should be granted for the following reasons:

**INTRODUCTION**

This Court should grant the motion to intervene and allow True the Vote to be a defendant in this case for two independent reasons. First, this Court should grant Movant intervention as of right under Fed. R. Civ. P. 24(a)(2). Movant has satisfied

CONFIDENTIAL

TTV_006854

all the criteria for such intervention because (i) Movant's motion is timely as Plaintiff only recently filed its complaint, litigation has yet to begin in earnest, and no party will be prejudiced; (ii) Movant has protected interests in this action in that the election reforms enacted in Georgia Senate Bill 202 (2021) ("SB 202") will accomplish many of Movant's goals in promoting election integrity; (iii) this action threatens to impair Movant's interests by invalidating Georgia's duly enacted election laws, and if SB 202's election reforms are not upheld, Movant expects to incur substantial additional expenses in monitoring future elections in the State of Georgia; and (iv) no party adequately represents Movant's interests as Defendants do not share Movant's distinct interests as a nonpartisan group with the goals of ensuring voting integrity through researching the veracity of voter rolls and election processes, and providing information, training, and support in the interest of protecting election integrity for the benefit of the public.

Second, and in the alternative, this Court should grant Movant permissive intervention under Fed. R. Civ. P. 24(b). (i) Movant's motion is timely; (ii) Movant's defenses share common questions of law and fact with the existing parties. Incremental prejudice is unlikely—this case will inevitably involve multiple parties because it is one of eight challenges to SB 202 before this Court; and (iii) The

CONFIDENTIAL

Court's resolution of these important questions will have significant implications for Movant as it works to promote election integrity on behalf of the public.

Whether under Rule 24(a)(2) or (b), this Court should allow Movant to intervene as a Defendant in this action.

## STATEMENT OF FACTS AND BACKGROUND

True the Vote is a grassroots, citizen-led nonpartisan group founded in 2009. (Affidavit of C. Engelbrecht, ¶ 6.) True the Vote was founded with the objective of protecting voting rights by mobilizing citizens to volunteer for service in election processes and by ensuring that the voting rolls utilized by states were updated and accurate. (*Id*. at ¶ 7.) In the time since its founding, True the Vote's mission has expanded to include training citizens to protect election integrity at the polls and helping to protect all voters' rights by promoting fair elections. (*Id*. at ¶ 9.) Through these efforts, True the Vote seeks to restore integrity and public confidence in the electoral process and empower citizens to promote free and fair elections. (*Id*. at ¶ 10.)

True the Vote operates an election integrity hotline for voters to report any suspected irregularities. (*Id*. at ¶ 11.) Through its operation of the election integrity hotline, True the Vote received reports of ballot harvesting operations during the November 3, 2020 General Election and January 5, 2021 United States Senate

CONFIDENTIAL

TTV_006856

runoff. (*Id*. at ¶ 12.)  After receiving these reports, and as part of its mission to promote fair elections, True the Vote began an investigation into whether ballot harvesting operations had, in fact, taken place in the State of Georgia during the November 3, 2020 election ("General Election") and January 5, 2021 runoff ("Runoff Election").  (*Id*. at ¶ 13.)  In furtherance, True the Vote engaged the data analytics and operations security company OPSEC Group ("OPSEC") to research and evaluate available information concerning the use of ballot drop boxes within metro Atlanta and surrounding areas.  (*Id*. at ¶ 14.)  True the Vote's investigation was undertaken at considerable cost. (*Id*. at ¶ 16.)  At present, True the Vote has expended over $1,500,000.00 in support of its investigation into the General Election and Runoff Election.  (*Id*.)

OPSEC's analysis suggests that ballot harvesting did occur during the early and regular voting periods for both the General Election and the Runoff Election) (*Id*. at ¶ 15; *see generally*, Affidavit of G. Phillips.  As explained in detail in the Affidavit of Gregg Phillips, mobile devices such as cellular telephones are assigned a unique, alphanumeric "fingerprint" which enables cellular service providers and software application developers to identify the specific devices that are using their services. (Affidavit of G. Phillips, ¶¶ 10-11.)  While operating over cellular and Wi-Fi networks, mobile devices frequently transmit their device ID over device and

CONFIDENTIAL                                                                                    TTV_006857

application networks. (*Id.* at ¶ 12.)  These electronic "pings" of mobile devices are commonly tied to positioning information. (*Id.*)  By analyzing a mobile device's identifying and positioning information ("geospatial data"), a particular device's location can be determined with great precision. (*Id.* at ¶ 13)

Through analysis of geospatial and temporal data, the location over time of a particular mobile device can be reliably tracked to a specific time and location within seconds and inches. (*Id.* at ¶ 14.)  OPSEC analyzed commercially available geospatial and temporal data to determine whether evidence existed that ballot harvesting had taken place in connection with the November 2020 General Election and January 5, 2020 runoff in the State of Georgia. (*Id.* at ¶¶ 16-18.)  OPSEC analyzed in excess of 25 terabytes of data consisting of over 1.2 trillion mobile device "pings" that were collected over a period of 97 days from October 1, 2020 through January 5, 2021 ("the Study Period"). (*Id.* at ¶ 20)  As part of its analysis, OPSEC cross-referenced mobile device geospatial and temporal data against ballot drop box locations and applied analytical methods to identify irregularities in the patterns of movement of specific mobile devices. (*Id.* at ¶¶ 21-24.) Such irregularities included making repeated trips to ballot drop box locations, traveling to multiple ballot drop box locations on the same day, and visiting ballot drop box locations in the middle of the night, among others. (*Id.* at 24.)

CONFIDENTIAL

TTV_006858

During the investigation and analysis, True the Vote received information concerning 10 organizations which were allegedly involved in the ballot harvesting process ("Organizations of Interest"). (*Id*. at ¶ 25.) After receiving this information, OPSEC included the Organizations of Interest in analysis of geospatial and temporal data. (*Id*.) OPSEC matched devices that were found within 100 feet of one or more ballot drop box locations on at least 10 occasions and had also been located within 100 feet of an organization of interest multiple times during the voting periods within the Study Period. (*Id*. at ¶ 26.) From this analysis, OPSEC identified 242 unique mobile "Devices of Interest", whose patterns of movement as determined through their analysis of their geospatial and temporal data, were distinctly different from the other 552,987 mobile Devices of Interest that were included in the study. (*Id*. at ¶ 27.)

These 242 Devices of Interest were found within 100 feet of a drop box on 5,297 occasions and within 100 feet of an organization of interest on 2,227 occasions during the voting periods within the Study Period. (*Id*.) The investigation also measured frequencies in times of day during which the 242 Devices of Interest were identified in close proximity to ballot drop boxes, including repeated trips during irregular hours. (*Id*. at ¶ 28.) The geospatial and temporal data shows that a significant number of the Devices of Interest had been located in close proximity to

CONFIDENTIAL

TTV_006859

ballot drop box locations between the hours of 12:00 a.m. and 5:00 a.m. (*Id*.) In addition, the geospatial and temporal data for the 242 Devices of Interest showed that a significant number of them had traveled to or from other states during the voting periods within the Study Period. (*Id*. at ¶ 29.) This data is suggestive that out-of-state actors may have been involved in ballot harvesting operations within the State of Georgia.

Plaintiff's attempt to overturn SB 202, which includes important and needed reforms concerning the use of ballot drop boxes, will materially harm True the Vote's interests in promoting fair elections. (Affidavit of C. Engelbrecht, ¶ 17.) If Plaintiff is successful in overturning SB 202, True the Vote anticipates incurring additional, significant, and unnecessary expense. (*Id*. at ¶ 18.) Without the benefit of the critical election reforms enacted in SB 202, True the Vote expects to expend additional substantial sums in continuing to monitor and investigate the use of ballot drop boxes for ballot harvesting operations in future elections in the State of Georgia. (*Id*. at ¶ 19.) For example, the voter identification provisions of SB 202 help to mitigate the potential for fraud resulting from outdated and inaccurate voter rolls by ensuring only eligible voters are casting ballots one time for an election. (*Id*. at ¶ 20.) As such, SB 202 is strongly supportive of True the Vote's mission, in that it largely accomplishes many of True the Vote's core objectives. (*Id*. at ¶ 21.) As a result of

CONFIDENTIAL

TTV_006860

SB 202, True the Vote expects that it will incur substantially reduced costs in monitoring future elections in the State of Georgia. (*Id.* at ¶ 22.)

## PROPOSED INTERVENOR'S INTERESTS

The other parties in this action are governmental entities and the admitted intervenors are partisan political groups. True the Vote differs from every other intervenor as a nonpartisan group. It has a primary goal of protecting voting integrity through ensuring that voter rolls are accurate and promoting fair elections. True the Vote opposes Plaintiff's attempts to invalidate various provisions of SB 202 which, if upheld, will facilitate True the Vote's mission and purpose. These needed election reforms include, but are not limited to: the time to apply for absentee ballots, O.C.G.A. § 21-2-381(a)(1)(A) (eff. July 1, 2021); the voter-ID requirements for absentee ballots, O.C.G.A. § 21-2-381(a)(1)(C)(i); the restrictions placed on drop boxes, *id.* § 21-2-382(c)(1); the constraints on government entities mailing unsolicited absentee request forms, *id.* § 21-2-381(a)(3)(A); and the fines imposed for sending duplicative absentee request forms, *id.* § 21-2-381(a)(3)(B). The Georgia legislature adopted these provisions in an effort to increase the efficiency, reliability, and integrity of Georgia's elections. GA S. Weekly Rep., 2021 Reg. Sess. No. 9 (May 26, 2021). This action is an attempt to invalidate a law duly-passed and enacted by elected legislators, is an afront to separation of powers, and, if Plaintiff's

CONFIDENTIAL

TTV_006861

prevail, will impede and substantially impair True the Vote's interests and mission as well as harm election integrity in Georgia.

## STANDARD FOR INTERVENTION

Intervention under Rule 24 can be either as of right or permissive. Fed. R. Civ. P. 24.

### 1. Intervention by Right

The district court is required to allow intervention as of right if (1) the proposed intervenor's motion is timely; (2) the movant has a legally protected interest in the action; (3) the action may impair or impede that interest; and (4) no existing party adequately represents movant's interests. Fed. R. Civ. P. 24(a)(2); *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989).

### 2. Permissive Intervention

Courts have broad discretion to grant permissive intervention to anyone who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Courts generally construe Rule 24 motions to intervene liberally and resolve doubts in favor of the proposed intervenor. *See Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir. 1993) ("Any doubt concerning the propriety of allowing intervention should be resolved in favor of the proposed intervenors because it allows the court to resolve

CONFIDENTIAL                                                                 TTV_006862

all related disputes in a single action."). Under either right or permission, the Court should GRANT True the Vote's Motion to Intervene.

## ARGUMENT AND CITATION OF AUTHORITY

The Court should grant True the Vote's motion under right because (1) the filing is timely; (2) True the Vote has a legally protected interest; (3) this action threatens True the Vote's interests; and (4) no other party adequately represents True the Vote's interests. In the alternative, the Court should grant True the Vote permissive intervention as it has a "defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B).

### A. True the Vote is Entitled to Intervene as a Right Because It Timely Filed Its Motion.

In determining the timeliness of a motion to intervene, courts consider the following factors: (1) the length of time during which the proposed intervenor knew or reasonably should have known of its interest in the case before moving to intervene; (2) the extent of prejudice to the existing parties as a result of that delay; (3) the extent of prejudice to the proposed intervenor if the motion is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the motion was timely. *Id.* The convenience of the parties is not a factor. *Clark v. Putnam Cty.*, 168 F.3d 458, 462 (11th Cir. 1999). However, "[t]he

CONFIDENTIAL

TTV_006863

requirement of timeliness must have accommodating flexibility toward both the court and the litigants." *Chiles*, 865 F.2d at 1213 (internal quotation marks omitted). As set forth below, a consideration of those factors here favors a finding that Movant's motion is timely.

Plaintiff only filed its Complaint on June 25, 2021. The short delay between when True the Vote knew of its interests in this case and its filing of this motion is so slight as to be inconsequential. Courts have declared motions to intervene timely even in cases where they were not so speedily filed. *See, e.g., Comm'r, Ala. Dep't of Corr. v. Advance Local Media, LLC*, 918 F.3d 1161, 1172 (11th Cir. 2019) (declaring motion filed two months after complaint timely); *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1259-60 (11th Cir. 2002) (finding motion to intervene filed after six-month delay and completion of discovery timely because intervention did not delay the proceedings and the court had yet to take significant action).

Additionally, True the Vote's intervention will not prejudice the parties. Litigation in this matter has only recently begun. No parties have filed responsive pleadings, and this Court has not decided any dispositive motions. *See U.S. Army Corps of Eng'rs*, 302 F.3d at 1259-60. True the Vote will comply with all deadlines governing the parties, will work to prevent duplicative briefing, and will coordinate

CONFIDENTIAL

TTV_006864

with the parties on discovery. If True the Vote is not allowed to intervene, however, an order invalidating Georgia's election laws and undermining the integrity of the State's elections could irreparably harm True the Vote's interests in safeguarding the reliability and fairness of those processes. *See Chiles*, 865 F.2d at 1213. Lastly, there are no unusual circumstances present. *See id.* True the Vote timely filed its Motion and meets the first element of the analysis.

**B. True the Vote Has a Legally Protected Interest in this Action.**

A party has a protected interest in the subject matter of the litigation if that interest is direct, substantial, and legally protectable. *U.S. Army Corps of Eng'rs*, 302 F.3d at 1249. "All that is required under Rule 24(a)(2) is that the could-be intervener be practically disadvantaged by his exclusion from the proceedings." *Huff v. Comm'r of IRS*, 743 F.3d 790, 800 (11th Cir. 2014). "[I]n cases challenging . . . statutory schemes as unconstitutional or as improperly interpreted and applied, . . . the interests of those who are governed by those schemes are sufficient to support intervention." *Chiles*, 865 F.2d at 1214.

Plaintiff's attempt to overturn SB 202, which includes important and needed reforms concerning the use of ballot drop boxes, will materially harm True the Vote's interests in promoting fair elections. (Affidavit of C. Engelbrecht, ¶ 17.) True the Vote is doing work (e.g. truing voter rolls, investigating voting irregularities and

CONFIDENTIAL

TTV_006865

security issues with drop boxes, etc.) that would now be largely supplanted by or rendered unnecessary by the reforms in SB 202. For example, the voter identification provisions of SB 202 help to mitigate the potential for fraud resulting from outdated and inaccurate voter rolls, which will reduce the need for True the Vote to engage in expensive monitoring efforts in future elections. (*Id.* at ¶¶ 20, 22.) On the other hand, if SB 202 is overturned, True the Vote anticipates incurring significant future expenses relating to continuing to monitor and investigate the use of ballot drop boxes in ballot harvesting operations in future elections in the State of Georgia. (*Id.* at ¶ 19.)

True the Vote's efforts to protect election integrity is a public service which benefits all citizens. SB 202 is supportive of True the Vote's mission—in that it largely accomplishes many of the ultimate goals that True the Vote seeks to achieve. (*Id.* at ¶ 21.) Consequently, True the Vote has a direct interest in this bill being upheld in its entirety to allow the State to take over these tasks as it is best equipped to investigate and prosecute, if necessary. As a result of SB 202, True the Vote expects that it will incur substantially reduced costs in monitoring future elections in the State of Georgia. (*Id.* at ¶ 22.)

Given these compelling reasons, True the Vote has a "direct, substantial, and legally protectable interest[s] in [this] proceeding" that attempts to erode Georgia's

CONFIDENTIAL

TTV_006866

elections. *See Chiles*, 865 F.2d at 1213-14. Throughout its tenure as an organization, True the Vote has worked to research voting irregularities to aid State officials and empower citizens. SB 202 and other similar laws are designed to serve "the integrity of [the] election process," *Eu v. San Fran. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989), and the orderly administration of elections, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196 (2008). "[I]n cases challenging . . . statutory schemes as unconstitutional or as improperly interpreted and applied, . . . the interests of those who are governed by those schemes are sufficient to support intervention." *Chiles*, 865 F.2d at 1214. True the Vote has an interest in the enforcement of the laws. *See Linda R.S. v. Richard D., et al.*, 410 U.S. 614, 617 n.3 (1973).[1]

SB 202 strengthens the voting laws in the State of Georgia and protects voting integrity, which is True the Vote's mission. Therefore, True the Vote has a

---

[1] *See also Sw. Ctr. For Biological Diversity v. Berg*, 268 F.3d 810 (9th Cir. 2001). To establish a significantly protectable interest relating to the subject of the action, it is generally enough that the interest asserted is protectable under some law and that there is a relationship between the legally protected interest and the claims at issue. *Id.* at 818. A district court is required to accept as true the non-conclusory allegations made in support of a motion to intervene. *Id.*

CONFIDENTIAL

TTV_006867

significant interest in this litigation.

### C. This Action Threatens to Impair True the Vote's Interests.

The Plaintiff targets key provisions of SB 202. In particular, court action limiting or overturning the following provisions would threaten True the Vote's interests:

1. the voter-ID requirements for absentee ballots, O.C.G.A. § 21-2-381(a)(1)(C)(i);
2. the restrictions placed on drop boxes, *id.* § 21-2-382(c)(1); and
3. the fines imposed for sending duplicative absentee request forms, *id.* § 21-2-381(a)(3)(B).

In order to show that an interest is threatened, a movant must be "so situated that disposing of [this] action may as a practical matter impair or impede [its] ability to protect its interest." Fed. R. Civ. P. 24(a)(2). True the Vote does not need to establish that its interests *will* be impaired, but, rather, only that the disposition of the action *may* impede or impair its ability to protect its interests. *See Fed. Sav. & Loan Ins. Corp.*, 983 F.2d at 215. This inquiry is flexible and intended to liberalize the right to intervene in federal actions. *See Chiles*, 865 F.2d a 1213-14. True the Vote meets and exceeds these minimal standards as forth below.

True the Vote has an interest in this proceeding because its mission is to ensure voting integrity including; truing the voter rolls, requiring identification, truing drop box voting, and eliminating the confusion of duplicative absentee request forms sent

CONFIDENTIAL

TTV_006868

to eligible voters. An adverse decision would undercut the election laws that were enacted to promoting voting integrity. SB 202 provides a means to strengthen and safeguard elections against actions that weaken the process's integrity.  A court order that conflicts with SB 202 would result in a less secure voting process in the State of Georgia.

The purpose of intervention under Rule 24 is to allow interested parties an opportunity to be heard by the court before the court renders a potentially adverse decision.  *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264-65 (5th Cir. 1977); *accord Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).  True the Vote is one such party and this action threatens its interests. Additionally, True the Vote's inclusion in this action would enable the Court to analyze the evidence found which will demonstrate that those key provisions are necessary for a secure electoral process in Georgia.

**D. No Other Party Adequately Represents True the Vote's Interests.**

The final element is that Movant's interests are not adequately represented by the existing parties in the dispute.  The other parties are governmental entities and the other intervenors are partisan political groups. True the Vote differs from every other party and intervenor as it is a nonpartisan and not-for-profit group. It has a

CONFIDENTIAL

TTV_006869

primary goal of ensuring voting integrity through voter rolls being accurate and in protecting election integrity for the benefit of the public. True the Vote's interests are different and protected.  Further, upon information and belief, no other party or intervenor has expended the resources or conducted such technical investigation into general and runoff elections as True the Vote. True the Vote's mission is to promote voting integrity in the electoral process.  As a nonpartisan group, True the Vote's interest are not adequately represented.  Inadequacy is not a demanding showing. *See Chiles*, 865 F.2d at 1214.  It is satisfied if the proposed intervenor shows that representation of its interest may be inadequate. *Fed. Sav. & Loan Ins. Corp.*, 983 F.2d at 216.  True the Vote "should be allowed to intervene unless it is clear that [the current parties] will provide adequate representation."  *Chiles*, 865 F.3d at 1214. Although adequate representation may exist in certain circumstances when the movant has the same objective as one of the parties, that "presumption is weak and can be overcome if the [movant] present[s] some evidence to the contrary." *Stone v. First Union Corp.*, 371 F.3d 1305, 1311-12 (11th Cir. 2004).  The existence of differences in interests is sufficient evidence to overcome the presumption of adequateness in such situations. *See id.* at 1312.

In this action, no other party adequately represents True the Vote's interests as a nonpartisan, nonprofit organization focused on voter integrity with the use of

Page 17 of 21

CONFIDENTIAL

TTV_006870

scientifically backed investigations. Courts often conclude that governmental entities do not adequately represent the interests of aspiring intervenors. *See Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 539 (1972). The government's representation of the public interest generally cannot be assumed to be identical to that of a private movant, even if both share the same general objective, merely because both entities occupy the same posture in the litigation. *See Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, 874 F.3d 692, 697 (11th Cir. 2017). The current Defendants and Intervenors represent the overarching public interest, rather than True the Vote's particular interests as a non-partisan group with an interest in protecting election integrity and empowering and educating voters. True the Vote's investigation shows that the provisions targeted by Plaintiff are necessary and crucial for secure elections in the State of Georgia.

State officials, acting for all Georgia citizens and the State itself, must consider "a range of interests likely to diverge from those of the intervenors." *Meek v. Metro. Dade Cty.*, 985 F.2d 1471, 1478 (11th Cir. 1993), *abrogated on other grounds by Dillard v. Chilton Cty. Comm'n*, 495 F.3d 1324 (11th Cir. 2007). True the Vote has a concrete, real interest in this action because it has invested time, money, and resources into researching voting issues during multiple elections in Georgia over the years. Furthermore, the findings of True the Vote's ballot

CONFIDENTIAL

TTV_006871

harvesting investigation will aid the Court in its review by demonstrating the need for SB 202's reforms, particularly those that reduce the risk of ballot harvesting involving the use of ballot drop boxes.

This difference in interests makes Defendants less likely to make the same arguments, less likely to exhaust all appellate avenues, and more likely to settle. *See Tech. Training Assocs., Inc.*, 874 F.3d at 697; *Clark*, 168 F.3d at 461-62. At the very least, True the Vote will be a helpful supplement to Defendants and can reasonably be expected to contribute to resolving these questions. True the Vote affirmatively seeks to preserve Georgia's voting safeguards, including SB 202, and bring a unique and well-informed, nonpartisan perspective to this action. Accordingly, this Court should grant True the Vote's intervention under Rule 24(a)(2).

**E. *In the Alternative*, True the Vote is Entitled to Permissive Intervention.**

Even if this Court determines that True the Vote is not entitled to intervene as of right under Rule 24(a), this Court should GRANT True the Vote permissive intervention under Rule 24(b). Courts have broad discretion to grant permissive intervention to anyone who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B); *Chiles*, 865 F.2d at 1213. Additionally, courts consider "whether the intervention will unduly delay or

CONFIDENTIAL

TTV_006872

prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1)(B); *Chiles*, 865 F.2d at 1213.

True the Vote meets Rule 24(b)'s requirements. As explained above, True the Vote timely filed its motion to intervene and will raise defenses that share common questions with the parties' claims and defenses. Plaintiff alleges that the contested provisions of SB 202 are violative of Section 2 of the Voting Rights Act, 52 U.S.C. § 10501, and must be enjoined. True the Vote rejects that allegation and will argue that the provisions are valid, that an injunction is unwarranted, and that Plaintiff's desired relief would undermine True the Vote's interests.

True the Vote's intervention will not unduly delay this litigation or prejudice anyone involved. True the Vote moved swiftly to intervene in this case and its participation will not contribute to any delay beyond that which is normal in such multi-party litigations. True the Vote will also comply with all deadlines that govern the parties, work to prevent duplicative briefing, and coordinate with the parties on discovery, which undermines potential claims of undue delay by an objector. *See Chiles*, 865 F.2d at 1215. Any delay by the inclusion of True the Vote is minimal because Rule 24(b) is concerned with "undue" delay or prejudice, which is additional to the normal delay a party's intervention causes. *Meek*, 985 F.2d at 1479. Moreover, any prejudice from granting intervention would be no greater than the

CONFIDENTIAL

TTV_006873

prejudice from denying intervention. *See Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 377 (1987). Given the ability of True the Vote to enlighten the Court with its data and information, it will allow a full adjudication of the issue and allow for a meaningful defense of Plaintiff's claims. Accordingly, True the Vote should be allowed to intervene as a Defendant in this matter with an opportunity to be heard.

## CONCLUSION

Based on the foregoing reasons, Movant True the Vote respectfully requests that this Court grant its motion and all it to intervene as a Defendant in this case.

Respectfully submitted this __ day of July, 2021.

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with Local Rule 5.1(B).

*/s/ Alex B. Kaufman*

## CERTIFICATE OF SERVICE

I certify that on July ___, 2021, I electronically filed this document with the Clerk of Court using the CM/ECF system, which provides notice of such filling and service to all attorneys of record.

*/s/ Alex B. Kaufman*

CONFIDENTIAL

TTV_006874

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

THE STATE OF GEORGIA
and THE GEORGIA STATE
ELECTION BOARD,

    Defendants,

TRUE THE VOTE, INC,

    Proposed Intervenor-Defendant.

No. 1:21-cv-02575-JPB

---

## MOTION FOR ENTRY OF PROTECTIVE ORDER
## AND MEMORANDUM IN SUPPORT

Proposed Intervenor-Defendant True the Vote, ("Movant") files this Motion for Entry of Protective Order and Memorandum in Support, pursuant to Local Rules 7.1 and 79.1, and states the following:

1.    Movant has conducted highly sensitive research on absentee voting in Georgia during the 2020 election cycle and has compiled, interpreted, and analyzed data derived from that research.  More specifically, Movant's research concerned the use of drop boxes to cast absentee ballots.  Movant's findings show individuals

CONFIDENTIAL

TTV_006875

engaged in questionable activities involving absentee ballots and drop boxes. That is to say those individuals repeatedly drove to and from: common central meeting locations, mail drops, and numerous drop box locations throughout the state (in which each individual deposited multiple items on multiple occasions which appear to be absentee ballots). Movant's research and data demonstrates the need for, *inter alia*, drop box restriction and security and is vital to disproving the United States of America's claims that Georgia Senate Bill 202 (2021) violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301. However, Movant's research and data will likely impact present and future law enforcement investigations, criminal liability, and legal actions separate from the present litigation.

2.    Considering the nature of this litigation and the information likely to be exchanged or obtained from third parties, Movant requests a conference with Plaintiff, the State of Georgia, the Georgia State Election Board, the Republican National Committee, the National Republican Senatorial Committee, and the Georgia Republican Party, Inc. (collectively, "Parties") and the Court for the purposes of discussing the information involved in this dispute and working with the Parties and the Court to establish a satisfactory process and procedure for filing materials designated as "Confidential" and/or "Attorney's Eyes Only" when such

CONFIDENTIAL

TTV_006876

information is relied on in support of Movant's or the Parties' motions, responses, briefs, or other documents filed with the Court or is used during a hearing or at trial. Movant anticipates providing the Parties and the Court with a separate proposed order describing the aforementioned process and procedure for filing such designated materials once Movant and the Parties receive further guidance from the Court.

3.    Movant respectfully requests that the Court enter the Protective Order attached hereto as Exhibit "A."

Respectfully submitted,

**HALL BOOTH SMITH, P.C.**

*/s/ Alex B. Kaufman*
ALEX B. KAUFMAN
Georgia Bar No. 136097
WILLIAM BRADLEY CARVER, SR.
Georgia Bar No. 115529

*Counsel for Intervenor-Defendant*
*True the Vote*

191 Peachtree Street NE
Suite 2900
Atlanta, Georgia 30303
P: (404) 954-5000
F: (404) 954-5020
akaufman@hallboothsmith.com
bcarver@hallboothsmith.com

CONFIDENTIAL                                        TTV_006877

## CERTIFICATE OF SERVICE

I certify that on July ___, 2021, I electronically filed this document with the

Clerk of Court using the CM/ECF system, which provides notice of such filling and

service to all attorneys of record.

*/s/ Alex B. Kaufman*

CONFIDENTIAL

TTV_006878

# EXHIBIT A

CONFIDENTIAL

TTV_006879

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

UNITED STATES OF AMERICA,

     Plaintiff,

     v.                                                 No. 1:21-cv-02575-JPB

THE STATE OF GEORGIA
and THE GEORGIA STATE
ELECTION BOARD,

     Defendants,

TRUE THE VOTE, INC,

     Proposed Intervenor-Defendant.

---

## [PROPOSED] PROTECTIVE ORDER

---

     This Court issues this Protective Order to facilitate document disclosure and production under the local rules and practice of this Court and the Federal Rules of Civil Procedure among the United States of America ("Plaintiff"), the State of Georgia, the Georgia State Election Board (collectively, "Defendants"), and the Republican National Committee, the National Republican Senatorial Committee, the Georgia Republican Party, Inc., and True the Vote, (collectively, "Intervenor-Defendants" and together with Plaintiff and Defendants referred to as

CONFIDENTIAL

TTV_006880

"Parties").  Unless modified pursuant to the terms contained in this Protective Order, this Protective Order shall remain in effect through the conclusion of this litigation.

In support of this Protective Order, the Court finds that:

a.  Documents or information containing confidential: personal, proprietary and/or business information, and/or trade secrets that bear significantly on the Parties' claims or defenses is likely to be disclosed or produced during the course of discovery in this litigation;

b.  The Parties may assert that public dissemination and disclosure of confidential information could severely injure or damage the author/creator of the information, the subject of the information, and/or the Party disclosing or producing the information and could place them at risk of adverse legal and extrajudicial actions;

c.  Counsel for the Party or Parties receiving confidential information are presently without sufficient information to accept the representations(s) made by the Party or Parties producing confidential information as to the confidential, proprietary, and/or trade secret nature of such confidential information; and

CONFIDENTIAL

TTV_006881

d. To protect the respective interests of the Parties and those of third parties who may be impacted by the production of discovery by a Party and to facilitate the progress of disclosure and discovery in this case, the following Protective Order should issue.

**IT IS THEREFORE ORDERED THAT:**

1.    This Protective Order is for the sole purpose of facilitating discovery in the above-styled and numbered cause.

2.    Except as otherwise provided below, any document, data, or thing produced, deposition testimony, or interrogatory answer produced, given, or served pursuant to discovery requests in this litigation and designated by the producing Party as "Confidential" or "Attorney's Eyes Only" (collectively, the "Material"), or any information contained in or derived from any of the foregoing Material, shall be subject to the provisions of this Protective Order until further order of the Court. Except as provided herein, this Protective Order shall not permit one Party to designate documents, or any information contained in or derived from any documents, produced by another Party as "Confidential" or "Attorney's Eyes Only," or otherwise subject those documents, or any information contained in or derived from any documents, to the provisions of this Protective Order.

CONFIDENTIAL

TTV_006882

3.     The Material shall be designated as "Confidential" or "Attorney's Eyes Only" by stamping the legend "Confidential" or "Attorney's Eyes Only" on each page thereof as to when confidentiality is claimed.  All copies of Material stamped "Confidential" or "Attorney's Eyes Only" shall again be stamped "Confidential" or "Attorney's Eyes Only" if the duplicating process by which copies of such Materials are made does not reproduce the original stamp.  Any Party may designate a deposition or portion thereof as "Confidential" or "Attorney's Eyes Only" Material by denominating by page and line those portions of the deposition which are to be considered "Confidential" or "Attorney's Eyes Only" Material within twenty-one (21) calendar days of receipt of the transcript and so informing all other Parties of such designation.  Any portion of a deposition so designated shall not be filed with the Court, except in accordance with paragraphs 10 and 11 of this Protective Order, as applicable.  With respect to any Material designated as "Confidential" or "Attorney's Eyes Only" that is not produced in paper form (such as thumb drives, CD/DVD, magnetic media, and other Material not produced in paper form) and that is not susceptible to the imprinting of a stamp signifying its confidential nature, the producing Party shall, to the extent practicable, produce such Material with a cover labeled "Confidential" or "Attorney's Eyes Only" and shall inform all counsel in

CONFIDENTIAL

TTV_006883

writing of the "Confidential" or "Attorney's Eyes Only" designation of such Material at the time such Material is produced.

4.      No "Confidential" Material subject to this Protective Order or extracts or summaries therefrom shall be given or shown to any person except the following:

a.  Inside and outside attorneys for any Party engaged in the litigation of this action and the employees of such attorneys.

b.  A Party or employees of a Party actively engaged in assisting the Party's attorneys in the conduct of this litigation to the extent reasonably necessary to enable the attorneys for that Party to render professional services in the litigation.

c.  Anyone who was the author or prior recipient of the Material now designated as "Confidential" under this Protective Order, after such person has signed and delivered to counsel a statement in the form annexed hereto as Exhibit "A."

d.  Persons not employees of any Party who are expressly retained to assist such Party's counsel ("Retaining Counsel") in the preparation of this action for trial including, but not limited to, consulting and testifying expert(s), after such expert(s) has signed and delivered to

CONFIDENTIAL

TTV_006884

Retaining Counsel a statement in the form annexed hereto as Exhibit "A."

e. The Court, other court officials (including court reporters), and the trier of fact so long as the "Confidential" Material is provided or shown in accordance with the remaining provisions of this Protective Order.

f. Fact witnesses, after such fact witness has signed and delivered to counsel interviewing such fact witness a statement in the form annexed hereto as Exhibit "A."

No person allowed to view "Confidential" Material shall use and "Confidential" Material for any purpose except as needed solely in connection with or to assist in the prosecution or defense of claims in this action.

5.     No "Attorney's Eyes Only" Material subject to this Protective Order or extracts or summaries therefrom shall be given or shown to any person except the following:

a. Inside and outside attorneys for any Party engaged in the litigation of this action and the employees of such attorneys.

CONFIDENTIAL

TTV_006885

b.  A Party actively engaged in assisting the Party's attorneys in the conduct of this litigation to the extent reasonably necessary to enable the attorneys for that Party to render professional services in the litigation after such person has signed and delivered to counsel a statement in the form annexed hereto as Exhibit "A."

c.  Anyone who was the author or prior recipient of the "Attorney's Eyes Only" Material after such person has signed and delivered to counsel a statement in the form annexed hereto as Exhibit "A."

d.  A deponent who is, at the time of the deposition, an employee or representative of the Party that produced the "Attorney's Eyes Only" Material.  The aforementioned deponent may be shown copies of "Attorney's Eyes Only" Material only during the course of preparation for his or her testimony or in the actual course of the deposition.  The aforementioned deponent, however, may not retain any "Attorney's Eyes Only" Material, and must sign and deliver to counsel a statement in the form annexed hereto as Exhibit "A."

e.  Those persons listed in paragraphs 4(d) and 4(e) above.

CONFIDENTIAL

TTV_006886

No person allowed to view "Attorney's Eyes Only" Material shall use and "Attorney's Eyes Only" Material for any purpose except as needed solely in connection with or to assist in the prosecution or defense of claims in this action.

6.    If counsel wish to disclose "Confidential" or "Attorney's Eyes Only" Material to any person not described in paragraphs 4 or 5, respectively, above, they must proceed in the following manner: the names of the persons to whom "Confidential" or "Attorney's Eyes Only" Material is to be disclosed and a description of the Material to be disclosed to such person shall be provided in writing to lead counsel for the producing Party ten (10) calendar days in advance of disclosure to afford counsel an opportunity to object to disclosure and move the Court for a protective order.  If no objection and motion for protective order are made within the ten (10) calendar day period, disclosure to such named persons may be made after the expiration of such ten (10) calendar day period.  If an objection and motion are made within the ten (10) calendar day period, such Material shall not be disclosed pending a decision by the Court on such motion.  Any person who becomes authorized to receive "Confidential" or "Attorney's Eyes Only" Material pursuant to this paragraph (whether such authorization arises from the lack of an objection and motion for protection or from the Court's ruling on a motion for

CONFIDENTIAL

TTV_006887

protection) shall, prior to the receipt of the Material, execute and deliver to counsel a statement in the form annexed hereto as Exhibit "A." Disclosure made to all persons to whom disclosures are permitted hereunder shall be made subject to and in accordance with the terms of this Protective Order. The signed original or true and correct copy of each Exhibit "A" shall be provided to lead counsel for the producing Party within five (5) business days of receipt of lead counsel's written request for same.

7.    The inadvertent, unintentional, or *in camera* production of any Material which has been designated as "Confidential" or "Attorney's Eyes Only" shall not, under any circumstances, be deemed a waiver, in whole or in part, of the confidentiality of the Material in question. The parties to whom the inadvertent or unintentional production was made shall cooperate in the return of such documents, records, things, and/or information, including all copies thereof, and shall make no use of the Material for any purpose. The Parties also agree that any document, record, thing, and/or information containing Material which has been designated as "Confidential" or "Attorney's Eyes Only" will not lose its status as "Confidential" or "Attorney's Eyes Only" by such inadvertent or unintentional production.

CONFIDENTIAL

TTV_006888

8.     If any Party believes that any Material which has been designated as "Confidential" or "Attorney's Eyes Only" is not properly subject to the confidentiality provisions of this Protective Order, that Party must so notify the producing Party in writing within ninety (90) calendar days of receiving the Material, provide a description of the Material which the objecting Party believes should be freed from the constraints of this Protective Order, and serve copies of such notice on lead counsel for all other Parties herein. The Party producing such designated Material must then file a motion for protective order within ten (10) calendar days from receipt of such notice and shall bear the burden of justifying confidential treatment of the disputed Material under applicable law. If such motion is timely filed, the protection afforded by this Protective Order shall continue until a decision on the motion is made by the Court. If no motion is made within the ten (10) calendar day period, the protection afforded "Confidential" or "Attorney's Eyes Only" Material by this Protective Order shall terminate as to the Material described in the objecting Party's notice given pursuant to this paragraph.

9.     Whenever "Confidential" or "Attorney's Eyes Only" Material is disclosed in a deposition, the Party making such disclosure shall inform the witness, on the record, that the use of such Material is subject to the terms of this Protective

CONFIDENTIAL

Order.  The witness must sign the statement form attached hereto as Exhibit "A," which form shall be included as an Exhibit to such deposition, or the witness shall agree on the record to be bound by the terms of this Protective Order and the statement attached hereto as Exhibit "A."  If a witness refuses both options, the deposition may cease, and the Parties should file any necessary motions with the Court and set them for hearing, or the Parties may agree to continue the deposition on terms agreeable to both Parties.  If any person present at the deposition is not encompassed within the categories of persons defined in paragraphs 4, 5, or 6 of this Protective Order, that person shall leave the deposition while any "Confidential" or "Attorney's Eyes Only" Material, as applicable, is being disclosed during the deposition.

10.    In the event that any "Confidential" or "Attorney's Eyes Only" Material that is subject to the provisions of this Protective Order is used in motions, briefs, or other documents filed with the Court, the Party seeking to use "Confidential" and/or "Attorney's Eyes Only" Material must seek an order from the Court allowing the designated Material to be filed under seal before filing the designated Material.  The process for filing such designated Material shall be subject to a further process and procedure to be established by the Court by separate order.

CONFIDENTIAL

TTV_006890

11.    During the trial, any exhibits offered into evidence shall have the "Confidential" or "Attorney's Eyes Only" designation provided for in paragraph 3 of this Protective Order removed, or the document shall be copied in such a manner that the "Confidential" or "Attorney's Eyes Only" designation shall not be visible on the exhibit.

12.    This Protective Order shall not be deemed a waiver of:

   a. Any Party's right to object to any discovery requests on any ground;

   b. Any Party's right to seek an order compelling discovery with respect to any discovery requests;

   c. Any Party's rights in any proceedings herein to object to the admission of any evidence on any ground; or

   d. Any Party's right to use its own documents, or any information contained in or derived from those documents, and its own "Confidential" or "Attorney's Eyes Only" Material in its sole and complete discretion.

13.    The provisions of this Protective Order shall continue in effect with respect to any "Confidential" or "Attorney's Eyes Only" Material until expressly released by the Party furnishing such Material or until such Material shall be freed

CONFIDENTIAL

TTV_006891

from the constraints of this Agreement, in compliance with paragraph 8 above, and such effectiveness shall survive the final determination of this action. Any Party may move the Court to amend any portion of this Protective Order, including amendment to permit actual trial witnesses' access to trial exhibits and transcripts of testimony that are reasonably necessary to assist such witnesses in preparation for that testimony.

14.    Unless otherwise agreed by the Party producing such Material, within sixty (60) days of the final determination of this action, each Party shall return all "Confidential" or "Attorney's Eyes Only" Material in its possession or control, and all copies, derivations, and summaries thereof, to the Party who furnished it, or certify that all such material and all copies, derivations, and summaries thereof have been destroyed. For purposes of this Protective Order, the "final determination of this action" shall be deemed to be the later of (i) full settlement of all claims, final judgments herein, or the completion and exhaustion of all appeals, rehearings, remands, trials, and reviews, if any, of this action; or (ii) the expiration of all time limits for the filing of or application for extension of time pursuant to applicable law.

15.    Counsel for the Parties to whom "Confidential or "Attorney's Eyes Only" Material has been furnished shall be responsible for restricting disclosure in

CONFIDENTIAL

TTV_006892

accordance with the provisions of this Protective Order and for securing execution of and retaining the statement attached hereto as Exhibit "A" as and when required under the provisions of this Protective Order.

16.    If any subpoenas, requests for production, or other forms of discovery in connection with other litigation are served on any Party receiving "Confidential" or "Attorney's Eyes Only" Material, such Party will notify lead counsel for the producing Party within seventy-two (72) hours, provide such lead counsel with a copy of the subpoena or other discovery request within seventy-two (72) hours, and consent to and assist in obtaining an order from the appropriate court protecting the Material from being disseminated outside the scope of this Protective Order.

17.    The inadvertent disclosure of any privileged documents shall not be deemed a waiver of that privilege as to any documents, testimony, or evidence.

18.    If a Party wishes to use Materials marked as "Confidential" or "Attorney's Eyes Only" during any trial of this action, including any hearings, the Parties will, in advance, confer in good faith to agree upon a method to protect such marked Materials during such proceedings. If the Parties are unable to agree upon a method to protect such marked Materials, any Party may apply to the Court for a mechanism to maintain the confidentiality of such marked Materials.

CONFIDENTIAL                                             TTV_006893

19.    This Protective Order shall apply to all discovery sought from any and all third parties. Any Party or third party may designate discovery produced by or obtained from third parties as "Confidential" and/or "Attorney's Eyes Only" contemporaneous with production or after such documents have been produced so long as the designation occurs within three (3) calendar days of a Party's receipt of the documents produced by the third party. Such designation is subject to objection and review in accordance with paragraph 8.

20.    By entering into this Protective Order, the Parties do not waive any objection, privilege, or right with regard to discovery, manner of discovery, compliance with discovery, or use or admissibility of evidence.

Respectfully submitted,

**HALL BOOTH SMITH, P.C.**

*/s/ Alex B. Kaufman*
ALEX B. KAUFMAN
Georgia Bar No. 136097
WILLIAM BRADLEY CARVER, SR.
Georgia Bar No. 115529
*Counsel for Intervenor-Defendant*
*True the Vote*

191 Peachtree Street NE, Suite 2900
Atlanta, Georgia 30303
P: (404) 954-5000 | F: (404) 954-5020
akaufman@hallboothsmith.com
bcarver@hallboothsmith.com

CONFIDENTIAL

TTV_006894

**SO ORDERED.**

Signed this ___ day of July, 2021.

_____
J.P. Boulee
United States District Judge

CONFIDENTIAL

TTV_006895