# EXHIBIT 11

YOU'VE BEEN SELECTED       WSJ is looking to ensure that the experience we deliver is constantly evolving to meet
                           your needs. Take part in this brief survey to help us improve your experience.

                           Take Survey                                                                        ✕

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For
non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/government-tracking-how-people-move-around-in-coronavirus-pandemic-11585393202

EXCLUSIVE   U.S.

# Government Tracking How People Move Around in Coronavirus Pandemic

Goal is to get location data in up to 500 U.S. cities to help plan response; privacy concerns call for 'strong legal safeguards,' activist says

*By* *Byron Tau* [Follow]

*March 28, 2020*



A man checks his phone in Times Square. The cellphone data being used by the government shows which public spaces are still drawing crowds. PHOTO: KENA BETANCUR/AGENCE FRANCE-PRESSE/GETTY IMAGES

WASHINGTON—Government officials across the U.S. are using location data from millions of cellphones in a bid to better understand the movements of Americans during the coronavirus pandemic and how they may be affecting the spread of the disease.

DDR-00069542

The federal government, through the Centers for Disease Control and Prevention, and state and local governments have started to receive analyses about the presence and movement of people in certain areas of geographic interest drawn from cellphone data, people familiar with the matter said. The data comes from the mobile advertising industry rather than cellphone carriers.

The aim is to create a portal for federal, state and local officials that contains geolocation data in what could be as many as 500 cities across the U.S., one of the people said, to help plan the epidemic response.

The data—which is stripped of identifying information like the name of a phone's owner—could help officials learn how coronavirus is spreading around the country and help blunt its advance. It shows which retail establishments, parks and other public spaces are still drawing crowds that could risk accelerating the transmission of the virus, according to people familiar with the matter. In one such case, researchers found that New Yorkers were congregating in large numbers in Brooklyn's Prospect Park and handed that information over to local authorities, one person said. Warning notices have been posted at parks in New York City, but they haven't been closed.

The data can also reveal general levels of compliance with stay-at-home or shelter-in-place orders, according to experts inside and outside government, and help measure the pandemic's economic impact by revealing the drop-off in retail customers at stores, decreases in automobile miles driven and other economic metrics.

The CDC has started to get analyses based on location data through an ad hoc coalition of tech companies and data providers—all working in conjunction with the White House and others in government, people said.

The CDC and the White House didn't respond to requests for comment.

The growing reliance on mobile phone location data continues to raise concerns about privacy protections, especially when programs are run by or commissioned by governments.

Wolfie Christl, a privacy activist and researcher, said the location-data industry was "covidwashing" what are generally privacy-invading products.

DDR-00069543



The Centers for Disease Control and Prevention has started to get data through one project, dubbed the Covid-19 Mobility Data Network. PHOTO: ELIJAH NOUVELAGE/BLOOMBERG NEWS

"In the light of the emerging disaster, it may be appropriate to make use of aggregate analytics based on consumer data in some cases, even if data is being gathered secretly or illegally by companies," said Mr. Christl. "As true anonymization of location data is nearly impossible, strong legal safeguards are mandatory." The safeguards should limit how the data can be used and ensure it isn't used later for other purposes, he said.

Privacy advocates are concerned that even anonymized data could be used in combination with other publicly accessible information to identify and track individuals.

Some companies in the U.S. location-data industry have made their data or analysis available for the public to see or made their raw data available for researchers or governments. San Francisco-based LotaData launched a public portal analyzing movement patterns within Italy that could help authorities plan for outbreaks and plans additional portals for Spain, California and New York. The company Unacast launched a public "social distancing scoreboard" that uses location data to evaluate localities on how well their population is doing at following stay-at-home orders.

Other state and local governments too have begun to commission their own studies and analyses from private companies. Foursquare Labs Inc., one of the largest location-data players, said it is in discussions with numerous state and local governments about use of its data.

DDR-00069544

Researchers and governments around the world have used a patchwork of authorities and tactics to collect mobile phone data—sometimes looking for voluntary compliance from either companies or individuals, and in other cases using laws meant for terrorism or other emergencies to collect vast amounts of data on citizens to combat the coronavirus threat.

Massachusetts Institute of Technology researchers have launched a project to track volunteer Covid-19 patients through a mobile phone app. Telecom carriers in Germany, Austria, Spain, Belgium, the U.K. and other countries have given data over to authorities to help combat the pandemic. Israel's intelligence agencies were tapped to use antiterrorism phone-tracking technology to map infections.

In the U.S., so far, the data being used has largely been drawn from the advertising industry. The mobile marketing industry has billions of geographic data points on hundreds of millions of U.S. cell mobile devices—mostly drawn from applications that users have installed on their phones and allowed to track their location. Huge troves of this advertising data are available for sale.

The industry is largely unregulated under existing privacy laws because consumers have opted-in to tracking and because the data doesn't contain names or addresses—each consumer is represented by an alphanumeric string.

Cellphone carriers also have access to massive amounts of geolocation data, which is granted much stricter privacy protection under U.S. law than in most other countries. The largest U.S. carriers, including AT&T Inc. and Verizon Communications Inc., say they have not been approached by the government to provide location data, according to spokespeople. There have been discussions about trying to obtain U.S. telecom data for this purpose, however the legality of such a move isn't clear.

—*Patience Haggin, Drew FitzGerald and Sarah Krouse contributed to this article.*

**Write to** Byron Tau at byron.tau@wsj.com

**Corrections & Amplifications**
The Covid-19 Mobility Data Network is working primarily with state and local governments. An earlier version of this story incorrectly said it was providing

DDR-00069545

location data insights to the federal government. Separately, researcher Wolfie Christl's last name was misspelled in one instance as Christi. (March 28 & 29, 2020)

*Appeared in the March 30, 2020, print edition.*

DDR-00069546



Blurry video showed shots being fired from a white Honda as the man was gunned down outside his home, but the police had no other leads.



Alex Welsh for The New York Times

DDR-00069547

11/5/24, 2:30 PM
Case 1:22-cv-04259-SDG   Document 268-17   Filed 12/20/24   Page 8 of 27
Tracking Phones, Google Is a Dragnet for the Police - The New York Times

# Tracking Phones, Google
# Is a Dragnet for the Police

The tech giant records people's locations worldwide. Now, investigators are using it to find suspects and witnesses near crimes, running the risk of snaring the innocent.

By JENNIFER VALENTINO-DeVRIES    APRIL 13, 2019

When detectives in a Phoenix suburb arrested a warehouse worker in a murder investigation last December, they credited a new technique with breaking open the case after other leads went cold.

The police told the suspect, Jorge Molina, they had data tracking his phone to the site where a man was shot nine months earlier. They had made the discovery after obtaining a search warrant that required Google to provide information on all devices it recorded near the killing, potentially capturing the whereabouts of anyone in the area.

Investigators also had other circumstantial evidence, including security video of someone firing a gun from a white Honda Civic, the same model that Mr. Molina owned, though they could not see the license plate or attacker.

But after he spent nearly a week in jail, the case against Mr. Molina fell apart as investigators learned new information and released him. Last month, the police arrested another man: his mother's ex-boyfriend, who had sometimes used Mr. Molina's car.

The warrants, which draw on an enormous Google database employees call Sensorvault, turn the business of tracking cellphone users' locations into a digital dragnet for law enforcement. In an era of ubiquitous data gathering by tech companies, it is just the latest example of how personal information — where you go, who your friends are, what you read, eat and watch, and when you do it — is being used for purposes many people never expected. As privacy concerns have mounted among consumers, policymakers and regulators, tech companies have come under intensifying scrutiny over their data collection practices.

DDR-00069548

The Arizona case demonstrates the promise and perils of the new investigative technique, whose use has risen sharply in the past six months, according to Google employees familiar with the requests. It can help solve crimes. But it can also snare innocent people.

Technology companies have for years responded to court orders for specific users' information. The new warrants go further, suggesting possible suspects and witnesses in the absence of other clues. Often, Google employees said, the company responds to a single warrant with location information on dozens or hundreds of devices.

Law enforcement officials described the method as exciting, but cautioned that it was just one tool.

## Opinion
## The Privacy Project

The New York Times is launching an ongoing examination of privacy. We'll dig into the ideas, history and future of how our information navigates the digital ecosystem and what's at stake.



"It doesn't pop out the answer like a ticker tape, saying this guy's guilty," said Gary Ernsdorff, a senior prosecutor in Washington State who has worked on several cases involving these warrants. Potential suspects must still be fully investigated, he added. "We're not going to charge anybody just because Google said they were there."

It is unclear how often these search requests have led to arrests or convictions, because many of the investigations are still open and judges frequently seal the warrants. The practice was first used by federal agents in 2016, according to Google employees, and first publicly reported last year in North Carolina. It has since spread to local departments across the country, including in California, Florida, Minnesota and Washington. This year, one Google employee said, the company received as many as 180 requests in one week. Google declined to confirm precise numbers.

DDR-00069549

The technique illustrates a phenomenon privacy advocates have long referred to as the "if you build it, they will come" principle — anytime a technology company creates a system that could be used in surveillance, law enforcement inevitably comes knocking. Sensorvault, according to Google employees, includes detailed location records involving at least hundreds of millions of devices worldwide and dating back nearly a decade.

The new orders, sometimes called "geofence" warrants, specify an area and a time period, and Google gathers information from Sensorvault about the devices that were there. It labels them with anonymous ID numbers, and detectives look at locations and movement patterns to see if any appear relevant to the crime. Once they narrow the field to a few devices they think belong to suspects or witnesses, Google reveals the users' names and other information.

"There are privacy concerns that we all have with our phones being tracked — and when those kinds of issues are relevant in a criminal case, that should give everybody serious pause," said Catherine Turner, a Minnesota defense lawyer who is handling a case involving the technique.

Investigators who spoke with The New York Times said they had not sent geofence warrants to companies other than Google, and Apple said it did not have the ability to perform those searches. Google would not provide details on Sensorvault, but Aaron Edens, an intelligence analyst with the sheriff's office in San Mateo County, Calif., who has examined data from hundreds of phones, said most Android devices and some iPhones he had seen had this data available from Google.

In a statement, Richard Salgado, Google's director of law enforcement and information security, said that the company tried to "vigorously protect the privacy of our users while supporting the important work of law enforcement." He added that it handed over identifying information only "where legally required."

Mr. Molina, 24, said he was shocked when the police told him they suspected him of murder, and he was surprised at their ability to arrest him based largely on data.

"I just kept thinking, You're innocent, so you're going to get out," he said, but he added that he worried that it could take months or years to be exonerated. "I was scared," he said.

DDR-00069550

11/5/24, 2:30 PM
Case 1:22-cv-04259-SDG   Document 268-17   Filed 12/20/24   Page 11 of 27
Tracking Phones, Google Is a Dragnet for the Police - The New York Times

# A Novel Approach

Detectives have used the warrants for help with robberies, sexual assaults, arsons and murders. Last year, federal agents requested the data to investigate a string of bombings around Austin, Tex.

Austin investigators obtained another warrant after a fourth bomb exploded. But the suspect killed himself three days after that bomb, as they were closing in. Officials at the time said surveillance video and receipts for suspicious purchases helped identify him.

An F.B.I. spokeswoman declined to comment on whether the response from Google was helpful or timely, saying that any question about the technique "touches on areas we don't discuss."

Officers who have used the warrants said they showed promise in finding suspects as well as witnesses who may have been near the crime without realizing it. The searches may also be valuable in cold cases. A warrant last year in Florida, for example, sought information on a murder from 2016. A Florida Department of Law Enforcement spokeswoman declined to comment on whether the data was helpful.

The approach has yielded useful information even if it wasn't what broke the case open, investigators said. In a home invasion in Minnesota, for example, Google data showed a phone taking the path of the likely intruder, according to a news report and police documents. But detectives also cited other leads, including a confidential informant, in developing suspects. Four people were charged in federal court.

According to several current and former Google employees, the Sensorvault database was not designed for the needs of law enforcement, raising questions about its accuracy in some situations.

Though Google's data cache is enormous, it doesn't sweep up every phone, said Mr. Edens, the California intelligence analyst. And even if a location is recorded every few minutes, that may not coincide with a shooting or an assault.

Google often doesn't provide information right away, investigators said. The Google unit handling the requests has struggled to keep up, so it can take weeks or months for a response. In the Arizona investigation, police

DDR-00069551

received data six months after sending the warrant. In a different Minnesota case this fall, it came in four weeks.

But despite the drawbacks, detectives noted how precise the data was and how it was collected even when people weren't making calls or using apps — both improvements over tracking that relies on cell towers.

"It shows the whole pattern of life," said Mark Bruley, the deputy police chief in Brooklyn Park, Minn., where investigators have been using the technique since this fall. "That's the game changer for law enforcement."


## A Trove of Data

Location data is a lucrative business — and Google is by far the biggest player, propelled largely by its Android phones. It uses the data to power advertising tailored to a person's location, part of a more than $20 billion market for location-based ads last year.

In 2009, the company introduced Location History, a feature for users who wanted to see where they had been. Sensorvault stores information on anyone who has opted in, allowing regular collection of data from GPS signals, cellphone towers, nearby Wi-Fi devices and Bluetooth beacons.

People who turn on the feature can see a timeline of their activity and get recommendations based on it. Google apps prompt users to enable Location History for things like traffic alerts. Information in the database is held indefinitely, unless the user deletes it.

"We citizens are giving this stuff away," said Mr. Ernsdorff, the Washington State prosecutor, adding that if companies were collecting data, law enforcement should be able to obtain a court order to use it.

Current and former Google employees said they were surprised by the warrants. Brian McClendon, who led the development of Google Maps and related products until 2015, said he and other engineers had assumed the police would seek data only on specific people. The new technique, he said, "seems like a fishing expedition."

DDR-00069552

# Uncharted Legal Territory

The practice raises novel legal issues, according to Orin Kerr, a law professor at the University of Southern California and an expert on criminal law in the digital age.

One concern: the privacy of innocent people scooped up in these searches. Several law enforcement officials said the information remained sealed in their jurisdictions but not in every state.

In Minnesota, for example, the name of an innocent man was released to a local journalist after it became part of the police record. Investigators had his information because he was within 170 feet of a burglary. Reached by a reporter, the man said he was surprised about the release of his data and thought he might have appeared because he was a cabdriver. "I drive everywhere," he said.

These searches also raise constitutional questions. The Fourth Amendment says a warrant must request a limited search and establish probable cause that evidence related to a crime will be found.

Warrants reviewed by The Times frequently established probable cause by explaining that most Americans owned cellphones and that Google held location data on many of these phones. The areas they targeted ranged from single buildings to multiple blocks, and most sought data over a few hours. In the Austin case, warrants covered several dozen houses around each bombing location, for times ranging from 12 hours to a week. It wasn't clear whether Google responded to all the requests, and multiple officials said they had seen the company push back on broad searches.

Last year, the Supreme Court ruled that a warrant was required for historical data about a person's cellphone location over weeks, but the court has not ruled on anything like geofence searches, including a technique that pulls information on all phones registered to a cell tower.

Google's legal staff decided even before the 2018 ruling that the company would require warrants for location inquiries, and it crafted the procedure that first reveals only anonymous data.

"Normally we think of the judiciary as being the overseer, but as the technology has gotten more complex, courts have had a harder and harder

DDR-00069553

time playing that role," said Jennifer Granick, surveillance and cybersecurity counsel at the American Civil Liberties Union. "We're depending on companies to be the intermediary between people and the government."

In several cases reviewed by The Times, a judge approved the entire procedure in a single warrant, relying on investigators' assurances that they would seek data for only the most relevant devices. Google responds to those orders, but Mr. Kerr said it was unclear whether multistep warrants should pass legal muster.

Some jurisdictions require investigators to return to a judge and obtain a second warrant before getting identifying information. With another warrant, investigators can obtain more extensive data, including months of location patterns and even emails.

# Mixed Results

Investigators in Arizona have never publicly disclosed a likely motive in the killing of Joseph Knight, the crime for which Mr. Molina was arrested. In a court document, they described Mr. Knight, a 29-year-old aircraft repair company employee, as having no known history of drug use or gang activity.

Detectives sent the geofence warrant to Google soon after the murder and received data from four devices months later. One device, a phone Google said was linked to Mr. Molina's account, appeared to follow the path of the gunman's car as seen on video. His carrier also said the phone was associated with a tower in roughly the same area, and his Google history showed a search about local shootings the day after the attack.

After his arrest, Mr. Molina told officers that Marcos Gaeta, his mother's ex-boyfriend, had sometimes taken his car. The Times found a traffic ticket showing that Mr. Gaeta, 38, had driven that car without a license. Mr. Gaeta also had a lengthy criminal record.

While Mr. Molina was in jail, a friend told his public defender, Jack Litwak, that she was with him at his home about the time of the shooting, and she and others provided texts and Uber receipts to bolster his case. His home,

DDR-00069554

where he lives with his mother and three siblings, is about two miles from the murder scene.

Mr. Litwak said his investigation found that Mr. Molina had sometimes signed in to other people's phones to check his Google account. That could lead someone to appear in two places at once, though it was not clear whether that happened in this case.

Mr. Gaeta was arrested in California on an Arizona warrant. He was then charged in a separate California homicide from 2016. Officials said that case would probably delay his extradition to Arizona.

A police spokesman said "new information came to light" after Mr. Molina's arrest, but the department would not comment further.

Months after his release, Mr. Molina was having trouble getting back on his feet. After being arrested at work, a Macy's warehouse, he lost his job. His car was impounded for investigation and then repossessed.

The investigators "had good intentions" in using the technique, Mr. Litwak said. But, he added, "they're hyping it up to be this new DNA type of forensic evidence, and it's just not."

Michael LaForgia contributed reporting. Kitty Bennett contributed research.

**Related Coverage**

- Google's Sensorvault Is a Boon for Law Enforcement. This Is How It Works.
  APRIL 13, 2019

- Hundreds of Apps Can Empower Stalkers to Track Their Victims  MAY 19, 2018

- Service Meant to Monitor Inmates' Calls Could Track You, Too  MAY 10, 2018

© 2024 The New York Times Company

DDR-00069555

🕐 This article was published more than **10 years ago**

*Democracy Dies in Darkness*

# Agencies collected data on Americans' cellphone use in thousands of 'tower dumps'

↗   🔖   💬 0

 By Ellen Nakashima

December 9, 2013 at 12:01 a.m. EST

Federal, state and local law enforcement agencies conducting criminal investigations collected data on cellphone activity thousands of times last year, with each request to a phone company yielding hundreds or thousands of phone numbers of innocent Americans along with those of potential suspects.

Law enforcement made more than 9,000 requests last year for what are called "tower dumps," information on all the calls that bounced off a cellphone tower within a certain period of time, usually two or more hours, a congressional inquiry has revealed.

The little-known practice has raised concerns among federal judges, lawmakers and privacy advocates who question the harvesting of massive amounts of data on people suspected of no crime in order to try to locate a criminal. Data linked to specific cell towers can be used to track people's movements.

The inquiry, by Sen. Edward J. Markey (D-Mass.), into law enforcement's use of cellphone data comes amid growing scrutiny of the bulk collection of geolocation data overseas and of Americans' phone records in the United States by the National Security Agency.

Tower dumps raise in the law enforcement context some of the same concerns presented by the NSA's mass collection of phone records without a warrant, when large amounts of data on law-abiding citizens are gathered to find clues about a small number of suspects, privacy advocates and some industry lawyers say. But unlike the NSA collection, which is bound by court-imposed rules on retention and use, the standards for obtaining tower data and the limits on its use by a plethora of agencies are inconsistent and unclear.

 View Graphic
A look at how the NSA collects cell phone data and uses it to track individual suspects.

"This isn't the NSA asking for information," said Markey, who is planning to introduce legislation this month to restrict law enforcement's use of consumers' phone data, including ensuring that tower dumps are narrowly focused. "It's your neighborhood police department requesting your mobile phone data. So there are serious questions about how law enforcement handles the information of innocent people swept up in these digital dragnets."

Markey's investigation, based on a survey of eight U.S. phone companies, has also revealed that carriers, following requests from law enforcement agencies, are providing a range of other records as well. Those include GPS location data, Web site addresses and, in some cases, the search terms Americans have entered into their cellphones.

Markey's legislation, which does not focus on NSA or other intelligence agencies' programs, would require a warrant to obtain GPS location data, impose limits on how long carriers can keep customers' phone data, and mandate routine disclosures by law enforcement agencies on the nature and volume of requests they make of carriers. The proposal would not require a warrant for tower dumps.

Markey is pushing for standardized rules on law enforcement's use of cellphone data, which has come under question in the courts. One federal judge this year, in a rare public ruling, required a warrant for tower dumps. The judge also ordered the prosecutor to destroy non-relevant data and — in an unprecedented move — to notify all non-suspects that their records had been collected.

Some companies Markey surveyed did not provide full responses. But in general, the survey reflects a greater reliance on cellphone data of all types, including text messages and call histories, by law enforcement.

"The industry as a whole in recent years experienced a substantial increase in these demands: the number of requests to Verizon Wireless has approximately doubled in the last five years, a trend that appears to be consistent with the industry in general," the company's general counsel, William B. Petersen, said in a letter to Markey.

Civil liberties advocates are alarmed.

"Tower dumps violate the privacy of hundreds or thousands of innocent people at a time, most of whom will never learn their location information was obtained by the government in order to find the proverbial needle in the haystack," said Christopher Soghoian, principal technologist at the American Civil Liberties Union.

# Following a digital trail

According to the industry, there are 330 million cellphones in use in the United States. Americans are texting, calling and moving about with devices that track their locations and enable them to surf the Internet. Those actions leave digital trails that companies log for business or technical reasons — and that can be invaluable for investigators on the trail of a murderer or a bank robber.

"Location information is a vital component of law enforcement investigations at the federal, state and local levels," FBI spokesman Christopher Allen said.

A senior Justice Department official, who was not authorized to talk on the record and so spoke on the condition of anonymity, said: "The data is useful if you think about the need to identify the location of drug traffickers — where are they at various points in their criminal dealings? It would be useful if you have a shooting by gang members. How do you figure who was at the scene of the shooting?"

In one notable instance, the FBI in 2010 located two bank robbers in Arizona, whom prosecutors had dubbed the "High Country Bandits," through the use of tower dumps. The men had robbed 16 banks at gunpoint in Arizona, New Mexico, Colorado and Utah.

Investigators traced the trail of the robbers by analyzing cellphone records from the towers closest to four of the more remote Arizona banks. "Investigators believed it would be extremely unusual for a cellphone number to appear on two or more" of the towers servicing the areas of the banks on the robbery dates, according to an FBI special agent in a March 2010 criminal complaint.

The FBI received more than 150,000 phone numbers in the dump, according to the complaint. Its analysis turned up only one number that bounced off the towers on the dates of three of the robberies. That number belonged to one of the robbers.

One former federal prosecutor familiar with the practice said federal agents make requests "a few dozen" times a year, typically in bank robbery cases. The vast majority of requests are made by state and local police agencies. Sprint, for instance, reported that it had provided tower dumps to agencies 6,000 times last year.

Some companies have fought to narrow the requests. One industry lawyer said his company fought an order that sought dumps from "any cell towers" that served a particular address for a 13-hour period. "We're worried that we're being asked a lot to give away all this data," said the lawyer, who was not authorized to speak on the record and so talked on the condition of anonymity. "We just think the law is being exploited."

# Warrants not always needed

In general, the data may be obtained with a showing to a judge that it is relevant and material to a criminal investigation based on a 1986 statute, the Electronic Communications Privacy Act. That is a lower standard than for a warrant, which is based on probable cause that the data will yield evidence of a crime.

The senior Justice Department official said a warrant is not required because the Supreme Court has held that Americans have no expectation of privacy in "dialing" data, such as the phone numbers they called. That is information given to the phone company by the customer, and the court has held that it is not protected by the Fourth Amendment, he said.

But privacy advocates and some industry lawyers are increasingly questioning the applicability of court rulings that predate the digital explosion, which has enabled mass collection of data.

DDR-00069558

In May, a federal magistrate judge in Texas insisted on a warrant for a tower dump that he said would have applied to 77 towers in a four-mile radius in a five-minute period, yielding "hundreds or even thousands of telephone numbers."

"The cell-site location records at issue here currently enable the tracking of the vast majority of Americans," wrote Brian L. Owsley, a federal magistrate judge in the Southern District of Texas, in an opinion denying the original request. "Thus, the collection of cell-site location records effectively enables 'mass' or 'wholesale' electronic surveillance, and raises greater Fourth Amendment concerns than a single electronically surveilled car trip."

Another concern is how long the data are kept. Allen, the FBI spokesman, said that "the FBI only collects and maintains information that has investigative value and relevance to a case." That could be indefinitely, former U.S. officials said.

The D.C. police department said it sometimes uses such data but does not keep them. Other jurisdictions, including Fairfax and Prince George's counties, declined to comment on their retention practices.

According to industry officials, prosecutors are asking more often for groups of Internet protocol, or IP, addresses for people who have viewed a video or a photo or logged into a Web site.

According to Markey's investigation, AT&T and T-Mobile are providing Web site addresses, which can include search-term data, to law enforcement. AT&T says it requires a court order. T-Mobile says it requires a warrant.

Verizon Wireless reported that it does not provide real-time GPS location data to law enforcement agencies but that it does provide near-real-time data on calls and text messages once they're made, spokeswoman Debra Lewis said.

Cecilia Kang contributed to this report.

*Democracy Dies in Darkness*

NATIONAL SECURITY

# Google location data was used to find Jan. 6 rioters. It's disappearing.

🎧 8 min    ↗    🔖    💬

By Rachel Weiner and Drew Harwell
Updated January 8, 2024 at 8:35 p.m. EST | Published January 6, 2024 at 6:00 a.m. EST

Special counsel Jack Smith has a plan for how to illustrate Donald Trump's influence over the rioters who stormed the U.S. Capitol on Jan. 6, 2021. Prosecutors will show a map of people gathered around the Ellipse to hear Trump say, "we're going to the Capitol" to "fight like hell," then follow those supporters in real time as they head down Pennsylvania Avenue to where lawmakers were certifying Joe Biden's victory.

That visualization, detailed in court filings in Trump's federal election subversion case in D.C., was created with data from Google. But the tool that has pitted law enforcement investigative priorities against personal privacy concerns soon won't be so accessible. The company will no longer store location history that was used to identify hundreds of people who stormed the Capitol on Jan. 6 and to prosecute the man those rioters hoped to keep in power.

Since 2016, law enforcement has used geofence warrants to pull information from smartphone owners who use "Google location history," which regularly records a person's location through a combination of cell tower, internet protocol, wireless, GPS and Bluetooth data. Police can also approximate locations through pings to cell towers. But the Google data is far more precise — making it possible in many cases, for instance, to discern whether someone was in the Capitol or right outside it.

The use of the data is still under debate. The chief judge in D.C. has yet to rule on a challenge to the geofence warrant from Israel Easterday, an Amish teen from Kentucky who helped rioters breach the Capitol Rotunda by pepper spraying a police officer. The neighboring U.S. Court of Appeals for the Fourth Circuit, which covers Virginia, Maryland and other neighboring states, is weighing whether this kind of warrant is constitutional, with stark disagreement over whether the data collection was voluntary sharing, fascist overreach or something in between.

"In the physical world, we have the scope of what's allowed in a warrant," said Orin Kerr, a law professor at the University of California at Berkeley who has tracked the legal debate over geofence warrants. "But we don't have a sense in the open world" of online data.

A Google representative said the change was part of an ongoing effort to give people more control over their data.

DDR-00069560

Richard Salgado, Google's director of Law Enforcement & Information Security for 13 years and a former Justice Department attorney, said that the warrants were seen initially as potentially useful in "exceptional" situations but quickly "evolved into this routine strategy" investigators used even when other techniques were more likely to be effective.

"In the vast majority of cases this turns out not to be a useful technique," he said. And he said these warrants can "evade oversight" since the government can just withdraw a warrant if the provider objects, thus avoiding a court ruling. Gag rules mean that users will never know their data was searched or exposed. "There is some discomfort that judges don't really understand the limited value of the searches at the outset, and challenges don't reach them."

On Jan. 6 three years ago, the Justice Department sent a letter to Google directing it to preserve a copy of its data as it existed that day. Then two search warrants were sent to the company asking for a list of all devices that Google registered in "Location History" as in or around the Capitol that afternoon. The government threw out phones shown as in the building before 12:50 p.m. or after 6:10 p.m., assuming those represented people working inside the Capitol. They also threw out any phone where the margin of error could place the user outside the grounds — unless that person had deleted their location history after the 6th, which the FBI took as a sign of culpability.

After that culling, the Justice Department obtained a court order for Google to "unmask" or name 9,341 users.

Judge James E. Boasberg said at an October hearing in Easterday's case that he would probably side with the government. But he wanted more information about why so few Capitol staff were identified even though many were in the building: "The numbers need to make more sense."

The government was following procedures developed by Google after consultation with the Justice Department, according to court records. The company would produce a list of the devices in the area and time requested. If asked, Google would provide more travel history for a smaller group deemed of interest to the government. With a court order, the company would then unmask the users of devices chosen from that list.

Geofence warrants became popular very quickly for law enforcement in the past 8 years because they could possibly pinpoint someone at or near the scene of a crime. In the first half of 2023, Google said it received more than 63,000 requests for disclosure of user information in the United States, covering 110,000 accounts, and handed over at least some data 85 percent of the time. The company did not break out location-data requests specifically, but Google said in 2021 that geofence warrants constituted more than a quarter of all warrants they received in the United States.

The Jan. 6 case — the largest investigation in U.S. history that has to date netted more than 1,200 people charged — is unusual in that the government could plausibly argue everyone within the geofence had committed or witnessed a crime. "Those are really the exceptions that prove the rule," said Brett Max Kaufman of the ACLU, which is involved in the Fourth Circuit challenge related to a Virginia robbery. But Jennifer Lynch of the Electronic Frontier Foundation argues that the Capitol warrants are as bad as other geofences.

"The January 6 example is a really tough one," she said. "But it's still not targeted. The whole reason we don't have mass warrants is that then we have to trust the government to make the right decisions."

DDR-00069561

Turning on location history is optional; as of 2019 Google said a third of users had the feature enabled. A user can also edit the "timeline" of past trips Google creates from the data. To respond to a geofence warrant, Google has to search data from every device using location history — approximately 592 million people. Now, Google says the data will only be stored for three months and only on the device itself, making it impossible to access remotely by law enforcement. That aligns Google with Apple, which does not store location data in a way that is open to a geofence warrant.

While the warrants might be disappearing, legal battles over their constitutionality will keep going for years. Experts disagree about whether data aggregation companies — also served warrants in Jan. 6 cases — could successfully replicate Google's data.

"For now I think that does sort of end the practice," Kaufman said, but "there are other types of databases where the same legal arguments could apply."

The question is whether such warrants are unreasonable searches invading the privacy of people who just happen to be near the scene of a crime. In the Fourth Circuit case, people in nearby buildings, including a church, were within the parameters of the search for a bank robber in Richmond. "Police cannot act like the prince in Cinderella, knocking on local doors to order occupants to try on a slipper left at the ball," Alexandria federal defender Geremy Kamens wrote in Easterday's case.

Google itself described the searches in court as "broad and intrusive" and said that "users have a reasonable expectation of privacy" in their location history, which is akin to "a virtual journal." Location history can remind you where you've been before and how long it took you to get there, and recommend stops and real-time traffic information on your regular commutes. It's also used for advertising — Location History helps Google tell businesses how many people visited a store after seeing its ads, which are targeted to users using different location data.

The location data varies in accuracy depending on whether and how the phone is being used, along with the strength of various signals.

The government has emphasized the voluntary, opt-in nature of the product and says no federal court has thrown out evidence obtained through a geofence warrant. (A state court in California has). In the Richmond case, a district court judge ruled that the warrant used to identify the bank robber was far too broad, but that the officers who used it were acting in "good faith." She also said the Jan. 6 warrants were different in "crucial" ways, including more judicial oversight.

Her decision was argued over at the Fourth Circuit last month. Judge Julius Richardson suggested there was no need for geofence warrants, because "if I didn't opt into the service ... it would not be searching my data." Judge James A. Wynn said the warrants would pave the way for "Nazi techniques" as technology evolved. "And at the end of the day," he said, "there's no privacy at all."

*This article has been updated to clarify how Location History is used in advertising.*

DDR-00069562

DDR-00069563

🕐 This article was published more than **2 years ago**

*Democracy Dies in Darkness*

**POSTEVERYTHING**

# Letting police access Google location data can help solve crimes

Acquiring anonymous data about which devices were in a bank at the time of a robbery should not be unconstitutional.

🎧 8 min    ↗    🔖    💬 0

 Perspective by Jane Bambauer

March 28, 2022 at 10:21 a.m. EDT

At 4:52 p.m. on May 20, 2019, a man walked into Call Federal Credit Union in Midlothian, Va., made threats against the bank teller's family, showed a gun and walked away with $195,000. After traditional investigative leads went dry, the detective working the case made use of an increasingly popular kind of warrant — a "geofence warrant" — to figure out who the criminal was. Camera footage had shown the suspect holding an Android phone up to his face, so after getting approval from a magistrate, the detective demanded that Google help find Android devices that were used in a one-hour window around the time of the crime, within a 300-meter-diameter circle that encompassed the bank.

Google's computers trawled its voluminous database of location records and turned up 19 devices that were in the relevant area. Google's response team provided deidentified data about where those devices traveled during the one-hour window — letting police see which movements were consistent with those of the robber. Eventually, after requesting an extra hour's worth of location data for nine of the phones, the detective asked Google to identify three phone users. One of the three, Okello Chatrie, was subsequently arrested.

This is the kind of high-tech, data-driven police investigation that would have been impossible a generation ago. But was the sifting of cellphone location databases constitutionally permissible? A U.S. District Court judge this month said it was not — that it violated the Fourth Amendment protection against unreasonable searches. There was, she said, no probable cause to suspect the 19 people in and around the bank of having committed the crime, and therefore no justification for obtaining their location information. (Despite this finding, the judge did not suppress the evidence, concluding the detective had acted in good faith in procuring the warrant — making the decision more relevant to privacy law than to the fate of Chatrie.)

DDR-00069564

The case joins a sometimes-confused body of opinions on privacy and electronic tracking. Clearly, some judges are uncomfortable with giving police any access, absent a finding of probable cause, to the gobs of data that are collected on law-abiding Americans. But while some civil-liberties advocates hailed the decision, it may reflect a too-cramped view of how to balance a right to privacy against the effective maintenance of public security. In truth, geofence warrants present an opportunity for sound policing that is consistent with constitutional principles.

When courts apply the Fourth Amendment to a brand new technology, they use the "reasonable expectations of privacy" test developed by the U.S. Supreme Court in _Katz v. United States_ (1967). In that case, the justices said that police who tapped a public phone booth violated their target's privacy rights; the suspect, the justices said, had reason to think the call was private. A later case, _Smith v. Maryland_ (1978), fine-tuned what an appropriate "expectation of privacy" might be: it did not extend to the phone numbers you dial from your home, for example, because people voluntarily reveal those to phone companies as a byproduct of their business relationships and transactions.

In the geofence warrant case, the judge decided smartphone users have a reasonable expectation of privacy regarding geolocation records held by Google in part because they had not given effective, voluntary consent to having their location tracked. "A user cannot simply forfeit the protections of the Fourth Amendment for years of precise location info by selecting 'YES, I'M IN' at midnight while setting up Google Assistant," the judge wrote. And the information collected is far more personal than the list of telephone numbers dialed, even though it's also the byproduct of a business transaction. Location history data allows minute-to-minute monitoring of a person's movements over years, and the Supreme Court has already ruled in _Carpenter v. United States_ (2017) that police cannot access 127 days' worth of location data without a warrant and probable cause.

There are two mistakes here. First, the judge overemphasized the importance of consent. Even though voluntary consent is a factor in determining which privacy expectations are "reasonable," it is not a necessary condition. There's clearly no consent involved when phone companies track the numbers people have dialed or banks keep records of deposits and withdrawals, but police can access these without a warrant. Police of course can also observe and follow people in public even though people have not affirmatively consented to being watched in public. And police can freely consult security-camera footage, inside and outside of buildings.

Then there's the question of the intimacy of locational data. To the judge in this case, geofencing raised concerns similar to those in _Carpenter_ because even though the location data covered a much shorter period of time, the geofence wrapped in more people. But the geofencing data will strike many observers as much more limited than the 127-day tracking in _Carpenter_. The deidentified data revealed in this case is arguably more similar to the sort of tracking police can do when they observe people walking around on the street.

Most Fourth Amendment cases — including those involving new technology — are best understood as striking a grand bargain: The police need to be able to gather a little information without a warrant and probable cause to start building legitimate suspicion. They can engage in "shallow" investigations on a lot of people, and it's only when the investigation goes deep into the personal spaces and details of an individual that a warrant becomes necessary.

Using this framing, it's easier to make the case that the geofencing investigation was not a Fourth Amendment intrusion. Police routinely observe a little bit of information (including location and short-term movements) about many individuals, and these observations often do not even count as "searches" under constitutional law.

Even when a search clearly does intrude on Fourth Amendment rights, the Supreme Court has allowed certain broad-but-thin investigations that lack probable cause when they are systematic and limited in scope. For example, the Supreme Court has decided that a temporary checkpoint can be set up to stop and question drivers to find drunk drivers or, more relevantly here, to get information related to a specific crime. In one such case, police had set up a checkpoint at the scene of a hit-and-run accident a week after the accident occurred in an attempt to find witnesses or other information related to the crime. Even though the checkpoint resulted in the "seizure" of each person who was stopped, the Supreme Court decided that the intrusion was small enough, and the purpose well-enough tethered to the facts of a particular crime, to justify the practice. Moreover, because checkpoints are uniform in application, they constrain police discretion and make it unlikely that police will abuse the procedure to target or harass a particular suspect.

Geofencing warrants are similarly systematic and tied to the facts of a crime. Courts analyzing them should take the opportunity to recognize the difference, in constitutional terms, between discretionary, suspect-driven fishing expeditions of data held by private companies and crime-driven investigations like this one. In the former, police identify suspicious people and attempt to connect them to crimes; in the latter, police follow the circumstances of a crime to find a suspect. If we want police to use more objective, less biased tools, geofenced data has much to offer.

After all, most traditional investigation practices are less efficacious *and* more privacy-violating that the geofence warrant process. In Chatrie's case, before the detective approached Google for data, he first investigated a phone tip from a woman who claimed that an ex-boyfriend committed the crime; he also chased down a tip from a bank employee about somebody who owned a blue Buick Lacrosse that may have been used in the robbery. Both of these tips were dead ends. It is not clear what sorts of encounters and information-gathering the police used to rule out these two potential suspects, but the anxiety and privacy burden absorbed by them was almost certainly greater than the burden to the 18 individuals whose approximate movements in public during a one hour time span were disclosed in deidentified form.

To be clear, there are real issues that courts will need to resolve to set legal constraints on the use of geofence warrants. Legislators or courts may want to ensure that geofence warrants are temporally and geographically tailored. Perhaps they should be used only in the investigations of the most serious crimes. And as the location tracking technology gets better, geofences should be constructed to avoid revealing movements that occur inside homes. These would be sensible limitations. But a requirement of probable cause for every person within a geofence would effectively eliminate this investigative tool. Those who are instinctively against the use of geofence warrants should ask themselves, as a gut check, what they would prefer to have happened in this very case. Yes, 21st-century policing is a continuing experiment. But not every aspect of 20th-century-policing deserves to be entrenched.

DDR-00069566

DDR-00069567