# EXHIBIT 67
## (1 of 2)

Access World News | Infoweb.newsbank.com



2020 ELECTIONS - Election fraud claims: Officials - Atlanta Journal-Constitution, The (GA) - December 15, 2020 - page A8

December 15, 2020 | Atlanta Journal-Constitution, The (GA) | Mark Niesse Mark.NStaff | Page A8

Allegations of election fraud in Georgia remain unsubstantiated after multiple vote counts, legislative hearings and court cases.

Still, many of President Donald **Trump**'s supporters say they're suspicious of how the election was run in Georgia.

Here's a look at some of the criticisms of Georgia's presidential election:

Ballot suitcases |Claim: **Trump**'s personal attorney, Rudy Giuliani, is promoting a video that allegedly shows Fulton County election workers pulled suitcases of ballots from beneath a table after Republican Party poll watchers were told to leave.

|Explanation: Election workers had put uncounted absentee ballots in ballot containers when they thought they were going home for the night around 10 p.m. Nov. 3, said Gabriel Sterling, the state's voting system manager.

Then a Fulton County elections official told poll watchers and media that ballot counting was done for the night after a long day of work. No one was forced to leave, said Richard Barron, the county's elections director.

Ballot counting resumed soon afterward when the secretary of state's office asked Fulton to keep working, Sterling said. Video shows the elections manager taking a phone call and informing staff that their work wasn't done. Though poll watchers were gone, the process was recorded, and a monitor from the secretary of state's office arrived about an hour later.

Electionworkersunpacked absentee ballots from their containers, which were ballot storage containers, not "suitcases." Then they resumed counting until about 1 a.m.

The chief investigator for the secretary of state's office told Channel 2 Action News she saw no evidence of wrongdoing.

Signature verification

DDR-00069344

|Claim: Voter signatures on absentee ballots weren't adequately checked to prevent fraud.

|Explanation: Election workers verify signatures on absentee ballot envelopes and absentee ballot applications by comparing them to the signatures that voters used when they registered.

Those original signatures are stored in county election computers, either from when they signed up to vote at driver's license offices or from paper registration forms. Absentee ballot applications requested through the state's website were verified with driver's license numbers instead of signatures.

Elections officials rejected absentee ballots because of signature issues at rates similar to the 2018 election, about 0.15%, according to state data. Overall absentee rejection rates declined after the Georgia General Assembly passed a bill last year that simplified absentee ballot envelopes and gave voters until the Friday after the election to verify their identities. But rejection rates based on signature issues remained the same.

Illegitimate voters |Claim: Tens of thousands of out-of-state residents and felons likely voted in Georgia's general election, according to an analysis by Matt Braynard, a former data expert for the **Trump** campaign.

|Explanation: Voter registration and property tax records indicate that many of the people Braynard suspected of casting illegal votes are either legitimate Georgia voters or didn't vote in November. Braynard has acknowledged he didn't verify that any of the thousands of voters he listed were illegitimate.

Braynard conducted his analysis by

cross-referencing Georgia voter registration

and absentee ballot lists with change of address records, national voter databases and addresses associated with post office boxes.

But information for many of these voters was easily authenticated.

State Rep. Bee Nguyen, a Democrat from Atlanta, told Braynard during a hearing that she checked property tax records and visited constituents on his list to confirm they weren't out-of-state voters. She also found that voters who lived in apartment buildings with mail centers on the ground floor

DDR-00069345

had been accused of using post office boxes for their addresses.

Some names were listed multiple times; others were matched with people living in different states who have similar names but different birth dates, she said.

A records search by Georgia Public Broadcasting also found the names of registered and active voters included on Braynard's lists.

Vote flipping |Claim: Voting machines "switched"votesfromTrump to **Biden** in Ware County, an allegation made by U.S. Rep. Jody Hice, a Republican from Georgia.

|Explanation: **Trump** gained 37 votes during a hand recount and audit, but that doesn't mean any votes were flipped. The change in votes shows a 0.26% difference from the initial count, which is well within the normal variation expected from a recount, according to the secretary of state's office.

"No one has unearthed evidence of 'vote flipping' because it didn't happen. And no one has discovered some secret algorithm for altering the election outcome because that's nonsense," said Walter Jones, a spokesman for the secretary of state's office.

Ware County Election Supervisor Carlos Nelson called the conspiracy theory "a darned lie" in an interview with Politico.

Statewide, a hand recount arrived at similar results as machine counts. **Biden** defeated **Trump** by 12,284 votes in the hand recount and 11,779 votes in the machine recount.

Dead voters |Claim: The **Trump** campaign said the identities of four deceased people were used to vote in Georgia.

|Explanation: Three of those people were confirmed not to have voted, and the fourth is under investigation.

In one case, James Blalock had died in 2006, but his widow, Mrs. James Blalock, is still alive and voted in this year's election, according to 11Alive news in Atlanta.

"He's not voting. He didn't vote," Agnes Blalock told 11Alive. "It was me."

Newton County election officials confirmed that Blalock uses her married name, Mrs. James Blalock,

DDR-00069346

in her voter registration.

In the other alleged cases of dead voters, one involved a person who died last year and didn't vote this year, and the other conflated two voters with similar first names

Secretary of State Brad Raffensperger has said there's no evidence of widespread fraud in Georgia's elections.

Copyright 2020 The Atlanta Journal-Constitution

DDR-00069347



JC CONTINUING COVERAGE : 2020 ELECTIONS - - Atlanta Journal-Constitution, The (GA) - November 20, 2020 - page A1

November 20, 2020 | Atlanta Journal-Constitution, The (GA) | Mark Niesse Jennifer Peebles and David WickertStaff | Page A1

A manual recount of nearly 5 million ballots cast in Georgia showed Thursday that Joe **Biden** won the presidential election, validating initial results.

The recount found that **Biden** received 12,284 more votes than President Donald **Trump**.

Secretary of State Brad Raffensperger plans to certify the election by today, a deadline set by state law to finalize results.

The hand recount, which also functioned as an audit of the election, mostly aligned with initial machine counts. It also uncovered almost 6,000 ballots in four counties that had been overlooked in the initial tally, resulting in **Trump** closing his deficit to **Biden** by 1,400 votes.

Both counts found the same outcome: Thousands more voters in Georgia chose **Biden** than **Trump**.

In addition to the votes **Trump** gained from the newly discovered ballots, he also picked up nearly 500 additional votes in the manual tally. The machine count showed **Trump** trailing by 12,780 votes.

The recount and audit, ordered by Raffensperger last week, was a major effort to verify the results of the presidential election. He sought the recount following political pressure from **Trump** allies who questioned Georgia's results.

"Georgia's historic first statewide audit reaffirmed that the state's new secure paper ballot voting system accurately counted and reported results," said Raffensperger, a Republican. "This is a credit to the hard work of our county and local elections officials who moved quickly to undertake and complete such a momentous task in a short period of time."

The Associated Press called the race in Georgia for **Biden** soon after the recount was completed. Several other major media outlets projected **Biden** would win last Friday.

The hand recount showed small differences from the original machine count, which election officials said they expected.

DDR-00069360

In all, there were 126 counties within 10 votes of their original vote tally, according to the audit data. Of those counties, 54 counties matched their initial results exactly. No county had an error rate higher than 0.73% compared with their original results.

Initial election results were produced by optical scanners that read either bar codes on printed-out paper ballots or filled-in ovals on absentee ballots.

The recount reviewed every ballot by hand, with humans reading the printed text or ovals on each ballot across Georgia's 159 counties.

**Biden** is on track to receive Georgia's 16 votes in the Electoral College, which will meet Dec. 14 to cast its ballots for president.

"We've been saying from the beginning that the results of this audit would show that Joe **Biden** won this race," said Maggie Chambers, a spokeswoman for the Democratic Party of Georgia.

The **Trump** campaign bashed Georgia's recount because it didn't include another verification of voter signatures on absentee ballot envelopes. Election workers checked signatures when absentee ballots are received, but signature matching is impossible during recounts because ballot envelopes can't be traced back to ballots. The Georgia Constitution guarantees ballot secrecy.

"Whatever the count in Georgia today is, it's totally ridiculous," said Rudy Giuliani, **Trump**'s personal attorney, during a nationally televised news conference earlier in the day. "They're counting the same fraudulent ballots one more time, and we're still very close."

An effort by a **Trump** supporter to block Georgia from finalizing its results fell short in federal court Thursday.

U.S. District Judge Steven Grim-berg, a **Trump** appointee, found no justification to halt certification of election results based on allegations of improprieties by attorney L. Lin Wood, the plaintiff in the case.

The hand-count audit made clear that mistakes that resulted in missed votes the first time around didn't affect the outcome of the election, said Aunna Dennis, executive director of Common Cause Georgia, a government accountability organization. Most of the overlooked votes were stored on memory cards that county election officials failed to load after election night.

DDR-00069361

"It's important to keep those mistakes in perspective:Humans make mistakes. That's why Georgia has a risk-limiting audit process, to look for these types of mistakes and double-check that the election outcome is correct," Dennis said.

Gwinnett County had a large difference in its manual recount, with 1,642 more ballots counted than were scanned by machine. The additional votes benefited **Trump**, netting him 285 more votes.

There could be another recount next week. Under Georgia law, candidates have the right to request a machine recount after certification if they lost by less than half a percentage point. **Trump** was trailing **Biden** by about 0.3 percentage point. The cost of the recounts will be paid by taxpayers.

If the next recount finds the original count was incorrect, the results of the election would be recertified, according to state law.

(Box)

ALSO INSIDE

POTENTIAL 2024 HOPEFULS VISIT STATE Senate runoffs are drawing high-profile Republicans, A3

HOWABSENTEE BALLOTS ARE VERIFIED

Signatures are checked before votes are counted, A6

FACTS & FIGURES

12,284 Joe **Biden**'s advantage over Donald **Trump** in a manual recount 12,780 Machine-counted margin between the candidates 5 million

Ballots recounted by hand since last Friday

Copyright 2020 The Atlanta Journal-Constitution

DDR-00069362

# Marquette Law Review

Volume 106
Issue 3 *Spring*

Article 7

2023

# Election Administration Concerns Meet Claims of a Fraudulent Election: A Comprehensive Analysis of the 2020 Presidential Election and its Aftermath in Wisconsin

Joe Franke

Follow this and additional works at: https://scholarship.law.marquette.edu/mulr

 Part of the Election Law Commons

## Repository Citation

Joe Franke, *Election Administration Concerns Meet Claims of a Fraudulent Election: A Comprehensive Analysis of the 2020 Presidential Election and its Aftermath in Wisconsin*, 106 Marq. L. Rev. 683 (2023).
Available at: https://scholarship.law.marquette.edu/mulr/vol106/iss3/7

This Response or Comment is brought to you for free and open access by the Journals at Marquette Law Scholarly Commons. It has been accepted for inclusion in Marquette Law Review by an authorized editor of Marquette Law Scholarly Commons. For more information, please contact elana.olson@marquette.edu.

# ELECTION ADMINISTRATION CONCERNS MEET CLAIMS OF A FRAUDULENT ELECTION: A COMPREHENSIVE ANALYSIS OF THE 2020 PRESIDENTIAL ELECTION AND ITS AFTERMATH IN WISCONSIN

*The 2020 presidential election unearthed valid questions about how the election was administered and whether various state laws were properly followed. However, President Donald Trump and his closest allies routinely fail to distinguish between questions about whether state officials correctly interpreted and applied the state's election code and actual fraud or malfeasance. There is a significant difference between accusing election officials of wrongly interpreting state law or incorrectly implementing election procedures, and alleging that those same officials intended to rig the outcome. Failure to make this distinction has contributed to the stolen election narrative, which continues to roil the American body politic. Since the 2020 election, the United States has seen the emergence of several alarming consequences which evidence the severe impact this narrative has had on the country's democratic institutions. First, President Donald Trump's contentions that he won the 2020 election and that the United States election system cannot be trusted have eroded public faith in the outcome of that election. Second, the United States has seen an influx of candidates running for office who show little allegiance to democratic norms. Although many of these candidates lost in the 2022 midterms, a significant number won, including for positions that oversee election administration. Third, claims of a fraudulent election system have birthed reform proposals that would fundamentally affect the way elections are administered, including proposals that would further expose election administration to partisanship. These trends give rise to legitimate concerns with respect to how elections will be administered in the future.*

*Wisconsin serves as a useful case study to illustrate these consequences. In the aftermath of the 2020 presidential election, questions arose regarding how Wisconsin's election was administered and whether various state laws were properly followed. Despite no evidence of fraud or official wrongdoing by Wisconsin's election administrators, President Donald Trump and his allies made—and continue to make—claims that the election was stolen from him in Wisconsin. These allegations have eroded public trust in Wisconsin's democratic institutions and have exacerbated an already divided political*

DDR-00069366

*environment. Therefore, Wisconsin has become a prime example of the harm that can be caused when valid concerns about election administration are improperly conflated with allegations of fraud. Ultimately, this Comment reasons that addressing the divisive rhetoric surrounding election administration is a necessary precursor to both implementing meaningful reform and restoring trust in democratic institutions.*

I. INTRODUCTION ...................................................................................... 684
II. A "PIVOT" IN ELECTION LAW SCHOLARSHIP .......................................... 691
    A. Post Bush v. Gore ....................................................................... 693
    B. New Institutionalism ................................................................... 694
    C. Warning ....................................................................................... 696
    D. New Era ....................................................................................... 697
III. VALID CONCERNS OF ELECTION ADMINISTRATION IN WISCONSIN'S 2020
    PRESIDENTIAL ELECTION .................................................................. 701
    A. Election Administration in Wisconsin ........................................ 702
    B. The Use of Drop-boxes Under Wisconsin State Law: Teigen v.
    WEC (2022) .................................................................................. 704
IV. MISCHARACTERIZING LEGITIMATE CONCERNS OF ELECTION
    ADMINISTRATION AS EVIDENCE OF FRAUD ...................................... 709
V. THE EFFECTS OF MISCHARACTERIZING THE 2020 ELECTION ................. 718
    A. Public Distrust in Election Outcomes ......................................... 718
    B. A Growing Number of Political Candidates Who Demonstrate Little
    Allegiance to Democratic Norms ............................................... 722
    C. Unfavorable Political Landscape for Meaningful Reform ............ 725
    i. Ideas to Increase Partisan Control of the Election System in
    Wisconsin ..................................................................................... 725
    ii. A Polarized Debate ................................................................. 728
VI. SOLUTIONS ........................................................................................ 730
    A. Addressing the Incendiary Rhetoric ............................................ 730
    B. Clarifying the Statutes that Gave Rise to Post-Election Litigation in
    2020 ............................................................................................. 732
    C. Clarifying How and When the WEC Must Promulgate Rules
    Through Chapter 227 .................................................................. 734
VII. CONCLUSION .................................................................................... 738

## I. INTRODUCTION

Claims of a stolen election have disturbed the American body politic and shaken the foundation of democracy. To this day, President Donald Trump's

DDR-00069367

contentions that he won the 2020 election[1] and that the United States election system cannot be trusted have eroded public faith in the outcome of that election, and continue to threaten the stability of American democracy at large.[2] In 2021, the Global State of Democracy Report labeled the United States a "backsliding democracy" for the first time ever, due in large part to President Trump's false assertion that the election was stolen.[3] Several alarming consequences—discussed below—evidence the severe impact this anti-democratic behavior has had on American democracy.[4] Before introducing these consequences, however, it is imperative to explain how President Trump and his allies successfully advanced the idea that the President was cheated out of a second term.

There are many reasons why voters embraced the stolen election narrative, one of which is that proponents of the narrative advanced their claims in the courtroom immediately following the election, thus providing their positions

---

1. Some have dubbed the contention that President Trump won the 2020 election as the "Big Lie." The term Big Lie refers to the unproven theory advanced by President Trump and his allies that the 2020 presidential election was "stolen" from him due to widespread voter fraud, conspiracies to rig the election, and an election administration system designed to favor his opponents. *Hearing Before the United States House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol*, 117th Cong. 2 (2022) [hereinafter *January 6th Hearing*] (statement of Wendy R. Weiser, V.P. for Democracy at the Brennan Center for Justice at NYU School of Law).

2. Judge Michael Luttig, a former judge of the United States Court of Appeals for the Fourth Circuit who is known for his conservative principles and constitutional expertise, told the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol that he believes American democracy is in a fragile moment: "False claims that our elections have been stolen from us corrupt our democracy, as they corrupt us. To continue to insist and persist in the false claim that the 2020 presidential election was stolen is itself an affront to our democracy and to the Constitution of the United States—an affront without precedent." January 6th Hearing (statement of Judge Michael Luttig, former judge of the United States Court of Appeals for the Fourth Circuit); *see also* Atiba R. Ellis, *"This Lawsuit Smacks of Racism": Disinformation Racial Coding, and the 2020 Election*, 82 LA. L. REV. 453, 454 (2022); Richard Hasen, *Identifying and Minimizing the Risk of Election Subversion and Stolen Elections in the Contemporary United States*, 135 HARV. L. REV. 265, 265–66 (2022).

3. INTERN'L INST. FOR DEMOCRACY & ELECTORAL ASSISTANCE, GLOBAL STATE OF DEMOCRACY REPORT 2021, at 7 (2021); *see also* Alex Goldstein, *The Attorney's Duty to Democracy: Legal Ethics, Attorney Discipline, and the 2020 Election*, 35 GEO. J. LEGAL ETHICS 737 (2022).

4. One additional consequence—although not directly explored in this Comment—is the violence that occurred on January 6, 2021, at the United States Capitol. It is well documented that some Americans acted that day on their belief that the election was stolen. *See, e.g.*, H.R. Rep. No. 117-663 at 5, 55. Unfortunately, some paid a significant price, including the loss of life and criminal prosecution. Chris Cameron, *These Are the People Who Died In Connection with the Capitol Riot*, N.Y. TIMES (Jan. 5, 2022), https://www.nytimes.com/2022/01/05/us/politics/jan-6-capitol-deaths.html [https://perma.cc/BU3L-57BS]; Alan Feuer, *In Capitol Attack, Over 900 People Have Been Criminally Charged*, N.Y. TIMES (Dec. 19, 2022), https://www.nytimes.com/2022/12/19/us/politics/jan-6-capitol-attack-charges.html [https://perma.cc/A6AU-BJCB].

DDR-00069368

*MARQUETTE LAW REVIEW*                    [106:683

with an air of legitimacy.[5] These challenges ranged in type, with some alleging unlawful voting procedures and others claiming outright fraud.[6] Whatever the case, these legal battles formed a critical element of the President's efforts to delegitimize 2020's outcome and to sow doubt about the integrity of his own country's voting institutions.[7]

To be fair, a few of these post-election challenges presented valid questions about how the election was administered and whether state law was properly followed.[8] Consider Wisconsin, where Trump and his allies brought seven cases in the immediate aftermath of the 2020 election.[9] These cases alleged, among other things, that Wisconsin election officials violated state law in permitting the use of drop-boxes and by allowing poll-workers to correct absentee ballots.[10] These two specific arguments failed at the time—primarily because the cases were filed too late.[11] However, both prevailed in subsequent cases.[12] But regardless of any merit these claims had when filed in the courts, Trump and his allies have not presented them honestly in the court of public opinion.[13] Proponents of the stolen election narrative conflated—and continue to conflate—valid questions about election administration procedures with proof of a fraudulent voting system.

---

5. Hasen, *supra* note 2, at 284 ("The benefit of technical arguments to subvert election results is that they have an aura of respectability and expertise."). *See generally* Alana Abaramson & Abigail Abrams, *Here Are All the Lawsuits the Trump Campaign Has Filed Since Election Day—And Why Most Are Unlikely to Go Anywhere*, TIME, https://time.com/5908505/trump-lawsuits-biden-wins/ [https://perma.cc/FZY7-B8VG] (last visited Apr. 2, 2023). *See generally* Steven Semeraro, *Scam: The 2020 Post-Election Litigation Wasn't about Counting Legal Votes*, 43 T. JEFFERSON L. REV. 15 (2021).

6. For an in-depth break down of the 2020 post-election litigation, see JOHN DANFORTH, BENJAMIN GINSBURG, THOMAS B. GRIFFITH, DAVID HOPPE, J. MICHAEL LUTTIG, MICHAEL W. McCONNELL, THEODORE B. OLSON & GORDON H. SMITH, LOST, NOT STOLEN: THE CONSERVATIVE CASE THAT TRUMP LOST AND BIDEN WON THE 2020 PRESIDENTIAL ELECTION (2022), https://lostnotstolen.org/wp-content/uploads/2022/07/Lost-Not-Stolen-The-Conservative-Case-that-Trump-Lost-and-Biden-Won-the-2020-Presidential-Election-July-2022.pdf [https://perma.cc/LGS6-VASC].

7. *See infra* Part IV (discussing other elements of the President's efforts to delegitimize the election).

8. *See infra* Part III.

9. DANFORTH, GINSBURG, GRIFFITH, HOPPE, LUTTIG, McCONNELL, OLSON & SMITH, *supra* note 6, at 64.

10. *See infra* Part III.

11. *Id.*

12. *See generally* Teigen v. Wisconsin Elections Comm'n, 2022 WI 64, 403 Wis. 2d 607, 976 N.W.2d 519 (drop-boxes); White v. Wis. Elections Comm'n, No. 22CV1008, ¶¶ 5–7 (Wis. Cir. Ct. Waukesha Cnty. Sept. 7, 2022).

13. *See infra* Part IV.

DDR-00069369

The President and his allies routinely fail to distinguish between questions concerning whether Wisconsin officials correctly interpreted and applied the state's election code and actual fraud or malfeasance.[14] There is nothing nefarious about using the courts system to challenge election laws and procedures.[15] However, it is critical for litigants and political leaders to differentiate between good faith challenges and baseless claims of election fraud. There is a significant difference between accusing election officials of wrongly interpreting state law or incorrectly implementing election procedures, and making allegations that those same officials intended to rig the outcome.[16] The former arises from a reasonable dispute over state law while the latter rests on intentional wrongdoing.[17] Despite no evidence of fraud, the President and his allies continue to assert that democratic institutions are untrustworthy, which continues to lead voters to perceive election administration disputes as evidence of corruption.[18] The stolen election narrative has had severe consequences for America's democratic institutions.

---

14. *See infra* Part IV.

15. Consider the Wisconsin Institute of Law and Liberty ("WILL") or Law Forward, two non-profit legal advocacy organizations in Wisconsin that routinely use the courts system to clarify election law, while also advocating for principles they believe in. WIS. INSTITUTE OF L. & LIBERTY, https://will-law.org [https://perma.cc/NH46-SAMU]; L. FORWARD, https://www.lawforward.org [https://perma.cc/4GQJ-VJHF].

16. *See* The Editorial Board, *The Best Summary of the 2020 Election*, WALL ST. J. (Jan. 25, 2022), https://www.wsj.com/articles/the-best-summary-of-the-2020-election-biden-wisconsin-trump-lawsuit-voting-rights-fraud-absentee-dropboxes-ballot-curing-big-lie-11642966744 (discussing the difference between misinterpretation of election procedures and proof of stolen election).

17. This Comment will consistently use phrases such as "valid concerns about election administration" or "legitimate disputes over interpretations of state election law." These phrases refer to the notion that election laws and how they are interpreted are fairly subject to criticism and challenge. On the other hand, this Comment frequently employs phrases such as "voter fraud," or "a rigged election system." In defining these terms, this Comment endorses the definition put forth by WILL in its 136-page report of the 2020 election. WILL defined fraud as an intentional effort to subvert the election by either preventing voters from casting a ballot or having their ballots counted, attempting to procure votes that were never cast or cast by an ineligible voter, or falsely increasing the vote for one candidate. *See* WILL FLANDERS, KYLE KOENEN, RICK ESENBERG, NOAH DIEKEMPER & MIRANDA SPINDT, REPORT SUMMARY: A REVIEW OF THE 2020 ELECTION 9 (2021), https://will-law.org/wp-content/uploads/2021/12/2021ElectionReviewSummary-web.pdf [https://perma.cc/8AHL-Z29C].

18. *See infra* Section V.A. This tactic has been used as recently as the 2022 midterms. Consider Arizona, where Kari Lake—one of the state's candidates for governor—and President Trump continue to push baseless claims of election fraud. Sara Dorn, *Trump, Kari Lake Amplify Unfounded Claims of Election Malfeasance in Arizona As Certification Deadline Nears*, FORBES (Nov. 28, 2022), https://www.forbes.com/sites/saradorn/2022/11/28/trump-kari-lake-amplify-unfounded-claims-of-election-malfeasance-in-arizona-as-certification-deadline-nears [https://perma.cc/H5J2-UKPZ].

DDR-00069370

*MARQUETTE LAW REVIEW*                    [106:683

For one, the narrative has eroded trust in the nation's democratic institutions.[19] For almost three years, roughly 35% of national voters continue to distrust the legitimacy of President Biden's victory, including 61% of Republicans.[20] Americans from both parties fear democracy is on the brink of collapse and that the next presidential race will bring with it political violence.[21] No immediate remedy appears to exist that will restore confidence among the body politic that democracy is stable.[22]

To make matters worse, this new political reality is accompanied by two alarming trends. First, in the last midterm election cycle voters witnessed an unprecedented rise in candidates running for office who demonstrated little allegiance to democratic norms.[23] Although many were defeated, a significant number prevailed, including in state contests for positions of influence over the election process.[24]

Second, this new reality has birthed a number of reform proposals that would fundamentally affect the way elections are administered and create unnecessary barriers for voting.[25] Often using false pretenses of widespread

---

19. *See infra* Section V.A (discussing the unprecedented level of distrust now plaguing American democracy and examining why this kind of distrust is different from prior trends).

20. Charles Franklin, *New Marquette Law School Poll National Survey Finds Rise in Support for DeSantis Candidacy for President and a Tie in a Possible Biden-DeSantis Race*, MARQ. UNIV. L. SCHOOL POLL, https://law.marquette.edu/poll/2022/12/01/mlspsc11-national-issues-release/ [https://perma.cc/MP7G-726U] (last visited Apr. 20, 2023).

21. Julia Mueller, *Majorities in Both Parties Say Democracy in Danger: Poll*, THE HILL (Sept. 9, 2022) https://thehill.com/homenews/administration/3623711-majorities-in-both-parties-say-democracy-in-danger-of-collapse-poll/ [https://perma.cc/E8J6-DU9X]; Richard H. Pildes, *Election Law in an Age of Distrust*, 74 STAN. L. REV. ONLINE 100, 102 (2022).

22. Pildes, *supra* note 21 ("Pandemic-driven changes in voting rules trigger suspicions among some. Rolling back any of those changes spawns similar suspicions among others. No voting change is innocent, or at least perceived to be. But neither is the status quo.").

23. *See infra* Section V.B. This Comment avoids the label "election denier" because it is overbroad and has—at times—been unfairly attached to candidates who are not deniers of the 2020 election. This position is further explored in Section V.B. What is more, this Comment does not attempt to provide a detailed or comprehensive account of the emergence of supposed "election denying candidates." Instead, it simply highlights the fact that the United States has experienced a surge in candidates running for office who appear to have little respect for democratic principles, including in the state of Wisconsin.

24. *Id.*

25. Hasen, *supra* note 2, at 292; Reid J. Epstein & Nick Corasaniti, *Republicans Push Crackdown on Crime Wave That Doesn't Exist: Voter Fraud*, N.Y. TIMES (Mar. 17, 2022), https://www.nytimes.com/2022/03/17/us/politics/republican-voter-fraud.html [https://perma.cc/B9Y6-32XP]; Amy Gardner & Yvonne Wingett Sanchez, *Republicans Push for Stricter Election Laws, Despite Scant Proof of Fraud*, WASH. POST (Apr. 2, 2023), https://www.washingtonpost.com/nation/2023/04/02/republicans-restrictive-voting-laws/ [https://perma.cc/ZA2M-KHLV].

DDR-00069371

fraud, state legislators across the country—primarily Republicans in GOP-controlled state legislatures—continue to push for stricter voting laws, partisan control over the administration of elections, and even criminal penalties for election officials.[26] For example, in 2022 alone lawmakers in twenty-seven states considered over 150 "election interference bills," with seven states enacting twelve of them.[27] This trend, coupled with the emergence of political leaders who discredit legitimately conducted elections and encourage subversive behavior, gives rise to legitimate concerns with respect to how elections will be administered in the future.[28]

Relatedly, other parts of the body politic—namely Democrat partisans and fierce opponents of the former President—balk at any effort to examine valid election administration concerns.[29] As noted by the Wisconsin Institute of Law and Liberty (WILL) in its report on Wisconsin's 2020 election, opponents of the stolen election narrative reason that because "there is little or no evidence that Trump won the election, any effort to look into whether the proper procedures were followed is just part of the baseless conspiracy-mongering that pushes 'the Big Lie.'"[30] As a result, legitimate election reform proposals have often been summarily discounted.[31]

Given these issues, the need for a remedy is undeniable. Trust in democratic institutions reinforces public perception of the legitimacy of the governing sovereign. Absent trust, the body politic not only questions the legitimacy of the government, but also becomes less respectful of government authority in general, thus inviting violence.[32] In fact, such violence came to fruition on January 6, 2021.

Unfortunately, the United States Congress is not politically poised to provide meaningful legislative input.[33] Moreover, states' legislative responses

---

26. Hasen, *supra* note 2, at 267; Epstein & Corasaniti, *supra* note 25.

27. *Voting Laws Roundup: December 2022*, BRENNAN CTR. FOR JUST. (Dec. 22, 2021), https://www.brennancenter.org/our-work/research-reports/voting-laws-roundup-december-2022 [https://perma.cc/97UN-VNSG]. The Brennan Center for Justice defines election interference bills as legislation which either "opens the door to partisan interference in elections," or criminally "threatens the people and processes that make elections work." *Id.*

28. Hasen, *supra* note 2, at 266.

29. *See infra* Section V.C.

30. *See* FLANDERS, KOENEN, ESENBERG, DIEKEMPER & SPINDT, *supra* note 17.

31. *See infra* Section V.C.

32. Adrienne LaFrance, *The New Anarchy: America Faces a Type of Extremist Violence it Does Not Know How to Stop*, ATLANTIC (Mar. 6, 2023) https://www.theatlantic.com/magazine/archive/2023/04/us-extremism-portland-george-floyd-protests-january-6/673088/ [https://perma.cc/958Z-52LF] (reasoning that violence becomes part of the strategy in a new political reality where people refuse to accept the outcome of elections).

33. Goldstein, *supra* note 3, at 739.

DDR-00069372

appear unlikely to move the United States forward. Partisan solutions to a growing partisan problem will not return the country to any rational political harbor. More critically, legislative reform—whether focused on the institutional side of elections or on voting rules—means little in the face of a body politic conditioned to distrust any election system which renders unfavorable results.

To move the country forward, it is essential to identify the underlying cause of the distrust that now plagues American democracy.[34] Remarkably, this distrust stems largely from the rhetoric and conduct of the former President and his closest allies.[35] Therefore, reform efforts ought to focus more on incendiary rhetoric, rather than relying on conventional approaches like restructuring election institutions or modifying voting rules through the legislative process. Changes in laws cannot correct perceptions that the process is rigged. Speaking honestly to voters might.[36]

That said, there is still value in addressing areas of election law which gave rise to post-election disputes in 2020. In this era of extreme angst towards democratic institutions, it is critical to have precise election laws and an election system which functions efficiently.[37]

To illustrate the impact of the stolen election narrative on democratic institutions, one can look to several states. But no state epitomizes this phenomenon better than the State of Wisconsin.[38] After the 2020 election, Wisconsin quickly emerged as a prime example of how legitimate concerns over election administration can be distorted into a narrative of a stolen election. President Biden's narrow margin of victory over President Trump led to a flood of post-election litigation. Efforts to evaluate the election extended beyond the courtroom, as the state became home to both partisan and non-partisan post-election audits. To this day, Wisconsin state politics continue to feel the weight

---

34. *Id.* at 737 ("Defining the threat that American democracy faces openly and honestly can allow legal and political institutions to treat this antimajoritarian movement with the seriousness and solemnity that is required.").

35. *January 6th Hearing* (statement of Judge Michael Luttig, former judge of the United States Court of Appeals for the Fourth Circuit) ("[I]n continued defiance of our democracy, both the former president and his political party allies still maintain that the 2020 presidential election was 'stolen' from him. . . . [This assertion] has laid waste to Americans' confidence in their national elections.").

36. Pildes, supra note 21, at 103.

37. Id.

38. For the past few decades, Wisconsin has endured as not only a critical electoral victory, but also as a showpiece for the growing divide between the country's two main political parties. Considering the consequential nature of its ten electoral votes, coupled with a hyperpolitical landscape, one can understand how Wisconsin was ripe for a post-election showdown. Dan Balz, *Wisconsin: The Incubator for America's Tribal Politics*, WASH. POST (Oct. 8, 2021), https://www.washingtonpost.com/politics/2021/10/08/wisconsin-polarization-democrats-republicans/

DDR-00069373

of the stolen election narrative, which has undermined public trust in the state's electoral systems. Therefore, this Comment posits that Wisconsin illustrates what happens when valid issues of election administration are distorted as proof of a fraudulent election system.

Part II of this Comment provides a brief overview of election law scholarship from the past two decades with a focus on how scholars have discussed concerns about election administration, partisan influence in elections, and faith in voting institutions. It highlights a recent institutional turn in the scholarship driven by concerns over the rise in anti-democratic behavior and divisive rhetoric. Part III discusses valid questions of election administration present in Wisconsin's 2020 election. It evaluates these concerns by highlighting a recent Wisconsin Supreme Court case, which held the use of drop-boxes illegal under Wisconsin state law.[39] Part IV examines how President Trump and his allies used issues of election administration as evidence that the 2020 election was rigged. Part V examines the specific consequences in Wisconsin which stem from this fundamental mischaracterization of election administration disputes.[40] Part VI examines several solutions and Part VII concludes. Ultimately, this Comment reasons that addressing the divisive rhetoric surrounding election administration is a necessary precursor to both implementing meaningful reform and restoring trust in democratic institutions.

Because the distortions at the heart of this Comment occurred in the context of the 2020 election, responsibility for those distortions necessarily falls on Donald Trump and those in the Republican Party who embraced the mischaracterization of election policy disputes as election fraud. Inevitably, several members of the Republican Party contributed both directly and indirectly to what many now call the "Big Lie." The intent of this Comment, however, is not to condemn a particular party or ideology, but to discuss the implications such a fundamental mischaracterization has had on the Wisconsin election system and to consider a path forward.

## II. A "PIVOT" IN ELECTION LAW SCHOLARSHIP

Concern for the health of the country's voting institutions after the 2020 election has triggered "urgent attention and sustained analysis" by many.[41] The

---

39. *See* Teigen v. WEC, 2022 WI 64, 403 Wis. 2d 607, 976 N.W.2d 519.

40. Molly Beck, *Wisconsin Assembly Speaker Robin Vos In Talks With Michael Gableman to Extend Contract for 2020 Election Review*, MILWAUKEE J. SENTINEL (Jan. 6, 2022), https://www.jsonline.com/story/news/politics/elections/2022/01/06/robin-vos-talks-michael-gableman-extend-contract-2020-wisconsin-election-review/9115268002/.

41. *See* Lisa Marshall Manheim, *Election Law and Election Subversion*, 132 YALE L. J. FORUM 312, 313 (2022).

DDR-00069374

*MARQUETTE LAW REVIEW*

public, politicians, and academics have discovered a new commitment to debating how we vote. In some respects, this is nothing new.

The 2020 election was not an isolated event.[42] Rather, several factors, which now underpin the current challenges facing democracy, have been developing in the background for years, including hyper-polarization, disinformation, close election outcomes, and concerns about election administration.[43] Election scholarship has, for some time now, debated how the election system could be re-imagined to not just work more efficiently, but also work to fortify public trust.[44] Since the 2020 election, however, the debate has drastically evolved in response to the hostile context within which elections are now being administered.[45]

Election law scholarship has long considered deficiencies in the United States' voting system and the effects these flaws have on effective election administration, as well as the public's faith in election administration. Traditionally, scholarship focused on the shortfalls of substantive election laws and the inadequacy of the system's de-centralized and partisan structure.[46] In

---

42. Concerns over election administration have long endured since the 2000 Presidential Election. *See, e.g.*, RICHARD HASEN, THE VOTING WARS: FROM FLORIDA 2000 TO THE NEXT ELECTION MELTDOWN ix–xi (2012). What is more, political actors have routinely utilized defects in the country's election system as means for some political end. *See, e.g.*, Joshua A. Douglas, *Discouraging Election Contests*, 47 U. RICH. L. REV. 1015, 1019–20 (2013); *see also* ELECTORAL INTEGRITY IN AMERICA: SECURING DEMOCRACY 3 (Pippa Norris, Sarah Cameron, Thomas Wynter eds., 2018) ("The challenges to electoral integrity in America are far from novel; the seismic fault lines were established many years earlier, in the litigious wars over Floridian ballots in *Bush v. Gore* in 2000.").

43. Anthony J. Gaughan, *Illiberal Democracy: The Toxic Mix of Fake News, Hyperpolarization, and Partisan Election Administration*, 12 DUKE J. CONST. L. & PUB. POL'Y 57, 59 (2017) (hyper-polarization and disinformation); HASEN, *supra* note 42, at ix–xi (close election outcomes). Manheim, *supra* note 41, at 313 n.2 (citing scholars that discuss the emergence of extremism, fragmentation, and disinformation in American democracy, thus positing the 2020 environment was ripe for subversive behavior).

44. *See, e.g.*, Daniel P. Tokaji, *The Future of Election Reform: From Rules to Institutions*, 28 YALE L. & POL'Y REV. 125 (2009); Heather K. Gerken & Michael S. Kang, *The Institutional Turn in Election Law Scholarship*, *in* RACE, REFORM, AND REGULATION OF THE ELECTORAL PROCESS 87–88 (Guy-Uriel E. Charles, Heather K. Gerken & Michael S Kane eds., 2011); Manheim, *supra* note 41, 317–20.

45. *See* Manheim, *supra* note 41, at 320 ("Pressures manifesting in recent years have fueled this change, with the 2016 election and 2018 elections sparking a fuse and the 2020 elections serving as a powerful accelerant.").

46. *See infra* Sections II.A. & II.B. (discussing Post *Bush v. Gore* and New Institutionalism). This Comment routinely distinguishes between reform centered on election rules and reform focused on the structure of the election system. Reform centered on election rules generally focuses on specific aspects of the voting process, including voter registration, ballot access, or the maintenance of voter rolls. Reform focused on the institutional design of the election system looks to address the broader

the early years after *Bush v. Gore*, scholars argued that reform centered on voting rules—both at the state and federal levels—could result in a stronger election system.[47] Unsatisfied with this recourse, the scholarship evolved. In turn, other scholars focused less on rules and more on the structural design of voting systems.[48] Around the mid-2010s, however, a smaller cadre of scholars began observing several factors amalgamating in America which, they reasoned, posed an unprecedented threat to both the administration of elections and faith in election outcomes.[49] In fact, some went as far as to forecast the 2020 election storm years in advanced and to warn of its torrential effects on American democracy.[50] Now, as the country weathers 2020's aftermath, scholarly discourse is adapting once again.[51] Those that study election law now find themselves confronted with the daunting question of how the election system should move forward while submerged in an extraordinary era of anti-democratic behavior and public distrust.[52]

### A. Post Bush v. Gore

In the years after *Bush v. Gore*, election scholarship primarily examined how reform to substantive election rules could decrease administrative errors, minimize the influence of partisanship on the system, and bolster public faith in voting institutions.[53] For example, the aftermath of the 2000 presidential election ushered in concerted efforts to develop comprehensive election reform at the federal level, which resulted in the Help America Vote Act of 2002.[54]

---

structure and processes that create the election administration process, including how states allocate responsibility and authority of the election process or the processes for resolving election disputes. *See generally* Tokaji, *supra* note 44 (discussing shift in election scholarship from a focus on rules to a focus on institutions).

47. *See generally* Tokaji, *supra* note 44; Manheim, *supra* note 41; *see infra* Section II.A.

48. Gerken & Kang, supra note 44; *see infra* Section II.B.

49. *See* HASEN, *supra* note 42; *see also infra* Section II.C.

50. *See, e.g.*, HASEN, *supra* note 42, at ix–xi; Manheim, *supra* note 41, at 318–19 (discussing scholar who warned of a "perfect storm" that could result in an election crisis due to various factors growing in America, including the politicization of the election system).

51. Pildes, *supra* note 21, at 102; Manheim, *supra* note 41, at 320; *see infra* Section II.C.

52. Pildes, *supra* note 21, at 102.

53. Tokaji, *supra* note 44, at 126 ("Since 2000, reformers have devoted most of their attention to such issues such as a paper trail for electronic voting machines, photo identification requirements, and the maintenance of voter registration lists."); *see* Manheim, *supra* note 41, at 317 ("In earlier years, academic work had prioritized the examination of substantive election laws.").

54. Tokaji, *supra* note 44, at 125; *see also* Daniel P. Tokaji, *Early Returns on Election Reform: Discretion, Disenfranchisement, and the Help America Vote Act*, 73 GEO. WASH. L. REV. 1206, 1206–07 (2005). At the same time, many states passed comprehensive legislation that replaced outdated voting technology, created voter registration data-bases, and updated training manuals for local election officials. *Id.* at 1213.

*MARQUETTE LAW REVIEW* [106:683

With federal legislation addressing issues such as a lack of uniform administrative standards with respect to voter rolls, scholars believed necessary improvements were being made.[55]

At the same time, election scholars also posited that the judicial branch played an important role in furthering the goals of substantive legal reform.[56] Advocates of the judicial branch reasoned courts—as independent arbitrators of the law and largely insulated from partisan politics—could serve as a check on misguided partisans seeking power over the levers of election administration.[57] But as time went on, some scholars acknowledged the lack of meaningful impact on bettering the election system and restoring electoral integrity through legislative-based solutions and the courts.[58] Criticism of these approaches mounted and scholars began advocating for a shift in attitude towards election law.[59]

### B. New Institutionalism

In the wake of this new thinking, election scholarship experienced a shift in focus from substantive election rules to system's structure. This approach— "dubbed New Institutionalis[m]"—reasoned that the reform efforts had done little to fix an election system prone to criticism, criticism which stemmed largely from the influx of partisan influence on democratic institutions.[60] Consequently, New Institutionalists called for "process-oriented" solutions and focused on re-structuring institutional apparatuses to insulate the voting process

---

55. Tokaji, *supra* note 44, at 125 ("There undoubtedly have been significant improvements in election administration since 2000, due in large measure to the greater legislative, scholarly, and public attention that this area has received.").

56. *Id.* at 129, 150 ("Although it is appropriate to promote nonjudicial solutions to partisan self-interest, courts are presently the institution best suited to police self-interested conduct by election officials."); *see id.* at 128 n.18 (citing scholarship debating whether the judiciary is a significant factor in bettering the election system due to its apolitical nature.); *see also* Gaughan, *supra* note 43, at 63 ("The integrity of the American election system is undergirded by the state and federal judiciaries.").

57. *See, e.g.*, Tokaji, *supra* note 44, at 150; Gaughan, *supra* note 43, at 63. Wisconsin Supreme Court Justice Rebecca Bradley recently endorsed a similar role for the courts, arguing that "the integrity of every election will be tarnished by the public's mistrust until the Wisconsin Supreme Court accepts its responsibility to declare what the election law says." *See* Trump v. Biden, 2020 WI 91, ¶ 153, 394 Wis. 2d 629, 700, 951 N.W.2d 568, 603 (Bradley, J., dissenting), *cert. denied*, 141 S. Ct. 1387 (2021).

58. Richard Hasen, *Election Administration Reform and the New Institutionalism*, 98 CALIF. L. REV. 1075, 1076 (2010) (arguing that neither the courts nor Congress had "taken the lead" in creating forceful election administrative reform); Gerken & Kang, *supra* note 44, at 90; Manheim, *supra* note 41, 317.

59. *See, e.g.*, Gerken & Kang, *supra* note 44, at 90 (listing scholarship that criticized the lack of meaningful election administrative reform).

60. *See* Hasen, *supra* note 58, at 1076; Gerken & Kang, *supra* note 44, at 90–93.

DDR-00069377

from partisanship.[61] Scholars proposed new system structures, such as through the creation of amicus courts, nonpartisan advisory commissions, or the invention of a "Democracy Index."[62] Although largely in disagreement on the best solution, these scholars agreed that a structural-based approach would best obviate the influx of partisanship in election administration. Accordingly, "the ensuing debates produced an extensive literature" with a variety of solutions.[63]

For one, some suggested abolishing partisan state election agencies and replacing them with nonpartisan ones.[64] Such proposals rest on the assumption that moving away from partisan agencies decreases political bias in administrative decision making and increases public trust in the voting process.[65] Yet, some have surrendered to the current political climate, a climate which renders such a proposal—which would need some level of bipartisanship—highly unlikely.[66] If anything, the trend of the moment is towards increasing partisan control of election administration, not lessening it.[67]

However, around the time New Institutionalism was taking hold, some scholars began pointing to a dangerous collection of factors festering in the United States.[68] More precisely, this smaller branch of scholarship began examining the divisive political context within which elections were being administered, spurred primarily by the emergence of hyper-polarization in the body politic and the spread of misinformation.[69] As Professor Lisa Manheim puts it, these scholars expressed concern over the "trajectory" of election law and warned "what might happen if a 'perfect storm' of electoral outcomes"

---

61. Gerken & Kang, *supra* note 44, at 90–93; Hasen, *supra* note 58, at 1077 (discussing institutional remedies to move the election system towards nonpartisan election reform).

62. Hasen, *supra* note 58, at 1077. In this article, Hasen discusses Heather Gerken's suggestion that a Democracy Index—an index which ranks states based on a number of election administration criteria, such as how well any given state's election system counts votes and how hard it is for voters to cast a ballot—could move the election system towards "professionalized and non-partisan election administration." *Id.*

63. Manheim, *supra* note 41, at 317.

64. *See, e.g.*, Gaughan, *supra* note 43, at 149.

65. *Id.*

66. *Id.* at 62.

67. *Id.* at 85. The Government Accountability Board (GAB), a nonpartisan election commission which was comprised of retired judges, administered Wisconsin's elections for eight years. In those years, some pointed to this board as representative of what a non-partisan election agency could look like. *See* Daniel P. Tokaji, *America's Top Model: The Wisconsin Government Accountability Board*, 3 U.C. IRVINE L. REV. 575, 577 (2013).

68. Manheim, *supra* note 41, at 313–314, 318–19.

69. *See, e.g.*, HASEN, *supra* note 42; Gaughan, *supra* note 43, at 59 (discussing both the emergence of hyper-polarization in the body politic and the proliferation of misinformation in the context of American democracy).

DDR-00069378

forced the United States into an election crisis.[70] In his 2012 book, *The Voting Wars*, Professor Richard Hasen predicted how one of these factors—the growing politicization of election administration—presented a threat to electoral integrity and stood to undermine it in the future.[71]

## C. Warning

Hasen warned that the United States election system was on the brink of a serious legitimacy issue.[72] He reasoned that the 2000 election unearthed two significant issues facing American democracy.[73] First, there existed valid concerns regarding how elections were being administered across the country.[74] In turn, state election systems were routinely failing to "effectively manage the complexity of a large modern election."[75] Second, he noted that political actors often politicized these administrative shortcomings by mischaracterizing them as evidence of fraud or voter suppression.[76] In turn, these misrepresentations distorted election reality by "undermining the legitimacy of the electoral process."[77] In light of this, Hasen worried that the next 2000-like election would be much worse and could call into question the legitimacy of the a future President-elect.[78]

Prophetically, Hasen warned that if the country did not address these two issues, the continued convergence of legitimate administrative disputes with claims of election illegitimacy would create another election crisis:

> We are just one more razor-thin presidential election away from chaos and an undermining of the rule of law. The next [razor-thin election] will be much more partisan and nastier than 2000, full of acrimony and unsubstantiated allegations of fraud or official wrongdoing. The rancor will be amplified as partisan tweets, instant messages, blog posts, and Facebook messages. The controversy could threaten the very legitimacy of the next president . . . .[79]

Discussed above, at the time of Hasen's writing, scholarly discourse had extensively debated what type of reform—whether rules-based or structural-

---

70. Manheim, *supra* note 41, at 318–19.

71. *See infra* Section II.C.

72. HASEN, *supra* note 42, at 4.

73. *Id.*

74. *Id.* at x–xi.

75. *Id.*

76. *Id.* at x.

77. *Id.*

78. *Id.* at ix–xi.

79. *Id.* at 4–5.

DDR-00069379

based—would improve election systems across the country.[80] Although some articulated concern over the direction of America's democratic institutions—such as Hasen—the scholarship had not extensively considered the consequences of intensive break-downs in democratic norms, such as respect for lawfully conducted elections.[81] With the United States now confronting these consequences, the scholarship is evolving once again.[82]

## D. New Era

The 2020 election has forced election law experts to confront two emerging threats to democracy: (1) unlawful efforts to overturn elections through the legal system, and (2) concerted efforts to undermine public trust in democratic institutions through incendiary rhetoric.[83] Faced with this unprecedented moment, the scholarship is now confronting much more pressing questions: How should the election system address efforts to subvert electoral outcomes, as well as respond to the fact that a significant part of the public distrusts the election system due to influential political leaders exacerbating perceptions of fraud?[84] If the United States is unable to respond to these problems soon, electoral integrity will remain tarnished, and the political environment will remain ripe for anti-democratic behavior.[85] Addressing this question is a daunting task, to say the least.

Professor Lisa Manheim is one of the first scholars to explicitly recognize the scholarship's recent shift.[86] In her article—*Election Law and Election Subversion*—Manheim explains that prior to the 2020 election, most legal experts assumed lawfully conducted elections would hold strong. Although the election system exhibited flaws, foundational democratic principles—such as respect for lawfully conducted elections and faith in democratic institutions—appeared secure.[87] This assumption permitted the scholarship to "proceed in a relatively straight forward manner."[88] Legal experts proposed substantive legal reform and institutional restructuring free from an imminent threat of

---

80. *See supra* Sections II.A–B.

81. Manheim, *supra* note 41, at 319 (discussing the scholarship's lack of focus on the erosion of democratic norms).

82. *Id.*

83. *See id.*; *see* Pildes, *supra* note 21, at 102.

84. *See* Pildes, *supra* note 21; Hasen, *supra* note 2, at 265. *See generally* Richard Hasen, *Optimism and Despair About a 2020 "Election Meltdown" and Beyond*, 100 B.U. L. REV. ONLINE 298 (2020).

85. *See generally* Hasen, *supra* note 2.

86. *See generally* Manheim, *supra* note 41.

87. *See generally id.*

88. *Id.* at 318.

DDR-00069380

subversive actors destabilizing the entire system. Although some warned of a potential election crisis,[89] none anticipated its precise ramifications.[90] Given the emergence of 2020's aftermath, scholarly discourse was forced to rapidly adapt:

> Without the rule of law as a dependable constant, the study of election law quickly becomes three-dimensional. Experts find themselves simultaneously occupied with concerns along several dimensions: first, with the substance of election laws; second, with the design of election institutions; and third, with the threat of elections being unlawfully undermined from with. . . . It is this third dimension—conceptualizing election law without the guaranteed existence of the rule of law—that poses particular difficulty for any scholar.[91]

Difficult, yes, but legal experts have met the moment by "urgently draft[ing]" a new body of scholarship which not only contextualizes the situation, but also sets forth remedial measures.[92] Although unified by a sense of urgency, scholars of this moment largely differ on how to combat anti-democratic behavior and its effects on voting institutions.[93]

For example, some persist—including Manheim herself—that solutions to these new set of issues can still be found in substantive legal reform.[94] Specifically, some posit that election rules must be modernized to preempt potential subversive conduct.[95] By updating laws such as the Electoral Count Act of 1877 the system might "minimize opportunities for subversive conduct."[96]

Alternative approaches look not to constrain subversive conduct through legislative reform, but to disincentivize it through judicially enforced legal doctrines.[97] For instance, scholars have called on the courts invoke the doctrine of laches to defeat and discourage post-election litigation.[98] This doctrine has been used to foreclose litigants from challenging administrative decisions after an election when the alleged errors existed before the election took place. There is merit here, as this legal principle was used in *Trump v. Biden*, where the

---

89. *See supra* Section II.C.

90. Manheim, *supra* note 41, at 318–19.

91. *Id.* at 314.

92. *Id.* at 320.

93. *See id.*

94. *Id.* at 329 (introducing "prophylactic reform of election rules" as a way to bolster the rule of law in elections).

95. *Id.*

96. *Id.* at 330.

97. *Id.* at 340–41.

98. *Id.*

DDR-00069381

Wisconsin Supreme Court held that the doctrine of laches barred the Trump Campaign's request to strike certain votes and to alter the certified winner of the 2020 presidential election.[99]

Some scholars have proposed alternative solutions that go beyond these traditional, legal-based approaches of using the legislative and judicial branches to spur change.[100] In place of these approaches, one scholar has advocated for "political-based" solutions grounded in the voting process itself.[101] This approach argues, in part, that the United States must depart from the two-party system to isolate and effectively weaken parts of the body politic that are receptive to anti-democratic behavior and rhetoric.[102] Beyond political-based solutions, a different proposal argues for the legal ethics regime—namely bar associations—to serve as a "guardrail" for democracy by enforcing a "heightened standard of scrutiny" when punishing potential ethical violations committed by attorneys engaged in efforts to overturn election outcomes.[103] Imposing harsh penalties may encourage attorneys to think twice before furthering the goals of those looking to subvert democratic outcomes and sow distrust in democratic institutions.[104] Nevertheless, these proposals rest on the notion that the traditional approach to election reform is ill-equipped to adequately address misconduct aimed at undermining democracy.

With the variety of solutions in mind, it is fair to wonder which one presents the best course of action. In light of the challenges posed by break-downs in democratic norms, it is critical to recognize that there is no single path forward. Instead, the public, political leaders, and the scholarship must remain committed to exploring a variety of solutions; the strongest guardrails for democracy do not come in one shape or size.

---

99. Trump v. Biden, 2020 WI 91, ¶ 141, 394 Wis. 2d 629, 692, 951 N.W.2d 568, 599, *cert. denied*, 141 S. Ct. 1387 (2021).

100. Manheim, *supra* note 41, at 329 ("Some alternative approaches—for example, those involving improved civics education or collective peaceful protests—look beyond law."). The phrase "traditional, legal-based approaches," refers to reform efforts focused on updating election rules or institutional designs through primarily the legislative process—whether at the state or federal level.

101. Lee Drutman, *Moderation, Realignment, or Transformation? Evaluating Three Approaches to America's Crisis of Democracy*, 669 ANNALS. AM. ACAD. POL. & SOC. SCI. 158 (2022). The phrase "political-based" solutions refers to the use of the political process to address issues related to elections, such as in the form of voting out politicians who support anti-democratic behavior or mobilizing grassroots organizations to raise awareness about issues facing democracy. *See* Manheim, *supra* note 41, at 315 n.13 (noting difference between legal-based solutions and political-based solutions); *see* Hasen, *supra* note 2, at 266 (exploring both political and legal-based solutions).

102. Drutman, *supra* note 101, at 162.

103. Goldstein, *supra* note 3, at 739.

104. *Id.*

That said, it is also important to acknowledge that traditional, legal-based approaches have limitations.[105] For one, given the current political climate, meaningful legislative reform—whether at the state or federal level—seems unlikely.[106] Specifically, various state-level reform efforts focused on revising voting rules and improving institutions have been dominated by partisan proposals, thus further complicating the moment.[107]

What is more, even revised election rules and structural reform passed without partisan intent will only go so far. True, it is possible that reforming election laws will prevent or impede attempts to overturn lawfully conducted elections.[108] But this approach alone leaves a critical part of the problem unaddressed: intentionally divisive rhetoric aimed at sowing distrust in both election outcomes and faith in democratic institutions. This is so because "[e]ven the most eloquent of legal principles is unlikely to convince actors who, for whatever reason, feel little loyalty" to democratic norms.[109] Irrespective of the laws in place, if political leaders continue to push divisive messaging to erode faith in election outcomes, parts of the body politic will remain skeptical to an election system perceived to be rigged. With a sizable part of the public doubting the integrity of the electoral process, the environment remains ripe for subversive conduct.[110] As one scholar notes, "[f]or the foreseeable future, our elections will take place in this sea of distrust. This is a fact, whether we like it or not."[111] This further highlights the position that legal-based reform alone is insufficient to address a significant issue facing American democracy— namely, distrust.

Therefore, this Comment posits that future scholarship must embrace and encourage non-conventional approaches aimed at correcting divisive rhetoric that now surrounds elections in the United States. Note, however, that this position does not necessarily mean abandoning traditional, legal-based approaches altogether. Instead, these efforts must compliment the more immediate need to address intentional efforts aimed at undermining faith in democratic institutions. Part VI and the solutions it sets forth reflects this position.

Professor Hasen's concerns about potential election issues are still prevalent today, but exist within a pervasive context of distrust. Fortunately,

---

105.  Manheim, *supra* note 41, at 322.
106.  Goldstein, *supra* note 3, at 739; *see infra* Section V.C.
107.  *See infra* Section V.C.
108.  *See* Manheim, *supra* note 41, at 329.
109.  *Id.* at 322.
110.  *See* Hasen, *supra* note 2, at 265–66.
111.  Pildes, *surpa* note 21, at 102.

DDR-00069383

those dedicated to upholding democratic principles are "energized"" and adapting.[112] Now, the question is no longer just how the election system should address voting laws or institutions to better serve American democracy, but how the system must deal with a body politic conditioned to be skeptical of any system that renders an unfavorable result. Unfortunately, the State of Wisconsin epitomizes this situation and its resulting effects.

### III. VALID CONCERNS OF ELECTION ADMINISTRATION IN WISCONSIN'S 2020 PRESIDENTIAL ELECTION

The 2020 election unearthed valid questions about how the election was administered and whether state law was properly followed.[113] Post-election litigation and post-election reports by various groups have raised legitimate issues concerning the clarity of Wisconsin's election statutes, the legality of guidance issued by the Wisconsin Elections Commission (WEC), and the way the election was ultimately administered.[114]

Specifically, criticisms of election administration in 2020 hinge on several related arguments: (1) WEC issued unlawful guidance permitting the use of "drop-boxes" in the 2020 election; (2) WEC issued unlawful guidance permitting local clerks to "cure"—or correct—missing witness information on absentee ballots; (3) the Madison Elections Clerk unlawfully allowed "Democracy in the Park" events, where roughly 17,000 voters dropped off absentee ballots at voting stations in Madison's 206 city parks; and (4) WEC unlawfully permitted absentee ballots be mailed to nursing homes in lieu of state law which required municipal clerks to use "special voting deputies" to assist with the process.[115] Although several of these alleged unlawful practices

---

112. Manheim, *supra* note 41, at 351.

113. *See* FLANDERS, KOENEN, ESENBERG, DIEKEMPER & SPINDT, *supra* note 17, at 9. *See generally*, LEGIS. AUDIT BUREAU, ELECTION ADMIN. REP. 21-19, JOINT LEGIS. AUDIT COMM. (Wis. 2021), https://docs.legis.wisconsin.gov/2021/committees/Joint/2295/070_november_9_2021/010_au dit_report_21_19_elections_administration [https://perma.cc/MZ5V-AK3Z]. Acknowledging the existence of these concerns does not make one a supporter of stolen election claims. Similarly, disagreements over whether proper administrative procedures were followed in 2020 should not support claims that an election was stolen. There is a fine line between issues of election *administration* and issues of election *fraud*. Political leaders' failure to distinguish between the two has affected both voter confidence and the reform debate. It is only when this critical distinction is made that the system can properly consider its own issues, develop solutions, and restore voter confidence in elections.

114. *See* FLANDERS, KOENEN, ESENBERG, DIEKEMPER & SPINDT, *supra* note 17; *see also* LEGIS. AUDIT BUREAU, *supra* note 113.

115. *See* FLANDERS, KOENEN, ESENBERG, DIEKEMPER & SPINDT, *supra* note 17 at 32, 48–50, 56–57; *see also* LEGIS. AUDIT BUREAU, *supra* note 113, at 46; Trump v. Biden, 2020 WI 91, ¶ 27, 394 Wis. 2d 629, 645, 951 N.W.2d 568, 576 (specifying that 17,000 voters dropped off absentee ballots), *cert. denied*, 141 S. Ct. 1387 (2021).

*MARQUETTE LAW REVIEW* [106:683

were not unique to 2020, such as absentee ballot curing, the recent influx of legal challenges brought these issues into the light.[116] An extensive examination of every legitimate question raised in 2020 is beyond the scope of this Comment. Instead, this Part focuses on one issue central to the 2020 dispute: the use of drop-boxes under Wisconsin state law. Before discussing this further, it is essential to understand the process Wisconsin follows for administering elections.

## A. Election Administration in Wisconsin

Under Article II, Section 2, Clause 1 of the United States Constitution, state legislatures hold the authority to select how presidential electors are chosen.[117] The State of Wisconsin uses a general election where a vote for one party's presidential and vice presential candidates is a vote for the electors of that party.[118] Chapters five through twelve of Wisconsin statutes spells out the administrative process for conducting election in Wisconsin, including presidential elections.[119]

Since 2016, WEC—an executive agency created by statute—has held the primary responsibility of overseeing and implementing Wisconsin's election laws.[120] However, it is the responsibility of county and municipal clerks to administer elections.[121] Still, WEC must provide these clerks with proper training and guidance to ensure both compliance with Wisconsin law and efficient election administration.[122]

Through this delegation of authority, the Wisconsin legislature permits WEC to interpret and implement state law in two distinct ways. Wis. Stat. § 5.05(1)(f) spells out the first process: WEC may "[p]romulgate rules under Ch[apter] 227 applicable to all jurisdictions for the purpose of interpreting or implementing the laws regulating the conduct of elections."[123]

---

116. Jacob Shamsian & Sonam Sheth, *Trump and His Allies Filed More Than 40 Lawsuits Challenging The 2020 Election Results. All Of Them Failed.*, BUS. INSIDER (Feb. 22, 2021), https://www.businessinsider.com/trump-campaign-lawsuits-election-results-2020-11 [https://perma.cc/8C5J-8JGD].

117. U.S. CONST. art. I, § 2, cl. 1.

118. WIS. STAT. § 8.25 (2021–2022) ("By general ballot at the general election for choosing the president and vice president of the United States there shall be elected as many electors of president and vice president as this state is entitled to elect senators and representatives in congress. A vote for the president and vice president nominations of any party is a vote for the electors of the nominees.").

119. *See generally* WIS. STAT. ch. 5–12 (2021–2022).

120. *See* WIS. STAT. § 5.05 (2021–2022) (outlining the commission's powers and duties).

121. *See* WIS. STAT. § 5.05(10)–(11) (2021–2022).

122. WIS. STAT. § 5.05(7) (2021–2022).

123. WIS. STAT. § 5.05(1)(f) (2021–2022).

DDR-00069385

Chapter 227 refers to Wisconsin's Administrative Code; a branch of Wisconsin law governing the administration of state agencies tasked with carrying out certain responsibilities delegated to them by the state legislature. Passing a rule through this process is no small feat. The Wisconsin State Legislature's website estimates the process can take up to thirteen months.[124]

In addition to issuing rules via Chapter 227, Wis. Stat. § 7.08(3) outlines an alternative way WEC can effectuate its duties through the use of guidance documents.[125] These duties include publishing written manuals, handbooks, or directives that instruct municipal and county clerks on administering state and federal elections.[126] Guidance documents require only a majority vote by the commission, thus standing in stark contrast to the burdensome Chapter 227 approach.[127] While guidance documents are not seen as holding the force of law, rules passed under Chapter 227 are.[128] Save for Wis. Stat. § 7.08(1)(d),[129] Wisconsin law is silent on when and under what circumstances WEC must promulgate rules through Chapter 227. Given the tenuous process of following Chapter 227, it is not unreasonable to expect WEC to forego Chapter 227 and instead provide direction through guidance documents. A close review of the 2020 election uncovers that post-election disputes and post-election audits, ultimately stemmed from disagreements over whether WEC's guidance was issued in the correct form—via either Chapter 227 or guidance documents— and whether such form endorsed a lawful understanding of Wisconsin law.[130]

---

124. Wis. State Legis., *Overview of Administrative Rulemaking Process*, https://docs.legis.wisconsin.gov/misc/lc/misc/rule_making_process_flowchart.pdf [https://perma.cc/4FBL-66DH]. The process generally consists of six stages, many of which require approval or review by the governor or the state legislature itself.

125. *Compare* Wis. Stat. § 5.05(1) (2021–2022) (stating the election commission *may* perform the following tasks), *with* Wis. Stat. § 7.08 (2021–2022) (stating the election commission *shall* perform the following tasks).

126. Wis. Stat. § 7.08(3) (2021–2022). In addition to Wis. Stat. § 7.08 (2021–2022), Wis Stat. § 5.05(6a) (2021–2022) permits the commission to issue advisory opinions upon request.

127. *Compare* Wis. Admin. Code WEC § 227.01(3m)(a) (2021–2022), *with* Wis. Stat. § 7.08 (2021–2022).

128. *See* Trump v. Biden, 2020 WI 91, ¶ 141, 394 Wis. 2d 629, 692, 951 N.W.2d 568, 599 (Bradley, J., dissenting), *cert. denied*, 141 S. Ct. 1387 (2021).

129. Wis. Stat. § 7.08(1)(d) (2021–2022).

130. *See, e.g.*, Trump v. Wisconsin Elections Comm'n, 506 F. Supp. 3d (E.D. Wis. 2020) ("Plaintiff seizes upon three pieces of election guidance promulgated by the Wisconsin Elections Commission (WEC)—a creation of the Wisconsin Legislature that is specifically authorized to issue guidance on the state election statutes—and argues that the guidance, along with election officials' conduct in reliance on that guidance, deviated so significantly from the requirements of Wisconsin's election statutes that the election was itself a failure."), *aff'd*, 983 F.3d 919 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1516, (2021). Disputes also centered on whether the WEC interpreted Wisconsin law correctly in the first place, irrespective of the form of the guidance.

The controversy surrounding WEC's decision to permit the use of drop-boxes further illustrates the kind of disagreement that stem from WEC's decision-making process.

### B. The Use of Drop-boxes Under Wisconsin State Law: Teigen v. WEC (2022)

Wisconsin law does not explicitly permit the use of drop-boxes as a method for casting an absentee ballot.[131] At the same time, state law does not explicitly prohibit their use.[132] Wis. Stat. § 6.87(4)(b)(1) permits a voter to either (1) mail in her absentee ballot, or (2) return the ballot in person to the municipal clerk's office.[133] In response to the flood of absentee voting due to the global pandemic, WEC issued two guidance documents—both before the 2020 presidential election—which allowed for the use of drop-boxes.[134]

These guidance documents were not passed under Chapter 227. Rather, WEC Administrator Meagan Wolfe directed municipal clerks to use ballot drop-boxes, provided they can ensure the boxes are secure and regularly emptied.[135] In line with this direction, election clerks around Wisconsin instituted this method of voting in both the 2020 general election and the 2021 spring election.[136] By 2022, WEC estimated that 570 drop-boxes existed in sixty-six of Wisconsin's seventy-two counties.[137]

The State Supreme Court did not evaluate the lawfulness of ballot drop-boxes in Wisconsin until the summer of 2022.[138] A few weeks after the 2020 election, the Wisconsin Supreme Court initially passed on the opportunity to evaluate the use of drop boxes in *Mueller v. Jacobs.*[139] A few weeks after *Mueller*, the Trump Campaign—in *Trump v. Biden*—did not overtly raise the issue as a specific source of illegal voting in its state post-election challenges.[140]

---

131.  *See generally* Teigen v. Wisconsin Elections Comm'n, 2022 WI 64, 403 Wis. 2d 607, 976 N.W.2d 519.

132.  *See id.* ¶ 54.

133.  WIS. STAT. § 6.87(4)(b)(1) (2021–2022).

134.  LEGIS. AUDIT BUREAU, *supra* note 113, at 40–45.

135.  *Teigen*, 2020 WI 91, ¶ 6.

136.  *Id.* ¶ 8.

137.  *Id.*

138.  *See id.*

139.  *See* Mueller v. Jacobs, No. 2020AP1958-OA, (Dec. 3, 2020 Wis.) (unpublished order).

140.  *See* Trump v. Biden, 2020 WI 91, ¶ 102, 394 Wis. 2d 629, 675, 951 N.W.2d 568, 591, ("However, because drop boxes are not separately identified as a source of illegal voting in this lawsuit, I will not dwell on the accountability problems they create, but I do not doubt that challenges to drop boxes in general and in specific instances will be seen as problems in future elections. Therefore, we may have the opportunity to examine them in a case arising from a subsequent election.") (Bradley, J., dissenting), *cert. denied*, 141 S. Ct. 1387 (2021).

The Trump Campaign *did* raise the issue in one of its post-election federal lawsuits, however the Seventh Circuit affirmed a district court's finding that the Campaign could not challenge voting procedures after the election took place because it had ample time to bring a pre-election challenge.[141] Although *dictum*, the Seventh Circuit also suggested that WEC's guidance regarding drop-boxes was lawful because it was issued under the authority granted to it by the Wisconsin State Legislature, specifically the power to administer Wisconsin's elections.[142]

In June of 2021, WILL filed a lawsuit on behalf of two Wisconsin voters against WEC, alleging that the use of drop-boxes under Wisconsin law was illegal.[143] A year later, the Wisconsin Supreme Court finally rendered an opinion on the matter, holding drop-boxes illegal under Wisconsin law in *Teigen v. WEC*.[144] Even though Wisconsin's highest court reasonably concluded state law does not permit the use of this voting mechanism, proponents of their legality—including a dissenting opinion—advanced an equally compelling argument.

The principal issue in *Teigen* was quite simple, turning on the intent of the statutory phrase "to the municipal clerk."[145] Wis. Stat. § 6.87(4)(b)1 explicitly requires that absentee ballots either be mailed to the municipal clerk, or be "delivered in person, to the municipal clerk issuing the ballot or ballots."[146] Thus, the issue in *Teigen* was whether the phrase, "to the municipal clerk" should be limited to the office of the municipal clerk, or should it include any location designated by the municipal clerk for the receipt of an absentee ballot.

The majority opinion held the guidance documents issued by WEC invalid because ballot drop-boxes under Wisconsin law were illegal.[147] Under the

---

141. Trump v. Wis. Elections Comm'n, 983 F.3d 919, 925 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1516 (2021) (dismissing the Trump Campaign's arguments pursuant to the *Purcell* Principle—a principle that advances the position that any claim against a state election procedure must be brought expeditiously).

142. *Id.* at 926. In making this determination, the Seventh Circuit appears to have relied on Chief Justice Rehnquist's concurring opinion in *Bush v. Gore*, which suggested the "proper inquiry" was to ask whether a state conducted its election in a manner "substantially consistent with the 'legislative scheme' for appointing electors." *Id.* (citing Bush v. Gore, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring)). The Seventh Circuit said it should not go as far as to ask whether WEC perfectly interpreted "'isolated sections' of the [Wisconsin] elections code." *Id.*

143. *Wisconsin    Drop    Box    Challenge*, DEMOCRACY    DOCKET, https://www.democracydocket.com/cases/wisconsin-drop-box-challenge/    [https://perma.cc/MJV5-D93H] (last visited April 3, 2023).

144. Teigen v. Wisconsin Elections Comm'n, 2022 WI 64, 403 Wis. 2d 607, 976 N.W.2d 519.

145. *See Teigen*, 2022 WI 64, ¶ 62.

146. WIS. STAT. § 6.87(4)(b)1 (2021–2022).

147. *Teigen*, 2022 WI 64, ¶ 4.

majority's reading of Wisconsin law, an absentee ballot must be returned by mail or "the voter must personally deliver it to the municipal clerk at the clerk's office or a designated alternate site."[148] The majority prefaced its holding by noting Wisconsin law requires the court to take a "skeptical view" of absentee voting.[149] Subchapter IV of Chapter 6 of Wisconsin statutes declares that although voting is a constitutional right, the right to vote by absentee ballot is "a privilege exercised wholly outside the traditional safeguards of the polling place."[150] Therefore, absentee voting must be "carefully regulated."[151] With this backdrop, the majority concluded that because "[n]othing in the statutory language detailing the procedures by which absentee ballots may be cast mentions drop boxes," and WEC's guidance conflicted with these statutory directives, the guidance was illegal.[152]

Specifically, the majority examined the statutory scheme for absentee ballots, as spelled out in Wis. Stat. §§ 5.02(10), 6.84, 6.855, and 6.87(4)(b)1.[153] The court laid out Wis. Stat. § 6.87(4)(b)1, noting that an absentee ballot "shall be mailed by the elector, or delivered in person, *to the municipal clerk* issuing the ballot or ballots."[154] Relying in part on Wis. Stat. § 5.02(10)—which sets the definition for the term municipal clerk—the majority interpreted "to the municipal clerk" to mean "mailing or delivering the absentee ballot to the municipal clerk *at her office*."[155]

To further its position, the majority opinion referenced Wis. Stat. § 6.855, which provides an exception to the requirement that voters return absentee ballots to the municipal clerk's office and permits the use of an alternate site:

> The governing body of a municipality may elect to designate a site other than the office of the municipal clerk or board of election commissioners as the location which electors of the municipality *may request and vote absentee ballots* and to which voted absentee ballots shall be returned by electors for any election . . . no function related to voting and return of absentee ballots that is to be conducted at the alternate site may be conducted in the office of the municipal clerk or board of election commissioners.[156]

---

148. *Id.*

149. *Id.* ¶ 52–53.

150. *Id.* ¶ 53 (citing Wis. Stat. § 6.84(1) (2019–2020)).

151. *Id.*

152. *Id.* ¶ 54.

153. *Id.* ¶¶ 55–83.

154. *Id.* ¶ 55; Wis. Stat. § 6.87(4)(b)1 (2019–2020) (emphasis added).

155. *Teigen*, 2022 WI 64, ¶ 62 (emphasis added).

156. *Id.* ¶ 56 (emphasis added); Wis. Stat. § 6.855 (2021–2022).

DDR-00069389

Evidently, an alternate site serves as a replacement for the office of the municipal clerk, "rather than an additional site for absentee voting."[157]

Under a strict reading of this statutory scheme, the majority concluded that Wisconsin law "contemplates" only two ways to vote absentee, both of which do not include through a ballot drop-box. First, a voter could mail or return his ballot to the municipal clerk at her office. Because of the definition of municipal clerk spelled out in section 5.02(10), the majority concluded that "[a]n inanimate object, such as a ballot drop box," cannot satisfy this requirement.[158]

Second, a voter could return an absentee ballot to an alternate ballot drop off site. The majority found that drop-boxes do not fit the definition of an alternate absentee drop box site:

> Ballot drop boxes are not alternate absentee ballot sites under Wis. Stat. § 6.855 because a voter can only return the voter's absentee ballot to a drop box, while an alternate site must also allow voters to request and vote absentee at the time. If a drop box were an alternate ballot site, by the plain language of the statute, "no function related to voting and return of absentee ballots that is to be conducted at the alternate site may be conducted in the office of the municipal clerk or board of election commissioners."[159]

The majority, in strictly reading state law, found no statutory basis for drop-boxes. Wis. Stat. §6.87 (4)(b)1 requires the voter to return the ballot to the municipal clerk, not a third-party drop-box.[160]    Also, Wis. Stat. § 6.855's exception cannot apply because drop boxes do not serve as the means for requesting—only receiving—absentee ballots.[161] With WEC's guidance having no basis in Wisconsin's statutory scheme, the court held it unlawful.

The dissent formed a different conclusion from its construction of Wisconsin law.[162] Specifically, the dissent did not read Wis. Stat. § 6.87(4)(b)1's reference to "the municipal clerk" as meaning "to the municipal clerk at her office."[163] Instead, Wisconsin's statutory scheme differentiates between these two phrases. First, "Wisconsin statutes are replete with specific references to the 'office of the municipal clerk' . . . or the 'clerk's office.'"[164] Given the legislature uses this phrase in some subsections, but omits it from the

---

157. *Teigen*, 2022 WI 64, ¶ 59; WIS. STAT. § 6.87(4)(b)1 (2021–2022).

158. *Teigen*, 2022 WI 64, ¶ 55.

159. *Id.* ¶ 57 (quoting Wis. Stat. § 6.855(1) (2019–2020)).

160. WIS. STAT. § 6.87(4)(b)1 (2021–2022).

161. *Id.*

162. *Teigen*, 2022 WI 64, ¶ 219 (Ann Walsh Bradley, J., dissenting).

163. *Id.* ¶¶ 223–24 (Ann Walsh Bradley, J., dissenting).

164. *Id.* ¶ 220 (Ann Walsh Bradley, J., dissenting).

section on absentee voting, the dissent concluded the legislature intended distinct meanings:

> If the legislature wanted to require return of a ballot to the clerk's office, it certainly could have done so, as it did in the litany of provisions using such language . . . But the legislature did not do that. Instead, it indicated that the ballots be delivered "to the municipal clerk," not to the clerk's office. Conflating "municipal clerk" with the "office of the municipal clerk" is not—as the majority/lead opinion claims—the "fairest interpretation" of the statute. Instead, it is a rank distortion of the statutory text.[165]

Under the dissent's reading of state law, Justice Ann Walsh Bradley concluded that delivery to a drop-box means—generally—delivery "to the municipal clerk."[166] Because a ballot drop-box is set-up, maintained, and emptied by the clerk or the clerk's designees, delivering a ballot to a drop-box is an alternative way to deliver a ballot to the municipal clerk administering an election.[167]

The import of this case—and other cases evaluating legitimate questions from 2020—is that election administration is a messy business and will inevitably lead to reasonable disagreements over how state law ought to be interpreted and ultimately how elections should be administered. While the differing opinions each defend their interpretation with vigor, there are reasonable arguments on each side. More critically, nothing in *Teigen* remotely suggests that WEC—a bipartisan Commission—promoted drop-boxes to further a partisan agenda at the expense of President Trump. Rather, *Teigen* illustrates the election and legal system at work: an administrative agency applied the law in good faith and after a judicial review concluded that the agency had erred, the agency then followed the court's decision, and recommended that municipal clerks do not use ballot drop boxes.[168] Since the decision, drop-boxes have not been used in Wisconsin.

Of course, the legislature remains free to permit and regulate drop boxes in future elections. If it does, any subsequent statutes will then be applied by WEC under its statutory authority subject to judicial review. But whether or not WEC perfectly interpreted "isolated sections" of Wisconsin's election code in administering the 2020 election cannot serve as the gauge for determining whether an election outcome is legitimate.[169] Again, there is a significant

---

165. *Id.* ¶ 223–224 (Ann Walsh Bradley, J., dissenting).

166. *Id.* ¶ 225 (Ann Walsh Bradley, J., dissenting).

167. *Id.* (Ann Walsh Bradley, J., dissenting).

168. *See id.* ¶ 87.

169. *See supra* notes 141–42 (discussing *Trump v. Wis. Elections Comm'n*).

difference between accusing election officials of wrongly interpreting state law and making allegations that those same officials intended to rig the outcome of an election. Absent showing serious fraud in conjunction with WEC's alleged missteps, or some showing of malintent on behalf of WEC's staff, claims that legitimate questions from 2020—such as the drop-box fiasco—show proof of a stolen election is abjectly false.

Unfortunately, President Trump and his cloest allies have refused to make this distinction.[170] Instead, debates surrounding the 2020 election have been wrapped up into claims of a stolen election.

## IV. MISCHARACTERIZING LEGITIMATE CONCERNS OF ELECTION ADMINISTRATION AS EVIDENCE OF FRAUD

Aside from the debate on legitimate administrative disputes, no one has ever presented credible evidence of widespread fraud or intentional wrongdoing in the 2020 election overall, or in Wisconsin, specifically. This conclusion is supported by various post-election audits, including reports by WILL,[171] the nonpartisan State Legislative Audit Bureau,[172] a conservative coalition of conservative lawyers and judges,[173] and a review by the Associated Press.[174] Although some of these reports correctly identify areas where WEC may have deviated from state law, or where certain 2020 procedures showed a lack of clarity, none reported anything close to fraud.

This position is shared by others, including various state and federal courts,[175] President Trump's Department of Homeland Security Cybersecurity and Infrastructure Security Agency,[176] and his own Department of Justice.[177] Most memorably, United States Attorney William Barr did not believe

---

170.  *See infra* Part IV.

171.  *See* FLANDERS, KOENEN, ESENBERG, DIEKEMPER & SPINDT, *supra* note 17, at 4.

172.  *See* LEGIS. AUDIT BUREAU, *supra* note 113.

173.  DANFORTH, GINSBURG, GRIFFITH, HOPPE, LUTTIG, MCCONNELL, OLSON & SMITH, *supra* note 6.

174.  Christina Cassidy, *Far Too Little Fraud to Tip Election to Trump, AP Finds*, AP PRESS (Dec. 14, 2021), https://apnews.com/article/voter-fraud-election-2020-joe-biden-donald-trump-7fcb6f134e528fee8237c7601db3328f [https://perma.cc/RPA5-U5G4].

175.  Alison Durkee, *Trump and the GOP Have Now Lost More Than 50 Post-Election Lawsuits*, FORBES (Dec. 8, 2021), https://www.forbes.com/sites/alisondurkee/2020/12/08/trump-and-the-gop-have-now-lost-50-post-election-lawsuits/?sh=4f1088532960 [https://perma.cc/J2CY-WP3X].

176.  Jan Wolfe, *Factbox: Trump's False Claims Debunked: the 2020 Election and Jan. 6 Riot*, REUTERS (Jan. 6, 2022), https://www.reuters.com/world/us/trumps-false-claims-debunked-2020-election-jan-6-riot-2022-01-06/ [https://perma.cc/NE9B-WFBB].

177.  *Id.*

DDR-00069392

President Trump's lies about the 2020 election.[178] In videotaped testimony before the House Select Committee investing January 6th, Barr did not mince words when speaking with the President, telling him such claims were "absolute rubbish," "idiotic," "bogus," "complete nonsense," and a "great disservice to the country."[179] Despite this, the President and his allies moved forward—and continue to move forward—under the guise that something nefarious happened in 2020.

President Trump and various political leaders in Wisconsin have consistently questioned the legitimacy of the 2020 election and the legitimacy of the state's voting institution, overall. To understand the President's strategy to delegitimize the 2020 election, it is important to first parse out the Big Lie's various parts.

The notion that the 2020 election was stolen must be understood as an umbrella term, with multiple parts underneath it. This belief relies on (1) unsubstantiated claims that millions of voters illegally cast ballots due to an election system ill-equipped to safeguard against fraudulent voters[180]; (2) disproven theories that local election officials conspired to steal the election through tactics such as late-night ballot dumps[181]; and (3) baseless theories that voter machines deleted votes for President Trump, either at the hands of a machine's manufacturer or some foreign government.[182]

---

178. Susan B. Glaser, *Bill Barr Calls "Bullshit" On Trump's Election Lies*, NEW YORKER (Jun. 13, 2022), https://www.newyorker.com/news/letter-from-bidens-washington/bill-barr-calls-bullshit-on-trumps-election-lies [https://perma.cc/X9XR-SSTZ].

179. *Id.*

180. *January 6th Hearing* (statement of Wendy R. Weiser, V.P. for Democracy at the Brennan Center for Justice at NYU School of Law).

181. Phillip Bump, *An Unusually Easy Trump Debunking: There Was No Suspicious Vote Dump In Wisconsin*, WASH. POST (Nov. 19, 2020), https://www.washingtonpost.com/politics/2020/11/19/an-unusually-easy-trump-debunking-there-was-no-suspicious-vote-dump-wisconsin/ [https://perma.cc/P5ZR-E5ND].

182. Zachary B. Wolf, *The 5 Key Elements of Trump's Big Lie and How it Came to Be*, CNN (May 19, 2021), https://www.cnn.com/2021/05/19/politics/donald-trump-big-lie-explainer/index.html [https://perma.cc/NAV7-9S4X] ("A key element of Trump's system of lies is that the voting equipment and software company Dominion Voting Systems was biased against him, had 'bum equipment' and helped rig the election.").

DDR-00069393

Also, roughly eighty lawsuits—seven in Wisconsin—paralleled these abject lies.[183] In court, many of these baseless claims were left out.[184] Instead, such as in Wisconsin, the Trump Campaign and his allies lodged arguments against election laws and voting procedures.[185] It is imperative to stress that those who wish to challenge election laws or procedures put in place by WEC undoubtedly hold the right to do so. The mere presence of post-election litigation—whether days, months, or years after an election—suggests no malintent by those who bring such lawsuits. However, the Trump Campaign and its allies used legitimate arguments over election administration advanced in the courtroom and lumped them with other pervasive election conspiracies, thus suggesting malfeasance by those tasked with administering elections in Wisconsin and the country.[186] In essence, the Big Lie seized—and continues to seize—on the presence of legitimate questions of election administration by couching them into a larger scheme to prove the election was stolen.[187] In a way, these legitimate questions of election administration have provided an air

---

183. Jacob Kovacs-Goodman, STANFORD-MIT HEALTHY ELECTIONS PROJECT: POST-ELECTION LITIGATION ANALYSIS AND SUMMARIES (2021), https://web.mit.edu/healthyelections/www/sites/default/files/2021-06/Post-Election_Litigation_Analysis.pdf [https://perma.cc/Y9JR-7KCW]; William Cummins, Joey Garrison & Jim Sergent, *By the Numbers: President Donald Trump's Failed Efforts to Overturn the Election*, USA TODAY (Jan. 6, 2021), https://www.usatoday.com/in-depth/news/politics/elections/2021/01/06/trumps-failed-efforts-overturn-election-numbers/4130307001/ [https://perma.cc/N22Y-V6JZ] (listing cases). Again, it is critical to note that post-election litigation is not alone indicative of any malintent. Those who have felt aggrieved by the election system can and should bring challenges to court. However, many of President Trump's initial legal challenges blurred a once fine-line between frivolous litigation and a fervent, last-ditch political effort to hold onto power. *See* Brendan Williams, *Did Present Trump's 2020 Election Litigation Kill Rule 11?*, 30 B.U PUB. INT. L. J. 181 (2021); Editorial Board, *supra* note 16.

184. *See* Kovacs-Goodman, *supra* note 183.

185. *See e.g.*, Trump v. Biden, 2020 WI 91, 394 Wis. 2d 629, 951 N.W.2d 568.

186. Reuters Staff, *Fact Check: Vote Spikes in Wisconsin, Michigan, and Pennsylvania Do Not Prove Election Fraud*, REUTERS (Nov. 10, 2020), https://www.reuters.com/article/uk-factcheck-wi-pa-mi-vote-spikes/fact-check-vote-spikes-in-wisconsin-michigan-and-pennsylvania-do-not-prove-election-fraud-idUSKBN27Q307 [https://perma.cc/6BDC-WWZY]; Shawn Johnson, *Gableman Report Calls for Decertifying 2020 Election. The Legislature's Nonpartisan Lawyers Say That's Not Possible*, WPR (Mar. 1, 2022), https://www.wpr.org/gableman-report-calls-decertifying-2020-election-legislatures-nonpartisan-lawyers-say-thats-not [https://perma.cc/BYV7-RZJ8] ("Gableman said the reason lawmakers should consider decertification is that his report makes several allegations that the 2020 election was conducted unlawfully.").

187. Arizona House Speaker Russel "Rusty" Bowers (R) testified to the House Select Committee to Investigate the January 6th Attack on the United States Capitol to a statement made by Mayor Rudolph Giuliani, which best captures this moment in time. Mayor Giuliani said, "We've got lots of theories. We just don't have the evidence." *See Here's Every Word From the Fourth Jan. 6 Committee Hearing On Its Investigation*, NPR (Jun. 21, 2022), https://www.npr.org/2022/06/21/1105848096/jan-6-committee-hearing-transcript [https://perma.cc/2XLN-X25H].

DDR-00069394

*MARQUETTE LAW REVIEW* [106:683

of legitimacy to the stolen election narrative. But for all the strong legal arguments proponents of the Big Lie have advanced, there have been many more illegitimate ones.

Although the scheme to undermine the legitimacy of the 2020 election comprises various mechanisms, this Part focuses primarily on the mischaracterization of legitimate administrative concerns as evidence of an alleged fraudulent voting system in Wisconsin.

Efforts to delegitimize voting procedures began before the 2020 election. On April 7, 2020, as Wisconsin voters stood in line to cast votes in the presidential primary, President Trump made "one of his first false claims" about absentee and mail-in-voting: "Mail ballots are a very dangerous thing for this country, because they're cheaters . . . . They go and collect them. They're fraudulent in many cases."[188] The President made this statement one day after the Wisconsin Supreme Court overturned Governor Evers' executive order to extend absentee and mail-in-voting due to COVID-19.[189]

Wisconsin soon found itself in a similar position, and the President took advantage. In September 2020, a federal district court judge ordered a six-day extension for the deadline to receive absentee ballots in Wisconsin.[190] The United States Supreme Court—split five to three—rejected the procedural change, despite the ongoing COVID-19 pandemic.[191] The same day—as similar legal battles continued to play out in other critical swing states—President Trump declared there were "[b]ig problems and discrepancies with Mail In Ballots all over the United States. Must have final total on November 3rd."[192]

Despite the President's wish, Wisconsin did not get its final vote total on November 3rd. Instead, the Associated Press did not call Wisconsin for Joe Biden until one day later.[193] In the face of defeat in Wisconsin, the President's

---

188. Steve Inskeep, *Timeline: What Trump Told Supporters for Months Before They Attacked*, NPR (Feb. 8, 2021), https://www.npr.org/2021/02/08/965342252/timeline-what-trump-told-supporters-for-months-before-they-attacked [https://perma.cc/9DF9-VPRN].

189. *Id.*; *see also* Brett Neely, *Wisconsin Plans to Vote in Person Tuesday, After Last Minute Chaos*, NPR (Apr. 6, 2020), https://www.npr.org/2020/04/06/828191015/wisconsin-governor-effectively-reschedules-tuesdays-primary-election [https://perma.cc/YG3B-7HRC].

190. Scott Bauer & Todd Richmond, *Judge Extends Wisconsin Absentee Cutoff 6 Days Post Election*, AP NEWS (Sept. 21, 2020), https://apnews.com/article/election-2020-wisconsin-elections-courts-voting-2020-0a1dd66665dff0f338c1afe23f920f66 [https://perma.cc/MT4J-YG6L].

191. Adam Liptak, *Supreme Court Won't Extend Wisconsin's Deadline for Mailed Ballots*, N.Y. TIMES (Oct. 26, 2020), https://www.nytimes.com/2020/10/26/us/supreme-court-wisconsin-ballots.html [https://perma.cc/94XP-H9WY].

192. *Id.*

193. Patrick Maks, *Calling the 2020 Presidential Race State by State*, ASSOCIATED PRESS (Nov. 8, 2020), https://blog.ap.org/behind-the-news/calling-the-2020-presidential-race-state-by-state

DDR-00069395

efforts to mischaracterize Wisconsin's election system accelerated in the following days. Evaluating all that President Trump alleged about Wisconsin and the nation's voting systems is an insurmountable task.[194] However, a handful of examples highlight the President's distortion of legitimate election administration concerns. Consider the following:

- On November 4, 2020, President Trump tweeted: "They are finding Biden votes all over the place—in Pennsylvania, Wisconsin, and Michigan. So bad for our Country."[195]
- On November 18, 2020, President Trump tweeted: "Look at this in Wisconsin! A day AFTER the election, Biden receives a dump of 143,379 votes at 3:32 AM, when they learned he was losing badly. This is unbelievable!"[196]
- On December 17, 2020, President Trump tweeted: "We won Wisconsin big. They rigged the vote!"[197]
- On December 21, 2020, President Trump tweeted the following: "Two years ago, the great people of Wisconsin asked me to endorse a man named Brian Hagedorn for State Supreme Court Justice, when he was getting destroyed in the Polls against a tough Democrat Candidate who had no chance of losing. After my endorsement, Hagedorn easily won!" and "WOW, he just voted against me in a Big Court Decision on voter fraud (of which there was much!), despite many pages of dissent from three highly respected Justices." and "Republicans in Wisconsin should take these 3 strong decisions to their State

---

[https://perma.cc/CR2Q-6QJK] (noting that the Associated Press called Wisconsin for Joe Biden at 2:16 PM on November 4, 2020).

194. In only twelve days after November 3rd, President Trump sent over three hundred tweets containing false or misleading facts about the 2020 election. *See* Linda Qiu, *Trump Has Amplified Voting Falsehoods In Over 300 Tweets Since Election Night*, N.Y. TIMES (Nov. 16, 2020), https://www.nytimes.com/2020/11/16/technology/trump-has-amplified-voting-falsehoods-in-over-300-tweets-since-election-night.html [https://perma.cc/S94Q-UD9X]. And in the months following his defeat, the President used the word "rigged" in seventy-five tweets, including tweets about Wisconsin. *See* William Cummins, Joey Garrison & Jim Sergent, *By the Numbers: President Donald Trump's Failed Efforts to Overturn the Election*, USA TODAY (Jan. 6, 2021), https://www.usatoday.com/in-depth/news/politics/elections/2021/01/06/trumps-failed-efforts-overturn-election-numbers/4130307001/ [https://perma.cc/85W7-H4KC].

195. Donald J. Trump (@realDonaldTrump), TWITTER (Nov. 4, 2020, 10:55 AM), https://www.thetrumparchive.com [https://perma.cc/P6CN-NXE8].

196. Donald J. Trump (@realDonaldTrump), TWITTER (Nov. 18, 2020, 7:22 AM), https://www.thetrumparchive.com [https://perma.cc/P3NZ-EU77].

197. Donald J. Trump (@realDonaldTrump), TWITTER (Dec. 17, 2020, 8:28 AM), https://www.thetrumparchive.com [https://perma.cc/A9V6-3UNJ].

Legislators and overturn this ridiculous State Election. We won in a LANDSLIDE!"[198]

- On January 1, 2021, President Trump argued in a tweet that because changes were made to the "voting process, rules and regulations," prior to the election in Wisconsin, the "whole State Election is not legal or Constitutional."[199] He reasoned that "[i]n Wisconsin, Voters not asking for applications invalidates the Election. All of this without even discussing the millions of fraudulent votes that were cast or altered!"[200]

These examples provide considerable insight into a key part of President Trump's strategy to undermine faith in the electoral process. By taking valid issues of election administration, and re-packaging them as proof of malfeasance, the President provided his claims of fraud with some foundation of legitimacy, while ultimately advancing an argument grounded in intentional wrongdoing. For example, President Trump accurately stated that Joe Biden received a large batch of votes during the night on November 4th. But this bump for Biden was because Milwaukee County reported its 170,000 absentee votes later in the evening on election day, which Biden won handily.[201] In Wisconsin, election officials may not process absentee or mail-in-votes until Election Day.[202] Given COVID-19 and the resulting influx of mail-in-ballots, this was a formidable task for election officials. But whether Wisconsin should have tabulated absentee votes before election day—or whether the way absentee votes were collected via ballot-drop boxes was in line with Wisconsin law— are merely questions worthy of election reform debate. Absent any showing of

---

198. Donald J. Trump (@realDonaldTrump), TWITTER (Dec. 21, 2020, 3:48 PM), https://www.thetrumparchive.com [https://perma.cc/N42T-9YDW].

199. Donald J. Trump (@realDonaldTrump), TWITTER (Jan. 1, 2021, 5:27 PM), https://www.thetrumparchive.com [https://perma.cc/9G54-PKTN].

200. *Id.*

201. Eric Litke, *Trump Again Flat Wrong With Claims About Wisconsin Voter Fraud*, POLITIFACT (Nov. 20, 2020), https://www.politifact.com/factchecks/2020/nov/20/donald-trump/trump-again-flat-wrong-claims-about-wisconsin-vote/ [https://perma.cc/5RT5-R3AM]; Reuters Staff, *Fact Check: Vote Spikes in Wisconsin, Michigan, and Pennsylvania Do Not Prove Election Fraud*, REUTERS (Nov. 10, 2020), https://www.reuters.com/article/uk-factcheck-wi-pa-mi-vote-spikes/fact-check-vote-spikes-in-wisconsin-michigan-and-pennsylvania-do-not-prove-election-fraud-idUSKBN27Q307 [https://perma.cc/66HZ-8BE6] ("Social media users have been sharing posts claiming that during the night of Nov. 3 to Nov. 4 there were vote dumps of hundreds of thousands of mail-in ballots only for Democrat Joe Biden in Wisconsin, Michigan and Pennsylvania, suggesting this proves voter fraud allegations. These vote spikes did occur, but they also included Trump votes . . . .").

202. National Conference of Statute Legislatures, *Table 16: When Absentee/Mail Ballot Processing and Counting Can Begin*, NCSL, https://www.ncsl.org/research/elections-and-campaigns/vopp-table-16-when-absentee-mail-ballot-processing-and-counting-can-begin.aspx [https://perma.cc/VH3G-7MXL] (last visited Apr. 4, 2023).

DDR-00069397

intentional wrongdoing by election officials, there is no room for allegations of fraud in this context.

President Trump was not the only political leader to distort the election administration conversation in Wisconsin. Several Wisconsin political leaders have either openly questioned the legitimacy of the 2020 election or acquiesced in delegitimizing efforts by others. For example, State Representative Janel Brandtjen (R-Menomonee Falls) sent her constituents an email a few days after the election, explicitly stating there was no doubt Donald Trump won re-election and that "several methods of fraud were used to change the outcome."[203] Until recently, Representative Brandtjen served as chair of the Wisconsin Assembly Elections Committee.[204]

During this last midterm cycle, Wisconsin saw two candidates for Governor in Wisconsin suggest the 2020 election was "stolen" from President Trump. Tim Michels, a Wisconsin businessman who recently lost to Governor Tony Evers in the 2022 Midterms, stated that the 2020 election was "maybe" stolen.[205] More critically, he stated that "President Trump probably would be president right now if we had election integrity."[206] Timothy Ramthun, another candidate for Governor, had publicly advocated for re-claiming Wisconsin's ten electoral votes cast for Joe Biden in 2020.[207] He reasoned that because, "we don't know exactly what the true outcome of the election [was] . . . how can

203. Melanie Conklin, *GOP Rep: There is No Doubt . . . Donald Trump Won This Election*, WIS. EXAM'R (Dec. 9, 2020), https://wisconsinexaminer.com/brief/gop-rep-there-is-no-doubt-donald-trump-won-this-election/ [https://perma.cc/SGE2-7MQD].

204. Rich Kremer, *State Rep. Brantjen—Who Called for Decertifying 2020 Presidential Election—is Joining Race for State Senate*, WPR (Dec. 5, 2022), https://www.wpr.org/republican-janel-brandtjen-state-senate-race-decertifying-2020-election [https://perma.cc/39NF-9GFX]. Rep. Brandtjen has used her platform for advocating for the overturning of the 2020 election. *Id.* She recently issued a statement claiming "Tyranny is at Wisconsin's door." *Id.* President Trump previously endorsed the state representative, noting she had been the most courageous Assembly member by "provid[ing] the platform for the investigation into the Rigged and Stolen 2020 Presidential Election." *Id.*

205. Patrick Marley, *Candidate for Governor Tim Michels Says 'Maybe' the 2020 Election Was Stolen Even Though Biden's Win Has Been Repeatedly Confirmed*, MILWAUKEE J. SENTINEL (May 9, 2022), https://www.jsonline.com/story/news/politics/elections/2022/05/09/tim-michels-says-maybe-election-stolen-despite-court-rulings/9705815002/ [https://perma.cc/MYX9-ZBE4].

206. *Id.*

207. Shawn Johnson, *Tim Ramthun's Campaign for Governor Promoted Election Denial. Election Law Experts Worry About the Consequences*, WPR (July 29, 2022), https://www.wpr.org/tim-ramthuns-campaign-governor-promoted-election-denial-election-law-experts-worry-about [https://perma.cc/3R7W-H5NU].

you certify something that is unknown?"[208] Ramthun received 6% of the vote—roughly 42,000 votes—in the Wisconsin GOP Gubernatorial Primary.[209]

To his credit, Speaker Robin Vos has never himself advanced abject lies about the 2020 election. However, after receiving significant pressure from President Trump decertify the 2020 election, Speaker Vos appointed retired Wisconsin Supreme Court Justice Michael Gableman to lead an independent investigation and review of the election.[210] Gableman's investigation, however, provided little added value to an election already highly scrutinized, and instead served as a vehicle for suggesting the 2020 election be decertified.[211] Roughly eight months into the investigation, a state circuit court judge released records which showed the review "consisted of little investigation."[212] Instead, the review reaffirmed what had been reported by several post-election audits—including ones by the State Legislative Audit Bureau and WILL. Again, the public was presented with evidence that legitimate questions of election administration existed in 2020, but no level of purported fraud affected the election's outcome.[213] Despite this, Gableman still advocated for the legislature to "take a very hard look" at decertifying the 2020 election—a position rejected by lawyers from both major parties.[214]

After a year of "much to-do about nothing," Speaker Vos fired Gableman and disbanded his investigation.[215] The decision came after Gableman endorsed

---

208. *Id.*

209. *Wisconsin Primary Results*, CNN, https://www.cnn.com/election/2022/results/wisconsin/primaries [https://perma.cc/Z728-CT7A] (last visited Dec. 26, 2022).

210. Molly Beck, *A Former Wisconsin Supreme Court Justice Will Oversee the Latest Election Review Sought by the State's GOP Leaders*, MILWAUKEE J. SENTINEL (June 26, 2021), https://www.jsonline.com/story/news/politics/elections/2021/06/26/former-wisconsin-supreme-court-justice-michael-gableman-will-oversee-robin-vos-2020-election-review/5357319001/ [https://perma.cc/AWQ7-VYJ6].

211. Patrick Marley & Molly Beck., *'Much To-Do About Nothing': Gableman Gets New Contract As Judge Releases Records Showing Little Evidence Of Investigation*, MILWAUKEE J. SENTINEL (Mar. 8, 2022), https://www.jsonline.com/story/news/politics/2022/03/08/wisconsin-robin-vos-michael-gableman-sign-new-contract-gop-republican-review-2020-election/9423494002/ [https://perma.cc/AG8X-V4LT].

212. *Id.*

213. *Id.*

214. Shawn Johnson, *Gableman Report Calls for Decertifying the 2020 Election. The Legislature's Nonpartisan Lawyers Say That's Not Possible*, WPR (Mar. 1, 2022), https://www.wpr.org/gableman-report-calls-decertifying-2020-election-legislatures-nonpartisan-lawyers-say-thats-not [https://perma.cc/Q6Y2-L2UW]. The Wisconsin Legislature's nonpartisan attorneys have said a move to decertify an election "would be impossible." *Id.*

215. *See* Marley & Beck, *supra* note 211. In March of 2022, Dane County Circuit Court Judge released 761 pages of records surrounding Gableman's investigation. *Id.* In doing so, he reasoned that everyone should "examine these documents . . . [and] when done, [he or she would] come to the conclusion that this [investigation] has been much to-do about nothing." *Id.*

Vos's challenger in the 2022 Midterms primary, Adam Steen—an outspoken advocate for the position that fraud plagued the 2020 election.[216] Although Vos called Gableman "an embarrassment to [the state of Wisconsin]," he has been less pointed about the financial cost of this investigation; the Milwaukee Journal Sentinel reported the election review cost taxpayers over $1 million.[217] The more significant cost, however, cannot be put into dollar figures, but instead must be measured by the way this investigation unnecessarily fueled the flames of fraud.

Although some evidence indicates that this incendiary messaging may be dwindling,[218] the 2020 election—and efforts to distort Wisconsin's election system—are hardly in the rear-view mirror. As long as issues surrounding the 2020 election continue to be litigated—which is alone completely reasonable if litigants believe the election administration system can or should be bettered—those who desire to distort public trust will continue to receive ammunition for doing so. For example, after the Wisconsin Supreme Court ruled ballot drop-boxes to be unlawful under Wisconsin law, President Trump posted on Truth Social that "Speaker Robin Vos has a decision to make! Does Wisconsin RECLAIM the Electors, turn over the Election to the actual winner (by a lot!), or sit back and do nothing as our Country continues to go to HELL? Brave American Patriots already have a Resolution on the Floor!"[219] Although Trump's rhetoric seems retrospective, its impact will continue to be felt long

216. Molly Beck, *Robin Vos Fires Michael Gableman, Ending a 2020 Election Review That's Cost Taxpayers More than $1 Million and Produced No Evidence of Fraud*, MILWAUKEE J. SENTINEL (Aug. 12, 2022), https://www.jsonline.com/story/news/politics/2022/08/12/robin-vos-fires-michael-gableman-ending-1-million-review-2020-election/10299570002/ [https://perma.cc/VE7S-6SPF]; *see* Molly Beck, *Assembly Speaker Rob Vos' Refusal to Decertify 2020 Election Pushes Donald Trump to Endorse Primary Opponent*, MILWAUKEE J. SENTINEL (Aug. 2, 2022), https://www.jsonline.com/story/news/politics/elections/2022/08/02/donald-trump-endorses-robin-vos-primary-opponent-adam-steen/10200624002/ [https://perma.cc/F7AK-W6E3]; *see also* Adam Rogan, *Racine County's Top Stories of 2022, No. 10 | Trump's Endorsee's Loss in Racine County*, J. TIMES (Dec. 22, 2022), https://journaltimes.com/news/local/govt-and-politics/racine-countys-top-stories-of-2022-no-10-trump-s-endorsees-loss-in-racine-county/article_ef839038-8153-11ed-966b-c795cd2547ca.html [https://perma.cc/XH32-YS8S] ("[Steen] got support from election deniers and opened his campaign in April by claiming the 2020 election was stolen from Trump.").

217. Beck, *Robin Vos Fires Michael Gableman*, *supra* note 216.

218. *See, e.g.*, Matthew DeFour, *Many in Wisconsin Drop Stop the Steal Talk, Play Up Inflation, Crime*, WISCONSIN WATCH (Nov. 2, 2022), https://wisconsinwatch.org/2022/11/many-in-wisconsin-gop-drop-stop-the-steal-talk-play-up-inflation-crime/ [https://perma.cc/69AQ-AYJM].

219. Molly Beck, *Trump Wants Wisconsin Ballot Drop Box Ruling to Apply to Past Elections. It Doesn't Work That Way*, MILWAUKEE J. SENTINEL (July 13, 2022), https://www.jsonline.com/story/news/politics/elections/2022/07/13/trump-uses-wisconsin-court-ruling-drop-boxes-stoke-bogus-claims/10028990002/ [https://perma.cc/MHT7-4EJF].

*MARQUETTE LAW REVIEW* [106:683

into the future.[220] As long as this rhetoric remains engrained in the American body politic, it will continue to undermine confidence in the election system.[221]

## V. THE EFFECTS OF MISCHARACTERIZING THE 2020 ELECTION

Mischaracterizations of the 2020 presidential election have had three downstream effects. First, the stolen election narrative has diminished the public's trust in election outcomes. Second, candidates who support—or acquiesce in—false claims that the 2020 election was fraudulent are increasingly running for public office, including in Wisconsin. Last, this narrative has created an environment not suitable for meaningful election reform.

### A. Public Distrust in Election Outcomes

Since November 2020, public polling consistently shows a significant number of American voters distrust the outcome of the 2020 election.[222] Recently, Marquette University Law School polled national voters and found that 35% of them did not believe the votes for president were accurately counted in the 2020 election.[223] In similar vein, a poll by Monmouth University conveyed that 29% of respondents believed President Biden won because of voter fraud.[224] While distrust in election outcomes is not novel to the 2020 election cycle, the fact that recent election distrust may be part of a longstanding trend should not discount its significance.[225] Also, polling trends across the country reveal a historic partisan gap of trust in election outcomes.[226] What is more, Americans from both parties fear democracy is on the brink of collapse

---

220. *Id.* (quoting Democratic State Sen. Kelda Roys stating that the continued effort by President Trump to delegitimize the election system is about future elections and undermining confidence in the system).

221. *Id.*

222. Justin McCarthy, *Confidence in Election Integrity Hides Deep Partisan Divide*, GALLUP (Nov. 4, 2022), https://news.gallup.com/poll/404675/confidence-election-integrity-hides-deep-partisan-divide.aspx [https://perma.cc/ZJY2-M4JG].

223. Charles Franklin, *Detailed Results of the Marq. L. School Supreme Court Poll November 15–22, 2022*, MARQ. UNIV. L. SCH. POLL, https://law.marquette.edu/poll/wp-content/uploads/2022/12/MLSPSC11Toplines.html [https://perma.cc/3K68-FVAT] (last visited Apr. 4, 2023).

224. Mary Murray, *Poll: 61% of Republicans Still Believe Biden Didn't Win Fair and Square in 2020*, NBC NEWS (Sept. 27, 2022), https://www.nbcnews.com/meet-the-press/meetthepressblog/poll-61-republicans-still-believe-biden-didnt-win-fair-square-2020-rcna49630 [https://perma.cc/5UWK-E5BS].

225. *Id.*; *see* Christopher J. Anderson & Yuliya V. Tverdova., *Winners, Losers, and Attitudes about Government in Contemporary Democracy*, 22 INT'L POL. SCI. REV. 322, 322–25 (2001).

226. *See, e.g.*, McCarthy, *supra* note 222.

DDR-00069401

and that the next presidential election will bring with it political violence.[227] Emulating the national trend, Wisconsin public polling has also shown a stable portion of in-state voters distrusting 2020's results.[228] Table 1 conveys this trend below.

**Table 1**[229]

How confident are you that, here in Wisconsin, the votes for president were accurately cast and counted in the 2020 election?

| Date | Very Confident | Somewhat Confident | Not Too Confident | Not at all Confident |
|---|---|---|---|---|
| 08/03/21 | 48 | 19 | 15 | 16 |
| 10/31/21 | 47 | 18 | 12 | 19 |
| 02/27/22 | 48 | 19 | 11 | 19 |
| 04/24/22 | 48 | 16 | 12 | 23 |
| 06/20/22 | 51 | 16 | 11 | 21 |
| 08/15/22 | 48 | 18 | 15 | 17 |
| 09/11/22 | 46 | 19 | 16 | 18 |
| 10/09/22 | 48 | 15 | 15 | 19 |
| 11/01/22 | 46 | 19 | 14 | 19 |

Public opinion on the accuracy of the 2020 presidential election has divided Wisconsin voters for almost three years. Since August of 2021, voters that are "not too confident" or "not at all confident" have sat between 30–35% of voters.[230] Conversely, roughly 65% of Wisconsin voters have said they are "very confident" or "somewhat confident" in the election result.[231] Unsurprisingly, a closer look at the data reveals that a "partisan gulf has widened."[232] Now, confidence in the accuracy of election results can be drawn

---

227. *See* Mueller, *supra* note 21; *see* Pildes, *supra* note 21, at 102.

228. Charles Franklin, *Detailed Results of the Marq. L. School Poll October 24–Nov. 1, 2022*, MARQ. UNIV. L. SCH. POLL, https://law.marquette.edu/poll/2022/11/02/detailed-results-of-the-marquette-law-school-poll-oct-24-nov-1-2022/ [https://perma.cc/Y7XR-2CHL] (last visited Apr. 4, 2023).

229. This data is from a series of polls conducted by the Marquette University Law School Poll between August 2021 and November 2022. MARQ. UNIV. L. SCH. POLL, https://law.marquette.edu/poll/ [https://perma.cc/99XS-YPF9] (last visited Apr. 4, 2023).

230. *Id.*

231. *Id.* These results—both pertaining to trusting and distrusting voters—mirrors that of national polling on the same topic. Just before the 2022 Midterms, Gallup News reported that roughly 63% of voters were confident the 2022 results would be accurate. *See* McCarthy, *supra* note 222.

232. McCarthy, *supra* note 222.

DDR-00069402

*MARQUETTE LAW REVIEW* [106:683

along a strong partisan divide.[233] Views on the 2020 election by party identification are shown in Table 2.

### Table 2[234]

How confident are you that, here in Wisconsin, the votes for president were accurately cast and counted in the 2020 election?

| Party Affiliation | Very Confident | Somewhat Confident | Not Too Confident | Not at all Confident |
|---|---|---|---|---|
| Republican | 15 | 23 | 25 | 35 |
| Independent | 40 | 41 | 12 | 41 |
| Democrat | 84 | 11 | 2 | 2 |
| Other/None | 29 | 22 | 9 | 26 |
| Total | 48 | 17 | 13 | 19 |

By pooling together the polling waves from 2021 and 2022—and breaking the data down by party identification—one can see that differences in public opinion towards the 2020 election can be explained by whether one is a Republican or one is a Democrat. Since August 2021, roughly 60% of Wisconsin Republican voters have exhibited little confidence in the 2020 election result.[235] Alternatively, a strong percentage of Democrats—95%—trust 2020's results.[236]

This 35% gap between Republicans and Democrats in Wisconsin is similar to the gap between the parties at the national level.[237] Most critically, the gap in confidence represents the largest gap recorded to date, according to Gallup News.[238] And this gap is likely attributable to recent misperceptions about election fraud.[239] Before 2020, national polling trends demonstrated upwards of 70% of Republicans were either "very" or "somewhat" confident election results were accurate.[240] What is more, a recent study conducted by the Center for Election Innovation & Research shows that disbelief about election integrity in 2020—as well as the 2022 midterms—is tied to false claims about election

---

233. *Id.*

234. This data is from a series of polls conducted by the Marquette University Law School Poll between August 2021 and November 2022. MARQ. UNIV. L. SCH. POLL, https://law.marquette.edu/poll/ [https://perma.cc/V94U-YNJR] (last visited Apr. 4, 2023).

235. *Id.*

236. *Id.*

237. McCarthy, *supra* note 222.

238. *Id.*

239. *Id.*

240. *Id.*

DDR-00069403

administration in 2020.[241] For example, nearly half of GOP and Trump supporters believed there was "widespread occurrences of election officials deliberately miscounting votes in" in 2020.[242] Only 25% of independents and 10% of Democrats share this belief.[243] Fittingly, roughly 50% of GOP and Trump supporters believed that election officials would "intentionally" miscount votes in 2022.[244]

As an alternative explanation of these trends, some may point to the fact that the American public has long been skeptical of government institutions—including voting institutions—for several decades.[245] Similarly, substantial research has long argued that an individual's trust in an election's outcome is primarily a function of whether the individual supported the winning or losing candidate.[246] In other words, supporters of a losing candidate often exhibit lower levels of trust in election outcomes, whereas supporters of a winning candidate exhibit higher levels of trust.[247] In light of these positions, one may reasonably conclude there is little novel about the public's distrust in the post-Trump era. Thus, it is fair to ask: is this kind of distrust in our election system different?

Yes—this election distrust differs from these long-standing trends for several reasons.[248] Again, the partisan divide between election trusting Democrats and election distrusting Republicans is at a historical high.

---

241. *Views on Election Integrity in 2020–22: GOP & Trump Voters*, CTR. FOR ELECTION INNOVATION & RSCH., https://electioninnovation.org/research/nov-2021-election-integrity-survey/ [https://perma.cc/6LER-AVPA].

242. *Id.*

243. *Id.*

244. *Id.*

245. *Public Distrust in Government: 1958–2022*, PEW RSCH. CTR. (June 6, 2022), https://www.pewresearch.org/politics/2022/06/06/public-trust-in-government-1958-2022/ [https://perma.cc/ZT9A-HUT7]. *See generally* Charles Stewart, III, *Trust in Elections*, 151 DÆDALUS 260 (2022).

246. Anderson & Tverdova, *supra* note 225; Stephen C. Craig, Michael D. Martinez, Jason Gainous & James G. Kane, *Winners, and Election Context: Voter Responses to the 2000 Presidential Election*, 59 POL. RSCH. Q. 579, 579 (2006) (noting that voters who support losing candidates often show distrust in election outcomes because the system produced an outcome deemed to be undesirable).

247. Anderson & Tverdova, *supra* note 225, at 323.

248. In addition to the examples listed above, evidence also suggests that Republican voters distrusted the outcome of the 2016 election—specifically the popular vote. Because this is an election President Donald Trump won, it does not square with the notion that election distrust is a function of winning or losing. *See* Ariel Malka & Yphtach Lelkes, *In a New Poll, Half of Republicans Say They Would Support Postponing the 2020 Election if Trump Proposed It*, WASH. POST (Aug. 10, 2017), https://www.washingtonpost.com/news/monkey-cage/wp/2017/08/10/in-a-new-poll-half-of-republicans-say-they-would-support-postponing-the-2020-election-if-trump-proposed-it/ [https://perma.cc/KUB6-QJKD].

DDR-00069404

Moreover, whereas distrust in the past may have been grounded in a vague suspicion, distrust today stems from a conviction that those tasked with running elections conspired to deliberately steal the 2020 election.[249] Additionally, voters demonstrating this distrust reportedly tie it directly to President Trump.[250] The extent to which major leaders from one political party continue to drive home lies and misinformation about the 2020 election is unmatched. What is more, this conviction has been met with a historical increase in post-election litigation.[251] Whereas in the past, voters and their party leaders may have moved on from an election outcome unfavorable to them, they now turn to the courts to litigate endlessly.[252] Unfortunately, the advent of such a strong skepticism has given rise to political candidates that exhibit questionable allegiance to democratic norms, including in Wisconsin.[253] And in a similar vein, this moment has created a political landscape unfavorable to meaningful election reform debate.[254] This next Section briefly discusses the implications of Wisconsin candidates who allegedly questioned or denied the results of the 2020 election. Then, I turn to how distrust in elections is fueling unproductive reform debate.

## B. A Growing Number of Political Candidates Who Demonstrate Little Allegiance to Democratic Norms

Mischaracterizations of the 2020 election, coupled with a public growing skeptical to election administration, led to an influx of candidates seeking office in 2022 who claimed the 2020 election was stolen or repeated disproven claims of fraud.[255] Election contests across Wisconsin undoubtedly involved such

---

249. CTR. FOR ELECTION INNOVATION & RSCH., *supra* note 241.

250. MIT Election Data & Science Lab, *Voter Confidence,* MASS. INST. TECH.: ELECTION DATA LAB (Apr. 2, 2021), https://electionlab.mit.edu/research/voter-confidence [https://perma.cc/T6B4-YPGU] (noting that the study found Republicans exhibiting distrust cited Donald Trump as their primary source for believing in a stolen or fraudulent election); Chris Cillizza, *How Believing the Big Lie Has Become Central to Being a Republican,* CNN (Sep. 13, 2021), https://cnn.com/2021/09/13/politics/trump-big-lie-gop-belief/index.html [https://perma.cc/8U2A-S47B].

251. Richard Hasen, *Research Note: Record Election Litigation Rates in the 2020 Election: An Aberration or a Sign of Things to Come?,* 21 ELECTION L. J. 150–54 (2022) ("Election litigation rates in the United States have been soaring, with rates nearly tripling from the period before the 2000 election compared to the post-2000 period.").

252. *Id.*

253. *See infra* Section V.B.

254. *See infra* Section V.C.

255. *See, e.g.,* Adrian Blanco, Daniel Wolfe & Amy Gardner, *Tracking Which 2020 Election Deniers Are Winning, Losing in the Midterms,* WASH. POST (Nov. 7, 2022), https://www.washingtonpost.com/politics/interactive/2022/election-deniers-midterms/

DDR-00069405

candidates.[256] However, it is critical to note that the all-encompassing phrase "election denier" has served as a double-edge sword. On one side, the use of this highly subjective phrase has been unfairly applied.[257] For example, *FiveThrityEight*—a news source that tracked alleged "election deniers" on the ballot in 2022—listed State Representative Glenn Grothman (R-6th District) as one who had "reservations" about the 2020 election.[258] State Representative Grothman, however, explicitly accepted President Joe Biden's victory.[259] More critically, he explicitly condemned his colleagues that sought to use administrative disputes as a precept for overturning the election:

> I ask my Republican friends how they would feel if in 2024, Mike Pompeo were to best Kamala Harris with 275 electoral votes, and a Democratic Congress were to throw out Wisconsin's electoral votes because we have photo I.D. laws or didn't have enough voting machines? We would be apoplectic.[260]

*FiveThirtyEight's* reporting does not capture Representative Grothman's position on the 2020 election and unfairly suggests he is closer to being a proponent of the stolen election narrative than to being a responsible representative who spoke honestly to his constituents. The portrayal of Representative Grothman is just one example, but of the 308 candidates CBS News considered "election deniers,"[261] or of the "more than 370 candidates who cast[ed] doubt in some way on the 2020 election" as reported by the *New York*

---

[https://perma.cc/3G67-VKLW]. The term "election denier" is a highly subjective phrase and its meaning varies considerably depending on who is using the term. For example, the Washington Post appears to define this term as any candidate who denied the legitimacy of the 2020 presidential election. However, the manner or extent to which one denied the legitimacy of an election may vary considerably. For this reason, I argue the term is over-inclusive, and may actually serve to undermine the effort to identify those candidates who truly pose a threat to American democracy.

256. *Id.*

257. *Id.*

258. FiveThirtyEight Staff, *60 Percent of Americans Will Have An Election Denier On the Ballot This Fall*, FIVETHIRTYEIGHT (Nov. 8, 2022), https://projects.fivethirtyeight.com/republicans-trump-election-fraud/ [https://perma.cc/4KWC-2HE2].

259. Rep. Glenn Grothman, *This Week's Events in Washington*, https://grothman.house.gov/news/email/show.aspx?ID=LSLOYL3KQZ7NRK4WLQ3Z6NFBLA [https://perma.cc/RA56-2TXK].

260. *Id.*

261. Joseph Wulfsohn, *CBS News Releases 'Criteria' For How It Defines 'Election Deniers,' Excludes Dems Who've Denied Past Elections*, FOXNEWS (Nov. 3, 2022), https://www.foxnews.com/media/cbs-news-releases-criteria-defines-election-deniers-excludes-dems-whove-denied-past-elections [https://perma.cc/72T6-D59H].

*Times*,[262] it is reasonable to conclude that other candidates were unfairly swept up by this over-inclusive term. This generalization not only fuels the argument of those who seek to downplay the aftermath of the 2020 election, but also reduces the effectiveness of the label when attached to those who truly sought to undermine democracy.

On the other side of the sword rests several favorable consequences of identifying political candidates who seemed to show little commitment to democratic values, such as upholding the integrity of elections or condemning incendiary rhetoric. First, voters deserved—and deserve—to know about the quality of candidates running for positions that influence election administration. Candidates that "proclaim their willingness to refuse to certify election outcomes" based on unfounded claims of fraud should be viewed as unqualified for office, and voters can then cast their votes accordingly.[263] Evidence from the 2022 midterms supports this position, as "[v]oters in a series of critical battleground states rejected Republican candidates for governor, attorney general, and secretary of state who have spread doubts about the 2020 election, blocking an effort to install allies of [President Trump] in positions with sweeping authority over voting."[264] Moreover, identifying those candidates who seek the levers of election power—who may not faithfully execute their administrative duties—keeps the body politic on alert for subversive behavior.[265] Professor Hasen recently posited that pervasive claims of a stolen election have ironically increased the prospect of an *actual* stolen election in the United States.[266] If elected officials who were unwilling to accept the stolen election narrative become replaced by those who would, it is easy to imagine a scenario where some who "seek to justify subverting future election results in response to earlier purported fraud."[267] To remain vigilant in the face of such behavior requires a knowledgeable body politic regarding candidate quality.

Still, it remains too early to tell how sharp these sides of the sword are. Only one election cycle has passed since the 2020 presidential election, and a lot of

---

262. Karen Yourish, Danielle Ivory, Weiyi Cai & Ashley Wu, *See Which 2020 Election Deniers and Skeptics Won and Lost in the Midterms Election*, N.Y. TIMES, (Nov. 10, 2022), https://www.nytimes.com/interactive/2022/11/09/us/politics/election-misinformation-midterms-results.html [https://perma.cc/GW2M-CENL].

263. Pildes, *supra* note 21.

264. Nick Corsaniti, *Election Denial Didn't Play as Well as Republicans Hoped*, N.Y. TIMES (Nov. 9, 2022), https://www.nytimes.com/2022/11/09/us/politics/trump-election-candidates-voting.html [https://perma.cc/9NNZ-9EED].

265. Hasen, *supra* note 2, at 266.

266. *Id.*

267. *Id.*

DDR-00069407

supposed "election denying" candidates lost, with still a noteworthy amount winning.[268] Whether such a label was correct—or whether those labeled deniers will actually try to subvert democracy—remains to be unseen. Future scholarship should examine the implications of such labeling and the extent to which it was correct or, alternatively, unfairly over-inclusive.

## C. Unfavorable Political Landscape for Meaningful Reform

The stolen election narrative has also created a political environment which is unsuitable for meaningful election reform. This is so for two primary reasons. First, the new political reality—marked by pervasive distrust—has birthed a number of reform proposals that would fundamentally affect the way elections are administered in Wisconsin. Specifically, political leaders in Wisconsin have recently pushed for partisan control over the administration of elections. Surely, partisan answers to a growing partisan issue will not return the state—or country—to a rational political harbor.[269] Second, the stolen election narrative has polarized the debate to an extent we have not seen before. At one end of the spectrum, opponents of the fraud narrative routinely reject any reform ideas, regardless of whether the reform is meaningful or not. In other words, many reasonable voters have become suspect to reasonable reform proposals. At the other end of the spectrum, many proponents of the 2020 election narrative press for reform ideas that are merely consistent with this narrative, irrespective of the value the reform would yield.

### i. Ideas to Increase Partisan Control of the Election System in Wisconsin

In the wake of the 2020 election, many Wisconsin politicians have suggested abolishing WEC and replacing it with a more partisan system.[270] In this past gubernatorial election, candidate Tim Michels called for dismantling

---

268. *See, e.g.*, Yourish, Ivory, Cai & Wu, *supra* note 262.

269. Molly Beck, *Wisconsin Republicans Overhauled Elections Oversight 5 Years Ago. Now They're Pushing To Do it Again*, MILWAUKEE J. SENTINEL (Dec. 3, 2021), https://www.jsonline.com/story/news/politics/elections/2021/12/03/wisconsin-republicans-primed-2nd-overhaul-elections-5-years/6184481001/ [https://perma.cc/3M83-MNTU]. Milwaukee County Circuit Court Judge John Franke observed that "[t]he notion that because you don't agree with what the agency has done, the Legislature should jump in and address these problems of process and problems and procedure after they've happened—it just isn't going to work. It's a recipe for disaster—the ultimate partisanship." *Id.*

270. Molly Beck, *GOP Candidates For Governor Want Wisconsin Election Oversight Duties Under Partisan Offices Of AG, Secretary Of State*, MILWAUKEE J. SENTINEL (Feb. 14, 2022), https://www.jsonline.com/story/news/politics/elections/2022/02/14/gop-governor-candidates-want-election-oversight-partisan-offices/6783557001/ [https://perma.cc/NSE6-G99R] ("Republican candidates for governor who want to dissolve the bipartisan Wisconsin Elections Commission are proposing new plans to shift election oversight to partisan elected offices.").

DDR-00069408

the commission and replacing it with a new board comprised of members appointed from each of Wisconsin's eight congressional districts.[271] With a strong GOP majority in Wisconsin's House districts, the proposal would have likely resulted in significant partisan influence over the election administration process.[272] In similar vein, Senator Ron Johnson proposed passing the power to administer elections from WEC to the state legislature.[273]

What is more, for the past two years, state GOP lawmakers have been pushing various bills that would effectively give their party more power over elections.[274] For example, Rep. Timothy Ramthun (R-Campbellsport) proposed a bill that would grant partisan officials the ability to declare an election fraudulent and order a new election within thirty days.[275] Most recently, a host of bills sought to give the state legislature—which is controlled by a strong Republican majority—new power to block WEC policies and guidance.[276] One of the bills would have required WEC guidance documents to be presented to the legislature on a "weekly basis."[277] In turn, the legislature would have held the ability to reject the guidance, thus effectively giving a one-party dominated legislature unfettered power over election policies in Wisconsin.[278]

Although Wisconsin has not seen any partisan reform proposals signed into law, several states have.[279] Many of these proposals should serve as warning signs for Wisconsin, not guideposts. In 2022 alone, roughly 638 election laws

---

271. Molly Beck, *Governor Candidate Tim Michels Proposes New 'WEC 2.0' Elections Board With Members From Congressional Districts*, MILWAUKEE J. SENTINEL (July 27, 2022), https://www.jsonline.com/story/news/politics/elections/2022/07/27/wisconsin-governor-candidate-tim-michels-proposes-new-elections-board/10162452002/ [https://perma.cc/TBL3-RSZ6].

272. *Id.*

273. Patrick Marley & Bill Glauber, *Ron Johnson Calls For Having Republican Lawmakers Take Over Federal Elections In Wisconsin*, MILWAUKEE J. SENTINEL (Nov. 10, 2021), https://www.jsonline.com/story/news/politics/elections/2021/11/10/ron-johnson-calls-gop-wisconsin-lawmakers-take-over-elections/6376079001/ [https://perma.cc/9LDH-766A].

274. Scott Bauer, *Wisconsin Governor Vetoes Republican Election Bills*, AP NEWS (Apr. 8, 2022), https://apnews.com/article/2022-midterm-elections-biden-steve-bannon-legislature-elections-d70584f7c2a038cc83ee3c3d706ee8d0 [https://perma.cc/FK9T-22GJ].

275. JT Cestkowski, *'Completely Bonkers': Republican Wants to Let Partisan Officials Nullify Elections*, UP N. NEWS (Jan. 7, 2022), https://upnorthnewswi.com/2022/01/07/ramthun-wants-to-let-partisan-officials-nullify-elections/ [https://perma.cc/H49S-3VXX].

276. Shawn Johnson, *Gov. Tony Evers Vetoed These Bills. They Could Be Reconsidered If Tim Michels Is Elected Governor*, WPR (Oct. 18, 2022), https://www.wpr.org/gov-tony-evers-vetoed-these-bills-they-could-be-reconsidered-if-tim-michels-elected-governor [https://perma.cc/QU7U-SBTP].

277. S.B. 943, 2021 Leg., 105th Sess. (Wis. 2021).

278. *Id.*

279. BRENNAN CTR. FOR JUST., supra note 27.

DDR-00069409

were introduced in state legislatures across the county.[280] Of these, lawmakers in twenty-seven states considered over 150 "election interference bills," with seven states enacting twelve of them.[281] The Brennan Center for Justice defines election interference bills as legislation which either "opens the door to partisan interference in elections," or criminally "threatens the people and processes that make elections work." For example, Georgia passed a law that permits Georgia's partisan State Election Board[282] to replace certain county election boards with a single "superintendent" after conducting a performance review, increasing the likelihood that partisan pressure could pervert the decision to certify an election result.[283] The superintendent would then assume an election administrative role in deciding what votes to count, which to reject, and ultimately whether to certify an election.[284] Consolidating such expansive power into one person—especially a person picked pursuant to a state election board dominated by one party—will not increase trust in the process. Instead, these types of reform efforts, coupled with the emergence of political leaders who discredit legitimately conducted elections, gives rise to legitimate concerns with respect to how elections will be administered in the future.[285]

Although Wisconsin re-elected Governor Tony Evers—a Democrat who will likely reject most, if not all, election-related bills—the trend of the moment is to suggest partisan answers to a growing partisan issue. Again, partisan proposals are not conducive to creating meaningful election reform, especially if the aim is to increase voter confidence in election outcomes. As we know, a significant portion of Wisconsin voters are skeptical of the state's election system. But answers grounded in partisanship will only shift skepticism onto a different portion of the electorate. Ideas to increase partisan control of the election system are not only a waste of valuable political time and resources, but they are also counter-productive to the aim of the moment. Proposals grounded in partisanship are detrimental to a healthy political environment.

---

280. *Id.*

281. *Id.*

282. Mark Niesse, *Prospect Of Georgia Election Takeover Fuels Concerns About Vote Integrity*, ATLANTA J.-CONST. (Dec. 23, 2021), https://www.ajc.com/politics/prospect-of-georgia-election-takeover-fuels-concerns-about-vote-integrity/CFMTLFW6TZFH7O4LLNDZ3BY4NE/ [https://perma.cc/4P24-BCXJ].

283. *Id.* ("The first step toward a state takeover is already underway in Fulton, the state's largest source of Democratic Party votes, where a performance review panel has been investigating the county's election management. Fulton has a history of long lines, lost absentee ballots applications, mismanagement, and slow results.").

284. *Id.*

285. Hasen, *supra* note 2, at 266.

DDR-00069410

ii. A Polarized Debate

Efforts to delegitimize the election system have caused reasonable opponents of the fraud narrative to become suspect to reasonable election reform proposals. In practice, this has caused Governor Tony Evers to veto outright any election bills put on his desk, some of which included legitimate proposals to enhance voter confidence and to better Wisconsin's election system.

Since January 2021, Governor Evers has vetoed roughly 20 election related bills.[286] While some of these proposals were undoubtedly worthy of rejection—such as partisan solutions discussed above—some were not. For instance, one bill, if enacted, addressed deficiencies in voting at nursing homes, "a point of contention" that election officials agree needs updating.[287] And one bill merely codified a measure the bipartisan WEC took "unanimously" in 2020—the banning of automatic mailing of absentee ballot applications.[288] It is difficult to believe that the Governor and his supporters would not have approached these bills differently had they been divorced from the election fraud narrative. One of the lasting impacts of baseless claims of fraud has been to create a political landscape that forces even meaningful election ideas to be met with skeptical eye.

Not only has Governor Evers rejected outright all election bills proposed by Republicans, but he has also mischaracterized a host of them as a general efforts to restrict voting rights.[289] In order to successfully combat efforts to delegitimize the election system, opponents to the Big Lie must also be careful not to mischaracterize certain proposals. When political leaders equate all election reform proposals to an effort to disenfranchise voters or please President Trump's narrative, election deniers are given more ammunition to paint Democrats as wanting to maintain an election system prone to fraud.[290]

---

286. Johnson, *supra* note 276.

287. *Id.*; Matthew DeFour, Matt Mencarini & Jacob Resneck, *In Search For Ineligible Wisconsin Voters, Activists Uncover Gaps—But No Plot*, PBS Wis. (Oct. 12, 2022), https://pbswisconsin.org/news-item/in-search-for-ineligible-wisconsin-voters-activists-uncover-gaps-but-no-plot/ [https://perma.cc/G333-CXVX] ("A Wisconsin Watch investigation has found a yet-to-be-determined number of Wisconsinites whom a court has deemed incompetent to vote are still listed as active voters—and actually cast ballots in past elections.").

288. Bauer, *supra* note 274.

289. Lauren Dezenski, *This Governor Had Some Harsh Words for Those Who Continue to Question the 2020 Election Result*, CNN (Aug. 10, 2021), https://cnn.com/2021/08/10/politics/tony-evers-wisconsin-2020-election-audits/index.html [https://perma.cc/2TNF-AJKE].

290. Laurel White, *Gov. Tony Evers Vetoes 6 GOP-Backed Election Bills*, Wis. Pub. Radio (Aug. 10, 2021), https://www.wpr.org/gov-tony-evers-vetoes-6-gop-backed-election-bills [https://perma.cc/X6XX-LV4V] (" 'I am frustrated but not surprised Governor Evers ignored lessons

DDR-00069411

At the other end of the polarized reform spectrum, many proponents of the 2020 fraud narrative press forward reform ideas simply because they are consistent with the narrative, irrespective of the value reform would yield. For example, some who argued the 2020 election was riddled with fraud often point to WEC authorizing local election clerks to "cure" absentee ballots that omitted certain witness information.[291] Wis. Stat. § 6.87 provides that if a municipal clerk receives an absentee ballot with an improper witness certificate, the clerk may return the ballot to the voter if time permits the voter to correct the defect.[292] Prior to the 2016 presidential election, Republicans suggested—and WEC unanimously agreed—WEC should authorize local clerks to cure absentee ballot certificates with omitted information if clerks could "reasonably discern" the missing information.[293] Although this guidance was in place prior to the presidential election in 2016, neither the Trump nor the Clinton Campaign challenged it. Instead, challenges to this guidance did not begin until after President Trump claimed the election was rigged in Wisconsin.[294]

Immediately after the 2020 election, many "latched" onto the question of whether or not WEC issued legal guidance, and it quickly became a part of the president's efforts to overturn Wisconsin's presidential results.[295] A year after the 2020 election, the Wisconsin Legislative Audit Bureau conducted a review on a 15,000-size absentee ballot sample from twenty-nine municipalities in Wisconsin.[296] Of this sample, the Bureau concluded that only sixty-six ballots—or 0.4%—were corrected by clerks pursuant to WEC's 2016 guidance.[297]

---

we learned from 2020 to play to his base,' [Sen. Duey Stroebel (R-Saukville)] said. 'It is now crystal clear to all Wisconsinites who want to pursue common sense election integrity measures and who does not.' ").

291. Haley BeMiller, *Fact Check: Wisconsin Clerks Followed Guidance In Place Since 2016 About Witnesses And Absentee Ballots*, USA TODAY (Nov. 11, 2022), https://www.usatoday.com/story/news/factcheck/2020/11/11/fact-check-wisc-clerks-followed-2016-guidance-absentee-ballots/6253055002/ [https://perma.cc/QM83-FPUK].

292. *See* White v. Wis. Elections Comm'n, No. 22CV1008, ¶¶ 5–7 (Wis. Cir. Ct. Waukesha Cnty. Sept. 7, 2022) (citing WIS. STAT. § 6.87 (2019–2020)).

293. BeMiller, *supra* note 291 ("[T]his policy has been in place since 2016 without objection, [and] was brought forth by Republicans and unanimously passed by a nonpartisan commission.").

294. Scott Bauer, *Wisconsin Judge Refuses to Suspend Ballot Ruling*, AP NEWS (Sept. 13, 2022), https://apnews.com/article/2022-midterm-elections-wisconsin-voting-supreme-court-28666f5631db0f9540b45e3b7c221224 [https://perma.cc/KD3R-8RQ7].

295. BeMiller, *supra* note 291.

296. *See* LEGIS. AUDIT BUREAU, *supra* note 113.

297. *Id.* at 43.

In July 2022, Republican lawmakers voted to eliminate the curing practice, but WEC refused to withdraw its guidance.[298] As a result, the legislature backed a lawsuit filed in September 2022, in which a Waukesha County Circuit Court judge ruled that Wisconsin law did not permit clerks to fill in missing information.[299] Instead of challenging the ruling, WEC withdrew its 2016 guidance.[300] Absentee ballot curing is not currently permitted in Wisconsin.

Given these facts, it is fair to conclude the fight over absentee ballot curing was never about genuine election reform, but was more about feeding the narrative that 2020 threatened election integrity. Again, the practice of curing absentee ballots stemmed from strong bipartisan support. Clerks had been curing ballots in over ten statewide elections prior to post-election challenges. Although marginal at best, this practice likely benefited voters from all parties. Absent the need to feed the Big Lie's narrative, time and energy could have been spent reviving trust in elections through more useful means.

## VI. SOLUTIONS

### A. Addressing the Incendiary Rhetoric

It is undeniable that there is a need to restore faith in democratic outcomes and to address the onslaught of anti-democratic behavior in the United States. As this Comment posited, traditional, legal-based remedies are an important part of the solution; however, they are not the entire solution.[301] Given the pervasive distrust that now exists in American democracy, even the best election system will not withstand future attempts to sow doubt in electoral outcomes. A car dealership may have a brand new, top-of-the-line automotive, with innovative steering capabilities, quick acceleration, and world-class brakes, but if the mechanics tasked with caring for the vehicle publicly undermine the safety of it, no one will buy it. So, while it is critical to debate, study, and understand how traditional approaches to bettering the election system might serve the moment, more must be done to address the underlying cause of the distrust that now plagues American democratic institutions: incendiary rhetoric aimed at intentional undermining trust in the process. Until

---

298. *Wisconsin Elections Commission Proceeds With Absentee Rule*, AP NEWS (Feb. 1, 2022), https://apnews.com/article/elections-wisconsin-legislature-local-elections-fa007a5fc11963c31eb0e98045b2ade2 [https://perma.cc/9G9B-D5YZ].

299. Scott Bauer, *Wisconsin Judge Sides With GOP in Absentee Ballot Fight*, AP NEWS (Sept. 7, 2022), https://apnews.com/article/2022-midterm-elections-wisconsin-lawsuits-voting-absentee-22ce95ea6172fa6e9a085dd5ca5fdacf [https://perma.cc/D6LY-R6VU].

300. Bauer, *supra* note 294.

301. *See* Hasen, *supra* note 2, at 266.

American democracy corrects the presence of the rhetoric, this distrust is here to stay.

One suggestion, albeit an unlikely one, is for all political leaders to forcefully condemn any rhetoric that over politicizes or mischaracterizes election outcomes. To his credit, Republican Congressman Michael Gallagher (R-8th District) continues to urge his colleagues to not oppose the 2020 election, calling it a "constitutional nihilism."[302] State Senator Kathleen Bernier (R-Chippewa Falls) characterized the ongoing attempts to undermine the 2020 election as a "charade."[303] Most noteworthy is Representative Liz Cheney from Wyoming. Helping to lead the fight against mischaracterizations of the 2020 election, Representative Cheney has called on her colleagues to consider the fundamental question of what is right and what is wrong here: "All of us as elected officials must do our duty to prevent the dismantling of the rule of law."[304] While a step in the right direction, these statements need to be made by more leaders with a focus on pursuing a strong rebuke against election misinformation.

Moreover, Wisconsin state lawmakers, specifically the Joint Legislative Audit Committee, should explore proposals that would require the Audit Bureau—or some non-partisan agency—to issue periodic reports addressing any material allegations of voter fraud or irregularities.[305] The Audit Bureau already supports the state legislature in its oversight of important state operations. This official response—aimed at clarifying inaccurate assessments of the law—could be limited to formal accusations made in court, submitted to the WEC, or any statements suggested by "high-ranking" government officials or officials running for office. Both parties have blamed the other for misleading the public about elections.[306] What is more, both parties routinely call for reform predicated on the need to restore trust in the election process.[307]

---

302. Craig Gilbert, *Enjoy Your Battleground Status, Wisconsin, Because Political History Suggests It Won't Last Forever*, Milwaukee J. Sentinel (Oct. 18, 2021), https://www.jsonline.com/story/news/politics/analysis/2020/08/10/wisconsins-fierce-political-split-unprecedented-and-may-not-last/3326757001/ [https://perma.cc/DH5G-74T3].

303. Brenda Wintrode & Jim Malewitz, *"This is a Charade": GOP Senator, Voting Experts Urge Wisconsin Republicans to Halt Election Attacks*, Wisconsin Watch (Dec. 13, 2021), https://wisconsinwatch.org/2021/12/gop-senator-voting-experts-urge-wisconsin-republicans-to-halt-election-attacks/ [https://perma.cc/57HU-VEZD].

304. Greg Sargant, Opinion, *Liz Cheney's Sharp Rebuke of The GOP Highlights A Big And Terrible Truth*, Wash. Post (Oct. 20, 2021), https://www.washingtonpost.com/opinions/2021/10/20/liz-cheney-jan-6-bannon-subpoena/ [https://perma.cc/8THS-47T9].

305. *See* Richard Hasen, Cheap Speech 77–135 (2022). This suggestion is in line with Richard Hasen's call for new rules countering disinformation about elections.

306. Balz, *supra* note 38.

307. *See* Brennan Ctr. for Just., *supra* note 27.

In the wake of an election era marked by routine allegations of fraud, calling on an agency to dispel these allegations or move forward with further investigation would provide a consistent check and balance on a highly politicized topic.

Recently, Democratic Governor Inslee of the State of Washington proposed legislation that would make it a "gross misdemeanor" for election officials to "spread lies about election."[308] While the governor is right there exists a real danger to the country's through election lies, legislative solutions that criminalize conduct surrounding the election would raise constitutional issues and merely politicize the issue further.[309] As Washington State Representative Drew Stokesbary (R-Auburn) stated, "Threatening to jail people for political speech is as dangerous to our democracy as questioning election results."[310] Although political leaders on one side may be employing dirty tactics—such as misleading the public with false statements about election fraud—leaders on the opposite side of such a tactic must remain vigilant. While it is important to recognize good ideas, it is equally important—if not more important—to recognize bad ones.[311]

As American democracy continues to confront itself with the consequential effects of the 2020 election and its aftermath, future literature must explore and propose solutions aimed at addressing the incendiary rhetoric surrounding elections. The scholarship must look beyond the traditional, legal-based approach at combating electoral illegitimacy and instead focus more on offering practical solutions for combating the prevalence of political leaders who intend to sow doubt about electoral outcomes. It is critical to appreciate the prevalence of this rhetoric, and the effects it has had on the American body politic.

### B. Clarifying the Statutes that Gave Rise to Post-Election Litigation in 2020

Beyond the need to correct the prevalence of divisive rhetoric surrounding elections, there is still value in addressing areas of election which gave rise to post-election disputes in 2020. In this era of extreme angst towards the electoral

---

308. Joseph O'Sullivan & Jim Brunner, *Inslee Will Support Bill To Make Lying By Elected Officials, Candidates About Election Results Punishable By Law*, SEATTLE TIMES (Jan 6, 2022), https://www.seattletimes.com/seattle-news/politics/gov-jay-inslee-to-support-bill-to-make-lies-by-elected-officials-candidates-about-election-results-a-gross-misdemeanor/ [https://perma.cc/F6RH-6TUW].

309. *Id.* For more information on correcting political rhetoric in light of looming constitutional concerns, see HASEN, *supra* note 305, at 77–135 (2022).

310. *Id.*

311. For a more comprehensive analysis of how the political process—as well as individual voters—can help solve the problem of election integrity, see HASEN, *supra* note 42, at 25–33.

DDR-00069415

process, it is critical to have precise election laws and an election system which functions efficiently.

The Wisconsin State Legislature must clarify the statutes that gave rise to election litigation in 2020.[312] For example, it could start by resolving unclear statutes that relate to the curing of absentee ballots. Such clarification serves as a logical first step with election-related litigation on the rise in America[313] and because there has been a significant increase in voting by mail—the basis for recent election disputes in Wisconsin.[314]

Legal challenges to election concerns and outcomes have increased significantly over the last decade.[315] Before the 2020 election, election-related litigation has more grown to an average of roughly two hundred and seventy-six cases per year.[316] Although COVID-19 played a role, over three hundred election-related lawsuits had been filed before November 3, 2020.[317] As already discussed, Wisconsin itself experienced numerous lawsuits contesting the election process.[318] Additionally, municipal clerks across Wisconsin received and processed nearly 2 million absentee ballot requests, a figure higher than ever before.[319] If the norm is now for voters to mail in ballots and for losers of elections to drag the winners into court, clarifying known uncertainties is a logical starting point.

Upon request by the Joint Legislative Audit Committee, the non-partisan Audit Bureau completed an audit of the 2020 Wisconsin election and put forth thirty recommendations for improvements.[320] The report highlights all the

---

312. Exactly how the legislature should clarify these laws is beyond the scope of this Comment. Although it would be ideal for the legislature to resolve the issues by striking a balance between voting accessibility and election integrity, the contention here is that *any* clarification is a step in the right direction. If elections continue towards a trend of being utilized as a political prop, decreasing the number of uncertainties in the law that might give rise to challenges is a logical remedy.

313. Richard L. Hasen, *The 2016 Voting Wars: From Bad to Worse*, 26 WM. & MARY BILL RTS. J. 629, 630 (2018).

314. *Wisconsin Elections Commission Released Nov. 2020 Election Data*, CBS 58 (Jan. 29, 2021), https://www.cbs58.com/news/wisconsin-elections-commission-releases-election-data [https://perma.cc/ZM6X-MQEM].

315. Hasen, *supra* note 251.

316. *Id.*

317. *Hundreds of Election-Linked Lawsuits Pile Up As Americas Navigate Voting Rules During Pandemic*, CBS NEWS (Oct. 16, 2020), https://www.cbsnews.com/news/election-voting-lawsuits-coronavirus-pandemic/ [https://perma.cc/D9NU-CGK9].

318. *See* Joshua Perry & William Tong, *Protecting Voting Rights after 2020: How State Legislatures Should Respond to Restrictive New Trends in Election Jurisprudence*, 53 CONN. L. REV. ONLINE, no. 2, 2021, at 1; *see also* Trump v. Biden, 2020 WI 91, 394 Wis. 2d 629, 951 N.W.2d 568, *cert. denied*, 141 S. Ct. 1387 (2021).

319. CBS 58, *supra* note 314.

320. LEGIS. AUDIT BUREAU, *supra* note 113.

major concerns from 2020, including absentee ballot statutes. However, Republicans in the state legislature indicated their plan to wait for the release of Justice Gableman's report before crafting legislative reform—a report ultimately criticized for being motivated by partisanship. Certainly, solutions stemming from a controversial audit report of a controversial election will not restore the state to a place of political civility. If the goal is to restore voter confidence, following the guidance from the nonpartisan Audit Bureau—at least as a starting point—is both logically and politically sound. That said, Governor Evers must confront election related bills without skepticism. Not all efforts to address legitimate concerns in election administration are efforts to impair access to the ballot box.

### C. Clarifying How and When the WEC Must Promulgate Rules Through Chapter 227

The Audit Bureau's report does, however, fail to address one critical issue that the state legislature must consider. Throughout the report, the Audit Bureau suggests that if the WEC believes its interpretation of the law is correct—for example, if the WEC believes municipal clerks are permitted under Wisconsin law to cure ballots, it should "promulgate [applicable] administrative rules" through Chapter 227.[321] Because these rules are given the weight of law, they would be less susceptible to meritorious post-election challenges. However, this solution is not as simple as it reads. Due to the bi-partisan structure of the WEC, and thus its grid-lock, it is infeasible for this agency to follow the administrative rulemaking process. As discussed above, much of the post-election litigation in Wisconsin stemmed from arguments that the WEC utilized the wrong process when passing election rules. To better avoid these challenges and thus decrease the chance of post-election challenges, this Comment puts forth two recommendations aimed at easing the grid-lock. First as a threshold matter, the state legislature must re-design WEC by adding two retired state judges to its structure. Second, it must clarify what election issues require a Chapter 227 rule, or alternatively, when issuing guidance documents will suffice. If adopted, these recommendations would alleviate political gridlock and clarify the situations for when WEC should pass rules under Chapter 227.

WEC is comprised of six commissioners all appointed by elected officials from both political parties.[322] The make-up is three commissioners appointed by Republicans officials and three commissioners appointed by Democrats.[323]

---

321. *Id.* at 93.

322. WIS. STAT. § 15.61(1)(a) (2021–2022).

323. WIS. ELECTIONS COMM'N, https://elections.wi.gov/about-wec/members-and-administrator [https://perma.cc/FEB4-CB86].

DDR-00069417

Although nothing about the statutory language suggests the commission be partisan, the members approach election issues through a partisan lens.[324] As a result, the commission has deadlocked along party lines on key administrative issues—Wis. Stat. § 5.05(1e) states that administrative action by WEC requires at least two-thirds of its members.[325] Leading up to the 2020 election, the commission found itself gridlocked thirty-two times on key issues such as ballots with unclear postmarking dates.[326] Prior to 2022, the commission tied three to three in a series of votes on how to update its current drop-box guidance.[327] As Wisconsin experienced in 2020, unclear and legally suspect guidance encourages post-election litigation. In turn, this fosters an environment for questioning election results. Evidently, it is unsurprising WEC does not routinely promulgate rules under Chapter 227, an already daunting process without the added strain of partisan politics.[328] Under procedure, the administrative rulemaking process in Wisconsin consists of six stages, each requiring input from various governmental actors such as the governor, both chambers of the state legislature, and the Legislative Reference Bureau.[329] The Wisconsin State Legislature website estimates the process to take seven-and-a-half to thirteen months.[330] To avoid this gridlock, increase the likelihood that the commission will promulgate administrative rules—which would hold the weight of law—and ultimately decrease the prospect for post-election litigation, the state legislature must alter the make-up of the commission.

Although ideally the legislature would replace the current structure with a nonpartisan one, this legislature is unlikely to do so.[331] However, the legislature must consider adding two individuals who are less likely to engage in partisanship:[332] retired judges who formerly served in Wisconsin state court.

---

324. Vanessa Swales, *Partisan Gridlock at Wisconsin Elections Commission Frustrates Voters, Local Officials*, WIS. WATCH (Oct. 26, 2020), https://wisconsinwatch.org/2020/10/wisconsin-elections-commission-gridlock-frustrates-voters-officials/ [https://perma.cc/CY3K-LY7U] (noting that commission members openly admitted to coordinating votes on certain issues with members of their appointing party).

325. *Id.; see also* WIS. STAT. § 5.05(1e) (2021–2022).

326. Michell Schmidt, *Split Votes on Wisconsin Elections Commission Spiked During Contentious 2020 Election*, MADISON (Nov. 22, 2021), https://madison.com/news/local/govt-and-politics/split-votes-on-wisconsin-elections-commission-spiked-during-contentious-2020-election/article_ba07c759-f98c-5999-974f-b3aca19c65e4.html [https://perma.cc/HK7L-KBNU].

327. *Id.*

328. WIS. STATE LEGIS., supra note 124.

329. *Id.*

330. *Id.*

331. *See* Swales, *supra* note 324.

332. *Id.* (noting that retired judges who once administered Wisconsin elections had a deliberate intention to avoid political gridlock.).

Fortunately, such a structure is not foreign to Wisconsin law: the state already has an agency with a similar structure and, most critically, nonpartisan judges used to administer Wisconsin's election laws.[333]

The Wisconsin Ethics Commission is comprised of four members appointed by elected officials.[334] However, Wis. Stat. § 15.62(1)(a)5 requires that the commission also seats two retired state judges.[335] The statute reads:

> Two individuals who formerly served as judges for a court of record in this state, who were elected to the positions in which they served, and who are nominated by the governor, and with the advice and consent of a majority of the members of the senate confirmed. The legislative leadership of the 2 major political parties that received the largest number of votes for president shall prepare a list of 3 individuals such that each major political party has prepared one list. The governor shall choose one nominee from each list.[336]

This language could serve as the model for the needed modification to the WEC. More important, however, is that judges already have a positive track record for avoiding deadlock in administering Wisconsin's elections.[337]

From 2008 to 2016, the GAB administered elections in Wisconsin.[338] The agency comprised six retired state court judges who "appeared to [hold] a conscious effort among commissioners to reach a consensus on votes."[339] Notably, the GAB rarely deadlocked during its tenure.[340] Evidently, adding two retired judges to the WEC could mitigate partisan deadlock—something which is now becoming inherent to the commission.[341]

Without a partisan divide, it is reasonable to conclude WEC would likely promulgate more rules via Chapter 227. In doing so, it would be creating law

---

333. *Id.*; *see also* WIS. STAT. § 15.62 (2021–2022).

334. WIS. STAT. § 15.62 (2021–2022).

335. *Id.* § 15.62(1)(a)5 (2021–2022).

336. *Id.*

337. Swales, *supra* note 324.

338. *Id.*

339. *Id.*

340. *Id.*

341. *Id.* ("In its first 3½ years, the commission split 3-3 on official decisions only twice. But starting in December 2019 through the end of 2020, it recorded 32 split votes, according to a Wisconsin State Journal analysis of meeting minutes from the last five years. In the commission's first 42 months after it replaced the former nonpartisan Government Accountability Board in May 2016, there were only seven out of 277 motions, or 2.5%, that failed, including the two splits. In the 13 months after that covering the 2020 election, there were 65 out of 223 motions that failed, or 29%, half of them because of a 3-3 tie.").

that would be less susceptible to post-election challenges.[342] Additionally, such a structure would insulate the system from partisan influence, something that could be important in the coming years: since the 2020 election, a significant number of election officials have quit their positions.[343] Most startingly, those who endorse false claims of fraud from the 2020 election are seeking these positions.[344] As this Comment has posited, partisan solutions—specifically partisan solutions predicated on unfounded claims of election fraud—will only sow further distrust in election outcomes. Retired judges, who are seemingly less likely to have any allegiance to partisan politics, can provide the necessary insulation from partisan tactics aimed at discrediting election results.

However, alleviating partisan gridlock is only part of the solution. As it stands now, the statutory language is vague on when the WEC ought to implement Wisconsin's election laws through Chapter 227, or if guidance documents will suffice.[345] Besides a few specific instances, WEC is not given this direction.[346] Instead, Wis. Stat. § 5.93 generally states that the commission "shall promulgate reasonable rules for the administration of this subchapter."[347] If this were the only mechanism for executing the rules for administering elections in Wisconsin, then there would be no issue. However, as discussed, the legislature also gives WEC the option to execute rules for administering elections through written guidance documents—such as the memoranda issued in the spring of 2020.[348] Given the political sensitivity of some issues which WEC is forced to address—such as ballot drop-boxes—the legislature must spell out which issues require promulgation through Chapter 227. This mandate, instead of leaving the decision up to the politically gridlocked WEC, would result in more formal law being promulgated by the WEC. And as Justice Bradley insinuated in *Trump v. Biden*, administrative rules—as opposed to

---

342.  Trump v. Biden, 2020 WI 91, ¶ 85, 394 Wis. 2d 629, 670, 951 N.W.2d 568, 589 (Bradley J., dissenting) ("Guidance documents "impose no obligations, set no standards, and bind no one." Functionally, and as a matter of law, they are entirely inert."), *cert. denied*, 141 S. Ct. 1387 (2021). As stressed throughout this Comment, guidance documents are the alternative to promulgating a rule through Chapter 227.

343.  Anthony Izaguirre, *Exodus of Election Officials Raises Concerns of Partisanship*, AP NEWS (June 13, 2021), https://apnews.com/article/election-officials-retire-trump-2020-threats-misinformation-3b810d8b3b3adee2ca409689788b863f [https://perma.cc/X474-L6UE].

344.  *Id.*

345.  *See supra* Section VI.B. (discussing the two primary means for the WEC to administer election rules in Wisconsin).

346.  *See* WIS. STAT. § 7.08(1)(d) (2021–2022) ("Promulgate rules for the administration of the statutory requirements for voting machines and electronic voting systems and any other voting apparatus which may be introduced in this state for use at elections.").

347.  WIS. STAT. § 5.93 (2021–2022).

348.  WIS. STAT. § 227.01(3m)(a) (2021–2022).

guidance documents—do provide mandatory authority for implementing Wisconsin's election laws.[349] Stronger authority could mean less post-election litigation which, in turn, means less ammunition for political leaders seeking to mischaracterize administrative concerns.

## VII. CONCLUSION

On November 3, 2020, local county and municipal clerks processed a record turnout of ballots, under a complex variety of state and local procedures.[350] This was done using new voting technologies, adding non-traditional voting methods, and within the context of a global pandemic.[351] Needless to say, it was more than reasonable to expect mistakes and debates about those mistakes. That the election, from an administrative standpoint, went as smoothly as it did is something to celebrate, not vilify. But, as discussed, this last election is emblematic of a larger issue at hand: There exists a growing divide between perceptions of stolen elections and the reality surrounding meaningful disputes about election administration. Unfortunately, Wisconsin has found itself at the center of this debate. It may be so that elections have been a messier business than many have wanted to acknowledge.[352] One need not look hard to find administrative concerns in any election.

---

349. Trump v. Biden, 2020 WI 91, ¶ 85, 394 Wis. 2d 629, 670, 951 N.W.2d 568, 589 (Bradley J., dissenting), *cert. denied*, 141 S. Ct. 1387 (2021).

350. Kristen Barbaresi, *Record-Shattering Number of Absentee Ballots Cast in Milwaukee*, CBS NEWS 58 (Nov. 3, 2020), https://www.cbs58.com/news/milwaukee-election-commission-aims-to-provide-full-transparency-on-election-day [https://perma.cc/HT6F-WQFQ].

351. *See id.*

352. *See* Beck, *supra* note 216.

DDR-00069421

However, the problem is no longer how election administrators should deal with these disputed issues. Rather, it is how to respond to a body politic conditioned to distrust any unfavorable election result. Therefore, solutions must focus more on the incendiary rhetoric driving this distrust. If Wisconsin—and the country at large—is going to find suitable solutions to resolve its eroding trust in voting institutions, it will not be because of partisanship, but rather in spite of it.

JOE FRANKE*

*J.D. 2023, Marquette University Law School, B.A. 2019, John Carroll University. Thank you to the entire staff at the *Marquette Law Review* for their hard work in preparing this Comment for publication. Specifically, I extend a special thank you to both Matt Kass, Editor in Chief, and Jacob Dalton, Managing Editor, for the considerable time and effort they dedicated to ensuring I made it to the finish line. I would also like to express my appreciation to my grandfather, Harry F. Franke, who built a career around encouraging others to join him in bettering his community. His unwavering commitment to truth and integrity serves as a constant source of inspiration in all of my work. Last, but not least, I thank my family, friends, and peers for their continued support throughout this Comment process.

DDR-00069422



ELECTION INTEGRITY - GOP leaders claim voting - Atlanta Journal-Constitution, The (GA) - November 7, 2020 - page A9

November 7, 2020 | Atlanta Journal-Constitution, The (GA) | Chris Joyner Maya T. Prabhu and James Salzer James.SStaff | Page A9

Republican leadership and President Donald **Trump**'s campaign brought a high-powered group of speakers to a Buckhead news conference Friday to bolster his claims of election fraud by promising specific examples of abuse.

But following 30 minutes of criticizing election officials and the media, Republican National Committee Chairwoman Ronna McDaniel held back, recycling instead vague claims of irregularities and urging patience.

"We are not going to jump the gun. They are serious, and we want to take a look at them before we go out and push that," she said.

McDaniel said the party was looking into "six or seven" allegations of election irregularities in Georgia, but she gave no details.

In a separate news conference earlier Friday at the Georgia Capitol, Secretary of State Brad Raffensperger defended the state's handling of the election as he announced the presidential race was likely headed to a recount.

"The stakes are high and emotions are high on all sides. We will not let those debates distract us from our work. We will get it right, and we'll defend the integrity of our elections," said Raffensperger, a Republican.

Gabriel Sterling, the state's voting system manager, told reporters Friday, "We're not seeing any widespread irregularities."

McDanielurgedthatballotcounting continue until "all legal votes" hadbeencounted, aseemingbreak from the president who has characterized the continued counting of ballots as evidence of fraud.

In an unprecedented speech Thursday night from the White House, **Trump** claimed he had "won" Georgia on election night and accused Democrats here and across the nation of stealing his victory, while making a variety of broad and unsubstantiated claims.

DDR-00069423

McDaniel was joined at the event by former Gov. Sonny Perdue, now serving as **Trump**'s agriculture secretary; firebrand Democratic state Rep. Vernon Jones; and Atlanta defense attorney Lin Wood, who said he had been asked by the **Trump** campaign to help with the effort.

While Perdue urged the state to complete a true and accurate count of "the legal votes," Jones and Wood spun darker tales, complete with criminal conspiracies and global agendas, to the delight of the 60 or so sign-waving supporters who gathered behind them.

Gov. Brian Kemp responded to **Trump**'s accusations of widespread fraud in the tightly contested states that were still counting presidential election ballots by saying Georgia's totals would include only legal votes.

"Any allegations of intentional fraud or violations of election law must be taken seriously and investigated," said a statement from Kemp, Lt. Gov. Geoff Duncan and House Speaker David Ralston, R-Blue Ridge.

"We trust that our Secretary of State will ensure that the law is followed as written and that Georgia's election result includes all legally-cast ballots -- and only legally-cast ballots," it stated. "We will continue to follow this situation to ensure a fair and transparent process."

In an email sent Friday, Kemp assured supporters "the fight is far from over." He said the state Republican Party was building a team of attorneys to send to Clarke, Clayton, Columbia, Dougherty, Fayette, Henry, Muscogee and Rockdale counties "to ensure that the process is fair and transparent."

Notably, Kemp did not repeat the president's claims that the state's continued tabulation of ballots amounted to fraud or that the election was rigged to favor former Vice President Joe **Biden**.

Some Georgia GOP officials sided with **Trump**'s assessment.

"GA's handling of this election is embarrassing," tweeted U.S. Rep. Jody Hice of Monroe. "Two days are gone and we still don't know the results .... are you kidding? Worse yet, partisan ballots keep appearing. A fair vote & **Trump** wins, end of story! Stop the fraud!"

Election officials across the country had warned that it could take several days to count the record turnout in the presidential election, particularly since far more people than usual voted with absentee ballots because many Americans wanted to avoid polling places due to the COVID-19 pandemic.

DDR-00069424

It was also widely predicted by Democrats and pundits that **Trump** would blame "widespread fraud" if he lost. In 2016, he lost the popular vote but made the unproven claim that millions of illegal votes were cast for his opponent, Democrat Hillary Clinton.

"Any of the claims he has made publicly have been without foundation or facts," Georgia Senate Democratic Leader Steve Henson said. "I find it very disturbing that he's undermining the democratic process. And it's very clear that he's being unfair and untruthful."

Copyright 2020 The Atlanta Journal-Constitution

DDR-00069425



GEORGIA - GOP plans challenges as vote count nears - Atlanta Journal-Constitution, The (GA) - November 7, 2020 - page A1

November 7, 2020 | Atlanta Journal-Constitution, The (GA) | Mark Niesse and Greg Bluestein Mark.NStaff | Page A1

Joe **Biden** opened a small but widening lead over President Donald **Trump** in Georgia on Friday as vote counts continued and a recount appeared likely.

Absentee ballots cast primarily in Democratic-leaning counties put **Biden** on top. The former vice president erased a 118,000-vote deficit Wednesday morning to gain his first lead of the election early Friday based on returns in Clayton County.

By Friday evening, **Biden** was ahead of **Trump** by over 4,000 votes after Gwinnett County finished almost all of its count.

The completion of most vote-counting Friday made clear that Georgia is more politically competitive than ever, with a fraction of a percentage point separating **Biden** from **Trump** and the presidency on the line.

But there were still as many as 22,600 military, overseas and provisional ballots that could be counted if they're returned on time and verified, according to the secretary of state's office. Georgia's deadline for domestic absentee ballots was Election Day, but overseas voters had until Friday to return their ballots.

"The final tally in Georgia at this point has huge implications for the entire country," Secretary of State Brad Raffensperger said. "We are committed to doing anything and everything to maintain trust in our electoral process here for every Georgian, regardless of partisan preference."

The last time a Democratic candidate for president won Georgia was in 1992, when Bill Clinton defeated President George H.W. Bush.

The count was far from over Friday.

Raffensperger said he's planning for a statewide recount, which is required under state law when the margin is within 0.5% of the total vote, upon request of a candidate. A recount of all in-person computer-printed ballots and absentee ballots would likely begin after initial certification of results, which will come as late as Nov. 20, according to state law.

DDR-00069429

At the same time, the Georgia Republican Party mobilized lawyers to look for problems that might allow them to contest results. These attorneys were dispatched to Athens-Clarke, Clayton, Columbia, Dougherty, Fayette, Henry, Muscogee and Rockdale counties.

Gov.Brian Kemp, a former Georgia secretary of state, responded to **Trump**'s claims of fraud by saying that vote totals would only include legal votes.

"Election Day has passed but the fight is far from over. There are ballots left to be counted and we must protect the integrity of Georgia elections," stated an email from Kemp's campaign.

The Republican-led secretary of state's office disputed the suggestion that there were significant problems in the election, saying there was no evidence of irregularities that would put the outcome of the election in question.

"There are Republican election directors; there are Democrat election directors," said Gabriel Sterling, the state's voting system manager. "But the job of elections directors and this office is to count every legal vote, follow the law and assure that every legal vote is counted."

Sterling said the secretary of state's office will investigate "any credible accusation with any real evidence behind it."

Democrats rejoiced Friday at the prospect of victory.

"**Trump** woke a sleeping giant in Georgia," said state Rep. Shelly Hutchinson of Lawrenceville. "Our reputation is that we're conservative, **Trump**-loving people. But we're changing how the whole world sees Georgia."

Republicans were quick to point out that they retained significant majorities in the Georgia General Assembly, stifling their rivals' hopes to flip the state House of Representatives.

Democratic Party candidates gained two seats in the state House, far short of the 16 they needed to take control.

"Their plan failed miserably," said state Rep. Bert Reeves, a Republican from Marietta and Kemp's floor leader in the House. "This ultraprogressive agenda that's been put forth by Democrats was roundly rejected, not just in Georgia, but in America."

DDR-00069430

Georgia will continue to attract the nation's attention over the next two months, when two U.S. Senate races appear to be heading to runoffs.

Republican U.S. Sen. Kelly Loeffer will face Democrat Raphael Warnock in one runoff. The second runoff hasn't officially been declared, but current vote tallies showed Republican U.S. Sen. David Perdue short of the 50% majority vote he'd need to avoid a runoff with Democrat Jon Ossoff.

(Box)

GEORGIA RECOUNTS

State law gives a losing candidate the right to a recount if the margin of defeat is within half of a percent of the total vote.

A recount will be conducted if the losing candidate requests it in writing within two days following the certification of the vote. The deadline for Raffensperger to certify Georgia's vote count is Nov.20, but he could do so sooner.

Election officials would rescan every paper ballot in the state, including ballots printed by voting computers and absentee ballots. Ballots would not be recounted by hand, according to a State Election Board rule approved this spring.

Besides recounts when a race is within a 0.5% margin, Georgia law also allows recounts to be ordered at the discretion of the secretary of state or county election superintendents, regardless of the margin. Discretionary recounts can be held anytime before certification.

Copyright 2020 The Atlanta Journal-Constitution

DDR-00069431



GEORGIA ELECTIONS - GBI to aid Georgia voting - Atlanta Journal-Constitution, The (GA) - December 5, 2020 - page A7

December 5, 2020 | Atlanta Journal-Constitution, The (GA) | David WickertStaff | Page A7

The secretary of state's office is enlisting the GBI to help investigate allegations of voter fraud and other election improprieties in Georgia.

The office says it is investigating more than 250 allegations involving this year's elections. The claims include possible instances of dead people voting, double voting and out-of- state voting.

That work has been done by the office's 23 investigators. But Secretary of State Brad Raffensperger announced Friday evening that Gov. Brian Kemp has agreed to his request to have the GBI aid in the investigations.

"The governor and I are committed to following every lead, and the expertise, experience and manpower provided by the GBI will help us move more quickly through a process where time is of the essence," Raffensperger said in making the announcement. "We will stop at nothing to guarantee that all Georgians can have faith in the integrity

of our election."

State election officials say the investigations will not affect the outcome of the presidential race, which was won by Joe **Biden**.

In a separate case, the secretary of state's office is investigating a Florida attorney who is accused of fraudulently applying to register to vote in Georgia so he could vote in next month's U.S. Senate runoff elections.

The governor and the secretary have come under increasing pressure from fellow Republicans as President Donald **Trump** has continued to make unproven allegations of massive voter fraud in Georgia and other states.

**Trump** could keep up the pressure at a rally today in Valdosta to support the runoff campaigns of Republican U.S. Sens. Kelly Loeffler and David Perdue.

On Friday the president's campaign announced it had filed another lawsuit in Fulton County

DDR-00069432

Superior Court. Among other things, it alleges thattensofthousandsofunderage voters, felons, out-of-state residents and other ineligible people voted in the November election.

The president and his supporters have filed dozens of lawsuits in key states, including Georgia, seeking to overturn the election of Joe **Biden**. None has been successful.

**Trump**'s own attorney general, William Barr, has said federal investigators have found no evidence of widespread voting fraud. Raffensperger has said investigators from his office also have not found evidence of fraud sizable enough to change the outcome of the election.

But the pressure on Kemp

and Raffensperger has been growing. **Trump** has blasted both men repeatedly. And Georgia lawmakers are hearing from their constituents that they want something done.

On Thursday, two state Senate committees held hearings on voting problems. A state House committee will follow suit next week.

Enlisting the GBI may provide credibiliy for the investigations

that--at least for the president's most ardent supporters -- Raffensperger's office lacks.

"Highly qualified GBI personnel will work alongside law enforcement officers within the secretary of state's office to ensure that Georgia's election lawsarefollowedandthe investigations are completed as soon as appropriate," Kemp said.

Staff writer Greg Bluestein contributed to this article.

Copyright 2020 The Atlanta Journal-Constitution

DDR-00069433

ONLY IN THE AJC 2020 ELECTIONS - Recount finds - Atlanta Journal-Constitution, The (GA) - November 17, 2020 - page B1

November 17, 2020 | Atlanta Journal-Constitution, The (GA) | Mark Niesse Mark.NStaff | Page B1

A recount in Georgia's presidential race found more than 2,600 ballots in Floyd County that hadn't originally been tallied, likely helping President Donald **Trump** reduce his 14,000-vote deficit to Joe **Biden**.

**Trump** could gain nearly 800 net votes from the discovered ballots. There were 1,643 new votes for **Trump** and 865 for **Biden**.

The problem occurred because county election officials didn't upload votes from a memory card in an ballot scanning machine, said Gabriel Sterling, the state's voting system manager.

He called it "an amazing blunder" and said the county's elections director should resign.

"It's not an equipment issue. It's a person not executing their job properly," Sterling said. "This is the kind of situation that requires a change at the top of their management side."

The previously uncounted votes were cast during in-person early voting at the Floyd County Administration Building, which includes the county's elections office, said Luke Martin, chairman of the Floyd County Republican Party.

Over half of 5,000 printed-out ballots cast on an optical scanner weren't initially recorded.

"It's very concerning," Martin said. "But this doesn't appear to be a widespread issue. I'm glad the audit revealed it, and it's important that all votes are counted."

The uncounted ballots in Floyd County is the most significant issue found so far during Georgia's recount. Secretary of State Brad Raffensperger has said that other counties' recounted figures closely match their original numbers.

The ballots will be rescanned and tabulated before results are finalized Friday, said State Elections Director Chris Harvey.

"You want every vote counted right the first time, but that is one of the goals of the audit: to

DDR-00069450

identify problems," Harvey said. "All the votes will be uploaded, and the results will be what they are."

Floyd County's elections director, Chief Clerk Robert Brady, didn't return a phone message seeking comment.

Martin said these ballots rectify a discrepancy between the number of people who checked in to vote early and ballots that were counted in Floyd County, located in northwest Georgia.

The issue appeared to occur on an optical scanner that stopped working after a couple of weeks of early voting, Martin said. County election officials were supposed to rescan all paper ballots cast on that machine, but roughly half of them weren't recorded.

Copyright 2020 The Atlanta Journal-Constitution

DDR-00069451

OPINION

# Why Do So Many Americans Think the Election Was Stolen?

Looking for the reasons behind a seemingly unreasonable belief.

Dec. 5, 2020



Illustration by Rob Dobi; photographs by Getty Images

 Share full article  



**By Ross Douthat**
Opinion
Columnist

DDR-00069452

There have been few surprises this past month in how Donald
Trump has dealt with the reality of his electoral defeat.

Anyone familiar with his career could have predicted that he would
claim to have been cheated out of victory. Anyone watching how he
wielded power (or, more often, didn't) as president could have
predicted that his efforts to challenge the election results would be
embarrassing, ridiculous and dismissed with prejudice in court.
And anyone watching how the Republican Party dealt with his
ascent could have predicted that its leaders would mostly avoid
directly rebuking him, relying instead on the inertial forces of
American democracy, the conscientiousness of judges and local
officialdom, and Trump's own incompetence to turn back his final
power grab.

So far, so predictable. But speaking as a cynical observer of the
Trump era, one feature of November did crack my jaded shell a bit:
not his behavior or the system's response, but the sheer *scale* of the
belief among conservatives that the election was really stolen,
measured not just in polling data but in conversations and
arguments, online and in person, with people I would not have
expected to embrace it.

The potency of this belief has already scrambled some of the
conventional explanations for conspiratorial beliefs, particularly the
conceit that the key problem is misinformation spreading
downward from partisan news outlets and social-media fraudsters
to the easily deceived. As I watch the way certain fraud theories
spread online, or watch conservatives abandon Fox News for
Newsmax in search of validating narratives, it's clear that this is
about demand as much as supply. A strong belief spurs people to go
out in search of evidence, a lot of so-called disinformation is
collected and circulated sincerely rather than cynically, and the
power of various authorities — Tucker Carlson's show or Facebook's
algorithm — to change beliefs is relatively limited.

ADVERTISEMENT

DDR-00069453

But what has struck me, especially, is how the belief in a stolen election has spread among people I wouldn't have thought of as particularly Trumpy or super-partisan, who aren't cable news junkies or intensely online, who didn't even seem that invested in the election before it happened.

Others have taken note of the same phenomenon: At National Review, Michael Brendan Dougherty writes that "friends who I did not know were political are sending me little snippets of allegations of voter fraud and manipulation." At The American Mind, the pseudonymous Californian Peachy Keenan describes watching a passel of lukewarm Trump-supporter moms in her Catholic parish suddenly "get MAGAfied" by election conspiracy theories. (As a fraud believer herself, she thinks that's a good thing.)

Drawn from my conversations in the past few weeks, here's an attempt at a taxonomy of these unlikely seeming fraud believers.

**The conspiracy-curious normie**

I say "normie" to reflect the reality that being open to the possibility of conspiracies is itself extremely normal and commonplace. There is nothing unusual, statistically speaking, about believing that a Cold War-era deep state assassinated John F. Kennedy or that the government is concealing evidence of U.F.O.s. Conspiracy theories are common among Democrats as well as Republicans: Witness the polling on Russia's supposed tampering with vote totals in 2016 or George W. Bush's supposed foreknowledge of the Sept. 11 attacks; recall the voting-machine theory spun to explain John Kerry's narrow defeat in 2004.

This means you don't need a complex story about Facebook or Fox News to understand why a person who isn't intensely political might nonetheless be open to the idea that an election settled by tens of thousands of votes in a few key states was actually fixed for the winner. That kind of openness is just human nature — and not the worst part of human nature, either, given that conspiracies and cover-ups exist (the military really has been hiding weird evidence of U.F.O.s!) and even wrongheaded theories often partake of a reasonable skepticism about elite malfeasance, from the Gulf of Tonkin era to the Jeffrey Epstein case.

Editors' Picks

 How And Lear Exile

 How Wel Into

 They Now

ADVERTISEMENT

DDR-00069454

What's happened in the past month with our open-minded normie, though, is that this openness has been validated by the president of the United States and his retainers in a way that other forms of conspiracy curiosity are not. There is a longstanding pattern in both political parties of gently encouraging conspiracizing. (The Diebold-stole-Ohio theories in 2004 were given oxygen by prominent congressional Democrats; MSNBC's Russiagate coverage was not exactly cautious in the theories that it entertained.) But Trump is obviously different — higher-profile and more radical. He's a president, not a cable-TV host or a congressman, and he's shouting allegations, any allegations, with no pussyfooting, hedging or deniability involved.

If you are biased against conspiracy theories, this shouting is ridiculous. If you're somewhat open toward them, though, and somewhat right-of-center, it provides encouragement. It's not that the curious normie listens to Trump and thinks that everything he says is true. It's that Trump is providing validation for the belief that something *might* be true, that where there are so many claims of fraud a few might be accurate, that where there's so much smoke there might be a blaze or two as well.

Of course there are also lots of pure Trump loyalists who trust his claims absolutely, and a certain number of QAnon-type fantasists who embrace any theory no matter how baroque. But the voter-fraud narrative is pervasive on the right because you don't have to be a loyalist or a fantasist to take something from Trump's rants — not belief itself, but the permission to believe.

**The outsider-intellectual**

The next category of believer consists of extremely smart people whose self-identification is bound up in constantly questioning and doubting official forms of knowledge. Conservatism has always had plenty of this sort in its ranks, but the consolidated progressive orthodoxy in elite institutions means that more and more people come to conservative ideas because they seem like a secret knowledge, an account of the world that's compelling and yet excluded from official discourse.

This, in turn, instills a perpetual suspicion about anything that seems to have too much of a liberal consensus defending it,

DDR-00069455

especially any idea that gets mocked and laughed at more than it gets rebutted. And it creates a strong epistemological bias toward *what you can only find out for yourself,* as opposed to what Yale's experts or Twitter's warning labels or The New York Times might tell you.

ADVERTISEMENT

In many cases the outsider-intellectual's approach generates real insight. (Anonymous right-wing Twitter was way out ahead of the coronavirus threat, for instance, at a time when official liberalism was still fretting more about xenophobia than the virus itself.) But it also tends to recapitulate the closed-circle problems of the official knowledge it rejects.

Thus the outsider-intellectual type looks at the no-voter-fraud consensus and immediately goes out in search of cracks in the pillar of official truth, anomalies that official certainty elides. A lot of the supposed evidence of fraud that circulates online comes from these efforts — not from grifts or lies (though grifters and liars do pick them up) but from sincere analyses of election data, which inevitably turn up anomalies here and there, which confirm the searchers' assumptions, which closes the circle and convinces them that the official narrative is false and voter fraud is real.

### The recently radicalized

This final camp includes many of the people reading and circulating the outsider-intellectual analyses — people on the right whose perceptions of what liberal institutions and actors are capable of doing have been altered by the coronavirus era.

Many liberals have spent the Trump years worried about a kind of Reichstag Fire moment, a crisis that Trump might use as an excuse to consolidate authoritarianism. But a lot of conservatives experienced May and June of the Covid era as a mirror image of those anti-Trump fears — as a crisis that seemed to be deliberately exploited for revolutionary purposes by politicians and activists of the left.

DDR-00069456

Their story of the spring and early summer starts with our country's leaders and experts calling for unprecedented sacrifice, with lockdowns and closures that disproportionately affected small businesses, churches and families with children — all conservative-coded groups and institutions — while liberal professionals on Zoom were in better shape and the great powers of Silicon Valley expanded their influence and wealth. Then, based on a single activist-amplified case of police brutality, the same experts and politicians suddenly abandoned restrictions for the sake of left-wing protests ... which the official media pretended were peaceful even when they cut a violent swathe through American cities ... which included a wave of iconoclasm against key symbols of American history ... even as a new ideological vocabulary seemed to suddenly take over elite institutions ... and dissenting figures were purged ... and in the background the world's elites loudly announced that they were seeking a "Great Reset," a post-coronavirus new world order.

ADVERTISEMENT

For the radicalized, all this felt stage-managed, prearranged — both as a further escalation in the establishment's battle against Trump, a successor to the Mueller investigation and the impeachment push, and as an attempt to use the weirdness of the Covid situation to consolidate radical power within elite institutions. Experiencing and interpreting the summer of 2020 this way primed people to expect further escalation in the fall: After all, if liberals exploited a pandemic to stage-manage an ideological revolution, why *wouldn't* they exploit all the weird features of pandemic voting to stage-manage the election outcome?

No doubt some of my liberal readers will find this question too ridiculous to even merit an answer. *You can't argue someone out of a conspiracy theory,* a common axiom goes, which means the only appropriate response to these ideas is condemnation and a kind of quarantine — to be achieved, presumably, through better Facebook algorithms, the comprehensive political defeat of the Republican Party and some sort of "have you no sense of decency, sir" courage from news anchors and political leaders whenever right-wing paranoia re-emerges.

DDR-00069457

I don't see any way that these efforts will work. (Certainly on the evidence of 2020, the Republican Party isn't going anywhere, let alone about to be "burned to the ground" as some anti-Trumpers hoped.)

Of course the alternative — actually trying to argue with people in the camps I've just described — may not work either, especially given the curated virtual realities that the internet increasingly enables us all to inhabit. But I've been argued in and out of a few outré theories in my life. (Only the best outré theories, I assure you.) And if you accept that there's more *reasoning* involved in conspiracy theorizing than official wisdom suggests, then once such theories achieve a certain prominence, there's an obligation to actually make the case against them rather than just laugh them away.

My own attempts at argument have run as follows: To the conspiracy-curious Republican whose curiosity is validated by Trump's allegations of fraud, I've suggested that the place to look for fire amid the smoke is in claims that the president's lawyers are actually willing to advance in court, as opposed to in news conferences, semiofficial hearings and on Twitter. Those lawyers — especially now that it's mostly just the Rudy Giuliani show — have every incentive to blow a fraud case wide open. If their *legal* claims don't actually allege fraud or they fall apart under scrutiny, then so should your assumption that the president's blustering must have some real-world correlative.

---

ADVERTISEMENT

---

To the outsider-intellectuals fascinated by anomalies in ballot counts or ballot return patterns, I've argued that anomalies indicating fraud would have to show up in the final vote totals — meaning some pattern of results in key swing-state cities that differ starkly from the results in cities in less-contested states, or some turnout pattern in a swing state's suburbs that looks weird relative to the suburbs in a deep- blue or deep-red state. But where claims for those kinds of anomalies have been offered, they've turned out

DDR-00069458

to be false. So until a compelling example can be cited, anomalies in the counting process should be presumed to be error or randomness, not fraud.

Finally to the radicalized, I've tried to convey, based on my own knowledge of how liberal institutions work, that what looked stage-managed to outsiders in the May and June disturbances actually reflected organic upheaval and division, sincere antiracism and disorganized Trump-phobia, a crisis in the mind of liberalism, a dose of religious revival, plus a chaotic revolt by city-dwellers against a lockdown experience that fell heavily on them. Hypocrisy and radicalism alike there was in plenty, but literally nobody was in charge, except sometimes for activists in the younger generation who sensed a professional opportunity, and any supposed "plan" or "reset" was just a hapless attempt by elder statesmen to get woke. Put more succinctly: The liberal establishment that I watched stagger through May and June could not plan a sweeping voter-fraud conspiracy to save its life.

Have I persuaded anyone with these arguments? Maybe not, and as a columnist for a noted establishment organ, I'm probably not the best person to make them anyway. That distinction belongs to people more enmeshed in the conservative universe, scribes for National Review and talk-radio hosts and conservative media critics, all of whom are the more important arguers for an intra-Republican debate.

But I am certain that these issues are connected to a larger and more important question for the future of the right. At the moment, the voter-fraud narrative is being deployed, often by people more cynical than the groups I've just described, to help an outgoing president — one who twice lost the popular vote and displayed gross incompetence in the face of his administration's greatest challenge — stake a permanent claim to the leadership of his party and establish himself as the presumptive Republican nominee in 2024. And it's being used to push aside the more compelling narrative that the Republican Party could take away from 2020, which is that Trump's presidency demonstrated that populism can provide a foundation for conservatism, but to build on it the right needs a very different leader than the man Joe Biden just defeated.

ADVERTISEMENT

DDR-00069459

Case 1:22-cv-04259-SDC    Document 273-23    Filed 12/20/24    Page 86 of 102

That's the most important argument for the next four years — and one I'll be making firmly, passionately, right up until the Republican Party nominates Trump again in 2024.

**More from Ross Douthat**

Opinion | Ross Douthat
Is There a Trumpism After Trump?

Opinion | Ross Douthat
2020 Will Not Be Decisive

Opinion | Ross Douthat
Have We Learned Nothing After Four Years of Trump?

**The Argument** Listen to our podcast *every Friday morning, with Ross Douthat and Michelle Goldberg*

*The Times is committed to publishing a diversity of letters to the editor. We'd like to hear what you think about this or any of our articles. Here are some tips. And here's our email: letters@nytimes.com.*

*Follow The New York Times Opinion section on Facebook, Twitter (@NYTopinion) and Instagram.*

Ross Douthat has been an Opinion columnist for The Times since 2009. He is the author of several books, most recently, "The Decadent Society."
@DouthatNYT · Facebook

DDR-00069460

10/23/24, 1:31 PM
How 9 mistakenly discarded ballots in Luzerne County, Pa., fueled Trump's 2020 lies about elections • Spotlight PA

Case 1:22-cv-04259-SDG    Document 273-23    Filed 12/20/24    Page 87 of 102

# How 9 mistakenly discarded ballots in Luzerne County, Pa., fueled Trump's 2020 lies about elections

by Carter Walker of Votebeat | July 29, 2024





MATT SMITH / FOR SPOTLIGHT PA

*This article is made possible through Spotlight PA's collaboration with Votebeat, a nonpartisan news organization covering local election administration and voting. Sign up for Votebeat's free newsletters*

DDR-00069461

Report: Luzerne Co. ballots fueled false election claims • Spotlight PA

*here*.

A new report from the U.S. Department of Justice found that under the Trump administration, a U.S. attorney violated department policies while handling an investigation into nine Pennsylvania ballots that were mistakenly discarded in 2020.

The report, released Thursday by the Justice Department's Office of the Inspector General, its internal watchdog, showed how these choices helped fuel then-President Donald Trump's false narrative of a stolen election.

The ballots at the center of the nearly four-year-old case were from Luzerne County. The report examined how top DOJ officials handled and publicly released information from the FBI's investigation into those ballots, including then-Attorney General William Barr's decision to share details of the investigation with Trump while it was ongoing.



FREE NEWSLETTER

Sign up for a free roundup of the top news from across Pennsylvania, all in one daily or weekly email from Spotlight PA.

| Email address |
| --- |

SIGN UP

DDR-00069462

Trump's reelection campaign seized on the investigation into the discarded Pennsylvania ballots as evidence that mail voting was being manipulated to steal the election from Trump.

However, the inspector general pointed out that the FBI found the real reason for the ballots' handling was much more mundane: A "mentally impaired" seasonal worker had simply made a mistake.

The Justice Department has policies to prevent investigations from being politicized, especially during an election year. The inspector general's report highlighted how breaches of these policies can snowball into false and exaggerated claims of election fraud, and recommended that DOJ make changes to clarify which information can be included in public statements.

Handling this kind of sensitive election information is something that Al Schmidt, Pennsylvania's top election official, has thought a lot about.

"These types of minor clerical errors in election administration can be misused by bad-faith actors to undermine confidence in our electoral process," Schmidt said in a statement Friday. "Election administration is highly scrutinized, and any error — no matter how inadvertent, no matter how minor — will be used by those seeking to undermine confidence in election results and our representative democracy."

## Seven ballots cast for Trump appear in the trash

DDR-00069463

Case 1:22-cv-04259-SDG   Document 273-23   Filed 12/20/24   Page 90 of 102
Reported out that 2 ballots queued? Election 2024 • Spotlight PA

The case dates back to Sept. 16, 2020, when then-Luzerne County Election Director Shelby Watchilla discovered that one of her temporary election workers had mistakenly put nine military absentee mail ballots in the trash, according to Politico reporting at the time.

Watchilla reported the incident to supervisors, and two days later the Luzerne County district attorney notified the FBI that a county elections employee had discarded seven military absentee ballots — which had been taken out of their envelopes, revealing votes cast for Trump — in a dumpster. Two still-sealed envelopes that the employee had "mishandled" were also provided to the FBI, according to the report.

The FBI took over the investigation on Sept. 21. The next day, the Luzerne County district attorney issued a press release about the incident and federal authorities' role in investigating it.

According to the inspector general's report, Barr briefed Trump on the incident on Sept. 23, and informed him that the ballots had been voted for him — information that was not public at the time. Trump went on to repeat that claim on a Fox Radio show the next morning.

The next day, Sept. 24, David Freed, who was overseeing the investigation as U.S. Attorney for the Middle District of Pennsylvania, released his own statement that incorrectly said all nine ballots had been cast for Trump. A corrected version said only seven had been cast for Trump, while the votes of the two unopened ballots were unknown.

The Trump campaign and its allies quickly began weaving the incident into a narrative about election fraud, which ultimately escalated to the Jan. 6, 2021, riot by Trump followers at the U.S. Capitol. Some examples:

- Matt Wolking, a Trump campaign official, tweeted on Sept. 24 that "Democrats are trying to steal the election," and repeated Freed's erroneous statement that all nine mishandled ballots had been cast for Trump.

DDR-00069464

Report outlines how PA balls squelched 2020 election disinfo • Spotlight PA

- Trump mentioned the incident twice at the first presidential debate to back his claim that the election was "going to be a fraud like you've never seen."
- On the stump, Trump inflated his claim at one point to say "thousands of ballots" with votes for him were "dumped in dumpsters."
- Conservative activist Dan Carr said on Facebook the incident was "true election interference," USA Today reported.
- Campaign surrogate Eric Trump, the president's son, alluded to the Luzerne case the day after the election as an indicator of Democratic cheating, saying "we've seen it from Day 1."

## Justice Department knew more than it let on

Even as Barr was informing Trump of the incident on Sept. 23, and Freed was drafting his statement, the Justice Department knew crucial information about the incident that it kept from the public, allowing misinformation about the case to go unchallenged.

The FBI had interviewed the temporary election worker on Sept. 22, and determined that he had "memory problems" and was "100% disabled" due to a "vehicle accident in 20s w[ith] brain injury," the inspector general's report said. The FBI also noted in an internal Sept. 23 email that the worker was "not capable of following simple instructions" and was assigned "menial tasks."

Part of the problem, according to the report, was that return envelopes for military ballots were being mistaken for envelopes containing mail ballot request forms, so Luzerne election workers were opening both, even though ballot envelopes are not to be opened until Election Day. The envelopes containing ballots were not clearly marked, the Pennsylvania Department of State said at the time. Training for workers was increased after the incident, and in a statement this week, Schmidt highlighted a new training program for election directors launched last year.

Prior to issuing his Sept. 24 statement, Freed also told Barr he was "not sure" that the investigation was "going to result in a criminal charge."

DDR-00069465

Case 1:22-cv-04259-SDG    Document 273-23    Filed 12/20/24    Page 92 of 102

"Indeed, the Department determined before Election Day that no charges would be brought in the matter, although it failed to inform the public of that fact until well after the election," the report said. It wasn't until Jan. 15, 2021, that Freed's successor announced publicly that no charges would be filed.

## Report says Freed's conduct violated some policies

The Justice Department has internal rules and policies on how federal investigators should handle and release details from an investigation, including "a longstanding policy prohibiting Department employees from commenting publicly about ongoing, uncharged investigations," the report states.

The report focused on determining whether Freed's public statements and Barr's involvement in them, as well as Barr's conversation with Trump, ran afoul of those policies.

The report said Freed's statements "raised questions" about whether departmental policy had been violated, and about the motivations for releasing those statements during an election cycle, in particular because the statements specified the "name of a candidate for whom the votes were cast on the discarded ballots."

The policy, the Election Year Sensitivities Memorandum, tells department employees they can "never select the timing of public statements (attributed or not) … in any matter or case for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party." The policy is meant to safeguard "the Department's reputation for fairness, neutrality, and non-partisanship," the report states.

Ultimately, the inspector general's report concluded that Freed's actions violated some DOJ policies, but that Freed and Barr hadn't committed misconduct, because of ambiguities in the attorney general's authority to approve the release of statements. The report also said while the inspector general was "troubled" by Barr's relaying of details about the investigation to Trump, it was not a policy violation.

DDR-00069466

The inspector general said it was referring the matter to the U.S. Office of Special Counsel for investigation into possible violations of the Hatch Act, which prohibits executive branch employees from using their "official authority or influence for the purpose of interfering with or affecting the results of an election."

WHILE YOU'RE HERE

If you learned something from this report, pay it forward and become a member of Spotlight PA so someone else can in the future.

CLICK TO CONTRIBUTE

Freed, whom Trump nominated as a U.S. attorney in 2017, denied to investigators that he acted with any political motivation.

DDR-00069467

Report: Luzerne Co. ballots queued 2020 election disinformation • Spotlight PA

## Incident highlights dangers of misinformation

Claire Wardle, associate professor at Cornell University who studies misinformation and disinformation, said incidents like the one in Luzerne are not uncommon, since elections are often run by volunteers or those working for little pay. But in today's partisan environment, the "messiness" of this process has been reframed through people's biases about elections.

"Whereas before some of those human mistakes didn't make the news, now we see what is a very natural part of democracy getting twisted," she said. "In almost every single case it gets sorted, but the problem we have now is that people take photos and weaponize it to say 'look, the system can't be trusted.'"

Wardle said that this year, news organizations should put out stories about how the system works and issues that may occur before they happen, not after. Individuals should also think carefully about what they share on social media before they have all the facts, she said, since it can take months for a proper investigation to determine what actually happened.

"America is in a really dangerous place right now because people don't trust the system… and the country will collapse if there's not trust in the system," she said.

**BEFORE YOU GO…** *If you learned something from this article, pay it forward and contribute to Spotlight PA at* spotlightpa.org/donate. *Spotlight PA is funded by* foundations and readers like you *who are committed to accountability journalism that gets results.*

 Carter Walker

DDR-00069468

# *As Trump Disputes Election Results, Republicans Target Voting by Mail*

Nearly half of voters cast absentee ballots in the election, a huge increase. If Republicans have their way, that might not last.





Submitting a mail-in ballot in Scranton, Pa., a state where some Republicans want to stiffen identification requirements and tighten standards for signature matching. Robert Nickelsberg for The New York Times

DDR-00069469

By Michael Wines

Published Dec. 10, 2020   Updated Jan. 7, 2021

*[Follow our live Capitol building lockdown reporter discussion here.]*

WASHINGTON — President Trump's barrage of losses in court cases trying to undermine the election has not stopped Republicans from turning to battles they might be able to win — attempts to limit or undermine the future use of the vote-by-mail ballots that so infuriated Mr. Trump.

Absentee ballots constituted nearly half the votes cast in the 2020 election, and the experiment in mass voting by mail has been viewed by election experts as a remarkable success, one that was less prone to errors than expected and had almost no documented fraud. But that has not stopped Republican critics eager to follow the president's lead.

This week in Georgia, as the president rages against the election he lost and the members of his party who oversaw it there, Republican state senators promised to make getting and casting mail ballots far more difficult.

The Georgia state senators pledged on Tuesday to eliminate no-excuse absentee voting, require a photo ID to obtain a ballot, outlaw drop boxes and scrap a court agreement to quickly tell voters about signature problems on ballots so that they could be fixed.

ADVERTISEMENT

DDR-00069470

Republicans were pressing that cause on other fronts as well: The national and state parties filed a lawsuit in Atlanta seeking to curtail the use of drop boxes in next month's runoff elections for the U.S. Senate. The suit claimed it was illegal to let absentee voters deposit ballots after business hours.

Gov. Brian Kemp, a Republican and a frequent target of Mr. Trump for not taking steps to overturn the election results, renewed an earlier call for a recheck of signatures on mail ballots after a Trump volunteer falsely claimed at a State Senate hearing that a video showed workers retrieving "suitcases" of ballots from under a table after observers left. Election officials said the video showed routine tabulation work.



Mail ballots in Atlanta could be opened, sorted and scanned before Election Day.
Nicole Craine for The New York Times

And Georgia has company. In Pennsylvania, Republicans preparing for the legislative session that convenes on Jan. 11 are seeking co-sponsors for bills to stiffen identification requirements for mail ballots, tighten standards for signature matching and, in one case, to repeal the law that allows anyone to vote absentee without an excuse.

Michigan Republicans have signaled that they want to review a 2018 ballot initiative approved by two-thirds of voters that authorized no-excuse absentee balloting as well as same-day registration and straight-ticket voting.

ADVERTISEMENT

DDR-00069471

Texas already has some of the nation's toughest restrictions on voting by mail. But Republicans have filed bills in advance of next month's state legislative session that would crimp officials' ability to distribute absentee ballot applications and even make it a felony to offer to help a voter fill out a ballot.

---

**A Guide to the Trump Investigations**

Confused about the inquiries and legal cases involving former President Donald Trump and his allies? We're here to help.

- **Case Tracker:** Trump is facing multiple criminal cases related to his business and political activities. Follow the latest developments.

- **Presidential Bid:** Will Trump's conviction in his hush-money trial hinder his 2024 campaign? Here is what we know, and what we don't know.

- **Election Interference Cases:** In Arizona, Georgia, Michigan, Nevada and Wisconsin, several allies of Trump are facing charges related to efforts to keep him in power after he lost in 2020.

- **Trump on Trial Newsletter:** Sign up here to get the latest news and analysis on the cases in New York, Florida, Georgia and Washington, D.C.

---

Editors' Picks



Do F
Supp
Wor



Are (
Real
Nutr



How
Hall

The specter of imagined voter fraud — the same rationale used for more than a decade to raise barriers to voting in person — is the stated rationale for all those proposals, and more.

"Republicans have heard the calls of millions of Georgians who have raised deep and heartfelt concerns that state law has been violated and our elections process abused," the state's Republican senators said in a statement this week. "We will fix this."

But rather than a problem to be fixed, most election experts say mail ballots — the backbone of voting in Western states like Colorado, Washington, Oregon and Arizona — helped propel a

ADVERTISEMENT

DDR-00069472

"The campaign to delegitimize and overturn the election has become a convenient justification for those who want to restrict access to voting," said Wendy R. Weiser, who directs the democracy program at the Brennan Center for Justice at New York University. "Even those who acknowledge that the president lost the election are using the same kinds of allegations to roll back voting rights."



Supporters of President Trump demonstrated outside of the Dallas County Elections office during a "Stop the Steal" protest in November.  Tamir Kalifa for The New York Times

In Georgia, despite the rush to amplify Mr. Trump's outrage at the election result, election workers have twice recounted about five million ballots and found no evidence of cheating.

Federal and state courts have repeatedly thrown out the Trump campaign's challenges to President-elect Joseph R. Biden Jr.'s victory of fewer than 12,000 votes in Georgia. Similar court

DDR-00069473

challenges to Mr. Biden's victories in Wisconsin, Pennsylvania and elsewhere have similarly failed to turn up fraud.

Yet for Republicans seeking to ward off Mr. Trump's ire, none of that appears to matter. Some say they wonder whether they are hurting themselves more than their rivals.

For the November election, registered Democrats cast nearly eight million more mail ballots than Republicans in those states that record voters' party affiliation, according to the United States Election Project.

ADVERTISEMENT

But conventional political wisdom holds that Republicans traditionally have voted by mail more often than Democrats, and many experts say any difference is shrinking as absentee voting becomes more popular. In this election, they say, Mr. Trump's furious denunciation of voting by mail probably steered million of Republicans away from it.

"Trump soured them on voting by mail," said Amber McReynolds, the chief executive of the National Vote at Home Institute, a nonpartisan group that works to improve voting by mail. "By attacking the method of voting that was most popular this year, he may have depressed his own turnout."

To be sure, not all the Republican pushback against voting by mail reflects support for Mr. Trump's false claims. State Senator Kathy Bernier, a Wisconsin Republican who heads the Senate's committee on campaigns and elections, said she did not buy Mr. Trump's conspiracy theories. But she said she rejected the idea that restricting easy access to mail ballots in the name of security would make it needlessly hard to cast one.

"I'm fed up with that argument," she said. "You shouldn't make it open for fraud in order to accommodate laziness, I guess, is a good term."

DDR-00069474



*Absentee ballots constituted nearly half the votes nationwide in November's election.*
*Jim Wilson/The New York Times*

ADVERTISEMENT

And some experts say that backers of tighter curbs on mail voting are correct on one point: Mail ballots are more prone to manipulation than ballots cast in person, even if the amount of fraud in either case is minuscule.

"When I go into the voting booth on Election Day, no one's going to help me or whisper in my ear," said Trey Grayson, an elections expert and Kentucky's former Republican secretary of state. "When a ballot is mailed, I don't know who's around when it's completed."

But he added that mail voting has election security advantages, too. States that vote largely by mail have more accurate and up-to-date voter rolls — an anti-fraud goal that Republicans embrace — because mailing ballots to voters effectively double-checks addresses and shows which voters have moved. It also appears to increase participation. "I've always been really impressed that in off-year elections, states that have more voting by mail have a little better turnout," Mr. Grayson said.

As for fraud risks, election experts say the biggest examples involve campaigns, not voters — most recently, in a 2018 House election in North Carolina where a Republican campaign worker directed a

DDR-00069475

crew that falsely filled out and signed hundreds of ballots that had
been sent to local residents.

That kind of organized fraud is very hard to conceal; signature
checks and odd voting patterns quickly uncovered the North
Carolina dodge. But fraud by individuals is hard, too: Signature
checks also flagged attempts by two Pennsylvanians this year to
request absentee ballots in the name of dead relatives.

ADVERTISEMENT

Many Democrats say the Republican outrage over imagined fraud
was completely predictable.

"They were building up to this storm, to the opportunity to cry
fraud," said Barbara Byrum, a Democrat who is the county clerk
and chief election official in Ingham County, Mich., which includes
most of the state capital, Lansing. "They were setting the stage for
the conspiracy claims we're hearing today."



Election workers in Georgia have twice recounted about five million ballots without
finding evidence of cheating.  Nicole Craine for The New York Times

DDR-00069476