IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **MARK ANDREWS**, <br><br>     Plaintiff, <br><br> v. <br><br> **DINESH D'SOUZA, *et al.*,** <br><br>     Defendants. | Case No. 1:22-cv-04259-SDG |

## DEFENDANTS TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, AND GREGG PHILLIPS'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants True the Vote, Inc. ("TTV"), Catherine Engelbrecht ("Engelbrecht"), and Gregg Phillips ("Phillips") (together, "TTV Defendants"), pursuant to Federal Rules of Civil Procedure 56, Local Rule 56.1, and Section IV of the Court's Standing Order Regarding Civil Litigation, hereby submit the following Statement of Undisputed Material Facts to support their Motion for Summary Judgment:

## A. Catherine Engelbrecht and TTV.

1.     Catherine Engelbrecht is the founder, President, and CEO of True the Vote, Inc. ("TTV"). Excerpts of the Deposition Transcript of Catherine Engelbrecht, *attached as* **Exhibit A** ("Engelbrecht Dep."), at 12:2-6, 18:4-6, 33:20-22;

Declaration of Catherine Engelbrecht, *attached as* **Exhibit B** ("Engelbrecht Decl."), ¶ 3.

2.      TTV is a nonprofit, nonpartisan organization whose mission is to empower voters and protect voters' rights through the power of citizen engagement. Engelbrecht Dep. at 18:12-17, 19:7-20:3; Engelbrecht Decl., ¶ 4.

3.      Prior to the film 2000 Mules (the "Film"), TTV and Engelbrecht had never worked with Salem Media Group, Inc. ("Salem") before. Engelbrecht Dep. at 32:20-33:7; Excerpts of the Deposition Transcript of Salem 30(b)(6), *attached as* **Exhibit C** ("Salem Dep."), at 21:22-22:3, 23:10-15; Engelbrecht Decl., ¶ 5.

4.      Engelbrecht had only briefly met Dinesh D'Souza one time before the initial meeting regarding the Film. Engelbrecht Decl., ¶ 6.

5.      Dinesh D'Souza and D'Souza Media LLC ("D'Souza Defendants") have had little to no contact with Engelbrecht since the Film's premiere in May 2022. Engelbrecht Decl., ¶ 7; Excerpts of the Deposition Transcript of Bruce Schooley, *attached as* **Exhibit D** ("Schooley Dep.") at 115:12-19; Excerpts of the Deposition Transcript of Dinesh D'Souza, *attached as* **Exhibit E** ("Dinesh D'Souza Dep.) at 23:21-24:10.

6.      Plaintiff has never met or spoken with Engelbrecht or anyone at TTV. Deposition Transcript of Mark Andrews, *attached as* **Exhibit F** ("Mark Andrews Dep."), at 86:1-3, 8-10; Engelbrecht Decl., ¶ 8.

**B.**     **Gregg Phillips.**

7.     Gregg Phillips previously served on TTV's board of directors from 2015 to 2017, but has not held any other positions at TTV after that. Engelbrecht Dep. at 12:13-21; Excerpts of the Deposition Transcript of Gregg Phillips, *attached as* **Exhibit G** ("Phillips Dep."), at 29:5-15; Declaration of Gregg Phillips, *attached as* **Exhibit H** ("Phillips Decl."), ¶ 3.

8.     Phillips has never been employed by TTV, and has never received any direct compensation from TTV. Phillips Dep. at 29:13-22; Phillips Decl., ¶ 4.

9.     Phillips owns OpSec Group ("OpSec"), which performs election information and data consulting work. Phillips Dep. at 15:24-16:5, 26:12-17; Phillips Decl., ¶ 5.

10.     Phillips did not personally enter into any agreement with respect to the making of the Film. Phillips Dep. at 172:8-11; Phillips Decl., ¶ 6; *see also* DDR-00046931-37, *attached as* **Exhibit I**.

11.     Prior to the Film, Phillips had never met Dinesh D'Souza, did not know him, and had never worked with him. Phillips Dep. at 30:4-17;  Dinesh D'Souza Dep. at 22:22-23:13; Phillips Decl., ¶ 7.

12.     OpSec has performed work as a contractor for TTV since 2020. Phillips Dep. at 27:7-15; Phillips Decl., ¶ 8.

13.    For the geospatial/geotracking analysis that was ultimately discussed in the Film, TTV entered into a contract with OpSec. Phillips Dep. at 46:3-15; TTV_009901-06, *attached as* **Exhibit J**; Phillips Decl., ¶ 9.

14.    OpSec hired Red Metrics as one of several contractors to assist with geospatial/geotracking analysis, and Red Metrics retained possession of the raw geospatial data. Phillips Dep. at 51:18-21, 63:17-64:25, 75:13-23, 169:8-14; Phillips Decl., ¶ 10.

15.    D'Souza Defendants have had little to no contact with Phillips since the Film's premiere in May 2022. Phillips Decl., ¶ 11; Phillips Dep. at 30:18-25; Schooley Dep. at 115:12-19.

16.    Other than the Film, Phillips has never worked with Salem, and is not in contact with them today. Phillips Dep. at 31:7-13; Salem Dep. at 21:22-22:3, 23:10-15; Phillips Decl., ¶ 12.

17.    Plaintiff has never met or talked with Phillips. Mark Andrews Dep. at 86:6-7; Phillips Decl., ¶ 13.

**C.    TTV Defendants' Work Regarding the 2020 Election.**

18.    D'Souza Defendants were planning on making a movie with Salem prior to ever meeting with TTV Defendants. Dinesh D'Souza Dep. at 74:24-75:11; Engelbrecht Dep. at 134:4-17.

19.    The issue of election fraud in the 2020 election was an issue of public concern and was often discussed in the news. Mark Andrews Dep. at 114:5-18, 116:20-22; Dinesh D'Souza Dep. at 62:5-10 ("The topic of election integrity and election fraud was in the air, if I can put it that way. Lots of people were talking about it."); Dinesh D'Souza Dep. at 57:22-58:8 (stating that the Film premiered at Mar-a-Lago, and included a theme President Trump was very interested in); Excerpts of the Deposition Transcript of Nathan Frankowski, *attached as* **Exhibit K** ("Frankowski Dep.") at 28:19-24 ("I think anyone with an Internet connection was familiar with what people were claiming happened during the 2020 election."); Schooley Dep. at 31:1-8 ("the entire country was talking about" election fraud); Engelbrecht Decl., ¶ 9; Phillips Decl., ¶ 14; *see also, e.g.*, Jason Carter & Cindy McCain, *Jason Carter and Cindy McCain on trust in America's election system*, THE ECONOMIST, Oct. 28, 2020, https://www.economist.com/by-invitation/2020/10/28/jason-carter-and-cindy-mccain-on-trust-in-americas-election-system ; *Common Cause, ACLU launch statewide election integrity program*, ACLU NEW MEXICO, Oct. 1, 2020, https://www.aclu-nm.org/en/news/common-cause-aclu-launch-statewide-election-integrity-program; Hans A. von Spakovsky, *U.S. Election Fraud is Real—And It Is Being Ignored*, THE HERITAGE FOUNDATION, Oct. 27, 2020 https://www.heritage.org/election-integrity/commentary/us-election-fraud-real-and-it-being-ignored; Doug Szajda,

*How voting security can protect the integrity of elections*, UNIVERSITY OF RICHMOND Now, Oct. 6, 2020 https://urnow.richmond.edu/features/article/-/19076/how-voting-security-can-protect-the-integrity-of-elections.html.Szajda.

20.     The purpose of the Film, and any Statements involving TTV Defendants, was to highlight the issues of election integrity, election process, and election fraud. Dinesh D'Souza Dep. at 244:3-11 ("[T]he thrust of this movie is, was there an elaborate coordinated election fraud operation going on in the swing states?"); Excerpts of the Deposition Transcript of Deborah D'Souza[1], *attached as* **Exhibit L** ("Deborah D'Souza Dep."), at 23:21-26:5; Phillips Decl., ¶ 15; Engelbrecht Decl., ¶ 10.

21.     Starting in late 2020 and early 2021, TTV and OpSec began performing research regarding the 2020 election, with the goal of providing the findings to law enforcement. The research was not originally done with the goal of appearing in a film. Phillips Decl., ¶ 16; Engelbrecht Decl., ¶ 11.

22.     In late 2021, Deborah D'Souza first discussed with Catherine Engelbrecht the possibility of using some of the surveillance film footage TTV had obtained and some of its research in a feature film, the working title of which at the time was "One Party America," that went on to become "2000 Mules." Deborah D'Souza Dep. at 36:19-25; Engelbrecht Decl., ¶ 12.

---

[1] Deborah D'Souza is Dinesh D'Souza's wife.

23.    TTV obtained publicly-available video of public ballot drop boxes from Georgia Open Records requests, and provided that video to OpSec. Phillips Dep. at 75:3-12; Engelbrecht Dep. at 82:6-21, 150:20-22, 350:4-12; Phillips Decl., ¶ 17; Engelbrecht Decl., ¶ 13.

24.    Phillips and OpSec, with the help of independent contractors, worked on certain geospatial data analysis—which analyzed the time-stamped locations of unique device IDs from cellphones—that was ultimately used in the Film. Phillips Dep. at 42:3-11, 78:7-25; Phillips Decl., ¶ 18.[2]

25.    For the geospatial analysis, there was no effort by TTV, OpSec, or Red Metrics to link any of the data or unique device IDs to any named individuals. Phillips Dep. at 79:5-9; Phillips Decl., ¶ 19.

26.    The research performed did not identify any named individuals as "mules," but rather identified unique device IDs. Phillips Dep. at 42:12-15; Phillips Decl., ¶ 20.

---

[2] Geotracking/geospatial analysis is a common and respected methodology used in numerous scenarios. *See* DDR-00069435-49, *attached as* **Exhibit QQQ** (New York Times article describing how location pings from smartphones revealed about 130 devices inside the Capitol building during January 6, 2021); Newsmax 192669, *attached as* **Exhibit RRR**, (retired NSA senior intelligence analyst stating, "I have used the techniques used by TruetheVote.Org and can testify to the efficacy of the findings. In addition, the Supreme Court itself has written about (see Chief Justice Roberts writing in the 2018 case Carpenter v. US) and endorsed the efficacy of the methodology used.").

27.     There is no one general definition of what a "mule" is. Dinesh D'Souza Dep. at 36:6-13 ("A mule is a delivery man or delivery woman. A mule is someone who is a conduit for depositing ballots, typically multiple ballots . . . into a mail-in drop box."); Engelbrecht Dep. at 288:13-289:4 (discussing the distinction between a "small m" mule versus a "large M" Mule, and that even non-geotracked videos were still reflective of "things that ran afoul of the law"); Phillips Decl., ¶ 21; Engelbrecht Decl., ¶ 14.

28.     As specifically used in the Film, a "mule" was defined as someone who went to ballot drop boxes at least ten times within a specified period of time during election season, and went to certain NGOs. Dinesh D'Souza Dep. at 36:6-37:5; DD_000536, *attached as* **Exhibit M**, at 26:35.

**D.    The Exclusive License Agreement.**

29.     On or about December 3, 2021, TTV, Salem, and D'Souza Media entered into an Exclusive License and Nondisclosure Agreement (the "Agreement"). DDR-00046931-37.

30.     Neither Phillips nor Engelbrecht entered into the Agreement individually. DDR-00046931-37; Phillips Dep. at 86:15-21.

31.     The Agreement specifies that TTV granted to Salem, D'Souza Media, and other defined "Licensed Parties," (1) an exclusive right and license in the film footage to incorporate it within the Film; and (2) a non-exclusive right to use the

footage in connection with the promotion of the Film. DDR-00046931, at DDR-00046932, § 2.

32.    The Agreement stated that TTV would receive an amount equal to 10% of the film's proceeds.[3] DDR-00046931, at DDR-00046932, § 4(a).

**E.    Surveillance Video Footage Sent to D'Souza Defendants.**

33.    The ballot drop box surveillance video footage TTV obtained was "paid for commercially and publicly available." DD_000411-12, *attached as* **Exhibit N**; Engelbrecht Decl., ¶ 15.

34.    In or around January 2022, OpSec provided 70 cuts of that publicly-available ballot drop box surveillance footage linked to geospatial analysis to the D'Souza Defendants. Phillips Dep. at 75:13-23, 84:24-85:8; Engelbrecht Dep. at 163:23-164:3; Dinesh D'Souza Dep. at 149:9-12 ("I was aware that there was an initial, roughly, 70 videos that were sent. And subsequently we got a second batch of videos."); Frankowski Dep. at 60:7-12 ("I think I received them January 9th."); Phillips Decl., ¶ 22.

35.    Phillips was "very concerned about the footage" and "was very protective of it." Frankowski Dep. at 39:23-40:9; Phillips Decl., ¶ 23.

---

[3] The film's proceeds is defined as: "all amounts actually received by Salem and D'Souza only, respectively, after all initial investments, capital contributions and returns are recouped by said parties pursuant to the Feature Film Agreement (and excluding amounts payable to any other person or entity as set forth in the Feature Film Agreement)." DDR-00046931, § 1(d).

36.    The original 70 videos OpSec provided to the D'Souza Defendants matched geospatial analysis with unique device IDs based on time and location. These videos did not include footage from Gwinnett County public ballot drop boxes, because TTV Defendants had not yet received that video.  Therefore, it did not include footage of Andrews. Phillips Dep. at 145:3-24, 147:24-148:9; 255:10-15; Engelbrecht Dep. at 116:12-21, 165:6-10, 190:11-17; TTV_007110-20, *attached as* **Exhibit O**, at TTV_00711 (explaining on November 23, 2021 to the Georgia Secretary of State that despite TTV submitting an open records request to Gwinnett County seeking all ballot drop box surveillance video recorded during the 2020 General Election, surveillance video had not yet been received for several locations); Engelbrecht Decl., ¶ 16; Phillips Decl., ¶ 24.

37.    An initial teaser trailer for the Film was released in late January 2022, in which Plaintiff does not appear. Dinesh D'Souza Dep. at 186:16-187:24; DDR-00021419-20 (Pl.'s Dep. Ex. 114), *attached as* **Exhibit P**.

38.    On February 4, 2022, Deborah D'Souza requested from TTV Defendants "1,000 videos" for the Film in order to "make a collage for the screen of all these videos compiled to fit the full screen." DD_000394, *attached as* **Exhibit Q**; *see also* Phillips Dep. at 150:10-151:10; Engelbrecht Decl., ¶ 17; Phillips Decl., ¶ 25.

39.    Phillips responded, stating: "this is a major lift and is way outside the scope, Catherine you will need to decide on this one." DDR-00010441, *attached as* **Exhibit R**; Phillips Decl., ¶ 26.

40.    On February 10, 2022, Engelbrecht informed Deborah D'Souza that it was "incredibly time consuming" to separate out the video clips tied to the geospatial analysis "because it involve[d] reading the geospatial data to try and find a match in really poorly detailed county video, so only analysists can do this. It is difficult to know how many more we will have. We have lots of footage, but finding the pieces that work is difficult. . . . We have millions of minutes of general footage so we can break apart clips and as long as they are too blurry to determine identifiable features, they could work for purposes of showing movement to the drop boxes and giving a 'fly' effect." TTV_007276-77 (Pl.'s Dep. Ex. 49), *attached as* **Exhibit S**; Engelbrecht Decl., ¶ 18.

41.    TTV Defendants "always emphasized, [i]t is very hard to process this video. It's extremely time-consuming. It's extremely expensive." Dinesh D'Souza Dep. at 153:7-9; *see also* TTV_007276-77 (Pl.'s Dep. Ex. 49) (Engelbrecht emphasizing to Deborah D'Souza that matching up the video with the geospatial analysis was "incredibly time-consuming because it involves reading the geospatial data to try and find a match in really poorly detailed county video."); Phillips Decl., ¶ 27; Engelbrecht Decl., ¶ 19.

42.     The D'Souza Defendants repeatedly asked for more surveillance video. TPNF-0004579 (Pl.'s Dep. Ex. 100), *attached as* **Exhibit T**; Dinesh D'Souza Dep. at 150:12-13; Frankowski Dep. at 85:25-87:11, 88:13-18; Phillips Decl., ¶ 28; Engelbrecht Decl., ¶ 20.

43.     On March 8, 2022, Phillips asked Deborah D'Souza: "Can y'all confirm that we have completed our to-dos for the movie?" Ms. D'Souza responded: "Yes we are pretty much done." DDR-00055752-55, *attached as* **Exhibit U**; Phillips Decl., ¶ 29.

44.     In approximately March 2022, Gwinnett County belatedly sent publicly-available ballot drop box surveillance video to TTV. TTV_006466-80, *attached as* **Exhibit V**, at TTV_006466 (in a March 10, 2022 complaint to the Georgia Secretary of State, stating "[a]t the time of our original filing, we had been advised by Gwinnett County that drop box surveillance video was not available for certain drop boxes. Since that time, the missing surveillance video was located by the County, affording us an opportunity to review the video and amend our original complaint."); Engelbrecht Decl., ¶ 21.

45.     Because the Gwinnett County video was received so late in the process, OpSec did not have the opportunity to tie additional geospatial analysis to that video. Phillips Dep. at 150:5-8; Engelbrecht Dep. at 191:5-12, 288:13-289:4, 289:21-291:3,

353:19-354:6; DD_00063-86, *attached as* **Exhibit W**,  (discussing "non-mule video" as a potential "tiger trap"); Phillips Decl., ¶ 30.

46.     In late March 2022, TTV Defendants sent additional video clips, including certain Gwinnett County footage, to the D'Souza Defendants. Frankowski Dep. at 85:11-16 (estimating receipt of new videos at around March 27, 2022); Schooley Dep. at 39:12-16, 69:3-5 (received a second batch of videos towards the end of March 2022); Phillips Decl., ¶ 31.

47.     TTV Defendants made clear that this second batch of videos was not tied to geospatial analysis, but was to be used only to complete the request from Debora D'Souza for backup images. DDR-00049510-11 (Pl.'s Dep. Ex. 104), *attached as* **Exhibit X,** (Phillips telling D'Souza "this isn't a mule. Didn't reach the threshold," in reference to an article discussing dismissal of Cross's State Election Board ("SEB") complaint against Plaintiff, and D'Souza responding: "All good points. I will take them on the podcast."); Dinesh D'Souza Dep. at 274:18-23 (admitting that Phillips was saying Plaintiff was not a mule); TTV_008975 (Pl.'s Dep. Ex. 72), *attached as* **Exhibit Y,** (Engelbrecht telling Salem's General Counsel that "[w]e did not track Mr. Andrews going to more than 10 dropboxes. He's not among the 242 individual devices identified that did go to 10+ ballot dropboxes in metro-Atlanta, GA."); Phillips Decl., ¶ 32; Engelbrecht Decl., ¶ 22.

**F.**    **TTV's Open Records Request Regarding Assistors.**

48.    On February 23, 2022, TTV sent a request pursuant to the Georgia Open Records Act, requesting Gwinnett County to produce "any report, record, or other documentation that will provide confirmation of Absentee Ballot Envelopes with Assistor Signatures collected during the November 2020 Election," and specifically, in accordance with O.C.G.A. § 21-2-385, "an accounting of Assistor Signatures on Absentee Ballot envelopes, by drop box location, during the entire absentee voting period for the November 2020 General Election." The statute provided: "the elector shall vote his or her absentee ballot, then fold the ballot and enclose and securely seal the same in the envelope on which is printed 'Official Absentee Ballot.' This envelope shall then be placed in the second one, on which is printed the form of the oath of the elector; the name and oath of the person assisting, if any; and other required identifying information." O.C.G.A. § 21-2-385(a) (2019). TTV_007283-84, *attached as* **Exhibit Z**; Engelbrecht Decl., ¶ 23.

49.    Gwinnett County responded on March 1, 2022, stating that it had reviewed its files and determined that there were "no responsive documents" to TTV's request. TTV_007283-84; Engelbrecht Decl., ¶ 24.

**G.**    **TTV's Complaints to the Georgia Secretary of State.**

50.    TTV initially sent the Georgia Secretary of State a complaint in November 2021. TTV discussed that "surveillance footage shows numerous

instances in which individuals deposited multiple ballots at a time – a practice which is prohibited under Georgia law except under very limited circumstances." TTV_010031-33, *attached as* **Exhibit AA,** (citing O.C.G.A. § 21-2-385(a)); Engelbrecht Decl., ¶ 25.

51.     TTV retained an attorney to assist with drafting, reviewing, and providing feedback on this initial complaint before it was sent to the Georgia Secretary of State. Engelbrecht Decl., ¶ 26; Engelbrecht Dep. at 121:3-19.

52.     On March 10, 2022, as part of its "ongoing nonpartisan election integrity research," TTV sent another complaint to the Georgia Secretary of State, alleging improprieties related to absentee voting. TTV_009376-9390, *attached as* **Exhibit BB**; Engelbrecht Decl., ¶ 26.

53.     Based on its review of public ballot drop box surveillance video, TTV concluded that individuals cast multiple ballots, and cited Gwinnett County's response to TTV's Open Records Request stating that there was "no record of any envelopes bearing assistor signatures." TTV_009376-9390 at TTV_009377; TTV_007283-84; Engelbrecht Decl., ¶ 28.

54.     TTV retained an attorney to assist with drafting, reviewing, and providing feedback on the March 10, 2022 complaint before it was sent to the Georgia Secretary of State. Engelbrecht Decl., ¶ 29; Engelbrecht Dep. at 121:3-19.

55.    TTV's Complaint did not identify Plaintiff or any other specific individuals. *See* TTV_009376-9390; Engelbrecht Decl., ¶ 30.

56.    TTV Defendants believed that Georgia law required that for individuals not depositing their own ballots, there needed to be the signature of an assistor. TTV_010031-33 ("surveillance footage shows numerous instances in which individuals deposited multiple ballots at a time – a practice which is prohibited under Georgia law except under very limited circumstances."); TTV_008975 ("It's important to note that Mark Andrews (unnamed and unrecognizable) was shown as one of the many Georgians who voted multiple ballots without properly signing as an "assistor", in the section of the movie that discussed Dropbox abuse in one isolated dropbox in Gwinnett County, GA."); TTV_009376-9390 at TTV_009377 ("Through an Open Records Request . . . we sought confirmation as to whether these individuals were authorized assistors who had signed ballot envelopes confirming by oath they were legally authorized to assist in the casting ballots other than their own. Gwinnett County responded to our request and stated that they had no record of any envelopes bearing assistor signatures. Therefore, none of the individuals could have legally cast more than one ballot."); Phillips Dep. at 111:8-19, 112:17-22, 123:9-18, 242:8-15; Engelbrecht Dep. at 111:11-112:20, 114:5-115:3, 288:13-289:1 (testifying Engelbrecht's understanding of the law was that depositing more than your own ballot was illegal without signing as an assistor, and there were no

assistor signatures); MA-0000933, *attached as* **Exhibit CC**, at 25:40 (Engelbrecht stating "There is a possible [exception] in that he could have been an assistor. . ."); Engelbrecht Decl., ¶ 31; Phillips Decl., ¶ 33.

57.    TTV concluded that "[t]herefore, none of the individuals could have legally cast more than one ballot." TTV_009376-9390 at TTV_009377; Engelbrecht Decl., ¶ 31.

**H.    David Cross's Complaint to the Georgia State Election Board.**

58.    On April 25, 2022, David Cross, who is unaffiliated with any of the Defendants, sent a Complaint to the Georgia SEB, the Georgia Secretary of State's Office, the Gwinnett Board of Elections, and several individuals (the "Cross Complaint"). TTV_008233, *attached as* **Exhibit DD**; Rule 30(b)(6) Excerpts of the Deposition Transcript of Georgia Secretary of State ("SOS Dep."), at 33:18-22, *attached as* **Exhibit EE**, (stating that SOS was not aware of any relationship between Cross and TTV other than reference to TTV in Cross's Complaint).

59.    The Cross Complaint does not identify Plaintiff by name, but includes his driver's license plate number, as well as photographs of Plaintiff and his vehicle at a Gwinnett County polling place taken from publicly available surveillance footage that Cross had apparently requested, received, and posted online. The Cross Complaint alleges Plaintiff was "ballot harvesting" by depositing five ballots. TTV_008233.

60.    TTV Defendants had nothing to do with the Cross Complaint. Phillips Dep. at 266:1-267:21, 268:9-15; TTV_008204, *attached as* **Exhibit FF**. (Engelbrecht asking Cross "please don't reference True the Vote or the movie. That will avoid future misrepresentations in the press, which will definitely help us both."); Engelbrecht Dep. at 94:9-23 (TTV had to request Cross Complaint via Open Records Request); Engelbrecht Dep. at 99:21-100:23, 106:6-12 (stating Cross's reference to TTV in his Complaint was false); Engelbrecht Decl., ¶ 33; Phillips Decl., ¶ 34.

**I.    The Georgia State Election Board Investigation and Amy Gardner Text Message.**

61.    On May 2, 2022, a Georgia investigator interviewed Plaintiff at his home. SOS Dep. at 44:21-23.

62.    All documents relied on in the SOS investigation are available to the public once the investigation closes. SOS Dep. at 58:11-20.

63.    On May 16, 2022 at 4:55 p.m., Plaintiff received a text message from a Washington Post reporter named Amy Gardner. Ms. Gardner stated:

> Is there any chance you'd be willing to chat for a moment about 2k mules? I understand the movie described you as a ballot harvesting "mule" and that this is not accurate? I would love to hear your story.

MA-0000027, *attached as* **Exhibit GG**.

64.    Prior to receiving this text message, Plaintiff "had no idea what '2000 Mules' was." Mark Andrews Dep. at 75:8-76:6.

65. Plaintiff testified that he signed an affidavit as a result of the election investigation into him, and that is how Amy Gardner reached out to him. Mark Andrews Dep. at 65:7-16.

66. Plaintiff does not know of anyone else other than Amy Gardner who has communicated with or contacted him about "2000 Mules" or any interviews about or related to the Film. Mark Andrews Dep. at 125:12-126:4.

67. On May 16, 2022 at 8:17 p.m., Ryan Germany, who served as General Counsel for the Georgia Secretary of State's Office, sent a text message to Plaintiff stating:

> We are presenting the case where a person wrongfully accused you of harvesting ballots to the State Election Board tomorrow. We will of course tell the Board that there appear to be no violations and that the case should be dismissed. I am concerned that there will be media attention to the case, and I wanted to give you a heads up on that. We will not identify you by name at the meeting, but open records law will allow media/public to get the investigative file after the case is dismissed, so then your name will be public.

MA_0000028, *attached as* **Exhibit HH**.

68. On May 17, 2022, the Georgia SEB held a public hearing at which it addressed several cases, including the Cross Complaint, and the hearing concluded at 10:05 a.m. DeWeese (SOS) Dep. Ex. 140, *attached as* **Exhibit II**.

69. Plaintiff testified that his name became public "after the Georgia Board of Elections identified" him. Andrews Dep. at 64:11-16; *see also id.* at 65:7-16 ("My name, again, was known at the Georgia Bureau of Investigation, election

investigation. I filed an affidavit. I signed it. That's how Amy Gardner reached out to me via my text phone. So my name was already out there after that hearing because it's public information.").

70.    On May 17, 2022, at 2:19 p.m., Ms. Gardner and Matthew Brown published an article in The Washington Post entitled "Georgia Elections Board Dismisses Allegations of Ballot Harvesting" (the "Washington Post Article"). It discussed that "[t]he Georgia State Elections Board on Tuesday dismissed three allegations of ballot fraud brought by a conservative activist who falsely accused residents of the Atlanta area of illegally turning in other people's ballots in the 2020 election." MA-0001562, *attached as* **Exhibit JJ**.

71.    The May 2022 Washington Post Article also discussed the Film, claiming that:

> The movie prominently features surveillance footage of a voter from Gwinnett County, Ga., outside of Atlanta, who was the subject of one of the complaints dismissed Tuesday. In the footage, the voter can be seen pulling up in a white Ford SUV alongside a ballot drop box, emerging from the truck and depositing five ballots into the box.

MA-0001562 at MA-0001563.

72.    The May 2022 Washington Post Article also provided a quote from Gregg Phillips, stating that, of the individual depicted in the footage (later determined to be Mr. Andrews): "That's not a mule to us." MA-0001562 at MA-0001565.

73.    On May 17, 2022, at 2:50 p.m., Germany texted Plaintiff again and suggested an attorney for him to contact. Germany provided Plaintiff with the name and phone number of attorney Von Dubose, who Germany stated "recently handled some similar cases." MA_0000028.

74.    On May 23, 2022, Ali Swenson, a reporter with The Associated Press, reached out to Plaintiff's daughter. Her inquiry was "regarding an investigation by the Georgia secretary of state's office." MA_0000078, *attached as* **Exhibit KK**.

75.    The earliest TTV Defendants first saw Andrews' name on or about May 26, 2022, when Engelbrecht and TTV received a response to their Open Records Request, after the SEB investigation and hearing had concluded. Although they saw Andrews' name in the responsive documents, they did not know he appeared in the Film until Plaintiff filed this lawsuit. Engelbrecht Dep. at 109:1-110:5; Engelbrecht Decl., ¶ 34; Phillips Decl., ¶ 35.

**J.    Alleged Defamatory Statements in Which TTV Defendants Appeared.**

**i.    The 2000 Mules Film (Statement 1).[4]**

76.    The 2000 Mules film was widely released on or about May 20, 2022. DDR-00015271-79, *attached as* **Exhibit LL**.

---

[4] Attached hereto as Appendix 1 is a chart of the alleged defamatory statements Plaintiff identified. TTV Defendants modified the chart only to include sequential "Statement Nos." for ease of reference.

21

77.     Out of the 89-minute Film, a 1.8 second clip of Plaintiff appears, taken from publicly available Gwinnett County drop box video, along with many other video clips. His face is completely blurred, and behind the blurred image he is wearing a COVID face mask, which covers his nose and mouth. DD_000536.

78.     The concept of the Film "originated fully" with Dinesh D'Souza. Salem Dep. at 38:24-39:1.

79.     Salem and D'Souza were "partner[s]" in making the Film. Salem Dep. at 66:14-20.

80.     TTV Defendants only met with Salem one time to discuss the possibility of making a film. Engelbrecht Dep. at 136:25-137:3; Engelbrecht Decl., ¶ 34.

81.     TTV Defendants had no editorial control over the Film. MA_0001518-61, *attached as* **Exhibit MM**, at MA-0001549 (Dinesh D'Souza stating TTV had "[z]ero" editorial control over the Film); Dinesh D'Souza Dep. at 72:13-17 (describing how his team made "editorial decisions about how best to depict the information"); Dinesh D'Souza Dep. at 74:1-2 (describing how his deal to make a movie with Salem Media was "completely kind of at my discretion"); Dinesh D'Souza Dep. at 112:17-23 ("[W]e were emphatic from the beginning that editorial control of the film would be ours – this is our film. It's a D'Souza Media project. I am the narrator of the film."); Dinesh D'Souza Dep. at 182:21-22 (discussing how

he "made a unilateral editorial decision to cut the film."); Frankowski Dep. at

105:20-106:16 (the one making the "ultimate decision" for recreated shoots was

Dinesh D'Souza); Schooley Dep. at 42:21-43:1 (it was Frankowski and Schooley

that selected the surveillance video clips for the Film); Schooley Dep. at 79:11-17

(the "final final" say for the Film was with Dinesh D'Souza); Schooley Dep. at 80:1-

3 (TTV Defendants never provided any feedback on things they wanted changed in

the movie); ██████████████████████████████████████

████████████████████████████████████████████

███████ TTV_008975 ("We can't speak to the movie, movie trailer, or book, as

we had no creative control in any of those projects . . ."); ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████ ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████ TPNG_0001072-1108,

*attached as* **Exhibit TT**, (D'Souza's team choosing the specific clips from interviews to include in the movie); Engelbrecht Dep. at 149:1-23, (discussing how TTV Defendants had no control over the script, how videos were selected, the graphics, or documents that were selected for the Film); Engelbrecht Dep. at 154:20-155:11 ("no editorial control"); Engelbrecht Dep. at 159:7-19 (infrequent communications regarding making of Film, and felt "very detached" from it); Engelbrecht Dep. at 166:21-167:8 ("no video control or script control"); Engelbrecht Dep. at 177:16-22 ("[W]e had no editorial control. We had no control over what happened in their studio or who they hired to do what."); Engelbrecht Dep. at 182:17-23 ("[W]e were not supposed to be in [the Film], which we had no editorial control, and we had no control over what was going to happen, did not know who was going to be there."); Engelbrecht Dep. at 191:13-18 ("[W]e had no editorial control, no control over what was used or how, which videos were selected. . . [T]hey were trying to do what they could to make it look good on screen.");; Phillips Dep.

at 40:16-19, 84:11-19, 138:13-16, 172:12-19, 196:4-13, 197:20-199:12, 200:5-201:22, 220:22-221:4, 228:19-229:2, 229:22-25, 231:8-23, 237:5-238:3; Engelbrecht Decl., ¶ 36; Phillips Decl., ¶ 36.

82.     Editing decisions were always made by Bruce Schooley and Dinesh D'Souza. Frankowski Dep. at 32:25-33:6, 34:11-17 (stating that Schooley and D'Souza always had "the final say").

83.     The dropbox footage for the Film, including the footage of Plaintiff, was selected by Bruce Schooley and Nathan Frankowski from D'Souza Media. Dinesh D'Souza Dep. at 137:20-24.

84.     In a Washington Post entitled *Discussing the gaps in '2000 Mules' with Dinesh D'Souza*, the following exchange took place:

> Phillip Bump (Reporter): So True the Vote, also executive producers, did they have any editorial control of the film?

> Dinesh D'Souza: Zero.

MA_0001518-61, at MA-0001549.

85.     ███████████████████████████████████████████

████████████████████████████████████████████████

86.     TTV Defendants' responses to questions in the portions of the Film in which they appeared were unscripted and unrehearsed. Engelbrecht Decl., ¶ 37; Phillips Decl., ¶ 37.

87.    In the Film, TTV Defendants pointed to blank screens, and graphics were created, selected, and superimposed after the fact by D'Souza Defendants. Engelbrecht Decl., ¶ 38; Phillips Decl., ¶ 38.

88.    In the Film, as a video clip of Plaintiff appears, Dinesh D'Souza's voiceover states: "What you are seeing is a crime. These are fraudulent votes." DD_000536.

89.    Neither Engelbrecht nor Phillips identified Andrews in the Film. DD_000536; Engelbrecht Decl., ¶ 39; Phillips Decl., ¶ 39.

90.    Nobody said Andrews' name during the Film. DD_000536; Engelbrecht Decl., ¶ 40; Phillips Decl., ¶ 40.

91.    Although Dinesh D'Souza originally advocated not blurring individuals' images, Engelbrecht and Phillips were in favor of blurring individuals' images. Dinesh D'Souza Dep. at 127:2-128:16; Schooley Dep. at 88:4-12 (stating Engelbrecht was one of individuals "obsessed with not identifying anybody.").

92.    Although TTV Defendants at times gave limited suggestions for the Film, they were often not accounted for or implemented in the Film. Engelbrecht Dep. at 196:18-197:1, 212:6-213:10; Schooley Dep. at 26:24-27:14 (there was only "[v]ery limited" input from Salem and TTV); Schooley Dep. at 28:1-11 (TTV Defendants provided "limited" input after they provided the research and the video); Schooley Dep. at 93:14-22 (Schooley "[v]ery seldom[ly] communicated with TTV

26

Defendants when the Film was being made); Engelbrecht Decl., ¶ 41; Phillips Decl., ¶ 41.

93.    TTV Defendants had very minimal involvement with marketing and promotion of the Film. Salem Dep. at 46:5-10 (testifying that Engelbrecht and Phillips did not provide input on the marketing of the Film); Salem Dep. at 64:14-16 (Salem did not discuss the creation of advertisements with TTV Defendants); Deborah D'Souza Dep. at 154:2-12 (discussing that TTV Defendants had "very minimal" involvement with marketing and promotion of the Film); Deborah D'Souza Dep. at 204:22-205:1 (Deborah D'Souza does not have any specific memory of TTV Defendants promoting the Film in any media appearance); Engelbrecht Decl., ¶ 42; Phillips Decl., ¶ 42.

94.    TTV Defendants had very limited coordination with D'Souza Media for publicity for the Film. Phillips Dep. at 136:4-12, 137:1-6, 179:13-180:7; Engelbrecht Decl., ¶ 43; Phillips Decl., ¶ 43.

95.    Dinesh D'Souza was upset that TTV Defendants were not doing enough to promote the Film. Dinesh D'Souza Dep. at 224:6-16.

96.    Salem never discussed with TTV Defendants the marketing of the Film, and TTV Defendants were not involved with discussions regarding how to promote the Film. Salem Dep. at 46:20-25, 57:9-11, 63:10-13, 63:20-22; Engelbrecht Decl., ¶ 44; Phillips Decl., ¶ 44.

97.    According to Dinesh D'Souza, during the making of the Film, his communications with Engelbrecht and Phillips was "sporadic." Dinesh D'Souza Dep. at 113:10-20.

98.    Salem and TTV Defendants had only "occasional contact" and "nothing on a regular basis" throughout the process of the Film being produced. Salem Dep. at 22:12-19, Salem Dep. at 43:25-44:6; Engelbrecht Decl., ¶ 45; Phillips Decl., ¶ 45.

99.    TTV Defendants did not know they were listed as executive producers on the Film until around the time the Film was released, and did not know why they were included. Phillips Dep. at 172:12-25, 183:19-23; Engelbrecht Dep. at 223:10-224:1; Schooley Dep. at 80:11-13 (D'Souza Defendants suggested that TTV Defendants be listed as executive producers); Engelbrecht Decl., ¶ 46; Phillips Decl., ¶ 46.

100.    TTV Defendants were not told what would appear on the screen when they appeared in the Film. Engelbrecht Decl., ¶ 47; Phillips Decl., ¶ 47.

101.    TTV Defendants has never had any control over the "2000 Mules" website, https://2000mules.com. Engelbrecht Decl., ¶ 48; Phillips Decl., ¶ 48.

**ii.**    **The Second 2000 Mules Trailer (Statements 4-5, 13-14, and 28).**

102.    The second 2000 Mules trailer (the "Trailer") was released on or about April 22, 2022. MA-0001796, *attached as* **Exhibit WW**.

103.   Out of the 3 minute 4 second trailer, a 1.8 second clip of Plaintiff appears, taken from publicly available Gwinnett County drop box video. His face is completely blurred, and behind the blurred image he is wearing a COVID face mask, which covers his nose and mouth. MA-0001796.

104.   TTV Defendants had no editorial control over any trailer for the Film. Phillips Dep. at 138:17-139:14; TTV_008975 ("We can't speak to the movie, movie trailer, or book, as we had no creative control in any of those projects . . ."); Engelbrecht Decl., ¶ 49; Phillips Decl., ¶ 49.

105.   TTV Defendants had nothing to do with the creation, production, or development of any trailer for the Film. Engelbrecht Decl., ¶ 50; Phillips Decl., ¶ 50.

106.   TTV Defendants were not told what would appear on the screen and did not know they would appear in the final "2000 Mules" Trailer. Engelbrecht Decl., ¶ 51; Phillips Decl., ¶ 51.

107.   The portions of the Trailer in which TTV Defendants appeared were unscripted and unrehearsed. Engelbrecht Decl., ¶ 52; Phillips Decl., ¶ 52.

108.   Neither Engelbrecht nor Phillips identified Plaintiff during the Trailer. MA-0001796; Engelbrecht Decl., ¶ 53; Phillips Decl., ¶ 53.

109.   Nobody said Plaintiff's name during the Trailer. MA-0001796; Engelbrecht Decl., ¶ 54; Phillips Decl., ¶ 54.

### iii. __Facts Matter with Roman Balmakov (Statements 6, 19, and 22-23).__

110.  On or about May 13, 2022, Engelbrecht and Phillips appeared on the show Facts Matter with Roman Balmakov ("Facts Matter"). Plaintiff's blurred image is shown for less than 1 second out of the 14:37 program while Mr. Balmakov is speaking, among several other clips of others from publicly available ballot drop box video. MA-0001585 at 0:23, *attached as* **Exhibit XX**; Engelbrecht Decl., ¶ 55; Phillips Decl., ¶ 55.

111.  The Facts Matter program reached out to Engelbrecht individually to set up the interview. Engelbrecht Decl., ¶ 56.

112.  Engelbrecht and Phillips had no editorial control over what was shown on the Facts Matter program. Engelbrecht Decl., ¶ 57; Phillips Decl., ¶ 56.

113.  TTV Defendants had nothing to do with the creation, production, or development of the Facts Matter program. Engelbrecht Decl., ¶ 58; Phillips Decl., ¶ 57.

114.  TTV Defendants were not told what would appear on the screen when they appeared on the Facts Matter program. Engelbrecht Decl., ¶ 59; Phillips Decl., ¶ 58.

115.  The portions of the Facts Matter program in which TTV Defendants appeared were unscripted and unrehearsed. Engelbrecht Decl., ¶ 60; Phillips Decl., ¶ 59.

116.    Neither Engelbrecht nor Phillips identified Plaintiff during the Facts Matter program. MA-0001585; Engelbrecht Decl., ¶ 61; Phillips Decl., ¶ 60.

117.    Nobody said Plaintiff's name during the Facts Matter program. MA-0001585; Engelbrecht Decl., ¶ 62; Phillips Decl., ¶ 61.

#### iv.    The *Charlie Kirk Show* Interview (Statements 15-16).

118.    On or about April 8, 2022, a segment aired on *The Charlie Kirk Show* involving Engelbrecht and Phillips, which was filmed a few days earlier. The interview includes a brief clip of Plaintiff, which Charlie Kirk showed to Phillips and Engelbrecht on a personal laptop computer, from publicly available Gwinnett County ballot drop box video, among several other clips of others from publicly available ballot drop box video. In the clip of Plaintiff, he is wearing a COVID face mask, covering his nose and mouth. MA-0000933 at 25:03; Phillips Dep. at 87:18-22; Engelbrecht Decl., ¶ 63; Phillips Decl., ¶ 62.

119.    Either Engelbrecht or Phillips reached out to Charlie Kirk to tell him they would be in town and to see if he wanted to get together for coffee. Kirk then offered for Engelbrecht and Phillips to come on his show, which they accepted. Engelbrecht Decl., ¶ 64; Phillips Decl., ¶ 63; Catherine Engelbrecht's Responses and Objections to Defendant Dinesh D'Souza's First Set of Interrogatories, at No. 12, *attached as* **Exhibit YY**.

120.   Both Engelbrecht and Phillips thought their appearance on *The Charlie Kirk Show* would be a radio interview and were surprised to learn it was being filmed when they arrived that day. Phillips Dep. at 270:19-25; Engelbrecht Dep. at 296:7-18, 302:16-303:14; Catherine Engelbrecht's Responses and Objections to Defendant Dinesh D'Souza's First Set of Interrogatories, at No. 12; Engelbrecht Decl., ¶ 65; Phillips Decl., ¶ 64.

121.   *The Charlie Kirk Show* used certain publicly available video clips, including those showing Plaintiff. Neither Engelbrecht nor Phillips know where those clips come from, but they seemed to be the same videos as appeared in a commercial advertisement that was run in Georgia and that were circulating on social media. MA-0000933; DD_000103, *attached as* **Exhibit ZZ**; DDR 00049450-51, *attached as* **Exhibit AAA,** ("[W]e did an interview with Charlie yesterday. He had the same videos from the ad in GA (the ones we talked about) and asked us to review them. He says Salem knows, etc., but didn't want to not tell y'all. It's supposed to air tomorrow. . . . It's our first big interview so it felt weird."); Phillips Dep. at 132:3-16, 133:2-6 (testifying that he had "no idea" what clips Mr. Kirk had), 133:17-19, 270:9-25; Engelbrecht Decl., ¶ 66; Phillips Decl., ¶ 65.

122.   Neither Engelbrecht nor Phillips had any editorial control over *The Charlie Kirk Show* program. Phillips Dep. at 115:19-22, 131:16-21, 133:2-6;

Engelbrecht Dep. at 301:5-21, 303:2-25, 308:4-14; Phillips Dep. at 87:18-22; Engelbrecht Decl., ¶ 67; Phillips Decl., ¶ 66.

123.   The interview was unscripted and unrehearsed. Engelbrecht Dep. at 302:5-8; Phillips Dep. at 87:18-22; Engelbrecht Decl., ¶ 68; Phillips Decl., ¶ 67.

124.   Plaintiff was never identified in the *The Charlie Kirk Show* interview. MA-0000933; Engelbrecht Decl., ¶ 69; Phillips Decl., ¶ 68.

125.   Nobody said Plaintiff's name during the *The Charlie Kirk Show* interview. MA-0000933; Engelbrecht Decl., ¶ 70; Phillips Decl., ¶ 69.

126.   Engelbrecht expressed her belief at the time that Plaintiff dropping off multiple ballots could have been legal if he had been an assistor, but that Gwinnett County had not produced any assistor certifications. MA-0000933 at 25:40.

127.   During the interview, Phillips did not know that unblurred video of Andrews was being played because he was too far away from the laptop screen and was not wearing his glasses. Phillips Dep. at 120:9-121:5; Phillips Decl., ¶ 70.

128.   After filming, Engelbrecht sent a message to Deborah D'Souza stating: "[W]e did an interview with Charlie yesterday. He had the same videos from the ad in GA (the ones we talked about) and asked us to review them. He says Salem knows, etc. but didn't want to not tell y'all." Ms. D'Souza responded: "This is no problem! But thanks for letting us know." DD_000103. She did so because she thought the Charlie Kirk interview was meant to be a radio interview, and was surprised it was

being filmed and that he showed publicly-available ballot drop box footage. Engelbrecht Decl., ¶ 71.

129.   TTV reposted the interview on social media expecting that it was appropriate because it had been vetted and posted online by Salem and Charlie Kirk's show. Engelbrecht Dep. at 304:24-305:15; Engelbrecht Decl., ¶ 72; *see also* Phillips Decl., ¶ 71.

### v.     The Tucker Carlson Interview (Statements 8, 17-18, 26, and 29).

130.   On May 5, 2022, Engelbrecht appeared on Tucker Carlson Tonight on Fox News ("Tucker Carlson Tonight"). As Engelbrecht discusses ballot drop boxes generally, the show included a clip of Plaintiff from publicly available Gwinnett County ballot drop box video, among several other clips of others from publicly available ballot drop box video. In the clip of Plaintiff, he is wearing a COVID face mask, covering his nose and mouth. MA-0001018 at 0:29; Engelbrecht Decl., ¶ 73.

131.   Plaintiff's clip was one of ten shown during the segment. MA-0001018.

132.   The Tucker Carlson Tonight program reached out to Engelbrecht individually to set up the interview. Engelbrecht Decl., ¶ 74.

133.   Phillips did not appear on the Tucker Carlson Tonight program and did not have a role in it. MA-0001018; Phillips Decl., ¶ 72; Phillips Dep. at 87:18-22;

134.   Engelbrecht did not mention the Film on the Tucker Carlson Tonight program. Engelbrecht Dep. at 278:10-13; Dinesh D'Souza Dep. at 227:1-9; MA-0001018; Engelbrecht Decl., ¶ 75.

135.   Engelbrecht did the interview remotely and had no ability to see or comment on what was shown on the television screen. Engelbrecht Dep. at 281:18-282:3; MA-0001018, *attached as* **Exhibit BBB**; Engelbrecht Decl., ¶ 76.

136.   Engelbrecht had no editorial control over what was shown on the Tucker Carlson Tonight program. Engelbrecht Dep. at 281:11-17; Engelbrecht Decl., ¶ 77.

137.   TTV Defendants had nothing to do with the creation, production, or development of the Tucker Carlson Tonight program. Engelbrecht Decl., ¶ 78; Phillips Decl., ¶ 73.

138.   Engelbrecht was not told what would be shown to the viewing public on the screen when she appeared on the Tucker Carlson Tonight program. Engelbrecht Decl., ¶ 79.

139.   The portions of the Tucker Carlson Tonight program in which Engelbrecht appeared were unscripted and unrehearsed. Engelbrecht Decl., ¶ 80.

140.   Engelbrecht never identified Plaintiff during the Tucker Carlson Tonight program. MA-0001018; Engelbrecht Decl., ¶ 81.

141.   Nobody said Plaintiff's name during the Tucker Carlson Tonight program. MA-0001018; Engelbrecht Decl., ¶ 82.

**vi.      The Gateway Pundit Interview (Statements 41-43).**

142.   On April 20, 2022, Phillips and Engelbrecht appeared on The Gateway Pundit podcast ("Gateway Pundit"). The video includes a clip of Plaintiff, from publicly available Gwinnett County ballot drop box video, and Plaintiff is wearing a COVID face mask, covering his nose and mouth. PDSA-0000001, *attached as* **Exhibit CCC**; Engelbrecht Decl., ¶ 83; Phillips Decl., ¶ 74.

143.   The Gateway Pundit program reached out to Engelbrecht individually to set up the interview. Engelbrecht Decl., ¶ 84.

144.   Engelbrecht and Phillips had no editorial control over what was shown on the Gateway Pundit program. Engelbrecht Decl., ¶ 85; Phillips Decl., ¶ 75.

145.   TTV Defendants had nothing to do with the creation, production, or development of the Gateway Pundit program. Engelbrecht Decl., ¶ 86; Phillips Decl., ¶ 76.

146.   TTV Defendants were not told what would appear on the screen when they appeared on the Gateway Pundit program. Engelbrecht Decl., ¶ 87; Phillips Decl., ¶ 77.

147.    The portions of the Gateway Pundit program in which TTV Defendants appeared were unscripted and unrehearsed. Engelbrecht Decl., ¶ 88; Phillips Decl., ¶ 78.

148.    Neither Engelbrecht nor Phillips identified Plaintiff during the Gateway Pundit program. PDSA-0000001; Engelbrecht Decl., ¶ 89; Phillips Decl., ¶ 79.

149.    Nobody said Plaintiff's name during the Gateway Pundit program. PDSA-0000001; Engelbrecht Decl., ¶ 90; Phillips Decl., ¶ 80.

**vii.    May 8, 2022 "TTV Video" (Statements 21 and 30).**

150.    On May 8, 2022, TTV released a video on its Facebook page (the "TTV Video"). The TTV Video contains a blurred image of Plaintiff from publicly available Gwinnett County ballot drop box video, which appears for a fraction of a second. MA-0000382, *attached as* **Exhibit DDD**; Engelbrecht Decl., ¶ 91; Phillips Decl., ¶ 81.

151.    Neither Engelbrecht nor Phillips identified Plaintiff during the TTV Video. MA-0000382; Engelbrecht Decl., ¶ 92; Phillips Decl., ¶ 82.

152.    Nobody said Plaintiff's name during the TTV Video. MA-0000382; Engelbrecht Decl., ¶ 93; Phillips Decl., ¶ 83.

**K.**  **Alleged Defamatory Statements With No Involvement from TTV Defendants.**

**i.**  **The 2000 Mules Book (Statement 2).**

153.  On or about October 25, 2022, Regnery Publishing published the book "2000 Mules" (the "Book"), which was written by Dinesh D'Souza. DD_000535, *attached as* **Exhibit EEE**.

154.  Dinesh D'Souza had a two-book deal with Salem Media. Dinesh D'Souza Dep. at 292:24-293:5.

155.  The TTV Defendants had no involvement in the development, writing, editing, or publication of the Book. Dinesh D'Souza Dep. at 293:17-22 (stating that "[a] book is typically an individual's enterprise, and so I undertook to do [the Book] as an individual."); Dinesh D'Souza Dep. at 295:4-7, 295:23-25 (stating that D'Souza "write[s] everything myself. I write every word."); Deborah D'Souza Dep. at 34:6-12 (stating "Dinesh writes all his books" and that no one worked on the book with him); TTV_008774-76, *attached as* **Exhibit FFF**, ("We had not seen the manuscript. . . . However, we still haven't seen the book so there may be other controversies ahead."); Engelbrecht Dep. at 312:8-15 (TTV Defendants had not been consulted on the book, had no idea a book was actually being written, and were not involved in it at all); Engelbrecht Decl., ¶ 94; Phillips Decl., ¶ 84.

156.  TTV Defendants had no editorial control over the Book. Phillips Dep. at 203:5-10; TTV_008975 ("We can't speak to the movie, movie trailer, or book, as

we had no creative control in any of those projects . . ."); Engelbrecht Decl., ¶ 95; Phillips Decl., ¶ 85.

157.    None of the TTV Defendants ever saw a copy of the Book before it was published. Phillips Dep. at 202:4-19; Engelbrecht Decl., ¶ 96; Phillips Decl., ¶ 86.

158.    TTV Defendants never received any funds from the Book. Engelbrecht Dep. at 237:9-12; Engelbrecht Decl., ¶ 97; Phillips Decl., ¶ 87.

159.    Salem was not in communication with TTV Defendants regarding the Book. Salem Dep. at 22:21-23, 75:7-11; Engelbrecht Decl., ¶ 98; Phillips Decl., ¶ 88.

### ii.    The Time Square Billboard (Statement 3).

160.    TTV Defendants were not involved with the billboard including an image of Plaintiff in Times Square (the "Times Square Billboard"), and did not know anything about it until this lawsuit was filed. Engelbrecht Decl., ¶ 99; Phillips Decl., ¶ 89.

161.    TTV Defendants had no editorial control over the Times Square Billboard. Engelbrecht Decl., ¶ 100; Phillips Decl., ¶ 90.

162.    TTV Defendants had no prior knowledge that the Times Square Billboard was being put up. Engelbrecht Decl., ¶ 101; Phillips Decl., ¶ 91.

### iii. __Dinesh D'Souza's Media Appearances (Statements 7, 9-12, 20, 24-25, and 27).__

163. TTV Defendants were not involved with Statements 7, 9-12, 20, 24-25, and 27, which all involve media appearances by Dinesh D'Souza. Engelbrecht Decl., ¶ 102; Phillips Decl., ¶ 92.

164. To the extent prior video clips of TTV Defendants appeared in any of Statements 7, 9-12, 20, 24-25, and 27, they were not made aware that such clips would be used. Engelbrecht Decl., ¶ 103; Phillips Decl., ¶ 93.

165. TTV Defendants had no editorial control over Statements 7, 9-12, 20, 24-25, and 27. Engelbrecht Decl., ¶ 104; Phillips Decl., ¶ 94.

166. TTV Defendants had no prior knowledge regarding Statements 7, 9-12, 20, 24-25, and 27. Engelbrecht Decl., ¶ 105; Phillips Decl., ¶ 95.

### iv. __Dinesh D'Souza's Social Media (Statements 35-39)__

167. TTV Defendants were not involved with Statements 35-39, which all involve social media posts by Dinesh D'Souza. Engelbrecht Decl., ¶ 106; Phillips Decl., ¶ 96; Deborah D'Souza Dep. at 35:12-36:2 (stating that Dinesh D'Souza would only use another subcontractor or two to assist him with social media posts, and that he Tweets himself).

168. TTV Defendants did not appear in Statements 35-39. Engelbrecht Decl., ¶ 107; Phillips Decl., ¶ 97.

169.    TTV Defendants had no editorial control over Statements 35-39. Engelbrecht Decl., ¶ 108; Phillips Decl., ¶ 98.

170.    TTV Defendants had no prior knowledge regarding Statements 31-35. Engelbrecht Decl., ¶ 109; Phillips Decl., ¶ 99.

**v.        Dinesh D'Souza's Podcast Appearances (Statements 40-44)**

171.    TTV Defendants were not involved with Statements 40-44, which all involve podcast appearances by Dinesh D'Souza. Engelbrecht Decl., ¶ 110; Phillips Decl., ¶ 100.

172.    TTV Defendants did not appear in Statements 36-40. Engelbrecht Decl., ¶ 111; Phillips Decl., ¶ 101.

173.    TTV Defendants had no editorial control over Statements 36-40. Engelbrecht Decl., ¶ 112; Phillips Decl., ¶ 102.

174.    TTV Defendants had no prior knowledge regarding Statements 36-40. Engelbrecht Decl., ¶ 113; Phillips Decl., ¶ 103.

**L.        TTV Defendants' Lack of Knowledge Regarding Plaintiff.**

175.    TTV Defendants did not know Andrews was an individual in the Film until he filed this lawsuit. Engelbrecht Dep. at 108:7-14 (testifying she did not know who Plaintiff was); Schooley Dep. at 41:1-4 ("We knew that [TTV Defendants] didn't who [the individuals in the videos] were."); Engelbrecht Decl., ¶ 114; Phillips Decl., ¶ 104

176.   TTV Defendants have no connection to and, outside of court filings, have never identified Mark Andrews by name. Phillips Dep. at 217:2-12; Engelbrecht Decl., ¶ 115; Phillips Decl., ¶ 105

177.   TTV Defendants did not believe the individual they later learned to be Mark Andrews was a "mule" according to the definition in the Film. DDR-00049511 (Pl.'s Ex. 104) (Phillips telling Dinesh D'Souza "[i]n addition, this isn't a mule, didn't meet the threshold," and D'Souza responding: "All good points. I will take them on the podcast."); MA_000817, *attached as* **Exhibit GGG**; TTV_008975 (Pl.'s Dep. Ex. 72) ("We did not track Mr. Andrews going to more than 10 dropboxes. He's not among the 242 individual devices identified that did go to 10+ ballot dropboxes in metro-Atlanta, GA."); Dinesh D'Souza Dep. at 274:18-23 (admitting that in DDR-00049511, Phillips was saying Plaintiff was not a mule); Engelbrecht Decl., ¶ 116; Phillips Decl., ¶ 106.

## M.   Plaintiff and the Complaint

178.   Plaintiff filed his Complaint in this action on October 26, 2022. *See* ECF No. 1.

179.   Plaintiff admits that there are no known news reports published prior to the filing of Plaintiff's lawsuit that identified him by name. *See* Plaintiff's First Supplemental Responses and Objections to Defendant Dinesh D'Souza's First Requests for Admission to Plaintiff, at No. 4 (Plaintiff admitting that he is not aware

of any news report published prior to the filing of the Lawsuit that identified him by name), *attached as* **Exhibit HHH**.

180.   Plaintiff is not aware of any individuals who identified him based solely on what they saw in the Film without being told or being otherwise aware that Plaintiff's image appears in the Film. Plaintiff's Second Supplemental Responses and Objections to Defendant Catherine Engelbrecht's First Set of Interrogatories to Plaintiff, at No. 1, *attached as* **Exhibit III**; Mark Andrews Dep. at 47:21-48:3, 95:20-96:7.

181.   No one at his current employer treated Plaintiff any differently because of the Film. Mark Andrews Dep. at 47:4-12; Excerpts of the Deposition Transcript of Bob Varnado, *attached as* **Exhibit JJJ** ("Varnado Dep."), at 15:11-18, 17:18-22; Excerpts of the 30(b)(6) Deposition Transcript of NCR Voyix (by David Flores), *attached as* **Exhibit KKK** ("NCR Dep."), at 21:10-12, 23:13-18; Excerpts of Deposition of Kelly Coveleski, *attached as* **Exhibit LLL** ("Coveleski Dep."), at 22:20-23:18; Excerpts of the Deposition Transcript of Kelly Moyer, *attached as* **Exhibit MMM** ("Moyer Dep."), at 22:5-16, 28:23-25; Excerpts of the Deposition Transcript of Nive Loganathan, *attached as* **Exhibit NNN** ("Loganathan Dep."), at 19:5-10, 19:21-23, 22:3-16; Excerpts of the Deposition Transcript of William Smith, *attached as* **Exhibit OOO** ("Smith Dep."), at 15:3-9; Excerpts of the Deposition Transcript of Brian Beasley, *attached as* **Exhibit PPP** ("Beasley Dep.") at 22:2-4.

182.   No one has ever put Plaintiff in harm's way because of the Film or any affiliated interviews. Mark Andrews Dep. at 126:19-21.

183.   Plaintiff is unaware of anyone recognizing him in public as an alleged "mule" or as having appeared in the Film. Mark Andrews Dep. at 126:22-24.

184.   No one has ever threatened Plaintiff about voting. Mark Andrews Dep. at 144:19-20.

185.   No individuals have ever intimidated Plaintiff from voting. Mark Andrews Dep. at 144:21-23.

186.   The premier of the Film in May 2022 did not affect or stop Plaintiff from voting in the 2022 primary or general election. Mark Andrews Dep. at 57:1-4.

187.   Plaintiff voted in the 2024 general election. Mark Andrews Dep. at 57:18-20.

188.   No one ever told Plaintiff not to vote. Mark Andrews Dep. at 57:5-6.

Served this 20th day of December, 2024.

/s/ Jake Evans
JAKE EVANS
Georgia Bar No. 797018
PHILIP J. GEORGE
Georgia Bar No. 441996
JULIA MARTIN
Georgia Bar No. 199070
GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road NE, Suite 2500

Atlanta, Georgia 30305
P: (678) 553-2100
F: (678) 553-2212
Jake.Evans@gtlaw.com
Philip.George@gtlaw.com
Julia.Martin@gtlaw.com

*Attorneys for Defendants True the Vote, Inc.,*
*Catherine Englebrecht and Gregg Phillips*

**APPENDIX 1**
**(THE ALLEGED DEFAMATORY STATEMENTS PLAINTIFF CLAIMS)[5]**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Plaintiff's Supplemental Response to Defendants' Interrogatory 1** | | | | | | |
| **Statement No.** | **Publication** | **Date** | **Venue** | **URL** | **Statements** | **Supplemental Detail** |
| 1. | 2000 Mules Film | 5/20/2022 | E.g., Walmart, Patriot Depot, Public Square, Amazon, SalemNow Store, Watch.SalemNOW .com, Dinesh D'Souza's Locals, Cinemark theaters, Mar-a-Lago screening | E.g., https://www.walmart.com/ip/2000-Mules-Documentary-DVD- y-Dinesh D-Souza/643463268; https://patriotdepot.com/products/2000- mules-by-dinesh-d- souza-dvd; https://www.publicsquare. com/products/ce4ecc20-146f-11ee-a94a-adf0145e8648/V2924792/2000-mules-dvd--by-dinesh-dsouza,%20https://patriotdepot.com/products/2 000-mules- by-dinesh-d-souza-dvd; https://www.amazon.com/Mules DSouza-Media-Version-Selections Subtitles/dp/B0B5NK87DK; https://shop.salemnow. com/product/2000-mules/; https://www.dallasnews. com/business/local-companies/2022/05/24/cinemark- alone-in-showing-dubious-2020-election-fraud-documentary-2000-mules/ | *See*, Paragraphs 6-8, 34-46. | Mr. Andrews' image is used in the film as an example of a ballot mule, defined in the film as an individual paid to traffic in ballots, and specifically whom Defendants claim in the movie that they had tracked to at least ten ballot drop boxes and one non-profit "stash house." As video of Mr. Andrews and his white SUV appear on screen during the film, Defendant D'Souza's voiceover falsely states: "What you are seeing is a crime. These are fraudulent votes." An image of Mr. Andrews is again shown as the final standalone video clip in a series of clips depicting voters depositing ballots in drop boxes, reinforcing the false implication that Mr. Andrews was a "ballot mule" and, therefore, a criminal. Throughout the movie, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct, associating them with "organized crime," "a cartel," and "trafficking." Throughout the movie Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 2. | 2,000 Mules: They Thought We'd Never Find Out. They Were Wrong. | 10/25/202 2 | E.g., Amazon, BulkBookstore, Barnes & Noble, Simon & Schuster, Target, Regnery site | E.g., https://www.amazon.com/000-Mules-Thought- Never-Wrong/dp/1684514460?ccs_id=ea2b4cfb-5a74-468d-8b42-b6f6310e0775; https://bulkbookstore.com/2- 000-mules-they-thought-wed-never-find-out-they-were- wrong-9781684514465-9781684514465; https://www. barnesandnoble.com/w/2000-mules-dinesh- | *See*, Paragraphs 70-75, 163. | Mr. Andrews' image is used in the book as an example of a ballot mule, defined in the book as an individual paid to traffic in ballots, and specifically whom Defendants claim in the book that they had tracked to at least ten ballot drop boxes and one non-profit "stash house." The 2000 Mules book contains numerous screenshots from the 2000 Mules film, including the image of Mr. Andrews |

[5] This chart is copied verbatim from Plaintiff's Supplemental Response to Defendant's Interrogatory No. 1. TTV Defendants added in the first column entitled "Statement No." for ease of reference. TTV dispute the characterizations in this chart, but include them only for reference.

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | dsouza/1141490353; https://www.simonandschuster.com/books/2-000-Mules/Dinesh-DSouza/9781684511150; https://www.target.com/p/2-000-mules-by-dinesh-d-souza-hardcover/-/A-87610742 | | voting by delivering his ballot to the dropbox, and the image of his car. The caption on the page with Mr. Andrews image reads: "What we see here are screenshots from the videos of mules stuffing multiple ballots into mail-in drop boxes. While vote harvesting is legal in some states, typically under restricted conditions, paid ballot trafficking is illegal across the country. What you are seeing here is organized crime on behalf of the Democratic Party." Mr. Andrews' image appears in the 2000 Mules book in a center full color photo spread, along with a repetition of the false and defamatory claims of the 2000 Mules film, nearly in their entirety. The promotional materials for the book state: "the criminals are still at large." Throughout the book, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct, associating them with "organized crime," "a cartel," and "trafficking." Throughout the book Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 3. | 2000 Mules Times Square Billboard | 6/16/2022 | Banners 4 Freedom billboard | https://t.me/Banners4Freedom/420; https://t.me/Banners4Freedom/419 | Features Plaintiff's image in promoting the film, thereby linking him to the Defendants' allegations of voter fraud and illegal ballot harvesting. | Defendants included Mr. Andrews' image, depicting Mr. Andrews putting ballots into a ballot drop box, in a Times Square video billboard promoting the film 2000 Mules. Mr. Andrews' image is used as an example of a ballot mule, implied in the context of the billboard as an individual paid to traffic in ballots, engaged in illegal voting, conspired to steal the 2020 election, and specifically whom Defendants claim in the movie the billboard promotes that they had tracked to at least ten ballot drop boxes and one non-profit "stash house." Throughout the movie the billboard promotes and the context surrounding the billboard, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | | presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 4. | 2000 Mules Trailer | | 2000 Mules Website | https://2000mules.com/ | *See*, Paragraphs 45-46. | Defendants also included the footage of Mr. Andrews voting in their "official" trailer for 2000 Mules. In the trailer, D'Souza asks, "do you have video evidence?" of the alleged mules engaged in criminal conduct. Phillips replies: "four million minutes of surveillance video," as Mr. Andrews' image is shown. Defendants included in the trailer the following dialogue from the film discussing the purported mules (including Mr. Andrews): Phillips: "This is not grandma walking her dog: bad backgrounds, bad reputations. They are interested in one thing: that's money." Engelbrecht: "And in no shape, in no way, in no time is that legal." Phillips: "This is organized crime." Throughout the trailer, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. Through the trailer and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 5. | 2000 Mules Trailer | | Salem News Channel | https://salemnewschannel.com/watch/2000-mules-extended-trailer-a-film-on-election-integrity-charlie-kirk-6266e365bbf5b900010a0ccc | *See*, Paragraphs 45-46. | Defendants also included the footage of Mr. Andrews voting in their "official" trailer for 2000 Mules. In the trailer, D'Souza asks, "do you have video evidence?" of the alleged mules engaged in criminal conduct. Phillips replies: "four million minutes of surveillance video," as Mr. Andrews' image is shown. Defendants included in the trailer the following dialogue from the film discussing the purported mules (including Mr. Andrews): Phillips: "This is not grandma walking her dog: bad backgrounds, bad reputations. They are interested in |

| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
|---|---|---|---|---|---|---|
| | | | | | | one thing: that's money." Engelbrecht: "And in no shape, in no way, in no time is that legal." Phillips: "This is organized crime." |
| | | | | | | Throughout the trailer, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. |
| | | | | | | Through the trailer and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 6. | TTV on Facts Matter with Roman Balmakov 5/13 | 5/14/2022 | TTV site | https://truethevote.org/news/the-epoch-times-interview- about-who-is-funding-the-ballot-mules | *See*, Paragraphs 66-69. | On May 13, 2022, Defendants Engelbrecht and Phillips appeared on The Epoch Times' news show Facts Matters with Roman Balmakov and showed the TTV clip of Mr. Andrews voting as they explained the purported illegal "mules" scheme.<br><br>Phillips stated that they used geolocation tracking because "we were looking for ways to solve a crime." Phillips claimed that they tracked people going to "stash houses," and "delivering" to ballot drop boxes, then "backed [that] up with video." He stated, "in no case, either by federal law or any state law, can you get paid to traffic ballots."<br><br>In discussing the footage of voters (including Mr. Andrews), Defendant Engelbrecht stated: "Their phone was at a violent riot." Throughout the video, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct.<br><br>Through the video and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 7. | D'Souza on | 9/13/2022 | NTD News | https://mms.tveyes.com/transcript.asp? | *See*, Paragraphs | On May 4, 2022, Defendant D'Souza appeared on NTD |

4

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | NTD News channel WMBC 63 5/4 | | | StationID=12090&DateTime=9/13/2022%20% 209:00: 46%20PM&playclip%20=true&pbc=search%3 a%2b | 54-55. | News on New York news channel WMBC 63, where he repeated the false claim that Mr. Andrews had committed voter fraud. Defendant D'Souza stated that "[2000 Mules] is an exposé of a coordinated ring of paid ballot trafficking, illegal votes, fraudulent votes being dumped en masse into mail-in drop boxes." The TTV clip of Mr. Andrews voting appeared onscreen as Defendant D'Souza said "dumped en masse into mail-in drop boxes." Later in the interview, Defendant D'Souza said that by watching the film, "you will actually be taken to the scene of the crime. You'll be able to see it for yourself. Now where do you see the movie, there's only one way to see it: go to the website." Defendant D'Souza went on to explain that they had identified "more than 2000 mules. A mule is just kind of the trafficker, it's a term taken out of sex trafficking or drug trafficking, except we're talking now about ballot trafficking." Throughout the video, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 8. | Tucker Carlson 5/5 | 5/6/2022 | Fox News | n/a | *See*, Paragraphs 56-57. | On May 5, 2022, Defendant Engelbrecht appeared on Tucker Carlson Tonight on Fox News. During her appearance, the TTV clip of Mr. Andrews appeared as she made false claims about the election fraud purportedly depicted in 2000 Mules. Neither Mr. Andrews' face nor his license plate are blurred as she described "a recipe for fraud." One minute later, Defendant Engelbrecht said: "As I sit here tonight, I can tell you there was rampant abuse of those drop boxes, and the data that we have is immutable and proves it, now buttressed increasingly by video." She also commented: "the subversion was in fact real." Throughout the appearance, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. Through the interview and its context, Defendants falsely |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | | imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 9. | D'Souza on Weekly Briefing with Chanel Rion 5/21 | 5/21/2022 | OANN | https://www.mediamatters.org/media/3988753 | *See*, Paragraphs 139-141. | On May 21, 2022, Defendant D'Souza appeared on OANN's "Weekly Briefing with Chanel Rion" show. Alongside the TTV clip of Mr. Andrews voting, Defendant D'Souza reiterated his false narrative: "a mule is a paid operative who is delivering these fraudulent and illegal votes" to multiple drop boxes. With Mr. Andrews' image on screen, Defendant D'Souza claimed that there was widespread fraud during the 2020 election.<br><br>Defendant D'Souza later said, "Out of 240 mules, 242 mules in Atlanta, something like 67 of them were in the violent antifa BLM riots. It doesn't look to me like that's likely to be a population of cops, it's more likely that the Democrats, who by the way dominate these inner cities, basically went to these antifa BLM guys and said: 'Look you've had enough fun burning cities and pulling people out of their cars and beating them up, why don't we pay you to do a different kind of operation that might help our guys to get to the White House.'"<br><br>Throughout the appearance, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct.<br><br>Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 10. | D'Souza on KUSI News 5/23 | 5/23/2022 | KUSI | https://web.archive.org/web/20221228055134/h ttps://www.kusi.com/dinesh-dsouza-on-the- success-of-his- new-film-2000-mules/? | *See*, Paragraphs 145-146. | On May 23, 2022, Defendant D'Souza also appeared on "KUSI News" on San Diego channel KUSI. Mr. Andrews' image was shown (with his face blurred) as Defendant |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Plaintiff's Supplemental Response to Defendants' Interrogatory 1** | | | | | | |
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | fbclid=IwAR3LB8eLsSXx0xKeLxQvaNnYn84JdbN6tiSQ aQ7c0rkmVTZGQRcvwRaGUE4 | | D'Souza described 2000 Mules as "damning evidence"—again falsely portraying the image of Mr. Andrews as evidence of the election fraud scheme. The TTV clip of Mr. Andrews voting was shown a second time as Defendant D'Souza spoke about how the purported "mules" wore gloves to avoid leaving fingerprints. He explained the scheme: "These mules are paid operators who deliver illegal and fraudulent votes to mail-in drop boxes and by monitoring the movement of their phones, you can show these guys go from one drop box to another to another to another and track their movements in the crucial weeks leading up to the election." Defendant D'Souza elaborated that the "mules" were paid ten dollars per ballot. He further claimed that the filmmakers "set a very high bar, because you don't want to get false positives" for deeming a person a mule: "ten or more drop boxes, because there's no rational or innocent reason to go to more than ten. Even if you're dropping off the votes of your family members, you're going to go to one drop box and put them all in there, why would you go to ten?"<br><br>Throughout the appearance, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct.<br><br>Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 11. | D'Souza on OANN's Tipping Point 5/11 | 5/11/2022 | OANN | https://www.mediamatters.org/media/3988751 | *See*, Paragraph 65. | On May 11, 2022, Defendant D'Souza appeared on One America News Network's Tipping Point with Kara McKinney. He showed the TTV clip of Mr. Andrews voting. During the interview, D'Souza claimed that the film "shows that there was fraud, coordinated fraud in all the key states that decided the election." As evidence of this, he claimed that the video "confirmed" the scheme, as it showed the same "mules" that were geotracked "stuffing the ballot box" and constituted "proof of a very high order."<br><br>Throughout the appearance, Defendants accuse "mules" -- |

| | | | | Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | | including Mr. Andrews -- of criminal conduct. |
| | | | | | | Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 12. | D'Souza on Real America with Dan Ball 5/17 | 5/17/2022 | OANN | n/a | *See*, Paragraphs 142-144. | On May 17, 2022, Defendant D'Souza appeared on OANN's Real America with Dan Ball. He shared the 2000 Mules trailer in its entirety, including the clip of Mr. Andrews voting with Defendant D'Souza's voiceover describing it as "evidence" of an organized crime scheme. Later in the interview, while discussing the purported fraud scheme, he again played the TTV clip of Mr. Andrews voting, while the host asked about "ballot stuffers" making five to ten dollars per ballot. D'Souza commented that "fact checkers" were incorrect, referencing the finding that Mr. Andrews was legally dropping off his family members' ballots:
 
"It's really hard to argue, because when you look at what the fact checkers are saying, it doesn't really square with what's in the film. So they'll say things like, well, you know, in Georgia, people are allowed to return ballots for their family members. That's true, but if you're returning ballots for your family members, why would you go to more than one drop box? You'd go to one to drop them off, you go home. We're looking at mules that went to a minimum of ten drop boxes. And, as you know, if you've seen that video in the film ⋯"

Throughout the appearance, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct.

Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | | on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 13. | 2000 Mules Trailer | 4/23/2022 | Rumble | https://rumble.com/v1238uc-2000-mules-trailer.html | *See*, Paragraphs 45-46. | Defendants also included the footage of Mr. Andrews voting in their "official" trailer for 2000 Mules. In the trailer, D'Souza asks, "do you have video evidence?" of the alleged mules engaged in criminal conduct. Phillips replies: "four million minutes of surveillance video," as Mr. Andrews' image is shown. |
| | | | | | | Defendants included in the trailer the following dialogue from the film discussing the purported mules (including Mr. Andrews): Phillips: "This is not grandma walking her dog: bad backgrounds, bad reputations. They are interested in one thing: that's money." Engelbrecht: "And in no shape, in no way, in no time is that legal." Phillips: "This is organized crime." |
| | | | | | | Throughout the trailer, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. |
| | | | | | | Through the trailer and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted |
| | | | | | | ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| 14. | 2000 Mules Trailer | 4/23/2022 | Rumble | https://rumble.com/v124geo-2000-mules-extended-trailer.html | *See*, Paragraphs 45-46. | Defendants also included the footage of Mr. Andrews voting in their "official" trailer for 2000 Mules.<br><br>In the trailer, D'Souza asks, "do you have video evidence?" of the alleged mules engaged in criminal conduct. Phillips replies: "four million minutes of surveillance video," as Mr. Andrews' image is shown.<br><br>Defendants included in the trailer the following dialogue from the film discussing the purported mules (including Mr. Andrews): Phillips: "This is not grandma walking her dog: bad backgrounds, bad reputations. They are interested in one thing: that's money." Engelbrecht: "And in no shape, in no way, in no time is that legal." Phillips: "This is organized crime."<br><br>Throughout the trailer, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct.<br><br>Through the trailer and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 15. | Charlie Kirk Show 4/8 | 4/8/2022 | Rumble | https://rumble.com/v10ajh2-how-the-did-it-true-the-votes- catherine-engelbrecht-and-gregg-phillips-on-t.html | *See*, Paragraphs 49-53. | On April 8, 2022, Defendants Engelbrecht and Phillips twice showed an excerpt of Mr. Andrews voting without any blurring of his face on The Charlie Kirk Show. During the interview, the unblurred video, which includes Mr. Andrews' face and the license plate on his car, shows him voting while Engelbrecht and Phillips falsely describe the video as depicting Mr. Andrews committed crimes: Kirk:<br><br>"Ok let's watch this video here. This is Gwinnett County, is that right?" Engelbrecht: "Yes." Kirk: "Ok. And we can talk over the video as it's happening because there's no sound. Ok so a white [video of Andrews voting begins] SUV [Andrews' vehicle] pulls up, middle of the day, what are we looking at here guys?" Phillips: "You're going to see a voter [Andrews] get out—a mule get out." Engelbrecht: "A mule [referring to Andrews] get out." Kirk: "So this is a mule [referring to Andrews]? [Referring to the unblurred image of Andrews.] This is one of your 2000 that you've profiled." |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Plaintiff's Supplemental Response to Defendants' Interrogatory 1** | | | | | | |
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | | Engelbrecht: "Yes." Philips: "And they've—and they've got their ballots [referring to Andrews holding his and his family's ballots]. And they [referring to Andrews] walk up to the box. You can only fit a couple of ballots in at the same time." Kirk: "Is this the state of Georgia?" Phillips: "Yeah." Engelbrecht: "Yes." Kirk: "So you're not allowed to turn in more than one?" Engelbrecht: "Yes." Kirk: "Unless it's for a close relative?" Engelbrecht: "That is correct." Phillips: "And [referring to Andrews depositing the ballots] he's trying to figure out how to even get them into the box because he has so many he can't fit them in the little—the little slot. So then he starts having to put them in one by one. Everybody's sitting there waiting on him. One." Kirk: "[Referring to Andrews' behavior] Now this is illegal?" Engelbrecht: "Right." Kirk: "Highly illegal to do this." Engelbrecht: "Right." Phillips: "[Referring to Andrews depositing the ballots] Every one past that first one was illegal." Engelbrecht: "Well there is a possible in that he [Andrews] could have been an assistor, which would have meant he would have had [video of Andrews voting ends] a signed envelope that would had indicated that he was an assistor in that capacity, but through our open records we confirmed that Gwinnett County had no assistors." Kirk: "Ok." Engelbrecht: "So we tried to kick over you know every, every rock." Kirk: "Good for you. Because that would have been in The Washington Post: 'Hey could have been an assistor.'" Engelbrecht: "Absolutely." Kirk: "Well, no, we looked into it." Later in the interview, Defendants' clip of Mr. Andrews voting plays again, with his face unblurred, and including a location and timestamp: "Drop box - Gwinnett County Election Office - Grayson Hwy" and "10/6/20 9:48AM." Onscreen in large, bold letters is the caption: "Ballot Harvesting is illegal in GA!" <br><br>Throughout the appearance, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. <br><br>Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 |

| | | | | | | |
|---|---|---|---|---|---|---|
|  | **Plaintiff's Supplemental Response to Defendants' Interrogatory 1** | | | | | |
| **Statement No.** | **Publication** | **Date** | **Venue** | **URL** | **Statements** | **Supplemental Detail** |
| | | | | | | presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 16. | Charlie Kirk Show 4/8 | 4/13/2022 | Rumble | https://rumble.com/v10ubu3-charlie-kirk-interviews-true-the-vote.html?mref=hsiwx&mrefc=2 | *See*, Paragraphs 49-53. | On April 8, 2022, Defendants Engelbrecht and Phillips twice showed an excerpt of Mr. Andrews voting without any blurring of his face on The Charlie Kirk Show. During the interview, the unblurred video, which includes Mr. Andrews' face and the license plate on his car, shows him voting while Engelbrecht and Phillips falsely describe the video as depicting Mr. Andrews committed crimes: Kirk: "Ok let's watch this video here. This is Gwinnett County, is that right?" Engelbrecht: "Yes." Kirk: "Ok. And we can talk over the video as it's happening because there's no sound. Ok so a white [video of Andrews voting begins] SUV [Andrews' vehicle] pulls up, middle of the day, what are we looking at here guys?" Phillips: "You're going to see a voter [Andrews] get out—a mule get out." Engelbrecht: "A mule [referring to Andrews] get out." Kirk: "So this is a mule [referring to Andrews]? [Referring to the unblurred image of Andrews.] This is one of your 2000 that you've profiled." Engelbrecht: "Yes." Philips: "And they've—and they've got their ballots [referring to Andrews holding his and his family's ballots]. And they [referring to Andrews] walk up to the box. You can only fit a couple of ballots in at the same time." Kirk: "Is this the state of Georgia?" Phillips: "Yeah." Engelbrecht: "Yes." Kirk: "So you're not allowed to turn in more than one?" Engelbrecht: "Yes." Kirk: "Unless it's for a close relative?" Engelbrecht: "That is correct." Phillips: "And [referring to Andrews depositing the ballots] he's trying to figure out how to even get them into the box because he has so many he can't fit them in the little—the little slot. So then he starts having to put them in one by one. Everybody's sitting there waiting on him. One." |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | | Kirk: "[Referring to Andrews' behavior] Now this is illegal?" Engelbrecht: "Right." Kirk: "Highly illegal to do this." Engelbrecht: "Right." Phillips: "[Referring to Andrews depositing the ballots] Every one past that first one was illegal." Engelbrecht: "Well there is a possible in that he [Andrews] could have been an assistor, which would have meant he would have had [video of Andrews voting ends] a signed envelope that would had indicated that he was an assistor in that capacity, but through our open records we confirmed that Gwinnett County had no assistors." Kirk: "Ok." Engelbrecht: "So we tried to kick over you know every, every rock." Kirk: "Good for you. Because that would have been in The Washington Post: 'Hey could have been an assistor.'" Engelbrecht: "Absolutely." Kirk: "Well, no, we looked into it." Later in the interview, Defendants' clip of Mr. Andrews voting plays again, with his face unblurred, and including a location and timestamp: "Drop box - Gwinnett County Election Office - Grayson Hwy" and "10/6/20 9:48AM." Onscreen in large, bold letters is the caption: "Ballot Harvesting is illegal in GA!" |
| | | | | | | Throughout the appearance, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. |
| | | | | | | Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 17. | Tucker Carlson 5/5 | 5/5/2022 | Rumble | https://rumble.com/v13oocs-tucker-carlson-tonight- catherine-engelbrecht-may-5-2022.html? mref=hsiwx&mrefc=4 | *See*, Paragraphs 56-57. | On May 5, 2022, Defendant Engelbrecht appeared on Tucker Carlson Tonight on Fox News. During her appearance, the TTV clip of Mr. Andrews appeared as she made false claims about the election fraud purportedly depicted in 2000 Mules. Neither Mr. Andrews' face nor his license plate are blurred as she described "a recipe for fraud." One minute later, Defendant Engelbrecht said: "As I sit here tonight, I can tell you there was rampant abuse of those drop boxes, and the data that we have is immutable and proves it, now buttressed increasingly by video." She |

| | | | | | | Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | |
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
|---|---|---|---|---|---|---|
| | | | | | | also commented: "the subversion was in fact real."<br><br>Throughout the appearance, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct.<br><br>Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 18. | Tucker Carlson 5/5 | 5/6/2022 | Rumble | https://rumble.com/v13qlbn-catherine-engelbrecht-joins- tucker-to-discuss-the-groundbreaking-technology.html?mref=hsiwx&mrefc=3 | *See*, Paragraphs 56-57. | On May 5, 2022, Defendant Engelbrecht appeared on Tucker Carlson Tonight on Fox News. During her appearance, the TTV clip of Mr. Andrews appeared as she made false claims about the election fraud purportedly depicted in 2000 Mules. Neither Mr. Andrews' face nor his license plate are blurred as she described "a recipe for fraud." One minute later, Defendant Engelbrecht said: "As I sit here tonight, I can tell you there was rampant abuse of those drop boxes, and the data that we have is immutable and proves it, now buttressed increasingly by video." She also commented: "the subversion was in fact real."<br><br>Throughout the appearance, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct.<br><br>Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| 19 | TTV on Facts Matter with Roman Balmakov 5/13 | 5/13/2022 | Rumble | https://rumble.com/v14no71-epoch-times-obama-affiliated-ngos-poured-billions-to-steal-elections.html?mref=hsiwx&mrefc=6 | *See*, Paragraphs 66-69. | On May 13, 2022, Defendants Engelbrecht and Phillips appeared on The Epoch Times' news show Facts Matters with Roman Balmakov and showed the TTV clip of Mr. Andrews voting as they explained the purported illegal "mules" scheme.<br><br>Phillips stated that they used geolocation tracking because "we were looking for ways to solve a crime." Phillips claimed that they tracked people going to "stash houses," and "delivering" to ballot drop boxes, then "backed [that] up with video." He stated, "in no case, either by federal law or any state law, can you get paid to traffic ballots." In discussing the footage of voters (including Mr. Andrews), Defendant Engelbrecht stated: "Their phone was at a violent riot."<br><br>Throughout the video, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct.<br><br>Through the video and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 20. | D'Souza on Real America with Dan Ball 5/17 | 5/17/2022 | Rumble | https://rumble.com/v1548vv-real-america-dan-ball-w-dinesh-dsouza-everyone-needs-to-watch-2000-mules-51.html | *See*, Paragraphs 142-144. | On May 17, 2022, Defendant D'Souza appeared on OANN's Real America with Dan Ball. He shared the 2000 Mules trailer in its entirety, including the clip of Mr. Andrews voting with Defendant D'Souza's voiceover describing it as "evidence" of an organized crime scheme. Later in the interview, while discussing the purported fraud scheme, he again played the TTV clip of Mr. Andrews voting, while the host asked about "ballot stuffers" making five to ten dollars per ballot. D'Souza commented that "fact checkers" were incorrect, referencing the finding that Mr. Andrews was legally dropping off his family members' ballots:<br><br>"It's really hard to argue, because when you look at what the fact checkers are saying, it doesn't really square with what's in the film. So they'll say things like, well, you know, in Georgia, people are allowed to return ballots for |

15

| | Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | | their family members. That's true, but if you're returning ballots for your family members, why would you go to more than one drop box? You'd go to one to drop them off, you go home. We're looking at mules that went to a minimum of ten drop boxes. And, as you know, if you've seen that video in the film       "<br><br>Throughout the appearance, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct.<br><br>Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 21 | TTV Video | 5/8/2022 | Rumble | https://rumble.com/v13zwyp-true-the-vote-this-is-not-the- end.html?mref=hsiwx&mrefc=7 | *See*, Paragraph 64. | On May 8, 2022, TTV published on its Facebook page another video about how it planned to release all of its video and data evidence of mass fraud beyond that contained in 2000 Mules. Interspersed among ominous footage and statements about how "all the easy choices are in the past" and "pull[ing] the ripcord," the trailer contained Mr. Andrews' image as the first in a series of examples of video evidence. This trailer has more than 95,000 views and remains online. TTV shared the trailer on its website, Instagram, and Rumble.<br><br>Throughout the video, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct.<br><br>Through the video and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| 22. | TTV on Facts Matter with Roman Balmakov 5/13 | 6/3/2022 | YouTube | https://www.youtube.com/watch?v=LoRp9Ppi NQE | *See*, Paragraphs 66-69. | On May 13, 2022, Defendants Engelbrecht and Phillips appeared on The Epoch Times' news show Facts Matters with Roman Balmakov and showed the TTV clip of Mr. Andrews voting as they explained the purported illegal "mules" scheme.<br><br>Phillips stated that they used geolocation tracking because "we were looking for ways to solve a crime." Phillips claimed that they tracked people going to "stash houses," and "delivering" to ballot drop boxes, then "backed [that] up with video." He stated, "in no case, either by federal law or any state law, can you get paid to traffic ballots." In discussing the footage of voters (including Mr. Andrews), Defendant Engelbrecht stated: "Their phone was at a violent riot."<br><br>Throughout the video, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct.<br><br>Through the video and its context, Defendants falsely imply, assert, and claim to prove that "mules," (including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 23. | TTV on Facts Matter with Roman Balmakov 5/13 | 5/13/2022 | Epoch Times site | https://www.theepochtimes.com/epochtv/obam a-affiliated- ngos-poured-billions-into-local- insurgencies-to-steal- 2020-election-analyst-4458553 | *See*, Paragraphs 66-69. | On May 13, 2022, Defendants Engelbrecht and Phillips appeared on The Epoch Times' news show Facts Matters with Roman Balmakov and showed the TTV clip of Mr. Andrews voting as they explained the purported illegal "mules" scheme.<br><br>Phillips stated that they used geolocation tracking because "we were looking for ways to solve a crime." Phillips claimed that they tracked people going to "stash houses," and "delivering" to ballot drop boxes, then "backed [that] up with video." He stated, "in no case, either by federal law or any state law, can you get paid to traffic ballots." In discussing the footage of voters (including Mr. Andrews), Defendant Engelbrecht stated: "Their phone was at a violent riot."<br><br>Throughout the video, Defendants accuse "mules" -- |

| | | | | Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | |
|---|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail | |

| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
|---|---|---|---|---|---|---|
| | | | | | | including Mr. Andrews -- of criminal conduct. Through the video and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 24. | D'Souza on NTD News channel WMBC 63 5/4 | 5/4/2022 | NTD News | https://www.ntd.com/ntd-news-today-full-broadcast-may- 4-3_774836.html | *See*, Paragraphs 54-55. | On May 4, 2022, Defendant D'Souza appeared on NTD News on New York news channel WMBC 63, where he repeated the false claim that Mr. Andrews had committed voter fraud. Defendant D'Souza stated that "[2000 Mules] is an exposé of a coordinated ring of paid ballot trafficking, illegal votes, fraudulent votes being dumped en masse into mail-in drop boxes." The TTV clip of Mr. Andrews voting appeared onscreen as Defendant D'Souza said "dumped en masse into mail-in drop boxes." Later in the interview, Defendant D'Souza said that by watching the film, "you will actually be taken to the scene of the crime. You'll be able to see it for yourself. Now where do you see the movie, there's only one way to see it: go to the website." Defendant D'Souza went on to explain that they had identified "more than 2000 mules. A mule is just kind of the trafficker, it's a term taken out of sex trafficking or drug trafficking, except we're talking now about ballot trafficking." Throughout the video, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| 25. | D'Souza on The Epoch Times' Crossroads 5/6 | 5/6/2022 | Epoch Times | https://www.theepochtimes.com/dinesh-dsouza-enough-fraud-was-committed-to-steal-2020-election_4443068.html | *See*, Paragraphs 59-60. | On May 6, 2022, Defendant D'Souza appeared on The Epoch Times' Crossroads with host Joshua Philipp, a news show broadcast online and on television via a streaming service. Mr. Andrews' blurred image was shown twice. The first instance was in Philipp's introduction to the segment as he claimed that "alleged paid couriers called mules were traveling to various nonprofit groups and ballot drop boxes." Later in the interview, Defendant D'Souza said: "What seals the deal and what made this movie so powerful…is when True the Vote began to show me surveillance video that they had obtained from the states themselves, official surveillance video which kind of catches the mules in the act." Mr. Andrews' image appears during Defendant D'Souza's first mention of "surveillance video." During the interview, Defendant D'Souza falsely claimed that "everything that you see in the movie is 100% illegal in all the 50 states." He continued to claim that the "mules" engaged in other criminal activity: "We happen to know that a number of the mules are Antifa-BLM types. Those are the sort of thugs who are being hired to do this." Throughout the appearance, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 26. | Tucker Carlson 5/5 | 5/6/2022 | Fox News online | n/a | *See*, Paragraphs 56-57. | On May 5, 2022, Defendant Engelbrecht appeared on Tucker Carlson Tonight on Fox News. During her appearance, the TTV clip of Mr. Andrews appeared as she made false claims about the election fraud purportedly depicted in 2000 Mules. Neither Mr. Andrews' face nor his license plate are blurred as she described "a recipe for fraud." One minute later, Defendant Engelbrecht said: "As I sit here tonight, I can tell you there was rampant abuse of those drop boxes, and the data that we have is immutable and proves it, now buttressed increasingly by video." She also commented: "the subversion was in fact real." |

| | | | | Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | | Throughout the appearance, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 27. | D'Souza on Weekly Briefing with Chanel Rion 5/21 | 5/23/2022 | X | https://twitter. com/ChanelRion/status/1528812903494819842 | *See*, Paragraphs 139-141. | On May 21, 2022, Defendant D'Souza appeared on OANN's "Weekly Briefing with Chanel Rion" show. Alongside the TTV clip of Mr. Andrews voting, Defendant D'Souza reiterated his false narrative: "a mule is a paid operative who is delivering these fraudulent and illegal votes" to multiple drop boxes. With Mr. Andrews' image on screen, Defendant D'Souza claimed that there was widespread fraud during the 2020 election. Defendant D'Souza later said, "Out of 240 mules, 242 mules in Atlanta, something like 67 of them were in the violent antifa BLM riots. It doesn't look to me like that's likely to be a population of cops, it's more likely that the Democrats, who by the way dominate these inner cities, basically went to these antifa BLM guys and said: 'Look you've had enough fun burning cities and pulling people out of their cars and beating them up, why don't we pay you to do a different kind of operation that might help our guys to get to the White House.'" Throughout the appearance, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |

| | | | Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| 28. | 2000 Mules Trailer | 4/23/2022 | Facebook | https://www.facebook.com/TrueTheVote/posts/1187649231982163/ | *See*, Paragraphs 45-46. | Defendants also included the footage of Mr. Andrews voting in their "official" trailer for 2000 Mules.<br><br>In the trailer, D'Souza asks, "do you have video evidence?" of the alleged mules engaged in criminal conduct. Phillips replies: "four million minutes of surveillance video," as Mr. Andrews' image is shown.<br><br>Defendants included in the trailer the following dialogue from the film discussing the purported mules (including Mr. Andrews): Phillips: "This is not grandma walking her dog: bad backgrounds, bad reputations. They are interested in one thing: that's money." Engelbrecht: "And in no shape, in no way, in no time is that legal." Phillips: "This is organized crime."<br><br>Throughout the trailer, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct.<br><br>Through the trailer and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 29. | Tucker Carlson 5/5 | 5/6/2022 | Facebook | https://www.facebook.com/watch/?v=1381334499041217&ref=sharing | *See*, Paragraphs 56-57. | On May 5, 2022, Defendant Engelbrecht appeared on Tucker Carlson Tonight on Fox News. During her appearance, the TTV clip of Mr. Andrews appeared as she made false claims about the election fraud purportedly depicted in 2000 Mules. Neither Mr. Andrews' face nor his license plate are blurred as she described "a recipe for fraud." One minute later, Defendant Engelbrecht said: "As I sit here tonight, I can tell you there was rampant abuse of those drop boxes, and the data that we have is immutable and proves it, now buttressed increasingly by video." She also commented: "the subversion was in fact real."<br><br>Throughout the appearance, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct.<br><br>Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | | criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 30. | TTV Video | 5/8/2022 | Facebook | https://www.facebook.com/watch/?v=3357702 81958423 | *See*, Paragraph 64. | On May 8, 2022, TTV published on its Facebook page another video about how it planned to release all of its video and data evidence of mass fraud beyond that contained in 2000 Mules. Interspersed among ominous footage and statements about how "all the easy choices are in the past" and "pull[ing] the ripcord," the trailer contained Mr. Andrews' image as the first in a series of examples of video evidence. This trailer has more than 95,000 views and remains online. TTV shared the trailer on its website, Instagram, and Rumble. Throughout the video, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. Through the video and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 31. | 2000 Mules Music Video Trailer | 10/22/2022 | Facebook | https://www.facebook.com/TrueTheVote/videos/3304988439758013/ | *See*, Paragraph 162. | On October 22, 2022, the TTV Defendants published the "music video trailer" for 2000 Mules on TTV's Facebook page. This trailer, which repeats Defendants' false "mules" narrative, repeatedly includes TTV's image of Mr. Andrews voting as an exemplar mule. More than once, Mr. Andrews' image appears onscreen, including as background to the lyrics "2000 Mules/on a mission/riggin' elections." The song repeats the lyrics, "Like a thief in the night, they [referring to the mules] stole them votes." The song continues, "This is organized crime, True the Vote got that evidence." Throughout the video, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | | Through the video and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 32. | 2000 Mules Trailer | 4/23/2022 | Instagram | https://www.instagram.com/p/Cct3Y-cjupV/ | *See*, Paragraphs 45-46. | Defendants also included the footage of Mr. Andrews voting in their "official" trailer for 2000 Mules. In the trailer, D'Souza asks, "do you have video evidence?" of the alleged mules engaged in criminal conduct. Phillips replies: "four million minutes of surveillance video," as Mr. Andrews' image is shown. Defendants included in the trailer the following dialogue from the film discussing the purported mules (including Mr. Andrews): Phillips: "This is not grandma walking her dog: bad backgrounds, bad reputations. They are interested in one thing: that's money." Engelbrecht: "And in no shape, in no way, in no time is that legal." Phillips: "This is organized crime." Throughout the trailer, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. Through the trailer and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| 33. | Tucker Carlson 5/5 | 5/6/2022 | Instagram | https://www.instagram.com/p/CdN1ud6D11e/ | *See*, Paragraphs 56-57. | On May 5, 2022, Defendant Engelbrecht appeared on Tucker Carlson Tonight on Fox News. During her appearance, the TTV clip of Mr. Andrews appeared as she made false claims about the election fraud purportedly depicted in 2000 Mules. Neither Mr. Andrews' face nor his license plate are blurred as she described "a recipe for fraud." One minute later, Defendant Engelbrecht said: "As I sit here tonight, I can tell you there was rampant abuse of those drop boxes, and the data that we have is immutable and proves it, now buttressed increasingly by video." She also commented: "the subversion was in fact real." <br><br> Throughout the appearance, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. <br><br> Through the interview and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 34. | TTV Video | 5/8/2022 | Instagram | https://www.instagram.com/p/CdTt8_ujYbI/ | *See*, Paragraph 64. | On May 8, 2022, TTV published on its Facebook page another video about how it planned to release all of its video and data evidence of mass fraud beyond that contained in 2000 Mules. Interspersed among ominous footage and statements about how "all the easy choices are in the past" and "pull[ing] the ripcord," the trailer contained Mr. Andrews' image as the first in a series of examples of video evidence. This trailer has more than 95,000 views and remains online. TTV shared the trailer on its website, Instagram, and Rumble. <br><br> Throughout the video, Defendants accuse "mules" -- including Mr. Andrews -- of criminal conduct. <br><br> Through the video and its context, Defendants falsely imply, assert, and claim to prove that "mules," including Mr. Andrews: (1) engaged in illegal voting; (2) engaged in a criminal conspiracy to steal the 2020 presidential election; (3) took payment to illegally submit ballots in the 2020 presidential election; (4) visited at least one left-wing stash house and also illegally submitted ballots in ten drop boxes |

| | | | | | | Plaintiff's Supplemental Response to Defendants' Interrogatory 1 |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | | on at least ten different occasions during the 2020 presidential election; and (5) joined violent riots and/or had a criminal and/or violent reputation. |
| 35. | Dinesh D'Souza Truth Social | 5/18/2022 | Truth Social | https://truthsocial. com/@DineshDSouza/posts/108322959068782 884 | *See*, Paragraph 130. Defendant D'Souza refers to Plaintiff as 'the mule.' | |
| 36. | Dinesh D'Souza Tweet | 5/18/2022 | X | https://twitter. com/DineshDSouza/status/1526903524130537 472 | *See*, Paragraph 130. Defendant D'Souza refers to Plaintiff as 'the mule.' | |
| 37. | Dinesh D'Souza Tweet | 6/18/2022 | X | https://twitter. com/DineshDSouza/status/1538211490741772 289 | Defendant D'Souza responds to a tweet featuring a video of Plaintiff and questioning whether the findings of the Georgia investigation undermined Defendants' claims. In his reply, Defendant D'Souza again refers to Plaintiff as 'the mule.' | |
| 38. | Dinesh D'Souza Tweet | 6/16/2022 | X | https://twitter. com/DineshDSouza/status/1537427073819713 536 | Defendant D'Souza replies to a tweet stating that the GBI determined Plaintiff acted lawfully in casting ballots for his family members. In his response, | |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | Defendant D'Souza once again refers to Plaintiff as 'the mule.' | |
| 39. | Dinesh D'Souza Tweet | 6/16/2022 | X | https://twitter. com/DineshDSouza/status/1537538830882029 579 | Defendant D'Souza replies to a tweet linking to a fact-check of the 2000 Mules narrative. In his response, Defendant D'Souza disputes the fact-check and once again refers to Plaintiff as 'the mule.' | |
| 40. | Dinesh D'Souza Podcast 5/18 | 5/18/2022 | Dinesh D'Souza Podcast | https://dineshdsouza.com/podcast/episode-333-unlawful- conduct/ | Defendant D'Souza refers to Plaintiff as 'a mule' and questions the GBI's investigation and its finding that Plaintiff lawfully delivered ballots for his family members. "The Georgia investigators, instead of going after the mules, are trying to protect the mules, at least trying in this one case [referring to Plaintiff]. 'Whose votes were they?' 'Oh, they were the votes of my family members.' 'Oh, wonderful, | |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | investigation concluded.' So, instead of really investigating the mules, they're trying to find the whistleblower." | |
| 41. | Dinesh D'Souza Podcast 5/18 | 5/18/2022 | Rumble | https://rumble.com/v1579sf-unlawful-conduct-dinesh- dsouza-podcast-ep333.html | Defendant D'Souza refers to Plaintiff as 'a mule' and questions the GBI's investigation and its finding that Plaintiff lawfully delivered ballots for his family members.<br><br>"The Georgia investigators, instead of going after the mules, are trying to protect the mules, at least trying in this one case [referring to Plaintiff]. 'Whose votes were they?' 'Oh, they were the votes of my family members.' 'Oh, wonderful, investigation concluded.' So, instead of really investigating the mules, they're trying to find the whistleblower." | |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| 42. | Dinesh D'Souza Podcast 5/18 | 5/18/2022 | X | https://twitter. com/DineshDSouza/status/1527020313531363 329 | Defendant D'Souza refers to Plaintiff as 'a mule' and questions the GBI's investigation and its finding that Plaintiff lawfully delivered ballots for his family members.<br><br>"The Georgia investigators, instead of going after the mules, are trying to protect the mules, at least trying in this one case [referring to Plaintiff]. 'Whose votes were they?' 'Oh, they were the votes of my family members.' 'Oh, wonderful, investigation concluded.' So, instead of really investigating the mules, they're trying to find the whistleblower." | |
| 43. | Dinesh D'Souza Podcast 5/18 | 5/18/2022 | Salem News site | https://salemnewschannel.com/watch/unlawful- conduct- were-legal-ballots-delivered-illegally- dinesh-dsouza- 6285422f721125000161bcd7 | Defendant D'Souza refers to Plaintiff as 'a mule' and questions the GBI's investigation and its finding that Plaintiff lawfully delivered ballots for his family | |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | members.<br><br>"The Georgia investigators, instead of going after the mules, are trying to protect the mules, at least trying in this one case [referring to Plaintiff]. 'Whose votes were they?' 'Oh, they were the votes of my family members.' 'Oh, wonderful, investigation concluded.' So, instead of really investigating the mules, they're trying to find the whistleblower." | |
| 44. | Dinesh D'Souza Podcast 5/18 | 5/18/2022 | Salem Rumble | https://rumble.com/v157zl8-dinesh-dsouza-georgia- lawmakers-refuse-to-investigate-mules.html | Defendant D'Souza refers to Plaintiff as 'a mule' and questions the GBI's investigation and its finding that Plaintiff lawfully delivered ballots for his family members.<br><br>"The Georgia investigators, instead of going after the mules, are trying to protect the mules, at least trying in this one case [referring to Plaintiff]. 'Whose votes were they?' | |

| | | | | Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | 'Oh, they were the votes of my family members.' 'Oh, wonderful, investigation concluded.' So, instead of really investigating the mules, they're trying to find the whistleblower." | |
| 45. | TTV on The Gateway Pundit 4/20 | 4/20/2022 | The Gateway Pundit website | https://www.thegatewaypundit.com/2022/04/live-5-pm-et-gateway-pundit-100-fed-interview-investigators-catherine-engelbrecht-gregg-phillips-behind-upcoming-2000-mules-movie/ | Catherine Engelbrecht: "What we what we learned through our research was that there was a systematic and coordinated effort to exploit those vulnerabilities around the drop boxes, specifically through what we call ballot trafficking and that is uh individuals who are moving uh according to what we can can tell moving back and forth between non-profit organizations, key non-profit organizations, and the drop boxes… The movie tells that story, it tells it through the data [Unblurred footage of Plaintiff voting is shown with the caption "Ballot Harvesting is | |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | illegal in GA!"], it tells it through the video."<br><br>Gregg Phillips [referring to video of Plaintiff]: "Those people that you just showed, Jim and Patty, that are stuffing those ballot boxes— that's legit, and by the way [Unblurred footage of Plaintiff voting is shown with the caption "Ballot Harvesting is illegal in GA!"], two of those most egregious ones are in one ballot box. | |
| 46. | TTV on The Gateway Pundit 4/20 | 4/20/2022 | The Gateway Pundit Rumble | https://rumble.com/v1v7nqm-tgps-jim-hoft-interviews- catherine-engelbrecht-and-gregg-phillips.html | Catherine Engelbrecht: "What we what we learned through our research was that there was a systematic and coordinated effort to exploit those vulnerabilities around the drop boxes, specifically through what we call ballot trafficking and that is uh individuals who are moving uh according to what we can can tell moving back and forth between non-profit | |

| | | | | Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | organizations, key non-profit organizations, and the drop boxes… The movie tells that story, it tells it through the data [Unblurred footage of Plaintiff voting is shown with the caption "Ballot Harvesting is illegal in GA!"], it tells it through the video." Gregg Phillips [referring to video of Plaintiff]: "Those people that you just showed, Jim and Patty, that are stuffing those ballot boxes— that's legit, and by the way [Unblurred footage of Plaintiff voting is shown with the caption "Ballot Harvesting is illegal in GA!"], two of those most egregious ones are in one ballot box. | |

| Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | | | | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| 47. | TTV on The Gateway Pundit 4/20 | 4/20/2022 | The Gateway Pundit YouTube | https://www.youtube.com/watch?v=aiuQCPxj_38 | Catherine Engelbrecht: "What we what we learned through our research was that there was a systematic and coordinated effort to exploit those vulnerabilities around the drop boxes, specifically through what we call ballot trafficking and that is uh individuals who are moving uh according to what we can can tell moving back and forth between non-profit organizations, key non-profit organizations, and the drop boxes… The movie tells that story, it tells it through the data [Unblurred footage of Plaintiff voting is shown with the caption "Ballot Harvesting is illegal in GA!"], it tells it through the video." <br><br> Gregg Phillips [referring to video of Plaintiff]: "Those people that you just showed, Jim and Patty, that are stuffing those ballot boxes— | |

| | | | | Plaintiff's Supplemental Response to Defendants' Interrogatory 1 | | |
|---|---|---|---|---|---|---|
| Statement No. | Publication | Date | Venue | URL | Statements | Supplemental Detail |
| | | | | | that's legit, and by the way [Unblurred footage of Plaintiff voting is shown with the caption "Ballot Harvesting is illegal in GA!"], two of those most egregious ones are in one ballot box. | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the within and foregoing **Defendants True the Vote, Inc., Catherine Engelbrecht, and Gregg Phillips' Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment** was electronically filed on the Court's ECF filing system, which will automatically serve a copy on all counsel of record.

This 20th day of December, 2024.

**GREENBERG TRAURIG, LLP**

*/s/ Jake Evans*
JAKE EVANS
Georgia Bar No. 797018

*Attorney for Defendants True The Vote, Inc., Catherine Engelbrecht, and Gregg Phillips*

1