# EXHIBIT A

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION
3     MARK ANDREWS,          |
                             |
4       Plaintiff,           |
                             |
                             |   Case No.
5     V.                     |   1:22-cv-04259-SDG
                             |
6     DINESH D'SOUZA, et     |
      al.,                   |
7                            |
       Defendants.           |
8
9        ********************************************
        CONFIDENTIAL ORAL AND VIDEOTAPED DEPOSITION
10                          OF
                   CATHERINE ENGELBRECHT
11                 SEPTEMBER 18, 2024
         ********************************************
12
13           ORAL AND VIDEOTAPED DEPOSITION of
       CATHERINE ENGELBRECHT, produced as a witness
       at the instance of the Plaintiff, and duly
14     sworn, was taken in the above-styled and
       numbered cause on September 18, 2024, from
15     9:33 a.m. to 6:42 p.m., before Mendy A.
       Schneider, CSR, RPR, in and for the State of
16     Texas, recorded by machine shorthand, at the
       offices of Greenberg Traurig LLP,
17     1000 Louisiana, Houston, Texas, pursuant to
       the Federal Rules of Civil Procedure and the
18     provisions stated on the record or attached
       hereto; that the deposition shall be read and
19     signed.
20
21
22
23
24
25

CONFIDENTIAL

```
                                              Page 12

  1            A.      Yes.

  2            Q.      Okay.  What do you do for a

  3      living?

  4            A.      Pardon me.  I'm the founder of

  5      True the Vote and also an owner and executive   09:37:37

  6      in one or two other companies.

  7            Q.      Okay.  And what are the two

  8      other companies?

  9            A.      CoverMe and KLOK.

 10            Q.      And you work with Gregg          09:37:55

 11      Phillips in those businesses?

 12            A.      I do, yes.

 13            Q.      Do you -- does Mr. Phillips

 14      hold any position at True the Vote?

 15            A.      No.                              09:38:08

 16            Q.      I understand he was on the

 17      board of directors at one point in time?

 18            A.      That's correct.

 19            Q.      Has he ever held any other

 20      position at True the Vote?                     09:38:17

 21            A.      No, ma'am.

 22            Q.      And are there any other

 23      companies in which you hold a position, just

 24      those three?

 25            A.      No, no other companies where I    09:38:24
```

CONFIDENTIAL

Page 13

1    hold a position.

2            Q.    Okay.  Any other companies

3    where you're a limited partner?

4            A.    Yes, there's one, Shadow Beach.

5            Q.    Okay.  And what does that          09:38:34

6    entity do?

7            A.    Yes.  It was just nothing

8    really.  It's an LLC that is -- was set up

9    for just a variety of other purposes and

10   projects.                                        09:38:47

11           Q.    And does it still exist today?

12           A.    I -- I believe so, yes.

13   We're -- we're -- it's likely going to be

14   dissolved.  I just don't remember if it's

15   already been done or not.                        09:39:05

16           Q.    Okay.  And are you involved

17   in -- with any PACs?

18           A.    Yes.

19           Q.    Okay.  And tell me about that.

20           A.    It's a newly started PAC called    09:39:13

21   Pit Pac, and that's -- it's an organized as a

22   super PAC.

23           Q.    And what is its mission?

24           A.    To help support pro-liberty,

25           faith-based candidates and messages and  09:39:32

CONFIDENTIAL

Page 18

1          Q.     Do you know who the contractors

2     are?

3          A.     I don't.

4          Q.     Now, you said you were also a

5     founder of -- of True the Vote?              09:42:51

6          A.     Yes.

7          Q.     Which I'll refer to sometimes

8     as TTV.  You know what I'm talking about?

9          A.     Oh, yes.  I do the same, so

10    we're fine.                                   09:42:59

11         Q.     Okay.  Good.

12                How did you come to found True

13    the Vote?

14         A.     I started True the Vote in

15    2009.  Didn't submit paperwork until 2010.    09:43:07

16    So sometimes you'll see the distinction 2009,

17    2010.  2010 is when paperwork was filed.

18                After working at the polls and

19    having an experience that I thought didn't

20    make a lot of sense and that we should take a  09:43:21

21    closer look at the process.  The process just

22    seemed to be dysfunctional to me.

23                And so it -- it started

24    initially here in Harris County just as a --

25    a local effort.  And grew very quickly.  And,  09:43:32

Page 19

```
 1      you know, I -- I -- if you would have told me
 2      15 years ago that I would be sitting here
 3      having this kind of a conversation based on
 4      what happened in 2009, I couldn't have
 5      imagined it, but here we are.              09:43:50
 6          Q.     Got it.
 7                 And is it a nonprofit
 8      organization?
 9          A.     Yes, ma'am.
10          Q.     Okay.  And what is its mission?   09:43:55
11      What does it do?
12          A.     We are all about empowering the
13      voters and protecting voters' rights.  So
14      very much about the -- you know, what we
15      refer to as the power of citizen engagement.  09:44:09
16          Q.     And I think - think that I've
17      seen references where you say it's a
18      nonpartisan organization?
19          A.     Yes.  Yes.
20          Q.     And when you say "nonpartisan,"    09:44:21
21      what do you mean by that?
22          A.     I mean that we are straight
23      down the line around election integrity.  And
24      irrespective of party, if there's an issue
25      with process or with a particular election, I  09:44:32
```

CONFIDENTIAL

Page 20

```
 1      mean, we've -- we've -- we've helped on all

 2      sides.  It doesn't -- you know, it's just

 3      about getting the process right.

 4                  I firmly believe that if we

 5      have a solid election -- we need two parties.   09:44:50

 6      We need debate.  And so if we have a solid

 7      election that people can believe in, then --

 8      then the country is better for that.

 9          Q.    Okay.  But you -- but you do

10      coordinate your work with political             09:45:02

11      candidates, right?

12          A.    No.

13          Q.    How many employees does TTV

14      have?

15          A.    I think right now I'm the only        09:45:08

16      employee.

17          Q.    Okay.  So do you work with

18      contractors?

19          A.    Yes.

20          Q.    And so how many contractors are       09:45:21

21      you working with right now?

22          A.    I think five.

23          Q.    Okay.  Can you identify those?

24          A.    By name?

25          Q.    Yeah.                                 09:45:36
```

CONFIDENTIAL

Page 32

1          A.    Oof.  Probably -- probably 2010

2     maybe -- or maybe even earlier.

3          Q.    Okay.  And she wasn't married

4     to Dinesh D'Souza at that point?

5          A.    No.                              09:59:02

6          Q.    Okay.  When was the last time

7     you spoke to her?

8          A.    Her mother passed away

9     recently, and I reached out to her.

10         Q.    Okay.  Prior to that time, were   09:59:09

11     you in regular contact -- well, from the

12     period of the time of when the movie was

13     released up until the time you recently

14     reached out to her, were you in regular

15     contact with her?                          09:59:25

16         A.    No.

17         Q.    Why not?

18         A.    Just there wasn't really much

19     to, you know, talk about.

20         Q.    Okay.  Have you ever worked      09:59:35

21     with Salem Media Group before?

22         A.    No.  I mean, I'm sure that I

23     have been on programs that were affiliated

24     with Salem, you know, by their own virtue,

25     but not me directly with Salem other than   09:59:55

CONFIDENTIAL

Page 33

1       that.

2               Q.      Okay.  So you -- you haven't

3       had any relationship with them separate from

4       the 2000 Mules project?

5               A.      No, not separate from that --        10:00:06

6       well, I'm just trying to really think.  No, I

7       don't believe so.

8               Q.      Okay.  Let's look at what's

9       been marked Exhibit 5 in your pile there.

10              A.      Okay.                                10:00:24

11              Q.      And this was an answer filed in

12      this litigation on behalf of you, TTV, and

13      Mr. Phillips, correct?

14              A.      Yes, ma'am.

15              Q.      And did you authorize your          10:00:34

16      lawyers to file it on your behalf?

17              A.      Yes.

18              Q.      And on behalf of TTV?

19              A.      Yes.

20              Q.      I'm not sure if I asked you,        10:00:39

21      but what is your position at TTV?

22              A.      President.  CEO.  That's it.

23              Q.      And there's -- there's no one

24      else employed by TTV, right?

25              A.      Right.                              10:00:52

Page 82

1    from us.

2        Q.    Okay.  So the first category

3    under geospatial data, would that have come

4    from OpSec?

5        A.    Yes.                          11:08:28

6        Q.    And then under the second

7    category, which is video --

8        A.    Yes.

9        Q.    -- was that information that

10   you had at TTV?                          11:08:34

11       A.    That's a good question.  We did

12   request the video, but we did not have the

13   capacity to open and view it.  It required

14   special -- everything had a different viewer,

15   and it was a ton of data.  And so -- and it   11:08:49

16   was all hard drive and whatever so...

17       Q.    Uh-huh.  So did you then

18   provide that data for OpSec for OpSec to do

19   its work with?

20       A.    Yes, we provided the hard       11:09:04

21   drives to OpSec.

22       Q.    Okay.  And then in parentheses

23   under the first bullet under video, it says:

24   "Video availability in other states is

25   essentially nonexistent despite CISA         11:09:13

CONFIDENTIAL

                                                      Page 94

1        I should refer you to 82 -- I think it's

2        Page 8231 --

3                    MS. HYLAND:  8231?

4                    MS. KUCK:  Yeah.

5                    THE WITNESS:  Okay.           11:22:40

6        (BY MS. KUCK)

7            Q.      -- through 8237.

8            A.      Okay.

9            Q.      That's his complaint?

10           A.      I -- I -- just to be clear,    11:22:51

11       this is -- we got -- everything came back as

12       part of his complaint so --

13           Q.      Okay.

14           A.      -- I don't -- I'm not entirely

15       sure what would be considered as -- was what   11:23:06

16       Mr. Cross specifically submitted.

17           Q.      Okay.  And when you say "what

18       came back," you're referring -- you -- you --

19       your testimony is you obtained these

20       documents from an open records request?       11:23:21

21           A.      Open records request.

22           Q.      In Georgia?

23           A.      Yes.

24           Q.      And what caused you to make

25       that request?                                11:23:27

CONFIDENTIAL

Page 99

1      really don't recall the -- the back-and-forth

2      specifics, but -- I don't -- I really don't

3      recall the back-and-forth specifics.

4                  The end result was, as I -- as

5      I believe out of this meeting, the state      11:28:51

6      election board authorized to advance or -- or

7      shortly after -- thereafter we received a

8      subpoena.  So that -- that was the nature of

9      that, but I didn't know anything about it.  I

10     wasn't prepared for it.                        11:29:07

11          Q.    Did -- did you or anyone else

12     representing True the Vote attend this

13     meeting on May 17, 2022, of the Georgia state

14     election board?

15          A.    Not to the best of my             11:29:20

16     knowledge.

17          Q.    So when -- so you received

18     Mr. Cross's complaint through the open

19     records process in Georgia?

20          A.    Yes.                               11:29:42

21          Q.    And if you look at 8233, which

22     is the second page of the exhibit, Exhibit 9

23     I think it is -- 29, it says, quote, A

24     private investigative organization, True the

25     Vote, purchased billions of cell phone pings,  11:30:00

CONFIDENTIAL

Page 100

1     and they identified this individual -- which

2     is underlined -- by tracking his cell phone

3     pings to multiple ballot drop boxes.

4               Do you see that?

5          A.    I do.                          11:30:11

6          Q.    Is that statement true?

7          A.    No.  That is not true.

8          Q.    And so where would Mr. Cross

9     have gotten that idea?

10         A.    I really don't know.           11:30:18

11         Q.    Did you ever ask him?

12         A.    Yes, I did.  I e-mailed him

13    and -- because I wanted to have something in

14    writing.  And said what -- you know, it's

15    part -- it's an exhibit somewhere because    11:30:31

16    I've seen it.

17              And asked why he included True

18    the Vote.  And he said he -- he didn't think

19    that he had.  And I just -- oh, you know,

20    Okay.  I mean, yes, you did.  But that was   11:30:45

21    it.

22              And then I went on to say:

23    "Please don't do that."

24         Q.    Did you -- in that e-mail

25    chain, did you tell him that that statement   11:30:54

CONFIDENTIAL

Page 106

1 couldn't tell you the specific

2 conversation --

3   Q. Right.

4   A. -- or who told me that, but I

5 do recall that.        11:36:48

6   Q. But none of that would have

7 formed any basis for a statement that True

8 the Vote had purchased cell phone pings and

9 identified this individual by tracking his

10 cell phone?        11:37:00

11   A. No, that would not have been --

12 that's not true.

13   Q. Right.

14   And you never asked him where

15 he got that impression from?   11:37:06

16   A. No.  And -- and honestly when

17 we looked at this in -- in yesterday's

18 setting, my first recollection was only that

19 he said True the Vote.  I was shocked afresh

20 to see that that was written in there in this 11:37:22

21 way.  That's -- yeah, I -- I have no idea why

22 or...

23   Q. Where he would have gotten that

24 impression from?

25   A. I don't know.     11:37:35

CONFIDENTIAL

Page 108

1    had been cleared by the SEB?

2         A.    Yes, I believe that that's part

3    of what you -- what I -- what I got back in

4    this, yes.

5         Q.    And we talked about earlier the    11:38:43

6    movie hadn't come out at this point, right?

7               The movie ultimately came out,

8    and it included the footage of Mr. Andrews,

9    correct?

10        A.    Yeah.  I did not know -- I        11:39:05

11   still don't know, you know, who Mark Andrews

12   is, but -- but yes, that video that -- that

13   was included in this complaint was in the

14   movie.

15        Q.    Okay.                             11:39:18

16        A.    Or a portion of it, I guess I

17   should say.

18        Q.    But you were aware by that time

19   that the SEB had concluded that there was no

20   evidence that that individual, whoever they   11:39:27

21   were, had engaged in -- in ballot harvesting?

22        A.    I'm sorry, can you repeat

23   the...

24        Q.    Yeah.  And let me just be

25   clear.                                        11:39:39

1            By the time the film came out,

2      you were aware that the SEB had concluded

3      that there was no evidence that that

4      individual, whoever they were, had engaged in

5      ballot harvesting?                          11:39:52

6            A.    I was -- I became aware of that

7      after the film came out.  Is that -- is that

8      the way you're -- is that the question?

9            I was not aware of it before.

10     I was aware of it after.                    11:40:05

11           Q.    And how did you become aware of

12     it?

13           A.    I read it in the paper -- or I

14     must have read it in the paper or someone

15     told me about it because -- because it was     11:40:13

16     being attached to True the Vote.  And because

17     I had not heard anything from the state

18     election board, I didn't -- I didn't even

19     know that there had been a hearing.

20           Q.    Right.  So you -- yeah, my         11:40:24

21     question is unclear.

22           So you knew there was a

23     hearing, and at that hearing the individual

24     who appears in the -- the footage at 8235 was

25     cleared of any wrongdoing by the SEB,          11:40:40

CONFIDENTIAL

Page 110

```
 1      correct?

 2          A.    I -- I didn't -- I did not know

 3      that there was a hearing.  I mean, I -- in

 4      advance -- you know, whenever the hearing

 5      was, I didn't know that was happening.        11:40:50

 6          Q.    Okay.

 7          A.    I want to make sure I'm

 8      answering your question.

 9          Q.    Yeah.

10          A.    Okay.                                11:40:54

11          Q.    And then but once you got the

12      open records request, you understood that the

13      SEB investigator had cleared that individual?

14          A.    I did understand that, yes.

15          Q.    Okay.  And the investigator had    11:41:01

16      found no evidence of ballot harvesting by

17      that individual?

18          A.    That's what the investigator

19      had in here, yes.

20          Q.    Okay.  So by the time the film     11:41:15

21      came out, which included the same video, you

22      were aware that the video in the film was of

23      someone who the SEB had cleared of ballot

24      harvesting?

25               MR. EVANS:  Objection;              11:41:34
```

CONFIDENTIAL

Page 111

1          misstates testimony.

2                  THE WITNESS:  Do I --

3                  MR. EVANS:  Yeah.  You can

4          still answer.

5          A.    No.  I did not know of this          11:41:43

6     before the film came out.

7                  Our open records request was

8     May the 26th.  I think that the movie was

9     much earlier in May.

10    (BY MS. KUCK)                                    11:42:01

11         Q.    When you did your open records

12    request and you learned that the individual

13    had been cleared, did you take any steps to

14    make sure that that individual did not have

15    any further public allegations of ballot        11:42:24

16    harvesting made against them?

17         A.    I -- I -- I really don't

18    recall.  I -- yeah.  I really -- I don't

19    recall a specific conversation.  I -- you

20    know, in my -- in my at that point still        11:43:08

21    understanding of the law, which is pertinent,

22    it -- it was illegal.  If you could not -- if

23    you mailed -- excuse me -- deposited more

24    than your own ballot, which you could do in

25    the case of immediate family or family as       11:43:23

Page 112

1    defined by Georgia law or if you were infirm,

2    in the hospital or in prison, you can do

3    that, but you had to sign -- my understanding

4    was you had to sign as an assister.

5                   And because we already had the        11:43:36

6    open records request back from Gwinnett, as

7    we talked about the Gwinnett anomaly and the

8    reason that we were looking at Gwinnett, and

9    we knew that there were no assister

10   signatures.  And so, you know, that -- to me,   11:43:48

11   that -- that still held.

12        Q.    So your view was that

13   regardless of whether they were ballots of

14   his family or not, they were being deposited

15   illegally because your view was that there        11:44:09

16   would have had to have been an assister

17   certificate filed for him to deposit even the

18   ballots of his family?

19        A.    That was my absolute

20   understanding, yes.                                11:44:24

21                   Additionally, I will say, you

22   know, he went on record as saying he

23   deposited five ballots, but when you actually

24   look at the voter records, there's only an

25   indication of four.                                11:44:33

CONFIDENTIAL

Page 114

1          Q.     Right.

2          A.     Yeah.

3          Q.     One of them was received later?

4          A.     Yes, it was received later.

5          Q.     Okay.  And so -- and your          11:45:26

6     understanding of the law, where does that

7     come from?

8          A.     I cannot quote you the specific

9     citation, but there is a passage in the

10    Georgia law that describes in two parts how    11:45:45

11    you can -- how you can cast a ballot for

12    someone other than yourself and then the --

13    the requirement that there be an assister

14    signature accompanying that.

15         Q.     And that's based on your own        11:45:59

16    reading of the statute?

17         A.     Initially based on my own

18    reading of the statute, yes.  And then

19    corroborated by just general consensus.

20         Q.     Okay.  So even -- even if your      11:46:11

21    interpretation of the law were correct, you

22    are taking the position that he must have

23    been depositing these five ballots illegally

24    because he didn't file an assister

25    certificate, right?                            11:46:39

CONFIDENTIAL

Page 115

1          A.     No, not -- not filing an

2     assister certificate, but just sign the back

3     of the envelope.

4          Q.     Okay.  But that still would not

5     be evidence of ballot harvesting, would it?    11:46:52

6          A.     I'm sorry.  Can you --

7          Q.     Yeah.

8                 You don't have -- even if

9     your -- your assumptions about what happened

10    on those five ballots is correct, you don't    11:47:05

11    have any evidence that he went to more than

12    one drop box to deposit ballots?

13         A.     Well, it's two -- I think

14    that's two different questions.

15         Q.     Yeah.  It is.  That's --        11:47:21

16    that's --

17         A.     Yeah, so no, I mean, I don't

18    have any indication that he went to more than

19    one, but I do have indication, depending upon

20    how you want to define ballot harvesting,       11:47:32

21    that, you know, any -- any ballot beyond your

22    own, if -- if not accompanied by a signature,

23    very simple signature on the back of the

24    envelope, would have had that run afoul of

25    Georgia law.                                    11:47:48

CONFIDENTIAL

Page 116

1          Q.     Okay.  But you don't have any

2     evidence of him going to more than one drop

3     box?

4          A.     If we're talking about like in

5     the 242, the study of the 242.            11:48:03

6          Q.     Any evidence of any kind.

7          A.     No, I mean, the -- that was

8     not -- that was part of the Gwinnett anomaly

9     period, and that video footage became -- I

10    mean, that was separate and apart from the    11:48:17

11    study of the 242.

12         Q.     Because at the time that the

13    geospatial data was done you didn't have

14    video from Gwinnett County?

15         A.     Correct.                          11:48:28

16         Q.     And so you couldn't match the

17    video with the geospatial analysis at that --

18    at that point in time where the movie was

19    getting made because you got the Gwinnett --

20         A.     Yeah.  We got the Gwinnett       11:48:41

21    video much later.

22         Q.     Okay.  Do you have any evidence

23    that that individual was paid to -- to

24    deposit those ballots?

25         A.     No.                              11:48:50

CONFIDENTIAL

Page 121

1    filed by TTV with the Georgia state election

2    board.

3              Is -- is Exhibit 19 a copy of

4    that complaint?

5         A.    I believe it's a -- I believe    11:55:10

6    it's a copy of all three -- of all three

7    complaints.

8         Q.    Okay.  Looking at the -- the

9    first complaint -- well, before I have you

10   look at the specific one, did -- do the same    11:55:27

11   people draft all three complaints?

12        A.    Yes, I drafted all three.

13        Q.    You drafted them yourself?

14        A.    Yes, I drafted them.  I had

15   others, you know, proof them, but I drafted    11:55:39

16   them.

17        Q.    Did you have any counsel

18   involved in drafting them?

19        A.    Yes, I did.

20        Q.    And what was the involvement of    11:55:48

21   counsel, without giving me any specific

22   information about advice they may have given

23   you?

24        A.    Oof.  I don't even know how to

25   answer that without saying what advice they    11:56:01

CONFIDENTIAL

Page 134

1      talking about business things that, you know,

2      we had no knowledge or, you know, furtherance

3      in.

4           Q.     Right.  But this -- so at

5      this -- is this generally the first time you      13:23:03

6      discussed with the D'Souzas turning your work

7      into a film?

8           A.     I -- I can't say that it was

9      the very first --

10          Q.     Yeah.                                  13:23:17

11          A.     -- but it was -- I mean, it was

12     still uncertain if that would happen because

13     they didn't -- they were going to make a

14     movie regardless, and -- it was my

15     understanding.  And whether or not this was      13:23:25

16     going to be it, they -- they didn't know.

17     And that was it.

18          Q.     Okay.  All right.  So -- so the

19     idea was they were planning to make a movie,

20     it was possible it was going to involve your     13:23:37

21     research, but you hadn't reached an agreement

22     on that yet?

23          A.     Sort of.  They were -- my

24     understanding was they were going to make a

25     movie full stop.  They were going to make a      13:23:47

CONFIDENTIAL

Page 136

1    right.

2         A.    Okay.

3         Q.    So I'm going to mark as

4    Exhibit 36 a document bearing Control

5    No. TTV_006932.                              13:24:43

6         A.    Thank you.

7         (Marked Engelbrecht Exhibit No. 36.)

8         A.    Oh, okay.

9    (BY MS. KUCK)

10        Q.    And is that the dinner -- is    13:24:54

11   this a -- this appears to be an OpenTable

12   invitation sent to you from Mrs. D'Souza for

13   a reservation on September 15, 2021 at -- is

14   it Uchi in Dallas?

15        A.    Uchi, yes.  Yeah.              13:25:08

16        Q.    And is this the dinner you're

17   referring to?

18        A.    Yes.

19        Q.    So it's -- and then is it your

20   testimony that you believe that you met with  13:25:15

21   Salem the next day?

22        A.    Yes.  Well, at this dinner we

23   had not met with Salem yet, so it must have

24   been the next day.

25        Q.    Okay.  Did you have more than   13:25:24

1    one meeting with Salem to discuss the

2    possibility of -- of making a film?

3          A.    No, we were in and out.

4          Q.    Okay.  So let me show you --

5    let me go to your Exhibit 31, which is your    13:25:37

6    response to the interrogatories.

7                And there are separate ones for

8    TTV, but am I correct that they're for all

9    intents and purposes the same as your own

10   personal ones?                                 13:26:06

11         A.    For all intents and purposes,

12   yes.

13               Okay.

14         Q.    So if you look at Page 8,

15   there's Interrogatory No. 3.  There's a --     13:26:13

16   there's a reference to this -- the Summit

17   that was held with Salem.  And this says

18   October 2021 in Dallas.

19               If you go on the next page,

20   third full paragraph, it says:  "Engelbrecht   13:26:42

21   states that the "summit" referenced in

22   this... it was a meeting that took place at

23   the Salem Media's offices in Dallas, Texas,

24   on or around October 16, 2021?"

25               I'm wondering if that should be     13:26:53

CONFIDENTIAL

Page 149

1          Q.     Do you know why you were

2     calling it a disaster deal?

3          A.     Well, the document was designed

4     just to lease the -- lease, I'm so sorry.

5     Strike that.                              13:40:51

6                 The document was designed to be

7     a licensing agreement for the use of -- of

8     this -- this video that we had.  And it --

9     you know, in my opinion that we'd never been

10    involved in anything like this before.  We    13:41:08

11    had no -- we had no expectations coming in.

12    I had never -- you know, hindsight is 20/20,

13    but I had no expectation of what it would or

14    would not be like to -- to have an agreement

15    like this.                                13:41:23

16                It ended up where we -- you

17    know, we were asked to participate in -- at

18    events where we weren't prepared, where we --

19    I mean, we had no editorial control.  We --

20    we had no control over the script.  We had no   13:41:43

21    control over how videos were selected.  We

22    had no control over graphics.  We had no

23    control over documents.

24                And, you know, we are

25    comfortable speaking for the work that we    13:41:54

CONFIDENTIAL

Page 150

```
1     did.  But I didn't have -- I didn't
2     understand moviemaking.  And that's just my
3     feeling.
4         Q.    This -- if you'd turn to the --
5     the next page after the e-mail, there's an     13:42:16
6     exclusive license and nondisclosure
7     agreement.
8              Is that the agreement that you
9     entered into with Mr. D'Souza and Salem?
10        A.    I apologize.  I'm -- I'm --       13:42:29
11    what page again are we?
12        Q.    8963.  It's the first page
13    after the e-mail.
14        A.    Okay.  I believe so, yes.
15        Q.    Was -- it says -- it says, the     13:42:41
16    second paragraph:  "Whereas, TTV is the owner
17    of highly confidential film footage."
18              Do you see that?
19        A.    Yes.
20        Q.    I -- wasn't this footage           13:42:53
21    obtained by you through public sources?
22        A.    Yes.
23        Q.    So what was so highly
24    confidential about it?
25        A.    Nothing.  And -- no, nothing.     13:43:06
```

CONFIDENTIAL

Page 154

1      recollection as to what led him to propose

2      that to you?

3              A.      I really don't.

4              Q.      Okay.  In Paragraph 7, there's

5      a whole indemnification procedure.  It's on     13:46:49

6      the following page.

7              A.      Yes.

8              Q.      Has anyone ever made any

9      indemnification requests to TTV pursuant to

10     this provision?                                 13:47:02

11             A.      No.

12             Q.      Salem hasn't requested that you

13     indemnify them in connection with any

14     disputes arising out of the film?

15             A.      I'm not even sure what that      13:47:17

16     would look like.

17             Q.      Okay.

18             A.      Did they contact us in -- that

19     would be something in writing?  I don't know

20     how that --                                     13:47:23

21             Q.      Well, you haven't -- they

22     haven't had -- you haven't had any contact

23     with -- you, TTV, haven't had any contact

24     with Salem in which Salem requested that you

25     pay any expenses they've occurred --            13:47:34

CONFIDENTIAL

Page 155

1          A.     Oh, no.

2          Q.     -- in connection with any film

3     or anything else?

4          A.     No.

5          Q.     When was the last time you had      13:47:40

6     contact with Salem?  With anyone at Salem?

7          A.     I think -- well, I saw their

8     counsel -- I believe his name is Chris, I

9     don't know if it's Anderson or Henderson --

10    at a hearing some months ago.  And just said   13:48:01

11    hi.  And then, I mean, that's -- that's the

12    most recent.

13         Q.     Okay.  Let's look at a document

14    we marked yesterday as Exhibit 23.  It says

15    22 on there.  22.                              13:48:31

16              MR. EVANS:  23 or 22?

17              MS. KUCK:  22.

18         A.     Okay.

19    (BY MS. KUCK)

20         Q.     This appears to be an e-mail      13:49:07

21    sent to you, Mr. Phillips, and some other

22    people affiliated with the D'Souzas on

23    December 9, 2021, from Bruce Schooley.

24              Do you see that?

25         A.     I think I'm using the wrong       13:49:24

CONFIDENTIAL

Page 159

1    elements in here that, you know, he would

2    have -- he would have taken from the -- the

3    base of the -- the work that we had done, but

4    that's it.  I mean, there's just a lot here

5    that was never -- I don't even know where it     13:52:35

6    came from.

7         Q.    Okay.  So starting at this

8    point in time, December 9 of 2021, when he

9    circulates this schedule and this beat sheet,

10   how frequently were you in touch with          13:52:48

11   Mrs. D'Souza concerning the making of the

12   film?

13        A.    I -- I couldn't tell you.  I

14   would characterize it as infrequently.

15              In hindsight, I didn't -- at        13:53:00

16   the time, I didn't know what to expect.  I

17   didn't -- I felt -- I felt very detached from

18   it.  I -- so I couldn't tell you with any

19   real clarity how often.

20        Q.    Okay.  Do you recall having         13:53:19

21   regular Zoom meetings between the TTV team

22   and the D'Souza team about the making of the

23   film?

24        A.    I -- I recall seeing in a

25   document that we had one that that -- so I --   13:53:33

CONFIDENTIAL

Page 163

1       using the drop box to vote.  Nothing illegal.

2       Do you have video of multiple drops by the

3       same person and/or multiple ballots and/or

4       evidence they were out of state?"

5               And then it goes on a bit --      13:57:22

6       A.      Uh-huh.

7       Q.      -- but do you see what I'm

8       talking about?

9       A.      Yes.

10      Q.      And then it looks like in         13:57:25

11      response to that you sent him some videos?

12      A.      No.  There was a platform that

13      we had given them access to.

14      Q.      Okay.

15      A.      And so that's why I was saying     13:57:37

16      they're -- you know, just look at what you've

17      been given access to.

18      Q.      And how many videos were given

19      to them on this initial platform?

20      A.      I believe initially because it     13:57:52

21      corresponded to the work that we had done,

22      there were approximately 70.

23      Q.      Okay.  And those initial 70

24      videos were videos where -- where OpSec or

25      its contractors had been able to link the    13:58:07

CONFIDENTIAL

Page 164

1    geospatial analysis with the video of drop

2    box voting, correct?

3            A.    That's what I understand, yes.

4            Q.    Okay.  And then it says -- you

5    say -- so you're talking about the platform    13:58:21

6    and you say:  "Look in the repeater and

7    multiple ballots folders."

8            Do you see that?

9            A.    Yes.

10           Q.    What were those folders?    13:58:28

11           A.    Repeater would have been just

12   same person going to different drop boxes.

13           And then multiple ballots would

14   have been, you know, same person of the 242

15   with -- you know, clearly voting in -- with    13:58:50

16   multiple ballots, so just different video

17   cuts.

18           Q.    And so you say the 242.

19           Those are the 242 individuals

20   that the geotracking project identified in    13:59:01

21   Georgia, right?

22           A.    Correct.

23           Q.    And of -- from that group,

24   there was a subset of 70 videos that then was

25   provided to Mr. D'Souza?    13:59:16

CONFIDENTIAL

Page 165

1           A.      Yeah.  Approximately.

2           Q.      Approximately.  Okay.

3           A.      But that's --

4           Q.      About 70?

5           A.      Yes.                          13:59:21

6           Q.      And those were not people,

7      though, in Gwinnett County, right, because at

8      this point you didn't have the Gwinnett

9      County video?

10          A.      Yeah.  My recollection is no.   13:59:29

11          Q.      Okay.  Who pulled the 70, those

12     70 videos?  Who on your team?

13          A.      On True the Vote's team?

14     Nobody on True the Vote's team.

15          Q.      Okay.  So who pulled them?      13:59:40

16          A.      It would have been OpSec and

17     their -- that team.

18          Q.      And do you know who on that

19     team pulled those together?

20          A.      I mean, I would be speculating.  13:59:47

21     It -- I can tell you it was -- you know, we

22     got the hard drives of the video, and it was

23     very difficult to unpack.  I don't know who

24     all was engaged in that.

25          Q.      And did you get them from        13:59:59

CONFIDENTIAL

Page 166

1     Mr. Phillips or somebody else?

2          A.    They were just put into the --

3     the platform that was being shared at the

4     time.  I don't know who put them.

5          Q.    Okay.  Who created the          14:00:10

6     platform?

7          A.    I don't -- I don't know who,

8     like, had the subscription or I don't -- I

9     don't know.

10         Q.    You don't know who set it up?   14:00:23

11         A.    I don't.

12         Q.    Somebody on the OpSec side?

13         A.    It -- well, definitely on the

14    OpSec side, but I don't -- I don't know who

15    or how.                                    14:00:31

16         Q.    Okay.  You say in your e-mail:

17    "We're glad to talk through the videos with

18    you and what to look for.  It would be

19    helpful to see the script online.  Let me

20    know when you can connect on a call."       14:00:39

21              Did you have a follow-up call

22    with him about this?

23         A.    I couldn't tell you.

24         Q.    Okay.

25         A.    Calls were very limited.        14:00:51

CONFIDENTIAL

Page 167

```
 1          Q.     But you may have, you just
 2     don't remember?
 3          A.     It's -- you know, it's
 4     possible.  We had no video control or script
 5     control or...                              14:01:03
 6          Q.     And did he give you access to
 7     the script outline?
 8          A.     Not that I can recall.
 9          (Discussion off the record.)
10          A.     This is -- this is -- before we  14:01:28
11     move from this one, if I may --
12     (BY MS. KUCK)
13          Q.     Sure.
14          A.     -- because I thought about this
15     after we talked earlier.                   14:01:34
16              I recall -- and you're going to
17     have to ask Dinesh about this so I don't want
18     to get too far out over my skis here, but I
19     do recall Dinesh making the observation that
20     it was possible that he felt like maybe      14:01:52
21     Mr. Andrews, after all of this occurred, was
22     seen in a -- in another video.
23              And I'm saying that only by way
24     of I've had this -- I've remembered this, and
25     you may want to ask about it, but I can't --  14:02:10
```

CONFIDENTIAL

Page 177

1          Q.     Yeah.

2                 You say:  "Sidebar re hackers."

3     And then you have a number of comments, and

4     you want to -- you say:  "We recommend we

5     substitute it with something else like          14:13:56

6     researchers or analysts."

7                 Do you remember having a

8     back-and-forth with him about the word -- the

9     use of the word "hackers" as opposed to

10    researchers or analysts?                          14:14:05

11         A.     I don't recall that.  I mean, I

12    can see that I responded to him when he said

13    "we have five extras acting as hackers," you

14    know, and to work on a hacker vibe, so that's

15    what I was responding to.                         14:14:21

16         Q.     Do you know whether they use

17    the term "hacker" in the movie?

18         A.     I -- I hope not.  I don't -- I

19    don't recall.  I don't know.  We had no -- we

20    had no editorial control.  We lad no control    14:14:30

21    over what happened in their studio or who

22    they hired to do what.

23         Q.     Let's mark as Exhibit 45 a

24    one-page document bearing Control

25    No. TTV_007235.                                   14:15:03

CONFIDENTIAL

Page 182

1        A.      -- and did that.

2                So I think what -- let me

3    just -- just for clarity --

4        Q.      Uh-huh.

5        A.      -- let me just read what Debbie    14:19:45

6    said here.

7                "Basically we are moderating a

8    Salem host panel discussing these issues and

9    why the significance.  You and Catherine are

10   two expert witnesses we need on hand to brief   14:19:52

11   them and also to answer questions that will

12   inevitably arise.

13               "The shooting there is

14   scheduled from 2:00 to 5:00.  However, we

15   would like to meet with you guys beforehand    14:20:02

16   to go over the format."

17               So it was like, you know, come

18   and, you know, if we have questions we'll ask

19   you, and we want to meet with you, but --

20   that we were not supposed to be in it, which    14:20:12

21   we had no editorial control, and we had no

22   control over what was going to happen, did

23   not know who was going to be there.

24               And so maybe that -- so maybe

25   this was trying to clear this up.  I -- I      14:20:25

CONFIDENTIAL

Page 190

1    don't know more than that except that we --
2    you know, when we -- our deal was with them
3    just to provide this video from the county
4    open records.  And so when we got it, we
5    provided it.  And that was it.              14:29:34
6        Q.    And that was Gwinnett County
7    you're talking about?
8        A.    Yes, I don't recall there being
9    anything else.  There could have been.
10   But...                                     14:29:44
11       Q.    And then so therefore that --
12   that second batch of video from Gwinnett
13   County, again, it wasn't part of the
14   geospatial analysis matching of video and
15   analysis because you didn't have it in time,  14:29:57
16   right?
17       A.    That's -- yes.
18       Q.    Okay.  And did the D'Souzas
19   understand that -- or did you tell Mr. and
20   Mrs. D'Souza that?                          14:30:06
21       A.    I -- I don't recall, but it
22   wouldn't -- I mean, I don't know how that
23   would have been material, but I -- I don't
24   recall telling them or not telling them
25   maybe.                                      14:30:17

CONFIDENTIAL

Page 191

```
 1            Q.     Okay.
 2            A.     I mean, we definitely talked
 3      about the Gwinnett anomaly because we had
 4      exhibits and everything with that.
 5            Q.     But you don't recall talking to     14:30:24
 6      them about whether the Gwinnett County video
 7      had been matched with the geospatial
 8      analysis?
 9            A.     I can't specifically recall it.
10      I just -- it came so late, it would -- it        14:30:42
11      would -- in my mind almost have been assumed,
12      but I can't recall it.
13                   Again, we had no editorial
14      control, no control over what was used or
15      how, which videos were selected.  It was --      14:30:54
16      they were making -- they were trying to do
17      what they could to make it look good on
18      screen.
19            Q.     Okay.  And then No. 2 on this
20      e-mail, it says:  "We need a list of             14:31:06
21      nonprofits that are involved with the
22      trafficking."
23                   Do you see that?
24            A.     I do.
25            Q.     And did you ultimately provide       14:31:11
```

CONFIDENTIAL

Page 196

```
 1          Q.     And then it -- this exhibit
 2     seems to be an e-mail responding to the
 3     e-mail we just looked at dated February 10,
 4     2022, from you to Ms. D'Souza.
 5                 Is this the e-mail you were      14:53:47
 6     remembering earlier when you spoke about you
 7     responded?
 8          A.     I believe so, yes.
 9          Q.     Okay.  And you respond on the
10     video footage.  It says:  "We have around 70  14:54:04
11     videos currently separated out in our scaling
12     efforts to review more."
13                 Are those the 70 the 70 that
14     we've been talking about that you initially
15     provided?                                     14:54:20
16          A.     Tied to the 242, yes.
17          Q.     Right.  Okay.
18                 And then you gave her a number
19     of ideas.
20                 Did the -- as to possible ways    14:54:27
21     to show some of these issues, including, you
22     know, showing some -- the path of a mule,
23     et cetera.
24                 Did they take you up on any of
25     those ideas?                                  14:54:43
```

Page 197

```
 1          A.      No.   No.

 2          Q.      Okay.  Did you ultimately give

 3     them additional footage?

 4          A.      After this -- after the 70 and

 5     242 and later --                        14:54:56

 6          Q.      Yeah.

 7          A.      -- we did give them the

 8     Gwinnett footage.

 9               Yeah.  I mean, I don't -- I

10     don't recall -- I just don't -- that's --   14:55:06

11     that's what I remember.

12          Q.      Okay.  And then the second item

13     which we talked about earlier, which is:  "We

14     still need a list of nonprofits that are

15     involved with the trafficking."            14:55:15

16               Do you see that?

17          A.      Yes.

18          Q.      And you say:  "Here's a link to

19     the Georgia and Arizona organizations that

20     have published 990s."                     14:55:22

21               Do you see that?

22          A.      Yes.

23          Q.      So you were responding to her

24     response for a list of nonprofits with

25     this -- this link.                        14:55:36
```

CONFIDENTIAL

Page 212

1       the GBI to take another look at our data that

2       we had done or -- or OpSec had done an

3       analysis of a crime scene, and editing got a

4       little messed up.  And so I mentioned those

5       things.                                    15:25:11

6            Q.    And how did the editing get

7       messed up?

8            A.    There were actually two crime

9       scenes --

10           Q.    Uh-huh.                          15:25:17

11           A.     -- that we -- that we provided

12      analysis on or OpSec specifically provided

13      analysis on.  And we described both of them

14      sitting in Dinesh's studio that day, but only

15      one made it in.  And the way it -- the way it  15:25:32

16      ended up looking, at least in our opinion,

17      was that there was one exchange where -- and

18      I'm going off of recall so --

19           Q.    Uh-huh.

20           A.     -- bear with me.  But there was   15:25:45

21      a question about they showed two individuals

22      who had been arrested or indicted.

23                 And then Gregg was asked a

24      question, and he -- it -- bottom line is it

25      made it look like we were saying that our     15:26:00

CONFIDENTIAL

Page 213

1      research had led to their indictment, and

2      that was not accurate.  No doubt it was just

3      a slip in editing, but we knew that that was

4      not going to be good.

5              Q.      And you told him that after you    15:26:13

6      saw the rough cut?

7              A.      As I generally recall, yes.

8              Q.      Okay.  And was any change made

9      to the film after you told him that?

10             A.      No.                                 15:26:21

11             Q.      Okay.  What was the other thing

12     you were concerned about?

13             A.      That an interview that we had

14     provided that -- with Heather Mullins in --

15     and a law enforcement officer that had only    15:26:35

16     spoken under condition of anonymity -- let's

17     see if that's what's actually -- this

18     actually -- because there were a lot of

19     issues with that clip.

20                     I would just characterize this    15:27:02

21     as I was -- you know, that was something that

22     I was mentioning there.  The thing I remember

23     is we had asked that his voice be modulated.

24             Q.      Uh-huh.

25             A.      And it, in my opinion, was not    15:27:11

CONFIDENTIAL

Page 223

1          A.      Yes, I remember that.

2       (BY MS. KUCK)

3          Q.      Okay.  And this is the document

4       I was actually referring to that says:  "No,

5       we need to add Gregg."                    15:38:55

6          A.      Uh-huh.

7                  MS. HYLAND:  Got it.  Thank

8          you.

9       (BY MS. KUCK)

10         Q.      And Mr. -- you and Mr. Phillips    15:38:59

11      were ultimately named as executive producers

12      in the film?

13         A.      Yes, we were.

14         Q.      How did that come to be?

15         A.      I have no idea.               15:39:10

16         Q.      When did you first know you

17      were being named as executive producers?

18         A.      I believe I saw it for the

19      first time on either -- something -- as I

20      recall, it was some printed material.       15:39:22

21         Q.      Okay.

22         A.      And I don't know if it was

23      maybe this or if it was -- I just -- I don't

24      recall.  I don't even know if it says that in

25      the movie.  I just -- I don't -- it was such   15:39:34

CONFIDENTIAL

Page 224

1      a shock, I -- we -- I don't know.

2           Q.    Did you have any objection to

3      that?

4           A.    At that point because

5      everything was already out and done, it was      15:39:46

6      just like a -- I mean, what -- what -- you

7      know, it's over.  I mean, we didn't have any

8      control or, you know -- I mean, it was --

9      what was I going to say?

10          Q.    Well, you could have objected      15:40:05

11     that you didn't want your name on it as

12     executive producer.

13          A.    Well, I mean, we were trying

14     not to be difficult.  And maybe -- you know,

15     it's possible I did say something.  I'm just     15:40:20

16     not recalling it.  But it was already printed

17     and done, and, you know, we were -- things

18     were very, very busy.

19          Q.    Okay.  And you also had -- you

20     also asked for the TTV website to be put at     15:40:31

21     the end of the film, right?

22          A.    Yes, I did ask for that.

23          Q.    Okay.  Even after you saw the

24     final cut of the film, you never publicly

25     disavowed the film in any way, did you?         15:40:43

CONFIDENTIAL

Page 237

```
 1          Q.      Yeah.

 2          A.      We -- we didn't -- there was no

 3     compensation for the book.  There -- when

 4     we -- I'm sure we'll talk about the book --

 5          Q.      Uh-huh.                      15:54:38

 6          A.      -- or possibly --

 7          Q.      Yep.

 8          A.      -- but that didn't happen.

 9          Q.      Okay.  You never received any

10     funds in connection --                    15:54:44

11          A.      No.

12          Q.      -- with the book?

13                  Was there talk at -- early on

14     about you writing a book about 2000 Mules?

15          A.      No.  There was talk that I      15:54:54

16     could write a book.

17          Q.      Yeah.

18          A.      And I was hopeful about that,

19     but what was ultimately -- it was through

20     Regnery.                                  15:55:03

21          Q.      Uh-huh.

22          A.      And they characterized it as a

23     pamphlet.

24          Q.      Okay.

25          A.      And I wasn't really interested   15:55:07
```

CONFIDENTIAL

Page 278

1    were on the Tucker Carlson show, right?

2          A.     Yes.

3          Q.     How did that come to be?

4          A.     Somebody would have reached out

5    and asked me to be on or maybe it went -- at    16:51:53

6    that point, maybe it went through one of the

7    PR firms -- not through Patricia, but that's

8    how -- I mean, they were interested in people

9    talking about the election, so...

10         Q.     And do you recall that you --    16:52:15

11   that you actually didn't mention the film

12   itself during that interview?

13         A.     Uh-huh.

14         Q.     Were you told by anyone not to

15   mention the film?                              16:52:32

16         A.     I -- I don't -- I don't

17   specifically recall any longer.  I do know

18   that there was -- well, I'll just leave it at

19   that.  I don't specifically recall any longer

20   because I couldn't tell you who said what to    16:52:50

21   whom.

22         Q.     Right.  Okay.

23                Do you recall, though, there

24   was some dispute between Mr. D'Souza and Fox

25   News over the film?                            16:52:59

Page 281

1    litigation, I'm talking about the time, did

2    you watch the interview?  Your own interview?

3         A.    Like, you mean just like watch

4    to see how it went?

5         Q.    How you did, yeah.                16:54:56

6         A.    I generally don't.

7         Q.    Okay.  And are you aware that

8    TTV reposted that -- that interview on

9    Facebook, Instagram, and Rumble?

10        A.    It doesn't shock me.             16:55:13

11        Q.    Okay.  There was unblurred

12   footage that was shown during that interview,

13   correct?

14        A.    You know, I have -- I -- I know

15   that that is true because I have watched it   16:55:24

16   since, but I had no editorial control, no

17   knowledge that that was happening.

18        Q.    And you don't recall watching

19   it -- the interview at the time and seeing

20   that you were being -- there was -- there was  16:55:37

21   unblurred footage being shown?

22        A.    No, I do recall where I did

23   that remote, and it was a -- a place in

24   Florida.  And it was a very tiny room with

25   just -- you just watch the camera, and that's  16:55:49

1    have been more, I don't recall, but -- but

2    that certainly was one.

3        Q.    And No. 2 says "ACLED."

4            What's that a reference to?

5        A.    It's just so long ago I -- I        17:02:20

6    don't want to speculate.  There -- there

7    was...

8            As I generally recall, there

9    were references that I was hearing, you know,

10   being made about ACLED and the data and the    17:02:55

11   way to understand the data that was not

12   accurate.

13       Q.    Okay.  And then 3 says

14   "non-mule video in the movie."

15           What's that referring to?         17:03:05

16       A.    That is referring to the

17   distinction between the 242, 70 videos, and

18   then other footage that was used.  And the

19   other footage that was used was not part of

20   that 242, 70.                                 17:03:23

21           Now, there were still -- you

22   know, I think this was a distinction

23   Mr. Phillips made yesterday, mule, small m,

24   Mule, large M.  In our opinion, the videos

25   that were used were still reflective of      17:03:37

CONFIDENTIAL

Page 289

1    things that ran afoul of the law.

2              But I felt it necessary to

3    clarify that that should be understood more

4    but, I mean, you know, that's...

5         Q.    Yeah.  Because is it accurate       17:03:50

6    to say you understand that "mules" as the

7    term is used in the film refers to the people

8    who were sort of linked between their video

9    and the geospatial harvest -- geospatial

10   project, the people on that original 70?        17:04:05

11        A.    Yeah.  I wouldn't say that.  I

12   would say that "mule" meant anybody.  I mean,

13   mule, ballot harvester, ballot.  I mean, all

14   of those words were fungible, just the

15   same -- you know, anybody that was running      17:04:17

16   afoul of the law was, you know, in our very

17   loose vernacular, a mule.

18              But then there was a set-aside

19   group that was the ones that had had

20   geospatial work attached to them, so...         17:04:28

21        Q.    But when you say "non-mule,"

22   you're referring to the people who didn't

23   have the -- when you're using it here in the

24   context of the film and the videos in the

25   film, you're referring to the people who were   17:04:41

1    not tracked with the geospatial data, right?

2         A.    It was the -- I was -- I am --

3    was probably the fastest path to explain what

4    I wanted to talk about.

5         Q.    So tell me again what was that.    17:04:56

6               What's the distinction that you

7    thought you should be drawing?

8         A.    There was, in my opinion, the

9    stories of -- of what was being shown in the

10   film were being convoluted, and the stories    17:05:07

11   about the Gwinnett anomaly and the Gwinnett

12   box and all of that footage was being

13   convoluted.  And that's not to say that they

14   weren't, you know, mules when they were --

15   you know, to be very, very clear, the Georgia   17:05:21

16   law says if you vote more than one ballot

17   more than -- you know, more than your own

18   ballot, you must sign an assister signature

19   on the back of the envelope, and we had done

20   the work to determine that had not happened.    17:05:33

21   So -- so, you know, that -- that is -- that

22   holds.

23               But it was the -- the -- the --

24   the video that was, you know, added much

25   later that I just -- I just felt like          17:05:49

CONFIDENTIAL

Page 291

1    needed -- it was a different -- it was a

2    different story line, I guess you could say,

3    for the movie.

4         Q.    Right, because the story line

5    in the movie is about the people who were        17:05:59

6    geospatially tracked?

7         A.    I wouldn't say -- I wouldn't

8    say it was -- I mean, that was one of them --

9         Q.    Right.

10        A.    -- but there was also the         17:06:08

11   Gwinnett anomaly and there were also, you

12   know, people -- little M mule just running

13   afoul of the law.  And that's, you know,

14   again, ballot harvesting depositing more than

15   one.  And in Georgia, you can't do that        17:06:19

16   without an assister signature.

17        Q.    No, I understand.  I'm just

18   trying to -- to figure out the distinction

19   you're drawing between the two groups of

20   videos.                                          17:06:29

21        A.    Uh-huh.

22        Q.    And when you say "non-mules" in

23   the film --

24        A.    Uh-huh.

25        Q.    -- you are referring to that --   17:06:37

CONFIDENTIAL

Page 296

1    y'all.  I -- it's supposed to air tomorrow."

2              Do you see that?

3         A.    Yes.

4         Q.    And that's referring to the

5    Charlie Kirk interview?                        17:22:17

6         A.    Yes.

7         Q.    And when you say "he had the

8    same videos from the ad in Georgia, the ones

9    we previously talked about," what are you

10   referring to?                                  17:22:25

11        A.    I do not remember what the ad

12   in Georgia was.

13              I do recall that I went into

14   this interview thinking it was a radio

15   interview, and then he had -- had videos that  17:22:36

16   we -- we were shown.  And I just -- I don't

17   remember -- zero recollection about what "the

18   ad in Georgia" means.

19        Q.    If I said there was a "Get

20   Georgia right" anti-Kemp ad, would that       17:22:51

21   refresh your recollection at all?

22        A.    I mean, no.  There -- there

23   were people doing all kinds of things.  I --

24   I --

25        Q.    Okay.  And according to the        17:23:02

CONFIDENTIAL

Page 301

1    know, going all the way back earlier when I

2    learned that, you know, somebody called me

3    and said they had -- so I -- I was making

4    some assumptions here.

5          Q.    Okay.  And in the course of          17:27:15

6    that interview, Mr. Kirk showed the video of

7    Mr. Andrews, correct?

8          A.    Yes.

9          Q.    And it was not blurred?

10         A.    It -- it was not -- I don't --        17:27:29

11   he showed it to us on his laptop.

12         Q.    Right.

13         A.    And I really don't recall

14   whether it was or wasn't then, but now since

15   all of this, I do know that what they posted    17:27:42

16   wasn't.

17               I -- I will state again.  I had

18   no editorial control.  And, frankly, the

19   thought that that was all going through

20   Salem, I just didn't -- it would have never     17:27:52

21   even occurred to me so...

22         Q.    So why don't we -- we're not

23   going to go through all the clips we watched

24   yesterday.

25         A.    Okay.                                17:28:02

CONFIDENTIAL

Page 302

1          Q.      Let's just go -- can we do the

2     one that's Deposition Exhibit 1C.

3                     (Video playing.)

4     (BY MS. KUCK)

5          Q.      Okay.  Did you rehearse that      17:29:54

6     interchange with Mr. Kirk before you had it

7     on camera?

8          A.      No.

9          Q.      When he says "this is Gwinnett

10    County, right," how does -- how did you --      17:30:04

11    how did you know that?

12         A.      Because that was the most

13    pristine video, and we had spent so much time

14    on that Gwinnett anomaly that I saw that drop

15    box, I mean, I just knew it.                     17:30:14

16         Q.      Okay.  And he says:  "This is

17    one of the 2000 you profiled."

18                     And you said, "Yes."

19                     Right?

20         A.      Yeah.  I -- I heard myself say      17:30:22

21    that.  I can only say that, you know, I was

22    just saying it in -- just sort of in passing.

23    I mean, it was all happening very quickly,

24    and I was shocked by all of it.  I was in,

25    you know, dungarees and expected to be on the   17:30:41

Page 303

1    radio.

2        Q.    Okay.  And it's your testimony

3    that you didn't notice that the -- the video

4    wasn't blurred?

5        A.    I -- I can't say that I -- I        17:30:51

6    mean, I didn't notice it, but I will say I

7    had no idea what was going to ultimately be

8    done with the video that they had.  I -- I

9    didn't know.  I mean, whatever I saw was on

10   Charlie's screen.  That's on Charlie's -- you  17:31:03

11   know, on Charlie's -- or on a laptop, but I

12   had no -- I had no editorial control over

13   whatever else they were going to do with the

14   video.

15       Q.    And you -- you never said to         17:31:14

16   Mr. Kirk, Hey, if you're going to use that,

17   you've got to blur the identity?

18       A.    I -- I mean, yeah, I don't know

19   that I did or didn't.  I mean, you know,

20   ultimately everything in the movie was         17:31:27

21   blurred.  I -- I don't know.  I mean, it

22   could have been that he -- I just don't know.

23   He could have showed us blurred images and

24   then not used them.  I really don't know.  I

25   had zero editorial control.                    17:31:39

Page 304

1          Q.     Yeah, I -- I understand you --
2     you didn't have any control of it.  I'm just
3     trying to get at what you actually saw when
4     you were sitting there --
5          A.     Yeah.                          17:31:46
6          Q.     -- and what you communicated to
7     Mr. Kirk or his staff --
8          A.     Uh-huh.
9          Q.     -- afterwards.
10          A.     Uh-huh.                        17:31:50
11               It's -- it's -- it's entirely
12     possible that I said something.  I don't -- I
13     don't -- I can't tell that, you know, that I
14     have any evidence of it or -- or I -- just an
15     interview that I thought was a radio          17:32:04
16     interview, and he's part of the Salem team,
17     and I -- you know, and I don't know what else
18     they're putting on or doing at -- I have zero
19     involvement in that.
20          Q.     Okay.  And are you aware that    17:32:15
21     TTV reposted on a number of social media
22     channels afterwards?
23          A.     It doesn't surprise me, so...
24          Q.     Okay.  And would it surprise
25     you that they posted it with the unblurred    17:32:27

CONFIDENTIAL

Page 305

1    footage?

2           A.    It doesn't.  They would have

3    just posted the interview.

4           Q.    Okay.  Whoever was doing your

5    social media, would -- would they have been    17:32:40

6    alerted to the fact that it was -- that they

7    shouldn't be posting any video accusing

8    people of voting fraud without -- without

9    redacting their identities?

10          A.    You know, I think that The View    17:32:53

11   was -- it was a show that had, you know,

12   checked all the boxes according to Salem and

13   Charlie and -- or Charlie's show and just

14   posted.  I mean, and I -- you know, that's --

15   that's it.                                      17:33:13

16          Q.    Let's look at what we marked as

17   Exhibit 19 or 16 -- 16 yesterday.

18          A.    Yes.  Got it.

19          Q.    Okay.  And that's an e-mail

20   dated April 19, 2022, from Jim Hoft of         17:33:57

21   Gateway Pundit to you and Mr. Engelbrecht,

22   correct?

23          A.    Yes.

24          Q.    And it looks like you were

25   going to appear on his program shortly after   17:34:10

CONFIDENTIAL

Page 308

```
 1      You know, I -- this -- I don't -- I mean, I

 2      don't even -- frankly, I don't even know that

 3      I did this.  I don't know.

 4           Q.    Okay.  Yeah.  My only question

 5      about that is that he's saying there the        17:36:09

 6      clips you ran on the Charlie Kirk interview,

 7      so he is characterizing them as your clips.

 8           A.    Yeah.  But that's -- that's

 9      just a, you know, turn of phrase.  I mean,

10      I -- clearly, I'm not running the Charlie       17:36:22

11      Kirk interview or Charlie Kirk show or, you

12      know, sitting at the editing board or

13      production board or whatever they even call

14      them.

15           Q.    And your testimony is you don't       17:36:32

16      remember providing those clips to Charlie

17      Kirk?

18           A.    No.

19           Q.    Are you aware of the unblurred

20      footage of -- of the video in which -- which    17:36:41

21      we've been talking about, about Mr. Andrews

22      voting?

23           A.    Uh-huh.

24           Q.    Do you have any recollection of

25      anyplace else that it was played in an          17:36:54
```

CONFIDENTIAL

Page 312

1      status of this?  And as I generally recall,

2      he said, Oh, no, it's nothing to worry about.

3                    And I was troubled enough that

4      I reached out to Salem, and that is when I

5      learned that books had -- had already been          17:40:42

6      released to the media and books were on their

7      way to stores.  And I was -- I was shocked.

8           Q.    And why were you shocked?

9           A.    Because we had never been

10     consulted on the book.  We had never -- I           17:41:02

11     have -- I just had no idea that there was a

12     book being -- actually being written.  I

13     mean, I knew there had been one that had been

14     talked about, but we were not involved in

15     that at all.                                         17:41:17

16          Q.    And when you were talking about

17     getting the 20 percent of the book profits,

18     is it your recollection you didn't even know

19     a book was in process?

20          A.    Huh-uh.  I will say this.  They           17:41:30

21     did talk about a book early in the -- in the

22     discussion like maybe at the time with Salem

23     when -- when we were there in Dallas.

24                    So I don't want to represent

25     that I had never heard of a conversation           17:41:43

Page 350

```
 1    was one of those additional videos that was
 2    not in the original 70, correct?
 3         A.     Correct.
 4         Q.     And do you know how those
 5    videos were obtained?  Like, where did they    18:35:43
 6    come from?
 7         A.     My understanding is they all
 8    came from open records requests.
 9         Q.     And do you know who actually
10    initiated the open records request?           18:35:56
11         A.     True the Vote would have.  We
12    always did.  I mean, yeah.
13         Q.     And do you remember actually
14    making that public records request?
15         A.     I mean, not specifically.  But    18:36:05
16    it was an ongoing -- we had heard that the
17    data was available and went back to try to
18    get it.
19         Q.     And do you know roughly the
20    time frame in which that request would have   18:36:17
21    been made?
22         A.     I -- I don't -- later.  I mean,
23    that -- I can tell you that much, just later
24    than, you know, the -- sort of the bigger
25    project.                                      18:36:29
```

Page 353

1    would be that they would pull people that
2    looked to be also running afoul of the law,
3    small m mule, not, you know, casting more
4    than one ballot in -- in the -- in the county
5    where we knew there were no assister        18:38:39
6    signatures.
7         Q.    And when you say "they would
8    pull the video," who is "they"?
9         A.    OpSec and that group.
10        Q.    Okay.  And do you have any       18:38:48
11   understanding of how those videos were
12   transmitted to Mr. D'Souza's team?
13        A.    I -- I know that there was an
14   instance where it was transferred via FedEx.
15   I don't -- I don't know the specifics.  I    18:39:05
16   just remember it was like very late, they
17   were trying to get the fly effect.  You know,
18   that was it.
19        Q.    And do you have any knowledge
20   of any disclaimers or any kind of concerns    18:39:18
21   that would have been expressed to anyone on
22   Mr. D'Souza's team about these videos not
23   being linked to geospatial data?
24        A.    I mean, I don't -- I don't know
25   how you could have had it confused because    18:39:47

CONFIDENTIAL

Page 354

1    there was such a long period of time where

2    there was one type of discussion.  And then

3    there was an, Oh, we just got more video.

4    Oh, gosh, we need video.

5              And that was a -- a second type    18:39:59

6    of discussion.

7         Q.    Okay.  Is it possible that any

8    of the videos that were provided -- based on

9    your knowledge, right, I'm not asking you to

10   speculate, but are you -- are you aware of    18:40:20

11   any possibility that any video footage was

12   sent to Mr. D'Souza's team by David Cross?

13        A.    It's -- it is -- it's not --

14   excuse me -- not to the best of my knowledge.

15        Q.    Okay.  And you -- you mentioned    18:40:37

16   that Heather Mullins knew David Cross?

17        A.    Yes.

18        Q.    What's your understanding of

19   their relationship?

20        A.    I -- friends and -- and fellow    18:40:51

21   researchers, that's -- that's about all I

22   know.

23        Q.    And does Heather live in

24   Georgia?

25        A.    Heather lives in New Hampshire,    18:41:04