# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **MARK ANDREWS**,<br><br>    Plaintiff,<br><br>v.<br><br>**DINESH D'SOUZA**, *et al.*,<br><br>    Defendants. | Case No. 1:22-cv-04259-SDG |

### DECLARATION OF CATHERINE ENGELBRECHT

I, Catherine Engelbrecht, hereby declare:

1. I am over 18 years of age and of sound mind, and the matters described herein are within my personal knowledge and, if called as a witness, I could and would competently testify thereto.

2. I make this declaration in support of Defendants True the Vote Inc. ("TTV"), Catherine Engelbrecht, and Gregg Phillips ("Phillips") (collectively "TTV Defendants")' Motion for Summary Judgment.

3. I am the founder, President, and CEO of True the Vote, Inc.

4. TTV is a nonprofit, nonpartisan organization whose mission is to empower voters and protect voters' rights through the power of citizen engagement.

5. Prior to the film "2000 Mules" (the "Film"), TTV and I had never worked with Salem Media Group, Inc. ("Salem") before.

1

6. I had only briefly met Dinesh D'Souza one time before the initial meeting regarding the Film.

7. Dinesh D'Souza and D'Souza Media LLC ("D'Souza Defendants") have had little to no contact with me since the Film's premiere in May 2022.

8. Plaintiff has never met or spoken with me or anyone at TTV.

9. The issue of election fraud in the 2020 election was an issue of public concern and was often discussed in the news.

10. I understand the purpose of the Film was to highlight the issues of election integrity, election process, and election fraud.

11. Starting in late 2020 and early 2021, TTV and OpSec began performing research regarding the 2020 election, with the goal of providing the findings to law enforcement. The research was not originally done with the goal of appearing in a film.

12. In late 2021, Debbie D'Souza first discussed with me the possibility of using some of the surveillance film footage TTV had obtained and some of its research in a feature film, which I understood the working title of at the time was "One Party America," that went on to become "2000 Mules."

13. TTV obtained publicly-available video of public ballot drop boxes from Georgia Open Records requests, and provided that video to OpSec.

14. There is no one general definition of what a "mule" is.

15. The ballot drop box surveillance video footage TTV obtained was paid for commercially and publicly available.

16. The original 70 videos OpSec provided to the D'Souza Defendants matched geospatial analysis with unique device IDs based on time and location. These videos did not include footage from Gwinnett County public ballot drop boxes, because TTV Defendants had not yet received that video. Therefore, it did not include footage of Andrews.

17. On February 4, 2022, Debbie D'Souza requested from TTV Defendants "1,000 videos" for the Film in order to "make a collage for the screen of all these videos compiled to fit the full screen." DD_000394.

18. On February 10, 2022, I informed Debbie D'Souza that it was "incredibly time consuming" to separate out the video clips tied to the geospatial analysis "because it involve[d] reading the geospatial data to try and find a match in really poorly detailed county video, so only analysists can do this. It is difficult to know how many more we will have. We have lots of footage, but finding the pieces that work is difficult. . . . We have millions of minutes of general footage so we can break apart clips and as long as they are too blurry to determine identifiable features, they could work for purposes of showing movement to the drop boxes and giving a 'fly' effect." TTV_007276-77.

19. I routinely emphasized it was very difficult to process the geospatially-linked video. It was extremely time-consuming, and extremely expensive.

20. The D'Souza Defendants repeatedly asked for more surveillance video.

21. In approximately March 2022, Gwinnett County belatedly sent publicly-available ballot drop box surveillance video to TTV.

22. TTV Defendants sent additional video clips, including certain Gwinnett County footage to the D'Souza Defendants, but made clear that this second batch of videos was not tied to geospatial analysis, but was to be used only to complete the request from Deborah D'Souza for the filler images she'd requested.

23. On February 23, 2022, TTV sent a request pursuant to the Georgia Open Records Act, requesting Gwinnett County to produce "any report, record, or other documentation that will provide confirmation of Absentee Ballot Envelopes with Assistor Signatures collected during the November 2020 Election," and specifically, in accordance with O.C.G.A. § 21-2-385, "an accounting of Assistor Signatures on Absentee Ballot envelopes, by drop box location, during the entire absentee voting period for the November 2020 General Election." TTV_007283-84. The statute provided: "the elector shall vote his or her absentee ballot, then fold the ballot and enclose and securely seal the same in the envelope on which is printed 'Official Absentee Ballot.' This envelope shall then be placed in the second one, on which is printed the form of the oath of the elector; the name and oath of the person

4

assisting, if any; and other required identifying information." O.C.G.A. § 21-2-385(a) (2019).

24. Gwinnett County responded on March 1, 2022, stating that it had reviewed its files and determined that there were "no responsive documents" to TTV's request. TTV_007283-84.

25. TTV initially sent the Georgia Secretary of State a complaint in November 2021. TTV discussed that "surveillance footage shows numerous instances in which individuals deposited multiple ballots at a time – a practice which is prohibited under Georgia law except under very limited circumstances." TTV_010031-33.

26. TTV retained an attorney to assist with drafting, reviewing, and providing feedback on this initial complaint before it was sent to the Georgia Secretary of State.

27. On March 10, 2022, as part of its "ongoing nonpartisan election integrity research," TTV sent another complaint to the Georgia Secretary of State, alleging improprieties related to absentee voting. TTV_009376-9390.

28. Based on its review of public ballot drop box surveillance video, TTV concluded that individuals cast multiple ballots, and cited Gwinnett County's response to TTV's Open Records Request stating that there was "no record of any envelopes bearing assistor signatures." TTV_009376-9390 at TTV_009377.

29. TTV retained an attorney to assist with drafting, reviewing, and providing feedback on the March 10, 2022 complaint before it was sent to the Georgia Secretary of State.

30. TTV's Complaint did not identify Plaintiff or any other specific individuals.

31. I believed at the time that Georgia law required that for individuals not depositing their own ballots, there needed to be the signature of an assistor.

32. TTV concluded that "[t]herefore, none of the individuals could have legally cast more than one ballot." TTV_009376-9390 at TTV_009377.

33. I later learned that David Cross, who is unaffiliated with TTV, sent a Complaint to the Georgia State Election Board (the "Cross Complaint"). TTV and I had nothing to do with the Cross Complaint.

34. TTV and I first saw Andrews' name on or about May 26, 2022, when we received a response to our Open Records Request, after the SEB investigation and hearing had concluded. Although we saw Andrews' name in the responsive documents, we did not know he appeared in the Film until Plaintiff filed this lawsuit.

35. TTV and I only met with Salem one time to discuss the possibility of making a film.

36. TTV and I had no editorial control over the Film.

37. My responses to questions in the portions of the Film in which I appeared were unscripted and unrehearsed.

38. In the Film, where Gregg Phillips or I pointed to screens, they were blank, and graphics were superimposed after the fact by D'Souza Defendants.

39. Neither Phillips nor I identified Andrews in the Film.

40. Nobody said Andrews' name during the Film.

41. Although I at times gave limited suggestions for the Film, they were often not accounted for or implemented in the Film.

42. TTV and I had very minimal involvement with marketing and promotion of the Film.

43. TTV and I had very limited coordination with D'Souza Media for publicity for the Film.

44. Salem never discussed with me the marketing of the Film, and TTV and I were not involved with discussions regarding how to promote the Film.

45. Salem, TTV, and I had only occasional contact throughout the process of the Film being produced.

46. I did not know I would be listed as an executive producer on the Film until around the time the Film was released, and did not know why I was included.

47. I was not told what would appear on the screen when I appeared in the Film.

48. TTV and I never had any control over the 2000 Mules website, https://2000mules.com.

49. TTV and I had no editorial control over any trailer for the Film.

50. TTV and I had nothing to do with the creation, production, or development of any trailer for the Film.

51. I was not told what would appear on the screen and did not know I would appear in the final 2000 Mules trailer (the "Trailer").

52. The portions of the Trailer in which I appeared were unscripted and unrehearsed.

53. Neither Phillips nor I identified Plaintiff during the Trailer.

54. Nobody said Plaintiff's name during the Trailer.

55. On or about May 13, 2022, Phillips and I appeared on the show Facts Matter with Roman Balmakov ("Facts Matter"). Plaintiff's blurred image is shown for less than 1 second out of the 14:37 program while Mr. Balmakov is speaking, among several other clips of others from publicly available ballot drop box video.

56. The Facts Matter program reached out to me individually to set up the interview.

57. TTV and I had no editorial control over what was shown on the Facts Matter program.

8

58. TTV and I had nothing to do with the creation, production, or development of the Facts Matter program.

59. I was not told what would appear on the screen when I appeared on the Facts Matter program.

60. The portions of the Facts Matter program in which I appeared were unscripted and unrehearsed.

61. Neither Phillips nor I identified Plaintiff during the Facts Matter program.

62. Nobody said Plaintiff's name during the Facts Matter program.

63. On or about April 8, 2022, a segment aired on *The Charlie Kirk Show* involving Phillips and I, which was filmed a few days earlier. The video includes a brief clip of Plaintiff from publicly available Gwinnett County ballot drop box video, among several other clips of others from publicly available ballot drop box video. In the clip of Plaintiff, he is wearing a COVID face mask, covering his nose and mouth.

64. Either Phillips or I reached out to Charlie Kirk to tell him we would be in town and to see if he wanted to get together for coffee. Kirk then offered for Phillips and me to come on his show, which we accepted.

65. I thought our appearance on *The Charlie Kirk Show* would be a radio interview and was surprised to learn it was being filmed when we arrived that day.

66. *The Charlie Kirk Show* used certain publicly available video clips, including those showing Plaintiff. I know do not know where those clips come from, but they seemed to be the same videos as appeared in a commercial advertisement that was run in Georgia and that were circulating on social media.

67. TTV and I had no editorial control over *The Charlie Kirk Show* program.

68. The *Charlie Kirk Show* interview was unscripted and unrehearsed.

69. Plaintiff was never identified in the *The Charlie Kirk Show* interview.

70. Nobody said Plaintiff's name during the *The Charlie Kirk Show* interview.

71. After filming, I sent a message to Debbie D'Souza stating: "[W]e did an interview with Charlie yesterday. He had the same videos from the ad in GA (the ones we talked about) and asked us to review them. He says Salem knows, etc. but didn't want to not tell y'all." Ms. D'Souza responded: "This is no problem! But thanks for letting us know." DD_000103. I did so because I had thought the Charlie Kirk interview was meant to be a radio interview, and was surprised it was being filmed and that he showed us publicly-available ballot drop box footage.

72. TTV reposted the interview on social media expecting that it was appropriate because it had been vetted and posted online by Salem and Charlie Kirk's show.

73. On May 5, 2022, I appeared on *Tucker Carlson Tonight* on Fox News ("Tucker Carlson Tonight"). As I discussed ballot drop boxes generally, the show included a clip of Plaintiff from publicly available Gwinnett County ballot drop box video, among several other clips of others from publicly available ballot drop box video. In the clip of Plaintiff, he is wearing a COVID face mask, covering his nose and mouth.

74. The *Tucker Carlson Tonight* program reached out to me individually to set up the interview.

75. I did not mention the Film on the *Tucker Carlson Tonight* program.

76. I did the interview remotely and had no ability to see or comment on what was shown on the television screen by *Tucker Carlson Tonight*.

77. TTV and I had no editorial control over what was shown on the *Tucker Carlson Tonight* program.

78. TTV and I had nothing to do with the creation, production, or development of the *Tucker Carlson Tonight* program.

79. I was not told what would appear when I appeared on the *Tucker Carlson Tonight* program.

80. The portions of the *Tucker Carlson Tonight* program in which I appeared were unscripted and unrehearsed.

81. I never identified Plaintiff during the *Tucker Carlson Tonight* program.

11

82. Nobody said Plaintiff's name during the *Tucker Carlson Tonight* program.

83. On April 20, 2022, Phillips and I appeared on *The Gateway Pundit* podcast ("Gateway Pundit"). The video includes a clip of Plaintiff, from publicly available Gwinnett County ballot drop box video, and Plaintiff is wearing a COVID face mask, covering his nose and mouth.

84. The Gateway Pundit program reached out to me individually to set up the interview.

85. TTV and I had no editorial control over what was shown on the Gateway Pundit program.

86. TTV and I had nothing to do with the creation, production, or development of the Gateway Pundit program.

87. I was not told what would appear on the screen when I appeared on the Gateway Pundit program.

88. The portions of the Gateway Pundit program in which I appeared were unscripted and unrehearsed.

89. Neither Phillips nor I identified Plaintiff during the Gateway Pundit program.

90. Nobody said Plaintiff's name during the Gateway Pundit program.

12

91. On May 8, 2022, TTV released a video on its Facebook page (the "TTV Video"). The TTV Video contains a blurred image of Plaintiff from publicly available Gwinnett County ballot drop box video, which appears for a fraction of a second.

92. Neither Phillips nor I identified Plaintiff during the TTV Video.

93. Nobody said Plaintiff's name during the TTV Video.

94. TTV and I had no involvement in the development, writing, editing, or publication of the 2000 Mules Book (the "Book") (Statement 2).

95. TTV and I had no editorial control over the Book.

96. TTV and I never saw a copy of the Book before it was published.

97. TTV and I never received any funds from the Book.

98. Salem was not in communication with TTV or me regarding the Book.

99. TTV and I were not involved with the billboard including an image of Plaintiff in Times Square (the "Times Square Billboard") (Statement 3), and did not know anything about it until this lawsuit was filed.

100. TTV and I had no editorial control over the Times Square Billboard.

101. TTV and I had no prior knowledge that the Times Square Billboard was being put up.

102. In addition, TTV and I were not involved with Statements[1] 7, 9-12, 20, 24-25, and 27, which all involve media appearances by Dinesh D'Souza.

103. To the extent prior video clips of me appeared in any of Statements 7, 9-12, 20, 24-25, and 27, I was not made aware that such clips would be used.

104. TTV and I had no editorial control over Statements 7, 9-12, 20, 24-25, and 27.

105. TTV and I had no prior knowledge regarding Statements 7, 9-12, 20, 24-25, and 27.

106. In addition, TTV and I were not involved with Statements 35-39, which all involve social media posts by Dinesh D'Souza.

107. I did not appear in Statements 35-39.

108. TTV and I had no editorial control over Statements 35-39.

109. TTV and I had no prior knowledge regarding Statements 35-39.

110. In addition, TTV and I were not involved with Statements 40-44, which all involve podcast appearances by Dinesh D'Souza.

111. I did not appear in Statements 40-44.

112. TTV and I had no editorial control over Statements 40-44.

113. TTV and I had no prior knowledge regarding Statements 40-44.

---

[1] The "Statements" are those Plaintiff has identified in his interrogatory responses, and are reflected in Appendix 1 to TTV Defendants' Statement of Undisputed Material Facts.

14

114. TTV and I did not know Andrews was an individual in the Film until he filed this lawsuit.

115. TTV and I have no connection to and, outside of court filings, have never publicly identified Mark Andrews by name.

116. TTV and I did not believe the individual we later learned to be Andrews was a "mule" within the definition of the Film.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of December, 2024.

_____
Catherine Engelbrecht