# EXHIBIT E

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                 ATLANTA DIVISION
3    MARK ANDREWS,                    :
                                      :
4         Plaintiff,                  :
                                      : Case No.
5    V.                               : 1:22-cv-04259-SDG
                                      :
6    DINESH D'SOUZA, et al.,          :
          Defendants.                 :
7
8
9

        *********************************
10               C O N F I D E N T I A L
11      VIDEOTAPED / REALTIMED DEPOSITION OF
12               DINESH J. D'SOUZA
13               OCTOBER 17, 2024
14      *********************************
15
16
17
18
19
20
21
22
23
24
25

1    refreshed my memory about things I knew, but

2    it gave me more detail.

3            Q.    And can you identify anything

4    specifically?

5            A.    No.  I think it was really more

6    in the nature of being able to establish a

7    timeline, refresh my memory about, oh, this

8    happened in January instead of February, that

9    kind of thing.

10           Q.    Okay.  Did you review the

11   testimony of Mr. Phillips or Ms. Engelbrecht?

12           A.    Yes, I did.

13           Q.    And was that in the preparation

14   meeting with your counsel or separate?

15           A.    Well, I just briefly looked it

16   over.

17           Q.    Okay.  But, I mean, somebody --

18           A.    On my own.

19           Q.    On your own.  Somebody provided

20   it to you and you reviewed it?

21           A.    Exactly.

22           Q.    You were here yesterday when

23   Mrs. D'Souza was deposed.  Right?

24           A.    Right.

25           Q.    And did you have any

Page 22

```
 1            Q.     And what was that?
 2            A.     It's a campaign finance
 3     violation.  I was convicted of exceeding the
 4     limit in campaign finance donation.
 5            Q.     And your conviction was
 6     pardoned by President Trump in 2018.  Is that
 7     correct?
 8            A.     Yes.
 9            Q.     How long have you known
10     Mr. Trump?
11            A.     I met him for the first time in
12     the fall of 2019, a year and a half after my
13     pardon.
14            Q.     Okay.  So you weren't
15     acquainted with him before the pardon?
16            A.     No.
17            Q.     Have you kept in touch with him
18     since 2019 through the present?
19            A.     I have been in touch with him
20     sporadically the -- since 2019, but in no way
21     on a regular basis.
22            Q.     And when did you first met
23     Catherine Engelbrecht?
24            A.     I first met Catherine
25     Engelbrecht through Debbie in the -- in the
```

Page 23

```
 1      meeting that we had to talk about the film.
 2           Q.     Okay.  And that was a meeting
 3      at your home?
 4           A.     Yes.
 5           Q.     And you had never met
 6      Ms. Engelbrecht before that?
 7           A.     As far as I can remember, I
 8      hadn't.
 9           Q.     Okay.  And was Mr. Phillips at
10      that meeting?
11           A.     Yes.
12           Q.     And had you met him previously?
13           A.     No.
14           Q.     Were you aware of his work
15      prior to the time that you first met him?
16           A.     I had heard of him and I had
17      heard about his -- I had heard about some of
18      the things he had done.
19           Q.     Did he have a good reputation?
20           A.     Yes.
21           Q.     When did you last speak to
22      Ms. Engelbrecht?
23           A.     It's been a while.  It would be
24      in the -- in the aftermath of "2000 Mules,"
25      but not since.
```

Page 24

```
 1          Q.      Have you spoken with her since
 2    this litigation was filed?
 3          A.      Yes, I think we spoke once,
 4    perhaps twice, just to -- just to take note
 5    of the litigation, but not very much beyond
 6    that.
 7          Q.      Okay.  And how about the last
 8    time you talked to Mr. Phillips?
 9          A.      I haven't spoken to
10    him -- generally, it's about the same.
11          Q.      Okay.  And what relationships
12    do you have with D'Souza Media or its
13    affiliates?
14                  I'm sorry.  Strike that.
15                  With Salem Media or its
16    affiliates?
17          A.      I have -- I'm partnered with
18    Salem Media on my podcast.  We do a -- we do
19    it as a kind of a revenue share.  And I made
20    the film "2000 Mules" in partnership with
21    Salem.
22                  And, let's see, I've obviously
23    appeared as a guest on various Salem shows.
24    And Salem and I are contracted to do a film,
25    one film, in the future.
```

Page 34

```
 1     just say Catherine Engelbrecht has some
 2     connection with Davis Cross.
 3          Q.     And what do you understand that
 4     connection to be?
 5          A.     I don't know anything about it.
 6          Q.     Okay.  So what do you
 7     understand?  What did you learn about that?
 8          A.     I just learned subsequently
 9     about a request by Catherine Engelbrecht to
10     add Davis Cross to credits; and, therefore, I
11     assumed, based on that, that there was some
12     connection.
13          Q.     Okay.  And when you said her
14     request to add him to the credits, is that
15     what we talked about at the deposition
16     yesterday?
17          A.     Yes.
18          Q.     And before you heard it at the
19     deposition yesterday, were you -- were you
20     aware of that at all?
21          A.     I was not aware of it.
22          Q.     Okay.  So when you say you
23     learned it subsequently, it was yesterday
24     when you learned of it.  Right?
25          A.     Yes.
```

Page 35

```
 1            Q.      Okay.
 2            A.      Right.
 3            Q.      Let's go to Exhibit 93, I
 4     believe, which are your amended responses.
 5                    Let's look at Page 6, which is
 6     where Interrogatory No. 4 starts, and your
 7     answer is on Page 7.
 8                    Do you see that?
 9            A.      Yes.
10            Q.      And it's talking about the
11     methodology that was used to support the
12     allegations in the "2000 Mules" film.
13                    Do you see that?
14            A.      Yes.
15            Q.      Okay.  And it says, in the
16     second paragraph (as read):  "Mr. D'Souza
17     states that he relied on methodology, data
18     and presentations of TTV, Catherine
19     Engelbrecht, and Gregg Phillips."
20                    Do you see that?
21            A.      Yes.
22            Q.      Did you rely -- well, what
23     methodology are you referring to?
24            A.      The methodology is twofold.
25     One is the use of cell phone geotracking to
```

Page 36

```
 1    identify mules going to drop boxes, mail-in
 2    drop boxes.
 3                  And the other is the use of
 4    surveillance video to depict mules going to
 5    drop boxes.
 6         Q.     When -- can you tell me, when
 7    you use the term "mules," how -- what do you
 8    mean by that?
 9         A.     A mule is a delivery man or
10    delivery woman.  A mule is someone who is a
11    conduit for depositing ballots, typically
12    multiple ballots, into a -- into a mail-in
13    drop box.
14                  "Mules" is used in the film in
15    a fairly specific context.  So it's not
16    anyone doing those things.  It is people
17    doing those things who meet a certain
18    specified or enumerated criteria.
19         Q.     And can you give me that
20    criteria?
21         A.     That criteria is that a mule
22    has to go to ten or more drop boxes within a
23    specified period of time, essentially
24    election season.
25                  And the mule has to also go to
```

```
                                              Page 37
```

1      so-called NGOs or nonprofit houses, stash

2      houses it's sometimes called colloquially.

3                    And it is the combination of

4      those two things that creates the criterion

5      for the cell phone geotracking.

6           Q.     And does that person need to

7      have been paid to deliver those ballots?

8           A.     Not necessarily, but there is a

9      discussion in the film about some plausible

10     reasons to believe that the mules were paid.

11          Q.     Do you have any evidence that

12     the mules were paid other than the theories

13     in the film?

14          A.     No.

15          Q.     The second sentence there says

16     (as read):  "In addition, D'Souza Defendants

17     conducted research into the nature and use of

18     geotracking and how it is routinely used in

19     criminal cases and other applications.  The

20     D'Souza Defendants interviewed other experts

21     about the implications of the findings."

22                    Do you see that?

23          A.     Yes.

24          Q.     And who else did you interview

25     about the geotracking findings?

1          A.      The people that we interviewed

2     are, number one, a fellow named Hans von

3     Spakovsky, who is a former member of the

4     Federal Election Commission.

5               A second person was an election

6     lawyer named Harmeet Dhillon.

7               A third person is a person -- a

8     long-time public policy intellectual who does

9     research into the nature of nonprofit

10    organizations and their sources of funding.

11    His name is Scott Walter.  He's head of the

12    Capital Research Center based in Washington,

13    D.C.

14               And those -- two of those three

15    interviews are in the film, and the third

16    one, Harmeet Dhillon, is

17    represented -- reflected in the book.

18          Q.      And are any of them experts on

19    geotracking?

20          A.      I don't know what you mean by

21    "experts on geotracking."  Do you mean the

22    technical aspects of geotracking?

23          Q.      Yes.

24          A.      Not to my knowledge, no.  Their

25    expertise is in election-related areas.

1          Q.      And so did you talk to any
2     expert about the methodology that TTV used in
3     its study of the mules?
4          A.      Do you mean any outside expert?
5          Q.      Any outside expert on
6     geotracking, on the methodology they used?
7          A.      I didn't speak to anyone, but I
8     did a considerable amount of reading.
9          Q.      Okay.  And what reading did you
10    do?
11         A.      I read articles both in the
12    general media, as well as in law enforcement
13    media, to -- articles that I pulled up on
14    geotracking and to develop a good, I would
15    call it, layman's understanding of what it
16    is, how it worked, what it showed and didn't
17    show, its relative accuracy, and its -- the
18    frequency of its use in law enforcement, as
19    well as potential objections or problems with
20    geotracking.
21         Q.      And -- but you didn't have
22    anyone review specifically what Mister -- or
23    what TTV did with its methodology.  You were
24    looking at geotracking in general and what
25    its capacity was.

Page 57

```
 1    places.
 2                    And I also knew that there were
 3    enormous obstacles and difficulties to
 4    getting comprehensive footage.
 5            Q.      Okay.  On Page 6, there is a
 6    reference to a Frank Lamont?
 7            A.      Yeah.
 8            Q.      And who is Mr. Lamont?
 9            A.      He is a graphic designer.
10            Q.      And who -- in connection with
11    the film, who supervised his work or who gave
12    him instructions and had him produce things?
13            A.      My partner, Bruce Schooley.
14            Q.      Okay.  Did you work with
15    them -- work with him at all on the graphics
16    that were shown in the film?
17            A.      No.
18            Q.      And then finally, under
19    Promotion, it says -- No. 19, it says
20    "Mar-a-Lago"?
21            A.      Yes.
22            Q.      And the premier for the film
23    was held at Mar-a-Lago.  Right?
24            A.      Right.
25            Q.      How did it come to be that the
```

Page 58

```
 1    event was held at Mar-a-Lago?
 2         A.      It was my idea.  And I thought
 3    it would be a -- film premiers are ultimately
 4    glamorous events, and I thought it would be
 5    cool to have it in a -- in that setting, not
 6    to mention the fact that it tied in with a
 7    theme that President Trump was very
 8    interested in.
 9              It -- so that's why we
10    approached Mar-a-Lago to host the premier.
11    But, you know, we were a normal customer and
12    we paid a hefty fee to do it; and we worked
13    with their organizational team in having that
14    event.
15         Q.      And Mr. Trump attended the
16    event?
17         A.      He did.
18         Q.      Okay.  Now I am done with that
19    big stack.
20              All right.  Were you asked to
21    collect any documents in connection with this
22    litigation?
23         A.      Yes.
24         Q.      And what documents were you
25    asked to collect?
```

Page 62

```
 1      is because I do a lot of speaking events and
 2      I do meet a lot of people in a casual
 3      context, so -- but, no, in terms of sitting
 4      down with her, that was the first time.
 5            Q.      Okay.  And how did that meeting
 6      come to take place?
 7            A.      The topic of election integrity
 8      and election fraud was in the air, if I can
 9      put it that way.  Lots of people were talking
10      about it.
11                   And my wife, Debbie, is friends
12      with Catherine Engelbrecht.  And so I don't
13      remember if Catherine reached out to Debbie
14      or the other way around.
15                   But, in any event, Debbie
16      reported to me that, hey, it looks like
17      Catherine and True the Vote has been doing
18      some original work in the area of election
19      integrity and either they want us to know
20      about it or I think it would be good if we
21      learned more about it.
22            Q.      And so Ms. D'Souza set up that
23      meeting at your home?
24            A.      Yes.
25            Q.      And it was just the four of
```

Page 72

1          A.      That is right.  Although --
2    although, as I recall, during that discussion
3    there were times when Gregg did open up his
4    computer and show us things in the
5    conversation.  And I'm not quite sure how
6    much of that in the edited version made it
7    into the movie.
8              So did Gregg have maps and
9    computer presentations?  Yes, he did, during
10   both presentations, meaning the presentation
11   in The Woodlands as well as the LA
12   presentation.
13             And then ultimately we make
14   movie decisions, editorial decisions about
15   how best to depict the information that is
16   collected and how best to present it.  How do
17   we make it more understandable.
18             This is an inherently complex
19   topic and so I have a task that I normally am
20   considered good at, but it's very difficult
21   here, the supreme task of taking an
22   inherently technical topic, you know, similar
23   to ballistics or something like that, and
24   trying to convey this in an understandable
25   manner that makes sense to an audience that

Page 74

```
 1              He might have.  I just don't
 2      recall.
 3          Q.      Okay.  But your recollection is
 4      he seemed to have some of them with him in
 5      this briefcase?
 6          A.      He had a lot of stuff with him
 7      in the briefcase, yes.
 8          Q.      And some of it was paper?
 9          A.      Yes.
10          Q.      So what was -- we'll take a --
11      we'll take a break in a minute.  We've been
12      going about an hour.
13              What was the next step after
14      that Woodlands meeting?
15          A.      The next step after the
16      Woodlands meeting was to think about whether
17      this topic had enough new material, by which
18      I mean new concepts, new ideas, new
19      information.  Whether the topic was of
20      sufficient public importance to seriously
21      hunker down and consider making it our next
22      movie, or at least beginning the process of
23      that.
24              As you know, we had a deal with
25      Salem Media to make a movie, but they didn't
```

Page 75

```
 1    tell us what to make the movie about.  It was
 2    completely kind of at my discretion.  It was
 3    based upon my record with earlier films.
 4              We had talked about two or
 5    three other ideas for a movie.  In fact, the
 6    fact that our LLC was called One-Party
 7    America is a little bit of a hint of one of
 8    the earlier incarnations of a movie that we
 9    were -- we had done some research and we were
10    somewhat down the road of wanting to make
11    that film.
12              And so essentially I just had
13    to think about whether this is something that
14    was sufficiently interesting.
15              And I've got to say that the --
16    initially it met that bar quite easily
17    because it -- first of all, there had been
18    widespread ruminations about election fraud
19    in a variety of angles.
20              I had been very intrigued by
21    all of those things, boarded up windows and
22    allegations about machines, but I was not on
23    board with any of those as proving anything.
24              In other words, an anomaly is
25    not same thing as a proof.  An anomaly is
```

Page 112

1    a first stab at laying out a scenario.  And

2    it's a very rough scenario.  This is done

3    extremely early in the process.  And it's a

4    lot of maybe this and maybe that and possibly

5    that and how about this?  And a lot of

6    question marks.

7                   But the idea is to give some

8    form to a rather amorphous subject, list

9    potential people that we might or might not

10   interview, things we might or might not show.

11                  I would describe this as an

12   early brainstorming document.

13        Q.    Okay.  And I see that

14   Ms. Engelbrecht and Mr. Phillips are copied

15   on it?

16        A.    Yes.

17        Q.    And why were they copied?

18        A.    They're copied because although

19   we were emphatic from the beginning that

20   editorial control of the film would be

21   ours -- this is our film.  It's a D'Souza

22   Media project.  I am the narrator of the

23   film.

24                  Nevertheless, we intended to

25   try to work as collaboratively as possible

Page 113

1    with them, have them know what we were doing

2    so -- just to give them a feeling of

3    knowledge, but also trust, that we were

4    thinking stuff through, we were asking the

5    right questions.

6              In other words, we saw them as

7    sources of potential ideas and input even

8    into things that we were doing on an informal

9    basis.

10        Q.    And during the course of the

11   making of the film, how much did you

12   personally interact with Ms. Engelbrecht and

13   Mr. Phillips?

14        A.    It was, I would say, sporadic

15   and periodic.  Some of it had to do with the

16   content of the film.  Some of it had to do

17   with the sort of logistics or mechanics of

18   the film.  When will we get this?  When are

19   you guys doing that?  When can we expect

20   this?  Things like that.

21             The strategy of the film was to

22   try to keep the content of the film inside

23   the film.  In other words, to do what, I

24   guess, as a kid I heard from my teacher as a

25   show your work.

Page 127

1    that even entered into my mind.

2         Q.      And this didn't -- and the

3    blurring didn't have anything to do with the

4    insurance, the liability insurance, because

5    you didn't get that for this film.

6         A.      Well, I wasn't involved in the

7    insurance part of the discussion, Bruce was.

8              But Bruce and I, you know,

9    talked about blurring, and basically Bruce

10   and then Debbie were advocates of blurring

11   and I was an advocate for not blurring.

12             But ultimately I acceded to

13   their concerns and agreed with them, and we

14   made the decision -- I mean, I did -- to

15   blur.

16        Q.      Okay.  So your testimony now is

17   it was just a -- it was really just a

18   stylistic issue?

19        A.      I didn't say that.

20             MS. HYLAND:  Objection.  I

21        don't -- I don't --

22             MS. HABER KUCK:  Okay.

23             MS. HYLAND:  -- think that's

24        what he said.

25        A.      Yeah, I didn't say it was a

1    stylistic issue.  I thought it was

2    substantive on a number of levels.

3         Q.       (By Ms. Haber Kuck)  Okay.  But

4    you also were in favor of not blurring the

5    faces.

6         A.       Initially.

7         Q.       And you were convinced by

8    Mrs. D'Souza and Mr. Schooley that you

9    should.

10        A.       Yes.  And I'm trying to

11   remember if Catherine -- Catherine and Gregg

12   also weighed in on that.  I'm pretty sure

13   that they were on, loosely speaking, the

14   Bruce and Debbie side of this -- of this

15   discussion, but I don't remember anything

16   specific that they said.

17        Q.       Okay.  The last question I have

18   about Exhibit 23 is on the last page.  It

19   says (as read):  "Other."  And it says (as

20   read):  "The third thing is we need a couple

21   of investigators to hit the street.  They

22   could be on screen."

23             Do you see that?

24        A.       Where is that?

25        Q.       The last page.

1    they have seen the movie and have commented

2    on that.

3                But at the time, no.  They were

4    commenting on the topic, the nature of the

5    operation, the plausibility of something like

6    this happening at scale, and also on the

7    credibility of Catherine and Gregg as far as

8    they knew it.

9         Q.    As far as they knew it in terms

10   of election work, election integrity work?

11        A.    Election integrity work and

12   election intelligence work.

13        Q.    Who selected the videos that

14   were used in the film?

15              MS. HYLAND:  Objection,

16        ambiguous.

17        Q.    (By Ms. Haber Kuck)  Who

18   selected the videos of the drop box footage

19   that -- strike that.

20              Who selected the drop box

21   footage that was shown in the film?

22        A.    That was selected by Bruce and

23   Nathan based upon the videos that we received

24   from Catherine and Gregg.

25              And in -- I don't know if

1          A.      I know about these indirectly

2     in that -- in that I am kept informed of

3     what's happening, but I'm not the direct

4     recipient.

5                   Generally, our video content

6     will go -- I mean, I might be copied on it

7     initially, but it really goes to Bruce and

8     Nathan.

9                   And -- but I was aware that

10    there was an initial, roughly, 70 videos that

11    were sent.  And subsequently we got a second

12    batch of videos.  I'm not sure if we got them

13    all at once.  I'm not sure how many there

14    were exactly.  But they -- it was Batch 2.

15         Q.      Let me -- I'm going to mark as

16    Exhibit 100 a document bearing Control No.

17    TPNF-0004579.

18      (Marked was Plaintiff's Exhibit No. 100.)

19         Q.      (By Ms. Haber Kuck)  Do you

20    recognize this document?

21         A.      (Reviewing.)  Yeah.

22         Q.      And what is it?

23         A.      It's a communication between

24    Nathan and then Bruce and then me.

25         Q.      And what are you discussing?

1          A.     We're discussing -- Nathan is

2     talking about what he got from Gregg and

3     Catherine, G&C.  And Nathan is talking about

4     some VO, a voice over, to connect to the

5     Salem part that comes next in the -- in the

6     structure of the film.

7                (As read):  "I played one full

8     screen because it's the only good left that

9     wasn't shown."

10                Don't quite know what that

11     means.

12                And then he is making a plea to

13     get more mule videos.

14          Q.     And you say (as read):

15     "Realistically I think this is out of the

16     question, at least for now."

17                Do you see that?

18          A.     Yes.

19          Q.     And why were you saying that?

20          A.     I'm not entirely sure,

21     but -- I'm not entirely sure.  It could

22     be -- well, I mean, I can -- I can think of a

23     couple of reasons just given the context and

24     given where this is on the calendar with

25     things.

Page 153

1    that it was difficult to get video from them,
2    that maybe this -- that maybe they didn't
3    have the video, maybe it didn't exist?
4          A.     At times I thought that -- that
5    there may be video that we're not getting.
6    At other times they -- they never said that
7    to us.  They always emphasized, It is really
8    hard to process this video.  It's extremely
9    time-consuming.  It's extremely expensive.
10                And so we understood that we
11   were operating with limited, sort of,
12   availability here.  And we were trying to
13   make the best of what we had.
14         Q.     Did there come a time shortly
15   after this when the Salem folks viewed the
16   film?
17         A.     The Salem folks viewed the film
18   shortly after "this," meaning after the --
19         Q.     At the --
20         A.     -- 29th of March?
21         Q.     Yeah.  Yeah.
22         A.     Yeah.  The film was released in
23   early May, and so there would have been a
24   rough cut of the film sometime in April and
25   then more of a final cut in late April, and

Page 182

1    nobody wants to have a big panel discussion

2    at the end about, why are there -- how do we

3    reform Shawshank?  And, What are the seven

4    things we need to do to clean the place up?

5               No.  The movie is the movie.

6    And the moment that the guy breaks out, the

7    movie is over.

8               And not that the rest of it

9    doesn't need to be done, but it's not a good

10   idea to put it in the film.  It takes the air

11   out of the tire.  It deflates the energy of

12   the film.

13              So this was a section I had

14   originally thought belongs in the film.

15   You've described the problem.  You need to

16   have an extended discussion of the solution.

17              The more I thought about it,

18   the more I realized that there needs to be an

19   extended discussion of the solution, but not

20   in the film.

21              So I made a unilateral

22   editorial decision to cut the film.  He

23   didn't tell us how to cut it or how much to

24   shorten it, but I agreed that -- not just

25   that it was too long, it just wasn't a matter

1          A.     Yes.   Correct.

2          Q.     Okay.   And you don't recall

3     having any direct conversations with him

4     about the film, other than -- well, you had a

5     conversation at the screening?

6          A.     Yes.

7          Q.     And then you saw him again at

8     the premier?

9          A.     Right.

10          Q.     And you don't remember any

11     conversations with him in between.

12          A.     Right.

13          Q.     Do you recall that there was a

14     time in -- at the end of January of 2022 when

15     you were -- well, strike that.

16          Do you recall there were two

17     trailers for the film?  There was a teaser

18     trailer and then there was a longer trailer?

19          A.     Yes.

20          Q.     And do you recall that there

21     was a time around the end of January with

22     respect to the teaser trailer that Salem was

23     threatening to pull out?

24          A.     Yes, I do.  I do want to

25     qualify what we mean by "pull out."  At no

1       point did Salem remotely consider pulling the

2       funding of the movie or its involvement in

3       the movie.

4                    The pullout here had to do with

5       whether or not Salem wanted to be an

6       executive producer and have their name appear

7       on the movie.  So "pullout" in that context

8       has to do with public recognition.

9                    We explained to Salem at the

10      outset of this project that we have had a

11      pool of maybe 40 investors over a series of

12      films.  The vast majority of them have no

13      intention of their names appearing in the

14      film.  They are just contributing money.

15                   They'd rather actually stay out

16      of any public debate around a film, so their

17      names are confidential.

18                   And we told Salem, You're

19      welcome to be an investor in the film and

20      have your name on the film or not have your

21      name on the film.  That's completely up to

22      you.

23          Q.    And what caused them to have

24      second thoughts about having their name on

25      the film?

1            As I say, what I -- when I

2    learned about was she -- and I think people

3    told me.  It's not that I even watched the

4    show -- not a word about "2000 Mules."

5            And I'm like, yeah, Tucker, I

6    had this bad blood.  But Catherine never said

7    a word about it?  No?  It's like the movie

8    doesn't exist.  That was like, This is

9    horrible.

10        Q.    So at some point in time did

11   you come to understand that Ms. Engelbrecht

12   was instructed not to mention the movie by

13   name?

14        A.    No, I was never -- I never got

15   the inside story of that.  I'm merely

16   offering the two possibilities.

17        Q.    And you don't recall Tweeting

18   about Fox instructing her not to mention the

19   film?

20        A.    I don't remember that.  I do

21   remember a little bit later doing some

22   postmortems on the film and Fox.  I've

23   actually not been on Fox since "2000 Mules,"

24   and it has to do with their extreme

25   skittishness around this issue, even though

Page 224

1     want to say a word about the movie.
2     Catherine is evidently on board with this.
3                     I sort of felt that it was bad
4     blood from Tucker, going back to my earlier
5     skirmish with his -- you know, his sidekick.
6                     But I was more bewildered by
7     Catherine because I thought it's Catherine's
8     job to help us promote this film.  The film
9     is, like, red hot.  This is the time to be
10    doing that kind of promotion.  You're clearly
11    okay with not doing it.
12                    I understand you like to be on
13    "Tucker."  I don't know if this is a
14    condition that Tucker and his people imposed
15    on you.  I have no idea.  But this is not
16    what we had hoped for.
17         Q.     And did you know in advance she
18    was going to be on the show?
19         A.     I think she told us that she
20    was going to be on the show, but I don't
21    remember if she told Debbie or if she told
22    me.  I think she said, I'm going on "Tucker."
23         Q.     And where did the footage that
24    was shown on "The Tucker Carlson Show" come
25    from?

Page 244

```
 1             And maybe it came after the
 2     podcast.  I'm not sure.
 3        Q.     And so you said, well, it
 4     wasn't -- it wasn't that significant because
 5     it was the same geotracking information.  And
 6     that's what your point was?
 7        A.     No.  The -- in a movie you have
 8     a central narrative or a central thrust of a
 9     movie.  And the thrust of this movie is, was
10     there an elaborate coordinated election fraud
11     operation going on in the swing states?
12             That would be quite different,
13     for example, from me making a "Forensic
14     Files" episode on who killed Secoriea Turner.
15             The purpose of referencing the
16     murder cases at all was merely to make a
17     point that I think is now well known, which
18     is that law enforcement habitually relies on
19     these kinds of techniques.
20             I thought what was interesting
21     in those cases was that Gregg and Catherine
22     themselves got the idea of trying to
23     investigate two unsolved murders using
24     geotracking.
25             I was like, Wow, that's really
```

Page 274

1    250 mules."

2                      That's basically a recitation

3    of what happened in the movie.

4                      So I don't think I -- I don't

5    think I digested this at any level of depth.

6    I simply took it as Gregg going, this is --

7    seeming to agree at the surface with me about

8    this investigation.

9                      He then sort of distances

10   himself from it by -- the way I read it, as

11   saying, you know, we didn't get sort of

12   dumped here because this wasn't our

13   complaint.

14                     And I'm like, uh-huh, uh-huh, I

15   will discuss this on the podcast, which is

16   another way of saying I will take a look at

17   it.  I'll consider it.

18        Q.    But he's also telling you

19   that that person isn't a mule.

20        A.    Yes, he is.  And -- and I don't

21   think I took any significance out of that

22   because I don't think I got any further

23   clarification of what Gregg meant by that.

24        Q.    You didn't understand what he

25   meant by (as read):  "This isn't a mule,

Page 292

1          A.      Well, my -- let me see.
2     (Reviewing.)
3                  It is not uncommon for her to
4     say, I will send you something, and not send
5     it.
6                  So, in other words, it's not
7     obvious to me that this is that.  It could
8     be.  But the reason I say it's not obvious to
9     me is because she implies that she will send
10    it later.
11         Q.      Yeah.
12         A.      (As read):  "If you haven't
13    seen that, I will send," and then, boom, it's
14    there.  I don't know if that's it or if that
15    is, quite honestly, something else.
16         Q.      Okay.  We are done with that.
17                 So we talked a little bit about
18    the book that you wrote about "2000 Mules."
19    Correct?
20         A.      Yes.
21         Q.      Sitting here today, do you
22    stand by everything in the book?
23         A.      Yes.
24         Q.      How did it come to pass that
25    you also wrote a book based on the film?

Page 293

1          A.      How did it come to pass?  I had

2     a two-book deal with Salem Media.  It is

3     customary for me to write books that go along

4     with my films.  I've done that on multiple

5     occasions.

6                  The Obama book, the book called

7     "America" that matched a film of the same

8     title.  "Hillary's America," which matched a

9     film of the same title.

10                 So this was my practice to do

11    something like this.  And I undertook the

12    project very much in the understanding that

13    this would be my book.  As with the film, it

14    would give a lot of credit to True the Vote

15    and it would cite them and refer to their

16    work.

17                 But a book is not a -- a film

18    is different than a book.  A book is

19    typically an individual's enterprise, and so

20    I undertook to do this as an individual.

21    And, of course, I told Catherine and Gregg

22    about it.

23          Q.      Was Ms. Engelbrecht at some

24    time thinking about also writing a book?

25          A.      After I told her that I was

1          Q.      So what is your book-writing

2    process?  Do you write everything yourself?

3    Do you have a ghostwriter?

4          A.      I write everything myself.  I

5    write every word.  I mean, I'm the primary

6    figure in the book, and most likely I do 90

7    percent of the research myself.

8                  I sometimes will have someone

9    help me, but -- because, you know, I mean,

10    I'm 63 and I'm hiring a 21-year-old.  I give

11    them very limited tasks and, by and large, do

12    most of the lifting myself.

13                  So, in general, the research in

14    my book is almost all mine except for maybe

15    some -- you know, Will you check this, Pull

16    this article for me, Get me -- I heard about

17    this article.  It's -- you know, can you get

18    it for me?  Or, There was an interview, can

19    you transcribe it?

20                  Things like that, relatively

21    menial type of tasks I'll sometimes delegate

22    out.  Otherwise, it's my -- it's my work.

23          Q.      And that was true of the "2000

24    Mules" book as well?

25          A.      Yes.