# EXHIBIT G

Page 1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION
3     MARK ANDREWS,           |
                              |
4      Plaintiff,             |
                              |  Case No.
5     V.                      |  1:22-cv-04259-SDG
                              |
6     DINESH D'SOUZA, et      |
      al.,                    |
7                             |
       Defendants.            |
8
9      ***********************************************
       CONFIDENTIAL ORAL AND VIDEOTAPED DEPOSITION
10                          OF
                      GREGG PHILLIPS
11               SEPTEMBER 17, 2024
       ***********************************************
12
              ORAL AND VIDEOTAPED DEPOSITION of GREGG
13     PHILLIPS, produced as a witness at the
       instance of the Plaintiff, and duly sworn,
14     was taken in the above-styled and numbered
       cause on September 17, 2024, from 9:37 a.m.
15     to 4:29 p.m., before Mendy A. Schneider, CSR,
       RPR, in and for the State of Texas, recorded
16     by machine shorthand, at the offices of
       Greenberg Traurig LLP, 1000 Louisiana,
17     Houston, Texas, pursuant to the Federal Rules
       of Civil Procedure and the provisions stated
18     on the record or attached hereto; that the
       deposition shall be read and signed.
19
20     NY 6909303
21
22
23
24
25

CONFIDENTIAL

Page 15

1        A.      Yes.

2        Q.      And how long did you prepare?

3        A.      We had a -- maybe a four- or

4    five-hour discussion yesterday and I --

5               MR. EVANS:  Don't talk about

6           anything that we discussed.

7    (BY MS. KUCK)

8        Q.      I don't want to know the

9    substance.

10       A.      I've read -- I've read

11   documents for, you know, a few weeks in

12   advance.

13       Q.      Okay.  And the documents that

14   you read a few weeks in advance, were they --

15   where did those documents come from?

16       A.      From -- from the law firm.

17       Q.      From Mr. -- Mr. Evans provided

18   you with those documents?

19       A.      Yes.

20       Q.      Did any of those documents

21   cause you to remember things that you hadn't

22   remembered before you looked at them?

23       A.      Not particularly.

24       Q.      Mr. Phillips, what do you do

25   for a living?

CONFIDENTIAL

Page 16

1          A.     I own several businesses,
2     mostly in the technology space.
3          Q.     Could you list those for me.
4          A.     CoverMe, KLOK, OpSec, and
5     Ground Fusion.
6          Q.     What does CoverMe do?
7          A.     We use advanced analytics to
8     help patients in hospitals find a pain
9     source.
10          Q.     And what about KLOK?
11                 What does that business do?
12          A.     It is a private -- we've built
13     a privacy hub that allows people to not -- or
14     it -- it prevents people from being tracked
15     on their phone.
16          Q.     Tracked by whom?
17          A.     Anybody.
18          Q.     And when did you set up that
19     business?
20          A.     Which one are we discussing?
21          Q.     We're talking about KLOK.
22          A.     KLOK.
23                 I'm going to say a couple of
24     years ago.
25          Q.     Before or after the 2000 Mules

CONFIDENTIAL

Page 26

1          Q.      Yeah.  Yeah.

2                  Are there any other companies

3      or entities in which you are working with

4      Ms. Engelbrecht?

5          A.      CoverMe.

6          Q.      Okay.

7          A.      And KLOK.

8          Q.      And are there any LLPs, other

9      than the ones we mentioned, that you and

10     Ms. Engelbrecht have together?

11         A.      No.

12         Q.      So let's focus on OpSec.

13                 What does that company do?

14         A.      Consulting.

15         Q.      What kind of consulting?

16         A.      Election information and data

17     consulting.

18         Q.      And -- and without naming

19     specific names, generally who are its

20     clients?

21         A.      For-profits, campaigns,

22     not-for-profits.

23         Q.      And OpSec is a for-profit

24     company?

25         A.      Correct.

CONFIDENTIAL

Page 27

1          Q.      How many people does it employ?
2          A.      We employ no one.  Everything
3    is on contract.
4          Q.      Okay.  And has that always been
5    the case?
6          A.      Yes.
7          Q.      What is your relationship with
8    TTV?  True -- when I say "TTV," I'm going to
9    mean True the Vote.
10         A.      OpSec is a contract.
11         Q.      And is that currently the case?
12         A.      Yes.
13         Q.      When did OpSec first start
14   doing business with TTV?
15         A.      Summer of 2020.
16         Q.      And was that -- that first
17   project, was that the one that led to the
18   2000 Mules film?
19         A.      No.
20         Q.      What was that project?
21         A.      Working on the 2020 elections.
22         Q.      What type of work?
23         A.      Call centers and analytics
24   analysis of a variety of types.
25         Q.      And, again, that would have

CONFIDENTIAL

Page 29

1          Q.      And did you do similar work for
2     the midterm elections in 2022?
3          A.      On a limited basis.  I was -- I
4     was sick at the time.
5          Q.      Okay.  Have you -- have you
6     personally ever held any position at TTV?
7          A.      No.
8          Q.      Have you ever been on their
9     board of directors?
10         A.      Yes.
11         Q.      When was that?
12         A.      2015 to January of 2017.
13         Q.      Have you ever been employed as
14    a researcher for TTV?
15         A.      No.
16         Q.      Other than through OpSec --
17    well, no, strike that.
18                 Do you receive any compensation
19    from TTV?
20         A.      No.
21         Q.      Have you ever?
22         A.      No.
23         Q.      Has OpSec?
24         A.      We receive payment on
25    contracts.

CONFIDENTIAL

Page 30

1          Q.      Okay.  Okay.  Do any of your
2     other businesses do work for TTV?
3          A.      No.
4          Q.      What is your relationship with
5     Dinesh D'Souza?
6          A.      We worked with them on the 2000
7     Mules movie.
8          Q.      How did you meet them -- meet
9     him?
10          A.      I was introduced to him by
11     Ms. Engelbrecht.
12          Q.      Okay.  And had you -- so before
13     the 2000 Mules project, had you ever worked
14     with him before?
15          A.      No.
16          Q.      Did you know him before at all?
17          A.      No.
18          Q.      Are you in contact with him
19     now?
20          A.      No.
21          Q.      When was the last time you were
22     in contact with him?
23          A.      During the premiere process.  I
24     think the last premiere was in Las Vegas and
25     I saw him there.  And that was it.

CONFIDENTIAL

Page 31

1          Q.      So you're talking about the

2     premiere of the film in the -- in the summer

3     of 2021?

4          A.      '22.

5          Q.      '22?

6          A.      Right.

7          Q.      Have you ever -- other than on

8     the 2000 Mules project, have you ever worked

9     with Salem Media Group?

10         A.      No.

11         Q.      Are you in contact with them

12    today?

13         A.      No.

14         Q.      When was the last time you had

15    contact with anyone from there?

16         A.      I don't recall.  I would say at

17    the premiere.  I have no idea.

18         Q.      I'm going to mark as

19    Exhibits 3, 4, and 5, the first amended

20    complaint in this action, a supplemental

21    complaint, and the answer of the TTV

22    defendants.

23              So 3 will be the first amended

24    complaint.

25         (Marked Plaintiff Exhibit Nos. 3-5.)

CONFIDENTIAL

Page 34

1          Q.      Okay.  And there was an answer
2      filed on behalf of you, TTV, and
3      Ms. Engelbrecht, correct?
4          A.      Yes.
5          Q.      Did you authorize your lawyers
6      to file that on your behalf?
7          A.      Yes.
8          Q.      Okay.  And did you review it
9      before it was filed?
10         A.      Yes.
11         Q.      And without giving me any
12     substance of the discussions, did you discuss
13     the allegations in the complaint and your
14     responses with your counsel before the answer
15     was filed on your behalf?
16                 Again, it's a yes or no.  I
17     don't want to know what the substance was.
18         A.      No.
19         Q.      You didn't have any discussions
20     with them?
21         A.      I don't recall.
22         Q.      I want to mark --
23         A.      Can I re- --
24         Q.      Sure.  Absolutely.
25         A.      I actually think we did have a

```
 1    moment.  I just want to have it ready to go
 2    in case we need it.
 3          A.    So we're still on 6?
 4          Q.    I'm not -- you can set them all
 5    aside for the moment.
 6          A.    Oh.
 7          Q.    As you know, we are -- we're
 8    here today to discuss the film 2000 Mules,
 9    which alleges that fraud occurred in the 2020
10    presidential election.
11                Can you tell me where the
12    number 2000 comes from?  The 2000 Mules?
13    Tell --
14          A.    I had nothing to do with the
15    naming of the movie.
16          Q.    Okay.  And you have no idea
17    where -- where the name came from?
18          A.    No.  We had no -- we had no
19    editorial control over the movie.
20          Q.    And you never discussed with
21    Mr. D'Souza where the name 2000 Mules came
22    from?
23          A.    No.
24          Q.    Do you have an understanding of
25    what it meant?
```

CONFIDENTIAL

Page 42

1    certain geospatial data analysis that led to
2    or that -- strike that.
3                You worked on certain
4    geospatial data analysis that was used in the
5    film 2000 Mules, correct?
6         A.    Yes, but it has nothing to do
7    with this case.
8         Q.    That's not my question.
9                My question is:  Is that
10   correct?
11        A.    Yes.
12        Q.    Okay.  And in the course of
13   that research, did you identify people who
14   you referred to as mules?
15        A.    No.
16        Q.    Did you -- in the context of
17   the film, so that we're on the same page, how
18   do you define mule in that context?
19        A.    Mule broadly in our -- in the
20   context was someone that was improperly
21   making -- placing ballots in drop boxes.
22        Q.    Okay.  And when you say
23   "improperly," what do you mean?
24        A.    Breaking a rule, a process, a
25   law, et cetera.

CONFIDENTIAL

Page 46

```
 1      with your recollection of when it started?
 2              A.      I don't have any recollection.
 3              Q.      All right.  The -- the proposal
 4      provides that OpSec is to be paid ███████████
 5      for this project up front.
 6                      Did -- do you see that?
 7              A.      Yes.
 8              Q.      Okay.  And -- and did TTV pay
 9      OpSec?
10              A.      Yes.
11              Q.      At the time the agreement was
12      executed?
13              A.      I don't recall.
14              Q.      But you know they paid it?
15              A.      Yes.
16              Q.      And it says that the -- in
17      the -- the top, the objective is to analyze
18      historic and near real-time behavioral
19      mobility data to assist True the Vote in
20      analyzing possible election process diversion
21      in the form of ballot harvesting in the
22      following states.
23                      And then it says GA, which I
24      take to mean Georgia; AZ, which I understand
25      to mean Arizona; TX, which I understand to be
```

CONFIDENTIAL

Page 51

```
 1          Q.     Okay.  And you -- you did not
 2    in any way use any of the -- well, strike
 3    that.
 4                So in coming up with which
 5    organizations were suspected of ballot
 6    harvesting and you drew a geofence around
 7    them, did you incorporate any of the other
 8    tips you were getting or was it solely on the
 9    data?
10          A.     It likely would have been
11    solely on the data.
12          Q.     And who -- who at OpSec --
13    well, strike that.
14                Both Paragraphs 1 and 2 say
15    that OpSec group -- the first one says:
16    "...will build a mobile device behaviorable
17    database."
18                Who at the OpSec group was
19    involved in building that database?
20          A.     A number of our contractors,
21    including Red Metrics.
22          Q.     Okay.  What other ones?
23          A.     I do not recall.
24          Q.     You have no recollection?
25          A.     I don't.
```

CONFIDENTIAL

Page 63

1          Q.    Okay.  Let's go to -- let's go

2     to the page number TTV_006846.

3          A.    Okay.

4          Q.    Under the Heading 16, it says:

5     "OpSec group was engaged by True the Vote to

6     conduct an analysis of mobile device

7     geospatial and temporal data in the state of

8     Georgia."

9               Do you see that?

10         A.    Yes.

11         Q.    And is that correct?

12         A.    That was -- yeah.  That was the

13    contract we just looked at.

14         Q.    That's the contract we just

15    looked at?

16         A.    Uh-huh.

17         Q.    Okay.  And then if you turn the

18    page and you look at Paragraph 18, it says:

19    "To conduct its analysis, OpSec group

20    utilized commercially available mobile device

21    geospatial and temporal data."

22               Do you see that?  Is that

23    correct?

24         A.    Yes.

25         Q.    Okay.  Where did that data come

CONFIDENTIAL

Page 64

1    from?

2         A.      We just answered that.

3         Q.      It came from Red Metrics?

4         A.      Vendors.

5         Q.      Right.

6         A.      Yeah.

7         Q.      And any -- can you identify any

8    vendor other than Red Metrics?

9         A.      Well, they would have bought it

10   from any number of vendors of the data.

11        Q.      Okay.  So Red Metrics bought

12   the data.  OpSec didn't buy the data?

13        A.      Correct.

14        Q.      Did any of your other

15   contractors or vendors buy the data?

16        A.      In this case, no.

17        Q.      Okay.  So all the data was

18   bought by Red Metrics?

19        A.      As far as I remember.

20        Q.      And then what was the role of

21   the other contractors?

22        A.      Analysis.  There's lots of

23   different pieces that go to analysis.  I

24   mean, they would have conducted some

25   analysis.

CONFIDENTIAL

Page 75

1    time, you also obtained video Dropbox --

2    strike that.

3                 At some point in time, OpSec

4    obtained Dropbox video from election

5    officials in Georgia; is that correct?

6    A.      That is incorrect.  We obtained

7    Dropbox video from True the Vote.

8    Q.      From True the Vote.

9                 And is your understanding True

10   the Vote obtained it from election officials

11   in Georgia?

12   A.      Yes.

13   Q.      Okay.  And at some point did --

14   did someone working with you attempt to

15   correlate the geospatial data with the

16   Dropbox video?

17   A.      Yes.

18   Q.      And who did that work?

19   A.      There were a variety of people

20   involved in that.

21   Q.      Okay.  Tell me everybody you

22   remember.

23   A.      Red Metrics.

24   Q.      Anybody else?

25   A.      No.

1          Q.      You know what, I'm going to
2    strike that.  I'm sorry.
3                  Review -- can you go to
4    Page 18, your Interrogatory No. 9.  And then
5    your answer is at 18 and 19.  It's a little
6    bit shorter.
7                  And there's a statement in
8    there that says:  "As the film makes clear,
9    no individual phones were tied to any
10   identifiable individuals as part of the
11   filmmaking process."
12                 Can you explain that sentence
13   to me?
14         A.      Yes.  Geospatial analysis
15   analyzes the unique device IDs that are on
16   our cell phones.
17         Q.      Okay.
18         A.      And those unique device IDs are
19   associated with a number.
20         Q.      Right.
21         A.      A phone number.
22         Q.      Uh-huh.
23         A.      And then the carrier, who owns
24   the phone number, is the owner of the data,
25   who it is.

CONFIDENTIAL

Page 79

1       Q.    Okay.  Although, you told me at

2   some point there was an effort to link that

3   data.

4       A.    No.

5       Q.    There was no effort to link the

6   geospatial data to the video of people voting

7   at drop boxes?

8       A.    It -- there was no effort to

9   link anything to any human being.

10       Q.    Okay.  So I had asked you

11   earlier whether at some point someone working

12   with you attempted to correlate the data with

13   the Dropbox video.

14       A.    But that's a different topic.

15       Q.    How is that different?

16       A.    That's not what you just asked

17   me to look at.

18       Q.    Okay.

19       A.    That's not what you were asking

20   me to respond to.

21       You asked me to respond to this

22   answer.

23       Q.    Right.

24       A.    Number 9.

25       Q.    Okay.

1                Because I -- we just want to
2        make sure both of you guys are on the
3        same page.
4    (BY MS. KUCK)
5        Q.      Okay.  So in the film -- you're
6    familiar with the film?
7        A.      Yes.
8        Q.      There is video --
9        A.      Yes.
10       Q.      -- correct?
11               And in the film there is an
12   implication that the video lines up with what
13   is shown in the geospatial data.
14               Am I right about that?
15       A.      No.  We had no editorial
16   control.  Our -- our job was to provide raw
17   footage --
18       Q.      Uh-huh.
19       A.      -- and some limited analysis.
20       Q.      Okay.  What raw -- what
21   criteria did you use to give the raw footage?
22       A.      I don't know that there was any
23   criteria.
24       Q.      You just -- well, how much raw
25   footage did you provide to Mr. D'Souza?

1          A.      We originally -- I think we

2     originally provided 70 cuts of it.

3          Q.      And how did you choose those

4     70?

5          A.      I don't recall.  I didn't do

6     it.

7          Q.      Who did it?

8          A.      Red Metrics.

9          Q.      Okay.  And did you give them

10    instructions?

11              MR. EVANS:  Objection; asked

12         and answered.

13              MS. KUCK:  No, I don't think

14         so.

15         A.      No.

16    (BY MS. KUCK)

17         Q.      Did you give them instructions

18    as to which -- how to choose the 70?

19         A.      No.

20         Q.      Okay.  So you just said, Give

21    me 70 cuts?

22         A.      Right.  Later in the process,

23    there's an e-mail around that Mrs. D'Souza

24    asked for, I think, another thousand cuts or

25    something like that, to which I said it's out

CONFIDENTIAL

Page 86

1     of scope.

2            Q.      What do you mean "it's out of

3     scope"?

4            A.      It was out of scope.  It was

5     more than we had agreed to provide under the

6     terms of the agreement.

7            Q.      Did you have more?

8            A.      Oh, we had a lot more.

9            Q.      Okay.  And when you say "the

10    terms of the agreement," what are you

11    referring to?

12           A.      The agreement to provide

13    video -- raw video to -- to Dinesh and Debbie

14    for the film.

15           Q.      Okay.  And does the agreement

16    specify how much you were going to provide?

17           A.      I wasn't a party to the

18    agreement.  I don't know.

19           Q.      So you don't know what the

20    agreement says?

21           A.      No.

22           Q.      And did you -- did -- did you

23    provide video of more -- of any one person

24    going to more than one drop box?

25           A.      I don't recall.

1          Q.      You have no idea?

2          A.      No idea.

3          Q.      Okay.

4                  MR. EVANS:  We've been going

5          about an hour and a half.

6                  MS. KUCK:  Yeah, we can take a

7          break.

8                  MR. EVANS:  Yeah.  Very brief

9          break.

10                 THE VIDEOGRAPHER:  All parties

11         in agreement with going off the

12         record, we're going off the record at

13         10:59 a.m.

14     (Break from 10:59 a.m. to 11:21 a.m.)

15                 THE VIDEOGRAPHER:  We are going

16         back on the record at 11:21 a.m.

17     (BY MS. KUCK)

18         Q.      Mr. Phillips, you and

19     Ms. Engelbrecht appeared on The Charlie Kirk

20     Show on April 8, 2022, to discuss the 2000

21     Mules project; is that correct?

22         A.      Yes.

23         Q.      And let me show you a document

24     I've marked as Plaintiff's Deposition

25     Exhibit 10.  It bears the Bates

CONFIDENTIAL

Page 111

1          Q.      You referred to Mr. Andrews as

2      a "mule."

3                  Am I correct?

4          A.      I said he was a voter and then

5      I said a mule.

6          Q.      Right.

7          A.      Yes.

8          Q.      And when you said he was a

9      mule, what did you mean by that?

10         A.      The law requires -- in Georgia

11     the law requires any -- any -- the law

12     requires signatures on the -- for assisters

13     on ballots as Catherine said in the latter

14     part of the clip.

15                 And we had asked -- True the

16     Vote had asked Gwinnett County for all their

17     assisters and they didn't have any.  And

18     therefore he would meet the category of being

19     a mule.

20         Q.      So to you a mule is anyone

21     who -- who puts in more than one ballot?

22         A.      I didn't say that.

23         Q.      Okay.  So define a mule for me.

24         A.      We already -- we did that

25     earlier.

Page 112

```
 1          Q.      Okay.  So you -- you are just
 2     saying a mule, in your understanding, is just
 3     anyone who submits a ballot illegally?
 4          A.      Yes.
 5          Q.      And Mr. Kirk says in there
 6     that -- when you say it's highly illegal, he
 7     says:  "...unless for one of your close
 8     relatives."
 9                  And you seem to acknowledge
10     that, right?
11          A.      That's not at all what
12     happened.  Catherine answered the question
13     about --
14          Q.      Okay.
15          A.      -- about needing -- about
16     needing assister's signatures.
17          Q.      Okay.  Is it your testimony
18     that in Georgia in order to -- in order to
19     deposit ballots of your close relatives you
20     need a signature to do that?
21          A.      The assister's signature is
22     always required --
23          Q.      In order to -- even for
24     relatives?
25          A.      Yes.
```

Page 115

1    documents -- of ballots out and putting them
2    into a -- a black -- a black sort of carrying
3    pouch and then they walked off with it,
4    violating all sorts of terms of the rules of
5    engagement, the -- the chain of custody
6    documents were improperly done.
7              They said they weren't turned
8    in until 11 o'clock that morning.  There were
9    lots of problems with the Gwinnett anomaly.
10             And -- and what was submitted
11   to the state board of elections, which they
12   never still to this moment have not ruled on,
13   is what was -- what was happening.  What was
14   this all about.
15             So what you just showed me from
16   Charlie was sandwiched in between the
17   discussion about the Gwinnett anomaly.  So
18   when Charlie said, This is Gwinnett.
19             It was said in that context.
20   That said, that's Charlie's show.  We had no
21   editorial control whatsoever over what
22   Charlie says, does, or produces.
23        Q.    Well you didn't -- before we go
24   to there, the complaint that you filed with
25   the board of elections, that's been

1          Q.      Okay.  Did you --

2                  THE REPORTER:  I'm sorry, I did

3          not get an answer from him.

4                  MS. KUCK:  Oh, okay.

5      (BY MS. KUCK)

6          Q.      You have no understanding --

7          A.      No.

8          Q.      -- what the 2000 referred to?

9                  Did you object at any time

10     during the taping that Mr. Kirk was using on

11     blurred video?

12         A.      I didn't -- I didn't know.

13         Q.      Even at the time you didn't

14     know it was unblurred?

15         A.      I didn't have my glasses on.

16         Q.      So during the -- your testimony

17     is during this interview you did not

18     realize --

19         A.      Watch it.  I don't have my

20     glasses on.

21         Q.      Strike that.

22                 When -- at the time of the

23     interview --

24         A.      Uh-huh.

25         Q.      -- is it your testimony that at

Page 121

1    that time you didn't understand that the

2    video being played on the show was unblurred?

3         A.    Yes.

4         Q.    That is your testimony?

5         A.    Yes.

6              MR. EVANS:  Objection; asked

7         and answered.

8    (BY MS. KUCK)

9         Q.    Okay.  With respect to the --

10   the individual shown on the videotape that we

11   just watched, do you have any evidence that

12   that person was engaged in any ballot

13   harvesting?

14        A.    What's ballot harvesting to

15   you?

16        Q.    What is ballot harvesting?

17        A.    He put more ballots -- the law

18   compels there to be assister signatures.

19        Q.    Uh-huh.

20        A.    He put five ballots in the drop

21   box.  He violated the law.  There are no

22   assister signatures in Gwinnett County.

23        Q.    But do you -- do you

24   characterize that as ballot harvesting?

25        A.    I didn't characterize that.

1          Q.     -- that that particular

2     evidence --

3          A.     No.

4          Q.     -- that -- okay.

5                Do you have any evidence that

6     that particular individual picked up ballots

7     from any nonprofit organization?

8          A.     I have no idea.

9          Q.     Okay.  And other than the --

10    the fact that he was putting in more than one

11    ballot, do you have any reason to allege that

12    he was doing anything illegal?

13         A.     Yes.  There are no assister

14    signatures in Gwinnett County.

15         Q.     Right.  So, therefore, you

16    contend that because he was putting in more

17    than one ballot it must have been illegal?

18         A.     That's the law.

19         Q.     Okay.  That's why you called

20    him a mule, you're saying?

21              MR. EVANS:  Objection; asked

22         and answered.

23    (BY MS. KUCK)

24         Q.     Okay.  That's why you're

25    calling him a mule?

1          Q.       Okay.  Do you -- he says he has

2     a couple clips of ballot traffickers you ran

3     during the Charlie Kirk interview.

4          A.       Uh-huh.

5          Q.       Did you -- did you correct him

6     in any way and say, Oh, wait a minute, those

7     weren't ballot traffickers?

8          A.       I -- I -- I don't know I -- I

9     don't even know if I even saw this.

10         Q.       Okay.  It's sent to you, but

11    you don't remember seeing it?

12         A.       Didn't make any difference.

13         Q.       What do you mean it doesn't

14    make any difference?

15         A.       We were busy.

16         Q.       Okay.  Are you aware that the

17    unblurred footage of the plaintiff was run

18    again on the Gateway podcast?

19         A.       I'll say yet again that we

20    didn't run anything.  We had no editorial

21    control over what Charlie ran.

22         Q.       That's right.  But he says he

23    has the clips from Charlie, although he says

24    you ran but --

25         A.       That makes no sense.

1          Q.      Okay.  You didn't tell him
2     that, though.
3                   All right.  So you didn't
4     object to him using those clips as far as you
5     know, do you -- did you?
6          A.      I didn't give him the clips.
7          Q.      Right.  But he -- you were just
8     on The Charlie Kirk Show.  You knew what
9     clips he had.
10         A.      I had no idea.
11         Q.      Okay.  And he -- are you aware
12    that during that podcast he ran again the
13    clip of the plaintiff unblurred?
14         A.      I am not.
15         Q.      Okay.
16         A.      Didn't get it from me.
17         Q.      I'm not asking if he got it
18    from you.  I'm asking you whether, when you
19    were on his program, he ran it.
20         A.      I don't remember.
21         Q.      Are you aware of any other
22    interviews where the unblurred footage of the
23    plaintiff was used?
24         A.      I'm not even aware of those.  I
25    wasn't aware on Charlie's.  Wasn't -- no

CONFIDENTIAL

Page 133

1    recollection of Hoft's.

2         Q.    And your testimony is you

3    weren't aware on Charlie's because you didn't

4    have your glasses on?

5         A.    We didn't give him the clip.

6    We weren't in charge of Charlie's program.

7         Q.    No, but you were sitting with

8    Mr. Kirk looking at the footage on the

9    computer.  He was running the footage and you

10   were looking at it.

11        A.    Yeah, that's exactly what I'm

12   saying.

13        Q.    Right.

14        A.    But my eyesight is bad.

15        Q.    All right.

16        A.    That's what I'm saying.

17        Q.    All right.  Where did he get

18   that footage?

19        A.    Who knows.

20        Q.    Okay.

21        A.    Not from us.

22        Q.    How did it -- how did it come

23   to you that you and Ms. Engelbrecht were on

24   his program?

25        A.    Don't recall.  We were out

CONFIDENTIAL

Page 136

1          A.     My testimony is I don't recall
2     ever speaking to her nor was I ever on a show
3     that she set me up on.
4          Q.     Okay.  Do you remember speaking
5     to any publicist hired by Mr. D'Souza?
6          A.     No.  We had a very limited
7     role.
8          Q.     Did you coordinate the
9     publicity for 2000 Mules with Mr. D'Souza?
10         A.     No.  It was out of the scope.
11    I was asked to provide some limited video and
12    some limited research.
13         Q.     And your testimony is that's
14    all you did?
15         A.     My testimony is that's all that
16    we were contracted to do.
17         Q.     Okay.  What did you actually
18    do?
19         A.     You know, we ended up on the
20    movie.  I guess you saw that.
21         Q.     I did see that.
22                So you gave interviews for the
23    movie?
24         A.     I don't recall -- I gave a few,
25    but none through Dinesh's team.

CONFIDENTIAL

Page 137

1          Q.      Right.  Did you coordinate

2     publicity for the movie?

3          A.      I've already answered this.

4     No.

5          Q.      No, you did not?

6          A.      I did not.

7          Q.      Okay.  Did Ms. Engelbrecht?

8          A.      No idea.  I'm not in control of

9     her calendar.

10         Q.      And you were -- as you said,

11    you were in the 2000 Mules film, correct?

12         A.      I was.

13         Q.      Okay.  Did you --

14         A.      I wasn't part of the contract,

15    though.  I was contracted to provide video

16    and some limited research.

17         Q.      And what contract are you

18    referring to?

19         A.      I can't remember what it was

20    called.  The agreement between -- between

21    Dinesh and -- and True the Vote.

22         Q.      But I believe you said earlier

23    you don't -- you've never seen a copy of that

24    contract?

25         A.      I may have seen it but I wasn't

CONFIDENTIAL

Page 138

1    party to it so it wasn't part of my -- my

2    world.

3         Q.     How -- how long were you taped

4    in your interview -- strike that.

5               There is footage of you in the

6    film 2000 Mules.

7         A.     Uh-huh.

8         Q.     How -- how long did you tape

9    interviews for that movie?

10        A.     A few hours.

11        Q.     Less than ten?

12        A.     Yeah.

13        Q.     Did all of the footage make it

14   into the movie?

15        A.     No.  We had no editorial

16   control.

17        Q.     Did you approve the trailer for

18   the movie?

19        A.     Which trailer?

20        Q.     Trailer for the 2000 Mules

21   movie?

22        A.     Which trailer?

23        Q.     Any trailer?

24        A.     No.

25               We had no editorial control.

CONFIDENTIAL

Page 139

1          Q.        That wasn't my question.

2                    My question was:  Did you

3     approve any trailer for the movie?

4                    MR. EVANS:  Asked and answered;

5          objection.

6     (BY MS. KUCK)

7          Q.        I'm not asking about control.

8     I'm just asking if you approved it or not.

9                    MR. EVANS:  He just answered

10         the question.  I'm reading the

11         question and answer right here.

12    (BY MS. KUCK)

13         Q.        And is the answer no?

14         A.        You already know it's no.

15         Q.        Okay.

16                   MS. KUCK:  I think that's

17         probably a good spot to stop for

18         lunch.

19                   THE VIDEOGRAPHER:  All parties

20         in agreement with going off the

21         record, we're going off the record at

22         12:18 p.m.

23         (Break from 12:18 p.m. to 1:32 p.m.)

24                   THE VIDEOGRAPHER:  We are going

25         back on the record at 1:32 p.m.

CONFIDENTIAL

Page 145

```
1            A.     Mr. and Mrs. D'Souza.  Sorry.
2            Q.     The -- but I guess I'm trying
3       to understand the link here.  It said:  "We
4       didn't extend the geolocation pattern study
5       to incorporate Gwinnett County video."
6                   Are you saying you -- that --
7       was there a study done of the Atlanta Metro
8       area?
9            A.     Yeah.  That's how we matched
10      the 70 that we were able to match.
11           Q.     Okay.  But what does it mean
12      that True the Vote did not extend the pattern
13      study to incorporate Gwinnett County?
14           A.     We didn't go back and then try
15      to figure out was there Gwinnett video that
16      matched any Gwinnett drop box visits.
17           Q.     Okay.  So for purposes of
18      Gwinnett County, there was no matching done
19      between the geospatial location data and the
20      video?
21           A.     Right.
22           Q.     Because you got the video too
23      late?
24           A.     That's right.
25           Q.     So there -- so in the 70 video
```

CONFIDENTIAL

Page 147

1          Q.      Right.   Okay.

2          A.      -- number one.

3                  Number two, the -- the -- the

4     positioning of the video was often not -- not

5     very clear.

6          Q.      Okay.

7          A.      So it might be -- you know, if

8     it was at night in the rain --

9          Q.      Right.

10         A.      -- or whatever, I mean, these

11    cameras were not set up to be that way.

12                 That said, the law -- the law

13    compelled any county in Georgia that had drop

14    boxes to have surveillance video on them.

15         Q.      Uh-huh.

16         A.      And that was also false.  They

17    did not.

18         Q.      They didn't com- -- your -- you

19    found that they did not comply with the

20    requirement?

21         A.      That's correct.

22         Q.      Okay.

23         A.      And so it left gaps.

24         Q.      Right.  So any video in the

25    film that is of a Gwinnett County voter would

Page 148

1    not have been linked to your geospatial

2    analysis, right, because you didn't match

3    those two up?

4         A.    That's correct.

5         Q.    Okay.  And so for that reason,

6    you know you didn't match the plaintiff video

7    with the geospatial because he's in Gwinnett

8    County?

9         A.    I think that's fair, yes.

10        Q.    Yeah.  Okay.

11             How many -- of the 70 that you

12   gave, how many of them had been linked and

13   how many of them hadn't?

14        A.    All of them had been linked in

15   some way.  I mean, again, the challenge was

16   that -- that, you know, the -- the -- there

17   wasn't a hundred percent certainty, because

18   there were a lot of things going on that

19   can -- that can change, you know, like -- I

20   don't have a great example -- a time zone.

21        Q.    Uh-huh.

22        A.    You know, the time zones

23   weren't changed on the cameras --

24        Q.    Right.  Right.  Sure.

25        A.    -- or some of them didn't even

CONFIDENTIAL

Page 150

1           Q.      Uh-huh.

2           A.      And -- and I was in the thread

3    and sort of objected and said, I think that's

4    out of scope.

5                   We ended up sending more video,

6    but we had no control over what ended up

7    happening with it.  And it wasn't associated

8    with the 242 mules.

9           Q.      Okay.

10          A.      So -- so the way it was

11   described to us what was going to happen --

12   and I think you see it in -- maybe see it in

13   one of the trailers or something --

14          Q.      Uh-huh.

15          A.      -- that they were -- what they

16   wanted from the -- the videos was the ability

17   to create -- there's like a matrix they

18   create --

19          Q.      Sure.

20          A.      -- that happens somewhere in

21   the video --

22          Q.      Yeah.

23          A.      -- where it shows like a

24   thousand pictures.

25          Q.      Right.

CONFIDENTIAL

Page 151

1          A.     And we were assured that

2     that -- you know, that those people would all

3     be blurred and, you know, whatever, because

4     we -- you know, we made it clear, we haven't

5     done -- you know, this is -- this is raw

6     video that's, you know, outside of the scope

7     of our contract and what we were to provide,

8     which was, you know, a limited set of video

9     and a limited set of research on -- on the

10    242 people.

11         Q.     And so Mr. and Mrs. D'Souza

12    were aware that that additional video had not

13    been linked to the geospatial?

14         A.     I -- I've only read that e-mail

15    one time, and so I'm only recalling from

16    memory.  I -- I would have to refer to the

17    e-mail.  And I don't know where it is.  I

18    know it's in here somewhere, but...

19         Q.     Okay.  But do you recall at any

20    point any conversation about there being

21    non-mules in the video -- in the film?

22         A.     Non-mules?

23         Q.     Yeah.

24         A.     I don't know that there were

25    any non-mules in the film.

CONFIDENTIAL

Page 169

1      A.      I don't recall.  According to
2  this, yeah.
3      Q.      Okay.
4      A.      But we never posted this, nor
5  did we ever post the data.
6      Q.      Right.
7      A.      Okay.
8      Q.      Did you -- did you retain the
9  geospatial data?
10      A.      I never actually have
11  possession of the geospatial data.
12      Q.      Okay.  Who had possession of
13  it?
14      A.      Red Metrics.
15      Q.      And do you know what they did
16  with it?
17      A.      I do not.
18      Q.      Did you give them any
19  instructions?
20      A.      No.  Once the project was done,
21  they did with it what they will.
22      Q.      Okay.
23      A.      Took it offline, I'm sure.  It
24  cost them a lot of money to have it online
25  too.

```
 1          A.      To bring light to the crimes
 2     that were being committed with people
 3     depositing more than one ballot in the drop
 4     box inappropriately.
 5                  We never would have made the
 6     movie if law enforcement would have
 7     investigated it.
 8          Q.      Did you personally enter into
 9     any agreement with respect to the making of
10     the film?
11          A.      No.
12          Q.      You're listed as an executive
13     producer, correct?
14          A.      That was listed without our
15     knowledge.  We didn't know about it until it
16     came out.
17          Q.      You didn't know you were going
18     to be listed as an executive --
19          A.      We had zero editorial control.
20          Q.      When did you first find out you
21     were going to be listed as an executive
22     producer?
23          A.      When the movie was released at
24     Mar-a-Lago, the premiere in front of 500
25     people.
```

CONFIDENTIAL

Page 179

1    day before you went to Mar-a-Lago for the

2    screening?

3         A.    I assume that's what it is but,

4    again, I don't remember the dates.

5         Q.    Okay.  But this would be about

6    the right time?

7         A.    Yes.

8         Q.    And Mr. D'Souza starts out by

9    saying:  "Hey, guys.  You ready to go over

10   marketing plan at noon in a few?"

11         And then you write back:

12   "We're both flying."

13         Did you at some point review

14   with him the marketing plan for the film?

15         A.    I -- I didn't.

16         Q.    Okay.  And then the first --

17   the second chat with your name on it, which

18   is the fifth one down, it says:  "I called

19   the PR lady and left her a message."

20         Does that refresh your memory

21   in any way of ever having spoken to Patricia

22   Jackson?

23         A.    No, I don't think I ever spoke

24   to her.

25         Q.    Okay.  Do you know why you

CONFIDENTIAL

Page 180

1    called her?

2         A.    No.

3         Q.    What -- what role did you have

4    in the marketing of the film?

5         A.    None.  I was -- I was to

6    provide limited research and video.  That's

7    it.  There was my role.

8         Q.    Let's mark TTV 977 -- I'm

9    sorry -- TTV_009770.  And we're up to 21.

10        A.    I'll catch up in a minute here.

11        Q.    It's okay.

12              You said you didn't participate

13   in the marketing of the film.

14              To your knowledge, did

15   Ms. Engelbrecht?

16        A.    Can you define "marketing"?

17        Q.    Well, Mr. D'Souza -- we were

18   looking at a text where he said the marketing

19   plan.

20        A.    I -- I have -- I have no idea.

21        Q.    Okay.  Do you know whether she

22   was involved in the promotion of the movie?

23        A.    I'd be speculating, but broadly

24   we weren't -- we weren't hired to do that.

25              We were subcontractors that

CONFIDENTIAL

Page 183

1              Have I ever talked to President
2    Trump outside of the Mules movie?
3         Q.    No.  Did you talk to him
4    concerning the mules or your research that
5    was used in the film?
6         A.    Oh, I see what you're saying.
7              Not outside of those three
8    meetings.
9         Q.    Okay.  And you don't recall
10   what you were referring to in the document we
11   just looked at?
12        A.    No.
13        Q.    You said you did -- you did
14   attend the premiere?
15        A.    Yes, ma'am.
16        Q.    There were about 500 people
17   there?
18        A.    That's my guess.
19        Q.    Okay.  It's your testimony that
20   until that time -- until you saw the movie
21   there you didn't know you were being listed
22   as an executive producer?
23        A.    Not that I recall.
24              MR. EVANS:  Objection; asked
25         and answered.

CONFIDENTIAL

Page 196

```
 1          Q.      Do you have any recollection of
 2     this?
 3          A.      I don't.
 4          Q.      Do you have any recollection
 5     that there was a -- a form used in the film
 6     which was alleged to have been fabricated?
 7          A.      Out of my -- above my pay
 8     grade.
 9                  We had nothing to do with this.
10                  We didn't provide forms.
11                  We didn't provide anything.
12                  We provided research and
13     limited video.
14          Q.      But my question is were you --
15     do you recall being aware of the allegation
16     that he's giving --
17          A.      I -- no.  Mark Davis is
18     irrelevant to me.  I mean, he wasn't part of
19     the contract.  He wasn't part of the deal.
20     He wasn't part of anything.
21          Q.      But  you responded to him?
22     You went back and forth?
23          A.      Well, I said it's similar to
24     the pixelation of the dog where he's making
25     all these decisions.
```

Page 197

1          (Discussion off the record.)

2              THE VIDEOGRAPHER:  All parties

3         in agreement with going off the

4         record, we're going off the record at

5         2:51 p.m.

6         (Break from 2:51 p.m. to 2:58 p.m.)

7              THE VIDEOGRAPHER:  We are going

8         back on the record at 2:58 p.m.

9    (BY MS. KUCK)

10         Q.    Okay.  So when we broke, we

11    were talking about Exhibit 24, which is the

12    e-mails between you and Mr. Davis.

13         A.    Yep.

14         Q.    And you said he's a citizen

15    researcher, correct?

16         A.    That's all I know about him.

17         Q.    Okay.  But you responded to his

18    inquiry, yes?

19         A.    Yes, I did.

20         Q.    And I think we were starting to

21    discuss your response, in which you said:

22    "It's similar to the pixilation of the dog,

23    lawyers make all these decisions, we provided

24    all the" --

25         A.    Detail.

Page 198

1        Q.        -- "detail.  What they chose to
2    share is completely out of our hands,
3    interests, or control."
4        A.        That's right.
5        Q.        Okay.
6        A.        We had no editorial control
7    whatsoever.  If you look -- if you look
8    further into it, what he's actually talking
9    about, if you look in here --
10       Q.        Uh-huh.
11       A.        -- on the second page where he
12   says:  Good morning and congrats on the
13   success of the film.  A democrat lawyer named
14   Loren Collins posted this and voted GA
15   10 hours ago.  Can either of you help me with
16   a response?
17                 Midway through -- the Mule --
18   Dinesh puts a document on the screen.  As
19   Gregg Phillips says, there's one box in
20   Gwinnett County that is a chain of custody --
21                 This is the Gwinnett anomaly
22   that I talked to you about earlier.
23       Q.        Right.
24       A.        And if you look, what he's
25   referring to on Page 3 --

CONFIDENTIAL

Page 199

1          Q.      Uh-huh.

2          A.      -- that looks to me like what

3    they put on the movie.

4          Q.      Yeah.

5          A.      But what we gave them was on

6    the last page.

7          Q.      Right.  So what they put in the

8    movie you're saying is not what you gave

9    them?

10         A.      Correct.

11                 We had no editorial control.

12   Period.

13         Q.      Did you raise this issue with

14   Mr. D'Souza?

15         A.      I -- this is after the movie

16   was out.  There was -- I haven't talked to

17   Dinesh since the movie came out.

18         Q.      Okay.  When you saw the movie

19   did you --

20         A.      I didn't notice it.

21         Q.      You didn't notice it?

22         A.      Huh-uh.

23         Q.      Okay.

24         A.      I think everybody in the

25   theater noticed that they pixilated the dog,

CONFIDENTIAL

Page 200

```
 1    though.
 2          Q.      Right?
 3          A.      They noticed it because it was
 4    a little comical, you know, but...
 5          Q.      You said lawyers make all these
 6    decisions.
 7                  What were you referring to?
 8          A.      I guess -- I was talking about
 9    the pixilation because again --
10          Q.      Oh, about the dog?
11          A.      Yeah.  I know nothing about
12    making movies.  I don't know who makes what
13    decisions about what.  All I know is we made
14    no decisions.
15                  We provided limited research
16    and limited video.  And if you look at the --
17    again, if you look at the last page, I guess
18    it wasn't the last page.  I'm sorry.  It's
19    the second to last page in this exhibit.
20          Q.      Uh-huh.
21          A.      That is what we provided.  That
22    is the actual chain of custody document.  If
23    you look on there, you see where it says:
24    "Number of absentee ballots"?
25          Q.      Uh-huh.
```

1          A.     "352 plus 6 applications, total

2     1692."

3          Q.     Yep.

4          A.     That's what we provided them.

5                 And this is what I was

6     suggesting earlier needed investigation.

7                 This was what one of our three

8     complaints to the state board of elections --

9     this particular document is what we were

10    talking about.

11         Q.     But Mr. D'Souza seems to have

12    altered it when he put it into the film?

13         A.     I don't know.  We had no

14    control.  I don't know who did it.

15         Q.     But it was altered in the film.

16    Is there --

17         A.     According to Davis, yeah.  And

18    I assume -- I mean, I don't know.  I mean,

19    I -- like I said, I haven't -- I haven't

20    talked to Dinesh since the movie.

21         Q.     Okay.

22         A.     Ever since the premiere.

23         Q.     And why not?

24         A.     Just no reason.  Everybody is

25    getting back to work.  Dinesh is making

1    movies and we're doing our thing.

2          Q.    Okay.

3          A.    No point.

4          Q.    Mr. D'Souza also later in the

5    summer came out with a book from the 2000

6    Mules.

7                Do you know anything about

8    that?

9          A.    I don't know anything about the

10   book.

11         Q.    But you know that there was a

12   book?

13         A.    I only know that there was a

14   book.

15         Q.    Okay.

16         A.    I've never seen it.  I've never

17   read it.  I was never asked to comment on it.

18   I never had any communications whatsoever

19   with anybody about that book.

20         Q.    All right.  Do you -- has

21   anybody ever -- well, strike that.

22                Have you and Ms. Engelbrecht

23   discussed the book?

24         A.    Have we ever discussed it?

25         Q.    Yeah.

CONFIDENTIAL

Page 203

1           A.      Maybe.

2           Q.      Do you recall anything about

3      those discussions?

4           A.      Not really.

5           Q.      Did she tell you that some of

6      the interview material that you gave for the

7      film ended up in the book?

8           A.      She did not.  But as I said, we

9      had no -- even in the book we had no

10     editorial control.

11          Q.      All right.  So --

12          A.      We were just -- we were just

13     bit players.  We were just a subcontractor.

14          Q.      And executive producer.

15          MR. EVANS:  No pending

16     question.

17     (BY MS. KUCK)

18          Q.      Let's mark DDR-00049441

19     [verbatim] as Exhibit 25.

20          (Marked Plaintiff Exhibit No. 25.)

21          A.      Is this the new one?

22     (BY MS. KUCK)

23          Q.      Uh-huh.  Okay.  This appears to

24     be another text exchange between Ms. D'Souza,

25     Ms. Engelbrecht, and yourself.

CONFIDENTIAL

Page 217

```
 1          A.      No.
 2          Q.      Do you recall receiving a
 3     letter from Mr. Andrews' attorneys requesting
 4     a retraction of certain things about
 5     Mr. Andrews?
 6          A.      I don't know who Mr. Andrews
 7     is.
 8          Q.      The plaintiff in this case.
 9          A.      I don't know him.
10          Q.      Okay.  Do you remember --
11          A.      I have no connection to him.
12     We've never identified him.  Nothing.
13          Q.      My question is:  Do you
14     remember receiving --
15          A.      No.
16          Q.      Okay.  So you don't know that
17     you got a cease and desist letter in
18     connection, this cease and desist letter?
19          A.      I didn't receive it.
20          Q.      Do you remember anybody telling
21     you about it?
22          A.      We had a lot going on.
23          Q.      So you don't?
24          A.      I don't.
25          Q.      Okay.  So did you take any
```

CONFIDENTIAL

Page 220

1    about video shown of him in the film 2000
2    Mules?
3         A.      We never identified him.  I had
4    nothing to preserve.
5         Q.      My question is:  You
6    understand, though, that at the heart of the
7    case is an allegation by Mr. Andrews about
8    videos shown of him during the 2000 Mules?
9                 That's the basis of the
10   lawsuit.
11        A.      How would I even know who that
12   was?
13        Q.      I'm not asking whether you knew
14   who he was or not.  I'm asking you:  Do you
15   understand that the lawsuit is based on an
16   allegation from Mr. Andrews concerning video
17   that he says of him was shown in 2000 Mules?
18        A.      I -- I do now.  I don't know
19   how to answer your question.
20                Did I know then?  I don't know.
21        Q.      No.  When did you -- right.
22                You understand, though, as
23   we're sitting here today, that's what this
24   lawsuit is about?
25                That's why I'm asking you

CONFIDENTIAL

Page 221

1    questions.

2         A.    Well, we had no editorial

3    control over what went in that movie.

4    Period.

5         Q.    I understand that's your

6    position.

7               But you understand that why

8    we're -- you understand what the nature of

9    the allegation in the lawsuit that we're

10   talking about today is?

11        A.    Until this exact moment, I

12   believe it's the first time Mark Andrews has

13   been mentioned at all.

14        Q.    I guess I'm a little confused,

15   but let's back up a minute.

16              You -- you knew at some point

17   in time there was a lawsuit brought against

18   you by Mark Andrews?

19        A.    Yes.

20        Q.    And were you -- and how did you

21   learn that?

22        A.    I don't recall.

23        Q.    Okay.  And are you aware that

24   prior to that time --

25        A.    I'm sure the AJC told us.

CONFIDENTIAL

Page 228

1    happened.

2         Q.    Okay.  And did you provide

3    graphics for use in the film?

4         A.    We provided limited graphics.

5              We provided the chain of

6    custody document in that one case and may

7    have provided a handful of others, but -- but

8    I don't think any of them made the movie.

9         Q.    Okay.  The -- the graphic that

10   I was referring to about the ballot mule

11   traveling around Atlanta, you know what I'm

12   talking about?

13        A.    I do.

14        Q.    In the film you're interviewed

15   while that is shown?

16        A.    That's not what happened.

17        Q.    Okay.

18        A.    We -- we --

19        Q.    Tell me what happened.

20        A.    During the interviews we were

21   in a studio and every screen in that studio

22   was a blue screen.

23        Q.    Okay.

24        A.    Meaning that everything was

25   inserted after the shoot.

CONFIDENTIAL

Page 229

1              So what I was responding to was

2      nothing.

3          Q.     So when you talk about in the

4      film, though, the graphics showing something,

5      what were you looking at?

6          A.     It was Dinesh -- you're taking

7      it all out of context.

8          Q.     Okay.

9          A.     But Dinesh's description to us

10     in the video -- or excuse me -- in the

11     interview --

12         Q.     Right.

13         A.     -- which may or may not have

14     made it on -- into the movie.

15              I mean, let's just say for the

16     sake of this discussion they interviewed us

17     for 20 hours.  I think we were in there for

18     21 minutes or something.

19              So you want to know what's

20     left, I mean, you're going to have to get

21     with Mr. D'Souza.  I don't know.

22         Q.     Okay.  And your testimony is

23     that even -- that you did not see the

24     graphics as you were speaking in the film?

25         A.     That's correct.

CONFIDENTIAL

Page 231

1          (Marked Plaintiff Exhibit No. 28.)

2          A.      Don't remember it at all, but

3     it is on my e-mail.  So yeah.

4     (BY MS. KUCK)

5          Q.      Okay.  But you have no

6     recollection of ever e-mailing with him?

7          A.      No.

8          Q.      And you say the second one

9     down, quote, The movie graphics are not

10    literal interpretations of our data.

11         A.      Right.

12         Q.      But you don't remember saying

13    that to him?

14         A.      No.

15         Q.      That statement is accurate,

16    though?

17         A.      Yes.

18         Q.      Okay.  And did you ever discuss

19    that issue with Mr. D'Souza?

20         A.      No.  We were subcontractors

21    hired to provide some limited video and some

22    limited research.  They were the moviemakers.

23    We don't make movies.

24              MS. KUCK:  Why don't we take a

25         break and I'll see --

CONFIDENTIAL

Page 237

1     interviews, you said, you know, you might
2     have been talking about a graphic but it
3     wasn't actually going on behind your head.
4             A.      Uh-huh.
5             Q.      What -- so what happened in
6     those interviews?
7                     You were sitting in a room that
8     was totally blank?
9             A.      Yeah.
10            Q.      Okay.
11            A.      It was a studio.
12            Q.      Right.
13            A.      Dinesh's studio up in The
14    Woodlands.  And what happens -- and I didn't
15    know this either.  This is news to me.
16            Q.      Yeah.
17            A.      So like if -- like if -- if
18    they were shooting us in here and this was
19    part of a movie --
20            Q.      Uh-huh.
21            A.      -- and there was ultimately
22    going to be something up on the screen --
23            Q.      Yeah.
24            A.      -- that's added post
25    production.

CONFIDENTIAL

Page 238

```
 1              Q.      Okay.
 2              A.      So all that's on the screens
 3      are blue screens.
 4              Q.      Right.
 5              A.      And so you don't really see
 6      anything you're talking about.  You're
 7      talking to air.  And -- and, you know, little
 8      disconcerting because I had never been there
 9      before and never done anything like that.
10                      But, you know, I mean, all in
11      all, you know, I think that -- that raising
12      the awareness of some of the election
13      challenges that America faces was still the
14      right thing to do.
15              Q.      So you did those interviews in
16      Woodlands and then you went out to -- you
17      went out to California?
18              A.      Yeah.  Yeah.
19              Q.      And had more filming out there?
20              A.      Well, a little bit more.
21      The -- the part of the movie where the --
22      where the Salem hosts --
23              Q.      Uh-huh.
24              A.      -- are -- are sitting around --
25              Q.      Yeah.  Yeah.
```

CONFIDENTIAL

Page 242

```
 1     (BY MS. KUCK)
 2          Q.     We talked earlier about family
 3     members dropping off ballots for other family
 4     members.
 5          A.     Yes.
 6          Q.     And then we talked about the
 7     issue of assisters.
 8               Is it your testimony that your
 9     understanding is that in Georgia, for a
10     family member to drop off another family
11     member's ballot, they must file an assister
12     certificate?
13               MR. EVANS:  Objection; asked
14          and answered.
15          A.     Yes.
16     (BY MS. KUCK)
17          Q.     And what is that understanding
18     based on?
19               MR. EVANS:  Objection; asked
20          and answered.
21          A.     The law.
22     (BY MS. KUCK)
23          Q.     Your understanding of the law,
24     as you read it, or someone gave you an
25     understanding?
```

CONFIDENTIAL

Page 255

1    what happened was they didn't realize that

2    what we had given them actually had 70 of

3    them in there.

4              And I don't -- I -- I know it

5    was way out of the scope and we encouraged

6    them to make do with what they had.  I don't

7    know if we ever actually gave them anything

8    new or not.  We may have.  I don't -- I don't

9    recall.

10         Q.    And do you know if the video

11   containing the image of Mr. Andrews would

12   have been in the videos they already had?

13         A.    No, because we didn't get -- we

14   didn't get Gwinnett video until way late in

15   the game.

16         Q.    Okay.  And I think you

17   mentioned earlier that you actually objected

18   to using additional videos.  I'm not sure if

19   you meant that literally or more

20   colloquially.

21              Did you actually put something

22   in writing that you objected to the use of

23   any additional videos?

24         A.    I don't think so.  In part,

25   again, because it just wasn't what we were

```
 1          Q.      All right.  And the second
 2     bullet in the complaint, he says, quote, A
 3     private investigative organization, True the
 4     Vote, purchased billions of cell phone pings
 5     and they identified this individual
 6     underlined --
 7          A.      That's false.
 8          Q.      Let me finish.  And that's
 9     going to be my question.
10                  -- by tracking his cell phone
11     pings to multiple ballot drop boxes.
12          A.      That's false.
13          Q.      Okay.  And where would he have
14     gotten that idea?
15          A.      No idea.  Not from me.
16          Q.      And do you know any -- do you
17     know of anyone who -- well, did you have any
18     conversations with Mrs. -- Ms. Engelbrecht
19     about his complaint, Mr. Cross's complaint?
20          A.      We may have had some at some
21     point.  I don't recall.  I mean, this was --
22     these were not our complaints, so --
23          Q.      Right.
24          A.      -- we weren't interested in
25     these.
```

CONFIDENTIAL

Page 267

```
 1                    We were interested in ours.
 2                    They never acted on ours.
 3                    They acted on this.
 4          Q.        But the -- the statement in
 5     there is -- is a statement about your
 6     research, and that's why I'm asking whether
 7     or not --
 8          A.        I'm saying it's categorically
 9     false.
10                    MR. EVANS:  Objection;
11          misstates -- hold on.  Hold on.
12                    MS. KUCK:  Okay.
13                    MR. EVANS:  Objection;
14          misstates testimony.  Assumes facts
15          not in evidence.
16     (BY MS. KUCK)
17          Q.        Okay.  Just to clear it up from
18     the objection, are -- Mr. Phillips, we're in
19     agreement that the second bullet point on
20     8233 is false?
21          A.        Yes.
22          Q.        Okay.  And are you aware of
23     anyone reaching out to Mr. Cross to tell him
24     that was false?
25          A.        Well, I -- we would had to have
```

CONFIDENTIAL

Page 268

1    known about it to -- to do it.  It wasn't us.
2    We had no knowledge.
3          Q.    Right.  But you had his
4    complaint?
5          A.    How?
6          Q.    Well, if you look at the cover
7    page of this exhibit --
8          A.    Uh-huh.
9          Q.    -- and you also reference it in
10   your interrogatories -- there was a request
11   made by TTV for the complaint?
12         A.    That's an open records request.
13         Q.    Right.
14         A.    Right.  But we had no knowledge
15   of it when he submitted it.
16         Q.    You -- right.  But you had
17   knowledge of it at -- as of May 26, 2022.
18         A.    Yeah.  What we were to have
19   done about that?  It's not our complaint.  We
20   had our own complaints we were hoping them to
21   act -- they would act on.
22         Q.    But my question is:  Did anyone
23   straighten Mr. Cross out so that he knew that
24   he was making a false --
25         A.    I didn't -- I didn't --

Page 270

1          A.      -- number one.

2                  Number two, we had been, I want

3      to say, sequestered.  Mr. Schooley made it

4      abundantly clear that we were to sequester

5      all video and -- and nothing could be given

6      to anyone except for -- except for them until

7      the movie was out and then I think a year

8      afterwards or something like that.

9          Q.      Although we looked at your

10     interview on Charlie Kirk --

11         A.      We didn't --

12         Q.      -- which was April --

13         A.      We didn't give Charlie a video.

14         Q.      Which was on April 8?

15         A.      Yeah.

16         Q.      And you don't know where he got

17     it either?

18         A.      No, I don't.

19         Q.      Okay.  And is it your testimony

20     that you didn't know what video he was going

21     to be showing you until you showed up for the

22     interview?

23         A.      That's correct.  We thought it

24     was going to be a radio interview.  Look at

25     how we're dressed.  We were pretty rough.