# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **MARK ANDREWS**,<br><br>　　Plaintiff,<br><br>v.<br><br>**DINESH D'SOUZA**, *et al.*,<br><br>　　Defendants. | Case No. 1:22-cv-04259-SDG |

## DECLARATION OF GREGG PHILLIPS

I, Gregg Phillips, hereby declare:

1. I am over 18 years of age and of sound mind, and the matters described herein are within my personal knowledge and, if called as a witness, I could and would competently testify thereto.

2. I make this declaration in support of Defendants True the Vote Inc. ("TTV"), Catherine Engelbrecht ("Engelbrecht") and Gregg Phillips (collectively "TTV Defendants")' Motion for Summary Judgment.

3. I previously served on TTV's board of directors from 2015 to 2017, but have not held any other positions at TTV since that time.

4. I have never been employed by TTV, and have never received any direct compensation from TTV.

1

5. I own OpSec Group ("Opsec"), which performs election information and data consulting work.

6. I did not personally enter into any agreement with respect to the making of the film 2000 Mules ("the Film").

7. Prior to 2000 Mules, I had never met Dinesh D'Souza, did not know him, and had never worked with him.

8. OpSec has performed work as a contractor for TTV since 2020.

9. For the geospatial/geotracking analysis that was ultimately discussed in the Film, TTV entered into a contract with OpSec.

10. OpSec hired Red Metrics as one of several contractors to assist with geospatial/geotracking analysis, and Red Metrics retained possession of the raw geospatial data.

11. D'Souza Defendants have had little to no contact with me since the Film's premiere in May 2022.

12. Other than the Film, I have never worked with Salem, and am not in contact with them today.

13. Plaintiff has never met or talked with me.

14. The issue of election fraud in the 2020 election was an issue of public concern and was often discussed in the news.

15. I understand the purpose of the Film was to highlight the issues of election integrity, election process, and election fraud.

16. Starting in late 2020 and early 2021, TTV and OpSec began performing research regarding the 2020 election, with the goal of providing the findings to law enforcement. The research was not originally done with the goal of appearing in a film.

17. I understand TTV obtained publicly-available video of public ballot drop boxes from Georgia Open Records requests, and provided that video to OpSec.

18. OpSec and I, with the help of independent contractors, worked on certain geospatial data analysis—which analyzed the locations and times of unique device IDs from cellphones—that was ultimately used in the Film.

19. For the geospatial analysis, there was no effort by TTV, OpSec, or Red Metrics to link any of the data or unique device IDs to any named individuals.

20. The research performed did not identify any named individuals as "mules," but rather identified unique device IDs.

21. There is no one general definition of what a "mule" is.

22. In or around January 2022, OpSec provided 70 cuts of the publicly-available ballot drop box surveillance footage linked to geospatial analysis to the D'Souza Defendants.

23. I was very concerned about the footage and was very protective of it.

3

24. The original 70 videos OpSec provided to the D'Souza Defendants matched geospatial analysis with unique device IDs based on time and location. These videos did not include footage from Gwinnett County ballot drop boxes, because TTV Defendants had not yet received that video. Therefore, it did not include footage of Andrews.

25. On February 4, 2022, Debbie D'Souza requested from TTV Defendants "1,000 videos" for the Film in order to "make a collage for the screen of all these videos compiled to fit the full screen." DD_000394.

26. I responded, stating: "this is a major lift and is way outside the scope, Catherine you will need to decide on this one." DD_000394.

27. I routinely emphasized it was very difficult to process the geospatially-linked video. It was extremely time-consuming, and extremely expensive.

28. The D'Souza Defendants repeatedly asked for more surveillance video.

29. On March 8, 2022, I asked Debbie D'Souza: "Can y'all confirm that we have completed our to-dos for the movie?" Ms. D'Souza responded: "Yes we are pretty much done." DDR-00055752-55.

30. Because the Gwinnett County video was received so late in the process, OpSec did not have the opportunity to tie additional geospatial analysis to that video.

31. In late March 2022, TTV Defendants sent additional video clips, including certain Gwinnett County footage, to the D'Souza Defendants.

32. TTV Defendants made clear that this second batch of videos was not tied to geospatial analysis, but was to be used only to complete the request from Deborah D'Souza for filler, also referred to as B-roll, images.

33. I believed that Georgia law required that for individuals not depositing their own ballots, there needed to be the signature of an assistor.

34. I later learned that David Cross sent a Complaint to the Georgia State Election Board (the "Cross Complaint"). I had nothing to do with the Cross Complaint.

35. I first saw Andrews' name well after the SEB investigation and hearing had concluded. I did not know Andrews appeared in the Film until Plaintiff filed this lawsuit.

36. I had no editorial control over the Film.

37. My responses to questions in the portions of the Film in which I appeared were unscripted and unrehearsed.

38. In the Film, where Catherine Engelbrecht or I pointed to screens, they were blank, and graphics were created, selected, and superimposed after the fact by D'Souza Defendants.

39. Neither Engelbrecht nor I identified Andrews in the Film.

40. Nobody said Andrews' name during the Film.

41. Although I at times gave limited suggestions for the Film, they were often not accounted for or implemented in the Film.

42. I had very minimal involvement with marketing and promotion of the Film.

43. I had very limited coordination with D'Souza Media for publicity for the Film.

44. Salem never discussed with me the marketing of the Film, and I was not involved with discussions regarding how to promote the Film.

45. Salem and I had only occasional contact throughout the process of the Film being produced.

46. I did not know I would be listed as an executive producer on the Film until around the time the Film was released, and did not know why I was included.

47. I was not told what would appear on the screen when I appeared in the Film.

48. I never had any control over the 2000 Mules website, https://2000mules.com.

49. I had no editorial control over any trailer for the Film.

50. I had nothing to do with the creation, production, or development of any trailer for the Film.

51. I was not told what would appear on the screen and did not know I would appear in the final 2000 Mules trailer (the "Trailer").

52. The portions of the Trailer in which I appeared were unscripted and unrehearsed.

53. Neither Engelbrecht nor I identified Plaintiff during the Trailer.

54. Nobody said Plaintiff's name during the Trailer.

55. On or about May 13, 2022, Engelbrecht and I appeared on the show Facts Matter with Roman Balmakov ("Facts Matter"). Plaintiff's blurred image is shown for less than 1 second out of the 14:37 program while Mr. Balmakov is speaking, among several other clips of others from publicly available ballot drop box video.

56. I had no editorial control over what was shown on the Facts Matter program.

57. I had nothing to do with the creation, production, or development of the Facts Matter program.

58. I was not told what would appear on the screen when I appeared on the Facts Matter program.

59. The portions of the Facts Matter program in which I appeared were unscripted and unrehearsed.

60. Neither Engelbrecht nor I identified Plaintiff during the Facts Matter program.

61. Nobody said Plaintiff's name during the Facts Matter program.

62. On or about April 8, 2022, a segment aired on *The Charlie Kirk Show* involving Ms. Engelbrecht and I, which was filmed a few days earlier. The video includes a brief clip of Plaintiff from publicly available Gwinnett County ballot drop box video, among several other clips of others from publicly available ballot drop box video. In the clip of Plaintiff, he is wearing a COVID face mask, covering his nose and mouth.

63. Either Engelbrecht or I reached out to Charlie Kirk to tell him we would be in town and to see if he wanted to get together for coffee. Kirk then offered for Engelbrecht and I to come on his show, which we accepted.

64. I thought our appearance on *The Charlie Kirk Show* would be a radio interview and we was surprised to learn it was being filmed when we arrived that day.

65. *The Charlie Kirk Show* used certain publicly available video clips, including those showing Plaintiff. I do not know where those clips come from, but they seemed to be the same videos as appeared in a commercial advertisement that was run in Georgia and that were circulation on social media.

66. I had no editorial control over *The Charlie Kirk Show* program.

67. The *Charlie Kirk Show* interview was unscripted and unrehearsed.

68. Plaintiff was never identified in the *The Charlie Kirk Show* interview.

69. Nobody said Plaintiff's name during the *Charlie Kirk Show* interview.

70. During the interview, I did not know that unblurred video of Andrews was being played because I was too far away from the laptop screen and was not wearing my glasses. Even still, I had no idea as to what video the show's producers would ultimately include in their broadcast.

71. I expected that it was appropriate to repost the interview because it had been vetted and posted online by Salem and Charlie Kirk's show.

72. I did not appear on the *Tucker Carlson Tonight* program.

73. I had nothing to do with the creation, production, or development of the *Tucker Carlson Tonight* program.

74. On April 20, 2022, Engelbrecht and I appeared on *The Gateway Pundit* podcast ("Gateway Pundit"). The video includes a clip of Plaintiff, from publicly available Gwinnett County ballot drop box video, and Plaintiff is wearing a COVID face mask, covering his nose and mouth.

75. I had no editorial control over what was shown on the Gateway Pundit program.

76. I had nothing to do with the creation, production, or development of the Gateway Pundit program.

9

77. I was not told what would appear on the screen when I appeared on the Gateway Pundit program.

78. The portions of the Gateway Pundit program in which I appeared were unscripted and unrehearsed.

79. Neither Engelbrecht nor I identified Plaintiff during the Gateway Pundit program.

80. Nobody said Plaintiff's name during the Gateway Pundit program.

81. On May 8, 2022, TTV released a video on its Facebook page (the "TTV Video"). The TTV Video contains a blurred image of Plaintiff from publicly available Gwinnett County ballot drop box video, which appears for a fraction of a second.

82. Neither Engelbrecht nor I identified Plaintiff during the TTV Video.

83. Nobody said Plaintiff's name during the TTV Video.

84. I had no involvement in the development, writing, editing, or publication of the 2000 Mules book (the "Book") (Statement 2).

85. I had no editorial control over the Book.

86. I never saw a copy of the Book before it was published.

87. I never received any funds from the Book.

88. Salem was not in communication with me regarding the Book.

89. I was not involved with the billboard including an image of Plaintiff in Times Square (the "Times Square Billboard") (Statement 3), and did not know anything about it until this lawsuit was filed.

90. I had no editorial control over the Times Square Billboard.

91. I had no prior knowledge that the Times Square Billboard was being put up.

92. In addition, I was not involved with Statements[1] 7, 9-12, 20, 24-25, and 27, which all involve media appearances by Dinesh D'Souza.

93. To the extent prior video clips of me appeared in any of Statements 7, 9-12, 20, 24-25, and 27, I was not made aware that such clips would be used.

94. I had no editorial control over Statements 7, 9-12, 20, 24-25, and 27.

95. I had no prior knowledge regarding Statements 7, 9-12, 20, 24-25, and 27.

96. In addition, I was not involved with Statements 35-39, which all involve social media posts by Dinesh D'Souza.

97. I did not appear in Statements 35-39.

98. I had no editorial control over Statements 35-39.

99. I had no prior knowledge regarding Statements 35-39.

---

[1] The "Statements" are those Plaintiff has identified in his interrogatory responses, and are reflected in Appendix 1 to TTV Defendants' Statement of Undisputed Material Facts.

100. In addition, I was not involved with Statements 40-44, which all involve podcast appearances by Dinesh D'Souza.

101. I did not appear in Statements 40-44.

102. I had no editorial control over Statements 40-44.

103. I had no prior knowledge regarding Statements 40-44.

104. I did not know Andrews' was an individual in the Film until he filed this lawsuit.

105. I have no connection to and, outside of court filings, have never identified Mark Andrews by name.

106. I did not believe the individual I later learned to be Andrews was a "mule" within the definition of the Film.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of December, 2024.

_____
Gregg Phillips