# EXHIBIT MM

Democracy Dies in Darkness

**Politics**

Fact Checker

Biden administration

# Discussing the gaps in '2000 Mules' with Dinesh D'Souza

Analysis by Philip Bump

National correspondent

May 17, 2022 at 4:27 p.m. EDT

Political commentator Dinesh D'Souza speaks to supporters of former president Donald Trump on May 6 in Greensburg, Pa. (Jeff Swensen/Getty Images)



Not many people spend time watching hearings hosted by state legislative committees, for obvious reasons. In March, though, the Wisconsin State Assembly's Campaigns and Elections Committee hosted two representatives of the conservative group True the Vote to hear allegations about the collection and submission of ballots in the 2020 presidential election.

It was one of the first full articulations of a claim that has recently become a central part of the political right's efforts to undercut the election, thanks to conservative filmmaker Dinesh D'Souza's featuring True the Vote's allegations in his film "2000 Mules."

The case presented by True the Vote's Gregg Phillips and Catherine Engelbrecht

CONFIDENTIAL

MA-0001518

to those Wisconsin legislators was not convincing, as I wrote last month.
D'Souza responded, inviting me to watch his film and then debate him. I readily agreed to discuss the film with him from a position of skepticism.

*[Sign up for How To Read This Chart, a weekly data newsletter from Philip Bump]*

That conversation took place on Monday. D'Souza and I spent an hour (interrupted by occasional technical glitches) discussing his film and the evidence provided by True the Vote. The entire conservation is transcribed below; it has been lightly edited, with particularly interesting passages highlighted.

Advertisement

A few recurring themes arose. As I wrote in my assessment of the movie, the central claim developed by True the Vote and elevated by D'Souza focuses on cellphone geolocation data that they used to identify people who they claim visited both nonprofit organizations and at least 10 ballot drop-box locations in one day — the "mules." They also obtained video surveillance footage of some drop boxes. The movie focuses on a few snippets of that footage, including segments showing a guy who rides up on a bike (referred to as "bike guy") and a

CONFIDENTIAL    MA-0001519

woman wearing latex gloves as she casts her ballot.

True the Vote presented its claims to both the Georgia Bureau of Investigation (GBI) and Secretary of State Brad Raffensperger (R). In October, the GBI said it didn't find sufficient grounds for an investigation. This year, Raffensperger indicated he would evaluate True the Vote's claims. On Tuesday, the state elections board dismissed related complaints.

I will admit this conversation will read more easily if you have seen the film. But it can be summarized fairly succinctly: D'Souza admits his movie does not show evidence to prove his claims about ballots being collected and submitted.



Advertisement

# The full discussion

**Bump:** I want to start with the "bike guy." So this is, in the movie, a guy who is shown coming up to a drop box outside of a library late at night in Atlanta. He deposits a ballot, takes a picture of it. Gregg Phillips from True the Vote, who is sort of acting as the narrator for a lot of these video snippets, says that he understands that this is happening because the people who are making these deposits have been told that the only way they get paid is if they take a picture.

CONFIDENTIAL
MA-0001520

So I want to start by asking: Do you have evidence besides Phillips making that assertion that that is true, that these people needed to take a picture in order to get paid?

**D'Souza:** Yes. Our evidence on the payments is really threefold. The first is that the way the whole investigation got started is that True the Vote had a hotline and they were approached by a whistleblower in Atlanta who said that he was dropping off ballots, he was getting paid $10 a ballot and he described that he was not alone, but he was part of a larger operation.

Advertisement

This is what caused True the Vote to then say, "All right, let's try to figure out a way in which we can map out and track and perhaps figure out the scale of this operation." And then they got the idea of doing this through geotracking. So the first step of this investigation was not the geotracking — it was the whistleblower. And the whistleblower laid out the scheme, and the scheme then became the hypothesis or template for the investigation.

So you have direct testimony to the effect that this is a paid operation. I mean, common sense would tell you that, but it's obviously corroborated by an actual whistleblower.

CONFIDENTIAL                                                                                    MA-0001521

**Bump:** Except that it's not. In the movie, you don't make this case. You don't argue that there's any additional evidence for this. You don't present this whistleblower. And unless I'm mistaken, the state of Georgia asked True the Vote to provide information about this whistleblower, which they have not done. So, why do we take your word for that?

Advertisement

**D'Souza:** First of all, True the Vote submitted reports — in fact, they've done more than one — to Georgia long before the movie. So the movie is a part of all this, but the movie is also a movie. There are things that you can't do in a movie that are nevertheless being done on the ground that are part of the research process. I can't take the True the Vote report to the state of Georgia and include all that information in the movie. The movie is driven in part by decisions about what makes the movie work well. There's an emphasis, for example, on video because video is visual and you can see what's going on with your two eyes.

In some ways, I think geotracking is more powerful evidence than video, for the same reason that DNA evidence is more powerful than eyewitness evidence. DNA evidence unmistakably says that you were there. Eyewitnesses can be mistaken. And similarly, geotracking establishes unmistakably not that you were there, but that your cellphone was there. So you can give you a cellphone to your

CONFIDENTIAL

MA-0001522

wife. But that cellphone, the fact that that cellphone was at that drop box at that particular moment on that day is, I think, not open to rational dispute.

**Bump:** It is, and we'll come back to that.

Advertisement

**D'Souza:** Yeah, we'll come back to that, but let's talk about the whistleblower. What I'm saying is that we didn't go into the whistleblower in part because True the Vote made it really clear that the whistleblower provided the information to initiate an investigation and did not want to be contacted directly by the authorities, okay?

Now, the Georgia Bureau of Investigation and the Raffensperger team seems determined to follow up solely by chasing the whistleblower, a man who has already said, "I don't want to be part of this." They could easily go after the mules because True the Vote is happy to supply them with the cellphone IDs of all the mules. And yet they seem to insist that 'we've got to go find this whistleblower!' So I think — I mean, this is open to debate — are they conducting a serious investigation? Are they trying to create an investigation that goes nowhere?

Raffensperger, of course, has been on public record: This was a secure election.

CONFIDENTIAL

MA-0001523

So it's going to be a little embarrassing for him to say, "I was the sheriff and a big heist was going on under my nose. I knew nothing about it." He looks like a fool. Was he willing to come out in public and look like a fool? Or is he going to try to make sure that the investigation doesn't go further?

Advertisement

**Bump:** Let's take a step back — my understanding also is that the Georgia Bureau of Investigation was provided with the cellphone IDs because they had these spreadsheets of data that they were provided, I think, in October 2021.

But that aside, this is exactly the point. We have this assertion being made by Gregg Phillips about what is happening with this picture being taken. You are saying — and, actually, you haven't actually said yet — that this came from the whistleblower. Did the whistleblower say that they were paid only if they took photos of the ballots?

**D'Souza:** No, I don't know that. I don't know that because I haven't talked to the whistleblower. The whistleblower spoke to True the Vote investigators. So I have to admit that my information from that comes from True the Vote and also from the Georgia reports, which I've read.

CONFIDENTIAL
MA-0001524

Advertisement

**Bump:** Okay. So now this is important. So I appreciate your saying that you've not spoken to the whistleblower. I'm a little baffled: You are an experienced filmmaker. There are lots of ways to present nonvisual information in a visually striking way, that could have included having conversations. You have scenes that are obviously acted of people doing ballot drops, that are dramatizations. I don't know why you couldn't do that with this whistleblower. I'm not going to judge your filmmaking; I just don't accept that necessarily as an excuse.

But I want to go back to this issue of taking pictures of the ballot, because this bike guy goes up to the drop box, inserts the ballot, steps back, takes a picture of it. Now you recognize that a lot of people took photos of themselves voting in the 2020 election. And in fact, different jurisdictions encouraged people to do that because they understood that it would send the perception that everyone's voting and therefore increase turnout. You accept that that happened in the 2020 election, correct?

**D'Souza:** I think that you're doing a willfully ambiguous reading of this because, number one, if there was a picture of one guy in the movie who took a photo, I agree that that would be open to multiple interpretations. But when you start seeing a kind of pattern of people taking photos — and now here's the key point —

CONFIDENTIAL

MA-0001525

Advertisement

**Bump:** But you only show two.

**D'Souza:** Not of themselves. We show a lot more than two. Honestly, we show a lot more than two. Go back and watch the film. We have a lot of images of people taking photos, particularly when we show the expanded screen with multiple mules.

Now, what I'm saying is this: If they were taking photos of themselves, you could then argue they're taking a selfie to demonstrate that they voted. But I think it's quite obvious from the footage itself that they're taking photos of the ballots going in, and that's a whole different matter. So I think you're doing what I would call "armchair theorizing."

**Bump:** Oh, Dinesh!

**D'Souza:** It seems to me that maybe they were trying to record themselves. What I'm saying is investigators who study this can tell the difference between taking a photo of yourself in front of the ballot box and taking a photo of the ballots going in. And they can interpret taking photos of ballots very differently from taking a photo of yourself.

CONFIDENTIAL
MA-0001526

**Bump:** Okay. So I just —

**D'Souza:** You disagree?

**Bump:** Oh, absolutely. Not only do I disagree, I found examples of people taking photos of that exact same drop box, because they were just showing that they've gone to the drop box to vote! There's a lot of examples of —

**D'Souza:** So they were taking photos of just the ballots going in.

**Bump:** That's correct. At that Ponce de Leon library, the exact same one that we're talking about here in this movie.

Not only that, the bike guy didn't take a picture of the ballot going in. He took a picture after the fact, after he posed his bike next to it. Clearly, this is not someone who's taking a photo of the ballot going in. I think it's remarkable you accuse me being willfully ambiguous here, given that literally the entire crux of your argument with these mules is being ambiguous about the information that you have.

But I also want to point out that this bike guy, there's no evidence that he even submitted more than one ballot. He pulled a ballot out of the bag. There's no indication there's more than one ballot. Why do you think he has more than one ballot when he's doing that in the first place?

**D'Souza:** Well, when we're presenting this evidence, we're showing sometimes different things to draw different types of significance, right? And you also have to remember that surveillance footage is not taken by my cinematographer, for example. It's often grainy footage. It's bad footage. You can't see very clearly what's happening. So what happens is we'll show a video. And the purpose of the video is to show, for example, someone taking photos of the ballot.

CONFIDENTIAL

MA-0001527

Now, in that particular image, you can't see if it's one ballot or five ballots. My guess is that the True the Vote investigators can figure that out because they're able to zoom in on the photo. They have a different level of sophistication in approaching this than me sitting in a theater and watching the image.

Here's the problem I have with this mode of this argument.

**Bump:** Sure.

**D'Souza:** Let me give you an analogy, and I'll bring it home to this particular case. During the [Kyle] Rittenhouse case, you had an investigator say, "The antifa guys weren't chasing Rittenhouse. They were merely running in the same direction." Now it is possible to have that interpretation. But when the jury looks at the video, meh, they're chasing Rittenhouse. And the context of it — what happens before and what happens subsequently and the broader pattern of why these people are there and what they're there for — makes it really clear what was going on. And the consequence was acquittal. But the prosecution tried to take each individual fact, like in this particular scene of 10 seconds — you can't tell if they're chasing him or if they're just running in the same general direction.

**Bump:** But with all due respect, this is exactly what you're doing with this geotracking data. You're making assumptions about what this shows and pulling out these examples of people that you say showed up at these drop boxes, but you don't actually tie those two things together. You are making these broad assertions —

**D'Souza:** Tying what two things together? What are the two things?

**Bump:** So for example, the bike guy. The assertion is made by Gregg Phillips that this guy then went to other places and other drop boxes, but no evidence for that is shown. You don't even show the geotracking data.

CONFIDENTIAL                                                                                      MA-0001528

**D'Souza:** Wait a minute. When you say no evidence of that is shown, let's zoom in to that.

**Bump:** Please.

**D'Souza:** So we say in the movie very clearly that True the Vote set a high bar for who qualifies as a mule in their search algorithm.

**Bump:** Which is not true and we'll come back to that, but go ahead.

**D'Souza:** The high bar is 10 or more drop boxes. So right away this blows out of the water, the kind of nonsense that says these are people dropping off family ballots. If you were dropping off the ballots of your family members, would you need to go to ten drop boxes to do it?

**Bump:** Did the bike guy go to 10 drop boxes?

**D'Souza:** Of course he did.

**Bump:** How do you know that?

**D'Souza:** Otherwise he wouldn't be counted!

**Bump:** How do you know that?

**D'Souza:** How do I know that? Because that's what the geotracking — look, the Georgia Bureau of Investigation is perfectly — they have not contested that True the Vote's geotracking data is valid. They wouldn't open up an investigation into ballot trafficking, Raffensperger himself wouldn't do that, if he thought, "You know what? This geotracking is useless. This guy didn't even go to 10 drop boxes!" They know he did. They know he did.

**Bump:** No claim is made about the bike guy going to multiple — besides Gregg

CONFIDENTIAL

MA-0001529

Phillips saying —

**D'Souza:** Of course there is a claim being made! The context of the movie is to explain that that's the search criterion. All the mules being counted under that rubric went to 10 or more drop boxes.

**Bump:** Did you see evidence that each of the people who you saw in the video going to drop boxes was shown, through geotracking data, to go to other drop boxes? Or do you just take Phillips's word for that? Did you see evidence they went to other drop boxes?

**D'Souza:** I didn't take Phillips's word for that. What I recognize is that Phillips's data has been shared with multiple authorities in Wisconsin, in Arizona and in Georgia. Now, I read very carefully the response of the Georgia investigators to True the Vote's data. They said, "Just because these guys went to 10 or more drop boxes, it doesn't mean that they necessarily were committing crimes." So that's a whole different thing from saying they didn't go to 10 drop boxes.

**Bump:** That's not what they said.

**D'Souza:** And what you're asking me to do is unfair, which is you're asking me to unfurl that geotracking evidence, mule by mule, in the movie. And what I'm trying to say is that is putting impossible demands on the movie. It's kind of like, you bring out a ballistics expert and he says something about the gun, and then you're saying, "Prove to me that that particular gun has those exact qualities, even though that's uncontested in this debate." The investigators accept it as true. And so you're putting a burden on the movie that no movie can bear.

**Bump:** That's not true. I'm saying that the bike guy — the sole evidence presented for the guy being a, quote, "mule" in your movie is: A guy goes up to a drop box, deposits a ballot. After it is deposited, he takes a photo of the drop

CONFIDENTIAL
MA-0001530

box. That is the entire amount of evidence that is presented beyond Gregg Phillips's word. And now this is the point —

**D'Souza:** No, I don't agree.

**Bump:** Let me finish. This is the point at which I point out that Gregg Phillips misrepresented wildly the extent of voter fraud in the 2016 election. He claimed he had millions of illegal ballots that were cast in 2016, something that Donald Trump then elevated — he never offered any proof for it. Gregg Phillips is not someone who's credible on these issues, and his word is the only word we're given that the bike guy went to other drop boxes.

How am I wrong?

**D'Souza:** You're wrong because this video is taken in a place where there are authorities involved, who are looking into this exact matter. They have this exact data and, in fact, many of them inside of the GBI and inside of Brian Kemp's office and inside of Raffensperger's office are very eager to try to fight back and push back against True the Vote. They have never made the argument you've made. So you're literally playing ballistics expert, so-called, when, A, you don't know anything about ballistics and, B, no ballistics expert is saying what you're saying.

**Bump:** If we are taking the movie at face value, my point is totally valid. The only evidence presented is a claim that he's carrying multiple ballots, which is unfounded. That he deposited the ballots and then took a picture.

And that this was the so-called new standard for how they had to get paid — even though we also see this footage of the woman with the gloves, who is voting in January in Georgia but doesn't take a picture. So if this is the standard, then how does that apply, right?

CONFIDENTIAL

MA-0001531

**D'Souza:** First of all, as we know, this is an operation that's been conducted in five different places simultaneously. And no one is claiming that when you organize an operation in Atlanta and another one in Phoenix and another one in Detroit, that the operations are going to be precisely identical. No one's claiming that.

**Bump:** Although both of those were in Georgia. Both of those were in Atlanta.

**D'Souza:** You're acting as if the whole movie is hinging on the bike guy. And what I'm saying is the bike guy is presented — as are the other cases, by the way — as mere examples. It's sort of like, look, we got these 2,000 mules. Now, unhappily, the majority of the mail-in drop boxes did not have surveillance. So we don't have surveillance everywhere. But in the places we do, let's identify some of these mules and let's show them doing their thing. Now you're saying, "How do we know they went to 10 drop boxes? Well, that's the search criterion that dictated who we're going to be looking at.

**Bump:** Okay. So let's be very clear though, because you are making a very broad claim about broad illegality in multiple states that is dependent on our assuming that this data is valid. And yet, in your film, you do not show one single person for whom you present geotracking data placing them at multiple drop boxes, much less doing so on multiple days. Do you disagree with that?

**D'Souza:** Well, we do — I put out on social media that we do have video of the same guy on more than one occasion at the same drop box in a different outfit. That's true.

**Bump:** But you don't know who he is.

**D'Souza:** Now, whenever there's something that you don't have, you always have to ask: What is the significance of you not having this, right? I mean, if you have a serial killer that goes to five homes and murders people and leaves this

CONFIDENTIAL

MA-0001532

DNA at all five places, but only one of the five homes has a video camera, is it reasonable to say, "Why don't I have video camera of the serial killer at all five homes?" You don't because the other four didn't have a camera that was turned on.

**Bump:** But that's not —

**D'Souza:** Let me finish. But if you have the DNA — and in this case, we're talking about digital DNA — that places this guy at the crime scene in all five homes and then, moreover, the digital DNA shows that he arrived at home number three, let's just say at 2 a.m. in the morning, and you look on the video and there he is. What more proof do you need?

**Bump:** So here's what I would say: That is not analogous for a couple of reasons. The first being that it's not as though we have access to this DNA. We are told by someone who is trying to make a case — who has lied to us in the past about this exact issue — that they have the evidence that this exists. We are not presented with that actual evidence in the film.

The second thing is — now we get to the geotracking — it's obviously very misleading to call this digital DNA. We're not being told DNA is found in the home. We're being told it was found in the general vicinity of the house, which could have any number of explanations. And this, of course, gets to the core issue about geotracking.

A lot of your defenders are trying to create this straw man, suggesting that I or other critics reject broadly the idea of using geotracking. But there's a big difference between being able to say someone is inside the U.S. Capitol — a very large building in a very isolated location — than it is to say they were sitting at a particular desk in that building.

**D'Souza:** Well, first of all, I don't agree with that. I don't agree with your

CONFIDENTIAL

MA-0001533

January 6 description.

**Bump:** Well, then you're incorrect.

**D'Souza:** Because I'll tell you why. It makes a huge difference whether you are inside or outside the building, right? So, for example, you could have been outside the door yelling, or you could have been five feet inside the door. We're talking about a gap of 10 feet. And the geotracking is being used to pinpoint where the accused was, to claim that he was inside the door of the Capitol as opposed to, let's just say, within a 30-meter radius.

**Bump:** This is exactly my point. You can't differentiate that finely.

**D'Souza:** I don't agree with that.

**Bump:** When you show in your movie the people inside the Capitol, you use apparently real evidence that shows these big circles around them that are the margins of uncertainty around their position, and showed them very clearly in the middle of the building. Because you're right: If they were just inside the door, the geotracking is not refined enough to be able to identify if they were in the building or not, and therefore they don't use that sort of information in order to obtain these indictments. That's exactly the point.

**D'Souza:** I disagree. They may not use them to obtain the indictments, but they are using them in the cases themselves to pinpoint these people. That's number one. So you can just look at the charging documents.

**Bump:** I have.

**D'Souza:** They use geotracking to say this guy was inside of the door as opposed to outside of the door. They do that. Number two, the CDC, as you know, is using geotracking, in a pretty broad way, to try to verify people are

CONFIDENTIAL

MA-0001534

social distancing. So you tell me, if geotracking is not accurate to within six feet, how would you do that?

**Bump:** Geotracking can be accurate to within six feet, but in normal use-case scenarios, it is not. I spoke to an expert. He says the best estimate here is about a 30-feet margin and that's a really, really wide margin, according to —

**D'Souza:** But he's wrong and I'll tell you why. He's not wrong, he's probably working off of an article. But what I'm getting at is, as with GPS and as with geotracking, an article circa 2016 or 2009 is not going to give you an idea of what geotracking can do today.

**Bump:** This guy has written books about it.

**D'Souza:** Okay. So that's your source. That's your source. I have a whole bunch of sources, starting with the New York Times —

**Bump:** No, no, no, no. The New York Times did not make that claim. That's not true.

**D'Souza:** Well, why don't we go with — let me just rely here on Chief Justice [John] Roberts in the Carpenter case, 2018, surveying the literature on geotracking — I think you'll admit he's a fair and competent authority to be able to review what's out in the literature. [He] says that geotracking is about as accurate as putting an ankle bracelet on somebody and following their movements that way.

**Bump:** Sure. I don't disagree with that.

**D'Souza:** Your authority is an academic that no one has heard of. My authority is the chief justice of the United States.

CONFIDENTIAL                                                                MA-0001535

**Bump:** But your authority is not making the argument you claim he's making.

**D'Souza:** No, he is! He's claiming that geotracking is as accurate as an ankle bracelet.

**Bump:** Yes. An ankle bracelet can tell when you're walking down the street or when you're on your property, but it's not going to be able to tell you which room you're in.

But we can set this aside, because even True the Vote doesn't claim they get that accurate. They put these geofencing around these drop box locations — they use a 100-foot radius. And that's according to the documents from the GBI, the Georgia Bureau of Investigation. If you were within 100 feet of a drop-box location —

**D'Souza:** Okay. I have two observations about this.

**Bump:** — you're not necessarily anywhere near a drop box.

**D'Souza:** I have two observations about this. One is I think you will agree that geotracking can clearly tell the difference between someone who is in motion and someone who is stationary. Agree?

**Bump:** Yeah. If you have data over time.

**D'Souza:** Okay. Yeah. In other words, if you have geotracking through time, you can tell. All right. So there's a big difference between walking by a drop box and walking to a drop box. And you can tell that difference, correct. Or do you disagree with that?

**Bump:** Well, I disagree because you don't know when someone is actually going to the drop box.

CONFIDENTIAL

MA-0001536

**D'Souza:** What I'm saying is if you're following — if you're making a blue line of someone going through time, right, if they walk by the drop box, you will have a smooth line of somebody going right by the drop box and continuing onward. If someone goes to the drop box and stops there, right? That's a whole different line. It's a blue line that comes to a stop and then it turns around, and the person obviously goes back to that car or wherever they came from. So there's a difference between going to a point — so, see, if you don't agree with me on this, this is basically geotracking 101.

**Bump:** Let me give you an alternate scenario. You've been to a public library before. When you go to the public library, do you have to take the books inside or no?

**D'Souza:** Yeah, sometimes you can take the books inside and sometimes they have a return place so you can put books.

**Bump:** Exactly. So sometimes are there sometimes at public library forms you can pick up, tax forms on a little table in the lobby, things like that. Have you ever seen that before at a library? Have you ever seen a library which had a book sale outside? There are all sorts of explanations here which have people going to libraries —

**D'Souza:** I just want to draw out the absurdity of what you're saying, because —

**Bump:** We're talking about being within 100 feet. There are all sorts of reasons people could go to a library, including being an employee for the library, including being employees of the county who are going to the drop boxes. There are all sorts of reasons to go to multiple libraries. There are all sorts of reasons to walk up to a library, to drive by a library. And we again are taking your word for it. We don't have specific location data which shows these people doing anything besides coming within 100 feet of a library where there has to be a drop

CONFIDENTIAL

MA-0001537

box.

**D'Souza:** Okay, so pause right there. Because first of all, let's return to — now you're free to disbelieve the data. But what I'm saying is this: We're talking about 10 or more drop boxes now. It's possible that one drop box is near a library, but you have to admit that drop boxes are not only points in front of libraries. Many drop boxes are by the side of the road. Sometimes you have to get off the highway and take a turn. So drop boxes are all over the place.

**Bump:** Have you seen where the Atlanta drop boxes were? [Of the 36 locations in Fulton County, 28 were at libraries.]

**D'Souza:** So the library explanation works in that one isolated context. But if I'm saying — it's kind of like saying, you know, again, if you have a guy and he is within, let's even take your 100 feet measure, which —

**Bump:** Comes from True the Vote.

**D'Souza:** And you have a person, a suspect who is within a 100 feet of 10 dead bodies, but one dead body happened to be near a location where he could have had a plausible reason for going there but there's no plausible reason for being near all the 10 dead bodies, that's the key point.

**Bump:** Well, that's the key point if you assume that there are actually murders that occurred.

**D'Souza:** We are assuming here that — we are assuming here that somebody —

**Bump:** You're working backward.

**D'Souza:** Let's follow a hypothesis and then you can challenge it. Our hypothesis is that there is no —

CONFIDENTIAL

MA-0001538

**Bump:** You are assuming that because this person went to these 10 places, you're going to find dead bodies, even though no dead bodies have turned up. That's why your analogy doesn't work in the first place.

**D'Souza:** We're merely assuming that there is no rational reason for someone, let alone in the middle of the night, to make more than 10 trips to mail-in drop boxes. Let's remember, first of all, we're not talking about the post office. This is not places where you drop off regular mail. The only purpose of going to a mail-in drop box is to drop in a ballot.

**Bump:** But you don't know the people went to the drop boxes.

**D'Souza:** The only explanation I've even heard is that these are people dropping off lawful family members' ballots and you have not been able to provide any explanation for why such a person would, A, go to 10 more —

**Bump:** It's not up to me! It's up to you to prove this even happened. But again, your movie doesn't prove that this even happened even once. You show no one who went to multiple drop boxes.

**D'Souza:** But what I'm saying is I do show it. You're demanding video evidence when you know that there are whole states that took no video. There are other states that that took very partial video. There are other states that took video, but the camera is not even pointed at the drop box. So the absence, my inability to — if this had been done properly according to the election rules and there was video surveillance on all the drop boxes, I am firmly convinced that a mule going to 10 different drop boxes would be seen on the video 10 different times. But if only one of those drop boxes have video, you can't then fault me and say, "Wait, why can't I see more video?" Because the states didn't take it.

**Bump:** I can fault you because you are the one making the proposition. It's not up to me to prove you wrong, but for you to prove your point. And you just

CONFIDENTIAL

admitted you don't have the evidence to prove that point.

**D'Souza:** Well, I'm saying that I have the evidence — when I say "I'm," I'm speaking also, by the way, for True the Vote — we have the electronic evidence, which is decisive in itself, and the video evidence happens to completely correspond with the geotracking evidence.

**Bump:** Although we don't see that in the movie.

**D'Souza:** The video evidence I agree is partial. It doesn't show every mule. In fact, it shows a minority of the mules. But the strength of the video evidence is it is supported by the geotracking evidence. In other words, True the Vote knew where to look on the video.

**Bump:** You don't actually —

**D'Souza:** You have a guy whose phone is at a location on a given date at a given time. You look in the video and boom, there he is.

**Bump:** But you don't actually show that. You at no point in the movie show, "Here is the geotracking data. We saw the bike guy, for example, or the dog guy. We saw them heading to this location. Then boom, there they were at this date and time. And then they went on to this place where there is no camera." You never showed that.

You never actually prove or show any evidence for what you claim is fundamentally happening. The burden is on you to provide the evidence, not on me to rebut it. And that's really one of the challenges that this whole movie has.

**D'Souza:** This is the problem is that there is a difference between what a movie does and what a law court does. What a law court would do is they would say: You know what? This is all very suspicious and what we need to do is raid the

CONFIDENTIAL                                                                                  MA-0001540

stash houses and what we need to do is arrest the mules. Now, happily, we have the cellphone IDs of all the mules, so we can unmask them — which is to say we can get their names, we can go talk to them. Who paid you? How much? How is this organized? Who organized it? That's a logical next step in any other investigation. That's what they would do. They wouldn't go to the filmmaker and say, "Wait a minute. How come you have not, in fact, verified? How come you haven't gone into these stash houses and found out who these mules are?" The answer is, that is the logical next step. So some of the questions you are raising —

**Bump:** That's such a cop-out!

**D'Souza:** Hold on, they can be answered decisively, right? You're asking, "Show me proof that these guys were paid." And I say, "You know what? I would love to see these guys arrested and charged, and let's see what they say and we'll see if you're right or I'm right."

**Bump:** So, Dinesh, you are saying that you are not trying to make an affirmative case that this fraud occurred. You're simply saying: Here's maybe a speculative thing that happened.

**D'Souza:** I'm saying that I'm making a persuasive case.

**Bump:** You're not making a persuasive case.

**D'Souza:** I'm making a case that is completely persuasive to an independent observer who is not clouded, who is not trying to play defense attorney as you are for the Biden administration.

**Bump:** [laughs]

**D'Souza:** You are trying to play defense attorney and find holes in my theory

CONFIDENTIAL

MA-0001541

and I understand it. But you don't recognize that you're doing the same thing you're accusing me of.

**Bump:** No, man, that's not how it works!

**D'Souza:** You are attacking the case one way and I'm saying, "Listen, I'm making a case. You're welcome to try to take it apart, and a court will have to examine this kind of thing in a completely different way." But just as you say my evidence is not in a sense sufficient for a court, you think yours is?

**Bump:** Mine doesn't have to be. I'm not the one who's making a case. If you're using your court analogy, you have to prove guilt and you don't have the evidence to prove guilt.

**D'Souza:** Hold on.

**Bump:** If you walk into a courthouse and say, "Oh, don't worry. My investigators will provide the evidence down the road, so please find my client guilty." That's not how it works!

**D'Souza:** First of all, no movie by itself is the, quote, "case for the prosecution." What the movie does is it's a spur to the prosecution to do its job. So what I'm saying is I'm hoping that [Attorney General Mark] Brnovich in Arizona or Raffensperger's office in Georgia or the guys in Philadelphia will dive into this. If this were 2016, right, and The Washington Post published this exposé on how Trump stole the 2016 election, there would be a massive furor.

**Bump:** If it were based on this evidence, I'd be embarrassed.

**D'Souza:** I mean, literally, people would be demanding this guy be physically yanked out of the White House. I think, you know, what kind of reaction that would ensue. But because it's your guy, you're suddenly going to work to show,

CONFIDENTIAL

MA-0001542

oh, no, they were all, "They weren't chasing Rittenhouse."

**Bump:** Come on, man.

**D'Souza:** They were all running in the same direction.

**Bump:** Dinesh, the challenge here — and I hope you'll forgive me for calling you Dinesh — the point here is you are making an affirmative case, which you have claimed elsewhere is sufficiently persuasive as to be somewhat definitive.

Gregg Phillips called this thing "organized crime." You use words like "stash house" and "ballot trafficking," which imply criminality — which, you admit yourself in this conversation, you don't have the evidence to back up. You then say, "Well, you know, maybe investigators will come up with evidence. And maybe! If the investigators come up and say, here's evidence of rampant ballot harvesting —"

**D'Souza:** Wait, hold on. The investigators will come up with the evidence of a legal offense. I'm not saying investigators are needed to show that there was corruption on an organized scale in the 2020 election. That's obvious to anyone who watches the movie. You don't have to be, quote, an "investigator" or the D.A.

**Bump:** You just said it's obvious to anyone who watches the movie because you present an incomplete case. What I'm saying is you don't have the evidence to bolster your claims.

**D'Souza:** I think I do. And I think the way to look at it — and again, this is the case of any narrative, right? When someone puts out a narrative, the narrative has got to be seen in its totality and in its totality, what does it show? What's going on? And then you have to look at alternative explanations. So for example, let's consider the possibility that these are legal votes that have been delivered.

CONFIDENTIAL

MA-0001543

**Bump:** Well, they are legal votes, and we can talk about that.

**D'Souza:** Yeah, that's a separate issue. But let's zoom in to that for a moment. Okay? Let's explore the idea that there are legal votes that are being maybe delivered in the illegal way but that doesn't make them illegal votes.

Now, first of all, I say to myself — and, again, I'm thinking about this just as an intelligent individual surveying the situation — you've got all these nonprofits deeply embedded in the inner city, these activist organizations. We're talking now about standards of proof. The way I look at these things is: I always look at which explanation makes more sense. So let's just take, for example, I'll come back to the legal votes, but let's take, for example, the gloves.

First of all, there are fact-checking sites that say that people are wearing gloves because it's really cold. I think you realize that that's dumb. We're looking at latex gloves, not woolen gloves. Agree?

**Bump:** Sure. Yeah.

**D'Souza:** Okay. Then the second explanation is that these gloves are an artifact of covid. People are wearing gloves because they are concerned about perhaps touching the drop box and that's why they're wearing gloves so as not to contaminate their hands. Okay, that's a possibility.

Now, first of all, it is a little odd when people immediately dispose of the gloves because most people don't do that. If you wear gloves, you go back to your car with the gloves on, right? Because after all, if you take the gloves and toss them out, you're going to be touching the car door. You could be touching all kinds of stuff, so if you're really paranoid about covid, the question becomes, is that a normal way to behave?

CONFIDENTIAL

MA-0001544

But here is the key point, which is raised by Gregg Phillips and is open to refutation: His argument is the gloves weren't present in the 2020 election and only emerge in the runoffs in Georgia.

**Bump:** Okay.

**D'Souza:** And his reason was —

**Bump:** I understand his reason — he claims there was this case that involved fingerprinting. [In the film, Phillips claims that the gloves were introduced following an investigation in Arizona.]

**D'Souza:** Yeah, exactly.

**Bump:** Which I found no evidence for, by the way. I looked and I saw that later in the —

**D'Souza:** You didn't see the evidence of any indictment in Arizona?

**Bump:** No, I did see the evidence of the indictment in Arizona, in Yuma City.

**D'Souza:** Did you see that in that indictment? Did you see that in that indictment there was an issue of fingerprint evidence on the part of the FBI?

**Bump:** I saw that the FBI — I saw an online thing, I was not able to validate this — apparently was trying to use fingerprint evidence to track down other ballots. But I don't know that that was publicly known in January of 2021.

**D'Souza:** Well, it doesn't have to be publicly known to be known by the organizers of ballot trafficking.

**Bump:** But this goes back to my other point.

CONFIDENTIAL

MA-0001545

First of all, I take issue with your assertion that someone would leave their gloves on. The whole point is that if you touch something that's contaminated, you then get rid of the glove so you don't contaminate your own car door or touch your face or something along those lines. I think it makes perfect sense to remove latex gloves if you're actually worried about coronavirus.

But second of all, you are again basing this on the assumption that this person is a quote unquote "mule," which you provide no evidence for. You provide no geotracking evidence. You again only see her put one ballot in the drop box. And I just don't understand why we should take your word for it and Gregg Phillips's word for it. You don't show any evidence of it. And you don't show anyone else wearing gloves.

**D'Souza:** Okay, so you keep coming back to the fact that, quote, that "I'm not showing the geotracking evidence" in the movie. What do you think that this geotracking evidence would look like, and how did you how do you expect me to show it in the movie?

**Bump:** Sure. Very easily. You show at one point a big map of someone's purported activity, which you say is then a "smoothed-out pattern of life," which means that it doesn't actually necessarily represent every stop the person made. You could very easily say, "So we have this person at this point in time here — you could superimpose on a Google map. You could do all sorts of cool aesthetic tricks with it —"

**D'Souza:** But hold on. If I did that, it would be open to the exact same objection you just made. You would say the following, then to me, "Dinesh, you put up a sea of numbers on the screen, and then you produced a map and you pinpointed the guy and you showed the guy over there. How do I know that your numbers correspond to that exact location on the map?"

CONFIDENTIAL

MA-0001546

**Bump:** I'm not — I don't really know what the argument there is.

**D'Souza:** The argument there is that whenever you're dealing with any kind of expert testimony, you can always push the investigation one step further. For example, a ballistic expert says the gun traveled, the bullet traveled at this velocity. You can say, "I don't believe it. You didn't show me proof that it traveled at this velocity." So then he goes, "Okay, look, this is my chart. And this chart shows the bullet traveling at this trajectory." And then you say, "How do I know your chart is accurate?" And then he goes, "Me and my friend who are experts in this, we compiled a chart," and then you say, "What are your friend's credentials?"

So I guess what I'm saying is that when you're applying the kind of extreme, "I don't believe anything that you tell me. I don't believe there's geotracking. I don't believe it's that accurate. I don't believe Gregg Phillips knows how to do it."

**Bump:** I didn't say any of those things! All I said is if you are making an affirmative assertion about someone having gone to multiple drop boxes and you provide zero evidence of it — besides one video of one lady, and then the word of Gregg Phillips who is known to have said dishonest things about the 2016 election — I don't know what to tell you, man.

**D'Souza:** Well, let me frame it differently. If I were able to convince you to your complete satisfaction that there were 2,000 people who were in the close vicinity of 10 or more drop boxes and five or more left-wing nonprofit organizations, would you agree that on that basis alone, there was something highly suspicious going on, yes or no?

**Bump:** I don't know that I would say it was highly suspicious, but I would certainly be curious and I would seek out people who were actually participating in this alleged scheme and try and figure out what's going on. Clearly, if you have

CONFIDENTIAL

MA-0001547

their cellphone data, you know where they live, you could have knocked on the doors. There are ways to do this to figure out the answer to these questions, which you show absolutely no evidence in the film of even trying to answer.

I mean, for example, you had this case of the guy dropping off multiple ballots at the drop box in the middle of the night. Georgia reached out to him, found out he's just dropping off ballots for his family members, which he's allowed to do, right? You did none of that investigating.

**D'Souza:** Okay. So now just notice the credulity that you extend! "Georgia reached out to him and to their complete satisfaction ... !" See, that's not my view. My view is that Georgia is in an awkward position. Georgia is in a position where they are holding to two contradictory positions: their original position, essentially echoing The Washington Post, safe and secure election, most secure election in history, right? That was the Raffensperger position. That's not his position now. His position now is: We got to investigate ballot trafficking. But this is very awkward for him. And so you've got to look at their actions and statements in the context of the fact that any investigation exposes the deficiencies of the sheriff conducting that investigation. And that's going to give that investigation a bit of an ambiguous character.

I mean, Gregg Phillips said that when he turned over data to the GBI, the GBI used the data to unmask his analysts instead of unmasking the mules. Right away, that suggests that there is institutional resistance to the data while not contesting the data. I've never seen anybody in the GBI or anyone say that this data is invalid. In fact, there's no reason to open an investigation if it's invalid; it's obviously valid.

**Bump:** So this is the point, though. You are suggesting that there's a bigger burden of proof on the GBI, not just Brad Raffensperger, but on state law enforcement in the state of Georgia, that we should assume that they are being

CONFIDENTIAL

MA-0001548

<mark>dishonest in their presentation and not the Gregg Phillipses. And I'm just going to leave that there and let readers make their own decisions.</mark>

**D'Souza:** No, no. Put it this way. I'm not saying we should assume. I'm simply saying that, just as Gregg Phillips, who works for a conservative organization, True the Vote — you can say, "Wait a minute. They're a conservative organization." And I'm saying by the same token, you've got to realize that, by and large, bureaucratic establishments protect their own institutional authority. They don't like to look like idiots. And so when something comes up that's going to make them look bad, I'm saying institutional forces tried, by and large, to make that something go away. And as a reporter, I think you wouldn't be naive enough to not see that that's the case.

**Bump:** I think that the idea that the Georgia Bureau of Investigation is giving a pass to a guy who submitted six false absentee ballots, when obviously it would help Governor [Brian] Kemp and Raffensperger to be able to say, "Hey, you know what? We worked with True the Vote, these are good folks, vote for us in the primary in the upcoming weeks." Obviously, they have also a political motivation to actually agree with you here. But they didn't, and I think that's worth noting.

[I edited out a question I posed to D'Souza about a panel of conservative pundits included in the movie, all of whom worked for Salem Media Group, one of the film's funders. He explained that Salem had suggested it would be good to include their hosts, and D'Souza explained how he worked them in.]

So True the Vote, also executive producers, did they have any editorial control of the film?

**D'Souza:** Zero.

**Bump:** Okay. Did it concern you at all that they had recently been sued by a

CONFIDENTIAL                                                                 MA-0001549

large donor for not having generated any evidence for election fraud? Granted, that lawsuit was dismissed, but were you at all concerned?

**D'Souza:** I looked into that. I mean, I did — I did my own homework on that. And I looked as to, what was the essence of the disagreement? What was the fight about?

As it turns out, this was not a fight about geotracking or any of that. In fact, they hadn't begun their geotracking work at that point. Apparently, Eshelman wanted them to file certain lawsuits early on in the process. He claims they didn't. They claimed that they have reasons for why that didn't occur. So I saw it as a side dispute. Eshelman wasn't saying that data was invalid. In fact, he didn't know about it. I don't even know if he knows about it to this day, so it's not relevant to the movie. But I did check it out.

[I edited out a question about when True the Vote began doing their research, which D'Souza wasn't able to definitively answer, though he said it was prior to July 2021.]

**Bump:** The last point I want to discuss: Your movie tries to make the case that the election results themselves hinge on this. And so, you know, True the Vote, Raffensperger, others have said — if we assume that everything that what you're saying is true, that there were these people, they did do these pickups and drop-offs, and that they were being harvested in a way that violated the law in some states — those are still legal ballots.

So the crux of your argument, and I think the thing that's really compelling to a lot of supporters of Donald Trump is that, "Oh, the election would have gone the other way had this not occurred." But is it not the case that you don't know that those ballots wouldn't just simply been submitted by people anyway and therefore counted, and therefore Biden would still win those states?

CONFIDENTIAL

MA-0001550

**D'Souza:** Well, first of all, you're making a giant assumption here that I think is false.

Let's assume, and we can look at that in a minute, these are all legal votes. So we're talking about, you know, 400,000 legal votes that somehow came into the possession of these nonprofits. The nonprofits, by the way, are forbidden by IRS regulations from engaging in any partisan electioneering for any candidate or any party. But nevertheless, somehow a bunch of legal voters decided, "You know what? I don't really want to deposit my own ballot or even give it to a family member. I'm going to go give it to this left-wing organization, so they can hire mules to deliver these ballots." Okay, that's your assumption. And what I'm saying is, "Okay, let's say that's true." The question is this: Once you have paid ballot trafficking enter the process, does a legal vote nevertheless remain a legal vote? My answer to that question, by the way, is no. And the reason is that the process has been corrupted with the inclusion of money.

Let's take, for example, California, which has the most liberal vote harvesting law in the country, where I'm allowed to go to my neighbor and say, "Listen, here's my ballot. You drop it off." That's allowed, that's legal. But if I go to my neighbor and I say, "Listen, I'll give you $50 if you drop my ballot off." That's not legal. And not only is that not legal, it contaminates my vote. And even though I'm a legal voter and I filled out the form properly, the fact that I have, in a sense, bribed somebody to drop that ballot off makes that an illegal vote that must not be counted.

So I think it's a completely fallacious assumption that when there's paid ballot trafficking involved, that somehow these legal votes remain legal, even though it paid mule operation is executed to deliver these ballots.

**Bump:** So, you know, I understand that that is your position. However, it is not the position of, for example, Brad Raffensperger in Georgia, who has said —

CONFIDENTIAL

**D'Souza:** I think it is his position. I just think that he's relying on what he doesn't know. He's basically saying he's saying —

**Bump:** He said these are still lawful ballots that have been handled fraudulently. So he says explicitly, in an interview, that they were lawful ballots still and therefore should still be counted.

**D'Souza:** He doesn't know that. There's no way for him to know that.

**Bump:** He's literally the secretary of state of Georgia, I'm going to give him some credence on law in Georgia.

**D'Souza:** Honestly, Mr. Bump, let's apply a little common sense here, right? A guy walks in, goes up to a ballot box. A guy stops at an organization, he gets a backpack full of ballots. He then goes to some drop boxes and he puts a few here, one there, eight here, 10 there. Okay. And you're telling me that Brad Raffensperger, sitting in his office and twiddling their thumbs, knows that those are all legal ballots?

**Bump:** No, I'm saying that there's no evidence that any of that occurred.

**D'Souza:** So stop right there. Stop right there.

**Bump:** What I'm saying, though, is that Brad Raffensperger asserts that if someone collected a bunch of votes that were legally cast, they're still legal votes.

**D'Souza:** Okay, hold on. We have to put this into really slow motion because, as you know, these laws are complex. They vary from state to state. So now you introduce some qualifiers. You're saying that Brad Raffensperger is saying that if they were legal votes and they were merely collected for drop-off, right?

But see, even then, you have the issue of money. Money is critical here because

CONFIDENTIAL

this money is the difference between harvesting and trafficking. Brad Raffensperger, at this point before the investigation, does not know, does not know if and how much money changed hands. And that's critical because I would say that paid ballot trafficking is illegal in every state.

**Bump:** Let me give you a quote. The quote is, "I want to make very clear that we're not suggesting the ballots that were cast were illegal ballots." That's Catherine Engelbrecht in Wisconsin saying that True the Vote is not suggesting that the ballots that are cast are illegal ballots. There's zero evidence. You don't even try to make the case.

**D'Souza:** In the movie, we say what we know and we don't know, okay?

So here's the point. As you know, we're not able to go scrutinize the ballots. And we admit freely in the movie that it's not possible to reverse-engineer the process. It's not possible to look at the ballots. All we know is these ballots were obtained or curated at these activist centers.

Now, how they did that is the subject of the necessary next step in this investigation. In other words, do they copy the ballots on a high-quality printer? Did they get them from homeless people? Did they get them from nursing homes? Did they get them from dorms? Did they get them from housing projects? Did they go door to door in housing projects and ask people to request absentee ballots that were then mailed to the activist center? I mean, these are all, and I'd say, not just possibilities, because voter fraud cases, by and large hinge on these kinds of things. What I'm saying is this all can easily be found out.

**Bump:** You have no evidence that any of those things happened in any of these states, is that correct?

**D'Souza:** Right. I'm simply saying that there are 10 different places that they

CONFIDENTIAL                                                                          MA-0001553

could have gotten these fraudulent ballots and there's no way that I can see for all these legal ballots to end up with these organizations. There's simply no way to do it.

**Bump:** That's the point!

**D'Souza:** And frankly, if these are that these organizations had a nationwide campaign of collecting other people's ballots, I'd like them to come out and admit it.

**Bump:** Well, sure. Because it didn't happen!

**D'Souza:** "Yeah, what we do is we go in housing projects and collect people's ballots and then pay mules to deliver it." I mean —

**Bump:** Let's talk about McCrae Dowless, right? McCrae Dowless in North Carolina who got busted collecting ballots and submitting on behalf of people. And the way he got busted is because — and I covered it at the time — he submitted a disproportionate number of absentee ballots in favor of a particular candidate in a congressional race in North Carolina where it stood out and people noticed, "Hey, this is weird in this county." Then, very quickly, people came forward, said, "Yes, I did this for him." They talked to local TV and so on, so forth. McCrae Dowless is cited twice in the movie as an example of how election fraud can take place, both in the beginning and by Hans von Spakovsky as an example of how this fraud can take place.

And he's a really good example of the point you were just making, that, yes, you would love to see these people come forward to say this happened, but there's been nothing that has come forward to suggest this happened. And you're suggesting thousands of people just involved in the trafficking, so to speak, alone in these states — nothing has come forward besides one whistleblower you don't talk to in the film and then this other lady who makes a series of very broad

CONFIDENTIAL

claims in Arizona that we have no other context for.

**D'Souza:** Okay, so let's go slow, because the sheriff in Yuma has just opened up an investigation based upon the exact evidence provided by True the Vote and unfurled in the movie. And this was announced, like, two days ago, okay? So clearly, they're taking it seriously.

In the McCrae Dowless case, it wasn't the case that people spontaneously came forward, because you've reported on it. I've read three books. I've read a whole bunch of news articles on it. The truth of it is the suspicions were raised. The election commission got involved. This was obviously not an election overturned by a court but overturned by an election board. They held hearings. That's what caused people to come forward.

**Bump:** That's not true.

**D'Souza:** So what I'm saying is you're jumping the process in this case. I mean, we've released a movie that we hope will be the impetus for exactly the same kinds of things. And quite frankly, if all of this were really innocent and there's no problem in paying people to deliver ballots, there'd be no reason to overturn the North Carolina election.

**Bump:** I'm very confident those people came forward before the hearings started from the North Carolina Board of Elections.

**D'Souza:** Well, they might have, but let's remember that what happened was that — I forget the name of the guy right now, the guy who was running as the Democrat — I mean, there was a major public furor that resulted in news articles, people starting to interview people, people trying to identify who might be involved in this. Obviously, this was something disruptive to his own family, as you know, that Mark Harris's own son testified in the eventual hearings.

CONFIDENTIAL                                                                                                MA-0001555

So what I'm getting at is that — usually when there is some kind of a criminal operation, it doesn't get busted until people start talking. And the reason people start talking is they experience fear. And the reason they experience fear is they're facing more risk on that side than in not talking. So I don't think that all these all these guys who are paid by Dowless just suddenly had a pang of conscience and all came forward. No, they came forward when they realized: "My face is going to be in the paper. People are going to start asking me questions. You know what? I better 'fess up."

**Bump:** No. If you go back and look at the interviews, they stepped forward because they didn't know what they were doing was wrong. If you have someone who's working for a nonprofit organization, a 501(c)(3) that's focused on increasing voter turnout and doing ballot collection because they want to make sure people are voting, which is a fairly common tactic in places where this is legal — and was the case in Wisconsin in 2020 that there were people that encouraged people to go out and vote — when you have that happening, if people find out, oh, this particular thing was illegal. If it was illegal in their state, then all of a sudden they're like, "Oh, I didn't know."

But again, there's no evidence this happened. I have just one more question.

**D'Souza:** Oh, yeah, go for it.

**Bump:** It's an important one. So, again, the argument that this is all illegal and could overturn the election, which, again, I think is a selling point for a lot of Trump fans, is based on the numbers that you flashed up on the screen. Where does the estimate of five absentee ballots per quote-unquote "mule" come from? Because there's literally no way to know that.

**D'Souza:** There actually is a way to know that, but it does require a pretty sophisticated ability to look more closely at video that is shown very broadly in

CONFIDENTIAL

the screen. So I agree, if someone is watching the movie, they're not able to tell — if somebody is holding a sheaf of ballots, let's say — is that two or five or 10? That is not visible in a video box on a screen. You can see, I mean, obviously, you can tell if there are more than one ballot and they fall on the ground. You can obviously tell there are many ballots, as we showed with video, where people are putting in ballot ballot, ballot, ballot, ballot. Then, you know, obviously there's multiple ballots.

**Bump:** On two or three occasions, right.

**D'Souza:** I mean, no, we have cases of people who put a minimum of 10 ballots, shown on the screen. Now, in some cases, I agree: You cannot tell if it is if it is one or many ballots. But investigators can tell. That's the key point.

**Bump:** So what's the average based on?

**D'Souza:** They're able to zoom in and tell.

**Bump:** So the national average that you use, the five ballots per, is based on a review of some ballot boxes that were monitored in some states.

**D'Souza:** Right. They're based upon taking an average of what — they based upon the observed videos and using those videos to develop a sophisticated estimate. And then you notice that when we did the broader look, we dropped the average to three, to make it an ultraconservative estimate. So we used the estimate of five, and then we lowered the estimate to three.

**Bump:** Right. Well, I don't think that's the point in your favor, because it makes —

**D'Souza:** It is a point of favor because —

CONFIDENTIAL                                                                                    MA-0001557

**Bump:** It makes clear that you don't know how many ballots were theoretically dropped by each of these mules in each of these stops. I mean, obviously, there's a big difference between saying — you dropped to three, but then you also vastly increased the number of mules, so therefore increased the number of votes. So you can say it's a more conservative estimate —

**D'Souza:** So our mode of argument is like this, okay? Even when we estimated the number of ballots that were dropped off by the 2000 mules, first of all, we started with an assumption that there were only 2,000 mules, right? Not 2,010. Not 2,050. But in fact, if you add the numbers up, it's more than 2,000. We just took a conservative estimate. The mules went to 10 or more drop boxes.

Okay, then we have to develop some sort of an estimate, as accurate as we can, of the average number of ballots.

**Bump:** Why? Why did you have to develop that?

**D'Souza:** The point is this: Let's just say we're slightly off. Let's just say the average isn't five but four —

**Bump:** No, this is important. Why do you have to develop an average number of ballots that they dropped off?

**D'Souza:** Because you have to try to estimate the amount of illegality going on.

**Bump:** Because the point is you want to prove the election was overturned.

**D'Souza:** No, because what I'm saying is — let's just say, for example, someone's talking about counterfeiting money, right? The question then becomes: Did somebody counterfeit a $100 bill, or is counterfeiting going on a large scale? And what is the impact of this counterfeiting on the larger economy?

CONFIDENTIAL

MA-0001558

Discussing the gaps in '2000 Mules' with Dinesh D'Souza - The Washington Post

**Bump:** Exactly.

**D'Souza:** In other words, is it a matter of $100, $1,000, $1,000,000, $10 million? It's obviously relevant to know.

**Bump:** Okay. All right. I think we can leave it there. I appreciate your time.

CONFIDENTIAL

MA-0001559

View more

Loading...

CONFIDENTIAL

MA-0001560

CONFIDENTIAL

MA-0001561