## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **MARK ANDREWS,**<br><br>        Plaintiff,<br><br>    v.<br><br>**DINESH D'SOUZA, *et al.*,**<br><br>    Defendants. | Case No. 1:22-cv-04259-SDG |

## PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS'
## <u>MOTIONS FOR SUMMARY JUDGMENT</u>

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................................v

PRELIMINARY STATEMENT ...........................................................................1

ARGUMENT .......................................................................................................2

1. Defendants Are Not Entitled To Summary Judgment On Count III For
   Defamation/Defamation Per Se. ................................................................2

   (a)   Defendants Do Not Dispute that the Statements in the Film,
         Book, and Promotional Materials Regarding Mr. Andrews are
         False............................................................................................3

   (b)   Statements in the Film, Book, and Promotional Materials
         Regarding Plaintiff are Defamatory Per Se and Defamatory...............4

   (c)   Defendants' Statements are Of and Concerning Plaintiff...................5

   (d)   Negligence is the Appropriate Standard of Fault...............................12

         (i)    At a bare minimum, Defendants acted negligently. .................12

         (ii)   The actual malice standard is inapplicable to this case. ..........14

                (1)   The defamatory statements are not "privileged
                      statements."....................................................................14

                (2)   Plaintiff is not a "limited purpose public figure." ..........18

         (iii)   Even if actual malice were the appropriate standard, a
                 reasonable juror could find that Defendants' conduct
                 meets this threshold....................................................................21

   (e)   Defendants Published the Statements .................................................25

2. Defendants Are Not Entitled to Summary Judgment on Count I,
   Conspiracy In Violation of 42 U.S.C. § 1985(3)...........................................30

   (a)   A Reasonable Juror Could Find that Defendants Knowingly
         Agreed and Engaged in a Conspiracy. .................................................31

(b)    A Reasonable Juror Could Find That One Purpose of Defendants' Conspiracy Was To Intimidate Voters. ..........................36

(c)    Alternatively, or in Addition, A Reasonable Juror Could Find That One Purpose of Defendants' Conspiracy Was To Injure Voters. ....................................................................................43

(d)    Defendants' Arguments Rest On Material Disputes Of Facts. ..........43

    (i)    Defendants Cannot Escape Liability for an Unlawful Purpose by Having Additional Lawful Purposes for their Conduct. ......................................................................44

    (ii)    D'Souza Defendants' Arguments Rely On Disputed Material Facts. ............................................................45

    (iii)    TTV Defendants Rely on Disputed Material Facts. ................48

3.    Defendants are Not Entitled to Summary Judgment on Count IV, False Light. ..................................................................................50

    (a)    Defendants' False Statements Do Not Fall Under the "Newsworthiness Exception."..............................................51

    (b)    Overwhelming Evidence Contradicts TTV's Argument that They Did Not Depict Plaintiff As Something or Someone He Is Not. ..............................................................................52

4.    Defendants are Not Entitled to Summary Judgment on Count V, Misappropriation.........................................................................53

    (a)    Plaintiff's Likeness was Recognizable..............................................54

    (b)    The Newsworthy Exception Does Not Apply to Defendants' False Statements. ..................................................................56

5.    Defendants' are Not Entitled to Summary Judgment on Count VI, Civil Conspiracy. ........................................................................57

    (a)    A Reasonable Juror Could Infer That Defendants Conspired to Make the Defamatory Statements. ....................................................57

    (b)    Defendant' Legal Arguments Are Incorrect. ....................................59

6.     TTV Defendants are Not Entitled to Summary Judgment on Count VII
        for Punitive Damages. .....................................................................64

CONCLUSION .......................................................................................68

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Alonso v. Parfet*,
  325 S.E.2d 152 (1985) ....................................................................................55

*American Broadcasting-Paramount Theatres, Inc. v. Simpson*,
  126 S.E.2d 873 (Ga. Ct. App. 1962) ............................................................6, 8

*American Civil Liberties Union, Inc. v. Zeh*,
  312 Ga. 647 (2021) ........................................................................................12

*Arizona Alliance for Retired Americans. v. Clean Elections USA*,
  No. CV-22-01823-PHX-MTL, 2022 WL 17088041 (D. Ariz. Nov. 1,
  2022) ..........................................................................................................39, 41

*Arizona Alliance for Retired Americans. v. Clean Elections USA*,
  638 F. Supp. 3d 1033 (D. Ariz. 2022) ...........................................................37

*Arizona Democratic Party v. Arizona Republican Party*,
  No. CV-16-03752-PHX-JJT, 2016 WL 8669978 (D. Ariz. Nov. 4,
  2016) ...............................................................................................................37

*Aroonsakul v. Shannon*,
  664 N.E.2d 1094 (Ill. App. Ct. 1996) ..............................................................8

*Atlanta Journal Co. v. Doyal*,
  60 S.E.2d 802 (Ga. Ct. App. 1950) .................................................................27

*Atlanta Journal Co. v. Pearce*,
  89 S.E. 759 (Ga. 1916) ......................................................................................8

*Bell v. Johnson Publishing Co.*,
  2018 WL 357888 (M.D. Ga. Jan. 10, 2018) .....................................................6

*Branson v. Fawcett Publications, Inc.*,
  124 F. Supp. 429 (E.D. Ill. 1954) ..............................................................54, 55

*Brauer v. Globe Newspaper Co.*,
  217 N.E.2d 736 (Mass. 1966) ..........................................................................55

*Buckley v. Littell,*
    539 F.2d 882 (2d Cir. 1976) ............................................................26

*Bullard v. MRA Holding, LLC,*
    740 S.E.2d 622 (Ga. 2013) ........................................................53, 55

*Chaney v. Harrison & Lynam, LLC,*
    708 S.E.2d 672 (Ga. Ct. App. 2011) .........................................16, 17

*Choice Hotels International, Inc. v. Ocmulgee Fields, Inc.,*
    474 S.E.2d 56 (Ga. Ct. App. 1996) ................................................16

*Cabaniss v. Hipsley,*
    151 S.E.2d 496 (Ga. Ct. App. 1966) ..............................................53

*Capital Inventory, Inc. v. Green,*
    No. 1:20-CV-3224-SEG, 2024 WL 1383228 (N.D. Ga. Feb. 29, 2024) .......66

*United States v. Tomey,*
    783 F. App'x 832 (11th Cir. 2019) ................................................46

*Chung v. JPMorgan Chase Bank, N.A.,*
    975 F. Supp. 2d 1333 (N.D. Ga. 2013) ..........................................68

*Collins v. Creative Loafing Savannah, Inc.,*
    592 S.E.2d 170 (Ga. Ct. App. 2003) ..............................................54

*Continental Technical Services, Inc. v. Rockwell International Corp.,*
    927 F.2d 1198 (11th Cir. 1991) ..........................................31, 36, 43

*Cook v. Robinson,*
    116 S.E.2d 742 (Ga. Ct. App. 1960) ..............................................61

*Coomer v. Donald J. Trump for President, Inc.,*
    552 P.3d 562 (Colo. App. 2024) ....................................................61

*Cottrell v. Smith,*
    788 S.E.2d 772 (Ga. 2016) ............................................................21

*Cox Enterprises, Inc. v. Bakin,*
    426 S.E.2d 651 (Ga. Ct. App. 1992) ..............................................11

*Craig v. Holsey*,
  590 S.E.2d 742 (Ga. Ct. App. 2003)................................................................65

*Davis v. Macon Telegraph Publishing Co.*,
  92 S.E.2d 619 (Ga. Ct. App. 1956)................................................................10

*DeLong Equipment Co. v. Washington Mills Abrasive Co.*,
  887 F.2d 1499 (11th Cir. 1989)......................................................................36

*Dowd v. Calabrese*,
  589 F. Supp. 1206 (D.D.C. 1984)..................................................................60

*Drummond v. McKinley*,
  15 S.E.2d 535 (Ga. Ct. App. 1941)................................................................58

*Eakin v. Rosen*,
  No. 7:15-CV-224 (HL), 2017 WL 5709564 (M.D. Ga. Nov. 27, 2017)..........8

*Echols v. Lawton*,
  913 F.3d 1313 (11th Cir. 2019).......................................................................2

*Evans v. Federal Bureau of Prisons*,
  951 F.3d 578 (D.C. Cir. 2020) ......................................................................53

*Evans v. Sandersville Georgian, Inc.*,
  675 S.E.2d 574 (Ga. Ct. App. 2009)..............................................................21

*Five for Entertainment S.A. v. Rodriguez*,
  No. 11-cv-24142, 2013 WL 4433420 (S.D. Fla. Aug. 15, 2013) ..................15

*Ganske v. Mensch*,
  480 F. Supp. 3d 542 (S.D.N.Y. 2020) .............................................................5

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)..............................................................................12, 19

*Gettner v. Fitzgerald*,
  677 S.E.2d 149 (Ga. Ct. App. 2009).......................................................12, 18

*Hardy v. Williamson*,
  12 S.E. 874 (Ga. 1891) ...................................................................................6

*Harris v. Pierce County*,
No. CV 513-82, 2014 WL 3974668 (S.D. Ga. Aug. 14, 2014) ......................8

*Howe v. Bradstreet Co.*,
69 S.E. 1082 (Ga. 1911) ................................................................27

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979)......................................................................19

*Jordan v. Hancock*,
86 S.E.2d 11 (Ga. Ct. App. 1955)....................................................62

*Kennedy v. Meta Platforms, Inc.*,
No. 3:24-cv-02869-WHO, 2024 WL 4031486 (N.D. Cal. Sept. 3,
2024) ..........................................................................................37

*Krass v. Obstacle Racing Media, LLC*,
667 F. Supp. 3d 1177 (N.D. Ga. 2023) .............................................51

*Ladner v. New World Communications of Atlanta, Inc.*
806 S.E.2d 905 (Ga. Ct. App. 2017)................................................20

*Lavassani v. City of Canton*,
760 F. Supp. 2d 1346 (N.D. Ga. 2010) .............................................44

*League of United Latin American Citizens–Richmond Region Council 4614
v. Public Interest Legal Foundation (LULAC)*,
No. 1:18-cv-00423, 2018 WL 3848404
(E.D. Va. Aug. 13, 2018) ....................................................38, 39, 41

*Libertad v. Welch*,
53 F.3d 428 (1st Cir. 1995) ............................................................44

*Mac Isaac v. Twitter, Inc.*,
557 F. Supp. 3d 1251 (S.D. Fla. 2021) .............................................11

*Maples v. National Enquirer*,
763 F. Supp. 1137 (N.D. Ga. 1990) .................................................51

*Metro Atlanta Task Force for the Homeless, Inc. v. Ichthus Community Trust*,
780 S.E.2d 311 (Ga. Ct. App. 2015)............................57, 58, 60, 63

*Miller v. Lomax*,
    596 S.E.2d 232 (Ga. Ct. App. 2004)............................................................58

*National Coalition on Black Civic Participation v. Wohl (Wohl II)*,
    661 F. Supp. 3d 78 (S.D.N.Y. 2023) ......................................................*passim*

*National Coalition on Black Civil Participation v. Wohl (Wohl I)*,
    498 F. Supp. 3d 457 (S.D.N.Y. 2020) ........................................................30

*North Atlanta Golf Operations, LLC v. Ward*,
    860 S.E.2d 814 (Ga. Ct. App. 2022)............................................................17

*Promoworks, L.L.C. v. Graham*,
    No. 1:09-CV-2030-TCB, 2009 WL 10670413 (N.D. Ga. Dec. 9, 2009) ......23

*Reid v. City of Atlanta*,
    No. 1:08–cv–01846–JOF, 2010 WL 1138456 (N.D. Ga. Mar. 22,
    2010) ......................................................................................................33, 45

*Reid v. Viacom International Inc.*,
    No. 1:14-CV-1252-MHC, 2016 WL 11746046 (N.D. Ga. Sept. 14,
    2016) ..............................................................................................................26

*Roberts v. Lane*,
    435 S.E.2d 227 (Ga. Ct. App. 1993)............................................................62

*Southern Business Machines, etc. v. Norwest, etc.*,
    194 Ga. App. 253, 258-260(3), (4), 390 S.E.2d 402 (1990)........................17

*Southern Co. v. Hamburg*,
    470 S.E.2d 467 (Ga. Ct. App. 1996)........................................................8, 24

*Satanic Temple, Inc. v. Newsweek Magazine LLC*,
    661 F. Supp. 3d 159 (S.D.N.Y. 2023) ..........................................................20

*Schafer v. Time, Inc.*,
    142 F.3d 1361 (11th Cir. 1998).....................................................................65

*Scheetz v. Morning Call, Inc.*,
    747 F. Supp. 1515 (E.D. Pa. 1990), *aff'd*, 946 F.2d 202 (3d Cir. 1991) .......60

*Sewell v. Trib Publications, Inc.*,
    622 S.E.2d 919 (Ga. Ct. App. 2005)............................................................19

*Sheftall v. Central of Georgia Railway Co.*,
    51 S.E. 646 (Ga. 1905) ................................................................... 15

*Smith v. DiFrancesco*,
    802 S.E.2d 69 (Ga. Ct. App. 2017) ................................................ 15

*Smith v. Stewart*,
    660 S.E.2d 822 (Ga. Ct. App. 2008) ........................................... 6, 10

*Stoploss Specialists, LLC v. Vericlaim, Inc.*,
    340 F. Supp. 3d 1334 (N.D. Ga. 2018) ............................................ 2

*Straw v. Chase Revel, Inc.*,
    813 F.2d 356 (11th Cir. 1987) ........................................................ 65

*Tanisha Systems, Inc. v. Chandra*,
    No. 1:15-CV-2644-AT, 2015 WL 10550967
    (N.D. Ga. Dec. 4, 2015) ................................................... 27, 29, 59

*Triangle Publications, Inc. v. Chumley*,
    317 S.E.2d 524 (Ga. 1984) ............................................................ 13

*Trump v. Cable News Network, Inc.*,
    684 F. Supp. 3d 1269 (S.D. Fla. 2023) ............................................ 5

*Turnage v. Kasper*,
    704 S.E.2d 842 (Ga. Ct. App. 2010) ................................... 61, 62, 63

*Tyler v. Thompson*,
    707 S.E.2d 137 (Ga. Ct. App. 2011) ........................................ 27, 58

*United States v. Adkinson*,
    158 F.3d 1147 (11th Cir. 1998) ...................................................... 44

*United States v. Arias-Izquierdo*,
    449 F.3d 1168 (11th Cir. 2006) ...................................................... 35

*United States v. Calderon*,
    127 F.3d 1314 (11th Cir. 1997) ...................................................... 47

*United States v. Guerra*,
    293 F.3d 1279 (11th Cir. 2002) ................................................. 33, 48

*United States v. Myers*,
  972 F.2d 1566 (11th Cir. 1992) ............................................................... 40, 43

*United States v. Reeves*,
  742 F.3d 487 (11th Cir. 2014) ........................................................................ 33

*United States v. Envistacom, LLC*,
  No. 1:22-cr-00197-VMC-RGV, 2022 WL 19001962 (N.D. Ga. Nov.
  14, 2022) ......................................................................................................... 33

*United States v. Schwartz*,
  541 F.3d 1331 (11th Cir. 2008) ................................................................. 32, 44

*United States v. US Infrastructure, Inc.*,
  576 F.3d 1195 (11th Cir. 2009) ...................................................................... 32

*Warner Brothers Pictures v. Stanley*,
  192 S.E. 300 (1937) .......................................................................................... 8

*Weinstein v. Holmes*,
  810 S.E.2d 320 (Ga. Ct. App. 2018) ............................................................... 68

*Willis v. United Family Life Insurance*,
  487 S.E.2d 376 (Ga. Ct. App. 1997) ............................................................... 11

*Wolf v. Ramsey*,
  253 F. Supp. 2d 1323 (N.D. Ga. 2003) .............................................. 12, 20, 28

*Woodruff v. Hughes*,
  58 S.E. 551 (Ga. Ct. App. 1907) ............................................................... 61, 62

*Zedan v. Bailey*,
  522 F. Supp. 3d 1363 (M.D. Ga. 2021) .......................................................... 65

*Zimmerman v. Al Jazeera Am., LLC*,
  246 F. Supp. 3d 257 (D.D.C. 2017) ................................................................ 13

## STATUTES

42 U.S.C. § 1985(3) ............................................................................... 30, 31, 44

O.C.G.A. § 21-2-413(a) ...................................................................................... 56

O.C.G.A. § 21-2-413(e) ...................................................................................... 56

O.C.G.A. § 51-5-7(4) ................................................................................................. 14

O.C.G.A. § 51-12-5.1 ............................................................................................... 64

O.C.G.A. § 51-12-5.1(b) ........................................................................................... 65

## PRELIMINARY STATEMENT

Defendants' summary judgment briefing primarily involves disputing facts with Plaintiff, disputing facts with *each other*, and contradicting their *own* public and private statements. Far from meeting their high burden on these motions, Defendants have succeeded only in showing that multiple disputed issues of fact preclude summary judgment in favor of any of them.

The central fact not disputed, however, is that the defamatory statements Defendants made about Plaintiff Mark Andrews are false. Plaintiff legally voted in the 2020 election; Defendants knew it; and they nonetheless produced, promoted, and profited from a film publicly denouncing him as a criminal ballot mule.

In a desperate attempt to avoid liability for their conspiracy to publicly and falsely accuse Plaintiff and other innocent people of serious crimes, they resort to pointing the finger at each other. Dinesh D'Souza and D'Souza Media (together, D'Souza Defendants) point the finger at True the Vote (TTV), Catherine Englebrecht, and Gregg Phillips (together, TTV Defendants), contending they lied about TTV's geolocation analysis and drop box surveillance videos. TTV Defendants dispute this. TTV Defendants point the finger at D'Souza Defendants saying the Film contains editorial fabrications over which they had no control. D'Souza Defendants dispute this. And despite their cross-accusations, all Defendants continue to publicly promote their falsehoods, with D'Souza posting

on X just days before this filing that "'2000 Mules' busted the election fraud." SAF ¶ 14.

As discussed below and in Plaintiff's Motion for Partial Summary Judgment, it is Plaintiff who is entitled to summary judgment on liability as to his defamation claim.  *See* Plaintiff's Motion For Partial Summary Judgment, ECF 250 ("Pl. MSJ").  Defendants are not entitled to summary judgment on that claim or any of the other claims.

## **ARGUMENT**

### **1.     Defendants Are Not Entitled To Summary Judgment On Count III For Defamation/Defamation Per Se.**

Only one party is entitled to summary judgment on Count III: Plaintiff. Plaintiff's Motion for Partial Summary Judgment conclusively establishes that Plaintiff has proven every element of his claim for defamation/defamation per se under Georgia law against both sets of Defendants, including: (a) a false and defamatory statement of and concerning the plaintiff; (b) an unprivileged communication of the statement to a third party; (c) fault by the defendant amounting at least to negligence; and (d) harm to the plaintiff—unless the statement amounts to per se defamation, which requires no showing of harm.  Pl. MSJ; *Echols v. Lawton*, 913 F.3d 1313 (11th Cir. 2019); *see also Stoploss Specialists, LLC v. Vericlaim, Inc.*, 340 F. Supp. 3d 1334, 1346 (N.D. Ga. 2018).

Though both sets of Defendants assert they are entitled to summary judgment on Count III, they have each relied on only certain of the elements of defamation. Both the D'Souza Defendants and TTV Defendants argue that Defendants' statements are not "of and concerning" Plaintiff and that they did not have the requisite fault because they did not act with "actual malice." D'Souza Defendants' Motion for Summary Judgment and Memorandum of Law in Support Thereof ("D'Souza MSJ"), ECF 268 at 20-34; TTV Defendants' Motion for Summary Judgment and Memorandum of Law in Support Thereof ("TTV MSJ"), ECF 279 at 11, 14. In addition, TTV Defendants argue that they did not "publish" many of the statements and that two of Defendants' statements are not defamatory. TTV MSJ at 11-26. All of these arguments are unavailing.

    (a)   *Defendants Do Not Dispute that the Statements in the Film, Book, and Promotional Materials Regarding Mr. Andrews are False.*

Critically, Defendants *do not dispute* that Defendants' statements portraying Plaintiff as a ballot "mule" and as committing a crime are patently false. In fact, as described in Plaintiff's Motion for Partial Summary Judgment, all Defendants have *admitted* that Plaintiff is not a ballot "mule." Pl. MSJ at 13-16. Indeed, D'Souza Defendants concede that the decision to include Plaintiff in *2000 Mules* and label him a "mule," was a "mistake." D'Souza MSJ at 2. Put simply: the falsity of Defendants' statements is not in dispute.

(b)     *Statements in the Film, Book, and Promotional Materials Regarding Plaintiff are Defamatory Per Se and Defamatory.*

The D'Souza Defendants do not contest that Defendants' statements identifying Plaintiff as a ballot "mule" and accusing him of committing a crime are defamatory or defamatory per se. TTV Defendants, on the other hand, half-heartedly assert that two of Defendants' statements do not amount to defamation because the language used by Defendants is "generalized" and does not identify Plaintiff. TTV MSJ at 26. In the case of both statements, however, Plaintiff's image depositing ballots into a drop box is shown alongside voiceovers from TTV Defendants asserting allegations of election fraud, a crime in the state of Georgia. Pl. SMF ¶¶ 104, 111-112. As Plaintiff established in his Motion for Partial Summary Judgment, "[a]n assertion that someone has committed a crime constitutes defamation per se." Pl. MSJ at 16. And that is precisely what these two statements do. TTV Defendants' attempt to disregard "generalized language" like "I can tell you there was rampant abuse of those drop boxes, and the data that we have is immutable and proves it, now buttressed increasingly by video," "the subversion was in fact real," and "a recipe for fraud." TTV MSJ at 26. But this "generalized language," in the context of allegations of widespread election fraud and criminal conspiracy, and when tied to an image of Plaintiff depositing ballots into a drop box, is categorically defamatory per se or defamatory.

The cases relied upon by TTV Defendants do not support their "generalized language" theory. In fact, contrary to TTV Defendants' claims, the courts in each case held that the statements at issue were not defamatory, not because they used "generalized language," but because the statements were *opinions*. *Trump v. CNN,* 684 F. Supp. 3d 1269, 1274 (S.D. Fla. 2023) ("[T]he complained of statements are opinion, not factually false statements, and therefore are not actionable."); *Ganske v. Mensch,* 480 F. Supp. 3d 542, 551 (S.D.N.Y. 2020) ("[T]he Court agrees with Defendant that these statements are expressions of opinions and not defamatory statements of fact."). Indeed, neither case talks about "generalized language," and this Court has already rejected the argument that the defamatory statements at issue here constitute "opinions." *See* Opinion and Order ("MTD Order"), ECF 106 at 41. In the context of discussions of alleged widespread election fraud and criminal conspiracy, and when tied to an image of Plaintiff depositing ballots into a drop box, these statements are categorically defamatory.

(c)    *Defendants' Statements are Of and Concerning Plaintiff*

Defendants assert that their admittedly false statements are not actionable because their repeated publication of actual video and pictures of Plaintiff and his car are not "of and concerning" Plaintiff. D'Souza MSJ at 31-33; TTV MSJ at 14-16. Defendants' arguments misrepresent the facts and relevant case law. Indeed,

there can be no dispute that the statements were "of and concerning" Plaintiff. *See* Pl. MSJ at 18-20.

To be actionable, a defamatory publication "must refer to some ascertained or ascertainable person, and that person must be the plaintiff." *Smith v. Stewart*, 660 S.E.2d 822, 828 (Ga. Ct. App. 2008). The test for what is considered "ascertainable" is whether "persons who knew or knew of the plaintiff could reasonably have understood that the [portrayal] was a portrayal of the plaintiff." *Id.* at 829. This burden is met even if the statement is not universally understood to be about the plaintiff, or even if the language used is very general. *Id.*; *see also Hardy v. Williamson*, 12 S.E. 874, 876 (Ga. 1891). Courts have applied this standard to find publications sufficiently "of and concerning" plaintiffs even where, for example, the publication: (i) used pseudonyms and did not include the plaintiff's likeness, but contained description sufficient for those who knew the plaintiff to identify him, *see Bell v. Johnson Publ'g Co.*, 2018 WL 357888, at *4 (M.D. Ga. Jan. 10, 2018); (ii) was a television drama that did not employ an actor resembling, or name, the plaintiff, but was a reenactment of a real-life incident that involved the plaintiff, *see Am. Broad.-Paramount Theatres, Inc. v. Simpson*, 126 S.E.2d 873, 881 (Ga. Ct. App. 1962); (iii) concerned an expressly fictional book character, but was based in part on the plaintiff, *see Smith v. Stewart*, 660 S.E.2d at

829. Here, Defendants' use of Plaintiff's actual image, both blurred and unblurred, clearly meets this test.

Most significantly, it is undisputed that certain individuals actually *did* recognize Plaintiff from the video and images Defendants' published, including blurred images. *See* Pl. SMF ¶¶ 139-43; SAF ¶ 16 (Plaintiff, Plaintiff's wife, Plaintiff's daughter, and two reporters recognized Plaintiff in the video and images contained in the Film).[1] Indeed, even Mr. Cross acknowledges that he only filed the SEB complaint as a direct result of seeing TTV Defendants' appearance on the Charlie Kirk show, which included the unblurred video of Plaintiff. SAF ¶ 18. This puts to rest any of Defendants' arguments that the materials did not sufficiently identify Plaintiff.

In all events, each of Defendants' multiple arguments as to why their publications of Plaintiff's image, both unblurred and blurred, are not "of and concerning" Plaintiff is wrong. D'Souza Defendants' argument that their use of Plaintiff's image in the Film, Book, and promotional materials does not meet this standard turns on their assertion that individuals would have to rely on "extrinsic

---

[1] This Court already rejected the argument that a blurred image of Plaintiff could not be "of and concerning" him, because viewing the allegations in the light most favorable to Plaintiff, "both he and his wife recognized his blurred image." MTD Order at 34. The evidence now shows that Plaintiff, his wife, and multiple other individuals recognized Plaintiff. This alone is sufficient to establish that Plaintiff was identifiable.

evidence" to identify Plaintiff. D'Souza MSJ at 33. In fact, individuals actually identified Plaintiff from the Statements. Pl. SMF ¶¶ 139-43; SAF ¶ 16. Further, courts in Georgia have explicitly held that relevant context may be established outside the bounds of the defamatory publication itself, i.e., "extrinsic evidence." *Warner Bros. Pictures v. Stanley*, 192 S.E. 300, 313 (1937) ("It may be shown by extraneous facts that the defamatory matter applied to the plaintiff."); *accord Hardy*, 12 S.E. at 876; *Am. Broad.-Paramount Theatres, Inc.*, 126 S.E.2d at 880 ("The 'extrinsic fact' approach is not new in Georgia."). Courts have found that relevant circumstances can include, for example, other statements made by a defendant before and/or after an allegedly defamatory statement that serve to identify the defamatory statement as being about the plaintiff. *See, e.g.*, *Harris v. Pierce Cnty.*, No. CV 513-82, 2014 WL 3974668, at *16 (S.D. Ga. Aug. 14, 2014); *S. Co. v. Hamburg*, 470 S.E.2d 467, 472 (Ga. Ct. App. 1996); *Atlanta J. Co. v. Pearce*, 89 S.E. 759 (Ga. 1916).

The cases cited by D'Souza are inapposite, as they each involve "extrinsic circumstances" that are far more attenuated than those at issue here, or statements over which defendants had no control. *Eakin v. Rosen*, No. 7:15-CV-224 (HL), 2017 WL 5709564, at *1-2 (M.D. Ga. Nov. 27, 2017) (statement described "white female" at a school party, who was described in further detail in anonymous email to law enforcement); *Aroonsakul v. Shannon*, 664 N.E.2d 1094, 1099 (Ill. App. Ct.

8

1996) (applying Illinois law) (holding that plaintiff could only be identified in statement—which made no mention of her—through other information disseminated over which defendant had "no control"). In this instance, the extrinsic circumstances are: the other promotional images and videos used to promote the Film and Book. In other words, the "extrinsic circumstances" are the Statements themselves and the statements of D'Souza's co-conspirators. D'Souza had control over these statements, and can be held liable for the actions of TTV Defendants in making the promotional statements. *See* Sections 1(e), 5 *supra*.

TTV Defendants assert that Plaintiff fails the "of and concerning" requirement because Plaintiff cannot show that the Statements refer to "an ascertainable person." TTV MSJ at 14. TTV Defendants make three unavailing arguments: (1) TTV Defendants did not know who Plaintiff was when they published the relevant Statements and never identified him by name; (2) TTV Defendants were only involved in some, but not all, of the statements; and (3) Plaintiff's face was blurred or obscured in some of the Statements.

First, contrary to TTV Defendants' argument, whether Defendants knew Plaintiff's identity at the time they defamed him is irrelevant. This Court unequivocally stated in the Motion to Dismiss Order, that the "'of and concerning' test . . . is whether persons who knew or knew of the plaintiff could reasonably have understood that the [portrayal] was a portrayal of the plaintiff." MTD Order

at 34-35 (alteration in original); *Smith v. Stewart*, 660 S.E.2d at 829. Plaintiff clearly meets this test. As demonstrated above, the test does not require the defendant's knowledge that the statements in question referred to the plaintiff. *Davis v. Macon Tel. Pub. Co.*, 92 S.E.2d 619, 636 (Ga. Ct. App. 1956) (reversing grant of summary judgment for publisher because of a dispute as to whether unnamed party referred to in publication was plaintiff) ("The language of an alleged libel must be construed, not by what the [publisher] intended to mean, but by the construction which would be placed upon it by the average and reasonable [viewer]"). Simply put, the "of and concerning" standard is in the eyes of the beholder rather than the defendant.

Second, TTV Defendants' assertion that they were only responsible for certain Statements concedes their potential liability for those statements – for example, when they undisputedly published Plaintiff's unblurred image on the Charlie Kirk Show. Moreover, as Plaintiff has demonstrated, TTV Defendants are jointly responsible for all of the Statements. *See* Section 1(e) *supra*.

Third, TTV Defendants argue that Plaintiff was rendered unrecognizable because of blurring and the duration of his exposure. But none of TTV Defendants' cited cases involve the use of the plaintiff's actual image, blurred or unblurred. *Willis v. United Fam. Life Ins.*, 487 S.E.2d 376 (Ga. Ct. App. 1997) (defamation claim brought by owner of funeral home could not survive where defamatory letter

only referred to an unidentified "local funeral home" in a letter that also identified a person accused of wrongdoing for a separate business); *Cox Enterprises, Inc. v. Bakin*, 426 S.E.2d 651 (Ga. Ct. App. 1992) (defamation claim could not survive because there was no reference to plaintiff at all, either specifically *or* by innuendo, and those that did reference plaintiff were true); *Mac Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251 (S.D. Fla. 2021) (applying Florida law) (defamation claim could not survive where the identifying photo at issue was not included in the statements, and no other reference to plaintiff was included in the statement).

As a factual matter, while in certain images Plaintiff's face was blurred, other identifying information was not blurred, including his clothing, gait, posture, car, and bumper stickers. *See* Pl. SMF ¶ 141; SAF ¶ 16 (Courtni Andrews describes recognizing her father immediately in both blurred and unblurred clips, from the way he "walks, his posture, that car we've had since I was a kid. As soon as I saw that, I was like, *oh, that's my dad*."); *see also* SAF ¶ 17 (Brendetta Andrews describing college bumper stickers and a Michelle Obama sticker as what makes the "truck distinctive. And the truck's -- the truck's in the movie, it's in the trailer, it's everywhere"). Defendants were hardly "meticulous enough" to preserve Plaintiff's identity here. *Mac Isaac*, 557 F. Supp. 3d at 1260. And, again, this

argument is eviscerated by the fact that individuals actually identified Plaintiff from his appearance in the Statements.[2]

### (d)    *Negligence is the Appropriate Standard of Fault*

Defendants argue that actual malice, rather than negligence, applies here. D'Souza MSJ at 22-25; TTV MSJ at 16-20.  Defendants' arguments ignore this Court's prior holding that negligence is the appropriate standard. MTD Order at 32-33 (citing *Am. Civil Liberties Union, Inc. v. Zeh*, 312 Ga. 647, 650 (2021)) ("Because Andrews is not alleged to be a public figure – something no Defendant disputes – the level of fault he must show is only ordinary negligence." (footnote omitted)).  As discussed in Plaintiff's Motion for Partial Summary Judgment and below, Plaintiff is not a public figure, and Defendants' statements about Plaintiff are not privileged. Accordingly, Plaintiff need only show that Defendants acted with ordinary negligence to prevail on his defamation claim.  Pl. MSJ at 26-36; *see also Gettner v. Fitzgerald*, 677 S.E.2d 149, 154 (Ga. Ct. App. 2009) ("To recover in a suit for defamation, a plaintiff who is a private person must prove that the defendant acted with ordinary negligence.").

### (i)    *At a bare minimum, Defendants acted negligently.*

---

[2] Additionally, Defendants' reliance on *Wolf v. Ramsey,* 253 F. Supp. 2d 1323 (N.D. Ga. 2003) and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) is misplaced, as the actual malice standard does not apply here. *See* Section 1(d) *supra.*

Ordinary negligence, the standard of care owed by publishers, like Defendants, is "defined by reference to the procedures a reasonable publisher in [their] position would have employed prior to publishing" the statements at issue. *See Triangle Publ'ns, Inc. v. Chumley*, 317 S.E.2d 524, 537 (Ga. 1984). Georgia courts consider:

> (1) whether the material was topical and required prompt publication, or whether sufficient time was available for a thorough investigation of its contents; (2) the newsworthiness of the material and public interest in promoting its publication; and (3) the extent of damage to the plaintiff's reputation should the publication prove to be false; and (4) the reliability and truthworthiness of the source.

*Id.* (citation omitted). "The thoroughness of the accuracy check a reasonable person would make before publishing a defamatory statement will vary, depending on the relative weight of these factors and the circumstances of the case." *Id.*

Here, as discussed in Plaintiff's Motion for Partial Summary Judgment, the undisputed facts establish that each factor unquestionably weighs in Plaintiff's favor. Pl. MSJ at 26-36 (sufficient time was available to investigate, Film was released to assist political candidates, damage to plaintiff's reputation was significant, and all sources lacked reliability and trustworthiness). No reasonable juror could find that Defendants acted within the standard of care for any of the defamatory statements.

Courts may also consider the context of the statements at issue, including the genre and medium of a work in which they were published. *See Zimmerman v. Al*

13

*Jazeera Am., LLC*, 246 F. Supp. 3d 257, 277-78 (D.D.C. 2017) ("[T]he statements at issue in the instant case were published as part of an editorialized documentary that features a discernable theme and a story line—circumstances that, together, more readily imply that the reported statements represent the tested positions of the investigators."). The Film here presents itself as a documentary, implying to viewers that its content and conclusions are factual, and making Defendants' lack of care all the more glaring.  Pl. MSJ at 26-36.

(ii)    <em>The actual malice standard is inapplicable to this case.</em>

Defendants claim that the malice standard, not the ordinary negligence standard, applies because (1) the statements are "privileged" under Georgia law; and (2) Plaintiff is a limited purpose public figure. Defendants are wrong under both the law and the facts.

(1)    <em>The defamatory statements are not "privileged statements."</em>

Citing O.C.G.A. § 51-5-7(4), Defendants assert the defamatory statements were privileged under Georgia law, making them subject to the actual malice standard, because the statements relate to "election integrity," which Defendants claim—without explanation—is an issue of "public interest or concern." D'Souza MSJ at 21-22; TTV MSJ at 17.  Defendants further fail to explain how any individual statement about Plaintiff is privileged, instead making the sweeping but unsupported assertion that the privilege for every statement "revolve[d] around the

14

issue of election integrity." *See, e.g., Five for Ent. S.A. v. Rodriguez*, No. 11-cv-24142, 2013 WL 4433420, at *8 (S.D. Fla. Aug. 15, 2013) ("[T]o claim a qualified privilege, Defendants must establish that each of the statements individually was entitled to a privilege. . . . Defendants' motion has not done a specific analysis for each of the statements; instead, the motion makes broad generalizations.").

For a statement to be conditionally privileged, Defendants must show that they "(a)[] acted in good faith; (b) in connection with an interest to be upheld; (c) the statement was properly limited in its scope and occasion; and (d) publication was made to proper persons." *Smith v. DiFrancesco*, 802 S.E.2d 69, 73 (Ga. Ct. App. 2017). "[T]he absence of any one or more of these constituent elements will, as a general rule, prevent the party from relying upon the privilege." *Sheftall v. Cent. of Ga. Ry. Co.*, 51 S.E. 646, 648 (Ga. 1905). Here, Defendants fail this test. *First*, Defendants' cannot have acted in good faith because Defendants had no evidence or factual basis for accusing Plaintiff of being a criminal a ballot mule. *See Smith*, 802 S.E.2d at 73 (record did not establish that defendant acted in good faith because defendant "had no basis" to believe his statement was true). Indeed, the evidence shows that at no point did any Defendant possess any evidence supporting the claim that Plaintiff (and other voters featured in the Film) were "mules" who, consistent with Defendants' own definition, had been geotracked picking up ballots on multiple occasions and depositing them in drop boxes. *See* Pl.

15

SMF ¶¶ 42-44. Discovery has revealed that *none* of the voters in the Film were geotracked at all because "the ability to match [the surveillance footage and geotracking data] was negligible, was nonexistent." *Id.* ¶ 190; *see also* D'Souza SMF ¶ 131. Thus, Defendants knew (or at best, willfully avoided knowledge) that geotracking could not be used to prove the election fraud conspiracy as detailed in the Film and Defendants knew that the surveillance footage was not matched to the geolocation data.  Pl. SMF ¶¶ 5-6, 75, 82-85, 178-79. Indeed, the SEB publicly declared that it had found no evidence that Plaintiff engaged in ballot fraud. *Id.* ¶ 65. Because Defendants nevertheless continued to peddle their blatantly false narrative that Plaintiff was a criminal ballot mule, a reasonable juror could find that Defendants did not make these statements in good faith, or to protect election integrity. *C.f.*, *Chaney v. Harrison & Lynam, LLC*, 708 S.E.2d 672, 679 (Ga. Ct. App. 2011) ("[N]othing in the record indicates that [statements] were not made as part of a good faith effort to resolve the [relevant] issues").

*Second*, Defendants' statements were neither properly limited in scope nor audience. Defendants' statements were not limited in scope because they were unverified claims that Plaintiff committed crimes, which go far beyond the scope needed to discuss the general issue of election integrity, and were also published repeatedly, significantly more than needed to address any concern of election fraud. *C.f.*, *Choice Hotels Int'l, Inc. v. Ocmulgee Fields, Inc.*, 474 S.E.2d 56, 59

16

(Ga. Ct. App. 1996) (holding that a "single letter," "made on a proper occasion," "limited to those concerned," "was properly limited in scope," and distinguishable from over fifty harassing phone calls in another case (citing *Southern Business Machines, etc. v. Norwest, etc.*, 194 Ga. App. 253, 258-260(3), (4), 390 S.E.2d 402 (1990))). Defendants' statements about Plaintiff were also broadcast broadly through the Film, Book, and promotional interviews and social media posts, instead of being discreetly communicated to authorities capable of and tasked with investigating their claims and curing any perceived harm. *N. Atlanta Golf Operations, LLC v. Ward*, 860 S.E.2d 814, 820 (Ga. Ct. App. 2022) (defendant not entitled to privilege as matter of law where "he did not attempt to give management any feedback [about the matter of concern], instead choosing Twitter as the forum for raising the problems"); *c.f. Chaney*, 708 S.E.2d at 679 (proper audience found where defendant "was communicating with the proper people about a topic" of public interest, and statements were "submitted to appropriate recipients," the city counsel). Indeed, it is clear from Defendants' actions that the Film was a for-profit venture with the apparent purpose of making money for the filmmaker, investors, and contributors, including all Defendants. Response to TTV SMF ¶ 20.

The undisputed evidence shows that the test for conditional privilege is not met and therefore the actual malice test is not implicated.

17

(2)     *Plaintiff is not a "limited purpose public figure."*

The TTV Defendants argue that an actual malice standard applies because Plaintiff is a "limited purpose public figure." TTV MSJ at 17. This claim is meritless. Plaintiff is a private citizen who has made no effort to thrust himself into the public eye. It was *Defendants* who put Plaintiff on a public stage when they improperly featured his image in promotional appearances and the Film and Book. And now TTV Defendants argue that his claim should be held to a higher standard of fault because of their actions. The law does not allow for such a conclusion.

A plaintiff can be "a public figure for a limited range of issues." *Gettner*, 677 S.E.2d at 155.  To determine whether a plaintiff is a limited purpose public figure, "a court must isolate the public controversy, examine the plaintiff's involvement in the controversy, and determine whether the alleged defamation was germane to the plaintiff's participation in the controversy." *Id.* at 155.

Applying this standard here, Plaintiff is plainly not a "limited purpose public figure." Plaintiff did not "thrust himself to the forefront of the controversy in any public forum, so as to have gained access to media outlets generally unavailable to private citizens," he did not "assume[] any risks incident to acceptance of a public role in the matter," "he made no comments to the media," he "did not appear on television," "he certainly was not an actor in the events giving rise to the public controversy," and "prior to publication of the [statements], [Plaintiff] was in no

way a public figure with respect to the controversy either in [the local] community or in the global community." *Sewell v. Trib Publ'ns, Inc.*, 622 S.E.2d 919, 923-24 (Ga. Ct. App. 2005) (teacher discussing Iraq war in classroom was not limited purpose public figure for controversy around Iraq war).

"[T]hose classed as public figures . . . invite attention and comment." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974) ("[T]he instances of truly involuntary public figures must be exceedingly rare."). There is no evidence that Plaintiff has done anything to invite attention and comment, especially with respect to election integrity or ballot mules. But for Defendants labeling Plaintiff a ballot "mule," and including his image in *2000 Mules* and related marketing materials, Plaintiff and his participation in the 2020 Presidential election would have remained private. "[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979). TTV Defendants are not permitted to drag Plaintiff and his voting activity into the public eye by baselessly accusing him of crimes and then use their own publication of Plaintiff's private activity as a shield for defamation. If their argument were correct, then every single person who voted could considered a public figure.

TTV Defendants argue that the SEB complaint filed by David Cross ("Cross") and Plaintiff's filing of this lawsuit dragged Plaintiff into this

controversy. TTV MSJ at 19-20.  But they ignore (1) that even in the absence of

Cross's SEB complaint, people could have, and did, discern Plaintiff's identity

from the Film, Book, or promotional materials, Pl. SMF ¶¶ 139-43, and (2) that it

was their own public lies about Plaintiff that led Cross to file his complaint, not

any action by Plaintiff.  The undisputed evidence is that Cross filed his SEB

complaint —which explicitly repeats TTV's own assertions that they geotracked

Plaintiff engaged in criminal activity—as a direct result of seeing the TTV

Defendants on *The Charlie Kirk Show*. SAF ¶ 18.  Further, Courts have established

that filing a lawsuit alone does not render someone a limited public person. *See,*

*e.g., Satanic Temple, Inc. v. Newsweek Mag. LLC*, 661 F. Supp. 3d 159, 169

(S.D.N.Y. 2023) ("One does not voluntarily inject itself into a public controversy

simply by filing a lawsuit to vindicate its rights, even if doing so incidentally

attracts public attention.").[3]

      Finally, *Ladner v. New World Communications of Atlanta, Inc.* and *Wolf v.*

*Ramsey*, are distinguishable from the facts in the present case. 806 S.E.2d 905 (Ga.

Ct. App. 2017); 253 F. Supp. 2d 1323 (N.D. Ga. 2003); TTV MSJ at 17-18.

Namely, in both *Ladner* and *Wolf*, plaintiffs were already known to the public

---

[3] Further, public policy concerns require that victims of defamation be permitted to file lawsuits holding their alleged defamers accountable without simultaneously giving life to a defense that would heighten the pleading standard for their own lawsuit.

before the allegedly defamatory statements were made. That is undisputably not the case here. But for the statements of Defendants, Plaintiff's name never would have been the subject of public discussion.

The actual malice standard does not apply.

> (iii)    *Even if actual malice were the appropriate standard, a reasonable juror could find that Defendants' conduct meets this threshold.*

Actual malice requires that the defendant "either knew the allegedly defamatory material was false, or published it with a reckless disregard of whether it was false or not." *Straw v. Chase Revel, Inc.*, 813 F.2d 356, 361 (11th Cir. 1987). Viewing all evidence in the light most favorable to Plaintiff, the record shows that a reasonable juror could find that Defendants knew Plaintiff was not a "mule," but nonetheless continued to portray him as one.

Critically, before the Film's public theatrical release, no Defendant possessed evidence that Plaintiff was a criminal ballot mule because he was never geotracked, Pl. SMF ¶¶ 190-94, and there is no evidence he went to a non-profit to pick up ballots, was paid, or went to more than one drop box. *Id.* ¶¶ 81, 82. Defendants also knew that the SEB had cleared Plaintiff of wrongdoing and discussed this fact among themselves. D'Souza SMF ¶ 116; TTV SMF ¶ 47. After the SEB publicly cleared Plaintiff of any wrongdoing, Phillips texted Engelbrecht and D'Souza a link to an article noting that, "this isn't a mule. Didn't reach the

threshold." Pl. SMF ¶ 71. Yet, Defendants proceeded to broadly release *2000 Mules* and included images of Plaintiff in online posts and interviews used to promote the film. *Id.* ¶¶ 1-7, 57, 78, 89, 94, 123; TTV SMF ¶¶ 20, 77, 88, 103, 110, 118, 129-131, 142, 150, 160. Moreover, Plaintiff's cease and desist letter to Defendants specifically put them on notice of Plaintiff's innocence. Nonetheless, Defendants continued to falsely portray Plaintiff as a ballot "mule" and criminal and republished the Book three weeks later. Pl. SMF ¶ 132.

The D'Souza Defendants contend that the SEB investigation and Plaintiff's demand letter fail to demonstrate malice because they had "no faith" in the validity of the SEB investigation and, despite receipt of Plaintiff's letter, remained "highly confident that the film got it right, and that Mr. Andrews was a mule." D'Souza MSJ at 27-29. Even if true, D'Souza Defendant's wholesale dismissal of the SEB investigation and Plaintiff's letter does not inoculate them from liability even under the actual malice standard; rather, it evidences their reckless disregard for the truth.

In fact, for months before the movie was released, the D'Souza Defendants harbored misgivings about whether the surveillance footage actually supported the mules narrative, even as Defendants continued to emphasize the importance of having such footage in the Film. Pl. SMF ¶¶ 202-12; Statement of Additional Facts ¶ 4 ("SAF"). The D'Souza Defendants expressed concerns about the lack of geotracking or surveillance footage showing mules making multiple trips to ballot

boxes before the Film was released.  Pl. SMF ¶¶ 202-12. Dinesh D'Souza testified that he was concerned that he could not find a video of anyone going to more than one drop box and that he "raised that concern" during the film-making process. *Id.* ¶ 210. Further, on June 6, 2022, a Salem employee forwarded to D'Souza an e-mail from the company's executive chairman, who watched the movie and saw "no evidence remotely close to throwing the election into doubt," saying "I'm not remotely persuaded that Dinesh proved a thing." *Id.* ¶ 221. Given these persistent concerns about the credibility of information propping up the mules narrative, the D'Souza Defendants showed a reckless disregard for the truth by summarily dismissing the SEB investigation and the demand letter that confirmed their suspicions and, instead, proceeding to release and promote the Film and Book.

The TTV Defendants argue that they acted with no malice because they never identified Plaintiff by name, never met Plaintiff, and did not know the individual they targeted was named Mr. Andrews. TTV MSJ at 23. TTV Defendants cite no case law suggesting that a defendant's previous familiarity with a plaintiff is indicative of malice, or lack thereof.  This is not surprising, as defamatory statements need not identify a particular individual by name. *See Promoworks, L.L.C. v. Graham*, No. 1:09-CV-2030-TCB, 2009 WL 10670413, at *2-3 (N.D. Ga. Dec. 9, 2009) ("the fact that neither [defendant] is specifically identified by name in the email is not fatal to their defamation claim"). And as

established above, Plaintiff is ascertainable in the defamatory statements. *S. Co. v. Hamburg*, 470 S.E.2d at 471; *see* Section 1(c).

TTV Defendants also contend that because they requested an accounting of assistor signatures from Gwinnett County, their belief that Plaintiff was acting illegally was in good faith and they acted with no malice. TTV MSJ at 23-25. This single act does not make up for the reckless disregard for the truth or negate all other evidence of malice. Defendants falsely accused Plaintiff of being a ballot "mule," which implied much more than failure to sign as an assistor. Pl. SMF ¶ 43; *see also id.* ¶¶ 39, 44 (Engelbrecht explained in the Film the "elements" of being a mule, including "going to the non-profits, the ability to identify the pattern of approach to a drop box. And that it is going not past a drop box and on, but directly to a drop box and back to another point - and then to another drop box.") In fact, Defendants did not accuse Plaintiff of failing to sign the ballots that he submitted for his family members—they accused Plaintiff of being a ballot mule engaged in a vast conspiracy to steal the election.

Finally, TTV Defendants argue that they lacked the editorial control over certain statements, and thus cannot be said to have published the statements with malice. TTV MSJ at 25-26. However, editorial control is irrelevant to whether TTV acted with malice. Regardless of whether the TTV Defendants had editorial control – a fact that is disputed, *see* Response to TTV SMF ¶ 81, their malice is

demonstrated by the fact that they *knew* that Plaintiff was not a ballot "mule," yet continued to characterize him as one, and never attempted to correct the record despite multiple opportunities to do so.  Pl. SMF ¶ 227; D'Souza SMF ¶¶ 71-73. TTV Defendants' research and footage was the backbone of the Film and, indeed, they claimed as their own.  Pl. SMF ¶¶ 26, 28, 30; Response to TTV SMF ¶ 81. And many of the statements involve TTV Defendants themselves stating that Plaintiff was involved in "organized crime," Pl. SMF ¶¶ 49-50, and that his conduct was "highly illegal." *Id.* ¶ 93; *see also id.* ¶ 48, 93, 99, 115.

As established in Plaintiff's Motion for Partial Summary Judgment, the record shows Defendants acted with actual malice, because Defendants' allegations that Plaintiff was a ballot mule were completely premised on knowing falsehoods and reckless disregard for the truth. Pl. MSJ at 31-36

(e)    *Defendants Published the Statements*

Given that no Defendant disputes that they published at least some of the defamatory statements, there can be no dispute that Plaintiffs have established this element against all Defendants. Further, the statements and claims made in the Film, Book, and promotional materials are jointly attributable to all Defendants, and all Defendants conspired to publish the defamatory statements, such that fault is indivisible and they can be held jointly and severally liable for all statements. *See* Pl. MSJ at 21-25.

As established in Plaintiff's Motion for Partial Summary Judgment, all Defendants were listed as producers of the Film, contributed content to the Film, starred in the Film, and promoted the Film. *See generally, Reid v. Viacom Int'l Inc.*, No. 1:14-CV-1252-MHC, 2016 WL 11746046 (N.D. Ga. Sept. 14, 2016) (finding plaintiff produced evidence of actual malice against the producer of a film). The Defendants had a written agreement to share profits from the Film, and did in fact profit from the Film. Pl. SMF ¶ 126. All Defendants also contributed to the publication of the Book which was a "companion" to the Film. D'Souza wrote the Book, TTV provided the much of research relied upon by D'Souza, including the image of Plaintiff used the Book as an exemplar ballot "mule," and their interviews were widely quoted in the Book. *See Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976) (affirming judgment against the author of a book). All Defendants also promoted the Film using their false "ballot mule" narrative, collaborated on appearances, reposted each other's statements on various platforms, and profited from the promotion of the Film. All promotional statements were part of the Defendants' joint plan to promote the Film and the "ballot mules" narrative. Pl. SMF ¶¶ 88-90.

In short, the record shows that Defendants jointly published the defamatory statements.[4]

The TTV Defendants attempt to skirt liability by relying on the disputed factual assertion that they lacked "editorial control" over the defamatory statements and therefore they did not publish *almost* all of the statements. TTV MSJ at 12. But as established in Plaintiff's MSJ and above, joint and several liability does not turn on editorial control—it turns on joint publication. *See Howe v. Bradstreet Co.*, 69 S.E. 1082, 1082 (Ga. 1911); *Atlanta J. Co. v. Doyal,* 60 S.E.2d 802, 809-10 (Ga. Ct. App. 1950); *Tyler v. Thompson*, 707 S.E.2d at 141. The evidence establishes that all Defendants conspired and worked jointly to publish the statements.

In all events, as discussed above, a reasonable jury could find that TTV Defendants had sufficient editorial control over the Film and the defamatory statements to be held liable.  For example, although TTV Defendants claim they

---

[4] Even if each Defendant did not individually publish each statement, as explained *infra* at Section 2 and 5, the record also shows that Defendants conspired to publish the defamatory statements. *Tyler v. Thompson*, 707 S.E.2d 137, 141 (Ga. Ct. App. 2011) ("After the conspiracy is formed, members of the conspiracy are jointly and severally liable for acts of co-conspirators done in furtherance of the conspiracy."); *Tanisha Sys., Inc. v. Chandra*, No. 1:15-CV-2644-AT, 2015 WL 10550967, at *9 (N.D. Ga. Dec. 4, 2015) (allowing civil conspiracy claim for defamation to go forward where plaintiff alleged defendants "materially contributed" to the defamatory post, and "operated as a team to create the defamatory blog post at issue and to reinforce its impact") (citation omitted).

had no editorial control over their appearance on *The Charlie Kirk Show*, it is clear from the program that TTV Defendants explicitly approved the use of this video, and when Charlie Kirk asked if the video of the plaintiff was depicting a mule, Engelbrecht affirmatively responded, "yes." *See* Response to TTV SMF ¶¶ 121-24, 127, 142-46, 136-37.

The facts also establish that TTV Defendants exercised control over the Film, the Book, the Trailer.  It is undisputed that TTV Defendants were the ones who *collected*, *provided*, and *pitched* the very footage at issue in this case, which was "not easily obtainable by the public," for the purpose of publishing stories about the "mules," and they never objected that their work had in any way been misrepresented in the Film.  *See* Pl. SMF ¶¶ 16-17, 19, 24, 26, 30.

Defendants cite *Wolf v. Ramsey*, 253 F. Supp. 2d 1323 (N.D. Ga. 2003), in support of their argument that they cannot be held liable for certain statements. But *Wolf* is distinguishable from the facts here.  The defendant in *Wolf* testified that the statements were not in relation to the plaintiff, and the defendant was unaware that the photo of the plaintiff would be shown.  *Id.* at 1338.

Defendants cannot credibly analogize their own situation to that in *Wolf*.  As explained above, this was not some widely-available video of Plaintiff that programs picked up on their own accord, and unbeknownst to TTV, published along with TTV's statements.  The TTV Defendants approved the use of the

Plaintiff's image, and Engelbrecht and Phillips affirmatively identified Plaintiff as a mule in the videos played in promotional statements. *See, e.g.*, Response to TTV SMF ¶ 122 (conversation between Kirk and Phillips) (Kirk: "Gregg, which one would you like us to play, is that – is that Gwinnett County, Georgia?" Phillips: "Let's play Gwinnett County."), (Kirk: "Ok let's play – is this video okay to play?" Phillips: "Yes, let's do that."), *Id.* ¶ 124 (Charlie Kirk Show transcript) (Phillips: "You're going to see a voter [Andrews] get out—a mule get out." Engelbrecht: "A mule [referring to Andrews] get out." Kirk: "So this is a mule? [Referring to the unblurred image of Andrews.] This is one of your 2000 that you've profiled." Engelbrecht: "Yes." Kirk: "[Referring to Andrews' behavior] Now this is illegal?" Engelbrecht: "Right." Kirk: "Highly illegal to do this." Engelbrecht: "Right."); *see also id.* ¶¶ 127, 142-146, 136-37.

Further, Engelbrecht's contention that because she "appeared remotely" on the Tucker Carlson Show and "could not even see what was shown on the screen when she commented" she cannot be held liable, TTV MSJ at 14, is wholly indefensible because what was shown on screen were the same clips that TTV described as "highly confidential" footage in their License Agreement, Pl. SMF ¶ 25. *Tanisha Sys., Inc.*, 2015 WL 10550967, at *9 ("[I]t would make little sense to allow an individual to work in concert with another to defame someone, but allow him to disclaim liability because he worked behind the scenes, did not initially

29

publish the defamatory statement he helped create, and only 'passed along' the defamatory statement once it was out in the air").  As demonstrated before, Engelbrecht affirmatively identified Plaintiff as a mule in other shows on which she appeared. *See* D'Souza MSJ at 11.  Indeed, the only reason Plaintiff was ever publicly labeled as a "mule" conducting "criminal" activity is because the TTV Defendants published the footage of Plaintiff and claimed it was so.

## 2. Defendants Are Not Entitled to Summary Judgment on Count I, Conspiracy In Violation of 42 U.S.C. § 1985(3).

In order to prevail at trial on his claim under the support or advocacy clauses of the Ku Klux Klan Act, 42 U.S.C. § 1985(3) ("Klan Act"),[5] Plaintiff must show (1) a conspiracy, (2) that one of purposes of the conspiracy was *either* to "force, intimidate, or threaten" under clause [iii] *or* to "injure" under clause [iv], (3) an individual legally entitled to vote who was engaging in lawful activity related to voting in federal elections. *See* MTD Order at 19 (citing *Nat'l Coalition on Black Civil Participation v. Wohl* (*Wohl I*), 498 F. Supp. 3d 457, 486-87 (S.D.N.Y. 2020)). Plaintiff must also show an overt act "in furtherance of the . . . conspiracy,

---

[5] The support-or-advocacy clauses of the Klan Act make it unlawful for "two or more persons" to "conspire *either* to "prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy" in a federal election (clause [iii]), *or* to "injure any citizen in person or property on account of such support or advocacy" (clause [iv]). 42 U.S.C. § 1985(3). For ease of reference, this brief adopts the naming convention for the various constituent clauses within 42 U.S.C. § 1985(3) used by this Court in its Opinion and Order on Defendants' Motions to Dismiss.

whereby another is injured in his person or property," and that Plaintiff was "so injured." 42 U.S.C. § 1985(3). This Court has already ruled that Plaintiff's allegations, if true, would establish a violation of the Klan Act.  MTD Order at 24-29.  The evidence uncovered in discovery now establishes the truth of Plaintiff's allegations.

Nevertheless, Defendants have moved for summary judgment on the first two elements, conspiracy and purpose.[6]  TTV MSJ at 5-9; D'Souza MSJ at 38-40. As detailed below, their arguments fail because the evidence, when viewed in the light most favorable to Plaintiff and drawing all reasonable inferences therefrom, shows that (1) Defendants conspired to create and promote a Film that falsely accuses voters, including Plaintiff, of being participants in a criminal ballot trafficking plot that "stole" the 2020 presidential election; and (2) *at least one* purpose of Defendants' conspiracy was to intimidate or to injure lawful voters (such as Plaintiff) for voting by drop box, and that Plaintiff was in fact so injured.

>   (a)    *A Reasonable Juror Could Find that Defendants Knowingly Agreed and Engaged in a Conspiracy.*

---

[6] Neither TTV nor D'Souza Defendants challenge the remaining elements of Plaintiff's Klan Act claim and have therefore waived these arguments for the purposes of their Motions for Summary Judgment. *Cont'l Tech. Servs., Inc. v. Rockwell Int'l Corp.*, 927 F.2d 1198, 1199 (11th Cir. 1991).

There can be no serious dispute "there was an agreement among all defendants to create, publish, and promote a film[,]" and that Defendants carried out this agreement. D'Souza MSJ at 39; *see also* Pl. SMF ¶ 28; SAF ¶ 11. To establish that this agreement was an *unlawful conspiracy*, this Court has articulated the allegations that, if established as true, would suffice: (1) "the TTV Defendants worked together to intentionally mischaracterize information to support their ballot mules theory, including the footage depicting Andrews and his SUV" and (2) "[t]he TTV Defendants and D'Souza Defendants directly targeted Andrews by asserting that he was committing a crime by putting multiple ballots in the drop box." MTD Order at 27-28. To be sure, a conspiracy may be inferred "from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct," *United States v. Schwartz*, 541 F.3d 1331, 1361 (11th Cir. 2008), and "[t]o hold otherwise 'would allow [defendants] to escape liability . . . with winks and nods,'" *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1203 (11th Cir. 2009) (alterations in original).

TTV misconstrues the legal standard, arguing, for example, that they could not have engaged in a conspiracy because, they claim, they were allegedly not involved in making some of the at-issue statements. TTV MSJ at 8-9. But this is legally incorrect.

Showing a conspiracy does not require proof "that a defendant participated in every stage of the conspiracy or had direct contact with each of the other alleged co-conspirators." *U.S. v. Reeves*, 742 F.3d 487, 498 (11th Cir. 2014). It is black letter law that partners in a conspiracy "may divide up the work, yet each is responsible for the acts of the other." *Reid v. City of Atlanta*, No. 1:08–cv–01846–JOF, 2010 WL 1138456, at *17 (N.D. Ga. Mar. 22, 2010). Thus, *even if* TTV Defendants were not the first to conceive of the idea of a film, were uninvolved in certain statements, communicated only infrequently with D'Souza Defendants, or lacked editorial control – all of which are disputed facts – as a matter of law, this would not be sufficient to negate their participation in, and thus liability for, the unlawful conspiracy. *U.S. v. Guerra*, 293 F.3d 1279, 1285 (11th Cir. 2002) (finding that individuals may be engaged in a conspiracy "even if [they] did not know all its details or played only a minor role in the overall scheme").[7]

Viewed in the light most favorable to Plaintiff and drawing all reasonable inferences therefrom, the evidence shows that at no point did any Defendant

---

[7] TTV Defendants also allege Phillips' relationship with TTV is solely that of an independent contractor. TTV MSJ at 8. But the precise nature of the relationship between these Defendants (which in Phillips' case is disputed, *see* Responses to D'Souza SMF ¶ 3; TTV SMF ¶¶ 7-10) has no bearing on Phillips' liability as a participant in the unlawful conspiracy. *United States v. Envistacom, LLC*, No. 1:22-cr-00197-VMC-RGV, 2022 WL 19001962, at *2, *12 (N.D. Ga. Nov. 14, 2022), *report and recommendation adopted*, No. 1:22-CR-00197-VMC, 2023 WL 1965277 (N.D. Ga. Feb. 13, 2023) (regarding a conspiracy prosecution involving an entity and its subcontractor).

possess any evidence supporting their claim that Plaintiff and other voters featured in the Film were "mules" met their definition. *See* Pl. SMF ¶¶ 42-44, 75, 81-85, 178-79, 190-92.  Nevertheless, the TTV Defendants agreed to, and did, provide to the D'Souza Defendants the footage of Plaintiff (and other voters) for the very purpose of depicting him (and other voters) as a criminal "mule," Pl. SMF ¶¶ 25-26, 28, 30; all Defendants worked together to create, promote, and profit from the Film's false narrative accusing Plaintiff of being a criminal ballot "mule," *id*. ¶¶ 43-50, 88-119, 230-42; all Defendants were in contact throughout the making of their Film, including to discuss content and revisions, but none suggested or implemented the removal of Plaintiff's image, or corrections or changes to the mules narrative, *id.* ¶¶ 31, 34-35; all Defendants appeared in the Film and, in their own voices, contributed to the "mules" narrative; all Defendants promoted the Film using the same blurred and unblurred images of Plaintiff to publicly and falsely accuse him of being a criminal "mule," *id.* ¶¶ 88-119; and, before the public release of the Film, all Defendants knew that Plaintiff himself did not meet their own definition of a "mule," *see* SAF ¶ 1; *id.* ¶¶ 42-44, 51, 71-72, 79-85, 87, and that Plaintiff had already been exonerated of any voter fraud by election authorities, Pl. SMF ¶¶ 66-73, 75, 87.

Defendants seemingly would have this Court believe that the persistence of their identical false narratives is somehow a coincidence and that they did not

coordinate to defame or intimidate Plaintiff.  D'Souza MSJ at 6-7, 10; TTV MSJ at 39-40. Particularly when viewed in the light most favorable to Plaintiff, the evidence shows otherwise. In addition to the facts detailed above, further evidence shows that, facing a deluge of information disproving their false claims, the TTV and D'Souza Defendants continued to privately coordinate and publicly advance their false narrative. For example, all Defendants worked together to collaboratively develop shared talking points to "rebut" factcheckers.  Pl. SMF ¶¶ 70-73. The record is replete with additional examples of Defendants' concerted action that would support a finding of conspiracy. *See, e.g., id.* ¶¶ 70-78 (coordination), 88-138, 146 (publicly advancing narrative), 230-242 (profit).

The totality of Defendants' conduct described above—including but not limited to direct and indirect evidence of coordination to produce and promote a consistent, false narrative, coordination in response to fact checks, and their mutual financial interest in promoting their false claims—provides overwhelming evidence of Defendants' conspiracy. *See also U.S. v. Arias-Izquierdo*, 449 F.3d 1168, 1182 (11th Cir. 2006) (proof of conspiracy does not require "the existence of a 'formal agreement,' but may instead demonstrate by circumstantial evidence a meeting of the minds to commit an unlawful act"); *Nat'l Coal. on Black Civic Participation v. Wohl* (*Wohl II*), 661 F. Supp. 3d 78, 113 (S.D.N.Y. 2023) (finding

35

a conspiracy under similar facts where defendants' robocall spread disinformation about voting by mail).

As Defendants offer little to contest this evidence "beyond the[ir] bald denial of concerted action," *DeLong Equipment Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir. 1989), a reasonable juror has ample evidence to conclude that TTV Defendants and D'Souza Defendants entered into a conspiracy **both** between **and** among themselves to falsely accuse voters, including Plaintiff, of committing the crime of election fraud. *See* MTD Order at 27-29.[8]

> (b)    *A Reasonable Juror Could Find That One Purpose of Defendants' Conspiracy Was To Intimidate Voters.*

Voluminous evidence in the record also would permit a reasonable juror to conclude that, in creating and widely promoting a Film featuring footage of real voters while falsely accusing them of criminal election fraud, Defendants intended to intimidate lawful voters. *Wohl II*, 661 F. Supp. 3d at 125-26.

---

[8] Defendants' summary judgment motions focus only on the question of whether TTV Defendants conspired with D'Souza Defendants, and do not raise any argument to contest a separate (but overlapping) Klan Act conspiracy among the TTV Defendants or among the D'Souza Defendants. *See, e.g.,* MTD Order at 29 ("Andrews has carried his burden to plead a conspiracy between and among the TTV Defendants as well as the D'Souza Defendants" and have therefore waived any such argument that summary judgment should be issued on the question of whether TTV Defendants or D'Souza Defendants entered into a prohibited conspiracy amongst themselves. *Cont'l Tech. Servs., Inc.*, 927 F.2d at 1199).

It is well-settled that "unlawful threats or intimidation . . . need not be violent or physical." *Id.* at 113. Defendants' agreement and overt acts to create, produce and promote *2000 Mules* are intimidating for the same reasons the *Wohl* court found— they "warn[] of several specific and foreboding consequences of voting"—here, false accusations of criminality and loss of privacy.  *Id.*[9]

Evidence produced in discovery confirms that Defendants engaged in the very conduct that this Court has explained would "plausibly intimidate a reasonable person in connection with voting." MTD Order at 26. Specifically, this conduct includes: "accus[ing] Andrews of being a ballot mule, participating in an illegal voting conspiracy, having engaged in unrelated violent conduct, all while displaying blurred and unblurred images of Andrews's face and license plate." *Id.*; *see* Pl. SMF ¶¶ 42-50, 73-74, 91-124, 134.  Based on this conduct and the voluminous record evidence demonstrating that the Film's accusations were

---

[9] TTV Defendants rely on three cases using an inapplicable standard to advance the proposition that courts "routinely" fail to find a showing of the "purpose" element of the Klan Act. TTV MSJ at 9-10. But TTV's cited cases are inapposite to the present circumstances because they are all denials of preliminary injunctions or temporary restraining orders (TROs), which require a much higher standard than at summary judgment where the facts are to be construed in favor of the non-moving party. *See Kennedy v. Meta Platforms, Inc.*, No. 3:24-cv-02869-WHO, 2024 WL 4031486, at *8 (N.D. Cal. Sept. 3, 2024); *Ariz. Democratic Party v. Ariz. Republican Party*, No. CV-16-03752-PHX-JJT, 2016 WL 8669978, at *1 (D. Ariz. Nov. 4, 2016); *Ariz. All. for Retired Ams. v. Clean Elections USA*, 638 F. Supp. 3d 1033, 1042 (D. Ariz. 2022).

wholly unsupported, Pl. SMF ¶¶ 67-68, 81-84, 167-79, 192-93, a reasonable juror

could conclude that Defendants' widely publicized accusations that Plaintiff and

others engaged in a criminal voting conspiracy were intended to intimidate lawful

voters. *See League of United Latin Am. Citizens–Richmond Region Council 4614*

*v. Pub. Int. Legal Found.* (*LULAC*), No. 1:18-cv-00423, 2018 WL 3848404 (E.D.

Va. Aug. 13, 2018) (holding false accusations of illegal voter registration

intimidating).[10]

There can be no doubt that a juror could conclude Plaintiff's fear was

reasonable given that Plaintiff actually suffered some of these consequences as a

direct outcome of Defendants' false accusations against him.  Pl. SMF ¶¶ 144, 149-

54. For example, Plaintiff no longer votes in person out of fear he will be

recognized as one of the "mules" portrayed in the Film. *Id.* ¶ 153. Additionally,

after Defendants published footage of Mr. Andrews as an exemplar "mule," he

was: subjected to a government investigation for voter fraud that explicitly cited

---

[10] The facts here are analogous to those in *Wohl II*, in which the court granted
summary judgment for the plaintiffs on their Klan Act claim. 661 F. Supp. 3d at
113-15. The court found that the defendants' robocall, which falsely claimed that
voting by mail would result in voters' data being used to trigger old warrants,
collect past debts, and track vaccines, was sufficient to establish the defendants'
intent to intimidate voters.  *Id.* at 113-15, 125-26. The court found that
"communications inspiring fear of legal consequences, economic harm,
dissemination of personal information, and surveillance" may all amount to
unlawful voter intimidation.  *Id.* at 113.

Defendant TTV's accusation that Plaintiff is a "mule" whose illegal activity they geotracked, *id.* ¶¶ 55-59; identified by two reporters as one of the alleged "mules," *id.* ¶¶ 139-40; and targeted in online threats, *id.* ¶¶ 145-148. Further, whether Plaintiff's name became public because of Defendants' activities or as a result of the SEB investigation is highly disputed. *See* Response to TTV SMF ¶¶ 58, 60, 65; Pl. SMF ¶¶ 139-40. As such, for the purposes of Defendants' Motions, this fact should be resolved in Plaintiff's favor.

A reasonable juror could also find that the Film constitutes voter intimidation given that Plaintiff not only feared, but in fact actually experienced, the very harms warned of in *Wohl II* and other analogous cases. MTD Order at 22; *Wohl II*, 661 F. Supp. 3d at 115 ("That [the defendants' actions] induced these feelings of fright, rage, and distress confirms that the Individual Plaintiffs were in fact intimidated and threatened by the message."); *LULAC*, 2018 WL 3848404, at *4 (defamation by linking "Plaintiffs' names and personal information to a report condemning felonious voter registration" constitutes intimidation); *Ariz. All. for Retired Ams. v. Clean Elections USA*, No. CV-22-01823-PHX-MTL, 2022 WL 17088041, at *2 (D. Ariz. Nov. 1, 2022) (TRO granted after finding drop box voter intimidation).

Defendants' relentless peddling of their false narrative – without proof and despite contradictory evidence—also evinces their *intent* to intimidate. *See* Section

1(d)(3) *supra*; *Wohl II,* 661 F. Supp. 3d at 116. As detailed herein, abundant evidence demonstrates that Defendants created and promoted the Film while knowing they had no evidence that Plaintiff was a "mule." *See*, *e.g.,* Pl. SMF ¶¶ 178, 190, 201-12, 221. Moreover, in publicizing the Film, all Defendants endeavored to ensure images of Plaintiff and other actual voters, including unblurred images, were widely disseminated in promotion of their false narrative. *See id.* ¶¶ 91, 93-94, 104-07, 98-100; Response to TTV SMF ¶ 176.

A jury may "infer that a person ordinarily intends all the natural and probable consequences of an act knowingly done." *U.S. v. Myers*, 972 F.2d 1566, 1573 (11th Cir. 1992). Here, TTV and D'Souza Defendants collaborated to create, develop, and promote *2000 Mules* promising viewers that, in the Film, they "can actually watch the criminals at work." Pl. SMF ¶ 7; *see also id.* ¶¶ 1-2, 4, 6, 32-33, 39, 42-45, 47, 50. Viewing the evidence in the light most favorable to Plaintiff, as a natural and probable result of Defendants' intentional acts to peddle these lies about Plaintiff while simultaneously displaying his image, Plaintiff was publicly accused of being a criminal, investigated by law enforcement, and has changed his voting behavior. *Id.* ¶¶ 45-47, 55, 63-68, 153. A juror could reasonably infer that Defendants intended those probable consequences, which alone is sufficient to satisfy the Klan Act. *See, e.g., Wohl II*, 661 F. Supp. 3d at 113, 115 (because defendants' communication "portends the risk of arrest" it "could easily be

perceived as threatening or intimidating to a reasonable recipient" as could the threat of "increased surveillance and scrutiny"); *LULAC*, 2018 WL 3848404, at *1 (defendants' intimidating actions occurred "even after . . . election officials repeatedly informed Defendants of the methodological deficiencies").

In addition, the record contains *even more* evidence to substantiate a jury finding that Defendants had a shared purpose of intimidating voters generally. For example, the evidence shows that Defendants also wanted to deter voters from exercising their right to use drop boxes and used the Film and various promotional actions to encourage surveillance of drop boxes and voters. *See, e.g.,* SAF ¶ 4; Pl. SMF ¶¶ 244-45.  In their promotional appearances, Defendants stressed that drop boxes be monitored, not just by law enforcement but also by "patriots." *See, e.g.*, SAF ¶¶ 3-4, 6, 13. A reasonable juror could conclude that these calls for vigilante action and drop box monitoring constitute additional evidence of Defendants' broader intent to intimidate. *See, e.g., Ariz. All. for Retired Ams.*, 2022 WL 17088041, at *2 (granting TRO prohibiting defendants from drop box monitoring actions). Defendants' statements over the course of their coordinated promotion of the Film make it clear that an explicit goal was that the Film and underlying research would result in arrests and indictments of "mules", including those voters depicted in the Film. SAF ¶ 5. Indeed, as recently as February 2025, Mr. D'Souza posted on social media calling for the Attorney General of the United States to

investigate, writing: "'2000 Mules' busted the election fraud" and "DOGE and @elonmusk exposed the money trail." SAF ¶ 14.

A reasonable juror could also conclude that Defendants had an additional partisan motivation for intimidating and injuring drop box voters: helping their preferred candidates win elections. Defendants coordinated the content and promotion of the Film with Donald Trump, Pl. SMF ¶¶ 251-254; sought to use the Film to benefit Republican candidates in the 2022 midterms, *id.* ¶ 250; SAF ¶¶ 9-10; and limited the Film's "mules" research to Democratic centers in battleground states Donald Trump lost in 2020, SAF ¶¶ 7-8. *See Wohl II*, 661 F. Supp. 3d at 117 (noting the defendants targeted "cities with significant Black populations, all for the purpose of deterring voters -- in particular Black, Democratic voters -- from voting in the 2020 Election").

Considering the full context of Defendants' conduct discussed above – including curating a false narrative of "ballot mules" featuring images of real voters; broadcasting the repeated accusation that those voters committed the egregious crime of stealing a presidential election; publicly calling for their arrest; associating the accused with other crimes and acts of violence; and urging viewers, who believe themselves to have been disenfranchised based on Defendants' own claims, to take action and monitor drop boxes – a jury could reasonably conclude Defendants intended to intimidate voters. *Wohl II*, 661 F. Supp. 3d at 115.

    *(c)*    *Alternatively, or in Addition, A Reasonable Juror Could Find That One Purpose of Defendants' Conspiracy Was To Injure Voters.*

As this Court already found, Plaintiff separately alleged a cognizable claim under clause [iv] of § 1985(3). MTD Order at 22. In their Motions for Summary Judgment, Defendants at best "raised perfunctorily without citation to authority" Plaintiff's allegations under clause [iv]—namely, that one unlawful purpose of Defendants' conspiracy was to *injure* the voters they depicted. *Cont'l Tech. Servs., Inc.*, 927 F.2d at 1199. Defendants therefore waive this issue. *Id.*

In any event, as Plaintiff has explained above and elsewhere, the evidence shows that Defendants repeatedly defamed Plaintiff and other lawful drop box voters. *See* Section 1 *supra*. Viewing this evidence in the light most favorable to Plaintiff and drawing all inferences in Plaintiff's favor, a reasonable juror could find that, in defaming Plaintiff (and others), Defendants also intended to injure lawful drop box voters for their support-or-advocacy in federal elections. *See* Section 1 *supra*. Moreover, because a natural and probable result of using Plaintiff's (and other voters') images to falsely accuse them of criminality is that those voters would be baselessly accused of being criminals, a reasonable juror could find that Defendants intended such injury. Pl. SMF ¶ 47; *see Myers*, 972 F.2d at 1573.

    *(d)*    *Defendants' Arguments Rest On Material Disputes Of Facts.*

Defendants' arguments seek to distance themselves from the unlawful aspects of their agreement, erroneously heighten the standard to show a conspiracy under the Klan Act, 42 U.S.C. § 1985(3), and ignore the standard for summary judgment.

### (i) Defendants Cannot Escape Liability for an Unlawful Purpose by Having Additional Lawful Purposes for their Conduct.

Defendants argue that their agreement to create and promote the Film was lawful, TTV MSJ at 6; D'Souza MSJ at 38-39, but a myopic focus on the four corners of Defendants' Licensing Agreement ignores the evidence of "the totality of [Defendants'] conduct" that shows the other unlawful purposes detailed above. *See Schwartz*, 541 F.3d at 1361. "[A] conspiracy may have multiple objectives," and an unlawful conspiracy is shown "if one of its objectives, even a minor one" is unlawful. *U.S. v. Adkinson*, 158 F.3d 1147, 1155 (11th Cir. 1998); *see also Lavassani v. City of Canton*, 760 F. Supp. 2d 1346, 1370 (N.D. Ga. 2010) (defining conspiracy to include "accomplish[ing] a lawful end by unlawful means"); *Libertad v. Welch*, 53 F.3d 428, 446 (1st Cir. 1995) (focusing on the lawful part of a 1985(3) conspiracy is "akin to saying that a bank robber lacks mens rea and thus cannot be convicted because his ultimate objective was to make money, not to commit robbery").

Accordingly, whether or not Defendants also had *some* lawful objectives does not shield them from liability when, as here, the evidence also establishes that

they had at least one unlawful objective: to intimidate and/or injure voters. At a bare minimum, Defendants' purposes for falsely portraying voters as criminals are disputed issues of fact which cannot be resolved at summary judgment. *Reid v. City of Atlanta*, 2010 WL 1138456, at *18 (finding a genuine dispute to be decided by a jury where there were at least two plausible explanations – one lawful and one unlawful – for defendants' actions).

> (ii)    *D'Souza Defendants' Arguments Rely On Disputed Material Facts.*

D'Souza Defendants offer several other arguments that rely on disputed issues of fact.   First, notwithstanding D'Souza's insistence that he personally researched and fact-checked his false claims in *2000 Mules*, Pl. SMF ¶¶ 1, 47, 48, 99, 104, 156; D'Souza SMF ¶ 57, now D'Souza Defendants argue they "reasonably relied upon TTV's evidence that Mr. Andrews illegally cast ballots," and had no "awareness that Mr. Andrews was a legal voter," D'Souza MSJ at 39. This argument should be rejected for at least three independent reasons.

*First*, D'Souza's claim that he had no awareness that Mr. Andrews was a legal voter is disputed by TTV Defendants. *See* TTV SMF ¶ 47 (claiming that TTV "made clear" that the batch of videos including Plaintiff's image "was not tied to geospatial analysis, but was to be used only to complete the request from Debora D'Souza for backup images"). The fact that even Defendants cannot agree on this fact forecloses D'Souza Defendants' argument.

45

*Second*, D'Souza Defendants could not have "reasonably relied upon TTV's evidence," because it is undisputed that neither set of Defendants ever possessed any evidence that Plaintiff was a "ballot mule." Pl. SMF ¶¶ 81-85. Stated differently, the record supports a reasonable inference that D'Souza *never saw* any evidence that Plaintiff was a ballot mule, *id.* ¶¶ 211-219, and therefore there was no such evidence on which D'Souza could have reasonably relied. A reasonable juror could reach this conclusion from emails and testimony demonstrating that D'Souza Defendants were well aware throughout the filmmaking process that TTV's videos did not show wrongdoing. *See, e.g.,* Pl. SMF ¶¶ 201-12, 221. And before the Film was widely released in theaters, *id.* ¶ 87, Defendant Phillips texted Defendant D'Souza about Plaintiff, writing "this isn't a mule." *Id.* ¶ 71; *Cf U.S. v. Tomey*, 783 F. App'x 832, 842 (11th Cir. 2019) (affirming conspiracy conviction where there was "ample circumstantial evidence that [defendant] knew . . . and thus a jury reasonably could infer that [both defendants] reached an agreement").

*Finally*, a reasonable juror could find that any reliance on TTV by D'Souza Defendants was entirely unreasonable.  Pl. SMF ¶¶ 201-24. And a reasonable juror could further find that it is not credible that D'Souza continued to believe that Plaintiff was a mule after both a government investigation cleared Plaintiff *and* Phillips privately admitted that Plaintiff was not a mule.  *Id.* ¶¶ 71-72. At

minimum, D'Souza's assertions are disputed facts and subject to a credibility

determination by the jury.

D'Souza Defendants also argue that the promotional appearances that used

unblurred images of Plaintiff were "contrary to their agreement," D'Souza MSJ at

39, implying that those statements are the only ones that may have been

intimidating or injurious.  However, drawing all inferences in Plaintiff's favor, a

reasonable juror could find that the other statements (where Plaintiff's image *is*

blurred) are also injurious and intimidating because Plaintiff is still recognizable.

Indeed, Plaintiff was in fact recognized. *See* Section 1(c) *supra*. Moreover, an

action that goes beyond the text of the License Agreement does not mean that the

action was outside of the overall conspiracy. *See also U.S. v. Calderon*, 127 F.3d

1314, 1329 (11th Cir. 1997) ("[T]he fact that coconspirator may change roles in the

conspiracy or even depart from the conspiracy may signal only that the single

conspiracy has moved to a new phase.").  In all events, the evidence supports a

finding that D'Souza Defendants were in fact involved in specific interviews that

showed the unblurred images. Most significantly, D'Souza himself published the

unblurred footage of Plaintiff shown on the Tucker Carlson Show, exposing

Plaintiff's unblurred image to hundreds of thousands of additional views.  Pl. SMF

¶ 107; SAF ¶ 15. Indeed, while Engelbrecht was filming the interview, Phillips was

in contact with D'Souza and discussed ways to leverage the interview to promote the Film.  Pl. SMF ¶ 105; *see also id.* SMF ¶ 96.

*Finally*, as discussed above, a reasonable juror could find that all these publicity statements were also part of the unlawful agreement, regardless of the D'Souza Defendant's specific involvement in – or even knowledge of – each one, especially because evidence shows that D'Souza encouraged TTV's promotional actions. *See, e.g.,* SAF ¶ 12; *see also Guerra*, 293 F.3d at 1285 (finding that individuals may be engaged in a conspiracy "even if [they] did not know all its details or played only a minor role in the overall scheme.").

(iii)   <em>TTV Defendants Rely on Disputed Material Facts.</em>

TTV Defendants also make a number of additional arguments in support of their Motion, all of which rely almost entirely on matters of disputed fact.  Among other things, TTV Defendants argue that the origins of the Film lie with D'Souza Defendants, TTV MSJ at 7, but that fact is disputed by D'Souza Defendants. *See* D'Souza SMF ¶ 13 (Engelbrecht approached the D'Souzas "to discuss a possible film based on TTV research").  Regardless of the precise "origin" of the Film, TTV's research and surveillance footage formed the "backbone" of the Film.  Pl. SMF ¶ 28. Although TTV Defendants also seek to minimize the amount of contact they had with D'Souza Defendants, this fact is also disputed: Debbie D'Souza testified that they communicated "three or four times" a week during the making of

the Film.[11] Response to TTV SMF ¶ 97. While TTV Defendants assert that their

"primary role was to send video clips" and that they "had *no editorial control*,"

TTV MSJ at 7 (emphasis in original), these are also disputed facts. *See*, *e.g.,*

Response to TTV SMF ¶ 81. Finally, TTV's arguments that they were minimally

involved with the Film's marketing and publicity and "had nothing to do with"

certain statements, TTV MSJ at 93, 105, 113, 137, 144, 155, 160, 163, 167, 171,

are also contradicted by the evidence. *See* Section 2(a) *supra*; Response to TTV

SMF ¶ 93.

Finally, TTV Defendants seek to shield themselves from liability by

contending (without submitting any independent proof) that they, on the advice of

an attorney, believed that Georgia law required assistor signatures to deposit the

ballot of others. TTV MSJ at 8-9. This is a red herring.

Critically, the claim here is not that Defendants publicly accused Plaintiff of

merely failing to sign his immediate family's four assistor envelopes. First Am.

Compl., ECF 27 ¶¶ 34-44. Rather, Plaintiff's claims result from the TTV

Defendants portrayal of Plaintiff as a criminal, geotracked "ballot mule," who, as

stated by Defendant Engelbrecht in the Film, "is, by our definition, a person that is

---

[11] TTV Defendants likewise fail to acknowledge that Engelbrecht and Phillips
continued to work together to advance the conspiracy in additional ways
including, for example, certain promotional activities advancing the mules
narrative, Pl. SMF ¶¶ 90-91, 93, 98, 111-12, 115, 123, and attempts to get law
enforcement to investigate mules. TTV SMF ¶¶ 50-54.

involved in picking up ballots from locations and running them to the drop boxes."
Pl. SMF ¶ 42. In fact, Engelbrecht expressly disclaimed the idea that the "mules'"
conduct could be merely explained as dropping off family ballots. She said: "One
of the questions that will come up in the work that we've done is, 'Well *how do
you know that this wasn't just somebody that's got a big family and they just
deposited a bunch of ballots once*.' . . . The elements that are additive here - the
going to the non-profits, the ability to identify the pattern of approach to a drop
box. And that it is going not past a drop box and on, but directly to a drop box and
back to another point - *and then to another drop box*." *Id.* ¶ 43 (emphasis added);
*see also id.* ¶¶ 39, 44; SAF ¶ 1.

TTV Defendants repeatedly advanced their false narrative, including on
appearances during which they showed unblurred video of Plaintiff voting while
discussing him specifically. *See, e.g.*, Pl. SMF ¶ 93.  Far from simply accusing
Plaintiff of violating a technicality, Defendants accuse him and others of much
more: participating in a vast criminal conspiracy.

**3.    Defendants are Not Entitled to Summary Judgment on Count IV, False
Light.**

Defendants argue that Plaintiff is not permitted to bring a false light claim
because it "is based on the same facts as his defamation claim" and is thus
subsumed in his defamation claim.  D'Souza MSJ at 34; TTV MSJ at 27.  Plaintiff
has pleaded his claims for defamation and false light in the alternative.  In the

50

event that the Court were to find that the statements at issue were non-defamatory (and it should not), then Plaintiff may still proceed with his false light claim. *See Krass v. Obstacle Racing Media, LLC*, 667 F. Supp. 3d 1177, 1214 (N.D. Ga. 2023) (where defendants' "only ground for seeking summary judgment on the claims for false light" is plaintiff's "inability to prove defamation," "the Court cannot hold that Defendants are entitled to judgment as a matter of law").

(a)    *Defendants' False Statements Do Not Fall Under the "Newsworthiness Exception."*

Defendants also argue that summary judgment is warranted because the statements in question involve a matter of public interest and that use of Plaintiff's image was therefore newsworthy. TTV MSJ at 28-29; D'Souza MSJ at 35. As the Court recognized in denying Defendants' motions to dismiss, however, this exception is only applicable when the account is factually accurate. *See* MTD Order at 48 (citing *Maples v. Nat'l Enquirer*, 763 F. Supp. 1137, 1143 (N.D. Ga. 1990) ("[T]o fit within the zone of protection afforded 'news', an account must be factually accurate.")).

Plaintiff has more than met his burden of coming forward with evidence that none of the depictions of Andrews as a ballot "mule" who was geotracked voting multiple times were true. Indeed, Defendants have now admitted that they have no evidence to support any such allegation. Section 1(a) *supra*; Pl. SMF ¶¶ 65-68, 71-72, 132; D'Souza SMF ¶¶ 134-35.

51

    *(b)*    *Overwhelming Evidence Contradicts TTV's Argument that They Did Not Depict Plaintiff As Something or Someone He Is Not.*

Rehashing many of the same arguments that they made regarding Plaintiff's claim for defamation, TTV Defendants also assert that the false light claim fails because they did not "depict[] the plaintiff as something or someone which he is not." TTV MSJ at 27-28. These arguments are frivolous given the evidence that they appeared on multiple programs during which unblurred footage of Plaintiff was shown as they described him as a "mule" and his behavior as criminal. Pl. SMF ¶¶ 93-95, 98-101, 104. Moreover, although they now claim they had no "editorial control" over the Film, Book, Trailer and promotional materials, they were the source of all the surveillance footage (including the footage of Plaintiff) that was used in the Film, *id.* ¶¶ 25-26, 33, 93-94, 98-100; D'Souza SMF ¶¶ 52, 63; they were interviewed for and appeared in the Film; and, although they had many chances to do so, they never sought to correct, publicly, or even privately, the manner in which their geotracking research and the footage they provided was portrayed in the Film. Pl. SMF ¶¶ 56-58. As discussed in Section 3(b), TTV Defendants directly accused Plaintiff of criminal conduct on multiple occasions. *See id.* ¶¶ 33, 93-94, 98-100.

TTV's arguments that Plaintiff's face was blurred in certain clips,[12] that they never identified him by name, and that the clips were obtained from publicly available surveillance footage have been addressed above.  *See supra* Section 3(c).

For all of these reasons, none of the Defendants are entitled to summary judgment on Count IV, false light.

## 4.    Defendants are Not Entitled to Summary Judgment on Count V, Misappropriation.

An appropriation of likeness claim in Georgia consists of:  "[1] the appropriation of another's name and likeness, whether such likeness be a photograph or [other reproduction of the person's likeness], [2] without consent[, and] [3] for the financial gain of the appropriator."  *Bullard v. MRA Holding, LLC*, 740 S.E.2d 622, 626 (Ga. 2013) (alterations in original); *see also Cabaniss v. Hipsley*, 151 S.E.2d 496, 503-04 (Ga. Ct. App. 1966).

Defendants contend that they are entitled to summary judgment on Count V for misappropriation of likeness because (1) Plaintiff's likeness was not recognizable and (2) there could be no invasion of privacy because the information

---

[12] TTV Defendants cite *Evans v. Federal Bureau of Prisons* for the blanket assertion that techniques such as "blurring out faces" "eliminate unwarranted invasions of privacy." 951 F.3d 578, 587 (D.C. Cir. 2020). TTV MSJ at 28. However, *Evans* is a District of Columbia case analyzing whether *unblurred* surveillance footage fell within an exemption to the Freedom of Information Act, not the impact of blurring in a civil tort claim for invasion of privacy by false light. The case has no application here.

disclosed was open to public observation. *See* TTV MSJ at 29-32; D'Souza MSJ at

35-37. Both of these arguments fail.

       (a)    *Plaintiff's Likeness was Recognizable.*

As discussed above, the undisputed facts establish that Plaintiff has

demonstrated that he was recognizable to others because multiple persons *did*

recognize him, including at least two reporters and the SOS investigator.  Pl. SMF

¶¶ 139-43; *see* D'Souza SMF ¶ 106; TTV SMF ¶¶ 61-66.

Defendants' arguments that Plaintiff's "image was either blurred, or so small

and of such poor quality, that he could not be recognized" find no support in the

cases cited by Defendants.  D'Souza MSJ at 36; *see also* TTV MSJ at 31.  For

example, the photo underlying the claim in *Collins v. Creative Loafing Savannah,*

*Inc.,* was not of an actual person, but rather a "cartoon character" that was

"unrecognizable as a 'real person'" with antennae and four hands.  592 S.E.2d 170,

174 (Ga. Ct. App. 2003).  The image at issue in *Branson v. Fawcett Publications,*

*Inc.*, was that of an automobile, containing no human "form" or "silhouette" such

that it appeared that no one was in the vehicle.  124 F. Supp. 429, 432 (E.D. Ill.

1954).  Here, even when blurred, Plaintiff's "form," and "silhouette" are clearly

visible.  Pl. SMF ¶ 37; *see id.*  Further, "no identifying marks or numbers on the

car" were visible in *Branson*, whereas, the surveillance video clearly shows the

make, model, and color of Plaintiff's car, and on several occasions, his unblurred

license plate.  Pl. SMF ¶¶ 93-94, 98-100, 104; *see Branson*, 124 F. Supp. at 432.

In *Brauer v. Globe Newspaper Co.* the photo was "a side view" of the plaintiff

"sitting bent over on a stairway," and showed only "one ear and the partial outline

of the back of his head." 217 N.E.2d 736, 738 (Mass. 1966).  Defendants'

misappropriation, here, in addition to several other instances, involved a video

showing Plaintiff's entire body and his vehicle, and includes frames where he faces

the camera.  Pl. SMF ¶ 37.

The TTV Defendants also argue that Plaintiff was not recognizable because

he was never named in the Film, and they did not know his identity until this

lawsuit (a fact which is disputed).  *See* TTV MSJ at 31; Response to TTV SMF ¶

174.  However, to establish "likeness," the misappropriated image need not include

an individual's name.  *See, e.g., Bullard*, 740 S.E.2d at 627 (holding that the use of

a photo of plaintiff, published without her name, could subject the defendant to

liability); *Alonso v. Parfet*, 325 S.E.2d 152, 749 (1985) ("The courts in this state

have long recognized that one who makes an unsanctioned appropriation of

another's name *or* likeness for his own benefit may be liable to that person in tort."

(emphasis added) (citation omitted)).

The TTV Defendants also repeat their assertion that they lacked "editorial

control" over "almost all" the statements and contend that because they "did not

select the videos that were used," they could not have intended to appropriate

55

Plaintiff's likeness. TTV MSJ at 31. This argument is disingenuous given that they provided and were the *only source* of any the videos that were used. Pl. SMF ¶¶ 56-58; D'Souza SMF ¶¶ 52, 63. Even if they did not choose which specific videos were used as they assert, they provided the entire universe of the videos from which the videos were chosen. *Id.*

      (b)    *The Newsworthy Exception Does Not Apply to Defendants' False Statements.*

TTV Defendants repeat their argument that the Statements involve "a matter of public interest" and therefore there was no invasion of privacy by appropriation of likeness. TTV MSJ at 31. As discussed in Section 5(a) above, Defendants' statements do not fall within this exception because it applies only when the statements concerning the Plaintiff were true, which they were not here.

Relatedly, Defendants also cite cases involving the newsworthy exception to argue that because Plaintiff's voting "was a non-private act done in public," "open to public observation," and a "matter of public record," D'Souza MSJ at 37; TTV MSJ at 30, his likeness cannot be misappropriated.

The idea that voting is a "non-private" act has no support in the law or record. Indeed, the protections afforded under Georgia law for voters indicate voting is not viewed as a public act. *See* O.C.G.A. § 21-2-413(a) ("No elector shall be allowed to occupy a voting compartment or voting machine booth already occupied by another . . . ."); O.C.G.A. § 21-2-413(e) ("No person shall use

photographic or other electronic monitoring or recording devices, cameras, or cellular telephones while such person is in a polling place while voting is taking place . . . and no photography shall be allowed of an electors list, electronic electors list, or the use of an electors list or electronic electors list.").  Further, it has been acknowledged that "[v]oter privacy . . . is vital to election integrity." *Wohl II*, 661 F. Supp. 3d at 115.  Nor does the footage of Plaintiff voting constitute a widely available "public record."  *See* Response to TTV SMF ¶ 23.  At best, Defendants' argument gives rise to a question of fact to be resolved at trial.

For all of these reasons, summary judgment for Defendants should also be denied on Count V, misappropriation.

## 5.    Defendants' are Not Entitled to Summary Judgment on Count VI, Civil Conspiracy.

Defendants' motions for summary judgment on civil conspiracy to defame should be denied because a reasonable juror could find that Defendants conspired and had a common design to defame Plaintiff.

### (a)    *A Reasonable Juror Could Infer That Defendants Conspired to Make the Defamatory Statements.*

Under Georgia law, "[a] conspiracy upon which a civil action for damages may be founded is a combination between two or more persons either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort." *Metro Atlanta Task Force for the Homeless, Inc. v. Ichthus Cmty. Tr.*, 780

57

S.E.2d 311, 317 (Ga. Ct. App. 2015); D*rummond v. McKinley*, 15 S.E.2d 535, 535 (Ga. Ct. App. 1941). "The existence of a conspiracy may 'be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.'" *Metro Atlanta Task Force.*, 780 S.E.2d at 317-318. Accordingly, claims for civil conspiracy are typically not resolved on summary judgment. *Id.* at 318 ("It is usually within the province of the jury to draw such inferences; and so cases involving an alleged civil conspiracy are typically not resolved on summary judgment."); *Miller v. Lomax*, 596 S.E.2d 232, 242 (Ga. Ct. App. 2004) ("Because civil conspiracy is by its very nature a secret endeavor, concert of action, amounting to a conspiracy, is best suited for jury resolution."); *Tyler*, 707 S.E.2d at 141 (finding trial court erred in granting summary judgment on civil conspiracy claim because inference could be made that co-defendants conspired).

D'Souza Defendants argue in a conclusory fashion that Plaintiff "cannot show any evidence that a conspiracy existed," D'Souza MSJ at 38, and TTV Defendants argue that "there must be a defined, intended fruit of the conspiracy which the members of the conspiracy agree upon." TTV MSJ at 33.

There is ample evidence from which a reasonable juror could find that the Defendants conspired to make the defamatory statements. Here, as discussed above, Section 2(a) *supra,* the Defendants worked in close collaboration to

formulate their story about the mules, develop their purported "evidence," and to publish the statements about Plaintiff, even though Defendants never possessed evidence that *any* voters in the Film were criminal ballot "mules," and even after a public government investigation cleared Plaintiff of all wrongdoing. *See, e.g.*, Pl. SMF ¶¶ 66-78, 87, 102-03, 108-10, 113-14, 117-19. All Defendants frequently communicated and strategized together to develop, publish, disseminate and promote the *2000 Mules* narrative included in the Film and Book. *See id.* ¶¶ 15-31, 37-39, 49-50, 89, 104-07, 136-38. The Defendants used each other's research, promoted each other's statements, and worked to create a common narrative. *Tanisha Sys., Inc.*, 2015 WL 10550967, at *6 (finding plaintiff alleged conspiracy to defame where plaintiff alleged defendant was "commenting on and supporting [co-defendant's] allegedly defamatory blog post and second, by acting as a co-conspirator with [co-defendant] in the creation of the blog post by virtue of [their] alleged assistance in collecting" information). Further, they entered into written profit-sharing arrangements for the Film.  Pl. SMF ¶ 126. The D'Souza Defendants even *admit* that "there was an agreement among all defendants to create, publish, and promote a film." D'Souza MSJ at 39.

      (b)    *Defendant' Legal Arguments Are Incorrect.*

D'Souza Defendants argue that summary judgment should be granted because the agreement between the Defendants was "a perfectly legal plan."

D'Souza MSJ at 39. TTV Defendants also assert that proof of "joint purpose to publish" is insufficient, and that there must be specific evidence of a joint purpose to defame. TTV MSJ at 33. Defendants cite incorrect legal standards.

The cases relied on by the TTV Defendants apply the law of District of Columbia, Colorado, and Delaware, but not the law of Georgia. Each case also repeats the same language from *Dowd v. Calabrese*, 589 F. Supp. 1206, 1214 (D.D.C. 1984). But *Dowd*'s proposition that the conspiracy must be specifically to defame is far from universal. *See, e.g.*, *Scheetz v. Morning Call, Inc.*, 747 F. Supp. 1515, 1520 (E.D. Pa. 1990), *aff'd*, 946 F.2d 202 (3d Cir. 1991) (finding *Dowd*'s "strict" formulation of conspiracy to be inapplicable) ("Whether [defendants], or the editors of The Morning Call intended to violate the [plaintiffs'] privacy rights is irrelevant; the question is whether they intended to perform the acts that caused the alleged violation of the [plaintiffs'] privacy rights.")

Georgia law is clear: civil conspiracy requires "a combination between two or more persons either to do some act which is a tort, *or else* to do some *lawful* act by methods which constitute a tort." *Metro Atlanta Task Force*, 780 S.E.2d at 317 (emphasis added). Thus, while agreeing to publish a movie, book, or other statement may be legal, conspiring to do so with defamatory content is actionable. Even the cases on which Defendants rely demonstrate that all that is needed is an agreement *to make the defamatory statements*, not an agreement *to defame*. *See,*

*e.g.*, *Coomer v. Donald J. Trump for President, Inc.*, 552 P.3d 562, 602 (Colo. App. 2024) (to prevail on civil conspiracy claim, "plaintiff must present some indicia that the defendant actually agreed with at least one other person to make the defamatory statements").

    In all events, even if the law required Plaintiff to show that the Defendants conspired to defame Plaintiff, the record is replete with evidence that would allow a reasonable jury to infer that Defendants did just that. As explained by the Georgia Supreme Court,

> The essential element of the charge is the common design; but it need not appear that the parties met together either formally or informally, or entered into any explicit or formal agreement; *nor is it essential that it should appear that either by words or by writings they formulated their unlawful objects*.

*Cook v. Robinson*, 116 S.E.2d 742, 745 (Ga. Ct. App. 1960) (emphasis added).

    Defendants may be liable for actions undertaken in furtherance of a conspiracy "*although neither present nor participating*." *Woodruff v. Hughes*, 58 S.E. 551, 551 (Ga. Ct. App. 1907) (emphasis added). TTV Defendants contend, however, that Plaintiff must show that "(1) both parties were present when the slanderous words were uttered, and (2) the slanderous words spoken by one party was done with the consent of the other party and in furtherance of a common design and purpose." TTV MSJ at 35. In making this claim, TTV Defendants cite a Georgia Court of Appeals decision, *Turnage v. Kasper*, where the court held that

there was "no evidence to suggest that [the defendant] engaged in a conspiracy with [the co-defendant] as to the subject encounter." 704 S.E.2d 842, 855 (Ga. Ct. App. 2010). Although the *Turnage* court said that there "must" be a showing that both parties were present when the standard occurs, the cases *Turnage* cites for this proposition do not hold.  Both *Roberts v. Lane*, 435 S.E.2d 227 (Ga. Ct. App. 1993) and *Jordan v. Hancock*, 86 S.E.2d 11 (Ga. Ct. App. 1955) state that a conspiracy to slander "*may*" be established by showing that both parties were present when the slanderous words were uttered, but they do not state that it is a requirement. *Jordan*, 86 S.E.2d at 11, 16 ("The conspiracy *may* be established by showing that both parties were present when the slanderous words were uttered." (emphasis added)); *Roberts*, 435 S.E.2d at 228 ("The conspiracy *may* be established by showing that both parties were present when the slanderous words were uttered." (emphasis added)).  Further, as the Supreme Court of Georgia has recognized, "conspiracy is important to the action" "because it will enable the plaintiff to recover his damages . . . not only from the actual participants engaged in committing the injury, *but also* from those defendants who conspired to accomplish it, *although neither present nor participating*." *Woodruff*, 58 S.E. at 551 (emphasis added).[13]

---

[13] Indeed, *Turnage* actually supports the notion that although some acts of the tort may be committed independently, a reasonable juror could still find that co-

*(cont'd)*

What all cases do agree on is that: "a person who has not spoken slanderous words may be held liable for them if they were uttered by another in furtherance of a conspiracy to which he was a party." *Turnage*, 704 S.E.2d at 854. Here, TTV Defendants themselves slandered Plaintiff in their promotional interviews as well as through their interviews shown in the Film and quoted in the Book.  It is also well-established that "[t]he essential element of a civil conspiracy is a common design." *Metro Atlanta Task Force*, 780 S.E.2d at 318. The record here is replete with evidence that Defendants were "part of a concerted action with a common design." *Id.* ("[Defendant] could be held jointly liable for any torts committed by the other defendants to effect the common design of the conspiracy, even if he did not directly engage in each and every tort alleged.").

Finally, TTV Defendants assert that there is no evidence of an underlying tort. For the reasons stated above, there is more than enough evidence for a jury to find that the Defendants defamed Plaintiff.

---

defendants conspired to commit the tort. *See Turnage*, 704 S.E.2d at 851 (in trial on civil conspiracy to maliciously prosecute, "[t]he fact that the arresting officer testified at trial that the decision to pursue a charge . . . was made in his individual judgment does not change" the finding that there was evidence to support conspiracy, because he "was operating based upon the photographic and audio evidence provided by [his co-defendant] in conjunction with [co-defendant's] . . . assertion that it showed [plaintiff] to have committed the crime"). Here, even if the decision to ultimately hit "post" on certain statements was the decision of one party, the evidence would still allow a reasonable juror to infer a conspiracy to do so.

**6.      TTV Defendants are Not Entitled to Summary Judgment on Count VII for Punitive Damages.**

TTV Defendants move for summary judgment on Plaintiff's claim for punitive damages, arguing that Plaintiff cannot show that TTV acted with "actual malice" or "specific intent to cause harm," TTV MSJ at 37-40. To the contrary, as discussed above, the record is replete with examples of TTV Defendants' actual malice and specific intent to cause harm, such that the high summary judgment standard cannot be met here.

This Court previously held that Plaintiff sufficiently pleaded a claim for punitive damages under O.C.G.A. § 51-12-5.1 when he alleged that Defendants: continued to publish false statements about him even after they were aware he had been cleared by the SEB, continued to make the Film and Book available, and promote the same, even after receiving notice from Plaintiff's attorneys that the statements therein were false and defamatory, and promulgated the mules narrative despite the fact that the geolocation data was not precise enough to show any such thing. MTD Order at 43-44. The undisputed facts show that Plaintiff has established every one of these facts.  Pl. SMF ¶¶ 69-78 (Defendants were aware of the SEB investigation), 81-85 (Defendants never had any evidence of illegality), 86-92 (Defendants continued to advertise *2000 Mules),* 93-119 (Defendants' media appearances), 125-138 (Defendants promoted the book).

64

The Eleventh Circuit has "explained that 'actual malice' refer[s] to the speaker's actual or constructive knowledge regarding the truth of the statement." *Schafer v. Time, Inc.*, 142 F.3d 1361, 1366 (11th Cir. 1998); *see also Straw v. Chase Revel*, 813 F.2d at 361. Here, TTV Defendants knew that the *2000 Mules* narrative was false as to Plaintiff, and yet they continued to publish his image anyway.

TTV Defendants argue that they could not have acted with actual malice because:  they did not "know" Plaintiff, the defamatory statements did not identify Plaintiff, they had no "editorial control" over the defamatory statements, they acted reasonably by blurring Plaintiff's image, and that they held the reasonable belief that Georgia law required an assistor signature if an individual dropped multiple ballots into a drop box. TTV MSJ at 39. As discussed above, all of these arguments hinge on disputed facts.

TTV Defendants also attempt to read new elements into O.C.G.A. § 51-12-5.1(b). The statute does not require that a tortfeasor "know" the victim—instead it focuses on the "want of care" of the tortfeasor's actions, including his actual or constructive knowledge of the falsity of his statements. *See Craig v. Holsey*, 590 S.E.2d 742, 747 (Ga. Ct. App. 2003) (upholding punitive damages award despite that "there [was] no evidence that [Defendant] acted with malice or with knowledge of any vulnerability of [Plaintiff]."); *Zedan v. Bailey,* 522 F. Supp. 3d

65

1363, 1375-76 (M.D. Ga. 2021) ("malice" as it appears in the Georgia Code means a statement that "is of a type calculated to injure [and] . . . suggests *injurious* . . . things about the subject to the ordinary reader," irrespective of the "defendant's subjective state of mind or intentions towards the plaintiff."). But even if the statute *did* require a tortfeasor to "know" the victim, the undisputed facts overwhelmingly establish that TTV Defendants had specific knowledge that Plaintiff was not a ballot "mule" and yet continued to portray him as such in the Film, Book, promotional materials, and during media appearances. Pl. SMF ¶¶ 69-78, 93-119, 125-38.

TTV Defendants further argue that any award for punitive damages should be capped, as a matter of law, at $250,000 because there is no evidence of TTV Defendants' specific intent to cause harm. This Court has explained that "specific intent to cause harm" means that "the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Cap. Inventory, Inc. v. Green*, No. 1:20-CV-3224-SEG, 2024 WL 1383228, at *4 (N.D. Ga. Feb. 29, 2024). Here, there is no question that TTV Defendants knew that the geolocation data relied upon in the Film and Book did not show that Plaintiff was a ballot "mule," that the SEB exonerated Plaintiff from election fraud, and that Plaintiff did not meet the definition of a ballot "mule" as used in the Film and Book. Notwithstanding this undisputed knowledge of the truth, TTV

Defendants continued to portray Plaintiff as a ballot "mule" and criminal with the substantially certain consequence that doing so would cause Plaintiff unwarranted harm. Indeed, a reasonable juror could conclude that TTV Defendants specifically intended to cause harm to Plaintiff and other so-called ballot "mules." TTV Defendants argued that state and federal authorities should prosecute the ballot "mules" featured in *2000 Mules*, including Plaintiff who TTV Defendants knew was not a mule. SAF ¶ 7. They also sought the extrajudicial persecution of dropbox voters, like Plaintiff. For example, in multiple interviews in which blurred and unblurred footage of Plaintiff was featured, TTV Defendants appealed to the public to monitor dropboxes.  Pl. SMF ¶¶ 93-95, 98-100, 104-05; SAF ¶¶ 8, 15. TTV Defendants praised David Cross as a "patriot" for his role in filing several complaints—including against Plaintiff—with the Georgia SOS, even when the complaint lacked credible support.  Pl. SMF ¶ 60. So not only did TTV Defendants anticipate that the voters featured in *2000 Mules* would be victims of public backlash, they publicly praised vigilantes who went after so-called ballot mules. *Id.* ¶¶ 60, 145-47. In fact, Plaintiff has been the victim of many online threats.  *Id.* ¶¶ 145-48. And, Plaintiff credibly fears for his safety given TTV Defendants posted Plaintiff's personal information on their website, "open.ink."  Response to TTV SMF ¶ 176.

67

Finally, the issue of punitive damages is typically a matter for the jury, and that is the case here where TTV Defendants' arguments are grounded in issues of disputed fact. *See Weinstein v. Holmes*, 810 S.E.2d 320, 321 (Ga. Ct. App. 2018); *Chung v. JPMorgan Chase Bank, N.A.*, 975 F. Supp. 2d 1333, 1350 (N.D. Ga. 2013). That is especially the case here given the disputed facts related to Defendants' intent to cause harm.

## CONCLUSION

For the reasons set forth above, Defendants' Motions for Summary Judgment must be denied, and judgment should be entered for Plaintiff as to liability on Count III of the First Amended Complaint pursuant to Fed. R. Civ. P. 56.

Dated: February 28, 2025          Respectfully submitted,

By: */s/Lea Haber Kuck*

Lea Haber Kuck*
Quinn Balliett*
Scott Boisvert*
Sonia Qin*
Danuta Egle*
One Manhattan West
New York, NY 10001-8602
Tel: (212) 735-3000
lea.kuck@probonolaw.com
quinn.balliett@probonolaw.com
scott.boisvert@probonolaw.com
sonia.qin@probonolaw.com
danuta.egle@probonolaw.com

Rajiv Madan*
Paige Braddy*
1440 New York Avenue NW
Washington, DC 20005
Tel: (202) 371-7000
raj.madan@probonolaw.com
paige.braddy@probonolaw.com

Vernon Thomas*
320 S. Canal
Chicago, IL 60606-1720
Tel: (312) 407-0648
vernon.thomas@probonolaw.com
lindsey.sieling@probonolaw.com

Von A. DuBose, Esq.
Georgia Bar No. 231451
DuBose Trial Law
128 Richardson St. SE
Atlanta, GA 30312
Tel: (404) 720-8111
von@dubosetrial.com

Sara Chimene-Weiss*
PROTECT DEMOCRACY PROJECT
7000 N. 16th Street, Suite 120, #430
Phoenix, AZ 85020
Tel: (202) 934-4237
sara.chimene-weiss@protectdemocracy.org

Rachel E. Goodman*
John Paredes*
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
rachel.goodman@protectdemocracy.org
john.parades@protectdemocracy.org

Jared Fletcher Davidson*
PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA 70117
Tel: (202) 579-4582
jared.davidson@protectdemocracy.org

Jane Bentrott*
Catherine Chen*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Tel: 202-843-3092
jane.bentrott@protectdemocracy.org
catherine.chen@protectdemocracy.org

*Counsel for Plaintiff*

*\*Admitted Pro Hac Vice*

70

## <u>RULE 7.1(D) CERTIFICATE</u>

The undersigned counsel certifies that this document was prepared double-spaced using Times New Roman font (14 point), in compliance with Local Rule 5.1B.

Dated: February 28, 2025         <u>*/s/Lea Haber Kuck*</u>
Lea Haber Kuck*
Quinn Balliett*
Scott Boisvert*
Sonia Qin*
Danuta Egle*
One Manhattan West
New York, NY 10001-8602
Tel: (212) 735-3000
lea.kuck@probonolaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the within and foregoing Plaintiff's Consolidated Opposition To Defendants' Motions For Summary Judgment was electronically filed with the Clerk of Court using CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

Dated: February 28, 2025        */s/Lea Haber Kuck*
                                       Lea Haber Kuck*
                                       Quinn Balliett*
                                       Scott Boisvert*
                                       Sonia Qin*
                                       Danuta Egle*
                                     One Manhattan West
                                     New York, NY 10001-8602
                                     Tel: (212) 735-3000
                                     lea.kuck@probonolaw.com