## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **MARK ANDREWS**, | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-04259-SDG |
| **DINESH D'SOUZA**, *et al.*, | |
| Defendants. | |

## DEFENDANTS TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, AND GREGG PHILLIPS'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................1

STATEMENT OF MATERIAL FACTS ....................................5

LEGAL STANDARD..................................................................7

ARGUMENT .................................................................................8

     A.    TTV Defendants Did Not "Publish" Almost All the Statements..........8

          1.    Statements in Which TTV Defendants Had No Role Cannot be Attributed to Them. ................................. 10

          2.    For the Statements in Which TTV Defendants Appear, They Had No Editorial Control. ............................. 11

     B.    The Statements Do Not Refer to An Ascertainable Person. ..............14

          1.    To Be Actionable, Statements Must Be "Of and Concerning" Plaintiff. ............................................... 14

          2.    There is No Evidence the Publications Were "Of and Concerning" Plaintiff. ............................................... 17

     C.    The Statements Are Not Defamatory Because There Was No Actual Malice, and, in Any Event, They Are Privileged Under Georgia Law. ........................................................................20

          1.    Plaintiff Must Prove Actual Malice by Clear and Convincing Evidence. ............................................... 20

               a.    Plaintiff Became a Limited Purpose Public Figure. ...... 20

               b.    There is No Evidence TTV Defendants Were Malicious. ..................................................... 25

                    i.    The Actual Malice Standard of Proof is "Extremely High."................................25

               c.    There is No Evidence of Actual Malice. ...................... 27

                    i.    TTV Defendants Had No Involvement With Most of the Statements.........................28

i

        ii.    TTV Defendants Reasonably Believed
Assistor Signatures Were Necessary For
Individuals Depositing Multiple Ballots. .............28

        iii.   TTV Defendants Lacked Editorial Control
Over the Publications. ..........................................31

    2.    The Statements Are Privileged Under Georgia Law. .............. 32

  D.    TTV Defendants' Statements Are Not Defamatory Under Any
Standard..................................................................................................34

CONCLUSION ........................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*800 Mktg. Sols., Inc. v. GMAC Ins. Mgmt. Corp.*,
2008 WL 2777140 (M.D. Ga. July 14, 2008)....................................................15

*Amin v. NBCUniversal Media, LLC*,
2024 WL 3188768 (S.D. Ga. June 26, 2024) .............................................25, 26

*Aroonsakul v. Shannon*,
279 Ill. App. 3d 345 (1996) ................................................................................19

*Atlanta J Co. v. Doyal*,
60 S.E.2d 802 (Ga. Ct. App. 1950)....................................................................13

*Atlanta Journal-Constitution v. Jewell*,
251 Ga. App. 808 (2002) ....................................................................................21

*Baskin v. Rogers*,
229 Ga. App. 250 (1997) ..............................................................................13, 14

*Basulto v. Netflix, Inc.*,
2023 WL 7129970 (S.D. Fla. Sept. 20, 2023) ............................................26, 27

*Bell v. Johnson Publishing Co., LLC*,
2018 WL 357888 (M.D. Ga. Jan. 10, 2018)......................................................16

*Berisha v. Lawson*,
973 F. 3d 1304 (11th Cir. 2020) ........................................................................21

*Blankenship v. NBCUniversal, LLC*,
60 F.4th 744 (4th Cir. 2023) ..............................................................................29

*Catalfo v. Jensen*,
628 F. Supp. 1453 (D.N.H. 1986).......................................................................10

*Chaney v. Harrison & Lynam, LLC*,
308 Ga. App. 808 (Ga. Ct. App. 2011)........................................................26, 27

*Collins v. Creative Loafing Savannah, Inc.*,
264 Ga. App. 675 (2003) ..............................................................................14, 15

*Connick v. Myers*,
    461 U.S. 138 (1983) ................................................................... 33

*Cottrell v. Smith*,
    299 Ga. 517 (2016) .................................................................... 25

*Cox Enters., Inc. v. Bakin*,
    206 Ga. App. 813 (1992) ........................................................... 15

*Diamond v. Am. Fam. Corp.*,
    186 Ga. App. 681 (1988) ........................................................... 34

*Dresbach v. Doubleday & Co.*,
    518 F. Supp. 1285 (D.D.C. 1981) .............................................. 22

*Eakin v. Rosen*,
    2017 WL 5709564 (M.D. Ga. Nov. 27, 2017) ..................... 16, 19

*Eidson v. Berry*,
    202 Ga. App. 587 (1992) ........................................................... 35

*Finch v. City of Vernon*,
    877 F.2d 1497 (11th Cir. 1989) ................................................. 10

*Fitzpatrick v. City of Atlanta*,
    2 F.3d 1112 (11th Cir. 1993) ....................................................... 7

*Flowers v. Carville*,
    266 F. Supp. 2d 1245 (D. Nev. 2003) ................................. 10, 14

*Ganske v. Mensch*,
    480 F. Supp. 3d 542 (S.D.N.Y. 2020) ...................................... 37

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ...................................................... 20, 21, 25

*Gettner v. Fitzgerald*,
    677 S.E.2d 149 (Ga. Ct. App. 2009) ......................................... 35

*H&R Block E. Enters., Inc. v. Morris*,
    606 F.3d 1285 (11th Cir. 2010) ................................................... 8

*Kirch v. Liberty Media Corp.*,
  449 F.3d 388 (2d Cir. 2006) ................................................................15

*Klayman v. City Pages*,
  650 F. App'x 744 (11th Cir. 2016) ......................................................26

*Koncul Enters, Inc. v. Fleet Fin., Inc.*,
  279 Ga. App. 39 (2006) ......................................................................15

*Krass v. Obstacle Racing Media, LLC*,
  667 F. Supp. 3d 1177 (N.D. Ga. 2023)..........................................*passim*

*Ladner v. New World Commc'ns of Atlanta, Inc.*,
  343 Ga. App. 449 (2017) ....................................................................20

*Lewis v. Meredith Corp.*,
  293 Ga. App. 747 (2008) ......................................................................8

*Little v. Breland*,
  93 F.3d 755 (11th Cir. 1996) ..............................................................21

*Lovingood v. Discovery Commns., Inc.*,
  800 F. App'x 840 (11th Cir. 2020)..................................................26, 27

*Mac Isaac v. Twitter, Inc.*,
  557 F. Supp. 3d 1251 (S.D. Fla. 2021)................................................15

*Mathis v. Cannon*,
  276 Ga. 16 (2002) ..........................................................................8, 22

*Matthews v. Mills*,
  357 Ga. App. 214 (2020) ......................................................................9

*Moakler v. Furkids, Inc.*,
  374 F. Supp. 3d 1306 (N.D. Ga. 2019)..................................................7

*Mullinax v. Miller*,
  242 Ga. App. 811 (2000) ..................................................................8, 9

*Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*,
  867 F. Supp. 925 (D. Or. 1994) ..........................................................30

*San Diego v. Roe*,
   543 U.S. 77 (2004).................................................................................22, 33

*Saye v. Deloitte & Touche, LLP*,
   295 Ga. App. 128 (2008) .................................................................................8

*Smith v. Stewart*,
   291 Ga. App. 86 (2008) ...........................................................................15, 16

*StopLoss Specialists, LLC v. VeriClaim, Inc.*,
   340 F. Supp. 3d 1334 (N.D. Ga. 2018)..........................................................28

*Thompson v. Trump*,
   590 F. Supp. 3d 46, 79 (D.D.C. 2022)............................................................33

*Tolston v. City of Atlanta, Georgia*,
   723 F. Supp. 3d 1263 (N.D. Ga. 2024)............................................................7

*Torrance v. Morris Pub. Grp., LLC*,
   289 Ga. App. 136 (2007) ...............................................................................25

*Triangle Publications, Inc. v. Chumley*,
   S.E.2d 534 (Ga. 1984) ...................................................................................35

*Triangle Pubs., Inc. v. Chumley*,
   253 Ga. 179 (1984) ...................................................................................16, 34

*Trump v. Cable News Network, Inc.*,
   684 F. Supp. 3d 1269 (S.D. Fla. July 28, 2023) ............................................37

*United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa
   Counties in State of Ala.*,
   941 F.2d 1428 (11th Cir. 1991) .......................................................................7

*Van-Go Transport Co. v. N.Y.C. Bd. of Educ.*,
   971 F. Supp. 90 (E.D.N.Y. 1997) ..................................................................10

*Watson v. NY Doe 1*,
   439 F. Supp. 3d 152 (S.D.N.Y. 2020) ......................................................10, 14

*Willis v. United Fam. Life Ins.*,
   226 Ga. App. 661 (1997) ...............................................................................15

*Wolf v. Ramsey*,
  253 F. Supp. 2d 1323 (N.D. Ga. 2003)........................................................*passim*

## Statutes

O.C.G.A. § 9-11-11.1(c) .................................................................33, 34

O.C.G.A. § 21-2-385(a) .............................................................................29

O.C.G.A. § 21-2-385(b) .............................................................................29

O.C.G.A. § 51-5-1(b) .................................................................................8

O.C.G.A. § 51-5-7(4) .......................................................................32, 33, 34

O.C.G.A. § 51-5-9 .........................................................................33, 34

## Other Authorities

Fed. R. Civ. P. 56 ................................................................................1, 7

Local Rule 56.1 ...................................................................................1

U.S. Const. amend I ...............................................................................4

Defendants True the Vote, Inc. ("TTV"), Catherine Engelbrecht, and Gregg Phillips (together, "TTV Defendants"), pursuant to Fed. R. Civ. P. 56 and L.R. 56.1, hereby submit the following Response in Opposition to Plaintiff's Motion for Partial Summary Judgment (ECF No. 250) (the "Motion" or "Pl.'s Mot.").

## INTRODUCTION

Plaintiff's extraordinary request that this Court grant him affirmative summary judgment on his own defamation claim must be rejected. Plaintiff's Motion relies on the wrong legal standards, distorts and ignores key record evidence, makes inappropriate logical leaps, and improperly lumps all the Defendants together. The undisputed material facts prove, as shown in TTV Defendants' Motion for Summary Judgment (ECF No. 279), that TTV Defendants are entitled to summary judgment dismissal on all the counts in Plaintiff's Complaint. Plaintiffs' Motion, by contrast, must be summarily denied.

*First*, TTV Defendants did not publish almost all the statements Plaintiff put at issue (the "Statements"). Publication entails the ability to control the alleged defamatory statements. But TTV Defendants had no involvement whatsoever with virtually all the Statements—including numerous Dinesh D'Souza podcasts (the "D'Souza Podcasts"), Dinesh D'Souza appearances on news programs ("D'Souza News Appearances"), Dinesh D'Souza social media posts (the "D'Souza Posts"), a billboard in Times Square (the "Billboard"), the book *2000 Mules: They Thought*

1

*We'd Never Find Out. They Were Wrong* (the "Book"), and a music video created by a third party (the "Music Video"). Although Plaintiff improperly seeks to jointly attribute all of these to TTV Defendants, they had nothing to do with them, and there is no basis to hold TTV Defendants liable for any of them.

For the Statements in which TTV Defendants did appear, they had no editorial control over them. D'Souza had full editorial control over the *2000 Mules* film (the "Film") and the accompanying trailer (the "Trailer"). The interviews Phillips and Engelbrecht gave, portions of which D'Souza decided to put in the Film and Trailer, were all given **before** TTV Defendants even received the publicly available surveillance video from Gwinnett County that includes Plaintiff. Thus, there is no way they were referring to Plaintiff when they provided those interviews.

For the remaining interviews TTV Defendants gave, including an appearance by Engelbrecht on *Tucker Carlson Tonight* (the "Tucker Carlson Interview), and Engelbrecht and Phillips on the *Charlie Kirk Show* (the "Charlie Kirk Interview"), The Gateway Pundit (the "Gateway Pundit Interview"), and *Truth Matters with Roman Balmakov* (the "Truth Matters Interview"), TTV Defendants had no editorial control. They did not know, much less pick, which video clips those shows would select, the shows were unrehearsed, and for most of them, TTV Defendants could not even see what was appearing on the screen when they were speaking. In other words, TTV Defendants did not publish these interviews.

*Second*, all the Statements do not refer to an ascertainable person. It is undisputed that Plaintiff's name is not mentioned in any of the Statements involving TTV Defendants, and that TTV Defendants did not even know Plaintiff was in the Film until he filed this lawsuit. They could not have ascertained him if they tried.

Additionally, it is undisputed that all the surveillance footage TTV Defendants obtained through Open Records Requests from Georgia counties, including that from Gwinnett County, was unblurred. Anyone could have obtained this publicly-available footage, and others, like David Cross, did.

Even so, most of the Statements involve blurred clips of Plaintiff. It is undisputed that TTV Defendants advocated blurring clips of all individuals at poll places in the Film. And, with that blurring, it is impossible to identify Plaintiff or anyone else. For the few unblurred clips, it is still impossible to identify Plaintiff because the images of him were either shown extremely quickly (often for less than one second), he appears indecipherably small on the screen, and/or because he was one of many individuals shown (none of whom have filed a lawsuit against TTV Defendants). No individuals were able to identify Plaintiff without first being told by him or his wife that he was in the Film. And, although two reporters reached out to Plaintiff, they did so because of the public State Board of Elections ("SEB") investigation into Plaintiff, which resulted from a complaint submitted by David Cross. There is no evidence anyone independently identified Plaintiff on their own.

*Third*, all the Statements fail to meet the applicable standard of proof. Plaintiff incorrectly assumes an ordinary negligence standard applies. In fact, Plaintiff became a limited purpose public figure, either voluntarily or involuntarily, regarding an issue of great public importance. The Supreme Court's First Amendment jurisprudence mandates that Plaintiff must show by clear and convincing evidence that TTV Defendants acted with "actual malice" towards him, and there is no evidence of that in the record. Alternatively, all the Statements are privileged under Georgia law because they were "made in good faith as part of an act in furtherance of the person's or entity's right of petition or free speech . . . in connection with an issue of public interest or concern." As the record shows, TTV Defendants did not think Plaintiff fit the definition of a "mule" according to the Film, they told Dinesh D'Souza this belief, and they reasonably believed that individuals like Plaintiff who dropped off multiple ballots had to have the signature of an "assistor."

*Fourth*, many of the Statements do not rise to the level of defamation under any standard. It is undisputed that issues of election integrity, particularly involving the 2020 election, were topical and newsworthy. Any damage to Plaintiff's reputation is minimal, particularly because no one was able to independently identify him, and he has continued at his current job and received raises. And again, TTV Defendants held a reasonable belief that for individuals such as Plaintiff delivering multiple ballots, there needed to be an assistor signature.

4

For the foregoing reasons, explained in greater detail below, Plaintiff's Motion should be denied in its entirety. As shown in TTV Defendants' Motion for Summary Judgment (ECF No. 279), they are entitled to summary judgment on all counts of Plaintiff's Complaint.

## STATEMENT OF MATERIAL FACTS

TTV Defendants incorporate by reference their contemporaneously filed Responses to Plaintiff's Statement of Undisputed Material Facts ("Pl.'s SMF") and their Additional Material Facts (the "Counterstatement"), and highlight some of the key points below.

TTV Defendants had a defined and circumscribed role for the Film. Primarily, they provided certain geotracked information and the associated publicly available surveillance video. (Counterstatement ¶¶ 21, 30-47). TTV Defendants obtained this video via Open Records Request which, even when produced by the counties, contained unblurred images of individuals. (Counterstatement ¶¶ 19-20).

TTV Defendants had nothing whatsoever to do the D'Souza Podcasts, D'Souza News Appearances, D'Souza Posts, the Billboard, the Book, and the Music Video. (Counterstatement ¶¶ 158-83).

In contrast to the D'Souza Defendants, which planned, filmed, edited, and marketed the Film, TTV Defendants had no editorial control over the Film. (Counterstatement ¶¶ 77-88, 93-104). Other than limited interactions for the Film,

TTV Defendants had little to no contact with D'Souza Defendants. (Counterstatement ¶¶ 1-11). Editing decisions were made by D'Souza Defendants, the footage included in the Film was selected by D'Souza Defendants, and almost all marketing and publicity efforts were undertaken by D'Souza Defendants. (Counterstatement ¶¶ 83-84, 95-98, 103-04). As Dinesh D'Souza admitted in an interview, TTV Defendants had "*[z]ero*" editorial control of the Film. (Counterstatement ¶ 85).

Until Plaintiff filed this lawsuit, TTV Defendants had no idea who he was. They have never spoken with Plaintiff (Counterstatement ¶¶ 4, 12), have never identified Plaintiff (Counterstatement ¶¶ 111-12, 119-20, 127-28, 144-45, 152-53, 155-56, 185), and did not know he was an individual in the Film (Counterstatement ¶ 184). Notably, TTV Defendants were interviewed for the Film several months *before* they even received the publicly available surveillance footage from Gwinnett County that included Plaintiff (Counterstatement ¶¶ 44, 82), and therefore their statements in those interviews necessarily did not implicate Plaintiff.

Moreover, there is no evidence that anyone identified Plaintiff from the Film or any related media without first being told of his appearance in the Film, such that they already knew he appeared in the Film and were actively looking for him. (Counterstatement ¶ 190).

Significantly, TTV Defendants even warned D'Souza that the individual they later learned to be Plaintiff was not a mule. (Counterstatement ¶¶ 45, 47, 72, 186).

## LEGAL STANDARD

"Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Moakler v. Furkids, Inc.*, 374 F. Supp. 3d 1306, 1313 (N.D. Ga. 2019) (citing Fed. R. Civ. P. 56). Plaintiff "must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim on that legal issue." *Id.* (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). He must support his motion with "credible evidence that would entitle [him] to a directed verdict if not controverted at trial." *Id.* The court should "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Counties in State of Ala.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions,' and cannot be made by the district court in considering whether to grant summary judgment." *Tolston v. City of Atlanta, Georgia*, 723 F. Supp. 3d 1263, 1296 (N.D. Ga. 2024).

## ARGUMENT

This is not a defamation case, and Plaintiff is trying to force facts into elements he cannot satisfy. Under Georgia law, a libel plaintiff must establish: (1) a false statement of fact (2) of and concerning the plaintiff (3) that is defamatory and (4) published with the requisite degree of fault. *See, e.g.*, *Mathis v. Cannon*, 276 Ga. 16, 20-21 (2002); *Lewis v. Meredith Corp.*, 293 Ga. App. 747, 748-49 (2008). "In Georgia, a statement generally may support a claim for defamation only if it is false, published, and unprivileged, among other requirements." *H&R Block E. Enters., Inc. v. Morris*, 606 F.3d 1285, 1296 (11th Cir. 2010).

Here, there is no evidence that: (1) TTV Defendants "published" almost all the Statements; (2) any of the Statements were "of and concerning" Plaintiff; and (3) any of the Statements were published with the requisite fault. Accordingly, Plaintiff's Motion should be denied in its entirety, and summary judgment should be granted in favor of TTV Defendants on the claim.

**A.    TTV Defendants Did Not "Publish" Almost All the Statements.**

Plaintiff must, but is unable to, prove TTV Defendants published each of the Statements. *Mullinax v. Miller*, 242 Ga. App. 811, 814 (2000); *Saye v. Deloitte & Touche, LLP*, 295 Ga. App. 128, 130 (2008); O.C.G.A. § 51–5–1(b). "Publication of the statement is imperative and, without it, the defamation claim fails." *Saye*, 295 Ga. App. at 130.

Significantly, "publication entails the ability to *control* the libel." *Mullinax*, 242 Ga. App. at 814 (no liability for campaign manager who provided information to a candidate who used it in a flyer because manager did not control the verbiage of the writing); *Wolf v. Ramsey*, 253 F. Supp. 2d 1323, 1364 (N.D. Ga. 2003) (granting summary judgment to defendant where defendant had no control over NBC's editing decisions); *Matthews v. Mills*, 357 Ga. App. 214, 216 (2020) (affirming summary judgment for defendant where no evidence defendant had any role in or control over the drafting or content of a report). Even if a party helps shape another's views about a situation, that does not signal the party controlled the content of the statement. *Mullinax*, 242 Ga. App. at 814.

*Wolf v. Ramsey* is persuasive, if not controlling. In *Wolf*, as the defendant made a statement on a television program suggesting he believed an unnamed suspect might be a killer, NBC displayed a picture of the plaintiff on screen. 253 F. Supp. 2d at 1364. Plaintiff, however, could not demonstrate defendant intended to refer to plaintiff when he made his statement. *Id.* The court found that "even though the photograph of plaintiff appeared on the screen when defendant made the statement, it is undisputed that defendant had no control over NBC's editing decisions." *Id.* Thus, the court granted defendant's motion for summary judgment on plaintiff's slander claim. *Id.* The same conclusion should be reached here.

### 1. Statements in Which TTV Defendants Had No Role Cannot be Attributed to Them.

As a matter of law, there is no basis to hold TTV Defendants liable for statements which were exclusively made by or featured Dinesh D'Souza or others. *See Finch v. City of Vernon*, 877 F.2d 1497, 1505 (11th Cir. 1989) (finding defendant not liable for damage to plaintiff's reputation caused by statements published by others); *Flowers v. Carville*, 266 F. Supp. 2d 1245, 1252 (D. Nev. 2003) (dismissing defamation claim against individual where no allegations he made any statements); *Watson v. NY Doe 1*, 439 F. Supp. 3d 152, 162, 165 (S.D.N.Y. 2020) (dismissing claim where defendant was not "personally involved" with and did not "actually ma[k]e" alleged defamatory statements); *Catalfo v. Jensen*, 628 F. Supp. 1453, 1456-57 (D.N.H. 1986) (plaintiff failed to show he was a responsible participant in the publication); *Van-Go Transport Co. v. N.Y.C. Bd. of Educ.*, 971 F. Supp. 90, 102 (E.D.N.Y. 1997) ("the defendant must induce or cause publication in some fashion.").

TTV Defendants had no involvement with the D'Souza Podcasts, D'Souza News Appearances, D'Souza Posts, the Billboard, the Book, and the Music Video. (Counterstatement ¶¶ 158-83). Nevertheless, Plaintiff repeatedly attempts to improperly lump all "Defendants" together, and incorrectly claims that all of "the Film, Book, and promotional materials" should be "jointly attributable to all Defendants." (*E.g.*, Pl.'s Mot. at 21). This is incorrect as a matter of law.

In fact, Plaintiff acknowledges that many of these statements were exclusively made by D'Souza. (*See, e.g.*, Pl.'s SMF ¶ 124 ("D'Souza wrote 'every word' of the Book himself."); Pl.'s SMF ¶ 92 ("D'Souza Defendants worked with Banners4Freedom to put up a billboard . . ."); Pl.'s SMF ¶¶ 117-22 (describing a series of programs which D'Souza appeared on and social media posts he made)). Although Plaintiff argues the author and contributors of a book may be held liable for defamatory statements (Pl.'s Mot. at 23), there is no evidence that TTV Defendants authored or contributed in any way to the Book. (*See* Counterstatement ¶¶ 161-68).[1] And there is no evidence TTV Defendants participated in any way, let alone "in concert," for D'Souza's promotional statements. (Counterstatement ¶¶ 161-83).

There is **_no_** basis to attribute the statements made exclusively by others in the D'Souza Podcasts, D'Souza News Appearances, D'Souza Posts, the Billboard, the Book, and the Music Video, to TTV Defendants.

### 2. For the Statements in Which TTV Defendants Appear, They Had No Editorial Control.

Even though the TTV Defendants appear in the Film, the Trailer, and some of the remaining Statements, they had no editorial control over them. (*See*

---

[1] Although Plaintiff cites to Pl.'s SMF ¶ 126, which TTV Defendants dispute (*see* Pl.'s Mot. at 23), the evidence shows TTV Defendants never received any profit share from the Book, and never even saw it before it was published. (Counterstatement ¶¶ 165-66).

Counterstatement ¶¶ 76-154). Contrary to Plaintiff's argument (Pl.'s Mot. at 22-23), as Dinesh D'Souza admitted in a contemporaneous 2022 interview, TTV Defendants had "*[z]ero*" editorial control of the Film. (Counterstatement ¶ 85). TTV Defendants told D'Souza that Plaintiff was not a mule. (Counterstatement ¶¶ 45, 47, 72, 186). D'Souza Defendants selected all the video that was selected in the Film. (Counterstatement ¶ 81, 84, 88).

And, for the interviews in which TTV Defendants participated in for the Film and Trailer, they were filmed months **before** TTV Defendants obtained the Gwinnett County video surveillance footage which included the footage of Plaintiff. (Counterstatement ¶¶ 44, 82). This is the opposite of "acting in concert" because TTV Defendants lacked complete editorial control over the Film, and there is no way they were even referring to Plaintiff when they made their comments.

In fact, many of Plaintiff's "undisputed" material facts recognize that D'Souza Defendants alone had editorial control. (*See, e.g.*, Pl.'s SMF ¶ 8 ("Defendant Dinesh D'Souza (**D'Souza**) directed, produced, and narrated the Film and made numerous media appearances promoting it. D'Souza is listed as writer and director of the Film. D'Souza is a writer, filmmaker, podcaster, media personality, and merchandise purveyor."); Pl.'s SMF ¶ 9 ("Defendant D'Souza Media, LLC (**D'Souza Media**, and collectively with D'Souza, **D'Souza Defendants**) is a production company responsible for the Film and was the Film's distributor."); Pl.'s SMF ¶ 124 ("In

addition to continuing to promote the Film, in the summer of 2022, D'Souza wrote a book based on the Film titled *2,000 Mules:  They Thought We'd Never Find Out. They Were Wrong* (the **Book**) which was published by Regnery Publishing, a Salem affiliate at that time.  Ex. 134; Ex. 133; Ex. 135.  D'Souza wrote "every word" of the Book himself.  Ex. 14 at 295:1-5.")).

Plaintiff also improperly relies on third party comments from unknown individuals. (*See* Pl.'s Mot. at 17-18) (citing Pl.'s SMF ¶¶ 145-48). These comments are original to those third parties, and there is no evidence TTV Defendants had anything to do with them. (*See id.*). But even if these comments somehow constituted repetition of original statements by TTV Defendants (which they do not), such repetition only "render[s] the person *so repeating it* liable to an action." *Baskin v. Rogers*, 229 Ga. App. 250, 252 (1997).[2] Because TTV Defendants did not make such statements, they cannot be held liable for them.

For the remaining Statements, TTV Defendants had no editorial control regarding: (1) the Truth Matters Interview; (2) the Charlie Kirk Interview; (3) the

---

[2] Although Plaintiff cites a 75-year old case for the proposition that a "republisher of a defamatory statement is equally liable with the original publisher thereof," *Atlanta J Co. v. Doyal*, 60 S.E.2d 802, 809-10 (Ga. Ct. App. 1950), that case also recognizes that "[n]o liability, however, attaches to a republication of such defamatory matter if the republication thereof is privileged." *Id.* (finding petition presented a question of fact for jury as to whether allegedly defamatory newspaper account of judicial proceedings was fair and honest so as to be privileged and that the allegations of petition were sufficient to justify imputing to defendant the malice of reporter who wrote allegedly defamatory account). As discussed below, not only does Plaintiff have to show by clear and convincing evidence that the Statements were made with "actual malice," but the Statements are privileged under Georgia law. Plaintiff cannot overcome either threshold.

Tucker Carlson Interview; and (4) the Gateway Pundit Interview. (Counterstatement ¶¶ 113-54). Although TTV Defendants appeared on the programs, the interviews were entirely unscripted, TTV Defendants did not know what videos or images (if any) would be shown, and TTV Defendants often could not even see what appeared on the screen when they spoke. (*See id.*).

For example, in the Tucker Carlson Interview, Englebrecht[3] appeared remotely and could not even see what was shown on the screen when she commented. (Counterstatement ¶ 140). And, as D'Souza complained about, Engelbrecht did not even mention the Film in the Tucker Carlson Interview. (Counterstatement ¶ 139). This, and the other Statements, cannot provide a basis for liability. *See Wolf*, 253 F. Supp. 2d at 1364.

## B.    The Statements Do Not Refer to An Ascertainable Person.

### 1.    To Be Actionable, Statements Must Be "Of and Concerning" Plaintiff.

None of the Statements Plaintiff complains about identify Plaintiff or refer to an ascertainable person. An essential requirement of any defamation claim is the publication of a false and defamatory statement "of and concerning" the plaintiff. *Collins v. Creative Loafing Savannah, Inc.*, 264 Ga. App. 675, 678 (2003). "[T]he allegedly defamatory words or picture must refer to some ascertained or

---

[3] Phillips did not appear in the Tucker Carlson interview, so there is no basis to hold him liable. *See, e.g.*, *Flowers*, 266 F. Supp. 2d at 1252; *Watson*, 439 F. Supp. 3d at 162, 165.

ascertainable person, and that person must be the plaintiff." *Id.* (affirming summary judgment where illustration was an unidentified cartoon character, and there was no evidence anyone recognized the cartoon face as that of the plaintiff); *Wolf*, 253 F. Supp. 2d at 1364 (granting summary judgment where there no evidence defendant intended to refer to plaintiff); *Koncul Enters, Inc. v. Fleet Fin., Inc.*, 279 Ga. App. 39, 42 (2006) ("On their face, such communications made no reference to Koncul, and thus cannot be held defamatory.").

The "of and concerning" requirement "stands as a significant limitation on the universe of those who may seek a legal remedy for communications they think to be false and defamatory and to have injured them." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 399-400 (2d Cir. 2006). The plaintiff must show "that the publication was about the plaintiff, that is, whether it was of and concerning [the plaintiff] as a matter of identity." *800 Mktg. Sols., Inc. v. GMAC Ins. Mgmt. Corp.*, 2008 WL 2777140, at *5 (M.D. Ga. July 14, 2008) (quoting *Smith v. Stewart*, 291 Ga. App. 86, 92 (2008)).

"Georgia law is abundantly clear that [the plaintiff] cannot rely on rumor, innuendo, and extraneous circumstances to create an inference of defamation." *Willis v. United Fam. Life Ins.*, 226 Ga. App. 661, 663 (1997); *see also Cox Enters., Inc. v. Bakin*, 206 Ga. App. 813, 816 (1992) (if the "words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory"); *Mac Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1260 (S.D. Fla.

2021) (plaintiff unidentifiable where statement identified certain information, but not Plaintiff or any other information that made his identity ascertainable; noting no liability where defendant is "meticulous enough" to preserve plaintiff's anonymity).

The cases Plaintiff relies on either help TTV Defendants or are distinguishable. First, in *Eakin v. Rosen*, 2017 WL 5709564, at *3 (M.D. Ga. Nov. 27, 2017), the court dismissed a defamation claim because the article was not "of and concerning" the plaintiff. The other cases, among other distinguishing factors, do not involve affirmative motions for summary judgment brought by the plaintiff. *See, e.g.*, *Smith v. Stewart*, 291 Ga. App. 86 (2008) (where the defendant moved for summary judgment, the Court of Appeals merely affirmed the trial court's finding that genuine issues of fact existed on the defamation claim); *Bell v. Johnson Publishing Co., LLC*, 2018 WL 357888, at *4 (M.D. Ga. Jan. 10, 2018) (where the defendant moved for partial judgment on the pleadings, the court merely found that plaintiffs met their "initial burden" of establishing the articles were about them, and "Defendants have not argued to the contrary."); *Triangle Pubs., Inc. v. Chumley*, 253 Ga. 179 (1984) (where the defendant moved for summary judgment, the appellate court simply found the trial court correctly denied summary judgment for the defendant on this point). None suggest Plaintiff should be entitled to the extraordinary relief of affirmative summary judgment on his own defamation claim.

### 2.    There is No Evidence the Publications Were "Of and Concerning" Plaintiff.

There is no evidence the at-issue Statements meet the "of and concerning" requirement. TTV Defendants have no connection to and have never identified Plaintiff by name. (Counterstatement ¶ 127, 145, 153, 156, 186). In fact, TTV Defendants did not know Andrews was an individual in the Film until he filed his lawsuit. (Counterstatement ¶ 75, 185). And TTV Defendants had no involvement with the D'Souza Podcasts, D'Souza News Appearances, D'Souza Posts, the Billboard, the Book, and the Music Video. (Counterstatement ¶¶ 161-83).

Of the Statements in which TTV Defendants appear, the Film, Trailer, Facts Matter Interview, and TTV Video, all contain blurred images of Plaintiff. (Counterstatement ¶¶ 76, 106, 113, 155). TTV Defendants advocated blurring these images, even though the video as originally received from the counties was unblurred. (Counterstatement ¶¶ 20, 92). None of the Statements involving TTV Defendants name or identify Plaintiff. (Counterstatement ¶¶ 111-12, 119-20, 127-28, 144-45, 152-53, 155-56, 185). In the TTV Video, Plaintiff's image is completely unrecognizable because it only appears for a fraction of a second. (Counterstatement ¶ 155). And for the few unblurred videos, Plaintiff is wearing a face mask that covers most of his face and he is also unrecognizable. (Counterstatement ¶¶ 76, 106, 121, 134, 147). Moreover, in The Tucker Carlson Interview, the unblurred footage is

displayed in such a small, pixelated box that Plaintiff cannot be identified. (Counterstatement ¶ 136).

Significantly, despite extensive discovery in the case, Plaintiff failed to identify **anyone** who was able to identify him without being prompted or told by Plaintiff or his wife that he was in the Film. (Counterstatement ¶ 190). There is no evidence Plaintiff was identified by anyone.

Plaintiff points to the fact that two reporters eventually reached out to him (*see* Pl.'s Mot. at 19),[4] but this too fails to show the at-issue Statements were the cause of those communications. Tellingly, the Charlie Kirk Interview occurred back on April 8, 2022 (Counterstatement ¶ 121), and Engelbrecht appeared on The Tucker Carlson Show on May 5 (Counterstatement ¶ 134). The reporters, however, only reached out to Plaintiff much later, on May 16 and 23 (Counterstatement ¶¶ 65, 74)—well after those appearances. One reporter (Swenson) reached out several days **after** the public SEB meeting regarding Plaintiff (Counterstatement ¶ 74), and one (Gardner) reached out just the day before it happened. As for Gardner, Plaintiff **admitted** that she reached out to him because of the investigation. (*See* Counterstatement ¶ 69) ("My name, again, was known at the Georgia Bureau of Investigation, election investigation. I filed an affidavit. I signed it. ***That's how Amy***

---

[4] Plaintiff admits that before these reporters reached out to him, Plaintiff had "no idea what '2000 Mules' was." (Counterstatement ¶ 65).

***Gardner reached out to me via my text phone***. So my name was already out there after that hearing because it's public information.") (emphasis added). And the SEB investigation was initiated based on a complaint from David Cross, a third party unaffiliated with TTV Defendants. (Counterstatement ¶¶ 58-60). In short, to the extent these two reporters became aware that Plaintiff was one of the individuals featured in the Film, such awareness was based on events unrelated to TTV Defendants. And a defendant cannot be liable for libel if the plaintiff can only be identified through extrinsic investigation or facts. *Eakin*, 2017 WL 5709564, at *3 ("the defamed person must be able to be identified through the words contained in the defamatory statement — not through taking the additional step of submitting an open records request to obtain some extrinsic document"); *see also Aroonsakul v. Shannon,* 279 Ill. App. 3d 345, 351 (1996) (holding that statements were not "of and concerning" the plaintiffs because "[t]here is no way to connect the statement, standing alone, to the plaintiffs" because it was "only through other information . . . over which [defendant] did not exercise any control, the plaintiffs could possibly be connected to the statement.").

Thus, there is no evidence supporting the "of and concerning" requirement. Plaintiff has not identified anyone who recognized him without he or his wife telling them about the Film. And there is certainly not undisputed evidence to say, as a

matter of law, that the depictions in the publications were "of and concerning" Plaintiff, particularly where TTV Defendants did not know who he was.

## C.    The Statements Are Not Defamatory Because There Was No Actual Malice, and, in Any Event, They Are Privileged Under Georgia Law.

Although Plaintiff conclusorily assumes the ordinary negligence standard applies in this case (Pl.'s Mot. at 26-37), Plaintiff must actually prove actual malice by clear and convincing evidence, and his claims are independently barred by the conditional privileges enumerated in Georgia statutory law.

### 1.    Plaintiff Must Prove Actual Malice by Clear and Convincing Evidence.

#### a.    Plaintiff Became a Limited Purpose Public Figure.

The actual malice standard applies because Plaintiff became a limited purpose public figure. [5] *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974) (recognizing plaintiffs can be public figures either for all purposes or for the limited purpose of the particular public controversy at issue); *Ladner v. New World Commc'ns of Atlanta, Inc.*, 343 Ga. App. 449, 457 (2017) (finding individual was a limited public purpose public figure because he injected himself into a public controversy). When the plaintiff is a public figure, "he cannot prevail in [his] suit

---

[5] Plaintiff cites this Court's Opinion and Order on the defendants' motions to dismiss (ECF 106 at 32-33), but there the Court merely considered that Plaintiff did not allege that he was a public figure and Defendants did not dispute it. But that was *solely for purposes of the motion to dismiss*, where the Court had to accept Plaintiff's factual allegations as true. That is not the case for this motion for summary judgment. Plaintiff's Motion simply assumes the negligence standard applies, and does not substantively address the fact that he became a limited purpose public figure. Thus, a large portion of Plaintiff's Motion relies on a false premise. (*See* Pl.'s Mot. at 26-36).

unless he shows, by clear and convincing evidence, that the defendants acted with actual malice toward him." *Berisha v. Lawson*, 973 F. 3d 1304, 1312 (11th Cir. 2020).

Individuals can become limited purpose public figures involuntarily. *See Gertz*, 418 U.S. at 345 (recognizing that "it may be possible for someone to become a public figure through no purposeful action of his own"); *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808, 820 (2002) ("[i]njection is not the only means by which public-figure status is achieved. Persons can become involved in public controversies and affairs without their consent or will."); *Berisha*, 973 F. 3d at 1311.

"A limited purpose public figure is 'an individual [who] voluntarily injects himself ***or is drawn into a particular public controversy*** and thereby becomes a public figure for a limited range of issues.'" *Wolf*, 253 F. Supp. 2d at 1352 (emphasis added) (quoting *Little v. Breland*, 93 F.3d 755, 757 (11th Cir. 1996)). "Courts use a three part-test to determine whether an individual is a limited-purpose public figure: (1) 'isolate the public controversy,' (2) 'examine the plaintiff's involvement in the controversy' and (3) 'determine whether the alleged defamation was germane to the plaintiff's participation in the controversy.'" *Krass v. Obstacle Racing Media, LLC*, 667 F. Supp. 3d 1177, 1207 (N.D. Ga. 2023) (applying Georgia law).

21

Whether a person is a public figure is a question of law for the court. *Matthis v. Cannon*, 276 Ga. 16, 22 (2002) (reversing summary judgment to plaintiff, finding he became a limited-purpose public figure when he became involved in a public controversy, including by filing a lawsuit against a public authority). A public controversy exists where there is a "subject of legitimate news interest" or "a subject of general interest and of value and concern to the public." *San Diego v. Roe*, 543 U.S. 77, 83-84 (2004); *see also Matthis*, 276 Ga. at 25 (public controversy arises when an issue "generates discussion, debate, and dissent in the relevant community"; finding actual malice standard applied even though messages accused plaintiff of being a crook and a thief because they were made as part of a debate about a public issue).

"Only in cases of flagrant breach of privacy which has not been waived or obvious exploitation of public curiosity where no legitimate public interest exists should a court substitute its judgment for that of the publisher." *Dresbach v. Doubleday & Co.*, 518 F. Supp. 1285, 1290 (D.D.C. 1981). In other words, "if the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." *Krass*, 667 F. Supp. 3d at 1207. "There is no requirement that the controversy affect the public at large." *Id.* at 1208 (public controversy about plaintiff's conduct toward women sufficient).

Here, Plaintiff became a limited-purpose public figure because he was drawn into a public controversy. *First*, the impetus for the Film and the at-issue interviews was to discuss election integrity, which clearly generated "discussion, debate, and dissent in the relevant community." *Krass*, 667 F. Supp. at 1207. Intensive reporting on the issue of voter fraud after the 2020 election demonstrated a high level of public concern regarding public confidence in elections. (Counterstatement ¶ 14). And David Cross, an unrelated third party, filed a series of complaints with the Georgia SEB, including one involving Plaintiff, which were investigated and publicly discussed. (Counterstatement ¶¶ 58-60).

*Second*, Plaintiff was "sufficiently involved" in the controversy. *See Krass*, 667 F. Supp. at 1207. The SEB held a public hearing that was live-streamed, and Plaintiff testified in this case that his name became public "after the Georgia Board of Elections identified" him. (Counterstatement ¶ 69). A few hours after the SEB case was dismissed, it received significant media coverage, including an article published by The Washington Post discussing it in depth. (Counterstatement ¶¶ 70-72). A little while later, a reporter with The Associated Press reached out to Plaintiff's daughter specifically "regarding an investigation by the Georgia secretary of state's office." (Counterstatement ¶ 74). Even at that point, Plaintiff's identity was not publicly known. Plaintiff admits that prior to him filing his lawsuit, there are no known news reports that identified him by name. (Counterstatement ¶ 189). Despite

23

being cleared and unidentified after the SEB hearing, Plaintiff voluntarily threw himself into the public spotlight by filing this action, and only then became publicly identified. In any event, he was at least involuntarily brought into the public controversy by David Cross's complaint.

*Finally*, the alleged defamation was germane to Plaintiff's participation in the controversy. *See Krass*, 667 F. Supp. at 1207. The only use of Plaintiff's image was from publicly available drop box surveillance video. (Counterstatement ¶¶ 19, 32, 44, 76). David Cross similarly obtained the publicly available footage, which he included in his complaint. (Counterstatement ¶¶ 58-59). And the evidence shows TTV Defendants reasonably believed that under Georgia law, if multiple ballots were being delivered by a single individual, assistor signatures were required, and there were none in Gwinnett County. (Counterstatement ¶¶ 50-57, 129). This final factor is easily satisfied. *See Krass*, 667 F. Supp. 3d at 1210 (for the final factor, "[t]his is a low bar: '[a]nything which might touch on the controversy is relevant.").

Because Plaintiff was drawn into a public controversy, he became a limited purpose public figure, and the actual malice standard applies. At the very least, Plaintiff is not entitled to affirmative summary judgment on this issue.

### b.    There is No Evidence TTV Defendants Were Malicious.

### i.    The Actual Malice Standard of Proof is "Extremely High."

Because Plaintiff became a limited purpose public figure, the actual malice standard applies. There is no evidence of actual malice by TTV Defendants, particularly because they did not even know who Plaintiff was, and they held an honest belief regarding Georgia law.

The standard of proof to show actual malice is "extremely high." *Krass*, 667 F. Supp. 3d at 1210. Actual malice is "knowledge that the defamatory matter was false or that it was published with reckless disregard for whether it was false or not." *Wolf*, 253 F. Supp. 2d at 1352-53; *see also Amin v. NBCUniversal Media, LLC*, 2024 WL 3188768, at *24 (S.D. Ga. June 26, 2024) ("Actual malice is not merely spite or ill will, or even outright hatred; it must constitute actual knowledge that a statement is false or a reckless disregard as to its truth or falsity.") (citing *Cottrell v. Smith*, 299 Ga. 517 (2016)). "[U]nsupported inferences or conjecture regarding a defendant's motivation do not suffice to show malice." *Torrance v. Morris Pub. Grp., LLC*, 289 Ga. App. 136, 140 (2007). "The evidence must show in a clear and convincing manner that a defendant in fact entertained serious doubts as to the truth of his statements." *Cottrell*, 299 Ga. at 525-26; *see also Gertz*, 418 U.S. at 332 (plaintiff must show the publication was made with a "high degree of awareness of . . . . probable falsity.").

"Malice to avoid qualified privilege must be actual and with evil intent."

*Chaney*, 308 Ga. App. at 81. As a court recently elaborated:

> [K]nowledge of falsity or reckless disregard of the truth may not be presumed nor derived solely from the language of the publication itself. Reckless disregard requires clear and convincing proof that a defendant was aware of the likelihood he was circulating false information. Thus, it is not sufficient to measure reckless disregard by what a reasonably prudent man would have done under similar circumstances nor whether a reasonably prudent man would have conducted further investigation. The evidence must show in a clear and convincing manner that a defendant in fact entertained serious doubts as to the truth of his statements.

*Amin*, 2024 WL 3188768, at \*24; *see also Krass*, 667 F. Supp. 3d at 1213 ("Actual malice is not concerned with 'what a reasonably prudent man would have done under similar circumstances' or 'whether a reasonably prudent man would have conducted further investigation'; the proper inquiry is whether the defendant held substantial doubt about the truth of the published statements.").

"Failure to investigate before publishing, even when a reasonably prudent person would have done so, is ***not sufficient*** to establish reckless disregard." *Lovingood v. Discovery Commns., Inc.*, 800 F. App'x 840, 850 (11th Cir. 2020) (emphasis added); *see also Klayman v. City Pages*, 650 F. App'x 744, 750-51 (11th Cir. 2016) (finding that failure to investigate and poor journalistic standards were insufficient to establish actual malice, and holding that district court did not err in granting summary judgment in favor of defendants); *Basulto*, 2023 WL 7129970, at

*48 (even an "extreme departure from professional [publishing] standards" does not necessarily rise to the level of actual malice).

"Rather, to show reckless disregard that amounts to actual malice, a defamation plaintiff must point to evidence that the defendant had *real, subjective suspicions* about the veracity of the statement in question." *Lovingood*, 800 F. App'x at 850 (emphasis added); *see also Basulto*, 2023 WL 7129970, at *47-*48 (recommending granting summary judgment to Netflix where no evidence it doubted the accuracy of the film, noting "Netflix should be able to obtain a . . . summary judgment ruling when it had absolutely no involvement with the creative process of making the movie."). "There must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts* as to the truth of his publication,". . . or that he acted with a "high degree of awareness of ... probable falsity." *Lovingood*, 800 F. App'x at 850 (emphasis added).

A defendant need only show that "by reference to the affidavits, depositions and other documents in the record" that there is an absence of evidence to support [plaintiff's] claim of malice." *Chaney*, 308 Ga. App. at 81.

### c.    There is No Evidence of Actual Malice.

There is no evidence TTV Defendants had ***any*** malice towards Plaintiff. Indeed, TTV Defendants have no connection to and have never identified Plaintiff by name, have never met or spoken with Plaintiff, and did not know Plaintiff was an

individual in the Film until he filed his lawsuit. (Counterstatement ¶¶ 4, 12, 111-12, 119-20, 127-28, 144-45, 152-53, 155-56, 184-85). And TTV Defendants had a good faith understanding that Georgia required assistor signatures when individuals, like Plaintiff, dropped off multiple ballots. There was no reason for TTV Defendants to have any ill-will towards Plaintiff, and they had none.

### i. TTV Defendants Had No Involvement With Most of the Statements.

As discussed above, TTV Defendants cannot be held liable for and had no involvement with the D'Souza Podcasts, D'Souza News Appearances, D'Souza Posts, the Billboard, the Book, and the Music Video. *Supra* at 5, 10, 17. Although Plaintiff repeatedly uses the general term "Defendants" when referring to many of these items, there is no evidence supporting the conclusion that TTV Defendants should be held liable for these unrelated statements. As a matter of law, TTV Defendants cannot be held liable for these statements. *See id.*; *StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1347 (N.D. Ga. 2018) ("Publication of the statement is imperative and, without it, the defamation claim fails.").

### ii. TTV Defendants Reasonably Believed Assistor Signatures Were Necessary For Individuals Depositing Multiple Ballots.

For all the Statements in which TTV Defendants appeared, TTV Defendants reasonably believed that, under Georgia law, for an individual to deposit multiple ballots, there needed to be a signature from an assistor. (Counterstatement ¶¶ 50-57,

129). This belief is consistent with a plausible reading, especially from non-lawyers, of the pertinent statute. *See* O.C.G.A. § 21-2-385(a) (2019) ("the elector shall vote his or her absentee ballot, then fold the ballot and enclose and securely seal the same in the envelope on which is printed 'Official Absentee Ballot.' This envelope shall then be placed in the second one, on which is printed the form of the oath of the elector; the name and oath of the person assisting, if any; and other required identifying information."); O.C.G.A. § 21-2-385(b) (2019) ("The person rendering assistance to the elector in preparing the ballot shall sign the oath printed on the same envelope as the oath to be signed by the elector.").

That is why TTV requested from Gwinnett County "an accounting of Assistor Signatures on Absentee Ballot envelopes, by drop box location, during the entire absentee voting period for the November 2020 General Election," and Gwinnett County responded stating that it had no responsive documents. (Counterstatement ¶¶ 48-49). Thus, when TTV Defendants saw video of individuals, such as Plaintiff, depositing multiple ballots, they thought this violated Georgia law, independent from any definition of "mules" in the Film. (Counterstatement ¶¶ 50-57).

Expression of honestly held opinions, such as these, preclude a defamation claim. *Wolf*, 253 F. Supp. 2d at 1352 ("expression of an honestly held belief" is a defense to defamation); *see also Blankenship v. NBCUniversal, LLC*, 60 F.4th 744

(4th Cir. 2023) (finding several on air remarks were not defamatory because defendants reasonably made a mistake in calling plaintiff a convicted felon).

Even more, TTV Defendants also retained an attorney to assist with the drafting, reviewing, and providing feedback on its complaints. (Counterstatement ¶¶ 51, 54). This further supports the conclusion that their comments were not malicious. *See Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 867 F. Supp. 925 (D. Or. 1994) (granting summary judgment on defamation counterclaim where company's statements were supported by legal opinion).

Finally, this is reflected in the different definitions of the term "mule," as established in the record. When TTV Defendants used that term in the context of interviews, they did not mean Plaintiff was a "mule" within the definition provided in the Film. (Counterstatement ¶¶ 28-29, 187). Nor could they have meant that—for example, when the TTV gave the interviews for the Film and that were used for the Trailer, they had not yet even received the Gwinnett County video surveillance footage including Plaintiff, which they received months later in March. (Counterstatement ¶ 82). In fact, TTV Defendants contemporaneously stated that Plaintiff was ***not*** a mule per the definition in the Film. (Counterstatement ¶¶ 45, 47, 72, 186). Rather, as discussed above, TTV Defendants reasonably believed that when an individual like Plaintiff delivered multiple ballots, there needed to be an assistor signature, and there were none in Gwinnett County. (Counterstatement

¶¶ 48-57). Thus, Plaintiff's singular focus on the Film's definition of a "mule" and the accuracy of geotracking (*see, e.g.*, Pl.'s Mot. at 13, 15) is a red herring as applied to TTV Defendants.

### iii. TTV Defendants Lacked Editorial Control Over the Publications.

For all Statements (except the TTV Video), TTV Defendants had no editorial control over what would be shown. *Supra* at 10-14. Again, TTV Defendants had nothing to do with numerous of the Statements. *Supra* at 10-11. For the Film and Trailer, TTV Defendants did not have editorial control over the selection of videos or content. (Counterstatement ¶¶ 81, 85-86, 107-08). Although they appeared in the Film at certain points, TTV Defendants did ***not*** make the offending statement, which was said by D'Souza: "What you are seeing is a crime. These are fraudulent votes." (Counterstatement ¶ 89).

Nor did TTV Defendants have any editorial control over the remaining Statements. For programs such as the Tucker Carlson Interview, Phillips did not even appear, and Engelbrecht could not even see what was being shown on the screen while she spoke and had no editorial control. (Counterstatement ¶¶ 138, 140-42). There can be no liability for these statements. *See Wolf*, 253 F. Supp. 2d at 1364. For the Charlie Kirk Interview[6], Engelbrecht specifically qualified her answer—she

---

[6] Although it is not entirely clear where The Charlie Kirk Show acquired the publicly-available surveillance footage, as Plaintiff notes, on March 22, 2022, days before Engelbrecht and Phillips'

left open the possibility that depositing multiple ballots could be legal if there were an assistor signature, but because Gwinnett County confirmed there were none, she believed individuals could not deposit multiple ballots. (Counterstatement ¶ 129). And for all the interviews, TTV Defendants did not select the videos that were selected, all the interviews were unscripted, and often they could not even see the videos that were displayed. (Counterstatement ¶¶ 130, 140).

Because there is no malice, none of the Statements are actionable.

## 2.    The Statements Are Privileged Under Georgia Law.

In addition, the Statements are privileged under Georgia statutory law because they all involve issues of public interest or concern. Privileged communications include "[s]tatements made in good faith as part of an act in furtherance of the person's or entity's right of petition or free speech . . . in connection with an issue of public interest or concern" (O.C.G.A. § 51-5-7(4)), which includes:

> Any written or oral statement or writing or petition made in a place open to the public or a public forum in connection with an issue of public interest or concern; or

> Any other conduct in furtherance of the exercise of the constitutional right of petition or free speech in connection with a public issue or an issue of public concern.

---

appearance on the Charlie Kirk show, D'Souza exchanged text messages with Kirk explaining that he would provide "a couple of exclusive short clips from the movie," "videos of people putting ballots into the drop boxes," and "part of our mule interview." (Pl.'s SMF ¶ 97).

O.C.G.A. § 9-11-11.1(c)(4)). Public concern "is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004); *see also Connick v. Myers*, 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."). For privileged communications, "if the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted, the party defamed shall have a right of action." O.C.G.A. § 51-5-9.

The Statements fall under O.C.G.A. § 51-5-7(4) and are privileged under Georgia law because they all relate to the issue of election integrity, which was and remains one of the most discussed political issues. (Counterstatement ¶ 14). Indeed, few things could be of greater public concern than public confidence in elections, a fact underscored by the reporting on the issue after the 2020 election (*See id.*). *See, e.g.*, *Thompson v. Trump*, 590 F. Supp. 3d 46, 79 (D.D.C. 2022) (noting statements "addressed matters of public concern: the outcome of the 2020 Presidential Election and election integrity. Whatever one thinks of the President's views on those subjects, they plainly were matters of public concern."). Further election integrity efforts is a large part of TTV's mission—TTV is a nonprofit, nonpartisan organization whose mission is to empower voters and protect voters' rights through

citizen engagement. (Catherine Engelbrecht Decl. ¶ 4). The purpose of the Film and the Statements was to publicly discuss the issue of election integrity, and it is undisputed that the issue of election fraud in the 2020 election was an issue of public concern and was discussed often on the news. (Counterstatement ¶ 14). The Film, and the Statements, all relate to free speech issues that are protected under Georgia law. *See* O.C.G.A. § 51-5-7(4); O.C.G.A. § 9-11-11.1(c). And there is no evidence that these privileged communications were "used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted." O.C.G.A. § 51-5-9.

Accordingly, the fact that the Statements are protected as privileged under Georgia provides another basis for why Plaintiff's defamation claim fails.

## D.    TTV Defendants' Statements Are Not Defamatory Under Any Standard.

Even if an ordinary negligence standard applied and the Statements were not privileged, Plaintiff misconstrues the negligence standard and factors.

Preliminarily, assessing negligence is usually the province of the jury. *See Diamond v. Am. Fam. Corp.*, 186 Ga. App. 681, 683 (1988) ("whether a broadcaster practiced that degree of care required of a reasonable broadcaster under the circumstances is an issue for the jury."); *Triangle Pubs.*, 253 Ga. at 182 ("there was sufficient evidence to create a jury issue as to the reasonableness of appellants' screening procedures").

Plaintiff also completely misstates the holdings of various cases it cites. For example, although Plaintiff claims "[c]ourts have routinely found defendants negligent on facts far less egregious than those here" (Pl.'s Mot. at 36), that is <u>not</u> what those Georgia cases say. Rather, they merely stand for the proposition that negligence should be a jury issue. *See Gettner*, 677 S.E.2d at 156 ("a jury issue exists regarding whether VNU's publication of the defamatory statement was negligent"); *Eidson v. Berry*, 202 Ga. App. 587, 588 (1992) (merely finding the court erred in granting summary judgment for the defendant).

Substantively, Plaintiff misevaluates the relevant factors. As discussed above, there is no doubt that the material in the Film was "topical." *See Triangle Publ'ns*, 317 S.E.2d at 537. The 2020 election was a matter of great public concern which was prominently discussed in the news. (Counterstatement ¶ 14). And, contrary to Plaintiff's characterization, the issues discussed in the Film required "prompt publication." Plaintiff cites no case for the proposition that a publication must be "breaking news." (Pl.'s Mot. at 28). Rather, D'Souza Defendants put together the Film quickly, and that the issues discussed therein were very timely when released.

Second, the issues discussed in the Film and other Statements, chiefly election integrity, were extremely newsworthy, and high in the public interest. (Counterstatement ¶ 14).

Third, the extent of damage to Plaintiff's reputation is extremely minimal, if anything. Plaintiff was unable to provide any evidence of **anyone** identifying him without he or his wife informing them first. (Counterstatement ¶ 190). He has continued to succeed at work and receive raises, and was unable to identify any negative repercussions at work. (Counterstatement ¶ 191). Outside of self-serving testimony, all Plaintiff is able to substantiate is increasing some payments for security systems he chose to upgrade at his home. (Pl.'s SMF ¶¶ 150-51).

The final factor also weighs in favor of TTV Defendants. Although Plaintiff spends a significant amount of time trying to refute the geotracking analysis that was performed for the Film, the specific statements involving Plaintiff have nothing to do with geotracking. As the evidence demonstrates, when providing their interviews for the Film and what was ultimately used in the Trailer, TTV Defendants did not even have the video of Plaintiff yet, so were not and could not have been discussing him. (Counterstatement ¶ 82). The evidence shows that to the extent TTV Defendants referred to Plaintiff as a "mule," that was unrelated to the definition in the Film, and relied on their good faith belief that individuals that dropped off multiple ballots had to have assistor signatures, for which there were none in Gwinnett County. (Counterstatement ¶¶ 28- 29, 48-57, 187). In fact, TTV Defendants contemporaneously stated that Plaintiff was **not** a mule per the definition in the Film. (Counterstatement ¶¶ 47, 72, 187). Regardless, TTV Defendants'

statements did not identify, let alone target, Plaintiff. (Counterstatement ¶¶ 185-86). Thus, TTV Defendants could not have defamed Plaintiff under any standard.

Additionally, many of the statements Plaintiff identifies are in no way even potentially defamatory. For example, Plaintiff cites to language such as "all the easy choices are in the past," and "pull[ing] the ripcord." (Pl.'s ¶ SMF 112). For the Tucker Carlson Interview, Plaintiff identifies generalized language such as "a recipe for fraud," "I can tell you there was rampant abuse of those drop boxes, and the data that we have is immutable and proves it, now buttressed increasingly by video," and "the subversion was in fact real." (Pl.'s ¶ SMF 104). None of these come close to identifying Plaintiff, and none are defamatory. *See, e.g.*, *Trump v. Cable News Network, Inc.*, 684 F. Supp. 3d 1269, 1275 (S.D. Fla. July 28, 2023) (no defamation where CNN used the phrase "the Big Lie" regarding his election challenges even though the phrase is attributed to the Hitler regime); *Ganske v. Mensch*, 480 F. Supp. 3d 542 (S.D.N.Y. 2020) (granting motion to dismiss where blogger made social media comments that journalist was "xenophobic" and "personally spread Russian bots" on a website because both were nonactionable opinions).

As discussed, the negligence standard is not the correct analytical framework. But even if it were, at the very least, Plaintiff is unable to show he is entitled to relief as a matter of law. And many of the statements do not even implicate a possible defamation claim.

## <u>CONCLUSION</u>

The undisputed record evidence demonstrates that TTV Defendants did not defame Plaintiff. The Court should deny Plaintiff's partial motion for summary judgment. And for the reasons set forth in TTV Defendants' Motion for Summary Judgment (ECF No. 279), summary judgment should be entered in favor of TTV Defendants.

Filed this 28th day of February, 2025.

/s/ Jake Evans
JAKE EVANS
Georgia Bar No. 797018
PHILIP J. GEORGE
Georgia Bar No. 441996
GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
P: (678) 553-2100
F: (678) 553-2212
Jake.Evans@gtlaw.com
Philip.George@gtlaw.com

*Attorneys for Defendants True the Vote, Inc., Catherine Englebrecht and Gregg Phillips*

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 5.1</u>

I HEREBY CERTIFY that the foregoing document was prepared in Times

New Roman, 14-point font, as approved by Local Rule 5.1.

*/s/ Jake Evans*
JAKE EVANS
Georgia Bar No. 797018

*Attorney for Defendants True The Vote, Inc.,*
*Catherine Engelbrecht, and Gregg Phillips*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the within and foregoing Defendants True the Vote, Inc., Catherine Engelbrecht, and Gregg Phillips' Response in Opposition to Plaintiff's Motion for Partial Summary Judgment was electronically filed on the Court's ECF filing system, which will automatically serve a copy on all counsel of record.

This 28th day of February, 2025.

**GREENBERG TRAURIG, LLP**

*/s/ Jake Evans*
JAKE EVANS
Georgia Bar No. 797018

*Attorney for Defendants True The Vote, Inc., Catherine Engelbrecht, and Gregg Phillips*

40