## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **MARK ANDREWS**, <br><br>     Plaintiff, <br><br> v. <br><br> **DINESH D'SOUZA**, *et al.*, <br><br>     Defendants. | Case No. 1:22-cv-04259-SDG |

## DEFENDANTS TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, AND GREGG PHILLIPS'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN RESPONSE TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT

Defendants True the Vote, Inc. ("TTV"), Catherine Engelbrecht ("Engelbrecht"), and Gregg Phillips ("Phillips") (together, "TTV Defendants"), pursuant to Federal Rules of Civil Procedure 56, Local Rule 56.1(B)(2)(b), and Section IV of the Court's Standing Order Regarding Civil Litigation, hereby submit the following Statement of Additional Material Facts to support their Response to Plaintiff's Partial Motion for Summary Judgment:

## A.    Catherine Engelbrecht and TTV.

1.    Prior to the film 2000 Mules (the "Film"), TTV and Engelbrecht had never worked with Salem Media Group, Inc. ("Salem") before. Excerpts of the Deposition Transcript of Catherine Engelbrecht, *attached as* **Exhibit 1** ("Engelbrecht Dep.") at 32:20-33:7; Excerpts of the Deposition Transcript of Salem

1

30(b)(6), *attached as* **Exhibit 2** ("Salem Dep."), at 21:22-22:3, 23:10-15; Declaration of Catherine Engelbrecht, *attached as* **Exhibit 3** ("Engelbrecht Decl."), ¶ 5.

2.      Engelbrecht had only briefly met Dinesh D'Souza one time before the initial meeting regarding the Film. Engelbrecht Decl., ¶ 6.

3.      Dinesh D'Souza and D'Souza Media LLC ("D'Souza Defendants") have had little to no contact with Engelbrecht since the Film's premiere in May 2022. Engelbrecht Decl., ¶ 7; Excerpts of the Deposition Transcript of Bruce Schooley, *attached as* **Exhibit 4** ("Schooley Dep.") at 115:12-19; Excerpts of the Deposition Transcript of Dinesh D'Souza, *attached as* **Exhibit 5** ("Dinesh D'Souza Dep.) at 23:21-24:10.

4.      Plaintiff has never met or spoken with Engelbrecht or anyone at TTV. Deposition Transcript of Mark Andrews, *attached as* **Exhibit 6** ("Mark Andrews Dep."), at 86:1-3, 8-10; Engelbrecht Decl., ¶ 8.

**B.**    <u>**Gregg Phillips.**</u>

5.      Gregg Phillips previously served on TTV's board of directors from 2015 to 2017, but has not held any other positions at TTV after that. Engelbrecht Dep. at 12:13-21; Excerpts of the Deposition Transcript of Gregg Phillips, *attached as* **Exhibit 7** ("Phillips Dep."), at 29:5-15; Declaration of Gregg Phillips, *attached as* **Exhibit 8** ("Phillips Decl."), ¶ 3.

6.    Phillips has never been employed by TTV, and has never received any direct compensation from TTV. Phillips Dep. at 29:13-22; Phillips Decl., ¶ 4.

7.    Phillips did not personally enter into any agreement with respect to the making of the Film. Phillips Dep. at 172:8-11; Phillips Decl., ¶ 6; *see also* DDR-00046931-37, *attached as* **Exhibit 9**.

8.    In 2021, Phillips' company, OpSec Group ("OpSec"), contracted with TTV to undertake specific tasks outlined in the OpSec Agreement. OpSec Agreement, *attached as* **Exhibit 10**; Phillips Decl., ¶ 7.

9.    Prior to the Film, Phillips had never met Dinesh D'Souza, did not know him, and had never worked with him. Phillips Dep. at 30:4-17; Dinesh D'Souza Dep. at 22:22-23:13; Phillips Decl., ¶ 8.

10.    D'Souza Defendants have had little to no contact with Phillips since the Film's premiere in May 2022. Phillips Decl., ¶ 12; Phillips Dep. at 30:18-25; Schooley Dep. at 115:12-19.

11.    Other than the Film, Phillips has never worked with Salem, and is not in contact with them today. Phillips Dep. at 31:7-13; Salem Dep. at 21:22-22:3, 23:10-15; Phillips Decl., ¶ 13.

12.    Plaintiff has never met or talked with Phillips. Mark Andrews Dep. at 86:6-7; Phillips Decl., ¶ 14.

C.     **TTV Defendants' Work Regarding the 2020 Election.**

13.     D'Souza Defendants were planning on making a movie with Salem prior to ever meeting with TTV Defendants. Dinesh D'Souza Dep. at 74:24-75:11; Engelbrecht Dep. at 134:4-17.

14.     The issue of election fraud in the 2020 election was an issue of public concern and was often discussed in the news. **Exhibit 11** (DDR-00069344–47, DDR-00069360–62, DDR-00069365–422, DDR-00069423–25, DDR-00069429–31, DDR-00069432–33, DDR-00069434, DDR-00069450–51, DDR-00069452–60, DDR-00069461–68, DDR-00069469–78, DDR-00069479–507, DDR-00069508–21); Mark Andrews Dep. at 114:5-18, 116:20-22; Dinesh D'Souza Dep. at 62:5-10 ("The topic of election integrity and election fraud was in the air, if I can put it that way. Lots of people were talking about it."); Dinesh D'Souza Dep. at 57:22-58:8 (stating that the Film premiered at Mar-a-Lago, and included a theme President Trump was very interested in); Excerpts of the Deposition Transcript of Nathan Frankowski, attached as **Exhibit 12** ("Frankowski Dep.") at 28:19-24 ("I think anyone with an Internet connection was familiar with what people were claiming happened during the 2020 election."); Schooley Dep. at 31:1-8 ("the entire country was talking about" election fraud); Engelbrecht Decl., ¶ 9; Phillips Decl., ¶ 14; *see also, e.g.*, Jason Carter & Cindy McCain,  Jason Carter and Cindy McCain on trust in America's election system, The Economist, Oct. 28, 2020,

https://www.economist.com/by-invitation/2020/10/28/jason-carter-and-cindy-

mccain-on-trust-in-americas-election-system ; Common Cause, ACLU launch

statewide election integrity program, ACLU New Mexico, Oct. 1, 2020,

https://www.aclu-nm.org/en/news/common-cause-aclu-launch-statewide-election-

integrity-program; Hans A. von Spakovsky, U.S. Election Fraud is Real—And It Is

Being Ignored, The Heritage Foundation, Oct. 27, 2020

https://www.heritage.org/election-integrity/commentary/us-election-fraud-real-

and-it-being-ignored; Doug Szajda, How voting security can protect the integrity of

elections, University of Richmond Now, Oct. 6, 2020

https://urnow.richmond.edu/features/article/-/19076/how-voting-security-can-

protect-the-integrity-of-elections.html.Szajda.

15.    The purpose of the Film, and any Statements involving TTV

Defendants, was to highlight the issues of election integrity, election process, and

election fraud. Dinesh D'Souza Dep. at 244:3-11 ("[T]he thrust of this movie is, was

there an elaborate coordinated election fraud operation going on in the swing

states?"); Excerpts of the Deposition Transcript of Deborah D'Souza[1], *attached as*

**Exhibit 13** ("Deborah D'Souza Dep."), at 23:21-26:5; Phillips Decl., ¶ 16;

Engelbrecht Decl., ¶ 10.

---

[1] Deborah D'Souza is Dinesh D'Souza's wife.

16.     Starting in late 2020 and early 2021, TTV and OpSec began performing research regarding the 2020 election, with the goal of providing the findings to law enforcement. The research was not originally done with the goal of appearing in a film. Phillips Decl., ¶ 17; Engelbrecht Decl., ¶ 11.

17.     In late 2021, Deborah D'Souza first discussed with Catherine Engelbrecht the possibility of using some of the surveillance film footage TTV had obtained and some of its research in a feature film, the working title of which at the time was "One Party America," that went on to become "2000 Mules." Deborah D'Souza Dep. at 36:19-25; Engelbrecht Decl., ¶ 12.

18.     Around August 2021, there was a meeting at the D'Souzas' house at which Engelbrecht and Phillips appeared. The meeting involved "things pertain[ing] to cell phone geotracking," a "discussion of election laws and election rules," "the criteria for elections to be called into question, overturned," a "discussion of surveillance video," a discussion regarding "technical questions," and a discussion regarding "some of the research." There was no formal presentation made, and TTV Defendants did not understand what they were supposed to do. D'Souza Dep. at 63:9-64:2; Phillips Dep. at 251:13-25; Engelbrecht Dep. at 139:14-23, 140:24-141:6; Phillips Decl., ¶ 18; Engelbrecht Decl., ¶ 13.

19.     TTV obtained publicly-available video of public ballot drop boxes from Georgia Open Records requests, and provided that video to OpSec. Phillips Dep. at 75:3-12; Engelbrecht Dep. at 82:6-21, 150:20-22, 350:4-12; Engelbrecht Decl., ¶ 14.

20.     The counties that produced the surveillance video of individuals in public places produced it without any blurring, meaning anyone that requested the video would receive it without any blurring. Phillips Decl., ¶ 19; Engelbrecht Decl., ¶ 15.

21.     Phillips and OpSec, with the help of independent contractors, worked on certain geospatial data analysis—which analyzed the time-stamped locations of unique device IDs from cellphones—that was ultimately used in the Film. Phillips Dep. at 42:3-11, 78:7-25; Phillips Decl., ¶ 21.[2]

22.     OpSec hired Red Metrics as one of several contractors to assist with geospatial/geotracking analysis, and Red Metrics retained possession of the raw geospatial data. Phillips Dep. at 51:18-21, 63:17-64:25, 75:13-23, 169:8-14; Phillips Decl., ¶ 11.

---

[2] Geotracking/geospatial analysis is a common and respected methodology used in numerous scenarios. *See* DDR-00069435-49, *attached as* **Exhibit 14** (New York Times article describing how location pings from smartphones revealed about 130 devices inside the Capitol building during January 6, 2021); Newsmax 192669, *attached as* **Exhibit 15**, (retired NSA senior intelligence analyst stating, "I have used the techniques used by TruetheVote.Org and can testify to the efficacy of the findings. In addition, the Supreme Court itself has written about (see Chief Justice Roberts writing in the 2018 case Carpenter v. US) and endorsed the efficacy of the methodology used.").

23.    For the geospatial analysis, there was no effort by TTV, OpSec, or Red Metrics to link any of the data or unique device IDs to any named individuals. Phillips Dep. at 79:5-9; Phillips Decl., ¶ 22.

24.    The research performed did not identify any named individuals as "mules," but rather identified unique device IDs. Phillips Dep. at 42:12-15; Phillips Decl., ¶ 23.

25.    Red Metrics' work was one step of many, including working with eyewitnesses and informants in several states (including two who appeared in the Film), as well as other contractors. Phillips Decl., ¶ 24; *see also* Pl.'s Ex. 12 at 51:18-25, 75:13-20; Ex. 186 at Interrogatory Response 15.

26.    Red Metrics performed additional analysis, including creating AI models to track similarities and ranking and scoring videos based on selected indicators. Phillips Decl., ¶ 25.

27.    Red Metrics suggested looking into data obtained from ACLED to Phillips. Prior to Red Metrics' suggestion, TTV Defendants were unaware of ACLED. Phillips Decl., ¶ 26.

28.    There is no one general definition of what a "mule" is. Dinesh D'Souza Dep. at 36:6-13 ("A mule is a delivery man or delivery woman. A mule is someone who is a conduit for depositing ballots, typically multiple ballots . . . into a mail-in drop box."); Engelbrecht Dep. at 288:13-289:4 (discussing the distinction between

a "small m" mule versus a "large M" Mule, and that even non-geotracked videos were still reflective of "things that ran afoul of the law"); Phillips Decl., ¶ 27; Engelbrecht Decl., ¶ 16.

29.    As specifically used in the Film, a "mule" was defined as someone who went to ballot drop boxes at least ten times within a specified period of time during election season, and went to certain NGOs. Dinesh D'Souza Dep. at 36:6-37:5; DD_000536 (the Film), *attached as* **Exhibit 16**, at 26:35.

**D.    The Exclusive License Agreement.**

30.    Neither Phillips nor Engelbrecht entered into the Exclusive License and Nondisclosure Agreement individually. **Exhibit 17** (DDR-00046931-37); Phillips Dep. at 86:15-21.

31.    The Agreement specifies that TTV granted to Salem, D'Souza Media, and other defined "Licensed Parties," (1) an exclusive right and license in the film footage to incorporate it within the Film; and (2) a non-exclusive right to use the footage in connection with the promotion of the Film. DDR-00046931, at DDR-00046932, § 2.

**E.    Surveillance Video Footage Sent to D'Souza Defendants.**

32.    The ballot drop box surveillance video footage TTV obtained was "paid for commercially and publicly available." DD_000411-12, *attached as* **Exhibit 18**; Engelbrecht Decl., ¶ 17.

33.    In or around January 2022, OpSec provided 70 cuts of that publicly-available ballot drop box surveillance footage linked to geospatial analysis to the D'Souza Defendants. Phillips Dep. at 75:13-23, 84:24-85:8; Engelbrecht Dep. at 163:23-164:3; Dinesh D'Souza Dep. at 149:9-12 ("I was aware that there was an initial, roughly, 70 videos that were sent. And subsequently we got a second batch of videos."); Frankowski Dep. at 60:7-12 ("I think I received them January 9th."); Phillips Decl., ¶ 28.

34.    Phillips was "very concerned about the footage" and "was very protective of it." Frankowski Dep. at 39:23-40:9; Phillips Decl., ¶ 29.

35.    The original 70 videos OpSec provided to the D'Souza Defendants matched geospatial analysis with unique device IDs based on time and location. These videos did not include footage from Gwinnett County public ballot drop boxes, because TTV Defendants had not yet received that video.  Therefore, it did not include footage of Andrews. Phillips Dep. at 145:3-24, 147:24-148:9; 255:10-15; Engelbrecht Dep. at 116:12-21, 165:6-10, 190:11-17; TTV_007110-20, *attached as* **Exhibit 19**, at TTV_00711 (explaining on November 23, 2021 to the Georgia Secretary of State that despite TTV submitting an open records request to Gwinnett County seeking all ballot drop box surveillance video recorded during the 2020 General Election, surveillance video had not yet been received for several locations); Engelbrecht Decl., ¶ 18; Phillips Decl., ¶ 30.

36.     TTV Defendants sent D'Souza Defendants several videos of the same person visiting multiple drop boxes. Engelbrecht Decl., ¶ 19; Phillips Decl., ¶ 31.

37.     An initial teaser trailer for the Film was released in late January 2022, in which Plaintiff does not appear. Dinesh D'Souza Dep. at 186:16-187:24; DDR-00021419-20 (Pl.'s Dep. Ex. 114), *attached as* **Exhibit 20**.

38.     On February 4, 2022, Deborah D'Souza requested from TTV Defendants "1,000 videos" for the Film in order to "make a collage for the screen of all these videos compiled to fit the full screen." DD_000394, *attached as* **Exhibit 21**; *see also* Phillips Dep. at 150:10-151:10; Engelbrecht Decl., ¶ 24; Phillips Decl., ¶ 33.

39.     Phillips responded, stating: "this is a major lift and is way outside the scope, Catherine you will need to decide on this one." DDR-00010441, *attached as* **Exhibit 22**; Phillips Decl., ¶ 34.

40.     On February 10, 2022, Engelbrecht informed Deborah D'Souza that it was "incredibly time consuming" to separate out the video clips tied to the geospatial analysis "because it involve[d] reading the geospatial data to try and find a match in really poorly detailed county video, so only analysists can do this. It is difficult to know how many more we will have. We have lots of footage, but finding the pieces that work is difficult. . . . We have millions of minutes of general footage so we can break apart clips and as long as they are too blurry to determine identifiable features, they could work for purposes of showing movement to the drop boxes and giving a

'fly' effect." TTV_007276-77 (Pl.'s Dep. Ex. 49), *attached as* **Exhibit 23**; Engelbrecht Decl., ¶ 25.

41.    TTV Defendants "always emphasized, [i]t is very hard to process this video. It's extremely time-consuming. It's extremely expensive." Dinesh D'Souza Dep. at 153:7-9; *see also* TTV_007276-77 (Pl.'s Dep. Ex. 49) (Engelbrecht emphasizing to Deborah D'Souza that matching up the video with the geospatial analysis was "incredibly time-consuming because it involves reading the geospatial data to try and find a match in really poorly detailed county video."); Phillips Decl., ¶ 35; Engelbrecht Decl., ¶ 26.

42.    The D'Souza Defendants repeatedly asked for more surveillance video. TPNF-0004579 (Pl.'s Dep. Ex. 100), *attached as* **Exhibit 24**; Dinesh D'Souza Dep. at 150:12-13; Frankowski Dep. at 85:25-87:11, 88:13-18; Phillips Decl., ¶ 36; Engelbrecht Decl., ¶ 27.

43.    On March 8, 2022, Phillips asked Deborah D'Souza: "Can y'all confirm that we have completed our to-dos for the movie?" Ms. D'Souza responded: "Yes we are pretty much done." DDR-00055752-55, *attached as* **Exhibit 25**; Phillips Decl., ¶ 37.

44.    In approximately March 2022, Gwinnett County belatedly sent publicly-available ballot drop box surveillance video to TTV. TTV_006466-80, *attached as* **Exhibit 26**, at TTV_006466 (in a March 10, 2022 complaint to the

Georgia Secretary of State, stating "[a]t the time of our original filing, we had been advised by Gwinnett County that drop box surveillance video was not available for certain drop boxes. Since that time, the missing surveillance video was located by the County, affording us an opportunity to review the video and amend our original complaint."); Engelbrecht Decl., ¶ 28.

45.     Because the Gwinnett County video was received so late in the process, OpSec did not have the opportunity to tie additional geospatial analysis to that video. Phillips Dep. at 150:5-8; Engelbrecht Dep. at 191:5-12, 288:13-289:4, 289:21-291:3, 353:19-354:6; DD_00063-86, *attached as* **Exhibit 27** (discussing "non-mule video" as a potential "tiger trap"); Phillips Decl., ¶ 38.

46.     In late March 2022, TTV Defendants sent additional video clips, including certain Gwinnett County footage, to the D'Souza Defendants. Frankowski Dep. at 85:11-16 (estimating receipt of new videos at around March 27, 2022); Schooley Dep. at 39:12-16, 69:3-5 (received a second batch of videos towards the end of March 2022); Phillips Decl., ¶ 39.

47.     TTV Defendants made clear that this second batch of videos was not tied to geospatial analysis, but was to be used only to complete the request from Debora D'Souza for backup images. DDR-00049510-11 (Pl.'s Dep. Ex. 104), *attached as* **Exhibit 28** (Phillips telling D'Souza "this isn't a mule. Didn't reach the threshold," in reference to an article discussing dismissal of Cross's State Election

Board ("SEB") complaint against Plaintiff, and D'Souza responding: "All good points. I will take them on the podcast."); Dinesh D'Souza Dep. at 274:18-23 (admitting that Phillips was saying Plaintiff was not a mule); TTV_008975 (Pl.'s Dep. Ex. 72), *attached as* **Exhibit 29** (Engelbrecht telling Salem's General Counsel that "[w]e did not track Mr. Andrews going to more than 10 dropboxes. He's not among the 242 individual devices identified that did go to 10+ ballot dropboxes in metro-Atlanta, GA."); Phillips Decl., ¶ 40; Engelbrecht Decl., ¶ 29.

**F.    TTV's Open Records Request Regarding Assistors.**

48.    On February 23, 2022, TTV sent a request pursuant to the Georgia Open Records Act, requesting Gwinnett County to produce "any report, record, or other documentation that will provide confirmation of Absentee Ballot Envelopes with Assistor Signatures collected during the November 2020 Election," and specifically, in accordance with O.C.G.A. § 21-2-385, "an accounting of Assistor Signatures on Absentee Ballot envelopes, by drop box location, during the entire absentee voting period for the November 2020 General Election." The statute provided: "the elector shall vote his or her absentee ballot, then fold the ballot and enclose and securely seal the same in the envelope on which is printed 'Official Absentee Ballot.' This envelope shall then be placed in the second one, on which is printed the form of the oath of the elector; the name and oath of the person assisting,

if any; and other required identifying information." O.C.G.A. § 21-2-385(a) (2019). TTV_007283-84, *attached as* **Exhibit 30**; Engelbrecht Decl., ¶ 30.

49.    Gwinnett County responded on March 1, 2022, stating that it had reviewed its files and determined that there were "no responsive documents" to TTV's request. Ex. 30 (TTV_007283-84); Engelbrecht Decl., ¶ 31.

**G.    TTV's Complaints to the Georgia Secretary of State.**

50.    TTV initially sent the Georgia Secretary of State a complaint in November 2021. TTV discussed that "surveillance footage shows numerous instances in which individuals deposited multiple ballots at a time – a practice which is prohibited under Georgia law except under very limited circumstances." TTV_010031-33, *attached as* **Exhibit 31** (citing O.C.G.A. § 21-2-385(a)); Engelbrecht Decl., ¶ 32.

51.    TTV retained an attorney to assist with drafting, reviewing, and providing feedback on this initial complaint before it was sent to the Georgia Secretary of State. Engelbrecht Decl., ¶ 33; Engelbrecht Dep. at 121:3-19.

52.    On March 10, 2022, as part of its "ongoing nonpartisan election integrity research," TTV sent another complaint to the Georgia Secretary of State, alleging improprieties related to absentee voting. TTV_009376-9390, *attached as* **Exhibit 32**; Engelbrecht Decl., ¶ 34.

53.    Based on its review of public ballot drop box surveillance video, TTV concluded that individuals cast multiple ballots, and cited Gwinnett County's response to TTV's Open Records Request stating that there was "no record of any envelopes bearing assistor signatures." TTV_009376-9390 at TTV_009377; TTV_007283-84; Engelbrecht Decl., ¶ 35.

54.    TTV retained an attorney to assist with drafting, reviewing, and providing feedback on the March 10, 2022 complaint before it was sent to the Georgia Secretary of State. Engelbrecht Decl., ¶ 36; Engelbrecht Dep. at 121:3-19.

55.    TTV's Complaint did not identify Plaintiff or any other specific individuals. *See* TTV_009376-9390; Engelbrecht Decl., ¶ 37.

56.    TTV Defendants believed that Georgia law required that for individuals not depositing their own ballots, there needed to be the signature of an assistor. Ex. 31 (TTV_010031-33) ("surveillance footage shows numerous instances in which individuals deposited multiple ballots at a time – a practice which is prohibited under Georgia law except under very limited circumstances."); Ex. 29 (TTV_008975) ("It's important to note that Mark Andrews (unnamed and unrecognizable) was shown as one of the many Georgians who voted multiple ballots without properly signing as an "assistor", in the section of the movie that discussed Dropbox abuse in one isolated dropbox in Gwinnett County, GA."); Ex. 32 (TTV_009376-9390), at TTV_009377 ("Through an Open Records Request . . . we sought confirmation as

to whether these individuals were authorized assistors who had signed ballot envelopes confirming by oath they were legally authorized to assist in the casting ballots other than their own. Gwinnett County responded to our request and stated that they had no record of any envelopes bearing assistor signatures. Therefore, none of the individuals could have legally cast more than one ballot."); Phillips Dep. at 111:8-19, 112:17-22, 123:9-18, 242:8-15; Engelbrecht Dep. at 111:11-112:20, 114:5-115:3, 288:13-289:1 (testifying Engelbrecht's understanding of the law was that depositing more than your own ballot was illegal without signing as an assistor, and there were no assistor signatures); MA-0000933, *attached as* **Exhibit 33**, at 25:40 (Engelbrecht stating "There is a possible [exception] in that he could have been an assistor. . ."); Engelbrecht Decl., ¶ 38; Phillips Decl., ¶ 41.

57.    TTV concluded that "[t]herefore, none of the individuals could have legally cast more than one ballot." Ex. 32 (TTV_009376-93900), at TTV_009377; Engelbrecht Decl., ¶ 39.

### H.    David Cross's Complaint to the Georgia State Election Board.

58.    On April 25, 2022, David Cross, who TTV Defendants understand is a resident of Georgia and highly involved in election integrity matters, but who is unaffiliated with any of the TTV Defendants, sent a Complaint to the Georgia SEB, the Georgia Secretary of State's Office, the Gwinnett Board of Elections, and several individuals (the "Cross Complaint"). TTV_008233, *attached as* **Exhibit 34**; Rule

30(b)(6) Excerpts of the Deposition Transcript of Georgia Secretary of State ("SOS Dep."), at 33:18-22, *attached as* **Exhibit 35**, (stating that SOS was not aware of any relationship between Cross and TTV other than reference to TTV in Cross's Complaint).

59.     The Cross Complaint does not identify Plaintiff by name, but includes his driver's license plate number, as well as photographs of Plaintiff and his vehicle at a Gwinnett County polling place taken from publicly available surveillance footage that Cross had apparently requested, received, and posted online. The Cross Complaint alleges Plaintiff was "ballot harvesting" by depositing five ballots. Ex. 34 (TTV_008233).

60.     TTV Defendants had nothing to do with the Cross Complaint, and had to request it by Open Records Request. Phillips Dep. at 266:1-267:21, 268:9-15; TTV_008204, *attached as* **Exhibit 36**. (Engelbrecht asking Cross "please don't reference True the Vote or the movie. That will avoid future misrepresentations in the press, which will definitely help us both."); Engelbrecht Dep. at 94:9-23 (TTV had to request Cross Complaint via Open Records Request); Engelbrecht Dep. at 99:17-100:23, 106:6-12 (stating Cross's reference to TTV in his Complaint was false); Engelbrecht Decl., ¶ 40; Phillips Decl., ¶ 42.

61.     Engelbrecht testified that "someone from [her] team at the time knew [Cross]," and that she was "extremely frustrated" because what Cross held up in his

video "wasn't accurate" and she "would not have done this." Engelbrecht Dep. at 90:25-91:15.

62.    Heather Mullins appeared in the Film and interviewed a law enforcement officer who had seen and reported ballot harvesting, and TTV Defendants understand she worked closely with David Cross on that issue. Mullins brought the research to TTV Defendants, TTV Defendants showed that to D'Souza, and D'Souza decided to use it in the Film. Engelbrecht Decl., ¶ 41; Phillips Decl., ¶ 43; Ex. 16 (the Film).

I.    **The Georgia State Election Board Investigation and Reporter Text Messages.**

63.    On May 2, 2022, a Georgia investigator interviewed Plaintiff at his home. SOS Dep. at 44:21-23.

64.    All documents relied on in the SOS investigation are available to the public once the investigation closes. SOS Dep. at 58:11-20.

65.    Prior to receiving a text message from Amy Gardner, a reporter with the Washington Post, on May 16, 2022, Plaintiff "had no idea what '2000 Mules' was." Mark Andrews Dep. at 75:8-76:6; *see* Pl.'s Ex. 152.

66.    Plaintiff testified that he signed an affidavit as a result of the election investigation into him, and that is how Amy Gardner reached out to him. Mark Andrews Dep. at 65:7-16.

67.    Plaintiff does not know of anyone else other than Amy Gardner who has communicated with or contacted him about "2000 Mules" or any interviews about or related to the Film. Mark Andrews Dep. at 125:12-126:4.

68.    On May 16, 2022 at 8:17 p.m., the day before a public SEB meeting regarding Cross's Complaint, Ryan Germany, who served as General Counsel for the Georgia Secretary of State's Office, sent a text message to Plaintiff stating:

> We are presenting the case where a person wrongfully accused you of harvesting ballots to the State Election Board tomorrow. We will of course tell the Board that there appear to be no violations and that the case should be dismissed. I am concerned that there will be media attention to the case, and I wanted to give you a heads up on that. We will not identify you by name at the meeting, but open records law will allow media/public to get the investigative file after the case is dismissed, so then your name will be public.

MA_0000028, *attached as* **Exhibit 37**.

69.    Plaintiff testified that his name became public "after the Georgia Board of Elections identified" him. Andrews Dep. at 64:11-16; *see also id.* at 65:7-16 ("My name, again, was known at the Georgia Bureau of Investigation, election investigation. I filed an affidavit. I signed it. That's how Amy Gardner reached out to me via my text phone. So my name was already out there after that hearing because it's public information.").

70.    On May 17, 2022, at 2:19 p.m., following the public SEB hearing on the Cross Complaint, Amy Gardner and Matthew Brown published an article in The Washington Post entitled "Georgia Elections Board Dismisses Allegations of Ballot

Harvesting" (the "Washington Post Article"). It discussed that "[t]he Georgia State Elections Board on Tuesday dismissed three allegations of ballot fraud brought by a conservative activist who falsely accused residents of the Atlanta area of illegally turning in other people's ballots in the 2020 election." MA-0001562, *attached as* **Exhibit 38**.

71.    The May 2022 Washington Post Article also discussed the Film, claiming that:

> The movie prominently features surveillance footage of a voter from Gwinnett County, Ga., outside of Atlanta, who was the subject of one of the complaints dismissed Tuesday. In the footage, the voter can be seen pulling up in a white Ford SUV alongside a ballot drop box, emerging from the truck and depositing five ballots into the box.

Ex. 38 (MA-0001562), at MA-0001563.

72.    The May 2022 Washington Post Article also provided a quote from Gregg Phillips, stating that, of the individual depicted in the footage (later determined to be Mr. Andrews): "That's not a mule to us." Ex. 38 (MA-0001562), at MA-0001565.

73.    On May 17, 2022, at 2:50 p.m., Germany texted Plaintiff again and suggested an attorney for him to contact. Germany provided Plaintiff with the name and phone number of attorney Von Dubose, who Germany stated "recently handled some similar cases." Ex. 37 (MA_0000028).

74.    On May 23, 2022, Ali Swenson, a reporter with The Associated Press, reached out to Plaintiff's daughter. Her inquiry was "regarding an investigation by the Georgia secretary of state's office." MA_0000078, *attached as* **Exhibit 39**.

75.    The earliest TTV Defendants first saw Andrews' name was on or about May 26, 2022, when Engelbrecht and TTV received a response to their Open Records Request, after the SEB investigation and hearing had concluded. Although they saw Andrews' name in the responsive documents, they did not know the 1.8 seconds of his blurred, masked image appeared in the 89-minute Film until Plaintiff filed this lawsuit. Engelbrecht Dep. at 109:1-110:5;  Engelbrecht Decl., ¶ 42; Phillips Decl., ¶ 44.

**J.    Alleged Defamatory Statements in Which TTV Defendants Appeared.**

**a.    The 2000 Mules Film.**

76.    Out of the 89-minute Film, a 1.8 second clip of Plaintiff appears, taken from publicly available Gwinnett County drop box video, along with many other video clips. His face is completely blurred, and behind the blurred image he is wearing a COVID face mask, which covers his nose and mouth. Ex. 16 (the Film).

77.    The concept of the Film "originated fully" with Dinesh D'Souza. Salem Dep. at 38:24-39:1.

78.     TTV Defendants do not make films, have never worked to create a film before, do not understand the film-making process, and are unaware of the proper terminology for the Film. Engelbrecht Decl., ¶ 43; Phillips Decl., ¶ 45.

79.     Salem and D'Souza were "partner[s]" in making the Film. Salem Dep. at 66:14-20.

80.     TTV Defendants only met with Salem one time to discuss the possibility of making a film. Engelbrecht Dep. at 136:25-137:3; Engelbrecht Decl., ¶ 44.

81.     TTV Defendants had no editorial control over the Film. MA_0001518-61, *attached as* **Exhibit 40**, at MA-0001549 (Dinesh D'Souza stating TTV had "[z]ero" editorial control over the Film); Dinesh D'Souza Dep. at 72:13-17 (describing how his team made "editorial decisions about how best to depict the information"); Dinesh D'Souza Dep. at 74:1-2 (describing how his deal to make a movie with Salem Media was "completely kind of at my discretion"); Dinesh D'Souza Dep. at 112:17-23 ("[W]e were emphatic from the beginning that editorial control of the film would be ours – this is our film. It's a D'Souza Media project. I am the narrator of the film."); Dinesh D'Souza Dep. at 182:21-22 (discussing how he "made a unilateral editorial decision to cut the film."); Frankowski Dep. at 105:20-106:16 (the one making the "ultimate decision" for recreated shoots was Dinesh D'Souza); Schooley Dep. at 42:21-43:1 (it was Frankowski and Schooley

that selected the surveillance video clips for the Film); Schooley Dep. at 79:11-17

(the "final final" say for the Film was with Dinesh D'Souza); Schooley Dep. at 80:1-

3 (TTV Defendants never provided any feedback on things they wanted changed in

the movie); Ex. 46 (DDR-00019278) ████████████████████████

████████████████████████████████████████████

██████████████; Ex. 29 (TTV_008975) ("We can't speak to the movie, movie

trailer, or book, as we had no creative control in any of those projects . . ."); 

TPDG_0000230-31, *attached as* **Exhibit 41** ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

TPDG_0000232, *attached as* **Exhibit 42** ████████████████

████████████████████████████████████████████

████████████████████████████; TPDG_0000234, *attached as* **Exhibit**

**43** ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ TPDG_0000448-50, *attached as* **Exhibit 44**

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

TPNG_0001072-1108, *attached as* **Exhibit 45** (D'Souza's team choosing the specific clips from interviews to include in the movie); Engelbrecht Dep. at 149:1-23 (discussing how TTV Defendants had no control over the script, how videos were selected, the graphics, or documents that were selected for the Film); Engelbrecht Dep. at 154:20-155:11 ("no editorial control"); Engelbrecht Dep. at 159:7-19 (infrequent communications regarding making of Film, and felt "very detached" from it); Engelbrecht Dep. at 166:21-167:8 ("no video control or script control"); Engelbrecht Dep. at 177:16-22 ("[W]e had no editorial control. We had no control over what happened in their studio or who they hired to do what."); Engelbrecht Dep. at 182:17-23 ("[W]e were not supposed to be in [the Film], which we had no editorial control, and we had no control over what was going to happen, did not know who was going to be there."); Engelbrecht Dep. at 191:13-18 ("[W]e had no editorial control, no control over what was used or how, which videos were selected. . . [T]hey were trying to do what they could to make it look good on screen."); Phillips Dep. at 40:16-19, 84:11-19, 138:13-16, 172:12-19, 196:4-13, 197:20-199:12, 200:5-201:22, 220:22-221:4, 228:19-229:2, 229:22-25, 231:8-23, 237:5-238:3; Engelbrecht Decl., ¶ 45; Phillips Decl., ¶ 46.

82.    The interview TTV Defendants participated in, which D'Souza Defendants selected portions of for the Film, was filmed months before TTV Defendants obtained the Gwinnett County video surveillance footage which included the footage of Plaintiff. Engelbrecht Decl., ¶¶ 20, 23, 60; Phillips Decl., ¶¶ 32, 39.

83.    Editing decisions were always made by Bruce Schooley and Dinesh D'Souza. Frankowski Dep. at 32:25-33:6, 34:11-17 (stating that Schooley and D'Souza always had "the final say").

84.    The dropbox footage for the Film, including the footage of Plaintiff, was selected by Bruce Schooley and Nathan Frankowski from D'Souza Media. Dinesh D'Souza Dep. at 137:20-24.

85.    In a Washington Post entitled *Discussing the gaps in '2000 Mules' with Dinesh D'Souza*, the following exchange took place:

Phillip Bump (Reporter): So True the Vote, also executive producers, did they have any editorial control of the film?

Dinesh D'Souza: Zero.

Ex. 40 (MA_0001518-61), at MA-0001549.

86.    ██████████████████████████████████████████

██████████████████████████████ DDR-00019278, *attached as* **Exhibit 46**.

87.    TTV Defendants' responses to questions in the portions of the Film in which they appeared were unscripted and unrehearsed. Engelbrecht Decl., ¶ 21; Phillips Decl., ¶ 47.

88.    In the Film, TTV Defendants pointed to blank screens, and graphics were created, selected, and superimposed after the fact by D'Souza Defendants. Engelbrecht Decl., ¶ 22; Phillips Decl., ¶ 48.

89.    In the Film, as a video clip of Plaintiff appears, Dinesh D'Souza's voiceover states: "What you are seeing is a crime. These are fraudulent votes." Ex. 16 (the Film).

90.    Neither Engelbrecht nor Phillips identified Andrews in the Film. Ex. 16 (the Film); Engelbrecht Decl., ¶ 23; Phillips Decl., ¶ 49.

91.    Nobody said Andrews' name during the Film. Ex. 16 (the Film) Engelbrecht Decl., ¶ 46; Phillips Decl., ¶ 50.

92.    Although Dinesh D'Souza originally advocated not blurring individuals' images, Engelbrecht and Phillips supported D'Souza Defendants' ultimate decision to blur individuals' images. Dinesh D'Souza Dep. at 127:2-128:16; Schooley Dep. at 88:4-12 (stating Engelbrecht was one of individuals "obsessed with not identifying anybody.").

93.    Although TTV Defendants at times gave limited suggestions for the Film, they were often not accounted for or implemented in the Film. Engelbrecht

Dep. at 196:18-197:1, 212:6-213:10; Schooley Dep. at 26:24-27:14 (there was only "[v]ery limited" input from Salem and TTV); Schooley Dep. at 28:1-11 (TTV Defendants provided "limited" input after they provided the research and the video); Schooley Dep. at 93:14-22 (Schooley "[v]ery seldom[ly] communicated with TTV Defendants when the Film was being made); Engelbrecht Decl., ¶ 47; Phillips Decl., ¶ 51.

94.    TTV Defendants had very minimal involvement with marketing and promotion of the Film. Salem Dep. at 46:5-10 (testifying that Engelbrecht and Phillips did not provide input on the marketing of the Film); Salem Dep. at 64:14-16 (Salem did not discuss the creation of advertisements with TTV Defendants); Deborah D'Souza Dep. at 154:2-12 (discussing that TTV Defendants had "very minimal" involvement with marketing and promotion of the Film); Deborah D'Souza Dep. at 204:22-205:1 (Deborah D'Souza does not have any specific memory of TTV Defendants promoting the Film in any media appearance); Engelbrecht Decl., ¶ 48; Phillips Decl., ¶ 52.

95.    TTV Defendants had very limited coordination with D'Souza Media for publicity for the Film. Phillips Dep. at 136:4-12, 137:1-6, 179:13-180:7; Engelbrecht Decl., ¶ 49; Phillips Decl., ¶ 53.

96.    D'Souza's publicist, Patricia Jackson, never worked with TTV Defendants in any significant fashion. Phillips Dep. at 135:11-136:12, 179:16-180:7;

Declaration of Patricia Jackson ("Jackson Decl."), *attached hereto* as **Exhibit 47**, at ¶¶ 13 ("On several occasions, I learned about media appearances that Catherine had scheduled, without my knowledge or approval after the fact."); *id.* ¶ 14 (Jackson unaware of Engelbrecht's appearance on Tucker Carlson Tonight beforehand, and noting she did not set it up); *id.* ¶ 18 (Jackson unaware of Engelbrecht's and Phillips' appearance on The Charlie Kirk Show at the time); Engelbrecht Decl., ¶ 50; Phillips Decl., ¶ 54.

97.    Dinesh D'Souza was upset that TTV Defendants were not doing enough to promote the Film. Dinesh D'Souza Dep. at 224:6-16.

98.    Salem never discussed with TTV Defendants the marketing of the Film, and TTV Defendants were not involved with discussions regarding how to promote the Film. Salem Dep. at 46:20-25, 57:9-11, 63:10-13, 63:20-22; Engelbrecht Decl., ¶ 51; Phillips Decl., ¶ 55.

99.    According to Dinesh D'Souza, during the making of the Film, his communications with Engelbrecht and Phillips was "sporadic." Dinesh D'Souza Dep. at 113:10-20.

100.    Salem and TTV Defendants had only "occasional contact" and "nothing on a regular basis" throughout the process of the Film being produced. Salem Dep. at 22:12-19, Salem Dep. at 43:25-44:6; Engelbrecht Decl., ¶ 52; Phillips Decl., ¶ 56.

101.   TTV Defendants did not know they were listed as executive producers on the Film until around the time the Film was released, and did not know why they were included. Phillips Dep. at 172:12-25, 183:19-23; Engelbrecht Dep. at 223:10-224:1; Schooley Dep. at 80:11-13 (D'Souza Defendants suggested that TTV Defendants be listed as executive producers); Engelbrecht Decl., ¶ 53; Phillips Decl., ¶ 57.

102.   TTV Defendants were not told what would appear on the screen when they appeared in the Film. Engelbrecht Decl., ¶ 54; Phillips Decl., ¶ 58.

103.   TTV Defendants has never had any control over the "2000 Mules" website, https://2000mules.com. Engelbrecht Decl., ¶ 55; Phillips Decl., ¶ 59.

104.   TTV Defendants had no editorial control over and were not involved with the creation of the Film's DVD cover. Engelbrecht Decl., ¶ 56; Phillips Decl., ¶ 60.

**b.    The Second 2000 Mules Trailer.**

105.   The second 2000 Mules trailer (the "Trailer") was released on or about April 22, 2022. MA-0001796, *attached as* **Exhibit 48**.

106.   Out of the 3 minute 4 second trailer, a 1.8 second clip of Plaintiff appears, taken from publicly available Gwinnett County drop box video. His face is completely blurred, and behind the blurred image he is wearing a COVID face mask, which covers his nose and mouth. Ex. 48 (MA-0001796).

107.    TTV Defendants had no editorial control over any trailer for the Film. Phillips Dep. at 138:17-139:14; Ex. 29 (TTV_008975) ("We can't speak to the movie, movie trailer, or book, as we had no creative control in any of those projects . . ."); Engelbrecht Decl., ¶ 57; Phillips Decl., ¶ 61.

108.    TTV Defendants had nothing to do with the creation, production, or development of any trailer for the Film. Engelbrecht Decl., ¶ 58; Phillips Decl., ¶ 62.

109.    TTV Defendants were not told what would appear on the screen and did not know they would appear in the final "2000 Mules" Trailer. Engelbrecht Decl., ¶ 59; Phillips Decl., ¶ 63.

110.    The portions of the Trailer in which TTV Defendants appeared were unscripted and unrehearsed. Engelbrecht Decl., ¶ 60; Phillips Decl., ¶ 64.

111.    Neither Engelbrecht nor Phillips identified Plaintiff during the Trailer. Ex. 48 (MA-0001796); Engelbrecht Decl., ¶ 61; Phillips Decl., ¶ 65.

112.    Nobody said Plaintiff's name during the Trailer. Ex. 48 (MA-0001796); Engelbrecht Decl., ¶ 62; Phillips Decl., ¶ 66.

**c.    Facts Matter with Roman Balmakov.**

113.    On or about May 13, 2022, Engelbrecht and Phillips appeared on the show Facts Matter with Roman Balmakov ("Facts Matter"). Plaintiff's blurred image is shown for less than 1 second out of the 14:37 program while Mr. Balmakov is speaking, among several other clips of others from publicly available ballot drop

box video. MA-0001585 at 0:23, *attached as* **Exhibit 49**; Engelbrecht Decl., ¶ 63; Phillips Decl., ¶ 67.

114.   The Facts Matter program reached out to Engelbrecht individually to set up the interview. Engelbrecht Decl., ¶ 64.

115.   Engelbrecht and Phillips had no editorial control over what was shown on the Facts Matter program. Engelbrecht Decl., ¶ 65; Phillips Decl., ¶ 68.

116.   TTV Defendants had nothing to do with the creation, production, or development of the Facts Matter program. Engelbrecht Decl., ¶ 66; Phillips Decl., ¶ 69.

117.   TTV Defendants were not told what would appear on the screen when they appeared on the Facts Matter program. Engelbrecht Decl., ¶ 67; Phillips Decl., ¶ 70.

118.   The portions of the Facts Matter program in which TTV Defendants appeared were unscripted and unrehearsed. Engelbrecht Decl., ¶ 68; Phillips Decl., ¶ 71.

119.   Neither Engelbrecht nor Phillips identified Plaintiff during the Facts Matter program. Ex. 49 (MA-0001585); Engelbrecht Decl., ¶ 69; Phillips Decl., ¶ 72.

120.   Nobody said Plaintiff's name during the Facts Matter program. Ex. 49 (MA-0001585); Engelbrecht Decl., ¶ 70; Phillips Decl., ¶ 73.

     d.   **The *Charlie Kirk Show* Interview.**

121.   On or about April 8, 2022, a segment aired on *The Charlie Kirk Show* involving Engelbrecht and Phillips, which was filmed a few days earlier. The interview includes a brief clip of Plaintiff, which Charlie Kirk showed to Phillips and Engelbrecht on a personal laptop computer, from publicly available Gwinnett County ballot drop box video, among several other clips of others from publicly available ballot drop box video. In the clip of Plaintiff, he is wearing a COVID face mask, covering his nose and mouth. Ex. 33 (MA-0000933), at 25:03; Phillips Dep. at 87:18-22; Engelbrecht Decl., ¶ 71; Phillips Decl., ¶ 74.

122.   Either Engelbrecht or Phillips reached out to Charlie Kirk to tell him they would be in town and to see if he wanted to get together for coffee. Kirk then offered for Engelbrecht and Phillips to come on his show, which they accepted. Engelbrecht Decl., ¶ 72; Phillips Decl., ¶ 75; Catherine Engelbrecht's Responses and Objections to Defendant Dinesh D'Souza's First Set of Interrogatories, at No. 12, *attached as* **Exhibit 50**.

123.   Both Engelbrecht and Phillips thought their appearance on *The Charlie Kirk Show* would be a radio interview and were surprised to learn it was being filmed when they arrived that day. Phillips Dep. at 270:19-25; Engelbrecht Dep. at 296:7-18, 302:16-303:14; Catherine Engelbrecht's Responses and Objections to Defendant

Dinesh D'Souza's First Set of Interrogatories, at No. 12; Engelbrecht Decl., ¶ 73; Phillips Decl., ¶ 76.

124. *The Charlie Kirk Show* used certain publicly available video clips, including those showing Plaintiff. Neither Engelbrecht nor Phillips know where those clips come from, but they seemed to be the same videos as appeared in a commercial advertisement that was run in Georgia and that were circulating on social media. Ex. 33 (MA-0000933); DD_000103, *attached as* **Exhibit 51**; DDR 00049450-51, *attached as* **Exhibit 52** ("[W]e did an interview with Charlie yesterday. He had the same videos from the ad in GA (the ones we talked about) and asked us to review them. He says Salem knows, etc., but didn't want to not tell y'all. It's supposed to air tomorrow. . . . It's our first big interview so it felt weird."); Phillips Dep. at 132:3-16, 133:2-6 (testifying that he had "no idea" what clips Mr. Kirk had), 133:17-19, 270:9-25; Engelbrecht Decl., ¶ 74; Phillips Decl., ¶ 77.

125. Neither Engelbrecht nor Phillips had any editorial control over *The Charlie Kirk Show* program. Phillips Dep. at 115:19-22, 131:16-21, 133:2-6; Engelbrecht Dep. at 301:5-21, 303:2-25, 308:4-14; Phillips Dep. at 87:18-22; Engelbrecht Decl., ¶ 75; Phillips Decl., ¶ 78.

126. The interview was unscripted and unrehearsed. Engelbrecht Dep. at 302:5-8; Phillips Dep. at 87:18-22; Engelbrecht Decl., ¶ 76; Phillips Decl., ¶ 79.

127.   Plaintiff was never identified in the *The Charlie Kirk Show* interview. Ex. 33 (MA-0000933); Engelbrecht Decl., ¶ 77; Phillips Decl., ¶ 80.

128.   Nobody said Plaintiff's name during the *The Charlie Kirk Show* interview. Ex. 33 (MA-0000933); Engelbrecht Decl., ¶ 78; Phillips Decl., ¶ 81.

129.   Engelbrecht expressed her belief at the time that Plaintiff dropping off multiple ballots could have been legal if he had been an assistor, but that Gwinnett County had not produced any assistor certifications. Ex. 33 (MA-0000933), at 25:40.

130.   During the interview, Phillips did not know that unblurred video of Andrews was being played because he was too far away from the laptop screen and was not wearing his glasses. Phillips Dep. at 120:9-121:5; Phillips Decl., ¶ 82.

131.   After filming, Engelbrecht sent a message to Deborah D'Souza stating: "[W]e did an interview with Charlie yesterday. He had the same videos from the ad in GA (the ones we talked about) and asked us to review them. He says Salem knows, etc. but didn't want to not tell y'all." Ms. D'Souza responded: "This is no problem! But thanks for letting us know." Ex. 51 (DD_000103).

132.   Engelbrecht sent this note because she thought the Charlie Kirk interview was meant to be a radio interview, and was surprised it was being filmed and that he showed publicly-available ballot drop box footage. Engelbrecht Decl., ¶ 79.

133.   TTV reposted the interview on social media expecting that it was appropriate because it had been vetted and posted online by Salem and Charlie Kirk's show. Engelbrecht Dep. at 304:24-305:15; Engelbrecht Decl., ¶ 80; *see also* Phillips Decl., ¶ 83.

### e.    The Tucker Carlson Interview.

134.   On May 5, 2022, Engelbrecht appeared on Tucker Carlson Tonight on Fox News ("Tucker Carlson Tonight"). As Engelbrecht discusses ballot drop boxes generally, the show included a clip of Plaintiff from publicly available Gwinnett County ballot drop box video, among several other clips of others from publicly available ballot drop box video. In the clip of Plaintiff, he is wearing a COVID face mask, covering his nose and mouth. MA-0001018, *attached hereto* as **Exhibit 53**, at 0:29; Engelbrecht Decl., ¶ 81.

135.   Plaintiff's clip was one of ten shown during the segment. Ex. 53 (MA-0001018).

136.   The footage including Plaintiff in the interview is displayed in a small, pixelated box. Ex. 53 (MA-0001018).

137.   The Tucker Carlson Tonight program reached out to Engelbrecht individually to set up the interview. Engelbrecht Decl., ¶ 82.

138.    Phillips did not appear on the Tucker Carlson Tonight program and did not have a role in it. Ex. 53 (MA-0001018); Phillips Decl., ¶ 84; Phillips Dep. at 87:18-22;

139.    Engelbrecht did not mention the Film on the Tucker Carlson Tonight program. Engelbrecht Dep. at 278:10-13; Dinesh D'Souza Dep. at 227:1-9; Ex. 53 (MA-0001018); Engelbrecht Decl., ¶ 83.

140.    Engelbrecht did the Tucker Carlson Tonight interview remotely and had no ability to see or comment on what was shown on the television screen. Engelbrecht Dep. at 281:18-282:3; Ex. 53 (MA-0001018); Engelbrecht Decl., ¶ 84.

141.    Engelbrecht had no editorial control over what was shown on the Tucker Carlson Tonight program. Engelbrecht Dep. at 281:11-17; Engelbrecht Decl., ¶ 85.

142.    TTV Defendants had nothing to do with the creation, production, or development of the Tucker Carlson Tonight program. Engelbrecht Decl., ¶ 86; Phillips Decl., ¶ 85.

143.    Engelbrecht was not told what would be shown to the viewing public on the screen when she appeared on the Tucker Carlson Tonight program. Engelbrecht Decl., ¶ 87.

144.    The portions of the Tucker Carlson Tonight program in which Engelbrecht appeared were unscripted and unrehearsed. Engelbrecht Decl., ¶ 88.

145.    Engelbrecht never identified Plaintiff during the Tucker Carlson Tonight program. Ex. 53 (MA-0001018); Engelbrecht Decl., ¶ 89.

146.    Nobody said Plaintiff's name during the Tucker Carlson Tonight program. Ex. 53 (MA-0001018); Engelbrecht Decl., ¶ 90.

### f.    **The Gateway Pundit Interview.**

147.    On April 20, 2022, Phillips and Engelbrecht appeared on The Gateway Pundit podcast ("Gateway Pundit"). The video includes a clip of Plaintiff, from publicly available Gwinnett County ballot drop box video, and Plaintiff is wearing a COVID face mask, covering his nose and mouth. PDSA-0000001, *attached as* **Exhibit 54**; Engelbrecht Decl., ¶ 91; Phillips Decl., ¶ 86.

148.    The Gateway Pundit program reached out to Engelbrecht individually to set up the interview. Engelbrecht Decl., ¶ 92.

149.    Engelbrecht and Phillips had no editorial control over what was shown on the Gateway Pundit program. Engelbrecht Decl., ¶ 93; Phillips Decl., ¶ 87.

150.    TTV Defendants had nothing to do with the creation, production, or development of the Gateway Pundit program. Engelbrecht Decl., ¶ 94; Phillips Decl., ¶ 88.

151.    TTV Defendants were not told what would appear on the screen when they appeared on the Gateway Pundit program. Engelbrecht Decl., ¶ 95; Phillips Decl., ¶ 89.

152.    The portions of the Gateway Pundit program in which TTV Defendants appeared were unscripted and unrehearsed. Engelbrecht Decl., ¶ 96; Phillips Decl., ¶ 90.

153.    Neither Engelbrecht nor Phillips identified Plaintiff during the Gateway Pundit program. Ex. 54 (PDSA-0000001); Engelbrecht Decl., ¶ 97; Phillips Decl., ¶ 91.

154.    Nobody said Plaintiff's name during the Gateway Pundit program. Ex. 54 (PDSA-0000001); Engelbrecht Decl., ¶ 98; Phillips Decl., ¶ 92.

**g.    May 8, 2022 "TTV Video."**

155.    On May 8, 2022, TTV released a video on its Facebook page (the "TTV Video"). The TTV Video contains a blurred image of Plaintiff from publicly available Gwinnett County ballot drop box video, which appears for a fraction of a second. MA-0000382, *attached as* **Exhibit 55**; Engelbrecht Decl., ¶ 99; Phillips Decl., ¶ 93.

156.    Neither Engelbrecht nor Phillips identified Plaintiff during the TTV Video. Ex. 55 (MA-0000382); Engelbrecht Decl., ¶ 100; Phillips Decl., ¶ 94.

157.    Nobody said Plaintiff's name during the TTV Video. MA-0000382; Engelbrecht Decl., ¶ 101; Phillips Decl., ¶ 95.

**h.**    **October 22, 2022 2000 Mules Music Video Trailer.**

158.    On October 22, 2022, TTV posted a music video on its Facebook page (the "Music Video"). The Music Video contains a blurred image of Plaintiff from publicly available Gwinnett County ballot drop box video, which appears for a fraction of a second. Pl.'s Ex. 126, 127; Engelbrecht Decl., ¶ 102; Phillips Decl., ¶ 96.

159.    The Music Video was not produced by TTV Defendants; rather, it was produced and released by a musician known as "Forgiato Blow," who created the video and posted it on social media. Pl.'s Ex. 126, 127; Engelbrecht Decl., ¶ 103; Phillips Decl., ¶ 97.

160.    TTV Defendants did not know Mr. Blow and had no role in the creation of the music video. Engelbrecht Decl., ¶ 104; Phillips Decl., ¶ 98.

**K.**    **Alleged Defamatory Statements With No Involvement from TTV Defendants.**

**a.**    **The 2000 Mules Book.**

161.    On or about October 25, 2022, Regnery Publishing published the book "2000 Mules" (the "Book"), which was written by Dinesh D'Souza. DD_000535, *attached as* **Exhibit 56**.

162.    Dinesh D'Souza had a two-book deal with Salem Media. Dinesh D'Souza Dep. at 292:24-293:5.

163.   The TTV Defendants had no involvement in the development, writing, editing, or publication of the Book. Dinesh D'Souza Dep. at 293:17-22 (stating that "[a] book is typically an individual's enterprise, and so I undertook to do [the Book] as an individual."); Dinesh D'Souza Dep. at 295:4-7, 295:23-25 (stating that D'Souza "write[s] everything myself. I write every word."); Deborah D'Souza Dep. at 34:6-12 (stating "Dinesh writes all his books" and that no one worked on the book with him); TTV_008774-76, *attached as* **Exhibit 57** ("We had not seen the manuscript. . . . However, we still haven't seen the book so there may be other controversies ahead."); Engelbrecht Dep. at 312:8-15 (TTV Defendants had not been consulted on the book, had no idea a book was actually being written, and were not involved in it at all); Engelbrecht Decl., ¶ 105; Phillips Decl., ¶ 99.

164.   TTV Defendants had no editorial control over the Book. Phillips Dep. at 203:5-10; Ex. 29 (TTV_008975) ("We can't speak to the movie, movie trailer, or book, as we had no creative control in any of those projects . . ."); Engelbrecht Decl., ¶ 106; Phillips Decl., ¶ 100.

165.   None of the TTV Defendants ever saw a copy of the Book before it was published. Phillips Dep. at 202:4-19; Engelbrecht Decl., ¶ 107; Phillips Decl., ¶ 101.

166.   TTV Defendants never received any funds from the Book. Engelbrecht Dep. at 237:9-12; Engelbrecht Decl., ¶ 108; Phillips Decl., ¶ 102.

167.    Salem was not in communication with TTV Defendants regarding the Book until well after it was published and distributed. Salem Dep. at 22:21-23, 75:7-11; Engelbrecht Decl., ¶ 109; Phillips Decl., ¶ 103.

168.    TTV Defendants were not involved with any promotional materials for the Book. Ex. 57 (TTV_008774-76) ("We had not seen the manuscript. . . . However, we still haven't seen the book so there may be other controversies ahead."); Engelbrecht Dep. at 312:8-15 (TTV Defendants had not been consulted on the book, had no idea a book was actually being written, and were not involved in it at all); Engelbrecht Decl., ¶ 110; Phillips Decl., ¶ 104.

### b.    **The Time Square Billboard.**

169.    TTV Defendants were not involved with the billboard including an image of Plaintiff in Times Square which is referenced in Plaintiff's Statement of Undisputed Material Facts (the "Times Square Billboard"), and did not know anything about it until this lawsuit was filed. Engelbrecht Decl., ¶ 111; Phillips Decl., ¶ 105.

170.    TTV Defendants had no editorial control over the Times Square Billboard. Engelbrecht Decl., ¶ 112; Phillips Decl., ¶ 106.

171.    TTV Defendants had no prior knowledge that the Times Square Billboard was being put up. Engelbrecht Decl., ¶ 113; Phillips Decl., ¶ 107.

### c.    <u>Dinesh D'Souza's Media Appearances.</u>

172.   TTV Defendants were not involved with any media appearances by Dinesh D'Souza which are referenced in Plaintiff's Statement of Undisputed Material Facts ("D'Souza Media Appearances"). Engelbrecht Decl., ¶ 114; Phillips Decl., ¶ 108.

173.   To the extent prior video clips of TTV Defendants appeared in any the D'Souza Media Appearances, they were not made aware that such clips would be used. Engelbrecht Decl., ¶ 115; Phillips Decl., ¶ 109.

174.   TTV Defendants had no editorial control over the D'Souza Media Appearances. Engelbrecht Decl., ¶ 116; Phillips Decl., ¶ 110.

175.   TTV Defendants had no prior knowledge regarding the D'Souza Media Appearances. Engelbrecht Decl., ¶ 117; Phillips Decl., ¶ 111.

### d.    <u>Dinesh D'Souza's Social Media Posts</u>

176.   TTV Defendants were not involved with any Dinesh D'Souza social media posts which are referenced in Plaintiff's Statement of Undisputed Material Facts ("D'Souza Posts"). Engelbrecht Decl., ¶ 114; Phillips Decl., ¶ 108; Deborah D'Souza Dep. at 35:12-36:2 (stating that Dinesh D'Souza would only use another subcontractor or two to assist him with social media posts, and that he Tweets himself).

177.   TTV Defendants did not appear in the D'Souza Posts. Engelbrecht Decl., ¶ 114; Phillips Decl., ¶ 108.

178.   TTV Defendants had no editorial control over the D'Souza Posts. Engelbrecht Decl., ¶ 116; Phillips Decl., ¶ 110.

179.   TTV Defendants had no prior knowledge regarding the D'Souza Posts. Engelbrecht Decl., ¶ 117; Phillips Decl., ¶ 111.

**e.     Dinesh D'Souza's Podcast Appearances.**

180.   TTV Defendants were not involved with any Dinesh D'Souza podcasts which are referenced in Plaintiff's Statement of Undisputed Material Facts ("D'Souza Podcasts"). Engelbrecht Decl., ¶ 114; Phillips Decl., ¶ 108.

181.   TTV Defendants did not appear in any D'Souza Podcasts. Engelbrecht Decl., ¶ 114; Phillips Decl., ¶ 108.

182.   TTV Defendants had no editorial control over Statements 36-40. Engelbrecht Decl., ¶ 116; Phillips Decl., ¶ 110.

183.   TTV Defendants had no prior knowledge regarding Statements 36-40. Engelbrecht Decl., ¶ 117; Phillips Decl., ¶ 111.

**f.     Other Statements**

184.   For other statements Plaintiff identifies, such as third-party posts and comments (*see* Pl.'s Ex. 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170),

TTV Defendants had nothing to do with the referenced posts and comments. Engelbrecht Decl., ¶ 118; Phillips Decl., ¶ 112.

**L.**    **TTV Defendants' Lack of Knowledge Regarding Plaintiff.**

185.    TTV Defendants did not know Andrews was an individual in the Film until he filed this lawsuit. Engelbrecht Dep. at 108:7-14 (testifying she did not know who Plaintiff was); Schooley Dep. at 41:1-4 ("We knew that [TTV Defendants] didn't who [the individuals in the videos] were."); Engelbrecht Decl., ¶ 119; Phillips Decl., ¶ 117.

186.    TTV Defendants have no connection to and, outside of court filings, have never identified Mark Andrews by name. Phillips Dep. at 217:2-12; Engelbrecht Decl., ¶ 120; Phillips Decl., ¶ 118.

187.    TTV Defendants did not believe the individual they later learned to be Mark Andrews was a "mule" according to the definition in the Film. DDR-00049511 (Pl.'s Ex. 104) (Phillips telling Dinesh D'Souza "[i]n addition, this isn't a mule, didn't meet the threshold," and D'Souza responding: "All good points. I will take them on the podcast."); MA_000817, *attached as* **Exhibit 58**; Ex. 29 (TTV_008975) ("We did not track Mr. Andrews going to more than 10 dropboxes. He's not among the 242 individual devices identified that did go to 10+ ballot dropboxes in metro-Atlanta, GA."); Dinesh D'Souza Dep. at 274:18-23 (admitting that in DDR-

00049511, Phillips was saying Plaintiff was not a mule); Engelbrecht Decl., ¶ 121; Phillips Decl., ¶ 119.

## M.     Plaintiff and the Complaint

188.     Plaintiff filed his Complaint in this action on October 26, 2022. *See* ECF No. 1.

189.     Plaintiff admits that there are no known news reports published prior to the filing of Plaintiff's lawsuit that identified him by name. *See* Plaintiff's First Supplemental Responses and Objections to Defendant Dinesh D'Souza's First Requests for Admission to Plaintiff, at No. 4 (Plaintiff admitting that he is not aware of any news report published prior to the filing of the Lawsuit that identified him by name), *attached as* **Exhibit 59**.

190.     Plaintiff is not aware of any individuals who identified him based solely on what they saw in the Film without being told or being otherwise aware that Plaintiff's image appears in the Film. Plaintiff's Second Supplemental Responses and Objections to Defendant Catherine Engelbrecht's First Set of Interrogatories to Plaintiff, at No. 1, *attached as* **Exhibit 60**; Mark Andrews Dep. at 47:21-48:3, 95:20-96:7.

191.     No one at his current employer treated Plaintiff any differently because of the Film. Mark Andrews Dep. at 47:4-12; Excerpts of the Deposition Transcript of Bob Varnado, *attached as* **Exhibit 61** ("Varnado Dep."), at 15:11-18, 17:18-22;

Excerpts of the 30(b)(6) Deposition Transcript of NCR Voyix (by David Flores), *attached as* **Exhibit 62** ("NCR Dep."), at 21:10-12, 23:13-18; Excerpts of Deposition of Kelly Coveleski, *attached as* **Exhibit 63** ("Coveleski Dep."), at 22:20-23:18; Excerpts of the Deposition Transcript of Kelly Moyer, *attached as* **Exhibit 64** ("Moyer Dep."), at 22:5-16, 28:23-25; Excerpts of the Deposition Transcript of Nive Loganathan, *attached as* **Exhibit 65** ("Loganathan Dep."), at 19:5-10, 19:21-23, 22:3-16; Excerpts of the Deposition Transcript of William Smith, *attached as* **Exhibit 66** ("Smith Dep."), at 15:3-9; Excerpts of the Deposition Transcript of Brian Beasley, *attached as* **Exhibit 67** ("Beasley Dep.") at 22:2-4.

192.   No one has ever put Plaintiff in harm's way because of the Film or any affiliated interviews. Mark Andrews Dep. at 126:19-21.

193.   Plaintiff is unaware of anyone recognizing him in public as an alleged "mule" or as having appeared in the Film. Mark Andrews Dep. at 126:22-24.

194.   No one has ever threatened Plaintiff about voting. Mark Andrews Dep. at 144:19-20.

195.   No individuals have ever intimidated Plaintiff from voting. Mark Andrews Dep. at 144:21-23.

196.   The premier of the Film in May 2022 did not affect or stop Plaintiff from voting in the 2022 primary or general election. Mark Andrews Dep. at 57:1-4.

197.  Plaintiff voted in the 2024 general election. Mark Andrews Dep. at 57:18-20.

198.  No one ever told Plaintiff not to vote. Mark Andrews Dep. at 57:5-6.

Served this 28th day of February, 2025.

/s/ Jake Evans
JAKE EVANS
Georgia Bar No. 797018
PHILIP J. GEORGE
Georgia Bar No. 441996
GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
P: (678) 553-2100
F: (678) 553-2212
Jake.Evans@gtlaw.com
Philip.George@gtlaw.com

*Attorneys for Defendants True the Vote, Inc.,*
*Catherine Englebrecht, and Gregg Phillip*

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 5.1</u>

I HEREBY CERTIFY that the foregoing document was prepared in Times New Roman, 14-point font, as approved by Local Rule 5.1.

<u>/s/ Jake Evans</u>
JAKE EVANS
Georgia Bar No. 797018

*Attorney for Defendants True The Vote, Inc., Catherine Engelbrecht, and Gregg Phillips*

1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the within and foregoing **Defendants True the Vote, Inc., Catherine Engelbrecht, and Gregg Phillips' Statement of Additional Material Facts in Response to Plaintiff's Partial Motion for Summary Judgment** was electronically filed on the Court's ECF filing system, which will automatically serve a copy on all counsel of record.

This 28th day of February, 2025.

**GREENBERG TRAURIG, LLP**

*/s/ Jake Evans*
JAKE EVANS
Georgia Bar No. 797018

*Attorney for Defendants True The Vote, Inc., Catherine Engelbrecht, and Gregg Phillips*

2