## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| MARK ANDREWS, | |
|        Plaintiff, | |
| v. | Case No. 1:22-CV-04259-SDG |
| DINESH D'SOUZA, TRUE THE VOTE, INC., CATHERINE ENGLEBRECHT, GREGG PHILLIPS, D'SOUZA MEDIA LLC, SALEM MEDIA GROUP, INC., REGNERY PUBLISHING, INC., and JOHN DOES, | |
|        Defendants. | |

## DEFENDANTS DINESH D'SOUZA AND D'SOUZA MEDIA LLC'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants Dinesh D'Souza and D'Souza Media LLC ("D'Souza Defendants") hereby file this opposition to the Motion for Partial Summary Judgment ("SJM") filed by Plaintiff Mark Andrews.

## INTRODUCTION

When a film, or a news story, or a documentary is created, the producers and journalists are not the subject-matter experts. They interview the people who have expertise about the issue at hand. They look at documents and investigate. And sometimes, their sources are wrong. Sometimes errors are made.

Our nation's reliance on a free press mandates latitude for such errors. This latitude is expressed in a variety of ways, including in Georgia's statutory privileges that require a plaintiff to prove actual malice in cases involving public speech on matters of public concern — requirements that the D'Souza Defendants have, unequivocally, satisfied. Accordingly, this case requires Mr. Andrews to show, by clear and convincing evidence, that the D'Souza Defendants published *2000 Mules* with a high degree of awareness of its probable falsity.

Mr. Andrews cannot do that. The facts are clear that the D'Souza Defendants relied on Catherine Engelbrecht and Greg Phillips — knowledgeable, trusted sources — to provide drop box surveillance footage that had been linked to geolocation data. This footage, it turned out much later, had never been geotracked, and was provided to Mr. D'Souza's team under false representations.

*There was no reason Mr. D'Souza and his team should have known this.* They were duped. And as set forth in great detail in the D'Souza Defendants' Motion for Summary Judgment, a jury could not possibly find with clear and convincing evidence that Mr. D'Souza and his team published *2000 Mules,* or any related publications, with a high degree of awareness of probable falsity. Indeed, in

defamation cases under an actual malice standard, "summary judgment is the rule, not the exception."[1]

Mr. Andrews, however, filed his own Motion for Summary Judgment. This motion is based on numerous mischaracterizations and key factual omissions, and most notably, on an inapplicable standard of fault. Specifically, Mr. Andrews assumes that *negligence* is the proper standard, when this case is governed by *actual malice.* Not only is the motion predicated on the wrong standard of fault, but it does so despite the fact that the correct standard was identified and described *dozens* of times in discovery in this case, meaning that Mr. Andrews knowingly ignored the appropriate standard of fault. The only obvious explanation for Mr. Andrews' motion, drafted in disregard for the correct legal standard, is that it was never intended as a means to dispose of the claim, but instead as a means to create the illusion of jury issues where none exist.

## FACTS:

The D'Souza Defendants provided a detailed background of the relevant facts in their Motion for Summary Judgment, and they will incorporate them by reference rather than repeat them here.

---

[1] Rosanova v. Playboy Enters., Inc., 411 F. Supp. 440 (S.D. Ga. 1976), aff'd, 580 F.2d 859 (5th Cir. 1978).

As set forth fully in the argument section *infra,* Mr. Andrews' summary judgment motion is predicated on the application of a negligence standard of fault. This is the incorrect standard, and on this basis alone, the motion fails. Indeed, Mr. Andrews' motion appears not to be intended as a means of winning his claim, as he would have at least mentioned the correct legal standard, or attempted to argue its inapplicability, if he had a legitimate belief in his motion. Instead, Mr. Andrews' summary judgment motion appears to be a vehicle to confuse the facts in hopes of diluting the D'Souza Defendants' summary judgment motion. Although the motion fails because it fails to apply the proper legal standard, the D'Souza Defendants will nonetheless address some of the key factual mischaracterizations to underscore the merit of their summary judgment motion. Mr. Andrews' Motion relies on several key mischaracterizations and omissions, as follows:

**1. Factual mischaracterizations relating to the surveillance video**

The Motion argues that the D'Souza Defendants were aware of numerous red flags surrounding the surveillance footage but proceeded with the film anyway. Specifically, Mr. Andrews asserts that the D'Souza Defendants "were aware that the surveillance video was insufficient to demonstrate wrongdoing." SJM at 5. In support of this assertion, the Motion cites to various internal communications, and communications with the TTV Defendants and Salem, relating to mid-production

requests and concerns around TTV's surveillance video. (Andrews SMF ¶¶ 202–12). The context and the timeline are important here.

Mr. Andrews relies on various communications that were made *not about the final film,* but during the production of the film and prior to the final cut of the film. *See, e.g.,* Andrews SMF ¶¶ 204, 206, 208; D'Souza SMF ¶¶ 144–46.

The D'Souza Defendants were, admittedly, frustrated with the initial batch of videos for a variety of reasons. D'Souza SMF ¶ 147. Many of the videos were unclear and grainy, and the first batch failed to show visually obvious suspicious activity. *Id.* at ¶ 148. The D'Souza Defendants and the production company, Salem Media, raised these concerns with TTV in the emails Mr. Andrews now cites. *Id.* at ¶ 149. Notably, Mr. D'Souza did not shy away from these issues and concerns but rather welcomed them because he wanted "to make the most persuasive, intelligent film . . . [and] anticipate all potential objections beforehand," such that the initial concerns about the surveillance video "was a very welcome critique." *Id.* at ¶ 150.

When faced with these critiques of the video, TTV made it clear that numerous technical issues were impeding the collection of better video. *Id.* at ¶ 151. For example, the majority of drop boxes in Georgia did not have video, and those that did often had poor quality cameras positioned at bad angles for visually identifying individuals. *Id.* at ¶ 152. TTV also explained that for the video available from the Run-Off "most cameras were positioned in ways that made video unusable, drops at

night weren't lit, etc." *Id.* at ¶ 153. Moreover, some mules were actually *instructed* to avoid drop boxes with cameras, as evidenced by a mule informant interviewed in the movie who explained that she was instructed to deposit ballots at a specific drop box that did not have surveillance cameras and only after dark. *Id.* at ¶ 154. Indeed, illegal voters are highly motivated to *avoid* dropping off numerous ballots in a manner that might be perceptible to onlookers or on security cameras. *Id.* at ¶ 155. (Ms. Engelbrecht explaining that the entire "idea [of ballot trafficking] is to stay under the radar at any one stop, not dumping buckets of ballots."). Without a good library of available surveillance footage, it made sense to Mr. D'Souza that TTV did not have a large collection of geotracked videos showing clear illegal voting. *Id.* at ¶ 156.

Nonetheless, TTV was able to produce a second batch of videos on March 27, which were incorporated into the final version of the film completed in late April 2022. *Id.* at ¶ 157. The second batch of videos contained much of the footage ultimately featured in the final cut of the film, including the footage of Mr. Andrews, and notably, numerous clips of individuals clearly depositing multiple ballots and video showing repeat drops by the same person. *Id.* at ¶ 158. One of the "repeat" voters was, in fact, Mr. Andrews and a lookalike:



*Id.* at ¶ 159 (showing Mr. Andrews (right) and a look-alike of Mr. Andrews (left) in unblurred surveillance footage). In fact, the individual on the left so closely resembles Mr. Andrews that his attorneys mistook him for Mr. Andrews twice — once when producing PDSA-0000570[2] and again when creating Plaintiff's Ex. 160 from this document to support his Motion for Summary Judgment.[3] Specifically,

---

[2] The video depicted in Plaintiff's Ex. 160 is titled *2000 Mules Clip – Video Montage of Mules* by TheSaltyCracker and is found at the following address: https://rumble.com/v14ck4s-2000-mules-clip-video-montage-of-mules.html?e9s=src_v1_ucp. *Id.* at ¶ 161. The default screen shown at this link depicts a tiled video mosaic, not the scene appearing in Plaintiff's Ex. 160. *Id.* at ¶ 162. Accordingly, to take the screenshot depicted in Plaintiff's Ex. 160, the video had to be deliberately advanced to approximately 00:06–00:18 (which does not show Mr. Andrews) before taking the screenshot. *Id.* at ¶ 163.

[3] Plaintiff's Ex. 160 purports to be a "legible version created using the native file of the document Plaintiff Mark Andrews produced to Defendants in discovery as Bates No. PDSA-0000570." *Id.* at ¶ 164.

Andrews's SMF at ¶ 145 cites to Plaintiff's Ex. 160, which shows the man on the left, not Mr. Andrews, as support for a contention relating to "Plaintiff's image." Accordingly, Mr. Andrews cannot reasonably deny that the video clips included in the final version of the Film appear to show the same person making multiple drop box visits.

## 2. The D'Souza Defendants reasonably relied on TTV's videos and geotracking

Mr. Andrews claims that if the D'Souza Defendants "had exercised even a modicum of due care, they would have been aware that TTV Defendants — the source of the Film's geotracking and video surveillance evidence — were not reliable." (SJM at 6, 32). This uncited assertion provides no factual support, likely because the record in this case shows the opposite — that Mr. Phillips, Mr. Engelbrecht and TTV were credentialed and credible.

### a. Mr. Phillips' resume

Mr. Phillips' resume and experience was impressive. He had held various positions in the corporate world as well as high-level positions within government, as the head of Human Services in Mississippi and as the head of the Health & Human Services Commission in Texas, leading Mr. D'Souza to determine that Mr. Phillips was a "visible, competent managerial person." D'Souza SMF ¶¶ 165–66. Additionally, he "represented to [Mr. D'Souza] that he had been, for not years, but decades, involved in election integrity and election intelligence," including

"involvement in studying, monitoring, [and] investigating elections not just in the United States, but around the world." *Id.* at ¶ 167. Mr. Phillips further stated that he had performed this work in conjunction with both intelligence agencies and law enforcement agencies. *Id.* at ¶ 168. He also conveyed that he knew a great deal about geotracking, which he was able to corroborate by answering detailed questions on the topic. *Id.* at ¶ 169. Mr. Phillips's affidavit indicated that he had more than three decades of data analysis experience. *Id.* at ¶ 170. This experience included "us[e] of large data sets in fraud control, quality control, and identify resolution in voting-related cases and analysis," and previous "expert testimony on matters pertaining to mobile device geospatial and temporal data analysis, mobile device tracking, and law enforcement matters . . . includ[ing] testimony in front of the Foreign Intelligence Surveillance Court." *Id.* at ¶ 171.

### b. Mr. Phillips' Methodology

Before Mr. D'Souza agreed to make the film, Mr. Phillips provided Mr. D'Souza with a detailed, scientific document detailing the methodology behind the project. Mr. Phillips' company, OpSec, utilized commercially available mobile device geospatial and temporal data to identify cell phones that had been located in close proximity to the 309 ballot drop boxes in Georgia by establishing geofences around those drop boxes and identifying cell phone pings within those boundaries. *Id.* at ¶ 172. Through its analysis, OpSec identified 242 "devices of interest" that had each been located within 100 feet of one or more drop boxes on at least 10 occasions

and within 100 feet of one or more organizations suspected of ballot harvesting. *Id.* at ¶ 173. The documents also included maps individually tracking 10 different devices on as many as 53 visits to 14 different drop boxes and 35 visits to four suspected ballot harvesting organizations. *Id.* at ¶ 174.

Mr. D'Souza set up a meeting for Mr. Phillips and Ms. Engelbrecht with Salem Media Group ("Salem") in October 2021, largely to see how their theories would hold up to probing questions from Salem's attorney, Salem's past and present CEOs, and other media executives. *Id.* at ¶ 175. The presentation included maps of the mules traveling to numerous drop boxes, discussion of geotracking mules to violent protests, the use of geotracking to aid in Atlanta murder investigations, and surveillance video footage. *Id.* at ¶ 176. In short, before agreeing to produce the film, Mr. D'Souza had been given numerous detailed documents and he had watched two separate presentations explaining the project.

### c. Additional support for Mr. Phillips' and Ms. Engelbrecht's credibility

By the time they approached Mr. D'Souza to pitch a film, TTV had already spent $1.5 million on the investigation. *Id.* at ¶ 177. Moreover, Ms. Engelbrecht and Mr. Phillips had already undertaken many significant efforts to get the attention of law enforcement. Mr. Phillips first took the information to the FBI on March 25, 2021 and then to Governor Kemp of Georgia, the Georgia Bureau of Investigation, and legislators, each time hoping that law enforcement or a similarly competent organization would dig deeper into their findings. *Id.* at ¶ 178. They spent much of

the summer trying to get authorities' attention, but each time, they were "pushed off and shoved aside." *Id*. at ¶ 179.

### d. Credibility issues only arose during the pendency of this case

Throughout the development of the *2000 Mules* film and in the aftermath and promotion of its release, Ms. Engelbrecht and Mr. Phillips were *unequivocal* in their claim that the drop box surveillance videos they had provided to Mr. D'Souza's team only featured individuals who had been geotracked, claims they made directly to Mr. D'Souza, within the film itself, and on national television. *Id.* at ¶¶ 180–88. The record is also clear that Ms. Engelbrecht and Mr. Phillips had numerous opportunities to correct the characterization of the surveillance footage in the film, but did not do so, and moreover, testified that no one told anyone on the D'Souza team that the videos were not geotracked. *Id.* at ¶¶ 189–96.

Indisputably, the D'Souza Defendants did not know, and had no ability to know, that the video provided to them was not what it was purported to be. Nothing in the record supports Mr. Andrews argument that the D'Souza Defendants failed to exercise "a modicum of due care" in determining the credibility of TTV. The facts show the opposite: that Mr. D'Souza agreed to make a film based on numerous written and in-person detailed presentations of data and methodology demonstrated by a credentialed expert who had spent $1.5 million on the project and who believed

in the results enough to approach the FBI and the Governor with requests for further investigation. *Id.* at ¶¶ 165–96.

Yet, it is clear today that the contractor retained to link the geolocation date to the videos was unable to do so. This was a jaw-dropping, bombshell revelation, not a failure of character or credibility that Mr. D'Souza could have, or should have, predicted.

### 3. The film did not advance a preconceived narrative

Mr. Andrews asserts that the D'Souza Defendants had a "pre-conceived narrative." SJM at 7. But no evidence indicates that the Mr. D'Souza made the film for a pre-conceived reason. In fact, Mr. D'Souza testified that he had found other, prior claims of election fraud to be unconvincing, noting that an "anomaly" is not the same thing as "proof." D'Souza SMF ¶ 197. It was only once TTV brought the geolocation data to him in a manner that suggested rampant election fraud that he had any interest in producing a film on the topic — and even then, he was skeptical initially about the project. *Id.* at ¶ 198.

Mr. D'Souza then did the opposite of what he would have done if he was determined to produce an election fraud video, regardless of accuracy. He facilitated a meeting with Salem for the main purpose of seeing if Mr. Phillips' methodology and conclusions could hold up against a "free-for-all" critique of a room full of lawyers, CEOs, and media professionals. *Id.* at ¶ 199. And once filming began, Mr.

D'Souza continued to subject the premise of the film to scrutiny, inviting panelists to comment on the data in real time, and choosing the format of a "freewheeling" interview with "informal, unrehearsed answers" without notes and without a script. *Id.* at ¶ 200. Moreover, when Mr. D'Souza learned about an illegal ballot trafficking case orchestrated by Republicans, he included it in the film "to emphasize that this was not a kind of a mere partisan type of film; that there may have been partisan implications, but on the other hand, there was — there had been Republican ballot trafficking." *Id.* at ¶ 201.

### 4. The government investigation was not credible and did not exonerate Mr. Andrews

Mr. Andrews asserts that Mr. D'Souza "was on actual notice of the falsity of the statements concerning Plaintiff" by May 18, when news of the SOS exoneration reached Mr. D'Souza in a text message from Mr. Phillips. SJM at 34–35:



Mr. D'Souza was not on "actual notice" of falsity for several reasons. First, the Secretary of State investigation did <u>not</u> occur as a result of *2000 Mules,* a film

that was not released until the investigation had already begun, but rather the investigation was initiated by a citizen activist. D'Souza SMF ¶ 202–06. While the news reporting on the investigation made numerous references to *2000 Mules,* there was no actual claim that the investigation was prompted by the film. *Id.* at ¶ 207. And while Mr. D'Souza appreciated that the investigation *might* somehow be connected to the film, it never occurred to him that the investigation related to the same surveillance footage that was included in the film because the film had only been released a few days prior, and all of the footage included in the film had been blurred to render the mules completely unrecognizable:

> A. Let's remember the movie is a few days old.
>
> Q. Right.
>
> A. So the idea that there is a movie that just came out, like, last Tuesday and somehow there is some sort of case before the election commission, quote, coming out of the movie based upon images that are unrecognizable and completely blurred struck me as sort of preposterous.

*Id* at ¶ 208. [4]

Second, Mr. D'Souza did not believe that the Secretary of State's office was motivated to, or did, complete a thorough investigation into voter fraud. *Id.* at ¶¶ 210–12. His thought was, "This is not what I would call an investigation," because

---

[4] Also, Mr. D'Souza had never filed any complaints with the SEB. *Id.* at ¶ 209.

the state had done only the "irresponsible bare minimum." *Id*. at ¶ 210. Indeed, The SOS investigated Mr. Andrews by interviewing him once, during which he asserted that he had only dropped off ballots of his household. *Id*. at ¶ 213. Even though the complaint against Mr. Andrews referenced TTV's geotracking research, the investigator did not collect or analyze geospatial evidence. *Id*. at ¶ 214.

Mr. D'Souza thought the state's effort was perfunctory, an investigation of one incident, not "an investigation of the phenomenon that is very seriously presented in the movie." *Id*. at ¶ 211. Even prior to this investigation, Mr. D'Souza was wary of Secretary Raffensperger because Mr. D'Souza believed that he enabled the ballot trafficking in the first place by entering into a consent decree that weakened ballot signature-matching rules. *Id*. at ¶ 212. Moreover, the Secretary was under pressure in court and from within his own party for the perceived failure to root out fraud.[5] *Id*. at ¶ 215.

Mr. Andrews also claims that Mr. Phillips, in the text message to Mr. D'Souza "confirmed Plaintiff 'isn't a mule.'" SJM at 35. This text message meant nothing to Mr. D'Souza, for numerous reasons. First, as set forth fully above, it was never

---

[5] Senate candidates Kelly Loeffler and David Perdue both called for Raffensperger's resignation for "fail[ing] to deliver honest and transparent elections," and Donald Trump declared Secretary Raffensperger "an enemy of the people." D'Souza SMF ¶ 216. Numerous high profile lawsuits were also filed in Fulton County against the Secretary relating to claims of election fraud. *See, e.g., Trump v. Raffensperger,* 2020-cv-343255; *American Oversight v. Raffensperger,* 2020-CV-341511; *Wood v. Raffensperger,* 2020-cv-342949.

15

established at the time that the individual cleared by the SOS was in the film at all, and no one, including Mr. D'Souza, would have had a reason to believe that the "mule" referenced in the text message was also featured in the film. Moreover, Mr. D'Souza testified that at the time he received the text, he didn't understand what Mr. Phillips meant at all, that he wasn't even trying to understand it, and that his response to it was "rhetorically polite" but "not going into the meat of it." D'Souza SMF ¶ 217. Indeed, a review of the entire text message makes clear that Mr. Phillips was defending the film and complaining about the investigation, which would be entirely inconsistent with simultaneously revealing a bombshell admission that the film featured people who "were not mule."

Quite simply, Mr. D'Souza had no reason to think there was an issue with the content of *2000 Mules* based on the exoneration of an anonymous person who had been investigated on the basis of a citizen complaint, and who had been investigated in a single interview by an agency that was motivated to exonerate him. These facts hardly support Mr. Andrews' claim that the D'Souza Defendants "were on actual notice of the falsity of the statements concerning Plaintiff."

### 5. Mr. Andrews was not recognized, nor was he harmed or threatened

Mr. Andrews asserts that "[a]ll viewers, whether unfamiliar or familiar with Plaintiff, are able to see  him in the unblurred footage, including his unblurred face and his unblurred white SUV, which was used in Defendants' appearances and online posts promoting the film." SJM at 10–11. Yet, throughout discovery, Mr. Andrews *has been unable to identify a single person that identified him from 2000*

*Mules* or any related media without first being told of Mr. Andrews' appearance in the film, such that they already knew he appeared in the film and were actively looking for him. D'Souza SMF ¶ 218. This is unsurprising, as Mr. Andrews is only shown in a single clip for 8 seconds of the film's 1.5 hour run time, and during that time, both his face and the license plate of his car are blurred and visually small, and he is wearing a face mask. *Id*. at ¶ 219. Mr. Andrews was also unable to identify anyone who had called, texted, e-mailed, or mailed him about *2000 Mules* or any related interviews other than two reporters, who never interviewed him and never printed any article about him. *Id*. at ¶¶ 220–21. Notably, there is nothing in record indicating that these reporters identified Mr. Andrews from the movie; rather, they identified him from his own affidavit filed as part of the investigation launched by David Cross. *Id*. at ¶ 222. ("My name, again, was known at the Georgia Bureau of Investigation, election investigation. I filed an affidavit. I signed it. That's how [the reporter] reached out to me via my text phone."). Moreover, neither Mr. Andrews nor his coworkers were able to identify a single person who thought less of him due to *2000 Mules* or the associated interviews. *Id*. at ¶ 223.

Mr. Andrews also claims that now "he does not vote in person out of fear that he will be recognized." SJM at 12. *This is not true*. To the extent he stopped voting in person, his change in voting habits started in 2020, well before *2000 Mules*, and was due to concerns over Covid. *Id*. at ¶ 224.

17

Mr. Andrews also asserts in his motion that his wife has "viewed online posts threatening her family as a result of Plaintiff's inclusion in the film," and that these threats caused Mr. Andrews to "experience anxiety and fear," that he "refrained from pursuing potential employment and other opportunities," and "changed his voting habits." SJM at 11. *These assertions are also, unequivocally, untrue.*

The reality is that Mr. Andrews has not identified a single threat directed specifically at himself or his family; instead, all of the threats he cites are broadly directed to mules in general. *See, e.g.,* Plaintiff's SMF ¶ 145 (citing various examples of threats pertaining to plural groups such as "these bastards," "mules," "their personal info," "traitors," etc.). Mr. Andrews also admitted that no one had ever intimidated or threatened him or put him in harm's way due to *2000 Mules*. D'Souza Def. SMF ¶¶ 225, 226. In regards to pursuing potential employment, the testimony demonstrates that, to the contrary, he has applied for numerous jobs and that "if opportunities present themselves . . . [he] would entertain them." *Id*. at ¶ 227.

And while Mr. Andrews alleges that his family feared real world confrontations (Plaintiff's SMF ¶ 148); his wife's actions demonstrate that this assertion was merely self-serving testimony. In fact, Ms. Andrews changed her X/Twitter account name to "Godfightbattles" to hide her ties to Mr. Andrews and posted *tens of thousands* of messages pertaining to *2000 Mules* from at least July 2022 through August 2024, which regularly copied Defendants (@DineshDSouza,

@TrueTheVote, and @SalemMediaGrp) and various public figures (@KariLake, @elonmusk, @BrianKempGA, @TuckerCarlson, etc.) to spread publicity and foster public discourse related to *2000 Mules*. D'Souza SMF at ¶ 228. Ms. Andrews even encouraged strangers to buy a copy of *2000 Mules* on numerous occasions.

> **Godfightbattles**
> 05/10/2023 11:58:31 PM
> @LadyRedWave @gonofurther https://t.co/6ZfSfiEokc go get a copy more money for them

> **Godfightbattles**
> 05/11/2023 11:56:34 PM
> @sfricchione @JamesBradleyCA https://t.co/6ZfSfiEokc scam but go buy it - more money for @TrueTheVote

> **Godfightbattles**
> 05/10/2023 11:59:54 PM
> @Littletrae64 @gonofurther Go buy a copy https://t.co/KDXSQQGQi7

*Id*. at ¶ 229.

Contrary to the actions someone would take if they honestly feared a real-world encounter, Ms. Andrews regularly made posts that would assist a would-be assailant in identifying and locating her family, including posting her husband's name hundreds of times, indicating that Mr. Andrews lives in Gwinnett County providing information about Plaintiff's employment, including that he is "an Executive who specializes in information security" insisting that her husband was identifiable in the Film and noting details that could be used to identify him, such as his car, the placement of stickers on his car, and Mr. Andrews's glasses as a "defining characteristic."

> **Godfightbattles**
> 03/12/2024 03:02:47 PM
> RT @PootDibou: 📺 THE CHARLIE KIRK SHOW Complaint: Salem Media produced The Charlie Kirk Show which unblurred footage of Mark Andrews votin…

**Godfightbattles**
09/29/2023 12:15:42 AM
@CryptoNinjaco @PootDibou @QuispMe That was the point right @DineshDSouza @truethevote But you chose the one black guy who is an Executive who specializes in information security

**Godfightbattles**
10/19/2023 04:01:28 AM
RT @0203Willow: @TrueTheVote Have you ever ver been able to show how Mark Andrews met your basic patterns of life and metrics of multiple d…

*Id*. at ¶ 230.

Further, Ms. Andrews frequently posts that her husband will refuse to settle and that she expects he will receive substantial punitive damages *Id*. at ¶ 231.  Some examples are shown below:

**Godfightbattles**
12/14/2023 09:26:29 PM
@TxCowboy64 @GoshDarnIt15 @mmpadellan That is exactly why they deserve 50 million plus another 100 million for punitive damages- you and people like you

**Godfightbattles**
04/21/2023 08:23:19 PM
@jongavin021 @DineshDSouza THERE WILL BE NO SETTLEMENT WITH @DineshDSouza

**Godfightbattles**
06/04/2024 01:18:38 AM
@salvor_x @archt67 @7Veritas4 PUNITIVE DAMAGES ARE A HELL OF A THING - ASK RUDY G

*Id*.

Again, these screenshots are a sampling of tens of thousands of similar tweets. Any assertion that this lawsuit was or is motivated by Mr. Andrews' suffering, embarrassment, fear, or financial loss is demonstrably untrue. This is, instead, a case involving a plaintiff who was only identified by his own lawsuit, and his wife's prolific social media messages make clear that all motives behind this case are financial.

### 6. The TTV Defendants' media appearances were not part of an agreement to promote the film together

In support of his theory of joint liability, Mr. Andrews asserts that that all Defendants "agreed to promote the film together and actively worked in concert to do so." SJM at 24. He also claims "Defendants repeatedly used Plaintiff's image— both blurred and unblurred—in their promotional efforts." SMF ¶ 91. These assertions underscore Mr. Andrews' frequent references to "Defendants" as a unitary group, a wording choice designed to obfuscate distinctions among the defendants and their respective conduct. This is particularly true in regards to allegations around cited media appearances.

Yet notably, the two interviews referenced by Mr. Andrews — Charlie Kirk and Tucker Carlson — *had nothing to do with 2000 Mules.* These were interviews arranged independently by Ms. Engelbrecht to promote the work of TTV, during which no reference to the film was made, and which were scheduled without any involvement of Mr. D'Souza or the publicist for the film. D'Souza SMF ¶¶ 232–38.

Moreover, any use of the surveillance footage of Mr. Andrews during these interviews was in direct violation of the contract with D'Souza Media. Specifically, D'Souza Media and Salem executed a licensing and nondisclosure agreement with TTV, with an effective date of December 3, 2021, relating to the footage in TTV's possession that purportedly contained evidence of voting irregularities occurring in the 2020 election. *Id.* at ¶ 239. The agreement expressly prohibited TTV and its

representatives from disclosing the surveillance film or its contents to anyone prior to the public release of the film. *Id.* at ¶ 240.

The reality is that Ms. Engelbrecht and Mr. Phillips made media appearances promoting their own agenda — not *2000 Mules* — and did so in direct violation of their contract with D'Souza Media and without any involvement of the D'Souza Defendants.[6]  It therefore goes without saying that the TTV media appearances Mr. Andrews cites were hardly done in "concert" with Mr. D'Souza.

## **PROCEDURAL STATEMENT**

### **Mr. Andrews' noncompliance with the local rules requires many of his facts to be stricken**

Of the 254 facts set forth in Mr. Andrews' Statement of Material Facts (Dkt. 279-1) more than 100 of them fail to comply with the local rules. The most pervasive violation is Mr. Andrews' failure to provide pinpoint citations to the evidence, such as page or paragraph numbers. *See* LR 56.1(B)(1) ("The Court will not consider any fact: (a) not supported by a citation to evidence (including page or paragraph number) . . . ."). Mr. Andrews' noncompliance often related to lengthy exhibits or videos, and the D'Souza Defendants simply could not review hundreds of pages of documentation and watch dozens of hours of video footage in hope of correctly guessing which excerpts Mr. Andrews relies upon to supports his facts. In addition

---

[6] These facts are set forth in detail in the D'Souza Defendants' Summary Judgment Motion on pages 11–13.

to these violations, Mr. Andrews repeatedly relied upon pleadings, rather than evidence, to support his facts and now relies upon newly available "legible" versions of documents that have never been produced into evidence rather than the previously produced versions that were illegible, and thus provided no prior notice to the D'Souza Defendants as to the substance of these documents. *See* LR 56.1(B)(1) ("The Court will not consider any fact: (a) not supported by a citation to evidence . . . [or] (b) supported by a citation to a pleading rather than to evidence . . . .").

The D'Souza Defendants request any relief the Court deems proper under these circumstances.

## **ARGUMENT**

### **A. Mr. Andrews applied the incorrect standard of fault**

Throughout the course of this case, the D'Souza Defendants have made clear that this case is governed by the public interest privilege in O.C.G.A. § 51-5-7(4).[7] Yet Mr. Andrews' Motion fails any attempt to address this issue, and instead is predicated on the assumption that this case is governed by a negligence standard of fault because Mr. Andrews is not a public figure. (SJM at 26). This assumption ignores O.C.G.A. § 51-5-7, which establishes actual malice as the standard of fault

---

[7] By way of example, the D'Souza Defendants asserted this privilege in their Answer and in their Initial Disclosures. *Id*. at ¶ 251.

when a claim is based on speech that meets one of the statutory definitions, including:

> "[s]tatements made in good faith as part of an act in furtherance of the . . . entity's right of . . . free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern as defined in [O.C.G.A. § 9-11-11.1(c)]."

O.C.G.A. § 9-11-11.1(c)(2)-(4) defines an act in furtherance of free speech to include

> "[a]ny written or oral statement . . . made in . . . a public forum in connection with an issue of public concern"; or "[a]ny other conduct in furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public concern."

As set forth fully in the D'Souza Defendants' Motion for Summary Judgment, the statements at issue in this lawsuit all were made in public forums (a film, a book, and on social media) and concern a matter of public concern (election integrity). The statutory privilege therefore applies. The privilege applies and may only be overcome by "clear and convincing" evidence that the statements were made with actual malice. *Neff v. McGee,* 346 Ga. App. 522, 527 (Ga. Ct. App. 2018). The burden is on the plaintiff to prove actual malice. *Rabun v. McCoy*, 273 Ga. App. 311, 317–18 (2005).

Mr. Andrews has made no argument that the D'Souza Defendants acted with actual malice. Because this case is governed by actual malice, and Mr. Andrews has

not made any showing that the D'Souza Defendants published any statement with actual malice, summary judgment must be denied.

## B. Mr. Andrews makes additional misstatement of law throughout his motion

As set forth *supra* and in full detail in the D'Souza Defendants' Motion for Summary Judgment, the libel claim against the D'Souza Defendants requires proof of actual malice under O.C.G.A. § 51-5-7(4). Because Mr. Andrews does not argue that any facts support summary judgment for him under the proper legal standard, no further analysis of Mr. Andrews' Motion is necessary. Nonetheless, in an abundance of caution, the D'Souza Defendants note several additional errors of Mr. Andrews' application of law to the facts.

### 1. The D'Souza Defendants are not liable for statements made by co-defendants.

Mr. Andrews argues that all of the defendants are jointly and severally liable for each other's statements under a joint tortfeasor theory. SJM at 21. In support of this argument, Mr. Andrews argues that "[a]ll who engage in the publication of the writing are liable as publishers; and where they jointly engage in the publication, their act is joint, and they may be jointly sued," citing *Howe v. Bradstreet Co.*, 69 S.E. 1082, 1082 (Ga. 1911). *Id.* Mr. Andrews further asserts that "where concert of action appears, a joint tortfesor relation is presented and all joint tortfeasors are jointly and severally liable for the full amount of plaintiff's damage." *Id.* (citing

*FDIC v. Loudermilk*, 826 S.E.2d 116, 125 (Ga. 2019)). But here, the facts do not support any "concert of action" between the D'Souza Defendants and the TTV Defendants in regards to the key events the form the basis of this lawsuit.

Joint tortfeasor liability is established through "concert of action." *Loudermilk*, 305 Ga. at 569–75. Concert of action "amounts to conspiracy." *Wright v. Apartment Inv. & Mgmt. Co.*, 315 Ga. App. 587 (Ga. Ct. App. 2012); *Hansford v. Veal,* 369 Ga.App. 641, 654 (Ga. Ct. App. 2023) ("concerted action [is] also known as civil conspiracy").

To prove civil conspiracy, Mr. Andrews must first establish that there was an agreement. "It is by now axiomatic that a conspiracy requires a meeting of the minds between two or more persons to accomplish a common and unlawful plan." *McAndrew v. Lockheed Martin Corp.,* 206 F.3d 1031, 1036 (11th Cir. 2000). Moreover, "[t]here can be no conspiracy without a purpose, express or implied, to do something unlawful, oppressive, or immoral . . . ." *Zeal Glob. Servs. Priv. Ltd. v. SunTrust Bank*, 508 F. Supp. 3d 1303, 1314 (N.D. Ga. 2020) (quotations omitted). Here, no such agreement existed as to the key occurrences in this case.

### a. No agreement existed to defame anyone

As a threshold matter, Mr. D'Souza and his team had no awareness that the surveillance video was not linked to geolocation data, and, *ergo,* they could not have had an agreement to use mischaracterized videos with any awareness that they were

doing so. Here, there was an agreement among all defendants to create, publish, and promote a film — a perfectly legal plan. The undisputed facts show that Mr. D'Souza believed that the purpose of the film was to uncover *illegal* voting and to prompt government action. Not a single fact in this case indicates any agreement to mischaracterize the video or falsely accuse anyone of illegal voting. This Court has already held that an agreement to publish a truthful film is not enough to establish liability. *Andrews,* 696 F.Supp.3d at 1347–48 (dismissing claim against Salem because, "[w]hile there does not appear to be any dispute that the Salem Defendants had agreements to publish and promote the movie and book," the claim fails because no allegations assert "a conspiracy to prevent advocacy through intimidation . . .").

### b. No agreement existed for Ms. Engelbrecht and Mr. Phillips to promote their own research on Tucker Carlson or Charlie Kirk

Likewise, no agreement existed between the D'Souza Defendants and the TTV Defendants relating to the Charlie Kirk and Tucker Carlson media appearances. In early April 2022, Ms. Engelbrecht or Mr. Phillips reached out to Charlie Kirk to tell him they would be in town and to see if he wanted to get together for coffee. D'Souza SMF ¶ 241. Mr. Kirk then offered for both of them to come on his show, which they accepted. *Id.* On April 8, 2022, before the release of the film, talk show host Charlie Kirk aired that interview. *Id.* ¶ 232. During the interview, Ms. Engelbrecht and Mr. Phillips made no reference to *2000 Mules,* and appeared on the

show apparently only to promote TTV's research. *Id*. ¶¶233–34. Mr. D'Souza did

not know about the interview, and only became aware of it afterwards. *Id*. ¶235.

Similarly, Ms. Engelbrecht appeared on Tucker Carlson after producers

reached out to her individually to set up the interview, and with no involvement of

Mr. D'Souza or his team. *Id*. ¶242. Again, the interview had *nothing* to do with the

Film, which was never mentioned, but rather it related to Ms. Engelbrecht's and

TTV's research (headlined as "'True the Vote' has been Probing Potential Election

Fraud"). *Id*. ¶¶ 238, 243–45.

### c. No agreement existed for Ms. Engelbrecht and Mr. Phillips to use the surveillance footage

TTV executed an agreement with D'Souza Media prohibiting disclosure of

the dropbox surveillance footage with the media. *Id*. ¶¶ 240, 246. To the extent Ms.

Engelbrecht or Mr. Phillips provided surveillance video to the Charlie Kirk show or

Tucker Carlson show, such action was *directly contrary* to TTV's contract with

D'Souza Media.

### d. No agreement existed for Ms. Engelbrecht and Mr. Phillips to use unblurred images of Mr. Andrews

As part of the production process of the film, the TTV Defendants and the

D'Souza Defendants came to an explicit agreement to use only blurred images of

the dropbox users. *Id*. ¶ 247. In fact, this agreement was largely the result of efforts

advanced by Ms. Engelbrecht. *Id*. To the extent unblurred surveillance footage was

used on Charlie Kirk and Tucker Carlson, such use was directly contrary to this agreement to blur.

### 2. No concert of action existed

In sum, the TTV Defendants agreed, *expressly,* with the D'Souza Parties to (1) provide surveillance footage that had been geotracked, (2) avoid any disclosures of the surveillance footage, and (3) use only blurred images of the dropbox voters. The media appearances on Charlie Kirk and Tucker Carlson directly violated all of these agreements, and moreover, the interviews did not reference *2000 Mules.* Yet, Mr. Andrews now asserts that the D'Souza parties are liable for these media appearances. Such would require "concert of action" or conspiracy, for which Mr. Andrews has no facts to support.

### 3. The Statements actually made by the 'Souza Defendants were not published with negligence

Even if this case could be assessed under a theory of negligence, Mr. Andrews cannot show that negligence exists as a matter of law. Mr. Andrews's factual support for the D'Souza Defendants' negligence is underwhelming, and largely irrelevant.

#### a. Nearly every claimed act of negligence is irrelevant to this case

Mr. Andrews provides a bulleted list of seven alleged shortcomings related to the production of *2000 Mules.* SJM at 32–33. Only the first of these seven points relates to the use of surveillance footage or the claims in this case. The remaining six points consist of inferences and accusations relating to Mr. D'Souza's diligence

in investigating and producing segments of the film that are not remotely relevant to this case, including ACLED data, riots, nonprofit centers or "stash houses," the reliability of geotracking data, and the computing center where it was analyzed. SJM at 33–34. Because these topics are outside the relevant claims and defenses in this case, discovery was not done (nor should it have been done) to prove or disprove the accuracy of these irrelevant portions of the Film.

For example, this case does not concern the accuracy of TTV's geotracking data analysis, which was completed before the film was conceived, and which was the subject of TTV's requests to the FBI and the Governor for investigations. Because the accuracy of that data is not at issue in this case, the parties therefore did not undertake any effort to scrutinize it or validate it. Yet now, Mr. Andrews simply *assumes* that it was wrong, so that he can complain that Mr. D'Souza did not personally review the data or visit Mr. Phillips' computing center.

This case concerns exactly eight seconds of *2000 Mules,* and whether the D'Souza Defendants are sufficiently at fault for the publication of Mr. Andrews' (unrecognizable) image during those eight seconds. No other part of the film is relevant, and Mr. Andrews cannot now properly argue that the D'Souza Defendants were negligent because they were insufficiently aggressive in their investigation into other parts of the film.

Allegations like these, which pertain to unrelated purported acts of negligence, are not admissible. The principle that "evidence of a similar act of negligence is not admissible to prove negligence in performing the same act later" is well settled in the Eleventh Circuit. *Am. Airlines, Inc. v. United States*, 418 F.2d 180, 197 (5th Cir. 1969). "On motions for summary judgment, [the Court] may consider only that evidence which can be reduced to an admissible form." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005).

It is therefore improper to consider any acts of alleged "negligence" in this case that do not relate to the publication of Mr. Andrews' surveillance footage. Not only is such "negligence" predicated on the unproven assumption that other aspects of the film were inaccurate, but moreover, any such "negligence" is precisely the "evidence of a similar act of negligence" that is, as a matter of law, "not admissible to prove negligence in performing the same act." *Am. Airlines, Inc.*, 418 F.2d at 197.

Common sense mandates the same result. How is it relevant to the fault in publishing Mr. Andrews' image that Mr. D'Souza did not visit Mr. Phillips' computing center? It is not. And the same goes for the other six bulleted points.

### b.  The D'Souza Defendants were not negligent in trusting the TTV Defendants

Setting aside the numerous irrelevant arguments, Mr. Andrews is left with just *one* point that actually relates to the D'Souza Defendants fault in publishing Mr. Andrews' image. Mr. Andrews asserts that the D'Souza Defendants were negligent

in trusting Mr. Phillips and Ms. Engelbrecht because Mr. D'Souza "knew that neither Phillips nor Engebrecht had any credentials to qualify them to geotrack individuals or analyze video surveillance." SJM at 33.

This assertion fails to acknowledge Mr. Phillips' resume and qualifications. Mr. Phillips owns a company, OpSec, which performs election information and data consulting work. Within OpSec and separately, Mr. Phillips has more than 30 years of data analysis experience, including "us[e] of large data sets in fraud control, quality control, and identify resolution in voting-related cases and analysis," and previous "expert testimony on matters pertaining to mobile device geospatial and temporal data analysis, mobile device tracking, and law enforcement matters . . . includ[ing] testimony in front of the Foreign Intelligence Surveillance Court."

Mr. Phillips held high-level positions in corporations, as well as serving as Human Services in Mississippi and as the head of the Health & Human Services Commission in Texas. D'Souza SMF ¶ 165–66. Mr. Phillips had decades working in election integrity and election intelligence," including "involvement in studying, monitoring, [and] investigating elections . . . around the world," done in conjunction with both intelligence agencies and law enforcement agencies. *Id.* ¶¶ 167–68.

This is not the resume of someone who could not be trusted, or someone who did not have appropriate credentials. Notably, Mr. Andrews has never introduced into this case the identity or existence of someone he believes to be a credible

geotracking expert — someone who Mr. D'Souza should have involved in the film and didn't. It would make sense to do so if such an expert existed. Perhaps the absence of such evidence and argument is because Mr. Phillips is as much of an expert on the topic as anyone in the country.

### c. The negligence factors do not weigh in Mr. Andrews' favor

In evaluating whether a publisher acted negligently in publishing a false statement, Georgia courts consider: (1) whether the material was topical and required prompt publication, or whether sufficient time was available for a thorough investigation of its contents; (2) the newsworthiness of the material and public interest in promoting its publication; and (3) the extent of damage to the plaintiff's reputation should the publication prove to be false; []and (4) the reliability and truthworthiness of the source. *Triangle Publ'ns*, 317 S.E.2d at 537. Mr. Andrews cannot show that *any* of these factors weigh in his favor.

(1) Whether the material was topical and required prompt publication, or whether sufficient time was available for a thorough investigation of its contents

The *2000 Mules* film required several months to film and complete. Any assertion that the project was rushed is simply not supported by the timeline. Moreover, practical limits always exist on the time, money, personnel, and energy that can be dedicated to any film project, and the level of self-education, data

analysis,[8] on-site visits and verification Mr. Andrews argues should have occurred would have required months, or even years, for Mr. D'Souza's small team to do. In other words, Mr. Andrews is arguing that the film could only have been competently and non-negligently produced if it was done with an investment of time and money that would have rendered the film's production impossible.

    (2) the newsworthiness of the material and public interest in promoting its publication;

As set forth fully in the D'Souza Defendants' Motion for Summary Judgment, the statements in this case are of great public interest. Indeed, it's challenging to image a matter of greater newsworthiness or public concern than election integrity. *See, e.g., Thompson v. Trump,* 590 F. Supp. 3d 46, 79 (D.D.C. 2022) (Noting that "the outcome of the 2020 Presidential Election and election integrity" are "matters of public concern.").

    (3) The extent of damage to the plaintiff's reputation should the publication prove to be false

As described fully in this brief *supra* pages 16–17, Mr. Andrews has been unable to identify anyone who independently identified him from viewing the film. He has been unable to identify any threats made to him personally. He has been

---

[8] Prior to that time, the geospatial analysis required 12 analysist to work on the data for 16 hours per day for 15 months. D'Souza SMF ¶ 249.

unable to identify any social problems or employment challenges that he has faced as a result of the film. Mr. Andrews cannot show *any* harm to his reputation.

(4) The reliability and truthworthiness of the source

As set forth fully in this brief *supra* pages 8–11, the credibility and reliability of Mr. Phillips was impressive. Mr. Andrews cannot identify a single objective reason that Mr. D'Souza should have reasonably been suspicious of Mr. Phillips' credibility.

In sum, Mr. Andrews cannot show that *any* of the negligence factors weigh in his favor. Any argument that negligence exists as a matter of law as a matter law of is meritless. Notably, Mr. Andrews cannot cite a single case awarding summary judgment to a plaintiff in a defamation case.[9] It is entirely plausible that none exist.

**4. Mr. Andrews was not identified**

Mr. Andrews asserts that he has satisfied the requirement to show that the eight-second clip was about him because "because multiple persons *did* identify him, including at least two reporters." SJM at 19 (emphasis in original). Yet *none* of the individuals referenced by Mr. Andrews recognized him from the film, and independently without prompting.

---

[9] Mr. Andrews' citations are inapplicable to his argument. In *Gettner,* 677 S.E.2d, 156, the court reversed summary judgment granted to the *defendant* because there were facts that showed a jury issue on negligence. In *Georgia Soc'y of Plastic Surgeons, Inc. v. Anderson*, 363 S.E.2d 140, 143 (Ga. 1987), the court

No evidence exists that the reporters reached out to Mr. Andrews by identifying him from the film. Rather, they identified him from his own affidavit filed as part of the SOS investigation — a fact Mr. Andrews knew and highlighted in his deposition. D'Souza SMF ¶ 248. ("My name, again, was known at the Georgia Bureau of Investigation, election investigation. I filed an affidavit. I signed it. That's how [the reporter] reached out to me via my text phone."). And notably, that SOS investigation had nothing to do with the film either, but rather was launched by a citizen activist who had never seen the film. *Id*. ¶ 202–05.

When asked in discovery to identify all individuals who recognized him from *2000 Mules*, Mr. Andrews identified several coworkers and family members. Discovery, however, revealed that not one person saw the film and identified Mr. Andrews unless they did so *after* he told them he was in the film and they were *already aware* that he was the blurred individual. *Id.* ¶¶ 218–20, 223–24. In sum, it is an undisputed fact that no one *actually* identified Mr. Andrews from the film.

It was, in fact, impossible to identify Mr. Andrews from the film. The below images show Mr. Andrews and his look-alike voter, as each were depicted in the film, blurred.



Depicting Mr. Andrews (left)), and his look-alike (right). *Id.* ¶ 159.

As set forth *supra,* Mr. Andrews' attorneys were unable to correctly identify the correct Mr. Andrews, citing twice in their summary judgment materials to the look-alike. If Mr. Andrews could be identified from the film, his own attorneys should not have had difficulty identifying the proper segment of the film in which he actually appears. No reasonable juror could determine that Mr. Andrews is identifiable, not only from the fact that we was never actually identified, but from watching the film itself.

Furthermore, even if a reasonable jury could find that Mr. Andrews was identifiable, they would also have to find that the D'Souza Defendants were at least negligent in creating the ability for Mr. Andrews to be identified. This requirement is a result of the holding in *Gertz v. Robert Welch, Inc.*, which mandated that the government may not impose liability for defamation without fault. 418 U.S. 323,

342 (1974). Thus, it is not enough for a libel plaintiff to prove that the defendant acted with the requisite degree of fault as to falsity, but also as to the "of and concerning" requirement. In other words, the plaintiff must prove that the defendant either knew that a reasonable observer would identify him, or that the defendant was subjectively aware or negligent that the plaintiff would be identifiable. *See* Robert D. Sack, *Sack on Defamation* § 2:9.1 (4th ed. 2010) ("The rule for permitting liability without fault for unintentional defamation has doubtless been attenuated by the rule in *Gertz* abolishing liability without fault.");[10] *see also Greene v. Paramount Pictures Corp.*,  813 Fed. Appx. 728, 731–32 (EDNY 2018) (finding a lack of actual malice because "a reasonable jury could only find [that] defendants took appropriate steps to ensure that no one would be defamed by the Film"); *New England Tractor-Trailer Training, Inc. v. Globe Newspaper Co.*, 395 Mass. 471, 478 (1985) ("While the plaintiff need not prove that the defendant "aimed" at the plaintiff, he or she must prove that the defendant was negligent in writing or saying words which reasonably could be understood to "hit" the plaintiff).

---

[10] In upholding *Gertz*, courts applied the fault requirement to each element of libel claims. *See, e.g., Dworkin v. Hustler,* 867 F.2d 1188, 1194–95 (9th Cir. 1989) ("[I]f a speaker knowingly publishes a literally untrue statement without holding the statement out as true, he may still lack subjective knowledge or recklessness as to the falsification of a statement of fact required by *New York Times"); New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 163 (Tex. 2004) (actual malice standard requires court to ask "did the publisher either know or have reckless disregard for whether the article could reasonably be interpreted as stating actual facts?").

**CONCLUSION**

No facts exist in this case that show the D'Souza Defendants were anything but careful in obscuring the identity of Mr. Andrews, as well as the other ballot drop box users in the film. Indeed, the D'Souza Defendants were "obsessed with not identifying anybody" and blurred potentially identifiable details, including a dog, a woman's t-shirt, license plates on cars, and other markings on cars. D'Souza SMF ¶ 250.

Mr. Andrews simply cannot plausibly claim that he is identifiable when no one ever identified him from *2000 Mules*, and even his own lawyers could not properly locate his image in the film. The reality is that to the extent anyone is presently aware that Mr. Andrews' image was used in *2000 Mules*, it is because either (1) he told the person himself, (2) he filed this lawsuit, or (3) the person read a few Brendetta Andrews' thousands of tweets.

Mr. Andrews' motion for summary judgment is so woefully meritless that it can only be described as a red herring — a motion filed without a sliver of hope that it might be granted, but intended to create the illusion of a messy case with competing facts that should go to a jury. Under the correct standard of fault, looking at *all* the facts and the correct timeline of events, no jury issue exists as to the D'Souza Defendants' liability in this case. They relied, reasonably, on credentialed experts who misrepresented the video surveillance footage used in the film. While

these events are unfortunate, they simply were not the result of reckless disregard for the truth, or even a lack of ordinary care.

And while it is regrettable that Mr. Andrews' surveillance footage was mischaracterized, its use in the film did not actually harm Mr. Andrews. He can claim that he was identifiable and that he has suffered, but when the time came to look at these issues under oath and with documents in hand, he could not produce a single person who recognized him independently and without prompting, nor could he produce evidence of any adverse employment or social consequences, nor could he identify any threats directed to him or his family. Instead, discovery revealed that his wife posted tens of thousands of messages on social media in which she identified him by name, encouraged the public to buy *2000 Mules,* and made clear her plans to obtain a massive punitive damages award. The motivation here could not be more clear.

This case is actually not that complicated. Mr. Andrews cannot show that he was identified, let alone harmed, by a film in which he was unrecognizable, and which was produced by a team of well-intentioned filmmakers that were given no reason to doubt the credibility of their sources or the accuracy of the video provided to them. Summary judgment should be granted to the D'Souza Defendants.

Respectfully submitted this 28th day of February, 2025.

**BUCHALTER APC**

/s/ *Amanda G. Hyland*

Amanda G. Hyland

Georgia Bar No. 325115

Austin C. Vining

Georgia Bar No. 362473

Cory Mull

Georgia Bar No. 595376

3475 Piedmont Rd. NE, Ste. 1100

Atlanta, GA 30305

(404) 832-7350 Telephone

ahyland@buchalter.com

avining@buchalter.com

cmull@buchalter.com

*Attorneys for Defendants Dinesh D'Souza
and D'Souza Media LLC*