## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MARK ANDREWS,

        Plaintiff,

v.

DINESH D'SOUZA, TRUE THE VOTE,
INC., CATHERINE ENGELBRECHT,
GREGG PHILLIPS, D'SOUZA MEDIA
LLC, SALEM MEDIA GROUP, INC.,
REGNERY PUBLISHING, INC., and
JOHN DOES,

        Defendants.

Case No. 1:22-CV-04259-SDG

## REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

Dinesh D'Souza and D'Souza Media LLC ("D'Souza Parties") hereby file this reply in support of their Summary Judgment Motion ("SJM"), and in response to the Opposition filed by Mr. Andrews ("Opposition").

### I.     Factual Issues

Two factual issues govern the D'Souza Parties' SJM:

(1) Did the D'Souza Parties know, or entertain serious doubts, that the surveillance videos in the 2000 Mules film ("Film") were not linked to geolocation data?

(2) Was Mr. Andrews identifiable in any statement made by the D'Souza Parties?

Mr. Andrews' Opposition makes numerous blanket assertions on both of these issues, often without citation, or using citations that do not actually support his generalizations. In order to provide clarity on these fundamental issues, the D'Souza Parties will begin their reply with a series of quotations from the record.

1

### A. Ms. Engelbrecht and Mr. Phillips described the drop box videos as geotracked, until discovery in this case proved otherwise.

Throughout his Opposition, Mr. Andrews asserts that the D'Souza Parties had no basis to believe the individuals depicted in the Film were illegal voters. This assertion is directly contradicted by the record. Ms. Engelbrecht and Mr. Phillips characterized the drop box surveillance footage as having been linked to the geolocation data to the D'Souza team, in the film itself, and in media appearances:

True the Vote Project Overview Document, e-mailed to Debbie D'Souza (Dkt. 250-18 (143:2-9) (Plaintiff's SMF ¶ 17 (Dkt. 250-19 at TTV_007088)):

> Our project involved the use of geospatial data to track unique cell phone signatures . . . In total, the 242 individuals went to drop boxes over 5,000 times . . . *Video evidence corroborates the digital data and supports the need for full investigations by law enforcement.*

Email from Ms. Engelbrecht (SMF[1] ¶ 60 (Dkt. 271-3 at TTV_007276)):

> *We have around 70 videos currently separated out and are scaling efforts to review more. This is **incredibly** time consuming because it involves reading the geospatial data to try and find a match in really poorly detailed county video, so only analysts can do this. It is difficult to know how many more we will have. We have lots of footage, but finding the pieces that work is difficult. We need to understand what you need, how you want to use it, and the **deadline** by which you need it. Here are some ideas:*

Testimony from Mr. Phillips (SMF ¶ 42 (Dkt 268-3 p. 92:18-23)):

> A:    *[O]nce the geospatial analysis was done and we started getting chunks of video in, matching that video back into the -- back into the geospatial analysis was difficult and took a lot of time*

Ms. Engelbrecht, speaking in the Film (SMF ¶ 57 (Dkt. 246, Ex. 9 at 00:36:31–00:36:40, Ex. 9E)):

> *"What kicks it up a notch is that we have the geospatial data to support the video."*

---

[1] "SMF" refers to the D'Souza Defendants' Statement of Material Facts (Dkt. 268-1) and Statement of Additional Material Facts (Dkt. 308-1).

Ms. Engelbrecht, speaking on Charlie Kirk interview (SMF ¶ 78):

Mr. Kirk (showing clip of Mr. Andrews):    *So this is a mule? . . . One of the 2000 that you profiled?*

Ms. Engelbrecht:    *Yes.*

Ms. Engelbrecht, speaking on Tucker Carlson (SMF ¶ 90):

*"[W]e are able to match the droppings with the video, and you see it for yourself."*

The record is also clear that they did *not* tell Mr. D'Souza that any non-geotracked video had been provided to him:

Testimony of Mr. Phillips:

> Q:    *And do you remember any discussion happening with anyone around that particular video footage in terms of why it was chosen or why it went in the film or if somebody thought it shouldn't go in the film? Was there any attention paid to that?*
>
> A:    *No.*
>                              …
> Q:    *And I think you mentioned earlier that you actually objected to using additional videos. . . Did you actually put something in writing that you objected to the use of any additional videos?*
>
> A:    *I don't think so.*

(SMF ¶ 130; 191) (Dkt. 250-14 (Phillips Dep.) at 255:16–24; 256:24 – 257:6).

> Q:    *And your testimony is that Mr. D'Souza was aware that the second batch of video that you provided were videos that had not been geospatially linked?*
>
> A:    *I don't know if Mr. D'Souza had.*

(SMF ¶¶ 130 (Dkt. 268-3 (Phillips Dep.) at 264:4-9), 191).

Testimony of Ms. Engelbrecht:

Q:    *[D]id the D'Souzas understand that -- or did you tell Mr. and Mrs. D'Souza that [the Gwinnett County videos had not been geotracked]?*

A:    *I -- I don't recall, but it wouldn't -- I mean, I don't know how that would have been material, but I -- I don't recall telling them or not telling them maybe.*

. . .

Q:    *But you don't recall talking to them about whether the Gwinnett County video had been matched with the geospatial analysis?*

A:    *I can't specifically recall it.*

(SMF ¶ 130 (Dkt. 268-2 (Engelbrecht Dep.) at 190:18-191:12)).

After the production of the Film was mostly complete, Ms. Engelbrecht and Mr. Phillips were shown the rough cut. Ms. Engelbrecht had specific concerns, including that dialogue misstated TTV's involvement in solving a murder investigation. SOF ¶¶ 71, 73 (Dkt. 268-2 at 212-213). Despite clearly being capable of asking for correction in the Film, neither she nor Mr. Phillips raised a concern about the characterization of the surveillance video. SOF ¶¶ 71-73.

It was only during discovery in this case that the story changed. First, Ms. Engelbrecht and Mr. Phillips testified that the Gwinnett County footage had not been geotracked – a fact that *had never been disclosed* prior. SMF ¶ 128. Then, Mr. Phillips' vendor, Red Metrics, testified that *no* drop box videos had been geotracked, from Gwinnett County or otherwise. *Id.* ¶ 132. In other words, to the extent Ms. Engelbrecht and Mr. Phillips had told the D'Souza team and the public that they had linked the surveillance footage to the geotracking data, those statements were false.

Incredibly, their shifting story did not end there. In connection with the TTV Defendants' Motion for Summary Judgment, Ms. Engelbrecht and Mr. Phillips submitted declarations, *in direct contradiction to their deposition testimony,* stating that TTV "made clear that this second batch of videos was not tied to geospatial analysis." Dkt. 279-4 ¶ 22; 279-10 ¶ 32. This testimony is not only false, but inadmissible. *See Van T. Junkins and Assoc. v. U.S. Industries*, 736 F.2d 656 (11th Cir. 1984) (holding that "a district court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony without giving any valid explanation."); *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) ("Given that there is an inherent inconsistency between the affidavit and the two previous depositions, and Latimer has failed to provide an explanation for the contradiction, the affidavit may be dismissed as a sham.").

The sham declarations underscore the recurring credibility issues with the TTV Defendants, who told one story about the surveillance videos to the D'Souza team and the public, another in their depositions, and now a third in their sham declarations – *all of which is contradicted by Red Metrics' testimony in this case*. Importantly, the question relevant to the D'Souza Parties' SJM is this: What does the record show that the D'Souza Parties knew when they made and promoted the Film? There is no evidence, let alone clear and convincing evidence (as required), that the D'Souza team had knowledge that Mr. Andrews' footage had not been linked to geospatial data.

### B. Mr. Andrews was NOT recognizable

Mr. Andrews states that he was recognized by his wife and daughter, and two reporters. DKt. 294 at 19. Mr. Andrews' own testimony makes clear, however, that *no one* recognized him independently of Mr. Andrews' own prompting. Indeed, Mr. Andrews' interrogatory response makes this clear:

> *Plaintiff is not presently aware of the individuals who identified him based* <u>*solely*</u> *on what he or she saw in the film 2000 Mules* <u>*without*</u> *being told or being otherwise aware that Plaintiff's image appears in the film.*

SOF ¶ 136. Mr. Andrews further confirmed this fact in his deposition (*Id.*):

> Q:  *And so no one has identified you in "2000 Mules" or any related interviews without you first talking to them about the movie, right?*
> A:  *I don't know that.*
> Q:  *But to your knowledge, there's no one?*
> A:  *To my knowledge.*

Furthermore, the timeline is clear that reporters reached out to Mr. Andrews *not because they saw the film,* but based on the Secretary of State investigation. As Mr. Andrews testified, "My name, again, was known at the [GBI], election investigation. I filed an affidavit. I signed it. That's how [the reporter] reached out to me via my text phone.").  SMF ¶ 222. It is further undisputed that the Secretary of State investigation was prompted by David Cross's complaint, which was prompted by Mr. Cross's viewing of the Charlie Kirk show – a media appearance that had *nothing* to do with the D'Souza Parties or 2000 Mules. SMF ¶¶ 95-102. Similarly, the Secretary of State investigator recognized the clip of Mr. Andrews on Tucker Carlson, not because of the film, or because he knew Mr. Andrews, but because he was the investigator working on the SEB investigation concerning that

exact clip – a clip provided by Mr. Cross and shown on Tucker Carlson in a segment that had nothing to do with the Film or the D'Souza Parties. (Plaintiff's SMF ¶ 141).

## II.    Legal Argument

### A. This case is governed by actual malice

Mr. Andrews argues that this is not a case governed by O.C.G.A. § 51-5-7(4), which requires actual malice to be proven by clear and convincing evidence when the statement at issue is made in a public forum about an issue of public concern.

#### 1.    The statements were about a matter of public concern

Mr. Andrews disputes that the statements were made about a matter of public concern. DKt. 294 at 26. Yet, the D'Souza Parties provided numerous examples of national media coverage concerning the integrity of the 2020 election (SMF ¶143) as well as a case specifically holding that election integrity is a matter of public concern, *Thompson v. Trump*, 590 F. Supp. 3d 46, 79 (D.D.C. 2022) (Noting that "the outcome of the 2020 Presidential Election and election integrity" are "matters of public concern."). If the integrity of the 2020 presidential election is not a matter of public concern, then nothing is, and O.C.G.A. § 51-5-7(4) has no effect.

Mr. Andrews then cites to *Five for Ent. S.A. v. Rodriguez*, a Florida case concerning Florida's common law qualified privilege. 2013 U.S. Dist. LEXIS 116016, *24 (S.D. Fla. 2013). The court denied the defendants' summary judgment on the issue of the privilege because the case concerned nine wholly separate statements with different content, each subject to unique claims of falsity, and the defendants did not make any arguments relating to the applicability of the privilege as to each of the nine statements. *Id.* The relevance of this case is unclear. Florida's

common law conditional privilege bears no relationship to this case. Unlike the Florida case, this is not a case involving multiple statements with different allegedly false content. Indeed, Mr. Andrews has not made any complaint about the use of his image other than in connection with the Film, the related book, and media appearances – all of which used the image in direct support of concerns over election integrity. O.C.G.A. § 51-5-7(4) applies across the board because the underlying use of Mr. Andrews' image, and the underlying claim of falsity, is identical. Indeed, Mr. Andrews does not argue that there are multiple statements at issue here that require unique analysis under the statute.

### 2. The statements were made in good faith

Mr. Andrews then argues that the privilege does not apply because the D'Souza Parties cannot show good faith. Dkt. 294 at 27. "Good faith" exists unless the speaker "acted with actual malice." *Amin v. NBCUniversal Media, LLC*, 2022 U.S. Dist. LEXIS 208063, *25 (N.D. Ga. 2022).

As a threshold issue, the D'Souza Parties highlight an opinion issued after the D'Souza Parties moved for summary judgment. In *Oskouei v. Matthews*, the Georgia Supreme Court held that "actual malice," in the context of Georgia's statutory conditional privileges, means "private malice," which is defined as "ill will toward the plaintiff or with an intent to injure him." 2025 Ga. LEXIS 23, *42-43 (Ga. Feb. 18, 2025). Therefore, "a plaintiff seeking to overcome a conditional-privilege defense must establish by a preponderance of the evidence (the standard that generally applies to civil cases, see OCGA § 24-14-3) that the defendant made the allegedly defamatory statements with ill will toward the plaintiff or with an intent to

injure him." *Id.* at 43-44. *Oskouei,* however, specifically carves out, and declines to address, cases like this one, involving a plaintiff seeking to overcome a conditional privilege who is "seeking presumed or punitive damages related to a defamatory statement about a matter of public concern." *Id.* at 43. Indeed, the holding "conclude[s] that the 'actual malice' standard in *New York Times* does not apply in the context of analyzing whether a private-figure plaintiff whose claim is based on defamatory statements *that do not involve matters of public concern* has overcome a conditional privilege as a matter of Georgia law." *Id.* at 41 (emphasis added). Thus, *Oskouei* does not change the applicable standard in this case, or the D'Souza Parties original briefing or Mr. Andrews' opposition, which applies *New York Times* actual malice as the test for overcoming good faith.

Thus, the question on summary judgment is whether Mr. Andrews could point to facts in the record that show, by clear and convincing evidence, that the D'Souza Parties published Mr. Andrews' blurred image with a high degree of awareness that Mr. Andrews was not engaged in any illegal voting activity.

Mr. Andrews' arguments on this issue are meritless. He asserts that the D'Souza Parties "cannot have acted in good faith" because they "had no evidence or factual basis for accusing Plaintiff of being a criminal a ballot mule" and did not "possess any evidence supporting the claim that Plaintiff [was a mule]." Dkt. 294 at 15. Mr. Andrews further states that the D'Souza Parties "knew (or at best, willfully avoided knowledge) that geotracking could not be used to prove the election fraud conspiracy as detailed in the Film and Defendants knew that the surveillance footage was not matched to the geolocation data." Dkt. 294 at 16.

These generalized assertions of "no evidence" ignore the record in this case, which demonstrates that the D'Souza Parties had dozens of reasons to believe that their use of surveillance footage, including that of Mr. Andrews, corresponded to geolocation analysis performed by Mr. Phillips' team. These facts are set forth in detail on pages 24-25 of the D'Souza Parties' SJM. (Dkt. 268).

Mr. Andrews also cites to the existence of the SEB investigation, but this reliance ignores the law that "[t]he actual malice inquiry is based on what the writer knew *when he wrote it*, and the claimant must show that the writer had a subjective awareness of probable falsity *when the material was published*." *Weaver v. Millsaps*, 370 Ga. App. 513, 516 (2024) (emphases added). On this basis alone, the SEB investigation is irrelevant, as it post-dates the Film.

To the extent this case concerns post-Film media appearances and the book, the SEB investigation still does not negate a finding of good faith. To reiterate the applicable standard, the question is whether the SEB investigation was sufficient to create, by clear and convincing evidence, an inference that the D'Souza Parties' post-Film activities were done with a "high degree of awareness" of probable falsity.

Mr. Andrews argues that the SEB investigation is, essentially, dispositive as to Mr. D'Souza's state of mind, such that Mr. D'Souza was required, at the time of the SEB hearing, to *believe* that the results of that investigation were more compelling and persuasive than his own lived experience. At the time of the SEB investigation, Mr. D'Souza did not simply disregard all the communications, interviews, and data provided to him by Ms. Engelbrecht and Mr. Phillips over the prior months that collectively appeared to demonstrate that they had performed

geospatial analysis on all the surveillance footage, such that Mr. D'Souza was confident at that time that *all* the voters depicted in the Film had been geotracked. Furthermore, Mr. D'Souza was reasonable to doubt the SEB's findings, given that the investigator did not look into any geolocation data (which was the premise of the original David Cross complaint), and given that the "investigation" consisted of a single, mechanical interview, executed by an organization that was self-motivated to disprove any election fraud. SMF ¶¶ 109-114. Mr. D'Souza did entertain serious doubts following the SEB inquiry, but those doubts pertained to the credibility of the investigation, not the Film. *Id.*

### 3. The statements were appropriate in scope and audience

Mr. Andrews argues that a juror could reasonably determine that the purpose of the film was not to protect election integrity. Dkt. 294 at 28. The statements begs the question – Where in the record is there evidence to support a jury finding that Mr. D'Souza made this film for some other reason?

Mr. Andrews argues that the statements at issue were not properly limited in scope or audience because they were published repeatedly. *Id.* at 29. Responding to this assertion requires a summary of the Film's premise. Mr. Phillips' organization, OPSEC, using $1.5 million in funding provided by TTV's donors, analyzed 25 terabytes of geolocation data, or 1.2 trillion mobile device pings. SMF ¶¶ 31-34. The analysis identified 242 unique mobile "devices of interest" that were found within 100 feet of a drop box on 5,297 occasions and within 100 feet of an organization of interest on 2,227 occasions. *Id.* ¶ 32. This data suggests that ballot harvesting operations were conducted on a significant scale in Georgia. To be clear, while the

video evidence used in the Film has been shown to be inaccurate, *the underlying data and premise of the film has not been debunked, in this case or otherwise.*

Despite this significant fact, Mr. Andrews now argues that a film providing scientific evidence of widespread ballot fraud in a presidential election should not have been published "repeatedly" and should have been "discreetly communicated to authorities." Dkt. 294 at 28-29. For obvious reasons, no authority holds, or should ever hold, that issues of momentous national importance and newsworthiness should be communicated "discreetly," only to authorities,[2] and without repetition.

Mr. Andrews likens the facts of this case to those in *Choice Hotels Int'l, Inc. v. Ocmulgee Fields, Inc.*, which involved a hotel franchisor/ franchisee contract dispute in which the court held that "a single letter" sent by the defendant to a third party was properly limited in scope. 474 S.E.2d 56, 59 (Ga. Ct. App. 1996). There exists no overlap between the "proper scope" of a letter sent as part of a franchise agreement dispute, and the "proper scope" of distribution of a film about widespread election fraud. The same lack of overlap exists in *N. Atlanta Golf Operations, LLC v. Ward*, which concerned a golf club member's numerous tweets complaining about the management of his former golf club. 363 Ga. App. 259, 260 (Ga. Ct. App. 2022).

## B. Andrews cannot show actual malice by clear and convincing evidence

The D'Souza Parties have presented extensive evidence that they relied, in good faith, on Ms. Engelbrecht's and Mr. Phillips' credentials, research, funding and

---

[2] Ironically, Mr. Phillips and Ms. Engelbrecht *exhaustively* tried to bring their data and analysis to the attention of authorities, but were "pushed off and set aside." SMF ¶¶ 10-11.

investment, presentations, communications, and media appearances to believe that the surveillance videos had been geotracked. *See* Dkt. 268 at 24-25 and supporting SMF). Despite many broad generalizations in Mr. Andrews Opposition Brief, the record is undisputed on these facts.

The standard for actual malice is "clear and convincing proof that a defendant was aware of the likelihood he was circulating false information." *Cottrell v. Smith*, 299 Ga. 517, 525–26 (Ga. 2016). Before the Court can deny a defendant's summary judgment motion, it "must conclude that, based on the evidence asserted in the plaintiff's affidavits, 'a reasonable jury **could find** malice with convincing clarity." *Yiamouyiannis v. Consumers U. of United States*, 619 F.2d 932, 940 (2nd Cir. 1980), *cert. denied,* 449 U.S. 839 (1980) (emphasis original). This involves a higher standard than in normal summary judgment cases. *See Rebozo v. Washington Post Co.*, 637 F.2d 375, 381 (5th Cir. 1981) (holding that since "a jury verdict in a defamation case can only be supported when the actual malice is shown by clear and convincing evidence, rather than by a preponderance of evidence as in most other civil cases . . . the evidence and all the inferences drawn from the record when considering summary judgment motions must meet that higher standard").

Mr. Andrews argues that he can meet this incredibly high standard on the basis that the D'Souza Parties dismissed the SEB investigation. Dkt. 294 at 34. Setting aside that this investigation occurred after the completion of the Film, nothing in the record indicates that the D'Souza Parties *actually* entertained any doubts about the Film as a result of the SEB investigation – an investigation that was not even tied to

the Film, and that concerned an individual that Mr. D'Souza initially didn't even know was depicted in the film. SMF ¶ 208.

The standard does not ask if the defendant *could* have, or even *should* have, had doubts about its publication. Rather, "[t]here must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (88 SCt 1323, 20 LE2d 262) (1968) (emphasis added). The record could not be more clear as to Mr. D'Souza's state of mind regarding the SEB investigation. In the aftermath of the investigation, Mr. D'Souza defended his film and aggressively, publicly mistrusted the SEB investigation. Below are a few examples of his posts from that time period:



(Plaintiff's SMF ¶¶ 120-123). These are not the posts of man who, "*in fact*," entertained "serious doubts" as to the accuracy of his film as a result of the SEB

inquiry. Indeed, Mr. D'Souza's confidence in the film is *underscored* by his response to the SEB investigation, and relatedly, his refusal to retract the Film upon receipt of a demand letter from Mr. Andrews' counsel. The D'Souza Parties did not doubt the Film, and their communications and actions as cited by Mr. Andrews only serve to reinforce how confident they were in the truth of the Film.

Mr. Andrews also points to internal communications made during the production of the film in which the D'Souza's team was looking for more video clips. Dkt. 294 at 22-23. The team was, admittedly, frustrated with the initial batch of videos because many of the videos were unclear and grainy, and the first batch failed to show visually obvious suspicious activity. *Id.* at ¶¶ 147-48. The D'Souza Defendants and the production company, Salem, raised these concerns with TTV in the emails Mr. Andrews now cites. *Id.* at ¶ 149. In response, TTV provided a second batch of video that solved these concerns, and notably, included numerous clips of individuals clearly depositing multiple ballots and video showing repeat drops by the same person, including footage of Mr. Andrews and a look-alike. *Id.* at ¶¶ 158-59. A complete analysis of this issue is provided at Dkt. 308, pp. 5-8. Mid-production efforts to make a better film with better evidence is evidence of diligence, the antithesis of actual malice.

Mr. Andrews finally points to an email forwarded to Mr. D'Souza after the release of the film in which a viewer said he wasn't persuaded by the Film. Dkt. 294 at 35. One viewer's opinion on the Film bears no relevance to actual malice.

Mr. Andrews simply cannot make a case that he will be able to show, by clear and convincing evidence, that the D'Souza Parties entertained serious, real, doubts

about the use of the surveillance footage in the film, during the production or during its promotion. There is *no* evidence that they did.

### C. The Film was not "of and concerning" Mr. Andrews

Mr. Andrews argues that his blurred image in the Film and related use of his image in the book and promotional media was sufficient to meet the "of and concerning" threshold because his wife and daughter could identify him. Dkt. 294 at 19. Yet, none of these people, or anyone else, saw the Film and identified Mr. Andrews unless they did so *after* he told them he was in the film and they were *already aware* that he was the blurred individual. SMF ¶¶ 136–40.

Such purposeful, instructed identification cannot be sufficient to satisfy the "of and concerning" requirement. Otherwise, any plaintiff could satisfy this element by providing his wife/daughter/mother with a copy of the statement at issue in his own lawsuit and informing her that the statement is about him. Voila, he has someone who can identify him from the statement, even if she never could have done so without prompting. Allowance of such events would serve as a *de facto* elimination of the "of and concerning" element of libel. In this case, Mr. Andrews' image was shown blurred, wearing a face mask, mere inches tall, for *seconds.* It is no surprise that not a single person recognized him without being prompted.

Mr. Andrews' cited case is irrelevant to this issue. In *Bell v. Johnson Publ. Co., LLC*, the parties did not even dispute that the plaintiffs were identifiable, and the opinion contains no relevant analysis on the issue. 2018 U.S. Dist. LEXIS 4283, *10 (N.D. Ga. 2018).

To the extent Mr. Andrews relies on two reporters who called him, not a single piece of evidence in the record indicates that these reporters identified him from the Film. Mr. Andrews himself testified that "My name, again, was known at the [GBI], election investigation. I filed an affidavit. I signed it. *That's how [the reporter] reached out to me via my test phone.*" SMF ¶ 222. And, as exhaustively detailed in the D'Souza Summary Judgment Brief (Dkt. 268 at 11-12; 14-15), that investigation was initiated through David Cross's complaint, which he filed because he saw Ms. Engelbrecht's and Mr. Phillips' appearance on the Charlie Kirk show - events that had absolutely nothing to do with the Film or the D'Souza Parties. Such extrinsic events cannot give rise to liability on the D'Souza Parties.

Mr. Andrews claims that the extrinsic circumstances in this case are "the other promotional images and videos used to promote the Film and Book" and that "D'Souza had control over these statements." Dkt. 294 at 21. Yet these statements are *not* how the reporters identified Mr. Andrews, and *nothing* in the record indicates that Mr. D'Souza had *any* control over the events that led the reporters to find him.[3]

Finally, and most importantly, Mr. Andrews does not (likely because he cannot) address the law that liability for each element of libel cannot be imposed without fault. *See* arguments at Dkt. 268 at 33-34. Liability simply cannot be imposed here unless Mr. Andrews can provide evidence that the D'Souza Parties

---

[3] Those events were (1) Ms. Engelbrecht and Mr. Phillips' appearance on the Charlie Kirk show, (2) the use of surveillance footage in that appearance, (3) Mr. Cross's viewing of the Charlie Kirk episode and his decision to file a complaint because of it, (4) the SEB investigation launched as a result of Mr. Cross's complaint, and (5) the reporters' knowledge of Mr. Andrews' name and phone number as a result of the SEB investigation.

were at least negligent in using Mr. Andrews' image in a way that it was likely he would be identifiable. *See id.* The D'Souza Parties took great effort to *avoid* revealing the identity of the drop box users, an effort that was successful because no one identified Mr. Andrews as a result of seeing the Film, reading the book, or watching any promotional media.

### D. The claim for false light fails

Mr. Andrews concedes that he cannot pursue his claim for false light unless the statements at issue are shown to be non-defamatory. Dkt. 294 at 63. The D'Souza Parties have not argued that this case relates to non-defamatory statements. Moreover, even if the false light claim could proceed, it would require a showing of actual malice, for which there is no clear and convincing evidence.

### E. The claim for misappropriation fails

Mr. Andrews asserts that he *was* identifiable and therefore can pursue a claim for misappropriation of likeness. Dkt. 294 at 66. As set forth *infra,* the only individuals who recognized Mr. Andrews did so with prompting, or as a result of extrinsic events. A misappropriation claim cannot stand when the plaintiff's likeness is not apparent. He asserts that the D'Souza Parties' cases (Dkt. 268 at 36) are distinguishable because they concern factual scenarios that are not identical to those presented here. Yet they *do* hold that a plaintiff must actually be identifiable in order to state a claim – an element missing from the claim against the D'Souza Parties.

### F. No evidence supports a conspiracy

Mr. Andrews has asserted a conspiracy in an effort to hold the D'Souza Parties liable for the actions of the TTV Defendants, and as an element of his civil rights

claim under 42 U.S.C. § 1985(3). In their summary judgment motion, the D'Souza Parties argued that no conspiracy exists because there is no evidence that they had an agreement with TTV to do anything other than make a Film. Because there is no evidence that the D'Souza Parties had any awareness (until discovery in this case) that Mr. Andrews (or any other voter) was improperly characterized in the film, it is clear that they made the Film and promoted it to highlight *illegal* voting, and with no intent to intimidate or obstruct *lawful* voting.

Mr. Andrews makes generalizations, including that the D'Souza Parties made the film "knowing they had no evidence that Plaintiff was a 'mule,'" and engaged in "intentional acts to peddle these lies," (Dkt. 294 at 52) but the record simply does not support these claims. For all of the reasons the D'Souza Parties did not act with actual malice, they did not engage in a conspiracy. In this case, both would require that the D'Souza Parties had an awareness that the Film featured legal voters, such that their agreement to produce the film was done with an intent to deprive legal voters of their rights or intimidate them. Nothing in the record shows that such awareness or intent existed.

If there was an agreement to defame, or commit some other tort, Mr. Andrews should be able to point to at least one email, text, or document in which the D'Souza team had any awareness that they were producing a film showing footage of legal voters, but characterizing them as "mules." He should be able to point to a document showing that the D'Souza parties recognized, even nominally, that the Film would intimidate legal voters. Yet no such document exists. What *does* exist is a veritable trove of documents and communications showing that the D'Souza team believed

they were making a film about data-based potential election fraud (elements of the Film that have not been shown to be unreliable) and corresponding geotracked video. Plaintiff's SMF ¶ 16-22; 27; 30-31; SMF 6-9; 19, 28-38.

Moreover, the discussion alleging that Mr. Andrews has a fear of voting (*Id.* at 50-51) is factually wrong. He may have *said* that he is afraid to vote, but his testimony was clear: his change in voting habits started in 2020, well before *2000 Mules*, and was due to concerns over Covid. SMF ¶ 224.

## CONCLUSION

The main question here is simple: Is there clear and convincing evidence that the D'Souza Parties made and promoted the Film, using drop box surveillance footage, with a non-theoretical, actual awareness that that the footage had not been linked to geospatial data? What in the record would give a jury *clear and convincing* evidence that this occurred? That evidence does not exist. This means that the defamation, false light, and conspiracy claims against the D'Souza Parties fail. If they did not know the video was not geotracked, they did not act with actual malice.

The next question is also simple: What evidence exists that the D'Souza Parties published an image of Mr. Andrews such that a jury could find by a preponderance of the evidence that Mr. Andrews was identifiable, and that he was identifiable through the negligence of the D'Souza Parties? Again, that evidence does not exist. This means the defamation and misappropriation of likeness claims against the D'Souza Parties fail.

Respectfully submitted this 28th day of March, 2025.

**BUCHALTER APC**

/s/ *Amanda G. Hyland*
Amanda G. Hyland
Georgia Bar No. 325115
Austin C. Vining
Georgia Bar No. 362473
Cory Mull
Georgia Bar No. 595376
3475 Piedmont Road NE, Ste. 1100
Atlanta, GA 30305
(404) 832-7350 Telephone
ahyland@buchalter.com
avining@buchalter.com
cmull@buchalter.com

*Attorneys for Defendants Dinesh D'Souza
and D'Souza Media LLC*

## CERTIFICATE OF COMPLIANCE WITH L.R. 5.1

I HEREBY CERTIFY that the foregoing document was prepared in Times

New Roman, 14-point font, as approved by Local Rule 5.1.

/s/ *Amanda G. Hyland*
Amanda G. Hyland
Georgia Bar No. 325115

*Attorney for Defendants Dinesh D'Souza
and D'Souza Media LLC*