IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **MARK ANDREWS,**<br><br>Plaintiff,<br><br>v.<br><br>**DINESH D'SOUZA,** *et al.,*<br><br>Defendants. | Case No. 1:22-cv-04259-SDG |

**PLAINTIFF MARK ANDREWS' RESPONSE TO
DEFENDANTS DINESH D'SOUZA AND D'SOUZA MEDIA LLC'S
<u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>**

Pursuant to LR 56.1(B)(3) (ND Ga), Plaintiff files the following response to

Defendants Dinesh D'Souza and D'Souza Media LLC's Statement of Undisputed

Material Facts.

## <u>INTRODUCTORY STATEMENT</u>

In ruling on a motion for summary judgment, a court should only consider

material facts. See *Anderson v. Liberty Lobby, Inc.*:

> As to materiality, the substantive law will identify which facts are material.
> Only disputes over facts that might affect the outcome of the suit under the
> governing law will properly preclude the entry of summary judgment.
> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. 242, 248 (1986).

The majority of the facts in D'Souza Defendants' Statement (61 out of 107) are not material to the Court's resolution of Plaintiff's motion for summary judgment. *See* D'Souza Defendants' Statements ¶¶ 144-56, 161-66, 169-181, 197, 201, 206, 209-214, 216, 218, 220-23, 225-31, 234-35, 237, 242-244, 252, *infra*.

Further, many of D'Souza Defendants' statements are already in the record through Plaintiff's Statement of Material Facts (ECF 250) and D'Souza Defendants' Statement of Material Facts (ECF 268).

Finally, Plaintiff objects to D'Souza Defendants' 22 facts that are not supported by the record or by D'Souza Defendants' proffered evidence, *see* D'Souza Defendants' Statements ¶¶ 158-60, 191, 195-96, 198-99, 200, 202, 205, 207-08, 215, 217, 224, 233, 238, 246, 249-250, *infra*, and to Statement ¶ 154 which, in addition to being immaterial, is supported solely by hearsay.

## **PLAINTIFF'S RESPONSES AND OBJECTIONS**

144.    Andrews Exs. 194, 198, and 200 are communications which are dated January 10, 2022, which predates the final cut of the Film and the Film's May 4th, 2022 release date by several months. Dkt. 265-18 (Andrews Ex. 194) at DD_000157, Dkt. 265-22 (Andrews Ex. 198) at TPNF-0001270, Dkt. 265-24 (Andrews Ex 200) at DDR-00056096 (identifying the date range as January 10, 2022); Dkt. 250-16 (Andrews Ex. 14 (Dinesh D'Souza Dep.)) at 153:22-25

(indicating that the final cut was completed in late April, 2022); Dkt. 271-19 (D'Souza Ex. 35) at TTV_007440 (invitation indicating the *2000 Mules* premiere occurred on May 4, 2022).

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Plaintiff objects to this statement to the extent that it implies the timeframe of the communications is material.

145.   Plaintiff's Ex. 193 is a communication reproducing comments from David Evans in an email dated April 7, 2022, which predates the final cut of the Film and the Film's May 4th, 2022 release date. Dkt. 265-17 (Plaintiff's Ex. 193) at TPNF 0001638; Dkt. 250-16 (Dinesh D'Souza Dep.) at 153:22-25 (indicating that the final cut was completed in late April, 2022), 155:7-19 (indicating that Mr. Evan's feedback pertained to an earlier version of the rough cut, not the final cut); Dkt. 271- 19 (D'Souza Ex. 35) at TTV_007440 (invitation indicating the *2000 Mules* premiere occurred on May 4, 2022).

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308 (Defendants Dinesh D'Souza And D'Souza Media LLC's Response In Opposition To Plaintiff's Motion For Partial Summary Judgment).

146. Plaintiff's Ex. 199 is a communication in which Mr. Schooley relays comments from David Santrella in an email dated April 5, 2022, which predates the final cut of the Film and the Film's May 4th, 2022 release date. Dkt. 274-6 (Andrews Ex. 199) at TPNF-0004778-79; Dkt. 250-16 (Dinesh D'Souza Dep.) at 153:22-25 (indicating that the final cut was completed in late April, 2022); Dkt. 250-24 (Andrews Ex. 22 (Schooley Dep.)) at 82:2-7, 84:8-9 (indicating that David Santrella's feedback did not pertain to the final cut of the Film); Dkt. 271-19 (D'Souza Ex. 35) at TTV_007440 (invitation indicating the *2000 Mules* premiere occurred on May 4, 2022).

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308.

147. The D'Souza Defendants were, admittedly, frustrated with the initial batch of videos for a variety of reasons. Dkt. 250-24 (Schooley Dep.) at 30:5-25, 42:21-43:15, 83:16-84:3; Dkt. 250-23 (Andrews Ex. 21 (Frankowski Dep.)) at 77:11-78:5; Dkt. 265-22 (Andrews Ex. 198) at TPNF-0001270.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF

308. While the evidence does show that D'Souza Defendants were frustrated by the failure to of TTV to provide any footage showing clear evidence of illegal activity, such as individuals visiting multiple drop boxes, in addition to issues with the quality and legibility of the video footage provided by TTV Defendants, Plaintiff further objects to the inclusion of cited testimony from Mr. Schooley claiming that D'Souza Defendants included in the film footage of an individual visiting multiple ballot drop boxes as not supported by the record. Pl. MSJ Ex. 22 at 83:16-84:3.[1] Record evidence shows that Mr. D'Souza admitted on his podcast that neither he nor TTV has released any footage of a "mule" visiting multiple drop boxes. Pl. MSJ Ex. 203.

148.   Many of the videos were unclear and grainy, and the first batch failed to show visually obvious suspicious activity. Dkt. 250-16 (Dinesh D'Souza Dep.) at 145:11-18.

---

[1] In *Plaintiff's Response* paragraphs, "Pl. MSJ Ex. []" refers to exhibits attached to ECF 250-2, Declaration of Von DuBose; "Pl. Resp. Ex. []" refers to exhibits attached to ECF 294-4, Declaration of Lea Haber Kuck; "TTV MSJ Ex. []" refers to exhibits attached to ECF 279-1, Defendant True the Vote, Inc., Catherine Engelbrecht, and Gregg Phillips' Statement of Undisputed Material Facts, and ECF 302-1, Defendant True the Vote, Inc., Catherine Engelbrecht, and Gregg Phillips' Statement of Additional Material Facts In Response to Plaintiff's Partial Motion for Summary Judgment; "D'Souza MSJ Ex. []" refers to exhibits attached to ECF 268-1, Defendants Dinesh D'Souza and D'Souza Media LLC's Statement of Undisputed Material Facts, and ECF 308-2, Defendants Dinesh D'Souza and D'Souza Media LLC's Statement of Undisputed Material Facts.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308. No objection to the statement that video footage provided by TTV for use in the film showed no evidence of illegal activity, but noted that the evidence cited does not support the statement that videos were unclear and grainy.

149.   The D'Souza Defendants and the production company, Salem Media, raised these concerns with TTV in the emails Mr. Andrews now cites. Dkt. 265-18 (Andrews Ex. 194) at DD_000157, Dkt. 265-22 (Andrews Ex. 198) at TPNF 0001270, Dkt. 265-24 (Andrews Ex 200) at DDR-00056097; Dkt. 274-6 (Andrews Ex. 199) at TPNF-0004778-79; Dkt. 265-17 (Plaintiff's Ex. 193) at TPNF-0001638.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308. Plaintiff further objects to this statement as not supported by cited evidence. Pl. MSJ Exs. 193, 198, and 199 consist of emails exchanged exclusively among the D'Souza Defendants, with no involvement from the TTV Defendants as recipients or CC'ed parties. In Pl. MSJ Ex. 200, text messages between Ms. D'Souza and the TTV Defendants, she expresses her concern that Mr. Frankowski selected the

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████ Pl. MSJ Ex. 194 at DD_000157, suggests D'Souza Defendants ever raised concerns that footage provided by TTV Defendants showed "nothing illegal" with TTV Defendants.

150.   Mr. D'Souza did not shy away from these issues and concerns but rather welcomed them because he wanted "to make the most persuasive, intelligent film … [and] anticipate all potential objections beforehand," such that the initial concerns about the surveillance video "was a very welcome critique." Dkt. 250-16 (Dinesh D'Souza Dep.) at 154:6-21.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308.

151.   When faced with these critiques of the video, TTV made it clear that numerous technical issues were impeding the collection of better video. Dkt. 265-21 (Andrews Ex. 197) at DDR-00049499.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF

308. Plaintiff further objects to this statement as vague and ambiguous as to the time frame it references. To the extent D'Souza Defendants intend this statement to cover the entire time period during which they made the Film, Plaintiff objects to this statement as not supported by record evidence. The record evidence shows that Defendants together claimed that TTV Defendants were eventually able to cull "particular meaningful content" showing evidence of illegal activity, and depicted this video, together with the alleged geotracking research, as evidence of an illegal ballot trafficking scheme. "[I]t's difficult to get this video . . . And not only did [TTV] have this video, but more importantly, they had gone through the video and they had – in an ocean of essentially nothing had excavated particular meaningful content, clips and so on . . . They are the clips that they have painfully culled from the large body of video." Pl. MSJ Ex. 14 at 90:14-91:10; *see also* Pl. MSJ Ex. 1; Pl. MSJ Ex. 2; Pl. MSJ Ex. 14 at 91:16-18, 285:21-287:18, 334:17-21; Pl. MSJ Ex. 21 at 44:14-45:15, 62:20-23, 65:12-23, 74:1-75:1; Pl. MSJ Ex. 22 at 30:15-17, 39:25-40:25, 111:14-18, 112:19-23, 123:5-6; Pl. MSJ Ex. 9; Pl. MSJ Ex. 40 at 1:42-1:50; Ex. 47 at 5:22-6:15; Pl. MSJ Ex. 11 at ¶ 59; Pl. MSJ Ex. 107 at 00:00-00:17, 5:20-5:37; Pl. MSJ Ex. 111.

152.   For example, the majority of drop boxes in Georgia did not have video, and those that did often had poor quality cameras positioned at bad angles for visually identifying individuals. Dkt. 265-21 (Andrews Ex. 197) at DDR-

00049499 (Ms. Engelbrecht stating that "90% of video was unavailable in Fulton

County for the General Election); Dkt. 250-16 (Dinesh D'Souza Dep.) at 158:4-15.

**Plaintiff's Response:** Plaintiff objects to this statement because it is

immaterial to the Court's resolution of Plaintiff's Motion. Plaintiff further objects

to this statement as not supported by record evidence. *See* Response to ¶ 151

*supra*.

153.    TTV also explained that in the video available from the Run-Off,

"most cameras were positioned in ways that made video unusable, drops at night

weren't lit, etc." Dkt. 265-21 (Andrews Ex. 197) at DDR-00049499.

**Plaintiff's Response:** Plaintiff objects to this statement because it is

immaterial to the Court's resolution of Plaintiff's Motion. Plaintiff further objects

to this statement as not supported by record evidence. *See* Response to ¶ 151

*supra*.

154.    Some mules were actually *instructed* to avoid drop boxes with

cameras, as evidenced by a mule informant interviewed in the movie who

explained that she was instructed to deposit ballots at a specific drop box that did

not have surveillance cameras and only after dark. D'Souza Dkt. 246 (D'Souza

Ex. 9 (*2000 Mules* film - digital copy (DDR-00059987)) at 01:03:10-01:03:54.

**Plaintiff's Response:** Plaintiff objects to this statement because it is

immaterial to the Court's resolution of Plaintiff's Motion. Defendants' statement

about what "mules'" alleged instructions have no bearing as Defendants do not

dispute that Plaintiff legally voted in the 2020 election. Plaintiff further objects to

this statement as not supported by record evidence other than hearsay contained in

the discredited Film itself. Pl. MSJ Ex. 1; Pl. MSJ Ex. 2; Pl. MSJ Ex. 183 at 38:7-

39:14, 99:24-100:5, 102:1-15, 140:25-142:13; Pl. MSJ Ex. 185 at 74:17-19.

Defendants produced nothing in discovery to support any contention that

individuals involved in a ballot fraud scheme were actually instructed to avoid

drop boxes with cameras; that they were instructed to deposit ballots after dark; or

that they received any instructions at all.

155.   An illegal voter would be highly motivated to *avoid* dropping off

numerous ballots in a manner that might be perceptible to onlookers or on security

cameras. D'Souza Dkt. 246, Ex. 9 (*2000 Mules* film (DDR-00059987)) at 37:29-

38:22 (Ms. Engelbrecht explaining that the entire "idea [of ballot trafficking] is to

stay under the radar at any one stop, not dumping buckets of ballots.").

**Plaintiff's Response:** Plaintiff objects to this statement because it is

immaterial to the Court's resolution of Plaintiff's Motion. Speculation about what

an "illegal voter" might be inclined to do is not relevant to Plaintiff's defamation

claims, and it is not disputed that Plaintiff legally voted in the 2020 election.

Defendants Dinesh D'Souza and D'Souza Media LLC's Statement of Undisputed

Material Facts ("D'Souza SUMF"), ECF 268-1, ¶ 134. Plaintiff further objects to

this statement as speculative and not supported by record evidence. The cited evidence does not support any contention that "[a]n illegal voter would be highly motivated" to drop ballots in certain ways, but rather contains mere speculation from Ms. Engelbrecht about a theory based on "evidence" that has been discredited by the record. *See* Response to ¶ 154 *supra*.

156.   Without a good library of available surveillance footage, it made sense to Mr. D'Souza that TTV did not have a large collection of geotracked videos showing clear illegal voting. Dkt. 250-16 (Dinesh D'Souza Dep.) at 158:3-21.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308. Plaintiff further objects to this statement as not supported by record evidence. In contrast, record evidence shows that Mr. D'Souza was concerned about the inclusion of video evidence of illegal activity, and communicated to co-Defendants that including the surveillance video was an important part of showing the ballot trafficking "mules" narrative. Pl. MSJ Ex. 14 at 64:3-25, 67:2-8, 88:7-8 (calling the surveillance videos the "key visual features of the film"); Pl. MSJ Ex. 55 at DD_000079-81 (Texts from D'Souza to Phillips and Engelbrecht asking for video proof including: "If you have the geotracking and the boxes had surveillance,

where's the video?", "This is what we need to show. Just to shut these guys up."

Even *after* Ms. Engelbrecht claims that video is limited for technical and logistical

reasons, Mr. D'Souza replies, "Even if it's indistinct it might be worth showing

just to say: Here you go."); Pl. Resp. Ex. 233 ("I would like to have tons of videos

for the website. So not all for the movie. But we do want to overwhelm people

with evidence so video upon video until they literally yell, 'Stop! We've seen

enough'").

157.   TTV was able to produce a second batch of videos on March 27,

which were incorporated into the final version of the film completed in late April

2022. Dkt. 250-24 (Schooley Dep.) at 84:10-21 (testifying that the D'Souza

Defendants continued to edit the Film for 10-15 days after the April 5th email from

Mr. Santrella); Dkt. 250-23 (Frankowski Dep.) at 85:11-16; D'Souza Ex. 71

(Plaintiff's Dep. Ex. 126) at DDR-00022531 (discussing new clips of mules that

Nathan added on April 7, 2022).

**Plaintiff's Response:** No objection.

158.   The second batch of videos contained much of the footage ultimately

featured in the final cut of the film, including the footage of Mr. Andrews, and

notably, numerous clips of individuals clearly depositing multiple ballots (D'Souza

Dkt. 246, Ex. 9 (*2000 Mules* film (DDR-00059987)) at e.g., 00:37:01-00:37:28,

00:40:16-00:40:30, 00:42:51-00:43:11, 00:43:15-00:43:33, 00:44:26-00:44:48) and

video showing repeat drops by the same person. Dkt. 250-24 (Schooley Dep.) at

83:6-84:3, 85:21-25; Dkt. 250-16 (Dinesh D'Souza Dep.) at 140:24-141:4, 144:3-

145:1, 147:17-25, 330:24-332:20; Dkt. 246, Ex. 9 (*2000 Mules* film (DDR

00059987)) at 00:47:24-00:47:49 (look-alike of Mr. Andrews with black Mercedes

sedan), 00:47:57-00:48:05 (Mr. Andrews with white SUV).

 **Plaintiff's Response:** Plaintiff objects to the statement that the second batch

of videos contained "video showing repeat drops by the same person" as

unsupported by the evidence. The cited testimony refers to footage provided by the

TTV Defendants, which was later included in the final version of the Film. Pl. MSJ

Ex. 2 at 00:47:24-00:47:49, 00:47:57-00:48:05. This footage represents what

Defendants testified they believed to show "multiple mule drops by a single person

in the video." *Id.* at 00:47:24-00:47:49, 00:47:57-00:48:05. But critically, these

"doppelganger videos" categorically do *not* show repeat visits to a ballot drop box

by the same individual, which Defendants' own characterization in the statement

above ("look-alike of Mr. Andrews") evidences. Further, the full testimony of the

cited excerpts shows that D'Souza Defendants had no reason to believe these clips

showed repeat drops by the same individual beyond their subjective

misinterpretation of the footage, as Mr. D'Souza testified that TTV Defendants did

not confirm via the geotracking data that these two videos were of the same person.

Pl. MSJ Ex. 14 at 145:2-6; Pl. MSJ Ex. 22 at 85:21-25. Plaintiff additionally

objects to the characterization of the individual appearing at the top of Pl. MSJ

Ex. 160 as a "look-alike of Mr. Andrews" as Defendants' subjective

misinterpretation of visual imagery that speaks for itself.

159.    One of the "repeat" voters was, in fact, Mr. Andrews and a look-alike:



Dkt. 246, Ex. 9 (*2000 Mules* film (DDR-00059987)) at 00:47:44 (depicting a

person who D'Souza Defendants believed to be a repeat voter (left) with face

blurred, 00:48:04 (depicting Mr. Andrews (right) with face blurred, who the

D'Souza Defendants believed to be the same man shown at left)).



D'Souza Ex. 68 (Plaintiff's Dep. Ex. 110) (submitted herewith) at

DD_000466 (showing Mr. Andrews (right) and the look-alike of Mr. Andrews

(left) in unblurred surveillance footage).

**Plaintiff's Response:** Plaintiff objects to the statement as an expression of

opinion, not as a statement of fact. Plaintiff further objects to the characterization

of the individual appearing at the top of Pl. MSJ Ex. 160 as a "look-alike of Mr.

Andrews" as not supported by the evidence; it is Defendants' subjective

misinterpretation of visual imagery that speaks for itself. Notably, Defendants'

comparison of these sets of different images (and concededly different individuals)

is a post-hoc attempt to defend their failure to verify through video evidence that

*any* individual actually visited more than one drop box. *See* Pl. MSJ Ex. 14 at

336:20 ("It was only after the Andrews litigation that we went back and looked a

little harder at the videos to see if there were any other, you could say, matching

videos . . . ."). Numerous documents created contemporaneously with the

filmmaking process show that D'Souza and his team repeatedly asked for

additional video and expressed the concern that there was no video of the same

person going to multiple drop boxes. TTV MSJ Ex. W (D'Souza asking, "if you

have the geotracking and the boxes had surveillance, where's the video?"); Pl. MSJ

Ex. 193; Pl. Resp. Ex. 268; Pl. MSJ Ex. 55 at DD_000079-82; Pl. Resp. Ex. 234;

Pl. MSJ Ex. 199.

160.    The individual on the left so closely resembles Mr. Andrews that his

attorneys mistook him for Mr. Andrews twice - once when producing PDSA

0000570 and again when creating Plaintiff's Ex. 160 from this document to

support his Motion for Summary Judgment. Dkt. 264-10 (Plaintiff's Ex. 160).

**Plaintiff's Response:** Plaintiff objects to Defendants' subjective

misinterpretation of the other voter's appearance for the same reasons as set forth

*supra. See* Response to ¶ 159 *supra*. Plaintiff further disputes the statement that

Mr. Andrews' attorneys mistook this individual for Mr. Andrews as unsupported

by the record or cited evidence. In fact, the cited evidence, PDSA 0000570 and

Dkt. 264-10 (Plaintiff's Ex. 160), does not support Defendants' statement that

Plaintiffs' counsel made any such mistake. These are in fact the same document: the first is the Bates-stamped version produced in discovery; the second is the same document that Plaintiff attached as evidence using the appropriate naming convention when filing a document in this Court. As is plain from reading Plaintiff's SUMF, Plaintiff's Ex. 160 is cited once as evidence of the violent and threatening *comments* about the mules generally that appeared below an online video. *See* Plaintiffs' Statement of Undisputed Material Facts ("Pl. SUMF"), ECF 250-1, ¶ 145. Plaintiff's counsel previously produced the full video file titled "2000 Mules Clip – Video Montage of Mules" (which includes footage of Plaintiff from 0:33-0:40) as MA-0000580. Plaintiff's counsel never argued or suggested that the image in the still at Plaintiff's Ex. 160 was Plaintiff; this was not the purpose of that exhibit, nor was there any need to do so, as Defendants had access to the full video (MA-0000580) and could confirm its contents for themselves. The specific video frame captured in the exhibit is entirely arbitrary and immaterial to the purpose for which the exhibit has been introduced. *See* Response to ¶ 163 *infra*.

161.    The video depicted in Plaintiff's Ex. 160 is entitled *2000 Mules Clip – Video Montage of Mules* by TheSaltyCracker and can be found at the following email address: https://rumble.com/v14ck4s-2000-mules-clip-video-montage-of-mules.html?e9s=src_v1_ucp. Dkt. 264-10 (Plaintiff's Ex. 160).

**Plaintiff's Response:** Plaintiff objects to this statement because it is not

material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not

cite this statement in the Legal Argument section of their Response Brief. ECF

308. Plaintiff further objects to the statement that the listed address is an email

address—it is a webpage link.

162.    The default screen shown at this link depicts a tiled video mosaic, not

the scene appearing in Plaintiff's Ex. 160:



https://rumble.com/v14ck4s-2000-mules-clip-video-montage-of

mules.html?e9s=src_v1_ucp (showing default screen). *Compare* with Dkt. 264-10

(Plaintiff's Ex. 160) (showing look-alike of Mr. Andrews).

**Plaintiff's Response:** Plaintiff objects to this statement because it is not

material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not

cite this statement in the Legal Argument section of their Response Brief. ECF

308. Plaintiff further objects to Defendants' subjective misinterpretation of the other voter's appearance for the same reasons as set forth *supra. See* Response to ¶ 159 *supra*.

163.   To create the screenshot depicted in Plaintiff's Ex. 160, the video had to be deliberately advanced to approximately 00:06-00:18 (which shows the look alike, not Mr. Andrews) before taking the screenshot:



https://rumble.com/v14ck4s-2000-mules-clip-video-montage-of-mules.html?e9s=src_v1_ucp (advanced to 00:11 and showing the look-alike of Mr. Andrews). *Compare* with Dkt. 264-10 (Plaintiff's Ex. 160) (showing look-alike of Mr. Andrews).

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Plaintiff further objects to Defendants' subjective misinterpretation of the other voter's appearance for the same reasons as set forth *supra. See* Response to ¶ 159 *supra*. Plaintiff further

objects to this statement as unsupported by the facts and cited evidence. The cited evidence offers no support for the statement that the video had to be deliberately advanced to this timestamp before the capture was taken nor any reason to believe the screenshot was not simply captured eleven seconds into a video on autoplay, as it was irrelevant to the purpose of the exhibit, which was to capture the comments beneath the video. *See* Response to ¶ 159 *supra*.

164.   Plaintiff's Ex. 160 purports to be a "legible version created using the native file of the document Plaintiff Mark Andrews produced to Defendants in discovery as Bates No. PDSA-0000570." *See* Dkt. 250-2 (Von DuBose Declaration) at ¶ 163.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308.

165.   During the initial meeting between the D'Souzas and TTV Defendants, Mr. D'Souza probed Mr. Phillips's background and learned that he had held various positions in the corporate world as well as high-level positions within government, leading Mr. D'Souza to determine that Mr. Phillips was a "visible, competent managerial person. Dkt. 250-16 (Dinesh D'Souza Dep.) at 42:6–18.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Plaintiff further objects to this statement as not supported by record evidence. By contrast, the record evidence shows that Mr. Phillips generally did not have a good reputation. Pl. MSJ Exs. 260-265.

166.    Mr. Phillips was the head of Human Services in Mississippi and the head of the Health & Human Services Commission in Texas. Dkt. 250-16 (Dinesh D'Souza Dep.) at 42:11–16.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Plaintiff objects to this statement as not supported by cited evidence. In the cited evidence, Mr. D'Souza testifies that Mr. Phillips had previously worked "at the Health and Human Services Commission in Texas" from 1992 to 1995, and "was in the governor's cabinet in Mississippi" from 2003 to 2005. Ex. 12 at 21:18-23:24.

167.    Additionally, "Gregg represented to [Mr. D'Souza] that he had been, for not years, but decades, involved in election integrity and election intelligence," including "involvement in studying, monitoring, [and] investigating elections not just in the United States, but around the world." Dkt. 250-16 (Dinesh D'Souza Dep.) at 42:19–43:3. *See also* Dkt. 268-9 (D'Souza Ex. 8, pt. 1) at DDR-00060744;

Dkt. 246, Ex. 9 (*2000 Mules* film (DDR-00059987)) at 00:15:19–00:15:35,

00:15:51– 00:16:21); Dkt. 246, Ex. 9A (00:15:17–00:16:25 of DDR-00059987).

    **Plaintiff's Response:** No objection.

    168.   Mr. Phillips further insinuated that he had performed this work in

conjunction with both intelligence agencies and law enforcement agencies. Dkt.

250- 16 (Dinesh D'Souza Dep.) at 43:4–9.

    **Plaintiff's Response:** No objection.

    169.   Mr. Phillips also conveyed that he knew a great deal about

geotracking, which he was able to corroborate by answering detailed questions on

the topic. Dkt. 250-16 (Dinesh D'Souza Dep.) at 43:18–44:2.

    **Plaintiff's Response:** Plaintiff objects to this statement because it is not

material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not

cite this statement in the Legal Argument section of their Response Brief. ECF

308. Plaintiff further objects to this statement that Mr. Phillips was "able to

corroborate" his knowledge of geotracking as not supported by the evidence. The

full testimony of cited excerpts shows that the questions he answered on the topic

were posed and assessed by another non-expert on geotracking, Mr. D'Souza. Pl.

MSJ Ex. 14 at 40:1-13, 44:12-15, 81:5-14.

170.   Mr. Phillips's draft affidavit (Dkt. 268-14 (D'Souza Ex. 10, pt. 1) at TTV_006843–53) indicated that he had more than three decades of data analysis experience. Dkt. 268-14 (D'Souza Ex. 10, pt. 1) at TTV_006844.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308. Plaintiff further objects to this statement as not supported by record evidence. Mr. Phillips testified that he had never seen the draft affidavit before and disavowed many of the statements in it, saying that "whoever wrote this [draft affidavit] seems to be that they didn't understand what we were doing." Pl. MSJ Ex. 12 at 61:4-62:25, 68:16-18. Record evidence additionally undermines this statement, showing that Mr. Phillips has no advanced degrees and has undergone no formal training in forensics or cybersecurity. *Id.* at 18:2-4, 19:1-19.

171.   This experience included the "us[e] of large data sets in fraud control, quality control, and identify resolution in voting-related cases and analysis," and previous "expert testimony on matters pertaining to mobile device geospatial and temporal data analysis, mobile device tracking, and law enforcement matters . . . includ[ing] testimony in front of the Foreign Intelligence Surveillance Court." Dkt. 268-14 (D'Souza Ex. 10, pt. 1) at TTV_006844.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308. Plaintiff further objects to the statement that Mr. Phillips had given "previous 'expert testimony'" on certain matters as not supported by the evidence. The full testimony of cited excerpts shows that Mr. Phillips testified that he has never given expert testimony. Pl. MSJ Ex. 12 at 10:17-19. Additionally, Mr. Phillips testified he had never seen the draft affidavit before and disavowed many of the statements in it. *See* Response to ¶ 170 *supra*.

172. It also indicated that OpSec Group utilized commercially available mobile device geospatial and temporal data to identify devices, such as cell phones, that had been located in close proximity to the 309 ballot drop boxes in Georgia by establishing geofences around those drop boxes and identifying cell phone pings within those boundaries. Dkt. 268-14 (D'Souza Ex. 10, pt. 1) at TTV_006846–48.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308. Plaintiff further objects to this statement as not supported by cited evidence. The cited evidence does not support any contention that OpSec Group actually

performed any such analysis or otherwise substantiating what or whether analysis

was actually done. By contrast, the record evidence indicates that the analysis was

not done as claimed. Pl. MSJ Ex. 183 at 30:16-31:9; Pl. MSJ Ex. 12 at 66:13-17.

Plaintiff further objects to Defendants' characterization that the geofences were

drawn to locate devices in "close proximity" to ballot boxes as subjective and

vague; the cited evidence states that certain ballot drop box geofences were set at

100 feet and others were set at 500 feet.

173.   Through its analysis, OpSec Group identified 242 "devices of

interest" that had each been located within 100 feet of one or more drop boxes on

at least 10 occasions and within 100 feet of one or more organization suspected of

ballot harvesting on multiple occasions. Dkt. 268-14 (D'Souza Ex. 10, pt. 1) at

TTV_006849.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not

material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not

cite this statement in the Legal Argument section of their Response Brief. ECF

308. Plaintiff further objects to this statement as not supported by cited evidence.

The cited evidence does not support any contention that OpSec Group actually

performed any such analysis or otherwise substantiating what or whether analysis

was actually done. By contrast, the record evidence indicates that the analysis was

not done as claimed. Pl. MSJ Ex. 183 at 30:16-31:9; Pl. MSJ Ex. 12 at 66:13-17.

174.   The documents also included maps individually tracking 10 different

devices on as many as 53 visits to 14 different drop boxes and 35 visits to four

suspected ballot harvesting organizations. Dkt. 268-14 (D'Souza Ex. 10, pt. 1) at

TTV_006851, TTV_006826–835.

Plaintiff's Response: Plaintiff objects to this statement because it is not

material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not

cite this statement in the Legal Argument section of their Response Brief. ECF

308. Plaintiff further objects to this statement as not supported by record evidence.

The cited evidence does not support any contention that "the documents" included

maps of any kind. By contrast, the record evidence shows that these documents do

not exist. The cited evidence additionally does not support the contention that

Defendants actually individually tracked "10 different devices" on any "visits" to

any locations—record evidence shows that the analyst who performed the

geospatial analysis testified that it would have been impossible to make such

findings with the data Defendants claim to have used. Pl. MSJ Ex. 185 at 54:23-

55:17.

175.   Mr. D'Souza set up a meeting for Mr. Phillips and Ms. Engelbrecht

with Salem Media in October 2021, largely to see how their theories would hold up

to probing questions from a diverse group of intelligent people, including Salem's

attorney, Salem's past and present CEOs, and other media executives. Dkt. 250-16

(Dinesh D'Souza Dep.) at 76:18–77:20, 78:1–3, 78:14–79:1; Dkt. 250-17

(Plaintiff's Ex. 15 (Debbie D'Souza Dep.)) at 59:19–60:5.

   **Plaintiff's Response:** Plaintiff objects to this statement because it is not

material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not

cite this statement in the Legal Argument section of their Response Brief. ECF

308. Plaintiff further objects to the statement that Mr. D'Souza set up the meeting

between TTV Defendants and Salem Media "largely to see how their theories

would hold up to probing questions from a diverse group of intelligent people" as

not supported by the evidence. First, cited testimony does not support the

contention that Mr. D'Souza did anything to vet TTV's data or methodology—

indeed, the cited testimony listing participants in the meeting did not include

anyone with the knowledge or expertise to "vet" TTV's claims. The Salem Media

team was not in a position to evaluate the data or analytics provided by TTV, as

their expertise is in media, not data analysis, and they did not consider it their

responsibility to "fact check" TTV's presentation. Indeed, record evidence shows

that Salem left that responsibility to Mr. D'Souza. Pl. MSJ Ex. 192 at 36:12-37:9.

   Finally, Mr. D'Souza's full testimony of the cited excerpts shows that part of

his goal in setting up the meeting was to "persuade Salem . . . [that] this is

something that you would like to pursue," Pl. MSJ Ex. 14 at 77:21-78:1,

undermining the statement that the meeting was set up "largely" to pressure-test TTV's claims.

176. The presentation included maps of the mules traveling to numerous drop boxes, discussion of geotracking mules to violent protests, the use of geotracking to aid in Atlanta murder investigations, and surveillance video footage. Dkt. 250-17 (Debbie D'Souza Dep.) at 60:21–61:19, 62:1–6, 62:25–63:3.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308. Plaintiff further objects to the statement that the presentation included "maps of the mules traveling to numerous drop boxes" as not supported by the evidence. Ms. D'Souza's full testimony of the cited excerpts shows that she couldn't "remember exactly when" she was shown "maps of the mules traveling around," although she testified that "it could have been at this meeting" with Salem. Pl. MSJ Ex. 15 at 62:25-63:9. Plaintiff further objects to this statement as record evidence shows that TTV Defendants have admitted that no such maps exist, and the contractor that performed the geospatial analysis testified that such maps would have been impossible to create with the data Defendants claim to have used. Pl. MSJ Ex. 18 at 56:8-59:2; Pl. MSJ Ex. 185 at 54:23-55:17.

177.   Ms. Engelbrecht's draft affidavit indicated that TTV had already spent

███████████████████████████. Dkt. 268-14 (D'Souza Ex. 10, pt. 1) at

TTV_006840.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not

material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not

cite this statement in the Legal Argument section of their Response Brief. ECF

308.

178.   Moreover, Ms. Engelbrecht and Mr. Phillips had already undertaken

many significant efforts to get the attention of law enforcement. Mr. Phillips first

took the information to the FBI on March 25, 2021 and then to Governor Kemp of

Georgia, the Georgia Bureau of Investigation, and legislators, each time hoping

that law enforcement or a similarly competent organization would dig deeper into

their findings. Dkt. 250-14 (Plaintiff's Ex. 12 (Phillips Dep.)) at 245:22-246:5;

Dkt. 250- 20 (Plaintiff's Ex. 18 (Engelbrecht Dep.)) at 49:18-23, 50:5-7.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not

material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not

cite this statement in the Legal Argument section of their Response Brief. ECF

308. Plaintiff further objects to the statement that Mr. Phillips had submitted their

"information" to officials with the hopes that "law enforcement or a similarly

competent organization would dig deeper into their findings" as not supported by

the evidence. By contrast, the record evidence demonstrates that when law enforcement did attempt to investigate and obtain support for TTV's allegations, the TTV Defendants refused to substantiate their allegations with the evidence they claimed to have. Pl. Resp. Ex. 258; Pl. Resp. Ex. 259, True the Vote Inc.'s Response to Court Order, *State Election Bd. v. True the Vote, Inc.*, No. 2023CV3 82520 (Ga. Super. Ct. Fulton Cnty. Dec. 11, 2023) (in response to a court order compelling True the Vote to respond to a subpoena, True the Vote claimed not to have any documentary evidence to support its claims of ballot fraud during the 2020 general election and runoff, including but not limited to "[t]he identities of the `network of non-governmental organizations that worked together to facilitate a ballot trafficking scheme in Georgia").

179.   TTV spent much of the summer trying to get authorities' attention, but each time, they were "pushed off and shoved aside." Dkt. 250-14 (Phillips Dep.) at GP Dep. 245:25-246:9.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308. Plaintiff further objects to this statement as not supported by record evidence. By contrast, the record evidence shows that law enforcement conducted the very investigations Defendants claimed to have sought, though Defendants disagreed

with the outcome of those investigations when the results disproved their conspiracy theory. Pl. MSJ Ex. 18 at 49:16-50:7, 85:2-17; Pl. MSJ Ex. 12 at 171:24-172:7; Pl. MSJ Ex. 14 at 122:2-22; Pl. MSJ Ex. 2 at 32:41-32:52, 57:31-57:55; Pl. MSJ Ex. 60; Pl. MSJ Ex. 123; Pl. MSJ Ex. 125; Pl. MSJ Ex. 55 at DD_000073; Defendant True the Vote, Inc., Catherine Engelbrecht, and Gregg Phillips' Statement of Undisputed Material Facts ("TTV SUMF"), ECF 279-1, ¶¶ 35-44; Pl. MSJ Ex. 61 (showing that TTV was aware that multiple of David Cross' complaints of voter fraud had been investigated and heard by the Georgia SEB). In the case of Mr. Andrews, law enforcement found no evidence of wrongdoing. *See* ¶ 211 *infra*.

180.   In August of 2021, Ms. Engelbrecht and Mr. Phillips went to the D'Souza's home to discuss their investigation. Dkt. 250-14 (Phillips Dep.) at 244:23–245:8; Dkt. 250-17 (Debbie D'Souza Dep.) at 46:18–20).

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308.

181.   Mr. Phillips showed the D'Souzas a presentation and supporting materials on his laptop, including background information and graphics explaining cell phone geotracking methodology, his data and maps depicting the geospatial

data and pattern-of-life schematics, and drop box surveillance video clips, which all supported the theory that numerous individual cellphone ids, or IMEIs, could be correlated with multiple drop box visits. Dkt. 250-16 (Dinesh D'Souza Dep.) at 63:9–64:8, 67:9–68:8, 72:1–12; Dkt. 250-17 (Debbie D'Souza Dep.) at 46:13–20, 51:13–21, 52:2–12.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308. Plaintiff further objects to the statement that Mr. Phillips' presentation and supporting materials "all supported the theory that numerous individual cellphone ids, or IMEIs, could be correlated with multiple drop box visits" as not supported by the evidence. In contrast, the record evidence shows that TTV Defendants did not create any so-called "pattern of life" schematics, as this was not possible with the data they claim to have analyzed, and Defendants have cited no such evidence. Pl. MSJ Ex. 183 at 87:12-16, 88:18-90:25.

182.    During the interviews, Ms. Engelbrecht was clear that the video surveillance footage that they had provided had been linked to geotracked cell phones: "What kicks it up a notch is that we have the geospatial data to support the video." Dkt. 268-9 (D'Souza Ex. 8, pt. 1) at DDR-00060772–73; Dkt. 246, Ex. 9

(*2000 Mules* film (DDR-00059987)) at 00:36:31–00:36:40; Dkt. 246, Ex. 9E
(00:36:31–00:36:55 of DDR-00059987).

**Plaintiff's Response:** With the understanding that Defendants' reference to
"the interviews" refers to the interviews with Ms. Engelbrecht for inclusion in the
Film, no objection.

183.   Mr. Phillips, looking at a surveillance video, then states, "this
particular individual, we have in a number of different locations . . . he's actually a
mule." Dkt. 246, Ex. 9 (*2000 Mules* film (DDR-00059987)) at 00:36:41–00:36:50;
Dkt. 246, Ex. 9E (00:36:31–00:36:55 of DDR-00059987).

**Plaintiff's Response:** No objection.

184.   In their interview, TTV also discussed the criteria for a "mule": only
phones that had been to ten separate drop boxes and to at least one liberal non-
profit organization would qualify for purposes of the film. Dkt. 268-9 (D'Souza
Ex. 8, pt. 1) at DDR-00060760; Dkt. 246, Ex. 9 (*2000 Mules* film (DDR-
00059987)) at 00:25:24–00:25:38, 00:43:50–00:44:11); Dkt. 246, Ex. 9F
(00:25:16–00:25:40 of DDR-00059987); Dkt. 246 Ex., 9G (00:43:44–00:44:20 of
DDR-00059987).

**Plaintiff's Response:** No objection.

185.   As progress continued, Ms. D'Souza requested additional surveillance videos for the film. Dkt. 271-2 (D'Souza Ex. 21) at TTV_007271; Dkt. 271-3 (D'Souza Ex. 22) at TTV_007276–77.

**Plaintiff's Response:** No objection.

186.   Ms. Engelbrecht balked at this request because it was so "time consuming" to link the videos to the date:

> **1) Video footage and how many can we realistically have. We want to show the mules... all of what you have that works.**
>
> *We have around 70 videos currently separated out and are scaling efforts to review more. This is **incredibly** time consuming because it involves reading the geospatial data to try and find a match in really poorly detailed county video, so only analysts can do this. It is difficult to know how many more we will have. We have lots of footage, but finding the pieces that work is difficult. We need to understand what you need, how you want to use it, and the **deadline** by which you need it. Here are some ideas:*

Dkt. 271-3 (D'Souza Ex. 22) at TTV_007276–77.

**Plaintiff's Response:** No objection.

187.   During the interview, Mr. Kirk displayed an unblurred video of Mr. Andrews dropping ballots into a ballot box. Dkt. 250-20 (Engelbrecht Dep.) at 301:5–10, 308:19–23; Dkt. 250-14 (Phillips Dep.) at 110:1–7; Dkt. 246, Ex. 28 (Charlie Kirk interview) at 00:25:00–00:25:48; Dkt. 246 Ex. 28A (00:24:51–00:25:54 from Ex. 28). Mr. Kirk asks, "So this is a mule . . . one of the 2000 that you profiled?" to which Ms. Engelbrecht replied, "Yes." Dkt. 246 Ex. 28 (Charlie

Kirk interview) at 25:09–25:13; Dkt. 246, Ex. 28A (00:24:51–00:25:54 from Ex. 28).

**Plaintiff's Response:** No objection.

188.   Two days after the *2000 Mules* film premiered at Mar-a-Lago, Ms. Engelbrecht appeared on Tucker Carlson's show. Dkt. 246, Ex. 38 (Tucker Carlson interview)). Ms. Engelbrecht was unequivocal during the interview that "we are able to match the drop box pings with the video, and you see it for yourself." Dkt. 246 Ex. 38 (Tucker Carlson interview) at 00:03:17–00:03:23; Dkt. 246, Ex. 38A (00:03:16–00:03:24 of Ex. 38).

**Plaintiff's Response:** No objection.

189.   Eventually, on March 27, 2022, Mr. Frankowski received a hard drive containing the second and final batch of surveillance video clips from TTV. Dkt. 250-20 (Engelbrecht Dep.) at 353:10–18; Dkt. 250-14 (Phillips Dep.) at 165:13–16; Dkt. 250-23 (Frankowski Dep.) at 85:11–19.

**Plaintiff's Response:** No objection.

190.   This hard drive contained the footage obtained from the Gwinnett County drop box, including the footage of Mr. Andrews. Dkt. 250-20 (Engelbrecht Dep.) at 168:10–12, 187:23–190:17, 197:2–8.

**Plaintiff's Response:** No objection.

191.   There was no indication that these videos had not been geotracked, no discussion that they had not been geotracked, and no reason for anyone on the D'Souza team to believe they were not geotracked. Dkt. 250-20 (Engelbrecht Dep.) at 190:11– 25, 191:5–12; Dkt. 250-14 (Phillips Dep.) at 255:10–256:7 Dkt. 250-16 (Dinesh D'Souza Dep.) at 161:22–162:16, 163:23–165:12; Dkt. 250-17 (Debbie D'Souza Dep.) at 120:9–13, 120:21–121:2, Dkt. 250-23 (Frankowski Dep.) at 62:20–23, 71:1–6.

**Plaintiff's Response:** Plaintiff objects to this statement as not supported by cited evidence. The cited testimony reveals a lack of consensus among the parties as to whether or not there was any discussion as to whether the Gwinnett County videos had been geotracked and whether the D'Souza team "had no reason . . . to believe they were not geotracked." Ms. Engelbrecht's cited testimony shows that she did not recall one way or the other whether the D'Souza team was explicitly informed that the second batch of videos had not been geotracked: "Q: But you don't recall talking to them about whether the Gwinnett County video had been matched with the geospatial analysis? A: I can't specifically recall it. I just – it came so late, it would – it would – in my mind almost have been assumed, but I can't recall it." Pl. MSJ Ex. 18 at 190:18-191:12. Additionally, the cited portions of Mr. Phillips' testimony also show that he did not believe that Mr. D'Souza objected to the use of additional, potentially un-geotracked footage in the film. Pl.

MSJ Ex. 12 at 255:10-256:7, 150:2-151:10 ("I was in the thread and sort of objected and said, I think that's out of scope. We ended up sending more video, but we had no control over what ended up happening with it. And it wasn't associated with the 242 mules . . . What they wanted from the – videos was the ability to create – like a matrix . . . where it shows like a thousand pictures . . . And we were assured that . . . those people would all be blurred and you know, whatever, because we . . . made it clear, we haven't done – you know, this is raw video that's . . . outside of the scope of our contract and what we were to provide, which was . . . a limited set of video and a limited set of research on the 242 people.").

Furthermore, the cited evidence does not support any contention that there was "no reason for anyone on the D'Souza team to believe they were not geotracked." Indeed, record evidence demonstrates that Mr. D'Souza and his team had numerous reasons to question whether the video had been geotracked, but never did so. Mr. Schooley testified that D'Souza came up with the idea for a collage to show "there were lots of video – of mules." Pl. MSJ Ex. 22 at 68:10-12, 68:15-24. He further testified that the collage is "just a way of filling the screen and expressing something visually." *Id.* at 70:14-15, 70:19-25. He later testified that the D'Souza team wanted the video because "it helped the film be more cinematic," and not to confirm the research. *Id.* at 124:9-11. As he explained, the video was "always just a plus," *id.* at 124:8, "secondary" to the data, *id.* at 25:23-

24. This, combined with the fact that Ms. Engelbrecht had already offered "general footage" that had not been matched to geotracking results, D'Souza SUMF ¶ 61, supports the notion that the D'Souza team was not concerned with whether the video was in fact geotracked or not. Finally, numerous documents reveal that the D'Souza team asked for additional video and expressed the concern that there was no video of the same person going to multiple drop boxes, providing yet another reason for Mr. D'Souza to believe the surveillance footage provided by TTV was not actually tied to geotracking. Pl. MSJ Ex. 193; Pl. Resp. Ex. 268; Pl. MSJ Ex. 55 at DD_000079-82; Pl. Resp. Ex. 234; Pl. MSJ Ex. 199. In Mr. D'Souza's own words, "if you have the geotracking and the boxes had surveillance, where's the video?" TTV MSJ Ex. W.

192.   By early April, the rough cut of the film had been completed, followed by the final cut in late April. Dkt. 250-16 (Dinesh D'Souza Dep.) at 153:23–25.

**Plaintiff's Response:** No objection.

193.   Mr. Phillips and Ms. Engelbrecht viewed the rough cut in the D'Souzas' home and were given an opportunity to provide their feedback. Dkt. 250-20 (Engelbrecht Dep.) at 208:25–209:7; Dkt. 250-14 (Phillips Dep.) at 176:20–177:1.

**Plaintiff's Response:** No objection.

194.   The pair also attended a pre-screening of the movie in Mar-a-Lago with Mr. Trump. Dkt. 250-20 (Engelbrecht Dep.) at 227:13–16; Dkt. 250-14 (Phillips Dep.) at 177:2–5.

**Plaintiff's Response:** No objection.

195.   Ms. Engelbrecht provided some small suggestions, but Mr. Phillips did not share any concerns or perceived inaccuracies with the team. Dkt. 250-20 (Engelbrecht Dep.) at 211:14–213:23; Dkt. 250-14 (Phillips Dep.) at 177:6–21, 177:25–178:11; Dkt. 271-4 (D'Souza Ex. 23 (TTV_007347–48) at TTV_007347; Dkt. 271-5 (D'Souza Ex. 24 (DDR-00049438–39) at DDR-00049439.

**Plaintiff's Response:** Plaintiff objects to the characterization of Catherine Engelbrecht's feedback to the rough cut as "small suggestions" as not supported by the evidence. The cited deposition testimony shows Ms. Engelbrecht gave several pieces of feedback, and record evidence reflects that she insisted those changes be made – i.e. they were not "suggestions." *See* Pl. MSJ Ex. 36 (Catherine Engelbrecht text message on April 20, 2022 stating, "The call I missed yesterday was to ask that I *personally confirm the changes were made to the movie*. What is the best way to do this? Can we talk them through or can I view another rough cut?" (emphasis added)). No objection to the statement that Gregg Phillips did not share any of his concerns or alert D'Souza Defendants to inaccuracies in the film.

196.   They had previously been given no reason to believe that any of the surveillance footage provided by Mr. Phillips and Ms. Engelbrecht had not been geotracked. Dkt. 250-16 (Dinesh D'Souza Dep.) at 164:1–165:12; Dkt. 250-17 (Debbie D'Souza Dep.) at 175:4–16; Dkt. 250-24 (Schooley Dep.) at 74:10–19; Dkt. 250-23 (Frankowski Dep.) at 44:11–45:10. Indeed, in their depositions, Ms. Engelbrecht and Mr. Phillips were each unable to identify any time they had told Mr. D'Souza or anyone on his team that any of the videos had not been linked to geotracking data:

Q. Okay. And did the D'Souzas understand that -- or did you tell Mr. and Mrs. D'Souza that?

A. I -- I don't recall, but it wouldn't -- I mean, I don't know how that would have been material, but I -- I don't recall telling them or not telling them maybe.

. . .

Q. But you don't recall talking to them about whether the Gwinnett County video had been matched with the geospatial analysis?

A. I can't specifically recall it. I just -- it came so late, it would -- it would -- in my mind almost have been assumed, but I can't recall it.

Dkt. 250-20 (Engelbrecht Dep.) at 190:18-191:12; Dkt. 250-14 (Phillips Dep.) at 255:16-24 ("Q. Okay. And I think you mentioned earlier

that you actually objected to using additional videos. I'm not sure if you

meant that literally or more colloquially. Did you actually put something in

writing that you objected to the use of any additional videos? A. I don't think

so."), 264:4-9 ("Q. And your testimony is that Mr. D'Souza was aware that

the second batch of video that you provided were videos that had not been

geospatially linked? A. I don't know if Mr. D'Souza had.").

    **Plaintiff's Response:** Plaintiff objects to this statement as not supported by

record evidence. *See* Response ¶ 191 *supra*. The cited testimony from Mr. and Ms.

D'Souza does not support the contention that they were given "no reason" to

believe what should have been readily apparent. The depositions of Mr. Schooley

and Mr. Frankowski likewise do not indicate in any way that D'Souza Defendants

were "given no reason" to believe the videos were not geotracked. For example, in

Mr. Schooley's referenced testimony, he responded, "yeah" to the question, "So

did you understand that in March of 2022, they [TTV] were still going through and

looking for and matching geo-tracking to surveillance video?" Pl. MSJ Ex. 22 at

74:10-14. Similarly, Mr. Frankowski was asked whether it was his "understanding

that they [TTV] were able to tie specific videos to specific geotracking data?" and

he responded, "Yes." Pl. MSJ Ex. 21 at 44:20-25. Whether or not Mr. Schooley

and Mr. Frankowski believed the videos to have been "geotracked" does not

support the statement that the D'Souzas were "given no reason" to believe

otherwise. The TTV Defendants' testimony likewise does not support the statement.

197.  In fact, Mr. D'Souza testified that he had found other, prior claims of election fraud to be unconvincing, noting that an "anomaly" is not the same thing as "proof." Dkt. 250-16 (Dinesh D'Souza Dep.) at 75:20-76:17.

**Plaintiff's Response:** Plaintiff objects to this statement because it is immaterial to the Court's resolution of Plaintiff's Motion. Whether or not Mr. D'Souza found prior claims of election fraud to be conclusive or likely to be particularly convincing is immaterial to Plaintiff's defamation claim.

198.  It was only once TTV brought the geolocation data to Mr. D'Souza in a manner that suggested rampant election fraud that he had any interest in producing a film on the topic - and even then, he was skeptical initially about the project. Dkt. 250-16 (Dinesh D'Souza Dep.) at 64:9-11.

**Plaintiff's Response:** Plaintiff objects to this statement as not supported by cited evidence. The cited evidence supports the statement that Mr. D'Souza testified he was initially "skeptical" about producing a film based on TTV Defendants' research, but the full testimony of the cited excerpts show that Mr. D'Souza characterized his skepticism as resulting from the fact that "the topic was kind of new to [him]," as well as "filmmaker questions" about what the audience would see during the film—not because he was skeptical of their claims of

"rampant election fraud." Pl. MSJ Ex. 14 at 64:9-25. The cited evidence also does

not support the contention that Mr. D'Souza had no interest in producing a film

concerning "rampant election fraud" before TTV approached him with their

claims. Again, the full testimony of the cited excerpts undermine this statement—

Mr. D'Souza testified that he was "very intrigued" by "widespread ruminations

about election fraud in a variety of angles," and found claims of election fraud a

sufficiently interesting topic for a film. *Id.* at 74:15-76:17. He also described the

topic of election fraud as "in the air," saying that "[l]ots of people were talking

about it" and that his wife, Ms. D'Souza, was interested in learning more about

TTV's claims before he agreed to take the initial meeting with TTV Defendants in

the summer of 2021. *Id.* at 62:7-21.

199.   Mr. D'Souza facilitated a meeting with Salem for the main purpose of

seeing if Mr. Phillips' methodology and conclusions could hold up against a "free

for-all" critique of a room full of lawyers, CEOs, and media professionals. Dkt.

250- 16 (Dinesh D'Souza Dep.) at 77:10-20.

**Plaintiff's Response:** Plaintiff objects to the statement that Mr. D'Souza set

up the meeting between TTV Defendants and Salem Media "for the main purpose

of seeing if Mr. Phillips' methodology and conclusions could hold up against a

'free for-all' critique" as not supported by the evidence. Cited testimony does not

support the contention that Mr. D'Souza did anything to vet TTV's data or

methodology. The "room full of lawyers, CEOs, and media professionals" on the Salem Media team was not in a position to evaluate the data or analytics provided by TTV, as their expertise is in media, not data analysis, and they did not consider it their responsibility to "fact check" TTV's presentation, leaving that responsibility to Mr. D'Souza. *See* Response to ¶ 175 *supra*. Additionally, Mr. D'Souza's full testimony of the cited excerpts shows that part of his goal in setting up the meeting was to "persuade Salem . . . [that] this is something that you would like to pursue," Pl. MSJ Ex. 14 at 77:21-78:1, undermining the statement that the "main purpose" of the meeting was to pressure-test TTV's claims.

200.   Once filming began, Mr. D'Souza continued to subject the premise of the film to scrutiny, inviting panelists to comment on the data in real time, and choosing the format of a "freewheeling" interview with "informal, unrehearsed answers" without notes and without a script. Dkt. 250-16 (Dinesh D'Souza Dep.) at 114:5-24.

**Plaintiff's Response:** Plaintiff objects to the statement that "Mr. D'Souza continued to subject the premise of the film to scrutiny" once filming began as not supported by the evidence. Though it is undisputed that Mr. D'Souza filmed unscripted interviews with Ms. Engelbrecht and Mr. Phillips for inclusion in the movie, Mr. D'Souza's full testimony of the cited excerpts contradict this contention that this was in an effort to subject their claims to scrutiny. Mr.

D'Souza testified that this decision was made from a filmmaking perspective ("[K]eeping the film in mind, I wanted unrehearsed reactions, both from Catherine and Gregg and from the Salem hosts . . . I wanted to capture expressions of surprise, disbelief, what the heck?") in a calculated effort to lend the film an air of a serious journalistic project Defendants were approaching "not uncritically." Pl. MSJ Ex. 14 at 115:5-17. Mr. D'Souza also testified that D'Souza Defendants don't script their films generally, further undermining the contention that the interview format was chosen with the intention of applying pressure to TTV Defendants' claims. *Id.* at 111:21-23.

201. When Mr. D'Souza learned about an illegal ballot trafficking case orchestrated by Republicans, he included it in the film "to emphasize that this was not a kind of a mere partisan type of film; that there may have been partisan implications, but on the other hand, there was – there had been Republican ballot trafficking." Dkt. 250-16 (Dinesh D'Souza Dep.) at 131:21-130:19.

**Plaintiff's Response:** Plaintiff objects to this statement because it is immaterial to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308.

202. David Cross, a Gwinnett County citizen activist, conducted his own independent election integrity research, including open records requests for drop

box surveillance video. Dkt. 250-16 (Dinesh D'Souza Dep.) at 33:3–8; Dkt. 250-17 (Debbie D'Souza Dep.) at 139:24–140:3; Dkt. 271-23 (D'Souza Ex. 39 (November 11, 2024 Declaration of David Cross)) at ¶¶ 3–10.

**Plaintiff's Response:** Plaintiff objects to this statement as not supported by record evidence and is contradicted by ¶ 214 *infra* ("the [David Cross] complaint against Mr. Andrews specifically referenced True the Vote's research and the use of geotracking to identify voter fraud based on cell phone pings").

203.   Seeing TTV's appearance on the Charlie Kirk show, Mr. Cross became concerned by the allegations because he recognized the drop box shown during the interview as the same drop box he had seen in footage that he had previously acquired through open records requests. Dkt. 271-23 (D'Souza Ex. 39 (November 11, 2024 Declaration of David Cross)) at ¶¶ 8–10, 17, 19.

**Plaintiff's Response:** No objection.

204.   Mr. Cross was able to locate in his own possession the same footage of Mr. Andrews that was depicted in the interview, and he filed a complaint with the Georgia State Elections Board ("SEB") on April 25, 2022, to seek an investigation. Dkt. 271-23 (D'Souza Ex. 39 (November 11, 2024 Declaration of David Cross)) at ¶¶ 20–22, 24; Dkt.271-24 (D'Souza Ex. 40 (TTV_008231–84)) at TTV_008233–37, TTV_008254–57, TTV_008272–75; Dkt. 271-25 (D'Souza Ex. 41 (TTV_010051– 91)) at TTV_010059.

**Plaintiff's Response:** No objection.

205.    Mr. Cross's complaint, relying on his own, *independently-obtained*
Gwinnett County surveillance footage, included the license plate number of Mr.
Andrews' SUV, through which the SOS was able to identify Mr. Andrews as the
vehicle's owner. Dkt.271-24 (D'Souza Ex. 40 (TTV_008231–84) at TTV_008233,
TTV_008239.

**Plaintiff's Response:** Plaintiff objects to this statement as not supported by
record evidence. On the contrary, the cited evidence and Mr. Cross' declaration
state that his complaint relied on assertions by Ms. Englebrecht and Mr. Phillips
that they had geotracked the person in the unblurred footage as going to more than
one Dropbox and from that footage Plaintiff was identified as the vehicle's owner.
*See also* ¶ 214 *infra* ("the complaint against Mr. Andrews specifically referenced
True the Vote's research").

206.    The SEB began its investigation on May 2, 2022, before the May 4,
2022 premier of the *2000 Mules* film. Dkt. 271-19 (D'Souza Ex. 35) at
TTV_007440 (invitation dating the premier of the Film as May 4, 2022); Dkt.271-
24 (D'Souza Ex. 40 (TTV_008231–84) at TTV_008231 (indicating that the
investigation of Mr. Andrews was opened and assigned on May 2, 2022),
TTV_008239 (indicating Investigator DeWeese met with Mr. Andrews in Mr.
Andrews home on May 2, 2022).

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308.

207.    While the news reporting on the exoneration made numerous references to *2000 Mules,* there was no actual claim that the exonerated individual was in the film. *See, generally,* Dkt. 259-8 (Andrews Ex. 58).

**Plaintiff's Response:** Plaintiff objects to this statement as not supported by the cited evidence. In fact, the very document cited as evidence explicitly contains this claim, including in its opening sentence, "Surveillance video showed a man pull up in a white SUV and insert five absentee ballots into a Gwinnett County drop box, leading to allegations of 'ballot harvesting' promoted by the movie '2000 Mules,'" and again later in the article: "So far, Georgia election investigators have debunked the movie's allegations, which conservative filmmaker Dinesh D'Souza used to assert that the 2020 presidential election was stolen from Republican Donald Trump. One of the videos reviewed by the State Election Board was featured in '2000 Mules' and on *Tucker Carlson Tonight* on Fox News." Pl. MSJ Ex. 58.

208.    While Mr. D'Souza appreciated that the investigation *might* somehow be connected to the film, it never occurred to him that the investigation related to

the same surveillance footage that was included in the film because the film had

only been released a few days prior, and all of the footage included in the film had

been blurred to render the mules completely unrecognizable:

> A. Let's remember the movie is a few days old.
>
> Q. Right.
>
> A. So the idea that there is a movie that just came out, like, last Tuesday and somehow there is some sort of case before the election commission, quote, coming out of the movie based upon images that are unrecognizable and completely blurred struck me as sort of preposterous.
>
> Dkt. 250-16 (Dinesh D'Souza Dep.) at 263:16-25.

**Plaintiff's Response:** Plaintiff objects to this statement as not supported by

cited evidence. The cited testimony demonstrates that Mr. D'Souza obviously

considered a connection between the investigation and the film (it allegedly "struck

[him] as sort of preposterous"), which contradicts the allegation that it "never

occurred to him."

209.   Mr. D'Souza and his team had never filed any complaints with the

SEB. Dkt. 250-16 (Dinesh D'Souza Dep.) at 262:9–12.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not

material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not

cite this statement in the Legal Argument section of their Response Brief. ECF 308.

210.    When Mr. D'Souza became aware of the investigation, his immediate thought was, "This is not what I would call an investigation," because the state had done no more than the "irresponsible bare minimum." Dkt. 250-16 (Dinesh D'Souza Dep.) at 260:5–7, 262:17–24.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308. Plaintiff further objects to the characterization of Mr. D'Souza's "immediate" thought as not supported by the evidence. Cited deposition testimony from Mr. D'Souza represents his post-hoc characterization of his recollection, and does not use the word "immediate."

211.    Mr. D'Souza found the state's effort to be wholly perfunctory, an investigation of a single incident, not "an investigation of the phenomenon that is very seriously presented in the movie." Dkt. 250-16 (Dinesh D'Souza Dep.) at 260:22–261:13, 262:19–21.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not

cite this statement in the Legal Argument section of their Response Brief. ECF
308.

212.   Even prior to this investigation, Mr. D'Souza had already been
suspicious of Secretary Raffensperger's motives because Mr. D'Souza believed
that Mr. Raffensperger enabled the ballot trafficking in the first place by entering
into a consent decree that weakened ballot signature-matching requirements. Dkt.
268-10 (D'Souza Ex. 8, pt. 2) at DDR-00060790–91; Dkt. 273-3 (D'Souza Ex. 48)
at DDR 00052129.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not
material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not
cite this statement in the Legal Argument section of their Response Brief. ECF
308. Plaintiff further objects to this statement as not supported by the cited
evidence. Although Mr. D'Souza noted the consent decree and his belief that it
"weaken[ed] the signature matching requirements" in the cited testimony, he did
not state that this belief made him suspicious of Secretary Raffensberger.
Similarly, the cited e-mail is dated April 29, 2022 and contains D'Souza's
statement that Raffensberger "is very weak" and that he "caved into Stacy Abrams
. . . which led to the chaos last November." D'Souza MSJ Ex. 48. Neither of these
statements supports D'Souza's claim that he was "suspicious of Secretary

Raffensberger's motives," nor do they connect his alleged suspicion to the validity of the SEB investigation.

213.   The SOS investigated Mr. Andrews by interviewing him once, during which he asserted that he had only dropped off ballots of his household. Dkt.271-24 (D'Souza Ex. 40 (TTV_008231–84) at TTV_008239, TTV_008246–51.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308. Plaintiff further objects to this statement as not supported by the cited evidence. As demonstrated by the cited evidence, the investigation is far more extensive than Defendant's characterization. The investigator researched the SUV vehicle registration and Plaintiff's address, locating five registered voters living in the home; he confirmed the names were those of Plaintiff's family members. The investigator confirmed that five absentee ballots were placed in the dropoff box on October 6, 2020 and marked as received the same day. The investigator then met with Plaintiff at his home and interviewed him; Plaintiff completed a voluntary statement form. The investigator confirmed various pieces of information and determined no violation of Georgia Election Code occurred.

214.   Even though the complaint against Mr. Andrews specifically referenced True the Vote's research and the use of geotracking to identify voter

fraud based on cell phone pings, the investigator made no attempt to collect geospatial evidence, let alone perform geospatial analysis, nor did he seek assistance or resources necessary to do so. Dkt.271-24 (D'Souza Ex. 40 (TTV_008231–84) at TTV_008233, TTV_008239.

**Plaintiff's Response:** Plaintiff objects to this statement because it is not material to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308. No objection that David Cross' complaint mentions "A private organization, True the Vote, purchased billions of cell phone 'pings' and they have identified this individual by tracking his cell phone pings to multiple ballot drop boxes." Pl. MSJ Ex. 46. Record evidence has shown this allegation to be entirely false, as Mr. D'Souza himself finally admitted after months of litigation. No objection that the investigator did not attempt to collect this purported (but non-existent) evidence, which would have been a waste of his time.

215.    Secretary Raffensperger was under pressure from within his own party for the perceived failure to root out fraud. Dkt. 273-4 (D'Souza Ex. 49 (MA 0001646–49)) at MA-0001647.

**Plaintiff's Response:** Plaintiff objects to this statement as not supported by the cited evidence. Plaintiff further objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion.

216.   Republican senatorial candidates Kelly Loeffler and David Perdue both called for Secretary Raffensperger's resignation for "fail[ing] to deliver honest and transparent elections," and Donald Trump declared Secretary Raffensperger "an enemy of the people." Dkt. 273-4 (D'Souza Ex. 49 (MA-0001646–49)) at MA 0001647; Dkt. 273-5 (D'Souza Ex. 50 (PDSA-0002388)).

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion.

217.   Mr. D'Souza testified that he did not understand what Mr. Phillips meant at all by his text message, that Mr. D'Souza wasn't even trying to understand it, and that his response to it was "rhetorically polite" but "not going into the meat of it." Dkt. 250-16 (Dinesh D'Souza Dep.) at 272:23-273:1.

**Plaintiff's Response:** Plaintiff objects to this statement as it does not specify which text message is being referred to. In all events, the cited testimony from Mr. D'Souza does not support the contention that he "did not understand what Mr. Phillips meant" or that he "wasn't trying to understand it." The cited portion reads, "Yeah, this is–this is my rhetorically polite way of acknowledging what he's saying, but not–not going into the meat of it, if you know what I mean." Pl. MSJ Ex. 14 at 272:23-273:1.

218.   Throughout discovery, Mr. Andrews has been unable to identify a single person that identified him from *2000 Mules* or any related media without

first being told of Mr. Andrews' appearance in the film, such that they already knew he appeared in the film and were actively looking for him. Dkt. 252-12 (Andrews Ex. 37 (Mark Andrews Dep.) at 96:2–7; Dkt. 273-16 (D'Souza Ex. 60.1 (Plaintiff Mark Andrews' Second Supplemental Responses and Objections to Defendant Catherine Engelbrecht's First Set of Interrogatories to Plaintiff)), p. 3 ("Plaintiff is not presently aware of the individuals who identified him based **solely** on what he or she saw in the film 2000 Mules **without** being told or being otherwise aware that Plaintiff's image appears in the film."(emphasis reproduced from original)).

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion. As D'Souza Defendants acknowledge, those individuals did recognize Mr. Andrews when viewing the Film.

219.   Mr. Andrews is only shown in a single clip for 8 seconds of the film's 1.5 hour run time, and during that time, both his face and the license plate of his car are blurred and visually small, and he is wearing a face mask. Dkt. 246 Ex. 9 (*2000 Mules* film (DDR-00059987)) at 00:47:58–00:48:06; Dkt. 246 Ex. 9I (00:47:47– 00:48:15 of DDR-00059987).

**Plaintiff's Response:** To the extent the Statement purports to describe aspects of Plaintiff's appearance in the Film only and no other defamatory statements raised in Plaintiff's Motion, no objection.

220.   Mr. Andrews was also unable to identify anyone who had called, texted, e-mailed, or mailed him about *2000 Mules* or any related interviews other than two reporters. Dkt. 273-15 (D'Souza Ex. 60 (Mark Andrews Dep.)) at 65:11–14, 125:12– 25.

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion. In all events, as D'Souza Defendants acknowledge, two reporters did attempt to contact him about the Film.

221.   Mr. Andrews did not return their calls, and neither reporter ever authored a news article mentioning Mr. Andrews by name, and in fact no news article written by anyone referenced Mr. Andrews by name prior to the filing of this lawsuit. Dkt. 271-29 (D'Souza Ex. 45 (MA-0000027, MA-0000038, MA-0000078, MA-0000089)); Dkt. 273-1 (D'Souza Ex. 46 (MA-0001562–69)); Dkt. 273-2 (D'Souza Ex. 47 (Plaintiff Mark Andrews' First Supplemental Response and Objections to Defendant Dinesh D'Souza's First Requests for Admission to Plaintiff)), pp. 4-5 (Plaintiff admitting that he is not aware of any news report published prior to the filing of this lawsuit that identified him by name in response to Plaintiff's Request for Admission No. 4).

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308.

222.   There is nothing in record indicating that these reporters identified Mr. Andrews from the movie; rather, they identified him from his own affidavit filed as part of the investigation launched by David Cross. Dkt. 252-12 (Mark Andrews Dep.) at 64:11-16; *see also id.* at 65:7-16 ("My name, again, was known at the Georgia Bureau of Investigation, election investigation. I filed an affidavit. I signed it. That's how [the reporter] reached out to me via my text phone.").

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308. Additionally, Defendants' own facts reflect that the reporter *did* identify Mr. Andrews from the Film, as her text message referenced "2k mules" and was sent before Mr. Andrews' name was made public through the SEB investigation. *See* TTV SUMF ¶¶ 63, 67-68.

223.   Neither Mr. Andrews nor his coworkers were able to identify a single person who thought less of him due to 2000 Mules or the associated interviews. Dkt. 273-15 (D'Souza Ex. 60 (Mark Andrews Dep.)) at 47:21–49:7; Dkt. 273-17 (D'Souza Ex. 61 (Deposition of Bob Varngadoe)) at 15:11–18, 17:18–22; Dkt. 273- 18 (D'Souza Ex. 62 (Deposition of Kelly Moyer)) at 18:19–19:1, 20:13–19, 22:14– 16, 23:4–10, 28:23–25; Dkt. 273-19 (D'Souza Ex. 63 (Deposition of Nive Loganathan)) at 18:22–19:15, 30:12–22, 37:18–35; Dkt. 273-20 (D'Souza Ex. 64

(Deposition of Brian Beasley)) at 21:5–22:4, 24:5–7; Dkt. 273-21 (D'Souza Ex. 65 (Deposition of William Smith)) at 14:24–15:9; Dkt. 273-22 (D'Souza Ex. 66 (Deposition of Kelly B. Coveleskie)) at 22:20–23:18.

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion.

224.    To the extent he stopped voting in person, the change in voting habits started in 2020, well before the premier of 2000 Mules, and was due to Covid which he and his family still viewed as a threat. Dkt. 273-15 (D'Souza Ex. 60 (Mark Andrews Dep.)) at 143:11–15, 143:20–22; D'Souza Ex. 69 (B. Andrews Social Media Posts) (submitted herewith) at, *e.g.*, BA-0000229 (Ms. Andrews indicating that Covid was "[t]he only reason" Plaintiff stopped voting in person); BA-0000363 (Ms. Andrews noting that "Covid is on the rise" in an August 24, 2023 Tweet); BA 0000399 (Ms. Andrews alleging that "[e]ach time a person has Covid, it weakens their immune system" and noting that people are not immune from previous infections because the virus continues to mutate); BA-0000656 (Ms. Andrews alleging that Covid kills thousands of people very week in a November 4, 2023 Tweet); BA-0000700 (Ms. Andrews authoring multiple November 11, 2023 Tweets about the ongoing risks presented by Covid); BA-0001726-27 (Ms. Andrews commenting that people do not want to wear masks until they get long Covid in June 8, 2024 Tweet); BA-0001918 (Ms. Andrews identifying Covid and

Mpox as reasons not to stand in line to vote in August 26, 2024 Tweet); BA-0001935 (Ms. Andrews alleging that the U.S. faced an "Unprecedented COVID-19 Surge with 1.2 Million New Cases Daily" in August 27, 2024 Tweet).

**Plaintiff's Response:** Plaintiff objects to this statement as not supported by record evidence. Mr. Andrews' testimony speaks directly to this issue: "Q: And is there any other reasons [besides COVID] why you changed your voting habit and stopped voting in person in 2020? A: I – 2020 it was because of COVID. After 2020, it's because of this mule movie and me being in it." Pl. MSJ Ex. 37 at 143:20-23.

225.   Mr. Andrews did not stop voting after discovering 2000 Mules, nor had anyone ever intimidated or threatened him for voting. Dkt. 273-15 (D'Souza Ex. 60 (Mark Andrews Dep.)) at 56:7–10, 57:18–25, 144:19–23.

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308.

226.   Mr. Andrews admitted that no one had ever put him in harm's way due to the movie or promotion of it. Dkt. 273-15 (D'Souza Ex. 60 (Mark Andrews Dep.)) at 126:19–21.

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308.

227.   In regards to pursuing potential employment, Mr. Andrews has applied for numerous jobs and testified that "if opportunities present themselves . . . [he] would entertain them." Dkt. 252-19 (Brendetta Andrews Dep.) at 83:20-84:4, 84:8- 11; Dkt. 252-12 (Mark Andrews Dep.) at 44:6-9, 44:13-21, 47:17-20.

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308.

228.   Ms. Andrews changed her X/Twitter account name to "Godfightbattles" to hide her ties to Mr. Andrews and posted tens of thousands of messages pertaining to 2000 Mules from at least July 2022 through August 2024, which regularly copied Defendants (@DineshDSouza, @TrueTheVote, and @SalemMediaGrp) and various public figures (@KariLake, @elonmusk, @BrianKempGA, @TuckerCarlson, etc.) to spread publicity and foster public discourse related to *2000 Mules*. *See, generally,* D'Souza Ex. 69 (B. Andrews Social Media Posts);[3] Dkt. 252-19 (Brendetta Andrews Dep.) at 21:10-11, 22:11-16.

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308.

229.    Ms. Andrews even encouraged strangers to buy a copy of 2000 Mules on numerous occasions:

**Godfightbattles**
05/10/2023 11:58:31 PM
@LadyRedWave @gonofurther https://t.co/6ZfSfiEoke go get a copy more money for them

**Godfightbattles**
05/10/2023 11:59:54 PM
@Littletrae64 @gonofurther Go buy a copy https://t.co/KDXSQQGQi7

**Godfightbattles**
05/11/2023 11:56:34 PM
@sfricchione @JamesBradleyCA https://t.co/6ZfSfiEoke scam but go buy it - more money for @TrueTheVote

D'Souza Ex. 69 (B. Andrews Social Media Posts), *e.g.*, BA-0000223, BA-0000225.

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308.

230.    Ms. Andrews regularly made posts that would assist a would-be assailant in identifying and locating her family, including posting her husband's name hundreds of times (*see* D'Souza Ex. 69 (B. Andrews Social Media Posts), *e.g.*, BA-0000165-68, BA-0000181, BA-0000183-84, BA-0000187, BA-0000202,

BA 0000275, BA-0000280, BA-0000364-68, BA-0000620, BA-0000672, BA 0001485-88, BA-0001524, BA-0001528-39, BA-0001547-50, BA-0001580-85, BA-0001587-88, BA-0001647, BA-0001656-57, BA-0001668-79, BA-0001682, BA-0001697), indicating that Mr. Andrews lives in Gwinnett County (see *id.*, e.g., BA-0000126, BA-0000397, BA-0000780, BA-0001920), providing information about Plaintiff's employment, including that he is "an Executive who specializes in information security" (*id.* at BA-0000464), insisting that her husband was identifiable in the Film and noting details that could be used to identify him, such as his car, the placement of stickers on his car, and Mr. Andrews's glasses as a "defining characteristic," (see *id.* at, *e.g.*, BA-0000241, BA-0000262, BA-0001123, BA-0001125, BA-0001244).

> **Godfightbattles**
> 03/12/2024 03:02:47 PM
> RT @PootDibou: ■ THE CHARLIE KIRK SHOW Complaint: Salem Media produced The Charlie Kirk Show which unblurred footage of Mark Andrews votin...

> **Godfightbattles**
> 09/29/2023 12:15:42 AM
> @CryptoNinjaco @PootDibou @QuispMe That was the point right @DineshDSouza @truethevote But you chose the one black guy who is an Executive who specializes in information security

> **Godfightbattles**
> 10/19/2023 04:01:28 AM
> RT @0203Willow: @TrueTheVote Have you ver ver been able to show how Mark Andrews met your basic patterns of life and metrics of multiple d...

*Id.* at BA-0000464, BA-0000620, BA-0001485.

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308.

231.   Ms. Andrews frequently posts that her husband will refuse to settle and that she expects he will receive substantial punitive damages (D'Souza Ex. 69 (B. Andrews Social Media Posts) *e.g.*, BA-0000167, BA-0000202, BA-0000702, BA 0000853, BA-0001204, BA-0001263, BA-0001685, BA-0001687).

**Godfightbattles**
04/21/2023 08:23:19 PM
@jongavin021 @DineshDSouza THERE WILL BE NO SETTLEMENT WITH @DineshDSouza

**Godfightbattles**
06/04/2024 01:18:38 AM
@salvor_x @archt67 @7Veritas4 PUNITIVE DAMAGES ARE A HELL OF A THING - ASK RUDY G

**Godfightbattles**
12/14/2023 09:26:29 PM
@TxCowboy64 @GoshDamIt15 @mmpadellan That is exactly why they deserve 50 million plus another 100 million for punitive damages- you and people like you

*Id.* at BA-0000167, BA-0000910, BA-0001685.

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion. Notably, Defendants do not cite this statement in the Legal Argument section of their Response Brief. ECF 308.

232.   On April 8, 2022, before the release of the Film, talk show host Charlie Kirk aired an interview with Mr. Phillips and Ms. Engelbrecht. Dkt. 268-3

(D'Souza Ex. 2 (Phillips Dep.)) at 87:18–22, 270:9–15; Dkt. 271-6 (D'Souza Ex. 25 (MA 0000479–82)) at MA-0000479; Dkt. 271-7 (D'Souza Ex. 26 (MA-0000550–53)) at MA-0000550.

**Plaintiff's Response:** No objection.

233.   During the interview, no reference was made to 2000 Mules. Dkt. 268- 8 (Ex. 7 (Debbie D'Souza Dep.)) at 204:17–25. *See, generally,* Dkt. 246 Ex. 28 (Charlie Kirk interview).

**Plaintiff's Response:** Plaintiff objects to this statement as not supported by the cited evidence. Charlie Kirk explicitly named *2000 Mules* at the start of the cited interview. Pl. MSJ Ex. 97 at 1:29. Ms. Engelbrecht and Mr. Phillips went on to have an in-depth discussion of "mules," including footage of Mr. Andrews that is featured in the Film, who they claim is one of their profiled 2000 mules. Mr. Phillips then later explained that they found "2000 plus mules, hence the 2000 Mules movie," *id.* at 36:53, and then again mentions a specific part of the movie, *id.* at 41:50.

234.   Mr. Phillips and Ms. Engelbrecht only appeared on the show to promote TTV's research. Dkt. 268-2 (D'Souza Ex. 1 (Engelbrecht Dep.)) at 294:19–295:1; Dkt. 268-3 (D'Souza Ex. 2 (Phillips Dep.)) at 87:18–22. *See, generally,* Dkt. 246 Ex. 28 (Charlie Kirk interview).

**Plaintiff's Response:** Plaintiff objects to this statement as their purported motive was immaterial to the Court's resolution of Plaintiff's Motion. Plaintiff additionally objects to this statement as it is not supported by the record. *See* Response to ¶ 233 *supra*.

235.   Mr. and Ms. D'Souza did not consent to the interview, and only became aware of the interview after it had occurred. Dkt. 268-7 (D'Souza Ex. 6 (Dinesh D'Souza Dep.)) at 205:21–206:23, 217:11–218:6; Dkt. 268-22 (D'Souza Ex. 16 (DDR-00046930–37)) at DDR-00046932–33; Dkt. 271-8 (D'Souza Ex. 27 (DD 000469–512 (February 29, 2024 Declaration of Patricia Jackson))) at DD-000473, ¶18; Dkt. 271-10 (D'Souza Ex. 29 (DDR-00055834–37)) at DDR-00055836.

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion. Plaintiff additionally objects to this statement as it is not supported by the record, which shows Mr. D'Souza was aware of the interview prior to it being aired and said that it was "no problem." Pl. MSJ Ex. 130 at DD_000103. As the cited evidence demonstrates, it was neither in the parties' contract nor their practice to provide advance notice of all interviews or promotional activities, nor is there any evidence that the D'Souzas were asked at any time to "consent" to all or any interviews. D'Souza MSJ Ex. 27 at DD_000471, DD_000499 (Declaration of Patricia Jackson).

236.   Two days after the 2000 Mules film premiered at Mar-a-Lago, Ms. Engelbrecht appeared on Tucker Carlson's show. *See, generally,* Dkt. 246 Ex. 38 (Tucker Carlson interview).

**Plaintiff's Response:** No objection, although Plaintiff notes that the interview was the day after the Mar-a-Lago premier.

237.   The Tucker Carlson interview was coordinated without involving the D'Souzas or their publicist, Patricia Jackson. Dkt. 268-2 (D'Souza Ex. 1 (Engelbrecht Dep.)) at 277:25–278:9; Dkt. 271-8 (D'Souza Ex. 27 (DD-000469– 512 (February 29, 2024 Declaration of Patricia Jackson))) at DD_000472, ¶14.

**Plaintiff's Response:** Plaintiff objects to this statement as immaterial to the Court's resolution of Plaintiff's Motion.

238.   During the interview, Ms. Engelbrecht never mentioned Film. Dkt. 268-2 (D'Souza Ex. 1 (Engelbrecht Dep.)) at 278:10–21; Dkt. 268-7 (D'Souza Ex. 6 (Dinesh D'Souza Dep.)) at 222:16–223:3, 223:8–12, 224:6–11, 225:23– 227:9; Dkt. 271-19 (D'Souza Ex. 35 (TTV_007439–41 (Engelbrecht Dep. Ex. 59))) at TTV_007440; Dkt. 271-20 (D'Souza Ex. 36 (DDR-00014532)).

**Plaintiff's Response:** While it true that during the interview, Ms. Engelbrecht did not say "2000 Mules," Plaintiff objects to this statement to the extent that D'Souza Defendants intend it to support any contention that Ms. Engelbrecht's interview was unrelated to the Film and its promotion. Indeed,

record evidence shows that Mr. D'Souza referred to the interview as "good exposure for the cause." Pl. MSJ Ex. 86.

239.   D'Souza Media and Salem Media Group, Inc. executed a licensing and nondisclosure agreement with TTV, with an effective date of December 3, 2021, relating to the footage in TTV's possession that purportedly contained evidence of voting irregularities occurring in the 2020 election. Dkt. 268-22 (D'Souza Ex. 16 (DDR-00046930–37)).

**Plaintiff's Response:** No objection.

240.   The agreement expressly prohibited TTV and its representatives from disclosing the surveillance film or its contents to anyone prior to the public release of the film. Dkt. 268-22 (D'Souza Ex. 16 (DDR-00046930–37)) at DDR-00046932– 33.

**Plaintiff's Response:** No objection.

241.   In early April 2022, Ms. Engelbrecht or Mr. Phillips reached out to Charlie Kirk to tell him they would be in town and to see if he wanted to get together for coffee, and Mr. Kirk subsequently offered for both of them to come on his show, which they accepted. Dkt. 279-4 (Engelbrecht Decl.), ¶ 64; Dkt. 279-10 (Phillips Decl.), ¶ 63.

**Plaintiff's Response:** No objection.

242.    Ms. Engelbrecht appeared on Tucker Carlson after producers reached out to her individually to set up the interview, and with no involvement of Mr. D'Souza or his team. Dkt. 279-4 (Engelbrecht Decl.), ¶ 74.

**Plaintiff's Response:** Plaintiff objects to this statement because it is immaterial to the Court's resolution of Plaintiff's Motion.

243.    During the interview, unblurred footage of Mr. Andrews was once again shown, and, again this footage did not originate from the D'Souzas or D'Souza Media. Dkt. 246 (D'Souza Ex. 38 (Tucker Carlson interview)) at 00:00:45– 00:01:11; Dkt. 246 (D'Souza Ex. 38B (00:00:43–00:01:12 of Ex. 38)).

244.    **Plaintiff's Response:** While it is not disputed that during the interview, unblurred footage of Mr. Andrews was once again shown, Plaintiff objects to the statement that "this footage did not originate from the D'Souzas or D'Souza Media" as immaterial to the Court's resolution of Plaintiff's Motion.

245.    The footage used by Tucker Carlson was in a small box, such that the actual image of Mr. Andrews is extraordinarily small, rendering Mr. Andrews no more recognizable than he would have been if he had been blurred:



Dkt. 246 (Ex. 38 (Tucker Carlson interview) at 00:01:10).

**Plaintiff's Response:** Plaintiff objects to this statement as an expression of an opinion, not a statement of fact.

246.   Ms. Engelbrecht did not mention the Film on the *Tucker Carlson Tonight* program. Dkt. 279-4 (Engelbrecht Decl.), ¶ 75.

**Plaintiff's Response:** While it is not disputed that during the interview, Ms. Engelbrecht did not say "2000 Mules," Plaintiff objects to this statement to the extent that D'Souza Defendants' intend it to support any contention that Ms. Engelbrecht's interview was unrelated to the Film and its promotion. In contrast, record evidence shows that Mr. D'Souza referred to the interview as "good exposure for the cause." Pl. MSJ Ex. 86.

247.   Accordingly, on January 7, 2022, D'Souza Media and Salem Media Group, Inc. executed a licensing and nondisclosure agreement with TTV, with an

effective date of December 3, 2021, relating to the footage in TTV's possession that purportedly contained evidence of voting irregularities occurring in the 2020 election. Dkt. 268-22 (Ex. 16 (DDR-00046930–37)).

**Plaintiff's Response:** Objection on the grounds that the use of the word "Accordingly" renders the statement ambiguous. Otherwise, it is not disputed that TTV, D'Souza Media, and Salem Media entered into an agreement which is found at Pl. MSJ Ex. 17 and the terms of which speak for themselves.

248.   As part of the production process of the film, the TTV Defendants and the D'Souza Defendants came to an explicit agreement to use only blurred images of the dropbox users, which was largely the result of efforts advanced by Ms. Engelbrecht. Dkt. 250-16 (Ex. 14 (Dinesh D'Souza Dep.)) at 127:2-128:16; Dkt. 250-24 (Ex. 22 (Schooley Dep.)) at 88:4-12 (stating Engelbrecht was one of individuals "obsessed with not identifying anybody.").

**Plaintiff's Response:** No objection.

249.   The reporters who reached out to Mr. Andrews identified him from his own affidavit filed as part of the SOS investigation, not from the Film. Dkt. 252-12 (Andrews Ex. 37 (Mark Andrews Dep.)) at 64:11-16, 65:7-16 ("My name, again, was known at the Georgia Bureau of Investigation, election investigation. I filed an affidavit. I signed it. That's how [the reporter] reached out to me via my text phone.").

**Plaintiff's Response:** Plaintiff objects to this statement as not supported by evidence, because it seeks to communicate as a matter of fact that a reporter identified Plaintiff through his affidavit (as opposed to Plaintiff's guess as to how she identified Plaintiff). Defendants' own evidence indicates that this would not have been possible, as the reporter messaged Plaintiff before his affidavit had been made public by the Georgia investigators. *See* TTV SUMF ¶¶ 63, 67, 68.

250.   The geospatial analysis required 12 analysist to work on the data for 16 hours per day for 15 months. Dkt 261-22 (Charlie Kirk video 13:25-13:35).

**Plaintiff's Response:** Plaintiff objects to this statement because it is not supported by the record. In fact, the record evidence is that only two employees from Red Metrics worked on the geospatial analysis portion of the project and there is no evidence that they worked 16 hours per day for 15 months. Pl. MSJ Ex. 183 at 35:25-36:7, 39:16-22 (showing that Tim Gerwing and Azeddine Rahlouni were the only two Red Metrics employees assigned to the project, with two subcontractors hired temporarily, solely to review surveillance footage), 40:16-43:04 (estimating that Red Metrics' work with OpSec lasted approximately three to six months, during which time the "mid-sized project" would have taken up about five to 15 hours per week for the team). Mr. Phillips himself admitted that his statement to Charlie Kirk was an "estimate" based on his "understanding," as

he was "not personally involved" and could not remember the names of any contractors besides Red Metrics. Pl. MSJ Ex. 12 at 91:17-93:2.

251.   Once the decision was made to blur the mules, the team was "very careful and very diligent" about blurring potentially identifiable details because the team was "obsessed with not identifying anybody" and wanted to ensure that they did not "invade their privacy that way." Dkt. 250-17 (Debbie D'Souza Dep.) at 166:22–167:1, 167:13–15, Dkt. 250-24 (Schooley Dep.) at 88:8–9, 88:18.

**Plaintiff's Response:** Plaintiff objects to this statement because it is vague and ambiguous and not supported by the record, particularly with the respect to the reference to "the team." Notably, Mr. Schooley expressly testified that Mr. D'Souza "wasn't obsessed" with "not identifying anybody." Pl. MSJ Ex. 22 at 88:4-16.

252.   The D'Souza Defendants asserted that their statements were privilege in their Answer (Dkt. 111, p. 115) and in their Initial Disclosures (D'Souza Ex. 70 (D'Souza Defendants Initial Disclosures) (submitted herewith).

**Plaintiff's Response:** Plaintiff objects to this statement because it is immaterial to the Court's resolution of Plaintiff's Motion.

Respectfully submitted, this 28th day of March, 2025.

*/s/Lea Haber Kuck*
Lea Haber Kuck*
One Manhattan West
New York, NY 10001-8602
Tel: (212) 735-3000
lea.kuck@probonolaw.com

Von A. DuBose, Esq.
Georgia Bar No. 231451
DuBose Trial Law
128 Richardson St. SE
Atlanta, GA 30312
Tel: (404) 720-8111
von@dubosetrial.com

Sara Chimene-Weiss*
PROTECT DEMOCRACY PROJECT
7000 N. 16th Street, Suite 120, #430
Phoenix, AZ 85020
Tel: (202) 934-4237
sara.chimene-weiss@protectdemocracy.org

Rachel E. Goodman*
John Paredes*
PROTECT DEMOCRACY PROJECT
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
rachel.goodman@protectdemocracy.org
john.parades@protectdemocracy.org

Jared Fletcher Davidson*

PROTECT DEMOCRACY PROJECT
3014 Dauphine Street, Suite J
New Orleans, LA 70117
Tel: (202) 579-4582
jared.davidson@protectdemocracy.org

Jane Bentrott*
Catherine Chen*
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Tel: 202-843-3092
jane.bentrott@protectdemocracy.org
catherine.chen@protectdemocracy.org

Quinn Balliett*
Scott Boisvert*
Sonia Qin*
Danuta Egle*
One Manhattan West
New York, NY 10001-8602
Tel: (212) 735-3000
quinn.balliett@probonolaw.com
scott.boisvert@probonolaw.com
sonia.qin@probonolaw.com
danuta.egle@probonolaw.com

Rajiv Madan*
Paige Braddy*
1440 New York Avenue NW
Washington, DC 20005
Tel: (202) 371-7000
raj.madan@probonolaw.com
paige.braddy@probonolaw.com

Vernon Thomas*
Lindsey Sieling*
155 N. Wacker Drive
Chicago, IL 60606-1720
Tel: (312) 407-0648
vernon.thomas@probonolaw.com
lindsey.sieling@probonolaw.com

*Counsel for Plaintiff*
*Admitted Pro Hac Vice*

## <u>RULE 7.1(D) CERTIFICATE</u>

The undersigned counsel certifies that Plaintiffs' Response To Defendants

Dinesh D'Souza and D'Souza Media LLC's Statement of Undisputed Material

Facts was prepared double-spaced using Times New Roman font (14 point), in

compliance with Local Rule 5.1.C.

Dated: March 28, 2025                          */s/Lea Haber Kuck*
                                               Lea Haber Kuck*
                                               One Manhattan West
                                               New York, NY 10001-8602
                                               Tel: (212) 735-3000
                                               lea.kuck@probonolaw.com

                                               *Counsel for Plaintiff*
                                               *Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of Plaintiffs'

Response To Defendants Dinesh D'Souza and D'Souza Media LLC's Statement of

Undisputed Material Facts was this day filed with the Clerk of Court using the

CM/ECF system, which will automatically send email notifications of such filing

to all counsel of record.

Dated: March 28, 2025

/s/ Lea Haber Kuck
Lea Haber Kuck*
One Manhattan West
New York, NY 10001-8602
Tel: (212) 735-3000
lea.kuck@probonolaw.com

*Counsel for Plaintiff*
*Admitted Pro Hac Vice*