1                    UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3

4    MARK ANDREWS                    )  Docket Number
                                     )  1:22-CV-4259-SDG
5                                    )
                                     )
6                v.                  )
                                     )
7                                    )  Atlanta, Georgia
                                     )  June 6, 2025
8    DINESH D'SOUZA, et al.          )
                                     )
9                                    )

10                    TRANSCRIPT OF MOTIONS
             BEFORE THE HONORABLE STEVEN D. GRIMBERG
11                 UNITED STATES DISTRICT JUDGE

12
     APPEARANCES OF COUNSEL:
13

14   For the Plaintiff:
                                          MR. VON DuBOSE
15                                        MS. LEA HABER-KUCK
                                          MR. SCOTT BOISVERT
16                                        MS. JANE BENTROTT
                                          MS. CATHERINE CHEN
17

18   For Dinesh D'Souza and              MS. AMANDA HYLAND
     D'Souza Media, LLC:                  MR. AUSTIN VINING
19                                        MR. CORY MULL

20
     For True the Vote, Inc.;            MR. JAMES EVANS
21   Catherine Engelbrect;                MR. PHILIP GEORGE
     and Gregg Phillips:
22

23   Official Court Reporter:       ALICIA B. BAGLEY, RMR, CRR

24
      Proceedings recorded by mechanical stenography, transcript produced
25                         by computer

<u>P R O C E E D I N G S</u>

(Atlanta, Fulton County, Georgia; June 6, 2025,

all parties present)

THE COURT:  All right.  Let me call the case.  This is

Andrews vs. D'Souza, et al.  Case Number 22-CV-4259.  Let's have

appearances of counsel beginning with the plaintiff.

MR. DuBOSE:  Von DuBose for Plaintiff Mark Andrews.  I

have here with me Lea Haber-Kuck and Scott Boisvert, Jane Bentrott,

and Cathleen Chen.  Pleasure to be here this morning.

THE COURT:  Good morning.  Good to see you all.

MR EVANS:  Good morning, Judge.  Jake Evans on behalf of

Ms. Englebrecht, True the Vote, and Mr. Phillips.  I'm joined by Phil

George.  Ms. Englebrecht is likewise here and Mr. Phillips is here and

we have two summer associates with us, as well.  Pleasure to be here.

THE COURT:  All right.  Good to see you.

MS. HYLAND:  Good morning, Judge Grimberg.  Amanda

Hyland here on behalf of Dinesh D'Souza and D'Souza Media, LLC.  I'm

joined by my colleagues Austin Vining and Cory Mull and Mr. D'Souza is

here as well this morning.

THE COURT:  Okay.  Great.  Good morning.  Good to see

you all.

We're here on oral argument on the parties' motions for

summary judgment.  I did review the briefings and they were excellent

so thank you very much for your hard work on those papers.  I'm

looking forward to argument.  I do have some questions and so I'm

```
 1   looking forward to it.

 2           We intended to place time limits on the argument and I

 3   think at the time we set the hearing I wasn't quite sure how long I

 4   thought we might need and then we never went back and set those.  But

 5   I still would like to have some parameters because knowing how lawyers

 6   are we would be here until 8:00 o'clock this evening if I didn't have

 7   time limits.  So have you all discussed that or the order of argument

 8   among yourselves?  If not, I'm happy to set the ground rules.

 9           MR EVANS:  Judge, on behalf of Defendants True the Vote

10   we have not.  As far as order, we would respectfully submit that

11   defendants, who were the primary movants here, go in order of filing.

12   Mr. D'Souza filed before True the Vote.  We would then go second and

13   then plaintiffs would go on their cross MSJ and then we would have an

14   opportunity to respond.  As far as timing, we would submit 45 minutes

15   to an hour per argument.

16           THE COURT:  Yeah.  Okay.  Well, here's my thought.  My

17   inclination is to have plaintiffs go first, if that's okay with you,

18   with 45 minutes then I would -- I think the issues, obviously, on

19   plaintiff's affirmative motion and the defendants' motions obviously

20   overlap, it's all the same claims we're talking about.  So, you know,

21   when you have your time addressing both your affirmative motion as

22   well as defense of theirs.

23           So 45 minutes for plaintiff and then 45 minutes for the TTV

24   defendants, 45 minutes for the D'Souza defendants.  I'm giving you all

25   each 45 minutes because I know that you're not exactly aligned here,
```

1    but hopefully there's some efficiency that you could save, Ms. Hyland,

2    in going second on that and then we'll go back around and I'll give

3    each party, set of parties, 15 minutes for rebuttal.  All right.  Is

4    that fair?

5                    MR EVANS:  Okay, Judge.

6                    THE COURT:  No breaks.  Just kidding.  We'll take some

7    breaks.

8                    Okay.  Luckily I don't have to decide these motions.  I've

9    arranged for a jury to be here to resolve that for you.  No.  These

10   are -- being summer season, we have interns here as well and, if it's

11   okay with you, they'll sit there so that they don't have to see the

12   backs of your heads the entire morning.

13                   All right.  So we have 45 minutes.  The clocks are up above

14   the jury box for you to reference.  Who would like to take this first

15   on behalf of plaintiff?

16                   MS. HABER-KUCK:  I will, Your Honor.

17                   THE COURT:  All right.

18                   MS. HABER-KUCK:  There's a lot of paper.

19                   THE COURT:  Indeed there is.

20                   MS. HABER-KUCK:  Good morning, Your Honor.

21                   THE COURT:  Good morning.

22                   MS. HABER-KUCK:  My name is Lea Haber-Kuck on behalf of

23   plaintiff Mark Andrews.

24                   I know the Court is familiar with this case from the

25   numerous discovery issues and there's been a lot of briefing on the

1    summary judgment motion so I won't spend a lot of time laying out the

2    background.

3           But despite all the paper this case is not that

4    complicated.  It is about defendants working together to publicly and

5    repeatedly spread the lie that plaintiff was part of a criminal

6    conspiracy to rig the 2020 election in order to further their own

7    commercial and political interests and now that they've been caught

8    trying to disclaim any responsibility by pointing their fingers at

9    each other.

10          With that in mind and recognizing that movant bears the

11   burden on a motion for summary judgment, plaintiff has made a narrow

12   motion for partial summary judgment for liability on Count Three of

13   the operative complaint for defamation.

14          We submit that there are no issues of disputed material

15   fact as to any of the four elements of the defamation claim and that,

16   therefore, as to that claim the only task for the jury should be

17   determine damages.

18          I want to preface my argument by noting that it is clear

19   from the papers there are plenty issues of disputed fact here.

20   Indeed, the defendants themselves can't agree on what happened and

21   are now blaming each other for, in the words of the D'Souza

22   defendants, the regrettable errors that were made in connection with

23   the film.  But as I will explain, none of these disputes is material

24   to plaintiff's motion and does not preclude summary judgment on

25   liability for defamation.

1          Turning to the four elements of defamation.  As the Court

2    stated in its opinion denying the motions to dismiss, a defamation

3    claim has four elements.  False and defamatory statement about the

4    plaintiff, publication, fault by the defendants, and special damages

5    or per se actionability of the statement, i.e., defamation per se.

6          So beginning with the first element, all defendants admit

7    that the defamatory statement the plaintiff was a criminal ballot

8    mule and part of a vast conspiracy are false.  These statements were

9    made in the 2000 Mules film, the 2000 Mules book, and the many, many

10   related promotional activities leading up to and after the release of

11   the film.

12         In fact, the D'Souza defendants publicly apologized to

13   plaintiff for the false portrayal of him in the movie and the book.

14   The TTV defendants also admit that plaintiff was never geotracked

15   picking up ballots for nonprofits and going to multiple ballot boxes

16   to deposit them, let alone having been paid to do so.  That plaintiff

17   was falsely labeled as a ballot mule participating in a vast

18   conspiracy is undisputed.  The only issue on this element raised by

19   defendants is whether the false statements were about the plaintiff.

20         Now, both sets of defendants assert that the video of

21   plaintiff voting that they used on multiple occasions was not about

22   or of and concerning the plaintiff.  The test in Georgia is whether

23   persons who knew or knew of the plaintiff could reasonably have

24   understood that the portrayal was a portrayal of the plaintiff.  It

25   is irrelevant, as TTV argues, whether the defendants knew his name or

1  had contact with him.  It is also irrelevant, as defendants argue,

2  whether his face and his license plate on his car were sometimes,

3  although not always, blurred.  Simply because his face and license

4  plate were sometimes blurred does not mean that he was not still

5  identifiable.  As his daughter testified, even with his face and

6  license plate blurred she recognized his walk, his posture, and his

7  vehicle.

8          THE COURT:  What about the argument that the -- yes, the

9  daughter and other family and friends recognized him, but only after

10  being directed to the film knowing that he was portrayed in it, so

11  they were sort of looking out for it?  It wasn't that they just

12  happened to be watching the movie and they said, oh, there's Dad?

13          MS. HABER-KUCK:  Well, I think -- I'm not sure that's

14  legally relevant.  I mean, it may go to damages, but they didn't.

15  There's no question that they did recognize him and he was

16  recognizable from the film.

17          I think the other point on which this is defeated is by the

18  affidavit of Mr. Cross that the D'Souza defendants submitted.  Now, he

19  was the individual who initiated the Georgia SEB investigation which

20  cleared Mr. Andrews.  He states in his affidavit that he watched the

21  Charlie Kirk Show and he heard Ms. Englebrecht and Mr. Phillips saying

22  that the person showed in the un-blurred video was a mule,

23  specifically one of their 2000 and then based on that he filed a

24  complaint with the still from that and based on that the SEB

25  investigator was able to identify Mr. Andrews from the license plate

1    number.

2          So he was identified even by people who were not his family

3    members and friends.  Although, as I said, I don't -- you know, that

4    testimony can come out at trial and it can go to damages, but I don't

5    think as a legal matter -- if they could watch an hour-and-a-half film

6    and say, oh, yeah, that's the plaintiff, I think that that's

7    sufficient.

8          So, you know, as a result of the public investigation his

9    identity as the person in that clip did become known and so it's also,

10   therefore, relevant that his face was blurred in the film which was

11   released in hundreds of theaters a few days after they -- there's a

12   timing question.  It was released in a premiere to 500 people in

13   Florida, but the main release was following the SEB investigation so

14   at that point -- by that time the identity of the person in the clip

15   had already become known.

16         I would refer the Court to *Warner Brothers Pictures vs.*

17   *Stanley*, which is cited in our brief opposing defendants' motions, and

18   in that case the court held that related statements have to be looked

19   at as a whole or in context because although there are -- you know,

20   there are many statements here, they're all essentially the same

21   thing.  There's a clip of him playing with commentary saying he's a

22   mule.

23         THE COURT:  I had a question about -- we had a question

24   about that which is your motion -- your affirmative motion does not

25   make clear what statement you're moving on.  I mean, there's a lot of

1    statements, as you pointed out, and you reference them throughout your

2    motion, but you don't then say and so we're moving for summary

3    judgment on X.  So is that necessary?

4               MS. HABER-KUCK:  I don't think it is necessary.  I mean,

5    that kind of gets us into the publication side of things.  There are a

6    number of statements and they're all listed in the Appendix 1 to the

7    TTV Statement of Material Facts - and it's 32 pages in small type -

8    but it's essentially all the same statement.  It's all a picture of

9    Mr. Andrews being portrayed as a ballot mule.

10              Now, there's a debate over which defendants are liable for

11   which statements, but they're certainly all liable for the ones that

12   they made and they're certainly -- we say because they acted in

13   concert they're all liable for all of their statements, as well.

14              THE COURT:  And you think that there's enough undisputed

15   facts to make a finding that they are all collectively liable for each

16   statement?

17              MS. HABER-KUCK:  I think that there is.  They're

18   certainly liable for the ones they made themselves.

19              THE COURT:  Right.  That's a cleaner argument on summary

20   judgment.  But on summary judgment is it your position that we can

21   just gloss and say they're all liable for everything?

22              MS. HABER-KUCK:  Well, yes, because I think it goes to

23   concerted action.  So on that point I think the undisputed evidence

24   here is that they did act in concert.  I know that TTV defendants have

25   made this action that it was parallel conduct.  I think the easiest

 1   way to look at it here is that the film would not have existed without

 2   TTV's research and TTV could not have made the same film to widely

 3   disseminate and promote its research without D'Souza, which is why

 4   they went to him in the first place.  So it's hard for me to see how

 5   you weren't acting in concert because you couldn't have one without

 6   the other.

 7            So they got together and they agreed that D'Souza

 8   defendants would make the film with TTV providing the research.  They

 9   conferred with each other throughout the filmmaking process with the

10   TTV defendants serving as executive producer and providing all the

11   video footage that was used.  Their claim that they have no editorial

12   control over what footage was used -- they provided all the footage.

13   Maybe they don't know which ones were selected, but there was no other

14   universe of footage so they did have control over that.

15            All the defendants appeared in the film, all the defendants

16   promoted the film on their social media pages, and all the individuals

17   made public appearances to promote the film.  They agreed to promote

18   the film together and they actively worked together to do so and they

19   texted about their various appearances and reposted each other's

20   interviews.

21            So, for example, Ms. Englebrecht told Mr. D'Souza before

22   the Charlie Kirk Show that it was going to air and Mr. D'Souza said

23   that was fine and Mr. Phillips and Mr. D'Souza conferred while the

24   Tucker Carlson episode was being aired talking about how to capitalize

25   on it.

1          THE COURT:  What about the argument that the -- I mean

2  the discussion during those talk shows, Charlie Kirk Show and Tucker

3  Carlson, did not reference the movie and they did not have control

4  over the clips that were being played while they were speaking and I

5  think there was some evidence that they couldn't even see what was

6  being shown while they were speaking on the show.  So how do we get to

7  that?

8          MS. HABER-KUCK:  I think there's -- well, I think there

9  are two points to that.  The easiest one -- or not the easiest.  The

10  most straightforward one is after those interviews they reposted those

11  interviews on their social media.  So whether or not they controlled

12  the editing -- although they've never said they didn't say the things

13  in there, they've never said somebody edited them.  They reposted

14  them.  So in and of themselves the republishing of the statement is a

15  separate defamation.  So I don't think we even have to -- you know, so

16  I think that argument falls flat because they did adopt them.  The

17  same thing with the movie.  TTV now wants to disown the movie, but on

18  their website and social media page they called it TTV's movie.

19          So the other thing I want to say with the Charlie Kirk is

20  that both sets of defendants claimed that -- you're right, that they

21  were using some other definition of mule and it didn't mention the

22  movie, that's just not correct as a matter of fact, and it's in the

23  response to the D'Souza Statement of Fact 75 in response to 233.

24          Charlie Kirk mentioned the film at the beginning of the

25  interview and he specifically said regarding plaintiff this is one of

1   the 2000 that you profiled?  And Ms. Englebrecht says yes.  Later in

2   the interview Mr. Phillips says they found 2000 plus mules, hence, the

3   2000 Mules movie.  The movie had already been filmed and Charlie Kirk

4   was in the movie.  Of course they were talking about the movie.  They

5   didn't say to Charlie Kirk, oh, yeah, we're going to have this

6   interview about mules, but it's not really what we were talking about

7   when we talked to you about it in the film.  No reasonable jury could

8   find that they weren't about the film.

9           But I think the other important point is certainly

10  Mr. Cross understood that Mr. Phillips and Ms. Englebrecht were saying

11  that plaintiff was geotracked because he included that statement in

12  his SEB complaint and he confirms in Paragraph 18 of his declaration

13  that that was the basis for his complaint.

14          THE COURT:  I'm sorry.  Go back to the shows, the

15  Charlie Kirk Show and the Tucker Carlson show.

16          MS. HABER-KUCK:  Yeah, yeah.

17          THE COURT:  Was there any evidence obtained during

18  discovery as to how the production folks of that show got a hold of

19  the clip of Mr. Andrews and the un-blurred version of that clip?

20          MS. HABER-KUCK:  I would say there's not a definitive

21  answer.  Although the text where Ms. Englebrecht informs Mr. D'Souza

22  that they're going to be on -- and don't forget, that was not aired

23  live, that was taped, and nobody objected between the time of the

24  taping and the airing that there was something wrong with it or it

25  shouldn't have been un-blurred.  During that time they reached out to

1   Mr. D'Souza and they said, oh, we're going to have this -- this is

2   going to be on and in that text she said he had the un-blurred -- he

3   had the political ad that we told you about.  It comes out in

4   discovery that political ad showed the un-blurred version, that came--

5   that footage came from Mr. Phillips.

6        We also know that if you look at the parts we cite in the

7   complaint of the Charlie Kirk Show he starts out by -- he's saying

8   what are we seeing here, guys, and let's go to Gwinnett County.

9   Should we look at this one?  And Mr. Phillips says yes.  So I don't

10  know -- we don't know exactly how it got there, but it's clear from

11  the conversation that the TTV defendants knew what it was and there's

12  a long discussion in there about Mr. Phillips saying, yeah, this was

13  originally on a huge tape.  I mean, if you look at the transcript as a

14  whole, there's no way that they didn't know what was being shown to

15  them and it does all seem to go back to this political ad that was

16  un-blurred.  It's also referenced in the Gateway video.

17       THE COURT:  All right.

18       MS. HABER-KUCK:  So the other thing I was just going to

19  mention on this of and concerning point is that the D'Souza defendants

20  also make what I call the 8-second argument and that is somehow that

21  the defamatory statements are not of and concerning plaintiff because

22  the clip of him in the film is only 8 seconds long.  As a legal

23  matter, it's a non sequitur, right.  The length of time plaintiff is

24  shown in the film doesn't have anything to do with whether the footage

25  was about him.  But in all events it's disinguous because the film

1    is not the only place that the footage was used.

2        Going back to your point about there being a lot of

3    statements, this case isn't just about 8 seconds in the film.  It's

4    about the use of plaintiff's image as an exemplar mule in an extensive

5    campaign to promote the film and the 2000 Mules narrative.  So the

6    plaintiff was offered up as a poster child of a mule in many, many

7    forms by the defendants.  His image was included in the centerfold of

8    the book.  His image was used on a billboard in Times Square.

9        In response to Paragraph 137 of the D'Souza Statements of

10   Material Fact, we list all the places where Mr. Andrews' image was

11   shown, it takes up half a page.  Referring back to that Appendix 1,

12   that lists all of the defamatory statements involving situations where

13   images of plaintiff were shown.  That Appendix 1 goes on in small type

14   for 32 pages, which is my point about they really are all the same

15   statement, and we believe we have sufficient concerted action to hold

16   everybody liable for everyone's statements.

17       THE COURT:  I guess my question is more sort of a

18   technical one on that score which is -- if you're asking me to find

19   summary judgment in your favor --

20       MS. HABER-KUCK:  Yes.

21       THE COURT:  -- and I'm not saying I would - but just

22   hypothetically if I wanted to what does that look like without

23   identifying what the statement is?

24       MS. HABER-KUCK:  Well, we do have all the statements,

25   they are all on that Appendix 1.

 1              THE COURT:  So is it all or nothing?

 2              MS. HABER-KUCK:  I don't think it has to be all or

 3    nothing because -- we could do it one of two ways; right?  You could

 4    say I find as a matter of undisputed fact there was concerted action

 5    here and, therefore, under the common law concerted action doctrine

 6    all defendants are jointly and severally liable for all of the

 7    statements.

 8              But there's also no question that each defendant made a

 9    defamatory statement; right?  There's no -- they each made one and

10    they each made them jointly in the film.  The question is just who's

11    responsible for whose.  The other thing that could be done is you

12    could find on liability for defamation, we can give the jury an

13    instruction that said if you find concerted action, then you have to

14    find everyone jointly and severally liable in damages or you can

15    apportion the damages based on the statements.  So I think it can go--

16    I think affirmatively it could go either way.

17              THE COURT:  All right.

18              MS. HABER-KUCK:  So the second issue is publication and

19    this gets to the -- first the TTV defendants arguing they didn't

20    publish and the words they used are "almost all of the statements," so

21    they concede they published at least some statements.  Incredibly,

22    they assert that even in instances where they were voluntarily

23    speaking in their own words and where there was no allegation that

24    their words were edited in some way they're not responsibile because

25    they have the no editorial control.  As I said, we can easily dispose

1   of that argument because regardless of whether they had editorial

2   control at the time it was made, they and the D'Souza defendants

3   republished them after the fact on their social media and the video

4   platforms.  So Plaintiff's Statement of Facts 106, 107, and Defendants

5   D'Souza's 92, both TTV and D'Souza reposted the Tucker Carlson Show.

6        Plaintiff's Statement of Material Facts 116, TTV posted the

7   Truth Matters' interview.  Plaintiff's Paragraph 123, TTV reposted a

8   music video.  Plaintiff's Statement 95 and TTV's Statement 129, TTV

9   reposted the Charlie Kirk Show.  So a republisher of a defamatory

10   statement is equally liable.  So if they didn't defame him the first

11   time, they defamed him the second time when they published it.

12        As to their lack of editorial control, it's particularly

13   disingenuous as to the film where they had multiple opportunities to

14   comment and give feedback on the film before it was released and, in

15   fact, they did so.  They stood on stage before 500 people at the

16   premier and took credit for it.  On their website, as I said, they

17   promoted it as TTV's movie and on social media they posted a picture

18   of -- a poster of the film with the comment "Here's a poster for our

19   new movie."  So to now say, oh, we're not responsible for any of that

20   I think is entirely disingenuous.

21        THE COURT:  Well, I think what they're saying -- not

22   that they're not responsible for the movie or the general argument

23   that it's making about the ballot mules but that it was never intended

24   to be about Mr. Andrews individually.

25        MS. HABER-KUCK:  Well, but it is about Mr. Andrews

1    individually.  As I said, it was a campaign -- he is put on the

2    billboard, he is used in every interview as the exemplar -- he becomes

3    the symbol of this mule.

4         The whole point of having the movie -- I think Mr. D'Souza

5    said at the beginning of the movie "We'll take you to the scene of the

6    crime," you know, and the whole point of it is to give video evidence

7    that there actually are these mules out there.  That was the whole

8    reason they made the movie instead of just writing an article about

9    it.  So I don't know how you can say it's not about Mr. Andrews.  He's

10   put up there and it says "This person is committing a crime."

11        THE COURT:  I don't want to interrupt your flow, but I

12   would like to talk about what the applicable standard is here for the

13   defamation claim because I think -- it seems to me, based on my

14   reading of it, that it's going to come down to that.

15        MS. HABER-KUCK:  The false standard?

16        THE COURT:  Yes.

17        MS. HABER-KUCK:  Yeah.  Let me turn to that.  And I

18   think my 40 -- oh, okay.

19        Yeah.  We have said that negligence is the standard and the

20   D'Souza defendants repeatedly accuse us of stating the wrong standard

21   in order to create some sort of sham motion.  I'm not saying that they

22   can't now argue actual malice, but they ignore that the Court stated

23   on Page 33 of the opinion denying the motion that the standard here is

24   simple negligence so we were guided by that when we filed the motion.

25        THE COURT:  Right.  But I don't think they argued actual

1    malice at the time.

2            MS. HABER-KUCK:  I think they did.  But in any case.

3            THE COURT:  Okay.

4            MS. HABER-KUCK:  So they have two arguments as to why

5    actual malice is the appropriate standard.  TTV alone argues that

6    plaintiff's a limited purpose public figure.  That argument has no

7    merit.  As the Supreme Court said in *Gertz*, that's an exceedingly rare

8    case where a plaintiff becomes an involuntary public figure.

9            Plaintiff did not inject himself into some public

10   controversy.  He just exercised his right to vote.  And then other

11   than filing this lawsuit he's done absolutely nothing to bring public

12   attention to himself.  Nor was he drawn into the particular public

13   controversy by voting at a drop box.  This argument would make every

14   drop box voter a public figure.

15           The defendants cite the SEB investigation, but that was

16   based on the complaint of Mr. Cross.  As I said, if you go back, the

17   reason we have Mr. Cross's complaint is because we have the TTV

18   defendants on Charlie Kirk.  They also cite the Tweets by plaintiff's

19   wife, not by plaintiff, who was responding to the Tweets of others

20   about her husband and she was just defending her family after the SEB

21   investigation cleared him.  As the D'Souza defendants admit in their

22   Statement of Facts Paragraph 228, she changed her Twitter account name

23   to hide her ties to plaintiff demonstrating that she wasn't trying to

24   draw attention to him.

25           In short, everything known about plaintiff goes back to the

defendants' portrayal of him as a criminal ballot mule.  As the

Supreme Court said in the *Hutchinson* case, those charged with

defamation cannot by their own conduct create their own defense by

making a claimant a public figure.

        THE COURT:  So someone can become a limited public

figure based on their *post hoc* conduct?

        MS. HABER-KUCK:  Well, this is like -- I think one of

the cases is the *Jewel* case about the bombing here in Atlanta.

        THE COURT:  Right.

        MS. HABER-KUCK:  But that individual went on TV

afterwards and portrayed himself as a hero and he called attention to

himself and those are the kind -- or the people give interviews, they

do all sorts of things to sort of make themselves a spokesman for

whatever it is.  Mr. Andrews has done none of that.  Mr. Andrews, he

filed this lawsuit.

        THE COURT:  He filed the lawsuit.

        MS. HABER-KUCK:  But then everybody -- but then people

wouldn't be able to file a lawsuit to vindicate their rights without

becoming a limited public figure.

        THE COURT:  Right.

        MS. HABER-KUCK:  Everybody who files a lawsuit,

everybody who brings a defamation claim is a limited public figure,

and that can't be right either.

        THE COURT:  Right.  I can see, though, the analogy to

the Richard Jewel situation because he was -- I mean, just like

1    Mr. Andrews, as you say, was just voting.  Mr. Jewel was just doing

2    his job; right?  The argument is that he became a limited public

3    figure, Mr. Jewel did by --

4            MS. HABER-KUCK:  He gave interviews.  He went on TV.  He

5    kind of portrayed himself as this hero in connection with the -- he

6    sort of seized on the moment and made it about him.  Mr. Andrews has

7    done nothing.  So I think -- I don't think he becomes a limited public

8    figure.  And then the other issue is whether --

9            THE COURT:  It seems like I'm weighing evidence to make

10   that determination.

11           MS. HABER-KUCK:  I don't think so.  I mean, I think if

12   you look at the case law you have to do -- first of all, as the

13   Supreme Court said in *Gertz*, it's exceedingly rare that you become a

14   limited purpose public figure.  Under, you know, that reasoning

15   anybody who voted -- you don't become a public figure by voting.  If

16   somebody then violates your right in connection with that, you file a

17   lawsuit.  Okay.  Now you're a public figure?  I mean, that can't be.

18           So the other argument that they're making is that we have

19   to apply the actual malice standard because the defamatory statements

20   were privileged under Georgia statutory law because they dealt with

21   election integrity and we say they are not privileged for at least two

22   reasons.

23           First, in order to be privileged the statements in question

24   must have been made in good faith and I know that often can be a fact

25   question.  But here they couldn't have been made in good faith because

1  plaintiff admittedly was not a mule.  I would refer the Court to

2  Defendants' responses to Plaintiff's Statement of Facts 80 through 84

3  in which none of the defendants dispute that Mr. D'Souza was aware in

4  Georgia that it's legal for family members to deposit the ballots of

5  other family members, that's Paragraph 80.

6          Defendants never had any evidence that plaintiff was paid

7  to deposit any ballots or went to a ballot box more than once, that's

8  Paragraph 81.  Defendants never had any evidence that plaintiff went

9  to a nonprofit to pick up ballots, that's Paragraph 82.  The TTV

10  defendants never tracked plaintiff's cellphone or any device linked to

11  plaintiff, that's Paragraph 84.  In other words, they admit they never

12  had any evidence that he was a criminal ballot mule and as a matter of

13  undisputed fact the statements could not have been made in good faith.

14          Now, TTV tries to refute that argument with its so-called

15  assistor argument and it contends that since there were no record of

16  any assistor ballots on file in Georgia then plaintiff couldn't have

17  legally deposited the ballots of his family.  Leaving aside that this

18  is a misstatement of Georgia law on assistor requirements, the entire

19  argument is a red herring.

20          The film and the related appearances don't accuse plaintiff

21  of failing to fill out some paperwork.  They accuse him of picking up

22  ballots and going to multiple drop boxes for a fee.  The lack of any

23  assistor signatures doesn't support any such allegation.  It may

24  explain why there's a question as to why one person is depositing more

25  than one ballot, but it doesn't tell you that that person went to

1   multiple drop boxes which is what the definition of a "mule" in the

2   movie is.

3          Secondly, defendants' arguments were not properly limited

4   in scope and audience and went well beyond what was necessary to

5   discuss election integrity.  Of course a serious documentary could be

6   made about whether drop box voting was advisable and secure, but

7   that's not what this movie was.  It was a dramatized, sensationalized

8   story that without basis shows videos of individual voters, called

9   them criminals and analogized to a drug cartel.  It was not intended

10  as a public service but as entertainment to make money for defendants.

11  I would refer to my Statement of Facts at 230 to 236 and to assist

12  their preferred political candidates, that's our facts Paragraph 250

13  to 53.

14         As discussed in connection with the Klan Act, it was

15  intended to intimidate voters from voting at drop boxes and to incite

16  the public to act as vigilantes at drop boxes.  So for both of those

17  reasons we contend that the privilege doesn't apply and we contend

18  that the statement is not actual malice.

19         THE COURT:  Now, there's a hybrid, though, isn't there,

20  as to the standard?  Even if the individual is a private individual

21  but the matter is of public controversy, it seems to me that actual

22  malice could apply in that situation, as well.

23         MS. HABER-KUCK:  Well, that's statute, whether it's

24  privileged.

25         THE COURT:  Right.

1          MS. HABER-KUCK:  It's privileged because it's a matter

2   of public controversy.  But if you look at the statute, as I said, you

3   still have to make a -- the statement has to be made in good faith and

4   you still have to have it limited in scope and in audience.  So it's

5   one thing if you're Mr. Cross and you file a complaint with the SEB or

6   you're TTV and you go to the FBI and you say I have this evidence,

7   you're well beyond the necessary scope when you sensationalize it and

8   create a movie to make money about it.

9          THE COURT:  I mean, is it your position that there's no

10  material dispute of fact as to their good faith?

11         MS. HABER-KUCK:  I mean, I don't know how there could be

12  good faith.  I understand there usually is.  But how can there be good

13  faith when they never had any evidence that he was a mule?  They put

14  him up there and they say you're committing a crime, right, but they

15  don't have any evidence ever that he went to multiple boxes, that he

16  was paid to do anything.  They never tracked his phone.  They knew

17  that family members could deposit more than one ballot.  So what

18  evidence -- how can you in good faith, then, put up a picture of this

19  man and say he's a criminal?

20         THE COURT:  I guess that goes back to which statement

21  we're talking about, right, because the argument can be made that as

22  to the movie -- because if it was just the movie, nothing else, and

23  it's a blurred vision of some unidentified person that they were never

24  intending to attribute it to Mr. Andrews.

25         Now, that argument becomes less persuasive when everything

1  else happens later on with the going on the talk shows and the

2  un-blurred versions and then everyone backtracking to the movie and

3  realizing that that blurred version is him.  But if you looked at the

4  statements in the movie itself, they never intended to attribute this

5  to Mr. Andrews.  They were just using him basically as a prop, you

6  know, a blurred vision of him as a prop for the narrative they were

7  trying to tell.

8          MS. HABER-KUCK:  Well, and that's what -- and that's

9  what I think the difference is here, actually.  Yeah, they were using

10 him -- they didn't say this a dramatization, which they could have

11 done, right.  They didn't.  They said - and that's the whole point of

12 the movie - these are actual people going to drop boxes.

13         Now, as I said, you're probably right, they were hoping

14 nobody would figure out who the people actually were and, therefore,

15 it was a lie that these people were committing a crime and they got

16 caught for reasons of their own doing.  But they did intend to say

17 those people were committing a crime.  They were just hoping nobody

18 identified them and because -- as I said, because of their promotional

19 activities, you know, he did become identified.  But I don't think we

20 can say, oh, they did intend those people.  They just hoped the people

21 wouldn't figure out who they were so they could figure out it was a

22 lie.

23         Then as to the evidence of actual malice -- you know,

24 starting with TTV, the evidence demonstrating their actual malice is

25 that Charlie Kirk interview because -- again, I'll read from Paragraph

1    Statement of Facts 93.  Mr. Kirk begins by showing an un-blurred clip

2    of plaintiff saying this is Gwinnett County; is that right?  Ms.

3    Englebrecht says yes.  Kirk then says what are we looking at, guys?

4    Phillips says you're going to see a voter get out, a mule get out.

5    And Englebrecht says a mule get out.  So Mr. Kirk says so this is the

6    mule -- this is one of your 2000 that you profiled?  And she says yes.

7            Now, we know that that's a blatant lie because the

8    defendants have readily admitted that no video from Gwinnett County

9    was geotracked so they had no evidence that that person in the video

10   was one of their purported 2000 mules.  I know they say it wasn't

11   about the movie but, again, I've addressed that and certainly

12   Mr. Cross understood what they were saying.  As I also pointed out,

13   that interview was taped, not aired live.  So if there was some

14   misunderstanding they could have corrected it, they didn't, and also

15   they reposted the interview.  All of that is evidence of actual

16   malice.

17           THE COURT:  You talked about the taping of those

18   interviews.  Is there evidence that they had an opportunity to, I

19   mean, weigh in between the taping and the airing?

20           MS. HABER-KUCK:  So it was taped.  It wasn't aired live.

21   In between, I mean, they could have - they could have called.

22           THE COURT:  What was the time -- I mean, my experience

23   is that those tapes -- even the tapings occur usually within hours of

24   it being broadcast.

25           MS. HABER-KUCK:  I think it was days.  But even then --

1  this was in our Statement of Facts Paragraph 96.  They told

2  Mr. D'Souza about it and he didn't object, he said it was fine.  But

3  when they texted him they reference the political ad, but there's no

4  mention in their text to Mr. D'Souza about how they were surprised or

5  caught off guard what they were shown.  I mean, they don't -- they

6  never have -- until the lawsuit they've never said, oh, that was all a

7  big misunderstanding.  As I said, if they thought it was so bad, why

8  did they repost it on their own social media?

9          THE COURT:  Yeah.

10         MS. HABER-KUCK:  As to Mr. D'Souza, there is also

11  sufficient undisputed evidence for a finding that those defendants

12  either had actual knowledge that the statements against plaintiff were

13  false or they acted with reckless disregard.

14         On Page 33 through 34 of our moving brief we set forth some

15  of the many things that the D'Souza defendants disregarded during the

16  making of the film which evidenced to reckless disregard for the

17  truth.  In our Statement of Facts Paragraphs 201 to 212 we set forth

18  the evidence where multiple people on the D'Souza team expressed

19  concerns about the making of the film, about the quality of the video,

20  and that there was no video of any person going to more than one drop

21  box.

22         The D'Souza Media executive, Bruce Schooley, summed it up

23  in an in email stating that the surveillance video footage, quote,

24  doesn't convince me and I want it to be true.  That's Paragraph 248 of

25  our Statement of Facts.

1          After they were sued the defendants -- the D'Souza

2    defendants went back and tried to find some footage of someone going

3    to more than one box, but they couldn't.  The best they could come up

4    with was their look-alike footage which ultimately they confirmed was

5    not the plaintiff and we set that out in our response to their

6    Statement of Facts 158 and 159.

7          Now, as to plaintiff himself the D'Souza defendants

8    acknowledge in their own motion at Pages 26 through 29 that

9    Mr. D'Souza had actual knowledge that the statements about plaintiffs

10   were false or, at a minimum, recklessly disregarded the truth no later

11   than when he learned the results of the SEB investigation.

12         As to the SEB, he simply mocks the investigation and

13   essentially claims that the SEB whitewashed it for political reasons.

14   But the problem for him is that at the same time Mr. Phillips

15   confirmed that Mr. Andrews was not a mule in both the text to D'Souza,

16   that's our Statement of Facts Paragraph 71, and to the *Washington Post*

17   which is TTV's Statement of Facts Paragraph 72.

18         While Mr. D'Souza claims he wasn't really paying attention

19   to the texts and he was just being polite when he said all good

20   points, I'll take them up in my podcast.  The very next day - this is

21   in our Statement of Facts Paragraph 73 - he posted the commentary on

22   his Truth Social account about the investigation and he copied

23   Mr. Phillips's text verbatim except he omitted the statements in the

24   text message that Mr. Andrews wasn't a mule.

25              THE COURT:  I mean, you would agree, though, that the

1    fact that the Election Board cleared him doesn't necessarily mean that

2    he had to retract the position he was taking?  I mean, certainly that

3    should have put him on notice to make an independent determination,

4    but it's not -- just because they're clearing Mr. Andrews in their

5    investigation for their limited purposes doesn't necessarily mean that

6    the statement is false?

7                MS. HABER-KUCK:  Except that when the defendants talked

8    about it together, Mr. Phillips said to Mr. Andrews, yeah, and he's

9    not a mule, he doesn't meet our criteria.

10               So you had the SEB investigation, they talk about it,

11   another concerted action, and Mr. Phillips tells him, yeah, that guy's

12   not a mule anyway because he doesn't meet our criteria and then

13   nothing happens.  They don't -- you know, this whole 8-second argument

14   in the movie, it would be very easy to just take him out of the movie,

15   they didn't do that.  They didn't stop publicizing it.  Then

16   Mr. D'Souza writes this book and the book is long after the fact and

17   with the book we also send him a cease and desist letter telling him

18   that Mr. Andrews was not a mule and yet his excuse is that he didn't

19   take it seriously and he didn't further inquire whether there was any

20   evidence.  I think that's further evidence of reckless disregard for

21   the truth, particularly since the first printing of the book had

22   already been recalled because it contained false information that was

23   provided by TTV.  So the book comes out, other people say, wait a

24   minute, this is false, they pull the book back.  We send our letter

25   saying and also Mr. Andrews is not a mule, they do nothing.  That's at

1    Paragraphs 127 to 132.

2                THE COURT:  What were the other distractions about?

3                MS. HABER-KUCK:  One of them was -- again, it's our

4    Statements 127 to 132.  There were two things.  One of them was

5    regarding ACLED which is the organization that allegedly tracks

6    violent protests.  Mr. Phillips had made some statements about they

7    tracked peoples' phones and they don't track peoples' phones and ACLED

8    wrote a letter, the publisher settled with ACLED, that was number one.

9                Number two is they published a list of the alleged

10   nonprofits in the book and then those nonprofits came forward and

11   said, wait a minute, we had nothing to do with this and, again, so

12   they republished the book without the names of the nonprofits, but

13   they didn't take Mr. Andrews out of the book.  He's still in the

14   centerfold.

15               THE COURT:  So it wasn't like other people who said I'm

16   not a mule?

17               MS. HABER-KUCK:  No.  There were others -- but, again,

18   our point is that at that point how can Mr. D'Souza not be at least on

19   notice that what TTV was telling this whole story didn't make sense

20   and there wasn't evidence and people kept coming forward and saying,

21   wait, this doesn't work, this doesn't work, that doesn't work.

22               I do want to -- let me just say one more point on the

23   actual malice and that's -- you know, despite the conciliatory tone in

24   his brief and his apology to Mr. Andrews, even now Mr. D'Souza is

25   still trying to capitalize on the 2000 Mules.  Even as these motions

1    were being briefed defendants continued their campaign to try and get

2    traction for the Mules and to intimidate the plaintiffs.

3        On February 25th, this is in our Statement of Material

4    Fact -- Additional Material Facts 14, D'Souza posted on social media

5    calling for the Attorney General of the U.S. to investigate writing

6    "2000 Mules busted the election fraud and DOGE and Elon Musk exposed

7    the money trail."  When those Tweets didn't work, he Tweeted threats

8    against plaintiff's attorneys and copied the President, the United

9    States Attorney General, and the head of the FBI which Tweets were

10   re-Tweeted by Elon Musk in an effort to get plaintiff's counsel to

11   drop out of the litigation.  So despite all the evidence that's come

12   out in discovery demonstrating that the entire 2000 Mules narrative is

13   a house of cards, defendants continue to relentlessly pedal their

14   false narrative without proof and despite contradictory evidence.

15       And then I just I want to -- the last element is harm and

16   there's a lot in the briefing about all the ways that Mr. Andrews

17   wasn't harmed.  But there can be no dispute that the facts in question

18   were defamation per se as they accused him of committing a crime.

19   Given that, harm is presumed for purposes of the elements of the

20   claim.  He's also well within the Georgia statute which infers damages

21   because statements that he's a criminal are sufficient to injure his

22   reputation and expose him to hatred, ridicule, and contempt which he

23   was as a mule.  So all of that would satisfy the fourth element

24       And then finally the D'Souzas have an evidentiary objection

25   to our Statement of Facts and they made a request to strike nearly

1    half of the Statements of Fact for purportedly failing to comply with

2    the local rules.  In fact, that's just an attempt to avoid admitting

3    unhelpful, but undisputed facts, and notably the TTV defendants had no

4    problem responding.

5             THE COURT:  Weren't you responding to the -- weren't you

6    reciting to the answers?

7             MS. HABER-KUCK:  Well, there are a couple things.  One,

8    they claim we didn't have pincites and a lot of those are -- there

9    will be five cites to a deposition with line and page reference and

10   then a cite to a document that was discussed in the deposition and

11   they just refused to answer because there's no pincite to the

12   documents.  Their other objection is that the document is a pleading,

13   not evidence.

14            THE COURT:  Right.

15            MS. HABER-KUCK:  Some of those are sworn interrogatories

16   which are evidence.

17             The other thing is the answers which are admissible as

18   judicial admissions, but in all events -- and we cited the testimony.

19   I asked Mr. D'Souza at his deposition if he reviewed the answer and if

20   there were any errors in it and he said there were not.

21            THE COURT:  Right.  Well, even without that, there's

22   nothing wrong with citing to the answer.

23            MS. HABER-KUCK:  No, I don't think there is.  But, I

24   mean, there's nothing wrong with citing to the answer, that's part of

25   it.  The other part of it is, you know, there's not a pincite and some

1    of those documents are documents that he wrote.  Like, for example,

2    his public apology, we didn't put a pincite to what paragraph it was.

3    It was a one-page apology.

4          THE COURT:  Let me ask you this.  The surveillance

5    footage of Mr. Andrews, is that public record or confidential?

6          MS. HABER-KUCK:  Well, it's an interesting question.  We

7    cite the -- in our brief we cite the rules.  I don't think it's a

8    public record.  They did get it from the State of Georgia.  But people

9    voting, it's not intended to be a public act.  I mean, we cite the

10   statutes in there.  If he had been in a polling place that had a

11   surveillance camera, I don't think they could have gotten the video.

12         THE COURT:  No.  But he's in a public space.  I mean,

13   he's outside.

14         MS. HABER-KUCK:  He is outside.  But, again, that's the

15   situation we found ourselves in.  But I think the other point about it

16   not being a public record is that you can't just go on the internet

17   and start watching this video.  There's plenty of evidence in the

18   record, and Mr. Phillips talks about it in the Charlie Kirk interview,

19   they had to go get this stuff.  First of all, it was hard to get it

20   from the State.  They get it.  They have to process it and then they

21   have to go through it meticulously.  So it's not a public record in

22   the sense that, you know, I could do a Google search and find the same

23   evidence.

24         THE COURT:  All right.  Does it make a difference

25   whether it's public or confidential for the defamation claim?

1          MS. HABER-KUCK:  Whether he was in a public place?  I

2     don't think it does.  I mean, if somebody's in a public place and you

3     lie about them, it's still a lie.

4          THE COURT:  Well, I mean, the fact that what they are

5     broadcasting is him in a public place doing -- so does that impact at

6     all the defamation analysis?  I presume not because it's not about --

7          MS. HABER-KUCK:  No.

8          THE COURT:  -- the footage.  It's about what was said in

9     conjunction with the footage.

10          MS. HABER-KUCK:  Right.  It's not here's Mark Andrews

11     voting.

12          THE COURT:  Right.

13          MS. HABER-KUCK:  It's this is a criminal ballot mule.

14          THE COURT:  Right.

15          MS. HABER-KUCK:  It's the description of the footage.

16          THE COURT:  All right.

17          MS. HABER-KUCK:  I think there's a lot of overlap with

18     the other claims so I can address it in my 15 minutes or I can talk

19     about it now.

20          THE COURT:  Yes.  Talk about it now briefly.

21          MS. HABER-KUCK:  Okay.  So just very quickly.  The

22     claims that don't overlap -- I mean, I think the biggest one is the

23     Klan Act, and we talked about all the conspiracy evidence and we've

24     laid that out.  So on that, I think the conspiracy -- you know, we

25     have all the law in there.  You can have a conspiracy by taking some

1    unlawful act by methods that are a tort.  The agreement can be tacit,

2    it can be inferred.  As we have said multiple times, you know, we've

3    come forward with sufficient evidence that they worked together to

4    publicly and repeatedly make the movie, advance the movie, spread the

5    lie.

6             And then on the intimidation, under the case law that we

7    cite attempted intimidation is enough, it doesn't have to be

8    successful and it doesn't have to be violent or physical and it's also

9    not sufficient that defendants can articulate some lawful privilege.

10   I think the Court noted in the motion to dismiss the fact that they

11   publicly accused Mr. Andrews of being a ballot mule participating in

12   an illegal voting conspiracy, having engaged in unrelated violent

13   conduct all while displaying blurred and un-blurred images of his face

14   and license plate could plausibly intimidate a reasonable person in

15   connection with voting in an advocacy for federal candidates.

16             THE COURT:  Plausible, yes --

17             MS. HABER-KUCK:  Plausibly, okay.

18             THE COURT:  -- at the motion to dismiss stage.  But now

19   we're post discovery.  So what's the evidence?

20             MS. HABER-KUCK:  Now we've come forward with evidence

21   that supports those things and that he and his family actually were

22   intimidated.  That's our Statement of Facts 144, 149 through 53, and

23   our response to TTV's Statement of Facts 182, 185, and 186.  So I

24   think that we do -- we have now supported those allegations, all the

25   allegations in the complaint, actually, with evidence and then some.

1          The false light claim they say is duplicative of the

2    defamation claim, and we've always maintained that.  We agree if the

3    defamation claim goes forward, that claim doesn't.  The false light

4    claim I think is the same -- that does get to the open-to-public

5    observation that we've discussed.  It also -- they claim he wasn't

6    identifiable, we've already discussed that.

7          Civil conspiracy we've discussed.  But as the cases in our

8    opposition brief at 58 hold, claims for civil conspiracy are typically

9    not resolved on summary judgment because it can be inferred, it can be

10   tacit.

11         Then finally the punitive damages claim -- you know, this

12   argument, again, is based on their argument that there's no evidence

13   of actual malice and we've shown that to be wrong.  There's plenty of

14   evidence of actual malice.

15         I think that that covers everything in my motion.

16             THE COURT:  Okay.  Thank you.

17             MS. HABER-KUCK:  Thank you.

18             THE COURT:  Why don't we take a break.  Let's take a

19   10-minute recess.  Be back at 11:05 and I'll turn it over to your

20   team, Mr. Andrews, okay.

21         (recess was taken from 10:56 a.m. until 11:10 a.m.)

22             THE COURT:  Mr. Evans.

23             MR EVANS:  It looks like the jury pool has grown.

24             THE COURT:  Yes.

25             MR EVANS:  That's right.

```
 1              Judge, I have two, I guess, courtesy copies.  We're also
 2    going to reference a PowerPoint.  It should be right in front of Your
 3    Honor.
 4              THE COURT:  Great.  Thank you.  These are two different
 5    things?
 6              MR EVANS:  Yeah.  All counsel has one and you have one.
 7    So I'm ready to go when you are.
 8              THE COURT:  Yes.  Do you have an extra one?
 9              MR EVANS:  I gave the clerk, as well.
10              THE COURT:  Okay.  Great.  She's the brains behind the
11    operation.  Thank you.
12              MR EVANS:  Absolutely.
13          So I'm ready, Judge, when you are.
14              THE COURT:  Yes.
15              MR EVANS:  Okay.  Great.  Jake Evans, Judge Grimberg,
16    pleasure to be before you.  I represent True the Vote,
17    Ms. Englebrecht, and Mr. Phillips.
18              First what I want to do very quickly -- and I fully
19    appreciate the 45 minutes, I think that was a good idea, and I'm going
20    to shoot through what this case is about.  As I was thinking about --
21    we can go to the next slide -- what in essence -- because every case
22    is crystallized down to what I believe is the core thematic and the
23    thematic of this case is a message in search of a messenger.
24              This case is not about Mark Andrews.  No defendant -- it's
25    undisputed in the record that no defendant knows or at any point prior
```

1   to this case being filed who Mark Andrews was.  Mark Andrews didn't

2   know who any of the defendants were.  If you look at every defamation

3   case you have a case where one person was mad at another person and

4   they said something maybe they shouldn't have said.  That's not the

5   case here.  This is a case where a message wanted to find someone to

6   put forth a messenger and that's exactly what happened.  Mark Andrews

7   I don't even believe is at this hearing today, the defendants are.

8          So if we can go to the next slide.  So why is that

9   important?  That is important because it shows the facts don't fit the

10  claims.  As much as the plaintiffs try to force the facts to make a

11  case -- a defamation case that is not it's not.  We'll go through each

12  of these one-by-one.  There's a couple other claims which I regard as

13  low-hanging fruit and we'll get to those in a second.

14         But what is the story of this case?  The story of this case

15  is True the Vote, an organization which has been engaged in voter

16  empowerment since around 2010, has an idea and identified an issue in

17  2020 where there was widespread concern about election issues in our

18  country, I don't think anyone can dispute that.  I don't think Mark

19  Andrews when I deposed him disputed the fact that this was on the

20  news, he admitted it.  He admitted it was a highly talked about and

21  discussed issue, has an idea and has identified underlying problems.

22         Ms. Englebrecht is then connected to Mr. D'Souza.  They

23  decide that they want to show the country underlying issues in a film.

24  The film was not created to defame any individual.  The film certainly

25  wasn't created to defame Mr. Andrews, a person who the defendants did

1   not know.  They couldn't have picked him out -- they could be sitting

2   next to him on an airplane.  They probably couldn't even pick him out

3   here today.  I know him because I deposed him.  Other than that,

4   nobody knows who he is.  So the fact of the matter is as we look at --

5          THE COURT:  But isn't the issue not that you don't know

6   him or that your clients don't know him but that his family and

7   friends know him and they're watching a film and he's being called a

8   criminal?

9          MR EVANS:  I'm going to get to that in one second.  Let

10  me get through the facts and we'll jump right to it, Judge, but that's

11  a very good question and I appreciate that question.

12         So continuing to set the theme here for what this case is

13  about -- if we can go to the next slide.  There was testimony after

14  testimony asking Mr. Andrews how are you impacted.  We deposed

15  Mr. Andrews' employer.  Did you treat Mr. Andrews any differently?

16  Did you know about the film?  No, no, no.

17         Mr. Andrews, we deposed him personally.  Do you have any

18  reason to dispute that you were not treated differently, no one knew

19  about the film?  No, I do not.  Next slide.  We then ask has anyone

20  ever harmed you?  The only two issues, which I'll talk about more in a

21  moment, is when someone allegedly set outside his cul-de-sac for a

22  short period of time and there was a lizard.

23         Next slide.  This is where he talks about the cul-de-sac.

24  I asked him do you have any reason to believe -- did this person try

25  to talk to you?  Did this person try to harm you?  No.  Do you have

1   any reason to believe this wasn't just an Amazon person dropping

2   something off?  No, I don't.  That's what we're talking about today.

3          Next slide.  So what created the interest in this case?

4   What created it was the filing of the case.  Next slide.  But not just

5   the filing of the case, press releases.  Not one press release.  Next

6   slide.  Not two press releases.  Next slide.  Three press releases.

7   And what happened after the filing of the case?

8          Next slide.  The plaintiffs admit in an RFA that they were

9   not aware of any news report about this case until what?  After the

10  case was filed.  So what pushed this into the public spotlight?  What

11  pushed it was an individual who said in his deposition I'm very

12  private, I don't want interest, I don't want to be involved, because

13  he was the messenger.  He is the messenger of a message to try to

14  create claims the facts do not support.

15         Next slide.  So we just pulled a number of press releases

16  and what's important with these are the dates.  The case was filed

17  October 26th, 2022.  The next day you have a headline drafted by

18  Mr. Niesse who's in the courtroom today.  Then you have another

19  headline, October 28th, the following day.  Then you have another

20  headline the following day, October 28th.

21         THE COURT:  Are you saying this goes to his damages or

22  to the claim itself?

23         MR EVANS:  This is going to go to whether or not, number

24  one, it's an issue of public concern and, number two, whether or not

25  he became a limited public figure by virtue of his own actions.

 1          THE COURT:  Well, I had that conversation with Ms. Kuck

 2   earlier.  I think the case law is clear that the filing of a lawsuit

 3   cannot transform a person into whether it's a public figure or sort of

 4   change the characterization of the claim.  Isn't that right?

 5          MR EVANS:  That is correct.  But what is important is

 6   that, number one, these affirm public interest about the underlying

 7   issue which is voter integrity in 2020 which is what the film was

 8   primarily about.

 9          Next slide.  Same thing.  Again, as I referenced earlier,

10   we deposed Mr. Andrews' wife and asked her what are the issues that

11   have impacted you about the film or that you allege in the lawsuit and

12   she testifies - here's the testimony - that an alert goes off on her

13   phone because the camera -- because there's movement outside.  The

14   movement outside turns out to be a lizard.

15          So the underlying issues that they -- plaintiffs, by their

16   own testimony, claim that they've been impacted is not a demotion at

17   work, is not someone identified them in a grocery store, they said

18   that never happened.  It's we had a lizard and someone set outside

19   their cul-de-sac.

20          So continue.  So we're down to about six claims.  Your

21   Honor dismissed Count Two on the motion to dismiss and so we have some

22   left.  Some are what I regard as low-hanging fruit.

23          Next.  But the standard that Your Honor evaluates - and

24   it's a higher standard at the federal level - is there has to be --

25   plaintiff must come forward with significantly probative evidence, not

1  merely colorable evidence, to demonstrate that a triable issue of fact

2  exists.

3          In addition to that, on defamation claims, because they

4  involve First Amendment rights to free speech, there is a presumption

5  that they should be resolved at the summary judgment stage and we'll

6  talk about that more in a moment.

7          Next slide.  So we'll start with the low-hanging fruit.

8  The low-hanging fruit, first, is the KK Act.  The KK Act was an act

9  that was built in the -- or adopted in the 1960s and the language is

10 pretty strong based upon the jurisprudence, next slide, which is the

11 origin was a reaction against murders, whippings, beatings committed

12 by rogues in white sheets in postbellum south and its intent to stop,

13 force, or threat against those voting.  This is something that I don't

14 think any of us should take lightly and this is a claim that shouldn't

15 just be thrown out willy-nilly.  There should be a good-faith basis

16 and now we're at the summary judgment stage and evidence to support

17 it.  The law has shown there must be a conspiracy, there must be a

18 purpose supported by evidence to force, intimidate, or threaten an

19 individual from voting.

20         Next slide.  There is nothing in the evidence -- there is

21 nothing in the record that, number one, shows any defendant knew who

22 Mark Andrews was.  There is nothing in the record that shows that

23 Ms. Englebrecht, Mr. Phillips, True the Vote, D'Souza took any act to

24 operate in concert to threaten, intimidate, or in any way negatively

25 impact Mr. Andrews voting.  Devoid.  This claim is what I regard as a

1    throwaway claim.  I also regard it as a claim that should not just be

2    thrown in complaints unless you have a good-faith basis to bring it.

3    For all of the plaintiffs saying be careful about making false

4    statements about people, this is a very delirious, it is a very

5    inflammatory claim that dies because the record is devoid of any

6    evidence - next slide, please - to show there was any purpose to

7    force, intimidate, or threaten.

8            I'll read very quickly.  This is the *Wolf* case which is one

9    of the very few cases -- there are very few cases, Judge, where a KK

10   violation has ever been found.  The only one that really is prominent

11   is where you had a robo-call -- the 11(b) claim, as Your Honor knows,

12   has been dismissed -- a robo-call to individually target voters in

13   order to scare them into not voting, that is not here.  But there must

14   be an agreement between two or more persons to commit an unlawful

15   act -- an agreement to commit an unlawful act, an illegal act,

16   knowingly engaging, I know I'm doing this, and the conspiracy to

17   commit those offenses and then there must be commission of an overt

18   act to do that.  Nothing in the record.  Plaintiffs have pointed to

19   nothing in the record.  There's no -- honestly, the only alleged

20   disputes are testimony that's unrelated to anything about purpose to

21   force, intimidate, or threaten.  Low-hanging fruit must be dismissed.

22           Next count.  Here, very quickly, and we'll talk about this

23   briefly in a little bit.  There's no purpose.  Number one, the True

24   the Vote defendants show that because they didn't know who Mr. Andrews

25   was.  In fact, they said he was not a mule.  There's text messages

1   Mr. Phillips said he wasn't a mule and there's also communications

2   that confirm that Mr. Englebrecht was bringing up the concern about

3   people who were not mules be included in the 2000 Mules movie.

4           Count Two's no longer before Your Honor, that knocks out

5   Two.  We're down to five.

6           False invasion light of privacy.  This one it appears that

7   plaintiff has admitted must be dismissed is subsumed by the defamation

8   claim.  So if you have a defamation claim --

9           THE COURT:  Well, it's in the alternative, I think.

10          MR EVANS:  That's correct.  But both of them fail.  But

11  if the -- they have not alleged, one, any non-defamatory statement.

12  We've asked for it in discovery.  What are the non-defamatory

13  statements you have?  What we got was what Your Honor has, which is

14  one of the exhibits which is the defamatory statement, so because of

15  that this fails.

16          THE COURT:  But it falls only if the defamation claim

17  survives.  If I find the defamation claim does not survive, then we

18  have to evaluate this independently.

19          MR EVANS:  That's correct.  That's right, Judge.

20          THE COURT:  I assume you're not conceding the defamation

21  claim survives.

22          MR EVANS:  We're absolutely not.  Both of them fail.

23  But this one fails, one, is subsumed.  But you're correct, if

24  defamation also fails, which it does, they have to put forth in

25  discovery a non-defamatory statement.  They were asked what's your

1  non-defamatory statement?  They never provided any.  We can't go back

2  in time.

3         As Your Honor remembers in one of our discovery conference,

4  I made clear we need to know what are the statements.  What are the

5  non-defamatory statements?  There's nothing in the record that shows

6  plaintiffs have put forth any non-defamatory statement.  Again, this

7  is a throwaway claim.  Because of that, it must be dismissed.

8         THE COURT:  I think we're talking in circles, though,

9  because their primary position is that these statements are

10  defamatory.  But they're arguing in the alternative that if I find

11  that they're not that they should still be able to pursue those

12  statements under the false light claim.

13         MR EVANS:  Uh-huh, that's right.  But notwithstanding

14  that -- for false light, one, if it's an issue of public concern or in

15  public spotlight those claims fail because it's in the public

16  spotlight.  So while it may not necessarily affect a defamation claim

17  it's going to affect both of the alleged false light claims.

18         Everything involved with Mark Andrews in this case is

19  public.  Public video.  Whether or not you vote is public.  We can

20  pull up the Secretary of State's website right now and I could find

21  anyone -- not who you voted for.  I could find out whether anyone in

22  this room voted.  So irrespective, the defamation claim fails, this

23  one also fails because he wasn't shown in any false light and,

24  additionally, it's issues of public concern and publicly available.

25  Next one.  So that knocks Three.

1        So the next one is invasion of privacy by appropriation of

2   likeness.  For the same reason Georgia law is clear that that which is

3   open to public observation cannot be appropriated.  If you can find

4   via public means, either showing up at a public place and seeing

5   someone getting drop box video, which is public, it must be

6   necessarily public based upon Georgia's Open Meetings and Open Records

7   Act, this claim fails.  It's undisputed that all of this was obtained

8   via Open Records.  In fact, people other than any of the defendants in

9   this case obtained it and publicly made it available.

10        Additionally, he's unrecognizable and involves issues of

11   public interest.  Those show in a claim like this, undisputed in the

12   record, it's available publicly.  Plaintiff's counsel, you just

13   questioned it, she tried to create some weird answer.  The answer is

14   it must be public under Georgia law; otherwise, it's a violation and

15   you can get attorneys' fees and also a court's going to mandate that

16   it be provided.  So that count must be dismissed.

17        So now we're down to three.  First, Judge, what I'm going

18   to do -- and really these are kind of interrelated.  We have civil

19   conspiracy, defamation, punitives.  In some respects these are all

20   tied together.  We've now knocked out three.  Let's knock out these.

21        Civil conspiracy.  Your Honor talked about this earlier and

22   this is very important.  Each of these claims must be evaluated

23   independently.  We can't make any all-encompassing evaluation whether

24   a defamation claim meets the four elements that are required.  That's

25   established in the *Reid* case which is 217, that is on Slide 32 of the

1    PowerPoint, 317 WL 11634619, and the *Watson* case.

2         These cases make clear that Your Honor as the judge must

3    determine whether there's a false statement, whether it was concerning

4    someone, whether there's a publication as to each one of these.  The

5    list that we have provided Your Honor and also counsel, this is a list

6    that is plaintiff's list.  Many of these statements are duplicative.

7    Many of these statements are the same interview, the same podcast, the

8    same social media post and so they can be grouped together.

9         In the far right column we articulate the reasons why they

10   must be dismissed as to True the Vote and I'll talk about that more in

11   a moment.  We have really narrowed the statements into three buckets,

12   three buckets.  The first bucket are statements that True the Vote

13   defendants - I'm going to refer generally to them, Ms. Englebrecht,

14   Mr. Phillips, and True the Vote - they didn't say they didn't do.

15   This is Mr. D'Souza posting on social media, talking on podcasts

16   unrelated completely to True the Vote defendants.

17        Next you have the film, the trailer, the music video.  True

18   the Vote didn't publish it, it had no editorial control, that's not

19   what True the Vote does.

20        And then last you have the interviews which is about four

21   interviews.  One and 2, Buckets 1 and 2, the D'Souza statements, the

22   film trailer, and music videos.  The only way True the Vote can be

23   liable for those is conspiracy.  They didn't publish it.  They had no

24   editorial control.  We'll talk about that more in a moment.  So if the

25   conspiracy claim dies, which it should and does, then Buckets 1 and 2

1    are gone as to True the Vote.

2         It then comes down to the third bucket which are statements

3    True the Vote actually said and those should likewise be dismissed.

4    For purposes of evaluation of the Court and simplifying what I think

5    plaintiffs have made an overly complicated case, no civil conspiracy,

6    1 and 2 are over.

7         What do you have to prove to prove civil conspiracy?  Well,

8    there's a case that's very spot on which is the *Turnage* case.  This

9    is -- go back one more.  So these are -- as I say, *Watson* and *Reid*,

10   each of these one-by-one must be evaluated whether there's a

11   conspiracy.

12        From a general perspective, there was no conspiracy.  There

13   was no conspiracy by the defendants to say, guys, we're going to work

14   together in concert to defame someone that we do not know exists.  We

15   don't know who he is, we don't know where he is, we've never seen him,

16   we couldn't pick him out if he was right in front of our face.  We're

17   going to work together to defame him.  That's what is required for

18   conspiracy.

19        You can't create -- you have to think, Judge, the slippery

20   slope of broadening a conspiracy to such a wide net that you can

21   jointly do something that you don't know what you're doing and create

22   a cause of action that has 20 depositions, going against 30 lawyers,

23   to force you to have to defend a lawsuit over multiple years.  That is

24   not what the law says and the policy that creates is dangerous and a

25   significant deviation of what the clear jurisprudence says.

1          The clear jurisprudence says you must have - and this is a

2     finding from the *Dowd* case - specific evidence of joint purpose to

3     defame.  Not joint purpose to make a movie, not joint purpose to do

4     research on something that's very important to you.  Joint purpose to

5     defame.

6          As a matter of commonsense, you can't defame someone you

7     don't know exists, and this begins to rip the veil off of what Slide 1

8     or 2 said.  This case is not about Mark Andrews, it never has been.

9     He's not here today, no defendant knows who he is.  This case is about

10    a message in search of a messenger which at a conceptual level should

11    not be what the civil justice system is used to do.  But for purposes

12    of this claim you can't have specific evidence - I'm citing from the

13    case - of a joint purpose to defame a person you don't know.

14         Okay.  Next case -- or next slide.

15         THE COURT:  So are you saying that the coconspirators

16    need to have -- need to know the name of the person, that you can't

17    defame someone based on a visual depiction?

18         MR EVANS:  I have not seen one defamation case, Judge,

19    where you have a defamation claim against a person you don't know, and

20    it makes perfect sense.  Every defamation case I've read -- and this

21    is where I go into plaintiffs are trying to smoosh facts into a claim

22    it doesn't fit.

23         Every case - and I will welcome Your Honor and your

24    brilliant clerks to search - is about a malice, this person made me

25    mad, I'm going to call him a bad name against a tangible human being

1    that you know.  You can't make a generalized statement, and here there

2    was no statement about Mark Andrews specifically, and not create a

3    defamatory cause of action.  That would create -- number one, it would

4    be a profound deviation from decades, even centuries of defamation

5    jurisprudence and, two, it creates a policy that is dangerous and

6    opens the door for limitless defamation claims.

7             THE COURT:  So you're saying, let's say

8    hypothetically -- and let's remove the sort of blurred depiction of

9    this for the moment, okay.  But you're saying, Mr. Evans, that if

10   somebody were to put your photo on the evening news, perfect accurate

11   depiction of you, and say "This person is a criminal," you're saying

12   you don't have a defamation claim?

13            MR EVANS:  Well, there's two parts of that.

14            THE COURT:  Because they didn't name you by name?

15            MR EVANS:  Yeah.  There's two parts of that.

16        So, one, it depends on who was the one that put the photo

17   up.  It depends on -- if I'm the speaker, let's say I'm the speaker --

18   so generally would there be a potential defamation claim?  There could

19   be, but as to who is the question and as to who is -- if the person

20   who put it up -- if I didn't put it up.  Let's just say I'm the one

21   they're suing.  If I didn't put it up, I didn't speak the words, I had

22   no control over it, I can't be liable for it.

23            In this next case, *Turnage*, I think, Judge, is a good case

24   that can provide another layer of color on this, and I love this case.

25   Your Honor's probably read it.  It's one of my favorite cases I've

```
 1   probably read in four months.  It's about two neighbors that get in a

 2   fight and it's amazing how this fight turns.  It starts from one

 3   neighbor's son driving a motorcycle and the other neighbor -- the

 4   other neighbor then putting up a cord, the other one pushing and

 5   shoving him in the chest.  But what this case says is for

 6   defamation -- I'm going to read the case.  It's on Page 854.

 7            This case says while it is true that a person who has not

 8   spoken slanderous words may be held liable for them if they were

 9   uttered by another in furtherance of a conspiracy to which he was a

10   party, there must be a showing that, one, both parties were present

11   when the slanderous words were uttered and, two, the slanderous words

12   were spoken by one party, was done with the consent of the other party

13   and in furtherance of a common design and purpose.

14            So, one, you have to be present when it's uttered and, two,

15   they must be done with consent.  If you look at -- and, again, Your

16   Honor, the law is clear, we have to evaluate these one-by-one.  Bucket

17   1 and 2.  The core comment in this case was a comment made by Dinesh

18   D'Souza saying "What you're seeing here is a crime."  Dinesh D'Souza

19   testified he had complete editorial control.  True the Vote had zero

20   editorial control.  But this was his film.  This was done by his media

21   company, D'Souza Media, that is uncontroverted in the record.  The

22   plaintiffs try to create an issue by saying, oh, True the Vote had an

23   opportunity to comment, True the Vote could have said this.  Well,

24   guess what.  Georgia law makes clear that's not enough.

25            THE COURT:  I mean, you're making this argument in the
```

1    context of the civil conspiracy claim and what you're suggesting is

2    that each coconspirator has to be present for every act in the

3    conspiracy which belies hundreds of years of jurisprudence.

4              MR EVANS:  I'm not making it up, Your Honor.  I'm

5    reading it from the opinion.  That's what the opinion says.  This is--

6    I didn't say anything.  I read verbatim from the opinion.  So the

7    opinion says that -- and this is a Georgia state court.  This is a

8    substantive claim so we're applying Georgia state law.  You must be

9    present and you must have consent of the other party when you make it,

10   that is the law.  Now, in addition to that --

11             THE COURT:  For a conspiracy claim?

12             MR EVANS:  That's correct, Judge.  That's right.

13             THE COURT:  We'll take a look at it.

14             MR EVANS:  Yeah.

15        Number one, I think that's spot on.  But regardless,

16   applying the law more broadly you have to have intent to defame.  You

17   can't have intent to make the film.  You can't have intent to talk

18   about an issue that's very important to the public and reveal concerns

19   that the public finds important to them.  You can't defame a human you

20   don't know.

21        Okay.  Next slide.  So here is -- and that's conspiracy.  I

22   would argue, Judge, that with no conspiracy, with no working together

23   to defame Mark Andrews, who no one knew who he was, Buckets 1 and 2

24   die to True the Vote.  True the Vote can't be liable for them, they

25   didn't say them, they didn't consent to them, they didn't write the

1    script for them, those die, those narrow the issues.

2          Directly they likewise can't -- and I'll talk about why.

3    But what's important first -- okay, that's fine.  What's important

4    first, Judge, is in defamation cases summary judgment is the rule, not

5    the exception.  Defamation actions should be disposed of at the

6    earliest possible stage of the proceedings if the facts as alleged are

7    insufficient as to matter of law to support a judgment for plaintiff.

8          In the U.S., we support free speech.  The First Amendment

9    is something -- it's very important here and this is an issue that's

10   of public concern and we should not allow these cases to continue and

11   the first opportunity that Your Honor sees a lack of evidence to

12   support the claims -- and, again, they have to prove them one-by-one.

13   If Statement Number 1 dies, True the Vote needs to be dismissed now.

14   If Statement Number 2 dies, True the Vote needs to be dismissed now,

15   that's why we are here and that's why this is so important.

16         Next slide.  So again more generally.  As I talked about

17   earlier, this is not a defamation case.  This is not we identified a

18   particular individual and said something bad about him.  Nothing was

19   said about him personally, nothing said his name, we didn't know him.

20   We cite a couple cases which are standard defamation cases.

21   Disgruntled former employee.  I've seen some about an ex-wife fighting

22   another ex-wife, which is a case I'll cite shortly.  Very interesting

23   fact patterns in these case, but they're very interesting fact

24   patterns because they involve people with a history who know who they

25   are, that's not this case.

1          All right.  Next slide.  So here are the three buckets that

2     we talked about.  D'Souza, statements, no knowledge, didn't know he

3     said it, didn't consent to him.  He said them on his own.  The film,

4     the trailer, music video, D'Souza Media did them, complete editorial

5     control.  There's nothing in the record that says they didn't.  Mere

6     input is not enough, and I'll talk about that case in a moment.  That

7     narrows it to three and we'll talk about those, as well.

8          Go ahead.  Next slide.  So here are the big D'Souza

9     statements.  The book, the media appearances that he solo appears on,

10    social media posts that he solely makes on his Twitter, podcast

11    appearance that he solely does, Times Square billboard, that was him.

12         Next slide.  No True the Vote involvement, we didn't

13    publish them, made exclusively by him.  As I established earlier,

14    there's no conspiracy.

15         Okay.  Next slide.  Here are some of the alleged statements

16    that the plaintiffs allege True the Vote should be liable for.  This

17    is his Twitter.  My clients don't have access to his Twitter.  My

18    clients don't have access to his keyboard.  We don't have any way to

19    input one way or another what he posts.  He did this, not us.  If

20    anyone is liable - and we're not saying Mr. D'Souza should be liable -

21    it's not us, it's him, he said it.

22         Okay.  Next slide.  So here again this is the *Turnage* case,

23    this is the language.  There must be a showing both parties were

24    present and that the slanderous words were said with the consent of

25    the other party, that's *Turnage*, 2010, Georgia Court of Appeals case.

 1          So the next batch, the film, the trailer, and music video.

 2          Okay.  Next slide.  No editorial control.  I want to talk

 3     about some specific cases here.  The first is the *Miller* case, which

 4     is 242 Ga.App. 811.  I'm going to read some important language.  This

 5     is a case where -- a defendant was sued.  He was the campaign manager

 6     for an ad that ran.  The individual did provide input on the ad.  The

 7     individual did operate as a go-between and communicates in the context

 8     of the ad maker, but he had no ultimate control.  So what the court

 9     says, one, reading from the opinion, we have held that publication and

10     tells the ability to control the libel.  A core element, an

11     indispensable element of a defamation claim is publication and to have

12     publication you must have control.

13          So the court goes on to say with this framework Miller

14     cannot be liable for playing some lesser role such as contributing

15     background information for the article or allowing Sams to use his

16     office to write the ad and his employees delivering the ultimate paper

17     that did not entail controlling the content of the ad.  With this

18     framework in mind, we find plaintiff failed to present any evidence

19     that Miller exercised the requisite degree of control.  Sams testified

20     unequivocally that she alone wrote the ad, including the word stolen.

21     Miller likewise testified that he did not write the ad.  None of the

22     evidence identified by plaintiffs contradicted testimony or suggest

23     that *Miller* had any control over the statement, that's just what

24     happened here.

25          Mr. D'Souza testified under oath that True the Vote -- by a

 1    question from plaintiff's counsel -- did True the Vote have any

 2    editorial control of the film?  He responded zero.  There was then a

 3    followup question.  Whose film was this?  It was my film.  My

 4    company's film.  He's very proud of the film, I get it.  But

 5    ultimately what the court says plaintiffs point out that Miller gave

 6    Sams information and acted as a liaison between Sams and Brown.  While

 7    this evidence suggests that Miller may have helped shape Sams' views

 8    about Brown's situation and plaintiff's role, it does not signal that

 9    Miller controlled the ad's content, including the reference to the

10    stealing.  While True the Vote may have had some input and views by

11    doing the research, it did not control what was in the movie, it did

12    not control what the script said, it did not control who said it, and

13    none of the True the Vote defendants said it.  Spot on.  That shows

14    Bucket 1 and 2, no publication, no control undisputed in the record

15    dies.

16              THE COURT:  But control is a conclusion; right?  It's

17    not a fact.  It's a conclusion based on the facts.  It seems to me

18    that the record has facts that at least circumstantially suggest that

19    there was coordination about the content of the broadcasts.

20              MR EVANS:  I would -- I think the record is very clear

21    on this issue.  If you look at plaintiff's statement of undisputed

22    fact - which I know Your Honor will do and your clerks will do, I'm

23    absolutely certain you will do it - the only thing that they cite is

24    they say True the Vote had an opportunity to input, provide input.

25    What they additionally try to do, because they know that this opinion,

1   there's two other opinions, make them dead in the water, they try to

2   create a standard which doesn't exist under the law and they say True

3   the Vote could have voiced opposition and tried to change it and

4   affect it, that's not the standard.

5          Number one, there's nothing to say that if True the Vote

6   said do not publish this that it wouldn't have been published anyway

7   by D'Souza Media.  It was his film, he was the publisher.  True the

8   Vote was in a very subcontractor under cuff role.  Also, there is no

9   opinion that has ever written into the law an affirmative duty to try

10  to change what someone else's editing controlling.  There's nothing

11  that says in the media context if I go on a TV show and they show a

12  video that I have to go back and try to get them to change it, they

13  don't have any obligation to stop me.  That would be creating new law

14  that does not exist and because of that fact it's irrelevant.  It's a

15  red herring that's trying to put the court in an affirmative duty

16  which does not exist under the law.

17         The next case - very quickly, Judge, because I know I have

18  10 minutes left - is the *JonBenet Ramsey* case, 253 F.Supp 2d 1323.

19  Moreover - I'm reading from the opinion - even though the photograph

20  of plaintiff appeared on the screen when defendant made the statement

21  it is undisputed the defendant had no control over NBC's editing

22  decisions.  Nevertheless, even if they did it was not malicious.

23         Finally, Judge, the *Matthews v. Mills'* case reading from

24  the opinion there's no evidence in the record that Mills played any

25  role or had any control over the drafting or content of the report.

1    Accordingly, the trial court did not err in granting Mills' summary

2    judgment libel claim.

3         Just like Your Honor has done time and time again, when you

4    read 50 of these opinions on defamation, you can synthesize what the

5    law is over time.  What is critically important in Georgia defamation

6    law is if you don't have control you can't be liable, and it makes

7    complete sense.  If I don't have control over what's put in a film,

8    who says it, how it's said, what the script says, I can't be liable

9    for it.  I didn't ultimately publish it.  That's exactly what

10   happened here, undisputed.  There was no control, it was someone

11   else's film, they made the ultimate statement, we can't be

12   responsible.  So with no conspiracy, no control, those bases alone

13   knock out 1 and 2.

14        Now I would like to very quickly go over the final three

15   and then I want to talk about maliciousness, Judge, because that kind

16   of encompasses all of them.

17        Keep going.  All right.  Go ahead.

18        Okay.  Here's some of the testimony, Your Honor.  This is

19   in the record, you have this.  It's also in your PowerPoint.  So True

20   the Vote, also executive producers, did not have any editorial

21   control, zero.  They asked why True the Vote was copied.  Because

22   although we were empathetic from the beginning, the editorial control

23   of the film would be ours, this is our film, it's a D'Souza Media

24   project.  I'm the narrator of the film.  I didn't say that,

25   Ms. Englebrecht didn't say that, Mr. Phillips didn't say that.

1    Mr. D'Souza said it plain and simple clear.  That was not from a

2    question I asked.  I wish I could say I had this great deposition

3    line.  That was plaintiff.  They asked it.  They said it.  I don't

4    think there's any dispute on that issue.

5            So the final -- keep going.  Okay.  Here's the final ones.

6    One and two are done.  Each of these individually have to be

7    evaluated one-by-one-by-one.  We've probably knocked out about

8    80 percent of them.  We're down to a couple more.

9            First is the Tucker Carlson interview.  Tucker Carlson is

10   spot on in the *JonBenet Ramsey* case.  There's one other case we cite,

11   I believe it's the *Wolf* case, where if you go on the news - and I

12   don't know if Your Honor's ever been on - but you've got a TV in

13   front of you, you're trying to look at a little bubble here, you

14   don't know what they're showing.  Someone else is showing it.

15   Ms. Englebrecht goes on.  No reference to Mark Andrews.  Something

16   pops up for about 2 seconds and she's talking general about election

17   issues, ballot harvesting, that's it.  This is plain and simple

18   pointblank -- and this is Statements 17, 18, as I've said.  The

19   plaintiffs kind of make one statement into like seven statements, but

20   it's really just one statement.  She can't be liable for that.

21           The law is very clear.  When you go on the news, *JonBenet*

22   *Ramsey*, the *Wolf* case, you don't know what's being said or shown, you

23   have no editorial control, she couldn't have been referencing because

24   she didn't see it.  This is live TV.  There's no affirmative duty to

25   try to get it after the fact because that's not possible, that one

1    dies.  Gateway Pundit, that's --

2              THE COURT:  What about Mr. Kirk's statement that it was

3    taped and there was an opportunity to correct it before it was

4    broadcast, is there evidence of that?

5              MR EVANS:  That's a good question, Judge.  That's the

6    Charlie Kirk interview.  I can get to that one now.  I'm trying to

7    knock out these final four one-by-one.

8              THE COURT:  Okay.  Go ahead.  Sorry.

9              MR EVANS:  Yeah.  But that is a good question.

10             So Tucker Carlson, Number 3, gone for that reason.  Gateway

11   Pundit, another one.  This one, it was put up for one second, no

12   direct reference to Mark Andrews, didn't know who he was, no ability

13   to control, this was live, done.  Facts Matter with Roman Balmakov -

14   my pronunciation's awful of any Russian, I don't know what that is.

15   But same one.  They make one statement into like five statements, this

16   was one similar situation.  No editorial control, nothing.

17             Charlie Kirk is the one that you're referring to and I'll

18   spend a little bit of time on this because this is the one that

19   involves the -- this is the only one where it really comes down to any

20   interpretation of maliciousness -- or any assessment above editorial

21   control for the Court.  All of the claims, all the statements -- and,

22   again, Your Honor the laws are clear, you have to evaluate one

23   statement by one statement.  I can't just sue someone and put 55

24   statements in and say, oh, generally you're liable for all if you're

25   liable for one.  This is the only one that implicates any additional

1  interpretation aside from no conspiracy, no editorial control, they

2  all die.

3         I've got 4 minutes.  So this is one where they go and

4  appear on Charlie Kirk.  Charlie Kirk is primarily a podcast.  If you

5  have your phone now, you can go to the App Store and download his app.

6  Almost nobody actually watches it.  It does have like if you want to

7  go to YouTube and watch it.  So if you wanted to do that you could do

8  it.  But on this one the defendants' beliefs in what they said were

9  reasonable and what the law says is that if -- what you believe at the

10  time is an opinion and you're reasonable in making that opinion that

11  necessarily cannot be malicious.

12         If you look at the slide, I think 51 -- if you look at

13  these letters here, what Georgia law says is Georgia law says that

14  what defendants believe Georgia law in 2020 was that if an individual

15  goes to deposit more ballots than one they have to sign the absentee

16  ballot as an assistor.  You can't just go deposit more than one ballot

17  without having signed the underlying envelope.

18         They retained an attorney to draft this letter.  This

19  letter says surveillance footage shows a normal instance in which

20  individuals put multiple ballots at the same time.  In practice, this

21  is prohibited under Georgia law under very limited circumstances.

22  This is a November 30th, 2021, letter.  What this shows is -- at the

23  time the statement was made True the Vote believed earnestly - they're

24  not lawyers - that if you go deposit ballots, more than one, and you

25  haven't signed as an assistor that's not compliant with the law,

 1    that's what they believed.

 2            Now, if you go to the statute -- let's go to the statute,

 3    Phil, if we have that.  O.C.G.A. 21-2-385(a) and (b).  We've bolded

 4    the appropriate language here.  The elector, in preparing the ballot,

 5    shall sign the oath printed on the same envelope as the oath to be

 6    signed by the elector.  It's pretty clear, if you read that, it should

 7    be signed.  So at the time that they said this statement on Charlie

 8    Kirk they believed that you had to sign it.

 9            Now, they sent an Open Records request -- do we have the

10    Open Records request?  They sent an Open Records request to Gwinnett

11    County and they said, Gwinnett County, we want all of the absentee

12    ballot envelopes that have been signed by the electors.  Give us all

13    of them so we can evaluate if these people are properly depositing

14    more ballots than one in compliance with Georgia law.

15            Gwinnett said we have reviewed its files and determined

16    there are no responsive documents to your request.  So the ultimate

17    conclusion is the law requires you to sign an absentee ballot envelope

18    for more than one ballot to be deposited.  Gwinnett County says no one

19    has signed it.  So for the few people that -- and there were not huge

20    numbers of people that were depositing more than one absentee ballot,

21    that means they weren't operating compliant with the law.

22            So their belief -- and this is only relevant to Charlie

23    Kirk.  Their belief at the time when they said it - they're not

24    lawyers, they're lay people - is this person is not complying with the

25    law so they go on the Charlie Kirk Show and they say is this person

1    compliant with the law, they see the Gwinnett County depositing, and

2    they say, no, he's not.  He's not compliant with the law.

3             THE COURT:  Well, maybe that belief is true and maybe

4    it's not.  How am I supposed to make that determination without

5    weighing facts?

6             MR EVANS:  So malicious -- the case law says whether or

7    not there was malicious.  Maliciousness is an issue of fact that Your

8    Honor and the judge should decide.  Now for this one, too, all the

9    other reasons also apply for dismissal.

10            So, again, Judge, I've got 46 seconds.  I've got punitive

11   damages, too, but that one fails because all this failed which is we

12   have now narrowed it -- we started today seven claims, one dismissed.

13   We've dismissed all of the claims really down to defamation.  We've

14   now dismissed almost all of these because True the Vote had no

15   editorial control, no conspiracy, all of those are done.

16            The only one that now we're down to is Charlie Kirk and

17   this one dies of and concerning a person.  There is nothing -- this

18   is a critically important point, Judge, critically.  There is nothing

19   in the record that anyone ever identified Mark Andrews in the Charlie

20   Kirk interview.  While the daughter said she identified him in the

21   film, there is nothing in the record that anyone identified Mark

22   Andrews in the Charlie Kirk interview.  That is decisive because it

23   has to be of and concerning a person.  And even if you assume the

24   plaintiff's very broad theory, which is you can identify someone

25   after you're told about the film and you're looking, oh, is this my

1    dad, and it can only be your daughter, nobody identified him here.

2    So that fact kills this claim.

3           So I will very quickly go, Judge, for punitive damages.

4    Punitive damages here --

5           THE COURT:  That's not a separate claim; right?  It's

6    dependent on these other claims.  I'll let you talk about that during

7    your rebuttal time.

8           MR EVANS:  You're right, Judge.  If all the other claims

9    fail as to True the Vote, which they should, we went through

10   methodically in a deliberate way showing why, punitive damages

11   likewise fails.  This is a very significant and serious allegation.

12   You have to have willfulness conduct, malice, fraud, wantonness.  You

13   can't have this against someone you don't know.  There's no testimony

14   Ms. Englebrecht, Mr. Phillips, True the Vote knew who he was, hated

15   the guy so much that they're going to go through all this to defame

16   him or hurt him in some way, that one also necessarily must be

17   dismissed.  Thank you, Judge.

18          THE COURT:  Okay.  Thank you.  I bet you're regretting

19   telling me that 45 minutes was reasonable.

20          MR EVANS:  I'm proud of myself for making it, honestly.

21   Thank you.

22          THE COURT:  Well done.  Well done.

23          All right.  Why don't we take another break, this will be

24   the last one because Ms. Hyland's going to be able to consolidate her

25   arguments to avoid overlap with Mr. Evans, but you have your

1  45 minutes, and then we'll roll from there right into the rebuttal

2  time.  Okay.  So let's take another little over 10 minutes and be back

3  at 12:05.

4          (recess was taken from 11:53 a.m. until 12:05 p.m.)

5              THE COURT:  Ms. Hyland.

6          MS. HYLAND:  We need the screen, if you could.  Great.

7  Thank you.  Good afternoon, Your Honor.  We've officially transitioned

8  into the afternoon.

9           I'm going to level set before we do anything else today and

10 I want to go ahead and actually play the clip from 2000 Mules and I'm

11 going to refer to this throughout the day and I just want to make sure

12 that we're all on exactly the same page as to what I'm talking about

13 when I'm talking about this video clip.  In this clip you're going to

14 see an 8-second clip of a man struggling to get several ballots in a

15 drop box.  That man is Mark Andrews.

16                 (recording played)

17         MS. HYLAND:  Okay.  So I'm going to jump right in.  I

18 know we've got limited time and I want to jump right into the standard

19 of fault in this case.

20          This case is governed by actual malice.  In Georgia, we're

21 talking about O.C.G.A 51-5-7(4) which creates a privilege for any

22 statement made in good faith as part of an act in furtherance of an

23 entity's right of free speech in connection with an issue of public

24 interest or concern as defined in 9-11-11.1(c).  When we go there --

25 oops.  I'm advancing the slides, I'm sorry.  When we go there, we see

that the statute defines this speech as a written or oral statement

made in a public forum in connection with an issue of public concern.

So, some threshold questions here.  Are the statements in

this case made in a public forum?  We're talking about a film, a book,

media appearances.  I don't think there's really any debate that these

are public forums.  Then we ask are these a matter of public concern.

It's hard to imagine that there's much debate on whether the integrity

of a presidential election is a matter of public concern.

THE COURT:  Well, how do we define what the matter of

public concern is?  I mean, election integrity, that's pretty broad.

Who decides how broad or how narrow that question is?

MS. HYLAND:  So I think what you're asking, Your Honor,

refers to one of the comments in their briefs that the individual clip

of Mr. Andrews is not a matter of concern even if the film as a whole

is.  What I would say to that is, one, if we start dissecting all of

our news stories, our films, our documentaries to say is this one

little piece of it a matter of concern if it was a necessary

ingredient to the entire story or the entire film which wouldn't have

been possible without lots of little ingredients, then we completely

eviscerate the whole entire point behind the statute.

I would also say that if this clip had turned out to truly

capture someone engaging in ballot fraud, which Mr. D'Souza believed

it to be at the time, that would be a matter of public concern, if the

video had actually depicted what he thought it depicted.

So all that's left now is good faith.  So good faith can be

1    a little confusing here.  I'm going to walk through it in two steps.

2    The statute affirmatively requires good faith.  That good faith in the

3    context of the statute is the traditional sense of the absence of

4    malice, the absence of evil intent.  This parallels -- our case

5    parallels *Harkins vs. Atlanta Humane Society* where the Georgia Court

6    of Appeals looked at the issue, the *prima facie* issue of good faith,

7    and I'm going to quote from it.  It found good faith because the

8    purpose of the defendant's speech was to, quote, influence or persuade

9    government officials and the public at large to help change problems.

10   Boy, does that sound like our case today.

11           As I'm going to walk through in my remarks later, the

12   D'Souza parties have met the initial burden because there is

13   absolutely no evidence of malice or evil intent or ill-will anywhere

14   in this case, and I think Mr. Evans really stressed on that as well.

15           So once we have made this *prima facie* showing of meeting

16   the elements of 51-5-7(4), then it can only be overcome by the

17   plaintiff at that point.  We've got burden shifting.  It goes back to

18   the plaintiff to prove actual malice by clear and convincing evidence.

19           There have been some comments made by plaintiffs in their

20   briefing and it came up again today that we actually have additional

21   hurdles and additional requirements.  Namely here that privileged

22   communication can only be limited to a proper audience, scope, and

23   occasion.  First, I cannot find a single case anywhere in state or

24   federal court where that requirement has been applied to a 51-5-7(4)

25   case.  Okay.  I think that's obvious as to why.  This privilege

 1    requires a public statement about a matter of public concern.  It is

 2    entirely circular to then say, oh, but it can't be that public or it

 3    shouldn't have been public at all; right?  So the very fact that we're

 4    in the realm of this statute to begin with negates any need for a

 5    showing of a limited scope or a proper audience because we're

 6    inherently talking about matters of public concern made in a public

 7    forum.

 8            But I'll humor this for just a minute anyway and I will say

 9    we're talking about election fraud, we're talking about matters of

10    incredible public importance.  I think mass distributed media to the

11    American public is exactly the right scope and audience for something

12    like that.

13            So I'm going to proceed with a walk through of some of the

14    facts of this case and what I hope you will agree with me on is that

15    you're going to see that the D'Souza parties relied on experts and

16    these experts made representations to the D'Souza parties, to the

17    media, in their depositions and even in the 2000 Mules film itself

18    that the drop box surveillance footage, including that of Mr. Andrews,

19    had been linked to geospatial data and Mr. D'Souza had no reason to

20    doubt this, and I think you'll see why.

21            So I've got a timeline here and I'm going to walk through

22    some dates on this timeline.  So in early August 2021 Ms. Englebrecht

23    on behalf of her organization True the Vote and Mr. Phillips arranged

24    a meeting with Mr. and Mrs. D'Souza to pitch a film.  At this meeting

25    Mr. Phillips showed the D'Souzas materials, graphics, all kinds of

stuff came out in this meeting.  But the gist of it was they analyzed over 25 terabytes of data consisting of 1.2 trillion device pings and those had been analyzed in connection with the location of drop boxes to show that many individual cellphones pinged at a drop box on numerous occasions.  This was suggesting scientific evidence of voter fraud.

At that same meeting Mr. Phillips said that those pings could be matched to drop box surveillance footage.  At that meeting he shared his credentials with Mr. D'Souza.  He explained that he had been involved in election integrity for decades, that he worked for intelligence agencies, that he'd worked for law enforcement, he'd been the head of Human Services in Mississippi, the head of Health and Human Services in Texas.

So after that meeting on August the 12th Ms. Englebrecht sent the D'Souzas a draft affidavit including even more support for the methodology behind the geotracking project.  In her affidavit it explained that Mr. Phillips' organization had analyzed this data for cellphone pings around Georgia's 390 drop boxes and identified 242 devices of interest that had been within 100 feet of a drop box on 10 or more occasions.  The affidavit further bolstered Mr. Phillips' credentials and it indicated that $1.5 million had already been spent on this project.

Mr. D'Souza then starts doing his own research on geotracking.  He's looking at articles like the ones I'm showing right now confirming that geotracking is used by law enforcement to

1   investigate crimes and by the CDC to track the spread of covid.

2           So in October of that year Mr. D'Souza set up a meeting for

3   Ms. Englebrecht and Mr. Phillips to meet with the executives of Salem

4   Media knowing these executives would push hard and try to find any

5   holes in their methodology or anything else that they were relying on

6   for their film.  Mr. Phillips held up in this meeting and that was

7   when they agreed to do the film.

8           On January 7th TTV executed a licensing and nondisclosure

9   agreement with Mr. D'Souza's company and Salem.  This agreement forbid

10  TTV and its representatives from disclosing this drop box footage in

11  any manner.  On January 9th Mr. Phillips sent a batch of 70 drop box

12  surveillance videos to the D'Souza's editor.  They reviewed those

13  videos and they found them lackluster.  We've seen this email pop up a

14  lot in summary judgment.  This is Mr. D'Souza's business partner,

15  Bruce, wanting more videos.  He's not impressed with what they've got

16  so far.

17          So then throughout the month of January -- let's back up.

18  Throughout the month of January Mr. D'Souza did research for the

19  interviews and he did -- he didn't speak to anyone in this time

20  period.  This is important.  No one raises an alarm bell.  There's

21  nothing in the record to say that at any point in the production of

22  this film that anyone said don't trust Mr. Phillips, don't trust

23  Ms. Englebrecht, they're not credible, they're not reliable, their

24  skills aren't what they depict them to be.

25          So then Mr. D'Souza does these unscripted interviews for

1    the film and these make it into the film.  What you're seeing right

2    now is in the film, and I'm going to play this for you.

3                        (recording played)

4            MS. HYLAND:  Okay.  Unequivocal in the film that the

5    videos had been geotracked.

6            So on February the 10th - this movie is still in production

7    at this point - Ms. Englebrecht emails the D'Souzas a response to

8    Ms. D'Souza's request for more video.  I've highlighted the part I'm

9    going to read.  Okay.  So they've already got the 70 videos, right.

10   The 70 videos are already sent, they've already been reviewed, Bruce

11   has already complained about them, so here we are.  What does

12   Ms. Englebrecht say?  She says this an incredibly time consuming --

13   I'm sorry.  This is incredibly time consuming because it involves

14   reading the geospatial data to try and find a match in really poorly

15   detailed county video so only analysts can do this.

16           Okay.  I would also point to the sentence before it that's

17   not highlighted.  We have around 70 videos currently separated out and

18   are scaling efforts to review more, okay.  This is someone in the

19   process of doing more matching.  This is someone in the middle of

20   matching videos beyond the 70 with geolocation data.

21           THE COURT:  And who wrote this?

22           MS. HYLAND:  This is from Ms. Englebrecht.

23           THE COURT:  Okay.

24           MS. HYLAND:  In that same email Ms. Englebrecht offers

25   general footage.

1          THE COURT:  Do you have a Bates number or something we

2    can identify it with?

3          MS. HYLAND:  They're going to pull it really quickly for

4    me.

5          THE COURT:  Okay.  Okay.

6          MS. HYLAND:  We'll come back to it in a second.

7          THE COURT:  Okay.  Sounds good.

8          MS. HYLAND:  Okay.  So she's offering general footage,

9    right.  What did Mr. D'Souza think about that offer?  I'm going to

10   play his deposition.

11                    (recording played)

12         MS. HYLAND:  Okay.  And I'm also going to play some

13   clips from Ms. Englebrecht's deposition, Mr. Phillips' deposition to

14   explain, I would imagine, what they were telling Mr. D'Souza at the

15   time, right, this is the process of matching the videos.

16                    (recording played)

17         MS. HYLAND:  Okay.  So on March 27th the D'Souza team

18   received another batch of videos from Ms. Englebrecht.  This is the

19   batch from Gwinnett County that contained the image of Mr. Andrews and

20   this, I think, is one of the most important points in this entire

21   case, probably the most important in this entire case.  Did

22   Ms. Englebrecht tell the D'Souza team that the videos were not

23   geotracked?

24                    (recording played)

25         MS. HYLAND:  There's no recollection of ever providing

1    any kind of warning or any kind of disclaimer and there's certainly

2    none in the record in this case.

3            So by April the rough cut is completed and Ms. Englebrecht

4    and Mr. Phillips were invited to look at this rough cut and invited to

5    provide feedback twice, once in the D'Souza's home and again at

6    Mar-a-Lago.  So did they raise any concern about the way this video

7    was characterized?  And remember the very first clip that I showed

8    there's a voiceover being very clear that what you're seeing here is a

9    crime.  Were they concerned about that?

10                       (recording played)

11            MS. HYLAND:  Okay.  So, notably, nowhere in any of her

12    suggestions relating to the rough cut of the film is anything about

13    the characterization of the drop box video or the characterization

14    that it had been geotracked.

15            So before the film is released - and we're talking about a

16    month before the film is released - on April 8th Ms. Englebrecht and

17    Mr. Phillips filmed an interview with Charlie Kirk and we've talked

18    about that a lot today.  I want to stress here that Ms. Englebrecht

19    and Mr. Phillips set this interview up on their own without any

20    involvement from Mr. D'Souza for the purpose of promoting their own

21    research.

22            I think we've been a little fast and loose at times in this

23    case referring to defendants, okay, and I cannot be more clear here.

24    Mr. D'Souza did not know about this interview before it occurred and

25    there is nothing in the record to indicate that he did, okay.  At

1    Plaintiff's Statement of Material Facts 96, plaintiff himself states

2    in quotes from an email from Ms. Englebrecht saying we did an

3    interview with Charlie yesterday, it's supposed to air tomorrow, okay.

4    This is not Mr. D'Souza agreeing to this in advance or having anything

5    to do with it beforehand.  This is him getting an FYI about it after

6    it had already occurred, okay.

7          I believe also the assertion was made earlier that

8    defendants reposted this particular interview.  Defendants did not.

9    There is nothing in the record showing that Mr. D'Souza reposted this

10   and, in fact, he had no incentive to because, recall, he's trying to

11   keep this video footage close to the chest, right.  We're a month

12   before the film comes out.  This is not what he wants.  Okay.  So

13   going back.

14              THE COURT:  Nobody that he controlled reposted it?

15              MS. HYLAND:  Say again.  I'm sorry.

16              THE COURT:  Nobody that Mr. D'Souza controlled posted it

17   on any social media account?

18              MS. HYLAND:  No, no.  So I'm going to play that clip

19   right now or a clip from -- I'm sorry, a clip from that interview.

20                        (recording played)

21              MS. HYLAND:  Okay.  Yes.  So here in this interview

22   Ms. Englebrecht looking at the video of Mr. Andrews says that he is a

23   mule.

24              Going back to the timeline.  Now we get to the actual

25   release of the film first at Mar-a-Lago on May the 4th.  Then on May

1    the 5th Ms. Englebrecht does another interview.  This is before the

2    film is released to the public.  She does this interview on Tucker

3    Carlson.

4                        (recording played)

5                MS. HYLAND:  Okay.  So now we have a second interview

6    with Ms. Englebrecht clearly stating that the videos are geotracked.

7                Back to our timeline.  We get to the premiere nationally on

8    May the 8th.  I want to pause here on May the 8th when the film is

9    released to the public to say --

10               THE COURT:  Let me ask you again, Ms. Hyland, because I

11   just want to make sure I'm clear about the record, because I

12   understand the argument that Mr. D'Souza was not -- may not have had

13   awareness or involvement with the original broadcast of these shows.

14   But my recollection is that either him or someone that he controlled

15   reposted those broadcasts on social media.  Are you saying that's not

16   true?

17               MS. HYLAND:  Mr. D'Souza's staff reposted the Tucker

18   Carlson interview.

19               THE COURT:  Okay.  He did.

20               MS. HYLAND:  Okay.  So there is a repost of the Tucker

21   Carlson.  As I'll get to later in my presentation, there's no denial

22   of that.

23               THE COURT:  Okay.

24               MS. HYLAND:  Okay.  Okay.  So we know -- at this point

25   everything we've seen correlates the drop box videos to the

1    geotracking data.  We don't have any reason to think they haven't been

2    geotracked.

3              Okay.  I'm going to start a new timeline now.  I'm going to

4    start over and I'm going to begin this timeline on April the 8th back

5    to that Charlie Kirk interview that was on April the 8th, okay.

6              Let's begin this timeline here and I want to take a look at

7    this declaration.  This is the declaration of David Cross.  He's a

8    Gwinnett County citizen.  Mr. Cross saw that interview and was very

9    concerned about what he saw especially because it was happening in his

10   home county, right.  He's a Gwinnett County citizen.  This is just

11   like where truth is stranger than fiction.  Mr. Cross happens to be

12   sitting on all of the surveillance footage from Gwinnett County

13   because he had done an Open Records request himself prior to watching

14   this interview on Charlie Kirk so he's got all the video.  And then he

15   sees these clips on Charlie Kirk, including the Gwinnett County clips,

16   and that motivates Mr. Cross to go into his private personal stash of

17   video, find those same clips and put together a complaint to the State

18   Elections Board and it's because of that complaint that we kind of get

19   where we're going here to this State Elections Board investigation.

20             Okay.  As can be seen from the memorandum of the interview

21   of Mr. Andrews, what they did here to investigate him pretty much was

22   to interview him.  And going back here, May 17th, they hold a hearing

23   dismissing the complaint against Mr. Andrews.  They don't reference

24   Mr. Andrews in that specific hearing.

25             So Mr. Andrews has claimed throughout this case that this

investigation creates somewhat of an open-and-shut case that

Mr. D'Souza should have automatically understood at this moment in

time that his film is wrong and that Mr. Andrews was not a mule.  But

the law does not impose on Mr. D'Souza an obligation to believe in the

outcome of an investigation that he saw was woefully inadequate.

Actual malice requires us to ask if the defendant in fact

entertained serious doubts as to the truth of his publication.  So the

question is not whether the defendant could have or should have

believed that that investigation wasn't dispositive of the issue.  The

question is whether there is clear and convincing evidence that

Mr. D'Souza in fact doubted the truth of his film after that

investigation.

THE COURT:  And how am I supposed to make that decision

without weighing facts?

MS. HYLAND:  Without weighing facts?  There's nothing -

there's nothing in the record suggesting otherwise.  There's literally

nothing in the record suggesting that Mr. D'Souza believed the

investigation or doubted anything about his film afterwards.

THE COURT:  Right.  But you have the investigation

clearing Mr. Andrews' name and you certainly can't put your head in

the sand and sort of ignore counter facts; right?  So the argument

from Mr. Andrews would be that that should have at least prompted him

to ask questions and dig deeper before he doubled down on the idea

that Mr. Andrews was a mule.

MS. HYLAND:  So I wonder what kind of questions

1    Mr. D'Souza was supposed to ask and to whom, right.  We've got an

2    investigation that's been done, it's over, the case is closed.  It's

3    also apparent at this point in time that the entire investigation was

4    triggered by Mr. Cross's complaint and the face of that complaint

5    makes very clear that there's geotracking data out there, right.  That

6    Mr. Andrews, at least according to what was on Charlie Kirk, that

7    Mr. Andrews had been geotracked, okay.  It was in Paragraph 23, I

8    believe, of Mr. Cross's declaration.

9           So the State Elections Board, what do they do?  Do they ask

10   for that data?  Do they go to True the Vote?  Do they try to replicate

11   some kind of analysis that prompted this investigation in the first

12   place?  No.  And at this moment in time Mr. Dinesh fully, completely,

13   and reasonably believed that that video had been geotracked, okay.  So

14   he's seeing an investigation where the very research and scientific

15   data that he thought existed was never even looked at and they went to

16   his home, they asked the suspect if he committed the crime, and he

17   said he didn't and that was it.  Mr. D'Souza talks about this in his

18   deposition, if I can play it for just a moment.

19                      (recording played)

20          MS. HYLAND:  Okay.  And Mr. D'Souza was posting, as he

21   does, around this time and I think those posts also show what he in

22   fact believed about the secretary's investigation.  I wish these were

23   a little more clear.  I'm sorry that they're not.  I think we can make

24   them out.

25          Okay.  These are just three of his posts from the time.

1    Mr. D'Souza did not find this investigation credible.  Furthermore, he

2    wrote the book.  He spent an entire chapter of his book responding to

3    criticisms of the film further evidencing he truly believed in the

4    film.  But at some point we get to a place where we know that

5    Mr. Andrews was not geotracked and that part of the story begins

6    during this lawsuit.

7                         (recording played)

8               MS. HYLAND:  Okay.  So Red Metrics did the linking of

9    the geospatial data to the videos.  By the way, this is a deposition

10   of Red Metrics.

11                        (recording played)

12              MS. HYLAND:  Okay.  So on October 30th, 2024, we get

13   this information.  That is the date on which Mr. D'Souza in fact

14   entertained doubts as to the truth of what was in his film.  And what

15   did he do?  He did this.  He apologized.  As you could predict, this

16   was picked up by every national press organization.  This came at

17   great personal humiliation to Mr. D'Souza to do this, but he did it

18   because it was the right thing to do.

19              And I could speculate what happened here and I could take a

20   guess on why these videos were provided to Mr. D'Souza under false

21   pretenses, but that doesn't really matter for purposes of our motion

22   for summary judgment.  What matters is what Mr. D'Souza and his team

23   knew and when they knew it.

24              Despite everything I've shown the Court today - and all of

25   this is in our summary judgment briefing - Mr. Andrews still argues

that he has clear and convincing evidence of actual malice and I want

to address his arguments.  The first argument he makes is related to

this particular email.  So this is an email forwarded from a guy named

Hugh to a guy named Edward to Dinesh and you can see in the first

line, see below the first two paragraphs of the email Hugh sent me.

Okay.  I think there's been some confusion that these were the words

of Edward, the executive chairman of Salem.  It is not.  Edward is

forwarding an email from this guy Hugh and Hugh doesn't really think

the movie is convincing, right.  He's not saying I don't think your

drop boxes were actually geotracked.  He's not making any comment

specific as to any of the facts that have actually come up in this

case.  He's just not persuaded.  I'm not really sure how this is

relevant, honestly, to this case.

        Then we have this, right.  This is the text from May 18th

and Mr. Phillips at the beginning here is talking, right, and the

first thing he does is express frustration over an *AJC* article.  He's

complaining about it.  He calls it comical.  He knows it's not

credible.  He's citing to True the Vote's own evidence, he's linking

to it.  And then after all of that he says this isn't a mule, didn't

reach the threshold.  Mr. Andrews would like the Court to construe

this text as a bombshell confession from Mr. Phillips, right, which at

this point in time is what this would be.  This would be a bombshell

confession in light of everything we've seen prior.

        THE COURT:  You mean Mr. D'Souza?

        MS. HYLAND:  Mr. D'Souza, right.

1          Mr. Andrews wants the Court to say there's only one

2    interpretation of this text and that is that this is something

3    Mr. D'Souza would take seriously, that he would read carefully, that

4    he would pay attention to, that he would digest, but that's really not

5    what the context of this string shows, right.  This context, for one,

6    shows this is the week after the premiere of the film.  Mr. D'Souza is

7    drowning in media appearance requests.  He's a very, very busy guy.

8    And if you could go into the record further here they're going back

9    and forth back and forth and back and forth and back and forth all

10   day, right.  This isn't just some, you know, singular text that pops

11   up.  Notably, Mr. Phillips doesn't say we didn't geotrack Mr. Andrews.

12   Okay.  Mr. Phillips does not say the movie is wrong.  Mr. Phillips

13   does not say we made a mistake.  Mr. Phillips doesn't say anything

14   here to cause alarm.  He says the mule didn't reach the threshold.

15                         (recording played)

16          MS. HYLAND:  Okay.  And this is really important because

17   as long as we're talking about thresholds we're assuming the existence

18   of geotracking, right.  The idea that we would be having any

19   discussion about meeting a threshold, the very definition of threshold

20   comes from the idea of how many pings around a particular box do we

21   need.  How many times does a cellphone ID need to go to a particular

22   drop box in order for us - "us" meaning the producers of this film and

23   TTV and Gregg and Katherine to call them a mule, count them, include

24   them in the film, etcetera, etcetera.

25          THE COURT:  So the threshold is the number of visits,

1    not the number of ballots?

2            MS. HYLAND:  Correct.  Correct.  Exactly, Your Honor.

3            I'm again going to really stress actual malice must exist

4    at the time of publication and so at the time of publication does

5    Mr. Andrews show a high probability - and I'm quoting from cases

6    here - high probability that Mr. D'Souza published the video clip of

7    Mr. Andrews with a high degree of awareness that Mr. Andrews was not

8    actually a mule.  The answer to that is no.  There is simply no clear

9    and convincing evidence that Mr. D'Souza or anyone on his team had a

10   high degree of awareness that the drop box video provided by TTV and

11   Mr. Phillips had not been geotracked.

12           The whole rest of my presentation relates to the

13   identifabilty in the of and concerning requirement.  I'm out of time.

14   Perhaps I should save that for rebuttal.

15           THE COURT:  That would be good.  Let me ask you another

16   question before you sit down, though.  This argument of actual malice

17   is all premised on the statute kicking in; right?

18           MS. HYLAND:  Correct.

19           THE COURT:  Which as a threshold matter first requires a

20   finding of good faith?

21           MS. HYLAND:  Correct.

22           THE COURT:  Do you have a case where good faith was

23   found as a matter of law?

24           MS. HYLAND:  Yes, Your Honor.  Give me just a moment.  I

25   believe in *Neff vs. McGee*, 346 Ga. App 522, 2018.  I believe in *Fine*,

1    F-I-N-E *vs. Commuin Trends*, C-O-M-M-U-I-N Trends, 305 Ga. App 298,

2    2010.  *Amin*, A-M-I-N, *vs. NBC Universal Media*, 2022.  US Dist Lexus

3    208063, that's 2022.

4                    THE COURT:  Thank you.

5                    MS. HYLAND:  Thank you.

6                    MR. VINING:  Your Honor, if I may.

7                    THE COURT:  Oh, the citation, yes.  Thank you.

8                    MR. VINING:  We were looking at a February --

9                    THE COURT REPORTER:  I'm sorry.  Could you speak into

10   the mic?

11                   MR. VINING:  Is this better?

12                   THE COURT REPORTER:  Yes.

13                   MR. VINING:  We were looking at a February 10th, 2022,

14   email from Ms. Englebrecht to Ms. D'Souza and that comes from the

15   D'Souza Defendants Statement of Material Facts Paragraph 60 and that's

16   Docket Number 294-2 and that cites to Exhibit 22 which is Bates Number

17   TTV7276 through 7277, and that's Docket 271-3.

18                   THE COURT:  What's your name again, sir?

19                   MR. VINING:  Austin Vining.

20                   THE COURT:  Okay.  Thank you very much.

21          All right.  We're moving on to the lightning round.

22    15 minutes each side.  Nobody's going to be upset if you use less

23    than your 15 minutes.

24                   MS. HABER-KUCK:  Okay.  So with respect to the TTV

25    arguments, again, I want to -- I just want to stress that this version

1    of facts that Mr. Evans talked about with respect to harm, those are

2    all disputed facts.  It's Plaintiff's Statement of Facts 144 to 153.

3    We have defamation per se here and harm is presumed so that's really

4    not a relevant point in terms of whether we've satisfied the elements

5    of the claim.  It may go to damages, as I said.  But in terms of

6    whether the elements of the claim are made out, it's presumed, so that

7    whole argument is irrelevant.

8            Mr. Evans spent a lot of time talking about how you can't

9    defame a human that you don't know, which makes no sense.  They

10   defamed the person on the screen.  They put up a picture of a person

11   and said he was a criminal.  Whether they knew his name or not is

12   irrelevant.  The problem here is they thought nobody would ever catch

13   them and they did and now they're caught.  But they put up a picture

14   of a person and they said that person was a criminal.

15           The *Turnage* case, we deal with that in our brief, our

16   opposition brief, 61 through 63, and we cite the *Woodruff* case there

17   that -- as Your Honor noted -- and that's the Supreme Court of

18   Georgia and it's talking about conspiracy and they say, quote,

19   conspiracy is important to the action because it will enable the

20   plaintiff to recover damages not only from the actual participants

21   engaged in committing industry, but also from those defendants who

22   conspired to accomplish it although neither present nor

23   participating, and that's the Supreme Court of Georgia.  So we

24   distinguished *Turnage*.  But whatever *Turnage* says, it doesn't trump

25   the Supreme Court.

 1          THE COURT:  That sounds more in line with conspiracy

 2   law.

 3          MS. HABER-KUCK:  And then just I wanted to refer the

 4   Court -- in terms of this issue that we discussed about whether this

 5   tape -- the video was public record.  I would refer to our Statement

 6   of Material Facts at 25 through 26.  That's where we have all the

 7   evidence about -- there's a lot of testimony by Mr. D'Souza on the

 8   highly confidential nature of the video.  It became an issue because

 9   in the licensing agreement TTV agreed to provide, quote, highly

10   confidential film footage containing evidence of voting irregularities

11   that occurred during the 2020 U.S. presidential election.  The

12   question became, well, is this public record or is it something else?

13   Mr. D'Souza goes on at length about it's difficult to get this video,

14   it's not available online, and you simply search it by Google and it

15   pops up.  You have to go through a complex process.  You often have to

16   pay money to get access to this video.  You sometimes need legal

17   expertise to be able to retain it.

18          Not only did TTV have this video but, more importantly,

19   they had gone through the video and they had in an ocean of

20   essentially nothing had excavated particularly meaningful content

21   clips and so on.  They are the clips they have painfully culled from

22   this large body of video so it's not easily obtainable.  It's not a

23   matter of public record in the same way that you can go look up

24   whether someone voted in a particular election.

25          On the point that -- about when Mr. Andrews's name became

 1   public, there was an argument that it never became public until the

 2   lawsuit.  I would refer to our response to Paragraph 67 of TTV's facts

 3   and in that paragraph they cite an email from the general counsel for

 4   the Georgia Secretary of State's Office who sent a text to plaintiff

 5   and in that he said, we're presenting the case where a person

 6   wrongfully accused you of harvesting ballots to the State Election

 7   Board tomorrow.  We will of course tell the board that there appear to

 8   be no violations and the case should be dismissed.  I'm concerned that

 9   there will be media attention to this case and I wanted to give you a

10   head's up on that.  We will not identify you by name at the meeting,

11   but Open Records law will allow media public to get the investigative

12   file after the case is dismissed so then your name will be public.  So

13   as soon as they made that decision Mr. Andrews's name became public.

14          THE COURT:  But that's from Mr. Cross's complaint, not

15   from the movie.

16          MS. HABER-KUCK:  Well, there was an argument that like

17   no one knew who this person was who was in the movie and who had been

18   cleared until we brought this lawsuit and that's just not - that's

19   just not accurate from their own Statement of Facts.  His name was out

20   there after the investigation and that's why I also said then it's

21   somewhat irrelevant, then, that when the film is released in over 400

22   theaters nationwide a week later it's blurred because at this point

23   his name is out there.

24          On the issue of editorial control, I don't think Mr. Evans

25   ever addressed the point that when the TTV defendants reposted those

```
 1   interviews and republished the statements, whether they originally had

 2   editorial control or not, the reposting of it itself is defamation.

 3              THE COURT:  So you would agree that they're not liable

 4   for the original broadcast?

 5              MS. HABER-KUCK:  No, I think that they are.  I think, as

 6   I said, particularly -- I mean, you just watched the video.  It's not

 7   a question of -- when they're on Charlie Kirk, it's not a question of

 8   somebody showing something they don't know what it is.  I mean,

 9   they're talking through that video with him and they've said that they

10   didn't say the things that are reflected there.

11              They never said, oh, they edited it out and they took out

12   all the good things or they changed our words.  No.  We say that

13   they're liable for that as well.  But to the idea that like they're

14   not responsible for anything because they didn't have editorial

15   control -- again, like the movie, they appeared on stage and took

16   credit for it.  They were interviewed in the film and they promoted it

17   as TTV's movie.  How they can now say like no editorial control, we're

18   not responsible for that.

19              On the Charlie Kirk interview, I just want to just quickly

20   go back to that assistor argument.  The point is they didn't just say

21   when the video of Mr. Andrews was playing, oh, this person is

22   illegally depositing multiple ballots, that's not what they said,

23   which is the assistor point.  What they said is this person is a mule.

24   And he says one of your 2000 that's profiled?  And they say yes.  The

25   whole point of the mule concept is that the person went to multiple
```

1  boxes depositing ballots which they picked up from the nonprofits.  So

2  the fact that one person went and deposited four ballots, yeah, maybe

3  that clears you on the assistor, but calling them a mule has nothing

4  to do with the assistor point.

5          As to the D'Souza defendants, the clip that Ms. Hyland

6  started with which is talking about vote harvesting and it actually

7  does acknowledge that family members could deposit more ballots than--

8  they could deposit the ballots of their family members and they're

9  talking specifically about harvesting ballots.  But as I said, this is

10  not about 8 seconds in the film.  It's about the use of plaintiff's

11  image as a poster child mule in an extensive campaign to promote the

12  film and the narrative and that's why we have all these statements.

13          I would just say when we were talking about the statements,

14  we do go through them all in Paragraphs 92 to 138 of our Statement of

15  Facts so we have gone through each statement.  Again, I think that

16  they're all the same statement.  It's almost like a continuing

17  defamation.  So I don't think the Court would have to go through each

18  one, but if you believe you do, it's all there.

19          With respect to Mr. D'Souza's point that the credentials of

20  Mr. Phillips and Ms. Englebrecht, they had a great reputation, no

21  reason to doubt them, I would refer to Paragraph 55 of our Statement

22  of Material Facts where we go through all the reasons that they should

23  have known that, in fact, they did not have a good reputation.

24          On the actual malice point, I would say -- you know,

25  Ms. Hyland didn't really address the reckless disregard point.  I

 1   think the -- as I said, we go through in Paragraph 201 to 212 about

 2   all of the concerns that there were when they were making the film

 3   and, as she pointed out, they kept telling TTV they needed tracked

 4   video.  Ms. Englebrecht said, oh, it's very hard to do.  And then

 5   miraculously all of this perfect video which they didn't have before

 6   materializes.  I mean, that in and of itself should have raised a red

 7   flag.  They also put in their papers, you know, that law enforcement

 8   wasn't listening to TTV, another red flag.

 9           I think we go through the red flags in our papers but even

10   if you go to this point where Mr. Phillips very clearly says he's not

11   a mule -- you know, Ms. Hyland said, well, who would we have asked?

12   Well, they could have asked Mr. Phillips and Ms. Englebrecht.  He

13   could have said to Mr. Phillips what do you mean he's not a mule?

14           There's another email from Ms. Englebrecht in the record

15   where she says to Mr. D'Souza, you know, I want to talk to you about

16   your interviews you have coming up because there's some tiger traps

17   and there's non-mule footage in the movie.  Now, Mr. D'Souza says,

18   well, you know, there were lots of non-mules in the movie.  You know,

19   TTV people were in the movie.  But again -- we put it in the papers.

20   But if you look at the accumulation of evidence, it's clear we could

21   make a case for reckless disregard.

22           THE COURT:  And that is a subset of actual malice?

23           MS. HABER-KUCK:  Well, the standard for actual malice is

24   actual knowledge or reckless disregard for the truth.

25           THE COURT:  Okay.

1              MS. HABER-KUCK:  Let me find it here.  Actual malice

2    requires the defendant, quote, either they knew the allegedly

3    defamatory material was false or published it with reckless disregard

4    of whether it was false or not.  That's an Eleventh Circuit case,

5    *Straw vs. Chase Revel* we cite on Page 21 of our opposition.  I think

6    Mr. D'Souza in his brief has a long discussion of the actual malice

7    standard and even if there's some issue as to whether he knew or

8    didn't know it was false certainly there's enough to show reckless

9    disregard here, particularly with respect to the book.  We also sent

10   them a cease and desist letter which, again, he just says he didn't

11   take it seriously.

12             But, you know, I would submit that's why I think the quote

13   from Mr. Schooley is significant because they wanted to believe it,

14   right.  He says I don't believe the video, but I want to -- and I want

15   to believe it and that's what it was.  They wanted to continue making

16   money off of this and promoting the video and so they disregarded all

17   of the evidence that was to the contrary.

18             THE COURT:  Now, I'm gathering you're not conceding,

19   though, that the actual malice is the standard.

20             MS. HABER-KUCK:  No, I'm not.

21             THE COURT:  And that is because, from what I understand,

22   your position is that the privilege statute does not kick in because

23   there's no showing of good faith?

24             MS. HABER-KUCK:  Right.  And I went through those

25   paragraphs where everyone admits they never had any evidence.  So if

1  they never had any evidence I'm not sure how in good faith you could

2  say this person, even if you don't know the name, this person is

3  committing a crime.

4         THE COURT:  Let me ask you sort of an issue that I don't

5  think the parties have fully briefed which is -- again, the actual

6  malice standard is always discussed in the context of this Georgia

7  privilege statute.  But from what I understand, as a matter of First

8  Amendment jurisprudence a private individual who's engaged in a matter

9  of public controversy - and we can debate whether that is the case

10  here - but in that situation, a private individual in a matter of

11  public controversy, has a heightened standard under First Amendment

12  jurisprudence of showing actual malice independent of Georgia law.

13         MS. HABER-KUCK:  Well, I believe that what you're

14  talking about is this whole limited purpose public figure issue,

15  because a private person does not.  If they become, because of some

16  public concern or there's some public incident -- the *Jewel* case, for

17  example, right.  They become a limited purpose public figure, then

18  they're subject to actual malice.  Again, without looking at the

19  cases -- I mean, my recollection is that that's where the rub is in

20  the federal cases is you're private, it's not actual malice.  It can

21  be where there's a matter of public concern and you take a lead role

22  in it, then, you know -- then you can become a limited purpose public

23  figure.  So I think that's where it comes in.

24         THE COURT:  Okay.

25         MS. HABER-KUCK:  But, again, this is a movie that's made

```
 1    two years after the election so it's sort of hard to say it's

 2    newsworthy at that point in time, but we can debate that.

 3                    THE COURT:  Okay.  All right.  Thank you very much.

 4                    MS. HABER-KUCK:  Thank you.

 5                    MR EVANS:  Ready when you are.

 6                    THE COURT:  Go ahead.

 7                    MR EVANS:  Okay.  Well, I think what I'm going to try to

 8    do is tie this all together, hopefully easily for the Court, and focus

 9    on a couple things I think that have been forgotten.  They've been

10    forgotten because there's probably not -- there's a concession that

11    they should be dismissed.

12                    First is the KKK Act.  Not much comment on plaintiff

13    disputing our position that the record is clear there was no purpose

14    to threaten, intimidate, there was no conspiracy to do that against

15    Mr. Andrews.  It should be dismissed as a matter of law.

16                    Invasion of privacy by false light, that is subsumed by the

17    defamation claim.  The law on this is -- and this is the *Smith v.*

18    *Stewart* case because I know Your Honor asked a couple questions on

19    this.  But in order to survive as a separate cause of action a false

20    light claim must allege a non-defamatory statement.  Plaintiffs have

21    to have alleged a non-defamatory statement.  They have not done that.

22    If the statements alleged are defamatory, which that's what they are

23    here, a claim would be for defamation only, not a false light invasion

24    of privacy.  So that claim - and that is Count Four - should be

25    dismissed.  So One, Two, Four are gone.
```

1          Now we're down to Five.  Five is the one -- there's still

2     no articulable statement about why videos that are publicly available,

3     required to be publicly available under Georgia law, all you have to

4     do is send an Open Records request.  Of course they're not posting

5     every government document online that is publicly available so that

6     defeats as a matter of law the invasion of privacy by appropriation of

7     likeness claim, that's Count Five, that's gone.

8          So with those four gone we're really down to three,

9     defamation, conspiracy, punitive damages.  So I will talk about

10    conspiracy -- well, I'll talk about defamation first.  First I want to

11    flip the script on what I did earlier which is whether there is a

12    direct defamation claim against the True the Vote defendants and I'll

13    explain why there's not.

14         I'm not going to get into whether Mr. D'Souza had malice,

15    the record speaks on that.  I will say that there is evidence in the

16    record that the first 70 videos were geotracked.  There's evidence in

17    the record that says Ms. Englebrecht said this is a tiger trap,

18    informing Mr. D'Souza about Mr. Andrews not being a mule.  There's a

19    text message saying he wasn't a mule, that's what the record -- I'll

20    let plaintiff fight about that with D'Souza.  But what matters for the

21    True the Vote defendants is this.  One, we have to go

22    statement-by-statement.  Your Honor has the statements, there's 47 on

23    the list.  Really there's probably about 20.  The plaintiffs kind of

24    combined them together.

25         Bucket 1, 2, and 3.  Bucket 1 and 2 must fail because True

1  the Vote had no editorial control.  These are summary judgment issues.

2  The *Wolf* v. *Ramsey* case, as I read to Your Honor, even though the

3  photograph of plaintiff appeared on the screen when defendant made the

4  statement, it's undisputed defendant had no control over NBC's editing

5  decisions.  The court grants defendant's summary judgment.  That's one

6  summary judgment issue.  This is not a jury issue.

7          Two, *Matthews v. Mills*.  There's no evidence in the record

8  that Mills played any role or had any control of drafting of the

9  consent of the reporter.  Accordingly --

10          THE COURT:  Slow down when you're reading for the court

11  reporter.

12          MR EVANS:  Sorry about that.  I'm trying to save my

13  time, but I also want to make the record clear.

14          Accordingly, the trial court did not air in granting

15  Mills's summary judgment.  Summary judgment issue.

16          Next we have the *Mullinax v. Miller* case.  This is the one

17  I think is the most spot on.  Plaintiff points out that Miller gave

18  Sams information, acted as a liaison, influence what he did, and

19  absence of any evidence that Miller wrote or exercised control over

20  the stolen sentence in the ad defendants are entitled to summary

21  judgment.  Summary judgment issue.

22          So for Bucket 1 and 2 there is no evidence in the record

23  that True the Vote had any editorial control over the script, who said

24  what, what video was shown, that's uncontroverted.  In plaintiff's

25  response to our disputed material fact they say, oh, well, we gave

 1    them information, we had an opportunity to comment.  Georgia law makes

 2    clear that is not enough.  There has to be more.  You have to actually

 3    exercise control.  Because the record is undisputed, there was no

 4    exercise of control, there was no publication of any comment in Bucket

 5    1 or 2 and we make it -- lay it out for Your Honor.  If you look at

 6    Statements 1 to 47.  Number one, Bucket 2.  Number 2, Bucket 1.  So it

 7    goes through because the Court must evaluate decision-by-decision.

 8    You can't have one alleged defamatory comment and then under that

 9    encapsulate every Tweet you've ever done about anything.  The law

10    makes clear you have to evaluate one-by-one.  That eradicates

11    70 percent.  Bucket 1 and 2 are gone.

12           As far as the remaining direct defamation, we're down to

13    the four interviews which we talked about earlier.  I think on these

14    the same reasons True the Vote's entitled to summary judgment.  Tucker

15    Carlson, that's the one Ms. Englebrecht has no idea what's being

16    shown.  She doesn't talk about Mark Andrews.  She has no editorial

17    control.  On that one as well there is nothing saying that anyone --

18    again, he had a mask on.  You couldn't see or know who he was.  That

19    one fails because even assuming plaintiffs are right, which we

20    disagree, that having a self-serving testimony of a daughter is

21    sufficient to establish of and concerning, there is nothing in the

22    record that says anyone ever identified Mark Andrews in that Tucker

23    Carlson interview.  For those reasons, it fails.  For the Romakov

24    (sic), that one fails for the same reason.  No editorial control, not

25    of and concerning an individual.  That one fails.  And then, finally,

1    I believe it's the Gateway Pundit, it fails.

2                    THE COURT:  What about the rebroadcasting?

3                    MR EVANS:  I'm glad you asked that and I was going to

4    get to that, Judge.

5            It is nonsensical, unsupported by any law that reposting

6    what someone else Tweeted exposes you to defamation.  If that was the

7    case, everyone in this courtroom that has social media could be sued

8    for reposting someone else's Tweet.  I think that is such a

9    nonsensical argument, I haven't even directly looked at it.

10   Section 230 may be implicated.

11           What I will say is there is no case, plaintiff has cited no

12   case, that says that merely reposting someone's post qualifies is a

13   sufficient act to subject you to a direct defamation claim.  That

14   fails right out of the gate.  I'm glad you asked that.  I had it on my

15   list at the end to hit on.  But I wanted to make sure to hit on that

16   as well.

17           So where are we now with all the arguments I've made?

18   Count One is gone, that's KKK, there's not really a dispute on that.

19   Count Two, that's 11(b), already dismissed.  Count Four, invasion of

20   privacy, that's dismissed.  Count Five is dismissed.

21                   THE COURT REPORTER:  I'm sorry.  Could you slow down?

22                   MR EVANS:  Absolutely.

23           Count Five has been dismissed, invasion of privacy by

24   appropriation of likeness.  That leaves us to all the defamation

25   claims Bucket 1 and 2 must be dismissed.  There's no dispute True the

1    Vote had no editorial control.  The first three must be dismissed

2    because there is no editorial control.

3         Tucker Carlson -- or I'm sorry.  Charlie Kirk -- there is

4    likewise no editorial control over Charlie Kirk.  But Charlie Kirk

5    comes down to of and concerning Mark Andrews.  The plaintiffs had to

6    come forward, that is an indispensable element of their claim, with

7    evidence that someone actually saw it, identified it, and knew that

8    that was Mark Andrews in that interview.  That never took place.  This

9    is primarily a podcast, not many people watch it.  But what matters

10   for purposes of the Court is is there evidence in the record to show

11   that anyone came forward and said that's Mark Andrews.  In addition to

12   that -- and that is a matter of law.  It's undisputed evidence.

13        In addition to that, there was no malice.  I see Your Honor

14   is focusing on good faith.  Can I make a determination as a matter of

15   law?  I would argue absolutely.  There are many cases that affirm

16   that, one, courts are to decide defamation cases as early as they

17   possibly can because of the preference to protect free speech.  So

18   that's one.  Two, many cases also say courts are to evaluate malice

19   as a matter of law at this stage.

20        The case that I was referencing earlier, Judge, is the *NBC*

21   case -- and I don't know if I have the cite, I wrote it down

22   somewhere.  It may or may not be in our briefing.  But this is a case

23   where -- directly analogous facts.  An individual goes on the news

24   and actually calls someone a felon and they believed at the time

25   earnestly that that person was in fact a felon and the court said

1    that negates malice.

2            For the same reason here, any comment about Mr. Andrews --

3    and, again, plaintiff's counsel made an allegation that True the Vote

4    defendants called him a mule and that means something different.

5    "Mule" is an interchangeable term.  Although in the movie they

6    defined it a certain way, this interview was prior to the movie, it

7    was unrelated to the movie, and it was stated in a more general not

8    compliant with the law.  But regardless, Ms. Englebrecht and

9    Mr. Phillips, when they talked about this, as is confirmed,

10   undisputed, by a letter in December of 2021, also a followup Open

11   Records request that if you didn't sign - and no one in Gwinnett

12   County, according to the response signed that you weren't in

13   compliance with the law.

14           So given all of this -- and we start very broad because the

15   plaintiffs have thrown everything and the sun out of here and tried

16   to make it look bigger than it is.  You have 47 alleged defamatory

17   statements.  It was really probably about 15 to 20.  I would say

18   two-thirds of them are in Bucket 1 and 2 and must be dismissed

19   because there is no editorial control.  As these decisions make

20   clear, this is a summary judgment issue.  This is an issue that

21   merely giving information influencing is insufficient.

22           The remaining three in Bucket 3, that leaves Four, there

23   was no editorial control and those must be dismissed.  Finally,

24   Tucker Carlson not of and concerning a person, nothing to show that

25   he was ever identified; therefore, that should be dismissed.

1          I've got 3 minutes to talk about conspiracy.  So with the

2    direct defamation claim falling as to True the Vote defendants, the

3    only way True the Vote defendants can be liable for conspiracy for

4    statements made by somebody else.  Most of these statements are

5    Tweets, podcasts made by Mr. D'Souza.  Obviously, no True the Vote

6    defendant conspired with Dinesh to put a Tweet up or conspired with

7    Mr. D'Souza to go on a podcast.

8          One very instructive case is the *Calabrese* case which is

9    589 F.Supp 1260.  The law on this issue really says you must conspire

10   to do the unlawful act.  What the plaintiffs must come forward in

11   showing is there is undisputed -- or there is evidence to support a

12   claim that the defendants in this case conspired to do the unlawful

13   act and the unlawful act is not making a movie, it's not talking

14   about election integrity, it is defaming Mark Andrews.  There's

15   nothing in the evidence to say that.

16         This case puts color on the way the Court should interpret

17   it.  This is a case where two individuals - I'm going to read from

18   the opinion - collaborated in the sense that Calabrese provided

19   information to Drinkhall and Drinkhall used that information as

20   material for his article.  Where this type of collaboration occurs,

21   two parties could be said in one sense to be working together for the

22   same end.  Publication of a story in a newspaper or a magazine or on

23   a radio or television, sounds very similar, but such collaboration

24   does not without more make -- does not without more a conspiracy make

25   that is an unlawful agreement which is provided gives rise to civil

1    damages.  An actionable agreement requires more than evidence of

2    collaboration between two parties.  There must be an improper object

3    or purpose.  Taking all the law together and synthesizing it down for

4    a conspiracy the defendants must reach an agreement to do the

5    unlawful purpose.

6         The agreement under these facts, Judge, it's very easy.

7    You can't have a purpose or object to defame a person that you don't

8    know exists.  That is an issue -- an undisputed issue of law that is

9    very easy on a summary judgment.  There is no possible scenario - and

10   the plaintiffs haven't done it and they can't do it - to come forward

11   and say the defendants in this case operated in concert and generated

12   a commonality of agreement to defame a person they didn't know

13   existed, that's not possible.

14        That's why when you go back, Judge, to this case at my very

15   beginning, the plaintiff has not -- he testified has not paid one

16   penny in legal fees.  He has more lawyers than I've ever gone against

17   in my entire legal career.  We have had innumerable depositions,

18   innumerable documents, and that is because at the end of the day this

19   case is not about the person who isn't even here today.  If this case

20   was important to Mark Andrews, he would have showed up.  This case is

21   about a message in search of a messenger trying to force claims where

22   facts do not exist.

23        So with that - I think I'm out of time - we have covered

24   all the bases and the bases is each of the claims -- Count One, KKK,

25   has really been conceded, dismissed.  Count Two is gone.  Count Four,

1    invasion of privacy by false light, there's no alleged non-defamatory

2    statement.  Appropriation of likeness.  You can't dispute in good

3    faith that something responding to an Open Records request, which

4    must be publicly available, is not public, that fails.  Defamation.

5    As to my clients, Judge, we've got three buckets, 1 and 2.

6                    THE COURT:  I got it.

7                    MR EVANS:  Got it.  Thank you, Judge.  I appreciate it.

8                    THE COURT:  Thank you very much.

9               Ms. Hyland, bring it home for us.

10                   MS. HYLAND:  All right.  So we've spent a lot of time--

11   at least I have spent a lot of time, probably more time than you

12   wanted me to, talking about actual malice and defamation from the

13   perspective of the standard of fault.  But there is an equally

14   compelling reason that most of the claims in this case fail and that

15   is that Mr. Andrews is not identified in the film, the book, or the

16   Tucker Carlson interview.  I want to, again, just pull up these things

17   briefly so we can look at them.

18                        (recording played)

19                   MS. HYLAND:  There he is.  Okay.  Depending on the size

20   of your TV, he's small, he's wearing a mask.

21               We're going to look at the book.  What I actually want to

22   do here is pull the actual page from the book.  This is the guy here.

23   We measured -- that blurry thing is three-sixteenths of an inch tall

24   in the book.  It's bigger than that when you put it on the screen.

25               Here's Tucker Carlson.

1              (recording played)

2         MS. HYLAND:  We get the idea.  He's very, very blurry

3    even when he has not been blurred by the production team on 2000

4    Mules.  We actually blew him up here bigger to see what that face

5    actually looks like and you can see it there.  So this begs the

6    question did anyone actually identify Mr. Andrews after seeing the

7    film or any of this media related to the film, and the answer is no.

8         This has been discussed earlier today, but I want to hammer

9    it again.  The reporters who contacted Mr. Andrews found his name in

10   the records from the State Elections Board.  As Mr. Andrews himself

11   testified right here, he knows how the reporters found him, okay.  The

12   State Election Board records only exist because Mr. Cross filed a

13   complaint and he only did that because he saw the Charlie Kirk

14   interview, and that interview only occurred because Ms. Englebrecht

15   and Mr. Phillips set it up.

16        I think at some point today plaintiff's counsel said none

17   of this was relevant, I'm not sure why it matters.  It matters because

18   of *Gertz*.  It matters because *Gertz* has found that we cannot impose

19   liability for defamation without some standard of fault, okay, at

20   least amounting to negligence.  That whole chain of events I just

21   recited did not involve Mr. D'Souza.  It did not involve anyone

22   associated with Mr. D'Souza.  So to hold him liable for the fact that

23   Mr. Andrews was at some point identified by reporters for a series of

24   events over which he had no involvement, he had no control, that would

25   be a blatant violation of the prohibition on imposing liability

1   without fault.

2           Aside from those reporters, the only individuals

3   Mr. Andrews ever claimed could identify him were the exact same people

4   that he himself notified in advance that he was in the film, as he

5   himself testified.  I've got his testimony up on the screen.  There is

6   no one who identified him without first talking to him about the film.

7           In fact, Mr. Andrews was so difficult to identify that his

8   own attorneys swapped his image for that of someone else, okay.  Which

9   guy is he?  All right.  In Statement of Material Facts Paragraph 45

10  plaintiffs cite to this picture here.  The gray jacket guy, that is

11  not Mr. Andrews.  Mr. Andrews is the guy on the right.

12          So the law simply cannot allow for a plaintiff to

13  self-solve for an element of libel, right.  We've got to imagine what

14  this looks like carried to its natural conclusion.  We will eviscerate

15  the of and concerning requirement of libel.  It will cease to have any

16  meaning at all if every plaintiff going forward can simply self-solve

17  for this element by notifying their friends and family that they are

18  featured in whatever it is, right.  You know, that's me in the movie,

19  that's me, and then the plaintiff's spouse or daughter can come

20  forward and say I recognize my dad, my husband, that's him, okay.  We

21  can't write an element out of existence by allowing this sort of

22  thing.

23          So I want to conclude -- do I have any -- oh, I do.  I've

24  been talking fast.  Good.

25          I want to conclude by saying this.  We've talked a lot

 1    about the standards and I heard your concerns, Judge, about I feel

 2    like there's something here, right.  Like there's a text message.

 3    There is something in the record where it looks like there's a little

 4    red flag here.  What I would like to do is remind you that we're not

 5    under a normal summary judgment standard here.  We are under clear and

 6    convincing.  So a scintilla of circumstantial evidence is not enough

 7    to send this to a jury, okay.

 8            What I specifically have in mind is that text message from

 9    Greg Phillips, okay.  That is not enough here, in spite all the mounds

10    of evidence we've seen, that Mr. D'Souza was told and did in fact

11    believe that these videos were geotracked.  He had a reasonable

12    frustration and level of doubt in the Secretary's State Election Board

13    investigation and he didn't put a lot of weight on that text, right,

14    that didn't mean a whole lot to him.  To find these little, minuscule

15    circumstantial issues, none of which are coming out in a way that

16    really say, okay, now that's a big red flag, right -- like any

17    reasonable person should have seen this, you know, that would be

18    different, right.  But what we're talking about here are such minor,

19    minor small things and we have to show a high probability that he had

20    a high degree of awareness and what plaintiffs have been able to put

21    into the record simply doesn't get us there.

22            So I conclude by saying that our First Amendment requires

23    some breathing room for mistakes.  Mistakes were made here and they're

24    always inevitable, especially in investigative reporting and

25    investigative filmmaking.  If we don't have this breathing room in our

1    press, where does that leave us?  Who will ever publish investigative

2    pieces about politicians, our electoral process, corruption or

3    corporate fraud if a mistake means liability?

4        Georgia's conditional privilege supports this breathing

5    room by requiring in this case clear and convincing evidence that the

6    D'Souza parties published the drop box video of Mr. Andrews showing an

7    identifiable person with actual awareness of probable falsity.  That

8    hasn't happened here and no reasonable jury could find that it does.

9        THE COURT:  All right.  Thank you very much.

10        Well, I said at the outset that the briefing was excellent

11   and I will say that the oral argument lived up to the task, it was

12   also very excellent on all sides and it was very helpful so thank you.

13   I know it takes a lot to prepare for arguments like this and I

14   appreciate the time that you obviously all spent preparing.

15        I'm going to take the motions under advisement.  I hope you

16   didn't think I was going to just rule from the bench right here.  This

17   case has aged, it's about two and a half years old already.  We're

18   talking about an election -- a book that came out of an election that

19   was in 2020 so we are mindful of trying to get this opinion out as

20   soon as we can.

21        This is not at all forecasting where I'm headed, but what I

22   would like to do is go ahead and set a trial date as a placeholder in

23   the event that there are issues that remain to be tried because what I

24   don't want is for us to all just kind of be on a standstill until we

25   get the order out and then only at that point begin to discuss

```
 1   scheduling given how many lawyers and parties are involved and all of
 2   your various conflicts.
 3           So what I would like to do is go ahead and get a date on
 4   the calendar as a placeholder so that if there is a need to try
 5   remaining issues everyone has that already set aside.  So what I would
 6   like to do -- ask counsel to do is enter any leave of absence
 7   conflicting dates on the docket by Tuesday, if you would, for
 8   yourselves and your clients.  Include in there any dates, let's say,
 9   from October of this year to June of next year, and we will do our
10   best to set aside a period of time that does not conflict with any of
11   those dates.
12           Okay.  I know there were also sealing motions that are
13   pending.  We'll work through those in the course of resolving these
14   dispositive motions, as well.
15           Is there anything else for us to take up?  No?  All right.
16   Well, excellent job and especially with all the interns that we have
17   in the courtroom, what you saw today was major league oral argument.
18   That's a treat for you all so I'm glad you got to see it.
19           Good to see you all.  I order you to take the rest of the
20   day off.  Have a great weekend.  We're in recess.
21               (Proceedings concluded at 1:40 p.m.)
22
23
24
25
```

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF GEORGIA

3    CERTIFICATE OF REPORTER

4

5    I do hereby certify that the foregoing pages are a true and correct

6    transcript of the proceedings taken down by me in the case aforesaid.

7

8

9                    This the 23rd day of June, 2025.

10

11

12                              /S/ Alicia B. Bagley _____
                                ALICIA B. BAGLEY, RMR, CRR
13                              OFFICIAL COURT REPORTER
                                (706) 378-4017
14

15

16

17

18

19

20

21

22

23

24

25