# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

MARK ANDREWS,
     Plaintiff,

        v.

DINESH D'SOUZA, *et al.*,
     Defendants.

Civil Action No.
1:22-cv-04259-SDG

## <u>OPINION AND ORDER</u>

Plaintiff Mark Andrews is a Georgia voter. During the 2020 presidential election, Andrews exercised his right to vote by placing his ballot, along with the ballots of several family members, in a voter drop box in Gwinnett County. No Defendant contests now that Andrews voted *legally*. But in a documentary movie named *2000 Mules*, a companion book, television interviews, and on social media, Defendants said otherwise.

Because of Defendants' statements, Andrews sues for various state and federal claims, including defamation, violation of the Ku Klux Klan Act, false-light invasion of privacy, appropriation of likeness, and civil conspiracy. He now seeks summary judgment on his defamation claim. Defendants Dinesh D'Souza and D'Souza Media LLC (the D'Souza Defendants) and Defendants True the Vote, Inc. (TTV), Catherine Engelbrecht, and Gregg Phillips (the TTV Defendants) seek summary judgment in their favor on all of Andrews's claims.

1

Before the Court are the following motions:

- Andrews's motion for partial summary judgment [ECF 250];

- the D'Souza Defendants' motion for summary judgment [ECF 268];[1]

- the TTV Defendants' motion for summary judgment [ECF 279];

- Andrews's motions for leave to file under seal [ECFs 277, 300, 323];

- the D'Souza Defendants' motions for leave to file under seal [ECFs 310, 315]; and

- the TTV Defendants' motions for leave to file under seal [ECFs 283, 306, 318].

Having reviewed the parties' briefing, and with the benefit of oral argument, the Court **GRANTS in part** and **DENIES in part** Andrews's motion for summary judgment, and **GRANTS in part** and **DENIES in part** Defendants' summary judgment motions. The assorted motions to seal are **DENIED** to the extent information sought to be sealed is referred to in this Order and **DENIED without prejudice** in all other respects.

---

[1] Despite the Court's extension of the page limits for dispositive motions, ECF 244, the D'Souza Defendants exceeded that limitation by failing to comply with formatting required by LR 5.1(C)(2), NDGa. The parties are cautioned that they must follow the Court's formatting and page-length requirements.

## I. Background

The Court's summary of the material facts is drawn from those statements about which there is no dispute, except where otherwise noted. Because the parties have cross-moved, the Court does not in this section draw inferences from those facts in favor of either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999).[2]

### A. General Facts

#### 1. The Movie

Defendants worked together to create *2000 Mules* (the Movie), which claims to "expose a massive network of coordinated fraud" across the states that

---

[2] The D'Souza Defendants assert a general objection and numerous specific objections that evidence cited by Andrews lacks pinpoint citations *See, e.g.,* ECF 309-1 (SEALED), at 1–2. But Andrews's citations either did not require pin cites or were clear in context and required no searching "for the proverbial 'needle in a haystack,'" *id.*, as the D'Souza Defendants claim. These objections to the lack of pin cites are therefore **OVERRULED**.

The D'Souza Defendants also object to Andrews's citations to "pleadings." *Id.* at 3. This objection is not well-taken and serves only to waste the Court's time. Those pleadings are Defendants' **Answers**. ECFs 250-12, ECF 250-13. While an answer to a complaint is indeed a pleading, Fed. R. Civ. P. 7(a)(2), it also contains the answering party's admissions, Fed. R. Evid. 801(d)(2); *Roe v. City of Atlanta*, 456 F. App'x 820, 822 (11th Cir. 2012) (per curiam) (indicating a denial in the defendant's answer constituted a judicial admission). Such admissions may plainly be used to support a motion for summary judgment. Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) . . . admissions."). All objections concerning Andrews's citations to Defendants' Answers are **OVERRULED**, as are all similar objections to Andrews's citations of Defendants' interrogatory responses, Fed. R. Civ. P. 33(c).

controlled the outcome of the 2020 presidential election.[3] D'Souza directed, produced, wrote, and narrated the movie.[4] D'Souza Media distributed it.[5] The Movie premiered at Mar-a-Lago in early May 2022.[6] It later debuted in theaters and was available online.[7] It made over $9 million.[8] TTV was entitled to 10% of the Movie's proceeds.[9]

The Movie purports to show evidence that "paid criminal traffickers"—so called "mules"—picked up fraudulent ballots from "leftist" non-profit organizations and then illegally stuffed those ballots into drop boxes in swing states, including Georgia.[10] The Movie claimed to rely on two types of evidence to support its thesis: geotracking location data from cell phones, and surveillance

---

[3]   ECF 309-1 (SEALED), ¶ 1.

[4]   *Id.* ¶ 8.

[5]   *Id.* ¶ 9.

[6]   *Id.* ¶ 86.

[7]   *Id.* ¶ 87.

[8]   *Id.* ¶ 230.

[9]   ECF 270-8 (SEALED), at 3 ¶ 4(a). The parties have sought to seal a significant amount of information submitted in support of their motions—including the agreement that reflects TTV's entitlement to proceeds. *See infra* Section IV. But they have not sufficiently supported their contention that the agreement should be sealed. Accordingly, to the extent that agreement is discussed in this Order, the motions to seal are denied. The parties are invited to demonstrate good cause for sealing the remaining portions of the agreement. *See infra* Section V.

[10]   ECF 309-1 (SEALED), ¶ 2.

footage of actual voters who were (allegedly) geotracked.[11] TTV had obtained the surveillance footage through open records requests and provided all of the footage that appeared in the Movie.[12] TTV also purportedly had an analysis of cell phone geotracking data matched to that footage.[13] This research became the "backbone" of the Movie.[14]

The Movie asserted that geotracking is precise enough to follow a cell phone signal directly to a ballot drop box.[15] It showed surveillance footage of supposed mules who had purportedly been geotracked.[16] The DVD cover for the Movie says that the viewer will be able to "watch the criminals at work."[17] The Movie uses a

---

[11] *Id.* ¶¶ 3–4. The D'Souza Defendants dispute Andrews's assertion that the Movie relied on only two types of evidence. Andrews's statement, however, is a direct quote from the back of the Movie's DVD cover: "This film uses two types of evidence. The first is geotracking, which monitors the cell phone movements of mules or paid criminal traffickers delivering illegal ballots to mail-in drop boxes. . . . The second is video evidence, obtained from the official surveillance cameras installed by the states themselves." ECF 250-3, at 2.

[12] ECF 299-2 (SEALED), ¶ 8; ECF 299-3 (SEALED), ¶ 23; ECF 309-1 (SEALED), ¶ 26, 30, 38; ECF 321 (SEALED), ¶ 19.

[13] ECF 305-2 (SEALED), ¶¶ 15–17; ECF 309-1 (SEALED), ¶¶ 15–17. The geotracking data purportedly analyzed whether certain cell phones appeared within "a couple hundred feet" of certain "geofenced" locations—voter drop box sites and various non-profit organizations. ECF 309-1 (SEALED), ¶¶ 164–165, 167.

[14] ECF 309-1 (SEALED), ¶ 28.

[15] *Id.* ¶ 5.

[16] *Id.* ¶¶ 5–6.

[17] *Id.* ¶ 7.

clip of Andrews walking to a ballot drop box and depositing multiple ballots. His car is visible, but his face and license plate are blurred.[18] The parties dispute the exact length of the clips shown in the Movie; Defendants contend the full segment is between approximately 2 to 8 seconds long.[19]

### 2. Defendants' Uses of Andrews's Image

#### i. The Movie and Trailer

Although the parties dispute the ***prominence*** of the use of Andrews's image in the Movie and trailer, there is no debate that a clip of Andrews—with his face blurred—appears in both.[20] While images of Andrews and his SUV are on screen, D'Souza states: "What you are seeing is a crime. These are fraudulent votes."[21] The Movie claims that ballot mules participated in violent riots and accused them of being involved in organized crime.[22]

In the trailer (culled from the Movie), Engelbrecht says that a "mule" is a person picking up ballots and "running them" to drop boxes.[23] Engelbrecht and

---

[18]  ECF 305-2 (SEALED), ¶¶ 45–46, 50; ECF 309-1 (SEALED), ¶ 50.

[19]  *See, e.g.*, ECF 305-2 (SEALED), ¶ 36 (TTV Defendants asserting the clip of Andrews is 1.8 seconds); ECF 309-1 (SEALED), ¶ 36 (D'Souza Defendants asserting the clip is 8 seconds).

[20]  ECF 309-1 (SEALED), ¶ 36; ECF 322 (SEALED), ¶ 219.

[21]  ECF 309-1 (SEALED), ¶ 45.

[22]  ECF 305-2 (SEALED), ¶¶ 47–50; ECF 309-1 (SEALED), ¶¶ 47–50.

[23]  ECF 305-2 (SEALED), ¶ 39; ECF 309-1 (SEALED), ¶ 39.

Phillips assert that mules were engaged in illegal conduct and organized crime.[24] After Phillips states that "[t]his is organized crime," a clip of Andrews (with his face blurred) appears.[25] An ad promoting the Movie and containing Andrews's blurred image was run on a billboard in Times Square.[26]

The D'Souza Defendants do not dispute that the footage actually shows Andrews legally depositing absentee ballots for himself and his family.[27] D'Souza himself also admits that he is aware Georgia law permits a person to deposit absentee ballots for family members.[28] No Defendant has any evidence that Andrews was paid by anyone to deposit any ballots; went to any drop box more than once; visited any non-profit to pick up ballots; or was ever at a violent riot.[29]

### ii. The Book

Based on the Movie, D'Souza also wrote a book—*2,000 Mules: They Thought We'd Never Find Out. They Were Wrong* (2022) (the Book).[30] A still, color image from the footage of Andrews used in the Movie appears along with another photo in

---

[24] ECF 309-1 (SEALED), ¶¶ 47–50.

[25] ECF 305-2 (SEALED), ¶ 50; ECF 309-1 (SEALED), ¶ 50.

[26] ECF 309-1 (SEALED), ¶ 92.

[27] *Id.* ¶¶ 51, 53. The D'Souza Defendants object that Andrews mischaracterizes the evidence and omits crucial details. *Id.* ¶ 51. This objection is overruled.

[28] *Id.* ¶ 80.

[29] ECF 305-2 (SEALED), ¶¶ 81–83; ECF 309-1 (SEALED), ¶¶ 81–83.

[30] ECF 309-1 (SEALED), ¶ 124.

the Book's centerfold.[31] The caption states: "What we see here are screenshots from the videos of mules stuffing multiple ballots into mail-in drop boxes. . . . What you are seeing here is organized crime on behalf of the Democratic Party."[32]

### iii. Defendants' Uses of Andrews's Image in Media Appearances and Social Media

Andrews has identified numerous instances of Defendants using or referring to his image in social media and during interviews. Among the most significant instances: On April 8, 2022, Engelbrecht and Phillips appeared on the *Charlie Kirk Show*.[33] During the interview, the footage of Andrews was played and showed his *un*blurred face, car, and license plate.[34] Engelbrecht and Phillips directly commented on the footage during the interview, and Engelbrecht acknowledged in a subsequent text that she and Phillips were aware of the videos on which they were commenting.[35] They referred to Andrews as a mule and claimed his conduct was illegal.[36] The TTV Defendants posted this interview on

---

[31]   *Id.* ¶ 134. A copy of the centerfold image is also in the record at ECF 105, at 7.

[32]   ECF 309-1 (SEALED), ¶ 134. *See also id.* ¶ 136 (indicating that Andrews's image was used as an example of a ballot mule).

[33]   *See generally* ECF 299-3 (SEALED), ¶¶ 118–129; ECF 305-2 (SEALED), ¶¶ 93–96.

[34]   ECF 309-1 (SEALED), ¶¶ 93–94.

[35]   ECF 263-5, at 18; ECF 305-2 (SEALED), ¶¶ 93–94.

[36]   ECF 305-2 (SEALED), ¶¶ 93–94.

TTV's Rumble social media account, including the unblurred footage of Andrews.[37]

On April 20, 2022, an unblurred image of Andrews was shown during Engelbrecht and Phillips's appearance on the *Gateway Pundit*, run with a caption stating "Ballot Harvesting is illegal in GA!"[38] Phillips describes the footage (including that depicting Andrews) as one of the most "egregious" examples of stuffing ballot boxes.[39]

On May 5, 2022, Engelbrecht appeared on *Tucker Carlson Tonight* on Fox News. During the segment, unblurred footage of Andrews putting ballots into a drop box was displayed; his car and its license plate—also unblurred—are visible.[40] The D'Souza Defendants argue that the images are in a "small, pixelated box" such that neither Andrews nor his license plate could be identified.[41]

During the Carlson segment, Engelbrecht discussed how drop boxes are a "recipe" for fraud and that video footage proved there was "rampant" abuse of

---

[37] ECF 309-1 (SEALED), ¶ 95. The TTV Defendants do not object, and therefore concede, that they were responsible for posting the Kirk interview on their social media accounts. *Id.*

[38] ECF 305-2 (SEALED), ¶¶ 98–100.

[39] *Id.* ¶ 100.

[40] *Id.* ¶ 104; ECF 309-1 (SEALED), ¶ 104.

[41] ECF 309-1 (SEALED), ¶ 104. The Court notes that the box of the surveillance footage is larger than the combined size of the headshots of Carlson and Engelbrecht. ECF 262-3, at 00:45.

them.[42] The day after her appearance, the interview was reposted on D'Souza's Rumble social media account,[43] and posted to TTV's Rumble, Facebook, and Instagram accounts.[44] The individual Defendants all deny personal responsibility for these social media posts.[45] The D'Souza Defendants say one of D'Souza's "social media guys" was responsible.[46]

On May 13, 2022, Engelbrecht and Phillips appeared on *Facts Matter* with Roman Balmakov.[47] During the interview, a clip of Andrews (with his face blurred) was played while they explained their ballot mules theory. Phillips stated that they had used geolocation tracking to look for "ways to solve a crime" and that they had tracked people going to "stash houses" then delivering ballots to drop boxes, which conduct was backed up with video.[48] While a series of clips of voters (including Andrews) was played, Engelbrecht stated: "Their phone was at a violent riot," to support the TTV Defendants' contention that the so-called mules

---

[42] ECF 305-2 (SEALED), ¶ 104; ECF 309-1 (SEALED), ¶ 104.

[43] ECF 309-1 (SEALED), ¶ 107.

[44] ECF 305-2 (SEALED), ¶ 106.

[45] *Id.*; ECF 309-1 (SEALED), ¶ 107.

[46] ECF 309-1 (SEALED), ¶ 107.

[47] *See generally* ECF 299-3 (SEALED), ¶¶ 110–117; ECF 305-2 (SEALED), ¶¶ 115–116.

[48] ECF 305-2 (SEALED), ¶ 115.

had engaged in other criminal activity.[49] The TTV Defendants assert that they had no editorial control over the program and "were not told what would appear on the screen when they appeared"[50]—suggesting they were not told in advance of the actual interview. However, they do not deny knowing what was being shown on the screen while the interview was taking place.[51]

## B. Procedural History

On October 26, 2022, Andrews filed suit against the D'Souza Defendants; the TTV Defendants; and Salem Media Group, Inc. and "Regnery Publishing, Inc."[52] (collectively, Salem).[53] He asserted claims for (1) conspiracy in violation of the federal Ku Klux Klan Act (the Klan Act); (2) violation of the federal Voting Rights Act (VRA); (3) defamation/defamation per se; (4) false light invasion of privacy; (5) appropriation of likeness invasion of privacy; and (6) civil conspiracy.[54] All Defendants moved to dismiss,[55] which the Court granted in part

---

[49] *Id.*

[50] ECF 299-3 (SEALED), ¶ 114; ECF 305-2 (SEALED), ¶ 115.

[51] *See generally* ECF 299-3 (SEALED), ¶¶ 110–117; ECF 305-2 (SEALED), ¶¶ 115–116.

[52] In its answer, this entity indicated that its correct name is Salem Communications Holding Corporation d/b/a Regnery Publishing. ECF 110, at 1.

[53] ECF 1.

[54] ECF 27.

[55] ECFs 48, 50, 58.

and denied in part. The Court dismissed the VRA cause of action (Count II) as to all Defendants and the conspiracy causes of action (Count I, VI) as to Salem.[56] The case proceeded to discovery. On June 3, 2024, Andrews voluntarily dismissed his remaining claims against Salem with prejudice.[57] The D'Souza and TTV Defendants now seek summary judgment on Andrews's remaining causes of action.[58] Andrews seeks summary judgment on his claim for defamation.[59]

## II.   Applicable Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the suit under the applicable legal principles. *Anderson*, 477 U.S. at 248. In determining whether there is a genuine dispute of material fact, the Court views the evidence in the light most favorable to the non-movant, "and all justifiable inferences" are construed in the non-movant's favor. *Id.* at 255; *Herzog*, 193 F.3d at 1246 ("All reasonable doubts about the facts should be resolved in favor of the non-movant."). Credibility determinations, weighing evidence, and drawing

---

[56]   ECF 106.

[57]   ECF 180.

[58]   ECFs 268, 279.

[59]   ECF 250.

inferences are jury functions—not the province of the Court. *Anderson*, 477 U.S. at 255; *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

## III.    The Summary Judgment Motions

In the time-honored tradition of those alleged to be joint tortfeasors, each set of Defendants blames the other for the admittedly false statements they made about Andrews. But this finger pointing is not relevant to whether there are disputes of material fact between *Andrews* and Defendants. Each motion for summary judgment must be evaluated on its own, applying the appropriate presumptions in favor of the non-movant. *See Mitchell v. Globe Life & Acc. Ins. Co.*, 548 F. Supp. 2d 1385, 1393 (N.D. Ga. 2007). Because the parties' cross-motions cover multiple claims, Defendants, and uses of Andrews's image, the Court addresses the parties' arguments by cause of action. Since all parties have moved on Andrews's defamation claim, the Court starts there.

### A.    Defamation/Defamation Per Se (Count III)

> Every person may speak, write, and publish sentiments on all subjects ***but shall be responsible for the abuse of that liberty***.

GA. CONST. ART. I, § 1, ¶ V (emphasis added).

A claim for defamation under Georgia law has four elements: (1) a false and defamatory statement about the plaintiff; (2) publication; (3) fault by the defendant; and (4) special damages or the per se actionability of the statement (*i.e.*,

defamation per se). *Am. Civil Liberties Union, Inc. v. Zeh*, 312 Ga. 647, 650 (2021) (citing *Mathis v. Cannon*, 276 Ga. 16, 20–21 (2002)); *see also H&R Block E. Enters., Inc. v. Morris*, 606 F.3d 1285, 1296 (11th Cir. 2010) ("In Georgia, a statement generally may support a claim for defamation only if it is false, published, and unprivileged."). Defamation per se involves words that are "recognized as injurious on their face" without the need for extrinsic proof of damages—such as falsely accusing someone of having committed a crime. *Cottrell v. Smith*, 299 Ga. 517, 523–24 (2016) (quoting *Bellemeade, LLC v. Stoker*, 280 Ga. 635, 637–38 (2006)).

### 1. Falsity

In his motion for summary judgment, Andrews identifies the following statements (among others) as defamatory:

- D'Souza's statement in the Movie and trailer that "[w]hat you are seeing is a crime. These are fraudulent votes," while the footage of Andrews at the drop box plays.[60]

- Andrews's image in the Book, with the caption that he was engaging in organized crime.[61]

- Phillips's statement in the trailer, during an exchange with D'Souza, that "this is organized crime" while

---

[60]   ECF 305-2 (SEALED), ¶ 45; ECF 309-1 (SEALED), ¶ 45.

[61]   ECF 309-1 (SEALED), ¶¶ 134–138. *See also id.* ¶ 136 (indicating that Andrews's image was used as an example of a ballot mule).

the clip of Andrews plays.[62] TTV posted the trailer to its social media accounts.[63]

- Engelbrecht's and Phillips's statements on the *Charlie Kirk Show* during which an unblurred clip of Andrews plays while Phillips states "you're going to see a voter get out—a mule get out." During the same clip, in response to questions by Kirk about whether this conduct was illegal, Englebrecht twice responds "right" and Phillips states that every ballot "past that first one was illegal." The TTV Defendants reposted this segment on their social media accounts.[64]

- Engelbrecht's and Phillips's statements during their appearance on the *Gateway Pundit* during which an unblurred clip of Andrews plays while Engelbrecht states: "What we learned through our research was that there was a systematic and coordinated effort to exploit those vulnerabilities around the drop boxes, specifically through what we call ballot trafficking and that is . . . individuals who are moving . . . according to what we can tell moving back and forth between non-profit organizations, key non-profit organizations, and the drop boxes." During a subsequent playing of the Andrews clip, Phillips states: "Those people that you just showed . . . that are stuffing those ballot boxes—that's legit, and by the way, two of those most egregious ones are in one ballot box."[65]

- Engelbrecht's statements on *Tucker Carlson Tonight* during which an unblurred clip of Andrews plays while Engelbrecht describes ballot drop boxes as a "recipe for fraud" and shortly thereafter said that

---

[62]  ECF 305-2 (SEALED), ¶ 50.

[63]  *Id.* ¶ 32.

[64]  *Id.* ¶¶ 93–95.

[65]  *Id.* ¶¶ 98–100.

"there was rampant abuse of those drop boxes, and the data that we have is immutable and proves it, now buttressed increasingly by video." This segment was reposted to TTV's and D'Souza's social media accounts.[66]

- Phillips's statements on *Facts Matter* with Roman Balmakov about the mules scheme. Specifically, Phillips explained that they used geotracking data because they "were looking for ways to solve a crime" and that they tracked people going to "stash houses" then delivering ballots to drop boxes. After a series of clips played (including of Andrews), Phillips says "their phone was at a violent riot." The interview was reposted on TTV's website and Rumble page.[67]

As discussed in more detail below, Defendants object to and dispute much about these statements, and the TTV Defendants contest their level of editing control over these materials. But Defendants admit that they never had any evidence that Andrews was paid to deposit any ballots or that he went to any drop box more than once; that he ever went to any non-profit to pick up ballots; or that he was ever at a violent riot.[68] Nor did the TTV Defendants ever geotrack Andrews's cell phone or any other device linked to him.[69]

---

[66]  *Id.* ¶¶ 104, 106; ECF 309-1 (SEALED), ¶¶ 104, 107.

[67]  ECF 305-2 (SEALED), ¶ 116.

[68]  *See, e.g., id.* ¶¶ 81–83; ECF 309-1 (SEALED), ¶¶ 81–83.

[69]  ECF 305-2 (SEALED), ¶ 84; ECF 309-1 (SEALED), ¶ 84.

In opposing Andrews's summary judgment motion, Defendants do not contest that the statements Andrews identified in his summary judgment motion accusing him of criminal conduct—including of being a "ballot mule"—are false.[70] Such statements are defamatory as a matter of law. *Cottrell*, 299 Ga. at 523–24; *Speedway Grading Corp. v. Gardner*, 206 Ga. App. 439, 441 (1992) (citation omitted) ("Although as a general rule the question whether a particular communication is defamatory is for the jury, if the statement is not ambiguous and reasonably can have only one interpretation, the question of defamation is one of law for the court.").

Andrews is entitled to summary judgment in his favor on the per se defamatory nature of Defendants' statements.[71]

---

[70] *See generally* ECF 268, at 20–34 (D'Souza Defendants arguing only that Andrews cannot show the necessary level of fault or satisfy the "of and concerning" requirement for defamation claim); ECF 279, at 22–25 (TTV Defendants arguing that Andrews cannot satisfy the publication, "of and concerning," and fault elements of defamation).

[71] To conclude that Andrews is entitled to judgment on this element, the Court need not rule on every potentially defamatory statement scattered throughout his motion and supporting documents. The statements identified above and all their uses (e.g., repostings on social media) are sufficient to establish falsity. Andrews will be required in the proposed consolidated pretrial order to identify each specific defamatory or allegedly defamatory statement on which he intends to proceed to trial.

## 2. Publication[72]

In the context of a defamation claim, publication refers to the communication of a defamatory statement to "any person" other than the party defamed. O.C.G.A. § 51-5-3; *StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1347 (N.D. Ga. 2018) (citing, *inter alia*, *Saye v. Deloitte & Touche, LLP*, 295 Ga. App. 128 (2008)). The D'Souza Defendants do not argue that Andrews cannot establish publication as to them.[73] The TTV Defendants argue that they did not publish "almost all" of the statements and lacked editorial control over the Movie, the trailer, and their various media appearances.[74] That is, they do not contend the statements were not published; rather, they assert that *they* did not publish them and therefore cannot be liable.[75] Georgia law indeed requires that a defamation defendant have had some ability to control the content of the defamatory statement for the publication element to be met. *Mullinax v. Miller*, 242 Ga. App. 811, 814-15 (2000) (concluding there was no error in granting summary

---

[72] To rule on the parties' cross-motions for summary judgment, the Court need not decide whether any Defendant is responsible for defamatory statements published by another Defendant. There is sufficient evidence for a jury to conclude that each Defendant published at least one per se defamatory statement about Andrews.

[73] Accordingly, Andrews is entitled to summary judgment in his favor on the publication element of his defamation claim as to the D'Souza Defendants.

[74] ECF 279, at 22–25.

[75] *Id.* at 23–24.

judgment to a defendant who did not exercise any control over the content of the allegedly defamatory advertisement and did not write, edit, or pay for it).[76] But the TTV Defendants' arguments are unavailing because they clearly published the statements that they themselves made to other people and are responsible for the interviews they reposted on social media—even if they did not have editorial control over the original interviews.

### i.    The TTV Defendants' Statements to Others

Whether the TTV Defendants had editorial control over the Movie or trailer is irrelevant as a matter of law: Any defamatory statements they made about Andrews were published to those to whom they were speaking in the Movie—including the D'Souza Defendants. For example, Phillips's exchange in the trailer with D'Souza that "this is organized crime" while a clip of Andrews plays was published at the time he made the statement.[77] *Mathis*, 276 Ga. at 28 (holding that "publication" in O.C.G.A. § 51-5-11(b) means "a communication made to any person other than the party libeled"; citing, *inter alia*, O.C.G.A. § 51-5-3); *Smith v. Stewart*, 291 Ga. App. 86, 91 (2008) (noting that a defamation claim requires proof that the defamatory communication was made "to a third party"). For the same

---

[76]    Neither set of Defendants distinguishes between the individuals and the business entities for purposes of the publication element. Accordingly, the Court does not make such fine distinctions either.

[77]    ECF 305-2 (SEALED), ¶¶ 33, 43–50.

reasons, the TTV Defendants published defamatory statements they made about Andrews during their interview with Charlie Kirk, which clearly reflect that they were commenting directly on the footage of Andrews and in which Andrews's unblurred image was displayed.[78] The defamatory statements made by the TTV Defendants in the Movie, the trailer, and during the Charlie Kirk interview were published by them as a matter of law.

### ii.  Statements by the D'Souza Defendants

The TTV Defendants could also be held liable for certain defamatory statements made by the D'Souza Defendants in the Movie and trailer. "[A] person who has not spoken slanderous words may be held liable [in defamation] for them if they were uttered by another in furtherance of a conspiracy to which he was a party," if there is "a showing that (1) both parties were present when the slanderous words were uttered, and (2) the slanderous words spoken by one party was done with the consent of the other party and in furtherance of a common design and purpose." *Turnage v. Kasper*, 307 Ga. App. 172, 185 (2010) (citations omitted). The evidence would certainly permit a jury to conclude that D'Souza's statements during the Movie while in a round-table discussion with Engelbrecht and Phillips satisfy the criteria set out in *Turnage*.[79]

---

[78]  *Id.* ¶¶ 93–96. *See supra* Section III.A.1.

[79]  *See infra* Section III.E. concerning the "common design" aspect.

### iii. The TTV Defendants are responsible for their own statements that they reposted.

The TTV Defendants disclaim responsibility for the Movie, the trailers, various interviews, and other statements over which they purportedly lacked editorial control.[80] Their assertions ring hollow when they reposted many of their own statements in those media appearances to TTV's web page and social media accounts—including the Movie, the trailers, and the interview with Kirk.[81] That's so despite their counsel's insistence during oral argument that reposting someone else's defamatory statement cannot itself constitute defamation.[82] These were the TTV Defendants *own* defamatory statements that they were reposting.

Moreover, the Georgia Court of Appeals long ago held that

> "Talebearers are as bad as talemakers." Every repetition of a slander originated by a third person is a willful publication of it, rendering the person so repeating it liable to an action, and it is no defense that the speaker did not originate the slander, but heard it from another, even though he in good faith believed it to be true.

*Ivester v. Coe*, 33 Ga. App. 620 (1925) (citations omitted); *see also, e.g.*, *Bryant v. Cox Enters., Inc.*, 311 Ga. App. 230, 235 (2011) (citing *Baskin v. Rogers*, 229 Ga. App. 250,

---

[80]  ECF 279, at 23–24.

[81]  *Id.* at 23–24 (indicating the TTV Defendants had some editorial control over statements 1, 4–6, 8, 13–19, 21–23, 26, and 28–34 identified on Appendix 1); ECF 282-1, at 46–79 (Appendix 1); ECF 305-2 (SEALED), ¶¶ 32, 111 (posting of trailer), ¶ 95 (posting *Kirk* interview).

[82]  ECF 335, at 95.

252 (1997) and *Ivester* ) (noting that a party can be held liable for publishing another person's slanderous statement). The TTV Defendants published statements by reposting them, whether they had editorial control over the original or not. As a result, they can also be liable for reposting defamatory statements made by them or by others—such as, for example, the music video trailer for the Movie, which used Andrews's image as an exemplar ballot "mule."[83]

Further, Georgia law makes clear that at least TTV and Engelbrecht can be held responsible for their employees' conduct in reposting such materials. *Mullinax*, 242 Ga. App. at 815 ("[A] principal is liable for the libel committed by his employees in the scope of their employment."); *Gantt v. Patient Commc'ns Sys., Inc.*, 200 Ga. App. 35, 39 (1991) (citation omitted) (in determining a principal's liability, an agent need not be expressly directed by the principal to publish a libel), *overruled in part on other grounds by Ferrell v. Mikula*, 295 Ga. App. 326 (2008). This would apply to the interviews with Carlson and Balmakov that were reposted on TTV's social media accounts, despite the TTV Defendants' denials of having personally posted them.[84]

---

[83] ECF 305-2 (SEALED), ¶ 123.

[84] *Id.* ¶¶ 104, 106, 115–116. Because the TTV Defendants deny having themselves posted these interviews, *id.* ¶¶ 106, 116, the Court cannot rule as a matter of law that the TTV Defendants published those statements.

### iv. Lack of Editorial Control Over Statements that Were Not Reposted

The Georgia Court of Appeals has indicated that "publication" requires a defendant to have had some "control over sentence construction or word choice, as opposed to merely generating ideas, providing logistical support, and the like." *Mullinax*, 242 Ga. App. at 815. As noted above, the TTV Defendants argue that they cannot be liable for statements over which they lacked editorial control.[85] In support, they rely heavily on *Wolf v. Ramsey*, 253 F. Supp. 2d 1323 (N.D. Ga. 2003), which they describe as "persuasive, if not controlling."[86] It is neither.

In *Wolf*, another judge of this Court considered a libel claim under Georgia law based on a defendant's statement during a television interview. The defendant referenced an unnamed person as "the killer," during which the network displayed a picture of the plaintiff on screen. *Id.* at 1364. *Wolf* is ***not*** controlling. *Kinsale Ins. Co. v. Pride of St. Lucie Lodge 1189, Inc.*, 135 F.4th 961, 968 (11th Cir. 2025) (in applying state law, the court is bound by the decisions of the state's highest court, as well as of its intermediate appellate court "unless there is persuasive evidence that the highest state court would rule otherwise"). But even if it ***were*** controlling, *Wolf* would not help the TTV Defendants. There, (1) the plaintiff failed

---

[85] *See, e.g.*, ECF 279, at 22–25.

[86] *Id.* at 23.

to demonstrate that the defendant was referring to him when the offending statement was made and (2) **the parties did not dispute that the defendant had no control over the network's editing decisions**. *Wolf,* 253 F. Supp. 2d at 1364.

Here, the facts show the exact opposite. The parties do not dispute that the defamatory statements were about Andrews (although they disagree whether he was recognizable[87]), and they *do* dispute the extent to which the TTV Defendants had control over statements they made in various contexts (particularly in media appearances). For statements they did not themselves repost or otherwise bear responsibility for posting,[88] were the TTV Defendants aware that the footage of Andrews was being displayed while they made their allegedly defamatory statements? A jury could reasonably conclude that they were, based on the context of the entire discussion. The TTV Defendants' assertions that they are not liable for defamatory statements over which they purportedly lacked editorial control depend on disputed facts and involve issues of credibility—things the Court will not decide as a matter of law.

\* \* \* \*

To the extent the TTV Defendants published defamatory statements they made in the Movie, the trailer, during the Charlie Kirk interview, and published

---

[87] *See infra* Section III.A.3.

[88] *See supra* Section III.A.2.

the defamatory music video trailer, Andrews is entitled to summary judgment in his favor in that limited regard. As for whether the TTV Defendants published other defamatory statements, those issues are to be resolved by a jury.

### 3. About the Plaintiff: Of and Concerning

To prove a defamation claim, "the plaintiff has the burden of showing . . . that the publication was 'of and concerning' [him] as a matter of identity." *Smith*, 291 Ga. App. at 92 (citations omitted). Stated slightly differently, a plaintiff must show that "the allegedly defamatory words [ ] refer to some ascertained or ascertainable person, and that person must be the plaintiff." *Id.* (citation omitted). "[I]t is sufficient if those who knew the plaintiff can make out that [he] is the person meant." *Id.* (citations omitted). Defendants' assertions that they never disclosed Andrews's name and did not know who he was are therefore irrelevant.[89] They published his image along with per se defamatory statements. If that image was identifiable as Andrews to those who know him, then "it was of and concerning [him] as a matter of identity." *Id.* (citations omitted).

The evidence is very much in dispute on this point. It shows that Andrews recognized himself in the trailer and family members and friends recognized him from the Movie and its promotional materials.[90] As the D'Souza Defendants point

---

89    ECF 268, at 32; ECF 279, at 26.

90    ECF 305-2 (SEALED), ¶¶ 142–143; ECF 309-1 (SEALED), ¶¶ 142–143.

out, however, Andrews recognized himself only *after* having been informed that he was in the Movie and trailer in the first place.[91] All Defendants note that family members and friends recognized Andrews only after having spoken to him about the Movie.[92] Andrews did not identify anyone who recognized him without first having spoken with him about the Movie.[93] Moreover, Andrews' image in the Movie, the trailer, and the Book were all blurred.[94] Even in the unblurred uses of his image during various interviews, Andrews is wearing a surgical face mask.[95] Defendants also contend that certain uses of the surveillance footage, the depiction of Andrews was so small or unclear that he was unrecognizable.[96] But adopting Defendants' arguments that Andrews was unrecognizable would require the Court to decide these material disputes in their favor. A jury could reasonably find that Andrews was identifiable. It could also conclude otherwise. Neither Defendants nor Andrews is entitled to judgment as a matter of law on this issue. *Smith*, 291 Ga. App. at 93 (citations omitted) ("Whether [the fictional character in]

---

[91]   ECF 309-1 (SEALED), ¶ 142.

[92]   ECF 305-2 (SEALED), ¶ 143; ECF 309-1 (SEALED), ¶ 143.

[93]   ECF 268, at 19; ECF 309-1 (SEALED), ¶ 143.

[94]   ECF 105, at 7; ECF 305-2 (SEALED), ¶ 50; ECF 309-1 (SEALED), ¶ 50.

[95]   *See, e.g.*, ECF 271-9 (*Kirk* interview), at 50:53.

[96]   ECF 268, at 31.

the book was actually understood by third parties to be about [the plaintiff] is, of course, a question of fact for the jury.").

### 4. Actual Malice

The parties dispute whether Andrews must show actual malice to prove his defamation claim. Andrews contends that the Court, in ruling on Defendants' motions to dismiss, held that actual malice does not apply.[97] The Court's decision was not so broad.[98] Its determination was based on the arguments presented by the parties at the pleading stage—Defendants did not argue actual malice, so the Court applied a negligence standard. Defendants have now raised the issue, so the Court addresses their arguments and concludes that the actual malice standard applies to part of Andrews's defamation cause of action.[99]

First, the TTV Defendants assert that Andrews became a limited public figure because of his involvement in this controversy such that actual malice applies.[100] But defendants cannot through their own conduct make the plaintiff a public figure, even for limited purposes. Second, both sets of Defendants rely on

---

[97] ECF 294, at 24.

[98] ECF 106, at 33.

[99] Andrews has not asserted that Defendants waived this issue by failing to raise it at the motion to dismiss stage. *See generally* ECF 294, at 24; *see also* ECF 335, at 17 (Andrews's counsel conceding that she was not arguing waiver).

[100] ECF 279, at 28–31.

Georgia's privileged communications statute as the basis for their actual malice arguments.[101] They have not, however, analyzed the relevant case law accurately and conflate two distinct malice standards, only one of which is applicable. They commingle actual malice as a matter of federal constitutional privilege with the private malice required under the Georgia privileged communications statute — something the Georgia Supreme Court has cautioned against. *See generally Oskouei v. Matthews*, 321 Ga. 1 (2025). Only the former is at issue here, which requires the application of the actual malice standard only as to Andrews's presumed and punitive damages.

Actual malice as a federal constitutional privilege generally applies to defamation claims brought by public figures (including limited public figures), who must show by clear and convincing evidence that the defamatory statements were made with actual malice. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334, 342 (1974); *Oskouei*, 321 Ga. at 19. That is, the public-figure plaintiff must demonstrate the defendant knew — or recklessly disregarded that — his statements were false. *Gertz*, 418 U.S. at 342; *Straw v. Chase Revel, Inc.*, 813 F.2d 356, 361 (11th Cir. 1987). The federal actual malice standard can also apply where a plaintiff who is *not* a public figure sues in connection with statements about a matter of public

---

[101] ECF 268, at 21–31; ECF 279, at 27–28. The privileged communications statute is addressed *infra*, Section III.A.4.iv.

controversy, but *only* as to presumed and punitive damages. *Gertz*, 418 U.S. at 349–50; *Oskouei*, 321 Ga. at 19–21.[102] Defendants do not assert this as a basis for the application of actual malice to Andrews's defamation claim. Nor has any party pointed to cases applying the actual malice standard to statements about a private figure concerning a matter of public controversy, and the Court has found none. It is, however, the test applicable here under United States and Georgia Supreme Court precedent. *Gertz*, 418 U.S. at 349–50; *Oskouei*, 321 Ga. 1.

### *i.* **Andrews is not a limited public figure.**

The U.S. Supreme Court has made clear that it is possible for a person to become a public figure through no purposeful action of his own, but that such instances are exceptional. *Gertz*, 418 U.S. at 345 ("[T]he instances of truly involuntary public figures must be exceedingly rare."). Usually "those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.* As a result, defamation cases brought by such public figures or limited public figures are subject to the actual malice standard. *Zeh*, 312 Ga. at 652 n.5.

---

[102] For special (*i.e.*, actual) damages, there is no such heightened requirement, and the plaintiff need only prove negligence by a preponderance of the evidence. *No Witness LLC v. Cumulus Media Partners LLC*, Civ. A. No. 1:06-CV1733-JEC, 2007 WL 4139399, at *17 (N.D. Ga. Nov. 13, 2007) (indicating that special damages are actual damages—"the counterpart" to presumed damages).

Here, no Defendant argues that Andrews is such a household name that he is a public figure for all purposes. But the TTV Defendants *do* assert that he is a limited public figure in this context.[103] A three-part test applies to that determination, which is a question of law for the Court. *Mathis*, 276 Ga. at 22; *Infinite Energy, Inc. v. Pardue*, 310 Ga. App. 355, 359–60 (2011); *see also Rosenblatt v. Baer*, 383 U.S. 75, 88 (1966) (recognizing that it is the role of the trial judge to determine whether a party in the case is a public official). The Court must isolate the public controversy, examine the plaintiff's involvement in it, and determine if the defamation was "germane to the plaintiff's participation in the controversy." *Mathis*, 276 Ga. at 23 (citation omitted); *see also Infinite Energy*, 310 Ga. App. at 359–60; *Atlanta Journal-Const. v. Jewell*, 251 Ga. App. 808, 816–17 (2001). Applying that test, the Court readily concludes that Andrews is not a limited public figure for purposes of his defamation claim.

### *a.* **Public Controversy**

"A public controversy is an issue that generates discussion, debate, and dissent in the relevant community. But it must be more than merely newsworthy. If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." *Infinite Energy*, 310 Ga. App. at 360 (cleaned up). The Georgia Court of Appeals further cautions that

---

[103] ECF 279, at 28–31.

the Court look at the controversies that are already the subject of public debate and not define the controversy too narrowly. *Jewell*, 251 Ga. App. at 817.

Here, Defendants assert that the relevant public controversy was election integrity.[104] While the Court is not convinced that the law requires the relevant controversy to be defined quite so broadly, Andrews does not seem to dispute this framing or that election integrity is a matter of public controversy.[105]

### *b.* Andrews's Participation in the Controversy

For a person to be a limited public figure, he must have "thrust [himself] into the forefront of the controversy." *Infinite Energy*, 310 Ga. App. at 360. *Very* rarely, this can happen involuntarily when a person is caught up in a controversy through events beyond his control and, against his will, "assumes a prominent position" in the outcome. *Id.* at 360–61 (quoting *Jewell*, 251 Ga. App. at 820); *see also Dameron v. Wash. Mag., Inc.*, 779 F.2d 736, 740–43 (D.C. Cir. 1985) (concluding the plaintiff was the "rare" "truly involuntary" limited-purpose public figure for discussions about a plane crash because he had been the only air traffic controller on duty at the time of the crash). Even in those rare instances, the person may be able to avoid the limited public figure designation by rejecting any role in the debate. *Infinite Energy*, 310 Ga. App. at 360–61; *Jewell*, 251 Ga. App. at 819.

---

[104]   ECF 268, at 22; ECF 279, at 28.

[105]   ECF 294, at 30–33.

For instance, in *Jewell*, the Georgia Court of Appeals considered defamation claims brought by Richard Jewell in connection with various news articles that portrayed him as guilty of the 1996 Olympic Park bombing. 251 Ga. App. 808. The appellate court upheld the trial court's determination that Jewell was a voluntary limited-purpose public figure despite his arguments that he did not put himself to the forefront of the controversy about Olympic Park safety or intentionally seek to influence the outcome of that controversy. *Id.* at 816. Even though he was initially drawn into the controversy unwillingly, he "thereafter assumed a prominent position as to its outcome." *Id.* at 819. The Court of Appeals concluded that Jewell had thrown himself into the controversy and tried to influence it by, among other things, giving numerous interviews (to the point where he needed a media handler to coordinate his appearances) and commenting on the adequacy of the Olympic security *Id.* at 818–19. The TTV Defendants have not pointed to any similar evidence here that Andrews thrust himself into the election integrity controversy by giving interviews, publicly commenting on anything, courting public attention, or trying to influence the debate.

Moreover, it is clear that a defamation defendant cannot cause the plaintiff to become a public figure through his defamatory statements. A person charged with defamation cannot through his own conduct shove the plaintiff into the spotlight, claim the plaintiff is therefore a limited public figure, then argue that the

actual malice standard applies. *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."); *see also Infinite Energy*, 310 Ga. App. at 360–61 (same; quoting *Hutchinson*). And that is what the evidence shows happened here: Andrews was involuntarily thrown into a public controversy *because of* Defendants' use of his image and the per se defamatory statements they made about him. This does not make him a limited public figure.

Instead, the TTV Defendants claim that Andrews became a limited public figure because he filed this suit.[106] That is incorrect as a matter of law. The relevant timeframe to consider **is before the alleged defamation was published**. *Jewell*, 251 Ga. App. at 817; *see also Waldbaum v. Fairchild Pubs., Inc.*, 627 F.2d 1287, 1295 n.19 (D.C. Cir. 1980) (applying the three-part limited public figure test and noting: "The court must examine these factors as they existed before the defamation was published. Otherwise, the press could convert a private individual into a general public figure simply by publicizing the defamation itself and creating a controversy surrounding it and, perhaps, litigation arising out of it."). The concern expressed in *Waldbaum* is exactly what the TTV Defendants urge the Court to adopt here. It will not.

---

[106]  ECF 279, at 30–31.

### c. Relevance of the Defamation to Andrews's (Non-)Participation in the Controversy

This factor looks at whether the plaintiff's participation in the public controversy is germane to the defamatory statements. *Jewell*, 251 Ga. App. at 819–20. To be sure, Defendants' defamatory statements about Andrews relate to concerns about election integrity. But Defendants are the ones who thrust Andrews into that debate in the first place by using the surveillance footage of him and calling him a criminal. This does not make him a limited public figure.

### ii. Andrews must show actual malice by clear and convincing evidence to prove his claims for presumed and punitive damages.

Although the Court concludes that Andrews is not a limited public figure, the parties do not dispute that Defendants' statements involved a matter of public controversy.[107] Accordingly, to the extent Andrews seeks presumed and punitive damages, he must show that Defendants knew or recklessly disregarded that their statements about him were false. *Gertz*, 418 U.S. at 349–50; *Oskouei*, 321 Ga. at 20–21. Presumed damages are those that are assumed by virtue of law when statements are defamatory per se. *No Witness LLC v. Cumulus Media Partners LLC*, No. CIV.A.1:06CV1733 JEC, 2007 WL 4139399, at *13 (N.D. Ga. Nov. 13, 2007). Here, there is sufficient evidence from which a jury could conclude that

---

[107] *See supra* Section III.A.4.i.a.

Defendants satisfy that standard. Specifically, a reasonable jury could find that Defendants knew that the surveillance footage of Andrews was never geotracked, that there was no evidence he was ever at a violent riot or had picked up multiple absentee ballots from multiple locations, and that he was not committing a crime by depositing multiple ballots in the drop box, but continued to accuse him of engaging in criminal activity anyway.[108]

> ### iii. Andrews may establish special damages by a preponderance of the evidence that Defendants acted negligently.

There is enough evidence for a jury to conclude that Andrews suffered special damages because of Defendants' portrayal of him as a ballot mule. He need only show they acted negligently by a preponderance of the evidence. *No Witness LLC*, 2007 WL 4139399, at *13. He has experienced increased fear and anxiety for his and his family's safety.[109] His image has appeared in online posts that threaten or endorse hostile actions against mules.[110] As a result, Andrews has adjusted his daily routine, taken additional safety measures, and changed his voting

---

[108]  *See, e.g.,* ECF 305-2 (SEALED), ¶¶ 81–83; ECF 309-1 (SEALED), ¶¶ 81–83.

[109]  ECF 309-1 (SEALED), ¶ 144.

[110]  *Id.* ¶ 145.

behavior.[111] He has incurred actual expenses as a result of his injuries.[112] Andrews also asserts that he has forgone pursuing potential employment opportunities because of Defendants' conduct.[113] For these types of damages, no heightened level of proof applies. Indeed, the D'Souza Defendants admit that Andrews has incurred these expenses because of their portrayal of him as a ballot mule.[114]

### iv. Privileged communications under Georgia law (O.C.G.A. § 51-5-7(4))

The federal constitutional "actual malice" requirement does not apply to defamation cases brought by non-public-figure plaintiffs based on statements that do not involve matters of public concern. Such cases are controlled by Georgia law. *Oskouei*, 321 Ga. at 22. No such statements are at issue here. Nor have Defendants pointed to any basis for the Court to apply Georgia's privileged-communications law under these facts.

\* \* \* \*

Accordingly, Andrews is entitled to summary judgment on the falsity element of his defamation claim as to all Defendants and as to the publication

---

[111] *Id.* ¶¶ 149, 153.

[112] *Id.* ¶¶ 150–151 (describing security system upgrades, replacing his license plate, and having a company scrub the internet to remove his and his family's personal information).

[113] *Id.* ¶ 152.

[114] *Id.* ¶¶ 149–151.

element as to the D'Souza Defendants. As to the TTV Defendants, Andrews is entitled to summary judgment on the element of publication with regard to the TTV Defendants' own statements in the Movie; the trailer; in the Charlie Kirk interview; and the music video trailer posted on their Rumble page.

### B. Ku Klux Klan Act Violation (Count I)

Andrews is pursuing a claim under Section 2 of the Ku Klux Klan Act (the Klan Act), 42 U.S.C. § 1985(3), based on Defendants' alleged conspiracy to intimidate him to deter his support or advocacy on behalf of his preferred candidates.[115] To prove such a claim under § 1985(3)[iii], a plaintiff must show "(1) a conspiracy; (2) the purpose of which is to force, intimidate, or threaten; (3) an individual legally entitled to vote who is engaging in lawful activity related to voting in federal elections." *Nat'l Coalition on Black Civil Participation v. Wohl*, 498 F. Supp. 3d 457, 486–87 (S.D.N.Y. 2020) (*Wohl I*).[116]

A plaintiff can also proceed under § 1985(3)[iv], which governs conspiracies to "injure any citizen . . . on account of" his support or advocacy related to a federal election.[117] Under either prong of the statute, the plaintiff must also demonstrate an actual injury. 42 U.S.C. § 1985(3). The Court has already held that these types

---

[115] ECF 27, ¶ 261, Count I.

[116] *Id.* at 19.

[117] ECF 106, at 16–19.

of support-or-advocacy claims do not require proof of discrimination or specific intent.[118] *Kush v. Rutledge*, 460 U.S. 719, 725–26 (1983). Nor is Andrews required to show that the conspiracy actually prevented him from voting.[119] *Paynes v. Lee*, 377 F.2d 61, 64 (5th Cir. 1967) ("The right to be free from threatened harm and the right to be protected from violence for an attempted exercise of a voting right are no less protected than the right to cast a ballot on the day of election."); *Nat'l Coalition on Black Civil Participation v. Wohl*, 661 F. Supp. 3d 78, 110 (S.D.N.Y. 2023) (*Wohl II*) ("The statutes also prohibit attempts to intimidate, threaten, or coerce a person for voting or attempting to vote, and thus a violation of the VRA, the KKK Act, or the Civil Rights Act does not require that the intimidation actually succeed in preventing people from voting. . . . Accordingly, a plaintiff who was the target of such an attempt need not ultimately refrain from participating in the election to have suffered a legally cognizable injury.").

### 1. The Parties' Arguments

It is important to note that Defendants' motions do not dispute the legality of Andrews's conduct. And, because it is Defendants who have moved for judgment on this claim, the Court views the evidence, and draws all inferences, in favor of Andrews. The D'Souza Defendants argue that there is no evidence that

---

[118]  *Id.* at 18. *See generally id.* at 17–19.

[119]  *Id.* at 21.

they engaged in a conspiracy.[120] According to them, their agreement with the TTV Defendants to "create, publish, and promote a film" was perfectly legal.[121] They also assert that Andrews did not suffer any harm as a result of the alleged conspiracy.[122] Like the D'Souza Defendants, the TTV Defendants argue that Count I must be dismissed because there was no conspiracy.[123] They also contend there was no intent to intimidate or threaten Andrews.[124] But Defendants' arguments rely on assuming disputed material facts in their favor. That is not the appropriate standard. Viewing the evidence in *Andrews's* favor, a jury could reasonably conclude that Defendants conspired to defame him because of his act of voting—and depositing his family's absentee ballots in a Gwinnett County drop box—during the 2020 Presidential election and that Andrews was injured as a result. That is sufficient to withstand summary judgment.

### *i.* On Account of Support or Advocacy

A conspiracy requires a meeting of the minds to accomplish a common and unlawful plan. *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (citations omitted). However, the meeting of the minds necessary to

---

[120] ECF 268, at 39.

[121] *Id.*

[122] *Id.* a 40.

[123] ECF 279, at 16–20.

[124] *Id.* at 16, 20–22.

demonstrate an agreement may be proven through "inferences drawn from the participants' conduct or other circumstantial evidence of the scheme." Conspiracies may be inferred from the totality of the defendants' conduct. *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1203 (11th Cir. 2009) (citations omitted) ("Since illegal conspiracies are secretive by nature, the existence of the agreement and the defendant's participation in the conspiracy may be proven entirely from circumstantial evidence.").

Although Defendants deny any agreement to achieve an unlawful goal,[125] Andrews's evidence would permit a jury to conclude that Defendants worked together, not just to make and promote the Movie, but to do so for the purpose of advancing a knowingly false narrative about criminal ballot mules that intentionally defamed Andrews "***on account of***" the manner he used to vote (and to advocate for his family's chosen method of voting).[126] A jury could readily decide that, if Andrews had deposited only one absentee ballot or voted in person, Defendants never would have made defamatory statements about him while using the surveillance footage of his act of voting.

The D'Souza Defendants assert that they acted in good faith and thought that the footage of Andrews had been linked to geolocation data establishing him

---

[125] ECF 268, at 39; ECF 279, at 17–22.

[126] *See infra* Section III.E. concerning Andrews's civil conspiracy claim.

as a mule.[127] In contrast, the TTV Defendants claim minimal involvement in the Movie, the Book, and the related publicity push, and point the finger at the D'Souza Defendants for any wrongdoing.[128] They claim their purpose was to bring awareness to issues of election integrity.[129] Regardless of Defendants' differing explanations, they are just that—alternatives a finder of fact may accept or reject depending largely on the credibility of the evidence's proponent. Whether Andrews, the D'Souza Defendants, the TTV Defendants, or none of them are to be believed is up to a jury. *Hammer v. Slater*, 20 F.3d 1137, 1143 (11th Cir. 1994) (citations omitted) ("At the heart of this dispute are issues of credibility: whether one believes Hammer's evidence or that of the Jaffesses. We have repeatedly held that credibility is a factual issue that is uniquely the province of the jury.").

### *ii.* **Injury**

A plaintiff need not have suffered bodily harm to recover under Section 2. Instead, "threats of economic harm, legal action, dissemination of personal information, and surveillance" can be sufficient. *Wohl I*, 498 F. Supp. 3d at 477; *see*

---

[127] *See, e.g.*, ECF 313, at 2–5, 8–11.

[128] *See, e.g.*, ECF 279, at 18 ("The TTV Defendants' primary role was to send video clips to D'Souza Defendants."); *id.* (the TTV Defendants and the D'Souza Defendants only had "sporadic" communications); *id.* (the TTV Defendants were "minimally involved with any marketing or promotion" of the Movie); *id.* (the TTV Defendants had no editorial control over the Movie).

[129] *Id.* at 21.

*generally id.* at 477–82 (discussing the forms of threats and intimidation that can satisfy Section 2). Here, the Court has already concluded that Andrews has sufficient evidence of injury to survive summary judgment.[130]

The evidence is sufficient to preclude summary judgment in favor of Defendants on Count I.

### C.  False-Light Invasion of Privacy (Count IV)

"To establish a claim of false light invasion of privacy, a plaintiff must show the existence of false publicity that depicts the plaintiff as something or someone which he is not. Next, the plaintiff must demonstrate that the false light in which he was placed would be highly offensive to a reasonable person." *Doe v. Roe*, 362 Ga. App. 23, 32 (2021) (quoting *Williams v. Cobb Cnty. Farm Bureau*, 312 Ga. App. 350, 353 (2011)); *Smith*, 291 Ga. App. at 100. However, false-light claims must be based on non-defamatory statements. *Smith*, 291 Ga. App. at 100 (citing *Bollea v. World Championship Wrestling, Inc.*, 271 Ga. App. 555, 557 n.1 (2005)) ("In order to survive as a separate cause of action, a false light claim must allege a nondefamatory statement. If the statements alleged are defamatory, the claim would be for defamation only, not false light invasion of privacy.").

---

[130]  *See supra* Section III.A.4.iii.

Andrews has not identified any non-defamatory statements—in fact, all of the statements are defamatory as a matter of law.[131] And he concedes that if Defendants' statements are defamatory, his false-light claim must fail.[132] Accordingly, there is no basis for Andrews to proceed on his false-light invasion of privacy claim and Defendants are entitled to judgment on Count IV.

### D.   Appropriation of Likeness (Count V)

Under Georgia law, an appropriation of likeness tort claim requires a plaintiff to show that the defendant (1) appropriated his name or likeness, (2) without consent, (3) for the defendant's financial gain. *Bullard v. MRA Holding, LLC*, 292 Ga. 748, 752 (2013); *Cabaniss v. Hipsley*, 114 Ga. App. 367, 377 (1966) (stating that an appropriation claim "consists of the appropriation, for the defendant's benefit, use or advantage, of the plaintiff's name or likeness"). The interest being protected is a proprietary one—the plaintiff's exclusive ability to use his name and likeness as an aspect of his identity. *Bullard*, 292 Ga. at 752 (quoting

---

[131]  *See supra* Section III.A.1.

[132]  ECF 294, at 62–63 ("Plaintiff has pleaded his claims for defamation and false light in the alternative. In the event that the Court were to find that the statements at issue were non-defamatory (and it should not), then Plaintiff may still proceed with his false light claim."); ECF 335, at 35 (Andrews's counsel conceding that, if the defamation claim goes forward, Andrews cannot proceed on his false light claim).

*The Martin Luther King, Jr., Ctr. for Soc. Change, Inc. v. Am. Heritage Prods., Inc.*, 250 Ga. 135, 142 (1982)).

The D'Souza Defendants argue that Andrews's appropriation of likeness claim fails because (1) he was not identifiable in the image they used and (2) the image was taken from public records.[133] The TTV Defendants echo those arguments and assert that they lacked editorial control over the display of Andrews's image and the defamatory statements involved a matter of public interest.[134] Andrews counters that voting is a private act and the footage of him going to the drop box was not widely available.[135] That the footage was recorded while Andrews was in a public place in view of others is dispositive here.

The Eleventh Circuit has made clear that the right of publicity inherent to a misappropriation claim attaches only "to that **which is not open to public observation** and is appropriated for the commercial benefit of another." *Toffoloni v. LFP Pub. Grp., LLC*, 572 F.3d 1201, 1207 (11th Cir. 2009) (footnote omitted) (emphasis added); *see also Somerson v. World Wrestling Enter., Inc.*, 956 F. Supp. 2d 1360, 1366 (N.D. Ga. 2013) (citing *Toffoloni*, 572 F.3d at 1207) ("[T]he right of publicity does not attach 'to that which is open to public observation."); *Pavesich*

---

133  ECF 268, at 35–37.

134  ECF 279, at 40–43.

135  ECF 294, at 68–69.

*v. New England Life Ins. Co.*, 122 Ga. 190, 50 S.E. 68, 72 (1905) (stating that the right of privacy may be waived "provided the effect of [the] waiver will not be such as to bring before the public those matters of a purely private nature which express law or public policy demands shall be kept private"). *How* the information is obtained isn't what matters: "[I]t is the publicizing of that which is private in character" that matters. *Toffoloni*, 572 F.3d at 1207 n.1 (quoting *Virgil v. Time, Inc.*, 527 F.2d 1122, 1126 (9th Cir. 1975)). So, whether the surveillance footage was a public record or widely available is not determinative here. The public nature of Andrews's acts is.

His approach to and deposit of ballots in the drop box was done in public and observed by other people. Andrews has not cited any law suggesting that such acts may form the basis of a misappropriation claim simply because his public conduct related to the act of voting. Because the images about which Andrews complains are of him, in public, engaging in acts in full view of others, they cannot be the basis for his appropriation of likeness claim. Defendants are thus entitled to judgment on Count V.

### E. Civil Conspiracy (Count VI)

To establish a civil conspiracy, the plaintiff must show that two or more persons combined "either to do some act which is a tort, or else to do some lawful act by methods which constitute a tort." *McIntee v. Deramus*, 313 Ga. App. 653, 656

(2012). "The gist of the action . . . is not the conspiracy alleged, but the tort committed against the plaintiff and the resulting damage." *Metro Atlanta Task Force for the Homeless, Inc. v. Ichthus Cmty. Tr.*, 298 Ga. 221, 225 (2015) (quoting *Cook v. Robinson*, 216 Ga. 328, 329 (1960)). The nature of the civil conspiracy may be inferred from the relevant circumstances. *Id.* It is generally the function of the jury to draw such inferences, and granting summary judgment on civil conspiracy claims is unusual. *Id.* at 225–26.

Although Defendants deny any agreement to achieve an unlawful goal,[136] Andrews's evidence would permit a jury to draw the following conclusions:

- The TTV Defendants knew that neither the surveillance footage of Andrews nor any other drop box surveillance footage had been geotracked, so they knew there was no video evidence supporting their mules theory but nonetheless worked with the D'Souza Defendants to use the made-up geotracking arguments as the "backbone" of the Movie;[137]

- the D'Souza Defendants never reviewed the underlying geotracking analysis or the purported matching of that analysis to the surveillance footage;[138]

- the D'Souza Defendants knew or recklessly disregarded that there was no geotracking evidence

---

[136]  *See, e.g.,* ECF 268, at 39; ECF 279, at 17–20.

[137]  *See, e.g.,* ECF 309-1 (SEALED), ¶¶ 84, 172, 174–185, 189–190, 192.

[138]  *See, e.g., id.* ¶ 219.

linked to the surveillance footage of Andrews (or anyone else);

- Defendants knew or recklessly disregarded that there was no evidence that Andrews voted illegally, was paid by anyone to deposit any ballots, went to any drop box more than once, visited any non-profit to pick up ballots, or was ever at a violent riot, but made such assertions because the surveillance footage of him appeared to support their theories about 2020 election fraud;[139]

- Defendants used the footage of Andrews anyway because the D'Souza Defendants had expressed concerns that the first batch of videos from the TTV Defendants did not show "mules" depositing multiple ballots or going to several drop boxes; after the D'Souza Defendants expressed those concerns, the TTV Defendants provided them with the surveillance footage that showed Andrews clearly (but legally) putting several ballots into a drop box;[140]

- in the Book, the D'Souza Defendants accuse Andrews of engaging in organized crime;[141]

- in publicity appearances and on their own social media accounts, Defendants doubled down on their allegations that Andrews was engaged in criminal

---

[139] *See, e.g.,* ECF 305-2 (SEALED), ¶¶ 69–71, 81–83; ECF 309-1 (SEALED), ¶¶ 69–71, 81–83.

[140] *See, e.g.,* ECF 299-3 (SEALED), ¶ 42; ECF 305-2 (SEALED), ¶¶ 203–207; ECF 309-1 (SEALED), ¶¶ 86, 203–207, 210–212; ECF 322 (SEALED), ¶¶ 157–158, 189–190.

[141] *See, e.g.,* ECF 309-1 (SEALED), ¶¶ 134–138.

activity and had been tracked going to violent riots;[142]

- Defendants entered an explicit agreement to work together to produce, distribute, and publicize the Movie;[143]

- an entirely separate company owned by Engelbrecht and Phillips (rather than TTV) was paid the profits earned by TTV from the Movie;[144]

- Defendants discussed giving a portion of the profits from the Book to Engelbrecht and Phillips;[145]

- Defendants continued to accuse Andrews of illegal conduct after he had been cleared of election fraud by the Board of Elections and after his counsel sent cease-and-desist letters.[146]

This evidence would allow a jury to conclude that Defendants worked together, not just to make and promote the Movie, but to do so for the purpose of advancing a knowingly false narrative about criminal ballot mules and defaming Andrews in the process.

There are material facts in dispute relevant to Andrews's conspiracy allegations. Those disputes are for the fact finder to resolve. A jury could conclude

---

[142] *See, e.g.,* ECF 299-3 (SEALED), ¶¶ 115–116, 118–129, 130, 142, 148; ECF 305-2 (SEALED), ¶¶ 32–33, 49–50, 98–101, 111, 123; ECF 309-1 (SEALED), ¶¶ 102–103, 107–110, 113–114, 117–123.

[143] *See, e.g.,* ECF 270-8 (SEALED).

[144] *See, e.g.,* ECF 305-2 (SEALED), ¶¶ 238–239; ECF 309-1 (SEALED), ¶¶ 238–239.

[145] *See, e.g.,* ECF 305-2 (SEALED), ¶ 126; ECF 309-1 (SEALED), ¶ 126.

[146] *See, e.g.,* ECF 305-2 (SEALED), ¶¶ 69, 132; ECF 309-1 (SEALED), ¶¶ 69, 132.

that the TTV Defendants conspired among themselves, or with the D'Souza Defendants, to make defamatory statements about Andrews for the purpose of supporting their ballot-mules thesis. Accordingly, Andrews's civil conspiracy claim survives to the extent it is based on his defamation claim.[147]

During oral argument, counsel for the TTV Defendants asserted that they could not be held liable for *civil conspiracy* based on defamatory statements unless they were present when the statements were made and the statements were made with their consent, citing *Turnage v. Kasper*, 307 Ga. App. 172. That is not an accurate description of the Court of Appeals' holding. Rather, the *Turnage* court held that a separate *defamation* claim against one defendant could not stand based on an allegation that he conspired with another defendant to slander the plaintiff. *Id.* at 185. That is a far cry from saying that a defendant cannot be found liable for *civil conspiracy* for combining with another defendant to defame the plaintiff. Indeed, the argument advanced by counsel is contrary to the law of conspiracy. *Metro Atlanta Task Force for the Homeless*, 298 Ga. at 225.

Even if the TTV Defendants could not be held liable in defamation for statements made by the D'Souza Defendants, if they combined with the D'Souza Defendants to defame Andrews, they can be liable for civil conspiracy. *Kimball v.*

---

[147] To the extent the civil conspiracy claim is predicated on Andrews's false-light or misappropriate causes of action, Defendants are entitled to judgment.

*Better Bus Bureau of W. Fla.*, 613 F. App'x 821, 825–26 (11th Cir. 2015) (per curiam) (indicating that conspiracy to commit libel can support a civil conspiracy claim under Georgia law); *Metro Atlanta Task Force for the Homeless*, 298 Ga. at 225 (citing *Cook v. Robinson*, 216 Ga. 328, 329 (1960)) ("While the conspiracy is not the gravamen of the charge, it may be pleaded and proved as aggravating the wrong of which the plaintiff complains, enabling him to recover in one action against all defendants as joint tortfeasors . . . . where a cause of action is alleged, the fact of conspiracy, if proved, makes any actionable deed by one of the conspirators chargeable to all.").

### F.  Punitive Damages (Count VII)

The Court has already held that a demand for punitive damages under O.C.G.A. § 51-12-5.1(b) is not a stand-alone claim. Rather, some causes of action (such as intentional torts) supply a basis for the recovery of this type of damages.[148] Because Andrews's defamation claim survives, he retains the right to pursue punitive damages on that claim, but he must establish his entitlement to such damages under the actual malice standard.[149]

The TTV Defendants argue that they are entitled to judgment as to punitive damages for a litany of reasons: (1) they did not know who Andrews was; (2) he

---

[148]  ECF 106, at 42–43 n.147.

[149]  *See supra* Section III.A.4.ii.

was unrecognizable in the images they used; (3) they did not have editorial control over other images; (4) they reasonably believed Andrews was committing a crime; and (5) they had no specific intent to cause harm.[150] The Court has already addressed arguments (1) through (3).[151] As for (4) and (5), these contentions plainly depend on credibility issues and disputed factual matters that are inappropriate for resolution on summary judgment.

## IV. The Motions to Seal

Collectively, the parties have filed eight motions to seal.[152] Those filings, however, make it difficult for the Court to assess whether the materials designated as confidential or highly confidential should be sealed in their entirety, redacted, or publicly filed. For instance, unredacted versions of filings do not reflect what was redacted, so the Court must compare the redacted and unredacted documents to assess what, exactly, the parties are seeking to keep under seal.[153] Given the volume of materials related to the cross-motions for summary judgment, it is not an effective use of the Court's time to hunt through the plethora of submissions to find provisionally sealed information.

---

[150]  ECF 279, at 48–51.

[151]  *See supra* Sections III.A.2. to III.A.3.

[152]  ECFs 277, 283, 300, 306, 310, 315, 318, 323.

[153]  *E.g.*, *compare* ECF 313-1, at 5–6 ¶ 3 *with* ECF 314-1, at 5–6 ¶ 3.

Nor is it clear what the basis is for maintaining this information under seal other than the parties' own seemingly overbroad confidentiality designations during discovery.[154] Indeed, the Court has referred to information sought to be sealed in this Order because there is no basis to shield it from the public. Andrews only seeks leave to file materials under seal with his summary judgment motion—including Defendants' interrogatory responses and various deposition transcripts—at the request of Defendants and non-parties.[155]

The Court may enter a protective order sealing documents or portions thereof on a showing of good cause. Good cause is determined by balancing the public's "interest in obtaining access" against the "party's interest in keeping the information confidential." *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1315 (11th Cir. 2001). Good cause will generally only be established where the materials contain trade secrets, personal identifying information, or sensitive commercial information, such that public disclosure would result in "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). When parties try to seal documents that do not contain such information, the public interest in disclosure should prevail.

---

[154] *Id.* (redacting a text message between D'Souza and his daughter).
[155] ECF 277, at 1–3.

Here, the parties have not shown good cause for sealing all the materials designated by their motions. Although the Court does not grant the motions to seal, the provisionally sealed filings will remain sealed pending the parties' submission of revised sealing motions.

## V.     Conclusion

Plaintiff Mark Andrews's motion for partial summary judgment [ECF 250] is **GRANTED in part** and **DENIED in part**. The motion is granted as to the falsity prong of Andrews's defamation claim as to both sets of Defendants. Andrews's motion is also **GRANTED** as to the D'Souza Defendants concerning the publication element of the defamation claim, and **GRANTED** as to the TTV Defendants with regard to their own statements in the Movie; the trailer; in the Charlie Kirk interview; and the music video trailer posted on their Rumble page.

Defendants Dinesh D'Souza and D'Souza Media LLC's motion for summary judgment [ECF 268] is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** as to Counts IV (false-light invasion of privacy) and V (appropriation of likeness), as well as to the extent Count VI (civil conspiracy) relies on Counts IV and V. The motion is **DENIED** in all other respects.

Defendants True the Vote, Inc., Catherine Engelbrecht, and Gregg Phillips's motion for summary judgment [ECF 279] is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** as to Counts IV (false-light invasion of privacy)

and V (appropriation of likeness), as well as to the extent Count VI (civil conspiracy) relies on Counts IV and V. The motion is also **GRANTED** to the extent that Andrews's request for punitive damages relies on dismissed claims. Andrews may not seek punitive damages against any Defendant on claims that are no longer in the case. The TTV Defendants' motion is **DENIED** in all other respects.

To the extent the parties seek to seal information relied on in this Order, their motions to seal [ECFs 277, 283, 300, 306, 310, 315, 318, 323] are **DENIED**. The motions are **DENIED without prejudice** in all other respects. The parties must again confer concerning which materials they believe should remain partially or fully sealed. The parties should file a single, consolidated motion to seal only the materials they agree should be maintained under seal or redacted, clearly identify the information sought to be sealed or redacted, and set forth good cause for the Court to grant leave to seal.

For materials for which the parties are not able to reach agreement, the party that designated the document as confidential or highly confidential shall file one motion properly identifying every document or portion thereof for which leave to seal or redact is sought, setting forth the nature of the parties' disagreement about the need to seal or redact, clearly identifying the information sought to be sealed or redacted, and providing good cause to support the need for such sealing. If the document was designated as confidential or highly confidential by a non-party,

that non-party shall file a motion clearly identifying every document or portion thereof for which leave to seal or redact is sought and providing good cause to support the need for such sealing. All such motions to seal must be filed no later than November 3, 2025.

The parties are further **ORDERED** to file their consolidated proposed pretrial order by November 3, 2025. The proposed pretrial order shall specifically identify each defamatory statement on which Andrews intends to proceed to trial and, consistent with this Order, indicate which Defendant published the particular statement.

No later than October 15, 2025, counsel are directed to file updated leaves of absence for conflicting dates from January through June 2026. **Trial and the Pretrial Conference shall be set by separate order without further notice.**

**SO ORDERED** this 30th day of September, 2025.

Steven D. Grimberg
United States District Judge